# EXHIBIT A-77

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Stephanie Brooker
Direct: +1 202.887.3502
Fax: +1 202.530.4216
SBrooker@gibsondunn.com

M. Kendall Day
Direct: +1 202.955.8220
Fax: +1 202.831.6050
KDay@gibsondunn.com

Richard W. Grime
Direct: +1 202.955.8219
Fax: +1 202.530.9652
RGrime@gibsondunn.com

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

March 15, 2023

<u>VIA ELECTRONIC MAIL</u>

Paul E. Kim
Kathleen Hitchins
Ann Rosenfield
Colby Steele
Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, DC 20549

Re:     *In the Matter of Binance.US, HO-13865*

Dear Counsel:

On behalf of our client, Binance Holdings Limited ("Binance" or the "Company"), enclosed please find the Company's Wells submission.

*     *     *

This letter and the enclosed document contains confidential business information of Binance. On behalf of Binance, we request that this letter and the enclosed Wells Submission, and all other information or documents that may be supplied by Binance to the SEC, be accorded confidential treatment under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b).

Binance requests, under 17 C.F.R. § 200.83, that the SEC afford confidential treatment to, and not disclose, this transmission—including this letter and the enclosed Wells Submission, as well as any other such information or documents that may be provided to the SEC in the future by Binance—in response to any request under FOIA. The transmission referenced above contains confidential business information belonging to Binance. A copy of this written request for confidential treatment will be mailed to the SEC Office of Freedom of Information and Privacy Act Operations at 100 F Street NE, Washington, DC 20549. Should the SEC receive a request under FOIA for disclosure of the information to which this request for confidential treatment relates, Binance requests immediate notification of the undersigned by telephone or electronic mail, so that we may provide any additional information necessary regarding this request for confidential treatment.

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# GIBSON DUNN

March 15, 2023
Page 2

The information in this letter is made available to the SEC without prejudice to any privileges that Binance may have, including the attorney-client and work product privileges, which privileges are expressly reserved.  It is possible that, despite our diligent efforts, certain information protected by the attorney-client privilege or other applicable privileges may have been included in this production.  Accordingly, we reserve our right to seek the return of any privileged or protected materials that may have been inadvertently produced, and respectfully advise you that any inadvertent production should not be considered a waiver.  We respectfully request that you inform us immediately if you become aware of any such materials in our production.  In the event that you do become aware of any such materials in this production or any future productions from Binance, please inform us and immediately return such materials to us on behalf of Binance.

We request that the SEC use these documents only in furtherance of this investigation and not use the materials for unrelated purposes without first consulting with, and obtaining the prior written consent of, Binance.  Binance also requests that, upon completion of your investigation into this matter, all documents produced by Binance promptly be returned and that no copies be retained.

*     *     *

Should you have any questions, please do not hesitate to contact me at (202) 887-3502 or my colleagues Kendall Day at (202) 955-8220 or Richard Grime at (202) 955-8219.

Sincerely,

Stephanie Brooker
M. Kendall Day
Richard W. Grime

*Confidential Treatment Requested*

**BEFORE THE UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

|  |  |  |
|---|---|---|
| In the Matter of: | ) ) ) | HO-13865 |
| Binance.US | ) ) | |

**WELLS SUBMISSION ON BEHALF OF**

**BINANCE HOLDINGS LIMITED**

STEPHANIE BROOKER
M. KENDALL DAY
RICHARD W. GRIME
THOMAS J. KIM
DAVID C. WARE
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500

*Attorneys for Binance Holdings Limited*

March 15, 2023

*Confidential Treatment Requested*

## TABLE OF CONTENTS

**Page**

EXECUTIVE SUMMARY ................................................................................................1

FACTUAL BACKGROUND ...........................................................................................4

    A.    Binance.com ................................................................................................4

    B.    Growing U.S. Interest and Creation of Binance.US ...................................5

    C.    BHL's Contractual Relationship with BAM .............................................7

    D.    BAM, Not BHL, Maintains Custody and Control of Digital Assets on the Binance.US Platform ............................................................................................10

    E.    BAM, Not BHL, Maintains BAM's Internal Ledger and Reconciles It with the Blockchain. ...............................................................................................12

PROCEDURAL HISTORY ...........................................................................................13

ARGUMENT ................................................................................................................15

I.      The SEC's Contemplated Exchange Act Charges Against Binance Are Meritless ..........15

    A.    BHL Has Never Violated Section 5 with Respect to Binance.US. ...................................17

        1.  BHL Is Not an "Exchange" with Respect to the Activities of Binance.US. ..................18

            a.    BHL and BAM Are Not an "Organization, Association, or Group of Persons" with Respect to the Activities of Binance.US. .....................................18

            b.    BHL Does Not Perform Functions "Commonly Performed by a Stock Exchange as That Term Is Generally Understood" with Respect to the Activities of Binance.US. ...............................................................21

        2.  BHL's Software Is Not the "Facility" of an Exchange Under Section 5. .......................22

    B.    BHL Is Not a Clearing Agency Under Section 17A. .........................................................24

II.    The BAM Staff's Deviations from Longstanding Agency Norms Are Arbitrary and Capricious Under the Administrative Procedure Act ("APA"). .........................................26

III.   Due Process and Fair-Notice Principles Additionally Bar the Contemplated Charges. ....29

CONCLUSION ...........................................................................................................30

i

*Confidential Treatment Requested*

On behalf of Binance Holdings Limited ("BHL"), a non-U.S. private company, we respectfully submit this Wells Response.

## EXECUTIVE SUMMARY

A central premise of the Wells process is that the Division of Enforcement's initial impression of a case may be mistaken.[1]  Properly implemented, the process enables the Commission to reassess the wisdom of pursuing an enforcement action the Division has proposed with the benefit of the potential defendant's input.  Another key purpose is to permit a potential defendant to understand the nature of the contemplated charges so that it can obtain informed advice from its counsel.[2]  The process is intended to benefit both sides.  The Commission can gain a "full and accurate picture" of the facts—and a last clear chance to avoid an unwarranted enforcement action—while the defendant receives due process and the opportunity to be heard.[3]

*This* contemplated action, in contrast, demonstrates the dangers of allowing that process to break down.[4]  On February 21, 2023, the BAM Staff abruptly informed BHL's counsel that the Staff is on the brink of proposing charges against BHL under Sections 5 and 17A of the Securities Exchange Act of 1934 ("Exchange Act") for its activities relating to BAM Trading Services Inc. and its affiliated entities (together, "BAM").  The BAM Staff team investigating this matter had no contact with BHL or its counsel about such allegations until now, and appears to have formed conclusions about BHL with no investigative process involving BHL.

---

[1] *Cf. WHX Corp. v. SEC*, 362 F.3d 854, 860 (D.C. Cir. 2004) ("[U]nder SEC rules parties at risk of enforcement actions are entitled to make 'Wells submissions' to the Commissioners, presenting arguments why the Commissioners should reject the staff's recommendation for enforcement . . . an entitlement obviously based on recognition that staff advice is not authoritative." (citation omitted)).

[2] *See, e.g.*, SEC, REPORT OF THE ADVISORY COMMITTEE ON ENFORCEMENT POLICIES & PRACTICES 37 (1972) ("When the staff refuses to disclose its evidence or the theory of its case to the respondent's attorney before the hearing, the attorney, not knowing what his client faces, may be unable or reluctant to recommend settlement.").

[3] Steven Peikin, *Keynote address at the New York City Bar Association's 7th Annual White Collar Crime Institute*, SEC (May 9, 2018), https://bit.ly/2G0O4qO.

[4] All references herein to the "BAM Staff" or the "Staff" relate to the Division Staff conducting the investigation *In the Matter of Binance.US*, HO-13865.  The Division team conducting the investigation *In the Matter of Binance USD*, HO-14376, is referred to as the "BHL Staff."

