# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO, | ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No. 1:23-01599

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
U.S. SECURITIES AND EXCHANGE COMMISSION'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER
FREEZING ASSETS AND GRANTING OTHER RELIEF AND
ORDER TO SHOW CAUSE WHY RELIEF SHOULD NOT CONTINUE**

## PRELIMINARY STATEMENT

Plaintiff U.S. Securities and Exchange Commission ("SEC") respectfully requests that the Court enter a temporary restraining order that maintains the status quo, provides assurances regarding the safety of U.S. investor assets, and preserves the availability of funds should the SEC prevail on the merits in this action.  Specifically, the SEC asks the Court to exercise its equitable powers to enter a tailored order requiring Defendants Binance Holdings Limited ("Binance"), BAM Trading Services Inc. ("BAM Trading"), BAM Management US Holdings Inc. ("BAM Management"), and Changpeng Zhao ("Zhao") to, *inter alia*, (i) repatriate and freeze the company assets of BAM Management and BAM Trading; (ii) repatriate BAM Trading customer assets, comply with specified relief concerning the custody and control of customer assets, and refrain from transferring them other than in the ordinary course of business, provided such ordinary course transfers are not made to any entity or person affiliated with Binance or Zhao; (iii) provide an accounting, not destroy or otherwise alter or conceal relevant documents and information, and engage in expedited discovery; and (iv) show cause why certain relief should not continue.  The SEC also seeks the Court's permission to serve Defendants Binance and Zhao via alternative means.

The SEC has just filed a complaint raising serious allegations that Defendants have for years provided illegal platforms to offer and sell crypto asset securities to U.S. investors, and unregistered broker and clearing services.  Defendants knew that their conduct with respect to U.S. investors was illegal and risked U.S. government enforcement actions.  Instead of ceasing such illegal activity, Zhao and Binance doubled down.  They engaged in a detailed plan to tell the world that U.S. investors were no longer able to trade on the Binance.com Platform (defined below), while creating a new platform in the United States that would (1) feign compliance with

U.S. law in order to distract U.S. regulators and law enforcement and (2) feign independence from Binance and Zhao. But an essential component of this plan was that Zhao and Binance would secretly continue to control the new U.S. platform and the assets of U.S. investors, while remaining outside of the United States. That control continues. As set forth below, the SEC has a reasonable likelihood of success on the merits of its claims based on its detailed allegations that Defendants violated, and continue to violate, numerous securities laws, and has set forth more than sufficient evidence from which an inference can be drawn that a violation has occurred.

When the SEC seeks equitable emergency relief, it understands that such relief must be carefully calibrated to ensure that the remedy protects the interests of investors and maintains the status quo. At present BAM Trading states that it holds $2.2 billion in crypto assets (as well as hundreds of millions more in fiat currency) belonging to investors who have entrusted BAM Trading to custody those assets on the Binance.US platform. Prior to filing this action, the SEC made extensive efforts to try to ensure that during the pendency of this litigation, those investors' assets would be custodied in the United States and under the exclusive control of BAM Trading, rather than under the control of Binance and Zhao, who have flouted U.S. regulatory oversight. Because Defendants have repeatedly failed to provide sufficient assurances, the SEC now seeks the Court's assistance in ensuring the safety and availability of investor assets and that Defendants do not dissipate assets that may become due should the SEC prevail in this action

## STATEMENT OF FACTS

## I.  Defendants and the Binance Platforms

Defendant Binance is a Cayman Islands limited liability company founded and owned by Defendant Changpeng Zhao. *See* Exhibit A, Declaration of Colby Steele ("Steele Dec."), at Ex. A-1. Since at least July 2017, it has operated an internet-based crypto asset platform available at

Binance.com ("Binance.com Platform").  Ex. A-2.  The Binance.com Platform markets itself as offering over 350 crypto assets for trading that is available to customers in more than 100 countries, among other crypto asset-related services.  Ex. A-3.   Neither Binance nor any of its subsidiaries or affiliated entities have ever been registered with the Commission in any capacity. Steele Dec. ¶98.

Defendant BAM Trading is a Delaware corporation that is the legal entity that operates a U.S.-based crypto asset platform available at Binance.US ("Binance.US Platform").[1]  Ex. A-4. The Binance.US Platform is available in 46 U.S. states and 8 territories, including in this District. Ex. A-5.

Defendant BAM Management is a Delaware corporation and the parent of BAM Trading and other affiliated entities.  Ex. A-6.  When the Binance.US Platform launched, BAM Management was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn was wholly owned by CPZ Holdings Limited, a British Virgin Islands company that Zhao owns and controls.  *Id.*  Presently, Zhao continues to own 81 percent of BAM Management.  Ex. A-7, at BTS00831968.   Neither BAM Management nor any of its subsidiaries or affiliated entities (including BAM Trading) have ever been registered with the SEC in any capacity.  Steele Dec. ¶97.

Defendant Changpeng Zhao, widely known as "CZ," is a Canadian citizen who resides outside of the United States and is Binance's founder, beneficial owner, and CEO.  Ex. A-8.

---

[1] As alleged in the Complaint and discussed herein, Defendant BAM Trading is the public-facing entity for Binance.US Platform operations, but Defendant Binance plays a significant role in Binance.US Platform operations, all under Zhao's control.

Binance operates through several subordinate or affiliated entities, in multiple jurisdictions, all tied to Zhao as the beneficial owner.  Ex. A-9.  Zhao has been publicly dismissive of notions of corporate formalities, separation, and associated regulatory requirements, and has refused to identify the headquarters of Binance.  He has been quoted as dismissing such "traditional mentalities" by saying "what kind of horse is a car?  So you have to have an office.  Wherever I sit is going to be the Binance office. Wherever, wherever I meet somebody is going to be the Binance office. 'You have to have an entity.  You have to have a headquarters.  You have to have a bank account.'  All those things [don't] have to exist for blockchain companies."  Steele Dec. ¶15.

Since the Binance.com Platform launched in July 2017, Zhao has deliberately engaged in concerted efforts to provide a crypto asset platform for U.S. investors while shunning the applicability of U.S. law to protect securities investors.  As he stated in an interview in December 2017, "The more you deal with fiat, the more [authorities] can control you . . . . The bank will freeze your bank account.  They can make the wire transfer slow."  He further explained that crypto asset exchanges are "a way to bypass the tightening regulation."  *Id.*  This motivation has permeated Zhao's and Binance's activities in operating the Binance.com Platform, and creating and controlling the Binance.US Platform, while keeping the locus of their control outside of the United States.  Indeed, Zhao has admitted that his "goal" was "to reduce our own losses, but at the same time to prevent the U.S. regulatory entities from troubling us." Ex. A-38.

Despite Zhao's desire to evade regulation, Binance has been the subject of a number of regulatory actions around the world, including by the CFTC in the United States.[2]  It has also been widely reported that Binance and Zhao are under investigation by criminal authorities in the United States.[3]

## II.     Binance Offered and Sold BNB as a Security

BNB is an ERC-20 token that Binance issued on the Ethereum blockchain.  Ex. A-10.  In June 2017, Binance began issuing BNB—formerly called "Binance Coin"—in an initial coin offering ("ICO") explicitly meant to fund the launch of the Binance.com Platform in July 2017. *Id.*  Binance's BNB ICO was marketed and sold to investors globally, and Binance imposed no restrictions on U.S. investments in BNB or on the ability of BNB investors to immediately resell BNB to U.S. investors.  Ex. A-83 at 48-50.

To promote its ICO, Binance also issued the Binance Whitepaper to prospective BNB investors globally over the internet.  Ex. A-11.  The Binance Whitepaper explained that the purpose of the ICO was to raise money for Binance's team to "build a world-class crypto exchange," but that Binance needed the "help" of ICO "investors."  *Id.* at BHL-SEC-BUSD-0000005.  The Binance Whitepaper gave an overview of its proposed new crypto asset platform, touting several competitive advantages the platform would supposedly have over other crypto asset platforms due to Zhao and his cohorts' supposed entrepreneurial and managerial expertise over the trading platform.  *Id.* at BHL-SEC-BUSD-00000012-13.

---

[2] *CFTC v. Zhao, et al.*, No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023).

[3] Reuters, "Exclusive:  U.S. Justice Department is Split Over Charging Binance as Crypto World Falters." *available at* https://www.reuters.com/markets/us/us-justice-dept-is-split-over-charging-binance-crypto-world-falters-sources-2022-12-12/

The Binance Whitepaper repeatedly referred to ICO participants as "investors," and it lauded the credentials and financial expertise of Zhao and other founding members to create a successful crypto asset platform. *Id.* at BHL-SEC-BUSD-00000010 and 013. The Binance Whitepaper concluded, "The question is: given our team, track record, experience, industry resources and product, do you believe we stand a better chance than the rest of the pack? If yes, then please join our ICO." *Id.* at BHL-SEC-BUSD-00000019.

During the ICO, Binance created 200 million BNB on the Ethereum blockchain and stated publicly that it would never issue more BNB. *Id.* at BHL-SEC-BUSD-00000009. Binance offered 100 million of the 200 million BNB in the ICO at approximately $0.15 per coin, and Binance structured the ICO in phases that involved increasing BNB prices with each phase (effectively offering a sale discount and potential immediate resale profit to early BNB investors). *Id.* In less than a month, however, Binance had sold all 100 million BNB tokens during the ICO's first phase at $0.15. Ex. A-12.

In the Binance Whitepaper, Binance also stated that it would reserve 40 percent of all BNB tokens, or 80 million BNB, for its "Founding Team" and 10 percent, or 20 million BNB, for "Angel investors" who purchased BNB prior to the ICO. Ex. A-11, at BHL-SEC-BUSD-00000010. For the Founding Team's BNB allocation of 80 million BNB, Binance established a "vesting plan" that permitted the release of 20 percent of the 80 million BNB allocation, or 16 million BNB, during the ICO that was unrestricted at the time of issuance, and another 20 percent every year for four years. Ex. A-11, at BHL-SEC-BUSD-00000011.

Further, the Binance Whitepaper stated that Binance would "destroy," or burn, half of the BNB over time by using Binance's profits with respect to the Binance.com Platform to repurchase and then destroy BNB. *Id.* In deciding to use Binance's profits to decrease the

supply of BNB over time, Binance gave BNB investors a reasonable expectation of profits because lower demand tends to increase price, similar to how a stock issuer uses profits to provide dividends to investors or to execute stock buybacks to increase the ownership stake of remaining shareholders.  In other words, in stating that it would use the profits from the platform to effectively support the price of BNB, Binance further tied the success of the platform to BNB's success as well.

Binance raised approximately $15 million through its ICO by selling BNB to about 20,000 investors globally.  Ex. A-12.  It pooled the proceeds of its BNB ICO to develop the Binance.com Platform—as it stated publicly it would.  The Binance Whitepaper explained to BNB investors that funds raised by the ICO were to build the Binance.com Platform.  It provided the following fund allocation: (1) 35 percent "to build the Binance platform"; (2) 50 percent for "Binance branding and marketing," including to make Binance "popular among investors"; and (3) 15 percent in "reserve" for emergencies.  Ex. A-11, at BHL-SEC-BUSD-00000012.

Since the ICO, Binance has encouraged the Binance.com Platform's customers to buy BNB by offering a 25 percent discount when investors use BNB to purchase a crypto asset. (This discount was 50 percent in the first year after the BNB ICO).  *Id.*  Accordingly, Binance creates additional financial incentives to buy BNB, thereby increasing demand for BNB, and its value.  In other words, the trading discounts that Binance offered BNB purchasers further tie BNB's success, and thus BNB purchasers' profits, to Binance's success.  Since Binance.com launched in July 2017, BNB has traded on the Binance.com Platform, and Binance and Zhao have continued to lead BNB investors to believe that BNB's price is tied to the success of the Binance.com Platform.

Binance has continued to tout the investment potential of BNB over time and has

continued to tell investors after the ICO that Binance's efforts to make the Binance.com Platform more profitable will increase BNB's value.  Ex. A-15.

From the launch of BNB to the present, Binance has maintained a BNB price prediction blog on its website that tracked customers' "consensus rating" and "price target" for BNB for the upcoming three years.  Among other things, it offers the past 200-day moving average price for BNB and gives a resultant "bearish or bullish divergence" on the token, while cautioning that investors should "do your own research and trade on your own knowledge."  Ex. A-16.

Binance has additionally worked to increase demand for BNB by seeking to create additional ways in which BNB can be used—thereby further increasing demand for the token and its value.  Ex. A-17.

While Binance initially launched BNB on its own platform, it has also sought to make BNB available for trading on other platforms that, like the Binance Platforms, tend to attract investors in crypto assets.  Ex. A-18.  As of March 30, 2023, BNB was traded on more than 100 crypto asset trading platforms.  *Id.*

 In addition, since at least 2019, Binance has offered and sold BNB to its employees by offering to pay salaries in BNB.  Ex. A-83 at 48-50.  Publicly reminding investors what the economic reality made plain—that Binance and its employees' fortunes with respect to BNB were tied to BNB investors' fortunes—Binance has frequently touted the popularity of Binance's program of offering BNB as compensation to its employees.  For example, in a February 11, 2019 interview, Zhao stated, "Almost all [employees] take some comp in BNB.  Many take 100% in BNB.  They know what we do, and how we do it, literally, from inside out.  And it is an

easy decision for them to make."[4]

Binance did not place any restriction on these employees' ability to resell their BNB tokens to any person, in whatever amounts they wished.  Steele Dec. ¶99.  Binance has also offered and sold BNB to recruit new employees to work with Binance or BAM Trading.  For example, when Zhao hired BAM CEO A, she received 50,000 BNB as an "Incentive Bonus." Ex. A-19.

