# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS, INC.,
AND CHANGPENG ZHAO,

Defendants.

**No. 1:23-cv-01599 (ABJ)**

## DEFENDANTS BAM TRADING SERVICES INC. AND BAM MANAGEMENT US HOLDINGS INC.'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

**WILMER CUTLER PICKERING HALE AND DORR LLP**

William R. McLucas
Matthew T. Martens
Tiffany J. Smith
Matthew Beville

**MILBANK LLP**

Andrew M. Leblanc
George S. Canellos
Adam J. Fee
Matthew J. Laroche

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 6

    A.    Overview of BAM ............................................................................... 6

    B.    BAM's Cooperation with the SEC ....................................................... 7

    C.    BAM Provided Substantial Information to the SEC Concerning Customer Assets and Worked with the SEC to Address Its Concerns ................................ 9

    D.    The SEC's Opportunistic "Emergency" Application Omits Key Facts that Refute Its Need for Emergency Relief ............................................................. 11

        1.    BAM Customer Fiat Assets are Secure ................................... 11

        2.    BAM Customer Crypto Assets are Secure................................ 12

ARGUMENT ..................................................................................................... 15

I.    THE COURT SHOULD ENTER BAM'S PROPOSED ORDER CONCERNING THE CUSTODY OF ASSETS ................................................................................ 15

    A.    BAM's Proposed Order Contains Effectively All of the Material Provisions in the SEC's TRO ..................................................................................... 15

    B.    The SEC's TRO is Unduly Burdensome and Unnecessary ................................ 17

II.    THE SEC HAS FAILED TO MEET ITS BURDEN TO SHOW THAT BAM MUST BE TEMPORARILY RESTRAINED ................................................................... 17

    A.    The SEC Misstates the Standard for Obtaining a Temporary Restraining Order. 17

    B.    The SEC has Not Established that Any Digital Assets Offered by BAM for Trading are Securities ......................................................................... 19

        1.    The SEC has Failed to Establish the Essential Ingredients of an Investment Contract................................................................................... 20

        2.    The SEC Cannot Satisfy the *Howey* Test ................................. 21

    C.    The SEC Cannot Establish that BAM's Platform Included Wash Trading or that BAM Made Any Material Misstatements or Omissions ...................................... 28

       1.     The Allegedly Manipulative Trading Identified by the SEC was Entirely Appropriate and, In Any Event, was Not Material ................................. 28

       2.     BAM Did Not Make Any Material Misstatements or Omissions ............ 30

III.    THE SEC FAILS TO SATISFY ITS BURDEN TO OBTAIN AN ASSET FREEZE .... 31

CONCLUSION.................................................................................................................... 33

# **TABLE OF AUTHORITIES**

**Cases**

*AAR Airlift Grp., Inc. v. United States Transp. Command,*
    161 F. Supp. 3d 37 (D.D.C. 2015) ..................................................................17

*Brink v. Raymond James & Assocs., Inc.,*
    892 F.3d 1142 (11th Cir. 2018) .....................................................................31

*Davis v. Rio Rancho Estates, Inc.,*
    401 F. Supp. 1045 (S.D.N.Y. 1975).................................................................27

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    756 F.2d 230 (2d Cir. 1985)...........................................................................21

*Glen-Arden Commodities, Inc. v. Costantino,*
    493 F.2d 1027 (2d Cir. 1974)......................................................................5, 21

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)........................................................................................4

*Hocking v. Dubois,*
    885 F.2d 1449 (9th Cir. 1989) (en banc) .......................................................22

*Honig v. Hansen,*
    2022 WL 1239632 (S.D.N.Y. 2022).................................................................31

*Int'l Bhd. of Teamsters v. Daniel,*
    439 U.S. 551 (1979).......................................................................................23

*Int'l Controls Corp. v. Vesco,*
    490 F.2d 1334 (2d Cir. 1974).........................................................................32

*Lavery v. Kearns,*
    792 F. Supp. 847 (D. Me. 1992) .....................................................................27

*Marine Bank v. Weaver,*
    455 U.S. 551 (1982)...............................................................................5, 21, 27

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997).......................................................................................20

*New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.,*
    208 F. Supp. 3d 142 (D.D.C. 2016) ...........................................................16, 17

Order, *SEC v. Nanotech Eng'g, Inc.*,
 No. 19 Civ. 3633 (ABJ) (D.D.C Dec. 5, 2019)..............................................................18, 33

*Reno Air Racing Ass'n, Inc. v. McCord*,
 452 F.3d 1126 (9th Cir. 2006) ...............................................................................28, 29

*Revak v. SEC Realty Corp.*,
 18 F.3d 81 (2d Cir. 1994)......................................................................................25, 26

*Rodriguez v. Banco Cent.*,
 990 F.2d 7 .................................................................................................................26

*Salameh v. Tarsadia Hotel*,
 726 F.3d 1124 (9th Cir. 2013) ...............................................................................27, 28

*SEC v. Belmont Reid*,
 794 F.2d at 1388, 1391 ...............................................................................................26

*SEC v. Cavanagh*,
 1 F. Supp. 2d 337 (S.D.N.Y. 1998) ............................................................................19

*SEC v. Commonwealth Chem. Sec., Inc.*,
 574 F.2d 90 (2d Cir. 1978)........................................................................................19

*SEC v. Current Fin.*,
 783 F. Supp. 1441 (D.D.C. 1992) ...............................................................................32

*SEC v. Dubovoy*,
 2015 WL 6122261 (D.N.J. Oct. 16, 2015)...................................................................32

*SEC* v. *Glenn W. Turner Enters.*,
 474 F.2d 476 (9th Cir. 1973) ......................................................................................26

*SEC v. Goble*,
 682 F.3d 934 (11th Cir. 2012) .....................................................................................31

*SEC v. Int'l Loan Network*,
 770 F. Supp. 687 (D.D.C. 1991) ............................................................................18, 33

*\*SEC v. Life Partners, Inc.*,
 87 F.3d 536 (D.C. Cir. 1996) ......................................................................................25

*\*SEC v. Life Partners, Inc.*,
 898 F. Supp. 14 (D.D.C. 1995) ..................................................................................4, 18

*SEC v. Manor Nursing Ctrs.*,
 458 F.2d 1082, 1106 (2d Cir. 1974)............................................................................32

*SEC v. Mgmt. Dynamics, Inc.*,
515 F.2d 801 (2d Cir. 1975)..................................................................................18

*SEC v. Mut. Benefits Corp.*,
408 F.3d 737 (11th Cir. 2005) ..............................................................................27

*SEC v. Rubera*,
350 F.3d 1084 (9th Cir. 2003) ..............................................................................23

*SEC v. Stratton Oakmont, Inc.*,
1994 WL 721502 (D.D.C. Dec. 19, 1994)..............................................................18

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990)......................................................................4, 19, 33

*SEC v. Variable Annuity Life Ins. Co.*,
359 U.S. 65 ...........................................................................................................25

*\*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) ........................................................................... *passim*

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
253 F. Supp. 359 (S.D.N.Y. 1966) ........................................................................26

*Spin Master v. Aciper*,
2020 WL 6482878 (S.D.N.Y. Nov. 4, 2020) ......................................................3, 33

*Stoppelman v. Owens*,
1984 WL 609 (D.D.C. June 7, 1984) .....................................................................28

*Warfield v. Alaniz*,
569 F.3d 1015 .......................................................................................................24

*Wellman v. Dickinson*,
497 F. Supp. 824 (S.D.N.Y. 1980) ...................................................................18, 19

**Statutes**

15 U.S.C. § 77b(a)(1).........................................................................................5, 19

15 U.S.C. § 78c(a)(10)........................................................................................5, 19

**Other Authorities**

CME MRAN RA 2008-5, CME Group .....................................................................29

FINRA Rule 5210 ..................................................................................................29

Notice of proposed rulemaking, Regulation Automated Trading, 80 Fed. Reg.
78,823.................................................................................................................................30

Order Approving Proposed Rule Change, as Modified by Amendment No. 1,
Relating to Self-Trades and FINRA Rule 5210, SEC (May 1, 2014) ....................................29

Defendants BAM Trading Services Inc. ("BAM Trading") and BAM Management US Holdings Inc. ("BAM Management," collectively with BAM Trading, "BAM"), respectfully submit this memorandum in opposition to Plaintiff Securities and Exchange Commission's motion for a temporary restraining order, asset freeze, and other relief. *See* Dkt. 4 (Motion and Proposed TRO); Dkt. 29-2 (Corrected Memorandum ("Mem.")).  BAM Management is the holding company of BAM Trading, which operates Binance.US., a cryptocurrency trading platform for United States residents.  On June 5, 2023, the SEC brought various claims against BAM all predicated on the SEC's belief that BAM's platform trades securities without registering as an exchange, broker dealer, or clearing agency.  The following day, the SEC brought the instant motion seeking to, among other things, freeze all of BAM's assets without any exceptions.  For the reasons that follow, the Court should deny the SEC's motion and instead enter Defendants' proposed order concerning customer assets and other relief.

