# Exhibit 1

# GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III

## VIRTUAL HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

———

MAY 6, 2021

———

Printed for the use of the Committee on Financial Services

## Serial No. 117–22



———

U.S. GOVERNMENT PUBLISHING OFFICE

44–837 PDF                WASHINGTON : 2021

## HOUSE COMMITTEE ON FINANCIAL SERVICES

MAXINE WATERS, California, *Chairwoman*

CAROLYN B. MALONEY, New York
NYDIA M. VELÁZQUEZ, New York
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
DAVID SCOTT, Georgia
AL GREEN, Texas
EMANUEL CLEAVER, Missouri
ED PERLMUTTER, Colorado
JIM A. HIMES, Connecticut
BILL FOSTER, Illinois
JOYCE BEATTY, Ohio
JUAN VARGAS, California
JOSH GOTTHEIMER, New Jersey
VICENTE GONZALEZ, Texas
AL LAWSON, Florida
MICHAEL SAN NICOLAS, Guam
CINDY AXNE, Iowa
SEAN CASTEN, Illinois
AYANNA PRESSLEY, Massachusetts
RITCHIE TORRES, New York
STEPHEN F. LYNCH, Massachusetts
ALMA ADAMS, North Carolina
RASHIDA TLAIB, Michigan
MADELEINE DEAN, Pennsylvania
ALEXANDRIA OCASIO-CORTEZ, New York
JESUS "CHUY" GARCIA, Illinois
SYLVIA GARCIA, Texas
NIKEMA WILLIAMS, Georgia
JAKE AUCHINCLOSS, Massachusetts

PATRICK McHENRY, North Carolina,
   *Ranking Member*
FRANK D. LUCAS, Oklahoma
BILL POSEY, Florida
BLAINE LUETKEMEYER, Missouri
BILL HUIZENGA, Michigan
ANN WAGNER, Missouri
ANDY BARR, Kentucky
ROGER WILLIAMS, Texas
FRENCH HILL, Arkansas
TOM EMMER, Minnesota
LEE M. ZELDIN, New York
BARRY LOUDERMILK, Georgia
ALEXANDER X. MOONEY, West Virginia
WARREN DAVIDSON, Ohio
TED BUDD, North Carolina
DAVID KUSTOFF, Tennessee
TREY HOLLINGSWORTH, Indiana
ANTHONY GONZALEZ, Ohio
JOHN ROSE, Tennessee
BRYAN STEIL, Wisconsin
LANCE GOODEN, Texas
WILLIAM TIMMONS, South Carolina
VAN TAYLOR, Texas
PETE SESSIONS, Texas

CHARLA OUERTATANI, *Staff Director*

# C O N T E N T S

————

|  | Page |
|---|---|
| Hearing held on: | |
| May 6, 2021 ................................................................................ | 1 |
| Appendix: | |
| May 6, 2021 ................................................................................ | 69 |

## WITNESSES

### THURSDAY, MAY 6, 2021

| | |
|---|---|
| Bodson, Michael C., President and Chief Executive Officer, The Depository Trust & Clearing Corporation (DTCC) ............................................. | 6 |
| Cook, Robert W., President and Chief Executive Officer, Financial Industry Regulatory Authority (FINRA) ......................................................... | 8 |
| Gensler, Hon. Gary, Chairman, U.S. Securities and Exchange Commission (SEC) ................................................................................................. | 5 |

## APPENDIX

| | |
|---|---|
| Prepared statements: | |
| Bodson, Michael C. ................................................................... | 70 |
| Cook, Robert W. ......................................................................... | 76 |
| Gensler, Hon. Gary .................................................................... | 89 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | |
|---|---|
| Williams, Hon. Nikema:: | |
| Written responses to questions for the record from Hon. Gary Gensler ...... | 96 |

# GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III

————

**Thursday, May 6, 2021**

U.S. HOUSE OF REPRESENTATIVES,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, D.C.*

The committee met, pursuant to notice, at 12 p.m., via Webex, Hon. Maxine Waters [chairwoman of the committee] presiding.

Members present: Representatives Waters, Maloney, Sherman, Meeks, Scott, Green, Cleaver, Perlmutter, Himes, Foster, Vargas, Gottheimer, Lawson, Axne, Casten, Torres, Adams, Tlaib, Dean, Garcia of Illinois, Williams of Georgia, Auchincloss; McHenry, Lucas, Posey, Luetkemeyer, Huizenga, Wagner, Barr, Williams of Texas, Hill, Zeldin, Loudermilk, Mooney, Davidson, Budd, Kustoff, Hollingsworth, Gonzalez of Ohio, Rose, Steil, Timmons, and Taylor.

Chairwoman WATERS. The Financial Services Committee will come to order.

Without objection, the Chair is authorized to declare a recess of the committee at any time.

As a reminder, I ask all Members to keep themselves muted when they are not being recognized by the Chair. The staff has been instructed not to mute Members except when a Member is not being recognized by the Chair and there is inadvertent background noise.

Members are also reminded that they may only participate in one remote proceeding at a time. If you are participating today, please keep your camera on, and if you choose to attend a different remote proceeding, please turn your camera off.

Today's hearing is entitled, "Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III."

I now recognize myself for 4 minutes to give an opening statement.

Today, this committee convenes for part three of our series of hearings focused on market volatility related to GameStop and other stocks. In our first hearing on those events, we received testimony from the CEOs of trading app, Robinhood; Wall Street firms, Citadel and Melvin Capital; and social media company, Reddit; as well as Keith Gill, a trader involved in WallStreetBets on subreddit. We heard directly from those involved in the short squeeze and volatility and we got the facts.

(1)

2

In our second hearing, we received testimony from a number of capital markets experts and investor advocates to hear their views and begin to assess possible legislative and regulatory steps that may be necessary. We examined conflicts of interest in the market. We scrutinized payment for order flow, potential systemic risks to our financial system, the gamification of trading, the clearance and settlement process for trades, and the evolution of trading with the rising use of social media and new technologies.

Today, we will focus on the regulatory response to the market volatility. Specifically, we will hear testimony from the U.S. Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), and the Deposit Trust and Clearing Corporation (DTCC) about their responses to events we are examining. It is critical for our cops on the block at the SEC to protect investors and ensure that our markets are transparent and fair. Unfortunately, the previous Administration's appointees to financial regulatory agencies were often more interested in helping out Wall Street than protecting Main Street.

I am very pleased that, thanks to President Biden's strong leadership, we now have Gary Gensler at the helm of the SEC. Chair Gensler, I look forward to hearing your testimony and discussing your views on the short squeeze and surrounding events, as well as practices like payment for order flow.

I am also interested in hearing from Mr. Cook and Mr. Bodson, the CEOs of private-sector corporation, FINRA, which oversees broker-dealers; and DTCC, which provides clearing and settlement services to our securities markets, respectively.

Under my leadership, this committee is focused on ensuring accountability for Wall Street. I decided to convene this series of three hearings on this topic to ensure that Congress is well-informed on developments in and functioning of our capital markets, and to put Wall Street on notice that we are watching closely.

I yield back the balance of my time, and I now recognize the ranking member of the committee, the gentleman from North Carolina, Mr. McHenry, for 4 minutes.

Mr. McHenry. Thank you, Madam Chairwoman. I would like to talk about what was learned at our last hearing on GameStop, We learned that everyday Americans have a newfound interest in the markets, and that is positive. We learned that financial technology is here to stay, and it is providing more opportunities for retail investors to participate in our markets. That is positive. We learned that Reddit is powerful. And we learned that Roaring Kitty is indeed not a cat, and we know just as much as we did at the first hearing.

And I continue to hear the same policy solutions from my Democrat colleagues, the repackaged, old, outdated, policy failures wrapped in whatever is in the news this week to sell the American people on the idea that this time is different. Well, it is not. Like so many other bad progressive ideas sold under the guise of investor protection, which I think is important, Democrats' proposals will ultimately reduce access to investment opportunities and charge D.C. bureaucrats and give them control of investing decisions of everyday Americans. If this committee is interested in re-

3

sponding to late January's events, we need to expand the credit investor regime, not restrict it.

It is ridiculous that our securities laws force most everyday Americans to the sidelines of early-growth investment opportunities. We need to find innovative solutions that allow more people to invest in businesses they support, while retaining the flexibility our changing workforce needs and requires.

This week I reintroduced my bill, the Gig Worker Equity Compensation Act, to expand the category of workers that can benefit from equity compensation to include nontraditional workers. If you want to see the juxtaposition of Democrat and Republican priorities right now, just yesterday, the Biden Administration moved to dismantle past efforts to provide gig workers with the flexibility they demand, that they need, that they require. If a State as liberal as California can recognize that a one-size-fits-all mandate on gig workers would be destructive, it should be obvious that the Biden Administration should not take those same actions that went down at the ballot box in California, actions that hurt nontraditional workers, not help them.

I initially called for this hearing on GameStop to begin the process of fact finding to inform our policy discussions, and the bottom line is that we are still gathering a number of facts. That is why we have representatives from FINRA and DTCC testifying before us today. I think that is a good thing.

Additionally, the SEC's review of the events is ongoing, as is the committee's work behind-the-scenes in terms of document review and interviews. Despite the ongoing investigations and the testimony we will receive today, many Democrats have their so-called solutions. A lot of these things have been kicked around for a long time.

At our first GameStop hearing, I asked Democrats to side with everyday American investors. I will ask that same thing today. We should not punish everyday American investors with a Democrat agenda, a progressive agenda that results in fewer investment options or forces folks to start paying to make trades again. So, let's go off of what we have learned. Let's stand up for everyday investors and make it easier for them to invest, and let's tear down barriers keeping folks out of the market instead of throwing up new ones to impair their ability to be in the market. Let's stand up for equity—true equity—and that is ownership of the American economy, and ownership in our capital markets so we can remain the center of the free world's economic policies.

And with that, Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much, Mr. McHenry. I am pleased that you see something good about our hearing today.

I now recognize the gentleman from California, Mr. Sherman, who is also the Chair of our Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, for 1 minute.

Mr. SHERMAN. I thank Chairman Gensler for being here, and I hope he joins us often. The ranking member is concerned about whether gig workers in my State have the protection that we accord employees. It is a little far from the mandate of our committee. But within our committee's jurisdiction is to make sure that when investors trade stocks, they get the best possible deal and are

4

not told that there is zero transaction cost when the big transaction cost is the spread, and you are paying for the transaction unless you are getting the best possible price improvement. Price improvement may not be fully available if your broker is getting paid for order flow or if your broker is acting as a market-maker.

We also need to look at short-sale disclosures. Right now, there are disclosures filed with the SEC quarterly. That is so 1977. We would expect reports to be filed far more often, and we have to discuss what reports should be made public, and I look forward also to looking at margin selling.

Chairwoman WATERS. Thank you. I now recognize the ranking member of the subcommittee, the gentleman from Michigan, Mr. Huizenga, for 1 minute.

Mr. HUIZENGA. Thanks, Madam Chairwoman. Advancements in technology have improved access to our capital markets and created new opportunities for countless Americans to participate in our markets who were previously excluded. App-based interfaces, combined with zero commission trades, fractional share trading, and lowered account minimums, have ushered in a new generation of investors. However, instead of celebrating this new era of investment, how have my colleagues across the aisle responded for the most part? By falsely claiming that this increase in market participation has caused gamification in the experience, that markets are rigged, and some have even gone so far as to equating it to gambling in a casino.

As Rahm Emanuel famously said, "You never want a serious crisis to go to waste. It is an opportunity to do things that you think you could not do before." Well, that is exactly what my friends on the other side of the aisle are doing. They are exploiting a high-profile situation to push a radical progressive agenda of these proposed, small "D," democratic solutions that will only further prevent everyday American investors from accessing our capital markets, and deny them the opportunity to further save and invest for a more prosperous future.

I yield back.

Chairwoman WATERS. Thank you. I want to now welcome today's distinguished witnesses to the committee.

First, we have the Honorable Gary Gensler, who is the recently-confirmed Chair of the U.S. Securities and Exchange Commission. This is Chair Gensler's first time appearing before the committee in his current capacity. He has previously served as Chair of the Commodity Futures Trading Commission, and in several senior roles at the Department of the Treasury.

Second, we have Mr. Michael Bodson, who is the President and Chief Executive Officer of the Depository Trust & Clearing Corporation (DTCC).

And finally, we have Mr. Robert Cook, who is the President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA).

Each of you will have 5 minutes to summarize your testimony. You should be able to see a timer on your screen that will indicate how much time you have left, and a chime will go off at the end of your time. I would ask you to be mindful of the timer, and quick-

ly wrap up your testimony if you hear the chime. And without objection, your written statements will be made a part of the record.

Chair Gensler, you are now recognized for 5 minutes to present your oral testimony.

**STATEMENT OF THE HONORABLE GARY GENSLER, CHAIRMAN, U.S. SECURITIES AND EXCHANGE COMMISSION (SEC)**

Mr. GENSLER. Good afternoon, Chairwoman Waters, Ranking Member McHenry, and members of the committee. I am honored to appear before you today for the first time as Chair of the Securities and Exchange Commission. I have been in front of this committee multiple times in multiple Administrations, and I will say this: I look forward to the day when we can meet in person in your beautiful hearing room again.

Thank you for inviting me to testify about January's market volatility, and I am pleased to be here with Mike Bodson and Robert Cook, whom I have known for a number of years as well.

I would like to note that my views are my own, and I am not speaking on behalf of my fellow Commissioners or of the SEC staff.

These events are part of a larger story about the intersection of finance and technology, which have lived in a symbiotic relationship since antiquity. And one thing that I have come to believe is that technology can allow greater access to our capital markets. Our central question is this, though: When new technologies come along and change the face of finance, as they have done for decades, how do we continue to achieve our core public policy goals?

In my role, I will always be animated by thinking about working families in the SEC's three-part mission: protecting investors; promoting fair, orderly, and efficient markets; and facilitating capital formation. I am pleased to submit written testimony that goes into detail on several factors at play during January's events. I will just highlight a few of those key issues in this opening statement.

The first is gamification and user experience. I agree with the Members who have already said that these new user experiences have facilitated a lot of opportunity for investors. They have expanded access to capital, making it easier for investors to sign up, start trading, and learn about investing. These apps also use a host of features that have come to be familiar in our increasingly-online world such as gamification, behavioral props, and predictive data analytics. Many of these features, in essence, encourage investors to trade more frequently. This could have a substantial effect on a saver's financial position. Some academic studies suggest that the more actively you trade, the lower your returns, so while they are encouraging investing, they may also be encouraging active trading.

I have asked the staff to prepare a request for public comment on these issues. The SEC must remain attuned to rapidly-changing technologies with an eye to freshening up our rule set, where appropriate, to continue to achieve our mission. If we don't address this now, the investing public, those saving for future retirement and education, may shoulder the burden later.

The second topic I would like to discuss is this area around payment for order flow. This practice brings to mind a number of questions, including whether it creates inherent conflicts of interest be-

6

tween the broker-dealers on the one side, and their customers on the other, who want to achieve, under our rules, best execution. Now, it is important to consider this, I think, in the overall context of market structure. Currently, a significant amount of retail orders are routed to a small number of wholesalers. I detail this more in my written testimony, but I think it raises questions about whether the market structure best promotes fair, orderly, and efficient markets. Evolving market technologies, along with this payment for order flow, has also led to increasing market concentration, which we have found, and history and economics show, can lead to fragility in markets, deter healthy competition, and limit innovation.

The next issue is short selling and market transparency, and, again, as outlined in my written testimony, under the Dodd-Frank Act reforms, the SEC received mandates and authorities to increase transparency in the markets. So, I have asked SEC staff to prepare recommendations on transparency and short sale, stock loan markets, and something called total return swaps, which was at the center of this Archegos event in March, for Commission consideration. And the five of us Commissioners can take a look to see what to do next.

Next, today's social media tools have far greater reach, scale, and anonymity than previous technology. This raises the possibility that wrongdoers will attempt to use their powerful forums to hype certain stocks or manipulate markets. I am not concerned about regular investors exercising their free speech rights online; I am more concerned whether bad actors potentially take advantage of influential platforms.

Further, the decisions by some broker-dealers to redirect customer trading raised several issues around clearance and settlement. In essence, they stopped investors from investing, and this raises questions of the market, what I will call, "plumbing." Sorry to Mike Bodson if I call infrastructure, "plumbing," but investors were shut out. I do believe we can lower costs and risk in our market by shortening the settlement cycle. For instance, I have asked SEC staff to put together a draft proposal for the Commission on the possibility of shortening the settlement cycles.

Thank you. I look forward to your questions. It is good to be back with you, and, again, I look forward to doing this in person.

[The prepared statement of Chairman Gensler can be found on page 89 of the appendix.]

Chairwoman WATERS. Thank you, Chair Gensler. Next, we will go to Mr. Bodson. You are now recognized for 5 minutes to present your oral testimony.

## STATEMENT OF MICHAEL C. BODSON, PRESIDENT AND CHIEF EXECUTIVE OFFICER, THE DEPOSITORY TRUST & CLEARING CORPORATION (DTCC)

Mr. BODSON. Chairwoman Waters, Ranking Member McHenry, and members of the committee, my name is Michael Bodson, and I am the CEO of The Depository Trust & Clearing Corporation (DTCC), a holding company that operates three SEC-regulated clearing agencies, including the National Securities Clearing Cor-

7

poration, or NSCC, of which I will speak to you today. I appreciate this opportunity to speak to the committee.

In my line of work, the best days are those when nothing too exciting happens. That is because DTCC is, at its heart, a risk management organization enhancing efficiencies and reliability in the markets. On a normal day, we process about 200 million buys and sells for a value of nearly $2 trillion. Through netting, that is reduced to about $1 million in securities movement and $35 billion in cash movement, creating significant efficiencies in the market.

When you buy or sell a stock, it takes 2 days for the trade to be completed. This is called T+2 settlement: trade date plus 2 days. A lot could happen during those 2 days that could create a risk that the buyer or seller fails to deliver money or shares. Because of clearing, investors don't have to worry about that. Clearing protects both firms and their customers against default risk. Default risk can destabilize markets, particularly in volatile times. People are reluctant to trade if they aren't sure they will get what they agreed to. And imagine how inefficient it would be for every market participant to have to assess the creditworthiness of everyone else in the market.

That is where DTCC comes in. We are infrastructure. You can call us, "plumbing." We are not insulted. We operate behind the scenes to guarantee completion of virtually all equity trades. We do not trade or take positions or bet on the direction in the market. We do not give investment advice. We do not know who the customers are behind the trades or their reasons for trading. We simply process and risk-manage trades.

DTCC protects against default risk by collecting margin, which is money that clearing members post as collateral. If a declaring member defaults between trade date and settlement date, DTCC uses that collateral to complete the defaulting member's trades no matter how much prices may have changed.

Margin requirements are calculated using statistical models and model-based calculations that are set forth in our rules, which must be approved by the SEC. Margin requirements increase the risk, and the member's portfolio increases. In other words, the greater the potential loss the default could produce, the greater the need for collateral.

Volatility has a very large impact on margin requirements. We saw this play out during the week of January 25th. Both volume and volatility that week were extraordinary, exceeding the pandemic-related record volume from March 2020 by more than 100 million trades. The concentration of trading in a small number of meme stocks that week was also extraordinary. Applying those statistical models of formulas, margin requirements increased substantially for firms with large volumes in these stocks.

I appreciate that this committee is exploring ways to continue to improve our markets. I would like to describe one effort that DTCC has undertaken to date, which is shortening the settlement cycle for equities from 2 days to 1 day. That may sound like a small thing if it is just 1 day, but cutting the settlement period in half can make a difference. We believe that shortening the settlement cycle to T+1 would enhance market resilience, reduce margin requirements, and lower costs for investors. Following a multi-year,

8

industry-wide effort, settlements were shortened in 2017 from T+3 to T+2, achieving margin savings estimated at 25 percent. DTCC estimates that the volatility component of margin requirement could potentially be reduced by 40 percent when it moves to T+1. This could save our clearing members upwards of $6 billion per day during periods of extreme volatility.

While DTCC's technology can support T+1 today, changing the industry convention is a major undertaking that will require coordinated efforts across the whole industry. Over the past year, DTCC has engaged with a cross-section of the industry to assess readiness to further shorten the settlement cycle. In February, DTCC published a White Paper outlining the benefits associated with multiple changes to the settlement cycle, including a move to T+1. We are working with the Securities Industry and Financial Markets Association (SIFMA) and the Investment Company Institute (ICI) to accelerate this effort.

Thank you again for the opportunity to testify today. I look forward to your questions.

[The prepared statement of Mr. Bodson can be found on page 70 of the appendix.]

Chairwoman WATERS. Thank you very much, Mr. Bodson. Mr. Cook, you are now recognized for 5 minutes to present your oral testimony.

## STATEMENT OF ROBERT W. COOK, PRESIDENT AND CHIEF EXECUTIVE OFFICER, FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA)

Mr. COOK. Thank you, Chairwoman Waters, Ranking Member McHenry, and members of the committee for this opportunity to testify today, together with Chair Gensler and Mr. Bodson, regarding the January market events related to trading in GameStop and in other stocks. We commend the committee's review of these events and related investor protection concerns.

FINRA's mission is to protect investors and promote market integrity. We are a not-for-profit self-regulatory organization (SRO), and we support the SEC in overseeing one critical part of the securities industry: certain broker-dealers and the individuals they employ. To that end, we administer comprehensive regulatory programs, including surveillance, risk monitoring, examination, and enforcement. And we, in turn, are subject to comprehensive examination and oversight by the SEC.

This committee has heard already about the events of January, including the significant price swings and trading volume in GameStop and a limited number of other stocks. In this context, some broker-dealers restricted trading in these securities on a short-term basis. This led to confusion and frustration among some investors and concerns about the fairness of the markets. The event also focused attention on the growth of popular new retail trading platforms and services, changes in investor behavior, and the influence of social media on the markets.

Our markets are dynamic and are continually evolving. Market participants constantly innovate new technologies, methods of communication, and investment products and services. These innovations often benefit investors, such as by providing easier access to

9

the markets, lower costs, and a wider range of investment products and services to choose from, but they can also present new and sometimes unanticipated risks, so regulators must constantly review whether the rules governing the road need to be updated in light of new developments to better protect investors, while still facilitating vibrant and innovative markets and the opportunities these create. At FINRA, we are committed to doing just that. One important resource we rely on in this process is the research of the FINRA Investor Education Foundation, including recent research on new, inexperienced investors, and how they approach investing.

Since the events of January, FINRA has established an internal working group that is devoting significant resources to investigating whether its broker-dealer members comply with SEC and FINRA rules. We have also issued regulatory notices reminding firms of relevant duties and responsibilities in this area.

Although I cannot comment on specific firms or ongoing investigations or enforcement matters, generally speaking, we are reviewing order routing practices, the circumstances under which trading restrictions were imposed, any potential manipulative conduct, and compliance with short-sale requirements, among other matters. I can assure the committee that we will take all appropriate disciplinary or other remedial action as warranted if the facts indicate a violation of SEC or FINRA rules.

The upcoming SEC report on these market events will be critical in analyzing whether existing rules and standards should be updated. Many of the policy questions raised in your hearings to date involve areas in which the SEC has primary policymaking responsibilities such as market structure, payment for order flow, short sale regulation and disclosure, the settlement cycle, enhanced broker-dealer financial responsibility requirements, and whether certain communications with retail investors constitute recommendations that should be covered by the SEC's Regulation Best Interest. We will support the SEC in its review of these areas and then align FINRA's rules and oversight activities where necessary or appropriate.

My written testimony offers some further perspectives on key topics under the SEC's jurisdiction and also describes some areas where we are considering whether updates to guidance regarding our own rules would be appropriate. For example, we intend to review short sale position reporting by broker-dealers, as well as continue our review of the effects of gamification on retail investors. FINRA looks forward to working with this committee, the SEC, and our fellow regulators to review and learn from these recent market events so that we can strengthen investor protections and enhance confidence in our nation's capital markets.

Thank you, and I would be happy to answer your questions.

[The prepared statement of Mr. Cook can be found on page 76 of the appendix.]

Chairwoman WATERS. Thank you very much, Mr. Cook.

I now recognize myself for 5 minutes for questions, and my first question is for Chair Gensler. This committee has examined numerous issues that have arisen out of the GameStop short squeeze that took place earlier this year, including systemic risk arising from firms such as Citadel, who are executing close to 50 percent

10

of all U.S.-listed retail volume. During the first hearing, I questioned whether Citadel poses a systemic risk to our financial markets. I am also concerned about what Citadel's outsized market impact means for pricing and best execution, another market structure issue that this committee has examined as part of these hearings.

As the newly-confirmed Chair of the SEC, what will your approach be with respect to mitigating the risk associated with outsized market impact and understanding threats to our financial stability?

Mr. GENSLER. Thank you for that question. I think that at the heart of well-functioning markets and the mission of the SEC—fair, orderly, and efficient markets—is promoting competition in markets. It can be done through transparency, but it is also looking at our rule set to make sure that our rule set inspires more competition rather than concentration. And we have seen, as you noted in your hearing, an increasing concentration in market making, and also, separately, in brokerage, and particularly around retail order flow.

And so I have asked the staff from the Divisions of Economic Risk and Analysis, and Trading and Markets, to sort of give us a view, give internally the Commission a view of what we should be thinking about in our market structure to address this.

We have seen such concentration come in other markets. We know it is in search. When we all go online and search, there is really one dominant search engine. We know it is true in retail buying, retail products online. There is some dominance to that. And so, our modern 2020's economy does tend towards certain, what is called economics network effects. So, I have asked the staff just to think through that and to provide us with guidance as Commissioners on how do we promote competition in the face of these network economic effects that are leading to concentration.

Chairwoman WATERS. I want to thank you for that response, and I think what I am hearing from you is that there is real concern about concentration. And while you have instructed staff to do some additional research to determine the extent of it, it is something that we should be concerned about, is that correct?

Mr. GENSLER. Yes. I think that capital formation for issuers and for investors on the other side benefit from some broad competition amongst market actors. And as we get more concentration in the middle market, whether it is market making or brokerage, we could lose that concentration. It could lead to more fragile markets, meaning less orderly, and also more costly or less efficient markets. And that is what history and economics tell us when we get concentration.

Chairwoman WATERS. Thank you very much. I appreciate the concern that you are identifying as we talked about this concentration, and what could happen if, in fact, we are not aware of it and don't make an effort to deal with it.

I now recognize the ranking member, Mr. McHenry, for his questions.

Mr. MCHENRY. Thank you, Madam Chairwoman. Chairman Gensler, thank you for being here, and welcome back before the committee, and congratulations on your new role. I know that Act-

11

ing Chair Lee, at the time of this GameStop trade, emphasized that the core market infrastructure is quite resilient. Does the Commission intend to release any additional findings?

Mr. GENSLER. Thank you. And thank you for our meeting earlier this week. I look forward to doing those on a regular basis with the Chair, and you, and the subcommittee, and other members. We are looking at putting together a report. I am only in my 3rd week on the job, but our economists, our Trading and Markets folks have come together, and I think we will be releasing a report sometime this summer that will detail the range of activities out of the January events.

Mr. MCHENRY. Thank you for that. Small businesses right now are emerging from the pandemic just like everyone is, and these small businesses need access to capital. And, as you know, I have been focused on some of the burdensome requirements of the original Regulation Crowdfunding (Reg CF), which I helped legislate, and President Obama signed into law. There have been some helpful changes made to Reg CF to make it more efficient and to boost trading in Reg A and Reg CF securities, such as preemption under certain State regulations. Do you support these streamlining efforts for small businesses, and are you looking at additional steps?

Mr. GENSLER. I look forward to working with you and your staff to learn more about your initiatives and suggestions. But at the core, and maybe it is just a bit because my dad had a small business, never more than 30 employees, and didn't have access to the capital markets, but I think that small business, entrepreneur efforts are really kind of, if I might say, a bit of the backbone of American entrepreneurism and our economy. And so, access to the capital markets is a critical piece, whether it is accessing loans that might be securitized in the markets or accessing through equities. But I look forward to hearing more from you and your staff on ideas.

Mr. MCHENRY. Okay. But no comment on Reg CF?

Mr. GENSLER. Again, I'm just 3 weeks on the job, so I haven't looked closely at Reg CF yet or, frankly, done a detailed enough briefing to see how we can, as you say, and I really do believe this, facilitate capital formation up and down the issue or spectrum.

Mr. MCHENRY. Let's pivot to something that you spent some time out of government understanding. I think what we all have tried to seek is greater collaboration across agencies on the regulatory framework for digital assets, cryptocurrencies, notably. This includes more engagement from industry and appropriate regulators. In 2019, SEC staff produced the framework for investment contract analysis of digital assets. Since then, the staff has sought feedback on a number of issues, most recently on the evolving standards and the best practices for custody. This is progress, but I believe more concrete steps are necessary to further the crypto market. As you look at this issue, what steps can you outline to bring regulatory clarity so that we can have a vibrant digital asset marketplace with legitimate money and the rule of law?

