**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE
COMMISSION,

       *Plaintiff*,

   v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

       *Defendants*.

**No. 1-23-cv-01599-ABJ**

**JOINT MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS BINANCE
HOLDINGS LIMITED AND CHANGPENG ZHAO IN OPPOSITION TO PLAINTIFF'S
<u>EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND .......................................................................................... 4

    A.     Mr. Zhao ......................................................................................... 4

    B.     Binance.com ..................................................................................... 5

    C.     Binance.US ....................................................................................... 5

    D.     The SEC's Actions Belie the Need for Emergency Relief ..................................... 6

    E.     Defendants' Proposed Consent Order Obviates the Need for Any Non-Consensual
        Emergency Relief .............................................................................. 7

III.    LEGAL STANDARD .................................................................................... 9

IV.     ARGUMENT .............................................................................................. 10

    A.     The SEC's Requested Relief that Remains in Dispute is Improper and
        Unwarranted .................................................................................. 11

        1.     BHL and Mr. Zhao Have Provided Reasonable Compromises to the SEC.
               .............................................................................................. 11

        2.     The SEC Has No Evidence To Support the Disputed Requested
            Emergency Relief ..................................................................... 12

        3.     The Disputed Requested Emergency Relief Is Improper. ........................ 15

    B.     The SEC Cannot Show a Substantial Likelihood of Success on the Merits ......... 20

        1.     The SEC Lacks Article III Standing With Respect to Relief Sought in the
            TRO Against BHL and Mr. Zhao. ................................................. 20

        2.     The SEC Has Failed to Establish that BHL and Mr. Zhao Violated the
            Federal Securities Laws. ............................................................. 21

        3.     The Court Lacks Personal Jurisdiction over Mr. Zhao and BHL. ............ 29

    C.     Entry Of A Temporary Restraining Order Is Not In The Public Interest ............ 30

        1.     The SEC Has Eschewed Rulemaking in Favor of Ad-Hoc Enforcement in
            Violation of the Administrative Procedure Act. ............................... 31

        2.     Granting the SEC's Requested Temporary Restraining Order Will Cause
            Significant Harm to the Public and the Digital Asset Industry ............... 33

V.      CONCLUSION ........................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

CASES

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*,
   282 F. Supp. 3d 190 (D.D.C. 2017) ............................................................11, 30

*Aaron v. SEC*,
   446 U.S. 680 (1980) ...................................................................................13

*Al-Bukhari v. Dep't of Correction*,
   2018 WL 4539663 (D. Conn. Sept. 21, 2018) ..............................................18

*Bd. of Tr. of City of Chi. v. SEC.*,
   923 F.2d 1270 (7th Cir. 1991) ...............................................................27, 28

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
   582 U.S. 255 (2017) ...................................................................................31

*Brown v. Jones County Junior College*,
   463 F. Supp. 3d 742 (S.D. Miss. 2020) ........................................................21

*Cato Inst. v. Securities and Exch. Comm'n*,
   4 F. 4th 91 (D.C. Cir. 2021) ..............................................................11, 20

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018) ..........................................................................31

*Chicago Teachers Union v. DeVos*,
   468 F. Supp. 3d 974 (N.D. Ill. 2020) ...........................................................21

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ....................................................................16

*Cockrum v. Donald J. Trump for President, Inc.*,
   319 F. Supp. 3d 158 (D.D.C. 2018) ........................................................30, 31

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*,
   15 F. Supp. 2d 1 (D.D.C. 1997) *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) ...................13

*Commodity Futures Trading Commission v. Changpeng Zhao, et al.*,
   Case No. 1:23-cv-1887 (N.D. Ill. Mar. 27, 2023).........................................27

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008)...................................................................................19

*Disability Rights Council of Greater Wash v. Wash. Metro. Area Transit Authority*,
234 F.R.D. 4 (D.D.C. 2006)................................................................................17, 18

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F. 3d 371 (D.C. Cir. 2017)...............................................................................20

*Elemary v. Philipp Holzmann A.G.*,
533 F. Supp. 2d 116 (D.D.C. 2008)........................................................................32

*Elite Ent., Inc. v. Reshammiya*,
2008 WL 9356287 (D.D.C. Apr. 18, 2008)............................................................20

*In re Baan Co. Sec. Litig.*,
245 F. Supp. 2d 117 (D.D.C. 2003).........................................................................31

*In re Coinbase Inc.*,
No. 23-1779 (3d Cir. filed Apr. 26, 2023)..............................................................34

*In re Fannie Mae Derivative Litig.*,
227 F.R.D. 142 (D.D.C. 2005).................................................................................18

*Intercontinental Exch., Inc. v. SEC*,
23 F.4th 1013 (D.C. Cir. 2022)...............................................................................28

*INTL FCStone Fin., Inc. v. Jacobson*,
2019 WL 2356989 (N.D. Ill. June 4, 2019)............................................................35

*Intl' Shoe Co. v. Washington*,
326 U.S. 310 (1945).................................................................................................30

*Inventus Power v. Shenzhen Ace Battery*,
2020 WL 8254383 (N.D. Ill. Nov. 12, 2020) .........................................................19

*Khatib v. All. Bankshares Corp.*,
846 F. Supp. 2d 18 (D.D.C. 2012) ....................................................................11, 32

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................................................................................33

*Lewis v. Mutond*,
62 F.4th 587 (D.C. Cir. 2023)..................................................................................30

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).................................................................................................20

*Mazza v. Verizon Washington DC, Inc.*,
852 F. Supp. 2d 28 (D.D.C. 2012) ..........................................................................32

*Nat'l Treasury Emps. Union v. Yeutter*,
    918 F.2d 968 (D.C. Cir. 1990) ......................................................................16

*Nguyen v. U.S. Dept. of Homeland Sec.*,
    460 F. Supp. 3d 27 (D.D.C. 2020) ................................................................20

*NLRB v. Bell Aerospace Co. Div. of Textron Inc.*,
    416 U.S. 267 (1974) ......................................................................................33

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................33

*R.W. Grand Lodge of Free & Accepted Masons of Pa. v. Meridian Capital Partners, Inc.*,
    634 Fed. App'x. 4 (2d Cir. 2015) ..................................................................21

*S.E.C. v. Bremont*,
    954 F. Supp. 726 (S.D.N.Y. 1997) ...........................................................15, 16

*S.E.C. v. Brown*,
    740 F. Supp. 2d 148 (D.D.C. 2010) ..............................................................13

*S.E.C. v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) ...........................................................22, 23, 25

*S.E.C. v. Mut. Benefits Corp.*,
    323 F. Supp. 2d 1337 (S.D. Fla. 2004), *aff'd*, 408 F.3d 737 (11th Cir. 2005) ........................23

*S.E.C. v. Quan*,
    2011 WL 1667985 (D. Minn. 2011) ..............................................................12

*S.E.C. v. Richie*,
    2008 WL 2938678 (C.D. Cal. May 9, 2008) .................................................22

*S.E.C. v. Stratton Oakmont, Inc.*,
    1994 WL 721502 (D.D.C. Dec. 19, 1994) ...........................................10, 13, 33

*S.E.C. v. Am. Inst. Couns., Inc.*,
    1975 WL 440 (D.D.C. Dec. 30, 1975) ...........................................................33

*S.E.C. v. Banner Fund Int'l*,
    211 F.3d 602 (D.C. Cir. 2000) ......................................................................26

*S.E.C. v. Chenery Corp.*,
    332 U.S. 194 (1947) ......................................................................................33

*S.E.C. v. Coinbase, Inc.*,
    No. 23-cv-04738 (S.D.N.Y. June 6, 2023) ....................................................34

*S.E.C. v. Dalius,*
   2018 WL 11363498 (C.D. Cal. Oct. 11, 2018)................................................14, 19

*S.E.C. v. Gen. Refractories Co.,*
   400 F. Supp. 1248 (D.D.C. 1975) .........................................................................35

*S.E.C. v. Kik Interactive Inc.,*
   492 F. Supp. 3d 169 (S.D.N.Y. 2020)..................................................................22

*S.E.C. v. LBRY, Inc.,*
   2022 WL 16744741 (D.N.H. Nov. 7, 2022) ........................................................22

*S.E.C. v. Life P'ners, Inc.,*
   898 F. Supp. 14 (D.D.C. 1995) ............................................................................10

*S.E.C. v. Mgmt. Dynamics, Inc.,*
   515 F.2d 801 (2d Cir. 1975).................................................................................10

*S.E.C. v. Nanotech Engineering, Inc.,*
   Case 1:19-cv-03633-ABJ (D.D.C. filed Dec. 5, 2019)........................................10

*S.E.C. v. Telegram Group, Inc.,*
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)..................................................................22

*S.E.C. v. Unifund Sal,*
   910 F.2d 1028 (2d Cir. 1990)...............................................................................11

*S.E.C. v. W.J. Howey Co.,*
   328 U.S. 293 ........................................................................................................22

*Shapiro, Lifschitz & Schram, P.C. v. Hazard,*
   90 F.Supp.2d 15 (D.D.C. 2000) ..........................................................................31

*Tyndale House Publishers, Inc. v. Burwell,*
   2015 WL 13700485 (D.D.C. July 15, 2015)........................................................17

*United States v. Zaslavskiy,*
   2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ....................................................22

*Wurth Elecs. ICS, Inc. v. Elemary,*
   2023 WL 3159738 (S.D. Ohio Apr. 18, 2023) ....................................................18

