**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               *Plaintiff*,<br><br>v.<br><br>BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO,<br><br>               *Defendants*. | No. 1-23-cv-01599-ABJ |

**DECLARATION OF J. Gregory Eastman**

      I, J. Gregory Eastman, hereby declare under penalty of perjury that the following is true and correct:

**I.      Relevant Professional Background**

1.      I am a Senior Vice President at Cornerstone Research, an economic consulting firm.  I received my B.A. from the University of Kansas and my Ph.D. in Economics from Harvard University.  I have more than 25 years of experience addressing complex financial, economic, and accounting issues arising in litigation and regulatory matters.

2.      I have led a variety of consulting projects involving accounting and financial reporting issues.  In these matters, I have evaluated the adequacy of disclosures, fair value and asset impairments, materiality, goodwill, accounting for losses, deferred taxes, concentrations of risk, and revenue recognition.  I have also evaluated issues pertaining to whether financial statements were prepared in accordance with generally accepted accounting principles ("GAAP") and whether audit and review procedures complied with generally accepted auditing standards ("GAAS").  I have led engagements involving the computation of damages and assessment of liability in multiple industries, including financial, insurance, oil, transportation, electric utilities, nuclear utilities, energy, private equity, and medical services.

3.      I have extensive experience reviewing company financial statements to determine profitability of companies, divisions, or product lines.  I have reviewed detailed and specific expense items to determine potential cost efficiencies and synergies for merger transactions.  I have reviewed detailed trading records and account balances with respect to investigations of market timing in mutual funds, reviews of financial products portfolios including junk bonds, equities, hedge fund assets and derivatives, multinational related-party transactions, multinational cash management systems, and structured financial transactions.

4.      I have testified on behalf of the U.S. Department of Justice and the Canadian Competition Bureau on failing firm and efficiency issues in challenged merger cases.  I have presented data and analysis to the U.S. Department of Justice, the Commodities Futures Trading Commission, the Federal Bureau of Investigation, the Competition and Markets Authority, the Environmental Protection Agency, and the California Air Resources Board.

5.      This section only includes my relevant experience and does not include my full professional background.  A copy of my curriculum vitae, which includes a list of my publications over the last 10 years, and a list of my testimony over the last four years, is attached as Appendix A.

## II.    Scope Of Opinion

6.      I have been retained by counsel for Binance Holdings Limited ("BHL") for the purpose of addressing certain concepts that the Securities and Exchange Commission ("SEC") is relying on in its Proposed Temporary Restraining Order Freezing Assets, Granting Other Relief, and Order to Show Cause Why Relief Should Not Continue, filed on June 6, 2023 (the "Proposed TRO"), which includes a demand by the SEC for an "accounting" by each Defendant for certain information for the period beginning January 1, 2023.  Specifically, I have been asked to respond to the First and Second Declarations of Sachin Verma, executed on June 5, 2023, and filed on June 7, 2023, on behalf of the SEC, including the opinions and information within the declarations (hereafter, "Verma Declaration I" and "Verma Declaration II").

### III.     Summary Of Opinions

7.     Based on my review and analysis of the materials produced in this matter, I have formed the following opinions:

    a. Mr. Verma has presented no evidence that BAM Trading Services Inc. ("BAM Trading") and BAM Management US Holdings Inc. ("BAM Management" and, collectively with BAM Trading, "BAM") customer assets are at risk.  The audited financial statements that the SEC submitted in support of its requested relief indicate that BAM maintains accounts for its customer funds that are segregated from other cash funds used in the ordinary course of business.  Mr. Verma fails to identify which, if any, of the bank accounts he has analyzed now hold or ever held BAM customer assets.  As a result, he has presented no evidence that BAM customer assets are at risk and provides no methodology to calculate whether customer assets have been improperly transferred extraterritorially or improperly commingled.  *See* Section VII for additional details.

    b. Mr. Verma portrays an incomplete picture of the financial activities of BAM making his analysis incomplete and unreliable.  Mr. Verma's analysis only relates to a subset of BAM Trading's bank account activity, but BAM Trading's audited financial statements that the SEC submitted in support of its requested relief demonstrate that BAM Trading maintained significant assets in bank accounts other than the few accounts at Silvergate and Signature Bank that Mr. Verma selectively references in his declarations.  *See* Section VIII for additional details.

    c. Mr. Verma's analysis includes references to six non-US entities but fails to show that any of the transactional activity at these non-US entities is relevant to the relief sought by the SEC in the present motion, fails to show that these activities are related to BAM or to funds held by BAM customers, and fails to show that these transactions were not made in the ordinary course of business.  *See* Section IX for additional details.

    d. Mr. Verma's summary of BAM Trading's transactional activity is incomplete and unreliable because he analyzes only a subset of counterparty transactions and for the counterparties he does address, he does not present a full analysis of their

activity making his summary incomplete and unreliable.  The counterparty transactions summarized by Mr. Verma involve well-known companies that operate in the cryptocurrency space.  Mr. Verma fails to show why transactions with these entities do not represent typical transactions that are part of BAM's ordinary course of business.  *See* Section X for additional details.

e.  Verma Declaration II does not address BAM Trading's profitability at the operating profit or net income level.  Mr. Verma's Declaration relies on a Gross Profit metric when assessing BAM's profitability; however, this methodology does not account for the operating expenses and ordinary costs necessary to operate a business.  Operating Profit, not Gross Profit, is the more appropriate metric to use for assessing BAM's profitability.  *See* Section XI for additional details.

f.  An accounting as proposed by the SEC would require a significant undertaking given the volume, complexity, and locations of the data, records, and custodians involved and would require a significant investment of both time and resources.  BAM is a large and active business that processes thousands of transactions each month.  A complete accounting of these transactions would require a time and resource-intensive review of each of these transactions.  *See* Section XII for additional details.

## IV.    Materials Relied Upon

8.    A list of the materials I relied upon in preparing this declaration is attached as Appendix B.  However, I have not been able to review in full all of the documents provided to BHL on Friday, June 9, 2023, and Saturday, June 10, 2023, less than one business day or two calendar days prior to the date of this declaration.  I understand that the materials were provided in support of the Proposed Temporary Restraining Order (the "TRO") and represent the supporting materials referenced in the Verma Declarations.  These materials contain more than 10,000 documents comprising millions of pages of materials, including financial statements, third party bank account documents, electronic communications, various contracts and agreements between parties, and financial data.  It is my understanding that prior to the SEC's productions of June 9-10, BHL did not have access to these third-party documents (other than a small subset that were

produced by BHL to the SEC).  My work in this matter is ongoing, and I reserve the right to supplement my opinions, including in the event that additional information is provided to me or submitted in connection with this matter.

## V.    Independence Of Opinions And Compensation

9.    The analyses and opinions expressed in this report are my own.  Cornerstone Research is billing $1,095 per hour for my work on this matter.  I have been assisted by staff of Cornerstone Research, who worked under my direction.  Neither my nor Cornerstone Research's compensation is contingent or based on the content of my opinion or the outcome of this matter.

## VI.    Background

10.    Binance was founded by Changpeng Zhao ("CZ" or "Zhao") in July 2017 and has grown to become one of the world's leading blockchain ecosystems.[1]  Its stated mission is to "provide the core infrastructure services for organizing the world's crypto,"[2] and its suite of products "includes the largest digital asset exchange" in the world.[3]  Binance's digital asset trading platform operates in countries worldwide ("Binance.com").[4]

11.    BAM Trading, headquartered in San Francisco, California, commenced operations on February 4, 2019 and is a wholly-owned subsidiary of BAM Management.[5]  As described below, BAM Trading licenses the software underlying Binance.com from BHL to operate its digital asset trading platform for the United States market, Binance.US.[6]  Binance.US launched in

---

[1] Citations to "Ex. BH-__" are to the Declaration of Mary Beth Maloney in Support of the Joint Memorandum of Law on Behalf of Defendants Binance Holdings Limited and Changpeng Zhao in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order ("Maloney Decl.").
*See* Ex. BH-64, "About," Binance, https://www.binance.com/en/about, accessed June 10, 2023.
[2] *See* Ex. BH-65, "Mission," Binance, https://www.binance.com/en/mission, accessed June 10, 2023.
[3] *See* Ex. BH-64, "About," Binance, https://www.binance.com/en/about, accessed June 10, 2023.
[4] *See* ECF No. 22 ("Verma Declaration II"), at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 772.
[5] *Id*.
[6] *Id*. at 772, 785.

September 2019 and "provides secure and reliable digital asset trading and a hosted wallet service to its users."[7]

12.     According to BAM Trading's audited financial statements for the periods ending December 31, 2020, December 31, 2021, and December 31, 2022, BAM Trading "derives revenue from various digital asset transaction services.  The Company derives a majority of its revenue from exchange transactions, where users can buy, sell or convert digital assets on the platform for an exchange service fee.  The Company also derives revenue from deposit fees when customers use credit cards to deposit funds into their platform account, as well as from withdrawal fees when a customer requests a transfer of their funds out of their platform account."[8]  BAM Trading also incurred operating costs, including "Crypto Trading Network Fees," "Web Hosting and Other Exchange Costs," "Legal and compliance fees," Compensation and benefits," and "Advertising and marketing fees" to support its business operations.[9]

13.     As disclosed in the "Related Party Transactions" note of BAM Trading's audited financial statements, BHL and BAM Trading entered into several licensing and service support agreements, including:[10]

> a.  <u>Software License Agreement:</u> Grants BAM Trading a license to allow BAM Trading to operate a digital currency trading platform in the U.S. market.
>
> b.  <u>Master Services Agreement:</u> Dictates the licensing terms and prescribes the hosting and support services BHL will provide to BAM Trading.
>
> c.  <u>Trademark License Agreement:</u> Grants BAM Trading a license to use certain BHL trademarks.[11]

---

[7] *Id*. at 772.

