# EXHIBIT BH-31



# EXHIBIT BH-32



HOME    ANNOUNCEMENTS    ECOSYSTEM    DEFI    NFT & GAMING    TECH

# Introducing BEP-95 With a Real-Time Burning Mechanism

BNB CHAIN DEVELOPER
22 OCT 2021 • 3 MIN READ

 



In this article, we'd like to introduce and propose the new Binance Evolution Protocol, BEP-95. This BEP introduces a real-time burning



HOME    ANNOUNCEMENTS    ECOSYSTEM    DEFI    NFT & GAMING    TECH

The abstract behind this BEP is to speed up the burning process of BNB and make BSC more decentralized, as part of the gas fee will be burned. The BEP-95 burn is solely dependent on the activity on the BSC network, and it will continue functioning (decreasing BNB supply), even after the scheduled BNB burns by Binance.com reach the target supply of 100m BNB in circulation.

Please note that this BEP is still in the draft stage.

**Two points before we start:**

- Each block will burn a fixed ratio of the gas fee collected by the validators in each block.
- The burning ratio is adjustable through governance.

## Why does BSC need BEP-95?

The BSC network can speed up the BNB burning process and improve its intrinsic value by burning a portion of gas fees. The BNB holders will decide how to dispatch the BSC gas reward.

While implementing this BEP might decrease the total amount of BNB that validators and delegators receive from staking, the fiat-denominated value of their rewards may increase. This burning mechanism would further reduce BNB supply; thus, increasing demand would drive the BNB value higher.

# BEP-95 Specification

## Gas Fee Distribution

 **BNB CHAIN**    HOME    ANNOUNCEMENTS    ECOSYSTEM    DEFI    NFT & GAMING    TECH    ⋮

the supply is regularly decreasing according to Binance's scheduled BNB burns. BNB is a utility token with many use cases, and delegators and validators will still enjoy other benefits stemming from holding BNB.

**The gas fee is collected each block and split into two system smart contracts:**

- System Reward Contract. The contract can possess at most 100 BNB. 1/16 of the gas fee will be transferred to the system reward contract if it possesses less than 100 BNB. The funding within the reward contract is used as cross-chain package subsidies.

- ValidatorSet Contract. The rest of the gas fee is transferred to the ValidatorSet contract. It is the vault to keep gas fees for both validators and delegators. The funding within the contract will be transferred to Binance Chain and distributed to delegators and validators according to their shares every day.

## Burning Mechanism

The mechanism will be enabled by introducing Governable parameters: **burnRatio** in the ValidatorSet Contract. At the end of each block, the Validator will sign a transaction to invoke the **deposit** function of the contract to transfer the gas fee. The burning logic is implemented within the **deposit** function that **burnRatio * gasFee** will be transferred to the burn address;

**The initial proposed setting:**

*burnRatio = 10%*

## Governance



HOME    ANNOUNCEMENTS    ECOSYSTEM    DEFI    NFT & GAMING    TECH

This process will be carried on Binance Chain, and every community member can propose a change of the parameters. In order for the proposal to be reviewed by the validators, it has to receive a minimum deposit of 2,000 BNB (mainnet). This will allow the validators to vote on the proposal; all BNB is returned after the proposal has been voted on. The BSC validators can vote "for" or "against" based on their voting power.

Suppose the total voting power of bounded validators that votes for it reaches the quorum (50% on mainnet). In that case, the proposal will pass, and the corresponding change of the parameters will be passed onto BSC via cross-chain communication and take effect immediately. The vote of unbounded validators will not be considered into the tally.

---

**Follow us to stay updated on everything BSC!**

[Website](Website) | [Twitter](Twitter) | [Telegram](Telegram) | [Youtube](Youtube) | [Gitcoin](Gitcoin)

# EXHIBIT BH-33

Case 1:23-cv-01599-ABJ Document 53-4 Filed 06/12/23 Page 9 of 88



bnb-chain / BEPs   Public

<> Code    ⊙ Issues  16    ⚉ Pull requests  16    ▷ Actions    ⊞ Projects    ⊘ Security    ∿ Insigh

New issue                                                                    Jump to bottom

# [WIP] BEP-176: Validator Reward Model 2.0 #176

⚉ Open

**brilliant-lx** wants to merge 2 commits into `bnb-chain:master` from `brilliant-lx:bep_reward_model_2.0` ⧉

Conversation  18      Commits  2      Checks  0      Files changed  1

**brilliant-lx** commented on Dec 5, 2022 • edited ▾                          Contributor

# BEP-176: Validator Reward Model 2.0

- BEP-176: Validator Reward Model 2.0
  - 1. Summary
  - 2. Abstract
  - 3. Status
  - 4.Motivation
  - 5. Specification
    - 5.1 Mechanism & Governance
  - 6. License

## 1. Summary

This BEP will introduce a new validator reward model on BNB Smart Chain. As a result of this BEP, the
validator staking reward policy is going to be modified such that it is more accurately representative of the
validator's contribution to the overall network.

## 2. Abstract

The mechanism for validator income distribution will be altered when this BEP is implemented. The specifics
are still being worked out, but in general, we may divide the overall rewards from gas fees into two parts:

- Network Verification Reward: will be distributed among all validators more equitably, according to their
  contributions to the whole network.

- Block Reward: The single producer for its work on this block.

The proportion of each part is up for debate, and validators will have the possibility to alter the value through governance.

The idea suggests that we may favor a slightly greater ratio of the Network Verification Reward vs Block Rewards, given that the primary objective is to validate the network to enable real and secure transactions. Our viewpoint is that transactions are resources shared among validators; a validator should not consider them to be their property.

## 3. Status

Draft

## 4.Motivation

Before this BEP, the validator's reward mostly relied on the transaction gas fee it received, as their only source of rewards is the gas fee for the transaction in the blocks they produce. A validator will get more rewards if it packs more transactions into the block it produces. It was designed to encourage validators to add more transactions, but it didn't represent the overall contribution that a validator made. In general opinion, a validator should be rewarded even if it only produces empty blocks, because it helps build the network, e.g. verify blocks, keep a copy of the latest network storage state, broadcast blocks and transactions... But validator will lose its dedicated block reward if it produces empty block, so it still encourages validator to add more transactions in its block.

The rewards logic will serve multiple objectives. In addition to transaction inclusion, it is necessary to consider efforts to validate blocks and maintain network security.

Absolute fairness is not an easy goal to accomplish, but we do our best to bring about some improvements with this BEP. We name it Validator Reward Model 2.0, it could have further revisions to keep improving it.

## 5. Specification

Currently, as defined by the Parlia consensus, block producers will collect the gas fee of each transaction as its reward and distribute it to a system contract temporarily.
The system contract will forward the reward information to Beacon Chain periodically to settle the reward along with the staking information kept on Beacon Chain.

The general procedure will not be changed in this BEP, but 2 steps will be added:

- For each block, part of the block reward will be put into the shared network contribution funding pool. Initially, the ratio is set to 50%, i.e. half of the rewards will be shared with the other validators.
- Before the system contracts forward the reward information to Beacon Chain, the funding pool will be distributed according to the network contribution of each validator. The contribution could be simply determined by the block number it produces.

## 5.1 Mechanism & Governance

A governable parameters: **validatorRewardRatio** will be introduced in the ValidatorSet Contract. At the end of each block, the Validator will sign a transaction to invoke the deposit function of the contract to transfer the gas fee. The validator reward model logic is implemented within the deposit function that: **validatorRewardRatio * ( gasFee - burnRatio*gasFee)** will be transferred to the validator contribution funding pool address;

The initial setting:

- validatorRewardRatio = 50%

This process will be carried on BNB Beacon Chain, every community member can propose a change of the params. The proposal needs to receive a minimum deposit of BNB (2000BNB on mainnet for now, refundable after the proposal has passed) so that the validators can vote for it. The validators of BSC can vote for it or against it based on their staking amount of BNB.

If the total voting power of bounded validators that votes for it reaches the quorum (50% on mainnet), the proposal will pass and the corresponding change of the params will be passed onto BSC via cross-chain communication and take effect immediately. The vote of unbounded validators will not be considered into the tally.

## 6. License

The content is licensed under CC0.

 2

---

  BEP-176: Validator Reward Model 2.0                                      1138974

---

**48ClubIan** commented on Dec 5, 2022                                        Contributor

No offence to person, but this proposal looks extremely stupid.

In other chain , let's take ethereum as example, miner gets reward for sealing empty block, true but miner also doesn't get slashed for not sealing in turn. More important, the real reason why miners on ethereum get reward for even empty block is there does be real block reward besides gas spending.

It also astonishes me that "It is unethical toward the other validators... to include more transactions into their own block". Then what is bnb-chain/bsc#1186 doing?

Unethical ? To include more transactions ? Seriously ? I thought it was talking about FTX.

```
 Absolute fairness is not an easy goal to accomplish
```
No it's not ture. Actually I have a best idea, how about all validators split reward equally?

Simple & Easy.

[QVP-01] 99% AB validator Document 53-4 brilliant-lx · Pull Request #176 · bnb-chain/BEPs · GitHub

 👍 2

---

**alexbrownf1** commented on Dec 5, 2022

1. Validators should be encouraged to include more transactions, to help increase the highest TPS of this chain, to make this chain more stable and stronger, not to only increase the profit of some validators, especially when these validators take advantage of the imperfect code design or system bugs.

2. What ⑂ worker: enhancement of the current block generation logic. bsc#1186 does is to improve the efficiency (the highest TPS) of the chain. It is absolutely different from "utilize an excessive amount of time to include more transactions into their own block in order to increase their revenue...it would also lead to the instability of the network".

All my above opinion is based on that I heard the way some validators are being doing is not good for the network stability. If I'm wrong, please let me know.

---

**48Clublan** commented on Dec 5, 2022 · Contributor

> 1. Validators should be encouraged to include more transactions, to help increase the highest TPS of this chain, to make this chain more stable and stronger, not to only increase the profit of some validators, especially when these validators take advantage of the imperfect code design or system bugs.
>
> 2. What worker: enhancement of the current block generation logic. bsc#1186 does is to improve the efficiency (the highest TPS) of the chain. It is absolutely different from "utilize an excessive amount of time to include more transactions into their own block in order to increase their revenue...it would also lead to the instability of the network".
>
> All my above opinion is based on that I heard the way some validators are being doing is not good for the network stability. If I'm wrong, please let me know.

I suggest you review worker: enhancement of the current block generation logic. bsc#1186 better before you criticizing in your first point, because that's exactly what it is.

If you think it is take advantage of the imperfection code design or system bugs, then it is.

---

**brilliant-lx** commented on Dec 5, 2022 · Contributor · Author

Case 1:23-cv-01599-ABJ    Document 53-4    Filed 06/12/23    Page 13 of 88

you may misunderstand what bnb-chain/bsc#1186 has done.
As a matter of fact, validator is encouraged to add more transactions as long as the timestamp in its block header is not reached.
Before this PR, most validators did not fully use its block window to add more transactions.
If all of the validators are unambitious, it is fine. But if some of the validators are ambitious, then it will impact others' interest.
So #1186 did not take the advantage of imperfection design, what #1186 has done is to try to make sure every validator can fully use the 3s block window.

---

**48Clublan** commented on Dec 5, 2022 • edited ▾                              `Contributor`

> you may misunderstand what bnb-chain/bsc#1186 has done. As a matter of fact, validator is
> encouraged to add more transactions as long as the timestamp in its block header is not reached.
> Before this PR, most validators did not fully use its block window to add more transactions. If all of the
> validators are unambitious, it is fine. But if some of the validators are ambitious, then it will impact
> others' interest. So #1186 did not take the advantage of imperfection design, what #1186 has done is to
> try to make sure every validator can fully use the 3s block window.

Actually "fully use the 3s block" is literally just another saying of "being ambitious" as #1186 has done, exactly the same as what is done by some validators before. The only difference this time is it is merged in master branch.

Just being adopted by everyone doesn't make what's "unethical" ethical, unless it was never "unethical".

---

**brilliant-lx** commented on Dec 5, 2022                          `Contributor`  `Author`

Actually, I agree on it, "it is not unethical", I can change the sentence to use other word.
#1186 tries to make validator "ambitious" by default, validator is allowed to gain more profit as long as it follows the consensus rules.

---

**GalaIO** commented on Dec 5, 2022 • edited ▾

I think all matters. Let's think of a simple scenario if all validators fulfill gas limit per block with the same gas price, all validators get the same reward.

Now, there are many reality scenes, related with compete gas price, diff txs in your txpool, package time, and Infrastructure influence. So every validator will get a different reward, the same reward just in probabilistic. By the way, BSC hasn't coinbase reward, only the tx gas fee.

All is about fairness, BSC encourage validators to fulfill their block to reach gas limit, encourage validators to exchange txpool as much as possible, encourage broadcast block in time, and get then fairness reward back. That is to aim for a higher smooth TPS in BSC. notice: it's an encouragement only.

Case 1:23-cv-01599-ABJ Document 53-4 Filed 06/12/23 Page 14 of 88

So BSC needs to improve client performance to keep fairness in block produce bnb-chain/bsc#1186, and redistribute part of reward #176 share high gas price or package more txs from txpool.

Validators get slashed or jailed is kill themselves, you will get nothing or little reward. The empty block will get less reward than others, and it's possible to produce empty block in many scenarios, like txpool empty, Network delay or CPU matter. I think it will balance with eco.

---

─◦─     BEP-176: updated on community feedback.                                                    ae2f9e9

---

**48Clublan** commented on Dec 6, 2022                                                              `Contributor`

> Actually, I agree on it, "it is not unethical", I can change the sentence to use other word. #1186 tries to
> make validator "ambitious" by default, validator is allowed to gain more profit as long as it follows the
> consensus rules.
>
> Appreciate it.
>
> However, this way the motivation of this BEP doesn't stand well any more.
>
> We already have #1186 to balance rewards among, why do we need model 2.0 to make sure validator which
> produces empty block still get rewarded?
>
> They may did part of its job, but they also failed to finish the entire job, I mean sealing txs in time. I don't see
> the point to compensate such disfunction.

---

**brilliant-lx** commented on Dec 6, 2022 • edited ▾                                    `Contributor`  `Author`

> Actually, I agree on it, "it is not unethical", I can change the sentence to use other word. #1186 tries
> to make validator "ambitious" by default, validator is allowed to gain more profit as long as it
> follows the consensus rules.
>
> Appreciate it.
>
> However, this way the motivation of this BEP doesn't stand well any more.
>
> We already have #1186 to balance rewards among, why do we need model 2.0 to make sure validator
> which produces empty block still get rewarded?
>
> They may did part of its job, but they also failed to finish the entire job, I mean sealing txs in time. I
> don't see the point to compensate such disfunction.

The motivation of this BEP is simple:
1. validators can be rewarded according their true contribution.
2. validators can be incentivized to build a strong network.

[CP-0xc594...] · Validator Reward · brilliant-lx · Pull Request #176 · bnb-chain/BEPs · GitHub

bnb-chain/bsc#1186 did some improvements but there is still a long way to go.

First of all, we have to make sure if we can align on the these points:
1.Empty block is also a valuable block, although it did not contain any transaction, it has contribution on security.
2.Producing block is only a part of the contribution to the network. Other contributions could be: block verification, transaction propagation... (In an even broader view, full node, light node, archive node are also important parts of the network, but we focus validator right now.)
3.Generally speaking, TxPool is a shared resource, validators share transactions in this pool.

