# EXHIBIT BH-41

# SOFTWARE LICENSE AGREEMENT

This **SOFTWARE LICENSE AGREEMENT** (this "Agreement") is entered into as of January 7, 2020 (the "Effective Date") by and between BAM Technology Services Inc., a Delaware corporation, on behalf of itself and its Affiliates ("BAM TRADING") and Binance Holdings Limited, a company incorporated under the Laws of the Cayman Islands ("BINANCE").  As used in this Agreement, "Party" means either BAM TRADING, on the one hand, or BINANCE, on the other hand, as appropriate, and "Parties" means BAM TRADING and BINANCE, collectively.

**WHEREAS**, BINANCE owns a digital currency trading platform which it operates in multiple countries;

**WHEREAS**, BAM TRADING, desires to obtain a license to the Licensed Software in order to operate a digital currency trading platform for the U.S. market, and BINANCE desires to grant such license; and

**WHEREAS**, concurrently with the execution of this Agreement, the Parties have entered into that certain Master Services Agreement (the "Services Agreement") pursuant to which BINANCE will host, support and maintain the Licensed Software, and develop enhancements to the Licensed Software as requested by BAM TRADING.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

## 1.    DEFINITIONS

Capitalized terms used in this Agreement will have the meanings set forth below.

| | |
|---|---|
| *Affiliates* | means, with respect to any Party, any Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Party, whether such Person is now in existence or hereafter formed. The term "Control" and its derivatives means any of (1) the possession, direct or indirect, of the power to direct or cause the management and policies of a Person and (2) ownership of more than 50 percent of the capital stock of a Person or, in the case of a non-corporate Person, an equivalent interest. |
| *Applicable Law* | means (regardless of jurisdiction) any applicable (1) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, guidance notes, policy statements, customary laws, decrees, injunctions, or judgments and (2) ruling, declaration, regulation, requirement, request or interpretation issued by any (or any |

|  | quasi-) regulatory, judicial, administrative or governmental body or person. |
|---|---|
| *Center* | has the meaning set forth in Section 10.7. |
| *Confidential Information* | has the meaning set forth in Section 5.1. |
| *Custom Enhancements* | has the meaning set forth in the Services Agreement. |
| *Deliverables* | means the Licensed Software, Documentation, Custom Enhancements and any other materials provided to BAM TRADING by BINANCE under this Agreement. |
| *Dispute* | has the meaning set forth in Section 10.7. |
| *Documentation* | means all documentation and supportive literature which explains the use or operation of, or otherwise relates to, the Licensed Software, including all proprietary user or operating manuals, brochures or electronic text. |
| *Electronic Message* | means any communication made (1) by telephone, email or other computer or electronic initiated transmission, (2) by any other telegraphically transmitted means, or (3) otherwise over any distance other than by physical delivery. |
| *Intellectual Property Rights* | means all past, present, and future rights of the following types, which may exist or be created under the Applicable Laws of any jurisdiction in the world:  (1) rights associated with works of authorship, including exclusive exploitation rights, copyrights, moral rights, and mask work rights; (2) trademark and trade name rights and similar rights; (3) trade secret rights; (4) patents and industrial property rights; (5) other proprietary rights in intellectual property of every kind and nature; and (6) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in subsections (1) through (5) of this sentence. |
| *Licensed Software* | means the compiled, machine-readable, and/or executable version of BINANCE's proprietary software that comprises its digital currency trading platform, as may be improved or modified by BINANCE, as more fully described in <u>Exhibit A</u>, including all Maintenance Changes and Custom Enhancements provided pursuant to this Agreement and the Services Agreement. |
| *Maintenance Changes* | means (1) changes, bug fixes, updates, upgrades and enhancements to existing functionality of the Licensed Software to facilitate improvement in terms of efficiency and/or |

|  | performance of the Licensed Software and (2) new releases of the Licensed Software. |
|---|---|
| *Malware* | has the meaning set forth in Section 6.2(I). |
| *Open Source License* | means any license or other contractual obligation that requires, as a condition of use, modification, or distribution of the covered technology, that the covered technology or other technology incorporated into, derived from, or distributed with the covered technology (1) be disclosed or distributed as source code; (2) be licensed by the user to third parties for the purpose of making or distributing derivative works; or (3) be redistributable at no or minimal charge.  Open Source Licenses include licenses or distribution models similar to any of the following: GNU's General Public License (GPL) or Lesser/Library GPL (LGPL); the Artistic License (e.g., PERL); the Mozilla Public License; the Netscape Public License; the Common Development and Distribution License (CDDL); the Apache Software License; and the Common Public License (CPL). |
| *Open Source Software* | means software that is subject to an Open Source License. |
| *Person* | means an individual, partnership, corporation, limited liability company, unincorporated organization, association, trust, joint venture, joint stock company, a governmental agency (or political subdivision thereof) or any other entity. |
| *Rules* | has the meaning set forth in Section 10.7. |
| *Services Agreement* | has the meaning set forth in the recitals. |
| *Use* | means load, execute, store, transmit, import, display, copy, and prepare (and have prepared) derivative works. |

## 2.   LICENSE GRANT

### 2.1   Grant of License to BAM TRADING.

    **(A)**    BINANCE hereby grants to BAM TRADING a worldwide, non-exclusive, perpetual, irrevocable (except as set forth in Section 8.2), non-transferable, fully paid-up, royalty-free license, under all of BINANCE's Intellectual Property Rights, to Use the Licensed Software and Documentation relating thereto in the furtherance of BAM TRADING's business and operations.

    **(B)**    BAM TRADING may sublicense the licenses granted in Section 2.1(A) to (1) third parties, including BAM TRADING's contractors, consultants, outsourcers, service providers and other similar parties, for the benefit of BAM TRADING, and (2) to any portion of BAM TRADING's business that is divested by BAM TRADING, or the acquirer thereof, for the benefit of such divested business.

3

**(C)**     BAM TRADING may make copies of the Documentation as BAM TRADING deems reasonably necessary or appropriate and may provide copies of the Documentation to BAM TRADING's employees, contractors, customers, consultants, agents, outsourcers, service providers and other similar parties as necessary for such parties to use the Licensed Software to conduct BAM TRADING's business.  BAM TRADING will also have the right to copy and use the Documentation at any off-site location for back-up and recovery purposes.

**2.2**     <u>Limitations and Restrictions on License Rights</u>.  There will be no limitations or restrictions on BAM TRADING's use of the Licensed Software pursuant to the licenses granted in Section 2.1, including limitations or restrictions on (1) the use of the Licensed Software on any CPU or other item of equipment regardless of size, and on any computer independent of the number of processors within such computer or (2) the number of users that may access or use the Licensed Software.

**2.3**     <u>API License</u>**.**  BINANCE hereby grants to BAM TRADING, at no charge, a worldwide, non-exclusive, perpetual, irrevocable (except as set forth in Section 8.2), transferable, fully paid-up, royalty-free license to use any application programming interface (API) for the Licensed Software.  BAM TRADING may sublicense such license to the Persons described in Section 2.1(B).

**3.     THIRD PARTY SOFTWARE**

The Licensed Software does not include any third party software or Open Source Software other than such software listed in <u>Exhibit A</u>.

**4.     MAINTENANCE AND DEVELOPMENT**

BAM TRADING's obligations with respect to maintenance and support of the Licensed Software, including the development of Custom Enhancements, are set forth in the Services Agreement.

**5.     CONFIDENTIALITY**

**5.1**     <u>General</u>**.**  BAM TRADING AND BINANCE each acknowledge that they may be furnished with, receive or otherwise have access to information of or concerning the other Party that such Party considers to be confidential, a trade secret or otherwise restricted.  As used in this Agreement, "<u>Confidential Information</u>" will mean all information, in any form, furnished or made available directly or indirectly by one Party to the other under this Agreement which is marked confidential, restricted, or with a similar designation, or that, based on the type or nature of the information and the circumstances of disclosure, should reasonably be understood by the receiving Party to be confidential or proprietary.  Confidential Information also will include, whether or not marked as confidential (or with a similar designation), (A) all information concerning the operations, affairs and businesses of the disclosing Party, the financial affairs of the disclosing Party, and the relations of the disclosing Party with its customers, employees and service providers; (B) software provided to the receiving Party  by the disclosing Party and the related Documentation; and (C) the terms and conditions of this Agreement.

DocuSign Envelope ID: 772F9C36-1041-430C-8A69-453EAD5B52D5

5.2     Obligations.

(A)     Subject to the licenses granted to BAM TRADING in this Agreement, BAM TRADING AND BINANCE will each (1) hold Confidential Information received from the other Party in confidence and, except as expressly permitted by Section 5.2(B) or Section 5.2(C), or by the express, prior written approval of the disclosing Party in each instance, which approval may be withheld or granted by the disclosing Party in its sole discretion, not provide, disseminate, sell, assign, lease, transfer or otherwise dispose of, disclose to or make available any Confidential Information of the disclosing Party to any third party, (2) use the Confidential Information of the other Party only for performing its obligations or exercising its rights under this Agreement, and (3) use at least the same degree of care as it employs to avoid unauthorized disclosure of its own information, but in any event no less than commercially reasonable efforts, to prevent disclosing to third parties the Confidential Information of the other Party.

(B)     Subject to the licenses granted to BAM TRADING in this Agreement, each Party may disclose Confidential Information of the other Party to its employees, directors, attorneys, auditors, accountants, and subcontractors, provided that (1) the recipient has a need to know the Confidential Information for purposes of performing his or her obligations under or with respect to this Agreement or as otherwise naturally occurs in such person's scope of responsibility and (2) such disclosure is made pursuant to obligations of confidentiality that are no less stringent than those set forth in this Section 5.2.

(C)     A Party may disclose Confidential Information of the other Party under compulsion of legal process by a court of competent jurisdiction or Applicable Law, provided that, immediately upon receiving any such request and to the extent that it may legally do so, such Party advises the other Party of the request prior to making such disclosure in order that the other Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information.

(D)     Upon a Party's request at any time and upon the termination of this Agreement for any reason, the other Party will return or destroy, as such Party may direct, all material in any medium that contains Confidential Information of such Party.

5.3     Exclusions.  Section 5.2 will not apply to any particular information that the receiving Party can demonstrate:  (A) was, at the time of disclosure to it, in the public domain; (B) after disclosure to it, was published or otherwise became part of the public domain through no fault of the receiving Party; (C) was in the possession of the receiving Party at the time of disclosure to it without any obligation of to restrict its further use or disclosure; (D) was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure; or (E) was independently developed by the receiving Party without reference to Confidential Information of the furnishing Party.

6.     REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS

6.1     Mutual Representations and Warranties.  Each Party represents and warrants that:

       **(A)**    it is duly incorporated or organized, validly existing and in good standing under the laws of the state or country of its incorporation or organization; and

       **(B)**    it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, and it has duly authorized the execution, delivery and performance of this Agreement.

    **6.2**    <u>Additional BINANCE Representations, Warranties and Covenants</u>**.**  BINANCE represents, warrants and covenants that:

       **(A)**    the execution, delivery and performance of this Agreement by BINANCE will not conflict with, result in a breach of, or constitute a default under any other agreement to which BINANCE is a party or by which BINANCE is bound;

       **(B)**    the Licensed Software complies with, and will, for the duration of the Services Agreement, comply with, the provisions, descriptions, and representations (including performance capabilities, accuracy, completeness, characteristics, specifications, configurations, standards, functions and requirements) which are contained in the Documentation and <u>Exhibit A</u>;

       **(C)**    BINANCE is in compliance with, and will, for the duration of the Services Agreement, comply with, all Applicable Laws governing BINANCE's obligations under this Agreement, and has obtained and BINANCE will maintain all applicable permits and licenses required of BINANCE in connection with its obligations under this Agreement;

       **(D)**    the Licensed Software is in compliance with, and BINANCE will maintain the Licensed Software so that it complies with, all Applicable Laws and in a manner so as not to cause BAM TRADING to be in violation of any Applicable Laws;

       **(E)**    there is no outstanding litigation, arbitrated matter or other dispute to which BINANCE is a party which, if decided unfavorably to BINANCE, would reasonably be expected to have a material adverse effect on BINANCE's ability to fulfill its obligations under this Agreement;

       **(F)**    the Licensed Software and Documentation do not and will not infringe or misappropriate any third party's Intellectual Property Rights;

       **(G)**    BINANCE will promptly notify BAM TRADING if BINANCE learns of any claim, pending or threatened, or any fact upon which a claim could be made, that asserts that the Licensed Software or any Documentation may infringe upon any third party's Intellectual Property Rights;

       **(H)**    the Licensed Software does not include, and BINANCE will not include in the Licensed Software, any third-party software without BAM TRADING's prior written consent;

       **(I)**    the Licensed Software does not include and viruses, Trojan horses, worms, spyware, back doors, email bombs, malicious code or similar items (collectively, "<u>Malware</u>"), and BINANCE will ensure that no Malware is coded or introduced by BINANCE into the

Licensed Software, and will use best efforts to prevent Malware from being introduced by third parties into the Licensed Software.  In the event that Malware is found to have been introduced into the Licensed Software, BINANCE will promptly remove, and mitigate the effects of, the Malware and restore any affected data; and

**(J)**     the Licensed Software does not include any code that is designed and intended to disable or otherwise shut down all or any portion of any Licensed Software, and PARTY B will ensure that no such code is coded or introduced into the Licensed Software.

**6.3**     Disclaimer.  EXCEPT AS SPECIFIED IN THIS AGREEMENT, THE SERVICES AGREEMENT AND THE DOCUMENTATION, NEITHER PARTY MAKES ANY WARRANTIES AND EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**7.     LIMITATION OF LIABILITY**

EXCEPT WITH RESPECT TO DAMAGES ARISING FROM BREACH OF SECTION 5 OR SECTION 6, AND A PARTY'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT, WHETHER IN CONTRACT OR IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT LIABILITY IN TORT), WILL A PARTY BE LIABLE FOR INDIRECT OR CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

**8.     TERMINATION**

**8.1**     Termination by BAM TRADING**.**  BAM TRADING may terminate this Agreement upon a notice sent to BINANCE.

**8.2**     Termination by BINANCE**.**  BINANCE may only terminate this Agreement if BAM TRADING materially breaches Section 2.1, and fails to cure such breach within 60 days following BAM TRADING's receipt of notice of such breach from BAM TRADING or if termination is required by Applicable Laws.

**8.3**     Survival**.**  The provisions of Section 1, Section 5, Section 7, this Section 8.3, Section 9, and Section 10, as well as any other provision of this Agreement that contemplates performance or observance subsequent to termination of this Agreement will survive termination of this Agreement and continue in full force and effect.

**9.     NOTICES**

All notices given hereunder will be signed by or on behalf of the Party giving them and given by sending the same by (A) prepaid recognized commercial courier (e.g., DHL), or (B) an Electronic Message confirmed by a signed copy sent that same business day by prepaid first class post (e.g., United States mail) or by prepaid commercial courier.  Any notice sent by post or by prepaid commercial courier as provided in this Section 9 will be deemed to have been

given five business days after being sent and any notice sent by email shall be deemed to have been given upon dispatching if confirmation of transmission is received.  Evidence that the notice was properly addressed, stamped and posted shall be presumptive evidence of posting.  A notice received outside business hours (9:30 a.m. to 4:00 p.m. Pacific time on a business day) will be considered received when business hours resume.  All notices to the Parties will be validly sent to the relevant address set out above.  Notices given hereunder may be given in such manner as the sender and the recipient may agree in writing from time to time.

## 10.    MISCELLANEOUS

**10.1**    <u>Counterparts</u>**.**  This Agreement may be executed in multiple counterparts, each of which will be deemed an original but all of which taken together will constitute one and the same instrument.

**10.2**    <u>Amendment</u>**.**  Any amendment to this Agreement must be agreed in writing and be signed by all the Parties.  Unless otherwise agreed, an amendment will not affect any legal rights or obligations which may already have arisen.

**10.3**    <u>Binding Nature and Assignment</u>**.**  This Agreement will be binding on and will inure to the benefit of the Parties and each of their successors and assigns.  Neither Party may, or will have the power to, assign this Agreement without the prior written consent of the other, except that BAM TRADING may assign its rights and obligations under this Agreement without the approval of BINANCE, to an entity that acquires all or substantially all of the assets of BAM TRADING, to an Affiliate, or to a successor in a merger or acquisition of BAM TRADING.

**10.4**    <u>Entire Agreement</u>**.**  This Agreement, including all Exhibits attached hereto, constitutes the entire understanding and agreement of the Parties.  If any provision herein is determined to be void or unenforceable in whole or in part for any reason whatsoever, such unenforceability or invalidity will not affect the enforceability or validity of the remaining provisions or parts contained in this Agreement and such void or enforceable provisions will be deemed to be severable from any other provisions or parts herein contained.

**10.5**    <u>Interpretation</u>**.**  In this Agreement, unless the context otherwise requires, (A) words importing the singular shall include the plural and vice versa and words importing the masculine gender shall include the feminine and the neuter and vice versa; (B) references to Sections and Exhibits are to Sections of and Exhibits to this Agreement; (C) a reference to "including" means including without limiting the generality of any description preceding such term and any general statement followed by or referable to an enumeration of specific matters shall not be limited to matters similar to those specifically mentioned; (D) references to any enactment shall be deemed to include references to such enactment as re-enacted, amended, supplemented, restated or extended from time to time; and (E) where any expression is defined or the interpretation of it is set out herein, other parts of speech of such expression shall have a corresponding meaning References to and the use of the word "days" will mean calendar days, unless otherwise specified.  The Section headings are used for convenience only and will not affect the construction or interpretation of this Agreement.  The Exhibit forms part of this Agreement and will have the same force and effect as if it was expressly set out in the body of this Agreement and any reference to this Agreement will include the Exhibit.

