# EXHIBIT BH-71

Check out our world-class Ambassador Program

Forum   Docs   Whitepaper   



Tech   Farm   Team   News   Learn   FAQ   Jobs

# Web3 @ Internet Scale

Subspace is a fourth generation blockchain
built for the next wave of crypto creators

**Learn how it works**

 **Free & Fair Consensus**

Energy-intensive *mining* and capital-intensive *staking* are replaced with a new form of disk-based *farming*.

 **No Compromises Scalability**

We leverage key academic research to resolve the blockchain trilemma without sacrificing security or decentralization.

 **True Interoperability**

Archiving the history of the blockchain ecosystem allows for simple, secure, and trustless bridges between networks.

 **Distributed Archival Storage**

Farmers store unique segments of the history allowing the blockchain to *bloat* without sacrificing decentralization.

 **Decoupled Smart Contracts**

Executors process smart contracts and maintain the blockchain state, keeping farming lightweight and decentralized

 **Radically Decentralized**

Designed from first-principles for maximum decentralization, community ownership and on-chain governance.

## NETWORKS ARCHIVED ON ARIES TESTNET

We are backing up every block across the Polkadot and Kusama
Networks as public good for the benefit of the ecosystem

 **Polkadot** 

 ...15 live networks and counting

 **Kusama** 

 ...29 live networks and counting

 **Ethereum** SOON

      Ethereum L2s coming soon!

English

Be the first to get updated about the latest news, upcoming events & the project roadmap.

Email address

Subscribe

## HOW SUBSPACE WORKS

*Farm, Build, Hold*

### Share space, farm coins

Eco-Friendly   Low-Barriers   Fair Rewards

Anyone can share space on their home computer and earn rewards for producing blocks.

Start farming today   →





### Build data-rich dApps

Permanent   Scalable   Storage

Devs pay once to store data on-chain forever. Storage costs go down as more farmers join the network.

←   Archiving Kusama on Subspace

### Hold coins, run contracts

Staking Rewards   Compute   Capped-Supply

Stake coins on an executor node to process smart contracts and earn transaction fees.

Delegated execution coming soon   →

## OUR PROGRESS

Subspace is in active development with a live test network. Follow our progress on Github.

ARIES

GEMINI


English   ›



### Public Testnet

Proof-of-Archival-Storage (PoAS) Consensus

Over **25,000** community-run nodes

*Retired*

### Non-Incentivized Testnet

Scalable Smart Contracts via Decoupled Execution

Over **27,000** community-run nodes to date (60+ countries)

*Gemini III Non-Incentivized Stress-Test is live!*

### Mainnet Beta

Pre-version of Subspace Network Mainnet

*Coming soon*

## OUR BACKERS





PRODUCTS
Farmer App
Explorer
Relayer
Status page
Telemetry

RESOURCES
Whitepaper
Forum
News
FAQ
Learn
Support

COMPANY
Technology
Farm
Team
Jobs
Ambassadors
Privacy policy
Terms of use

Email address    Subscribe

© 2023 Subspace Labs, Inc. All Rights Reserved

English

# EXHIBIT BH-72

coinbase

Explore    Web3    Learn    Individuals    Businesses    Developers    Company        Sign in    Get started

About    Careers    Mission    Press



# About Coinbase

We are building the cryptoeconomy – a more fair, accessible, efficient, and transparent financial system enabled by crypto.

We started in 2012 with the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin. Today, we offer a trusted and easy-to-use platform for accessing the broader cryptoeconomy.

## Coinbase powers the cryptoeconomy

Customers around the world discover and begin their journeys with crypto through Coinbase.

245,000 ecosystem partners in over 100 countries trust Coinbase to easily and securely invest, spend, save, earn, and use crypto.

| | | |
|---|---|---|
| **$145B** Quarterly volume traded | **$130B** Assets on platform | **100+** Countries |
| **3,500+** Employees | | |

## Our Commitment to Compliance

A strong compliance foundation is critical to Coinbase's mission of being the most trusted crypto platform. Adherence to regulatory requirements in all jurisdictions in which Coinbase operates ensures that we keep our customers - and the broader financial ecosystem - safe. To this end, we have developed a Compliance Program that is rooted in best practices from traditional financial services as well as innovative, sophisticated compliance technology to bring the crypto industry forward. We hold a high standard for what assets we list, what services we provide, and who has access to our products.

Check out the links below to learn more about our commitment to compliance and the technology we use to keep the crypto economy safe.





Know-your-customer (KYC) verification

Compliance Requirements

Scaled Compliance Solutions

## Recent Compliance Blogs



Apr 28, 2023

**How Coinbase monitors tokens we list for ongoing compliance**

Coinbase monitors the tokens we list to ensure they remain aligned with our listing standards.

Read the post

---



Apr 14, 2023

**A deep dive into sanctions compliance**

Coinbase is committed to compliance with relevant laws and regulations in the places we operate so customers can feel safe using our platform.

Read the post

---



Mar 31, 2023

**Identity verification and financial compliance**

rust is built on dependable security and protections — which is why we make protecting your account & your digital assets our number one priority.

Read the post

---



Nov 1, 2022

**Regulators and Industry: Building a Path to Compliance 3.0**

Coinbase submitted its response to the U.S. Treasury Department's request for comment on "Ensuring Responsible Development of Digital Assets," which focuses on the risk of illicit finance in crypto.

Read the post

---

## Our Executive Team



**Brian Armstrong**
Co-founder & Chief Executive Officer



**Emilie Choi**
President & Chief Operating Officer



**Alesia Haas**
Chief Financial Officer



**L.J. Brock**
Chief People Officer



**Paul Grewal**
Chief Legal Officer



**Manish Gupta**
EVP, Engineering



**Gregory Tusar**
VP, Institutional Product



**Max Branzburg**
VP, Product



**Will Robinson**
VP, Engineering

---

## Our Board of Directors

| | | | |
|---|---|---|---|
| **Brian Armstrong**<br>Co-Founder & Chief Executive Officer | **Fred Ehrsam**<br>Co-Founder & Board Director | **Fred Wilson**<br>Lead Independent Director | **Katie Haun**<br>Board Director |
| **Gokul Rajaram**<br>Board Director | **Marc Andreessen**<br>Board Director | **Kelly Kramer**<br>Board Director | **Tobias Lütke**<br>Board Director |

---

## Global Advisory Council

| | | | |
|---|---|---|---|
| **John Anzalone**<br>Founder of Impact Research Polling | **Chris Lehane**<br>Chief Strategy Officer at Haun Ventures | **Sean Patrick Maloney**<br>Former Congressman | **Tim Ryan**<br>Former Congressman |
| **Patrick Toomey**<br>Former Senator | | | |

---

## Working at Coinbase

Our mission is to increase economic freedom in the world. Join us and make an impact at a global scale.

View open positions



---

coinbase

English

© 2023 Coinbase
Blog • Twitter • Facebook

**Company**
About
Careers
Affiliates
Blog
Press

**Individuals**
Buy & sell
Earn free crypto
Wallet
NFT
Card

**Support**
Help center
Contact us
Create account
ID verification
Account information

Security

Investors

Vendors

Legal & privacy

Cookie policy

Cookie preferences

Digital Asset Disclosures

**Learn**

Ethereum Merge

Browse crypto prices

Coinbase Bytes newsletter

Crypto basics

Tips & tutorials

Market updates

What is Bitcoin?

What is crypto?

What is a blockchain?

How to set up a crypto wallet

How to send crypto

Taxes

Derivatives

Coinbase One

**Businesses**

Institutional

Prime

Asset Hub

Commerce

**Developers**

Cloud

Wallet as a Service

Wallet SDK

Coinbase Wallet Faucet - Get testnet funds

Coinbase Pay SDK

Node

Commerce

Base

Sign in with Coinbase

Rosetta

Participate

Prime API

Payment methods

Account access

Supported crypto

Supported countries

Status

# EXHIBIT BH-73



Kbit is a global quantitative trading firm in the digital assets space, trading 1% of the global daily spot market.



