UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SECURITIES AND EXCHANGE                 )
COMMISSION,                             )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )        No. 1:23-cv-01599-ABJ-ZMF
                                        )
BINANCE HOLDINGS LIMITED,               )        UNDER SEAL
BAM TRADING SERVICES INC.,              )
BAM MANAGEMENT US HOLDINGS              )
INC., AND CHANGPENG ZHAO,               )
                                        )
            Defendants.                 )
_____ )

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO
COMPEL AND FOR OTHER RELIEF AND OPPOSITION
<u>TO THE BAM DEFENDANTS' MOTION FOR A PROTECTIVE ORDER</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 4

I.      The Proceedings Leading Up To The Consent Order ................................................. 4

II.     The SEC's Efforts to Obtain Discovery Regarding Customer Assets ......................... 5

        A.      The SEC's Requests for Production and Interrogatories ................................. 5

                i.      Discovery concerning crypto asset wallet custody and "Ceffu" ............... 9

                ii.     Discovery concerning BAM's communications ........................................ 13

                iii.    Accounting documents and other financial information........................... 14

                iv.     The SEC's request for inspection............................................................ 16

                v.      BAM's Interrogatory responses .............................................................. 17

        B.      SEC's Notice of Depositions .............................................................................. 19

LEGAL STANDARD ......................................................................................................... 20

ARGUMENT ..................................................................................................................... 22

I.      The Court Should Compel Defendants to Comply With The Consent Order's
        Expedited Discovery Provisions......................................................................................... 22

II.     The Court Should Deny BAM's PO Motion and Allow the SEC to Depose BAM's
        CEO, CFO, and the Additional Witnesses the SEC Identified for Deposition ........ 27

        A.      The SEC Should Be Permitted to Depose BAM's CEO and CFO ................. 27

        B.      The Court Should Deny BAM's Motion for Protective Order as to the
                Number of Depositions and Allow the SEC to Depose Identified Witnesses............ 30

III.    The Court Should Extend the Expedited Discovery Period........................................ 32

CONCLUSION ................................................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Affinity Labs of Tex. v. Apple, Inc.*,
No. C 09-4436 CW JL, 2011 WL 1753982 (N.D. Cal. May 9, 2011)............................. 29

*Athridge v. Aetna Cas. & Sur. Co.*,
184 F.R.D. 181 (D.D.C. 1998)........................................................................................ 21

*Breiterman v. United States Capitol Police*,
324 F.R.D. 24 (D.D.C. 2018)......................................................................................... 21

*Celerity, Inc. v. Ultra Clean Holding, Inc.*,
No. C 05-4374 MMC (JL), 2007 WL 205067 (N.D. Cal. Jan. 25, 2007).................. 29, 30

*English v. Wash. Metro. Area Transit Auth.*,
323 F.R.D. 1 (D.D.C. 2017)........................................................................................... 26

*Moore v. Napolitano*,
723 F. Supp. 2d 167 (D.D.C. 2010) ............................................................................... 24

*Reif v. CNA*,
248 F.R.D. 448 (E.D. Pa. 2008)..................................................................................... 29

*Ronaldson v. Nat'l Assoc. of Home Builders*,
No. 19-01034 CKK/DAR, 2020 WL 3259226 (D.D.C. June 3, 2020)........................... 21

*Salter v. Upjohn Co.*,
593 F.2d 649 (5th Cir. 1979) ......................................................................................... 29

*In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*,
No. MDL 1428(SAS)THK, 2006 WL 1328259 (S.D.N.Y. May 16, 2006) .................... 29

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co., Ltd.*,
242 F.R.D. 1 (D.D.C. 2007).......................................................................... 21, 22, 24

*United States v. Newman*,
531 F. Supp. 3d 181 (D.D.C. 2021) ............................................................................... 30

*Welzel v. Berstein*,
233 F.R.D. 185 (D.D.C. 2005)....................................................................................... 26

*Wilson v. DNC Servs. Corp.*,
831 F. App'x 513 (D.C. Cir. 2020) ............................................................................... 29

**<u>Rules</u>**

Fed. R. Civ. P. 26 .................................................................................................. 21

Fed. R. Civ. P. 33 .................................................................................................. 27

Fed. R. Civ. P. 34 ....................................................................................... 15, 21, 25

## PRELIMINARY STATEMENT

On June 17, 2023, the Court entered a Consent Order (Dkt. No. 71) in which all of the Defendants—including BAM Trading Inc. and BAM Management US Holdings Inc. (together, "BAM")—agreed to provide expedited discovery and other relief relating to the custody, security, and availability of U.S. customer assets and those of BAM itself.  That Consent Order followed the Court's express recognition of the "legitimate concerns, given the offshore nature of some of the defendants and the ease of moving money from place to place, given the overlapping ownership, that something needs to be done."  (*See* "Farer Decl." ¶ 3, Ex. 1, at 79:17-21.)[1]

Critically, the Consent Order required that all Customer Assets—to include all existing and New Private and Administrative Keys relating to BAM's Customer Crypto Assets and root access associated with the Amazon Web Services ("AWS") account(s) for the Binance.US Platform—be solely in BAM's custody and "complete control" in the United States, absent an express exception, and "not be provided to or in any way shared with the Binance Entities." (Dkt. No. 71 at I, II.2.)[2]

More than two months later and despite repeated good faith attempts by the SEC to reach further compromise with BAM, the SEC finds itself essentially where it was when it first sought relief from the Court.  BAM continues to refuse, even in light of the Consent Order, to provide anything beyond extremely limited information to ensure that BAM's Customer Assets are not at the mercy of Defendants Binance Holdings Limited ("Binance") and Changpeng Zhao, two persons who view themselves outside the reach of the Court.  To the contrary, the limited

---

[1] "Farer Decl." refers to the Declaration of Jennifer Farer submitted in further support of the SEC's Motion to Compel and Opposition to the BAM Defendants' Motion for a Protective Order.  Exhibits to the Farer Declaration are hereafter cited as "Ex."

[2] "Customer Assets," "New Private and Administrative Keys," "Customer Crypto Assets," and "Binance Entities" are defined in Sections I and II of the Consent Order.  (Dkt. No. 71.)

discovery BAM has provided to date raises questions about whether Defendants are in violation of the Consent Order because Binance Entities, including a newly rebranded Binance Entity called "Ceffu," appear to have control of Customer Assets through their role in the establishment of wallets and keys shards related to BAM Customer Crypto Assets and control of the AWS environment that hosts the wallet custody software and stores the keys for BAM company and Customer Assets.

Accordingly, while the SEC is mindful of seeking the Court's intervention, immediate production of the requested discovery is essential to determine not only whether Customer Assets are being safeguarded in the manner agreed to by the parties and contemplated by the Court in the Consent Order, but whether it may be appropriate for the SEC to seek an order to show cause why BAM should not be held in contempt of that Order.

Following entry of the Consent Order, the SEC issued discovery requests focused on information sufficient to provide assurances that all customer and BAM assets are properly accounted for, within BAM's exclusive control in the United States, available for withdrawal to satisfy customer liabilities, and not subject to control by Binance Entities.  BAM has produced only approximately 220 documents, many of which relate to reporting otherwise required under the Consent Order, and many that consist of unintelligible screenshots and documents without dates or signatures.  Further, BAM has refused to produce essential witnesses for deposition, instead agreeing only to four depositions of witnesses it has unilaterally deemed appropriate.  It has responded to requests for relevant communications with blanket objections and has refused to produce documents kept in the ordinary course of its business, claiming those documents do not exist, only for the SEC to later receive such documents from other sources.

