# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION**,**<br><br>              Plaintiff,<br><br>   v.<br><br>BINANCE HOLDINGS LIMITED, et al.,<br><br>           Defendants. | Civil Action No. 1:23-cv-01599-ABJ |

### DEFENDANTS BAM TRADING SERVICES INC. AND BAM MANAGEMENT US HOLDINGS INC.'S OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION TO COMPEL AND REPLY IN FURTHER SUPPORT OF BAM DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .....................................................................................................................5

    1.    BAM Has Fully Explained Its Custody Practices. ...................................................5

    2.    BAM Was Entirely Transparent That BHL Would Continue to Be Involved in Providing Wallet Custody Software After Entry of the Consent Order. .................8

    3.    The SEC's Other Concerns Are Unfounded. ........................................................10

APPLICABLE LAW ..............................................................................................................11

ARGUMENT ........................................................................................................................11

    1.    The SEC's Requests for Production and Interrogatories Are Overly Broad, Unduly Burdensome, and Beyond the Scope of the Consent Order ....................12

    2.    The SEC's Demand for Certainty Is Unreasonable. ..............................................17

    3.    The SEC's Requests for the Depositions of Six BAM Witnesses—Including BAM'S CEO and CFO—Are Overly Broad, Unduly Burdensome, and Beyond the Scope of the Consent Order ........................................................................18

        a.    The SEC's Requests for the Depositions of BAM's CEO and CFO Are Unreasonable ................................................................................................18

        b.    The SEC's Requests for Depositions Are Overbroad and Unduly Burdensome .................................................................................................20

CONCLUSION .....................................................................................................................21

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*United States v. All Assets Held at Bank Julius Baer & Co, Ltd.*,
   202 F. Supp. 3d 1 (D.D.C. 2016) ............................................................14

*Attkisson v. Holder*,
   113 F. Supp. 3d 156 (D.D.C. 2015) ...................................................11, 20

*Celerity, Inc. v. Ultra Clean Holding, Inc.*,
   2007 WL 205067 (N.D. Cal. Jan. 25, 2007) ......................................18, 19

*Cobell v. Norton*,
   226 F.R.D. 67 (D.D.C. 2005) ..................................................................11

*Crutchfield v. City of New Orleans*,
   2017 WL 4812408 (E.D. La. Oct. 25, 2017) ...........................................14

*Gen. Star Indem. Co. v. Platinum Indem. Ltd.*,
   210 F.R.D. 80 (S.D.N.Y. 2002) ...............................................................19

*MCI Commc'ns Servs., LLC v. Core Commc'ns, Inc.*,
   2022 WL 18028102 (Bankr. D.D.C. Dec. 30, 2022) ...............................16

*In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*,
   2023 WL 2467738 (D.D.C. Mar. 7, 2023)................................................14

*Pederson v. Preston*,
   250 F.R.D. 61 (D.D.C. 2008).....................................................................20

*Regail Brand All., Inc. v. Factory Mut. Ins. Co.*,
   2008 WL 622810 (S.D.N.Y. Mar. 7, 2008) .............................................18

*Reif v. CNA*,
   248 F.R.D. 448 (E.D. Pa. 2008)................................................................18

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)..............................................................................5, 11, 12

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("SEC") repeatedly acknowledged to this Court at the June 13, 2023 hearing that, after a multi-year investigation, it has no evidence that BAM customer assets have been dissipated, commingled, or misused in *any* way.  Dkt. 74-2 at 33:1–6; 44:22–45:9 (June 13, 2023 Hearing Tr.).  That has not changed despite four months of expedited discovery on the question.  Since the June 13 hearing, Defendants BAM Trading Services Inc. ("BAM Trading") and BAM Management US Holdings Inc. ("BAM Management," collectively with BAM Trading, "BAM"), have submitted a verified accounting demonstrating that all customer assets are fully accounted for.  In addition, BAM has produced over 5,000 pages of documentary discovery, answered 19 interrogatories, and made multiple employees available for depositions, including its Chief Information Security Officer ("CISO").  And, as required by the Consent Order, BAM confirmed in writing that it would maintain custody and control of its customers' assets during the pendency of this case; would not transfer any assets to Defendants Binance Holdings Limited ("BHL"), Changpeng Zhao, or their affiliates; and that it would maintain exclusive control over all Private and Administrative Keys related to its customer assets through personnel in the United States.  BAM's compliance with these provisions of the Consent Order were supported by signed confirmations by BHL and Mr. Zhao that they did not have control over any Private and Administrative Keys associated with BAM's customer assets.  Dkt. 95-5 (Kellogg Certification); Dkt. 95-7 (Second Kellogg Certification); Exs. 5 (Wad Confirmation), 6 (Zhao Confirmation).

