**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

            v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS INC.,
AND CHANGPENG ZHAO,

                    Defendants.

**No. 1:23-cv-01599-ABJ-ZMF**

**DEFENDANTS BAM TRADING SERVICES INC. AND
BAM MANAGEMENT US HOLDINGS INC.'S
<u>MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

    A.    The Digital Assets Traded on BAM's Platform ................................................. 5

    B.    BAM's Staking Program ...................................................................................... 8

    C.    The Role of Sigma Chain .................................................................................... 9

    D.    The SEC's Claims ................................................................................................ 9

LEGAL STANDARD........................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.     The SEC Has Not Plausibly Alleged Securities Transactions Involving The Digital Assets. ............................................................................................................... 11

    A.    An Investment Contract Must Involve Contractual Undertakings By a Seller to Deliver Future Value or Profits................................................................................ 12

    B.    The SEC's Allegations Fall Far Short of Alleging Investment Contracts. ........... 16

          1.    The SEC Misunderstands the Meaning of "Scheme" in Howey. ............. 16

          2.    The SEC is Wrong that Digital Assets Are Investment Contracts in Perpetuity. ................................................................................................. 20

          3.    The SEC's Reliance On Initial Coin Offering Cases is Misplaced. ......... 25

    C.    The SEC's Theory of an Investment Contract has Unbounded Application. ....... 27

    D.    The SEC Cannot Regulate Digital Assets As Securities Under the Major Questions Doctrine................................................................................................ 31

II.    The SEC has Not plausibly Alleged that BAM's staking service constitutes an unregistered security. ..................................................................................................... 32

    A.    The Complaint Fails to Allege That BAM's Staking Customers Make an "Investment of Money."........................................................................................... 32

          1.    There Is No Allegation That Staking Customers Purchase Anything. ..... 32

          2.    The Complaint Does Not Allege That Staking Customers Face a Risk of Loss as a Result of Their Participation in the Staking Program. ............. 33

    B.    The Complaint Fails to Allege That BAM's Staking Rewards Represent Profits Derived From BAM's Managerial Efforts............................................................... 35

III.    The SEC Has Failed to Plausibly Allege a Section 17(a) Claim. ................................... 36

    A.    The Complaint Does Not Plead a Claim Under Section 17(a) as It Relates to Crypto Currency Customers. ................................................................................. 36

    B.    The Complaint Does Not Plead a Claim Under Section 17(a) as It Relates to Equity Investors in BAM. ..................................................................................... 37

1.     The Complaint Does Not Adequately Plead That Reported Trade Volumes on BAM's Platform Were Inflated by Manipulative Wash Trading or Material to Equity Investors ..................................................................... 37

2.     The Complaint Does Not Plead That BAM Made Material Misrepresentations About Its Trade Surveillance Program. ..................... 41

CONCLUSION ............................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................40

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)............................................................................31

*Brink v. Raymond James & Assocs., Inc.*,
892 F.3d 1142 (11th Cir. 2018) ..............................................................37

*Coburn v. Evercore Tr. Co., N.A.*,
844 F.3d 965 (D.C. Cir. 2016) ...............................................................10

*Fabrinet USA, Inc. v. Micatu, Inc.*,
2020 WL 3414657 (N.D. Cal. June 22, 2020) ........................................24

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................................31

*Flannery v. SEC*,
810 F.3d 1 (1st Cir. 2015).......................................................................45

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985)...............................................................22, 33

*George v. McDonough*,
142 S. Ct. 1953 (2022)............................................................................12

*Gomez v. Leonzo*,
788 F. Supp. 604 (D.D.C. 1992)..............................................................15

*Harris v. Corr. Corp. of Am.*,
796 F. Supp. 2d 7 (D.D.C. 2011).............................................................25

*Harris v. Republic Airlines, Inc.*,
1988 WL 56256 (D.D.C. May 19, 1988)..................................................15

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) ................................................................22

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .....................................42, 44

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015)................................................................45

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)..................................................................44

*In re U.S. Off. Prods. Co. Sec. Litig.*,
   251 F. Supp. 2d 77 (D.D.C. 2003).......................................................25

*In re U.S. Off. Prods. Sec. Litig.*,
   326 F. Supp. 2d 68 (D.D.C. 2004).................................................38, 45

*Int'l Bhd. of Teamsters v. Daniel*,
   439 U.S. 551 (1979)..............................................................15, 32, 34

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..............................................................5

*Kidd v. Thomson Reuters Corp.*,
   925 F.3d 99 (2d Cir. 2019)................................................................20

*Koch v. SEC*,
   793 F.3d 147 (D.C. Cir. 2015)...........................................................38

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994)...........................................................25

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982)..............................................................15, 22, 34

*Nat'l ATM Council, Inc. v. Visa Inc.*,
   922 F. Supp. 2d 73 (D.D.C. 2013) .....................................................10

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) ..............................................................30

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015).....................................................................42

*Patrick v. Dist. of Columbia*,
   126 F. Supp. 3d 132 (D.D.C. 2015).......................................................5

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..........................................................43

*Risley v. Universal Navigation Inc.*,
   2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023).......................................23

*Rockies Fund, Inc. v. SEC*,
  428 F.3d 1088 (D.C. Cir. 2005) ............................................................................... 3, 38, 39

*Rodriguez v. Banco Cent. Corp.*,
  990 F.2d 7 (1st Cir. 1993) .................................................................................................... 29

*Rogers v. Assur. IQ, LLC*,
  2023 WL 2646468 (W.D. Wash. Mar. 27, 2023) ................................................................ 24

*SEC v. Am. Inst. Couns., Inc.*,
  1975 WL 440 (D.D.C. Dec. 30, 1975) ................................................................................. 15

*SEC v. Aqua–Sonic Prods. Corp.*,
  524 F. Supp. 866 (S.D.N.Y. 1981) ...................................................................................... 22

*SEC v. Banner Fund Int'l*,
  211 F.3d 602 (D.C. Cir. 2000) ..................................................................................... 14, 32

*SEC v. Belmont Reid & Co.*,
  794 F.2d 1388 (9th Cir. 1986) ............................................................................................. 30

*SEC v. Better Life Club of Am., Inc.*,
  995 F. Supp. 167 (D.D.C. 1999) ......................................................................................... 15

*SEC v. Edwards*,
  540 U.S. 389 (2004) ............................................................................................................ 14

*SEC v. Goble*,
  682 F.3d 934 (11th Cir. 2012) ............................................................................................. 37

*SEC v. Int'l Loan Network, Inc.*,
  968 F.2d 1304 (D.C. Cir. 1992) .......................................................................................... 14

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................................................................ 25

*SEC v. LBRY, Inc.*,
  2022 WL 16744741 (D.N.H. Nov. 7, 2022) ....................................................................... 25

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) .............................................................................................. 35

*SEC v. Marasol Props*,
  1973 WL 427 (D.D.C. 1973) ............................................................................................... 15

*SEC v. Milan Grp., Inc.*,
  962 F. Supp. 2d 182 (D.D.C. 2013) .................................................................................... 14

*SEC v. Parkersburg Wireless Ltd. Liab. Co.*,
   991 F. Supp. 6 (D.D.C. 1997) ............................................................15

*SEC v. Ripple Labs, Inc.*,
   2023 WL 4507900 (S.D.N.Y. July 13, 2023) .................................27, 33

*SEC v. RPM Int'l, Inc.*,
   282 F. Supp. 3d 1 (D.D.C. 2017) ................................................ *passim*

*SEC v. Telegram Grp. Inc.*,
   2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) .....................................26

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..............................19, 25, 26, 30

*SEC v. Terraform Labs Pte Ltd.*,
   2023 WL 4858299 (S.D.N.Y. July 31, 2023) ...............................25, 26

*SEC v. Tolstedt*,
   545 F. Supp. 3d 788 (N.D. Cal. 2021) .............................................43

*SEC v. United Benefit Life Ins. Co.*,
   387 U.S. 202 (1967) ........................................................................14

*SEC v. Variable Annuity Life Ins. Co. of Am.*,
   359 U.S. 65 (1959) ..........................................................................14

*SEC v. W.J. Howey Co.*,
   1946 WL 50582 (U.S. Apr. 17, 1946) ..............................................13

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................ *passim*

*SEC v. Wey*,
   246 F. Supp. 3d 894 (S.D.N.Y. 2017) .............................................36

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) .............................................................42

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
   253 F. Supp. 359 (S.D.N.Y. 1966) ..................................................28

*Spicer v. Chicago Bd. Options Exch., Inc.*,
   1990 WL 172712 (N.D. Ill. Oct. 30, 1990) ......................................41

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) ........................................................................14

*TSC Indus., Inc. v. Northway, Inc.*,
     426 U.S. 438 (1976) ................................................................................41

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
     389 F.3d 1251 (D.C. Cir. 2004) ...............................................................39

*Underwood v. Coinbase Glob., Inc.*,
     2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023) .............................................23

*United Hous. Found., Inc. v. Forman*,
     421 U.S. 837 (1975) ................................................................................23

*United States v. Bowdoin*,
     770 F. Supp. 2d 142 (D.D.C. 2011) .....................................................15, 33

*Util. Air Regul. Grp. v. EPA*,
     573 U.S. 302 (2014) ................................................................................32

*Versyss Inc. v. Coopers & Lybrand*,
     982 F.2d 653 (1st Cir. 1992) ....................................................................21

*West Virginia v. EPA*,
     142 S. Ct. 2587 (2022) .........................................................................2, 31

**State Cases**

*Agnew v. Daugherty*,
     209 P. 34 (Cal. 1922) ..............................................................................13

*Creasy Corp. v. Enz Bros. Co.*,
     187 N.W. 666 (Wis. 1922) .......................................................................13

*Dobal v. Guardian Fin. Corp.*,
     251 Ill. App. 220 (Ill. App. Ct. 1929) .......................................................19

*Fid. Inv. Ass'n v. Emmerson*,
     235 Ill. App. 518 (1924) ..........................................................................13

*Lewis v. Creasey Corp.*,
     248 S.W. 1046 (Ky. Ct. App. 1923) .........................................................13

*McCormick v. Shively*,
     267 Ill. App. 99 (1932) ............................................................................13

*State v. Agey*,
     88 S.E. 726 (N.C. 1916) ..........................................................................13

*State v. Gopher Tire & Rubber Co.*,
     177 N.W. 937 (Minn. 1920) .....................................................................13

*State v. Ogden*,
    191 N.W. 916 (Or. 1923) ..............................................................................13

*State v. Robbins*,
    240 N.W. 456 (Minn. 1932) ..........................................................................18

*Stevens v. Liberty Packing Corp.*,
    161 A. 193 (N.J. Ch. 1932) ......................................................................13, 19

**Federal Statutes**

15 U.S.C. § 77 ....................................................................................2, 11, 36

15 U.S.C. § 78 ........................................................................1, 2, 10, 11, 23

**Other Authorities**

Andrew Throuvalas, *CFTC Chair Says Ethereum Is a Commodity—Despite
    Gensler's 'Bitcoin Only' Position*, DECRYPT (Mar. 8, 2023) ...................................6

Brief of Petitioner SEC, *SEC v. Edwards*,
    No. 02-1196, 2003 WL 21498455 (U.S. June 26, 2003) .................................17, 18

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1, 10

Federal Rule of Civil Procedure 9(b) ..........................................................3, 38, 39, 45

Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th
    Congress (2023) ..........................................................................................1

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and
    Retail Investors Collide, Part III: Virtual Hearing Before the Comm. on Fin.
    Servs.*, 117th Cong. 12 (May 6, 2021) (statement of Gary Gensler, Chairman,
    SEC) ...........................................................................................................1

Hester M. Peirce, SEC Commissioner, *Outdated: Remarks Before the Digital
    Assets at Duke Conference* (Jan. 20, 2023) ..................................................23

*In re Tether*,
    CFTC Docket No. 22-04 (Oct. 15, 2021) ...........................................................6

Letter Response, *SEC v. Coinbase Inc.*,
    No. 23 Civ. 4738 (KPF) (S.D.N.Y. 2023), Dkt. 26 ...........................................16

Lummis-Gillibrand Responsible Financial Innovation Act S. 2281, 118th Cong.
    (2023) .....................................................................................................1, 2

Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong.
    (2022) ..........................................................................................................2

Nikhilesh De, *SEC Chair Gensler Declines to Say if Ether Is a Security in
   Contentious Congressional Hearing*, CoinDesk (Apr. 19, 2023)..............................................7

No Action Letter, *American Diamond Co.*,
   1977 WL 10907 (SEC Aug. 15, 1977) .....................................................................17

No Action Letter, *Future Sys. Inc.*,
   1973 WL 9653 (SEC June 8, 1973) .........................................................................17

No Action Letter, *London Diamond Exch.*,
   1972 WL 8488 (SEC Oct. 3, 1972)...........................................................................17

Order Approving Proposed Rule Change, as Modified by Amendment No. 1,
   Relating to Self-Trades and FINRA Rule 5210 (SEC May 1, 2014).....................................40

Tr. of Hr'g on Mot., *SEC v. LBRY, Inc.*,
   No. 21-cv-260 (D.N.H. Jan. 30, 2023), Dkt. 105....................................................27

Defendants BAM Trading Services, Inc. and BAM Management US Holdings Inc. (together, "BAM") move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims in the Complaint asserted against BAM for failure to state a claim.

