**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| *Plaintiff*, | |
| v. | **No. 1:23-cv-01599-ABJ-ZMF** |
| BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO, | **Oral Argument Requested** |
| *Defendants*. | |

**Joint Motion To Dismiss Claims Against Defendants**
**Binance Holdings Limited And Changpeng Zhao**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................ 4

    I.       Blockchains And Crypto Assets ............................................. 4

    II.      Regulation Of Crypto Assets .................................................. 5

          A.      The CFTC ................................................................. 6

          B.      The SEC ................................................................... 7

    III.     Binance.com And The Crypto Assets At Issue Here ........................................... 10

          A.      Changpeng Zhao, BHL, And Binance.com ........................... 10

          B.      The BNB Offering, BNB Vault, And Simple Earn ................ 11

          C.      The BAM Entities ................................................... 11

    IV.     The CFTC's Claims Against BHL And Mr. Zhao In The Northern District Of Illinois ................................................... 12

    V.      The SEC's Claims Against BHL And Mr. Zhao ................................. 12

STANDARDS OF REVIEW ........................................................................ 13

ARGUMENT ............................................................................................... 13

    I.       The SEC Fails To Plead That Any Token, BNB Vault, Or Simple Earn Is A "Security."  (Most Of Count 1 & All Of Counts 2–3, 5–12) ........................... 14

          A.      An "Investment Contract" Requires Both A Contract And An Investment. ................................................... 14

          B.      The SEC Has Not Plausibly Alleged The Existence Of Any Investment Contract. ................................................... 20

                1.      BNB ........................................................ 20

                2.      BUSD ...................................................... 24

                3.      The Third-Party Tokens ...................................... 26

                4.      BNB Vault And Simple Earn ................................. 28

           C.      The Major-Questions Doctrine Forecloses The SEC's Novel Interpretation Of The Securities Laws. ................................................... 30

                1.      The SEC's Attempt To Expand Its Authority Is A Major Question. ................................................... 30

                2.      The SEC Lacks The Clear Authorization Mandated By Supreme Court Precedent. ................................................... 33

    II.      The SEC's Challenge To The BNB Offering Is Time-Barred.  (Remainder Of  Count 1) ................................................... 35

III.  The Claims Regarding Binance.com Transactions And The BNB Offering Are Impermissibly Extraterritorial.  (Foreign Components Of Counts 1–2 & All Of Counts 3, 5–7, & 11) ........................................................................ 36

    A.  The Statutory Provisions At Issue Do Not Apply Extraterritorially......... 37

    B.  The SEC Fails To Plausibly Allege A Domestic Application With Respect To Binance.com Or The BNB Offering. .................................... 38

        1.  The SEC's Claims Concerning Binance.com Are Impermissibly Extraterritorial....................................................... 39

        2.  The SEC's Allegations Concerning The BNB Offering Are Impermissibly Extraterritorial....................................................... 41

IV.  The SEC's Failure To Provide Fair Notice Of Its Regulatory Requirements Compels Dismissal.  (All Counts) ........................................................... 42

V.  The Court Lacks Personal Jurisdiction Over Mr. Zhao.  (Counts 11 and 12) ....................................................................................................... 43

CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012)........................................................................39, 40, 41

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021)........................................................................................30, 32

*Anderson v. Binance,*
  2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ...........................................................37

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)........................................................................................26, 28

*Atlantigas Corp. v. Nisource, Inc.,*
  290 F. Supp. 2d 34 (D.D.C. 2003) ...........................................................................13

*Banco Safra S.A.-Cayman Is. Branch v. Samarco Mineracao S.A.,*
  849 F. App'x 289 (2d Cir. 2021) ..............................................................................40

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................................13

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023)....................................................................................30, 31, 32

*In re Braskem S.A. Sec. Litig.,*
  246 F. Supp. 3d 731 (S.D.N.Y. 2017)......................................................................45

*Bregman v. Perles,*
  747 F.3d 873 (D.C. Cir. 2014) .................................................................................35

*CFTC v. Eisenberg,*
  No. 1:23-cv-00173 (S.D.N.Y.) ...................................................................................6

*CFTC v. McAfee,*
  2022 WL 3969757 (S.D.N.Y. July 14, 2022) ...........................................................6

*CFTC v. McDonnell,*
  332 F. Supp. 3d 641 (E.D.N.Y. 2018) .......................................................................6

*CFTC v. Russell,*
  No. 1:23-cv-02691 (E.D.N.Y.) ...................................................................................6

*CFTC v. Zhao,*
  No. 1:23-cv-01887 (N.D. Ill.) ...................................................................................12

*Charles Schwab Corp. v. Bank of Am. Corp.,*
  883 F.3d 68 (2d Cir. 2018).......................................................................................44

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142 (2012)..................................................................................................43

iii

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ..................................................................................44

*City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)..............................................................................40, 41

*Coates v. Edgewood Mgmt. Corp.*,
   258 F. Supp. 3d 107 (D.D.C. 2017) ......................................................................36

*Cockrum v. Donald J. Trump for President, Inc.*,
   319 F. Supp. 3d 158 (D.D.C. 2018) ................................................................43, 44

*In re Coinflip, Inc.*,
   CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) ..........................................6

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   622 F.2d 216 (6th Cir. 1980) ................................................................................21

*Democracy Forward Found. v. White House Off. of Am. Innovation*,
   356 F. Supp. 3d 61 (D.D.C. 2019) ........................................................................11

*Elemary v. Philipp Holzmann A.G.*,
   533 F. Supp. 2d 116 (D.D.C. 2008) ......................................................................45

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).........................................................................................31, 35

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).......................................................40

*Gen. Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ..............................................................................42

*Hall v. Hall*,
   138 S. Ct. 1118 (2018)...........................................................................................16

*In re iFinex Inc., & BFXWW Inc.*,
   CFTC No. 22-05, 2021 WL 8322873 (Oct. 15, 2021).............................................7

*Int'l Bhd. of Teamsters v. Daniel*,
   439 U.S. 551 (1979)........................................................................................28, 29

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)...............................................................................................43

*In re J Squared Inv. LLC*,
   CFTC No. 21-06, 2021 WL 1610170 (Apr. 19, 2021) ....................................6, 7, 8

*Keeton v. Hustler Mag., Inc.*,
   465 U.S. 770 (1984)...............................................................................................43

*Klatt v. Guaranteed Bond Co.*,
   250 N.W. 825 (Wis. 1933).....................................................................................17

*Kokesh v. SEC*,
   581 U.S. 455 (2017)...............................................................................................36

*Landmark Legal Found. v. IRS*,
   267 F.3d 1132 (D.C. Cir. 2001) ...................................................................14

*Landreth Timber Co. v. Landreth*,
   471 U.S. 681 (1985) ......................................................................................16

*Laydon v. Cooperatieve Rabobank U.A.*,
   55 F.4th 86 (2d Cir. 2022) ...........................................................................38

*Lewis v. Mutond*,
   62 F.4th 587 (D.C. Cir. 2023) .....................................................................43

*Loginovskaya v. Batratchenko*,
   764 F.3d 266 (2d Cir. 2014) .........................................................................41

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ............................................................15, 25, 30, 33

*Mazza v. Verizon Washington DC, Inc.*,
   852 F. Supp. 2d 28 (D.D.C. 2012) ......................................................44, 45

*Merck & Co. v. HHS*,
   962 F.3d 531 (D.C. Cir. 2020) .....................................................................31

*Moody v. Bache & Co.*,
   570 F.2d 523 (5th Cir. 1978) .......................................................................23

*Mordaunt v. Incomco*,
   686 F.2d 815 (9th Cir. 1982) .......................................................................21

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ...........................................................3, 37, 38, 40, 42

*Mpoy v. Rhee*,
   758 F.3d 285 (D.C. Cir. 2014) .....................................................................13

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
   76 F.4th 291 (4th Cir. 2023) ..................................................................32, 33

*NFIB v. OSHA*,
   142 S. Ct. 661 (2022) ............................................................................31, 34

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) .........................................................................23

*In re Opyn, Inc.*,
   CFTC No. 23-40, 2023 WL 5937238 (Sept. 7, 2023) .................................6

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ...................................................................38, 41

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016) .........................................................................43

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
   937 F.3d 94 (2d Cir. 2019) ...........................................................................41

*Prohaska v. Hemmer-Miller Dev. Co.*,
    256 Ill. App. 331 (1930) ................................................................................................17

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) .......................................................................................................19

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ..............................................................................................21

*Rimini St., Inc. v. Oracle USA, Inc.*,
    139 S. Ct. 873 (2019) .....................................................................................................16

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993) ..............................................................................................15

*Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    682 F.2d 459 (3d Cir. 1982) ..........................................................................................21

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) .......................................................................................23

*SEC v. Benger*,
    934 F. Supp. 2d 1008 (N.D. Ill. 2013) ..........................................................................38

*SEC v. Coinbase, Inc.*,
    No. 1:23-cv-04738 (S.D.N.Y.) .........................................................................................9

*\*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) .............................................3, 15, 18, 21, 22, 23, 25, 26, 27, 29

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) .......................................................................................23

*\*SEC v. Ripple Labs, Inc.*,
    ---F. Supp. 3d---, 2023 WL 4507900 (S.D.N.Y. July 13, 2023)......9, 10, 18, 20, 21, 22, 25, 27

*SEC v. Rubera*,
    350 F.3d 1084 (9th Cir. 2003) ...........................................................................17, 19, 28, 30

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) ............................................................................................21

*SEC v. Terraform Labs Pte. Ltd.*,
    ---F. Supp. 3d---, 2023 WL 4858299 (S.D.N.Y. July 31, 2023).....................10, 18, 19, 24, 32

*SEC v. Terraform Labs Pte Ltd.*,
    No. 1:23-cv-01346 (S.D.N.Y.) .........................................................................................9

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ...........................................................................................2, 16, 19

*Shapiro, Lifschitz & Schram, P.C. v. Hazard*,
    90 F. Supp. 2d 15 (D.D.C. 2000) ...................................................................................44

*SNR Wireless LicenseCo, LLC v. FCC*,
    868 F.3d 1021 (D.C. Cir. 2017) .....................................................................................42

*State v. Evans*,
   191 N.W. 425 (Minn. 1922) ................................................................17

*Stevens v. Liberty Packing Corp.*,
   161 A. 193 (N.J. Ch. 1932) ................................................................17

*Teague v. Bakker*,
   35 F.3d 978 (4th Cir. 1994) ................................................................21

*In re Tether Holdings Ltd.*,
   CFTC No. 22-04, 2021 WL 8322874 (Oct. 15, 2021) ......................6, 7

*Triple Up Ltd. v. Youku Tudou Inc.*,
   235 F. Supp. 3d 15 (D.D.C. 2017) ......................................................45

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
   651 F.2d 1174 (6th Cir. 1981) ............................................................30

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ............................................................................25

*Util. Air. Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ....................................................................31, 32

*In re Voyager Digit. Holdings, Inc.*,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023) ..........................................9, 35

*Wals v. Fox Hills Dev. Corp.*,
   24 F.3d 1016 (7th Cir. 1994) ........................................................19, 21

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ............................................30, 31, 32, 33, 34

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) .........................................................................16

*Woodward v. Terracor*,
   574 F.2d 1023 (10th Cir. 1978) ....................................................15, 21

*Yates v. United States*,
   574 U.S. 528 (2015) ...........................................................................16

## STATUTES

7 U.S.C. § 1a(19)(i) ................................................................................6

7 U.S.C. § 9 ...........................................................................................6

15 U.S.C. § 77b(a)(1) ...........................................................14, 19, 33

15 U.S.C. § 77e(a) ................................................................................37

15 U.S.C. § 77e(c) ................................................................................37

15 U.S.C. § 77h(a) .................................................................................8

15 U.S.C. § 78c(a)(10) .........................................................6, 14, 19, 33

15 U.S.C. § 78e ..............................................................................................................37

15 U.S.C. § 78o .......................................................................................................37, 38

15 U.S.C. § 78q–1(b)(1) ...............................................................................................37

15 U.S.C. § 78t(a) ..........................................................................................................38

15 U.S.C. § 78u(d)(8)(A)(i) .......................................................................................3, 36

28 U.S.C. § 2462 ........................................................................................................3, 36

**Rules**

Fed. R. Civ. P. 12(b)(2) .................................................................................................13

Fed. R. Civ. P. 12(b)(6) .................................................................................................13

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...............................................................................................................16

*Binance Launches BNB Vault – Earn Daily Income from the BNB Ecosystem*, Binance.com (Nov. 3, 2020), https://tinyurl.com/yjkwkcfv ...................................29

Black's Law Dictionary (3d ed. 1933)............................................................................16

