# Declaration of Matthew Beville Ex. 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO, <br><br> Defendants. | UNDER SEAL <br><br> No. 1:23-cv-01599-ABJ-ZMF |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION TO COMPEL AND FOR OTHER RELIEF**

BAM's Opposition (Dkt. No.108, "Opp.") to the SEC's Motion to Compel perfectly illustrates the house of mirrors the SEC has been navigating for months. Despite agreeing to the Consent Order's expedited discovery provisions, BAM now attempts to relitigate their scope and purpose. BAM insists that this Court, like the SEC, should accept packaged counsel narratives, carefully drafted declarations, and small curated sets of documents regarding control of BAM's customers' assets, and that any lingering concerns are "much ado about nothing." Opp. 3. The problem of course is that the Consent Order was entered precisely because these conclusory representations, undermined by BAM's own documents and inability to keep its story straight, did not actually establish that BAM exercised exclusive control over its customers' assets. Accordingly, the Court ordered expedited discovery so that the SEC could obtain actual evidence and not just BAM's questionable representations concerning custody, control, and availability of customer assets. But rather than engage in a fulsome response to the Consent Order's

requirements, BAM has provided inconsistent representations about key facts, slow-rolled small productions of documents and information, and stonewalled on entire categories of information that would likely shed light on its shaky assertions concerning the custody of customer assets.

Indeed, recent depositions have revealed a plethora of responsive documents and information, which demonstrates that BAM either failed to conduct a reasonable search or has withheld these documents and information without proper basis. Moreover, the limited information that BAM has produced during expedited discovery has revealed that BAM may be violating the Consent Order, and without additional discovery, the SEC and the Court will be left where they were when this process began—unable to ensure the safety and availability of BAM's customers' assets during the pendency of this litigation. The accelerating mass exodus of BAM employees, now including its CEO and others who may possess crucial information regarding the custody, control, and availability of assets, further underscores the urgent need for expedited discovery into these issues now. This Court should reject BAM's half-hearted claims of irrelevance, prejudice, and burden, and instead grant the Motion to Compel in its entirety.

## ARGUMENT

### I. BAM Has Failed to Fulfill Its Discovery Obligations in Response to the SEC's Requests For Production and Interrogatories

BAM claims that it has fulfilled its discovery obligations because it has produced all documents in its possession, custody, and control, after a reasonable search (Opp. 12), but this is demonstrably false. Multiple witnesses have now identified sources of relevant documents directly responsive to the SEC's requests that would have been identified by any reasonable search by counsel and that BAM did not produce, including categories of documents it represented did not exist. Moreover, BAM has refused to conduct a search for communications at all, despite the deponents' testimony that communications about BAM's custody of customer

2

assets exist and are easily identifiable. BAM's objection that the SEC seeks nonexistent documents or unreasonable certainty is a strawman that has been refuted by its own employees. The SEC seeks information that is reasonably obtainable and that falls squarely within the scope of the Consent Order and the Federal Rules.

### a. BAM's Evolving Explanations of Ceffu and Binance's Role Highlight the Need for Documents and Communications Concerning BAM's Wallet Custody Practices

The SEC seeks an order compelling BAM to produce documents and communications concerning any entity providing it wallet custody software and related services. Mem. in Supp. Of Mot. to Compel ("Mem."), Dkt. No. 102-3. As the SEC has demonstrated, BAM has failed to comply with the Consent Order's expedited discovery provisions concerning wallet custody. BAM has only provided an extremely limited amount of information, resting its refusal to do more primarily on unsupported burden objections. Mem. at 22-27. But even this limited discovery has revealed that BAM still cannot credibly explain its crypto asset wallet custody arrangements. *Id.* at 10-13; 22-23. And BAM has continued to provide the SEC with conflicting information concerning Defendant Binance Holdings Limited's ("BHL" or "Binance") role, and that of a Binance-related entity called "Ceffu," in the custodying of Customer Assets. *Id.*

BAM now asserts that its arrangements with Binance as a wallet service provider have essentially never changed, casting Binance as a mere third-party vendor whose wallet software services are akin to BAM's internet service provider—such that BAM cannot be expected to be sure how that vendor operates or handles BAM's information. Opp. 17. Far from being a mere innocuous service provider, however, Binance and BAM are under the common ownership of another Defendant in this action, an individual who views himself outside the jurisdiction of any court. Worse, as the SEC has demonstrated, Binance has a long history of controlling BAM to serve Binance's own unlawful purposes. *See* Mem. 27-28. It is precisely these circumstances

3

that led to the Consent Order in the first place. *See* Ex.[1] 1, at 57:12-15; 79:17-21. Binance's control of BAM assets is not some "theoretical risk," Opp. 17, but rather the foundation for the current expedited discovery process—to ensure that BAM customers' assets are safe throughout the pendency of this litigation, including by being under the "sole" custody and control of BAM personnel in the United States.[2]

