IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

BINANCE HOLDINGS LIMITED, BAM
TRADING SERVICES INC., BAM
MANAGEMENT US HOLDINGS INC., and
CHANGPENG ZHAO,

        Defendants.

No. 1:23-cv-01599-ABJ-ZMF

**BRIEF OF *AMICUS CURIAE* PARADIGM OPERATIONS LP
IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS**

Rodrigo Seira
(admission *pro hac vice* pending)
PARADIGM OPERATIONS LP
548 Market Street
San Francisco, CA 94104
(415) 986-9283
rodrigo@paradigm.xyz

Andrew Kim (D.C. Bar No. 1029348)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
AndrewKim@goodwinlaw.com

*Counsel for Amicus Curiae
Paradigm Operations LP*

Dated:  September 28, 2023

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICUS CURIAE* ...................................................................1

INTRODUCTION ......................................................................................................2

ARGUMENT .............................................................................................................4

I.    An "investment contract" requires contractual undertakings that promise the delivery of *future* value. ..............................................................................4

      A.    When Congress enacted the Securities Act of 1933, it adopted a universally understood definition of "investment contracts" that required both contractual undertakings and the right to delivery of future value. ........................5

      B.    *Howey*'s use of the word "scheme" referred to complex contractual arrangements—it did not intend to drop the "contract" requirement of "investment contracts." ..............................................8

II.    The SEC's definition of "investment contract" would inject the Securities Laws into the realm of ordinary asset sales. ...........................................11

      A.    The expectation of market-driven profit is not enough to turn an ordinary asset sale into the sale of a security. ..................................11

      B.    The SEC's construction of "investment contract" would radically expand the concept of a "common enterprise" to wherever an asset travels....................14

III.    Congress must provide a framework for the regulation of crypto assets; the SEC cannot assert the authority to engage in such regulation by fiat. .......................17

CONCLUSION.........................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Health-Mor, Inc.*,
 549 F.2d 342 (5th Cir. 1977) ............................................................10

*Cmty. Television of S. Cal. v. Gottfried*,
 459 U.S. 498 (1983)............................................................................18

*Daggett v. Jackie Fine Arts, Inc.*,
 733 P.2d 1142 (Ariz. Ct. App. 1986).................................................12

*Dahl v. English*,
 578 F. Supp. 17 (N.D. Ill. 1983) .......................................................12

*Hector v. Wiens*,
 533 F.2d 429 (9th Cir. 1976) .............................................................16

*Int'l Brotherhood of Teamsters, Chauffeurs,*
  *Warehousemen & Helpers of Am. v. Daniel*,
 439 U.S. 551 (1979)..............................................................................9

*King v. Burwell*,
 576 U.S. 473 (2015)............................................................................21

*McClatchy Newspapers, Inc. v. NLRB*,
 131 F.3d 1026 (D.C. Cir. 1997) .........................................................18

*Mechigian v. Art Capital Corp.*,
 612 F. Supp. 1421 (S.D.N.Y. 1985)..............................................12, 14

*Moody v. Bache & Co.*,
 570 F.2d 523 (5th Cir. 1978) .............................................................16

*Noa v. Key Futures, Inc.*,
 638 F.2d 77 (9th Cir. 1980) ...............................................................11

*Prohaska v. Hemmer-Miller Development Co.*,
 256 Ill. App. 331 (Ill. App. Ct. 1930) ..................................................7

*Revak v. SEC Realty Corp.*,
 18 F.3d 81 (2d Cir. 1994)................................................................8, 17

*Reves v. Ernst & Young*,
 494 U.S. 56 (1990)................................................................................5

*Rodriguez v. Banco Central Corp.*,
    990 F.2d 7 (1st Cir. 1993) ........................................................................................8

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) ...............................................................................11

*SEC v. Edwards*,
    540 U.S. 389 (2004) .................................................................................................4

*SEC v. Glenn W. Turner Enters., Inc.*,
    474 F.2d 476 (9th Cir. 1973) .................................................................................10

*SEC v. Int'l Mining Exch., Inc.*,
    515 F. Supp. 1062 (D. Colo. 1981) .......................................................................11

*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) ...........................................................................10, 11

*SEC v. Ripple Labs, Inc.*,
    --- F. Supp. 3d ----, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ....................9, 16

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020)......................................................................9

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)..........................................................5, 6, 7, 8, 9, 12, 15, 16, 18

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995)..................................................................................................18

*State v. Bushard*,
    205 N.W. 370 (Minn. 1925)......................................................................................6

*State v. Gopher Tire & Rubber Co.*,
    177 N.W. 937 (Minn. 1920)......................................................................................6

*State v. Heath*,
    153 S.E. 855 (N.C. 1930).......................................................................................6, 7

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967)................................................................................................17

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975).........................................................................................16, 17

*United States v. Williams*,
    553 U.S. 285 (2008)..................................................................................................4

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .................................................................................................3, 17

**Other Authorities**

Brief for the SEC, *SEC v. W.J. Howey Co.*, No. 843,
   1946 WL 50582 (U.S. filed Apr. 17, 1946) ...........................................................7

Brief for the SEC, *SEC v. Edwards*, No. 02-1196,
   2003 WL 21498455 (U.S. filed June 26, 2003) ....................................................7

Lewis R. Cohen et al., *The Ineluctable Modality of Securities Law:  Why Fungible
Crypto Assets Are Not Securities* (Nov. 10, 2022) ..........................................10, 15

Coinbase,
   *Petition for Rulemaking – Digital Asset Securities Regulation*
   (July 21, 2022) .........................................................................................................4

Coinbase, *What is a token?*,
   https://www.coinbase.com/learn/crypto-basics/what-is-a-token ............................19

