**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 1:23-cv-01599 |
| BINANCE HOLDINGS LIMITED, et al., | ) ) | |
| *Defendants*. | ) ) | |

**BRIEF OF CIRCLE INTERNET FINANCIAL, LLC**
**AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY ON**
**DEFENDANTS' MOTIONS TO DISMISS**

Heath P. Tarbert (D.C. Bar No. 468065)**
Daniel Kaleba**
Jeremy Gray**
CIRCLE INTERNET FINANCIAL, LLC
99 High Street, Suite 1801
Boston, MA 02110
Telephone: 617.326.8326
heath.tarbert@circle.com

Mark W. Rasmussen**
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, TX 75201
Telephone: 214.220.3939
mrasmussen@jonesday.com

Yaakov M. Roth (D.C. Bar No. 995090)
Alexis Zhang (D.C. Bar No. 90008032)*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202.879.3939
yroth@jonesday.com

Eric Tung**
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: 213.489.3939
etung@jonesday.com

*admission pending
**pro hac forthcoming

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

CORPORATE AND FINANCIAL DISCLOSURE STATEMENT ............................................. 1

INTEREST OF AMICUS CURIAE ..................................................................................... 1

INTRODUCTION ............................................................................................................ 2

ARGUMENT .................................................................................................................. 4

I.      STABLECOINS ARE AN IMPORTANT INNOVATION .................................................. 4

      A.     Stablecoins Are an Essential Part of the Digital-Asset Economy.......................... 5

      B.     Circle's USDC Stablecoin Illustrates the Value a Digital Dollar Brings ............. 9

II.     THE SEC LACKS AUTHORITY OVER PAYMENT STABLECOIN OFFERINGS ........................ 11

      A.     Standalone Offerings of Payment Stablecoins Are Not Securities ..................... 12

            1.     Standalone Offerings of Payment Stablecoins Are Not Securities
                  Within the Meaning of the Federal Securities Laws................................ 13

            2.     The Purpose and Structure of the Securities Laws Confirm that
                  Standalone Offerings of Payment Stablecoins Are Not Securities .......... 16

      B.     The SEC Attempts to Allege an Investment Contract Based on How
           Binance Marketed and Sold BUSD ..................................................................... 18

      C.     Pending Congressional Legislation Counsels Against Extending the SEC's
           Enforcement Authority to Payment Stablecoins................................................. 19

III.    THE LEGAL AND PRACTICAL STAKES UNDERSCORE THE NEED FOR CAREFUL
      SCRUTINY OF SEC CLAIMS OF AUTHORITY OVER PAYMENT STABLECOINS ..................... 21

CONCLUSION............................................................................................................... 23

CERTIFICATE OF SERVICE ............................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramski v. United States*,
573 U.S. 169 (2014)................................................................................................16

*Badaracco v. Comm'r*,
464 U.S. 386 (1984)...............................................................................................22

*C.N.S. Enters. v. G. & G. Enters.*,
508 F.2d 1354 (7th Cir. 1995) ................................................................................18

*CFTC v. Zhao*,
No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023) .........................................................21

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018)............................................................................................18

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).....................................................................................17, 18, 21

*Gonzales v. Oregon*,
546 U.S. 243 (2006)...............................................................................................20

*In re Tether & Bitfinex Crypto Asset Litig.*,
576 F. Supp. 3d 55 (S.D.N.Y. 2021) ......................................................................22

*Int'l Bhd. of Teamsters v. Daniel*,
439 U.S. 551 (1979)..........................................................................................17, 22

*Landreth Timber Co. v. Landreth*,
471 U.S. 681 (1985)...............................................................................................18

*Revak v. SEC Realty Corp.*,
18 F.3d 81 (2d Cir. 1994)........................................................................................15

*Reves v. Ernst & Young*,
494 U.S. 56 (1990)...........................................................................................16, 17

*Risley v. Univ. Navigation, Inc.*,
No. 22-cv-2780, 2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023).........................19, 20

*Robinson v. United Mine Workers of Am. Health & Retirement Funds*,
435 F. Supp. 245 (D.D.C. 1997) .............................................................................17

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*SEC v. Belmont Reid & Co.*,
794 F.2d 1388 (9th Cir. 1986) ............................................................................... 15

*SEC v. Bennett*,
889 F. Supp. 804 (E.D. Pa. 1995) .......................................................................... 16

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) .............................................................................. 12, 14, 16

*SEC v. Int'l Loan Network, Inc.*,
770 F. Supp. 678 (D.D.C. 1991) ............................................................................. 13

*SEC v. Life Partners, Inc.*,
87 F.3d 536 (D.C. Cir. 1996) ......................................................................... 13, 14, 15, 17

*SEC v. Ralston Purina Co.*,
346 U.S. 119 (1953) .............................................................................................. 17

*SEC v. Ripple Labs., Inc.*,
__ F. Supp. 3d __, No. 20-cv-10832, 2023 WL 4507900
(S.D.N.Y. July 13, 2023) ........................................................................................ 12

*SEC v. Telegram Grp., Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..................................................................... 12

*SEC v. Terraform Labs Pte. Ltd.*,
__ F. Supp. 3d __, No. 23-cv-1346, 2023 WL 4858299
(S.D.N.Y. July 31, 2023) ........................................................................... 11, 13, 14

*SEC v. Trendon T. Shavers & Bitcoin Sav. & Trust*,
No. 4:13-CV-416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) ......................... 12

*United Housing Found., Inc. v. Forman*,
421 U.S. 837 (1975) .............................................................................................. 16

*Woodward v. Terracor*,
574 F.2d 1023 (10th Cir. 1978) .............................................................................. 16

**STATUTES**

15 U.S.C. § 77b ....................................................................................................... 16

15 U.S.C. § 78c ................................................................................................... 16, 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281,
118th Cong. (2023) .................................................................................................20

Stablecoin TRUST Act of 2022, S. 5340, 117th Cong. ............................................20

**OTHER AUTHORITIES**

12 C.F.R. pt. 204 .........................................................................................................8

31 C.F.R. pt. 1022 .......................................................................................................8

31 C.F.R. § 1010.100 .................................................................................................21

80 Fed. Reg. 71388 (Nov. 16, 2015) ...........................................................................8

*Always-on Dollars, Internet Speed*, Circle .........................................................9, 11

Teana Baker-Taylor, *Circle, Stellar, MoneyGram and the UNHCR Convene to
Advance Humanitarian Aid*, Circle (Apr. 13, 2023) ...........................................10

Alex Behrens, *How USDC Provides New Fiat On & Off-Ramp Opportunities for
Crypto Startups*, Circle (Aug. 25, 2021) .............................................................11

Blockchain Education, *Guide to Stablecoins: What They Are, How They Work
and How to Use Them*, Bitpay (Oct. 10, 2022) .....................................................8

Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. .....................7

*Cryptocurrency Perception Study*, Morning Consult (Feb. 24, 2023) ........................5

Telis Demos, *SEC Crypto Action Leaves Stablecoins in Limbo*, Wall Street J.
(June 9, 2023) .......................................................................................................11

Jack Denton, *Fed's Powell Eyes Oversight of Stablecoin Issuers, Regulation of
Crypto Wallets*, Barron's (Sept. 27, 2022) .........................................................21

Chris Dowsett, *What Are Stablecoins?*, BuiltIn (Feb. 3, 2023) .................................7

Dan Ennis, *NY Regulator Orders Paxos to Stop Minting Binance Stablecoin,
Banking Dive (Feb. 13, 2023),* .............................................................................22

Exec. Order No. 14,067, 87 Fed. Reg. 14143 (Mar. 9, 2022) ......................................2

Fed. R. App. P. 26.1 .....................................................................................................1

iv

## TABLE OF AUTHORITIES
(continued)

Page(s)

Fed. R. App. P. 29........................................................................................................1

Jeremy Fox-Geen, *Deepening Our Partnership with BlackRock,* Circle
(Nov. 3, 2022)....................................................................................................11

Framework for "Investment Contract" Analysis of Digital Assets ...............................15

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and
Retail Investors Collide, Part III:  Hearing Before the H. Comm. on Fin.
Servs.* (May 6, 2021)....................................................................................2, 21

Ekin Genç, *Bitcoin Spent on Two Pizzas in 2010 Now Worth $384 Million*,
Decrypt (May 22, 2021)........................................................................................8

Alyssa Hertig, *Open Source: What It Is and Why It's Critical for Bitcoin and
Crypto*, CoinDesk (updated Oct. 6, 2022) ...............................................................6

Alyssa Hertig, *What Is a Stablecoin?*, CoinDesk (updated Aug. 8, 2023) ....................5

William Hinman, Speech, *Digital Asset Transactions:  When Howey Met Gary
(Plastic)*, SEC (June 14, 2018) ............................................................................17

H.R. ___, 118th Cong. ...............................................................................................20

House Financial Services Committee Reports Digital Asset, ESG Legislation to
Full House for Consideration, H. Fin. Servs. Cmte. (July 27, 2023).......................20

IMVU, Inc., SEC Staff No-Action Letter (Nov. 17, 2020) ...........................................14

Arjun Kharpal, *Beyond the Valley Podcast, How Stablecoins Became the
Backbone of Crypto*, CNBC (July 8, 2022) ...............................................................3

Local R. 7(*o*) ...............................................................................................................1

Dave Michaels, *Stablecoins Like USDC Are Commodities, CFTC Chair Says,*
Wall Street J. (Mar. 8, 2023)................................................................................21

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008) ...............4

Danny Nelson, *FinCEN:  Stablecoin Issuers Are Money Transmitters, No Matter
What*, CoinDesk (Nov. 19, 2019)..........................................................................21

*Paxos Will Halt Minting New BUSD Tokens*, Paxos (Feb. 13, 2023) ............................3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Press Release, Circle, *Circle Selects BNY Mellon to Custody USDC Reserves*(Mar. 31, 2022) ..............................................................................11

Andjela Radmilac, *Adoption Grows as More than $7T Settled with Stablecoins in 2022*, CryptoSlate (Dec. 23, 2022) ..............................................................7

Release No. 8450-21, CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million, CFTC (Oct. 15, 2021) ..................................................22

James Royal, *What Are Stablecoins and How Do They Affect the Cryptocurrency Market?*, Bankrate (May 12, 2022)..............................................................8

*State of the USDC Economy*, Circle (Jan. 17, 2023) .............................................9, 10

*Today's Cryptocurrency Prices by Market Cap*, CoinMarket Cap ...............................4

*Top Stablecoin Tokens by Market Capitalization*, CoinMarketCap ...........................7

*Understanding Stablecoins' Roles in Payments and the Need for Legislation: Hearing Before the Subcomm on Digital Assets, Financial Technology and Inclusion, of the H. Comm. on Fin. Servs.* (Apr. 19, 2023) ....................................10

*USD Coin for Businesses*, Circle ...............................................................................10

*U.S. CFTC Head Urges Congress to Act Fast on Crypto Regulation*, Reuters (Dec. 1, 2022) ........................................................................................................2

*What Is Cryptocurrency?* Coinbase ...........................................................................5, 6

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29 of the Federal Rules of Appellate Procedure, as incorporated through Rule 7(*o*) of the Local Rules of the United States District Court for the District of Columbia, *amicus* discloses that its parent company is Circle Internet Holdings, Inc., and no publicly held corporation owns 10 percent or more of its stock.

## INTEREST OF *AMICUS CURIAE*

Circle Internet Financial, LLC is a global financial technology company that works to increase economic opportunity and prosperity through the power of digital currency.  Circle is the issuer of USDC, a trusted, regulated, widely accepted, and highly liquid "payment stablecoin"— *i.e.*, a digital asset designed to be used to make payments or settlements, whose redemption value is pegged to the U.S. dollar at a 1:1 ratio.  Around $25 billion of USDC is in circulation today, and this payment stablecoin has facilitated more than $12.1 trillion in total transactions.  Accordingly, Circle has a strong interest in advancing a robust, well-defined regulatory and legal framework for payment stablecoins and in ensuring that existing laws and regulations are enforced with both vigor and precision.  Circle has closely followed assertions of jurisdiction by the Securities and Exchange Commission (SEC) in this realm.  The SEC's claim that Binance offered and sold its competing stablecoin as an unregistered security raises serious legal questions affecting digital currency and the U.S. economy more broadly.  Circle therefore submits this brief pursuant to Local Rule 7(*o*), not to support either party, but to assist the Court in understanding stablecoins and their status under the federal securities laws.[1]

---

[1] In accordance with Rule 29(a)(4) of the Federal Rules of Appellate Procedure, as incorporated through Local Rule 7(*o*), Circle certifies that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund preparing or submitting this brief; and (3) apart from *amicus curiae*, its members, and its counsel, no person contributed money to fund the preparation or submission of this brief.

## INTRODUCTION

Unlike other countries, the United States has failed to pass comprehensive legislation to regulate the digital-asset industry at the federal level.  Within the last several years, regulators have attempted to fill that void by making use of existing federal laws that most openly admit are not fit for that purpose.[2]  For its part, the SEC has asserted broad regulatory authority over much of the industry.  Yet the SEC has not done so through new rulemakings, which would at least provide clarity to American consumers and industry participants alike while offering the benefit of the Administrative Procedure Act's procedural safeguards and transparency.  Instead, it has taken an *ad hoc* approach—alleging that individuals and companies have violated the securities laws by offering and selling unregistered securities and engaging in other unregistered market conduct.  These individual enforcement actions foster regulatory uncertainty in the digital-asset industry and uneven protection for consumers, resulting in one-off settlements of select enforcement cases and a patchwork of rulings about whether and to what extent the laws apply to participants and transactions involving digital assets.

