## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

     v.

BINANCE HOLDINGS LIMITED, BAM
TRADING SERVICES INC., BAM
MANAGEMENT US HOLDINGS INC., AND
CHANGPENG ZHAO,

           Defendants.

Civil Action No. 1:23-cv-01599

---

## BRIEF FOR *AMICUS CURIAE* INVESTOR CHOICE ADVOCATES NETWORK IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS

**KIRK & INGRAM, LLP**
David E. Kirk *(pro hac vice filed)*
43 West 43rd St., Suite 279
New York, NY 10036
Tel: (302) 593-0650
dkirk@kirkingram.com

Michael W. Ingram *(pro hac vice filed)*
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Tel: (310) 487-0270
mingram@kirkingram.com

**MILES & STOCKBRIDGE, PC**
John T. Farnum *(DC Bar 983831)*
1201 Pennsylvania Ave., Suite 900
Washington, DC 20004
Tel: (202) 465-8385
jfarnum@milesstockbridge.com

**GRAY REED McGRAW LLP**
Chris Davis *(pro hac vice filed)*
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Tel: (469) 320-6215
cdavis@grayreed.com

*Attorneys for Amicus Curiae*
*Investor Choice Advocates Network*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Investor Choice Advocates Network ("ICAN") is a nonprofit, public interest organization.  ICAN has no parent corporation, and no publicly held company has a 10% or greater ownership interest in ICAN.

## STATEMENT OF INTEREST

ICAN is a nonprofit organization that advocates for expanding access to markets—including markets for digital assets—for underrepresented investors and entrepreneurs who do not share the same access and market power as those with more assets and resources.

ICAN has a significant interest in ensuring clarity in the Securities and Exchange Commission's application of the federal securities laws to assets, including digital assets.  As an organization speaking on behalf of underrepresented market participants, ICAN has a significant interest in ensuring that the SEC's power to regulate securities does not improperly hamper the ability of individuals and organizations who choose to transact in digital assets.  The SEC's ambiguous and expansive interpretation and application of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") to digital assets would have far-reaching negative impacts on the opportunities available to investors.

The interests of ICAN differ from those of the parties.  As stated above, ICAN is a nonprofit organization advocating for the protection and maximization of investor choice—a perspective that may not be adequately represented by the positions of either Binance (a for-profit cryptocurrency exchange) or the SEC (a federal government regulatory agency).[1]

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than *amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................. i

STATEMENT OF INTEREST ....................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

   I.    A RESIDENCY-BASED APPLICATION OF THE FEDERAL SECURITIES LAWS
       RISKS REDUCING OPPORTUNITIES AVAILABLE TO UNITED STATES
       INVESTORS. ......................................................................................................... 2

   II.   THE SEC'S ALLEGATIONS REGARDING DIGITAL ASSETS'
       CHARACTERISTICS DO NOT PLAUSIBLY PLEAD THE EXISTENCE OF AN
       INVESTMENT CONTRACT. ................................................................................. 6

      A.  Depleting supplies cannot transform a digital asset into an investment contract. ........... 6

      B.  The ability to generate yield cannot transform a digital asset into an investment
         contract. ............................................................................................................ 9

   III.  ABSENT A CONTRACTUAL PROMISE, STATEMENTS ABOUT A DIGITAL
       ASSET CANNOT TRANSFORM IT INTO AN INVESTMENT CONTRACT. .......... 11

CONCLUSION .............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)........................................................................................................14, 16

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)..........................................................................................13

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)..............................................................................................3

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014).........................................................................................15

*Boykin v. K12, Inc.*,
    54 F.4th 175 (4th Cir. 2022).........................................................................................13

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) ....................................................................................13

*Chamber of Commerce of the United States of America v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005) ......................................................................................17

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)......................................................................................4, 13

*Counterman v. Colorado*,
    600 U.S. 66 (2023)........................................................................................................15

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
    621 F.3d 800 (8th Cir. 2010) ........................................................................................12

*E.E.O.C. v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991)........................................................................................................5

*Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) ........................................................................................13

*Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*,
    246 F. App'x 780 (3d Cir. 2007) ..................................................................................13

*Kong v. Fluidigm Corp.*,
    2023 WL 2134394 (9th Cir. Feb. 21, 2023) .................................................................13

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001)............................................................................7

*Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*,
  39 F.4th 1092 (9th Cir. 2022) ................................................................13

