**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS, INC., AND CHANGPENG ZHAO,<br><br>*Defendants.* | Civil Action No. 1:23-cv-01599 (ABJ-ZMF) |

**BRIEF OF *AMICUS CURIAE* CHAMBER OF DIGITAL COMMERCE
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Steven F. Gatti*
Weisiyu Jiang
CLIFFORD CHANCE US LLP
2001 K Street NW
Washington, District of Columbia 20006
(202) 912-5000
Steven.Gatti@cliffordchance.com
Weisiyu.Jiang@cliffordchance.com

*pro hac vice* to be filed

Jesse Overall*
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
(212) 878-8000
Jesse.Overall@cliffordchance.com

*pro hac vice* to be filed

*Attorneys for* Amicus Curiae
*The Chamber of Digital Commerce*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Interest of the *Amicus Curiae* ............................................................................. 1

Introduction and Summary of Argument ............................................................. 2

Argument ............................................................................................................... 6

    I.    The Regulation-by-Enforcement Approach Stifles Innovation and Drives Market Participants Offshore ....................................................... 6

    II.   An Asset that is a S*ubject* of an Investment Contract is not Itself an Investment Contract, so a Venue where that Asset is Traded is not a Securities Exchange ............................................................................. 10

        A.    Courts Consistently Distinguish Between the S*ubject* of an Investment Contract and the Overall Arrangement ................................ 10

        B.    Recent Court Decisions Generally hold that Tokens are not Investment Contract Securities ............................................... 11

        C.    Transactions in Tokens that are not Securities do not Trigger Exchange Act Registration Requirements ................................. 15

    III.   The SEC's Regulation-By-Enforcement Regime Raises Separation of Powers And Due Process Concerns .................................................... 16

Conclusion ........................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ................................................................................... 16, 17, 19

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ......................................................................................... 16, 17

*Alabama Association of Realtors v. HHS*
  141 S. Ct. 2485 (2021) ................................................................................................ 16

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................................. 16, 17

*S.E.C. v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ....................................................................................... 4, 10, 15

*United States v. Leonard*,
  529 F.3d 83 (2d Cir. 2008) ......................................................................................... 10

*Bailey v. J.W.K. Prop., Inc.*,
  904 F.2d 918 (4th Cir. 1990) ............................................................................... 10, 15

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) ....................................................................... 11, 15, 16

*SEC v. Aqua-Sonic Prods. Corp.*,
  687 F.2d 577 (2d Cir. 1982) ....................................................................................... 10

*Miller v. Cent. Chinchilla Grp., Inc.*,
  494 F.2d 414 (8th Cir. 1974) ..................................................................................... 11

*SEC v. Glen-Arden Commodities*,
  493 F.2d 1027 (2d Cir. 1974) ............................................................................. 10, 15

*SEC v. Ripple Labs, Inc.*,
  *et al.*, No. 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................. 12, 14

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) ........................................................ 14

*SEC v. Telegram Grp. Inc.*,
  448 F.Supp.3d 352 (S.D.N.Y. 2020) ................................................................. 14, 17

## Other Authorities

*Cryptocurrency Regulations Wanted: Iterative, Flexible, and Pro-Competitive Preferred*,
  61 Boston College L. Rev. 1149 (2020) .................................................................... 8

*The Financial Innovation and Technology for the 21st Century Act (FIT21)*,
  H.R.4763, 118th Cong. (2023) ................................................................................. 18

*Responsible Financial Innovation Act (RFIA)*,
  S. 2281, 118th Cong. (2023) ..................................................................................... 17

*Digital Commodities Consumer Protection Act of 2022 (DCCPA)*,
  S. 4760,117th Cong. (2022) ...................................................................................... 18

## INTEREST OF THE *AMICUS CURIAE*[1]

Founded in 2014, the Chamber of Digital Commerce ("The Chamber") is the world's largest digital asset and blockchain trade association.  The Chamber represents more than 200 diverse members of the blockchain industry globally, including digital asset exchanges, leading banks and investment firms, startups, and other digital asset economy participants.  Guided by the principle of promoting industry compliance with applicable law, The Chamber seeks to foster a legal and regulatory environment in which digital asset users can enjoy regulatory certainty as they apply blockchain technologies to an array of commercial, technological, and social purposes.  An important aspect of that mission is representing the interests of its members, including regularly filing briefs as *amicus curiae* in novel cases that implicate issues of importance to the blockchain community.[2]

Pursuant to its mission, The Chamber also sponsors several compliance-focused initiatives, in addition to advocating for regulatory clarity.  These include the Blockchain Alliance, which since 2015 has combatted criminal uses of blockchain technology, providing technical assistance and information-sharing resources.  This initiative serves over 100 governmental and commercial entities, including the Securities and Exchange Commission (the "SEC" or the "Commission").

