**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————
| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) )     No. 1:23-cv-01599-ABJ-ZMF |
| BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO, | ) ) ) ) ) |
| Defendants. | ) ) |
—————————————————————

**PLAINTIFF SECURITIES AND EXCHANGE
COMMISSION'S OMNIBUS MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF THE COMPLAINT'S FACTUAL ALLEGATIONS ................................... 4

I.  In 2017, Zhao and Binance Raised Capital in the BNB "Initial Coin Offering" and Launched the Binance.com Platform .................................................................. 4

II.  Zhao and Binance Actively Solicited Investors in the United States and Created a Plan to Avoid Regulatory Scrutiny ...................................................................... 5

III.  Consistent with the Tai Chai Plan, Zhao and Binance Established the Binance.US Platform While Maintaining Substantial Control Over Its Operations ...................... 6

IV.  BAM Defrauded Investors ................................................................................................ 6

STANDARD OF REVIEW .................................................................................................... 8

ARGUMENT ........................................................................................................................ 8

I.  The Complaint Plausibly Alleges That Defendants Intermediated Securities Transactions in Violation of the Exchange Act .......................................................... 8

    A.  The Statutory Foundation and the *Howey* Test ............................................... 10

    B.  The Crypto Asset Securities at Issue Here Meet the *Howey* Test .................. 11

        1.  *Courts Have Flexibly Applied the Howey Test, Including as to Crypto Assets* ................................................................................................. 11

        2.  *BNB Is Offered, Sold, and Traded as an Investment Contract* ................ 14

        3.  *The Third Party Crypto Asset Securities Meet the Howey Test* ............... 18

    C.  *Howey's* Flexible Approach Does Not Require a Contract or Legally Enforceable Rights .......................................................................................... 20

        1.  *Defendants' Cases Do Not Support Their Invented Requirements* .......... 21

        2.  *Defendants Ignore Relevant Precedent That Does Not Support Their Claimed Requirements* ....................................................................... 25

        3.  *Defendants' Other Arguments Do Not Withstand Scrutiny* ..................... 26

    D.  Defendants' Hypothetical Scenarios and Comparisons to "Ordinary Assets" Are Misplaced .................................................................................... 28

E.      **Defendants' Additional Distortions of *Howey* Should Be Rejected** ............... 31

        1.     *Binance Attempts to Invent a Nonexistent "Flow of Funds" Requirement* ......................................................................................... 31

        2.     *Defendants' Distinctions Based on a Transaction's Forum Are Inapposite* ............................................................................................ 33

**II.     The Complaint Plausibly Alleges Securities Act Section 5 Claims** ............................ 36

    A.      **The SEC Asserts Plausible Claims as to Binance's Offers and Sales of BNB** ............................................................................................................. 36

        1.     *The SEC's Claim Relating to the BNB ICO Is Timely* ............................. 37

        2.     *The SEC Plausibly Alleges Offers and Sales of BNB to its Employees* .... 38

    B.      **Binance Offered and Sold BUSD as an Investment Contract** ........................ 38

    C.      **BAM's Staking Program, and Binance's BNB Vault and Simple Earn Programs Were Offered and Sold as Investment Contracts** ......................... 41

**III.    The Major Questions Doctrine Is Inapposite** ..................................................... 44

    A.      **The Major Questions Doctrine Is Not Concerned with Agency Enforcement of Congressional Enactments** ............................................................... 44

    B.      **Even If the Major Questions Doctrine Were Applicable in the Enforcement Context, the Circumstances Warranting Its Application Are Absent Here** .. 47

**IV.    This Action Does Not Violate Zhao's or Binance's Due Process Rights** ................... 50

**V.     The Complaint Plausibly Alleges that BAM Violated the Anti-Fraud Provisions of the Securities Act** ..................................................................................... 52

    A.      **BAM Misconstrues the SEC's Claims as Manipulative Trading Claims** ...... 55

    B.      **BAM's Arguments as to the Fraud on Securities Investors Are Unavailing** ................................................................................................. 55

    C.      **BAM's Arguments as to the Fraud on Equity Investors Are Unavailing** ...... 59

**VI.    The Claims Against Zhao and Binance Allege Domestic Violations Of U.S. Law** .... 59

    A.      **Binance's Domestic Violations of Securities Act Section 5** ............................ 61

    B.      **Binance's Domestic Violations of Exchange Act Sections 5, 15(a), and 17A** .......................................................................................................... 63

C.    The "Irrevocable Liability" Test Used in the Second Circuit in Exchange Act Section 10(b) Actions Does Not Require Dismissal ........................................... 65

D.    Zhao's and Binance's Position, If Adopted, Would Encourage Pernicious Consequences to the Detriment of U.S. Markets ............................................. 68

VII.   This Court Has Personal Jurisdiction Over Zhao ........................................................ 69

CONCLUSION ................................................................................................................... 73

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Abitron Austria GmbH v. Hetronic Int'l Inc.*,
    600 U.S. 412 (2023)............................................................................................ 61, 66

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)................................................................................ 65, 66

*\*Alabama Ass'n of Realtors v. HHS*,
    141 S. Ct. 2485 (2021)............................................................................................ 47

*All. for Fair Bd. Recruitment v. SEC*,
    2023 WL 6862856 (5th Cir. Aug. 23, 2023)........................................... 46, 49, 50

*Anderson v. Binance*,
    2022 WL 976824 (S.D.N.Y. 2022)....................................................................... 66

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................. 8

*Audet v. Fraser*,
    605 F. Supp. 3d 372 (D. Conn. 2022)................................................................... 26

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019)................................................... 13, 14, 20

*Barron v. Helbiz Inc.*,
    2021 WL 4519887 (2d Cir. Oct. 4, 2021)............................................................ 65

*Belizan v. Hershon*,
    434 F.3d 579 (D.C. Cir. 2006).............................................................................. 72

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................. 8

*\*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023)............................................................................... 44, 45, 48

*Brink v. Raymond James & Assocs., Inc.*,
    892 F.3d 1142 (11th Cir. 2018) ............................................................................ 57

*Buckley v. Valeo*,
    424 U.S. 1 (1976).................................................................................................. 45

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).............................................................................................. 70

*Cameron v. Outdoor Resorts of Am., Inc.*,
608 F.2d 187 (5th Cir. 1979) ............................................................. 31

*Capital Bank Int'l Ltd. v. Citigroup, Inc.*,
276 F. Supp. 2d 72 (D.D.C. 2003) ........................................................ 8

*CFPB v. Ocwen Fin. Corp.*,
2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) ..................................... 52

*CFTC v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y. 2018) ................................................ 41

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ............................................................. 71

*City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)............................................................... 68

*Continental Mktg. Corp. v. SEC*,
387 F.2d 466 (10th Cir. 1967) ...................................... 23, 26, 30, 40

*Diskin v. Lomasney & Co.*,
452 F.2d 871 (2d Cir. 1971)............................................................... 24

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016)................................................................ 71

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
147 F.3d 118 (2d Cir. 1998)........................................................ 61, 62

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)........................................................................... 45

*Fedance v. Harris*,
1 F.4th 1278 (11th Cir. 2021) .......................................................... 30

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996)........................................................... 37

*Flannery v. SEC*,
810 F.3d 1 (1st Cir. 2015)................................................................. 59

*Friel v. Dapper Labs, Inc.*,
2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023)............................... passim

*FTC v. Kochava Inc.*,
2023 WL 3249809 (D. Idaho May 4, 2023) ...................................... 45

*FTC v. Wyndham Worldwide Corp.*,
  799 F.3d 236 (3d Cir. 2015) ............................................................... 51

*\*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) ........................................................... passim

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ............................................................ 51

*Giunta v. Dingman*,
  893 F.3d 73 (2d Cir. 2018) ............................................................ 67, 68

*Glen-Arden Commodities, Inc. v. Costantino*,
  493 F.2d 1027 (2d Cir. 1974) ................................................... 17, 26, 42

*Golden v. Garafalo*,
  678 F.2d 1139 (2d Cir. 1982) ............................................................. 27

*Graham v. SEC*,
  222 F.3d 994 (D.C. Cir. 2000) ............................................................ 51

*Grenader v. Spitz*,
  537 F.2d 612 (2d Cir. 1976) ............................................................... 31

*Guidry v. Bank of LaPlace*,
  954 F.2d 278 (5th Cir. 1992) .............................................................. 26

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ........................................................................ 24

*Hocking v. Dubois*,
  885 F.2d 1449 (9th Cir. 1989) ....................................................... 21, 33

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ............................................................... 56

*In re Arthur Hays & Co.*,
  5 S.E.C. 271 (1939) ........................................................................ 56

*In re Baan Co. Sec. Litig.*,
  245 F. Supp. 2d 117 (D.D.C. 2003) .................................................... 71

*In re Bed Bath & Beyond Corp. Sec. Litig.*,
  2023 WL 4824734 (D.D.C. July 27, 2023) ........................................... 56

*In re BitConnect Sec. Litig.*,
  2019 WL 9104318 (S.D. Fla. Aug. 23, 2019) ............................... 13, 16, 32

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) .......................................................... 72

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) .......................................................... 59, 70

*\*In re Xcel Energy, Inc.*,
  286 F. Supp. 2d 1047 (D. Minn. 2003) .......................................................... 55

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
  439 U.S. 551 (1979) .......................................................... 11

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) .......................................................... 69

*Landreth Timber Co. v. Landreth*,
  471 U.S. 681 (1985) .......................................................... 10, 27

*Lay v. United States*,
  623 Fed. Appx. 790 (6th Cir. Aug. 17, 2015) .......................................................... 65

*Lewis v. Creasey Corp.*,
  248 S.W. 1046 (Ky. Ct. App. 1923) .......................................................... 24

*Lewis v. Mutond*,
  62 F.4th 587 (D.C. Cir. 2023) .......................................................... 69, 72

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019) .......................................................... 56, 59

*Malouf v. SEC*,
  933 F.3d 1248 (10th Cir. 2019) .......................................................... 56

*Marine Bank v. Weaver*,
  455 U.S. 551 (1982) .......................................................... 23

*Mazza v. Verizon Washington DC, Inc.*,
  852 F. Supp. 2d 28 (D.D.C. 2012) .......................................................... 72

*Morrison v. Nat'l Australia Bank*,
  561 U.S. 247 (2010) .......................................................... 60, 62, 65

*Myun-Uk Choi v. Tower Research Capital LLC*,
  890 F.3d 60 (2d Cir. 2018) .......................................................... 66, 67

*NFIB v. OSHA*,
  595 U.S. 109 (2022) .......................................................... 45

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ........................................................................ 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .................................................................................... 58

*One-O-One Enters., Inc. v. Caruso*,
    668 F. Supp. 693 (D.D.C. 1987) ................................................................ 11

*Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) ....................................................................... 68

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019) ......................................................................... 68

*Rensel v. Centra Tech, Inc.*,
    2018 WL 4410126 (S.D. Fla. June 25, 2018) ............................................. 13

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990) ......................................................................... 25, 27, 49

*SEC v. Ahmed*,
    308 F. Supp. 3d 628 (D. Conn. 2018) ........................................................ 67

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982) ....................................................................... 44

*SEC v. Arbitrade Ltd.*,
    2023 WL 2785015 (S.D. Fla. Apr. 5, 2023) .......................................... 39, 40

*SEC v. Banner Fund Int'l*,
    211 F.3d 602 (D.C. Cir. 2000) ............................................................. passim

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) ................................................................... 22

*SEC v. Benger*,
    934 F. Supp. 2d 1008 (N.D. Ill. 2013) ....................................................... 66

*SEC v. Better Life Club of Am.*,
    995 F. Supp. 167 (D.D.C. 1998) .......................................................... 24, 43

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ............................................................................. passim

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) .................................................................................... 46

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)..............................................................................................52

*SEC v. Crowe*,
  216 F. Supp. 3d 866 (S.D. Ohio 2016) ................................................................57

*SEC v. Edwards*,
  540 U.S. 389 (2004)......................................................................................13, 42

*SEC v. e-Smart Techs., Inc.*,
  926 F. Supp. 2d 231 (D.D.C. 2013) .................................................................8, 70

*SEC v. Glob. Inv. Strategy UK Ltd.*,
  2021 WL 4896127 (S.D.N.Y. Oct. 19, 2021) ......................................................68

*SEC v. Goble*,
  682 F.3d 934 (11th Cir. 2012) .............................................................................57

*SEC v. Gruss*,
  859 F. Supp. 2d 653 (S.D.N.Y. 2012)............................................................65, 66

*SEC v. Int'l Loan Network, Inc.*,
  770 F. Supp. 678 (D.D.C. 1991) ....................................................................11, 12

*SEC v. Int'l Loan Network, Inc.*,
  968 F.2d 1304 (D.C. Cir. 1992)......................................................................12, 30

*\*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020)............................................................passim

*SEC v. LBRY, Inc.*,
  639 F. Supp. 3d 211 (D.N.H. 2022)..........................................13, 14, 19, 31

*\*SEC v. Life Partners, Inc.*,
  102 F.3d 587 (D.C. Cir. 1996) ............................................................................14

*\*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) .......................................................................passim

*SEC v. Life Partners, Inc.*,
  898 F. Supp. 14 (D.D.C. 1995) ......................................................................11, 12

*SEC v. NAC Found.*,
  512 F. Supp. 3d 988 (N.D. Cal. 2021) .................................................................13

*SEC v. Parkersburg Wireless LLC*,
  991 F. Supp. 6 (D.D.C. 1997) ...................................................................11, 12, 24

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ............................................................. 56

*SEC v. Ripple Labs, Inc.*,
    2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................................... 12, 26, 29, 35

*SEC v. Ripple Labs, Inc.*,
    2023 WL 6445969 (S.D.N.Y. Oct. 13, 2023) .................................... 35

*\*SEC v. RPM Int'l, Inc.*,
    282 F. Supp. 3d 1 (D.D.C. 2017) .................................................. passim

*SEC v. Rubera*,
    350 F.3d 1084 (9th Cir. 2003) ...................................................... 32, 43

*SEC v. Scoville*,
    913 F.3d 1204 (10th Cir. 2019) .................................................... 26

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) .......................................................... 23, 25, 30

*SEC v. Sharp*,
    626 F. Supp. 3d 345 (D. Mass. 2022) ........................................... 37

*SEC v. Spinosa*,
    31 F. Supp. 3d 1371 (S.D. Fla. 2014) .......................................... 56

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020).......................................... passim

*SEC v. Terraform Labs Pte Ltd.*,
    2022 WL 2066414 (2d Cir. June 8, 2022) ..................................... 71

*\*SEC v. Terraform Labs Pte., Ltd.*,
    2023 WL 4858299 (S.D.N.Y. July 31, 2023) ................................. passim

*\*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)..................................................................... passim

*SEC v. Winemaster*,
    529 F. Supp. 3d 880 (N.D. Ill. 2021) ........................................... 56

*SEC v. Xia*,
    2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) ............................... 35, 40

*Shapiro, Lifschitz & Schram, P.C. v. Hazard*,
    90 F. Supp. 2d 15 (D.D.C. 2000)................................................. 71

*Slack Techs., LLC v. Pirani*,
    598 U.S. 759 (2023) ........................................................................................ 10

*SNR Wireless LicenseCo, LLC v. FCC*,
    868 F.3d 1021 (D.C. Cir. 2017) ..................................................................... 51

*Solis v. Latium Network, Inc.*,
    2018 WL 6445543 (D.N.J. Dec. 10, 2018) .................................................... 14

*\*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
    883 F.3d 904 (D.C. Cir. 2018) .................................................. 61, 62, 64, 69

*State v. Gopher Tire & Rubber Co.*,
    177 N.W. 937 (Minn. 1920) ........................................................................... 24

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) ............................................................................... 9, 10, 25

*Triple Up Ltd. v. Youku Tudou Inc.*,
    235 F. Supp. 3d 15 (D.D.C. 2017) ................................................................. 72

*UBS Asset Mgmt. Inc. v. Wood Gundy Corp.*,
    914 F. Supp. 66 (S.D.N.Y. 1996) ................................................................... 64

*\*United Hous. Found. v. Forman*,
    421 U.S. 837 (1975) .................................................................................. 10, 40

*United States v. Bowdoin*,
    770 F. Supp. 2d 142 (D.D.C. 2011) ................................................... 11, 24, 50

*United States v. Cinergy Corp.*,
    495 F. Supp. 2d. 892 (S.D. Ind. 2007) .......................................................... 52

*United States v. Coscia*,
    177 F. Supp. 3d 1087 (N.D. Ill. 2016) ........................................................... 55

*United States v. Freeman*,
    2023 WL 5391417 (D.N.H. Aug. 22, 2023) ................................................... 45

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ............................................................................. 44

*United States v. Naftalin*,
    441 U.S. 768 (1979) ........................................................................................ 57

*United States v. NGL Crude Logistics, LLC*,
    2018 WL 4762901 (N.D. Iowa July 3, 2018) ................................................ 52

*United States v. Texas,*
    599 U.S. 670 (2023) ........................................................................ 45

*United States v. Vilar,*
    729 F.3d 62 (2d Cir. 2013) .............................................................. 68

*United States v. Zaslavskiy,*
    2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ....................... 11, 17

*Uselton v. Com. Lovelace Motor Freight, Inc.,*
    940 F.2d 564 (10th Cir. 1991) ........................................................ 38

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................................ 45

*Wals v. Fox Hills Dev. Corp.,*
    24 F.3d 1016 (7th Cir. 1994) .......................................................... 32

*Weiss v. SEC,*
    468 F.3d 849 (D.C. Cir. 2006) ................................................. 53, 56

*\*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ............................................................. passim

*WesternGeco LLC v. ION Geophysical Corp.,*
    138 S. Ct. 2129 (2018) .................................................................... 61

*William Loveland Coll. v. Distance Educ. Accreditation Comm'n,*
    347 F. Supp. 3d 1 (D.D.C. 2018) ..................................................... 8

*Woodward v. Terracor,*
    574 F.2d 1023 (10th Cir. 1978) ...................................................... 23

*Zacharias v. SEC,*
    569 F.3d 458 (D.C. Cir. 2009) ........................................................ 36

## **Statutes**

15 U.S.C. § 7001 *et. seq.* ..................................................................... 67

15 U.S.C. § 77b ...................................................................... 10, 62

15 U.S.C. § 77e ............................................................. 36, 61, 62

15 U.S.C. § 77q ............................................................................ 52, 53

15 U.S.C. § 78c ...................................................................... 10, 63

15 U.S.C. § 78e ...................................................................... 63, 64

15 U.S.C. § 78j .................................................................................................. 65

15 U.S.C. § 78o .......................................................................................... 63, 66

15 U.S.C. § 78q-1 ....................................................................................... 63, 64

15 U.S.C. § 78u .................................................................................... 37, 41, 51

28 U.S.C. 2462 ................................................................................................ 37

**Rules**

Fed. R. Civ. P. 12(b)(2) ...................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 8

Fed. R. Civ. P. 9(b) ............................................................................................ 8

