**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| | )   CIVIL ACTION NO. 1:23-cv-01599-ABJ-ZMF |
| BINANCE HOLDINGS LIMITED, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| _____ | ) |


**BRIEF OF NEW FINANCE INSTITUTE AS *AMICUS CURIAE***
**IN SUPPORT OF PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

Timothy C. Parlatore (NY0332)
Scott D. Brenner, Esq. (Admission Pending)
*Counsel for Proposed Amicus Curiae*
*New Finance Institute*
Parlatore Law Group, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
212-603-9918
timothy.parlatore@parlatorelawgroup.com
scott.brenner@parlatorelawgroup.com

# **TABLE OF CONTENTS**

**Page**

INTEREST OF AMICUS CURIAE ………………………………………………...1

.  PRELIMINARY STATEMENT ...……………………………………………1

ARGUMENT ………………………………………………………………………...5

      I.      Investing is Not a Prerequisite to Finding an "Investment Contract" ………5

              A.      Cash Flows Are a Prerequisite for Investing ……………………..5

              B.      President Roosevelt Guided Congress Toward Full

                     Transparency ………………………………………………………..6

              C.      The Disclosures Needed in the 20st Century Pertained to

                     Cash Flows ………………………………………………………..7

              D.      The Disclosures Needed in the 21st Century Increasingly Pertain to

                     the Characterization of the Assets ………………………………...9

      II.      A Contract is Not a Prerequisite to Finding an "Investment Contract".....11

              A.      Congress Did Not Limit "Investor Protection" to

                     Contractual Arrangements ………………………………………11

               B.      A Contract Almost Always Accompanies a

                     Cash-Flow-Generating Asset ……………………………………13

      III.     A Principled Refinement of *Howey* Is Needed To Match The Economic

                     Realities of Crypto Assets ……………………………………….13

               A.      *Howey* Is Not Meant To Be Conjunctive; It is More Like a

Set of Toggles …………………………………………...…13

B.      The "Efforts of Others" Prong Becomes Moot With Assets

That Do Not Generate Cash Flows ……………………………...15

C.      The "Common Enterprise" Prong Becomes Moot With Assets

Transacted on Secondary Markets ………………………………16

D.      The "Security vs. Commodity" Narrative is a Misconception

That This Court Should Ignore …………………………………18

E.      The Alternative Reading of *Howey* Is Entirely Consistent

With Its Progeny …………………………………………...21

IV.      The SEC Has The Authority To Regulate Cryptocurrencies ……………23

A.      Denying the SEC Its Regulatory Authority Creates an

Incongruence.……………………………………………………23

B.      Other Regulators Have Similar Broad Regulatory Powers ……...23

C.      Historically, State Regulators Had Similar Powers ……………..24

CONCLUSION ...............................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Basic, Inc. v. Levinson*,

　　485 U.S. 224 (1988) …………………………………………...……..8,9,15

*Golden v. Garafalo*,

　　678 F.2d 1139, (2d Cir. 1982) ……………………………….…………...17

*Hocking v. Dubois*,

　　839 F.2d 560 (9th Cir. 1988) ..……………………...………………...…12

*In re Voyager Digit. Holdings, Inc.*,

　　649 B.R. 111, (Bankr. S.D.N.Y. 2023) ………………...……...………...19

*Landreth Timber Co. v. Landreth*,

　　471 U.S. 681, (1985) …………………………………………………17

*Reves v. Ernst & Young*,

　　494 U.S. 56 (1990) …………………………………...………………10

*SEC v. Capital Gains Research Bureau, Inc.,*

　　375 U.S. 180 (1963) …………….........................................................10

*SEC v. W.J. Howey Co.,*

　　328 U.S. 293 (1946) …………………….………………………...2,22

**Other Authorities**

Aswath Damodaran, *Thoughts on Intrinsic Value, Musings on Markets,* June 8, 2011,
    available at https://aswathdamodaran.blogspot.com/2011/06/thoughts-on-
    intrinsic-value.html……………………………………………………………..5

Aswath Damodaran, *Finance professor Aswath Damodaran warns investors not to get
    cocky, dismisses bitcoin as a currency or store of value, and blasts the Fed in a
    new interview. Here are the 11 best quotes*, available at:
    https://markets.businessinsider.com/currencies/news/aswath-damodaran-cocky-
    investors-bitcoin-currency-store-value-federal-reserve-2021-6-1030511159 ..…..6

Benjamin Graham and David L. Dodd, *Security Analysis, Principles and Technique,
    Seventh Edition*, Mc-Graw Hill (2023), p. xxxviii ………………………………15

Bloomberg video titled *Is Crypto A Security or Commodity?* with the host asking her
    guest: "Where are you on the big debate about whether crypto is a security or a
    commodity?" available at:
    https://www.youtube.com/watch?v=A4msDGQ53rM&t=183s ………………...19

Chairman McHenry, *Chairman McHenry Questions Chair Gensler on Ether at
    Hearing to Conduct Oversight of the SEC*, available at
    https://www.youtube.com/watch?v=VhA1dZXeao0 ……………………………18

Commercial and Financial Chronicle, April 1, 1933, Vol. 136, No. 3536, p. 53, available
    at https://fraser.stlouisfed.org/files/docs/publications/cfc/cfc_19330401.pdf …......7

Commissioner Dawn D. Stump, *Digital Assets: Clarifying CFTC Regulatory
    Authority & the Fallacy of the Question, "Is it a Commodity or a Security?".
    Statement of Commissioner Dawn D. Stump on the CFTC's Regulatory Authority
    Applicable to Digital Assets*, August 23, 2021  available at
    https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement082321
    ……………………………………………………………………..…….20

Commissioner Goldsmith Romero, *Security? Commodity? What happens if crypto is
    both?*, available at https://fortune.com/crypto/2023/04/12/security-
    commodity-crypto-both-cftc/ ……………………………………….…..…..20

