```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * * *    )
        SECURITIES AND EXCHANGE          )    Civil Action
 4      COMMISSION,                      )    No. 23-01599
                                         )
 5                      Plaintiff,       )
                                         )
 6         vs.                           )
                                         )
 7      BINANCE HOLDINGS LIMITED, et al., )   Washington, D.C.
                                         )    November 27, 2023
 8                      Defendants.      )    9:39 a.m.
                                         )
 9      * * * * * * * * * * * * * * *    )

10

11                  TRANSCRIPT OF STATUS CONFERENCE
            CONDUCTED IN PERSON AND VIA VIDEOCONFERENCE
                BEFORE THE HONORABLE ZIA M. FARUQUI
12                 UNITED STATES MAGISTRATE JUDGE
                (Transcribed from the Audio Recording)
13

14
        APPEARANCES:
15
        FOR THE PLAINTIFF:      JOHN EMMETT MURPHY, ESQ.
16                              SECURITIES AND EXCHANGE COMMISSION
                                100 Pearl Street
17                              Suite 20-100
                                New York, New York 10004
18
                                JENNIFER L. FARER, ESQ.
19                              SECURITIES AND EXCHANGE COMMISSION
                                100 F Street, Northeast
20                              Washington, D.C. 20549

21
        FOR THE DEFENDANT       JASON MENDRO, ESQ.
22       BINANCE HOLDINGS:      DANIEL W. NELSON, ESQ.
                                RICHARD W. GRIME, ESQ.
23                              AMY FEAGLES, ESQ.
                                TEDDY KRISTEK, ESQ.
24                              GIBSON, DUNN & CRUTCHER, LLP
                                1050 Connecticut Avenue, Northwest
25                              Suite 300
                                Washington, D.C. 20036
```

```
 1        APPEARANCES, CONT'D:

 2        FOR THE BAM              MATTHEW LAROCHE, ESQ.
          DEFENDANTS:              MILBANK, LLP
 3                                 55 Hudson Yards
                                   New York, New York 10001
 4
                                   WILLIAM R. McLUCAS, ESQ.
 5                                 MATTHEW BEVILLE, ESQ.
                                   WILMER, CUTLER, PICKERING, HALE &
 6                                   DORR, LLP
                                   2100 Pennsylvania Avenue, Northwest
 7                                 Washington, D.C. 20037

 8                                 DANIEL J. DAVIS, ESQ.
                                   KATTEN, MUCHIN, ROSENMAN, P.A.
 9                                 1919 Pennsylvania Avenue, Northwest
                                   Suite 800
10                                 Washington, D.C. 20006

11
          FOR DEFENDANT           WILLIAM R. BAKER, III, ESQ.
12        CHENGPENG ZHAO:         MOLLY ROSEN, ESQ.
                                  LATHAM & WATKINS, LLP
13                                555 Eleventh Street, Northwest
                                  Suite 1000
14                                Washington, D.C. 20004

15
          TRANSCRIBED BY:         LISA EDWARDS, RDR, CRR
16                                Official Court Reporter
                                  United States District Court for the
17                                  District of Columbia
                                  333 Constitution Avenue, Northwest
18                                Room 6706
                                  Washington, D.C. 20001
19                                (202) 354-3269

20

21

22

23

24

25
```

```
 1            THE COURTROOM DEPUTY:  Good morning, your Honor.

 2            This is Civil Action 23-1599, the Securities and

 3    Exchange Commission versus Binance Holdings, Limited, et al.

 4            Starting with the Plaintiff, will you please

 5    approach the lectern and introduce yourself for the record.

 6            (NOTE FROM TRANSCRIBER:  Gap in audio.  No

 7    appearances announced on behalf of the Plaintiff.)

 8            MR. LAROCHE:  Matt Laroche from Milbank on behalf

 9    of the BAM Defendants.

10            THE COURT:  One second.

11            How's that microphone working?  Let's try it

12    again.

13            MR. LAROCHE:  Matt Laroche from Milbank on behalf

14    of the BAM Defendants.  And with me today from Wilmer, Hale

15    is Bill McLucas and Matt Beville, and also Dan Davis from

16    Katten.

17            THE COURT:  All right.

18            MR. MENDRO:  Good morning, Judge.  Jason Mendro

19    from Gibson Dunn.  And here with me today are Dan Nelson,

20    Richard Grime, Amy Feagles and Teddy Kristek.

21            Thank you.

22            MR. BAKER:  Good morning, your Honor.  William

23    Baker.  And with me is Molly Rosen on behalf of Defendant

24    Changpeng Zhou.

25            THE COURT:  Great.
```

```
1           You'd think you guys were coming to appellate.

2    You didn't realize we were in circuit court now and I have

3    two extra seats.  We had a high school thing last week.  I

4    guess we didn't clean up.

5           Well, it's good to see you all.  I hope you all

6    had a good Thanksgiving.  I thought you all maybe noticed,

7    well, stuff on the news.  So it's just -- some things have

8    happened since we last got together.

9           I don't want to stick my nose where it's not

10   wanted, but I didn't know -- I just wanted to make sure

11   we're still -- things are moving apace, just with the SEC,

12   that we're all full steam ahead, nothing that we need to

13   sort of reevaluate or you all need time to sort things out

14   with events in the news last week.  No?  We're good?

15           MR. MURPHY:  No, your Honor.

16           THE COURT:  Okay.  Fair enough.

17           Yes.  Please.  Go ahead.

18           MR. LAROCHE:  May I make a suggestion:  that BAM

19   go first?  I just think it might be most efficient today,

20   given that most of what's going to be discussed is what BAM

21   has been doing.

22           THE COURT:  Sure.

23           MR. MURPHY:  Your Honor, I actually would prefer

24   that we go first as Plaintiffs, number one.

25           And, number two, because we actually think BHL is
```

```
1    now front and center.  You'll see that they've been sitting
2    in the back --
3               THE COURT:  Okay.
4               MR. MURPHY:  -- at counsel table.
5               THE COURT:  Well, they're the Plaintiffs.  I'm
6    going to let them go first.  But I'll make sure you get your
7    time.  Go ahead.
8               MR. LAROCHE:  Understood.
9               THE COURT:  Yes.
10              MR. LAROCHE:  Good.
11              THE COURT:  Thanks.
12              MR. MURPHY:  So can I start with the good news?
13              THE COURT:  Yes.  That's what we talked about last
14   time.  Yes.  We like to start with the good news.
15              MR. MURPHY:  We're making progress.
16              THE COURT:  Okay.
17              MR. MURPHY:  The issues are narrowing
18   substantially.  And I think we're really homing in on some
19   precise and specific issues on how -- the technical details
20   of how BAM's crypto assets are stored.
21              THE COURT:  Yes.
22              MR. MURPHY:  And let me just -- I'm going to
23   describe it in two buckets.  One, as I said, focuses on
24   BHL --
25              THE COURT:  Sure.
```

1          MR. MURPHY:  -- because I really think they're

2     front and center now.

3          THE COURT:  Okay.

4          MR. MURPHY:  And the other is more of a status

5     report on BAM.

6          THE COURT:  Okay.

7          MR. MURPHY:  On BHL, it is becoming increasingly

8     clear to us that we are never going to get to the bottom of

9     how BAM's crypto assets are stored until we understand how

10    BHL's wallet custody software works.

11         THE COURT:  Okay.

12         MR. MURPHY:  It's going to require some kind of

13    substantive document production and likely some kind of

14    testimony from BHL.  And we have been working with them.

15    Granted, they've been on the back burner now.  They have no

16    obligation to produce this yet.

17         THE COURT:  Yes.

18         MR. MURPHY:  And we could talk about what the

19    mechanisms are for doing that, and we've had an agreement.

20         But it seems clear to us that there are gaping

21    holes that just deal with those technological realities.

22    They have not signaled a willingness to make those

23    productions or offer those witnesses, at the 30,000-foot

24    view.

25         I'm hoping they're going to surprise me when they

1    come up here.  They haven't taken a very hardline position

2    in writing.  I take that as a hopeful sign.  So we'll hear

3    from them and hope we can make progress on that, because

4    they have made some inclinations that they would be open to

5    doing more than what they've done.

6              THE COURT:  Yes.

7              MR. MURPHY:  On BAM, we're continuing to work

8    through -- again, with the 30,000-foot view, I'd like to

9    just -- I'll give you a little bit more detail on both of

10   these buckets.

11             THE COURT:  Sure.

12             MR. MURPHY:  But on the BAM bucket, we've taken a

13   lot of -- we've taken some depositions, I'll say, since we

14   last saw you.

15             THE COURT:  Yes.

16             MR. MURPHY:  You'll be happy to hear some of them

17   have been very short.  We have a few more coming.

18             THE COURT:  Yes.

19             MR. MURPHY:  And the document productions that

20   they've agreed to make in response to our September 21st

21   letter -- you'll remember those --

22             THE COURT:  Yes.

23             MR. MURPHY:  -- we're working through those.  They

24   are making productions.  You'll recall in the last joint

25   status report, they said they expected to have all document

1    productions done by the 13th, so that by the 20th we would

2    have been able to at least take a first crack at them and by

3    now signal all of our disagreements.

4         That didn't happen.  I'm not here to do all the

5    timing --

6         THE COURT:  Sure.

7         MR. MURPHY:  -- understanding Thanksgiving.  But

8    we really did get many of the documents leading right up

9    literally to the eve of Thanksgiving.  Some of them haven't

10   been loaded yet.

11        So we're just not in a position to say which of

12   those document requests are crossed off.  I suspect we will

13   be able to in the next few weeks.  And we can talk about the

14   timing in our next report.

15        THE COURT:  Okay.

16        MR. MURPHY:  There are some sticking points I

17   think we'll probably need to talk about on the BAM side,

18   30(b)(6) being one of them, inspection being one of them.

19        THE COURT:  I see.

20        MR. MURPHY:  I'm not sure how dispute any of these

21   ripes are -- how ripe any of these disputes are, but I'll

22   give you some more color.

23        THE COURT:  Okay.

24        MR. MURPHY:  So first, on BHL, if I could just --

25   if I may just explain why I think we need them to explain

```
 1    how their software works.

 2            Defendants tend to get up when they talk here and

 3    spend a lot of time talking about whether there's evidence

 4    that their clients have misappropriated assets if the

 5    consent order says, Don't steal the customer assets.

 6            But the consent order spells out some very

 7    specific requirements.  And if you bear with me, I just want

 8    to talk about the ones we're focused on.

 9            THE COURT:  Sure.  Of course.

10            MR. MURPHY:  BAM personnel in the United States

11    must have exclusive control and custody of the assets.  BHL

12    and other Binance entities and Mr. Zhou cannot have any

13    possession or custody or control of BAM's assets.

14            And to avoid any doubt about what these words

15    mean, "custody, control," it spells out:  You can't have the

16    keys.  BHL -- and I'll use BHL as a catch-all for the

17    Binance entities and Mr. Zhou, unless we need to be more

18    precise.

19            THE COURT:  Yes.

20            MR. MURPHY:  They can't have the keys because, as

21    Mr. Kellogg said in his declaration -- he will be mentioned

22    as an authority on these issues -- anyone with the private

23    key can authorize a transfer from a crypto wallet.

24    That's -- I know this is basic.  I know this is basic.  But

25    I'm just trying to --
```

1            THE COURT:  No.  No.  I appreciate it.

2            MR. MURPHY:  -- set out the fundamentals here.

3            BHL had to destroy any keys that it had.  And just

4    so that we didn't have to worry about whether they follow

5    through on that, BAM had to create new wallets and new keys

6    to make sure they were wallets and keys that BHL never had

7    access to.

8            You know these.  You helped us.  You very

9    helpfully helped us negotiate these terms.

10           But it's important because it frames what we're

11   trying to get at here.  Those are the requirements we're

12   focused on.

13           We've taken a lot of discovery of BAM here.  And

14   BAM has made the assertion that, despite using Binance's

15   wallet custody software, they have exclusive control of the

16   keys.  So we've been pushing on that.

17           And it boils -- and BAM counsel can get up and

18   correct anything I'm saying here or clarify it.  But it

19   really boils down to, they have this PNK system.  It's an

20   interface.  And when they do a manual transfer, they're

21   looking at a list of wallets, and they put in a number and

22   it goes from wallet A to wallet B and it seems to go

23   through.  And that's a blockchain transaction.

24           And they set thresholds.  They say:  If this

25   crypto asset goes over X number of whatever it is, it'll

1    automatically transfer over to a different wallet.  And it

2    seems to work.

3              That seems to be the basis of their assertion of

4    exclusive control.  And we've pressed on that.

5              For example, the PNK system, I don't think it's

6    disputed, doesn't have the private keys.  In fact, the

7    private keys are nowhere within BAM's environment.  It's

8    somewhere else.  It appears to be in a BHL environment that

9    is controlled by BHL and that BAM does not have access to.

10             So we've asked the question:  How do you know that

11   you have exclusive --

12             THE COURT:  And I assume from your perspective

13   you'd view that as inconsistent with the consent order.  Is

14   that right or no?

15             MR. MURPHY:  It depends.  This is what we're

16   getting at, right?  Because there's a story.  It starts with

17   the deposition of Eric Kellogg, where he said, I don't have

18   access to the back-end system.  I don't have any reason to

19   think that they have unfettered access, but I don't have any

20   access to the back-end system.  I can't tell you exactly how

21   it works.

22             More recently, his deputy, CISO, said he thinks

23   BHL stores the keys.  He doesn't understand how the PNK

24   system interacts with the private keys.  He has no

25   understanding of any controls that prevents any BHL employee

1     to access the private keys.

2           And there are little glitches that cause us to

3     have questions about the arrangement, like the head of

4     clearing, who's in Canada, who really makes the decisions

5     about many of these transfers, said almost always when he

6     puts in the transfer, it goes through.  But -- except when

7     it doesn't.  And in one instance, it didn't go through and

8     he had to call BHL.  And he doesn't know what they did, but

9     whatever they did caused the assets to transfer.

10          The same for the shards that you've heard about.

11    It's -- they have phones.  We've done -- BAM has been great

12    in facilitating inspections of these really helpful -- gave

13    us plenty of time with the witnesses.  But they're pressing

14    buttons.  They have no idea what's under the hood.

15          THE COURT:  Are you the good cop and Ms. Farer is

16    the bad cop?  This is great.  I love it.

17          MR. MURPHY:  If you see me up here, you can assume

18    that she has more important things to do.

19          THE COURT:  No.  I like that.  I'm sure.  Right

20    now.  Great.  That was very holiday spirit.  Thank you.  I'm

21    glad to hear the inspection went well.

22          MR. MURPHY:  There could be -- and a lot of this

23    has happened recently, since we last saw you.  Right?

24          It may be that BHL doesn't control the keys.

25    Right?  There could be some cryptographic technology that

1    Ms. Farer will have to explain to me once it's produced

2    where -- it's like a double-blind situation --

3              THE COURT:  Sure.

4              MR. MURPHY:  -- where BHL actually doesn't have

5    the keys.  And that's what we need to get to.  Right?  What

6    is the story?

7              We've -- now, we've been working in parallel with

8    BHL.  I'm confident -- again, BAM counsel may get up and

9    explain this in more detail and explain how I'm wrong.  I

10   suspect they won't, just because the people they've held out

11   as most knowledgeable haven't been able to explain.

12             BHL -- you know, we served -- we can talk about

13   the timing.  We won't get into the timing.  But, you know,

14   we filed -- we served them document requests back in August.

15   They haven't had to respond.  But they have said they're

16   looking.

17             We sent them more specific requests in October.

18   But more kind of fundamentally, they've been sitting in the

19   back of the courtroom listening to this and in the

20   depositions.  And we do scratch our heads, like, Why haven't

21   they jumped up and said, "This is crazy.  Of course we don't

22   have the keys.  That would violate the consent order.

23   Here's how it works"?

24             That's where we want to get.

25             They have -- we had a call with them last Tuesday,

1      lots of back-and-forth.  We've been mostly waiting on them.

2      They said they were considering a document production.

3             They called Tuesday and said:  We have agreed --

4      we don't -- we think BAM has answered all the questions.

5      But we're going to produce eight documents to us.

6             And I'm not joking.  They acknowledged that we

7      already had seven of them.

8             THE COURT:  Okay.

9             MR. MURPHY:  One of them is an agreement that

10     doesn't address any of these issues, the one that we didn't

11     have, I think.  It's around those numbers.  It's seven,

12     eight, but not much more than that.

13            THE COURT:  Sure.

14            MR. MURPHY:  We don't think we're going to make

15     progress until they make a substantive production and

16     explain how the software works with a technical person who

17     can answer these questions.  And I think it's going to

18     require direction from you.

19            So that's where it is, the 30,000-foot view on the

20     BHL side.

21            On the BAM side, as I already mentioned, we've

22     taken some depositions.  We've got four agreed depositions

23     in the next few weeks.  We have another agreed deposition

24     that had been postponed because of the witness's personal

25     reasons that will be, we expect, in December.  We've worked

1    with them on the accounting issues.  They continue to

2    provide information, answer our questions.  There's a few

3    outstanding questions, but we continue to work on that.  I

4    don't -- again, there may be a dispute down the road, but I

5    don't think -- certainly there's not one that is ripe right

6    now; and I'm hopeful there won't be that, by the time we

7    report to you.

8         There does seem to be a sticking point on the

9    30(b)(6) deposition.

10        THE COURT:  Yes.

11        MR. MURPHY:  You'll recall that BAM long ago

12   agreed in joint status reports, here in hearings, that they

13   would produce a 30(b)(6) witness.  They cited that as a

14   reason that we didn't need other certain witnesses.

15        In the last joint status report a month ago,

16   you'll recall they said -- and this was one of the few

17   things we agreed on.  This was actually like at the joint

18   part of the joint status report.  They said -- they reported

19   to you a proposal that they had earlier flagged to us, which

20   was:  We are going to designate testimony that our witnesses

21   have already given that we think at least partially answers

22   some of the 30(b)(6) topics.

23        We reserved our rights on that.  It's kind of a

24   strange construct, because we don't know -- the

25   [indiscernible] didn't actually review anything.  They said

1   they would send it the first week of November.  That's what

2   they reported in the joint status report.  And you're

3   naturally wondering whether we think those designations

4   satisfy any of the 30(b)(6) topics.

5           The thing is, we never got them.  We still haven't

6   gotten them.  They have changed their tune and said -- they

7   refuse now to give any designations.  And they wrote a

8   letter on Saturday that I'm still trying to understand.  And

9   I could speculate until I'm blue in the face.

10          We've all had difficult clients who change their

11  mind about things.  It may be that they're not happy with

12  Mr. Kellogg's testimony, which they had said they were going

13  to designate.  They were in the process of producing his

14  documents, which we just got.  Maybe they've decided that

15  the documents say -- tell a slightly different story and

16  maybe they want to write whatever it is.

17          I think that -- we think the answer to this is we

18  sit down and hash out the topics.  And we can do that and we

19  can report in the next status report where that is.  We

20  think it's on them to do it in the first instance.  I don't

21  think they've satisfied their obligation under the rule to

22  give specific objections about why specific topics are

23  burdensome.  And -- but we're willing to work with them on

24  that.

25          I think that's the result here, but I'm happy to

1   hear out BAM counsel on this.  I think it could be

2   illuminating.

3           We've got an inspection that we have not -- that

4   BAM has agreed to but we have not done yet.  We've, I think,

5   agreed on what systems will be inspected, the PNK system,

6   the TSS protocol, app, Whitelisting.  We've had a lot of

7   back-and-forth about whether they need more detail.  I think

8   this can get -- we've given things -- examples of things we

9   want to see that I think a technical person will understand.

10  And if they read them to their technical person, that person

11  would say:  Yeah.  I get it.  Or maybe they wouldn't get it,

12  and then we could talk about that or maybe have a call with

13  technical people.

14          Either way, if they get us someone who actually

15  knows how the system works, I think we'll be okay.  What we

16  don't want and what we've signaled is we don't want a user

17  showing us the interface.  I punch in the numbers and I see

18  things move.

19          THE COURT:  Sure.

20          MR. MURPHY:  Right?

21          THE COURT:  Yes.

22          MR. MURPHY:  And, for example, Eric Kellogg talked

23  about how he wanted to kick the tires a little bit and he

24  had someone run a test where it created some kind of packet

25  which showed the zeroes and ones that actually get spit out

1    from the PNK system.

2         I suspect we're going to hit the end of their

3    knowledge of it pretty quickly.  There might not be that

4    much to it.  But we just -- it has to get scheduled.

5    They're going to get us a date and they're going to get us a

6    proposal.

7         Just to give you a sense of -- I'm not -- I'm

8    trying to give you -- I think that we are working through

9    most things.  To give you a sense of some of the things that

10   we are encountering in discovery and to show you that we are

11   asking the right questions and getting to the right place,

12   they've cited the shard holders as a key control.  Right?

13   So when we said we need to get BAM employees in the U.S.

14   controlling the assets, they have cited, Well, we have shard

15   holders.  Four of them have to approve every asset.

16        The first shard -- the first two shard holders we

17   deposed said basically -- and we can dispute what they said,

18   but I think it's a fair characterization to say -- "I don't

19   really make any independent decision.  I'm making -- I'm

20   getting directions from someone outside the U.S., the head

21   of clearing."

22        THE COURT:  That's the lady in Canada?

23        MR. MURPHY:  Yeah.  Yeah.

24        And I think BAM recognized that.  And they've now

25   put in -- I think -- we were told now in subsequent

1    depositions another control, very recent, in October, where

2    a BAM employee is monitoring those transactions and a second

3    set of eyes.

4              That's great.  While we applaud remedial measures,

5    we're not here to score points.  We're here to get to the

6    right place.  I'm just giving you a sense of --

7              THE COURT:  Yes.  Sure.

8              MR. MURPHY:  -- how these depositions are fruitful

9    and I think they're leading to improvements in the systems.

10             It has -- the shard issue is a little bit, again,

11   troubling because no one knows what's going on behind the

12   hood and they have tried -- witnesses have said they have

13   tried to domesticate that request for process, where the

14   person in Canada is not the only person who's requesting the

15   transfers.

16             When that person tried to reach out to the

17   administrator of the TSS protocol, who is reported to be a

18   very close associate of Mr. Zhou, the communications went

19   dead.  That was back when we deposed him.  Things may have

20   changed.  Again, we may hear more about this.

21             But it's something that we're still -- right?

22   That's something we'd like to talk to someone about, if that

23   has changed.

24             A lot of the key communications between folks in

25   Canada and BHL, wherever those people are, is on a chat -- I

1    think it's a homemade, BHL-developed chat app called Wea.

2    And we've been talking to BAM's counsel for a long time.

3    And as of last week, they didn't know if they had access to

4    communications on that app that have happened during this

5    period, like since the consent order.

6         Again, we may get updates on that.  And I'm --

7    they -- BAM counsel's deferred on some of the details, and

8    I'm happy to get the right answer.  I'm not criticizing

9    them.  I'm just giving you a sense of what...

10        What I want to make clear is, because we don't

11   bring up something specifically here doesn't mean

12   everything's been resolved.  You have that point.  Right?

13        Another recent disclosure is that, you know, some

14   of the people up in Canada are the key contacts to people in

15   BHL.  And they -- a lot of them are former BHL employees.

16   We were told last week that some of those folks are getting,

17   quote, "allowances" from a BHL-affiliated entity.  We don't

18   have -- we got some details, but not much.  Not an amount.

19   Again, counsel deferred.  Waiting for more details.  If you

20   hear more details than that today, it'll be the first time

21   we're hearing them.  Again, that's fine, but it's the kind

22   of thing we're working through.

23        So I think that's -- those are the two buckets

24   where I see them.  I think it probably calls for, number

25   one, BHL, Zhou, you know, whichever entity, to propose some

1    kind of production.  I think on the BAM side, an update soon
2    will come, probably in the form of a status report maybe
3    after the next depositions are due in mid-December.  We
4    haven't talked about the timing of that.  I'm happy to talk
5    about that.
6         I'll just say, ending, because I kind of expect
7    what's going to come, I expect you're going to hear a lot
8    from defense counsel about how they're sick and tired of
9    this process.  And I'll just stipulate:  We're sick and
10   tired of the process.  And we've got very strong, different
11   opinions on who's caused delay, on whose patience should be
12   running out.
13        THE COURT:  Sure.
14        MR. MURPHY:  It's like Thanksgiving dinner.  Like
15   we all have a long list of grievances.  It's better mostly
16   not to go through them.  I've tried to keep them to a
17   minimum.  I'm ready to respond if it turns into a litany.  I
18   don't think it should.  I don't think that's productive.
19        But this is not going to get resolved by who shows
20   the most indignation.  These are fair questions we're
21   asking.  And we think it's not going to get to the end until
22   we get these questions answered.
23        THE COURT:  So trying to put a finer point on
24   that, I mean, I guess that's going to be their question, is:
25   When will -- when will all of the questions be asked and

```
1    when -- you know, which is hard, because you have followup

2    questions.  And then is there sort of an event horizon here?

3              And so, I mean, starting with BAM, it's once the

4    depositions are over, right?  That is like mid-December,

5    you're saying?

6              MR. MURPHY:  Yes.  We have the 30(b)(6) and we

7    have a deferred issue on the CFO and CEO.

8              I was wondering -- I don't know if BAM represents

9    them anymore.

10             THE COURT:  Right.

11             MR. MURPHY:  So maybe they can clarify that if

12   that's even there, in dispute anymore.

13             THE COURT:  Sure.

14             MR. MURPHY:  But we've got that and we've got the

15   30(b)(6).

16             I'll tell you, a lot could be cleared up from BHL.

17   Right?  We have these depositions.  But if they came in and

18   showed how the technology actually works and showed that

19   there's just no way that BAM -- that they can access any of

20   the keys, that goes a long way.

21             THE COURT:  Yes.

22             MR. MURPHY:  We have these questions about the

23   people, like who really is a BAM employee?  But we're going

24   to be taking depositions in Vancouver next week.  I think

25   that's going to shed a lot of light.  I think we can tie a
```

1    ribbon around a lot of these issues with a 30(b)(6).

2              So, short answer, I would love for this to be done

3    by the end of the year.  I think it's possible.  It's not

4    mostly in our control.  We think most of the questions have

5    been teed up other than followup that could come out of -- I

6    just mentioned some questions, right, that have come up

7    literally -- we're getting letters Saturday.  Again, people

8    are working hard.  I'm not criticizing them.

9              THE COURT:  Fair.

10             MR. MURPHY:  But we're getting information in

11   realtime.

12             And as I said, I flagged to you somewhat how it's

13   a moving target.  Compliance often is an evolving thing.  So

14   we'll never -- right?  We don't -- the fact that they

15   evolved their compliance program does not mean we want to do

16   discovery forever.  But we have to get some of these basic

17   questions asked -- answered.  Sorry.

18             THE COURT:  And so I just -- I'll hear from them

19   and we'll come back on that.  I'm not trying to push on the

20   fact that there's a separate, you know, criminal resolution

21   and things going on.  But in some ways, right, if Mr. Zhou

22   as I understand it has relinquished his role front and

23   center at all in the company, if what we're doing is

24   forward-looking, right, this just right here -- this is

25   not -- you know, in terms of the litigation, this in no way

 1    speaks to people's historical roles in the company.  That's
 2    what you are -- right?  This is just a small piece of the
 3    larger puzzle.
 4           But if what we're worried about is BHL control and
 5    Mr. Zhou's control -- right?  I think at a prior hearing the
 6    concern that, you know, Ms. Farer raises is that there was a
 7    fear and that you all had, you know, documents and things to
 8    support that that -- you know, this was an entity still.
 9           If BAM was the one that indeed could control, just
10    limited to the disposition of assets and keeping things
11    here, have you thought about how -- I'm sure you've thought
12    about it -- but how should I think about how that's changed
13    the dynamics?  Or when are we going to go -- are we going to
14    talk about that?  Because it just seems like it -- some
15    things are different.  Right?  At least one thing.
16           MR. MURPHY:  Yes.  So let me give some high-level
17    reactions to that.
18           THE COURT:  Yes.  Please.
19           MR. MURPHY:  One is that I'm not sure how it
20    affects -- and I really mean I'm not sure.  It may be
21    somewhere in the papers and we haven't processed it.
22           THE COURT:  Right.  Sure.
23           MR. MURPHY:  Ms. Farer is much more of an expert
24    in processing this right now, so she may get up at some
25    point to give her opinion on this.

1           THE COURT:  Yes.

2           MR. MURPHY:  I'm not sure how it affects his role

3     at BAM at all.  He still is a shareholder.  I assume they're

4     working through that.  I assume that's back-door -- I mean,

5     boardroom conversation.

6           THE COURT:  Right.  Not pejoratively.  I know what

7     you meant.

8           MR. MURPHY:  Right.  So I don't know.  That's a

9     question for them.

10          THE COURT:  Yes.

11          MR. MURPHY:  I don't think there's, when you're

12    reading the filings from last week, it gives you a lot of

13    comfort about anything right now.  In the future, it may.

14    But it calls for remedial measures that I don't think anyone

15    says are in place right now.  And it doesn't give a lot of

16    confidence about corporate separation leading up until -- I

17    don't know -- when these were filed last week.

18          So from our perspective, we just don't have enough

19    information.  I'm happy -- it's more of a question for them,

20    I would say.

21          THE COURT:  Okay.

22          MR. MURPHY:  But, you know, I'm happy to give more

23    color on that.

24          THE COURT:  Okay.  No.  I think that's a good

25    stopping point right now.  Does that sound good?  Yes.

1   Okay.

2           I'm happy to hear from BAM.  I'll tell you, we

3   have -- our chambers motto is -- we have two:  One is,

4   always be networking.  And the second one is, don't snatch

5   defeat from the jaws of victory here.

6           So it sounds like that they're happy.  You're no

7   longer the bad guy.  So I mean, it's BHL.  Happy to beat up

8   on Gibson.  But, you know, I understand.  I think they've

9   already flagged that perhaps you feel like you've done all

10  the things you need to do and it's just time for some things

11  to sunset.

12          But before you get in, I'm going to hear

13  everything you need to say -- is there some value, right, in

14  just continuing to see sort of where things get to?  I mean,

15  this 30(b)(6) thing, I mean, I don't think we need to get

16  into this, right, the 30(b)(6) thing.  We can just wait and

17  see.

18          When you finish the depositions, I think it's

19  reasonable.  You're saying:  Look, let's look back and see

20  if the mosaic is done.  Right?  And you don't know until

21  afterwards.  And then we'll handle that issue.

22          So, you know, setting that aside, it still sounds

23  like, you know, the inspection, some of the things -- I

24  didn't hear the words "source code."  That's a good thing.

25  Right?  I think that is reflective, it sounds like -- we'll

1    see the SEC speak for themselves, but I would imagine, and

2    hopefully it's based on what I flagged at the prior hearing,

3    is that, you know, if there is a sufficient inspection, we

4    don't need, right, the suspender.  The belt is good.

5                MR. LAROCHE:  Right.

6                THE COURT:  And so it seems like we're really

7    narrowing a lot of BAM issues.

8                And if ultimately they're like, Hey, let's put a

9    pin in the 30(b)(6) and a few other things, but we've still

10   got, like, 80 percent of what we want to done with BAM at

11   the end of the year, we want to shift and go to BHL now, and

12   just let you guys do your thing to the extent that they are,

13   and you're in litigation, is that something that -- I don't

14   want to say you can live with it, because you're going to

15   say no, but I don't know what the right word is.  Is that

16   something that -- is that even a path forward, I guess, to

17   consider?

18               MR. LAROCHE:  Our message to you today, Judge, is

19   we've committed to doing an awful lot.

20               THE COURT:  Yes.

21               MR. LAROCHE:  We've done an awful lot.

22               THE COURT:  Yes.  Which they recognize.

23               MR. LAROCHE:  When that's done in two weeks,

24   which, to be clear, is the remaining fact depositions and

25   the inspections, our message is:  This needs to end --

```
 1                    THE COURT:  Yes.

 2                    MR. LAROCHE:  -- for BAM.

 3                    THE COURT:  Yes.

 4                    MR. LAROCHE:  And I'd like to give just a little

 5      bit of --

 6                    THE COURT:  Yes.  Please.

 7                    MR. LAROCHE:  And part of this goes to things the

 8      SEC has raised about BAM's purported inability to raise any

 9      burden concerns or to explain why, you know, this has been

10      any sort of harm to the organization.

11                    THE COURT:  Yes.

12                    MR. LAROCHE:  And I think just a little bit of

13      context.

14                    THE COURT:  Yes.  I want to hear you on that.  I

15      mean, I don't want to be -- and I've tried to be clear with

16      this at the last hearing:  I believe the burden is squarely

17      on the company.

18                    I mean, it does seem like, you know, it's one

19      thing to say the company's burdened, but it's another thing

20      when there is documented, you know, layoffs and things that

21      you all have demonstrated.  So I want you to lay it out

22      because I think it's important to hear it, but I also want

23      them to hear that I hear you on this and I feel that, you

24      know, again, it does feel like there's a point where we just

25      have to figure out where they're not satisfied and you're
```

1    satisfied, and I'm just going to have to split somewhere in

2    there because we can't just keep going.  You guys have a

3    business to run and litigation to operate and you can't

4    juggle all these things.