*Confidential Treatment Requested*

Given this complete lack of contact, BHL's counsel made repeated requests for a full-fledged proffer of facts, but the BAM Staff refused to provide anything more than a cursory additional description of the factual basis for the potential charges; a "clarification" delivered a mere five days ago. In so doing, the BAM Staff revealed its incorrect assumption that BHL has obtained the full record of the documents produced by BAM and testimony elicited from BAM personnel. BHL has not. And despite blindsiding BHL with these new allegations, the BAM Staff repeatedly denied BHL's request for a reasonable extension of time to piece together the BAM Staff's ostensible theory, gather relevant information, and meaningfully respond. BHL suggested a deadline of April 3, 2023 for its response (representing about a three-week extension); the BAM Staff granted BHL only an additional five days.

The procedural path thus far has left this Wells process badly broken and has severely complicated the present task. The BAM Staff's refusal to clearly state its factual premises has hindered BHL's ability to respond effectively and provide information that would aid the Commission's decision. And the BAM Staff's insistence that, in preparing its response, BHL should assume that Binance.US is a *securities* trading platform—even though the BAM Staff has refused to identify a single security allegedly offered or traded on Binance.US—is unwarranted. That blinkered approach will only further skew the Commission's consideration of the matter and diminish even more the value this process can provide. The BAM Staff's approach to due process compromises the integrity of the Commission's work.

Yet even those severe procedural shortcomings and departures from well-settled practice cannot obscure the basic defects in the charges that the BAM Staff is considering. The BAM Staff's theory appears to be that BHL is liable for what BAM—a wholly separate entity—does domestically on the Binance.US platform. Based on BHL's still-developing understanding of this matter after a mere three weeks to investigate and prepare this response, BHL believes that there is

*Confidential Treatment Requested*

significant evidence that BAM and BHL do not together constitute an "organization, association, or group of persons" running an "exchange" as the Exchange Act uses those terms.  Rather, BHL has acted as a service provider for BAM's Binance.US-related activities.  BHL performs no "functions" with respect to activities on Binance.US commonly understood as the "functions" of a securities exchange.  Nor does BHL's software licensed to BAM represent a "facility" of Binance.US.  Similarly, BHL's limited role as a service provider to Binance.US does not make it an unregistered clearing agency in violation of Section 17A.  Indeed, the agreements between BHL and Binance.US are administrative and technical in nature—hardly the founding documents of a joint "exchange."

Properly construed, therefore, the relevant statutes unambiguously preclude the BAM Staff's apparent theories.  A service provider is not a "clearing agent" or "exchange," and the services BHL provides vis-à-vis BAM are not "facilities."  But even if there *were* some relevant ambiguity for the BAM Staff to exploit, stretching the statutory text to encompass service providers like BHL would sweep in untold numbers of *other* entities that no one—before now, not even the Commission—has considered "exchanges" or "clearing agencies."  That would give rise to a glaring major-questions problem.  To subject a vast universe of service providers to regulation as "exchanges" or "clearing agencies"—and to expose them to severe potential penalties based on the conduct of their *clients*—the SEC would need a clear statement from Congress in the statutory text supporting such capacious jurisdiction.  Nothing in Sections 5 or 17A comes close.

In addition, the flawed process the SEC has pursued here would independently bar an enforcement action.  The Administrative Procedure Act ("APA") prohibits such a drastic departure from the ordinary investigative and Wells processes.  The APA also bars the SEC from dramatically retooling its regulatory approach and asserting an unprecedentedly broad reading of the statute through an ad hoc enforcement action, rather than notice-and-comment rulemaking.  Moreover, any

3

enforcement action would encounter grave due-process problems, given the absence of any prior notice that anodyne service-provider business relationships—such as BHL's services to BAM that apparently underlie the contemplated charges here—implicate the Exchange Act.

## FACTUAL BACKGROUND

Below, BHL provides a summary of its current understanding of the facts of this matter with the aim of advancing its dialogue with the BAM Staff regarding the completion of this investigation. To be clear, BHL's efforts to develop the factual record are a mere three weeks old in light of the BAM Staff's unfair process. The facts described here have not had the benefit of full investigative scrutiny, and while BHL disclaims any obligation to update this submission as its understanding of that record advances, it intends to continue engaging with the BAM Staff to reach accord on the relevant facts.[5]

### A.      Binance.com

Binance.com was established in 2017 to provide infrastructure for the world's digital-asset markets.[6] BHL's affiliated entities involved in the operation of Binance.com (collectively with BHL, "Binance") provide banking alternatives to the unbanked, the underbanked, and other individuals in countries with relatively unstable currencies and underdeveloped banking infrastructures. Binance.com has grown over the last six years to become the world's leading cryptocurrency exchange.[7] Historically, BHL held certain of the intellectual property associated with Binance.com, including for its spot-trading matching engine.

---

[5] In the same vein, BHL recognizes that its factual summary does not provide citations for several of the assertions made. Again, the BAM Staff's determination not to request documents or take testimony from BHL in this matter (or make a document-based reverse proffer of the information the BAM Staff thinks relevant to the contemplated charges) has left BHL with no record to cite.

[6] *Welcome to Binance*, BINANCE, https://bit.ly/3YVYm48 (last visited Mar. 15, 2023).

[7] *Top Cryptocurrency Spot Exchanges*, COINMARKETCAP, https://bit.ly/2Gw5JJj (last visited on Mar. 15, 2023).

*Confidential Treatment Requested*

Today, Binance.com has millions of registered users around the world, lists more than 350 cryptocurrencies, and averages greater than $38 billion in daily trading volume.[8]  Binance.com employs a workforce of approximately 8,000 personnel who work to run a platform that serves millions of users.  The business is supported by robust control functions, including its extensive compliance department; a large global risk-management team; and a sophisticated and experienced legal team, all of which have grown exponentially in recent years.  Many of these personnel have deep experience with U.S. compliance regimes, having previously held senior positions in the federal government.  They include former Deputy U.S. Attorney Joshua Eaton;[9] former Assistant U.S. Attorney Noah Perlman; former Special Counsel to the CFTC Enforcement Director Neel Chopra; former IRS-CI Special Agents Matthew Price and Tigran Gambaryan;[10] and former UK Financial Conduct Authority Regulator Steven McWhirter.[11]

## B.    Growing U.S. Interest and Creation of Binance.US

In 2018, in consultation with U.S. counsel, Binance began to consider establishing a separate trading platform focused on U.S. users and then blocking those U.S. users from the Binance.com platform.  Binance believed that separating its U.S. activities into a distinct entity would allow that entity to compete in the U.S. market and provide U.S. customers with products and services compliant with U.S. law, while Binance could continue to offer its full suite of products to customers outside the United States.

Binance implemented this plan early the following year.  In February 2019, it set up three new Delaware corporations—BAM Management US Holdings Inc., BAM Trading Services Inc., and

---

[8] https://bit.ly/3TiD2Eo (last visited Mar. 15, 2023).
[9] *Binance Announces Former Deputy US Attorney as its First Deputy General Counsel*, BINANCE BLOG (May 11, 2022), https://bit.ly/3LorPjJ.
[10] *Former IRS-CI Special Agent Matthew Price joins Binance as Senior Director of Investigations*, BINANCE BLOG (Sept. 30, 2021), https://bit.ly/40aegbN; *Former IRS-CI Special Agent Tigran Gambaryan joins Binance as VP of Global Intelligence and Investigations*, BINANCE BLOG (Sept. 30, 2019), https://bit.ly/3YMAhML.
[11] *Binance Appoints Former FCA Regulator Steven McWhirter as Director of Regulatory Policy*, BINANCE BLOG (Apr. 21, 2022), https://bit.ly/42hr8Ph.