BNB has traded on the Binance.com Platform since its July 2017 launch and on the Binance.US Platform since its September 2019 launch.  Each BNB token is identical to every other BNB token, and the price of all BNB tokens increases or decreases together.

Binance never registered its offers and sales of BNB with the SEC.

### III.   Under Zhao's Control, Binance Provided Unregistered Exchange, Broker-Dealer, and Clearing Agency Services to U.S. Investors Through The Binance.com Platform.

In 2017, Binance, controlled by Zhao, launched the Binance.com Platform to provide services to crypto asset investors.  From inception, it offered several crypto asset securities for purchase and sale, including BNB.

#### A.   Zhao and Binance Actively Solicited Investors in the United States to Trade Crypto Assets on the Binance.com Platform.

At least since the launch of the Binance.com Platform in 2017, Binance has regularly solicited customers in the United States—at first overtly and later furtively—to transact in crypto asset securities.  Throughout, it has held itself out as being in the business of effecting

_____

[4] "Exclusive Interview with Binance CEO Changpeng Zhao," *available at* https://medium.com/@rallyqt/exclusive-interview-with-binance-ceo-changpeng-zhao-b8c07d9443ed (last visited June 5, 2023).

transactions in many different crypto assets offered and sold as securities.  It has engaged in this solicitation on a worldwide basis, including through its website, blog posts, and social media. Among other things, Binance's website has solicited "investors" and "traders" to "buy and sell crypto in minutes," inviting them to "Trade.  Anywhere."  Ex. A-20.

From the Binance.com Platform's launch until at least September 2019, Binance overtly marketed its services to all customers and imposed no restrictions whatsoever on the ability of U.S. persons to buy, sell, and trade crypto assets on the Binance.com Platform.  During this period, Binance opened tens of thousands of accounts for customers who either submitted "Know Your Customer" ("KYC") identity verification information that indicated the customers were based in the United States or accessed the platform via Internet Protocol ("IP") addresses indicating that the customers were physically located in the United States.  Ex. A-21.  Binance, and Zhao as its control person, knew that U.S. persons transacted on the Binance.com Platform. *Id.*

In addition, until at least August 2021, Binance did not require customers whose accounts were limited to withdrawing two Bitcoin per day to submit ***any*** KYC information, allowing those investors to bypass well-recognized international anti-money laundering restrictions and disclosures when seeking to open accounts on the Binance.com Platform.[5]

Zhao and Binance regularly tracked customer activity on the Binance.com Platform and were thus aware that U.S. customers made up a substantial portion of Binance's business.  Ex. A-22.

---

[5] Binance, https://www.binance.com/en/support/announcement/important-changes-about-binance-identity-verification-51bf294e26324211a4731ca998e110ca (last visited June 5, 2023).

### B. The Binance.com Platform Provides a Marketplace and Facilities for Trading Crypto Asset Securities.

Customers can access and create accounts on the Binance.com Platform via the Binance.com website, a Binance mobile phone application, or through a Binance-created application programming interface ("API"). Ex. A-23. The Binance.com Platform displays customer account information, including account balances, and open orders, order history, and trade history with respect to crypto assets available on the platform. Ex. A-24. The platform also displays open crypto asset orders on the order book and provides real-time data of bid and ask prices, trading volume, and the times that the orders were submitted. *Id.* Additionally, the Binance.com Platform displays information about executed trades (*i.e.*, price, quantity, and time historical data for such trades). Ex. A-25. The Binance.com Platform offers "spot" (immediate) market trading, through an order-matching functionality similar to that of a traditional securities exchange. Ex. A-24.

Since at least January 2019, Binance has offered other services that it refers to as "Binance OTC." Binance OTC (short for "over the counter") allows customers to transact directly with Binance, where Binance is the counterparty trading in its own account. Ex. A-23, at 15. Binance quotes prices directly to Binance OTC customers, acts as the principal on each trade, and profits from the spread between their bid and ask quotations. *Id.*

Since the launch of the Binance.com Platform, Merit Peak Limited ("Merit Peak")—a Zhao-owned entity—provided OTC trading services on the Binance.com Platform while it also provided market making services on the Binance.US Platform. Ex. A-26.

### C. Binance Holds and Controls Customers' Funds and Crypto Assets.

To utilize any of the functionalities on the Binance.com Platform, investors must create and fund Binance accounts with either fiat currency or crypto assets. Ex. A-25.

To deposit crypto assets, customers are required to transfer crypto assets from their own crypto asset wallets on the blockchain to wallets that Binance controls.  Ex. A-30.  Binance holds these customer crypto assets in omnibus wallets, and it tracks transactions on the Binance.com Platform on an internal ledger.  Ex. A-31.

Since at least 2018, Binance has also allowed customers to fund their accounts and purchase crypto assets with U.S. dollars or other fiat currencies by, among other things, linking credit cards through a third-party processor, or through bank accounts or payment services. ExA-23.  It also has methods of permitting customers to withdraw in fiat.  Ex. A-32.

### D.      Binance Clears and Settles Customers' Trades

Binance clears and settles all trades on the Binance.com Platform.  After matching a buy and sell order, Binance settles the resulting trade by debiting and crediting the accounts associated with each of the counterparties on the internal ledger Binance maintains.  Ex. A-31.  Customer crypto assets generally stay in Binance-controlled omnibus wallets.  *Id.*

### E.      Binance's Compensation

Binance's revenue derives primarily from fees for transactions in crypto assets effected through the Binance.com Platform.  For spot trading, Binance typically charges between 0.015 percent and 0.2 percent of the nominal value of transactions, depending on various parameters. Binance also charges fees for withdrawals and for trading on margin.  Ex. A-31.  By 2021 its trading volume spiked to $9.58 trillion, making it the largest crypto asset trading platform in the world.[6]

---

[6] "Centralized crypto exchanges recorded $14 trillion in trading volume his year," https://www.binance.com/en/news/flash/6670327 (last visited June 4, 2023).

IV.     **BAM Trading Was Born of Zhao's and Binance's "Tai Chi" Plan to Knowingly Circumvent U.S. Law While Secretly Controlling the Binance.US Platform's Operations For Their Benefit.**

Zhao and Binance understood that they were operating the Binance.com Platform in violation of numerous U.S. laws, including the federal securities laws, and that these ongoing violations presented existential risks to their business.  In December 2018, Binance's CCO admitted this fact in a communication with another compliance officer, stating "***we are operating as a fking unlicensed securities exchange in the USA bro.***"  Ex. A-37, at BHL-SEC-BUSD-0036523 (emphasis added).

In 2018, Zhao and Binance hired several advisors to advise them on managing their U.S. legal exposure.  They developed a plan that involved developing a U.S. entity, dubbed the "Tai Chi" entity that would become the target of U.S. enforcement efforts and "insulate Binance from legacy and future liabilities."  Ex. A-34.

By November 2018, Zhao and Binance had hatched the idea of launching a U.S. trading platform in response to efforts by U.S. authorities to protect against abuses in the crypto asset market.  At the time, Zhao and Binance were aware of the patently obvious risk that their operation of the Binance.com Platform—including offering and selling crypto asset securities to U.S. investors and carrying out the functions of an exchange and broker in U.S. securities markets on an unregistered basis—violated numerous U.S. laws.  Among other things, Zhao and Binance were aware that they were subject to SEC regulatory actions due to their "[i]ssuance of BNB to US Persons," and "for [operating an] unregistered securities brokerage."  Ex. A-34, at BHL-SEC-BUSD-0235537-538.

In the face of increased regulatory risk in the U.S. but unwilling to give up the highly lucrative U.S. market for its platform services, Zhao and Binance plotted to create a new

purportedly separate and compliant U.S. entity, which they called the "Tai Chi" entity, to "become the target of all built-up enforcement tensions" and "**reveal**, **retard**, and **resolve** built-up enforcement tensions" and "insulate Binance from legacy and future liabilities." *Id.*  As Zhao admitted in June 2019, their "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us."  Ex. A-38.

This proposed "Tai Chi" entity became the Binance.US Platform, operated by BAM Trading and its parent company, BAM Management.  Zhao and Binance directed the platform's creation in 2019 and structured its operations to create the appearance that it was independently operated.  But behind the scenes, Zhao and Binance engaged in deliberate circumvention of this structure.  First, as set forth in greater detail in the SEC's Complaint (¶¶ 110-140), Zhao and Binance continued to allow and even encourage valuable U.S. customers to trade on the Binance Platform, including by instructing customers on how to circumvent controls purportedly intended to block U.S. customers and by onboarding them on the Binance.US Platform and then "let[ting] them trade on [the Binance Platform] through a special arrangement."  Ex. A-39.  Second, and particularly relevant for this motion, Zhao and Binance exerted control over the Binance.US Platform that allowed them to continue enjoying the profits generated by U.S. crypto asset investors while evading regulatory scrutiny.

Binance's intent was clear—it wanted to use BAM Trading to protect Binance.  As Binance's CCO admitted in 2020, "[b]ecause we do not want [Binance].com to be regulated ever, we created local entities to be registered with the regulators, and ringfence accordingly.  So BAM, BAS etc. these are entities that are regulated/licensed."  Ex. A-40, at BHL-SEC-BUSD-0391010.

V.     **Under Zhao's Control, BAM Trading and Binance Provide Unregistered Exchange and Clearing Agency Functions to U.S. Customers, and BAM Trading Also Provides Brokerage Services to U.S. Customers.**

The Binance.US Platform officially launched on September 24, 2019.[7]  Since that time, it has offered U.S. retail and institutional investors the opportunity to buy, sell, and transfer approximately 150 crypto assets, including crypto asset securities such as BNB.[8]

Today, the Binance.US Platform is available in 46 U.S. states and 8 U.S. territories, including in this District.[9]

A.     **BAM Trading and Binance, Under Zhao's Control, Solicit Investors.**

To solicit investors to open accounts and trade crypto asset securities on the Binance.US Platform, BAM Trading actively markets its various services in the United States, including through its website, blog, and various social media platforms.[10]   BAM Trading also consistently touts certain metrics of the Binance.US Platform, such as daily trading volumes and each crypto asset and trading pair available for spot trading.[11]

---

[7] Crypto Exchange Giant Binance to Launch US Trading Tuesday
https://www.coindesk.com/markets/2019/09/23/crypto-exchange-giant-binance-to-launch-us-trading-tuesday/ (accessed on June 5, 2023).

[8] Binance.US Launches in Two New U.S. Territories; Receives Money Transmitter Licenses in American Samoa, Guam, and Louisiana, https://blog.binance.us/binance-us-new-territories (last accessed on June 5, 2023).

[9] List of Unsupported States, https://support.binance.us/hc/en-us/articles/360046786914-List-of-Unsupported-States (last accessed on June 5, 2023).

[10] Binance.US Homepage: Buy, Sell & Trade Cryptocurrencies, https://www.binance.us/ (last accessed on Jun 5, 2023).

[11] Cryptocurrency Prices, Charts, and Trends, https://www.binance.us/price (last accessed on June 5, 2023).

BAM Trading's solicitation of customers has occurred at Zhao's direction.  Ex. A-41 at CC000406027.  In addition, Zhao has regularly marketed the Binance.US Platform services and the crypto asset securities available for trading on the Binance.US Platform.[12]  Binance, at Zhao's direction, has also marketed and solicited customers for the Binance.US Platform, particularly when the Binance.com Platform purported to prohibit U.S. investors after September 2019.[13]

**B.     BAM Trading and Binance Together, Under Zhao's Control, Maintain and Provide a Marketplace and Facilities for Trading Crypto Asset Securities.**

In February 2019, Zhao and Binance directed the creation of two U.S. corporate entities that would launch the Binance.US Platform:  BAM Management and its wholly owned subsidiary, BAM Trading.  Ex. A-42.  BAM Trading is the public facing entity that operates the Binance.US Platform.  Ex. A-43.

Zhao and numerous Binance personnel working at Zhao's direction developed and planned the launch of the Binance.US Platform.  They designed and implemented all aspects of platform operations, including designing the website, identifying crypto asset trading pairs to make available for trading, arranging fiat services with U.S. banks, designing the platform's trading ledgers, developing a trading engine, and developing the platform's trade clearing and settlement functions.  Exs. A-44 to A-46.

---

[12] A Letter from Our CEO: Reflecting on Progress and the Road Ahead, https://www.binance.com/en/blog/from-cz/a-letter-from-our-ceo-reflecting-on-progress-and-the-road-ahead-421499824684902301 (last accessed on June 5, 2023).

[13] BUSD: $100 Million Total Supply/Market Cap, $416 Million Tokenized, https://www.binance.com/en/blog/all/busd-$100-million-total-supplymarket-cap-$416-million-tokenized-421499824684900456 (last accessed on June 5, 2023).

Since the Binance.US Platform launched in September 2019, BAM Trading and Binance, both under Zhao's control, have operated the platform's exchange functions.  Throughout its existence, the Binance.US Platform has operated using Binance's matching engine software, digital wallet, clearing and settlement technology, trademarks, and related technology support and hosting environment, all of which were created, deployed, and maintained by Binance engineers and other employees at Zhao's direction and input.  Exs. A-47; A-86 at 332-35.