## PRELIMINARY STATEMENT

On June 7, 2023, the Court held a scheduling conference during which it encouraged the parties to work together and reach a compromise concerning the SEC's application, something that BAM and the other Defendants had been doing already for several days.  To that end, BAM and the other defendants—Defendants Binance Holdings Limited ("BHL") and Changpeng Zhao— twice proposed stipulations to the SEC addressing all the areas of concern identified in the motion including: (i) ensuring that BAM customer assets continue to be maintained in the United States and that BAM personnel in the United States have control over any associated private keys; (ii) that BAM continues to maintain sole possession and control of customer assets; (iii) preservation of documents and information; (iv) an accounting; and (v) expedited discovery provisions.  The Defendants also requested a provision allowing BAM to conduct ordinary course business

activities—such as paying salaries and for professional services—while prohibiting any asset transfers to BHL, Zhao, or any affiliated entities, which Defendants understood was one the SEC's concerns.  The SEC rejected these proposals because it believed they were insufficient to address unspecified "risks" to customer assets.  The SEC's position is unreasonable, and BAM requests that the Court enter the second order Defendants proposed to the SEC.  Doing so would obviate the need to make rulings involving novel and innovative financial assets in an undeveloped and highly uncertain area of the law on an expedited basis and incomplete record.

If the Court does address the merits of the SEC's motion, it should deny that motion.  The SEC seeks unnecessary and unjustified relief.  Far from requesting relief that is "carefully calibrated" to "maintain[] the status quo" (Mem. at 3), the SEC's proposed remedies would effectively end BAM's business.  The SEC seeks, among many other things, a draconian and unduly burdensome freeze of *all the company's operations without any exceptions*.  The requested relief would primarily harm BAM's customers, effectively put BAM out of business, and prevent BAM from defending itself in this litigation.  Without the ability to pay its employees, vendors, suppliers, and professionals in the ordinary course of business and to maintain its technology platform, operations would quickly grind to a halt and BAM would be unable to even fund its defense to this action.  With a freeze of all corporate assets, banking partners would most likely cease to honor requests to transfer funds for any purpose, including customer redemptions.

In fact, this has already happened.  After the SEC filed the complaint and TRO motion, one of BAM's banking partners holding customer assets informed BAM that it would no longer service the company on June 14, 2023.  This same banking partner—concerned about the broad language in the SEC's proposed TRO to freeze all assets—decided to freeze all activity in BAM's account until after the Court ruled on the SEC's motion or the parties entered a consent and stipulation.

The SEC provided no compelling basis and identified no precedential support for the extreme and punitive relief it seeks.  The SEC proffered no evidence that any Defendant has dissipated assets or plans to do so.  The SEC's application boils down to "concern[s]" that assets **may** be transferred outside of the United States because Defendants BHL and Zhao are located outside the United States, hold and use foreign bank accounts, and Defendant Zhao allegedly sought to avoid potential application of U.S. regulations to Binance's international business.  The SEC's speculative and unsubstantiated concerns are insufficient for demonstrating a need to effectively end BAM's business the moment the proposed order is entered.  *See Spin Master v. Aciper*, 2020 WL 6482878, at *5 (S.D.N.Y. Nov. 4, 2020) ("Plaintiffs provide no legal authority for their argument that the harsh remedy of an asset freeze would be justified by the mere fact that a corporation is [foreign] and uses a cross-border payment processing service.").

There is no need for the draconian relief sought by the SEC because BAM steadfastly shares the SEC's desire to protect customer assets.  BAM customer assets are secure, appropriately segregated, and available to customers.  In fact, the SEC's motion does not identify a single instance in which BAM customer assets were mishandled or misused.  The SEC's application is also not an "emergency."  BAM publicly announced in June 2019 its intention to engage in the cryptocurrency trading the SEC now challenges.  The SEC did not even begin investigating BAM's cryptocurrency trading until a year and a half later.  BAM cooperated in good faith with the SEC's investigation for years; BAM received a Wells notice informing BAM that the SEC staff had made a preliminary determination to recommend an action against BAM on February 3, 2023, months ago; and the SEC informed BAM weeks ago that it planned to bring an action against BAM containing all the allegations set forth in the complaint.  Now, approximately four years after BAM launched its cryptocurrency trading platform in the United States, the SEC contends that it is

clearly illegal and must urgently be stopped.  No facts have come to light that warrant emergency relief and the SEC has presented no evidence that BAM did anything inappropriate involving customer assets before or after it was charged.

The SEC's application is contrary to the applicable legal standards.  Where, as here, the SEC seeks to do more than simply maintain the status quo, it must make "a more substantial showing of likelihood of success [on the merits], both as to violation and risk of recurrence." *SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990); *SEC v. Life Partners, Inc.*, 898 F. Supp. 14, 18 (D.D.C. 1995) (similar).  It cannot do so.  All the SEC's claims fail because the SEC has not identified a single security trading on BAM's platform.  The SEC suggests that it is a foregone conclusion that cryptocurrency is a security, but that is not the case.  That numerous cryptocurrency exchanges, including BAM, have operated in the United States for years without interference by the SEC belies the claim that they are clearly covered by the securities laws.  Indeed, in 2021, SEC Chair Gensler publicly stated that the Commission lacked statutory authority to regulate businesses like BAM because "exchanges trading in these crypto assets do not have a regulatory framework . . . at the SEC."  Fee Decl. Ex. 1 (May 6, 2021 statement of G. Gensler)  The SEC has explicitly acknowledged that at least some cryptocurrencies are not, in fact, securities, and has issued vague and ever-shifting guidance on digital assets in general, which at times has directly contradicted positions by other federal regulators.  *See, e.g.*, *id.* Fee Decl. Ex. 2 (June 14, 2018 statement of W. Hinman).  At a minimum, the SEC's public statements and "guidance" have injected such confusion as to deny persons of ordinary intelligence any "reasonable opportunity to know what is prohibited."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The SEC's instant motion falls far short of showing a substantial likelihood that BAM's platform traded securities.  The SEC's motion focuses on a single cryptocurrency—BNB—that

the SEC claims was sold as an "investment contract" as that term is used in the federal securities laws and defined in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).[1]   The SEC's application fails for the simple reason that it is trying to prove that BNB was sold as investment contract without pointing to a single contract at issue.  *See Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974) (explaining that the *Howey* test evaluates "whether a contract constitutes an investment contract within the Securities Act").   The SEC also does not claim that the acquisition of BNB created any contractual rights in the buyer or imposed any obligations on the seller—elements that *Howey* identified as the "essential ingredients" of any investment contract.

Beyond that, the SEC's "evidence" that BNB is a security—which is comprised of a Binance whitepaper from 2017 and a handful of Binance blog posts or public statements—is insufficient to carry its burden of proof even at this preliminary stage of the litigation.  Separately dispositive is the fact that the SEC's evidence predates BAM's existence.  To show that BAM was illegally offering or selling securities, the SEC must show that BNB was sold as an investment contract (*i.e.*, a security) **when it was traded on BAM's platform**, but the SEC has presented **no evidence about even one of those trades**.  *See Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").