Mr. GENSLER. Thank you for asking that. And I think that this market, which is close to $2 trillion, the crypto asset market, is one that could benefit from greater investor protection within the SEC's current authorities, our authorities around securities, and around

12

asset managers and products that might invest in these cryptocurrencies. As you mentioned, we put out a comment, I think it was in October or November, asking for feedback on custody. I would hope that we would move forward and provide greater clarity around custody.

I do think that working with Congress, and I think it is only Congress that could really address it, it would be good to consider, if you would ask my thoughts, to consider whether to bring greater investor protection to the crypto exchanges. And I think if that were the case, because right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission, that could instill greater confidence. Right now, there is not a market regulator around these crypto exchanges, and, thus, there is really not a protection against fraud or manipulation or a—

Mr. MCHENRY. I have time for one final question, Chairman Gensler. I am encouraged by your comments on crypto. Last year, the Commission proposed to allow certain gig workers to have access to equity compensation under the SEC's rules. Will you commit to finishing this important rulemaking?

Mr. GENSLER. Again, I'm in my 3rd week, so I need to get a briefing on it. I commit to work with the staff to understand what the comments were, because I don't know what comments came in, and to trying to understand the economics around that rule set.

Mr. MCHENRY. Thank you, and I wish you great luck in your tenure, and thank you for your testimony. Thank you for your outreach.

Mr. GENSLER. Thank you.

Chairwoman WATERS. I now recognize the gentlewoman from New York, Mrs. Maloney, for 5 minutes.

[No response.]

Chairwoman WATERS. We will go on to the gentlewoman from New York, Ms. Velazquez.

[No response.]

Chairwoman WATERS. The gentleman from California, Mr. Sherman, who is also the Chair of our Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, is now recognized for 5 minutes.

Mr. SHERMAN. Responding to the ranking member, who wants to instill confidence in those buying and selling cryptocurrencies, the only confidence I have is the U.S. dollar is an outstanding good currency, but cryptocurrencies, if they succeed, will have unique appeal to only two groups: narco-terrorists; and tax evaders. And for us to channel the animal spirits that should be investing in the American economy into creating tools for those who want to evade U.S. taxes is a step toward a much weaker America.

Mr. Gensler, you talked about Archegos and the total return swap. The image I have of 1929 is investors jumping out of buildings on Wall Street because they bought stock at 7, 8, 9 times margin. And in the 1930s, we decided to protect the markets and say that if you want to buy stock, the most margin you could get was 1-time margins, sometimes a little more. But we then see that using a total return swap, the big guys, like Archegos, can get 7

13

times margin, can invest only one-seventh of the cash to control $100 million worth of this block of shares or that block of shares.

This raises the question, is 7-to-1 margin fine for everybody, and is that good for the markets? Should 1-time margin either rule for everybody and we should plug the loopholes, or should we continue to have a system where, if you are a family office, you can have 7 times margin by calling it a total return slot, and if you are the regular Robinhood investor, you can only get 1 time? What should the market rule be?

Mr. GENSLER. I think you raise some very important questions that came out of the market events late in March, not the January ones but the March events around a family office, Archegos. Family offices are outside of much of the SEC's remit, but not all of it.

Mr. SHERMAN. If I can clarify, this is not a question about family offices.

Mr. GENSLER. Oh, okay.

Mr. SHERMAN. Just that one investment company that has $1 billion and decides they want a 7-to-1 margin. The fact this was a family office, put that aside. Whether you disclose it or you don't, whether you are a family office or a hedge fund or a billionaire, should you be able to get 7-to-1 margin, and if so, why can't Robinhood?

Mr. GENSLER. I have asked staff to better understand—and, again, it is just the 3rd week—the rules that were adopted by the SEC that are yet to go into final implementation around the margin and for these securities-based swaps, and how they would have affected the circumstances.

Mr. SHERMAN. I look forward—

Mr. GENSLER. But you are right, sir, that they are different than the retail investor, and this is true across our markets. And I have asked staff to better inform me as to what are we seeing there.

Mr. SHERMAN. For Mr. Cook, when it comes to disclosing short selling, there are arguments on both sides as to whether to disclose what an individual investor is doing. Some say it is harmful, some say it is helpful, but there seems to be agreement that the aggregate information is helpful, but we ought to know in aggregate how many shares of GameStop are short. You generate that information, but you don't put it on your website. I am told that you provide it to the exchanges and they publish it if they want to, and, often behind a pay wall. Why doesn't FINRA disclose all this information to everybody for free as quickly as you can?

Mr. COOK. Thank you, Mr. Sherman. That is a great question. As we look at disclosure around short selling, I think there are some good arguments that we can do more here. I have asked our staff to prepare a regulatory notice to solicit comment on changes to FINRA's disclosure here to make it more frequent and more granular. And certainly as part of that, we can look at the way in which that disclosure is disseminated.

Mr. SHERMAN. Is there any justification for what is a regulatory agency generating this information and giving it to private companies for them to sell rather than disclosing it to the public?

Mr. COOK. I appreciate the gist of your question, sir, and I am inclined to be biased towards making it publicly available. I don't understand all the history behind how this developed. I think that

14

is something we need to look into, but I commit to you that we can certainly do that.

Mr. SHERMAN. My time has expired, but I look forward to looking at not only payment for order flow, but how we get the best price improvement for every investor, whether it be an internalized transaction or when it goes to a market maker. I will just say, if Citadel can't pay Robinhood, would it be different if Citadel bought Robinhood? That is just for the record. I yield back.

Chairwoman WATERS. Thank you very much. The gentlewoman from Missouri, Mrs. Wagner, is now recognized for 5 minutes.

Mrs. WAGNER. Thank you, Madam Chairwoman. Chairman Gensler, welcome as the new SEC Chair. And I want to take this opportunity to veer off course a bit and mention that after years of thorough and proactive input and feedback from stakeholders, including Main Street investors, the SEC has finalized its Regulation Best Interest (Reg BI), which is now in effect. This rule raises the standard of care for broker-dealers while preserving access and choices for Main Street investors.

Chairman Gensler, under your leadership, does the SEC plan to make any amendments to Reg BI?

Mr. GENSLER. Thank you. It's good to see you here today. As I said in my confirmation hearing, when a similar question came up, I think that it is important that investors actually have brokers take their best interests to heart, and that is what we are going to do through examination and enforcement guidance, ensure that that rule is fully complied with as written.

Mrs. WAGNER. Great. Applied as written. I'm glad to hear it. Thank you. Chairman Gensler, as you begin your work at the SEC, I want to really urge you to ensure that the Commission and its staff, under your leadership, follow its very core mission, which is to protect investors, which I care deeply about here in Missouri's 2nd District; to maintain fair, orderly, and efficient markets; and to facilitate capital formation. I want to thank you for appearing before us today, and I hope that we can work together to provide investment choice, and access, and affordability, I would say, to America's Main Street investors. Thank you.

Mr. Bodson, is it possible that a financial transaction tax (FTT) could increase financial market volatility?

Mr. BODSON. Thank you, Congresswoman. FTT is not an area of my expertise. Obviously, there have been a lot of studies done in a lot of different markets with very, very mixed results, mostly focused on whether or not they are an effective tool for raising taxes. In some markets, like Hong Kong, they have been effective, but they have a very different income tax and capital gain structure, and no capital gains tax. In other markets, they have been shown to limit trading or subdue it, so they don't have the effect that is expected. I have not seen anything discussing FTTs and volatility, per se. My uneducated guess would be they would be somewhat separated, but, again, I have not seen any studies to indicate either way.

Mrs. WAGNER. Aren't there more effective ways to improve our financial market operations than the bills being proposed today? Can you describe any of those, Mr. Bodson?

15

Mr. BODSON. Thank you, Congresswoman. The step from T+2 to T+1 will create a lot of efficiencies in the marketplace, both on the operational side as well as lowering the margin requirements that we imposed because of the 2-day settlement versus 1-day settlement. So, I think those would be steps in the right direction in terms of lowering cost, not just for our direct members, but for the end beneficiaries, be it mutual fund, pension funds, or the small retail investor. We look to decrease cost whichever way we can.

Mrs. WAGNER. Mr. Bodson, in your view, how would shortening the settlement cycle help prevent future trading restrictions similar to the ones imposed by Robinhood and other brokerages earlier this year?

Mr. BODSON. I am not aware of the reasons for other firms, so I am not going to speculate about that. Robinhood did say that their decision was based on their ability to meet our margin charges. If we do lessen the time to settlement from T+2 to T+1—time is risk, which I think has been well explained—that by lowering the period, the amount of open transactions that we have to charge margin against would get smaller. And our estimation is that the volatility charge, which is a main component, will go down by 40 percent. So in that sense, the capital charge against Robinhood would have been smaller, but, again, it is a little bit of apples and oranges, because to say it would automatically happen without knowing the market circumstances obviously is hard to say. But there would be a benefit to firms in having lower capital charges.

Mrs. WAGNER. It sounds like, if proposed, going even further than T+1 and moving to real-time trade settlement. What sort of impact do you think this would have on the market liquidity?

Mr. BODSON. We are not a proponent for a real-time gross settlement, as you articulate. You would lose all the benefits that our clearinghouse provides, all the netting inefficiencies I spoke about in terms of trillions of trades being netted down to millions of movements or 100 millions of trades going down to millions of movements, and trillions of dollars being netted down to billions of dollars. You would lose all that benefit. All transactions would have to be pre-funded and the securities would have to be on hand, so it would have a very large impact on institutional trading. It would cause some liquidity issues across the marketplace, so, a bridge too far, in my eyes.

Mrs. WAGNER. Thank you, Mr. Bodson. My time has expired, and, Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you. The gentleman from Georgia, Mr. Scott, who is also the Chair of the House Agriculture Committee, is now recognized for 5 minutes.

Mr. SCOTT. Thank you, Chairwoman Waters, for this interesting and much-needed hearing. The question before us today is, how can we on the Financial Services Committee ensure that our investors can both have access to our markets, but also are able to participate in our markets by investing safely? You see, when erroneous and inaccurate information posted on social media sites has the ability to broadly influence investors and move the market, sometimes drastically, this poses a serious question for you, our regulators. There is now such a huge hole in our regulatory process be-

16

cause of GameStop with inexperienced investors relying on unverified information from unqualified social media.

Mr. Cook, let me start with you. How can we effectively regulate the impact of new technology social media sites as they pertain to inexperienced investors, and also, how do we treat that investment advice they are getting from unqualified people on social media? And then the real question, who is held accountable when bad investment advice leads to market volatility like we have seen and massive losses for our investors? I would like for the three of you—Chair Gensler, Mr. Cook, and Mr. Bodson—to answer this important question and the three parts that I outlined. This is what the American people need answers to from you, the regulators. Mr. Cook, why don't you start?

Mr. COOK. Thank you, Congressman, for that question. I think you raised some really profound questions about where technology and other aspects of investor behavior may be going, and how does that fit within the current regulatory regime. When we talk about statements by people on social media and other places, just to be clear, FINRA doesn't regulate that environment, and we would look to the SEC in sort of understanding whether existing authorities around concepts like manipulation or providing investment advice might apply. I do think that what we are also seeing, though, to your point about retail investors making decisions without an intermediary or a financial advisor, is an important one. As we see more of that happen, and we are seeing a lot of that happen, I think we need to ask whether the existing regime is adequate in that regard.

Mr. SCOTT. Let me quickly get to Chair Gensler. I worked with him when he was Chair of the CFTC. Chair Gensler, how do we hold somebody accountable? Answer this for me. As Mr. Cook just said, the SEC is the one responsible. What do we do about this, Chair Gensler?

Mr. GENSLER. I think you raise a good point. I know, probably like me, it is not about somebody's free speech rights on social media, but if somebody is trying to manipulate a market, to defraud the market through social media, and in our rapidly-changing technology, it could be computers and not even human, by the way. It could be computers communicating. So, the SEC is a cop on the beat. We are going to vigorously lean in against individuals and companies to try to assess, but we will have to update our resources, too, to be able to see that relationship.

Mr. SCOTT. My time is counting down. How are you going to solve this? Do you feel that we can so we don't have any more of this GameStop?

Mr. GENSLER. Madam Chairwoman, I don't know what I am supposed to do, because the timer is beeping.

Chairwoman WATERS. Thank you. I would expect that you would respond in writing to that question as we move on.

And I am now going to call on the gentleman from Oklahoma, Mr. Lucas, who is recognized for 5 minutes.

Mr. LUCAS. Thank you, Madam Chairwoman. First, congratulations, Chairman Gensler, on your confirmation. I have confidence that you will bring the same gusto and tenacity to your role as you did as Chairman of the CFTC, and I look forward to working with

17

you. And for the benefit of our colleagues, perhaps who are not on the Agriculture Committee, of course, Chairman Scott, you and I spent a lot of time in a previous position, both of us, working on a variety of issues over there. So that said, this past February, Acting Chair Lee announced that the SEC would enhance its focus on climate-related disclosure for public company filings and would begin to update climate disclosure guidance. As you can imagine, the industries that are vital to Oklahoma, meaning agriculture and energy, are following this topic very closely. I will put it that way.

Chairman Gensler, could you shed some light on what this enhanced focus means? Does this represent a change from current SEC practices, or is this a continuation of current policy?

Mr. GENSLER. First, let me say thank you, I really do look forward to working with you and Chair Scott. I think we did some good work together on behalf of the American public, and on behalf of agricultural interests across the country as well.

If I can broaden it out a little bit, I think that disclosure has been at the core of the securities laws for 90 years. Investors get to take risk, but they want to understand their risk and have disclosures from the issuing companies, and technology has changed, markets have changed.

So, what I have asked the staff to do is to prepare recommendations to the Commission on how we can, through notice and comment, hearing a lot of public input as to what are those disclosures in a climate-risked area, that investors want to take into consideration in their decisions and their investment decisions. Acting Chair Lee already put out a comment period. We are going to benefit from that, and I encourage the public to weigh in and tell us what is important to them and their investment decisions and their proxy decisions, and the like.

And I think it actually can help an issuer to bring some consistency and comparability in this area because there are a lot of investors that are asking for things. We can try to maybe help bring some consistency and comparability, of course, through economic analysis and vital input from the public.

Mr. LUCAS. I promise you, Mr. Chairman, you have gotten the attention of my constituents, and, of course, how questions are asked and how the data is interpreted can have a dramatic effect. So with that in mind, give me a feel for what kind of a timeline we are looking at when we get to the review part of this process, where my folks can offer their insights?

Mr. GENSLER. If they wish, we could get some insight from them and input. There is an open comment period right now through June—we can tell you the exact date, but through June—that Acting Chair Lee had put up. But I think based on that and the economic analysis, we will try to put a proposal together. I don't want to commit to a certain month, since I have only been there for 3 weeks, but to try to put a proposal together and then put that out to public comment based on what we have already heard this summer. And then, that sort of starts a multi-month process after that.

Mr. LUCAS. Along that line, Mr. Chairman, the SEC has also created a climate and ESG task force within the Division of Enforcement to, I believe the phraseology is, develop initiatives to proactively identify ESG-related misconduct. Can you visit with us

18

for a moment about that, and do you envision that there will be
enforcement actions prompted by the task force based on this new
guidance? This new standard, I guess, is the better way to put it.

Mr. GENSLER. The task force is looking at the guidance that is
already in place. There is guidance that was put out on climate, I
think in 2010. Two things: one, to see if companies are following
that 2010 guidance and following the overall important disclosure
regimes that are in place at this point in time; and two, it helps
us and informs the Commission, all five of us, as we move forward
to consider any future rules because we can sort of learn from what
is happening right now in the Division of Corporation Finance, in
the Division of Enforcement, and in the Division of Examinations,
what is going on now. So one is just, are folks complying with the
rules and laws that are in place, but two, it helps inform us about
some of what is going on and how we can help bring more consist-
ency and comparability in the future.

Mr. LUCAS. Thank you, Madam Chairwoman.

Chairwoman WATERS. Thank you. The gentleman from Texas,
Mr. Green, who is also the Chair of our Subcommittee on Oversight
and Investigations, is now recognized for 5 minutes.

Mr. GREEN. Thank you, Madam Chairwoman, and I thank the
witnesses for appearing as well.

Madam Chairwoman, as you know, from the genesis of this proc-
ess I have been concerned about trading ahead, and you called to
our attention earlier that the one company, the largest market-
maker, executes approximately 50 percent of all U.S. retail volume.
That is quite an amount for one firm to manage, and that causes
a good deal of consternation, especially when this firm finds itself
engaged in trading ahead. There are penalties associated with
trading ahead, but these penalties are primarily civil penalties.
And as a result of a civil penalty, many times there is no acknowl-
edgement of liability, just the penalty paid. For example, in one
case, $700,000 was paid, but that $700,000, while it seems like a
lot, really is not when we are dealing in billions of dollars.

As a result, I have been very much concerned, and I see that
there is one proposed piece of legislation that would amend the Se-
curities and Exchange Act of 1934 to prohibit trading ahead by
market makers and for other purposes as well.

This is something that I think has reached a point where its time
has come, and I'd like to ask Chair Gensler, are you of the opinion
that we should not allow trading ahead, and also that we should
not allow a major firm to simply build in a penalty as the cost of
doing business?

Mr. GENSLER. I thank you for that question, and I look forward
to working with you. I think that our current rules, you are correct,
are civil, but our current rule is that if you take a customer order
and then trade ahead of that, that is out of bounds, it's not allowed.
And I think that is because the customer needs to come first, and
in our market structure, that is what brokers are supposed to do.

I look forward to working with you and your staff on any pro-
posed legislation. I have not had a chance to look at that more
carefully.

Mr. GREEN. Thank you. The process, as Chair Gensler has indi-
cated, is unfair to the persons who are making the purchase in the

19

market, who would like to become a participant but they do not
have the advantage of the market maker.

Let me ask Mr. Bodson, do you agree that this is a circumstance
that we have to take a look at because we don't want people to sim-
ply build into the cost of doing business, the cost of trading ahead?

Mr. BODSON. Thank you, Congressman Green. DTCC is not a di-
rect regulator of the market as the SEC and FINRA are, but I
think the situation described obviously would not be something any
company would endorse. Having similar criminal penalties viewed
as a normal cost of business is not something that I think any indi-
vidual should be supportive of, so your comments stand, but unfor-
tunately, the part of the market you are talking about is the trad-
ing side. That is not what we are involved in. We are post-trade,
and not being regulated there is not much I can do about that spe-
cific issue, but thank you for asking me.

Mr. GREEN. Thank you, and that is one of the reasons why I
think legislation similar to what is being proposed is necessary, be-
cause to penalize criminally requires some creative prosecution. We
do not have a definitive law that makes it a crime to do this, lit-
erally. And I am concerned that if you can simply make it the cost
of doing business, you can continue to do business and build in that
cost. This legislation would require due diligence on the part of the
CEO, would require the CEO to, on an annual basis, certify that
the CEO has performed a reasonable due diligence in ensuring that
the market maker has not traded ahead, and has some liability
when this occurs.

This is something that we cannot allow to continue as simply a
pat on the back, to a certain extent—some would say a slap on the
wrist—but we have to do something about it. I think this legisla-
tion addresses it, and I look forward to working with persons who
are going to push this legislation to see if we can get it done.

And I yield back, Madam Chairwoman.

Chairwoman WATERS. Thank you very much. The gentleman
from Florida, Mr. Posey, is now recognized for 5 minutes.

Mr. POSEY. Thank you very much, Madam Chairwoman. Chair-
man Gensler, some people believe the current short-selling prac-
tices drag down share prices below fundamentals. What does your
experience tell you, and what should we or could we do about it?

Mr. GENSLER. Thank you for asking that question. Short selling
has been part of the market structure for many decades, in fact,
even before the securities laws, and economists have many studies,
and there have been many debates on short selling and long. Your
question is, could it move something to something other than fun-
damentals. Long buying can also move something to something
other than fundamentals.

Our remit at the SEC is to ensure that the markets are fair, or-
derly, and efficient, and that they are free of fraud and manipula-
tion, but there are some times that individual securities might be,
in a personal opinion, not aligned with fundamentals. But it might
be sentiment, is the other piece. So, I just want to be careful that
we stick to our important piece of it.

We do think that there is a need for greater transparency on the
short-selling side, and I have asked staff to propose, under the au-
thorities Congress has already vested, that we have greater trans-

20

parency on the short-selling side. I am encouraged to hear that FINRA, under Robert Cook, is going to be doing some things in that area as well.

Mr. POSEY. Thank you. Mr. Bodson, please share with us how you are working to reduce the settlement cycle to 1 day while preserving the benefits of netting and [inaudible] what the savings proposed on margin funds might be?

Mr. BODSON. Thank you, Congressman, for that question. Shortening the settlement cycle is the big concept of time equals risk. Reducing the period that trades are open and reducing the potential impact of the default of one of our members means that we simply have to collect lower levels of margin or collateral. One of the biggest components of our calculation of margin is volatility-driven, what is happening in the market, how are prices moving, and by shorting that period, we believe we can reduce that charge by 40 percent in a volatile period. That could be $6 billion less capital that firms have to post with us and can use elsewhere. So, it would be a significant amount for our members.

Mr. POSEY. Great. I am really glad to hear that.

Chairman Gensler, tell us about what the SEC is doing to ensure that payment for order flow doesn't mean retail investors are subject to unfair trades?

Mr. GENSLER. I have asked the staff to take a close look at this in the context of the overall market structure, because payment for order flow, which some brokers use and some don't, is, in essence, a payment to the broker for that order flow, and it can be in conflict with the interests of that customer. And that inherent conflict—we found in a case that was settled in December, where there was actually communication between the wholesaler and broker saying, "Look, I can give your customer more or I can give you more." There was a tradeoff between these two.

I think that we need to take a closer look at that, but also in the context of the overall equity market structure, because there is also payment for order flow on exchanges, which is called rebates. So, there are other pieces of this puzzle, not just to wholesalers.

Mr. POSEY. Thank you, Mr. Chairman. Do you believe that cooperation among retail investors in chat rooms, for example, can be undesirable collusion in the equities market?

Mr. GENSLER. I think that we should always be vigorously enforcing our laws and ensuring that there is not fraud and manipulation. But again, we have a free speech right to go and say to a neighbor, whether it is online or in person, "I like this investment," and thoughtfully say why I like this investment. Our laws are about if somebody is trying to defraud another person, mislead another person, manipulate the markets, and that we should root out and vigorously root that out, whether it is a big institution, or an individual. or, frankly, a computer that's controlled by a big institution.

Mr. POSEY. Okay. During your CFTC service, you once said that transparency isn't costly. Would you explain that concept in the context of financial markets?

Mr. GENSLER. Did you say that I had said transparency is a—

Mr. POSEY. Transparency isn't costly. It pays to be transparent.

21

Mr. GENSLER. I think transparency is at the heart of efficient markets. At dot-com, disclosure regimes are important for companies, and that is a form of transparency, but I think that is at the heart of investors being able to take risk and understanding their risks.

Mr. POSEY. Thank you, Mr. Chairman.

Madam Chairwoman, my time is up, and I yield back.

Chairwoman WATERS. Thank you. The gentleman from Missouri, Mr. Cleaver, who is also the Chair of our Subcommittee on Housing, Community Development, and Insurance, is now recognized for 5 minutes.

Mr. CLEAVER. Thank you, Madam Chairwoman, and I thank all of our guests for being here. Chair Gensler, thank you for all the work you have done over the years, and I appreciate your presence here today.

My great-grandpa, Reverend Noah Albert Cleaver, died in 1980. He was 103. He used to say—some new invention would come out, whether it was a toaster or a microwave, and he would say, "What are they going to do next?" And he was concerned. He thought that the people landing on the moon created a bunch of weather problems in Texas. I never could get that out of his head.

But sometimes, I am tempted to join in with my Grandpa on stuff. Going back to Mr. Scott's discussion with you earlier, I have to tell you, I do have a lot of concerns, and maybe it is just something I am going to have to learn to live with. But let me give you an example. The shares in Metro Bank in the UK, back in May, their shares fell over 10 percent before Metro could get control of the fake news about their financial free fall, and they are fortunate that it didn't go further.

I am extremely concerned about what is going on in regulations and what we need to do to ensure that social media doesn't take control of our lives and take it in a direction that could be detrimental to our democracy. Do you share that concern, and if so, what should we do, and how do we address the issue that was just experienced with Metro Bank?

Mr. GENSLER. I think that the best way is to be technology-neutral but recognize that technologies in each generation provide us new ways to communicate, even as to when the telephone came along and there were debates about whether to allow the first telephone on the floor of the New York Stock Exchange. These are real debates that happened in the 1920s. I think technologies will come along in the 2020s, and we have to ensure we still stick to our principles of investor protection; fair, orderly, and efficient markets; and capital formation.

So, we have to lean in at the SEC and learn how to basically be a cop on the beat so that free speech goes on but if somebody is trying to manipulate a market or spoof a market or put fraudulent information into a social media channel, that we protect investors against that. And particularly in this new computer age, that is more challenging. I think the SEC is up to the challenge, but it is definitely more challenging, and I have asked the folks at the SEC, how do we freshen up our rules in this new environment?

Mr. CLEAVER. Do you have a division that works on this, that thinks about this, that plans for this, that goes through all kinds

22

of scenarios on what to do when this happens, anticipating an anticipatory department?

Mr. GENSLER. No. Again, I am only in my third week, but I think between our Trading and Markets Division, our Enforcement Division, and our Examinations Division, it is through those units. But I think we constantly have to be evaluating, and to an earlier question, even, about Regulation Best Interest, we are going to vigorously get the most out of regulation best interest, but we are also going to evaluate. If it is not serving the purpose of investors, then we will update and freshen that rule as well as other rules, because we always have to be evaluating that investors come first, aligned with our three-part mission.

Mr. CLEAVER. Let me congratulate you on your confirmation, and I do recognize that you just walked in the door, and I am asking you some questions that you probably need a little more time to deal with. But I am hoping that, on a night when you are about to get a peaceful night's rest, you will remember the questions raised by Congressman Cleaver about the markets and practice paranoia with the SEC, because I am really afraid of some bad stuff happening. I am hoping I am wrong, but I am glad you are there, and I look forward to you fixing some things.

Mr. GENSLER. Thank you, and I wish I had met your grandfather. My mother would say that out of a space journey, the best thing that came out of it was Velcro. Mrs. Gensler thought that was the best thing that came out, so there you go.

Chairwoman WATERS. Thank you. Thank you, gentlemen, very much.

The gentleman from Missouri, Mr. Luetkemeyer, is now recognized for 5 minutes.

Mr. LUETKEMEYER. Thank you, Madam Chairwoman, and welcome to our witnesses.

Mr. Gensler, in September of 2018, the Federal Reserve, the FDIC, the NCUA, the OCC, and the CFPB all issued an interagency statement that clarified the differences between supervisory guidance and laws and regulations. Most notably, that supervisory guidance does not have the force and effect of law, and that the law and regulations does.

In January of this year, the prudential regulators issued a final rule to confirm the difference of regulations and guidance by codifying the 2018 statement. While I understand the SEC operates differently from the regulators I just mentioned, in many key ways, it is still imperative that the SEC distinguishes between guidance and rule or law.

Do you agree that distinguishing between guidance and rules is an essential proponent of sound regulation?

Mr. GENSLER. Thank you for that question, and I look forward to working with their Office of General Counsel to better understand what the bank regulators did in that circumstance. But there is a difference between rules that have gone through notice and comment and staff guidance, and that is something I am familiar with from my prior service in government as well.

Mr. LUETKEMEYER. I guess you maybe answered this question here, but will you commit to issuing a final rule similar to the prudential regulators that clarifies the role of guidance and ensures

23

that enforcement actions will only be based on violations of rule or law?

Mr. GENSLER. Again, sir, I need to meet with staff, understand what the SEC has done in the past on this, and whether there is an appropriate need for such new rules, as you say. But I do understand rules as duly operating from Congress, delegated to the agencies, I understand are different than guidance. But I would look to work with you and understand your concerns better.

Mr. LUETKEMEYER. Very good. Thank you for that.

Chairman Gensler, as you know, the Securities Act of 1933 and the Securities Exchange Act of 1934 established the ability of the SEC to accept generally accepted accounting principles (GAAP) that have been established by a private entity. While I believe that private standard-setter can help facilitate the effective accounting principles that promote transparency for investors, recent actions by the Financial Accounting Standards Board (FASB), and an overall lack of oversight by any regulatory entity whatsoever, have raised serious concerns regarding the standard-setting process and FASB's ability to conduct proper analysis before finalizing a standard. In my opinion, since the SEC has given FASB the authority to operate as a private standard-setter, the SEC should ensure FASB is carrying out its duties in an appropriate manner.

Can you broadly tell me what you think the relationship between the SEC and FASB is, and should be?

Mr. GENSLER. I think Congress has been clear, as I understand it, that the securities markets benefit by disclosure, and that includes accounting disclosure, and the SEC has that authority. And then through, I believe it was in the Sarbanes-Oxley Act, working with Senator Mike Oxley from your committee and Paul Sarbanes on the side, put in place exactly what you said, a provision that there could be reliance on a standard-setter meeting certain goals. But our Office of the Chief Accountant has an important role in communicating with FASB on these important accounting standards, and at the SEC, our congressional system is at the top of that chain.