**STATUTES**

15 U.S.C. § 77b(a)(1)..............................................................................................22, 25

15 U.S.C. § 77e(a)........................................................................................................21

15 U.S.C. § 77e(c)........................................................................................................21

15 U.S.C. § 78c(a)(1) ................................................................................................27, 28

15 U.S.C. § 78c(a)(23) ...............................................................................................29, 30

15 U.S.C. § 78e .................................................................................................................21

15 U.S.C. § 78o(a)(1) .......................................................................................................21

15 U.S.C. § 78q-1(b)(1) ..............................................................................................21, 29

28 U.S.C. § 2462 ..............................................................................................................22

**OTHER AUTHORITIES**

S.E.C. Enforcement Manual Section 2.1.1 .......................................................................10

**RULES**

Fed. R. Civ. P. 26(d)(1)....................................................................................................17

## I.      INTRODUCTION

The SEC's request for a temporary restraining order should be denied for several reasons, but the most important is this:  there is no risk to BAM's customer assets.  Indeed, there is no "emergency" here at all, other than the one manufactured by the SEC for its own purposes, when the alleged securities law violations, according to the SEC, have been going on publicly and openly for years.  The SEC alleges that Binance.US has been operating unlawfully since it launched in 2019.  It alleges that Binance.com has been operating unlawfully since its launch in 2017, including the early years when the SEC says it openly had U.S. users.  BNB launched in 2017 and traded on both platforms since their respective launches.  Why did the SEC let these platforms grow to their current size if it was always illegal?  And how is it that the sudden "emergency" happens to coincide with the SEC's assault on the crypto industry as a whole, with Binance and Coinbase being sued on back-to-back days?  This particular investigation has been going on for years and until May 30, 2023, the SEC never suggested to Defendants Binance Holdings Limited ("BHL") or Changpeng Zhao that there was even a theoretical risk to BAM's customer assets.  Neither the SEC's complaint nor its brief in support of its motion for a temporary restraining order ("TRO") provide any answer to the fundamental question: ***why now***?  A party's desire to obtain litigation advantage (for this case and for cases it is pursuing against other industry participants) by hurrying through fundamental issues that go to the heart of its claims cannot be the answer.

The TRO should be denied as to BHL and Mr. Zhao for additional reasons.

***First***, the relief the SEC requests is unwarranted and improper.  The SEC must carry the burden of establishing a right to the relief it requests, and extraordinary remedies require extraordinary evidence.  But all the SEC can point to are the unfounded and subjective worries of its staff.  (*See, e.g.*, MOL at 31 ("the SEC has not obtained sufficient reassurance . . ."); *id.* at 33

("The SEC is concerned . . .".)  The SEC does not and cannot point to anything that would justify such dramatic action which does little more than risk panic selling and destabilization of the cryptocurrency markets.   Moreover, and notwithstanding the SEC purportedly seeking "emergency" relief to protect BAM customer assets, the SEC requests that the Court order BHL and Mr. Zhao to provide a verified accounting of *all of BHL's and Mr. Zhao's assets*.  The SEC's request for an accounting is overbroad and unduly burdensome.  Nor has the SEC shown a need for emergency relief to obtain expedited discovery from BHL and Mr. Zhao.  Any relevant evidence the SEC could possibly need is in BAM's possession.  And service waivers have already been returned so the aspect of the TRO seeking alternative service is moot.

*Second*, the remedies that the SEC seeks are untethered to the actual violations asserted against BHL and Mr. Zhao.  The case alleges only *registration violations* against BHL and only *control person* liability for registration violations against Mr. Zhao.  The SEC's brief does not identify a single instance in which BAM customer assets were mishandled or misused.  Its charges against BHL and Mr. Zhao, focused exclusively on failure to register, do not demonstrate that the dramatic remedies the SEC seeks are justified at all.  Crucially, as to BHL and Mr. Zhao, the requested relief does not preserve the *status quo ante*.  To the contrary, it seeks a set of remedies that are untethered to the claims that have been brought against them.  The SEC has failed its own test: "When the SEC seeks equitable emergency relief, it understands that such relief must be carefully calibrated to ensure that the remedy protects the interests of investors and maintains the status quo."  (*See* MOL[1] at 3.)

---

[1]  Citations to the "Complaint" or "Compl." are to ECF No. 1.  Citations to "Brief" or "MOL" are to the Memorandum of Law in Support of Plaintiff U.S. Securities and Exchange Commission's ("SEC") Emergency Motion for a Temporary Restraining Order Freezing Assets and Granting Other Relief and Order to Show Cause Why Relief Should Not Continue.  (ECF No. 29-2; *see also* ECF Nos. 4, 8-2 and 26.)  Citations to the "Proposed Order" are to ECF No. 4-1.

***Third,*** the SEC has failed to show the requisite likelihood of success as to the registration claims against BHL and the control person claims against Mr. Zhao.  The SEC does not have authority to require registration when it has not answered the threshold question of what cryptocurrency assets, if any, constitute securities under federal securities laws.  This complex question is the subject of intense debate and extensive legal proceedings across the nation.  It deserves to be considered on a full record, not on a purportedly emergency basis over a matter of just a few days.  But that is what the SEC pushes this Court to resolve on an expedited basis.  Because if the SEC cannot establish that registration was required (be it for offers and sales of securities, as an exchange, as a broker-dealer, or as a clearing agency), it cannot prevail on the merits.

The TRO should thus be denied in its entirety, but in the event the Court is inclined to grant some of the SEC's requested relief, Defendants have jointly proposed a pragmatic resolution.  All Defendants are prepared to enter immediately into a proposed stipulation and consent order ("Proposed Consent Order") where, among other things, BAM has agreed to not transfer assets to BHL, Mr. Zhao, or their affiliated entities.  (Ex. BH-20.[2])  Defendants have also offered to do much more than simply maintain the status quo.  BAM has agreed to an accounting and expedited discovery.  BHL has agreed to send to the United States *all* "Private and Administrative Keys" in its possession even though the SEC's argument that BHL's possession of such keys poses a risk

---

[2] Defendants made a clarifying edit to the description of "private and administrative keys" in Section I and Paragraph 4 of the Proposed Consent Order submitted to the SEC on June 11, 2023; the proposed order filed by BHL and Zhao is otherwise identical to what was sent to the SEC.

Citations to "Ex. BH-__" are to the Declaration of Mary Beth Maloney in Support of the Joint Memorandum of Law on Behalf of Defendants Binance Holdings Limited and Changpeng Zhao in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order ("Maloney Decl.").

to BAM's customer assets is unsupported; and BAM has agreed to ensure that no customer assets are controlled by keys or physical devices outside the United States.  Finally, all Defendants have agreed to submit to the Court's jurisdiction for the limited purpose of "implement[ing] and carry[ing] out the terms" of the Proposed Consent Order (although BHL and Mr. Zhao reserve the right to contest personal jurisdiction otherwise).  These are significant concessions by Defendants and should allay any "concern" raised by the SEC that BAM customer assets are purportedly not safe.  Simply put, the Proposed Consent Order obviates the need for any non-consensual emergency relief requested by the SEC.

## II.       BACKGROUND

### A.       Mr. Zhao

Mr. Zhao was born in China, raised in Canada, and resides in the UAE.  He emigrated from China to Canada at the age of 12 with his parents, who were teachers, shortly after the 1989 Tiananmen Square protests.  (Exs. BH-1; BH-2.)  Mr. Zhao went to high school in Vancouver and subsequently studied computer science at McGill University in Montreal.  (Exs. BH-2; BH-3.)  In 2001, he joined Bloomberg Tradebook Futures in New York, where he worked for four years in Research & Development on software for futures trading.  This position was his only work experience and time residing in the United States.  After leaving Bloomberg, Mr. Zhao devoted himself to entrepreneurial efforts.  (Exs. BH-1 to BH-3.)  In 2013, struck by cryptocurrency's potential as a transformational technology, Mr. Zhao began pursuing opportunities in the cryptocurrency industry in Asia.  He worked as Head of Development at Blockchain.info (2013); served as Chief Technology Officer of Okcoin (2014-2015); and founded and served as CEO of BijieTech, a technology company that offered software to exchanges (for art and similar items) in Shanghai (2015-2017).  (Exs. BH-1; BH-5; BH-6.)  Though each of these positions brought Mr.

Zhao additional experience and expertise in cryptocurrency, none of his roles involved or required expertise in compliance with U.S. laws or regulations.

**B.      Binance.com**

In 2017, Mr. Zhao founded Binance.com in Asia with colleagues in order to provide infrastructure for global digital asset markets.  (Ex. BH-64; *see also* Exs. BH-1; BH-6.)  Among other services, Binance.com provides much-needed banking alternatives to the unbanked, the underbanked, and other individuals in countries with relatively unstable currencies and underdeveloped banking infrastructures.  (*Id.*)

Binance.com has grown over the last six years to become the world's leading cryptocurrency exchange.  (Ex. BH-60.)   Today, Binance.com has millions of registered users around the world, is registered or licensed in 17 countries, lists more than 350 cryptocurrencies, and averages greater than $38 billion in daily trading volume.  (Ex. BH-63.)  Today, Binance has grown its compliance team to 750 people worldwide, led by a well-respected former Morgan Stanley alum.  (Exs. BH-101.)