[8] "Fees are charged at the transaction level and represents a single performance obligation. The Company has determined it is an agent in the transaction between customers and presents revenue for the fees earned on a net basis."  *Id*. at 813.

[9] *See* ECF No. 22, Verma Declaration II, at Ex. C-2, BAM Trading Service Inc., Income Statement Details as of April 30th, 2023.

[10] *See* ECF No. 22, Verma Declaration II, at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 785.

[11] The "Related Party Transactions" also discloses a Wallet Custody Agreement between BHL and BAM.  I understand from BHL that the description of this Agreement in the financial statements may not be accurate. I note it here for completeness, but the status of that Agreement is not determinative to my conclusions.

14.     Under the terms of these agreements, BAM Trading incurred certain operating expenses, such as Royalty and IT Support expenses.[12]  For the periods ending December 31, 2019, December 31, 2020, December 31, 2021, December 31, 2022, and April 30, 2023 such expenses were as follows:

**Figure 1**

|  | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Royalty Expense | $         - | $         427 | $      10,827 | $        3,805 | $        1,527 |
| IT Support | $         - | $         127 | $         127 | $         127 | $         42 |
| **Total** | **$         -** | **$         554** | **$      10,954** | **$        3,932** | **$        1,569** |

Source:  Verma Declaration II, Exhibit C-2, BAM Trading Services, Inc., Income Statement Details as of April 30, 2023

## VII.   Mr. Verma Has Presented No Evidence That BAM Customer Assets Are At Risk And Mr. Verma Does Not Provide A Methodology To Assess Whether Customer Assets Have Ever Been Improperly Transferred Out Of The United States Or Whether They Have Been Improperly Commingled

15.     Mr. Verma's analysis does not provide evidence that BAM customer assets are presently, or have ever been, improperly handled.[13]  This is because his declaration fails to identify which, if any, of the analyzed bank accounts hold BAM customer assets and which, if any, of the transfers from BAM to other entities involved customer assets.  Furthermore, he does not provide any methodology to assess which, if any, of BAM's accounts hold customer assets, or to assess which, if any, of the transactions at issue involve BAM customer assets.

16.     At no point in Mr. Verma's declarations does he conclude that any BAM customer assets were ever commingled or transferred improperly.[14]  And none of the documents Mr. Verma cites indicate that any of the accounts discussed in Verma Declaration I are currently or were ever used to maintain BAM customer assets.

---

[12] ECF No. 22, Verma Declaration II, at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 785.

[13] In this declaration, by "customer assets," I specifically refer to fiat assets and funds that have been purportedly analyzed by Mr. Verma.  I have not been asked to analyze or opine on issues related to digital assets of BAM Trading or BAM's customers.

[14] Mr. Verma asserts that "Binance related accounts" commingled funds at certain entities, however, he makes no conclusions regarding whether BAM customer assets were ever commingled or transferred improperly.  ECF No. 21, Verma Declaration I, at ¶ 12.

17.     Mr. Verma's declaration summarily analyzes BAM's accounts with Silvergate and Signature banks, but he fails to identify whether customer assets are held within these accounts. The evidence I have reviewed indicates that BAM Trading held eight accounts at Silvergate Bank and seven accounts at Signature Bank,[15] and that BAM Management held four accounts at Silvergate Bank and four accounts at Signature Bank.[16]  In my experience, it is often the case that companies utilize separate bank accounts for different purposes.  BAM's financial statements indicate that BAM followed these common practices and segregated its customer and corporate assets into separate bank accounts.  BAM Trading's audited financial statements show that the company segregates customer funds and company assets as separate line items on its balance sheet.[17]  The audited financial statements disclose that:  "Customer custodial funds represent cash and cash equivalents held in Company controlled bank accounts that are **held for the exclusive benefit of customers**."[18]  These financial statements demonstrate that BAM establishes accounts for its fiat customer funds *separately* from other cash funds used in the ordinary course of business.

18.     Mr. Verma's declaration does not indicate that he has conducted an analysis to determine whether any of the accounts he has analyzed currently hold or at any point in time held customer assets.  Based on my review so far of the supporting documents filed along with Mr. Verma's Declarations, I have not identified any documents that specify which BAM accounts hold or held customer assets.  Nor does Mr. Verma claim that any of the accounts or transactions he has analyzed involved BAM customer assets.

---

[15] Based on my review to date, the BAM Trading accounts at Silvergate included:  5090021113; 5090021121; 5090021295; 5090023424; 5090023432; 5090026245; 5090031377; and 5090037416.  *See* Ex. BH-67, 2 H360 - BAM Trading Services Inc.xlsx.

[16] Based on my review to date, the BAM Management accounts at Silvergate included: 5090014563; 5090019810; 5090037846; and 5090037853.  *See* Ex. BH-68, 1 H360 - BAM Management US Holdings Inc.xlsx

[17] ECF No. 22, Verma Declaration II, at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 768; ECF 19-10, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798– BTS00833823 at 802.

[18] ECF No. 22, Verma Declaration II, at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 774; ECF No. 19-10, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798–BTS00833823 at 811 (emphasis added).

19.     Mr. Verma identifies three transactions that he asserts involved transfers of commingled funds.  Mr. Verma states that "[m]illions of dollars from Binance related accounts were commingled in Merit Peak's accounts."[19]  He then goes on to summarize transfers from three entities into a Merit Peak account, only one of which was sent from BAM Trading.[20]  However, Mr. Verma does not offer any evidence that these transactions involved commingled funds or BAM customer assets, and I have not seen any documentary evidence that supports this conclusion.  In addition, all three of these transactions occurred in 2021.  Even supposing these transactions were somehow improper (I have not seen any evidence that they were) because they occurred approximately two years ago they do not necessarily offer any insight regarding the current safety of BAM customer assets.

## VIII.   Mr. Verma Portrays An Incomplete Picture Of The Financial Activities Of BAM Trading Making His Analysis Incomplete and Unreliable

20.     Mr. Verma's analysis only addresses a subset of BAM's account activity.  First, he acknowledges that his analysis only relates to BAM accounts held at Signature Bank and Silvergate Bank.  However, BAM Trading's audited financial statements indicate that these banks only handled a portion of the funds held by the company.

21.     BAM Trading has audited financial statements for the periods ended December 31, 2020, December 31, 2021, and December 31, 2022.[21]  The auditor's reports reflects that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of BAM Trading, in accordance with generally accepted accounting principles in the United States.[22]  BAM Trading's audited financials indicate that BAM Trading had bank

---

[19] ECF No. 21, Verma Declaration I, ¶ 12.

[20] *Id*. (identifying transfers into Merit Peak's accounts from Key Vision, Prime Trust (through BAM Trading), and Bifinity UAB (through BHL)).

[21] ECF No. 22, Verma Declaration II, at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785; ECF No. 19-10, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798–BTS00833823; ECF No. 19-11, Ex. A-75, BAM Management US Holdings Inc., Financial Statements as of December 31, 2019 and for the Period from February 4, 2019 (Inception) through December 31, 2019, BTS00031479.

[22] Auditing standard AU-C 200.04 states, "The purpose of an audit is to provide financial statement users with an opinion by the auditor on whether the financial statements are presented fairly, in all material respects, in accordance with an applicable financial reporting framework,

accounts other than those at Silvergate Bank and Signature Bank.  For example, in its 2022 audited financial statement, BAM Trading disclosed that "[a]s of December 31, 2022, the Company had $143,298,844 and $37,911,076 of cash and cash equivalents, restricted cash and customer custodial funds held at Silvergate Capital Corp. and Signature Bank, respectively," a total of approximately $180 million.[23]  Yet a review of BAM Trading's balance sheet demonstrates that the company held over $245 million of cash and cash equivalents, restricted cash and customer custodial funds as of December 31, 2022.  *See* Figure 2.  This difference indicates that as of year-end 2022, BAM Trading held over $64 million in accounts other than those at Silvergate and Signature Banks.[24]

**Figure 2**

|  | | 2022 |
| --- | --- | --- |
| Cash and cash equivalents | $ | 75,643,897 |
| Restricted cash | | 22,754,309 |
| Customer custodial funds | | 146,995,183 |
| Total – Amounts Held [A] | $ | 245,393,389 |
| | | |
| Silvergate Bank | $ | 143,298,844 |
| Signature Bank | | 37,911,076 |
| Total – Silvergate and Signature [B] | $ | 181,209,920 |
| | | |
| **Amounts Not Held at Silvergate or Signature [A] - [B]** | **$** | **64,183,469** |

Source:  TRO Exhibit A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798– BTS00833823

22.     Trading companies routinely have significant flows of funds into and out of accounts in the ordinary course of business in response to standard trading activity, and other normal operating activity.  Because Mr. Verma has not analyzed a complete set of accounts, his analysis

---

which enhances the degree of confidence that intended users can place in the financial statements."  *See* Ex. BH-66.