Great appreciate for your feedback, it is important, without the majority of validators's support, this BEP would not be accepted. As you may know, currently BNB Chain does not have the vast validator size as Ethereum has. It is crucial for these validators to participate in building a stronger network.
This may be not the final edition, any constructive advices will be considered seriously.

---

**Jolly23** commented on Dec 6, 2022

It's hard to understand you know the contribution can make network more stable. The normal nodes play a more important part on this topic, but you only talk about validators here.
If you really want to, how do you explain "UpgradeStatusExtension.DisablePeerTxBroadcast"? That's the weirdest thing I've ever seen in the blockchain design.

---

**48Clublan** commented on Dec 6, 2022                                                    Contributor

I don't feel my question answered.

Producing empty block may have some contribution on security, but that's not all the contribution it is supposed to make.
Not doing all job deserves penalty, or at least not extra compensation.
My question is, why do you suggest reward instead?

Actually, not being slashed is already some kind of reward for 0 block producer.

Also, I am curious, is empty block very common recently ? Why is this worth proposing a special BEP?

---

**brilliant-lx** commented on Dec 6, 2022                                         Contributor   Author

> It's hard to understand you know the contribution can make network more stable. The normal nodes play a more important part on this topic, but you only talk about validators here. If you really want to, how do you explain "UpgradeStatusExtension.DisablePeerTxBroadcast"? That's the weirdest thing I've ever seen in the blockchain design.

well, short reply: "Rome is not built in one day", all of the current Layer1 blockchains are far from perfect, let us just keep building it.

 1

---

**brilliant-lx** commented on Dec 6, 2022                                    Contributor    Author

1.Empty block will lost its dedicated block reward, 50% by default, the ratio can be adjusted through governance. Meanwhile, empty block may only impact its own revenue, does not impact other validator's revenue. It is not encouraged, since it is bad for the overall performance.
2.Empty block is rarely seen recently, since the bear market. Actually this BEP is not proposed for empty block, it is about fairness.

---

 **guagualvcha** closed this on Dec 7, 2022

---

 **guagualvcha** reopened this on Dec 7, 2022

---

**48Clublan** commented on Dec 7, 2022                                       Contributor

Enough, the whole thing makes no sense to me. I will not comment further.

What is "dedicate block reward" ?
Why is current model "unfair"? How can a validator produce its own block without secure the network?
Why is the proposed formula capable to solve the "unfairness" ? Math proof ?
What are validators supposed to do different before and after this BEP ?

Lots of terms are referred to without being defined, they just bounced out.
But it doesn't matter, just like before.

 The proportion...  will have the possibility to alter the value through governance.
Great.

Wait, don't we even need governance to adopt it ?
We don't.

We didn't have governance about whether to adopt BEP-95
We didn't have governance about whether to adopt BEP-131

But we do have vote on its parameters.

Isn't it great?

[VP-012] % Validator Incentive %-4 brian[cast](#request) · bnb-chain/BEPs · GitHub

**Jolly23** commented on Dec 7, 2022

But actually the `UpgradeStatusExtension.DisablePeerTxBroadcast` is not a kind of building, it's destroying.

---

**darren-liu** commented on Dec 7, 2022 | Contributor |

I personally vote for the change. It is not in the name of fairness, but for the best of the network.

1. Empty block is better than no block. When validators get no incentive for empty blocks, they may skip a few as long as they don't get caught for slash. But such skipping can cause a lot of fork and re-org, which downgrades the network's performance, especially when it is busy. Liveness is quite key, especially if BSC may change the way of blocking rotation to increase the capacity as Polygon or Solana is doing.

2. Validators should be encouraged to include more transactions. This means better throughput of the whole network.

3. A balanced validator set was the design goal of BSC, described even in the first version of the white paper. A skewed APR purely based on the transaction inclusion capability will cause voting power centralization. There should be a way to trade off between efficiency and democracy.

I look forward to seeing other options but so far this is the most balanced one.

The validators who put effort into including more transactions will get hurt, but their effort will not be 100% in vain; while the other validators who don't put effort will not get the full benefits.

 1

---

**thy-r** commented on Dec 12, 2022

It needs to be said that the real motivation behind this proposal is not to reward validators for empty blocks. Validators that frequently produce empty blocks are either malfunctioning or running on cheap hardware / bandwidth, and there is no reason to reward them at the expense of the other validators who perform well.

The real motivation behind this proposal is the fact that some validators are extracting MEV and accept private transactions. As a result, they earn more than the rest and consequently, attract more delegations. As they get more and more delegations, they can add more validators and potentially take control over the network.

This is a potential threat, but this proposal will not mitigate it because validators will still get to keep 50% of their individual profit, which is a large enough edge to maintain such a threat. Raising the sharing ratio to 100% might solve this, but that would be a very bad idea because in such a case validators will have no incentive to excel or improve. Instead, their optimal strategy would be to operate by doing the minimum work necessary, as cheaply as possible, and this will result in a degraded network performance.

For this reason, I strongly suggest the BNB Smart Chain community to scrap this proposal, and instead debate on whether and how to standardize MEV extraction on the BNB chain.

One possible solution is to integrate MEV-Boost built-in the BSC client, similar to the way it is done on Ethereum, to allow all validators to extract MEV. A better longer term solution might be Proposer/Builder Separation on the protocol level, similar to what is planned on Ethereum.

In the meantime, the BNB Smart Chain community should be alert that if MEV extracting validators will be prevented from adding more validators to the network, they will have no incentive to share their MEV profits with their delegators. This will result in lower APR for the delegators, which is already at all times low.

Increasing delegators APR is another reason to consider standardizing MEV as a priority, as otherwise, more and more delegators will convert their BNB to ETH as the yield for staking ETH on Ethereum is much higher than it is for staking BNB on the BNB chain, thanks in part to the built-in MEV extraction support on Ethereum.

 6     4

---

**brilliant-lx** commented on Dec 13, 2022 • edited ▾    `Contributor` `Author`

It needs to be said that the real motivation behind this proposal is not to reward validators for empty blocks. Validators that frequently produce empty blocks are either malfunctioning or running on cheap hardware / bandwidth, and there is no reason to reward them at the expense of the other validators who perform well.

The real motivation behind this proposal is the fact that some validators are extracting MEV and accept private transactions. As a result, they earn more than the rest and consequently, attract more delegations. As they get more and more delegations, they can add more validators and potentially take control over the network.

This is a potential threat, but this proposal will not mitigate it because validators will still get to keep 50% of their individual profit, which is a large enough edge to maintain such a threat. Raising the sharing ratio to 100% might solve this, but that would be a very bad idea because in such a case validators will have no incentive to excel or improve. Instead, their optimal strategy would be to operate by doing the minimum work necessary, as cheaply as possible, and this will result in a degraded network performance.

For this reason, I strongly suggest the BNB Smart Chain community to scrap this proposal, and instead debate on whether and how to standardize MEV extraction on the BNB chain.

One possible solution is to integrate MEV-Boost built-in the BSC client, similar to the way it is done on Ethereum, to allow all validators to extract MEV. A better longer term solution might be Proposer/Builder Separation on the protocol level, similar to what is planned on Ethereum.

> In the meantime, the BNB Smart Chain community should be alert that if MEV extracting validators will be prevented from adding more validators to the network, they will have no incentive to share their MEV profits with their delegators. This will result in lower APR for the delegators, which is already at all times low.
>
> Increasing delegators APR is another reason to consider standardizing MEV as a priority, as otherwise, more and more delegators will convert their BNB to ETH as the yield for staking ETH on Ethereum is much higher than it is for staking BNB on the BNB chain, thanks in part to the built-in MEV extraction support on Ethereum.

Thanks for in-depth reply, I would try to explain from my side:
1.The motivation of this BEP is not for empty block, as I have said, it is about the validator reward, how to reward the validators according to their true contribution.

2.MEV is another big topic, but it is `not the real intention` of this BEP as well. IMO, it would be better for a third-party to provide this service, since it is not part of the consensus. Ethereum has considered PBS, but many details are not settled yet, it could take a very long time to support it officially. This BEP will not solve the MEV problems.

3.Reply to some of your concerns:
Q1: validator could save cost on hardware and reluctant to add transactions.
A1: it could loss the 50% block reward in this case. The device cost should be affordable, and this BEP would not be applied if validator could gain higher APR by not adding transactions. We will take into consideration, make sure it would not be a problem.

Q2:validator with higher APR attracts more staking and gradually take over the network
A2:it is the challenge of all the PoS based chain. Generally speaking, the big stake holder should contribute to make a better network, but it could hurt smaller holders in short term. it could be a problem, but same as MEV, it is another topic, not be covered in this BEP.

4.I will not scrap this BEP right now, but it would not be enabled in a hurry. We will do further investigation on it to address your concerns. And appreciate the feedback from you and `48ClubIan` . There is a long way to go to build the 100% incentive mechanism to make sure every participant can be rewarded according to their contribution, even developer, bug reporter, P2P provider, archive node... I believe it won't be accomplished in short term, this BEP could be only a small part of it.

 2

---

⎋  This was referenced on Dec 26, 2022

**[R4R] implement BEP-176: Validator Reward Model 2.0** bnb-chain/bsc#1241

⚟ Closed

**feat(reward): implement BEP-176: Validator Reward Model 2.0** bnb-chain/bsc-genesis-contract#217

⚟ Open

Case 1:23-cv-01599-ABJ   Document 53-4   Filed 06/12/23   Page 20 of 88

**Reviewers**

No reviews

---

**Assignees**

No one assigned

---

**Labels**

None yet

---

**Projects**

None yet

---

**Milestone**

No milestone

---

**Development**

Successfully merging this pull request may close these issues.

None yet

---

**8 participants**



# EXHIBIT BH-34

PAXOS (https://paxos.com)

☰



# BUSD

Paxos **no longer** mints new BUSD, but allows customers to redeem BUSD for USD or convert their BUSD to USDP. Learn more. (https://paxos.com/2023/02/13/paxos-will-halt-minting-new-busd-tokens/)

View Reports (https://paxos.com /busd-transparency/)

About BUSD



## Regulated

Paxos and BUSD are approved and regulated by the New York State Department of Financial Services, ensuring the utmost of consumer protections.



## Backed by Dollars

BUSD is 100% backed by reserves held in either or both (i) fiat cash in dedicated omnibus accounts at insured U.S. banks[1] and/or (ii) U.S. Treasury bills (including through repurchase agreements and/or money-market funds invested in U.S. Treasury bills).



**Transparent**

A top auditing firm will attest to the matching supply of BUSD tokens and underlying U.S. dollars on a monthly basis.

---

[1]FDIC Pass Through Insurance Disclosures (https://paxos.com/2022/08/09/fdic-pass-through-insurance-disclosures/)

Regulation & Transparency

Building trust in digital assets with regulated blockchain infrastructure & regulated, fully-backed USD stablecoins.

**LEARN MORE → (http://paxos.com/regulation-and-transparency)**

# Learn More About Paxos, Launching Your Own Crypto Solution and Stablecoins



(https://insights.paxos.com/stablecoins101)

How Stablecoins Support an Open Financial System
(https://insights.paxos.com/stablecoins101)

**READ MORE → (https://insights.paxos.com/stablecoins101)**



(https://paxos.com/2022/09/23/rise-in-stablecoin-use-inspires-greater-financial-connectivity/)

Rise In Stablecoin Use Inspires Greater Financial Connectivity
(https://paxos.com/2022/09/23/rise-in-stablecoin-use-inspires-greater-financial-connectivity/)

**READ MORE → (https://paxos.com/2022/09/23/rise-in-stablecoin-use-inspires-greater-financial-connectivity/)**

(https://paxos.com/2022/07/08/transparency-and-trust-in-paxos-issued-stablecoins/)

## Transparency and Trust in Paxos-Issued Stablecoins (https://paxos.com/2022/07/08/transparency-and-trust-in-paxos-issued-stablecoins/)

**READ MORE  → (https://paxos.com/2022/07/08/transparency-and-trust-in-paxos-issued-stablecoins/)**

**Products**

**Company**

About (https://paxos.com/company/)

FAQs (https://paxos.com/category/common-questions/)

Newsroom (https://paxos.com/newsroom/)

Blog (https://paxos.com/blog/)

Careers (https://paxos.com/careers/)

Crypto Brokerage (https://paxos.com/crypto-brokerage/)

Stablecoin and Payments (https://paxos.com/stablecoin-and-payments/)

USDP (https://paxos.com/usdp/)

BUSD (https://paxos.com/busd/)

PAXG (https://paxos.com/paxgold/)

itBit (https://paxos.com/itbit/)

Securities Settlement (https://paxos.com/securities-settlement/)

Commodities Settlement (https://paxos.com/commodities-settlement/)

## Resources

User Guide (https://help.paxos.com)

Regulation & Transparency (https://paxos.com/regulation-and-transparency/)

Contact (https://paxos.com/contact/)

## Social

(https://twitter.com/paxosglobal)

(https://www.facebook.com/PaxosGlobal/)

(https://www.linkedin.com/company/paxos/)

(http://www.medium.com/paxos)

© 2023 Paxos Trust Company, LLC All Rights Reserved. NMLS #1766787

From Forbes. © 2020 Forbes. All rights reserved. Used under license.
From Fortune. © 2020 Fortune Media IP Limited All rights reserved. Used under license.
From The New York Times. © 2015 The New York Times Company. All rights reserved. Used under license.

Terms and Conditions (/general-terms-and-conditions/) | Privacy Policy (/privacy-policy) | Cookie Policy (/cookie-policy)

# EXHIBIT BH-35

Case 1:23-cv-01599-ABJ   Document 53-4   Filed 06/19/23   Page 31 of 88

  Log In    Register    

 Register now and get verified - Enjoy Welcome Rewards up to $100!    →

## Understanding BUSD and Binance-Peg BUSD

2022-11-15



# BUSD Transparency

BUSD is a stablecoin pegged to the US Dollar (USD) and issued by Paxos with branding support from Binance. It is approved by the New York Department of Financial Services (NYDFS), a regulator known throughout the finance industry for applying exceptionally rigorous standards to the entities and products it oversees. The asset is always available for purchase and redemption at a rate of 1 BUSD to 1 USD.

BUSD is designed with three key areas in mind: high-quality reserves, audits, and regulation. Well-designed stablecoins should only be backed by cash and short-term US Treasuries with a maturity of **fewer than 90 days.** To ensure maximum transparency, monthly reserve attestation reports & monthly holding reports are provided, allowing anyone to verify that BUSD is 100% backed by cash or cash equivalents.