DocuSign Envelope ID: 773E0C36-1041-429C-8A89-452EAD5B52BB

**10.6**   <u>Governing Law</u>.  The validity, interpretation, construction and performance of this Agreement will be governed by the laws of the State of New York without regard to the choice of law principles thereof.

**10.7**   <u>Arbitration</u>.  Without limiting the right of a Party to seek specific performance, injunctive relief or any other equitable remedy in connection with any alleged breach of Section 5, any dispute, controversy or claim arising out of or relating to this Agreement or its subject matter (including a dispute regarding the existence, validity, formation, effect, interpretation, performance or termination of this Agreement) (each, a "<u>Dispute</u>") will be finally settled by arbitration.  The place of arbitration will be Hong Kong, and the arbitration will be administered by the Hong Kong International Arbitration Centre (the "<u>Center</u>") in accordance with the Center's Administered Arbitration Rules in force when the notice of arbitration is submitted (the "<u>Rules</u>").  The arbitration will be decided by a tribunal of three arbitrators to be appointed in accordance with the Rules.  Arbitration proceedings (including any arbitral award rendered) will be in English.  The tribunal will decide any dispute submitted by the Parties strictly in accordance with the substantive law of the State of New York and will not apply any other substantive law.  Subject to the agreement of the tribunal, any Dispute(s) which arise subsequent to the commencement of arbitration of any existing Dispute(s) will be resolved by the tribunal already appointed to hear the existing Dispute(s).  The award of the arbitration tribunal will be final and conclusive and binding upon the Parties as from the date rendered.  Judgment upon any award may be entered and enforced in any court having jurisdiction over a party or any of its assets.  For the purpose of enforcing this agreement to arbitrate, the Parties irrevocably and unconditionally submit to the jurisdiction of the courts of Hong Kong and waive any defenses to such enforcement based on lack of personal jurisdiction or inconvenient forum.  For the purpose of enforcement of an award, the Parties irrevocably and unconditionally waive any defense of inconvenient forum in any court of competent jurisdiction.

**10.8**   <u>Waiver of Default</u>.  No waiver by any Party of any of the provisions of this Agreement will be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**10.9**   <u>Export Controls</u>.  The Parties acknowledge that the Deliverables may be subject to export controls under the Applicable Laws of the United States and other countries.  Without limiting the Parties' other obligations under this Agreement, neither Party will export or re-export any such items or any direct product thereof or undertake any transaction in violation of any Applicable Laws.  BINANCE will be responsible for, and will coordinate and oversee, compliance with such Applicable Laws in respect of such items exported or imported hereunder.

IN WITNESS WHEREOF, BAM TRADING AND BINANCE have each caused this Agreement to be signed and delivered by its duly authorized officer, all as of the Effective Date.

**BAM TRADING SERVICES INC.**

_Catherine Coley_
DocuSigned by:
62D54DC0A8942C...
Signature

Catherine Coley
Name

CEO                          1/7/2020
Title                        Date

**BINANCE HOLDINGS LIMITED**

_Changpeng Zhao_
DocuSigned by:
48787FC11D74433...
Signature

Changpeng Zhao
Name

CEO                          1/7/2020
Title                        Date

**Exhibit A**
**Specifications**

BINANCE's digital currency trading platform consisting of the following modules, as may be modified or improved from time to time:

1. Digital currency exchange platform;
2. Matching engine;
3. Digital currency wallet services;
4. Android mobile application;
5. iOS mobile application;
6. "MIS" management console;]
7. User center;
8. Risk control center; and
9. And all other related pages, components, modules, scripts, programs and software in support of the foregoing modules.

# EXHIBIT BH-42

<u>**MASTER SERVICES AGREEMENT**</u>

This **MASTER SERVICES AGREEMENT** (this "<u>Agreement</u>") is entered into as of January 7, 2020 (the "<u>Effective Date</u>") by and between BAM Trading Services Inc. on behalf of itself and its Affiliates ("<u>BAM TRADING</u>") and Binance Holdings Limited, a company incorporated under the Laws of the Cayman Islands ("<u>BINANCE</u>").  As used in this Agreement, "<u>Party</u>" means either BAM TRADING, on the one hand, or BINANCE, on the other hand, as appropriate, and "<u>Parties</u>" means BAM TRADING and BINANCE, collectively.

**WHEREAS**, BINANCE owns a digital currency trading platform which operates in multiple countries;

**WHEREAS**, concurrently with the execution of this Agreement, the Parties have entered into that certain Software License Agreement (the "<u>License Agreement</u>") pursuant to which BINANCE granted BAM TRADING, a strategic partner of BINANCE, a license to the Licensed Software in order to operate a digital currency trading platform for the U.S. market;

**WHEREAS**, BAM TRADING desires for BINANCE to host the Licensed Software, provide BAM TRADING and End Users access to and use of the Licensed Software in the hosted environment, and maintain, support, and develop and implement BAM TRADING - specific enhancements to, the Licensed Software; and

**WHEREAS**, BINANCE desires to provide such services in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

1.   **DEFINITIONS**

Capitalized terms used in this Agreement will have the meanings set forth below.

| | |
|---|---|
| *Affiliate* | means, with respect to any Party, any Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Party, whether such Person is now in existence or hereafter formed. The term "<u>Control</u>" and its derivatives means any of (1) the possession, direct or indirect, of the power to direct or cause the management and policies of a Person and (2) ownership of more than 50 percent of the capital stock of a Person or, in the case of a non-corporate Person, an equivalent interest. |
| *Applicable Law* | means (regardless of jurisdiction) any applicable (1) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, guidance notes, policy statements, customary laws, decrees, injunctions, or |

| | judgments and (2) ruling, declaration, regulation, requirement, request or interpretation issued by any (or any quasi-) regulatory, judicial, administrative or governmental body or person. |
|---|---|
| *Center* | has the meaning set forth in Section 12.7. |
| *Confidential Information* | has the meaning set forth in Section 6.1. |
| *Custom Enhancements* | has the meaning set forth in Section 5.1. |
| *Deliverables* | means the Licensed Software, Documentation, and any other materials provided or made accessible to BAM TRADING by BINANCE under this Agreement. |
| *Development Services* | has the meaning set forth in Section 5.1. |
| *Dispute* | has the meaning set forth in Section 12.7. |
| *Documentation* | means all documentation and supportive literature which explains the use or operation of, or otherwise relates to, the Licensed Software, including all proprietary user or operating manuals, brochures or electronic text. |
| *DR Plan* | has the meaning set forth in Section 9. |
| *Electronic Message* | means any communication made (1) by telephone, email or other computer or electronic initiated transmission, (2) by any other telegraphically transmitted means, or (3) otherwise over any distance other than by physical delivery. |
| *End Users* | means BAM TRADING's employees, customers, agents, contractors, and other third parties authorized by BAM TRADING to access and use the Licensed Software. |
| *Enhancement Request* | has the meaning set forth in Section 5.1. |
| *Enhancement Work Order* | has the meaning set forth in Section 5.1. |
| *Hosting Environment* | means equipment, software and other infrastructure controlled or maintained by BINANCE that is used to host the Licensed Software. |
| *Hosting Services* | has the meaning set forth in Section 4.1. |
| *Industry Standards* | means the best practices exercised by Persons who host, operate and/or maintain digital currency exchanges or financial services platforms. |
| *Intellectual Property Rights* | means all past, present, and future rights of the following types, which may exist or be created under the Applicable Laws of any jurisdiction in the world:  (1) rights associated with works of authorship, including exclusive exploitation rights, copyrights, |

| | moral rights, and mask work rights; (2) trademark and trade name rights and similar rights; (3) trade secret rights; (4) patents and industrial property rights; (5) other proprietary rights in intellectual property of every kind and nature; and (6) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in subsections (1) through (5) of this sentence. |
|---|---|
| *License Agreement* | has the meaning set forth in the recitals. |
| *Licensed Software* | has the meaning set forth in the License Agreement. |
| *Maintenance Changes* | means (1) changes, bug fixes, updates, upgrades and enhancements to existing functionality of the Licensed Software to facilitate improvement in terms of efficiency and/or performance of the Licensed Software and (2) new releases of the Licensed Software. |
| *Malware* | has the meaning set forth in Section 7.2(J). |
| *Person* | means an individual, partnership, corporation, limited liability company, unincorporated organization, association, trust, joint venture, joint stock company, a governmental agency (or political subdivision thereof) or any other entity. |
| *Platform* | means the Licensed Software as hosted by BINANCE in the Hosted Environment. |
| *Rules* | has the meaning set forth in Section 12.7. |
| *Services* | means the Development Services, Hosting Services and Support Services. |
| *Support Services* | has the meaning set forth in Section 4.2. |
| *Term* | has the meaning set forth in Section 2. |

## 2.    TERM

The term of this Agreement will commence on the Effective Date and continue until it is terminated in accordance with the provisions of Section 10 (the "Term").

## 3.    ACCESS AND USE

Commencing on the Effective Date and continuing throughout the Term, BINANCE will provide BAM TRADING and the End Users with browser-based access to the Licensed Software through an Internet connection meeting or exceeding the requirements set forth in Exhibit A. There will be no limitation on the number of End Users who may access the Licensed Software in the Hosting Environment, including concurrent End Users.

## 4.    HOSTING AND SUPPORT SERVICES

**4.1**    Hosting Services.  BINANCE's obligations with respect to the hosting of the Licensed Software include the services described in Exhibit A, as well as any services, functions or responsibilities reasonably required for the proper provision of such services in accordance with Industry Standards (collectively, the "Hosting Services").

**4.2**    Maintenance and Support Services.  BINANCE's obligations with respect to maintenance and support of the Licensed Software include the services described in Exhibit A, as well as any services, functions or responsibilities reasonably required for the proper provision of such services in accordance with Industry Standards (collectively, the "Support Services") BINANCE will make available to BAM TRADING or, at the request of BAM TRADING, implement on the Platform, (A) Maintenance Changes and updated Documentation relating thereto at the same time as BINANCE makes such changes available to other users of the Licensed Software, and (B) Custom Enhancements and updated Documentation relating thereto within 10 days after acceptance thereof by BAM TRADING, unless a different time frame is agreed by the Parties in writing.

**5.**    **DEVELOPMENT SERVICES**

**5.1**    Enhancement Requests.  BAM TRADING may, from time to time during the Term, request that BINANCE perform services ("Development Services") to develop enhancements to the Licensed Software to implement BAM TRADING'S requirements (such enhancements, "Custom Enhancements").  If BAM TRADING desires for BINANCE to implement a Custom Enhancement, BAM TRADING will submit a request that describes the requested features, functionality and timing for development and implementation of the Custom Enhancement (each, an "Enhancement Request").  Within 10 business days following receipt of an Enhancement Request, BINANCE will provide BAM TRADING with a proposal for Custom Enhancement, the schedule for when and how such Enhancement will be implemented, and other relevant information, substantially in the form of Exhibit B (each, an "Enhancement Work Order").  BINANCE will commence development of the Custom Enhancement promptly following the Parties' agreement on and execution of the applicable Enhancement Work Order. Custom Enhancements will be developed at no cost to BAM TRADING.

**5.2**    Review and Acceptance.  All Custom Enhancements will be subject to BAM TRADING's review and testing during the applicable acceptance period set forth in the Enhancement Work Order, in order to confirm that such Custom Enhancements conform to the acceptance criteria identified in the applicable Enhancement Work Order, if any.  If BAM TRADING identifies nonconformities in any Custom Enhancements, BAM TRADING will notify BINANCE and provide a description of such nonconformity.  BINANCE will correct the nonconforming Custom Enhancement and cause it to comply with the relevant acceptance criteria promptly following BINANCE's receipt of the notice of nonconformity.  The acceptance process will be repeated until the Custom Enhancement is accepted by BAM TRADING.

**6.**    **CONFIDENTIALITY**

**6.1**    General.  BINANCE and BAM TRADING each acknowledge that they may be furnished with, receive or otherwise have access to information of or concerning the other Party that such Party considers to be confidential, a trade secret or otherwise restricted.  As used in this Agreement, "Confidential Information" will mean all information, in any form, furnished or

DocuSign Envelope ID: 773E0C36-1041-439C-9A69-4625AD5B53BB

made available directly or indirectly by one Party to the other under this Agreement which is marked confidential, restricted, or with a similar designation, or that, based on the type or nature of the information and the circumstances of disclosure, should reasonably be understood by the receiving Party to be confidential or proprietary.

**6.2**     Obligations.

**(A)**     Subject to the licenses granted to BAM TRADING in the License Agreement, BAM TRADING and BINANCE will each (1) hold Confidential Information received from the other Party in confidence and, except as expressly permitted by Section 6.2(B) or Section 6.2(C), or by the express, prior written approval of the disclosing Party in each instance, which approval may be withheld or granted by the disclosing Party in its sole discretion, not provide, disseminate, sell, assign, lease, transfer or otherwise dispose of, disclose to or make available any Confidential Information of the disclosing Party to any third party, (2) use the Confidential Information of the other Party only for performing its obligations or exercising its rights under this Agreement, and (3) use at least the same degree of care as it employs to avoid unauthorized disclosure of its own information, but in any event no less than commercially reasonable efforts, to prevent disclosing to third parties the Confidential Information of the other Party.

**(B)**     Subject to the licenses granted to BAM TRADING in the License Agreement, each Party may disclose Confidential Information of the other Party to its employees, directors, attorneys, auditors, accountants, and subcontractors, provided that (1) the recipient has a need to know the Confidential Information for purposes of performing his or her obligations under or with respect to this Agreement or as otherwise naturally occurs in such person's scope of responsibility and (2) such disclosure is made pursuant to obligations of confidentiality that are no less stringent than those set forth in this Section 6.2.

**(C)**     A Party may disclose Confidential Information of the other Party under compulsion of legal process by a court of competent jurisdiction or Applicable Law, provided that, promptly upon receiving any such request and to the extent that it may legally do so, such Party advises the other Party of the request prior to making such disclosure in order that the other Party may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information.

**(D)**     Upon a Party's request at any time and upon the termination of this Agreement for any reason, the other Party will return or destroy, as such Party may direct, all material in any medium that contains the Confidential Information of such Party.

**6.3**     Exclusions.  Section 6.2 will not apply to any particular information that the receiving Party can demonstrate: (A) was, at the time of disclosure to it, in the public domain; (B) after disclosure to it, was published or otherwise became part of the public domain through no fault of the receiving Party; (C) was in the possession of the receiving Party at the time of disclosure to it without any obligation of to restrict its further use or disclosure; (D) was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure; or (E) was independently developed by the receiving Party without reference to Confidential Information of the furnishing

DocuSign Envelope ID: 773E0C36-1041-429C-9A69-4625A0B5B52BB

Party.

## 7.    REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS

**7.1**    <u>Mutual Representations and Warranties</u>**.**  Each Party represents and warrants that:

**(A)**    it is duly incorporated or organized, validly existing and in good standing under the laws of the state or country of its incorporation or organization; and

**(B)**    it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, and it has duly authorized the execution, delivery and performance of this Agreement.

**7.2**    <u>Additional BINANCE Representations, Warranties and Covenants</u>**.**  BINANCE represents, warrants and covenants that:

**(A)**    the execution, delivery and performance of this Agreement by BINANCE will not conflict with, result in a breach of, or constitute a default under any other agreement to which BINANCE is a party or by which BINANCE is bound;

**(B)**    BINANCE will provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services, and BINANCE will use adequate numbers of qualified individuals with suitable training, education, experience and skill to perform the Services;

**(C)**    BINANCE will maintain the equipment in the Hosting Environment so that such equipment operates in accordance with its specifications, including: (1) maintaining equipment in good operating condition, subject to normal wear and tear and (2) undertaking repairs and preventive maintenance on equipment in accordance with the applicable manufacturer's recommendations;

**(D)**    the Services and the Hosting Environment comply with, and will, for the duration of the Term, comply with, the provisions, descriptions, and representations (including performance capabilities, accuracy, completeness, characteristics, specifications, configurations, standards, functions and requirements) which are contained in the Documentation;

**(E)**    BINANCE is in compliance with, and will, for the duration of the Term, comply with, all Applicable Laws governing BINANCE's obligations under this Agreement, and has obtained and BINANCE will maintain all applicable permits and licenses required of BINANCE in connection with its obligations under this Agreement;

**(F)**    the Platform is in compliance with, and BINANCE will, for the duration of the Term, maintain the Platform so that it complies with, all Applicable Laws, and in a manner so as not to cause BAM TRADING to be in violation of any Applicable Laws;

**(G)**    there is no outstanding litigation, arbitrated matter or other dispute to which BINANCE is a party which, if decided unfavorably to BINANCE, would reasonably be expected to have a material adverse effect on BINANCE's ability to fulfill its obligations under

DocuSign Envelope ID: 773E0C36-1041-439C-8A69-452FAD5B52BB

this Agreement;

        **(H)**    the Services and Platform do not and will not, for the duration of the Term, infringe or misappropriate any third party's Intellectual Property Rights;

        **(I)**    BINANCE will promptly notify BAM TRADING if BINANCE learns of any claim, pending or threatened, or any fact upon which a claim could be made, that asserts that the Services or Platform may infringe upon any third party's Intellectual Property Rights;

        **(J)**    BINANCE will ensure that no viruses, Trojan horses, worms, spyware, back doors, email bombs, malicious code or similar items (collectively, "Malware") is coded or introduced by BINANCE into the Platform or BAM TRADING's systems, and will use best efforts to prevent Malware from being introduced by third parties into the Platform or BAM TRADING's systems.  In the event that any Malware is detected by BINANCE, BINANCE will promptly remove, and mitigate the effects of, the Malware and restore any affected data; and

        **(K)**    the Platform does not include any code that is designed and intended to disable or otherwise shut down all or any portion of Platform, and BINANCE will ensure that no such code is coded or introduced into the Platform or BAM TRADING's systems.