Kbit specializes in high-frequency global market making, liquidity

providing, and arbitrage across 30 exchanges. We apply software engineering, data engineering, and financial engineering to crypto trading

We take a scientific approach to identify and capture trading opportunities. Hypothesize, research, confirm, implement.

# Interested in joining our growing and fast-paced team, apply here



Careers



Careers   Contact

# EXHIBIT BH-74

**AUROS**

STRATEGIC MARKET MAKING     ABOUT     JOIN US



# Utilising innovative trading technologies, we underpin growth in digital assets

WHO WE ARE

# Auros is an algorithmic trading and market making firm that delivers best-in-class liquidity for exchanges and token projects

Founded in 2019, we account for a significant proportion of global cryptocurrency volume. Combining the technological innovation that powers our high frequency trading strategies with a unique partnership based approach, Auros is redefining liquidity provision and sustainable growth in the digital assets space.

MEET THE TEAM



Benjamin



AUROS

STRATEGIC MARKET MAKING   ABOUT   JOIN US

# Benjamin Roth

A portfolio manager and trader for over 20 years, Ben oversees Auros' commercial trajectory, where and how we invest in projects and venues, and has ultimate oversight for our algorithmic market making business. He has a proven track record of performance in the fields of derivatives structuring, volatility and high frequency trading. His early career was forged at Optiver in Sydney and Chicago, running various trading books in New York and Hong Kong, before going on to establish Auros as the firm's Head of Trading. He holds a First Class Honours degree in Accounting and Finance from UNSW.

**CO-FOUNDER & CHIEF INVESTMENTS OFFICER**

CO-FOUNDER & CHIEF TECHNOLOGY OFFICER

CHIEF COMMERCIAL OFFICER

AUROS

STRATEGIC MARKET MAKING          ABOUT          JOIN US

# Our sights are set on becoming the global leader in digital asset trading

We welcome those seeking to join our mission by partnering, or joining our team, to get in touch

We welcome those seeking to join our mission by partnering, or joining our team, to get in touch

Partner with AUROS →

Join our team →



INFO@AUROS.GLOBAL

# EXHIBIT BH-75

FORBES > MONEY > FINTECH

BREAKING

# Coinbase Buys Crypto Trading Firm Tagomi To Boost Institutional Trading Business

**Jeff Kauflin** Forbes Staff

*Senior editor covering fintech and crypto.*

 Follow

May 27, 2020, 08:25am EDT

 Listen to article 4 minutes 

🕐 **This article is more than 3 years old.**



Coinbase CEO Brian Armstrong. With the company's newest acquisition of Tagomi, he's making a deeper ... [+]  JAMEL TOPPIN/THE FORBES COLLECTION

Coinbase, the largest cryptocurrency company in the U.S., is acquiring the two-year-old, 20-person digital asset trading firm Tagomi for a price between $75 and $100 million, say multiple people familiar with the situation.

New York-based Tagomi caters to deep-pocketed crypto traders who make transactions between $250,000 and $2 million. It doesn't have its own exchange—it links to a dozen of the largest, including Coinbase and Binance U.S., aiming to route investors' orders to the venues offering the best prices. Tagomi has attracted high-profile backers and clients, including Peter Thiel's Founders Fund and crypto investment firms like Paradigm, Polychain, Pantera and Multicoin. It had raised $28 million in venture capital before the Coinbase deal was announced, and it was valued at $72 million when it last raised funding in early 2019.

Coinbase is acquiring Tagomi for its technology and talent. Greg Tusar, who previously led electronic trading at Goldman Sachs GSBD +0.4%, is Tagomi's co-CEO alongside Jennifer Campbell, a former venture capitalist at Union Square Ventures who was named to Forbes' 30 Under 30 list last year. Marc Bhargava, Tagomi's third cofounder, did prior stints at McKinsey and Airbnb. As of October 2019, the startup was facilitating $17 million in crypto trades on average a week, with estimated monthly revenue of $75,000. The trio will help Coinbase accelerate Coinbase Prime, a trading platform for institutional investors announced in 2018, says a person familiar with the deal.

Campbell declined to comment on any details of a potential "earn-out" contract, where entrepreneurs are typically guaranteed a large, additional payout if they meet certain goals and remain at the acquiring company for a specified number of years.



Tagomi cofounders Jennifer Campbell, Greg Tusar and Marc Bhargava.   PAOLO TESTA

MORE FROM **FORBES ADVISOR**

### Score 5% Back In Your Top Spending Category With New Citi Custom Cash Card

By **Robin Saks Frankel**   Forbes Advisor Staff



### What Is Cryptocurrency?

By **Kate Ashford**   Contributor



The two teams started discussing an acquisition in the summer of 2019, says Jennifer Campbell. Last fall, The Block reported that Coinbase was in talks to buy Tagomi, but that deal never materialized.

**Investing Digest: Know what's moving the financial markets and what smart money is buying with Forbes Investing Digest.**

Email address

**Sign Up**

By signing up, you accept and agree to our Terms of Service (including the class action waiver and arbitration provisions), and Privacy Statement.

Campbell says Coinbase's balance sheet, which includes $8 billion in bitcoin and other cryptocurrencies stored through its institutional custody business, will help Tagomi serve large customers. With that access to cheap funding, Tagomi can vastly expand its "prime brokerage" services, including letting customers borrow cash, borrow crypto assets and sell assets short (betting that they'll go down in value).

Coinbase's balance sheet will also help Tagomi with a liquidity challenge, since trading platforms like Tagomi need to pre-fund trades, having cash in the right places at the right times. "When you want to buy $1 million of bitcoin, we need to have thought through where you're likely to want to buy," Tusar told *Forbes* last year.

The Tagomi purchase follows other key acquisitions by Coinbase over the past two years. Last summer, it bought cryptocurrency custody company Xapo for $55 million. Two years ago it bought Earn.com, a company that lets people make money for giving advice, for a reported $100 million. The Earn.com deal hasn't been a success—it was widely perceived as a strategic move to bring on Earn.com CEO Balaji Srinivasan as CTO and have him boost Coinbase's institutional investor business, but he left the firm after just a year. Coinbase's acquisition of Tagomi is another attempt to acquire outside talent and turbocharge its institutional business. *Follow me on* Twitter *or* LinkedIn. *Check out my* website. *Send me a secure* tip.

 **Jeff Kauflin**   **Follow**

I lead our fintech coverage at Forbes and also cover crypto. I edit our annual Fintech 50 and 30 Under 30 for fintech, and… **Read More**

Editorial Standards                                    Reprints & Permissions

# EXHIBIT BH-76

Alameda Research: Company Profile and News - Bloomberg Markets

US Edition    Your Account

Live Now
Markets
Economics
Industries
Technology
Politics
Wealth
Pursuits
Opinion
Businessweek
Equality
Green
CityLab
Crypto
More

Alameda Research operates as a principal trading firm. The Company provides market making services for dozens of coins across the top crypto exchanges. Alameda Research serves customers worldwide.

| SECTOR | INDUSTRY | SUB-INDUSTRY | INCORPORATED | ADDRESS | WEBSITE |
|---|---|---|---|---|---|
| Financials | Financial Services | Specialty Finance | -- | Central and Western Hong Kong Island Hong Kong (SAR) | www.alameda-research.com |

NO. OF EMPLOYEES

--

# Latest News

Money Stuff
**FTX Lost Track of Its Money**
Apr 10, 2023

**Sam Bankman-Fried Charged With Bribing Chinese Officials**
Mar 29, 2023

Technology
**FTX Administrators Say Bankman-Fried Got $2.2 Billion Mainly From Alameda**
Mar 16, 2023

Personal Finance
**US Prosecutors Are Digging Into Jane Street, Jump Trading Chats on Terra Bailout**
Mar 13, 2023