The circumscribed discovery that BAM has produced to date has not alleviated the concerns that led to the entry of the Consent Order at the outset of this action.  Defendants still cannot credibly explain the continued role of the Binance Entities in the custody and control of BAM's crypto assets and Customer Crypto Assets or provide credible evidence that BAM personnel maintain sole possession, custody, and control of BAM company and Customer Assets in the United States.  BAM, for example, initially refused to provide information concerning Ceffu, claiming such discovery was "unrelated to the current custody and control of Customer Assets," but later admitted that Ceffu had created BAM's new crypto asset cold wallets and New Private and Administrative Keys, and simply referred the SEC to Ceffu to obtain information on how Ceffu created BAM's wallets.  Further, the SEC's recent deposition of BAM's Chief Information Security Officer only increased the SEC's concerns; he testified that Binance itself, not Ceffu, provided BAM's wallet software and created the keys controlling Customer Assets, but he had no knowledge about how the wallets and keys were created, could not identify the Binance personnel with access to the AWS environment that stores and interacts with the private keys for the Binance.US Platform, and confirmed that BAM did not have access to this AWS environment.

Because BAM has refused to provide meaningful discovery regarding the safety and security of customer and BAM assets, and because its conduct has resulted in delay, the SEC respectfully requests that the Court (1) order BAM to produce responsive documents, communications, information, and inspection access, as more fully set forth herein and in the attached Proposed Order; (2) deny BAM's Motion for a Protective Order; and (3) extend the period for expedited discovery to permit BAM 14 days from the Court's order on the pending discovery motions to substantially complete any additional discovery ordered by this Court, and

then an additional 30 days for the SEC to review this discovery and conduct any remaining depositions.

## BACKGROUND

I.     **The Proceedings Leading Up to The Consent Order**

On June 5, 2023, the SEC filed its Complaint, alleging that Defendants violated the federal securities laws through their operation of the Binance.US Platform and the Binance.com Platform.  (Compl., Dkt. No. 1.)  On June 9, 2023, the SEC filed its TRO Motion, presenting evidence of Defendants' unlawful activities and the need for Court intervention to protect the assets of U.S. investors under the control of the Binance Entities.  (Dkt. No. 56.)  The SEC requested, *inter alia*, an asset freeze of BAM's company assets, the repatriation and other specified relief concerning the custody and control of Binance.US Platform "Customer Assets"; expedited discovery; and other related relief.  (*Id.*)  In its TRO Motion and at the subsequent hearing, the SEC presented extensive evidence that the Binance Entities had (1) maintained significant control of the Binance.US Platform since the platform's inception, as well as Binance.US company and Customer Assets; (2) commingled funds from both Binance crypto asset Platforms; and (3) recently moved large amounts of money outside of the United States. (*See id.* at 58-66.)

At the TRO Motion hearing, the Court twice recognized that the evidence demonstrated, "the government's, I think, legitimate concerns*, given the offshore nature of some of the defendants and the ease of moving money from place to place, given the overlapping ownership, that something needs to be done*."  (Ex. 1 at 79:18-21 (emphasis added); *see also id.* at 57:12-15 ("But we do have considerable evidence of offshore transfers and we do have the problem of the individual defendants' ownership of the entities that own BAM Management.").)

The parties ultimately agreed to a Consent Order that requires Defendants to repatriate all Customer Assets and maintain them in the exclusive possession, custody, and control of BAM employees, while allowing customer withdrawals.  (Dkt. No. 71 at II.)  The Consent Order permits BAM to rely upon *non-affiliated* U.S.-based third parties to provide custody and related services for Customer Assets, but prohibits BAM from transferring any of the assets or control thereof to any of the Binance Entities.  (*Id.*)  To further ensure that the Binance Entities do not maintain any control, such as through any copies of the prior Private and Administrative Keys for the wallets holding customer and company assets, the Consent Order requires BAM to establish and transfer Customer Crypto Assets to new wallets, with New Private and Administrative Keys.  (*Id.* at II.2.)  The Consent Order also specifically orders that "[t]hese New Private and Administrative Keys, will not be provided to or in any way shared with the Binance Entities."  (*Id.*)

The Consent Order also contains various reporting and verified accounting provisions regarding customers, accounts, and assets on the Binance.US and Binance.com platforms.  (*Id.* at IV.)  In addition to this reporting, it permits the SEC to conduct expedited discovery, including depositions, interrogatories, and document requests, of BAM's third-party auditors and custodians of assets concerning "Customer Assets and their possession, custody, control, transfer or movement, security, segregation, availability, and any encumbrances that would make them unavailable for transfer or withdrawal by customers . . . ."  (*Id.* at V.1.)

## II.    The SEC's Efforts to Obtain Discovery Regarding Customer Assets

### A.    The SEC's Requests for Production and Interrogatories

On June 23, 2023, the SEC served its First Set of Requests for Production of Documents and Inspection ("RFPs") and First Set of Interrogatories ("Interrogatories") on BAM (Exs. 2, 3.)

In accordance with the scope of discovery permitted under the Consent Order, the SEC sought, among other things, discovery concerning Customer Assets, such as financial account and wallet information; BAM's policies, procedures, and controls relating to Customer Assets; and information concerning the infrastructure, systems, and software relating to Customer Assets, including Binance's and Zhao's involvement as to these core issues.  (*See id.*)  On June 30, the SEC first met and conferred with BAM to discuss the SEC's first set of discovery requests.  (Farer Decl. ¶ 7.)[3]  BAM informed the SEC that it believed the SEC's discovery requests were overbroad and questioned the relevance of historic and other information.  (*Id.*)  BAM stated it would present a proposed discovery plan based on the requests BAM deemed relevant that would prioritize production of information about the current status of Customer Assets and include a proposal to address some of the other issues.  (*Id.*)

At BAM's request, the SEC agreed to extend the response deadline in an effort to work with BAM in good faith and facilitate a substantive production of documents and information.  (Farer Decl. ¶ 8.)

On July 5, BAM served its objections and responses to the RFPs though it did not produce any documents.  (Farer Decl. ¶ 9, Ex. 4.)  From the outset, BAM's primary objection was and has been the burden purportedly imposed by the SEC's discovery requests.  (*See, e.g.*, Exs. 4 at ¶¶ 2-8; 5.)  BAM's relevance objections were in large part limited to whether the SEC is entitled to evidence concerning historical custody and control of Customer Assets.  (*See, e.g.*, Ex. 4 at ¶ 6; Ex. 5 at 3.)  To address its objections, BAM's July 5 letter proposed a "discovery plan" that would divide BAM's document productions in "priority" and "non-priority" items,

---

[3] On June 21, during a discussion concerning issues relevant to the joint status report (*see* Dkt. No. 87), the parties briefly discussed expedited discovery and what the SEC may want in addition to the declarations BAM had filed in support of its opposition to the SEC's TRO Motion.  (Farer Decl. ¶ 6.)

distinguished by whether it determined requests were related "to the current custody and control of Customer Assets." (Ex. 5 at 3.) The SEC has, from the outset, disputed BAM's characterization of any of its discovery requests as unrelated to Customer Assets or not a priority to addressing the concerns the expedited discovery is intended to address. (Farer Decl. ¶ 11.)

On July 7, the parties conducted a meet and confer concerning BAM's objections and responses to the SEC's RFPs and BAM's proposed discovery plan. (Farer Decl. ¶ 12.) The SEC explained that BAM's interrogatory responses and information required under Section IV of the Consent Order did not satisfy BAM's production obligations in response to the RFPs, as BAM proposed. (*Id.*) While the SEC maintained that BAM was required to produce documents in response to all of the SEC's RFPs, the SEC agreed to a rolling production of materials based on the prioritization from BAM's July 5 letter, as expanded during the meet and confer to include, among other materials, the documents in response to Request 18 concerning Ceffu. (*Id.*; *see* Exs. 5, 8.)