Simply put, even after all of the discovery already produced by BAM during the expedited discovery period, the SEC still has no evidence to support its unsubstantiated allegations that imply investor assets have been somehow diverted.  Nonetheless, the SEC insists on being granted leave to continue its futile fishing expedition.  Instead of focusing on the "*limited*" issues permitted by

the Consent Order—namely, to confirm customer assets were safe and accounted for—the SEC has continued to seek ever-expanding discovery over all aspects of BAM's current and historical custody policies, procedures, and practices, including noticing over a dozen depositions and issuing expansive demands for electronic communications.  See Dkt. 71 at 9 (Consent Order) (emphasis added).

The misleading and mistaken allegations that form the basis of the SEC's cross-motion to compel and opposition to BAM's motion for a protective order highlight the complete disconnect between the SEC's overbroad and abusive approach and the limited expedited discovery to which the SEC agreed in the Consent Order.  For example, the SEC devotes several pages of its brief to arguing that BAM "cannot credibly explain the continued role of the Binance Entities in the custody and control of BAM's crypto assets."  Dkt. 102-4 at 2–4 (Plaintiff SEC's Memorandum in Support of its Motion to Compel and For Other Relief and Opposition to the BAM Defendants' Motion for a Protective Order).  The SEC's entire basis for this assertion is that there was some confusion regarding the ***name*** of the BHL wallet custody software and the fact that that BHL, in its role as the provider of that software, was involved in creating certain new wallets that BAM established ***pursuant*** to the Consent Order.  As BAM has explained, this software license support does not mean that BHL had custody of any customer assets; on the contrary, BAM continues to have the sole authority to access or control the assets maintained in its instance of the BHL wallet custody software.

Further, as BAM has also explained, including in a presentation to the SEC in March 2023 as well as in filings with this Court, it relies on wallet custody software developed by BHL to maintain the digital asset wallets that hold much of its customers' assets.  Beville Decl. ¶ 3. [1]

---

[1]    "Beville Decl." refers to the Declaration of Matthew Beville submitted in further support of BAM's motion, and "Ex." refers to the exhibits thereto.

Throughout BAM's history, it has referred to that software generically as the "BHL wallet custody software."  Accordingly, when BAM learned that BHL was planning to market the software commercially under the name "Ceffu," it adopted the name as a shorthand reference to the software, including in correspondence with the SEC.  █████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████  In other words, the SEC's purported concerns about "Ceffu" are much ado about nothing.  However, the SEC continues to demand documents explaining BAM's relationship with Ceffu.

Further, the SEC now expresses shock that BHL "provides BAM's wallet software" and was involved in creating certain new wallets for BAM.  This concern is not reasonable.  Since at least March 2023, BAM has repeatedly informed the SEC that it relies on the BHL's wallet custody software, and the parties expressly contemplated that BAM would continue to do so after the entry of the Consent Order.  As counsel for BAM explained, while BAM did not believe that creating new wallets was necessary, it would agree to transition to new wallets to assuage the SEC's concerns with the explicit understanding that BAM would continue to rely on the BHL wallet custody software and that, as a result, BHL would need to be involved in the process.

Respectfully, it is difficult to believe the SEC did not understand these aspects of BAM's custody arrangement and failed to appreciate that arrangement until now.  But, more importantly, none of the SEC's "concerns" suggest that BAM's customer assets are at risk of loss or dissipation.

All the evidence in this matter—including documents, declarations, and sworn deposition testimony—supports BAM's position that it has custody and control of its digital assets.

It should be considered that this is not a case about the custody and safety of BAM's customer assets.  Indeed, there is no allegation that any customer assets have been misappropriated. It is also not a case about whether BAM uses software or services provided by BHL or other persons or entities located outside the United States.  There is no requirement under the law that BAM or any other business entity—including those regulated by the SEC—rely solely on domestically sourced software and services in conducting their business activities.  Moreover, the SEC's "concerns" about a particular subject do not provide a basis for discovery of matters that are not relevant to the subject of its claims or reasonably calculated to lead to evidence relevant to those claims.

Nevertheless, BAM remains willing to provide the SEC the information that it reasonably needs to confirm that BAM's customer assets are safe and secure.  Indeed, it has done so. Immediately after the Consent Order was entered in June, BAM asked that the SEC staff prioritize its deposition of Mr. Kellogg because it believed that meeting with him would both address the SEC's concerns and would otherwise help narrow the SEC's discovery requests.  Beville Decl. ¶ 7.  The SEC declined and continued to insist that BAM respond to its overly broad document requests in full.  Dkt. 102-12 (July 13, 2023 Electronic Mail), 102-13 (July 19, 2023 Electronic Mail).  When the SEC finally did depose Mr. Kellogg on August 24, the staff was able to articulate much more specific requests for information, which BAM readily agreed to provide in whole or in part.  Beville Decl. ¶ 12.