## PRELIMINARY STATEMENT

In May 2021, the current Chairman of the U.S. Securities and Exchange Commission ("SEC") told Congress that "[r]ight now" digital asset trading platforms "do not have a regulatory framework at the SEC, or our sister agency, the Commodity Futures Trading Commissions" and "there is not a market regulator around these crypto exchanges." Digital asset exchanges "do not have a regulatory framework" or "market regulator" because they are not securities; a regulatory framework for securities exchanges has existed for nearly 90 years. *See* Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act"). The SEC Chair then asked Congress for additional authority to address those perceived "gaps."[1]

Since the SEC Chair's concession, Congress has not adopted new legislation to expand the SEC's authority in the digital asset space. Instead, the SEC brought this action in June 2023, seeking to achieve by litigation what it lacks by legislation, alleging that some digital assets offered through BAM's trading platform available online at Binance.US ("BAM's Platform") are "investment contracts" and thus "securities," thereby rendering BAM's Platform subject to SEC regulation. The SEC did so while Congress was considering multiple pieces of legislation that would create a comprehensive regulatory framework for digital assets and could bring much needed regulatory clarity to the digital asset market. *See, e.g.*, Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Congress (2023); Lummis-Gillibrand

---

[1] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Virtual Hearing Before the Comm. on Fin. Servs.*, 117th Cong. 12 (May 6, 2021) (statement of Gary Gensler, Chairman, SEC), at 12, https://www.govinfo.gov/content/pkg/CHRG-117hhrg44837/pdf/CHRG-117hhrg44837.pdf.

Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023); Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong. (2022).  Notably, none of this proposed legislation grants the SEC the jurisdiction it seeks to assert here.  Thus, this Court appropriately questioned why "a lone federal district judge" should be assigned a "determination that would . . . establish a national, consistent, and understandable policy for the regulation of trading in crypto assets."  Tr. of TRO Hr'g at 28:8-25 (June 13, 2023), Dkt. 69.  The SEC lacked a satisfying answer to this Court's question.

The SEC's attempt by litigation to extend the securities laws (and hence the reach of its own authority) in this context goes far beyond the support of any existing precedent.  Most notably, the SEC alleges that secondary sales of digital assets are "investment contracts" under the statutory definition of a "security" as interpreted in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), yet the Complaint nowhere alleges the existence of a contractual arrangement.  People invest in all manner of assets (*e.g.*, real estate, gems, wine, baseball cards, and art), and the presence of an investment alone does not create a security.  For an asset to be a "security," the statute requires the presence of an "investment contract"—a contractual investment arrangement.  *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The failure to allege one is alone fatal to nearly all the Complaint.

Even if the Court determines that the SEC's reinterpretation of the term "investment contract" has potential merit, the major questions doctrine would still require dismissal.  *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608–09 (2022).  Because this case implicates the regulation of a one trillion-dollar industry potentially impacting as many as one in five Americans, the SEC must have "clear congressional authorization" to act.  *Id.* at 2609.  It does not.

The SEC's attempt to fit BAM's staking-as-a-service program ("Staking Program") into the statutory definition of "security" fares no better.  Although the SEC summarily alleges that the

Staking Program itself constitutes an "investment contract" issued by BAM, the SEC fails to allege facts that would satisfy key elements of an investment contract—namely, an investment of money or managerial efforts by BAM.  The Complaint notes various ministerial actions that BAM took on behalf of customers to stake their own digital assets on blockchains more efficiently than if they staked their digital assets directly to achieve rewards generated by the blockchains themselves. These ministerial actions involving customer assets do not create an investment contract.

The Complaint also alleges that BAM deceived its own venture capital investors and customers by materially misstating the trading volume on its platform and the maturity of its trade surveillance program.  The foundation for this claim is an allegation that Sigma Chain, a non-party to this action, engaged in "wash trading" on BAM's Platform because it occasionally appeared on both sides of a trade.  The SEC suggests that such "self-dealing" would have been important to investors because it "artificially inflated the trading volume of crypto assets on [BAM's] Platform" and because BAM "touted the surveillance and controls supposedly in place to prevent manipulative trading on [BAM's] Platform."

But establishing "wash trading" under the securities laws requires a fraudulent intent to manipulate the market.  *See Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005). The Complaint offers the conclusory allegation that there was "wash trading in 48 of 51 newly listed crypto assets," Compl. ¶ 273—most of which are not even alleged to be securities, *see id.* ¶ 352—but offers no details in support of this fraud allegation, as Federal Rule of Civil Procedure 9(b) requires.  And apart from allegations concerning trading volumes of a single (unidentified) digital asset on a single day in September 2019, *id.* ¶ 272, and another asset on a few days in April 2022, *id.* ¶ 274, the Complaint contains no allegations from which one could infer that any of the purported wash trading of a single asset was material in volume *on even a single day*.

3

There is not, for example, an allegation of trading volumes or an allegation that the price of any digital asset on BAM's Platform was out of line with market prices due to supposed wash trading. Furthermore, there is no allegation that the unidentified digital asset subject to supposed wash trading in September 2019 was even a security. Nor is there any allegation that BAM was negligent in failing to detect the purported wash trading on the few days in April 2022. Still further, none of this is sufficient to suggest that the extent of "self-dealing" affected *the overall volume of trading on BAM's Platform* such that any statement by BAM to equity investors in the company about trading volume was false or misleading. The SEC's remaining allegations about trading on BAM's Platform relate to statements that are neither false nor misleading, or that are otherwise inactionable as a matter of law.

In sum, SEC has failed to allege facts sufficient to demonstrate that the digital assets or Staking Program were "securities." As the SEC Chair admitted more than two years ago, the SEC lacks regulatory jurisdiction over digital assets. And the SEC's wash trading allegations, while sensationalized with labels, are unsubstantiated with facts. Accordingly, the Complaint should be dismissed.

## BACKGROUND[2]

BAM has operated a digital asset trading platform in the United States for years, launching its operations in September 2019 and growing to be, at the time the Complaint was filed, "one of the top 5 [digital] asset trading platforms in the United States by daily trading volume." Compl. ¶¶ 28–29, 144, 210. BAM is not registered with the SEC, but it is regulated as a money transmission business in 42 states and the District of Columbia. *Id.* ¶ 29. Through its platform, BAM offers customers the ability to transact in approximately 150 digital assets. *Id.* ¶ 209. BAM

---

[2] Only for purposes of this motion, BAM assumes the truth of the Complaint's allegations. *See SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 11–12 (D.D.C. 2017).

is not alleged to be the issuer of any of the digital assets offered on its trading platform, and the Complaint does not allege that it was otherwise involved in the issuance of any other digital asset.

BAM's core trading platform allows customers to anonymously place orders for listed digital assets on a continuously updated electronic order book. *Id.* ¶ 224; Ex. 1 §§ 5.1—5.1.2.[3]  In addition, BAM offers customers the ability to use its Over-the-Counter ("OTC"), One-Click-Buy-Sell ("OCBS"), or Convert services. *Id.* ¶ 225.  The OTC service allows institutional customers to buy or sell a large quantity of digital assets for a single price, against a single counterparty; for most orders, the process for executing trades is "automated." *Id.* ¶ 226.  OTC trading is favored for "Fast Settlement" and a "Simple Process - The trading discussion happens on chat, and a trade can be confirmed in as quickly as 1-2 minutes . . . [and] you don't need to send coins anywhere." *Id.* ¶ 93.  The OCBS and Convert services allow retail customers to immediately buy or sell smaller quantities of digital assets against a single counterparty without interacting with the order book. *Id.* ¶ 228.  These services are a means "to avoid slippage, simplify [the] trading experience, or make one less trade." *Id.*

## A.      The Digital Assets Traded on BAM's Platform

A digital asset is a new financial technology designed to facilitate transactions without the need for a trusted central counterparty, such as a bank. *Id.* ¶ 62.  Digital assets accomplish this

---

[3] On a motion to dismiss, the Court may consider documents incorporated by reference in the Complaint. *See Patrick v. Dist. of Columbia*, 126 F. Supp. 3d 132, 135–136 (D.D.C. 2015). Here, those documents include (i) BAM's Trading Rules (Compl. ¶ 233, 244–45); (ii) a Crypto Exchanges Markets and Liquidity Webinar transcript (*id.* ¶ 246); (iii) BAM's Trade Surveillance Manual (*id.* ¶ 249); BAM's Seed Round Pitch Deck (id. ¶ 248, 256–57, 265); and (iv) BAM's Terms of Use (*id.* ¶ 126, 153, 244, 346).  The doctrine of incorporation is particularly appropriate where, as here, the SEC creates a misleading impression by cherry-picking words from documents referenced in the Complaint. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) ("[T]he incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs.").  Documents incorporated by reference are attached to the Declaration of Matthew Beville submitted in further support of BAM's motion.

core task through a publicly accessible "blockchain" that maintains a complete record of the ownership and transaction history for the relevant digital asset. *Id.* ¶¶ 63–66.

The maintenance and accuracy of the blockchain depends on the work of multiple, independent "validators" that review proposed transactions and update the blockchain as part of a digital asset "network." *Id.* ¶¶ 66–68, 340. This work is conducted pursuant to "consensus mechanisms" that provide rules for determining how transactions are reviewed and for making corresponding updates to the relevant blockchain. *Id.* ¶¶ 66–68, 340. If a requisite number of validators agree on the validity of a transaction, it is processed and recorded on the blockchain. *Id.* In exchange for performing this work, the network gives validators "rewards," typically in the form of new tokens. *Id.* ¶¶ 66–68, 340.

In June 2018, before the current SEC Chair took office, SEC officials determined that the two most prominent digital assets—Bitcoin and Ether—are commodities and not securities. *See* William Hinman, Director, Division of Corporate Finance, SEC, Remarks at the Yahoo Finance Markets Summit: Crypto (June 14, 2018) ("Director Hinman Remarks"). And as recently as March 2023, the Commodity Futures Trading Commission ("CFTC") reiterated that Bitcoin, Ether, Litecoin, and certain stablecoins are commodities and not securities. *See, e.g.*, *In re Tether*, CFTC Docket No. 22-04 (Oct. 15, 2021) ("Digital assets such as bitcoin, ether, litecoin, and tether tokens are commodities."); Andrew Throuvalas, *CFTC Chair Says Ethereum Is a Commodity—Despite Gensler's 'Bitcoin Only' Position*, DECRYPT (Mar. 8, 2023), decrypt.co/123032/cftc-chair-says-ethereum-is-a-commodity-despite-genslers-bitcoin-only-position.