Brief for the SEC, *SEC v. W.J. Howey Co.*, No. 843 (U.S. Apr. 17, 1946), 1946 WL 50582 ....................................................................................................18, 33

*How Can Third-World Countries Counter Inflation Using Bitcoin?*, Cointelegraph, https://tinyurl.com/3v77ujce (last visited Sept. 21, 2023) .............11

*Introducing BNB Vault: One-Click Earning for Your BNB Holdings*, Binance Blog (Nov. 3, 2020), https://tinyurl.com/5aask7ym .............................................29

Joel Khalili, *Binance and Coinbase Have Been Sucked into a Regulatory Turf War*, Wired (Apr. 6, 2023), https://tinyurl.com/29wectxm ...................................34

*Licenses, Registrations and Other Legal Matters*, Binance.com, https://tinyurl.com/22tmhz5c (last visited Sept. 21, 2023) ....................................11

*Simple Earn*, Binance.com, https://tinyurl.com/ycxh7e7v (last visited Sept. 21, 2023)................................................................................29, 30

*Your BNB Holdings*, Binance Blog (Nov. 3, 2020), https://tinyurl.com/5aask7ym ....................29

**Introduction**

For years, the SEC allowed the burgeoning crypto industry to operate openly, permitting it to grow into the trillion-dollar industry it is today.  As recently as 2021, SEC Chair Gensler publicly acknowledged that *no* "regulatory framework" existed under the authority of the SEC for crypto exchanges and that "only Congress" could confer that authority.  In late 2022, however, the SEC suddenly reversed course and asserted that virtually all crypto assets are securities subject to its authority.  Soon after, and despite ongoing legislative debate regarding crypto assets, the SEC began enforcing its new position through litigation.  Indeed, since 2019, Congress has considered more than a dozen proposals that would provide a coherent and workable framework for crypto assets and their trading platforms.  Critically, *none* of those proposals would confer sole regulatory jurisdiction over the crypto industry to the SEC.  Despite this, the SEC now seeks to expand its authority and filed this lawsuit, asserting claims against Binance Holdings Limited ("BHL") and Changpeng Zhao, among others.  It is clear that the SEC's lawsuit has no foundation in the currently enacted securities laws.

In attempting to claim regulatory power over the crypto industry, the SEC distorts the text of the securities laws—reading the word "contract" out of the statutory phrase "investment contract."  The SEC also seeks to enlarge its jurisdiction globally to include transactions on foreign cryptocurrency platforms, defying Supreme Court precedent holding that the agency's regulatory authority ends at the U.S. border.  And the SEC pursues these novel theories retroactively, seeking to impose liability for sales of crypto assets that occurred as far back as July 2017, before the SEC provided any public guidance concerning cryptocurrency.  As the SEC lacks authority to do this, BHL and Mr. Zhao respectfully move to dismiss the Complaint.

In 2017, before the SEC issued any guidance about the regulatory status of crypto assets or exchanges, Binance.com was founded outside the United States.  Binance.com is now the largest platform for trading crypto assets in the world.  This case involves some of the products traded on or offered by Binance.com.  One such token, BNB, was created during the launch of Binance.com and is now traded freely around the world on multiple platforms.  Another token, BUSD, is a stablecoin, meaning that it maintains a stable value of $1.  People worldwide use BUSD and other stablecoins as a convenient way to transfer money, including in countries that lack stable financial systems.  Other tokens were created by third-party developers and are sometimes traded on Binance.com or Binance.US—a U.S.-based platform owned and operated by separate and distinct legal entities, Defendants BAM Trading Services Inc. and BAM Management US Holdings Inc.  This case also concerns two products available on Binance.com—"BNB Vault" and "Simple Earn"—that, according to the SEC, allow consumers to lend their crypto assets to BHL and earn interest.

The SEC claims that by offering these crypto assets and products, BHL violated registration requirements in the federal securities laws and that Mr. Zhao, as founder and CEO, is responsible as a control person for those alleged violations.  Significantly, the SEC does *not* claim that BHL or Mr. Zhao committed any fraud or harmed a single investor.

The SEC's claims against BHL and Mr. Zhao fail as a matter of law.  The SEC's only theory as to why BHL wrongly offered and sold unregistered securities is that its products constituted "investment contracts" under the federal securities laws, which the Supreme Court interpreted in its *Howey* decision.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  But—as the SEC itself argued in *Howey*—there can be no "investment contract" without a *contract*, which necessarily entails a legal relationship between parties.  Under the binding law of this Circuit, that

relationship obligates one party to undertake ongoing efforts to enrich another *after* transferring an asset. *SEC v. Life Partners, Inc.*, 87 F.3d 536, 545 (D.C. Cir. 1996). But here the SEC fails to plausibly allege such required post-sale rights or obligations. Moreover, the secondary-market transactions in which most of the crypto assets at issue were alleged to be traded necessarily fail the *Howey* test. If there is any doubt that the SEC's novel spin on the meaning of "investment contract" is wrong, then the major-questions doctrine resolves that doubt against the SEC. Only Congress can make policy choices of the magnitude the SEC is asking the Court to make here.

After dispensing with the SEC's flawed view of "investment contracts," all that remains of its case is a thin sliver of Count 1, which challenges the BNB "Initial Coin Offering" or "ICO" (the "Offering"). For multiple reasons, that claim fails too. *First*, the claim is time-barred because the Offering occurred more than five years before the SEC brought this case. 28 U.S.C. § 2462; 15 U.S.C. § 78u(d)(8)(A)(i). *Second*, the SEC fails to plausibly allege that the Offering was a "domestic transaction" as required to avoid an impermissible extraterritorial application of the securities laws (Counts 3, 5–7, and 11 fail for the same reason). *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). *Third*, the Offering was complete by early July 2017, and the SEC failed to provide fair notice that crypto assets such as the BNB token are subject to the securities laws until at least the end of that month. Indeed, the entire Complaint fails because the SEC did not provide fair notice of its novel interpretation of the securities laws.

Finally, among other deficiencies, the Complaint fails to adequately allege that Mr. Zhao personally had the requisite suit-related contacts with the United States to support an exercise of personal jurisdiction over him.

## Background

### I.    Blockchains And Crypto Assets

Traditional currencies are known as "fiat currenc[ies]" and are backed by the governments that issue them.  Compl. ¶ 72.  By contrast, this case involves "cryptocurrencies," such as Bitcoin or Ether, sometimes referred to as "crypto asset[s]" or "token[s]."  *Id.* ¶ 62.  Cryptocurrencies are virtual currencies that work on blockchains.

*Blockchains.*  Blockchain technology records transactions stored on a digital ledger that is distributed across a broad network.  Blockchain networks are operated by thousands (or hundreds of thousands) of different servers around the world to record, maintain, and verify transaction records, making them decentralized.  *See* Compl. ¶ 63.  There are a number of different blockchain networks; the most well-known are Bitcoin and Ethereum.

The individual servers that run on the networks validate each new ledger entry.  *See* Compl. ¶¶ 63, 66–67.  In other words, multiple computers independently perform a checking function on every transaction or bundle of transactions and reach a consensus.  *See id.*  Each of these recorded validations, or "blocks," is added to the end of the public ledger, creating a public "chain of blocks" or "blockchain."  *Id.* ¶ 67.  A large network of "validators" across a blockchain ensures that every transaction is accurately recorded.  *Id.* ¶¶ 67–68.  The use of a blockchain therefore eliminates many limitations of traditional banking and payment systems by replacing a system reliant on single points of failure and a limited number of gatekeepers, which create expense and inefficiency, with a system that stores and transmits value through decentralized networks and a public ledger.

*Crypto Assets And Tokens.*  There are many types of crypto assets, including "token[s]."  Compl. ¶ 62.  Individual crypto assets come into existence in a few ways, but are always associated with a blockchain that serves as their public digital ledger.  Some developers sell newly created tokens in what is known as an "initial coin offering[]" or "ICO."  *Id.* ¶ 69.  Developers often keep

4

newly created tokens for themselves.  *See, e.g.*, *id.* ¶ 294.  In addition, a blockchain sometimes gives tokens to validators.  *Id.* ¶ 68.

One type of crypto asset is a "stablecoin," which is designed to maintain a stable value in reference to another asset, such as fiat currency or gold.  Compl. ¶ 317.  Typically, the developer of a fiat-backed stablecoin maintains the link by holding a "reserve[]" of the reference asset, which serves as collateral for the stablecoin.  *Id.*  When the holder of the stablecoin wishes to "cash out" her token, the developer removes an equal amount of the reference asset from the reserve and gives it to the holder.  *Id.*  This allows the stablecoin to maintain its "peg," or value, to be consistent with the underlying asset.  *See id.*  For example, if a stablecoin is designed to maintain its value at $1, and a company sells 1,000 of these coins, the company would maintain a reserve of $1,000.  *See id.*  BUSD, one of the crypto assets at issue in this case, is one such stablecoin.  *Id.* ¶¶ 315–17.

***Crypto Transactions.***  Crypto owners store their tokens in "wallets," which are essentially public addresses on a blockchain network.  Compl. ¶ 65.  If Jill wants to send tokens to Dave, she utilizes the user interface for her wallet to initiate the transfer to Dave's wallet address.  This transfer instruction is broadcast onto the network, validated, and then recorded in the next block on the ledger.  *Id.* ¶ 67.

Another way to buy or sell crypto assets is through a secondary market through a platform such as Binance.com.  *See* Compl. ¶¶ 71–74.  The platforms typically hold the assets for the customer and track ownership on internal ledgers.  *Id.* ¶ 73.  These platforms allow users to trade crypto assets without requiring them to use their own wallets on the blockchain.  *Id.* ¶¶ 72–73.

## II.    Regulation Of Crypto Assets

Over the last 15 years, crypto assets have grown immensely in popularity.  The industry is now worth more than a trillion dollars.  Hundreds of millions of people and businesses worldwide rely on crypto assets for many purposes.  In the United States, the question whether and how this

new industry should be regulated by federal agencies has been the subject of robust debate in the Executive Branch and Congress. In particular, the CFTC and SEC have each fought to be the primary civil enforcement authority for this massive new industry.

### A. The CFTC

The CFTC has broad anti-fraud and anti-manipulation authority over all commodities, as defined by the Commodity Exchange Act ("CEA"). *See* 7 U.S.C. § 9. The CEA defines "securities" as excluded commodities, *id.* § 1a(19)(i), and Congress has granted the SEC authority over only securities, 15 U.S.C. § 78c(a)(10). In general, if a commodity is not a security, then the CFTC is the agency with enforcement authority; if a commodity is a security, then it is the SEC.

Based on this regulatory framework, the CFTC has long claimed jurisdiction over crypto assets. As early as 2015, the CFTC asserted that "Bitcoin and other virtual currencies are . . . properly defined as commodities" under the CEA. *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015). The CFTC subsequently brought other enforcement actions related to other popular tokens. *See, e.g.*, *CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018) (Litecoin); *CFTC v. McAfee*, 2022 WL 3969757 (S.D.N.Y. July 14, 2022) (Dogecoin); *In re Tether Holdings Ltd.*, CFTC No. 22-04, 2021 WL 8322874 (Oct. 15, 2021) (Tether); *In re J Squared Inv. LLC*, CFTC No. 21-06, 2021 WL 1610170 (Apr. 19, 2021) (Ether). In *Tether Holdings*, the CFTC determined that stablecoins—which, as explained, are common crypto tokens tied to the value of a fiat currency—are commodities. 2021 WL 8322874, at *7. The CFTC has also determined that "stablecoins such as USDC" (another stablecoin tethered to the U.S. dollar) are commodities. *See In re Opyn, Inc.*, CFTC No. 23-40, 2023 WL 5937238, at *3 (Sept. 7, 2023); *see also* Compl. ¶ 62, *CFTC v. Russell*, No. 1:23-cv-02691 (E.D.N.Y. Apr. 11, 2023); Compl. ¶ 15, *CFTC v. Eisenberg*, No. 1:23-cv-00173 (S.D.N.Y. Jan. 9, 2023).

The CFTC Chairman has publicly stated that "[E]ther"—a popular crypto token—"is a commodity and therefore would fall under our jurisdiction," and that "similar assets should be treated similarly."  Appx. tbl. A line 4 (emphasis omitted).[1]  And in 2021, the agency stated that "Bitcoin, [E]ther, litecoin, and [T]ether tokens, along with other digital assets, are encompassed within the broad definition of 'commodity.'"  *In re iFinex Inc., & BFXWW Inc.,* CFTC No. 22-05, 2021 WL 8322873, at *1 n.2 (Oct. 15, 2021).[2]  In June 2022, a top CFTC official testified to Congress that "[d]igital assets have been broadly determined by the CFTC and federal courts to be commodities under the CEA."  Appx. tbl. A line 7.  And just a few months before the SEC filed this action, the CFTC Chairman stated that "there is a strong legal argument that USDC and other similar stablecoins would be commodities."  *Id.* tbl. A line 13.  At a September 2022 hearing on the Digital Commodities Consumer Protection Act, the CFTC Chairman reaffirmed the agency's stance that its "expertise and experience make it the right regulator for the digital asset commodity market."  *Id.* tbl. A line 8.