BAM also suggests that the SEC essentially blessed *sub silentio* BAM's *status quo* relationship with Binance. Opp. 3. Apart from being untrue,[3] this assertion makes no sense given the heavily negotiated Consent Order requirements, which are neither disputed nor ambiguous. The Consent Order makes clear that BAM personnel located in the United States are to have "sole" and "complete" possession, custody, and control of all Customer Assets, which, as defined, includes relevant wallets, private and administrative keys, software, and AWS root accounts, and that all transfers and withdrawals are to be "solely" under the direction and control of BAM personnel located in the United States. (*See*, *e.g.*, Dkt. No. 71 at I, II.). The Consent Order expressly *prohibits* BAM from using Binance affiliates as third-party custodians (Dkt. No. 71 at II) which means, among other things, that Binance cannot have custody or control of the private keys relating to BAM's crypto asset wallets. The Consent Order further *assumes* Binance previously had access to the private keys of BAM's wallets and requires Binance to

---

[1] "Ex." refers to exhibits to the Declaration of Jennifer Farer that the SEC filed in support of its Motion to Compel.

[2] BAM's reliance on Defendants' written certifications, *see* Opp. 17, is yet another attempt to write out the Consent Order's expedited discovery provisions; those provisions give the SEC the right to test Defendants' blanket assertions.

[3] BAM has not and cannot provide any evidence that the SEC agreed to an ongoing wallet custody arrangement between BHL and BAM, which based on current evidence extends beyond simply BAM's use of BHL's software. Indeed, the plain terms of the Consent Order, which BAM points to as incorporating negotiations on this issue, evidence the opposite.

destroy any copies. *Id.* It further requires BAM to create new wallets as a further step to ensure that Binance does not have access to the private keys controlling BAM's assets. *Id.*

While the Consent Order does not take a position on whether BAM could continue using Binance wallet software, BAM concedes the Consent Order provisions were designed "to ensure that BHL did not have any unknown ability to access BAM's customer assets." Opp. 10. This is why the SEC's frustrated discovery requests seek documents and other information on whether BAM's arrangements with Binance (or any other wallet software provider) comply with the Consent Order, to get to the bottom of certain fundamental questions like: *How were the new wallets created? Who controls the keys? How is BAM comfortable that Binance does not retain control of the assets?* BAM has information related to all of this, including diagrams and other documents it provided to its auditor or were otherwise disclosed at depositions (*see, e.g.*, Mem. 13, 16), and multiple categories of communications (discussed below), but inexplicably and inexcusably withheld them from the SEC. This must be remedied by the relief requested in the Proposed Order.

In the meantime, BAM's categorical statements about its exclusive control of the wallet keys deserve no credence, for the purposes of this Motion to Compel or otherwise. The SEC and BAM seem to agree that the mysterious Binance-related entity "Ceffu" has caused much confusion as to who controls BAM's customers' crypto assets. Opp. 13. But BAM's attempt to casually brush aside this critical issue as one of "an understandable misuse of a brand name" (*id.*) both misstates the record and ignores BAM's own evident and startling confusion. For example, BAM now claims that it understood as early as June 5 that Ceffu had no role relating to BAM's crypto assets (the date it stated to the SEC that Ceffu-related discovery was "non-priority") (Opp. 13, n.4). But after weeks of the SEC pressing for details on the creation of new wallets under the

5

Consent Order, BAM sent a letter on *July 31* informing the SEC the new wallets "were created in consultation with Ceffu," such that "BAM submits that inquiries concerning how Ceffu creates wallets should be directed to *Ceffu*." Ex. 11 (emphasis added)). If BAM and its counsel knew Ceffu was totally unrelated to BAM's wallets as early as June 5, it defies logic that they would then direct the SEC to go to Ceffu to obtain the requested information on wallet formation.

It is more likely that BAM still doesn't understand what Ceffu is, as its key witness Erik Kellogg seemed to admit: "Right now, I don't know what [CEFFU] is anymore. It was my -- at that time it was my attempts understanding that it may become a branch of BHL where they commercially sell their services, was my understanding at that time. Now I'm not sure what CEFFU is." Murphy Decl. Ex. B at 176-77.[4]

Other discovery since the SEC filed its Motion to Compel has further cast doubt on BAM's confident but unsupported assertions that it has exclusive custody and control of its customers' assets. For example:

- BAM touts that its current "key shard" holders who purport to control disposition of the assets are all now based in the United States as required by the Consent Order. Opp. 6. But the SEC recently deposed one of those key shard holders, who testified that he exercises limited discretion in approving transfer, staking, and whitelisting requests, all of which come ███████████████ "the initiator." Murphy Decl. ¶ 3(a).  BAM shard holders are thus being instructed on how to vote their shards by someone outside of the United States who has ambiguous payment arrangements with a non-BAM entity.