Cornerstone Research, *SEC Cryptocurrency Enforcement: 2022 Update*,
   https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-
   Cryptocurrency-Enforcement-2022-Update.pdf ....................................................21

Cornerstone Research, *SEC Cryptocurrency Enforcement: June 2023 Update*,
   https://www.cornerstone.com/insights/research/sec-cryptocurrency-
   enforcement-june-2023-update/ ............................................................................21

Ramsay Eyre, *Meaning from Money:  Jeff Koons and the Tautology of Value*,
   15 Morningside Review 26 (May 2019) .................................................................14

Thomas L. Hazen, *Treatise on the Law of Securities Regulation*,
   1 Law. Sec. Reg. § 1:49 ..........................................................................................10

Miles Jennings & Brian Quintenz, *It's Time to Move Crypto From Chaos to
Order*, a16zcrypto (July 15, 2023), https://a16zcrypto.com/posts/article/its-
time-to-move-crypto-from-chaos-to-order/ ............................................................22

Statement of Commissioner Hester M. Peirce, *On the Spot:  Remarks at
"Regulatory Transparency Project Conference on Regulating the New Crypto
Ecosystem:  Necessary Regulation or Crippling Future Innovation*?, sec.gov
(June 14, 2022), https://www.sec.gov/news/speech/peirce-remarks-regulatory-
transparency-project-conference ............................................................................20

Props Project, *A Letter From Our CEO* (Aug. 12, 2021),
   https://blog.propsproject.com/a-letter-from-our-ceo-1332f6cabab1 .....................20

Felix Salmon, *Jeff Koons: A Master Innovator Turning Money Into Art*, The
    Guardian (July 3, 2014, 11:23 AM),
    https://www.theguardian.com/artanddesign/2014/jul/03/jeff-koons-master-
    innovator-whitney-money-art ........................................................................................14

*Scheme*, *Chamber's Twentieth Century Dictionary* (1908)............................................9

*Scheme,* dictionary.com ..................................................................................................9

Rodrigo Seira et al., *SEC's Path to Registration-Part II:  Lessons from Crypto
    Projects' Failed Attempts to Register With the SEC*, Paradigm (Mar. 23,
    2023), https://policy.paradigm.xyz/writing/secs-path-to-registration-part-ii ........20

Rodrigo Seira et al., *SEC's Path To Registration - Part III:  The Current SEC
    Disclosure Framework is Unfit for Crypto*, Paradigm (Apr. 20, 2023),
    https://policy.paradigm.xyz/writing/secs-path-to-registration-part-iii...................19

*Stock, Black's Law Dictionary* (11th ed. 2019) .........................................................15

## INTEREST OF THE *AMICUS CURIAE*[1]

Paradigm Operations LP ("Paradigm") is a research-driven investment firm that focuses on crypto and related technologies at the frontier. Paradigm takes a hands-on approach to help projects reach their full potential, from the technical (mechanism design, security, engineering) to the operational (recruiting, go-to-market, legal and regulatory strategy).

Crypto and the blockchain technology that powers it have the potential to create a new computational framework that can democratize the internet and revamp many sectors of the economy, including the global financial system. Blockchain-based protocols can be decentralized by distributing their operations across a network of computers and using crypto assets (tokens) as a mechanism to enable coordination. These systems are, in effect, community owned and operated.

Despite the great promise of crypto, the SEC has pursued an incoherent approach to regulating crypto assets that is premised on its mistaken assertion that a crypto asset falls within the reach of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (collectively, "Securities Laws"), so long as that asset might potentially yield a profit to its purchaser. That extraordinary and overreaching construction of the Securities Laws threatens the development of crypto technology in the United States and could destabilize other significant markets that are widely understood to be outside the SEC's jurisdiction.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. As of the time of this brief's filing, the undersigned counsel and his law firm do not represent any of the parties before this Court with respect to this case or any related matters, although other attorneys in the same law firm currently represent BAM Trading Services Inc. with respect to unrelated matters.

Paradigm did not invest in Defendants, and has no financial or other interest tied to Defendants.  And Paradigm takes no view on any of the SEC's allegations against Defendants, other than those concerning ordinary transactions for the purchase and sale of tokens on Defendants' exchange platforms.

But Paradigm has a strong interest in ensuring that the Securities Laws are interpreted correctly and in a way that is not colored by the tint of misconduct, like the allegations leveled by the SEC in this case.  Here, and in other cases, the SEC has acted in excess of its statutory authority.  The agency's arrogation of authority cannot stand, regardless of whatever the SEC may say about a particular defendant—unsavory allegations should not define the scope of an agency's powers.  Paradigm seeks to participate as an amicus here to ensure that the SEC's regulatory overreach does not serve as an impediment to innovation, and does not interfere with Congress's ability to create a framework for sensible, effective regulation of crypto assets.

## **INTRODUCTION**

Tokens are critical to the operation of blockchain systems.  They serve a wide range of functions, but at their core, tokens are units of value that incentivize coordination within a decentralized ecosystem.  They are generally designed and intended for in-ecosystem use.  For example, BTC is used to transfer value on the Bitcoin network.

According to the SEC, when a crypto asset like a token is sold on the secondary market, the transaction could be construed as the sale of a security (an investment contract).  The SEC's theory appears to hinge on the mistaken notion that a crypto asset that is the object of an investment contract is itself a security because it can be a vehicle for speculation—demand drives up the value of the asset and makes it profitable to sell.  Because a token's issuer may have, at some point, promoted the development of the ecosystem and the use of the token, the

SEC believes every subsequent transaction in which the token changes hands is an investment contract—even if the issuer plays no part in the secondary sale, and owes no obligations to a token's holder.