The *Binance* case follows this pattern.  It contains serious allegations, to be sure, but it is notable for one reason of particular concern to *amicus*:  The SEC's complaint now potentially extends the current regulatory uncertainty to payment stablecoins—fixed-value digital assets that

---

[2] *See, e.g.*, Hannah Lang & Chris Prentice, *U.S. CFTC Head Urges Congress to Act Fast on Crypto Regulation*, Reuters (Dec. 1, 2022), https://tinyurl.com/c7nw8z9w (urging Congress to "install a regulatory framework for digital assets"); *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III:  Hearing Before the H. Comm. on Fin. Servs.* 12 (May 6, 2021) (testimony of Gary Gensler, SEC Chair), https://tinyurl.com/yeyufyxm (previously recognizing that digital assets do not currently "have a regulatory framework"); *see also* Exec. Order No. 14,067, § 5(b)(vi), 87 Fed. Reg. 14143, 14148 (Mar. 9, 2022) (directing various agencies to analyze the extent to which they have jurisdiction "to address the risks of digital assets and whether additional measures may be needed").

have been described as the "backbone" of the digital-asset ecosystem.[3]  The complaint accuses Binance of illegally offering and selling BUSD—a payment stablecoin backed by the U.S. dollar— as an "investment contract" and therefore a type of "security" under federal law—without registering it with the SEC.  Compl. ¶¶ 315–24.  This marks the first time the SEC has taken enforcement action against a true payment stablecoin.  Accordingly, this Court's decision may have significant ramifications for competing issuers like Circle, as well as for the digital-asset ecosystem and U.S. economy more broadly.

Because of this, it is vital that there be no misunderstanding about the scope of the SEC's allegations regarding the BUSD stablecoin. The SEC does not allege that BUSD, by itself, is a security.  Nor could it.  Payment stablecoins, on their own, do not have the essential features of an investment contract.  They do not independently give buyers any potential for profit, and certainly not based on the efforts of the stablecoin issuer.  As a result, the SEC has no jurisdiction over such stablecoins, absent additional factors that turn the sale of the stablecoin into an investment contract.

Here, the SEC attempts to plead the existence of an investment contract based on the transactional context of Binance's BUSD sales.  It contends that Binance offered and sold BUSD through a "profit-earning scheme within the Binance ecosystem." *Id.* ¶ 315.[4]  In other words, according to the SEC, Binance marketed and sold BUSD in a way that caused BUSD buyers to expect profits based on Binance's efforts.  When measuring the sufficiency of the SEC's

---

[3] Arjun Kharpal, Beyond the Valley Podcast, *How Stablecoins Became the Backbone of Crypto*, CNBC (July 8, 2022), https://tinyurl.com/ydena59w.

[4] The suit does not contain allegations about the issuance of BUSD, as opposed to the broader transactional context in which sales were solicited.  Nor could it, as Binance did not directly issue BUSD or manage its reserves or redemption; instead, its partner Paxos handled these more technical responsibilities. *See Paxos Will Halt Minting New BUSD Tokens*, Paxos (Feb. 13, 2023), https://tinyurl.com/yvk2awmd.

allegations, it is critical that the Court evaluate the allegations about the *entire* undertaking related to the BUSD sales and not simply focus on BUSD the *standalone* digital asset.  Sales of payment stablecoins, without more, are just asset sales.  Decades of case law support the view that an asset sale—decoupled from any post-sale promises or obligations by the seller—is not sufficient to establish an investment contract.

Circle submits this brief not to support either party, but to aid the Court's consideration of the SEC's allegations about BUSD.  The brief makes three points.  *First*, payment stablecoins—and especially U.S. dollar-backed payment stablecoins—are an essential part of the digital-asset ecosystem, and they are fundamentally different from the tokens that the SEC has previously asserted are securities.  *Second*, standing alone, such payment stablecoins are neither investment contracts nor any other type of security, and so the SEC has no authority over standalone sales of these tokens.  In evaluating the SEC's complaint, it is critical that the Court assess the entire transactional context that the SEC alleges surrounded Binance's sales of BUSD.  *Third*, the legal and practical stakes at play underscore why this Court should reject any overbroad or imprecise SEC assertions of jurisdiction in this area.

## ARGUMENT

### I.   STABLECOINS ARE AN IMPORTANT INNOVATION.

Digital assets have had a meteoric rise:  Over the past 15 years, they have transformed from a short white paper into a full-blown sector of the economy with a market capitalization of over $1 trillion.[5]  And stablecoins—digital-asset tokens whose value is pegged to the value of another asset—have been both a case study in the innovative potential of digital assets, and an integral

---

[5]  *See* Satoshi Nakamoto, *Bitcoin:   A Peer-to-Peer Electronic Cash System* (2008), https://tinyurl.com/29xmawvf; *Today's Cryptocurrency Prices by Market Cap*, CoinMarket Cap, https://tinyurl.com/5n899zbk (last visited Sept. 28, 2023).

force behind Americans' widespread adoption of digital assets for real-world use cases. To aid the Court in evaluating the SEC's BUSD allegations, this Part provides a brief overview of how stablecoins work and how they are used, with particular focus on the U.S. dollar-backed payment stablecoins at issue in this case. A proper understanding of this factual context highlights just how far afield these digital dollars are from "securities" falling within the SEC's jurisdiction.

### A.  Stablecoins Are an Essential Part of the Digital-Asset Economy.

As its trillion-dollar market cap reflects, digital assets are a major and fast-growing part of the U.S. and worldwide economy. One recent study found that 20 percent of Americans currently own digital assets, and 29 percent are likely to buy or trade them in the next 12 months.[6] These digital assets run the gamut—from digital currencies like Bitcoin,[7] to utility tokens that give their holders access to services and features,[8] to the payment stablecoins that are the focus of this brief,[9] and more. The upshot is that the blockchain technology that powers digital assets has spurred tremendous economic activity.

The popularity of digital assets is unsurprising. Digital assets and digital-asset platforms offer Americans access to a financial ecosystem with unique advantages over traditional models. For one, blockchain technology allows users to securely buy, sell, and trade tokens without needing to route their transactions through an intermediary, such as a bank or payments processor. So digital-asset transactions can occur much faster (indeed, almost instantaneously), at any hour of

---

[6] *Cryptocurrency Perception Study*, Morning Consult (Feb. 24, 2023), https://tinyurl.com/ndenw3k2.

[7] *What Is Cryptocurrency?*, Coinbase, https://tinyurl.com/46z55amx.