*Marsh Grp. v. Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) ........................................................12, 13

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010).............................................................................2, 6

*Noa v. Key Futures, Inc.*,
  638 F.2d 77 (9th Cir.1980) .......................................................................7

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ......................................................................13

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994).........................................................................10

*Rodriguez v. Banco Cent. Corp.*,
  990 F.2d 7 (1st Cir. 1993) .........................................................................8

*SEC v. Belmont Reid & Co.*,
  794 F.2d 1388 (9th Cir. 1986) ..................................................................7

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)....................................................................... *passim*

*SEC v. Everest Mgmt. Corp.*,
  475 F.2d 1236 (2d Cir. 1972) ..................................................................17

*SEC v. Ripple Labs, Inc.*,
  2021 WL 4555352 (S.D.N.Y. Oct. 4, 2021) ...........................................17

*Simon Schuster v. Crime Victims Bd.*,
  502 U.S. 105 (1991) ................................................................................15

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*,
  531 U.S. 159 (2001)................................................................................16

*In re Stratasys Ltd. S'holder Sec. Litig.*,
  864 F.3d 879 (8th Cir. 2017) ..................................................................13

*Suna v. Bailey Corp.*,
  107 F.3d 64 (1st Cir. 1997)......................................................................12

*In re Tezos Sec. Litig.*,
  2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ............................................3

iv

*Williams v. Block One*,
   2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022).........................................................................3

**Other Authorities**

SEC Commissioner: Investors Have the Right to Make Their Own Decisions
   Without Regulators Standing in the Way,
   https://www.cnn.com/2021/10/11/perspectives/sec-commissioner-investors-
   regulators/index.html .............................................................................................................17

## INTRODUCTION

The SEC's positions in this litigation jeopardize the ability of investors in the United States to fully participate in markets for digital assets at home and abroad.  Recent innovations have empowered these investors to participate in foreign asset markets with greater ease and efficiency.  Where such opportunities were once reserved for those able to travel abroad, work with international investment firms, or establish offshore entities, the Internet and blockchain technology have helped afford the same access to investors with fewer resources.  The SEC risks hindering that progress to the extent it contends that transactions placed by United States investors on foreign digital platforms are domestic by mere virtue of the residency of such investors, absent a showing that the transactions in question were domestic.  Doing so would extend the scope of the federal securities laws beyond their domestic mandate and risk shutting United States investors out of these markets.  *See infra* Point I.

The SEC's stance that certain digital assets constitute investment contracts stretches the definition of that phrase to encompass certain digital assets designed to have diminishing supplies or be capable of generating a yield of additional digital assets.  The characteristics are inherent to the assets, much like oil is depleted through consumption, or orange trees generate oranges.  Such qualities alone cannot form the basis of an investment contract because they do not entail the managerial efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  To conclude otherwise would hamper the ability of innovators to program such features into digital assets, harming investor choice.  *See infra* Point II.

The SEC's allegations that certain digital assets constitute investment contracts also rely on statements made by the creators of those assets concerning their creations or their plans for them.  The SEC contends that these statements led investors to expect to profit from the efforts of the creators, even without pleading any contractual promise.  Absent such promises, these

unguaranteed statements cannot be reasonably relied upon by investors and so cannot underpin a reasonable expectation of profit from the efforts of others.  Finding otherwise would leave creators uncertain about whether they can talk about their creations and may ultimately deprive investors and consumers of useful information about the digital assets they wish to purchase.  An interpretation of "investment contract" that runs afoul of the First Amendment by chilling important commercial speech is not a plausible one.  *See infra* Point III.

## ARGUMENT

### I.    A RESIDENCY-BASED APPLICATION OF THE FEDERAL SECURITIES LAWS RISKS REDUCING OPPORTUNITIES AVAILABLE TO UNITED STATES INVESTORS.