---

[1] Defendants consented to this brief's filing; the SEC declined to take a position but reserved the right to object upon review of the brief.  No counsel for any party authored any part of this brief.  No party, counsel, or person other than *amicus*, its members, or its counsel financed the brief's filing or preparation. BAM Trading Services Inc., ("BAM Trading") and BAM Management US Holdings Inc., are members of The Chamber, but neither entity nor its personnel participated in any way in the drafting of this brief.

[2] The Chamber has filed amicus briefs in other cases involving similar issues of law.  For example, The Chamber recently filed an amicus brief in *Securities and Exchange Commission v. Coinbase, Inc., et al., and Coinbase Global, Inc.,* which involves some issues similar to the present litigation. *See* Brief of Amicus Curiae, The Chamber of Digital Commerce, *SEC v. Coinbase Inc. et al.*, Case No. 1:23-cv-04738-KPF, Dkt. No. 55 (S.D.N.Y. filed Aug. 11, 2023).

The Chamber also encourages industry compliance with federal securities law through initiatives like the Token Alliance, a network of 400+ thought leaders and technologists that has developed numerous tools and resources for industry and policymakers as they engage with the blockchain and digital asset community.

The Chamber takes no position on the factual merits of any factual assertion made by the SEC in its Complaint relating to alleged conduct by the Defendants.  The Chamber's interest in filing this amicus brief is to assist the court in weighing the legal merits of the SEC's allegations that certain Defendants are required to register with the agency as national securities exchanges, broker-dealers, and clearing agencies under the Securities Exchange Act of 1934, as amended ("Exchange Act") because they make available for trading certain tokens that the SEC alleges are "securities" under applicable US securities laws.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, the United States has served as the center of the world's digital economy. This is the birthplace of early computer hardware companies like IBM, software companies like Microsoft, digital media companies like Netflix, social media companies like Facebook, as well as global leaders like Amazon, Apple and Google that offer a wide range of digital products and services.  These companies have benefitted from the legal and regulatory certainty offered by this country's laws, courts, and regulators.  And U.S. workers and U.S. consumers, in turn, have benefitted greatly from the efficiencies of the digital economy over the last several decades.

Now, however, one of the newest frontiers of the digital economy—the trillion-dollar blockchain economy—is conspicuously avoiding the United States, finding the regulatory environment too opaque and too hostile to conduct business here.  Blockchain technology enables a community of users to record transactions in a highly secure ledger shared within that

community, without the need for a central authority (such as a government or a bank) to maintain

the ledger's integrity.  Some blockchains are capable of being deployed to solve a very wide range

of computational problems, while others may be used for more targeted purposes, such as hosting

a social media platform, a "metaverse" environment, or a video game.  The use cases for this

technology are not restricted to a particular industry, but instead are limited in theory only by

human ingenuity.[3]

This promising industry, however, is unfortunately developing primarily offshore, in large

measure because the SEC has adopted a regulation-by-enforcement approach, arbitrarily

categorizing various blockchain-based digital assets as securities and penalizing businesses for

failing to obtain SEC registrations that are not actually available to them.  The SEC has not

proposed rules or released formal guidance regarding which digital assets do or do not constitute

securities.  But despite this administrative regulatory silence, the SEC's enforcement message to

blockchain businesses is loud and clear:  If your operations in any way touch the United States,

then you risk protracted and costly SEC investigation and litigation.  Not surprisingly, unlike

---

[3]   A 2022 US Government Accountability Office (GAO) report illustrated blockchain's many
commercial use cases.  Among others, the GAO Report highlighted non-financial use cases,
such as using blockchain to ensure the reliability of supply chains with numerous suppliers
who do not trust one another, without the use of escrow accounts, multiple contracts, and
verification processes.  Blockchain technology might reduce costs in this area by replacing the
escrow provider with an automatically enforced set of rules enabling trustless data sharing over
a computer network.  In addition, companies are developing blockchain applications tailored
to industries such as pharmaceuticals and food, to help combat counterfeit medicines, trace
food-borne illnesses, and track food provenance.  Potential public sector applications include
maintaining property records, such as title transfer, or improving information sharing in federal
agencies.  For financial use cases, the GAO report found that blockchain has the potential to
reduce costs and improve access to the financial system.  United States Government
Accountability Office, Report to Congressional Requesters, *Technology Assessment,
Blockchain*, (March 2022) (the "GAO Report"), p. 10., https://www.gao.gov/assets/gao-22-
104625.pdf.

previously emerging segments of the digital economy, blockchain businesses have grown up largely outside of the United States, to the detriment of U.S. consumers and U.S. workers. The harm this approach has caused has drawn bipartisan condemnation in Congress.