**Regulations**

17 C.F.R. § 230.901 .......................................................................................... 62

17 C.F.R. § 230.902 .......................................................................................... 62

17 C.F.R. § 230.903 .......................................................................................... 62

**Constitutional Provisions**

U.S. Const. art. II, § 3 ....................................................................................... 45

**Session Laws**

Securities Act of 1933,
    H.R. 5480, 73d Cong., 48 Stat. 74 (1st Sess. 1933) ............................... 10, 36, 52

Securities Exchange Act of 1934,
    H.R. 9323, 73d Cong., 48 Stat. 881 (2d Sess. 1934) ................................... 10, 63

**Legislative Material**

H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933) ........................................... 10

**Other Authorities**

Brief for SEC, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455 (U.S. June 26, 2003) .......... 27

Brief for SEC, *SEC v. W.J. Howey Co.*, No. 843, 1946 WL 50582 (U.S. Apr. 17, 1946) .......... 28

CFTC Letter, *SEC v. Telegram Grp. Inc.*, No. 19-cv-09439, Dkt. No. 203 (S.D.N.Y. Feb. 18, 2020) ............................................................................................................................ 41

*Proof-of-Stake Rewards and Penalties,* ETHEREUM.ORG, *available at*
https://ethereum.org/en/developers/docs/consensus-mechanisms/pos/rewards-and-penalties/#rewards (last visited Nov. 5, 2023) ................................................................. 41

Registration Requirements for Foreign Broker-Dealers, 54 Fed. Reg. 30,013, 1989 WL 279892 (SEC July 18, 1989) ................................................................................................... 63

SEC No-Action Letter, *Am. Diamond Co.*, 1977 WL 10907 (Aug. 15, 1977) ............................ 28

SEC, *Crypto Assets and Cyber Actions*, *available at*
https://www.sec.gov/spotlight/cybersecurity-enforcement-actions ................................. 50

SEC, *Framework for 'Investment Contract' Analysis of Digital Assets*, *available at*
https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last modified Mar. 8, 2023) .......................................................................................... 50

*Statement of the Commission Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Services Offshore*, 63 Fed. Reg. 14,806, 1998 WL 135626 (SEC Mar. 27, 1998) .......................................................................... 64

Thomas Lee Hazen, The Law of Securities Regulation § 1.5 (1985) ........................................... 30

Uniform Law Commission, *Electronic Transactions Act*, *available at*
https://www.uniformlaws.org/committees/community-home?CommunityKey=2c04b76c-2b7d-4399-977e-d5876ba7e034 .................................................................................. 67

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Omnibus Memorandum of Law in Opposition to the (1) Motion to Dismiss filed by Defendants BAM Trading Services Inc. ("BAM Trading") and BAM Management US Holdings Inc. ("BAM Management," collectively, "BAM"), Dkt. No. 117; and (2) Motion to Dismiss filed by Defendants Binance Holdings Limited ("Binance") and Changpeng Zhao ("Zhao"), Dkt. No. 118.  For the reasons stated below, this Court should deny Defendants' Motions.

## PRELIMINARY STATEMENT

Binance's Chief Compliance Officer crudely but succinctly summed up this case when he admitted that Binance was "operating as a fking unlicensed securities exchange in the USA bro." Compl. ¶ 111, Dkt. No. 1.  He was right.  Defendants now seek to avoid the repercussions of their actions by asking this Court to dismantle decades of foundational precedent upon which the nation's securities laws operate.  In its place, Defendants would install a rigid framework that turns entirely on contract law and the form transactions take, in clear contravention of Congress' broad, flexible regime "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  No court has adopted Defendants' tortured interpretation of the law.  To the contrary, courts have consistently rejected it, and this Court should as well.

As alleged in the Complaint, Defendants established two crypto asset trading platforms, the Binance.com Platform and the Binance.US Platform (collectively, "Binance Platforms"), where they have made crypto assets available for trading by investors in the United States and around the world, including at least 12 crypto assets and three investment programs that are offered and sold as investment contracts and, therefore, as securities under the federal securities laws as interpreted by *Howey* and its progeny.  In doing so, Defendants have operated as brokers,

dealers, exchanges, and clearing agencies in the United States subject to the federal securities laws, including registration with the SEC.  Yet Defendants have never complied with these laws.

This was a deliberate choice.  The Complaint contains detailed allegations that Zhao and Binance—knowing they were operating the Binance.com Platform in violation of U.S. law—hatched a plan to give the appearance they were not operating in the United States, while surreptitiously profiting off of U.S. capital markets.  The core of this so-called "Tai Chi" plan was BAM.  BAM Trading and BAM Management were the purportedly independent U.S. entities that operated the Binance.US Platform.  Behind the scenes, however, Zhao and Binance secretly controlled BAM's operations, to the point that BAM's employees believed they were "puppet[s]."  Compl. ¶ 199.  In executing this plan, Zhao admitted that his "goal" was "to reduce the losses to ourselves, and … to make the U.S. regulatory authorities not trouble us."  *Id.* ¶ 132.

But here we are.  The SEC brings 13 Claims for Relief against Defendants relating to their operation of the Binance Platforms.  In their latest bid to evade accountability, Defendants' Motions ignore most of the Complaint's allegations demonstrating that the assets on their platforms are being offered and sold as securities, while attempting to insert new requirements into *Howey*'s test.  BAM, for example, argues that *Howey* requires a formal "contractual arrangement."  Mem. Supp. BAM Mot. Dismiss ("BAM Mem.") 2, Dkt. No. 117-1.  Binance goes further, asserting that "not just any type of contract will do," but that an undefined "forward-looking contract" is required.  Mem. Supp. Binance & Zhao Mot. Dismiss ("Binance Mem.") 15-16.  Defendants posit that "post-sale obligations [that] are legally enforceable" are required (Binance Mem. 18; *see* BAM Mem. 13), although they vacillate as to precisely what kinds of obligations are supposedly required.  Binance also insists that *Howey* requires an investors' money to flow directly "*into* the relevant common enterprise."  Binance Mem. 19.

These arguments elevate form over substance and seek to turn the federal securities laws into matters of contract law in contravention of decades of well-established law. They also rely on distorted readings of the caselaw and the SEC's positions in other cases. Critically, Defendants do not cite one case holding that these nebulous requirements are part of the analysis.

Lacking support in the law, Defendants resort to inapt analogies, comparing the assets sold on their platforms to supermarket items like oranges. *See* BAM Mem. 28-29. These comparisons are absurd. The simple truth is that investors on Defendants' platforms were not offered oranges or baseball cards. They were offered the opportunity to participate—via the potential appreciation of the value of the crypto assets—in the promoters' efforts to develop and grow the issuers' blockchain-based business and related network, infrastructure, services, and programs, just as the defendant in *Howey* enticed investors with the prospect of profits by investing in the development of orange groves. *See* 328 U.S. at 299-300. If oranges alone were at issue, those selling and promoting these assets and Defendants themselves would have had no need to entice investors with extended marketing campaigns touting their potential to increase in value based upon the efforts of others.

Defendants further engage in theatrics, casting the SEC's application of *Howey* as "breathtaking," BAM Mem. 12, and this action as an attempt to "regulate this trillion-dollar industry through enforcement." Binance Mem. 14. But it is Defendants, not the SEC, that offer blanket pronouncements, including that "the secondary-market transactions in which most of the crypto assets at issue were alleged to be traded necessarily fail the *Howey* test." *Id.* 3. They further complain they did not have "fair notice" of statutes under which the SEC has brought thousands of actions since the Great Depression, including dozens in the crypto asset space. They also claim that this enforcement action raises "major questions" that extinguish the Court's

3

jurisdiction.  Zhao and Binance even take the remarkable position that they are not subject to the federal securities laws at all, despite operating a platform that had over a million U.S. investors.

The laws at issue provide all that is required to sustain the SEC's claims.  And Defendants' arguments ring especially hollow given their history, including the substantial allegations of intent to subvert the federal securities laws while profiting off of U.S. investors. Defendants cannot escape their legal obligations by rewriting *Howey*.  Nor can they assert defenses based on legal uncertainty when, as they admitted, they were operating an "unlicensed securities exchange" in the United States.  This Court should deny Defendants' Motions.

## SUMMARY OF THE COMPLAINT'S FACTUAL ALLEGATIONS

**I.      In 2017, Zhao and Binance Raised Capital in the BNB "Initial Coin Offering" and Launched the Binance.com Platform**

Defendants' unlawful conduct began in 2017, when Zhao and Binance launched a crypto asset trading platform available over the internet ("Binance.com Platform").  Compl. ¶ 80.  To finance the business, they conducted a so-called "Initial Coin Offering" ("ICO"), the offer and sale of a crypto asset that they created called the "Binance Coin," or "BNB."  *Id*.

Since July 2017, the Binance.com Platform has provided a marketplace for trading crypto asset securities, including broker-dealer, exchange, and clearing agency functions to investors in the United States and elsewhere.  *Id.* ¶¶ 86-101.  Yet it never registered with the SEC.  *Id.* ¶ 86.

From inception, Zhao and Binance made BNB available for trading on the Binance.com Platform, and later added additional crypto asset securities, including SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI (collectively, "Third Party Crypto Asset Securities"), and another crypto asset called BUSD.  *Id.* ¶¶ 301, 352, 360.  Each of these assets has been offered and sold in exchange for cash, crypto assets, or other tangible consideration, which constituted an investment into a common enterprise from which investors reasonably

expected to profit based upon the efforts of others.  Among other things, the issuers and promoters of the Third Party Crypto Asset Securities touted efforts they promised to and did undertake, funded with sales of the asset, to create and increase demand and value for these assets and returns for investors.  *E.g.*, *id.* ¶¶ 364-77 (SOL), ¶¶ 496-509 (COTI).  These representations began when the assets were first offered and sold and continue through the present day, including while the securities were traded on the Binance Platforms.  In fact, Defendants typically themselves directed investors to these promises.  *E.g.*, ¶¶ 216, 357, 368.

Binance also offers two investment programs, "BNB Vault" and "Simple Earn," that it markets as a way for investors to make money from Binance's entrepreneurial and managerial efforts.  *Id.* ¶¶ 325-38.

## II.   Zhao and Binance Actively Solicited Investors in the United States and Created a Plan to Avoid Regulatory Scrutiny

From the beginning, Zhao and Binance actively solicited investors in the United States to trade on the Binance.com Platform.  *Id.* ¶¶ 104-09.  By August 2019, for example, Binance estimated it had more than 1.47 million U.S. investors trading on the platform.  *Id.* ¶ 108.

Zhao and Binance knew they were violating the federal securities laws by operating the Binance.com Platform in the United States.  *Id.* ¶¶ 110-11.  Among other things, by November 2018, Zhao and Binance were advised they could face "regulatory actions" for issuing "BNB to US Persons," and "for [operating an] unregistered securities brokerage."  *Id.* ¶ 113.  Later, Binance's Chief Compliance Office plainly admitted that's what they were doing.  *Id.* ¶ 111.

Rather than complying with U.S. law, Zhao and Binance implemented an illegal scheme dubbed the "Tai Chi Plan" to continue profiting from U.S investors while evading U.S. law.  *Id.* ¶¶ 112-24.  That plan had two parts:  (1) implement superficial measures that purported to block U.S. customers from the Binance.com Platform while furtively encouraging them to circumvent

these measures so they could continue to trade on the platform; and (2) establish a new U.S. crypto asset trading platform that would appear independent of Binance, but that Zhao and Binance would secretly control. *Id.* ¶¶ 113-40. For years, and contrary to their public statements, Binance successfully avoided blocking U.S. investors from the platform. *Id.*

### III. Consistent with the Tai Chai Plan, Zhao and Binance Established the Binance.US Platform While Maintaining Substantial Control Over Its Operations

By February 2019, Zhao and Binance created BAM Trading and BAM Management to operate the Binance.US Platform. *Id.* ¶ 143. On June 13, 2019, Binance announced it would launch the platform in a "partnership" with BAM through which Binance would "license" its technology to BAM. *Id.* ¶ 151. Behind the scenes, however, Zhao and Binance controlled BAM and the Binance.US Platform's operations. *Id.* ¶¶ 154-236.

The Binance.US Platform launched on September 24, 2019. *Id.* ¶ 209. It provides a marketplace for trading crypto asset securities, including broker, exchange, and clearing agency functions. *Id.* ¶¶ 209-36. Since its inception, the Binance.US Platform has made available for trading for trading crypto asset securities, including BNB, BUSD, and the Third Party Crypto Asset Securities. *Id.* ¶¶ 352, 360. BAM also offers a "Staking Program" that it markets as a way for investors to make money from BAM's and others' entrepreneurial and managerial efforts to successfully "stake" those assets. *Id.* ¶¶ 339-51.

Throughout the platform's existence, BAM and Binance, both under Zhao's control, have operated the Binance.US Platform's exchange and clearing functions. *Id.* Yet the platform has never registered with the SEC in any capacity. *Id.*

### IV. BAM Defrauded Investors

BAM defrauded investors concerning its purported monitoring for manipulative trading on the Binance.US Platform and about the trading volume on the platform. For example, BAM

told investors seeking to trade crypto asset securities on the Binance.US Platform that BAM prohibited market manipulation, including "wash trading," also referred to as "self dealing." *Id.* ¶¶ 240-46 (statements in "Trading Rules" and statements by BAM's then-CEO). Starting in 2021, BAM made similar misrepresentations when soliciting investors in BAM Management ("Equity Investors"). *Id.* ¶¶ 247-49. In a "Pitch Deck" and other solicitation materials, BAM told Equity Investors that BAM monitored the Binance.US Platform for manipulative trading, including that it had the "highest level of compliance." *Id.* ¶¶ 248-49. Further, since the Binance.US Platform's launch, BAM has publicly disseminated purported trading volumes to investors in crypto asset securities on the Binance.US Platform in several ways, *id.* ¶¶ 250-55, and touted those volumes when soliciting Equity Investors. *Id.* ¶¶ 256-58. BAM, however, did not implement any controls to monitor for or prevent manipulative trading until after February 2022. *Id.* ¶¶ 265-67. Senior BAM personnel had reason to know these facts, and continued to discuss the problem without taking reasonable steps to correct it. *Id.* ¶¶ 262-64.

Further, Sigma Chain AG ("Sigma Chain"), an entity that Zhao owned and controlled, engaged in strategically timed wash trading on the Binance.US Platform, artificially inflating the platform's trading volumes at strategically important times. *Id.* ¶¶ 268-76. For example, on April 6, 2022, the Binance.US Platform began offering COTI, a crypto asset security, for trading on the platform, and in the ensuing days, Sigma Chain's wash trades comprised up to as much as 35.52% of COTI's daily trading volume on a given day. *Id.* ¶ 274.

These statements and acts and practices were material to investors. As Zhao himself once declared publicly, "CREDIBILITY is the most important asset for any exchange! If an exchange fakes their volumes, would you trust them with your funds?" *Id.* ¶ 242.

## STANDARD OF REVIEW

To withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in the plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may also consider documents incorporated by reference in the Complaint and facts as to which the Court may take judicial notice, including websites.  *William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1, 6 n.3 (D.D.C. 2018).  As to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a "plaintiff 'must allege specific facts connecting the defendant with the forum.'"  *SEC v. e-Smart Techs., Inc.*, 926 F. Supp. 2d 231, 235 (D.D.C. 2013) (quoting *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003)).  As to the SEC's claims based on Section 17(a) of the Securities Act of 1933, courts apply Rule 9(b)'s requirement that a plaintiff plead with specificity the "time, place, and contents of the false representations."  *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12 (D.D.C. 2017) (quotation and emphasis omitted).  But "intent [or] knowledge … may be alleged generally."  Fed. R. Civ. P. 9(b).

## ARGUMENT

**I.     The Complaint Plausibly Alleges That Defendants Intermediated Securities Transactions in Violation of the Exchange Act**

Defendants do not dispute they engaged in the functions of an exchange, broker-dealer, or clearing agency without registering with the SEC.  Instead, they make the sweeping assertion that the law does not apply to them because "the secondary market transactions … of the crypto assets at issue … necessarily fail the *Howey* test."  Binance Mem. 3; *see also* BAM Mem. 23.

Nearly 80 years ago, the Supreme Court held that an investment contract is "a contract, transaction or scheme" that constitutes the investment of money in a common enterprise with a reasonable expectation of profits derived from the efforts of others. *Howey*, 328 U.S. at 298-301.

Defendants pay lip service to *Howey*'s test, but in reality ask that the Court impose additional requirements Defendants have invented. Principally, Defendants contend that *Howey* requires a formal contract. *E.g.*, Binance Mem. 14-20; BAM Mem. 16-31. And they insist that "not just any type of contract will do," asserting that a "forward-looking" contract with "legally enforceable" rights and "post-sale obligations" is required. Binance Mem. 15-16, 18; *see also* BAM Mem. 11, 19-20. Binance also claims that the investment of money must "flow[] *into* the relevant 'common enterprise.'" Binance Mem. 19.

Unsurprisingly, Defendants do not cite a single case holding that these requirements exist or acknowledge that many cases reject or foreclose imposing them. By focusing myopically on specific facts of cases and elevating them to purported requirements, Defendants persistently and earnestly ignore *Howey*'s actual test. Similarly, in pointing to the other instruments in the statute (*id.* 16), Defendants ignore that the characteristics of one type of security do not define or limit the scope of another. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350-52 (1943).

In short, the approach that Defendants urge upon the Court is fundamentally at odds with the flexibility of the securities laws and *Howey*'s focus on the substance and economic reality of a transaction over its form. *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Under *Howey*, properly applied, the crypto assets alleged in the Complaint were offered and sold as securities while trading on the Binance Platforms, which subjects the platforms to the registration provisions of the federal securities laws.

A.        **The Statutory Foundation and the *Howey* Test**

The Securities Act of 1933 ("Securities Act") is focused on offers and sales of securities and requires that material information be provided in a registration statement in connection with a public offering of securities.  The Securities Exchange Act of 1934 ("Exchange Act") "sweeps more broadly" and regulates securities intermediaries while requiring ongoing disclosure for the benefit of investors and the marketplace.  *See Slack Techs., LLC v. Pirani*, 598 U.S. 759, 762-63 (2023).  The same Congress included the same term—"investment contract"—in the definition of "security" set forth in both Acts.  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  Nowhere did Congress draw a distinction between "investment contracts" traded on securities exchanges and those offered and sold elsewhere; nor do the statutes suggest that an "investment contract" made in an initial offering under the Securities Act ceases to be a "security" under the Exchange Act when it is traded in the secondary market.  Instead, Congress "sought to define the term 'security'" to include "the many types of instruments that in our commercial world fall within the ordinary concept of a security."  *United Hous. Found. v. Forman*, 421 U.S. 837, 865 (1975) (citing H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n.1 (1985) (the definitions are "virtually identical" and are construed as such).

*Howey*'s test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299.  The Supreme Court has stressed that "'form should be disregarded for substance and the emphasis should be on economic reality.'"  *Forman*, 421 U.S. at 848 (quoting *Tcherepnin*, 389 U.S. at 336).  The D.C. Circuit has thus explained that an investment contract is "*anything* that investors purchase with (1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others."  *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614 (D.C. Cir. 2000) (emphasis added).