Dan Berkowitz, Statement on Securities vs. Commodities via Unchained podcast,
    video excerpt post on X by Laura Shin, available at
    *https://x.com/laurashin/status/1661114787751948288?s=20* …..…………...20

Dan Glickman, Release of Final National Organic Standards, U.S. DEP'T
    OF AGRIC., (Dec. 20, 2000), available at
    https://www.ecomall.com/greenshopping/usdafinal.htm …………………......24

Elisabeth Keller, *"Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934."* Ohio State Law Journal 49 (1988): 329-352 …...………………………………………………………6,7

Fortune.com, *Your father's stock market is never coming back, available at https://fortune.com/2021/06/02/changing-stock-market-meme-stocks-day-trading-reddit-crypto-investing-robinhood-btc-tsla-gme-eth-amc-nfts/* ………...11

John Tracy, *The New Federal Securities Act*, Mich. L. Rev., Vol. 31, No. 8 (Jun., 1933), pp. 1117-1124, available at https://www.jstor.org/stable/1281038 ………….24,25

Joseph C. Long, *An Attempt to Return Investment Contracts to the Mainstream of Securities Regulation*, 24 Okla. L. Rev. 135 (1971) ……...………………..…22

Professor Stephen Bainbridge, *Maybe Goldman Sachs Sold Some Rotten Eggs? So What?,* available at https://www.professorbainbridge.com/professorbainbridgecom/2010/04/maybe-goldman-sachs-sold-some-rotten-Eggs-so-what.html ………………………………………………………...7,8

SEC Chairman Jay Clayton, *SEC Chairman Jay Clayton on market euphoria: When stocks run away, we get concerned*, available at https://www.youtube.com/watch?v=b6l0vbU4a3c ………………………………9

*SEC v. LBRY, Inc.*, Transcript of the Motion Hearing Before the Honorable Paul J. Barbadoro, July 20, 2022, available at https://www.crypto-law.us/wp-content/uploads/2022/11/Transcript.pdf …....................................…13,14

Stuart Alderoty X Post on October 12, 2023, available at https://twitter.com/s_alderoty/status/1712535465725932012?s=20……………18

United States Congress, *S.2108* - Organic Foods Production Act of 1990, available at https://www.congress.gov/bill/101st-congress/senate-bill/2108/text ………...23

United States Congress, Public Health Cigarette Smoking Act, available at https://en.wikipedia.org/wiki/Public_Health_Cigarette_Smoking_Act ………...24

## INTEREST OF AMICUS CURIAE

New Finance Institute ("NFI") is a public benefit corporation with a dedicated mission to discover financial truths and bring financial empowerment to the masses. NFI's corporate website can be found at: www.newfinanceinstitute.com. NFI publishes two blogs: Finance 2027 ("F27") and Full Court Press ("FCP"). F27 can be found at https://www.finance2027.com/ and, through its publication, NFI aims to build consensus on financial definitions. FCP is available at https://www.fullcourtpress.io/ and is dedicated to exploring the legal implications of financial definitions. NFI recently filed an amicus brief with the District Court for the Southern District of New York in *SEC v. Coinbase*.

This case necessitates the application of legal principles to a unique set of facts which must be situated within the appropriate historical and financial context. NFI has a strong interest in building consensus on all financial definitions, most notably the word investing, which it sees as a gating item toward prosperity and informed decision-making. This amicus brief, drawing on financial expertise, hones in on the definition of investing, which NFI believes to be central to this case. As such, NFI advocates for an evaluation of the boundaries of investor protection through that lens. This holistic, multi-disciplinary approach is intended to offer the Court a novel and distinct viewpoint.

## PRELIMINARY STATEMENT

This case can be conceptually represented through a straightforward two-by-two table, guided by two key yes-or-no questions. First, the finance question: Are the secondary market crypto purchase transactions investments? Second, the legal question: Are such transactions

1

investment contracts? Answering each of these questions with a 'yes' or 'no' results in four potential outcomes (yes/yes, yes/no, no/yes and no/no).

NFI contends that a comprehensive resolution of this case necessitates the simultaneous examination of both the finance and legal questions. A common-sense approach underscores the importance of viewing the issues represented by this case as an application of the law through the lens of finance: determining the boundaries of investor protection, after all, would be a difficult task unless a consensus can simultaneously be established on the definition of the term investing.

NFI answers the finance question with a "no," and the legal question with a "yes." At first glance, it may seem implausible to reach the legal conclusion of an investment contract in the absence of both an investment, as the term is conventionally defined in finance, and a contract. That potential discomfort, if any, fully goes away under a legal refinement of *Howey*. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). More specifically, the refinement proposed in this brief is based on fundamental principles of finance ("Modified *Howey*"), an approach that provides a clear bridge from finance to law. Under this proposed refinement, NFI rejects the popular, but ultimately incorrect view that *Howey* is a conjunctive test, necessitating the satisfaction of all four prongs, at all times. Instead, NFI contends that *Howey* is meant to be a flexible framework that becomes relevant depending on both the type of asset and the circumstances under which the asset is sold.

That *Howey* is meant to be flexible is well-known; what is different under the proposed framework is an explicit roadmap that maps that flexibility into the prongs themselves, i.e. for any given transaction, the Modified *Howey* analysis starts by first asking: Which prongs are relevant? In that regard, NFI views *Howey* as a set of toggles that the legal analyst chooses to

"turn on or off" before proceeding with the full analysis based on the economic realities of the transactions, rather than applying the prongs conjunctively, *all the time*.

The cryptocurrency industry engages in what can be best characterized as financial alchemy: taking non-cash-flow-generating assets and turning them into "investments." That is not only a violation of basic finance principles, but, in the absence of full and fair disclosure, also a violation of the securities laws. This amicus brief asserts that the purchasing of crypto tokens should not be characterized as investments due to the lack of cash flow generation (a long-established prerequisite for any true investment). Such purchases are still investment contracts, however, because the buying public is denied the full and fair disclosure that they are *not* investing. Ultimately, NFI aligns with Plaintiff's position, reaching the same legal conclusion, but taking a different path of reasoning.