5              So yes.  Please go through and talk about what it

6    is.  But I want you to know that I'm very receptive to your

7    concerns.

8              MR. LAROCHE:  I appreciate that, your Honor.  And

9    part of the reason I want to do this is because I do think

10   it goes directly to some of the issues that Mr. Murphy just

11   raised, which I think from our perspective we're just a

12   little surprised that they -- that Mr. Murphy is raising

13   issues with the control of the keys and how the system

14   works.

15             I mean, to be very clear, we told him how the

16   system worked six months ago.  This stuff is no surprise in

17   terms of how the keys are stored and how they're controlled

18   and our perspective as to what that means with respect to

19   control.

20             So when Mr. Murphy comes up and says, Well, Judge,

21   I mean, the keys are in an environment that, you know,

22   apparently BAM doesn't have control of, there's no surprise

23   there.  We said that in the first declaration in June.

24             And so it's a bit shocking to us to hear that as

25   the basis to continue doing this and to continue requiring

1    more discovery on the issues that we raised in June.  We

2    just don't think that's an appropriate way to go.

3              And as we said in June and as we gave them the

4    declarations, this is how our system works.  But we said:

5    Okay.  We're going to do expedited discovery in good faith.

6    We're going to try to address your concerns.

7              Now we're almost six months later.  And what have

8    we done?  BAM has produced thousands of documents about

9    every conceivable aspect of its asset custody practices.

10   It's responded to two dozen interrogatories.  It's

11   supplemented them last week.  It's had inspections of

12   multiple shard devices.  It's going to allow more

13   inspections of its systems.  It submitted at least half a

14   dozen declarations concerning its compliance with the

15   consent order and asset custody practices.  It provides a

16   monthly report of its expenses to the SEC saying what it's

17   doing with all of its expenses.

18             The SEC has taken seven depositions to date.  In

19   the next two weeks, they're going to do five more, for a

20   total of 12 depositions.  I mean, this is just not limited

21   by any reasonable definition of the word "limited."

22             And despite all of that, we're in the same exact

23   spot we were six months ago.  The SEC has no evidence that

24   assets had been misused in any way.  And in fact, we believe

25   that discovery has confirmed that our systems work exactly

1    as we told them they work six months ago.  There's been no

2    surprises.

3              And Mr. Murphy referred to this, but we've

4    improved the systems.  We've added more controls.  We've

5    added more security, which should just give everybody more

6    comfort that we're trying to do the right thing on this.

7              And what the SEC is left arguing about are

8    hypothetical and speculative concerns that software might be

9    used to transfer assets away from the platform.

10             And frankly, that's just not good enough.  It's

11   just not good enough six months ago, discovery to keep the

12   parties going through this exercise.

13             And this comes with significant harm to BAM.  I

14   mean, when the SEC filed its TRO, they tried to shut down

15   BAM's business immediately.  And if you couple that with the

16   really onerous discovery requests that we've been dealing

17   with for six months now, I mean, that's a really significant

18   impact on BAM.

19             And your Honor mentioned one of the real impacts

20   we've had is we've had to reduce our workforce by hundreds

21   of employees.  That's really painful for the organization.

22   And beyond that, it makes it really difficult to keep

23   responding to all these requests.

24             In addition to that, because of the TRO, our

25   banking partners either limited or effectively ended their

1    relationship with BAM.  Multiple potential banking partners

2    won't do business with BAM, citing the TRO.  We've lost

3    significant revenue.  Our average value, average monthly

4    value in terms of what the assets are on the platform, have

5    decreased by almost 90 percent.  We've lost almost half of

6    our users on a monthly basis.  I mean, this has had really

7    significant and negative impacts.

8          And we're not even close to the merits, your

9    Honor.  There's been no determination that BAM's done

10   anything wrong.  Like we want to litigate this case.  The

11   mere filing of an enforcement action and a TRO should not

12   cripple a company, particularly a company that's operated

13   openly for years and when the underlying claims have nothing

14   to do with the misuse of assets.

15         But that's exactly where we are.  And I know

16   Mr. Murphy is saying, you know, I don't want to, you know,

17   say who's more, you know -- but frankly, I mean, this is

18   having real pain on the organization.

19         The SEC is drowning us in requests.  We've been

20   doing this for six months.  And respectfully, it just needs

21   to end.  And from our perspective, we've done more than

22   enough to satisfy the purpose of the consent order.

23         And so very -- you know, we just want -- you know,

24   your Honor knows this.  But very clearly, our position is

25   this has to stop after we get through these next set of fact

1    depositions and inspections.

2              And I would just add, I was going to mention what

3    your Honor raised, which is our reaction to the resolutions

4    last week.

5              So a couple points from our perspective.

6              THE COURT:  Yes.  Please.

7              MR. LAROCHE:  And obviously, BHL and CISO are

8    here.  Mr. Zhou's counsel are here.

9              One is, there's nothing in those resolutions which

10   suggests in any way that BAM's assets are at risk or have

11   been misused in any way.

12             And then I think the second point which your Honor

13   focused on, which I think for us reinforces why the need for

14   expedited discovery is essentially gone, is the fact that

15   the whole concern from the SEC at the outset was that there

16   was going to be an inappropriate transfer of assets for the

17   benefit of Mr. Zhou through binance.com.

18             The resolution means that Mr. Zhou no longer has a

19   role with binance.com.  And with respect to BAM, the same is

20   true:  He's no longer a director with respect to BAM.  He no

21   longer has voting rights.  They're now exercised through

22   BAM's CEO.  So he no longer has a role with respect to BAM

23   as well.

24             And in addition to that, there's going to be a

25   monitor to -- put in place to make sure that binance.com is

1    effectively implementing its new compliance program.

2         So the concerns that there's going to be some

3    asset transfer that no one knows about that is just going to

4    go, you know, that there's no, you know, binance.us of

5    assets, is just -- it's just gone.  It's just gone,

6    respectfully.

7         And so that's just another significant reason at

8    this point to think that expedited discovery should end.

9         THE COURT:  So.

10        MR. LAROCHE:  And --

11        THE COURT:  Go ahead.

12        MR. LAROCHE:  Sorry.

13        THE COURT:  I just wanted to ask a couple

14   scheduling questions.  But I'm happy to keep hearing from

15   you if you want to -- if you had something you were about to

16   say, I think.

17        MR. LAROCHE:  I was just going to give you the

18   update, your Honor.

19        THE COURT:  Yes.  That's perfect.

20        MR. LAROCHE:  I'm sorry.

21        THE COURT:  No, no.  We're on the same track.

22        MR. LAROCHE:  I appreciate you hearing us out on

23   those points.

24        THE COURT:  Yes.

25        MR. LAROCHE:  So I think the remaining -- what

1    remains to be done for BAM, to give you three categories.

2             THE COURT:  Yes.

3             MR. LAROCHE:  One is the documents and

4    communications; two is depositions; and three is the

5    inspections.  So I'm just going to take each in turn, and

6    then I'm going to try to respond to a few of the points that

7    my colleague Mr. Murphy made.

8             THE COURT:  Okay.

9             MR. LAROCHE:  I think, as you've said, the

10   headlines, I think, are good, are good.  As the document

11   requests, BAM has from our perspective satisfied all but a

12   few of the SEC's 70-plus requests either by producing

13   documents or confirming to the SEC that we couldn't identify

14   documents.

15            And the remaining fact depositions and

16   inspections, as I said, should be done in the next few

17   weeks.

18            So let me just give you a little bit more color on

19   documents and communications.

20            With two exceptions related to source code, we

21   agreed to search for documents.  This was an exceptionally

22   onerous process.  It took a lot of time.  It involved, you

23   know, numerous interviews of BAM employees, an extensive

24   search for hard-copy documents.  We reviewed thousands of

25   email communications.  We had to pull data from our systems

1    and review it.  We also had to translate foreign-language

2    documents.

3              So it was not a simple process, but we did that in

4    less than I think 60 days.  Maybe a little bit more,

5    depending on the service of the requests.

6              And since they served the requests in September,

7    we've made seven productions of -- totaling thousands of

8    documents and tens of thousands of pages of documents.

9              That's in addition to the thousands of pages of

10   documents we produced before September 21st and the hundreds

11   of thousands of pages of documents we produced for the

12   [indiscernible] of the investigation.

13             THE COURT:  Sure.

14             MR. LAROCHE:  So again, we think that's a really

15   extensive record and a good record.

16             The open issues, Judge, with respect to documents

17   is -- there's some -- they requested some Slack

18   communications.  We've had difficulty processing the Slack

19   communications.  We've -- we're trying to use a vendor.

20   It's just taken a little bit more time than we expected.

21   We're working with the client on that.

22             THE COURT:  Okay.

23             MR. LAROCHE:  And then as Mr. Murphy said, the Wea

24   communication chats:  So we do not believe we have access to

25   the chats beyond 30 days.  We understand that those chats

 1     are archived with BHL, and we've communicated that issue

 2     with BHL and we understand they're open to discussing it

 3     with the SEC.

 4             So that's the update on documents.

 5             I would say, just in terms of -- to give you a

 6     little sense of why we think these should absolutely address

 7     their concerns, so, you know, what are the documents we've

 8     produced?

 9             So the SEC has concerns about access to our

10     systems.  We've produced access logs showing who's had

11     access to those systems.

12             The SEC raised concerns about CEFFU.  Well, we

13     conducted an extensive search for CEFFU documents.  We

14     produced the limited amount of communications and documents

15     that we could identify.  We confirmed in writing again that

16     BAM has never used CEFFU's services, which is consistent

17     with the testimony under oath of its CISO, that there was

18     just a miscommunication about the word "CEFFU."  So we've

19     bottomed that out as well.

20             You know, they've claimed that they have concerns

21     about the availability of assets.  In addition to the

22     verified accounting, we've produced reconciliation reports,

23     our general ledger, bank statements.  We've communicated

24     with them when they've raised any issues with respect to

25     that.

```
 1              There is, to be clear, no issue with respect to
 2      the availability of assets from our perspective.  We think
 3      that issue is off the table.
 4              To depositions:  So, you know, at the last
 5      conference, we agreed to eight additional depositions.  So
 6      that's the remaining six shard holders, a former shard
 7      holder and BAM's head of product.  We've gotten through
 8      three more.  We're going to get the next five done in the
 9      next two to three weeks.
10              As Mr. Murphy said, the issue is 30(b)(6).  I
11      would say I'm happy to address it.  I think --
12              THE COURT:  I don't think we need to.
13              MR. LAROCHE:  Then I won't say more than to say
14      we've given them a letter with our position.  We think that
15      we've done more than enough to address the topics in the
16      30(b)(6) --
17              THE COURT:  Yes.
18              MR. LAROCHE:  -- and have otherwise objected on
19      other grounds.  If we need to raise it again with your
20      Honor, we will.
21              THE COURT:  Sure.  It sounds like he felt like he
22      was going to get some more communications, though, about
23      what was covered or not.  Is that right?  Or --
24              MR. LAROCHE:  We've taken the position -- we want
25      them to -- our basic point, your Honor, is that --
```

```
 1                THE COURT:  What are you missing?

 2                MR. LAROCHE:  -- many of those topics, many of

 3      those topics, relate to things that people have testified

 4      about at length.

 5                THE COURT:  Yes.

 6                MR. LAROCHE:  And from our most knowledgeable

 7      individuals --

 8                THE COURT:  Yes.

 9                MR. LAROCHE:  -- you know, one being our CISO.  As

10      Mr. Murphy said, Well, maybe they're concerned about the

11      CISO.

12                We're not concerned about the CISO.  He's our most

13      knowledgeable person on those topics.  Our basic point to

14      them is:  You've had that deposition.  What are the

15      questions that you think are left unanswered?

16                THE COURT:  Yes.

17                MR. LAROCHE:  Tell us what they are so we can help

18      you answer them.

19                And basically what they say is:  We're not going

20      to do that until you confirm in writing that the CISO is

21      your most knowledgeable person, which we've done.  So I'm

22      hopeful that, given that we've sent them that letter, they

23      will come back to us.  And if they have open questions,

24      they'll let us know.

25                THE COURT:  Okay.  And then what about the -- I
```

1    mean, I think it's just sort of a factual question.  But the

2    former kind of C-suite employees that they've discussed who

3    before, you know, I think in the briefing we talked about

4    when they were employees; and I thought it resonated to me

5    that, you know, we don't need to go to the top here.  We can

6    work our way up and then see if need be.

7            But at the last hearing, I think it was right

8    when, you know, they have left the company.  Have you all

9    kind of taken a position with these -- the former employees,

10   sort of where you're at?

11           MR. LAROCHE:  I mean, we still take the position

12   as we did when we filed our motion for protective order and

13   those -- they should not be permitted to depose those

14   individuals.  I think now the fact that they're former

15   employees -- as you said, we're looking forward.  I just

16   don't see a basis why they could actually add anything that

17   would be relevant to the pertinent issues.

18           THE COURT:  Sure.

19           MR. LAROCHE:  So, I mean, our position has been

20   consistent on this.

21           THE COURT:  Okay.

22           MR. LAROCHE:  And if we're going to that -- I

23   mean, that's -- we're already going to give 12 depositions.

24           THE COURT:  I get you.  I just want to know if you

25   had a --

1          MR. LAROCHE:  So that's our position, your Honor.

2          THE COURT:  That's fair.

3          MR. LAROCHE:  So I think that covers depositions.

4          THE COURT:  Yes.

5          MR. LAROCHE:  The last thing I'll say on

6     inspections, your Honor, is we're going to do the

7     inspection.  We're going to do the inspection.  I think one

8     thing your Honor said at the last conference is:  We

9     obviously don't want to do an inspection that we know the

10    SEC is going to think is insufficient.

11         THE COURT:  Right.

12         MR. LAROCHE:  And I think the struggle for us has

13    been that we've asked them several times, several times, to

14    articulate in writing specifically what they want.

15         The most we've gotten was about a week ago.  We

16    got essentially like a one- or two-sentence summary which

17    says:  We want to understand how the back end works.  And

18    they give us some examples.

19         I don't know what they mean by "We want to

20    understand what the back -- how the back end works" and what

21    exactly they're looking for.  They've also included in that

22    summary source code, which we've told them we're not going

23    to do.  We've told them specifically what we are willing to

24    do, and we understand that they've -- they think that's

25    insufficient.

1          So our concern is we're just going to get to the

2     inspection without any detail provided from their side and

3     they're just going to tell us it's insufficient, when I

4     think it could be avoided if they would just tell us with

5     some detail beyond saying "We want to see the back end"

6     exactly what they want.  And from our perspective, they

7     haven't done it.

8          If they're not willing to do it -- we're not

9     saying we're not going to do the inspection.  We'll still do

10    it.

11          THE COURT:  Sure.

12          MR. LAROCHE:  I just worry that it's not going to

13    be from their perspective sufficient.  And our position is,

14    we shouldn't have to do this twice just because they haven't

15    articulated what they want.

16          THE COURT:  No.  I hear you.  But on the flip

17    side, they don't want to sort of cut against what I want,

18    but -- which is compromised.  But at some point, I think,

19    you know, you all are in a better position to argue once

20    you've done it once and say, Hey, we did it, you know.  We

21    tried it.  So it's kind of -- the ship has sailed.

22          So I want -- and I hear you, and I'm sure they

23    will respond.  And that you all just continue to try your

24    best to get to as much agreement as you can on what the

25    inspection will look like.  But then you've just got to get

```
 1    it done.

 2                MR. LAROCHE:  Yeah.  Understood.  And we will,

 3    your Honor.

 4                THE COURT:  Yes.

 5                MR. LAROCHE:  If I could just make one final

 6    point.

 7                THE COURT:  Yes.  Absolutely.

 8                MR. LAROCHE:  Sorry.

 9                THE COURT:  No.  It's no problem.

10                MR. LAROCHE:  I guess two points, just because

11    Mr. Murphy raised them.

12                THE COURT:  Yes.

13                MR. LAROCHE:  One is on the depositions.  And I

14    think he said it specifically for the deputy CISO's

15    testimony about what he understood or didn't understand.

16                I think part of our frustration with the

17    depositions is that -- exactly what happened with the deputy

18    CISO:  He is not knowledgeable about the questions they were

19    asking him about.  He made clear he was not knowledgeable.

20    And they nevertheless continued to ask him questions about

21    his knowledge about something he doesn't know about.

22                And so when they say, Oh, the deputy CISO doesn't

23    know this and doesn't understand this, it's not his role.

24    That's not what he does.  And so there's now a record of him

25    saying he doesn't understand how it works.  But that's not
```

1    what he's supposed to do.  It doesn't mean that the company

2    itself is somehow insecure or doesn't understand how its

3    systems work.  And I think that's part of our issue with

4    respect to the depositions so far.

5         The second is, we totally disagree that shard

6    holders have testified that they just push a button, which

7    is basically the leading questions that they get during

8    deposition.  "So it's your testimony that you just push a

9    button?"

10        And then they'll say:  No.  That's not my

11   testimony, actually.  I consider this and I consider that

12   and I exercise my judgment.

13        It might be their view that they just push a

14   button, but it certainly hasn't been the testimony.  And

15   it's certainly not the company's view that this is some sort

16   of just, you know, like ho-hum exercise for the shard

17   holders.  They take it seriously.  They take that role very

18   seriously.  And it's an important aspect of our custody

19   practices that should give everyone comfort that the assets

20   are secure.

21        And so we disagree on that as well.  I just want

22   to make clear that that's not how we viewed the testimony,

23   because it's important.

24             THE COURT:  Sure.  Okay.

25        If this is a good place, I'm happy to come back.

 1                    MR. LAROCHE:  Thanks, your Honor.

 2                    THE COURT:  But thanks for the updates.  This is

 3       really helpful.  Thanks for -- it sounds like you all are --

 4       your clients are diligently working.  Please express to them

 5       my appreciation.

 6                    All right.  I think -- does it make sense for BHL?

 7       Yes.

 8                    MR. MENDRO:  Yes, your Honor.  Jason Mendro for

 9       BHL.

10                    I agree with a lot of what's been said here this

11       morning.  I agree with many things that Mr. Murphy said and

12       I agree with everything that you heard from Mr. -- from

13       Mr. Laroche.

14                    I particularly agree with Mr. Murphy that the SEC

15       has taken a lot of discovery from BAM.  That's absolutely

16       true.  And Mr. Laroche made the same point.

17                    I agree with both of the first speakers that it's

18       time to move on.  And we want to move on.

19                    The expedited discovery should stop and we should

20       move on to the merits at this point, your Honor.  The SEC's

21       requests have been broad.  BAM's productions have been very

22       broad and have sufficiently addressed the questions that the

23       SEC asked.

24                    At the Court's request, we've considered

25       supplementing BAM's productions, too, even though BAM's

1    discovery is ongoing.  And this is really all about BAM,

2    your Honor.  The consent order at this point is about

3    protecting BAM's customer assets, and it's appropriate that

4    discovery be focused primarily on BAM.

5          Although the number of documents that BHL has

6    produced in addition to BAM's documents is modest, so also

7    is BHL's ability to add meaningfully to what has already

8    been produced.  And that's the issue we're confronting.

9          As you heard Mr. Laroche said -- say, there have

10   been thousands of documents now produced by BAM amounting to

11   hundreds of thousands of pages if you include the

12   investigation that preceded this case.

13         The SEC has taken seven depositions, and over the

14   next couple weeks there'll be five more:  a dozen

15   depositions for limited discovery in an amount that exceeds

16   the number that are permitted for merits by default under

17   the federal rules.  That is a lot of testimony.

18         And that testimony and the documents that have

19   been produced do cover all the issues that are reasonably

20   within the scope of the consent order.

21         BAM's head of clearing testified about how BAM

22   reconciles the assets that are on the public blockchain with

23   the assets that are on BAM's internal accounting system.

24   And BAM receives an alert whenever there's a discrepancy.

25   There's been testimony about that.  The SEC has asked about

1    that.

2            So there's a mechanism for noticing if something

3    is off.

4            BAM's CISO has testified that BAM is realtime

5    monitoring anytime there's a request made within its

6    accounting system and anytime there's a permission change

7    within it.  That generates an alert that BAM finds out

8    about.

9            The SEC has and we have reproduced the master

10   services agreement between BHL and BAM.  That agreement

11   provides expressly that BHL will not have any back door that

12   allows it to access the assets in the BAM system.

13           The SEC has deposed several shard holders and will

14   depose all the shard holders.  We disagree that the SEC

15   hasn't received information about the keys.  The keys, as

16   the SEC knows and has been explained to the Court, are not

17   put in one place.  They're broken into shards for security

18   reasons.

19           And the SEC has extensive information about how

20   that shard process works.  They've deposed the shard

21   holders.  They have heard how the shards work from the

22   technical people at BAM.

23           And the shard holders have not said that they just

24   check a box.  They've said, for example, that in order for

25   transfers to be initiated, two people at BAM have to approve

1    first and then a quorum of the similar holders, four, have

2    to separately approve.

3            The same is true with Whitelisting accounts for

4    transfers.  And they explained that they look out for a

5    regular transfer request.  They raised questions when issues

6    were identified and they review certain transfers or

7    Whitelist requests against internal records.  So they're

8    looking.

9            Even if the SEC doesn't agree with that process,

10   that they have a quibble with the security of the process,

11   they're not saying that they're not getting information.

12   This is about providing information; and they're getting

13   that information.

14           The witnesses have also consistently testified

15   that they don't believe that BHL employees could access or

16   remove assets in the BAM wallets.  So it's there in the

17   testimony.  It's there in the documents.  It's there in the

18   agreement.

19           And as you've heard both the SEC and BAM say, the

20   SEC has ongoing discussions with BAM about inspecting its

21   systems further.  The parties are working that out.

22           We believe that it doesn't make sense for there to

23   be burdensome discovery on BHL until that process has run

24   its course.  We believe that the discovery produced to date

25   does answer the questions that are reasonably within the

1    scope of the consent order, and more is coming.

2            Despite the fact that we believe that the SEC has

3    had sufficient discovery from BAM, we are working diligently

4    with our client to identify any gaps.  If there are specific

5    gaps, we're open to hearing about that.  We're open to

6    discussing that.  We're open to trying to fill that.

7            We've produced what we believe to be all the

8    agreements that are relevant between BAM and BHL.  That does

9    include some documents that the SEC hasn't had before.

10           The SEC has asked a lot of questions recently

11   about an entity called Boran, which is not affiliated with

12   BHL as we understand it.

13           THE COURT:  How do you spell that?

14           MR. LAROCHE:  Boran, B-O-R-A-N.

15           THE COURT:  Okay.

16           MR. LAROCHE:  We've produced BHL's agreement with

17   Boran.  That's a specific area where they said:  Here's a

18   gap.  We'd like you to fill it.  We've endeavored to fill

19   it.

20           The documents that we've produced were responsive

21   to the third and fifth requests in the SEC's discovery

22   request that we received on October 5.

23           The SEC has also asked about certain security

24   reports called the SOC 2 reports that they have been unable

25   to obtain from BAM.  We're working with our client to

1    confirm what are the right reports.  When we confirm what

2    are the right reports, we're going to produce those.

3          So again, we're going to fill the gap.  That's --

4    that's what we've agreed to do.  That's what we have

5    considered at the Court's request.

6          But we don't agree that there's much more to do at

7    this point, your Honor.

8          The SEC has said, We don't understand how it

9    works.  But they've been told how it works.  If they're

10   trying to understand this at some molecular level, you know,

11   I don't know how that understanding is going to be conveyed.

12         If there were a document, a definitive guide to

13   how everything works, and we were able to find that document

14   and produce it, I think that's something we'd be open to.

15   But there isn't a definitive guide to how everything works.

16         BHL is a young company that grew very fast.  It

17   invented the software.  It understands the software.  It's

18   explained the software to BAM in all relevant respects, and

19   BAM has testified about that.

20         We just don't think that there's any blanks left

21   to fill on that front.

22         So we respectfully submit that what we have

23   offered, above and beyond what BAM has produced, should be

24   more than enough at this stage.  Merits discovery is stayed

25   by the district court judge.  Expedited discovery should be

1    limited and focused on the security of BAM assets, and it

2    has already been extensive.  The productions have been

3    extensive.

4              We have little to add, but we've made a good-faith

5    effort to supplement where we could.  And we think that that

6    should be enough, your Honor.

7              THE COURT:  Okay.  Well, what about the sort of

8    archived chat history?  We've heard from BAM and from the

9    SEC about that.  Is that a gap from your perspective?  It

10   sounds like at least you're exploring that.

11             MR. LAROCHE:  Yeah.  So, your Honor, this is an

12   issue that came up last week.  I think you're referring to

13   the Wea chats.

14             THE COURT:  Yes.

15             MR. LAROCHE:  And we'd like to understand a little

16   bit better what the parameters are.  What is the

17   timeframe --

18             THE COURT:  Sure.

19             MR. LAROCHE:  -- that the SEC wants?  What is it

20   the BAM isn't able to supply?  Are there particular topics?

21   Are there particular custodians?

22             I think if we know the parameters, we can take

23   that back to our client and consider whether that's another

24   area where we can fill a blank.

25             THE COURT:  Okay.  That's all [indiscernible].  It

1      sounds like you'll keep looking into that.

2              And I think we've talked about what BAM -- I think

3      the SEC has done a good job of where we are now, not looking

4      historically, but where we are now, is that they are, you

5      know, trying to tailor those requests.  I'm sure that they

6      would try to do the same with that.  But it seems like that

7      could be potentially a situation where if the records are

8      with BHL, not with BAM, it makes sense that they would need

9      to get that from you all.

10             You know, I think really a lot of what both sides

11     continue to talk about is the fear of the unknown and then

12     the lack of, you know, an actual bogeyman on this.  And so I

13     think in many ways this, you know, inures to BAM's and

14     BHL's, sort of, benefit, is that they keep saying, like,

15     Nothing bad has happened.  Nothing bad is happening.  It's

16     been going on.  And so that's hopeful.

17             My concern is that on this one specific issue --

18     and maybe it's one.  Right?  Maybe I'm missing the trees for

19     the forest here because you're saying, Well, like, Judge,

20     there's only one thing out of the hundred or thousand out of

21     how many days that there's been a problem.

22             But they have identified one thing here.  At least

23     I hear them saying at the last hearing, and it was in their

24     last pleading and they mentioned it again here, is that when

25     there was an inability to get a transaction done, you know,

1    someone picks up the phone and asks BHL and then they sort

2    of cleaned up whatever was necessary.

3          And so that does give me a little bit of

4    heartburn.  You know, maybe it's a one-off thing or maybe

5    it's been remedied.  But have you all investigated or tried

6    to sort of suss out what that was about and what it means?

7          MR. LAROCHE:  Well, what I can say, your Honor, is

8    that it's clear and it's always been clear that BHL provides

9    the wallet custody software.

10          The SEC knew that during the investigation and

11    knew that at the time of the consent order.

12          THE COURT:  Yes.

13          MR. LAROCHE:  There's no ambiguity about that.

14          And so the wallet custody software is the software

15    that is used to facilitate the transfers that BAM controls

16    through the shards which only BAM holds.

17          And when there are issues with the software, it

18    makes sense to contact the software provider.  It's -- what

19    I can say is it's the same as my iPhone.  I control the

20    iPhone.  If I have an issue with it, I call Apple and hope

21    that someone there can help me resolve it, because they're

22    the provider of the technology.  That's what we can say.

23    That's what the record reflects.  And I don't think that

24    there are any secrets about that or any mysteries to

25    unravel.

1              THE COURT:  I guess the question just I think

2       really that we're trying to home in on, I hope, from the

3       SEC's perspective is:  Does -- in your example, you know --

4       I lack knowledge on this myself -- but I think one of the

5       things Apple goes around and talks about is, once they've

6       encrypted the software, you know, they can help reset the

7       software and things like that, but they can't get into the

8       substance of what's on the inside.  Right?  That there's a

9       locked door.  What happens in that room is only the user's

10      sort of purview.

11             And so what -- I'm hoping we can end this, and I

12      agree that it needs to end -- is really the answer to the

13      question of:  Understanding that BHL is the software

14      provider, does the software allow BHL to get into a

15      transaction in spite of what BAM may or may not want?

16             And how do I get an answer to that question from

17      BHL's perspective?  Because part of this, BAM can't answer

18      that question.  Right?  BAM doesn't have visibility into --

19      I mean, they're going to be told by BHL.  Right?  Just like

20      I am told by Apple that they can't get into my iPhone.

21      Right?  But ultimately, only Apple knows that.

22             And so how -- is there not some path of discovery

23      where there's some people to answer those questions or

24      some -- because it doesn't seem like a document thing.  That

25      just seems like a substantive knowledge thing.

 1              Is sort of BHL's position right now -- from the

 2    last [indiscernible] it's like, we're still thinking about

 3    this, you know.  We're -- we think enough has been done.

 4    And I think you're right:  The more that BAM does, the more

 5    it benefits you.

 6              But it seems like there's still a targeted thing

 7    out there that I want to get my arms around.  And so where

 8    is BHL on that?  Are you still thinking about it?  Or are

 9    you sort of leaning towards no and waiting for the Court to

10    kind of intervene or hoping the Court won't?

11              MR. LAROCHE:  Yeah.  We certainly are hopeful that

12    the Court won't have to intervene, your Honor.

13              But the problem that we're struggling with is we

14    don't know how to end this.  We don't know what is the

15    question that we can answer that won't lead to another

16    question.

17              THE COURT:  Right.

18              MR. LAROCHE:  So it feels a little bit like we're

19    sort of a hamster on a wheel.

20              THE COURT:  Right.

21              MR. LAROCHE:  And it keeps on spinning.

22              THE COURT:  Right.

23              MR. LAROCHE:  And there has been extensive

24    testimony about what the security is, how BAM would detect

25    any issues.

1          THE COURT:  From BAM's perspective?

2          MR. LAROCHE:  From BAM's perspective.  That's

3    right, your Honor.  Which is, I think, the relevant

4    perspective at this point.

5          But, you know, to be able to prove the negative is

6    a very difficult thing.  As I said, if there were a document

7    that says, "Here are the ten reasons why the SEC shouldn't

8    have any concerns," I think we would be glad to hold that

9    document up in court and produce it to the SEC.

10          We -- the struggle we're having is we don't think

11    there's a document on that and we don't know what specific

12    question.

13          I've heard a lot of vague questions; I've heard a

14    lot of metaphysical concerns.  Right?  How does it really

15    work?  What makes it work?

16          There isn't a "yes" or "no" answer to that

17    question.  There isn't a specific way to explain how it

18    works or even to understand what it means.

19          So I think if we had specific direction about, Is

20    there a certain thing that they need to know, and that's

21    going to be the end, then we're done, so if we answered this

22    specific question, then we're done, I think we could try our

23    best to find out if there's a way to answer it.  And I don't

24    think there's going to be a document.  I don't know that

25    there is going to be a person who --

1          THE COURT:  I don't think there's going to be a

2     document.  I agree with that.  I mean, I think those can

3     still be helpful, though, to prepare to ask the relevant

4     questions to a witness or witnesses.

5          But I want to be clear to both BAM and BHL:  I

6     don't want you all -- I was trying to say this before to

7     BAM:  I don't want you all to -- right.  I get it.  You want

8     to get off the hamster wheel.  And they're never going to

9     let you off.  I agree.  I mean, that's the Government's job.

10    I don't think they're doing it wrong.  I mean, they have to

11    do what they have to do.  But that's ultimately why we have

12    a system where we are.  It's my job.  It's not their job to

13    get you out of there.

14         And so I just don't want you all to not answer

15    things, to just think:  This is only going to lead to 10,000

16    more questions.  Right?  Like what's the point?

17         MR. LAROCHE:  Right.

18         THE COURT:  So I think once we hear from the

19    Government again, I'm going to try to narrow this down.  But

20    I do think, right, it's not only like a hypothetical of,

21    like, what does BHL know on its end?

22         There is at least some example that they can point

23    to where something happened.  So even if it's just sussing

24    out what happened on that one transaction and asking that

25    person, right, Since then, have you had to do this again or

1    can you?  Like what happens when BAM -- you know, their

2    computers all freeze and they can't do anything?  They've

3    got to move money.  I mean, I presume there are some

4    questions that are tailored to people who manage and created

5    this software.

6              But I also agree with you that we can't have every

7    single person who wrote code related to this be made

8    available at some point.  Right?  BAM has said they're not

9    trying to do this.

10             And I think that, you know, I'm happy to hear from

11   you on this.  But, you know, we talked about this at the

12   last hearing.  I mean, my perspective is that, again, the

13   bogeyman is when there's a U.S. company with no lawyers in

14   the United States representing the foreign entity or the

15   foreign individuals.  That's when we are afraid about the

16   dissipation of assets.

17             Here, we have officers of the Court who are

18   saying:  We are doing our best.  We're watching this.  We

19   don't think our client is going to be able to do this.