*Confidential Treatment Requested*

BAM Technology Services Inc. (collectively, "BAM").  Together, those companies would run the new Binance.US platform.  BAM Trading Services is the consumer-facing operating entity behind the platform; it holds the necessary state licenses and charters.  BAM Technology Services is a holding company for BAM's intellectual property.  And BAM Management US Holdings is the parent company of the other two entities; it holds the assets needed to cover operating expenses and payroll.

The new entities were set up as standalone corporations, not owned (even in part) by BHL. When they were formed, BAM Management US Holdings owned 100% of the common stock of both BAM Trading and BAM Technology.  BAM Management US Holdings, in turn, was ultimately beneficially owned by Binance founder Changpeng Zhao.  Indirectly, therefore, Mr. Zhao was the ultimate beneficial owner of Binance.US, but BHL itself has never had any ownership interest in any BAM entity.

In June 2019, as BAM Trading launched Binance.US, BHL announced that it would license matching engine and wallet technologies to BAM.[12]  Concurrent with that announcement, BHL changed its Terms of Service to prohibit U.S. users on its Binance.com platform.  Binance.US, meanwhile, filed its initial registration as a money-services business with FinCEN.  The Binance.US platform launched in September 2019.[13]  Since then, Binance.US has served only those U.S. users in jurisdictions for which Binance.US received the appropriate government-issued licenses.  Forty-nine states, the District of Columbia, Puerto Rico, and Guam make money-transmission licenses available to entities like Binance.US.  Accordingly, Binance.US has gradually expanded from its more limited

---

[12] *Binance Announces Partnership with BAM to Launch US Exchange*, BINANCE BLOG (June 13, 2019), https://bit.ly/42f3H9u.  In connection with the establishment of Binance.US, BHL and certain of its personnel provided other forms of corporate support to the BAM entities, which have been described in a presentation to the BHL Staff. Based on the limited proffer received from the BAM Staff, BHL understands that these other forms of support are outside the scope of the BAM Staff's investigation, but BHL is happy to deliver that same presentation to the BAM Staff as part of its cooperation in this matter.

[13] *Our US Partner, Binance.US, Opens for Registration and Deposits*, BINANCE (Sept. 17, 2019, 8:35 PM), https://bit.ly/3FoCwPF.

*Confidential Treatment Requested*

scope at launch to operating a licensed cryptocurrency exchange in 39 states, as well as in Puerto Rico, Guam, and the District of Columbia.

### C.     BHL's Contractual Relationship with BAM

Though BHL and BAM are distinct companies, BHL nonetheless provides BAM certain technical assistance in its operations.  Their relationship initially was memorialized by three agreements they signed in January 2020:  the Master Services Agreement ("Services Agreement,"), the Software License Agreement ("Software Agreement") and the Trademark License Agreement ("Trademark Agreement").  (As discussed below, *see infra* at 10, a fourth agreement, the Wallet Custody Agreement ("Wallet Agreement") was signed at the same time as the others but should not be read to define the relationship between the parties.)  As reflected in these agreements, BHL acts as a service provider for BAM, licensing software and trademarks to BAM to help its software infrastructure and platform maintenance.  Additionally, until approximately June 2021, BHL personnel provided certain other services related to the movement and reconciliation of assets in BAM-controlled wallets.  But BAM decides how it will use the resources BHL provides it; BHL does not control BAM or operate the Binance.US platform.

#### *Software License Agreement*

Pursuant to the Software Agreement, BHL grants BAM a license to use BHL's proprietary software (the "Licensed Software") to operate a digital-currency trading platform for the U.S. market. The Licensed Software includes BHL's digital-currency exchange platform, its matching engine, digital-currency wallet services, mobile applications, a management console, a user center, a risk-control center, and related components.  The Software Agreement does not limit how BAM can use the Licensed Software.  Under the Software Agreement, BHL represents and warrants that the Licensed Software complies with all applicable laws, complies with the specifications agreed to by

*Confidential Treatment Requested*

the parties, and is free of viruses, spyware, and the like. But the Software Agreement imposes no obligations on BHL (other than a confidentiality clause).

### *Master Services Agreement*

The Services Agreement governs the support functions that BHL provides to BAM in connection with licensing its software. BHL provides four services to BAM under the Services Agreement: 1) Access and Use; 2) Hosting Services; 3) Maintenance and Support Services; and 4) Development Services. The Services Agreement makes clear that BHL is "acting as an independent contractor" in furnishing these services, is "not an agent" of BAM, and "has no authority to represent" BAM in any matters. In addition, it does not give BHL the ability (or responsibility) to manage any user data or the operation of the BAM platform.

As to Access and Use, the Services Agreement provides that BHL will furnish BAM and its end users with browser-based access to the Licensed Software. The agreement requires BHL to, among other things, "use best efforts to make the platform available and functioning in accordance with its intended use to BAM TRADING and End Users on a 24 x 7 basis, 365 days each year, excluding scheduled maintenance windows." Under the agreement, BHL cannot limit the number of end users who may access the Licensed Software at any one time; decisions regarding user management are within BAM's purview.

As to Hosting Services and Maintenance and Support Services, the Services Agreement explains that BHL will provide to BAM the following: hosting services, user-access services, maintenance services, support-desk services, user-support services, and incident-response and resolution services. Under the agreement, BHL provides to BAM a "hosting environment" on which to host the Licensed Software. This hosting environment consists of "equipment, software and other infrastructure controlled or maintained by BINANCE [*i.e.*, BHL] that is used to host the Licensed Software." The hosting environment includes one production environment and one staging

8

*Confidential Treatment Requested*

environment that will be available to BAM and will function in accordance with its intended use on a nonstop basis. The Services Agreement also provides that BHL is responsible for the implementation and automated monitoring of platform availability, response times for transactions, and automatic alarming and notification of intrusion activities. If issues arise with respect to the platform's availability or response time, BHL must provide notice on the platform and notify BAM of any outages.

The agreement further explains that BHL will provide industry-standard full data backup and recovery for BAM's end-user data. Beyond its hosting services, BHL also provides end-user access to the Licensed Software, including by providing a process for the establishment of user accounts. Moreover, BHL is responsible for performing preventative and remedial maintenance on the equipment and software in the hosting environment. BHL also provides user-support services, such as providing channels for BAM and its users to submit inquiries and report incidents, responding to such inquiries and reports, training BAM employees on the use of the platform, and responding to any incidents that occur on the platform.

The Services Agreement last requires BHL to provide BAM with Development Services for the software. BAM is entitled to request custom enhancements to the Licensed Software to suit its needs, and BHL must develop those enhancements in a timely fashion at no cost to BAM.

### Trademark License Agreement

Finally, under the Trademark Agreement, BHL grants BAM a license to use BHL's logo and related marks (the "Licensed Marks"). BAM can use these marks in the marketing, use, and offering of virtual-currency-related services to customers on its platform. In return, it must use commercially reasonable efforts to conduct its business in a manner that will reflect positively on the Licensed Marks, and it may not disparage the Licensed Marks or impair the goodwill associated with them. BHL retains sole ownership over the Licensed Marks and retains primary responsibility for their

*Confidential Treatment Requested*

filing, prosecution, registration, and maintenance.    BHL also retains responsibility to use commercially reasonable efforts to enforce BAM's non-exclusive rights to the Licensed Marks in the event of an exclusivity violation, infringement, or misuse of the marks.

### *Wallet Custody Agreement*

At the same time that BAM and BHL entered into the Services Agreement, Software Agreement, and Trademark Agreement, they also entered into the Wallet Agreement.  This agreement purported to appoint BHL as custodian to, among other things, "establish and maintain" user custody accounts and hold the assets in those accounts "in safe custody."    Importantly, however, this agreement was not operationalized concerning BHL's role as the custodian of assets on the Binance.US platform.  BHL does not, and has not, served as the custodian of the digital assets on Binance.US, and the agreement was officially terminated by letter on December 30, 2022.  As discussed in greater detail throughout, BHL does not serve as the custodian of the assets on BAM's Binance.US platform, and it has not served in that capacity.