At the time of Binance.US Platform's launch, Binance personnel were primarily responsible for managing trading.  Ex. A-57.  As reflected in the Master Services Agreement, Binance is responsible for maintaining, supporting, developing, and implementing additional features and upgrades to the Binance.US Platform, including the platform's crypto asset trading services and features.  Ex. A-46.  Over time, Binance has transitioned certain of its responsibilities and functions to BAM Trading personnel (sometimes by converting Binance employees into BAM Trading employees), but nonetheless BAM Trading and Binance personnel have increasingly worked together to provide and maintain the Binance.US Platform's exchange functions.  Exs. A-83 at 49-50; A-86 at 126-127, 136-137, 150.

To effect spot trading on the Binance.US Platform, BAM Trading licenses Binance's proprietary software, including its matching engine technology, which Binance adapted for the Binance.US Platform.  Ex. A-47.  The Binance.US Platform's website, API, and mobile apps allow customers to enter orders, view account information, and otherwise access the platform's trading services and other functions.  *Id.*

Customers can enter different order types on the Binance.US Platform.  Ex. A-43.  Its matching engine, like the one for the Binance.com Platform, automatically matches and fills orders, executing trades using programmed, non-discretionary price-time priority rules.  *Id.*

In addition to spot trading, BAM Trading offers customers the ability to purchase and sell crypto assets, including crypto asset securities, through additional Binance.US Platform services described as the "OTC Desk," "OCBS," and "Convert" trading services.  Ex. A-48.

Since in or around May 2020, the Binance.US Platform has maintained an OTC Desk that allows customers, primarily institutional traders, to execute generally large volume trades for crypto asset and fiat pairs.[14]  Through the Binance.US Platform's OTC Desk, BAM Trading serves as the interface between a customer and a counterparty firm and provides requested quotes to the customer, which the customer can accept through the Binance.US Platform.  Ex.49 at BTS00037800.

In addition, BAM Trading offers "OCBS" and "Convert" services on the Binance.US Platform.  The OCBS service permits customers to exchange U.S. Dollars for crypto assets, and the Convert service permits the exchange of one crypto asset for another of over 130 crypto assets.  *Id.* at BTS00037799.  Sigma Chain AG ("Sigma Chain"), a Swiss entity wholly owned and controlled by Zhao and operated by Binance employees, has been the sole counterparty for the OCBS and Convert services since they were first offered in early 2020 and April 2021, respectively. *Id.* at BTS00037794.

### C.    BAM Trading and Binance, Under Zhao's Control, Hold and Control Customers' Funds and Crypto Assets.

To trade on the Binance.US Platform, a user must create a Binance.US account.  Customers must deposit and maintain sufficient crypto assets or U.S. Dollars to cover their orders when placed.  *Id.* at BTS00037793.

---

[14]  Binance.US Launches OTC Trading Portal, https://support.binance.us/hc/en-us/articles/360047529534-Binance-US-Launches-OTC-Trading-Portal (last accessed on June 5, 2023)

To transact in fiat currency, generally customers first establish and deposit funds into an account with Trust Company B, a U.S.-based trust company, which is linked by APIs to the Binance.US Platform.  Each customer enters into an agreement with Trust Company B, which authorizes BAM Trading to debit and credit the account directly to settle the fiat leg of any trades involving fiat, pay fees, and process withdrawals.  *Id.* at BTS00037794.

BAM Trading manages customer onboarding and account maintenance for the cash accounts held at Trust Company B, including the deposit and withdrawal of funds deposited for use on the Binance.US Platform.  *Id.*

Binance has also cleared and settled trades on the Binance.US Platform.  Until at least July 2021, a Binance employee named Guangying Chen (named the "Binance Back Office Manager" in the Complaint) had signatory authority over the Trust Company B account holding the fiat deposits of the platform's customers, as did Zhao until at least May 2023.  Ex. A-50. Further, to deposit crypto assets, customers transfer crypto assets to a digital wallet created through Binance software.  Ex. A-49, at BTS00033793-94.  The crypto assets are then held in omnibus wallets.  Ex. A-51.

At least through December 2022, Binance provided the digital wallets associated with the Binance.US Platform and held and controlled the crypto assets deposited and traded on the Binance.US Platform.  Ex. A-52.  Over time, Binance has given BAM Trading more control over these clearing and settlement functions.  Exs. A-83 at 49-50, 126-127; A-86 136-137; 150.

### D.   BAM Trading's Compensation

BAM Trading charges Binance.US Platform customers transaction fees for trades on the platform.  Ex. A-52 at BTS00833807.  These transaction fees are BAM Trading's primary revenue source.  *Id.*

**VI.    BAM Trading and BAM Management Engaged In Acts and Practices That Operated As A Fraud and Deceit Upon, and Made False And Misleading Statements to, Investors.**

Zhao stated in April 2019 when commenting on a ranking of crypto asset platforms by trading volume: "CREDIBILITY is the most important asset for any exchange!  If an exchange fakes their volumes, would you trust them with your funds?"[15]  But Defendants BAM Trading and BAM Management failed to implement controls to prevent manipulative trading on the Binance.US Platform, which resulted in the very "fake volumes" that Zhao decried in April 2019.  Defendants told investors that the platform was engaged in monitoring for manipulation. But not only was that not true, BAM Management and BAM Trading had reason to know that manipulative trading could occur and, was occurring, and yet they continued to report volume and liquidity statistics as though those numbers reflected natural volume and liquidity unaffected by manipulation.

The Binance.US Platform prohibited traders "from engaging in Market Manipulation" and defined "Market Manipulation" as "any action taken or procured to be taken, or any course of conduct … which is intended to, or does, or is likely to, create a false or misleading appearance of active trading in any Digital Asset on the BAM Platform; or artificially control or manipulate the price or trading volume of a Digital Asset."  Ex. A-43, at BTS00048333.

BAM Trading and BAM Management also publicly touted their supposed efforts to monitor and prevent manipulative trading.  Among other things, between at least September 2021 and April 2022, when soliciting investors ("Equity Investors") during a seed funding round offering equity in BAM Management, BAM Trading and BAM Management falsely touted the

---

[15] Changpeng Zhao Twitter post April 6, 2019, *available at* https://twitter.com/cz_binance/status/1114431388696989701.

trade surveillance and other measures purportedly in place on the Binance.US Platform to detect and prevent manipulative trading.  In a pitch deck they used to solicit investment in BAM Management starting on or around September 2021 ("Pitch Deck"), BAM Management and BAM Trading touted the Binance.US Platform's supposedly robust "trade surveillance."  Ex. A-53 at 12.  The Pitch Deck further identified the numerous vendors that BAM Trading had engaged to supposedly "deploy[] human intelligence" and "artificial intelligence" to "ensure the highest level of compliance" on the Binance.US Platform.  *Id.* at 13.  The Pitch Deck further described the role of a third-party provider of trade surveillance software for crypto asset platforms ("Trade Surveillance Company A") as providing "[t]rade surveillance, market manipulation, and transaction monitoring."  *Id.* at 12.   BAM Trading and BAM Management raised at least $200 million selling preferred shares to Equity Investors.[16]

BAM Trading has provided Binance.US Platform trading volume through various public resources that are popular resources for crypto asset investors.  That information includes the market data API and the Binance.US Platform and its website.  Steel Dec. ¶103.  In addition, from September 2021 through at least April 2022, BAM Trading and BAM Management also touted the Binance.US Platform's trading volume to Equity Investor offerees and provided them with voluminous data.  Ex. A-53.

BAM Trading's and BAM Management's statements and actions misled investors that it could surveil for manipulation, and that it was in fact surveilling for such manipulation.

---

[16] *Binance.US Tops its Valuation to $4.5b Stirred by $200m in Seed Raise*, https://www.google.com/search?q=Binance.US+Tops+its+Valuation+to+%244.5b+Stirred+by+%24200m+in+Seed+Raise&rlz=1C1GCEA_enUS1002US1002&oq=Binance.US+Tops+its+Valuation+to+%244.5b+Stirred+by+%24200m+in+Seed+Raise&aqs=chrome..69i57.1924j0j4&sourceid=chrome&ie=UTF-8 (last Visited June 5, 2023).

Moreover, when BAM Trading and BAM Management reported trading volume without disclosing the extensive nature of the wash trading that they knew existed on the Binance.US Platform, they deceived investors into thinking that the trading volumes on the platform were robust, real, and reliable.

Senior BAM Trading officers and employees were on notice even before the platform's launch that wash trading was possible.  Ex. A-54, at CC000272029.   This continued throughout at least 2022.  In January 2021, for example, BAM Trading's Director of Institutional Sales informed BAM CEO A that "[a]pparently we have nothing in place to prevent wash trading? Just tested myself, sold market order into my own bid." Ex. A-55, at CC000391899.  He then warned that he was "not sure if this is being exploited on any level.  The lower the fees for a [market maker], the easier it might be to manipulate the market." *Id.*  Another BAM Trading employee responded, "Yikes." *Id.*

BAM Trading lacked *any* trade surveillance mechanisms until at least February 2022— six months after BAM Trading and BAM Management began approaching prospective Equity Investors with the Pitch Deck and more than three-and-a half years after the Binance.US Platform launched and stated publicly that it prohibited fraudulent trading.  Steele Dec. ¶106-07; 110.

But even after February 2022, BAM Management and BAM Trading failed to provide Trade Surveillance Company A with account owner information that would enable it to detect trades between related accounts, thus preventing Trade Surveillance Company A from actually monitoring for certain manipulative trading, such as wash trading between related accounts (*i.e.*, different account numbers might be owned and/or controlled by the same entity). Steele Dec. ¶108-10; 119.

23

Not only does the SEC have evidence that wash trading on the Binance.US Platform did occur and went undetected, much of this wash trading occurred through numerous accounts affiliated with Sigma Chain, an entity owned and controlled by Zhao and operated by Binance employees.  Steele Dec. ¶111.  Wash trading between Sigma Chain's accounts occurred from the launch of the Binance.US Platform in 2019 through at least June 23, 2022.  Steele Dec. ¶114.  This wash trading activity corrupted the Binance.US Platform's reported trading volume in a strategic pattern that coincided with at least three critical periods for crypto asset investors and the Equity Investors: (1) the Binance.US Platform's launch in September 2019; (2) BAM Trading's making available certain new crypto asset securities for trading on the Binance.US Platform; and (3) the months leading up to BAM Trading's seed funding round starting in September 2021.  *Id.* 115-18.

Although they were aware of the high number of Sigma Chain and other Zhao- and Binance-related accounts on the Binance.US Platform, neither BAM Management nor BAM Trading took any steps to ensure that their statements about either trading volume or trading surveillance were accurate and complete or not otherwise materially misleading, including but not limited to implementing controls that would ensure Sigma Chain, other Binance-connected accounts, or any other customers were not engaging in wash trading on the Binance.US Platform. Instead, BAM Management and BAM Trading provided trading volume numbers to the investing public without qualification.

BAM Trading's and BAM Management's statements about trade surveillance and trading volumes would be material to investors trading in crypto assets securities on the Binance.US Platform and to Equity Investors in deciding whether to trade in certain crypto assets on the Binance.US Platform or to invest in BAM Management.  A reasonable investor would consider it

24

important to know that BAM Management and BAM Trading were not, in fact, taking reasonable steps to prohibit manipulative trading on the platform, and could not ensure that the platform's trading volume reflected real supply and demand based on arm's length transactions. Steele Dec. ¶120.  As a result of these practices and misleading statements, BAM Trading and BAM Management obtained substantial revenue from the transaction fees that crypto asset investors paid for trading on the Binance.US Platform and the approximately $200 million that Equity Investors invested in BAM Management.

## VII.   Since 2019, Zhao and Binance Have Moved Billions Of Dollars Through The United States, and Have Commingled Binance Platform Customer Assets.

While Zhao and Binance engineered the creation and operation of the Binance.US Platform to avoid U.S. legal scrutiny, and while they maintained control and custody of Binance.US Platform investor assets, they were also moving billions of U.S. dollars through U.S. bank accounts using Binance and other entities beneficially owned and controlled by Zhao. Declaration of Sachin Verma ("Verma Dec."), ¶¶ 13-17, Attachment 1.  Some of those Zhao-owned accounts have moved substantial amounts of money offshore over the last several months. During 2022, a U.S. bank account for Swipewallet (beneficially owned by Zhao) sent $1.5 billion offshore in foreign exchange, or "FX," wires.  Verma Dec. ¶11(d), Attachment 3.   On January 1, 2023, $840 million was deposited into eight Binance/Zhao-owned companies, and $899 million was withdrawn, from those accounts.  *Id.*  At the end of March 2023, those accounts had a zero balance except for one account with $180,000.  *Id.*  Between January and March 2023, multiple Binance accounts wired more than $162 million offshore for further credit of a foreign account belonging to the company beneficially owned by the Binance Back Office Manager. Verma Dec. at ¶¶ 18-19.

Further, two foreign-domiciled Zhao-owned entities, Merit Peak and Sigma Chain, commingled funds from both Binance Platforms into their U.S. bank accounts, along with other funds.  Verma Dec. ¶¶ 8(f), 12, & Attachment 2.

Merit Peak is a Zhao-owned trading firm.  It served as an "over-the-counter," or "OTC," trading firm on the Binance.com Platform, Ex. A-26 —meaning it would directly buy and/or sell crypto assets with Binance.com Platform users.  It was also a "market maker" for trading on the Binance.US Platform, providing liquidity for crypto asset trading on the platform.  Ex. A-56. Zhao was Merit Peak's beneficial owner, and the Binance Back Office Manager was a signatory on its bank accounts.  Verma Dec. Attachment 2.