The SEC has also failed to show that BAM made any material misstatements or omissions about its trading practices.  The Staff alleges that BAM knew or should have known that Sigma Chain AG ("Sigma Chain"), a market maker on BAM's platform, was engaged in "wash trading" and, as a result, any representations regarding the volume on its trading platform or trade

---

[1]     The federal securities laws define a "security" as, among other things, an "investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).

surveillance program were materially misleading.  Even assuming securities were traded on BAM's platform (and they were not), this claim fails.  The trading activity in question resulted from legitimate interactions between independent trading strategies, which were largely facilitating retail customer demand.  As the SEC has repeatedly acknowledged, this type of self-trading—as opposed to prohibited wash trading—is bona fide and entirely appropriate.  Moreover, the SEC claims that BAM failed to disclose that it could not identify certain prohibited trading practices, but BAM made no statements at all about its ability to do so.  The SEC has simply not cited any false or misleading statements that could form the legal basis for a securities fraud claim.

The SEC, to our knowledge, has never obtained a temporary restraining order and total asset freeze in circumstances remotely comparable to those here—where defendants have been cooperating with the SEC for years, there is no evidence of dissipation or mishandling of assets, and the underlying charges amount to failing to register with the SEC in connection with novel financial assets for which there is no clear statutory, regulatory, or precedential authority.  Granting the SEC's motion would be particularly unwarranted given the uncertainty in the law on the issues at the core of this case; the fact that the Court would be deciding those issues without the benefit of a full evidentiary record; and that Defendants have already agreed to stipulate to effectively all the material provisions in the proposed TRO to maintain the status quo and protect customer assets.

## BACKGROUND

### A.    Overview of BAM

BAM operates a cryptocurrency trading platform (the "Platform"), through which customers can sell or purchase digital assets (sometimes referred to as cryptocurrency) in exchange for other digital assets.  A unit of a cryptocurrency generally is a digital representation of value that can be traded and functions as a medium of exchange.  Units of a cryptocurrency have no physical form; they exist as registry entries in a "blockchain," which effectively serves as an

electronic public ledger of all transactions in, and thus also all "wallets" currently holding, that currency.  Owning a cryptocurrency is nothing like owning a stock in a company.  Cryptocurrency typically does not confer upon its owner any of the rights commonly associated with owning stock, like an ownership interest in the issuer of the cryptocurrency, a right to share in the issuer's profits, or the right to sue derivatively in the issuer's name for wrongful acts.

BAM's Platform supports over 150 digital assets, including cryptocurrencies that the SEC and other regulators have explicitly declared are not securities, like Bitcoin and Ether.  *See* Fee Decl. Ex. 3 (May 2022 article quoting CFTC Chair Behnam:  "I can say for sure Bitcoin . . . is a commodity.  Ether as well."); Fee Decl. Ex. 4 (February 23, 2023 article quoting Chairman Gensler as stating that Bitcoin is not a security); Fee Decl. Ex. 2 (June 14, 2018 statement of W. Hinman).  BAM's Platform also supports "stablecoins," which are cryptocurrencies with values pegged to external assets, like the dollar.  Fee Decl. Ex. 5 (list of supported assets on BAM's Platform).  BAM has not and does not issue or manage any of its own digital assets.  The SEC's motion focuses on the cryptocurrency called BNB, but BAM did not issue BNB and has no role managing it.  Rather, BNB was initially issued by Binance in 2017, and it is now traded on dozens of cryptocurrency trading platforms.

### B.    BAM's Cooperation with the SEC

BAM Trading made significant efforts over more than three years to cooperate with the SEC's investigation in this matter.  The SEC first served BAM Trading with a subpoena on December 17, 2020, leading to more than two years of document productions and a series of follow-up requests, including additional subpoenas issued on September 17, 2021, January 14, 2022, June 9, 2022, and October 28, 2022; a set of twenty-eight written interrogatories on December 28, 2022; and a bevy of informal written and oral requests throughout the investigation.

During this time, BAM Trading produced more than 700,000 individual communications, including approximately 11,391 emails, 8,196 email attachments, and 652,817 other messages.

BAM Trading also prepared bespoke data (including years' worth of revenue data) and dozens of pages of narrative and interrogatory responses to the SEC's requests and follow-up questions, detailing virtually every aspect of its business—narrative submissions that BAM Trading voluntarily provided but which is beyond the ability of the SEC's administrative subpoenas to compel. Despite BAM Trading's significant cooperation, and in the midst of discussions about newly issued information requests from the SEC, BAM Trading was issued a Wells notice on February 3, 2023 to which BAM submitted responses on March 6, March 20, and May 1, 2023.

In parallel with BAM Trading's efforts to cooperate with the SEC's investigation, BAM Trading vastly grew and improved its compliance policies, procedures, and systems. BAM Trading, which at the beginning of the SEC's investigation was still very much a start-up in a nascent industry, now has an industry-leading compliance program helmed by a world-class management team. While the SEC investigation was ongoing, BAM Trading significantly grew its Compliance and Risk and Sanctions Teams, which are collectively responsible for risk-management, including anti-money laundering, sanctions screening, and corporate internal controls. This included the hiring of a Head of Investigations, who is responsible for leading and overseeing all aspects of BAM Trading's commitment to protecting its users by partnering closely with law enforcement, regulators, and industry peers, and identifying and mitigating any criminal activity related to digital assets on the BAM Trading platform. BAM Trading also expanded its technology and operations in the United States, including back-office applications and systems, custody of digital assets, clearing services, and all financial and accounting recordkeeping, reducing its use of offshore technology and services.

In short, BAM Trading has proactively enhanced its compliance policies, procedures, and systems, has cooperated extensively with the SEC's investigation in this matter, and continues to make all reasonable efforts to do so.

### C.   BAM Provided Substantial Information to the SEC Concerning Customer Assets and Worked with the SEC to Address Its Concerns

Until very recently and despite being provided with substantial information about BAM's custody of assets, the SEC did not express to BAM any of the concerns animating its motion.  This was unsurprising given that there is no evidence that BAM customer assets have been misused or mishandled.  Over the past several weeks, the SEC inexplicably began to focus on the custody of BAM's assets, and BAM continued to cooperate in good faith, working around the clock to address the SEC's questions.  In addition to numerous telephone conversations, BAM provided the SEC with detailed written responses to the SEC's questions about BAM's customer assets in letters dated May 25, 2023, May 26, 2023, June 1, 2023, and June 2, 2023.  SEC Ex.[2] A-68 (Letter from BAM Counsel to SEC, May 26, 2023); SEC Ex. A-69 (Letter from BAM to SEC, June 2, 2023).

BAM was unable to convince the SEC that preliminary injunctive relief was unnecessary, and the SEC requested that all defendants enter a consent stipulation and injunction.  SEC Ex. A-78 at 4.  For several days, BAM worked with the SEC to draft a consent stipulation to address the SEC's concerns while ensuring that the relief was administratively feasible and would allow BAM to continue operating its business while substantive issues played out in Court.  *Id*. at 4-5; Fee Decl. Ex. 6 (email correspondence regarding stipulation).

On the night before the instant motion was filed, BAM provided the SEC with a proposed stipulation.  *Id.* (Email from BAM Counsel to SEC, June 5, 2023).  BAM represented that it was

---

[2]     "SEC Ex." denotes exhibits submitted with the Declaration of Colby Steele.  Dkt. 12-20.

prepared to enter the stipulation to assuage the SEC's concerns about customer assets and in the hope of obviating the potentially destructive consequences of a contested temporary restraining order hearing. *Id.* The SEC did not respond to BAM's proposal and the next day filed the instant motion. Based on correspondence with the SEC, BAM understood that the SEC's only objection to BAM's proposal was that all Defendants did not want to enter into the proposed stipulation. *Id.* Immediately after the instant motion was filed, the SEC emailed BAM's counsel about its proposal, stating that it may be amenable to entering the proposal as to BAM only, but still believed it needed to seek relief against all Defendants. *Id.* (Email from SEC to BAM, June 6, 2023).