Mr. LUETKEMEYER. My concern, quite frankly, is with their ability to implement something like current expected credit losses (CECL), which they did not do any standard-setting studies about. They just arbitrarily went out there and decided, in their own wisdom, that this was something that they should be doing.

All of the other government agencies out there that affect what we do every day, how we administer the rules and regulations every day and the laws of this country, have to go through the Administrative Procedure Act. They do not.

Would you support something along the line to rein them in, so to speak, so that maybe they would fall under the Administrative Procedure Act and have to do qualitative and quantitative studies before they can issue a rule or regulation that would protect the economy, protect the industry, protect the people, consumers, from a bad rule or regulation that they might implement?

Mr. GENSLER. Congressman, I would like to meet with you and your staff to better understand your concerns, because as I understand it, what Congress decided some 20 years ago in the Sarbanes-Oxley Act was that it is best to rely [inaudible] SEC to rely

24

on an outside standard-setter, and that that helped sort of set them apart a bit.

So, the concerns that you are speaking about, I would like to better understand, and see how we can address them as best we can.

Mr. LUETKEMEYER. I thank you for your answers, sir, and I look forward to working with you on this at length. I think it is a very serious concern there that I have with regards to these folks.

With that, Madam Chairwoman, I yield back. Thank you very much.

Chairwoman WATERS. Thank you. The gentlewoman from New York, Mrs. Maloney, who is also the Chair of the House Committee on Oversight and Reform, is now recognized for 5 minutes.

Mrs. MALONEY. Thank you, Chairwoman Waters.

Chairman Gensler, it is great to have you before the committee once again, and to have you as the Chair of the SEC. I have a few questions. First, I want to ask you about a very important issue that I worked on for several years, and that is forced arbitration. A few years ago, some people were pushing public companies to include forced arbitration provisions in their corporate governance documents, which would prevent their own shareholders from suing them for securities fraud in Federal court. If the SEC allowed this, it would essentially be the end of all security fraud cases in Federal court, and shareholders wouldn't be able to hold companies accountable in court.

So, I led a letter with Chairwoman Waters to then-SEC Chairman Clayton, which was signed by every Democrat on this committee, strongly opposing this move, which would reverse the Commission's longstanding position that such forced arbitration provisions violate Federal securities law. And because this effort came so close to succeeding, I think it is very important to get you on the record on this issue.

So my first question is, do you believe it would violate Federal securities law if a public company inserted a forced arbitration provision into its bylaws and governance documents?

Mr. GENSLER. It is really good to see you, and to work with you again.

Mrs. MALONEY. Likewise.

Mr. GENSLER. I think, again, I need to get more fully briefed on the law, but let me say, on the spirit and where the SEC has been, the SEC has said consistently to issuers, as I understand it, that it would be best not to put this into these corporate charters. And I think that the American public needs to be able to have redress in their courts, and that is sort of a fundamental piece, to be able to go straight to the courts. And that has been true in terms of issuers for decades, and I think that has worked well.

Mrs. MALONEY. That is great to hear, and it is a very important signal to investors and the confidence in the U.S. capital markets, and I thank you for that position.

Next, I want to talk to you about GameStop. In this committee's initial hearing on the GameStop frenzy, I questioned whether our capital markets were working for all investors or just for some investors, and I emphasized the need to have rules that are consistent, predictable, and, very importantly, enforceable.

25

What struck me the most about Robinhood's behavior regarding the GameStop frenzy was the seemingly arbitrary nature of its trading faults and the lack of transparency on the front and back ends of how and why Robinhood and other broker-dealers imposed these restrictions.

So, Chair Gensler, not speaking specifically to Robinhood's situation but broadly speaking, do you believe broker-dealers should improve their transparency with their customers about how and when they impose trading halts, and what role do you believe the SEC should play in improving these disclosures and ensuring trading halts are integrated into firms' risk management plans?

Mr. GENSLER. I think that probably what we could all agree on is that access to markets, whether you are an individual investor trading one share or a big institution, access to markets as they are moving up and down is a really critical piece of our capital markets. And what happened on January 27th and 28th was not good for millions of investors.

So, the transparency you mentioned is important between broker-dealers and their customers, and we have asked, and I think Robert Cook has said already, that maybe they are looking at this too, is what is that transparency between, and under what circumstances? And do each of the broker-dealers have enough liquidity to meet their requirements with the clearinghouse, which Michael Bodson was talking about earlier.

Mrs. MALONEY. Thank you. And next, I would like to turn to the topic of corporate board diversity. Along with Chairman Meeks, I have made fighting for women a hallmark of my time in public service, fighting for equal pay, for equal work, to bring our family leave policies into the 21st Century, for Equal Right Administration, and I just left a hearing on maternal Black health. Mr. Meeks and I have also strongly advocated for measures to diversify the ethnic, racial, and gender composition of corporate boards and in executive ranks, because leaders set the tone and they set the priorities.

From your perspective, does improving diversity on corporate boards bring a material benefit to companies?

Mr. GENSLER. I can speak just in terms of what we are doing at the agency, and I do believe that diverse points of view, diverse backgrounds help in decision-making, and we are leaning into that in terms of building a senior leadership at the SEC.

Mrs. MALONEY. Thank you. My time has expired.

Chairwoman WATERS. The gentlelady's time has expired. The gentleman from Michigan, Mr. Huizenga, is now recognized for 5 minutes.

Mr. HUIZENGA. Thank you, Madam Chairwoman. And before I begin, I would like to submit for the record a letter from the Private Investor Coalition.

Chairwoman WATERS. Without objection, it is so ordered.

Mr. HUIZENGA. Thank you. Mr. Cook, my colleague from New York was talking a little bit about arbitration and what that would mean. And I am curious if arbitration clauses were banned in customer contracts, do you perceive potentially negative consequences on that, and what would those potentially be?

26

Mr. Cook. Thank you for that question, Congressman Huizenga. I believe that if the current status of these clauses requiring arbitration—I just want to be clear that is not something that FINRA currently imposes; that is something that happens as a matter of contract. And FINRA does not have authority right now to address that. That is something that the SEC has authority to address.

Mr. Huizenga. No, I understand that. I understand that FINRA does provide faster, less expensive ways to resolve disputes, correct?

Mr. Cook. I think we work hard to administer an arbitration program that is fair for investors, that is prompt, that is—

Mr. Huizenga. I understand. So, you are not willing to say whether there would be a negative impact on that. Okay, I am going to move on.

Mr. Gensler, it's good to have you back, and I appreciate this time. I am going to ask you a pretty quick, simple question: Is market participation akin to gambling in a casino?

Mr. Gensler. It is good to see you, and thank you for the call earlier this week. I think market participation is investing and it takes risk, and material disclosure behind that risk is important, and the cop on the beat is there to protect against fraud and manipulation. So I would consider it part of that capital formation and part of risk taking.

Mr. Huizenga. I do not want to put words in your mouth, but I do want to be clear. So, it is not like gambling in a casino?

Mr. Gensler. It is risk taking, and risk taking can be in different forms, but I am trying to choose my words carefully. The risk in capital markets is something where Congress has said, let's ensure that there is no fraud and manipulation in those risk-taking markets.

Mr. Huizenga. Reclaiming my time, I understand. We have some people who are trying to portray this as literally walking in and letting chance decide whether you are going to walk out a winner or a loser. That is very different than taking a calculated risk.

Very quickly, I want to touch on BDCs, and how the acquired fund fees and expenses disclosure requirements distort the operating costs of those. And will the Commission prioritize trying to fix the acquired fund fees and expenses (AFFE) disclosure requirements here very shortly?

Mr. Gensler. Again, maybe it is just because I am in my third week, and you used some letters with which I am not familiar—

Mr. Huizenga. BDCs are business development companies.

Mr. Gensler. Oh, I'm sorry. I still need to get a briefing, and I look forward to working with you and your staff to understand that better in terms of the fee disclosure that is important to our public markets.

Mr. Huizenga. Okay. We are happy to get you that information, and I want to continue that conversation.

Earlier in the hearing, you had talked about cryptocurrencies and crypto exchanges, and you said that, "Only Congress can bring greater regulatory protection to crypto exchanges." And I am curious, if Congress is needed for crypto exchanges, why would it not be necessary for Congress to be involved in specific regulations when we are talking about the environment and social issues and

27

governance? It seems to me that those may not be appropriate just
for the SEC to be doing on its own. Does it not need congressional
involvement?

Mr. GENSLER. I think that at the heart of our securities laws are
disclosures, and from the 1930s, the SEC has had robust authority
to ensure that investors have the disclosures that investors wish to
have to make their investments. So in that regard, I do think that
there is the authority to move forward on climate and human cap-
ital and other—

Mr. HUIZENGA. Reclaiming my last moments here, acting Chair
Lee, at one point, implied that people attack companies that [in-
audible] care about climate should not donate to Republicans and
face securities liability and perhaps even SEC enforcement. I would
hope that would not be the attitude of the SEC, moving forward.

With that, I yield back, and I look forward to continuing the con-
versation.

Mr. GENSLER. Thank you.

Chairwoman WATERS. Thank you very much. The gentleman
from Colorado, Mr. Perlmutter, who is also the Chair of our Sub-
committee on Consumer Protection and Financial Institutions, is
now recognized for 5 minutes.

Mr. PERLMUTTER. Thanks, Madam Chairwoman. It's good to see
all of you. I have two specific questions I want to start with. One
involves delisting what would be penny stocks, if you will, and the
second involves diversity and inclusion, and then I'll get into some
general questions.

So, Mr. Gensler, back in 2005, in response to changing market
structure and then new technology, the SEC adopted amendments
to the penny stock rule that, among other things, requires the stock
to have a minimum bid price of $4 a share to initially be listed on
a national exchange. And in addition, the SEC has classified penny
stocks as securities trading with a value of less than $5.

GameStop's stock traded under $4 back in 2019, then hov-
ered between $4 and $5 throughout 2020, until the end of 2020,
when it began to tick up and then went skyrocketing starting in
mid-January.

In Colorado, we used to be the penny stock capital of the world,
and a lot of abuses occurred during that timeframe. Would you
agree with my concerns about the potential to manipulate low-
priced stocks?

Mr. GENSLER. Yes. There has been a long history. The lower the
price, the lower the aggregate market value. Fraudsters find that
more appealing. And, in fact, earlier this year the SEC took actions
to delist, I think it was about 30 entities that fell into these various
categories.

Mr. PERLMUTTER. Okay. With so many more retail investors com-
ing to the market through mass platforms like Reddit and other
ways, do you think it would be timely for the Commission to exam-
ine whether the rules around penny stocks, including exchange list-
ing standards for these stocks, need to be updated?

Mr. GENSLER. I think you raise a very good set of concerns, and
now I have some more work to ask the staff to look at just what
are the current roles, how did they affect what happened in the

28

spring or late winter, and even how it relates to broader subjects in the markets.

Mr. PERLMUTTER. Okay. Thanks. My second question primarily goes to you, Mr. Gensler, and it is a follow-up from Mrs. Maloney's diversity questions. It is a question that was raised to me by a friend of mine, so I am going to ask it, just as he presented it to me.

When you were Chair of the CFTC, you did not have any Black division directors at that agency. Will you commit to doing better on this point in your current role at the SEC?

Mr. GENSLER. Well, not to fuss with your friend, but I actually hired the first Chief Operating Officer who is African American in the history of the CFTC. He has done just a terrific job, and he is still there, by the way.

But yes, the answer is yes, sir.

Mr. PERLMUTTER. Okay. Thank you. To all of you, I am perplexed by this whole GameStop thing. In 2019 and 2020, it was at $4. On January 7th, it was at $17, on January 27th, it was at $347, on February 9th, it was at $50, and now it is bouncing around at around $162.

So, I am concerned about the mass platform and the potential for hyping a stock in that way. I am concerned about the unfair advantage in order flow. And I am concerned about the potential harm from short sales.

Mr. Cook, I will start with you. If you were to look at those three things, which one bothers you the most, or do any of them?

Mr. COOK. I think those are all important areas of concern. We are looking at all of those areas. The one that I think is most novel at the moment and requires our real attention, and we look forward to working with the SEC on this, is the expanded use of online trading platforms, which, again, can really create better access to our markets and be very good for investors. But how do we make sure that, at the same time, they are being protected and that we are making sure that, especially as they may go towards complex products, that that is being properly overseen.

Mr. PERLMUTTER. I would like to talk about the dropping down to T1. Do you think that takes some of the potential for fraud out of the system?

Mr. COOK. Yes. I think that while we fully support reducing the settlement cycle, I am not sure that, in and of itself, is going to address those types of concerns that you raised. I just think—

Mr. PERLMUTTER. Okay. Thank you.

Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you. The gentleman from Kentucky, Mr. Barr, is now recognized for 5 minutes.

Mr. BARR. Thank you, Madam Chairwoman, and I appreciate this hearing, especially these witnesses, whom I think bring a great deal of expertise to the topic.

Let me start with Mr. Bodson, on GameStop, specifically. As you noted in your testimony, the temporary restrictions on trading by Robinhood and others were due to the additional collateral required by the DTCC, but those were extraordinary circumstances in an exceptionally volatile market. For the sake of retail investors, of

29

course, we do not want to see, and generally speaking, halts in trading to happen frequently or ever again.

I do appreciate your testimony that moving to an accelerated settlement could reduce margin requirements, and specifically, value at risk (VaR) charges up to 40 percent if we go to T+1. But can you describe how DTCC communicates with brokers regarding their collateral requirements, and specifically, are there ways to improve that communication, and otherwise increase transparency to mitigate the risk of repeating this kind of surprise margin call and what happened in January?

Mr. BODSON. Thank you, Congressman. Our process for computing the margin and communicating such are as laid out in our rules. We conclude the market formula itself—there are margin guides. We have a form that they can use to estimate their margin.

The calculation works overnight. Every day, it is run at the end of the trading day. It takes into consideration market volatility. It looks at specific security volatility, concentration of activity in certain securities. So, what you saw in GameStop was almost the perfect storm of going through these retail platforms where a lot of buy activity, massive buy activity, 130 times normal buy, and we saw it weeks before, in stocks that were moving around anywhere from 100 to 300 percent a day, and just highly volatile over this period of time.

So, the margin calculation reflects the risk that the firm is presenting to us. That calculation is done overnight, and it is communicated the next day, automatically, by email generation. In the case of Robinhood, there was an additional charge, a capital premium, which was as a result of the fact that their margin requirement was in excess of their net capital, indicating that they were taking on more financial risk than we felt would be prudent. That charge was later waived, but the core margin charge of a billion-four, again, it is articulated in our rules, we give the client the tools.

Transparency is something that we will always try to get better at, but we do believe that we provide those tools.

Mr. BARR. Thank you very much. Moving to Chairman Gensler, congratulations on your confirmation. I look forward to working with you, sir. Let me just, briefly, this is a question that Mr. Luetkemeyer and also Mr. Lucas asked, and kind of bring them together, the regulation by enforcement question from Mr. Luetkemeyer, and the ESG disclosure question from Mr. Lucas. We don't want to see regulation by enforcement. We want to see notice-and-comment rulemaking wherever possible.

On March 4th, the SEC announced its new Enforcement Task Force focused on climate, as was discussed earlier, in ESG issues. But it wasn't until March 15th that it issued a request for public comment, and the SEC has not completed its recently-announced review of the 2010 guidance.

Chairman Gensler, can you explain the sequence? In other words, why is the announcement of a new focus on enforcement coming before market participants know the rules, and will you commit to adhering to requirements under the Administrative Procedures Act in completing a notice-and-comment rulemaking prior to engagement in any enforcement actions?

30

Mr. GENSLER. I am committed to complying with the Administrative Procedure Act on rulemaking, and I said, in this hearing and in my confirmation process, I think the market investors do want to bring some consistency and comparability to climate disclosure, human capital disclosure, and moving out and getting that comment.

But there are rules of the road that are already in place—the guidance from 2010, our overall securities laws—and we are going to be vigorously enforcing the laws and rules that are in place, as they are in place. But yes, I am committed to using notice and comment for new rules, but we still have to enforce the old guidance and old rules as vigorously as you would want us to.

Mr. BARR. Thank you, and I don't have time for this question, but I am going to be talking to you about horse racing, Chairman Gensler. I represent the horse industry in Kentucky, and we have a Reg A problem. We want to democratize ownership of securities in racehorses, and I look forward to working with you and the Commission on that issue.

Mr. GENSLER. I look forward to that, a different issue than GameStop.

Mr. BARR. That is right, and we just finished the Kentucky Derby, so it is a timely issue.

I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from Connecticut, Mr. Himes, who is also the Chair of our Subcommittee on National Security, International Development and Monetary Policy, is now recognized for 5 minutes.

Mr. HIMES. Thank you, Madam Chairwoman, and thank you to our witnesses. It is a real pleasure for me to see all three of you before the committee.

Chair Gensler and Mr. Cook, I am glad you are our cops on the beat. You have, in your careers and today, distinguished yourselves for your balanced approach and really intelligent approach to the issues.

And Mr. Bodson, it is great to see you. Kudos to you. When the chant from both ends of the political spectrum was, "Let them trade," kudos to you for pointing out that the trading stops were actually part of the system architecture designed to keep disaster and catastrophe from happening. We do not let airplanes fly in horrible thunderstorms, and there will be times when we need to just stop and pause the markets for prudential reasons.

I want to reflect on a lot of thoughts on GameStop. There has been a lot said. And, as usual, we have sort of devolved into a little of a silly, partisan conversation on the topic. We ought to be able to agree, as I think we do, that investing is a critical part of asset accumulation for American families. We ought to be able to agree— I have a little problem with my good friend, Mr. Huizenga, on this—that investing done irresponsibly—that is to say, without research, without thought, around companies that you didn't know about—will, in fact, result in a return that begins to look a little bit like the return you will assuredly receive in a casino or on the horse track.

So, I think our objective is how do we maximize the former—good, smart investing—and maybe discourage the latter, that is to

31

say, investing that actually ends up hurting retail investors. And the facts are pretty clear on what behavior leads to them being hurt.

This is a question for Mr. Gensler and Mr. Cook. Having really looked at what happened with GameStop, I am satisfied that the market will fix itself in the sense that when we do return to a bear market, some people are going to learn some fairly expensive lessons about the fact that the stock market is a risky place to put your money. And that will all be good.

Where I get concerned, though, is when you start talking about a lot of complexity, and, in particular, leverage, margin, option strategies that I am really pretty certain that most of us, much less the average retail investors, don't understand.

My question, I guess for Mr. Cook and Mr. Gensler, is, is there a point where you are employing leverage or synthetic leverage through margin or through derivatives that we should begin to think about restricting the ability of retail investors to employ those strategies? I do not need to remind the committee that we all know the story of Mr. Alex Kearns, who took his own life because he traded in some fairly complicated option strategies and discovered that he had created a liability for himself that he had not anticipated.

So my question is, is there a line around leverage or complexity, where we ought to not let the market teach touch lessons?

Mr. GENSLER. I will go first, and I am sure Robert will want to add something. I do think that our core mission is protecting investors, and for a long time we have said to open an options account, there is more discussion between a broker and that customer. Suitability used to be the word, and if I have the word wrong, I apologize, in my third week. But basically, they are taking more risk.

I would also add, in terms of these apps, these applications that have made it easier to open accounts, and making it easier, we have lost that human in the middle saying, "Is this appropriate? Is this risk appropriate?" The thing that is like those buildings in Las Vegas and Atlantic City is that through gamification, you are using psychological prompts and behavioral prompts to get investors to trade more, and trading more, economic studies show, doesn't necessarily mean getting better returns.

I wanted to add that, if I could, Congressman Himes, but I know Robert wants to—

Mr. HIMES. Yes, thank you. Mr. Cook, do you have anything to add to that?

Mr. COOK. Thank you for that question. I do think it is a matter of striking the right balance, because, as you say, there are lots of risks that people may be taking on, it is two complex products, margin, and we do have rules around some of that. There are limits on how much margin you can take. There are special requirements to open up an options account.

But I think many of these rules were developed at a time when the only way you would do that was if you had a broker or an investment advisor, someone advising you and understanding the risks that might be appropriate for you. And so in light of that, in light of the fact that many of these same products are now available directly, without some intermediation, we need to think about

32

whether the existing rules should reflect the change in the technology.

Mr. HIMES. Thank you very much. I yield back the balance of my time.

Chairwoman WATERS. Thank you very much. The gentleman from Texas, Mr. Williams, is now recognized for 5 minutes.

Mr. WILLIAMS OF TEXAS. Thank you, Madam Chairwoman. This is the third hearing on the GameStop saga, and one of the over-arching themes has been protecting retail investors. I am completely in agreement with the need to do this and to ensure that everyone, no matter how much money they have invested, is competing on an equal playing field.

However, one of the positive proposals that is being discussed to pay for some of the Democrats' progressive priorities would be detrimental to the investors we are trying to protect. Of course, I am speaking of the financial transaction tax (FTT). Contrary to what some on the left may want you to think, implementing this new tax would not only affect hedge funds and wealthy individuals, but rather anyone with a 401(k) or who opened their own brokerage account to trade stocks in their free time.

So, Mr. Bodson, can you give us your thoughts on the most likely changes we will see if a financial transaction tax is imposed?

Mr. BODSON. Thank you, Congressman. Again, I am not going to claim expertise in FTT, but the studies we have seen show mixed results. In some instances, they did slow down trading and it did dampen levels of market activity. Hong Kong is the contrary one, but again, Hong Kong has no income tax,and no capital gains tax, so it's a very different set of circumstances.

And the question you raised is exactly how does the tax get paid, who ends up paying it? And in many cases it will flow, as you said, right back to the end investor, so the retail investor, the pension fund, the mutual funds, and if that is the case, then that would obviously impact returns natively, it would impact the wealth creation that you would want to see in the stock market.

Mr. WILLIAMS OF TEXAS. Okay. Raising taxes does not help, I will tell you.

Chairman Gensler, first of all, congratulations to you, and I want to welcome you to your first hearing before this committee as the Chair of the SEC. I hope we will have a productive working relationship as you take on this important role. And I wanted to start by asking you about transparency, we have used that today, during the rulemaking process. For market participants, certainty is the key, and there needs to be a clear roadmap on what the SEC is focusing their attention on.

So, Mr. Chairman, what steps do you plan on taking to ensure the public is informed about the priorities and regulatory agenda that the SEC is undertaking during your tenure?

Mr. GENSLER. I look forward to working with you, Congressman Williams, as well. I think that the transparency of our regulatory agenda, along with the rest of the Administration—we would be publishing, I think it is twice a year, a unified agenda that is required under the law to publish our agenda.

33

But it is through hearings like this and talking with the public more broadly about the agenda, about disclosure, market structure, and ensuring that the markets work for working families.

Mr. WILLIAMS OF TEXAS. Thank you for that. Our capital markets are extremely regulated, and no single entity, whether it be exchange or broker-dealer or SRO, acts unilaterally without any oversight. As we are discussing broad changes to our capital markets we must first ensure we all have an understanding about how all of the different players interact within the ecosystem.

So, Mr. Bodson, can you discuss quickly how the DTCC communicates and it is overseen by the SEC as you are setting margin requirements, as well as how you give notice to your clearinghouse members?

Mr. BODSON. Thank you, Congressman. All of our margin requirements are reviewed and approved by the SEC. They are subject to public commentary. So if we are introducing any change to the margin rules, there will be a period of time where other members, or anybody else who is interested, can make a comment, and then the SEC approves it. The models are subject to very vigorous reviews internally by our risk department, and our audit department. They are reviewed by the board. So, we have a very rigorous governance and regulatory oversight of all of our models.

Mr. WILLIAMS OF TEXAS. I want to thank all of you for participating, and Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from New York, Mr. Meeks, who is also the Chair of the House Committee on Foreign Affairs, is now recognized for 5 minutes.

Mr. MEEKS. Thank you, Madam Chairwoman. Thank you very much for this timely hearing, and I want to thank our witnesses today.

Chair Gensler, during these market volatility hearings, ensuring that markets are fair and transparent so that investors are well-informed has been a focus. Transparency is particularly important where investors are seeking information on the demographic make-up of company boards. In 2009, the SEC adopted its current board diversity rule to shine light on the demographics of corporate boards. However, the results of the current rule have been vague and abstract disclosures, as indicated by former Commissioner Luis Aguilar and former Chair Mary Jo White.

In fact, an advisory committee at the SEC recommended, in 2017, more specific disclosures around race, gender, and ethnicity, because of the current rule's deficiencies. Those recommendations were not adopted by your predecessor. So my question to you is, first, can you commit today to revisiting the SEC's board diversity rule and requiring more specific disclosures around race, gender, and ethnicity, as recommended by the SEC's Advisory Committee on Small and Emerging Companies in 2017?

Mr. GENSLER. Thank you, Congressman, and I look forward to working with you, or should I call you Mr. Chairman? And I have asked staff to make recommendations on how we can do what you have suggested, in terms of that investors increasingly want to understand these particular issues around diversity, and more broadly, human capital, both. And it is driven by what investors want

34

to see, and I have asked staff to try to serve up some suggestions on this.

Mr. MEEKS. Thank you. I would hope that you could also think of maybe other initiatives that you can consider or encourage others within the department to have greater diversity in both corporate America and at the SEC itself. I do not know if you have any additional thoughts on that?

Mr. GENSLER. We have 4,400 people at the agency, but we also have a number of outside advisory groups, and as those terms roll, they are on rolling terms and everything, we have also asked the staff to look to ensure that those committees reflect the great diversity in our nation.

Mr. MEEKS. Thank you. Thank you for that, and I look forward to working with you on this particular issue.

Let me go to Mr. Cook quickly with the time I have left. Mr. Cook, this committee has examined inherent conflicts of interest with payment for order flows that can be difficult to mitigate and adequately protect investors. For example, brokers can often be incentivized to route customer orders to a higher submitter instead of to another training venue or other better prices.

Despite disclosures, investors may not entirely be aware of how payment for order flow affect their pricing, or whether they are getting the best execution. FINRA requires that any transaction should be bought and sold in a market in which the resulting price to the customer is as favorable as possible under the market conditions.

So, Mr. Cook, how can FINRA ensure that firms are always meeting their best-execution obligations to their customers when the firm uses payment for order flow?

Mr. COOK. Thank you for that question, Congressman. You are absolutely right. Our rules do require fast execution by both the firm that is routing the order and by the firm that is executing the order, and payment for order flow does create a conflict that does complicate that, because, of course, we have to evaluate, is the order flow being routed because of the payment or because that is where the best execution is available?

And that is an analysis that we work on every day, through our oversight and surveillance, through our examinations, and through guidance. We look forward to working with Chair Gensler, who has indicated he is going to be asking his staff to take a fresh look at this, because I think fundamentally the question is, is that conflict that you are describing adequately addressed through disclosure? And also, what disclosures are retail investors really getting, and it is something that they understand? I think many investors really don't understand these aspects of the market. We need to think about, are there better ways we can help make sure they understand how their orders are being routed?

Mr. MEEKS. Thank you very much. I see my time is about to expire. Thank you, Madam Chairwoman, for holding this hearing.

Chairwoman WATERS. You are so welcome. The gentleman from Arkansas, Mr. Hill, is now recognized for 5 minutes.

[No response.]

Chairwoman WATERS. Mr. Hill? If Mr. Hill is not on the platform—

Mr. HILL. I'm sorry, Madam Chairwoman.

Chairwoman WATERS. Are you there?

Mr. HILL. Yes, I am. Thank you.

Chairwoman WATERS. You are recognized for 5 minutes.

Mr. HILL. Thank you so much. This is a good hearing. I like part three as much as I liked parts one and two. Thank you, Madam Chairwoman. Thank you for our panelists. And let me start with Robert Cook.

Mr. Cook, in the first two hearings we talked a lot about Robinhood and other app-based broker-dealers versus a traditional retail-facing broker-dealer, and it was clear to me that customer service access for clients of Robinhood seemed to be lacking. I talked a little bit about sales practices in the area of small-dollar stocks or options. Have you looked into this, and what are your views here, Mr. Cook?

Mr. COOK. Thank you, Congressman Hill, for that question. Without speaking about any particular firm, it is an area that we are taking a look at. You mentioned customer service. We do expect firms to have sufficient infrastructure to comply with our obligation that they capture knowledge and respond to customer complaints. We do not particularly require, for example, a live customer service agent. We provide flexibility for how that is done.

But, basically, traditionally it wasn't thought necessary to regulate how firms provide customer service, and the expectation was that they knew how to be responsive to their customers without regulators telling them how to do so. But the financial services sector is evolving, as you know, just like the rest of the world, and commerce online, and lots of businesses do not have 800 numbers.

So as we work with the SEC to review these events, that is one of the things we will consider, whether there might be additional guidance moving forward about kind of what the minimum levels of support customers might need.