**C.      Binance.US**

In February 2019, Binance set up new Delaware corporations, including Defendants BAM Management US Holdings Inc. and BAM Trading Services Inc. (collectively, "BAM"). (Exs. BH-7 to BH-9.)  Together, those companies would run the new Binance.US platform.

In June 2019, Binance changed its Terms of Use to prohibit U.S. users on its Binance.com platform.  (Ex. BH-11.)  The Binance.US platform launched in September 2019.  (Ex. BH-12.)  It currently operates as a licensed cryptocurrency exchange in thirty-nine states, as well as in Puerto Rico, Guam, and the District of Columbia.  (Ex. BH-10.)

**D.**     **The SEC's Actions Belie the Need for Emergency Relief**

Despite having been engaged with the SEC since 2021, BHL and Mr. Zhao first learned they were potential targets of an SEC investigation related to Binance.US in late February 2023. (Ex. BH-15.)  However, despite numerous and frequent interaction over the next three months, the SEC never expressed *any* concern to BHL and Mr. Zhao about the safety and security of user assets on the Binance.US platform until May 30, 2023.  (Ex. BH-14, BH-15.)

On May 30, 2023, however, the SEC's position markedly shifted when the SEC—for the first time—suggested in a letter to BHL (the "May 30 Letter") that it had "significant questions and concerns" about "the safety of customer assets and the unencumbered availability of funds at BAM Trading."  (Ex. BH-14, BH-15.)  The May 30 Letter provided no factual basis for the SEC's purported concerns.[3]   The May 30 Letter included an appendix of 26 questions (several with multiple subparts) and demanded BHL produce a witness to testify to the factual questions within two days' time (by June 1, 2023).  (*Id.*)  The SEC sent an identical list of questions to BAM the same day.  (Ex. BH-16.)  Despite its representations in its Brief (MOL at 36), the SEC did not direct any such letter to Mr. Zhao regarding its newfound concerns.

BAM followed up with written responses to many of the SEC's questions on June 1, 2023, and sent a further response the following day offering, among other things, a witness to assist the SEC with its questions.  (Exs. BH-17; BH-18.)

---

[3] Six days earlier, on May 24, 2023, the SEC held a call with BHL concerning a news article in Reuters that made allegations about financial practices at BHL. During that call, the SEC expressed no specific concerns about customer assets on the Binance.US or Binance.com platform, and suggested that assurance from both BAM and BHL about the safety of their respective user assets would suffice—a far cry from what it started demanding six days later.  (Ex. BH-15.)  Indeed, BAM's Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order ("BAM Opposition") makes clear that user assets on Binance.US are, and always have been, safe.

In the meantime, and even before receiving BAM's responses to its questions, on Friday, June 2, the SEC demanded that Defendants stipulate to a preliminary injunction with expansive and draconian terms.  (Ex. BH-15.)  The SEC also informed Defendants that it intended to file suit against them in the coming week alleging broad theories of liability.  (*Id.*)  Later on June 2, the SEC sent Defendants a proposed Stipulation and Consent Order for Preliminary Injunction ("June 2 Stipulation").  (Ex. BH-19.)  The SEC demanded an executed Stipulation within 24 hours by 5:00 p.m. on Saturday, June 3; otherwise, the SEC threatened it would "seek all available preliminary relief before the court as necessary."  (*Id.*)

Defendants responded to the June 2 Stipulation the next day with a proposal to further address the SEC's key expressed concern regarding user assets on Binance.US.  (Ex. BH-15.) Specifically, BHL offered as part of a larger proposal to transfer *all* of its remaining key shards to BAM personnel in the United States, even though BAM currently exercises control over the movement of user assets onto and off of the Binance.US platform, as well as between wallets on that platform, and there is no evidence that the security of those assets is at risk.  The SEC rejected that proposal without articulating why it purportedly failed to address the SEC's unspecified concerns about the safety of BAM customer assets.  (Ex. BH-19.)

The SEC filed its Complaint on June 5.  (ECF No. 1.)  And, despite its failure to explain the basis for, or provide any evidence substantiating, its purported theory about the safety of BAM customer assets, on the night of June 6, 2023, the SEC filed for a TRO.  (ECF No. 4; *see also* ECF No. 4-1, 8-2, 29-2.)

**E.    Defendants' Proposed Consent Order Obviates the Need for Any Non-Consensual Emergency Relief**

Since June 6, Defendants have continued to engage in discussions with the SEC about a potential resolution to the TRO in an effort to avoid, among other things, fueling panic in the

cryptomarkets and causing harm to users.  Although the parties have been unable to agree upon a proposed stipulation and consent order, their dispute is substantially more narrow than when the SEC moved for emergency relief on June 6.

Most recently, on Sunday, June 11, Defendants provided the SEC with a revised Proposed Consent Order, following earlier proposals to the SEC.[4]  (Ex. BH-20.)  Critically, and in order to maintain the status quo, BAM has agreed not transfer assets to BHL, Mr. Zhao or their affiliated entities, and *all* Defendants have agreed to preserve documents.  (*Id.* at §§ II, III.)  The Proposed Consent Order also provides the SEC with the vast majority of the *affirmative* injunctive relief requested in the TRO.  Specifically, BAM has agreed to an accounting and to provide the SEC with expedited discovery.  (*Id.* at §§ IV, V.)  BHL has also agreed to provide the SEC with certain information regarding U.S. users of the Binance.com platform, to participate in expedited discovery, and to limited aspects of the SEC's request for an accounting.   (*Id.* at §§ IV, V.)  BHL has further agreed to transfer to BAM personnel in the United States: (i) the three key shards in its possession involved in the transfer of BAM customer assets from cold[5] wallets to hot[6] wallets; and (ii) the two keys shards in its possession involved in the staking[7] and un-staking of certain BAM customer assets.  (*Id.* at § I.)   Additionally, BAM has agreed that no customer assets will be

_____

[4]  As of this filing, discussions with the SEC about a proposed consent order remain ongoing.

[5]  "Cold wallet" is a term of art to describe wallets that are configured to only move assets to hot wallets (i.e., assets cannot move off platform from a cold wallet).  These wallets are more secure and store the majority of digital assets on the BAM platform.

[6]  "Hot wallet" is another term of art for wallets that are permissioned and/or configured to send digital assets off of the Binance.US platform.  Hot wallets serve multiple functions.  They serve as the wallets that facilitate withdrawals off of the Binance.US platform, as well as the in-between stop for "cold" wallets (defined above) moving from user-deposit wallets to cold wallets.

[7]  Staking is a process by which individuals lock their cryptocurrency (their "stake") to support the security and operation of a blockchain network.  When someone stakes their crypto, they are essentially helping to secure the chain and validate transactions on the blockchain.  One simple explanation of the process and its importance can be found at Ex. BH-21.

controlled by any physical device located outside the United States.  (*Id.* § II.)  Finally, all Defendants, including Mr. Zhao, have agreed to submit to the Court's jurisdiction "in order to implement and carry out the terms" of the Proposed Consent Order.  (*Id.* §§ VII.)

The only aspects of the SEC's original emergency relief that BHL and Mr. Zhao have not agreed to are a verified accounting of *all of BHL*'s *and Mr. Zhao's* assets and certain timing aspects of the expedited discovery demanded by the SEC.  (*Compare* ECF 4-1 §§ VI, VII *with* Ex. BH-20 §§ IV, V.)  As discussed below in Section IV.A, the aspects of the SEC's original emergency relief that BHL and Mr. Zhao have not agreed to are overbroad and unduly burdensome, and, even if they were not, the SEC has not provided *any* evidence that a verified accounting and expedited discovery is necessary to maintain the status quo.

### III.    LEGAL STANDARD

To obtain a TRO, the SEC must demonstrate (1) "a substantial likelihood of success on the merits" and (2) that "the public interest favors entry of a temporary restraining order."  *S.E.C. v. Stratton Oakmont, Inc.*, 1994 WL 721502, at *3–4 (D.D.C. Dec. 19, 1994).  Although the SEC need not show irreparable harm, "this does not mean that 'judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into the court.'"  Order at 3, *SEC v. Nanotech Engineering, Inc.*, Case 1:19-cv-03633-ABJ (D.D.C. filed Dec. 5, 2019) (Jackson, J.) (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)).  The court "can assess 'all those considerations of fairness that have been the traditional concern of equity courts.'"  *Id.* (quoting *Mgmt. Dynamics, Inc.*, 515 F.2d at 808).  The SEC's Enforcement Manual similarly provides that the SEC should take into account whether there is "ongoing" conduct that "poses a threat or imminent harm to investors" in considering whether "there is an urgent need to file an enforcement action."  SEC Enforcement Manual Section 2.1.1.

To establish a substantial likelihood of success on the merits, the SEC must make two showings: "a 'strong prima facie case of previous violations' and . . . a reasonable likelihood that the wrong will be repeated." *SEC v. Life P'ners, Inc.*, 898 F. Supp. 14, 18 (D.D.C. 1995) (internal quotations and citation omitted).  Further, where, as here, the SEC seeks some form of mandatory relief (*e.g.*, a sworn accounting), it must make a "more substantial showing of likelihood of success, both as to violation and risk of recurrence."  *SEC v. Unifund Sal*, 910 F.2d 1028, 1039 (2d Cir. 1990)).