[23] *See* ECF No. 19-10, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798– BTS00833823 at 809.

[24] BAM Trading also disclosed in its audited financial statements that "Customer custodial funds do not include approximately $279 million of customer funds, as of December 31, 2022, that were directly custodied by Prime Trust under separate contractual arrangements between Prime Trust and the customer." Mr. Verma also fails to identify or analyze customer funds held under those agreements.  *See* ECF No. 19-10, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798–BTS00833823 at 817.

of the flow of funds into and out of BAM Trading is incomplete and, therefore, cannot be relied upon to accurately portray the reality of the company's transactional history or to suggest improper conduct.

### IX.   Mr. Verma Does Not Provide Evidence That Any Of The Transfers He Identifies Are Out of Ordinary Course of Business

23.    I understand that the SEC is seeking an order to "Freez[e] The Assets of BAM Management and BAM Trading."[25]  Given that the SEC's proposed relief in the form of an asset freeze only relates to the BAM entities, Mr. Verma's analyses do not show what, if any, of the activity related to entities other than BAM Management and BAM Trading are relevant.

24.    In addition to his review of a limited set of bank accounts associated with BAM entities, Mr. Verma reviewed Silvergate and Signature Bank account statements related to the following non-U.S. entities:[26]

    a.   Binance is "a Cayman Islands company."[27]

    b.   Binance Capital Management Co Ltd. ("Binance Capital") is "a British Virgin Islands company."[28]

    c.   Binance (Switzerland) AG ("Binance Switzerland") is "a Swiss company."[29]

    d.   Sigma Chain AG ("Sigma Chain") is "a Swiss company"[30]

    e.   Merit Peak Limited ("Merit Peak") is "a British Virgin Islands company"[31]

    f.   Key Vision Development Limited ("Key Vision") is "a Seychelles company"[32]

25.    Mr. Verma provides no evidence or analysis that shows why the transactional activity of these non-US entities demonstrates that BAM commingled or otherwise misused customer funds. Furthermore, Mr. Verma has not shown that these accounts are related to BAM, nor has he tied

---

[25] *See* ECF No. 4-1, Proposed TRO, at p. 1.

[26] I have not seen documents indicating whether or not the non-US entities held accounts at banks other than Silvergate and Signature Bank.  To the extent they did, Mr. Verma's analysis of the non-US entities is also incomplete and unreliable.

[27] *See* ECF No. 21, Verma Declaration I, ¶ 8(j).

[28] *Id*. at ¶ 8(k).

[29] *Id*. at ¶ 8(i).

[30] *Id*. at ¶ 8(e).

[31] *Id*. at ¶ 8(c).

[32] *Id*. at ¶ 8(a).

any of the transactional activities at these entities to any customer funds of BAM.  For example, in his analysis of BHL's Silvergate and Signature bank accounts, Mr. Verma identifies transactions between BHL and ten entities.[33]  Notably, Mr. Verma does not identify any transactions between BHL and either BAM entity in these accounts.  The same pattern holds true for Binance Capital's accounts, Binance Switzerland's accounts, and Key Vision's accounts.[34]  Mr. Verma's declaration does not analyze a single transaction between a BAM entity and these accounts.

26.     Mr. Verma does identify transactions flowing between the BAM entities and both Merit Peak and Sigma Chain.  I understand that Sigma Chain is a major market maker on the Binance.US platform.[35]  It is my understanding that both entities worked with, or traded on, the Binance.US platform in potentially large volumes.

27.     Mr. Verma notes that Merit Peak's account at Silvergate received $1.2 billion from BAM Trading between 2019-2023, while Sigma Chain's Silvergate account paid BAM Trading a net of $15 million during that period.[36]  Mr. Verma then indicates that funds that flowed into Merit Peak from BAM Trading were subsequently paid to Paxos Global PTE Ltd.  Mr. Verma suggests these transactions indicate Binance "commingled funds at Merit Peak" for further transfer to Paxos.[37]  However, Mr. Verma provides no evidence to suggest that the flow of funds to Merit Peak, Sigma Chain, or Paxos represent a commingling of BAM customer assets, or anything other than ordinary course of business payments from BAM to a corporate customer.[38]  And none of the documents cited by Mr. Verma provide any indication that any of the transfers to Merit Peak, Sigma Chain, or Paxos were anything but ordinary course of business transactions.

---

[33] *Id.* at ¶¶ 8(j), 10(f).

[34] *Id.* at ¶¶ 8, 10.

[35] *See* ECF No. 16-4, Ex. A-28; ECF No. 18-10, Ex. A-58; ECF No. 18-11, Ex. A-59.

[36] Mr. Verma's declaration notes that Sigma Chain's Silvergate account received $145 million from BAM Trading and paid $160 million to BAM Trading, implying a net debit of $15 million. ECF No. 21, Verma Declaration I, ¶¶ 8(c)-(f).

[37] ECF No. 21, Verma Declaration I, ¶ 12.  Mr. Verma also suggests that funds from Key Vision and BHL that were transferred to Merit Peak also flowed to Paxos.

[38] In addition, he fails to explain why the fund flows between Merit Peak and Sigma Chain and Paxos would indicate anything abnormal, as these trading firms could have transacted with Paxos in order to, for example, mint or redeem BUSD during the normal course of business.

## X.   Mr. Verma's Summary Of BAM Trading's Transactional Activity Is Incomplete And Unreliable

28.   In Paragraph 8(h) of Verma Declaration I, Mr. Verma claims to provide a summary of BAM Trading's Silvergate account history between 2019 and 2023.[39]  However, the summary provided by Mr. Verma is incomplete and inaccurate.  It is, therefore, not reliable.

29.   First, the summary addresses BAM Trading's history with respect to a fraction of the counterparties that interacted with BAM Trading's Silvergate Bank accounts.[40]  Mr. Verma includes a summary of the transfers to and from eleven entities, while neglecting any discussion of the other 34 counterparties that interacted with the account.  In so doing, Mr. Verma excludes from his analysis 4,807 transactions totaling nearly $1 billion ($510 million in withdrawals and $468 million in receipt of funds).[41]

30.   Second, Mr. Verma offers no discussion of why his analysis was limited to and focused on transfers to and from these entities, many of which are well-known crypto trading firms.  It is not surprising that BAM Trading would transact with these entities on a regular basis given each company's role as a player in the crypto trading space:

   a.   Prime Trust is one of the payment processors that BAM relies on for customer payments.  Prime Trust also creates application programming interfaces ("APIs") that "power the world's leading crypto exchanges, NFT creators, digital wallets, Alternative Trading Systems, RIA platforms, broker dealers, crowdfunding platforms, and neobanks."[42]

---

[39] Mr. Verma also provided a summary of BAM Trading's Signature Bank account.  Mr. Verma simply states, "[b]etween 2019 and 2023, deposits and withdrawals exceeded $500 million." ECF No. 21, Verma Declaration I, ¶ 10(b).  However, in my review of the underlying documents produced by the SEC in support of Mr. Verma's declaration, I have not been able to identify documents with sufficient detail to analyze the transactions in this account.

[40] BAM Trading held eight accounts at Silvergate Bank.  *See* Ex. BH-68, 1 H360 - BAM Management US Holdings Inc.xlsx.  Mr. Verma's analysis appears to have been limited to a single bank account on the Silvergate Exchange Network ("SEN," and specifically account number 5090023432).  By only summarizing the BAM Trading's SEN account, Mr. Verma is potentially excluding thousands of transactions with hundreds of other counterparties.

[41] *See* Ex. BH-67, 2 H360 - BAM Trading Services Inc.xlsx.

[42] *See* Ex. BH- 69, "About," Prime Trust, https://www.primetrust.com/about.

    b. Wintermute is "a leading algorithmic trading firm that is focused on the innovative digital asset markets."[43]

    c. Subspace is "a fourth generation blockchain built for the next wave of crypto creators."[44]

    d. Coinbase "offer[s] a trusted and easy-to-use platform for accessing the broader cryptoeconomy."[45]

    e. KBIT Global is "a global quantitative trading firm in the digital assets space."[46]

    f. Auros Tech Limited is "an algorithmic trading and market making firm that delivers best-in-class liquidity for exchanges and token projects."[47]

    g. Tagomi Trading LLC, a "digital asset trading firm," was acquired by Coinbase in 2020.[48]

31.    Third, further analysis revealed that Mr. Verma only summarized transfers if they were made on the Silvergate Exchange Network ("SEN" or "SEN Transfers").[49]  In so doing, Mr. Verma did not take into consideration transactions with non-Silvergate bank accounts, and he also did not take into account all other means of transferring funds (e.g., wire transfers, ACH transfers, checks, deposits).  By limiting his analysis to SEN Transfers, Mr. Verma neglected 52,457 transactions worth nearly $2.5 billion (approximately $1.2 billion in withdrawals and over $1.3 billion in receipt of funds).[50]  *See* Figure 3.

---

[43] *See* Ex. BH-70, "About," Wintermute, https://www.wintermute.com/about/.