# EXHIBIT BH-36

President's Working Group on Financial Markets,
the Federal Deposit Insurance Corporation,
and the Office of the Comptroller of the Currency

# Report on
# STABLECOINS

**November 2021**

# CONTENTS

Executive Summary..................................................................... 1

I. Background ............................................................................. 4

    Creation and Redemption of the Stablecoin.................................... 4

    Transfer and Storage of the Stablecoin ........................................ 5

    Activities and Participants in Stablecoin Arrangements ................... 6

    Use of Stablecoins .................................................................... 7

    Digital Asset Trading Platforms and DeFi...................................... 8

II. Risks and Regulatory Gaps ................................................... 12

    Loss of Value: Risks to Stablecoin Users and Stablecoin Runs......... 12

    Payment System Risks ............................................................ 12

    Risks of Scale: Systemic Risk and Concentration of Economic Power ... 14

    Regulatory Gaps .................................................................... 14

III. Recommendations................................................................ 15

    Legislation............................................................................. 16

    Interim Measures................................................................... 18

    Illicit Finance Risk ................................................................ 19

    International Standards ......................................................... 22

    Annex: List of Outreach Participants ..................................... 23

# INTERAGENCY REPORT ON STABLECOINS

## Executive Summary

Stablecoins are digital assets that are designed to maintain a stable value relative to a national currency or other reference assets. Today, stablecoins are primarily used in the United States to facilitate trading, lending, or borrowing of other digital assets, predominantly on or through digital asset trading platforms. Proponents believe stablecoins could become widely used by households and businesses as a means of payment. If well-designed and appropriately regulated, stablecoins could support faster, more efficient, and more inclusive payments options. Moreover, the transition to broader use of stablecoins as a means of payment could occur rapidly due to network effects or relationships between stablecoins and existing user bases or platforms.

Stablecoins and stablecoin-related activities present a variety of risks. Speculative digital asset trading,[1] which may involve the use of stablecoins to move easily between digital asset platforms or in decentralized finance (DeFi) arrangements, presents risks related to market integrity and investor protection. These market integrity and investor protection risks encompass possible fraud and misconduct in digital asset trading, including market manipulation, insider trading, and front running, as well as a lack of trading or price transparency. Where these activities involve complex relationships or significant amounts of leverage, there may also be risks to the broader financial system. In addition, digital asset trading platforms and other market participants play a key role in providing access to stablecoins and liquidity in the market for stablecoins. To the extent activity related to digital assets falls under the jurisdiction of the Securities and Exchange Commission (SEC) and Commodity Futures Trading Commission (CFTC), the SEC and CFTC have broad enforcement, rulemaking, and oversight authorities that may address certain of these concerns (*for more detail, see **Digital Asset Trading Platforms and DeFi***).

Stablecoins also pose illicit finance concerns and risks to financial integrity, including concerns related to compliance with rules governing anti-money laundering (AML) and countering the financing of terrorism (CFT) and proliferation. To prevent misuse of stablecoins and other digital assets by illicit actors, Treasury will continue leading efforts at the Financial Action Task Force (FATF) to encourage countries to implement international AML/CFT standards and pursue additional resources to support supervision of domestic AML/CFT regulations. Illicit finance concerns, and recommendations to mitigate illicit finance risks, are discussed in more detail in ***Illicit Finance Risk***.

In addition to market integrity, investor protection, and illicit finance concerns, the potential for the increased use of stablecoins as a means of payment raises a range of prudential concerns. If stablecoin issuers do not honor a request to redeem a stablecoin, or if users lose confidence in a stablecoin issuer's ability to honor such a request, runs on the arrangement could occur that may result in harm to users and the broader financial system. Further, to the extent stablecoins are widely used to facilitate payments, disruptions to the payment chain that allows stablecoins to be transferred among users could lead to a loss of payments efficiency and safety and undermine the functioning of the

---

1   In general, references in this document to "digital asset trading" include trading, lending, or borrowing transactions that involve digital assets.

broader economy. The potential for stablecoin arrangements to scale rapidly raises additional issues related to systemic risk and concentration of economic power.

There are key gaps in prudential authority over stablecoins used for payments purposes. This report focuses on analyzing prudential risks posed by stablecoins used as a means of payment and provides recommendations for addressing these gaps.[2] These prudential recommendations apply to "payment stablecoins," defined as those stablecoins that are designed to maintain a stable value relative to a fiat currency and, therefore, have the potential to be used as a widespread means of payment. These stablecoins are often, although not always, characterized by a promise or expectation that the stablecoin can be redeemed on a one-to-one basis for fiat currency.

To address the prudential risks of payment stablecoins, the President's Working Group on Financial Markets (PWG),[3] along with the Federal Deposit Insurance Corporation (FDIC) and the Office of the Comptroller of the Currency (OCC) (together, the agencies) recommend that **Congress act promptly to enact legislation to ensure that payment stablecoins and payment stablecoin arrangements are subject to a federal prudential framework on a consistent and comprehensive basis**. Because payment stablecoins are an emerging and rapidly developing type of financial instrument, legislation should provide regulators flexibility to respond to future developments and adequately address risks across a variety of organizational structures. Such legislation would complement existing authorities with respect to market integrity, investor protection and illicit finance, and would address key prudential concerns:

- **To address risks to stablecoin users and guard against stablecoin runs**, legislation should require stablecoin issuers to be insured depository institutions, which are subject to appropriate supervision and regulation, at the depository institution and the holding company level.

- **To address concerns about payment system risk**, in addition to the requirements for stablecoin issuers, legislation should require custodial wallet providers[4] to be subject to appropriate federal oversight. Congress should also provide the federal supervisor of a stablecoin issuer with the authority to require any entity that performs activities that are critical to the functioning of the stablecoin arrangement to meet appropriate risk-management standards.

---

2   Stablecoins are being used for trading, lending, borrowing, and, in the future, may also be widely used by households and businesses as a means of payment. This report does not provide recommendations regarding issues or risks under the federal securities laws or the Commodity Exchange Act (CEA) as they pertain to any digital assets, digital asset trading platforms, DeFi, stablecoins or stablecoin arrangements, and the prudential framework recommendations are not intended to affect any analysis under the federal securities laws or the CEA.

3   Executive Order 12631 of March 18, 1988 (Working Group on Financial Markets) established the President's Working Group on Financial Markets, which is chaired by the Secretary of the Treasury, or their designee, and includes the Chair of the Board of Governors of the Federal Reserve System, the Chair of the Securities and Exchange Commission, and the Chair of the Commodity Futures Trading Commission, or their designees. The OCC and the FDIC also joined in this report.

4   Digital "wallets" provide a variety of services to users, including facilitating the transfer of stablecoins between users. A "custodial wallet provider" is a wallet provider that users may rely on to hold stablecoins on their behalf.

- **To address additional concerns about systemic risk and concentration of economic power**, legislation should require stablecoin issuers to comply with activities restrictions that limit affiliation with commercial entities. Supervisors should have authority to implement standards to promote interoperability among stablecoins. In addition, Congress may wish to consider other standards for custodial wallet providers, such as limits on affiliation with commercial entities or on use of users' transaction data.

In the immediate term, the agencies are committed to taking action to address risks falling within each agency's jurisdiction, including efforts to ensure that stablecoins and related activity comply with existing legal obligations, as well as continued coordination and collaboration on issues of common interest.

In addition, in the absence of Congressional action, which is urgently needed to address the prudential risks inherent in payment stablecoins, the agencies recommend that the Financial Stability Oversight Council (Council) consider steps available to it to address the risks outlined in this report. Such steps may include designation of certain activities conducted within a stablecoin arrangement as, or as likely to become, systemically important payment, clearing, and settlement activities.

The rapid growth of stablecoins increases the urgency of this work. Failure to act risks growth of payment stablecoins without adequate protection for users, the financial system, and the broader economy. In contrast, a regulatory framework that supports confidence in payment stablecoins, in normal times and in periods of stress, could increase the likelihood of stablecoins supporting beneficial payments options. The recommendations in this report build on the work of international forums, including the Financial Stability Board, on stablecoin arrangements. *See **International Standards*** for more detail.

While the scope of this report is limited to stablecoins, work on digital assets and other innovations related to cryptographic and distributed ledger technology is ongoing throughout the Administration. The Administration and the financial regulatory agencies will continue to collaborate closely on ways to foster responsible financial innovation, promote consistent regulatory approaches, and identify and address potential risks that arise from such innovation.

The remainder of this report is organized as follows: ***Part I*** provides background on stablecoins, focusing on the mechanisms that support the creation and redemption of stablecoins, the transfer and storage of stablecoins, and the activities and participants necessary to support a stablecoin arrangement; ***Part II*** of the report describes key prudential risks, and prudential regulatory gaps, attendant to the use of stablecoins as a means of payment; and ***Part III*** describes the agencies' recommendations for addressing prudential risks.

# I. Background

### Creation and Redemption of the Stablecoin

Stablecoins are generally created, or "minted," in exchange for fiat currency that an issuer receives from a user or third-party. To maintain a stable value relative to fiat currency, many stablecoins offer a promise or expectation that the coin can be redeemed at par upon request. These stablecoins are often advertised as being supported or backed by a variety of "reserve assets."[5] However, there are no standards regarding the composition of stablecoin reserve assets, and the information made publicly available regarding the issuer's reserve assets is not consistent across stablecoin arrangements as to either its content or the frequency of its release. Based on information available, stablecoins differ in the riskiness of their reserve assets, with some stablecoin arrangements reportedly holding virtually all reserve assets in deposits at insured depository institutions[6] or in U.S. Treasury bills, and others reportedly holding riskier reserve assets, including commercial paper, corporate and municipal bonds, and other digital assets.

Stablecoin redemption rights can also vary considerably, in terms of both who may present a stablecoin to an issuer for redemption and whether there are any limits on the quantity of coins that may be redeemed.[7] Some issuers are permitted under the terms of the arrangement to postpone redemption payments for seven days, or even to suspend redemptions at any time, giving rise to considerable uncertainty about the timing of redemptions. As a further point of variation, stablecoins also differ in the nature of the claim provided to the user, with some providing a claim on the issuer and others providing no direct redemption rights to users.[8] Moreover, users' ability to redeem their stablecoin may be affected by other aspects of the stablecoin arrangement, including the ability to transfer the proceeds of any redemption into the banking system.

By comparison, a demand deposit held at an insured depository institution is a claim on the issuing bank that provides the depositor with the right to receive U.S. dollars upon request. The value of this claim is insured up to certain amounts and entitled to depositor preference in resolution. In addition, the issuing institution may access emergency liquidity, and is subject on an ongoing basis to supervision and regulation designed to limit the riskiness of the issuer's balance sheet and operations.

---

5  Stablecoins that are purportedly convertible for an underlying fiat currency are distinct from a smaller subset of stablecoin arrangements that use other means to attempt to stabilize the price of the instrument (sometimes referred to as "synthetic" or "algorithmic" stablecoins) or are convertible for other assets. Because of their more widespread adoption, this discussion focuses on stablecoins that are convertible for fiat currency.

6  In some stablecoin arrangements, reserve assets include deposits at insured depository institutions; however, this feature does not mean that deposit insurance extends to the stablecoin user. If the stablecoin issuer deposits fiat currency reserves at an FDIC-insured bank and does so in a manner that meets all the requirements for "pass-through" deposit insurance coverage, the deposit would generally only be insured to each stablecoin holder individually for up to $250,000. Without pass-through coverage, the deposit at the bank would be insured only to the stablecoin issuer itself, up to $250,000. *See* 12 C.F.R. § 330.5.

7  For example, some existing stablecoin issuers purport to place no limitations on the amount of stablecoins a holder (whether an end user or a digital asset platform) may redeem for a fiat currency, while others set minimum redemption amounts that must be met before the issuer will process a redemption request. In some cases, these minimum redemption amounts may be considerably greater than the value of stablecoins held by a typical user.

8  In addition, even if the purported value of stablecoins in circulation is equal to the value of the reserve assets, other creditors may have a claim on the reserve assets that competes with that of stablecoin holders.

## Transfer and Storage of the Stablecoin

To become useful as a means of payment, a stablecoin also must be readily transferrable with a reliable and accurate mechanism for transferring ownership. Stablecoin arrangements typically facilitate the transfer of coins between or among users of the stablecoin arrangement, by having issuers and other participants record the transfer either "on the books" of the wallet provider (for transactions between users of the same wallet provider[9]) or on the distributed ledger (for transactions involving users of different wallets).[10] In this sense, they can facilitate the transfer of value as in payment systems.[11] More specifically, the payment processes underlying both distributed ledger and traditional payment systems share similarities, in that they each rely on the following conceptual steps: (1) initiation of payment, typically through a message to the payment network, (2) validation or verification of the integrity of the message and the conditions for settlement (e.g., sufficient funds), and (3) settlement of the transaction, in which value is transferred and the obligation is discharged.

Many of the stablecoins currently in circulation are underpinned by "public blockchain" networks.[12] Potential benefits and drawbacks inherent with any distributed network technology are present in these types of stablecoin arrangements, such as transparency provided by a public ledger. In particular, the process for public blockchains to come to agreement over updates to the ledger typically involves the node operators communicating and validating transactions and then agreeing to a new version of the ledger (often referred to as consensus).[13] Compared to a traditional centralized system, certain public blockchain networks are designed to require greater computational resources to achieve consensus, which in turn constrains the network's capacity for transaction throughput (i.e., maximum number of transactions capable of being processed per second) and may be more expensive and energy intensive than traditional payment systems.[14] In contrast to public blockchains, "permissioned blockchains" do not allow such open and direct access to the distributed ledger.[15] Compared to public blockchains, permissioned blockchains may offer more certainty as to who is responsible for monitoring the network and complying with the rules of the network (e.g., processing only valid transactions) and thus faster and more predictable settlement. Depending on design, however, they may also offer less transparency and security.

---

9   Transactions recorded on the books of a wallet provider or other holder of digital asset rather than on the distributed ledger are sometimes referred to as "off-chain" transactions.

10  Participants in stablecoin arrangements may be able to process stablecoin transfers internally. For example, a wallet provider could hold stablecoins on behalf of customers and allow its customers to send or receive stablecoins without interacting with the distributed ledger. Stablecoin arrangements may establish rules for how participants should conduct such internal transfers.

11  At various stages of the transfer process, the successful transfer of stablecoins might depend on wallet providers, node operators, and various other intermediaries and technologies.

12  In these types of arrangements, as a general matter, anyone can become a "node operator" responsible for one or both of the following functions: (1) communicating transactions to other participants, or (2) participating in the settlement and processing stablecoin transactions. In a public blockchain network, by design, no prior approval is needed for parties to participate in these activities; in principle, the arrangement's integrity is guaranteed by the underlying consensus mechanism (e.g., proof-of-work or proof-of-stake).

13  See "Payment System Risks," in *Part II* below, for more information on consensus-based settlement mechanisms.

14  While these issues are not the focus of this report, Treasury and the Council are actively engaged in addressing climate-related financial risks through a number of different initiatives. See e.g., Financial Stability Oversight Council, *Report on Climate-Related Financial Risk*, (October 2021), https://home.treasury.gov/system/files/261/FSOC-Climate-Report.pdf

15  The term "permissioned blockchains" refers to blockchain networks that require participants to obtain permission to access the blockchain, thereby creating a control layer on top of the blockchain to govern the actions performed by the allowed participants.

As a further point of variation among stablecoins, in some stablecoin arrangements, individual users can directly hold and spend the stablecoins they own without relying on a third-party custodian or custodial wallet provider.[16] In these cases, stablecoins are akin to bearer assets that can be transferred in a peer-to-peer fashion among those who maintain an address on the appropriate blockchain network. In contrast, other types of stablecoin arrangements can only be accessed by having an account with a wallet provider. In these arrangements, a limited group of participants are responsible for transferring assets on behalf of account holders.