    **7.3**    **Disclaimer.**  EXCEPT AS SPECIFIED IN THIS AGREEMENT, THE LICENSE AGREEMENT AND THE DOCUMENTATION, NEITHER PARTY MAKES ANY OTHER WARRANTIES, AND EACH PARTY EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**8.**    **LIMITATION OF LIABILITY**

    EXCEPT WITH RESPECT TO DAMAGES ARISING FROM BREACH OF SECTION 6 OR SECTION 7, AND A PARTY'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT, WHETHER IN CONTRACT OR IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT LIABILITY IN TORT), WILL A PARTY BE LIABLE FOR INDIRECT OR CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

**9.**    **DISASTER RECOVERY AND BUSINESS CONTINUITY**

    BINANCE will have and maintain a disaster recovery and business continuity plan ("DR Plan") for each data center that it uses to provide the Hosting Services.  The DR Plans will permit BINANCE to reinstate the impacted Services as promptly as possible, and in any case in accordance with Industry Standard recovery time objectives and recovery point objectives. Unless otherwise agreed by the Parties in writing, BINANCE will test the operability of each DR Plan at least once during each 12-month period during the Term and will promptly thereafter provide the results of each test to BAM TRADING.  BINANCE will implement the applicable DR Plan upon the occurrence of a disaster.

## 10.    TERMINATION

**10.1**    <u>Termination by BAM TRADING</u>.  BAM TRADING may terminate this Agreement upon a notice to BINANCE.

**10.2**    <u>Termination by BINANCE</u>.  BINANCE may only terminate this Agreement if required by Applicable Law or BAM TRADING materially breaches its obligations hereunder and fails to cure such material breach within 60 days of its receipt of notice from BINANCE of such material breach.

**10.3**    <u>Effect of Termination</u>.  Upon termination of this Agreement, BAM TRADING will cease use of the Platform (provided that such termination will not affect BAM TRADING's license to the Licensed Software under the License Agreement) and BINANCE will promptly provide to BAM TRADING a copy of the BAM TRADING and End User data residing in the Platform (including any backup data) in the format reasonably specified by BAM TRADING.

**10.4**    <u>Survival</u>.  The provisions of Section 1, Section 6, Section 8, Section 10.3, this Section 10.4, Section 11, and Section 12, as well as any other provision of this Agreement that contemplates performance or observance subsequent to termination or expiration of this Agreement will survive termination of this Agreement and continue in full force and effect.

## 11.    NOTICES

All notices given hereunder will be signed by or on behalf of the Party giving them and given by sending the same by (A) prepaid recognized commercial courier (e.g., DHL), or (B) an Electronic Message confirmed by a signed copy sent that same business day by prepaid first class post (e.g., United States mail) or by prepaid commercial courier.  Any notice sent by post or by prepaid commercial courier as provided in this Section 10 will be deemed to have been given five business days after being sent and any notice sent by email shall be deemed to have been given upon dispatching if confirmation of transmission is received.  Evidence that the notice was properly addressed, stamped and posted shall be presumptive evidence of posting.  A notice received outside business hours (9:30 a.m. to 4:00 p.m. Pacific time on a business day) will be considered received when business hours resume.  All notices to the Parties will be validly sent to the relevant address set out above.  Notices given hereunder may be given in such manner as the sender and the recipient may agree in writing from time to time.

## 12.    MISCELLANEOUS

**12.1**    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which will be deemed an original but all of which taken together will constitute one and the same instrument.

**12.2**    <u>Amendment</u>.  Any amendment to this Agreement must be agreed in writing and be signed by all the Parties.  Unless otherwise agreed, an amendment will not affect any legal rights or obligations which may already have arisen.

**12.3**    <u>Binding Nature and Assignment</u>.  This Agreement will be binding on and will inure to the benefit of the Parties and each of their successors and assigns.  Neither Party may, or

will have the power to, assign this Agreement without the prior written consent of the other, except that BAM TRADING may assign its rights and obligations under this Agreement without the approval of BINANCE, to an entity that acquires all or substantially all of the assets of BAM TRADING, to an Affiliate, or to a successor in a merger or acquisition of BAM TRADING

**12.4**    <u>Entire Agreement</u>**.**  This Agreement, including all Exhibits attached hereto and any Enhancement Work Orders entered into hereunder, constitutes the entire agreement of the Parties.  If any provision herein is determined to be void or unenforceable in whole or in part for any reason whatsoever, such unenforceability or invalidity will not affect the enforceability or validity of the remaining provisions or parts contained in this Agreement and such void or enforceable provisions will be deemed to be severable from any other provisions or parts herein contained.

**12.5**    <u>Interpretation</u>**.**  In this Agreement, unless the context otherwise requires, (A) words importing the singular shall include the plural and vice versa and words importing the masculine gender shall include the feminine and the neuter and vice versa; (B) references to Sections and Exhibits are to Sections of and Exhibits to, this Agreement; (C) a reference to "including" means including without limiting the generality of any description preceding such term and any general statement followed by or referable to an enumeration of specific matters shall not be limited to matters similar to those specifically mentioned; (D) references to any enactment shall be deemed to include references to such enactment as re-enacted, amended, supplemented, restated or extended from time to time; and (E) where any expression is defined or the interpretation of it is set out herein, other parts of speech of such expression shall have a corresponding meaning References to and the use of the word "days" will mean calendar days, unless otherwise specified.  The Section headings are used for convenience only and will not affect the construction or interpretation of this Agreement.  The Exhibits form part of this Agreement and will have the same force and effect as if they were expressly set out in the body of this Agreement and any reference to this Agreement will include the Exhibits.

**12.6**    <u>Governing Law</u>**.**  The validity, interpretation, construction and performance of this Agreement will be governed by the laws of the State of New York without regard to the choice of law principles thereof.

**12.7**    <u>Arbitration</u>**.**  Without limiting the right of a Party to seek specific performance, injunctive relief or any other equitable remedy in connection with any alleged breach of Section 5, any dispute, controversy or claim arising out of or relating to this Agreement or its subject matter (including a dispute regarding the existence, validity, formation, effect, interpretation, performance or termination of this Agreement) (each, a "<u>Dispute</u>") will be finally settled by arbitration.  The place of arbitration will be Hong Kong, and the arbitration will be administered by the Hong Kong International Arbitration Centre (the "<u>Center</u>") in accordance with the Center's Administered Arbitration Rules in force when the notice of arbitration is submitted (the "<u>Rules</u>").  The arbitration will be decided by a tribunal of three arbitrators to be appointed in accordance with the Rules.  Arbitration proceedings (including any arbitral award rendered) will be in English.  The tribunal will decide any dispute submitted by the Parties strictly in accordance with the substantive law of the State of New York and will not apply any other substantive law.  Subject to the agreement of the tribunal, any Dispute(s) which arise subsequent to the commencement of arbitration of any existing Dispute(s) will be resolved by the tribunal already appointed to hear the existing Dispute(s).  The award of the arbitration tribunal will be

final and conclusive and binding upon the Parties as from the date rendered.  Judgment upon any award may be entered and enforced in any court having jurisdiction over a party or any of its assets.  For the purpose of enforcing this agreement to arbitrate, the Parties irrevocably and unconditionally submit to the jurisdiction of the courts of Hong Kong and waive any defenses to such enforcement based on lack of personal jurisdiction or inconvenient forum.  For the purpose of enforcement of an award, the Parties irrevocably and unconditionally waive any defense of inconvenient forum in any court of competent jurisdiction.

**12.8**   Equitable Remedies**.**  Each Party acknowledges that, in the event it breaches (or attempts or threatens to breach) its obligations provided in Section 6 or if BINANCE breaches (or attempts or threatens to breach) its obligations under Section 10.3, the other Party may be irreparably harmed.  In such a circumstance, the non-breaching Party may proceed directly to court.  If a court of competent jurisdiction should find that a Party has breached (or attempted or threatened to breach) any such obligations, the breaching Party agrees that, without any additional findings of irreparable injury or other conditions to injunctive relief, it will not oppose the entry of an appropriate order compelling its performance and restraining it from any further breaches (or attempted or threatened breaches).

**12.9**   Waiver of Default**.**  No waiver by any Party of any of the provisions of this Agreement will be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**12.10**   Export Controls**.**  The Parties acknowledge that the Deliverables may be subject to export controls under the Applicable Laws of the United States and other countries.  Without limiting the Parties' other obligations under this Agreement, neither Party will export or re-export any such items or any direct product thereof or undertake any transaction in violation of any Applicable Laws.  BINANCE will be responsible for, and will coordinate and oversee, compliance with such Applicable Laws in respect of such items exported or imported hereunder.

**12.11**   Relationship of Parties**.**  BINANCE, in furnishing the Services, is acting as an independent contractor, and BINANCE has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all Services to be performed by BINANCE under this Agreement.  BINANCE is not an agent of BAM TRADING and has no authority to represent BAM TRADING as to any matters, except as expressly authorized in this Agreement.

IN WITNESS WHEREOF, BAM TRADING and BINANCE have each caused this Agreement to be signed and delivered by its duly authorized officer, all as of the Effective Date.

**BAM TRADING SERVICES INC.**  **BINANCE HOLDINGS LIMITED**

DocuSigned by:

_Catherine Coley_
Signature  62D54DDC0A8942C...

Catherine Coley
Name

CEO                    1/7/2020
Title                       Date

DocuSigned by:

_Changpeng Zhao_
Signature  48787FC11D74433...

Changpeng Zhao
Name

CEO                    1/7/2020
Title                       Date

**Exhibit A**
**Hosting and Support Services**

## 1.      HOSTING SERVICES

**1.1      Access Requirements.**  The Licensed Software should be accessible worldwide by visitors using all major desktop, mobile web or API clients.

**1.2      Hosting Services.**  BINANCE's obligations under this Agreement will include the following:

| # | Service, Function or Responsibility |
|---|---|
| **Hosting and Availability** | |
| **(A)** | Provide and maintain all resources and services required to host the Licensed Software in accordance with the requirements of this Agreement and Industry Standards. |
| **(B)** | Provide notice to BAM TRADING of any changes to the Hosting Environment that may have an adverse impact on BAM TRADING's use of the Platform. |
| **(C)** | Provide one production environment and one staging environment |
| **(D)** | Implement and maintain physical access controls for the Hosting Services that comply with Industry Standards. |
| **(E)** | Use best efforts to make the Platform available and functioning in accordance with its intended use to BAM TRADING and End Users on a 24 x 7 basis, 365 days each year, excluding scheduled maintenance windows. |
| **(F)** | Implement and maintain automated monitoring of Platform availability, response times for transactions on the Platform, and automatic alarming and notification of intrusion activities. |
| **(G)** | Notify BAM TRADING and End Users of unavailability of the Platform or material components thereof, and issues with transaction response times as soon as such issues are discovered by providing notice on the Platform, and notify BAM TRADING by telephone of any outages of the Platform.  Notify BAM TRADING as soon as availability of the Platform resumes. |
| **(H)** | Provide industry-standard full data backup and recovery for BAM TRADING and End User data stored on the Platform and send copies of data to an off-site facility. |
| **User Access** | |
| **(I)** | Provide a process for the establishment of accounts on the platform for End Users. |
| **(J)** | Provide access to the Licensed Software in the hosting environment to BAM TRADING and End Users on a 24 x 7 basis, 365 days each year. |

## 2.   SUPPORT SERVICES

| # | Service, Function or Responsibility |
|---|---|
| **Maintenance Services** | |
| **(A)** | Perform preventive and remedial maintenance on the equipment and software in the Hosting Environment in accordance with Industry Standards to ensure availability of the Platform. |
| **(B)** | Notify BAM TRADING of the maintenance windows for the Platform and in any case schedule maintenance windows during time periods that will minimize impact on End User access to and use of the Platform.  Provide reasonable advance notice to BAM TRADING if any Platform outages are expected to occur during a maintenance window. |
| **(C)** | Provide to BAM TRADING all Maintenance Changes for the Licensed Software, and implement such changes on the Platform only during scheduled maintenance windows, provided that, if a Maintenance Change is comprised of a new version or release of the Licensed Software, implement such Maintenance Change following BAM TRADING's written approval. |
| **(D)** | Support each version of the Licensed Software in accordance with the Agreement for the duration such version is in use by BAM TRADING. |
| **(E)** | Perform testing on all Maintenance Changes prior to providing to BAM TRADING or implementing in the production environment. |
| **Support Desk** | |
| **(F)** | Provide multiple channels for BAM TRADING and End Users to submit inquiries and report incidents and problems on a 24 x 7 basis, including telephone, website, and email. |
| **User Support** | |
| **(G)** | Respond to and resolve user inquiries regarding the Platform, such as issues with system access, within Industry Standard time frames. |
| **(H)** | Provide training on the use and features of the Platform to BAM TRADING as reasonably requested. |
| **Incident Response and Resolution** | |
| **(I)** | For all incidents and problems that arise with respect to the Platform, proactively triage and resolve the issue as soon as reasonably practicable (commensurate with the severity of the issue) and in accordance with Industry Standard time frames. |
| **(J)** | Notify and update BAM TRADING on a periodic basis regarding the status of resolution, with the frequency of such updates commensurate with the severity of the issue. |

**Exhibit B**
**Form of Enhancement Work Order**

**Enhancement Work Order**
**No. [___]**

       This Enhancement Work Order is entered into by and between BAM Trading Services Inc. ("BAM TRADING") and Binance Holdings Limited ("BINANCE") and is hereby incorporated into and made a part of that certain Master Services Agreement (the "Agreement"), effective as of [___], 2020 by and between BAM TRADING and BINANCE.  Unless otherwise defined herein, all capitalized terms that are used in this Enhancement Work Order will have the meanings given to such terms in the Agreement.  The effective date of this Enhancement Work Order is [___], 2020.

**1.**      **GENERAL INFORMATION**

| | |
|---|---|
| **Description of Custom Enhancement:** | |
| **Objective of Custom Enhancement:** | |
| **Specific Services or Features of Licensed Software affected by Custom Enhancement:** | |
| **BAM TRADING Sponsor:** | |
| **BINANCE Sponsor:** | |

## 2. LICENSOR RESOURCES

| BINANCE personnel assigned to project (including location): | List below or attach list. | |
|---|---|---|
| | **Level/Role** | **Location** |
| | | |
| | | |
| | | |
| | | |

| BINANCE subcontractors that will work on project (if any): | | | | |
|---|---|---|---|---|
| | **Name** | **Level/Role** | **Location** | **Nature of Services Provided** |
| | | | | |
| | | | | |
| | | | | |
| | List below or attach list. | | | |

## 3. SCHEDULE

| Project start date: | |
|---|---|
| Project completion date: | |

## 4. DELIVERABLES

The deliverables applicable to this Enhancement Work Order are set forth below.  The deliverables will be subject to BAM TRADING's review and acceptance in accordance with Section 5.2 of the Agreement.

| Name of Deliverable | Description | Milestone / Due Date | Acceptance Criteria | Acceptance Period *(# days)* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2

**5.**     **ADDITIONAL INFORMATION**

This Enhancement Work Order will become effective upon execution by both Parties below and BINANCE will thereafter develop the Custom Enhancement in accordance with the terms set forth herein.  Any change to this Enhancement Work Order after it is approved must be agreed by the Parties in a written amendment.

**BAM TRADING SERVICES INC.**     **BINANCE HOLDINGS LIMITED**

_____          _____
Signature                                                        Signature

_____          _____
Name                                                             Name

_____          _____
Title                                    Date                    Title                                    Date

# EXHIBIT BH-43



BAM Trading Services Inc. d/b/a Binance.US
611 Cowper Street, Suite 400
Palo Alto, CA 94301
legal@binance.us

December 30, 2022

Hon Ng
Binance Holdings Ltd.
c/o Sertus Chambers
Governors Square, Suite #5-204
23 Lime Tree Bay Avenue
P.O. Box 2547
Grand Cayman, KY1-1104, Cayman Islands

      Re:    *Termination of Wallet Custody Agreement*

Dear Mr. Ng,

    We are writing to provide you with notice that BAM Trading Services, Inc. d/b/a Binance.US has terminated the Wallet Custody Agreement ("Agreement") executed on January 7, 2020 between Binance.US and Binance Holdings Limited.  Binance.US is exercising the termination rights set forth in Section 14 of the Agreement and the termination is effective as of December 1, 2022.

    We will continue to operate under the terms of the Software License Agreement that the parties also entered into on January 7, 2020.

    Please let us know if you have any questions.


                  Sincerely,

                  DocuSigned by:

                  *Brian Shroder*

                  ACA2F0AF79BC412...

                  Brian Shroder
                  CEO & President

# EXHIBIT BH-44

## Speech

---

# Outdated: Remarks before the Digital Assets at Duke Conference



**Commissioner Hester M. Peirce**

**Washington D.C.**

**Jan. 20, 2023**

Thank you, Jimmie [Lenz] and Lee [Reiners] for putting together this conference and for inviting me to be part of it. I must begin with my standard disclaimer: the views I represent are my own and do not necessarily represent the views of the Securities and Exchange Commission ("SEC") or my fellow Commissioners.

I was particularly drawn to this conference because it embodies what a university discussion should be—people with different perspectives coming together to listen to and challenge one another. Our cohosts set the tone for this viewpoint diversity. Professor Lenz actively experiments with blockchain technology,"[1] while Professor Reiners is a self-proclaimed "long-time crypto skeptic," albeit one who acknowledges "that the broader digital asset industry is not going away."[2]

Had this conference happened a couple of years ago, to capture the crypto mood, I could simply have lit my speech on fire, watched it burn while someone videoed the blaze, and then created an NFT.[3] Now, however, much of the crypto world is burning, so you will have to endure hearing the speech. The fires that bad and careless actors lit in the crypto world last year offer lessons for the new year, some of which I will discuss this evening. People within the crypto industry and those of us who regulate it could stand to learn something from the terrible, horrible, no good, very bad year[4] of 2022. Underlying these lessons is the truth that technology takes time to develop and often must combine with innovative developments in other fields to realize its full potential. In the interim, it can appear, particularly to outsiders looking in, awkward, useless, or downright harmful.