# Most Popular

TSLA:US
TESLA INC
244.40 USD ▲ +9.54 +4.06%

GT10:GOV
US TREASURY N/B
**97.00** USD ▼ -0.17 -0.18%

AAPL:US
APPLE INC
**180.96** USD ▲ +0.39 +0.22%

GS:US
GOLDMAN SACHS GP
**336.02** USD ▲ +0.55 +0.16%

AMZN:US
AMAZON.COM INC
**123.43** USD ▼ -0.82 -0.66%

## People Also Search For

EURUSD:CUR
EUR-USD
**1.0744** USD ▼ -0.0005 -0.0465%

CL1:COM
WTI Crude
**70.03** USD/bbl. ▼ -0.14 -0.20%

INDU:IND
DJIA
**33,876.78** USD ▲ +43.17 +0.13%

DM1:IND
Generic 1st 'DM' Future
**34,217.00** USD ▲ +15.00 +0.04%

SPX:IND
S&P 500
**4,298.86** USD ▲ +4.93 +0.11%

## More from Bloomberg


**SEC Sues Binance and CEO Zhao for Breaking Securities Rules**


**SEC's Lawsuit Against Binance Strikes at Heart of Ailing Crypto Sector**


**SEC Seeks to Freeze Binance.US Assets and Protect Customer Funds**


**SEC's Regulatory Net Now Covers $120 Billion of Crypto After Coinbase, Binance Action**

Terms of Service  Do Not Sell or Share My Personal Information   Trademarks  Privacy Policy
©2023 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices      Help

# EXHIBIT BH-77

Audit Sampling                                                    **2067**

# AU Section 350
## *Audit Sampling*

**(Supersedes SAS No. 1, sections 320A and 320B.)**

**Source: SAS No. 39; SAS No. 43; SAS No. 45; SAS No. 111.**

**See section 9350 for interpretations of this section.**

**Effective for periods ended on or after June 25, 1983, unless otherwise indicated.**

**.01** Audit sampling is the application of an audit procedure to less than 100 percent of the items within an account balance or class of transactions for the purpose of evaluating some characteristic of the balance or class.[1] This section provides guidance for planning, performing, and evaluating audit samples.

**.02** The auditor often is aware of account balances and transactions that may be more likely to contain misstatements.[2] He considers this knowledge in planning his procedures, including audit sampling. The auditor usually will have no special knowledge about other account balances and transactions that, in his judgment, will need to be tested to fulfill his audit objectives. Audit sampling is especially useful in these cases.

**.03** There are two general approaches to audit sampling: nonstatistical and statistical. Both approaches require that the auditor use professional judgment in planning, performing, and evaluating a sample and in relating the audit evidence produced by the sample to other audit evidence when forming a conclusion about the related account balance or class of transactions. The guidance in this section applies equally to nonstatistical and statistical sampling. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

**.04** The third standard of field work states, "The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit." Either approach to audit sampling, when properly applied, can provide sufficient audit evidence. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

**.05** The sufficiency of audit evidence is related to the design and size of an audit sample, among other factors. The size of a sample necessary to provide sufficient audit evidence depends on both the objectives and the efficiency of the sample. For a given objective, the efficiency of the sample relates to its design; one sample is more efficient than another if it can achieve the same objectives with a smaller sample size. In general, careful design can produce more efficient

---

[1] There may be other reasons for an auditor to examine less than 100 percent of the items comprising an account balance or class of transactions. For example, an auditor may examine only a few transactions from an account balance or class of transactions to (a) gain an understanding of the nature of an entity's operations or (b) clarify his understanding of the entity's internal control. In such cases, the guidance in this statement is not applicable.

[2] For purposes of this section the use of the term misstatement can include both errors and fraud as appropriate for the design of the sampling application. Errors and fraud are discussed in section 312, *Audit Risk and Materiality in Conducting an Audit*.

**The Standards of Field Work**

samples. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

**.06** Evaluating the appropriateness of audit evidence is solely a matter of auditing judgment and is not determined by the design and evaluation of an audit sample. In a strict sense, the sample evaluation relates only to the likelihood that existing monetary misstatements or deviations from prescribed controls are proportionately included in the sample, not to the auditor's treatment of such items. Thus, the choice of nonstatistical or statistical sampling does not directly affect the auditor's decisions about the auditing procedures to be applied, the appropriateness of the audit evidence obtained with respect to individual items in the sample, or the actions that might be taken in light of the nature and cause of particular misstatements. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

## Uncertainty and Audit Sampling

**.07** Some degree of uncertainty is implicit in the concept of "a reasonable basis for an opinion" referred to in the third standard of field work. The justification for accepting some uncertainty arises from the relationship between such factors as the cost and time required to examine all of the data and the adverse consequences of possible erroneous decisions based on the conclusions resulting from examining only a sample of the data. If these factors do not justify the acceptance of some uncertainty, the only alternative is to examine all of the data. Since this is seldom the case, the basic concept of sampling is well established in auditing practice.

**.08** The uncertainty inherent in applying audit procedures is referred to as audit risk. Audit risk includes both uncertainties due to sampling and uncertainties due to factors other than sampling. These aspects of audit risk are sampling risk and nonsampling risk, respectively.[3] [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**[.09]** [As amended, effective for audits of financial statements for periods ended after September 30, 1983, by Statement on Auditing Standards No. 45. Paragraph deleted by the issuance of Statement on Auditing Standards No. 111, March 2006.]

**.10** Sampling risk arises from the possibility that, when a test of controls or a substantive test is restricted to a sample, the auditor's conclusions may be different from the conclusions he would reach if the test were applied in the same way to all items in the account balance or class of transactions. That is, a particular sample may contain proportionately more or less monetary misstatements or deviations from prescribed controls than exist in the balance or class as a whole. For a sample of a specific design, sampling risk varies inversely with sample size: the smaller the sample size, the greater the sampling risk.

**.11** Nonsampling risk includes all the aspects of audit risk that are not due to sampling. An auditor may apply a procedure to all transactions or balances and still fail to detect a material misstatement. Nonsampling risk includes the possibility of selecting audit procedures that are not appropriate to achieve the

---

[3] See paragraph .22 of section 312, *Audit Risk and Materiality in Conducting an Audit*, for definition of risk of material misstatement. [Footnote added, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

specific objective. For example, confirming recorded receivables cannot be relied on to reveal unrecorded receivables. Nonsampling risk also arises because the auditor may fail to recognize misstatements included in documents that he examines, which would make that procedure ineffective even if he were to examine all items. Nonsampling risk can be reduced to a negligible level through such factors as adequate planning and supervision (see section 311, *Planning and Supervision*) and proper conduct of a firm's audit practice (see section 161, *The Relationship of Generally Accepted Auditing Standards to Quality Control Standards*). [As amended, effective for audits of financial statements for periods ended after September 30, 1983, by Statement on Auditing Standards No. 45.]

## Sampling Risk

**.12** The auditor should apply professional judgment in assessing sampling risk. In performing substantive tests of details the auditor is concerned with two aspects of sampling risk:

- *The risk of incorrect acceptance* is the risk that the sample supports the conclusion that the recorded account balance is not materially misstated when it is materially misstated.

- *The risk of incorrect rejection* is the risk that the sample supports the conclusion that the recorded account balance is materially misstated when it is not materially misstated.

The auditor is also concerned with two aspects of sampling risk in performing tests of controls when sampling is used:

- *The risk of assessing control risk too low* is the risk that the assessed level of control risk based on the sample is less than the true operating effectiveness of the control.

- *The risk of assessing control risk too high* is the risk that the assessed level of control risk based on the sample is greater than the true operating effectiveness of the control.

**.13** The risk of incorrect rejection and the risk of assessing control risk too high relate to the efficiency of the audit. For example, if the auditor's evaluation of an audit sample leads him to the initial erroneous conclusion that a balance is materially misstated when it is not, the application of additional audit procedures and consideration of other audit evidence would ordinarily lead the auditor to the correct conclusion. Similarly, if the auditor's evaluation of a sample leads him to unnecessarily assess control risk too high for an assertion, he would ordinarily increase the scope of substantive tests to compensate for the perceived ineffectiveness of the controls. Although the audit may be less efficient in these circumstances, the audit is, nevertheless, effective.