On July 13, BAM served its objections and responses to the Interrogatories. (Ex. 6.) It provided some limited information, such as identifying employees involved with Customer Assets and key shard holder information, but it also lodged numerous objections and entirely refused to answer five of the interrogatories. (*Id.*, Interrog. Resp. Nos. 8-12 (objecting without providing a response).)

Over the ensuing nearly two months, the SEC continued to press BAM on outstanding relevant discovery in response to the SEC's RFPs and Interrogatories, while also agreeing in good faith to BAM's multiple requests to extend interim deadlines. (Farer Decl. ¶ 14.) Since then, the SEC has met and conferred with BAM's counsel via telephonic conference and email communications on at least a weekly basis, and on multiple occasions requested that BAM

provide a schedule of remaining productions, noting that a prolonged production schedule would require extension of the expedited discovery period.  (*Id.*; *see, e.g.*, Exs. 7, 8.)

Nonetheless, as of July 24, BAM had only produced approximately 32 documents in response to the RFPs, and 14 documents pursuant to their obligations to provide certain information under Section IV of the Consent Order.  (Farer Decl. ¶ 17.)  During a July 24 meet and confer, the SEC expressed its concerns with BAM's discovery deficiencies as to timing, scope, and format of production, including failure to complete the priority productions promised on July 7.  (*Id.* ¶ 18.)  The SEC stressed the need to understand the relevant systems, software, devices, and operational components, including the need for diagrams and other documents describing the AWS environment, TSS protocol, related protocols, software, and technology. (*Id.*)  BAM represented that it had not been able to identify any such documents, suggesting depositions may be the only method to obtain such information, and the SEC reiterated that, if that was the case, an inspection may be the only option.  (*Id.*)

And as further summarized below, BAM has made several concerning statements regarding its custody and control of Customer Assets, including admitting to the involvement of Binance Entities in creating wallets and key shards relating to BAM's Customer Crypto Assets and maintaining the AWS environment that hosts the wallet custody software.  (*Id.* ¶ 19; Ex. 9.) BAM has also made inconsistent statements about Ceffu's and Binance's involvement in these matters, first claiming that Ceffu was BAM's wallet custody software and services provider (*see* Ex.10), but later stating that Binance is BAM's wallet custody software provider (Farer Decl. ¶ 19).  As more follow explained below, these circumstances reinforce the need for discovery on these topics.

> ### i. *Discovery concerning crypto asset wallet custody and "Ceffu"*

The SEC's RFPs and Interrogatories sought documents concerning BAM's crypto asset wallets, the role of third-party wallet custodians, such as BAM's relationship with, and the services provided by, a company called "Ceffu." (*See, e.g.,* Ex. 2, RFP Nos. 6, 18, & 20; Ex 3, Interrog. Nos. Interrog. Resp. Nos. 15, 17, 22, 23, 24.) The specific request for documents concerning Ceffu was based on a document BAM produced shortly before the SEC filed its TRO Motion that stated that BAM "license[d] wallet custody software and support services from Ceffu (previously Binance Holdings Limited)" and the "Ceffu solution makes up a majority of our wallet technology." (Ex. 10.)

BAM initially sought to defer Ceffu-related discovery as "non-priority," asserting it was "unrelated to the current custody and control of Customer Assets." (Ex. 5.) However, given that BAM's policy identified Ceffu as providing "wallet custody software and support services," during a July 7 meet and confer, the SEC emphasized the need for this discovery, and BAM agreed to prioritize it. (*See* Farer Decl. ¶ 12; Ex. 8.)

BAM finally provided information as to Ceffu in a letter on July 31, addressing the issue in connection with SEC's Interrogatory No. 22 and request for information concerning the creation of the New Private and Administrative Keys and security protocols related to them. (Ex. 11.) BAM admitted it had created new cold wallets, and that Ceffu, a Binance affiliate, played a role in establishing New Private and Administrative Keys. (*Id.*) BAM nevertheless refused to provide any documents about Ceffu's role, stating: "The New Private and Administrative Keys were created in consultation with Ceffu, and BAM submits that inquiries concerning how Ceffu creates wallets should be directed to Ceffu." (*Id.*) In other words, BAM indicated that, contrary to the terms of the Consent Order, it may have entrusted a Binance Entity

with custody and control of its crypto assets and Customer Crypto Assets in violation of the Consent Order—all the while refusing to provide any discovery about this relationship or how the wallets and keys were created to ensure no Binance Entities had custody and control.

Given the admission of Ceffu's involvement, as well as subsequent public information the SEC obtained from Ceffu's website about its third-party wallet custody service offerings and registration with foreign-based Binance affiliates, on August 3, 2023, the SEC raised concerns to BAM regarding Ceffu's role in the custody and control of Customer Assets.  (Farer Decl. ¶¶ 23, 25; Exs. 12, 13.)  The SEC stressed that the Consent Order required the creation of new wallets and private keys to address this very same lack of information about the preexisting wallets created by Binance, and that BAM was prohibited from using a foreign Binance affiliated third-party for wallet custody services.  (Farer Decl. ¶ 23.)

In response, BAM reversed course again.  In an August 4 email, BAM agreed to provide "any documents BAM has that are relevant to the Ceffu role in creating the new wallets for Customer Crypto Assets (as required by Section II.2. of the Consent Order) and we will explain what we understand the process to entail."  (Ex. 14, Aug. 4, 2023 email from J. Adler at 4:17 PM.)  However, the additional information eventually provided only further heightened the SEC's concerns about Binance Entities' control over its Customer Assets.  During a meet and confer that same day, BAM's counsel explained that Binance markets its wallet custody software to third parties as "Ceffu."  (Farer Decl. ¶ 27.)  However, BAM's wallet custody software had not changed—it was the same wallet custody software licensed from Binance under the Software License Agreement.  (*Id.*)  BAM further explained that BAM sometimes internally referred to the wallet custody software solution as "Ceffu," but that BAM's wallet custody software solution predated Binance's commercial offering of "Ceffu" as a third-party wallet custodial solution.

(*Id.*; Ex. 9.)  In other words, BAM suggested that Binance was providing the wallet services—as it had been doing all along.  (Farer Decl. ¶ 27.)

During that same August 4 meet and confer, BAM also agreed to provide additional information about the Wallet Custody Agreement, the roles, responsibilities, and functions set forth in the agreement, and the identification of Binance and other entities and individuals who provide the services, including a detailed chronology with back-up documentation about the evolution of the relationship with Binance through the termination of the agreement.  (Farer Decl. ¶ 28.)  BAM further agreed to explain its position that the Wallet Custody Agreement was purportedly "not operationalized" and therefore did not describe or govern the relationship between BAM and Binance in providing wallet custody software and related services to BAM. (*Id.*; *see also* Ex. 15 (memorializing request).)

In light of BAM agreeing to provide this information, the SEC sent a follow-up email the next day, requesting from BAM specific information that would be responsive to BAM's RFPs concerning Ceffu, Binance.com, and the third-party custodians used by Binance.US for custody and control of BAM and Customer Assets, including relevant infrastructure, system, technology and related security information.  (*See* Ex. 16.)

On August 14, 2023, BAM produced documents in response to the SEC's August 5 request.  (*See* Ex. 9.)  Although BAM's counsel explained on August 4 that BAM was continuing to use Binance software, BAM made a document production on August 14 production in response to the SEC's August 5 request that did not contain any information about Binance's provision of that software service to BAM, as BAM's counsel had represented.  (*Id.*; Farer Decl. ¶ 31.)  Rather, the production included, in relevant part, a security report for a Ceffu predecessor, Block Technologies, and a spreadsheet BAM identified as Ceffu's answers to a questionnaire,

called the "Custody Solution Provider Security Questionnaire," that BAM requires its custody

solution providers to fill out.  (*Id.*)  The questionnaire appears to cover, generally speaking,

policies and procedures related to the security of keys, among other things.  (*Id.*; Exs. 9, 17.)