However, BAM is not willing to subject itself to an endless fishing expedition that goes well beyond the scope of the Consent Order.  The Federal Rules of Civil Procedure limit discovery

when its burden outweighs its benefit.  *See* Fed. R. Civ. P. 26(b)(1).  The expedited discovery pursuant to the Consent Order here has exhausted that limit.  Instead of using the expedited discovery process to narrowly confirm that BAM's customer assets are safe and secure, the SEC is instead using the opportunity to manufacture issues and unfairly suggest in public filings that BAM's assets are not secure despite the agency's continued inability to identify any fact or any actual evidence to support those concerns.  And this follows both a multi-year investigation as well as additional discovery pursuant to the Consent Order.  The reality is that today, just as was the case at the Temporary Restraining Order ("TRO") hearing, the staff had no evidence of the dissipation or misappropriation of customer assets but remains "concerned."  Now, after repatriation of the shards and the entry of this Court's Order prohibiting any transfer of assets to the affiliated defendants, and with no indication whatsoever that BAM has in any way violated the Court's Order, the SEC seeks open-ended "expedited discovery" that goes beyond what the Court's Order and the Federal Rules of Civil Procedure allow for.

## BACKGROUND

### 1.    BAM Has Fully Explained Its Custody Practices.

In connection with the SEC's investigation, BAM provided several detailed overviews of its custody practices and responded to a number of specific questions posed by the SEC Staff.  *See* Exs. 1 (May 25, 2023 Letter), 2 (May 26, 2023 Letter), 3 (June 1, 2023 Letter), 4 (June 2, 2023 Letter).  These summaries have since been supplemented by sworn statements from BAM personnel:  BAM's CISO submitted a sworn declaration in connection with BAM's opposition to the SEC's motion for a TRO and more recently provided extensive deposition testimony regarding the safety and security of BAM's customer assets.

These summaries explained the material details over how BAM maintains custody and control of its user assets.  As relevant to this submission, the sworn evidence described that:

- BAM maintains custody of most customer assets using wallet custody software developed by and licensed from BHL.  Dkt. 42 ¶ 29 (Declaration of Erik Kellogg in Support of BAM's Opposition to SEC's Motion for TRO ("Kellogg Decl.")).

- This wallet custody software has three types of wallets: (i) customer-specific deposit wallets; (ii) omnibus hot wallets; and (iii) omnibus storage wallets, also known as "cold" wallets.  Kellogg Decl. ¶ 30.

- The wallet custody software runs on servers in an Amazon Web Services ("AWS") datacenter in northern Virginia.  The AWS account was established by BHL on behalf of BAM Trading.  Kellogg Decl. ¶ 30(a).

- Transfers from BAM's hot wallets and deposit wallets are controlled by BAM's PNK system.  While the software underlying PNK was originally developed by BHL, BAM Trading is now solely responsible for managing its use of PNK, without the involvement of BHL.  No BHL personnel have access or authority to initiate or approve transfers from BAM Trading's hot and deposit wallets.  Kellogg Decl. ¶ 30(b)(i), 31(a)-(b), 32(b).

- Transfers from BAM's cold wallets are controlled by seven key shards, four of which must approve any crypto asset movement.  At the time Mr. Kellogg's declaration was submitted, BAM held four key shards, which meant that any transfer from BAM Trading's cold wallets would require the approval of at least one BAM Trading personnel.  Since that date, BAM obtained control over all seven key shards.  Kellogg Decl. ¶ 33(a)(i).

- Because BAM maintains control over the means to transfer assets, BHL does not have access to, or control over, BAM's customer assets, even though it provides the software

6

used to maintain the digital asset wallets holding those assets.   Kellogg Decl. ¶¶ 30(a)(ii); 30(b); 33.

Taken together, these disclosures made clear that BAM's custody practices relied on software licensed from BHL and maintained in a BHL-owned AWS environment, but that BAM itself had custody of the underlying assets because it ultimately controlled the associated private keys.  These descriptions are not ambiguous and BHL's role as a software provider was never obscured or minimized.

During the SEC's investigation and subsequent negotiations over the Consent Order, BAM occasionally referred to the wallet custody software as "Ceffu."  For most of its existence, BAM had only referred to the wallet custody software generically.  *See* Ex. 7 at 171:1–172:21 (Kellogg Tr.).  ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██

While BAM referred to the BHL software as "Ceffu," it never suggested that it licensed software from any entity other than BHL.  BAM has been clear that it relies on wallet custody software licensed from BHL in all its correspondence with the SEC and submissions to this Court.