But in April 2023, although there had been no legislative or judicial developments suggesting that these digital assets are not commodities, the SEC's current Chair pointedly refused to confirm the agency's prior conclusion that Ether is a commodity and not a security. Nikhilesh

De, *SEC Chair Gensler Declines to Say if Ether Is a Security in Contentious Congressional Hearing*, CoinDesk (Apr. 19, 2023), www.coindesk.com/policy/2023/04/19/sec-chair-gensler-declines-to-say-if-ether-is-a-security-in-contentious-congressional-hearing.  The SEC and CFTC also have not issued guidance to the markets concerning the regulatory status of any particular digital asset.  Rather, each has chosen to speak primarily through enforcement actions without expressing a clear view as to whether any particular digital asset is a security or commodity.

In this matter, the SEC alleges that twelve of the digital assets offered on BAM's Platform—BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI (collectively, the "Digital Assets")—are investment contracts, a type of security.  Compl. ¶ 352.  Yet, nowhere does the Complaint identify a contract.  *Id.* ¶¶ 352–509.  Nor does the Complaint charge that BAM was involved in primary sales of any of the Digital Assets.  *Id.* ¶¶ 287–324, 352–509.  On the contrary, the Complaint makes clear that the primary offerings of all but one of the Digital Assets occurred well before BAM listed the tokens on its trading platform. Indeed, most occurred before BAM even began operating in September 2019.[4]  For the final token—BUSD—there are no allegations that BAM was involved in the transactions or statements

---

[4] *See* Compl.  ¶ 287 (BNB initial coin offering ("ICO") occurred in 2017); ¶¶ 366–67 (SOL first offered in 2018; subsequent "Initial Exchange Offering" conducted on CoinList, in March 2020, before BAM first offered SOL for trading); ¶¶ 378, 381 (primary offerings of ADA occurred between 2015 and 2017); ¶ 388 (primary offering of MATIC occurred in 2018 and early 2019; sponsor made subsequent "private" sales, but none allegedly involved BAM); ¶¶ 401–02 (primary sales of FIL occurred in 2017; "public" sales began in October 2020, almost a year before BAM listed the token in June 2021); ¶ 430 (primary sales of ATOM took place in 2017); ¶ 440 (original sales of SAND occurred in May and July 2019; an initial public listing allegedly occurred in August 2020, more than two years before BAM listed the token); ¶ 451 (primary sales of MANA occurred in 2017); ¶ 466 (primary sales of ALGO occurred in 2019); ¶ 489 (primary sales of AXS occurred in 2020, before BAM listed the token in November 2021); ¶ 497 (primary sales of COTI occurred in June 2019).

described in the Complaint.[5]  *Id.* ¶¶ 315–24.

Further, while the Complaint alleges that BAM made each of the Digital Assets "available for trading," *id.* ¶ 352, it makes no allegations regarding these secondary market transactions or how they could be considered investment contracts, *see id.* ¶¶ 287–324, 352–509.  There are, for example, no allegations that a contractual arrangement existed between the token sponsor and the secondary market purchasers on BAM's Platform.  In fact, there are no allegations at all about any specific transaction that occurred on BAM's Platform.

## B.     BAM's Staking Program

As noted above, instead of relying on intermediaries to validate transactions, digital asset networks rely on consensus mechanisms.  One of the two primary consensus mechanisms is "proof of stake."  *Id.* ¶ 68.  In a proof of stake network, validators "stake" (or deposit) tokens in exchange for the opportunity to validate transactions.  *Id.*  "Staked" tokens are used "as collateral in the protocol to incentivize validators" to accurately validate proposed transactions.  *Id.* ¶ 341.  Various networks for the tokens may impose "lock-up" periods associated with staking in which tokens cannot be transferred for a certain period of time.  *Id.* ¶ 347.  If a validator performs its work accurately, the network will reward it with new tokens (called rewards).  *Id.* ¶ 341.  However, some networks may penalize validators who make mistakes by "slashing" or deducting tokens from the validator's staked collateral.  *Id.*  Any network participant can act as a validator if it satisfies the network's requirements to be a validator and downloads the required validation software, although the chance of earning rewards may increase based on the amount staked.  *Id.*

---

[5] Further, unlike the other digital assets described in the Complaint, BUSD is a stablecoin, meaning the token was designed to hold a stable value of $1 and be "redeemable on a 1:1 basis for U.S. dollars."  Compl. ¶ 317.

Through BAM's Staking Program, customers can participate in staking and earn rewards. *Id.* The Complaint alleges no facts to support the conclusory statement that participation in BAM's Staking Program requires an "investment of money," *id.* ¶ 349, and, instead, documents referenced in the Complaint, *id.* ¶ 346, reflect that customers who participate "retain ownership" of their tokens, which "shall remain [the customers'] property when staked," *see* Ex. 5.

## C.    The Role of Sigma Chain

The Complaint also alleges that BAM made misstatements relating to supposed "wash trading" by Sigma Chain in digital assets on BAM's Platform.  Specifically, the Complaint alleges that BAM made misstatements to prospective equity investors concerning BAM's monitoring of the trading platform for potential wash trading.  Compl. ¶¶ 244–49.  In addition, the Complaint alleges that BAM reported trading volumes for digital assets on its platform, a metric that the SEC contends would have been material to those trading digital assets.  *Id.* ¶¶ 250–81.

Beyond conclusory allegations and citations to isolated instances where Sigma Chain accounts interacted, *id.* ¶¶ 272–74, the Complaint provides no specific allegations regarding Sigma Chain's alleged misconduct.  Indeed, the Complaint provides no basis to conclude that Sigma Chain's activity was undertaken with manipulative intent, rather than the result of inadvertent interactions of its various strategies on BAM's anonymous trading platform.  Further, the Complaint does not allege facts from which one could infer that Sigma Chain's supposed wash trading was material to BAM's overall trading volume or the volume of any particular token over any meaningful period of time.

## D.    The SEC's Claims

The Complaint alleges five claims against BAM, four (the Eighth, Ninth, Tenth, and Thirteenth Claims) of which turn on the question of whether the Digital Assets traded on BAM's Platform are "securities."  The Eighth, Ninth, and Tenth Claims allege that BAM was operating as

an unregistered securities exchange, unregistered securities broker, and unregistered securities clearing agency, respectively, in violation of various sections of the Exchange Act.  *See* 15 U.S.C. § 78e (Eighth Claim); 15 U.S.C. § 78o(a) (Ninth Claim); 15 U.S.C. § 78q-1(b) (Tenth Claim).  The Fourth Claim alleges that BAM offered its Staking Program as an unregistered security in violation of Section 5 of the Exchange Act, 15 U.S.C. § 78e.  Finally, the Thirteenth Claim alleges that BAM made false statements "to investors" and defrauded "purchasers" of securities concerning the platform's trade monitoring and trading volumes, in violation of Section 17(a)(2) and (3) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2), (3).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must 'state a claim to relief that is plausible on its face.'"  *Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965, 968 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted)); *see* Fed. R. Civ. P. 12(b)(6).  "A pleading must offer more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'. . . and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12 (D.D.C. 2017) (quoting *Iqbal*, 556 U.S. at 678).  The court "need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions."  *Id.*; *see also Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73, 75 (D.D.C. 2013) (dismissing action where complaint "bristle[s] with indignation, but when one strips away the conclusory assertions and the inferences proffered without factual support, there is very little left to consider").

Claims under Section 17(a)(2) and 17(a)(3) must meet Rule 9(b)'s heightened pleading standard.  *See RPM Int'l*, 282 F. Supp. 3d at 13 (citing *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017)) (concluding that Section 17(a) claims "all sound in fraud," so they must be

pled with particularity).  To satisfy this heightened pleading obligation, a plaintiff must plead with specificity the "time, place, and contents of the false representations," the fact misrepresented, and "what was retained or given up as a consequence of the fraud."  *Id.* at 12.

## ARGUMENT

### I.    THE SEC HAS NOT PLAUSIBLY ALLEGED SECURITIES TRANSACTIONS INVOLVING THE DIGITAL ASSETS.

The bulk of the SEC's claims against BAM turn on whether transactions involving twelve digital assets traded on BAM's Platform are "investment contracts" and, therefore, "securities." *See* Compl. ¶ 352; 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The seminal case defining "investment contracts" is the Supreme Court's decision nearly 80 years ago in *Howey*.  In *Howey*, the defendants offered the opportunity to invest in an orange grove by means of two contracts: a land sales contract and a related service contract.  The issue presented was "whether, under the circumstances, the land sales contract, the warranty deed and the service contract together constitute an 'investment contract' within the meaning of" the federal securities laws.  *Howey*, 328 U.S. at 297.

The Court concluded that because this arrangement comprised a "scheme [that] involve[s] an investment of money in a common enterprise with profits to come solely from the efforts of others," it was an "investment contract" and thus a "security."  *Id.* at 301.  *Howey* and its progeny— as well as the statutory text—make clear that for a transaction to qualify under this definition, the buyer must have ***contractual rights*** to share future profits in a common enterprise operated by others.  Indeed, in every case BAM has identified involving an "investment contract," the buyer had a contractually grounded expectation that the seller would deliver future value.

This requirement of future contractual obligations is critical—otherwise ordinary asset sales become securities.  Every sale of an asset involves a contract of sale.  Yet, it has long been

the law that simply buying and selling an asset, even for investment purposes and with the expectation that the asset will increase in value, is not an "investment contract."  And for good reason.  People buy assets all the time hoping they will increase in value—gems, gold, fine art, classic cars, fine wine, trading cards, and real estate.  But those sales do not morph into investment contracts simply because the buyer hopes to make money, and that is true even if the hope is driven by what others are saying in the market about the asset.  What makes an asset sale an "investment contract" is the seller promising the buyer to deliver future value through the managerial efforts of the seller or a third party.  Without that direct financial and contractual relationship, there is no limiting principle for distinguishing an asset sale from an investment contract.

In this case, the SEC does not allege that any buyer of the Digital Assets on BAM's Platform was promised anything from the seller (or anyone else, for that matter), let alone the delivery of future value.  The SEC is unlikely to dispute this.  Rather, its position seems to be that an investment contract can arise so long as the buyer *might* have an "expectation" that the value of the asset will increase based on public statements of the original promoter of the asset, with whom the buyer has no relationship whatsoever.  The SEC's theory is breathtaking.  Not only is it inconsistent with decades of precedent interpreting the term "investment contract," but it would have near limitless application to ordinary asset sales.  The Court should halt the SEC's legally unsupported expansion of its jurisdiction.

### A.   An Investment Contract Must Involve Contractual Undertakings By a Seller to Deliver Future Value or Profits.

As *Howey* explained, Congress did not invent the term "investment contract"; it "was using a term the meaning of which had been crystallized by . . . prior judicial interpretation" applying states' blue sky laws.  *Howey*, 328 U.S. at 298; *see George v. McDonough*, 142 S. Ct. 1953, 1959 (2022) ("Where Congress employs a term of art 'obviously transplanted from another legal

source,' it 'brings the old soil with it.'"); Brief for the SEC at 18, *SEC v. W.J. Howey Co.*, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946) ("SEC *Howey* Br.") ("[I]n adopting the definition of a security from the 'blue sky' laws, Congress must be deemed to have intended also to adopt that construction of the term which was uniformly followed by the state courts."). By the time the term "investment contract" was added to the federal securities laws, state courts had uniformly interpreted it to mean a contractual arrangement in which a seller was obligated to deliver, and the buyer was entitled to receive, future value.[6] State courts routinely relied on this requirement— namely, that the seller have post-sale obligations to deliver future value—to distinguish investment contracts from basic asset sales. *See Lewis v. Creasey Corp.*, 248 S.W. 1046, 1049 (Ky. Ct. App. 1923) (no investment contract where buyer entered into contract to purchase groceries with no post-sale obligations on the seller); *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) (similar); *McCormick v. Shively*, 267 Ill. App. 99, 101 (1932) (no investment contract where contract gave seller rights to all resources on land (*e.g.*, crops, timber, and oil), but seller had no obligation to exercise those rights).