## B.    The SEC

Unlike the CFTC, the SEC has only recently claimed expansive authority over crypto assets—an about-face from its prior statements.  Despite the proliferation of crypto assets, the SEC offered no public guidance at all until July 2017, when the agency analyzed "the particular facts and circumstances of the offer and sale" of one type of token, and concluded that issuers of other crypto assets would have to analyze the "facts and circumstances" of each "particular transaction"

---

[1] For the Court's convenience, attached to this brief is an appendix containing consolidated tables listing citations to the agency statements and legislation cited in the brief, including web links where applicable.  Citations in the body of this brief are to the table and line (or lines) containing full citations to the applicable source (or sources).

[2] *See also In re Tether Holdings Ltd.*, 2021 WL 8322874, at *1 ("Tether introduced the U.S. dollar tether token . . . as a stablecoin in 2014.  [Tether] is a commodity as defined by [the CEA].");  *In re J Squared Inv. LLC*, 2021 WL 1610170, at *4.

to determine if it "involves the offer and sale of a security."  Appx. tbl. A line 1.  On June 14, 2018, an SEC official clarified in a speech that a crypto-asset transaction "may no longer represent a security offering [where] the network on which the token or coin is to function is sufficiently decentralized," such that "purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts."  *Id.* tbl. A line 2.  The official affirmed that a "token . . . all by itself is not a security."  *Id.*  In 2019, the SEC released a "Framework" that listed more than 60 factors to assess in determining if a crypto-asset transaction involves a security.  *Id.* tbl. A line 3.  But the "Framework" also stated that "the Commission has neither approved nor disapproved its content" and that it "d[id] not replace or supersede" the 2018 speech.  *Id.*

In April 2021, the SEC accelerated the effectiveness of the registration statement for the initial public offering of common stock of Coinbase, a U.S.-based crypto exchange, allowing that company's common stock to be sold to the public.  Appx. tbl. A line 5.  In order to take this action under the Securities Act of 1933, the SEC necessarily had to make the finding that the offering was in the public interest.  15 U.S.C. § 77h(a).  A month later, SEC Chair Gensler admitted that there is no "regulatory framework" at the SEC for crypto exchanges, and that "only Congress" could confer that authority.  Appx. tbl. A line 6.

Near the end of 2022, however, the SEC changed its position.  Chair Gensler asserted that "the vast majority [of crypto assets] are securities."  Appx. tbl. A line 9.  In February 2023, he declared that "[e]verything other than [B]itcoin" is a security.  *Id.* tbl. A line 11.  A few weeks later, the CFTC Chairman told Congress that Ether "is a commodity," *id.* tbl. A line 12, which followed CFTC enforcement proceedings that also confirmed the CFTC's view that it has enforcement authority over Ether, *In re J Squared Inv. LLC*, 2021 WL 1610170.  When later asked about the status of Ether, Chair Gensler avoided the question, stating that "all securities" are

"excluded commodities" under the CEA, but that "a security cannot be also an excluded commodity and an included commodity" under the CEA.  Appx. tbl. A line 14.  A court in New York recently noted that "[r]egulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities."  *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023).

Amid the conflicting positions taken by regulators, Congress has consistently recognized that regulatory authority over crypto assets remains unclear.  Since 2019 alone, Congress has considered more than 20 proposals to establish a regulatory framework for crypto assets.  Appx. tbl. B lines 1–21.  Some would allocate regulatory oversight across multiple agencies.  *Id.* tbl. B line 10.  Others would vest authority primarily with the CFTC.  *Id.* tbl. B line 6.  Still others would expressly state that the SEC has *no* authority in this space.  *Id.* tbl. B line 8.  *None* would vest the SEC with sole regulatory jurisdiction.  *See generally SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. Aug. 11, 2023), ECF 53, at 7 (amicus brief of Senator Lummis) ("Each of these bills recognizes that the crypto industry does not fit entirely within existing securities laws and transcends the current statutory powers of the SEC.").

Against this backdrop, the SEC recently brought several enforcement actions—including this action—premised on its new position that virtually all crypto assets, and virtually all crypto-asset transactions, are securities.  *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. Feb. 16, 2023); *Coinbase*, No. 1:23-cv-04738 (S.D.N.Y. June 6, 2023).  In *SEC v. Ripple Labs, Inc.*, a judge in the Southern District of New York held that the defendant's *initial* sales of its token to institutional investors constituted securities, but held that later transactions— including sales of the same token to public buyers on crypto-asset platforms and the distribution of the token to the defendant's employees as compensation—were *not* securities.  ---F. Supp.

9

3d---, 2023 WL 4507900, at *8–14 (S.D.N.Y. July 13, 2023).  The court observed that "the SEC's theories as to" these latter transactions "are potentially inconsistent with its enforcement in prior digital asset cases."  *Id.* at *15 n.20.  About two weeks later, in *Terraform*, another judge in the Southern District of New York disagreed with *Ripple* in a securities-fraud case and held that similar crypto transactions were securities.  *See SEC v. Terraform Labs Pte. Ltd.*, ---F. Supp. 3d---, 2023 WL 4858299, at *10–15 (S.D.N.Y. July 31, 2023).

Unlike in the United States, other jurisdictions have developed comprehensive regulatory frameworks for crypto assets from the ground up through legislative changes, not enforcement actions.  *See, e.g.*, Regulation (EU) on Markets in Crypto-Assets, 2023 O.J. (L 150) Vol. 66; Legal Framework for Virtual Assets in Brazil, Federal Law No. 14,478/22 (Dec. 22, 2022).

### III.   Binance.com And The Crypto Assets At Issue Here

#### A.   Changpeng Zhao, BHL, And Binance.com

Defendant Changpeng Zhao was born in China, emigrated to Canada as a child, and continues to reside outside the United States.  Compl. ¶ 30.  The SEC alleges that Mr. Zhao "founded and own[s]" Defendant BHL, which is a Cayman Islands limited-liability company, and that BHL operates Binance.com, "an international crypto asset trading platform."  *Id.* ¶ 27.  Over the past six years, Binance.com has grown to become the world's leading cryptocurrency exchange.  Today, it is "the largest crypto asset trading platform in the world," *id.* ¶ 314, and is

registered or licensed in 18 countries.[3]  Among other services, Binance.com provides much-needed banking alternatives to people without access to reliable banking services.[4]

To conduct trades on Binance.com, customers place orders that enter an automated matching engine, "MatchBox," which pairs buy-and-sell orders.  Compl. ¶ 90.  The parties to the transactions are automatically matched and anonymous.  *Id.* ¶ 91.  After matching the orders, the trades are settled by debiting and crediting the parties' accounts on an internal ledger.  *Id.* ¶ 100.  Binance.com charges compensation for trades in the form of transaction fees.  *Id.* ¶¶ 101–03.

### B.      The BNB Offering, BNB Vault, And Simple Earn

The SEC alleges that in June 2017, BHL conducted a "global[]" Offering for a newly created crypto asset, Binance Coin—now known as "BNB."  Compl. ¶¶ 81, 287.  Over the course of the Offering, 200 million BNB tokens were created and 100 million were sold.  *Id.* ¶ 293.  The remaining 100 million BNB allegedly went to Binance.com's "Founding Team" and "Angel investors."  *Id.* ¶ 294.  "BNB Vault" and "Simple Earn" are programs offered on Binance.com that "pay interest to investors who lend their crypto assets to Binance for fixed or flexible lengths of time."  *Id.* ¶¶ 325–27, 336.

### C.      The BAM Entities

BAM Trading, which operates the Binance.US platform, is a Delaware corporation that is indirectly owned by CPZ Holdings Limited, a British Virgin Islands company.  Compl. ¶¶ 28–29, 145.  The Binance.US platform officially launched in September 2019.  *Id.* ¶ 209.  It helps U.S.

---

[3] *Licenses, Registrations and Other Legal Matters*, Binance.com, https://tinyurl.com/22tmhz5c (last visited Sept. 21, 2023).  The Court may take judicial notice of the administrative records summarized on the cited webpage.  *See, e.g.*, *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 69 (D.D.C. 2019).

[4] *See How Can Third-World Countries Counter Inflation Using Bitcoin?*, Cointelegraph, https://tinyurl.com/3v77ujce (last visited Sept. 21, 2023).

customers buy, sell, and transfer crypto assets. *Id.* ¶¶ 209–10.  BHL has never owned, partially or wholly, any of the BAM entities.  *See id.* ¶¶ 28–29.  BHL allegedly provides information technology and support services to the BAM entities.  *Id.* ¶¶ 175, 223, 236.

**IV.   The CFTC's Claims Against BHL And Mr. Zhao In The Northern District Of Illinois**

In March 2023, the CFTC filed an enforcement action in the Northern District of Illinois against BHL, Mr. Zhao, and others.  *See* Compl., *CFTC v. Zhao*, No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF 1 ("CFTC Compl.").  The CFTC alleges registration violations under the Commodity Exchange Act.  Notably, the CFTC alleges that "BUSD" is a "commodit[y]" under the CEA.  *Id.* ¶ 24.  The defendants moved to dismiss the CFTC's complaint.  *Zhao*, No. 1:23-cv-01887 (N.D. Ill. July 27, 2023), ECF 58–61.  Briefing is ongoing.

**V.   The SEC's Claims Against BHL And Mr. Zhao**

A few months after the CFTC filed its complaint, the SEC sued BHL and Mr. Zhao.  All of the SEC's claims depend on the contention that certain crypto assets traded or offered on the Binance.com and Binance.US platforms are "securities."  Compl. ¶¶ 4, 282–83, 352, 359.  The SEC asserts eight claims against BHL and two against Mr. Zhao.  These claims fall into four categories.  *First*, the SEC claims that BHL offered and sold BNB, BUSD, Simple Earn, and BNB Vault as unregistered securities in violation of Section 5 of the Securities Act.  *Id.* ¶¶ 514–22 (Counts 1–3).  *Second*, the SEC claims that BHL failed to register as an "exchange," "broker-dealer," and "clearing agency" for the Binance.com platform in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act.  *Id.* ¶¶ 526–34 (Counts 5–7).  *Third*, the SEC similarly claims that BHL and BAM Trading each failed to register as an "exchange" and "clearing agency" for operating the Binance.US platform.  *Id.* ¶¶ 535–37, 541–43 (Counts 8 and 10).  *Fourth*, the SEC claims that Mr. Zhao is liable for the alleged registration violations as a "control person."  *Id.* ¶¶ 544–53 (Counts 11–12).

## Standards Of Review

Under Rule 12(b)(6), a complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." *Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (quotation marks omitted).

Under Rule 12(b)(2), the plaintiff "bears the burden of establishing personal jurisdiction over each individual defendant." *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). "In order to meet its burden, plaintiff must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations." *Id.*

## Argument

The Court should dismiss the SEC's claims against BHL and Mr. Zhao. Virtually all of the claims should be dismissed on one threshold ground: the SEC fails to plausibly allege that any of the crypto assets at issue is a security. The statutory text and precedent compel that conclusion, and the major-questions doctrine further resolves any doubt against the SEC. The only remaining claim (a subset of Count 1) challenges the BNB Offering and should be dismissed because it is time-barred, impermissibly extraterritorial, and violates the fair-notice doctrine. Counts 3 and 5–7 also fail because they are impermissibly extraterritorial, as are portions of Counts 1–2. And the entire Complaint also fails because the SEC did not provide fair notice of its novel interpretation of the securities laws. Because the predicate claims fail, so too do the control-person claims against Mr. Zhao.

13

I.      **The SEC Fails To Plead That Any Token, BNB Vault, Or Simple Earn Is A "Security."  (Most Of Count 1 & All Of Counts 2–3, 5–12)**

Most of the Complaint fails because the SEC's claims are premised on a flawed interpretation of the Securities Act's and Exchange Act's definition of a "security."  In attempting to regulate this trillion-dollar industry through enforcement rather than rulemaking, the SEC's interpretation receives no deference because the agency has refused to follow the procedures contemplated by the Administrative Procedure Act.  *See, e.g.*, *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1135–36 (D.C. Cir. 2001).  Moreover, the major-questions doctrine requires Congress to make policy decisions of this magnitude.  *See infra* at 30–35.  Thus, any uncertainty as to the application of the securities laws here must be resolved *against* the SEC.