- The "TSS" protocol governing the key shards is administered ████████ a Binance employee ████████ who is at the heart of many of the SEC's allegations concerning the extensive control that Binance exerted over the Binance.US Platform. ████████ Only ██ can apparently change the protocol to add additional

---

[4] References to "Murphy Decl." are to the Declaration of J. Emmett Murphy, dated September 18, 2023.

"initiators" beyond the ███████████████████████████ and ████████ does not know whether or no ████ can create additional shards. Murphy Ex. A at 144-45. The Apple ID for the shard holder device that the SEC recently reviewed ties to an email address that appears to be associated with ████████. Murphy Decl. 3(b). In addition, Kellogg testified that ████ was the Binance "support person for our wallet operations support, if needed." Murphy Decl. Ex. B at 342-43

- Kellogg testified that he has no insight into how the wallet software operates other than through the interfaces available to BAM and discussions with BHL, and his diligence appears to have been based primarily on a questionnaire that BAM identified was completed by Ceffu that provides little substantive information, and an outdated SOC report that he understood to be for an entity that was later acquired by BHL and that did not govern the actual infrastructure and services used by BAM and Binance.US. BHL withdrew his access to that report. While Kellogg testified he has tried in 2023 to obtain a current SOC report that would govern the wallet custody services BHL claims to provide, as of August, Binance has declined and Kellogg is unable to explain why. Murphy Ex. B 60-63; 110-116; 314-320.

- While BAM claims it has exclusive control of the hot wallets through the PNK system, the head of clearing testified during his deposition that when assets failed to move from deposit wallets to hot wallets consistent with preconfigured thresholds, BAM had to contact BHL to address the issue, which resulted in the movement of assets to the hot wallets. Murphy Ex. A 70-74; 78.

The foregoing demonstrates that BAM has limited visibility into the details of its crypto asset custody technology and that, contrary to the terms of the Consent Order, BHL retains at least a certain level of control. At a minimum, BAM has shown that its strident assurances of exclusive control are not supported or credible. For this and other reasons set forth in the SEC's motion (and below) BAM must be ordered to comply with its discovery obligations.

### b. The SEC's Requests for Communications Are Not Unduly Burdensome

BAM asserts that the relief the SEC seeks, particularly standard requests for relevant communications, is overly broad and unduly burdensome because this is a limited expedited discovery process that follows a years-long SEC investigation. Opp. at 12. At the outset it is worth noting that Defendants successfully urged this Court to stay merits discovery "because the SEC is conducting expedited discovery at this time that will consume *extensive* time and resources from the parties." (Joint Status Report, at 2, Dkt. No. 87 (emphasis added)). In

granting that request the Court agreed it had "authorized the SEC to engage in the *extensive* early discovery" pursuant to the Consent Order. (Order, Dkt. No. 88) (emphasis added).

BAM now argues that it should be relieved from further discovery obligations after putting up three deposition witnesses and producing fewer than 250 documents, citing inapposite authority that the "burden for the defendants to comply with expedited discovery should be 'low, such as responding to only one or a few discovery requests.'" Opp. 11 (citing *Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015)).[5] BAM's burden arguments are frivolous, and are in any event entitled to no weight given their lack of specificity or BAM's failure to even attempt to substantiate the burden. *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 8 (D.D.C. 2007) ("the Court only entertains an unduly burdensome objection when the responding party demonstrates how the document is 'overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden'") (internal citation and quotation marks omitted).

Nor does the fact that the SEC originally requested "[a]ll documents and communications" excuse BAM from performing *any* search for relevant communications on key topics, as BAM again argues. Opp. 14. This is particularly so given the SEC's multiple offers for a limited scope by date, custodian, and topic, (Mem. 23-24) efforts BAM's opposition disingenuously ignores.

In any event, the limited discovery to date has revealed multiple sources of communications that are squarely relevant to the issues under the Consent Order, and that would have been identified by the most basic diligence by counsel. These include Slack, Telegram, and

---

[5] The language from *Attkisson* that BAM quotes refers to one prong of the test for *whether* to grant expedited discovery, an issue the Court decided long ago, after which it described the contemplated discovery as "extensive." Order, Dkt. 88.