The SEC's theory would upend what we know about securities law in several ways. First, it would require this Court to accept the facially incredible argument that an "investment *contract*" does not require a "contract."  As Defendants explain (ECF No. 117-1, at 12-15; ECF No. 118, at 14-19), and as explained further below, an "investment contract" requires contractual undertakings that promise the delivery of future value.  A crypto asset sale, particularly one on secondary markets, promises nothing, other than the delivery of the crypto asset.

Second, the SEC's theory would improperly place all sorts of ordinary asset sales within the reach of the Securities Laws.  Courts have long held that the mere fact that an asset might appreciate in value due to market forces does not mean there is a "reasonable expectation of profits" that makes the sale of the asset an investment contract.  Moreover, an asset sale cannot create a common enterprise, a necessary ingredient for an investment contract.  A shared hope that an asset will appreciate in value might create a common *interest*, but that hope does not constitute a common *enterprise*—especially as there may be no relationship between the asset's issuer and a secondary purchaser far down the line.

Finally, the fact that sales of crypto assets are a poor fit for the "investment contract" framework illustrates the SEC's lack of authority to regulate the crypto assets industry. "Extraordinary grants of regulatory authority are rarely accomplished through … 'vague terms.'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citation omitted).  The SEC does not have the "clear congressional authorization" it needs to subjugate the crypto assets industry through its piecemeal approach of regulation by enforcement.  Indeed, it has not even acted like an agency

with any kind of mandate to regulate crypto assets.  The SEC has provided no actionable ground

rules for crypto asset issuers to follow; instead, its hide-the-ball approach has only set up

cooperating industry participants for failure.[2]

For these reasons, and those set forth below, Defendants' Motions to Dismiss should be

granted.

## ARGUMENT

## I.  An "investment contract" requires contractual undertakings that promise the delivery of *future* value.

As the plain text of the Securities Laws make clear, an "investment contract" requires at

least two things:  an "investment" and a "contract."  An "investment" is the exchange of money

for the right to "profits," *i.e.*, "income or return."  *SEC v. Edwards*, 540 U.S. 389, 394 (2004).

And the "contract" is an undertaking from the issuer to deliver those "profits."  *E.g.*, *id.* at 395

(providing examples of such contractual commitments).  This interpretation is confirmed by the

context in which the phrase "investment contract" is used.  *See United States v. Williams*, 553

U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with

which it is associated.");  *see also* ECF No. 118, at 16 (arguing that "investment contract" must

be construed as requiring "enforceable post-sale obligations" to "ensure[] consistency with other

instruments in Congress's line of securities").  "Investment contract" is paired with other terms

used in the definition of "security," all of which refer to an instrument that either promises some

---

[2] *See, e.g.*, Coinbase, *Petition for Rulemaking – Digital Asset Securities Regulation* (July 21, 2022), https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf, the lack of response to which prompted a mandamus proceeding in which the Third Circuit ordered the SEC to provide updates on its progress in responding to the petition for rulemaking.  Order, ECF No. 28, *In re Coinbase Inc.*, No. 23-1779 (3d Cir. June 6, 2023) (ordering the SEC to either explain whether the SEC "has now decided to deny Coinbase's petition for rulemaking," or "how much additional time the SEC requires to decide whether to grant or deny that petition").

future value,[3] the ability to control the affairs of the issuing entity,[4] or some other future obligation.  In other words, the definition of "investment contract" is informed by the other terms used in the statutory definition of "security," and the nature of those other terms reaffirms that an "investment contract" requires some future or continuing contractual undertaking.

A simple asset sale does not meet the definition of "investment contract" because there is no obligation that runs after the sale.  Rather, in order for an "investment contract" to exist, the promoter—or some other party affiliated with the transaction—must have a contractual commitment to deliver future value through its efforts after the sale has concluded.  As explained below, this is consistent with how courts (and the SEC, for the better part of six decades) have always understood "investment contract."

None of the crypto asset sales identified in the SEC's Complaint involves a contractual undertaking to deliver future value as part of the sale; consequently, they are not "investment contracts."

A.     **When Congress enacted the Securities Act of 1933, it adopted a universally understood definition of "investment contracts" that required both contractual undertakings and the right to delivery of future value.**

By the time Congress enacted the Securities Act of 1933, and, later, when the Supreme Court decided the seminal case of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), courts across the country had already fashioned a unanimous view of what constitutes an "investment contract":  an exchange of money for contractual undertakings that would deliver future value. Indeed, *Howey* itself looked to state blue-sky laws and decisions interpreting them to derive an understanding of what constitutes an investment contract.  *Id.* at 298 (noting that Congress

---

[3] A "note," a "bond," and a "profit-sharing agreement" are just three examples of promises to deliver future value; the first two pay out interest, *Reves v. Ernst & Young*, 494 U.S. 56, 60, 68 n.4 (1990), while the third might entitle the holder to a share of the profits.

[4] A "stock" or a "voting interest certificate" fall into this category.

"crystallized … prior judicial interpretation" of "investment contract" under "state 'blue sky' laws in existence prior to the adoption of the federal statute").