[8] *Utility Token Meaning*, Ledger Academy (updated July 18, 2023), https://tinyurl.com/3mzapbt3.

[9] Alyssa Hertig, *What Is a Stablecoin?*, CoinDesk (updated Aug. 8, 2023), https://tinyurl.com/4a76mr24.

the day, and with lower fees, even for cross-border transactions.[10]  And digital-asset platforms can constantly improve:  Such platforms are generally open-source, so anyone can see and refine the computer code used to build blockchain networks.[11]  This accessibility and transparency makes digital assets a compelling alternative for many Americans.

Stablecoins exemplify the promise of digital assets as having everyday utility.  The concept is simple:  A stablecoin is a digital asset whose value is pegged to another asset, allowing users to take advantage of the speed of digital assets without risking the value fluctuations common to other tokens.[12]  Different stablecoins pursue price stability in different ways:  Some, like Binance's BUSD and Circle's USDC payment stablecoins, are pegged to a fiat currency like the U.S. dollar, while others are pegged to a real-world commodity like gold, to another digital asset like Ether,[13] or to a mathematical formula that aims to simulate the value-fixing of a true, asset-backed stablecoin.[14]  All told, stablecoins constitute a substantial share of the digital-asset market; they have a current market cap of roughly $124 billion, and are used to facilitate trillions of dollars in transactions each year, more than even major credit-card networks.[15]  And the stablecoin market continues to grow.

---

[10] *What Is Cryptocurrency?*, *supra* note 6.

[11] Alyssa Hertig, *Open Source: What It Is and Why It's Critical for Bitcoin and Crypto*, CoinDesk (updated Oct. 6, 2022), https://tinyurl.com/mwu8c38h.

[12] *Id.*

[13] *Id.*; Compl. ¶ 317.

[14] Hertig, *supra* note 10.

[15] *Top Stablecoin Tokens by Market Capitalization*, CoinMarketCap, https://tinyurl.com/5f2rv6ws (last visited Sept. 28, 2023); Andjela Radmilac, *Adoption Grows as More than $7T Settled with Stablecoins in 2022*, CryptoSlate (Dec. 23, 2022), https://tinyurl.com/5bym98b3.

By far the most prevalent stablecoins—and the focus of this brief—are payment stablecoins, and especially ones backed by the U.S. dollar.[16]  Payment stablecoins are designed to be sold and redeemed at a fixed value.  For example, a pending bill on stablecoin regulation, which the House Financial Services Committee recently approved, defines a "payment stablecoin" as a digital asset "designed to be used as a means of payment or settlement," such that "the issuer … is obligated to convert, redeem, or repurchase [tokens] for a fixed amount of monetary value," in accordance with the issuer's representations that the stablecoin "will maintain a stable value."[17]  Any reputable U.S. dollar-backed payment stablecoin will accomplish this by maintaining reserves to ensure the tokens can be redeemed at a 1:1 ratio:  A user can exchange $1 for 1 token of the relevant stablecoin, and the token can later be exchanged again for the same value.  In the interim, the stablecoin issuer will hold that dollar in reserve as collateral, while the user can use the stablecoin as a digital dollar to fund transactions, secure in the knowledge that its conversion value is fully backed by that collateral.[18]

As this description suggests, payment stablecoins differ from other fungible digital assets, including those the SEC has previously targeted, in two ways.  *First*, because payment stablecoins are redeemable at a constant value, it is especially clear that they cannot alone be a vehicle for anticipated profit.  Rather, they are used primarily as "a store of value and a low-cost medium of … exchange."[19]  In other words, as the term "payment stablecoin" suggests, the core utility of the

---

[16] *Top Stablecoin Tokens by Market Capitalization*, *supra* note 14.

[17] Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. § 13.

[18] Chris Dowsett, *What Are Stablecoins?*, BuiltIn (Feb. 3, 2023), https://tinyurl.com/k7mw3hb2.

[19] Blockchain Education, *Guide to Stablecoins: What They Are, How They Work and How to Use Them*, Bitpay (Oct. 10, 2022), https://tinyurl.com/5a4v8d54.

stablecoin is as a method of payment or settlement.  And *second*, these stablecoins have a unique risk profile:  While other digital assets may be notable for their price volatility, the central question for a payment stablecoin is whether its issuer in fact holds sufficient, accessible reserves to maintain its fixed value.[20]  Thus, the key regulatory task in the stablecoin context is to safeguard against inadequate and illiquid reserves.[21]

These differences also distinguish payment stablecoins from instruments typically subject to SEC regulation.  When choosing a payment mechanism, a "security" is hardly what comes to mind.  People do not use a stock certificate to buy pizza, for example.[22]  And while other regulators—like the Federal Reserve and the Treasury Department's FinCEN bureau—have substantial experience regulating reserve requirements and money transfers, the SEC decidedly does not.[23]

## B.    Circle's USDC Stablecoin Illustrates the Value a Digital Dollar Brings.

As the issuer of one of the world's most popular payment stablecoins, Circle well understands their benefits and risks.  Its stablecoin—USDC—provides a paradigmatic example of how U.S. dollar-backed payment stablecoins work, their many uses, and how they are safeguarded.

Circle follows industry-wide best practices in its management of USDC.  This payment

---

[20] James Royal, *What Are Stablecoins and How Do They Affect the Cryptocurrency Market?*, Bankrate (May 12, 2022), https://tinyurl.com/36mjn2v5.

[21] *Accord* 80 Fed. Reg. 71388, 71458 (Nov. 16, 2015) (explaining, in another financial-regulation context, that the SEC's approach is to "structure rules tailored to the [activities at issue] that address the risks posed by such activities").

[22] *Cf.* Ekin Genç, *Bitcoin Spent on Two Pizzas in 2010 Now Worth $384 Million*, Decrypt (May 22, 2021), https://tinyurl.com/yc2mz38c.

[23] *See, e.g.*, 12 C.F.R. pt. 204 (establishing Federal Reserve requirements for reserves of depository institutions); 31 C.F.R. pt. 1022 (establishing FinCEN requirements for money services businesses).

stablecoin, which is sold by Circle directly to its customers and also is traded on third-party platforms, can be bought or redeemed from Circle at a 1:1 ratio with the U.S. dollar.[24]  It offers a way to transact without the hassle of settlement times or the hefty fees associated with traditional payment systems, and its presence in more than 190 countries allows it to be easily used worldwide.[25]  In furtherance of Circle's commitment to redeem USDC at a 1:1 ratio with the U.S. dollar, Circle maintains in segregated reserves an amount equivalent to or greater than the amount of USDC in circulation—currently around $25 billion for U.S. dollar-pegged USDC—as a mix of cash and similarly liquid assets, such as U.S. Treasuries and Treasury-denominated assets.[26]  Circle earns interest on these reserve holdings, but USDC holders do not receive any portion of that interest and their USDC does not appreciate in value; holders can redeem their USDC only at the 1:1 ratio.