Binance Holdings Limited's motion explains that the SEC's claims should be dismissed to the extent they rely on the extraterritorial application of the Securities Act of 1933 and the Exchange Act of 1934.  *See* Binance Holdings Limited Motion to Dismiss at 37-42.  In considering this argument, the Court should take into account the interests of investors based in the United States who knowingly choose to leave the borders of the United States, whether physically or digitally, to participate in foreign asset markets that are not intended to be governed by domestic securities laws.  *See Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

The SEC's complaint alleges that Binance.com is a foreign platform, not a domestic one.  *See* Compl. ¶ 27 (alleging that Binance is a Cayman Islands entity operating the Binance.com platform).  It nonetheless asserts that transactions made by United States investors on the Binance.com platform are governed by the federal securities laws.  In so contending, the SEC appears to rely heavily on the residency of those investors.  Compl. ¶¶ 105-08.  To the extent the SEC advocates for a residency-based approach, rather than requiring a showing that the transactions in question occurred in the United States, it would run contrary to the principle that "a purchaser's citizenship or residency does not affect where a transaction occurs; a foreign

resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (quoting *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp.2d 166, 178 (S.D.N.Y. 2010)).

That principle exists for good reason.  Applying federal securities laws merely because participants in a transaction are United States residents would extend those laws into foreign markets where they do not belong.  This would ultimately harm United States investors rather than help them.  For example, imagine a United States resident who made the unsolicited choice to travel to Germany and, while abroad, purchased German securities from a German exchange. If residency were enough, then the federal securities laws—in addition to German securities laws—would govern that transaction.  Of course, nobody, including the SEC, would contend this to be the case, as investors based in the United States should be free to travel overseas to participate in foreign markets without implicating the federal securities laws.  Put differently, a contention that a transaction is subject to the federal securities laws should be accompanied by specific allegations demonstrating that the transactions took place on United States soil.[2]

Imagine if that same United States resident made the same decision to leave the protections of the United States and invest in German securities, but completed the transaction using the German website of that same German exchange—perhaps using a "virtual private network" to route her connection through another geographic point and mask her physical location.  Whether she did so while sitting at home in the United States, at an Internet café in

---

[2] For instance, other courts have grappled with the sites of servers, the geographic points where blockchain transactions were confirmed, or the locations of participants at the time transactions were placed or solicited.  *See, e.g.*, *Williams v. Block One*, 2022 WL 5294189, at *6 (S.D.N.Y. Aug. 15, 2022); *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018).  The appropriate factors to consider are beyond the scope of this brief, but should not hinge on the residency of investors.

Berlin, or anywhere else, should make no difference.  Even if she "placed a buy order in the United States that was then executed on a foreign exchange," that would not, without more, amount to a domestic transaction subject to the federal securities laws.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

That rule reflects technological progress.  Choosing to depart from the protections of the federal securities laws to pursue opportunities in foreign asset markets once required investors to leave the physical borders of the United States, hire international investment firms, or establish offshore entities—impracticable burdens for many investors.  The Internet and blockchain technology have enabled investors based in the United States to participate in foreign asset markets digitally with far greater ease.  That development represents laudable progress for investor choice that should be embraced.  Investors who make the knowing and unsolicited decision to deploy their capital in foreign markets should be free to do so, subject to the risks, rewards, and regulatory regimes attendant to the markets in which they decide to invest.

To the extent the SEC endorses a residency-based stance to the contrary, it would threaten to undo that progress.  If the federal securities laws can be triggered by the mere participation of United States residents in foreign asset markets, regardless of where the transaction itself took place, then foreign asset markets—digital or otherwise—will try to keep United States residents out.  That would deprive United States investors of opportunities to invest their capital internationally as they see fit.  That harm is already often keenly felt by digital asset investors located in the United States, who are frequently blocked from participating in opportunities available to the rest of the world.

That stance would also risk subjecting foreign transactions and marketplaces to multiple and potentially conflicting legal regimes.  This problem is particularly acute for digital assets,

4

where some foreign regulators disagree with the SEC's position that they constitute securities.  It would make little sense for foreign platforms, not viewed by their regulators as being in the securities industry at all, to become subject to United States securities laws simply because a United States resident decided to use them.  But that is where such a sweeping position would lead.

An inevitable reality of digital progress is that platforms based in one country will sometimes be accessed by residents of another, even without the knowledge or consent of the platform (for instance, through the residents' use of increasingly prevalent virtual private networks).  These developments are especially pronounced in the digital asset space, where blockchain transactions are often by design borderless and permissionless, allowing participants to interact with a decentralized blockchain network confidentially and automatically, without the participation or permission of any central authority.  Such technology allows United States investors the opportunity to participate in new and rapidly evolving opportunities at home and abroad.