In the instant action, the SEC has trained its sights on another U.S. digital assets exchange, BAM Trading and certain affiliated entities, claiming (among other things) that various digital "tokens"[4] available for trading on the exchange constitute "investment contract" securities, and that BAM Trading and its named affiliates are therefore subject to various registration requirements under the federal securities laws. But the gravamen of the SEC's Complaint collapses the long-recognized distinction between the *subject* of an investment-contract security, which could be virtually any type of asset, and the "investment contract" itself, which may be a security subject to U.S. law and regulation.

Courts have long recognized this obvious distinction, in arrangements involving both digital tokens and many other types of more conventional assets. For example, in the Supreme Court's seminal decision in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Court held that it was the offer of an interest in a Florida citrus grove *coupled with* the right to receive a share of the grove's profits that constituted an "investment contract." But of course, the Court did not hold that the asset itself—the citrus grove— or its output—fruit—constituted a security.

Despite the SEC's dogged efforts to collapse the distinction between an investment contract itself and the underlying subject of that contract, tokens generally available for trading on exchanges are not a "contract, transaction or scheme" that is the embodiment of a security. The SEC does not and cannot allege that the tokens traded here grant the holder a right to receive profits

---

[4]   Blockchain networks use programmable digital assets, or "tokens" for a wide variety of purposes, including to conduct transactions, record changes of ownership, exchange verifiable data, and achieve coordination across organizations and on the web.

generated by the token creator or allocator, nor would any reasonable token holder believe that to be the case.  Rather, the token holder buys an ordinary asset through an exchange like BAM Trading that may have some commercial or consumer use—not unlike oranges—or some investment or speculative value—again, like many other non-security assets.  A bundle of rights, responsibilities, services and promises promoted by the issuer and creating an expectation of profits by the investor arising from *the issuer's entrepreneurial or managerial efforts* may be an investment contract, such as an orange grove packaged with a management contract that promises efforts by the promoter to generate profit for the holder, but the individual component parts alone generally are not.  When courts have addressed the issue (including recently with respect to tokens), they have generally held that the *subject* of an investment contract—including tokens— are *not themselves* an investment contract or other type of security.

In bringing a case against the Defendants here, the SEC is suing the equivalent of a grocery store selling oranges and other fruit, or an online ecommerce marketplace, like Amazon.  Tokens alone are not securities, and the markets where they are available to buy and sell are not securities exchanges.  Whether or not a token was initially sold as part of an "investment contract" is of no consequence.  The token alone, when sold on a secondary market between anonymous market participants in blind bid/ask transactions, is not an investment contact.  If it is, then the SEC could conceivably extend its jurisdiction beyond securities and into a range of markets for products and assets which may have once served as the *subject* of an investment contract, such as citrus groves, oranges, chinchillas, or whiskey, and to the marketplaces and intermediaries through which those ordinary assets or products are sold or resold.

That cannot be right.  This Court has the opportunity here to follow the path of other courts who have analyzed the applicability of the securities laws to arrangements that embody investment

securities and maintain the distinction between those relationships, and the *subject* of those arrangements, which are not themselves securities.[5]

Moreover, given the size of the blockchain economy, the SEC's attempt to treat tokens as investment contract securities presents a "major question" under the U.S. Supreme Court's Major Questions Doctrine. The SEC should have sought proper authorization from Congress rather than attempting to capture a bigger piece of the regulatory and enforcement pie via actions such as this one.

For these reasons, and those set forth below, this Court should grant the Defendants' Motion to Dismiss.

## ARGUMENT

### I. The Regulation-by-Enforcement Approach Stifles Innovation and Drives Market Participants Offshore

Despite its obvious interest in regulating blockchain businesses, the SEC has refused to address digital assets via any of its ordinary administrative or regulatory procedures, such as public notice-and-comment rulemaking or the publication of binding interpretive guidance. Instead, the SEC has chosen to regulate principally by bringing enforcement actions, leaving market participants guessing as to which assets the SEC will and will not consider to be securities next. This unprecedented approach creates avoidable confusion, disruption and harm to the many individuals and business that are part of the blockchain economy. Indeed, SEC Commissioner Hester Peirce acknowledged earlier this year that "[u]sing enforcement actions to tell people what

---

[5]   The Chamber takes no position in this brief on whether the tokens alleged to be securities in the SEC's Complaint were or were not initially sold pursuant to an investment contract. The Chamber believes that, under applicable law, this issue has no bearing on whether a platform facilitating purchases and sales of the *subject* of such an investment contract has a national securities exchange, securities broker-dealer, or clearing agency registration obligation under the Exchange Act.

the law is in an emerging industry is not an efficient or fair way of regulating."  Commissioner Hester M. Peirce, *Kraken Down: Statement on SEC v Payward Ventures, Inc., et al*, Feb. 9, 2023, https://www.sec.gov/news/statement/peirce-statement-kraken-020923.