Courts look at the totality of the circumstances and at what promoters invite investors to reasonably understand about and expect from the investment.  *See SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 688-93 (D.D.C. 1991), *aff'd*, 968 F.2d 1304, 1307-08 (D.C. Cir. 1992) (finding *Howey* satisfied by evaluating totality of circumstances and disregarding technical distinctions as "deliberate attempt to avoid the application of the test").

### B.   The Crypto Asset Securities at Issue Here Meet the *Howey* Test

1.   *Courts Have Flexibly Applied the Howey Test, Including as to Crypto Assets*

Courts have divided the *Howey* test into several elements.  First, courts broadly define an "investment of money" as when an investor "places his money at risk in anticipation of a profit." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) (cleaned up).  "Money" here is not limited to fiat currency, but includes anything of value, such as another crypto asset or services.  *E.g.*, *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560-61 (1979) (rejecting that an investment must take the form of cash only, rather than goods and services); *One-O-One Enters., Inc. v. Caruso*, 668 F. Supp. 693, 700 (D.D.C. 1987); *United States v. Zaslavskiy*, 2018 WL 4346339, at *5 (E.D.N.Y. Sept. 11, 2018).

Second, although the Supreme Court has not adopted a test to determine the "common enterprise," courts have found one exists if there is either (1) "horizontal commonality," when the fortunes of all investors are tied together; (2) "broad vertical commonality," when investors' success is tied to the success of the promoter's efforts; or (3) "strict vertical commonality," when investors' and promoter's fortunes are tied.  *See SEC v. Life Partners, Inc.*, 898 F. Supp. 14, 19 (D.D.C. 1995), *rev'd on other grounds*, 87 F.3d 536, 549 (D.C. Cir. 1996); *SEC v. Parkersburg Wireless LLC*, 991 F. Supp. 6, 8 (D.D.C. 1997).  The D.C. Circuit has held that horizontal commonality establishes a common enterprise, but has not ruled on whether either broad or strict

11

vertical commonality is also sufficient. *SEC v. Life Partners, Inc.*, 87 F.3d 536, 543-45 (D.C.

Cir. 1996). Courts in this district have evaluated both broad and strict vertical commonality.

*Life Partners, Inc.*, 898 F. Supp. at 19; *Parkersburg*, 991 F. Supp. at 8; *see Int'l Loan Network,

Inc.*, 770 F. Supp. at 690, 691-92.

Horizontal commonality exists where investors share in the enterprises' profits, *i.e.*,

where there is an "inter-dependency" of fortunes among investors. *E.g.*, *Life Partners*, 87 F.3d

at 544; *see also SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992) (common

enterprise exists where the "fortunes of investors are clearly linked" by the profits). Courts have

*not* required that funds flow directly to the issuers to establish commonality. *E.g.*, *Gary Plastic

Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 233, 240-41 (2d

Cir. 1985) (common enterprise existed where investor funds went to third-party banks issuing

certificates of deposit (CDs), not to defendant promoter whose role was to increase the value of

the CDs by, among other things, marketing the CDs, developing a secondary trading market for

the CDs, and negotiating with the issuing banks).

In crypto asset cases, courts have found horizontal commonality where investors' funds

were pooled to develop a crypto asset and related ecosystem, or investors shared *pro rata* in the

success or failure of the enterprise through changes in the price of the crypto asset (at times

referred to as the "token"). *E.g.*, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y.

2020) (promoter "as it said it would, pooled proceeds from its sales of Kin in an effort to create

an infrastructure for Kin, and thus boost the value of the investment. This is the nature of a

common enterprise"); *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *8-9 (S.D.N.Y. July 13,

2023). Courts have also found horizontal commonality even after the launch of a crypto asset

and related ecosystem if the fortunes of investors continued to be tied together through the value

of the token.  *E.g.*, *SEC v. Terraform Labs Pte., Ltd.*, 2023 WL 4858299, at *13-14 (S.D.N.Y.

July 31, 2023); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353-54 (S.D.N.Y. 2019).

Courts have found broad vertical commonality if investors were reliant on issuers to

develop and deliver the promised crypto asset ecosystem.  *E.g.*, *In re BitConnect Sec. Litig.*,

2019 WL 9104318, at *7-8 (S.D. Fla. Aug. 23, 2019) ("platform *itself* was the common

enterprise" and successful investment in BCC was inextricably linked to its value, which

depended upon the efforts of issuers, promotors, and others); *Rensel v. Centra Tech, Inc.*, 2018

WL 4410126, at *5 (S.D. Fla. June 25, 2018).  Courts have found strict vertical commonality

where crypto asset issuers retain a large cache of the tokens—*i.e.*, a large financial and

reputational interest in the project.  *E.g.*, *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369-71

(S.D.N.Y. 2020); *SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021).  *Cf. SEC v.*

*LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. 2022) (finding issuer and investor interests

aligned because financial fates intertwined when issuer retained millions of tokens).

Third, the D.C. Circuit has stated that the expectation of profits "must, in conformity with

ordinary usage, be in the form of a financial return on the investment, not in the form of

consumption."  *Life Partners*, 87 F.3d at 542-43.  In evaluating whether an issuer created an

expectation of profits, courts examine what the issuers, developers, and promoters of an

investment "promised" or "pledged," including in "marketing" the investments, concerning their

efforts and the investment's profitability.  *Id.* at 546-47; *see also Banner Fund Int'l*, 211 F.3d at

614 (advertisements, brochure, and referral system promising additional return on new earnings);

*Joiner*, 320 U.S. at 346, 352-53 ("sales campaign" and "sales literature"); *SEC v. Edwards*, 540

U.S. 389, 391 (2004) (marketing brochure); *Gary Plastic*, 756 F.2d at 233, 240 ("implicit"

promise); *Friel v. Dapper Labs, Inc.*, 2023 WL 2162747, at *17 (S.D.N.Y. Feb. 22, 2023)

(public statements and marketing materials); *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at
*3 (D.N.J. Dec. 10, 2018) (promotional materials and public statements); *see also LBRY*, 639 F.
Supp. 3d at 219-20 (in addition to promotional materials, LBRY's retention of hundreds of
millions of LBC "would lead purchasers of LBC to expect that they too would profit … as a
result of LBRY's assiduous efforts.").

Fourth, the D.C. Circuit has held that profits must be generated "predominantly from the
efforts of others, not counting purely ministerial or clerical efforts." *Banner Fund Int'l*, 211 F.3d
at 615. In this circuit, pre-purchase efforts are relevant but not sufficient—post-purchase efforts
are required. *See SEC v. Life Partners, Inc.*, 102 F.3d 587, 588 (D.C. Cir. 1996) (clarifying prior
ruling in denying rehearing). As to crypto assets, courts have held as sufficient the promoters'
representations that profits would result from their efforts to develop and commercialize a crypto
asset and its related ecosystem, engage in improvements, attract others into the ecosystem, and
develop a secondary market. *E.g.*, *Balestra*, 380 F. Supp. 3d at 357 (without the promised
blockchain, there would be no market for the crypto asset); *Friel*, 2023 WL 2162747, at *19-20
(development of secondary market and control and continued maintenance of the blockchain);
*Kik*, 492 F. Supp. 3d at 180 (crypto asset security "would rely heavily" on Kik's efforts).

### 2.      *BNB Is Offered, Sold, and Traded as an Investment Contract*

Under *Howey*, Binance's own crypto asset, BNB, is offered and sold as an investment
contract and, therefore, as a security. Binance does *not* even dispute this fact, at least as it relates
to its BNB ICO in 2017. *See* Binance Mem. 3. Nor could it. In or around June 2017, Binance
first offered BNB for purchase and sale in an ICO in which it raised $15 million from investors,
and then used those proceeds to build the Binance.com Platform, touting a purchase of the BNB
token as an investment in the success of that endeavor. *See* Compl. ¶¶ 287-301.

Instead, Binance attempts to distinguish post-ICO trading in BNB, taking the remarkable position that BNB could not have been offered and sold as a security after the ICO, including when trading on its own platform.  Binance Mem. 20-24.  But it runs headlong into this fact: nothing about BNB changed post-ICO.  Nothing substantive changed about BNB's relationship to Defendants and the Binance Platforms, how the Defendants have marketed BNB and its corresponding investment returns, or its ongoing efforts, which have continued to lead BNB investors to reasonably expect profits.  Binance's promotion of BNB as an investment into its efforts has continued—if not increased—since the ICO.  *E.g.*, Compl. ¶ 302.

Defendants have, for example, told BNB purchasers, post-ICO, that they are like "owner[s]" in Binance who are "effectively holding an influential share of the crypto project," and who "want the company to succeed; their interests are aligned with that of the company."  *Id.* ¶ 302(a), (d).  Binance has continued to offer discounts to customers who use BNB to pay for transaction fees, tying demand for BNB, and therefore its price, to the growth of the Binance enterprise, *id.* ¶ 300.  *See Telegram*, 448 F. Supp. 3d at 373 (finding the economic realities of the promised integration of Grams and the TON Blockchain with Telegram Messenger supported a reasonable expectation that Grams would increase in value and return a profit).  Binance has also advertised its "burn," or removal from circulation, of BNB over time creating further expectations of profits by BNB investors by reducing supply.  Zhao even admitted that this program "works the same way as a [stock] dividend economically."  Compl. ¶ 296.  These burn mechanisms do not "depend on the efforts of no one."  Br. *Amicus Curiae* Investor Choice Advocates Network ("ICAN Br.") 8-9, Dkt. No. 150.  They are coded into the protocol or otherwise involve transfers to burn wallets and then promoted—and at times also executed—by Binance, Compl. ¶ 296.  *See Kik*, 492 F. Supp. 3d at 179 (finding the "role of supply and demand

in driving the value of Kin" sufficient to establish profit expectation).  Based on these representations and efforts by Binance to grow its ecosystem around BNB, investors who traded BNB on the Binance Platforms reasonably expected to profit from Binance enterprise, Compl. ¶¶ 296, 300, 302, 304, 307-10.  *See BitConnect Sec. Litig.*, 2019 WL 9104318, at *8-9.

Binance claims that the Complaint alleges only pre-sale efforts (Mem. 23), but ignores allegations in the Complaint, that Binance to this day continues its entrepreneurial and managerial efforts to enhance the BNB ecosystem, attempting to deliver on its promises to investors to engage in efforts to generate profits.  *E.g.*, Compl. ¶¶ 294-95, 300-10.  This is all that *Life Partners* requires.  87 F.3d at 545-48.

Binance also contends that there is no strict vertical commonality because BNB investors could suffer losses while Binance was profitable or vice-versa.  Binance Mem. 21 n.6.  But this could be true in nearly any investment contract where the promoter has multiple sources of revenue.  A company may run businesses as to which it has not offered investment contracts while still offering investment contracts to public investors for other aspects of its business.  The *Howey* investors, for example, could suffer a loss with respect to the orange grove investments, and the *Howey* promoter could still turn a profit on the separate businesses that it was running.  328 U.S. at 295.  Binance cites *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982), but that holds only that a broker merely furnishing investment advice for trade commissions on discretionary trading accounts does not amount to a common enterprise.  That obvious point has nothing to do with the commonality alleged here, where Zhao and Binance have proudly acknowledged their common interest with all BNB investors, including in touting their own extensive holdings in BNB, which they tied to their own efforts and the success of the Binance enterprise.  *E.g.*, Compl. ¶¶ 294, 301-02, 304, 307.  This is more than sufficient to show "there is

some direct relation between the success or failure of the promoter and that of his investors." *Mordaunt*, 686 F.2d at 817.  Binance ignores the well-pled allegations establishing not only strict vertical commonality, *see Telegram*, 448 F. Supp. 3d at 370-71; *NAC Found.*, 512 F. Supp. 3d at 996, but broad vertical commonality, *In re BitConnect Sec. Litig.*, 2019 WL 9104318 at *7.

Finally, Binance contends that there can be no reasonable expectation of profits from the efforts of others because the price of BNB is a function of market supply and demand.  Binance Mem. 23.  Courts have repeatedly rejected this argument, and for good reason.  *E.g.*, *Kik*, 492 F. Supp. 3d at 180 ("[T]hat 'market forces' would drive the value of Kin ignores the essential role of Kik in establishing the market"); *Zaslavskiy*, 2018 WL 4346339, at *7 ("[T]hat market forces might contribute to the value of the schemes' underlying assets does not change the fact that … [defendant] and his co-conspirators induced investors to participate based on promises of 'the soundest' investment strategies.") (quotation omitted).  The question is not whether market forces are relevant, but whether there is *nothing* that the promoter can do to affect the outcome of the investment.  *Life Partners*, 87 F.3d at 545, 548.  Or, as stated in another case, "the value of Scotch [was] determined by the basic laws of supply and demand," but the whiskey was still sold as part of an investment contract because investors were led to believe they were "dependent upon" the promoter to deliver the promised profits.  *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1032, 1034-35 (2d Cir. 1974).

Similarly, here, the Complaint alleges that Binance led BNB investors to expect that Binance's and others' entrepreneurial and managerial efforts would impact their investment returns.  Moreover, Binance holds such a significant amount of BNB, which both intertwines its fortunes with and signals to BNB investors that Binance had a strong financial incentive to continue to develop and contribute to the success of the Binance ecosystem centered around

BNB.  Compl. ¶ 294.  Clearly, there are many things that Binance could do to affect BNB's price, including increasing its burn rate, redoubling efforts to attract users to its platforms or the Binance ecosystem more generally (potentially increasing it), or dumping its entire stash into the market (potentially crashing it).  Nothing more is required.

3.  *The Third Party Crypto Asset Securities Meet the* Howey *Test*

The Complaint also plausibly alleges that the Third Party Crypto Asset Securities that Defendants made available for trading on the Binance Platforms were offered and sold as investment contracts.  First, each of these assets required investors to make an "investment of money"—they were originally sold for cash or other consideration, and they continued to be available for purchase on the Binance Platforms for cash or crypto assets.  *E.g.*, Compl. ¶¶ 353, 366-67, 369, 378, 381, 388, 401-04, 430, 433, 440-42, 452-54, 466-72, 489-90, 493, 497-98.

Second, investors in these crypto assets bought into a common enterprise.  They purchased identical tokens whose prices rise and fall together.  *Id.* ¶¶ 354-56.  Their fortunes were thus interdependent.  *See Life Partners*, 87 F.3d at 544; *see also Kik*, 492 F. Supp. 3d at 179.  Investors' fortunes were further dependent on the success of the enterprise, establishing broad vertical commonality.  The issuers and promoters of the crypto assets tied their value (and thus investors' fortunes) to the success of their efforts with respect to the token ecosystem, a message that Defendants amplified using their trading platforms—such that the more successful the efforts, the greater the profits for investors, and vice versa.  *E.g.*, Compl. ¶¶ 305, 371, 375-76, 383, 387, 390, 394, 397, 406, 409-26, 431-37, 443-46, 448-50, 456-63, 467-69, 481-85, 499-500, 507-08.  Further, many issuers retained significant portions of the crypto assets' supply, and therefore their fortunes were tied to their investors', establishing strict vertical commonality. *E.g.*, *id.* ¶¶ 313, 413-14, 421, 459-60, 467-78, 473.

Third, the Complaint plausibly alleges that all investors in these crypto assets were led to reasonably expect profits based on the efforts of others.  The Complaint sets forth in extensive detail the publicly available statements of the issuers of the crypto assets including through "white papers" and online.  Issuers promoted their respective ongoing efforts to develop their token and related ecosystem to increase the profitability of the token.  *E.g.*, *id.* ¶¶ 24, 93, 105, 212-13, 215, 221, 251, 253, 254, 284, 286, 368, 370-77, 382-83, 387-98, 409-26, 434-37, 443-50, 455-64, 477-85, 491-95, 507-09.  Defendants, too, would amplify these marketing activities through their own promotions on the Binance Platforms, and other online advertising.  *E.g.*, ¶¶ 213-16, 254, 357.  For example, Defendants post research on crypto assets trading on their websites.  *E.g.*, "*The Sandbox (SAND)*," BINANCE, *available at* https://www.binance.com/en/research/projects/the-sandbox (last visited Nov. 6, 2023).

Further, the structure of the offerings—broadly disseminated to any and all persons without limitation, with issuers publicly noting that they were withholding large amounts of their respective tokens for themselves—led investors to reasonably understand that the issuers were financially compelled to undertake these efforts, *e.g.*, *id.* ¶¶ 313, 356-59, 413-14, 421, 446, 459-60, 467-78, 473.  *See LBRY*, 639 F. Supp. 3d at 220 (issuer's retention of tokens signaled it would work to improve the value of blockchain, "intertwining [its] financial fate with the commercial success of LBC").  Similarly, promoters marketed "burn" events that led investors to reasonably expect profits because reducing supply would increase the value of their respective tokens.  *E.g.*, Compl. ¶¶ 295, 377, 398, 422, 464; *see also Kik*, 492 F. Supp. 3d at 179 (finding the "role of supply and demand in driving the value of Kin" sufficient to establish the expectation of profits); *Friel*, 2023 WL 2162747, at *17 (same).  Finally, issuers touted the efforts they would undertake to develop a secondary market, including efforts to have their

respective tokens trade on platforms such as Defendants'. *E.g.*, *id.* ¶¶ 368, 383, 395, 415, 444, 448. *See Gary Plastic*, 756 F.2d at 233, 234, 240-41 (promise to maintain secondary market fueled expectation of profits); *Balestra*, 380 F. Supp. 3d at 356 n.14 (same).

Nor can there be any contention that the efforts touted as to the Third Party Crypto Asset Securities were only promises and efforts that were completed before the ongoing sales on the Binance Platforms.[1]  As these well-pled allegations demonstrate, issuers, developers, and promoters promised to and then did undertake significant managerial and entrepreneurial efforts with respect to their tokens and ecosystems before and well after the initial sales, after the assets were available on the Binance Platforms, and to the present day.  This is all that *Howey* requires.

## C.   *Howey's* Flexible Approach Does Not Require a Contract or Legally Enforceable Rights

Defendants claim adherence to *Howey*, but ask the Court to go beyond its well-established test and create new requirements.  What exactly they claim *Howey* requires is unclear.  BAM argues that *Howey* requires a "contractual arrangement," while Binance asserts that the existence of a "contract" is a threshold requirement before the Court may even conduct a *Howey* analysis, and that the test articulated in *Howey* goes only to the term "investment" in "investment contract."  BAM Mem. 2; Binance Mem. 15-20.  BAM posits that the "buyer must have contractual rights to share future profits in a common enterprise."  BAM Mem. 11; *see also id.* 12-15, 23-25, 28.  BAM further asserts that a promoter must be committed to "deliver future

---

[1] BAM's argument that the SEC has not pled that a single investor was aware of pre-ICO statements (Mem. 24) is yet another attempt to impose new requirements into *Howey*.  *Howey* is an objective test, not focused on what particular investors knew.  *See Telegram*, 448 F. Supp. 3d at 371.  No such requirement exists, and to the extent it did, the broadly disseminated marketing campaigns described above, often amplified on the Binance Platforms, permits the Court to draw the reasonable inference that the average investor was aware of these statements.

value," but concedes that the relevant efforts may exist as promises outside the four corners of contractual arrangements. *Id.* 11, 19.  Binance, meanwhile, asserts that legally enforceable rights must be "post-purchase commitments" that are "'entrepreneurial or managerial' in nature." Binance Mem. 18.  Defendants, however, lack support for these vague, convoluted, and ill-defined proposals. *See also* Br. *Amicus Curiae* Paradigm Operations LP ("Paradigm Br.") 4-10, Dkt. No. 147 (advancing similar arguments).