This is how the Modified *Howey* analysis takes basic principles of finance and connects them to the application of the law in this case: i) The concept of investing *requires* the ability to value an asset, which in turn, can only be performed when there are current or future cash flows. With true investing, finding a willing buyer is never the *only* way to realize a profit, as cash flows would accrue to the investor eventually; one does not need to trade the asset out to realize a profit. The corollary is that one can speculate on, but *not* invest in crypto tokens. ii) A large number of purchasers of crypto tokens *think* they are investing because that's largely what is being promoted to them, but, they are merely speculating. In NFI's view, that is the biggest concealment of all, which is diametrically opposed to Congress's broad mandate of full and fair disclosure. iii) The finding of an investing contract requires neither investing nor a contract. iv) That investing requires cash flows is not just a definitional issue in finance, but it has substantial implications for legal analysis. Illuminating that bridge is what necessitates a legal refinement of

3

*Howey*. v) Under the Modified *Howey* analysis, the "effort of others" prong is only applicable to cash-flow-generating assets. When that is not the case, the "effort of others" prong of *Howey* simply becomes moot. vi) Similarly, the "common enterprise" prong is intended to apply to primary market transactions. As such, that prong, too, becomes moot in the case of secondary market transactions. vii) The "security *or* commodity" distinction is a misconception; an asset can be both at the same time. The insistence by the crypto industry regarding a distinction that does not exist appears to be more about regulatory shopping than legal principles; in fact, the distinction is rejected by three current or former commissioners of the Commodity Futures Trading Commission ("CFTC"), the very regulator the cryptocurrency industry is seeking solace in. viii) The Modified *Howey* approach is not an attempt to rewrite the judicial history; in fact, it is largely consistent with *Howey* and its progeny. All it does is recognize the fact that the voluminous record of cases largely reflects what was being transacted in markets at the time and under certain conditions: sales of cash-flow-generating assets most of which can be characterized as primary market transactions. The universe of the assets traded has expanded, resulting in a need to revisit *Howey*. ix) Similarly, the case law around how *Howey* was applied to commodities remains largely undisturbed. The modified *Howey* analysis proposed in this brief would have generally reached the same result, albeit through a different prong of *Howey*, namely the "expectation of profits" prong.

What's at stake in this case is not just whether or not the Defendants intermediated securities transactions, but how *Howey* should apply to an entirely new set of products that largely ride on the good connotations of the word "investment," thus leading to purchase decisions by the buying public without offering them what a true investor is ultimately looking for: safety of principal through full and fair disclosure. Alongside *SEC v. Coinbase*, this case is

the best opportunity to clarify *Howey's* role in 21st-century finance. Therefore, this Court should deny Defendant's Motion to Dismiss.

**ARGUMENT**

**I.     Investing is Not a Prerequisite to Finding an "Investment Contract."**

**A.     Cash Flows Are a Prerequisite for Investing.**

A fundamental finance principle dictates that intrinsic value is inextricably linked to the presence of cash flows, which is the bedrock of true investing. As Aswath Damodaran, Professor of Finance at the Stern School of Business at New York University aptly explains: "Only assets that are expected to generate cash flows can have intrinsic values." *See*, Aswath Damodaran, *Thoughts on Intrinsic Value*, *Musings on Markets*, June 8, 2011, available at https://aswathdamodaran.blogspot.com/2011/06/thoughts-on-intrinsic-value.html. In turn, the ability to determine intrinsic value is a necessary (but not sufficient) condition for an asset transaction to be characterized as investing. "To invest in something, you need to assess its value, compare to the price, and then act on that comparison, buying if the price is less than value and selling if it is greater." *Ibid*.

The notion that investments can exist devoid of cash flows represents not only a profound divergence from established financial wisdom, but it suggests that we are at a crossroads moment; the misconception of transactions in non-cash-flow-generating assets being investments potentially infiltrating the judiciary and undermining the protective intent of Congress cannot be overlooked. It is also worth noting that "investment" is not a label that is meant to be applied to assets or individuals universally. A stock is not an investment when purchased at any given price, it becomes one when purchased *at the right price*. Aswath Damodaran recently reiterated

this same philosophy: "We have all these people telling you to buy a quality company. That's really bad advice. If you buy a quality company that everybody else recognizes as a quality company, you're going to pay through the roof. Good companies can be bad investments, and bad companies can be good investments. The sooner we recognize that, the healthier investing is going to be." *See, Finance professor Aswath Damodaran warns investors not to get cocky, dismisses bitcoin as a currency or store of value, and blasts the Fed in a new interview. Here are the 11 best quotes*, available at:

https://markets.businessinsider.com/currencies/news/aswath-damodaran-cocky-investors-bitcoin-currency-store-value-federal-reserve-2021-6-1030511159.   Not everyone participating in the stock market qualifies as an investor, either; individuals may adopt the role of an investor in some instances but not in others. Instead, the investment label pertains to transactions and requires *two* critical elements: a cash-flow-generating asset (an absolute prerequisite to an investment characterization), and sufficient margin between the price and value, often referred to as "margin of safety."

In simple terms, investing is akin to purchasing an apple tree at a cheap price. The cash flows generated by an asset are comparable to the fruits produced by the tree and the asset can be likened to the tree itself. However, the price paid for the apple tree, *relative to its value*, plays a pivotal role. The same apple tree can be an investment at a low price, but not so at a higher price.

**B.      President Roosevelt Guided Congress Toward Full Transparency.**

Just like how a purchaser of an apple tree would want to know about an infection to the tree that might materially impact how many apples the tree will produce, an investor would want to know about disclosures that might materially impact the cash flows that the company will generate. The marketplace was not necessarily producing that outcome; "[a]ccording to

6

congressional reports, in the decade after World War I, approximately fifty billion dollars of new securities were floated in the United States, and half of them were worthless." *See,* Elisabeth Keller, "Introductory Comment: *A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*." Ohio State Law Journal 49, (1988): 329-352, 334. Therefore, an act of Congress was needed to mandate proper disclosures.