20             And now I am laying on top of that the company

21   that has a monitor and has been divested of the person who

22   was the -- and so I mean, I think the moral persuasion of

23   their arguments has been reduced in my perspective because

24   we continue to have more checks than I would think in a

25   typical case.

1           But they still -- it still does not mean that it

2    doesn't exist.  It's just that I'm trying to balance their

3    fears with the burden on you.  Right?  I think ultimately

4    that's what we're looking at.  Right?  And I think that the

5    burden is certainly large as I see it to BAM.  I'm not sure,

6    you know, from BHL's perspective what it is.  And we don't

7    need to get into that right now.

8           But some of it also just can't be, like, you know,

9    even if we're not burdened, we just have -- just keep doing

10    things because, you know, we're able to.  There has to be

11    some ending to what this is.

12           And so as I view it, that other resolution does

13    sort of -- it makes me -- again, I'm incrementally

14    concerned.  But I want to still get -- like there is a

15    fundamental question that I don't think that I have had

16    answered, and I believe the SEC would say it has not, which

17    is just:  I've got to find out at least if some people have

18    the ability to say, you know, with the new systems in check,

19    I mean, nothing is impossible.  Right?  Like someone could

20    hack through.  We're not talking about that, and you can't

21    be worried about that.  They can be worried about that, but

22    I'm not.

23           I want to know:  In the sort of due course, is

24    someone able to just go flip a switch and enter from the

25    back door into BAM's sort of access to the shards?  Or is

1   it:  No, the software doesn't allow for that?

2            Could something, you know, evolve in, you know, a

3   Jurassic Park-style scenario where nature, you know, finds a

4   way?  I'm not worried about that.  I want to get, like, the

5   realm of the reasonable or possible.

6            And, you know, we'll get to the point where BHL

7   has produced some folks that say, like:  Yeah.  That's not

8   what is possible or likely.  Then I think that with all the

9   other things that we've had, BAM's discovery, the

10  resolution, the fact that you're still here, you know,

11  representing your client, if they did that, part of what the

12  SEC's fear is -- and I'll hear from the SEC -- is that when

13  someone sends their money overseas, we can't claw it back.

14           But I presume it gets -- if this then happens,

15  it's going to call their client, you know.  I imagine that

16  this is not theater for them.  They're paying their bills.

17  They're doing their business.  Like if they didn't want to

18  do this, they wouldn't do it, that you would just say, "What

19  did you just do?  You can't do that.  You're violating the

20  consent order.  Move the money back."

21           And so I've got a lot of things that are making me

22  feel better today than where I think Judge Jackson was on

23  Day 1.  But I'm still not there.

24           And so that's what I want to hear from -- I think

25  the SEC first, and then I'll let you respond if you need to.

1    But I want to still get to -- I don't think we have an

2    answer from BHL, which I need, is that we don't -- you know,

3    the way the software is now, it does not allow us a back

4    door in.  Because even with all of these things, which are

5    wonderful, that we have there, I'd prefer not to have to

6    have Gibson dress down its client or have the monitor come

7    in and say:  Oops, you know, we missed this one gap.  Let's

8    claw it back.

9          Let's not go there, because I don't think it's

10    good for everybody.  And I know that you're not suggesting

11    that it is.  But that's kind of what I'm looking for an

12    answer for.

13          If you have something else, I'm happy to hear from

14    you.  But I'd like to hear from them and then hear from you

15    again, if need be.  Does that make sense?

16          MR. LAROCHE:  Oh --

17          THE COURT:  And I can hear from you.

18          MR. LAROCHE:  -- it does, your Honor.

19          And if the specific question is:  If in due course

20    is there some way for someone to simply flip a switch and

21    take the assets, and that will end this, then we need to

22    hear that.  And then we can go back and try to figure out

23    the best way to answer that --

24          THE COURT:  But you don't need to hear it from

25    them; I guess you need to hear it from me.

```
1                    MR. LAROCHE:  Oh.

2                    THE COURT:  That's what I think.  Right?

3                    MR. LAROCHE:  Yeah.

4                    THE COURT:  But I want to hear from them more

5      before I sort of cut them out at the knees, because I don't

6      know if there's more that they want to hear that I think is

7      reasonable.

8                    And, you know, they may find out something, of

9      course, that leads to more questions.  But there has to be

10     an end.  I hear you on this.

11                   MR. LAROCHE:  Yes.  Thank you, your Honor.

12                   THE COURT:  Okay.  I'll hear from the Government

13     first, because I think it will be relevant to hearing from

14     Mr. Zhou.  So let's just start with that.  I want to hear

15     from the SEC.  Yes.  Please.

16                   Let's just deal with this narrow issue and we'll

17     come back to BAM, because I'm sure you've got stuff you want

18     to talk about.

19                   But as I understand it, right, I don't think BHL

20     is disputing it, right, at least our facts.  Right?  Like I

21     think our facts are the same, pretty much, here.  They're

22     saying they've got software, you know.  They've said that in

23     their prior pleadings.  They provide the software.

24                   And I think your question is a reasonable one.

25     It's like:  Okay.  What are the guardrails within -- means
```

1    you have the software?  Is this like a six-lane highway?  Is

2    it unlimited?  Are we the autobahn?  Or is it like 66 in

3    rush hour, like it's real slow and there's not much you can

4    do?

5            I mean, is that not the same question that the SEC

6    has for BHL?

7            MR. MURPHY:  Yeah.  I'm crossing out the notes as

8    you're talking, I guess.

9            THE COURT:  Okay.

10           MR. MURPHY:  The one -- I'll just say, what

11   Mr. Laroche -- the one insinuation I just have to correct

12   here is Mr. Laroche said that everyone knows how the keys

13   are held.

14           THE COURT:  Yes.

15           MR. MURPHY:  Mr. Laroche has no idea how the keys

16   are held.  He cited the deputy CISO.

17           THE COURT:  Yes.

18           MR. MURPHY:  He said:  I have no idea how the keys

19   are held.

20           Mr. Mendro, I'm confident, has no idea how the

21   keys are held, because he described the keys as all being

22   shards.

23           The keys, the wallets that control all of the

24   assets that go off the platform, are hot wallets.  We've

25   never been told they're controlled by shards.  I assume he's

1   mistaken or he's giving enough information.  But I'm

2   assuming he has no idea how the keys are held.

3            And I had some hope that this was the new day.

4   Right?  They were opening up the black box, given

5   developments.  Clearly not.

6            Mr. Laroche cited the declaration in June.  It

7   explained everything.  This is what I think he's referring

8   to, the declaration in June.

9            While BHL established the AWS, the account that

10  hosts BAM Trading's wallet custody software, BHL does not

11  have access to or control over the assets BAM Trading

12  maintains on behalf of its customers or its own account.

13  That is a statement of fact.  It's not going to be answered

14  by lawyers pointing to contract provisions; it's going to be

15  answered by engineers.  That's not proving a negative.

16           They have third parties come in and audit this all

17  the time.  They're called SOC reports.  And beyond that,

18  right, it's just --

19           THE COURT:  I don't think -- you're hoping to get

20  those from BHL, though, at least?

21           MR. MURPHY:  Yeah.

22           THE COURT:  I understand a lot can --

23           MR. MURPHY:  But I'll just say --

24           (Speaker overlap.)

25           MR. MURPHY:  I'll just say what we know about the

1    SOC report is, look, I understand they're turning a new

2    leaf.  I understand there may be developments.

3            Those developments for the monitor don't speak to

4    the consent order.  Right?  Hopefully it creates some

5    culture of compliance that will -- that's in the future

6    unless they want to tell us about concrete measures that are

7    being put in place right now.

8            But our complaint describes an entity -- and it

9    sounds like a lot -- the same description of an entity that

10   we heard about last week that had disdain for the U.S. law,

11   that was incredibly reluctant to open up the black box.  And

12   maybe that will change at some point.

13           But you have in the regulatory compliant world --

14   you have transparency.  You have third-party auditors that

15   come in and look at controls and you show them:  I can't get

16   to the assets.

17           I can't even tell what Mr. Mendro is representing

18   as to the state of play.  I can't tell what anyone is

19   representing as to the state of play that would make someone

20   reasonably say, BHL does not have access to or control over

21   the assets BAM Trading maintains on behalf of its

22   customers --

23           THE COURT:  I hear you.  And I mean, we don't

24   expect the attorneys when they're here -- and I know you're

25   not saying this -- I'm not expecting them to give us those

1     facts.  But I just want to home in on, in terms of discovery

2     from BHL, that's it.  Right?  I mean, that's the key issue.

3              MR. MURPHY:  That is the --

4              THE COURT:  What else is there to decide?

5              MR. MURPHY:  That is the thrust of it.

6              THE COURT:  Right.

7              MR. MURPHY:  But again, the Wea chats.  Right?

8              THE COURT:  Yes.

9              MR. MURPHY:  We know that there's a problem with

10    corporate formalities.  Right?  Who's getting paid by who?

11             We've got this Boran entity that is paying half

12    the salary of certain BAM employees in Canada.  It may be

13    totally innocuous.  The BAM folks that we've talked to have

14    different stories about what's being told.  I didn't even

15    bring this up because I'm hoping it is going to get cleared

16    up through the documents.  But Mr. Mendro just used very

17    precise language, "We're not aware if it's affiliated with

18    BHL" or something like that.  He said what he said and he

19    can clear it up now.

20             Is it affiliated to any other Binance entity?

21    What diligence have they done to do that?  They're paying

22    half the salary of certain BAM employees and the record has

23    been a mess.  This doesn't happen in the regulatory-

24    compliant world.

25             THE COURT:  Sure.

```
1                 MR. MURPHY:  So it does touch on merits.

2                 THE COURT:  And is your concern, though -- I want

3      to understand -- if somebody's getting paid by someone else

4      is that they're going to -- I mean, if the software still

5      does not allow them, right, to manipulate the assets, does

6      that really -- I understand it.  It doesn't look good and it

7      could give concern.  But does it still get to the narrow

8      issue we're talking about here?

9                 MR. MURPHY:  It sure would resolve a lot of issues

10     and probably get us all the way there.

11                The only -- my only hesitation there --

12                THE COURT:  Yes.

13                MR. MURPHY:  -- is there's technological controls.

14                THE COURT:  Right.

15                MR. MURPHY:  And there's people controls.  Right?

16     And there's marching orders and there's incentives.

17                And if you don't -- and this is the kind of thing

18     that companies look at.  This is part of good internal

19     controls.  If you don't know who's paying your employees,

20     that's an issue.  BAM just told us -- and now I'm

21     remembering; I don't remember if Mr. Laroche addressed

22     this -- who's paying the employees that we're about to go

23     depose?

24                Apparently, Binance -- remember, this is why I

25     started with the -- we heard a lot.  We didn't hear a lot
```

1    about the fundamental requirements of the consent order.  If

2    they want to amend it, they can seek relief from the Court

3    to amend it.  They can't have the private keys, and BAM

4    employees in the United States need to control the assets.

5            We're talking now about people controlling the

6    assets, potentially, who are outside of the United States

7    and who are getting paid by entities that may or may not be

8    related to Binance, which is not allowed to have any say in

9    how the assets get transferred.

10            And it sounds like -- again, now that I bring it

11   up, I would like Mr. Laroche if he has further details to

12   give further details on that.  And why wouldn't BHL produce

13   these Wea chats, where someone from BAM is asking for

14   control over the apparatus that controls the assets?

15            This is the key issue.  There's a lot of other

16   things that I disagree with that were said.

17            THE COURT:  No, no.

18            MR. MURPHY:  But I know you're focused on this.

19            THE COURT:  I'm focused on -- I just wanted to

20   raise this in terms of BHL.  I mean, I think you would agree

21   in terms of BHL, right, the reason that we had sequenced

22   discovery was that you need to tee up with BAM first and get

23   sort of 90 percent of the picture and that BHL could have a

24   very -- you know, it has a narrow, right now, for what we're

25   talking about -- a narrow sort of role, which is you just

1    want to make sure that they can't come in and pull the rug

2    out from underneath.  Right?

3              MR. MURPHY:  And I want to be clear.  I think

4    you've said this.  I am not criticizing counsel for not

5    knowing the technological details.

6              THE COURT:  Yes.

7              MR. MURPHY:  And if they came out and spit out a

8    bunch right here, I wouldn't be ready to react.

9              THE COURT:  Yes.

10             MR. MURPHY:  But I really have the strong sense

11   they don't know.  They're not being provided the information

12   themselves.   That's -- and that's the case with the

13   witnesses as well.

14             THE COURT:  In terms of Mr. Zhou, because I'm

15   going to hear from, I think, him next and then we'll come

16   back to figure out who's after that.  But for Mr. Zhou, I

17   assume you have the same sort of BHL type of questions,

18   right?  Just can he personally?  That's what's -- he has

19   not --

20             MR. MURPHY:  Yes.

21             THE COURT:  I mean, we'll come to why that seems

22   unlikely.  But that is really your main -- that is still

23   that same issue you have for him?

24             MR. MURPHY:  It is.  And you've been using them

25   interchangeably.

1          THE COURT:  Okay.

2          MR. MURPHY:  I'll say that, often, CEOs come in

3     and say, "I don't deal with these things.  It's on a

4     different level."

5          THE COURT:  Yes.

6          MR. MURPHY:  The things you see online might be

7     fake.  So -- but I believe I saw right after our hearing

8     last time Mr. Zhou tweeted, BAM has never had their assets

9     held by CEFFU or something like that.

10          THE COURT:  Okay.

11          MR. MURPHY:  A statement of fact about a story

12     that is a mess that would never happen.  Right?  The

13     confusion that they've had over CEFFU, that just would never

14     happen in the kind of environment that they're describing.

15     Right?  And I understand everyone's working hard to get to

16     the right place.

17          Again, I don't think anyone addressed a question

18     we have.  Maybe they're not prepared to.  I'm not sure how

19     the settlement affects his status with BAM at all.  He's on

20     the board, I think.  Is he still on the board?  He's still

21     obviously the majority owner of the company, so I think that

22     may be helpful.

23          THE COURT:  Okay.  One more thing.  So then for --

24     do you have -- I mean, I think you had your sort of broad.

25     Everyone starts broad, you know, and that's maybe still the

1    way for BHL and Mr. Zhou.  Have you narrowed or do you think

2    you're in the process of possibly narrowing your discovery

3    requests to just focus in on these issues?

4              MR. MURPHY:  We really did in our October letter,

5    because it was very narrow.  And we're signaling flexibility

6    and openness.

7              Mr. Mendro described being on a hamster wheel.  He

8    produced eight documents, seven of which we had.  So we need

9    some movement.

10             They have the answers.  So we're open to a

11   proposal.  I don't think we're even in a position to talk

12   about the best form it would be; they are.  We just need a

13   good-faith proposal from them.

14             THE COURT:  But do you have people that -- I

15   mean --

16             MR. MURPHY:  Yes.

17             THE COURT:  -- do you have BHL folks you're hoping

18   to depose or do you have, you know, priority, I guess, of

19   your discovery to them from the October letter?

20             MR. MURPHY:  Yes.  We've named -- we've served

21   deposition notices, including a 30(b)(6), so that would

22   be -- that could go a long way.  Right?  Because then we

23   don't have to decide who the person is.

24             I'll tell you that we got emails very recently

25   that we're just beginning to process with BHL people

1    communicating with BAM folks -- and I'm reluctant to mention

2    any names --

3              THE COURT:  Yes.  Please don't.

4              MR. MURPHY:  -- that put someone on our radar that

5    hadn't been on our radar.  If we get -- if we can talk about

6    that.  Right?  If they can tell us that's not the person,

7    then maybe a 30(b)(6) is the way to get to it.  We're not

8    only open to that.  We're open to proposals.

9              I didn't hear one from Mr. Mendro, though, that

10   would get to our concerns here.

11             THE COURT:  Okay.  Just one more sort of broad

12   question.  And maybe it's not one you want to answer now,

13   but it's one that when we get to -- ultimately, it still

14   seems like eventually we just get to a point where as I say

15   it's getting more, it's getting more and then there's an

16   end.  Right?  And the end will only, likely, it seems like,

17   come from me and then if necessary Judge Jackson.

18             But, you know, as I think about -- I understand.

19   We have to follow the consent order and it's -- the consent

20   order is more than just dissipation of assets.  It says:

21   Control is here.

22             But I still -- I mean, part of this is trying to

23   think about the parade of horribles.  And, you know, after a

24   company, right, has pled guilty and done all of these other

25   things, like, when is -- I guess I just don't understand,

1    like, what is the fear that Mr. Zhou -- what would be the

2    thing that would trigger somebody to dissipate the assets

3    overseas if all these things have happened?  The filing of

4    the SEC complaint?  You know, the loss of banking

5    relationships?  You know, pleading guilty?

6              Just like if it hasn't happened now, I understand

7    that doesn't give you comfort.  But at some point, isn't the

8    risk of it lessened the further out we get from the filing

9    of the SEC complaint and there hasn't been to date any

10   indication of dissipation of assets?  Doesn't it make it a

11   harder sort of hill for you to climb to say, like, "We need

12   more"?

13             Let me put it the other way:  It does make it

14   harder from my perspective -- and I'm happy to hear why it's

15   not from yours.  I don't need an answer to that right now.

16   It's more something I just want you to think about as you're

17   negotiating with them, is that, like, every day that we go

18   by that asset isn't dissipated -- which I understand you may

19   have imperfect information, so you can't answer that

20   question.  But every day that, you know, control doesn't

21   seem like it's been lost here, it makes it harder for me to

22   think we should be continuing to impose burdensome requests.

23             Now, that being said, I think that you have

24   highlighted something that really gives me concern, which is

25   that when, you know, the breaking case of emergency when

1        there was a transaction that didn't go through, they called

2        BHL.  That doesn't sound good.  But again, it's something

3        that perhaps can be very easily answered.

4              And I can understand what your perspective is.

5        It's, like, Hey, from still whatever discovery we've got,

6        it's not as expansive as we want to and we've already found

7        one huge red flag.  Enormous.  Right?  Like they called and

8        got the easy button fix, BHL.  It cannot be that.

9              And so I don't want to undercut you all again.  I

10       have concerns.  I continue to have concerns.  But the longer

11       that we go and the more that things have happened, I have to

12       look at the whole, like, you know, atmosphere of this.  And

13       it's one of, like:  Well, okay.  At some point, I'm going to

14       have to take a leap of faith and just say:  Enough is

15       enough.  Let's go.

16             And so that's just sort of what's in the -- I'm

17       looking at from my 30,000-foot view.

18             MR. MURPHY:  Totally understood.  Just, again, I

19       think most of those questions you're talking about, how did

20       things change after last week's developments, are directed

21       to them.  I thought we might see a change in tone because of

22       that.  Right?

23             THE COURT:  Sure.

24             MR. MURPHY:  But the pleadings of last week don't

25       give comfort about the people working at that company.  They

1    do suggest that changes are coming.  Those changes will be

2    in the future.  They don't have to deal with BAM right now.

3              But it'll be what it'll be.  And you're right:

4    The landscape may have changed by the time we come back

5    here.

6              But it gives us pause.  There are current

7    obligations under U.S. law.  The story that we tell in our

8    complaint and the ones in the filing last week is a company

9    that doesn't care about the requirements under U.S. law.

10              And those current requirements are not that hard

11   to comply with.  And instead of talking about what might

12   happen in the future, why not just show you have controls

13   now that comply with the consent order?  Isn't that the

14   simplest answer?  Why not show your basis for saying that

15   BHL doesn't have access?  That's not proving a negative;

16   that is just backing up your statement of fact that you have

17   repeated.

18              THE COURT:  Okay.

19              MR. MURPHY:  That's all.  Thanks.

20              THE COURT:  So I want to hear from counsel for

21   Mr. Zhou.  Well, I guess, let me ask this:  Have you -- you

22   start with what you want to start with.  Then I'll ask my

23   questions.

24              MR. BAKER:  I'm happy to answer any questions you

25   have.

1          THE COURT:  I just want to know, I guess, what the

2     October letter in terms of discovery requests for you all --

3     are you still sort of thinking of things?  I don't know what

4     the scope is of those requests.

5          MR. BAKER:  I'm not aware of any requests that are

6     directed specifically to Mr. Zhou.

7          THE COURT:  That was my question.  All right.

8     Great.

9          MR. BAKER:  But I think your Honor is asking

10    exactly the right questions.

11         Last Tuesday, Mr. Zhou appeared in court, pled

12    guilty to the charges, has agreed to -- he and BHL both

13    agreed to what I think anyone would agree is an

14    extraordinarily punitive resolution.

15         If you recall the initial hearing, the transcript

16    of the initial hearing, the concern was flight of capital

17    from the United States.  The resolution -- and I urge the

18    SEC to read, rather than speculate, about what the criminal

19    resolution requires.  There's 4.5 billion being -- coming

20    into the United States.

21         Mr. Zhou has already posted bond that requires him

22    to put $175 million in capital up.  You're asking exactly

23    the right questions, your Honor, as to where the concern

24    should be.  There's no more powerful control than the

25    jurisdiction of the Court.

1                He's undertaken not to violate the law during that

2       period of time.  If he's got any hope of getting an

3       appropriate sentence, he's got to be squeaky clean.

4                If Mr. Murphy would read the criminal resolution,

5       he would see he's no longer the CEO.  He is not going to be

6       a board member of BAM.  He is stepping aside.  That much is

7       clear.

8                Now, there may be issues that they believe require

9       further elucidation.  We're happy to provide that.

10               THE COURT:  Okay.  And so you believe that your

11      client -- of course, you know, I understand that thousands

12      of miles away things change, and we'll hear from BAM -- but

13      at least --

14               MR. BAKER:  He's in the United States right now.

15               THE COURT:  Oh, he's still in the United States?

16      Okay.

17               -- that you believe he's not retaining a board

18      sort of role or his current role is going to be reduced at

19      BAM?  Is that your belief?

20               MR. BAKER:  My understanding --

21               THE COURT:  Sure.  That's all I'm asking, is your

22      understanding.

23               MR. BAKER:  My understanding is he has no role

24      going forward other than as an owner.

25               THE COURT:  Yes.  Yes.  Okay.

1          MR. BAKER:  And the criminal resolution didn't

2     require him to divest ownership.

3          THE COURT:  Yes.  And so where -- I mean, I think

4     I've said -- those are the sort of things I've said -- I

5     mean, there's no greater sword of Damocles than, you know, a

6     criminal sentencing and even when sentencing occurs.  Right?

7     Someone's on, presumably, supervision, that if they're doing

8     things, you know, shenanigans in another case, I would think

9     the district judge -- that would factor into the analysis.

10          So, I mean, from my view, I think the focus of the

11     SEC really is pretty clearly on BHL.  It seems like BAM is

12     hopefully from BAM's perspective for this issue receiving --

13     but what is it, I guess, that is Mr. Zhou at this point?  If

14     you don't have any discovery requests, should we actually --

15     I mean, do we want to hear from the Government?  Do they

16     anticipate that?  Have you had any conversations with them?

17     What do you sort of --

18          MR. BAKER:  I've sat in on most of the

19     depositions, reviewed transcripts --

20          THE COURT:  Yes.

21          MR. BAKER:  -- of all of them, reviewed the

22     documents.

23          There's nothing that's been produced to date that

24     suggests that Mr. Zhou has had any role in expropriating

25     money that should be here in the United States and should be

```
 1    at BAM.
 2             THE COURT:  And so do you have -- I mean, you
 3    don't have any view as to sort of what needs to be done in
 4    terms of Mr. Zhou right now in this limited discovery?
 5             MR. BAKER:  I'd say so far, the Government
 6    hasn't -- the SEC hasn't demonstrated the need --
 7             THE COURT:  Right.
 8             MR. BAKER:  -- for discovery from him.
 9             THE COURT:  Okay.
10             MR. BAKER:  If they put a request to us, we'll
11    consider it.
12             THE COURT:  Sure.
13             MR. BAKER:  If we think it's unnecessary, we'll
14    object.
15             THE COURT:  Yes.  Okay.  Well, why don't we hear
16    from the Government and then maybe I'll come back to you and
17    then we'll go to --
18             MR. BAKER:  Thank you, your Honor.
19             THE COURT:  Sure.
20             So do you have an understanding -- you know,
21    again, there's no "Speak now or forever hold your peace" --
22    but, you know, you haven't talked to BHL.  So if the first
23    BHL guy comes in and it's like, "Oh, there's no one that has
24    control, except for Mr. Zhou used to," then I could
25    understand you might have some questions for him.
```

1           Setting that aside, assuming that that -- there's

2     always a possibility to come back to this.  But as of right

3     now, it sounds like you haven't issued discovery requests.

4     Is it fair to say that, you know, there's a possibility that

5     you may not?  Or what kind of do we have to deal with

6     Mr. Zhou?

7           MR. MURPHY:  Your Honor, it's long enough ago that

8     I'm actually trying to recall if the discovery requests were

9     directed to Mr. Zhou as well.  I thought perhaps they were.

10          THE COURT:  Okay.

11          MR. MURPHY:  But --

12          THE COURT:  Your October request or the original

13    ones?

14          MR. MURPHY:  The original.  And I'll have to look

15    back.

16          THE COURT:  Ms. Farer seems like she has some

17    ideas.  So if you guys are happy to jump in here, whatever

18    you want to do.

19          MR. MURPHY:  But to cut through this, I mean, the

20    main issue remains what it is.  And if it's answered best by

21    BHL and there's no need to get to Mr. Zhou, that's fine.

22    That's something we can work out with the other parties.

23          So again, Mr. Zhou makes factual statements about

24    the state of play of BAM's assets --

25          THE COURT:  Right.

1          MR. MURPHY:  -- in tweets, like right after these

2     hearings.  If that's a real tweet.  Again, I never know if

3     what's online is real.

4          THE COURT:  Yes.

5          MR. MURPHY:  But if it's real, he's showing that

6     he has plenty of involvement in all of this.

7          And the reason why, when I was talking about BHL

8     and Mr. Zhou and I said I'm not actually going to

9     distinguish between the entities and people, that's not --

10    I'm taking their cue.  Right?  So I don't know where one

11    begins and where one ends.  And I think the filings that we

12    have made and the filings of last week reinforce that

13    impression, at least as of very recently.  I don't know what

14    the state of play is right now.

15         So that's a long way of saying, we're certainly

16    open to going to BHL first, and acknowledge that all the

17    information may be there.  And it may not.  And that's --

18    there's answers to these questions.  It's not about hacking

19    risk.  And if they answer them and we decide we don't need

20    any further discovery, then we can move on.  We all want to

21    move on.

22         THE COURT:  Okay.  That's helpful.

23         So, I mean, before I go back to BAM, I think --

24    you're good.  Thanks.

25         From my perspective, it is certainly iterative;

1    and you want to focus on BHL and get as much answers.  I

2    think, while I appreciate what you're saying, it seems like

3    that is part of presumably the reason why Mr. Zhou, you

4    know -- I have not spent time looking at the documents, but

5    I think that the implication is that there was, you know --

6    he was very involved.

7            I'm still looking at going forward.  And I think

8    BHL hopefully will be able to answer those questions.  And,

9    you know, I understand a lot of those answers about going

10   forward is what happened historically.  But I think that

11   they likely would be able to.  And if they do -- I mean,

12   it's easy for me to imagine a world where Mr. Zhou, although

13   he's been subject to discovery, may not need to answer it

14   because we're going to get what we need from BHL.

15           But, you know, if the BHL folks start saying

16   things like, Yeah, I mean, I think that this is what happens

17   and that we don't have control but, you know -- I don't

18   know.  I mean, that was -- Mr. Zhou knows more about like,

19   you know, from your example, I mean, he knows things about

20   the history and about the software and about the ones and

21   zeroes that just no one else does.  So could I tell you that

22   there's no back door?  No.  Really, only one person could

23   tell you that.

24           If someone says that, then it's going to be a

25   situation where I think that perhaps we would need to have a

1    very, very focused but discovery request, you know,

2    information from him.  Hopefully, it's ones where maybe it's

3    perhaps interrogatories or things where we wouldn't have to

4    get to deposition.  But perhaps we would, because if BHL

5    folks keep saying, like, This is a person who really

6    controls, you know, how everything was going, then it's

7    going to be hard to get some of that comfort without, you

8    know, some information from him.

9         To his credit, he has come to the United States.

10   He has subjected himself to U.S. jurisdiction.  And so I can

11   understand although still at the end of the day why counsel

12   for Mr. Zhou is going to be like, you know, He's put up a

13   bond; he's done these things.  Again, from my perspective,

14   that gives the Court a lot of comfort.  I'm not trying to

15   credit or blame one way or another, whatever happened.

16   That's a totally different case.  Whatever happened has

17   happened.

18        But the point is, I do think it's impacted our

19   facts.

20        So I'll hear from BAM, counsel for BAM.  I don't

21   know on -- let's just focus right now on BHL.

22        And, Mr. Zhou, if you want to come up.  If you

23   have anything.  Do you have anything you need to add on

24   that?  Because we haven't heard from the SEC, and they may

25   have things to what you initially said.

1          MR. LAROCHE:  Just very briefly.

2          THE COURT:  Yes.  Sure.  I mean, I'm not going

3    anywhere.  But okay.

4          MR. LAROCHE:  I'll try to keep this focused

5    totally on the software issue.

6          THE COURT:  Yes.

7          MR. LAROCHE:  So I don't mind -- I don't mind when

8    Mr. Murphy said I don't know what I'm talking about.

9          But I do -- I do -- and I hope I wrote some of

10   these quotes down wrong.  When he says things like BAM is

11   not being told the right information by its people or BAM

12   doesn't care about requirements under U.S. law, I mean --

13         THE COURT:  Well, I think he's saying that in

14   terms of -- and maybe it shouldn't be BAM -- I think he was

15   talking about that the guilty plea may indicate a culture

16   which has nothing to do with BAM.  Right?  They were not

17   part of that proceeding.  I understood him to be talking

18   about the other entity.

19         MR. LAROCHE:  Well, I certainly heard him say

20   something along the lines of, BAM is not being told the

21   right information.

22         I would just say -- I would just say, we've been

23   very -- the people have done exceptionally well at trial to

24   be helpful to the SEC during multiple depositions.  They're

25   working extremely hard, because this matters to them.  They

1    care very deeply that they're doing the right thing at BAM,

2    that they're trying to maintain the assets in the

3    appropriate way, that they're responding to numerous

4    requests which keep ever changing.

5              So we just really take -- really take issue --

6              THE COURT:  Yes.

7              MR. LAROCHE:  -- with any suggestion that the

8    people there aren't acting in good faith.  And it's not the

9    only time that that suggestion has been made to us.  And I

10   think just on the record, very clearly, we disagree strongly

11   with any suggestion that that's the case.

12             THE COURT:  Sure.

13             MR. LAROCHE:  The second part is, he led with:

14   They don't know how the assets are custodied.

15             We've been totally clear where all the assets are

16   custodied.  To the extent they are concerned with the fact

17   that there's an AWS environment that the wallet software

18   sits in, we've told them that since the beginning.  There's

19   another AWS environment within which BAM's PNK system sits

20   in.

21             It's always been our position that we control the

22   assets through that PNK system and there are, separately,

23   key shards for the cold wallets, which we now control.

24   There's been no confusion about that.

25             So when we make the point that we're just

1    surprised that they come up here and say, "This is

2    inconsistent with the consent order, you know, and we need

3    more discovery on this," this is what we've told them from

4    the start.  And he cites to Mr. Kellogg's declaration.  It's

5    like 25 pages long, your Honor.  And then he testified for

6    eight hours.

7          And part of our frustration is, we keep saying to

8    them:  If there are questions that BAM can answer that you

9    don't have the answer to, talk to us and tell us what those

10   questions are.  And we haven't gotten those questions yet.

11         So we just feel strongly that we're doing

12   everything we can to try to address their questions.  We've

13   given them the information to the best of our ability.

14         THE COURT:  Yes.

15         MR. LAROCHE:  And they either don't understand it

16   or aren't willing to communicate with us about it in a way

17   that could be productive to the process.

18         THE COURT:  Yes.  Well, I hear you.  And I think

19   still in spite of them saying those things, I also hear them

20   saying that they think that they've made good progress and

21   they're getting to the point where they've -- well, at least

22   I am getting to the point where I feel like we're getting

23   what we needed from BAM and so it's just -- I think I'm in

24   harmony with them -- is that it's more to move to BHL.

25         I understand that, you know, you can be as sure as

 1     you want to with BAM.  But if BHL has its own pathway, which

 2     BAM cannot answer, then that still needs to be resolved.

 3     But I think we're getting close.  I mean, I think we need to

 4     get the inspection done.  And it sounds like you're going to

 5     resolve, you know, sort of other extant issues.  But it

 6     sounds like we're getting close.

 7             MR. LAROCHE:  Yes.  Thank you.

 8             THE COURT:  I'm going to go back to the SEC and

 9     then I'll come back to BHL.

10             So let's just focus right now on -- I mean, you

11     know, BAM has sort of flagged this, and I think BHL has

12     echoed this, is that, you know, we're in a bit of a standoff

13     here, that, you know -- I understand.  From your

14     perspective, you want them to sort of lay out parameters and

15     then you pressure-test them.  And they want you to lay out

16     the scope of things.  Right?