### D.    BAM, Not BHL, Maintains Custody and Control of Digital Assets on the Binance.US Platform.

BAM itself provides digital-wallet services to users on its Binance.US platform, allowing them to store their digital assets on the platform.  BAM does so using the wallet-custody software it licenses from BHL, but it is ultimately BAM—and not BHL—that maintains custody and control of the digital assets on the Binance.US platform.

BAM maintains and controls the custody of digital assets on the Binance.US platform through custodial services provided by two Amazon Web Services data centers.  Custodial and IT services for vast majority of the digital assets are based in Northern Virginia—the site of the hot wallet—while

*Confidential Treatment Requested*

the rest are based in Tokyo, Japan—the site of the cold wallet.  BAM is in the process of preparing the digital assets located in Tokyo to be re-located to the Northern Virginia facility.[14]

Moreover, BAM (not BHL) controls the movement of digital assets on the Binance.US platform.  When a user transfers digital assets onto the platform, BAM automatically creates a user-specific deposit wallet for each network underlying the deposited digital assets.  When the holdings of a user-specific wallet exceed predefined thresholds, the surplus digital assets are automatically swept into one or more "hot wallets."  A hot wallet is an omnibus cryptocurrency wallet that is connected to the internet and configured to allow transfers to external wallets.  When the holdings of a hot wallet, in turn, exceed that wallet's pre-defined threshold, the surplus digital assets are moved to one or more "cold wallets," which, as described below, are subject to additional security features that only allow these wallets to transfer assets to predefined wallets owned by BAM.

BHL has historically provided certain technical and administrative services to BAM in connection with the above processes, consistent with BHL's role as a service provider to BAM.  For example, the thresholds defining the maximum size of a deposit or hot wallet were originally calculated by BHL.  BAM has assumed control over these processes, however, including by setting the thresholds that trigger the movement of assets from deposit wallets to hot wallets and hot wallets to cold wallets.

When moving digital assets from cold wallets to hot wallets,[15] BAM employs the Threshold Signature Scheme ("TSS") protocol.  The TSS protocol is a form of multi-signature and multi-computational authorization, and it provides an additional level of security for assets moved from

---

[14] The information provided herein reflects BAM's current custody arrangement for assets maintained on AWS.  Certain user assets that have been enrolled in BAM's staking service are separately maintained on a Ledger hardware wallet.  This device is currently held by BAM, but a Binance employee assists with implementing certain of the mechanical aspects of staking or unstaking assets. Until recently, this Binance employee also held the Ledger device.  However, at all times, this employee's actions related to staking are carried out pursuant to instructions from BAM.

[15] Assets maintained in BAM's Tokyo data center are on digital asset networks that do not currently support the TSS protocol.  As a result, BAM does not use the TSS protocol for the digital assets in Tokyo.

*Confidential Treatment Requested*

cold wallets to hot wallets.  Pursuant to the TSS protocol, when assets are to be moved from cold wallets to hot wallets, an authorization request is sent to a predetermined number of key shards, which are assigned to authorized individuals or systems.  Since January 2023, BAM's TSS protocol has seven total key shards, and approval from four key-shard holders is required to move digital assets from cold wallets to hot wallets.  BAM holds four of the key shards, while BHL, as the licenser of the wallet-custody software, maintains three for disaster recovery.  BAM thus holds the requisite number of key shards to move digital assets from cold wallets to hot wallets; BHL does not.  Prior to January 2023, BAM's TSS protocol required approval from only three out of nine total key-shard holders, with BAM holding three key shards, and BHL six—three by BHL itself for disaster-recovery purposes and three by individuals within BHL.  As a result, BHL had the technical ability to move digital assets from cold wallets to hot wallets.  But BHL never exercised that ability unless authorized to do so by, and on the instruction of, BAM personnel.  BAM thus maintains, and historically has maintained, control over the movement of digital assets from cold wallets to hot wallets.

Finally, BAM has exclusive control over the movement of digital assets off its Binance.US platform.  Such transfers can be made only from BAM's hot wallets, over which BAM exercises exclusive control, and only by using the BAM user interface.  Moreover, any transfers involving amounts greater than $1 million must be manually approved by an authorized BAM employee.

### E.    BAM, Not BHL, Maintains BAM's Internal Ledger and Reconciles It with the Blockchain.

BAM maintains an internal ledger called PNK that records customer deposits and withdrawals that take place on the Binance.US platform, as well as transfers of ownership that occur on-platform.  To ensure accuracy, PNK must be periodically cross-referenced against the blockchain.  BAM, not BHL, currently conducts this reconciliation.

*Confidential Treatment Requested*

## PROCEDURAL HISTORY

### *BHL's Cooperation with the SEC's Binance USD Team*

For years now, BHL has cooperated extensively with the BHL Staff in HO-14376 as it investigates the operations of Binance.com. BHL has worked extensively to address the BHL Staff's concerns and bring the investigation to an appropriate conclusion. The Company has preserved, collected, and produced documents from 26 custodians spanning multiple systems and sources. It has also collected and processed more than eight terabytes of data comprising more than 10 million documents. A team of over 100 attorneys has reviewed more than one million of those documents. Based on that extensive review, BHL has made over 40 productions to the BHL Staff, including more than 100,000 documents spanning over 400,000 pages.[16]

BHL has undertaken many other additional steps to engage in good faith with the BHL Staff in that separate matter. Through outside counsel, BHL has interviewed approximately 80 witnesses. It has made six substantive presentations to the BHL Staff. Outside counsel has provided the BHL Staff with weekly call updates since April 2022, and it has provided prompt updates on the departures of key Binance employees. BHL also has continued to invest in enhancing its compliance efforts. It has engaged Kroll, a risk-consulting firm, to evaluate the effectiveness of certain controls relevant to that matter, including the controls verifying that U.S. users are kept off Binance.com. The Company even entered into a limited privilege waiver regarding an internal presentation to assist the BHL Staff team in its factfinding.

On February 2, 2023, the BHL Staff team issued BHL a Wells Notice. Although the conduct underlying the BHL Staff's contemplated charges had not been a focus of the investigation to date, it

---

[16] The productions included aggregate trading data for U.S. Know Your Customer ("KYC") and potential U.S. non-KYC users from June 2019 to October 2022, granular Earn participation and holding data for U.S. KYC and potential U.S. non-KYC from product launch to January 16, 2023, unmasked account information for all U.S. KYC users of BUSD Savings since September 2019, unmasked account information for all U.S. KYC users of BNB Vault (and BNB Flexible Savings) since October 2019, trading data for all U.S. KYC users who transacted in a list of 22 specific tokens from January 1, 2019 to September 8, 2021, and global trading data for the first month MKR and ALGO were listed on Binance.com.

*Confidential Treatment Requested*

was conduct that at least had occurred *on the Binance.com platform* and that had been alleged by the SEC team *investigating Binance*, meaning that BHL had both some warning that a Wells Notice might issue and access to the relevant facts.  Even then, the BHL Staff permitted BHL to make an additional factual presentation prior to its Wells submission to assist the parties in reaching some mutual understanding of the factual and legal issues on which the Wells submission should concentrate.

### BAM Staff's Surprise Announcement of BAM-Related Allegations

The BHL Staff's engagement with BHL concerning its operation of the Binance.com platform contrasts starkly with the BAM Staff's approach to this matter.  BHL has had virtually no dealings with the BAM Staff.  The only exceptions are two quite limited and non-substantive points of contact—both of which took place over a year ago.  In November 2021, the BAM Staff requested phone data belonging to Wei Zhou, a former BHL employee who had served as a BAM director.  Because it possessed the phone data, BHL produced it directly for the BAM Staff's convenience.  Then, in late 2021, when the BAM Staff sought from BAM certain information over which BHL held a legal privilege, BHL again engaged constructively with the BAM Staff to address the matter.  No other contact had occurred during the entire pendency of this investigation.