In opening an account on the Binance.US Platform, Merit Peak stated that it was "a proprietary trading firm with [Zhao's] self-made wealth from the digital asset business."  Ex. 57. In other words, Merit Peak intended to conduct trading on the Binance.US Platform using Zhao's own funds.

Between 2019 and 2021, Merit Peak's account received over $22 billion.  Verma Dec. ¶6(d).  These funds consisted in significant part of Binance Platforms customers' assets, including those of Binance.US Platform customers and other sources.  *Id.*  In total, Merit Peak received approximately $11 billion in Binance.com Platform customers' funds through an entity, Key Vision Development Limited, that was created to accept these deposits, and approximately $1.2 billion from BAM Trading.  Further, Merit Peak received approximately $6.3 billion in funds from Binanced.  Verma Dec. ¶12.  These funds were commingled in Merit Peak's accounts and then sent to a New York limited purpose trust company.  However, the SEC has been unable to determine why a Zhao-controlled entity that was purportedly trading on the Binance.US

Platform using Zhao's personal funds would have acted as a "pass through" account for billions of dollars of Binance Platforms customers' funds.

Sigma Chain is another Zhao-owned entity, and the Binance Back Office Manager had signatory authority over its U.S. bank accounts.  It describes itself as "the main market maker for Binance.com."  Ex. A-58.  It also served as an OTC trader on the Binance.US Platform and as a market maker when the platform started.  Ex. A-59, at BTS00831951.

Between 2019 and 2023, Sigma Chain's U.S. bank accounts received almost $500 million, including $184 million from Binance, $145 million from BAM Trading, $36 million from Binance Capital Management, and $15 million from Key Vision.  Verma Dec. ¶8(f).  Presently, the SEC is unable to determine the purpose of Sigma Chain's commingling of funds relating to the Binance Platforms.

## VIII.   Zhao and Binance Had—and Continue to Have—Substantial Involvement and Control Over BAM Trading.

Since BAM Trading's inception, Zhao's and Binance's control over the Binance.US Platform's operations has been substantial.  As a formal and legal matter, Zhao has been the ultimate beneficial owner and controlling shareholder of BAM Management, BAM Trading's parent company, and he was a member of both companies' Board of Directors.  Exs. A-60 to A-61.  But Zhao's and Binance's control over BAM Trading extended well beyond these formal roles.  By 2020, BAM Trading personnel described Binance's control as "shackles," and, over time, BAM Trading sought to gain their "independence" from Zhao and Binance.  Exs. A-62; A-63, at CC000650408.  In 2020, BAM Trading's CEO even started an independence initiative dubbed "Project 1776," which was ultimately unsuccessful.  Ex. A-63, at CC000650408.

A more fulsome description of Zhao's and Binance's extensive control over BAM Trading is alleged in the Complaint (¶¶ 141-281), but for present purposes, of most significance

is that, from its inception, Zhao and Binance controlled BAM Trading's bank accounts and crypto assets.

### A.   Zhao and Binance Have Controlled BAM Trading' Bank Accounts.

At inception, Zhao and Binance had control of BAM Trading's bank accounts.  They even coordinated with BAM Trading's first CEO (named "BAM CEO A" in the Complaint) to set up bank accounts in a way that allowed Binance and thus Zhao to retain control while avoiding scrutiny from U.S. regulators.  Specifically, in November 2019, BAM CEO A asked Binance's CFO why Binance had instructed her to have a "non-US resident non-employee on the bank applications" because it "will be a red flag for regulators and will open .com to US scrutiny," while also acknowledging "there is not that much separation internally" between Binance and BAM Trading.  Ex. A-64.  Ultimately, she followed Binance's direction, and a Binance employee had control over all of BAM Trading's accounts at that time.  Ex. A-65.

For at least the first two years of the operation of the Binance.US Platform, Binance employees on its Shanghai-based finance team had and exercised the power to transfer assets in and out of BAM Trading's bank accounts without BAM Trading's knowledge.  As one prime example, in December 2020, Binance transferred $17 million from BAM Trading's bank accounts without BAM Trading's knowledge.  After learning of the transfer, BAM CEO A asked Binance's Shanghai-based finance employees about the transaction, and eventually learned that the transfer related to trading on the Binance.US Platform by Merit Peak Limited.  Ex. A-66, at CC00289051-053.  In response, BAM CEO A responded, "thanks – helpful.  Just had to get explanation anytime someone breaking our limits with massive withdraw[als] I have to ask – where you get that kind of money?  And where is it going?"  She further noted, "haha [I'm] on a

wild goose chase to make sure we have knowledge of where $17M is moving around." *Id.* at CC00289053.

Over time, Zhao and Binance may have ceded formal bank signatory control over the bank accounts to new signatories for BAM Trading. But as of at least the end of May 2023, Zhao remained a signatory on BAM Trading's Prime Trust accounts, ***which held Binance.US Platform customer funds***. Exs. A-67; A-68 at BAM-WH-CORR-034.[17]

## B.   Zhao and Binance Have Had Extensive Control Over BAM Trading's Crypto Assets Until at Least December 2022.

Historically, as memorialized in the Wallet Custody Agreement ("WCA") that was signed between Binance and BAM Trading in January 2020, Binance served as the "custodian" of BAM Trading's digital assets and held and controlled, including coordinating transfers, of Binance.US Platform customer assets. Ex. A-70, at BHL-SEC-BUSD-0203506. In conducting these duties, BAM Trading agreed not to "exercise day-to-day oversight" of Binance. *Id.*

Binance, under Zhao's direction, took steps to shield BAM Trading personnel from having significant knowledge or involvement in Binance's crypto asset custody practices. As BAM Trading's second CEO ("BAM CEO B" in the Complaint) testified under oath, up until his departure in August 2021, he did not "have any firsthand knowledge of exactly what [Binance] entity managed [Binance.US Platform's] servers. I know that it wasn't [BAM Trading]." He deemed the "level of . . . connection" between Binance and BAM Trading a "problem," and decided that BAM Trading "need[ed] to migrate the technology to full [BAM Trading] control."

---

[17]     In recent correspondence, BAM Trading first affirmed that Zhao had signatory authority over this account, and then a few days later, retracted its earlier statement. Ex. A-68 at BAM-WH-CORR-034; Ex. A-69, at BAM-WH-CORR-049 & n.3. That BAM Trading contradicted itself in a matter of days only heightens concerns about its policies and practices. Further, it is inconsistent with documents PrimeTrust produced to the SEC in May 2023. Ex. A-67.

He concluded, the "biggest risk in this company is we are highly dependent on a bunch of technology that sits in Asia."  Ex. A-83 at 74-75, 114.  Zhao, however, refused BAM CEO B's attempts to migrate this technology, leading BAM CEO B to quit because, as he testified, "what became clear to me at a certain point was [Zhao] was the CEO of BAM Trading, not me."  *Id.* (at 74.

Between 2019 and 2022, the existence and implementation of this agreement and Binance's functional operation as custodian was recognized by both BAM and its auditors.  On March 9, 2020, Binance signed a representation letter to BAM Trading's audit firm confirming that Binance and BAM Trading had a verbal agreement that the 2020 WCA was in fact in effect during 2019, and that during that period, Binance was the custodian of all Binance.US Platform customers' crypto assets.  Ex. A-71.  In March 31, 2021 and May 6, 2022 representation letters to its auditor, BAM Trading and BAM Management again affirmed that Binance was the custodian of BAM Trading's crypto assets, and that Binance could "exert[] control over any digital wallet holding either corporate or custodial digital assets held on [BAM Trading's] behalf."  Ex. A-72 at pg. 4; Ex. A-73, at pg. 9.

The evidence soundly demonstrates that the WCA was in effect and Binance continued to operate as custodian through 2022.  In audited financials issued by BAM Trading's new auditor on May 10, 2023—less than a month ago—and provided to SEC staff on May 26, 2023, the auditor concluded that at least until December 1, 2022, pursuant to the WCA, Binance "had custody and control of" the assets required to maintain ***Binance.US customers' crypto assets***. According to the auditor, BAM Trading purportedly terminated the WCA on December 1, 2022. Ex. A-84, at BTS00833817.  The audit report did not make clear who has custody and control of those U.S. customer assets since December 1, 2022.  *Id.*

Despite communications with Binance counsel regarding Binance's custody and control of Binance.US assets and numerous communications back and forth with counsel for BAM Trading and BAM Management in the last several weeks, the SEC has not obtained sufficient reassurance that Binance.US customer assets—which total over $2.2 billion (Ex. A-68)—are squarely in the control of BAM Trading, rather than under the control or influence of Binance or Zhao, a person who has openly expressed his desire to avoid compliance with U.S. law.

Even worse, since the Binance.US Platform's inception and continuing through at least 2022, auditors have identified significant control deficiencies that aggregated to material weaknesses[18] relating to Binance's control over the operation of the Binance.US Platform and custody and control of customer assets, and the fact that Binance's custody of U.S. customer assets was completely opaque to BAM Trading employees.  Exs. A-74 and A-75; A-88-A-89.

 In the May 2022 formal deficiency letter sent to BAM Management, its auditor found that "[t]he Binance.US team does not have much visibility into on-chain activity related to it[]s exchange.  The Company is dependent on the [Binance].com custodian to tell them the addresses holding the assets, or other relevant metrics . . . with limited visibility into the process for pulling the data."  Ex A-83.  It further concluded that BAM Trading's lack of access to data relating to its crypto asset "makes it ***very difficult to ensure the Company is fully collateralized*** at specific points in time."  *Id.* (emphasis added).

---

[18] Auditing standards define a "material weakness" as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."  PCAOB Auditing Standard No. 5, at A7, *available at* https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/Auditing_Standard_5_Appendix_A#:~:text=2%2F,detected%20on%20a%20timely%20basis.

In other words, Zhao and Binance have had free reign to handle Binance.US Platform customer assets worth billions of U.S. Dollars.  They have exercised this control over U.S. investor assets with no oversight or controls to ensure that those assets are properly secured, potentially requiring Binance.US Platform customers to rely entirely on Zhao and Binance—who have steadfastly maintained that they are subject to no particular jurisdiction, let alone the jurisdiction of the United States and its federal securities laws—to guarantee the safety and security of their assets.  U.S. investors deserve the protection of U.S. law and are entitled to enforceable representations from BAM Trading that their assets are reachable within the United States during the pendency of the SEC's action.

As of December 31, 2022, BAM Trading's audited financials reflected that BAM Trading maintained over $1.7 billion in Binance.US Platform customers' crypto assets.  Ex. A-74, at BTS00833817.  As of May 2023, counsel for BAM Trading has represented that it has custody of over $2.62 billion in customer assets, approximately $377 million in U.S. Dollar bank accounts, and the remaining $2.246 billion in crypto assets.  Ex. A-68.

The SEC staff has been engaged with BAM Trading on these issues since its December 17, 2020 subpoena requesting documents pertaining to the company's control of its crypto assets, including the crypto asset wallets, private keys, and storage devices to hold, as well as its custody and/or shared custody of the Binance.US platform's crypto assets.  Steele Dec. ¶ 121. BAM Trading gave limited responses to the staff's requests. In September 2022, the staff requested that BAM Trading provide further information concerning the control and custody of the platform's crypto assets, and in February 2023, BAM Trading finally tried to answer the SEC's questions about the current state of its wallet custody practices.  *Id.*  Its answers were not reassuring.  In discussions with SEC staff between March and June 2023, BAM Trading has

repeatedly claimed that the WCA "was never operationalized" but has not identified aspects of the agreement that Binance did not perform.  *See* Ex. A-81, at BAM-WH-CORR-42.

Binance took a similar position in its March 15, 2023 Response to the SEC's Wells notice, stating that the WCA, "was not operationalized concerning BHL's role as the custodian of assets on the Binance.US platform," and claiming further, despite all the evidence cited above, that "BHL does not, and has not, served as the custodian of the digital assets on Binance.US." Ex. A-77, at 10.  Similarly, Binance has not provided any response to Staff's request as to the functions in the agreement that Binance has not performed.

These statements are directly contrary to the substantial evidence the SEC has received in its investigation, as described above, including the formal reports of its auditor during the relevant period (produced this week from the auditor), and representations made by both Binance and BAM Trading personnel.

Given BAM's new assertions that the WCA is not (and was not) in operation and recent other changing information about control and custody of customer assets, and the lack of disclosure from its current auditor on who now custodies Binance.US Platform customers' assets, the SEC is concerned about the safety and security of those assets.  In recent days and in preparation for the filing of this litigation, SEC staff requested additional information from BAM Trading and Binance concerning their safeguarding and the ultimate control of BAM Trading's customers' assets.  Ex. A-79.

Between May 25, 2023, and June 2, 2023, SEC staff and counsel for BAM Trading had numerous written and oral exchanges concerning custody of Binance.US Platform customers' assets and, more importantly, who is in ultimate control those assets.  In multiple letters, counsel for BAM Trading has continually asserted, without supporting evidence, that "we understand

that customers['] assets are secure, appropriately segregated, and available for immediate withdrawal." Ex. A-68.  But BAM Trading's responses highlight the urgent need to verify that BAM Trading now has custody and control in the United States of crypto customer assets, and to obtain undertakings to ensure that those assets remain in BAM Trading's sole control (and not under the control of Binance and Zhao) pending the resolution of the litigation.