Following that correspondence, BAM and the other Defendants (who are now willing to sign onto virtually all of the conditions in the stipulation the SEC negotiated with BAM) have twice proposed additional stipulations to address the SEC's concerns. Fee Decl. Ex. 7 (June 11 email chain). Notably, the proposed stipulations included a provision that would allow BAM to continue operating in the ordinary course of business (*i.e.*, to pay salaries, professional services, and vendors). *Id.* After proposing the first stipulation, the parties had a call on June 9, 2023, during which the SEC expressed concerns that (i) the ordinary business purpose exception was vague and may allow transfers to Binance entities; (ii) it was important for the SEC that BAM create "new wallets" for customer funds; and (iii) BHL and CZ had not agreed to expedited discovery. Fee Decl. ¶ 14. The following day, Defendants provided the SEC with a revised stipulation that addressed each of those concerns, including by adding a provision that prohibited BAM from transferring any assets to Defendants BHL, Zhao, or any affiliated entities. Exhibit 7 (June 11 email chain). On the afternoon of June 12, the SEC proposed changes and additions to Defendants' proposal including, among other things, provisions for a broad asset freeze of BAM's assets for 10 days and precluding BAM from transferring assets except in connection with

customer redemptions.  Defendants' proposal, attached as Exhibit 8, is identical to the proposal

sent to the SEC on June 11.

### D.      The SEC's Opportunistic "Emergency" Application Omits Key Facts that Refute Its Need for Emergency Relief

The SEC filed this "emergency" motion on June 5, 2023—four months after notifying

BAM of a potential enforcement action and more than three years after initiating an investigation

into BAM's business.  As described below, the SEC's motion is riddled with mistakes and

omissions to inappropriately suggest that BAM customer assets are not secure.

### 1.      BAM Customer Fiat Assets are Secure[3]

BAM Trading maintains its customers' fiat currency in segregated accounts maintained

with its banking partners, separate from any corporate funds.  SEC Ex. A-68 at 6.  BAM Trading

personnel maintain exclusive control over all transfers of fiat currency out of BAM Trading's

accounts.  *Id.* Moreover, all customer fiat currency is unencumbered and available for immediate

withdrawal, subject to any periodic transaction-volume limits imposed by BAM's banking

partners.  *Id.* at 7. The SEC has expressed "concern" that BHL personnel and Defendant Zhao may

still have control over accounts with BAM customer fiat currency.  *See* Mem. at 28-29.  As BAM

told the SEC in writing, this is not the case.  SEC Ex. A-68 at 6.  BHL personnel and Defendant

Zhao do not have signatory authority to move or withdraw funds from those accounts.  *Id.*

(explaining that although counsel had identified Defendant Zhao as a signatory on an account

holding customer fiat, counsel subsequently contacted the bank in question, which clarified that

Defendant Zhao is not a signatory and does not have the ability to move or withdraw funds from

the account).  Indeed, the exhibit submitted to support the SEC's claim that Mr. Zhao does have

---

[3]      The accompanying declaration of Sara Sisenwein, BAM's Senior Director of Treasury Operations, describes BAM's banking relationships and the custody of fiat currency.

signatory authority actually confirms BAM's position—Mr. Zhao is listed as the ultimate beneficial owner of one of BAM's bank accounts, but has no signatory authority.  *See* Ex. A-50, -67.  No BHL personnel may approve transfers of fiat currency held on behalf of BAM customers.

### 2.    BAM Customer Crypto Assets are Secure[4]

BAM holds customer digital assets in wallets maintained on computer servers housed in a datacenter in the United States ("Datacenter-1").  SEC Ex. A-68 at 4.  Individual holdings are tracked via an internal ledger and regularly reconciled against the public blockchain balances for BAM's wallets.  *Id.*  BAM Trading maintains exclusive control over the movement of these assets and no BHL personnel can change the permissions for BAM Trading's wallets.  SEC Ex. A-69 at 6-7.  BAM maintains three types of wallets for customer assets—deposit wallets, hot wallets, and cold wallets.  SEC Ex. A-68 at 4-5.  As described below, these wallets ensure BAM's platform has sufficient liquidity while mitigating potential security risks.

When a user deposits cryptocurrency on the Platform, the assets move to the user's deposit wallet.  *Id.*  If the balance in a deposit wallet exceeds predefined thresholds, the assets are transferred to an omnibus hot wallet.  *Id.*  The hot wallet is used to conduct activity on the Platform, including providing liquidity to facilitate customer withdrawals.  *Id.*  If the balance held in a hot wallet exceeds the thresholds set by BAM personnel, the excess balance is automatically transferred to one of BAM Trading's cold wallets for security purposes.  *Id.*  The majority of customer assets are held in BAM's cold wallets, which have additional security controls that make the wallets more secure.  SEC Ex. A-77 (Wells Submission of BHL, dated March 15, 2023).

---

[4]    The accompanying declaration of Erik Kellogg, BAM's Chief Information Security Officer, describes the security of BAM's crypto assets.  Moreover, this section of the memorandum describes BAM's default custody process.  BAM has a separate custodial process for the assets of customers that have opted-into BAM's staking services.  Similar to the default custodial process, assets held as part of staking services are similarly secure.  Further detail about the staking custodial process is described in the Kellogg Declaration.

All customer assets maintained in deposit wallets, hot wallets, and cold wallets are unencumbered and available for immediate withdrawal. SEC Ex. A-68 at 5. Furthermore, any movement of digital assets between the wallets occurs on the blockchain, where actions are publicly visible and any unauthorized transactions would generate immediate alerts and investigations by BAM Trading's Investigations, Information Security, and Risk teams.

BAM Trading maintains strict oversight of withdrawals out of its hot wallets and transfers between its hot wallets and cold wallets. Any customer withdrawals (which are funded by the hot wallets) in excess of $1 million (or a customer-specified limit) must be manually approved by a member of the BAM Trading Clearing team. SEC Ex. A-68 at 4. Any transfers from BAM Trading's cold wallets to its hot wallets must be initiated via a request by an authorized member of the BAM Trading Clearing team. The key needed to approve these transactions is randomly generated for each transaction on dedicated hardware devices via multiple pieces, called "key shards." BAM Trading's encryption protocol is currently configured to generate seven "key shards." *Id.* Four shards are held by BAM Trading personnel (including BAM Clearing Team members capable of identifying unauthorized requests); the remaining three shards are held by BHL personnel. Four shards are required to approve any transfers from the cold wallets. Thus, no transfers may be initiated without the involvement of at least one BAM Trading employee.

The SEC's application misstates or omits these facts and otherwise attempts to cast doubt on BAM's practices by misrepresenting information about how BAM maintains its customers' digital assets. *First*, the SEC mischaracterizes a non-operational Wallet Custody Agreement ("WCA") between BAM and BHL, which the SEC argues shows that BHL serves as the custodian of BAM's digital assets. Mem. at 29. BAM has repeatedly explained to the SEC that the WCA was never actually implemented and did not govern BAM's custody practices. Mem. at 32-33;

SEC Ex. A-81 at BAM-WH-CORR-042.  Moreover, the WCA was formally terminated months ago, on December 30, 2022, and so is irrelevant in evaluating BAM's custody practices today. SEC Ex. A-81 at BAM-WH-CORR-042.

*Second*, the SEC mischaracterizes a report by an outside auditor to suggest that the WCA governs custody over BAM's assets.  However, the auditor's report clearly states that "[e]ffective December 1, 2022, the Company [defined elsewhere as BAM Trading] is the custodian of its crypto assets."  SEC Ex. A-74 at 21.  The only definitive conclusion that can be drawn from the auditor's report is that BAM (not BHL) currently has custody of BAM customer digital assets. Accordingly, BAM's repeated statement to the SEC that BAM (and not BHL) has custody over customer crypto assets are not "contrary" to the documents cited by the SEC (Mem. at 33); they are fully in line with them.

*Finally*, the SEC claims that BAM "admits that Zhao and Binance" have "substantial control" over BAM's digital assets, but that is a gross mischaracterization of the record.  Mem. at 34.  The SEC's laundry list of alleged "admissions" omits key facts and clarifying details that entirely undermines the SEC's position, or otherwise do not support the assertion that Defendants BHL and Zhao have "substantial control" over BAM customer digital assets.  For example, the SEC suggests that BHL has control over BAM digital assets because BAM told the SEC that the account in Datacenter-1 is "associated with" BHL.  Mem. at 34.  The SEC omits that the "associated with" language conveyed only that the Binance licensed wallet custody software runs from a cloud storage account opened by Binance—it does not mean that Binance has access to the contents of the wallets.  SEC Ex. A-69 at 6.  As BAM represented to the SEC in writing (and the SEC omitted from its motion), "BAM Trading maintains exclusive control over the movement of

these assets and no BHL personnel have the ability to change the permissions for BAM Trading's wallets."  SEC Ex. A-68 at BAM-WH-CORR-032.