Mr. HILL. Thank you for that. Chairman Gensler, congratulations. We are delighted to have you back in the regulatory leadership space. My question for you, sir, is, are you familiar with the Task Force on Climate-Related Disclosures that was led by former Mayor Mike Bloomberg?

Mr. GENSLER. Yes, sir, I am. It is good to see you again.

Mr. HILL. My pleasure. Have you read that yet or had a chance to study the sort of executive summary of it?

Mr. GENSLER. I had an opportunity to take a look at it during my confirmation process, but I have yet to sort of dig into it with the career staff at the SEC.

Mr. HILL. Right. I noted in your comments in your confirmation hearing before the Senate Banking Committee that you believe that companies obviously should be required to disclose material things, and you made a statement that companies have a legal obligation to determine what is material. Do you think companies have any obligation to disclosure nonmaterial risks, regarding any topic?

Mr. GENSLER. I think that the heart of our disclosure regimes, over multiple decades, is that which investors are looking for, investors to make their decisions. And we have regimes from accounting regimes, management discussion and analysis, employ-

36

ment compensation, that those regimes are that which investors needs to pick up on and make their decisions on.

Mr. HILL. But you believe that public companies should be based on materiality in their disclosures?

Mr. GENSLER. There is a materiality component of disclosures, but there are also individual disclosures that are often very small but still can have a really meaningful part in investment decisions.

Mr. HILL. Do you think that the principles for effective, meaningful disclosures are that they are reliable, verifiable, and objective?

Mr. GENSLER. You have picked very specific words, sir.

Mr. HILL. Because Mike Bloomberg picked the words. I am going by what Mike Bloomberg is suggesting. He says that disclosures have to be reliable, verifiable, and objective. I wondered if you agreed with that?

Mr. GENSLER. I think what we are going to be trying to do is to go out for public comment, get the best thoughts from the public on climate risk disclosure, human capital, diversity that we talked about here, and get that which the investing public wants for their decision-making to bring consistency and comparability in these various regimes as they make their decisions.

So, I don't want to get caught up in Mike Bloomberg's words. I think the public will have a chance to comment, and I think you would probably not want me to just pick one person's words.

Mr. HILL. In a cost-benefit analysis, do you believe that anything that is required, required disclosures, should be subject to the Commission's cost-benefit analysis?

Mr. GENSLER. I am very proud this week that we hired a world-class financial economist, Jessica Wachter, to lead our Division of Economic and Risk Analysis. Those 160 people are going to be integrated from the design phase all along in terms of doing rigorous economic analysis.

Mr. HILL. Thank you, Madam Chairwoman. I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from Illinois, Mr. Foster, is now recognized for 5 minutes.

Mr. FOSTER. Thank you, Madam Chairwoman, and to our witnesses. You are now going to be subject to yet another question on horse racing, for Mr. Cook and Chair Gensler, but this one will be about transparency in retail trade execution quality in payment for order flow.

Retail investors don't care directly about payment for order flow. What they really care about are their total trading costs, how the price that they got for the trades that they completed on their trading app compares to a fair price that they—

Mr. HILL. No. My—

Mr. FOSTER. Careful, French. Anyway, so what they really care about is how the price they got compares to the price they should have gotten, or should have gotten on some competing end. The big players, and some retail investors, analyze this by holding horse races between different order execution firms, and small players, retail traders, can't do this. They are simply told that they paid no fees but they can't really compare the execution quality. To do that, they need some sort of reference price to know how the trades that they completed compared to some reference price that presumably

37

could be based on the National Best Bid and Offer (NBBO) or the Consolidated Audit Trail (CAT), or something similar.

Could you comment on the feasibility of providing retail investors some estimate of the quality of their order execution, so that they can use that to choose the app that works best for them in the items that they actually trade?

Mr. GENSLER. I look forward to working with you, and it is good to see you again, Congressman.

I think that you have put your finger on it. There is an inherent conflict. If a broker has arrangements and has two or three sole-source arrangements on payment for order flow as to whether that payment for order flow is really getting best execution, or as you say, a horse race. Competition is a really good thing in markets and bringing market efficiency. And these are not free apps. They are just zero-commission apps. The cost is inside the order execution. And that is what I have asked staff to really take a look at and think about our overall market structure, because it is not just payment for order flow. It is a lot of other pieces—wholesalers have about 37, 38 percent of the market now, which means that 38 percent of the market is not going to the markets like the New York Stock Exchange or NASDAQ, and not even going to regulated markets like alternative trading systems. So, looking at the overall—

Mr. FOSTER. All of that information, I believe, is present on the Consolidated Audit Trail, correct? So what I am thinking about is just some algorithm that runs on the record of completed trades, and some time window around when the app claimed to have executed the trade, and then say what would a fair price have been, and report that back to the user, compared to the price that they got on the trade they executed, none of all fees and everything else.

Mr. GENSLER. I look forward to working with you and your staff to understand the specifics of what you are asking. There is some disclosure on a quarterly basis under SEC rules already, but you are talking about more like maybe daily or trade by trade. I look forward to understanding—

Mr. FOSTER. Trade by trade—they could collect those statistics over the course of months or years, on the timescale that they could realistically transition to a better app, and they may find out what the institutional investors find out, that one order execution firm works well for very liquid, high-volume securities, and another one is best for options, and so on. And so, they could have access to that sort of information.

Mr. GENSLER. I think the question you raised at the center of it is disclosure, even if it is more specific disclosure, how does that work in the market structure, and do we somehow get best execution for a customer on one app, and it is even one app that is sort of promoting more activity through gamification, and so forth.

Mr. FOSTER. Or not even that. Actually, Mr. Cook, do you have any comments on the feasibility of this?

Mr. COOK. Yes, I think it is a very interesting idea. I think what you are raising is the point that would require us to think about what is the right benchmark, how do we ensure consistency in measurement against that benchmark, and then, how do we get that information to the customer?

38

I think a lot of the data is there. There are the Rule 606 reports that Chair Gensler just mentioned. But I think to get to what you are talking about would probably require some more reporting, maybe even more reporting of information into CAT if that was to be done by a regulator. You could imagine this process being done either by the firms themselves or through a centralized process.

But I think it is a very interesting idea, and we welcome the chance to talk further with you about it.

Mr. FOSTER. Although it would be necessary as an agreement on what the algorithm you are running in the time window to establish the reference price, and it doesn't have to be the best algorithm. It has to be a standard one that pretty well reflects the price that they should have gotten and allows an apples-to-apples comparison of the apps.

Chairwoman WATERS. Thank you. The gentleman's time has expired. The gentleman from Georgia, Mr. Loudermilk, is now recognized for 5 minutes.

Mr. LOUDERMILK. Thank you, Madam Chairwoman. Chairman Gensler, I would like to switch topics a little bit with you and discuss the SEC's Consolidated Audit Trail. When I was in the military, I was in a position in Intelligence where I was responsible for protecting a lot of highly-sensitive data. And we had one principle that we lived by, and that principle was that you don't have to protect what you don't have. And if you don't absolutely need something, especially if you have access to get it by other means, do not keep it. Now, that is a basic rule of cybersecurity that you can't disclose something if you don't actually have it.

As you know, the Consolidated Audit Trail is expected to collect 60 billion records every day of trading in the equities and options market. In July of next year, brokers will be required to report the personal identifiable information (PII) of every retail investor to the Consolidated Audit Trail.

While there are certainly times when the SEC needs to access investor data, this massive database will be a major target for cyber criminals. That is why I proposed legislation that would require the SEC to instead obtain this data by requesting it from the broker, and make sure the SEC is able to quickly access the data it needs. Brokers would have to provide that data to the SEC within 24 hours.

So, Chairman Gensler, a 2018 poll indicate that 89 percent—89 percent—of retail investors opposed having their personal data collected in the Consolidated Audit Trail, and that is why I proposed decentralizing this data across thousands of different brokerage firms instead of just one giant database, which, when it is all consolidated, it is a primary target.

My question is, will you take action to protect the investors' sensitive personal data?

Mr. GENSLER. Congressman, I thank you for asking that, and the SEC is committed to protecting data. I think also, just as an update, and I believe this was late last year under Chairman Clayton's leadership at the SEC, the SEC passed some updates to the Consolidated Audit Trail provision that a lot of that personal information that was going to be collected no longer will—people's birthdays, people's Social Security numbers, and the like. And it might

39

be that Mr. Cook has more details, because it is really under FINRA that the Consolidated Audit Trail project is being put together.

But I concur. I think a lot of that personal information is now not going to be collected, sir.

Mr. LOUDERMILK. That is a good start, but again, the basics of cybersecurity and protecting data is, if you have access to get that data somewhere—and data is always more secure when it is dispersed in multiple locations. That is why a lot of companies are going to new technologies, the blockchain technology, which disperses that data. It is much more protected than when it is centralized. And if you don't have PII, if you have a certain amount of information that can close the loop from other information, it puts a lot of people at risk.

And so, I think it is vitally important that we protect investors' data from unnecessary risk, and I hope that you will make an effort to address this, to make sure that people's information is protected, because, as we know, the Federal Government has been shown to be one of the targets, and has disclosed a lot of information in the past.

On another topic, as I stated in the first hearing on the GameStop issue of February, it is unfortunate that some of my colleagues are using this issue to call for a laundry list of new regulations. But beyond just calling for the new regulations, they are actually proposing them in this hearing. Many of these proposals are actually solutions in search of a problem.

So, Mr. Cook, if Congress was to ban payment for order flow, what effect would that have on the availability of commission-free trading for the everyday investor?

Mr. COOK. Thank you for that question, sir. I think a ban on payment for order flow—the impact would vary significantly across different firms, based on their business models. There are some firms who don't accept payment for order flow now and still charge zero commissions. But there are others who rely heavily on it, and one of the things to think about, if you are thinking about banning payment for order flow, would be what would be the pass-through effects on investors?

Payment for order flow also does have some advantages that have been identified by the SEC in the past, including the potential for guaranteed execution with some price improvement, or prompt execution. But I think this is a very complicated area. I think if the Congress and the SEC were to think about banning it, we would have to think about all of the knock-on effects throughout the market structure system.

Mr. LOUDERMILK. Thank you for that.

Chairwoman WATERS. Thank you very much. The gentleman from California, Mr. Vargas, is now recognized for 5 minutes.

Mr. VARGAS. Thank you very much, Madam Chairwoman. I want to thank you again for holding not only this hearing but the two previous hearings. I think it was very important for us to really take a look at what happened at GameStop. The only thing I would ask, Madam Chairwoman, is please don't scare Mr. Hill again. He seemed to be very frightened at some point, and I would just ask you to be a little more delicate with him.

40

Chairwoman WATERS. I assure you it was not me. Thank you.
[laughter]

Mr. VARGAS. He is a good friend to many of us, so please—I
know; I am just teasing.

I do want to thank the witnesses for being here. Again, I appre-
ciate it very much. I was going to ask about two things, the short-
ening of the settlement cycle, the T1, and really if their savings are
40 percent, and also about market concentration. However, Mr.
Lucas first opened the door to ESG, and then Mr. Huizenga kind
of kicked it open, and then, of course, Mr. Hill smashed it open.
I have to say that I am very interested in ESG myself, and I want
to ask a few questions about that.

Chair Gensler, I don't want to put words in your mouth. I noticed
that others tried and they weren't very successful, so I am not
going to do that. But I do want to say this: A very wise man once
said, "Transparency is at the heart of efficient markets." And the
same very wise man said, "At the heart of our laws are disclo-
sures." Even though you have only been there for 3 weeks, Chair
Gensler, I think you know the man who said that. Of course, you
just did, a little while ago.

I have a bill, H.R. 1187, which passed out of the committee, and
among other things, it would establish a sustainable financial advi-
sory committee to communicate with interest groups and individ-
uals regarding sustainable finance, and ultimately provide the SEC
with a report identifying policy changes that could facilitate sus-
tainable investments. In addition, the bill requires this committee
to submit recommendations to the SEC regarding what ESG
metrics the SEC should require to be disclosed.

Because many companies already disclose ESG metrics, and I
think it is very unfair that some do and some don't, I am curious
to know, in your own words, without putting words in your mouth,
what do you have to say about that, Mr. Chairman?

Mr. GENSLER. I look forward to looking closely at your bill and
talking to your staff about that. But I think that to the extent the
broad public is listening to this, please give us comments. Even
now, in an open comment period, it would be really helpful to un-
derstand, as investors, what you think you need and which, in
making your investment decision, your proxy votes and the like, on
climate, on human capital, on diversity, and the issues that we
have been talking about here in this hearing, or other disclosures.
And it is really helpful for the agency as we are doing this.

I think consistency and comparability are helpful as well, and
right now, a lot of issuers are dealing with varying needs around
this issue, and around the globe, because our companies here have
to look after U.S. investors, but our companies are also trying to
raise money overseas, or operate overseas, and there is a bit of an
alphabet soup of different approaches to that.

So, I think it is important. It is within the authority and mission
of the SEC to enhance this disclosure and bring some consistency
and comparability to it.

Mr. VARGAS. That is music to my ears. What I would also add,
and I think you have already discussed this, is materiality. When
we take a look at materiality, it is the investor who gets to decide

41

that, not the company. I think it is very, very important that the investors know this information. But again, I will put that aside.

And I know my time is running out, but I did want to ask you about the T+1, Chair Gensler, what do you think? Is there really all that savings, 40 percent savings there? And if that is the case, why not real-time settlement? We heard that is probably impossible to do.

Mr. GENSLER. I think the technology exists to come to same-day settlement. There are real savings, lower costs, and lower risk. The question about same-day settlement is it is still netted, as Mr. Bodson pointed out. Netting is a really important piece of the economics. But you could have same-day evening, so to speak, and have it all netted. But there are obviously transition costs. Moving from T+5 to 3 to 2 took time. I noted that in the 1920s, we were at T+1, so getting back to T+1 100 years later, in modern technology—Mike Bodson is writing this down, and he is saying, "Oh no." But I want to say that we can get to T+1, we can get to T+evening, but it will take some time.

Mr. VARGAS. Thank you. I yield back.

Chairwoman WATERS. Thank you. The gentleman from Ohio, Mr. Davidson, is now recognized for 5 minutes.

Mr. DAVIDSON. Thank you, Madam Chairwoman, and I thank our witnesses for their lengthy testimony today. It certainly adds value, Each of our three witnesses contributes important roles in ensuring that our capital markets operate efficiently and effectively, and I thank each of you for taking such important responsibility.

The market volatility we saw in January has more people talking about the clearing and settlement cycle, and during the first GameStop hearing, I highlighted some projects that the DTCC was working on regarding use of distributed ledger technology to shorten the settlement cycle and enhance our capital market structure. Mr. Bodson, I want to personally thank you and your team for sending me an update on those projects, and I look forward to monitoring their progress.

Speaking of distributed ledger technology, or blockchain, more broadly, I would like to hear Mr. Gensler's thoughts. It is well-known that you are a blockchain expert, as evidenced by your time as a professor at MIT. There are some fascinating videos on YouTube where you are teaching on that subject. If anyone has time and wants to learn more about blockchain technology, I highly recommend they take a look at these videos.

Chairman Gensler, I would like to follow up on our conversation from 2 years ago at the Facebook Libra hearing. I want to get your views on regulation of digital assets. Since 2017, this topic has been a passion of mine, and I have set out a legislative goal of creating a bipartisan and clear, light-touch regulatory framework for digital assets that promotes innovation while protecting consumers.

The final product was the Token Taxonomy Act, first introduced in 2018, and reintroduced last Congress, and now this Congress. It has bipartisan support; it always has. The bill has had input from academics at Wharton School of Business, trade groups like the U.S. Chamber of Commerce, specialized groups such as the Blockchain Association, various State regulators, and plenty of market participants.

42

In 2019, you told me, Chairman Gensler, that the SEC has been, "slower than I think we want," in terms of creating a regulatory framework for digital assets. Just 2 days ago, Secretary Yellen publicly stated that we do not have adequate framework to deal with cryptocurrencies from a regulatory standpoint.

Now with you at the helm of this agency, I think it is an opportune time for the SEC to work with Congress on creating this regulatory framework that is bipartisan and clear. Chairman Gensler, have your views changed since 2019 on the SEC's approach to digital asset regulation?

Mr. GENSLER. Congressman, thank you for that personal shout-out. It is a free course, by the way. It is free, online.

But I think that there are things that we can do better and get done at the Securities and Exchange Commission, and we have the authority, but I also look forward to working with Congress, if it is a desire of Congress to try to fill some gaps. As I said earlier, I think crypto changes. Particularly if one trades bitcoin in America today, there is not an investor protection regime that really protects as I think would be appropriate around these exchanges.

So I look forward to working with you and this committee, if the Chair wishes, on anything you would do in this area.

Mr. DAVIDSON. Thank you so much, and I look forward to working with you, and, frankly, our bipartisan group will certainly as well.

Regulation by enforcement has been characteristic of this space. Obviously, XRP is a key case. But it would be great to have a bright-line test so that we wouldn't be dependent on so many enforcement actions or no-action letters. So, I greatly appreciate it.

Lastly, I do want to talk about the SEC's authority to suspend trading. I look forward to working with you on a bill that would provide additional transparency about why the trading was suspended, and more specifics there. Some of that has already been commented on by others, but I would leave you the opportunity, sir, for any closing comments on that kind of transparency.

Mr. GENSLER. I look forward to hearing more about the issue, as you said. I haven't looked at your bill, and whether you are talking about suspending penny stocks or was it suspending others, because sometimes they're small, market-capped companies that in some cases have no products and no employees even, but that just are ripe for fraud and manipulation. There has been a regime for decades around penny stocks and trying to protect the public from what are easily-manipulated circumstances.

Mr. DAVIDSON. Just like that clarity that you had there, that is the piece that when you put the disclosure out for information flowing, what information triggered the halt. But I look forward to it. Madam Chairwoman, thanks again for the hearing. I yield back.

Chairwoman WATERS. Thank you. The gentleman from New Jersey, Mr. Gottheimer, is now recognized for 5 minutes.

Mr. GOTTHEIMER. Thank you, Madam Chairwoman, and thank you to our witnesses for being here today. Chairman Gensler, congratulations on your confirmation to lead the SEC, and welcome to the House Financial Services Committee. It is good to see you, and I know we are all looking forward to working with you in the coming years.

43

I am helping to lead a bipartisan effort to reinstate the State and Local Tax (SALT) deduction that was eliminated in the tax hike bill of 2017. Capping the SALT deduction has enormously increased the tax burden on hard-working, middle-class families in New Jersey's 5th District. To make matters worse, some legislators now want to impose a financial transaction tax (FTT) on stock and bond transactions, including in my State.

Chairman Gensler, according to a study by Vanguard, an FTT would cost retirement savers $36,000, more than 3½ years of savings over their lifetime, and would send jobs and markets overseas. Mr. Chairman, first, do you support a financial transaction tax?

Mr. GENSLER. First, let me say it is good to see you. Full disclosure, we first knew each other maybe 20-some years ago, working in an Administration.

I really think that I alluded to Congress and the Executive Branch to sort through taxes, and our remit at the SEC is about ensuring that working families are protected, we protect them, and we have fair, orderly, efficient markets and capital formation. And the tax questions are really outside our jurisdiction, if that is okay, Congressman.

Mr. GOTTHEIMER. No, I appreciate that, and yes, I am excited to work together again.

Can I maybe just ask it in a slightly different way? Maybe that will let you answer on the remit of the SEC. Are you concerned about an impact it would have on the markets, on pushing markets overseas, if we did any kind of new levy? There is a lot of concern that it is so easy, given technology, to move the back end of these processes overseas, which is kind of what we are facing in New Jersey. From a market perspective, would you be concerned about that, or would you prefer to—

Mr. GENSLER. Again, what you are raising is that there are tradeoffs, I think more appropriately made by Congress and the Executive Branch, in terms of those tradeoffs. We do have a modest fee. It funds the agency. It is about $2 billion a year that we have had. So but whatever tradeoffs beyond that, I think I would leave it to the appropriate—the White House, Treasury, and Congress.

Mr. GOTTHEIMER. Thank you, sir. Separately, if I can ask you about investment, broker-dealers are, as you know, legally required to offer best execution for their clients and to provide the most advantageous order execution for their customers, given the prevailing market environment. However, as you know, there is a perception that the practice of payment for order flow creates a conflict of interest between brokers and the investors they serve. Do you believe that payment for order flow presents a conflict of interest too significant to be adequately addressed by regulations such as enhanced disclosures or strengthening best-execution obligations?

Mr. GENSLER. You raised a good question, because we have found conflicts in various enforcement cases, like one that we filed in September, where the wholesaler was literally saying, "Well, you tell me. I can pay more to the broker or I can pay the customer more."

We know, at least from that case, this inherent conflict is there, and whether we can address it enough through disclosures or it sort of implicates the broader market structure. And I have asked

44

staff to think about that broader market structure, and not just the wholesaler payment order flow but also the exchanges through rebates, and just how is this market structure that has led to concentration—right now, we have a pretty highly concentrated and growing concentration in the retail order flow. Economics tells us that competition lowers costs to investors.

Mr. GOTTHEIMER. I appreciate that, and I really appreciate that you are hopefully going to have input from stakeholders before taking any action, and I like that you are asking the SEC to do so.

Lastly, as Warren was saying, and building on your professorial acuity in the cryptocurrency space—and, by the way, I really enjoyed our conversations on this, because I think it is wonderful to have somebody with your level of expertise at the SEC, given the competitive marketplace, and I think it is really important that we take the lead here and cede the lead to others in the world on Fintech and cryptocurrency.

As markets continue to grow and innovate, I would hope—and I think I know the answer to this, but commit to providing clarity for market participants in the crypto space and working with stakeholders to ensure that we do not lose our nation's place as the country for innovation and technology. Just making sure [audio interruption].

Mr. GENSLER. Congressman, I can't—our capital markets, for decades, have been part of our economic success story, and technology comes along, markets change, but we want to make sure we enhance our rules and get ahead of this, in the crypto space as well as in the traditional securities space, and always refresh our rules.

Mr. GOTTHEIMER. Thank you. I yield back. Thank you so much. It's good to see you.

Chairwoman WATERS. Thank you. The gentleman from North Carolina, Mr. Budd, is now recognized for 5 minutes.

Mr. BUDD. Thank you, Madam Chairwoman, and Chairman Gensler, welcome and congratulations on your new role.

Following up on the crypto conversation, in all of my conversations about crypto, industry leaders mention a lot of the same priorities—the need for a coherent, clear, regulatory framework. Clarity from the legacy institutions to offer decentralized finance (DeFi) products and even regulatory steps to offer a bitcoin [inaudible]. But the U.S.'s lack of clear guidance is both a competitive disadvantage and it is a national security concern. As you know, this is a complex issue, but I hope you are going to be willing to work with Congress as we talk about some of the steps to be taken.

There is a strong group of bipartisan lawmakers and regulators who want to help solve the issue, but I would just like to turn it back over to you and see what would you like to work with in this area in regards to blockchain and cryptocurrencies? I appreciate the other Members coming before me, who have mentioned cryptocurrencies and blockchain.

Mr. GENSLER. Thank you. I look forward to working with you and any member of this committee and your staffs. I think that there is a lot of authority that the SEC currently has in the securities space, and there a number of cryptocurrencies that fall within that jurisdiction. But there are some areas, particularly bitcoin trades in large exchanges, where the public is not currently really

45

protected on these crypto exchanges, trading just bitcoin. And so, that would be one area I would highlight.

Mr. BUDD. Very good. Second question, the GameStop episode—switching back after talking about GameStop—it highlighted the need to revisit settlement times. So, it is understandable that any move away from T+2 will need full and strict support, but the struggle of moving from T+2 to T+0 settlement time is not lost on me.

So, Mr. Chairman, with today's state of technology, including blockchain technology, what is the SEC and the DTCC, and I also want to include Mr. Bodson in this, what are you all doing to evaluate the potential use of blockchain to help speed up settlements?

Mr. GENSLER. You are right that technology exists today to shorten settlement cycles, even maybe to the same day. I think there is a business model issue as to whether it is still netted, which has a lot of economic advantages.

In terms of the underlying ledger technology itself, I would defer to Mr. Bodson as to whether they find it is helpful to have a distributed shared ledger or a sort of single-party ledger, and then what role the SEC would have is to ensure that whatever rules they are proposing have the resiliency and the important safety of a clearinghouse, because this is a systemically important clearinghouse. It is the largest, really, the sole clearinghouse for [inaudible]. But I would turn to Mr. Bodson.

Mr. BUDD. Thank you. Mr. Bodson?

Mr. BODSON. Thank you, Congressman. Distributed ledgers are a very exciting technology. As was pointed out before, we have two projects underway that we are publicly discussing, Project Ion, which is using distributed ledger technology (DLT) for settlement purposes and digitizing securities, and Project Whitney, which is more concentrated on the private security market and bringing some standardization in record-keeping over those markets.

What we are going to do, working with SIFMA and ICI and the entire industry, over the next few months, is look at those business processes, look at those conventions that are out there, and see how best to deal with the impact of shortening time.

As I said before, time is risk. If you shorten it, your credit risk goes down, but if you shorten it without really understanding it, operational risk goes up, and all of a sudden, you have a market in disarray.

DLTs, smart contracts, all of these are exciting developments. The question is, what is the right time to use it? They are new technologies. We have 45 years of resiliency—I am going to jinx our company—but we have a great track record. So anything we do, we want to maintain that reputation for the DTCC. But new technology is something obviously we are looking at, and it is very, very exciting for the industry, longer term, that it could revolutionize what we do.

Mr. BUDD. Very good. Thank you both. Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from Florida, Mr. Lawson, is now recognized for 5 minutes.

46

Mr. LAWSON. Thank you, Madam Chairwoman, and I welcome our guests to the committee today. One of the things that I have been actually concerned about, more so than anything else, is safety for the investor ever since the pandemic hit, and we have seen a lot of things happen within the marketplace.

So, Mr. Bodson, are current brokers of capital investments sufficient to prevent harm to the investor and to the financial system?

Mr. BODSON. Thank you, Congressman. It is a difficult question. What we saw during this period of time is obviously our requirements went up tremendously as a result of the market conditions, which were unseen. I have to be truthful that I have been in this business for 40 years, and I have never seen this sort of concentrated activity in a series of stocks, and the impact that it had on the market, and therefore on the clearinghouse.

What we want to make sure that people understand is that our collection of the margin protects everybody from almost everybody. We talk a lot about what happened with Robinhood and their meeting the margin charge, which they did and they remained in good standing. But if somebody else had gone into default during that period of time, neither Robinhood nor Robinhood's clients would have had to worry about trades being consummated. That is the story that I think is getting lost somewhere in this somehow, is that the system worked. There was incredible volume. The system processed that volume. There were big changes in margin. Firms met that margin. Nobody was defaulting. Nobody was pushed into that situation, from a firm basis. And the impact on the retail client, obviously, is something that both the SEC and this committee hopefully will come back with recommendations of [inaudible].

But from our aspect, the post-trading aspect, it was an incredible period of stress. We didn't see the circumstances, but we were prepared for volume surges. We were prepared for market stresses, and that part of the process worked very well.

Mr. LAWSON. Okay. Thank you. And this is to the whole panel, do you believe that gamification has a place in investing, and if so, what guardrails should be in place to ensure investors are protected?

Mr. GENSLER. Congressman, I thank you for asking that. This term, "gamification," which means embedding game-like features into applications, does not just relate to finance; it relates to our whole online existence. And if I might say, the streaming apps figured out some time ago that I am kind of a rom-com guy. Here, I admitted it, on open air, and I see a number of the Members are looking up. You thought I was a thriller guy, but I'm a rom-com guy.

If I watch a rom-com that they recommend. and I lose an hour-and-a-half and it was a lousy rom-com, it is okay. But if you use gamification features and folks are trading more actively, and day trading, then all of a sudden, that is their investment future. That is their challenge for their future and for their security.

So, I think we really have to take a look at this. We have asked the staff to put together something, a request for public comment, about all of these features that are getting imported into finance. Investing, good, but if it is sort of churning folks or getting them

47

to trade a lot, what does that mean and what protections should
we have in those communications?

Mr. LAWSON. That is a great answer, Mr. Chairman. Would any-
one else like to comment on that?

Mr. COOK. I would just add that I applaud the decision by Chair
Gensler to solicit comment on this topic, because I do think we
want to make sure we understand it, the different features, what
they are used for and why. We need to make sure we understand
the benefits, and I believe there are some really important benefits
for investors. We also want to make sure we understand the risks,
and I believe there are some important risks. And I think the bene-
fits and risks may change in different contexts. We also need to un-
derstand that.

So, I think we need to move forward in this area by really get-
ting a process where all of the stakeholders can share their views,
and the regulators can be even better-educated. We fully support
the concept of soliciting more comment in this space.

Mr. LAWSON. Okay. Mr. Chairman, do you think that the SEC
broker-dealer capital and liquidity framework needs to be strength-
ened for the larger retail broker-dealers? If so, how?

Mr. GENSLER. You have raised a great question, because what we
found in January is a number of brokers then denied access or shut
out access, and it was about liquidity to the clearinghouse or for
margin to the clearinghouse. So, we are taking a close look at that.
But you raised a good question, whether it also relates to their cap-
ital or liquidity needs.