Finally, at the TRO stage, the SEC must demonstrate a "substantial likelihood" that the court has personal jurisdiction over each Defendant.  *See 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 282 F. Supp. 3d 190, 200 (D.D.C. 2017).  The SEC "may meet this burden by showing '*a reasonable probability* that personal jurisdiction can ultimately be established.'"  *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18, 25-26 (D.D.C. 2012) (emphasis added).

## IV.   ARGUMENT

The TRO should be denied for several reasons.  *First*, the SEC provides no evidence that BAM customer assets are ***currently*** at risk or ***will be*** in the future, and, in any event, a number of the remedies sought by the SEC are moot or otherwise improper.  *Second*, the SEC lacks standing to seek the remedies sought in the TRO against BHL and Mr. Zhao.  *Cato Inst. v. Securities and Exch. Comm'n.*, 4 F. 4th 91, 94–95 (D.C. Cir. 2021).  *Third*, the SEC has failed to meet its burden showing a substantial likelihood of success on its claims that BHL violated the Exchange Act or Securities Act, or that Mr. Zhao acted as a control person for those alleged violations.  *Finally*, entry of a TRO here is plainly not in the public interest.  On the contrary, a TRO risks panic and destabilizing of the cryptocurrency markets.  For these reasons, as discussed in more detail below,

the SEC has not and cannot carry its burden to justify imposition of the extraordinary relief sought in the TRO.

**A.      The SEC's Requested Relief that Remains in Dispute is Improper and Unwarranted**

Notwithstanding the failures discussed below which warrant denial of the SEC's requested relief in its entirety, BHL and Mr. Zhao have offered significant compromises to allay the SEC's unfounded "concerns" about the safety of customer assets on Binance.US.  (Ex. BH-20.)  As discussed further below: (1) the relief originally requested by the SEC that remains subject to dispute are the SEC's requests for a verified accounting and expedited discovery; (2) the SEC does not provide the Court with sufficient evidence for the Court to grant the disputed relief; and (3) under the circumstances presented here, the disputed relief is improper and unwarranted.

**1.      BHL and Mr. Zhao Have Provided Reasonable Compromises to the SEC.**

While BHL and Mr. Zhao do not believe that the SEC has made a sufficient showing on any of its requested relief (which is based merely on unsubstantiated speculation), BHL and Mr. Zhao are willing to agree to the SEC's requests for a document preservation order and to transfer "Customer Assets," and the keys related thereto, that are in the possession of BHL or Mr. Zhao to BAM personnel in the United States.  (*See* Ex. BH-20 §§ I, III; Proposed Order at 6-19, 12.[8])

*First*, BHL and Mr. Zhao have committed not to destroy any evidence relevant to these proceedings.  Given their representation, there is no need for the Court to enter a document preservation order, but BHL and Mr. Zhao do not contest entry of a reasonably tailored order.

*Second*, BHL and Mr. Zhao have provided the SEC with executed service waivers, which moots the SEC's request to serve defendants by alternative means.

---

[8]  The SEC does not allege—nor could it—that Mr. Zhao currently has control over BAM's bank accounts or its digital assets (including any key shards).  Nevertheless, the Proposed Consent Order offered by Defendants includes a provision that includes BHL and Mr. Zhao.

*Third*, even though repatriation is not appropriate because there is no "evidence on the present record that the Defendants hold ill-gotten gains overseas," *S.E.C. v. Quan*, 2011 WL 1667985, at *8 (D. Minn. 2011), BHL and Mr. Zhao have offered to transfer to BAM *all* key shards in their possession in a further attempt at resolution, (Ex. BH-20)

The SEC has not established that the verified accounting and expedited discovery requests that remain in dispute are necessary here.

> **2.     The SEC Has No Evidence To Support the Disputed Requested Emergency Relief.**

Since the sudden shift on May 30, 2023, the SEC had failed to explain its theory on why any customer assets on Binance.US are at risk.  Indeed, the papers filed in support of the TRO make clear that the SEC lacks any evidence that BAM customer assets *currently* are at risk or *will be* in the future, and the disputed requested relief should therefore be denied.

"In the context of an SEC action to enjoin future violations," the requested relief is only appropriate where it is "designed to protect the public" against future violative conduct.  *Aaron v. SEC*, 446 U.S. 680, 718, (1980).  Courts have explained that "the equitable relief sought by the SEC should only be granted under this Circuit's law upon a showing of *future risk of harm*."  *S.E.C. v. Brown*, 740 F. Supp. 2d 148, 157 (D.D.C. 2010) (emphasis added).  Further, "where, as here, the SEC seeks an injunction to order some form of mandatory relief, it must make a 'more substantial showing'" that it is entitled to the relief it requests.  *Stratton Oakmont, Inc.*, 1994 WL 721502, at *3; *see also Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) ("[W]here a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo during litigation, the party is held to a higher burden of proof.").  While the SEC has asked the Court to order

*mandatory relief* as to BHL and Mr. Zhao, the SEC has not provided *any* evidence whatsoever of a potential for future harm.

Only three of the 556 paragraphs in the Complaint discuss the *current* state of BAM customer assets. Each of those paragraphs contains conclusory allegations that BHL and Mr. Zhao purportedly continue "to be involved in the custody and control" of BAM customer assets, but critically absent is any factual allegation (much less evidentiary support) that the underlying assets themselves are not safe *now or in the future*. (Compl. ¶ 236; *see also* ¶¶ 176, 181.)

The Brief and its supposed supporting evidence are similarly devoid of facts establishing that BAM customer assets are *currently* at risk or *will be* in the future. The SEC dedicates over two dozen pages to discussing the history and operation of Binance.US and Binance.com, but never explains how BHL and Mr. Zhao are purportedly *currently* putting Binance.US customer assets at risk. (*See* MOL at 1-25.) Rather, the SEC's allegations are limited to supposed *prior arrangements* that are no longer in place. (*See, e.g.*, MOL at 29 (acknowledging that Binance has "ceded formal bank signatory control over the [BAM] bank accounts to new signatories for BAM Trading"); *id.* at 30 (discussing the Wallet Custody Agreement that was in place "until December 1, 2022"); *id.* at 31 (discussing a "May 2022 formal deficiency letter sent to BAM Management").)

And while the SEC heavily relies on the Declaration of Sachin Verma (ECF No. 21) as support for its inflammatory statements that Defendants have engaged in the "commingling of funds relating to the Binance Platforms" (MOL at 27), nowhere does Verma provide evidence that the transfers described include customer funds or customer assets or that there is any risk of dissipation of customer assets from the Binance.US platform. (*See* Declaration of J. Gregory Eastman ("Eastman Declaration") at ¶ 7.a., Section VII ("Mr. Verma has presented no evidence that BAM . . . customer assets are at risk. The audited financial statements that the SEC submitted

13

in support of its requested relief indicate that BAM maintains accounts for its customer funds that are segregated from other cash funds used in the ordinary course of business.  Mr. Verma fails to identify which, if any, of the bank accounts he has analyzed now hold or ever held BAM customer assets.").)[9]  So not only do Defendants dispute the accuracy of the SEC's allegations, but the allegations themselves are insufficient to support a credible basis for extraordinary relief to protect customer funds.

The SEC's lack of evidence is observed by the former Chief Economist at the SEC and CFTC, Jeffrey R. Harris in his declaration.  "Based on [his] review of the SEC's TRO papers," Mr. Harris opines that he has "not seen evidence of imminent risk posed by Binance or Binance.US to United States crypto market participants."  (Declaration of Jeffrey R. Harris ("Harris Declaration") at ¶ 3.a; *see also id.* at ¶¶ 17-20.)  Mr. Harris therefore concludes that he "see[s] no economic evidence to support an extreme measure such as the TRO."  (*Id.* at ¶ 3.c; *see also id*. at ¶ 26.)

Without a showing that customer assets are currently at risk, the SEC has not demonstrated any purpose for the requested relief.  And worse, because the SEC's "concerns" are unsubstantiated, they have already begun to cause the exact harm the SEC is supposed to protect against.  (*See, e.g.*, BAM Opposition § Argument III ("As has been widely reported, the SEC's motion has concerned BAM's banking partners, some of which have threatened to not allow BAM

---

[9] Indeed, Mr. Eastman further opines that "Mr. Verma' summary of BAM transactional activity is incomplete and unreliable" noting that he "portrays an incomplete picture of the financial activities of BAM."  (Eastman Declaration ¶ 7.b., d., Sections VIII & X)  In particularly, he notes that "BAM's audited and reviewed financial statements demonstrate that it maintains bank accounts other than the accounts at Silvergate and Signature Bank that Mr. Verma selectively references in his declarations.  In addition, while BAM has disclosed that it segregates customer funds in separate bank accounts, Mr. Verma provides no evidence to suggest any funds were commingled with BAM customers' assets."  (*Id.* ¶ 7.a., c., Sections VII & IX.)

to access assets, including for customers").)  Put simply, there is no "emergency" requiring the Court to impose the draconian remedies sought here and certainly no evidentiary record put forward by the SEC to meet its heightened burden when requesting affirmative injunctive relief. *See SEC v. Dalius*, 2018 WL 11363498, at *5 (C.D. Cal. Oct. 11, 2018) (denying the SEC's request for a TRO because "[e]vidence that [plaintiff] controls and transfers his assets in a complicated manner does not 'clearly show' that harm will result in the absence of emergency relief").