[44] *See* Ex. BH-71, "Subspace Network," Subspace Network, https://subspace.network/.

[45] *See* Ex. BH-72, "About," Coinbase, https://www.coinbase.com/about.

[46] *See* Ex. BH-73, "Kbit," Kbit, https://www.kbit.com/.

[47] *See* Ex. BH-74, "About," Auros Global, https://www.auros.global/about/.

[48] *See* Ex. BH-75, "Coinbase Buys Crypto Trading Firm Tagomi To Boost Institutional Trading Business," *Forbes*, March 27, 2020.

[49] *See* Ex. BH-67, 2 H360 - BAM Trading Services Inc.xlsx.  Note, transfers on the Silvergate Exchange Network are identified by filtering column "R" ("EDD Acct Type") for "SEN."

[50] Note, these figures exclude accounts where BAM Trading is identified as the "Counterparty" (i.e., when BAM Trading is making transfers between its own accounts).

**Figure 3**



32.     Finally, for those counterparties for which Mr. Verma did summarize their transaction history with BAM Trading, Mr. Verma's summary is incomplete.  For example, Mr. Verma notes that BAM Trading received "$326 million from Tagomi Trading LLC;" however, he does not note that BAM Trading sent Tagomi Trading LLC $537,667,481, resulting in a net payment of $200 million.[51]  Similarly, Mr. Verma notes BAM Trading received "$424 million from Coinbase" but account records show that BAM Trading sent Coinbase $119,448,945, meaning Mr. Verma's summary misstates the relationship between these two entities by over $100 million.[52]

## XI.     Mr. Verma's Declaration Does Not Address BAM Trading's Profitability At The Operating Profit Or Net Income Level And Is, Therefore, Not Reliable

33.     The Second Verma Declaration calculates Gross Profit for BAM Trading for the period February 2019 through April 2023 using BAM Trading's financial statements as being

---

[51] Compare ECF No. 21, Verma Declaration I, ¶ 8(h), with Ex. BH-67, 2 H360 - BAM Trading Services Inc.xlsx.
[52] *Id.*

$224,676,408.[53]  Figure 4 below shows the Total Revenue and Gross Profit figures Mr. Verma presents in his Second Declaration.  However, Mr. Verma fails to explain why Gross Profit is the appropriate metric to assess BAM Trading's profitability.  Net Profit, rather than Gross Profit, is the appropriate metric to determine the net economic benefit from the company's activities. When I utilized two Net Profit metrics, Operating Profit and Net Income, to assess BAM's profitability, the results differed significantly from Mr. Verma's flawed analysis.

**Figure 4**

| Year | Total Revenue[1] | | Gross Profit |
|---|---|---|---|
| 2019[2] | $ | 254,184 | $ | 138,983 |
| 2020 | | 11,002,835 | | 5,352,417 |
| 2021 | | 265,850,338 | | 147,178,971 |
| 2022 | | 95,585,671 | | 51,112,209 |
| 2023[3] | | 38,208,558 | | 20,891,828 |
| **Total** | **$** | **410,901,585** | **$** | **224,674,408** |

Source:  Verma Declaration II, Exhibit C-5

Note:
[1]  Total Revenue and Gross Profit reflect the figures shown in Exhibit C-5 of Verma Declaration II.
[2]  Mr. Verma includes 2019 figures from February 4 through December 31, 2019.
[3]  Mr. Verma includes 2023 figures from January 1 through April 30, 2023.

34.     In my experience, Gross Profit is not the most accurate metric to assess the profitability of a company.  Gross Profit is defined by Mr. Verma as "the amount of total minus cost of revenue."[54]  This methodology does not account for the operating expenses and ordinary costs necessary to operate a business.  Instead, a Net Profit metric, such as Operating Profit or Net Income, is a more appropriate metric because these methodologies do account for the numerous ordinary business costs that are necessary to support the business operation but not captured in a Gross Profit calculation.  I also understand from counsel that it is common practice for the SEC to use a "net profit" figure, such as Operating Profit or Net Income, rather than a Gross Profit figure, when assessing disgorgement.[55]

---

[53] *See* ECF No. 22, Verma Declaration II, ¶¶ 9-11, Ex. C-5.
[54] *Id*. at ¶ 9.
[55] *See, e.g., Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020) ("Congress prohibited the SEC from seeking an equitable remedy in excess of the defendant's *net* profits from wrongdoing") (emphasis added).

35.     Mr. Verma's calculation of BAM Trading's Gross Profit resulted in his overstating the company's profitability during the relevant period.  This is so because his calculation does not take into consideration the significant operating costs of BAM Trading's business.  For instance, in 2022, the last year for which there is a complete set of audited financial statements, while BAM Trading had revenue of $95.6 million, it incurred significant costs including: operating expenses of $130.2 million, crypto asset impairments of $16.8 million, and a cost of revenue of $44.5 million.[56]  Mr. Verma's Gross Profit calculation of BAM Trading's profitability does not take into account *any* such costs.  When these significant costs are taken into account, BAM Trading and an Operating Loss for 2022 of $95.9 million.[57]

36.     BAM Trading's profitability show that the company had an Operating Loss from February 2019 to April 2023 of over $72 million.  *See* Figure 5.  In other words, BAM Trading operated at a loss of slightly more than $72 million dollars between February 4, 2019 and April 20, 2023.  For the sake of completeness, I also calculated what BAM Trading's Operating Profit would be if the approximately $17 million dollars incurred by BAM Trading due to its agreements with BHL are excluded from the model.  Under this formulation, BAM Trading's Operating Loss was just over $55 million in the relevant period.[58]

---

[56] ECF No. 22, Verma Declaration II, Ex. C-2, BAM Trading Inc., Income Statement Details as of April 30, 2023.
[57] ECF No. 22, Verma Declaration II, Ex. C-2, BAM Trading Inc., Income Statement Details as of April 30, 2023.
[58] *Id*.

**Figure 5**

| Year | Total Revenue [1] | Operating Profit (Loss) [2] | BHL Royalty Expense and IT Support [3] | Adjusted Operating Profit [4] = [2]+[3] |
|---|---|---|---|---|
| 2019[5] | $ 254,184 | $ (2,662,000) | $ - | $ (2,662,000) |
| 2020 | $11,002,835 | (3,358,875) | 554,500 | (2,804,375) |
| 2021 | $265,850,338 | 62,757,354 | 10,954,647 | 73,712,001 |
| 2022 | $95,585,671 | (95,923,581) | 3,932,102 | (91,991,479) |
| 2023[6] | $38,208,558 | (33,269,000) | 1,569,000 | (31,700,000) |
| **Total** | **$ 410,901,585** | **$ (72,456,102)** | **$ 17,010,249** | **$ (55,445,853)** |

Source: Verma Declaration II, Exhibit C-5; TRO Exhibit A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798– BTS00833823; Verma Declaration II, Exhibit C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785; Verma Declaration II, Exhibit C-2, BAM Trading Services, Inc., Income Statement Details as of April 30, 2023

Note:
[1]  Total Revenue figures reflect those included in Exhibit C-5 to Mr. Verma's 22nd Declaration.
[2]  Operating Profit (Loss) figures reflect those in BAM Trading's 2020–2022 Audited Financial Statements and BAM Trading's Income Statement Details as of April 30, 2023 for 2019 and 2023.
[3]  Represents line items Royalty Expense - BHL and IT Support - BHL on BAM Trading's Income Statement Detail as of April 30, 2023 for 2019 and 2023, and BAM Trading's Audited Financial Statements for 2020, 2021, and 2022. For 2022, $127,000 for IT Support has been added to the royalty expense included in Note 3 of BAM Trading's Audited Financial Statements as listed for 2022 in BAM Trading's Income Statement Detail as of April 30, 2023.
[5]  2019 figures reflect February 4 through December 31, 2019.
[6]  2023 figures reflect January 1 through April 30, 2023.

37.     Another appropriate methodology one could employ to assess BAM Trading's profitability is Net Income.  Net Income is defined as the "aggregation of revenues, expenses, gains, and losses that are not items of other comprehensive income."[59]  BAM Trading calculates Net Income as Operating Profit, plus the gain or loss on crypto assets, other net income, and provision for income taxes.[60]  These adjustments, particularly for the gain or loss on crypto assets, have a significant impact on BAM Trading's profitability during the relevant period.[61] This can be best demonstrated by comparing BAM Trading's profitability in 2021 and 2022.  In 2021, a year when crypto assets increased significantly in value, BAM Trading's Net Income

---

[59] *See* Ex. BH-79, ASC Master Glossary, "Net Income," available at https://asc.fasb.org/MasterGlossary.
[60] ECF No. 22, Verma Declaration II, at Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 769; ECF No. 19-10, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798–BTS00833823 at 803.
[61] BAM Trading reported a gain on crypto assets of $3 million in 2020, $137.1 million in 2021, and $2 million through April 30, 2023.  BAM Trading reported losses on crypto assets of $20,000 in 2019 and $123.1 million in 2022.  *See* ECF No. 22, Verma Declaration II, Ex. C-2, BAM Trading Inc., Income Statement Details as of April 30th, 2023.

was nearly $150 million.[62]  By contrast, in 2022, a year in which crypto prices plummeted, BAM Trading's Net Income was a loss of over $180 million.[63]  Overall, BAM Trading's Net Income during the relevant period shows a loss of over $51 million.  *See* Figure 6.