Unlike most stablecoins, the traditional retail non-cash payments systems—that is, check, automated clearing house (ACH), and credit, debit, or prepaid card transactions—all rely on financial institutions for one or more parts of this process, and each financial institution maintains its own ledger of transactions that is compared to ledgers held at other institutions and intermediaries. Together, these systems process over 600 million transactions per day.[17] In 2018, the number of non-cash payments by consumers and businesses reached 174.2 billion, and the value of these payments totaled $97.04 trillion.[18] Risk of fraud or instances of error are governed by state and federal laws, and within the boundaries of these laws, transparent rules governing participation in the payment network may provide for allocation of loss more generally with respect to participating financial institutions.[19] For example, such payment network rules govern the order in which transactions are processed and limit customer liability for unauthorized transactions.

### Activities and Participants in Stablecoin Arrangements

The key functions performed by a stablecoin arrangement—as described above, (1) creation and redemption of the stablecoin, (2) its transfer between parties, and (3) storage of the stablecoin by users—typically entail a range of different activities. While there is some variation among stablecoin arrangements, these key functions are generally supported by the following activities:

- **Governance** – Governance functions include defining and ensuring compliance with standards related to the purchasing, redeeming, holding, and transferring of stablecoins.

- **Management of Reserve Assets** – Stablecoin arrangements that are supported by reserve assets typically define the standards for the composition of those assets and purport to ensure a one-to-one ratio between reserve assets and the par value of stablecoins outstanding. Management of the reserve assets involves making investment decisions with respect to the reserve, including with respect to the riskiness of the assets.

- **Custody of Reserve Assets** – Stablecoins that are supported by reserve assets typically require a custodian or trust to acquire and hold the assets and execute transactions to facilitate management of reserve assets, in adherence with standards for reserve assets described above.

---

16  Despite this capability, many users voluntarily rely on such custodians.

17  *See* Mills, David et al., *Distributed ledger technology in payments, clearing, and settlement*, (BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Finance and Economics Discussion Series 2016-095, December 2016), https://doi.org/10.17016/FEDS.2016.095

18  This amount includes prepaid and non-prepaid debit cards, credit cards, ACH credit and debit transfers, and checks, which comprise a set of noncash payment types commonly used today by consumers and businesses in the United States. *See* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *2019 Federal Reserve Payments Study*, (December 2019), https://www.federalreserve.gov/newsevents/pressreleases/files/2019-payments-study-20191219.pdf

19  *See, e.g.*, U.C.C. Article 4, 12 C.F.R. § 1005 (Reg. E), 12 C.F.R. § 226 (Reg. Z), National Automated Clearing House Association (NACHA) Operating Rules.

- **Settlement** – Transfers of digital assets such as stablecoins on a distributed ledger require other parties to process stablecoin transactions (e.g., to engage in authentication and validation) and, for on-chain transactions, to update the ledger in accordance with the underlying protocol.

- **Distribution** – Distribution of the stablecoin to users, such as consumers and businesses, involves providing access channels and other services that allow users to obtain, hold, and transact in the stablecoin.

These activities may be conducted by one or more parties and may be highly distributed and complex. For example, one party (or set of parties) may be responsible for aspects of governance, another for the minting and burning of coins, another for distributed ledger operation, validation, or settlement, another for reserve management, and others for interfacing with users of the coin. While many of these activities are generally carried out by a stablecoin issuer and its agents, others may be performed by third parties. For example, with respect to distribution, stablecoin users may choose to rely on wallet providers or exchanges to facilitate their stablecoin holding and trading activities, such as communicating stablecoin transactions to the distributed ledger. In particular, users may choose to rely on custodial wallet providers to hold and facilitate the transfer of stablecoins on their behalf. Depending on the arrangement and its terms, users of a payment stablecoin may have only limited rights, if any, that they can assert against the stablecoin issuer; their recourse could be limited to their custodial wallet provider.

## Use of Stablecoins

The market capitalization of stablecoins issued by the largest stablecoin issuers exceeded $127 billion as of October 2021. This amount reflects a nearly 500 percent increase over the preceding twelve months.[20] The current market largely consists of a few large U.S. dollar-pegged stablecoins.



**Chart 1: Top Stablecoins by Market Capitalization (in billions)**

- USDT (Tether)
- USDC (USD Coin)
- BUSD (Binance USD)
- DAI (Dai Stablecoin)
- TUSD (TrueUSD)
- Others, including USDP (Pax Dollar) and GUSD (Gemini Dollar)

*Source: Coin Metrics, The Block*
*Updated: October 21, 2021*

---

20  Stablecoin supply grew from $21.5 billion on October 19, 2020 to $127.9 billion as of October 18, 2021, representing an increase of approximately 495 percent. *See Total Stablecoin Supply*, The Block, (October 18, 2021), https://www.theblockcrypto.com/data/decentralized-finance/stablecoins/total-stablecoin-supply-daily

At the time of publication of this report, stablecoins are predominantly used in the United States to facilitate trading, lending, and borrowing of other digital assets. For example, stablecoins allow market participants to engage in speculative digital asset trading and to move easily between digital asset platforms and applications, reducing the need for fiat currencies and traditional financial institutions. Stablecoins also allow users to store and transfer value associated with digital asset trading, lending, and borrowing within the distributed ledger environment, also reducing the need for fiat currencies and traditional financial institutions. Currently, digital asset trading platforms and other intermediaries also play a key role in providing access to and enabling trading of stablecoins, as well as in the stabilization mechanisms of stablecoin arrangements. *See Digital Asset Trading Platforms and DeFi*.

Beyond digital asset trading, several existing stablecoin issuers and entities with stablecoin projects under development have the stated ambition for the stablecoins they create to be used widely by retail users to pay for goods and services, by corporations in the context of supply chain payments, and in the context of international remittances. The extent to which stablecoins will be used for these purposes is difficult to predict and is likely to depend on the convenience of service options, the competitiveness of stablecoin transaction costs, and users' confidence in the stablecoin issuer, including confidence in the issuer's ability to maintain a stable value and facilitate redemption. However, the transition to more widespread use could occur quickly – for example, due to network effects or the ability of stablecoins to expand through relationships with existing user bases or platforms.

### Digital Asset Trading Platforms and DeFi

This section focuses on the activities and related risks of digital asset trading platforms and DeFi, and on the interactions between stablecoins and digital asset trading platforms and DeFi. Digital asset trading platforms and DeFi depend on stablecoins to facilitate borrowing, lending, and trading. At the same time, digital asset trading platforms and DeFi also play an important role in the current functioning of stablecoins. Digital asset trading platforms and DeFi also raise broader questions about digital asset market regulation, supervision, and enforcement. These questions are under active consideration by the CFTC and SEC but are not the subject of the recommendations in this report.

### Background

Stablecoins facilitate a large and growing volume of digital asset trading by allowing market participants to quickly convert volatile digital assets into a digital asset with more perceived stability, and vice versa; providing a digital asset with more perceived stability to transfer across platforms without the use of national currencies and reducing the need for traditional financial institutions; and serving as a source of collateral against which market participants can borrow to fund additional activity, sometimes using extremely high leverage. Market participants also use stablecoins to earn yield by transferring stablecoins into digital asset trading platforms, or by using stablecoins to serve as collateral for loans and margined transactions, in exchange for interest or returns. As evidence of the importance of stablecoins to the digital asset market, stablecoins are reportedly among the most highly traded assets as a percentage of total volume on several large venues that enable the trading of digital assets.

Stablecoins issued by a private entity and used for trading, lending, or borrowing purposes have unique risks associated with secondary market activity and market participants beyond the stablecoin issuer itself. Stablecoin arrangements generally require a mechanism for distribution to end users and a mechanism for repurchase or conversion of the stablecoins into national currency. These activities are often undertaken by market participants other than the stablecoin issuer. For example, rather than mint or redeem stablecoins through the issuer, most market participants rely on digital asset trading platforms to exchange stablecoins with national currencies (or even other stablecoins).

Key to some national currency-based stablecoin arrangements are the arbitrage activities of market participants. The active trading of stablecoins between parties is part of the essential stabilization mechanism to keep the price of the stablecoin close to or at the pegged value.

Digital asset trading platforms typically hold stablecoins for their customers in non-segregated omnibus custodial wallets and reflect trades on internal records (off-chain). These platforms and their affiliates can also have significant holdings of stablecoins, which may be co-mingled with their customers' stablecoins. The platform or its affiliates may also engage in active trading, on a principal basis, of the stablecoins that they distribute and as market makers, without any disclosure or oversight of, or constraint on, these proprietary trading activities.

**DeFi**

Stablecoins also play a central role in facilitating trading, lending, and borrowing activity in DeFi. "DeFi" broadly refers to a variety of financial products, services, activities, and arrangements supported by smart contract-enabled distributed ledger technology. This technology can reduce the use of traditional financial intermediaries and centralized institutions to perform certain functions, although the degree of decentralization across DeFi differs widely. In some cases, despite claims of decentralization, operations and activities within DeFi are highly concentrated in and, governed or administered by, a small group of developers and/or investors. Despite some asserted distinctions from more traditional or centralized financial products, services, and activities, DeFi arrangements often offer the same or similar products, services, and activities, and raise similar investor and consumer protection, market integrity, and policy concerns.

Stablecoins are central to the functioning of DeFi, as they are often used in DeFi arrangements to facilitate trading or as collateral for lending and borrowing. For example, stablecoins often are one asset in a pair of digital assets used in a so-called "automated market maker" or "AMM" arrangements. The AMM is a mechanism designed to create liquidity for others seeking to effectuate trades. As another example, stablecoins are frequently "locked" in DeFi arrangements to garner yield from interest payments paid by others borrowing those stablecoins from the arrangement for leveraged trading or other activities.

Industry measures for the size of DeFi participation, although unverified, include the percentage of stablecoins that are "locked" in Ethereum smart contracts. Ethereum currently is the predominant blockchain on which DeFi protocols and applications function. The chart below includes the type of national-currency referenced stablecoins discussed in this report (USDC and USDT), as well as an algorithmic stablecoin (DAI).

**Chart 2: Percentage of Stablecoin Supplies Locked in Ethereum Smart Contracts**



*Source: Glassnode*
*Updated: October 20, 2021*

**Risks**

Digital asset trading platforms and DeFi arrangements present risks of particular focus to the agencies, and most notably to the SEC and CFTC. Among others, these risks include:

- Risks of fraud, misappropriation, and conflicts of interest, including those arising from misleading disclosures to the market, misuse of inside information, and manipulative trading activities;

- Reliance of stablecoin arrangements on digital asset trading platforms (e.g., for distribution, to enable customers to convert stablecoins into national currency, and to facilitate arbitrage mechanisms), such that a failure or disruption to the digital asset trading platform could threaten the stablecoin;

- Reliance of digital asset trading platforms on stablecoins (e.g., to facilitate transactions occurring on the platform, or as a means of storing platform reserves), such that a failure or disruption of the stablecoin could threaten the digital asset trading platform;

- Money laundering and terrorist financing risks;

- Excessive leverage facilitated by use of stablecoins as collateral on unregulated or non-compliant trading platforms;

- Risks as a result of digital asset trading platforms' non-compliance with applicable regulations;

- Interlinkages between digital asset trading platforms and stablecoins, including in platforms' ownership of stablecoins (and potential co-mingling with customer funds);

- Information asymmetries and market abuse as a result of inaccurate, limited or non-standard trade and price reporting from certain platforms related to stablecoin and other digital asset transactions that could adversely affect users of the stablecoin and the trading platforms;

- Market integrity risks as a result of manipulative or deceptive trading activity on unsupervised trading venues;
- Risks resulting from unique aspects of distributed ledger-based arrangements, including governance issues, interoperability, scalability, protocol and smart contract vulnerabilities, cybersecurity, and other operational issues; and,
- Risks resulting from novel custody and settlement processes that lack standardization and quality control.

**SEC and CFTC Regulatory Authority**

In addition to existing AML/CFT regulations, stablecoin arrangements and activities may implicate the jurisdiction of the SEC and/or CFTC. As an initial matter, and depending on their structure, stablecoins, or certain parts of stablecoin arrangements, may be securities, commodities, and/or derivatives. Moreover, much of the trading, lending, and borrowing activity currently fueled by stablecoins on digital asset trading platforms and within DeFi similarly may constitute securities and/or derivatives transactions that must be conducted in compliance with federal securities laws and the CEA, including applicable regulations. To the extent that a given stablecoin activity falls within the jurisdiction of the SEC and/or CFTC, it must be conducted in compliance with applicable provisions of the federal securities laws and/or the CEA.

For digital assets, including stablecoins, that are securities within the SEC's jurisdiction, the federal securities laws cover, for example, digital asset offers, sales, and promotions; investment company activities where the stablecoin issuer or platforms holding stablecoins are engaging in the business of investing in securities and meet the definition of "investment company;" investment adviser activities where entities provide advice on securities (such as in connection with the investment of stablecoin proceeds); and activities of intermediaries and trading platforms.

For digital assets, including stablecoins, that are, or incorporate, commodity futures, options, and swaps within the CFTC's jurisdiction, the CEA provides the CFTC with regulatory authority over all persons engaged in relevant transactions. For example, the CFTC's regulatory authority covers intermediaries and exchanges offering or engaged in commodity futures, options, and swaps, as well as certain leveraged retail transactions. In addition, the CFTC maintains certain antifraud and anti-manipulation authority over commodity transactions in interstate commerce, which includes digital assets that are commodities as defined by the CEA.

As markets for digital assets and DeFi grow, it is essential to address the significant investor and market risks that could threaten end users and other participants in stablecoin arrangements and secondary market activity. This may be accomplished through promotion of investor and market protection measures, such as requiring clear and complete disclosures and protecting against fraud, manipulation, and other risks. Regulatory oversight of digital asset trading platforms and intermediaries promotes important investor and market protections by providing for, among other things, appropriate rulemaking, examination, supervision, and enforcement authorities. Oversight also provides, among other things, trading and price transparency, and protections against fraud and misconduct, including market manipulation, insider trading, and front running.

# II. Risks and Regulatory Gaps

**Loss of Value: Risks to Stablecoin Users and Stablecoin Runs**

An instrument can serve as a reliable means of payment or store of value only when there is confidence in its value, particularly in periods of stress. For stablecoins, this confidence could arise in part from its redeemability, and the belief that such redeemability is supported by a stabilization mechanism that will function effectively both during normal conditions and during periods of stress. Confidence in a stablecoin may be undermined by factors including: (1) use of reserve assets that could fall in price or become illiquid;[21] (2) a failure to appropriately safeguard reserve assets; (3) a lack of clarity regarding the redemption rights of stablecoin holders;[22] and (4) operational risks related to cybersecurity and the collecting, storing, and safeguarding of data.

Failure of a stablecoin to perform according to expectations would harm users of that stablecoin and could pose systemic risk. The mere prospect of a stablecoin not performing as expected could result in a "run" on that stablecoin – i.e., a self-reinforcing cycle of redemptions and fire sales of reserve assets. Fire sales of reserve assets could disrupt critical funding markets, depending on the type and volume of reserve assets involved. Runs could spread contagiously from one stablecoin to another, or to other types of financial institutions that are believed to have a similar risk profile. Risks to the broader financial system could rapidly increase as well, especially in the absence of prudential standards. The internal dynamics of a stablecoin run, as well as the potential implications of such a run for the financial system and broader economy, would likely depend on the volume and liquidity characteristics of reserve assets sold,[23] as well as on broader economic and financial conditions. Some stablecoin arrangements are already sizable, and many stablecoins are growing. A run occurring under strained market conditions may have the potential to amplify a shock to the economy and the financial system.