Over the holidays, I watched an episode of an old TV series, "That Girl," in which Marlo Thomas plays an aspiring actress trying to make her way in New York City. The episode, which ran originally in the mid-1960s, was about CompuDate, a computer dating service that was "the coming thing in human relations."[5] I was surprised to see that computer matching had already begun more than half a century ago, but the show seems to have drawn on reality. Around that time, two sets of students—one at Stanford and another at Harvard—developed operational computer dating projects.[6] Given the limitations of computer technology in the 1960s, it was not, of course, exactly the internet dating that has become so prevalent today. As an experiment, the Marlo Thomas character called up CompuDate, which fed her wish list into its computer on old-timey punch cards. The computer spat out the perfect match, and Marlo Thomas's character went to the CompuDate office to pick up a photo of the guy who showed up at her door a few hours later. Spoiler alert: In the end, the Marlo Thomas character decided the boyfriend she had picked for herself was better than the guy the computer picked, but not by much.

Computer dating at the time the show was filmed was still very much a work in progress, but, as one character on the show explained, it had "splendid possibilities."[7] These possibilities would not fully manifest until technology, including

personal computers, the internet, artificial intelligence, and smartphones, unleashed it.[8] While this TV episode presciently explored the cutting edge of computer dating at the time, even the best fiction writers could not have predicted how technological developments have helped dating both evolve . . . and admittedly also devolve.[9]

On the show, CompuDate, a centralized intermediary, was still very involved in selecting your date. You still had to go down to the CompuDate office. You had to trust the people running the computer to enter your dating criteria accurately and not to override its results with their own judgments about who might be your perfect date. You could not chat with potential dates online before meeting them; they got your name, address, and photo and showed up at your door. Arguably, the involvement of a computer did not add much to the process. Why not simply hire a human matchmaker? [10] Now, however, online dating is the norm; one in four married couples met that way.[11] Computer matching is more workable on a large scale because the technology has developed to support it.

This silly example should not be mistaken for a prophecy that crypto will sweep society off its feet as online dating has, but prophets of crypto's demise do not know the future either. Crypto's value proposition depends primarily on the builders of this technology, not on regulators like me, who lack technical expertise and stand on the periphery looking in. Maybe that means you also ought to take the lessons for the industry that I will offer with a grain of salt, but here goes:

The first and most important lesson of the evening for people who believe in crypto's future is that they should not wait for regulators to fix the problems that bubbled to the surface in 2022. They can act themselves to root out harmful practices and encourage good behavior. Regulatory solutions, which tend to be inflexible, should be a last resort, not a first resort. People working together voluntarily are much better at fixing things than regulators using their inherently coercive power to impose mandatory solutions. Privately designed and voluntarily implemented solutions can be both more effective and more tailored because the people driving them better understand the technology and what they are trying to achieve with it. Iterating and experimenting with private solutions is easier than it is with regulatory ones. Moreover, private solutions avoid the systemic risk that comes from an industry homogenizing because everyone has to fit into the same regulatory parameters.

Second, remember the point of crypto. It is *not* driving up crypto prices so that you can dump your tokens on someone else. Digital assets need to trade, so centralized venues or decentralized exchange protocols are necessary, but trading markets are not the ultimate point. Nor is the point of crypto to lend your crypto assets so that other people can trade them, although lending markets, in which everyone is aware of the risks, are not inherently problematic. Rather, at its core, crypto is about solving a trust problem: how can you interact and transact safely with people you do not know. Traditionally, people have looked to centralized intermediaries or government to solve this problem, but technology like cryptography, blockchain, and zero-knowledge proofs offer new solutions. Out of these technologies flows a multitude of potential uses, including smart contracts, payments, provenance, identity, recordkeeping, data storage, prediction markets, tokenization of assets, and borderless human collaboration. The technology is not an end in itself, but useful only if it can "tackle the hard, messy, human problems . . . and serve real people."[12] If it creates more problems than it solves, then critics are right to dismiss it.

Third, each crypto asset, blockchain, and project needs to be assessed on its own merits. Talking about crypto as if it is a monolith obscures important differences and makes it easier for scammers to hide in the crowd.

Fourth, problems in the design of a protocol or at a centralized infrastructure provider can have sweeping, disastrous consequences. Testing protocols and careful analysis of the incentives you are building into infrastructure can prevent problems from arising after the protocol or infrastructure has been widely adopted.

Fifth, although crypto enables reduced reliance on centralized intermediaries, as long as companies are actively involved in crypto, people should take the same precautions as they would when dealing with any other company. Unthinking trust in centralized intermediaries is antithetical to crypto. As you assess a company's products and services, consider the associated risks. For example, if a company plans to take your assets and lend them to someone else, who is that person, and what happens if that person cannot return the assets or if the company goes bankrupt? Regulation is not a silver bullet, but understanding whether, by whom, and how the company is regulated can help you calibrate your own due diligence. For their part, crypto companies should take the steps necessary to earn and keep their customers' and counterparties' trust. Proofs of reserve, audits of assets and liabilities, internal control audits, and other mechanisms for ensuring that the company is sound and customers' assets are safe are key.[13]

Sixth, in addition to the importance of recognizing and protecting against counterparty risk, many other lessons from traditional finance are equally applicable in crypto. To highlight several:

- Risks matter. Higher returns come with higher risks.

- Counterparties matter. Choose your counterparties and the amount of exposure to each of them wisely.

- Your counterparties' counterparties matter. There is no such thing as pure bilateral risk. An entity's financial problems can quickly become its customers' and counterparties' financial problems and their counterparties' problems, and then the whole industry's problems.

- Collateral matters. If you make an unsecured loan, you will be at the back of the line in bankruptcy. A secured loan affords you more protection, but only if the collateral is good.

- Leverage matters. Leverage magnifies losses in the same way that it can magnify gains.

- Conflicts of interest matter. Before buying based on someone else's recommendation, understand, among other things, whether her interests match yours. If she is telling you to buy while she is selling, you might want to ignore her advice.

- Motives for buying matter. Fear of missing out is an inadequate reason to buy any asset, including a crypto asset.

- Risk controls matter. Effective risk controls are necessary to prevent traders from doing what traders too often try to do: try to make up for losses with more trading.

- Concentration matters. If a few large, interconnected companies or corporate groups dominate the crypto industry, it will struggle to be nimble and innovative. A multitude of smaller, independent projects fosters dynamism and, when fraud or failure happens, the repercussions are likely to be more contained. Distributed systems are generally more resilient than centralized systems, in part because they have multiple nodes so failure of one does not cause the failure of all.

Perhaps the most important message to the crypto industry is to listen to your critics inside or outside the industry. Critics' voices are sometimes shrill, and their messages sometimes melodramatic or nonsensical. However, thoughtful people raise more nuanced critiques of crypto assets and blockchain technology. John Reed Stark, an alumnus of Duke and of the SEC, is in this camp. He champions a "healthy mix of skepticism, distrust, cynicism, and scorn" for "all things crypto, DeFi, NFT, and other Web3 nonsense."[14] An open letter signed by 1500 "software engineers and technologists with deep expertise in our fields" "dispute[d] the claims made in recent years about the novelty and potential of blockchain technology" and argued, among other things, that "Financial technologies that serve the public must always have mechanisms for fraud mitigation and allow a human-in-the-loop to reverse transactions; blockchain permits neither."[15] Some crypto fans have been equally harsh.[16] Thoughtful critiques merit serious consideration.[17] For example, critics have raised concerns about how customers would be treated in bankruptcy,[18] warned of conflicts of interest arising from exchanges performing multiple functions,[19] called out scams, and warned of interconnections between the traditional financial system and crypto.[20]

Last year was as much a teachable moment for regulators as it was for the crypto industry. Regulation should foster an environment where good things flourish, and bad things perish, not the other way around. Assessing regulatory successes and failures in light of recent events can help us determine how we can ensure regulation plays a constructive role. What we should *not* learn from the events of 2022 is that the failures of centralized entities are failures of decentralized protocols. Many of the 2022 failures involved crypto market participants doing the same foolish and fraudulent things that participants in other markets have been doing for centuries.

Pursuing fraudsters, no matter their chosen medium, is important. Hot areas attract scammers: in addition to dating apps, [21] think the 4 Cs: crypto, climate, COVID, and cannabis. The SEC has brought many cases alleging people have engaged in fraud involving actual or fictional crypto.[22] In judging the SEC's success at stamping out fraud in crypto, remember that our jurisdiction is limited. Congress did not empower the SEC with general anti-fraud authority and instead limited it to investigating and addressing fraud occurring in connection with securities transactions with a nexus to the United States. And although some might suggest otherwise, everything, everywhere is *not* securities fraud.[23] Additionally, the SEC's routine examination authority, which is a key way we identify securities violations, extends only to entities that register with the SEC.

Working with entities is also important as it tells the industry that, while we do not compromise on our statutory mandate, we can be flexible in how we achieve it. For example, recently an on chain money market fund that uses "blockchain to process transactions and record share ownership" negotiated its way through the SEC's registration process.[24] While the process reportedly took longer than normal, the step is encouraging.[25] The SEC also has worked with sponsors of closed-end funds that wanted to hold bitcoin. Putting these efforts in the success column is a bit of a stretch, given that staff's direction to such funds seems to flirt with merit regulation, even though we lack the legal authority to do so.[26]

As I will discuss later, the SEC should conduct some form of notice and comment process to resolve the thorniest crypto-related policy issues. Our governing statutes allow us, however, to waive or modify legal obligations when we have a good reason for doing so. Using this authority, the SEC has provided bespoke relief through exemptive orders or no-action letters, which pledge that staff will not recommend enforcement if certain conditions are met. You can think of these regulatory tools as the SEC's version of innovation sandboxing.[27]

The SEC has given some of this type of relief. I discount the value of several no-action letters that were the regulatory equivalent of promising not to recommend speeding tickets for drivers conscientiously adhering to the speed limit.[28] Several others have been more promising. In 2019, the SEC's Division of Trading and Markets staff issued a no-action letter granting time-limited relief to permit a company to test its ability to settle transactions on a private, permissioned distributed ledger.[29] In 2019, Trading and Markets staff also issued a no-action letter to facilitate a three-step settlement process for broker-dealers that operate a non-custodial ATS that trades digital asset securities.[30]

Perhaps additional sandboxing is coming. Chair Gensler has "asked staff to sort through how we might best allow investors to trade crypto security tokens versus or alongside crypto non-security tokens,"[31] which is an area in which experimentation through no-action letters and exemptions would be possible. Chair Gensler also has acknowledged that "[g]iven the nature of crypto investments . . . it may be appropriate to be flexible in applying existing disclosure requirements."[32] While the proof of the pudding will be in the eating, I strongly agree with the sentiment.

One effort I had hoped would be successful fell flat. In December 2020, the Commission provided time-limited relief that was intended to facilitate the custodying of digital asset securities by special purpose broker-dealers.[33] No firm has taken advantage of this relief because it was too limited in scope: a key restriction is that securities could not be traded in the same entity as digital asset securities. This restriction is unworkable for multiple reasons, including the difficulty of determining which digital assets are securities.[34] And that brings us to our first area in which the SEC needs to do better.

The SEC needs to conduct better, more precise, and more transparent legal analysis. The SEC's approach to regulating crypto looks somewhat like a decidedly unromantic version of CompuDate from the old TV show: we tell people to come down to the office to talk to us about their projects, plug the information they give us into our proprietary security-identifying algorithms, and then send the people home with a court date. Hardly a reasonable way forward, and one that results in what one lawyer has dubbed "regulation by anxiety."[35] Operating in such an opaque environment is very stressful for law-abiding people.

Invoking the *Howey* Supreme Court case,[36] which fleshed out the investment contract subcategory of securities, we repeat the mantra that all, or virtually all, tokens are securities.[37] As one commenter has argued, functionally the "most important" factor of the *Howey* test is an SEC-invented "fifth shadow factor": whether the SEC wants to regulate the asset.[38] The SEC wants to regulate crypto assets.

Even in applying *Howey*, the SEC's legal analysis is askew. A recent article by Lewis Cohen and several coauthors conducted an exhaustive study of federal *Howey* cases.[39] The study found that the SEC's insistence that "fungible blockchain-based crypto assets are clearly securities under current law" violates "the Supreme Court's definition of the term 'investment contract' as developed by federal appellate courts for nearly a century."[40] The article explains that under *Howey*, an investment contract requires "some form of business relationship between the parties"[41] and "a counterparty against which rights can be enforced ."[42] Owning the crypto token itself "without more, does not create any sort of *legal relationship* between the token owner" and the token creator.[43] Thus, secondary market-based transfers of crypto assets do not create an investment contract unless they sufficiently "convey a bundle of rights and obligations" or the facts and circumstances of the secondary transaction itself are otherwise sufficient to do so.[44] In other words, an initial fundraising transaction involving a crypto token can create an investment contract, but the token

itself is not necessarily the security even if it is sold on the secondary market. The SEC, however, often refers to the crypto assets themselves as securities.[45]

Whether or not we buy the article's framework, we must develop a coherent and consistent legal framework that works across all asset classes. Our imprecise application of the law has created arbitrary and destructive results for crypto projects and purchasers. We have pursued registration violations in a seemingly random fashion, often years after the original offering. We have spent time pursuing and shutting down projects that people were using and have not pursued other projects that raised money in similar ways. We have implied that secondary trading of tokens that were once sold as part of a securities contract is also governed by the securities laws without adequately explaining why that trading constitutes securities transactions. When we insist on applying the securities laws in this manner, secondary purchasers of the token often are left holding a bag of tokens that they cannot trade or use because the SEC requires special handling consistent with the securities laws. Many of these requirements are enforced under a strict liability standard, so clarity is essential.

Why not set forth a coherent legal framework in a rule? After all, if we continued with our regulation-by-enforcement approach at our current pace, we would approach 400 years before we got through the tokens that are allegedly securities.[46] By contrast, an SEC rule would have universal—albeit not retroactive—coverage as soon as it took effect.

Why no rule? If they are all securities, then voila—problem solved! But if we seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us. And Congress might decide to give that authority to someone else.

Congress can figure out whether and how to fill the regulatory gaps. Given our extensive experience regulating disclosure, if tokens need federal disclosure rules, the SEC could do the job well. Given our extensive experience regulating retail-oriented exchanges, if trading platforms need a federal regulator, the SEC could do the job well.[47] But the SEC must make that case, and our undisciplined approach to crypto regulation thus far is not helping that case.

Whether Congress gives the disclosure task to the SEC or another regulator, several models exist. A few projects have been able to navigate their way through existing registration regimes. Disclosure under current regulations, however, is not well-suited to elicit the most useful and appropriate information for token purchasers because it does "not cover a number of features unique to digital assets that would undoubtedly be considered important when making an investment decision," as a recent petition to the SEC argued.[48] Instead, traditional disclosures are "designed for traditional corporate entities that typically issue and register equity and debt securities" and "focus on disclosure about companies, their management and their financial results—topics that poorly fit the decentralized and open-source nature of blockchain-based digital asset securities."[49] Thus, a more tailored crypto disclosure regime would be good for investors *and* crypto companies.

Several models for bespoke token disclosure already exist. There have been domestic and international legislative proposals, such as European Markets in Crypto-Assets (MiCA) legislation and the recent bills in Congress,[50] my proposed safe harbor, and proposals by academics and lawyers.[51] Potential disclosure elements include source code, token economics matters like an asset's supply schedule or protocol governance, development team, the network development plan, prior token sales, and listing the trading platforms on which the tokens trade, as laid out in my proposal.[52] Similarly, MiCA's approach would require crypto companies to produce a white paper with information about the issuer, the crypto asset, and the related project, an explanation of rights and obligations of the asset, various technological information about the asset, and a description of investment risks.[53]

Of course, Congress, which is directly accountable to the American people, should decide whether federal regulation is necessary, and, if it is, which agency should regulate. Congress could conclude that the SEC is not the best choice to regulate some or all crypto. Is the SEC, for example, the best regulator of crypto lending? We have claimed the territory because, among other things, no other federal regulatory scheme exists, but Congress might opt for no federal regulation or decide another regulator is better. Legislative activity to date suggests that the SEC is unlikely to be the regulator of stablecoins.

Some people within crypto would prefer to see regulatory authority over token disclosures and spot markets given to the Commodity Futures Trading Commission ("CFTC"). The CFTC's retail experience is more limited than the SEC's.

Moreover, if the CFTC were given regulatory authority over crypto spot markets, would there soon be calls for the CFTC to regulate other spot markets, such as wheat, oil, and corn markets? Adding crypto to the CFTC's remit also would stretch the small agency's resources. But, again, it is up to Congress to decide whether a federal regulator is necessary and, if so, who it should be.

Attorney Steven Lofchie has argued for a Solomonic solution in which platforms and tokens could pick between the SEC and CFTC.[54] This approach would allow for regulatory competition, which could improve regulatory quality. It would also provide regulatory clarity to market participants who might otherwise incur legal bills to evaluate if their product is a security or a commodity and defend their decision to a skeptical regulator. Then Professor, now CFTC Commissioner, Kristin Johnson argued for something similar in a recent law review article.[55] She pointed out that one benefit of such an approach is that "[t]he process of declaring their preferred regulator is, in part, a disclosure process" that provides greater transparency to regulators about the firms they regulate.[56]

I reiterate that decisions about allocating regulatory authority belong to Congress, but regulators can lay the groundwork for Congress to craft a workable approach. The ideal framework would reduce regulatory anxiety for would-be innovators and increase the difficulty for would-be fraudsters, which would help to separate the wheat from the chaff. A rational framework should facilitate the compliance of good faith crypto actors with our securities laws, which would free the SEC to focus more of its resources on the bad faith actors.