**.14** The risk of incorrect acceptance and the risk of assessing control risk too low relate to the effectiveness of an audit in detecting an existing material misstatement. These risks are discussed in the following paragraphs.

## Sampling in Substantive Tests of Details

### Planning Samples

**.15** Planning involves developing a strategy for conducting an audit of financial statements. For general guidance on planning, see section 311, *Planning and Supervision*.

**.16** When planning a particular sample for a substantive test of details, the auditor should consider

- The relationship of the sample to the relevant audit objective (see section 326, *Audit Evidence*).

- Preliminary judgments about materiality levels.

- The auditor's allowable risk of incorrect acceptance.

- Characteristics of the population, that is, the items comprising the account balance or class of transactions of interest.

[Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 106.]

**.17** When planning a particular sample, the auditor should consider the specific audit objective to be achieved and should determine that the audit procedure, or combination of procedures, to be applied will achieve that objective. The auditor should determine that the population from which he draws the sample is appropriate for the specific audit objective. For example, an auditor would not be able to detect understatements of an account due to omitted items by sampling the recorded items. An appropriate sampling plan for detecting such understatements would involve selecting from a source in which the omitted items are included. To illustrate, subsequent cash disbursements might be sampled to test recorded accounts payable for understatement because of omitted purchases, or shipping documents might be sampled for understatement of sales due to shipments made but not recorded as sales.

**.18** Evaluation in monetary terms of the results of a sample for a test of details contributes directly to the auditor's purpose, since such an evaluation can be related to the auditor's judgment of the monetary amount of misstatements that would be material for the test. When planning a sample for a test of details, the auditor should consider how much monetary misstatement in the related account balance or class of transactions may exist when combined with misstatements that may be found in other tests without causing the financial statements to be materially misstated. This maximum monetary misstatement that the auditor is willing to accept for the balance or class is called tolerable misstatement for the sample. Tolerable misstatement is a planning concept and is related to the auditor's determination of materiality for planning the financial statement audit in such a way that tolerable misstatement, combined for all of the tests in the entire audit, does not exceed materiality for the financial statements. This means that auditors should normally set tolerable misstatement for a specific audit procedure at less than financial statement materiality so that when the results of the audit procedures are aggregated, the required overall assurance is attained. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**.19** The second standard of field work states, "The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures." After assessing and considering the levels of inherent and control risks, the auditor performs substantive tests to restrict detection risk to an acceptable level. As the assessed levels of inherent risk, control risk, and detection risk for other substantive procedures directed toward the same specific audit objective decreases, the auditor's allowable risk

of incorrect acceptance for the substantive tests of details increases and, thus, the smaller the required sample size for the substantive tests of details. For example, if inherent and control risks are assessed at the maximum, and no other substantive tests directed toward the same specific audit objectives are performed, the auditor should allow for a low risk of incorrect acceptance for the substantive tests of details.[4] Thus, the auditor would select a larger sample size for the tests of details than if he allowed a higher risk of incorrect acceptance. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

**.20**   The auditor planning a statistical or nonstatistical sample may use the model in paragraph .26 of section 312, *Audit Risk and Materiality in Conducting an Audit*, to assist in planning the allowable risk of incorrect acceptance for a specific test of details. To do so, the auditor should determine an acceptable audit risk and subjectively quantify his or her judgment of the risk of material misstatement (consisting of inherent risk and control risk), and the risk that substantive analytical procedures and other relevant substantive procedures would fail to detect misstatements that could occur in an assertion equal to tolerable misstatement, given that such misstatements occur and are not detected by the entity's controls. Some levels of these risks are implicit in evaluating audit evidence and reaching conclusions. Auditors using the model might prefer to evaluate these judgment risks explicitly. The relationships between these risks are illustrated in Table 1 of the Appendix [paragraph .48]. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**.21**   As discussed in section 326, the sufficiency of tests of details for a particular account balance or class of transactions is related to the individual importance of the items examined as well as to the potential for material misstatement. When planning a sample for a substantive test of details, the auditor uses his judgment to determine which items, if any, in an account balance or class of transactions should be individually examined and which items, if any, should be subject to sampling. The auditor should examine those items for which, in his judgment, acceptance of some sampling risk is not justified. For example, these may include items for which potential misstatements could individually equal or exceed the tolerable misstatement. Any items that the auditor has decided to examine 100 percent are not part of the items subject to sampling. Other items that, in the auditor's judgment, need to be tested to fulfill the audit objective but need not be examined 100 percent, would be subject to sampling.

**.22**   The auditor may be able to reduce the required sample size by separating items subject to sampling into relatively homogeneous groups on the basis of some characteristic related to the specific audit objective. For example, common bases for such groupings are the recorded or book value of the items, the nature of controls related to processing the items, and special considerations associated with certain items. An appropriate number of items is then selected from each group.

---

[4] Some auditors prefer to think of risk levels in quantitative terms. For example, in the circumstances described, an auditor might think in terms of a 5 percent risk of incorrect acceptance for the substantive test of details. Risk levels used in sampling applications in other fields are not necessarily relevant in determining appropriate levels for applications in auditing because an audit includes many interrelated tests and sources of evidence. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

**.23** To determine the number of items to be selected in a sample for a particular test of details, the auditor should consider the tolerable misstatement and the expected misstatement, the audit risk, the characteristics of the population, the assessed risk of material misstatement (inherent risk and control risk), and the assessed risk for other substantive procedures related to the same assertion. An auditor who applies statistical sampling uses tables or formulas to compute sample size based on these judgments. An auditor who applies nonstatistical sampling uses professional judgment to relate these factors in determining the appropriate sample size. Ordinarily, this would result in a sample size comparable to the sample size resulting from an efficient and effectively designed statistical sample, considering the same sampling parameters.[5] Table 2 in the Appendix [paragraph .48] illustrates the effect these factors may have on sample size. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

## Sample Selection

**.24** Sample items should be selected in such a way that the sample can be expected to be representative of the population. Therefore, all items in the population should have an opportunity to be selected. For example, haphazard and random-based selection of items represents two means of obtaining such samples.[6]

## Performance and Evaluation

**.25** Audit procedures that are appropriate to the particular audit objective should be applied to each sample item. In some circumstances the auditor may not be able to apply the planned audit procedures to selected sample items because, for example, the entity might not be able to locate supporting documentation. The auditor's treatment of unexamined items will depend on their effect on his or her evaluation of the sample. If the auditor's evaluation of the sample results would not be altered by considering those unexamined items to be misstated, it is not necessary to examine the items. However, if considering those unexamined items to be misstated would lead to a conclusion that the balance or class contains material misstatement, the auditor should consider alternative audit procedures that would provide sufficient appropriate audit evidence to form a conclusion. The auditor should also consider whether the reasons for his or her inability to examine the items have implications in relation to assessing risks of material misstatement due to fraud,[7] the assessed level of control risk that he or she expects to be supported, or the degree of reliance on management representations. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

---

[5] This guidance does not suggest that the auditor using nonstatistical sampling compute a corresponding sample size using statistical theory. [Footnote added, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

[6] Random-based selection includes, for example, random sampling, stratified random sampling, sampling with probability proportional to size, and systematic sampling (for example, every hundredth item) with one or more random starts. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

[7] See section 316, *Consideration of Fraud in a Financial Statement Audit*. [Footnote added, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**.26** The auditor should project the misstatement results of the sample to the items from which the sample was selected.[8,9] There are several acceptable ways to project misstatements from a sample. For example, an auditor may have selected a sample of every twentieth item (50 items) from a population containing one thousand items. If he discovered overstatements of $3,000 in that sample, the auditor could project a $60,000 overstatement by dividing the amount of misstatement in the sample by the fraction of total items from the population included in the sample. The auditor should add that projection to the misstatements discovered in any items examined 100 percent. This total projected misstatement should be compared with the tolerable misstatement for the account balance or class of transactions, and appropriate consideration should be given to sampling risk. If the total projected misstatement is less than tolerable misstatement for the account balance or class of transactions, the auditor should consider the risk that such a result might be obtained even though the true monetary misstatement for the population exceeds tolerable misstatement. For example, if the tolerable misstatement in an account balance of $1 million is $50,000 and the total projected misstatement based on an appropriate sample (see paragraph .23) is $10,000, he may be reasonably assured that there is an acceptably low sampling risk that the true monetary misstatement for the population exceeds tolerable misstatement. On the other hand, if the total projected misstatement is close to the tolerable misstatement, the auditor may conclude that there is an unacceptably high risk that the actual misstatements in the population exceed the tolerable misstatement. An auditor uses professional judgment in making such evaluations.