Notwithstanding this production of additional information relating to Ceffu's

involvement in BAM's wallet custody services, BAM's Chief Security Officer, Erik Kellogg,

testified during his recent deposition that BAM's use of the term "Ceffu" in internal documents

and communications with third-party auditors, as reflected in third-party auditor documents, was

inaccurate, and that BAM should have continued to refer to their wallet software provider as

Binance.  (Farer Decl. ¶ 34.a.)  Further, documents recently produced by BAM's auditor raise

questions about BAM's representations concerning its wallet custody provider.  These

documents refer to a wallet custody solution provided by "Block Technologies," the company

that was rebranded as Ceffu.  (Ex. 18.)  The documents also reflect that Kellogg coordinated a

screenshare for BAM's external auditors access to view security reports for this separate entity,

even though it ultimately turned out that the report did not cover the services the entity provided

to BAM.  (*Id.*)  Kellogg testified during his deposition that he was told by a Binance employee

that the software covered in the security report was the same software that BAM used, but he

was not able to independently verify that.  (Farer Decl. ¶¶ 34.b.)

Even setting aside the confusion over whether it is Binance or Ceffu that is providing

BAM the wallet custody software provider, and despite being responsible for the security of

BAM's crypto assets including Customer Assets, Kellogg testified that he had no independent

knowledge and could not independently verify information he received from Binance concerning

the creation of wallets and keys and related security controls because BAM has no access to the

AWS environment hosting the wallet custody software or the backend of the wallet custody software that was controlled and operated by Binance.  (*Id.* ¶ 34.c.)

Other than this everchanging and contradictory information, BAM has failed to provide any additional information in response to the SEC's repeated requests concerning Ceffu or technical documentation or other evidence related to BAM's infrastructure, systems, security protocols, wallet custody software and the creation, custody, and control of the wallets and private keys.  BAM initially objected to the RFP's overbreadth and otherwise claimed such materials did not exist; however, during his deposition, Kellogg testified about a number of diagrams, summaries, logs, communications, and other records that would provide at least certain technical information that the SEC had requested.  (Farer Decl. ¶¶ 34.d, 35.)  Therefore, it is apparent that BAM has not conducted a reasonable search consistent with its discovery obligations, including for such documents specifically referenced in the Proposed Order.

### ii.  *Discovery concerning BAM's communications*

The RFPs seek BAM's communications concerning Customer Assets and related topics. (*See, e.g.*, Ex. 2, RFP Nos. 1-6, 9, 10, 11, 14, 15, 18-28, 30-33, and 38.)  From the outset, BAM has maintained that the SEC's requests for any "communications" is overly broad despite their relevance to the Consent Order.  (*See* Exs. 4, 5 at 1.)  The SEC has repeatedly attempted to negotiate an acceptable scope to its requests.  For example, on August 2 the SEC proposed as a starting point that BAM produce responsive communications from personnel the SEC noticed for deposition.  (Ex. 19.)  Yet BAM never offered any counterproposal despite almost two months of negotiations and, astonishingly, it has not produced ***any*** of the requested communications.  (*See* Ex. 22.)  Rather, BAM's position has been that the SEC is simply not entitled to such discovery, asserting that "we have repeatedly stated that we believe a communications search in the context

of expedited discovery is inappropriate and unnecessary for your purposes."  (Ex. 22 at Aug. 10, 2023 email from M. Martens at 11:00 AM.)

To the contrary, the requested communications are essential to understanding the status of Customer Assets and to the SEC's efforts to ensure their safety and security.  To illustrate, BAM's external auditor recently produced for the first time several documents and communications between the auditor and BAM personnel that provide insight into various areas relevant to the Consent Order, including representations BAM made to the auditor concerning Ceffu's role in BAM's custodying of Customer Assets.  (*See, e.g.*, Ex. 18.)  For example, BAM's external auditor produced a June 15, 2023 letter in which it raised many of the same questions that the SEC had raised to BAM concerning the role of Binance Entities in the custodying of BAM crypto assets.  (Ex. 20.)  And BAM's external auditor testified that BAM recently responded to that letter on August 18.  (Farer Decl. ¶ 33.a.)  The external auditor, not BAM, has produced the auditor's June 15 letter.  After multiple requests, BAM just produced its August 18 response letter as this opposition was being finalized for filing, underscoring BAM Trading's lack of transparency during this expedited discovery period.  (Farer Decl. ¶ 41.)  The SEC did not even learn of the existence of BAM's auditor's concerns expressed in its June letter until it received the auditor's document production in July 2023, and the SEC did not learn of BAM's August 18 response until the SEC deposed the auditor's representative on August 23.  (*Id.*)  It is therefore clear that BAM has had highly relevant communications relating to the Consent Order that it has failed to produce to the SEC based on its blanket burden objections.

### iii.   Accounting documents and other financial information

In the RFPs and related meet and confer communications, the SEC sought certain BAM accounting documents and financial information relating to Customer Assets including, as relevant here: (1) BAM's general ledgers that tracks deposits, trading, transfers, and

withdrawals; (2) certain bank account opening documents, including for new accounts within the past few months, and documents sufficient to show authorized signatories on key financial accounts; (3) trial balances; detailed monthly financial statements; and (4) documents concerning the reconciliation performed between the accounting ledgers and the newly-created wallet addresses that would show the movement of the customer crypto assets.  (Ex. 2, RFP Nos. 6, 7, 8, 9, 16, 17, 20, 25, 32, 33 39; Ex. 15.)

To date, BAM has failed to produce information responsive to these RFPs.  First, it initially claimed that its production of documents pursuant to Part IV of the Consent Order, including information showing balances of Customer Assets for each Customer as of a mutually agreed date, and a general ledger as of that date was sufficient in evaluating whether BAM maintained sufficient asset.[4]  (*See, e.g.*, Exs 4, 5; Farer Decl. ¶ 42.)  In addition, BAM initially produced only screenshots of certain bank account information (some of which were unintelligible) and information prepared by counsel identifying account balances, owners, and signatories to establish the account balances and authorized owners and signatories for fiat accounts.  (*See, e.g.*, Ex. 21; Farer Decl. ¶ 42.)  But that information is insufficient.  (Farer Decl. ¶ 42.)  During the July 7 and July 24 meet and confers and subsequent communications, the SEC explained it needed more detailed financial information—based on documents or other evidence—and beyond this snapshot in time to evaluate and verify the information provided regarding its fiat and crypto asset holdings, expenses, and accounting and bank statement information and ensure that Binance.US maintains sufficient assets, including such documents and information identified herein.  (*Id.*)  While BAM has since provided certain bank account

---

[4] The SEC is continuing to meet and confer with all Defendants concerning their respective productions pursuant to Section IV of the Consent Order.  The SEC reserves the right to seek further relief from the Court if the parties are unable to resolve these issues.

information and represented it would produce at least some of the other categories of outstanding materials, these requests remain outstanding. (*See, e.g.*, Ex. 22.)  Accordingly, the SEC continues to seek critical financial information from BAM to assess whether it possesses assets to satisfy customer liabilities, and that assets are appropriately controlled by BAM personnel in the United States, as required under the Consent Order.

### iv.   The SEC's request for inspection

Pursuant to Federal Rule of Civil Procedure 34(a)(2), the RFPs sought to inspect BAM's technological infrastructure relating to BAM's holding of Customer Crypto Assets.  (*See* Ex. 2.) BAM objected, claiming, among other things, that an inspection is "administratively infeasible." (Ex. 4, Resp. to RFPs. at 30-31.)