*See, e.g.*, Kellogg Decl. ¶ 29; Dkt. 102-14 at 3 ("As previously explained during our August 4, 2023 meet and confer, the wallet custody software developed by BHL is marketed to third parties as 'Ceffu.' BAM licenses the BHL wallet custody software from BHL pursuant to a licensing agreement that predates the commercial offering of "Ceffu" as a third-party custodial solution."). Counsel for BAM has also repeatedly explained that references to Ceffu were solely due to confusion of the correct terminology to use for the otherwise unbranded software. And, contrary to the SEC's suggestion that BAM misled its auditors about the entity that provided its wallet custody software, documents introduced by the SEC at Mr. Kellogg's deposition indicate that BAM expressly told its auditors that in "February 2023, Binance.com changed the name of their suite of Wallet Services Platform from Binance Custody to CEFFU," but that "while Binance.com changed the name of the services for which they offered, there is no change to any of the service functionality, and has no material impact to the services licensed by [BAM]."[2]  Dkt. 102-28 at FGMK_SEC_005000 (Binance.US Infrastructure Overview Memo).

2.    **BAM Was Entirely Transparent That BHL Would Continue to Be Involved in Providing Wallet Custody Software After Entry of the Consent Order.**

The SEC cannot plausibly claim that it was unaware that BAM relied on the BHL wallet custody software to maintain most of its customers assets. As noted above, BAM has been entirely transparent that its custody practices rely heavily on the wallet custody software licensed from BHL. Exs. 1 (May 25, 2023 Letter), 2 (May 26, 2023 Letter), 3 (June 1, 2023 Letter), 4 (June 2,

---

[2] ███████████████████████████████████████████████
██████████████████████████████████ ████████████████
████████████ █████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████

2023 Letter).  BAM was equally clear that, notwithstanding the use of BHL software, it maintains custody over its customers' assets because it ultimately controls the associated private keys.  Exs. 1 (May 25, 2023 Letter), 2 (May 26, 2023 Letter), 3 (June 1, 2023 Letter), 4 (June 2, 2023 Letter).

Nor can the SEC claim that it was unaware that BAM would continue to rely on the wallet custody software after the entry of the Consent Order.  During its negotiations over the Consent Order, including in a call on June 12, 2023 and August 3, 2023, BAM was explicit that it would continue using the BHL wallet custody software and that there was no way to transition its wallets to another provider in a timely or cost-effective manner.  Beville Decl. ¶ 5.  To address this practical necessity, the parties agreed to several provisions that were expressly designed to give the SEC comfort that BAM maintained custody of its customers' assets, while continuing to use the BHL software:

*First*, the Consent Order required BHL to transfer its key shards to BAM and to "delete or destroy" any "existing copies" of any private keys that could be used to control BAM's customer assets.  Dkt. 71 at 3 (Consent Order).  This provision only makes sense if BAM were continuing to use the same wallets that existed prior to the entry of the Consent Order—the wallets that BAM had made clear were maintained in the BHL wallet custody software.

*Second*, the Consent Order required BAM to "begin to establish new wallets" within 14 days that would be controlled by new private keys "in the sole possession, custody, and control of BAM Trading officers and employees who are located in the United States."  Dkt. 71 at 3-4 (Consent Order).  Beyond beginning the project within 14 days, the requirement is not subject to a deadline.  This provision was drafted after the SEC raised a concern that BHL could have, at some unknown point in the past, copied the private keys associated with BAM's existing wallets. While BAM believed this concern was unfounded, it agreed to create new wallets within the BHL

9

software, under the conditions imposed by the Consent Order, to ensure that BHL did not have any unknown ability to access BAM's customer assets.

### 3. The SEC's Other Concerns Are Unfounded.

Beyond these two specific concerns, the SEC's submission raises a number of more generalized allegations about BAM's purportedly limited visibility into certain proprietary and technical aspects of the BHL wallet custody software, largely based on misleading citations to Mr. Kellogg's testimony. For example, the SEC alleges that Mr. Kellogg "testified that he had no independent knowledge and could not independently verify information he received from Binance concerning the creation of wallets and keys and related security controls because BAM has no access to the AWS environment hosting the wallet custody software or the backend of the wallet custody software that was controlled and operated by Binance." Mot. at 12–13.

These selective citations misstate Mr. Kellogg's position. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Far from conceding a lack of

---

[3] ████████████████████████████████████████████████

████████████████████████ ███████████████████████████████

████████████████████████████████████

independent knowledge, Mr. Kellogg testified that he had responsibly conducted diligence on the BHL wallet custody software and achieved a level of comfort that was appropriate for a third-party software solution.

Other than the SEC's suggestions that something untoward must be going on, there is neither any evidence nor any indication that critical information relative to the security of customer assets is somehow being hidden or obfuscated or, more importantly, that assets can be or have been diverted. BHL manages the wallet custody software, but only BAM personnel can access or direct the transfer of assets from the platform. And this Court's order would make any contrary conduct by any of the parties to this action punishable by contempt.