Applying this framework, the *Howey* Court determined that the transaction at issue was an investment contract. *Howey* involved a company's land sales in an orange grove coupled with service contracts in which the company promised to grow and market the oranges and distribute profits. Thus, the purchasers were not simply purchasing an asset (the orange groves) with hope

---

[6] *See, e.g.*, *State v. Agey*, 88 S.E. 726 (N.C. 1916) (seller obligated to cultivate trees and deliver share of profits); *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 937–38 (Minn. 1920) (seller obligated to pay investors a pro rata share of future profits from sale of tires and tubes); *Agnew v. Daugherty*, 209 P. 34, 34–35 (Cal. 1922) (seller obligated to deliver share of profits from exploitation of mineral lease); *State v. Ogden*, 191 N.W. 916, 917 (Or. 1923) (seller obligated to drill wells and divide profits among purchasers); *Fid. Inv. Ass'n v. Emmerson*, 235 Ill. App. 518, 521–22 (1924) (promoter obligated to invest money and pay annual annuity), *rev'd on other grounds,* 149 N.E. 530 (Ill. 1925); *Stevens v. Liberty Packing Corp.*, 161 A. 193, 193–94 (N.J. Ch. 1932) (seller obligated to breed rabbits and purchase offspring).

that they would increase in value; the purchasers were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise." *Howey*, 328 U.S. at 299. This offer and sale constituted an investment contract because the seller was contractually obligated— through "land sales contracts, warranty deeds and service contracts"—to deliver future value to the buyers. *Id.* at 300. The "economic reality" was that this bundle of contractual rights was indistinguishable from an equity investment in an orange-growing enterprise. *Id.* at 298; *see also id.* at 299–300 (referring to the buyers' "shares in the enterprise").

Since *Howey*, every arrangement that the Supreme Court has deemed an investment contract included this common thread—namely, that the seller promised the buyer some ongoing, contractual interest in the future value of an enterprise. *See, e.g.*, *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (sale-and-leaseback agreement involving payphones in which the seller promised to pay a fixed return each month to the investors); *Tcherepnin v. Knight*, 389 U.S. 332, 338–39 (1967) ("withdrawable capital share" in a corporation that provided voting and dividend rights was an investment contract); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 204–05 (1967) (variable- and fixed-annuity contract in which life insurance company promised to pay a proportionate share of the gains); *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 71 (1959) (same). The same holds true for all cases in this circuit that have found the existence of an investment contract. *See, e.g.*, *SEC v. Banner Fund Int'l*, 211 F.3d 602, 615 (D.C. Cir. 2000) (promoters promised future returns from "arbitrage and leveraging" transactions); *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992) (written agreement and oral representations promised investors future profits derived from recruitment of more members).[7]

---

[7] *See also SEC v. Milan Grp., Inc.*, 962 F. Supp. 2d 182, 199 (D.D.C. 2013) (contract in which promoter was obligated to purchase bank instrument with pooled funds and distribute profits from trade by a secret third party), *aff'd in part, vacated in part,* 595 F. App'x 2 (D.C. Cir.

The Supreme Court has never expanded the term "investment contract" to reach circumstances outside of this paradigm, and for good reason. In determining whether a transaction is an investment contract, the Supreme Court considers whether it resembles "the ordinary concept of a security." *Howey*, 328 U.S. at 299. Every enumerated category of "security" in the federal securities laws involves a legal relationship between the issuer and the investor in which the investor is entitled to future value or returns. Transactions that do not have these core characteristics of an ordinary security are not investment contracts. *See Marine Bank v. Weaver*, 455 U.S. 551, 559–60 (1982) (finding that a business agreement between two parties did not "fall within 'the ordinary concept of a security'" and, thus, was not an investment contract because, among other reasons, it did not include a right to receive future profits); *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559–60 (1979) ("In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security.").

---

2015); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011) (seller promised to operate a "profitable internet advertising company" and distribute profits); *SEC v. Better Life Club of Am., Inc*., 995 F. Supp. 167, 171–74 (D.D.C. 1999) (written agreement under which the promoter promised to distribute profits from various "profit-making business activities"), *aff'd*, 203 F.3d 54 (D.C. Cir. 1999); *SEC v. Parkersburg Wireless Ltd. Liab. Co*., 991 F. Supp. 6, 8 (D.D.C. 1997) (in exchange for investor funds promoter promised to run wireless cable operation and distribute pro rata shares of the revenue); *Gomez v. Leonzo*, 788 F. Supp. 604, 606 (D.D.C. 1992) (written agreement under which promoter was obligated to deliver fixed interest payments and dividends from pooled investment earnings); *Harris v. Republic Airlines, Inc*., 1988 WL 56256, at *7 (D.D.C. May 19, 1988) (employees entitled to employer's "potential future profits" pursuant to Partnership Plan); *SEC v. Am. Inst. Couns., Inc*., 1975 WL 440, at *3 (D.D.C. Dec. 30, 1975) (promoter promised to purchase assets and deliver future profits); *SEC v. Marasol Props*, 1973 WL 427, at *4 (D.D.C. 1973) (seller promised to manage condominium units and distribute rental profits).

### B.  The SEC's Allegations Fall Far Short of Alleging Investment Contracts.

In the Complaint, the SEC does not allege a contractual relationship in which the seller of Digital Assets was undertaking to do anything for the buyer's benefit following the sale on BAM's Platform.  Nor does the SEC allege that the buyers of the Digital Assets had rights to anything from the original promoters of the Digital Assets or that those promoters were obligated to do anything for those buyers.  These deficiencies are fatal to the SEC's claims, but the SEC is unlikely to dispute those pleading failures.  Rather, BAM expects the SEC will offer two responses: in the SEC's view (i) there can be an "investment contract" without post-sale contractual undertakings because *Howey* also referred to "schemes"; and (ii) so long as a Digital Asset was initially offered as an investment contract, the Digital Asset itself remains an investment contract when sold on the secondary market.  *See* Tr. of TRO Hr'g at 16:23–24 (June 13, 2023), Dkt. 69; *see also* Letter Response at 2–3, *SEC v. Coinbase Inc.*, No. 23 Civ. 4738 (KPF) (S.D.N.Y. 2023), Dkt. 26.  These arguments are wrong as a matter of law and amount to an unsanctioned expansion of the SEC's jurisdiction.

#### 1.  The SEC Misunderstands the Meaning of "Scheme" in Howey.

The SEC's new and expansive position that there can be an investment contract without a contract runs roughshod over the statutory text and the SEC's own prior briefing and analysis.  Going back decades, the SEC has consistently and accurately described an investment contract as involving contractual arrangements to deliver future value.  Beginning with *Howey*, the SEC defined an investment contract as "any *contractual arrangement* for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoter."  SEC *Howey* Br. at *9 (emphasis added).  In analyzing why the sales of orange groves were investment contracts, the SEC explained that "there [was] no doubt as to the *contractual rights* of investors

who acquire not merely interests in the land, but enforcible [*sic*] written contracts for development, cultivation and marketing of produce by the promotors." *Id.* at *28–29 (emphasis added).

In line with its position in *Howey*, the SEC Staff issued no-action relief to several entities because, as the SEC Staff then reasoned, assets sold without accompanying contractual promises are not securities even when they are sold as "investment[s]." *See, e.g.*, *American Diamond Co.*, 1977 WL 10907, at *4–5 (SEC Aug. 15, 1977) (SEC no-action letter where seller intended to advertise "the value of diamonds as an investment" but was "not contractually bound to provide any further services to the Buyer" after the transaction); *London Diamond Exch.*, 1972 WL 8488, at *2–3 (SEC Oct. 3, 1972) (same); *Future Sys. Inc.*, 1973 WL 9653, at *3 (SEC June 8, 1973) (SEC no-action letter where, although broker-dealers "indicated an interest in making and maintaining a market" for receipts evidencing ownership of silver deposited in banks, the seller did not "give any assurances that such a market will exist or that particular broker-dealers will continue to be interested in maintaining such a market").

More recently, in its Supreme Court brief in *Edwards*, the SEC highlighted the requirement that there be a contractual relationship by separately defining each of the terms in "investment contract":

> The first word in the quoted term, "investment," means the investing of money or capital in some species of property for income or profit . . . The second word in the quoted term, "contract" means 'an agreement between two or more persons to do or forbear something. Thus, the very term "investment contract" makes clear that instruments of that name include those in which a return . . . is promised in a contract.

Brief of Petitioner SEC at 17, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455, at *17 (U.S. June 26, 2003) (cleaned up). The SEC reinforced the point in the same brief, explaining that several "leading dictionaries, both [from] when the securities laws were enacted and today, confirm that the term 'investment contract' includes an agreement that promises a specified or

fixed return." *Id.* at *17 n.8 (citing Webster's New International Dictionary (2d ed. 1934); The Oxford English Dictionary (1933); Black's Law Dictionary (3d ed. 1933); The Random House Dictionary of the English Language (1987)).

With no contract to point to in this case, the SEC misinterprets the second word in "investment contract."  To make this leap, the SEC relies on *Howey's* statement that "[a]n investment contract . . . came to mean a contract ***or scheme*** for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'"  328 U.S. at 298 (emphasis added) (quoting *Gopher Tire*, 177 N.W. at 938); *see, e.g.*, Compl. ¶ 2 (alleging defendants engaged in "investment schemes"), 315–317 (alleging the existence of "various profit-earning schemes").  But *Howey* does not support the SEC's position.

As an initial matter, to the extent the *Howey* Court suggested that non-contractual "schemes" could satisfy that definition of "investment contract" (and, as explained below, it did not), such a statement was plainly dicta.  The factual scenario presented in *Howey* involved two types of contracts—a "land sales contract" and "service contracts."  *Howey*, 328 U.S. at 300.  There was thus no question before the *Howey* Court concerning non-contractual arrangements.

In any event, *Howey's* reference to a "scheme" was *not* intended to read the word "contract" out of the statute.  It was meant to capture the more complex arrangements giving rise to an investment contract.  As *Howey* explained, state courts had focused on the "economic reality" of a transaction to determine whether an investment contract existed.  This is because some promoters had "devised" "schemes" to try to evade blue sky laws by masking the economics of their offerings through multiple agreements and arrangements with investors.  *Howey*, 328 U.S. at 299.  State courts considered these various agreements together so that the form of a transaction would not win over its substance.  *See, e.g.*, *State v. Robbins*, 240 N.W. 456, 457 (Minn. 1932) (agreement

for sale of muskrats and agreement for breeding and management services "together . . . constitute a sale of an interest in a profit-sharing scheme"); *Stevens*, 161 A. at 193, 194–95 (contract to lease rabbits and related "'buy back' contract" to repurchase rabbits from investors was a "twofold" "scheme" in which seller promised to deliver future value to buyer); *Dobal v. Guardian Fin. Corp.*, 251 Ill. App. 220, 224 (Ill. App. Ct. 1929) (similar).

Thus, *Howey* stands for the unremarkable proposition that when deciding if an investment agreement exists, a court should look not only to the four corners of each individual contract or arrangement, but also to the broader context of the relevant transaction. *Howey* itself is an example in that the Court's central holding was that multiple contractual arrangements "together" amounted to an investment contract, even if one of those documents standing alone would not have sufficed. *See* 328 U.S. at 297 ("Under the circumstances, the land sales contract, the warranty deed and the service contract together constitute an 'investment contract'"). *Edwards* is yet another example in that the Court considered the investment "package" together, which included a payphone sale and related agreement providing for contractually specified returns. *See* 540 U.S. at 391–92. Put simply, the term "scheme" refers to the full relationship between the parties, grounded in one or more contractual instruments or arrangements that confer rights and obligations on the parties. *See SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) ("This case presents a 'scheme' to be evaluated under *Howey* that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the [digital asset at issue]. *Howey* requires an examination of the entirety of the parties' understandings and expectations.").