A.      **An "Investment Contract" Requires Both A Contract And An Investment.**

The Securities Act defines a "security" to mean more than a dozen types of instruments, including any note, stock, debenture, bond, or—as relevant here—"investment contract."  15 U.S.C. § 77b(a)(1); *see also id.* § 78c(a)(10) (similar definition in Exchange Act).  The SEC's claims are premised solely on the theory that the crypto assets at issue are investment contracts. *See* Compl. ¶¶ 288, 316, 348, 352.

The Supreme Court's decision in *Howey* is the leading precedent on the meaning of "investment contract."  There, a Florida company offered hotel guests an investment opportunity: they could buy small plots of a citrus grove through "land sales contract[s]," and then separately enter into "service contracts" obligating the company to maintain the plots, sell the oranges, and distribute the resulting profits to investors.  328 U.S. at 295–96.  The Supreme Court held that the division of the scheme into two nominally separate transactions (land-sale and service contracts) did not defeat the application of the securities laws.  Instead, the phrase "investment contract"

includes agreements whereby "a person invests his money in a common enterprise and is led to expect profits solely from the efforts of [a] promoter or a third party." *Id.* at 298–99.

*Howey*'s focus on post-sale obligations—the efforts of the promoter—tracks the statutes' plain text. The phrase "investment contract" consists of a noun (contract) modified by an adjective (investment). Thus, for something to be an "investment contract," two things must be true. *First*, there must be a "contract," meaning an agreement that includes enforceable legal obligations. *Second*, the contract must be for "investment," meaning the contribution of capital to a common enterprise, which then uses that capital to generate and distribute profits.

The SEC must plead facts plausibly alleging that a particular transaction is an "investment contract." "Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982).

**The Contract Requirement.** The express statutory requirement of a "contract" between the issuer and purchaser must be satisfied in every case. And not just any type of contract will do. Rather, under D.C. Circuit precedent, the parties' agreement must entail "post-purchase commitments" of the promoter. *Life Partners*, 87 F.3d at 545; *see also Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (no investment contract without post-sale obligations); *Woodward v. Terracor*, 574 F.2d 1023, 1026–27 (10th Cir. 1978) (investment contract requires ongoing "contractual obligation"). That is part of what distinguishes an *investment* contract from other run-of-the-mill contracts that focus on *pre-sale* efforts (for instance, the labor expended to plant, grow, and harvest a crop). *See Life Partners*, 87 F.3d at 546–47. The adjective "investment" *narrows* the universe of "contracts" that the securities laws cover; it does not *broaden* the phrase to include investments that lack any post-sale obligations. After all, "[a]djectives modify nouns—

15

they pick out a subset of a category that possesses a certain quality." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018); *see also Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878–79 (2019) (adjectives "do[] not alter the meaning" of the noun they modify).

Construing the phrase "investment contract" to require enforceable post-sale obligations— *i.e.*, a forward-looking contract—also ensures consistency with other instruments in Congress's lists of securities, each of which gives the owner of the instrument legally enforceable rights beyond mere ownership. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (discussing the "associated-words canon"); *Yates v. United States*, 574 U.S. 528, 544–45 (2015). A "stock," for example, typically gives investors rights including "the right to receive dividends," and "voting rights in proportion to the number of shares owned." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). Contemporary legal dictionaries defined a "note" to be a "negotiable promissory note," which in turn means "[a] promise or engagement, in writing, to pay a specified sum at a time therein limited, or on demand" to another person. Black's Law Dictionary 1433 (3d ed. 1933). A "bond" means "[a] contract by specialty to pay a certain sum of money" at a later date, after the bond has matured. *Id.* at 284.

The historical context reinforces what the plain text makes clear. Where, as here, a phrase "is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (quotation marks omitted). In the federal securities laws, the phrase "investment contract" derived from preexisting state "Blue Sky" laws, as the Supreme Court's decision in *Howey* recognized. "Congress was using a term the meaning of which had been crystallized by . . . prior judicial interpretation" and "attach[ed] that meaning to the term as used by Congress." 328 U.S. at 298. The Blue Sky laws uniformly required a contract between the purchaser and promoter, with the purchaser obtaining

an enforceable promise that the promoter would use its efforts to deliver returns at a later date.  In *State v. Heath*, for instance, the court explained that the phrase "investment contract" "implies the apprehension of an investment *as well as of a contract*."  153 S.E. 855, 857 (N.C. 1930) (emphasis added).  Other Blue Sky laws similarly treated "investment contracts" as a particular kind of contract.  *See, e.g.*, *State v. Evans*, 191 N.W. 425, 426–27 (Minn. 1922) ("We think the contract before us in this case is an investment contract."); *Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 338 (1930) (similar); *Klatt v. Guaranteed Bond Co.*, 250 N.W. 825, 829 (Wis. 1933) ("It is certainly a contract from which neither party is entitled to withdraw.").

To be sure, *Howey* held that "an investment contract for purposes of the Securities Act means a contract, *transaction*, or *scheme* whereby a person invests his money in a common enterprise."  328 U.S. at 298–99 (emphases added).  But the Supreme Court's references to "transactions" and "schemes" did not write the noun "contract" out of the phrase "investment contract."  To the contrary, the Court held that the phrase "investment contract" encompasses more exotic contractual arrangements like those then in vogue, where promoters sought to evade the securities laws by dividing their schemes into *multiple* contracts; for instance, promises to sell land, coupled with separate promises to improve the land.  *See, e.g.*, *Stevens v. Liberty Packing Corp.*, 161 A. 193, 193–94 (N.J. Ch. 1932) (land-sale contract with separate obligation to develop oil wells); *Prohaska*, 256 Ill. App. at 338 (similar).  Courts have continued to apply *Howey*'s holding in similar situations where a promoter packages multiple agreements into an investment contract.  *See, e.g.*, *SEC v. Rubera*, 350 F.3d 1084, 1091 (9th Cir. 2003) (two "agreements were marketed and sold to investors as a package").  In the 90 years since the securities laws' enactment, no Supreme Court or federal Circuit Court decision has found an "investment contract" where the

parties exchanged an asset without creating a prospective legal relationship imposing post-sale obligations—in other words, a forward-looking contract.

The multiple contracts at issue in *Howey* itself demonstrate this point.  The question presented to the Court was whether the land-sale contract, "coupled with a contract" for services and profits, together constituted an "investment contract" under the securities laws.  *See* Br. for the SEC, *SEC v. W.J. Howey Co.*, No. 843 (U.S. Apr. 17, 1946), 1946 WL 50582, at *2.  And the SEC vigorously pressed the position that "investment contract[s]" require "contractual arrangement[s]."  *Id.* at *9.  The SEC never maintained that the underlying assets (oranges and citrus groves) were *themselves* "investment contracts" absent the accompanying contract creating post-sale obligations.

In reaching a different conclusion, the Southern District of New York's recent opinion in *Terraform* misreads the plain text of the securities laws and *Howey* itself.  In holding that an investment contract need not include a contract, the court reasoned that the statute requires no "formal common-law contract."  2023 WL 4858299, at *11.  But that is not the point.  What matters is whether post-sale obligations are legally enforceable, not whether they are memorialized in a formal written document.  *See Ripple*, 2023 WL 4507900, at *7 n.11.

*Terraform*'s contract-without-a-contract interpretation is impermissible for several additional reasons.  *First*, it conflicts with *Life Partners*, which is controlling precedent here, but not in the Southern District of New York.  *See* 87 F.3d at 545, 548 (an investment contract requires "post-purchase commitments" that are "entrepreneurial or managerial" in nature (quotation marks omitted)).  *Second*, the court read the *Howey* opinion like a statute, applying the presumption against surplusage and reasoning that because the Supreme Court mentioned a "contract" *and* a "transaction or scheme," that latter phrase must have abolished the statutory requirement of a

contract.  *Terraform*, 2023 WL 4858299, at *11.  But "the language of an opinion is not always to be parsed as though [a court] were dealing with language of a statute."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).  That principle is especially important where, as here, the district court read *Howey* like a strict textualist, but impermissibly ignored the plain text of the statutes themselves.  The court's holding makes nonsense of the statutory text, which expressly requires a contract.  *Third*, the court misread *Howey* itself, which included multiple contracts and nowhere says that an "investment contract" need not include any enforceable post-sale obligations.

 ***The Investment Requirement.***  In addition to identifying a contract (or a scheme involving multiple contracts), the SEC must plausibly allege that the contract was for an "investment."  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  *Howey* provides the applicable test for that question, and requires four elements: (1) an investment of money; (2) into a common enterprise; (3) with a reasonable expectation of profits; and (4) that those profits derive solely from the efforts of others.  328 U.S. at 298–99, 301.  Each element, in turn, has a well-established meaning.  An "investment of money" occurs when an investor "commit[s] his assets *to* the enterprise in such a manner as to subject himself to financial loss."  *Rubera*, 350 F.3d at 1090 (quotation marks omitted, emphasis added).  A "common enterprise" requires "horizontal commonality," meaning that the promoter *pooled* together investors' money *to finance the enterprise*, and that the investors, in turn, shared profits and losses.  *See, e.g.*, *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1017–18 (7th Cir. 1994).

 Whether analyzed under the "investment of money" or "common enterprise" prongs, case law dictates what logic and *Howey* make clear; there can be no "investment contract" unless the buyer's "investment of money" flowed *into* the relevant "common enterprise."

 The upshot is this:  The question whether a defendant sold "investment contracts" turns on the relationship between the promoter and the purchaser after the sale.  And this is a transaction-

by-transaction analysis—in the context of crypto tokens, the SEC must show that the tokens were sold as part of a transaction that includes post-sale contractual obligations and manifests each of *Howey*'s elements.  It cannot simply point to a token—the underlying asset—and baldly claim that *all* sales of the token are "investment contracts."

### B.   The SEC Has Not Plausibly Alleged The Existence Of Any Investment Contract.

The Complaint claims that BHL sold or facilitated the sale of "investment contracts" with respect to BNB, BUSD, certain third-party tokens, and Binance.com's "BNB Vault" and "Simple Earn" programs.  All but one of the SEC's counts against BHL and Mr. Zhao should be dismissed entirely because the SEC fails to plausibly allege the existence of a security.   Much of the remaining count (Count 1) concerning sales of BNB after the Offering fails for the same reason.

### 1.   BNB

Except with regard to the Offering, the SEC's claims center on BNB sales in transactions that took place on secondary-market platforms (including Binance.com and similar platforms). These transactions are not investment contracts for several reasons.  Most fundamentally, the SEC is incorrectly conflating the token—which is just an asset—with an investment contract, which requires a post-sale relationship between the purchaser and the promoter, pursuant to which the promoter will pool the purchaser's money and use it to earn profits.[5]  On that logic, in *Howey* the oranges themselves would have been securities when they were later resold—and of course nobody, including the SEC, contends that oranges are securities.

---

[5] In addition to sales on crypto platforms, the Complaint alleges that BHL "offered and sold" BNB by using tokens to pay employees.  Compl. ¶¶ 306, 309.  Those allegations do not establish an "investment contract," since outflows of tokens *from* BHL cannot establish the first *Howey* factor—that there were investments of money *into* BHL.  *See Ripple*, 2023 WL 4507900, at *13 (citing cases).  The SEC's claims concerning the use of the tokens to pay salaries additionally fail for the same reasons as its claims for the other transactions.

**No Contract.**  Purchasers who bought BNB on a platform such as Binance.com or similar platforms acquired a token only.  The SEC does not allege that BNB purchases involved any contract or any other enforceable post-sale obligations.  The SEC does not allege that BHL was "under any contractual obligation to do anything more than deliver" ownership of the tokens. *Woodward*, 574 F.2d at 1027.  The SEC's assertion that BNB tokens are themselves "investment contracts" is accordingly irreconcilable with the text of the securities laws, D.C. Circuit precedent, and prior admissions by SEC officials.  *Supra* at 14–20; *Life Partners*, 87 F.3d at 545, 548 (investment contract requires "post-purchase commitments"); Appx. tbl. A line 2 (SEC official stating that "the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not").