8

Wea channels that are dedicated to discussions about asset transfers and communications with auditors about Binance's role as custodian of assets. Murphy Decl. Ex. A at 78; 87-88; Ex. B at 258-59; 311-20. These facts all illustrate the need for the Court to order BAM to perform a reasonable search for responsive communications.[6]

### c. BAM Fails To Explain Why The SEC Is Not Entitled To Additional Financial And Accounting Documents

BAM also challenges the SEC's request for additional accounting documents and financial information. Opp. at 15-16. It relies exclusively on the fact that it had supplemented its prior production of bank records, but it fails to address the SEC's arguments that such records, such as more recent general ledgers, trial balances, and month-end statements, are necessary to reconcile discrepancies the SEC has identified and evaluate the accounting BAM produced under Section IV of the Consent Order. Mem. 14-15. Nor could it, as these requests are central to the determination of whether Customer Assets remain safe and available for customer withdrawal. *Id.* at 26. This Court should therefore compel their production.

### d. BAM Fails To Explain Why An Inspection Is Not Warranted

The SEC has demonstrated the need for an inspection of BAM's technological infrastructure, and relevant systems and software, including due to BAM's varying positions as to the nature and extent of Binance's involvement. BAM cannot credibly object to such critical discovery, particularly concerning the extent to which Binance may be able to access systems that BAM relies upon in claiming they have control of the crypto assets, and how those systems in fact control the private keys as BAM claims. Mem. at 25. Indeed, one deponent testified about an instance in which BAM needed Binance to facilitate a transfer of assets to the hot

---

[6] As a point of comparison, BAM's own auditor has produced over 6,526 documents and communications concerning custody and control of assets.

9

wallets pursuant to preconfigured thresholds in the PNK system, which raises questions about how PNK interacts with the private keys and whether BAM in fact has sole control of the private keys for these wallets through PNK, exclusive of Binance. Murphy Ex. A 70-74; 78. BAM's claim in its opposition that it does not have any additional documents concerning this infrastructure (Opp. At 16), and the CISO's lack of knowledge about the infrastructure and software—even about how BAM's own systems may interact with these systems to control the private keys—further highlights the importance of an inspection, and BAM does not argue to the contrary.

The limited inspection the SEC has been able to conduct so far demonstrates the urgent need for an inspection. The cursory review of the phone of one shard holder revealed previously unknown potential connections between key Binance personnel like ▮▮▮▮▮▮▮▮ and BAM's shard technology. Murphy Decl. ¶3(b). The Court should order the inspection the SEC seeks as set forth in its Motion to Compel.

## II.     The Court Should Order Depositions Sought by the SEC

BAM's Opposition confirms it has no basis to block the depositions of the additional witnesses sought by the SEC, particularly Brian Shroder (CEO) and Jasmine Lee (CFO). While BAM argues that "the SEC has failed to show that Shroder and Lee have *unique* knowledge of the relevant issues," Opp. 19, it conspicuously does not address the specific documents the SEC relied upon demonstrating Shroder's and Lee's participation in crucial communications and other events that inform who runs BAM and who controls its assets. *See* Mot. 28-29. Contrary to BAM's assertion, discovery under the Consent Order is not limited to oversight of day-to-day transactions, but also covers the broader question of who ultimately controls BAM and, therefore, BAM's customers' assets. Apparently, that person is no longer Brian Shroder (if he

ever was) because the SEC was informed in recent days that he has left the company.[7] This fact disposes of BAM's argument that Shroder's "apex" deposition "would be disruptive to BAM's business" (Motion for Protective Order, Dkt. 95 at 14).  It also raises the question of whether anyone other than Zhao and Binance has *ever* exercised control over BAM and its assets.  *See* Mot. 27-28 (noting BAM's second CEO decided to quit when he realized Zhao "was the CEO of BAM Trading, not me.").  BAM again fails to provide any specific basis for its objections to any of the other individuals noticed for deposition. Like BAM's other burden arguments, any arguments about the burden of these additional requested depositions are meritless for the reasons discussed above.[8]

---

[7] On September 12, 2023, counsel for BAM notified counsel for the SEC that Norman Reed had been appointed as the new CEO of BAM Trading.  On September 15, 2023, counsel for Mr. Shroder confirmed to the counsel for the SEC that Mr. Schroder had separated from Binance.US.

[8]  The Court should also deny BAM's request for a protective order to limit the scope of the topics addressed during the depositions is unnecessary.  The Consent Order makes clear the scope of discovery, including as it applies to the depositions, and no further relief on this issue is necessary.

## **CONCLUSION**

For these reasons, the Court should grant the SEC's Motion, deny the BAM Defendants' Motion for Protective Order, and order the other relief the SEC seeks.

Dated:  September 18, 2023 	Respectfully submitted,

 /s/ Jennifer L. Farer
Matthew Scarlato (D.C. Bar No. 484124)
Jennifer L. Farer (D.C. Bar No. 1013915)
J. Emmett Murphy
David A. Nasse (D.C. Bar No. 1002567)
Jorge G. Tenreiro
SECURITIES AND EXCHANGE COMMISSION
(202) 551-5072 (Farer)
farerj@sec.gov

*Attorneys for Plaintiff*