Before *Howey*, state courts applying blue-sky laws understood "investment contract" to mean an instrument that conferred a right to future profits or some other measure of value.  To the extent that these decisions encouraged a broad construction of the phrase "investment contract," they did so only to ensure that blue-sky protections were not frustrated by a labeling exercise.  In *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937 (Minn. 1920) (quoted by *Howey*, 328 U.S. at 298), the Minnesota Supreme Court opined in the first instance on what constituted an "investment contract" under Minnesota's blue-sky laws.  There, a promoter sold "certificates" which, in exchange for a cash payment and the purchaser's commitment to publicize the promoter's products, the purchaser would receive quarterly profits for 20 years.  *Id.* at 937. Although the instruments were labeled "certificates," the court held that these certificates were "investment contracts," opining that "[t]he mere fact that [the promoter] has studiously declared that they are not [investment contracts] does not require a court to hold that they are something else."  *Id.* at 938.  The court's investment-contract analysis turned on two facts:  (1) the cash contribution provided "capital," and (2) the certificate's holders were promised "the right to share in the profits of the corporation."  *Id.*

State courts across the country followed *Gopher Tire*'s approach to construing "investment contracts"; those decisions were consistent in highlighting the need for (1) a contractual right that (2) delivers future value.  *See, e.g.*, *State v. Bushard*, 205 N.W. 370, 370 (Minn. 1925) (concluding that there is an investment contract where a driver "invested with a view of making profit," and "the 'operator's agreement' was the contract").  In *State v. Heath*, 153 S.E. 855 (N.C. 1930), for example, the North Carolina Supreme Court, in following *Gopher*

*Tire*, determined that the phrase "investment contract" "implies the apprehension of an investment as well as of a contract." *Id.* at 857.  Similarly, in *Prohaska v. Hemmer-Miller Development Co.*, 256 Ill. App. 331 (Ill. App. Ct. 1930), the Appellate Court of Illinois surveyed several examples of cases involving "investment contracts," and noted in its analysis of each that (1) there was a contract that (2) promised some future value generated from an undertaking, *i.e.*, "a right to participate in the proceeds of a venture," such as "the net profits from the crops of the land." *Id.* at 341, 343.

It is no surprise, then, that the SEC's "proffered definition of an 'investment contract'" in *Howey* was also "any *contractual* arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters."  Brief for the SEC at 9, *SEC v. W.J. Howey Co.*, No. 843, 1946 WL 50582 (U.S. filed Apr. 17, 1946) (emphasis added). Indeed, the SEC's brief went on to emphasize the importance of "the contractual rights of investors" in discerning whether "the character of the transaction was that of an investment contract." *Id.* at 28-29.[5]

Against this backdrop, the Supreme Court announced in *Howey* that "an investment contract for purposes of the Securities Act means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298-99.  To avoid reducing the analysis to a labeling exercise, the Court cautioned that the concept of "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and

---

[5] The SEC's views remained consistent over the years.  Nearly six decades after *Howey*, in *SEC v. Edwards*, the SEC reaffirmed its view that "the very term 'investment *contract*' makes clear that instruments of that name include those in which a return—whether labeled income or profit—is promised *in a contract*."  Brief for the SEC at 17, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455 (U.S. filed June 26, 2003) (second emphasis added).

variable schemes devised by those who seek the use of the money of others on the promise of

profits." *Id.* at 299.  But nothing in *Howey* suggests the Court was shedding two key components

contained within the definition of "investment contract" "uniformly applied by state courts," *id.*

at 298:  (1) contractual rights (2) to the delivery of future value.

Post-*Howey* decisions confirm that an "investment contract" requires contractual rights

for the delivery of future value.  In *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994), the

Second Circuit explained that "[a] condominium offer is an investment contract only if it is

accompanied by one or more … collateral *agreements*." *Id.* at 88 (emphasis added).  The SEC

acknowledged, and the court reaffirmed, that "the sale of a condominium, without more, does not

constitute a security transaction." *Id.* at 89 (citing 38 Fed. Reg. 1735 (Jan. 18, 1973)).  Likewise,

the First Circuit held in *Rodriguez v. Banco Central Corp.*, 990 F.2d 7 (1st Cir. 1993), that "[a]

simple sale of land" is not a security, even if the owner "hope[s] to profit from rents or the

natural increase in the value of property." *Id.* at 10.  What makes a land sale an investment

contract, the court opined, are "the commitments and promises incident to a land transfer," such

as a promise to "develop the community" so as to drive up the price of a parcel of land

"harnessing the entrepreneurship of the promoter." *Id.* at 10-11.

**B.**     ***Howey*'s use of the word "scheme" referred to complex contractual arrangements—it did not intend to drop the "contract" requirement of "investment contracts."**

The SEC appears to have latched onto a disjunctive phrase used in *Howey*, "contract,

transaction, *or* scheme," to support the notion that an "investment contract" does not require a

contract, despite the statute's plain terms.  Tr. of TRO Hr'g, ECF No. 69, at 16:23-24 ("*Howey*

says that an investment contract can cover schemes *or* contracts." (emphasis added)).  But

*Howey*'s use of the word "scheme" refers to any complex arrangement where the "contract"

might be obscured across multiple agreements and instruments—*i.e.*, under a single "plan,

design, or program of action," *Scheme,* dictionary.com; *Scheme*, *Chamber's Twentieth Century Dictionary* (1908).

*Howey* itself provides one such example.  While the basic bargain in *Howey* is often described as simply an agreement where investors paid money to passively reap the proceeds of an orange grove that someone else would maintain and harvest, *e.g.*, *Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 559-60 (1979) (providing one such description of *Howey*), the arrangement in *Howey* was far more complicated than that.  The profit-sharing agreement in *Howey* encompassed multiple contracts and transactions:  "the land sales contract, the warranty deed[,] and the service contract."  328 U.S. at 297.  The question considered was whether these documents "*together* constitute an 'investment contract.'"  *Id.* (emphasis added).