USDC holders can use the tokens for a multitude of purposes that benefit customers. USDC has facilitated more than $12.1 trillion in transactions.[27]  It can be used to fund transactions both within the digital-asset ecosystem (as one of the most popular payment stablecoins on Ethereum and other leading blockchain networks) and outside of it (through Circle's partnerships with major companies like Mastercard, Visa, and WorldPay).[28]  Indeed, more than 75 percent of all USDC in circulation is held in digital wallets and smart contracts—automated ways to transfer

---

[24] *State of the USDC Economy*, Circle (Jan. 17, 2023), https://tinyurl.com/mtrw6pdm.

[25] *Id.*

[26] *Always-on Dollars, Internet Speed*, Circle, https://tinyurl.com/3um2cee5 (last visited Sept. 28, 2023).

[27] *Id.*

[28] *State of the USDC Economy*, *supra* note 23.

money, which underscore USDC's primary use as a digital dollar.[29]

USDC's uses also go well beyond consumer cases. Many companies use USDC for treasury management (such as for vendor payments and payroll processing) and as a way to engage in blockchain-based borrowing and lending.[30] For example, major companies like Stripe and Twitter support payments on their platforms in USDC.[31] USDC likewise can be used for crowdfunding or charitable giving, as exemplified by Circle's partnership with the UN High Commissioner for Human Rights to provide digital cash assistance for Ukrainian refugees.[32] And more generally, it serves as a store of value—allowing users to keep digital dollars without worrying about price volatility.

Moreover, USDC holders can be confident in the sufficiency of the token's reserves and the liquidity of its redemption thanks to both a robust regulatory scheme and Circle's careful safeguards. As a money-transmitter business, Circle is registered nationally with FinCEN and locally with regulators in 46 states; Washington, DC; and Puerto Rico.[33] Circle also takes additional steps to ensure security and transparency, such as by placing its reserves under the management and custody of leading U.S. financial institutions; publishing monthly independent

---

[29] *Understanding Stablecoins' Roles in Payments and the Need for Legislation: Hearing Before the Subcomm on Digital Assets, Financial Technology and Inclusion, of the H. Comm. on Fin. Servs.* (Apr. 19, 2023) (statement of Dante Disparte, Chief Strategy Officer and Head of Global Policy, Circle), https://tinyurl.com/2h2eckxe.

[30] *USD Coin for Businesses*, Circle, https://tinyurl.com/mtn7e3xm.

[31] *State of the USDC Economy*, *supra* note 23.

[32] Teana Baker-Taylor, *Circle, Stellar, MoneyGram and the UNHCR Convene to Advance Humanitarian Aid*, Circle (Apr. 13, 2023), https://tinyurl.com/38d2yxtw.

[33] Alex Behrens, *How USDC Provides New Fiat On & Off-Ramp Opportunities for Crypto Startups*, Circle (Aug. 25, 2021), https://tinyurl.com/2p9rwc55.

attestations about the size, composition, and location of these reserves; and subjecting its finances to annual public audits.[34]

## II.   THE SEC LACKS AUTHORITY OVER PAYMENT STABLECOIN OFFERINGS.

Although stablecoin issuers like Circle have long been regulated by a host of agencies, the SEC's interest is new:   As recently as June of this year, commentators observed that the Commission "still seemingly hasn't addressed [stablecoins] head-on."[35]  This case marks the first SEC enforcement action raising questions about the regulatory status of *bona fide* payment stablecoins, much less payment stablecoins that function as digital equivalents of the U.S. dollar.[36] Accordingly, this Court should carefully scrutinize the SEC's novel claims of authority to ensure that Binance's BUSD offering in fact falls within the agency's jurisdiction.

While Circle takes no position on whether the SEC has sufficiently alleged that Binance offered or sold a security, it offers three points for this Court's consideration.  *First*, because payment stablecoins—and particularly U.S. dollar-backed payment stablecoins—are not securities, neither are standalone offerings of such stablecoins.  *Second*, the SEC has not alleged that payment stablecoins or standalone offerings are securities; instead, it alleges that Binance's BUSD sales, when considered together with the entire transactional context of Binance's BUSD

---

[34] *Always-on Dollars, Internet Speed*, *supra* note 25; *see, e.g.*, Jeremy Fox-Geen, *Deepening Our Partnership with BlackRock*, Circle (Nov. 3, 2022), https://tinyurl.com/ykdv6chx; Press Release, Circle, *Circle Selects BNY Mellon to Custody USDC Reserves*(Mar. 31, 2022), https://tinyurl.com/2p9e5hn.

[35] Telis Demos, *SEC Crypto Action Leaves Stablecoins in Limbo*, Wall Street J. (June 9, 2023), https://tinyurl.com/3ttwmnpd.

[36] The SEC previously brought an enforcement action involving two so-called stablecoins—UST and Luna—but those tokens, which were not backed by U.S. dollar reserves and did not function primarily as "stable stores of value," were not true payment stablecoins.  *See SEC v. Terraform Labs Pte. Ltd.*, __ F. Supp. 3d __, No. 23-cv-1346, 2023 WL 4858299, at *1, 12 (S.D.N.Y. July 31, 2023).

offering, gave rise to an investment contract.  *Third*, courts should avoid approving any SEC claims of jurisdiction over standalone offerings of payment stablecoins while congressional debate and legislation addressing their regulation remain pending.

### A.   Standalone Offerings of Payment Stablecoins Are Not Securities.

To start, payment stablecoins like BUSD are not securities.  Courts have long recognized that, while all manner of non-security assets can be marketed as part of an investment scheme, that does not convert the assets themselves into securities.

For example, the Supreme Court in *SEC v. W.J. Howey Co.* "drew a distinction between the purchase of a fee simple interest in an orange grove (not a security) and the purchase of an orange grove coupled with a contract entitling the purchaser to share in profits of a larger citrus enterprise managed by others (a security)."  *SEC v. Trendon T. Shavers & Bitcoin Sav. & Trust*, No. 4:13-CV-416, 2014 WL 12622292, at *8 (E.D. Tex. Aug. 26, 2014) (citing 328 U.S. 293, 299–300 (1946)).  That distinction applies here.  As several courts have recognized, digital tokens standing alone are assets and not securities.  *See, e.g.*, *SEC v. Ripple Labs., Inc.*, __ F. Supp. 3d __ , No. 20-cv-10832, 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023) (XRP digital asset "is not in and of itself" an investment contract); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) (describing digital assets as "little more than alphanumeric cryptographic sequence[s]"); *see also Terraform Labs*, 2023 WL 4858299, at *12 (UST and Luna coins, "as originally created and when considered in isolation, might not then have been, by themselves, investment contracts").