These technological innovations make it difficult or impossible to confine the worldwide Internet to a series of walled gardens neatly divided by nation.  While not without growing pains, these developments increase investor choice and opportunity.  Subjecting digital platforms or blockchain networks to the laws of every country from which a person might transact, overtly or otherwise, is not the answer.  It would create an unworkable web of compliance requirements, rather than a solution that fits with technological progress.  Investors would ultimately pay for that regulatory morass through increased costs and decreased opportunities.  *See E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (observing that the presumption against

extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord").

Taken to its logical conclusion, a residency-focused test would allow the SEC to govern any centralized or decentralized digital asset platform accessed by United States residents, regardless of whether their residency could even be confirmed by the platform, or whether their use of the platform could even be prevented. The result would be to transform the SEC into a global police force in digital asset markets, a result entirely contrary to *Morrison* and ultimately harmful to United States investors.

## II. THE SEC'S ALLEGATIONS REGARDING DIGITAL ASSETS' CHARACTERISTICS DO NOT PLAUSIBLY PLEAD THE EXISTENCE OF AN INVESTMENT CONTRACT.

### A. Depleting supplies cannot transform a digital asset into an investment contract.

In contending that certain digital assets constitute investment contracts, the SEC relies on numerous allegations that they have a "deflationary" supply, meaning that the quantity of the asset in existence will decrease as it is "burned" or destroyed over time. *See* Compl. ¶ 377 (referencing SOL's "deflationary model" and "built-in mechanism to decrease the supply and therefore increase the price"); Compl. ¶ 398 (referencing the "deflationary effect" of MATIC's "built-in mechanism to decrease the supply and therefore increase the price of MATIC"); Compl. ¶ 422 (referencing process of "burn[ing] FIL tokens, thereby reducing the FIL supply"); Compl. ¶ 464 (referencing that "the protocol 'burns' (or destroys) MANA tokens when used within the Decentraland ecosystem"). The SEC alleges that those mechanisms "led investors reasonably to view their purchase . . . as having the potential for profit." Compl. ¶¶ 377, 398, 422, 464.

6

Boiled down, these allegations are simple:  Certain digital assets are programmed to be consumed or destroyed over time, decreasing their supply.  As the available supply of such an asset decreases and it becomes more scarce, its price may rise.

Those allegations do not plausibly contribute to the existence of an investment contract. The *Howey* test requires the SEC to allege a scheme involving an investment of money in a common enterprise with the expectation of profit solely through the efforts of someone other than the investor.  *See Howey*, 328 U.S. at 298.  But, where an investor's expectation of profit results from market forces rather than the managerial efforts of others, no investment contract exists.  *See SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (no investment contract where profits depended on "fluctuations of the gold market, not the managerial efforts of [others]"); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir.1980) (no investment contract where profitability turned on fluctuations of silver market); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (no investment contract where profits "would result in large part from market movements, not from capital appreciation due to [promoter's] efforts").

The built-in mechanisms mentioned by the SEC here are simply rules, programmed into the computer code, that govern how a digital asset's supply operates.  These supply rules, whether they be deflationary, inflationary, static, or otherwise, are dictated by the same code that allows the asset to exist in the first place.  For example, should someone attempt to execute a transaction without "burning" on a network that requires it, the transaction will be rejected.  The supply rules are therefore intrinsically linked to the digital asset itself, and they operate automatically—without the efforts of any others—as a function of the blockchain's operation.

This means the SEC's allegations regarding supply amount to nothing more than the operation of market forces—namely that "decreas[ing] the supply" would "therefore increase the price," Compl. ¶¶ 377, 398.  Those allegations depend on basic assumptions about supply and demand, not the managerial efforts of others.  As such, they have no bearing on whether an asset is an investment contract.  Otherwise, any scarce commodity could be shoehorned into an investment contract.  Consider oil.  To borrow the SEC's language, the world's oil supply has a "deflationary mechanism"—it is a depleting natural resource with a supply that is reduced through consumption and destruction.  Oil owners who anticipate that reserves will be depleted may hope to profit from resulting price increases.  But that expectation arises from the inherently "deflationary" quality of oil and the resulting impact on supply and demand, not from anyone's managerial efforts.  The same can be said for other non-renewable natural resources, such as precious metals or undeveloped land.  Or for manmade resources, such as rare vintage wines, collectibles, or scarce seats at sought-after concerts.  None of those natural or manmade assets are securities, even if some buyers purchase them with the hope that decreases in supply over time will lead to increases in price.