This point was echoed by Republican Representative Patrick McHenry at a committee hearing just a few weeks ago, who cautioned SEC Chair Gary Gensler that "your [agency's] efforts to choke off the digital asset ecosystem . . . has created real harm for consumers and our markets. . . .  You said the law is clear, but your actions have created more confusion and lasting damage."  Patrick McHenry, Chairman, Financial Services Committee, Press Release, *McHenry to SEC Chair Gensler: While Your Time in This Role May be Temporary, the Repercussions of Your Actions May be Permanent for the Agency*, Sep. 27, 2023, https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=408984.  These concerns with the SEC's regulation-by-enforcement approach are bipartisan and widely shared. For example, Democratic House Member Ritchie Torres recently wrote in a letter to Chair Gensler: "The SEC has chosen to regulate not by clear rule or guidance but by enforcement actions," urging the agency to "reassess its regulatory assault on crypto assets."  Rep. Ritchie Torres, *Letter to Chair Gensler*, Jul. 18, 2023, https://twitter.com/RepRitchie/status/1681336088873279488.

The Chamber agrees.  This Court should resist the SEC's invitation to apply inapposite "investment contracts" precedents to the underlying *subject* of the investment contract, digital assets, rather than the investment contract itself, as this will stifle innovation and harm consumers while sending jobs abroad.  Indeed, the SEC's scorched-earth enforcement program against blockchain businesses—predictably—has already harmed investors.  *See* Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset Managers Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020), perma.cc/WP9T-4MJ5; Parikshit Mishra & Jamie Crawley,

*Nasdaq Halts Plan for Crypto Custody Service Due to U.S. Regulatory Conditions,* CoinDesk (July 19, 2023), perma.cc/H4QR-4RH6; Helen Braun, *ADA, SOL Underperform as Robinhood Gets Set to Delist Them Amid SEC Crackdown*, CoinDesk (Jun. 27, 2023), perma.cc/ZGK7-WP2G. Commentators warn that "the United States is losing innovative startups to other countries with more established regulatory cryptocurrency schemes." *See* Avery Minor, Note, *Cryptocurrency Regulations Wanted: Iterative, Flexible, and Pro-Competitive Preferred*, 61 Boston College L. Rev. 1149, 1151 (2020) (citing examples).  Similarly, a report found that merchants often cite a regulatory environment that undermines trust in digital assets as the basis for refusing them as payment.  *See* Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin Adoption*, Wall Street J. (Apr. 6, 2022), perma.cc/9TJ7-7WQJ.

Unlike in prior decades, when the United States was the leader in digital innovation, the United States is now falling behind other countries in the blockchain space as a result of the SEC's power grab.  This crusade against digital assets risks causing innovative technologies and the companies behind them to block U.S. users, depriving U.S. consumers and participants access to entirely new and emerging technologies that the rest of the world can access.  This would for the first time make America a laggard in the adoption of emerging technologies, marking a contrast with earlier decades, when U.S. innovation powered the computer revolution and subsequent internet boom.

Further, even if SEC registration of digital assets and market intermediaries were required, the current registration frameworks are not compatible with many use cases and commercial deployments inherent in digital assets.  Requiring the creators and allocators of digital assets and the exchanges upon which they trade to register under the same regulatory framework used for traditional securities and market participants would undermine the commercial and consumer

utility of digital assets without a concomitant regulatory benefit. Because securities must be purchased and sold through intermediaries like broker-dealers or national securities exchanges registered under the Exchange Act, ordinary transactions involving digital assets that must be registered as securities would require the use of SEC-registered intermediaries—a service not currently offered by SEC registrants to The Chamber's knowledge.

All of this would lead to an absurd result. Should every company seeking to use blockchain-based payments really be expected to register with the SEC as a securities exchange, broker-dealer, or clearing agency, and comply with the voluminous financial regulations that those traditional financial institutions are subject to? Moreover, by targeting the specific tokens that it does in the Complaint (which include several digital entertainment and gaming tokens, *see* Compl. ¶ 352) the SEC is targeting various commercial, consumer and entertainment companies that the securities laws were not intended to cover as regulated businesses. To put it mildly, there is no evidence that Congress ever intended to treat digital entertainment companies that build blockchain-based metaverse apps, computer games, or virtual reality worlds and offer products that can be used in those apps as regulated securities business and securities transactions. The SEC nevertheless seeks to treat these businesses and marketplaces where their tokens are sold like the New York Stock Exchange or Charles Schwab.