1. *Defendants' Cases Do Not Support Their Invented Requirements*

BAM argues that *Howey* "make[s] clear" that the existence of a contract is a *requirement*. BAM Mem. 11.  Not so.  *Howey* is clear:  an "investment contract" is a "contract, transaction, or scheme" that contains the three characteristics outlined in the test.  328 U.S. at 298-99.  The D.C. Circuit has similarly explained that an investment contract is "*anything* that investors purchase" that meets the prongs of *Howey*'s test.  *Banner Fund Int'l*, 211 F.3d at 614 (emphasis added).

In fact, the Supreme Court in *Howey* found that all investors to whom the arrangements were marketed were offered investment contracts, even though some of them never entered into the actual service agreements that imposed contractual obligations on the promoter.  328 U.S. at 296-99.  As the Court explained, the investment contracts "*in this instance* take the form of land sales contracts, warranty deeds and service contracts."  *Id.* at 300 (emphasis added).  The Court emphasized that it was "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."  *Id.* at 299; *see also Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) ("In defining the term investment contract, *Howey* itself uses the term 'contract, transaction, or scheme,' leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general 'scheme' of profit seeking activities.") (citations omitted).  In other words, while contractual terms were present and relevant in *Howey*, they were not dispositive or required.

21

Defendants cite no case concluding that, as a matter of law, an investment contract did not exist because "legally enforceable" contractual rights were absent.  No such case exists. Defendants' cases do not turn on whether the arrangements at issue give rise to "legally enforceable" rights or obligations or "contractual privity" as a matter of state law, or whether the allegations list the "identity" of the parties to these contracts.  BAM Mem. 21, 23-24, 28; Binance Mem. 15-16.  Instead, the case law "flexibly" analyzes all the facts and circumstances, including the terms of contracts (if any) to determine if *Howey*'s elements are established.

Binance relies on *Life Partners'* emphasis on post-purchase efforts.  Binance Mem. 15-18.  But that reliance is misplaced.  The court focused on whether "the promoter's efforts have a predominant influence upon investors' profits," noting that after the investors purchased the interests in life insurance settlements "the only variable affecting profits is the timing of the insured's death" and that "[n]othing that [the promoter] could do … had any effect whatsoever" on this outcome.  87 F.3d at 545, 548.  The same is true of cases involving the sale of precious metals.  BAM Mem. 30 (citing *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) and *Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980)).  The profits depended entirely upon external factors over which the promoters had no control.

None of those cases hold, mention, or even imply that the existence of legally enforceable rights to post-purchase efforts is required.  To the contrary, *Life Partners* recognized that the expectation of profits can exist based solely on what promoters and others had "promised" or "pledged."  87 F.3d at 547, 552-53 (citation omitted).  Here, similarly, the issuers, developers, and promoters of the crypto assets made promises to undertake—and did in fact undertake— post-purchase efforts that would affect investors' profits, including efforts to create and maintain

the ecosystem and enhance the secondary market.  *E.g.*, Compl. ¶¶ 370-76, 380, 382-83, 389-98, 410-26, 434-37, 443-50, 455-64, 467-85, 491-95, 499-509.

Binance also misleadingly claims that *Woodward v. Terracor*, 574 F.2d 1023, 1026-27 (10th Cir. 1978), held that an investment contract "*requires* ongoing 'contractual obligation.'" Binance Mem. 15 (emphasis added).  But *Woodward* created no such requirement.  Instead, the court noted that a sale of land was not a securities transaction absent contractual obligations or any "*promise* to run the development."  *Woodward*, 574 F.2d at 1026 (emphasis added).  In another case, the Tenth Circuit held that a promoter offered and sold investment contracts even though the promoter's own "formal contractual documents" "begin and end with the sale and delivery of live … animals," because the promoter marketed profit-making opportunities available post-purchase, none of which it was obligated to undertake under a contract. *Continental Mktg. Corp. v. SEC*, 387 F.2d 466, 468-70 (10th Cir. 1967).

BAM cites cases that generally involved contracts, and tries to weave this "common thread" into a legal requirement (BAM Mem. 14-15 & n.7).  But not a single case that BAM cites holds that any specific "legally enforceable" obligation is required, and BAM is candidly unwilling to state otherwise.  *See Friel*, 2023 WL 2162747, at *16-17 (finding that the court used the "persistent promise" language in *SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001), "to describe SG's actual actions in that case, not to define a rule").  *Marine Bank v. Weaver*, 455 U.S. 551 (1982), is particularly unavailing.  In that case, the Supreme Court distinguished the one-on-one sale of a CD in a "private transaction" from the instruments at issue in *Joiner* and *Howey*, which were offered indiscriminately to a large number of investors and which "had equivalent values to most persons and could have been traded publicly."  *Marine Bank*, 455 U.S. at 559-60.  So, too, are the securities at issue here.  BAM also ignores that here, as in the cases they cite, the

23

arrangements that facilitated the offer and sale of investment contracts involved various common-law contracts. *See, e.g.,* Compl. ¶¶ 126, 244 (Terms of Use); 366, 404 ("SAFT" agreements); 367, 504 (purchase agreements); 431, 437 (business contracts and service agreements); 440 (SAFE agreement); 317 (Stablecoin as a Service Agreement).

On the other hand, cases in this circuit that BAM relegates to a footnote (BAM Mem. 14-15, n.7) foreclose any argument that post-sale, legally enforceable managerial efforts or payments are required. In *Bowdoin*, for example, there were no contractual obligations to operate the company from which investors could expect to profit. Instead, the defendant vaguely "promise[d] to use [investor] funds" to deliver a return. 770 F. Supp. 2d at 145; *see also SEC v. Better Life Club of Am.*, 995 F. Supp. 167, 173-74 (D.D.C. 1998) (only "promises" to distribute profits); *Parkersburg*, 991 F. Supp. at 8 (no mention of any contractual obligations).

Even the pre-*Howey* cases upon which Defendants rely based on state "Blue Sky" laws (*e.g.*, BAM Mem. 13) undercut their arguments. *E.g.*, *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920) (contractual obligation to undertake certain efforts was imposed on the investor, not the promoter); *Lewis v. Creasey Corp.*, 248 S.W. 1046, 1049 (Ky. Ct. App. 1923) (state securities law not "intended to apply to contracts containing mutual obligations"). Nevertheless, *Howey*'s treatment of those laws as applied to the federal securities laws is what governs, not state law itself. Courts have long rejected similar attempts to subordinate the federal securities laws to restrictive state law contract principles. *E.g.*, *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) (the definition of "offer" under the Securities Act "goes well beyond the common law" (citation omitted)); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983) (finding references to common law "unavailing").

24

2.      *Defendants Ignore Relevant Precedent That Does Not Support Their Claimed Requirements*

Defendants claim that no Supreme Court and Courts of Appeals cases applying *Howey* have found investment contracts absent ongoing contractual obligations.  *E.g.*, BAM Mem. 19-20.  They are incorrect.  Starting with *Joiner*, the Supreme Court held that the sale of oil leasehold interests gave rise to investment contracts based on the promoter's stated intent to drill an exploratory oil well, which appeared only in sales literature and not in the leasehold assignments.  *See* 320 U.S. at 346-48.  As the Court held, "[w]hether … the assignee acquired a legal right to compel the drilling of the test well is a question of state law which we find it unnecessary to determine."  *Id.* at 349.

The Supreme Court has continued to adhere to this principle, distinguishing the inquiry into the existence of an investment contract from the question of legally enforceable rights under state law.  *E.g.*, *Tcherepnin*, 389 U.S. at 337-38 ("While Illinois law gives legal form to the withdrawable capital shares held by the petitioners, federal law must govern whether shares having such legal form constitute securities"); *Reves v. Ernst & Young*, 494 U.S. 56, 71 (1990) ("The 'maturity' of the notes, however, is a question of federal law.… We are unpersuaded that Congress intended the Securities Acts to apply differently to the same transactions depending on the accident of which State's law happens to apply.").

The Courts of Appeals have uniformly followed suit.  The First Circuit in *SG Ltd.* found an investment contract based solely on representations on the promoter's website, without a common law written agreement binding the promoter to undertake efforts.  *See* 265 F.3d at 49-55.  The Second Circuit in *Gary Plastic* found CDs were an investment contract based on Merrill Lynch's statements in an "Information Bulletin" that it "fully intends to maintain a secondary market for" the CDs investors purchased from banks, and its "implicit promise to

maintain its marketing efforts" with respect to the instruments.  756 F.2d at 233-34, 240; *see also Glen-Arden*, 493 F.2d at 1034 (focusing on sales literature and "economic inducements [which] were in the nature of inducements to invest").  The Tenth Circuit took the same approach in *SEC v. Scoville*, where the offerees' reasonable expectation of profits was based only on "the representations made to them" on websites.  913 F.3d 1204, 1221-22 (10th Cir. 2019); *see also Continental Mktg.*, 387 F.2d at 468 (investment contract exists based on marketed profit-making opportunities, where seller of beavers had no contractual obligation after delivery of beaver was complete); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 284 (5th Cir. 1992) (finding no investment contract where "legally binding and fully enforceable agreement to pay" a specific amount to investor foreclosed any reasonable expectation of profit).

Finally, the courts that have directly addressed some version of the "contractual obligations" requirement have squarely, explicitly, and unequivocally rejected it.  *Terraform*, 2023 WL 4858299, at *11 ("[T]he Supreme Court made clear in *Howey* that Congress did not intend [investment contract] to apply only where transacting parties had drawn up a technically valid written or oral contract under state law."); *Ripple*, 2023 WL 4507900, at *6 ( post-sale contractual obligations not required); *Kik*, 492 F. Supp. 3d at 178 ("an ongoing contractual obligation is not a necessary requirement"); *see also Audet v. Fraser*, 605 F. Supp. 3d 372, 386, 395-97 (D. Conn. 2022) (crypto asset that "traded on public exchanges" was an investment contract based only upon "promotional materials," "press release[s]," and website "graphic[s]").

3.    *Defendants' Other Arguments Do Not Withstand Scrutiny*

Binance attempts to make textualist arguments based on the words "investment" and "contract" (Binance Mem. 15-18), but the words used to label different types of securities do not themselves define those terms.  Otherwise, the Supreme Court's various and distinct, multi-

pronged tests for determining whether something is a "stock," an "investment contract," or a "note," *see e.g., Reves*, 494 U.S. at 61, would not be needed.

Binance also claims that ongoing, legally enforceable obligations are necessary to make the term "investment contract" consistent with the characteristics of other instruments that Congress included in each Act's list of securities, such as stocks, which grant certain rights under state law.  Binance Mem. 15.  But this turns the correct reading of the text of the statute on its head.  The term "investment contract" is explicitly meant as a "catch-all phrase."  *Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982).  The Supreme Court has accordingly held that courts should not "read out of the statute [the] general descriptive designations merely because more specific ones have been used to reach some kinds of documents."  *Joiner*, 320 U.S. at 351; *see also Landreth*, 471 U.S. at 691-92 ("applying the *Howey* test to traditional stock … would make the Acts' enumeration of many types of instruments superfluous").

For its part, BAM claims that the SEC "misunderstands" *Howey*'s reference to a "scheme," claiming that it was "plainly dicta" and "*not* intended to read the word 'contract' out of the statute."  BAM Mem. 17-18.  Again, the words "investment contract" simply label the instrument—the definition of those words together comes from *Howey*'s test, which plainly and quite clearly never mentions the need for contractual obligations or the need for contracts.

Finally, because they find little support in the caselaw, Defendants rely upon mischaracterizations of statements by the SEC or SEC staff.  BAM Mem. 17.  Even a cursory review of the SEC's briefs in *Edwards* and *Howey*, for example, shows the SEC argued that investment contracts can *include* contractual arrangements with certain characteristics, not that contractual arrangements are *required*.  *See* Brief for SEC, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455, at *17 (U.S. June 26, 2003); *see also* Brief for SEC, *SEC v. W.J. Howey Co.*, No.

843, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946).  Similarly, BAM cites SEC "No Action

Letters" (BAM Mem. 17), but fails to note that the SEC staff's conclusions not to recommend an

enforcement action were based on the lack of contractual obligations *as well as* because the

promoter would "not offer to perform future resale or other services for the buyer."  *See, e.g.,*

SEC No-Action Letter, *Am. Diamond Co.*, 1977 WL 10907, at *4 (Aug. 15, 1977).

### D.     Defendants' Hypothetical Scenarios and Comparisons to "Ordinary Assets" Are Misplaced

Defendants also set up a strawman.  They contend that the SEC's proposed application of

*Howey* has "virtually limitless application" because the SEC would make "straightforward asset

sales—such as diamonds, gold, jewelry, real estate, and art— … constitute securities" if an

investor had hopes that an asset will increase in value based on generalized advertisements or

promotions, such as "a diamond is forever."  BAM Mem. 27-29.  *Amici* similarly contend that

the Binance Platforms are akin to supermarkets, and that the SEC is suing the grocery store.

*E.g.*, Br. *Amicus Curiae* Chamber of Digital Commerce ("Chamber Br.") 5, Dkt. No. 169.

This argument is a canard.  At bottom, it is premised on likening crypto assets to so-

called "ordinary assets" (*e.g.*, BAM Mem. 11-12, Paradigm Br. 11-14), a term neither Defendant

nor *amici* attempts to define.  Nor do Defendants, tellingly, grapple with the fundamental nature

of the assets at the heart of this case.  BAM glosses over any taxonomy of crypto assets, stating

vaguely that they are simply "lines of computer code used in certain computer applications."

BAM Mem. 23.  Binance concedes that the crypto assets are typically created by their

developers, who often keep large amounts at inception or give them to validators.  Binance Mem.

4-5.  It otherwise studiously avoids stating what the assets do or are for.  *Id.*

Whatever else Defendants mean by "ordinary assets," crypto tokens are not at all like

oranges, diamonds, or oil in any way that is dispositive in a securities analysis.  The crypto assets

at issue here are the embodiment of the investment contract.  *E.g.*, *Telegram*, 448 F. Supp. 3d at 379 ("While helpful as a shorthand reference, the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence"); *see also Ripple*, 2023 WL 4507900, at *7.  A crypto asset does nothing on its own.  It represents the value of something, tracked on a ledger distributed across a network of computers.  Here, the crypto asset securities reflect the value their respective issuers and promoters give them, by leading reasonable investors to expect profits based on the managerial and entrepreneurial efforts of the issuers and others.  The value in a crypto asset offered and sold as an investment contract arises from that very enterprise.  An orange, by contrast, can be separated from an orange grove enterprise.  For the crypto assets alleged in the Complaint, those crypto assets cannot be separated from the investment contracts they represent.  In their attempt to distract with misleading analysis, Defendants and *amici* elide this fundamental point.  *E.g.*, Chamber Br. 4-5.

Stated another way, investors are not purchasing these crypto assets to own a digital sequence of letters and numbers like one may buy an orange to eat it.  They are purchasing the value the crypto asset represents.  That value is the enterprise that issuers and promoters promise to grow.  If the enterprises surrounding these assets vanished, the value of the tokens would disappear, a "critical causal connection that other … cases" involving collectible items "lack." *Friel*, 2023 WL 2162747, at *13; *see also Telegram*, 448 F. Supp. 3d at 375 (without promoter's efforts, crypto assets would "exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable" investors to expect profits); *Kik*, 492 F. Supp. 3d at 179.

The true nature of the crypto assets here is revealed most obviously by the deliberate efforts of Defendants and others to echo traditional securities markets.  The one-letter difference between "ICO" and "IPO" is no coincidence, nor is the resemblance between a crypto

whitepaper and investing prospectuses.  Nor is the uncanny resemblance between the Binance

Platforms' trading interfaces and those of registered broker-dealers.  *See* Compl. ¶¶ 74, 88-89.

Whether it is an ICO or an IPO, investors are not buying a "commodity for personal

consumption."  BAM Mem. 23.  They are buying with the expectation that issuers and promoters

will work to increase the value of their investment to enable a profitable sale of the asset in a

secondary market.  The solicitation of investors using the language and appearance of regulatory

compliant equities markets is not like opening a grocery store.  Crafty legal arguments aside, the

touchstone is the reasonable expectation of investors, who know they are not buying oranges.

In analyzing the assets at the crux of this case, the Court should not accept Defendants'

unsubtle invitation to gloss over these fundamental characteristics of crypto assets, the value they

may represent, and the sources of that potential value.

In any case, even if these assets have some inherent use like an orange or a diamond

does, that would not alter the analysis.  The investment contracts in *Howey* involved the sale of

an asset—orange groves.  "Plenty of items that can be consumed or used … have been the

subject of transactions determined to be securities because they had the attributes of an

investment." *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021) (citing Thomas Lee

Hazen, The Law of Securities Regulation § 1.5, at 14 (1985)).  What matters are the "economic

inducements" used to encourage the transaction.  *Joiner*, 320 U.S. 352-53; *Int'l Loan Network*,

968 F.2d at 1307; *Continental Mktg.*, 387 F.2d at 470-71; *SG Ltd.*, 265 F.3d at 53-54; *see also*

*Banner Fund Int'l*, 211 F.3d at 614 (an investment contract is "anything that investors purchase

with an expectation of profits arising from a common enterprise that depends upon the efforts of

others").  All of the relevant circumstances surrounding the sale of the asset must be analyzed.

Thus, when *Howey*'s requirements are met, courts find that sales of commonplace assets involve the sale of an investment contract. Where those requirements do not exist, even with respect to the same instruments, courts find no investment contract. *Compare Grenader v. Spitz*, 537 F.2d 612, 617-18 (2d Cir. 1976) (co-op shares were not investment contracts), *with Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 193 (5th Cir. 1979) (co-op shares were investment contracts). Tellingly, not a single one of these cases considers whether an "ordinary asset" is involved or ends the analysis there. They all apply *Howey*. Nor do courts resort to "contractually grounded expectations" (whatever that means) to distinguish between the sale of an asset for consumption and one for investment. Accordingly, to the extent that BAM seeks a "limiting principle" that distinguishes the unadorned, naked sale of a diamond from the sale of the crypto assets in this case, the Court need look no further than *Howey* itself.

Defendants obscure the circumstances under which the assets *in this case* were offered and sold. Investors' reasonable expectation of profits in trading the crypto asset securities at issue were not mere "hope[s]" created by vague slogans; neither were those expectations untethered from promoters' efforts, nor were investors left to their "own devices." Binance Mem. 28. Rather, investors' expectations were based on the persistent representations by issuers and other third parties—magnified by the loudspeaker of the Binance Platforms' promotions. And they were based on the twin economic realities that were made plain to investors: without such efforts the assets would have no value, and the promoters themselves had tremendous financial incentives to undertake these efforts. *See LBRY*, 639 F. Supp. 3d at 220.