On March 29, 1933, President Roosevelt conveyed a crucial message to Congress, emphasizing the need for transparency and investor protection. His statement resounded with the following words: "Of course, the Federal Government cannot and should not take any action which might be construed as approving or guaranteeing that newly issued securities are sound in the sense that their value will be maintained or that the properties which they represent will earn profit. There is, however, an obligation upon us to insist that every issue of new securities to be sold in interstate commerce shall be accompanied by full publicity and information, and that *no essentially important element attending the issue shall be concealed from the buying public*." *See*, Commercial and Financial Chronicle, April 1, 1933, Vol. 136, No. 3536, p. 53, available at: https://fraser.stlouisfed.org/files/docs/publications/cfc/cfc_19330401.pdf (emphasis added)

This message remains pivotal for a compelling reason: True investors must have access to complete and unobstructed information *of any kind* to make informed decisions.

C.    **The Disclosures Needed in the 20th Century Pertained to Cash Flows**

Guided by President Roosevelt's vision, the "Truth in Securities Act" was born, ushering in an era of full and fair disclosure.  One legal scholar aptly stated: "As a result, the New Deal Congress explicitly rejected the blue sky regulatory model in favor of a disclosure-based system. The SEC thus has no authority to pass on the merits of an offering of securities. The system that resulted fairly has been called a rotten egg statute. You could sell all the rotten eggs you wanted

as long as you fully told people just how rotten they were." *Maybe Goldman Sachs Sold Some Rotten Eggs? So What?,* available at

https://www.professorbainbridge.com/professorbainbridgecom/2010/04/maybe-goldman-sachs-sold-rotten-eggs-so-what.html.

It is essential to recognize the audience the disclosure regime intended to serve. The disclosure regime is not designed to protect *all* market participants, rather, it focuses on safeguarding those who *seek* to become true investors. Investing inherently demands the estimation of value, which is contingent on an assessment of cash flows. A robust valuation is only possible with full and fair disclosure, and a true investor would still need to have a buffer, the margin of safety, because some uncertainty remains even with full and fair disclosure. To illustrate this point, consider a potential investor who values a stock at $10, while the asking price is $8. In this scenario, the investor might conclude that the margin of safety is sufficient and decide to make a purchase. However, if material information was concealed from the investor and if, once revealed, it resulted in a revised valuation of, say, $7, the stock may then cease to be an attractive purchase.[1]

On the other hand, for the speculators who believe the price could reach $12, notwithstanding the fact that the true value is $7, the decision to buy when the asking price is $8 remains unchanged. Congress's goal was not that everybody in the market would turn into a true investor, but rather, that they could, if they wanted to. "No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his

---

[1] The need for disclosure does not disappear whether the sale is on the primary or secondary market. The potential investor needs that disclosure to make an informed decision regardless of who the seller is.

judgment as to the value of the securities he buys or sells.'" *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (internal citations omitted).

**D.      The Disclosures Needed in the 21st Century Increasingly Pertain to the Characterization of the Assets.**

21st-century finance ushers in an entirely new set of challenges.  "... [T]here is a new paradigm. There are more retail investors participating in the market than ever before." S*ee*, *SEC Chairman Jay Clayton on market euphoria: When stocks run away, we get concerned*, available at https://www.youtube.com/watch?v=b6l0vbU4a3c. When it pertains to cash-flow-generating assets, that paradigm can be perplexing in its own right, as excessive speculation in markets can result in asset bubbles where prices significantly exceed the intrinsic value of the assets. However, it does not warrant a different disclosure regime because the valuation of a cash-flow-generating asset is inherently a subjective exercise, and no matter how expensive a stock may seem, making the determination that the transaction crossed into the territory of excessive speculation implies a merit-based assessment; this is precisely what Congress intended to avoid. "We regulate disclosure, we regulate trading... one thing that we don't regulate, directly, ... is euphoria." *Ibid*.

When that speculative mindset extends to assets devoid of cash flows, however, it results in a more profound predicament, because the debate stops being a mere disagreement between price and value. Instead, the crux of the issue lies in the lack of intrinsic value to calculate in the first place.[2] Investing fundamentally hinges on the comparison of an objective element, which is the price, with a subjective benchmark, which is the value. However, this assessment loses its

---

[2] Any crypto tokens that generate cash flows, or staking contracts are the exception; they can be valued, and, at the right price, could potentially qualify as investments. The vast majority of crypto tokens, however, do not have the ability to generate cash flows.

meaning when there is no intrinsic value to reference. When the intrinsic value of the asset is zero, there is no room for subjectivity. Effectively, *all* purchasers of the asset are speculating because they are *all* paying too high a price relative to value. This complex scenario underscores the unique challenges posed by the changing landscape of 21st-century finance. Most people *think* they are investing, but they are merely speculating.

A naive view might suggest that in a free market economy, purchasers can buy any asset they desire; they certainly can but with a crucial and needed caveat: full and fair disclosure. The pivotal question is: What does full and fair disclosure mean? In the 20th century, finance predominantly dealt with cash-flow-generating assets, and disclosure centered around the investing public having access to material information.  In the 21st century, in the case of cryptocurrencies, disclosure takes a whole new meaning and could take the form of telling cryptocurrency purchasers that they are *not* investing. The fact that it's a different type of disclosure is simply a result of what is being transacted in the market today and is perfectly consistent with what Congress intended to accomplish. "A fundamental purpose … was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*, and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963) (emphasis original). "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

Such disclosure would not necessarily deter all cryptocurrency purchases; one can expect that purchasers with a consumptive intent or those who are speculating would *willingly* continue to buy. However, it could change some purchasing decisions at the margin, *i.e.* a group of purchasers might stop buying crypto tokens once they realize they are not investing, and that

change in behavior, in turn, could potentially inconvenience a crypto exchange, such as Binance, which is incentivized to maximize trading volume.