17             And initially, they requested that there sort of

18     be topics that were verboten, you know.  And it was like:

19     No.  The consent order is our playing field.  Let's stick to

20     those.  You know, that's our boundaries.

21             I still want to get to the finish line here.  And

22     so I think that, you know, I just want to encourage SEC, I

23     think it's still easier.  BAM and BHL sort of put forth

24     areas here like we talked about -- or rather when you talked

25     about the 30(b)(6) issue.  Right?  Like you want them to

1    say, Well, what have you covered and what have you not

2    covered?

3              But I think that there's a risk at some point that

4    you're going to lose out on things that maybe you could have

5    gotten if you just start taking the bull by the horns and

6    saying:  Okay.  Well, here's what we think we're missing.

7              And it's hard to know what you're missing because

8    you're also trying to prove a negative.  Right?  Both of you

9    are.  I get that.

10             But I think that perhaps if you can take a little

11   bit of a leap of faith here and just start staying, like,

12   Here's the things -- because some of it, I mean, on a large

13   level you are saying.  And so if we can get more focused in

14   terms of, like, Why do we think we need a 30(b)(6)?  I think

15   you have some of that information, that knowledge there.

16   And if you can share that, you know, through

17   meet-and-confers, it certainly puts you in a better

18   situation when we have that argument or we have something

19   else going on to say, like, Well, why isn't sort of, you

20   know, this necessary?

21             It's like, well, you know, the SEC went above and

22   beyond.  They said:  This is what we need.  And they still

23   haven't gotten that gap filled.

24             So I mean, I don't think that it's traditionalist

25   or that you'd be the one setting up the parameters, but I

1   think it could be helpful.  So I just want to encourage

2   that.

3           But, I mean, I'm hopeful that with the inspection

4   that things like that -- I mean, I still take the sort of

5   top-level take-away from this is that we're getting close

6   with BAM and that really the issue is now:  Does Mr. Zhou

7   and BHL -- do they have things to indicate otherwise that

8   whatever BAM has said is not, like, willfully inaccurate;

9   it's just that they don't know?  Right?

10          Like, again, I don't know what my software

11  providers can and can't do.  I certainly don't read the

12  agreements or things like that, you know, to the extent it

13  would even be explicit, if not said.

14          And this is a company that -- I hear you -- has

15  pled guilty.  And so your concerns are even if they've

16  explicitly said something, you need to now be sure that it's

17  right and there's a benefit.  It's not just to them, but to

18  the Government, that they are in this other disposition,

19  that they have to be very clear with how they're answering

20  your questions now because -- so there's some, you know,

21  wind behind the sails, hopefully, of the Government, not

22  just to theirs of their argument, but to yours, to "Let's

23  get this finished because now you've already put yourself

24  out on Front Street."

25          So do you think that -- how do we sort of manage

1    this getting to the end with BAM?  That's what I want to

2    know right now, because it's still --

3            MR. MURPHY:  I think we are close.  I hear you on

4    your suggestion that we do more than we normally would in a

5    30(b)(6) context and be specific.

6            THE COURT:  And in the source code.  Those two

7    things.

8            MR. MURPHY:  And we will -- that's well-taken.

9            THE COURT:  Okay.

10           MR. MURPHY:  And we will proceed accordingly.

11           THE COURT:  Okay.  Thank you.

12           MR. MURPHY:  And I think, look, they haven't

13   produced all the documents.  We haven't reviewed all the

14   documents.

15           THE COURT:  Sure.  Yes.

16           MR. MURPHY:  I can't say whether we think they

17   have produced all the documents.  We're just -- literally,

18   we're getting them the day before Thanksgiving.

19           THE COURT:  Yes.

20           MR. MURPHY:  But we will work around the clock

21   like we've been doing for many months to review them and

22   narrow the issues as much as possible and be flexible.

23           If Mr. Laroche heard me criticizing the

24   information that he's been getting, I think you heard me

25   correctly, which is I don't think they have the information.

1   Right?  Like I just -- when he says, "I don't understand the

2   witness" -- like we know how the assets are being held

3   and -- it's not about that it's in some AWS environment.

4           The question is:  What is the basis for saying,

5   like they have said in a series of contexts over and over

6   again, BHL does not have access to or control over the

7   assets BAM Trading maintains on behalf of its customers or

8   itself?  What's the basis for saying that?

9           I don't know if they have information about how

10  BHL is holding those assets.  That's why BHL has to provide

11  the information.  And so I think we're -- we could probably

12  do -- send you a status report after our next depositions.

13          THE COURT:  Okay.

14          MR. MURPHY:  Mid-December.  Right?  And I didn't

15  hear answers to some of the other questions we threw out

16  about payments to BAM employees and things like that.  But I

17  guess we'll get that in discovery if people don't want to

18  address it in this context.

19          THE COURT:  Yes.  Well, I don't think we need to

20  address it in this context.

21          But I do want to get sort of to what our next

22  benchmark is vis-à-vis BAM.  And so is that, do you think, a

23  joint status report after the final deposition?

24          MR. MURPHY:  Well, it won't be after the 30(b)(6),

25  but it'll be after the schedule for fact depositions.

```
1                      THE COURT:  Yes.

2                      MR. MURPHY:  And I think it's a good time to give

3         you an update.  It'll be a little bit late and we can -- if

4         you're open to us also talking offline --

5                      THE COURT:  Yes.

6                      MR. MURPHY:  -- or if Mr. Laroche wants to talk

7         now about the timing of that status update, I'm happy to do

8         that.

9                      THE COURT:  I don't think he --

10                     MR. MURPHY:  It does seem like that's around the

11        right time to do it.

12                     THE COURT:  Right.

13                     MR. MURPHY:  And I'll just -- I'm not casting

14        aspersions.  It's partly human nature.  We get a lot more

15        information when we're about to report to you.

16                     THE COURT:  Yes.  Sure.

17                     MR. MURPHY:  And it moves the ball when we're

18        about to report to you.

19                     THE COURT:  Yes.  Well, I mean, that's how it

20        works for their clients, too, right?  I mean, they've got a

21        business to run.  This litigation is just a cost center.

22        And so yes.  That's totally fair.

23                     So I mean, I think from BAM's perspective, does

24        that make sense, that we just wait for you all to sort of

25        talk offline about figuring this out, ideally after the
```

1    final fact deposition, about doing a joint status report?

2              MR. LAROCHE:  Yeah.  That makes sense, your Honor.

3              THE COURT:  Okay.  Great.  So I think we're good

4    on that, and we'll leave that where it is.

5              I'm just going to remind -- I know that you view

6    those as intertwined.  Who's paying who?  Because if

7    someone's paying somebody, presumably they have some control

8    over that person.  It's just -- there's a difference between

9    that sort of, you know, spiritual control and just the ones

10   and zeroes.  And I get it:  They're intertwined.

11             But let's really focus on, right -- at the end of

12   the day, if someone put a gun to my head, which I hope they

13   don't, and said, like, What's our number one issue, that is

14   my number one issue still.  It's like:  Does the software --

15   let's just start with that baseline.  Does the software

16   allow for this?

17             But I think it's reasonable to ask, you know, what

18   are people's incentives in here?  Because, you know,

19   software's manipulated by people.  It's controlled by

20   people.  We've not yet reached the, you know --

21             MR. MURPHY:  It's more like the lack of clarity.

22             THE COURT:  Okay.

23             MR. MURPHY:  The word "allowance" was used very

24   precisely, and we were told:  That's the only -- I didn't

25   really get an allowance growing up.  It was capricious when

1    I got it.  It signaled absolute control.  Right?

2              THE COURT:  Yes.  Yes.

3              MR. MURPHY:  So I assume they mean something

4    different when they use the word "allowance."  But that's

5    the only information we have on it.

6              My guess is the information will be much more

7    innocuous.  It's almost like the uncertainty.

8              THE COURT:  Yes.

9              MR. MURPHY:  Like:  Why don't we know?  Right?

10   That's a question we have.  But I'm sure we'll get to the

11   bottom of it.

12             THE COURT:  Okay.  That sounds good.  So we're

13   good on the BAM front.

14             I think what we're going to do, we're going to get

15   fact witnesses done.  I'm hopeful -- I've heard the

16   Government is going to -- I don't think they have to do this

17   and, you know, when we get to litigation, if we do, about

18   the mosaic not being complete, you know, obviating any need

19   for a 30(b)(6), I don't think it's going to hurt them.  I

20   think it's only going to help them if they've said, Look, we

21   went and gave, you know, so much, all the sort of contours

22   of what we're trying to get, and there are still all these

23   missing gaps.

24             I think that would be helpful in litigation,

25   because then if there are gaps, it's very concrete things to

1    point to and it's sort of been given up front.  So I think

2    it helps you if we're going to avoid litigation.  I think it

3    helps them if we get to litigation.

4         But I think we're going to avoid that, because I

5    keep hearing from them:  We're getting there.  And I do

6    think that we are.  So we'll leave it at that with BAM.

7         Okay.  For BHL, why don't we -- I think, you know,

8    I don't know if there's any more questions from my end.

9    You've heard me.  It's that sentence that they've read.  I

10   just want to get to the bottom.

11        And I think that I need some -- that these are

12   questions that need to be answered by people, not just

13   through documents alone.  And so that there is some, you

14   know, tailored, narrow discovery.

15        But, you know, some of that is also based in fact,

16   not just hypotheticals, so that we understand how the

17   software works, but that I also agree that, you know, of the

18   things BAM has done, the things that have happened since our

19   last hearing, have all continued to put you in a better

20   position to say:  Look, at the end of the day, no one is

21   going to be able to say with 100 percent nothing can happen.

22   But we're not at, you know 49 or 51 percent.  You know,

23   we're at -- in the 70s and 80s based not only upon the

24   testimony, but just the reality.  Right?

25        What has happened?  This is an investigation that

1   has spanned years and we still don't see, you know, money

2   leaving.  Now, we want to still comply with the consent

3   order.

4           So I'll let you add anything you want to if you

5   need to.  If you don't, okay.  And then I want to hear

6   about, do you think that, given that we're talking about

7   like in mid-December, I think that you would just piggyback

8   on again to a joint status report with BAM and if it simply

9   states like, We're still figuring out what we're willing to

10  do or not, that's fine.  I think that that's sort of my

11  intuition of what we should do.

12          But if you think it's better to do it -- you know,

13  if that's not sufficient time and you're going to be just

14  like, "We're still working," then I don't want to just

15  create work.  So what do you think in terms of timing?

16          MR. MENDRO:  Well, we're absolutely happy to

17  contribute to any joint status report, whether it's in

18  mid-September [sic] or later.  Obviously, the longer it is,

19  the more time we'll have to work out some of the details.

20  But if the Court wants to hear from us from in

21  mid-September -- or December, the Court will hear from us in

22  mid-December.

23          THE COURT:  Okay.  Well -- you can stay at counsel

24  table.  What do you feel like as to this issue here?  In

25  terms of timing, do you want December for a BHL update and

1    joint status report?  I mean, it seems like you can be

2    pretty curt and just say, "Still working on it; we'll get

3    back to you," which is fine.  Or do you think that that --

4    it's sort of so perfunctory it's not helpful?

5              MR. MENDRO:  No.  It's just -- it would be strange

6    to get a report in mid-December saying "We're still working

7    on it."

8              THE COURT:  Okay.

9              MR. MENDRO:  Right?  The issues are clear enough.

10   So that's the only thing I would like to signal to the

11   Court.

12             THE COURT:  Yes.

13             MR. MENDRO:  And I think counsel has that point.

14             THE COURT:  Great.  So let's plan on getting our

15   update then; and we've heard the SEC is hopeful that, you

16   know, you'll have things to show them.

17             And I think it's hard for me to imagine that it

18   isn't a few things that -- not just the documents, but

19   documents and again witness testimony.  Someone who's going

20   to be able to say with knowledge, having created this

21   software, managing this environment, right, we can answer

22   this question.  We don't need to get into a million

23   different things here.  But do we have control over what BAM

24   employees are doing in terms of the management of assets and

25   do we have software control?  Those seem to be the two big

```
 1    issues.

 2              MR. MENDRO:  Well, I do want to take issue with

 3    one thing --

 4              THE COURT:  Yes.  Please.

 5              MR. MENDRO:  -- that Mr. Murphy just suggested,

 6    which is that the issues are clear.  What I'm struggling

 7    with is exactly what the issues are.  So on the documents,

 8    let's just take it one step at a time.

 9              THE COURT:  Sure.

10              MR. MENDRO:  We understand that they're requesting

11    the SOC 2 reports.

12              THE COURT:  Yes.

13              MR. MENDRO:  The Court has heard me say that we're

14    going to identify which are the right reports and we're

15    going to produce those.

16              THE COURT:  Yes; which is great.

17              MR. MENDRO:  We've heard last week about the

18    chats.  We want to work with the SEC to understand

19    specifically what --

20              THE COURT:  Tailored.

21              MR. MENDRO:  -- it is that they want and what it

22    is that they're getting from BAM and see if we can do

23    something to bridge the gulf.  So we're working on that.

24              THE COURT:  Yes.

25              MR. MENDRO:  As far as I can tell, I don't believe
```

1    that there are any more open issues with respect to any

2    documents.

3            THE COURT:  Yes.  Why don't we hear from -- do you

4    all believe -- or at least are those the two big buckets to

5    start with, but there might be some ancillary stuff?

6            MR. MURPHY:  We're looking for documents that'll

7    support the assertion that says BHL does not have access to

8    BAM's assets.

9            THE COURT:  True.

10           MR. MURPHY:  If the SOC report answers that, fine.

11   If the SOC report talks about how everyone has security

12   badges to get into the building, that's not going to answer

13   the question.

14           THE COURT:  No.  I've got you.

15           MR. MURPHY:  Okay.

16           THE COURT:  So I think -- I mean, I can clear that

17   as my concern.  I think that you understand that that's a

18   concern.  So I don't think we should limit ourselves to just

19   the things that they have said have been helpful that you'll

20   produce.

21           I think that you all, as I'm sure you must be,

22   continue to do your due diligence, figure out:  Are there

23   other documents that would answer those questions?  And if

24   there are, great.  And, you know, within reason.  Right?  I

25   mean, this is not just a simple Google search within your

1    software.  Right?  You know, it's limited expedited

2    discovery.

3            And so I think the things that are helpful also,

4    if there is litigation, is that you set -- it shouldn't be

5    just, "They said these are the two things.  We identified

6    that and we gave them those two things."

7            I think you're going to need to be able to say a

8    little bit of, What are all the other things you tried to do

9    to suss out there's anything else to answer that question?

10   Which there may not be.

11           MR. MENDRO:  Yes.

12           THE COURT:  Okay.

13           MR. MENDRO:  And we are, your Honor.  To be clear,

14   we're working closely with our client on that.  My concern

15   is, is the documentation of this company wasn't around

16   rebutting this sort of accusation --

17           THE COURT:  Right.  I'm totally with you.

18           MR. MENDRO:  -- which doesn't have any support or

19   any historical basis to be there.

20           So I --

21           THE COURT:  I hear you loud and clear.

22           MR. MENDRO:  We're working hard on this.  And I

23   don't know that there will be a lot more in terms of

24   documentation on this front.

25           THE COURT:  That's okay.  Right?  If that's where

1    you get to, as long as you think you have some -- the

2    working-hard part, you can flesh that out whenever it is, at

3    the next hearing or in litigation, whatever it is.  That's

4    what I'm going to want to know.

5              I think ultimately that's what the SEC is going to

6    still want to know, because if you say there aren't more

7    documents, I think they're going to say, Well, why aren't

8    there?

9              But if you can say, like, Hey, here's all the

10   different types of things we've done to try to find those

11   different documents, I would like to think that they would

12   say:  Okay.  We're not satisfied, but we also think that

13   you've done what you can do.

14             So that's the document request.

15             Yes.

16             MR. MURPHY:  Just one other thing.  I mean,

17   Mr. Mendro, like me, like all of us in this room, are more

18   comfortable with documents.  Right?  But engineers are used

19   to answering these questions all the time about access.

20             THE COURT:  Yes.

21             MR. MURPHY:  So I think it will require speaking

22   to an engineer.  And they have code, right, that they write

23   and they keep in a repository by design to make sure that

24   they can spot bugs.  They all go to this.

25             I'll say -- I'll remind Mr. Mendro that he did say

1    that his client was thinking about pointing us to public

2    source code.

3            We don't think that will come close to answering

4    the question.  But at least it showed some willingness to

5    talk about the plumbing here, which is I think what we have

6    to get to.

7            THE COURT:  Yes.

8            MR. MURPHY:  So we're told from our experts that

9    the whole infrastructure would have to be on top of that and

10   would have to be explained.  That will not, to be clear,

11   provide the answer, but it's moving in the right direction.

12           THE COURT:  Sure.  It's a starting point.

13           So I think I've said and I've been clear and I'm

14   just going to be clear again:  It's hard for me to imagine

15   answering these questions without some sort of witness

16   testimony.  The documents are a start.  But some engineer,

17   somebody who can say.

18           But again, the limited question, not about every

19   single thing how BHL -- right?  The intermingling of the

20   corporate relationships is not -- you know, I understand why

21   the SEC thinks it touches upon it, and it does.  It's not

22   totally out in left field.  But we've got to get to a

23   resolution here.

24           And so it's getting them to say some simple

25   questions of, like, who can -- you know, who wrote -- you

1   know, who wrote the software?  Just figuring out, what does

2   the software -- what are the constraints?  What are the sort

3   of guardrails?  Is this totally open-ended?  Is it -- was it

4   created like that, but now it's not?  And just -- but

5   ultimately, what are we doing right now to make sure that

6   the software doesn't evolve or isn't able to control, you

7   know, what BAM is doing with its assets?

8          And so it's -- I just don't see that happening

9   without witness testimony.  But I think it can be very

10  limited testimony.  I'm hoping there could be very few

11  witnesses.  Right?  Like a witness, maybe, witnesses.  It's

12  hard to imagine one.  But I leave it to you all.  Find that

13  one person who's going to be able to do that all.  Maybe, as

14  I said, do a 30(b)(6).  I don't know.

15         But yes.  I think there will have to be some

16  testimony, particularly given at least we have one instance

17  of something happening.

18         Again, it could be something that's totally

19  innocuous but that is certainly -- it's just a -- I think in

20  a lot of other places BAM has pointed and BHL, like these

21  are all bogeymen with nothing behind it.  This is not saying

22  that this is that, in fact, parade of horribles that we

23  fear.  It's just saying that there's something that at least

24  gives us a reason to run that down to the ground.

25         MR. MENDRO:  Understood, your Honor.

```
 1              And when it comes to testimony, I think the
 2    devil's going to be in the details about how limited we can
 3    be --
 4              THE COURT:  Right.
 5              MR. MENDRO:  -- how focused we can be and how
 6    clear the SEC can be about exactly what it wants, because I
 7    keep hearing that we have all the answers; and I'm not even
 8    sure that we even have all the questions.
 9              THE COURT:  The questions.  Yes.  I got it.
10              MR. MENDRO:  You know, when --
11              THE COURT:  So my direction to them is, again, the
12    same as it was as to BAM, is that they need to -- they need
13    to bend over backwards to try to give you all as much
14    contours of what the questions are.  Right?  So that you can
15    get some sort of -- I think it's helpful to give you
16    comfort, even if their job is not to give you that comfort,
17    to give you some comfort that there is an end point and that
18    there are boundaries to this.
19              So I mean, I've said that to BAM.  It applies
20    equally to BHL.  I'm hoping that, you know, when we're
21    talking about -- I think that they're going to be able to
22    say:  Here are the topics generally we're trying to get
23    into.  Help us find that person who's going to be able to
24    get into it.
25              I think it is -- I think it is pretty direct what
```

1     it is they're asking for.  They may want a lot more, and

2     that's their job to want more.  But I think that we can

3     agree that there's this sort of -- control the software and

4     patrol the people who control the software here, just making

5     sure that there is some, in fact, substance to the

6     statement, like what backs up just the statement that

7     there's no control?

8                 MR. MENDRO:  And I'm optimistic that if we have

9     specific questions and we know that those -- the answers to

10    those questions are going to end this, that we can work

11    constructively with the SEC to try to find answers and

12    deliver them in the best way that we can.

13                THE COURT:  Okay.

14                MR. MENDRO:  But I'm concerned when Mr. Murphy

15    says:  We want to talk to engineers; we want to understand

16    the code; the public code isn't good enough.

17                We very much agree with the comment that the Court

18    made in our October hearing that it would be very atypical

19    to have to produce the source code in a case like this.  And

20    I don't think that our client thinks that that is reasonable

21    under the circumstances.  In fact, it would be profoundly

22    unreasonable to have to produce and expose and make

23    available the most sensitive information the company has

24    just to answer questions about hypothetical risks that just

25    haven't borne out.

1          THE COURT:  Right.  What I'm hopeful is that an

2    engineer answering a question of, "I don't need to give you

3    the source code.  I can just tell you:  Yeah.  I can't get

4    in there.  It's a locked door."  You know?

5          Is it within the realm of possibility that someone

6    could hack through?  They're saying that that's not what

7    they're looking for.  They're asking for the -- you know,

8    what is the sort of standard course when there is an

9    emergency at BAM?  If they can't move assets and they pick

10   up the phone and call BHL, what happens and what could

11   happen?

12         And so I think it's hard for me to imagine how you

13   get those questions answered without talking to an engineer.

14   But I also agree with you that it doesn't -- I mean, they

15   don't want the entire source code, I don't think.  I mean, I

16   think they view that if they can't get these questions

17   answered, then that's what they have to go to.

18         Is at least that fair to say from the SEC's

19   perspective?  It's like, well, you want less work, not more

20   work.  I think that's fair to say.  Right?

21         And so if you could -- they're nodding their head

22   yes, the record will reflect.

23         And so I think that engineers could answer some of

24   these questions.  And it would obviate the need for it and,

25   if not obviate the need, it does with me if not with them.

1    Right?  At some point you've got folks who are saying, like,

2    "I can't do that.  Like give me a break."

3              You know, they may still be suspicious.  That's

4    their right to be so.  But enough's enough.

5              But I think that that is a more efficient way to

6    answer these questions, is by having people answer "yes" or

7    "no."  Then their expert is -- because their expert is

8    probably going to see things there that, you know, it's

9    going to be different than how your folks are going to see

10   it.

11             And so I don't want to get into this fight of

12   experts.  I just want to hear some witness say:  Hey, I

13   didn't have to -- BHL doesn't have to do all these things.

14   They're doing it.  They're putting their best foot forward.

15   They're saying:  We don't think we can do this.  We haven't

16   done it, P.S., for the last whatever.  That one thing that

17   came up, let me explain to you, put that to bed.

18             I mean, I think you guys are looking pretty good

19   in that spot then.  But I just need you to get there.

20             MR. MENDRO:  Yes.  That's helpful, your Honor.

21             THE COURT:  Okay.

22             MR. MENDRO:  Anything else I can answer for you?

23             THE COURT:  No.  I don't think so.

24             MR. MENDRO:  Thank you.

25             THE COURT:  Great.

```
1              And I think on the Mr. Zhou end, we're just going

2    to -- I understand that you all have document requests.  I

3    think it would be helpful for you all to talk offline and

4    just make sure that we understand what Mr. Zhou's role is at

5    BAM because I think I appreciate we're trying to flesh that

6    out, but I think that goes major -- you know, it goes -- go

7    ahead.  You can answer.

8              MR. BAKER:  I'm sorry.

9              THE COURT:  No.  Please.  I forgot to ask you

10   before.

11             MR. BAKER:  I thought I did earlier.

12             THE COURT:  Yes.  Maybe you did.

13             MR. BAKER:  I might not have.  But I just wanted

14   to be clear about how things stand today with BAM.

15             THE COURT:  Okay.  That would be great.

16             MR. BAKER:  So Mr. Zhou has stepped down as a BAM

17   director effective as of last week.  And he's also foregone

18   his voting rights via a proxy agreement.

19             THE COURT:  Okay.

20             MR. BAKER:  So he has no voting rights.  He has no

21   management responsibilities with respect to BAM at all.  So

22   he's out of BAM for -- in terms of anything that matters

23   with respect to management or strategy or anything with that

24   respect.  So I can confirm that again on the record, your

25   Honor.
```

1           THE COURT:  Okay.  Great.

2           And so as I understand it, sir, the remaining --

3   and from the SEC's perspective, it might be large.  But I

4   think your point is well-taken -- it sounds like it's been

5   very [indiscernible] -- is that, you know, he has his --

6   retains his ownership interest that he had, you know, as a

7   shareholder.  That's still there.  But that's really the

8   bulk of where --

9           MR. BAKER:  Economic rights only.  Yes, your

10  Honor.

11          THE COURT:  Yes.  And one would think as a

12  shareholder -- this is what we call a leading question --

13  one would think as a shareholder that he's not going to want

14  things done at the company that you believe would then cause

15  the SEC to come and take apart the company.

16          MR. BAKER:  I would presume that's true, your

17  Honor.

18          THE COURT:  All right.  So I mean, I think the

19  discovery of Mr. Zhou, I'm most hopeful that there is

20  perhaps an end and that it may not need to really begin,

21  depending on what BHL says, because if BHL folks come in

22  here and start -- the engineer starts saying, like, you

23  know -- I mean, I think a very reasonable question to ask

24  every engineer is:  Could Mr. Zhou have the ability, you

25  know, in the past, right, before the change?  Could he have

1    gotten into this?  Could he have -- what were his sort of --

2    what were the -- you know, given his sort of central role in

3    this company allegedly, you know, what could he have done?

4    And then asking and then as of today.

5         And if the answer is, like, "Yeah.  Before, it

6    didn't matter.  I mean, the software, there's only person

7    who had, you know, both keys to go unlock it.  And it was

8    him.  Yeah.  I assume he's turned it over" and things like

9    that, then that you've got to revisit, because that

10   certainly then gives a lot of concern that if he had some

11   sort of, you know, really unique authority or unique sort of

12   power, we want to be very sure that that has been buttoned

13   up and that it's not an issue now going forward.

14        But I think Mr. Zhou's in the best position right

15   now of any of the three parties to feel like that there

16   perhaps will be little to no discovery.  But we'll wait and

17   see.  Okay.

18        So I'll let Mr. -- so I think again, it sounds

19   like from Mr. Zhou's perspective you can just join in that

20   report.  But, you know, continue to talk to the SEC.  It

21   sounds like they view that there's some request.  If there

22   are things, it sounds like you'll continue to think of what

23   you can do.  That's helpful, and do so.

24        But I could also understand why, you know, you're

25   just going to say:  Look, we're going to wait and see how

1   things kind of shake out.

2           You know, I don't know if there are other things

3   that Mr. Zhou could provide, for instance, prospectively,

4   saying that -- you know, a declaration or things that he

5   could say, like, not historical, as of today, right,

6   November 27th, I am not able to do these things or whatever.

7   Like perhaps there is a draft declaration or something that

8   he could -- that you could get from the SEC; and maybe he's

9   not going to say it verbatim, but there are things in there,

10  again, understanding there's a judge with criminal

11  liability, right?  And that he is under all these other

12  things here.  Couldn't that give us that cushion that we

13  need?

14          And so perhaps we could avoid something very

15  invasive from him and that, more, that you all could

16  negotiate even though it may not be necessary something that

17  really puts to bed what -- I hear you, because I mean, I do,

18  that it's really hard to imagine he's the person right now

19  who's going to be breaking in and doing anything.  It's hard

20  for me imagine -- I want to be clear -- on what BAM has

21  said.  It is hard for me to imagine anyone doing it, because

22  we've had a long time and nothing has happened.  But I've

23  got to be careful.

24          And I want to uphold the consent order.  But I

25  think maybe there's something he could do, just one more

1    thing, perhaps.  And it may not satisfy the SEC, but it

2    might satisfy both me, knowing that there's another judge

3    out there watching him, and that, you know, he's flown here,

4    put himself up.  He's, you know, agreed to pay a fine.  He's

5    put a bond on top of that.  I mean -- and it's not a trivial

6    amount of money.  So I think he's -- you all, I'm hoping you

7    can -- let's just narrow the playing field.

8            Sound good?

9            MR. BAKER:  I'm happy to consider that.

10           THE COURT:  That sounds great.  Thanks.

11           Okay.  So from the SEC's perspective, I think, you

12   know, where we are is we're going to get through our fact

13   depositions here.

14           We're going to -- you're considering and willing

15   to try to sort of take on the, you know, burden that isn't

16   yours necessarily and to sort of help chart out what are the

17   things that we're trying to get to the bottom of.

18   Understand, I think it'll help me if there is litigation in

19   showing that you've really tried to give them every

20   opportunity to give you what you need.  And that we'll look

21   for a report in December with, if necessary, then a hearing,

22   you know, shortly thereafter.  And I'm not looking for a

23   date.

24           MR. MURPHY:  I'll just throw out, so that we don't

25   have -- we can save ourselves a filing -- December 15th?

1    I'm happy to confer separately if that's not good.

2              THE COURT:  Well, we can just say December 15.  If

3    you need to change it, you can just change it.  I mean,

4    that's fine by me.

5              MR. LAROCHE:  That's fine, your Honor, by BAM.

6    That's fine.

7              THE COURT:  Sound good by BHL?

8              MR. MENDRO:  Yes, your Honor.

9              THE COURT:  Okay.  Mr. Zhou?

10             MR. BAKER:  Yes, your Honor.

11             THE COURT:  Okay.  Let's just plan on that.  You

12    know, if things happen, I'll reschedule, et cetera.

13             So December 15th is when I'm hopefully going to

14    get my update, and then we're moving towards the end.  I

15    think we're moving in the right direction.

16             Anything else from the SEC?

17             MR. MURPHY:  No.  Thank you, your Honor.

18             THE COURT:  From counsel for BAM?

19             MR. LAROCHE:  No.  Thank you, your Honor.

20             THE COURT:  Counsel for BHL?

21             MR. MENDRO:  Thank you, your Honor.  No.

22             THE COURT:  And counsel for Mr. Zhou?

23             MR. BAKER:  No, your Honor.  Thank you.

24             THE COURT:  All right.  Thanks a lot, everybody.

25    I really appreciate it.  I keep saying it's helpful, but I

1    think we'll get there.  Take care.