As a result, BHL was blindsided when it received a Wells Notice from the BAM Staff on February 21, 2023 alleging violations of Exchange Act Sections 5 and 17A.  At that time, BHL was fully focused on responding to the earlier Wells Notice it had received from the BHL Staff with which it had been actively engaged for many months.  By contrast, BHL had received no contact from the BAM Staff in more than a year.  The BAM Staff had not issued even a single document request to BHL.  Nor had it conducted any testimony or interviews with any BHL personnel.  Other than the limited actions noted above, the BAM Staff had not asked Binance for any information at all in connection with its investigation.

*Confidential Treatment Requested*

The BAM Staff's Wells Notice took no account of these circumstances.  The BAM Staff provided little detail about the nature of the charges; declined to answer clarifying questions; denied requests to meet so that Binance counsel could walk the team through certain factual points; and did not invite Binance to present to the team.  In a follow-up call with BHL on March 10, the BAM Staff again refused to provide a sufficiently detailed factual description of the alleged conduct underlying the charges.  It refused to provide relief from the Wells submission deadline (beyond a five-day extension) to give BHL appropriate time to gather facts about a *different company's* platform.  And it denied any further opportunity to meet prior to this March 15 submission.  This Wells submission, then, marks the first opportunity BHL has been given to make any type of affirmative statement to the Commission or BAM Staff on any aspect of this investigation whatsoever.

## ARGUMENT

**I.      The SEC's Contemplated Exchange Act Charges Against Binance Are Meritless.**

The contemplated charges against BHL would allege that BHL is operating the Binance.US platform as an unregistered securities exchange and clearing agency in violation of Sections 5 and 17A of the Exchange Act.  The BAM Staff appears to posit that BHL is complicit in and responsible for the conduct of BAM—a separate legal entity—in operating the Binance.US platform for U.S. users.  Binance believes that theory is misplaced.

The BAM Staff's twin failures to present a more detailed factual proffer to Binance and to permit Binance the time to gather those facts itself have severely limited BHL's ability to address the BAM Staff's concerns in detail.  As discussed below, requiring BHL to rebut charges that the BAM Staff has inadequately specified is unreasonable, unfair, and inconsistent with due process.  The problems created by that approach are exacerbated here because the allegations are principally

*Confidential Treatment Requested*

focused on the operations of a *separate* cryptocurrency-trading platform run by a *separate* company. In that posture, the lack of process has severely impeded BHL's ability to respond.

The BAM Staff has further compounded the problem and made this Wells process more dysfunctional still by instructing BHL to assume away substantial legal arguments that BHL is entitled to press. Specifically, the BAM Staff directed BHL to take as given that the Binance.US platform deals in securities. The BAM Staff has refused to identify any particular assets offered on the platform or explain why those assets qualify as securities. Instead, the BAM Staff referred obliquely to Chairman Gensler's statement that the "vast majority" of cryptocurrencies are securities.[17]

That forced assumption goes to a dispositive threshold issue in the BAM Staff's entire case. The SEC cannot bring charges under Sections 5 and 17A unless Binance.US hosts transactions in *securities*.[18] And, as BHL showed at length in its Wells submission on February 27 to the BHL Staff, the assumption that digital assets are necessarily securities is demonstrably wrong. It rests on an unjustifiably broad interpretation of the securities laws that contradicts their plain text and original meaning, distorts the relevant precedents, and is foreclosed by the major-questions doctrine and other principles of statutory interpretation. That view also is incompatible with the Commodity Futures Trading Commission's treatment of numerous cryptocurrencies as commodities rather than securities. Independent of the statutory merits, statements like Chairman Gensler's are constitutionally inadequate to provide crypto issuers and platforms fair notice of what conduct the agency believes implicates the securities laws.[19] Because the BAM Staff has hindered BHL's ability to respond to the merits of the contemplated charges, BHL provides this submission but reserves the right to raise

---

[17] Chair Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://bit.ly/3yBwxDp ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities.").

[18] *See* 15 U.S.C. § 78e (making it unlawful to use instrumentalities of interstate commerce "for the purpose of using . . . an exchange . . . to effect any transaction in a *security*, or to report any such transaction," unless the exchange is registered or exempt from registration (emphasis added)); *id.* § 78q-1(b)(1) (making it unlawful to operate an unregistered clearing agency "with respect to any *security*" (emphasis added)).

[19] *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 n.15 (explaining that even *formal* agency interpretations of ambiguous agency rules can fail to provide the requisite fair notice).

*Confidential Treatment Requested*

additional arguments when it has had more than three weeks to conduct an inquiry into the events at issue and better understands the actual basis of the contemplated charges.

Setting aside the BAM Staff's unwarranted attempted expansion of the term "security," the contemplated charges rest on another, fallacious attempt to stretch the securities laws in an unprecedented and erroneous way. As explained above, it is BAM—not BHL—that runs Binance.US and processes the crypto sales that take place on it. BHL is merely a service provider to BAM: it licenses its software and trademarks, provides support services to help maintain that software, and at certain times in the past has performed other services as an independent contractor. BHL has no control over the offer and sale of digital assets on Binance.US; they are overseen by a separate legal entity over which it has no control. To hold BHL responsible for those transactions would appear to sweep into the reach of the securities laws *any* company that provides services that indirectly facilitate a securities transaction, however remote its services are from the actual offer and sale of a security. At a minimum, having disclosed little about its theory in this case, the BAM Staff has failed to articulate any limiting principle that would avoid that novel and untenably broad interpretation.

## A. BHL Has Never Violated Section 5 with Respect to Binance.US.

The BAM Staff's claim that BHL violated Section 5 with respect to Binance.US fails on any view. First, BHL itself cannot be liable for failing to register as an exchange because it is not an "exchange" under Section 5 in connection with the activities of Binance.US. BHL is not part of an "organization, association, or group of persons" with Binance.US as the statute uses those terms, and the services BHL provides are not the kind "commonly performed by a stock exchange." Second, the software BHL licenses to BAM is not the "facility" of an exchange within the meaning of Section 5.

*Confidential Treatment Requested*

1.      **BHL Is Not an "Exchange" with Respect to the Activities of Binance.US.**

BHL cannot be liable for failure to register as an exchange because it is not an "exchange," as

Section 5 of the Exchange Act defines that term, with respect to any of the activities undertaken by

Binance.US.  Under the statute, an exchange is

> any organization, association, or group of persons . . . which constitutes, maintains, or
> provides a market place or facilities for bringing together purchasers and sellers of
> securities or for otherwise performing with respect to securities the functions
> commonly performed by a stock exchange as that term is generally understood, and
> includes the market place and market facilities maintained by such exchange.[20]

The BAM Staff's effort to shoehorn BHL into that definition fails for two independent reasons.  BHL

is not an "organization, association, or group of persons" as the statute uses that term.[21]   And the

services BHL furnishes to BAM are not functions "commonly performed by a stock exchange as that

term is generally understood."[22]

a.      **BHL and BAM Are Not an "Organization, Association, or Group of
Persons" with Respect to the Activities of Binance.US.**

As noted above, BHL can be an "exchange" for purposes of Binance.US's activities only if

BHL and BAM together constitute an "organization," "association," or "group of persons" with

respect to those activities.  The first two of those terms are non-starters for the contemplated charges.

When the definition of "exchange" was enacted, "organization" or "association" denoted (and still

denotes) some unified legal entity formed for a common, particular purpose.  An "association" meant

"a body of persons organized, for the prosecution of some purpose, without a charter, but having the

general form and mode of procedure of a corporation."[23] "Organization" referred (and still refers) to

a "group . . . formed for a particular purpose" functioning as a "systematic whole."[24]

---

[20] 15 U.S.C. § 78c(a)(1).