BAM Trading now *disputes its own auditor's conclusion of past Binance custody over customer assets*, claiming that "[the auditor] did not undertake to determine whether the Wallet Custody Agreement actually governed how BAM Trading custodied assets on behalf of its customers," and was not based on "a legal assessment of the facts of BAM Trading's custody practices," Ex. A-68, at BAM-WH-CORR-031.  But such post-hoc disputes that BAM Trading may have with an auditor that BAM Trading itself retained to examine its financial statements and controls do little to reassure the SEC that customer assets are safely in the United States in the custody of persons within the jurisdiction of this Court, particularly given the information about Binance.US Platform operations and Binance's role with respect to custody and control of assets.  In fact, they increase the SEC's concerns.  BAM Trading's current position that the WCA "was not actually implemented, and the termination of that agreement in December 2022 did not result in any changes to BHL's access to or control over assets held on behalf of BAM Trading's customers" fails to provide necessary and sufficientassurances regarding current custody arrangements for U.S. investor assets.

Crucially, BAM Trading admits that Zhao and Binance continue to possess substantial control over at least some of BAM Trading's crypto assets.  These representations include:

1) BAM Trading's account with Amazon Web Services that hold its customers' "unstaked" crypto assets is "associated with" Binance.  Ex. A-68, at BAM-WH-CORR-032.

2)  BAM Trading's security encryption, and therefore control, for Binance.US Platform customers' crypto assets involves the use of seven so-called "key shards," four of which are required to approve transfers.  *Id.* at BAM-WHO-CORR-33.   Only ***one*** of those key shards is currently held by a BAM Trading employee in the U.S.  *Id.* BAM Trading has three other shard holders, but they reside in Canada, and two of them are former Binance employees with unknown current ties to Zhao or Binance. *Id.*  Binance -- and not BAM Trading -- further continues to maintain three shards in an undisclosed location.  *Id.* at BAM-WHO-CORR-32.

3)  From May to June 2, 2023, BAM Trading reported 404 transfers of crypto assets using the key shards, and at least 45 percent of these transfers included approvals by Binance executives.  Ex. A-82.

4)  BAM Trading's trade clearing team that manually approves digital asset transfers of over $1 million includes one BAM Trading employee that formerly worked for Binance.  Ex. A-69, at BAM-WH-CORR052.

5)  Binance continues to maintain control of Binance.US Platform customers' "staked" crypto assets.  They are held in wallets in the United States that have four key shards, only two of which are required to approve transfers.  Binance continues to hold two key shards—***thereby giving Binance control without the need to involve BAM Trading employees***.  Ex. A-68 at AM-WHO-CORR-033.

6)  BAM Trading maintains certain staked customer assets on a hardware device located in Singapore for reasons that have not been explained.  *Id.*

7)  BAM Trading implemented formal policies as to its crypto asset custody and operations about for the first time about ***three weeks ago*** on May 15, 2023.  Ex. A-84.

8)  BAM Trading's newly implemented crypto asset custody and operations policy demonstrate that Binance employees still manage requests from BAM Trading employees in numerous circumstances.  *Id.* at BTS00833841.

9)  A company called "Ceffu," which is a spinoff of Binance's former crypto asset custody operations, provides wallet technology licensing and "support services" to BAM Trading relating to a "majority" of BAM Trading's wallet technology and control protocols (called "TSS" or "Threshold Signature Scheme").  *Id.* at BTS00833848.

10) BAM Trading failed to identify any insurance or other financial protection in the event that crypto assets were moved beyond BAM Trading's control.  Ex. A-69, at BAM-WH-CRR-053.

On May 30, 2023, the SEC made a similar request to Binance and Zhao to understand their role in the custodying of Binance.com Platform customers' assets. Only Binance has responded, only to object to the SEC's requests and vaguely note that it is "prepared to engage further with the Staff." Ex. A-85.  In these conversations, moreover, Zhao's attorneys have continued to maintain that Zhao is not subject to the jurisdiction of the United States—despite setting up a crypto trading platform in the United States that has made hundreds of millions from trading with U.S. customers, and despite his beneficial ownership of accounts held at banks in the United States through which billions of dollars flowed to some of his foreign domiciled companies like Merit Peak and Sigma Chain.

During a call on May 31, 2023, Binance's counsel noted they would defer to BAM to respond because it related to BAM assets, and Binance did not believe it had any unique information in its possession that BAM did not have within its control.   On June 1, 2023, Binance sent a letter memorializing its position stated on the call and overall process objections, but it did not provide *any* substantive response, other than vaguely note that it is "prepared to engage further with the Staff." Ex. A-85.  In these conversations, Zhao's attorneys generally only continued to maintain that Zhao is not subject to the jurisdiction of the United States. Binance and Zhao further submitted a joint response, through counsel, by letter dated June 4, 2023. Ex. A-78.  In the letter, they again object to the SEC's request, stressing their concerns with having to submit to the personal jurisdiction of the court or court oversight of any agreement, and raising various other issues that do not relate to the substance of the SEC's claims or concerns with respect to assets (other than to claim that the SEC's concerns are not well founded because the SEC has never told Binance or Zhao it was concerned).  *Id.*

## LEGAL ARGUMENT

### I.   Legal Standard

Pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Section 20(b) of the Securities Act of 1933 ("Securities Act"), the SEC can apply for a permanent or temporary injunction or restraining order upon a "proper showing" that a person is engaged, or is about to engage, in acts or practices constituting a violation of the securities laws.  15 U.S.C. §§ 77t(b), 78u(d).

This Court also has the authority to enter an appropriate freeze order upon a proper showing.  *See SEC v. Current Financial Services*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999); *SEC v. Current Financial*, 783 F. Supp. 1441, 1443 (D.D.C. 1992).  "A freeze of assets is designed to preserve the *status quo* by preventing the dissipation and diversion of assets."  *SEC v. Infinity Grp., Co.,* 212 F.3d 180, 197 (3d Cir. 2000); *Current Financial*, 62 F. Supp. at 68.  An asset freeze can ensure "that any of the funds that may become due," such as disgorgement, civil penalty, and prejudgment interest, "can be collected."  *Unifund SAL,* 910 F.2d 1028, 1041-42 (2d Cir. 1990) (freeze of a brokerage account in an amount equal to potential disgorgement and civil monetary penalty was appropriate); *see also Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1347 (2d Cir. 1974).

When seeking an asset freeze, the Commission's burden of proof is lower than for a preliminary injunction or temporary restraining order.  *See SEC v. Dubovoy*, No. 15-6076, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015) (citing *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, No 13-4645, 2014 WL 5026153, at *8 (S.D.N.Y. Sept. 29, 2014)).  The Commission need only show "either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws."  *Id.* (citing *Smith v. SEC,*

653 F.3d 121, 128 (2d Cir. 2011). "The Court may also factor [in its analysis] the concern that defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States." *Id.* When a freeze order is appropriate, the court may freeze any of Defendants' available assets, including assets not traceable to the fraud. *SEC v. Grossman,* 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd, SEC v. Estate of Hirshberg,* 101 F.3d 109 (2d Cir. 1996); *see also SEC v. Forte,* 598 F. Supp. 2d 689, 693 (E.D. Pa. 2009) (rejecting defendant's motion to release frozen funds even if they were not traceable to defendant's fraud because the amount of frozen funds remained below the total investor losses).

Because an asset freeze is necessary to preserve the status quo under the circumstances here, the traditional standard applies and is readily satisfied.

Moreover, to obtain a preliminary injunction, the SEC need only show a likelihood of success on the merits, and that the public interest favors the relief sought. *SEC v. Stratton Oakmont, Inc.*, No. 94-2681(JHG), 1994 WL 721502, at *3 (D.C. Cir. Dec. 19, 1994). "[T]he standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief." *SEC v. Stratton Oakmont, Inc.*, 878 F. 250, 255 (D.D.C. 1995) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944)). "A major difference between this preliminary injunction standard and the common law standard is that in SEC enforcement cases, the court is 'guided by the primary objectives of the statute involved using public interest standards as opposed to private litigation requirements.'" *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 688 (D.D.C. 1991) (citation omitted). In matters of public interest, the SEC's burden of proof with regard to the first prong of the test "depends upon the form of relief sought. If the SEC seeks only to maintain the status quo, the traditional burden applies." *Stratton Oakmont, Inc.*, 1994 WL 721502, at *3. The SEC is "relieved . . . of the

obligation, imposed on private litigants, to show risk of irreparable injury . . . or the unavailability of remedies at law." *Id*. (quoting *SEC v. Unifund Sal*, 910 F.2d at 1036).  In other words, "unlike a private litigant, the SEC is not required to show irreparable injury or a balance of equities in its favor."  *SEC v. Life Partners, Inc*., 898 F. Supp. 14, 18 (D.D.C. 1995); *rev'd and remanded on other grounds*, 87 F.3d 536 (D.C.Cir.1996).

## II.     The SEC Is Likely to Succeed on the Merits and An Inference Can Be Drawn that Defendants Have Violated the Securities Laws.

As set forth below, the detailed allegations in the Complaint and the supporting materials accompanying this submission are more than sufficient to show the SEC's likelihood of success on the merits of all of its claims, and, at a minimum, that an inference can be drawn that a violation has occurred sufficient to justify the freeze of assets sought herein.

### 1.     Crypto Assets Traded on the Binance Platforms Are Securities

The Complaint is premised on the allegation that Defendants offered or sold, or made available for trading on the Binance Platforms, certain crypto assets that were "investment contracts" and therefore "securities" under both Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10).  *See* 15 U.S.C. §§ 77b, 78c.  Since the Binance Platforms launched, Defendants have made available for trading crypto assets that are offered and sold as investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), and thus are securities ("Crypto Asset Securities").  These include, but are not limited to, BNB, BUSD, and the units of each of the Crypto Asset Securities further described in the SEC's Complaint—with trading symbols SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI.  Compl. Sections VII.-VIII. They also include crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities, including but not limited to AMP, REP, UST, and TRX.  Compl. Section VIII.

As set forth in the Complaint, each Crypto Asset Security is being offered and sold as an investment contract under the Supreme Court's *Howey* test because investors purchased them "with (1) an expectation of profits arising from (2) a common enterprise that (3) depend[ed] upon the efforts of others." *SEC v. Life Partners, Inc.*, 87 F.3d 536, 542 (D.C. Cir. 1996); *SEC v. Banner Fund. Int'l*, 211 F.3d 602, 614 (D.C. Cir. 2000).  Courts have repeatedly found similar crypto assets to be investment contracts under *Howey*, including in the context of seeking preliminary injunctive relief.  *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (SEC likelihood of succeeding on the merits that crypto asset was offered and sold as part of investment contract); *see also SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) (granting summary judgment on similar claim); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (same); *United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) (denying motion to dismiss indictment based upon similar claim).

For purposes of the present Motion and as an example, the SEC describes below allegations relating to the Crypto Asset Security BNB to establish that it is being offered and sold as an investment contract under *Howey*.  Such an analysis applies equally to the other Crypto Asset Securities identified in the Complaint Sections VII. and VIII.

## 2.      BNB under *Howey*

First, there was an investment of money.  BNB investors paid BTC or ETH to purchase BNB in the ICO.  Statement of Facts ("SOF") Section II.  *See SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that investment of Bitcoin was an investment of money under *Howey*).  In addition, certain Binance employees provided services to Binance pursuant to their terms of employment and received BNB as compensation.  SOF Section II.  *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991)

(investment may take the form of "goods and services" or some other "exchange of value").

Second, there was a common enterprise. A common enterprise can be established by showing horizontal commonality (*i.e.*, the tying of each individual investor's fortunes to other investors by the pooling of assets, usually combined with the pro-rata distribution of profits). *See Life Partners*, 87 F.3d at 543. As the Binance Whitepaper explained, the purpose of the ICO was to raise money for Binance to "build a world-class crypto exchange," and Binance needed the "help" of ICO "investors" to accomplish that. SOF Section II. The proceeds from the BNB ICO were pooled and used to launch and support the Binance.com Platform, and BNB investors shared in the BNB price increase or decrease on a pro rata basis. SOF Section II. *See Kik Interactive*, 492 F. Supp. 3d at 178 (finding horizontal commonality where "investors reaped their profits in the form of the increased value of" the traded asset); *Telegram*, 448 F. Supp. 3d at 370 (finding horizontal commonality where "there was a pooling of assets and . . . the fortunes of investors were tied to the success of the enterprise as well as to the fortunes of other investors").

Moreover, each BNB token is fungible and the price of all tokens rise and fall together—investors in BNB all profit in equal proportions to each other based upon each investors' holdings of BNB, which supports an inference of a common enterprise. *See SEC v. SG Ltd.*, 265 F.3d 42, 46-47, 51 (1st Cir. 2001) (explaining that to establish horizontal commonality, it is sufficient to show that "each investor was entitled to receive returns directly proportionate to his or her investment stake" as an "increase in the value of the investment"); *accord SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000) (finding horizontal commonality where the "return on investment was … directly proportional to the amount of that investment"); *Kik*, 492 F. Supp. 3d at 178 (summary judgment for SEC where "investors reaped their profits in the form of the increased value" of the asset).