Similarly, the SEC suggests that BHL personnel control the key shard process because some of the BAM key shard holders used to work for BHL and BHL key shard holders were involved in approving some transactions.  Mem. at 35.  This is entirely irrelevant to who controls the digital assets.  The undisputed facts are that four of seven key shards are needed to approve any transaction and that four of the current key shard holders are BAM employees, meaning that at least one BAM employee must approve any transaction.  SEC Ex. A-68 at 4.  The SEC further omits that assets can only be transferred from BAM's cold wallets to other wallets that BAM controls—thus, even if an unauthorized transfer occurred, the assets could not leave the platform.  The SEC also points out that one member of the BAM Trading Clearing team worked for BHL but omits that the employee worked for BHL years ago and that the Clearing team has five other employees, none of whom were previously employed by BHL.   SEC Ex. A-69 at 7.

The SEC's motion attempts to construct an "emergency" based on nothing more than misstatements and the omission of material facts that the SEC has been aware of for weeks or longer.  BAM provided the SEC with more than enough information to conclude that all BAM customer assets are secure.

## ARGUMENT

## I.  THE COURT SHOULD ENTER DEFENDANTS' PROPOSED ORDER CONCERNING THE CUSTODY OF ASSETS

### A.  Defendants' Proposed Order Contains Effectively All of the Material Provisions in the SEC's Proposed TRO

As detailed throughout this memorandum, the SEC's TRO application is extraordinary and evaluating whether to grant it would require the Court to address the novel and complex legal issues at the heart of this matter on short notice without the benefit of a full evidentiary record.

However, the Court need not reach these issues or hold a contested TRO or preliminary injunction hearing because there is a pragmatic solution.  Namely, the Court should enter Defendants' proposal, which mirrors the terms of the stipulation that Defendants negotiated with the SEC.

The SEC's only apparent objection to Defendants' proposal is that it believes they need a total asset freeze to preclude asset transfers to Defendants BHL and Zhao.  The SEC's position is unreasonable and illogical because Defendants have already agreed to not make any such transfers and there is no compelling basis to also require a total asset freeze for 10 days, which would be disastrous for BAM's business.  Moreover, the SEC has acknowledged that the terms of the proposed stipulation adequately address the Staff's concerns as to BAM.  In fact, the proposed stipulation includes many identical or nearly identical provisions in the TRO, including provisions addressing: (i) the repatriation of assets and return of private keys to the United States (Section I); (ii) BAM's sole possession and control of customer assets (Section II); (iii) preservation of documents and information (Section III); (iv) an accounting (Section IV); and (v) expedited discovery provisions (Section V).  Fee Decl. Ex. 8 (Proposed Stipulation and Consent Order).  These provisions more than adequately address the concerns animating the SEC's motion.

Where, as here, a party voluntarily agrees to preliminary injunctive relief requested by the other party in the interest of expeditiously addressing the merits of the case on a full record, the court should simply deny the application for preliminary relief as moot.  *See, e.g.*, *New England Anti-Vivisection Soc'y v. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 153 (D.D.C. 2016) ("This Court held a hearing on Plaintiffs' [preliminary injunction] motion on May 24, 2016 . . . , after which the Court denied the motion as moot in light of [defendant's] agreement [to comply with the relief requested in the injunction] in order to permit the matter to be briefed as cross-motions

for summary judgment and decided with the benefit of a full administrative record."); *see AAR Airlift Grp., Inc. v. United States Transp. Command*, 161 F. Supp. 3d 37, 41 (D.D.C. 2015) (same).

### B.     The SEC's Proposed TRO is Unduly Burdensome and Unnecessary

The Court should not, however, enter the SEC's proposed TRO, which includes additional provisions that are unduly burdensome, unnecessary, and administratively impossible.  Initially, the proposed TRO does not include provisions allowing BAM to operate its business in any capacity.  Thus, entering the TRO would effectively shut down operations and prevent BAM from paying basic and necessary expenses, including salaries and its legal team.  The SEC's effort to avoid a litigation on the merits by disabling its adversary from defending itself and extinguishing its business at the outset of the case cannot possibly be squared with due process especially where, as here, BAM is willing to provide the SEC with essentially all the requested relief.

Moreover, during discussions with BAM, the SEC previously agreed to omit many of the TRO's provisions, seemingly acknowledging that those provisions are unduly burdensome, unnecessary, or both.  Fee Decl. Exs. 6 and 7 (email correspondence regarding stipulation).  For example, Section IV.4 of the TRO would require any transfer of customer assets over $100,000 to be approved in writing by the CEO and CFO of BAM Trading.  This provision is unduly burdensome and administratively infeasible because there are simply too many transactions above that limit for two individuals to approve.

## II.    THE SEC HAS FAILED TO MEET ITS BURDEN TO SHOW THAT BAM MUST BE TEMPORARILY RESTRAINED

### A.     The SEC Misstates the Standard for Obtaining a Temporary Restraining Order

If the Court does address the SEC's TRO application, it should deny it.  The SEC suggests that it must only show a likelihood of success on the merits to obtain relief and that the Court need not consider fairness because the SEC, rather than a private litigant, made the application.  Mem.

at 37-39.  The SEC's description of the law is inaccurate and incomplete.  Indeed, a much more rigorous standard applies where, as here, the SEC seeks not to simply maintain the status quo but to, in effect, immediately shut down BAM's business.

In the typical case, the SEC cannot obtain a temporary restraining order without first demonstrating (1) "a substantial likelihood of success on the merits" and (2) that "the public interest favors entry of a temporary restraining order." *SEC v. Stratton Oakmont, Inc.,* 1994 WL 721502, at *3 (D.D.C. Dec. 19, 1994).  As this Court has explained, although the SEC does not need to establish all the elements traditionally required to obtain a temporary restraining order, "this does not mean that 'judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into the court.'"  *SEC v. Nanotech Eng'g, Inc.*, No. 19 Civ. 3633, Dkt. 5 at 3 (ABJ) (D.D.C. Dec. 5, 2019) (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)).  Instead, the court "can assess 'all those considerations of fairness that have been the traditional concern of equity courts.'"  *Id.*

To establish a substantial likelihood of success on the merits, the SEC must make two showings: "a 'strong *prima facie* case of previous violations' and . . . 'a reasonable likelihood that the wrong will be repeated.'"  *Life Partners, Inc.*, 898 F. Supp. at 18 (quoting *SEC v. Int'l Loan Network*, 770 F. Supp. 687, 688 (D.D.C. 1991)).  There is no likelihood of recurrence unless the SEC can establish "a likelihood or propensity to engage in future violations."  *Wellman v. Dickinson*, 497 F. Supp. 824, 837 (S.D.N.Y. 1980) (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) (internal quotations omitted)).  Furthermore, where the SEC seeks to do more than simply preserve the status quo, it must make "a ***more substantial showing of likelihood of success***, both as to violation and risk of recurrence." *Unifund SAL*, 910 F.2d at 1039 (emphasis added).  "Like any litigant, the Commission should be obligated to make a more

persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *Id.*

As detailed below, the SEC fails to make a substantial showing (let alone a more substantial showing) of a likelihood to succeed on the merits because it provides insufficient evidence to support each element of the asserted violations.  Moreover, the SEC's TRO and asset freeze are draconian and would cause significant and unnecessary harm to BAM's business, which weighs strongly in favor of denying the SEC's motion.  *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 384 (S.D.N.Y. 1998) ("Although a preliminary injunction is a useful device where a court finds that it is necessary to deter future violations, there are cases where an injunction may do more harm than good.").  The SEC has not identified a single instance in which BAM customer assets were misused or mishandled in any way.  Nor has the SEC credibly alleged that BAM has attempted to dissipate funds for its own gain or even transfer funds to avoid detection.  Rather, BAM has persistently demonstrated to the SEC that it fully intends to be cooperative, allay any SEC concerns, and make payments to customers in a manner that satisfies customers and the SEC.