Mr. LAWSON. Okay. Thank you. Madam Chairwoman, I yield
back, but that is very important.

Chairwoman WATERS. Thank you. Thank you very much. The
gentleman from Indiana, Mr. Hollingsworth, is now recognized for
5 minutes.

Mr. HOLLINGSWORTH. Good afternoon. I appreciate the oppor-
tunity to participate in this hearing, and I know a lot of very im-
portant topics have been talked about.

Chair Gensler, I wanted to speak directly with you for a few min-
utes. I was so encouraged to hear, during your Senate confirmation
hearing, of your willingness to work on transition to an eDelivery
system. Given the significant increase in communications via elec-
tronic means, it seems like a common-sense solution, where con-
sumers would win, ultimately firms would win, and everyone would
be better off on account of this. So, I certainly hope that this will
continue to be a priority. Do you expect it to be a priority as you
are getting started and spinning up in your new role?

Mr. GENSLER. Thank you. Yes, I was honored, in the late 1990s,
to work with Senator McCain on what was the eSignature bill that
President Clinton signed. I think these are ways to bring efficiency.
And look, the last 14 months we have been working through this
pandemic largely because of some of those earlier reforms. It has
been a very, very hard time, and too many of us have lost loved
ones. But electronic delivery is something that I hope that we can
continue to look to do, while still protecting investors and ensuring
they get the proper disclosures.

Mr. HOLLINGSWORTH. Wonderful. I certainly appreciate that, Mr.
Chairman. I think this is an important area where we could ring

48

a win both for consumers and their information, as well as for those that are providing it.

I wanted to switch topics and talk about minimum tick sizes, though. I have mentioned, in previous hearings, that we have seen a dramatic increase over the last decade in off-exchange trading, with this year, at some point, frankly, more exchanges happening, off-exchanges than on-exchanges. And look, the reality is, I don't want this to be a matter of preference. I don't want it to be a matter of party. But I do want it to be a matter of parity, where we have a regulatory regime that is equal across both types of trading, and I don't think we have that right now, because of the minimum tick size requirements for lit or exchange trading.

I wanted to reach out to you about this and help understand if there was any rationale for that discrepancy between on-exchange trading [audio interruption].

Mr. GENSLER. I don't know if we just lost the Congressman, but I think I got enough of the question to answer it. Should I go ahead, Madam Chairwoman?

Chairwoman WATERS. Go right ahead.

Mr. GENSLER. Okay. Thank you. One feature of our stock exchanges is there is a minimum price size of a penny, if I understand the question, or minimum tick size. I have asked staff to consider that in terms of market structure. Should that change? Should that address some of this segmentation that the wholesalers can trade within the penny, but on the exchanges we currently are not able to. And is that just a legacy of an earlier time?

Chairwoman WATERS. The gentleman from Illinois, Mr. Casten, is now recognized for 5 minutes.

Mr. CASTEN. Thank you, Madam Chairwoman. You caught me by surprise with a technical glitch there. I really appreciate you all coming.

Chair Gensler, I would like to dive into some of the weeds here on payment for order flow, and I want to frame this in the context of Robinhood, because it is top of mind in this hearing, but I think it is more illustrative of some challenges than the specifics.

Number one, I would just point out that last year, Robinhood paid $65 million in fines for failing to disclose their reliance on payment for order flow as a revenue stream, $65 million. By comparison, they earned $91 million in payment for order flow revenue in the first quarter of 2020, $180 million in the second quarter of 2020, and $331 million, 5 times the fund, in the first quarter of this year.

You were not at the SEC, so I am not going to ask you to comment on that, but I would just make the observation that if the pain of the fine is so much lower than the benefit of the crime, I am not sure it has the kind of deterrent property we would like.

In our hearing with Mr. Tenev, he noted that their payment for order flow agreements are structured where their revenue is earned as a percent of the spread earned by the wholesalers. Now, leaving the question of payment for order flow broadly aside, that seems to me like a total conflict of interest. The structure of that agreement puts the interest of the wholesalers and the brokers directly at odds with the investors, does it not?

49

Mr. GENSLER. I think you highlight two really important points, if I may. One is that an enforcement regime, I believe, without fear or favor, lean into individuals and corporations and holds them accountable, and that what you are highlighting is sometimes just a dollar payment doesn't fully address holding companies or individuals accountable and change the behavior in the market.

As to the behavior itself, what that finding in that case in December showed is that there was an inherent conflict, that there was the wholesaler saying, "Which way do you want me to go on this? It is either you or the investor."

That is why I have asked staff—I think that we have to take a holistic look at the market structure and see not only whether customers are really getting best execution but how the market structure can be addressed to get that, and also address some of the increasing concentration in the markets.

Mr. CASTEN. I appreciate that, because again, it is the structure. It is one thing to be paid 10 cents a trade. It is something else to say, I am going to get a percent of the spread.

The second point that Mr. Tenev made in those hearings was that, at least for their options orders, they only route trades to the four firms listed on their 606s that they have payment for order flow contracts with. To my mind, I don't understand how that is consistent with a best-execution obligation, if you are consciously not even talking to firms who might be able to do this, but don't pay you a fee on it. Would you agree—again, I am talking about the structure of how you implement your payment for order flow, not the concept, generally?

Mr. GENSLER. I think that you highlight a very good point, that in circumstances where you don't have that, then a broker sort of says, "Okay, I have to institute best execution," and goes out and surveys, I think it was earlier, a Member said it was a horse race, but you can go out and you can kind of say, okay, now—I think it was Congressman Foster, but I want to make sure—can I go out and sort of find the best execution, rather than a limited two or three or, in this case, four firms that are sending money back to the broker.

Mr. CASTEN. Okay. I would like to then just tie this all to the gamification question, because I think all of us on this committee, regardless of party, want to see U.S. investors create as much wealth as possible, and I don't think any of us have evidence to suggest that retail investors with high trading frequency come out better than retail investors who just invest in index funds, and are long hold, other than a couple of lucky casino winners. And yet that is precisely what gamification is designed to do.

And so, if you couple gamification with an incentive based on the spread, and you couple that with only funneling money to people who run the spread, I cannot conceive of a world where you are also fulfilling your best-execution obligations.

So in the time we have left, what tools do you have to enforce compliance with folks who are violating that best execution, and can you commit to making sure that the fines are commensurate with the gains from the crime?

Mr. GENSLER. That is certainly what we are going to lean in to do. I think that without fear and favor—and it is not just about the

50

firms but individuals and about sanctions and bars—you need to have orders that make sure of that.

Mr. CASTEN. Thank you. I yield back.

Chairwoman WATERS. Thank you. The committee will be in recess for 5 minutes.

[recess]

Chairwoman WATERS. The committee will come to order.

The gentleman from Ohio, Mr. Gonzalez, is now recognized for 5 minutes.

Mr. GONZALEZ OF OHIO. Thank you, Madam Chairwoman, and thank you to our esteemed panel. Mr. Gensler, I want to start with you, and thank you for your testimony and your thoughtfulness in today's hearing. It is our first time interacting, and it is great to meet you.

I want to start with the Archegos situation. As you know, under SEC rules, any person or firm who acquires greater than 5 percent ownership of a company must publicly disclose, and then greater than 10 percent, additional disclosures. Archegos, via swaps, had exposure, although not ownership, in excess of those triggers, and, therefore, they didn't have to disclose. Obviously, once the underlying shares started to tank, there were margin calls which they couldn't make, and then we had a disorderly liquidation. So my question around this is, from your view, how do we solve this going forward, and should the disclosures be triggered instead by exposure as opposed to outright ownership? Would that solve it? And if not, what are some ideas for that?

Mr. GENSLER. I think you raise a good point, and Congress anticipated this in reforms passed 12 years ago in the Dodd-Frank Act, and gave authority to the SEC with certain conditions, but authority to bring what is called securities-based swaps into these regimes, this 5- and 10-percent disclosure. I have asked staff to try to prepare recommendations for the full Commission. I think this Archegos circumstance, where this family office had well in excess of those numbers, shows some of the market-based and systemic-based reasons why, even if they didn't have the vote, it was an important set of exposures.

Mr. GONZALEZ OF OHIO. Right. And then with respect to this situation, from a systemic risk standpoint, do you think that Archegos was close to a long-term capital management-style dislocation, or was it more a blip in the radar? Where are you on that?

Mr. GENSLER. It is a very good question. I guess I have been around finance law enough that I was asked by then-Secretary Rubin to visit long-term capital management in 1997. I don't know all the figures, but this was smaller, and it is 24 years later. That circumstance had over $1 trillion of derivatives contracts and about $4 billion of capital, so I would say highly, highly levered. This was levered, as earlier members of this committee have said, pretty levered up, but I don't think it was quite at that level, but you raise a good point. There are systemic implications that we have to take the lessons even when the system holds, take those lessons and adjust our rules.

Mr. GONZALEZ OF OHIO. Okay. Thank you. And then, with all the volatility that we have seen in the last year, whether it is GameStop or Archegos, I would be curious what your thoughts are

51

on the effect of the zero interest rate environment and sort of the messaging around it, basically saying, hey, look, we are going to keep it low for as long as humanly possible, and what effect that has to risk taking, in general, and leverage, in particular. Just sort of your thoughts on that.

Mr. GENSLER. I am going to leave monetary policy to the Central Bank, and I think their remit under the securities laws is large enough. Regardless of where the markets are, up or down, interest rates high or low, I think our core mission of ensuring that we root out fraud and manipulation is a really critical piece. And what we found in the GameStop circumstances is that volatile markets, this is the time also to be protecting the retail public.

Mr. GONZALEZ OF OHIO. Great. I tried to get you to wade in there, but I appreciate the dodge. This isn't your first rodeo clearly. So, on the payment for order flow (PFOF) situation, sort of following up on that, when I look at GameStop, I see PFOF as sort of a bit player, but not the primary driver, right? It happens to be how Robinhood executes trades, but, to me, it was a short squeeze of a handful of companies, but, in particular, GameStop, driven by social media and then traded on zero commission platforms. Do you agree with that perspective? I want to make sure we are not adding payment for order flow as the primary driver of the GameStop situation, when payment for order flow was around long before GameStop, and hopefully long after. But I would love to just hear you kind of put a bow on that, if you could.

Mr. GENSLER. Yes, thank you, and it is in our remit, so I will address it. I think that the GameStop events raised a handful of issues, and payment for order flow and the inherent conflicts that they present for brokers and their customers, we need to take a closer look at.

Mr. GONZALEZ OF OHIO. Thank you, Madam Chairwoman, and I yield back.

Chairwoman WATERS. Thank you very much. The gentlewoman from Iowa, Mrs. Axne, is now recognized for 5 minutes.

Mrs. AXNE. Thank you, Madam Chairwoman, and thank you to the witnesses for being here. Chair Gensler, it is great to have you confirmed and have the SEC back at full strength.

Mr. GENSLER. Thank you.

Mrs. AXNE. It is obvious to everyone that people trade differently and invest, and it has changed a lot over the last 10 years. And you know what? Contrary to what my colleagues on the other side of the aisle are saying, we believe in that. That is okay. But I do worry about some of the standards and protections for investors so that we can keep up with those changes. And recently, I have been very focused throughout this process on how new digital platforms have gamified trading and can be designed to influence behaviors within those users.

My husband and I own a digital design firm, so I am pretty familiar with this, and one of the things I have heard along the way is that we shouldn't take away from some of those fun features of the apps. I don't disagree with that in general.

However, at our last hearing, I asked Dr. Vicki Bogan, who is an expert in this area, about this, and she said that app design can absolutely influence the decisions people make while they are using

52

that app. And in this case, that app design can encourage riskier trading, which is literally the last thing investors with limited knowledge need.

So, Chair Gensler, what I am wondering is if that is something that the SEC will look at in evaluating whether the current regulatory structures are doing enough to protect investors against gamification, towards riskier behavior?

Mr. GENSLER. Yes, Congresswoman, and I look forward to working with you. I think what we have found in our modern internet age is that service providers outside of finance figured out how to basically engage us in a more fun app and make the user experience more enjoyable. Bringing that to finance can be good because it is easier to use the app, but it also can lead to high trading activity, and that high trading activity is really important. Tie that app with predictive data analytics, some fancy words like, "deep learning," and "machine learning," tie that to predictive data analytics, then they can say to Gary Gensler, "This is the prompt you are going to get," and they can say to Chairwoman Waters, "This is the prompt you are going to get." And the computers figure out how to market to us differently, and all of a sudden it becomes somewhat, potentially, behaviorally addictive, and you start to find that your returns go down. So, I think it is a very important thing. We are putting it out for public comment to find out from the public more about this area. I think it is best to get ahead of it, rather than 5 years from now to look back and say, some problems have occurred.

Mrs. AXNE. Listen, that is music to my ears, and thank you so much. We will continue to work on this. Also, in this committee, we have looked a lot at the industries which have a business model where people aren't actually the customer of the service that they count on. From student loans to credit reporting servicers, we consistently hear about those businesses where we have gotten a lot of complaints from consumers.

Chair Gensler, it is pretty clear that this is a similar situation where Robinhood is selling to the marketplace, the vendor, so not the consumer. We have a clear conflict of interest here when it comes to payment for order flow, and one of the things that is pretty clear from both news coverage and from these hearings is that this business, with as much of a conflict here, we don't have enough transparency around the PFOF, both for the public and for policymakers to even understand. And I have had back and forth with Robinhood's CEO on this, and he said he would send us that information for the PFOF. We are still, of course, waiting to see that, since those currently aren't covered by Rule 606.

So, Chair Gensler, I am wondering if that is something that you would consider including in updating those rules, and what are some other options that we can look at to address this conflict?

Mr. GENSLER. I have asked staff to consider what we should do in terms of broad market structure, payment for order flow, and I would add that data is very valuable. What we find in our online life, if we are not paying, if it is a free commission, it is often that somebody else is getting data. In this case, the data is the actual transaction flow. That data is very valuable to the wholesaler, the internalizer who is taking that order flow, and then, as we heard,

53

maybe 50 percent of the retail flow, then they have a data advantage against all the other market makers, like a search engine that has data advantages against all other online platforms.

Mrs. AXNE. Listen, I can't wait to work with you on this, and I will tell you what, I am worried. While we all want people, of course, to be able to save and invest equitably, what we have right now could exacerbate inequity, so I am grateful to hear what you have to say. Thank you.

Mr. GENSLER. Thank you.

Chairwoman WATERS. Thank you very much. The gentleman from West Virginia, Mr. Mooney, is now recognized for 5 minutes.

Mr. MOONEY. Thank you, Madam Chairwoman. In the last few years, a record number of retail investors have opened brokerage accounts. Last year, individual investors' estimated share of equities trade volume reached a decade high. Although financial outcomes for individual investors will vary, I see increased participation in our capital markets as a positive development for wealth creation. Investors who bought shares of an ETF that tracks the S&P 500 on January 1, 2020, would see roughly a 29-percent return on their investment today. That kind of return can make it easier to buy a house or save for a child's education.

So, Chairman Gensler, do you consider increased participation by retail investors to be a positive development, and, if so, how will market access factor into your decision-making at the SEC?

Mr. GENSLER. I think, Congressman, that market access is important, market access and an informed public making their own risk decisions and participating in markets, and that these new financial technology apps have helped facilitate that. What we are also doing, though, is ensuring that investors are protected and that we look at these gamification features and other prompts to see that they are still protected and they are not just encouraging a method to trade more and trade more, chasing after something that behavioral prompts are encouraging them to do.

Mr. MOONEY. Thank you. Aas a good Republican, we always say, whenever possible, to quote Ronald Reagan. As President Ronald Reagan once said: "Government can and must provide opportunity, not smother it; foster productivity, not stifle it." So my fear is that overregulation could stifle the trend of greater participation from retail investors. Bad or just simply misguided legislation could have negative effects as well.

Specifically, banning payment for order flow is not the right approach. If we ban payment for order flow, a practice that has been around for decades, I fear we may see the end of commission-free trading, and commission-free trading has been a driving force behind increased retail participation, and a return to commissions would make it harder for new retail investors to participate in our markets. The consequences of that could be devastating. As we discussed earlier, participating in our markets is a fantastic way for everybody in America, every person, to build wealth.

So, I urge my Democrat colleagues to not get in the way of a good thing. Increased participation by retail is a positive development. Let's not regulate or legislate that progress away. Thank you, Madam Chairwoman, and I yield back.

54

Chairwoman WATERS. Thank you very much. The gentleman from New York, Mr. Torres, is now recognized for 5 minutes.

Mr. TORRES. Thank you, Madam Chairwoman. My first question is to Chair Gensler. Mr. Chairman, do you believe there is an inherent conflict between payment for order flow and best execution?

Mr. GENSLER. Thank you, Congressman. I look forward to working with you. We have found, as highlighted earlier in the hearing, that there have been times where there is an inherent conflict, even when a wholesaler paying for that order flow said, "Look, you tell me I can pay you more, or can sell the customer more." There are firms that have zero commission that don't have payment for order flow. And also to the earlier question, there are countries—the United Kingdom banned payment for order flow. Canada has banned payment for order flow. So I have just asked staff, let's look at this holistically as to what promotes fair, orderly, and efficient markets, and protects investors the best.

Mr. TORRES. I would ask you, payment for order flow is clearly a tradeoff. It has benefits. It has costs. Do you have a position on whether the costs outweigh the benefit at this moment?

Mr. GENSLER. I still want to hear from staff and work with my fellow Commissioners, but to your earlier question, there is this tension. There is a conflict there, and it has also led to a handful, really one or two wholesalers to have a dominant share in the retail market. And that concentration also raises issues of fragility, the data that they have. Do they get a competitive advantage on the rest of the market? Concentration usually leads to less efficient markets.

Mr. TORRES. It is often said that zero commission trading is free, but there is a sense in which it is deceptively free. It has no cost at the front end, but it certainly has a hidden cost at the back end. Do you agree with that assessment, and how can we make that hidden cost more visible to retail investors?

Mr. GENSLER. It is a very good question, because there are costs. It is sort of like an iceberg, but most of the iceberg is below the surface. The costs are below the surface. Payment for order flow is one of the costs. Someone else in the market gets enough data to trade that market better for them and a little less well for everybody else.

Mr. TORRES. Two concerns I have are market concentration and systemic risk. It has been reported that Citadel controls 47 percent of the retail order flow market. It has also been reported that Melvin Capital, which sustained, what, 51 percent losses in January 2021, was heavily leveraged. How are we going to address market concentration and systemic risk in this market?

Mr. GENSLER. I think by thinking through, as best we can, how to instill, through market rules and transparency, vibrant competition, and vibrant competition so that one firm doesn't necessarily, through economics, get to that center and get to dominate. We see concentration also on the brokerage side, increasing concentration on the brokerage side, so it is not just on the market-making side. And that is what I have asked staff, and our Division of Economic and Risk Analysis, and others to work out.

Mr. TORRES. And as you know, there was controversy around Robinhood's decision to restrict trading. I have heard the argu-

55

ments. I, for one, actually find the arguments to be reasonable. It seems like Robinhood would have had the inability to meet margin call, but it raises a larger question for me. It seems to me the ability of a broker to restrict trading appears to be absolute. I am wondering, should there be any limits on the ability of a broker to restrict trading to ensure that it is done reasonably, and that there is no abuse of power?

Mr. GENSLER. I think what happened there was to protect the clearinghouse, and because this firm didn't have enough liquidity and they scrambled around to raise a little over $1 billion that fateful day, they and some others restricted trading. I think access to the markets is a fundamental part of the markets, and so the folks who took it on the chin, so to speak, were the people who wanted that access at that critical time. And so, we are looking at that very closely.

Mr. TORRES. But should there be limits on the ability of a broker to restrict trading?

Mr. GENSLER. Again, it is only my 3rd week on the job, so—

Mr. TORRES. You have been thinking about these topics for a long time.

Mr. GENSLER. I understand.

Mr. TORRES. Okay.

Mr. GENSLER. I would have to say, whether you are the smallest investor or the largest investor, one of the hallmarks of our markets is access to trading. And so, it does concern me that retail investors were shut out during a fateful time, but again, it is a balance. They had to protect the clearinghouses as well.

Mr. TORRES. Thank you, Madam Chairwoman.

Chairwoman WATERS. Thank you very much. The gentleman from Tennessee, Mr. Rose, is now recognized for 5 minutes.

Mr. ROSE. Thank you, Madam Chairwoman and Ranking Member McHenry, and thank you to our witnesses for your testimony and participation in today's hearing. Chairman Gensler, I want to welcome you as well to your first appearance before the committee in your new role.

Historically, the SEC has administered the Federal securities laws in a bipartisan fashion. Chairman Gensler, I hope you continue that tradition, as I believe discussions about securities laws are not where we should be holding debates about climate change, or racial inequalities, or other extraneous issues. As the American economy continues to recover from the government-imposed shutdowns due to COVID-19, I also urge you to avoid placing overly burdensome regulations through backdoor regulating that could lead to limited consumer access to credit or stifle job growth.

As we analyze the events surrounding GameStop, we, again, are discussing payment for order flow, a conversation that has been ongoing since the 1980s. I am not in favor of banning payment for order flow like the legislation my Democratic colleagues have introduced to this hearing, especially without the proper due diligence of studying its benefits and costs. The updated reporting requirements released in 2018 were a good step forward, but I think we should continue to investigate if those changes are providing the necessary transparency for investors.

56

Chairman Gensler, in the previous hearing, I asked one of our witnesses what reforms he thought the SEC should implement or could implement with respect to payment for order flow to increase transparency for retail investors. And he suggested more granular 606 reports, specifically doing more to provide better public transparency of best execution. Are you looking into additional changes to those reports, and, if so, what changes?

Mr. GENSLER. I thank you for that, and I look forward to working with you and your staff in a bipartisan way with your advice. I want to turn to your question. I think transparency is very helpful, and transparency around these potential conflicts, I don't know if it will get us all the way there, and that is what I have asked the staff as to market structure, and, more broadly, not just about wholesalers and brokerage shops like Robinhood, but also exchanges and brokerage shops which pay rebates. In that whole market structure, what is going to promote the most competition, the most efficiency, so when a company goes to raise money, they have the most efficient markets, and when working families save, they can save best for retirement? And at the middle, if we have concentration, often economic shows leads to higher economic rents and higher costs. So, competition in that middle of the market is what would serve as my question to the staff.

Mr. ROSE. What is the timeframe and prioritization for your examination of payment for order flow?

Mr. GENSLER. Again, just 3 weeks on the job, so I don't know which month. But just because the chairwoman asked to have this hearing, you can imagine we have spent a lot of time just in the last 2 weeks. We are looking to probably publish a GameStop report this summer, but that won't be the only piece of it. It is really looking at what should we be doing in terms of overall market structure and whatever rules we can do, whether it be, as you said, updating our transparency around this Rule 606 or going further.

Mr. ROSE. Thank you. Mr. Cook, in your written testimony, you said that the SEC's 2018 disclosure requirement updates that took effect in 2020 have increased the public transparency of payment for order flow, but that FINRA believes that additional updates to order routing disclosure are necessary. Could you describe what updates you are planning to recommend?

Mr. COOK. Thank you for that question, sir. I think we would like to explore that with the SEC to build on it. I think it was a very positive development. The 2018 disclosure you are referring to just became effective in 2020. A lot of the debate around payment for order flow now is informed by that additional disclosure, so I think that has been very helpful. The question is whether there might be more granular information about payment for order flow. We might think about some of that being imported to regulators to help them investigate how orders are being routed, but also more disclosure to investors, and that might be enhanced 606 reports considering disclosures at the point of sale.

Mr. ROSE. Thank you, and I yield back, Madam Chairwoman.

Chairwoman WATERS. Thank you. The gentlewoman from North Carolina, Ms. Adams, is now recognized for 5 minutes.

Ms. ADAMS. Thank you, Madam Chairwoman. Thank you for holding this hearing, and thank you to our guests today.

57

Chair Gensler, first of all, congratulations on your confirmation. I want to focus my questions on increasing transparency within the markets. As you know, on a quarterly basis, some of our largest institutional investors must disclose their equity holdings via Form 13F. However, both the GameStop and Archegos controversies have highlighted some serious weak points and loopholes in Form 13F. For example, Archegos, which caused billions in losses for some of the world's largest financial institutions, like Credit Suisse, was able to skirt disclosing its sizable derivatives positions because Form 13F doesn't require covered filers to disclose.

As Chairman of the SEC, what reforms to 13F do you believe need to be made to provide more transparency to the markets and investors, and do you believe that 13F filings should be expanded to include derivatives?

Mr. GENSLER. Thank you for that question. I do think, and Congress anticipated this by giving authority to the SEC to do that. I think these derivatives, or what is known in this case as total return swaps, being included in those filings would be positive. I can't speak on behalf of the Commission. I am just speaking on my behalf. But I have asked staff to prepare recommendations to the five-member Commission to use that authority that the SEC has. I also think that there might be other updates that we should do beyond just derivatives as well.

Ms. ADAMS. Thank you. Mr. Bodson, Robinhood's CEO blamed the trade settlement cycle on Robinhood's inability to meet the National Securities Clearing Corporation's (NSCC's) margin demands, which he said forced Robinhood to restrict trading in GameStop and other stocks so it could reduce its risk profile, therefore, reducing the amount that it would have to pay into NSCC's margin fund.

So, Mr. Bodson, can you please describe generally what factors NSCC uses to determine a member firm's risk profile, and estimate how often it is that a member firm is surprised at the amount it has to pay into a clearinghouse's margin fund?

Mr. BODSON. Thank you, Congresswoman. Our formulas, our models are all SEC-approved and subject to public commentary. The model is commonly known as a value-at-risk model. It is a widely-accepted and supported model to estimate the potential loss in the portfolio of open trades that a firm has, what is the loss over the 2-day period to settlement. In the case of Robinhood and others, because they were not the only firm that was facing these situations, the model saw that they had a large concentration of transactions in buy, so instead of portfolio buys and sells, they were all buy trades and stocks that were moving around 100 to 200 to 300 percent a day, which is incredible volatility, and with volumes that were over 100 times above what would be normal. All of these factors led the model to say that this is a very risky situation. If a firm defaults, there is a possibility of those stocks losing all their value in an equal period of time. So, that is what drove the margin charge from Robinhood and some other firms where you saw this heavy retail flow.

We provide our members the model itself in our rules. We have model guides to help them understand it. We have APIs which send information to the firms. We have a customer portal where they can see what we are seeing. Now, the model itself runs over-

58

night, so one can understand a firm may not know the exact, precise amount that may come out the next day, especially in this type of marketplace. But they can anticipate that there will be a significant increase overnight as a result of seeing their customers' activity coming through them.

Ms. ADAMS. Okay. So We know that it was an unprecedented week, but do you believe that it was the settlement cycle that is to blame for Robinhood's margin issues, or is this just a case of poor risk management?

Mr. BODSON. I think it is more a question of, if there was a shorter settlement cycle, yes, the margin charge would be reduced, because that period of time would go from 2 days to 1 day. Therefore, the portfolio of open trades would be lower. The volatility would not have to be over 2 days, but over 1 day. I am not sure that, "blame," is the right term for any settlement cycle. That simply is an industry convention.

Ms. ADAMS. Okay. Thank you. Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from Wisconsin, Mr. Steil, is now recognized for 5 minutes.

Mr. STEIL. Thank you very much, Madam Chairwoman. I don't know about everybody else on these virtual hearings, but, man, I look forward to the Majority allowing us to be back in person in the not-too-distant future. I think it would be really nice just to actually see people instead of doing this virtually on some pretty important topics. But, away we go.

Chairman Gensler, I really appreciate you being here today. At the hearing last month, I asked Acting Director Coates about some statements he made regarding the SPAC market in his then-temporary capacity as the head of the Division of Corporation Finance. As you know, in my opinion, his comments had some pretty impactful effects on the SPAC markets. Acting Director Coates was hired by Commissioner Lee when she was the Acting Chair, but has remained in that role under your chairmanship. In fact, several of the Commissioners that Lee hired remain in prominent roles, including your Chief of Staff. Do you intend to retain Acting Director Coates as the permanent head of the Division of Corporation Finance?

Mr. GENSLER. Thank you for that, and I look forward to working with you. John Coates is a valued member of the senior staff of the SEC, and while I only met him recently, he is contributing and working really well.

Mr. STEIL. Did you provide any consultation with Commissioner Lee about or exert influence over staff hiring, both in the roles in the Chairman's office and for the SEC divisions prior to being sworn in as Chairman?

Mr. GENSLER. No.

Mr. STEIL. Okay. That is helpful. Did you have any input into the hiring of Acting Director Coates then? No?

Mr. GENSLER. As I just said, no.

Mr. STEIL. Okay. I will shift gears. Let's jump into a favorite topic of mine, ESG disclosures. I have been concerned that our securities laws are going to be misused to push social policy agendas that are, at best, tangentially related to investor protection and capital formation.