### 3. The Disputed Requested Emergency Relief Is Improper.

Here, the SEC has asked the Court to order mandatory relief that would require BHL and Mr. Zhao, among other things, to:  (1) "serve upon the Commission a verified written accounting" (Proposed Order at 9-10); and (2) engage in "expedited discovery" concerning the Customer Assets and their security segregation, availability, and any encumbrances or limitations that would make them unavailable for transfer or withdrawal by customers (*id.* at 11).  The SEC is not entitled to such relief on an emergency or preliminary basis.

#### a) The SEC Has Failed To Show Any Basis For An Accounting.

The SEC has not established that BHL and Mr. Zhao should be forced to undergo an onerous accounting process.

Courts have typically ordered accountings where the moving party has provided evidence that defendants "more than likely" are in possession of fraudulently obtained funds and the accounting would be "minimally intrusive."  *See S.E.C. v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997).

The SEC seeks an order requiring *each Defendant* to provide to the SEC a preliminary list of: all Binance.US customers, all U.S. customers of Binance.com, every U.S. customer account, every U.S. customer wallet, every account or wallet that holds "Customer Fiat Assets" or "Customer Crypto Assets," and any fund or asset of either BAM entity, all within *5 days*.

(Proposed Order at 9-10.)  In addition, the proposed order requests, among other things, a verified written accounting in *30 days* of:  *each* account or wallet holding BAM Customer Assets, as well as *all* "assets, funds, crypto assets, securities, or other property, real or personal, within each Defendant's possession, custody, or control, that is valued greater than $1,000, that was transferred to or for the benefit of any Defendant or other person or entity from January 1, 2023." (*Id.*)

Compliance with such an expedited request and timeline is plainly unreasonable.  The SEC has provided no justification to support probing into detailed and, for Mr. Zhao, personal and private financial information when it has brought no fraud or market manipulation claims against either Defendant.  Nor has the SEC provided any justification to impose the significant burdens that would be placed on BHL and Mr. Zhao to comb over and account for every asset, fund, wallet, and piece of personal property within a month's time.  (*See* Eastman Declaration ¶ 7.f., Section XII (opining that an accounting, as proposed by the SEC, "would require a significant undertaking given the volume, complexity, and locations of the data, records, and custodians involved and would require a significant investment of both time and resources.")   The SEC's accounting request is far from "minimally intrusive."  *Cf. Bremont*, 954 F. Supp. at 733.

The SEC's requested accounting as to BHL is abusively overbroad.  "[I]njunctions issued by federal courts should be narrowly tailored."  *Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).  While the SEC purports to be seeking a TRO to protect "assets belonging to Binance.US customers and BAM Trading customers" (MOL at 58), the requested accounting plainly extends far beyond any relation to such assets.  The Court should deny the SEC's overbroad and unduly burdensome accounting request.  *See Cobell v. Kempthorne*, 455 F.3d 301, 316 (D.C. Cir. 2006) (holding an injunction was "overbroad" and would cause "significant hardship" to the defendant because the language of the injunction "encompasses far

more information than could reasonably be required to complete an accounting" of relevant data in defendant's possession).

Alternatively, BHL and Mr. Zhao have offered to provide a more reasonable accounting than what the SEC requests in its Proposed Order (Proposed Consent Order § IV), but the SEC rejected BHL's and Mr. Zhao's proposal.  BHL and Mr. Zhao respectfully submit that the Court should deny any accounting request, but if the Court determines an accounting is necessary, it should order an accounting commensurate with what they have offered in the Proposed Consent Order.  *See Tyndale House Publishers, Inc. v. Burwell*, 2015 WL 13700485, at *2 (D.D.C. July 15, 2015) (rejecting the "unnecessarily broad injunction" requested by plaintiffs and adopting the more circumscribed injunction proposed by defendants).

### b)      The SEC Has Not Shown It Is Entitled to Expedited Discovery.

Finally, the SEC has failed to meet its burden to show any entitlement to expedited discovery.

A court may order expedited discovery for good cause.  *See* Fed. R. Civ. P. 26(d)(1).  In determining whether a plaintiff's request for expedited discovery is reasonable, courts consider the following factors: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made."  *Disability Rights Council of Greater Wash v. Wash. Metro. Area Transit Authority*, 234 F.R.D. 4, 6 (D.D.C. 2006) (internal quotations omitted).

The SEC asks this Court to dispose of numerous protections in the Federal Rules of Civil Procedure, including notice requirements and discovery limits, and to shorten deadlines (Proposed Order at 11), but has failed to establish the requisite "good cause" for expedited discovery.

*First*, the SEC's expedited discovery request is targeted at identifying "Customer Assets" to ensure such assets are protected, and "Customer Assets" are defined as assets of "investors *on the Binance.US platform*."  (MOL at 63 (emphasis added).)  Accordingly, BAM is the relevant party for such discovery.

*Second*, while the SEC's proposed order describes its request as "limited expedited discovery," it is anything but.  The proposed order requests expedited discovery for 60 days on Defendants and any "third parties" relating to the "security, segregation, availability, and any encumbrances or limitations . . . including, but not limited to, type, identity, location, value, custody, control restrictions and whether there are sufficient assets to satisfy customer liabilities" of "Customer Assets."  (Proposed Order at 11-12.)  The request also sets a 10 day response time for any requests the SEC serves.  (*Id.*)  To the extent the SEC seeks expedited discovery on anything other than customer assets on the Binance.US platform, such discovery should not be permitted as it would condone an end-run around the protections afforded by the Federal Rules of Civil Procedure.  *See In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 143 (D.D.C. 2005) (denying motion for expedited discovery where request appeared to be a "thinly veiled attempt to circumvent the normal litigation process"); *Wurth Elecs. ICS, Inc. v. Elemary*, 2023 WL 3159738, at *2 (S.D. Ohio Apr. 18, 2023) ("However, the Court generally finds that Defendants' proposed discovery requests as a whole, and a majority of the individual requests, are unduly burdensome on Wurth and are not narrowly tailored to the issues relevant to the preliminary injunction determination."); *Al-Bukhari v. Dep't of Correction*, 2018 WL 4539663, at *7 (D. Conn. Sept. 21, 2018) ("Even to the extent such evidence would be relevant to a claim in the present action, a temporary restraining order is not the appropriate vehicle for pursuing discovery efforts . . . . ").

*Third*, the SEC has admitted that it has already engaged in extensive discovery before filing this lawsuit.  (*See, e.g.*, MOL at 32-33 (noting the SEC's "December 17, 2020 subpoena requesting documents" and "the substantial evidence the SEC has received in its investigation").)  BAM also recently provided significant information to the SEC regarding the safety of customer assets.  (Exs. BH-17, BH-18.)  The SEC offered no adequate explanation of why it now needs additional extensive discovery on a truncated timetable.  *See Disability Rts. Council of Greater Washington v. Washington Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006) (courts consider "the reasonableness of the request in light of the entire record to date" when asked to order expedited discovery); *Dalius*, 2018 WL 11363498, at *7 (denying an SEC's TRO request for expansive expedited discovery because "[t]he record indicates that the SEC has engaged in extensive fact-finding before it filed this lawsuit.").

In sum, under the circumstances presented here, there is simply no basis for the Court to order BHL to submit to the burdensome and expansive expedited discovery requested by the SEC. However, if the Court is inclined to grant expedited discovery, Defendants respectfully request that the Court order the SEC to first identify what specifically it intends to seek and impose the time periods for expedited discovery in the Proposed Consent Order.  Moreover, any grant of expedited discovery must be mutual.  *See Inventus Power v. Shenzhen Ace Battery*, 2020 WL 8254383, at *1 (N.D. Ill. Nov. 12, 2020) (order "specified that any expedited discovery should be mutual, targeted to matters that will be addressed in a preliminary injunction hearing, and not duplicative of investigations that already have been made") (internal citations omitted). Defendants request, at a minimum, all documents and communications (i) pertaining to the SEC's assertion that each cryptocurrency asset named in the Complaint to be a security under the federal securities laws; (ii) concerning or related to the unnamed witnesses and individuals described in

the Complaint and Steele Declaration;[10] (iii) that tend to support or rebut the SEC's alleged concern regarding the security of BAM customer assets; and (iv) regarding the propriety of Chairman Gensler's participation in the decision to authorize this enforcement action (*see infra* at 29).

**B.      The SEC Cannot Show a Substantial Likelihood of Success on the Merits**

> **1.      The SEC Lacks Article III Standing With Respect to Relief Sought in the TRO Against BHL and Mr. Zhao.**

The SEC bears the burden of establishing standing for each form of relief it seeks.  *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).  In the context of a TRO, courts "require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F. 3d 371, 377 (D.C. Cir. 2017) (internal quotation marks and citation omitted).  Thus, a plaintiff seeking such extraordinary relief "cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing."  *Id.* (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  The Steele Declaration in particular makes factual assertions without citations or supporting exhibits and based on witness interviews for which Defendants do not have notes or transcript.

To establish standing to obtain the relief sought in the TRO, the SEC must demonstrate *redressability—i.e.*, it "must show that there is a 'substantial probability' that 'if the court affords the relief requested, the injury will be removed.'"  *Cato*, 4 F.4th at 94–95; *Nguyen v. U.S. Dept. of Homeland Sec.*, 460 F. Supp. 3d 27, 36 (D.D.C. 2020) ("Simply put, the court cannot remedy an injury that is not caused by the challenged action before it."); *Elite Ent., Inc. v. Reshammiya*, 2008

---

[10] The Steele Declaration in particular makes factual assertions without citations or supporting exhibits and based on witness interviews for which Defendants do not have notes or transcript.