**Figure 6**

| Year | Total Revenue [1] | | Net Income (Loss) [2] | | BHL Royalty Expense and IT Support [3] | | Adjusted Net Income [4] = [2]+[3] | |
|---|---|---|---|---|---|---|---|---|
| 2019[5] | $ | 254,184 | $ | (2,681,000) | $ | - | $ | (2,681,000) |
| 2020 | | $11,002,835 | | (398,888) | | 554,500 | | 155,612 |
| 2021 | | $265,850,338 | | 149,581,178 | | 10,954,647 | | 160,535,825 |
| 2022 | | $95,585,671 | | (181,350,271) | | 3,932,102 | | (177,418,169) |
| 2023[6] | | $38,208,558 | | (22,945,000) | | 1,569,000 | | (21,376,000) |
| **Total** | $ | **410,901,585** | $ | **(57,793,981)** | $ | **17,010,249** | $ | **(40,783,732)** |

Source:  Source:  Verma Declaration II, Exhibit C-5; TRO Exhibit A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798– BTS00833823; Verma Declaration II, Exhibit C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785; Verma Declaration II, Exhibit C-2, BAM Trading Services, Inc., Income Statement Details as of April 30, 2023

Note:
[1]  Total Revenue figures reflect those included in Exhibit C-5 to Mr. Verma's 22nd Declaration.
[2]  Net Income (Loss) figures reflect those in BAM Trading's 2020–2022 Audited Financial Statements and BAM Trading's Income Statement Details as of April 30, 2023 for 2019 and 2023.
[3]  Represents line items Royalty Expense - BHL and IT Support - BHL on BAM Trading's Income Statement Detail as of April 30, 2023 for 2019 and 2023, and BAM Trading's Audited Financial Statements for 2020, 2021, and 2022. For 2022, $127,000 for IT Support has been added to the royalty expense included in Note 3 of BAM Trading's Audited Financial Statements as listed for 2022 in BAM Trading's Income Statement Detail as of April 30, 2023.
[5]  2019 figures reflect February 4 through December 31, 2019.
[6]  2023 figures reflect January 1 through April 30, 2023.

38.     Operating Profit and Net Income, not Gross Profit, are appropriate metrics to assess BAM Trading's profitability during the relevant period.  Both of these Net Profit metrics show that, in contrast to Mr. Verma's assessment, over the relevant time period, BAM Trading operated at a ***loss*** when its profits are offset by the costs of running its business.

## XII.     An Accounting As Proposed by the SEC Would Be A Time-Consuming and Burdensome Undertaking Given the Volume, Complexity, And Locations Of The Data, Records, And Custodians Involved

39.     The SEC requests that the Court order Binance Holdings Limited, BAM Trading Services, Inc., BAM Management US Trading Holdings Inc., and Changpeng Zhao, to provide,

---

[62] ECF No. 22, Verma Declaration II, Ex. C-3, BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785 at 769.
[63] ECF No. 21, Verma Declaration I, Ex. A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798–BTS00833823 at 803.

on or before 30 days from the date of the TRO, a written accounting of broad categories of assets over a six-month period.[64]   Among other things, the SEC requests an accounting of "*[a]ll* assets, funds, crypto assets, securities, or other property, real or personal, within *each* Defendant's possession, custody, or control" that is valued at over $1,000 and that was transferred to or for the benefit of *any* "person or entity" over a more than six-month period.[65]   Each defendant would then be required to identify "a description of each transferred asset, the name of the recipient, the date of the transfer, and the reason for the transfer."[66]

40.     Given that trading firms such as BAM process hundreds or thousands of transactions each day, and that the Defendants are all active businesses or businessmen, simply analyzing the data to identify every $1,000 plus transfer made by or to each Defendant would be incredibly time-consuming.   To take a small example of the problems this accounting would pose, for the month of December 2022, BAM Trading undertook 3,568 banking transactions over $1,000 in its Silvergate accounts, which as discussed herein is only a portion of the transaction activity occurring within BAM Trading.[67]   While this transaction level information does include certain information like the date and amounts of the transfer, the individual transactions often do not include the "name of the recipient" or the "reason for the transfer."[68]   To ensure the accuracy of an accounting of these transactions, an individual transaction-by-transaction review would be necessary to determine the recipient and reason for the transfer.   Gathering the information for each of these individual parties, including a description of each transferred asset, the name of the recipient, the date of the transfer, and the reason for the transfer would be a significant undertaking requiring far more than the 30 days suggested by the SEC.

41.     To put this effort into context, an accounting of this nature, which requires that the transactions be identified and traced, would be a much larger burden than typically occurs during the course of an annual audit of a company, for example, when preparing and filing their annual financial statements.   When performing an audit, not all transactions are reviewed; instead, as

---

[64] ECF No. 4-1, Proposed TRO, at p. 10.

[65] *Id*.

[66] *Id*.

[67] *See* Ex. BH-67, 2 H360 - BAM Trading Services Inc.xlsx.   The 3,568 transactions totaled $383,471,231.57.

[68] *Id*.

specified by Generally Accepted Auditing Standards ("GAAS"), testing is done by sampling certain transactions.[69]  Even within the scope required by GAAS, audits of financial statements can typically take months to perform.

42.     The Proposed TRO also requests certain information from BHL and other non-U.S. entities.  The Proposed TRO requests certain information related to "Customer Assets or assets of either BAM entity or maintained in any Defendant's name, held by any Defendant or for any Defendant's direct or indirect beneficial interest, or over which any Defendant exercised any direct or indirect control."[70]  While I am not offering any legal determinations or analysis that may be required to evaluate such a determination, understanding which entities should be incorporated into this type of analysis is important to determine the scope of the analysis that would be required.  In my experience, this initial step of determining which entities may be affiliated with the named Defendants is a significant undertaking in and of itself.  This is especially so where, as here, the Defendants operate on an international basis.

43.     As I noted above, while I am not making a legal determination, I do not see anything in the SEC's filings in support of this relief to suggest they have considered the extraterritorial challenges created by privacy laws in numerous countries, including the People's Republic of China, the European Union ("EU"), and elsewhere. The SEC's requests for data or information appear to involve requests for customer specific data (including names and the last four digits of account numbers) from customers who are based outside of the U.S.  I understand that there are information protection regulatory requirements in jurisdictions outside of the U.S. that may prevent such an accounting from occurring.  In my experience, a request for such customer specific data may be inconsistent with and/or fail to address the requirements of the regulations of other jurisdictions. For example, if any of the data required to complete the accounting is in the EU, the General Data Protection Regulation ("GDPR") would apply.[71]  Under the GDPR,

---

[69] *See* Ex. BH-77, AU Section 350 – Audit Sampling.

[70] ECF No. 4-1, Proposed TRO, at p. 10.

[71] "The General Data Protection Regulation (GDPR) is the toughest privacy and security law in the world. Though it was drafted and passed by the European Union (EU), it imposes obligations onto organizations anywhere, so long as they target or collect data related to people in the EU. The regulation was put into effect on May 25, 2018. The GDPR will levy harsh fines against those who violate its privacy and security standards, with penalties reaching into the tens of millions of euros."  *See* Ex. BH-78, "What is GDPR, the EU's new data protection law," GDPR.EU, https://gdpr.eu/what-is-gdpr/.

transaction data cannot be brought into the U.S. without specific identifying information being removed from that data.  The effort required to remove that information from the EU dataset would require, among other things, obtaining the complete population of data and then performing that specific work overseas that cannot be done in the U.S., before bringing it into the U.S.

44.     Based on my experience and review of the materials to date, it is my opinion that the nature and extent of the accounting sought by the SEC would necessitate a time consuming and burdensome undertaking given the volume, complexity, and locations of the data, records, and custodians potentially involved.

Dated: June 12, 2023
Washington, DC

_____
        J. Gregory Eastman

# APPENDIX A

# J. GREGORY EASTMAN, Ph.D.
## Senior Vice President

**Cornerstone Research**
2001 K St. NW • Washington, DC  20006
202.912.8925
geastman@cornerstone.com

## ACADEMIC BACKGROUND

1992 – 1997 **Harvard University** Cambridge, MA
*Ph.D. Economics*

1988 – 1992 **The University of Kansas** Lawrence, KS
*B.A., Economics and Mathematics*

## PROFESSIONAL EXPERIENCE

2001 – Present **Cornerstone Research, Inc.** Washington, D.C.
*Senior Vice President*

Specializes in applying economic analysis and accounting to tax controversy, antitrust and competition, financial products and financial institutions, securities, and valuation and damages matters. Experience with directing complex cases with large teams and multiple experts. Substantial experience taking cases to trial.  Served as a testifying expert in cases addressing issues of damages, lost profits, cost efficiencies and the failing firm defense.  Testified in *EnergySolutions-Waste Control* proposed merger case and the *Secure-Tervita* challenged merger case. Presented analysis to the enforcement staffs at the DOJ, FTC, and CMA on merger analysis, the DOJ, CFTC and FBI on market manipulation analysis and the EPA and California Air Resources Board on economic benefit analysis.