**Payment System Risks**

Stablecoin arrangements' transfer mechanisms (and potentially other aspects of the arrangements' activities) between issuance and redemption can provide opportunities for efficient payment processing but also can pose risks to their participants and the broader financial system. Payment stablecoins face many of the same basic risks as traditional payment systems, including credit risk, liquidity risk, operational risk, risks arising from improper or ineffective system governance, and settlement risk.[24] When not managed comprehensively, these risks can make payment systems less available and less reliable for users, and they can create financial shocks or operate as a channel through which financial shocks spread.

---

21   These risks may be amplified by a lack of transparency with respect to the composition of reserve assets, as well as a lack of controls on conflicts of interest between stablecoin issuers and stablecoin holders regarding permissible reserve asset investments.

22   For example, there may be a lack of clarity as to whether stablecoin holders have a direct claim on reserve assets or whether there are creditors with a competing claim on such assets.

23   The financial stability risks of a stablecoin run would be greater in the context of stablecoins backed by potentially volatile and illiquid assets than in the context of stablecoins backed one-for-one by high quality liquid assets.

24   *See* Committee on Payment and Settlement Systems and the Technical Committee of the International Organization of Securities Commissions, *Principles for financial market infrastructures*, (Bank for International Settlements, April 2012), at p. 174 (Annex H), https://www.bis.org/cpmi/publ/d101a.pdf

These risks have the potential to manifest in novel ways as a result of a stablecoin arrangement's use of different technologies, transaction processes, and governance structures, among other factors. For example, unlike traditional payment systems where risk is managed centrally by the payment system operator, some stablecoin arrangements feature decentralized decision-making and complex operations where no single organization is responsible or accountable for risk management and resilient operation of the entire arrangement.

"Operational risk" is the risk that deficiencies in information systems or internal processes, human errors, management failures, or disruptions from external events will result in the reduction, deterioration, or breakdown of services. Operational issues in a payment system can disrupt the ability of users to make payments, which can in turn disrupt economic activity. If an operational problem results in a payment error or enables fraudulent payments, users could lose their money. Stablecoin arrangements face many of the same types of operational risks as existing payment systems but could have the potential to be more operationally resilient in some respects. However, they can also face novel operational risks related to the validation and confirmation of stablecoin transactions and the management and integrity of the distributed ledger. For example, incentives to validate transactions may not adequately motivate participants to respond to demand for processing transactions, resulting in network congestion. Operational risks may also be more difficult to manage or supervise in a stablecoin arrangement, especially when the supporting infrastructure is beyond the control of any one organization (including the entities involved in the stablecoin arrangement) and there is no clear entity to regulate.

"Settlement risk" is the risk that settlement in a payment system will not take place as expected. Well-designed and well-operated payment systems ensure transactions settle reliably, giving users confidence that their funds settlement is certain and final at a given time. Stablecoin arrangements that do not clearly define the point at which settlement is final in their rules and procedures can pose heightened uncertainty and create credit and liquidity pressures for arrangement participants. For example, many distributed ledger networks are permissionless, requiring no prior approval for new users to participate in network activities. When open network access is combined with consensus-based settlement mechanisms, technical settlement may be subject to uncertainty for longer periods, with no single party accountable for defining or ensuring legal settlement finality, creating questions about the reliability and finality of payments.

In addition, "liquidity risk" can arise in a stablecoin arrangement from misalignment of the settlement timing and processes between stablecoin arrangements and other systems (e.g., if a stablecoin arrangement operates 24/7, but the payment system used for funding stablecoin issuance and returning fiat currency upon stablecoin redemption has regular business hours), causing temporary shortages in the quantity of stablecoins available to make payments.

These risks may remain inadequately addressed for stablecoin arrangements due to the lack of consistent risk-management standards among arrangements, the number of different key parties that may be involved in an arrangement, and the operational complexity of an arrangement.[25] Moreover, if many entities are involved in operating the infrastructure where transfers take place, it may be challenging for the supervisor of the issuer to require that the arrangement's rules support effective risk management and governance across the entire arrangement.

---

25  Wallet providers themselves may, as to certain of their activities, be subject to varying levels of regulation and supervision by the states in which they operate, depending on the services provided and the laws and regulations of each state.

## Risks of Scale: Systemic Risk and Concentration of Economic Power

While small in comparison to traditional forms of private and public money, stablecoins have grown rapidly in the last year and may continue to grow rapidly at both an individual and aggregate level. For individual stablecoins, the potential for rapid growth may reflect economies of scale and scope; network effects that cause demand for a specific stablecoin to increase as more firms and consumers use the stablecoin; and first-mover advantages. In some cases, rapid scaling may be supported by access to existing customer bases and further enabled by access to end users' data.

The potential for an individual stablecoin to scale rapidly raises three sets of policy concerns. First, a stablecoin issuer or a key participant in a stablecoin arrangement (e.g., a custodial wallet provider) could pose systemic risk – meaning that the failure or distress of that entity could adversely affect financial stability and the real economy.[26] Second, the combination of a stablecoin issuer or wallet provider and a commercial firm could lead to an excessive concentration of economic power. These policy concerns are analogous to those traditionally associated with the mixing of banking and commerce, such as advantages in accessing credit or using data to market or restrict access to products. This combination could have detrimental effects on competition and lead to market concentration in sectors of the real economy. Third, a stablecoin that becomes widely adopted as a means of payment could present concerns about anti-competitive effects, for example, if users of that stablecoin face undue frictions or costs in the event they choose to switch to other payment products or services. Concerns about anti-competitive effects are thus likely to be greater absent interoperability standards for stablecoins and stablecoin arrangements.

In addition to the potential for individual stablecoins to scale rapidly, the aggregate growth of stablecoins could also have important implications for the financial system and the macroeconomy. If insured depository institutions lose retail deposits to stablecoins, and the reserve assets that back stablecoins do not support credit creation, the aggregate growth of stablecoins could increase borrowing costs and impair credit availability in the real economy. The perception of the safety of insured depository institutions relative to stablecoins could also shift during times of stress, with large and sudden inflows or outflows of deposits possible.

## Regulatory Gaps

Today, stablecoin arrangements are not subject to a consistent set of prudential regulatory standards that address the risks discussed above. Moreover, the number of different key parties that may be involved in an arrangement, and the operational complexity of these arrangements, pose challenges for supervisory oversight. For example, even if a given issuer of stablecoin is a bank, insight into the activities of key entities in the arrangement depends on the structure of the relationship and

---

26  These risks may be exacerbated by a lack of adequate recovery and resolution planning. While the recovery and resolution implications for stablecoin arrangements may vary based on their structures, many would likely be subject to the provisions of Chapter 7 and/or 11 of the Bankruptcy Code. Several other resolution schemes could also be involved, and non-US and cross-border issues could also arise.

the nature of the services, if any, provided to the issuer bank as client.[27] To address these gaps, a consistent and comprehensive regulatory framework is needed both to increase transparency into key aspects of stablecoin arrangements and to ensure that stablecoins function in both normal times and in stressed market conditions.

# III. Recommendations

As discussed above, stablecoins have multiple uses involving different types of participants and arrangements, which implicate a range of regulatory concerns. Stablecoins and stablecoin arrangements raise significant concerns from an investor protection and market integrity perspective. Stablecoin arrangements and digital asset trading activities may implicate the jurisdiction of the SEC and/or CFTC. Depending on the facts and circumstances, a stablecoin may constitute a security, commodity, and/or derivative implicating the jurisdiction of the SEC, and be subject to the U.S. federal securities laws, or implicating the jurisdiction of the CFTC, and be subject to the CEA. The federal securities laws and/or the CEA may apply to the stablecoin, the stablecoin arrangement, transactions in, and/or participants involved in, the stablecoin or stablecoin arrangement, and/or derivatives of any of the foregoing instruments. The SEC and CFTC have broad enforcement, rulemaking, and oversight authorities over transactions and participants falling within their respective jurisdictions to address the investor protection and market integrity risks discussed above. To the extent within the jurisdiction of the SEC or the CFTC, trading, lending, borrowing, and other activity involving stablecoins must be conducted in compliance with applicable provisions of the federal securities laws and the CEA, as well as applicable regulations (*See **Digital Asset Trading Platforms and DeFi**).

Stablecoins also present important prudential concerns, as discussed in ***Part II***. These prudential concerns relate to the potential for stablecoin runs, payment system risks, and the possibility that some stablecoins may rapidly scale. Because responsibilities within many of these arrangements are widely distributed, and currently fall within the jurisdiction of different regulatory agencies, or outside of the regulatory perimeter altogether, there is a risk of incomplete or fragmented oversight. Stablecoin arrangements have grown, and may continue to grow, rapidly. And as these arrangements grow, so may the risks associated with them. The recommendations presented below are focused on the prudential risks identified with respect to payment stablecoins.[28]

---

27  *See* 12 U.S.C. § 1867(c); *see generally* 12 U.S.C. §§ 1861-1867. Section 7 of the Bank Service Company Act (BSCA) provides the Federal Reserve, FDIC, and OCC with the authority to regulate and examine the performance of certain services by a third-party service provider for a depository institution "to the same extent as if such [banking-related] services were being performed by the depository institution itself on its own premises." *See also* 12 U.S.C. § 1464(d)(7). In addition to the BSCA, the agencies have other authorities that support examination and oversight of services provided by third-party service providers. For example, the Home Owners' Loan Act, reiterates this authority for services provided to savings associations. Other statutory authorities may also be relevant in specific situations. In the context of stablecoins, the ability to apply existing authority to regulate and examine stablecoin-related services provided by non-bank service providers might be dependent on the structure of the relationship and the nature of the services provided to the individual client banks.

28  *See supra* note 2.

## Legislation

To address prudential risks associated with the use of stablecoins as a means of payment, the agencies recommend that Congress act promptly to ensure that payment stablecoins are subject to appropriate federal prudential oversight on a consistent and comprehensive basis. Because payment stablecoins are an emerging and rapidly developing type of financial asset, legislation should provide regulators flexibility to respond to future developments and adequately address risks across a variety of organizational structures.

Legislation should address the risks outlined in this report by establishing an appropriate federal prudential framework for payment stablecoin arrangements.[29] In particular, with respect to stablecoin issuers, legislation should provide for supervision on a consolidated basis; prudential standards; and, potentially, access to appropriate components of the federal safety net. To accomplish these objectives, legislation should limit stablecoin issuance, and related activities of redemption and maintenance of reserve assets, to entities that are insured depository institutions. The legislation would prohibit other entities from issuing payment stablecoins. Legislation should also ensure that supervisors have authority to implement standards to promote interoperability among stablecoins.

Insured depository institutions include both state and federally chartered banks and savings associations, the deposits of which are covered, subject to legal limits, by deposit insurance, and which have access to emergency liquidity and Federal Reserve services.[30] Like other insured depository institutions, insured depository institutions that issue stablecoins would be subject to supervision and regulation at the depository institution level by a federal banking agency and consolidated supervision and regulation by the Federal Reserve at the holding company level.[31] The standards to which these institutions are subject include capital and liquidity standards that are designed to address safety and soundness and, for the largest banking organizations, also include enhanced prudential standards that address financial stability concerns. Under the Federal Deposit Insurance Act, insured depository institutions also are subject to a special resolution regime that enables the orderly resolution of failed insured depository institutions by, among other mechanisms, protecting customers' insured deposits, and according priority to deposit claims over those of general creditors, and limits any potential negative systemic impacts in the event of bank failure.

As discussed above, apart from a stablecoin issuer, other key entities in the stablecoin arrangement may be critical to a stablecoin's ability to function as a means of payment and may help a stablecoin to scale (*See Part I, Activities and Participants in Stablecoin Arrangements*). As noted above, the core functions of a stablecoin arrangement – (1) creation of the stablecoin, (2) its transfer between parties, and (3) storage of the stablecoin by end users, as described in *Part I* (*See Part I, Creation of Stablecoins, and Transfer and Storage of Stablecoin*) – can be carried out by the activities of separate entities, within an arrangement that may be highly distributed and complex. Because the activities and functions in a stablecoin arrangement may be distributed across different parties, a prudential

---

29  Given the global nature of stablecoins and other digital assets, legislation should apply to stablecoin issuers, custodial wallet providers, and other key entities that are domiciled in the United States, offer products that are accessible to U.S. persons, or that otherwise have a significant U.S. nexus.

30  The term "insured depository institution" is defined in the Federal Deposit Insurance Act. *See* 12 U.S.C. § 1813(c)(2).

31  *See* 12 U.S.C. § 1841, *et seq.*

framework that is exclusively focused on stablecoin issuers is likely to leave certain payment system risks inadequately or inconsistently addressed.

Given the central role that custodial wallet providers play within a stablecoin arrangement, and the risks attendant to the relationship between custodial wallet providers and stablecoin users, Congress should require custodial wallet providers to be subject to appropriate federal oversight. Such oversight should include authority to restrict these service providers from lending customer stablecoins, and to require compliance with appropriate risk-management, liquidity, and capital requirements. In addition, to address concerns about concentration of economic power, Congress should consider other standards for custodial wallet providers, such as limits on affiliation with commercial entities or on use of users' transaction data.

In addition to stablecoin issuers and custodial wallet providers, other entities may perform activities that are critical to the functioning of the stablecoin arrangement (*See **Part I, Activities and Participants in Stablecoin Arrangements***). To ensure that stablecoin arrangements are subject to a comprehensive regulatory framework, Congress should provide the federal supervisor of a stablecoin issuer with the authority to require any entity that performs activities critical to the functioning of the stablecoin arrangement to meet appropriate risk-management standards, such as the Principles for Financial Market Infrastructures[32] as adapted to stablecoin arrangements.[33] Legislation should also provide appropriate agencies with examination and enforcement authority with respect to the stablecoin activities of these entities. Finally, supervisors should have the ability to adopt standards to promote interoperability among stablecoins, or between stablecoins and other payment instruments.

Taken together, legislation along these lines would address the prudential risks described in ***Part II*** of this report on a comprehensive and consistent basis:

- **User Protection and Run Risk**: Require stablecoin issuers to be insured depository institutions, which are subject to appropriate supervision and regulation, at the depository institution and the holding company level.

- **Payment System Risk**: Require custodial wallet providers to be subject to appropriate federal oversight. In addition, provide the supervisor of a stablecoin issuer with authority to require any entity that performs activities critical to the functioning of the stablecoin arrangement to meet appropriate risk-management standards.

- **Systemic Risk and Concentration of Economic Power**: Require stablecoin issuers to comply with activities restrictions that limit affiliation with commercial entities. Supervisors also should have the authority to implement standards to promote interoperability among stablecoins. Limits on custodial wallet providers' affiliation with commercial entities or on custodial wallet providers use of user transaction data may also help address these issues.

---

32  Committee on Payment and Settlement Systems and the Technical Committee of the International Organization of Securities Commissions, *see supra* note 24.

33  The authority to establish risk-management standards for entities that perform activities that are critical to the functioning of the stablecoin arrangement is in addition to, and does not affect, other existing regulatory or supervisory authorities that may apply to these entities.

## Interim Measures

The agencies believe that legislation is urgently needed to comprehensively address the prudential risks posed by payment stablecoin arrangements. While Congress considers how to address risks associated with payment stablecoin arrangements, the agencies will continue to use their existing authorities to address these prudential risks to the extent possible. In the absence of Congressional action, the Council may consider steps available to it to address the risks outlined in this report.