The regulation-by-arbitrary-and-tardy-enforcement-actions approach on which we have relied is the opposite of a rational regulatory framework. Decisions made in the course of prosecuting or settling these cases can have far-reaching effects, and yet there is far too little deliberation before these actions occur. Concerning a recent CFTC case against a Decentralized Autonomous Organization ("DAO"), for example, Commissioner Summer Mersinger took issue with the CFTC's "approach of determining liability for DAO token holders based on their participation in governance voting," which "undermines the public interest by disincentivizing good governance in this new crypto environment."[57] DAOs pose difficult challenges for regulators, but their legal treatment should be the product of deliberation in advance of enforcement actions.

An enforcement-centric approach also precludes broad participation in developing what is or what doubles as a regulatory framework, even though such participation is needed to develop a sensible framework. Enforcement actions are adversarial proceedings with two participants: the defendant and the Commission staff. Both participants are focused on the facts of the particular case, and are concerned with larger legal and policy questions only to the extent they advance or stymie their respective positions in the case. In other words, litigants are focused on winning their case, not on what makes sense as a sensible, long-term regulatory framework. Furthermore, the views of third parties are not welcome, except occasionally in the very limited role of amicus curiae.

In contrast, a notice-and-comment process allows broad public and internal participation in developing a sound regulatory system. These public conversations should include our federal and state regulatory colleagues, people developing and using crypto, consumer protection advocates, and crypto critics to develop a reasonable regulatory approach. That process could include roundtables conducted jointly with the CFTC.[58] The collaborative work done to incorporate digital assets into the Uniform Commercial Code offers an example.[59]

As we develop this framework, we should consider five guiding principles. First, we have to take a nuanced approach that recognizes differences across blockchains, distinctions between Layer 1 blockchains and the chains and applications built on top of them, and differences among crypto assets. The crypto industry encompasses a wide variety of experiments being conducted by many different people, so we must avoid painting them all with the same regulatory brush. A centralized trading venue is a world away from a public, decentralized blockchain, but they all get talked about in one breath in Washington regulatory circles.

Second, and related, the government should be extremely careful when deciding what areas of crypto to regulate on a federal level, along with when and how to do so. As Tyler Cowen recently argued, immediately adopting a comprehensive crypto regulatory model in response to a crisis could stultify crypto because we do not yet know what its principal uses will be:

Crypto regulation is not easy to do well. If crypto institutions are treated like regular depository institutions, requiring heavy layers of capital and lots of legal staffing, crypto innovation is likely to dwindle. Such innovation has been more the

province of eccentric geniuses than of mainstream regulated institutions.[60]

Mainstream regulated institutions are experimenting to see whether cryptography and blockchain technology can make existing processes cheaper, faster, safer, and more efficient.[61] But a regulatory model that effectively forces all innovation into regulated entities is not likely to foster the kind of dynamism that will broadly benefit society.

Third, when we do decide to regulate, we should be clear that government regulation is not the same as government endorsement. Professor Reiners points out that "regulation brings the veneer of legitimacy and an invitation for broader adoption on the part of consumers."[62] However, even if something is regulated, people need to do their own due diligence. A decision to regulate something is not a seal of approval. A regulator who thinks crypto is more innovative than double-entry bookkeeping and another who agrees with crypto's placement on a top-ten list of "worst technologies of the 21st century"[63] could support the same regulatory framework.

Fourth, scaring traditional entities away from crypto is neither realistic nor protective of investors. If regulated entities perceive the regulatory risk or cost of being in the crypto space is too high, they will not participate. Staff Accounting Bulletin 121, for example, drives traditional custodians away from crypto by making custodied crypto take up precious space on banks' balance sheets. While self-custody is a great option for many people, why not also allow safe third-party custody? Audit firms are stepping away from crypto too. While on-chain transparency is powerful, crypto companies still need good audits.

Fifth, even though driving regulated entities away from crypto is not wise, preserving the core of crypto—decentralization—is lso important. Decentralization can help support the resilience of the financial system. Decentralized finance ("DeFi"), enables people to interact with one another through the intermediation of code rather than relying on a financial intermediary such as a bank. DeFi deserves special consideration because of its unique properties, some of which take the place of functions that regulation otherwise might perform. DeFi is self-executing, open-source code operating on top of public, permissionless, decentralized blockchains. Anyone can participate, but nobody has to, and everyone participates on the same terms, which everyone knows beforehand. The ease with which DeFi protocols can be forked creates pressure on people to improve them constantly.[64] Attacks on DeFi protocols are common, but early auditing, testing, and investigating the incentives that are built into the DeFi code can identify problems.

DeFi admittedly presents challenges to us regulators who are used to regulating companies, which are easy to cajole, monitor, and sue. Regulating people who write code is more difficult from a practical and legal perspective, including because it would impinge on free speech and would raise fairness issues since open-source coders cannot exercise control over how their code is used.[65] Regulating individual DeFi users would be impractical. Requiring the front ends of DeFi protocols—essentially interfaces allowing users to easily interact with the base code—to register under the securities laws also would be problematic.[66] Attempts to force DeFi into a traditional regulatory framework likely would produce a system in which a few large companies operated registered DeFi front-ends. Sounds a lot like centralized finance.

The decisions we make now could have profound consequences not only for the development of the technology, but for human freedom. Technology has empowered people to exert more control over their own lives, but it also has made it easier for the government to watch and control their actions. Government agencies must therefore proceed carefully in developing policies that govern their own use of technology and how the public can use technology. Legitimate law enforcement objectives require the government sometimes to gather information about private activities, but defaulting to government surveillance of all private activities runs counter to fundamental American principles. As technology facilitates greater privacy and autonomy, sometimes we assume government should be placing limits on what people do, but I posit that the more urgent need is for the people to set limits on what government can do.

People sometimes ask me where crypto will be in ten or twenty years. Frankly, who cares what I think? I have ideas about its possibilities and perils, but what the market has to say matters more. The SEC's job is not to predict innovation or to manage it, but to set out a framework within which people can use their ingenuity to set the course for their and their children's future.

Last year was so brutal for crypto that some people want to relegate it to the dustbin of failed experiments. Rather than swiping left on crypto, we should remember that new technologies sometimes take a long time to find their footing. What kind of country would we have if regulators prohibited people from experimenting with technologies that other people

think are stupid or meaningless or even ones that could cause harm? Our country is built on a presumption that people are best able to choose for themselves. People know their own preferences, limitations, risk tolerances, and circumstances better than the government does. Sure, sometimes people make very bad decisions on behalf of themselves or their families, but handing over the keys to the government does not ensure that decisions will be good. If you think the government should step in when people make stupid decisions, I guess we will be taking over your favorite dating app too. ReguDate anyone?

---

[1] See, e.g., Jimmie H. Lenz, *Beyond the Memes-How One NFT Is Changing the Post-Student Experience*, https://www.jimmiehlenz.com/_files/ugd/c09670_a2fd7dc1c3a64a49a59df170a4dc9096.pdf (describing how Lenz minted NFTs as proof that students had completed his blockchain course).

[2] Lee Reiners, *Now I know the cryptocurrency industry is here to stay*, CoinDesk (Jan. 10, 2023), https://www.coindesk.com/consensus-magazine/2023/01/10/now-i-know-the-cryptocurrency-industry-is-here-to-stay/?outputType=amp; *see also* Lee Reiners, *Cryptocurrency: The Future of Money or All Hype?* Seminars at Steamboat 2022 (Jul. 27, 2022), https://www.youtube.com/watch?v=fcijiWZQNl0; Lee Reiners, *Cryptocurrency and the State: An Unholy Alliance*, Southern California Interdisciplinary Law Journal, Vol. 30, 695-715 (2021), https://scholarship.law.duke.edu/faculty_scholarship/4102/.

[3] *See, e.g.,* Riah Pryor, *Slash and Burn: Does Artistic Sabotage Always Pay off?* The Art Newspaper (Sept. 28, 2021), https://www.theartnewspaper.com/2021/06/08/slash-and-burn-does-artistic-sabotage-always-pay-off (". . . NFTs of artists destroying works continue to attract headlines since the livestreaming of Banksy's Morons (2006) being burnt by the collective BurntBanksy, in March, giving the $95,000 print a $380,000 price tag in the process.").

[4] *See* Judith Viorst, *Alexander and the terrible, horrible, no good, very bad day*, Atheneum Books for Young Readers (1987).

[5] *That Girl - Season 2, Episode 4 - to Each Her Own - Full Episode*, (Sept. 28, 1967), https://www.youtube.com/watch?v=W4CcYoNxXAk at 1:30; *see also "That Girl" to Each Her Own*, IMDB, https://www.imdb.com/title/tt0720290/. /p>

[6] Hayley Matthews, *The History of Online Dating—(A Timeline from Paper Ads to Websites)*, DatingAdvice.com (updated (no pun intended) July 19, 2022), https://www.datingadvice.com/online-dating/history-of-online-dating.

[7] *To Each Her Own*, https://www.youtube.com/watch?v=W4CcYoNxXAk at 18:30.

[8] We have not yet seen the fruit that the marriage between artificial intelligence and online dating will bear. *See, e.g.*, Jordan Parker Erb, *I Asked Chatgpt to Reply to My Hinge Matches, No One Responded*, Business Insider (Jan. 10, 2023), https://www.businessinsider.com/chatgpt-replied-hinge-matches-dating-app-ai-2023-1.

[9] *See, e.g.,* Derek Thompson, *Why Online Dating Can Feel like Such an Existential Nightmare,* The Atlantic (Jul. 22, 2019), https://www.theatlantic.com/ideas/archive/2019/07/online-dating-taking-over-everything/594337/.

[10] I am envisioning a grudge match between Deep Blue and Sima Taparia from Mumbai. *See Indian Matchmaking*, Netflix (Jul. 16, 2020), https://www.netflix.com/title/80244565. i>

[11] *Outdoor Marriage Proposals Skyrocket in 2021, According to The Knot 2021 Jewelry & Engagement Study*, The Knot Worldwide (Dec. 2, 2021), https://www.theknotww.com/press-releases/2021jewelryandengagementstudy/; *see also* Michael J. Rosenfeld et. al., *Disintermediating your friends: How online dating in the United States displaces other ways of meeting*, Proceedings of the National Academy of Sciences Vol. 116, No. 36, 17753-17758 (Aug. 20, 2019), https://www.pnas.org/doi/full/10.1073/pnas.1908630116#abstract ("For heterosexual couples in the United States, meeting online has become the most popular way couples meet, eclipsing meeting through friends for the first time around 2013. Moreover, among the couples who meet online, the proportion who have met through the mediation of third persons has declined over time. We find that Internet meeting is displacing the roles that family and friends once played in bringing couples together.").

[12] Taylor Monahan, *The Original Sin by Taylor Monahan | Devcon Bogotá* (Oct. 12, 2022), https://www.youtube.com/watch?v=7OnxjlA-RKA at 14:25, 19:29.

[13] *See, e.g.,* On the Brink, Episode 387, *Luuk Strijers (Deribit) on a New Model for Proof of Reserves* (Jan. 17, 2023), https://onthebrink-podcast.com/deribit-por/(discussing different assurance mechanisms exchanges and other custodial intermediaries in crypto can use); Nic Carter, *The Status of Proof of Reserve as of Year End 2022*, Medium (Dec. 29, 2022), https://medium.com/@nic__carter/the-status-of-proof-of-reserve-as-of-year-end-2022-48120159377c; Scott Perry, *The Benefits of SOC Examinations for Blockchain*, Schellman (Nov. 15, 2022), https://www.schellman.com/blog/the-benefits-of-soc-for-blockchain.

[14] John Reed Stark, *12 Crypto-Predictions for 2023*, LinkedIn Pulse (Dec. 28, 2022), https://www.linkedin.com/pulse/12-crypto-predaictions-2023-john-reed-stark. Incidentally, I like the theme song he picked to go along with his prediction that my "ruthless, irresponsible and ad nauseam preaching of the gospel of crypto should ease up" during 2023. *See* Fossils and Fuels, *Destination* (cover of Nickel Creek song) (Mar. 3, 2022), https://www.youtube.com/watch?v=XrlXOyzL14U. *See also* David Dayen, *Regulators Prevented a Crypto-Fueled Economic Downturn*, The American Prospect (Jan. 10, 2023),

https://prospect.org/economy/2023-01-10-regulators-prevented-crypto-fueled-downturn/.

[15] Letter in Support of Responsible Fintech Policy (Jun. 1, 2022), https://concerned.tech/.

[16] *See, e.g.*, DeFi Watch, https://defiwatch.net/about/ ("DeFi Watch is not about stopping people from releasing dangerous, reckless code. It is about making sure that users know that it's dangerous, reckless code before they drop their money into it.").

[17] *See, e.g.*, Bankless Shows, *Why Crypto is 'like the internet' according to Marc Andreessen* (June 1, 2022), https://www.youtube.com/shorts/YEv0mJSHR1E ("[T]he critics make this long list of all of the problems. But you're getting these genius engineers and entrepreneurs flood into this space, what's happening right now. What happens is they look at this list of problems as a list of opportunities. They're like ok like that's the punch list. . . . Because if I fix these problems it's going to be really important. It's going to really matter . . . I can build a real business.").

[18] *See, e.g.*, Adam Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, Texas Law Review, Vol. 101 (Aug. 26, 2022), https://ssrn.com/abstract=4107019 ("If a customer does not hold the private key to cryptocurrency, its beneficial interest in a custodially held cryptocurrency could well be characterized as a mere contract right rather than a property right. That means that the customer of a failed exchange [] could well end up in the unhappy position of being a general unsecured creditor of the exchange, looking at eventually recovering only pennies on the dollar, rather than be deemed the owner of the cryptocurrency. Unfortunately, it might well take a high-profile bankruptcy of a U.S. cryptocurrency exchange for cryptocurrency investors to understand this Article's basic lesson: "not your keys, not your coins.").

[19] *See, e.g.*, Chair Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822; Commissioner Christy Goldsmith Romero, *Remarks of CFTC Commissioner Christy Goldsmith Romero before the International Swaps and Derivatives Association's Crypto Forum 2022, New York*, CFTC (Oct. 26, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/oparomero3.

[20] Molly White, for example, runs a snarkily titled website called "Web3 is Going Just Great . . . and is definitely not an enormous grift that's pouring lighter fluid on our already smoldering planet." She opposes banning cryptocurrencies altogether or regulating "the software that people can write or execute," but still cautions against "increasing the exposure of traditional finance to the regular failures of crypto projects." Molly White, *Statement to the Financial Stability Oversight Council: Regulating digital assets* (July 22, 2022), https://blog.mollywhite.net/fsoc-statement-regulating-digital-assets/.

[21] *See, e.g.,* Mike Snider, *From Facebook friend to romance scammer: Older Americans increasingly targeted amid COVID pandemic*, USA Today (Oct. 23, 2021), https://www.usatoday.com/story/money/2021/10/23/dating-scams-targeting-older-americans/6120130001/.

[22] *See, e.g., Securities and Exchange Commission v. Mauricio Chavez, et al.*, No. 4:22-cv-03359 (S.D. Tex. filed September 19, 2022), https://www.sec.gov/litigation/litreleases/2022/lr25547.htm?utm_medium=email&utm_source=govdelivery; *Securities and Exchange Commission v. Block Bits Capital, LLC, Block Bits Capital GP I, LLC and Japheth Dillman*, Civ. Action, o. 3:22-cv-02563 (N.D. Cal. Filed April 27, 2022), https://www.sec.gov/litigation/litreleases/2022/lr25376.htm; *Securities and Exchange Commission v. David B. Mata*, Civ.

Action, o. 3:22-cv-02565 (N.D. Cal. Filed April 27, 2022), https://www.sec.gov/litigation/litreleases/2022/lr25376.htm; In the Matter of GTV Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc., Release No. 10979, Administrative Proceeding File No. 3-20537 (Sept. 13, 2021), https://www.sec.gov/litigation/admin/2021/33-10979.pdf. /p>

[23] Matt Levine, Everything Everywhere is Securities Fraud, Bloomberg, June 26, 2019, available at Everything Everywhere Is Securities Fraud - Bloomberg (last visited Jan. 18, 2023).

[24] Laura Noonan, *Blockchain-powered breakthrough on mutual fund*, Financial Times (Dec. 9, 2021),https://www.ft.com/content/fd57521c-a2e9-415b-9c4f-4f74b4587f9e.

[25] *Id.* (noting that, although "the only thing changing was how records were kept and how transactions were done," the approvals process that took significantly longer than the four to six months that is typical for new products").

[26]*See* SEC Div. of Inv. Mgmt. Staff Statement on Funds Registered under the Investment Company Act Investing in the Bitcoin Futures Market, SEC (May 11, 2021), https://www.sec.gov/news/public-statement/staff-statement-investing-bitcoin-futures-market (directing closed-end funds that "seek to invest in the Bitcoin futures market [should] consult with the staff, prior to filing a registration statement, about the fund's proposed investment, anticipated compliance with the Investment Company Act and its rules, and how the fund would provide for appropriate investor protection"). For further discussion of this issue, *see* Commissioner Hester Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"* SEC (Jun. 14, 2022), https://www.sec.gov/news/speech/peirce-remarks-regulatory-transparency-project-conference.