**.27** In addition to the evaluation of the frequency and amounts of monetary misstatements, consideration should be given to the qualitative aspects of the misstatements. These include (*a*) the nature and cause of misstatements, such as whether they are differences in principle or in application, are errors or are caused by fraud, or are due to misunderstanding of instructions or to carelessness, and (*b*) the possible relationship of the misstatements to other phases of the audit. The discovery of fraud ordinarily requires a broader consideration of possible implications than does the discovery of an error.

**.28** If the sample results suggest that the auditor's planning assumptions were incorrect, he should take appropriate action. For example, if monetary misstatements are discovered in a substantive test of details in amounts or frequency that is greater than is consistent with the assessed levels of inherent and control risk, the auditor should alter his risk assessments. The auditor should also consider whether to modify the other audit tests that were designed based upon the inherent and control risk assessments. For example, a large number of misstatements discovered in confirmation of receivables may indicate the need to reconsider the control risk assessment related to the assertions that impacted the design of substantive tests of sales or cash receipts.

**.29** The auditor should relate the evaluation of the sample to other relevant audit evidence when forming a conclusion about the related account balance or class of transactions.

---

[8]   If the auditor has separated the items subject to sampling into relatively homogeneous groups (see paragraph .22), he separately projects the misstatement results of each group and sums them. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

[9]   See section 316, *Consideration of Fraud in a Financial Statement Audit*, paragraphs .75–.78, for a further discussion of the auditor's consideration of differences between the accounting records and the underlying facts and circumstances. This section provides specific guidance on the auditor's consideration of an audit adjustment that is, or may be, fraud. [Footnote revised, January 2004, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 99. Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

**.30**  Projected misstatement results for all audit sampling applications and all known misstatements from nonsampling applications should be considered in the aggregate along with other relevant audit evidence when the auditor evaluates whether the financial statements taken as a whole may be materially misstated.

# Sampling in Tests of Controls

## Planning Samples

**.31**  When planning a particular audit sample for a test of controls, the auditor should consider

- The relationship of the sample to the objective of the test of controls.
- The maximum rate of deviations from prescribed controls that would support his planned assessed level of control risk.
- The auditor's allowable risk of assessing control risk too low.
- Characteristics of the population, that is, the items comprising the account balance or class of transactions of interest.

**.32**  Sampling applies when the auditor needs to decide whether the rate of deviation from a prescribed procedure is no greater than a tolerable rate, for example in testing a matching process or an approval process. However, risk assessment procedures performed to obtain an understanding of internal control do not involve sampling.[10] Sampling concepts also do not apply for some tests of controls. Tests of automated application controls are generally tested only once or a few times when effective (IT) general controls are present, and thus do not rely on the concepts of risk and tolerable deviation as applied in other sampling procedures. Sampling generally is not applicable to analyses of controls for determining the appropriate segregation of duties or other analyses that do not examine documentary evidence of performance. In addition, sampling may not apply to tests of certain documented controls or to analyses of the effectiveness of security and access controls. Sampling also may not apply to some tests directed toward obtaining audit evidence about the operation of the control environment or the accounting system, for example, inquiry or observation of explanation of variances from budgets when the auditor does not desire to estimate the rate of deviation from the prescribed control, or when examining the actions of those charged with governance[11] for assessing their effectiveness. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**.33**  When designing samples for tests of controls the auditor ordinarily should plan to evaluate operating effectiveness in terms of deviations from prescribed controls, as to either the rate of such deviations or the monetary amount of the related transactions.[12] In this context, pertinent controls are

---

[10]  The auditor often plans to perform tests of controls concurrently with obtaining an understanding of internal control (see section 318.27) for the purpose of estimating the rate of deviation from the prescribed controls, as to either the rate of such deviations or monetary amount of the related transactions. Sampling, as defined in this section, applies to such tests of controls. [Footnote revised, May 2001, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94. Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

[11]  See footnote 4 in section 311, *Planning and Supervision*, for the definition of those charged with governance. [Footnote added, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

[12]  For simplicity the remainder of this section will refer to only the rate of deviations. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

ones that, had they not been included in the design of internal control would have adversely affected the auditor's planned assessed level of control risk. The auditor's overall assessment of control risk for a particular assertion involves combining judgments about the prescribed controls, the deviations from prescribed controls, and the degree of assurance provided by the sample and other tests of controls.

**.34** The auditor should determine the maximum rate of deviations from the prescribed control that he would be willing to accept without altering his planned assessed level of control risk. This is the *tolerable rate*. In determining the tolerable rate, the auditor should consider (*a*) the planned assessed level of control risk, and (*b*) the degree of assurance desired by the audit evidence in the sample. For example, if the auditor plans to assess control risk at a low level, and he desires a high degree of assurance from the audit evidence provided by the sample for tests of controls (i.e., not perform other tests of controls for the assertion), he might decide that a tolerable rate of 5 percent or possibly less would be reasonable. If the auditor either plans to assess control risk at a higher level, or he desires assurance from other tests of controls along with that provided by the sample (such as inquiries of appropriate entity personnel or observation of the application of the policy or procedure), the auditor might decide that a tolerable rate of 10 percent or more is reasonable. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

**.35** In assessing the tolerable rate of deviations, the auditor should consider that, while deviations from pertinent controls increase the risk of material misstatements in the accounting records, such deviations do not necessarily result in misstatements. For example, a recorded disbursement that does not show evidence of required approval may nevertheless be a transaction that is properly authorized and recorded. Deviations would result in misstatements in the accounting records only if the deviations and the misstatements occurred on the same transactions. Deviations from pertinent controls at a given rate ordinarily would be expected to result in misstatements at a lower rate.

**.36** In some situations, the risk of material misstatement for an assertion may be related to a combination of controls. If a combination of two or more controls is necessary to affect the risk of material misstatement for an assertion, those controls should be regarded as a single procedure, and deviations from any controls in combination should be evaluated on that basis.

**.37** Samples taken to test the operating effectiveness of controls are intended to provide a basis for the auditor to conclude whether the controls are being applied as prescribed. When the degree of assurance desired by the audit evidence in the sample is high, the auditor should allow for a low level of sampling risk (that is, the risk of assessing control risk too low). [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.][13]

**.38** To determine the number of items to be selected for a particular sample for a test of controls, the auditor should consider the tolerable rate of deviation from the controls being tested, the likely rate of deviations, and the allowable risk of assessing control risk too low. An auditor applies professional judgment to relate these factors in determining the appropriate sample size.

---

[13]  The auditor who prefers to think of risk levels in quantitative terms might consider, for example, a 5 percent to 10 percent risk of assessing control risk too low. [Footnote renumbered by the issuance of Statement on Auditing Standards No. 111, March 2006.]

## Sample Selection

**.39** Sample items should be selected in such a way that the sample can be expected to be representative of the population. Therefore, all items in the population should have an opportunity to be selected. Random-based selection of items represents one means of obtaining such samples. Ideally, the auditor should use a selection method that has the potential for selecting items from the entire period under audit. Section 318.37 provides guidance applicable to the auditor's use of sampling during interim and remaining periods. [Revised, May 2001, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 94.]

## Performance and Evaluation

**.40** Auditing procedures that are appropriate to achieve the objective of the test of controls should be applied to each sample item. If the auditor is not able to apply the planned audit procedures or appropriate alternative procedures to selected items, he should consider the reasons for this limitation, and he should ordinarily consider those selected items to be deviations from the prescribed policy or procedure for the purpose of evaluating the sample.