BAM has provided no detail explaining its bare assertion that an inspection to assess its software infrastructure is "administratively infeasible."  Nevertheless, as an attempt to compromise, during the various meet and confers, the SEC requested diagrams and other documents describing the relevant system architecture, infrastructure, systems, software, and protocols, stressing that absent such information, an inspection may be the only option to obtain the information necessary to evaluate the custody and control of Customer Assets.  (Farer Decl. ¶ 43; *see, e.g.*, Exs. 15, 16.)  BAM has responded that no such documents exist and has insisted that Kellogg's deposition would satisfy the SEC's need for discovery on this issue.  (Farer Decl. ¶ 43.)  During Kellogg's recent deposition, however, he confirmed that BAM has diagrams and other documents concerning BAM's technology infrastructure—including components relevant to Customer Assets.  (Farer Decl. ¶ 34.d.)  Indeed, when presented with documents the SEC received from BAM's third-party auditors, Kellogg confirmed the diagrams provided information concerning BAM's technology infrastructure, systems, and software relevant to Customer Assets.  (*Id.* ¶¶ 34.d, 43; Exs 23, 24, 25.)  In addition, throughout the deposition,

Kellogg referred to various searchable logs and communications relevant to the key issues of access and control that have not been produced.  (Farer Decl. ¶ 34.d.)  Kellogg himself could not provide information about the system architecture, systems, and software governing the custody and control of crypto assets, including critical components under Binance's control relating to Customer Assets because the AWS environment that hosts the wallet custody software is held by Binance.com, and nobody from BAM has access to that environment.  (*See* Farer Decl. ¶ 34.c.) Thus, the SEC urgently requires discovery that, to date, BAM has failed to produce, concerning Binance's rights and access to these systems to further evaluate Defendants' compliance with the Consent Order.  The requested inspection should, *inter alia*, everything that is identified, documented, or diagramed in the documents about which Kellogg testified during his deposition. (*See e.g.*, Exs. 23-25.)

> ### v.  BAM's Interrogatory responses

The SEC's interrogatories ask for the following information that is encompassed by within the Consent Order's terms:

- Relevant BAM personnel's prior employment, compensation, or other relationship with the Binance Entities (Interrog. Resp. Nos. 1-4);

- Explanation as to BAM's prior inconsistent representations regarding its Wallet Custody Agreement with Binance (Interrog. Resp. No. 8);

- Information concerning how BAM continues to receive the services set forth in the Wallet Custody Agreement in light of its inconsistent statements about it (Interrog. Resp. No. 9);

- Identify all Documents and Communications Concerning internal or external audits of the BAM Entities' possession, custody, control, transfer or movement, security, segregation, availability, and any encumbrances or limitations to its Customer Assets. (Interrog. Resp. No. 10);

- Information requested relating to the documents and information improperly withheld as discussed above, including information about CEFFU, the wallet custody software and related system architecture, infrastructure, and systems, and concerning the

establishment, control, and operation of the crypto asset wallets (Interrog. Resp. Nos. 15, 17, 22, 23, 24);

- Updated information about current banking partners (Interrog. Resp. Nos. 6, 17);

- Identify and describe in detail any agreement, relationship, affiliation, or association between any of the Binance Entities and any Person with any access, possession, authority, custody, or control of any Customer Assets, fiat or crypto assets of any of the BAM Entities, or any account or wallet holding Customer Assets or the fiat or crypto assets of any of the BAM Entities, including, but not limited to, the extent to which any of the Binance Entities or Zhao has the authority over or the ability to direct or instruct such Persons (Interrog. Resp. No. 15);

- Identify and describe in detail all systems and Persons involved in the management of any accounts, crypto asset wallets, Customer Assets, and fiat or crypto assets of the BAM Entities (Interrog. Resp. No. 17);

- Dates of all individuals' possession, custody, or control of any Private and Administrative Keys or New Private and Administrative Keys (Interrog. Resp. No. 2);

- Information for new wallets created under the Consent Order, including the date created, addresses, specific crypto assets held in each wallet, and holders of the New Private and Administrative Keys (Interrog. Resp. No. 2, 6, 7, 16, 17, 19, 22; Dkt No. 71 at II.2); and

- Information requested concerning crypto asset wallets for company and Customer Assets (Interrog. Resp. No. 22).

To date, BAM has not provided this information.  It has represented it would provide information in response to certain requests but has not yet done so, and, for others, it either objects to the relevance, refers generally to its productions for the information, or represents that it will discuss internally and provide its position.  In addition, the SEC requested that BAM supplement its interrogatory responses with information set forth in various written attorney correspondence and compilations of information.  (*See, e.g.*, Exs. 6, 22.)  BAM agreed it would provide certifications for responses in its July 31 letter, but it has not yet done so, and completely fails to acknowledge other information provided through counsel in its August 14 and other correspondence and productions.  (*See* Ex. 22.)  Over the course of weeks, the SEC has met and

conferred with BAM on numerous occasions, with multiple follow-up communications, pressing

on outstanding discovery, in a vain attempt to reach a compromise as to these issues.  (Farer

Decl. ¶ 47.)  But BAM has failed to respond or supplement its responses to the Interrogatories

even though none of its objections have merit.  (*Id.*)

*        *        *

The SEC has attempted to resolve these and other discovery issues in good faith,

including by agreeing to multiple extensions of BAM's deadlines under the Consent Order.  (*See,

e.g.,* BAM Mot. Extend Deadline Verified Written Accounting, Dkt. 94.)  But BAM still refuses

to produce and provide relevant information.  As of the date of this filing, BAM has only

produced a little over 220 documents.  Many are unintelligible screenshots of bank account

information, documents without dates or signatures, and letters from counsel and tables that

appear to be prepared for purposes of this litigation, without any supporting evidence or

verification by an individual with knowledge confirming the accuracy of the information.[5]

### B.      SEC's Notice of Depositions

In objecting to the SEC's RFPs on July 5, BAM asserted that various requests were

"more appropriate lines of inquiry for depositions," and urged the SEC to "tak[e] advantage of

the availability of witnesses who are best positioned to answer your questions."  (Ex. 11 at 2.)

Accordingly, pursuant to the deadlines set forth in the Consent Order, on August 2, 2023, the

SEC noticed 14 BAM personnel for depositions, including BAM's Chief Executive Office

("CEO") and Chief Financial Officer ("CFO").  (Ex. 19.)  Even though the SEC lacked

significant document and written discovery from BAM, the SEC crafted a list of deponents based

---

[5] As one reference point, in contrast, BAM's external auditor has produced over 6,500
documents that primarily concern BAM's custody and control of its assets, and that included
several documents BAM provided to its auditor but has not produced to the SEC.

the limited discovery the SEC had received that indicated that these deponents were:  (1) BAM personnel who hold "key shards" necessary to control the crypto asset wallets that hold the vast majority of BAM's company and customer assets; (2) involved in the custody of Customer Assets; and/or (3) BAM senior officers with ultimate control of the company's operations.  (*Id.*)

BAM objected to the SEC's deposition notice, unilaterally determining that it would produce only the four witnesses that ***BAM*** deemed most appropriate without explaining why other depositions the SEC noticed were improper.  (Ex. 14 at Aug. 8, 2023 M. Martens email at 5:21 PM.)  In response, the SEC agreed to narrow its initial list of deponents to six individuals and noticed a Rule 30(b)(6) of BAM, while reserving the right to seek relief from the Court for additional depositions.  (Ex. 15 at Aug. 10 J. Murphy email at 7:43 PM.)

At no time did BAM provide specific objections to each of the noticed individuals, not even as to BAM's CEO and CFO during the parties' meet and confer process.  (*See* Exs. 14, 15.) Instead, on August 14, BAM filed a Motion for a Protective Order ("PO Motion"), asking the Court to quash the SEC's request for production of relevant communications, limit the number of depositions to the four individuals that BAM had self-selected—not to include the CEO and CFO—and prevent the SEC from examining these witnesses on certain topics even though they fall within the scope of expedited discovery outlined in the Consent Order.  (Dkt. No. 95.)