## APPLICABLE LAW

Rule 26(b)(1) permits discovery only of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Whereas the requested information typically must pertain to "the nature of the claims that the parties have asserted," *Cobell v. Norton*, 226 F.R.D. 67, 79 (D.D.C. 2005), the standard for expedited discovery is far stricter, *see Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015). Expedited discovery is intended to be "limited in scope to requesting specific records or information" that bear on a particular issue and the burden for the defendants to comply with expedited discovery should be "low, such as responding to only one or a few discovery requests." *Id.* at 162, 165.

## ARGUMENT

The "limited" purposes of this expedited discovery is addressed to matters "concerning the Customer Assets [(as defined by the Consent Order, Dkt. 71)] and their possession, custody, control, transfer or movement, security segregation, availability and any encumbrances or

limitations . . . [that might make them unavailable]." Dkt. 71 at 9 (Consent Order) (authorizing "limited expedited discovery"). Nevertheless, in response to expedited discovery, BAM provided a sworn accounting, produced over 241 documents (totaling 5,063 pages), and offered to make four witnesses available for deposition. This information has been in addition to the information BAM provided the SEC over its multi-year investigation preceding the filing of this action, which uncovered no evidence of misappropriation of client assets. Nonetheless, the SEC seeks to compel BAM to produce numerous additional categories of documents (without regard to whether such documents actually exist), supplement its prior responses to interrogatories, make its servers and software available for an inspection, and make numerous company witnesses (including BAM's CEO and CFO) available for depositions. The Court should grant BAM's motion for a protective order and deny the SEC's motion to compel for the following reasons set forth below.

1.    **The SEC's Requests for Production and Interrogatories Are Overly Broad, Unduly Burdensome, and Beyond the Scope of the Consent Order.**

BAM has fulfilled its written discovery and production obligations under Rule 26(b)(1) because BAM has identified and produced, subject to its objections, all documents in its possession, custody, and control regarding third-party wallet custodians that it was able to identify through a reasonable search. Moreover, several of the categories of documents that the SEC is seeking are documents that BAM has already produced or agreed to produce following a reasonable search (*e.g.*, bank account information) or that do not exist (*e.g.*, information about Ceffu). Anything more, including communication searches in the context of expedited discovery following the SEC's years-long investigation, are overly broad and unduly burdensome.

*First*, the SEC seeks to compel documents and interrogatory responses concerning BAM's crypto asset wallets and the role of third-party vendors, including BHL and Bitgo. Mot. at 9–13, 22–23; *see, e.g.*, Dkt. 102-9 at RFP Nos. 6, 18, & 20 (BAM's Responses and Objections to

12

Plaintiff's First Set of Requests for the Production of Documents and Inspection); Dkt. 102-11 at Interrog. Nos. 15, 17, 22–24 (BAM's Responses and Objections to Plaintiff's First Set of Interrogatories).  As an initial matter, BAM has produced numerous documents that it was able to identify through a reasonable search related to the BHL wallet custody software and other third-party custody solutions including System and Organization Controls ("SOC") reports, information Security management ("ISO") System certifications, and security questionnaires that BAM used to conduct diligence.

The SEC now argues a conflict between these documents, BAM's meet-and-confer correspondence, and Mr. Kellogg's testimony regarding BAM's "relationship with Ceffu" warrant the production of additional documents.  Mot. at 9–13, 22–23.  But, as explained above, these explanations are not "everchanging" nor "contradictory."  They present a straightforward and consistent explanation for how BAM uses wallet custody software licensed from BHL, muddled only by an understandable misuse of a brand name.  Despite these explanations ███████████ ████████████████████████████████████████████████████████████████ ██████ the SEC continues to demand some unspecified universe of documents that would explain Ceffu's role in BAM's custody practices.  No such documents exist because, as explained above and in Mr. Kellogg's sworn testimony, BAM does not have a relationship with Ceffu.  From BAM's perspective, it was just a name or brand that has occasionally been used to refer to software that BAM has consistently and accurately described as owned and maintained by BHL.[4]

Similarly, the SEC's purported surprise at BHL's involvement in the creation of BAM's new cold wallets rings hollow.   The SEC's current position that BHL's involvement in creating

---

[4]        This also explains BAM's position that discovery related to Ceffu was "non-priority."  As reflected in Exhibit 5 to BAM's Motion for a Protective Order (Dkt. 95-6), but not cited by the SEC, BAM agreed that documents related to the "Custody of Customer Assets" and the "Security of Customer Assets" were "priority productions."  Information about Ceffu was not because Ceffu was not involved in the custody or security of BAM's customer assets.