But by referencing a "scheme," *Howey* was not jettisoning the word "contract" from "investment contract." Nor was it suggesting that there could be an investment contract when the buyer and seller have no post-sale contractual relationship with one another. No decision of the

19

Supreme Court or any Court of Appeals, has ever found that a "scheme" that does not involve a contract with post-sale obligations qualifies as an "investment contract."  And none of the state cases cited by *Howey*, 328 U.S. at 298 n.4, which formed the basis for the Court's understanding of investment contract, involved a "scheme" without contractual undertakings.  To the extent the SEC is now contending that such non-contractual arrangements can amount to an "investment contract," the SEC's position is unmoored from the statutory text and from the precedent construing that language.  *Cf. Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.9 (2d Cir. 2019) (courts "may not 'add words to the law to produce what is thought to be a desirable result'" but must "conform to the language of the statute").

## 2. The SEC is Wrong that Digital Assets Are Investment Contracts in Perpetuity.

Even accepting the SEC's (incorrect) view that there can be an investment contract without an ongoing contractual obligation, the SEC still has not plausibly alleged that the Digital Assets were traded as investment contracts *on BAM's Platform*.  The SEC focuses its allegations solely on the initial coin offerings ("ICOs") of the Digital Assets (which did not occur on BAM's Platform) and a handful of public statements about those assets after the ICOs (which did not involve BAM or the sellers of the Digital Assets on BAM's Platform).  Compl. ¶¶ 364–509.  From this, the SEC alleges that every transaction involving the Digital Assets, from the ICOs on, was an investment contract—even those that occurred years later and had nothing to do with the ICOs or alleged public statements.  *Id.* ¶ 362 ("From the time of each of their first offer or sale, each of these Crypto Asset Securities was offered and sold as an investment contract and, therefore, was and is a security.").

The SEC's approach is deeply flawed.  As an initial matter, the Complaint includes no allegations whatsoever about transactions involving the Digital Assets on BAM's Platform.

Instead, the SEC seems to be proceeding on the theory that the Digital Assets were offered as investment contracts during the ICOs (which BAM contests, for the reasons stated above) and so remain investment contracts in perpetuity.  But the fact that an asset may, at some point, be part of an investment contract does not make the asset itself an investment contract.  For example, orange groves (or any other asset) can be sold as part of an investment contract, as they were in *Howey*, but that is certainly not always the case.  If an orange grove in *Howey* was sold in a transaction stripped of the bundle of service and leasing contracts that rendered the entire transaction an investment contract, the grove would not continue to have the status of a security.  It would instead represent a real estate asset that could be bought and sold without implicating the securities laws.

In this way, investment contracts differ fundamentally from some other forms of securities—such as stocks, bonds, and notes—that permanently retain their attributes as securities. Those instruments carry with them a bundle of rights (*e.g.*, the right to repayment of interest and principal or the right to a pro rata share of the distributions of profits) and those rights are transferred from seller to purchaser whenever a transaction takes place.[8]  Those rights are enforceable both contractually (*e.g.*, under the terms of a bond or the articles of incorporation and bylaws of a corporate entity) and as a matter of corporate law (*e.g.*, pursuant to the fiduciary duties of a board of directors and management to act in the interest of constituent investors).

But the same is not true for an investment contract involving an ordinary asset such as an orange grove.  This is why, when applying the *Howey* test, "*[e]ach transaction* must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to

---

[8] Notably, even stock in a company, the quintessential security, might cease to be a security when the company's circumstances change.  *See Versyss Inc. v. Coopers & Lybrand*, 982 F.2d 653, 655 (1st Cir. 1992) (stock no longer a security following a merger because the company ceased to legally exist and, thus, stockholders no longer had rights to dividends).

be served, and the factual setting as a whole." *Marine Bank*, 455 U.S. at 560 n.11 (emphasis added); *see also SEC v. Aqua–Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) ("The enterprise and the described materials, by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place, together with the knowledge and the objective intentions and expectations of the parties at that time." (citing *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975)), *aff'd*, 687 F.2d 577 (2d Cir. 1982); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 232 (2d Cir. 1985).

Courts applying this framework have rejected a *per se* rule that assets once offered as investment contracts always remain investment contracts. *See Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) (en banc). In *Hocking*, a Ninth Circuit panel held that a secondary sale of a condominium (*i.e.*, by someone other than the condominium developer) was an investment contract because an accompanying rental pool agreement already existed. *Id.* at 1456. The panel relied on the fact that courts had previously held that where a developer initially sells condominiums along with a rental pool agreement, those agreements constitute an investment contract. *Id.* On rehearing *en banc*, however, the Ninth Circuit rejected that reasoning:

> Such a *per se* rule would be ill-suited to the examination of the economic reality of each transaction required by *Howey*. In the context of isolated resales, each case requires an analysis of how the condominium was promoted to the investor, including any representations made to the investor, and the nature of the investment and the collateral agreements.

*Id.* at 1462.

At least until recently, the SEC agreed that the sale of a digital asset must be assessed in the same way. In 2018, the Director of the SEC's Division of Corporate Finance stated that "the token . . . all by itself is not a security, *just as the orange groves in Howey were not*," because "[t]he digital asset itself is simply code" and whether it is a security depends on how it is sold.

Director Hinman Remarks (emphasis added).  This made clear that SEC leadership's view—at least at the time—that the developers of digital assets do not necessarily owe continuing legal obligations to the asset holders or any secondary-market purchasers, and secondary-market purchasers lack any rights against those developers.  *See also* Hester M. Peirce, SEC Commissioner, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023) ("[A]n initial fundraising transaction involving a crypto token can create an investment contract, but the token itself is not necessarily the security even if it is sold on the secondary market.").[9]

With these principles in mind, the Complaint plainly fails.  At the most basic level, the Digital Assets are merely lines of computer code used in certain computer applications.  Selling computer code, on its own, is not selling an investment contract; it is selling an asset or "commodity for personal consumption," which is not subject to the securities laws.  *Forman*, 421 U.S. at 858.  In acknowledging that Bitcoin and Ether are not securities, the SEC has conceded this point.  *See* Director Hinman Remarks.  The SEC thus needed to allege something about the specific transactions that occurred on BAM's Platform that made the Digital Asset sales into investment contracts—basic facts such as the identity of the person who offered and sold the Digital Asset, the terms of any contract or collateral agreements relating to the transaction, and the

---

[9] The fact that transactions involving digital assets must be analyzed on a transaction-by-transaction basis is reinforced by recent case law considering the Exchange Act.  *See Underwood v. Coinbase Glob., Inc.*, 2023 WL 1431965, at *11 (S.D.N.Y. Feb. 1, 2023).  In *Underwood*, plaintiffs alleged in conclusory fashion that every transaction involving digital assets on Coinbase's trading platform amounted to a separate "contract" under Section 29(b), which provides that any "contract" made in violation of the Exchange Act or any rule or regulation thereunder is void.  *See* 18 U.S.C. § 78cc(b).  The court rejected those allegations and granted defendants' motion to dismiss because (i) plaintiffs failed to "identify any transaction-specific contract" and (ii) "plaintiffs' notion that, without more, each individual purchase or sale [of a digital asset on a trading platform] qualifies as a contract within the meaning of Section 29(a) is without support in the case law."  *Underwood*, 2023 WL 1431965, at *11; *see also Risley v. Universal Navigation Inc.*, 2023 WL 5609200, at *13 (S.D.N.Y. Aug. 29, 2023) (same).

rights and obligations of the buyer and seller.  The SEC has been investigating BAM for years, and yet the Complaint is entirely silent on these issues.  *Cf. Rogers v. Assur. IQ, LLC*, 2023 WL 2646468, at *4 (W.D. Wash. Mar. 27, 2023) (partially granting motion to dismiss where "Plaintiffs chose to use the passive voice" for "information [that] is known to Plaintiffs without any discovery and should be simple to include").

The SEC's allegations about ICOs and various public statements do not solve this problem. Even assuming the initial ICO sales were investment contracts, that says nothing about whether transactions involving the Digital Assets later made available on BAM's Platform were too.  For example, the SEC included no allegations that when someone on BAM's Platform sold a Digital Asset to another user, the original promoter of the Digital Asset owed the buyer anything.  Nor does the SEC allege that secondary-market purchasers of the Digital Assets on BAM's Platform are in contractual privity with the original promoters of the Digital Assets or anyone making public statements about those assets.  *See, e.g.*, *Fabrinet USA, Inc. v. Micatu, Inc.*, 2020 WL 3414657, at *3 (N.D. Cal. June 22, 2020) ("Privity of contract is a doctrine of contract law that states that only parties to a contract, hence those in privity to it, have rights or liabilities under the contract.") (citation omitted).  In fact, the SEC includes no allegations that any purchaser of the Digital Assets on BAM's Platform even knew about the ICOs or any of the surrounding public statements.

These pleading failures are fatal.  Indeed, this Court highlighted the point during oral argument, observing that once the Digital Assets are available "on the platform and people can trade them, sell them, and repurchase them . . . people aren't responding to the initial offering, they're responding to the asset."  Tr. of TRO Hr'g at 14–15 (June 13, 2023), Dkt. 69 (cleaned up). The SEC has made no allegations supporting that those buying the Digital Assets on BAM's Platform were not simply "responding to the asset."  As a result, the SEC's assertion that the

Digital Assets were offered as investment contracts on BAM's Platform is nothing more than a legal conclusion that cannot overcome a motion to dismiss.  *See*, *e.g.*, *Harris v. Corr. Corp. of Am.*, 796 F. Supp. 2d 7, 12 (D.D.C. 2011) (allegations that contract existed were "legal conclusions couched as factual allegations") (cleaned up); *In re U.S. Off. Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 89 (D.D.C. 2003) ("when resolving a motion to dismiss, the court is not required to accept legal conclusions presented in a complaint as factual allegations"); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### 3.     The SEC's Reliance On Initial Coin Offering Cases is Misplaced.

To support its view of the law and that it stated a claim, the SEC may rely on recent decisions in enforcement actions involving digital assets, including:  *Telegram Grp.*, 448 F. Supp. 3d 352; *SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020); and *SEC v. Terraform Labs Pte Ltd.*, 2023 WL 4858299, at *1 (S.D.N.Y. July 31, 2023); *see* TRO Br. at 40 (June 7, 2023), Dkt. 26 (citing the first three cases for the proposition that "Courts have repeatedly found . . . crypto assets to be investment contracts under *Howey*[.]").  Those cases do not help the SEC here.

All those cases involved claims against the issuer of a digital asset, which present markedly different circumstances than the secondary-market transactions alleged here.  For example, in *Telegram* (a preliminary injunction decision), the issuer of the Gram token offered written agreements with promises to sell Gram in the future after the blockchain was developed, and the promoter acknowledged that the agreements at issue were securities.  *See* 448 F. Supp. 3d at 367.  In *Kik*, the promoters offered written agreements promising to develop digital tokens called kin, and the promoter also acknowledged those agreements were securities.  *See* 492 F. Supp. 3d at 174.  And in *Terraform*, the promoter sold LUNA tokens directly to investors pursuant to purchase agreements along with the right to purchase another token promoted as a yield-bearing investment.

*See* 2023 WL 4858299, at \*12.  Thus, *Telegram*, *Kik*, and *Terraform* each involved contractual rights and direct financial relationships with the original promoter that are absent here.  The money invested in Gram, Kin, or LUNA went to the promoter; the promoter undertook to use that money to build the blockchain, the functionality for the tokens, or to offer tokens with a yield-bearing return; and the investor could receive value if the promoter did what they promised.