**No Investment Of Money Into A Common Enterprise.**  The SEC also fails to plausibly allege a "common enterprise."  The SEC must show that BNB purchasers invested money *into* the relevant common enterprise—*i.e.*, that BHL "pool[ed] their funds." *Life Partners*, 87 F.3d at 549.[6] The SEC's conception of an "investment of money" into a "common enterprise" is so nebulous that the Complaint never even alleges that purchasers' money went to BNB's supposed promoter, a logical prerequisite for pooling their money into a common fund.  *Cf. Ripple*, 2023 WL 4507900,

---

[6] The SEC's TRO brief suggested in a footnote that the agency could establish a "common enterprise" through "strict vertical commonality," meaning that the fortunes of investors are tied to the fortunes of the promoter.  ECF 8-2, at 42 n.19.  The Sixth and Seventh Circuits have correctly rejected that theory.  *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 224 (6th Cir. 1980); *Wals*, 24 F.3d at 1019.  Most other circuits have also declined to adopt vertical commonality, albeit without deciding the issue.  *SEC v. SG Ltd.*, 265 F.3d 42, 50 (1st Cir. 2001); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 682 F.2d 459, 460 (3d Cir. 1982); *Teague v. Bakker*, 35 F.3d 978, 986 n.8 (4th Cir. 1994).  And even where vertical commonality is sufficient to establish a common enterprise, it does not exist where, as here, investors can experience gains and the promoter can experience losses, or vice versa.  *See, e.g.*, *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982).  The SEC concedes that "[BHL's] revenue derives primarily from" transaction fees, not from holding tokens, so there is no vertical commonality.  Compl. ¶ 101.

at *11 ("Therefore, the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all.").  For sales of BNB on platforms such as Binance.com, the Complaint lacks allegations suggesting that BHL (or anyone else) pooled or even received purchasers' funds.  *See* Compl. ¶¶ 287–314.  Instead, the SEC asserts in the passive voice that "BNB has traded" on the Binance platforms and that BHL "has . . . sought to make BNB available for trading on other platforms."  *Id.* ¶¶ 301, 305.  In other words, the SEC alleges that BHL ran a spot market for BNB, and various individuals traded BNB independently of each other.  BNB sales between secondary purchasers do not and are not alleged to involve the "pooling" of funds *into* any collective enterprise, just as different people purchasing other assets in secondary markets—say, gold or silver—are not pooling their money into any common enterprise.

The SEC alleges that "[e]ach BNB token is identical to every other BNB token, and the price of all BNB tokens increases or decreases together."  Compl. ¶ 312.  But uniform fluctuations do not satisfy the "common enterprise" test recognized in the D.C. Circuit and are characteristic of any fungible commodity.  The SEC's approach fails because it "provides no basis upon which to distinguish securities from non-securities."  *Life Partners*, 87 F.3d at 545.

***No Reasonable Expectation Of Profits From The Efforts Of Others*.**  For similar reasons, the Complaint fails to plausibly allege that BNB purchasers reasonably expected to earn profits from the efforts of others.  To be sure, the SEC alleges that some purchasers speculated that BNB would rise in value.  *See, e.g.*, Compl. ¶ 289.  But the mere fact that individuals hoped the value of BNB would appreciate does not suggest that they expected it would or that they had a right to "shar[e] profits" in a common enterprise financed by their purchase.  *Life Partners*, 87 F.3d at 543.

For the exchange transactions, the buyers "could not have known if their payments of money went to [BHL]" or to some other third-party seller.  *Ripple*, 2023 WL 4507900, at *11;

Compl. ¶ 91.  If purchasers had no reason to know whether they were giving money to BHL at all, then they necessarily lacked any reasonable expectation that BHL would use their money to earn them profits.  D.C. Circuit precedent is clear that where, as here, "the investor did not look to the promoter (or another party) to provide significant post-purchase efforts" to earn profits for the investor, there is no investment contract.  *Life Partners*, 87 F.3d at 548.

The Complaint also fails to plausibly allege that BHL's efforts—as distinguished from background market forces—drive BNB's price.  No matter what *pre-sale* efforts the promoter made to bring those assets into existence, there is no "investment contract" if the assets' prices are driven by "market forces," rather than post-sale efforts.  *E.g.*, *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005); *see also Life Partners*, 87 F.3d at 546–47.  Courts have repeatedly held that asset appreciation driven by market forces, rather than the promoter's performance of its post-sale obligations under the investment contract, falls outside the securities laws.  *See, e.g.*, *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) ("[p]rofits to the coin buyer depended upon the fluctuations of the gold market"); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (per curiam) (same result for silver); *Moody v. Bache & Co.*, 570 F.2d 523, 526 (5th Cir. 1978) (no investment contract where "expectation of profit ar[ose] solely from the speculative hope that the market price of the underlying [asset]" would increase).

Moreover, the mere fact that a company's activities may have an impact on asset prices does not transform an underlying asset into a "security."  The Complaint attempts to blur this line by, for example, claiming that BHL's alleged advertising of BNB constitutes "entrepreneurial" efforts affecting the token's price, thus making the token a security.  Compl. ¶¶ 290, 302–07.  That theory fails as a matter of law, since it does nothing to distinguish "securities from non-securities." *Life Partners*, 87 F.3d at 545.  The actions of many large companies that sell assets may drive the

prices of those assets.  Purchasers might buy a diamond from De Beers, oil from OPEC nations'

companies, or baseball cards from Topps, all in the hope that those companies might "decrease the

supply" and thus "increase [the] price" of the purchasers' investments.  Compl. ¶ 295.  But none

of those assets is a security, since purchasers' mere expectation that businesses will act in a way

that increases the value of their products in no way shows that sales of those products are

"investment contracts."

## 2.    BUSD

The BUSD token is not a security either, contrary to the SEC's assertion (Compl. ¶ 316).

***No Reasonable Expectation Of Profits.***    As the SEC admits, BUSD is a stablecoin

"redeemable on a 1:1 basis for U.S. dollars"; by design, therefore, a BUSD token's value is

intended to be pegged to $1 and to always be worth roughly $1, subject only to de minimis—and

unintended—fluctuations.  Compl. ¶ 317.  Thus, no BUSD purchaser reasonably expects to earn

profits.  "[W]here a stablecoin is designed exclusively to maintain a one-to-one peg with another

asset, there is no reasonable basis for expecting that the tokens . . . would generate profits through

a common enterprise."  *Terraform*, 2023 WL 4858299, at *12.  Indeed, in parallel litigation

involving BHL and Mr. Zhao, the CFTC claims that BUSD is a "commodit[y]" that functions as

a "stor[e] of value" or a "mediu[m] of exchange," CFTC Compl. ¶ 24, which is consistent with the

CFTC's longstanding position concerning stablecoins, *supra* at 6–7.  Although the CFTC's claims

in that case suffer from other flaws, the CFTC is correct that the fundamental purpose of a

stablecoin is use and consumption, not profits arising from a promoter's post-sale efforts.  *See,*

*e.g.*, *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975) (houses were not "investment contracts" when they were purchased for "use" and "consumption").[7]

The SEC asserts that BUSD "allows investors to participate in" *other* "profit-making schemes available through the Binance ecosystem." Compl. ¶ 317. But that does nothing to suggest that BUSD itself is an "investment contract"; the SEC is impermissibly conflating purchases of BUSD with subsequent transactions involving the token. *See, e.g.*, *Marine Bank*, 455 U.S. at 560 n.11 ("*Each transaction* must be analyzed and evaluated[.]" (emphasis added)); *Forman*, 421 U.S. at 858 (similar). The SEC does not allege that those subsequent transactions or programs (for example, "the BUSD Reward Program") constitute "investment contracts."

Moreover, the SEC never alleges that purchasers knew who they were buying BUSD from on the platform—whether BHL or some third party. As with BNB, purchasers cannot reasonably expect to earn profits from an enterprise when they have no reason to think their money will be used in that enterprise. *Ripple*, 2023 WL 4507900, at *13; *supra* at 22–23.

***No Post-Sale Entrepreneurial Efforts***. The Complaint also fails to allege adequate post-sale efforts by BHL after the sale of a BUSD token—a critical omission, given that the whole point of an "investment contract" is an enforceable right to reap the rewards of the promoter's post-sale efforts. *Life Partners*, 87 F.3d at 545. The Supreme Court's cases "have never suggested that purely ministerial or clerical functions are by themselves sufficient; indeed, quite the opposite is true." *Id.* Here, the only post-sale efforts alleged in the Complaint are ministerial—for example, the SEC alleges that BHL promised to mechanically convert one BUSD token into one dollar when

---

[7] As explained below, the CFTC's longstanding position concerning stablecoins deprived BHL and Mr. Zhao of fair notice that the SEC would step in and take an inconsistent position in subsequent enforcement actions seeking to claim stablecoins for itself. *See infra* at 42–43.

asked to do so.  Compl. ¶ 317.  "[P]ost-purchase ministerial functions" such as these are not the kind of entrepreneurial efforts required under *Howey*.  *Life Partners*, 87 F.3d at 545.

### 3.    The Third-Party Tokens

The SEC next alleges that BHL sold "investment contracts" by offering ten third-party tokens for sale, including SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI.  Compl. ¶ 352.[8]  None of these tokens constitutes an "investment contract" because the Complaint fails to allege: (1) meaningful post-sale contractual obligations; (2) an "investment of money" into a "common enterprise"; or (3) a reasonable expectation of profits.  In other words, the SEC improperly claims that its regulatory jurisdiction sweeps in underlying assets themselves (like the oranges in *Howey*), even when those assets are stripped of any potentially relevant features of an "investment contract" and sold on exchanges in blind bid or ask transactions.

***No Contract.***  For each of the third-party tokens, the SEC fails to allege sufficient post-sale contractual obligations.  *See Life Partners*, 87 F.3d at 545.  Instead, the SEC alleges exchange transactions pursuant to which purchasers bought tokens as ordinary assets.

For seven of the tokens—MATIC, FIL, ATOM, SAND, MANA, ALGO, and AXS—the Complaint does not even attempt to allege forward-looking contractual obligations.  That leaves SOL, ADA, and COTI.  As for SOL and COTI, the Complaint references only agreements relating to initial, primary sales, which are *not* alleged to have taken place on—or have had anything to do with—Binance.com (or Binance.US).  *See* Compl. ¶¶ 366–67 ("Simple Agreement for Future Tokens" for sales "[b]etween May 2018 and early March 2020," but SOL not alleged to be on

---

[8] The SEC also briefly mentions four other tokens, "AMP, REP, UST, and TRX," that allegedly "have been the subject of prior SEC enforcement actions."  Compl. ¶ 360.  But the SEC alleges no actual facts for those tokens and does not appear to be resting its claims on them.  In any event, the SEC's say-so is insufficient to satisfy its obligation to allege facts that plausibly suggest these tokens are securities.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Binance.com or Binance.US until September 2020 and April 2020, respectively); *id.* ¶¶ 497–98, 504 ("Purchase Agreement" alleged to govern COTI's 2019 initial exchange offering on a different platform, but COTI not alleged to be available on Binance.com or Binance.US until February 2020 and April 2022, respectively).  As for ADA, the Complaint includes a conclusory reference to the developers' announcement concerning "the creation of smart contracts on the protocol," *id.* ¶ 383, but lacks any allegation of post-sale contractual obligations that come with the token.  (The phrase "smart contracts" is misleading—in blockchain lingo, "smart contracts" are automated programs relating to a blockchain's functionality, not actual contracts.)  For the sales involving the two Binance platforms, therefore, the Complaint alleges only garden-variety secondary-market transactions—that is, purchases of an "underlying asset" rather than an investment contract.  *Ripple*, 2023 WL 4507900, at *7.

*No Investment Of Money Into A Common Enterprise.*  The Complaint also fails to plausibly allege a "common enterprise" with "shared profits, and shared losses."  *Life Partners*, 87 F.3d at 543.  The Complaint asserts that the third-party tokens "ha[ve] been available" on the Binance platforms.  *E.g.*, Compl. ¶¶ 369, 381, 408, 433, 454, 476, 490, 498.  But the SEC does not plausibly allege that their developers sold the tokens through the Binance platforms, pooled purchasers' money into a common fund, or then used that money to further the enterprise.[9]

*No Reasonable Expectation Of Profits From The Enterprise.*  Moreover, the SEC's Complaint as to the third-party tokens alleges blind transactions, which were executed with no

---

[9] The most the Complaint ever alleges regarding any direct connection between a third-party token developer and purchasers on Binance.com or Binance.US involves the SAND and MATIC tokens; according to the SEC, their developers made "initial exchange offering[s]" on the platforms. Compl. ¶¶ 388, 441.  But the Complaint makes no allegations about how these events would affect the *Howey* analysis.  For instance, it never specifies whether these were merely blind bid or ask transactions—and thus whether the purchasers had any reasonable expectation of profits from the issuers—and says nothing about whether purchaser payments flowed directly to the issuers.

"indicat[ion] to one party [of] the identity of the other party to a trade." Compl. ¶ 91. Thus, the Complaint lacks any plausible allegations indicating that purchasers reasonably expected their money would be used by those tokens' developers to earn them profits. *See supra* at 22–23.