This Court should reject the SEC's attempt to detach the word "scheme," as used in *Howey*, from its contractual underpinnings.  A "scheme" cannot be discerned where the only bond between the participants of the so-called "scheme" is the asset that travels amongst them— from the issuer, perhaps to an intermediary, then to a purchaser, another purchaser, and the next after that.  *See* pp. 14-17, *infra* (explaining the problems with defining "common enterprise" so broadly as to reach everywhere that an asset reaches).  If a token, "which is little more than an alphanumeric cryptographic sequence," *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020), is not in and of itself a "'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract," *SEC v. Ripple Labs, Inc.*, --- F. Supp. 3d ----, 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023) (citation omitted); *see also Telegram*, 448 F. Supp. 3d at 379 (noting that "the security in this case is not simply" the subject token), then a simple sale of that asset also cannot and should not be construed as a "contract, transaction, or

scheme."  An "investment contract" requires more; as *Howey*'s history and application (as well as the SEC's historical views) illustrate, that "more" is the contractual commitment that the promoter or some "other" will undertake efforts to deliver future value, a "reasonable expectation of profits," to the holder of the token.  *E.g.*, *SEC v. Life Partners, Inc.*, 87 F.3d 536, 545-46, 550 (D.C. Cir. 1996) ("investment contract" requires "post-purchase" "entrepreneurial exertions").

To be sure, a crypto asset can be the *object* of a scheme-qua-investment contract.  But so, too, can "scotch whiskey, self-improvement courses, cosmetics, earthworms, … beavers, muskrats, rabbits, chinchillas, animal breeding programs, cattle embryos, … fishing boats, vacuum cleaners, cemetery lots, coin operated telephones, … master recording contracts," and, famously, "fruit trees."  Thomas L. Hazen, *Treatise on the Law of Securities Regulation*, 1 Law. Sec. Reg. § 1:49 (collecting cases).  In these "schemes," the sale of the object is not what constitutes an "investment contract"; it is "an expectation of profit … based on the seller or an affiliated entity performing post-purchase functions (such as picking, bundling, and selling oranges, husbanding cattle and their embryos, or maturing whiskey in casks)."  Lewis R. Cohen et al., *The Ineluctable Modality of Securities Law:  Why Fungible Crypto Assets Are Not Securities* 57-58 (Nov. 10, 2022), *available at* https://dlxlaw.com/wp-content/uploads/2022/11/The-Ineluctable-Modality-of-Securities-Law-DLx-Law-Discussion-Draft-Nov.-10-2022.pdf.  A sale of an asset can only be transformed into a "security" if the "income opportunity can be considered independently of any sale of a product or service which might have been made."  *Bell v. Health-Mor, Inc.*, 549 F.2d 342, 346 (5th Cir. 1977).  In other words, an "investment contract" requires "the right to share in the proceeds of … *efforts*," *SEC v.*

*Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)—*i.e.*, contractual undertakings to provide future value.

## II. The SEC's definition of "investment contract" would inject the Securities Laws into the realm of ordinary asset sales.

### A. The expectation of market-driven profit is not enough to turn an ordinary asset sale into the sale of a security.

Assume that the SEC is right that crypto assets are sometimes bought and sold solely for their ability to appreciate in value—and even touted as such.  That fact alone cannot give rise to an investment contract between the seller and the buyer, particularly when the seller is not even the issuer of the crypto asset.  If profit-by-appreciation were enough to deliver an expectation of future value sufficient to render the underlying asset itself a security, it would be impossible to tell where the dividing line between a non-security asset and a security instrument lies.

There are a whole host of assets that are promoted, bought, and sold for their potential for profit, and yet have been deemed time and again <u>not</u> to be a security *per se*.  Take precious metals, for example.  Gold and silver fluctuate in value, so speculators often try to game purchases and sales so that they buy low and sell high.  But as courts have recognized, the fact that profits are derived from "fluctuations of the ... market" does not mean a precious metal, or the sale thereof, is "a security within the meaning of the federal security laws."  *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986); *accord Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980).  Precious metals can be the *object* of an investment contract, but the right to future value must flow from the efforts of the promoter or some other involved party—not the market writ large.  *E.g.*, *SEC v. Int'l Mining Exch., Inc.*, 515 F. Supp. 1062, 1066 (D. Colo. 1981) ("investment contract" where promoter would distribute proceeds of "the sale of options to purchase gold to be mined from the claim" to contributors); *see also Life Partners*, 87 F.3d at 547-48 ("[I]f neither the promoter nor anyone else is expected to make further efforts that will

affect the outcome of the investment, then the need for federal securities regulation is greatly diminished.").

Another example comes from the world of fine art.  Some works of fine art appreciate greatly in value.  That does not mean the sale of a work itself is a security, *e.g.*, *Dahl v. English*, 578 F. Supp. 17, 19 (N.D. Ill. 1983) (sale of "original works of art in lithographic plate form" not an "investment contract"), even if the promoter dangles the possibility of profits as an incentive for the sale, *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1424 (S.D.N.Y. 1985) (sale of original artwork not an investment contract, despite promoters' advice that "prints could be made from the original and could be sold for a profit").  The sale of a work of fine art, much like the sale of real estate or precious metals, cannot constitute an "investment contract" unless there is some contractual undertaking for the delivery of future value derived independently of the artwork's appreciation through market forces alone.  *E.g.*, *Daggett v. Jackie Fine Arts, Inc.*, 733 P.2d 1142, 1145-48 (Ariz. Ct. App. 1986) (noting, under *Howey*, an "art master purchase agreement" was an investment contract because the promoter promised passive income derived from efforts of a third-party distributor in producing and selling prints of artwork).

There is no principled distinction between the ordinary sale of the crypto assets at issue in this case, and the sale of each of these other assets.  Like gold, silver, and a Jackson Pollock, crypto assets can be bought for both consumptive and speculative purposes.  And like profits obtained from the buying and selling of precious metals and art masterpieces, the possibility of profits lies principally in the conditions of the market.  For those who speculate in crypto assets, the hope is that market forces will drive up the value of a token.  So too in the trade of precious metals and art.  That hope alone does not mean there is a "reasonable expectation of profit based

on the efforts of others."  The key element is that there must be at least the appearance of a *right* to delivery of future value through the efforts of the promoter, not future value, full stop.