Because payment stablecoins alone are not securities, stablecoin offerings marketing their inherent features—*e.g.*, that a stablecoin is a U.S. dollar-backed digital dollar of secure valuation—cannot be securities either.  A review of the federal securities laws confirms this point.

1.     **Standalone Offerings of Payment Stablecoins Are Not Securities Within the Meaning of the Federal Securities Laws.**

The only type of security that the SEC alleges in this case is an "investment contract," a term that does not cover standalone offerings of U.S. dollar-backed payment stablecoins.[37]  Compl. ¶ 316.  Under *Howey*, an investment contract is a contract or transaction that "investors purchase with (1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others."  *SEC v. Life Partners, Inc.*, 87 F.3d 536, 542 (D.C. Cir. 1996).  A standalone offering cannot meet this test.

At the outset, the *Howey* elements make clear that courts should focus on how a product is marketed *to the buyer*.  *See SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 692 (D.D.C. 1991).  Thus, in deciding whether a BUSD offering is a security, this Court should disregard any SEC allegations that focus on matters unrelated to whether BUSD buyers view a BUSD purchase standing alone as creating a profit-earning relationship with Binance.  For example, to the extent the complaint focuses on Binance's efforts to develop its business for its own profit, such as by recruiting more BUSD buyers or developing a revenue-sharing agreement with an affiliate (*see, e.g.*, Compl. ¶¶ 317–18), those allegations are irrelevant unless the SEC can prove that they bore on how BUSD buyers perceived Binance would work to earn money for *them*.

Properly framed, an offering that markets the basic features of a payment stablecoin cannot be a security under *Howey*.  As Judge Rakoff recently explained, "where a stablecoin is designed exclusively to maintain a one-to-one peg with another asset, there is no reasonable basis for expecting that the tokens—if used as stable stores of value or mirrored shares traded on public

---

[37] This brief focuses on the paradigmatic example of a payment stablecoin—one backed by the U.S. dollar.  *Amicus* takes no position on the regulatory status of stablecoins backed by other asset classes or whether they may properly be considered payment stablecoins.

stock exchanges—would generate profits through a common enterprise." *Terraform Labs*, 2023 WL 4858299, at *12.  In other words, while an investment contract exists only if *all* the *Howey* elements are met, a payment stablecoin offering by itself satisfies *none* of those elements.

*First*, purchasers of payment stablecoins have no reasonable expectation of profits, because they know from how stablecoins are marketed and operate that the coins have a fixed value and that buyers will be able to redeem their tokens only at the same price at which they purchased them.  *See Howey*, 328 U.S. at 299.  The SEC emphasized the significance of this characteristic when it previously granted no-action relief to a different stablecoin.[38]

*Second*, purchasers of payment stablecoins are not part of any common enterprise.  While it is an open question in this Circuit whether the common-enterprise element requires horizontal commonality, or if vertical commonality alone could suffice, stablecoin sales lack both.  *Life Partners*, 87 F.3d at 544.  Horizontal commonality exists if the promoter pools investment funds so that buyers can share in profits or losses.  *Id.*  But while payment stablecoin issuers like Circle maintain funds received in a reserve backing the issued coins, they do not pool funds to generate income for buyers, and stablecoin tokens do not generate profits or losses in any event.  In contrast, vertical commonality "focuses on the relationship between the promoter and the body of investors," requiring—depending on the formulation—that the investors' profits or losses be linked either "to the *efforts* of the promoter" or "to the *fortunes* of the promoter."  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87–88 (2d Cir. 1994) (rejecting the former formulation of vertical commonality).  But a payment stablecoin sale is linked to neither:  Because the stablecoin redemption price of $1 remains constant regardless of an issuer's efforts to drive more coins into circulation or generate profit for itself, and because stablecoin issuers hold the proceeds from

---

[38] IMVU, Inc., SEC Staff No-Action Letter (Nov. 17, 2020), https://tinyurl.com/3r68rr8m.

stablecoin sales in reserve rather than using them directly to fund operations, payment stablecoin holders are not betting on the promoter's efforts or successes in generating profits but simply that they honor their promise of 1:1 redemption.

And *third*, any "profits" associated with payment stablecoins cannot be attributed "predominantly" (or at all) to the efforts of the stablecoin issuer. *Life Partners*, 87 F.3d at 545 (quotation marks omitted). Any increased purchasing power that a stablecoin accrues reflects merely fluctuation in the underlying value of the dollar, something entirely outside issuers' control. *Cf. SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (no "investment contract" in gold where investors sought to take advantage of fluctuations in the gold market rather than any sellers' efforts to increase gold's value).

Indeed, payment stablecoins have several features that the SEC itself has acknowledged make it less likely that the *Howey* factors are met, such as: (1) immediate consumptive use; (2) a useful rather than speculative purpose; (3) no prospect of price appreciation; and (4) marketing that emphasizes the functionality of the asset, rather than potential for price appreciation.[39]

Finally, that an ordinary sale of payment stablecoins does not satisfy *Howey* is obvious even without considering the *Howey* elements individually. Such an offering simply cannot be squared with the plain meaning of an "investment contract." Congress adopted a well "crystallized" term when, in enacting the federal securities laws, it imported this concept from state "blue sky" laws. *Howey*, 328 U.S. at 298. As the SEC recognized in *Howey*, an investment contract is at bottom a "contractual arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters." Br. for the SEC, *Howey*,

---

[39] Framework for "Investment Contract" Analysis of Digital Assets, https://tinyurl.com/ym3w35z4.

328 U.S. 293 (No. 843), 1946 WL 50582, at *9.  Thus, as courts applying *Howey* have recognized,

asset sales—sales where the promoter has "no contractual obligation … other than to deliver title

once purchase terms [are] met"—by definition cannot be investment contracts.  *Woodward v.*

*Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978).  After all, there is no "security transaction" where

a buyer simply "purchases a commodity for personal consumption or … use."  *United Housing*

*Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975).  Accordingly, a payment stablecoin sold on its

own terms simply is not, and can never be, an investment contract.[40]

      **2.**      **The Purpose and Structure of the Securities Laws Confirm that Standalone Offerings of Payment Stablecoins Are Not Securities.**

To the extent there is any doubt, the purpose and structure of the securities laws confirm

the SEC's lack of jurisdiction over standalone payment stablecoin offerings.  Statutes do not apply

"in a vacuum."  *Abramski v. United States*, 573 U.S. 169, 179 (2014).  So the scope of the securities

laws must be understood in terms of their purposes, *see Int'l Bhd. of Teamsters v. Daniel*, 439 U.S.

551, 558 (1979), and "with a view to … the overall statutory scheme," *FDA v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation marks omitted).  The SEC cannot

claim jurisdiction over a "security" divorced from the laws' purpose and structure.