The same is true for digital assets.  As the SEC alleges, digital assets can be designed to have a limited supply that decreases over time through consumption, destruction, or any other mechanism programmed in the protocol.  That programming, although digital rather than chemical, is no different from the fact that oil is destroyed when consumed.  If purchasers of digital assets hope to profit from decreases in supply, they do so in reliance on that inherent characteristic, not on the managerial efforts of others.  *See Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10, 11 (1st Cir. 1993) (no investment contract for undeveloped land, even where buyers "hop[e] to profit from . . . the natural increase in the value of property" or for "develop[ment]

through natural forces").  Because these supply characteristics depend on the efforts of no one, they do not meet the *Howey* test, even if some buyers hope to profit from a resulting "natural increase in value."  *See id.*  Thus, even accepting all of the SEC's allegations as true, its contentions regarding the decreasing supplies of digital assets do not help them in pleading the existence of an investment contract.

Nor is the SEC helped by its suggestion that these burning functions are somehow managerial efforts in themselves, or are "marketed" as such.  For instance, the SEC alleges that "Solana Labs markets that it 'burns' (or destroys) SOL tokens."  Compl. ¶ 377.  But that same paragraph acknowledges that Solana Labs is not the one doing the "burning."  Instead, "fees are paid in SOL and burnt (or permanently destroyed) as a deflationary mechanism."  Compl. ¶ 377. In other words, token burning is an inherent mechanism built into the protocol and described as such, rather than being marketed as a service provided by Solana Labs or anyone else.  The same goes for other assets' allegedly "marketed" deflationary features.  *See* Compl. ¶¶ 398, 422, 464.

### B.  The ability to generate yield cannot transform a digital asset into an investment contract.

The SEC also contends that various digital assets are investment contracts in part because they can generate additional digital assets by being "staked."  *See* Compl. ¶ 365 ("SOL may be 'staked' on the Solana blockchain to earn rewards"); Compl. ¶ 386 ("MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform"); Compl. ¶ 439 (SAND holders can "earn rewards through the staking program on the platform"); Compl. ¶ 488 ("AXS can also be staked through Axie"); Compl. ¶¶ 465, 480 ("The Algorand blockchain uses a consensus algorithm it calls 'pure proof-of-stake,'" and participation in governance is "the best way to earn rewards for holding Algo").  Although they lack specificity, these allegations appear

to suggest that a digital asset may constitute an investment contract because it is capable of generating so-called "rewards" of additional digital assets.  That contention is similarly flawed.

Many natural and manmade non-security assets are inherently able to generate some form of yield.  Orange trees generate a yield of oranges, and solar panels generate a yield of electricity.  Real estate generates rental income.  Owners may use those assets to generate such yields, and may expect to profit from those yields.  But those profits are inherent to the assets themselves, and to the owners' efforts.  In *Howey*, for instance, it was not the ability of citrus trees to bear fruit that gave rise to an investment contract, but rather the professional development and cultivation services provided through the agreements attached to the purchases of the groves.  *See Howey*, 328 U.S. at 299-300.  There is no question that orange trees themselves, even while generating "rewards" in the form of oranges, are not securities.  Absent an agreement to professionally cultivate such "rewards," an asset's mere ability to generate them cannot give rise to an investment contract.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994) (no investment contract for "individual [condominium] units" with their own "rents and expenses" that "could make profits or sustain losses independent of the fortunes of other purchasers").

Digital assets that generate yields are no different.  A digital asset can be programmed so that owners or stakers of the asset can use them to receive "rewards," as the SEC alleges.  That yield could be in the form of additional quantities of that digital asset, or of another.  Just as the condominium owners in *Revak* could generate yield by renting out their condominium units, *see id.*, owners of digital assets can use staking functions to generate yield.  If they do so using their own digital assets, without relying on the managerial efforts of another person, those rewards cannot form the basis for an investment contract.

### III.    ABSENT A CONTRACTUAL PROMISE, STATEMENTS ABOUT A DIGITAL ASSET CANNOT TRANSFORM IT INTO AN INVESTMENT CONTRACT.

The SEC's complaint relies heavily on statements made by the creators of digital assets. Without a contractual promise of performance, these statements do not support the SEC's claim that such assets constitute investment contracts. Creators of digital assets—or assets of any kind—should be able to inform the public about their creations. If doing so risks turning them into unwitting securities dealers, essential commercial speech will be chilled, leaving investors with less information about the assets they wish to purchase.