The SEC's "answer" to the industry of "come in to register" is no answer at all. Ultimately, the securities laws—built around capital formation, investor protection, disclosure and transparency—are a poor fit for an industry structured around the core values of decentralization and disintermediation and would make it impossible to conduct ordinary consumer and commercial pursuits. That means U.S. consumers and companies will lose access to these products and lose out on market share in this promising and fast-growing sector of the global economy,

simply due to regulatory uncertainty caused by the SEC's regulatory overreach. Ultimately, the SEC's unchecked enforcement efforts, if ratified by courts, will push industry members offshore and deprive the United States of the ongoing benefits of an industry that is undoubtedly destined to grow, with plenty of innovation still to unlock.

## II.    An Asset that is a S*ubject* of an Investment Contract is not Itself an Investment Contract, so a Venue where that Asset is Traded is not a Securities Exchange

The Complaint alleges that certain tokens trading on the Defendants' platforms are "investment contracts" and therefore securities. Compl. ¶ 352. This is simply incorrect. While these tokens may (or may not) be a *subject* of an investment contract, they themselves are not investment contracts. In *Howey,* the Supreme Court found that an investment contract existed where title to parcels of land acquired by an investor were coupled with a management contract with a promoter, who contractually agreed to grow citrus trees on the land, harvest the citrus, and split the profits with the landowners. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The Court held that this arrangement constituted a "contract, transaction, or scheme" that was an investment contract. *Id.* at 298–99. The Court did not hold, of course, that the land, the citrus trees growing on the land, or the fruit that was sold from those trees constituted securities in and of themselves. That is precisely what the SEC asks this Court to do, in a break with precedent and with logic. The Court should reject the SEC's expansive definition of "investment contracts."

### A.    Courts Consistently Distinguish Between the S*ubject* of an Investment Contract and the Overall Arrangement

Courts have found the *Howey* "investment contract" test satisfied with regard to a variety of contracts, transactions, or schemes involving unconventional subjects, including: citrus fruit and citrus groves (*Howey,* 328 U.S. at 299); films (U*nited States v. Leonard*, 529 F.3d 83, 87–91 (2d Cir. 2008)); cow embryos (*Bailey v. J.W.K. Prop., Inc.*, 904 F.2d 918, 924–25 (4th Cir. 1990); licenses to sell dental products (*SEC v. Aqua-Sonic Prods. Corp*., 687 F.2d 577, 582 (2d Cir.

1982)); whiskey and whiskey casks (SE*C v. Glen-Arden Commodities*, 493 F.2d 1027, 1034 (2d Cir. 1974)); chinchillas (*Miller v. Cent. Chinchilla Grp., Inc*., 494 F.2d 414, 416–18 (8th Cir. 1974)); and bank certificates of deposit (*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 756 F.2d 230, 240 (2d Cir. 1985)).  In none of these cases did the court determine that the underlying *subject* of the investment contract was a security or that a marketplace where the underlying asset or consumer product could be purchased and sold was a securities broker-dealer or securities exchange.  As would otherwise seem obvious, neither has the SEC asserted nor any court held that a store that buys and sells oranges (*Howey)*, or a liquor store that sells whiskey (*Glen-Arden)*, or a cattle-breeding program that acquires and sells cow embryos (*J.W.K. Prop., Inc.*), needed to register with the SEC in any capacity.  To do so would extend the jurisdiction of the SEC and the reach of U.S. securities law into multiple, disparate sectors of the U.S. economy that have nothing to do with the securities markets.

The court has an opportunity to draw a clear line here.  While The Chamber agrees that "investment contracts" that embody the essential attributes of securities are and should be subject to SEC jurisdiction, tokens that may have been the *subject* of such an arrangement but are no longer coupled with the investment opportunity and arrangement promoted by the issuer are not themselves securities.  And anonymous secondary transactions in those subject assets, whether or not done on a marketplace that calls itself an "exchange," are ordinary asset sales and nothing more—not securities transactions.

### B.    Recent Court Decisions Generally hold that Tokens are not Investment Contract Securities

As tokens are a relatively new form of asset, judicial opinions analyzing tokens within the existing legal and regulatory frameworks are also relatively new.  Recent cases, however, support the proposition that tokens—which can represent rights to almost anything and may have all kinds

of commercial uses—are not *themselves* investment contracts.  As the court explained in *Ripple*, the *subject* of an investment contract—XRP tokens at issue in that case—is not itself inherently an investment contract:

> The plain words of *Howey* make clear that "an investment contract for purposes of the Securities Act means *a contract, transaction[,] or scheme.*" But the subject of a contract, transaction, or scheme is not necessarily a security on its face.  Under *Howey*, the Court analyzes the economic reality and totality of circumstances surrounding the offers and sales of the underlying asset.  *Howey* and its progeny have held that a variety of tangible and intangible assets can serve as the subject of an investment contract.  In each of these cases, the subject of the investment contract was a standalone commodity, which was not itself inherently an investment contract. . . .  XRP, as a digital token, is not in and of itself a "contract, transaction[,] or scheme" that embodies the Howey requirements of an investment contract.