### E. Defendants' Additional Distortions of *Howey* Should Be Rejected

1. *Binance Attempts to Invent a Nonexistent "Flow of Funds" Requirement*

Binance (but not BAM) additionally argues that anything trading on its platform does not satisfy *Howey* "unless the buyer's investment of money flowed *into* the relevant 'common

enterprise." Binance Mem. 19. Binance does not cite a single case in support of its proposed gloss on the common enterprise requirement. As noted, courts find a common enterprise exists based principally upon the tying, or "inter-dependency," of investors' fortunes, and none have turned on the *flow* of funds in any context. *E.g.*, *Life Partners*, 87 F.3d at 544. To the contrary, the D.C. Circuit has rejected any obsequious focus on how proceeds are handled, noting the handling of funds may be an "administrative detail" that could invite "scrupulously avoid[ing]" handling funds in a particular way to escape liability. *Id.* And in *Gary Plastic*, the Second Circuit found the existence of a common enterprise where investors' funds flowed to the third-party banks that sold the CDs, and not to Merrill Lynch, which was the seller of the investment contract at issue. 756 F.2d at 234. In *BitConnect Securities Litig.*, the court rejected a similar argument that investors were never led to believe their crypto asset purchases "would be used to invest in or develop any future product or common enterprise." 2019 WL 9104318 at *8 (quotation omitted). Finding the argument "misses the forest for the trees," the court explained that investors purchased the crypto asset as an investment whose success "was inextricably linked to the value" of the crypto asset because it was "interwoven with and dependent on the efforts and success" of platform's founders, administrators, and others. *Id.* (quotation omitted).

The cases Binance cites are not to the contrary. *Wals v. Fox Hills Dev. Corp.* did not require that funds "flow" in any particular matter. 24 F.3d 1016 (7th Cir. 1994). It found no commonality because there was no "pooling of profits." *Id.* at 1019. In *SEC v. Rubera*, the defendant conceded the common enterprise. 350 F.3d 1084, 1090 (9th Cir. 2003). In analyzing whether there was an "investment of money," the court found it was satisfied by the purchase of pay telephones with the service contracts, because the standard was only that investors commit themselves in a way that subjects them "to financial loss." *Id.*

2.       *Defendants' Distinctions Based on a Transaction's Forum Are Inapposite*

The subtext that underlies Defendants' arguments is the sweeping contention that, as a matter of law, sales of crypto assets on trading platforms and in secondary markets can never be sales of investment contracts.  BAM Mem. 22-25; Binance Mem. 3.  As an initial matter, Defendants only haltingly embrace this argument because, even if accepted, the Complaint contains well-pled allegations that issuers, including Defendants, sold their crypto assets directly on the Binance Platforms, and so this case does not involve only secondary market transactions.  *E.g.*, Compl. ¶¶ 363, 388, 441.  Arguments about whether and how *Howey* applies to a resale is thus not dispositive or even relevant for purposes of this motion.

It is ironic for Defendants to incorrectly argue that the SEC seeks to establish a *per se* rule that crypto tokens themselves remain securities in perpetuity (BAM Mem. 21-22; Binance Mem. 3, 20), while flirting with espousing a sweeping *per se* rule that would elevate the forum of a transaction over its economic reality.  In any event, this extreme position is simply wrong.  As discussed above in Section I.A, Congress included the identical term "investment contract" in both the Securities Act, governing direct offers and sales of securities, *and* in the Exchange Act, governing those who serve as intermediaries of securities transactions.  Nothing in the text, structure, or purpose of these statutes suggests that the term "investment contract" is construed differently simply because an issuer may sell it to an investor, or one investor may resell it to another.  To the extent courts have dealt with resales of investment contracts, they have applied *Howey*.  *E.g.*, *Hocking*, 885 F.2d at 1457.  Defendants unsurprisingly cite no case to the contrary.

Moreover, Defendants' theory makes no sense.  Imagine an issuer that offers or sells a crypto asset security directly to an initial investor, perhaps through the Binance Platforms.  The investor then turns around and immediately sells it to another investor.  That resale does not in any way alter the economic reality, the value the asset represents, or the enterprise into which the

new holder is now financially invested by virtue of her ownership.  Yet under Defendants' logic, the transfer would magically remove transactions in the asset from *Howey*'s domain and the reach of the federal securities laws, notwithstanding ongoing public representations by issuers and promoters leading *all* investors, including those transacting in the secondary markets, to expect profits based upon the efforts of others, and notwithstanding that nothing had changed in that nanosecond about the value the token represents or the ecosystem within which it operates.

This case provides a concrete illustration of the illogical nature of Binance's position: the transactions in BNB at issue.  Recall—Binance does not dispute that its offers and sales of BNB during its ICO constituted offers and sales of an investment contract.  Binance Mem. 3.  And despite Defendants' arguments to the contrary, the economic realities of subsequent transactions in BNB remain the same.  They continue to involve the offer and sale of an investment contract because purchases of BNB require an investment of money, Zhao and Binance still tout BNB as an investment in their enterprise, and its value remains tied to the platform ecosystem.  *Id.*

Indeed, as *Terraform* held, "*Howey* makes no such distinctions between purchasers" on the primary or secondary market."  2023 WL 4858299, at *15.  The court explained, "an investor selecting an investment opportunity is attracted by the representations the promoter makes about the promoter's efforts," and defendants "embarked on a public campaign to encourage" *all* investors to purchase the relevant crypto assets in furtherance of the larger enterprise.  *Id.*  Thus, whether "a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts."  *Id.*

This is particularly true here because the trading of the crypto asset securities via the Binance Platforms did not happen by chance—offering an issuer's crypto asset on the Binance

Platforms is a deliberate issuer strategy to facilitate broader token distribution into the hands of investors, to foster a liquid secondary market, to develop the token's network, to increase the price, and, accordingly, to generate greater profits for all investors.  *E.g.*, Compl. ¶¶ 367-68, 395, 415, 497.  Moreover, these inducements typically continue long after the asset is first sold by the issuer, *see supra* Section I.B.3, and are repeated on the Binance Platforms themselves.  *E.g.*, *id.* ¶¶ 24, 35, 87, 105, 212-13, 221, 223, 251, 253-54, 284, 286.

Defendants rely on *Ripple*, which found that certain "blind bid/ask transactions sales" did not involve securities because the buyers "could not have known if their payments of money went to Ripple, or any other seller of XRP," 2023 WL 4507900, at *11.  *See* BAM Mem. 27; Binance Mem. 21-22.  But, even on a developed evidentiary record, *Ripple* explicitly declined to rule on whether secondary market resales of tokens constituted investment contract transactions.  *See* 2023 WL 4507900, at *11 n.16; *see also SEC v. Ripple Labs, Inc.*, 2023 WL 6445969, at *3-4 (S.D.N.Y. Oct. 13, 2023) (subsequent ruling expressly limiting prior ruling "to the unique facts and circumstances of th[at] case," and further stating that it was based in part on supposed differing marketing materials but "did not hold that offers and sales on a digital asset exchange cannot create a reasonable expectation of profits based on the efforts of others")*.*  The Complaint alleges that all investors received the same marketing materials and other public promises of promoters and issuers.  On a motion to dismiss, there is no factual basis upon which to distinguish the reasonable expectations from one investor to the next.  *See also SEC v. Xia*, 2022 WL 17539124, at *20 (E.D.N.Y. Dec. 8, 2022) (explaining that "the inquiry under *Howey* is objective, and the investors' subjective motivations are categorically immaterial").

* * *

Under *Howey*, what is determinative is not any predicate formal agreement or "legally enforceable" obligations, but rather a flexible application of the economic reality surrounding the offer, sale, and entire scheme at issue, which may include a variety of promises, undertakings and corresponding expectations. Defendants urge the Court to focus on form over substance, but following their logic would create an enormous loophole, allowing issuers, intermediaries, and others to easily evade the federal securities laws by simply refusing to enter into a formal contract. Such an approach is fundamentally inconsistent with *Howey* and its progeny.

The Complaint plausibly alleges that—given the economic reality and the entirety of the circumstances—the crypto asset securities that traded on the Binance Platforms were offered and sold as investment contracts in accordance with *Howey*. Defendants therefore acted as broker-dealers, exchanges, and clearing agencies without registering with the SEC in violation of the Exchange Act. This Court should deny Defendants' Motions to dismiss these claims.

## II.     The Complaint Plausibly Alleges Securities Act Section 5 Claims

Securities Act Sections 5(a) and (c) "prohibit the 'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration." *Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) (quoting 15 U.S.C. §§ 77e(a), (c)). The Complaint charges Binance with unregistered offers and sales of BNB during its ICO and in sales to employees as compensation for their services (Claim 1), of BUSD (Claim 2), and of its BNB Vault and Simple Earn programs (Claim 3). It also charges BAM with unregistered offers and sales of its Staking Program (Claim 4).

### A.     The SEC Asserts Plausible Claims as to Binance's Offers and Sales of BNB

As to Binance's BNB ICO, again, Binance does not dispute that they constituted securities offers and sales that should have been registered. Binance Mem. 3, 20. Rather,

Binance argues only that claims arising from the ICO are time barred. *Id.* 35-36. It further asserts that its subsequent sales of BNB to its employees were not securities by doubling down on its incorrect application of *Howey*. *Id.* 20 n.5 Neither argument is correct.

1.   *The SEC's Claim Relating to the BNB ICO Is Timely*

Binance argues that the SEC's ICO-related Securities Act Section 5 claims are time-barred because a five-year statute of limitations period applies to the SEC's claim for penalties and disgorgement. *Id.* 36 (citing 28 U.S.C. § 2462; 15 U.S.C. § 78u(d)(8)(A)(i)). This argument is irrelevant because the SEC also seeks injunctive relief, which is subject to a 10-year limitations period. *See* 15 U.S.C. § 78u(d)(8)(B). In any event, the statute of limitations does not run when the defendant is located outside of the United States. *Id.* § 78u(d)(8)(C) (period does not run during "any time in which the person against which the action or claim, as applicable, is brought is outside of the United States"); 28 U.S.C. § 2462 (period does not run until "the offender or the property is found within the United States in order that proper service may be made thereon."). Binance is based in the Cayman Islands, Compl. ¶ 27, and there is no allegation that proper service can be made in the United States—and it did not accept service during the SEC's investigation into its conduct. Thus, the five-year limitations period under either statute has not run. *See SEC v. Sharp*, 626 F. Supp. 3d 345, 386 (D. Mass. 2022).

In any event, a motion to dismiss is no place to parse through the various remedies that may be available for each particular claim. All that matters is that the Court can provide relief as to that claim, as it undoubtedly can here. *See generally Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (the D.C. Circuit has "repeatedly held" that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint" because these issues "often depend on contested questions of fact").

2.      *The SEC Plausibly Alleges Offers and Sales of BNB to its Employees*

The Complaint alleges that, since at least 2019, Binance has violated Securities Act

Section 5 through its unregistered offers and sales of BNB to its employees, including U.S.-

based employees, as compensation for services rendered to Binance.  Compl. ¶¶ 306-10.

Binance's only challenge is that these offers and sales do not satisfy *Howey's* investment-of-

money element because these sales were "outflows" of BNB from Binance.  Binance Mem. 20

n.5.  Not so.  The labor that these employees undertake is tangible and definable consideration

that they provide in exchange for BNB.  *See Uselton v. Com. Lovelace Motor Freight, Inc.*, 940

F.2d 564, 574-75 (10th Cir. 1991).  In providing their labor, Binance's employees, like all other

investors, invest in the same common enterprise—the BNB ecosystem.

**B.      Binance Offered and Sold BUSD as an Investment Contract**

Binance offered and sold BUSD as an investment contract.  It induced investors to

purchase BUSD by offering financial returns and numerous profitmaking opportunities involving

BUSD that were dependent upon Binance's efforts to generate profits.  Compl. ¶¶ 315-24.  These

various opportunities included the "BUSD Reward Program," in which Binance promised

interest payments for simply holding BUSD.  *Id.* ¶ 323.  Binance also advertised that it would

establish and maintain the "Binance Flexible Savings, through which [BUSD holders] can earn a

bonus BUSD at a 2%-5% APY;" an auto-deposit function that "automatically transfers BUSD

from your spot wallet to Flexible Savings, making it possible for you to earn even if you forget

to proactively save;" and other offerings that "can give you around 20%-30% APY."  *Id.* ¶ 324.

Moreover, Binance (through an affiliate) and a third party together agreed to and then did

build and manage the platform on which BUSD is issued and redeemed, to list, market, and

promote BUSD to investors, to invest the BUSD reserves (essentially, proceeds from investors'

BUSD purchases) in profit-generating opportunities for the promoters, which Binance deployed

at least in part to further enable and promote the Binance ecosystem that gave BUSD its profit potential.  *Id.* ¶¶ 317, 321, 324.  As of February 2023, approximately 90 percent of BUSD was held in wallets Binance controlled, most of which was BUSD deposited by investors that Binance held in omnibus wallets on the platform.  *Id.* ¶ 318.

Binance argues that BUSD was not offered as an investment contract because (1) there is no profitmaking opportunity given that its value is supposed to stay at $1; (2) whatever profitmaking schemes are available as to BUSD are "other," separate schemes; (3) Binance's post-purchase efforts with respect to BUSD are ministerial; and (4) the CFTC, another federal agency charged with enforcing different statutes not at issue here, has supposedly determined that BUSD is a commodity.  Binance Mem.  24-26.  All of these arguments fail.

That BUSD does not change in price is not dispositive.  In many cases, the return promised to investors comes not from appreciation in the value of the asset purchased, but from deploying the asset so as to generate profits, like the citrus groves in *Howey* and the payphones in *Edwards*.  Indeed, as in *Terraform*, Binance's label that BUSD is a "stablecoin" is "only marginally of interest" where it is "pitched to investors, not as stablecoins, but primarily as yield-bearing investments."  2023 WL 4858299, at *12.  The court "decline[d] to erect an artificial barrier between the tokens and the investment protocols with which they are closely related for the purposes of its [*Howey*] analysis."  *Id.*; *see also SEC v. Arbitrade Ltd.*, 2023 WL 2785015, at *6 (S.D. Fla. Apr. 5, 2023) (holding an investment contract exists based on the "entire scheme" involving the crypto asset).

Nor does the fact that Binance has at times marketed BUSD's potential price stability affect the outcome, given that Binance widely and repeatedly touted BUSD as an investment. *Howey* requires an objective analysis, not a search for individual motivations.  *Telegram*, 448 F.

Supp. 3d at 371; *Xia*, 2022 WL 17539124, at *20.  Binance's offers and sales of BUSD were not restricted to those expected to use it for payments.  *See Forman*, 421 U.S. at 851.

The second argument—that the Court should parse out as separate schemes BUSD and the "other" profitmaking opportunities that depend upon its purchase (Binance Mem. 25)—fundamentally misunderstands the law.  *Howey* rejected precisely this sort of artificial separation of the schemes offered and sold.  328 U.S. at 297-98.  Instead, *Howey* and a long line of cases applying it look to "the full set of contracts, expectations, and understandings" to determine whether an asset sale is an investment contract and reject efforts to artificially cleave opportunities that were promoted together.  *Telegram*, 448 F. Supp. 3d at 379; *see also Terraform*, 2023 WL 4858299, at *12-13; *Continental Mktg.*, 387 F.2d at 470.

Binance also argues that its post-sale efforts are "ministerial" because all it has promised to do is "mechanically convert one BUSD token into one dollar."  Binance Mem. 25-26.  However, Binance offers no support for its position that these efforts are ministerial.  *Cf. Arbitrade Ltd.*, 2023 WL 2785015, at *6 (holding that promoters' efforts to back each crypto asset with $1 worth of gold satisfied "efforts of others" prong of Howey).  More important, Binance ignores the other efforts it is alleged to have undertaken, including actively deploying funds from investors' BUSD purchases to generate returns and actively managing the various products and services, such as Binance's BUSD Reward Program and Binance Flexible Savings programs, from which investors are paid.  Compl. ¶¶ 317, 321-24.

Finally, Binance's attempts to create supposed "intra-agency disagreement" between the SEC and the CFTC are misguided.  Binance Mem. 6-7, 12, 24, 34-35.  As a general matter, the SEC has authority to bring an enforcement action alleging violations of the securities laws.  15 U.S.C. § 78u(d).  The CFTC has authority to bring actions alleging violations of the commodities

laws.  When the SEC exercises its authority, it alleges that something is a security, and nothing

more.  Similarly, when the CFTC exercises its authority, it alleges that something is a

commodity, and nothing more.  It *does not*, as Binance contends, determine that assets are

"commodities *and not securities*."  Binance Mem. 6 (emphasis added).

Nor would there be any basis upon which to do so.  A crypto asset may be subject to

multiple regulatory frameworks.  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228-29

(E.D.N.Y. 2018).  As the CFTC's Office of General Counsel has stated, whether a crypto asset is

a commodity does not resolve the question of whether the crypto asset is a security.  *See* CFTC

Letter, *SEC v. Telegram Grp. Inc.*, No. 19-cv-09439, Dkt. No. 203 (S.D.N.Y. Feb. 18, 2020).

### C.   BAM's Staking Program, and Binance's BNB Vault and Simple Earn Programs Were Offered and Sold as Investment Contracts

Binance and BAM also offer and sell several programs as investment contracts.  On the

Binance.US Platform, BAM markets a "Staking Program."  Compl. ¶ 339.  Staking describes an

activity on blockchains that use the "Proof of Stake" method for validating transactions.  These

ledgers rely upon anyone willing to commit, or "stake," their crypto assets for certain periods to

put these assets at risk in exchange for the right to confirm and validate new transactions on the

blockchain and earn rewards in return.  *Id*. ¶¶ 340-42.[2]  Validators with staked assets run the risk

of some of the staked assets being removed, including if they fail to take certain required actions,

for performing malicious actions, or for being inactive for long periods of time, potentially

endangering the ability of the network to validate additional blocks.  *Id.* ¶ 349.

---

[2] Staking is a complex, resource-intensive endeavor.  *See* Compl. ¶¶ 340-42.  For example, one proof of stake blockchain, Ethereum, publicly discloses information about the complexity of staking on its blockchain.  *Proof-of-Stake Rewards and Penalties,* ETHEREUM.ORG, *available at* https://ethereum.org/en/developers/docs/consensus-mechanisms/pos/rewards-and-penalties/#rewards (last visited Nov. 5, 2023).

Under its Staking Program, BAM pools crypto assets that investors commit to the endeavor, including to meet the minimum amount requirements of a network, *e.g.*, Compl. ¶ 347, and then it initiates the "bonding" process for investors (the process of locking up the assets), and stakes the crypto assets to nodes run by third-party staking service providers, thereby using investors' crypto assets to generate passive returns for investors based on BAM's and others' efforts to profitably stake those assets. *Id.* ¶¶ 350-51. If rewards are earned, BAM deducts a commission and tenders the remaining profits to investors. *Id.* ¶ 346.