Ultimately, it is in Defendants' best interest for cryptocurrencies to be perceived as being on par with stocks, and the "investing" label is needed for that parity. As currently designed, most cryptocurrencies do not have the ability to generate cash flows, and such parity can never be achieved on technical finance grounds, but for most investors, perception is reality. *See*, *e.g.*, *Your father's stock market is never coming back, available at* https://fortune.com/2021/06/02/changing-stock-market-meme-stocks-day-trading-reddit-crypto-investing-robinhood-btc-tsla-gme-eth-amc-nfts/ ("The generation creating the new conventions of the investing landscape views stocks and crypto coins as interchangeable."). At the same time, Defendants try to eschew the regulatory regime that is designed to protect investors. Essentially, Defendants want the perception of investment without being burdened by the accompanying regulatory regime. NFI believes that Defendant's position is backward; cryptocurrencies are not investments, and that is precisely why a new form of disclosure is needed (in addition to standard disclosures that may also apply), and Defendants' "have your cake and eat it too" approach effectively amounts to regulatory arbitrage.

## II.     A Contract is Not a Prerequisite to Finding an "Investment Contract"

### A.     Congress Did Not Limit "Investor Protection" to Contractual Arrangements.

Defendants read the statute in a limited fashion, but that reading does not find support in the legislative history of the Securities Act of 1933. "The remedial purposes of the 1933 Act were expressed as follows: The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and

11

true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion . . . ." *Hocking v. Dubois*, 839 F.2d 560, 564 (9th Cir. 1988), citing S.Rep. No. 47, 73d Cong., 1st Sess. 1 (1933) (withdrawn on other grounds).

While it's true that Congress emphasized the acquisition of capital by an enterprise, the overarching goal was not explicitly linked to contracts. A closer examination reveals that the remedial purpose is centered on placing "adequate and true information before the investor" and safeguarding "honest enterprise" from unfair competition posed by deceptive securities promoted to the public. *Ibid*.

Failing to disclose the nature of crypto purchases as speculative not only contradicts the purpose of placing "adequate and true information before the investor" but it also fails to protect honest enterprises. *Ibid*. Currently, honest enterprises are compelled to compete not only against the dishonest promoters of other enterprises but also an entirely different set of promoters that advocate crypto "investments." To the public, both avenues may appear as investments, leading to capital being diverted from traditional capital markets to the crypto sector. This trend would likely accelerate if this Court decides to dismiss this case.

Every dollar that flows into the crypto sector is a dollar that could have been directed toward more productive uses in the stock and bond markets, contributing to cancer research, clean energy initiatives, or any other cause that the investing public may deem worthwhile. To that extent, individuals who would like to speculate on digital assets with their money, rather than providing it as equity or debt capital to enterprises, are entitled to do so, but the *new bargain* in the 21st century should be, at a minimum, that they are truly informed that they are transacting in a speculative asset, and are made aware that they are not actually investing at all.

B.     A Contract Almost Always Accompanies a Cash-Flow-Generating Asset.

It is not by mere chance that every single term enumerated in the legal definition of a security pertains to assets with the capacity to generate cash flows, whether directly or indirectly. Congress meticulously listed these terms based on the prevailing market transactions during that time, which involved cash-flow-generating assets like stocks and bonds.

That one would find contract(s) associated with cash-flow-generating assets is not at all surprising. Without a contract, how would the parties know what claims they have on the cash flows? The existence of a contract, then, was simply a result of the type of asset that was transacted in commerce. If there are no cash flows, then there is not necessarily a need to draft a contract that stipulates how and when the cash will move. That does not mean that the need for protection disappears.

III.    A Principled Refinement of *Howey* Is Needed To Match The Economic Realities of Crypto Assets.

A.     *Howey* Is Not Meant To Be Conjunctive; It is More Like a Set of Toggles.

The traditional view of *Howey* is that it is a conjunctive test with four prongs that collectively determine what constitutes an investment contract. A *Howey* analysis goes through each prong, resulting in yes or no answers for each. Currently, a single 'no' answer in any prong is all a transaction needs to escape the reach of securities laws, provided that none of the enumerated terms in the legal definition of security are invoked.

Crypto assets do pose unique challenges with respect to the application of *Howey*. This Court rightfully sought a principled framework during the hearings on June 13, 2023 and demanded, justly, definitional excellence: "What is a crypto asset that is different

13

from a crypto security? No one wants to tell me." The LBRY Court similarly wondered, at least in the context of the "expectation of profits" prong, whether another version of *Howey* could apply: "[D]o you have a view that there's some other test? What is it that you say is the legal refinement of <u>Howey</u> and <u>Joiner</u> and <u>Forman</u>?" *SEC v. LBRY, Inc.*, Transcript of the Motion Hearing Before the Honorable Paul J. Barbadoro, July 20, 2022, available at https://www.crypto-law.us/wp-content/uploads/2022/11/Transcript.pdf.

This brief offers the broad legal refinement of *Howey* that this Court, many other courts, legal scholars, practitioners and observers are undoubtedly seeking: *Howey* is best understood as a set of toggles that the legal analyst chooses to "turn on or off" before proceeding with the full analysis based on the economic realities of the transactions, rather than applying the prongs conjunctively, *all the time*. Simply put, *Howey* is *not* a conjunctive test.

Surely, *Howey felt* conjunctive, because it simply reflected what was being transacted in the market. To be clear NFI is *not* taking the position that *Howey* was misapplied for more than 75 years. In the majority of cases, *Howey* was applied properly. It is rather the fact that the transactions that reached the court were of the kind that necessitated "turning on" all the toggles, i.e. the application of all four prongs. The general tendencies of finance in the 20th century, what assets are issued and transacted in the markets and under what conditions, did genuinely call for all of the *Howey* prongs to be applied, concealing the fact that, all along, a very subtle and likely unconscious determination was being made to apply all four prongs. The judiciary simply followed the economic realities of the finance industry. When those realities change, so should the application of *Howey*; this is precisely the crossroads we are facing today.