2              (Proceedings concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>**CERTIFICATE**</u>

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                   Dated this 29th day of November, 2023.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**$**

**$175** [1] - 76:22

**/**

**/s** [1] - 115:12

**1**

**1** [1] - 60:23
**10,000** [1] - 57:15
**100** [3] - 1:16, 1:19, 95:21
**1000** [1] - 2:13
**10001** [1] - 2:3
**10004** [1] - 1:17
**1050** [1] - 1:24
**12** [2] - 30:20, 40:23
**13th** [1] - 8:1
**15** [1] - 113:2
**15th** [2] - 112:25, 113:13
**1919** [1] - 2:9

**2**

**2** [2] - 49:24, 98:11
**20-100** [1] - 1:17
**20001** [2] - 2:18, 115:14
**20004** [1] - 2:14
**20006** [1] - 2:10
**20036** [1] - 1:25
**20037** [1] - 2:7
**202** [2] - 2:19, 115:15
**2023** [2] - 1:7, 115:10
**20549** [1] - 1:20
**20th** [1] - 8:1
**2100** [1] - 2:6
**21st** [2] - 7:20, 36:10
**23-01599** [1] - 1:4
**23-1599** [1] - 3:2
**25** [1] - 86:5
**27** [1] - 1:7
**27th** [1] - 111:6
**29th** [1] - 115:10

**3**

**30** [1] - 36:25
**30(b)(6** [17] - 8:18, 15:9, 15:13, 15:22, 16:4, 22:6, 26:15, 26:16, 27:9, 38:16, 71:21, 72:7, 87:25,

88:14, 90:5, 91:24, 94:19
  **30(b)(6)** [4] - 22:15, 23:1, 38:10, 103:14
  **30,000-foot** [4] - 6:23, 7:8, 14:19, 74:17
  **300** [1] - 1:25
  **333** [2] - 2:17, 115:14
  **354-3269** [2] - 2:19, 115:15

**4**

**4.5** [1] - 76:19
**49** [1] - 95:22

**5**

**5** [1] - 49:22
**51** [1] - 95:22
**55** [1] - 2:3
**555** [1] - 2:13

**6**

**60** [1] - 36:4
**66** [1] - 63:2
**6706** [1] - 2:18

**7**

**70-plus** [1] - 35:12
**70s** [1] - 95:23

**8**

**80** [1] - 27:10
**800** [1] - 2:9
**80s** [1] - 95:23

**9**

**90** [2] - 32:5, 68:23
**9:39** [1] - 1:8

**A**

**a.m** [1] - 1:8
**ability** [5] - 46:7, 59:18, 86:13, 109:24, 115:7
**able** [19] - 8:2, 8:13, 13:11, 50:13, 51:20, 56:5, 58:19, 59:10,

59:24, 82:8, 82:11, 95:21, 97:20, 100:7, 103:6, 103:13, 104:21, 104:23, 111:6
**absolute** [1] - 94:1
**absolutely** [4] - 37:6, 43:7, 45:15, 96:16
**access** [21] - 10:7, 11:9, 11:18, 11:19, 11:20, 12:1, 20:3, 22:19, 36:24, 37:9, 37:10, 37:11, 47:12, 48:15, 59:25, 64:11, 65:20, 75:15, 91:6, 99:7, 101:19
**accordingly** [1] - 90:10
**account** [2] - 64:9, 64:12
**accounting** [4] - 15:1, 37:22, 46:23, 47:6
**accounts** [1] - 48:3
**accurate** [1] - 115:4
**accusation** [1] - 100:16
**acknowledge** [1] - 81:16
**acknowledged** [1] - 14:6
**acting** [1] - 85:8
**Action** [2] - 1:3, 3:2
**action** [1] - 32:11
**actual** [1] - 52:12
**add** [6] - 33:2, 40:16, 46:7, 51:4, 83:23, 96:4
**added** [2] - 31:4, 31:5
**addition** [5] - 31:24, 33:24, 36:9, 37:21, 46:6
**additional** [1] - 38:5
**address** [8] - 14:10, 30:6, 37:6, 38:11, 38:15, 86:12, 91:18, 91:20
**addressed** [3] - 45:22, 67:21, 70:17
**administrator** [1] - 19:17
**affects** [3] - 24:20, 25:2, 70:19
**affiliated** [4] - 20:17, 49:11, 66:17, 66:20
**afraid** [1] - 58:15
**afterwards** [1] - 26:21
**ago** [8] - 15:11, 15:15, 29:16, 30:23,

31:1, 31:11, 41:15, 80:7
  **agree** [17] - 45:10, 45:11, 45:12, 45:14, 45:17, 48:9, 50:6, 54:12, 57:2, 57:9, 58:6, 68:20, 76:13, 95:17, 105:3, 105:17, 106:14
  **agreed** [14] - 7:20, 14:3, 14:22, 14:23, 15:12, 15:17, 17:4, 17:5, 35:21, 38:5, 50:4, 76:12, 76:13, 112:4
  **agreement** [8] - 6:19, 14:9, 42:24, 47:10, 48:18, 49:16, 108:18
  **agreements** [2] - 49:8, 89:12
  **ahead** [5] - 4:12, 4:17, 5:7, 34:11, 108:7
  **al** [2] - 1:7, 3:3
  **alert** [2] - 46:24, 47:7
  **allegedly** [1] - 110:3
  **allow** [6] - 30:12, 54:14, 60:1, 61:3, 67:5, 93:16
  **allowance** [3] - 93:23, 93:25, 94:4
  **allowances** [1] - 20:17
  **allowed** [1] - 68:8
  **allows** [1] - 47:12
  **almost** [2] - 12:5, 30:7, 32:5, 94:7
  **alone** [1] - 95:13
  **ambiguity** [1] - 53:13
  **amend** [2] - 68:2, 68:3
  **amount** [4] - 20:18, 37:14, 46:15, 112:6
  **amounting** [1] - 46:10
  **AMY** [1] - 1:23
  **Amy** [1] - 3:20
  **analysis** [1] - 78:9
  **ancillary** [1] - 99:5
  **AND** [4] - 1:3, 1:11, 1:16, 1:19
  **announced** [1] - 3:7
  **answer** [41] - 14:17, 15:2, 16:17, 20:8, 23:2, 39:18, 48:25, 54:12, 54:16, 54:17, 54:23, 55:15, 56:16, 56:23, 57:14, 61:2, 61:12, 61:23, 72:12, 73:15, 73:19, 75:14,

75:24, 81:19, 82:8, 82:13, 86:8, 86:9, 87:2, 97:21, 99:12, 99:23, 100:9, 102:11, 105:24, 106:23, 107:6, 107:22, 108:7, 110:5
  **answered** [12] - 14:4, 21:22, 23:17, 56:21, 59:16, 64:13, 64:15, 74:3, 80:20, 95:12, 106:13, 106:17
  **answering** [5] - 89:19, 101:19, 102:3, 102:15, 106:2
  **answers** [10] - 15:21, 71:10, 81:18, 82:1, 82:9, 91:15, 99:10, 104:7, 105:9, 105:11
  **anticipate** [1] - 78:16
  **anytime** [2] - 47:5, 47:6
  **apace** [1] - 4:11
  **apart** [1] - 109:15
  **app** [3] - 17:6, 20:1, 20:4
  **apparatus** [1] - 68:14
  **appearances** [2] - 1:14, 3:7
  **APPEARANCES** [1] - 2:1
  **appeared** [1] - 76:11
  **appellate** [1] - 4:1
  **applaud** [1] - 19:4
  **Apple** [4] - 53:20, 54:5, 54:20, 54:21
  **applies** [1] - 104:19
  **appreciate** [6] - 10:1, 29:8, 34:22, 82:2, 108:5, 113:25
  **appreciation** [1] - 45:5
  **approach** [1] - 3:5
  **appropriate** [4] - 30:2, 46:3, 77:3, 85:3
  **approve** [3] - 18:15, 47:25, 48:2
  **archived** [2] - 37:1, 51:8
  **area** [2] - 49:17, 51:24
  **areas** [1] - 87:24
  **argue** [1] - 42:19
  **arguing** [1] - 31:7
  **argument** [2] - 88:18, 89:22
  **arguments** [1] - 58:23
  **arms** [1] - 55:7
  **arrangement** [1] -

12:3
**articulate** [1] - 41:14
**articulated** [1] - 42:15
**aside** [3] - 26:22, 77:6, 80:1
**aspect** [2] - 30:9, 44:18
**aspersions** [1] - 92:14
**assertion** [3] - 10:14, 11:3, 99:7
**asset** [6] - 10:25, 18:15, 30:9, 30:15, 34:3, 73:18
**assets** [52] - 5:20, 6:9, 9:4, 9:5, 9:11, 9:13, 12:9, 18:14, 24:10, 30:24, 31:9, 32:4, 32:14, 33:10, 33:16, 34:5, 37:21, 38:2, 44:19, 46:3, 46:22, 46:23, 47:12, 48:16, 51:1, 58:16, 61:21, 63:24, 64:11, 65:16, 65:21, 67:5, 68:4, 68:6, 68:9, 68:14, 70:8, 72:20, 73:2, 73:10, 80:24, 85:2, 85:14, 85:15, 85:22, 91:2, 91:7, 91:10, 97:24, 99:8, 103:7, 106:9
**associate** [1] - 19:18
**assume** [8] - 11:12, 12:17, 25:3, 25:4, 63:25, 69:17, 94:3, 110:8
**assuming** [2] - 64:2, 80:1
**atmosphere** [1] - 74:12
**attorneys** [1] - 65:24
**atypical** [1] - 105:18
**Audio** [1] - 1:12
**audio** [1] - 3:6
**audit** [1] - 64:16
**auditors** [1] - 65:14
**August** [1] - 13:14
**authority** [2] - 9:22, 110:11
**authorize** [1] - 9:23
**autobahn** [1] - 63:2
**automatically** [1] - 11:1
**availability** [2] - 37:21, 38:2
**available** [2] - 58:8, 105:23
**Avenue** [5] - 1:24,

2:6, 2:9, 2:17, 115:14
**average** [2] - 32:3
**avoid** [4] - 9:14, 95:2, 95:4, 111:14
**avoided** [1] - 42:4
**aware** [2] - 66:17, 76:5
**awful** [2] - 27:19, 27:21
**AWS** [4] - 64:9, 85:17, 85:19, 91:3

## B

**B-O-R-A-N** [1] - 49:14
**back-and-forth** [2] - 14:1, 17:7
**back-door** [1] - 25:4
**back-end** [2] - 11:18, 11:20
**backing** [1] - 75:16
**backs** [1] - 105:6
**backwards** [1] - 104:13
**bad** [4] - 12:16, 26:7, 52:15
**badges** [1] - 99:12
**Baker** [1] - 3:23
**BAKER** [26] - 2:11, 3:22, 75:24, 76:5, 76:9, 77:14, 77:20, 77:23, 78:1, 78:18, 78:21, 79:5, 79:8, 79:10, 79:13, 79:18, 108:8, 108:11, 108:13, 108:16, 108:20, 109:9, 109:16, 112:9, 113:10, 113:23
**balance** [1] - 59:2
**ball** [1] - 92:17
**BAM** [148] - 2:2, 3:9, 3:14, 4:18, 4:20, 6:5, 7:7, 7:12, 8:17, 9:10, 10:5, 10:13, 10:14, 10:17, 11:9, 12:11, 13:8, 14:4, 14:21, 15:11, 17:1, 17:4, 18:13, 18:24, 19:2, 20:7, 21:1, 22:3, 22:8, 22:19, 22:23, 24:9, 25:3, 26:2, 27:7, 27:10, 28:2, 29:22, 30:8, 31:13, 31:18, 32:1, 32:2, 33:19, 33:20, 33:22, 35:1, 35:11, 35:23, 37:16, 45:15, 46:1, 46:4,

46:10, 46:21, 46:24, 47:4, 47:7, 47:10, 47:12, 47:22, 47:25, 48:16, 48:19, 48:20, 49:3, 49:8, 49:25, 50:18, 50:19, 50:23, 51:1, 51:8, 51:20, 52:2, 52:8, 53:15, 53:16, 54:15, 54:17, 54:18, 55:4, 55:24, 57:5, 57:7, 58:1, 58:8, 59:5, 62:17, 64:10, 64:11, 65:21, 66:12, 66:13, 66:22, 67:20, 68:3, 68:13, 68:22, 70:8, 70:19, 72:1, 75:2, 77:6, 77:12, 77:19, 78:11, 79:1, 81:23, 83:20, 84:10, 84:11, 84:14, 84:16, 84:20, 85:1, 86:8, 86:23, 87:1, 87:2, 87:11, 87:23, 89:6, 89:8, 90:1, 91:7, 91:16, 91:22, 94:13, 95:6, 95:18, 96:8, 97:23, 98:22, 103:7, 103:20, 104:12, 104:19, 106:9, 108:5, 108:14, 108:16, 108:21, 108:22, 111:20, 113:5, 113:18
**BAM's** [29] - 5:20, 6:9, 9:13, 11:7, 20:2, 28:8, 31:15, 32:9, 33:10, 33:22, 38:7, 45:21, 45:25, 46:3, 46:6, 46:21, 46:23, 47:4, 52:13, 56:1, 56:2, 59:25, 60:9, 78:12, 80:24, 85:19, 92:23, 99:8
**bank** [1] - 37:23
**banking** [3] - 31:25, 32:1, 73:4
**based** [3] - 27:2, 95:15, 95:23
**baseline** [1] - 93:15
**basic** [5] - 9:24, 23:16, 38:25, 39:13
**basis** [8] - 11:3, 29:25, 32:6, 40:16, 75:14, 91:4, 91:8, 100:19
**bear** [1] - 9:7
**beat** [1] - 26:7
**becoming** [1] - 6:7
**bed** [2] - 107:17, 111:17
**BEFORE** [1] - 1:11

**begin** [1] - 109:20
**beginning** [2] - 71:25, 85:18
**begins** [1] - 81:11
**behalf** [7] - 3:7, 3:8, 3:13, 3:23, 64:12, 65:21, 91:7
**behind** [3] - 19:11, 89:21, 103:21
**belief** [1] - 77:19
**belt** [1] - 27:4
**benchmark** [1] - 91:22
**bend** [1] - 104:13
**benefit** [3] - 33:17, 52:14, 89:17
**benefits** [1] - 55:5
**best** [11] - 42:24, 56:23, 58:18, 61:23, 71:12, 80:20, 86:13, 105:12, 107:14, 110:14, 115:7
**better** [7] - 21:15, 42:19, 51:16, 60:22, 88:17, 95:19, 96:12
**between** [5] - 19:24, 47:10, 49:8, 81:9, 93:8
**Beville** [1] - 3:15
**BEVILLE** [1] - 2:5
**beyond** [6] - 31:22, 36:25, 42:5, 50:23, 64:17, 88:22
**BHL** [107] - 4:25, 5:24, 6:7, 6:14, 8:24, 9:11, 9:16, 10:3, 10:6, 11:8, 11:9, 11:23, 11:25, 12:8, 12:24, 13:4, 13:8, 13:12, 14:20, 19:25, 20:1, 20:15, 20:17, 20:25, 22:16, 24:4, 26:7, 27:11, 33:7, 37:1, 37:2, 45:6, 45:9, 46:5, 47:10, 47:11, 48:15, 48:23, 49:8, 49:12, 50:16, 52:8, 53:1, 53:8, 54:13, 54:14, 54:19, 55:8, 57:5, 57:21, 60:6, 61:2, 62:19, 63:6, 64:9, 64:10, 64:20, 65:20, 66:2, 66:18, 68:12, 68:20, 68:21, 68:23, 69:17, 71:1, 71:17, 71:25, 74:2, 74:8, 75:15, 76:12, 78:11, 79:22, 79:23, 80:21, 81:7, 81:16, 82:1, 82:8, 82:14, 82:15,

83:4, 83:21, 86:24, 87:1, 87:9, 87:11, 87:23, 89:7, 91:6, 91:10, 95:7, 96:25, 99:7, 102:19, 103:20, 104:20, 106:10, 107:13, 109:21, 113:7, 113:20
**BHL's** [7] - 6:10, 46:7, 49:16, 52:14, 54:17, 55:1, 59:6
**BHL-affiliated** [1] - 20:17
**BHL-developed** [1] - 20:1
**big** [2] - 97:25, 99:4
**Bill** [1] - 3:15
**billion** [1] - 76:19
**bills** [1] - 60:16
**Binance** [6] - 3:3, 9:12, 9:17, 66:20, 67:24, 68:8
**BINANCE** [2] - 1:7, 1:22
**Binance's** [1] - 10:14
**binance.com** [3] - 33:17, 33:19, 33:25
**binance.us** [1] - 34:4
**bit** [16] - 7:9, 17:23, 19:10, 28:5, 28:12, 29:24, 35:18, 36:4, 36:20, 51:16, 53:3, 55:18, 87:12, 88:11, 92:3, 100:8
**black** [2] - 64:4, 65:11
**blame** [1] - 83:15
**blank** [1] - 51:24
**blanks** [1] - 50:20
**blind** [1] - 13:2
**blockchain** [2] - 10:23, 46:22
**blue** [1] - 16:9
**board** [4] - 70:20, 77:6, 77:17
**boardroom** [1] - 25:5
**bogeyman** [2] - 52:12, 58:13
**bogeymen** [1] - 103:21
**boils** [2] - 10:17, 10:19
**bond** [3] - 76:21, 83:13, 112:5
**Boran** [4] - 49:11, 49:14, 49:17, 66:11
**borne** [1] - 105:25
**bottom** [4] - 6:8, 94:11, 95:10, 112:17
**bottomed** [1] - 37:19

**boundaries** [2] - 87:20, 104:18
**box** [3] - 47:24, 64:4, 65:11
**break** [1] - 107:2
**breaking** [2] - 73:25, 111:19
**bridge** [1] - 98:23
**briefing** [1] - 40:3
**briefly** [1] - 84:1
**bring** [3] - 20:11, 66:15, 68:10
**broad** [5] - 45:21, 45:22, 70:24, 70:25, 72:11
**broken** [1] - 47:17
**bucket** [1] - 7:12
**buckets** [4] - 5:23, 7:10, 20:23, 99:4
**bugs** [1] - 101:24
**building** [1] - 99:12
**bulk** [1] - 109:8
**bull** [1] - 88:5
**bunch** [1] - 69:8
**burden** [5] - 28:9, 28:16, 59:3, 59:5, 112:15
**burdened** [2] - 28:19, 59:9
**burdensome** [3] - 16:23, 48:23, 73:22
**burner** [1] - 6:15
**business** [5] - 29:3, 31:15, 32:2, 60:17, 92:21
**button** [4] - 44:6, 44:9, 44:14, 74:8
**buttoned** [1] - 110:12
**buttons** [1] - 12:14
**BY** [1] - 2:15

**C**

**C-suite** [1] - 40:2
**Canada** [6] - 12:4, 18:22, 19:14, 19:25, 20:14, 66:12
**cannot** [3] - 9:12, 74:8, 87:2
**capital** [2] - 76:16, 76:22
**capricious** [1] - 93:25
**care** [4] - 75:9, 84:12, 85:1, 114:1
**careful** [1] - 111:23
**case** [9] - 32:10, 46:12, 58:25, 69:12,

73:25, 78:8, 83:16, 85:11, 105:19
**casting** [1] - 92:13
**catch** [1] - 9:16
**catch-all** [1] - 9:16
**categories** [1] - 35:1
**caused** [2] - 12:9, 21:11
**CEFFU** [5] - 37:12, 37:13, 37:18, 70:9, 70:13
**CEFFU's** [1] - 37:16
**center** [4] - 5:1, 6:2, 23:23, 92:21
**central** [1] - 110:2
**CEO** [3] - 22:7, 33:22, 77:5
**CEOs** [1] - 70:2
**certain** [6] - 15:14, 48:6, 49:23, 56:20, 66:12, 66:22
**certainly** [12] - 15:5, 44:14, 44:15, 55:11, 59:5, 81:15, 81:25, 84:19, 88:17, 89:11, 103:19, 110:10
**CERTIFICATE** [1] - 115:1
**certify** [1] - 115:4
**cetera** [1] - 113:12
**CFO** [1] - 22:7
**chambers** [1] - 26:3
**change** [9] - 16:10, 47:6, 65:12, 74:20, 74:21, 77:12, 109:25, 113:3
**changed** [5] - 16:6, 19:20, 19:23, 24:12, 75:4
**changes** [2] - 75:1
**changing** [1] - 85:4
**Changpeng** [1] - 3:24
**characterization** [1] - 18:18
**charges** [1] - 76:12
**chart** [1] - 112:16
**chat** [3] - 19:25, 20:1, 51:8
**chats** [7] - 36:24, 36:25, 51:13, 66:7, 68:13, 98:18
**check** [2] - 47:24, 59:18
**checks** [1] - 58:24
**CHENGPENG** [1] - 2:12
**circuit** [1] - 4:2
**circumstances** [1] - 105:21

**CISO** [11] - 11:22, 33:7, 37:17, 39:9, 39:11, 39:12, 39:20, 43:18, 43:22, 47:4, 63:16
**CISO's** [1] - 43:14
**cited** [5] - 15:13, 18:12, 18:14, 63:16, 64:6
**cites** [1] - 86:4
**citing** [1] - 32:2
**Civil** [2] - 1:3, 3:2
**claimed** [1] - 37:20
**claims** [1] - 32:13
**clarify** [2] - 10:18, 22:11
**clarity** [1] - 93:21
**claw** [2] - 60:13, 61:8
**clean** [2] - 4:4, 77:3
**cleaned** [1] - 53:2
**clear** [28] - 6:8, 6:20, 20:10, 27:24, 28:15, 29:15, 38:1, 43:19, 44:22, 53:8, 57:5, 66:19, 69:3, 77:7, 85:15, 89:19, 97:9, 98:6, 99:16, 100:13, 100:21, 102:10, 102:13, 102:14, 104:6, 108:14, 111:20
**cleared** [2] - 22:16, 66:15
**clearing** [3] - 12:4, 18:21, 46:21
**clearly** [4] - 32:24, 64:5, 78:11, 85:10
**client** [12] - 36:21, 49:4, 49:25, 51:23, 58:19, 60:11, 60:15, 61:6, 77:11, 100:14, 102:1, 105:20
**clients** [4] - 9:4, 16:10, 45:4, 92:20
**climb** [1] - 73:11
**clock** [1] - 90:20
**close** [7] - 19:18, 32:8, 87:3, 87:6, 89:5, 90:3, 102:3
**closely** [1] - 100:14
**code** [12] - 26:24, 35:20, 41:22, 58:7, 90:6, 101:22, 102:2, 105:16, 105:19, 106:3, 106:15
**cold** [1] - 85:23
**colleague** [1] - 35:7
**color** [3] - 8:22, 25:23, 35:18
**Columbia** [2] - 2:17, 115:13

**COLUMBIA** [1] - 1:1
**comfort** [10] - 25:13, 31:6, 44:19, 73:7, 74:25, 83:7, 83:14, 104:16, 104:17
**comfortable** [1] - 101:18
**coming** [4] - 4:1, 7:17, 49:1, 75:1, 76:19
**comment** [1] - 105:17
**Commission** [1] - 3:3
**COMMISSION** [3] - 1:4, 1:16, 1:19
**committed** [1] - 27:19
**communicate** [1] - 86:16
**communicated** [2] - 37:1, 37:23
**communicating** [1] - 72:1
**communication** [1] - 36:24
**communications** [10] - 19:18, 19:24, 20:4, 35:4, 35:19, 35:25, 36:18, 36:19, 37:14, 38:22
**companies** [1] - 67:18
**company** [20] - 23:23, 24:1, 28:17, 32:12, 40:8, 44:1, 50:16, 58:13, 58:20, 70:21, 72:24, 74:25, 75:8, 89:14, 100:15, 105:23, 109:14, 109:15, 110:3
**company's** [2] - 28:19, 44:15
**complaint** [4] - 65:8, 73:4, 73:9, 75:8
**complete** [2] - 94:18, 115:6
**compliance** [5] - 23:13, 23:15, 30:14, 34:1, 65:5
**compliant** [2] - 65:13, 66:24
**comply** [3] - 75:11, 75:13, 96:2
**compromised** [1] - 42:18
**computers** [1] - 58:2
**conceivable** [1] - 30:9
**concern** [13] - 24:6,

33:15, 42:1, 52:17, 67:2, 67:7, 73:24, 76:16, 76:23, 99:17, 99:18, 100:14, 110:10
**concerned** [5] - 39:10, 39:12, 59:14, 85:16, 105:14
**concerning** [1] - 30:14
**concerns** [15] - 28:9, 29:7, 30:6, 31:8, 34:2, 37:7, 37:9, 37:12, 37:20, 56:8, 56:14, 72:10, 74:10, 89:15
**concluded** [1] - 114:2
**concrete** [2] - 65:6, 94:25
**CONDUCTED** [1] - 1:11
**conducted** [1] - 37:13
**confer** [1] - 113:1
**CONFERENCE** [1] - 1:10
**conference** [2] - 38:5, 41:8
**confers** [1] - 88:17
**confidence** [1] - 25:16
**confident** [2] - 13:8, 63:20
**confirm** [4] - 39:20, 50:1, 108:24
**confirmed** [2] - 30:25, 37:15
**confirming** [1] - 35:13
**confronting** [1] - 46:8
**confusion** [2] - 70:13, 85:24
**Connecticut** [1] - 1:24
**consent** [21] - 9:5, 9:6, 11:13, 13:22, 20:5, 30:15, 32:22, 46:2, 46:20, 49:1, 53:11, 60:20, 65:4, 68:1, 72:19, 75:13, 86:2, 87:19, 96:2, 111:24
**consider** [6] - 27:17, 44:11, 51:23, 79:11, 112:9
**considered** [2] - 45:24, 50:5
**considering** [2] - 14:2, 112:14
**consistent** [2] -

119

37:16, 40:20
**consistently** [1] - 48:14
**constitutes** [1] - 115:4
**Constitution** [2] - 2:17, 115:14
**constraints** [1] - 103:2
**construct** [1] - 15:24
**constructively** [1] - 105:11
**CONT'D** [1] - 2:1
**contact** [1] - 53:18
**contacts** [1] - 20:14
**context** [4] - 28:13, 90:5, 91:18, 91:20
**contexts** [1] - 91:5
**continue** [11] - 15:1, 15:3, 29:25, 42:23, 52:11, 58:24, 74:10, 99:22, 110:20, 110:22
**continued** [2] - 43:20, 95:19
**continuing** [3] - 7:7, 26:14, 73:22
**contours** [2] - 94:21, 104:14
**contract** [1] - 64:14
**contribute** [1] - 96:17
**control** [38] - 9:11, 9:13, 9:15, 10:15, 11:4, 12:24, 18:12, 19:1, 23:4, 24:4, 24:5, 24:9, 29:13, 29:19, 29:22, 53:19, 63:23, 64:11, 65:20, 68:4, 68:14, 72:21, 73:20, 76:24, 79:24, 82:17, 85:21, 85:23, 91:6, 93:7, 93:9, 94:1, 97:23, 97:25, 103:6, 105:3, 105:4, 105:7
**controlled** [4] - 11:9, 29:17, 63:25, 93:19
**controlling** [2] - 18:14, 68:5
**controls** [10] - 11:25, 31:4, 53:15, 65:15, 67:13, 67:15, 67:19, 68:14, 75:12, 83:6
**conversation** [1] - 25:5
**conversations** [1] - 78:16
**conveyed** [1] - 50:11
**cop** [2] - 12:15, 12:16
**copy** [1] - 35:24

**corporate** [3] - 25:16, 66:10, 102:20
**correct** [2] - 10:18, 63:11
**correctly** [1] - 90:25
**cost** [1] - 92:21
**counsel** [17] - 5:4, 10:17, 13:8, 17:1, 20:2, 20:19, 21:8, 33:8, 69:4, 75:20, 83:11, 83:20, 96:23, 97:13, 113:18, 113:20, 113:22
**counsel's** [1] - 20:7
**couple** [4] - 31:15, 33:5, 34:13, 46:14
**course** [8] - 9:9, 13:21, 48:24, 59:23, 61:19, 62:9, 77:11, 106:8
**court** [4] - 4:2, 50:25, 56:9, 76:11
**COURT** [236] - 1:1, 3:10, 3:17, 3:25, 4:16, 4:22, 5:3, 5:5, 5:9, 5:11, 5:13, 5:16, 5:21, 5:25, 6:3, 6:6, 6:11, 6:17, 7:6, 7:11, 7:15, 7:18, 7:22, 8:6, 8:15, 8:19, 8:23, 9:9, 9:19, 10:1, 11:12, 12:15, 12:19, 13:3, 14:8, 14:13, 15:10, 17:19, 17:21, 18:22, 19:7, 21:13, 21:23, 22:10, 22:13, 22:21, 23:9, 23:18, 24:18, 24:22, 25:1, 25:6, 25:10, 25:21, 25:24, 27:6, 27:20, 27:22, 28:1, 28:3, 28:6, 28:11, 28:14, 33:6, 34:9, 34:11, 34:13, 34:19, 34:21, 34:24, 35:2, 35:8, 36:13, 36:22, 38:12, 38:17, 38:21, 39:1, 39:5, 39:8, 39:16, 39:25, 40:18, 40:21, 40:24, 41:2, 41:4, 41:11, 42:11, 42:16, 43:4, 43:7, 43:9, 43:12, 44:24, 45:2, 49:13, 49:15, 51:7, 51:14, 51:18, 51:25, 53:12, 54:1, 55:17, 55:20, 55:22, 56:1, 57:1, 57:18, 61:17, 61:24, 62:2, 62:4, 62:12, 63:9, 63:14, 63:17, 64:19,

64:22, 65:23, 66:4, 66:6, 66:8, 66:25, 67:2, 67:12, 67:14, 68:17, 68:19, 69:6, 69:9, 69:14, 69:21, 70:1, 70:5, 70:10, 70:23, 71:14, 71:17, 72:3, 72:11, 74:23, 75:18, 75:20, 76:1, 76:7, 77:10, 77:15, 77:21, 77:25, 78:3, 78:20, 79:2, 79:7, 79:9, 79:12, 79:15, 79:19, 80:10, 80:12, 80:16, 80:25, 81:4, 81:22, 84:2, 84:6, 84:13, 85:6, 85:12, 86:14, 86:18, 87:8, 90:6, 90:9, 90:11, 90:15, 90:19, 91:13, 91:19, 92:1, 92:5, 92:9, 92:12, 92:16, 92:19, 93:3, 93:22, 94:2, 94:8, 94:12, 96:23, 97:8, 97:12, 97:14, 98:4, 98:9, 98:12, 98:16, 98:20, 98:24, 99:3, 99:9, 99:14, 99:16, 100:12, 100:17, 100:21, 100:25, 101:20, 102:7, 102:12, 104:4, 104:9, 104:11, 105:13, 106:1, 107:21, 107:23, 107:25, 108:9, 108:12, 108:15, 108:19, 109:1, 109:11, 109:18, 112:10, 113:2, 113:7, 113:9, 113:11, 113:18, 113:20, 113:22, 113:24
**Court** [17] - 2:16, 2:16, 47:16, 55:9, 55:10, 55:12, 58:17, 68:2, 76:25, 83:14, 96:20, 96:21, 97:11, 98:13, 105:17, 115:12, 115:13
**Court's** [2] - 45:24, 50:5
**courtroom** [1] - 13:19
**COURTROOM** [1] - 3:1
**cover** [1] - 46:19
**covered** [3] - 38:23, 88:1, 88:2
**covers** [1] - 41:3

**crack** [1] - 8:2
**crazy** [1] - 13:21
**create** [2] - 10:5, 96:15
**created** [4] - 17:24, 58:4, 97:20, 103:4
**creates** [1] - 65:4
**credit** [2] - 83:9, 83:15
**criminal** [6] - 23:20, 76:18, 77:4, 78:1, 78:6, 111:10
**cripple** [1] - 32:12
**criticizing** [4] - 20:8, 23:8, 69:4, 90:23
**crossed** [1] - 8:12
**crossing** [1] - 63:7
**CRR** [3] - 2:15, 115:3, 115:12
**CRUTCHER** [1] - 1:24
**crypto** [4] - 5:20, 6:9, 9:23, 10:25
**cryptographic** [1] - 12:25
**cue** [1] - 81:10
**culture** [2] - 65:5, 84:15
**current** [3] - 75:6, 75:10, 77:18
**curt** [1] - 97:2
**cushion** [1] - 111:12
**custodians** [1] - 51:21
**custodied** [2] - 85:14, 85:16
**custody** [11] - 6:10, 9:11, 9:13, 9:15, 10:15, 30:9, 30:15, 44:18, 53:9, 53:14, 64:10
**customer** [2] - 9:5, 46:3
**customers** [3] - 64:12, 65:22, 91:7
**cut** [3] - 42:17, 62:5, 80:19
**CUTLER** [1] - 2:5

---

**D**

**D.C** [8] - 1:7, 1:20, 1:25, 2:7, 2:10, 2:14, 2:18, 115:14
**Damocles** [1] - 78:5
**Dan** [2] - 3:15, 3:19
**DANIEL** [1] - 1:22, 2:8
**data** [1] - 35:25

**date** [6] - 18:5, 30:18, 48:24, 73:9, 78:23, 112:23
**Dated** [1] - 115:10
**DAVIS** [1] - 2:8
**Davis** [1] - 3:15
**days** [3] - 36:4, 36:25, 52:21
**dead** [1] - 19:19
**deal** [5] - 6:21, 62:16, 70:3, 75:2, 80:5
**dealing** [1] - 31:16
**December** [12] - 14:25, 21:3, 22:4, 91:14, 96:7, 96:21, 96:22, 96:25, 97:6, 112:21, 112:25, 113:2, 113:13
**decide** [2] - 66:4, 71:23, 81:19
**decided** [1] - 16:14
**decision** [1] - 18:19
**decisions** [1] - 12:4
**declaration** [7] - 9:21, 29:23, 64:6, 64:8, 86:4, 111:4, 111:7
**declarations** [2] - 30:4, 30:14
**decreased** [1] - 32:5
**deeply** [1] - 85:1
**default** [1] - 46:16
**defeat** [1] - 26:5
**Defendant** [1] - 3:23
**DEFENDANT** [2] - 1:21, 2:11
**Defendants** [4] - 1:8, 3:9, 3:14, 9:2
**DEFENDANTS** [1] - 2:2
**defense** [1] - 21:8
**deferred** [3] - 20:7, 20:19, 22:7
**definition** [1] - 30:21
**definitive** [2] - 50:12, 50:15
**delay** [1] - 21:11
**deliver** [1] - 105:12
**demonstrated** [2] - 28:21, 79:6
**depose** [4] - 40:13, 47:14, 67:23, 71:18
**deposed** [4] - 18:17, 19:19, 47:13, 47:20
**deposition** [9] - 11:17, 14:23, 15:9, 39:14, 44:8, 71:21, 83:4, 91:23, 93:1
**depositions** [31] - 7:13, 13:20, 14:22,

19:1, 19:8, 21:3, 22:4, 22:17, 22:24, 26:18, 27:24, 30:18, 30:20, 33:1, 35:4, 35:15, 38:4, 38:5, 40:23, 41:3, 43:13, 43:17, 44:4, 46:13, 46:15, 78:19, 84:24, 91:12, 91:25, 112:13