[21] *See id.*

[22] *Id.*

[23] Association, *Webster's New International Dictionary* ["*Webster's Second*"] 167 (2d ed. 1947).

[24] Organization, *Black's Law Dictionary* (11th ed. 2019); Organization, *Webster's Second*, *supra*, at 1719.

*Confidential Treatment Requested*

BHL and BAM plainly do not meet those definitions.  As previously detailed, BHL and BAM are, and have always been, separate and legally distinct entities.  They operate in different markets, have their own respective managers handling day-to-day management, and they lack any principal-agent relationship.

For those reasons, when the SEC has sought in the past to test the outer limits of its jurisdiction, it has historically relied on the phrase "group of persons."  The D.C. Circuit recently cautioned, however, that precisely because the term "remains murky," "vigilance is necessary to ensure the term is not stretched too far."[25]  The D.C. Circuit identified important safeguards.  The court indicated that a tight "corporate affiliation"—such as a parent-subsidiary relationship—can be "significant" in establishing a "group of persons."[26]  In the absence of that formal showing, the court also stated that whether a de facto "joint venture[]" constitutes a statutory "group of persons" hinges on a further showing that two or more entities are "acting in concert" to operate an exchange.[27]

The BAM Staff's contemplated charges flunk that standard.  To reiterate, BHL and BAM are legally distinct companies.  There is no parent-subsidiary relationship; neither one owns the other, even in part.  There is also no principal-agent relationship; BHL and BAM have expressly disclaimed one.  BHL has no authority to represent or to bind BAM.  Nor does BHL have control over BAM's day-to-day management.  It has no control over BAM's internal ledger.  Finally, BHL has no custody or control of BAM's digital assets.

What BHL continues to provide to BAM are simply support services, such as backing up data and helping to ensure BAM's platform is secure and free of intrusions.  But those services do not mean that BHL is "acting in concert" with BAM at all, much less to run a securities exchange.  The

---

[25] *Intercontinental Exch., Inc. v. SEC*, 23 F.4th 1013, 1025 (D.C. Cir. 2022).

[26] *Id.* at 1024-25.

[27] *Id.* at 1024.  In the context of analogous securities statutes, courts have confirmed that while a "group of persons" may be formally or informally organized, the group must nonetheless work toward some common, shared purpose to constitute a "group of persons" in the relevant sense.  *See, e.g.*, *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617 (2d Cir. 2002); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 123–24 (2d Cir. 2001).

*Confidential Treatment Requested*

law is replete with examples of individuals who confer de facto assistance to others but are not understood to "act in concert" with the persons they assist.  As then-Judge Kavanaugh observed for the D.C. Circuit, "[t]he company that provides electricity to power the sound system at . . . oral arguments" in that court no doubt confers important de facto assistance in making the oral argument possible.[28]  But the power company does not thereby "act in concert" with the judges or advocates in conducting that oral argument.  So too here.  One entity's mere provision of useful services to another does not establish that either or both constitute a "group of persons" acting in concert under Section 5.[29]

The BAM Staff's contemplated charges fail immediately, therefore, as a matter of ordinary statutory interpretation—a point the Commission *itself* has long implicitly acknowledged. Established exchanges like the New York Stock Exchange and Nasdaq rely extensively on third-party service providers for technical assistance critical to the execution of the securities trading that occurs there.[30]  But the Commission has never reasoned that merely because those service providers confer necessary services to exchanges, the providers *themselves* are exchanges.

By contrast, the BAM Staff's apparent contrary view that mere conferral of de facto assistance to an exchange suffices to establish a statutory "group of persons" would produce precisely the major-questions problem the D.C. Circuit left open in *Intercontinental Exchange*.[31]  Any provider of technology that assists BAM's operations could fall within that capacious category and thus become

---

[28] *United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011) (Kavanaugh, J.).

[29] For similar reasons, BHL does not constitute an exchange under the SEC's regulatory definition of the term.  BHL does not "[b]ring[] together the orders . . . of multiple buyers and sellers" or "use[] established, non-discretionary methods . . . under which such orders interact with each other."  17 C.F.R. § 240.3b-16(a).  BHL gives BAM the tools to process orders and match buyers and sellers, but it in no way itself completes any of the steps needed to make that happen.

[30] *See* Intercontinental Exchange, Inc., Form 10-K for the year ended December 31, 2022, at 20 (Feb. 2, 2023) (disclosing risk factor that "[o]ur systems and those of our third-party service providers are vulnerable to cyberattacks, hacking and other cybersecurity risks"); Nasdaq, Inc., Form 10-K for the year ended December 31, 2022, at 24 (Feb, 23, 2023) (disclosing risk factor that "[w]e rely on third parties for regulatory, data center, cloud, data storage and processing, data content, clearing and other services").

[31] *Intercontinental Exchange, Inc.*, 24 F.4th at 1023, 1025 (cautioning that statutory terms in the securities laws should not be "stretched too far" lest those constructions "en[d] in an irrational extension of the SEC's jurisdiction").

*Confidential Treatment Requested*

ensnared in the SEC's asserted jurisdiction.  But Congress does not "hide elephants in mouseholes," and there is no basis to believe it intended to sweep so broadly through "vague terms" such as "group of persons."[32]  Because of the breadth of that interpretation—which would subject an extremely broad swath of service providers to potential securities-law regulation and liability—Congress would have had to speak clearly to provide such jurisdiction.  The lack of a clear statement, the lack of precedent, and the lack of any coherent limiting principle in the BAM Staff's apparent interpretation of Section 5 strongly counsel against the adoption of its newfound and capacious understanding of that term.

> **b.      BHL Does Not Perform Functions "Commonly Performed by a Stock Exchange as That Term Is Generally Understood" with Respect to the Activities of Binance.US.**

Even if BHL and BAM could properly be characterized as a "group of persons" under Section 5, the contemplated charges still would fail for an additional reason:  BHL does not "perfor[m] . . . functions commonly performed by a stock exchange as that term is generally understood" with respect to any of the alleged activities that occur on Binance.US.  Like "group of persons," that language imports real limits.  For instance, even a company that "creates an electronic marketplace for securities traders" does not create a "stock exchange" when its marketplace does not perform the "common functions" of a stock exchange as that term is "generally understood."[33]  In the leading case on the issue, the Seventh Circuit agreed with the SEC's *own view* that a company's securities marketplace could not be a "stock exchange" when it lacked certain common functions of such an exchange, like brokers who function as market makers or a trading floor (as was then common).[34]

A fortiori, the contemplated charges fail as to BHL.  Unlike the company at issue before the Seventh Circuit, BHL does not operate Binance.US—the "electronic marketplace" at issue.  That task

---

[32] *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).
[33] *Bd. of Tr. of City of Chi. v. SEC.*, 923 F.2d 1270, 1272 (7th Cir. 1991) (Posner, J.).
[34] *Id.*

*Confidential Treatment Requested*

belongs to BAM, a legally and operationally distinct entity.  BHL licenses software to and maintains the software for BAM conducive to that goal, yet BHL performs no "functions" for BAM commonly associated with a *stock exchange's* functions.  What BHL *does* perform for BAM is, at bottom, tech support: hosting services, user-access services, maintenance services, support-desk services, user-support services, and incident-response and resolution services, along with site maintenance to ensure security for consumers.  None of that is commonly associated with the "functions" of a *stock exchange*.  Those functions are commonplace for countless modern and technically sophisticated businesses in the twenty-first century.  Without distinctively exchange-specific functions, however, Section 5 does not apply to BHL.  BHL's mere licensing of software and provision of tech-support services to BAM thus cannot suffice to bring BHL within the SEC's jurisdiction.