Here, as in *Kik*, "[t]he economic reality is that" Binance "pooled proceeds from its sale"

of BNB "in an effort to boost the value of the investment," such that "[t]he stronger the

ecosystem that" Binance "built, the greater the demand for" BNB "and thus the greater the value

of each purchaser's investment." 492 F. Supp. 3d at 179. "This is the nature of a common

enterprise . . . ." *Id.* "This is not a scenario where the funds of each investor were segregated

and separately managed, allowing for profits to remain segregated." *Id.*; *see also Revak*, 18 F.3d

at 87 (horizontal commonality exists where the fortunes of the investors are tied "to the success

of the overall venture"); *Audet v. Fraser*, 2022 WL 1912866, at *15 (D. Conn. June 3, 2022)

(horizontal commonality established as a matter of law where the price of the coin "rose and fell

across the board").[19]

Third, BNB investors had a reasonable expectation of profits based on Binance's and

Zhao's frequent touting of potential investment returns.  For example, during the BNB ICO,

Zhao stated: "Our current intention is to focus on building a successful exchange platform first.

The coin will be valuable if the exchange has high trading volume . . . ."  Higher trading volume

on the trading platform meant there would be greater demand for the intentionally limited

---

[19] Strict vertical commonality also exists as investors' fortunes were tied to the fortunes of the
token issuer.  Binance and Zhao have always held a concentrated percentage of BNB ranging
from at least 30-50% of all outstanding BNB tokens, and they have repeatedly cited how this
arrangement ties the interests of the "Founding Team" and other insiders to the fate of BNB.
[Compl.  294] *Life Partners, Inc*., 87 F.3d at 544 (leaving open the question whether "strict
vertical commonality" might satisfy the Howey commonality requirement).  Here, Defendants
"retained a healthy share of [BNB] for their personal and corporate coffers," the fortunes of BNB
purchasers "were 'linked' to the 'fortunes' of defendants … *or* the general success of their
enterprise (which would, as a matter of efficient market theory, drive the price of … [the] digital
asset[ ])."  *SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021).  As in *Telegram*,
Binance cannot dispute that its massive BNB reserves are its "most valuable asset" for its
operations. 448 F. Supp. 3d at 370.  Moreover, the fact that Binance even "affixed its good
name," *id.* at 371, to BNB by calling it "Binance Coin," and that it would suffer "reputational
damage," *id.* at 370, if BNB was not successful also establish strict vertical commonality.

volume of BNB tokens, which would drive up BNB's market price because people who wish to utilize the platform could use BNB to reduce their trading fees. Zhao also publicly stated: "I believe 100% that BNB will outpace BTC [bitcoin] … if I didn't believe that I would just hold BTC … I'm fully bullish that BNB will outrun BTC."  SOF Section II.  Binance has publicly committed to burning BNB on a quarterly basis based on the amount of Binance's revenues, which is intended to support the price of BNB.  *Id.  See Telegram*, 448 F. Supp. 2d at 371 ("An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investment.'").

Fourth, BNB investors reasonably expected to drive these profits from the efforts of others.  From the outset Binance touted a "track record of startups under our belt," and its "solid team," citing bios for several key Binance executives.  Binance also claimed several competitive advantages over other crypto asset platforms due to Zhao and his cohorts' entrepreneurial and managerial expertise, including the fact that Zhao had "exchange experience" from working on the Tokyo Stock Exchange.  SOF Section II.  *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992) ("efforts of others" requirement satisfied where profit derive from those "who created, promote and operate [the investment] programs"); *Telegram*, 448 F. Supp. 3d at 376 (issuer of crypto assets "created a reasonable expectation in the minds of the Initial Purchasers that their anticipated profits were dependent on [promoter's] essential post-launch efforts").

Fundamentally, the economic reality of BNB is indistinguishable from that of other cases involving crypto assets where courts have granted relief to the SEC.  For instance, in *LBRY* the court recently granted the SEC summary judgment on Securities Act Section 5 claims where a promoter offered and sold crypto asset tokens under largely indistinguishable material facts.

2022 WL 16744741, at *8.  The *LBRY* promoter retained and sold a significant portion of its

LBC holdings, and over the course of years made statements ensuring that investors knew that

the LBC tokens could go up in value if LBRY's efforts to attract "users" to its fully-functional

blockchain were successful.  *Id.* at *2-7.  The promoter also made clear to investors that its large

stash of the token gave it strong incentives to undertake these efforts, that "the interests of LBRY

and the holders of [the token] are aligned," that "if our product has the utility we plan, the

[token] should appreciate accordingly," and that the promoter's efforts were "a work in

progress."  *Id.* at *4, 7.

The economic reality here is akin to that of *LBRY*.  Zhao and Binance, by each retaining

tens of millions of BNB for itself, "signaled that it was motivated to work tirelessly to improve

the value of its [network] for itself and any" BNB purchasers.  *LBRY*, 2022 WL 16744741, at *6.

"The structure, which any reasonable purchaser would understand, would lead purchasers of"

BNB "to expect that they too would profit from their holdings of" BNB "as a result of"

Binance's "assiduous efforts."  *Id.*

### 3. Binance And BAM Trading Violated Section 5 Of The Securities Act.

Because Binance and BAM Trading offered and sold securities as alleged in the Complaint

without registering the respective offerings, they violated Sections 5(a) and 5(c) of the Securities

Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### 4. Defendants Violated Sections 5, 15(a), and 17A of the Exchange Act by Operating as an Unregistered Exchange, Broker-Dealer, and Clearing Agency Through the Binance.com and Binance.US Platforms.

Section 5 of the Exchange Act makes it unlawful for any broker, dealer, or exchange,

directly or indirectly, to effect any transaction in a security, or to report any such transaction, in

interstate commerce, unless the exchange is registered as a national securities exchange under

Section 6 of the Exchange Act or is exempted from such registration. 15 U.S.C. § 78e.

Section 3(a)(1) of the Exchange Act defines an "exchange" as:

> any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange.

15 U.S.C. § 78c(a)(1).

Under Exchange Act Rule 3b-16(a), an organization, association, or group of persons is considered to be providing the functions of an exchange where that group of persons: "(1) Brings together the orders for securities of multiple buyers and sellers; and (2) Uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade."  An organization, association, or group of persons that constitutes an "exchange" must register, pursuant to Section 5 of the Exchange Act, as a national securities exchange under Section 6 of the Exchange Act or operate pursuant to an appropriate exemption.

**5.      Binance Violated the Exchange Act by Operating as an Unregistered Exchange Through the Binance.com Platform.**

Binance, through the Binance.com Platform, is operating as an unregistered exchange in violation of Exchange Act Section 5 because it has used means and instrumentalities of interstate commerce to operate a marketplace and facilities for bringing together the orders of multiple buyers and sellers in crypto assets securities as defined by Section 3(a)(10) of the Exchange Act, including BNB.  As set forth in further detail in Section III of the Statement of Facts, Binance has accepted and displayed orders in crypto asset securities received from persons within the United States, and effected transactions in such securities.  Binance has brought together firm

orders of multiple U.S. buyers and sellers for crypto asset securities by displaying the top of

book orders (including crypto asset pairs, size, and price) as bids and offers.  Binance has

accepted orders of various order types in crypto asset pairs from Platform users through its

website, mobile app, and API.  An order that did not immediately execute or cancel upon entry

could rest on the Binance.com Platform's order book.  Binance has also used established,

nondiscretionary methods through the provision of an order matching trading facility.

> 6.  **Binance and BAM Trading, Together as a Group of Persons, Operated as an Unregistered Exchange Through the Binance.US Platform.**

Similarly, Binance and BAM Trading, together, operate as a group of persons that

constitute, maintain, or provide a marketplace or facilities through the Binance.US Platform for

bringing together purchasers and sellers of securities or for otherwise performing with respect to

securities the functions commonly performed by a stock.  SOF Section V.

In evaluating the term "group of persons" the Court of Appeals for the D.C. Circuit held

that "group of persons" "certainly includes closely connected corporate affiliates." "[I]f it did

not, then a party would itself be able to elude SEC jurisdiction by making simple changes to its

corporate structure, an obviously untenable result." *Intercontinental Exch., Inc. v. SEC*, 23 F.4th

1013, 1024-25 (D.C. Cir. 2022) (explaining that "overlooking corporate affiliation here would

allow a company that controls an exchange to evade SEC oversight by making a simple change

to its corporate structure").  The Court of Appeals further explained that "[w]hether two or more

persons are or may be acting in concert is likely the key consideration" in determining whether

two or more entities may constitute a "group of persons" for purposes of the statute.  *Id.* at 1024.

Here, BAM Trading and Binance formed a "group of persons" that maintain and provide

a marketplace and facilities for bringing together purchasers and sellers of crypto asset securities

under Exchange Act Section 3(a)(1) and Exchange Act Rule 3b-16(a) thereunder. The

Binance.US Platform operates the same type of trading software as the Binance.com Platform and brings together buyers and sellers in the same way—by displaying and then matching orders using established, non-discretionary methods through the provision of an order matching trading facility.  SOF Section V.B.

Moreover, Binance and BAM Trading are acting as a group of persons in constituting and maintaining the marketplace and facilities by acting in concert and exercising shared control. BAM Trading and Binance are closely-connected affiliates with the same beneficial owner, Zhao, who is actively involved with both companies' operation of the Binance.US Platform, including authorizing BAM Trading's requests for its own trading data.  Most critically, these closely connected affiliates agreed to provide and maintain the Binance.US Platform together, and entered into Service Level Agreements reflecting that purpose.  For example, Binance has engineered and deployed the matching engine code for the Binance.US Platform, including building out its backend and frontend features (*e.g.*, website, mobile apps), and continues to maintain the platform's technology, including its matching engine programming today. Binance has also controlled the Binance.US Platform's trading data, requiring Zhao's approval before sending such data to BAM Trading.  As set forth above, BAM Trading and Binance personnel continue to work together to provide and maintain the Binance.US Platform's exchange functions.  *Id.*

The relationship and operations of Binance and BAM Trading thus fall squarely within the D.C. Circuit's definition of a "group of persons."  Any finding otherwise would condone Defendants' efforts to exploit corporate form and structure to evade the jurisdiction of the SEC and the Court while operating as a securities exchange in the United States.

The SEC is thus likely to prevail on the merits that Defendants were and are operating as unregistered exchanges with no applicable exemption in violation of Exchange Act 5.[20]

### 7. Binance and BAM Trading Violated Section 17A of the Exchange Act Each by Operating as an Unregistered Clearing Agency.

The SEC has a likelihood of success on the merits on the Section 17A charges, and set forth sufficient facts from which inference can be drawn that Binance and BAM Trading violated Section 17A of the Exchange Act.  Section 17A of the Exchange Act requires that, absent an exemption, any person operating as a clearing agency must register with the Commission.  The Exchange Act defines a "clearing agency" as:

> any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities. Such term also means any person, such as a securities depository, who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates.

15 U.S.C. § 78c(a)(23).

Here, Binance acted as an unregistered clearing agency for the Binance.com Platform. As set forth above, Binance acted as a custodian of securities by serving as a central securities depository for all crypto asset securities that customers deposited, held, traded, and accrued on the Binance.com Platform, which were held in Binance-controlled wallets.  It treated the crypto

---

[20] BAM Trading also is violating Exchange Act Section 5 by itself as the legal owner and public face of the Binance.US Platform by maintaining and providing a marketplace for bringing together purchasers and sellers of crypto asset securities.

assets as fungible and transferred or pledged the crypto asset securities via bookkeeping entries on Binance's internal general ledger.  Binance also served as an intermediary in making payments or deliveries associated with all transactions in crypto asset securities effected on the platform through any means.  Finally, Binance facilitated the settlement of securities transactions, including by settling all trades in crypto asset securities conducted on the platform by debiting and crediting the users' accounts associated with each trade.  SOF Sections III, V.

Similarly, both Binance and BAM Trading have acted as an unregistered clearing agency with respect to the Binance.US Platform.  Each serves as an intermediary making payments and deliveries in connection with the settlement of all trades in crypto asset securities or, in the case of BAM Trading, fiat on the Binance.US Platform, and as a person who permits or facilitates the settlement of securities transactions without physical delivery of securities certificates.  Specifically, they instruct the movement of crypto asset securities, including BNB, and BAM Trading also instructs the payments of U.S. dollars in order to settle trades executed on the Binance.US Platform.  Binance provides and manages software upon which BAM Trading relies to effect settlement by sending instructions to execute debits and credits for the user's account balance in the internal ledgers within the Binance.US Platform's omnibus crypto asset wallets, or to debit and credit the balances for Prime Trust-linked accounts.  SOF Section V.C.

Second, BAM Trading and Binance each act as a securities depository for all crypto asset securities that are traded by investors (including U.S. persons) on the Binance.US Platform. Investors on the Binance.US Platform transfer their crypto asset securities into asset-specific omnibus wallets.  From the launch of the Binance.US Platform to at least December 2022, Binance served as the wallet custodian and maintained and controlled the omnibus wallets, including by controlling private key or portions thereof.  The crypto asset securities held in these

wallets are pooled by Binance and treated as fungible in order to be transferred via bookkeeping

debit and credit entries in the wallets' ledgers.  Those ledgers track each customer's crypto asset

holdings and their balances are correspondingly updated after trades are settled (as well as when

assets are deposited or withdrawn onto the Binance.US Platform). Binance has acted as a

securities depository for Crypto Asset Securities since the launch of the Binance.US Platform,

and BAM Trading has at least since the time when its employees began controlling private keys,

or portions thereof, to control the omnibus wallets.  *Id.*

### 8.    Binance and BAM Trading Violated Section 15(a) of the Exchange Act by Operating as Unregistered Broker-Dealers.

The SEC has a likelihood of success on the merits of its Exchange Act Section 15(a)

charges against Binance and BAM Trading, and set forth sufficient facts from which an

inference can be drawn that Binance and BAM Trading operated as unregistered brokers.