## B.    The SEC has Not Established that Any Digital Assets Offered by BAM for Trading are Securities

For all claims, the SEC must establish that BAM's platform offered a digital asset for trading that is a "security," as that term is defined in the federal securities laws.  *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  In its motion, the SEC focused exclusively on the cryptocurrency called BNB, arguing that BNB was "offered and sold as [an] investment contract[]" under *Howey*, and, thus, was a security.  Mem. at 39.  The SEC's position is without merit for the reasons discussed in the sections that follow.

As an initial matter, for purposes of the SEC's motion, the Court should not consider whether any other cryptocurrency asset identified in the Complaint is a security.  Each digital asset

is unique, such that a case-by-case analysis is necessary to determine whether any specific digital asset and transaction involving that asset qualifies as a security.  While the SEC asks the Court to conclude that every "Crypto Asset Security" identified in the Complaint is being offered and sold as a security, it offers ***no evidence*** for that broad conclusory statement other than the allegations in the Complaint.  The Complaint's allegations cannot, as a matter of law, serve as the basis for granting the SEC's TRO.  *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (explaining that a movant seeking a preliminary injunction must provide "substantial proof" that clearly shows her entitlement to relief); Federal Practice and Procedure § 2949 (3d ed.) ("Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction.") (collecting cases).

### 1.      The SEC has Failed to Point to an Investment Contract

As a matter of law, the SEC cannot prevail on its claim because it has presented no evidence of a contract involving BNB, let alone an "investment contract" under the Securities Act.  In *Howey*, the Supreme Court explained that the meaning of the statutory term "investment contract" was "crystallized" by a series of state cases interpreting state "blue sky" laws.  *Howey*, 328 U.S. at 298.  Every single blue sky case finding an investment contract had three "essential ingredients": (i) the investment contract involved a contract between a promoter and an investor that established the investor's rights as to an investment; (ii) that contract imposed post-sale obligations on the promoter to take specific actions for the investor's benefit; and (iii) that contract granted the investor a right to share in profits from the promoter's efforts to generate a return on the use of investor funds.  The *Howey* test then determines whether those contracts establishing rights and obligations are investment contracts.  *Glen-Arden*, 493 F.2d at 1034 (the *Howey* test evaluates "whether a contract constitutes an investment contract within the Securities Act").

Here, the SEC presents no evidence (and in fact makes no allegations in the Complaint) about any actual contracts involving BNB (or any other cryptocurrency).  This absence of contracts setting forth rights and obligations leaves a fatal gap in the SEC's case:  there is no set of contracts, rights, and obligations to which the Court can apply the *Howey* test to determine whether the rights and obligations transform those contracts into investment contracts.  The SEC does not address this issue and appears to believe that there can be an "investment contract" without any contract, rights granted to the purchaser, and obligations imposed on the issuer.  That is not the law and, if it was, would lead to absurd results.  The SEC's position would effectively convert the sale of any ordinary asset into sales of securities.

### 2.    The SEC Cannot Satisfy the *Howey* Test

Even accepting the SEC's (incorrect) reading that you can have an "investment contract" without a contract, the SEC still has not presented evidence satisfying the *Howey* test.  As refined over the years, the *Howey* test requires establishing that a purchaser (i) invests money; (ii) in a "common enterprise"; and (iii) is "led to expect profits solely from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 298-99.  When applying the *Howey* test, "*[e]ach transaction* must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."  *Marine Bank*, 455 U.S. at 560 n.11 (emphasis added); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 232 (2d Cir. 1985).  Put another way, the SEC cannot satisfy some *Howey* elements with one type of transaction and other elements with another.

The SEC attempts to do just that when evaluating whether BNB is a security.  The SEC points principally to the initial coin offering ("ICO") of BNB in 2017, a time when BAM was not even in existence.  From that, the SEC appears to conclude that every subsequent transaction of BNB was an investment contract—even those that occurred years later on BAM's platform and

had nothing to do with the ICO.  This approach fails because the SEC must satisfy each element of the *Howey* test with respect to the particular transactions at issue.  *See Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) (en banc) (panel misstated the law in concluding all condominium sales were investment contracts as long as some sales were; "[s]uch a per se rule would be ill-suited to the examination of the economic reality of each transaction required by *Howey*").

If the SEC wants to establish the *Howey* elements as to BNB trading on BAM's platform years after the ICO, it must present evidence concerning those transactions, but it has not even attempted to do so.  This is fatal to the SEC's claim.  Indeed, SEC leadership has acknowledged that, even as to cryptocurrencies that may have been securities when initially offered, there comes a time "when a digital asset transaction may no longer represent a security offering."  Fee Decl. Ex. 2 (June 14, 2018 statement of W. Hinman).  In 2018, then-Director of the SEC Division of Corporation Finance William Hinman explained that "[i]f the network on which the token or coin is to function is sufficiently decentralized—where purchasers no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts—the assets may not represent an investment contract."  *Id.*  In any event, the SEC has fallen far short of establishing the *Howey* elements as to BNB in any scenario.

### a.     The SEC Cannot Prove that BNB Involves an Investment of Money

The investment of money prong requires "the investor [to] commit his assets to the enterprise in such a manner as to subject himself to financial loss."  *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003).  For several reasons, the SEC has failed to satisfy this element.

*First*, the SEC has presented no evidence and, in fact, makes no arguments that the trading of BNB on BAM's platform constitutes an investment of money.  *Supra* Part II.B.2 (discussing how it is the SEC's burden to prove that all *Howey* elements are met for each transaction for which

it seeks to establish liability).  Even if the SEC presented evidence that purchasers of BNB on BAM exchanged money or value for BNB, any money paid would have gone to someone other than BNB's promoter.  As a matter of law, that does not satisfy *Howey's* "investment of money" element, which "requires that the investor commit his assets to *the enterprise*."  *Rubera*, 350 F.3d at 1090.  None of those BNB recipients would have committed assets to an enterprise—they would be strangers purchasing BNB from other strangers on the secondary market.

*Second*, in many instances not cited by the SEC, the recipients of BNB did not apparently exchange money in return for BNB.  For example, in May 2019, tens of thousands of BNB units were given away to users who traded the equivalent of 1 BTC on Binance.com.  Fee Decl. Ex. 9.  Binance engaged in a similar giveaway in February 2020.  Fee Decl. Ex. 10.  Distributions for nominal consideration do not involve an investor "giv[ing] up a ***specific consideration*** in return for a separable financial interest with the characteristics of a security."  *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979) (emphasis added).  The lack of any investment of money for this portion of BNB's distributions highlights a broader problem in the SEC's case.  Each unit of BNB is identical to all other units.  The recipient of a giveaway holds BNB that is indistinguishable from any other BNB, meaning that it is worth the same and creates the same exact claim on BNB's original issuer (that is, none) as BNB exchanged for money.  Moreover, a giveaway recipient could transfer their BNB to another holder, who will not even necessarily know the source of the BNB they received.  In those circumstances, there is no basis to conclude that BNB was obtained through an investment of money in an enterprise, and the SEC has not even attempted to differentiate for purposes of its claims between giveaway BNB and BNB purchased with money.

*Third*, the SEC's arguments that purchasers paid Bitcoin ("BTC") or Ethereum ("ETH") to obtain BNB in the ICO or that Binance compensated employees with BNB do not satisfy the first

*Howey* element.  This is because *Howey* requires an "investment of money," 328 U.S. at 301, not merely payment of money (or something of value).  *See, e.g.*, *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("The investment of money prong . . . requires that the investor . . . subject himself to [a risk of] financial loss" (internal quotation marks omitted)).  If mere payment were sufficient to satisfy the first *Howey* element, then that element would have no meaningful effect— it would be satisfied not just for people buying investment contracts in orange groves as occurred in *Howey*, but also for people who bought oranges at the supermarket.

> **b.**   **The SEC Cannot Prove that BNB Involves a Common Enterprise**

The SEC also fails to show that BNB holders joined in a "common enterprise."  To establish a common enterprise, the SEC must prove that purchasers of BNB received the economic equivalent of stock in a business enterprise.  *See Howey Co.*, 328 U.S. at 300 ("the elements of a profit-seeking business venture" are "investors [who] provide the capital and share in the earnings and profits" and "promoters [who] manage, control and operate the enterprise").  In other words, the SEC must show that the purchase of BNB was equivalent to a "share in the profits of a large citrus fruit enterprise" rather than merely the purchase of an orange.  *Id.*  The D.C. Circuit has held that a common enterprise may be shown through "horizontal commonality," which is "defined by the pooling of investment funds, shared profits, and shared losses."  *SEC v. Life Partners, Inc.*, 87 F.3d 536, 543 (D.C. Cir. 1996) (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)).