59

And with that in mind, I want to ask you about Commissioner Lee's recent remarks at the Center for American Progress. In her speech, Commissioner Lee suggested the SEC should focus its attention on political disclosures. She said, "Many companies that have made carbon-neutral pledges or otherwise state they support climate-friendly initiatives have donated substantial sums to candidates with climate voting records inconsistent with such assertions." And I am concerned that pursuing policies like this with the SEC is going to lead to mandatory disclosures of information that aren't material to your average investor, and that is, instead, really an attempt to leverage the SEC to engage in naming and shaming. Did you by chance discuss Commissioner Lee's remarks before she made them?

Mr. GENSLER. Congressman, I was a private citizen at MIT.

Mr. STEIL. Completely fair. So, you were not engaged in providing advice on those comments or in consultation?

Mr. GENSLER. Until I was honored by the U.S. Senate and appointed by the President, I was at MIT as a professor.

Mr. STEIL. Totally fine. I just wanted to confirm that that was the case. With all of the critical challenges we are facing today and, in particular, in front of the SEC, do you feel, at this time, that you intend to prioritize that issue?

Mr. GENSLER. I am, sir, and let me explain why. I think that a quarter of our market structure is disclosure, and investors being able to decide what risks they take based upon the disclosure from issuers. And in this decade, the 2020s, climate risk is something that an increasing number of investors, measured in the trillions of dollars, have really said that this is something they want to better understand as they make their investment choices, and I think we can help bring consistency and comparability. I think we can do it through notice and comment. There is a comment period that Acting Chair Lee actually started. I wasn't a part of that; she started it, Acting Chair Lee.

We are going to get a lot of comments from the public come June, and I encourage anybody to weigh in for or against. The details— it is really helpful to learn from the public their views on this, but it is about the investors and disclosure that investors want in making their investment and proxy choices.

Mr. STEIL. I appreciate you answering. With the limited time, I would say I look forward to the discussion. I look forward to working with you, and I appreciate you attending today's virtual hearing.

Mr. GENSLER. Thank you.

Mr. STEIL. And with that, Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from Illinois, Mr. Garcia, is now recognized for 5 minutes.

Mr. GARCIA OF ILLINOIS. Thank you, Chairwoman Waters and Ranking Member McHenry, for holding this hearing today, and thanks to all the witnesses for your informative testimony. This is the third hearing we have had about GameStop, and people joke about Congress having a short attention span, but unfortunatelyz, this is not old news. Every week, there is a stock price going up and down for no real reason. Every month, there is a new financial trend to get rich quick. GameStop [inaudible], and it is pretty much

60

always the same people who are getting rich. People in working-class communities like mine don't know how they will retire. They are worried about whether their parents are going to live. But they are the ones who come out ahead.

Mr. Gensler, as you mentioned in your written testimony, one firm, Citadel, apparently handles almost half of all retail trading volume. There are a lot of reasons why that is troubling, but retail traders talk all the time about democratizing finance and letting in the little guy. I think that is like saying Amazon democratized reading, because big players like Citadel, the only companies large enough to handle all these trades, are getting way bigger.

Mr. Gensler, do you think that the payment for order flow arrangements that companies like Robinhood use simply entrench big players like Citadel?

Mr. GENSLER. You raise a very good question, and I think it is an interrelated question which I have asked staff to help our five-member Commission on, is the market structure right now has some concentration in the retail space that you just mentioned, that there are dominant market makers buying this payment for order flow. I think there are also some conflicts that arise between are we, the public, getting best execution?

I no longer can do this because I am at the SEC, but before I got there, when I would put in an order to my broker that is a market order, about 90, 98 percent or something of those market orders, depending upon the month, are going to a handful of wholesalers. They don't go to the New York Stock Exchange or Nasdaq. They don't even go to dark markets, called ATSes. The retail order flows that are market orders to go to those, and so it raises questions. Is this the most efficient market? Is this the fair, orderly, efficient market that Congress has mandated the SEC to do? And does it lead to some fragility in markets from the market concentration? That is what I am going to look at, to make sure. And I think it matters to companies and issuers, too, that the capital formation is better when there is intense competition in the middle of the market.

Mr. GARCIA OF ILLINOIS. I am glad that you are looking at it, and that we will be hearing from you in the near future. Do you see a potential problem with one firm, like Citadel, having so much concentrated power in a single market?

Mr. GENSLER. It does raise questions of, does it leave the market potentially more fragile, potentially less innovative, and whether the pricing in that marketplace is not benefiting from as much robust competition? We know economics tells us that when there is a lot of competition in a market with multiple parties, it tends to lead to better pricing for the users of that market.

Mr. GARCIA OF ILLINOIS. Yes. And do you think that a firm like Citadel could potentially pose a systemic risk to the U.S. financial system, and should FSI review the risks associated with such a large market maker?

Mr. GENSLER. Again, sir, I haven't focused on just that firm, but I think that market concentration and market making can lead to issues that that player has data advantages like we have seen. There is one online search engine in America that most of us go to, and that has data advantages. Now, in the middle of our capital

61

markets, one firm may be in the retail order flow. So it is in the retail order flow that you mentioned, it may have growing data advantages over other market participants.

Mr. GARCIA OF ILLINOIS. Thank you very much. Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from South Carolina, Mr. Timmons, is now recognized for 5 minutes.

Mr. TIMMONS. Good afternoon. Thank you, Madam Chairwoman. And before I begin with my questions, I want to reiterate what my friend from Wisconsin, Congressman Steil, said. I really look forward to getting back in person. I hope that we can do that as soon as possible.

Mr. Bodson, it is easy to be a Monday morning quarterback, but, in your opinion, did Robinhood act appropriately in restricting trading in certain stocks based on current regulations they and the DTCC are subject to?

Mr. BODSON. I really can't comment on Robinhood's decision. Only Robinhood can do that. I would be speculating, and it really would not be appropriate. What we know is there was a large margin charge that they were subject to. The premium component was waived. They met their requirement and remain a member in good standing. What happened next, the decision to restrict trading ,really was internal to Robinhood. We did not have discussions about that.

Mr. TIMMONS. Understood. Thank you. Chairman Gensler, do you believe that payment for order flow improves overall market liquidity and order execution for retail investors?

Mr. GENSLER. I am going to have to study it a little bit more with our Division of Economic Research and Trading and Markets in terms of this very important question that you just raised. Does it increase liquidity, is it neutral, or is it negative to liquidity? I haven't formed a view on that yet, sir.

Mr. TIMMONS. Sure. Thank you. Also, Commissioner Gensler, Germany's financial regulator ran into trouble when it banned short selling in wire cardstock and filed criminal complaints against two journalists reporting whistleblower allegations against the company. Do you believe that it is necessary for short sellers to disclose their short positions in 13F filings, and could this additional disclosure lead to a similar situation of regulatory overreach in the United States?

Mr. GENSLER. I am not familiar with the circumstances you are mentioning, but let me say that Congress anticipated and gave authorities to the SEC to, on a monthly basis, require aggregate information in the short selling market. FINRA, and Mr. Cook could speak to it, already publishes some information on a biweekly basis. I think that transparency is positive to markets, and I have asked staff to put forward recommendations to our five-member Commission. It was actually a mandate from Congress. It wasn't a, "may." It was a, "shall." So we are going to lean in and follow Congress' mandate from 12 years ago.

Mr. TIMMONS. Sure. Thank you. Last question for you, do you believe that short sellers play a role in maintaining fair, orderly, and efficient capital markets?

62

Mr. GENSLER. I think that short selling, which is probably as old as capital markets, several hundred years or more old, does play a role in capital markets and price formation. The important tenant for the SEC is to ensure that the markets are free of fraud manipulation, and so those participants in the market, whether they are on the buy side, or the long side, or on the short side, are doing so without defrauding and manipulating the markets and that there is the appropriate transparency.

Mr. TIMMONS. Sure. Thank you. Mr. Cook, do you believe that Know Your Customer rules and current policies can continue to protect retail investors regardless of their broker-dealer?

Mr. COOK. Could you repeat that question, sir? There was some interference.

Mr. TIMMONS. Sure. Sorry. I said, do you believe that Know Your Customer rules and current policies can continue to protect retail investors regardless of their broker-dealer?

Mr. COOK. Oh, thank you for that question, sir. I think it is important to note that there are existing rules, along the lines that you described, that include Know Your Customer and for certain more complex products, like options, a requirement that additional information be acquired, and also that the firm make a determination about whether the account would be appropriate. That said, I think as sort of the theme of the hearing and some of the conversations around these events, technology has changed the world and some of those rules are quite old. And I think it is worth at least looking at whether they should be updated, but while taking into account the need to avoid unintended consequences or unduly limiting access to the markets.

Mr. TIMMONS. Sure. I appreciate that answer, and I am going to finish how I started. Madam Chairwoman, we really need to get back to work in person. I am getting very tired of ring lights and cameras on the computer, so I hope we can get back to work soon. And with that, I yield back. Thank you, Madam Chairwoman.

Chairwoman WATERS. The gentlewoman from Michigan, Ms. Tlaib, is now recognized for 5 minutes.

Ms. TLAIB. Thank you, Madam Chairwoman. I appreciate it. Thank you for the panelists. I know that many of you know that high-frequency trading conducted by market makers, like Citadel Securities, drive market volatility, and working people pay the price through their 401(k) and pension funds. That is what I am most concerned about. Prior to 2008 and the financial crisis in 2008, Citadel sought to leverage its status as a hedge fund to compete with U.S. investment banks. It didn't work, but Citadel has since used this regulatory blind spot to establish themselves as a dominant market maker for retail investors.

So, Chairman Gensler, as a hedge fund, is Citadel Securities supervised by the Federal Reserve?

Mr. GENSLER. It's good to see you again, by the way, Congresswoman, and I was just thinking that, are they supervised by the Federal Reserve, is a question for them. Citadel Securities is registered at the SEC.

Ms. TLAIB. Is this helpful? Are they designated as a systemically important financial institution by FSOC?

63

Mr. GENSLER. I do not believe that the Financial Stability Oversight Council (FSOC) has made such a designation.

Ms. TLAIB. Yes. According to its own website, Mr. Chairman, Citadel Securities says they execute about 40 percent of all U.S. listed retail value and reportedly handles almost as much trading volume as Nasdaq. As market makers, like Citadel, conduct these high-frequency trades, it is estimated that pension and retirement accounts already pay an annual $5 billion "tax," which is extremely alarming. And even though 50 percent of American families don't own stock at all, it is working people who pay the price when Wall Street gambles with our money.

And so, Chairman Gensler, in your testimony today, you did acknowledge that, "Issues of concentration may increase potential system-wide risks should any single incumbent with significant size or market value fail." Sorry if I misquoted you, but I think what I am more concerned about is, do you think Citadel, or a firm like it, currently poses systemic risk to our financial system?

Mr. GENSLER. Yes. I do think that what we are seeing inside the financial markets is concentration growth. We see this outside of finance as well. We see it in search engines and online retailing.

Ms. TLAIB. Do you not think this is an extreme version of that, when they are doing this much trading and they are not considered a systemic risk?

Mr. GENSLER. I don't know how to compare it to other parts of the economy, but we are seeing similar economics about the network effects that a firm gets with an increased advantage of data, then they are growing concentration. So, I have asked staff to really take a look at this because there are issues not just of fragility or resiliency, which you have raised, but also, is this the most efficient capital market? Now, this is just in the retail space, but players that are so concentrated in the space, and is the pricing in the market the best.

Ms. TLAIB. Yes. And, what is concerning is, as you know, with Citadel's own pricing and liquidity, they failed the pensions. There is going to be direct impact. But, Mr. Chairman, does the SEC have any contingencies in place in the event of a failure of a large market maker like Citadel right now if they fail?

Mr. GENSLER. Part of that is also our oversight of the clearinghouses and ensuring that there is appropriate oversight of their counterparties, and this would be true of any large market player. But I would like to work with you and your staff a little bit more, because in my 3rd week, I haven't yet sat down and sort of found out all those by rigorous oversight, of all the brokerage firms and the significant brokerage firms and clearinghouse.

Ms. TLAIB. Yes. As a market maker, like Citadel, has grown larger and consolidated their market position, they have used their status as a hedge fund to evade regulatory scrutiny, and it is very clear. So, I hope that the SEC doesn't turn a blind eye to this regulatory loophole or the systemic risk that hedge funds like Citadel pose. And so, again, I really appreciate the chairwoman bringing this to light because we will not have a healthy, transparent market so long as retail orders are directed towards a shrinking handful of wholesale traders. And it is really important. Thank you, and I yield back.

64

Chairwoman WATERS. Thank you. The gentleman from Texas, Mr. Taylor, is now recognized for 5 minutes.

Mr. TAYLOR. Thank you, Madam Chairwoman. And I appreciate our witnesses being here. I think this is an important hearing. I am Van Taylor. I represent Texas. I am the junior-most Republican, which means the end of the hearing is near, so you can celebrate that.

I wanted to, Mr. Gensler, just talk to you about something that happened in the previous Administration. President Trump signed an Executive Order prohibiting investors from trading in dozens of Chinese securities. However, those primarily U.S. investors investing in ADRs are now unable to divest those Chinese securities, and so it is really unclear what the plan is for those U.S. investors to get out of those Chinese securities. I realize this didn't happen on your watch, but I am wondering what the plan is. And some of those investors, there are some big ones and some small ones. I, of course, hear from the small ones. They are concerned about, hey, how am I going to get out of this? What is the SEC's view on that?

Mr. GENSLER. First, I congratulate you on your first term, and it is great to get to know you. This is a terrific committee. I have worked with this committee in three Administrations. There are many other great committees, too, though, but I would like to work with you and your staff to understand the issue better. I have to say I haven't yet been briefed on what you are saying, for investors to basically sell out of investments that they are kind of locked in.

Mr. TAYLOR. Right. The problem is that these investors got frozen into these investments, and as you said, and certainly it is something I heard in my time at Harvard Business School. I mean, hey, we have great capital markets in this country, and it is a major competitive advantage for our nation to have those great capital markets for the formation and allocation of capital. Chinese companies are taking advantage of that, and we said, okay, you are not going to take advantage of us anymore, but we ended up freezing investors into them, and so now investors have their capital stuck in investments, and I am trying to figure out how are we going to get them out? Again, we don't want people to play in that market, but how are we going to get them out of it?

Mr. GENSLER. One of the wonderful things for the public listening as a representative democracy, is if a Member raises a question like this to somebody in the administrative state, like me, I will now go back and try to learn about this issue, and I look forward to chatting more about it with you.

Mr. TAYLOR. I appreciate that. Thank you for letting me flag this one for you. Obviously, it is important for those people, and I think it also could perhaps create a roadmap for this kind of action in the future instead of just locking it up and then everybody going, okay, what now, that there is actually an exit ramp.

Mr. Bodson, the DTCC released a White Paper, "Advancing Together: Leaving the Industry to Accelerate Settlement." Obviously, the last iteration of this GameStop hearing focused a lot on accelerated settlement, T+1 versus T+2. I think you have done a good job of explaining some of the benefits of going from a T+1 to a T+2, and I think it would have certainly helped in this particular scenario that we are having this hearing under if you had had a T+1

65

instead of a T+2. But one of the things that I wanted to understand a little bit more from your point of view is, could you talk about distributed ledger technology, and what that would actually mean, and how it would work in this particular circumstance?

Mr. BODSON. Thank you, Congressman, for the question. The move to T+1 really will be based upon existing technology, looking to see if we could apply DLT and other technologies to help solve the problem. As I said, speeding up the process lowers credit risk, but it increases operational risk, so there are a whole series of processes that have to be done before a trade is settled. The easy parts, in some ways, are the trading part and the settlement part, but they are somewhat just bilateral transactions. But in between, as an example, any institutional asset manager has to take the trade it has done throughout the day, aggregate that trade, break it up amongst all the funds, et cetera, et cetera. I don't want to go into too much nuance. All of these steps could require communication, reconciliation, passing of information. So, there are instances where something like DLT, where you do have that advantage of a golden source being distributed, where it could be very much applicable. DLT smart contracts—

Mr. TAYLOR. I am sorry to interrupt you, Mr. Bodson.

Mr. BODSON. Sure.

Mr. TAYLOR. I just need to ask one quick question. Do you need any statutory authority to go from T+2 to T+1? Do you need us to pass a law, or do you have the authority you need?

Mr. BODSON. No. Thank you, Congressman. If I do, I will definitely reach out to the committee, but at this point, the industry is coalescing around the move to T+1. As you heard from Chairman Gensler and Mr. Cook, we are all moving in the right direction, so I think at this point, the industry itself will get there.

Mr. TAYLOR. Okay. Thank you. I yield back.

Chairwoman WATERS. Thank you very much. The gentleman from Massachusetts, Mr. Auchincloss, is now recognized for 5 minutes.

Mr. AUCHINCLOSS. Thank you to our witnesses for their patience and persistence in this hearing, and to the chairwoman for organizing this. In the first of these hearings, I focused on the tension between using technology to democratize access to assets and to wealth-building opportunities, and I believe that is critical and potentially a way for us to narrow the wealth gap in this country, but, on the other hand, the increasing gamification of finance for non-accredited investors or investors who don't have the wherewithal or the sophistication to be making the kind of bets that they are making.

And I think, in particular, where the rubber hits the road on this tension is with options and with the gamification of options, which are a very fast way to make money, but a very fast way to lose money as well, and that they have binary outcomes and a very narrow time window.

I would appreciate hearing from, first, Mr. Cook, and then, Mr. Gensler, on where FINRA and the SEC feels like they draw the line between creating a good user experience, which obviously is in the best interest of any business, without inappropriately inducing behavior that actually is not in the fiduciary interest of the user.

66

Mr. COOK. Thank you for that question, sir. I think you touch on the issue and characterize it exactly. There is a tension. There is a balance here and we need to try to strike the right balance. With respect to options, we have issued guidance recently reminding firms of their obligations here, but I appreciate your raising options because I think there is a way in which all these issues kind of come together—options, payment for order flow, gamification—because options tend to provide greater payment for order flow.

And so, one of the things we often think about with conflicts in payment for order flow is, which firm do I wrap my orders to, right? But there is a second level of conflict that options is one example of—I think there are others—where there is a question about which product and which orders do I want to route because some may give me more payment than others. And combined with the gamification, I think it becomes a package that we really need to look at all pieces of this together.

So, I really appreciate Chair Gensler's leadership on this, and talking about getting his staff to think through all these issues, and we welcome the opportunity to engage with them.

Mr. AUCHINCLOSS. Because, Mr. Cook, the spread is wider on options, and so they are more attractive for the payment for order flow?

Mr. COOK. Yes, the amounts of payment for order flow in the options world, which tend to come from exchanges, not from the wholesalers, is generally higher, yes.

Mr. AUCHINCLOSS. Thank you. Mr. Gensler?

Mr. GENSLER. I think that, as Mr. Cook said, it is taking somewhat of a holistic approach in a variety of places, but options raised a couple of other issues. There is more risk because of the inherent, what is called leverage. I can say I want to make an investment, that something is going to go up or down, but I could lose all my money very easily in an option.

Mr. AUCHINCLOSS. No, I know what options are, and what leverage is. My question, Mr. Gensler, is, do you think the SEC standards for de-marketing where gamification, and a good user experience, and a fiduciary responsibility begin are clear enough and being followed in the industry?

Mr. GENSLER. I think that we need to look very seriously at freshening up our rules because behavioral prompts, the gamification, is inspiring people to trade more. And economic research shows that more trading doesn't necessarily lead to better results, particularly in the field of options. I was just mentioning the leverage because it is potentially more pernicious than options.

Mr. AUCHINCLOSS. Absolutely, Chairman Gensler, and I appreciate that, and what I would encourage you and your staff to focus on is the reality that this trend of gamification is actually going to accelerate. It is a common maxim, for example, in the consumer technology industry that the frontier of tight feedback loops in user experience are actually in video games. Video games have always been on the leading edge of how to create captivating online experiences. And the time between when video games put something out there that works, and when other kinds of consumer technology adopt it, like brokers, is getting shorter and shorter and shorter.

67

Mr. GENSLER. And if I could add, it is also the use of predictive data analytics, or what is called deep learning and machine learning, which was part of my research at MIT. You combine that and then differentiate how you would market it to you differently than the chairwoman, and you would find a way to get the chairwoman to trade one way and you to trade another way. I am not saying that either of you are doing this, but I am just saying that is the sophistication of what is happening now.

Mr. AUCHINCLOSS. It is an excellent point, sir, and I do hope that you will tell this committee if you feel like you need more statutory authority or more funding to fully draw that line and enforce it because it is critically important.

Mr. GENSLER. Thank you.

Chairwoman WATERS. Thank you very much. Before we close the hearing, I would like to just share information in relationship to a question we have been getting about a financial transaction tax (FTT). That was not a part of any proposal in this committee hearing, and we don't have jurisdiction over that anyway. So for those people who have been contacting us about an FTT, that was not a part of this hearing.

And with that, I would like to thank our distinguished witnesses for their testimony today.

The Chair notes that some Members may have additional questions for these witnesses, which they may wish to submit in writing. Without objection, the hearing record will remain open for 5 legislative days for Members to submit written questions to these witnesses and to place their responses in the record. Also, without objection, Members will have 5 legislative days to submit extraneous materials to the Chair for inclusion in the record.

Again, I certainly would like to thank all of our witnesses today, and this hearing is now adjourned. Thank you very much.

Mr. GENSLER. Thank you, Madam Chairwoman.

Chairwoman WATERS. You are welcome.

[Whereupon, at 4:02 p.m., the hearing was adjourned.]

# A P P E N D I X

May 6, 2021

70

**Written Testimony of Michael C. Bodson**
**Chief Executive Officer**
**The Depository Trust & Clearing Corporation**

**Hearing Before the U.S. House of Representatives Committee on Financial Services**
**May 6, 2021**

The Depository Trust & Clearing Corporation ("DTCC") welcomes the opportunity to submit this statement to the House Financial Services Committee in connection with its May 6, 2021 hearing entitled "Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide."

**Background**

DTCC is a holding company that owns and operates three clearing agencies that are registered with the U.S. Securities and Exchange Commission ("SEC") under the Securities Exchange Act of 1934 (the "Exchange Act"): National Securities Clearing Corporation ("NSCC"), Fixed Income Clearing Corporation ("FICC") and The Depository Trust Company ("DTC"). The events under discussion in this hearing relate to securities transactions cleared by NSCC.

NSCC is the central counterparty or CCP that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members and guaranteeing completion of trades even if one party defaults. On a normal day, NSCC processes about 200 million transaction sides, covering an underlying value of securities of nearly $2 trillion. Netting reduces these obligations to around 1 million securities movements and $35 billion in cash movement, creating tremendous efficiency for the markets. For example, on March 3, 2020, during the pandemic-related volatility of last spring, the value of shares moving through NSCC exceeded $3.5 trillion, but the actual dollar value requiring final money settlement for those transactions was reduced by over 98%, to just $80.3 billion.

The U.S. markets are multi-layered, and customers generally execute trades through one or more brokers or broker-dealers. NSCC's direct clearing members are responsible for completing their customers' trades at NSCC. NSCC's rules outline clear financial and operational risk management obligations that apply to direct clearing members.[1] NSCC does not know the identity of the customers who executed or directed the trades, nor does NSCC know the customers' reasons for trading or what other positions customers may hold.

Securities trades submitted to NSCC settle at the end of the second business day after submission, in what is known as T+2 settlement. Between trade submission and settlement, NSCC guarantees all cleared trades among its members. If a clearing member defaults on its settlement obligations, NSCC guarantees the delivery of cash and securities to its non-defaulting members. That is what clearing is, and it is essential to facilitate the high-volume trading that makes today's U.S. equities markets the deepest, most liquid and efficient securities markets in the world. Because of clearing, investors can focus on obtaining the best

---

[1] NSCC currently has 155 full-service members, the category of clearing member to which NSCC refers in this statement.

1

71

price and do not need to concern themselves with the creditworthiness of the buyers and sellers on the other side of their transactions.

Active financial risk management is the foundation of this system. Margin protects NSCC and all market participants against clearing member defaults, and margin requirements must be met by clearing members on a timely basis. NSCC's margin requirements are rules-based and subject to regulatory review and approval. NSCC is obligated under the Exchange Act to fully cover its credit exposures to each clearing member with a high degree of confidence, and it is tested against this requirement daily. Meeting this high standard without imposing overly burdensome upfront collateral demands means that margin calls must always be satisfied within hours according to strict timelines. This is the core of the system, and it is the principal obligation of each clearing member. If a clearing member fails to satisfy a margin call, NSCC will use the margin previously posted to complete the defaulting clearing member's trades, no matter how much the value of the underlying securities has changed. If a clearing member fails to meet its margin requirements, it exposes other clearing members to risk and can put NSCC out of compliance with SEC rules. In a case of non-payment, NSCC may cease-to-act for the clearing member and liquidate its unsettled clearing portfolio. This is a drastic step. It can disrupt markets and impact end investors. This is, however, the appropriate outcome if a clearing member is unable to satisfy its margin requirements and allowing it to continue would increase the risk of needing to liquidate the portfolio later at even greater loss. In an extreme case, losses could even be allocated to non-defaulting clearing members. Correctly managing this balance is NSCC's most essential function.

NSCC collects clearing fund, or margin, at the start of each day and intraday in volatile markets. The calculation of clearing fund component charges and the timing of collection are set forth in NSCC's rules, which are known to every member and changes to which must be filed for public review and comment and approval by the SEC. Most of these charges – generally referred to as core clearing fund components – directly address the estimated risk of the clearing member's unsettled portfolio. The largest component is the value-at-risk or "VaR" charge. Core clearing fund components are calculated identically for each clearing member based on its portfolio and historical activity. Clearing fund component charges are calculated using statistical models and mathematical formulas set forth in NSCC's rules, which must be approved by the SEC. NSCC also provides reporting tools, calculators and documentation that allow clearing members to monitor their risk in near real-time and estimate potential clearing fund requirements for actual or hypothetical portfolios. Many clearing members have employed this information to build their own internal calculators and monitoring tools to aid them in risk management.

NSCC's rules-based clearing fund requirements also include certain "non-core" charges that address specific issues. These are also set forth in NSCC's rules. For example, if a clearing member's portfolio is highly variable from day to day, core charges may not adequately capture the risk. If so, the clearing member could be subject to a backtesting charge that addresses this gap. Other charges are intended to encourage operational resiliency and reduce settlement risk. One example is the fails charge that applies when a clearing member fails to deliver securities for settlement.

One such non-core charge that became important during the week of January 25 is the capital premium charge. This charge was adopted in 2006, following market disruptions caused by the failure of a clearing member of NSCC and other clearinghouses. The capital premium charge is intended to discourage clearing members from taking on more risk in their portfolios

2

72

at NSCC than their capital levels can reasonably support. Because a clearing member may be obligated to quickly provide funds to NSCC and other clearinghouses, a clearing member that is over-leveraged presents a heightened risk of default. NSCC looks to a clearing member's excess net capital (a measure of generally available capital for broker-dealers) as an important cushion against such risks. The capital premium charge applies if a specified portion of a member's core requirement (including the predominant VaR charge)[2] is greater than its excess net capital. The charge is calculated using a simple formula in NSCC's rules that scales upward based on the degree of leverage. A clearing member with a core requirement that barely exceeds its capital cushion will have a small charge. A clearing member with a core requirement that greatly exceeds its capital cushion will have a much larger charge. NSCC provides a warning to clearing members in their daily clearing fund statements on any day that their core requirement exceeds 50% of their capital cushion, to remind them that this charge will be applied if their core requirement grows to exceed their capital cushion.

The capital premium charge is collected not as revenue to NSCC but as part of the clearing fund requirement. It is released to the clearing member when portfolio risk comes down or the clearing member secures additional capital. Collecting this charge both protects NSCC against immediate default risk and operates as a disincentive to risky activity because of the higher margin costs to the clearing member or the need to raise additional capital on a short-term basis. The existence of the charge encourages clearing members to proactively manage the risk they are presenting to NSCC and to have plans to raise liquidity or capital if they take on increased risk. While this charge is important to encourage clearing members to proactively monitor their portfolio risk, liquidity resources and capital, the rule specifically permits NSCC to reduce or eliminate the charge if NSCC believes that imposing the charge in a specific situation is not necessary or appropriate. The rule describes several circumstances in which the charge could be caused by factors not genuinely reflective of a clearing member's risk profile, such that applying the charge would not be appropriate.

A clearing member can avoid a capital premium charge by either raising its capital level or reducing the risk in its portfolio. A clearing member that is monitoring market conditions and risk levels in its portfolio may take a variety of steps to reduce risk, including routing executed trades to other NSCC clearing members, limiting submissions from other broker-dealers that clear through it, or imposing other trading restrictions on its clients. Reducing risk in an unsettled portfolio will typically result in reduced core clearing fund charges, which in turn reduces the likelihood that a clearing member will become subject to the capital premium charge. NSCC does not direct its members whether or how to take such steps, but it does expect members to be able to meet their margin requirements for clearing activity, including the capital premium charge if they incur it.