WL 9356287, at *4 (D.D.C. Apr. 18, 2008) (holding TRO was not warranted where plaintiff failed to show how it could avoid staving off any imminent financial catastrophe by gaining the sought relief, which was expedited discovery).

Here, the SEC seeks an order freezing BAM's assets, repatriating and freezing of BAM's customer assets, requiring Defendants to preserve documents, requiring sworn accountings, and ordering expedited discovery.  (*See* ECF 4-1; *see also* MOL at 62-66.)  If granted, ***none*** of this relief would redress the alleged registration violations asserted against BHL or control person claims predicated on BHL's and BAM's alleged registration failures asserted against Mr. Zhao. To be direct, the SEC's expansive remedies simply do not match the harm it alleges: a failure to register.  Accordingly, the SEC has failed to establish redressability and therefore lacks standing with respect to the relief sought in the TRO against BHL and Mr. Zhao.  *See Elite Ent.*, 2008 WL 9356287, at *4; *Brown v. Jones County Junior College*, 463 F. Supp. 3d 742, 754 (S.D. Miss. 2020) (holding former student's injury could not be resolved by injunctive relief after she graduated); *Chicago Teachers Union v. DeVos*, 468 F. Supp. 3d 974, 984 (N.D. Ill. 2020) (denying TRO and PI where plaintiff "failed to establish that an order of any sort that the Court might issue would likely redress [its] alleged harm").

### 2.   The SEC Has Failed to Establish that BHL and Mr. Zhao Violated the Federal Securities Laws.

The SEC charges BHL with eight violations of the federal securities laws under Sections 5(a) and (c) of the Securities Act and Sections 5, 15(a), and 17A(b) of the Exchange Act.  (Compl. ¶¶ 514-19, 520-22, 526-37, 541-43.)  As the statutory language makes clear, each charge requires the SEC to prove that the underlying digital assets are "securities" or that BHL was otherwise engaged in facilitating "securities" transactions.[11]  The SEC has not shown and cannot show a

---

[11]  *See* ECF No. 26, Ex. A-74 at 5.

substantial likelihood of success on these claims.  It likewise cannot show a substantial likelihood

of success on the control person claims against Mr. Zhao.  *See R.W. Grand Lodge of Free &*

*Accepted Masons of Pa. v. Meridian Capital Partners, Inc.*, 634 Fed. App'x. 4, 8 (2d Cir. 2015)

(affirming dismissal of control person claim because "there can be no 'control person' liability

under Section 20(a)" where plaintiff "failed to plead a primary violation").

> ### a)  BHL's and BAM's Digital Assets Are Not "Securities" and Neither Platform Engages in "Securities" Transactions.

> #### (i)  BNB

The only digital asset addressed in the SEC's Brief in any detail is BNB, an "ERC-20 token

that Binance issued on the Ethereum blockchain." (MOL at 6.)  The SEC cannot show a substantial

likelihood of success that BNB is a "security" under federal securities laws.

As an initial matter, the SEC's arguments about the BNB Initial Coin Offering ("ICO") in

2017 (*see, e.g.*, MOL at 40 (arguing that the ICO constituted an "investment of money"), 42-43

("during the BNB ICO . . .")) are irrelevant because any charges related to such conduct are long

time-barred.  *See* 28 U.S.C. § 2462 (five year statute of limitations for enforcement proceedings);

*S.E.C. v. Richie*, 2008 WL 2938678, at *11 n.9 (C.D. Cal. May 9, 2008).

Regardless, the SEC cannot show a substantial likelihood of success in proving that BNB

is an "investment contract." *See* 15 U.S.C. §§ 77b(a)(1); Compl. ¶ 288.  As the Supreme Court

explained in  *SEC v. W.J. Howey Co.*, "investment contract" was a term of art "common[ly]"

employed "in many state 'blue sky' laws" governing securities and was "uniformly" understood

to require (1) a contract, (2) carrying post-sale obligations for the promoter, and (3) giving the

investor the right to receive profits from the promoter's efforts.  328 U.S. 293, 298 & n.4

(collecting cases, in all of which these requirements were satisfied).  The D.C. Circuit has held that

an "investment contract" is a "security" under *Howey* if investors purchased them "with (1) an

expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others." *S.E.C. v. Life Partners, Inc.*, 87 F.3d 536, 542 (D.C. Cir. 1996).

BNB fails at least the "efforts prong" of the *Howey* test[12]—specifically, the SEC cannot show a substantial likelihood of success that *BHL's* "efforts have a predominant influence upon investors' profits." *Life Partners*, 87 F.3d at 548. To find an "investment contract," *Howey* requires, at minimum, some common enterprise between BHL and the holders of BNB, in which those holders of BNB reasonably expect to earn profits as a result of the *efforts of BHL*. "[T]he key question for a court in assessing whether a transaction satisfies the third prong of Howey is to determine *whether profits are derived from the activities of the promoter or rather the operation of external market forces beyond the control of the promoter*." *S.E.C. v. Mut. Benefits Corp.*, 323 F. Supp. 2d 1337, 1342 (S.D. Fla. 2004), *aff'd*, 408 F.3d 737 (11th Cir. 2005) (emphasis added).

The SEC's Brief largely ignores this critical distinction. (MOL at 43.) The quote purportedly establishing that "Binance touted a 'track record of startups under our belt,'" is from a "Binance Whitepaper" published in connection with the BNB ICO in 2017. (*See id.* at 7.) As

---

[12] The inapposite enforcement actions relied upon by the SEC—relating to younger, less decentralized digital assets—are irrelevant to whether BNB (or any other digital assets traded on Binance.com) are "securities." *Compare* MOL at 40, *with SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 363 (S.D.N.Y. 2020) (issuer's managerial efforts still required because at-issue blockchain had not even launched by time of litigation); *SEC v. LBRY, Inc.*, 2022 WL 16744741, at *2 (D.N.H. Nov. 7, 2022) (unlike in BNB's ICO, at least 30% of all LBRY reserved for issuer's managerial efforts to "spread[] usage and adoption," "reward[] early adopters," "recruit[] producers," "reward[] contributors to the community," and "form[] . . . institutional partnerships"); *United States v. Zaslavskiy*, 2018 WL 4346339, at *2 (E.D.N.Y. Sept. 11, 2018) (ICO scam in which no digital assets were "ever developed"); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (in contrast to the 4,000 available dApps on BNB Smart Chain, only "57 applications . . . offered opportunities to earn and/or spend Kin" at the time of the *Kik* litigation). That BNB was less decentralized at the time of its time-barred ICO does not affect its non-security status today, as senior SEC officials have recognized. *See, e.g.*, Ex. BH-25 (acknowledging that some circumstances militate in favor "reevaluating" the status of a "digital asset previously sold as a security").

discussed above, claims related to the BNB ICO are time-barred.  And even if Mr. Zhao claimed Binance.com had "several competitive advantages over other crypto exchanges" (*id.* at 43), that says nothing about purported efforts of BHL from which holders of BNB could reasonably expect to earn a profit.

BNB's value is not driven by efforts of BHL but rather is the function of the BNB Smart Chain ("BSC"), a decentralized and widely used blockchain that BHL does not control.  BSC is overseen by a rotating set of 29 active "validators"—individuals that help verify transactions on the blockchain—who govern the BSC by majority vote.  (Exs. BH-58; BH-59.)  Today, BHL is affiliated with only 6 of these 29 active validators.  (*See, e.g.*, Ex. BH-61.)  Indeed, the validators recently rejected a proposal from a BHL-affiliated validator in December 2022.  (*See* Ex. BH-33.)

This decentralization affects BNB traits central to the SEC's allegations.  (*See, e.g.*, MOL at 7-8 ("[i]n deciding to use Binance's profits to decrease the supply of BNB over time, Binance gave BNB investors a reasonable expectation of profits").)  While BHL created BNB's initial supply years ago, that supply is now governed by algorithmic and automated burns that can only be adjusted with the approval of BSC's validators.  (Exs. BH-26; BH-32.)

The vast array of activities now occurring on BSC also have little or nothing to do with BHL.  BSC is home to over 4,000 dApps (decentralized applications), built and used by the community.  (*See* Ex. BH-62.)  Together with BNB's supply decentralization, this demand decentralization means that BNB's value is tied to a global community of validators and developers who come together and collectively contribute to BSC's direction, growth and utility.

Finally, BHL is also unnecessary for individuals to transact in BNB.  Numerous third-party merchants accept BNB for everything from airfare and hotels, to hiring contractors, to flight

lessons and digital art.  (*See, e.g.*, Exs. BH-28, BH-30, BH-31.)   Users can also transact in BNB on many other exchanges.  (Ex. BH-27.)

Accordingly, there is simply no basis to conclude that, to the extent an individual profits from buying and selling BNB *today*, it is due to the *efforts of BHL*.  *Life Partners*, 87 F.3d at 548 (vacating preliminary injunction finding that the SEC had failed "to show that the promoter's efforts have a predominant influence upon investors' profits" as required by *Howey*).

### (ii) BUSD and Other Crypto Assets

The SEC also fails to carry its burden to show that it has a substantial likelihood of success that BUSD and the other "Crypto Asset Securities" traded on Binance.com meet the definition of an "investment contract."  15 U.S.C. § 77b(a)(1); Compl. ¶¶ 316, 352, 360, 364-509.