1997 – 2001 **The Brattle Group** Washington, D.C.
*Associate*

Conducted economic analysis for cases in the firm's litigation practice, including antitrust, environmental, breach of contract, and valuation issues.  Assisted in taking several cases to trial.

### Testimony Experience

- *The Commissioner of Competition v. Secure Energy Services Inc. and Tervita Corporation*, The Competition Tribunal, 2021. (Affidavit, expert report and trial testimony).  For a challenged merger, reviewed efficiencies and proposed facilities closures.
- U.S. Department of Justice v. EnergySolutions, Inc., Rockwell Holdings, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC, U.S. District Court for the District of Delaware, 2017. (Expert report, deposition, and

trial testimony). For a proposed merger, analyzed merger-specific and verifiable efficiencies and performed failing firm and asset exit analyses.

- LG Life Science, LTD. v. Chiesi USA, Inc., F/K/A Cornerstone Therapeutics, Inc., F/K/A Cornerstone Biopharma, Inc., Merus Labs International Inc., and Vansen Pharma, Inc., International Chamber of Commerce Arbitration, 2015 (Expert report and arbitration testimony).  Estimated damages related to allegations of breach of contract.

- *Dan Frankenstein v. Host International, Inc., HMSHost 401(k) Retirement Savings Plan and Trust Retirement Committee, et al.* U.S. District Court for the District of Maryland, 2022. (Report). Analyzed the economics of pre-tax compared to post-tax contributions to retirement plan and applicability to class-wide treatment.

- *U.S. Federal Trade Commission v. Axon Enterprise, Inc. and Safariland LLC.* U.S Federal Trade Commission Office of Administrative Law Judges, 2020. (Report and deposition).  For a post-closing merger review, performed failing firm and asset exit analyses.

- *Phaedra A. Makris v. Endo International PLC et al.*, Ontario, CA Superior Court of Justice, 2020. (Affidavit). Analyzed trading volume of Endo's stock on Toronto Stock Exchange and NASDAQ.

- *United States of America v. Navistar, Inc.*, U.S. District Court for the Northern District of Illinois, 2020.  (Expert report and deposition). Analyzed Navistar's financial condition and impact of potential monetary fines on the firm's financial condition and future competitiveness.

- State of Washington v. Franciscan Health System d/b/ CHI Franciscan Health; Franciscan Medical Group; The Doctors Clinic, A Professional Corporation; and WestSound Orthopaedics, P.S., U.S. District Court for the Western District of Washington, 2018.   (Expert report and deposition).  For a post-closing merger review, analyzed merger-specific and verifiable efficiencies and performed failing firm and asset exit analyses.

- *Sharon Barnum et al. v. Equifax Information Services, LLC*, U.S. District Court for the District of Nevada, 2018.  (Expert Report and deposition).  Provided rebuttal opinions on class certification and damages.

- *Silfab Solar Inc. et al. v. U.S. et al.*, U.S. Court of International Trade, 2018. (Expert Report).  Performed economic analysis of injury to importers of solar panel components from U.S. Government's imposition of safeguard (Section 201) tariffs.

- *U.S. Department of Justice v. Aetna Inc. and Humana Inc.*, U.S. District Court for the District of Columbia, 2016. (Expert report and deposition). Estimated profitability of the individual commercial health insurance business.

- *Jason D. Burke vs. The Prudential Insurance Company of America,* U. S. District Court for the District of Arizona, 2014.  (Expert report). Estimated the value of past benefits and the present value of future benefits to plaintiff related to a long term disability plan.

- John B. Davidson, Individually, and on behalf of all others similarly situated v. Henkel Corporation, Henkel Of America, Inc., and Henkel Corporation Deferred Compensation and Supplemental Retirement Plan and Its Committee as Administrator Of The Henkel Corporation Deferred Compensation and

Supplemental Retirement Plan, U. S. District Court for the Eastern District of Michigan, Southern Division, 2014. (Expert report). Provided testimony on economic losses resulting from the alleged failure to timely withhold FICA payroll taxes within certain retirement and deferred compensation plans.

- *CBR Systems, Inc., v. Christopher Deigan and Cord:Use Cord Blood Bank, Inc.*, Superior Court of New Jersey, Chancery Division, Bergen County, 2013. (Expert report). Provided testimony on damages and causality in a breach of contract and trade secrets case involving cord blood services.

- *Universal Surveillance Corporation dba Universal Surveillance Systems v. Checkpoint Systems, Inc.,* U.S. District Court for the Northern District of Ohio, Eastern Division, 2013. (Expert report and deposition). Provided testimony on damages and causality in a breach of contract, trade secrets, and unfair competition case involving loss prevention products in the retail and apparel industry.

- New York State Citizens' Coalition for Children v. Gladys Carrion, Commissioner of the New York State Office of Children & Family Services, in her official capacity, U.S. District Court, Eastern District of New York, 2012 (Expert report and deposition). Estimated underpayments in the State of New York for foster care reimbursement rates as required by the U.S. Child Welfare Act. Proposed methodology to ensure future reimbursement rate increases are appropriate.

- *Peak Performance Nutrition, LTD., v. Incubation, LLC, Nature's Pure Body Institute, et al., and related cross actions,* Superior Court of the State of California for the County of Ventura, 2012 (Expert report). Estimated damages and unjust enrichment related to allegations of breach of contract and infringement and misappropriation of rights to name, likeness and product endorsement.

- *Aviva USA Corporation et al v. Anil Vazirani et al.*, U.S. District Court, District of Arizona, 2012 (Expert report and deposition). Estimated damages related to allegations of trademark infringement, trade dress infringement, cyberpiracy, unfair competition, and racketeering in insurance and annuity industry.

- *Tobacco Technology, Inc. v. TAIGA International N.V. et al.*, U.S. District Court, District of Maryland, 2008 (Expert report and deposition). Estimated damages and unjust enrichment in a breach of contract and trade secrets case involving tobacco flavorings.

- *Pestube Systems, Inc. v. HomeTeam Pest Defense LLC,* U.S. District Court, District of Arizona, 2007 (Expert report and deposition). Estimated damages and unjust enrichment in false advertising (Lanham Act) and unfair competition for pest control services.

- *HomeTeam Pest Defense v. Pestube Systems, Inc.*, U.S. District Court, District of Arizona, 2005 (Expert report and deposition). Estimated damages and unjust enrichment in false advertising (Lanham Act), unfair competition and trademark infringement case for pest control services.

**Trial and Arbitration Experience**
- For a challenged merger in the waste industry, reviewed efficiencies and proposed facilities closures in *The Commissioner of Competition v. Secure Energy Services Inc. and Tervita Corporation*.

- For a transfer pricing dispute related to medical devices, analyzed the cardiac rhythm management industry, analyzed the value of patents and cross-licensed and the value quality manufacturing know how for plaintiffs in *Medtronic, Inc & Consolidated Subsidiaries v. Commissioner of Internal Revenue*.

- For a partnership transaction dispute related to the transfer of the Chicago Cubs, analyzed the probability of financial distress and the value of debt guarantees, analyzed the substantive costs and benefits of ownership of a minority equity position, and assisted in the preparation of trial testimony and exhibits for petitioners in *Tribune Media Company v. Commissioner of Internal Revenue*.

- For transfer pricing dispute analyzed the benefits of local sales and marketing activities as compared to sales and marketing activities performed by the parent and assisted in the preparation of trial testimony and exhibits for plaintiffs in the *Coca-Cola Company and Subsidiaries v. Commissioner of Internal Revenue*.

- For a proposed merger, analyzed merger-specific and verifiable efficiencies and performed failing firm and asset exit analyses in *U.S. Department of Justice v. EnergySolutions, Inc., Rockwell Holdings, Inc., Andrews County Holdings, Inc., and Waste Control Specialists, LLC*.

- Analyzed profitability of individual commercial health insurance business for plaintiffs in *U.S. Department of Justice v. Aetna Inc. and Humana Inc.*

- Estimated damages related to allegations of breach of contract in LG Life Science, LTD. v. Chiesi USA, Inc., F/K/A Cornerstone Therapeutics, Inc., F/K/A Cornerstone Biopharma, Inc., Merus Labs International Inc., and Vansen Pharma, Inc.

- For an action related to insider trading, failure to report stock transactions as required by Rule 144 and evasion of taxes, reviewed trading records, analyzed corporate structures, and reviewed off-shore trusts structures.  Analyzed impact of but-for reporting of trades and assisted in preparation of trial testimony and exhibits for defendants in *Securities Exchange Commission vs. Samuel E. Wyly, Donald R. Miller, Jr., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., Michael C. French, and Louis J. Schaufele III*.  Analyzed stock price returns related to alleged insider trading information, including analysis related to the materiality of information.

- Analyzed non-tax related business purposes for a structured financing between an U.S. bank and U.K bank.  Assisted in the preparation of trial testimony and exhibits for plaintiff BB&T in *Salem Financial, Inc., et al., as Successor-in-Interest to Branch Investments LLC, vs. United States of America*, United States Court of Federal Claims, Case No. 10-192.