### A.   Regulatory Agencies

Given the significant and growing risks posed by stablecoins, the agencies are committed to taking action to address risks falling within each agency's jurisdiction and to continued coordination and collaboration on issues of common interest across the federal financial agencies. For example, in evaluating a charter application, the banking agencies will seek to ensure that applicants address the risks outlined by this report, including risks associated with stablecoin issuance and other related services conducted by the banking organization or third-party service providers. In the context of those stablecoins that are securities, commodities, and/or derivatives, application of the federal securities laws and/or the CEA would provide important investor and market protections, as well as transparency benefits. Relevant authorities, including the Department of Justice, may consider whether or how section 21(a)(2) of the Glass-Steagall Act may apply to certain stablecoin arrangements.[34] In addition, the Consumer Financial Protection Bureau (CFPB) and consumer financial protection laws also provide a number of safeguards in the payments sector, including but not limited to the Electronic Fund Transfer Act, the Gramm-Leach-Bliley Act, and the Consumer Financial Protection Act.[35] Finally, a stablecoin arrangement may also offer "money transmission services," triggering federal AML/CFT obligations under the Bank Secrecy Act (BSA), supervised and enforced by the Financial Crimes Enforcement Network (FinCEN).

### B.   Council

In the absence of Congressional action, the agencies recommend that the Council consider steps available to it to address the risks outlined in this report. Such steps may include the designation of certain activities conducted within stablecoin arrangements as, or as likely to become, systemically important payment, clearing, and settlement (PCS) activities.[36] Designation would permit the appropriate agency to establish risk-management standards for financial institutions that engage in designated PCS activities, including requirements in relation to the assets backing the stablecoin, requirements related to the operation of the stablecoin arrangement, and other prudential standards.[37] Financial institutions that engage in designated PCS activities also would be subject to an examination and enforcement framework. Any designation would follow a transparent process.

---

34  12 U.S.C. § 378(a)(2).

35  *See, e.g.*, 15 U.S.C. § 1693 *et seq.*, Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

36  In addition, the Council potentially could address stablecoin arrangements using its authority to designate systemically important financial market utilities (FMUs), subjecting those arrangements to consolidated supervision. *See* 12 U.S.C. §§ 5462, 5463. The council also has authority to designate nonbank financial institutions as "systemically important financial institutions" (SIFIs), pursuant to its authority in Title I of the Dodd-Frank Act. *See* 12 U.S.C. § 5323. PCS activities may be designated to the extent that such activities do not involve the offer or sale of a security or any quotation, order entry, negotiation, or other pre-trade activity or execution activity.

37  The financial stability risks of a stablecoin run would be greater in the context of stablecoins backed by potentially volatile and illiquid assets than in the context of stablecoins backed one-for-one by high quality liquid assets, *see supra* note 23.

## Illicit Finance Risk

As with all digital assets, stablecoins can present money laundering and terrorist financing (ML/TF) risks. The magnitude of these risks depends on various factors, including the application of anti-money laundering and countering the financing of terrorism (AML/CFT) controls, the degree to which it is adopted by the public, and the design of the stablecoin arrangement. To further prevent misuse of stablecoins and other digital assets by illicit actors, Treasury will continue leading efforts at the FATF to encourage countries to implement international AML/CFT standards and pursue additional resources to support supervision of domestic AML/CFT regulations. Treasury will also continue to assess the illicit financing risks to the United States associated with stablecoins and other digital assets, including through the forthcoming National Risk Assessments on Money Laundering, Terrorist Financing, and Proliferation Financing, and Illicit Finance Strategy.

A critical factor for illicit finance risk mitigation, regardless of the features of a stablecoin's design, is that international standards for the regulation and supervision of service providers associated with stablecoins and other digital assets are effectively implemented worldwide. Stablecoins and other digital assets can be used to transfer large amounts of value across borders very quickly. A rapid increase in cross-border payments could amplify ML/TF risks due to the uneven implementation of global international AML/CFT standards developed by the FATF.[38] While the United States regulates and enforces AML/CFT obligations for covered service providers, most countries have either not put these standards into their regulatory frameworks or are failing to supervise them, leading to gaps in AML/CFT regulation and supervision for stablecoins and other digital assets. Illicit actors can exploit these gaps by using services in countries with weak regulatory and supervisory regimes to launder funds, store proceeds of crime, or evade sanctions in stablecoins or other digital assets.

The promise of a stable value can, particularly when paired with the reach of commercial firms such as telecommunications or technology providers, increase the potential that stablecoins scale rapidly. Criminals often use the most common and liquid forms of value for ML and TF, and mass-adopted stablecoins or other digital assets may be attractive to illicit actors, which could heighten ML/TF risks. Conversely, mass adoption of a well-regulated and supervised stablecoin with strong AML/CFT protections built into the stablecoin could provide greater transparency into illicit financial activity and could mitigate ML/TF risks, especially if the stablecoin takes market share away from riskier alternatives.

Like other digital assets, stablecoins may be used to transact pseudonymously, depending on the underlying architecture.[39] However, in certain instances, stablecoin addresses and transactions on public blockchains can be paired with information, if available, that can enable regulators and law enforcement to identify address owners.[40] Users of some stablecoins can transact without

---

38  The FATF in June 2019 revised its standards to cover virtual assets, including stablecoins, and service providers.

39  The majority of the stablecoin market currently operates on public blockchains where transactions may be pseudonymous, meaning the identity of the sender or the receiver of a transaction is unknown, but other transactional information is available (e.g., the amount, the time, the value, etc.).

40  While stablecoins, like other digital assets, can be used with mixers or tumblers, which de-link the transaction trail and make it difficult to determine the address, sender identity, or original sum involved in the transaction, the use of these tools with stablecoins is uncommon.

the involvement of financial institutions subject to AML/CFT obligations, thus limiting collection of and access to investigative information and preventative measures used to identify illicit financial activity.

To encourage international implementation of AML/CFT standards, Treasury will continue to engage with the FATF to encourage countries to effectively implement the FATF standards for virtual assets. On October 28, 2021, the FATF published updated guidance on the implementation of the FATF standards for virtual assets and virtual asset service providers, which describes how the standards apply to digital assets and help countries and the private sector better understand how to effectively implement standards. As a result of the publication of the FATF standards, the FATF will now redouble its efforts on effective implementation of the standards on digital assets by member countries, and the United States will continue to support these efforts at the FATF and engage bilaterally to encourage countries to meet these standards.

In the United States, most stablecoins are considered "convertible virtual currency" (CVC) and treated as "value that substitutes for currency" under FinCEN's regulations.[41] All CVC financial service providers engaged in money transmission, which can include stablecoin administrators and other participants in stablecoin arrangements, must register as money services businesses (MSBs) with FinCEN. As such, they must comply with FinCEN's regulations, issued pursuant to authority under the BSA, which require that MSBs maintain AML programs, report cash transactions of $10,000 or more, file suspicious activity reports (SARs) on certain suspected illegal activity, and comply with various other obligations.[42] Current BSA regulations require the transfer of certain specific information well beyond what can be inferred from the blockchain resulting in non-compliance. While the Office of Foreign Assets Control (OFAC) has provided guidance on how the virtual currency industry can build a risk-based sanctions compliance program that includes internal controls like transaction screening and know your customer procedures, there may be some instances where U.S. sanctions compliance requirements (i.e., rejecting transactions) could be difficult to comply with under blockchain protocols.

While regulations are broadly sufficient to cover stablecoin administrators and other participants in stablecoin arrangements, Treasury will pursue additional resources, which could enable FinCEN, the Internal Revenue Service (IRS), and federal functional regulators to increase supervision of these regulations. This could result in better private sector compliance and, where it does not, could lead to enforcement actions for non-compliance. Enforcement activity would signal to stablecoin administrators and other financial institutions in the stablecoin industry that they will be held accountable for failing to meet AML/CFT and sanctions obligations, will incentivize compliance, and may enhance pressure on some foreign jurisdictions to follow suit. To that end, FinCEN's delegated examiners, the IRS, have been conducting compliance examinations on CVC administrators and

---

41  *See* 31 C.F.R. § 1010.100(ff)(5)(i)(A) (definition of "money transmitter" includes a person who accepts and transmits, *inter alia*, "value that substitutes for currency"). *See also* Joint Statement by Heath Tarbert, Kenneth Blanco, and Jay Clayton on Activities Involving Digital Assets, October 11, 2019, https://www.fincen.gov/sites/default/files/2019-10/CVC%20Joint%20Policy%20Statement_508%20FINAL_0.pdf

42  *See generally* 31 C.F.R. § 1022. FinCEN uses the term MSB to refer to several categories of business models to which FinCEN's regulations apply. One type of MSB is money transmitters, the category into which most exchanges, administrators, and other persons engaged in activity involving CVC—other than traditional institutions such as banks and broker dealers—fall.

exchangers, including administrators of stablecoin arrangements and the exchanges on which they are offered, since 2014. These examinations have also included foreign-located MSBs doing business in the United States in whole or substantial part.[43]

FinCEN has taken decisive action when it identifies financial institutions that fail to comply with these obligations. For example, in 2017 FinCEN assessed a $110 million civil money penalty against the foreign-located CVC exchanger BTC-e for failure to comply with the BSA's registration, AML program, reporting, and recordkeeping requirements.[44] More recently, FinCEN assessed a $100 million civil money penalty against the foreign-located, non-compliant futures commission merchant BitMEX for failing to maintain an AML Program and a Customer Identification Program, and failure to file SARs.[45] That penalty was concurrent with the CFTC's $100 million civil money penalty.[46]

Treasury in January will report to Congress the National Money Laundering and Terrorist Financing Risk Assessments, which assess the illicit financing risk landscape for digital assets, among other financial products and activities. The Risk Assessments are developed with input from U.S. government stakeholders, including law enforcement, the federal functional regulators, and the intelligence community, and use public or adjudicated case studies to demonstrate how illicit actors are misusing financial assets. The Risk Assessments inform the Illicit Finance Strategy, which is designed to identify goals, objectives, and priorities for disrupting and preventing illicit finance activities within and transiting the U.S. financial system.

---

43  31 C.F.R. § 1010.100(ff).

44  Assessment of Civil Money Penalty, Financial Crimes Enforcement Network, No. 2017-03, July 27, 2017, https://www.fincen.gov/sites/default/files/enforcement_action/2020-05-21/Assessment%20for%20BTCeVinnik%20FINAL2.pdf

45  Assessment of Civil Money Penalty, Financial Crimes Enforcement Network, No. 2021-02, August 10, 2021, https://www.fincen.gov/sites/default/files/enforcement_action/2021-08-10/Assessment_BITMEX_508_FINAL.pdf

46  *Commodity Futures Trading Commission v. HDR Global Trading Limited, et.al.,* 1:20-cv-08132, (S.D. NY, Aug. 10, 2021).

## International Standards

This report considers and builds on the work of international forums, including work that has led to recommendations, standards, principles, and guidance that may apply to stablecoin arrangements. The Financial Stability Board in October 2020 set out ten high-level recommendations that seek to promote coordinated and effective regulation, supervision, and oversight of Global Stablecoin (GSC) arrangements to address the financial stability risks posed by GSCs, both at the domestic and international level, while supporting responsible innovation and providing sufficient flexibility for jurisdictions to implement domestic approaches.

International standard-setting bodies are also pursuing work to examine the application of international standards, principles, and guidance to stablecoin arrangements. For example, the Committee on Payments and Market Infrastructures (CPMI) and the International Organization of Securities Commissions (IOSCO) published a consultative report on the application of the PFMIs to stablecoin arrangements. With respect to illicit finance, the FATF in June 2019 revised its standards to cover digital assets, including stablecoins and service providers, and is working on updated guidance for how to implement these standards.

The agencies are committed to continuing engagement at the FSB and the standard-setting bodies to ensure comprehensive oversight of stablecoin arrangements, further common regulatory outcomes across jurisdictions, and reduce opportunities for regulatory arbitrage.

# Annex: List of Outreach Participants

*To inform the work for this report, the staff of the agencies held discussions with the stakeholders listed below. While the staff considered input received, the agencies do not endorse any particular project, viewpoint, product, or service.*

| Market Participants | |
| --- | --- |
| Anchorage Digital | Gemini |
| BlockFi | Kraken |
| Circle | Mastercard |
| Coinbase | Paxos |
| Cumberland DRW LLC | Square |
| Diem Association | Stripe |
| FIS | Tether |
| Fiserv | Visa |
| Fnality International | |

| Trade Associations | |
| --- | --- |
| Bank Policy Institute | Independent Community Bankers of America |
| Blockchain Association | National Association of Federally-Insured Credit Unions |
| Electronic Transactions Association | |

| Experts and Advocates | |
| --- | --- |
| AFL-CIO | Gary Gorton, Yale School of Management |
| AID-Tech | Howell E. Jackson, Harvard Law School |
| Americans for Financial Reform | Markus Brunnermeier, Princeton University |
| Better Markets | Morgan Ricks, Vanderbilt University Law School |
| Center for Responsible Lending | National Community Reinvestment Coalition |
| Coin Center | National Consumer Law Center |
| Dan Awrey, Cornell Law School | Open Markets Institute |
| Darrell Duffie, Stanford University Graduate School of Business | Raúl Carrillo, Yale Law School |
| FinRegLab | Stellar Development Foundation |



# EXHIBIT BH-37

Case 1:23-cv-01599-ABJ  Document 53-4  Filed 06/12/23  Page 60 of 88



Log In    Register      

 Register now and get verified - Enjoy Welcome Rewards up to $100!    →

## Are Stablecoins the Safe Haven of Crypto? Protect Your Wealth With BUSD and BGBP Stablecoins.

2020-08-19



It's probably no surprise when we say that the cryptocurrency markets are extremely volatile. The prices of Bitcoin, Ethereum, XRP, and basically any other crypto are swinging up and down regularly, which might discourage more conservative investors from cryptocurrency trading.

Imagine going for holidays where you don't have access to the internet, just to come back two weeks later, realizing your crypto holdings are down 15%, 30%, or even 50%. Holding onto volatile assets has its benefits and disadvantages, but there's nothing sweet in losing your wealth.

This volatility doesn't only affect the investors, but also online shoppers and e-commerce business owners. When making a payment with a specific cryptocurrency, its price might change before the transaction is confirmed and settled, ultimately resulting in a loss (or profit).

# EXHIBIT BH-38

PAXOS (https://paxos.com)

☰

# Frequently Asked Questions

**Common Questions**

**Stablecoins (USDP & BUSD)**

**Crypto Brokerage**

**Paxos Gold (PAXG)**

**Custody**

**Commodities & FX Post-Trade**

**Securities Settlement Service**

< Back

## Outside of the Paxos platform, where can I use my Paxos stablecoins?

Paxos stablecoins are ERC-20 tokens built on the Ethereum blockchain. Because Paxos stablecoins follow standard ERC-20 protocol, many Ethereum-supporting exchanges and wallet applications have built-in support for viewing and transferring any ERC-20 tokens.

Paxos also has partnerships with various digital asset exchanges and leading platforms so that customers can trade, loan or hold their tokens. Check the Paxos Ecosystem to see where our tokens are supported.