[27] Of course, as I have previously argued, a regulatory "beach" is even better than a regulatory sandbox. *See* Commissioner Hester Peirce, *Beaches and Bitcoin: Remarks before the Medici Conference*, SEC (May 2, 2018), https://www.sec.gov/news/speech/speech-peirce-050218 ("The motivating notion behind a regulatory sandbox is that the regulator in a sense sits in the sandbox with the innovator. Not only is she right there to make sure that nobody gets hurt, but she has a front-row seat on the innovative process. She sits at the entrepreneur's shoulder as he thinks through how to address structural and aesthetic weaknesses in his sandcastle. Talk of sandboxes is welcome, and my fellow regulators' sandboxes have already yielded great dividends. . . . I would rather talk about beaches. On a beach, the lifeguard watches over what is happening, but she is not sitting with sandcastle builders monitoring their every design decision. From her perch on the lifeguard stand, she can spot dangerous activity and intervene with a blow of the whistle or, if necessary, a direct intervention. She always stands ready to answer questions about the rules of the beach. She puts up the red flag to warn of dangerous riptides or sharks.").

[28] *See* Jonathan Ingram, Chief Legal Advisor, FinHub, Division of Corporation Finance, *Response of the Division of Corporation Finance Re: TurnKey Jet, Inc.Incoming letter dated April 2, 2019*, SEC (Apr. 3, 2019), https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm (relating to tokens to be used in ir charter services); Jonathan A. Ingram, Chief Legal Advisor, FinHub Division of Corporation Finance, *Response of the Division of Corporation Finance, July 25, 2019, Re: Pocketful of Quarters, Inc. Incoming letter dated July 25, 2019*, SEC (July 25, 2019), https://www.sec.gov/corpfin/pocketful-quarters-inc-072519-2a1 (relating to tokens to be used on a gaming platform).

[29] Jeffrey Mooney, Associate Director, SEC, Division of Trading and Markets, *Re: Clearing Agency Registration Under Section 17A(b)(1) of the Securities Exchange Act of 1934* (Oct. 28, 2019),

a href="https://www.sec.gov/divisions/marketreg/mr-noaction/2019/paxos-trust-company-102819-17a.pdf" style="color:blue; text-decoration:underline">https://www.sec.gov/divisions/marketreg/mr-noaction/2019/paxos-trust-company-102819-17a.pdf.

[30] Elizabeth Baird, Deputy Director, Division of Trading and Markets, *Re: ATS Role in the Settlement of Digital Asset Security Trades*, SEC (Sept. 20, 2020), https://www.sec.gov/divisions/marketreg/mr-noaction/2020/finra-ats-role-in-settlement-of-digital-asset-security-trades-09252020.pdf.

[31] Chair Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

[32] *Id.*

[33] *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, Exchange Act Release No. 34-90788 (Dec. 23, 2020), https://www.sec.gov/rules/policy/2020/34-90788.pdf. To qualify for the relief, brokers must comply with various requirements, including relating to risk management, safeguarding and control of customer assets, maintaining written procedures to assess the security status of a particular digital asset, and providing customer disclosures about the nature and risks of their services.

[34] *See e.g.*, Letter from Charles De Simone, Securities Industry and Financial Markets Association (May 20, 2021), https://www.sec.gov/comments/s7-25-20/s72520-8819436-238123.pdf ("The Statement places a burden on SPBDs to find evidence or arguments for why a digital asset is or is not a security where there is unlikely to be a definitive answer, as the SEC has acknowledged by not itself providing unequivocal guidance as to how determine when a digital asset is a security."); Letter from Ron Quaranta, The Wall Street Blockchain Alliance (Apr. 27, 2021) ("We encourage the SEC to formally propose rulemaking that would clarify for all participants engaged in digital asset transactions, the role of marketing activities in determining whether a product is in fact a security, and which would provide further guidance on the treatment and classification of digital assets."), https://www.sec.gov/comments/s7-25-20/s72520-8734174-237103.pdf; Letter from Benjamin Kaplan, Prometheum (Apr. 26, 2021) ("As a result, we believe clarity is needed for Special Purpose Broker-Dealers, issuers, ATS'[s] and other market Participants . . . to understand the regulatory framework they must comply with. Therefore, we respectfully request that the Commission provide further clarification on the definition of digital asset securities.), https://www.sec.gov/comments/s7-25-20/s72520-8734178-237104.pdf.

[35] Steven Lofchie, *By Whom Should Digital Assets Be Regulated? The Solomonic Solution*, Fried Frank Regulatory Intelligence at 5 (Dec. 15, 2022), https://www.findknowdo.com/sites/default/files/news/attachments/2022/12/FORM%20-%2012-14-2022%20-%20FFRI%20-%20How%20Should%20Digital%20Assets%20Be%20Regulated%20%28002%29_0.pdf.

[36] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

[37] *See, e.g.*, Chair Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities.") (citing CoinMarketCap.com).

[38] Bankless Shows, *Are NFTs Securities? with Securities Lawyer Brian Frye* (Jan. 3, 2023), https://www.youtube.com/watch?v=jo1ZuhuCVZE at 16:56.

[39] Lewis Cohen et. al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets are not Securities* (Nov. 10, 2022), https://ssrn.com/abstract=4282385.

[40] *Id.* at 1.

[41] *Id.* at 53.

[42] *Id.* at 66.

[43] *Id.* at 72 (emphasis in original).

[44] *Id.* at 68-69.

[45] *See, e.g., id.* at 10 (citing *In the Matter of Poloniex, LLC*, Exchange Act Release No. 92607 (August 9, 2021), at 1 ("Poloniex operated a digital asset trading platform (the 'Poloniex Trading Platform') that meets the definition of an 'exchange' under the federal securities laws. The Poloniex Trading Platform displayed a limit order book that matched the orders of multiple buyers and sellers in digital assets, including digital assets that were investment contracts under *S.E.C. v. W.J. Howey Co.* … and therefore securities …" (citation omitted)).

[46] *See* Simona Mola, *SEC Cryptocurrency Enforcement 2022 Update*, Cornerstone Research (Jan. 2023), https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2022-Update.pdf (reporting 20 crypto cases in 2021 and 30 crypto cases during 2022). I reached the number by dividing 10,000 by the average (25), which is 400 years.

[47] Decentralized exchanges ("DEXs") offer an alternative to centralized exchanges. Because DEXs are autonomous code, requiring registration would raise a host of problems. A recent Cato working paper suggests that DEXs be allowed,

but not required, to voluntarily register with the government. *See* Jack Solowey and Jennifer J. Schulp, *Regulatory Clarity for Crypto Marketplaces* (Dec. 15, 2022), https://www.cato.org/sites/cato.org/files/2023-01/working-paper-71-update_0.pdf.

[48] Coinbase, *Re: Petition for Rulemaking – Digital Asset Securities Regulation* at 6 (Jul. 21, 2022), https://www.sec.gov/rules/petitions/2022/petn4-789.pdf.

[49] *Id.* at 15.

[50] *See, e.g.,* S. 4356 - Lummis-Gillibrand Responsible Financial Innovation Act (117th Congress), https://www.congress.gov/bill/117th-congress/senate-bill/4356?s=1&r=8; *Lummis, Gillibrand Introduce Landmark Legislation To Create Regulatory Framework For Digital Assets*, Senator Gillibrand press release (Jun. 7, 2022), https://www.gillibrand.senate.gov/news/press/release/-lummis-gillibrand-introduce-landmark-legislation-to-create-regulatory-framework-for-digital-assets#:~:text=The%20Lummis%2DGillibrand%20disclosure%20requirements,changes%20and%20digital%20asset%20lending (explaining that disclosure requirements are designed to "ensure that consumers understand the products they're purchasing, their rights, as well the associated risks of engaging in digital assets, including source code version changes and digital asset lending").

[51] *See, e.g.*, LeXpunK-Army, *Reg X Proposal: An Exempt Offering Framework for Token Issuances* (Apr. 25, 2022), https://github.com/LeXpunK-Army/Reg-X-Proposal-An-Exempt-Offering-Framework-for-Token-Issuances/blob/main/Lexpunk%20Reg%20X%20Proposal%20FINAL%20(4.25).pdf.

[52] Commissioner Hester Peirce, *Token Safe Harbor Proposal 2.0*, SEC (Apr. 13, 2021),

a href="https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0" style="color:blue; text-decoration:underline">https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0.

[53] Azad Ali and Pietro Piazzi, *EU's Proposed Legislation Regulating Cryptoassets, MiCA, Heralds New Era of Regulatory Scrutiny*, Skadden, Arps, Slate, Meagher & Flom LLP (Nov. 23, 2022), https://www.skadden.com/insights/publications/2022/11/eus-proposed-legislation.

[54] *By Whom Should Digital Assets Be Regulated? The Solomonic Solution* at 21.

[55] Kristin N. Johnson, *Decentralized Finance: Regulating Cryptocurrency Exchanges*, 6 William and Mary L. Rev. 1911 (2020-21).

[56] *Id.* at 1994-95.

[57] Commissioner Summer Mersinger, *Dissenting Statement of Commissioner Summer K. Mersinger Regarding Enforcement Actions Against: 1) bZeroX, LLC, Tom Bean, and Kyle Kistner; and 2) Ooki DAO,* CFTC (Sept. 22, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/mersingerstatement092222.

[58]Caroline Pham and Hester Peirce, *Making progress on decentralized regulation — It's time to talk about crypto*, *together*, The Hill (May 26, 2022), https://thehill.com/blogs/congress-blog/3503277-making-progress-on-decentralized-regulation-its-time-to-talk-about-crypto-together/.

[59] Law of Code Podcast, Episode 75, *UCC Article 12 Amendments with Drew Hinkes and Andrea Tosato* (Dec. 13, 2022) (discussing process by which amendments for digital asset transfers were added to the Uniform Commercial Code).

[60] Tyler Cowen, *Beware the Dangers of Crypto Regulation*, Bloomberg Opinion (Jan. 3, 2023), https://www.bloomberg.com/opinion/articles/2023-01-03/ftx-collapse-beware-the-dangers-of-crypto-regulation?utm_content=markets&cmpid%3D-socialflow-twitter-markets&utm_campaign=socialflow-organic&utm_medium=social&utm_source=twitter&sref=htOHjx5Y; *see also* Bankless Shows, *Why Crypto is Underrated with Tyler Cowen* (Jan. 16, 2023), https://www.youtube.com/watch?v=ByefgDAFgv8.

[61] *See, e.g.,* The Defiant - DeFi Podcast, *Onyx's Tyrone Lobban Takes Us Behind the Scenes of JP Morgan's First DeFi Trade* (Nov. 18, 2022) (describing JP Morgan's Singapore FX on blockchain experiment); *BNY Mellon Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-

us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html (announcing that BNY Mellon will allow "select clients to hold and transfer bitcoin and ether"); *DTCC to Launch Platform to Digitalize and Modernize Private Markets*, DTCC (Nov. 9, 2021) https://www.dtcc.com/news/2021/november/09/dtcc-to-launch-platform-to-digitalize-and-modernize-private-markets (announcing the creation of a DTCC platform that will "enable tokenization of securities"); Laurie McAughtry, *Goldman Sachs launches new digital assets platform,* The Trade (Nov. 30, 2022), https://www.thetradenews.com/goldman-sachs-launches-new-digital-assets-platform/ (announcing Goldman Sachs platform that will "facilitate the issuance, registration, settlement and custody of digital assets"); Camila Russo, *Yorke Rhodes Explains How Microsoft Is Leveraging Blockchain*, in The Defiant - DeFi Podcast (Jan. 12, 2023), https://podcasts.apple.com/us/podcast/the-defiant-defi-podcast/id1512654905.

[62] Lee Reiners, *Cryptocurrency and the State: An Unholy Alliance* at 713.

[63] *The 10 Worst Technologies of the 21st Century*, MIT Technology Review (Feb. 27, 2019), https://www.technologyreview.com/2019/02/27/66011/the-10-worst-technologies-of-the-21st-century/ (placing cryptocurrency on the top ten list of worst technologies, but leaving hope for blockchain).

[64] *See, e.g., What Does It Mean to "Fork" a DeFi Protocol?* DeFi Education Fund, https://www.defieducationfund.org/_files/ugd/d6f65d_ca7f6fcb4824449882e2b06326aa8661.pdf ("Forking creates an incredibly low barrier to entry in DeFi. All someone needs to do is launch their own DeFi protocol is copy existing code. The knowledge that anyone could fork your code at any time creates a strong incentive for DeFi protocols to maximize user experience and reduce user costs. If the users think that the protocol is compensating the token holder[s] too highly or passing costs of running the protocol onto the users, they can simply fork the source code and run their own protocol without the governance policies they disagree with.").

[65] *What's the Difference Between a Front End and a DeFi Protocol?* DeFi Education Fund, https://www.defieducationfund.org/_files/ugd/d6f65d_cd8da7bdfdd14ecc9ebbb03224724c1d.pdf

"Anyone is then able to build a front end that can make calls to the protocol and execute transactions using its smart contracts. The operator of the front end does not need to ask anyone's permission to interact with the network; they just need to know how to build a website that can interact with the protocol.").

[66] As one commentator noted, requiring front-ends to be licensed is essentially the same as requiring the code to be licensed: "the technical [user] could still legally engage directly with a smart contract via command prompt (or would command prompt software be considered an interface?), but for 99% of people, defi would become tradfi." Erik Vorhees, *A Response to SBF and Principled Crypto Regulation*, Money & State (Oct. 20, 2022), https://www.moneyandstate.com/blog/response-to-sbf.

# EXHIBIT BH-45



Consensus @ Consensus Report Rel — Download     ✕

## CoinDesk

| Bitcoin ▼ | $25,703.22 -0.91% | Ethereum ▼ | $1,747.80 -2.52% | Binance Coin ▼ | $235.77 -1.01% | XRP ▼ | $0.50433150 -0.09% | Cardano ▲ | $0.26170000 +6.48% | ► |

Crypto Prices →     CoinDesk Market Index →

**Markets**

# SEC Chair Hints Some Stablecoins Are Securities

Stock tokens and stablecoins backed by securities might be treated as securities under U.S. law, SEC Chair Gary Gensler said.

**By Nikhilesh De**

🕐 Jul 21, 2021 at 10:17 a.m. MDT

Updated Sep 14, 2021 at 7:28 a.m. MDT

f   in   ✗   ✉



*SEC Chair Gary Gensler*

Securities and Exchange Commission (SEC) Chair Gary Gensler said cryptocurrencies whose prices depend on more traditional securities might fall under securities laws.

Speaking to the American Bar Association on Tuesday, Gensler said some platforms are offering crypto tokens "that are priced off" securities and resemble derivatives products. In his view, any security-based products will have to comply with trade reporting rules and other laws, he said.

"Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities," he said. "These platforms – whether in the decentralized or centralized finance space – are implicated by the securities laws and must work within our securities regime."

Gensler warned that his agency may bring future enforcement actions as well, noting that "we've brought some cases involving retail offering of securities-based swaps," seemingly referring to a case the SEC brought against financial app Abra, which paid $300,000 in penalties on charges of selling security-based swaps to retail investors last year.

Crypto exchange Binance also recently announced it was closing its stock token business, though technically U.S. customers should not have been able to access this service.

Gensler didn't specify any tokens in his speech, but his remarks come amid increased regulatory scrutiny around digital assets, with stablecoins in particular popping up more and more in congressional hearings.

Yesterday, Circle, the issuer of USDC, published a breakdown of the assets backing the stablecoin. In addition to cash, the token is backed by money market funds, commercial paper, corporate and municipal bonds and certificates of deposits issued by foreign banks.

Some of these reserves, including the money market funds, bonds and commercial paper, are currently treated as securities under U.S. law.

Tether, the issuer of the world's largest stablecoin, USDT, has also said its reserves included investments in commercial paper and corporate bonds.

Read more: State of Crypto: Stablecoin Rules Are Coming

Gensler isn't alone in his view that stablecoins that are backed by securities should be treated as securities. U.S. Rep. Warren Davidson (R-Ohio) previously told CoinDesk that "it gets hard to say" that such a stablecoin isn't itself a security.

"I think you could easily craft a stablecoin that meets a test that says 'no, this is not a security,'" the lawmaker said.

---

**Recommended for you:**

- Crypto and Regulators Are Speaking the Same Language When It Comes to Financial Transparency
- Skyweaver Is a Great Blockchain Game, and an OK Regular Game
- Why Bitcoin Mining Is a Matter of National Security

---

Stablecoins that are backed by securities should be regulated by the SEC, he said.

---

**Newsletter →**        Every Weekday

# First **Mover**

Sign up for First Mover, our daily newsletter putting the latest moves in crypto markets in context.

Enter your Email                                                S

*By clicking 'Sign Up', you agree to recieve newsletter from CoinDesk as well as other partner offers and accept our terms of services and privacy policy.*

---

**DISCLOSURE**

*Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.*

*The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subs of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain C employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.*

    **Nikhilesh De**

Learn more about **Consensus 2024**, CoinDesk's longest-running and most influential event brings together all sides of crypto, blockchain and Web3. Head to **consensus.coindesk.cor** register and buy your pass now.

**Read more about**

( Circle )  ( Tether )  ( regulations )  ( Stablecoins )  ( Gary Gensler )  ( USDT )  ( USDC )

## For You

Recommended by 

**Amazon Hates When You Do This, But Can't Stop You**

Online Shopping Tools

**New Electric Cars Cost Almost Nothing (Take A...**

Electric Cars | Search Ads

**How Long Does $1 Million Last After 60?**

Fisher Investments

**2023's Top Family SUVs (Take A Look). 3 Rows Of...**

Search Ads



## About

About

Masthead

Contributors

Careers

Company News

## Stay Updated

Consensus

CoinDesk Studios

Newsletters

Follow

## Get In Touch

Contact Us

Advertise

Accessibility Help

Sitemap

## The Fine Print

Ethics Policy

Privacy

Terms Of Use

Do Not Sell My Personal Information

Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.