**.41** The deviation rate in the sample is the auditor's best estimate of the deviation rate in the population from which it was selected. If the estimated deviation rate is less than the tolerable rate for the population, the auditor should consider the risk that such a result might be obtained even though the true deviation rate for the population exceeds the tolerable rate for the population. For example, if the tolerable rate for a population is 5 percent and no deviations are found in a sample of 60 items, the auditor may conclude that there is an acceptably low sampling risk that the true deviation rate in the population exceeds the tolerable rate of 5 percent. On the other hand, if the sample includes, for example, two or more deviations, the auditor may conclude that there is an unacceptably high sampling risk that the rate of deviations in the population exceeds the tolerable rate of 5 percent. An auditor applies professional judgment in making such an evaluation.

**.42** In addition to the evaluation of the frequency of deviations from pertinent procedures, consideration should be given to the qualitative aspects of the deviations. These include (*a*) the nature and cause of the deviations, such as whether they are due to error or fraud, and (*b*) the possible relationship of the deviations to other phases of the audit. The discovery of fraud ordinarily requires a broader consideration of possible implications than does the discovery of an error. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**.43** If the auditor concludes that the sample results do not support the planned assessed level of control risk for an assertion, he should re-evaluate the nature, timing, and extent of substantive procedures based on a revised consideration of the assessed level of control risk for the relevant financial statement assertions.

## Dual-Purpose Samples

**.44** In some circumstances the auditor may design a sample that will be used for dual purposes: testing the operating effectiveness of an identified control and testing whether the recorded monetary amount of transactions is

correct. [14] In general, an auditor planning to use a dual-purpose sample would have made a preliminary assessment that there is an acceptably low risk that the rate of deviations from the prescribed control in the population exceeds the tolerable rate. For example, an auditor designing a test of control over entries in the voucher register may plan a related substantive procedure at a risk level that anticipates a particular assessed level of control risk. The size of a sample designed for dual purposes should be the larger of the samples that would otherwise have been designed for the two separate purposes. [15] In evaluating such tests, deviations from the prescribed control and monetary misstatements should be evaluated separately using the risk levels applicable for the respective purposes. The absence of monetary misstatements detected in a sample does not necessarily imply that related controls are effective; however, misstatements that the auditor detects by performing substantive procedures should be considered by the auditor as a possible indication of a control failure when assessing the operating effectiveness of related controls. [As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

## Selecting a Sampling Approach

**.45** As discussed in paragraph .04, either a nonstatistical or statistical approach to audit sampling, when properly applied, can provide sufficient audit evidence. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

**.46** Statistical sampling helps the auditor (*a*) to design an efficient sample, (*b*) to measure the sufficiency of the audit evidence obtained, and (*c*) to evaluate the sample results. By using statistical theory, the auditor can quantify sampling risk to assist himself in limiting it to a level he considers acceptable. However, statistical sampling involves additional costs of training auditors, designing individual samples to meet the statistical requirements, and selecting the items to be examined. Because either nonstatistical or statistical sampling can provide sufficient audit evidence, the auditor chooses between them after considering their relative cost and effectiveness in the circumstances. [Revised, March 2006, to reflect conforming changes necessary due to the issuance of Statement on Auditing Standards No. 105.]

## Effective Date

**.47** This section is effective for audits of financial statements for periods ended on or after June 25, 1983. Earlier application is encouraged. [As amended, effective retroactively to June 25, 1982, by Statement on Auditing Standards No. 43.]

---

[14] Section 318, *Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained*, discusses dual-purpose tests in paragraph .33. [Footnote added, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

[15] The test requiring the smaller sample size may be selected as a subset of the larger sample. [Footnote added, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

**The Standards of Field Work**

.48

# Appendix

## Relating the Risk of Incorrect Acceptance for a Substantive Test of Details to Other Sources of Audit Assurance

In Table 1 it is assumed, for illustrative purposes, that the auditor has chosen an audit risk (AR) of 5 percent for an assertion. Table 1 incorporates the premise that internal control cannot be expected to be completely effective in detecting aggregate misstatements equal to tolerable misstatement that might occur. The table also illustrates the fact that the risk level for substantive procedures for particular assertions is not an isolated decision. Rather, it is a direct consequence of the auditor's assessments of the risk of material misstatement (RMM) (combined assessments of inherent and control risks), and judgments about the effectiveness of substantive analytical procedures (AP) and other relevant tests of details (TD), and it cannot be properly considered out of this context.[1]

### Table 1

#### Allowable Risk of Incorrect Acceptance (TD) for Various Assessments of RMM and AP; for AR = .05

| Auditor's subjective assessment of risk of material misstatement. | Auditor's subjective assessment of risk that substantive analytical procedures and other relevant substantive procedures might fail to detect aggregate misstatements equal to tolerable misstatement. | | | |
|---|---|---|---|---|
| *RMM* | *AP* | | | |
| | *10%* | *30%* | *50%* | *100%* |
| | | *TD* | | |
| 10% | * | * | * | 50% |
| 30% | * | 55% | 33% | 16% |
| 50% | * | 33% | 20% | 10% |
| 100% | 50% | 16% | 10% | 5% |

* The allowable level of AR of 5 percent exceeds the product of RMM and AP, and thus, the planned test of details may not be necessary unless specified by regulation or other Standards (e.g., confirmation or inventory observation procedures).

*Note:* The table entries for TD are computed from the illustrated model: TD equals AR/(RMM x AP). For example, for RMM = .50, AP = .30, TD = .05/(.50 x .30) or .33 (equals 33%).

---

[1]  As amended, effective for audits of financial statements for periods ended after September 30, 1983, by Statement on Auditing Standards No. 45. Footnote deleted by the issuance of Statement on Auditing Standards No. 111, March 2006.]

**Audit Sampling**                                               **2079**

## Table 2

### Factors Influencing Sample Sizes for a
### Test of Details in Sample Planning

| *Factor* | *Conditions leading to* | | *Related factor for substantive sample planning* |
|---|---|---|---|
| | *Smaller sample size* | *Larger sample size* | |
| *a.* Assessment of inherent risk. | Low assessed level of inherent risk. | High assessed level of inherent risk. | Allowable risk of incorrect acceptance. |
| *b.* Assessment of control risk. | Low assessed level of control risk. | High assessed level of control risk. | Allowable risk of incorrect acceptance. |
| *c.* Assessment of risk for other substantive procedures related to the same assertion (including substantive analytical procedures and other relevant substantive procedures). | Low assessment of risk associated with other relevant substantive procedures. | High assessment of risk associated with other relevant substantive procedures. | Allowable risk of incorrect acceptance. |
| *d.* Measure of tolerable misstatement for a specific account. | Larger measure of tolerable misstatement. | Smaller measure of tolerable misstatement. | Tolerable misstatement. |
| *e.* Expected size and frequency of misstatements. | Smaller misstatements or lower frequency. | Larger misstatements or higher frequency. | Assessment of population characteristics. |
| *f.* Number of items in the population. | Virtually no effect on sample size unless population is very small. | | |
| *g.* Choice between statistical and nonstatistical sampling | Ordinarily, sample sizes are comparable. | | |

[As amended, effective for audits of financial statements for periods ended after September 30, 1983, by Statement on Auditing Standards No. 45. As amended, effective for audits of financial statements for periods beginning on or after December 15, 2006, by Statement on Auditing Standards No. 111.]

———————————

# EXHIBIT BH-78





This project is co-funded by the Horizon 2020 Framework Programme of the European Union 

Search...    🔍 Search

**Home**   **Checklist**   **FAQ**   **GDPR**   **News & Updates**



# What is GDPR, the EU's new data protection law?

What is the GDPR? Europe's new data privacy and security law includes hundreds of pages' worth of new requirements for organizations around the world. This GDPR overview will help you understand the law and determine what parts of it apply to you.