As set forth more fully below, the SEC opposes the PO Motion and respectfully moves to compel BAM to produce discovery, and for obtain related relief as further explained below.

## **LEGAL STANDARD**

Under the Federal Rules of Civil Procedure ("Rules"), unless limited by court order, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Relevance

is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on any party's claim or defense." *Ronaldson v. Nat'l Assoc. of Home Builders*, No. 19-01034 CKK/DAR, 2020 WL 3259226, at *4 (D.D.C. June 3, 2020) (internal citation and quotation marks omitted).

If a discovery request is relevant, the burden shifts to the objecting party to demonstrate why it is not permissible; the party must state their objections and reasons with specificity, and state whether responsive materials are being withheld based on that objection.  Fed. R. Civ. P. 34(b)(2)(B), (C); *Athridge v. Aetna Casualty & Surety Co.*, 184 F.R.D. 181, 191 (D.D.C. 1998). Rule 37 permits a party seeking relevant discovery to move to compel discovery from any party who fails to respond to discovery.  *See, e.g.*, *Breiterman v. United States Capitol Police*, 324 F.R.D. 24, 27-28 (D.D.C. 2018).

Similarly, when a party moves for a protective order from discovery, it must demonstrate "good cause" as to why the order is appropriate.  Fed. R. Civ. P. 26(c).  To show good cause, "the movant must articulate specific facts to support its request and cannot rely on speculative conclusory statements." *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 4 (D.D.C. 2007).  Rather, the responding party must show how a discovery request is overly broad or unduly burdensome "by submitting affidavits or offering evidence which reveals the nature of the burden." *Id.* at 10 (internal citation and quotation marks omitted).  Failure to meet these requirements constitutes a waiver of such objections. *Ronaldson*, 2020 WL 3259226 at *5. "In deciding whether or not to grant a protective order, courts typically weigh the burdensomeness to the moving party against the need for, and the relevant of, the information being sought." *Id.*

# ARGUMENT

The Court should grant the SEC's Motion and deny BAM's PO Motion.  BAM has unreasonably and unilaterally sought to limit the Consent Order's expedited discovery provisions, despite its continued failures in making credible assertions about the custody of Customer Assets.  This Court should reject BAM's attempts to deny the SEC the discovery necessary to verify the safety and security of those assets, which are issues that lie at the heart of the Consent Order.

## I.    The Court Should Compel Defendants to Comply With The Consent Order's Expedited Discovery Provisions

Despite the SEC's good faith efforts to agree to a reasonable scope of the discovery sought during the expedited discovery process, BAM has continued to take unreasonable positions that are contrary to the Consent Order's grant of expedited discovery to the SEC.  This Court should grant the SEC's motion to compel as to several areas of discovery.

*First*, this Court should order BAM to conduct a reasonable search for documents regarding Ceffu, the wallet software services BAM uses, and all other Binance affiliates involved in providing such services.  In particular, BAM has been unable to credibly explain its own relationship with Ceffu, including the extent to which it is owned and controlled by Binance or Zhao.  And whether the entity involved is Binance, Ceffu, or another Binance Entity, Defendants' compliance with the Consent Order is in question because the limited information it has produced to date reveals that BAM remains reliant on Binance for the custody of Customer Assets.  Indeed, Kellogg repeatedly equated Binance's role with that of the non-affiliated third-party custodians expressly authorized in the Consent Order – despite the Consent Order's requirement (Section I) that BAM have "complete control" over Customer Assets and can only rely upon non-affiliated third-party custodians located in the United States for wallet custody and

related services.  (*See* Farer Decl. ¶ 34.e.)  Thus, BAM should conduct a reasonable search for responsive documents and communications concerning any Binance Entity, including but not limited to Ceffu, providing wallet custody software and related services and further discovery regarding the technical architecture, infrastructure, systems, software, controls, and access as set forth in the Proposed Order.

*Second*, this Court should order BAM to produce communications (including with its auditor) regarding the custody, control, and availability of Customer Assets.  The SEC has repeatedly offered to confer on a reasonably limited search, most recently offering to limit its request to the noticed deponents concerning the topics responsive to the SEC's Requests relevant topics over a period of months.  (*See* Exs. 14, 15.)  Yet BAM has persisted in claiming that ***any*** such discovery is unwarranted, stating that "we have repeatedly stated that we believe a communications search in the context of expedited discovery is inappropriate and unnecessary for your purposes."  (Ex. 22.)

BAM's position is untenable in any case, let alone here where BAM's limited disclosures have resulted in conflicting accounts of key events, as explained herein and in the TRO Motion. (TRO Mot. at 32-33).[6]  And Kellogg testified about substantial and highly relevant communications that he had with Binance employees about BAM's key shards and wallet custody, further highlighting the need for discovery on the nature and extent of BAM's communications with Binance in this regard.  (Farer Decl. ¶ 34.f.)  Similarly, BAM's external auditor has recently produced and testified to relevant communications regarding wallet custody, including an August 18, 2023 letter from BAM to its external auditor concerning statements that

---

[6] It is also inconsistent with this Court's Order in which it observed it had "already authorized the SEC to engage in the extensive early discovery" pursuant to the Consent Order.  (Dkt. No. 88.)

its auditor has identified as contradicting BAM's previous representations to the SEC and this Court regarding wallet custody.  (Farer Decl. ¶ 31.)   These developments alone require BAM to explain its failure to search for such communications and remedy its failures.  *Moore v. Napolitano*, 723 F. Supp. 2d 167, 173 (D.D.C. 2010) ("Once a plaintiff uncovers such evidence that the defendant failed to search in particular locations or that individual searches conducted by the defendant's agents were inconsistent, it necessarily falls to the defendant, the party with superior knowledge of its own records, to show the reasonableness of its decisions regarding where and how to search for responsive documents.").

BAM's arguments to the contrary are unpersuasive.  BAM makes only vague (and implausible) burden assertions while failing to convey the context of the parties' discussions described above or provide further specificity about the nature of any burden as required. Indeed, other than the August 18 letter produced right before this filing, BAM has not even produced the single letter to its external auditor described above in response to a specific request from the SEC, a request that cannot plausibly be characterized as burdensome.  BAM's general complaint that "complying with the SEC's requests would likely take months or longer and come with significant and unwarranted expense," (BAM Mot. 14), is insufficient and constitutes a waiver of such objection.  *Tequila Centinela, S.A. de C.V.*, 242 F.R.D. 1, at 8 ("the Court only entertains an unduly burdensome objection when the responding party demonstrates how the document is 'overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden") (internal citation and quotation marks omitted).  Accordingly, this Court should order BAM to conduct a reasonable search for communications responsive to its RFPs as further detailed in the attached proposed order.

*Third*, the Court should order BAM to produce accounting documents and other financial information it has so far refused to produce.  BAM has either declined or so far has yet to produce general ledgers as of end of second quarter 2023, bank account opening documents, and documents sufficient to show authorized signatories on the accounts, but they are crucial to testing BAM's assertions that Customer Assets and BAM's assets are safe, secure, appropriately segregated, and ready for immediate customer withdrawal.  BAM has provided nothing but vague and general objections as to why its productions to date, which are wholly insufficient, are appropriate substitutes for this discovery.  For example, BAM produced bank account information in snapshot form, without providing additional documents that reflect the activity in the account over time, which could enable the SEC to further test the sources and uses of BAM's funds.[7]  Further, production of the signatory information would provide critical information concerning who controlled these accounts.