BAM's new cold wallets raises concerns under the Consent Order is, candidly, inexplicable. BAM and the SEC negotiated with the Consent Order with the express understanding that BAM would continue using the BHL wallet custody software. The fact that BHL, as the software vendor, had some role in generating the new wallets should be unsurprising and uncontroversial, as long as BAM continues to have the exclusive ability to control the associated private keys—which the certifications submitted by BAM, BHL, and Mr. Zhao confirm is the case.

Regardless, BAM has identified and produced all non-privileged documents in its possession, custody, and control regarding third-party wallet custody solutions that it was able to identify after a reasonable search. ████████████████████████████████ ████████████████████████████████

*Second*, the SEC's requests for "[a]ll documents and communications" concerning Customer Assets and related topics (Mot. at 13–14, 17, 23–24; *see, e.g.*, Dkt. 102-9 at RFP Nos. 1–6, 9–11, 14–15, 18–28, 30–33, 38) are "overbroad on their face and exceed the bounds of fair discovery." *In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 2023 WL 2467738, at *4 (D.D.C. Mar. 7, 2023); *see also United States v. All Assets Held at Bank Julius Baer & Co, Ltd.*, 202 F. Supp. 3d 1, 4–5 (D.D.C. 2016) (request to search for and produce "all" communications about a topic "would be 'very time-consuming, extremely burdensome, and unlikely to lead to the discovery of admissible, probative evidence.'"). This is especially true of communication searches in the context of expedited discovery following the SEC's years-long investigation and the fact that BAM has provided a sworn accounting. *Crutchfield v. City of New Orleans*, 2017 WL 4812408, at *2 (E.D. La. Oct. 25, 2017) (recognizing "[e]xpedited discovery is not the norm" and "the proposed discovery [in this context] must be narrowly tailored in scope to seek only necessary information). That BAM's external auditor produced a June 15, 2023 letter that BAM did not

14

produce is not evidence that BAM has failed to produce responsive documents.  To the contrary, BAM understood that its external auditor had already produced its entire audit file to the SEC and therefore BAM prioritized (and produced ahead of the letter) numerous policies concerning customer assets and provided narrative responses to the SEC's follow-up questions concerning those policies.  Further, it is clear from BAM's production of its August 18, 2023 letter to the auditors that, when the SEC expressed a specific interest, BAM re-prioritized its productions to quickly satisfy its latest request.  Beville Decl. ¶ 12; Ex. 8 (August 28, 2023 Letter).

*Third*, the SEC also seeks to compel BAM accounting documents and financial information relating to Customer Assets, including BAM's general ledgers, certain bank account opening documents, trial balances, detailed monthly financial statements, and documents concerning the reconciliation performed between the accounting ledgers and the newly-created wallet addresses. Mot. at 14–16, 25; s*ee, e.g.*, Dkt. 102-9 at RFP Nos. 6–9, 16, 17, 20, 25, 32–33 39 (BAM's Responses and Objections to Plaintiff's First Set of Requests for the Production of Documents and Inspection).  As the SEC concedes, Mot. at 15–16, BAM has already produced bank account information that it was able to identify through a reasonable search and agreed to produce additional categories of documents that demonstrate it possesses assets sufficient to satisfy customer liabilities and that those assets are controlled by BAM personnel in the United States.[5] The SEC takes issue with the fact that BAM "initially produced . . . screenshots" regarding bank accounts and authorized signatories on the accounts (which BAM did in the spirit of producing documents to the SEC as quickly as possible), Mot. at 15, but BAM has since provided more

---

[5]      The SEC belabors the point that BAM should be ordered to produce and reproduce documents consistent with the SEC's heightened data delivery standards.  The SEC cannot simultaneously complain about the rate in which they are receiving material and attempt to impose additional impediments to accelerating that rate.  In any event, BAM has supplied the SEC with the relevant information wherever possible, including identifying the revision history by reproducing a PDF as a Word document with tracked changes.  *See* Dkt. 102-16 (July 31, 2023 Letter).

detailed documents for almost all of these screenshots. BAM has also produced additional responsive documents regarding bank opening and authorization, which identified current and former BAM personnel who have (or had during the relevant period) authorization to initiate and/or approve transactions or are signatories for BAM's bank accounts and payment processors. Beville Decl. ¶ 10.