Moreover, these cases, cited by the SEC in its TRO briefing, made clear that any conclusion reached about the initial offerings was not also a conclusion about the digital assets themselves.  For example, in *Telegram*, the court explained that it was not analyzing the token in a vacuum, but "the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram" to determine whether it was sold as an investment contract.  448 F. Supp. 3d at 379.  Following a motion for clarification, the court reinforced the point, explaining that its "central" holding was that "the 'security' was not the Gram Purchase Agreements nor the Gram but the entire scheme that comprised the Gram Purchase Agreement and the accompanying understandings and undertakings made by Telegram" to the initial purchasers.  *SEC v. Telegram Grp. Inc.*, 2020 WL 1547383, at \*1 (S.D.N.Y. Apr. 1, 2020).

Citing *Telegram*, the court in *Terraform* made the same point—namely, that the digital assets themselves were not necessarily securities and needed to be analyzed together with the accompanying agreements, promises, and financial relationship of the parties.  *See* 2023 WL 4858299, at \*12.[10]  Similarly, in *LBRY*, the court explained that it had not concluded that the digital

---

[10] *Terraform* also concluded that no "enforceable written contract" is required to establish the existence of an investment contract, but that does not salvage the Complaint in this case.  2023 WL 4858299, at \*11.  The court reasoned that there is an investment contract "wherever the 'contracting parties' agree—that is 'scheme'—that the contractee will make an investment of money in the contractor's profit-seeking endeavor."  *Id.*  Even under this broad interpretation of *Howey*, the Complaint fails.  Nowhere in the Complaint does the SEC allege that there were

asset was itself an investment contract (just the initial offering) and that it was not restricting those holding the asset from selling it.  *See* Tr. of Mot. Hr'g, at 36:1–37:18, *SEC v. LBRY, Inc.*, No. 21-cv-260 (D.N.H. Jan. 30, 2023), Dkt. 105; *see also id.* at 25:7–13 (Court: "What I was focused on is what the parties were litigating, was whether these particular offerings of the token were securities offerings, and I said that they were.  That does not necessarily mean that . . . every resale of the token violates the Securities Act because it's a restricted security.").

The foregoing cases, which involved materially different facts, simply do not support the SEC's unprecedented theory of an investment contract in this case.  In fact, they support BAM's position.  To date, the only court to address transactions analogous to those that allegedly occurred on BAM's Platform found that such transactions were ***not investment contracts***.  In *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023), the court held that a company's sales of a digital asset that—like the sales alleged here—were "blind bid/ask transactions," *id.* at *11, "did not constitute the offer and sale of investment contracts," *id.* at *13.  The *Ripple* court reached that conclusion because, as with transactions on BAM's Platform in this case, the undisputed facts showed no relevant relationship between the parties to the sale that could transform the sale of a digital asset into the sale of an investment contract.  *Id.* at *11–12; *see also id.* at *6–7 (concluding that the absence of "any promises or offers" in context of "blind bid/ask transactions" on secondary exchanges precluded finding of an investment contract).

## C.    The SEC's Theory of an Investment Contract has Unbounded Application.

The SEC's theory of an investment contract in this case, *see* TRO Br. at 39 (June 7, 2023), Dkt. 26, has virtually limitless application.  The SEC believes there can be an investment contract when the purchaser of an asset has no rights to anything from the seller or anyone else, so long as

---

"contracting parties" who "agree[d]" or scheme[d] that the buyer's payment would be invested in the seller's "profit-seeking endeavor."

the promoter of the assets made public statements at some point in time that could be construed as creating an expectation that the asset's value will increase in the future.  This theory seeks to convert *Howey*'s requirement that the buyer have some entitlement to future value into an element that is satisfied whenever a buyer *expects* that an asset will increase in value—even if the expectation is unenforceable, not reasonably believed to be enforceable, and not tied to the actions of the seller.

This is not the law.  A purchaser's hope that an asset will increase in value "does not evidence the existence of an 'investment contract' within the meaning of the securities acts." *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966). This is because:

> anyone who buys or sells a horse or an automobile hopes to realize a profitable "investment."  But the expected return is not contingent upon the continuing efforts of another.  In the words of the Supreme Court [such a buyer] "has been left to its own devices for realizing upon its rights."

*Id*. (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943)).  Instead, the purchaser must receive a commitment from the seller to take action to return value to the purchaser.

Without such a limitation—and no such limitation exists in the Complaint—transactions long (and correctly) understood to be straightforward asset sales—such as diamonds, gold, jewelry, real estate, and art—would constitute securities.  For example, an art collector may purchase art in the hope that it will increase in value and reasonably rely on the artists, museums, and galleries to promote the art and artists for that purpose.  For their part, the artists, museums, and galleries may take steps to promote the artwork, including through marketing events and showings.  The same would be true of any other asset that is expected to be advertised or promoted by industry participants ("a diamond is forever") or whose resale value depends on actions that are expected to be performed or markets that are expected to be maintained.

Applying the SEC's theory, a subsequent sale of the art by an art collector would be an investment contract rather than an asset sale. This is so even in the absence of the touchstones of an investment contract: The secondary buyer has no enforceable rights against the collector, artists, museums, or galleries; the secondary sale is not part of an artist-initiated "scheme"; and at no point do the artist and the secondary buyer share in a common enterprise or owe anything to one another. One can easily come up with similar scenarios involving a wide variety of assets, such as baseball cards, fine wine, classic cars, or concert tickets, among many others.

And the principle is not limited to collectors' items but to any commercial item whose value turns on announced or expected actions of third parties. For example, the value of an investment in lithium (or lithium mines) turns on various companies' fulfillment of their publicly announced plans to purchase or develop electric batteries. But lithium is not transformed into a security just because an investor reasonably expects demand for lithium to increase based on these announcements and public statements. If such an expectation of future value is not *contractually* grounded—*i.e.*, based on *rights* conferred upon the investor through promises or otherwise—there would be no limit to the SEC's ability to argue that sales of ordinary assets qualify as securities and to arrogate to itself jurisdiction that neither Congress nor the *Howey* Court ever intended. *Cf. Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (expectations of purchasers of parcels of land that the parcels would increase in value because of sellers' representations that "the surrounding area would develop into a thriving residential community" were insufficient to establish an investment contract in the absence of evidence that sellers "promised, along with the land sales, to develop the community themselves").

These are not hypothetical scenarios. The SEC has previously tried (unsuccessfully) to extend the reach of investment contracts to reach asset sales that did not involve promises to deliver

29

future value.  In *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986), the SEC sued sellers of gold coins who promised to deliver coins at a future time pursuant to a prepayment system.  The Ninth Circuit found that these were not investment contracts because "the purchasers were speculating in the world gold market" rather than relying principally on the sellers' efforts. *Id.*  In reaching this conclusion, the court cautioned that the SEC's position, if accepted, could be applied "to any sale-of-goods contract in which the buyer pays in advance of delivery and the ability of the seller to perform is dependent, in part, on both his managerial skill and some good fortune."  *Id.*; *see also Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980) (sale of silver bars with no ongoing obligations not an "investment contract").

The SEC's theory here is even more overreaching.  Unlike in *Belmont* and the other digital asset cases discussed above, someone purchasing a Digital Asset on BAM's Platform had no right to anything except the asset itself.  The SEC's theory also provides no basis for distinguishing transactions involving the Digital Assets and those involving other tokens on BAM's Platform, such as Bitcoin and Ether, that the SEC has acknowledged are not securities.  Indeed, a purchaser who buys Bitcoin on BAM's Platform has the same contractual rights as a purchaser who buys any of the other Digital Assets: they are entitled to the tokens and nothing more.  *See Telegram*, 448 F. Supp. 3d at 358 ("In the abstract, an investment of money in a cryptocurrency utilized by members of a decentralized community connected via blockchain technology, which itself is administered by this community of users rather than by a common enterprise, is not likely to be deemed a security under the familiar test laid out in [*Howey*]. The SEC, for example, does not contend that Bitcoins transferred on the Bitcoin blockchain are securities.").

At bottom, the SEC is seeking to stretch the definition of investment contract in such a way that *Howey* becomes unrecognizable and could be haphazardly and opportunistically applied to

innumerable asset sales.  Ordinary asset sales were never intended to be covered as investment contracts, and *Howey* makes clear that more is needed, including an ongoing contractual relationship between the buyer and seller.  The absence of any such relationship is dispositive here. Accordingly, the Eighth, Ninth, and Tenth Claims must be dismissed with regard to BAM for failure to allege the existence of a "security," which is a legal requisite for each of those claims.

### D.   The SEC Cannot Regulate Digital Assets As Securities Under the Major Questions Doctrine.

Even if the SEC plausibly alleged that transactions involving the Digital Assets were investment contracts (which they have not), the major questions doctrine would require dismissal. Accepting the SEC's theory in this case would mean, in essence, that the SEC has regulatory authority over the entire digital asset industry—a nascent, transformative, trillion-dollar industry. Where, as here, an agency asserts authority over a question of major "economic and political significance"—particularly where the agency has not done so before—the major questions doctrine provides that an agency must "point to 'clear congressional authorization" for the power it claims.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (first quote); *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2614 (2022) (second quote).

Nothing in the federal securities laws authorizes the SEC to regulate digital assets in the manner asserted in the Complaint.  In fact, the SEC's position is inconsistent with the plain language of "investment contract" and decades of precedent interpreting those terms.  And the major questions doctrine applies with particular force where, as here, (i) the SEC claims authority it has previously acknowledged it lacks, *see Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159; (ii) Congress is actively considering legislation that directly addresses the question at issue in this case, *see West Virginia*, 142 S. Ct. at 2610, 2614; and (iii) the SEC's claim of authority is fundamentally "inconsistent" with the

statutory "structure and design," *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320-21 (2014). Indeed, the practical result of applying the existing securities-regulation framework to digital assets would likely be to ban the assets because compliance is infeasible.

## II. THE SEC HAS NOT PLAUSIBLY ALLEGED THAT BAM'S STAKING SERVICE CONSTITUTES AN UNREGISTERED SECURITY.

The SEC also claims that BAM's Staking Program is a security. Compl. ¶¶ 339–51. The Complaint appears to allege that the BAM "Terms of Use" document constituted an investment contract between BAM and its Staking Program participants. *Id.* ¶ 346. But other than summarily asserting that the Program is "an investment contract, and thus, a security," *id.* ¶ 348, the Complaint contains none of the necessary factual allegations to establish such. Specifically, the Complaint fails to put forth factual allegations plausibly demonstrating that BAM's Staking Program involves either (i) an "investment of money" or (ii) a right to profits generated by the "efforts of others." *Howey*, 328 U.S. at 301. Absent these allegations, the SEC's claim for offering for sale an unregistered security (Fourth Claim) must be dismissed.

### A. The Complaint Fails to Allege That BAM's Staking Customers Make an "Investment of Money."

#### 1. There Is No Allegation That Staking Customers Purchase Anything.

To satisfy *Howey's* investment-of-money element, the investor must make a "purchase," *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614 (D.C. Cir. 2000), by choosing to "*give up a specific consideration* in return for a separable financial interest with the characteristics of a security," *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 559 (1979) (emphasis added). Though the Complaint summarily asserts that "[p]articipation in BAM Trading's Staking Program requires the investment of money in the form of crypto assets," Compl. ¶ 349, the Complaint nowhere alleges that participants in the Staking Program are required

to purchase *anything* from BAM, let alone explain *what* they must purchase.[11]   As the Complaint acknowledges, participants in staking do not "give up" their crypto assets to "purchase" anything—rather, staked crypto assets are "held as collateral in the protocol to incentivize validators to perform required functions." *Id.* ¶ 341.   Indeed, BAM's Terms of Use, expressly state that BAM's staking customers *retain* ownership of their staked tokens.   *See* Ex. 5 ("Notwithstanding anything herein to the contrary, . . . the Digital Assets held in your Account(s) are *owned and controlled by you* and *title to the Digital Assets held in your Account(s) shall at all times remain with you*.") (emphasis added)).   In sum, the Complaint fails to plead an investment contract because, as in *Ripple Labs*, the alleged investors "did not pay money or 'some tangible and definable consideration'" to BAM, and thus there was no investment of money.   2023 WL 4507900, at *13.