### 4.     BNB Vault And Simple Earn

That leaves BNB Vault and Simple Earn. According to the SEC, these programs allow Binance.com customers to "lend their crypto assets to [BHL] for fixed or flexible lengths of time" and earn corresponding "interest." Compl. ¶ 327. As an initial matter, the SEC's allegations concerning these programs are threadbare and conclusory recitations of the elements of the *Howey* test. *See, e.g.*, *id.* ¶ 335 (alleging pooling without any supporting facts); *id.* ¶ 336 (conclusory list of supposed "entrepreneurial" efforts). These bare legal conclusions are insufficient to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[10]

In addition, the SEC never plausibly alleges any "investment of money" within the meaning of *Howey* as to either program. An "investment of money" entails at least two things: *First*, the investor must transfer ownership (rather than mere possession) of the funds or property he invests. *See Rubera*, 350 F.3d at 1090 (investor must "commit his assets to the enterprise" (quotation marks omitted)); *see also Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979) ("In every decision of this Court recognizing the presence of a 'security' under the [Securities Act and Exchange Act], the person found to have been an investor chose to give up a specific consideration."). *Second*, the investor must "subject himself to financial loss." *Rubera*, 350 F.3d at 1090 (quotation marks omitted).

---

[10] As explained below, the SEC's claim concerning BNB Vault and Simple Earn (Count 3) should be dismissed for the independent reason that the SEC fails to allege any domestic transactions that are subject to the U.S. securities laws. *See infra* at 36–42.

The Complaint lacks allegations sufficient to make either of those showings.  As for BNB Vault, the Complaint and the website it incorporates by reference indicate that BNB Vault is essentially a staking program.  *See* Compl. ¶ 334 (incorporating *Introducing BNB Vault: One-Click Earning for Your BNB Holdings*, Binance Blog (Nov. 3, 2020), https://tinyurl.com/5aask7ym).  Users lend their BNB tokens to BHL for either fixed or flexible time periods—but do not permanently "give [them] up."  *Daniel*, 439 U.S. at 559.  BHL then uses the tokens to validate transactions on the tokens' blockchain.  Once the validation is finished, users get the tokens back—and in fact they can "unstake whenever [they] want."  *Binance Launches BNB Vault – Earn Daily Income from the BNB Ecosystem*, Binance.com (Nov. 3, 2020), https://tinyurl.com/yjkwkcfv (incorporated at Compl. ¶ 332).  The SEC never alleges any transfer of ownership, nor any meaningful risk that the tokens will be lost.  Nor can the SEC satisfy the requirement that token owners reasonably expect to earn profits from the efforts of others, since BHL simply uses the tokens to validate blockchain transactions—a ministerial, rather than entrepreneurial, task.  *Life Partners*, 87 F.3d at 545.

The same is true with Simple Earn.  Users temporarily lend their tokens to BHL, and BHL then allegedly uses them "'for a variety of purposes,' including on-chain staking, loans, or for operational purposes by other business units within Binance."  Compl. ¶ 329.  Users deposit their tokens "for flexible or locked periods," but the tokens "will be returned" to participants upon redemption requests.  *Simple Earn*, Binance.com, https://tinyurl.com/ycxh7e7v (last visited Sept. 21, 2023) (incorporated at Compl. ¶ 328).  BHL returns tokens to users who withdraw early from "Flexible" products "immediately upon successful processing of redemption requests," and users who withdraw early from "Locked" products lose only the rewards they have already earned

(resulting in zero net loss).  *Id.*  Thus, for Simple Earn, too, the SEC fails to allege any transfer of ownership or meaningful risk of loss.  *See Rubera*, 350 F.3d at 1090.

If the SEC's theories were to succeed as to these programs, that would radically and improperly expand its regulatory jurisdiction.  The SEC implicitly concedes that these programs involve no "investment of money"—no relinquishment of title to assets—since it acknowledges that these products are merely "loan[s]" entitling users to recover their entire principal after a temporary lending period.  Compl. ¶ 327.  Construing the phrase "investment contract" to encompass arrangements where a person temporarily lends a useful asset to another in exchange for an interest payment would be unprecedented; courts unsurprisingly have rejected similarly aggressive interpretations.  *Cf., e.g.*, *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir. 1981) ("The securities laws are not a panacea for commercial loans gone awry."); *Marine Bank*, 455 U.S. at 558–59 (overly broad constructions of the securities laws are disfavored).

### C.  The Major-Questions Doctrine Forecloses The SEC's Novel Interpretation Of The Securities Laws.

The SEC's interpretation of the phrase "investment contract" also fails under the major-questions doctrine.  That canon of statutory construction provides that when an agency's interpretation of a statute implicates major political and economic issues, the agency must have "clear congressional authorization for the power it claims."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotation marks omitted).  Here, the SEC has no such authorization.

### 1.  The SEC's Attempt To Expand Its Authority Is A Major Question.

A case involves a major economic question when billions of dollars hinge on the agency's interpretation.  *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) ("$430 billion in student loans" at issue); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ($50

billion at stake).  And a case involves a major political question when an agency seeks to preempt the legislative process by claiming a controversial power on a matter of vast economic or political significance that remains subject to active debate.  *See, e.g.*, *West Virginia*, 142 S. Ct. at 2614 ("earnest and profound debate across the country" undercut "claimed delegation" (quotation marks omitted)); *see also NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (per curiam) (similar).

The doctrine applies with special force when an agency asserts novel power that it has previously disclaimed, or the agency's position conflicts with another regulator's authority.  *See, e.g.*, *Nebraska*, 143 S. Ct. at 2364 (Department of Education had disclaimed "statutory authority to provide blanket or mass cancellation" of student loans); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) ("distinct regulatory scheme" undercut FDA's claimed authority over cigarettes).  Here, the SEC's power grab implicates all of these concerns.

***Economic Significance***.  The SEC admits that the crypto assets at issue here are worth billions of dollars and that *trillions* ride on the questions it wants this Court to decide.  *See, e.g.*, Compl. ¶¶ 102, 172, 183, 228, 304, 314, 318, 324.  Congress must unmistakably delegate agency authority that implicates these staggering economic consequences.  *See, e.g.*, *Nebraska*, 143 S. Ct. at 2372; *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

Given the sweeping nature of the SEC's statutory arguments, far more is at stake here than even the enormous impact on the crypto market.  *See Merck & Co. v. HHS*, 962 F.3d 531, 541 (D.C. Cir. 2020) ("breadth" of "asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed").  The SEC is asking the Court to hold—for the first time and almost a century after the relevant laws were enacted—that the agency can regulate asset sales as "investment contracts," even absent any enforceable post-sale obligations, known counterparties, or an "investment of money" into a "common enterprise," so

long as some purchasers speculate that the assets will appreciate over time.  If that view prevails, the agency would be able to seize new authority over all sorts of assets never before thought to be securities, including traditional commodities such as gold and oil.   That would effect a "fundamental revision" of the SEC's authority over the American economy.  *West Virginia*, 142 S. Ct. at 2612 (quotation marks omitted).  And it would interfere with the CFTC's jurisdiction over commodities transactions.  That the SEC's position would displace "[t]his distinct regulatory scheme suggests that [the Court] should expect clear authorization from Congress."  *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 298 (4th Cir. 2023).

**Political Significance**.  This case has "vast . . . political significance," too.  *Util. Air. Regul. Grp.*, 573 U.S. at 324 (quotation marks omitted).  Congress has considered (or is considering) over 20 legislative proposals about how to best regulate crypto assets and trading.  *Supra* at 9.  Some would vest authority across multiple agencies; others would give it to the CFTC; still others would expressly clarify that the SEC *lacks* authority.  *Id.*  The agency cannot short-circuit this "earnest and profound debate" by claiming that it *already* possesses this controversial power.  *West Virginia*, 142 S. Ct. at 2614 (quotation marks omitted); *see also id.* at 2610 (rejecting agency interpretation that "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself"); *see also supra* at 9 (citing amicus brief of Senator Lummis).[11]

---

[11] *Terraform* declined to apply the major-questions doctrine on reasoning that conflicts with recent Supreme Court precedent.  For example, the court erroneously suggested that the doctrine is limited to the "energy and tobacco industries."  2023 WL 4858299, at *8; *but see, e.g.*, *Nebraska*, 143 S. Ct. at 2371 (student loans); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (landlord-tenant relationships).

### 2.     The SEC Lacks The Clear Authorization Mandated By Supreme Court Precedent.

This case involves a paradigmatic major question requiring "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2609.  In a case like this one, "an expansive, vaguely worded definition is" insufficient even where, unlike here, a defendant's alleged conduct "falls within the literal definition" of a statute.  *Capt. Gaston*, 76 F.4th at 302.  "[M]erely plausible" or "colorable" textual arguments will not cut it either.  *West Virginia*, 142 S. Ct. at 2609.  Instead, courts must "presume that Congress intends to make major policy decisions itself."  *Id.* (quotation marks omitted).

The securities laws contain nothing close to the unmistakable delegation of authority required by Supreme Court precedent.  The definition sections of both the Securities Act and Exchange Act specifically explain that overly broad interpretations are disfavored—even when some instrument falls within the literal definition of "security," the statute does not apply where "context otherwise requires."  15 U.S.C. §§ 77b(a)(1), 78c(a)(10); *see also Marine Bank*, 455 U.S. at 558–59.  Moreover, the plain text affirmatively *forecloses* the SEC's interpretation, which hinges on the SEC's attempts to read the word "contract" out of the phrase "investment contract" and otherwise ignores longstanding Supreme Court precedent in *Howey*.  *See supra* at 14–20.

The lack of clear statutory support for the SEC's interpretation is likewise illustrated by the SEC's own contradictory statements about the scope of its authority for a period stretching from *Howey* itself to as recently as 2021.  In 1946, the SEC's own *Howey* brief expressly defined an "investment contract" as involving a "contractual arrangement."  SEC Br., 1946 WL 50582, at *9.  Seventy-five years later, Chair Gensler admitted that the SEC lacks a "regulatory framework" for crypto exchanges like those at issue here.  *Supra* at 8; *see also* Appx. tbl. A line 10 ("[W]e would have to admit that we likely need more, or at least more clearly delineated, statutory

authority to regulate certain crypto tokens and to require crypto trading platforms to register with us.").

The SEC's self-doubt manifested itself in the agency's enforcement agenda—or, when it came to trading in crypto assets, the lack thereof. "[T]he want of assertion of power by those who presumably would be alert to exercise it . . . is . . . significant in determining whether such power was actually conferred." *West Virginia*, 142 S. Ct. at 2610 (quotation marks omitted). Here, until at least 2017, the SEC did nothing to indicate that it believed sales of crypto tokens are securities transactions regardless of the context. The agency even approved Coinbase's registration statement.[12] Put simply, the SEC permitted a thriving industry to grow and millions of people to purchase crypto assets on widely publicized platforms like Binance.com and Binance.US, demonstrating that the SEC did not consider these transactions to involve securities until very recently. The SEC's deafening, decade-long silence "is a 'telling indication'" that the agency's about-face exceeds its "legitimate reach." *NFIB*, 142 S. Ct. at 666.

Even today, the Executive Branch is in disarray about who should regulate crypto (and what that regulation should look like). The SEC and CFTC are each attempting "to stake their claim to jurisdiction" through enforcement actions resting on contradictory allegations about the nature of assets such as BUSD.[13] "Regulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they

---

[12] Six of the digital assets or services at issue here—SOL, ADA, MATIC, FIL, MANA, and staking—were traded on Coinbase when the SEC allowed its IPO in April 2021. *See Coinbase*, No. 1:23-cv-04738 (S.D.N.Y. June 28, 2023), ECF 22, ¶¶ 65, 114.

[13] Joel Khalili, *Binance and Coinbase Have Been Sucked into a Regulatory Turf War*, Wired (Apr. 6, 2023), https://tinyurl.com/29wectxm.

are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision." *Voyager*, 649 B.R. at 119.

BHL's own treatment at the hands of the CFTC and SEC provides a pointed example of this lack of clear statutory authority. The CFTC sued first, asserting in a parallel enforcement action that BUSD is a commodity under the Commodity Exchange Act. CFTC Compl. ¶¶ 2, 24. A few months later, the SEC filed this action asserting that BHL engaged in "unregistered offers and sales of securities" under the Securities Act and the Exchange Act on the basis that BUSD is a security. Compl. ¶¶ 282–83. This interagency disagreement reflects, at minimum, that the Securities Act and Exchange Act do not clearly and unmistakably define BUSD or other crypto assets to be securities. Thus, even if the SEC's interpretation of the statutory phrase "investment contract" were otherwise plausible, it would still fail under the major-questions doctrine. *Brown & Williamson*, 529 U.S. at 144. The Legislative Branch, not a district court or the SEC, is the proper decisionmaker here.