The SEC seeks to distinguish run-of-the-mill crypto asset sales from the sale of other appreciating asset types by alleging that the issuers of the crypto assets in question have promoted the growth of the ecosystems in which the crypto assets are used, which, in turn, drives up the demand for and value of the crypto assets.  *E.g.*, Compl. ¶¶ 370 (information disseminated by issuer about SOL was intended to "grow the … protocol, which, in turn, would increase the demand for and value of SOL"), 382 (ADA), 389 (MATIC), 410 (FIL), 434 (ATOM), 443 (SAND), 455 (MANA), 477 (ALGO), 491 (AXS), 499 (COTI).  At the outset, it is doubtful at all that a hodgepodge of statements promoting the use of a crypto asset and announcing desires to grow out an ecosystem—many made to sophisticated parties who knew they were making an investment in that specific context—can form a profit-making scheme with all holders of a particular crypto assets, including ordinary purchasers.  *E.g.*, *id.* ¶ 370 (information disseminated by issuer about SOL "led SOL holders … reasonably to view SOL as an investment in and expect to profit from Solana Labs' efforts"); *see also* pp. 14-17, *infra* (explaining why the sale of a crypto asset, especially on the secondary market, cannot create a common enterprise).

Moreover, the distinction does not hold up:  even in contexts where asset sales are squarely *not* sales of securities, the fact that the asset's creator takes steps to improve the market value of an asset does not mean the asset becomes a security.  Imagine, for example, an up-and-coming artist sells a work of art to a patron.  The artist claims that the sale will help him promote himself and his works, which will make the work of art that he sold even more valuable.  The more the artist promotes himself and his works, the more valuable that early work of art becomes.  Indeed, the appreciating value of the artist's works might become a critical part of the

13

artist's message.[6]  No one would accuse that artist of selling securities by way of his artwork.[7]

Yet the SEC's warped construction of what constitutes an "investment contract" would embrace

the artist's sale of his works to make a living.

This "expansion of the scope of the securities laws … seems … to be unwarranted and

even perhaps detrimental to the common good." *Mechigian*, 612 F. Supp. at 1428.  Courts

refusing to treat asset sales as the offer and sale of securities—even asset sales with a

profitmaking motive—have correctly recognized that "[i]n our mercantile economy, we should

not try to turn every 'thing' which might be purchased and sold into a 'security.'" *Id.*  The

SEC's overly expansive view of what constitutes an "investment contract" reflects such an effort,

leaving open the possibility that other asset sales will be caught in the wake of the SEC's naked

arrogation of statutory authority.

**B.     The SEC's construction of "investment contract" would radically expand the
         concept of a "common enterprise" to wherever an asset travels.**

The SEC articulates a view of "common enterprise" that marks a severe departure from

foundational securities law, which assumes the existence of a legal relationship between the

issuer and the purchaser.  A stock, for example, represents "the right to participate in the

company's general management and to share in its net profits or earnings."  *Stock, Black's Law*

---

[6] Ramsay Eyre, *Meaning from Money:  Jeff Koons and the Tautology of Value*, 15 Morningside Review 26, 30 (May 2019) ("If the monetary value of the art is indeed part of the work, it is precisely this that grants its substantive value.  Herein we glimpse the source of the *Balloon Dog's* worth:  The fact that it is worth so much monetarily is the reason why it has such immense value.  *It is expensive because it is expensive.*").

[7] Felix Salmon, *Jeff Koons: A Master Innovator Turning Money Into Art*, The Guardian (July 3, 2014, 11:23 AM), https://www.theguardian.com/artanddesign/2014/jul/03/jeff-koons-master-innovator-whitney-money-art ("What Koons discovered was that so long as his work was rising in value, few collectors would give up a work they had bought at a lower price. … And if they did, no harm, no foul – there was always a long line of new collectors happy to step into their shoes. … So long as the collectors could credibly believe that they had 'made money' on their non-existent art, they were generally happy to keep on funding it….").

*Dictionary* (11th ed. 2019).  The underlying relationship might be assignable or transferable, but there is still some tether to the issuer.  The same is true of investment contracts.  In management and profit-sharing agreements like the one in *Howey*, for example, the issuer commits that it (or some other related party) will undertake "efforts" and share the proceeds of those efforts with those participating in the arrangement.  Again, the agreement might be assigned or the interest otherwise transferred, but the *issuer* still bears some commitment to those benefiting from the agreement.

One review of 266 Supreme Court and federal appellate cases examining the "common enterprise" component of *Howey* confirms that a "common enterprise" requires a business relationship between an issuer and the participant.  Cohen, *Ineluctable Modality*, pp. 48-49.  "In each of these decisions, the one constant … was that the common enterprise was based on a direct business relationship."  *Id.*

By contrast, there is no such business relationship created by owning a crypto asset. Nowhere does the SEC allege that a crypto asset creates an obligation between the issuer and the asset's holder, never mind a "reasonable expectation of profit" derived from such an obligation as *Howey* requires, *i.e.*, a contractual right to an undertaking that delivers future value.  Instead, any opportunity for the holder to make a profit derives solely from "the demand for and [the] value of" the crypto asset—from market forces, not any act taken by the issuer (or some other party).  Compl. ¶¶ 370, 382, 389, 410, 434, 443, 455, 477, 491, 499.  That search for profit does not require *any* relationship between issuer and holder.

The lack of a common enterprise is laid particularly bare in a case like this one, which principally involves secondary market trading.  The SEC seeks to impose liability by watering down the "common *enterprise*" requirement to a "common *interest*" requirement.  To reach the

secondary market transactions that are at issue here, the SEC thinks it is enough for the issuer to (1) undertake efforts to make a crypto asset and its surrounding ecosystem more desirable (and thus, more valuable), and (2) for a purchaser of the crypto asset to potentially benefit from the uptick in value.  But without any relationship to link the issuer and the asset's holder, there is nothing to distinguish these secondary market sales from asset sales driven by speculation.