As to purpose, "Congress's purpose in enacting the securities laws" was "to regulate

*investments*," and in particular "to eliminate serious abuses" by those devising "schemes … [to]

use the money of others on the promise of profits."  *Reves*, 494 U.S. at 60–61 (emphasis original)

(quotation marks omitted).  It is thus dispositive that pure stablecoin offerings—which are *not*

---

[40] A standalone offering of payment stablecoins is even further afield from the other statutory categories of "securities."  *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  For example, a stablecoin cannot be a note because notes—which are not even necessarily securities—are "promise[s] to pay a specific payee a sum certain on a date certain," and stablecoins involve neither a maturity date nor a promise to pay a sum owed. *SEC v. Bennett*, 889 F. Supp. 804, 808 n.3 (E.D. Pa. 1995); *see Reves v. Ernst & Young*, 494 U.S. 56 (1990).

investments, do *not* promise profits, and so do *not* implicate the abuses that spurred the creation of the SEC—plainly fall outside this congressional purpose.

Where there is no "real risk confronting the invested capital" and purchasers are "deriving immediate benefits through use of [their purchases], rather than merely possessing an expectancy of benefits," the purchases fall outside "the function and purpose of the securities laws." *Robinson v. United Mine Workers of Am. Health & Retirement Funds*, 435 F. Supp. 245, 246–47 (D.D.C. 1997) (citing *Forman*, 421 U.S. at 860).   Put another way, the securities laws' purpose of "protect[ing] investors by promoting full disclosure of information thought necessary to informed investment decisions," *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953), loses force if "the investor's profits [do not] depend … predominantly upon the promoter's efforts." *Life Partners*, 87 F.3d at 547.  As a senior SEC official previously observed with respect to Bitcoin, a digital asset is generally not a security where "[a]pplying the disclosure regime of the federal securities laws … would seem to add little value."[41]  So it goes here:  Stablecoin buyers purchasing an instrument that does not appreciate in value are not *investors* needing to make informed *investment* decisions.

And as to structure, offerings cannot be securities if they "simply do not fit" within the securities laws' "regulatory scheme." *Brown & Williamson*, 529 U.S. at 143.  Here, payment stablecoins do not fit the SEC's regulatory scheme.  The integrity of stablecoins depends on the adequacy of their reserves—an area of regulation outside the SEC's purview.  If anything, stablecoins most closely fall within the statutory category of "currency," which the securities laws *exclude* from the definition of a "security."  *See* 15 U.S.C. § 78c(a)(10); *Landreth Timber Co. v.*

---

[41] William Hinman, Speech, *Digital Asset Transactions:  When Howey Met Gary (Plastic)*, SEC (June 14, 2018), https://tinyurl.com/2cfumt4x.

*Landreth*, 471 U.S. 681, 686 n.1 (1985).  Courts have interpreted this category to include not only literal fiat currency, but also "cash substitute[s]" that can be later "redeemed" for dollars.  *See, e.g.*, *C.N.S. Enters. v. G. & G. Enters.*, 508 F.2d 1354, 1363 (7th Cir. 1995).  That description precisely encapsulates the role of U.S. dollar-backed payment stablecoins in particular:  They function as 1:1 substitutes for the dollar, both to make payments and when being redeemed for actual dollars.  Because standalone offerings of U.S. dollar-backed payment stablecoins fall within this category, they cannot be securities.  *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (applying "the canon against reading conflicts into statutes").

### B.   The SEC Attempts to Allege an Investment Contract Based on How Binance Marketed and Sold BUSD.

The SEC's litigating position only confirms that this Court should focus its analysis on the entire alleged transactional context of the BUSD offering and whether the defendants have made promises sweeping beyond what a standalone payment stablecoin entails.

Nowhere in the complaint does the SEC allege that such stablecoins, standing alone, are securities.  *See* Compl. ¶¶ 315–24.  Nor could it for the reasons discussed above.  Instead, the SEC alleges that Binance took additional steps that collectively turned BUSD sales into investment contracts.  For instance, the SEC asserts that Binance touted that investors will receive "returns … from simply buying BUSD or deploying it in Binance profit-generating programs."  *Id.* ¶ 315.  It contends that Binance "has, from the outset, marketed BUSD's profit-earning potential" through promises of "'APYs' (annual percentage yield) that investors may earn with respect to their BUSD holdings," such as through the "'Binance Earn' programs, as well as margin and futures products."  *Id.* ¶ 322.  And it further contends that Binance promised interest earnings through a "'BUSD Reward Program'" and through blog posts touting yet more interest-bearing programs that would use investor capital to generate additional investor revenues.  *Id.* ¶¶ 323–24.  Collectively, the SEC

alleges, the offering constituted an investment contract under *Howey*.

Given the nature of the SEC's allegations and the clear distinctions between payment stablecoins and securities, *amicus* emphasizes that the proper inquiry is whether the SEC adequately alleged that Binance's *entire* advertised undertakings on behalf of BUSD purchasers entail an investment contract. While *amicus* takes no position on the answer to that question, it urges the Court to neither overstate the breadth of the SEC's allegations nor understate the SEC's burden in proving whether the entire BUSD offering is adequately alleged to be a security.

### C. Pending Congressional Legislation Counsels Against Extending the SEC's Enforcement Authority to Payment Stablecoins.

Notwithstanding the SEC's specific allegations here, the Court should be especially cautious before extending SEC enforcement authority over BUSD while stablecoins remain the subject of vigorous congressional debate and pending federal legislation. How open questions of law and policy should be resolved "is not for the Court to decide, but for Congress." *Risley v. Univ. Navigation, Inc.*, No. 22-cv-2780, 2023 WL 5609200, at *19 (S.D.N.Y. Aug. 29, 2023). As the Supreme Court has recognized, where the question is a matter of importance and "earnest and profound debate across the country," expansive agency claims of authority are "all the more suspect" if they seek to cut short that debate. *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006) (quotation marks omitted).

The state of congressional deliberations over payment stablecoins highlights the robust debate over their proper regulatory status. Legislators have proposed a variety of approaches but increasingly coalesced around the Clarity for Payment Stablecoins Act. If passed, the Act would establish a comprehensive regulatory framework for payment stablecoins and their issuance. Importantly, on the specific issue presented here, the Act would not alter the current reach of U.S.

securities laws, but instead simply "clarif[y] that payment stablecoins are not securities."[42]  The House Financial Services Committee recently approved the Act on a bipartisan basis.[43]  In light of this congressional recognition of the reach of U.S. securities laws, it would be both premature and contrary to emerging congressional intent for any court to extend the jurisdiction of the SEC to standalone offerings of payment stablecoins.  Here as elsewhere, "stretch[ing] the federal securities laws to cover [this] conduct" is an exercise "better addressed to Congress than to this Court." *Risley*, 2023 WL 5609200, at *11.