By way of example, the SEC relies on the following allegations:

- Solana made "promotional statements," including that its network "supports upwards of 50,000 [transactions per second]," that it "is engineered for widespread, mainstream use by being energy efficient, lightning fast, and extremely inexpensive," that many core developers "have a background in building cell phone networks," and that "fees are paid in SOL and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and therefore maintain a healthy SOL price." Compl. ¶¶ 376-77.

- Polygon "marketed" the fact that MATIC tokens are burned, including by stating that "Polygon's Matic has a fixed supply of 10 billion, so any reduction in the number of available tokens will have a deflationary effect." Compl. ¶ 398.

- The creators of ATOM "publicly disseminated" a list of team members, previously made grants, service agreements, and investments to develop the network, and a description of a mentorship program led by an experienced team. Compl. ¶¶ 434, 437.

- The creators of SAND "publicly disseminated" statements that "SAND is listed on over 60 global cryptocurrency exchanges" and "can accrue in value over time, due to the fact that it is scarce." Compl. ¶¶ 443-44, 447.

These statements, along with many others relied upon in the complaint, are descriptions of an asset: Who built it, how it works, what quantity exists, how it is created or destroyed, and what it is worth. Such descriptive statements cannot evince the existence of an investment contract any more than similar statements about other products of emerging technologies. If an electric vehicle manufacturer described the speed, efficiency, durability, and resale value of its

11

cars, those statements would not transform the cars into securities, even if they led purchasers to hold their cars in high esteem and ascribe a greater value to them.

The SEC also relies on statements about future plans for a digital asset and its surrounding technology.  For example, the Complaint alleges that:

- The founder of Polygon stated that he "will not rest till [Polygon] gets its well-deserved 'Top 3' spot alongside [Bitcoin] and [Ethereum]."  Compl. ¶ 397.

- Protocol Labs stated that "[w]e have great plans for the Filecoin network . . . We plan to deploy 100s of millions of dollars over the next few years to make Filecoin the world's best storage network," and that they "think and are working for Filecoin to be worth a lot more in the future."  Compl. ¶¶ 418-19;

- "[T]he Decentraland team described the marketplace tool as the 'first … in what will be a series of tools.'" Compl. ¶ 462;

- "[The owner of Sandbox] announced its intention to build a new 3D version of the Sandbox by leveraging blockchain technology."  Compl. ¶ 438.

The SEC likewise contends that these and similar statements caused investors to expect to profit from the creators' future efforts.  But, again, they contain no contractual promises tied to the asset.  Here too, if an electric vehicle manufacturer spoke about plans to grow a network of charging stations—a burgeoning "ecosystem" that improved the vehicles' usability and increased their resale value—that would not turn cars into investment contracts.

There is an additional reason why these statements cannot evince an investment contract: Investors could not have *reasonably* expected a profit based on them.  It is well-settled in the securities fraud arena that aspirational statements of "puffery" are immaterial and not actionable, because "[n]o reasonable investor would rely on these statements" in making investment decisions.  *See Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 807-08 (8th Cir. 2010) (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997)); *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 145 (4th Cir. 2002) (same); *Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir. 1997) (same).  For that reason, courts "do not anticipate that reasonable investors place

substantial reliance on generalizations regarding a company's health or the strength of a company's product." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020); *see also Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018) ("[A] reasonable investor will not judge [a company's] value based on its own generalized and self-serving statements").[3]

Nor can investors reasonably rely on statements of optimism regarding future plans. To have a securities fraud claim, an investor must be able "to reasonably rely on [the] statement as a *guarantee* of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (emphasis added). Thus, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 145 (4th Cir. 2002) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993).[4]

These principles apply to the *Howey* test by analogy, as the need for a guarantee goes hand-in-hand with the need for some legal relationship underlying an expectation of profit. Even an investor in a share of stock, which is unquestionably a security entailing an ongoing legal

---

[3] *See, e.g.*, *Kong v. Fluidigm Corp.*, 2023 WL 2134394, at *2 (9th Cir. Feb. 21, 2023) (rejecting statements that "mass cytometry adoption is robust" and "the mass cytometry franchise has grown extremely strongly" as "puffery"); *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) (rejecting descriptions of "a great growth market" and "huge market opportunity" as puffery); *Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) ("reasonable investors could not have relied upon" statements about "technological 'core competency,'" "expertise," and "flexibility"); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) (finding "proclamations that [company] was devoting 'substantial resources' to its problems, with 'improved results'" were "quintessential puffery"); *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (holding that "no reasonable investor would rely" upon statements that products had "unmatched speed, reliability, quality and connectivity").