*SEC v. Ripple Labs, Inc. et al*., No. 20 Civ. 10832 (AT), 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023) (internal citations omitted).

The *Ripple* court then analyzed the different transactions involving the sale and distribution of XRP and concluded that so-called "Institutional Sales" of XRP constituted securities transactions. *Id.* at 2023 WL 4507900 at *14–16.  The court found that these sales—which were negotiated transactions typically involving written contracts and promotional materials that emphasized Ripple's managerial efforts designed to generate profits—constituted investment contract securities.  *Id.*  In contrast, the court found that initial distributions of XRP tokens through blind bid/ask transactions on cryptocurrency exchanges were *not* securities transactions because these sales were not coupled with representations and promises that Ripple would undertake efforts to generate profits for the purchasers.  *Id.* at 16.  The *Ripple* court further recognized that the SEC's theories involving anonymous exchange transactions "are potentially inconsistent with its enforcement in prior digital asset cases."  *Id* at 22.

The *Ripple* court's skepticism illustrates the shaky foundations on which the SEC's theory

that it can regulate markets in the *subjects* of investment contracts rests.  Although the *Ripple* court expressly stated that it did not address whether secondary market sales of XRP constitute offers and sales of investment contracts, the court's reasoning about blind bid/ask initial sales transactions on exchanges is instructive and should apply with even greater force to secondary market transactions not involving the issuer.  In distinguishing between the initial distribution and secondary trading in XRP, the *Ripple* court stressed that a secondary market transaction in the *subject* of an investment contract—a token—is *not* inherently a securities transaction.

A District of New Hampshire judge in the LBRY litigation seemingly reached the same conclusion during oral argument.  Although that court found an investment contract as to the primary token offering and sale, the court explained during oral argument that it does not necessarily follow that the token that was the subject of the contract was itself the security or that secondary sales of the token should be restricted.  The court recognized that tokens may have consumptive uses and such tokens should be regulated as commodities rather than as securities:

> [T]his issue of secondary acquirers of LBC [tokens] . . . is an issue that has been of concern to me from the beginning, but it's not an issue that the parties have litigated with me.  . . . *it, does not necessarily follow that the token is the security that is restricted.*  What I was focused on is what the parties were litigating, [which] was whether these particular offerings of the token were securities offerings, and I said that they were.  *That does not necessarily mean that every . . . resale of the token violates the Securities Act because it's a restricted security. . . .*  At some point the SEC is going to have to [litigate the issue of secondary transactions in non-securities tokens], because *there are a lot of tokens that have consumptive use that maybe ultimately should be regulated as a commodity rather than as a security.*  But that's not me.  That's not my job.  That's the SEC's job, and I can't make the SEC litigate something in front of me that it doesn't want to.  . . . And I can tell you this, though: I don't have the power to take up issues that the SEC doesn't choose to litigate with me, but *I can be absolutely clear I'm not going to do anything to restrict resales of LBC [tokens] in this case, because the SEC had its chance to argue that in front of me, and they are not arguing it.  So, to the extent that somebody has some kind of concern that this Court is going to restrict resales of LBC, I'm not, because I think that raises interesting issues. . . . .  I'm going to make it very*

13

> *clear that nothing in my order has anything to do with secondary sales . . .*
> .

Transcript of Motions Hearing Before Judge Paul J. Barbodoro, *SEC v. LBRY Inc*., No. 1:21-cv-260-PB, Dkt. No. 105, at 24:24-25, 25:1-22, 26:4-11, 34:14-16 (D.N.H. Jan. 30, 2023) (emphasis added).

Other courts have recently reached similar conclusions.  For example, in *SEC v. Telegram Group Inc.,* the court explained that "the security in this case is not simply the [token] . . . .  *Howey* refers to an investment contract, *i.e.*, a security, as a 'contract, transaction or scheme' . . . that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram [token]." *SEC v. Telegram Grp. Inc.,* 448 F.Supp.3d 352, 379 (S.D.N.Y. 2020).  Yet another court further affirmed this same principle recently in *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299 (S.D.N.Y. July 31, 2023).   The SEC alleged that the creator or allocator of the UST and Luna tokens engaged in an illegal securities offering under the Securities Act of 1933, as amended ("Securities Act").   In its opinion, the court explained that:

> To be sure, *the original UST and LUNA coins, as originally created and when considered in isolation, might <u>not</u> then have been, by themselves, investment contracts.  Much as the orange groves in Howey would not be considered securities if they were sold apart from the cultivator's promise to share any profits derived by their cultivation,* the term "security" also cannot be used to describe any crypto-assets that were not somehow intermingled with one of the investment "protocols," did not confer a "right to . . . purchase" another security, or were otherwise not tied to the growth of the Terraform blockchain ecosystem. . . . So, in theory, *the tokens, if taken by themselves, might not qualify as investment contracts*."