Binance offers two investment programs on the Binance.com Platform, BNB Vault and Simple Earn. *Id.* ¶ 325. Binance markets these programs as profitmaking opportunities in which investors purchase certain crypto assets that they lend to Binance for it to deploy "for a variety of purposes," including staking (similar to BAM's Staking Program), but also to provide loans and other Binance business-related uses. *Id.* ¶¶ 325-39. Binance pools investors' crypto assets and uses them to maximize returns for itself and investors. *Id.* ¶ 335.

Defendants contend that these investment programs do not involve an "investment of money," because investors (1) are supposedly not making a "purchase," but are instead simply loaning or tendering the assets for deployment even though the assets can and are typically returned; and (2) do not risk loss. BAM Mem. 32-33; Binance Mem. 28-29. But *Howey* does not require a non-refundable purchase. The inquiry is whether investors "provide[d] the capital," *Howey*, 328 U.S. at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provid[ed]" cash. *Telegram*, 448 F. Supp. 3d at 368-69. Investors need only commit their assets to the enterprise, and even a revocable commitment suffices. *E.g.*, *Edwards*, 540 U.S. at 389 (investors entered into a payphone purchase agreement with buyback rights); *Rubera*, 350 F.3d at 1090 (holding that purchase of telephones from promoter was an investment of money even though the

investor had the indefinite option for the promoter to buy back the telephones at cost); *Better Life Club*, 995 F. Supp. at 173 (loaning money to a common enterprise suffices).

Further, investors in all three programs face the risk of loss. BAM's and Binance's staking activities present their own unique risks, such as "slashing penalties" and operational risks of BAM's and Binance's systems. Compl. ¶ 349. And Binance's BNB Vault and Simple Earn programs involve broader entrepreneurial activities such as providing loans and negotiating business deals using investors' crypto assets, such that investors could face losses. *Id.* ¶¶ 329, 331, 333. Other risks common to all three investment programs include BAM's and Binance's solvency and changes in the value of investors' crypto assets while committed to these programs, *id.* ¶¶ 329-36, 349. *See Rubera*, 350 F.3d at 1090 (risk of loss where "there was no guarantee that [the promoter] would be financially able to honor buyback requests at the time investors demanded them."); *Gary Plastic*, 756 F.2d at 241 (investors expected profits based on the solvency of underlying bank and the promoter).

BAM and Binance also argue that the Complaint fails to plausibly allege post-purchase entrepreneurial efforts with respect to these investment programs. BAM Mem. 35-36; Binance Mem. 29. Yet the Complaint alleges that BAM and Binance undertake to retain third parties to stake assets, and employ their own technical skill in operating the strategy—itself a complex and involved endeavor—to generate passive returns for investors, Compl. ¶¶ 329, 336, 344-49. *E.g.*, *Rubera*, 350 F.3d at 1092 ("investors' profits depended on [the promoter's] expertise and care" such as "service" and "expert management" of the telephones involved in the scheme).

Although it may be true that investors can stake on their own (Binance Mem. 35-36), that fact is not dispositive. The question is not "whether it was somehow possible for an investor to profit without [relying on the efforts of others] … but rather … whether the typical investor who

was being solicited would be expected under all the circumstances to … remain[] passive" and

rely on the promoter's efforts to generate the profits. *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d

577, 582-83 (2d Cir. 1982).  BAM marketed the Staking Program as a way for investors to turn

over their efforts to BAM and remain passive, promoting the Staking Program "as an investment

or as a means whereby participants could pool … their money and [BAM]'s contribution in a

meaningful way." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008).

Further, as to Simple Earn and BNB Vault, Binance "uses its entrepreneurial expertise in

managing both programs" and deploys assets for loans and other business activities to generate

returns.  Compl. ¶¶ 329, 336.  None of these are ministerial acts, and they can affect the

profitability of the investments as in *Life Partners*.  87 F.3d at 545-46.  Accordingly, this Court

should deny Defendants' motions to dismiss Claims 3 and 4.

## III.    The Major Questions Doctrine Is Inapposite

### A.    The Major Questions Doctrine Is Not Concerned with Agency Enforcement of Congressional Enactments

Defendants and *amici* urge dismissal based on their misunderstanding of the purpose and

reach of the major questions doctrine.  Binance Mem. 33-35; BAM Mem. 31-32; Chamber Br.

16-19.  That doctrine is rooted in "both separation of powers principles and a practical

understanding of legislative intent." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  It is

premised on the principle that "one branch of government" should not "arrogat[e] to itself power

belonging to another," *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023), and the "presum[ption]

that Congress intends to make major policy decisions itself, not leave those decisions to

agencies." *West Virginia*, 142 S. Ct. at 2609 (cleaned up).  Focused on preventing "the

Executive seizing the power of the Legislature," *Nebraska*, 143 S. Ct. at 2373, the doctrine

constrains agencies' "regulatory assertions" of "highly consequential power beyond what

Congress could reasonably be understood to have granted," *West Virginia*, 142 S. Ct. at 2609, 2621 (cleaned up), such as the adoption of an entirely new "regulatory scheme," *id.* at 2616, or the enactment of a new regulatory "program." *Nebraska*, 143 S. Ct. at 2369.  Relevant precedent identified by these cases similarly involved the exercise of regulatory, not enforcement, authority.  *See generally NFIB v. OSHA*, 595 U.S. 109 (2022); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).

The SEC's exercise of enforcement power here is fundamentally different.  The SEC filed this action pursuant to the Executive Branch's power to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts" the "'take Care'" "responsibility." *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Buckley v. Valeo*, 424 U.S. 1, 138 (1976)).  Given this distinction, courts have refused to extend this doctrine to an agency's exercise of enforcement authority.  *E.g.*, *FTC v. Kochava Inc.*, 2023 WL 3249809, at *13 (D. Idaho May 4, 2023) (holding the major questions doctrine inapplicable where the FTC was merely asking a court to interpret and apply a statute enacted by Congress); *United States v. Freeman*, 2023 WL 5391417, at *8 (D.N.H. Aug. 22, 2023) (rejecting major questions doctrine in statutory enforcement action).  Defendants fail to explain why a doctrine intended to protect Congressional authority to make major policy decisions would be served by precluding the SEC from enforcing the Congressional policy choices embodied in the securities laws.  As a court reasoned in rejecting the doctrine's application to an SEC enforcement action, "[d]efendants cannot wield a doctrine intended to be applied in exceptional circumstances as a tool to disrupt the routine work that Congress expected the SEC … to perform." *Terraform*, 2023 WL 4858299, at *9; *see also All. for Fair Bd. Recruitment v. SEC*, 2023 WL 6862856, at

*17 (5th Cir. Aug. 23, 2023) (rejecting application of major questions doctrine where "the SEC's asserted authority is an ordinary exercise of its power").

Instead of focusing on what Congress has done, Defendants and *amici* point to proposed legislation addressing the regulation of crypto assets.  Binance Mem. App. Table B; BAM Mem. 31; Chamber Br. 17-18.  But Defendants' request—that this Court conclude that the SEC has no authority to enforce existing laws because Congress may be considering proposed legislation relating to crypto assets—finds no support in the Supreme Court's major questions doctrine cases or otherwise.  Congress bestowed the SEC with authority to enforce the laws at issue in this case nearly 90 years ago.  The "history and the breadth" of this authority is neither "extraordinary" nor remarkable.  *West Virginia*, 142 S. Ct. at 2608 (citation omitted); *see also All. for Fair Bd. Recruitment*, 2023 WL 6862856, at *17 (the SEC's authority to approve self-regulatory organization rules, granted the Commission in 1975, is "unremarkable").

Congress created the SEC to administer and enforce the securities laws, designed to eliminate abuses that contributed to the stock market crash of 1929, and adopt a "philosophy of full disclosure … to achieve a high standard of business ethics in the securities industry."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963); *see also Terraform*, 2023 WL 4858299, at *9 ("[T]he SEC's role is not to exercise vast economic power over the securities markets, but simply to assure that they provide adequate disclosure to investors.").  Since its inception, the SEC has exercised its Congressionally bestowed enforcement authority with respect to a wide variety of securities.  *E.g.*, *Joiner*, 320 U.S. at 344 (oil and gas leases).  Proposed legislation does not alter the SEC's mandate to enforce existing law.

**B.**     **Even If the Major Questions Doctrine Were Applicable in the Enforcement Context, the Circumstances Warranting Its Application Are Absent Here**

The Supreme Court has indicated that the major questions doctrine applies to "agencies' assert[ions] of highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609.  Those concerns are absent here.

First, this civil enforcement action lacks the vast economic or political significance that the Supreme Court has pointed to when invoking the major questions doctrine.  In *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021), for example, the Court emphasized that the challenged Center for Disease Control and Prevention's eviction moratorium would govern 80 percent of the country and impose an estimated $50 billion cost.  And in *West Virginia*, the Court described the rule by the U.S. Environmental Protection Agency ("EPA") at issue as one that would have "force[d] a nationwide transition away from the use of coal to generate electricity." 142 S. Ct. at 2616 (cleaned up).  There is no indication that the breadth or scope of the entire "digital asset industry" (BAM Mem. 31)—let alone the subset of that industry that Defendants occupy—even begins to approach what was at issue in *Alabama* or *West Virginia.*

Ignoring that this case involves only Defendants' conduct, and misleadingly sweeping in the two largest crypto assets in existence but not at issue here—Bitcoin and Ether—Defendants assert that "the crypto assets at issue here are worth billions of dollars and … trillions ride on the questions [the Commission] wants this Court to decide."  Binance Mem. 31.  But the crypto asset industry "falls far short of being a portion of the American economy bearing vast economic and political significance." *Terraform*, 2023 WL 4858299, at *8 (quotation omitted).  Thus, even if the entire industry were at issue, "it would ignore reality to place the crypto-currency industry and the American energy and tobacco industries—the subjects of *West Virginia* and *Brown &*

47

*Williamson* …—on the same plane of importance." *Id.*  Indeed, as Defendants concede (*see* BAM Mem. 31), unlike those industries, "the entire digital asset industry [is] nascent."

Second, it is simply not the case that this enforcement action is an exercise of authority beyond what Congress could reasonably be seen to have granted to the SEC—in sharp contrast to the Supreme Court's major questions cases.  In *West Virginia*, the Court observed that the EPA had "located that newfound power in the vague language of an ancillary provision" of the Clean Air Act which "was designed to function as a gap filler and had rarely been used in the preceding decades."  142 S. Ct. at 2610 (quotations omitted).  The Court found "little reason to think" that Congress had, by means of that "previously little-used backwater" provision, "implicitly tasked [the EPA], and it alone, with balancing the many vital considerations of national policy implicated in deciding how Americans will get their energy."  *Id.* at 2612-13.

Similarly, in *Nebraska*, the Supreme Court found it unlikely that, by giving the Secretary of Education discretion to modify or waive statutory and regulatory student loan provisions, Congress authorized him to "create[] a novel and fundamentally different loan forgiveness program" that would "release 43 million borrowers from their obligations to repay $430 billion." 143 S. Ct. at 2369, 2372.  Noting it was the first time the Secretary had "claimed powers of this magnitude" and that "Congress ha[d] chosen not to enact" such a program, the Court concluded that "the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* at 2732-35 (cleaned up).

Those circumstances are a far cry from what is at issue here.  The SEC did not file this action pursuant to a "previously little-used backwater" provision, *West Virginia*, 142 S. Ct. at 2613, or some "humdrum reporting requirement," *Nebraska*, 143 S. Ct. at 2371.  Rather, the SEC filed this enforcement action pursuant to the same authority that it has exercised since its

establishment to enforce the same provisions of the federal securities laws—action that is "business as usual for the SEC," and "nothing unheralded or unprecedented." *All. for Fair Bd. Recruitment*, 2023 WL 6862856, at *17 (cleaned up).  Nor does Binance's and *amici's* reliance upon the SEC Chair's statements about a lack of "regulatory framework" reveal otherwise. Binance Mem. 33; *see also Amicus Curiae* Br. Circle Internet Fin., LLC ("Circle Br.") 21, Dkt. No. 149 (citing same testimony and arguing that the "SEC previously 'disavowed its jurisdiction' over" the entire crypto asset industry) (citation omitted).  This argument takes that statement out of context; it specifically concerned Bitcoin, a crypto asset that the SEC has never claimed is a security.  And as the Chair further explained, other than Bitcoin, "there is a lot of authority that the SEC currently has in the securities space, and there are a number of cryptocurrencies that fall within that jurisdiction."  Binance Mem. Appx. Table A line 6, at 44.

Indeed, even if "clear congressional authorization" were required here, *West Virginia*, 142 S. Ct. at 2614, that standard is satisfied.  Congress intended the Commission's enabling statutes to be brought to bear with respect to interests or instruments encompassed by the term "security," whatever the type and however novel, and "there is no indication that Congress intended to hamstring the SEC's ability to resolve new and difficult questions posed by emerging technologies where these technologies impact markets that on their face appear to resemble securities markets." *Terraform*, 2023 WL 4858299, at *9.  To the contrary, "Congress painted with a broad brush" precisely because "[i]t recognized the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes," not in spite of such advances. *Reves*, 494 U.S. at 60-61 (cleaned up).  Enforcing the federal securities laws here thus does not represent the exercise of a "newfound power," *West Virginia*, 142 S. Ct. at 2610 (cleaned up); rather, it is the exact type of enforcement action that Congress expected the SEC to

bring.  The SEC's authority to enforce those laws "is plain on the face of the Exchange Act," *All. for Fair Bd. Recruitment*, 2023 WL 6862856, at *17, and thus conclusively forecloses application of the major questions doctrine.

## IV.     This Action Does Not Violate Zhao's or Binance's Due Process Rights

Zhao and Binance argue that vague "principles of fair notice" compel dismissal of all claims against them.  Binance Mem. 41-43.  Zhao and Binance contend that (1) they lacked fair notice because the SEC has taken "new" and "shifting" positions on whether crypto assets may be sold as securities; (2) the SEC failed to act while the crypto asset industry experienced "massive growth," and (3) the SEC seeks to impose "retroactive liability" as to offers and sales of BNB.  *Id.*  Yet courts have consistently rejected the argument that the term "investment contract" fails to provide constitutionally required notice.  *E.g.*, *Bowdoin*, 770 F. Supp. 2d at 148.

This action does not represent a "new" position on whether crypto assets can be offered and sold as securities.  *See* Binance. Mem. 42.  "The instant lawsuit … is just one example of the SEC's longstanding view that some cryptocurrencies may fall within [its] regulatory ambit." *Terraform*, 2023 WL 4858299, at *9.  This argument ignores the over one hundred actions the SEC has brought with respect to crypto assets securities, and guidance from SEC staff as to how it analyzes the question of whether a crypto asset is a security.  *See* SEC, *Crypto Assets and Cyber Actions*, *available at* https://www.sec.gov/spotlight/cybersecurity-enforcement-actions; Compl. ¶¶ 78-79 (describing the SEC's "DAO Report"); SEC, *Framework for 'Investment Contract' Analysis of Digital Assets*, *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (last modified Mar. 8, 2023).

Similarly, Zhao's and Binance's claim that the SEC's position has "shifted" is based entirely on their say so—they cannot muster one example of the SEC contradicting itself, despite its extensive review of dozens of filings, court proceedings, and other agency pronouncements.

*See supra* Section I.C.3.  Nor does the time before the SEC brought *this* lawsuit—a thinly veiled

equitable estoppel defense—support any fair notice defense.  Congress provided limitations

periods for the SEC to bring cases.  *E.g.*, 15 U.S.C. § 78u(d).  "[T]he SEC's failure to prosecute

at an earlier stage does not estop the agency from proceeding once it finally accumulated

sufficient evidence to do so."  *Graham v. SEC*, 222 F.3d 994, 1008 (D.C. Cir. 2000).

      The SEC also does not seek any retroactive application of the law.  The laws at issue

were enacted in the 1930s.  The DAO Report did not announce new law, but was based on law

that was decades old.  Compl ¶¶ 78-79.  Nor does "the law … require the Government to reach

out and warn all potential violators on an individual or industry level."  *Kik,* 492 F. Supp. 3d at

183.  The cases Binance cites (Mem. 43) are inapposite; they concern agency rules or

interpretations of regulations.  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C.

Cir. 2017); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995).  Here, the SEC seeks to

apply a congressionally enacted statute, and this Court can determine whether Defendants dealt

in the alleged investment contracts.  "As a necessary consequence, [a defendant] is only entitled

to notice of the meaning of the statute and not to the agency's interpretation of the statute."  *FTC

v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015).

      *Amici's* similar complaints about the SEC's approach in this space do not merit a

different outcome.  *See* Chamber Br. at 3-5; ICAN Br. 16-17; Paradigm Br. 17-21.

Fundamentally, these are not serious arguments that the federal securities law do not apply to

crypto assets—but that they should not apply.  *E.g.*, Chamber Br. 8-9 (arguing current regulatory

regimes are "not compatible" with and are a "poor fit" for crypto asset markets).  While

"regulation-by-enforcement" (*id.* 6-10) may be a pithy soundbite, it is not a valid legal defense,

and courts uniformly reject it.  *E.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he

choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency"); *CFPB v. Ocwen Fin. Corp.*, 2019 WL 13203853, at *16-19 (S.D. Fla. Sept. 5, 2019) (rejecting fair notice defense based on "regulation through enforcement," and noting "[f]ederal courts have rejected this argument.").  And it is particularly duplicitous to claim both that the SEC must proceed by regulations while also arguing that the SEC lacks the authority to regulate the crypto markets. *Compare* Chamber Br. 3, 6-7 (faulting the SEC for not proposing rules), *with id.* 6, 16-19 (arguing crypto asset industry is too large for the SEC to regulate absent congressional action).

Finally, while not required, Zhao and Binance were, as alleged, *fully aware* that they were violating the federal securities laws and deliberately implemented a plan to evade them, Compl. ¶¶ 110-40.  *United States v. NGL Crude Logistics, LLC*, 2018 WL 4762901, at *17-20 (N.D. Iowa July 3, 2018) (summary judgment where defendant "had actual notice of the potential liability associated with its actions"); *United States v. Cinergy Corp.*, 495 F. Supp. 2d. 892, 900-05 (S.D. Ind. 2007) (similar).

## V.    The Complaint Plausibly Alleges that BAM Violated the Anti-Fraud Provisions of the Securities Act

The SEC alleges that BAM violated Securities Act Sections 17(a)(2) and (3) by defrauding investors who were offered and sold crypto asset securities on the Binance.US Platform ("Securities Investors"), and Equity Investors who invested in BAM Management. Compl. ¶¶ 239-81.  Securities Act Section 17(a)(2) prohibits obtaining money or property by means of a false statement or a statement that is misleading by omission.  15 U.S.C. § 77q(a)(2). Securities Act Section 17(a)(3) prohibits engaging in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  *Id.*

§ 77q(a)(3).  These claims require only a showing of negligence.  *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006).