14

**B.      The "Efforts of Others" Prong Becomes Moot With Assets That Do Not Generate Cash Flows**

The primary rationale behind the "efforts of others" prong is a couple of economic realities: i) a true investor invests on the basis of cash flows; and ii) when the investor is not fully in control, there may be substantial uncertainty regarding the cash flows that are being valued. A leading finance book noted: "Any security, as mentioned, can trade at any price at a particular moment, but its value is ultimately tethered to the value of the underlying business. Short-term volatility can drive markdowns in the value of one's portfolio… Longer term, the only risks that matter are being overly optimistic on corporate cash flows or choosing an inadequate discount rate." Benjamin Graham and David L. Dodd, *Security Analysis, Principles and Technique, Seventh Edition*, Mc-Graw Hill (2023), p. xxxviii.  The primary purpose behind securities laws was to mandate the provision of full and fair disclosure to the investor, so they don't become overly optimistic and misvalue the security. "Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets: 'No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells. The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [sic] about a situation where the market price reflects as nearly as possible a just price. Just as artificial manipulation tends to upset the true function of an open market, so the hiding and secreting of important information obstructs the operation of the markets as indices of real value.'" *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (internal citations omitted).[3]

---

[3] It is worth noting that the Supreme Court recognized that purchasers of common stocks can be investors or speculators, a distinction that is largely forgotten now. The focal point, naturally,

Is there reliance on the efforts of others, because, for example, there is a marketing effort that may successfully generate more demand for one crypto asset relative to another, increasing the price of that crypto asset, thus resulting in a higher return on speculative capital risked when the asset is sold. While that is undoubtedly true and could be justified as a flexible application of *Howey*, the slippery slope develops when any price change may be attributed to market forces, putting the transaction out of *Howey's* reach. NFI contends the Modified *Howey* approach offers a more principled reading. In the case of gold, for example, the failure of the "efforts of others" prong due to market forces is not the real reason why gold stays out of trouble. It is because the "efforts of others" prong is actually moot due to there being no cash flow generation. The remaining prongs are what a Modified *Howey* analysis would consider. The same principle applies to crypto asset transactions.

As mentioned above, the "removal" of the fourth prong from the *Howey* analysis in the absence of cash flows is also consistent with the notion that a contract is not required for finding an investment contract. A contract is needed if there are cash flows, in which case the fourth toggle, "efforts of others" is "turned on." If not, it is "turned off, and it would be, not surprisingly, unlikely to find a contract.

**C.    The "Common Enterprise" Prong Becomes Moot With Assets Transacted on Secondary Markets**

The characterization of a stock as a security does not change upon its transition from the primary to the secondary market. Applying this principle to cryptocurrencies logically calls for a comparable determination, a position contested by the Defendants. Conversely, the Defendants' contention that no common enterprise exists may appear, prima facie, reasonable. However, a

---

was information, which, once fully and fairly disclosed, could form the basis for informed decisions in which traders could choose to be an investor or a speculator.

closer examination, through a Modified *Howey* analysis, offers a means of reconciliation, notably by applying the investment contract analysis to stocks.

An objection might arise concerning this exercise, given the explicit inclusion of "stock" as an enumerated term in the legal definition of a security. Additionally, one can argue that the Supreme Court advised against it when it said: "Moreover, applying the *Howey* test to traditional stock and all other types of instruments listed in the statutory definition would make the Acts' enumeration of many types of instruments superfluous." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985) But the purpose here is not to apply the *Howey* framework to an instrument that does not require it. Rather, the purpose is to conduct a thought experiment and see how broad the net is cast by the term "investment contract." If, hypothetically, Congress decided to remove "stock" from the legal definition of security tomorrow, would the phrase "investment contract" step up and fill the void? The term, after all, is meant to be a "catch-all phrase." *Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982).

NFI believes that there is substantial value in that thought experiment. If the term investment contract is truly meant to be a "catch-all," then it should catch the most basic instrument: stocks. However, there is no pooling of any kind when a buyer purchases stock on the secondary market, thus there is no horizontal commonality between investors. There is not necessarily strict vertical commonality, either, the investors' and promoters' fortunes may or may not be tied, and it is not even clear what "promoter" means in this context. It is a simple secondary market transaction between two people. In this case, one might be forced to conclude that the *Howey* analysis leads to the conclusion that secondary market stock transactions do not constitute security transactions, which is absurd. Congress's enumeration of the term "stock" in the legal definition of security was not an accident; Congress knew that, regardless of whether

they traded on the primary or secondary market, stocks would be securities. That a traditional application of *Howey* does not lead there is problematic.

Again, the Modified *Howey* approach provides the reconciliation. Under that view, a stock would satisfy all four prongs of *Howey* when sold on the primary market. When the trading moves to the secondary market, the "common enterprise" toggle would be "turned off" leaving three prongs relevant for the analysis. A secondary stock transaction would still satisfy all those three prongs -cash flows still depend on the "efforts of others"- and the alternative reading of *Howey* advanced in this brief would have no trouble concluding stocks are securities.