**deputy** [5] - 11:22, 43:14, 43:17, 43:22, 63:16

**DEPUTY** [1] - 3:1

**describe** [1] - 5:23

**described** [2] - 63:21, 71:7

**describes** [1] - 65:8

**describing** [1] - 70:14

**description** [1] - 65:9

**design** [1] - 101:23

**designate** [2] - 15:20, 16:13

**designations** [2] - 16:3, 16:7

**despite** [3] - 10:14, 30:22, 49:2

**destroy** [1] - 10:3

**detail** [5] - 7:9, 13:9, 17:7, 42:2, 42:5

**details** [10] - 5:19, 20:7, 20:18, 20:19, 20:20, 68:11, 68:12, 69:5, 96:19, 104:2

**detect** [1] - 55:24

**determination** [1] - 32:9

**developed** [1] - 20:1

**developments** [4] - 64:5, 65:2, 65:3, 74:20

**devices** [1] - 30:12

**devil's** [1] - 104:2

**difference** [1] - 93:8

**different** [12] - 11:1, 16:15, 21:10, 24:15, 66:14, 70:4, 83:16, 94:4, 97:23, 101:10, 101:11, 107:9

**difficult** [3] - 16:10, 31:22, 56:6

**difficulty** [1] - 36:18

**diligence** [2] - 66:21, 99:22

**diligently** [2] - 45:4, 49:3

**dinner** [1] - 21:14

**direct** [1] - 104:25

**directed** [3] - 74:20,

76:6, 80:9

**direction** [5] - 14:18, 56:19, 102:11, 104:11, 113:15

**directions** [1] - 18:20

**directly** [1] - 29:10

**director** [2] - 33:20, 108:17

**disagree** [5] - 44:5, 44:21, 47:14, 68:16, 85:10

**disagreements** [1] - 8:3

**disclosure** [1] - 20:13

**discovery** [43] - 10:13, 18:10, 23:16, 30:1, 30:5, 30:25, 31:11, 31:16, 33:14, 34:8, 45:15, 45:19, 46:1, 46:4, 46:15, 48:23, 48:24, 49:3, 49:21, 50:24, 50:25, 54:22, 60:9, 66:1, 68:22, 71:2, 71:19, 74:5, 76:2, 78:14, 79:4, 79:8, 80:3, 80:8, 81:20, 82:13, 83:1, 86:3, 91:17, 95:14, 100:2, 109:19, 110:16

**discrepancy** [1] - 46:24

**discussed** [2] - 4:20, 40:2

**discussing** [2] - 37:2, 49:6

**discussions** [1] - 48:20

**disdain** [1] - 65:10

**disposition** [2] - 24:10, 89:18

**dispute** [4] - 8:20, 15:4, 18:17, 22:12

**disputed** [1] - 11:6

**disputes** [1] - 8:21

**disputing** [1] - 62:20

**dissipate** [1] - 73:2

**dissipated** [1] - 73:18

**dissipation** [3] - 58:16, 72:20, 73:10

**distinguish** [1] - 81:9

**district** [3] - 50:25, 78:9, 115:13

**DISTRICT** [2] - 1:1, 1:1

**District** [3] - 2:16, 2:17, 115:13

**divest** [1] - 78:2

**divested** [1] - 58:21

**document** [17] - 6:13, 7:19, 7:25, 8:12, 13:14, 14:2, 35:10, 50:12, 50:13, 54:24, 56:6, 56:9, 56:11, 56:24, 57:2, 101:14, 108:2

**documentation** [2] - 100:15, 100:24

**documented** [1] - 28:20

**documents** [47] - 8:8, 14:5, 16:14, 16:15, 24:7, 30:8, 35:3, 35:13, 35:14, 35:19, 35:21, 35:24, 36:2, 36:8, 36:10, 36:11, 36:16, 37:4, 37:7, 37:13, 37:14, 46:5, 46:6, 46:10, 46:18, 48:17, 49:9, 49:20, 66:16, 71:8, 78:22, 82:4, 90:13, 90:14, 90:17, 95:13, 97:18, 97:19, 98:7, 99:2, 99:6, 99:23, 101:7, 101:11, 101:18, 102:16

**domesticate** [1] - 19:13

**done** [39] - 7:5, 8:1, 12:11, 17:4, 23:2, 26:9, 26:20, 27:10, 27:21, 27:23, 30:8, 32:9, 32:21, 35:1, 35:16, 38:8, 38:15, 39:21, 42:7, 42:20, 43:1, 52:3, 52:25, 55:3, 56:21, 56:22, 66:21, 72:24, 79:3, 83:13, 84:23, 87:4, 94:15, 95:18, 101:10, 101:13, 107:16, 109:14, 110:3

**door** [7] - 25:4, 47:11, 54:9, 59:25, 61:4, 82:22, 106:4

**DORR** [1] - 2:6

**double** [1] - 13:2

**double-blind** [1] - 13:2

**doubt** [1] - 9:14

**down** [10] - 10:19, 15:4, 16:18, 31:14, 57:19, 61:6, 84:10, 103:24, 108:16

**dozen** [1] - 30:10, 30:14, 46:14

**draft** [1] - 111:7

**dress** [1] - 61:6

**drowning** [1] - 32:19

**due** [4] - 21:3, 59:23, 61:19, 99:22

**Dunn** [1] - 3:19

**DUNN** [1] - 1:24

**during** [5] - 20:4, 44:7, 53:10, 77:1, 84:24

**dynamics** [1] - 24:13

---

**E**

---

**easier** [1] - 87:23

**easily** [1] - 74:3

**easy** [2] - 74:8, 82:12

**echoed** [1] - 87:12

**economic** [1] - 109:9

**EDWARDS** [2] - 2:15, 115:3

**Edwards** [1] - 115:12

**effective** [1] - 108:17

**effectively** [2] - 31:25, 34:1

**efficient** [2] - 4:19, 107:5

**effort** [1] - 51:5

**eight** [5] - 14:5, 14:12, 38:5, 71:8, 86:6

**either** [4] - 17:14, 31:25, 35:12, 86:15

**Eleventh** [1] - 2:13

**elucidation** [1] - 77:9

**email** [1] - 35:25

**emails** [1] - 71:24

**emergency** [2] - 73:25, 106:9

**EMMETT** [1] - 1:15

**employee** [3] - 11:25, 19:2, 22:23

**employees** [16] - 18:13, 20:15, 31:21, 35:23, 40:2, 40:4, 40:9, 40:15, 48:15, 66:12, 66:22, 67:19, 67:22, 68:4, 91:16, 97:24

**encountering** [1] - 18:10

**encourage** [2] - 87:22, 89:1

**encrypted** [1] - 54:6

**end** [31] - 11:18, 11:20, 18:2, 21:21, 23:3, 27:11, 27:25, 32:21, 34:8, 41:17, 41:20, 42:5, 54:11, 54:12, 55:14, 56:21, 57:21, 61:21, 62:10,

**drowning** [1] - 32:19

72:16, 83:11, 90:1, 93:11, 95:8, 95:20, 104:17, 105:10, 108:1, 109:20, 113:14

**endeavored** [1] - 49:18

**ended** [2] - 31:25, 103:3

**ending** [2] - 21:6, 59:11

**ends** [1] - 81:11

**enforcement** [1] - 32:11

**engineer** [6] - 101:22, 102:16, 106:2, 106:13, 109:22, 109:24

**engineers** [4] - 64:15, 101:18, 105:15, 106:23

**enormous** [1] - 74:7

**enough's** [1] - 107:4

**enter** [1] - 59:24

**entire** [1] - 106:15

**entities** [4] - 9:12, 9:17, 68:7, 81:9

**entity** [10] - 20:17, 20:25, 24:8, 49:11, 58:14, 65:8, 65:9, 66:11, 66:20, 84:18

**environment** [8] - 11:7, 11:8, 29:21, 70:14, 85:17, 85:19, 91:3, 97:21

**equally** [1] - 104:20

**Eric** [2] - 11:17, 17:22

**ESQ** [13] - 1:15, 1:18, 1:21, 1:22, 1:22, 1:23, 1:23, 2:2, 2:4, 2:5, 2:8, 2:11, 2:12

**essentially** [2] - 33:14, 41:16

**established** [1] - 64:9

**et** [3] - 1:7, 3:3, 113:12

**eve** [1] - 8:9

**event** [1] - 22:2

**events** [1] - 4:14

**eventually** [1] - 72:14

**evidence** [2] - 9:3, 30:23

**evolve** [1] - 60:2, 103:6

**evolved** [1] - 23:15

**evolving** [1] - 23:13

**exact** [1] - 30:22

**exactly** [10] - 11:20,

30:25, 32:15, 41:21, 42:6, 43:17, 76:10, 76:22, 98:7, 104:6
**example** [6] - 11:5, 17:22, 47:24, 54:3, 57:22, 82:19
**examples** [2] - 17:8, 41:18
**exceeds** [1] - 46:15
**except** [2] - 12:6, 79:24
**exceptionally** [2] - 35:21, 84:23
**exceptions** [1] - 35:20
**EXCHANGE** [3] - 1:3, 1:16, 1:19
**Exchange** [4] - 3:3
**exclusive** [4] - 9:11, 10:15, 11:4, 11:11
**exercise** [3] - 31:12, 44:12, 44:16
**exercised** [1] - 33:21
**exist** [1] - 59:2
**expansive** [1] - 74:6
**expect** [4] - 14:25, 21:6, 21:7, 65:24
**expected** [2] - 7:25, 36:20
**expecting** [1] - 65:25
**expedited** [6] - 30:5, 33:14, 34:8, 45:19, 50:25, 100:1
**expenses** [2] - 30:16, 30:17
**expert** [3] - 24:23, 107:7
**experts** [2] - 102:8, 107:12
**explain** [10] - 8:25, 13:1, 13:9, 13:11, 14:16, 28:9, 56:17, 107:17
**explained** [5] - 47:16, 48:4, 50:18, 64:7, 102:10
**explicit** [1] - 89:13
**explicitly** [1] - 89:16
**exploring** [1] - 51:10
**expose** [1] - 105:22
**express** [1] - 45:4
**expressly** [1] - 47:11
**expropriating** [1] - 78:24
**extant** [1] - 87:5
**extensive** [7] - 35:23, 36:15, 37:13, 47:19, 51:2, 51:3, 55:23
**extent** [3] - 27:12,

85:16, 89:12
**extra** [1] - 4:3
**extraordinarily** [1] - 76:14
**extremely** [1] - 84:25
**eyes** [1] - 19:3

---

## F

**face** [1] - 16:9
**facilitate** [1] - 53:15
**facilitating** [1] - 12:12
**fact** [23] - 11:6, 23:14, 23:20, 27:24, 30:24, 32:25, 33:14, 35:15, 40:14, 49:2, 60:10, 64:13, 70:11, 75:16, 85:16, 91:25, 93:1, 94:15, 95:15, 103:22, 105:5, 105:21, 112:12
**factor** [1] - 78:9
**facts** [4] - 62:20, 62:21, 66:1, 83:19
**factual** [2] - 40:1, 80:23
**fair** [9] - 4:16, 18:18, 21:20, 23:9, 41:2, 80:4, 92:22, 106:18, 106:20
**faith** [6] - 30:5, 51:4, 71:13, 74:14, 85:8, 88:11
**fake** [1] - 70:7
**far** [3] - 44:4, 79:5, 98:25
**FARER** [1] - 1:18
**Farer** [5] - 12:15, 13:1, 24:6, 24:23, 80:16
**FARUQUI** [1] - 1:11
**fast** [1] - 50:16
**Feagles** [1] - 3:20
**FEAGLES** [1] - 1:23
**fear** [5] - 24:7, 52:11, 60:12, 73:1, 103:23
**fears** [1] - 59:3
**federal** [1] - 46:17
**felt** [1] - 38:21
**few** [11] - 7:17, 8:13, 14:23, 15:2, 15:16, 27:9, 35:6, 35:12, 35:16, 97:18, 103:10
**field** [3] - 87:19, 102:22, 112:7
**fifth** [1] - 49:21
**fight** [1] - 107:11
**figure** [4] - 28:25,

61:22, 69:16, 99:22
**figuring** [3] - 92:25, 96:9, 103:1
**filed** [4] - 13:14, 25:17, 31:14, 40:12
**filing** [5] - 32:11, 73:3, 73:8, 75:8, 112:25
**filings** [3] - 25:12, 81:11, 81:12
**fill** [6] - 49:6, 49:18, 50:3, 50:21, 51:24
**filled** [1] - 88:23
**final** [3] - 43:5, 91:23, 93:1
**fine** [9] - 20:21, 80:21, 96:10, 97:3, 99:10, 112:4, 113:4, 113:5, 113:6
**finer** [1] - 21:23
**finish** [2] - 26:18, 87:21
**finished** [1] - 89:23
**first** [18] - 4:19, 4:24, 5:6, 8:2, 8:24, 16:1, 16:20, 18:16, 20:20, 29:23, 45:17, 48:1, 60:25, 62:13, 68:22, 79:22, 81:16
**five** [3] - 30:19, 38:8, 46:14
**fix** [1] - 74:8
**flag** [1] - 74:7
**flagged** [5] - 15:19, 23:12, 26:9, 27:2, 87:11
**flesh** [2] - 101:2, 108:5
**flexibility** [1] - 71:5
**flexible** [1] - 90:22
**flight** [1] - 76:16
**flip** [3] - 42:16, 59:24, 61:20
**flown** [1] - 112:3
**focus** [6] - 71:3, 78:10, 82:1, 83:21, 87:10, 93:11
**focused** [9] - 9:8, 10:12, 33:13, 46:4, 51:1, 68:18, 68:19, 83:1, 84:4, 88:13, 104:5
**focuses** [1] - 5:23
**folks** [11] - 19:24, 20:16, 60:7, 66:13, 71:17, 72:1, 82:15, 83:5, 107:1, 107:9, 109:21
**follow** [2] - 10:4, 72:19

followup [2] - 22:1, 23:5
**foot** [1] - 107:14
**FOR** [5] - 1:1, 1:15, 1:21, 2:2, 2:11
**foregoing** [1] - 115:4
**foregone** [1] - 108:17
**foreign** [3] - 36:1, 58:14, 58:15
**foreign-language** [1] - 36:1
**forest** [1] - 52:19
**forever** [2] - 23:16, 79:21
**forgot** [1] - 108:9
**form** [2] - 21:2, 71:12
**formalities** [1] - 66:10
**former** [5] - 20:15, 38:6, 40:2, 40:9, 40:14
**forth** [3] - 14:1, 17:7, 87:23
**forward** [8] - 23:24, 27:16, 40:15, 77:24, 82:7, 82:10, 107:14, 110:13
**forward-looking** [1] - 23:24
**four** [3] - 14:22, 18:15, 48:1
**frames** [1] - 10:10
**frankly** [2] - 31:10, 32:17
**freeze** [1] - 58:2
**FROM** [1] - 3:6
**front** [7] - 5:1, 6:2, 23:22, 50:21, 94:13, 95:1, 100:24
**Front** [1] - 89:24
**fruitful** [1] - 19:8
**frustration** [2] - 43:16, 86:7
**full** [2] - 4:12, 115:5
**fundamental** [2] - 59:15, 68:1
**fundamentally** [1] - 13:18
**fundamentals** [1] - 10:2
**future** [4] - 25:13, 65:5, 75:2, 75:12

---

## G

**gap** [5] - 49:18, 50:3, 51:9, 61:7, 88:23
**Gap** [1] - 3:6

**gaping** [1] - 6:20
**gaps** [4] - 49:4, 49:5, 94:23, 94:25
**general** [1] - 37:23
**generally** [1] - 104:22
**generates** [1] - 47:7
**GIBSON** [1] - 1:24
**Gibson** [3] - 3:19, 26:8, 61:6
**given** [11] - 4:20, 15:21, 17:8, 38:14, 39:22, 64:4, 86:13, 95:1, 96:6, 103:16, 110:2
**glad** [2] - 12:21, 56:8
**glitches** [1] - 12:2
**good-faith** [2] - 51:4, 71:13
**Google** [1] - 99:25
**Government** [8] - 57:19, 62:12, 78:15, 79:5, 79:16, 89:18, 89:21, 94:16
**Government's** [1] - 57:9
**granted** [1] - 6:15
**great** [4] - 3:25, 12:11, 12:16, 12:20, 19:4, 76:8, 93:3, 97:14, 98:16, 99:24, 107:25, 108:15, 109:1, 112:10
**greater** [1] - 78:5
**grew** [1] - 50:16
**grievances** [1] - 21:15
**Grime** [1] - 3:20
**GRIME** [1] - 1:22
**ground** [1] - 103:24
**grounds** [1] - 38:19
**growing** [1] - 93:25
**guardrails** [2] - 62:25, 103:3
**guess** [14] - 4:4, 21:24, 27:16, 43:10, 54:1, 61:25, 63:8, 71:18, 72:25, 75:21, 76:1, 78:13, 91:17, 94:6
**guide** [2] - 50:12, 50:15
**guilty** [5] - 72:24, 73:5, 76:12, 84:15, 89:15
**gulf** [1] - 98:23
**gun** [1] - 93:12
**guy** [2] - 26:7, 79:23
**guys** [5] - 4:1, 27:12, 29:2, 80:17, 107:18

# H

hack [2] - 59:20, 106:6
hacking [1] - 81:18
HALE [1] - 2:5
Hale [1] - 3:14
half [4] - 30:13, 32:5, 66:11, 66:22
hamster [3] - 55:19, 57:8, 71:7
handle [1] - 26:21
happy [23] - 7:16, 16:11, 16:25, 20:8, 21:4, 25:19, 25:22, 26:2, 26:6, 26:7, 34:14, 38:11, 44:25, 58:10, 61:13, 73:14, 75:24, 77:9, 80:17, 92:7, 96:16, 112:9, 113:1
hard [17] - 22:1, 23:8, 35:24, 70:15, 75:10, 83:7, 84:25, 88:7, 97:17, 100:22, 101:2, 102:14, 103:12, 106:12, 111:18, 111:19, 111:21
hard-copy [1] - 35:24
harder [3] - 73:11, 73:14, 73:21
hardline [1] - 7:1
harm [2] - 28:10, 31:13
harmony [1] - 86:24
hash [1] - 16:18
head [6] - 12:3, 18:20, 38:7, 46:21, 93:12, 106:21
headlines [1] - 35:10
heads [1] - 13:20
hear [57] - 7:2, 7:16, 12:21, 17:1, 19:20, 20:20, 21:7, 23:18, 26:2, 26:12, 26:24, 28:14, 28:22, 28:23, 29:24, 42:16, 42:22, 52:23, 57:18, 58:10, 60:12, 60:24, 61:13, 61:14, 61:17, 61:22, 61:24, 61:25, 62:4, 62:6, 62:10, 62:12, 62:14, 65:23, 67:25, 69:15, 72:9, 73:14, 75:20, 77:12, 78:15, 79:15, 83:20, 86:18, 86:19, 89:14, 90:3,
91:15, 96:5, 96:20, 96:21, 99:3, 100:21, 107:12, 111:17
heard [19] - 12:10, 45:12, 46:9, 47:21, 48:19, 51:8, 56:13, 65:10, 67:25, 83:24, 84:19, 90:23, 90:24, 94:15, 95:9, 97:15, 98:13, 98:17
hearing [20] - 20:21, 24:5, 27:2, 28:16, 34:14, 34:22, 40:7, 49:5, 52:23, 58:12, 62:13, 70:7, 76:15, 76:16, 95:5, 95:19, 101:3, 104:7, 105:18, 112:21
hearings [2] - 15:12, 81:2
heartburn [1] - 53:4
held [8] - 13:10, 63:13, 63:16, 63:19, 63:21, 64:2, 70:9, 91:2
help [7] - 39:17, 53:21, 54:6, 94:20, 104:23, 112:16, 112:18
helped [2] - 10:8, 10:9
helpful [16] - 12:12, 45:3, 57:3, 70:22, 81:22, 84:24, 89:1, 94:24, 97:4, 99:19, 100:3, 104:15, 107:20, 108:3, 110:23, 113:25
helpfully [1] - 10:9
helps [2] - 95:2, 95:3
hereby [1] - 115:3
hesitation [1] - 67:11
high [2] - 4:3, 24:16
high-level [1] - 24:16
highlighted [1] - 73:24
highway [1] - 63:1
hill [1] - 73:11
himself [2] - 83:10, 112:4
historical [3] - 24:1, 100:19, 111:5
historically [2] - 52:4, 82:10
history [2] - 51:8, 82:20
hit [1] - 18:2
ho [1] - 44:16
ho-hum [1] - 44:16
hold [2] - 56:8, 79:21
holder [1] - 38:7
holders [11] - 18:12, 18:15, 18:16, 38:6, 44:6, 44:17, 47:13, 47:14, 47:21, 47:23, 48:1
holding [1] - 91:10
HOLDINGS [2] - 1:7, 1:22
Holdings [1] - 3:3
holds [1] - 53:16
holes [1] - 6:21
holiday [1] - 12:20
home [2] - 54:2, 66:1
homemade [1] - 20:1
homing [1] - 5:18
Honor [48] - 3:1, 3:22, 4:15, 4:23, 29:8, 31:19, 32:9, 32:24, 33:3, 33:12, 34:18, 38:20, 38:25, 41:1, 41:6, 41:8, 43:3, 45:1, 45:8, 45:20, 46:2, 50:7, 51:6, 51:11, 53:7, 55:12, 56:3, 61:18, 62:11, 76:9, 76:23, 79:18, 80:7, 86:5, 93:2, 100:13, 103:25, 107:20, 108:25, 109:10, 109:17, 113:5, 113:8, 113:10, 113:17, 113:19, 113:21, 113:23
HONORABLE [1] - 1:11
hood [2] - 12:14, 19:12
hope [8] - 4:5, 7:3, 53:20, 54:2, 64:3, 77:2, 84:9, 93:12
hopeful [10] - 7:2, 15:6, 39:22, 52:16, 55:11, 89:3, 94:15, 97:15, 106:1, 109:19
hopefully [7] - 27:2, 65:4, 78:12, 82:8, 83:2, 89:21, 113:13
hoping [9] - 6:25, 54:11, 55:10, 64:19, 66:15, 71:17, 103:10, 104:20, 112:6
horizon [1] - 22:2
horns [1] - 88:5
horribles [2] - 72:23, 103:22
hosts [1] - 64:10
hot [1] - 63:24
hour [1] - 63:3
hours [1] - 86:6
Hudson [1] - 2:3
huge [1] - 74:7
hum [1] - 44:16
human [1] - 92:14
hundred [1] - 52:20
hundreds [3] - 31:20, 36:10, 46:11
hurt [1] - 94:19
hypothetical [3] - 31:8, 57:20, 105:24
hypotheticals [1] - 95:16

# I

idea [5] - 12:14, 63:15, 63:18, 63:20, 64:2
ideally [1] - 92:25
ideas [1] - 80:17
identified [3] - 48:6, 52:22, 100:5
identify [1] - 35:13, 37:15, 49:4, 98:14
III [1] - 2:11
illuminating [1] - 17:2
imagine [10] - 27:1, 60:15, 82:12, 97:17, 102:14, 103:12, 106:12, 111:18, 111:20, 111:21
immediately [1] - 31:15
impact [1] - 31:18
impacted [1] - 83:18
impacts [2] - 31:19, 32:7
imperfect [1] - 73:19
implementing [1] - 34:1
implication [1] - 82:5
important [5] - 10:10, 12:18, 28:22, 44:18, 44:23
impose [1] - 73:22
impossible [1] - 59:19
impression [1] - 81:13
improved [1] - 31:4
improvements [1] - 19:9
IN [1] - 1:11
inability [2] - 28:8, 52:25
inaccurate [1] - 89:8
inappropriate [1] - 33:16
incentives [2] - 67:16, 93:18
inclinations [1] - 7:4
include [2] - 46:11, 49:9
included [1] - 41:21
including [1] - 71:21
inconsistent [2] - 11:13, 86:2
increasingly [1] - 6:7
incredibly [1] - 65:11
incrementally [1] - 59:13
indeed [1] - 24:9
independent [1] - 18:19
indicate [2] - 84:15, 89:7
indication [1] - 73:10
indignation [1] - 21:20
indiscernible [4] - 15:25, 36:12, 55:2, 109:5
indiscernible] [1] - 51:25
individuals [3] - 39:7, 40:14, 58:15
information [26] - 15:2, 23:10, 25:19, 47:15, 47:19, 48:11, 48:12, 48:13, 64:1, 69:11, 73:19, 81:17, 83:2, 83:8, 84:11, 84:21, 86:13, 88:15, 90:24, 90:25, 91:9, 91:11, 92:15, 94:5, 94:6, 105:23
infrastructure [1] - 102:9
initial [2] - 76:15, 76:16
initiated [1] - 47:25
innocuous [3] - 66:13, 94:7, 103:19
insecure [1] - 44:2
inside [1] - 54:8
insinuation [1] - 63:11
inspected [1] - 17:5
inspecting [1] - 48:20
inspection [13] - 8:18, 12:21, 17:3, 26:23, 27:3, 41:7, 41:9, 42:2, 42:9, 42:25, 87:4, 89:3
inspections [8] - 12:12, 27:25, 30:11, 30:13, 33:1, 35:5,

35:16, 41:6
  **instance** [4] - 12:7, 16:20, 103:16, 111:3
  **instead** [1] - 75:11
  **insufficient** [3] - 41:10, 41:25, 42:3
  **interacts** [1] - 11:24
  **interchangeably** [1] - 69:25
  **interest** [1] - 109:6
  **interface** [2] - 10:20, 17:17
  **intermingling** [1] - 102:19
  **internal** [3] - 46:23, 48:7, 67:18
  **interrogatories** [2] - 30:10, 83:3
  **intertwined** [2] - 93:6, 93:10
  **intervene** [2] - 55:10, 55:12
  **interviews** [1] - 35:23
  **introduce** [1] - 3:5
  **intuition** [1] - 96:11
  **inures** [1] - 52:13
  **invasive** [1] - 111:15
  **invented** [1] - 50:17
  **investigated** [1] - 53:5
  **investigation** [4] - 36:12, 46:12, 53:10, 95:25
  **involved** [2] - 35:22, 82:6
  **involvement** [1] - 81:6
  **iPhone** [3] - 53:19, 53:20, 54:20
  **issue** [29] - 19:10, 22:7, 26:21, 37:1, 38:1, 38:3, 38:10, 44:3, 46:8, 51:12, 52:17, 53:20, 62:16, 66:2, 67:8, 67:20, 68:15, 69:23, 78:12, 80:20, 84:5, 85:5, 87:25, 89:6, 93:13, 93:14, 96:24, 98:2, 110:13
  **issued** [1] - 80:3
  **issues** [27] - 5:17, 5:19, 9:22, 14:10, 15:1, 23:1, 27:7, 29:10, 29:13, 30:1, 36:16, 37:24, 40:17, 46:19, 48:5, 53:17, 55:25, 67:9, 71:3, 77:8, 87:5, 90:22,

97:9, 98:1, 98:6, 98:7, 99:1
  **it'll** [7] - 10:25, 20:20, 75:3, 91:25, 92:3, 112:18
  **iterative** [1] - 81:25
  **itself** [2] - 44:2, 91:8

**J**

  **Jackson** [2] - 60:22, 72:17
  **Jason** [2] - 3:18, 45:8
  **JASON** [1] - 1:21
  **jaws** [1] - 26:5
  **JENNIFER** [1] - 1:18
  **job** [6] - 52:3, 57:9, 57:12, 104:16, 105:2
  **JOHN** [1] - 1:15
  **join** [1] - 110:19
  **joint** [11] - 7:24, 15:12, 15:15, 15:17, 15:18, 16:2, 91:23, 93:1, 96:8, 96:17, 97:1
  **joking** [1] - 14:6
  **JUDGE** [1] - 1:12
  **judge** [4] - 50:25, 78:9, 111:10, 112:2
  **Judge** [7] - 3:18, 27:18, 29:20, 36:16, 52:19, 60:22, 72:17
  **judgment** [1] - 44:12
  **juggle** [1] - 29:4
  **jump** [1] - 80:17
  **jumped** [1] - 13:21
  **June** [5] - 29:23, 30:1, 30:3, 64:6, 64:8
  **Jurassic** [1] - 60:3
  **jurisdiction** [2] - 76:25, 83:10

**K**

  **KATTEN** [1] - 2:8
  **Katten** [1] - 3:16
  **keep** [16] - 21:16, 29:2, 31:11, 31:22, 34:14, 52:1, 52:14, 59:9, 83:5, 84:4, 85:4, 86:7, 95:5, 101:23, 104:7, 113:25
  **keeping** [1] - 24:10
  **keeps** [1] - 55:21
  **Kellogg** [3] - 9:21, 11:17, 17:22
  **Kellogg's** [2] - 16:12,

86:4
  **key** [7] - 9:23, 18:12, 19:24, 20:14, 66:2, 68:15, 85:23
  **keys** [29] - 9:16, 9:20, 10:3, 10:5, 10:6, 10:16, 11:6, 11:7, 11:23, 11:24, 12:1, 12:24, 13:5, 13:22, 22:20, 29:13, 29:17, 29:21, 47:15, 63:12, 63:15, 63:18, 63:21, 63:23, 64:2, 68:3, 110:7
  **kick** [1] - 17:23
  **kind** [17] - 6:12, 6:13, 13:18, 15:23, 17:24, 20:21, 21:1, 21:6, 40:2, 40:9, 42:21, 55:10, 61:11, 67:17, 70:14, 80:5, 111:1
  **knees** [1] - 62:5
  **knowing** [2] - 69:5, 112:2
  **knowledge** [6] - 18:3, 43:21, 54:4, 54:25, 88:15, 97:20
  **knowledgeable** [6] - 8:13, 11, 39:6, 39:13, 39:21, 43:18, 43:19
  **knows** [9] - 17:15, 19:11, 32:24, 34:3, 47:16, 54:21, 63:12, 82:18, 82:19
  **Kristek** [1] - 3:20
  **KRISTEK** [1] - 1:23

**L**

  **lack** [3] - 52:12, 54:4, 93:21
  **lady** [1] - 18:22
  **landscape** [1] - 75:4
  **lane** [1] - 63:1
  **language** [2] - 36:1, 66:17
  **large** [3] - 59:5, 88:12, 109:3
  **larger** [1] - 24:3
  **Laroche** [13] - 3:8, 3:13, 45:13, 45:16, 46:9, 63:11, 63:12, 63:15, 64:6, 67:21, 68:11, 90:23, 92:6
  **LAROCHE** [76] - 2:2, 3:8, 3:13, 4:18, 5:8, 5:10, 27:5, 27:18, 27:21, 27:23, 28:2, 28:4, 28:7, 28:12,

29:8, 33:7, 34:10, 34:12, 34:17, 34:20, 34:22, 34:25, 35:3, 35:9, 36:14, 36:23, 38:13, 38:18, 38:24, 39:2, 39:6, 39:9, 39:17, 40:11, 40:19, 40:22, 41:1, 41:3, 41:5, 41:12, 42:12, 43:2, 43:5, 43:8, 43:10, 43:13, 45:1, 49:14, 49:16, 51:11, 51:15, 51:19, 53:7, 53:13, 55:11, 55:18, 55:21, 55:23, 56:2, 57:17, 61:16, 61:18, 62:1, 62:3, 62:11, 84:1, 84:4, 84:7, 84:19, 85:7, 85:13, 86:15, 87:7, 93:2, 113:5, 113:19
  **last** [36] - 4:3, 4:8, 4:14, 5:13, 7:14, 7:24, 12:23, 13:25, 15:15, 20:3, 20:16, 25:12, 25:17, 28:16, 30:11, 33:4, 38:4, 40:7, 41:5, 41:8, 51:12, 52:23, 52:24, 55:2, 58:12, 65:10, 70:8, 74:20, 74:24, 75:8, 76:11, 81:12, 95:19, 98:17, 107:16, 108:17
  **late** [1] - 92:3
  **LATHAM** [1] - 2:12
  **law** [5] - 65:10, 75:7, 75:9, 77:1, 84:12
  **lawyers** [2] - 58:13, 64:14
  **lay** [3] - 28:21, 87:14, 87:15
  **laying** [1] - 58:20
  **layoffs** [1] - 28:20
  **lead** [2] - 55:15, 57:15
  **leading** [5] - 8:8, 19:9, 25:16, 44:7, 109:12
  **leads** [1] - 62:9
  **leaf** [1] - 65:2
  **leaning** [1] - 55:9
  **leap** [2] - 74:14, 88:11
  **least** [18] - 8:2, 15:21, 24:15, 30:13, 51:10, 52:22, 57:22, 59:17, 62:20, 64:20, 77:13, 81:13, 86:21, 99:4, 102:4, 103:16, 103:23, 106:18