### 2.    BHL's Software Is Not the "Facility" of an Exchange Under Section 5.

Even assuming that Binance.US could be shown to constitute an "exchange," that would not mean the Commission has jurisdiction to regulate BHL's software as the "facility" of an exchange. The relevant text of the Act is as follows:

> The term "facility" when used with respect to an exchange includes its premises, tangible or intangible property whether on the premises or not, any right to the use of such premises or property or any service thereof for the purpose of effecting or reporting a transaction on an exchange (including, among other things, any system of communication to or from an exchange), and any right of the exchange to the use of any property or service.[35]

Accordingly, the Commission would have jurisdiction over BHL's software only if (1) that software constitutes the "tangible or intangible property" *of the exchange* ("*its*" property) including the "right to the use of" that property, or if (2) BHL's software constitutes "any right of the exchange to the use of any property or service."  Right away, however, both of those theories fall flat.  BHL's software is not the property *of the exchange*; to the contrary, Binance.US may use that software only

---

[35] 15 U.S.C. § 78c(a)(2).

*Confidential Treatment Requested*

pursuant to a *license* secured by BAM.   The "intangible property"—the software and the corresponding intellectual-property rights—thus do not belong to BAM or Binance.US; that property belongs to BHL, as shown by the fact that the supposed "exchange" had to obtain a license to use it. There is thus no basis to conclude that BHL's software is the "property" of, or a "service" of, *the exchange*.  And the "right of the exchange" theory fails for similar reasons.  That clause provides that the *right* of the exchange to use a property or service—not the property or service *itself*—is the "facility" of an exchange.  At most, then, the Commission might be able to show that, to the extent Binance.US is a "securities exchange," the Commission's jurisdiction extends to BAM's license to use BHL software as a "facility" of that exchange.  But that clause does not permit the Commission to regulate BHL *itself*, nor to label BHL's underlying software the "facility" of an exchange and to regulate it as such.

That straightforward reading accords with the background fact that the SEC "has never claimed jurisdiction to regulate the technology underlying the markets."[36]  Rather, for more than fifty years, it has disclaimed the authority to broadly deem communications services "facilities"—even though they, like BHL, support the operations of a trading platform, and even though they are integral to its ability to process offers and sales of securities.[37]   And that reading is also consistent with the SEC's longstanding position that mere affiliation between two entities, and the mere performance of functions that support the operations of an exchange, does not make the supporting entity a "facility."[38]   Proceeding against BHL would mark a major reversal of course on both of those regulatory approaches—and would represent the arrogation of an essentially boundless power to

---

[36] Therese H. Maynard, *What Is an "Exchange?"—Proprietary Electronic Securities Trading Systems and the Statutory Definition of an Exchange*, 49 WASH. & LEE L. REV. 833, 845 n.60 (1992); *see also* Exchange Act Release No. 8661, 34 Fed. Reg. 12,952 (Aug. 4, 1969) (although exchanges rely on "traditional communications devices" to facilitate trading activities, the SEC "has never sought and does not now seek to assert regulatory jurisdiction over these traditional forms of communication").

[37] *Id.*

[38] *See* Release No. 34-44983, 66 Fed. Reg. 55,225, 55,234 (Nov. 1, 2001)  (rejecting notion that mere corporate affiliation is enough to make something a facility of an exchange and looking instead to the entity's role within the exchange).

*Confidential Treatment Requested*

regulate every service provider of an exchange.  But the "want of assertion of power by those who presumably would be alert to exercise it[] is . . . significant in determining whether such power was actually conferred."[39]  The SEC's own prior conduct, therefore, is once again good evidence that the novel assertion of authority contemplated here would lack any statutory basis.

### B.      BHL Is Not a Clearing Agency Under Section 17A.

The BAM Staff's apparent theory of how BHL is operating as an unregistered clearing agency fails for similar reasons.  BHL's limited role in providing certain services to the Binance.US platform falls far outside Section 17A.  That provision makes it unlawful for a clearing agency to engage in interstate commerce "to perform the functions of a clearing agency with respect to any security" unless it is registered.[40]  Because the statute prohibits engaging in the "functions of a clearing agency," the question is simply whether BHL is a "clearing agency" vis-à-vis its role in Binance.US.  It is not.

To constitute a clearing agency, an entity must perform one of four tasks: (1) "acts as an intermediary in making payments or deliveries or both in connection with transactions in securities," (2) "provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities," (3) "acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates," or (4) "permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates."[41]  Even treating all the crypto assets traded on

---

[39] *Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983); *see also Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (finding it "telling that the IRS had never before maintained that it possessed this authority").
[40] 15 U.S.C. § 78q-1(b)(1).
[41] *Id.* § 78c(a)(23).

24

*Confidential Treatment Requested*

Binance.US as securities—a premise BHL rejects—BHL executes none of those four tasks for Binance.US.

*First*, BHL does not act as an intermediary in processing transactions.  BHL licenses certain software to BAM so that BAM can operate the Binance.US trading platform.  But the whole point of the Software Agreement is that BAM—not BHL—controls and operates the Licensed Software.  BHL fulfills certain behind-the-scenes support roles in keeping the platform up and running.  But BHL plays no part in matching buyers and sellers of crypto assets or in processing transactions, or in handling the movement of digital assets from wallet to wallet.  Further, BHL does not exercise, and has not exercised, custody of digital assets on the Binance.US platform.  Nor does BHL maintain a record of transactions on Binance.US.  All of those functions—all the pieces needed to make crypto transactions happen—are firmly under BAM's control, and most importantly firmly *out of* BHL's control.  BHL thus is not an intermediary.[42]

*Second*, BHL does not "provide[] facilities" for comparing data regarding settlement of transactions or for anything else related to settlement.  In the securities context, "settlement" refers to the execution of a securities transaction.[43]  BHL may license to BAM the software underlying the Binance.US platform, but as the licensee, it is BAM that actually uses that software to power its platform and provides comparison and settlement functions to users.  As the D.C. Circuit has explained, a clearing agency "'compares' submissions of the seller's broker with those of the buyer's to make sure that there is a common understanding of the terms of the trade."[44]  BHL's licensed software may help BAM accomplish that task, but BHL itself does not.

---

[42] *See Financial Intermediary*, *Black's Law Dictionary* (11th ed. 2019) ("A financial entity — usu[ally] a commercial bank — that advances the transfer of funds between . . . buyers and sellers."); *Market Intermediary*, *id.* ("A person whose business is to enter into transactions on both sides of the market.").

[43] *See Bradford Nat. Clearing Corp. v. SEC*, 590 F.2d 1085, 1091 n.2 (D.C. Cir. 1978) (settlement "involves the delivery of securities certificates to the purchasing broker and the payment of money to the selling broker").

[44] *Bradford Nat. Clearing Corp. v. SEC*, 590 F.2d 1085, 1091 n.2 (D.C. Cir. 1978); *accord Agent*, *Black's Law Dictionary* (11th ed. 2019) (a "clearing agent" "provid[es] facilities for comparing data regarding securities transactions").

*Confidential Treatment Requested*

*Third*, as explained above, BHL does not act, and has not acted, as a custodian of any of the digital assets on the Binance.US platform.  Once again, all of that is in BAM's bailiwick.  Under the current TSS protocol, BHL does not have enough key shards to move digital assets from cold wallets to hot wallets.  And even under the old protocol, although BHL had the technical ability to move assets, it never exercised that ability in practice.  While BHL has licensed the wallet custody software to BAM, BAM has at all times maintained custody of the digital assets traded on its platform.  BHL, meanwhile, has not served as a custodian of Binance.US users' assets.

*Fourth*, and finally, BHL does not "permit[] or facilitate[] the settlement of securities transactions" on Binance.US.  Again, BHL has no role to play in settling transactions on the platform; that is all BAM.  Ultimately, any attempt to force BHL into the definition of a clearing agency falls flat in light of BHL's quite limited role as a service provider for the platform.  BHL licenses BAM the software that BAM uses to run the platform, and BHL helps maintain that software.  But it is BAM that actually uses the software and effects the transactions that take place on Binance.US.