Section 15(a)(1) of the Exchange Act makes it "unlawful for any broker or dealer . . . to make

use of the mails or any means or instrumentality of interstate commerce to effect any transaction

in, or to induce or attempt to induce the purchase or sale of, any security" unless, in relevant part,

such broker or dealer is registered with the Commission.  15 U.S.C. § 78o.  It is not necessary to

prove scienter to establish a violation of Section 15(a)(1).  *See SEC v. Interlink Data Network of

L.A., Inc.*, 1993 WL 603274, at *10 (C.D. Cal. Nov. 15, 1993).  The broker-dealer registration

requirement is "of the utmost importance in effecting the purposes of the [Exchange] Act," as it

enables the SEC to "exercise discipline over those who may engage in the securities business,"

and "establishes necessary standards with respect to training, experience, and records."  *SEC v.

River N. Equity LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019).

The Exchange Act defines "broker" as "any person engaged in the business of effecting

transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4).  The statute does not

define "engaged in the business," but "[c]ases and SEC No-Action letters interpreting the phrase have indicated that regularity of participation is the primary indicia of being 'engaged in the business.'" *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 12 (D.D.C. 1998); *see Mass. Fin. Servs., Inc. v. Sec. Investor Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976) (requiring a showing of "a certain regularity of participation in securities transactions at key points in the chain of distribution"). "Regularity of participation has been demonstrated by such factors as the dollar amount of securities sold . . . and the extent to which advertisement and investor solicitation were used." *Kenton Capital, Ltd*., 69 F. Supp. at 12-13 (internal citations omitted). Other factors that are indicative of broker activity include:  (1) solicitation of investors to purchase securities; (2) receipt of commission or transaction-based compensation; (3) involvement in negotiations between the issuer and the investor; (4) provision of advice or valuations as to the merits of the investment; (5) active rather than passive finder of investors; (6) handling customer funds and securities; and/or (7) whether the individual or entity was selling, or had previously sold, the securities of other issuers.  *See SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10-11 (S.D.N.Y. Apr. 6, 1984).  These factors are not exclusive, and not all, nor any particular number of them, must be satisfied to qualify as a broker. *See SEC v. Benger*, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010).

Binance and BAM Trading have acted as unregistered brokers with respect to the respective Binance Platforms.  As set forth above, Binance and BAM Trading used the means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding themselves out as places to buy and sell crypto asset securities, facilitating trading in crypto asset securities by opening customer accounts, handling customer funds and

crypto asset securities (which they commingled and treated as fungible) through Binance and

BAM Trading-controlled accounts and digital wallets, and being compensated for doing so.[21]

Binance and BAM Trading were therefore each required to register with the SEC as a broker or

operate pursuant to an exemption from registration, but did not do so.  SOF Section V.C.-D.

9.    **BAM Trading and BAM Management Violated Sections 17(a)(2) and (a)(3) of the Securities Act**

The SEC is further likely to prevail on its claim that BAM Trading and BAM

Management violated Sections 17(a)(2) and (a)(3) of the Securities Act.  Section 17(a)(2)

specifically prohibits anyone from directly or indirectly "obtain[ing] money or property" in the

offer or sale of securities by means of "any untrue statement of a material fact or any omission to

state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading." 15 U.S.C. § 77q(a)(2).  Section 17(a)(3) prohibits

anyone from directly or indirectly, in the offer or sale of securities, "engag[ing] in any

transaction, practice, or course of business which operates or would operate as a fraud or deceit

upon the purchaser." *Id.* § 77q(a)(3).  Scienter is not needed to prove a violation of Section

17(a)(2) or (a)(3); a showing of negligence is sufficient.  *See Aaron v. SEC*, 446 U.S. 680, 697

(1980); *Weiss v. SEC,* 468 F.3d 849, 855 (D.C. Cir. 2006); *Beck v. Dobrowski*, 559 F.3d 680, 682

(7th Cir. 2009) (negligence "is a failure, whether conscious or even unavoidable (by the

---

[21] Binance has also held itself out and acted as an unregistered dealer for the Binance.com Platform by regularly purchasing and selling crypto asset securities for its own accounts as part of Binance OTC or through accounts of Merit Peak, a Zhao-owned related entity. *See Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361–62 (5th Cir. 1968) (an entity that purchased many securities for its own account as part of its regular business and sold some of them was a dealer).

particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care").

Here, BAM Trading and BAM Management have made misrepresentations to investors about controls they claimed to have implemented on the Binance.US Platform, while raising approximately $200 million from private investors in BAM Management and attracting billions of dollars in trading volume, and thus trading fees, from investors (including retail and institutional investors) seeking to transact on the Binance.US Platform. SOF Section VI.

Defendants BAM Trading and BAM Management touted the surveillance and controls supposedly in place to prevent manipulative trading on the Binance.US Platform. *Id.* Statements in "Terms of Use," pitch decks to equity investors, and public tweets by Zhao both gave the impression of robust controls and showed that Defendants understood their importance. *Id.* But Defendants failed to implement on the Binance.US Platform the trade surveillance or manipulative trading controls BAM Trading and BAM Management touted to investors. *Id.*

**10. Defendant Zhao, as a Control Person Under Exchange Act Section 20(a), is Liable for Binance's and BAM Trading's Violations of Section 5, 15(a), and 17A.**

Exchange Act Section 20(a) makes any person who, directly or indirectly, controls any person liable for a violation of the Exchange Act. Liability of the control person is joint and several with and to the same extent as the controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation. *Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 316 (D.D.C. 2016). To establish liability under Exchange Act Section 20(a), the Commission must show: "a primary violation by the controlled person and control of the primary violator by the targeted defendant." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 111 (D.C. Cir. 2015) (quoting *SEC v. First Jersey*

*Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Control over the primary violator "may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise."  *First Jersey Secs.*, 101 F.3d at 1472-73 (internal quotation omitted) (citing 17 C.F.R. § 240.12b-2).

"There is a split in the circuits on whether the plaintiff must show that the alleged control person 'culpably participated' in the underlying fraud.  In those not requiring proof of culpable participation, the plaintiff need only show the defendant is a 'controlling person,' and the burden shifts to the defendant to show the actions were taken 'in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'"  *Harman*, 791 F.3d at 111-12 (quoting *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)).  The D.C. Circuit has not decided the issue, and most district courts in this district do not require the element of "culpable participant" as part of the plaintiff's prima facie case. *Harman*, 791 F.3d at 111-12; *but see In re Fed. Nat'l Mort. Ass'n Sec., Derivative, & Erisa Litig.*, 503 F. Supp. 25, 44 (D.D.C. 2007) (to state a Section 20(a) claim, plaintiffs must adequately plead defendants' "culpable participation").

Under either standard the SEC is likely to prevail in proving Zhao is liable as a control person for Binance's and BAM Trading's violations of Exchange Act Sections 5, 15(a), and 17A because he controlled Binance and BAM Trading and was a "culpable participant" in the violations.  The Complaint is replete with factual allegations demonstrating that Zhao was intimately involved in the founding of both entities, whose core business activities—those of an exchange, broker-dealer, and clearing agency—are the very activities that constitute a violation of the Exchange Act.  Zhao was not only the hands-on CEO of Binance, (and according to BAM

CEO B, the de facto CEO of BAM Trading, but he was also a driving force in the efforts those entities took to conceal their Exchange Act violations from U.S. regulators.  *See, e.g.*, SOF Section VIII. B.

### 11.    The Court Has Personal Jurisdiction Over All Defendants

The SEC does not expect BAM Trading or BAM Management to contest personal jurisdiction, but understands that this may be a primary defense of Binance and Zhao.  In fact, Binance's and Zhao's pattern of geographical elusiveness, combined with their relentless pursuit of revenue from U.S. investors, has been a driving factor in the current motion.  There is no doubt that the Court has personal jurisdiction over all Defendants.

The Due Process Clause of the Fourteenth Amendment permits a Court to exercise specific personal jurisdiction over a non-resident defendant when the defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Calder v. Jones,* 465 U.S. 783, 788 (1984) (internal quotations omitted).  When, as here, personal jurisdiction is invoked based upon a federal statute[22] providing for nationwide service, the relevant inquiry is whether the defendant has had sufficient minimum contacts with the United States as whole.  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 n.12 (2d Cir. 2001).

There are two ways to show minimum contacts, both of which are relevant here.  Courts analyze both a defendant's (1) "overall activity within the forum state" and (2) the "in-state effects of out-of-state activity," and both are "independent, if conceptually overlapping, methods

---

[22] This case arises under two statutes—the Securities Act of 1933 and the Securities Exchange Act of 1934 —both of which provide for nationwide service of process.  *See* 15 U.S.C. §§ 77v, 78aa.

of demonstrating minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir.

2007).  At bottom, minimum contacts are established if the defendant "purposefully availed"

herself of the forum, including the privileges of its markets or laws.  The purpose of minimum

contacts analysis is to ensure that a defendant had "fair warning that a particular activity may

subject [him] to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 472 (1985).  If a defendant should reasonably anticipate being hauled into court in the

forum based on conduct related to the complaint, a defendant has established purposeful

availment.  *Id*. at 474-75.

Here, Defendants Binance and Zhao purposefully availed themselves of the forum by

their coordinated operation of three essential securities market functions—exchange, broker-

dealer, and clearing agency—on the Binance Platforms in the United States without registering

with the SEC.  SOF Section III.  In addition, Binance and BAM Trading have engaged in the

offers and sales of crypto asset securities, including BNB in the United States.[23]  SOF Section II.

Defendants also transacted business in this District.  At least before September 2019,

Binance (as controlled by Zhao) made the Binance.com Platform available for trading to

customers in this District.  Further, BAM Management and BAM Trading (also under Zhao's

and Binance's control) obtained District of Columbia business licenses and transacted business

---

[23] Binance and BAM Management's contacts are also imputed to Zhao. *SEC v. Terraform Labs Pte Ltd.,* No. 22-368, 2022 WL 2066414, at *3 (2d Cir. June 8, 2022), *cert. denied sub nom. Terraform Labs Pte Ltd. v. SEC* 143 S. Ct. 1020 (2023) (citing *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016)) (holding that it is "appropriate" to consider company contacts in forum in evaluating whether court could exercise personal jurisdiction over CEO who "exercised extensive control" over said company).

in this District, including through the operation and availability of the Binance.US Platform, which was accessed by individuals in the District, and through personnel (such as one of its CEOs) in this District, who provided services to and engaged in business with and on behalf of all Defendants.  These contractual and other contacts support the exercise of personal jurisdiction, especially because they relate directly to the illegal conduct alleged in the Complaint.  *See, e.g., Terraform Labs Pte Ltd.*, 2022 WL 2066414 at *4 (Defendants purposefully availed themselves of the U.S. forum by "enter[ing] into agreements with U.S.-based entities to facilitate the trade" of crypto asset securities); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Ship. Co.*, 241 F.3d 135, 152 (2d Cir. 2001) (defendant purposely availed itself of the U.S. forum by "negotiating and forming a contract" with U.S.-based corporation); *M. Shanken Commc'ns, Inc. v. Cigar500.com*, 2008 WL 2696168, at **8-9 (S.D.N.Y. July 7, 2008).

In addition, Binance entered into contracts, specifically the service-level agreements with BAM Trading, a U.S.-domiciled company and which were governed by the laws of the State of New York.  Exs. A-46, A-47.  Agreeing to such clauses in contracting with companies of the relevant forum has been held a "factor alone . . . sufficient to establish purposeful availment." *Nissan Motor Co. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1159 (C.D. Cal. 2000); *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements"). Moreover, Defendants have employees located in the United States. *Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 664 (S.D.N.Y. 2020) (exercising specific personal jurisdiction over a Russian entity that "purposefully availed itself of the privilege of conducting business within the forum state by maintaining a studio and at least one full-time employee in New York and by distributing its programming to paying subscribers throughout New York")

Defendants regularly solicited U.S. investors via their social media and other internet postings to trade on both of the Binance Platforms. SOF Sections 3.A., 5.A.  Zhao also directed other Binance employees to actively solicit and take other steps to retain U.S. investors on the Binance.com Platform, even after Binance publicly announced in June 2019 that it would no longer serve U.S. investors. SOF Section IV.  By then, Binance estimated that it had over 1.47 million U.S.-based investors on the Binance.com Platform, and it continued to maintain a substantial U.S. customer base for several years thereafter.  SOF Section 3.A.  Many courts addressing crypto asset and securities companies have exercised jurisdiction because of the precisely this type of targeting of U.S. investors.  *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) (exercising specific personal jurisdiction over co-founders of digital asset company when they "targeted the U.S. market in an effort to promote the sale of ATB coins, the very unregistered security at issue in this litigation"); *see also SEC v. Carrill*o, 115 F.3d 1540, 1544 (11th Cir. 1997) ("[T]he advertisements were 'related to' the causes of action because the advertisements were a means by which [defendant] offered and sought to sell its unregistered securities to potential American investors.").

**III.    This Court Should Grant A Temporary Restraining Order And Asset Freeze To Maintain the Status Quo, Prevent Dissipation of Assets That May Become Due Should the SEC Prevail, and Ensure That Investor Assets Are Protected During the Pendency of This Action.**

This Court should grant the SEC's Motion to preserve the status quo, prevent dissipation of assets that should be secured given the SEC's likelihood of success on the merits in this action and the extensive facts from which an inference can be drawn that Defendants violated various provisions of the federal securities laws, and ensure that assets belonging to Binance.US Platform and BAM Trading customers are (a) actually within the control of BAM Trading in the United States, and (b) will remain within the jurisdiction during the pendency of this action.