The SEC claims that the "proceeds from the BNB ICO were pooled and used to launch" Binance.com.  Mem. at 41.  But even if Binance "pooled" proceeds from the ICO in a single account or crypto wallet, that would not establish horizontal commonality.  What matters under *Howey* is not whether funds are put into a single account, but whether the profits are distributed to purchasers based on their shares in that enterprise.  *See, e.g.*, *SEC v. Variable Annuity Life Ins. Co.*

*of America*, 359 U.S. 65, 71 (1959) (variable annuity contracts gave investors a right to a "*pro rata* share" of returns from a "portfolio of equity interests"). Here, the SEC does not allege that BNB holders have a future interest in any Binance property, such as revenues, dividends, or anything else that would make it similar to a stock. In fact, the SEC's own exhibits support that they did not: "***BNB does not provide users with a claim on Binance profits and does not represent an investment in Binance***." SEC Ex. A-10, at 1 (emphasis added).

The SEC also argues that horizontal commonality is satisfied because "each BNB token is fungible and the price of all tokens rise and fall together" based on the strength of the "ecosystem" built by Binance. Mem. at 41-42. This argument is really a vertical commonality argument (where a purchaser's fortunes are tied to the *promoter*) disguised as a horizontal commonality argument.[5] Regardless, the fact that BNB is fungible does not mean that BNB holders depend upon one another to earn profits. *See, e.g.*, *Revak*, 18 F.3d at 87 (to establish horizontal commonality "each individual investor's fortunes [were tied to] the fortunes of the other investors"). Rather, it simply shows that BNB holders have a common ***interest*** in BNB's price, which is far different than showing that BNB holders are in a common ***enterprise***. Indeed, owners of gold share a common interest in the price of gold, but that does not mean those owners are in a common enterprise that depends upon one another to earn profits on sales of gold or that they are in a common enterprise with whomever originally mined their gold. *See, e.g.*, *SEC v. Belmont Reid*, 794 F.2d at 1388,

---

[5]     The SEC asserts in footnote that strict vertical commonality exists because "investors' fortunes were tied to the fortunes of the token issuer." Mem. at 42, n.22. The D.C. Circuit has not adopted the theory of vertical commonality. *See Life Partners, Inc.*, 87 F.3d at 544. Regardless, the SEC's argument fails because it has not alleged that "the fortuity of the investments collectively is essentially dependent upon promoter expertise." *Revak*, 18 F.3d at 88. Binance's profits are not dependent on the relative price of BNB; as the SEC acknowledges, "Binance's revenue derives primarily from fees for transactions in crypto assets effected through the Binance.com Platform." Mem. at 13. Binance's revenues could increase as the price of BNB decreases.

1391 (9th Cir. 1986) (sale of gold coins was not an investment contract); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) (sugar futures).

> **c.    The SEC Cannot Prove that BNB Holders Reasonably Expect Profits from the Efforts of Others**

The SEC also has not established that BNB holders were "led to expect profits solely from the efforts of" others. *Howey*, 328 U.S. at 298-99; *see also SEC* v. *Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973) (investors must anticipate profits from the "undeniably significant" efforts of others, namely "those essential *managerial efforts* which affect the failure or success of the enterprise." (emphasis added)).  This is so for several reasons.

*First*, as detailed above (see *supra* II.A), the SEC has not alleged or presented evidence that Defendants (or anyone else) had contractual obligations to make efforts that would return a profit to BNB owners.  BNB owners could not have reasonably expected profits to come from the efforts of Binance when Binance had no obligation to expend any efforts on their behalf.  *See, e.g.*, *Rodriguez v. Banco Cent.*, 990 F.2d 7, 11 (1st Cir. 1993).

*Second*, BNB owners do not benefit from Binance's profits and, to the extent they profit at all, it is the function of a decentralized and widely used blockchain that Defendants do not control. *See generally* Defendants BHL and Zhao's Opposition Memorandum.  *Howey's* third prong is not met where, as here, "the realization of profits depends significantly on the post-investment operations of market forces" beyond the control of the promoter.  *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005).

*Third*, the SEC cannot establish this element by pointing to a handful of public statements that they allege create an expectation of profits.  As an initial matter, the SEC has not identified any contractual or binding obligation created from these public statements.  Even if extra-contractual public statements could be part of some theoretical contract involving BNB, none of

the public statements identified by the SEC establishes a reasonable expectation of profits. The SEC has pointed to statements allegedly showing that Binance had its own interest in developing Binance.com. But "[a]ny benefit to" BNB holders from such efforts is "purely incidental." *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975).

More broadly, even if a public statement alone could turn a non-security into a security, the SEC fails to explain which public statements allegedly created a reasonable expectation of profits for which transactions involving BNB on BAM's platform. This is highly problematic because the SEC is focused on the 2017 ICO, but then identifies some public statements from years later as purported evidence that an ICO purchaser had a reasonable expectation of profits. *See, e.g.*, Mem. at 9-10 (referencing certain public statements from 2019). As a matter of law, the SEC cannot rely on post-sale representations to prove its case. A "transaction must be characterized at its inception, not as it develops, for registration of securities must occur before their sale." *Lavery v. Kearns*, 792 F. Supp. 847, 855 (D. Me. 1992) (citing *Joiner*, 320 U.S. at 352-53); *see Marine Bank*, 455 U.S. at 559 n.9 (rejecting argument "that the certificate of deposit [of a bank] was somehow transformed into a security when it was pledged, even though it was not a security when purchased"); *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013).

*Finally*, the SEC does not present any evidence that any purchaser of BNB on BAM's Platform actually encountered any of the public statements it cites. Without evidence that many, some, or even any BNB purchasers on BAM's Platform encountered the statements upon which the SEC relies, the SEC cannot meet its burden of proof that such statements created an expectation of profits from others' efforts. *See Salameh*, 726 F.3d at 1131-32 (extra-contractual representations that were not made to the purchasers before the sale were "irrelevant").

- 27 -

### C.   The SEC Cannot Establish that BAM's Platform Included Wash Trading or that BAM Made Any Material Misstatements or Omissions

The SEC alleges that BAM knew or should have known that Sigma Chain, a market maker on BAM's platform, was engaged in "wash trading" and, as a result, any representations regarding the volume on its trading platform or trade surveillance program were materially misleading. Mem. at 23-24.  The SEC's claim fails for the simple reason that it has not identified a security involved in any of the alleged wash trading at issue.  Regardless, to establish a claim under Sections 17(a)(2) or (a)(3) of the Securities Act the SEC needs to show that BAM Trading (i) made a material misrepresentation or a material omission; (ii) that it knew or should have known was false; (iii) in connection with the offer or sale of securities. *Stoppelman v. Owens*, 1984 WL 609, at *13 (D.D.C. June 7, 1984).  It cannot do so for a variety of reasons.

### 1.   The Allegedly Manipulative Trading Identified by the SEC was Entirely Appropriate and, In Any Event, was Not Material

As an initial matter, the SEC has failed to present evidence supporting its insinuation that Sigma Chain was engaged in wash trading.  The SEC's "evidence" is comprised of conclusory statements of an SEC attorney contained in a declaration supporting the SEC's motion without any accompanying documentary evidence or data.  *See* Colby Decl. ¶¶ 111-118.  This is plainly insufficient to establish that wash trading occurred on BAM's platform.  *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006) (a "conclusory statement from counsel hardly qualified as evidence" in support of TRO application).

Regardless, the trading activity at issue was legitimate.  By way of background, Sigma Chain operates several independent trading strategies that perform different functions within BAM Trading's various products.  These trading strategies use algorithms that are automated, entirely independent of one another, and do not have information regarding the other algorithms' respective

positions, trades, or open interests.  The purpose of these trading strategies is to facilitate Sigma Chain's role as a market maker for BAM's customers.  While these strategies may interact in the market, the SEC has repeatedly recognized that this type of inadvertent self-trading between independent strategies is entirely *bona fide* and not improper.