**January Market Volatility Events**

During the week of January 25, 2021, the market saw unusually high volumes and price volatility in certain securities that had been popularized on internet message boards, including GameStop. NSCC actively monitored market developments as volumes and prices rose in these "meme" securities at the beginning of the week. NSCC experienced the two highest transaction volume days in its history on Wednesday, January 27 and Thursday, January 28.

---

[2] That portion of the core clearing fund requirement that is assessed for purposes of the capital premium charge is described hereafter as the core requirement for simplicity, although it is a specific aggregation of some but not all core component charges, as set forth in NSCC's rules.

73

On Wednesday, NSCC processed approximately 474 million transaction sides, exceeding the March 2020 volume record by more than 100 million. Risk at NSCC, as measured by NSCC's aggregate clearing fund requirement, also increased substantially on January 28, to $33.5 billion, slightly higher than the peak that occurred in March 2020 and just under NSCC's historical maximum.[3]

Extreme market volatility and even "short squeeze" events are not new phenomena. What was unusual was that activity in the volatile meme securities was also more concentrated in the portfolios of firms that primarily support individual investors. The concentrated retail interest in purchasing meme securities and the related spike in the prices of those securities was a substantial factor in generating the near-peak aggregate clearing fund requirements at NSCC on January 28. The impact of that increase was more concentrated in the clearing members whose clients drove that activity. The impact of the March 2020 market volatility and the related increase in NSCC clearing fund requirements, by contrast, was more evenly distributed across clearing members.

As volumes and volatility in the meme securities spiked on Wednesday, January 27, NSCC calculated and imposed a special charge under its rules that essentially accelerated collection of a portion of the following morning's VaR charge for many clearing members with exposure to these securities. The imposition of the special charge, in addition to NSCC's collection of intraday mark-to-market charges, reflected significant growth in risk in many clearing members' unsettled portfolios. Final VaR charge estimates were updated at the end of day in the NSCC risk portal to reflect changes in each clearing member's portfolio through the end of the trading day, and then updated overnight to reflect the impact of security price changes using Wednesday's closing prices. Clearing members would have observed these updates in the NSCC risk portal.

Shortly after 5 a.m. Eastern Time on Thursday, January 28, NSCC's daily margin statements were released to clearing members in NSCC's risk portal and excess/deficiency notices were emailed according to NSCC's standard operational timeline. Many clearing members whose unsettled portfolios were exposed to volatile meme stocks saw significant increases in the VaR charges that derived from the risk posed by increased volume and price volatility in these securities. Substantial VaR charge increases also generated capital premium charges for clearing members whose core requirements exceeded their capital cushions. Several clearing members were subject to capital premium charges, which were automatically generated by NSCC's systems based on the formula in NSCC's rules.

NSCC examined the market activity and clearing member margin requirements to consider whether it would be appropriate to adjust or waive the capital premium charge, as permitted under the applicable rule. NSCC determined that the spike in market volatility, particularly in the so-called meme stocks, was a material contributor to elevated VaR charges for several clearing members, including most of those subject to capital premium charges. NSCC determined that it would be appropriate to waive the capital premium charge for all clearing members, using the discretion provided in the rule to reduce or waive this charge.[4] Just after 9 a.m., prior to the market opening at 9:30 a.m., updated daily margin statements reflecting the

_____
[3] A peak of $36.4 billion was reached in December 2020 when Tesla was added to the S&P 500 Index.
[4] Consistent with this conclusion, NSCC also decided to waive the capital premium charge for all clearing members through Monday, February 1, by when the unusual market activity from Wednesday and Thursday would have settled.

4

74

waiver were released in NSCC's portal and revised excess/deficiency notices were emailed to clearing members. All clearing members timely satisfied their clearing fund requirements.

NSCC's clearing fund charges are rules-driven and based on formulas that are published to clearing members, which must be applied to each clearing member's portfolio of unsettled trades as it changes. A dramatic increase in a clearing member's VaR charges over a short period results directly from a correspondingly large increase in the risk presented to NSCC by the clearing member's portfolio, due to increases in transaction volume, volatility and concentration of the unsettled transactions in the clearing member's portfolio, and not from any discretionary action taken by NSCC.

NSCC's role in the market is a neutral one. It does not impose trading restrictions upon its clearing members or their customers, and it did not instruct any clearing member to impose restrictions during the market volatility events of late January. NSCC expects all clearing members to employ effective tools to monitor and manage their risk, and to maintain an appropriate level of capital to support any expansion of or change in their business activities. Clearing fund requirements are rules-based and subject to limited discretion. NSCC exercises this discretion carefully, often in unique circumstances. In such cases, NSCC's sole objective is to balance the need to protect the system from a potential clearing member default against the damage and other risks that could result if NSCC were to cease-to-act and liquidate a clearing member's portfolio.

**Accelerated Securities Settlement**

DTCC has long worked with the industry to identify ways to enhance efficiency and reduce costs in post-trade processing. Following a multi-year, industry-wide effort, securities settlement was shortened in 2017 from T+3 to T+2, achieving margin savings estimated at 25%. Shortening the settlement cycle beyond T+2 would reduce the risks that drive margin requirements and further reduce costs to clearing members.

Over the past year, DTCC has worked with a cross-section of clients and stakeholders to explore the benefits of moving to T+1 or T+0. DTCC has conducted pilot projects exploring new technologies that could be employed in accelerated settlement or even real-time gross settlement ("RTGS").[5] Additionally, DTCC is exploring an integrated settlement model with clearing members that could introduce more settlement efficiencies between NSCC and DTC, which is the central securities depository for the U.S. market, to reduce margin demands at NSCC. DTCC published a white paper in February 2021 outlining several steps that DTCC was exploring with the industry to accelerated settlement for equities, which recommended that the industry cooperate to achieve T+1 settlement within three years.[6] DTCC is working with the Securities Industry and Financial Markets Association and the Investment Company Institute to advance this important effort.

Engagement with the industry and DTCC's own assessment indicates that the industry is increasingly prepared to move to T+1. DTCC's analysis suggests that T+1 settlement could

---

[5] T+0 settlement, in which trades are netted and settled at the end of the same trading day, should not be confused with real-time gross settlement, in which trades are settled instantly.
[6] Available at https://www.dtcc.com/forms/advancing-together-leading-the-industry-to-accelerated-settlement-perspectives.

75

reduce NSCC VaR charges by as much as 40%, which could save clearing members upwards of $6 billion per day in margin requirements during periods of extreme volatility.[7]

Substantial procedural hurdles remain for a move to T+0. Beyond T+0, a move to RTGS would eliminate the substantial efficiencies of netting, which currently compresses the amount of cash required to fund daily transactions at NSCC by over 98%. RTGS could require that transactions be funded on a trade-by-trade basis. While this could eliminate most margin component charges for clearing members if customers fully prefunded all trading activity, that prefunding would be difficult to forecast as settlement obligations change in real-time. The heightened costs of the substantial liquidity buffers required to support this approach could erode market liquidity. Additionally, the real-time reconciliation and real-time stock records required for either T+0 or RTGS would be difficult for the industry to implement. There would be negative impacts to processing for short sales, the use of securities lending as a financing tool, and institutional trade processing operations. For these reasons, while NSCC is fully supportive of a shorter settlement cycle, NSCC does not believe the industry is ready to support shortening the settlement cycle beyond T+1 at this time.

**Conclusion**

As an SEC-registered clearing agency, NSCC is charged under the Exchange Act with facilitating the prompt and accurate clearance and settlement of securities transactions and safeguarding the securities and funds in its custody and control. It is subject to stringent SEC requirements regarding the management of financial risk, including the daily collection of margin requirements. The obligations that NSCC's rules-based requirements impose on clearing members protect not only NSCC and its other clearing members, but all securities investors. The regulatory framework established by the SEC and the stringent financial and operational risk management requirements at NSCC are the foundation of this system. Without clearing, investors could not trade in the accessible, transparent and highly efficient securities markets that they do today. DTCC continues to promote further improvements and efficiencies, such as acceleration of the current T+2 settlement cycle, that will ultimately benefit clearing members and securities investors alike. We look forward to engaging with our clearing members and the broader industry on this important initiative.

---

[7] These figures are based on sample portfolios of NSCC members. Potential margin reduction will vary based on portfolio characteristics.

76

**Statement of Robert W. Cook**
**President and Chief Executive Officer, Financial Industry Regulatory Authority**
**Before the Financial Services Committee**
**U.S. House of Representatives**
**May 6, 2021**

Chairwoman Waters, Ranking Member McHenry and Members of the Committee:

<u>Introduction</u>

On behalf of the Financial Industry Regulatory Authority, or FINRA, I want to thank you for the opportunity to appear today to discuss the important role that our organization plays in the regulation of broker-dealers and to share our response to the January market events related to trading in GameStop and certain other stocks. We commend the Committee's review of those events, as they have raised important – and in some cases, novel – investor protection concerns that warrant thorough investigation and careful study.

<u>Background</u>

FINRA's mission is to protect investors and promote market integrity. FINRA is a not-for-profit, self-regulatory organization (SRO) responsible for regulating its member broker-dealers and their associated persons pursuant to the Securities Exchange Act of 1934 (Exchange Act). FINRA supports the Securities and Exchange Commission (SEC or Commission) in overseeing one subset of the securities industry – more than 3,400 registered broker-dealers and more than 600,000 registered individuals. FINRA fulfills its mission by, among other things, adopting rules that supplement those of the SEC, examining its member firms for compliance with FINRA and SEC rules applicable to broker-dealers, surveilling trading in the securities markets and enforcing member firm compliance where necessary. All FINRA activities are subject to comprehensive SEC examination and oversight; FINRA's rules must be filed with the SEC, published for public comment and (with limited exceptions) approved by the SEC.

FINRA's jurisdiction under the Exchange Act is generally limited to most broker-dealers and their personnel. We do not have jurisdiction over other financial intermediaries or market participants.[1] However, we work collaboratively with our fellow regulators that oversee the activities of those market participants, including the Commission, the Federal Reserve Board, the Commodity Futures Trading Commission, state regulators and other SROs. This collaboration includes, where appropriate, sharing data and information obtained from our extensive market surveillance and investigative activities.

---

[1]   For example, we do not have jurisdiction over investment advisers, hedge funds, banks or other financial services providers, unless such entities are also registered as broker-dealers and members of FINRA.

77

For the broker-dealer activity within FINRA's oversight responsibility, we administer comprehensive regulatory programs that complement the SEC's oversight. These include testing and registration, surveillance, risk monitoring, examination and enforcement programs that enable FINRA to identify and remediate conduct that poses risks to investors or undermines confidence in our markets. Before discussing the recent market events, it is helpful to understand the tools available to FINRA to investigate and respond to such incidents.

*Surveillance*

FINRA oversees the trading activities of our member firms in the equities and options markets, and provides surveillance and other regulatory services to registered securities exchanges. FINRA's surveillance programs assess the handling and execution of customer orders for compliance with best execution obligations and other SEC and FINRA market rules designed to protect customers. FINRA also deploys sophisticated automated surveillance programs to identify trading patterns and activity that may indicate insider trading, market manipulation and other types of fraud or abuse. Further to those ends, FINRA's surveillance teams also conduct regular monitoring of social media platforms[2] related to market events to help uncover potential fraud or manipulation perpetrated through the use of false or misleading claims.

*Risk Monitoring and Examinations*

FINRA uses a detailed risk assessment program to inform how to monitor each member broker-dealer for potential risks to investors and markets. Informed by these assessments, FINRA examines each member firm regularly to assess its supervisory policies and procedures for compliance with applicable rules. In addition to routine firm examinations, FINRA also conducts "for cause" examinations – additional investigations and reviews triggered by specific allegations or events, including customer complaints, tips or arbitrations.

FINRA publishes a report annually that highlights some of its key risk monitoring activities and examination priorities. As described further below, the 2021 version of the report highlights our focus on, among other topics, the risks associated with app-based platforms with interactive "game-like" features that are intended to influence customer behavior. The report also discusses FINRA's ongoing targeted review of firms with a zero-commission model, including the potential impact on compliance with such firms' best execution obligations.[3]

---

[2]     While we monitor social media activity, we note that FINRA does not have jurisdiction over individuals who trade in the securities markets or participate on social media platforms unless those individuals are associated with a FINRA member firm.

[3]     *See* 2021 Report on FINRA's Examination and Risk Monitoring Program at pp. 22 and 32. https://www.finra.org/sites/default/files/2021-02/2021-report-finras-examination-risk-monitoring-program.pdf

78

*Enforcement*

Based on these risk monitoring, examination and surveillance activities, as well as other sources of information, FINRA investigates and takes disciplinary actions against firms and individuals as appropriate. FINRA can impose fines and suspensions, and in cases of serious misconduct, expel firms from FINRA membership and bar individuals from association with a FINRA member firm. Whenever possible, FINRA orders firms and individuals to make restitution to harmed customers. When we encounter potential violations that involve persons beyond FINRA's jurisdiction or that are linked to an existing matter at the SEC or other regulatory authorities, we will refer those matters to those authorities.

*Investor Education*

FINRA also works to protect investors in other ways. FINRA and the FINRA Investor Education Foundation provide free, unbiased information and tools to help retail investors protect themselves and better understand basic principles of investing and the markets. These resources include a mutual fund analyzer that allows investors to compare the impact of fees, expenses and discounts on fund values,[4] and a series of online micro-courses,[5] optimized for mobile technology, that cover essential topics for new investors – from setting investment goals to understanding risk and return. In addition, FINRA regularly issues investor alerts and articles that explain, in plain language, emerging products, popular strategies and current market trends. Recent publications have tackled such topics as meme investing, microcap stocks, short interest, special purpose acquisition companies (SPACs) and options trading.[6]

The Foundation also undertakes or sponsors research to better understand investor behavior, attitudes, knowledge and preferences. For example, a recent collaboration[7] with the National Opinion Research Center (NORC) at the University of Chicago revealed useful insights about new investors during the COVID-19 pandemic and their interaction with mobile apps. In addition, as part of an ongoing National Financial Capability Study, the Foundation conducts a

---

[4]   Available at: https://tools.finra.org/fund_analyzer/.

[5]   FINRA, *Follow a Course to Smart Investing* (available at https://www.finra.org/investors/learn-to-invest/smart-investing-courses).

[6]   *See, e.g.,* FINRA Investor Alert, *Following the Crowd, Investing and Social Media* (Jan. 29, 2021) (available at https://www.finra.org/investors/alerts/following-crowd-investing-and-social-media). FINRA Investor Insights articles are available at https://www.finra.org/investors/insights.

[7]   FINRA Investor Education Foundation & NORC, *Investing 2020: New Accounts and the People Who Opened Them* (Feb. 2021) (available at https://www.finrafoundation.org/sites/finrafoundation/files/investing-2020-new-accounts-and-the-people-who-opened-them_1_0.pdf). Additional issue briefs prepared as part of this research collaboration are available at https://finrafoundation.org/knowledge-we-gain-share/consumer-insights-money-investing.

79

triennial survey of U.S. adults who own investments outside of retirement accounts.[8] This in-depth exploration of investors yields rich data on the types of products, strategies and platforms that investors use, as well as their behaviors, beliefs, attitudes and knowledge – all of which can be analyzed by different demographic variables. The Foundation intends to conduct more research on new investors in light of the changing nature of trading markets. We would be happy to share this research, as well as other Foundation research, with this Committee.

The January Market Events

Over the course of a few weeks during January, the market witnessed extreme swings in the price of GameStop stock and a sudden surge in the trading volume of this stock and options on it. For example, on January 28 alone, GameStop stock traded in a range of $112 to $483 per share. Short sale volume in GameStop also increased substantially during this time. This trading activity coincided with significant interest in GameStop among participants in social media discussions – including on Reddit's "wallstreetbets" subchannel. A limited number of other stocks featured in social media discussions also experienced wide swings in prices and increases in trading volume during this time.[9]

In this context, some broker-dealers restricted trading in these securities on a short-term basis. Those trading restrictions led to confusion and frustration among some investors and created questions about the fairness of the markets. The January events also focused attention on the growth among retail investors of popular new trading platforms and services, including those offering zero-commission trades and trading in fractional shares. In addition, they highlighted apparent changes in investor behavior and attitudes and the influence of social media on the markets.

Although activity around the trading in GameStop and other stocks in January did not present the type of widespread volatility and disruption across the securities markets that we have seen in some other past events, it did underscore two important points. First, our markets and the environment in which they operate are dynamic and continually evolving, with market participants and others constantly innovating new technologies, methods of communication and investment products and services. These innovations can be beneficial for investors – such as by providing easier access to the markets, lower costs and a wider range of investment choices – but they can also present new and sometimes unanticipated risks for investors. Second, in light of this ongoing evolution in the markets and related changes in investor behavior, regulators must continually review the standards applicable to financial

---

[8]     FINRA Investor Education Foundation, National Financial Capability Study—Investor Study (available at https://www.usfinancialcapability.org/investor-survey.php).

[9]     GameStop stock experienced another volatile episode on February 24 and 25. Its stock price climbed 103% on February 24 and volume increased from about 7.5 million shares on February 23 to approximately 150 million shares on February 25. Although we generally refer to the "January market events" herein with special focus on GameStop, our regulatory reviews and related comments include trading during other periods and in other securities as appropriate.

80

intermediaries and the securities markets more generally and consider whether they should be updated to better protect investors and promote market integrity.

We understand that the SEC is conducting a comprehensive review of these recent market events and will share its findings in a published report. We look forward to reviewing the SEC's findings and to working collaboratively with the SEC and other regulators to develop and implement any appropriate responses to these events based on, and informed by, these findings.

In the meantime, FINRA is also separately investigating whether its broker-dealer members complied with existing rules in connection with these events and is actively considering whether FINRA rules or other standards should be strengthened in light of these events and other market trends. I will address some of our ongoing activities in each of these areas.

<u>Ongoing Investigations</u>

FINRA has an internal working group devoting significant resources to reviewing member firm conduct during recent market events to assess compliance with applicable SEC and FINRA investor protection and market integrity rules. We cannot comment on specific ongoing investigative or enforcement matters, but we can assure the Committee that we will take appropriate disciplinary or other remedial action, as warranted, if the facts indicate a violation of SEC or FINRA rules. In addition, we will coordinate our regulatory responses with the SEC based on the results of our respective investigations, and we will do so with other regulators as appropriate.

These ongoing investigations cover a range of regulatory requirements. For example, we have been reviewing the order routing practices of our member firms, including practices where payment for order flow is involved, to assess compliance with order handling and best execution requirements during the volatile market events and more generally. That review includes equities and options routing decisions and order handling by market makers. These order routing practices are also part of a continuing targeted review (commenced last year)[10] of zero-commission firms, several of which rely on payment for order flow as a revenue source. We have also been examining firms for compliance with short sale requirements. In addition, we are reviewing the circumstances under which member firms imposed trading restrictions on customers and, more generally, whether retail customers received fair treatment consistent with applicable rules during the periods of extreme market volatility. Finally, we have been reviewing trade data and social media activity to identify and investigate any trading patterns that may suggest manipulative conduct.

---

[10]   FINRA's targeted examination letters on zero commissions are posted publicly on FINRA's website and available at https://www.finra.org/rules-guidance/guidance/targeted-examination-letters.

81

Our ongoing investigations and related reviews include a number of other matters as well. As noted above, where we identify potentially violative activity by persons not under our jurisdiction, we refer these matters to the SEC or other appropriate regulatory authorities.

<u>Selected Policy Issues</u>

As noted above, we look forward to reviewing the SEC's report on the January market events. The findings of this report will establish a foundation that will guide policymakers in determining whether and how existing rules and standards should be updated to better protect investors and promote market integrity.

For its part, FINRA is committed to adapting its regulatory programs to new broker-dealer business models and technologies and the evolving ways in which investors access the capital markets. We believe that it is important to review the effectiveness of our rules on a regular basis, and we have an established retrospective rule review program for this purpose. This program includes a comprehensive process to look back at significant rules to assess whether those rules are meeting their intended regulatory objectives by reasonably efficient means, and to identify opportunities to improve their effectiveness or efficiency.[11] Of course, market events such as those that occurred in January also provide an important opportunity for us to review the effectiveness of existing requirements in light of the actual experience of investors and market participants under particular circumstances of market stress.

As we review the more significant policy questions that have surfaced in the weeks following the January market events, it is important to note that many of these questions involve areas in which the Commission, rather than FINRA, has primary authority and policymaking responsibility. FINRA will provide support to the SEC in its review of these areas and will work to align FINRA's rules and oversight activities with the approach taken by the SEC. These areas include, for example: issues relating to market structure and the overall national market system, including the practice of payment for order flow and disclosure or other requirements to address the conflicts of interest that arise; short sale regulation and disclosure; the timing of the settlement of securities transactions; the standards for establishing market manipulation under the Exchange Act; broker-dealer financial responsibility requirements; and determining whether certain communications with retail investors constitute recommendations covered by the SEC's Regulation Best Interest (Reg BI).

The SEC's report will be essential to informing our collective thinking on these and other key policy issues. In the meantime, FINRA has been considering some of issues raised by the January market events in light of our ongoing oversight responsibilities and our mission of protecting investors and promoting market integrity. I would like to briefly offer some

---

[11]     *See e.g., Regulatory Notice 14-14* (April - 2014) (outlining FINRA's general retrospective rule review process) available at <u>https://www.finra.org/rules-guidance/notices/14-14</u>.

82

perspectives on a few of the more prominent questions that have arisen and discuss some areas where we are considering whether updates to FINRA rules might be appropriate.

*Payment for Order Flow and Best Execution*

One issue that has drawn renewed scrutiny is the practice of payment for order flow[12] and how it may impact firms' obligations to obtain the best execution of customer orders. Whether such payments should be allowed, and how they are disclosed, are issues that the SEC has periodically reviewed since the 1980s (when the practice emerged) and addressed in the context of the broader set of market structure rules that the SEC has established.[13]

Longstanding SEC guidance holds that "a broker-dealer does not violate its best execution obligation solely because it receives payment for order flow or trades as principal with customer orders."[14] However, the SEC also has stated that payment for order flow may "raise concerns about whether a firm is meeting its obligation of best execution to its customer."[15] And ultimately, the SEC has stated that "a broker-dealer must not allow a payment or an inducement for order flow to interfere with its efforts to obtain best execution."[16] In addition, in 2016, the SEC staff explained that with respect to this practice, "[t]o date, the Commission has pursued an approach based primarily on disclosure to address concerns about the potential conflicts of interest caused by payment-for-order-flow arrangements."[17] The Commission updated its disclosure requirements in 2018, resulting in new aggregate payment-for-order-flow disclosures by broker-dealers since the requirements took effect in 2020.[18]

---

[12]  *See* Exchange Act Rule 10b-10(b)(8) (defining "payment for order flow").

[13]  *See, e.g.*, Memorandum to the Equity Market Structure Advisory Committee (EMSAC) from the SEC Division of Trading and Markets, Certain Issues Affecting Customers in the Current Equity Market Structure (Jan. 26, 2016), at pp. 7-8, available at https://www.sec.gov/spotlight/equity-market-structure/issues-affecting-customers-emsac-012616.pdf (describing the SEC's prior reviews of the practice and discussing relevant payment-for-order-flow disclosure requirements in Exchange Act Rule 10b-10 and Rules 606 and 607 of Regulation NMS).

[14]  *See* Securities Exchange Act Release No. 43590 (Nov. 17, 2000), 65 FR 75414, 75420 (Dec. 1, 2000) (Disclosure of Order Execution and Routing Practices Adopting Release); *see also* Securities Exchange Act Release No. 34902 (Oct. 27, 1994), 59 FR 55006, 55009 n.28 (Nov. 2, 1994) (Payment for Order Flow Adopting Release) (stating the SEC's belief "that bulk order routing based, in part, on the receipt of payment for order flow is not, in and of itself, a violation of [best execution] duties").

[15]  *See* Payment for Order Flow Adopting Release, *supra* note 14, at 55009.

[16]  *See id.*

[17]  *See* Division of Trading and Markets Memorandum to the EMSAC, *supra* note 13, at pg. 8.

[18]  *See* Securities Exchange Act Release No. 84528 (November 2, 2018), 83 FR 58338 (November 19, 2018) (Disclosure of Order Handling Information Adopting Release).

7

83

In applying these policies to its members within the broader national market system framework managed by the SEC, FINRA has incorporated the SEC's guidance on payment for order flow into FINRA's best execution rule. As noted earlier, the connection between payment for order flow and best execution has been a focus of our current targeted reviews of zero-commission trading.[19] As FINRA examines for compliance with existing rules and guidance, FINRA looks closely at whether firms allow payment for order flow to interfere with their obligation to seek the best possible prices for the customer orders that they handle. Where member firms have not sufficiently considered whether their customers may receive better execution quality at competing markets or market makers, FINRA has charged firms with violations of the best execution rule.[20]

Most recently, in March of this year, FINRA censured and fined a firm that did not sufficiently evaluate whether it was meeting its best execution obligations when it received payment for order flow.[21] In another such case, FINRA censured and fined a firm for violating FINRA's best execution rule because the firm routed its customer orders to four firms from which it received payment for order flow but did not exercise reasonable diligence to ascertain whether those four firms provided the best execution quality for the trades relative to other potential execution venues.[22] FINRA required the firm to retain an independent consultant to review the

---

[19]   *See supra* note 10. In addition to the targeted review currently underway on the impact of zero commissions, FINRA previously conducted targeted examinations of order routing and execution quality, beginning in 2014, and order routing conflicts, beginning in 2017. *See also* https://www.finra.org/rules-guidance/guidance/targeted-exam-letters/order-routing-and-execution-quality-customer-order and https://www.finra.org/rules-guidance/guidance/targeted-exam-letters/order-routing-conflicts.

[20]   FINRA has also brought a number of actions in recent years for other violations of the best execution rule. *See, e.g.*, Virtu Americas, LLC, Letter of Acceptance, Waiver and Consent (FINRA Case No. 2016049752801 (July 2020) (finding that the firm failed to provide best execution to customer orders received from two broker-dealer clients outside of normal trading hours); Morgan Stanley Smith Barney LLC, Letter of Acceptance, Waiver and Consent (FINRA Case No. 20120347147 (Aug. 2017) (finding best execution violations where the firm failed to use reasonable diligence to ascertain the best inter-dealer market for preferred securities and failed to buy or sell in such market so that the resultant price to its customer was as favorable as possible under prevailing market conditions); Merrill Lynch, Pierce, Fenner & Smith Inc., Letter of Acceptance, Waiver and Consent (FINRA Case No. 20110288421 (May 2017) (finding best execution violations where the firm failed to use reasonable diligence to ascertain the best market when manually executing non-convertible preferred and over the counter securities by failing to access liquidity at superior prices within fully automated venues).

[21]   *See* TradeStation Securities, Inc., Letter of Acceptance, Waiver and Consent (FINRA Case No. 2014041812501) (March 2021) (also finding violations of payment for order flow disclosure obligations under SEC rules).

[22]   *See* Robinhood Financial, LLC, Letter of Acceptance, Waiver and Consent (AWC) (FINRA Case No. 2017056224001). (Dec. 2019); *see also*  E*Trade Securities LLC, Letter of Acceptance, Waiver and Consent (FINRA Case No. 20130368815-01) (June 2016) (describing violations of FINRA's best execution rule because the firm lacked sufficient information to reasonably assess the execution quality it provided to its customers because, among other things, the firm "did not take into account the internalization model employed by the firm" and "was overly reliant on comparisons of the firm's overall execution quality with

84

adequacy of the firm's policies and procedures in this area and certify that the firm had adopted all of the consultant's recommendations. The SEC separately brought an action against the same firm regarding distinct best execution violations under federal antifraud provisions.[23]

We look forward to working with the SEC to support its review of best execution and payment for order flow in light of the January events. Fair dealing with customers is a foundational element of FINRA's rules, and we are fully supportive of efforts to consider whether additional requirements or guidance are needed to promote investor protection. FINRA also would support any SEC efforts to consider enhancements to the disclosure obligations that help support the oversight of best execution. The SEC's 2018 disclosure requirement updates that took effect in 2020 have increased the public transparency of payment-for-order-flow-arrangements and have served to inform much of the current debate around the practice, and FINRA believes that additional updates to order routing disclosures, along with the corresponding execution quality disclosures, may further advance important policy goals.

*"Gamification" and App-Based Discount Brokerage*

FINRA's communications with the public rules prohibit the use of false, exaggerated or misleading statements and require all firm communications to be fair and evenhanded with appropriate risk disclosure.[24] These standards apply to all types of public communications, including those in websites and apps, as well as more targeted communications that promote the products or services of a member firm.[25] We note that a broker-dealer's customer interface that promotes trading activity is not only subject to FINRA's communications rules but is also potentially subject to Reg BI, depending on the facts and circumstances.[26]

One of the recent trends of retail trading platforms is the use of "game-like" and other features that may encourage investor behaviors that impact sound investment decisions. These features

---

industry and custom averages, rather than focusing on comparisons to the actual execution quality provided by the market centers to which the firm routed orders").