In fact, the SEC does not even seriously try.  (*See* MOL at 40.)  A discussion of BUSD–which the SEC alleges is a "security" (*see* Compl. ¶¶ 315-324), but does not address in its Brief–illustrates the point that the Court cannot conduct a one-size-fits-all analysis of digital assets under *Howey*.

BUSD is a U.S. dollar-backed "stablecoin."  (*Id.* ¶ 317.)  It is designed to maintain a constant value, fixed "on a 1:1 basis" to the U.S. dollar—in other words, it can be purchased for exactly a dollar and sold for exactly a dollar.  (*Id.*)  Historically, its value has experienced only *de minimis* price fluctuations.  (*See* Exs. BH-34, BH-35.)

Therefore, BUSD—like other stablecoins—offers no reasonable expectation of profits.  *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614 (D.C. Cir. 2000) ("the expected profits . . . , in conformity with ordinary usage, [must] be in the form of a financial return on the investment, not in the form of consumption.") (citation and quotation marks omitted).  Indeed, the very purpose of holding BUSD is to *avoid* the risks associated with speculative investment.  Instead of buying BUSD with the hopes of turning a profit, purchasers buy BUSD as a stable store of value.  (*See*

Exs. BH-36; BH-37.)   BUSD functions as a medium of exchange and facilitates trading and lending.  (*Id.*)  It also functions like a fiat currency, as it can be used for the sale and purchase of goods or to enable the transfer of funds.  (*See* Exs. BH-38 to BH-40.)

Importantly, using BUSD to trade in other digital assets or invest in other products does not equate to an expectation of profit *in BUSD*.  The SEC attempts to shoehorn BUSD into *Howey* by alleging that users might use BUSD to purchase *other products* or that BHL made a profit by *investing the proceeds* of selling BUSD.  (*See* Compl. ¶ 321.)  These allegations merely show that BUSD can be used to buy other assets or participate in other products, which themselves may or may not be securities.  But the fact that a dollar can be invested in a mutual fund, for example, does not make the dollar *itself* an investment contract.  The same is true for BUSD.

BUSD clearly does not fit within the first prong of *Howey* and therefore is not a "security."[13]

      **b)**      **BHL Is Not an "Exchange" or "Clearing Agency" for BAM.**

      **(i)**      **BHL is Not an "Exchange" with Respect to the Activities on Binance.US.**

The SEC cannot establish a substantial likelihood of success that BHL is an "exchange" under Section 5 with respect to any activities undertaken by Binance.US.

---

[13] To the extent BUSD fits within any existing federal regulatory framework (which BHL does not concede), it would be the Commodity Exchange Act ("CEA").  Similar to physical commodities, BUSD is intended for use and consumption. It meets the demand for a stable crypto asset during volatile market conditions, as users can turn to BUSD, which acts as fiat of the crypto market. Indeed, in a parallel enforcement proceeding against BHL, the CFTC has asserted that certain digital assets, including "at least two fiat-backed stablecoins, tether [ ] and the Binance USD ('BUSD'), . . . are 'commodities,' as defined under Section 1a(9) of the [CEA]."  *Commodity Futures Trading Commission v. Changpeng Zhao, et al.*, Case No. 1:23-cv-1887 (N.D. Ill. Mar. 27, 2023), ECF No. 1 at ¶ 24.  The parallel and conflicting enforcement actions by the CFTC (alleging that BUSD is a commodity under the CEA) and SEC (alleging that BUSD is a security under the Securities Act) are a travesty of fair notice and fair process.

First, the SEC's Brief (MOL at 46-48) focuses exclusively on the "group of persons" element of this claim, but wholly ignores that, *even if* BHL and BAM constitute a "group of persons" (as discussed below, they do not), BHL may only be liable under Section 5 of the Exchange Act if it performs the "functions commonly performed by a stock exchange as that term is generally understood" for BAM.  15 U.S.C. § 78c(a)(1).  Indeed, even a company that "creates an electronic marketplace for securities traders" does not create a "stock exchange" when its marketplace does not perform the "common functions" of a stock exchange as that term is "generally understood."  *Bd. of Tr. of City of Chi. v. SEC.*, 923 F.2d 1270, 1272 (7th Cir. 1991) (Posner, J.).  BHL does not operate Binance.US—the "electronic marketplace" at issue.  *Id.*  BHL merely licenses certain software to BAM, but performs none of the "functions" (e.g., maintaining a trading floor, specialists, brokers who trade for their own account) for BAM commonly associated with a stock exchange.  *Id.*; *see also* Ex. BH-41.)  Its licensing of software and provision of tech-support services (*e.g.*, hosting services, maintenance, support-desk services, incident-response) to BAM is not sufficient to find otherwise.  (Exs. BH-41 at 1-3; BH-42 at Ex. A.)

Second, BHL can be an "exchange" for purposes of Binance.US's activities only *if* BHL and BAM together constitute an "organization," "association," or "group of persons" with respect to those activities.  15 U.S.C. § 78c(a)(1).

The first two clearly do not apply, as the SEC appears to concede.  (*See* MOL at 46-48.) In the absence of a parent-subsidiary relationship, which does not exist here between BHL and BAM (Compl. ¶ 35), whether a *de facto* "joint venture[]" constitutes a statutory "group of persons" hinges on a further showing that the entities are "acting in concert" to operate an exchange. *Intercontinental Exch., Inc. v. SEC,* 23 F.4th 1013, 1024-25 (D.C. Cir. 2022).  The SEC cannot make that showing here.

As discussed above, BHL's mere provision of certain support services to BAM does not mean that the two distinct legal entities constitute a "group of persons" "acting in concert," much less to run a securities exchange within the ambit of Section 5.  To find otherwise would vastly expand the SEC's asserted jurisdiction over providers of technology.  *See Intercontinental Exch*, 23 F.4th at 1025 (cautioning that statutory terms in the securities laws should not be "stretched too far" lest those constructions "en[d] in an irrational extension of the SEC's jurisdiction").

### (ii)   BHL Is Not a "Clearing Agency" Under Section 17A for BAM.

The SEC also cannot establish that BHL is a "clearing agency" under Section 17A(b).  15 U.S.C. § 78q-1(b)(1); MOL at 49.  Even assuming the SEC can demonstrate that the digital assets traded on Binance.US are "securities," BHL's limited service provider role to BAM falls far outside the scope of Section 17A.

BHL performs none of the tasks that would qualify it as a clearing agency under Section 17A.  BHL does not "act[] as an intermediary in making payments or deliveries or both in connection with transactions in securities."  15 U.S.C. § 78c(a)(23).  The SEC's arguments are not perfectly clear, but they appear to be that, because BHL personnel allegedly had historical signatory authority over certain trust accounts holding BAM customer fiat deposits and because BHL played *some* historical role in the transfer of BAM customer assets between wallets, BHL constitutes a clearing agency under Section 17A.  (MOL at 19-20, 49-50.)  But all of the necessary functions to facilitate transactions on Binance.US are currently performed by BAM.  Although BHL licenses certain software to BAM, it is BAM – not BHL – that controls and operates the software.  (Ex. BH-42 at 1.)  BHL fulfills certain back-end support roles, but plays no part in matching traders or processing transactions.  (Ex. BH-42 at Ex. A.)

Contrary to the SEC's arguments (*see* MOL at 49), BHL *does not* "permit[] or facilitate[] the settlement of securities transactions" on Binance.US, or "provide[] facilities" for comparing data regarding settlement of transactions.  15 U.S.C. § 78c(a)(23).  In fact, BHL plays *no* role in the settlement of transactions on Binance.US.  (Ex. BH-42 at Ex. A).  Rather, BHL merely licenses to BAM the software used to operate the Binance.US platform.  (*See* Ex. BH-41.)

Further, BHL has not acted as a "custodian" of any of the digital assets on the Binance.US platform since at least December 2022.  15 U.S.C. § 78c(a)(23).  (*See* Ex. BH-43; *see also* BAM Opposition § Background D.2.)

### (iii)     Additional Important Considerations.

Finally, in addition to the fundamental securities law questions at issue, among the important issues that the SEC's Brief hurries past are the due process implications of whether this action was appropriately authorized by the Commission, when Chairman Gensler had personal interactions with Mr. Zhao and Binance personnel during the relevant time period and on matters now at issue. *See* ECF No. 26, Ex. A-74 at 5.

### 3.     The Court Lacks Personal Jurisdiction over Mr. Zhao and BHL.

The Court need not reach the issue of personal jurisdiction here, as Defendants' Proposed Consent Order provides that BHL and Mr. Zhao will consent to jurisdiction for the limited purpose of implementing and carrying out its terms.  Accordingly, there is no need to rush consideration of this important matter on the one-sided record available at the expedited TRO stage.  But it bears mention that the SEC's Complaint puts forward a highly distorted history of BHL's and Mr. Zhao's purported "contacts" with the United States, including by relying on documents (some of which are incomplete and produced by third parties) that BHL and Mr. Zhao had not seen prior to June

6, 2023 and have not had an adequate opportunity to test.  BHL and Mr. Zhao reserve all right to contest personal jurisdiction based on a fair and fully developed evidentiary record.