- Analyzed investment returns related to a large portfolio of high-yield bonds, including the risks and suitability of investing in junk bonds.  Analyzed profitability for rehabilitated insurance company.  Analyzed adequate capitalization of insurance company from an actuarial perspective, including the application of risk-based capital standards.  Investigated market for letter of credit and credit guarantees.  Assisted with rebutting alleged damages analysis. Assisted in the preparation of trial testimony and exhibits for defendant Artemis S.A. in *John Garamendi v. Altus Finance S.A. et al. Case No. CV 99-2829 AHM (CWx)*, in the U.S. District Court for the Central District of California.

**GREG EASTMAN, PH.D.**
**Senior Vice President**

- Analyzed the liquidity position of a company including the impact of a number of acquisitions and asset dispositions.  Assisted in the preparation of trial testimony and exhibits for trial.  *Liberty Media Corp. et al. v. Vivendi Universal SA*, Case Number 1:03-cv-02175, in the U.S. District Court for the Southern District of New York.

- On behalf of a major investment bank, estimated damages related to valuations of a portfolio of hedge funds.  Drafted testimony and exhibits used at a Financial Industry Regulatory Authority (FINRA) Arbitration.

- On behalf of a former audit partner of a Big Four firm analyzed the accounting treatment of subsequent events for a Public Company Accounting Oversight Board (PCAOB) investigation and trial of enforcement action.

- Analyzed roles and responsibilities of chief financial officer as related to the appropriate accounting for real estate transactions with Duane Reade stores in criminal case. Helped prepare cross examination for trial for defendant William Tennant in *United States v. Anthony Cuti et al.*, case number 1:08-cr-00972, in the U.S. District Court for the Southern District of New York.

- Analyzed the liquidity position of a company including the impact of a number of acquisitions and asset dispositions.  Analyzed the appropriate disclosures for non-GAAP measures in the financial statements and press releases of a company.  Analyzed the differences in U.S GAAP and French accounting standards for company filing statements in both jurisdictions.  Assisted in the preparation of trial testimony and exhibits for *In re Vivendi Securities Litigation*, case number 1:02-cv-05571, in the U.S. District Court for the Southern District of New York.

- Analyzed the tax accounting treatment of net operating loss carry forwards.  Analyzed whether a shareholder rights agreement (poison pill) may have sustained the value of the net operating loss carry forwards.  Assisted in the preparation of trial testimony and exhibits for *Selectica, Inc., v. Versata Enterprises, Inc., and Trilogy, Inc.* trial in Delaware's Chancery Court.

- Analyzed investment returns related to a large portfolio of high-yield bonds.  Assisted in the preparation of trial testimony and exhibits for defendant Artemis S.A. in *John Garamendi v. Altus Finance S.A. et al.*

- Performed rebuttal damage analysis for breach of contract case involving an auditor resignation during an audit.  Drafted testimony and exhibits used at arbitration with the American Arbitration Association.

- Analyzed the economic benefits of alleged non-compliance (with both Clean Air and Clean Water Acts) for a steel company.  Assisted in the preparation of trial testimony and exhibits in *United States v. WCI Steel, Inc.*

- Estimated property and reputation damages due to environmental contamination.  Assisted in the preparation of trial testimony and exhibits.  *City of Newburgh, New York v. Central Hudson Gas & Electric Corporation*

- Estimated allocated share of environmental remediation costs for the Lipari Landfill Superfund site.  Assisted in the preparation of trial testimony and exhibits.  *Rohm and Haas v. Crown Cork & Seal Co. of Philadelphia, Continental Can Co. and NL Industries.*

- Analyzed franchise fee calculations related to electric utility's dispute with municipalities and assisted with trial preparations.  *Wharton, Galveston and Pasadena et al v. HL&P and Houston Industries Finance Inc.*

**GREG EASTMAN, PH.D.**
**Senior Vice President**

**Litigation Consulting Experience**

Tax Controversy

- For a state transfer pricing dispute, analyzed the non-tax benefits of a corporate reorganization.

- For a debt-equity case, determined the appropriate rating methodology to apply for a non-rated fully owned subsidiary.

- For a transfer pricing dispute, analyzed the value of licenses associated with a medical device product.

- For a transfer pricing dispute, analyzed a multisided platform business. Investigated the interaction of the technology, user base and marketing intangibles. Analyzed the value of the private company at the time of the transfer. Reviewed the marketing intangibles and how they provide value to the company.

- For a transfer pricing dispute, analyzed the relative value of various software components.

- For taxpayer dispute with IRS, assisted with analysis of manufacturing capabilities required for a medical device product and determined comparability to alternative products. Analyzed the FDA process associated with medical device approvals.

- For a taxpayer dispute with IRS, analyzed a company's cash managements and treasury systems to discuss how the company performed its internal banking services and how it managed its liquidity. Analyzed a company's debt capacity and whether it would have been able to issue and refinance an equivalent amount of intercompany debt to third parties.

- Based on analysis of market data, determined an appropriate arms-length guarantee fee payment to compensate a parental guarantee for an intercompany loan transaction.

- Analyzed the structure of a multinational financial institution and its risk management functions. Analyzed the normal and extraordinary risks a multinational financial institution faces. Discussed the appropriate allocation of settlement payments for a securities class action between different parents and subsidiaries of the institution.

- For taxpayer disputes with the Internal Revenue Service (IRS), analyzed the pre-tax expected profitability for collateralized loan transactions. Analyzed non-tax related business purposes for a structured financing between an U.S. bank and U.K bank. Compared financing costs with alternative forms of financing.

- Analyzed generally acceptable accounting principles for income taxes and reviewed appropriate accounting for net operating loss carry forwards. Discussed potential future values for net operating loss carry forwards in the context of tax sharing agreements between parties.

- Performed cost-benefit study of proposed Treasury regulations of the paid tax preparation market.

Antitrust and Competition

- For a proposed merger, provided analysis of the financial condition of the target for merging parties.

- For a proposed merger, provided analysis of potential efficiencies for merging parties.
- For a proposed merger worked for the Federal Trade Commission as potential cost efficiencies expert.
- Engaged to estimate the ability of a company to pay civil penalties and potential private litigation related expenditures.
- Investigated potential liability in several international price fixing conspiracy cases.
- Estimated plaintiff damages in monopolization and Lanham Act false advertising case in cable industry.
- Involved with a merger investigation before the FTC in a large horizontal merger in the paperboard industry.

Financial Products and Financial Institutions
- Analyzed the GSE bond market.
- Analyzed interest rate and commodities derivative positions to determine the commercially reasonable process and valuations assigned during close out process specified in ISDA agreements following the bankruptcy of one of the largest financial institutions.
- For a regulatory investigation into reporting of the London Interbank Offer Rate (LIBOR) and other interest rate benchmarks for investment bank, reviewed the firm's unsecured financing costs, investigated its interest rate swaps, swaptions, future rate agreements, futures and money markets transactions tied to LIBOR, analyzed the firm's IBOR submission processes and submission patterns, and provided multiple presentations to regulatory agencies.
- Analyzed appropriate accounting for sale and repurchase agreements of financial instruments.
- Analyzed the books and records of an asset management company and performed valuation of minority share of the privately held company.  Drafted testimony and exhibits to be used at arbitration.
- Analyzed the accounting treatment of energy traded contracts including the appropriateness of the related revenue recognition policies.
- Analyzed private equity investments and stock trading behavior for an insider trading case.
- Helped perform valuation of minority equity position in industrial corporation in the context of a proposed change of control transaction.

Securities and Financial Accounting
- Estimated potential damages exposure for Rule 10(b)-5 and Section 11 federal and state cases filed against international companies with ADS listed in U.S. Participated in mediation and settlement discussions with counsel.
- Estimated potential damages exposure for multiple Rule 10(b)-5 and Section 11 federal and state cases filed against the same company.  Participated in mediation and settlement discussions with counsel.  Assisted in the preparation of a class certification rebuttal report.

- Assisted in review of the appropriate disclosures made by company in its Management Discussion and Analysis portion of its financial statements.
- Estimated potential damages exposure for Rule 10(b)-5 claims and the equivalent exposure in a parallel Canadian securities case related to a Canadian company whose primary assets were in China.  Reviewed the timing of disclosures and whether new information was released to the market at the time of the alleged corrective disclosure.
- For an SEC investigation, reviewed purchase accounting treatment of assets acquired for a retail franchise along with the associated remodeling costs.  Reviewed subsequent accounting adjustments and impacts on earnings.
- Engaged to estimate potential damages in a Rule 10b-5 securities litigation.
- For a securities litigation involving Rule 10b-5 and Section 11 claims, analyzed the appropriate accounting treatment and disclosures of repurchase transactions.  Analyzed the appropriate auditing procedures for repurchase transactions.  Reviewed disclosure standards for non-GAAP metrics.
- Assisted in the review of loan files and underwriting decisions for mortgages packaged and sold to Fannie Mae.
- Estimated potential damages exposure for Rule 10(b)-5 and Section 11 claims in securities cases arising from the financial crisis.
- Analyzed the appropriate accounting for loan loss reserves.
- Analyzed the appropriate accounting for oil well decommissioning costs and hurricane remediation costs in the context of a dispute with the insurance company.
- Analyzed the appropriate internal control over financial reporting, including the appropriate disclosures related to material weaknesses as opposed to significant deficiencies.
- Analyzed the accounting treatment of stock option awards and the associated effects of changing measurement dates.  Analyzed the materiality of restated accounts.
- Analyzed the appropriate tax accounting, including the accounting for uncertain tax benefits, and the materiality of restated accounts.
- Analyzed the accounting treatment of investments in internet-related advertising companies, including issues of alleged impairment and extent of consolidation by parent.  Assisted in the preparation of summary judgment argument.  Drafted testimony and exhibits to be used at trial.
- Analyzed the appropriate software revenue recognition accounting and the materiality of restated accounts.
- Analyzed the tax accounting treatment of stock options and the associated effects of changing measurement dates.
- Analyzed the typical venture capital structure for investments in internet-related advertising companies. Drafted testimony and exhibits to be used at trial.
- Analyzed an individual's tax treatment of trading income in a breach of contract and valuation dispute.
- Analyzed trading behavior, returns and impacts of market timing and late trading for a mutual fund company.