 (/#twitter)   (/#copy_link)   (/#linkedin)

## Contact Us

**General Inquiries** info@paxos.com (mailto:info@paxos.com)

**Media Inquiries:** press@paxos.com (mailto:press@paxos.com)

**Customer Support** Submit a request (https://help.paxos.com/hc/en-us/requests/new)

**DFS Complaints:** You may direct a complaint to the attention of the New York State Department of Financial Services at One State Street New York, NY 10004-1511 or 1-800-342-3736 (tel:+18003423736). Please visit www.dfs.ny.gov (https://www.dfs.ny.gov/)for information.

Help

**Products**

Crypto Brokerage (https://paxos.com/crypto-brokerage/)

Stablecoin and Payments (https://paxos.com/stablecoin-and-payments/)

USDP (https://paxos.com/usdp/)

BUSD (https://paxos.com/busd/)

PAXG (https://paxos.com/paxgold/)

itBit (https://paxos.com/itbit/)

Securities Settlement (https://paxos.com/securities-settlement/)

Commodities Settlement (https://paxos.com/commodities-settlement/)

**Company**

About (https://paxos.com/company/)

FAQs (https://paxos.com/category/common-questions/)

Newsroom (https://paxos.com/newsroom/)

Blog (https://paxos.com/blog/)

Careers (https://paxos.com/careers/)

**Resources**

User Guide (https://help.paxos.com)

Regulation & Transparency (https://paxos.com/regulation-and-transparency/)

Contact (https://paxos.com/contact/)

**Social**

(https://twitter.com/paxosglobal)

(https://www.facebook.com/PaxosGlobal/)

(https://www.linkedin.com/company/paxos/)

(http://www.medium.com/paxos)

© 2023 Paxos Trust Company, LLC All Rights Reserved. NMLS #1766787

From Forbes. © 2020 Forbes. All rights reserved. Used under license.
From Fortune. © 2020 Fortune Media IP Limited All rights reserved. Used under license.
From The New York Times. © 2015 The New York Times Company. All rights reserved. Used under license.

Terms and Conditions (/general-terms-and-conditions/) | Privacy Policy (/privacy-policy) | Cookie Policy (/cookie-policy)

# EXHIBIT BH-39

| BTC | ETH | BNB | XRP | ADA | DOGE |
|-----|-----|-----|-----|-----|------|
| $25,859 | $1,752 | $239 | $0.51 | $0.277 | $0.06 |
| -2.36% | -4.79% | -8.20% | -5.31% | -6.27% | -11.01% |



ENGLISH

ADVERTISE

CAREERS

News    Markets    Magazine    People    Cryptopedia    Research    Video    Podcasts

Markets Pro



SARAH JANSEN                                                                    SEP 23, 2021

# BUSD: A case study for stablecoin compliance and security

Are stablecoins really stable? An in-depth case study based on the third-biggest stablecoin in the world answers the industry's most pressing concerns.

7626        77                                                                6:27



Cointelegraph.com uses Cookies to ensure the best experience for you.

ACCEPT

**Join us on social networks**

     



Stablecoins have emerged as significant players in the crypto market this year, driven by user demand for flexible liquidity in fiat currency times. These currencies are defined as a type of digital currency that can be pegged to underlying real-world assets or backed by them. These assets can be anything from fiat money, commodities like gold or silver, or even another cryptocurrency. As their name suggests, stablecoins are designed to have a value that stays (rather) stable like cash, a contrast to the volatility common in cryptocurrency trading today.

To further illustrate this scenario, a typical fiat-backed stablecoin might involve the token issuer holding 100,000 tokens, each worth $1 USD. Token holders can trade these coins, similar to any other cryptocurrency. The major difference is that the holder can also redeem the coins for an equivalent amount of USD at any time. Since USD is fairly stable, users don't have to worry that their money will lose its value overnight. As a result, according to CoinMarketCap, there is currently 120 billion dollars worth of stablecoins in circulation.

Although stablecoins have risen as an opportunity to reduce volatility, various segments of the crypto industry have brought up questions about their centralized nature. Since there is no way for the issuer to prove the number of backing funds, a 1:1 peg of major stablecoins to their backing assets, like the U.S. dollar and other fiat currencies, may not mean much, especially without proper regulation. That said, their potential is still evident in many everyday use cases.

To help prove their use, Binance launched BUSD with Paxos in 2019. A major driving force behind this release was ensuring that every unit of the stablecoin was verifiably backed with U.S. dollars and compliant with regulatory and public standards.

## A question of reserves

To give users peace of mind and provide more credibility to questions about reserves, BUSD's assets in USD are being held in FDIC-insured banks. In a reserve report from Paxos, 96% of BUSD's total market capitalization is backed by cash and other cash equivalent reserves, and US Treasury Bills back 4%.

6/10/23, 5:34 PM
BUSD: A case study for stablecoin compliance and security
Case 1:23-cv-01599-ABJ Document 53-4 Filed 06/12/23 Page 67 of 88



To further guarantee these numbers, BUSD continues to be one of the few stablecoins that provide a monthly audited report of their reserves. Therefore, any BUSD holder can verify at any point in time that the supply of BUSD tokens is consistent with the USD being held and managed by Paxos..

## MORE INSIGHTS ON BUSD HERE

Advertisement

**Buy crypto on a secure, trusted platform and get a $10 bonus**

The combination of audits and additional measures to verify BUSD's asset holding are increasingly crucial in addressing one of the main concerns brought up by the industry today.

## Maintaining compliant

The second primary concern with stablecoins today is the current regulation gap, which many believe offers little investor protection, especially in fraudulent activities. Addressing this, BUSD continues to adhere to the highest compliance standards held by the New York State Department of Financial Services (NYDFS). Having a regulator has allowed BUSD to become "Green listed" by regulatory bodies, making it pre-approved for custody and trading by existing virtual currency licenses.

Paxos, their stablecoin issuer, is also regulated by the same body, which ensures:

> The value of each stablecoin token is directly tied to the U.S. dollar, and the amount of "reserve" funds are at least equal to the number of stablecoins outstanding.

> Regulators are overseeing the establishment and maintenance of reserves backing the stablecoins.

> Reserves are being held in the safest forms of assets (i.e., Treasury bills, insured bank accounts).

> Reserves are fully segregated from corporate assets and are held bankruptcy-remote according to the New York Banking Law.

This level of regulatory oversight helps maintain consumer confidence in an asset that operates in a largely unregulated industry.

## Stablecoins in action

Stablecoins offer several additional benefits to regular cryptocurrencies in the right situation. These often include mitigating the effects of market instability, handling recurring transactions, and building a foundation for decentralized finance (DeFi)

### Managing market instability

Cryptocurrency prices have been known to fluctuate drastically based on popular opinion or private business decisions. Traders may then decide to trade their falling cryptocurrency for an asset or fiat-backed stablecoin to protect the value of their digital currency holdings. As a safe haven, investors can reduce risks by leaving their holdings in a more stable investment vehicle.

### Daily transactions

Like other fiat currencies, stablecoins can be used for daily transactions such as purchasing a coffee or transferring money to a family member overseas. Fees may be lower than conducting a transaction through the banking system, occur more quickly and ensure the receiver gets a fair value for the trade.

### Building DeFi foundations

Finally, stablecoins are essential in the continued growth in the world of decentralization by providing the foundation. BUSD is being used on the Binance Smart Chain (BSC) and Ethereum **ETH** ▼ $1,752 for several different functions, one of the key ones being lending. In the loan setting, users can over-collateralize an existing digital asset with stablecoins to ensure a consistent market price, further preventing any fluctuations caused by the underlying collateral.



Loans are just one example of how stablecoins can provide the stability necessary for the blockchain to continue growing as infrastructure and for cryptocurrencies to take on the role of traditional money as a

medium of exchange.

## Striving for compliance

With increasing use cases for stablecoins, many believe that the financial industry will be the area that suffers businesses fail to address these concerns.

For these reasons, BUSD continues to operate with an emphasis on compliance. Doing so can safeguard the trust users and regulators have in stablecoins and open more opportunities for both the public and private sectors. As more stakeholders show acceptance for trusted stablecoins, many believe growth opportunities wi follow closely behind.

In a recent virtual press conference, Binance CEO Changpeng "CZ" Zhao shares, "Our view is that it's great for regulators to be coming in... to get to 10%, 20%, 80%, 99% [crypto] adoption."

Learn more about  BUSD

Disclaimer. Cointelegraph does not endorse any content or product on this page. While we aim at providing you all important information that we could obtain, readers should do their own research before taking any actions related to the company and carry full responsibility for their decisions nor this article can be considered as an investment advice.

#Bitcoin Regulation    #Digital Currency    #Cryptocurrency Exchange    #Binance    #Stablecoin    #Trading

☺⁺ Add reaction

## RELATED NEWS



What is NFT rarity, and how to calculate it?



Louis Vuitton embraces Web3, launches its iconic trunk as a digital collectible



In crypto winter, DeFi needs an overhaul to mature and grow



First Rupiah-Backed Stablecoin Launches on Binance and Tokocrypto





Swiss crypto bank Sygnum scores approval for digital asset trading

Class-action lawsuit against Binance targets exchange's futures trading



**Buy Gift Cards With Crypto**
All Major Brands Included.

Buy a Gift Card

STARBUCKS   XBOX   Reebok   Virgin

 COINTELEGRAPH CONSULTING       SEP 23, 2021

## Cointelegraph Consulting: How Avalanche is reimagining DeFi

Avalanche is rapidly redefining the DeFi landscape with lower costs and faster transactions. Should Ethereum holders worry?

11750      67            9:37



**Collect article**    Collect with 40% discount from 

**Join us on social networks**

      

It's not the first time that the native token of the Avalanche blockchain has encountered wild fluctuations. In February, AVAX shot as high as $60 only to reach a nadir in June and July. But after bottoming at $9.34, AVAX is now beyond $60 and is currently trading at $76. This has earned it a spot in the top 20 cryptocurrencies by market capitalization with $16 billion, according to Cointelegraph Markets Pro. Avalanche is among the layer-one blockchains tagged as "Ethereum killers" that appear to have reduced the recent dominance of the top altcoin in terms of total locked value (TVL). Of the $170 billion in TVL, Ethereum presently controls 67% based on data from Defi Llama. But while the number appears high, it's actually much lower than February when it contained about 96% in TVL.

**Background on Avalanche**

Avalanche was developed by Cornell computer science associate professor Emin Gün Sirer and Ava Labs in 2018. The blockchain protocol boasts high throughputs and a swift finality time. In 2019, it received initial funding through the sale of 18 million AVAX tokens priced at $0.33 each, which amounted to nearly $6 million. The following year, an additional 24.9 million tokens were auctioned in a private sale, this time at $0.50 each, bringing in an extra $12 million in funding. In July 2020, Avalanche secured another $42 million through a public token sale. And on Sept. 16, 2021, Avalanche's most recent funding bagged $230 million from various investors led by Polychain and Three Arrows Capital. This brings a total funding amount of $290 million for Avalanche despite its mainnet launch just celebrating its first anniversary.

**How is Avalanche reimagining DeFi?**

Avalanche is caught in the midst of intensifying layer-one competition, with the likes of Binance Smart Chain (BSC), Polkadot and Terra vying for a larger market share from their main competitor, Ethereum. And much lik its counterparts, scalability for Avalanche is crucial. Avalanche boasts 4,500 transactions per second (TPS) with less than a three-second finality. In contrast, Ethereum processes 15–30 transactions per second with over 1-minute finality. Moreover, transaction fees are a lot more desirable on Avalanche compared to Ethereum. Avalanche's fees range from 75 nAVAX up to 225 nAVAX ($0.0000048 to $0.0000144 at the coin's present value

However, it takes more than lower costs and faster transactions to compete with the first-mover in Etheruem. Developers willing to build applications on Avalanche are necessary to foster adoption. In this regard, it's clear how Ethereum has the upper hand with 2,585 listed decentralized applications (DApps). But despite it being only a year old in existence, Avalanche already has attracted 320 projects.



Number of monthly added Avalanche Projects

*Source: Avax-Projects*

Projects such as SushiSwap, Chainlink, Circle and The Graph have benefited from the smart contract infrastructure provided by Avalanche. Nonfungible tokens, or NFTs, have also found a home on Avalanche; for

BUSD: A case study for stablecoin compliance and security

example, Topps, a sports-themed trading card company, has minted a Major League Baseball NFT collection on Avalanche called "Inception." Topps has also partnered with the German football league Bundesliga, releasing video moments from the league in two available card packages — all as NFTs on the Avalanche blockchain. What's more, the $230 million raised by Avalanche in 2021 will be earmarked to support this flourishing decentralized finance, or DeFi, ecosystem.



DELIVERED BIWEEKLY

**Subscribe to the Cointelegraph Research Newsletter**

Email Address

Subscribe

By subscribing, you agree to our
Terms of Services and Privacy Policy

### Ethereum Bridge

One of the significant steps that Avalanche has undertaken in redefining finance is its cross-chain Ethereum bridge, wherein it facilitates "seamless ERC-20 and ERC-721 transfers between Avalanche and Ethereum." The bridge helps migrate Ethereum's DeFi infrastructure to Avalanche, allowing users to conduct faster and cheaper transactions.

Pangolin, a notable player in the DeFi space, is built on Avalanche and benefits from the Avalanche–Ethereum bridge. The decentralized exchange (DEX) enables trading of all tokens issued on Ethereum and Avalanche. Thi enables users to circumvent the high and sluggish transaction times in swapping assets. Apart from Pangolin, other DApps, such as bZx, Union, JellySwap, Prosper, e-Money and others, have joined the Avalanche ecosystem.

So far, a total of $1.72 billion in assets have been transferred using the bridge.

### More DeFi growth

Also, in a move to further its burgeoning DeFi ecosystem, Avalanche is bringing on board two of the leading DApps on Ethereum to the Avalanche blockchain. Avalanche Rush, a $180-million liquidity mining incentive program, was partially distributed to Curve Finance and Aave. In the program's initial phase, AVAX will be used as liquidity incentives for Aave and Curve users over three months. About $27 million worth of AVAX has

already been set aside by the Avalanche Foundation to fund the program, and there are also additional allocations planned for its second phase.

In addition to Aave and Curve Finance, Pangolin also joined Avalanche Rush, supplying $2 million in AVAX incentives for a single-sided pool of Pangolin (PNG).

### What's under the hood?

Perhaps Avalanche's strongest suit is its network infrastructure, which is touted to provide better decentralization. Avalanche is composed of three integrated blockchains: The Exchange Chain (X-Chain), Platform Chain (P-Chain) and Contract Chain (C-Chain). The X-Chain is primarily for creating and exchanging assets, while the P-Chain is for creating subnets and coordinating validators, and the C-Chain is for executing Ethereum Virtual Machine contracts. Most of the transactions take place in the C-Chain as Ethereum developers can easily build Ethereum-compatible applications using this blockchain.

The three blockchains are validated and secured by a its main network, which is a special type of subnetwork or subnet. Anyone can secure the network by staking at least 2,000 AVAX, currently $152,000. Avalanche defines a subnet as a "dynamic set of validators working together to achieve consensus on the state of a set of blockchains." Essentially, a subnet is a new network capable of hosting multiple blockchains that can have its own consensus model and its own virtual machine.

These subnets open up opportunities for certain niche use cases as they are highly customizable. This can be useful for different organizations, companies and even governments because the network's architecture also supports private subnets, meaning that those who want to deploy private blockchains can do so.