The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.

©2023 CoinDesk

English

# EXHIBIT BH-46

Learn more about   **REFINITIV**

REUTERS®

□ My View     ○ Following     ☐ Saved

Future of Money

## SEC's Gensler says CFTC authority over stablecoins should be bolstered

Reuters

October 14, 2022 10:11 AM MDT · Updated 8 months ago



FILE PHOTO - U.S. Securities and Exchange Commission (SEC) Chairman Gary Gensler, testifies before the Senate Banking, Housing and Urban Affairs Committee during an oversight hearing on Capitol Hill in Washington, U.S., September 15, 2022. REUTERS/Evelyn Hockstein

       

WASHINGTON, Oct 14 (Reuters) - The U.S. Congress should give the Commodity Futures Trading Commission more powers to police cryptocurrency stablecoins to reduce risks to the financial system, Securities and Exchange Commission Chair Gary Gensler said on Friday.

Stablecoins are usually pegged to the U.S. dollar and are primarily used to facilitate trading in other digital assets.

With around $150 billion in market capitalization, stablecoins have many similarities to money market funds, and need to be regulated accordingly, Gensler said at a conference held by Georgetown University's Psaros Center for Financial Markets and Policy in Washington.

While the CFTC has anti-fraud and anti-manipulation regulatory authorities over firms that issue dollar-backed stablecoins, they do not have "actual plenary authority to write rules around the exchanges," Gensler said.

"I think the CFTC could have greater authorities. They currently do not have direct regulatory authorities over the underlying non-security tokens," he said.

The vast majority of cryptocurrencies, including so-called algorithmic stablecoins, are securities, and fall under the SEC's authority, while a handful are not, Gensler said.

Advertisement · Scroll to continue

Feedback

6/10/23, 10:43 PM
SEC's Gensler says CFTC authority over stablecoins should be bolstered | Reuters
Case 1:23-cv-01599-ABJ Document 53-5 Filed 06/13/23 Page 56 of 87

In March, TerraUSD, an algorithm-based, rather than asset-pegged, stablecoin, blew up spectacularly, pushing another major stablecoin, Tether, below its dollar peg and sending ripples through the global cryptocurrency market.

The Financial Stability Oversight Council, a U.S. regulatory panel comprising top financial regulators, earlier this month recommended that Congress pass legislation addressing the risks digital assets pose to the financial system, including bills to bolster oversight of crypto spot markets and stablecoins.

It remains unclear when Congress might pass crypto-related legislation, although several bills have been introduced to address stablecoins and digital commodities regulation.

Reporting by John McCrank; Editing by Paul Simao



Our Standards: **The Thomson Reuters Trust Principles.**

## Read Next

Future of Money
**Cryptoverse: Bitcoin miners get stuck in a bear pit**
September 27, 2022

Future of Money
**Cryptoverse: Ether snaps at bitcoin's heels in race for crypto crown**
September 13, 2022

Future of Money
**Cryptoverse: Blockchain bridges fall into troubled waters**
August 11, 2022

Future of Money
**Cryptoverse: What crisis? Venture capitalists bet big on crypto**
July 26, 2022

Newsletter | Daily.

### Technology Roundup

From startups to the FAANGs, get the latest news and trends in the global technology industry.

Sign up

## More from Reuters

Feedback

Are hologram witnesses headed to court? (1:44) - June 9, 2023
Watch more videos





**Are hologram witnesses headed to court?**
01:44



**Meet ANDI, the sweating robot**
02:48



**EU considers ban on using Huawei to build 5G - FT**
01:10

**TikTok and rivals face EU crypto ads complaint**

## Sponsored Content

Dianomi

**What's Tax-Loss Harvesting, and Why Should I Care?**
Sponsored by Charles Schwab



**Streaming only on Disney+**
Sponsored by Disney+



**Do You Have Enough To Retire? Use Our Free Retirement Calculator.**
Sponsored by Empower



**She-Hulk is in session**
Sponsored by Disney+



**Now streaming on Disney+**
Sponsored by Disney+



**Should investors have a longer-term horizon?**
Sponsored by Baillie Gifford



## Technology

Feedback

# Wingtech-owned Nexperia denied German subsidy

Technology · June 8, 2023

Computer chip maker Nexperia, which is headquartered in the Netherlands and owned by a Chinese company, has been denied a request for a subsidy in Germany.

---

Disrupted

**Legal AI company EvenUp raises $50 million at $325 million valuation**

June 8, 2023

---

Technology

**Exclusive: Taiwan's Acer ships computer hardware to Russia after saying it would suspend business**

June 8, 2023

---

Finance

**Visa, MasterCard fight off new UK mass actions over fees for now**

June 8, 2023

---

Technology

**Senators ask U.S. Justice Dept to probe Binance statements to Congress**

June 8, 2023

---

## Sponsored Content

Dianomi ▷

**Schwab's Daily Market Update: Market at Close**
Sponsored by Charles Schwab



**Now streaming: Ms. Marvel**
Sponsored by Disney+



**Should investors have a longer-term horizon?**
Sponsored by Baillie Gifford



**Here's Why I Love Disney+**
Sponsored by Disney+



**Seniors Get High-Speed Internet For Free**
Sponsored by WalletGenius



**How is technology reducing the impact of an engine?**
Sponsored by Aramco



## Sponsored Content

Dianomi ▷

**Now streaming on Disney+**
Sponsored by Disney+

**Now streaming on Disney+**
Sponsored by Disney+

**Embrace The Chaos On Disney+**
Sponsored by Disney+

**Do You Have Enough To Retire? Use Our Free Retirement Calculator.**
Sponsored by Empower

**50-Year Wall Street Legend Issues Stock Warning**
Sponsored by Chaikin Analytics

**Embrace The Chaos On Disney+**
Sponsored by Disney+

Latest

Home

Media

 Videos ⬈

 Pictures ⬈

 Graphics ⬈

Browse

World

Business

Legal

Markets

Breakingviews

Technology

Investigations ⬈

Lifestyle

About Reuters

About Reuters ⬈

Careers ⬈

Reuters News Agency ⬈

Brand Attribution Guidelines ⬈

Reuters Leadership ⬈

Reuters Fact Check ⬈

Reuters Diversity Report ⬈

Stay Informed

Download the App ⬈

Newsletters ⬈

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

 

Thomson Reuters Products

**Westlaw** ⬈

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⬈

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⬈

The industry leader for online information for tax, accounting and finance professionals.

Refinitiv Products

**Refinitiv Workspace** ⬈

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue** ⬈

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check** ⬈

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us** ↗   **Advertising Guidelines** ↗   **Coupons** ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ↗   **Terms of Use** ↗   **Privacy** ↗   **Digital Accessibility** ↗   **Corrections** ↗   **Site Feedback** ↗

© 2023 Reuters. All rights reserved

Feedback

6/10/23, 10:43 PM
SEC's Gensler says CFTC authority over stablecoins should be bolstered | Reuters
Case 1:23-cv-01599-ABJ Document 53-5 Filed 06/13/23 Page 61 of 87

6/10/23, 10:43 PM
Case 1:23-cv-01599-ABJ   Document 53-5   Filed 06/13/23   Page 63 of 87
SEC's Gensler says CFTC authority over stablecoins should be bolstered | Reuters

# EXHIBIT BH-47

Statement

# Response to Staff Accounting Bulletin No. 121



**Commissioner Hester M. Peirce**

**March 31, 2022**

I write regarding Staff Accounting Bulletin Number 121 ("SAB 121"), which is yet another manifestation of the Securities and Exchange Commission's scattershot and inefficient approach to crypto.

SAB 121 reflects the staff's evolving view on accounting for obligations to safeguard crypto-assets an entity holds for its platform users. The staff has determined that, because of risks particular to crypto-assets, affected companies should record a liability and corresponding asset on their balance sheets at fair value. In support of this position, the staff highlights technological, legal, and regulatory risks associated with safeguarding crypto-assets, and "an increased risk of financial loss."[1] My concern is not with the accounting determination itself, which may be appropriate, but with the way the change is being made.

First, why now? The staff cites an October 2020 Report of the Attorney General, which in turn cites a public report that estimates the amount of crypto-assets stolen from cryptocurrency platforms in 2018.[2] In other words, these risks are not new. Moreover, the staff has reviewed financial statements of entities that have obligations to safeguard crypto-assets held for their platform users since at least Fall 2020.

Second, the SAB does not acknowledge the Commission's own role in creating the legal and regulatory risks that justify this accounting treatment. The Commission has refused, despite many pleas over many years, to provide regulatory guidance about how our rules apply to crypto-assets, so some of the responsibility for the lack of legal and regulatory clarity lies at our doorstep. Some recognition of the Commission's own role in creating the conditions to which the staff points as justification for the SAB would be appropriate.

Third, a staff accounting bulletin may not be the appropriate vehicle through which to make this accounting change and communicate it to the public. SAB 121 is unusual among SABs in that it provides definitive interpretive guidance for a very specific, very limited number of public companies. SAB 121 is also unusual among SABs in the detailed description of disclosure the staff expects to see, including a full paragraph describing relevant disclosures that "may also be required outside the financial statements under existing Commission rules."[3] While past SABs have included statements suggesting companies should consider the applicability of other disclosure requirements outside of the financial statements, SAB 121's granular guidance is unique.[4] The SAB, as a staff statement, is not enforceable,[5] but much of the language in the document reads as if it is. For example, SAB 121 tells affected companies they do not have to issue a restatement and gives them a transition period so that they do not have to apply the guidance immediately.

Finally, if we are trying to encourage companies to enter our public markets, we ought to embrace a more deliberate approach to changing rules—one that involves consulting with affected parties. Commission rulemaking with public notice and comment, Financial Accounting Standards Board ("FASB") standard setting (especially given

recent indications that FASB may address the accounting treatment of crypto)[6], or even engaging affected public companies through the Division of Corporation Finance's filing review program in consultation with the Office of Chief Accountant would all be preferable methods to the SAB to address an issue such as this one.

---

[1] *See* SAB 121 at 4.

[2] *See* SAB 121 at note 6 (citing Report of the Attorney General's Cyber Digital Task Force: Cryptocurrency Enforcement Framework (Oct. 2020), at 15-16, available at https://www.justice.gov/ag/page/file/1326061/download).

[3] *See* SAB 121 at 5.

[4] *See* SAB 121 at 5-6 (stating "to the extent it is material [a company] may need to provide disclosure describing the types of loss or additional obligations that could occur, including customer or user discontinuation or reduction of use of services, litigation, reputational harm, and regulatory enforcement actions and additional restrictions. A discussion of the analysis of the legal ownership of the crypto-assets held for platform users, including whether they would be available to satisfy general creditor claims in the event of a bankruptcy should be considered. Further, [a company] may need to provide disclosure of the potential impact that the destruction, loss, theft, or compromise or unavailability of the cryptographic key information would have to the ongoing business, financial condition, operating results, and cash flows of the entity. [A company] should also consider including, to the extent material, information about risk-mitigation steps the entity has put in place (e.g., insurance coverage directly related to the crypto-assets held for platform users).")

[5] Indeed, the disclaimer on SAB 121 acknowledges "[t]he statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent staff interpretations and practices followed by the staff in the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the federal securities laws." *See* SAB 121 at 1.

[6] *See* FASB, Objectives of Research Projects, Accounting for Exchange-Traded Digital Assets and Commodities (last updated on Dec. 15, 2021), https://www.fasb.org/Page/ProjectPage?metadata=FASB_OBJECTIVESOFRESEARCHPROJECTS_022820221200#btnTitle_1.

# EXHIBIT BH-48

Case 1:23-cv-01599-ABJ   Document 53-5   Filed 06/12/23   Page 68 of 87

**thefintechtimes.com** /binance-helping-to-build-financial-freedom-in-africa-with-cryptocurrency-and-blockchain/

# Binance: Helping To Build Financial Freedom in Africa With Cryptocurrency and Blockchain | The Fintech Times

Francis Bignell6-8 minutes 10/7/2021

*Cryptocurrency and blockchain technologies have sky rocketed in popularity across the world in the last few years, catalysed by the pandemic. It has moved on from a technical niche to becoming something accessible to all. People living close to the poverty line are starting to see a possibility in escaping this through crypto.*

*Emmanuel Babalola is the director for Africa at Binance and the interim CEO of Bundle, the Africa-focused social payments app for cash and crypto, driving crypto adoption on the continent. Babalola implemented and drove take-up of the Binance Masterclass in Africa, free crypto classes for over 400,000 Africans on topics ranging from user protection to building a career in blockchain.*

*Speaking to The Fintech Times Babalola explains how and why the crypto uptake in Africa is such a good thing:*



Emmanuel Babalola, director for Africa at Binance and the interim CEO of Bundle

While much hyperbole has been made of the future of cryptocurrency, the number of global users has been steadily growing over the past few years and has proved a lifeline for many in the wake of the pandemic. Indeed, on the continent of Africa crypto trading has been taken up by millions of people and it now boasts one of the largest crypto trader user numbers anywhere in the world.

Akin to the other big users like Southeast Asia and Latin America the key driver is socioeconomic. Many millions of people live below the poverty line, and many more suffered as a result of pandemic-enforced lockdowns. Across Africa – and particularly in Nigeria – currency devaluation, low uptake of traditional bank accounts and high unemployment are forcing people to find inventive, non-traditional ways of making money.

With the youngest population globally, the African workforce is predicted to be the world's largest by 2045. There are around 226 million people aged between 15-24, a vast generation of young people and graduates trying to break into the world of work. Because of huge unemployment, the youth of Africa are driven towards entrepreneurialism to build businesses and generate wealth.

Enter crypto trading. A major benefit of the decentralised model of cryptocurrency is putting power back in the hands of users. Cryptocurrencies were designed as an alternative to traditional finance and therefore don't have a single point of failure, making them more resilient, efficient and democratic. Meanwhile, through blockchain, people can build and access systems not previously available to them, for example, micro-lending platforms that can help new businesses to establish themselves.

Central to its appeal is the ability to transact on an immutable, censorship-resistant and permissionless blockchain that cannot be affected by the hyperinflation seen so often in African economies. This is a huge step towards achieving self-sovereignty over finances. Indeed, the crypto and blockchain system allows users to gain access without prerequisites or qualifications. There has never been another system of finance as open or inclusive as this and the prospects are undeniably exciting.

With an almost ubiquitous usage of mobile phones across the continent, accessing crypto trading platforms has proved easy. And because the cost to access crypto platforms is low, many users have been using them to transfer money because of the lower cost compared to traditional banks. Access to blockchain and cryptocurrency platforms has also meant that the remote workforce has been able to work for start-ups in the crypto and blockchain space that are out of the country or continent.

A great example of using crypto trading to supplement income is a teacher who lived just outside Lagos. During the pandemic the school he worked at closed and ceased to give him a salary. He had a family to support, and employment prospects were nil in the area. He researched crypto trading and was able to make enough each week to support his family and get him through the bleak time.

While there are many great examples of user experience, there has been a huge need for education. Making sure people have access to basic insights has been – and continues to be – a crucial element to gaining trust, developing skills and arming users against fraudsters. Unfortunately, criminals were quick to capitalise on naïve traders and people began to associate crypto with scams or pyramid schemes. Action was needed quickly to make sure users and potential users were properly educated in order to build a stable userbase and sustainable future for blockchain and cryptocurrency.

As the world's leading blockchain ecosystem and cryptocurrency infrastructure provider, Binance recognised its role in educating users – both existing and potential – to ensure safe practice and maximum benefit for everyone. In 2020 it rolled out the Binance Masterclass programmes across the continent to teach Africans the fundamentals of cryptocurrencies; how to trade and how to identify scams to safeguard their crypto journey. The lessons were free to join and open to everyone.

In its first year, the Masterclass helped educate over 70,000 people.  Efforts have since doubled, providing educational resources to over 177,000 Africans in Q1 2021 and over 179,500 in Q2 2021- creating some great introductory educational infrastructure to help Africans find financial freedom and to stay informed.

These education programmes have seen huge take up and by virtue of "educate one and pass it on" the knowledge gleaned by one person at the academy is shared with friends and family, spreading best practice far and wide.

In addition to training crypto users, Binance wanted to equip blockchain developers with the necessary skills to build solutions. As such, it hosted an eight-week masterclass where 1000 blockchain developers in Africa

were trained in the key skills. The participants also took part in a live demo showcasing newly built blockchain-based products in action, including staking and farming projects, algorithm-based stablecoins, automated market makers, insurance projects amongst other things.

As the number of users grows and grows, there is little doubt the future of crypto trading and blockchain development in Africa is set to be a prosperous one. Certainly, the lifeline blockchain and cryptocurrency offers is without border or limit. Whether supplementing incomes or helping build lifelines, both have delivered financial freedom and inclusion for millions.

-  The Fintech Times

The Fintech Times

# EXHIBIT BH-49

**Make sense of it all.**

Become an FT subscriber. Pay annually and save 20%.

**Subscribe now**

**The Big Read** **Cryptocurrencies**

# Cryptocurrencies: developing countries provide fertile ground

Sometimes dismissed as a fad in advanced economies, crypto holds more appeal in countries with a history of financial instability

**Jonathan Wheatley** and **Adrienne Klasa** in London SEPTEMBER 4 2021

---

### Receive free Cryptocurrencies updates

We'll send you a *myFT Daily Digest* email rounding up the latest Cryptocurrencies news every morning.

| Enter your email address | Sign up |

---

In Lagos, Nigeria's commercial capital, a software coder bills her client in London and is paid in bitcoin, sidestepping a costly banking system and the naira currency's miserly official exchange rate. In São Paulo, Brazil, a dentist puts his monthly savings into an exchange traded fund investing in a basket of cryptocurrencies that is the second most popular ETF on the local bourse. Individuals and businesses in Vietnam invest, trade and transact so much in bitcoin and other cryptocurrencies that the south-east Asian nation has the world's highest rate of crypto adoption.