The General Data Protection Regulation (GDPR) is the toughest privacy and security law in the world. Though it was drafted and passed by the European Union (EU), it imposes obligations onto organizations anywhere, so long as they target or collect data related to people in the EU. The regulation was put into effect on May 25, 2018. The GDPR will levy harsh fines against those who violate its privacy and security standards, with penalties reaching into the tens of millions of euros.

With the GDPR, Europe is signaling its firm stance on data privacy and security at a time when more people are entrusting their personal data with cloud services and breaches are a daily occurrence. The regulation itself is large, far-reaching, and fairly light on specifics, making GDPR compliance a daunting prospect, particularly for small and medium-sized enterprises (SMEs).

We created this website to serve as a resource for SME owners and managers to address specific challenges they may face. While it is not a substitute for legal advice, it may help you to understand where to focus your GDPR compliance efforts. We also offer tips on privacy tools and how to mitigate risks. As the GDPR continues to be interpreted, we'll keep you up to date on evolving best practices.

If you've found this page — "what is the GDPR?" — chances are you're looking for a crash course. Maybe you haven't even found the document itself yet (tip: here's the full regulation). Maybe you don't have time to read the whole thing. This page is for you. In this article, we try to demystify the GDPR and, we hope, make it less overwhelming for SMEs concerned about GDPR compliance.

# History of the GDPR

The right to privacy is part of the 1950 European Convention on Human Rights, which states, "Everyone has the right to respect for his private and family life, his home and his correspondence." From this basis, the European Union has sought to ensure the protection of this right through legislation.

 Facebook   Twitter







Search…

**Home**   **Checklist**   **FAQ**   **GDPR**   **News & Updates**

required to be compliant.

# Scope, penalties, and key definitions

First, if you process the personal data of EU citizens or residents, or you offer goods or services to such people, then **the GDPR applies to you even if you're not in the EU**. We talk more about this in another article.

Second, the **fines for violating the GDPR are very high**. There are two tiers of penalties, which max out at €20 million or 4% of global revenue (whichever is higher), plus data subjects have the right to seek compensation for damages. We also talk more about GDPR fines.

The GDPR defines an array of legal terms at length. Below are some of the most important ones that we refer to in this article:

**Personal data** — Personal data is any information that relates to an individual who can be directly or indirectly identified. Names and email addresses are obviously personal data. Location information, ethnicity, gender, biometric data, religious beliefs, web cookies, and political opinions can also be personal data. Pseudonymous data can also fall under the definition if it's relatively easy to ID someone from it.

**Data processing** — Any action performed on data, whether automated or manual. The examples cited in the text include collecting, recording, organizing, structuring, storing, using, erasing… so basically anything.

**Data subject** — The person whose data is processed. These are your customers or site visitors.

**Data controller** — The person who decides why and how personal data will be processed. If you're an owner or employee in your organization who handles data, this is you.

**Data processor** — A third party that processes personal data on behalf of a data controller. The GDPR has special rules for these individuals and organizations. They could include cloud servers like Tresorit or email service providers like Proton Mail.

# What the GDPR says about…

For the rest of this article, we will briefly explain all the key regulatory points of the GDPR.

## Data protection principles

If you process data, you have to do so according to seven protection and accountability principles outlined in Article 5.1-2:

1. **Lawfulness, fairness and transparency** — Processing must be lawful, fair, and transparent to the data subject.
2. **Purpose limitation** — You must process data for the legitimate purposes specified explicitly to the data subject when you collected it.
3. **Data minimization** — You should collect and process only as much data as absolutely necessary for the purposes specified.
4. **Accuracy** — You must keep personal data accurate and up to date.







Search…

**Home**    **Checklist**    **FAQ**    **GDPR**    **News & Updates**

The GDPR says data controllers have to be able to demonstrate they are GDPR compliant. And this isn't something you can do after the fact: If you think you are compliant with the GDPR but can't show how, then you're not GDPR compliant. Among the ways you can do this:

- Designate data protection responsibilities to your team.
- Maintain detailed documentation of the data you're collecting, how it's used, where it's stored, which employee is responsible for it, etc.
- Train your staff and implement technical and organizational security measures.
- Have Data Processing Agreement contracts in place with third parties you contract to process data for you.
- Appoint a Data Protection Officer (though not all organizations need one — more on that in this article).

## Data security

You're required to handle data securely by implementing "appropriate technical and organizational measures."

Technical measures mean anything from requiring your employees to use **two-factor authentication** on accounts where personal data are stored to contracting with cloud providers that use **end-to-end encryption**.

Organizational measures are things like **staff trainings**, adding a **data privacy policy** to your employee handbook, or **limiting access to personal data** to only those employees in your organization who need it.

If you have a data breach, you have 72 hours to tell the data subjects or face penalties. (This notification requirement may be waived if you use technological safeguards, such as encryption, to render data useless to an attacker.)

## Data protection by design and by default

From now on, everything you do in your organization must, "by design and by default," consider data protection. Practically speaking, this means you must consider the data protection principles in the design of any new product or activity. The GDPR covers this principle in Article 25.

Suppose, for example, you're launching a new app for your company. You have to think about what personal data the app could possibly collect from users, then consider ways to minimize the amount of data and how you will secure it with the latest technology.

## When you're allowed to process data

Article 6 lists the instances in which it's legal to process person data. Don't even think about touching somebody's personal data — don't collect it, don't store it, don't sell it to advertisers — unless you can justify it with one of the following:

1. The data subject gave you specific, **unambiguous consent** to process the data. (e.g. They've opted in to your marketing email list.)
2. Processing is necessary to execute or to prepare **to enter into a contract** to which the data subject is a party. (e.g. You need to do a background check before leasing property to a prospective tenant.)
3. You need to process it **to comply with a legal obligation** of yours. (e.g. You receive an order from the court in your jurisdiction.)
4. You need to process the data **to save somebody's life.** (e.g. Well, you'll probably know when this one applies.)



 

Home     Checklist     FAQ     GDPR     News & Updates

reason, and notify the data subject.

## Consent

There are strict new rules about what constitutes consent from a data subject to process their information.

- Consent must be "freely given, specific, informed and unambiguous."
- Requests for consent must be "clearly distinguishable from the other matters" and presented in "clear and plain language."
- Data subjects can withdraw previously given consent whenever they want, and you have to honor their decision. You can't simply change the legal basis of the processing to one of the other justifications.
- Children under 13 can only give consent with permission from their parent.
- You need to keep documentary evidence of consent.

## Data Protection Officers

Contrary to popular belief, not every data controller or processor needs to appoint a Data Protection Officer (DPO). There are three conditions under which you are required to appoint a DPO:

1. You are a public authority other than a court acting in a judicial capacity.
2. Your core activities require you to monitor people systematically and regularly on a large scale. (e.g. You're Google.)
3. Your core activities are large-scale processing of special categories of data listed under Article 9 of the GDPR or data relating to criminal convictions and offenses mentioned in Article 10. (e.g. You're a medical office.)

You could also choose to designate a DPO even if you aren't required to. There are benefits to having someone in this role. Their basic tasks involve understanding the GDPR and how it applies to the organization, advising people in the organization about their responsibilities, conducting data protection trainings, conducting audits and monitoring GDPR compliance, and serving as a liaison with regulators.

We go in depth about the DPO role in another article.

## People's privacy rights

You are a data controller and/or a data processor. But as a person who uses the Internet, you're also a data subject. The GDPR recognizes a litany of new privacy rights for data subjects, which aim to give individuals more control over the data they loan to organizations. As an organization, it's important to understand these rights to ensure you are GDPR compliant.

Below is a rundown of data subjects' privacy rights:

1. The right to be informed
2. The right of access
3. The right to rectification
4. The right to erasure
5. The right to restrict processing
6. The right to data portability
7. The right to object



This project is co-funded by the Horizon 2020 Framework Programme of the European Union



Facebook   Twitter



Search...