*Fourth*, the Court should order BAM to make its systems and personnel available for inspection so that the SEC may conduct an inspection of BAM's crypto wallet architecture and systems, or at a minimum, as an initial matter, produce diagrams and infrastructure, systems, software, protocols, controls, and access information, including those set forth specifically in the Proposed Order and requested during Kellogg's deposition.  Whether to permit an inspection is within the court's discretion, and "the court must balance the respective interests by weighing the

---

[7] BAM has also continued to refuse to produce discovery pursuant to the SEC's data delivery standards.  (Ex 22.)  This refusal violates Federal Rule of Civil Procedure 34(b)(2)(E) and further demonstrates BAM's unreasonableness.  The documents BAM has produced do not comply with data delivery standards because do not contain relevant accompanying information that would be included in a proper production of electronic documents, such as cover communications or attachments or metadata identifying the source, custodian, file name, date, author, and revision history.  Accordingly, BAM should be ordered to produce (or reproduce) documents consistent with SEC data delivery standards.

degree to which the proposed inspection will aid in the search for truth" against the "burdens and dangers created by the inspection." *Welzel*, 233 F.R.D. at 186 (internal citation and quotation marks omitted). Inspections have been permitted in cases where the location to be inspected relates to the subject matter of the action, but also where information is sought for background or corroboration of witness testimony. *Id.* (and citing cases). Given the questions and inconsistencies raised by BAM's own representations and the testimony of its personnel about the Binance Entities' access to and control of those systems, an inspection is appropriate to permit the SEC to observe the system operating in real time and understand its permissions and controls. BAM has not made any credible argument that such an inspection would impose an unreasonable burden. Further, as discussed herein, when the SEC sought to find alternative discovery methods to get discovery on this issue, such as obtaining diagrams or other documents reflecting how this infrastructure operates, BAM claimed it did not possess such documents, only to have those assertions contradicted by documents produced by its external auditor or in Kellogg's testimony.[8]  Absent at least a complete production of diagrams or other documents and information describing how the infrastructure, systems, software, and protocols governing BAM's company and Customer Assets and the wallet custody software and services provided by a Binance Entity, the requested inspection is warranted.

*Fifth*, this Court should order BAM to supplement its responses to its Interrogatories to provide the information identified in Section II.A.v, above. These topics are appropriate and tailored to the issues ripe for discovery under the Consent Order. Under Rule 33, a "party to

---

[8] BAM also contradicts itself in claiming that further discovery is unnecessary due to the "enormous amount of documents and information concerning BAM's asset custody practices" that BAM produced in the SEC's investigation that preceded the Complaint. (BAM PO Mot. at 8; *see also id.* at 18). Those documents almost exclusively concern BAM's historical practices – which BAM now takes the erroneous position are fully outside the Consent Order's scope.

whom an interrogatory is propounded must provide true, explicit, responsive, complete, and candid answers." *English v. Wash. Metropolitan Area Transit Auth.*, 323 F.R.D. 1, 8 (2017) (citation and internal quotation marks omitted). Where a party provides business records instead of preparing a narrative written response to an interrogatory, the response must specify the records in sufficient detail to enable the interrogating party to locate them and identify them "as readily as the responding party could," and such records must provide a complete response if further narrative response is provided. *Id.* at 18 (internal citation and quotation marks omitted). BAM's responses have fallen short of these basic requirements, failing to provide relevant responses on issues concerning critical issues such as its wallet custody practices, and BAM personnel's prior affiliations with Binance Entities. Nor has BAM and it has offered no reasonable basis for refusing to provide fulsome, verified responses on these relevant issues.

Accordingly, the SEC's Motion to Compel should be granted in its entirety.

## II.   The Court Should Deny BAM's PO Motion and Allow the SEC to Depose BAM's CEO, CFO, and the Additional Witnesses the SEC Identified for Deposition

BAM moves for a protective order to limit the SEC's ability to take depositions beyond the four BAM witnesses that BAM offered, and to prohibit the SEC from deposing BAM's current CEO, Brian Shroder, and CFO, Jasmine Lee. The Court should deny BAM's PO Motion.

### A.   The SEC Should Be Permitted to Depose BAM's CEO and CFO

The SEC alleges that Binance and Zhao created BAM to operate the Binance.US Platform as part of their broader scheme to evade U.S. regulatory oversight while profiting off of U.S. capital markets. (Compl. ¶¶ 143-208.) As part of that plan, Binance and Zhao controlled BAM, including the custody of Customer Assets. (*Id.*) BAM's first two CEOs failed in their attempts to get more independence from Binance and Zhao. In fact, in August 2021, BAM's second CEO (named as "BAM CEO B" in the Complaint) decided to quit because Zhao "was the

CEO of BAM Trading, not me." (*Id.* ¶ 205.)  Among the issues BAM CEO B sought to remedy that Zhao refused was BAM's reliance on Binance for its custodying of crypto assets. (*Id.* ¶ 203-204.)  The Consent Order is premised primarily on concerns, as this Court twice acknowledged at the hearing, about Zhao's and Binance's continuing influence over BAM.  (Ex. 1 at 57:12-15; 79:18-21.)

BAM's current CEO succeeded BAM CEO B.  Its current CFO appears to have joined BAM in 2022.  The SEC has very limited information concerning whether BAM has gained more independence since that time.  But if it did, it would mark a watershed moment in BAM's operations and control of customer assets that would have been driven and witnessed by company executives at the highest levels.  If there are documents that show such a dramatic development, BAM has not provided them.  If BAM finally took full control of its operations and its Customer Assets, as BAM now claims, Shroder had to have had a key role in these issues, and as CFO, Lee had to have a role, and could verify or discredit BAM's claimed independence from Binance and Zhao.  These facts alone demonstrate that the SEC is entitled to the depositions of the BAM CEO and CFO to understand the extent to which they are controlled by Binance and Zhao as their predecessors were (which is relevant to, among other things, who is really in control of BAM customer assets), and BAM has not identified any alternatives to address these questions.

In fact, even the very limited evidence the SEC has received to date shows that Shroder and Lee have extensive firsthand and unique knowledge on the issue of BAM's control and handling of Customer Assets.  Examples include:

- Internal auditor notes of a February 2023 meeting between Shroder and BAM's external auditor reveal that Shroder was knowledgeable about whether BAM "shared employees" with Binance, Zhao's role in the company, and how BAM custodying its crypto assets, (Ex. 26.)

- In June 2023, BAM's external auditor wrote Lee a letter raising questions about BAM's representations to the SEC and this Court concerning Binance's role in the company's wallet custody practices, including questioning contrary representations that Shroder previously made.  (Ex. 20.)

- Shroder and Lee have negotiated and signed many of the key custodial agreements, and are the only signatories on some of the key customer fiat accounts.  (Exs. 27-29.)

- BAM itself identified Lee as a relevant witness on the issue of customer assets.  (Ex. 30.)[9]

BAM also argues that Shroder's and Lee's depositions should be precluded in light of the "apex" doctrine as applied to high-ranking corporate individuals.  The cases they cite, however, all involve circumstances where the noticing party failed to show the deponent's unique knowledge of the relevant issues, which is not the case here.[10]  BAM further cites cases

---

[9]  In opposition, BAM claims that "[t]he SEC has not explained why deposing BAM's CEO and CFO would be within the relevant scope of the Consent Order," (PO Mot. at 16), yet it fails to inform the Court that, at no time during the meet-and-confer process did BAM even ask the SEC for the basis for seeking these depositions.  Rather, BAM's counsel never mentioned these witnesses by name for two weeks after receiving the notices, and only accepted service for them the day before they filed their motion.  (*See* Ex. 15.)