*Fourth*, the SEC seeks to inspect BAM's "technological infrastructure" relating to BAM's holding of Customer Crypto Assets. Mot. at 16–17, 25–26; *see* Dkt. 102-9 at 30 (BAM's Responses and Objections to Plaintiff's First Set of Requests for the Production of Documents and Inspection). Specifically, the SEC requested BAM produce "diagrams and other documents describing the relevant system architecture, infrastructure, systems, software, and protocols." Mot. at 16. To the extent these documents do not exist, this request falls outside the scope of discovery (and even further outside the scope of expedited discovery) and is overly burdensome. *MCI Commc'ns Servs., LLC v. Core Commc'ns, Inc.*, 2022 WL 18028102, at *5 (Bankr. D.D.C. Dec. 30, 2022) ("A request may be overly burdensome if it directs the party to create documents that do not exist."). Insofar as the SEC alleges Mr. Kellogg referred to "various searchable logs and communications" regarding access and control, BAM has already produced (and will continue to produce) any existing documents referenced by Mr. Kellogg in BAM's possession, custody, and control following a reasonable search. *See, e.g.*, Beville Decl. ¶ 12; Ex. 8 (August 28, 2023 Letter).

*Finally*, the SEC seeks to compel BAM to supplement its responses to fourteen interrogatories. Mot. at 17–19, 26–27; *see* Interrogatories Nos. 1–4, 6–10, 15, 17, 22, 23, 24. BAM is in the process of supplementing its responses to the SEC's interrogatories and therefore this request is moot and no relief is needed.

2.      **The SEC's Demand for Certainty Is Unreasonable.**

Apart from these specific requests, the SEC's Motion is peppered with suggestions that BAM should not be able to rely on software provided by BHL—or presumably any other party—if there exists even some theoretical risk that the vendor could inappropriately access information stored on the system (or, worse, access the assets controlled by the software) through some means known or unknown. The implication of this position is breathtaking. It is common practice across the financial industry to rely on third party software providers and take all appropriate measures to ensure the system provided both works and is secure. Indeed, the SEC's implied concerns about the BHL software could just as easily be articulated against BAM's internet provider, or any other number of third-parties through which sensitive information is passed. And, in any event, there is no indication any such inappropriate access has occurred.

Indeed, BAM understands that its level of visibility into and control over the BHL software is higher than provided by other third-party custody solutions. But the SEC's position would prohibit BAM or other market participants from relying on third-party software unless it has access to the underlying source code, the datacenter in which the software is run, and the ability to independently audit every representation made by that third-party vendor.

These theoretical risks are not a legitimate reason to seek discovery and they are particularly inappropriate here. Unlike normal-course software licensing agreements, BAM, BHL, and Mr. Zhao are all subject to the Consent Order, which subjects to this Court's jurisdiction and requires them to ensure that BAM maintains custody and control over its customer assets. Indeed, pursuant to this Consent Order, BHL and Mr. Zhao have confirmed in writing that they do not have custody or control over the private keys for BAM's customer assets. Dkt. 95-5 (Kellogg Certification); Dkt. 95-7 (Second Kellogg Certification); Exs. 5 (Wad Confirmation), 6 (Zhao

17

Confirmation).  Given these assurances, and the Court's continued supervision of this matter, the SEC's extreme position should not be taken seriously.

   3.   **The SEC's Requests for the Depositions of Six BAM Witnesses—Including BAM'S CEO and CFO—Are Overly Broad, Unduly Burdensome, and Beyond the Scope of the Consent Order**

The SEC insists that BAM must make at least six more witnesses available for depositions—including BAM's CEO and CFO.  These deposition requests are overly broad, unduly burdensome, and beyond the scope of the Consent Order.

      a.   **The SEC's Requests for the Depositions of BAM's CEO and CFO Are Unreasonable**

The SEC argues that evidence BAM has produced to date shows that its Chief Executive Officer Brian Shroder and Chief Financial Officer Jasmine Lee possess "extensive firsthand and unique knowledge on the issue of BAM's control and handling of Customer Assets."  Mot. at 28 (listing four examples purportedly evidencing unique knowledge).  And the SEC dismisses the extensive case law supporting BAM's position that Mr. Shroder and Ms. Lee are protected from being deposed by the apex deposition doctrine, arguing in conclusory fashion that the present case does not "involve circumstances where the noticing party failed to show the deponent's unique knowledge of the relevant issues."  *Id.* at 29.

Courts regularly preclude depositions of senior corporate officials when other witnesses are better positioned to testify on the topics.[6]  *See, e.g., Regail Brand All., Inc. v. Factory Mut. Ins. Co.*, 2008 WL 622810, at *5 (S.D.N.Y. Mar. 7, 2008) ("Unless it can be demonstrated that a

_____

[6]      The modern trend among federal courts—the "apex doctrine"—acknowledges the tremendous potential for abuse and harassment in noticing the depositions of officers at the highest level of corporate management.  *See Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (collecting cases); *Reif v. CNA*, 248 F.R.D. 448, 451–53 (E.D. Pa. 2008) (collecting cases).  As noted in prior briefing, BAM is not aware of courts in this District applying the doctrine to non-government executives.  *See* Mot. for Protective Order at 15, n.2. The SEC argues that BAM "willfully ignore[es] that the 'apex doctrine' … requires a showing of 'extraordinary circumstances.'"  Mot. at 29–30.  BAM strongly disagrees that it "willfully ignore[ed]" anything by articulating the two-prong apex doctrine test applied to requesting parties seeking to depose highest-ranking corporate officials.

corporate official has 'some unique knowledge' of these issues in this case, 'it may be appropriate to preclude a deposition of a highly-placed executive' while allowing other witnesses with the same knowledge to be questioned."); *Gen. Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002) (protective order appropriate when party seeking deposition of executives "had not yet attempted to obtain information from lower level executives").