## 2. The Complaint Does Not Allege That Staking Customers Face a Risk of Loss as a Result of Their Participation in the Staking Program.

Inherent in the investment-of-money element is another requirement that the Complaint does not allege—that participants are exposed to a "risk of loss" as a result of their participation. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985) ("[F]or an instrument to be a security the investor must risk loss." (citing *Marine Bank*, 455 U.S. at 558–59)); *see also United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) ("'Investment' is defined as when a person 'places his money at risk in anticipation of a profit.'" (quoting *SEC v. Diversified Indus., Inc.*, 465 F. Supp. 104, 108 (D.D.C. 1979))).

The SEC posits that staked assets might "significantly decrease in market value while staked," including the period where the tokens are subject to lock-up periods, Compl. ¶¶ 347, 349,

---

[11] BAM's staking customers do not even pay a fee to participate.  As the Complaint correctly acknowledges, BAM's fee comes from rewards the *validator* earns from the protocol, not from the *customer*.  Compl. ¶¶ 341, 350.

but to satisfy *Howey's* investment-of-money requirement, the risk of loss must arise from participation in the alleged investment contract, *see Int'l Bhd. Of Teamsters*, 439 U.S. at 559 (requiring the investor's risk was assumed as "part of the relevant transaction"); *Marine Bank*, 455 U.S. at 560 n.11 ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."). The owner of a Digital Asset assumes the risk of a "decrease in market value," not when he or she stakes the asset, but in the earlier transaction involving the owner's purchase of the digital asset in the first place. Put another way, any risk of loss or decrease in market value would not be caused by participation in the Staking Program.[12]  For similar reasons, the risk that a Digital Asset could be lost due to hackers or otherwise, Compl. ¶ 349, is not a risk of loss arising from participation in the Staking Program; it is potentially the risk of doing business with BAM in the first place.

Finally, the Complaint suggests that investors risk loss if staked assets are assessed a "slashing penalt[y]" for which BAM cannot make investors whole, *id.* ¶ 349, but these allegations are in considerable tension with the Complaint's own reference to BAM offering its staking customers "compensation for slashing penalties," *id.* ¶ 343.  Nor does the Complaint allege that BAM has ever suffered a slashing event.  Customers do not face a risk of loss sufficient to satisfy *Howey's* investment-of-money requirement when—as far as the Complaint alleges—they are "virtually guaranteed payment in full." *Marine Bank*, 455 U.S. at 558–59 (certificates of deposit covered by FDIC insurance are not securities).

---

[12] Furthermore, the Complaint acknowledges that "lock-up" periods associated with staking are imposed by the various networks for the tokens, not BAM, and that these periods may actually be *shorter* for BAM customers than they would be for people who wish to independently stake their tokens.  Compl. ¶ 347.

**B.     The Complaint Fails to Allege That BAM's Staking Rewards Represent Profits Derived From BAM's Managerial Efforts.**

Under *Howey*, an investment contract must create a right to profits generated "from the efforts of others." 328 U.S. at 299, 301.   And those others' efforts must be managerial or entrepreneurial, not ministerial or clerical.  *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 545 (D.C. Cir. 1996).  The Complaint fails to allege facts showing that staking rewards are generated from anyone's managerial or entrepreneurial efforts, as opposed to arising from the relevant blockchain protocol's consensus mechanism.  *See* Compl. ¶¶ 340, 350.  Moreover, although the Complaint notes potential practical advantages of staking through a service such as BAM's, *id.* ¶ 339, the Complaint acknowledges that staking rewards simply do not depend on BAM's managerial efforts because "[i]ndividuals can stake assets on their own," *id.* ¶ 343.  Services that "anyone including the investor himself could supply" are not managerial or entrepreneurial as a matter of law, *Life Partners*, 87 F.3d at 546, and the fact a person makes a service more user friendly does not transform otherwise ministerial efforts to managerial ones.

Furthermore, *Howey's* efforts-of-others prong requires *post*-purchase efforts that "can meaningfully affect the profitability of the investment."  *Life Partners*, 87 F.3d at 546.  To the extent the Complaint alleges anything about BAM's efforts—involving creation of the Staking Program, establishment of staking nodes and related infrastructure, and selection of commercial counterparties, Compl. ¶¶ 343, 346—these activities all necessarily *pre*-date the customer's participation and are legally insufficient.  And, whatever "technical expertise and knowhow" BAM brought to the table, *id.* ¶ 343, these pre-purchase activities are insufficient to meet the element required for an investment contract.  *See Life Partners,* 87 F.3d at 545 (sponsor's "pre-purchase services as a finder-promoter" do not satisfy the efforts-of-others requirement).

## III.    THE SEC HAS FAILED TO PLAUSIBLY ALLEGE A SECTION 17(A) CLAIM.

The Complaint also asserts (Thirteenth Claim) that BAM defrauded Binance.US "investors" and "purchasers" in violation of Section 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2), (3), by (i) failing to disclose that Sigma Chain's "manipulative wash trading" on BAM's Platform caused the platform's reported trading volumes to be overstated, Compl. ¶¶ 240, 243, 250–58, 261, 268–76; and (ii) overstating the extent to which BAM had implemented trade surveillance controls to prevent manipulative trading, *id.* ¶¶ 239, 243–49, 260, 263–67, 277–81.  These allegations, too, are legally insufficient.

### A.    The Complaint Does Not Plead a Claim Under Section 17(a) as It Relates to Crypto Currency Customers.

To the extent the Section 17(a) claim is premised on the offer or sale of Digital Assets to customers trading on BAM's Platform, *see* Compl. ¶¶ 277–78, 280, it fails for several reasons. First, the Digital Assets are not "securities" for the reasons explained above, and thus cannot support a Section 17(a) claim, *see* 15 U.S.C. § 77q(a) (prohibiting fraud "in the offer or sale of any securities").  Indeed, the supposed wash trading on September 25, 2019, purportedly occurred with regard to an unidentified digital asset that the SEC does not allege to be a security.  *See* Compl. ¶ 272.  Second, there is no allegation that the offers or sales resulted in BAM obtaining any money or property.  *See* 15 U.S.C. § 77q(a)(2) (prohibiting "obtain[ing] money or property by means of any untrue statement of a material fact"); *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (dismissing Section 17(a)(2) claim for failure to allege that party offering or selling obtained money or property by means of his alleged misrepresentation).  Third, the Section 17(a)(3) claim requires allegations of deceptive acts beyond misstatements, and no such allegations are made here.  *See SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) ("[M]istatements and omissions can form *part* of a scheme liability claim [under Section 17(a)(3)], but an actionable scheme

liability claim requires something *beyond* misstatements and omissions."); *RPM Int'l*, 282 F. Supp. 3d at 31 ("Scheme liability [under Section 17(a)(3)] is only appropriate if Section 17(a)(2) 'cannot fully cover the deceptive acts.'").   Finally, to the extent the Section 17(a) claim is based on misstatements to crypto-currency traders regarding the operation of BAM's Platform, those misstatements cannot serve as the basis for a Section 17(a) claim because they are not statements "in the offer or sale."  *See Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1149–50 (11th Cir. 2018) (holding that statements about the trading platform, rather than statements that go to the value of the securities, are not statements in connection with an offer or sale of securities); *SEC v. Goble*, 682 F.3d 934, 943–44 (11th Cir. 2012) (same).

**B.     The Complaint Does Not Plead a Claim Under Section 17(a) as It Relates to Equity Investors in BAM.**

The Complaint's claim against BAM under Section 17(a) relates primarily to statements made to equity investors regarding wash trading and surveillance thereof on BAM's Platform.  *See* Compl. ¶¶ 247–49, 256–58, 279–80.   Specifically, the SEC alleges that BAM both reported misleading trading volumes that were inflated by manipulative wash trades, *see id.* ¶¶ 250–58, and falsely stated that it took steps to preclude manipulative trading on its platform, *see id.* ¶¶ 244–49. These allegations also fail to state a Section 17(a) claim on either ground.

**1.     The Complaint Does Not Adequately Plead That Reported Trade Volumes on BAM's Platform Were Inflated by Manipulative Wash Trading or Material to Equity Investors.**

To plead a Section 17(a) claim,[13] the SEC must allege facts showing, *inter alia*, that BAM "made material misrepresentations or omitted material facts necessary to make other statements not misleading."  *RPM Int'l*, 282 F. Supp. 3d at 14.  Here the SEC's first theory appears to be that

---

[13] As noted above, a Section 17(a)(3) claim requires allegations beyond merely a misstatement. *Rio Tinto*, 41 F.4th at 49; *RPM Int'l*, 282 F. Supp. 3d at 31.  No such allegations are present here with regard to the Section 17(a)(3) claims based on supposed misstatements to equity investors.

BAM reported trading volumes on its platform that were fraudulently inflated due to manipulative wash trading by Sigma Chain. *See* Compl. ¶¶ 250, 268–77, 279. But the Complaint does not allege facts evidencing that non-party Sigma Chain engaged in manipulative wash trading, and therefore fails to plead that such conduct fraudulently inflated BAM's reported trade volumes.

Because "[t]he gravamen of the SEC's action under Section 17 here is fraud," the SEC is required to comply with Federal Rule of Civil Procedure 9(b), *RPM Int'l*, 282 F. Supp. 3d at 13, by pleading the "who, what, when, where, and how" of the fraud, *In re U.S. Off. Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 73 (D.D.C. 2004). Wash trading requires proof of manipulative intent by the trading party, here Sigma Chain. *Rockies Fund, Inc*, 428 F.3d at 1093 (wash trades—transactions involving no change in beneficial ownership—are improper only if performed with fraudulent intent); *Koch v. SEC*, 793 F.3d 147, 152 (D.C. Cir. 2015) ("Market-manipulative behavior is '*intentional or willful* conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" (emphasis added)). And where, as here, the claim against BAM is that it falsely reported trading volumes inflated by manipulative trading, the claim further depends on allegations both that BAM's supposed misstatement was material and that BAM was at least negligent in reporting those purportedly inflated trading volumes. *See RPM Int'l*, 282 F. Supp. 3d at 14 (reciting elements). The Complaint's broad-brush approach falls far short.

As for the materiality requirement, the Complaint identifies trading volumes only as to four sets of trades. First, as noted above, the supposed wash trading on September 25, 2019 purportedly occurred in an unidentified digital asset that the SEC does not even allege to be a security. *See* Compl. ¶ 272. Second, the allegations concerning supposed wash trading between January and June 2022 fail to specify the particular digital assets (as Rule 9(b) requires) and, in any event, do not recount facts from which the Court could infer that the allegedly manipulated trading volumes

were materially inaccurate.  *Id.* ¶ 273.  The same is true to the purported wash trades from June

through August 2021.  *Id.* ¶ 275.

This leaves the allegations with regard to a single digital asset (COTI) on a few days in

April 2022.  *Id.* ¶ 274.  Assuming *arguendo* that the trading volumes on certain of the identified

dates were sufficient to be material, there is no allegation of facts that would suggest that BAM

acted negligently, much less fraudulently, with regard to its reporting of the trading volumes on

those few days.   To the contrary, the Complaint alleges that BAM had implemented trade

surveillance mechanisms by February 2022.  *Id.* ¶ 265.