## II.     The SEC's Challenge To The BNB Offering Is Time-Barred.   (Remainder Of Count 1)

Count 1 alleges that BNB is a "security" both with respect to BNB's Offering, *see* Compl. ¶¶ 287–99, and with respect to the trading of BNB on Binance.com and other platforms *after* the Offering, *see id.* ¶¶ 300–14. The post-Offering portion of Count 1 fails for the reasons explained above—the token itself is an asset, not a security, and post-Offering sales of BNB on Binance.com and similar platforms are not investment contracts. With respect to the Offering, the Court should dismiss that portion of Count 1 because it occurred outside the relevant limitations period.

Where a "complaint on its face" shows that claims are "conclusively time-barred," "dismissal" of those claims "is appropriate." *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014) (quotation marks omitted). Courts in this district regularly dismiss claims on this basis.

*See, e.g.*, *Coates v. Edgewood Mgmt. Corp.*, 258 F. Supp. 3d 107, 112 (D.D.C. 2017) (A. Jackson, J.).

Here, a five-year limitations period applies to the SEC's request for civil monetary penalties.  28 U.S.C. § 2462; *Kokesh v. SEC*, 581 U.S. 455, 459 (2017).  The SEC also must bring "a claim for disgorgement" "not later than 5 years after the latest date of the violation that gives rise to the action or proceeding."  15 U.S.C. § 78u(d)(8)(A)(i).  The allegations in the Complaint make clear that the BNB Offering occurred entirely outside of the applicable five-year limitations period.  The SEC specifically alleges that those sales were "to fund the launch of the Binance.com Platform in July 2017."  Compl. ¶ 287; *see also id.* ¶¶ 81, 293, 305.  To seek retrospective relief related to the Offering, therefore, the SEC needed to file this lawsuit by July 2022.  It is nearly a year too late.[14]

### III.   The Claims Regarding Binance.com Transactions And The BNB Offering Are Impermissibly Extraterritorial.   (Foreign Components Of Counts 1–2 & All Of Counts 3, 5–7, & 11)

Many of the SEC's claims fail for the additional reason that they concern extraterritorial conduct that is beyond the scope of the federal securities laws.  In particular, the SEC fails to plausibly allege that transactions on Binance.com (including the BNB Vault and Simple Earn products) or the BNB Offering were "domestic."  This deficiency compels the dismissal of Counts 3, 5, 6, 7, and 11 in their entirety; each of those claims is wholly premised on transactions on Binance.com.  Counts 1 and 2 also fail to state a plausible claim to the extent they challenge foreign transactions on Binance.com or the BNB Offering.

---

[14] The ICO also occurred before the SEC had given any meaningful public guidance concerning crypto assets, meaning that in July 2017 nobody had fair notice that the SEC would later view BNB sales as unlawful for lack of a registration statement.  *See infra* at 42–43.

### A.   The Statutory Provisions At Issue Do Not Apply Extraterritorially.

"It is a longstanding principle of American law" that statutes "apply only within the territorial jurisdiction of the United States" "unless a contrary intent appears." *Morrison*, 561 U.S. at 255 (quotation marks omitted).  In *Morrison*, the Supreme Court held that Section 10(b) of the Exchange Act "contains nothing to suggest" extraterritorial application, and that "the focus of the Exchange Act" as a whole is on "purchases and sales of securities in the United States." *Id.* at 262, 266.  In reaching that conclusion, the Court relied on several provisions of the Exchange Act beyond Section 10(b), including "the very prologue of the Exchange Act" and "[t]he Act's registration requirements." *Id.* at 267–68.  The Court also observed that "[t]he same focus on domestic transactions" is "evident in the Securities Act." *Id.* at 268.  Thus, the federal securities laws apply only to "domestic" transactions unless a specific statutory provision contains an unambiguous indication to the contrary. *Id.* at 267.

Here, Counts 1 and 2 allege that BHL violated 15 U.S.C. § 77e(a) and (c), and challenge, in part, transactions on Binance.com and the "global[]" BNB Offering in July 2017.  Compl. ¶¶ 287, 516.  Count 3 alleges that BHL violated the same provisions through the Simple Earn and BNB Vault products, which the SEC alleges were available on Binance.com only. *Id.* ¶¶ 325, 522. Those provisions ban the sale or delivery of a security in interstate commerce unless the seller has filed a registration statement with the SEC.  Neither discusses sales in foreign commerce or in foreign places.  Section 77e(a) and (c) therefore apply only to domestic securities transactions.

Counts 5 through 7 allege that BHL operated as an unregistered exchange, broker-dealer, and clearing agency with respect to the Binance.com platform in violation of 15 U.S.C. §§ 78e, 78o(a), 78q–1(b)(1).  None of those provisions indicates that Congress intended it to apply beyond U.S. borders, so they similarly apply only domestically. *Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (citing *Morrison*, 561 U.S. at 267), *appeal pending*, No.

22-972 (2d Cir.); *SEC v. Benger*, 934 F. Supp. 2d 1008, 1013 (N.D. Ill. 2013) (failure to register as a broker-dealer under 15 U.S.C. § 78o not actionable where related transaction was foreign).

Finally, Count 11 alleges "control person" liability "for the Binance.com Platform" under 15 U.S.C. § 78t(a), which also does not apply extraterritorially.  Compl. ¶¶ 544–48.

> **B.**     **The SEC Fails To Plausibly Allege A Domestic Application With Respect To Binance.com Or The BNB Offering.**

Since none of the statutes at issue applies extraterritorially, the SEC's claims under those statutes fail unless the SEC plausibly alleges that they "involve a domestic application" of the relevant statutory provisions.  *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 96 (2d Cir. 2022).  To do so, the SEC must plausibly allege—at minimum—a domestic transaction.  *See, e.g.*, *Benger*, 934 F. Supp. 2d at 1013.

A "domestic transaction" is either a "transaction[] in securities listed on domestic exchanges" or a "domestic transaction[] in other securities."  *Morrison*, 561 U.S. at 267.  Not just any domestic hook—*e.g.*, that U.S. consumers used a global website—will do: "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Id.* at 266.

In addition, because a domestic securities transaction "is not alone sufficient to state a properly domestic claim" under *Morrison*, the SEC must allege facts demonstrating that its claims are not "predominantly foreign."  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215–16 (2d Cir. 2014) (per curiam).  This requirement exists because "[i]f the domestic execution of" transactions "could alone suffice" to establish a "domestic" application, then that could "subject to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges."  *Id.*  "That is a result *Morrison* plainly did not contemplate."  *Id.* at 216.

1.    **The SEC's Claims Concerning Binance.com Are Impermissibly Extraterritorial.**

The SEC brings a series of claims (Counts 5–7) alleging that Binance.com is an unregistered exchange, broker-dealer, and clearing agency.  The SEC's claims against BHL in Count 3 and against Mr. Zhao in Count 11 similarly hinge in their entirety on transactions on Binance.com.  And Counts 1 and 2 also challenge (in relevant part) BNB and BUSD transactions on Binance.com.  But the Complaint fails to allege any facts indicating that Binance.com could plausibly be considered a domestic exchange or that transactions on Binance.com are domestic.

*Binance.com Is Not A Domestic Platform.*   The SEC admits that BHL is based in the Cayman Islands, and that Binance.com is "an international crypto asset trading platform." Compl. ¶ 27.  The SEC's failure to allege facts showing that Binance.com is a domestic exchange (or a domestic clearing house or a domestic broker-dealer) is enough by itself for the Court to dismiss Counts 5 through 7.

*Transactions On Binance.com Are Not Otherwise Domestic.*   The Complaint also fails to allege any domestic transactions on Binance.com, which dooms Counts 3, 5–7, and 11, as well as the portions of Counts 1 and 2 challenging transactions on Binance.com.  "[T]o sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange," the SEC "must allege facts suggesting that irrevocable liability was incurred" (*i.e.*, that the parties became "bound to effectuate the transaction") or that "title was transferred" "within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d Cir. 2012).  Relevant allegations include "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70.

With respect to transactions on Binance.com, the SEC relies primarily on the fact that U.S. investors bought or traded tokens on the website.  *See* Compl. ¶¶ 140 (BNB), 320 (BUSD), 326

(BNB Vault and Simple Earn).  But "[a] purchaser's citizenship or residency" "is irrelevant to the location of a given transaction," *Absolute Activist*, 677 F.3d at 69–70 (quotation marks omitted), and therefore "does not affect whether the transaction was foreign or domestic," *City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

Likewise, "the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange" is insufficient "to allege that a purchaser incurred irrevocable liability in the United States." *City of Pontiac*, 752 F.3d at 181; *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *26 (S.D.N.Y. Sept. 20, 2016) (transactions not domestic where alleged conduct occurred on "foreign exchanges that are made available to American investors through electronic trading platforms accessible on the Internet").

The SEC's other U.S.-related allegations also fail.  For example, the SEC alleges that BHL marketed Binance.com and certain tokens to customers in the United States.  *See, e.g.*, Compl. ¶ 24 (alleging that BHL "regularly solicited" U.S. investors to trade on Binance.com); *id.* ¶ 104 (alleging that BHL engaged in "solicitation on a worldwide basis"); *id.* ¶ 326 (alleging that BHL marketed Simple Earn and BNB Vault "to investors in the United States and elsewhere").  But allegations that an alleged security was "heavily marketed in the United States" "do not satisfy the transactional test announced in *Morrison*."  *Absolute Activist*, 677 F.3d at 70.

Similarly insufficient are allegations that BHL accepted U.S. dollars for the tokens, *see* Compl. ¶ 98, or accepted payment "through bank accounts in the United States," *id.* ¶ 284. "Because U.S. dollars can be exchanged outside of the United States, and a transacting party can decide and agree to use or accept dollars while abroad, the fact that U.S. dollars were used to purchase" an alleged security "is inadequate to show that" the transaction is "domestic" for purposes of the securities laws. *Banco Safra S.A.-Cayman Is. Branch v. Samarco Mineracao S.A.*,

849 F. App'x 289, 294 (2d Cir. 2021).  Nor does a foreign transaction become domestic merely because a third party's machinery in the United States might be "needed to carry out the transactions" or to "implemen[t] an aspect of a transaction."  *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014).

*Transactions On Binance.com Are Predominantly Foreign.*  For many of the same reasons, the Complaint does not plausibly allege that the challenged transactions were predominantly domestic, as opposed to foreign.  *Parkcentral*, 763 F.3d at 216; *see also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019).  Binance.com is an "international" trading platform, and the SEC's vague assertions that "U.S. customers made up a substantial portion of Binance's business," Compl. ¶ 108, or that Binance.com has or had customers "in the United States," *id.*, fail to justify the imposition of U.S. securities laws on a foreign platform absent clear congressional intent.  *See Parkcentral*, 763 F.3d at 216 (affirming dismissal due to "[t]he potential for regulatory and legal overlap" between U.S. and foreign regulations).

## 2. The SEC's Allegations Concerning The BNB Offering Are Impermissibly Extraterritorial.

Similar deficiencies require the dismissal of Count 1 to the extent it relies on the BNB Offering.  The SEC's allegation that "32 U.S.-based investors purchased at least 504,000 BNB tokens during the ICO" merely recites the residency of a few dozen buyers.  Compl. ¶ 297.  That is irrelevant to whether the transactions were domestic.  *See City of Pontiac*, 752 F.3d at 181; *Absolute Activist*, 677 F.3d at 69–70.  The alleged global marketing of the Offering is similarly insufficient and in fact emphasizes the lack of an adequate *domestic* connection specific to the United States.  *See* Compl. ¶ 287; *supra* at 38.  The SEC's allegations concerning the Offering make clear that these sales were predominantly foreign.  *See* Compl. ¶ 297.

41

The SEC's theory here—that foreign platforms must register in the United States if American citizens access their platforms through the internet—would effect a remarkable expansion of the securities laws into international markets.  That is precisely what the Supreme Court rejected in *Morrison*.  561 U.S. at 269; *see also id.* (citing amicus briefs from foreign governments and trade associations).  The risk of conflict is particularly acute in the context of crypto assets, where foreign regulators are working to establish their own regulatory structures for this new industry.  *See, e.g.*, Regulation (EU) 2023/1114 of the European Parliament and of the Council on Markets in Crypto-Assets, 2020 O.J. (L 150), https://tinyurl.com/4f3zh8x6.

The Court should dismiss Counts 3, 5–7, and 11 entirely because they impermissibly seek to extend the securities laws beyond U.S. borders.  For the same reason, the Court should dismiss Counts 1 and 2 to the extent they hinge on transactions on Binance.com or the BNB Offering.

## IV.  The SEC's Failure To Provide Fair Notice Of Its Regulatory Requirements Compels Dismissal.  (All Counts)

The Court should also dismiss the Complaint because principles of fair notice require that an agency must "identify, with ascertainable certainty, the standards with which the agency expects [an industry] to conform."  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017) (quotation marks omitted).