Consider the other problems that spring from the lack of any legal relationship.  Say a member of the public buys a crypto asset on the secondary market.  That money does not go to the asset's issuer, so there is no "investment," as an "investment of money" requires a commitment of assets "to the enterprise."  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976) (citation omitted); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("investment *in a common venture*" (emphasis added)); *cf. Ripple*, 2023 WL 4507900, at *11 (noting that programmatic sales of XRP did not satisfy the third *Howey* prong, as buyers "could not have known if their payments of money went to Ripple, or any other seller of XRP").  In a secondary market purchase, the funds paid do not go "to the enterprise"—they go to whatever the seller sees fit, *i.e.*, the seller's personal "enterprise."  *Cf. Moody v. Bache & Co.*, 570 F.2d 523, 526 (5th Cir. 1978) (in purchase of a commodity future contract, "[t]he 'enterprise' is an individual one," as "[t]he expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in his favor").  There is no theory of "common enterprise" that treats a collection of "personal enterprises"—each secondary seller's profiteering—as a "common enterprise" under *Howey*.  Moreover, to the extent that the SEC's legal theory relies on the assumption that a crypto asset sold as part of an investment contract is a security forever, that assumption is wrong.  Such an assumption is plainly belied by the Supreme Court's clear instruction that whether an instrument is a "security" must be determined by the

"economic reality" of "the present transaction." *Forman*, 421 U.S. at 848 (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

There is no theory of "common enterprise" that allows such an absurd result. The SEC's "common interest" umbrella has no basis in "horizontal commonality," *i.e.*, "the tying of each individual investor's fortunes to the fortunes of other investors by the pooling of assets," *Revak*, 18 F.3d at 87, because those who buy crypto assets for functional purposes, and those who buy such assets for speculation, do not "pool" assets in any way. "Vertical commonality" does not support the SEC's approach, either, as that kind of commonality requires a "*relationship* between the promoter and the body of investors." *Id.* (emphasis added). Plainly, there is no "relationship" between the token's issuer and a third-party trader seeking to capitalize on market forces.

This Court should reject the SEC's attempt to paint a "common enterprise" under which the only common element is the asset itself. Without an undertaking by the crypto asset's issuer to deliver the right of future value to the asset's holder, the sale of that asset cannot and should not be considered an "investment contract."

III.   **Congress must provide a framework for the regulation of crypto assets; the SEC cannot assert the authority to engage in such regulation by fiat.**

As Defendants explain (ECF No. 118, at 30-35; ECF No. 117-1, at 31-32), the SEC's attempt to regulate crypto assets through its capacious and unreasonable interpretation of "investment contract" must fail under the major questions doctrine. The regulation of crypto assets is of such economic and political significance that the SEC needs "clear congressional authorization" to engage in such regulation. *West Virginia*, 142 S. Ct. at 2609 (citation omitted). A 77-year-old interpretation (*Howey*) of a 90-year-old statute (the Securities Act) hardly delivers such clarity.

17

If the SEC truly has "clear congressional authorization" to regulate the crypto asset industry, it certainly has not acted like it.  When agencies are charged with administering a comprehensive regulatory scheme, they generally provide *regulations*—complete with the protections of notice-and-comment rulemaking—so that regulated entities know the rules of the road.  *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983) ("[R]ulemaking is generally a 'better, fairer, and more effective' method of implementing a new industry-wide policy than is the uneven application of conditions in … [adjudicatory] proceedings.").

To be sure, "agencies are entitled, just as courts, to proceed case by case."  *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026, 1035 (D.C. Cir. 1997).  But rules can only be *developed* by adjudication if there are rules to begin with.  *Cf. Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) ("all the specific applications of a rule" may "evolve" by adjudication, rather than "further, more precise rules").  A 77-year-old case applying a nearly century-old statutory definition hardly provides any meaningful ground rules to work with when it comes to the advent of new technology.

Instead of laying down ground rules as an exercise of "clear congressional authorization," the SEC has opted to play hide the ball by inviting crypto-asset trading platforms to "come register," under the Securities Exchange Act of 1934, while refusing to say how, and under what circumstances, a platform is supposed to do so.  Crypto assets and the exchanges that offer them cannot simply be plugged into existing regulatory frameworks.  As explained above, the concept of a "security" assumes some tether to the company that issues it—for the example, the right to ownership, the right to dividends, or the right to governance.  For that reason, the Securities Laws are intended to promote disclosure and transparency by the *issuer* of a securities instrument.  Crypto assets, by contrast, do not give rise to an issuer relationship.  They do not

confer ownership or governance rights over the issuer, or entitle the holder to the dividends and distributions of the issuer.  *See, e.g.*, Coinbase, *What is a token?*, https://www.coinbase.com/learn/crypto-basics/what-is-a-token.  Crypto assets are decentralized by design, with the ability to exist independently of the entity that originally developed and deployed the code that created the crypto asset.  Rodrigo Seira et al., *SEC's Path To Registration – Part III:  The Current SEC Disclosure Framework is Unfit for Crypto*, Paradigm (Apr. 20, 2023), https://policy.paradigm.xyz/writing/secs-path-to-registration-part-iii.  That makes crypto assets incompatible with the current registration requirements imposed on traditional securities. The securities registration regime is designed for issuer-centric relationships; crypto, by contrast, is *de*-centralized, and detached from the issuer.