The need for explicit congressional clarification that payment stablecoins are not securities also avoids shaking up a landscape where multiple agencies have already exercised regulatory oversight over payment stablecoins with little or no controversy.  FinCEN has long deemed stablecoin issuers to fall within its domain as money transmitters—a category that definitionally excludes businesses regulated by the SEC.  31 C.F.R. § 1010.100(ff)(5), (8)(ii).[44]  Likewise, the Commodity Futures Trading Commission believes payment stablecoins are not securities but rather commodities which, when used as the basis for futures and other derivatives, fall within *its* exclusive jurisdiction—even asserting as much with respect to BUSD specifically.[45]  *See* Compl.

---

[42] Clarity for Payment Stablecoins Act § 13.  Other recent leading congressional bills addressing payment stablecoins have taken a similar approach.  *See, e.g.*, H.R. ___, 118th Cong., § 101(2), https://tinyurl.com/543t3zbw (discussion draft) (a bill "[t]o provide requirements for payment stablecoin issuers, research on a digital dollars, and for other purposes"); Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. § 701 (2023); Stablecoin TRUST Act of 2022, S. 5340, 117th Cong. § 7(a).

[43] *See House Financial Services Committee Reports Digital Asset, ESG Legislation to Full House for Consideration*, H. Fin. Servs. Cmte. (July 27, 2023), https://tinyurl.com/bdzznskf.

[44] Danny Nelson, *FinCEN:  Stablecoin Issuers Are Money Transmitters, No Matter What*, CoinDesk (Nov. 19, 2019), https://tinyurl.com/ndh8tr3z.

[45] Dave Michaels, *Stablecoins Like USDC Are Commodities, CFTC Chair Says*, Wall Street J. (Mar. 8, 2023), https://tinyurl.com/mr38dypx.

¶ 24, *CFTC v. Zhao*, No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF 1 (identifying BUSD as a commodity).  Finally, the Federal Reserve has begun to signal that *it* must have a paramount role in stablecoin regulation.[46]  In contrast, the SEC previously "disavow[ed] [its] jurisdiction" over even the broader category of digital assets, *Brown & Williamson*, 529 U.S. at 146, and even the SEC's own Chairman once agreed that digital assets did not have a "market regulator" or "regulatory framework," and that "only Congress" could resolve this gap.[47]  Against this backdrop of potential regulatory conflict, courts should even more carefully scrutinize any extension of SEC jurisdiction relating to stablecoins.

## III. THE LEGAL AND PRACTICAL STAKES UNDERSCORE THE NEED FOR CAREFUL SCRUTINY OF SEC CLAIMS OF AUTHORITY OVER PAYMENT STABLECOINS.

The Court should carefully examine the limits of the SEC's BUSD claims for another reason too:  A ruling that treats offerings of standalone payment stablecoins as securities would have outsized legal and practical stakes.

In evaluating any claim of SEC authority over payment stablecoins, the Court should guard against any transformative expansion of the SEC's legal authority over digital assets.  Never before have courts found an "investment contract" with no *investment* utility.  *See Daniel*, 439 U.S. at 559–60 (noting that an "[i]nvestment of [m]oney" has been required "[i]n every case" "recognizing the presence of a 'security' under the Securities Acts").  And for good reason:  Reading the term "investment" out of "investment contract" would remove any apparent ending point from the SEC's authority.  And while "good policy" can never provide a reason to disregard statutory limits on agency authority, *Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984), no policy justification exists

---

[46] Jack Denton, *Fed's Powell Eyes Oversight of Stablecoin Issuers, Regulation of Crypto Wallets*, Barron's (Sept. 27, 2022), https://tinyurl.com/hx6yth9f.

[47] *Game Stopped?*, *supra* note 2, at 12.

for the SEC to have broad authority over payment stablecoins in any event.

Make no mistake, from a policy standpoint Circle believes payment stablecoins should be subject to a sound regulatory regime that protects both consumers and U.S. financial stability.  Not all payment stablecoins are equal in terms of the transparency and quality of reserves backing them.  It is therefore no surprise that a host of agencies at the state and federal levels have already sought to root out fraud, misconduct, and other unlawful behavior.  Examples include actions taken by the CFTC against USDT issuer Tether and the New York Department of Financial Services against Binance's partner Paxos, with New York most recently ordering Paxos to stop issuing new BUSD coins.[48]  Likewise, private parties can take direct action to protect their rights in the stablecoin realm by suing to hold parties accountable for alleged statutory and tort violations.  *See, e.g.*, *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 91–115, 128–130 (S.D.N.Y. 2021).  So legal remedies already exist to guard against misconduct in the stablecoin markets and, as noted in Section II.C, Congress is at present busy working on additional measures.  Against this backdrop, any potential jurisdictional conflict created by this Court would undercut the activities of other federal and state regulators, private plaintiffs, and even Congress itself.  More broadly, a novel grant of jurisdiction over payment stablecoins to the SEC by this Court would sow widespread confusion over a tool used to facilitate trillions of dollars in transactions each year and result in substantial detriment to the digital-asset industry and the U.S. economy at large.

## CONCLUSION

Given the legal and practical stakes, *amicus* urges the Court to scrutinize the SEC's stablecoin-related allegations closely.  A standard offering of a payment stablecoin is decidedly

---

[48] Release No. 8450-21, *CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million*, CFTC (Oct. 15, 2021), https://tinyurl.com/f8be68en; Dan Ennis, *NY Regulator Orders Paxos to Stop Minting Binance Stablecoin*, Banking Dive (Feb. 13, 2023), https://tinyurl.com/4jxmakuy.

not a security, and the SEC has not alleged otherwise.  Accordingly, this Court should be mindful

of the distinction between *standalone* sales of BUSD, on one hand, and the SEC's allegations about

the *entire* transactional context related to the BUSD sales, on the other, when measuring the

adequacy of the complaint.

Dated:  September 28, 2023

Heath P. Tarbert (D.C. Bar No. 468065)**
Daniel Kaleba**
Jeremy Gray**
CIRCLE INTERNET FINANCIAL, LLC
99 High Street, Suite 1801
Boston, MA 02110
Telephone: 617.326.8326
heath.tarbert@circle.com

Mark W. Rasmussen**
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, TX 75201
Telephone: 214.220.3939
mrasmussen@jonesday.com

Respectfully submitted,

/s/ Jacob ("Yaakov") M. Roth
Yaakov M. Roth (D.C. Bar No. 995090)
Alexis Zhang (D.C. Bar No. 90008032)*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202.879.3939
yroth@jonesday.com

Eric Tung**
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: 213.489.3939
etung@jonesday.com

*admission pending
**pro hac forthcoming

*Counsel for Amicus Curiae*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to all counsel of record.

/s/ Yaakov M. Roth
Yaakov M. Roth