[4] *See, e.g.*, *Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 785-86 (3d Cir. 2007) (rejecting "optimistic statements that [company] was . . . 'slated to begin to generate strong revenue and earnings growth in 2002'"); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (rejecting as puffery statements regarding "expected annual growth rate of 10% to 30% over the next several years" and that company was "poised to carry the growth and success of 1991 well into the future").

relationship with the issuer, cannot reasonably rely in their investment decisions on statements by the issuer that fall short of a guarantee.  It follows that purchasers of a digital asset cannot reasonably expect a profit merely based on public statements by the asset's creator, with whom they have no ongoing legal relationship at all.

*Howey* itself presents a useful contrast.  In *Howey*, the citrus groves were advertised as "fine groves," and "[i]t was represented, for example, that . . . a 10% annual return was to be expected over a 10-year period."  *Howey*, 328 U.S. at 296.  But those statements are not what gave rise to an investment contract.  "The investment contracts . . . [took] the form of land sales contracts, warranty deeds, and service contracts."  *Id.* at 297.  Absent such agreements, there is no guaranteed performance—there is no promise of performance at all.

Even discussing the past, present, or future financial value of assets—whether digital assets, cars, houses, precious metals, collectibles, or any other asset—does not create an investment contract where none otherwise exists.  Of course a digital asset's creators might say their creations are valuable, as might a painter, homebuilder, or winemaker.  But saying they are a good buy, or even a good *investment*, does not make for an investment *contract*, any more than it does when someone declares the same about gold, land, steel, or baseball cards.  All of this is information that consumers and investors may find useful and should be allowed to hear—taken with as many grains of salt as they wish.

In addition to being no help in satisfying the *Howey* test, the SEC's use of creators' statements to conjure up investment contracts risks chilling useful commercial speech and "depriv[ing] consumers of accurate information about their chosen products."  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996).  Creators of digital assets—and other assets— may opt to silence themselves out of fear that talking about their innovations could cause them to

fall under the federal securities laws.  The resulting regime of registration and disclosure

requirements would be "so burdensome that it essentially operates as a restriction on

constitutionally protected speech."  *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27

(D.C. Cir. 2014).  For instance, the Supreme Court in *Ibanez v. Florida Department of Business

and Professional Regulation* held that the detailed disclosures required by a regulatory regime

"effectively rule[d] out" the use of a professional designation on a business card or letterhead,

because it would require pages of attached disclosures.  *Ibanez v. Fla. Dep't of Bus. & Pro.

Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).  That regime ran afoul of the First Amendment by

rendering the commercial speech at issue impracticable.  *See id.*

  The SEC's stance here poses a similar concern.  It would thrust creators into the purview

of the federal securities laws because of public statements about their creations, even when

unattended by any contractual promise.  Applying a burdensome and otherwise inapplicable

regulatory regime as a consequence of such statements would, in the words of *Ibanez*,

"effectively rule out" commercial discourse about digital assets, particularly because creators

would be left "unsure about the side of a line on which [their] speech falls" when talking about

their creations.  *See Counterman v. Colorado*, 600 U.S. 66, 6-7 (2023).  Those fears will

"effectively drive certain ideas or viewpoints from the marketplace."  *Simon Schuster v. Crime

Victims Bd.*, 502 U.S. 105, 116 (1991).

  For instance, the SEC frequently relies on statements made in "whitepapers," which they

refer to as "marketing materials."  Compl. ¶ 69.  *See, e.g.*, Compl. ¶¶ 82, 290-92, 294-96, 298,

387, 390, 400, 436, 445-46, 448-50, 461, 463, 494-95.  Digital asset whitepapers are generally

descriptive documents posted publicly by the creators of digital assets that describe their design

intentions, functionality, rules, and instructions, thereby informing the public about their

creations.  Implying an investment contract from such a document serves to discourage innovators from sharing that useful information.