*Id*. at 20 (emphasis added).

In sum, an investment contract is a contract, transaction or scheme that is the embodiment of a security, as is common stock or a bond.  Secondary transactions in stocks and bonds are securities transactions because stocks and bonds are securities, as would be a secondary sale of the investment contract.  The subject of an investment contract, however, unlike the investment contract, is generally not itself a security once it is separated from the bundle of rights,

responsibilities, services, and promises that comprise the investment contract.  The subject is just an ordinary asset in most cases.  *See e.g.*, *Howey*, 328 U.S. at 299; *Glen-Arden*, 493 F.2d at 1034; *Bailey*, 904 F.2d at 925.

### C. Transactions in Tokens that are not Securities do not Trigger Exchange Act Registration Requirements

A token transaction in most cases is just an ordinary sale of an asset that has some consumer, commercial or speculative value, like any commodity.  Even assuming *arguendo* that the tokens listed in the Complaint are the subject of an investment contract, an exchange or other platform facilitating transactions in the tokens may need a license of some type, but not from the SEC *unless the asset is a security*.

The SEC does not have jurisdiction over non-securities markets.  The SEC has acknowledged the limitations of its jurisdiction in many contexts, even where the price of an asset sold on an electronic marketplace varied wildly, the asset generated profits or losses upon resale, or the asset attracted speculators.  *See, e.g.*, *The Ticket Reserve, Inc.,* SEC No Action Letter, Sept. 11, 2003, https://www.sec.gov/divisions/corpfin/cf-noaction/ticketreserve091103.htm, and Incoming Letter ("[n]either a seat ticket nor a right to acquire it is a security. . . .  Nor does the buying and selling of an event ticket, in the hope that the price of the ticket will increase, involve the trading of a security.") The Chamber is aware of no federal court decisions finding that a platform facilitating the purchase and sale of the underlying *subject* of an investment contract needed to register with the SEC under applicable federal securities laws.[6]

---

[6]   The Second Circuit decision in *Gary Plastics* is not inconsistent.  There, the court found an investment contract in respect of bank certificates of deposit based on statements by a selling broker that it "fully intends to maintain a secondary market for its customers which would enable them to sell" the instruments they were buying from the broker.  The broker committed to repurchase the certificates of deposit itself if interest rates dropped, guaranteeing investors both liquidity and a profit that they would not otherwise have made had they purchased the

### III.     The SEC's Regulation-By-Enforcement Regime Raises Separation of Powers And Due Process Concerns

The SEC is wrong to paint virtually all digital assets as securities.  Tokens, on their own, are not "investment contracts."  The SEC's decision nevertheless to consider most digital assets as securities raises grave separation of powers concerns under the Major Questions Doctrine, because the SEC is asserting jurisdiction over a major part of the economy that Congress did not intend for it to regulate.  If the SEC is not compelled to restrict itself to regulating *securities* and instead can regulate businesses that sells assets that may have been the subject of an investment contract, the SEC's jurisdiction would extend to many marketplaces and intermediaries for ordinary products, including e-commerce platforms for transactions in such assets, like eBay or Amazon.[7]  That plainly implicates a major question.

The Major Questions Doctrine requires dismissal of the Complaint in deference to Congress's prerogative to decide how to regulate generally, "a significant portion of the American economy."  *See e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022); *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).  In *Alabama Association of Realtors v. HHS*, the Court found that "$50 billion in emergency rental assistance" was "a reasonable proxy for the [challenged policy's] economic impact," and that this was enough to trigger major-questions scrutiny. 141 S. Ct. 2485, 2489 (2021).  The *Nebraska* Court, noting that if $50 billion in rental assistance was enough to "trigger[] analysis under the major questions doctrine," then a student-loan cancellation amounting to "ten

---

certificate of deposit from the issuer and been exposed to interest rate risk. The court explained that the customers relied on the skill and financial stability of the broker in making their investment decision.  *Gary Plastics Packaging*, 756 F.2d at 240.

[7]   Obviously, any company which offers investment contracts that are securities is subject to the securities *offering* registration requirements under the Securities Act of 1933.

times" that impact necessarily qualified as well. 143 S. Ct. at 2373.

The economic stakes implicated by the SEC's theory in the Complaint dwarf those in the cases cited above, given the size of the blockchain economy. *See Cryptocurrencies –United States*, Statista, perma.cc/YK3U-XG24 (last visited Oct. 9, 2023). By comparison, the production value of tobacco crops in 2000, the year the Supreme Court applied the major-questions doctrine to tobacco regulation in *Brown & Williamson*, was only $2 billion.  *See* USDA, Crop Production Historical Track Records 264 (2023), perma.cc/9ZR2-GWB2.  Clearly, in light of past Supreme Court cases, the SEC's actions raise an issue of vast economic importance, and is an attempt to regulate a "significant portion of the American economy."