BAM violated Securities Act Sections 17(a)(2) and (3) by negligently misleading Securities Investors and Equity Investors.  First, BAM led both Securities Investors (through its Trading Rules and its former CEO's statements) and Equity Investors (through its "Pitch Deck" and other solicitation materials) to believe that BAM had implemented procedures to monitor for and prevent manipulative trading on the Binance.US Platform.  Compl. ¶¶ 239-49.  Yet BAM failed to implement such measures until well after February 2022.  *Id.* ¶¶ 266-67.

Second, BAM regularly disseminated the Binance.US Platforms' trading volumes to Securities Investors through its website and other internet-based platforms, and to Equity Investors through the Pitch Deck and other solicitation materials.  *Id*. ¶¶ 250-58.  These statements and acts operated as a fraud on both groups of investors because BAM omitted the material fact that it lacked procedures to reasonably verify that its reported volumes represented genuine market activity.  In addition, BAM's reported trading volumes were corrupted by Binance-affiliate Sigma Chain's wash trading.  *Id*. ¶¶ 250-81.

BAM was negligent in misleading investors about its monitoring for manipulative trading, while failing to surveil the Binance.US Platform for manipulative trading.  *Id.* ¶¶ 261-76.  It was on notice of these failures; for example, one high-level BAM employee noted to BAM's CEO in January 2021, "[a]pparently we have nothing in place to prevent wash trading?  Just tested myself, sold market order into my own bid."  *Id.* ¶ 264.  And Sigma Chain engaged in strategically timed wash trading that BAM was on notice of, but did not prevent.  *Id*. ¶¶ 268-76.

The Complaint also includes detailed allegations relating to materiality.  Materiality is a mixed question of law and fact, and "courts have cautioned against granting a motion to dismiss

based on the failure to plead materiality." *RPM Int'l, Inc.*, 282 F. Supp. 3d at 23.  As alleged, trading volume was a key metric for Securities Investors deciding which platform to trade on and which crypto asset securities to trade.  Compl. ¶ 278.  The Binance.US Platform's trading volume was also important to Equity Investors because it was directly tied to BAM's profitability.  *Id.* ¶ 279.  Thus, these investors would have wanted to know that BAM was not taking reasonable steps to monitor for and prevent manipulative trading that could artificially inflate trading volume on the platform.  *Id.* ¶¶ 278-81.  Instead, BAM materially misled these investors when it (1) represented that it monitored for and prohibited manipulative trading, when it did not; and (2) disseminated its trading volumes without being able to reliably report that were the product of legitimate market forces.  *Id.*  Indeed, as Zhao stated before the Binance.US Platform launched, "CREDIBILITY is the most important asset for any exchange!  If an exchange fakes their volumes, would you trust them with your funds?"  *Id.* ¶ 242.

The Complaint further alleges that the existence of Sigma Chain's wash trading was material to Securities Investors' decisions (i) to trade on the Binance.US Platform, such as during its launch in September 2019, *id.* ¶ 272, and (ii) to trade in a particular crypto asset security.  *Id.* ¶¶ 273-74.  For example, Sigma Chain's wash trading in the days after the Binance.US Platform first made COTI available for trading comprised up to 35 percent of COTI's daily trading volume.  *Id.* ¶ 274.  Similarly, as to Equity Investors, right before BAM began soliciting them, Sigma Chain wash traded 51 of the 58 crypto assets trading on the Binance.US Platform, which inflated the volumes reported to Equity Investors in a time period that was critical to their investment decisions.  *Id.* ¶¶ 275, 78-79.  These allegations are sufficient to withstand a motion to dismiss.  *See RPM Int'l*, 282 F. Supp. 3d at 31-32.

## A.      BAM Misconstrues the SEC's Claims as Manipulative Trading Claims

Woven throughout BAM's arguments is a fundamental misunderstanding of the SEC's claims, including an attempt to engraft a scienter requirement onto the SEC's negligence-based claims.  The SEC is not charging BAM with manipulative trading.  That activity is relevant to the SEC's charges because it shows, among other things, BAM's negligence in engaging in the fraudulent conduct, and the falsity of BAM's trading volume reporting.  But the SEC does not need to meet the elements of a scienter-based market manipulation claim it has not charged.

Thus, BAM's arguments that the Complaint does not allege Sigma Chain's manipulative intent or plead Sigma Chain's wash trading in greater detail pursuant to Rule 9(b) are beside the point.  BAM Mem. 38-39.  So too are BAM's quibbles with the volume of Sigma Chain's wash trading (*id*. 38-41), factual points that are, in any event, not amenable to resolution on a motion to dismiss.  *See In re Xcel Energy, Inc.*, 286 F. Supp. 2d 1047, 1056 (D. Minn. 2003) (holding that trade volume reporting was materially misleading despite small amounts of wash sales); *United States v. Coscia*, 177 F. Supp. 3d 1087, 1091-92 (N.D. Ill. 2016) ("[T]he relevant deception in a wash trade necessarily conveys information about demand and price, which are quintessentially material to investors.").

## B.      BAM's Arguments as to the Fraud on Securities Investors Are Unavailing

BAM's arguments for dismissal of the SEC's claims as to Securities Investors lack merit. First, BAM incorrectly asserts that these claims do not involve securities, but as explained above in Sections I-II, BAM made at least 12 securities available for trading on the Binance.US Platform.  Second, BAM argues that it did not "obtain[] money or property" by means of its misleading statements to Securities Investors.  BAM Mem. 36.  But as alleged, BAM obtained substantial trading fee revenue by fraudulently inducing Securities Investors to trade on the platform, Compl. ¶ 281.  *See RPM Int'l, Inc.*, 282 F. Supp. 3d at 30 ("increased compensation

based on the volume of business enlarged by the alleged fraudulent activity" satisfied the money-or-property element) (quoting *SEC v. Spinosa*, 31 F. Supp. 3d 1371, 1379 (S.D. Fla. 2014)).

Third, BAM argues that the SEC's Securities Act Section 17(a)(3) claim fails because the SEC does not allege "deceptive acts beyond misstatements." BAM Mem. 36. But, after the Supreme Court's decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), numerous courts have rejected the proposition that a deceptive act distinct from a misstatement is required. *E.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021); *Malouf v. SEC*, 933 F.3d 1248, 1259 (10th Cir. 2019); *SEC v. Winemaster*, 529 F. Supp. 3d 880, 918 (N.D. Ill. 2021); *see also In re Bed Bath & Beyond Corp. Sec. Litig.*, 2023 WL 4824734, at *12 (D.D.C. July 27, 2023) (rejecting motion to dismiss Exchange Act Section 10(b) claims because plaintiff alleged deceptive conduct that included misstatements). *But see SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (Exchange Act 10(b) scheme liability claims require "something" beyond a misstatement, such as dissemination). As *Lorenzo* noted, "violations of both [Securities Act Section] 17(a)(2) and (a)(3)" have been historically "based on false representations in stock sales." 139 S. Ct. at 1102 (citing *In re Arthur Hays & Co.*, 5 S.E.C. 271 (1939)).

In any event, the Complaint plausibly alleges that BAM committed fraudulent acts beyond its misleading statements. For example, BAM disseminated these false statements to investors, Compl. ¶¶ 244-46, 252-53. *See Lorenzo*, 139 S. Ct. at 1101; *Rio Tinto*, 41 F.4th at 49. BAM also engaged in a course of business that operated as a fraud on Securities Investors by failing to implement procedures to prevent wash trading even as it touted such measures, Compl. ¶¶ 241-43. *E.g.*, *Weiss*, 468 F.3d at 855-56 (upholding Securities Act Section 17(a)(3) claims for acts and misstatements); *RPM Int'l, Inc.*, 282 F. Supp. 3d at 32 (denying motion to

dismiss when defendant withheld information from his company's auditors and other personnel that contributed to the company making misstatements to investors).

Fourth, BAM argues that the SEC's claims involving Securities Investors fail Section 17(a)'s offer-or-sale element.  BAM Mem. 37.  Yet this element is "expansive enough to encompass the entire selling process."  *RPM Int'l, Inc.*, 282 F. Supp. 3d at 28 (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)).  In *Naftalin*, for example, the Supreme Court held that a customer's misrepresentations to his brokers satisfied this requirement because the defendant "placed sell orders with the brokers; the brokers, acting as agents, executed the orders."  441 U.S. at 772.  Here, BAM's alleged misconduct induced Securities Investors to trade on the Binance.US Platform, where BAM provided broker and other securities-related services to these investors.  In addition, BAM's alleged misconduct materially impacted which specific securities investors purchased, such as COTI.  Compl. ¶¶ 274, 277-78.  These allegations suffice. *See e.g.*, *SEC v. Crowe*, 216 F. Supp. 3d 866, 863-67 (S.D. Ohio 2016) (holding that fraud affecting an investor's choice of securities custodian satisfied this element).

BAM counters with two Eleventh Circuit decisions holding that an investor's "choice of broker" and investment account "is not intrinsic to the investment decision itself."  BAM Mem. 37 (citing *Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1148-50 (11th Cir. 2018), and *SEC v. Goble*, 682 F.3d 934, 943 (11th Cir. 2012)).  These decisions are inconsistent with *Naftalin*.  In any event, this case is distinguishable because BAM's misconduct also affected Securities Investors' decisions as to which crypto asset securities to trade.

Fifth, BAM argues that the SEC's claims involving BAM's "Trading Rules" are not actionable.  BAM Mem. 41-42.  BAM's argument that the Trading Rules bind its customers, not BAM, *id.* 41, neglects that they "operate as a binding contract between BAM and each Trader."

Ex. 1 to BAM Mem., at 1.  The Trading Rules gave investors the misleading impression that

BAM prohibited market manipulation on the Binance.US Platform when it did not, and when at

least one customer, Sigma Chain, was engaged in precisely such misconduct.  *Id.* 14

(representing that market makers like Sigma Chain would comply with Trading Rules); Compl.

¶¶ 245, 268-75.  BAM further argues that the Trading Rules "do[] not implicitly represent to the

world that every alleged violation will be identified and prevented," that they are "too general

and aspirational to be actionable," and are statements of opinion under *Omnicare, Inc. v.*

*Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 203 (2015).  BAM Mem. 41-

42.  These arguments are inapposite.  The Complaint alleges that BAM made misleading

statements as to specific and verifiable representations of fact—whether or not BAM was taking

reasonable steps to prevent market manipulation.  *See RPM Int'l Inc.*, 282 F. Supp. 3d at 25

(rejecting dismissal of fraud claims based on statement that defendant's internal controls were

effective).  And BAM admits that the Complaint plausibly alleges that BAM made these

statements even though "BAM personnel knew that manipulative trading *could* occur," BAM

Mem. 42—which is precisely the negligence required to withstand its motion to dismiss.

Sixth, and finally, BAM challenges the SEC's claim based on BAM CEO's statements in

a public webinar, arguing it does not satisfy the offer-or-sale requirement because it occurred

before BAM offered any securities for sale.  BAM Mem. 42-43.  *Id.*  This is incorrect.  BAM

CEO's statements were made shortly after BAM launched the Binance.US Platform, when at

least one crypto asset security, BNB, was available for trading.  Compl. ¶¶ 164, 246.  BAM also

mischaracterizes its CEO's statements as referring to anti-money laundering controls (BAM

Mem. 43), and, at best, this an issue that cannot be resolved on a motion to dismiss.  The CEO

made those misstatements in response to questions about whether the platform's trade data was

"real."  *See id.* Ex. 2 at 19-20.  Finally, the SEC need not allege that an investor "participated or

was otherwise aware" of these statements (BAM Mem. 43), because the SEC is not required to

prove reliance.  *Lorenzo*, 139 S. Ct. at 1104.

### C.    BAM's Arguments as to the Fraud on Equity Investors Are Unavailing

This Court should reject BAM's arguments for dismissal of the SEC's claims involving

Equity Investors.  First, BAM's argument that the Pitch Deck contains "generic wording" that

was "too general and aspirational" and included "statements about the future" (Mem. 45) fare no

better here than with respect to the Trading Rules.  The Pitch Deck unambiguously states that

BAM "deploys"— *i.e.,* present tense—several means to "ensure [the] highest level of

compliance" and that BAM engages in "[t]rade surveillance, market manipulation, and

transaction monitoring."  Compl. ¶ 248, *see also* Ex. 4 to BAM Mem. 11.  These are concrete

representations about then-existing facts.  *E.g.*, *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791

F.3d 90, 109 (D.C. Cir. 2015) (holding that statements that defendant's sales were "very strong"

did not constitute immaterial puffery).

Second, BAM's argument that the SEC's claim is based upon a single reference "buried

in the middle of a slide deck," BAM Mem. 44, is fact-specific and unable to be resolved on a

motion to dismiss.  The case BAM cites, *Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015), was a

ruling after an evidentiary hearing, not on a motion to dismiss.  Finally, BAM's argument that

the Trade Surveillance Manual was an internal document (Mem. 45) is contrary to the well-pled

allegation that BAM gave it to Equity Investors during its solicitations.  Compl. ¶ 249.

### VI.    The Claims Against Zhao and Binance Allege Domestic Violations Of U.S. Law

Zhao and Binance move to dismiss the "Foreign Components" of Counts 1-2, and all of

Counts 3, 5-7, and 11, arguing that transactions on the Binance.com Platform are foreign and

outside the reach of the federal securities laws.  Binance Mem. 36-42.  Yet they have operated a

crypto asset trading platform available all over the world via the internet that permits transactions in crypto assets represented on online ledgers distributed across a network of computers, and they eschew jurisdiction or physical location anywhere.  Compl. ¶¶ 27, 63; *see also* ICAN Br. 5 (crypto transactions are "often by design borderless").  Given these realities, their argument boils down to a single fact:  Binance's primary place of business.  Because they are based abroad, Zhao and Binance argue they are not subject to U.S. law.  No other fact is apparently relevant. *See also id.* 2 (noting that Binance Platform is a "foreign exchange" based on place of company incorporation).  The Court should reject this remarkable position.

The Complaint alleges that Zhao's and Binance's violations of the federal securities laws were domestic because Binance offered and sold securities directly to U.S. investors (Claims 1-3) and, with Zhao as its control person, served as a broker-dealer, exchange, and clearing agency for U.S. investors (Claims 5-7, 11).  These activities were so pervasive that, by 2019, the Binance.com Platform had over 1.47 million U.S. investors.  Compl. ¶ 24.  Defendants also used U.S. high-volume traders to maintain liquidity on the platform, *id.* ¶ 109, U.S. banks to make and receive payments, *id.* ¶ 27, and U.S. banks to receive payments for sales of BUSD, BNB, BNB Vault, and Simple Earn.  *Id.* ¶¶ 282-86.  And while doing so, Zhao and Binance knew they were "operating [an] . . . unlicensed securities exchange in the USA."  *Id.* ¶ 111.

Ignoring this pervasive U.S.-focused conduct, Zhao and Binance argue that, pursuant to *Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010), all violations of the federal securities laws must be predicated on "domestic transactions" in securities.  Binance Mem. 37-38. *Morrison*, however, involved a specific statutory provision, Exchange Act Section 10(b), focused on fraud in connection with the purchase and sales of securities.  In contrast, the statutory provisions at issue here do not hinge on any particular securities transaction, but on domestic

conduct.  *See Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 916 (D.C. Cir. 2018) (holding that foreign broadcaster that "directs infringing performances into the United States from abroad commits a domestic violation of the Copyright Act" under *Morrison*).

Courts presume that, absent a clearly expressed congressional intent to the contrary, federal laws have only domestic application and cannot be applied extraterritorially.  *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 417-18 (2023).  Extraterritoriality is a two-step inquiry:  (1) whether the presumption against extraterritorial application has been rebutted and, if not, (2) whether the case involves a domestic application of the statute.  *Id.*  Here, it is unnecessary to assess whether any of the statutory provisions at issue rebut the presumption under step one because the SEC has alleged only domestic violations under step two.  *See WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (noting discretion to begin at step two).  Step two assesses whether "the conduct relevant to the statute's focus occurred in the United States"; if so, the case involves a permissible domestic application even if other conduct occurred abroad.  *Id.* at 2137; *Spanski*, 883 F.3d at 913.

As explained below, the focus of the registration provisions of the laws at issue is to regulate those who promote securities, and who create or facilitate a market for securities in the United States, regardless of where—or even whether—a "transaction" ultimately occurs.

## A.    Binance's Domestic Violations of Securities Act Section 5

Securities Act Section 5 prohibits the use of instrumentalities of commerce to offer, sell or deliver unregistered securities in the United States.  15 U.S.C. § 77e.  It intends "to assure full and fair disclosure in connection with the public distribution of securities" in the United States "to prevent the offer of securities *in the United States securities market* without accompanying standardized disclosures to aid investors, a course of conduct."  *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998), *abrogated on other*

grounds, *Morrison*, 561 U.S. 247 (citations omitted) (emphasis added).  The Second Circuit further explained that "in keeping with Congress's purpose, the registration provisions should apply to those offers of unregistered securities that tend to have the effect of creating a market for unregistered securities *in the United States*."  *Id.* (emphasis added).  Thus, this statute's focus is on the offer, sale, or delivery of securities, and that conduct is "domestic" if directed to the United States—*i.e.*, to U.S. investors.  *See Spanski*, 883 F.3d at 913.

Further, Securities Act Section 5 proscribes using domestic instrumentalities to make an unregistered *offer* of securities, which does not require a completed transaction.  15 U.S.C. § 77e(a), (c).  "Offer" is defined broadly: "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  *Id.* § 77b(a)(3).  The statute further proscribes using domestic instrumentalities for the mere "delivery" of securities.  *Id.* § 77e(a)(2).

To avoid applying this broad statutory language extraterritorially, the SEC has explained that "offer" and "sale" as used in Securities Act Section 5 excludes offerings that are exclusively foreign.  *See* Regulation S, Rule 901, 17 C.F.R. § 230.901.[3]  This includes that, among other things, that no offers are made to "a person in the United States."  *Id.* § 230.902(h)(1) (defining "offshore transaction"); *id.* § 230.903(a) (requiring "offshore transactions," and that "no directed selling efforts are made in the United States by the issuer" or anyone associated with it).  Thus, Regulation S reflects the judicial presumption against extraterritoriality, while preserving the interests of U.S. investors consistent with Securities Act Section 5's broad statutory language.

Here, the SEC alleges that Binance violated Securities Act Section 5 by engaging in unregistered offers and sales of securities to persons in the United States who invested in (1)

---

[3] *Morrison* cited this provision as consistent with Securities Act Section 5.  561 U.S. at 268-69.

BNB during the ICO (Compl. ¶ 297); (2) BNB as part of their employment by Binance (*id.* ¶ 308); (3) BUSD (*id.* ¶ 320); and (4) Binance's BNB Vault and Simple Earn Programs (*id.* ¶ 337).  Binance promoted these securities to U.S.-based investors, including using the internet and various social media observed by millions of U.S. investors.  *Id.* ¶¶ 287, 322-27, 332-34.  Thus, Binance's unregistered offers and sales to U.S. investors violated Securities Act Section 5.