**D.     The "Security vs. Commodity" Narrative is a Misconception That This Court Should Ignore.**

A popular, but erroneous narrative, is that an asset can be a security or a commodity, but not both. For example, in a recent congressional hearing, Chair McHenry asked SEC Chair Gensler: "Clearly, an asset cannot be both a security and a commodity. Do you agree?" *Chairman McHenry Questions Chair Gensler on Ether at Hearing to Conduct Oversight of the SEC*, available at https://www.youtube.com/watch?v=VhA1dZXeao0. Chair McHenry then asked Chair Gensler multiple times, "Is Ether a commodity, or a security?" *Ibid*. Ripple's Chief Legal Officer framed the question the same way: "Ripple has been on the forefront of that fight with the Securities and Exchange Commission here in the U.S. We have been defending the issue of whether XRP - again, the digital token that we use in our tech stack to enable our customers to benefit from our products- , *whether that should be classified as a security, or it should be classified as a commodity*, or virtual currency." (emphasis added). Stuart Alderoty X Post on October 12, 2023, available at https://twitter.com/s_alderoty/status/1712535465725932012?s=20 (video embedded in post).

18

The same narrative is also advanced by business media. A recent Bloomberg video was titled *Is Crypto A Security or Commodity?,* with the host asking her guest: "Where are you on the big debate about whether crypto is a security or a commodity?" https://www.youtube.com/watch?v=A4msDGQ53rM&t=183s.

There is no genuine debate here, but when a misconception is this pervasive, it is only natural for it to start showing up in droves in legal arguments. Coinbase, LBRY Inc. and Telegram all argued for a non-existent mutual exclusivity between securities and commodities in some form. Now, Binance is attempting the same trick. At least one court, the *Voyager* court, seems to have latched on to that distinction: "Regulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision." *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023).

This Court should reject the invitation to open a door to a distinction that does not exist. Ether, or any other crypto token for that matter, can certainly be a commodity when Ether futures are trading under the purview of the CFTC, but that does not preclude the possibility that purchases of Ether on a crypto exchange can be construed as a security transaction. To the extent CFTC may be viewed as a more crypto-friendly regulator than the SEC, the "commodity, therefore not a security" view is mutual exclusion created artificially by the crypto industry that reflects opportunistic regulatory shopping rather than acknowledging the regulatory regime that existed for decades.

Notably, the alleged security vs. commodity distinction is irrefutably rejected by the current and former members of the very regulator that the cryptocurrency industry is seeking

solace in, i.e., the CFTC. Dan Berkowitz, former Commissioner observed: "Something can be both. It can be a commodity under the [Commodity Exchange Act] and a security." Dan Berkowitz's statement on securities vs. commodities via *Unchained* podcast, video excerpt posted on X by Laura Shin, available at

https://x.com/laurashin/status/1661114787751948288?s=20. Similarly, current Commissioner Goldsmith Romero stated: "It's not an either/or - almost everything is a commodity unless it's an onion or movie ticket. Something can be a commodity and a security at the same time." *Security? Commodity? What happens if crypto is both?*, available at

https://fortune.com/crypto/2023/04/12/security-commodity-crypto-both-cftc/. Then-current Commissioner Stump offered perhaps the sharpest rebuke by issuing a statement, noting that "there has often been a grossly inaccurate oversimplification offered which suggests these are either securities regulated by the Securities and Exchange Commission, or commodities regulated by the Commodity Futures Trading Commission. The prevalence of this misunderstanding about U.S. regulatory delineations has grown to a point that I believe requires correction," with an accompanying slide deck titled *Digital Assets: Clarifying CFTC Regulatory Authority & the Fallacy of the Question, "Is it a Commodity or a Security?". Statement of Commissioner Dawn D. Stump on the CFTC's Regulatory Authority Applicable to Digital Assets*, August 23, 2021, available at

https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement082321.

Defendants' arguments implying a mutual exclusivity that does not exist are simply a red herring and should be ignored by this Court. What determines whether a transaction constitutes a security transaction by virtue of being an investment contract is determined by *Howey*, as has been the case for more than 75 years. The road to not being a security does not run through being

a commodity (and then, allegedly, not a security), but rather through the proper application of *Howey*. *Howey* is still the gold standard, it just needs to be modified to reflect the current-day economic realities that crypto assets have created and how they are traded.

      **E.**      **The Alternative Reading of *Howey* Is Entirely Consistent With Its Progeny**

The approach advanced by this brief analysis may be perceived as overly broad, and that it could potentially bring many assets into the domain of securities laws. But even when reduced to only two prongs, the Modified *Howey* analysis does no such thing. The "expectation of profits" prong still stands as an effective barrier for the asset where the predominant use is consumptive. Gold arguably has many industrial uses and so does oil, collectors buy baseball cards because many want to collect and not necessarily profit from trading, real estate is still largely about finding a home, not flipping a house for profit, and commodity futures appeal to risk managers and hedgers, not just speculators. It is true that some of the cases may have incorrectly applied the full *Howey* analysis when the Modified *Howey* would have been more appropriate, and those courts may have reached the right outcome for the wrong reasons. When those cases are run again through the Modified *Howey* approach proposed in this brief, most would likely end with the same result: a non-security, because they will be filtered out through the "expectation of profits" prong. In other words, just because *Howey* may have been applied in a less focused way in the past does not necessarily mean plausible reasons do not exist that produce the same result.

The same principle, of course, shall apply to cryptocurrencies, but it is not sufficient to assert that the predominant use of crypto tokens is consumptive. That assertion should be proven by facts and NFI is not aware of such an analysis being produced *for any token*. Anecdotal evidence won't suffice. Once proven, however, this modified approach would separate true

contenders from pretenders; crypto assets with genuine consumption cases would be filtered out by the Modified *Howey* analysis as they should. The goal, after all, is to protect investors, not users. Conversely, certain crypto assets that are generally deemed as non-securities, such as Bitcoin, could flip to a different characterization once the Modified *Howey* analysis is applied. This potential sea change alone is a good reason why Defendants' motions are premature.

Genuine questions do arise about what predominant use means, how it will be measured, and how the conclusions change if the measurement itself changes over time. These questions are important, but not urgent, certainly not at this stage. Once again, continuation of the case would allow the Court to become fully briefed on these and similar matters.