  **leave** [3] - 93:4, 95:6, 103:12
  **leaving** [1] - 96:2
  **lectern** [1] - 3:5
  **led** [1] - 85:13
  **ledger** [1] - 37:23
  **left** [5] - 31:7, 39:15, 40:8, 50:20, 102:22
  **length** [1] - 39:4
  **less** [2] - 36:4, 106:19
  **lessened** [1] - 73:8
  **letter** [7] - 7:21, 16:8, 38:14, 39:22, 71:4, 71:19, 76:2
  **letters** [1] - 23:7
  **level** [5] - 24:16, 50:10, 70:4, 88:13, 89:5
  **liability** [1] - 111:11
  **light** [1] - 22:25
  **likely** [4] - 6:13, 60:8, 72:16, 82:11
  **limit** [1] - 99:18
  **limited** [12] - 24:10, 30:20, 30:21, 31:25, 37:14, 46:15, 51:1, 79:4, 100:1, 102:18, 103:10, 104:2
  **Limited** [1] - 3:3
  **LIMITED** [1] - 1:7
  **line** [1] - 87:21
  **lines** [1] - 84:20
  **Lisa** [1] - 115:12
  **LISA** [2] - 2:15, 115:3
  **list** [2] - 10:21, 21:15
  **listening** [1] - 13:19
  **litany** [1] - 21:17
  **literally** [3] - 8:9, 23:7, 90:17
  **litigate** [1] - 32:10
  **litigation** [11] - 23:25, 27:13, 29:3, 92:21, 94:17, 94:24, 95:2, 95:3, 100:4, 101:3, 112:18
  **live** [1] - 27:14
  **LLP** [4] - 1:24, 2:2, 2:6, 2:12
  **loaded** [1] - 8:10
  **locked** [2] - 54:9, 106:4
  **logs** [1] - 37:10
  **Look** [1] - 94:20
  **look** [14] - 26:19, 42:25, 48:4, 65:1, 65:15, 67:6, 67:18, 74:12, 80:14, 90:12, 95:20, 110:25, 112:20
  **looking** [17] - 10:21,

13:16, 23:24, 40:15, 41:21, 48:8, 52:1, 52:3, 59:4, 61:11, 74:17, 82:4, 82:7, 99:6, 106:7, 107:18, 112:22
**lose** [1] - 88:4
**loss** [1] - 73:4
**lost** [3] - 32:2, 32:5, 73:21
**loud** [1] - 100:21
**love** [2] - 12:16, 23:2

---

## M

**MAGISTRATE** [1] - 1:12
**main** [2] - 69:22, 80:20
**maintain** [1] - 85:2
**maintains** [3] - 64:12, 65:21, 91:7
**major** [1] - 108:6
**majority** [1] - 70:21
**manage** [2] - 58:4, 89:25
**management** [3] - 97:24, 108:21, 108:23
**managing** [1] - 97:21
**manipulate** [1] - 67:5
**manipulated** [1] - 93:19
**manual** [1] - 10:20
**marching** [1] - 67:16
**master** [1] - 47:9
**Matt** [3] - 3:8, 3:13, 3:15
**matter** [1] - 110:6
**matters** [2] - 84:25, 108:22
**MATTHEW** [2] - 2:2, 2:5
**McLucas** [2] - 2:4, 3:15
**mean** [80] - 9:15, 20:11, 21:24, 22:3, 23:15, 24:20, 25:4, 26:7, 26:14, 26:15, 28:15, 28:18, 29:15, 29:21, 30:20, 31:14, 31:17, 32:6, 32:17, 40:1, 40:11, 40:19, 40:23, 41:19, 44:1, 54:19, 57:2, 57:9, 57:10, 58:3, 58:12, 58:22, 59:1, 59:19, 63:5, 65:23, 66:2, 67:4, 68:20, 69:21, 70:24, 71:15, 72:22,

78:3, 78:5, 78:10, 78:15, 79:2, 80:19, 81:23, 82:11, 82:16, 82:18, 82:19, 84:2, 84:12, 87:3, 87:10, 88:12, 88:24, 89:3, 89:4, 92:19, 92:20, 92:23, 94:3, 97:1, 99:16, 99:25, 101:16, 104:19, 106:14, 106:15, 107:18, 109:18, 109:23, 110:6, 111:17, 112:5, 113:3
**meaningfully** [1] - 46:7
**means** [5] - 29:18, 33:18, 53:6, 56:18, 62:25
**meant** [1] - 25:7
**measures** [3] - 19:4, 25:14, 65:6
**mechanism** [1] - 47:2
**mechanisms** [1] - 6:19
**meet** [1] - 88:17
**meet-and-confers** [1] - 88:17
**member** [1] - 77:6
**Mendro** [1] - 3:18, 45:8, 63:20, 65:17, 66:16, 71:7, 72:9, 101:17, 101:25
**MENDRO** [28] - 1:21, 3:18, 45:8, 96:16, 97:5, 97:9, 97:13, 98:2, 98:5, 98:10, 98:13, 98:17, 98:21, 98:25, 100:11, 100:13, 100:18, 100:22, 103:25, 104:5, 104:10, 105:8, 105:14, 107:20, 107:22, 107:24, 113:8, 113:21
**mention** [2] - 33:2, 72:1
**mentioned** [5] - 9:21, 14:21, 23:6, 31:19, 52:24
**mere** [1] - 32:11
**merits** [5] - 32:8, 45:20, 46:16, 50:24, 67:1
**mess** [2] - 66:23, 70:12
**message** [2] - 27:18, 27:25
**metaphysical** [1] -

56:14
**microphone** [1] - 3:11
**mid** [8] - 21:3, 22:4, 91:14, 96:7, 96:18, 96:21, 96:22, 97:6
**mid-December** [6] - 21:3, 22:4, 91:14, 96:7, 96:22, 97:6
**mid-September** [2] - 96:18, 96:21
**might** [12] - 4:19, 18:3, 31:8, 44:13, 70:6, 74:21, 75:11, 79:25, 99:5, 108:13, 109:3, 112:2
**MILBANK** [1] - 2:2
**Milbank** [2] - 3:8, 3:13
**miles** [1] - 77:12
**million** [2] - 76:22, 97:22
**mind** [3] - 16:11, 84:7
**minimum** [1] - 21:17
**misappropriated** [1] - 9:4
**miscommunication** [1] - 37:18
**missed** [1] - 61:7
**missing** [5] - 39:1, 52:18, 88:6, 88:7, 94:23
**mistaken** [1] - 64:1
**misuse** [1] - 32:14
**misused** [2] - 30:24, 33:11
**modest** [1] - 46:6
**molecular** [1] - 50:10
**Molly** [1] - 3:23
**MOLLY** [1] - 2:12
**money** [6] - 58:3, 60:13, 60:20, 78:25, 96:1, 112:6
**monitor** [4] - 33:25, 58:21, 61:6, 65:3
**monitoring** [2] - 19:2, 47:5
**month** [1] - 15:15
**monthly** [3] - 30:16, 32:3, 32:6
**months** [8] - 29:16, 30:7, 30:23, 31:1, 31:11, 31:17, 32:20, 90:21
**moral** [1] - 58:22
**morning** [4] - 3:1, 3:18, 3:22, 45:11
**mosaic** [2] - 26:20, 94:18

**most** [14] - 4:19, 4:20, 13:11, 18:9, 21:20, 23:4, 39:6, 39:12, 39:21, 41:15, 74:19, 78:18, 105:23, 109:19
**mostly** [3] - 14:1, 21:15, 23:4
**motion** [2] - 40:12
**motto** [1] - 26:3
**move** [10] - 17:18, 45:18, 45:20, 58:3, 60:20, 81:20, 81:21, 86:24, 106:9
**movement** [1] - 71:9
**moves** [1] - 92:17
**moving** [5] - 4:11, 23:13, 102:11, 113:14, 113:15
**MR** [237] - 3:8, 3:13, 3:18, 3:22, 4:15, 4:18, 4:23, 5:4, 5:8, 5:10, 5:12, 5:15, 5:17, 5:22, 6:1, 6:4, 6:7, 6:12, 6:18, 7:7, 7:12, 7:16, 7:19, 7:23, 8:7, 8:16, 8:20, 8:24, 9:10, 9:20, 10:2, 11:15, 12:17, 12:22, 13:4, 14:9, 14:14, 15:11, 17:20, 17:22, 18:23, 19:8, 21:14, 22:6, 22:11, 22:14, 22:22, 23:10, 24:16, 24:19, 24:23, 25:2, 25:8, 25:11, 25:22, 27:5, 27:18, 27:21, 27:23, 28:2, 28:4, 28:7, 28:12, 29:8, 33:7, 34:10, 34:12, 34:17, 34:20, 34:22, 34:25, 35:3, 35:9, 36:14, 36:23, 38:13, 38:18, 38:24, 39:2, 39:6, 39:9, 39:17, 40:11, 40:19, 40:22, 41:1, 41:3, 41:5, 41:12, 42:12, 43:2, 43:5, 43:8, 43:10, 43:13, 45:1, 45:8, 49:14, 49:16, 51:11, 51:15, 51:19, 53:7, 53:13, 55:11, 55:18, 55:21, 55:23, 56:2, 57:17, 61:16, 61:18, 62:1, 62:3, 62:11, 63:7, 63:10, 63:15, 63:18, 64:21, 64:23, 64:25, 66:3, 66:5, 66:7, 66:9, 67:1, 67:9, 67:13, 67:15,

68:18, 69:3, 69:7, 69:10, 69:20, 69:24, 70:2, 70:6, 70:11, 71:4, 71:16, 71:20, 72:4, 74:18, 74:24, 75:19, 75:24, 76:5, 76:9, 77:14, 77:20, 77:23, 78:1, 78:18, 78:21, 79:5, 79:8, 79:10, 79:13, 79:18, 80:7, 80:11, 80:14, 80:19, 81:1, 81:5, 84:1, 84:4, 84:7, 84:19, 85:7, 85:13, 86:15, 87:7, 90:3, 90:8, 90:10, 90:12, 90:16, 90:20, 91:14, 91:24, 92:2, 92:6, 92:10, 92:13, 92:17, 93:2, 93:21, 93:23, 94:3, 94:9, 96:16, 97:5, 97:9, 97:13, 98:2, 98:5, 98:10, 98:13, 98:17, 98:21, 98:25, 99:6, 99:10, 99:15, 100:11, 100:13, 100:18, 100:22, 101:16, 101:21, 102:8, 103:25, 104:5, 104:10, 105:8, 105:14, 107:20, 107:22, 107:24, 108:8, 108:11, 108:13, 108:16, 108:20, 109:9, 109:16, 112:9, 112:24, 113:5, 113:8, 113:10, 113:17, 113:19, 113:21, 113:23
**MUCHIN** [1] - 2:8
**multiple** [3] - 30:12, 32:1, 84:24
**MURPHY** [111] - 1:15, 4:15, 4:23, 5:4, 5:12, 5:15, 5:17, 5:22, 6:1, 6:4, 6:7, 6:12, 6:18, 7:7, 7:12, 7:16, 7:19, 7:23, 8:7, 8:16, 8:20, 8:24, 9:10, 9:20, 10:2, 11:15, 12:17, 12:22, 13:4, 14:9, 14:14, 15:11, 17:20, 17:22, 18:23, 19:8, 21:14, 22:6, 22:11, 22:14, 22:22, 23:10, 24:16, 24:19, 24:23, 25:2, 25:8, 25:11, 25:22, 63:7, 63:10, 63:15, 63:18, 64:21,

64:23, 64:25, 66:3,
66:5, 66:7, 66:9, 67:1,
67:9, 67:13, 67:15,
68:18, 69:3, 69:7,
69:10, 69:20, 69:24,
70:2, 70:6, 70:11,
71:4, 71:16, 71:20,
72:4, 74:18, 74:24,
75:19, 80:7, 80:11,
80:14, 80:19, 81:1,
81:5, 90:3, 90:8,
90:10, 90:12, 90:16,
90:20, 91:14, 91:24,
92:2, 92:6, 92:10,
92:13, 92:17, 93:21,
93:23, 94:3, 94:9,
99:6, 99:10, 99:15,
101:16, 101:21,
102:8, 112:24, 113:17
**Murphy** [16] - 29:10,
29:12, 29:20, 31:3,
32:16, 35:7, 36:23,
38:10, 39:10, 43:11,
45:11, 45:14, 77:4,
84:8, 98:5, 105:14
**must** [2] - 9:11,
99:21
**mysteries** [1] - 53:24

**N**

**named** [1] - 71:20
**names** [1] - 72:2
**narrow** [9] - 57:19,
62:16, 67:7, 68:24,
68:25, 71:5, 90:22,
95:14, 112:7
**narrowed** [1] - 71:1
**narrowing** [3] - 5:17,
27:7, 71:2
**naturally** [1] - 16:3
**nature** [2] - 60:3,
92:14
**necessarily** [1] -
112:16
**necessary** [5] - 53:2,
72:17, 88:20, 111:16,
112:21
**need** [62] - 4:12,
4:13, 8:17, 8:25, 9:17,
13:5, 15:14, 17:7,
18:13, 26:10, 26:13,
26:15, 27:4, 33:13,
38:12, 38:19, 40:5,
40:6, 52:8, 56:20,
59:7, 60:25, 61:2,
61:15, 61:21, 61:24,
61:25, 68:4, 68:22,
71:8, 71:12, 73:11,
73:15, 79:6, 80:21,

81:19, 82:13, 82:14,
82:25, 83:23, 86:2,
87:3, 88:14, 88:22,
89:16, 91:19, 94:18,
95:11, 95:12, 96:5,
97:22, 100:7, 104:12,
106:2, 106:24,
106:25, 107:19,
109:20, 111:13,
112:20, 113:3
**needed** [1] - 86:23
**needs** [5] - 27:25,
32:20, 54:12, 79:3,
87:2
**negative** [5] - 32:7,
56:5, 64:15, 75:15,
88:8
**negotiate** [2] - 10:9,
111:16
**negotiating** [1] -
73:17
**Nelson** [1] - 3:19
**NELSON** [1] - 1:22
**networking** [1] - 26:4
**never** [11] - 6:8, 10:6,
16:5, 23:14, 37:16,
57:8, 63:25, 70:8,
70:12, 70:13, 81:2
**nevertheless** [1] -
43:20
**new** [6] - 10:5, 34:1,
59:18, 64:3, 65:1
**New** [4] - 1:17, 2:3
**news** [4] - 4:7, 4:14,
5:12, 5:14
**next** [16] - 8:13, 8:14,
14:23, 16:19, 21:3,
22:24, 30:19, 32:25,
35:16, 38:8, 38:9,
46:14, 69:15, 91:12,
91:21, 101:3
**normally** [1] - 90:4
**Northeast** [1] - 1:19
**Northwest** [6] - 1:24,
2:6, 2:9, 2:13, 2:17,
115:14
**nose** [1] - 4:9
**NOTE** [1] - 3:6
**notes** [2] - 63:7,
115:5
**Nothing** [1] - 52:15
**nothing** [10] - 4:12,
32:13, 33:9, 52:15,
59:19, 78:23, 84:16,
95:21, 103:21, 111:22
**noticed** [1] - 4:6
**notices** [1] - 71:21
**noticing** [1] - 47:2
**November** [4] - 1:7,
16:1, 111:6, 115:10

**nowhere** [1] - 11:7
**number** [9] - 4:24,
4:25, 10:21, 10:25,
20:24, 46:5, 46:16,
93:13, 93:14
**numbers** [2] - 14:11,
17:17
**numerous** [2] -
35:23, 85:3

**O**

**oath** [1] - 37:17
**object** [1] - 79:14
**objected** [1] - 38:18
**objections** [1] -
16:22
**obligation** [2] - 6:16,
16:21
**obligations** [1] - 75:7
**obtain** [1] - 49:25
**obviate** [2] - 106:24,
106:25
**obviating** [1] - 94:18
**obviously** [4] - 33:7,
41:9, 70:21, 96:18
**occurs** [1] - 78:6
**October** [8] - 13:17,
19:1, 49:22, 71:4,
71:19, 76:2, 80:12,
105:18
**OF** [2] - 1:1, 1:10
**offer** [1] - 6:23
**offered** [1] - 50:23
**officers** [1] - 58:17
**official** [1] - 115:12
**Official** [1] - 2:16
**offline** [3] - 92:4,
92:25, 108:3
**often** [2] - 23:13,
70:2
**once** [6] - 13:1, 22:3,
42:19, 42:20, 54:5,
57:18
**one** [66] - 3:10, 4:24,
5:23, 8:18, 12:7, 14:9,
14:10, 15:5, 15:16,
19:11, 20:25, 24:9,
24:15, 24:19, 26:3,
26:4, 28:18, 31:19,
33:9, 34:3, 35:3, 39:9,
41:7, 41:16, 43:5,
43:13, 47:17, 52:17,
52:18, 52:20, 52:22,
53:4, 54:4, 57:24,
61:7, 62:24, 63:10,
63:11, 70:23, 72:9,
72:11, 72:12, 72:13,
74:7, 74:13, 79:23,

81:10, 81:11, 82:21,
82:22, 83:15, 88:25,
93:13, 93:14, 95:20,
98:3, 98:8, 101:16,
103:12, 103:13,
103:16, 107:16,
109:11, 109:13,
111:25
**one-off** [1] - 53:4
**onerous** [2] - 31:16,
35:22
**ones** [7] - 9:8, 17:25,
75:8, 80:13, 82:20,
83:2, 93:9
**ongoing** [2] - 46:1,
48:20
**online** [2] - 70:6,
81:3
**oops** [1] - 61:7
**open** [16] - 7:4,
36:16, 37:2, 39:23,
49:5, 49:6, 50:14,
65:11, 71:10, 72:8,
81:16, 92:4, 99:1,
103:3
**open-ended** [1] -
103:3
**opening** [1] - 64:4
**openly** [1] - 32:13
**openness** [1] - 71:6
**operate** [1] - 29:3
**operated** [1] - 32:12
**opinion** [1] - 24:25
**opinions** [1] - 21:11
**opportunity** [1] -
112:20
**optimistic** [1] - 105:8
**order** [23] - 9:5, 9:6,
11:13, 13:22, 20:5,
30:15, 32:22, 40:12,
46:2, 46:20, 47:24,
49:1, 53:11, 60:20,
65:4, 68:1, 72:19,
72:20, 75:13, 86:2,
87:19, 96:3, 111:24
**orders** [1] - 67:16
**organization** [3] -
28:10, 31:21, 32:18
**original** [2] - 80:12,
80:14
**otherwise** [2] -
38:18, 89:7
**ourselves** [2] -
99:18, 112:25
**outset** [1] - 33:15
**outside** [2] - 18:20,
68:6
**outstanding** [1] -
15:3
**overlap** [1] - 64:24

**overseas** [2] - 60:13,
73:3
**own** [2] - 64:12, 87:1
**owner** [2] - 70:21,
77:24
**ownership** [1] - 78:2,
109:6

**P**

**P.A** [1] - 2:8
**P.S** [1] - 107:16
**packet** [1] - 17:24
**pages** [5] - 36:8,
36:9, 36:11, 46:11,
86:5
**paid** [3] - 66:10,
67:3, 68:7
**pain** [1] - 32:18
**painful** [1] - 31:21
**papers** [1] - 24:21
**parade** [2] - 72:23,
103:22
**parallel** [1] - 13:7
**parameters** [4] -
51:16, 51:22, 87:14,
88:25
**Park** [1] - 60:3
**Park-style** [1] - 60:3
**part** [14] - 15:18,
28:7, 29:9, 43:16,
44:3, 54:17, 60:11,
67:18, 72:22, 82:3,
84:17, 85:13, 86:7,
101:2
**partially** [1] - 15:21
**particular** [2] -
51:20, 51:21
**particularly** [3] -
32:12, 45:14, 103:16
**parties** [5] - 31:12,
48:21, 64:16, 80:22,
110:15
**partly** [1] - 92:14
**partners** [2] - 31:25,
32:1
**party** [1] - 65:14
**past** [1] - 109:25
**path** [2] - 27:16,
54:22
**pathway** [1] - 87:1
**patience** [1] - 21:11
**patrol** [1] - 105:4
**pause** [1] - 75:6
**pay** [1] - 112:4
**paying** [7] - 60:16,
66:11, 66:21, 67:19,
67:22, 93:6, 93:7
**payments** [1] - 91:16

**peace** [1] - 79:21
**Pearl** [1] - 1:16
**pejoratively** [1] - 25:6
**Pennsylvania** [2] - 2:6, 2:9
**people** [28] - 13:10, 17:13, 19:25, 20:14, 22:23, 23:7, 39:3, 47:22, 47:25, 54:23, 58:4, 59:17, 67:15, 68:5, 71:14, 71:25, 74:25, 81:9, 84:11, 84:23, 85:8, 91:17, 93:19, 93:20, 95:12, 105:4, 107:6
**people's** [2] - 24:1, 93:18
**percent** [5] - 27:10, 32:5, 68:23, 95:21, 95:22
**perfect** [1] - 34:19
**perfunctory** [1] - 97:4
**perhaps** [12] - 26:9, 74:3, 80:9, 82:25, 83:3, 83:4, 88:10, 109:20, 110:16, 111:7, 111:14, 112:1
**period** [2] - 20:5, 77:2
**permission** [1] - 47:6
**permitted** [2] - 40:13, 46:16
**person** [22] - 14:16, 17:9, 17:10, 19:14, 19:16, 39:13, 39:21, 56:25, 57:25, 58:7, 58:21, 71:23, 72:6, 82:22, 83:5, 93:8, 103:13, 104:23, 110:6, 111:18
**PERSON** [1] - 1:11
**personal** [1] - 14:24
**personally** [1] - 69:18
**personnel** [1] - 9:10
**perspective** [30] - 11:12, 25:18, 29:11, 29:18, 32:21, 33:5, 35:11, 38:2, 42:6, 42:13, 51:9, 54:3, 54:17, 56:1, 56:2, 56:4, 58:12, 58:23, 59:6, 73:14, 74:4, 78:12, 81:25, 83:13, 87:14, 92:23, 106:19, 109:3, 110:19, 112:11
**persuasion** [1] - 58:22

**pertinent** [1] - 40:17
**phone** [2] - 53:1, 106:10
**phones** [1] - 12:11
**pick** [1] - 106:9
**PICKERING** [1] - 2:5
**picks** [1] - 53:1
**picture** [1] - 68:23
**piece** [1] - 24:2
**piggyback** [1] - 96:7
**pin** [1] - 27:9
**place** [8] - 18:11, 19:6, 25:15, 33:25, 44:25, 47:17, 65:7, 70:16
**places** [1] - 103:20
**Plaintiff** [3] - 1:5, 3:4, 3:7
**PLAINTIFF** [1] - 1:15
**Plaintiffs** [1] - 4:24, 5:5
**plan** [2] - 97:14, 113:11
**platform** [3] - 31:9, 32:4, 63:24
**play** [4] - 65:18, 65:19, 80:24, 81:14
**playing** [2] - 87:19, 112:7
**plea** [1] - 84:15
**pleading** [2] - 52:24, 73:5
**pleadings** [2] - 62:23, 74:24
**pled** [3] - 72:24, 76:11, 89:15
**plenty** [2] - 12:13, 81:6
**plumbing** [1] - 102:5
**PNK** [7] - 10:19, 11:5, 11:23, 17:5, 18:1, 85:19, 85:22
**point** [37] - 15:8, 20:12, 21:23, 24:25, 25:25, 28:24, 33:12, 34:8, 38:25, 39:13, 42:18, 43:6, 45:16, 45:20, 46:2, 50:7, 56:4, 57:16, 57:22, 58:8, 60:6, 65:12, 72:14, 73:7, 74:13, 78:13, 83:18, 85:25, 86:21, 86:22, 88:3, 95:1, 97:13, 102:12, 104:17, 107:1, 109:4
**pointed** [1] - 103:20
**pointing** [2] - 64:14, 102:1
**points** [6] - 8:16, 19:5, 33:5, 34:23,

35:6, 43:10
**position** [16] - 7:1, 8:11, 32:24, 38:14, 38:24, 40:9, 40:11, 40:19, 41:1, 42:13, 42:19, 55:1, 71:11, 85:21, 95:20, 110:14
**possession** [1] - 9:13
**possibility** [3] - 80:2, 80:4, 106:5
**possible** [4] - 23:3, 60:5, 60:8, 90:22
**possibly** [1] - 71:2
**posted** [1] - 76:21
**postponed** [1] - 14:24
**potential** [1] - 32:1
**potentially** [2] - 52:7, 68:6
**power** [1] - 110:12
**powerful** [1] - 76:24
**practices** [2] - 30:9, 30:15, 44:19
**preceded** [1] - 46:12
**precise** [3] - 5:19, 9:18, 66:17
**precisely** [1] - 93:24
**prefer** [2] - 4:23, 61:5
**prepare** [1] - 57:3
**prepared** [1] - 70:18
**pressed** [1] - 11:4
**pressing** [1] - 12:13
**pressure** [1] - 87:15
**pressure-test** [1] - 87:15
**presumably** [3] - 78:7, 82:3, 93:7
**presume** [3] - 58:3, 60:14, 109:16
**pretty** [6] - 18:3, 62:21, 78:11, 97:2, 104:25, 107:18
**prevents** [1] - 11:25
**primarily** [1] - 46:4
**priority** [1] - 71:18
**private** [6] - 9:22, 11:6, 11:7, 11:24, 12:1, 68:3
**problem** [4] - 43:9, 52:21, 55:13, 66:9
**proceed** [1] - 90:10
**proceeding** [1] - 84:17
**proceedings** [2] - 114:2, 115:6
**process** [13] - 16:13, 19:13, 21:9, 21:10, 35:22, 36:3, 47:20, 48:9, 48:10, 48:23,

71:2, 71:25, 86:17
**processed** [1] - 24:21
**processing** [2] - 24:24, 36:18
**produce** [11] - 6:16, 14:5, 15:13, 50:2, 50:14, 56:9, 68:12, 98:15, 99:20, 105:19, 105:22
**produced** [23] - 13:1, 30:8, 36:10, 36:11, 37:8, 37:10, 37:14, 37:22, 46:6, 46:8, 46:10, 46:19, 48:24, 49:7, 49:16, 49:20, 50:23, 60:7, 71:8, 78:23, 90:13, 90:17, 115:6
**producing** [2] - 16:13, 35:12
**product** [1] - 38:7
**production** [4] - 6:13, 14:2, 14:15, 21:1
**productions** [8] - 6:23, 7:19, 7:24, 8:1, 36:7, 45:21, 45:25, 51:2
**productive** [2] - 21:18, 86:17
**profoundly** [1] - 105:21
**program** [2] - 23:15, 34:1
**progress** [4] - 5:15, 7:3, 14:15, 86:20
**proposal** [4] - 15:19, 18:6, 71:11, 71:13
**proposals** [1] - 72:8
**propose** [1] - 20:25
**prospectively** [1] - 111:3
**protecting** [1] - 46:3
**protective** [1] - 40:12
**protocol** [2] - 17:6, 19:17
**prove** [2] - 56:5, 88:8
**provide** [6] - 15:2, 62:23, 77:9, 91:10, 102:11, 111:3
**provided** [2] - 42:2, 69:11
**provider** [3] - 53:18, 53:22, 54:14
**providers** [1] - 89:11
**provides** [3] - 30:15, 47:11, 53:8
**providing** [1] - 48:12
**proving** [2] - 64:15,

75:15
**provisions** [1] - 64:14
**proxy** [1] - 108:18
**public** [3] - 46:22, 102:1, 105:16
**pull** [2] - 35:25, 69:1
**punch** [1] - 17:17
**punitive** [1] - 76:14
**purported** [1] - 28:8
**purpose** [1] - 32:22
**purview** [1] - 54:10
**push** [4] - 23:19, 44:6, 44:8, 44:13
**pushing** [1] - 10:16
**put** [19] - 10:21, 18:25, 21:23, 27:8, 33:25, 47:17, 65:7, 72:4, 73:13, 76:22, 79:10, 83:12, 87:23, 89:23, 93:12, 95:19, 107:17, 112:4, 112:5
**puts** [2] - 12:6, 88:17, 111:17
**putting** [1] - 107:14
**puzzle** [1] - 24:3

**Q**

**questions** [61] - 12:3, 14:4, 14:17, 15:2, 15:3, 18:11, 21:20, 21:22, 21:25, 22:2, 22:22, 23:4, 23:6, 23:17, 34:14, 39:15, 39:23, 43:18, 43:20, 44:7, 45:22, 48:5, 48:25, 49:10, 54:23, 56:13, 57:4, 57:16, 58:4, 62:9, 69:17, 74:19, 75:23, 75:24, 76:10, 76:23, 79:25, 81:18, 82:8, 86:8, 86:10, 86:12, 89:20, 91:15, 95:8, 95:12, 99:23, 101:19, 102:15, 102:25, 104:8, 104:9, 104:14, 105:9, 105:10, 105:24, 106:13, 106:16, 106:24, 107:6
**quibble** [1] - 48:10
**quickly** [1] - 18:3
**quorum** [1] - 48:1
**quote** [1] - 20:17
**quotes** [1] - 84:10

## R

**radar** [2] - 72:4, 72:5
**raise** [3] - 28:8, 38:19, 68:20
**raised** [8] - 28:8, 29:11, 30:1, 33:3, 37:12, 37:24, 43:11, 48:5
**raises** [1] - 24:6
**raising** [1] - 29:12
**rather** [2] - 76:18, 87:24
**RDR** [3] - 2:15, 115:3, 115:12
**reach** [1] - 19:16
**reached** [1] - 93:20
**react** [1] - 69:8
**reaction** [1] - 33:3
**reactions** [1] - 24:17
**read** [5] - 17:10, 76:18, 77:4, 89:11, 95:9
**reading** [1] - 25:12
**ready** [2] - 21:17, 69:8
**real** [6] - 31:19, 32:18, 63:3, 81:2, 81:3, 81:5
**realities** [1] - 6:21
**reality** [1] - 95:24
**realize** [1] - 4:2
**really** [42] - 5:18, 6:1, 8:8, 10:19, 12:4, 12:12, 18:19, 22:23, 24:20, 27:6, 31:16, 31:17, 31:21, 31:22, 32:6, 36:14, 45:3, 46:1, 52:10, 54:2, 54:12, 56:14, 67:6, 69:10, 69:22, 71:4, 73:24, 78:11, 82:22, 83:5, 85:5, 89:6, 93:11, 93:25, 109:7, 109:20, 110:11, 111:17, 111:18, 112:19, 113:25
**realm** [2] - 60:5, 106:5
**realtime** [2] - 23:11, 47:4
**reason** [9] - 11:18, 15:14, 29:9, 34:7, 68:21, 81:7, 82:3, 99:24, 103:24
**reasonable** [8] - 26:19, 30:21, 60:5, 62:7, 62:24, 93:17, 105:20, 109:23

**reasonably** [3] - 46:19, 48:25, 65:20
**reasons** [3] - 14:25, 47:18, 56:7
**rebutting** [1] - 100:16
**received** [2] - 47:15, 49:22
**receives** [1] - 46:24
**receiving** [1] - 78:12
**recent** [2] - 19:1, 20:13
**recently** [5] - 11:22, 12:23, 49:10, 71:24, 81:13
**receptive** [1] - 29:6
**recognize** [1] - 27:22
**recognized** [1] - 18:24
**reconciles** [1] - 46:22
**reconciliation** [1] - 37:22
**record** [9] - 3:5, 36:15, 43:24, 53:23, 66:22, 85:10, 106:22, 108:24
**Recording** [1] - 1:12
**records** [2] - 48:7, 52:7
**red** [1] - 74:7
**reduce** [1] - 31:20
**reduced** [2] - 58:23, 77:18
**reevaluate** [1] - 4:13
**referred** [1] - 31:3
**referring** [2] - 51:12, 64:7
**reflect** [1] - 106:22
**reflective** [1] - 26:25
**reflects** [1] - 53:23
**refuse** [1] - 16:7
**regular** [1] - 48:5
**regulatory** [2] - 65:13, 66:23
**reinforce** [1] - 81:12
**reinforces** [1] - 33:13
**relate** [1] - 39:3
**related** [3] - 35:20, 58:7, 68:8
**relationship** [1] - 32:1
**relationships** [2] - 73:5, 102:20
**relevant** [6] - 40:17, 49:8, 50:18, 56:3, 57:3, 62:13
**relief** [1] - 68:2
**relinquished** [1] -

23:22
**reluctant** [2] - 65:11, 72:1
**remaining** [5] - 27:24, 34:25, 35:15, 38:6, 109:2
**remains** [1] - 35:1, 80:20
**remedial** [2] - 19:4, 25:14
**remedied** [1] - 53:5
**remember** [3] - 7:21, 67:21, 67:24
**remembering** [1] - 67:21
**remind** [2] - 93:5, 101:25
**remove** [1] - 48:16
**repeated** [1] - 75:17
**report** [25] - 6:5, 7:25, 8:14, 15:7, 15:15, 15:18, 16:2, 16:19, 21:2, 30:16, 65:1, 91:12, 91:23, 92:15, 92:18, 93:1, 96:8, 96:17, 97:1, 97:6, 99:10, 99:11, 110:20, 112:21
**reported** [3] - 15:18, 16:2, 19:17
**Reporter** [2] - 2:16, 115:12
**reports** [9] - 15:12, 37:22, 49:24, 50:1, 50:2, 64:17, 98:11, 98:14
**repository** [1] - 101:23
**representing** [4] - 58:14, 60:11, 65:17, 65:19
**represents** [1] - 22:8
**reproduced** [1] - 47:9
**request** [11] - 19:13, 45:24, 47:5, 48:5, 49:22, 50:5, 79:10, 80:12, 83:1, 101:14, 110:21
**requested** [2] - 36:17, 87:17
**requesting** [2] - 19:14, 98:10
**requests** [24] - 8:12, 13:14, 13:17, 31:16, 31:23, 32:19, 35:11, 35:12, 36:5, 36:6, 45:21, 48:7, 49:21, 52:5, 71:3, 73:22, 76:2, 76:4, 76:5,