Put simply, a clearing agency under Section 17A refers to a specific kind of entity that plays an intermediary or custodial role in securities transactions.  BHL does not fit that bill.

## II.   The BAM Staff's Deviations from Longstanding Agency Norms Are Arbitrary and Capricious Under the Administrative Procedure Act ("APA").

Independent of the multiple flaws in the BAM Staff's reading of the statute, bringing an enforcement action in these circumstances necessarily would be arbitrary and capricious and thus in violation of the APA.

Start with the BAM Staff's "investigation" here. The Commission's longstanding practice is to suggest charges only *after* the agency has conducted an investigation.  Here, however, there apparently has been *no* investigation as to BHL, and none of the typical dialogue accompanying one. It is a mystery how the BAM Staff could make a rational decision to recommend charges against BHL given that dearth of engagement.  That charge-first, investigate-later approach is inherently arbitrary.

*Confidential Treatment Requested*

More fundamentally, the BAM Staff's abrupt abandonment of the traditional investigatory process is textbook arbitrary agency action.  As courts have explained, "one of the core tenets of reasoned decisionmaking is that an agency changing its course is obligated to supply a reasoned analysis for the change."[45]  Indeed, "reasoned decisionmaking necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously."[46]  Here, however, the agency has set forth *no* explanation, much less a reasoned one, about why it has discarded the traditional investigatory process in favor of curt accusations of misconduct.

Similarly, the BAM Staff jettisoned the traditional Wells process without explanation.  That process was designed to facilitate a good-faith dialogue between counsel for both sides so that the SEC can get a "full and accurate picture" of the case at hand and so defense counsel can provide informed advice to her client about how to proceed.[47]  Yet here, the BAM Staff has eschewed that traditional process—in which it at least reveals the factual basis on which it relies to allege misconduct—in favor of conclusory accusations predicated on unfounded assumptions.  And it imposed an unjustifiably compressed timeline for BHL's response after standing silent on this matter for years—even while BHL engaged with BHL Staff throughout that time.  BHL has yet to receive any explanation for that sudden swerve from settled practice.

Finally, at an even more basic level, proceeding here via an enforcement action rather than through prospective rulemaking contravenes foundational principles reflected in the APA.  As BHL explained in its HO-14376 Wells submission, agencies have some discretion in choosing between enforcement actions and rulemaking when crafting policy.[48]  But agencies abuse that discretion when

---

[45] *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119-20 (D.C. Cir. 2010) (cleaned up).
[46] *Id.* (cleaned up).
[47] Steven Peikin, *Keynote address at the New York City Bar Association's 7th Annual White Collar Crime Institute*, SEC (May 9, 2018), https://bit.ly/2G0O4qO.
[48] *See SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947).

*Confidential Treatment Requested*

they eschew rulemaking and instead use adjudication to adopt a "new standard" that is "very broad and general in scope and prospective in application" and departs "radically" from the agency's past practice and the public's good-faith understanding.[49]  Rulemaking, not adjudication, is required when an agency "seeks to *change* the law and establish rules of *widespread application*."[50]

That is exactly the case here.  As explained above, the BAM Staff's desire to expand the notions of an "exchange" and a "clearing agency" to encompass anyone who provides services, however limited, to an exchange—especially when that exchange deals with digital assets, whose own legal status is far from clear—marks a new and aggressive reading of the law.  This profound shift in the agency's regulatory approach, with significant implications for the trillion-dollar crypto industry—and, as shown above, for service providers throughout the financial industry more broadly—cannot be rolled out bit-by-bit in ad hoc enforcement actions.

As SEC leadership has previously recognized, "[e]nforcement actions short-cut the regulatory process" in the crypto space—and ignore the years-long calls from the industry for clear guidance on the interaction of the securities laws and digital assets.[51]  And "[o]ne-off enforcement actions that represent the first time the Commission has addressed a particular issue publicly . . . are not the right way to build a regulatory framework."[52]  Rather, "the Commission needs to provide a level of clarity that heretofore has been absent."[53]  The "preferable approach" under these circumstances "would have been . . . to commence a rulemaking" and take a "proactive regulatory approach."[54]  That process enables the agency to provide fair notice and permits affected persons to seek judicial review before

---

[49] *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996).

[50] *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir. 1981) (emphasis added).

[51] "On the Spot: Remarks at 'Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?,'" Commissioner Hester Peirce (June 14, 2020), https://bit.ly/3l7Jm5m.

[52] *Id.*

[53] *Id.*

[54] *Id.*

*Confidential Treatment Requested*

the Commission may punish individuals for not following the agency's view of the law.  Seeking to establish the SEC's novel interpretation through ad hoc enforcement here would thus violate the APA.

## III.    Due Process and Fair-Notice Principles Additionally Bar the Contemplated Charges.

For similar reasons, pursuing an enforcement action here premised on the SEC's apparent new position would violate due process.  BHL received nothing approaching fair notice that providing tech support to a website where people can buy and sell digital assets would result in liability for that website's failure to register as an exchange and as a clearing agent.  Fair notice "is a fundamental principle in our legal system"; the Supreme Court has emphasized that agencies must give "regulated parties fair warning of the conduct a regulation prohibits or requires."[55]  And the courts of appeals have uniformly recognized that regulatory penalties are inappropriate when the relevant statutory and regulatory schemes deprive their targets of fair notice.[56]

Yet as to these contemplated charges—and as to the SEC's broader campaign of enforcement actions against digital assets—the agency has failed to meet this critical baseline.  Take first the issue of what constitutes a "security."  As BHL exhaustively detailed in its HO-14376 Wells submission, the agency's novel and unsupported re-envisioning of an "investment contract" under *SEC v. W.J. Howey Co.* cannot be squared with the original plain meaning of that term, or even with *Howey* itself. The crypto industry could not foresee that development—particularly while the CFTC had already labeled multiple digital assets "commodities," and the SEC itself acknowledged uncertainty regarding its own position.  And even *now*, the agency still does not want to have a full and frank discussion about how the proper understanding of an "investment contract" can possibly include a digital asset

---

[55] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Christopher,* 567 U.S. at 156.

[56] *See, e.g.*, *Phelps Dodge Corp. v. Fed. Mine Safety & Health Rev. Comm'n*, 681 F.2d 1189, 1192 (9th Cir. 1982); *Kropp Forge Co. v. Sec'y of Lab.*, 657 F.2d 119, 122 (7th Cir. 1981) (declining to impose sanctions because of lack of fair warning); *Dravo Corp. v. Occupational Safety & Health Rev. Comm'n*, 613 F.2d 1227, 1232–33 (3d Cir. 1980); *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976).

*Confidential Treatment Requested*

lacking several of that term's "essential ingredients"—as evidenced by the present demand to simply ignore this issue and pretend as if all digital assets are necessarily "securities."

The "exchange" and "clearing agency" theories introduced here suffer the same basic flaw. The BAM Staff's proposed pursuit of BHL as a "securities exchange" and a "clearing agency" is apparently predicated merely on BHL's provision of services to Binance.US. But anyone "of common intelligence" would be surprised to learn that these services could render a third party a "clearing agency" or "exchange."[57]

"[C]larity in regulation is essential to the protections provided by the Due Process Clause."[58] But clarity is precisely what the BAM Staff (and the Commission) have withheld. The industry has been left to witness the SEC's periodic unveiling of aggressive interpretations of the law through diffuse enforcement actions nationwide. Due process demands much more.

## <u>CONCLUSION</u>

Binance respectfully submits this Wells Response and requests pursuant to 17 C.F.R. § 202.5 that, in the event that the BAM Staff determines to recommend any charges against BHL, the Staff provide this submission to the Commission.

---

[57] *Fox Television Stations, Inc.*, 567 U.S. at 253 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).
[58] *Id.*