Zhao has openly expressed his desire to evade U.S. regulation.  Zhao and Binance engaged in concerted efforts to encourage U.S. investors to continue to trade on the Binance Platform even after instituting controls purportedly meant to block them from doing so.  Zhao and Binance have maintained long-standing involvement and control over the Binance.US Platform's operations and U.S. customer assets despite their public statements regarding the platform's independence. There are substantial assets at stake here.  BAM Trading last reported to the SEC that, as of May 24, 2023, it custodied over $2.62 billion in customer assets deposited, held, traded, and/or accrued with the Binance.US Platform, approximately $377 million in U.S. dollar bank accounts, and the remaining $2.246 billion in crypto assets.  SOF Section VIII.B.  Faced with undeniable red flags, the SEC has made extensive efforts to obtain sufficient information regarding the safety of these customer assets.  While BAM Trading has argued to the SEC that these assets are currently secure and fully within their control, these assertions ring hollow for several reasons.

*First*, BAM Trading has proven unable to reliably make representations about the state of its customer assets.  As to its management of customer funds, BAM Trading recently admitted that Zhao has signatory authority on its bank account that held Binance.US Platform customers' funds—which was consistent with documents produced by that bank—yet, several days later, it reversed course and asserted that Zhao did not have such authority.  SOF Section VIII.A.

Similarly, BAM Trading repeatedly asserted BAM Trading has maintained custody of its own crypto assets, and that it never "operationalized" the WCA.  SOF Section XIII.B.  Binance has parroted this position.  *Id.*  These statements, however, cannot be reconciled with the evidence of Binance's role with respect to the custody and control of Binance.US Platform custody assets and previous statements BAM Trading and Binance have made to BAM Trading's auditors about the WCA, which were relied upon by those auditors as reflected in the deficiency

letters explaining why Binance and BAM Trading were not following the terms of their agreement, and finding significant weaknesses in controls over those assets since 2020, and as recently as May 2023.  *Id*.  Thus, statements by BAM Trading and Binance now are either factually wrong or show that their auditor was deceived for years.  Either way, this heightens the need for court intervention.

*Second*, BAM Trading has made these statements against the backdrop of Zhao's and Binance's admitted disdain for U.S. law.   Zhao has admitted his intent to use crypto assets to avoid regulation over his assets—a pattern and practice demonstrated through his creation and control over the purportedly independent platform operated by BAM Trading, and his attempts to retain U.S. users on the Binance.com Platform while pretending to block them in the name of regulatory compliance.  SOF Section IV.  Zhao and Binance established the company as a "Tai Chi" entity designed protect Binance from U.S. regulatory scrutiny, and substantially controlled BAM Trading's operations, including its bank accounts and custody and control of U.S. investor crypto assets.  When the Binance.US Platform began serving U.S. customers, Binance—not BAM Trading—was in the driver's seat controlling ***both*** the bank accounts and crypto assets that were ostensibly in the hands of BAM Trading.  SOF Section VIII.A.

*Third*, BAM Trading admits that Binance continues to have substantial control over Binance.US Platform customers' crypto assets ***today***.  BAM Trading admitted, among other things, that Binance ***presently has*** sufficient control to move BAM Trading's staked customer crypto assets, and minority control over the remainder of the over $2.2 billion in crypto assets. SOF Section VIII.B.  In fact, BAM Trading admits that Binance employees have been involved in almost half of its crypto transfers over the last few weeks.  *Id.*  Further, BAM Trading admits that Binance employees still have significant involvement in assisting BAM Trading in executing

requests to move crypto assets.  *Id.*  Zhao also continues to have legal control of BAM Trading as controlling shareholder of its parent company, BAM Management.  SOF Section VIII.

BAM Trading has attempted to mute any concerns about Binance's continued involvement by pointing to BAM Trading personnel having technical control over some of the relevant functions.  Given the history of Zhao's and Binance's open desire to avoid U.S. regulation and oversight, and their surreptitious control over BAM Trading and commingling of and movements of BAM Trading assets through a web of Zhao-controlled entities outside of the United States, there can be no assurance that BAM Trading employees are not influenced by Zhao or Binance today.  Nor is there any assurance that what control they promise today will not change tomorrow.  The SEC is simply not prepared to accept that present representation without enforceable undertakings by persons subject to the jurisdiction of this Court to safeguard U.S. investor assets in the future until judgment is entered in this case.

*Fourth*, even to the extent they retain control over Binance.US Platform customers' crypto assets, BAM Trading's recent assertions raise concerns about its ability to properly custody them.  BAM Trading has operated the Binance.US Platform for over 3.5 years, yet it only implemented formal policies for handling crypto assets **last month** (a timing that corresponds to when the SEC was asking about precisely those practices).   SOF Section VIII.B. Nor has BAM Trading identified any insurance or other protections in place to protect investors in the case of loss.  *Id.*  And as recently as May 2022, BAM Trading's auditor concluded that BAM Trading's lack of access to data relating to its crypto assets "makes it **very difficult to ensure the Company is fully collateralized** at specific points in time."  *Id.*

*Fifth*, Zhao and Binance have a pattern and practice of commingling customer funds through entities such as Merit Peak and Sigma Chain, and in moving funds outside of the United States and/or on the blockchain where they are outside of this Court's reach.

Put together, assets belonging to the U.S. customers of a U.S.-based entity accused by the SEC of misrepresentations and multiple regulatory violations remain subject to the control of and thus are at significant risk of dissipation by a foreign national who has made overt his views that he is not subject to the jurisdiction of this Court.  Repatriation of and assurances regarding the security of customer assets is required, as is a freeze of BAM Trading and BAM Management's assets in order to preserve the status quo and ensure that funds are available should they become due at the conclusion of litigation.  As set forth in the Second Declaration of Sachin Verma (attached hereto as Exhibit C), at this preliminary stage in the litigation, it appears that BAM Trading and BAM Management's illicit gains were at a minimum approximately $420,416,085, including $216,772,488 in funds raised from Equity Investors and $203,643,597 in profits earned from BAM's unregistered activities.  Should the SEC prevail on the merits, as it has shown that it is likely to do, BAM Trading and BAM Management's total potential liability could well exceed these amounts, since the SEC would be entitled to seek not only disgorgement of Defendants' ill-gotten gains and prejudgment interest, to be determined following appropriate discovery and litigation, but substantial penalties as well.  *See* 15 U.S.C. §§ 77t(d), 78u(d); *Unifund SAL*, 910 F.2d at 1041-42.

Given the current enforcement action, the SEC's likelihood of success on the merits, and the extensive evidence that an inference of a violation can be drawn, the need to preserve the status quo and ensure the security of investor assets, and Defendants' refusal to agree to

satisfactory safeguards, the SEC respectfully submits that Court intervention is now appropriate and asks that this Court issue an order as outlined in the governing Motion, including:

1. freezing the assets of BAM Management and BAM Trading as set forth in the attached Proposed Order;

2. restrain Defendants concerning all fiat currency and crypto assets that are deposited, held, traded, and/or accrued by investors (referred to herein as "customers") on the Binance.US Platform, including for BAM's staking-as-a-service program, or otherwise held for the benefit of BAM and Binance.US Platform customers, including, but not limited to, any hardware crypto asset wallets, all private keys in any form (or portions thereof), and any device, hardware, or software holding such private key or portion thereof (hereinafter referred to as "Customer Fiat Assets" or "Customer Crypto Assets" and, collectively, "Customer Assets") as set forth in further detail in the Proposed Order;

3. Order the additional emergency relief described below.

## IV.   This Court Should Order Additional Emergency Relief

The SEC respectfully submits that this relief is necessary on an expedited basis to ensure the safety of customer assets and prevent the dissipation of available assets for any judgment, given the Defendants' years of violative conduct, disregard of the laws of the United States, evasion of regulatory oversight, and open questions about various financial transfers and the custody and control of Customer Assets—including by Defendants who claim they are not subject to the Court's jurisdiction—as described in the Complaint, Memorandum of Law, and supporting materials

A.      **Sworn Accounting**

The SEC requests that this Court order Defendants to promptly serve the SEC with a sworn accounting.  Given that Binance's and Zhao's location abroad and BAM Trading's inability to provide accurate information, the SEC does not yet know the full extent of Defendants' assets, and the whereabouts of investor money, or the status or location of other assets that may be used to satisfy a money judgment against Defendants.  An accounting will be a critical next step to ascertain these facts.  *See SEC v. Lybrand*, No. 00-CV-1387, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000) (holding that "[i]n light of the SEC's showing on the merits and the threat of dispersal of assets, an accounting is appropriate to determine: (1) the amount of profits reaped from the allegedly illicit sales; (2) the present location of such proceeds; and (3) these defendants' ability to repay"); *see also Schwartzman v. Talking Water, LLC*, No. 11-cv-3934, 2011 WL 3496055, at *1 (E.D Pa. Aug. 9, 2011) (ordering a sworn accounting); *SEC v. Lazare Indus., Inc.*, No. 3:CV-96-0705, 2007 WL 2844957, at * 3 (M.D. Pa. Sept. 26, 2007) (same).

B.      **Order Prohibiting Document Destruction**

To protect all relevant evidence necessary to establish a complete record in this matter, including the existence of all investors and the location of their investment assets, the SEC seeks an order prohibiting the destruction of relevant documents or tangible things.  Federal courts routinely grant such "innocuous" orders to protect the integrity of the litigation.  *See, e.g., Unifund SAL,* 910 F.2d at 1040, n.11.  This Court cannot assume good faith preservation of documents in the context of the fraudulent scheme Defendants have perpetrated.

### C.       Order Permitting Expedited Discovery

The SEC also requests expedited discovery as outlined in the proposed order.  This relief

is appropriate to enable meaningful discovery in the 14-day period between entry of the

temporary restraining order and any hearing on the show-cause order why the Court should not

grant a preliminary injunction and maintain the asset freeze until the litigation is concluded.  Fed.

R. Civ. Pro. 65(b)(2); *see Zavodchiko*, 2016 WL 9224898, at *1; *SEC v. One or More

*Purchasers of Call Options for the Common Stock of CNS, Inc.*, No. 06-cv-4540, 2006 WL

3004875, at *2 (E.D. Pa. Oct. 20, 2006).  Accordingly, the Commission seeks an order allowing

expedited depositions, written discovery, and document productions.

### D.       Asset Repatriation

This Court should exercise its power to order BAM Management to repatriate BAM

Trading's assets deposited overseas, and as a further prophylactic measure in case such actions

occur in the future.  See *FTC v. The Crescent Publ. Gr., Inc.*, 129 F. Supp. 2d 311, 325-26

(S.D.N.Y. 2001) (even where relatively minor overseas account identified, repatriation order was

appropriate to "ensure the enforceability of any judgment"); *SEC v. Chemical Trust*, 2000 WL

33231600, at *12 (S.D. Fla. 2000).  Any such funds may be necessary to satisfy a disgorgement

order.

### E.       Alternative Service

In addition to the means provided by the Federal Rules of Civil Procedure 4 and 5, the

SEC asks the Court to authorize alternative means of service on Defendants Zhao and Binance.

Binance and Zhao are not the typical foreign entity and individual, as they are widely known for

disagreeing with the premise of a headquarters or domicile, let alone identifying one, and Zhao is

famously protective of revealing his whereabouts.  The SEC requests that, in addition to any

means allowed by Federal Rules of Civil Procedure 4 and 5, the SEC be allowed to serve the summons and Complaint, any orders entered pursuant to this Motion (and all related papers), and any future filings, notices, subpoenas, or other process in the above-captioned case upon Zhao and Binance by sending copies by email to the attorneys who represented them during the investigation that led to this proceeding.  *See*, *e.g.*, *SEC v. Babikian*, 2014 WL 2069348, at * 1 (S.D.N.Y. April 21, 2014) (granting order to show cause, asset freeze, and service by email on a foreign citizen).

### F.     Order to Show Cause

The continuation of any relief granted and preservation of the status obtained pursuant to this Motion are dependent upon the Court's entry of a preliminary injunction within fourteen days. Fed. R. Civ. P. 65(b)(2).  To avoid any expiration of the temporary restraining order after fourteen days under Federal Rule of Civil Procedure 65(b)(2), the SEC seeks an order requiring Defendants to show cause why a preliminary injunction, imposing the same relief set forth in any Court-ordered temporary restraining order, should not be entered at a date and time set by the Court. The Commission can then present its evidence at a preliminary injunction hearing on notice.

### <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant the SEC's Motion and issue the accompanying proposed order.

Dated: June 6, 2023          By:    ___/s___ Matthew Scarlato_____
      Washington, D.C.          Matthew Scarlato (D.C. Bar No. 484124)
                                         Jennifer L. Farer (D.C. Bar No. 1013915)
                                         J. Emmett Murphy*
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street N.E.
Washington, D.C. 20549
Phone:    (202) 551-3746 (Scarlato)
             (202) 551-5072 (Farer)
             (212) 336-0078 (Murphy)
Emails:    scarlatom@sec.gov
             farerj@sec.gov
             murphyJoh@sec.gov

*Attorneys for the Plaintiff*

*Government attorney certification pursuant to
Local Rule 83.2(d) pending*

Of Counsel:   Jorge G. Tenreiro
              David L. Hirsch
              David A. Nasse
              Michael Baker
              Kathleen Hitchins
              Donna Norman
              Ann Rosenfield
              Colby Steele
              Martin Zerwitz

              SECURITIES AND EXCHANGE
              COMMISSION