For example, in 2014, the SEC approved changes to the supplementary material to FINRA Rule 5210 to require FINRA members to adopt policies and procedures to "review their trading activity for, and prevent, a pattern or practice of self-trades resulting from orders originating from a single algorithm or trading desk, or related algorithms or trading desks."  In its order approving the amendment, the SEC expressly noted that, under the final rule, "transactions resulting from orders that originate from unrelated algorithms or from separate and distinct trading strategies within the same firm would generally be considered bona fide self trades."  The SEC distinguished these legitimate trades from prohibited "wash trades," which require "a fraudulent or manipulative purpose behind the trading activity."  *See* Order Approving Proposed Rule Change Relating to Self-Trades and FINRA Rule 5210 at 4, (May 1, 2014); *see also* FINRA Rule 5210.[6]

Within this framework, there can be little question that Sigma Chain's trading was legitimate.  The SEC has presented no evidence that the trading at issue was the result of anything other than the interaction of independent algorithms, many of which respond directly to third-party customer demands.  This is exactly the type of activity that the SEC and CFTC, as well as numerous other regulatory bodies, have found to be permissible and in some instances "desirable." *See* Notice of proposed rulemaking, Regulation Automated Trading, 80 Fed. Reg. 78,823.

---

[6]    Other regulators also have made the distinction between permissible self-trading and impermissible wash trading clear.  *See* CME MRAN RA2008-5 (applicable to CME, CBOT, NYMEX, and COMEX), https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2020/09/RA2008-5.pdf.

Moreover, even if wash trading occurred (and it did not), the SEC has not established that it was material.  The Colby Declaration asserts that wash trading occurred on one day in 2019, from June through August 2021, and a handful of days in 2022.  The trading volume at issue over these time periods was a miniscule portion of BAM's aggregate trading volume.  For example, between June and August 2021, BAM Trading's aggregate trading volume was approximately $60 billion.  Of that volume, only 0.14% resulted from self-trades between accounts owned by Sigma Chain, all of which was attributable to trades between Sigma Chain's various independent algorithms.  *Id.*

## 2. BAM Did Not Make Any Material Misstatements or Omissions

The SEC also cannot establish that BAM made any material misstatement or omission. The SEC claims that BAM misstated its trading volume due to wash trading (though it does not identify when or by how much), but the putative wash trading reflected legitimate economic activity between independent algorithms.  Because this activity was legitimate, BAM's reported trade volumes were entirely accurate, omitted no significant information, and no additional disclosures were needed.

The Staff further alleges that BAM's statements in a pitch deck that it engaged in "trade surveillance" were misleading because BAM's trade surveillance program was allegedly not capable of identifying inappropriate conduct.  Mem. at 21-22.  This cannot form the basis of a misrepresentation claim because BAM made no statements at all about its ability to identify or prevent any specific types of conduct.  By merely stating that BAM engaged in trade surveillance, BAM did not represent or guarantee that BAM is able to identify and prevent that conduct. Nothing about BAM's statements were misleading because "[a] statement is actionable only if it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Honig v. Hansen*, 2022 WL 1239632, at *4 (S.D.N.Y. 2022).

Furthermore, the sufficiency of a trade surveillance program on a particular platform does not have any relevance to a customer's investment decisions, particularly where assets are widely traded across multiple venues.  To be actionable, a misstatement or omission must have some bearing on the price or characteristics of the asset being traded.  Courts have repeatedly held that a counterparty or intermediary's statements about itself are not material to a decision to buy or sell specific assets, even if the customer would have chosen a different counterparty or intermediary absent the alleged misrepresentation.  *See Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1149-50 (11th Cir. 2018); *SEC v. Goble*, 682 F.3d 934, 943-44 (11th Cir. 2012).

Here, the SEC has not alleged, and cannot show, that BAM's alleged trade surveillance issues had any impact on the price of the underlying digital assets, which were widely traded across different markets around the world.  Accordingly, those statements could not have been material to a customer's investment decision.

## III.   THE SEC FAILS TO SATISFY ITS BURDEN TO OBTAIN AN ASSET FREEZE

The SEC has fallen far short of showing that a freeze of ***all of BAM's assets without any exceptions*** is appropriate.  The SEC's request does not "preserve the status quo"—it would effectively end BAM's business immediately, lead to customer confusion, and have potentially disastrous consequences.  Given the SEC's total lack of evidence of any dissipation of assets, its request must be denied.  Moreover, to the extent the SEC's concern is that assets might be transferred to Defendants BHL or Zhao, BAM has already agreed not to do so and Defendants proposed an order to that effect.

When considering whether to order an asset freeze, the Court "must weigh the deleterious effects the freeze may have on the defendants' business against the considerations indicating the need for such relief." *SEC v. Current Fin.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992) (quotations

omitted); *see also Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 (2d Cir. 1974) (the "disruption in operations" resulting from an asset freeze is "an element to be considered by the district court in evaluating the appropriateness of an asset freeze." (citing *Manor Nursing Centers* 458 F.2d at 1106)); *SEC v. Dubovoy*, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015) (same).

The SEC's proposed freeze—which has no exceptions for payments in the ordinary course of business—would have more than deleterious effects on BAM's business, it would effectively end it.  Mem. at 58-59.  Without the ability to transfer assets ***for any reason***, BAM would be crippled.  BAM would not be able to provide any services to its customers such that they would have no ability to obtain fiat currency and digital assets stored by BAM.  BAM also would be unable to pay its employees, which could lead to swift employee departure.  BAM's inability to pay for professional services, including legal counsel, would obviously hinder its ability to effectively prepare a defense.   Even the SEC's motion for a freeze has had significant consequences for BAM.   As has been widely reported, the SEC's motion has concerned BAM's banking partners, some of which have threatened to not allow BAM to access assets, including for customers.  *See* Fee Decl. Ex. 11 (June 9, 2023 N.Y. Times Article).

The SEC also has not demonstrated any legitimate need for the freeze.  BAM has been cooperating with the SEC's investigation for years and has produced hundreds of thousands of documents addressing virtually every aspect of BAM's business, including its custody of assets. Yet, the SEC has not identified a single instance in which BAM customer assets were misused or mishandled in any way.  The SEC's argument boils down to a concern that assets might be transferred from BAM to BHL and/or Zhao because Zhao has allegedly sought to avoid potential application of U.S. regulations to Binance's international business.  Mem. 59-62.  The SEC's

speculative and unsubstantiated concerns are wholly insufficient for demonstrating a need to effectively end BAM's business immediately.  *See, e.g.*, *Aciper*, 2020 WL 6482878, at *5.

The SEC has not identified a single case in which a Court has ordered an asset freeze in similar circumstances—that is, where the defendants have been cooperating for years, there is no evidence of dissipation of assets by anyone, and the underlying charges amount to failing to register with the SEC.  Rather, cases involving asset freezes (including those cited by the SEC) almost universally involve defendants who misused or diverted assets, and/or were engaged in outright fraud.  *See* Order, *SEC v. Nanotech Eng'g, Inc.*, No. 19 Civ. 3633, Dkt. 5 (ABJ) (D.D.C. Dec. 5, 2019) (asset freeze appropriate where the SEC proffered evidence that defendants inappropriately used investor funds to purchase various luxury items, including jewelry, luxury vehicles, and a yacht); *Unifund Sal*, 910 F.2d 1028 (2d Cir. 1990) (similar); *Int'l Loan Network, Inc.*, 770 F. Supp. at 696-97 (similar).  None of those circumstances are present here.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter Defendants' proposed order and deny the SEC's motion.

Dated:  June 12, 2023

Respectfully submitted,

/s/ Matthew T. Martens

William R. McLucas (*pro hac vice* pending)
Matthew T. Martens (D.C. Bar #1019099)
Matthew Beville (*pro hac vice* pending)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
William.McLucas@wilmerhale.com
Matthew.Beville@wilmerhale.com
Matthew.Martens@wilmerhale.com

Tiffany J. Smith (*pro hac vice* pending)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tiffany.Smith@wilmerhale.com

/s/ Andrew M. Leblanc

Andrew M. Leblanc (D.C. Bar #479445)
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20003
ALeblanc@milbank.com

George S. Canellos (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
GCanellos@milbank.com
MLaroche@milbank.com

Adam J. Fee (*pro hac vice*)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
AFee@milbank.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc.*