[23]   *See In the Matter of Robinhood Financial, LLC, Securities Exchange Act Release No. 90694 (Dec. 17, 2020).*

[24]   *See* FINRA Rule 2210(d).

[25]   FINRA has published guidance on the applicability of its standards to communications on mobile devices and apps. *See, e.g., Regulatory Notice 19-31* (September 2019) available at https://www.finra.org/rules-guidance/notices/19-31; *Regulatory Notice 17-18* (April 2017) at https://www.finra.org/rules-guidance/notices/17-18 and *Regulatory Notice 11-39* (August 2011) at https://www.finra.org/rules-guidance/notices/11-39.

[26]   The SEC's Reg BI applies if there is a "recommendation," and the SEC has indicated that the determination of whether there is a "recommendation" depends on the facts and circumstances of a firm's interaction with the customer. *See* Securities Exchange Act Release No. 86031 (June 5, 2019), 84 FR 33318, 33335-37 (July 12, 2019) (Reg BI Release). Differences in platform design and the nature of communications may affect whether a firm provides a "recommendation" for purposes of Reg BI. In the absence of a "recommendation," self-directed trading by retail investors does not implicate Reg BI. *Id.* at 33384.

85

– commonly described as "gamification" features – include a range of technologies and techniques designed to influence investor behavior, including "games" at sign-up; social networking tools; streaks with prizes, such as free stock; points, badges and leaderboards; and push notifications. The use of such techniques – which appear not just in some broker-dealers' digital platforms but also in many other financial services and consumer-oriented businesses – are a focus of our risk monitoring and examination program. Our 2021 Report on FINRA's Examination and Risk Monitoring Program cautioned member firms that the use of gamification features must be carefully evaluated to ensure that they meet all applicable regulatory obligations, including, for example, whether the use of a feature may constitute a "recommendation" under Reg BI.

Some of these features and platform designs may educate investors, enhance retail market participation and encourage increased savings and investment. On the other hand, they may increase risks to customers by encouraging actions misaligned with customers' investment objectives or risk tolerance, or distract customers from the financial consequences of trading decisions in favor of winning competitions or achieving social status. FINRA has established a cross-departmental working group to assess how broker-dealers are using their trading platforms – including mobile applications, social media, other communications and customer data – to influence customers' behavior.

Given the growing prevalence of these features, this is an area where we are evaluating whether additional rulemaking or guidance may be necessary to ensure that their use by broker-dealers is consistent with investor protection. We are considering publishing a *Regulatory Notice* seeking additional information on the use and impacts of gamification or, alternatively, supporting any SEC request for comment on these developments. In particular, we believe that it would be useful to seek additional input on: the different types of gamification features being used and their attendant benefits and risks to investors; the use of these features on zero-commission trading platforms and whether the combination of such features and the absence of transaction costs may lead investors to focus less on risks or indirect costs; and whether the existing regulatory framework adequately addresses any emerging investor protection concerns posed by gamification features. Such a request for feedback would inform the need for any additional rulemaking, guidance or investor education efforts. We look forward to further discussions with the SEC about our collective approach to these developments and how best to align our initiatives with the SEC's regulatory framework, including the applicability of Reg BI.

*Availability and Supervision of Options Accounts*

Due to the enhanced risks of options trading, FINRA has specific rules around options account approvals, supervision and margin requirements. These rules are consistent with those across the options exchanges governing options accounts. Regardless of whether the account is self-directed, or if options are being recommended, the rules require members to perform due diligence on the customer and collect information to support a determination that options trading is appropriate for the customer. Based on that review, member firms may approve

10

86

accounts for only specified types of options activity – for example, requiring the purchase of puts and calls only, requiring minimum dollar amounts in accounts for particular types of options transactions, or placing dollar limitations on options transactions of various types. In addition, the rules require specific and periodic supervisory reviews of options accounts, including reviewing the compatibility of options transactions with investors' investment objectives and with the types of transactions for which the account was approved. Almost all option spread transactions (and certain other options transactions) are required to be in a margin account and therefore also must adhere to maintenance margin requirements.

FINRA issued a *Regulatory Notice*[27] last month reminding members about existing requirements for options account approvals, supervision and margin requirements, including the need to tailor account approvals to the investment objectives and risk profile of each investor. The *Notice* also reminds firms that FINRA's margin rules require firms to have procedures to review the limits and types of credit extended to all customers, to review the need for higher margin requirements for individual securities and customers and to formulate their own margin requirements.

FINRA continues to examine the role of options trading in recent market events and looks forward to reviewing the SEC's findings in this area. Our examination program found a significant increase in options account openings since the onset of the COVID-19 pandemic, many of them at self-directed online trading platforms popular with retail investors. In addition, for some firms, payment for options order flow is a significant percentage of the routing inducements they receive – and an important source of revenue more generally – which can exacerbate concerns about the adequacy of controls around options account approvals and trading activity.

We share the concerns raised by the SEC and others that retail investors may be opening accounts to trade options and other complex leveraged products without fully appreciating the risks involved. In a statement last year,[28] the SEC noted that advances in technology have increased access for retail investors to "stocks, bonds and complex products from their desktops, tablets and phones" and that "self-directed retail investors are typically making investment decisions on their own accord via online trading platforms and without the assistance of a financial professional." The SEC expressed concern that these self-directed investors "do not have the required protections that apply when they receive recommendations or advice from a broker or investment adviser, who must understand, and may explain if necessary, the characteristics and potential risks and rewards of the investment,

---

[27] *See Regulatory Notice 21-15* (April 2021) available at https://www.finra.org/rules-guidance/notices/21-15.

[28] *See* Joint Statement Regarding Complex Financial Products and Retail Investors, dated October 28, 2020, available at: https://www.sec.gov/news/public-statement/clayton-blass-hinman-redfearn-complex-financial-products-2020-10-28.

87

and determine that it is in the best interest of the retail investor."[29] The SEC stated its commitment to evaluating complex products made available to investors and solicited comment on this topic. We welcome the opportunity to assist in that important effort. In addition, in light of the aforementioned developments regarding options trading by retail investors, we are considering whether changes to the options rules may be warranted, recognizing that any such changes would require close consultation and coordination with the SEC and the options markets that share our rules.

*Obligations of Member Firms During Extreme Market Volatility*

More broadly, FINRA published a *Regulatory Notice*[30] in March reminding member firms of their obligations during periods of extreme market volatility. The *Notice* reinforced members' existing obligations with respect to handling customer orders, maintaining appropriate margin requirements and effectively managing their liquidity during extreme market conditions, such as those that occurred in January.

The *Notice* reminded member firms to maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility and maintain best execution for those investors. The *Notice* further reminded firms that the duty of best execution requires the fair, consistent and reasonable treatment of customer orders at all times, and reiterated prior guidance around disclosures that firms should make in connection with their fair dealing obligations. The *Notice* also provided guidance on sound liquidity practices that firms can use to meet their obligations to maintain reasonable funding and liquidity risk management during periods of extreme market volatility.

*Other Topics*

There are several other questions of regulatory policy arising from the January market events in connection with which FINRA is considering whether its rules should be updated to better support the overall approach established by the Commission. For example, the Commission has primary responsibility for establishing the rules relating to short selling – Regulation SHO – as well as the transparency around short selling and the stock lending market that supports it.[31] FINRA rules require periodic reporting by its members of open short interest. We are considering potential enhancements to our short interest reporting rules, particularly around the frequency and content of reporting. We would also welcome the opportunity to explore

---

[29]   *See Id.*

[30]   *See Regulatory Notice 21-12* (March 2021) available at https://www.finra.org/rules-guidance/notices/21-12.

[31]   *See* https://www.sec.gov/investor/pubs/regsho.htm.

12

88

with the SEC the potential for greater transparency for regulators and, potentially, the public with respect to the securities lending markets.

Liquidity risk management is another area where additional regulation or guidance may be warranted. Liquidity practices have been an ongoing focus of FINRA's financial supervision programs.[32] Broker-dealer financial responsibility is generally governed by the SEC's net capital and customer protection rules.[33] Given the importance of maintaining adequate liquidity during market volatility, even when it involves only a small number of stocks, we are considering whether additional requirements or guidance with respect to liquidity management by broker-dealers would be warranted in support of the SEC's overall financial responsibility regime. We would either recommend changes to SEC rules or, alternatively, could propose changes to FINRA rules. We will also work closely with the SEC to implement and ensure compliance with any changes that it makes to broker-dealers' financial responsibility requirements.

Market events also have prompted interest in shortening the settlement cycle. For example, the Depository Trust & Clearing Corporation (DTCC) issued a white paper in February setting out a two-year "roadmap" to move to a T+1 settlement cycle.[34] We note that shortening the settlement cycle requires the collaboration of broker-dealers and the asset management community. There are several issues for Congress, the Commission, the DTCC and the industry to consider in connection with this initiative, and FINRA looks forward to contributing to that discussion.

<u>Conclusion</u>

Thank you again for inviting me to testify today about these important issues.

FINRA looks forward to working with this Committee, the Commission and our fellow regulators to learn from these recent market events so that we can strengthen investor protections where necessary and ensure confidence in the markets.

---

[32]     *See Regulatory Notice 15-33* (September 2015) available at https://www.finra.org/rules-guidance/notices/15-33 and *Regulatory Notice 10-57* (Nov. 2010) at https://www.finra.org/rules-guidance/notices/10-57.

[33]     *See* Exchange Act Rules 15c3-1 and 15c3-3.

[34]     *See Advancing to Together: Leading the Industry to Accelerated Settlement* available at: https://perspectives.dtcc.com/articles/leading-the-industry-to-accelerated-settlement?utm_source=dtcc.com&utm_medium=press-release&utm_campaign=accelerated_settlement; *see also* "SIFMA, ICI and DTCC Leading Effort to Shorten U.S. Securities Settlement Cycle to T+1, Collaborating with the Industry on Next Steps." Press Release, April 28, 2021 available at: https://www.dtcc.com/news/2021/april/28/sifma-ici-and-dtcc-leading-effort-to-shorten-us-securities-settlement-cycle-to-t1.

89

Testimony of Gary Gensler
Chair, Securities and Exchange Commission
Before the House Committee on Financial Services
May 6, 2021

Good afternoon, Chairwoman Waters, Ranking Member McHenry, and members of the Committee. I'm honored to appear before you today for the first time as Chair of the Securities and Exchange Commission. Thank you for inviting me to testify on the market volatility we witnessed in January. I'd like to note that my views are my own, and I am not speaking on behalf of my fellow Commissioners or the staff.

We've all come to hear the general story: a stock that went from $20 to $480 and back down to $40, all in a matter of weeks. It opened at $162 Wednesday of this week. GameStop, though, was just one of the many so-called meme stocks that exhibited significant price volatility, trading volume, and attention in the markets in January. As these events reached an apex in late January, a number of broker-dealers imposed trading restrictions on some of these stocks.

While entities such as GameStop, Melvin Capital, Reddit, and Robinhood have garnered a significant amount of attention, the policy issues raised by this winter's volatility go beyond those companies. Instead, I think these events are part of a larger story about the intersection of finance and technology.

These forces have had a symbiotic relationship since antiquity. One thing that I've come to believe is that technology can bring greater access to our capital markets.

Our central question is this: When new technologies come along and change the face of finance, how do we continue to achieve our core public policy goals and ensure that markets work for everyday investors?

As we work to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation, I'd like to highlight seven factors that were at play in these volatile events:

- Gamification and User Experience
- Payment for Order Flow
- Equity Market Structure
- Short Selling and Market Transparency
- Social Media
- Market "Plumbing": Clearance and Settlement
- System-Wide Risks

We expect to publish a staff report assessing the market events over the summer. While I cannot comment on ongoing examination and enforcement matters, SEC staff is vigorously reviewing these events for any violations. I also have directed staff to consider whether expanded enforcement mechanisms are necessary.

90

**Gamification and User Experience**

Mobile apps have done a lot to expand access to capital markets, making it easy for investors to sign up, start trading, get wealth management advice, and learn about investing. These apps use a host of features that have come to be familiar in our increasingly online world — features such as gamification, behavioral prompts, predictive analytics, and differential marketing.

There isn't a settled definition of gamification, but broadly, it refers to the use of game-like features — such as points, rewards, leaderboards, bonuses, and competitions — to increase customer engagement.

Beyond gamification, there are also behavioral prompts that encourage users to engage more with an app, much like push notifications we receive on breaking news stories. Other features, such as social trading or copy trading, allow customers to see what others are buying and selling and make trades influenced by that information.

Underpinning many of these features is predictive data analytics, which has allowed apps to analyze the success of individual gamification and behavioral prompts to increase activity. Based on such data analytics, users might see an ever-changing set of features that are differentially communicated to different customer segments.

These types of features are implemented across many different technologies, from streaming platforms to fitness trackers.

If we watch a movie that a streaming app recommends and don't like it, we might lose a couple of hours of our evening. If a fitness app nudges us to exercise, that's probably a good thing.

Following the wrong prompt on a trading app, however, could have a substantial effect on a saver's financial position. A big loss could have immediate implications for the app user's ability to afford their rent or pay other important bills. A small loss now could compound into a significant loss at retirement.

Many of these features encourage investors to trade more. Some academic studies suggest more active trading or even day trading results in lower returns for the average trader.

It's in this context that I've asked staff to prepare a request for public input for consideration on these issues. We need to ensure investors using apps with these types of features continue to be appropriately protected and consider how all of our rules apply in these situations, including Regulation Best Interest. In addition, many of our regulations were largely written before these recent technologies and communication practices became prevalent. I think we need to evaluate our rules, and we may find that we need to freshen up our rule set. If we don't address this now, the investing public — those saving for their futures, retirements, and education — may shoulder a burden later.

**Payment for Order Flow**

Why might brokerage firms want to increase customer trading? Who benefits from it?

In the last few years, most retail broker-dealers have stopped charging fees for trades. Instead, some make money through other streams, including a process called payment for order flow.

2

91

Robinhood publicly reported $331 million in payment for order flow revenues in the first quarter of this year, more than triple the amount it brought in during the first quarter of 2020.[1]

There are two kinds of payment for order flow I'd like to highlight: payments from wholesalers to brokers, and from exchanges to market makers and to brokers.

Here, I focus on payment from wholesalers to brokers. Here's how that process works: retail broker-dealers enter into agreements with wholesalers, which purchase their order flow. Unlike public exchanges that must offer fair access to their publicly displayed quotes, these wholesalers can decide whether to execute these orders directly or to pass them along to be executed by the exchanges or other trading venues.

In addition, the wholesalers get valuable information from this order flow that other market participants get with a delay, if at all. In many aspects of the economy, from social media to search engines, access to data is a growing competitive advantage. Our capital markets are no different.

Higher volumes of trades generate more payments for order flow. This brings to mind a number of questions: Do broker-dealers have inherent conflicts of interest? If so, are customers getting best execution in the context of that conflict? Are broker-dealers incentivized to encourage customers to trade more frequently than is in those customers' best interest? What are the policy implications with regard to the data aggregated by the purchasers of order flow?

These questions, while not new, were highlighted in the SEC's recently settled enforcement action against Robinhood.[2] As described in the Commission's order, certain principal trading firms seeking to attract Robinhood's order flow told them that there was a tradeoff between payment for order flow and price improvement for customers. Robinhood explicitly offered to accept less price improvement for its customers in exchange for receiving higher payment for order flow for itself. As a result, many Robinhood customers shouldered the costs of inferior executions; these costs might have exceeded any savings they might have thought they'd gotten from a zero commission.

Finally, it's interesting to note that neither the United Kingdom[3] nor Canada[4] permits broker-dealers to route retail orders to off-exchange market makers in return for payments.

---

[1] *See* Wall Street Journal, "Robinhood's Biggest Business More Than Tripled Amid Trading Frenzy" (May 2, 2021), *available at* https://www.wsj.com/articles/robinhoods-biggest-business-more-than-tripled-in-the-first-quarter-11619975534?mod=searchresults_pos1&page=1.

[2] *See* Securities Act Release No. 10906, "In the Matter of Robinhood Financial, LLC" (Dec. 17, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10906.pdf.

[3] *See, e.g.,* CFA Institute, "Payment for Order Flow in the United Kingdom" at 1 (2016), *available at* https://www.cfainstitute.org/-/media/documents/article/position-paper/payment-for-order-flow-united-kingdom.ashx#:~:text=Payment%20for%20order%20flow%20(PFOF)%20is%20the%20practice%20of%20market,order%20flow%20by%20market%20makers.

[4] *See* Joint CSA/IIROC Consultation Paper 23-406, "Internalization within the Canadian Equity Market" at 8 (March 12, 2019) ("UMIR 6.4 requires that trades by marketplace participants and related entities, subject to some exceptions, are executed on a marketplace. The main policy objectives of this provision are to strengthen liquidity, support price discovery and contribute to transparency. UMIR 6.4 is relevant to internalization in the context that in jurisdictions such as the United States, the execution of retail orders can occur off-marketplace. This notable difference is a contributing factor in how the Canadian market has evolved and is a consideration in our review and discussion of any future policy work."), *available at*

92

**Equity Market Structure**

January's events bring new light to equity market structure. Today, our markets essentially have three different segments. While the public generally thinks of the markets as public exchanges like Nasdaq and New York Stock Exchange, those big public markets had about 53 percent of the volume in January, according to public data.[5] So where's the other 47 percent?

About 9 percent of January's volume was executed at alternative trading systems. These alternative trading systems, commonly known as dark pools, emerged following the 1998 Regulation ATS rules, taking advantage of then-new advances in the internet and communications technologies.

That leaves about 38 percent, the majority of which was executed by off-exchange wholesalers, a group that of firms that have been taking a growing share of trading volume. As publicly available data on reported trades show, just seven wholesalers made up the vast majority of this 38 percent. One firm, Citadel Securities, has publicly stated that it executes about 47 percent of all retail volume.[6] In January, two firms executed more volume than all but one exchange, Nasdaq.[7]

The high concentration of retail orders routed to a small number of wholesalers raises a number of questions about market structure. In essence, does this segmentation and related sector concentration best promote fair, orderly, and efficient markets?

History and economics tell us that when markets are concentrated, those firms with the greatest market share tend to have the ability to profit from that concentration. Market concentration can also lead to fragility, deter healthy competition, and limit innovation. I've asked staff to look closely at these issues to determine which policy approaches may be merited.

**Short Selling and Market Transparency**

At the center of January's market events was significant short selling of a number of the meme stocks. While FINRA and the exchanges currently publish or make available certain short sale data, Congress directed the SEC under the Dodd-Frank Act to publish rules on monthly aggregate short sale disclosures. In addition, Dodd-Frank provided authority to the SEC to increase transparency in the stock loan market. I've directed SEC staff to prepare recommendations for the Commission's consideration on these issues.

Additionally, I wanted to mention briefly the events in late March related to the failure of the family office Archegos Capital Management and the significant losses incurred by several global financial institutions that provided prime brokerage services to Archegos. At the core of that story was Archegos' use of total return swaps based on underlying stocks, and significant exposure that

---

https://www.osc.ca/sites/default/files/pdfs/irps/csa_20190312_internalization-within-the-canadian-equity-market.pdf.

[5] *See* Cboe Global Markets, *available at* https://www.cboe.com/us/equities/market_statistics/historical_market_volume/ (providing downloads of historical reported volume in NMS stocks by all self-regulatory organizations) ("SRO Volume Data"); *see* FINRA OTC (Non-ATS) Transparency Data, *available at* https://otctransparency.finra.org/otctransparency/OtcDownload (providing downloads of historical reported volume in NMS stocks by FINRA members) ("FINRA Member Volume Data").

[6] *See* Citadel Securities, "Equities & Options," available at https://www.citadelsecurities.com/products/equities-and-options/.

[7] *See supra*, note 5, SRO Volume Data and FINRA Member Volume Data.

93

the prime brokers had to the family office. Under Dodd-Frank, Congress gave the SEC rulemaking authority to extend beneficial ownership reporting requirements to total return swaps and other security-based swaps. Among other things, I've asked staff to consider recommendations for the Commission about whether to include total return swaps and other security-based swaps under new disclosure requirements, and if so how.

**Social Media**

This winter's events also highlighted the rapidly changing face of social media and its intersection with our capital markets. Online forums can serve as a real community, expanding access and participation. On Reddit, individuals gather in online communities to discuss a variety of topics anonymously, including investing; the subreddit r/wallstreetbets has about 10 million members.[8] A lot of people follow capital markets through various online communities — not only on Reddit, but also on other social media platforms and within trading apps.

New communications channels have long brought opportunities and challenges for markets. Today's social media tools have far greater reach, scale, and anonymity than previous technologies. This raises a potential issue: the possibility that wrongdoers will attempt to use these powerful forums to hype certain stocks or manipulate markets.

To be clear, I'm not concerned about regular investors exercising their free speech online. I am more concerned about bad actors potentially taking advantage of influential platforms.

Furthermore, it's no longer just retail investors or even humans who are following these online conversations, but institutional investors and their algorithms. Developments in machine learning, data analytics, and natural language processing have allowed sophisticated investors to monitor various forms of public communication to see relationships between words and prices.

This practice, called sentiment analysis, has picked up steam in the last couple of years, and it has grown to include online communities. With that comes the risk that nefarious actors may try to send signals to manipulate the market. This is an area for which we will continue to deepen our understanding, resources, and capabilities.

**Market "Plumbing": Clearance and Settlement**

In January, several broker-dealers decided to restrict customer access to trading in certain meme stocks. These decisions understandably drew a lot of questions from the investing public. Many investors lost access to the market at a critical time.

Clearing has been a crucial part of our capital markets since the 19th century. Clearinghouses are the buyer to every seller, and the seller to every buyer. They reduce risk and operational complexity in capital markets. Centralized clearing of standardized swaps and security-based swaps was mandated by the Dodd-Frank Act after the financial crisis.

When an investor enters into a trade on a Monday, the cash and the securities related to that trade settle on a Wednesday; that's called a settlement cycle of trade day plus two days ("T+2"). Clearinghouses have rules to cover the credit, market, and liquidity risk that is present during those

---

[8] *See* Reddit, "wallstreetbets," *available at* https://www.reddit.com/r/wallstreetbets/.

94

two days. All members transacting with the clearinghouses need to post collateral, called margin, to cover potential losses. If the broker went bankrupt before the trade is settled, the clearinghouse would use such margin to back the deliveries and payments with the goal of not disrupting the broader financial system.

In January, the rapidly changing prices, high volatility, and significant trading volume of the meme stocks prompted larger-than-usual central clearing margin calls on broker-dealers. Some of those broker-dealers, such as Robinhood, scrambled to secure new funding to post the required margin. A number of brokers chose to restrict additional buying activity by their customers in a variety of the meme stocks.

These decisions call into question whether broker-dealers are adequately disclosing their policies and procedures around potential trading restrictions; whether margin requirements and other payment requirements are sufficient; and whether broker-dealers have appropriate tools to manage their liquidity and risk. I've asked staff to look at these issues carefully.

With regard to the settlement cycle, I'm reminded of an old saying in the markets: "Time equals risk." These events have prompted questions about whether we can lower risk by shortening the time of our settlement cycles.

Interestingly, if one goes back to the 1920s, our capital markets had a one-day settlement cycle. This was prior to the establishment of the SEC, so it was a matter of convention rather than a regulatory requirement. Throughout the 20th century, the length of the settlement cycle ebbed and flowed; it was as long as five days. In 2017, the SEC adopted a rule to shorten the standard settlement cycle from three days (T+3) to two days (T+2). The Depository Trust & Clearing Corporation and other industry groups recently announced their intention to study these issues and collaborate on efforts to accelerate the transition to T+1.[9]

The longer it takes for a trade to settle, the more risk our markets assume. The good news is, though it will take a lot of work by many parties, we now have the technology to further shorten the settlement cycles, not only to the settlement cycle we had a century ago, but even to same-day settlement (T-0 or "T-evening").

I believe shortening the standard settlement cycle could reduce costs and risks in our markets. I've directed the SEC staff to put together a draft proposal for the Commission's review on this topic.

**System-Wide Risks**

Whenever there are major market events, it's a good idea to consider what risks they might have placed on the entire financial system, even when the system holds. I'd like to highlight a few areas:

First, at least one firm didn't have sufficient liquidity to meet margin calls and had to fundraise within hours to meet $1 billion-plus obligations, and several brokers chose to shut down customer access to trading. While these liquidity challenges faced by brokers didn't cascade to the rest of the economy, they did, unfortunately, affect many investors' ability to trade.

---

[9] *See* DTCC, "SIFMA, ICI and DTCC Leading Effort to Shorten U.S. Securities Settlement Cycle to T+1, Collaborating with the Industry on Next Steps" (April 28, 2021), *available at* https://www.dtcc.com/news/2021/april/28/sifma-ici-and-dtcc-leading-effort-to-shorten-us-securities-settlement-cycle-to-t1.

95

Second, several hedge funds lost significant money during these events. Though it doesn't appear to have triggered broader market events, at least one fund had to raise funds rapidly to cover losses. Further, as was publicly reported with the Archegos situation, losses at individual firms can have wider impacts on the banking system.

Third, issues of concentration, whether among market makers or brokers at the clearinghouse, may increase potential system-wide risks, should any single incumbent with significant size or market share fail.

\*\*\*

Thank you. I look forward to answering your questions.

7

96

**Nikema Williams (GA) Questions for the Record for Chair Gensler**

**House Committee on Financial Services**

**Full Committee Hearing: "Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Pt. III"?**

**Thursday, May 6, 2021**

**For everyday people, investing money isn't a game. Average investors put their money in the market because they want to grow their wealth and build a better life for themselves and their families. Investing needs to be accessible but also presented like the serious business it is.**

1. **I appreciate that your office will be preparing a request for public input on issues related to gamification in investing. Can you tell us a little bit more about the timeline on this and how you'll use the information you gather?**

On August 27, the Commission issued a Request for Information and Comment on matters related to the use of digital engagement practices (DEPs) by broker-dealers and investment advisers. The Request includes, but is broader than, information and comment on practices commonly known as gamification. It also seeks comment on the use of predictive data analytics, behavioral prompts, differential marketing, and other features designed to engage retail investors on digital platforms. Comments were due on or before October 1, 2021.

We are living in a transformational time, perhaps as transformational as the internet itself. Artificial intelligence, predictive data analytics, and machine learning are shaping and will continue to reshape many parts of our economy.

Finance is not immune to these developments. Here, too, policymakers must consider what rules of the road we need for modern capital markets and for the use of predictive data analytics.

New platforms can collect boundless amounts of data — from customers or from the world around them. With that data they can tune their marketing to each of us differently.

Therefore, fintech platforms have new capabilities to tailor marketing and products to individual investors, using predictive data analytics, behavioral prompts, and other DEPs.

These technologies can bring increased efficiencies and greater access in finance. In many cases too, though, these individualized features may encourage investors to invest in different products or change their investment strategy.

Predictive data analytics and other DEPs, including behavioral prompts and differential marketing, may be designed, in part, to increase platform revenues, data collection, and customer engagement.

This raises some key questions:

How are investors protected in light of the potential conflicts of interest that may exist when DEPs optimize for revenues, data collection, or investor behaviors?

97

There's a related policy question: if DEPs are affecting investors' behavior, when is that a recommendation or investment advice?

How do these new business models ensure for fairness of access and pricing? More specifically, this question arises when the underlying data used in the analytic models reflects society's data, with historical biases that may be proxies for protected characteristics, like race and gender.[1]

Advances in predictive data analytics also could raise some system-wide issues when we apply new models and artificial intelligence across our capital markets. This could lead to greater concentration of data sources, herding, and interconnectedness, and potentially increase systemic risk.

We're taking a look at these issues through the Request and as part of a broader examination of predictive data analytics and the intersection between finance and technology.

> **2.  In your testimony, you also mentioned that regulations may need to be reevaluated to ensure they keep pace with the development of technology and gamification. Are there specific regulations you think deserve examination?**

On June 11, the Office of Information and Regulatory Affairs released the Spring 2021 Unified Agenda of Regulatory and Deregulatory Actions.[2]  The agenda lists a number of specific short- and long-term regulatory actions I expect the Commission will take, across a wide array of important issues, including efforts to keep pace with new developments in technology.

> **3.  What are the most important policy principles to keep in mind to protect retail investors from gamification while still increasing their access to the markets?**

I'm motivated by working families and the SEC's three-part mission: to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.

While new technologies can bring us greater access and product choice, they also raise questions as to whether we as investors are appropriately protected when we trade and get financial advice. In many cases, these features may encourage investors to trade more often, invest in different products, or change their investment strategy. Predictive analytics and other DEPs often are designed with an optimization function to increase revenues, data collection, or customer time spent on the platform. This may lead to conflicts between the platform and investors. I'm interested in the varied questions included in the Request for Comment, and I'm particularly focused on how we protect investors engaging with DEPs.

\* \* \*

---

[1] *See* Gary Gensler and Lily Bailey, "Deep Learning and Financial Stability," *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3723132.
[2] A copy of the SEC's rulemaking list may be accessed at: https://www.reginfo.gov/public/do/eAgendaMain