While this Court should address personal jurisdiction once the parties have had an opportunity to develop a full and fair record, Defendants note that the SEC presently seeks to establish personal jurisdiction, in part, on the basis of considerations that are legally insufficient. The SEC fails to meet its burden to establish sufficient "minimum contacts" with the United States "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *See Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023) (*citing Intl' Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  For example, even if the SEC sufficiently alleged Mr. Zhao's control person status over either BHL or BAM, control person liability alone does not confer personal jurisdiction.  *See In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 126 (D.D.C. 2003) (citation omitted).  Tacking on generalized allegations that Mr. Zhao is the "ultimate decision maker" of BHL or the beneficial owner and former board member of BAM (see Compl. ¶¶ 26, 85) does not change this result.  *See Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 40 (D.D.C. 2012).  And the SEC repeatedly relies on impermissible group pleading when discussing the alleged registration and control person violations.  *See* Compl. ¶¶ 209-236; *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 122 (D.D.C. 2008) (plaintiffs cannot "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant").  The SEC's inability to adequately plead personal jurisdiction over BHL or Mr. Zhao is a further reason to accept at most Defendants' Proposed Consent Order.

**C.**     **Entry Of A Temporary Restraining Order Is Not In The Public Interest**

To obtain a TRO, the SEC must show that "the public interest favors entry of a temporary restraining order."  *Stratton Oakmont*, 1994 WL 721502, at *3–4; *accord SEC v. Am. Inst. Couns., Inc.*, 1975 WL 440, at *19 (D.D.C. Dec. 30, 1975) (stating that the "[c]ourt, in exercising its

discretion in issuing a statutory restraining order or injunction, is guided by the primary objectives of the statute involved, *using public interest standards*") (emphasis added)).  The SEC fails to make such a showing here.

       **1.**     **The SEC Has Eschewed Rulemaking in Favor of Ad-Hoc Enforcement in Violation of the Administrative Procedure Act.**

The SEC's campaign to feel out its position on crypto through diffuse enforcement actions, rather than through formal rulemaking, cannot be squared with the Administrative Procedure Act ("APA").

The D.C. Circuit has explained that "[t]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). More specifically, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).  Agencies have some discretion to choose whether to proceed via rulemaking or adjudication.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947).  But that discretion is not boundless, and relying on ad hoc enforcement in lieu of rulemaking "amount[s] to an abuse of discretion."  *NLRB v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 294 (1974).

None of the traditional rationales for selecting adjudication over rulemaking apply here.  It is implausible to suggest that the SEC "could not reasonably foresee" the question of whether digital assets are securities.  *Chenery Corp.*, 332 U.S. at 202.  That question surfaced years ago, leading to irreconcilable comments from top SEC personnel.  Nothing prevents the SEC from supplying meaningful guidance to all market participants.

The choice that the SEC has essentially offered here—register or be sued—is arbitrary.  No realistic process currently exists for cryptocurrency issuers to register the offer and sale of digital

assets with the SEC or for cryptocurrency exchanges to register as a securities exchange, broker-dealer or clearing agent.  Top SEC personnel have underscored that gap: "[T]raditional disclosures are 'designed for traditional corporate entities that typically issue and register equity and debt securities.'"  (Ex. BH-44.)  This "focus on disclosure about companies, their management[,] and their financial results" make for a "poo[r] fit" with "the decentralized and open-source nature of blockchain-based digital asset securities."  (*Id.*)  The SEC cannot credibly claim a lack of awareness about this issue when it has been recognized at its highest levels.

The SEC's abuse of discretion is underscored by its various enforcement actions.  In the last three years alone, the SEC has filed a slew of civil actions against companies and individuals in the digital asset industry, including an enforcement action against Coinbase *the day after* initiating this action.  *See SEC v. Coinbase, Inc.*, No. 23-cv-04738 (S.D.N.Y. June 6, 2023).[14] Further underscoring the SEC's abusive and dilatory tactics is the fact that the SEC and CFTC themselves cannot decide which agency has jurisdiction to regulate the digital asset industry. (*Compare* Ex. BH-45 (Nikhilesh De, *SEC Chair Hints Some Stablecoins Are Securities*, COINDESK (July 21, 2021)), *with* Ex. BH-46 (*SEC's Gensler Says CFTC Authority Over Stablecoins Should Be Bolstered*, REUTERS (Oct. 14, 2022)).)  The agencies' inconsistent stances.[15] persist despite the fact that "securities and commodity futures and options are distinct—so distinct that Congress has erected different regulatory regimes and enforcement agencies for the

---

[14]  On April 26, 2023, Coinbase filed a Petition for Writ of Mandamus requesting that the Third Circuit require the SEC to take action on Coinbase's Petition for Rulemaking, which has been pending since July 2022.  *See* Petition, *In re Coinbase Inc.*, No. 23-1779 (3d Cir. filed Apr. 26, 2023), ECF No. 1.  On June 6, 2023, the Third Circuit ordered the SEC to respond the Mandamus Petition within seven days of the court's order.  *See* Order, *In re Coinbase Inc.*, No. 23-1779 (3d Cir. June 6, 2023), ECF No. 28.

[15]  *See supra* Note 13 (discussing the CFTC's pending enforcement action against BHL).

different financial products." *INTL FCStone Fin., Inc. v. Jacobson*, 2019 WL 2356989, at *7 (N.D. Ill. June 4, 2019).  Clarity via formal rulemaking is clearly necessary.

### 2. Granting the SEC's Requested Temporary Restraining Order Will Cause Significant Harm to the Public and the Digital Asset Industry.

It bears repeating that when the SEC seeks injunctive relief "the public interest . . . is paramount."  *SEC v. Gen. Refractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C. 1975).  Yet, the SEC's request for emergency relief will do just the opposite—inflict harm on the public and market participants where there is no factual basis to do so.

*First*, as set forth in BAM's opposition brief, granting the SEC's requested relief would primarily harm BAM's customers and effectively end BAM's business, and prevent BAM from defending itself in this litigation.  (*See* BAM Opposition §§ Argument I.B, III.)

*Second*, relief sought by the SEC would have wide-ranging and far reaching impacts beyond BAM and its customers.  As the SEC admits, Binance.com has millions of registered users in over 100 countries around the world and lists more than 350 cryptocurrencies.  (MOL at 2-3.) BHL and its affiliates provide banking alternatives to the unbanked, the underbanked, and other individuals in countries with relatively unstable currencies and underdeveloped banking infrastructures.  (*See* Exs. BH-48 to BH-50.)  Journalists have rightly recognized, moreover, that the SEC's action "represents an existential threat to the entire industry."  (Ex. BH-57.)  Indeed, as Mr. Harris describes in his declaration, "it is well understood that regulatory uncertainty could have adverse effects on market participants."  (Harris Declaration at ¶ 3.b; *see also id.* at ¶ 22.) Mr. Harris opines that "[i]n this case, the TRO appears to have created just the kind of regulatory uncertainty we generally tried to avoid [during his time at the SEC and CFTC]," and thus concludes that "the uncertainty of these legal outcomes could have a negative impact on the whole crypto economy."  (*Id.*)

This Court should not permit the SEC to inflict harm in the United States and worldwide by enacting the drastic relief sought by the SEC on an incomplete record and expedited schedule.

## V.     CONCLUSION

The Court should deny the SEC's request for a temporary restraining order.


Dated:  June 12, 2023                                   Respectfully submitted,


                                                          */s/ Daniel W. Nelson*
                                                        Michael Celio (*pro hac vice*)
                                                        GIBSON, DUNN & CRUTCHER LLP
                                                        1881 Page Mill Road
                                                        Palo Alto, CA 94304-1211
                                                        MCelio@gibsondunn.com

                                                        Mary Beth Maloney (*pro hac vice*)
                                                        GIBSON, DUNN & CRUTCHER LLP
                                                        200 Park Avenue
                                                        New York, NY 10166-0193
                                                        MMaloney@gibsondunn.com

                                                        Daniel W. Nelson (D.C. Bar #433415)
                                                        Jason J. Mendro (D.C. Bar #482040)
                                                        Stephanie Brooker (*pro hac vice*)
                                                        M. Kendall Day (*pro hac vice forthcoming*)
                                                        Richard W. Grime (*pro hac vice forthcoming*)
                                                        GIBSON, DUNN & CRUTCHER LLP
                                                        1050 Connecticut Avenue, N.W.
                                                        Washington, D.C.  20036-5306
                                                        DNelson@gibsondunn.com
                                                        JMendro@gibsondunn.com
                                                        SBrooker@gibsondunn.com
                                                        KDay@gibsondunn.com
                                                        RGrime@gibsondunn.com

                                                        *Attorneys for Defendant Binance Holdings
                                                        Limited*

  /s/ Abid R. Qureshi
Abid R. Qureshi (D.C. Bar No. 459227)
William R. Baker, III (D.C. Bar No. 383944)
Michael E. Bern (D.C. Bar No. 994791)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
abid.qureshi@lw.com
william.baker@lw.com
michael.bern@lw.com

Douglas K. Yatter (*pro hac vice pending*)
Benjamin Naftalis (*pro hac vice pending*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
douglas.yatter@lw.com
benjamin.naftalis@lw.com

Heather A. Waller (*pro hac vice pending*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
heather.waller@lw.com

Melanie M. Blunschi (*pro hac vice pending*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: (415) 391-0600
Fax: (415) 395-8095
melanie.blunschi@lw.com

*Attorneys for Defendant Changpeng Zhao*