**GREG EASTMAN, PH.D.**
**Senior Vice President**

- Analyzed private equity investments and relative performance for a case involving executive compensation.  Reviewed detailed accounting records related to financial impacts of investment performance. Drafted testimony and exhibits to be used at trial.
- Analyzed the appropriate valuation of and accounting for goodwill for a manufacturing company.

Valuation and Damages

- Estimated the loss to the manufacturer from allegedly grey market activities by a distributor.
- Following the dissolution of a joint venture agreement, analyzed the value of multiple drugs, reviewed the impact of the valuations on the capital account of the JV and analyzed the appropriate allocation of cash distributions from the capital account.
- For an appraisal case claiming additional payments above the transaction price, performed valuation of drugs, including a focus on the FDA approvals process and the resulting company valuation.
- Performed valuation of a celebrity endorsement on product sales and estimated damages to alleged breach of contract.
- Estimated damages due to allegedly construction defects for a class of homeowners.  Helped prepare exhibits for trial.
- Engaged to estimate damages in a theft of trade secrets case.
- Estimated dimunition in value of a real estate property related to soil contamination.
- Estimated value of iPhone application related to the golf industry.
- Performed valuation of privately held company in education industry.
- Analyzed the valuation of long-term structured energy contracts, including the reasonableness of the energy modeling techniques used across time.
- Estimated damages in false advertising (Lanham Act) and trademark infringement case for cleaning products.
- Performed valuation of company taken private in leveraged buyout and provided critique of opposing experts valuation.
- Estimated damages and liability for alleged breach of contract in several cases, including a failed merger in the electric utility industry and litigation in the oil industry.
- Performed valuations of multiple companies within a variety of industries.
- Estimated damages from breach of contract allegations in several cases including for a large transportation firm, between the U.S. Department of Energy and several nuclear utility clients, and in a breach-of-contract class action involving a major energy firm.
- Estimated damages in a false advertising (Lanham Act) case in the baby formula industry.

Other

- Estimated economic benefit and beyond BEN benefit within the context of the mobile source civil penalty policy for multiple vehicle manufacturers.

- Analyzed the impact of marketing on the sales of a class of drugs for a pharmaceutical manufacturer.
- Analyzed the determinants of drug addiction.
- Estimated impact of fine on company's financial position to determine whether fine would result in financial distress.
- Assisted in drafting testimony for several cost of capital cases for utilities.
- Supervised analysis of IPO allocations for SEC related case.
- Performed analysis of the appropriate level of spending for the state of New York on its provision of foster care services to be in compliance with the federal Child Welfare Act.
- Analyzed the economic benefits of alleged non-compliance (with both Clean Air and Clean Water Acts) within several industries.
- Estimated property and reputation damages due to environmental contamination in several cases.

**Publications**

"Non-Standard Counterfactuals in Merger Control" with Peter Davis and Kostis Hatzitaskos, *Getting the Deal Through—Merger Control 2020*, available at https://www.cornerstone.com/Publications/Articles/Non-Standard-Counterfactuals-in-Merger-Control/Non-Standard-Counterfactuals-in-Merger-Control.pdf

"5 Questions with Greg Eastman: The Failing Firm Defense in the Age of COVID-19" available at https://www.cornerstone.com/Publications/Articles/5-Questions-with-Greg-Eastman-The-Failing-Firm-Defense-in-the-Age-of-COVID-19

"5 Questions with Greg Eastman and Ceren Canal Aruoba: The Horizontal Merger Guidelines and the Failing Firm Defense" with Ceren Canal Aruoba available at https://www.cornerstone.com/Publications/Articles/5-Questions-Horizontal-Merger-Guidelines-Failing-Firm-Defense

"Will PCAOB's New Audit Rule Trigger Shareholder Litigation?" with Elaine Harwood, Steven McBride, and Jean-Phillippe Poissant, available at https://www.law360.com/articles/1209786/will-pcaob-s-new-audit-rule-trigger-shareholder-litigation-

"The Increasing Importance of Loss Causation Analysis in Criminal Cases" available at http://www.law360.com/whitecollar/articles/276932/the-increasing-importance-of-loss-causation-analysis

"An Imprecise Measure Of Loss — At Best" available at http://www.law360.com/whitecollar/articles/353974/an-imprecise-measure-of-loss-at-best

**GREG EASTMAN, PH.D.**
**Senior Vice President**

"A Primer on When to Use Expert Witnesses and How to Find Them," with Vandy M. Howell and Maria Salgado, *Bloomberg BNA Expert Evidence Report* 13, no. 1 (January 2013)

"Working Successfully with Expert Witnesses," with Vandy M. Howell and Maria Salgado, *Bloomberg BNA Expert Evidence Report* 13, no. 4 (February 2013)

# APPENDIX B

**Documents Relied Upon**

**Pleadings and Legal Documents**

- Plaintiff U.S. Securities and Exchange Commission's Emergency Motion for a Temporary Restraining Order, Freezing Assets, Granting Other Relief, and Order to Show Cause Why Relief Should Not Continue, *Securities and Exchange Commission v. Binance Holdings Limited, BAM Trading Services Inc., BAM Management US Holdings Inc., and Changpeng Zhao*, filed June 6, 2023, and Exhibits
- Declaration of Sachin Verma, Document 21, *Securities and Exchange Commission v. Binance Holdings Limited, BAM Trading Services Inc., BAM Management US Holdings Inc., and Changpeng Zhao*, filed June 7, 2023, and Exhibits
- Declaration of Sachin Verma, Document 22, *Securities and Exchange Commission v. Binance Holdings Limited, BAM Trading Services Inc., BAM Management US Holdings Inc., and Changpeng Zhao*, filed June 7, 2023 and Exhibits
- Temporary Restraining Order Freezing Assets, Granting Other Relief, and Order to Show Cause Why Relief Should Not Continue, *Securities and Exchange Commission v. Binance Holdings Limited, BAM Trading Services Inc., BAM Management US Holdings Inc., and Changpeng Zhao*, filed June 6, 2023, and Exhibits
- *Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020)

**Accounting Standards and Guidance**

- ASC Master Glossary, "Net Income," available at https://asc.fasb.org/MasterGlossary
- AU-C 200.04
- AU Section 350 – Audit Sampling

**Bates-Stamped Documents**

- BAM Trading Services Inc., Financial Statements as of December 31, 2021 and 2020, BTS00833764–BTS00833785
- TRO Exhibit A-74, BAM Trading Services Inc., Financial Statements as of December 31, 2022, BTS00833798–BTS00833823
- TRO Exhibit A-75, BAM Management US Holdings Inc., Financial Statements as of December 31, 2019 and for the Period from February 4, 2019 (Inception) through December 31, 2019, BTS00031479
- TRO Exhibit A-28
- TRO Exhibit A-56
- TRO Exhibit A-57
- TRO Exhibit A-58

- TRO Exhibit A-59

**Other Produced Documents**
- 1 H360 - BAM Management US Holdings Inc.xlsx
- 2 H360 - BAM Trading Services Inc..xlsx
- BAM Trading, Inc., Income Statement Details as of April 30th, 2023

**Public Press and Other Publicly Available Documents**
- "About," Binance, https://www.binance.com/en/about, accessed June 11, 2023.

- "Mission," Binance, https://www.binance.com/en/mission, accessed June 11, 2023.

- "About," Prime Trust, https://www.primetrust.com/about, accessed June 11, 2023.

- "About," Wintermute, https://www.wintermute.com/about/, accessed June 11, 2023.

- "Subspace Network," Subspace Network, https://subspace.network/, accessed June 11, 2023.

- "About," Coinbase, https://www.coinbase.com/about, accessed June 11, 2023.

- "Kbit," Kbit, https://www.kbit.com/, accessed June 11, 2023.

- "About," Auros Global, https://www.auros.global/about/, accessed June 11, 2023.

- "Coinbase Buys Crypto Trading Firm Tagomi To Boost Institutional Trading Business," *Forbes*, March 27, 2020, available at https://www.forbes.com/sites/jeffkauflin/2020/05/27/coinbase-buys-crypto-trading-firm-tagomi-to-boost-institutional-trading-business/?sh=e7ff296270f5, accessed June 11, 2023.

- "Alameda Research," Bloomberg, available at https://www.bloomberg.com/profile/company/1872413D:HK#xj4y7vzkg, accessed June 11, 2023.

- "What is GDPR, the EU's new data protection law," GDPR.EU, https://gdpr.eu/what-is-gdpr/, accessed June 11, 2023.