### Why has the price of AVAX spiked lately?

Avalanche Rush was a major factor that contributed to the price of AVAX jumping by 192% in August. But another reason why the price of AVAX appreciated recently is due to more upcoming initial DEX offerings (IDO). AvaXlauncher, the launchpad and incubator for the Avalanche ecosystem, has announced two new IDOs on Twitter. One is Oracle on Avalanche, and the other is Gaming Project: Breed, Play and Earn.

And with those two IDOs, stakers and holders of AvaXlauncher (AVXL) tokens will get airdropped a small portion of those IDOs. An IDO is a new type of crowdfunding model in the crypto space. It offers immediate liquidity, immediate trading and lower costs for listing compared to anteceding models such as initial coin offerings and initial exchange offerings.

### Download the 31st issue of Cointelegraph Consulting Bi-weekly Newsletter in full, complete with charts and market signals, as well as news and overviews of fundraising events.

### Factoring the tokenomics

The tokenomics behind AVAX may also play a small role in its increasing value. There is a cap on token supply at 720 million AVAX, but it's worth noting that 40% of it is already allocated to private investors and the AVAX

team. Then, about 360 million is allotted for staking rewards, and 10% went to public sales.



*Source: Avalanche*

Moreover, the fees for each transaction also follow a similar burning mechanism akin to Ethereum Improvement Proposal 1559. To date, nearly 278,000 AVAX tokens ($21 million) have been burned since its inception, placing further deflationary pressures in addition to its limited supply. At present, the total circulating supply of AVAX is around 220 million AVAX.



*Source: Avascan*

There is no doubt that the growing popularity of layer-one protocols is reimagining the DeFi landscape. But even with Ethereum's dominance tapering slightly, as evidenced by its reduced TVL, it remains in an enviable spot that competitors may find hard to uproot. So, to count out Ethereum before Ethereum 2.0 could be

premature. Still, these "Ethereum killers" are on the rise, and sooner or later, one may emerge as a worthy adversary.

*Cointelegraph's Market Insights Newsletter shares our knowledge on the fundamentals that move the digital asset market. The newsletter dives into the latest data on social media sentiment, on-chain metrics, and derivatives.*

*We also review the industry's most important news, including mergers and acquisitions, changes in the regulatory landscape, and enterprise blockchain integrations. Sign up now to be the first to receive these insights. All past editions of Market Insights are also available on Cointelegraph.com.*

#Blockchain    #Altcoin    #Business    #Adoption    #Cointelegraph Consulting

 Add reaction

## RELATED NEWS

 How to use a crypto hardware wallet

 Web3 is transforming the music industry — Here's how

 Why didn't crypto walk the walk at ETHDenver?

 Snoop Dogg revealed as co-founder of Web3-powered livestream platform

 Crypto funding seen shifting from CeFi to DeFi after major collapses: CoinGecko

 OKX plans Australian expansion, citing 'huge appetite' for crypto

Claim your unique XGo wallet ID
XGo.com
Crypto on/off-ramp, effortlessly
Participate in weekly $$$ giveaway

Are you a journalist or an editor?

Join us

COINTELEGRAPH NEWSLETTER

Email

Subscribe

Terms of services and Privacy policy
© Cointelegraph 2013 - 2023

# EXHIBIT BH-40

6/10/23, 5:38 PM
Case 1:23-cv-01599-ABJ Document 53-4 Filed 06/12/23 Page 79 of 88
What's the Point of Stablecoins? The Reasons, Risks and Types to Know

Consensus @ Consensus Report Rel - Download ✕



≡  **CoinDesk**  👤 🔍

| Bitcoin ▼ | $25,862.65 -2.25% | Ethereum ▼ | $1,752.86 -4.59% | Binance Coin ▼ | $239.29 -7.97% | XRP ▼ | $0.50970142 -4.74% | Cardano ▼ | $0.27612400 -5.51% | ▶ |

Crypto Prices →                    CoinDesk Market Index →

Technology  >  What's the Point of Stablecoins? The Reasons, Risks and Types to Know



*Pegging the dollar (Getty Images)*

## Technology

### What's the Point of Stablecoins? The Reasons, Risks and Types to Know

Stablecoins are meant to provide a predictable haven within the volatile world of cryptocurrency, but they haven't always been as stable as the name promises.

**By Megan DeMatteo**

Updated Mar 22, 2023 at 3:12 p.m. MDT






Intermediate

Regulatory moves concerning Paxos, the issuer of Binance's dollar-pegged stablecoin BUSD, have brought renewed focus on stablecoins, the asset class within cryptocurrency that is meant to provide a haven from the highly volatile nature of most other cryptocurrencies. The investigation on Paxos has also reportedly caused payment giant PayPal to pause development on its own stablecoin. Which has led many to wonder what they need to know about stablecoins to understand the news.

You might already know that stablecoins are basically dollars in digital form. Except … that's not exactly true because stablecoins can also be algorithmically tied to any type of fiat (government) currency – including the euro, Australian dollars and others – as well as other forms of physical assets, like gold.

No matter the type, stablecoins exist to make cryptocurrency more predictable. While predictable cryptocurrency may sound like an oxymoron, stablecoins – like their name suggests – were designed to counter crypto's hallmark volatility and provide a convenient way for crypto traders to preserve their fiat value without having to cash out of the market and to allow users to pay for everyday goods and services in crypto without all the budgeting drama.

*See Also: Can Banks Issue Stablecoins?*

Let's take a look at how stablecoins work.



6/10/23, 5:38 PM
What's the point of stablecoins? The Reasons, Risks, and Types to Know

Case 1:23-cv-01599-ABJ   Document 53-4   Filed 06/12/23   Page 81 of 88

# How do stablecoins work?

Stablecoins generally work the same across the board: They are cryptocurrencies minted on a blockchain that users can buy, sell and trade on an exchange just like any other crypto coin. People can store stablecoins in their hot wallets and/or cold storage devices like they would bitcoin or any altcoin.

In order to have integrity, most stablecoins are linked to a reserve of external assets of some kind, whether it be a stash of fiat currency, commodities like gold or debt instruments like commercial paper. In most cases, the company or entity that develops the stablecoin owns reserves equal to the amount of stablecoins it has in circulation. This is such that any stablecoin holder should be able to redeem one stablecoin token for one dollar at any time.

## The four types of stablecoins

There are four different types of stablecoins, each with its own way of fixing the value of the tokens to a stable figure.

**Fiat-backed**

**Cryptocurrency-backed**

**Commodity-backed**

**Algorithmic**

## Fiat-backed stablecoins

The most popular stablecoins in the market are ones backed by fiat currency. USD coin (USDC), for instance, is fiat-backed and pegged to the U.S. dollar (USD) at a 1:1 ratio. Other stablecoins are linked to the euro, the British pound, the Japanese yen and the Chinese RMB.

## Cryptocurrency-backed stablecoins



Without getting too meta, crypto-backed stablecoins are cryptocurrencies pegged to the value of another more established cryptocurrency. For instance, MakerDAO is one of the most popular crypto-backed stablecoins. It uses a smart contract – a type of self-executing, code-based contract – alongside the Ethereum blockchain to pool enough ether (ETH) to use as collateral for its stablecoin. Then, once the amount of collateral reaches a certain level in the smart contract, users can mint DAI – the MakerDAO stablecoin.

## Commodity-backed stablecoins

As the name describes, commodity-backed stablecoins are pegged to the value of commodities like precious metals, industrial metals, oil or real estate. Commodity investors love the option of commodity-backed stablecoins because it allows them to invest in gold without the hassle of sourcing and storing it. Tether gold (XAUT) is an example of a commodity-backed stablecoin. The currency is backed by a reserve of gold kept inside a vault in Switzerland. One ounce of gold is equal to one XAUT.

## Algorithmic stablecoins

Not backed by any "real-world" commodities, this category of stablecoins uses algorithms to modulate the supply based on its market demand. In short, these algorithms automatically burn (permanently remove coins from circulation) or mint new coins based on the fluctuating demand for the stablecoin at any given time.

You can think of an algorithmic stablecoin as a bucket of water left outside with a water level marked on the inside. To keep the water inside the bucket at exactly the same level, you set up a mechanism that adds or removes water depending on how far the water level has deviated from the mark. This is controlled by a computer algorithm such that if it rains and the bucket begins to fill up, the algorithm instructs the mechanism to release water out of the bottom of the bucket until it reaches the water level mark. Conversely, if it's a hot day and water evaporates out of the bucket, the computer algorithm would instruct the mechanism to add more water to the bucket until the correct level is regained.

There's been a lot of trial and error in the quest to successfully introduce algorithmic stablecoins to the crypto ecosystem, and the failure of Terra's UST stablecoin shows just how badly things can go if the algorithm isn't able to keep up with dramatic swings.

*Read More:* *Algorithmic Stablecoins: What They Are and How They Can Go Terribly Wrong*

# Why use stablecoins?

Designed for our increasingly global economy, stablecoins theoretically solve a few key problems that inhibit the exchange of money.

6/10/23, 5:38 PM
Case 1:23-cv-01599-ABJ Document 53-4 Filed 06/12/23 Page 83 of 88
What's the Point of Stablecoins? The Reasons They Exist and Types to Know

**1** Stablecoin users don't need multiple international bank accounts to send crypto to their friends in other countries; they just need one crypto wallet.

**2** Stablecoins make true peer-to-peer digital transfers possible without the need for third-party intermediaries to facilitate transactions.

In theory, stablecoins cut down on the fees, transfer time and potential privacy infringement we've grown accustomed to under the paradigm of central banking.

Say you were a Chinese business owner who wanted to pay an invoice to a client in Japan who also had subcontractors in Europe.

"You'd need to have a Chinese bank account, a Japanese bank account and a European bank account," explains William Quigley, co-founder of the WAX blockchain and one of the founders of USDT issuer Tether. "If somebody wants to send you euros or yen or RMB, the intermediaries who can hold those accounts swap out those currencies for the currency you are able to hold and send it to your bank. And along the way, they've skimmed a lot of money off the top for that."

We can't all have 50 different bank accounts in 50 different countries, says Quigley. But with stablecoins there's no need.

Privacy lovers, in particular, appreciate this facet of stablecoins since they can avoid the process known as KYC, or know your customer – aka submitting photo ID and Social Security information to open a financial account. While KYC has become, for most of us, a normal part of dealing with money, crypto proponents argue KYC is prohibitive when applied to central banking institutions in other countries.

"This is why it's extraordinary to me that an individual in New York, California or Texas can hold in their Ledger [wallet] 10 different tokenized currencies that stay in their native form," said Quigley. "You don't need a Chinese bank account. You can keep a token representing that Chinese currency and use it as though it is Chinese currency without ever converting."



This direct, peer-to-peer model of stablecoins helps save money that otherwise goes to pay processing fees and administrative costs for third-party intermediaries.

"There's a trillion dollars each year siphoned out of the global economy – from businesses and consumers – to these 'money changers,'" Quigley says. "That disappears if the currency can be maintained in its original form because it's been tokenized and held on a blockchain accessible to the user instantly, rather than in a bank."

# How do you pick the right stablecoin?

There's a wide variety of stablecoins now available within the broader ecosystem of 16,000+ cryptocurrencies, so choosing which ones to buy, trade or simply use for everyday transactions remains a challenge even for experts.

As with all things crypto, there's a perpetual balance to keep in mind between centralization and decentralization, stability and freedom, regulation and permissionless-ness.

Fiat-backed stablecoins, for instance, are popular because they are as stable as the U.S. dollar (USD) or other widely accepted currencies. However, linking crypto to a federal currency makes fiat-backed cryptos a target for governmental regulation and overall more centralized – a certain trade-off when compared with algorithmic stablecoins, the most decentralized option.

There's also the issue of what exactly is backing each currency. For instance, not all the USD-backed stablecoins (USDT and BUSD – to name a few) are backed by an exact 1:1 ratio of dollars to crypto. What's inside the reserves varies depending on the entity behind the coin.

Tether (USDT), for instance, used to be set up where the dollar amount in reserves was identical to the amount of minted USDT. But that has changed, says Quigley, adding: "What Tether [the issuing company] has done now is they have a certain quantity of the outstanding tether [USDT] held in fiat and then a certain quantity held in liquid marketable securities."

So instead of dollar bills, there might be liquid reserves in the form of bonds, CDs, treasury bonds and cash equivalents.

"They periodically disclose the mix," Quigley says of Tether.

Another difference is on which platforms and exchanges you can find each stablecoin. Binance, for example, announced in Sept. 2022 it would convert USD Coin into its own stablecoin, BUSD.

When considering which stablecoins to add to your portfolio, consider the following questions:

---

**1**   Where can I buy and exchange the stablecoin?



**2** On what platform is the stablecoin minted?

**3** How often are the reserves audited and how transparent is the reporting?

**4** What's the market cap and circulating supply?

_Read More:_ What Are "Fully-Backed" Reserves?

_This article was originally published on Sep 16, 2022 at 1:32 p.m. MDT_

Newsletter →     Weekly every Tuesday

## Crypto Investing Course

Sign up for Crypto Investing Course, A weekly newsletter to be a smarter, safer investo

Enter your Email

_By clicking 'Sign Up', you agree to recieve newsletter from CoinDesk as well as other partner offers and accept our te_

**DISCLOSURE**

_Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated._

_The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet
and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group,
startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposu
rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG._



**Megan DeMatteo**

Megan DeMatteo is a service journalist currently based in New York City. Ir
Select, and she now writes for publications like CoinDesk, NextAdvisor, Mo
contributing writer for CoinDesk's Crypto for Advisors newsletter.

Follow @megdematteo on Twitter

Learn more about **Consensus 2024**, CoinDesk's longest-running and most influential ever
crypto, blockchain and Web3. Head to **consensus.coindesk.com** to register and buy your

## Related stories

CoinDesk Podcast Network

**Headlines | Top Stories of the Week 06-05-23**

Jun 10, 2023



6/10/23, 5:38 PM    What's the point of stablecoins? The reasons they exist and why its now

Case 1:23-cv-01599-ABJ   Document 53-4   Filed 06/12/23   Page 86 of 88



**CoinDesk Podcast Network**

**DOJ Reportedly Told to Investigate Binance for Potentially Lying to Lawmakers; Lens Protocol Raises $15M**

Jun 8, 2023



**CoinDesk's Money Reimagined**

**Chair Genslers' Obsession With Calling Tokens Securities and the Future of AI Governance**

Jun 7, 2023



**Consensus Magazine**

**Where the Mt. Gox Money Went: New Details in the BTC-e Exchange Case**

Jun 9, 2023

## Crash Courses

All →

**Bitcoin 101**
4 Courses | 20 Minutes

**DeFi 101**
3 Courses | 15 Minutes

## Crypto Terms



Crypto Flashcards & Glossary



**Other Topics**

 Bitcoin   Ethereum  Technology  Investing  DeFi  NFTs  Cryptocurrency  Industry



## About

About

Masthead

Contributors

Careers

Company News

## Stay Updated

Consensus

CoinDesk Studios

Newsletters

Follow

## Get In Touch

Contact Us

Advertise

Accessibility Help

Sitemap

## The Fine Print

Ethics Policy

Privacy

Terms Of Use

Do Not Sell My Personal Information

Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.

The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.

©2023 CoinDesk

English