In advanced economies, cryptocurrencies are viewed by many in the financial world with suspicion — the domain of zealous "crypto bros" and a speculative and highly volatile fad that can only end badly. Regulators in Europe and the US have issued stark warnings about the dangers of trading crypto.

6/9/23, 10:44 PM
Case 1:23-cv-01599-ABJ  Document 53-5  Filed 06/12/23  Page 73 of 87
Cryptocurrencies: developing countries provide fertile ground | Financial Times

But in the developing world, there are signs that crypto is quietly building deeper roots. Especially in countries which have a history of financial instability or where the barriers to accessing traditional financial products such as bank accounts are high, cryptocurrency use is fast becoming a fact of daily life.

## P2P bitcoin trading is becoming more popular in sub-Saharan Africa

P2P bitcoin trading on LocalBitcoins and Paxful platforms ($m, 7-day rolling average)



"While everyone was paying attention to [Tesla chief executive] Elon Musk's tweets, and which institutional investor or CEO was saying what they thought about bitcoin, there was this entire story unravelling in emerging markets around the world that's really powerful," says Kim Grauer, director of research at Chainalysis, a leading data company in the sector.

"There's a massive crypto footprint in many of these countries . . . [and] a massive amount of entrepreneurial opportunity."

6/9/23, 10:44 PM
Cryptocurrencies: developing countries provide fertile ground and financial times
Case 1:23-cv-01599-ABJ   Document 53-5   Filed 06/12/23   Page 74 of 87

Chainalysis ranks Vietnam first for crypto adoption worldwide — one of 19 emerging and frontier markets in its top 20, with only the US among advanced economies making an appearance at number eight in 2021. "It's very striking this year, [adoption] is a story of emerging and frontier markets," adds Grauer.

Separate data from UsefulTulips.org, tracking bitcoin transactions on the world's two biggest peer-to-peer crypto trading platforms, show that in the past few weeks, sub-Saharan Africa has overtaken North America to become the geographical region with the highest volume of this kind of crypto activity.



A customer buys bitcoins at a teller machine in Lagos. Some observers, including the Central Bank of Nigeria, are concerned that inexperienced investors could lose their meagre savings gambling on a highly speculative asset © Seun Sanni/Reuters

On Tuesday, the small central American nation of El Salvador — population 6.4m — will become the first in the world to make bitcoin legal tender, meaning merchants from car dealers to coffee shops will be obliged to accept it as payment. The project faces the scepticism of the IMF, among others. But some view it as groundbreaking.

"We should take it very seriously," says Paul Domjan, co-author of the 2021 book *Chain Reaction: How Blockchain Will Transform the Developing World*. "It changes the position of bitcoin in the [global financial] system and it accelerates the whole debate about digital currencies."

# An alternative to weak currencies

Emerging markets are fertile ground for cryptocurrencies, often because their own are failing to do their job. As a store of value, as a means of exchange and as a unit of account, national currencies in some developing countries too often fall short. Unpredictable inflation and fast-moving exchange rates, clunky and expensive banking systems, financial restrictions and regulatory uncertainty, especially the existence or threat of capital controls, all undermine their appeal.



Source: TripleA
© FT

Nigeria, Africa's most populous country, is a case in point. Its impatient, youthful population has to contend daily with high unemployment, the vagaries of black market currency exchanges and capital controls. As the price of oil, the country's main export, dropped during the pandemic and further squeezed dollar supply, many businesses were unable to pay foreign suppliers and lenders, almost leading to the default of a World Bank-backed power plant that provides a tenth of Nigeria's electricity. For individuals sending or receiving remittances or billing customers, the lack of dollars is a constant headache.

"When you touch boots to the ground in Africa, specifically Nigeria, and talk to people about their everyday challenges with money, you see that it is almost unfathomable to us in the west to imagine," says Ray Youssef, chief executive of Paxful, a peer-to-peer crypto exchange that allows users to trade directly with one another. In these transactions, bitcoin are held in escrow accounts by the platform until the payment clears — whether by bank transfer, mobile money or gift card.

A third of the company's users are in Africa, and Nigeria is its biggest market, the company says, with 1.5m users — an 83 per cent increase in the year to June. Peer-to-peer rival LocalBitcoins also has most of its customers in developing markets in Latin America and Africa, as well as Russia.



## Vietnam has the highest level of crypto adoption

Global crypto adoption index score

The index measures adoption of cryptocurrency by country across three metrics: total cryptocurrency value received, retail activity and peer-to-peer trading volume, weighted by population of internet users and purchasing power per capita.
Source: Chainalysis; World Bank
© FT

Transactions vary in size, from retail investors buying small amounts of crypto for under $100, to merchants settling invoices, to financial services businesses that have been built on these platforms and employ rosters of people. "There's a lot of commerce happening between China and Nigeria, importing of goods using cryptocurrency, because the foreign exchange policy has locked out the everyday entrepreneur who doesn't have a massive amount of money to get into international trade," says Grauer.

In countries such as Venezuela and Brazil, the cost and bureaucracy of legacy financial systems means many people are more comfortable experimenting with and switching between different cryptocurrencies.

"We thought that people would adopt one cryptocurrency and that would be their primary one, and what we have found instead is they use different ones for different purposes," says Ryan Taylor, CEO of Dash Core Group, a cryptocurrency network that first entered Venezuela in 2016. Coins such as Dash get used more for smaller purchases, bitcoin for larger ones because of higher fees, and litecoin for things like paying satellite bills, he says.

The big exchanges such as Binance and Coinbase still dominate crypto services throughout the developing world. In Latin America, central and south Asia and Africa, more than 80 per cent of cryptocurrencies by value sent to these regions moves through exchanges. Binance sent over $14bn worth of crypto to eastern Europe in the year to June 2020, accounting for 20 per cent of all funds sent through the exchange globally. It was also the exchange of choice in Latin America, sending more than $3bn in crypto to the region over the same period.



An employee works a bitcoin mining centre in Venezuela, where coins such as Dash get used more for smaller purchases, bitcoin for larger ones because of higher fees, and litecoin for things like paying satellite bills © Federico Parra/AFP via Getty Images

It also offers an alternative to traditional remittances, a crucial lifeline for many developing economies. Transferring money back and forth across borders through traditional channels such as Western Union can be prohibitively expensive.

6/9/23, 10:44 PM
Case 1:23-cv-01599-ABJ   Document 53-5   Filed 06/12/23   Page 78 of 87
Cryptocurrencies tempting countries in economic peril to take a gamble | Financial Times

"If you want to send money to the African country next door, it's a veritable nightmare, and sending money outside of Africa — to America, Europe, China, whatever it may be — is almost impossible unless you are rich," says Youssef.

According to the World Bank, the cost of sending $200 to countries in sub-Saharan Africa averaged 9 per cent of the transaction value in the first quarter of 2020, the highest of any world region, and can go into double digits in some places.

On peer-to-peer crypto networks, however, these fees are typically about 2-5 per cent, according to LocalBitcoins. Average transaction fees for bitcoin were below $3 in August 2021, according to data provider BitInfoCharts, while for ethereum they ranged between $8 and $44 over the same period.



## Sub-Saharan Africa embraces P2P bitcoin trading

P2P bitcoin trading on LocalBitcoins and Paxful platforms ($m, past 30 days)

Source: UsefulTulips
© FT

But some observers believe there are considerable dangers in cryptocurrencies being used for remittances or other payments.

Paola Subacchi, professor of international economics at the University of London's Queen Mary Global Policy Institute, says a better solution for migrant workers would be to reduce the cost of remittances. "This is a bad remedy for a problem that should be solved using technology we already have."

She adds: "Cryptocurrencies and crypto companies present themselves as instruments for financial inclusion, but those excluded from traditional financial facilities are precisely those who can least afford to take any risks with their money."

## More mainstream investment

As with peers in advanced economies, there is plenty of speculative fervour in parts of the developing world about bitcoin - especially in middle-income countries.

Yet crypto investment has already made greater inroads into the investment mainstream in some emerging markets than it has in advanced ones.

In the US and the UK, for example, regulators have yet to approve the creation of cryptocurrency ETFs, which allow investors to gain exposure to the potential gains and losses of bitcoin and others without directly owning any themselves. Brazil this year became one of only a handful of countries where cryptocurrency ETFs are available.

Hashdex Asset Management has launched three regulated crypto ETFs on the São Paulo stock exchange this year, which together have over 160,000 investors.



A barber shop displays a sign that it accepts bitcoins in San Salvador. On Tuesday, the small central American nation of El Salvador will become the first in the world to make bitcoin legal tender © Marvin Recinos/AFP via Getty Images

Its flagship fund, HASH11, tracks an index co-developed with Nasdaq based on a basket of crypto assets. Charging a 1.3 per cent management fee, it currently has net assets of R$2.17bn ($421m), and is the second-most owned ETF on the bourse.

Marcelo Sampaio, Hashdex chief executive, describes its customer base as "the mainstream financial market".

"It's the whole range from the largest institutional investors in the country to the smallest average Joe investors in the stock exchange," he says.

Hashdex continued to attract new investors during downturns in the crypto market, such as recent dips provoked by Tesla's decision to no longer accept bitcoin payments and China's crackdown on crypto mining. "What that shows is that even with a severe correction in the market they were investing long-term," Sampaio says.

Brazil is the leading country in Latin America for cryptocurrency users, with 10.4m people, according to analysis by TripleA, a Singapore-based provider of crypto payment solutions.

Crypto's growing popularity in Brazil is demonstrated by local exchange Mercado Bitcoin, whose total transaction volumes were up sevenfold by the end of August compared with 2020. The company recently secured a $200m investment from the Japanese technology group SoftBank and its customers have doubled to 2.8m in the past year.

"In Brazil, almost all activity is related to investments and trading," says Daniel Cunha, a Mercado Bitcoin executive. "[But] in Argentina, stable coins have a very important presence as a strategy to defend [against the changing] value of the currency. In Mexico, the use of crypto for remittances represents a very large part of the market."

## Leapfrog to blockchain

The speed with which many developing countries have taken to crypto is not the first example of such early-adopter behaviour.

Perhaps the best-known modern example is M-Pesa, a mobile payment system first developed in Kenya that allowed millions of people without bank accounts to make cash withdrawals and deposits, transfers and payments through their mobile phones, delivering financial inclusion through technological innovation.

6/9/23, 10:44 PM
Cryptocurrencies: developing countries provide fertile ground — Financial Times
Case 1:23-cv-01599-ABJ   Document 53-5   Filed 06/12/23   Page 81 of 87

To some enthusiasts of the new currencies, the spread of crypto is the first stage in the next great leap, as users get used to trusting the so-called distributed ledger technology (DLT) of which blockchain — the backbone of crypto — is one application.



A sign for the M-Pesa mobile payment system in Nairobi, Kenya, that allowed millions of people without bank accounts to make cash withdrawals and deposits, transfers and payments through their mobile phones © Patrick Meinhardt/Bloomberg

In *Chain Reaction*, Domjan and his co-authors note that institutions of trust, including the holders of public records such as land registries and licensing agencies, tend to be weaker in the developing world. And, they argue, where you see such weaknesses, it is easier for DLT or blockchain-based systems to be "good enough" to offer an attractive alternative.

"It seems rational to expect such innovation . . . to have the biggest impact in developing countries," they write.

Domjan says such applications could unlock a host of "dead capital" to feed investment and growth.

## Warnings of instability

While crypto acolytes are excited about El Salvador's bitcoin currency experiment, most regulators have greeted it more frostily.

## Weekly newsletter



For the latest news and views on fintech from the FT's network of correspondents around the world, sign up to our weekly newsletter **#fintechFT**

Sign up here with one click

After El Salvador's announcement, the IMF warned in late July of the dangers inherent in countries adopting cryptocurrencies as legal tender. The US-based multilateral lender said that widespread use of the volatile tokens could undermine "macroeconomic stability" and potentially expose financial systems to widespread illicit activity.

The UK's Financial Conduct Authority has warned that "if consumers invest in these types of products, they should be prepared to lose all their money". The Basel committee of global banking regulators said in June that "the growth of crypto assets and related services has the potential to raise financial stability concerns and increase risks faced by banks" — including fraud, hacking and terrorist financing.

Consumer protection, particularly from scams large and small, is a huge concern in crypto markets. Unfortunately, the most vulnerable in poorer countries often pay the price. "There's a lot of hype around [crypto], so I think people may be more willing to invest where they're more desperate," says Grauer.

Many national regulators have found themselves ill-equipped to deal with digital asset companies that claim not to be domiciled anywhere.



People check stock prices in São Paulo, Brazil, where the cost and bureaucracy involved in using legacy financial systems means many people are more comfortable experimenting with cryptocurrencies © Amanda Perobelli/Reuters

In countries such as Zimbabwe, regulators have come down hard on crypto ventures, only to reverse their positions. Zimbabwe's central bank has said it is drafting a policy framework for regulating cryptocurrencies, after banning local banks from transacting with them in 2018. In Nigeria, the central bank banned commercial banks from dealing with companies involved in cryptocurrency transactions — which quickly found a workaround using third-party accounts.

Some observers, including the Central Bank of Nigeria, have expressed concerns that inexperienced investors could lose their meagre savings gambling on a highly speculative asset. "Small retail and unsophisticated investors also face high probability of loss due to the high volatility of the investments in recent times," the bank said, as it sought to clamp down on the trade.

But while most crypto services say they are keen to comply with regulators, they believe excessive bureaucracy will drive people to seek out their services. "If a central bank decides to impose some direct form of restrictions on their people, you will see a flood of those people coming to [crypto platforms] looking for help," says Youssef. "They all move with the flux of the geopolitical world, and we have to be ready for that."

6/9/23, 10:44 PM
Cryptocurrencies: developing countries should be wary — Financial Times
Case 1:23-cv-01599-ABJ   Document 53-5   Filed 06/12/23   Page 84 of 87

In El Salvador, the government has decided that rather than clamping down on crypto, it should embrace it. For Domjan, whether the project succeeds or fails, it has changed the game.

"El Salvador is a genuine country," he says. "It's not under sanctions, it's a member of the IMF, it is inserted in the international financial system. The point is, it confers an element of legitimacy. We will learn lessons about how a country could implement an internationally tradable digital currency as a means of settlement."

*Additional reporting by Neil Munshi in Lagos and Michael Pooler in São Paulo*

**Letter in response to this article**:

*It's time to leapfrog a growth markets trope* / *From Emeka Ajene, Lagos, Nigeria*

Copyright The Financial Times Limited 2023. All rights reserved.

# EXHIBIT BH-50

www.financialexpress.com /business/blockchain-what-can-cryptocurrencies-ensure-for-economic-development-of-third-world-c…

# What can cryptocurrencies ensure for economic development of third-world countries

Ritarshi Banerjee4-4 minutes

## Market research has projected that potential crypto use cases such as remittances, microfinance, savings, identity verification, can help benefit third-world nations

Economic landscape around developing nations seems to suggest that decentralised finance (DeFi) can be an instrument for growth. From a financial purview, cryptocurrencies carry potential to ensure that developing economies get access to global monetary services.

According to United Nations Conference on Trade and Development (UNCTAD), an intergovernmental organisation, cryptocurrency ecosystem widened by 2,300% between September, 2019, and June, 2021, specifically in developing countries. Market estimates have shown that 2021's digital currency ownership constituted 15 of the top 20 economies belonging from emerging markets and developing countries. "In my opinion, with the right infrastructure in place, digital assets could help developing economies by lowering transaction costs for both retail and institutions, increased efficiency in multi-party processes and could also lead to currency stability in countries by providing a hedge against currency inflation," Karan Ambwani, India lead, dYdX Foundation, a decentralised platform, told FE Blockchain.

Market research has projected that potential crypto use cases such as remittances, microfinance, savings, identity verification, among others, can help benefit third-world nations. Insights from Medium, an online publishing platform, highlighted that cryptocurrencies such as Bitcoin can serve as a quasi-bank account. The cryptocurrency can help people from developing nations to ensure savings and conduct daily transactions. Furthermore, cryptocurrencies can help developing countries to avail loans quicker through reduction of transaction costs.

"In countries with high inflation or a weak economy, the local currency can lose value rapidly, making it difficult for people to save or plan for the future. Cryptocurrency, on the other hand, is based on blockchain and is decentralised, which can provide stability against political and economic instability," Punit Agarwal, founder, KoinX, a cryptocurrency taxation platform, stated.

Reportedly, Bitcoin legalisation for Ukraine, El Salvador, Slovenia, among others, has enabled the entry of investors, developers, entrepreneurs, among others, in these countries. As reported by Center for Strategic and International Studies (CSIS), a think tank, Bitcoin legalisation provided Ukrainian citizens with a medium of exchange to cover war and humanitarian costs during Russia-Ukraine crisis. Also, the step enabled Ukrainian government to receive donations which complemented Western Aid.

Moreover, future predictions indicate that cryptocurrency in developing nations can help tackle corruption through a transparent structure. Although, the benefits are believed to be dependent on mass adoption of

6/9/23, 10:28 PM
What Can Cryptocurrencies Do For Economic Development? Can India-won Eugencies  Reader View

Case 1:23-cv-01599-ABJ  Document 53-5  Filed 06/12/23  Page 87 of 87

cryptocurrencies and compliance of all three functions of money. "It is likely that we might see more developing countries implementing regulations or laws to promote innovation and digitalisation. Developing countries, such as India, can use cryptocurrencies to combat corruption by providing transparency and immutability to financial transactions,"  Edul Patel, co-founder and CEO, Mudrex, a crypto-investing platform, mentioned.