Home   Checklist   FAQ   GDPR   News & Updates

# Leave a Reply

Your email address will not be published. Required fields are marked *

Comment

Name *

Email *

Website

**Post Comment**



**Ben Wolford**
Editor in Chief, GDPR EU

A journalist by training, Ben has reported and covered stories around the world. He joined Proton to help lead the fight for data privacy.

Facebook   Twitter





Search...

**Home**   **Checklist**   **FAQ**   **GDPR**   **News & Updates**

GDPR can be found here. Nothing found in this portal constitutes legal advice.

## Getting Started

What is GDPR?

What are the GDPR Fines?

GDPR Compliance Checklist

## Templates

Data Processing Agreement

Right to Erasure Request Form

Writing a GDPR-compliant privacy notice

## Technical Review

Data Protection Office Guide

GDPR and Email

Does GDPR apply outside of the EU

## About Us

GDPR.eu is co-funded by the Horizon 2020 Framework Programme of the European Union **and operated by Proton AG.**

GDPR Forms and Templates

📄 Data Processing Agreement ›    📄 Right to Erasure Request Form ›    📄 Privacy Policy ›

© 2023 Proton AG. All Rights Reserved.

Terms and Conditions    Privacy Policy

# EXHIBIT BH-79

**NOTICE:** This website uses cookies to collect and process data. Some are required for the operation of our site, others help us to improve the user experience. By using this website, you are agreeing to the placement and use of any cookies, and to the terms of our **Privacy Policy.**

Accept



**FASB** FINANCIAL
ACCOUNTING
STANDARDS BOARD.
Accounting Standards Codification.

Ex. 740-10-25-1   Go To

🔍 Search

General Principles  ›

Presentation  ›

Assets  ›

Liabilities  ›

Equity  ›

Revenue  ›

Expenses  ›

Broad Transactions  ›

Industry  ›

**Master Glossary**

Other Sources  ›

Tools  ›

🔲 Logout

# Master Glossary

Filter for a specific term

Net Income

Reset Filter

N

**Net Income**                                                              ∧

Glossary Term Usage  |  See Topic(s):  205 ,  220

A measure of financial performance resulting from the aggregation of revenues, expenses, gains, and losses that are not items of other comprehensive income. A variety of other terms such as net earnings or earnings may be used to describe net income.

**Net Income** Unitrust                                                      ∨

| 0-9 | A | B | C |
|-----|---|---|---|
| D | E | F | G |
| H | I | J | K |
| L | M | N | O |
| P | Q | R | S |
| T | U | V | W |
| X | Y | Z | |

View All

# EXHIBIT BH-80

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/sec-sues-crypto-exchange-binance-over-u-s-rule-violations-6918ed0f

FINANCE

# SEC Says Binance Misused Customer Funds, Ran Illegal Crypto Exchange in U.S.

## Regulator's lawsuit asks federal judge to freeze company's assets

*By Dave Michaels* [Follow] *, Caitlin Ostroff* [Follow] *and Patricia Kowsmann* [Follow]

Updated June 5, 2023 5:31 pm ET

WASHINGTON—The Securities and Exchange Commission on Monday sued Binance, the world's largest cryptocurrency exchange, alleging the overseas company operated an illegal trading platform in the U.S. and misused customers' funds.

The SEC lawsuit also named Changpeng Zhao, Binance's founder and controlling shareholder, as a defendant. The SEC said that Binance and Zhao misused customers' funds and diverted them to a trading entity that Zhao controlled. That trading firm, Sigma Chain, engaged in manipulative trading that made Binance's volume appear larger than it actually was, the SEC said.

Binance also concealed that it commingled billions of dollars in customer assets and sent them to a third-party, Merit Peak, which was owned by Zhao, the SEC alleged. The Wall Street Journal reported last year that the SEC was examining the relationship between Binance.US, the U.S. arm created in 2019, and Sigma Chain and Merit Peak.

Advertisement - Scroll to Continue

"This will be a landmark case," said Kurt Gottschall, a partner at Haynes and Boone and former head of the SEC's Denver office. "The SEC appears to be very concerned about the commingling of customer funds."

The SEC filed the case in federal court in the District of Columbia. Binance engaged in "blatant disregard of the federal securities laws and the investor and market protections these laws provide," the agency wrote in its court complaint.

The SEC quoted Binance's chief compliance officer as saying in 2018, "we are operating as a fking unlicensed securities exchange in the USA bro."

U.S. regulators have been circling Binance for years, with the SEC and the Justice Department sending subpoenas to its U.S. arm in late 2020, according to documents viewed by the Journal. Officials have ramped up enforcement efforts over the past year, after the collapse of numerous crypto companies, including one of Binance's biggest rivals: FTX.

The lawsuit adds to Binance's challenges with U.S. regulators and law enforcement. The Commodity Futures Trading Commission alleged in March that Binance and Zhao evaded that agency's rules, which cover platforms that offer derivatives to American traders. Binance also faces a Justice Department investigation over its program to detect money laundering, according to people familiar with the matter.

The SEC's court complaint asks a federal judge to freeze Binance's assets and appoint a receiver, typically an outside lawyer or other professional who is given control of the company. The receiver is given the authority to track and preserve users' assets.

Advertisement - Scroll to Continue

The SEC typically seeks receivers in cases that involve fraud, such as Ponzi schemes, or in which regulators don't trust management to run a company in compliance with the law.

The bar for a court ordering an asset freeze and receiver is high, said Marc Fagel, a former director of the SEC's San Francisco office. Regulators must show a court they are likely to succeed in the case and require emergency action to prevent imminent harm to investors. "It would definitely be a challenge for them to get this," Mr. Fagel said.

Binance hasn't had any major outflows of user funds, Patrick Hillmann, Binance's strategy chief, told the Journal.

"Our team is all standing by, ensuring systems are stable, including withdrawals and deposits," Zhao said, referring to the possibility of customers pulling funds.

Advertisement - Scroll to Continue

Binance said it intends to defend its platform and denied allegations that user assets on the Binance.US platform were ever at risk. It had recently been negotiating a settlement with the SEC but the regulator instead chose to sue, it said.

"All user assets on Binance and Binance affiliate platforms, including Binance.US, are safe and secure, and we will vigorously defend against any allegations to the contrary," the company said.

Binance.US also said it would defend itself against the litigation. The SEC suit marks the first federal regulatory suit against Binance's U.S. arm. The CFTC focused on the exchange's global entities.

The SEC also alleged that Binance sold cryptocurrencies, including BNB and BUSD, that should have complied with investor-protection rules. The value of BNB fell more than 7% from the prior 24 hours, according to CoinDesk data. Before the announcement, it was down 2.5%.

Advertisement - Scroll to Continue

Bitcoin, the largest cryptocurrency, fell 4.5% from its level 24 hours earlier to trade near $26,000 apiece. It is seen as a bellwether for digital assets.

Executives for two major market makers, which facilitate buying and selling between crypto firms, said they were seeking ways to reduce exposure to Binance after the lawsuit. Both said such a task was difficult because of Binance's hold over so much crypto trading.

Founded in 2017, Binance quickly grew to be a behemoth in the world of cryptocurrency. As of last month, more than 40% of all crypto trading took place through the exchange, according to data provider CCData. In the past, it has at times controlled more than two-thirds of crypto trading.

Binance's founder, Zhao, is one of the biggest figures in crypto. He is the majority owner of Binance and Binance.US. While Zhao and executives portrayed Binance.US as fully independent, both exchanges were deeply intertwined, mixing staff and finances and sharing an affiliated entity that bought and sold cryptocurrencies, the Journal has reported.

Advertisement - Scroll to Continue

"Until at least the end of 2022, Binance, at Zhao's direction, maintained custody and control of the crypto assets deposited, held, traded, and/or accrued by customers on the Binance.US platform," the SEC said.

Almost all of the employees working on clearing and trade settlement on the Binance.US exchange were based outside the U.S., primarily in Shanghai, the SEC added. The Journal previously reported former Binance.US executives raised concerns about the setup.

As of this month, Binance.US staffers didn't have exclusive control of all Binance.US assets, the SEC said.