[10] *See Wilson v. DNC Servs. Corp.*, 831 F. App'x 513, 515 (D.C. Cir. 2020) (denying a second deposition to ask questions the plaintiff intentionally declined to ask, for strategic reasons, in the initial deposition); *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374, 2007 WL 205067, at *5 (N.D. Cal. Jan. 25, 2007) (ordering that executives not be deposed until the completion of other discovery because plaintiffs failed to show executives "possess firsthand and non-repetitive knowledge," citing authority that "[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error.") (*quoting Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979)); *Reif v. CNA*, 248 F.R.D. 448, 454 (E.D. Pa. 2008) (denying without prejudice motion to compel CEO deposition in age discrimination suit pending further discovery, where plaintiff  failed to show CEO had any role in or unique knowledge about termination); *Affinity Labs of Texas v. Apple, Inc.*, No. C 09-4436 CW JL, 2011 WL 1753982, at *16 (N.D. Cal. May 9, 2011) (denying plaintiff's motion to compel Steve Jobs's deposition in a patent infringement suit where plaintiff  "does not even try to contend that Mr. Jobs has any knowledge of [plaintiff], its patents, the inventors of those patents, or infringement by Apple products."); *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, No. MDL 1428, 2006 WL 1328259, at *10 (S.D.N.Y. May 16, 2006) (noting that certain courts' disfavor of senior executive depositions applies where the executive does not have "personal knowledge of relevant facts or some unique knowledge that is relevant to the action.").

regarding an entirely different test applied to depositions of senior government officials, willfully ignoring that the "apex doctrine" referred to in those cases requires a showing of "extraordinary circumstances" based on policy concerns inapplicable here. *See United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (discussing the concerns underlying the "apex doctrine" applied to senior government officials, including the need to protect the "integrity and independence of the government's decision-making processes."). BAM's cited cases show that to the extent an "extraordinary circumstances" standard applies in this context, it is a showing **BAM** must make in arguing why the depositions should not be permitted. *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374, 2007 WL 205067, at *5 (N.D. Cal. Jan. 25, 2007) ("[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error.") (quotation omitted).

Accordingly, BAM fails to demonstrate good cause to grant a protective order concerning the SEC's noticed depositions of Shroder and Lee.

### B. The Court Should Deny BAM's Motion for Protective Order as to the Number of Depositions and Allow the SEC to Depose Identified Witnesses

BAM further seeks a protective order "limiting the SEC to four depositions of BAM employees." PO Mot. at 2. The Court should reject BAM's position and allow the SEC to take the depositions necessary to address the relevant issues under the Consent Order.

Specifically, the SEC asks that the Court to deny BAM's PO Motion and compel BAM to produce for deposition the witnesses identified in Exhibit 31, that contains a description of the relevance of each witness.[11] Each of these witnesses is critical to the issues that are at the core of expedited discovery, including BAM's compliance with the Consent Order. For example,

---

[11] The SEC filed Exhibit 31 under seal given the security issues associated with the identification of shard holders.

BAM's current and former wallet key shard holders are of critical importance to the custody and control of crypto assets totaling over $2 billion, and Defendants have failed to provide any appropriate basis for their objection to the deposition of more than one shard holder.  They have not and cannot explain how one shard holder could speak to the other shard holders' experience, including security of the device that holds the shard and signing to approve transactions, the relationship with or any level of control by Defendants Binance or Zhao, and their respective compliance with the requirements of the Consent Order.  All of this information—which is unique to each individual shard holder—is necessary to confirm that the assets truly are within the custody and control of BAM personnel in the United States and are being handled appropriately.  Further, the SEC seeks depositions of key employees who work on BAM's "Clearing" and "Treasury" teams, who are involved in the custody and transfer of Customer Assets, to test whether BAM's processes comply with the Consent Order, including whether Binance and Zhao have any influence or control over those operations.[12]

        BAM's response is that the four witnesses it identified should suffice, and that the SEC should not be permitted anything more given the evidence BAM claims it already produced. (Dkt. No. 95 at 5-9.)  As explained above, however, BAM's compliance with the expedited discovery process has been woefully inadequate, and raises substantial questions about BAM's custody and control of Customer Assets, including whether it is currently in violation of the Consent Order.  Thus, the SEC should be permitted to take depositions of BAM personnel that it believes warranted.  BAM cites no authority to the contrary.

---

[12] The SEC has also issued deposition notices to Binance and Zhao but has agreed to continue to meet and confer as to those depositions (along with other discovery requests) until the discovery disputes between the SEC and BAM now before the Court are resolved. In addition, the SEC reserves its right, under the Consent Order, to seek the depositions of other witnesses as it obtains additional discovery from any of the Defendants.

The SEC therefore respectfully requests that this Court deny BAM's PO Motion to permit the SEC to depose the list of witnesses identified in Exhibit 31.[13]

## III.    The Court Should Extend the Expedited Discovery Period

Pursuant to Rule 6(b), the court may for good cause extend the time in which an act must be done "with or without motion or notice if the court acts, or if the request is made, before the original time or its extension expires." Here, there is good cause to extend the expedited discovery period. Despite the SEC's diligence in attempting to obtain the relevant discovery, including engaging in weeks of discussions with BAM to resolve numerous outstanding issues, BAM's stonewalling and consistent delays necessitate an extension of time to complete outstanding discovery. Notwithstanding the additional time the SEC has agreed to extend BAM as to almost every deadline under the Consent Order, when the SEC has reiterated that these extensions will likely necessitate an extension of the expedited discovery period, and the inordinate amount of time the SEC has spent following up on outstanding requests, BAM has

---

[13] Given BAM's numerous discovery failures as described herein, the SEC has discussed whether BAM and the other Defendants would agree to extent the 90-day time period for expedited discovery pursuant to Paragraph V.1 of the Consent Order. BAM has informed SEC counsel that it opposes any time extension. The SEC, Binance, and Zhao have separately agreed to an extension of the expedited discovery period as to those two Defendants. Specifically, the SEC, Binance, and Zhao have agreed to suspend the 45-day discovery period as to those two Defendants (Consent Order V.1) and begin a 45-day discovery period the day after either (1) the Court enters an order denying the SEC's motion to compel and granting BAM's motion for protective order or (2) the date upon which the Court orders BAM to comply with the SEC's discovery requests. During that suspended time period, the SEC agrees it will not serve any additional discovery requests on Binance or Zhao, but the parties agree to meet and confer in good faith on Binance's and Zhao's objections to all discovery and deposition notices issued to date. Further, Binance and Zhao will continue collecting documents and information during the suspended time period, such that, on the first day the 45-day discovery period begins as set forth above, Binance and Zhao will begin producing documents in response to the SEC's document requests, serve responses to the SEC's interrogatories, and be prepared to set dates for depositions, or, alternatively, file a motion for protective order. Further, the SEC, Binance, and Zhao have reserved the right to move the Court on additional discovery motions concerning any discovery disputes that become ripe after the 45-day period resumes.

been wholly delinquent in satisfying its discovery obligations under the Consent Order and the Federal Rules.

Thus, the SEC respectfully requests that if the Court grants the SEC's Motion in whole or in part, that it 1) require the production of any additional discovery be substantially completed within 14 days of its order, and 2) extend the expedited discovery period as to BAM for a period of 30 days beyond the date that BAM confirms it has substantially completed its document productions consistent with the Court's Order.[14]  This extended period strikes the appropriate balance in providing sufficient time to resolve outstanding issues while aligning as much as possible to the scope and timing of expedited discovery under the Consent Order.

## **CONCLUSION**

For these reasons, the Court should grant the SEC's Motion, deny the BAM Defendants' Motion for Protective Order, and order the other relief the SEC seeks in accordance with the Proposed Order attached hereto.

Dated:  August 28, 2023                    Respectfully submitted,

/s/Jennifer L. Farer
Matthew Scarlato (D.C. Bar No. 484124)
Jennifer L. Farer (D.C. Bar No. 1013915)
J. Emmett Murphy
David A. Nasse (D.C. Bar No. 1002567)
Jorge G. Tenreiro
SECURITIES AND EXCHANGE COMMISSION
(202) 551-5072 (Farer)
farerj@sec.gov

*Attorneys for Plaintiff*

---

[14] If the SEC disagrees that BAM has substantially completed its production, the SEC reserves the right to raise the issue with the Court if the parties cannot resolve the issue themselves.