  The SEC has failed to show that Shroder and Lee have *unique* knowledge of the relevant issues.  The SEC argues that Shroder and Lee possess unique information because they "are the only signatories on some of the key customer fiat accounts."  *Id.*  However, the SEC's motion does not identify any evidence that Shroder and Lee are involved in the day-to-day management details concerning the custody and transfer of customer assets or that they have any unique knowledge concerning those issues.  *See Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) ("Where a high-level decision maker 'removed from the daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper.").

  BAM's CEO and CFO have no unique knowledge regarding facts relevant to the limited topics identified in the Consent Order's expedited discovery provision, and BAM has offered numerous other witnesses that can provide the same information, with greater detail and familiarity.  These witnesses include: (i) Mr. Erik Kellogg, BAM's Chief Information Security Officer; (ii) Ms. Sara Sisenwein, BAM's Senior Director of Treasury Operations; and (iii) Tao Zhang, the leader of BAM's Asset Clearance Team.  Both Mr. Kellogg and Ms. Sisenwein submitted detailed declarations related to the custody and security of customer assets.  Dkt. 42 (Kellogg Decl.), 44 (Sisenwein Decl.).

The SEC has still not articulated why depositions of BAM's CEO and CFO fall within the scope of the Consent Order. *See* Dkt. 95 at 16, 19–20 (BAM's Motion for a Protective Order at 16, 19–20 ("Mot. for Protective Order")). The burden imposed by these depositions far outweighs their potential benefit, and the discovery sought is disproportionate to the needs contemplated by the Consent Order.

### b.   The SEC's Requests for Depositions Are Overbroad and Unduly Burdensome

The SEC has consistently refused to tailor its discovery requests to the topics at issue under the Consent Order—*i.e.,* confirmation that BAM's customer assets are safe, secure, and sufficient to cover any customer claims or liabilities Consent Order.  The SEC's request for six depositions, including those of the CEO and CFO, are not proportional to the needs of the case.

Courts routinely preclude voluminous discovery requests unmoored to the actual issues in the litigation. *See Pederson v. Preston*, 250 F.R.D. 61, 66 (D.D.C. 2008). This is especially true with regard to expedited discovery. *See Attkisson*, 113 F. Supp. 3d at 162. Rather than tailoring discovery to the limited scope provided for by the Consent Order, the SEC seeks overbroad and far-ranging discovery that would subject BAM to inordinate expense.[7]

Even if this Court permits the depositions of BAM's CEO and CFO, this Court should grant BAM's request for a protective order to ensure that the SEC's depositions relate to the topics at issue under the Consent Order, and not wide-ranging, unrelated topics getting to the merits of this case.  BAM has consistently taken the position that the SEC is not entitled to conduct freewheeling discovery of BAM's historical asset custody practices, which have nothing to do with

---

[7]    The SEC argues, without support, that the noticed topics "fall within the scope of expedited discovery outlined in the Consent Order." *See* Mot. at 20. The SEC also seemingly faults BAM for not "ask[ing] the SEC for the basis for seeking these depositions." *Id.* at 29, n.9. As detailed throughout this motion, the SEC is authorized to conduct "limited expedited discovery" to assuage the SEC's unfounded concern that customer assets might be dissipated. BAM has repeatedly offered depositions of senior employees with direct responsibility over and deep knowledge of the relevant concerns—the security, custody, and transfer of customer assets.

either the merits of this case or whether customer assets are presently secure.  The SEC is not permitted to use depositions pursuant to the Consent Order to conduct merits discovery.

## **CONCLUSION**

For the foregoing reasons, the Court should enter BAM's Proposed Protective Order and deny the SEC's Motion to Compel.

Dated:  September 11, 2023

Respectfully submitted,

*/s/ William R. McLucas*
William R. McLucas (*pro hac vice*)
Matthew T. Martens (D.C. Bar #1019099)
Matthew Beville (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
William.McLucas@wilmerhale.com
Matthew.Beville@wilmerhale.com
Matthew.Martens@wilmerhale.com

Tiffany J. Smith (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tiffany.Smith@wilmerhale.com

*/s/ George S. Canellos*
George S. Canellos (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
GCanellos@milbank.com
MLaroche@milbank.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc.*

21