Furthermore, the Complaint offers no specific allegations that plausibly support the

conclusion that wash trades occurred.  There is, for example, no allegation as to "what" and "how"

of the purported manipulative trading.  The SEC gets nowhere by liberally sprinkling the "wash

trading" label throughout the Complaint.  *See, e.g.*, Compl. ¶¶ 12, 268–69, 271–76.  Labels and

conclusions do not satisfy the plausibility standard, *RPM Int'l*, 282 F. Supp. 3d at 12, much less

Rule 9(b)'s heightened pleading requirements for a fraud allegation.   Similarly, the Complaint

does not adequately allege manipulative wash trading by simply stating that Sigma Chain's

"dozens of user accounts" traded with one another.  *See* Compl. ¶¶ 269, 271–72.  "[T]he simple

fact that a party has conducted a matched order or wash sale (or a series of them) does not establish

manipulative intent of any kind."  *Rockies Fund, Inc*, 428 F.3d at 1095.  The Complaint posits that

wash trading "may" "artificially inflate the aggregate trading volume of the platform upon which

the asset is being traded," Compl. ¶ 240, but it does not explain *why* Sigma Chain would have

engaged in such misconduct.  *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d

1251, 1256 (D.C. Cir. 2004) (Rule 9(b) requires an explanation of "what was retained or given up

as a consequence of the fraud").  There is, for instance, no allegation about which of Sigma Chain's strategies engaged in the purportedly improper trading, or how that trading was implemented.

To the contrary, the Complaint's allegations are consistent with trading activity that has been recognized by the SEC itself as completely lawful.  Inadvertent trades between accounts owned by the same beneficial owner (*i.e.*, bona fide" self-trades) are not violative of the securities laws when they are made by distinct algorithms.  *See* Order Approving Proposed Rule Change, as Modified by Amendment No. 1, Relating to Self-Trades and FINRA Rule 5210, at 9 (SEC May 1, 2014) ("[S]elf-trades between unrelated trading desks or algorithms are generally bona fide . . . .").  That is particularly true given the SEC's concession that Sigma Chain was a "frequent spot trader," Compl. ¶ 187, BAM's Platform's "main market maker," *id.* ¶ 33, and the counterparty for the OTC, OCBS, and Convert services, *id.* ¶ 225.  Each function naturally increased the possibility that its various trading strategies would interact with one another.

Finally, even if the Court were to indulge the SEC's speculation that *some* of the Sigma Chain trades in COTI (or otherwise) *might* have been manipulative, the SEC fails—despite having all the relevant trading records—to identify the *scale* of the purported manipulation.  As a result, there is no basis to infer that the volume of the trades in question was material to BAM's overall trading volumes, or for that matter, to the trading volume in any particular token for any specified time frame, or that it was otherwise significant over any meaningful window of time.  This omission is particularly significant because the viability of the SEC's fraud theory depends on the SEC adequately pleading (and ultimately proving) that BAM's reported trade volumes were misstated to a degree that would have been *material* to equity investors in BAM Management.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (information qualifies as material only if "there is a substantial likelihood that a reasonable shareholder would consider it important" in

making an investment decision as a result of it "having significantly altered the 'total mix' of information made available") (internal quotation marks omitted) (adopting for misrepresentation cases the standard of materiality set forth in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)). The Complaint, however, says nothing about what financial metrics BAM's venture capital investors regarded as important to their investment decisions or the extent to which any alleged wash trading affected any of those metrics. For this reason, the Complaint fails to plead a material misstatement concerning trading volumes on BAM's Platform.

### 2. The Complaint Does Not Plead That BAM Made Material Misrepresentations About Its Trade Surveillance Program.

The SEC is equally unsuccessful in its attempt to state a Section 17(a) claim by reference to: (i) a prohibition on wash trading in BAM's Platform's Trading Rules, (ii) statements about "on-chain analytics" that BAM's CEO made during a November 2019 webinar, and (iii) statements in a September 2021 "Seed Round Pitch Deck" provided to seed equity investors in BAM Trading that BAM had engaged Eventus to provide trade surveillance. Compl. ¶¶ 244–49, 265.

#### a) BAM's Trading Rules

According to the SEC, BAM made a material misstatement when it included a prohibition on wash trading in the "BAM Platform Trading Rules," to which customers trading on the platform had access when BAM allegedly lacked adequate controls to enforce that prohibition. That allegation is a mischaracterization of the statement on which it relies. Compl. ¶¶ 244–45. The statement or prohibition to which the SEC points—that "[t]raders are prohibited from engaging in Market Manipulation," *id*. ¶ 245, is a prohibition binding **on** customers. It is not a representation **to** them or to anyone else. Moreover, the existence of a trading rule by any financial services firm does not implicitly represent to the world that every alleged violation will be identified and prevented. *See, e.g.*, *Spicer v. Chicago Bd. Options Exch., Inc.*, 1990 WL 172712, at *9 (N.D. Ill.

Oct. 30, 1990) (dismissing Section 10(b) claim predicated on allegations that an exchange implicitly represented that it would "enforce its own rules" or that its rules were adequate to prevent alleged misconduct), *aff'd*, 977 F.2d 255 (7th Cir. 1992).

Even if the prohibition on manipulative trading identified by the SEC could be shoehorned into a "tout[ing]" of BAM's compliance program, Compl. ¶¶ 11–12, 246, such generalized references to compliance programs are "too general and aspirational to be actionable." *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *15 (S.D.N.Y. Mar. 24, 2023) (dismissing Section 10(b) claim predicated on statements that a financial institution had a "Risk Governance Framework" developed "in alignment with" Federal Reserve and OCC standards); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) ("[W]hen we have found that descriptions of compliance efforts amounted to actionable assurances of actual compliance, the descriptions of such efforts were far more detailed.").

Finally, even if the Trading Rules could be construed as a representation that BAM believed it could prevent manipulative trading (which they cannot), that, too, would not be false. Absent any facts—which are not pleaded—showing that BAM did not genuinely believe its statements to be true at the time, this allegation fails as a matter of law. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326–27 (2015). At best, the Complaint alleges that BAM personnel knew that manipulative trading *could* occur and that they were seeking guidance about whether more needed to be done. *See, e.g.*, Compl. ¶¶ 262, 264.

**b)      Statements in November 2019 CoinDesk Webinar**

Next, the SEC alleges that, during a CoinDesk webinar in November 2019, a former BAM executive, Ms. Coley, stated that BAM Trading had "on-chain analytics, monitoring all the behaviors that are taking place" on BAM's Platform. Compl. ¶ 246. The SEC's charges here fail for a number of reasons, the most critical of which is that the Complaint does not establish that the

November 2019 statements were "in the offer or sale of any securities," as Section 17(a) requires. There is no nexus between these statements and the offer of equity securities in BAM Trading, which occurred in a webinar *almost two years later*, or the offer of securities to any BAM customer, for the reasons set forth above. *Supra*, Section II; Compl. ¶ 247; *see SEC v. Tolstedt*, 545 F. Supp. 3d 788, 794 (N.D. Cal. 2021) ("[T]he SEC must allege that the defendant made the false or misleading statements . . . in materials or communications typically relied upon by investors engaged in the ordinary market trading of securities [], *while at the same time* engaging in transactions to offer and sell those securities" (emphasis added)). Indeed, there is no allegation in the Complaint that an equity investor participated in or was otherwise aware of the statements.

*Second*, Ms. Coley was not discussing monitoring that may have identified wash trading in connection with the quoted snippet referred to by the SEC and, equally important, her alleged false statement was in fact true. As noted, the quoted statements were taken from a webinar during which Ms. Coley made clear—in a part of the transcript that the SEC omits—that she was referring not to trade surveillance but to blockchain analytics, a common form of transaction monitoring that is used for AML (anti-money laundering) and KYC (know-your-customer) purposes. *See* Ex. 2 ("Every single user…goes through…AML…and [is] embedded through our KYC."). When Ms. Coley spoke, any reasonable participant in the digital asset markets (or otherwise) hearing her remarks would have understood she was referring to AML and KYC controls, not trade surveillance, as the SEC should well know. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("[T]he context in which the statements were made is key.").

### c) Statements in September 2021 Pitch Deck to Seed Funding Equity Investors

Finally, the SEC again accuses BAM of "tout[ing]" its trade surveillance program, this time by reference to portions of two slides in a 27-page September 2021 pitch deck that venture-

capital equity investors in BAM Trading's seed funding round allegedly received between September 2021 and April 2022.  Compl. ¶ 248.  Those slides reference a "Robust compliance framework: KYC checks, AML screens, on-chain monitoring, trade surveillance, risk management, etc."  Ex. 4.  And they contain the logo of Eventus ("Trade Surveillance Company A") under the text "Trade surveillance, market manipulation, and transaction monitoring."  Ex. 4.  These allegations fail to plead any materially false statement.

*First*, the reference to Eventus as one of BAM's service providers was *true*—the SEC concedes that BAM retained Eventus in late 2020.  Compl. ¶ 266.  The Complaint quibbles about the timing and extent of BAM's implementation of the full functionality of Eventus's software, but even if true, that would not make the statements materially false because the generic wording in the challenged slides makes no claims on that issue.  The challenged statement is correct and, in any event, "too general and aspirational to be actionable."  *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *15; *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (nonoccurrence of specific events did not render materially misleading indefinite statement that failed to reference such events).  Indeed, the slides used in the presentation made clear that they contained "statements about the future," including "statements concerning [BAM's] plans and objectives with respect to [its] present and future operations."  Ex. 4.  Notably, even the SEC concedes that BAM was using the Eventus software at issue to some extent, by February 2022, several months before the seed funding round closed.  Compl. ¶¶ 247, 266.

*Second*, the Complaint contains no support for the notion that whether and to what extent BAM had successfully implemented a specific piece of software was or would be important to any reasonable venture-capital equity investor.  The Complaint alleges that an "investor would consider it important to know" whether BAM implemented trade surveillance.  *Id.* ¶ 277.  This

allegation falls far short of the threshold for materiality, particularly with sophisticated, private investors.  A fact is material, not because someone considers it interesting as a general matter, but only if "a reasonable person would deem [it] important *to a securities investment decision*."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (emphasis added).  Far from showing that Eventus's software would be "important" to a decision to invest in BAM, the single, isolated reference to Eventus buried in the middle of a slide deck presented to a group of exceptionally sophisticated venture-capital investors tends to suggest just the opposite.  *See Flannery v. SEC*, 810 F.3d 1, 11 (1st Cir. 2015) (reference on "one slide of a presentation of at least twenty" was not material, given, *inter alia*, sophisticated investors' ability to ask about what was important to their investment decisions).

The SEC cannot salvage its claim by pointing to a July 2021 Trade Surveillance Manual that allegedly was "also provided to Equity Investors."  Compl. ¶ 249.  On its face, that is an internal manual—"a reference for Binance.US Trade Surveillance Department . . . personnel."  Ex. 3.  Despite the SEC's extended pre-filing investigation, the Complaint fails to allege the "who, what, when, where, and how" of the purported fraud—*e.g.*, that the Manual was presented to any investor as a representation or a guarantee that every one of the referenced processes was already fully in effect.  *See In re U.S. Off. Prods. Sec. Litig.*, 326 F. Supp. 2d at 73.  Therefore, the Complaint falls far short of the particularity standard required by Rule 9(b), which mandates that the SEC allege more than BAM's Manual "falsely described active surveillance of [BAM's] Platform" to equity investors.  Compl. ¶ 249.

## **CONCLUSION**

For the foregoing reasons, the Court should grant BAM's motion to dismiss.

Dated:  September 21, 2023

Respectfully submitted,

*/s/ William R. McLucas*
William R. McLucas (*pro hac vice*)
Matthew T. Martens (D.C. Bar #1019099)
Matthew Beville (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
William.McLucas@wilmerhale.com
Matthew.Beville@wilmerhale.com
Matthew.Martens@wilmerhale.com

Tiffany J. Smith (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tiffany.Smith@wilmerhale.com

*Attorneys for Defendants BAM Trading
Services Inc. and BAM Management
Holdings US Inc.*

*/s/ George S. Canellos*
George S. Canellos (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
GCanellos@milbank.com
MLaroche@milbank.com

*Attorneys for Defendants BAM Trading Services
Inc. and BAM Management Holdings US Inc.*