Here, the SEC's new position—that the vast majority of crypto assets and transactions are securities subject to the SEC's jurisdiction—was anything but ascertainably certain when Binance.com allegedly launched in July 2017.  Compl. ¶¶ 80–84; *supra* at 7–9.  The first public guidance from the SEC occurred later that month, Appx. tbl. A line 1, after the BNB Offering and the launch of the Binance.com platform were complete, Compl. ¶ 81.  Since then, the SEC's shifting positions and the enforcement battle between the SEC and CFTC have added to the confusion.  *Cf. Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995) ("[I]t is unlikely that

regulations provide adequate notice when different divisions of the enforcing agency disagree about their meaning.").

In light of the absence of action from the SEC despite the massive growth in the crypto industry, BHL and Mr. Zhao and others in the industry made major investments in a business model that appeared consistent with the SEC's view of the law. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (quotation marks omitted). Where, as here, the agency's new position is at odds with industry practice and the agency's "very lengthy period of conspicuous inaction," "the potential for unfair surprise is acute." *Id.* at 157–58.

At minimum, the Court should dismiss Count 1 to the extent it challenges the BNB Offering, which was completed weeks before the SEC's first public guidance concerning crypto assets. Compl. ¶ 81. The fundamental principle that agencies cannot impose retroactive liability for new interpretations of a statute is "Rule of Law 101." *PHH Corp. v. CFPB*, 839 F.3d 1, 48 (D.C. Cir. 2016), *reinstated in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc).

## V.     The Court Lacks Personal Jurisdiction Over Mr. Zhao.  (Counts 11 and 12)

The Complaint should be dismissed as to Mr. Zhao for the additional reason that the SEC has not sufficiently pleaded personal jurisdiction over him for the registration-based control person claims at issue. "[G]eneral jurisdiction does not exist" because Mr. Zhao does not live or work in the United States. *Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023). Specific jurisdiction is proper only if he has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Specific jurisdiction is tied to each defendant and to each claim," *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018), and "[e]ach defendant's contacts with the forum . . . must be assessed individually," *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984). Despite a lengthy pre-

suit investigation, the SEC fails to allege sufficient minimum contacts that *Mr. Zhao* personally had with the United States that relate to the SEC's claims.

*First*, even if the SEC were to sufficiently allege Mr. Zhao's control person status over either BHL or BAM, control person liability "cannot on its own support personal jurisdiction." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667 (6th Cir. 2005). Tacking on allegations that Mr. Zhao is the "ultimate decision maker" of BHL or the beneficial owner and a board member of BAM (Compl. ¶¶ 26, 85) does not change this result. *See Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 40 (D.D.C. 2012). Any attempt by the SEC to argue otherwise would "impermissibly conflate statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." *City of Monroe*, 399 F.3d at 667 (alteration and quotation marks omitted); *see also Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F. Supp. 2d 15, 22 (D.D.C. 2000) ("[A] defendant corporation's contacts with a forum may not be attributed to shareholders, affiliated corporations, or other parties.").

*Second*, the SEC's allegations that Mr. Zhao "actively solicited U.S. investors to trade on the Binance Platforms" (Compl. ¶ 24) are insufficient to establish the requisite "suit-related conduct" by Mr. Zhao that "create[d] a substantial connection" between him and the forum. *Cockrum*, 319 F. Supp. 3d at 175 (quotation marks omitted). The SEC alleges no direct contact between Mr. Zhao and U.S. users. Conclusory assertions purporting to show that Mr. Zhao "directed" BAM to solicit U.S. users (Compl. ¶ 216) or "directed Binance" to assist U.S. customers in "circumventing" controls (*id.* ¶ 8) are unrelated to and thus cannot support jurisdiction over him for the SEC's failure-to-register claims. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018) (general allegations that "[the parent] controlled or otherwise directed or materially participated in the operations of [the subsidiary], and reaped proceeds or other

financial benefits from the [subsidiary's] sales of [the suit-related] financial instruments" insufficient to support minimum contacts).  Nor is alleged awareness of U.S. persons transacting on Binance.com (Compl. ¶ 108) sufficient.  *See, e.g.*, *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 25 (D.D.C. 2017) ("failure to geoblock" does not constitute purposeful availment (emphasis omitted)).

A close examination of Mr. Zhao's alleged role in BHL's and BAM's purported violations—the only "suit-related" and therefore jurisdictionally relevant conduct—reveals that the SEC repeatedly relies on impermissible group pleading that BHL or BAM, "under Zhao's control," supplied the various functions that allegedly required registration with the SEC.  Compl. ¶¶ 209–36.  But broad allegations that a defendant "influence[d] and control[ed] . . . the decision-making of the Company" are insufficient to support personal jurisdiction.  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017).   And the SEC cannot "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction." *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 121–22 (D.D.C. 2008) (quotation marks omitted).

*Finally*, the SEC's allegations regarding *BAM's* "business licenses" and "transact[ing] business in this District," marketing activities, or contractual relationships (Compl. ¶ 23) do not speak to *Mr. Zhao's* own conduct in or directed at the United States—the only suit-related contacts relevant here.  *See Mazza*, 852 F. Supp. 2d at 40 (allegations that parent is "responsible for establishing" strategies for local subsidiaries is insufficient for establishing specific jurisdiction).

## Conclusion

For these reasons, the SEC's claims against BHL and Mr. Zhao should be dismissed with prejudice.

Dated:  September 21, 2023

Respectfully submitted,


 _/s/ Daniel W. Nelson_
Daniel W. Nelson (D.C. Bar #433415)
Jason J. Mendro (D.C. Bar #482040)
Stephanie Brooker (*pro hac vice*)
M. Kendall Day (*pro hac vice*)
Richard W. Grime (*pro hac vice*)
Matt Gregory (D.C. Bar #1033813)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
Fax: (202) 467-0539
dnelson@gibsondunn.com
jmendro@gibsondunn.com
sbrooker@gibsondunn.com
kday@gibsondunn.com
rgrime@gibsondunn.com
mgregory@gibsondunn.com


*Attorneys for Defendant Binance Holdings*
*Limited*

  /s/ Abid R. Qureshi
Abid R. Qureshi (D.C. Bar No. 459227)
William R. Baker, III (D.C. Bar No. 383944)
Eric S. Volkman (D.C. Bar No. 490999)
Michael E. Bern (D.C. Bar No. 994791)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
abid.qureshi@lw.com
william.baker@lw.com
eric.volkman@lw.com
michael.bern@lw.com

Douglas K. Yatter (*pro hac vice*)
Benjamin Naftalis (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
douglas.yatter@lw.com
benjamin.naftalis@lw.com

Heather A. Waller (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
heather.waller@lw.com

Melanie M. Blunschi (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: (415) 391-0600
Fax: (415) 395-8095
melanie.blunschi@lw.com

*Attorneys for Defendant Changpeng Zhao*

**Appendix Table A**
**CFTC and SEC Guidance**

| No. | Citation | Date | Link |
|-----|----------|------|------|
| 1 | Securities and Exchange Commission, *Report of Investigation Pursuant to Section 21(a) of the Securities and Exchange Act of 1934: The DAO* | July 25, 2017 | https://tinyurl.com/3hsth3bf |
| 2 | William Hinman, SEC Dir., Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)* | June 14, 2018 | https://tinyurl.com/3hamfszp |
| 3 | Strategic Hub for Innovation & Fin. Tech., SEC, *Framework for "Investment Contract" Analysis of Digital Assets* | April 3, 2019 | https://tinyurl.com/3hcvn9su |
| 4 | *IN CASE YOU MISSED IT: Chairman Tarbert Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit*, CFTC Release No. 8051-19 | October 10, 2019 | https://tinyurl.com/5bjnkabh |
| 5 | Coinbase Global Inc., Notice of Effectiveness | April 1, 2021 | https://tinyurl.com/bde7p3wk |
| 6 | *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g. before the U.S. H. Fin. Servs. Comm., 117th Cong. at 12 (statement of SEC Chair Gary Gensler) | May 6, 2021 | https://tinyurl.com/mtrnkbn2 |
| 7 | *The Future of Digital Asset Regulation*, Hr'g. before the U.S. H. Committee on Agriculture at 25, 117 Cong. (statement of Vincent McGonable) | June 23, 2022 | https://tinyurl.com/3dry2pu7 |
| 8 | *Legislative Hearing to Review S.4760, The Digital Commodities Consumer Protection Act*, Hr'g. before the U.S. S. Committee on Agriculture, Nutrition & Forestry, 117 Cong. at 2 (Statement of Rostin Behnam) | September 15, 2022 | https://tinyurl.com/266krkwt |

| | | | |
|---|---|---|---|
| 9 | Gary Gensler, SEC Chair, *Statement on Financial Stability Oversight Council's Report on Digital Asset Financial Stability Risks and Regulations Before the Financial Stability Oversight Counsel Open Meeting* | October 3, 2022 | https://tinyurl.com/54khu242 |
| 10 | Hester Peirce, SEC Comm'r, *Outdated: Remarks before the Digital Assets at Duke Conference* | January 20, 2023 | https://tinyurl.com/2kdu4rzw |
| 11 | Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s top financial cop on Bankman-Fried blowback*, N.Y. Mag. | February 23, 2023 | https://tinyurl.com/ke478bu5 |
| 12 | *Oversight of the Commodity Futures Trading Commission*, Hr'g. before the U.S. S. Committee on Agriculture, Nutrition & Forestry, 118th Cong. at 1:19:00 – 1:19:20 (testimony of Rostin Behnam, Chairman, CFTC) | March 8, 2023 | https://tinyurl.com/yc4ydced |
| 13 | Dave Michaels, *Stablecoins Like UDSC Are Commodities, CFTC Chair Says*, Wall St. J. | March 8, 2023 | https://tinyurl.com/56hh39rw |
| 14 | *Oversight of the Securities and Exchange Commission*, Hr'g. before the U.S. H. Fin. Servs. Comm., 118 Cong. at 0:43:45 – 0:45:45 (testimony of Gary Gensler, Chair, SEC | April 18, 2023 | https://tinyurl.com/33a3bty2 |

**Appendix Table B**
**Proposed Legislation**

| No. | Citation | Link |
|---|---|---|
| 1 | U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923, 116th Cong. (2019) | https://tinyurl.com/2ksvz76 |
| 2 | Eliminate Barrier to Innovation Act of 2021, H.R. 1602, 117th Cong (2021) | https://tinyurl.com/2mx3mt8m |
| 3 | Digital Asset Market Structure Discussion Draft, 118th Cong. (2023) | https://tinyurl.com/443zhpw8 |
| 4 | Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023) | https://tinyurl.com/yc2nmpsx |
| 5 | Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023) | https://tinyurl.com/3yx8f5hm |
| 6 | Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022) | https://tinyurl.com/45cnjwyd |
| 7 | Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022) | https://tinyurl.com/bdd7r5p3 |
| 8 | The Token Taxonomy Act of 2021, H.R. 1628, 117 Cong. (2021) | https://tinyurl.com/bezac866 |
| 9 | Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021) | https://tinyurl.com/2mx3mt8m |
| 10 | Crypto-Currency Act of 2020, H.R. 6154, 116th Cong. (2020) | https://tinyurl.com/589kheax |
| 11 | U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923, 116th Cong. (2019) | https://tinyurl.com/3hscvaj2 |
| 12 | Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong. (2022) | https://tinyurl.com/ysz9tspd |
| 13 | Securities Clarity Act, H.R. 4451, 117th Cong. (2021) | https://tinyurl.com/53xe9ehr |
| 14 | McHenry Discussion Draft Stablecoin Bill, 118th Cong. (2023) | https://tinyurl.com/mskumzxa |
| 15 | Crypto-Asset Environmental Transparency Act, S. 661, 118th Cong. (2023) | https://tinyurl.com/4jty5j2c |
| 16 | Crypto-Asset National Security Enhancement and Enforcement Act, S. 2355, 118th Cong. (2023) | https://tinyurl.com/5dmebz2j |
| 17 | Virtual Currency Tax Fairness Act, S. 4608, 117th Cong. (2022) | https://tinyurl.com/26as2bvp |
| 18 | Blockchain Regulatory Certainty Act, H.R. 1747, 118th Cong. (2023) | https://tinyurl.com/mr85pnhd |
| 19 | Stablecoin Transparency Act, S. 3970, 117th Cong. (2022) | https://tinyurl.com/2x4p88bz |

| 20 | Keep Your Coins Act, H.R. 4841, 118th Cong. (2023) | https://tinyurl.com/4dxn8hv4 |
|----|------------------------------------------------------|------------------------------|
| 21 | Financial Technology Protection Act, H.R. 2969, 117th Cong. (2021) | https://tinyurl.com/52vmufys |