"Come register" is plausible in theory, but impossible in fact.  And it is just one illustration of the contradiction and ambivalence that drive the SEC's haphazard attempts to regulate the crypto assets industry.  On the one hand, the SEC complains that the crypto asset industry fails to abide by existing registration requirements, and it threatens enforcement actions, injunctions, and penalties to coerce compliance.  On the other, the SEC has not explained *how* to comply with those requirements, an explanation that is necessary given the many incompatibilities evinced by attempts to jam decentralized crypto into a centralized registration regime.  Of course, the SEC could always work out those incompatibilities and provide a viable path for the registration of crypto assets—but that requires rulemaking, a process that allows the agency to iron out intricacies and tailor a regulatory regime to the particulars of the crypto asset industry.  Instead, the SEC has chosen scattershot litigation—a poor tool for fashioning a thoughtful and calibrated regulatory regime—taking the view that square pegs (crypto assets) *must* be hammered into round holes (traditional securities regulation).  Statement of

Commissioner Hester M. Peirce, *On the Spot:  Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem:  Necessary Regulation or Crippling Future Innovation*?, sec.gov (June 14, 2022), https://www.sec.gov/news/speech/peirce-remarks-regulatory-transparency-project-conference ("One-off enforcement actions that represent the first time the Commission has addressed a particular issue publicly … are not the right way to build a regulatory framework.  For that, Congress gave us other tools, including the authority to craft tailored exemptions and notice-and-comment rulemaking.").

But the crypto asset industry already knows that the SEC's attempts at square-peg-round-hole regulation-by-litigation will only end up in failure.  Good-faith attempts to grope around in the dark in search of a meaningful pathway to regulation have only resulted in a no-win scenario.  Crypto assets registered with the SEC have mostly been shut down due to nonviability.  Rodrigo Seira et al., *SEC's Path to Registration—Part II:  Lessons from Crypto Projects' Failed Attempts to Register With the SEC*, Paradigm (Mar. 23, 2023), https://policy.paradigm.xyz/writing/secs-path-to-registration-part-ii (noting that, of six token projects that registered with the SEC as a condition of settlement, "five are no longer operating in the US," and "none of the six tokens has any meaningful utility to market").  And even where registered crypto assets are viable conceptually, they are a failure commercially, as there are no broker-dealers and exchanges licensed to facilitate their trade.  *See, e.g.*, Props Project, *A Letter From Our CEO* (Aug. 12, 2021), https://blog.propsproject.com/a-letter-from-our-ceo-1332f6cabab1 (noting that, while the company was able to register its token as a security, "no U.S. exchange has been able to list crypto assets … which has hindered holders wishing to trade them").

The SEC's pronouncements in this case and others, which admonish crypto asset issuers and exchanges for not conforming to the Securities Laws by following frameworks that already

exist—are a sleight of hand.  Perhaps the SEC does not know how to grapple with the unique challenges posed by crypto assets.  But that is a reason to conclude that the Securities Laws do not apply at all, instead of contorting existing frameworks beyond recognition to fit the SEC's enforcement agenda.  *Cf. King v. Burwell*, 576 U.S. 473, 486 (2015) (noting that "[i]t is especially unlikely that Congress would have delegated" a question of "deep 'economic and political significance'" to an agency with "no expertise" in crafting policy in that area (citation omitted)).

The SEC may not have the power to regulate crypto assets, but its ability to zealously pursue enforcement actions in this space (despite having dubious statutory authority to do so) certainly gives it the power to cripple the crypto assets industry.  As of the end of 2022, the SEC has levied $2.61 billion in monetary penalties against digital-asset market participants;[8] in 2023, the SEC's enforcement activity has only continued to boom.[9]

The major questions doctrine allows this Court to restrain the SEC from inflicting damage in an area of economic and political significance in which the agency does not belong. To be clear, crypto assets should be regulated—under a carefully calibrated regime created by Congress, not an agency's arrogation of authority.  The "only way forward … is through thoughtful, well-calibrated legislation that protects consumers from scams and conflicts of interest—while still embracing the innovations of blockchain technology."[10]  The SEC's current

---

[8] Cornerstone Research, *SEC Cryptocurrency Enforcement: 2022 Update* 1, https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2022-Update.pdf.

[9] Cornerstone Research, *SEC Cryptocurrency Enforcement:  June 2023 Update*, https://www.cornerstone.com/insights/research/sec-cryptocurrency-enforcement-june-2023-update/

[10] Miles Jennings & Brian Quintenz, *It's Time to Move Crypto From Chaos to Order*, a16zcrypto (July 15, 2023), https://a16zcrypto.com/posts/article/its-time-to-move-crypto-from-chaos-to-order/

regulation-by-enforcement approach only leaves well-meaning actors to suffer under "dubious

U.S. regulatory enforcement actions, while ill-intentioned firms launch products that flagrantly

violate long standing rules."[11]

## **CONCLUSION**

Defendants' Motions to Dismiss should be granted.


Dated:  September 28, 2023                        Respectfully submitted,

                                                  /s/ Andrew Kim
                                                  Andrew Kim (D.C. Bar No. 1029348)
Rodrigo Seira                                     GOODWIN PROCTER LLP
(admission *pro hac vice* pending)                1900 N Street, N.W.
PARADIGM OPERATIONS LP                            Washington, D.C. 20036
548 Market Street                                 (202) 346-4000
San Francisco, CA 94104                           andrewkim@goodwinlaw.com
(415) 986-9283
rodrigo@paradigm.xyz

                                                  *Counsel for Amicus Curiae*
                                                  *Paradigm Operations LP*

---

[11] *Id.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LCvR 7(o), I certify that the Brief of Amicus Curiae Paradigm Operations LP In Support of Defendants' Motions to Dismiss complies with the rules of this Court, as the brief is 22 pages (maximum 25), excluding those parts of the brief exempted under Federal Rule of Appellate Procedure 32(f), and the brief otherwise meets the requirements of LCvR 5.4 and Federal Rule of Appellate Procedure 29(a)(4).


/s/ Andrew Kim
Andrew Kim