"[T]he free flow of commercial information is indispensable." *44 Liquormart*, 517 U.S. at 497.  Silencing creators with the threat of an ever-broadening securities regime would cut off that flow, an outcome that falls far short of the "constitutional protection for the dissemination of accurate and nonmisleading commercial messages" guaranteed by the First Amendment. *Id.* at 496.  It would also be an outcome directly contrary to the SEC's interest in disclosure, ultimately leaving investors and consumers with less information about the assets they purchase.  An interpretation of "investment contract" that risks such a drastic chilling effect on commercial speech is not plausible, even at the motion to dismiss stage.  The Court should not construe its statutory meaning in the manner endorsed by the SEC, as doing so "would raise serious constitutional problems." *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001).

*     *     *

Investors in the United States have the right to use their capital as they see fit. Accordingly, when they choose to invest in foreign assets, any attempt to restrict that choice through domestic securities laws should be evaluated with skepticism.  And when they choose to invest in assets lacking the elements of a contract, any claim that those assets can be regulated as investment contracts should be examined closely for plausibility, even at the pleadings stage.

The Court's rulings on this motion and in this litigation will have far-reaching impacts extending beyond the parties here.  They will affect the wider digital asset market and its participants, including creators and investors.  Absent from the Complaint is any suggestion that the owners of these assets have requested the remedies sought by the SEC.  Instead, this case

16

appears designed to expand the SEC's jurisdiction through piecemeal litigation rather than through rulemaking or by seeking statutory authority from Congress.  In litigation, as opposed to rulemaking, the SEC actively excludes investors—those the SEC is charged with protecting—from participating in the process.  *See, e.g.*, *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972) (upholding order granting SEC's opposition to investors' motion to intervene); *SEC v. Ripple Labs, Inc.*, 2021 WL 4555352, at *1 (S.D.N.Y. Oct. 4, 2021) (denying investors' motion to intervene that was opposed by SEC).

As current SEC Commissioner Hester Peirce said in addressing the importance of investor choice and the role of regulators:  "Investor protection means enforcing antifraud and disclosure rules, but it also means protecting an investor's right to make investment decisions for herself, to take risks and to use the latest technology to trade and invest.  As in other areas of life, people want to be able to make choices about their finances, even if others might question those choices or choose differently for themselves."  Equally important, she added that "regulators have a role to play, but that role should always be carried out with humility and a realization that investors have a right to make their own decisions."[5]  Here, the SEC's pursuit of these claims risks depriving the ability of United States residents to purchase their choice of assets, because the SEC disfavors them.  That restraint on choice harms buyers.  *See Chamber of Commerce of the United States of America v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005) (loss of opportunity to purchase mutual fund shares constituted a legally cognizable injury).  The Court should consider that harm in evaluating whether the SEC has plausibly alleged that the securities laws apply.

---

[5] SEC Commissioner: Investors Have the Right to Make Their Own Decisions Without Regulators Standing in the Way, *available at* https://www.cnn.com/2021/10/11/perspectives/sec-commissioner-investors-regulators/index.html.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss should be granted.


Dated:  September 28, 2023                    Respectfully submitted,


**KIRK & INGRAM, LLP**                        **MILES & STOCKBRIDGE, PC**
David E. Kirk *(pro hac vice filed)*
43 West 43rd St., Suite 279                   By:  /s/ *John T. Farnum*
New York, NY 10036                            John T. Farnum *(DC Bar 983831)*
Tel: (302) 593-0650                           1201 Pennsylvania Ave., Suite 900
dkirk@kirkingram.com                          Washington, DC 20004
                                              Tel: (202) 465-8385
                                              jfarnum@milesstockbridge.com
Michael W. Ingram *(pro hac vice filed)*
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401                        **GRAY REED McGRAW LLP**
Tel: (310) 487-0270                           Chris Davis *(pro hac vice filed)*
mingram@kirkingram.com                        1601 Elm Street, Suite 4600
                                              Dallas, Texas 75201
                                              Tel: (469) 320-6215
                                              cdavis@grayreed.com


                                              *Attorneys for Amicus Curiae*
                                              *Investor Choice Advocates Network*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LCvR 7(o), I certify that the Brief of Amicus Investor Choice Advocates Network in Support of Defendants' Motions to Dismiss complies with the rules of this Court, as the brief is under the 25 page limit, and the brief otherwise meets the requirements of LCvR 5.4 and Federal Rule of Appellate Procedure 29(a)(4).


/s/ *John T. Farnum*
John T. Farnum