Likewise, this case confronts issues of considerable political significance.  "[D]eep . . . political significance" can be found where Congress has "considered and rejected" the legislative adoption of similar regulatory schemes.  *West Virginia*, 142 S. Ct. at 2614 (quoting *Brown & Williamson*, 529 U.S. at 144).  In *West Virginia*, the Court faulted the government for adopting, "at bottom," a cap-and-trade program the likes of which Congress "ha[d] consistently rejected . . . long after the dangers posed by greenhouse gas emissions 'had become well known.' " *Id.* (quoting *Brown & Williamson*, 529 U.S. at 144); *See also, Nebraska*, 143 S. Ct. at 2373–74 (doctrine triggered where "[t]he Secretary's assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself.").

Similarly, Congress has long expressed interest in adopting a regulatory framework around digital assets but has declined—as yet—to do so.  Indeed, members of Congress have introduced dozens of bills relating to digital asset regulation.  *See* Brief of Amicus Curiae, Senator Cynthia Lummis, *SEC v. Coinbase Inc. et al.*, Case No. 1:23-cv-04738-KPF, Dkt. No. 53 (S.D.N.Y. filed Aug. 11, 2023), p. 5–7 (listing major pieces of legislations introduced, including the Responsible

Financial Innovation Act (RFIA), S. 2281, 118th Cong. (2023); The Financial Innovation and Technology for the 21st Century Act (FIT21), H.R. 4763, 118th Cong. (2023); and the Digital Commodities Consumer Protection Act of 2022 (DCCPA), S. 4760, 117th Cong. (2022)).  This level of congressional interest—including over whether digital assets should be classified as securities—strongly counsels against allowing the SEC to appropriate the authority through industry litigation.  Rather than leaving these issues to Congress, the SEC has seemingly taken matters into its own hands, using enforcement to do what Congress has declined to do through legislation.

Finally, *Ripple* has sparked even more congressional interest, further demonstrating in real time the "political significance" of the "major question" at hand.  The House Financial Services and House Agriculture Committees recently advanced bipartisan legislation to clarify the regulatory status of digital assets. Hannah Lang, *Crypto Bill Passes Congressional Committee in Victory for Industry*, Reuters (Jul. 26, 2023), perma.cc/8WYL-Y5L6.  And Senator Cynthia Lummis, who sponsors the Responsible Financial Innovation Act, which would create a framework for classifying digital assets under existing commodities and securities regulatory regimes, stated that *Ripple* "confirms the need for Congress to deliver a clear regulatory structure for the digital asset industry that provides the highest level of consumer protection" and should inspire Congress to pass legislation "uphold[ing] the *Howey* test as interpreted by the Southern District of New York." Senator Cynthia Lummis, *Lummis Releases Statement in Response to Ripple Decision* (Jul. 14, 2023), perma.cc/XHE3-V78B.[8]  In short, a "major question" is plainly

---

[8]   Likewise, several members of Congress have urged the SEC to end its regulation-by-enforcement regime and allow Congress to provide a path forward.  *See* Letter from Representatives French Hill & Dusty Johnson to SEC Chair Gary Gensler (Jul. 19, 2023), perma.cc/UV5N-QPTH (warning that the SEC's "regulate by enforcement . . . approach does

presented as to whether the SEC has the statutory authority, and courts should not defer to the agency's interpretation of the statute but should insist on a clear statement from Congress conferring upon the agency the "staggering" regulatory authority it asserts. *Nebraska*, 143 S. Ct. at 2373.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be granted.

Dated:  October 19, 2023

*/s/ Weisiyu Jiang*

Steven F. Gatti*
Weisiyu Jiang
CLIFFORD CHANCE US LLP
2001 K Street NW
Washington, District of Columbia 20006
(202) 912-5000
Steven.Gatti@cliffordchance.com
Weisiyu.Jiang@cliffordchance.com

Jesse Overall*
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
(212) 878-8000
Jesse.Overall@cliffordchance.com

**pro hac vice* to be filed

*Attorneys for Amicus Curiae*
*The Chamber of Digital Commerce*

---

not protect the public" and calling for a "statutory framework [that] would establish a process for firms to come into the regulatory parameter . . . rather than relying on enforcement actions"); Letter from Representative Ritchie Torres to SEC Chair Gary Gensler (Jul. 18, 2023), perma.cc/SM95-4HEY (condemning the SEC for "cho[osing] . . . to regulate not by clear rule or guidance but by enforcement actions, often politically timed").