B.    **Binance's Domestic Violations of Exchange Act Sections 5, 15(a), and 17A**

The Exchange Act's registration requirements likewise do not regulate purchase and sale transactions, but exchanges, brokers, dealers, and clearing agencies who provide ***services*** to investors within the United States.  The Exchange Act broadly defines "exchange," "broker," "dealer," and "clearing agency" focused on the activities of, or services provided by, those intermediaries.[4]  Nothing in those definitions limit coverage solely to U.S. *entities*.  Similarly, the Exchange Act's registration provisions apply to anyone, anywhere that engages in those defined functions *with U.S. investors*.  15 U.S.C. §§ 78e, 78o(a)(1), 78q-1(b)(1).

As the SEC has explained, broker-dealer registration is triggered by contacts "between a foreign broker-dealer and the U.S. securities markets or a U.S. investor in the United States." *Registration Requirements for Foreign Broker-Dealers*, 54 Fed. Reg. 30,013, 30,015 n.20, 1989 WL 279892 (SEC July 18, 1989); *see also id.* at 30,017 ("[T]he Commission's territorial approach generally would require broker-dealer registration by foreign broker-dealers that, from

---

[4] *See* 15 U.S.C. § 78c(a)(1) (defining "exchange" as any person that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities"); *id.* § 78c(a)(4) (defining "broker" as any person "engaged in the business of effecting transactions in securities for the account of others"); *id.* § 78c(a)(5) (defining "dealer" as any person engaged in the business of buying and selling securities for their own account); *id.* § 78c(a)(23)(A) (defining "clearing agency" to include, among other things "any person who acts an intermediary in making payments or deliveries or both in connection with transactions in securities," or "acts as a custodian of securities," or "permits or facilitates the settlement of securities transactions … without physical delivery of securities certificates").

outside the United States, induce or attempt to induce trades by any person in the United States.").  Specifically, as to the use of the internet to conduct such activities, the SEC has made clear that securities intermediaries domiciled outside the United States are required to register with the SEC "if, regardless of their location, they effect, induce, or attempt to induce securities transactions with investors in the United States."  *Statement of the Commission Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Services Offshore*, 63 Fed. Reg. 14,806, 14,812, 1998 WL 135626 (SEC Mar. 27, 1998).

This conclusion is the same as to foreign-domiciled exchanges and clearing agencies. "Foreign exchanges that knowingly provide U.S. persons with access to their trading facilities through the Internet … may be required to register with the Commission."  *Id.* at 14813, n.59. Further, Exchange Act Section 5 requires registration (or exemption) of any exchange "within *or* subject to the jurisdiction of the United States."  15 U.S.C. § 78e (emphasis added).  This disjunctive language makes clear that an exchange's location in the United States is not a prerequisite.  Finally, with respect to clearing agencies, Exchange Act Section 17A(b) prohibits the use of interstate commerce to act as an intermediary in making payments, deliveries, or both in connection with securities transactions without registration.  *Id.* § 78q-1(b).

Thus, requiring registration of an entity that uses domestic instrumentalities to provide broker-dealer, exchange, or clearing agency functions to U.S.-based investors is a regulation of domestic conduct that does not implicate extraterritoriality concerns.  *See UBS Asset Mgmt. Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66, 70 (S.D.N.Y. 1996) (denying motion to dismiss unregistered broker-dealer claim against Canadian broker-dealer for selling Canadian securities to a U.S. investor); *see also Spanski*, 883 F.3d at 913.  Here, Binance, with Zhao as its control person, engaged in this conduct in the United States by providing these services to more than a

million U.S.-based investors.  Compl. ¶ 24.  Binance also utilized U.S. banks to hold customers'

funds, and to settle many transactions effected on the Binance.com Platform, *id.* ¶¶ 27, 98-99—

all of which are domestic acts utilizing domestic payment systems.  Zhao and Binance, in fact,

deliberately targeted the U.S. market, including in executing its Tai Chi plan.  *Id*. ¶¶ 104-40.

> ### C. The "Irrevocable Liability" Test Used in the Second Circuit in Exchange Act Section 10(b) Actions Does Not Require Dismissal

Zhao and Binance rely on *Morrison* and its progeny in the Second Circuit interpreting

Exchange Act Section 10(b) to argue that the SEC's claims hinge upon where the parties became

"irrevocably bound" to the relevant securities transactions or where title was transferred.

Binance Mem. 38-42 (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60,

67-68 (2d Cir. 2012)).  These cases do not save Zhao and Binance because their holdings are

rooted in Exchange Act Section 10(b), which prohibits deception "'in connection with the

purchase or sale of any security registered on a national securities exchange or any security not

so registered.'"  *Morrison*, 561 U.S. at 266 (citing 15 U.S.C. § 78j(b)).  That language does not

exist in the statutory provisions at issue.  *E.g.*, *Barron v. Helbiz Inc.*, 2021 WL 4519887, at *3

(2d Cir. Oct. 4, 2021) (recognizing that *Morrison*'s analysis of Exchange Act Section 10(b) does

not necessarily apply to other provisions).  And as explained above, the statutory provisions at

issue here are focused upon certain defined conduct within or directed at the United States.  *E.g.*,

*Lay v. United States*, 623 Fed. Appx. 790, 796-97 (6th Cir. Aug. 17, 2015) (holding that

*Morrison* did not preclude claims against investment adviser because they were based on

statutory provisions that, unlike Exchange Act Section 10(b), regulated domestic conduct, not

transactions); *SEC v. Gruss*, 859 F. Supp. 2d 653, 660-64 (S.D.N.Y. 2012) (same).

Zhao and Binance erroneously attempt to apply the transactional test in *Morrison* as a

one-size-fits-all interpretive approach for all of the federal securities laws.  Binance Mem. 37.

But the Supreme Court recently clarified that *Morrison*'s "two-step analysis applies at the level of the particular provision." *Abitron*, 600 U.S. at 419, n.3. *Morrison* did not hold that, no matter the text of a particular securities law provision, the sole inquiry must be where a securities transaction was executed, even if the focus of that provision is on conduct and not on particular transactions. *See Gruss*, 859 F. Supp. 2d at 660-66.

The cases Binance cites (Mem. 37-38) erroneously conflate the statutory provision at issue in *Morrison* with the provisions at issue in those cases. *See Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. 2022), *appeal pending*, No. 22-972 (2d Cir.) (assuming, without analyzing, whether *Morrison's* transaction test applies in a private action); *SEC v. Benger*, 934 F. Supp. 2d 1008, 1013 (N.D. Ill. 2013) (following *Morrison* to hold that "a broker's failure to register under Section 15(a) of the [Exchange] Act is not actionable in those cases where the ultimate and intended purchase and sale was foreign."). Further, the court's reasoning in *Benger* failed to consider that the Exchange Act requires broker registration even in the absence of *any* transaction, including of persons who "attempt to induce" one. 15 U.S.C. § 78o(a)(1).

Even if *Absolute Activist's* irrevocable liability standard applied, it is satisfied here. In *Absolute Activist*, the Second Circuit recognized that several facts can provide a basis for holding a transaction is domestic, including the placement of purchase orders, the passing of title, or the exchange of funds. 677 F.3d at 70. In refining its own test, the Second Circuit has further explained that, given the highly-fact intensive nature of the inquiry, the motion to dismiss stage is not the place to resolve it. *See Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018); *see also Absolute Activist*, 677 F.3d at 71 (granting leave to amend). And the Complaint pleads that irrevocable liability for transactions on the Binance.com Platform occurred in the United States, including that U.S.-based investors placed orders, and that Binance

(1) used U.S.-based banks to receive investors' funds, Compl. ¶¶ 27; 98-99; (2) used U.S. large-volume traders to maintain liquidity on the Binance.com Platform, *id*. ¶ 109; (3) used domestic instrumentalities to offer and sell securities to U.S.-based investors; and (4) solicited U.S.-based investors, and maintained accounts on their behalf. *Id*. ¶¶ 297, 308, 315, 317, 337.

Further, under *Absolute Activist*, parties to a transaction "may become bound at two separate times and locations," such that where "the evidence demonstrates that at least one party…was acting from the United States, … the transactions are domestic under *Morrison*." *SEC v. Ahmed*, 308 F. Supp. 3d 628, 669 (D. Conn. 2018) (citation omitted); *see also Giunta v. Dingman*, 893 F.3d 73, 79-80 (2d Cir. 2018) (irrevocable liability can turn on where either the buyer or the seller becomes bound). For purposes of purely electronic transactions such as those at issue here, the principles of the Uniform Electronic Transactions Act ("UETA"), which has been adopted by 52 U.S. jurisdictions,[5] for determining the situs of a purchase or sale based on electronic communications, are instructive. *See generally* 15 U.S.C. § 7001 *et. seq*. Pursuant to the UETA, electronic communications sent by U.S. purchasers into the automated sales system of electronic trading platforms—necessary to irrevocably commit these investors to buy or sell their securities on their platforms—are deemed sent at the moment the investor transmits them to Binance's automated electronic systems and sent from the investors' place of business. *See* UETA § 15. Thus, Binance.com Platform U.S. customers' use of U.S.-based trading accounts, together with Binance's own use of U.S.-based accounts to handle customer funds, are sufficient to raise a plausible inference that transactions on the platform by U.S. investors are domestic. *See generally Myun-Uk Choi*, 890 F.3d at 66.

---

[5] Uniform Law Commission, *Electronic Transactions Act*, *available at* https://www.uniformlaws.org/committees/community-home?CommunityKey=2c04b76c-2b7d-4399-977e-d5876ba7e034.

In short, the SEC does not bring claims against Zhao and Binance for "'the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange.'"  Binance Mem. 40 (quoting *City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014)).  Rather, the Complaint alleges substantial domestic conduct that is sufficient to withstand a motion to dismiss.  *See Giunta*, 893 F.3d at 81 (noting that cases applying *Absolute Activist* have found "irrevocable liability may be incurred despite the existence of conditions necessary to closing the transaction abroad, including foreign approval"); *United States v. Vilar*, 729 F.3d 62, 78 (2d Cir. 2013) (finding domestic securities transactions when U.S.-based purchasers were solicited, and contracts were formed and money was exchanged in the United States); *SEC v. Glob. Inv. Strategy UK Ltd.*, 2021 WL 4896127, at *6 (S.D.N.Y. Oct. 19, 2021) (denying motion to dismiss failure to register as broker-deal claim despite defendant engaged in clearing and settlement activity abroad).

Finally, Binance's argument that transactions on the Binance.com Platform were "predominantly foreign," and thus the federal securities laws should not apply, is inapposite. Binance Mem. 41.  Binance relies upon private actions involving non-U.S. defendants and issuers and did not deal with the statutory provisions at issue in this case.  *Id.* (citing *Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198 (2d Cir. 2014); *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019).  In contrast, this is an SEC enforcement action claiming that Defendants used domestic instrumentalities to offer and sell securities and act as securities intermediaries to U.S. investors.  Binance's argument has no bearing here.

### D.    Zhao's and Binance's Position, If Adopted, Would Encourage Pernicious Consequences to the Detriment of U.S. Markets

At bottom, Zhao and Binance argue that U.S. law cannot reach them because they are based overseas, despite their deliberate and pervasive U.S.-focused conduct alleged in the

Complaint. In their view, the United States may regulate such activities only if the company that engages in them incorporates within the United States. If true, the U.S. securities market would be at risk. Anyone can set up shop in an offshore jurisdiction and then engage in purely online activities all over the world, including raising capital from U.S. investors. *See Spanski*, 883 F.3d at 913-15 (holding that foreign company was subject to U.S. law because it infringed a U.S. copyright, observing that, otherwise, "large-scale criminal copyright pirates could avoid United States copyright liability simply by locating their servers outside the United States"). This consequence is contrary to Congress' clear statutory directives.

## VII.   This Court Has Personal Jurisdiction Over Zhao

The SEC asserts claims against Zhao (Counts 11 and 12) as a control person liable for Binance's and BAM's Exchange Act violations for failing to register with the SEC as exchanges, broker-dealers, and clearing agencies. Compl. ¶¶ 549-56. Zhao seeks dismissal because "the SEC fails to allege sufficient minimum contacts that Zhao personally had with the United States that relate to the SEC's claims." Binance Mem. 43-44. His arguments, however, ignore allegations of his intentional efforts to profit from U.S. investors via the Binance Platforms.

Specific jurisdiction exists when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). As to foreign defendants, due process "requires meaningful contacts, ties, or relations with the United States to create a fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Id.* at 593 (quotations omitted). These contacts "must be 'purposefully directed' … at the forum to establish foreseeability … that the defendant's conduct and connection with the forum … are such that he should reasonably anticipate being haled into court there.'" *Id*. at 591 (quoting

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).  A plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum."  *Id.* (cleaned up).  In cases brought pursuant to statutes authorizing nationwide service, such as the Securities Act and Exchange Act, the relevant "forum" is the United States.  *e-Smart Techs., Inc.*, 926 F. Supp. 2d at  236.

 In assessing personal jurisdiction, the Court should begin with what is *not* in dispute. First, Binance does not contest personal jurisdiction; nor could it because Binance actively solicited U.S. investors, resulting in it having over 1.47 million U.S. investors by 2019.  Compl. ¶¶ 24, 104-06.  Second, BAM is U.S. based and similarly does not contest personal jurisdiction. *Id.* ¶ 29.  Third, Zhao does not dispute that he controlled both BAM and Binance, as the second element of a control person claim requires.  *See Harman Int'l*, 791 F.3d at 111.  Indeed, Zhao was Binance's ultimate decisionmaker and had substantial control over BAM.  Compl. ¶¶ 27, 30, 154-74.  This undisputed foundation alone shows Zhao's substantial U.S. connections.

 Further, the Complaint contains detailed allegations as to Zhao's specific efforts to target U.S. investors on both Binance Platforms.  Pursuant to the Tai Chi Plan, he directed Binance's efforts to covertly serve U.S. investors on the Binance.com Platform in an attempt to evade U.S. law.  Compl. ¶¶ 110-54.  As to the BAM and the Binance.US Platform, Zhao was intimately involved in their operations, including that he approved BAM's receipt of trading data on the Binance.US Platform, was a signatory on certain of BAM's U.S. bank accounts, and approved expenditures over $30,000.  *E.g., id.* ¶¶ 150, 154-158, 166, 170.  Zhao also directed BAM on at least one issue central to this lawsuit:  BAM's decision to offer BNB on the Binance.US Platform.  *Id.* ¶¶ 161-64.  Indeed, as alleged, BAM's first two CEOs tried but failed to gain "independence" from Zhao—so much so that its second CEO quit because Zhao "was the CEO of BAM Trading, not me."  *Id.* ¶¶ 195-206.  These allegations amply demonstrate this Court's

jurisdiction over Zhao.  *E.g., SEC v. Terraform Labs Pte Ltd.*, 2022 WL 2066414, at *3 (2d Cir. June 8, 2022) (defendants "purposefully availed themselves of the U.S. by promoting the digital assets at issue in the SEC's investigation to U.S.-based consumers and investors.").

      Zhao mischaracterizes the Complaint and the case law.  Zhao argues that "control person liability 'cannot on its own support personal jurisdiction,'" and that the Court cannot consider allegations concerning Binance and BAM when assessing personal jurisdiction because "a defendant corporation's contacts with a forum may not be attributed to shareholders, affiliated corporations, or other parties."  Binance Mem. 44 (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 667 (6th Cir. 2005), and *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F. Supp. 2d 15, 19 (D.D.C. 2000)).  But none of Zhao's cited authorities support this argument.  Although courts differ as to whether control person liability *alone* is sufficient to establish personal jurisdiction, the underlying factual inquiries have obvious overlap, since they "involve a similar contact-based analysis."  *City of Monroe*, 399 F.3d at 667*; see also In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 128 (D.D.C. 2003) (discussing split, and holding that pleading control alone is insufficient to establish personal jurisdiction).  And in contrast to these cases, Zhao was not a passive investor or remote subsidiary from the primary violator.  *Shapiro, Lifschitz & Schram*, 90 F. Supp. 2d at 19 (rejecting "lone fact that [she] gave one of plaintiff's attorneys a credit card to pay for some travel expenses" as basis for jurisdiction).  Rather, he had extensive control of both Binance's and BAM's U.S. business activities.  *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (considering company's contacts with forum in finding personal jurisdiction over its CEO, who was "no mere employee" but "exercised extensive control over [company's] day-to-day activities").

Zhao's remaining arguments (Mem. 44-45) are similarly premised on the faulty foundation that the SEC alleges "[c]onclusory assertions" of Zhao's high-level control, such as "purporting to show that Mr. Zhao 'directed' BAM to solicit U.S. users or 'directed Binance' to assist U.S. customers in 'circumventing' controls.'"  He ignores allegations demonstrating his extensive involvement in the precise "suit-related" conduct at issue:  including operating two unregistered exchanges, broker-dealers, and clearing agencies targeting U.S. investors.  Zhao's cited cases underscore this weakness, as they lacked similar allegations of the defendant's direct involvement.  *Cf. In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) (no personal jurisdiction over shareholder of defendant not involved in relevant alleged misstatements); *Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 40 (D.D.C. 2012) (allegations that corporate parent set high level guidance and provided infrastructure insufficient for personal jurisdiction relating to consumer credit claims).  Thus, the SEC's claims are not based upon Zhao's mere "awareness" that the Binance Platforms served U.S. customers (Binance Mem. 45), but Zhao's "purposeful availment" of the United States by actively targeting U.S. investors.  *Compare* Compl. ¶¶ 128-40, 217-18 (Zhao directed BAM's and Binance's solicitation of U.S. customers), *with Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 25 (D.D.C. 2017) (rejecting arguments in favor of personal jurisdiction that would "equate[] a *failure to geoblock* with purposeful availment").  This Court should reject Zhao's arguments.[6]

---

[6] To the extent the Court dismisses any of the SEC's claims, it should be without prejudice to permit an opportunity to amend.  "The standard for dismissing a complaint with prejudice is high," and "warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006).  And to the extent this Court finds any failure in the SEC's pleading of Zhao's personal jurisdiction, the SEC requests discovery to support an amended pleading.  *See Lewis*, 62 F.4th at 596 ( "[a] plaintiff need only have a good faith belief that reasonable discovery could supplement jurisdictional allegations" to be granted discovery).

**<u>CONCLUSION</u>**

For the foregoing reasons, this Court should deny Defendants' Motions to dismiss.


Dated:  November 7, 2023    Respectfully submitted,


          <u>s/ Matthew Scarlato</u>
          Matthew Scarlato (D.C. Bar No. 484124)
          Jennifer L. Farer (D.C. Bar No. 1013915)
          J. Emmett Murphy
          David A. Nasse (D.C. Bar No. 1002567)
          Jorge G. Tenreiro
          Elisa S. Solomon
          SECURITIES AND EXCHANGE
           COMMISSION
          100 F Street, NE
          Washington, DC 20549
          (202) 551-3479 (Scarlato)
          scarlatom@sec.gov

          *Attorneys for Plaintiff*