Finally, while a two-prong-only *Howey* test may seem novel, it is precisely what captures the most important element: risking capital guided by a profit motive. At its core, this is where the need for protection lies. On that note, the Supreme Court's assertion in *Howey* that "[b]y including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystalized by this prior judicial interpretation" appears to be dicta. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). Going through every state case, one legal scholar concluded: "The foregoing discussion should indicate beyond any doubt that there was no fixed definition of an investment contract in the state cases by 1933. As to the specific elements of the Murphy test, the cited cases support only one of the three suggested elements. All of the state cases, both cited and uncited, *seem to agree that an investment contract requires an expectation of profit on the part of the investor*." (emphasis added). Joseph C. Long, *An Attempt to Return Investment Contracts to the Mainstream of Securities Regulation*, 24 Okla. L. Rev. 135 (1971) p. 155. Thus, the Modified *Howey* analysis truly captures the two most critical elements.

**IV.      The SEC Has The Authority To Regulate Cryptocurrencies.**

      **A.      Denying the SEC Its Regulatory Authority Creates an Incongruence.**

Could Congress truly have intended that the securities laws stop being relevant when assets themselves stop generating cash flows? Such a narrow approach would result in incongruent outcomes. It would lead to a bifurcated regime where a plethora of information continues to be produced in the equity and debt markets, but purchasers of crypto tokens wouldn't even know what choice they are making between investing and speculating when that choice is not a matter of subjective beliefs, as is the case with stocks. Congress clearly did not want information being withheld from the public, when, as illustrated by the hypothetical example above, full and fair disclosure would have resulted in an intrinsic valuation adjustment from $10 to $7. If crypto tokens are deemed to be out of the SEC's reach, a much more substantial intrinsic valuation adjustment, from whatever the current price of the token is to all the way down to $0, would not be achieved in the marketplace.  This cannot be the outcome Congress had intended.

      **B.      Other Regulators Have Similar Broad Regulatory Powers.**

Effective regulation is an intricate dance, where the delicate balance between innovation and protection takes center stage. At its core, effective regulation aims to grant individuals the freedom to make choices, but with a crucial caveat: they must be *fully* informed.

In 1990, Congress enacted the Organic Foods Production Act to promote the production of organically produced foods through the establishment of a national standard production for organically produced products and providing for the labeling of organically produced products and for other purposes. S.2108 - Organic Foods Production Act of 1990, available at https://www.congress.gov/bill/101st-congress/senate-bill/2108/text. A decade later, USDA

released the final national organic standards. Dan Glickman, then Secretary of Agriculture stated: "This is the strongest and most comprehensive organic standard in the world. For consumers who want to buy organic foods, the standards ensure that *they can be confident in knowing what they are buying*." Dan Glickman, Release of Final National Organic Standards, U.S. DEP'T OF AGRIC., (Dec. 20, 2000), available at https://www.ecomall.com/greenshopping/usdafinal.htm. (emphasis added).

Another pertinent example is the Surgeon General's warning that was added to packs of cigarettes in 1970 after Congress passed the Public Health Cigarette Smoking Act in 1969. "The bill required cigarette packages to be labeled the following, "Warning, The Surgeon General has determined that cigarette smoking is dangerous to your health and may cause lung cancer or other diseases." Public Health Cigarette Smoking Act, available at

https://en.wikipedia.org/wiki/Public_Health_Cigarette_Smoking_Act.

These examples, drawn from two different regulatory regimes underscore the fundamental principle that individuals are free to make their own choices but should do so only with complete information.

### C.      Historically, State Regulators Had Similar Powers.

The regulatory labeling regime proposed here is not a novel concept. In fact, it's a revival of an age-old idea that actually predates the federal securities laws.  Under the blue sky laws, certain securities in certain states could not even reach potential buyers: "[T]he registration may show that the corporation has never had a record of earnings that will assure the payments of dividends or interest on the securities sold, unless the rosy hopes of promoters are realized, but such securities can be safely sold without fear of penalty, although they could never be sold in a State with a properly administered licensing act unless expressly labeled: 'This is a speculative

security.'" *See*, John Tracy, *The New Federal Securities Act*, Mich. L. Rev., Vol. 31, No. 8 (Jun., 1933), pp. 1117-1124, 1123, available at https://www.jstor.org/stable/1281038. This historical fact, largely forgotten, strongly points to the SEC having authority to regulate cryptocurrencies without further action by Congress. Just as state governments entrusted state regulators with these powers over a century ago, it stands to reason that the federal government should entrust its federal regulator with similar authority.

It is worth noting that labeling a stock as "speculative," while well-intended, was a misguided approach; a stock can be speculative at high prices but a true investment at a much lower price. That policy effectively died off nearly a century ago, but finds a true home in 21st-century finance, with the intrinsic value of most crypto assets firmly being set at zero. Essentially, in the absence of cash flows, cryptocurrencies will *always* be speculative in nature. In NFI's view, a regulatory solution that is not built around such labeling for cryptocurrencies would fall short and deny investors the protection they need. In addition, developing detailed guidance that builds on that idea is a task that the SEC is fully equipped to execute on.

## **CONCLUSION**

For the foregoing reasons, NFI respectfully requests that this Court deny Defendants' Motion to Dismiss.

Dated:  November 14, 2023                        Respectfully submitted,

Timothy C. Parlatore (NY0332)
Scott D. Brenner, Esq. (Admission Pending)
*Counsel for Proposed Amicus Curiae*
*New Finance Institute*
Parlatore Law Group, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
212-603-9918
timothy.parlatore@parlatorelawgroup.com
scott.brenner@parlatorelawgroup.com

# CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I certify that New Finance Institute Brief of Amicus Curiae In Support of Plaintiff's Opposition to Defendants' Motions to Dismiss complies with the rules of this Court, as the brief is 25 pages (maximum 25), excluding those parts of the brief exempted under Federal Rule of Appellate Procedure 32(f), and the brief otherwise meets the requirements of LCvR 5.4 and Federal Rule of Appellate Procedure 29(a)(4).

 /s/ *Timothy C. Parlatore*