78:14, 80:3, 80:8, 85:4, 108:2
**require** [5] - 6:12, 14:18, 77:8, 78:2, 101:21
**requirements** [6] - 9:7, 10:11, 68:1, 75:9, 75:10, 84:12
**requires** [2] - 76:19, 76:21
**requiring** [1] - 29:25
**reschedule** [1] - 113:12
**reserved** [1] - 15:23
**reset** [1] - 54:6
**resolution** [10] - 23:20, 33:18, 59:12, 60:10, 76:14, 76:17, 76:19, 77:4, 78:1, 102:23
**resolutions** [2] - 33:3, 33:9
**resolve** [3] - 53:21, 67:9, 87:5
**resolved** [3] - 20:12, 21:19, 87:2
**resonated** [1] - 40:4
**respect** [7] - 29:18, 33:19, 33:20, 33:22, 36:16, 37:24, 38:1, 44:4, 99:1, 108:21, 108:23, 108:24
**respectfully** [3] - 32:20, 34:6, 50:22
**respects** [1] - 50:18
**respond** [5] - 13:15, 21:17, 35:6, 42:23, 60:25
**responded** [1] - 30:10
**responding** [2] - 31:23, 85:3
**response** [1] - 7:20
**responsibilities** [1] - 108:21
**responsive** [1] - 49:20
**result** [1] - 16:25
**retaining** [1] - 77:17
**retains** [1] - 109:6
**revenue** [1] - 32:3
**review** [4] - 15:25, 36:1, 48:6, 90:21
**reviewed** [4] - 35:24, 78:19, 78:21, 90:13
**revisit** [1] - 110:9
**ribbon** [1] - 23:1
**Richard** [1] - 3:20
**RICHARD** [1] - 1:22
**rights** [5] - 15:23,

33:21, 108:18, 108:20, 109:9
**ripe** [2] - 8:21, 15:5
**ripes** [1] - 8:21
**risk** [4] - 33:10, 73:8, 81:19, 88:3
**risks** [1] - 105:24
**road** [1] - 15:4
**role** [13] - 23:22, 25:2, 33:19, 33:22, 43:23, 44:17, 68:25, 77:18, 77:23, 78:24, 108:4, 110:2
**roles** [1] - 24:1
**Room** [1] - 2:18
**room** [2] - 54:9, 101:17
**Rosen** [1] - 3:23
**ROSEN** [1] - 2:12
**ROSENMAN** [1] - 2:8
**rug** [1] - 69:1
**rule** [1] - 16:21
**rules** [1] - 46:17
**run** [5] - 17:24, 29:3, 48:23, 92:21, 103:24
**running** [1] - 21:12
**rush** [1] - 63:3

## S

**sailed** [1] - 42:21
**sails** [1] - 89:21
**salary** [2] - 66:12, 66:22
**sat** [1] - 78:18
**satisfied** [5] - 16:21, 28:25, 29:1, 35:11, 101:12
**satisfy** [4] - 16:4, 32:22, 112:1, 112:2
**Saturday** [2] - 16:8, 23:7
**save** [1] - 112:25
**saw** [3] - 7:14, 12:23, 70:7
**scenario** [1] - 60:3
**schedule** [1] - 91:25
**scheduled** [1] - 18:4
**scheduling** [1] - 34:14
**school** [1] - 4:3
**scope** [4] - 46:20, 49:1, 76:4, 87:16
**score** [1] - 19:5
**scratch** [1] - 13:20
**search** [4] - 35:21, 35:24, 37:13, 99:25
**seats** [1] - 4:3
**SEC** [64] - 4:11, 27:1,

28:8, 30:16, 30:18, 30:23, 31:7, 31:14, 32:19, 33:15, 35:13, 37:3, 37:9, 37:12, 41:10, 45:14, 45:23, 46:13, 46:25, 47:9, 47:13, 47:14, 47:16, 47:19, 48:9, 48:19, 48:20, 49:2, 49:9, 49:10, 49:23, 50:8, 51:9, 51:19, 52:3, 53:10, 56:7, 56:9, 59:16, 60:12, 60:25, 62:15, 63:5, 73:4, 73:9, 76:18, 78:11, 79:6, 83:24, 84:24, 87:8, 87:22, 88:21, 97:15, 98:18, 101:5, 102:21, 104:6, 105:11, 109:15, 110:20, 111:8, 112:1, 113:16
**SEC's** [8] - 35:12, 45:20, 49:21, 54:3, 60:12, 106:18, 109:3, 112:11
**second** [6] - 3:10, 19:2, 26:4, 33:12, 44:5, 85:13
**secrets** [1] - 53:24
**secure** [1] - 44:20
**SECURITIES** [3] - 1:3, 1:16, 1:19
**Securities** [1] - 3:2
**security** [7] - 31:5, 47:17, 48:10, 49:23, 51:1, 55:24, 99:11
**see** [25] - 4:5, 5:1, 8:19, 12:17, 17:9, 17:17, 20:24, 26:14, 26:17, 26:19, 27:1, 40:6, 40:16, 42:5, 59:5, 70:6, 74:21, 77:5, 96:1, 98:22, 103:8, 107:8, 107:9, 110:17, 110:25
**seek** [1] - 68:2
**seem** [6] - 15:8, 28:18, 54:24, 73:21, 92:10, 97:25
**send** [2] - 16:1, 91:12
**sends** [1] - 60:13
**sense** [13] - 18:7, 18:9, 19:6, 20:9, 37:6, 45:6, 48:22, 52:8, 53:18, 61:15, 69:10, 92:24, 93:2
**sensitive** [1] - 105:23

**sent** [2] - 13:17, 39:22
**sentence** [3] - 41:16, 77:3, 95:9
**sentencing** [2] - 78:6
**separate** [1] - 23:20
**separately** [3] - 48:2, 85:22, 113:1
**separation** [1] - 25:16
**September** [5] - 7:20, 36:6, 36:10, 96:18, 96:21
**sequenced** [1] - 68:21
**series** [1] - 91:5
**seriously** [2] - 44:17, 44:18
**served** [4] - 13:12, 13:14, 36:6, 71:20
**service** [1] - 36:5
**services** [2] - 37:16, 47:10
**set** [5] - 10:2, 10:24, 19:3, 32:25, 100:4
**setting** [3] - 26:22, 80:1, 88:25
**settlement** [1] - 70:19
**seven** [6] - 14:7, 14:11, 30:18, 36:7, 46:13, 71:8
**several** [3] - 41:13, 47:13
**shake** [1] - 111:1
**shard** [15] - 18:12, 18:14, 18:16, 19:10, 30:12, 38:6, 44:5, 44:16, 47:13, 47:14, 47:20, 47:23
**shards** [8] - 12:10, 47:17, 47:21, 53:16, 59:25, 63:22, 63:25, 85:23
**share** [1] - 88:16
**shareholder** [4] - 25:3, 109:7, 109:12, 109:13
**shed** [1] - 22:25
**shenanigans** [1] - 78:8
**shift** [1] - 27:11
**ship** [1] - 42:21
**shocking** [1] - 29:24
**short** [2] - 7:17, 23:2
**shortly** [1] - 112:22
**show** [5] - 18:10, 65:15, 75:12, 75:14, 97:16
**showed** [4] - 17:25,

22:18, 102:4
**showing** [4] - 17:17, 37:10, 81:5, 112:19
**shows** [1] - 21:19
**shut** [1] - 31:14
**sic** [1] - 96:18
**sick** [2] - 21:8, 21:9
**side** [6] - 8:17, 14:20, 14:21, 21:1, 42:2, 42:17
**sides** [1] - 52:10
**sign** [1] - 7:2
**signal** [2] - 8:3, 97:10
**signaled** [3] - 6:22, 17:16, 94:1
**signaling** [1] - 71:5
**significant** [5] - 31:13, 31:17, 32:3, 32:7, 34:7
**similar** [1] - 48:1
**simple** [3] - 36:3, 99:25, 102:24
**simplest** [1] - 75:14
**simply** [2] - 61:20, 96:8
**single** [2] - 58:7, 102:19
**sit** [1] - 16:18
**sits** [2] - 85:18, 85:19
**sitting** [2] - 5:1, 13:18
**situation** [4] - 13:2, 52:7, 82:25, 88:18
**six** [9] - 29:16, 30:7, 30:23, 31:1, 31:11, 31:17, 32:20, 38:6, 63:1
**six-lane** [1] - 63:1
**Slack** [2] - 36:17, 36:18
**slightly** [1] - 16:15
**slow** [1] - 63:3
**small** [1] - 24:2
**snatch** [1] - 26:4
**SOC** [6] - 49:24, 64:17, 65:1, 98:11, 99:10, 99:11
**software** [41] - 6:10, 9:1, 10:15, 14:16, 31:8, 50:17, 50:18, 53:9, 53:14, 53:17, 53:18, 54:6, 54:7, 54:13, 54:14, 58:5, 60:1, 61:3, 62:22, 62:23, 63:1, 64:10, 67:4, 82:20, 84:5, 85:17, 89:10, 93:14, 93:15, 95:17, 97:21, 97:25, 100:1, 103:1,

103:2, 103:6, 105:3, 105:4, 110:6
**software's** [1] - 93:19
**someone** [18] - 17:14, 17:24, 18:20, 19:22, 53:1, 53:21, 59:19, 59:24, 60:13, 61:20, 65:19, 67:3, 68:13, 72:4, 82:24, 93:12, 97:19, 106:5
**somewhat** [1] - 23:12
**somewhere** [3] - 11:8, 24:21, 29:1
**soon** [1] - 21:1
**sorry** [5] - 23:17, 34:12, 34:20, 43:8, 108:8
**sort** [60] - 4:13, 22:2, 26:14, 28:10, 40:1, 40:10, 42:17, 44:15, 51:7, 52:14, 53:1, 53:6, 54:10, 55:1, 55:9, 55:19, 59:13, 59:23, 59:25, 62:5, 68:23, 68:25, 69:17, 70:24, 72:11, 73:11, 74:16, 76:3, 77:18, 78:4, 78:17, 79:3, 87:5, 87:11, 87:14, 87:17, 87:23, 88:19, 89:4, 89:25, 91:21, 92:24, 93:9, 94:21, 95:1, 96:10, 97:4, 100:16, 102:15, 103:2, 104:15, 105:3, 106:8, 110:1, 110:2, 110:11, 112:15, 112:16
**sound** [4] - 25:25, 74:2, 112:8, 113:7
**sounds** [18] - 26:6, 26:22, 26:25, 38:21, 45:3, 51:10, 52:1, 65:9, 68:10, 80:3, 87:4, 87:6, 94:12, 109:4, 110:18, 110:21, 110:22, 112:10
**source** [8] - 26:24, 35:20, 41:22, 90:6, 102:2, 105:19, 106:3, 106:15
**spanned** [1] - 96:1
**speaker** [1] - 64:24
**speakers** [1] - 45:17
**speaking** [1] - 101:21
**speaks** [1] - 24:1

**specific** [15] - 5:19, 9:7, 13:17, 16:22, 49:4, 49:17, 52:17, 56:11, 56:17, 56:19, 56:22, 61:19, 90:5, 105:9
**specifically** [6] - 20:11, 41:14, 41:23, 43:14, 76:6, 98:19
**speculate** [2] - 16:9, 76:18
**speculative** [1] - 31:8
**spell** [1] - 49:13
**spells** [2] - 9:6, 9:15
**spend** [1] - 9:3
**spent** [1] - 82:4
**spinning** [1] - 55:21
**spirit** [1] - 12:20
**spiritual** [1] - 93:9
**spit** [2] - 17:25, 69:7
**spite** [2] - 54:15, 86:19
**split** [1] - 29:1
**spot** [3] - 30:23, 101:24, 107:19
**squarely** [1] - 28:16
**squeaky** [1] - 77:3
**stage** [1] - 50:24
**stand** [1] - 108:14
**standard** [1] - 106:8
**standoff** [1] - 87:12
**start** [13] - 5:12, 5:14, 62:14, 75:22, 82:15, 86:4, 88:5, 88:11, 93:15, 99:5, 102:16, 109:22
**started** [1] - 67:25
**starting** [3] - 3:4, 22:3, 102:12
**starts** [3] - 11:16, 70:25, 109:22
**state** [4] - 65:18, 65:19, 80:24, 81:14
**statement** [5] - 64:13, 70:11, 75:16, 105:6
**statements** [2] - 37:23, 80:23
**states** [1] - 96:9
**States** [2] - 2:16, 9:10, 58:14, 68:4, 68:6, 76:17, 76:20, 77:14, 77:15, 78:25, 83:9, 115:13
**STATES** [2] - 1:1, 1:12
**status** [16] - 6:4, 7:25, 15:12, 15:15, 15:18, 16:2, 16:19,

21:2, 70:19, 91:12, 91:23, 92:7, 93:1, 96:8, 96:17, 97:1
**STATUS** [1] - 1:10
**stay** [1] - 96:23
**stayed** [1] - 50:24
**staying** [1] - 88:11
**steal** [1] - 9:5
**steam** [1] - 4:12
**stenographic** [1] - 115:5
**step** [1] - 98:8
**stepped** [1] - 108:16
**stepping** [1] - 77:6
**stick** [2] - 4:9, 87:19
**sticking** [2] - 8:16, 15:8
**still** [51] - 4:11, 16:5, 16:8, 19:21, 24:8, 25:3, 26:22, 27:9, 40:11, 42:9, 55:2, 55:6, 55:8, 57:3, 59:1, 59:14, 60:10, 60:23, 61:1, 67:4, 67:7, 69:22, 70:20, 70:25, 72:13, 72:22, 74:5, 76:3, 77:15, 82:7, 83:11, 86:19, 87:2, 87:21, 87:23, 88:22, 89:4, 90:2, 93:14, 94:22, 96:1, 96:2, 96:9, 96:14, 97:2, 97:6, 101:6, 107:3, 109:7
**stipulate** [1] - 21:9
**stop** [2] - 32:25, 45:19
**stopping** [1] - 25:25
**stored** [3] - 5:20, 6:9, 29:17
**stores** [1] - 11:23
**stories** [1] - 66:14
**story** [5] - 11:16, 13:6, 16:15, 70:11, 75:7
**strange** [2] - 15:24, 97:5
**strategy** [1] - 108:23
**Street** [4] - 1:16, 1:19, 2:13, 89:24
**strong** [2] - 21:10, 69:10
**strongly** [2] - 85:10, 86:11
**struggle** [2] - 41:12, 56:10
**struggling** [2] - 55:13, 98:6
**stuff** [4] - 4:7, 29:16, 62:17, 99:5

**style** [1] - 60:3
**subject** [1] - 82:13
**subjected** [1] - 83:10
**submit** [1] - 50:22
**submitted** [1] - 30:13
**subsequent** [1] - 18:25
**substance** [2] - 54:8, 105:5
**substantially** [1] - 5:18
**substantive** [3] - 6:13, 14:15, 54:25
**sufficient** [4] - 27:3, 42:13, 49:3, 96:13
**sufficiently** [1] - 45:22
**suggest** [1] - 75:1
**suggested** [1] - 98:5
**suggesting** [1] - 61:10
**suggestion** [5] - 4:18, 85:7, 85:9, 85:11, 90:4
**suggests** [2] - 33:10, 78:24
**Suite** [4] - 1:17, 1:25, 2:9, 2:13
**suite** [1] - 40:2
**summary** [2] - 41:16, 41:22
**sunset** [1] - 26:11
**supervision** [1] - 78:7
**supplement** [1] - 51:5
**supplemented** [1] - 30:11
**supplementing** [1] - 45:25
**supply** [1] - 51:20
**support** [3] - 24:8, 99:7, 100:18
**supposed** [1] - 44:1
**surprise** [3] - 6:25, 29:16, 29:22
**surprised** [2] - 29:12, 86:1
**surprises** [1] - 31:2
**suspect** [3] - 8:12, 13:10, 18:2
**suspender** [1] - 27:4
**suspicious** [1] - 107:3
**suss** [2] - 53:6, 100:9
**sussing** [1] - 57:23
**switch** [2] - 59:24, 61:20
**sword** [1] - 78:5
**system** [17] - 10:19,

11:5, 11:18, 11:20, 11:24, 17:5, 17:15, 18:1, 29:13, 29:16, 30:4, 46:23, 47:6, 47:12, 57:12, 85:19, 85:22
**systems** [11] - 17:5, 19:9, 30:13, 30:25, 31:4, 35:25, 37:10, 37:11, 44:3, 48:21, 59:18

# T

**table** [3] - 5:4, 38:3, 96:24
**tailor** [1] - 52:5
**tailored** [3] - 58:4, 95:14, 98:20
**take-away** [1] - 89:5
**talks** [2] - 54:5, 99:11
**target** [1] - 23:13
**targeted** [1] - 55:6
**technical** [6] - 5:19, 14:16, 17:9, 17:10, 17:13, 47:22
**technological** [3] - 6:21, 67:13, 69:5
**technology** [3] - 12:25, 22:18, 53:22
**TEDDY** [1] - 1:23
**Teddy** [1] - 3:20
**tee** [1] - 68:22
**teed** [1] - 23:5
**ten** [1] - 56:7
**tend** [1] - 9:2
**tens** [1] - 36:8
**terms** [18] - 10:9, 23:25, 29:17, 32:4, 37:5, 66:1, 68:20, 68:21, 69:14, 76:2, 79:4, 84:14, 88:14, 96:15, 96:25, 97:24, 100:23, 108:22
**test** [2] - 17:24, 87:15
**testified** [7] - 39:3, 44:6, 46:21, 47:4, 48:14, 50:19, 86:5
**testimony** [21] - 6:14, 15:20, 16:12, 37:17, 43:15, 44:8, 44:11, 44:14, 44:22, 46:17, 46:18, 46:25, 48:17, 55:24, 95:24, 97:19, 102:16, 103:9, 103:10, 103:16, 104:1
**Thanksgiving** [5] - 4:6, 8:7, 8:9, 21:14,

90:18
**that'll** [1] - 99:6
**THE** [241] - 1:1, 1:11, 1:15, 1:21, 2:2, 3:1, 3:10, 3:17, 3:25, 4:16, 4:22, 5:3, 5:5, 5:9, 5:11, 5:13, 5:16, 5:21, 5:25, 6:3, 6:6, 6:11, 6:17, 7:6, 7:11, 7:15, 7:18, 7:22, 8:6, 8:15, 8:19, 8:23, 9:9, 9:19, 10:1, 11:12, 12:15, 12:19, 13:3, 14:8, 14:13, 15:10, 17:19, 17:21, 18:22, 19:7, 21:13, 21:23, 22:10, 22:13, 22:21, 23:9, 23:18, 24:18, 24:22, 25:1, 25:6, 25:10, 25:21, 25:24, 27:6, 27:20, 27:22, 28:1, 28:3, 28:6, 28:11, 28:14, 33:6, 34:9, 34:11, 34:13, 34:19, 34:21, 34:24, 35:2, 35:8, 36:13, 36:22, 38:12, 38:17, 38:21, 39:1, 39:5, 39:8, 39:16, 39:25, 40:18, 40:21, 40:24, 41:2, 41:4, 41:11, 42:11, 42:16, 43:4, 43:7, 43:9, 43:12, 44:24, 45:2, 49:13, 49:15, 51:7, 51:14, 51:18, 51:25, 53:12, 54:1, 55:17, 55:20, 55:22, 56:1, 57:1, 57:18, 61:17, 61:24, 62:2, 62:4, 62:12, 63:9, 63:14, 63:17, 64:19, 64:22, 65:23, 66:4, 66:6, 66:8, 66:25, 67:2, 67:12, 67:14, 68:17, 68:19, 69:6, 69:9, 69:14, 69:21, 70:1, 70:5, 70:10, 70:23, 71:14, 71:17, 72:3, 72:11, 74:23, 75:18, 75:20, 76:1, 76:7, 77:10, 77:15, 77:21, 77:25, 78:3, 78:20, 79:2, 79:7, 79:9, 79:12, 79:15, 79:19, 80:10, 80:12, 80:16, 80:25, 81:4, 81:22, 84:2, 84:6, 84:13, 85:6, 85:12, 86:14, 86:18, 87:8, 90:6, 90:9, 90:11, 90:15, 90:19, 91:13,

91:19, 92:1, 92:5, 92:9, 92:12, 92:16, 92:19, 93:3, 93:22, 94:2, 94:8, 94:12, 96:23, 97:8, 97:12, 97:14, 98:4, 98:9, 98:12, 98:16, 98:20, 98:24, 99:3, 99:9, 99:14, 99:16, 100:12, 100:17, 100:21, 100:25, 101:20, 102:7, 102:12, 104:4, 104:9, 104:11, 105:13, 106:1, 107:21, 107:23, 107:25, 108:9, 108:12, 108:15, 108:19, 109:1, 109:11, 109:18, 112:10, 113:2, 113:7, 113:9, 113:11, 113:18, 113:20, 113:22, 113:24
**theater** [1] - 60:16
**theirs** [1] - 89:22
**themselves** [2] - 27:1, 69:12
**there'll** [1] - 46:14
**thereafter** [1] - 112:22
**they've** [30] - 5:1, 6:15, 7:5, 7:20, 13:10, 13:18, 16:14, 16:21, 18:12, 18:24, 26:8, 37:20, 37:24, 40:2, 41:21, 41:24, 47:20, 47:24, 50:9, 54:5, 58:2, 62:22, 70:13, 86:20, 86:21, 89:15, 92:20, 94:20, 95:9
**thinking** [4] - 55:2, 55:8, 76:3, 102:1
**thinks** [3] - 11:22, 102:21, 105:20
**third** [3] - 49:21, 64:16, 65:14
**third-party** [1] - 65:14
**thousand** [1] - 52:20
**thousands** [9] - 30:8, 35:24, 36:7, 36:8, 36:9, 36:11, 46:10, 46:11, 77:11
**three** [5] - 35:1, 35:4, 38:8, 38:9, 110:15
**thresholds** [1] - 10:24
**threw** [1] - 91:15
**throw** [1] - 112:24
**thrust** [1] - 66:5

**tie** [1] - 22:25
**timeframe** [1] - 51:17
**timing** [8] - 8:5, 8:14, 13:13, 21:4, 92:7, 96:15, 96:25
**tired** [2] - 21:8, 21:10
**tires** [1] - 17:23
**today** [9] - 3:14, 3:19, 4:19, 20:20, 27:18, 60:22, 108:14, 110:4, 111:5
**together** [1] - 4:8
**tone** [1] - 74:21
**took** [1] - 35:22
**top** [5] - 40:5, 58:20, 89:5, 102:9, 112:5
**top-level** [1] - 89:5
**topics** [11] - 15:22, 16:4, 16:18, 16:22, 38:15, 39:2, 39:3, 39:13, 51:20, 87:18, 104:22
**total** [1] - 30:20
**totaling** [1] - 36:7
**totally** [11] - 44:5, 66:13, 74:18, 83:16, 84:5, 85:15, 92:22, 100:17, 102:22, 103:3, 103:18
**touch** [1] - 67:1
**touches** [1] - 102:21
**towards** [2] - 55:9, 113:14
**track** [1] - 34:21
**Trading** [3] - 64:11, 65:21, 91:7
**Trading's** [1] - 64:10
**traditionalist** [1] - 88:24
**transaction** [5] - 10:23, 52:25, 54:15, 57:24, 74:1
**transactions** [1] - 19:2
**Transcribed** [1] - 1:12
**TRANSCRIBED** [1] - 2:15
**TRANSCRIBER** [1] - 3:6
**transcript** [3] - 76:15, 115:5, 115:6
**TRANSCRIPT** [1] - 1:10
**transcripts** [1] - 78:19
**transfer** [9] - 9:23, 10:20, 11:1, 12:6, 12:9, 31:9, 33:16, 34:3, 48:5

**transferred** [1] - 68:9
**transfers** [6] - 12:5, 19:15, 47:25, 48:4, 48:6, 53:15
**translate** [1] - 36:1
**transparency** [1] - 65:14
**trees** [1] - 52:18
**trial** [1] - 84:23
**tried** [10] - 19:12, 19:13, 19:16, 21:16, 28:15, 31:14, 42:21, 53:5, 100:8, 112:19
**trigger** [1] - 73:2
**trivial** [1] - 112:5
**TRO** [4] - 31:14, 31:24, 32:2, 32:11
**troubling** [1] - 19:11
**true** [7] - 33:20, 45:16, 48:3, 99:9, 109:16, 115:4, 115:5
**try** [14] - 3:11, 30:6, 35:6, 42:23, 52:6, 56:22, 57:19, 61:22, 84:4, 86:12, 101:10, 104:13, 105:11, 112:15
**trying** [24] - 9:25, 10:11, 16:8, 18:8, 21:23, 23:19, 31:6, 36:19, 49:6, 50:10, 52:5, 54:2, 57:6, 58:9, 59:2, 72:22, 80:8, 83:14, 85:2, 88:8, 94:22, 104:22, 108:5, 112:17
**TSS** [2] - 17:6, 19:17
**Tuesday** [3] - 13:25, 14:3, 76:11
**tune** [1] - 16:6
**turn** [1] - 35:5
**turned** [1] - 110:8
**turning** [1] - 65:1
**turns** [1] - 21:17
**tweet** [1] - 81:2
**tweeted** [1] - 70:8
**tweets** [1] - 81:1
**twice** [1] - 42:14
**two** [20] - 4:3, 4:25, 5:23, 18:16, 20:23, 26:3, 27:23, 30:10, 30:19, 35:4, 35:20, 38:9, 41:16, 43:10, 47:25, 90:6, 97:25, 99:4, 100:5, 100:6
**two-sentence** [1] - 41:16
**type** [1] - 69:17
**types** [1] - 101:10
**typical** [1] - 58:25

# U

**U.S** [8] - 18:13, 18:20, 58:13, 65:10, 75:7, 75:9, 83:10, 84:12
**ultimately** [7] - 27:8, 54:21, 57:11, 59:3, 72:13, 101:5, 103:5
**unable** [1] - 49:24
**unanswered** [1] - 39:15
**uncertainty** [1] - 94:7
**under** [9] - 12:14, 16:21, 37:17, 46:16, 75:7, 75:9, 84:12, 105:21, 111:11
**undercut** [1] - 74:9
**underlying** [1] - 32:13
**underneath** [1] - 69:2
**understood** [6] - 5:8, 43:2, 43:15, 74:18, 84:17, 103:25
**undertaken** [1] - 77:1
**unfettered** [1] - 11:19
**unique** [2] - 110:11
**united** [1] - 2:16
**United** [11] - 9:10, 58:14, 68:4, 68:6, 76:17, 76:20, 77:14, 77:15, 78:25, 83:9, 115:13
**UNITED** [2] - 1:1, 1:12
**unknown** [1] - 52:11
**unless** [2] - 9:17, 65:6
**unlikely** [1] - 69:22
**unlimited** [1] - 63:2
**unlock** [1] - 110:7
**unnecessary** [1] - 79:13
**unravel** [1] - 53:25
**unreasonable** [1] - 105:22
**up** [42] - 4:4, 7:1, 8:8, 9:2, 10:17, 12:17, 13:8, 13:21, 20:11, 20:14, 22:16, 23:5, 23:6, 24:24, 25:16, 26:7, 29:20, 40:6, 51:12, 53:1, 53:2, 56:9, 64:4, 65:11, 66:15, 66:16, 66:19,

68:11, 68:22, 75:16, 76:22, 83:12, 83:22, 86:1, 88:25, 93:25, 95:1, 105:6, 106:10, 107:17, 110:13, 112:4
**update** [8] - 21:1, 34:18, 37:4, 92:3, 92:7, 96:25, 97:15, 113:14
**updates** [2] - 20:6, 45:2
**uphold** [1] - 111:24
**urge** [1] - 76:17
**user** [1] - 17:16
**user's** [1] - 54:9
**users** [1] - 32:6

# V

**vague** [1] - 56:13
**value** [3] - 26:13, 32:3, 32:4
**Vancouver** [1] - 22:24
**vendor** [1] - 36:19
**verbatim** [1] - 111:9
**verboten** [1] - 87:18
**verified** [1] - 37:22
**versus** [1] - 3:3
**VIA** [1] - 1:11
**via** [1] - 108:18
**victory** [1] - 26:5
**VIDEOCONFEREN CE** [1] - 1:11
**view** [13] - 6:24, 7:8, 11:13, 14:19, 44:13, 44:15, 59:12, 74:17, 78:10, 79:3, 93:5, 106:16, 110:21
**viewed** [1] - 44:22
**violate** [2] - 13:22, 77:1
**violating** [1] - 60:19
**vis-à-vis** [1] - 91:22
**visibility** [1] - 54:18
**voting** [3] - 33:21, 108:18, 108:20
**vs** [1] - 1:6

# W

**wait** [4] - 26:16, 92:24, 110:16, 110:25
**waiting** [3] - 14:1, 20:19, 55:9
**wallet** [10] - 6:10, 9:23, 10:15, 10:22, 11:1, 53:9, 53:14,

64:10, 85:17
**wallets** [7] - 10:5, 10:6, 10:21, 48:16, 63:23, 63:24, 85:23
**wants** [4] - 51:19, 92:6, 96:20, 104:6
**Washington** [8] - 1:7, 1:20, 1:25, 2:7, 2:10, 2:14, 2:18, 115:14
**watching** [2] - 58:18, 112:3
**WATKINS** [1] - 2:12
**ways** [2] - 23:21, 52:13
**Wea** [5] - 20:1, 36:23, 51:13, 66:7, 68:13
**week** [18] - 4:3, 4:14, 16:1, 20:3, 20:16, 22:24, 25:12, 25:17, 30:11, 33:4, 41:15, 51:12, 65:10, 74:24, 75:8, 81:12, 98:17, 108:17
**week's** [1] - 74:20
**weeks** [7] - 8:13, 14:23, 27:23, 30:19, 35:17, 38:9, 46:14
**well-taken** [2] - 90:8, 109:4
**what..** [1] - 20:9
**wheel** [2] - 55:19, 57:8, 71:7
**whichever** [1] - 20:25
**Whitelist** [1] - 48:7
**Whitelisting** [2] - 17:6, 48:3
**whole** [3] - 33:15, 74:12, 102:9
**willfully** [1] - 89:8
**William** [1] - 3:22
**WILLIAM** [2] - 2:4, 2:11
**willing** [6] - 16:23, 41:23, 42:8, 86:16, 96:9, 112:14
**willingness** [2] - 6:22, 102:4
**Wilmer** [1] - 3:14
**WILMER** [1] - 2:5
**wind** [1] - 89:21
**witness** [8] - 15:13, 57:4, 91:2, 97:19, 102:15, 103:9, 103:11, 107:12
**witness's** [1] - 14:24
**witnesses** [7] - 6:23, 12:13, 15:14,

15:20, 19:12, 48:14, 57:4, 69:13, 94:15, 103:11

**wonderful** [1] - 61:5
**wondering** [2] - 16:3, 22:8
**word** [5] - 27:15, 30:21, 37:18, 93:23, 94:4
**words** [2] - 9:14, 26:24
**workforce** [1] - 31:20
**working-hard** [1] - 101:2
**works** [20] - 6:10, 9:1, 11:21, 13:23, 14:16, 17:15, 22:18, 29:14, 30:4, 41:17, 41:20, 43:25, 47:20, 50:9, 50:13, 50:15, 56:18, 92:20, 95:17
**world** [3] - 65:13, 66:24, 82:12
**worried** [4] - 24:4, 59:21, 60:4
**worry** [2] - 10:4, 42:12
**write** [2] - 16:16, 101:22
**writing** [4] - 7:2, 37:15, 39:20, 41:14
**wrote** [5] - 16:7, 58:7, 84:9, 102:25, 103:1

## Y

**Yards** [1] - 2:3
**year** [2] - 23:3, 27:11
**years** [2] - 32:13, 96:1
**York** [4] - 1:17, 2:3
**young** [1] - 50:16
**yourself** [2] - 3:5, 89:23

## Z

**zeroes** [3] - 17:25, 82:21, 93:10
**ZHAO** [1] - 2:12
**Zhou** [40] - 3:24, 9:12, 9:17, 19:18, 20:25, 23:21, 33:17, 33:18, 62:14, 69:14, 69:16, 70:8, 71:1, 73:1, 75:21, 76:6, 76:11, 76:21, 78:13, 78:24, 79:4, 79:24,

80:6, 80:9, 80:21, 80:23, 81:8, 82:3, 82:12, 82:18, 83:12, 83:22, 89:6, 108:1, 108:16, 109:19, 109:24, 111:3, 113:9, 113:22
**Zhou's** [5] - 24:5, 33:8, 108:4, 110:14, 110:19
**ZIA** [1] - 1:11