1               IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2


3    SECURITIES AND EXCHANGE COMMISSION,
                                        Civil Action
4                   Plaintiff,          No. 1:23-cv-1599

5          vs.                          Washington, DC
                                        September 18, 2023
6    BINANCE HOLDINGS LIMITED, et al.,
                                        3:36 p.m.
7                   Defendants.
     _____/

8


9          TRANSCRIPT OF HYBRID DISCOVERY HEARING
          BEFORE THE HONORABLE ZIA M. FARUQUI
10              UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:    JENNIFER FARER
                           DAVID NASSE
13                         MATTHEW SCARLATO
                              Securities and Exchange Commission
14                            100 F Street, NE
                              Washington, DC 20549
15

16                         EMMETT MURPHY
                           JORGE TENREIRO
17                            Securities and Exchange Commission
                              100 Pearl Street
18                            New York, NY 10004

19

20   For BAM Defendants:   MATTHEW BEVILLE
                           MATTHEW MARTENS
21                         WILLIAM McLUCAS
                              WilmerHale
22                            2100 Pennsylvania Ave, NW
                              Washington, DC 20037

23

24                         MATTHEW LAROCHE
                              Milbank LLP
25                            55 Hudson Yards
                              New York, NY 10001

1    **APPEARANCES CONT:**

2    **For Defendant Zhao:     WILLIAM BAKER**
                                **MOLLY ROSEN**
3                                Latham & Watkins LLP
                                 555 11th Street, NW, Suite 1000
4                                Washington, DC 20004

5

     **For Defendant BHL:     JASON MENDRO**
6                                Gibson, Dunn & Crutcher LLP
                                 1050 Connecticut Ave, NW, Suite 300
7                                Washington, DC 20549

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **Court Reporter:        JEFF HOOK**
                                Official Court Reporter
24                               U.S. District & Bankruptcy Courts
                                 333 Constitution Avenue, NW
25                               Washington, DC 20001

1          **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  This is civil case 23-1599,

3    Securities and Exchange Commission vs. Binance Holdings

4    Limited, et al.  This matter is set for a discovery dispute.

5          Parties, please introduce yourselves for the

6    record, starting with plaintiff's counsel.

7          **MS. FARER:**  Good morning, Your Honor.  Jennifer

8    Farer for the SEC.  With me at counsel table is David Nasse,

9    and on screen is Jorge Tenreiro, Emmett Murphy and Matthew

10   Scarlato.

11         **THE COURT:**  Thanks so much.  Great to see you.

12         **MR. MARTENS:**  Good afternoon, Your Honor.  Matthew

13   Martens from WilmerHale for the BAM entities.

14         **MR. BEVILLE:**  Your Honor, Matthew Beville from

15   WilmerHale, also for the BAM.

16         **MR. LAROCHE:**  Good afternoon, Your Honor.  Matthew

17   Laroche from Milbank.

18         **MR. McLUCAS:**  Good afternoon, Your Honor.  Bill

19   McLucas from WilmerHale.

20         **MR. BAKER:**  Good afternoon, Your Honor.  Bill

21   Baker, Latham & Watkins, on behalf of Changpeng Zhao.  And

22   this is my colleague Molly Rosen.

23         **THE COURT:**  Great to see you, Ms. Rosen.

24         **COURT REPORTER:**  I'm sorry to interrupt, Judge.

25   This is Jeff, the court reporter.  I was not able to hear

1    the last few appearances because they weren't speaking into

2    the microphone.

3           **THE COURT:**  Okay.  Well, I won't have them belabor

4    their entry of appearance, but thank you for the reminder --

5    to the court reporter, please, I don't want to get in

6    trouble with.  Thank you.

7           Anyone else?  Please.

8           **MR. MENDRO:**  Good afternoon, Your Honor.  Jason

9    Mendro from Gibson Dunn on behalf of Binance Holdings

10   Limited.

11          (Inaudible appearance)

12          **THE COURT:**  It's great to see everyone in real

13   life this time.  Why don't we get started.  So I'm going to

14   try to -- once I get open my document here.  What I kind of

15   thought would make sense is I had some overall sort of

16   questions or comments, and then from there, I thought we'd

17   just go through kind of the different issues with the

18   different discovery sort of categories of the depositions,

19   interrogatories, requests for productions, et cetera.  So

20   we'll go through things.

21          And to the court reporter, please do chime in

22   again if you don't hear us.  I'll have people -- what I'll

23   try to do is be quite clear who I'm talking to, and then

24   have them come up to the lecturn.  I think what we'll do is

25   in the beginning deal with some of the, as I said, overall

1    issues that I see, and then as we go then through each

2    subject matter, give each person a chance and go back and

3    forth as need be.

4         Obviously there's been a request for some

5    materials to be kept under seal.  I don't think there's any

6    need to really get into anything that's under seal, you

7    know, identity of certain individuals or account balances,

8    things like that or really any other matter that there's

9    been a showing for sealing for.  We're not here to litigate

10   the actual materials, we're here to talk about the

11   framework.  And I do believe that the divide is not as far

12   apart as you both -- I'm sure you all may believe.

13        So, all that being said, let's get into it.  So I

14   think what helps frame for me, and I think it frames all of

15   your pleadings, is that two things can both be true at the

16   same time.  And so when I looked at the documents, I

17   think -- you know, from the SEC's perspective, is that the

18   consent order is following Judge Jackson's -- they say,

19   quote, legit concerns given the offshore nature of some of

20   the defendants, and the ease of moving money from place to

21   place given the overlapping ownership that something needs

22   to be done.  So, really, that seems to underpin a lot of

23   what the government's sort of arguments and concerns are is

24   that, you know, they reflect that Judge Jackson had some

25   heartburn about the nature of where entities were and

1    movement of money.  So I understand that.

2         That can be true, and also true which is what the

3    SEC continues to say, is that we don't have even a parade of

4    horribles.  We have -- and I take what you say very

5    seriously, that this was not -- the SEC sort of did not

6    answer a 911 call here, right.  Pre-complaint, BAM produced

7    more than 700,000 individual communications, over 11,000

8    e-mails -- you know, the list goes on.  It's not a small

9    discovery proceeding that occurred beforehand, you know, a

10   one-way discovery proceeding.  And that as the SEC has

11   acknowledged to this Court in the June 13th hearing, that

12   there's not evidence that BAM customer assets have been

13   dissipated, commingled or misused in any way.

14        So I think both of those things can be true, is

15   that there is nothing bad that SEC has established that's

16   been true.  But that because of the nature of the funds that

17   are here and the nature of the overseas companies, that

18   there is still an acute concern.  I'm sure the Court did,

19   and I know as I was involved in the consent order I

20   appreciated that the goal was to try to find a path.  I

21   think that's what the consent order did, it bridges those

22   two different things.

23        Again, just so we're all working with the same

24   framework here, as I see it, looking at the consent order --

25   and specifically what we're here today on is the expedited

1    discovery of -- you know, we're looking at defendants, BAM's

2    third-party auditors, custodians of assets concerning

3    customer assets in their possession, custody, control,

4    transfer or movement, security, segregation, availability

5    and any encumbrance or limitations that would make them

6    unavailable for transfer or withdrawal by customers.  And I

7    only restate that because I'm trying to get at this narrow

8    bandwidth.

9           I appreciate some of the concerns raised by the

10   folks at BAM that -- which, I mean, I think you're just --

11   you know, and I appreciate that time is very important, but

12   you're just buying yourself time.  Look, I mean, obviously

13   once you get to regular discovery, the SEC's going to get

14   into a lot of this.  But I think that you're right, that

15   what I'm looking at right now is very narrow.  It's just we

16   don't normally look at a full forensic autopsy or something

17   like that.  This is just a question of what is the health

18   right now, and is it sufficient to protect customer assets.

19          I view what the SEC's doing as trying to really --

20   it looks like consumer protection, right, that's what you're

21   looking at, I think, and I understand that.  Obviously, you

22   can't just look at this moment right here right now, you

23   need to have some sort of baseline, and so that seems

24   entirely appropriate.  But I hear where the folks at BAM are

25   coming from.  At some point, we don't want this to just

1    become the full discovery process, because then we can go

2    there.  But we don't need this to become some sort of

3    backdoor way into that.  So I am cognisant of that.

4          I mean, I just -- I don't think there's any

5    dispute about this, but I want to make sure.  So the consent

6    order talks about -- well, looking back, the consent order

7    talks about -- it required that all customer assets to

8    include all existing and new private and administrative keys

9    relating to BAM's customer crypto assets and route access

10   associated with the AWS accounts for the Binance.us platform

11   be solely in BAM's custody and complete control in the

12   United States absent an express exception, and not be

13   provided to or in any way shared with the Binance entities.

14   So I think we all understand that that is the sort of

15   playing field.  And where I think things get a little murky

16   is who are the Binance entities, and whether or not there's

17   custody or control.

18         But before I get into that, I just want to make

19   sure that we're all on the same sheet of music.  So my first

20   question to the folks at BAM is -- and you have this in your

21   pleadings, so I'm virtually certain the answer is yes, but I

22   just want to be clear.  The consent order required BHL to

23   transfer its key shards to BAM, and to delete or destroy any

24   existing copies of any private keys that could have been

25   used to control BAM's customer assets.  That's directly from

1    your pleading, and so I guess my question to BAM is I just

2    want to confirm this has been done?  And obviously it's to

3    the best of your knowledge and every caveat of course.  I'm

4    not trying to put anyone under the gun.

5          **MR. MARTENS:**  I mean, obviously we put in

6    declarations to that effect, yes.

7          **THE COURT:**  Okay, great.  And the second thing was

8    that to begin to establish new wallets within 14 days,

9    they'll be controlled by new private keys in the sole

10   possession, custody and control of BAM trading officers,

11   employees who are located in the United States.  And again,

12   I mean, I think you indicated you believe that's been done?

13         **MR. MARTENS:**  I think done is -- it's begun, which

14   is what was required.

15         **THE COURT:**  Right.  So it had to begin within 14

16   days if there was no sunset that was in the -- or sort of

17   deadline, I should say rather.

18         **MR. MARTENS:**  Correct, and so that we believe

19   that's been complied with by beginning that process.

20         **THE COURT:**  But yes, perfect, thank you.  I

21   appreciate that.  Precision is important here, so thank you.

22   I think what I want to hear from the parties first is

23   turning really to this BHL-Ceffu -- or I don't know if

24   there's a better pronunciation, I'm happy to have it.

25         Ms. Farer, maybe I can just start with you.  Is it

1     really -- so to me there's two questions, right.  There's --

2     one is is there enough assets, right, in terms of consumer

3     protection, right, to meet the balances.  And I'm not -- I

4     don't see that right now as your main concern at least, so I

5     don't know if that means that you've somewhat put that to

6     bed and that you're focused on -- right, because there's two

7     issues:  Do they have enough assets now, and then what

8     happens tomorrow to stop those assets from dissipating.  And

9     I view it as you're mostly looking at that second issue.

10    And I don't know if that means the first issue is resolved

11    or you're just focused on the second issue and you'll get to

12    the first issue when you get there.  I don't know if you can

13    give me any guidance on that.

14          **MS. FARER:**  So in answer is to the first question,

15    Your Honor, no, the SEC does not have sufficient evidence to

16    ensure that there are enough assets to meet balances.  And

17    this is one of the reasons that we've asked for the

18    additional financial information, including the general

19    ledgers, the trial balances, et cetera.  Defendants would

20    have us rely upon the very carefully prepared accounting and

21    related documents under section four of the consent order.

22    But that is insufficient for a number of reasons, including,

23    one, they produced the information in the aggregate, and we

24    need more granular information about particular account

25    information.  They didn't provide specific details about the

1    accounts.

2           But most fundamentally, Your Honor, is that with

3    the information that we have received, we have identified

4    discrepancies on -- as to the individual crypto asset level

5    in total, between the digital assets that are reported in

6    their PNK, which is their internal general ledger system,

7    and between the aggregate wallet balances.  So that's one of

8    the reasons we're asking for more granular detail, more --

9    additional financial information so that we can evaluate and

10   tie this out further.  In addition to the crypto

11   information, the SEC has also identified discrepancies

12   between the total fiat currency held by BAM as reported in

13   their PNK system -- again, that's their general ledger

14   system, as compared to the bank statements that are

15   provided.

16          And then finally, Your Honor, I know this wasn't

17   touched on, but the defendants do have a regular reporting

18   requirement relating to the monthly expenses.  And so the

19   general ledger and other financial information that we've

20   requested would help us evaluate whether the expense reports

21   that they have provided are unduly encumbering assets that

22   should be available for the customers.  So that's the answer

23   to your first question, is that while we have certainly

24   prioritized the custody and control, we do not have

25   sufficient evidence at this time to have satisfaction that

1    the assets are fully available to satisfy all customer

2    liabilities.

3         **THE COURT:**  And is your sort of hope is through

4    the requests for productions, is that where you're looking

5    to get the --

6         **MS. FARER:**  Yeah.

7         **THE COURT:**  Okay.  And have you all -- because

8    this is a little different than some of the things that

9    we're talking about today.  Is there any narrowing that's

10   being done with meet and confers or do you feel like you're

11   at a loggerhead also on that?

12        **MS. FARER:**  Your Honor, we have met and conferred

13   with counsel on a number of occasions, as demonstrated by

14   the exhibits to these briefs.  There have been a number of

15   e-mails, a number of calls, sometimes multiple calls in one

16   day.  There have been occasions where defendants have

17   indicated that they would be willing to provide the general

18   ledger information, initially for a snapshot in time.

19   Subsequently, they were open to providing more of this

20   information.  And it just hasn't happened.

21        I mean, this is part of the issue that we're

22   having, Your Honor, is that we're just being slow rolled.

23   We have these meet and confers, their "we'll take this

24   back," but then we're three months in and have less than 250

25   documents.  As you identified, there was a set of

1  categories.  The questions remain unanswered with the

2  evidence that's been produced.

3  **THE COURT:**  Well, that sort of is my global

4  question for the SEC, is that it seems like one of your main

5  concerns is that things are moving too slowly.  And I

6  understand obviously the expedited discovery period has now

7  elapsed, but that seems pretty easy to fix.  And so I would

8  think that the pace at which things are moving is more of a

9  concern.  Again, I understand there's a consumer protection

10  thing here, so I get that you're, like, concerned about

11  consumers.

12  But I would think that the defendants would be

13  more concerned -- I mean, you know, if they came up here --

14  you know, if they come up here today and say fine, but this

15  is going to add like six more months on to this, I feel

16  that's more their -- that's going to be more burdensome to

17  them than to you all if things are -- I mean, is that really

18  the pace a problem if things start coming forward?  It's not

19  the speed, it's the quantity -- or like the quality of

20  what's coming out; is that right?

21  **MS. FARER:**  Well, as Your Honor identified, it is

22  obviously of top importance to us, investor protection.  And

23  in addition to the issues that were raised in connection

24  with the TRO that led to this consent order, as reflected in

25  our recent papers, there have been a number of changes to

1    the company that has been publicly reported.  So that

2    exacerbates the issues and need for discovery, to ensure

3    that the assets are safe, secure and available for

4    customers.

5         With that being said, Your Honor, we have, again,

6    in the various meet and confers discussed with counsel

7    that -- you know, we've extended them -- you know, extended

8    deadlines for different productions to try and have them

9    work through whatever issues they were experiencing with

10   collection.  And so -- you know, and we've requested an

11   agreement on extending the expedited discovery period.  I

12   mean, we don't want to all be here forever, but we just do

13   need these questions answered.  And so -- but defendants

14   have objected to that, and so here we are.

15        THE COURT:  Yeah, okay.  Well, maybe I'll just go

16   into then the second subject, right, is the custody and

17   control.  Right now, you know, is it accurate to say, I

18   mean, that BHL-Ceffu, that's sort of -- is that the -- that

19   seems like it's the lion share.  I understand you want to

20   get the inspection and things like that to get some of the

21   real nitty-gritty and the details and things.  But that, to

22   me, seems like that's the 600-pound gorilla here that we're

23   trying to -- both sides are trying to -- is that kind of

24   fair to say it's the major point?

25        MS. FARER:  It's the major point in the sense of

1    we just need evidence to identify what entity is in control

2    of creating the wallets, creating the keys, how those

3    systems interact with the BAM controls that they claim

4    allows them to control these keys.  Because regardless of

5    whatever entity it is, the entity appears to be a Binance

6    entity.  The entity that is in charge of this infrastructure

7    and software, based on the evidence we've seen, creates the

8    wallets, has the entire back-end infrastructure that

9    interacts with the systems.  And so we just need to

10   understand the level of control that this Binance entity may

11   have, because as reflected in our papers, defendants may be

12   in violation of the consent order.

13          As Your Honor identified, non-affiliated

14   third-party custodians can have some measure of control as

15   long as BAM personnel in the United States are directing

16   transfers, withdrawals, et cetera.  But a Binance entity,

17   regardless of what you call it, is prohibited from serving

18   as a custodian.  And the evidence has indicated that that is

19   exactly what's happening here.

20          **THE COURT:**  Okay.

21          **MS. FARER:**  I'm happy to answer questions about

22   this muddled record of Binance and Ceffu, but that again,

23   Your Honor, as demonstrated by both parties' briefing, it is

24   a muddled record.  And so if the circumstances are such that

25   BAM now describes, that Ceffu was a misnomer, a misbranding,

1  there was confusion, the documents from the auditors don't

2  accurately reflect that there's this separate entity, there

3  should be evidence of that.  There should be communications

4  of how these individuals came up with Ceffu, why they

5  included it in their policy and procedure that identified

6  Ceffu as the wallet custodian -- which is how we learned

7  about it in the first place, and indicating that this is a

8  mistake.  Mr. Kellogg, in his deposition, identified that he

9  had multiple conversations with Binance personnel about

10  Ceffu clearing up this apparent confusion that he has.  So

11  if that's the case, produce the communications.

12        But again, as I said, Your Honor, at the end of

13  the day, it appears that there is a Binance entity that has

14  more custody and control than is permitted under the consent

15  order, and we just need evidence to really evaluate that.

16        **THE COURT:**  Yeah, and so I want to make sure we're

17  complying with the -- you know, the parties are complying

18  with the consent order.  But I think at bottom what it's

19  about, again, is you want to know what's going on, and you

20  want to know that it's safe.  And so I'm sort of leaving in

21  the rear view mirror the question of whether or not -- what

22  the consent order contemplated.

23        But my question is, is there a world in which --

24  you know, because I feel like we are a little bit trying to

25  prove a negative here from the government's perspective,

1    that something bad has not happened -- which is hard to do

2    or can't happen, because you can't ever prove that.  But is

3    there a world in which Ceffu, if whatever it is, you know,

4    you could view them as a credible party that could do these

5    services or is it just because of their relationship with

6    BHL that it's factually impossible?

7            **MS. FARER:**  We would need additional evidence for

8    sure, Your Honor.

9            **THE COURT:**  So I hear that's a maybe, it's

10   possible.

11           **MS. FARER:**  I was going to add the consent order

12   expressly prohibits Binance affiliates from having

13   possession, custody and control of these private

14   administrative keys, new private administrative keys --

15   which are a broad definition.  And the provision in the

16   consent order requiring the creation of wallets was

17   expressly included to ensure that the BAM personnel located

18   in the United States have sole and exclusive control of

19   the -- custody and control of the crypto access.

20           **THE COURT:**  Okay.  And so in the alternative, do

21   you have sort of a white list of who you would say would be

22   the right or, you know, acceptable actors to do this?  I

23   presume they're going to tell me it's just wildly expensive,

24   but so is arguing about this.  And so I'm just -- do you

25   have a sort of alternative in mind or does the SEC have some

1    ideas on who might be the sort of folks that you would feel

2    comfortable with?

3            **MS. FARER:**  Your Honor, there are two third-party

4    custodians that are identified in the consent order.  So

5    we've not received any proposal about the nature of

6    services, and we need to evaluate whatever the proposal may

7    be.  Again, the main focus would be under the direction and

8    control of BAM personnel in the United States, and whatever

9    entity it is that may serve those functions also be

10   permitted under the consent order as a non-affiliated

11   third-party custodian located in the United States.

12           **THE COURT:**  Okay.  Before I hear from I guess BAM,

13   my -- well, two things.  I understand we want to be as

14   studious about the consent order, but the consent order is

15   just that, it's by consent.  It can always be modified.  And

16   I'm sure the answer is no, but I'm just trying to understand

17   why the answer is no for you all.  It's not like the normal

18   situation where we say like, oh, I'm not going to do

19   something with someone else or something like that, and

20   you're just relying on one side here.  Because you have the

21   full picture.

22           I mean, you have represented by able counsel, you

23   know, the defendant CZ as well as BHL.  They're telling you

24   through counsel that they're going to abide by the order,

25   and so that's not -- why isn't that enough in terms of the

1   custody and control?  I still -- I understand that that's

2   totally unrelated from the balances and things like that.

3   But is it enough if everybody's here -- I mean, presumably

4   if they are being deceptive about this, there's possible

5   criminal liability then, right.

6          So why isn't that enough if you still feel unsure

7   about BHL or something like that?  I mean, most of these

8   overseas sort of concerns that Judge Jackson's concerned

9   about, like oh my God, money can move overseas and it can go

10  to like a foreign bank or something.  They're not normally

11  sitting in here via counsel, so that's not getting the job

12  done, cutting mustard -- I don't know what to say.

13         **MS. FARER:**  I mean, we need the evidence to

14  evaluate the representations made by counsel.  As reflected

15  in our papers, it appears that the certifications may not

16  entirely be accurate as to the control that is now -- has

17  been turned over through the form of various keys, and that

18  is now under BAM's direct custody and control.

19         **THE COURT:**  Okay.  And just the last thing then

20  was I just wanted to make I got it right from your pleading.

21         **MS. FARER:**  And I would just add, Your Honor, that

22  the concerns that you reference from Judge Jackson are very

23  much at the heart of this issue.  As we have obtained the

24  limited evidence that we have to date in evaluation of one

25  of the quote, unquote shard devices, the phone number that

1  alerts the shard holder to -- that there is an approval

2  required reflects a Singapore phone number.  The initiator

3  that sends requests to the shard holder is based in Canada,

4  and part of this individual's paycheck is from a company

5  based in Shanghai that is not BAM.

6          So there are a lot of foreign touch points that

7  relate to the concerns that gave rise to the consent order,

8  as Judge Jackson expressed in the initial hearing.

9          **THE COURT:**  Yeah, so what I wanted to ask was from

10  your reply, I mean, there's the question about the

11  initiator, and that the head of clearing is in turn a former

12  Binance employee recently relocated from China to Vancouver.

13  Obviously, I can understand why that raises some concerns.

14  And then the TSS protocols governing the key shards is

15  governed by a person who is named as a Binance back office

16  manager.  And that person seems that they can -- only that

17  person can apparently change the protocol to add additional

18  initiators beyond the current Canadian based one.

19          **MS. FARER:**  And this is the individual, Your

20  Honor, that had -- was on a number of BAM and Binance

21  accounts, was an officer of Sigma Chain that is at the heart

22  of a number of our allegations.  And this individual keeps

23  popping up with respect to the administrator of the protocol

24  that is the control that BAM relies upon in saying that they

25  control the private keys and the IDs on these shard devices.

1    So this is why we don't think that the order is sufficient

2    as it stands based on the evidence we've received.

3           **THE COURT:**  And then one of the other things you

4    note there is that BAM claims to control hot wallets through

5    the PNK system, but the head of clearing testified at a

6    deposition that when assets failed to move, BAM had to

7    contact BHL to address the issue.  So, again, your concern

8    is just that the consent order is requiring sort of a limit

9    here or exclusion of BHL from this, and that that is

10   evidence to you that is not in fact accurate -- or that's

11   not what's happening right now I guess I should say.

12          **MS. FARER:**  Correct, and that BAM is not actually

13   in control.  The two controls that BAM relies upon in saying

14   that they have custody and control of the assets,

15   notwithstanding Binance's involvement, is this TSS protocol

16   and these shards.  And it's a little bit cumbersome, so if

17   you allow me, Your Honor, I'll explain a little bit how we

18   understand the process to work.

19          **THE COURT:**  Sure.

20          **MS. FARER:**  Again, this is why we need more

21   evidence.  There is a system that this individual, the head

22   of clearing in Canada, he serves as the quote, unquote

23   initiator.  He logs on this TSS portal --

24          **THE COURT:**  Can I -- is it your view that him

25   being in Canada is a problem?

1  **MS. FARER:**  We are now -- based on the lack of

2  discretion that the shard holders exercise, we are

3  evaluating the extent to which he is actually in control of

4  directing transfers and withdrawals.

5  **THE COURT:**  Okay.  Start over with this person in

6  Canada.  So start over.  How does it go?

7  **MS. FARER:**  So the head of clearing is in Canada.

8  He logs on to a TSS portal, and he initiates these

9  transfers.  And the transfers that he initiates through this

10  TSS protocol relate to the movements from cold to hot

11  wallets.  The TSS protocol, from what we understand, does

12  staking wallets and cold wallets in these transfers.

13  So he initiates these transfers.  These shard

14  holders have a device, and they get a Slack message from

15  this initiator that says:  You're going to get these

16  transfers, here's the token, the amount number.  At some

17  point in time, the device rings like an actual voice phone

18  call with a number reflected from Singapore.  And there is

19  this app, like a software app, on the device that a to-do

20  list is updated.  And the individual can hit approve or

21  decline.

22  The one shard holder that we deposed said that he

23  simply checks whether the token and value match the request

24  that he made.  He exercises no discretion in evaluating who

25  the transfers go to to ensure compliance with the consent

1    order and no unauthorized transfers, other than he says the

2    initiator, the person based in Canada, that's his

3    responsibility.  So that's how the shard process works.

4         And as identified, Nina Chen is the administrator

5    of this protocol, and so BAM has to ask her to add different

6    initiators.  And it's not clear to anyone at BAM whom we've

7    asked what other authority and capabilities she has with

8    respect to this particular portal.  As we noted, she is

9    identified as the Apple ID for the device, which as Your

10   Honor may know, involves -- often involves a significant

11   amount of control over a particular device.  But again, this

12   is why we are seeking more evidence on this issue.  So we

13   need evidence to answer real questions with respect to the

14   cold wallets about who is actually in control.

15        And then if we look at the hot wallets and the

16   deposit wallets, BAM has explained -- and a number of

17   witnesses that we've since deposed, have explained that

18   their PNK system has preconfigured thresholds by which

19   deposit wallets move tokens to hot wallets.  And nobody

20   could verify that the software itself was preconfigured,

21   because all of that was done on the back end.  We understand

22   that BAM --

23        **THE COURT:**  By BHL or Ceffu presumably?

24        **MS. FARER:**  Correct, but nobody really knows, and

25   that's why we're asking for more evidence on this issue.

1   BAM and some of the individuals we've spoken to say that

2   they identify the amounts to, like, input into PNK, but they

3   don't actually set the configurations.  And so as Your Honor

4   read the portion of our brief, in deposing Mr. Zhang who is

5   the head of clearing, when identifying any issues with the

6   system or issues with transfers, he said that there was a

7   point at which there was not -- a transfer did not go

8   through pursuant to the predetermined thresholds, and so

9   they had to contact BHL and then the assets moved.  And when

10  asked sort of how that happened, he did not have any

11  understanding other -- and said he didn't receive an

12  explanation, it was just that the result was successful

13  which suggests, Your Honor, that there is a measure of

14  control over the wallets and keys.

15          THE COURT:  So to go back to my question of -- I

16  mean, just aren't you going to say that even if you have the

17  full understanding of -- you know, at a microscopic level of

18  how BHL/Ceffu operate, and that they do have control over

19  BAM's assets or they have the ability to backdoor their way

20  in or whatever, I mean, it seems to me that you're going to

21  say that that's not permissible; is that right?

22          MS. FARER:  We would certainly need to evaluate

23  the circumstances to determine compliance with the consent

24  order.

25          THE COURT:  Okay, thanks.  Let me hear from BAM.

1          You can just tell me you've got some new person,

2   and I can just go off the bench and start happy hour.  I

3   guess there's no chance that's the answer?

4          **MR. MARTENS:**  Maybe I think it makes sense to back

5   up here a little.

6          **THE COURT:**  Please, yeah.

7          **MR. MARTENS:**  So in response to the TRO from the

8   SEC, the TRO application, BAM put in a declaration from Eric

9   Kellogg, the chief information security officer from the

10  company, in which it was perfectly clear, explained in a

11  sworn declaration, that BHL provides the software that is

12  used by BAM for the custody of assets.  This has been known

13  before the -- at the TRO time, at the consent order.  So

14  this claim of shock and surprise that we rely on software

15  that at times has to be maintenanced by BHL is not in fact

16  genuine shock and surprise.  They have long known this

17  before the consent order.  And this is running down a rabbit

18  trail of now trying to understand exactly how this software

19  works when it doesn't matter.

20          It's long been understood that this was the

21  process that was utilized, and it was not forbidden by the

22  consent order.  It was not deemed custody or control, the

23  mere fact that we used BHL, a/k/a Ceffu, to provide this

24  custody software.  So I think that's the important starting

25  point, is there's a declaration June 12th that made

1  perfectly clear that BHL would be used for purposes of

2  providing that software.  And so chasing down exactly how

3  that software works is neither here nor there.  It's been

4  understood that we would use this software, and the

5  implication is no one ever thought that that was our custody

6  or control.

7         And the fact that a representative of BAM, Eric

8  Kellogg, who testified, whose testimony was referenced, the

9  chief information security officer, doesn't know exactly how

10  another entity operates its software is, again, no shock and

11  surprise.  He did due diligence, as he testified in his

12  declaration, and was satisfied that the software was secure,

13  and has been utilizing it.  None of that raises any

14  concerns, certainly not anything that we can answer, about

15  whether or not there's any issue of custody or control.

16         Now, I heard a lot of talk about today about,

17  well, we need this particular thing and we need that

18  particular thing, as if the SEC has made particularized

19  requests that we're rejecting.  Let me be clear:  Every

20  targeted request we have gotten we have responded to, every

21  single one.  What we're not going to respond to is the

22  foolishness -- and there is no better word for it, than the

23  document request that came from the government here.  What

24  they essentially asked for was every document for the

25  company since November of 2022.  There's no other way to

1    read these document requests.  And that is -- that is

2    foolishness, that's not serious litigation.

3           If there's targeted requests where they're

4    particularly concerned about employee A's pay -- which I

5    heard referenced, or something more targeted like that, we

6    have been willing to address targeted requests.  I think

7    what's noteworthy is when you look at the motion, there's

8    not targeted requests where the SEC is, for the most part,

9    saying we need this particular thing.  What their number two

10   request is:  All documents, all communications for 14

11   custodians, all documents and communications requested by

12   the RFP, which is literally all documents since

13   November 2022.  And it's that type of response -- that type

14   of request that we will not respond so, and we've made that

15   perfectly clear.

16          And while the SEC professes now to have targeted

17   requests, while they profess that they have been engaged in

18   good faith meet and confer, you can read as Exhibit 11 the

19   August 2nd, 2023 e-mail in which they said they need total

20   responses to those RFPs.  There's no narrowing of those to

21   be targeted in any way.  Their e-mail of August 2nd, which

22   they attached, contains the language that they want

23   everything in those RFPs.  And we are not producing that.

24   That is not a reasonable request; that is not a targeted

25   request.  That does not meet the requirements of Rule 26(b),

1    which requires that the burden -- that the benefit outweigh

2    the burden.

3            And so we're here today not saying we won't

4    produce any more documents.  I'm not here saying we wouldn't

5    respond to particularized requests.  But that's not what's

6    at issue in this motion.  They've moved for total and

7    complete production in response to these RFPs.  It's their

8    second item in their list.  They want first everything and

9    anything about the software and Ceffu.  And the second thing

10   they want is all communications related to these custodians.

11   And it's those type of requests that we will not respond to,

12   and we've told them that.  But -- and I just want to

13   emphasize this, every single time they've come and made a

14   targeted request, we have complied with that.  We are

15   here to -- if there are particularized concerns, we can

16   address those.

17           But I don't even know what they're asking for you

18   to rule on today.  Are they seriously saying we have to

19   respond in their entirety to the RFPs as written?  Because

20   that's the motion they made.  Just take it, look at the

21   number one:  "All documents and communications concerning

22   the policies, procedures, protocols, controls, software and

23   any changes thereto as to the deposit, custody, control,

24   storage, transfer, movement, withdrawal, security,

25   segregation and availability of customer assets."  In number

1    one, they've asked for every document of the company since

2    November of 2022.  And then they repeat that over and over

3    and over.

4            If you actually take the word concerning seriously

5    and the requests as written seriously, they're really asking

6    you to enforce that, they're asking you to order us to

7    produce in 14 days every document of the company since

8    November of 2022.  This is not a reasonable request.  This

9    is not narrow requests.  We're here willing to continue to

10   allay the paranoia, but we're not here to just make endless

11   productions and unconstrained productions.  And yet that's

12   what they're requesting for, their proposed order shows

13   that.

14           **THE COURT:**  Sure, so let's just back up.  I hear

15   you, I mean, and what I hear is just that if we can be

16   narrow, that we can get to where we need to to get

17   documents.  And so I kind of want to put a pin on the

18   overall.  I think -- you know, I understand from your

19   perspective if someone's asking for everything, and then you

20   say I can't give you everything, that then you need to

21   narrow.  Well, what to narrow?  It's kind of hard then,

22   because they've asked for everything.  So I --

23           **MR. MARTENS:**  The motion doesn't even narrow it.

24           **THE COURT:**  I gotcha.  Let's go back to just this

25   BAM-Ceffu thing, one thing at a time.  And so, I mean, I

1    think that from my perspective, as I look at this, they

2    could have known -- again, I mean, to me it doesn't matter

3    too much.  They could have known that BHL was involved, but

4    they seem to have -- their focus is very much on geography,

5    right.  And so presumably before this, they had some idea of

6    what BHL or Ceffu was -- well, BHL I should say.  They could

7    have known that BHL was the custodian, but not understood

8    the nature of what BHL's role was in it.  And so --

9          MR. MARTENS:  Well, just to be clear, not BHL, the

10   custodian.  We've never -- BHL, the software licenser.

11         THE COURT:  Sorry, yeah, thank you.  So as BHL

12   providing this wallet custody software, they may have known

13   that.  But it seems like now from the discovery -- right,

14   which I appreciate, it sounds like you all have given them

15   some discovery, and they've gotten it through the expedited

16   discovery.  It's raised new concerns.

17         MR. MARTENS:  What are the -- I don't know what

18   the concerns are --

19         THE COURT:  What about the --

20         MR. MARTENS:  -- the chief information security

21   officer.  And more importantly, I don't know what documents

22   they want on those concerns.

23         THE COURT:  Sure, sure.

24         MR. MARTENS:  That's the fatal flaw with this

25   motion.  It is a scattershot blunderbuss.  It's no more

1   narrow than the original request.  There's no particularized

2   request in this motion, just look at the order.

3        **THE COURT:**  No, no, I gotcha.  No -- yeah, I've

4   seen it.  So just stepping back, though, I mean, their

5   reply, right -- which I appreciate that it came out this

6   morning, and so I'm trying to -- which was helpful.  And so

7   I'm glad they had it.  But I need you to help me walk

8   through this, because I'm a little concerned that they

9   say -- for instance, they say -- I mean, and I believe it,

10  that BAM claims it has exclusive control of the hot wallets

11  through the PNK system.  But they give this example of when

12  the head of clearing testified during his deposition that

13  when assets failed to move, BAM had to contact BHL to

14  address the issue.  And so --

15       **MR. MARTENS:**  Right, they provide the software.

16  And so if the software doesn't work, you call the people who

17  provided the software.  But again, okay, what documents do

18  they want from me in response to that?  You still can't

19  answer that from the reply brief.  I mean, this is the

20  point:  They have not met and conferred in good faith.  And

21  you can see it from the order, you can see it from the reply

22  brief.

23       Great, they've got concerns about the fact that

24  our guy called somebody at BHL to say fix the software.

25  What's the narrow targeted request they want in response to

1    that?  One's left to guess, even here today.  Instead what

2    they've asked for is all documents since November 2022.

3    That's the problem.  If they want to make a list of here's

4    the 10 targeted things we want in response to the 10 issues

5    they've identified, that would be one thing.  We're still

6    not there.

7          **THE COURT:**  I mean, it seems to be I guess there's

8    a gulf, though, in this.  I mean, you all, I think is it

9    fair to say, then you feel that even if BHL has the ability

10   to control -- because they obviously have control of the

11   software, right.  You call up your help desk, I need help,

12   whatever.  They may be in Canada or Singapore or any other

13   place.  If they're calling folks and they can access the

14   assets, that that is not --

15         **MR. MARTENS:**  There's no evidence of that point.

16   I just want to make that clear because we're on the public

17   record.

18         **THE COURT:**  Right.

19         **MR. MARTENS:**  The fact that someone from BAM

20   called BHL to address an issue with the software, there is

21   no evidence that that gives them access to the assets.

22   There is no evidence of that.

23         **THE COURT:**  Okay.

24         **MR. MARTENS:**  Again, if they've got -- they talked

25   to our CISO, they deposed him for an entire day, our chief

1   information security officer, about the operation of the

2   software and the diligence he did around that.  If there's

3   134 some request for documents related to that, I'm happy to

4   have that discussion with them.  We have not -- again, we've

5   answered particularized requests, but I can't respond to

6   document requests written like this.

7       THE COURT:  I mean, BAM seems very confident

8   that -- and I appreciate you being very clear, because we're

9   on the public record, that no one outside of BAM has control

10  of the assets.  I mean, right, that's the billion dollar or

11  whatever question.

12      MR. MARTENS:  They have talked to the chief

13  information security officer.  They have deposed -- they

14  deposed the head of internal audit.  They deposed the head

15  of clearing.  They've deposed the external auditor.  So

16  again, if after taking those depositions there's

17  particularized requests, I'm happy to hear them.

18      THE COURT:  Sure.  I guess my question is just how

19  is BAM so certain that BAM has control over its assets?  I

20  mean, certainly there was -- I mean, how did BAM figure this

21  out?  Was it some sort of -- I mean, when you're coming up

22  with a consent order and you want to comply with it, right,

23  and it has whatever its strictures are -- and I understand

24  they may have known about BHL and all these other things,

25  but really it's about BAM's gotta have the keys to the car.

1    And it sounds like -- you know, I appreciate you all have

2    said that they do, and you've been very clear about that.

3              How did you all figure that out, is there some

4    discrete way?

5              **MR. MARTENS:**  Well, I would say two things.  One,

6    as the chief information security officer testified in his

7    deposition, he did due diligence around the software, and he

8    testified about that at the time.  And we've also, again,

9    pursuant to the consent order, moved the shards into the

10   United States in our possession.  So we have software that

11   we don't have any -- that our witnesses testified, the chief

12   information security officer has testified he doesn't have

13   any concerns about after due diligence, and we have the

14   shards in the United States.

15             If there's something beyond that that the SEC

16   thinks raises questions here and would like some

17   particularized document or particularized testimony, but at

18   the end of the day, I can't prove a negative either.

19             **THE COURT:**  No, I get that.

20             **MR. MARTENS:**  Respectfully, Your Honor, I think

21   the obligation is on them to make particularized requests,

22   and that this motion does not contain that.  The proposed

23   order does not contain that.  And so these vague concerns

24   about so and so said this in testimony doesn't translate

25   into something particularized.  Their response to that is,

1    okay, so give us all documents, all communications since

2    November for 14 custodians.  And our response to that is no.

3    But if you want to make some special -- some particular

4    concerns where we can allay concerns that where we think are

5    misguided but we're happy to address, then every time

6    they've made a particularized request we've responded.

7            **THE COURT:**  And in terms of the timeframe, I know

8    one thing we've talked about is this sort of November 2022

9    timeframe.  One of their points is that, okay, if that's too

10   broad, what is the sort of alternative?  I mean, is it

11   simply -- I mean, if you just look, right, that's just one

12   way to sort of --

13           **MR. MARTENS:**  It's a snapshot question.  The

14   question is not --

15           **THE COURT:**  How far back are you suggesting?

16           **MR. MARTENS:**  Our response is the relevant

17   question, if there is a relevant question here -- accepting

18   the consent order's position, the relevant question is

19   what's the condition today.  Now, that doesn't mean that

20   there's not some -- I'm not saying you can't go back five

21   days, I'm not being unreasonable about it.  But I'm saying

22   going back what is now approaching a year to answer the

23   question about the assets today is unnecessary.  So it's the

24   combination of every document going back what is now a year

25   that is just unworkable.

1          **THE COURT:**  Okay.  Well, in terms of -- at least

2     as I hear it then, what you're telling me is that the

3     interrogatories -- where at least there's some path forward,

4     right, we're working on that, and there were requests for

5     production of documents that sort of -- I guess BAM's

6     perspective is that you would be open to hearing whatever

7     the targeted requests are, right?

8          **MR. MARTENS:**  We're happy to continue that

9     discussion to have targeted requests, but I think that this

10    motion should be denied.  And if they want to make targeted

11    requests, and in light of those there's a feeling that

12    there's still some -- you know, we respond to seven things

13    and they think there's two more and we're fighting about

14    that, that that would be an appropriate issue for a motion.

15    But that their attached e-mail and their proposed order is

16    not an appropriate motion that this Court should grant.  It

17    is not narrow, it is a clear violation of Rule 26, and it's

18    not consistent with the idea of limited discovery.

19         **THE COURT:**  Okay.  Well, let me hear from them

20    again.  Thanks.

21         **MR. MARTENS:**  Thank you.

22         **THE COURT:**  So Ms. Farer, let's just start with

23    sort of the easiest thing to resolve, which is just that I

24    understand that your requests for production -- that you

25    have said in every single one of your pleadings I believe

1   that -- well, all two of them.  But I think you stated, and

2   it seems to be pretty consistent, that you feel that BAM has

3   indicated that they're open to hearing other requests, and

4   that you would like them to propose something and that they

5   haven't.

6          But is there really a harm in just -- what's the

7   problem with extending the expedited discovery now and just

8   asking you to start with some more tailored requests for the

9   requests for production?  The interrogatories, we're waiting

10  to see what happens, but that is moving along.  We'll talk

11  about the depositions later.  But this seems to be where the

12  main sort of -- and inspection, I'm setting that aside as

13  well.  For this, doesn't it make sense just to start with

14  some -- I mean, right now, it seems like there's some very

15  discrete questions, right, like what happened on that

16  transfer; who is -- you know, what is the control -- you

17  know, using the discovery process to figure out what is the

18  control that Ceffu, if at all, has, right.  BAM seems very

19  certain, they keep saying in every pleading that they have

20  got total control of their assets.  And you have certain

21  anecdotes that you're bringing up then, and you're trying to

22  sort of pressure test that.

23         But why doesn't it make sense to just ask some new

24  questions?

25         **MS. FARER:**  We have, Your Honor.

1          **THE COURT:**  No, I understand you have, but why not

2     do it one more time?

3          **MS. FARER:**  Counsel for BAM and I must have been

4     at different depositions and different meet and confers.  We

5     have had multiple conversations in an effort to work with

6     them and be reasonable on specific requests on a number of

7     occasions.  Let's talk, for example, about the issue you

8     exactly just described.  It is clear that the heart of this

9     issue is how this software operates, who has different

10    touchpoints of access and control.  We explained this to BAM

11    on a number of occasions:  Start with diagrams,

12    infrastructure documents, et cetera.  And if those are

13    insufficient, then we may have to do the inspection.  But

14    we're willing to work with you on this.  They told us

15    repeatedly that such documents do not exist.

16          So then we receive a very extensive production

17    from BAM's auditors who clearly understood the task of

18    providing documents concerning custody and control, and they

19    provided a set of over 6,500 documents.  And during the

20    course of those documents, we identified additional sets of

21    both diagrams, infrastructure reports, et cetera, that BAM

22    had represented to us did not exist.  It is difficult for us

23    to have narrow requests.  We've had multiple conversations

24    with counsel on this, and then they tell us that such

25    documents do not exist when in fact they do.

1            And as we've explained to BAM, we don't know what

2       we don't know.  Their explanation that we knew about how all

3       of this worked and they provided extensive letters, et

4       cetera, is frankly a strawman, Your Honor.  I mean, just for

5       example, they expect us to know about the BHL environment.

6       If we look at the excerpt from Mr. Kellogg's deposition that

7       relates to that environment, the wallet custody software

8       runs on servers in an Amazon Web Services data center in

9       Northern Virginia.  The AWS account was established by BHL

10      on behalf of BAM Trading.  Nowhere does that indicate that

11      BAM has no access or understanding of how that works.

12           And a very important point that we need to

13      address, Your Honor, is this understanding and the 11th hour

14      position that BAM has asserted that we've known this all

15      along.

16           **THE COURT:**  Well, I don't want to get past -- I

17      mean, I hear that, but I'm more focused on right now -- I

18      think the SEC should be more focused on even if you did

19      know -- I mean, wouldn't you agree, even if you did know

20      about it but then the assets are controlled by somebody

21      outside the United States -- which, I mean, the purpose of

22      the expedited discovery was -- you may have known and not

23      known things.  But the purpose was to figure out does it

24      meet this watermark of is this the custody and control in

25      the United States, right?

1        **MS. FARER:**  Yes.

2        **THE COURT:**  So, I mean, I don't want to focus on

3   that, because I don't think -- I think it colors the

4   atmospherics.  But it doesn't matter if you did even know

5   about it from the beginning, that BAM and BHL and Ceffu were

6   the same thing.  But if you now believe, because of

7   depositions or whatever, that people at BHL or Ceffu are

8   able to pull the levers from -- you know, like Wizard of Oz

9   style from the back, then that obviously is your concern,

10  right?

11       **MS. FARER:**  Yes.

12       **THE COURT:**  And so I just want to figure out --

13  and I hear you that you've tried before, but isn't there

14  now -- I mean, don't you think there's a possibility that

15  you could just draft up specific questions about -- I mean,

16  we know -- you know a lot more granular level now of what

17  you knew when you initially asked these, right?

18       **MS. FARER:**  Yes, Your Honor.  But I would say,

19  again, as to the Ceffu point, your point is well taken.  And

20  we did specifically ask for Ceffu.  They designated it as a

21  non-priority item, and when we followed up again with them

22  multiple times about information of Ceffu -- because we

23  agree with Your Honor, let's just get to the heart of this

24  issue.  You identified Ceffu as the wallet custodian, tell

25  us about Ceffu, the arrangement with BAM, how it controls

1    the assets, et cetera.  It subsequently comes back and says

2    you have to go ask Ceffu.  And then we hear oh, no, you

3    don't have to ask Ceffu, this is really BHL, nothing has

4    changed.

5           I mean, Your Honor, we are wringing our hands

6    here.  We are really trying to be reasonable, as I've said.

7    We've met and conferred on multiple occasions.  But to your

8    point of specific requests, through the course of the

9    depositions, we basically were forced to conduct custodial

10   interviews and take up some of our time given the lack of

11   documents produced by counsel.  And so we would identify and

12   present to the Court a four-page document identifying

13   categories of documents that these deponents could readily

14   identity of documents, diagrams, communications, et cetera,

15   that go to the heart of the issues.

16          And to us, Your Honor, while we appreciate what

17   you're proposing here, just as you know, discovery is a back

18   and forth.  Once we identify relevant requests, the onus is

19   then on BAM, with their knowledge of their client and the

20   systems, to propose and narrow the scope.  And we will work

21   together and meet and confer.  It's not just your request is

22   too broad, we will not produce any communications.  Instead

23   it should have been let me talk to my guys, they had just --

24   they had more access to Mr. Kellogg than any of the rest of

25   us, who Mr. Kellogg and a number of the other deponents

1    identified multiple Slack channels, for example.  Something

2    that they should have and could have easily identified for

3    us and helped narrow the dispute that has forced to us come

4    before Your Honor today.

5            And I ask Your Honor if we could just submit this,

6    and we'll submit this to counsel as well.  Because we do

7    think this is a starting point of documents that should be

8    produced, but also demonstrates that an unreasonable search

9    was conducted here and needs to be performed in response to

10   our requests.

11           **MR. MARTENS:**  Your Honor, I object.  If they

12   wanted to make particularized requests, they should have

13   made that part of the motion.

14           **THE COURT:**  No, no, that's fine.

15           **MS. FARER:**  We need these on the record in the

16   depositions, Your Honor.

17           **THE COURT:**  That's okay, I hear you.  I just want

18   to get to the finish line, and I know that both sides here

19   do too, right.  I mean, I think you are frustrated with the

20   pace, and they are frustrated with the volume and also with

21   the pace.  And so I don't think giving this to me -- I'm

22   happy to take anything.  I mean, you can get on ECF from

23   here on our very inadequate wifi and upload these things

24   right now.  So I don't think giving it to me is the

25   solution, right, simply it's to get that to them.  And I'm

1   happy to look at it, but I don't know if there's a value

2   added to me looking at it at this point, right.  Because I'm

3   not going to order from the bench right now that they

4   produce or not produce things.

5          And so what I'm hoping that you're going to do is

6   take this and tailor it to some questions, and then I'm

7   going to give you some -- and them some time to figure out,

8   you know, do we need to come back and talk about the

9   questions or is it enough to start an initial production --

10  which is what I would think makes sense based on what your

11  more targeted requests are.  And then from there, see if

12  that -- you know, I believe that you all are not trying to

13  get a hundred percent picture of what's going on.  You're

14  just trying to get enough that you feel comfortable.  I

15  don't know what that percent is, and I understand you feel

16  right now it's a lot beneath that.

17         But I just think let's continue to try to work

18  this out with a little more time.  So I don't think I need

19  to look at that right now, is that okay?

20         **MS. FARER:**  Understood, Your Honor.

21         **THE COURT:**  Can I just ask -- I don't want to jump

22  around too much, but the additional depositions you

23  requested and -- well, let me step back.  So they said if

24  you asked BHL, that that would yield some fruitful answers,

25  right.  And so obviously they're not BHL, they're very clear

1    about that.

2          Do you not think that the ability to ask BHL -- do

3    you not have that -- do you not feel that that's going to be

4    sufficient to get some of these questions answered?

5          **MS. FARER:**  Well, technically, Your Honor, they

6    directed us to Ceffu which is actually an independent

7    entity.  So at this point --

8          **THE COURT:**  Have you heard from them or have you

9    contacted them?

10         **MS. FARER:**  Then they told us we didn't need to go

11   to Ceffu.  So there is open questions about -- and Ceffu

12   is --

13         **THE COURT:**  You can ask --

14         **MS. FARER:**  -- registered in Lithuania and is a

15   related Binance entity, and we will certainly explore that.

16   But this is supposed to be BAM's software and wallet custody

17   provider.  And as Your Honor is I'm sure very familiar with

18   third party -- I mean, if this is their vendor, they have

19   access and control to the information we've requested.

20   Particularly if they say that the wallets and software and

21   the keys are in BAM's control, they should be able to get

22   that information and produce it to us.

23         **THE COURT:**  I get it, but do you -- or have you

24   asked BHL yet any of these questions?

25         **MS. FARER:**  We have served discovery on BHL, and

1  as reflected in our motion, we have agreed to sort of the

2  staggering, as reflected in the consent order, for discovery

3  as to BHL to kick in that is tied to the Court's ruling on

4  this motion.

5          THE COURT:  Okay.  And so when do you

6  anticipate -- setting aside how I rule on the motion, when

7  do you anticipate you'll get some -- do you have predictions

8  when you're going to get some records or answers from them?

9          MS. FARER:  The discovery is --

10          THE COURT:  Is that the stay as part of the --

11          MS. FARER:  Correct, Your Honor.

12          THE COURT:  Okay.  And then what about Ceffu, have

13  you tried yet --

14          MS. FARER:  We have not, Your Honor, because now

15  we understand that Ceffu is not the separate entity that is

16  the software provider.  But we are certainly considering all

17  discovery options.

18          THE COURT:  So I understood the stay as to with

19  Defendant CZ, but I just want to make sure I understand with

20  BHL.  So can't we have that part go forward, and that that

21  might yield some fruit as well?  Because it seems like

22  you're going to want to know from both ends, right, you're

23  going to want to know from BAM and from BHL.  Because

24  presumably, right, like I presume Microsoft Word, as I use

25  it, that I'm not monitored by Microsoft or whatever.

1          But I'd want to also presume that you're going to

2     want to ask them as well, let's say, from both ends, right,

3     you don't believe that you can be monitored -- or can be

4     controlled, on the other end, that they cannot control it.

5     So aren't you necessarily going to have to hear from them?

6          **MS. FARER:**  It is included in our -- yes, Your

7     Honor, it's included in our request.  The quote, unquote

8     stay is for both Binance Holdings and CZ.

9          **THE COURT:**  Okay.

10         **MS. FARER:**  And Your Honor, I would just note on

11    the last point that you made, that is the exact distinction

12    that is at issue here.  The quote, unquote software that we

13    understood that was going to be involved, as made very clear

14    in the unambiguous provisions of the consent order, is

15    supposed to be under the exclusive and direct control of

16    BAM.  By way of comparison, Your Honor, there are a number

17    of other BHL software that are under -- like underpin the

18    Binance.us platform.

19         The PNK system, for example, their trading

20    platform system, this was all software that was developed by

21    Binance that they quote, unquote forked or copied over, and

22    now BAM manages that software.  The circumstances that we

23    have now identified through the limited discovery produced

24    to date is far different than simple software.  You have

25    people running the back end.  We have a company that has no

1   idea what's going on.

2         And again, we must have been at different

3   depositions, because the quote, unquote due diligence, on a

4   number of occasions Mr. Kellogg testified that he doesn't

5   know how it works.  The security reports that he relied upon

6   do not actually cover the infrastructure and software that

7   is at use for Binance.us.

8         **THE COURT:**  Okay.  Then in terms of the

9   depositions, that was what I didn't want to jump to -- jump

10  around too much to.  But speaking of third parties, so now

11  the pleading indicates there's -- the CEO is no longer the

12  CEO.  Are you still seeking his deposition?

13        **MS. FARER:**  We are, Your Honor.

14        **THE COURT:**  And do you think there's anything

15  that's going to encumber that?  I haven't heard from BAM

16  yet.  Do you foresee, if he's no longer an employee, there's

17  any issue?

18        **MS. FARER:**  We have asked BAM's counsel if there's

19  a change in position on this issue, and we didn't receive a

20  response.  We have spoken with counsel for Mr. Shroder who

21  has indicated that at this time -- and this was before he

22  was officially separated, that their position was aligned

23  with that of BAM.  So we understand that he has now

24  officially separated, and so we've not received any position

25  from either individual counsel or company counsel on this

1    issue.  But as, again, reflected in our papers, it seems

2    that the main opposition appears to be alleviated at this

3    point.

4             **THE COURT:**  Okay.  Do you think that the other

5    depositions that you're requesting, if you were thinking of

6    sequencing, is there a world -- and I understand depositions

7    are more fruitful when you have documents to ask questions

8    with.  But I'm also just, again, trying to see what we can

9    get done, and get done quickly.  You know, these additional

10   depositions that you have asked for, do you think that

11   there's some benefit if -- because it seems like, again,

12   that perhaps BAM -- there's some of them that they're not

13   objecting to, it makes sense to just get those going and

14   perhaps put a pin on some of these?  Because you're

15   obviously going to have new document requests after -- I

16   mean, there may be some other thing that -- like this Apple

17   ID or something comes up that you have additional questions.

18            Does -- could you -- I don't need you to answer

19   right now, but at least can you consider -- or you could

20   answer yes right now, that's cool, too.  But maybe

21   sequencing some depositions first to keep things moving and

22   allow more detail-specific information to come out which

23   then allows for more targeted requests, is that something

24   worth thinking about?

25            **MS. FARER:**  We can certainly consider it, Your

1    Honor.  But as Your Honor identified, some of these issues

2    do require documents.  I mean, that was made abundantly

3    clear in Mr. Kellogg's deposition, that I had to spend a

4    significant amount of time simply conducting a custodial

5    interview.  And I was not able to press him on the core

6    issues at the heart of this consent order and this expedited

7    discovery absent documents.  Luckily, we did have some from

8    the auditor that helped facilitate the substance.  But

9    beyond that, we do need documents.

10           That being said, Your Honor, we do think that

11   there could be ways -- for example, like the 30(b)(6),

12   right.  Like, this could be a way for all parties to move

13   forward.  BAM could identify people on the core issues to

14   provide the explanations that we need that we could then

15   test with -- once we have documents and additional

16   information.

17           THE COURT:  And in terms of depositions, there

18   was -- there were at least three individuals -- and setting

19   aside the CEO and CFO, there were three additional

20   individuals and a 30(b)(6).  Although it looked to me

21   also -- I mean, are you asking at this time to depose all of

22   the key shard holders or is it just a couple of these folks?

23           MS. FARER:  We are, Your Honor.

24           THE COURT:  You're asking for everybody?

25           MS. FARER:  As reflected in our papers, that we

1    have, again, tried to be reasonable with counsel and narrow

2    the issues before the Court.  And so based on the initial

3    shard holder, it made clear that one shard holder is not

4    representative of all shard holders.  He doesn't know who

5    they are, how exactly they engage with their review, whether

6    they have communications with other people from Binance or

7    Mr. Zhao, from whom he may be getting directions or control.

8    That information is quite narrow.

9              As we've explained to counsel, this -- you know,

10   they keep talking about numbers only, and we keep telling

11   them for the shard holders, the universe of questions is

12   very discrete.  You keep pointing to these as controlling

13   literally the keys to the castle, and so we just want the

14   evidence to ensure that the assets are safe and secure as

15   required under the consent order.

16             **THE COURT:**  Okay.  I'll hear from BAM, thanks.

17             So my question to BAM, I guess we'll start

18   backwards just with the -- you know, let's look at the

19   depositions, and we'll come back to the requests for

20   productions.

21             What is -- do you have a position yet -- and I

22   understand it's sort of breaking news, so I don't want to

23   put you on the spot.  But do you have a position on what to

24   think about what Brian Shroder's sort of status is now in

25   terms of the objection as to his deposition?

1    **MR. MARTENS:** So as you note, he's separately

2    represented and not with the company anymore.  I would note

3    that the apex doctrine, according to district court

4    decision -- a district court decision in this district which

5    was applied in the context of -- not surprisingly of a

6    government entity, said that it applies as much to a former

7    senior leader as it does to a current.  And so I suspect --

8    and so I believe our position with regard to him is the

9    same.

10       Again, if we can revisit the issue and meet and

11   confer, if at some point it's determined there's something

12   uniquely within his knowledge where it couldn't have been

13   obtained through one of these other depositions.  But to

14   make him one of the first of, I guess at this point, five

15   seems wildly premature.

16       **THE COURT:** Okay.  And can you tell me -- and we

17   don't have to get into the names, that's fine.  But I think

18   BAM's senior director of treasury operations and leaders of

19   BAM asset clearance team you all had said was -- you were

20   okay with that, as I believe.  Those are two folks that you

21   offered.  And then we have three other people.  I think that

22   the government has identified a current BAM shard holder who

23   is also a VP of operations; a former BAM shard holder who

24   was the BAM then director of operations -- or is now I

25   guess; and then BAM's head of production who Kellogg

1    identified as his primary point of contact knowing most

2    about this; and a 30(b)(6).  So I count six sort of ones

3    that are teed up, aside from former CEO and current CFO.

4            And are those ones that -- well, two of them you

5    had proposed, so I'm hoping that two of the six is okay.

6    What about the other four?

7            MR. MARTENS:  With regard to the shard holders, I

8    guess I can start with those, it's the easiest.  Again, I

9    just want to correct what Ms. Farer said when she said, you

10   know, these are very targeted, just a few questions.  The

11   one shard holder they deposed for seven hours, maxed out the

12   time.  So the claim that this isn't really any burden, these

13   are targeted, is just not true.  And so we have not heard in

14   the discussions what is it that is unique about these

15   additional shard holders that would necessitate asking

16   presumably the same questions over and over and over.

17           They have gotten the representations that the

18   shards are in the United States, and they've had an

19   opportunity to talk with one shard holder about how those

20   are to work.  It seems unnecessary to pursue another, I

21   guess, 21 hours on additional -- on the issue of shard

22   holders when I thought this issue was addressed frankly by

23   the consent order and the repatriation into the United

24   States.

25           THE COURT:  I mean, that's the question, right, is

1    that I understand from your perspective where everyone,

2    officers of the Court have said we're good, we've done what

3    you told us to do.  But the purpose of the expedited

4    discovery, I think from their perspective, is that they want

5    to pressure test that.  And I'm inclined -- certainly when

6    Mr. Shroder was the CEO, I was inclined to at least have

7    this done iteratively, which is to save the CEO and CFO for

8    a later time.

9         Because I'm -- you know, if I could just use my

10   own analogy, I mean, our Chief Judge has no idea what's

11   going on.  We, magistrate judges, do the real work here down

12   in the trenches, right.  And so I appreciate that the idea

13   of those who are at the top may not have the visibility.

14   Now, you know, the government I think tried to draw on some

15   exhibits, and some of it was conjecture and some, I think,

16   had some predication.  But it doesn't matter.  There's no

17   reason to me we couldn't take it iteratively.

18        And I appreciate -- you know, there's some

19   argument that even if he was the former -- now the former

20   CEO, some of that takes the wind out of that sails.  But I

21   don't see the need, because I think some of these other

22   folks may answer the questions.  And I don't think the SEC

23   is just doing this for the sake of doing it, I think they

24   are trying to get to this question of custody and control.

25        And so my -- where I probably diverge from where

1    you are now -- and that's why I'm going to encourage you all

2    again, I think we should talk and set up a time to meet

3    again.  I appreciate a seven-hour deposition of a shard

4    holder is not insubstantial.  My hope is that some of the

5    questions are now resolved from the first, right, that

6    there's some efficiencies that are gained.

7         But I do think the shard holders are at the

8    linchpin of what Judge Jackson's concerns were -- and so

9    then therefore mine as well -- is that these are the folks

10   with the keys, right, literally the key shards there.  I

11   think getting in front of them makes sense, all of them,

12   just so that -- you know, I think it will be very helpful

13   for both sides.  Because I presume that they're going to say

14   like yeah, I'm in control, sure, just like anything else.  I

15   mean, I have software, I use this, I log in and I don't know

16   what's behind it, just like I have no idea how anything in

17   this courtroom works, right.  But I know that it does work.

18   I show up, and hopefully.  And if it doesn't, you know, I

19   call people.  But that doesn't mean that they control it,

20   that just means that they can fix it and then allow me to

21   work it.

22        So I see the difference that you are -- that you

23   have drawn.  I think that we just need to let these

24   questions get asked.  Because at some point, right, I think

25   that there's sort of three things that you have going for

1    you, right.  You have the one that's sort of the

2    pre-investigation tranche of evidence, right.  There's the

3    fact that nothing has yet been demonstrated.  And then

4    finally it's the -- and also how many times do you need to

5    pressure test this.  At some point, it's been pressure

6    tested, right, it's weatherproof.  But I don't think we're

7    there on that latter part.

8         And I think that the shard holders would be sort

9    of super important in resolving that, because they're the

10   people who were right there in the middle of this and can

11   say yeah, this is exactly what I can or can't do or I know

12   or I don't know.  I think it would be helpful.  And so that,

13   to me -- and I'm happy to -- I'm happy if I have to issue an

14   order, but I'm hoping that given my sort of inclination you

15   all can talk.  I do think that's appropriate.  I think the

16   current BAM shard holder, who's also the VP of operations;

17   the former, who was a shard holder, should be able to

18   testify to the sort of transition, who was also that

19   director of operations and that have product; Kellogg, in

20   his deposition, the internal primary point of contact who

21   knew most about BAM's key shards.  I think those folks in

22   addition make a lot of sense to me.

23        I will leave it to you all to talk about the

24   30(b)(6).  Again, 30(b)(6) as to this.  I mean, I agree with

25   the government, I don't need to -- I'm not going to issue a

1    protective order to limited folk, because they should not be

2    asking questions that is outside the boundaries.  And that

3    is -- there's no quicker way to short circuit all of this

4    expedited discovery, if they continue to go into what is

5    meant for the merits discovery.  I mean, they're going to

6    get there, they just have to wait.  I'm totally with you.

7            I only care about right now what is going to tell

8    me that the balances are there, what they are -- you know,

9    getting to that question, and then it is safe and secure.

10   What happened historically, I mean, it doesn't matter to

11   that, it's just totally irrelevant.  And so I don't think we

12   need another order to say what your order already says.  So

13   a 30(b)(6), but a 30(b)(6) as to knowledge about topics

14   relating to customer assets and control, I think that's

15   worth exploring.  And so I'll leave the depositions there.

16           On the requests for production, what I'm hoping

17   you can do is get from them -- and I'm going to remind them

18   again and talk to them about how can we -- I want narrowly

19   tailored ones.  I understand, I think, what they did is they

20   kicked us off with the standard discovery of give me

21   everything, and then they were willing to work it down.  And

22   I hear you just that that's not what we're -- this is not

23   what this discovery is, save that for the later merits

24   discovery.

25           MR. MARTENS:  Yeah, I would say on that, Your

1    Honor, just to take one example on the documents.  So the

2    proposed order says within 14 days, produce the

3    communications from the personnel to be deposed for RFPs

4    one, six -- one through six, nine, 10, 11, 14, 15, 18, 28,

5    30, 33 and 38.  Just as one example, we've never gotten from

6    them a request -- a proposal of keywords.  We're obviously

7    not going to go pull the entirety of those folks'

8    communications from November 2022 forward.

9         And I can't -- as much as Ms. Farer wants to put

10   it on me, I can't answer what they're looking for.  So if

11   they give keywords, we can then run and at least see what

12   hit counts are and have a productive discussion.  None of

13   that has occurred here, none of it.

14        **THE COURT:**  Yeah, I mean, I get it.  I think

15   they're going to say, you know, customer assets, but I'm

16   going to put it on them to come up with what that is scoped.

17   And I'm still hoping that you're going to give me -- well,

18   that you're going to give them, you don't have to give it to

19   me.  I understand that November 2022 is -- yes, 2022 is in

20   the rearview mirror.  So is it January 1, 2023?  Is it -- as

21   you said, it's not five days ago, so I think it would be

22   helpful to hear from BAM as to --

23        **MR. MARTENS:**  And part of that answer, Your Honor,

24   depends on hit counts.  We've all done this before, right, I

25   run it as to this particular -- we agree on X, Y and Z

1    custodians, we run it over this date period with these

2    keywords, see what the volume is.  You realize this word's

3    hitting too much or if we shorten the date by a few.  None

4    of that has occurred here.  We've never gotten that proposal

5    from them.  We have an e-mail which they've included

6    saying -- and I'll just say it again, everything since

7    November 2022.  That's not a serious request, but we're

8    happy to have a discussion about serious requests.

9          THE COURT:  Okay.  Well, let's switch gears and go

10   to the inspection.  I just have one question.  I mean, I'm

11   not inclined to allow the inspection at this time, but I do

12   think a simple way to sort of short circuit this, I'm

13   hoping, is that there's some debate --

14         MR. MARTENS:  So on the inspection, Your Honor,

15   I'm genuinely confused.  Honestly, we're not Amazon Web

16   Services.  So it seems like if they want to go walk around

17   Amazon Web Services' property, they need to talk to Amazon

18   Web Services.  I can't let them in.

19         THE COURT:  No, no, I get you.  So what I'm

20   hoping, however, is that we can short circuit this, at least

21   a little bit -- and I'll hear from Ms. Farer, is that

22   Kellogg confirmed that BAM has diagrams and other documents

23   concerning BAM's technology and infrastructure, including

24   components relevant to customer assets.  And then he

25   referred to various searchable logs of communications

1   relevant to the issues of access and control.  This seems to

2   be that that would moot at least, or nullify, a lot of their

3   concerns.

4          And so do you know -- it sounds like from your

5   pleadings that as you find things you're producing them.

6   Any -- I guess to the extent you know, idea if this -- some

7   of those diagrams initially that were thought to not exist

8   or maybe weren't found, after Kellogg sort of identified

9   some of these things, do we know if they have been or are

10  being produced?

11         **MR. MARTENS:**  I'm sorry, Your Honor, are you

12  referring to something in their brief in particular, a

13  particular page?

14         **THE COURT:**  Yes.

15         **MR. MARTENS:**  Just so I can make sure I see what

16  you're referencing.

17         **THE COURT:**  Sure.  That's the problem with notes,

18  hold on.  So in my notes, it's from Ms. Farer's declaration

19  at paragraph 34D.  And I'll pull it up in the brief, one

20  second.

21         Ms. Farer, you can always pipe in and tell me

22  where I'm quoting you.

23         **MR. MARTENS:**  You said paragraph 34D?

24         **THE COURT:**  Uh-uh.

25         **MR. MARTENS:**  Let me just ask if there's been a

1   follow up -- if I can just talk to my --

2           THE COURT:  Yeah, please, of course.

3       (Discussion off the record)

4           MR. MARTENS:  I'm informed, Your Honor, that we

5   have produced a lot of what's called for by 34D since the

6   depo.  So if there's more discussion to be had around that,

7   we're happy to do that.

8           THE COURT:  Then you just look to them.

9           MR. MARTENS:  But there has been a production in

10  response to that.

11          THE COURT:  I mean, it sounded like it, but I'm

12  trying to suss that out.  So that's great.  I'm going to

13  talk to them now.  Thank you.

14          So Ms. Farer, I don't know if you can answer

15  that -- or you already got the answer, that's great.  But

16  let's just start with that.

17          MS. FARER:  Which question, Your Honor?  My

18  apologies.

19          THE COURT:  My question is, you know, do you feel

20  like you're getting -- not gotten, like past tense it's

21  over, because they say they're continuing to find stuff.

22  But are you getting the diagrams that you felt like

23  Mr. Kellogg identified that you didn't have to begin with?

24          MS. FARER:  No, Your Honor.  The subsequent

25  production that BAM counsel referred to, we received 16

1    documents.  And I can show you, Your Honor, that there is a

2    page and a half of documents that were identified during

3    Mr. Kellogg's deposition, and to date, those documents have

4    not all been completed.  Separately, Your Honor, Mr. Kellogg

5    represented that the diagrams that he has prepared are

6    incomplete, particularly as it pertains to the environment

7    and related components for the wallets.  He doesn't have

8    knowledge about -- again, for all of these requests, we

9    don't know the systems, we don't know the language they

10   would use.  And we have invited and encouraged BAM to

11   provide options to really narrow this down.

12          They keep saying this is on us, but I can tell you

13   with respect to communications, Your Honor, we sat in all

14   three depositions and asked:  How do you communicate about

15   clearing, for example, or wallets, for example.  The

16   deponents immediately responded:  We have this Slack channel

17   called U.S. wallets.  I mean, that is counsel's

18   responsibility in response -- for a reasonable search in

19   response to discovery requests.  We should not be conducting

20   the custodial interviews for our own discovery requests,

21   Your Honor.

22          So, I will say, we can continue to meet and confer

23   if BAM is willing to produce documents --

24          **THE COURT:**  Yes, they said they are.

25          **MS. FARER:**  -- in response to Mr. Kellogg's

1   deposition.  And we understand that they are going to agree

2   to allow us to evaluate the shard device a little bit

3   further, so we can take that back and see what more may be

4   required.

5           But for example, Your Honor, the issue with PNK.

6   The PNK software, from what we understand, is solely managed

7   by BAM.  And they performed -- from what we understand from

8   documents and speaking with different deponents, there was

9   a, quote, PNK walk-through with BAM's auditor.  So we simply

10  would want a similar walk-through.  Again, Your Honor, just

11  to verify the very issues that we've all identified and that

12  BAM has identified, that this PNK software is the software

13  over which we have control of the keys.  All right, well,

14  give us the walk-through so we can evaluate that.

15          **THE COURT:**  So in terms of the inspection, I mean,

16  I guess, what were you hoping to do?  As I said, I'm not

17  inclined to do it now, we can save things for later.  I

18  mean, was it literally to go and sit in their office and

19  sort of test the software or see how it's created?

20  Obviously, the AWS site is not in-house.  I mean, do you

21  have your tech people who are --

22          **MS. FARER:**  We do, Your Honor, and the example I

23  just gave for PNK is one of the examples that there are

24  re-configured provisions, controls in the software from what

25  we understand.  And a PNK walk-through has been provided to

1    the auditor, both with respect to -- and this goes to the

2    heart of the reconciliation issue as well.  So some of this

3    really just goes to let's see how the software works and

4    pressure test, as Your Honor identified, some of the

5    controls that they say are in place.

6          And Your Honor, with respect to the time period,

7    we would just highlight that the November 2022 date is

8    triggered off of a promissory note that -- between Mr. Zhao

9    and BAM.  And so as we've explained to BAM, that we need

10   additional information as to, like, whether there are

11   certain encumbrances or priority obligations associated with

12   that promissory note that would encumber customer assets or

13   put customer assets as a lower priority.

14         And then similarly, again, because of this

15   ever-changing story about Binance's role with the custody

16   and control of BAM's assets, that is during the time in

17   which we were hearing from BAM's counsel that the wallet

18   custody agreement that governed the relationship was, quote,

19   not operationalized, was subsequently terminated, Ceffu came

20   about.  And so that's the basis of that time period, and we

21   think it's sufficiently scoped to address the issues of the

22   consent order.

23         THE COURT:  I mean, what's the downside, I guess?

24   I mean, I understand that.  But presumably if there were

25   encumbrances, right, they won't -- the discussion of them

1    won't disappear.  Isn't there some way to just start with

2    maybe like three months before or four months, and then as

3    questions come -- I mean, I think from their perspective,

4    right, it certainly cuts against the kind of -- if you all

5    just start small, then you can build your way out -- I mean,

6    I think I understand it, there's two different ways to come

7    at this.  And it's probably more burdensome for the SEC to

8    start going and re-slicing it one by one by one, and then

9    coming back and say look, I asked for this narrow thing, and

10   now I need more instead of normally how we do discovery,

11   right.  Normally we start broad and work our way in, but

12   this is a little different, it is expedited discovery.

13         And so why not just start with like a couple

14   months before?  And then if then you have questions, there's

15   some basis to then say like we need to expand this.  I

16   understand, what you're saying makes total sense.  That

17   seems like, right -- that's not typically it feels at the

18   time -- and I say this as a former prosecutor, just pick

19   some arbitrary date.  You've been very principled, it sounds

20   like, in how you've picked your date.

21         But what's the downside in starting small and just

22   seeing a couple of months before, and then working backwards

23   if that's not enough?

24         **MS. FARER:**  We have done that for certain

25   requests, Your Honor, because we appreciate your point.  And

1    so, for example, for the general ledgers, while initially

2    BAM proposed an exact snapshot in time that tied to the

3    accounting, we explained, as Your Honor identified, that we

4    need a little bit of a bigger snapshot to know what the lay

5    of the land was; that there wasn't like a capital infusion

6    or other expenses that fell out during that snapshot.  So we

7    are being very targeted in narrowed time periods for certain

8    issues.

9         And then for other issues -- I mean, this shard

10   process was an ever-changing process starting end of the

11   year 2022 through the present.  And so an understanding of

12   the evolution of that process, ensuring no copies of keys,

13   continued control by Binance, et cetera, that is why some of

14   the extended time period is warranted for some of those

15   issues.

16        **THE COURT:**  Okay.

17        **MS. FARER:**  We would just note one more thing

18   about the CEO, Your Honor.

19        **THE COURT:**  Yes, please.

20        **MS. FARER:**  In addition to the items that were

21   addressed in our papers, Mr. Shroder is the sole deponent

22   that was a member of the board, and Mr. Zhao is a member of

23   the board.  And there are a number of resolutions relating

24   to the control of the company writ large for which he would

25   have unique knowledge.  And then as for Ms. Lee, there were

1    a number of deponents who referred to her knowledge, both in

2    communications and with respect to the clearing and

3    financials, that make her knowledge unique as opposed to

4    some of the others that we've spoken with or have noticed.

5              THE COURT:  Yeah, I just -- I want to work my way

6    up.  I got it, I hear you, but I want to work my way up.  I

7    mean, I think it would be interesting certainly to hear what

8    counsel for Mr. Shroder has to say now.  Because I think

9    that if he says yeah, I'm fine, I want to talk about -- or

10   I'm okay, I'm not objecting, then we can hear about that.

11   But I think we need to hear from him, and we can do that

12   while we're still working on this other stuff.

13             MS. FARER:  And to your point, Your Honor, we

14   would certainly be open to some staging of depositions with

15   the understanding of keeping them open for additional

16   inquiry.  And BAM and counsel for the other defendants have

17   arduously objected to that.  But as we've seen, we're

18   developing information in realtime and receiving subsequent

19   productions in realtime that we haven't yet had the

20   opportunity to ask prior deponents.  And the seven hours for

21   the shard holder is not a correct characterization as to how

22   all of these would go.

23             As we've explained to counsel, there are going to

24   be some shard holders -- and the reason we identified this

25   particular shard holder is because their knowledge of the

1    relevant issues expands beyond their role as a shard holder.

2    Some of the individuals are solely going to be focused on

3    their role as a shard holder, and so the set of issues will

4    be discrete as to that.  And as Your Honor identified, now

5    even more focused based on our experience from the first

6    shard holder.

7            But I will say, Your Honor, based on the

8    experience with the first shard holder, we certainly have

9    more questions about the initiator in Canada.

10   **THE COURT:**  Yeah, no -- yeah, I get it.  I mean, I

11   think that it is certainly just a flag for BAM.  I mean, it

12   is certainly fairly possible for me to imagine a situation

13   where it's going to require someone coming back.  And I

14   appreciate BAM's frustration.  If it's like, well, we're

15   only going back to this person because the government asked

16   for too much, and so we couldn't give them everything and so

17   we didn't give them anything -- which is your right, right.

18   I mean, but then they backdoor their way into getting a

19   second sort of set of questions here.  And so it's not fair,

20   but I don't know what else I'm going to do.

21           Because if questions come up and they go to the

22   overarching question, I mean, this is a real concern about

23   whether -- you know, is there sufficient assets and then are

24   they sufficiently secure.  So I don't want to burden the

25   witnesses with repeated depositions, but it certainly is

1    within the realm of possibility.  I just -- I need a little

2    help here with this BHL situation.

3            So what are you asking happen in terms of -- or

4    have you talked to BHL and are they willing to unstay this

5    and move in parallel?  Because I think they're in the room.

6            **MS. FARER:**  They're certainly here to speak for

7    themselves, Your Honor.  But from our conversations, we

8    understand that Binance Holdings and Mr. Zhao had strong

9    objections to overlapping discovery that does not track this

10   staggering 45-day time period.  We've had multiple

11   conversations about this, but I'm sure they can state their

12   position better than I can.  We certainly would appreciate

13   that.  We think it would be more efficient on these

14   overlapping issues -- and have tried to, including by

15   coordinating a process where meet and confers take place, at

16   least during this time.  So we welcome any movement on that

17   issue.

18           **THE COURT:**  Sure.  So can I hear from BHL?  I

19   don't want to put BHL on the spot, but you're here.  I

20   promise I'm not going to put you on the spot.  What I want

21   to know is would BHL -- I mean, I understand there was a

22   framework, it was agreed to and was staggered and so

23   everything is stayed.  Which that seems pretty reasonable to

24   me, that everyone on the BHL and CZ side have said hey,

25   we'll take this -- again, that was my whole point, let's do

1    this iteratively.  But it just seems like it could help move

2    the ball forward.

3            Do you think that BHL would at least be -- and

4    this is a leading question.  Would BHL at least be willing

5    to consider a very narrow, targeted list of questions

6    specific to this just one question of -- because I think the

7    answer is going to be -- as I understand it from BAM and

8    from BHL, is going to be like yeah, no, BHL has software; we

9    give software; we answer questions; we've got our geek

10   squad, they answer it, but we don't get to go in their

11   backdoor and like sneak in in the middle of the night and

12   control what's happening.

13           And so if it's give us all accounting of everyone

14   who's ever done anything at BHL, that's one thing.  But if

15   it's a very targeted set of questions to try to get to the

16   bottom of this -- which I already know that the SEC's

17   probably never going to feel a hundred percent -- and I

18   think they've said they're never going to feel a hundred

19   percent.  But to get to whatever I think the Court feels,

20   right, somewhere in between where both parties are -- or all

21   the parties are as to what is, okay, enough is enough.  You

22   know, I mean, someone in the company could take over -- AI

23   could take over and sort of commandeer everything, you know,

24   Skynet.  And so, I mean, I'm not going to go there, but I

25   need to have a little more security than I do now.  I think

1    that's reasonable.

2           And so do you think that BHL is -- could there be

3    a consideration, a carve-out, or is it just that you're

4    going to tell me look, it's impossible to carve it out?

5           **MR. MENDRO:**  So Jason Mendro for BHL, Your Honor,

6    and thank you for the question.  We -- there can be a

7    consideration; there can always be a consideration.  We're

8    happy to talk with SEC about how we can get to the heart of

9    this and get this process, the expedited discovery process,

10   over in the most efficient manner.  And as Your Honor knows

11   as well as anyone in the room, the staggered discovery was

12   an important part of the consent order for us.  It's

13   something that we negotiated very hard for.  And the reason

14   for that is we believed that it would facilitate an

15   efficient resolution of these issues.

16          We believe, I think as the Court has said a number

17   of times, that this is pretty narrow.  This is a question

18   about whether there are enough assets, and whether the

19   assets are secure.  And those are assets of BAM.  So we did

20   not think that it would be efficient to begin sweeping

21   discovery of BHL before those issues were addressed to BAM.

22   And that's why we negotiated for that, and the SEC agreed to

23   it.  And we do feel strongly that that's the right way to

24   proceed.  But if the SEC is open to giving us a narrow,

25   targeted list of requests, that's certainly something we

1   would consider.

2           That is not where we are today, Your Honor.  We're

3   staring down the face of some three dozen document requests,

4   which are very similar to what counsel for BAM has

5   described, which seek virtually every single document the

6   company may have received or generated since the end of last

7   year -- which is not something we'd be able to do.  You

8   know, 25 interrogatories with a multitude of subparts asking

9   wide ranging questions that would be very difficult and

10  onerous to respond to, that's not something that is open for

11  consideration.

12          But yes, a narrow, targeted list of questions that

13  get right to the heart of the issues that are necessary to

14  wrap this up, those are always open for consideration.

15          **THE COURT:**  Okay, that sounds very reasonable.

16  Thanks for answering yes to my leading question, I

17  appreciate it.  Well, I mean, I think we'll take a little

18  break, and then just come back to see if there's things I

19  want to hear from the parties.  But I want to -- I mean, I

20  get where BAM is.  A part of it is, like, what are we asking

21  for, right, and what are you asking the Court to do.  I'm

22  happy to say I'm not really doing anything right now other

23  than just trying to encourage.

24          So first is that you all know as well as anyone

25  that these discovery disputes you can take back before Judge

1    Jackson after I rule.  And my experience has certainly been

2    that these things are kind of Rorschach tests where it's

3    just going to leave it to the judge, and the judge very much

4    splits the baby.  And so I don't think anyone is going to be

5    happy with whatever it is that I or then Judge Jackson do.

6         And so I still think the more that you all can do

7    to get some information across to each other or to narrow

8    your requests is going to help with however the Judge then

9    perceives this as -- so someone's going -- right, it's not

10   going to be 50/50, someone is going to end up getting the

11   short end of the stick here of what they want.  Because to

12   me, what both of you are saying is the same thing.  It's

13   like, well, we need them to narrow their requests, and

14   they're saying we need them to narrow their requests.  And

15   so I think someone's going to have to bite the bullet, and

16   so I'm going to put it on the government first to bite the

17   bullet and start some tailored requests -- understanding

18   that you're not giving up your right to ask broader requests

19   or follow up requests, right.  So both in terms of documents

20   or of deponents, because I just want to keep things moving.

21   And I'm concerned that we could end up fighting about these

22   things.

23        I think still that we can get to the finish line

24   that you want, although not the way that you want to get

25   there.  But that at least at some point you're going to

1   say -- because I imagine you all want to litigate your case,

2   right.  So this is not what you all want to do, and this is

3   not what you all want to do; you want to get to the merits

4   of the case here.  So at some point -- and I don't think

5   it's a war of attrition, you'll finally just say look, okay,

6   would I personally put my money there?  No, maybe not, but

7   that's not the point, right.

8            The question is:  Is it just reasonably safe and

9   sound, is it reasonably controlled, you know.  And the

10  answer is yeah, you know what, it's probably good enough for

11  now.  Again, I would presume if, during regular discovery,

12  something came up where some person came up to us like oh,

13  my God, well, you know about the Canadian issue here, but do

14  you know about the Australian.  And no one knew about it and

15  nothing came up, then we would come back and start with

16  like, well, uh-oh, what's happening now.  So I don't see

17  doors that are closing for the SEC.  Again, it's just you

18  are going to go and keep checking these things.  If new

19  information comes up, we come back to the well.  But the

20  only potential catastrophe is that if assets go overseas

21  that can't be repatriated and there's a sort of need to

22  liquidate those.

23           So that's like a -- it's a lot of hoops to jump

24  through, so I'm right now still -- you know, it's not to say

25  that there's one side or another.  But I share concerns

1   after reading the reply about some of these concrete

2   examples that it does not -- I'm not a hundred percent

3   confident.  I don't even know what the number is, but I'm

4   not super confident that BAM has total control over assets.

5   But I also think that it's very reasonable explanations, as

6   you said, that we could get out.

7          I just need some flow of information to get me

8   there, because I agree with you, I don't think -- you know,

9   I don't know that the SEC will ever be satisfied.  At some

10  point, the Court will have to step in and say, you know,

11  enough is enough, we're going to go forward with the case

12  now.  And officers of the court have said that there's

13  enough -- that the purported people who are going to ferret

14  away the assets, for God's sakes, they're in the litigation,

15  you never have that.  So at some point, we're just going to

16  have to bite the bullet and jump on to the rest of the case.

17         But I don't think I'm there yet.  I think I need

18  these depositions to occur of all the shard holders, the

19  additional individuals I identified.  I think the SEC should

20  consider just moving forward with those, understanding that

21  they won't have all the documents they need.  I mean, the

22  questions -- the knowledge they need is there, right.  You

23  know, at deposition, some of those documents are more to

24  cross-examine and catch people in a lie, and that's not what

25  we're trying to do here.  Because we're not trying to

1    litigate the case, we're just trying to answer a question.

2          And so perhaps it would just make sense to get

3    moving on those depositions, and then focus on a very core,

4    narrow set of documents on some of the issues and then come

5    back.  And maybe when we come back, you know, we've answered

6    enough that they're willing to live with it, and

7    understanding that they're not giving up their right to come

8    back on these issues.  But for now -- or maybe they're not.

9    And then I say, again, you're not going to get some sort of

10   surety on this.

11         The one thing is, I mean, it's not talking -- I

12   mean, is BAM considering just that you could save you all

13   some headache and understand you're -- you know, every

14   defendant -- this is what life is as a defendant -- and I

15   say this as a former prosecutor, just getting bullied from

16   issue to issue by the government, because they have all the

17   power and all the -- and you all know this, because you all

18   have walked a mile in their shoes.

19         Isn't it easier just to get someone else other

20   than BHL or CEFFU?  I understand it's not ideal and it's

21   costly, but just to move things forward, is it something at

22   least you all are considering?

23         **MR. MARTENS:**  We are not, Your Honor, because it

24   is not feasible.  Not because we want to be difficult, but

25   because --

1          **THE COURT:**  No, no, I believe you.  You just told

2     me it's not feasible, no, I believe you a hundred percent,

3     okay.  Well, that's fair.  Okay.  So then, I mean, let's

4     just put that to bed.  I'm not asking that again.  I don't

5     want the SEC to be getting into that, that's irrelevant.

6     The point is this is who has it now.  The only way we would

7     come back to that is if for some reason, yeah, you know,

8     this software -- or someone says like, oh, there's some

9     software that always has a failsafe, right, that allows a

10    back end user to come in.  So if that were the case then, I

11    presume BAM would come back and say either, A, as a

12    customer, tell them fix it, you know, we are the customer.

13    These are not like some immutable characteristics, this is

14    just code that someone is paying someone to write and now

15    fix the code.

16         And so I presume that we would talk about that

17    then or then say like, look, if there's so many of these

18    flaws, then, yeah, let's find somebody else.  But I don't

19    want us to start going down that path.  This is who there is

20    now.  I don't -- it does not matter to me that there was a

21    difference of opinion, whether it was right or wrong, as

22    to -- that BHL and CEFFU would be here.  They are now, and

23    so let's just figure out, through the shard holders and as

24    well as some of the other folks at the company, what they

25    understand -- and perhaps through BHL as well.  Because if

1    we did, I think that would move things along very

2    efficiently.

3           So what I want to do is just take like a -- it's

4    5:16, take a few minute break.  Let's come back at 5:25, and

5    I'll hear from the parties, if there's anything else on --

6    that I need to address.  And then I want to hear I guess

7    from you all on when it makes sense to get a status report

8    as to sort of how things are moving.  Obviously we're going

9    to extend expedited discovery while we're doing this, so

10   let's come back and talk about that.

11          And if it's hey, we need a couple days -- because

12   I appreciate these are large questions, and I don't need you

13   answering at 5:17 and just throwing a dart at something.  So

14   if you say like, you know, give us until the end of the week

15   to start -- you know, let's kick some proposals between the

16   two of us, and if nothing else then come back with that,

17   that's fine too.  But that's why I'm here.  So let's come

18   back at let's say 5:25.

19          (Recess taken at 5:17 p.m.)

20          (Back on the record at 5:27 p.m.)

21          **THE COURT:**  Go ahead.

22          **MR. MARTENS:**  Your Honor, we've had a chance to

23   confer, and what we would propose is that you put on a date

24   for a hearing two weeks from now; perhaps if it works for

25   you, two weeks from today.  And that will give us time to

1    talk about scheduling depositions --

2            **THE COURT:**  That sounds great.

3            **MR. MARTENS:**  -- particularized requests, search

4    terms, et cetera.  And if we can't work it out, or if we at

5    least narrow the issues that we can't work out, or if we've

6    worked it all out, we can --

7            **THE COURT:**  Hope springs eternal, right.

8            **MR. MARTENS:**  We can all be optimistic.

9            **THE COURT:**  I will.

10           **MR. MARTENS:**  We could tell the Court -- we could

11   just let the Court know that we don't need the hearing.  And

12   if we do, at least we have something on so there's kind of a

13   deadline and a set date for us all to work toward.

14           **THE COURT:**  That sounds great.  I can't -- I'm a

15   little backed up the first week of October until -- so I

16   could do the --

17           **MR. MARTENS:**  Or the end of the prior week.  I'm

18   sure nobody wants it to go on forever.

19           **THE COURT:**  No, no, I get that.  Unfortunately I'm

20   unavailable from the 27th to the 4th.  So I think the 6th --

21           **MR. MARTENS:**  Is it okay for me to check my

22   calendar?

23           **THE COURT:**  Yeah, of course.  Why don't you all

24   talk about -- what do you think about the 6th at like 2:30?

25   I hate doing these things in the afternoon, but --

1      **MR. MARTENS:**  The 6th is?

2      **THE COURT:**  Friday, October 6th.

3      **MR. MARTENS:**  Friday the 6th?

4      **THE COURT:**  No, hold on one second.

5      **MR. MARTENS:**  I believe I am unavailable on the

6   6th, but let me check.

7      **THE COURT:**  Okay.  What about the 9th?  Is the

8   9th -- the 9th would actually -- no, I'm sorry, it's a

9   holiday.  What about the 10th?  I see some nodding their

10   heads.  The 10th?

11      **MR. MARTENS:**  I believe I cannot do the 10th.

12      **THE COURT:**  Okay.  What looks good for you that

13   week, or else I'm happy --

14      **MR. MARTENS:**  I'm looking here, just one second.

15      **THE COURT:**  Sure.

16      **MR. MARTENS:**  I think I can do the 12th or the

17   13th.

18      **THE COURT:**  They both work for me, that's fair.

19   How about for the government?

20      **MS. FARER:**  That works for the government, Your

21   Honor.  In light of the period of time between now and then,

22   we would just ask for some of these ongoing productions

23   that -- to which BAM has agreed to keep moving.

24      **THE COURT:**  I think they're going to.  Yeah, I

25   don't think there's any reason to think that they're not.

1   And I think BHL said they're going to try to think about

2   things as well.  I mean, I don't think the purpose of this

3   time is to stay it, it's to do two things, move in parallel,

4   right.  That they continue to, I mean, receive tailored

5   requests from the government.  And if something fits the

6   sort of categories that they think is the benchmarks that

7   they're hoping to see, then, yeah, I think that they're

8   going to produce it.  And to the extent that something's

9   not, then you all will continue to talk about it.

10          So, yeah, I think we should be very clear:  We'll

11  be continuing on during this time to produce documents,

12  answer questions.  I mean, if there's a deponent who's

13  available on -- I mean, I've already identified who needs to

14  be deposed.  If someone is available on the 28th of this

15  month or the 29th, there's no reason to wait until the 12th

16  to get permission to then depose that person.  So I don't

17  want to be too ambitious or optimistic, but I think that's

18  where you all are, right.  You want to move this forward

19  more than anybody, right?

20          **MR. MARTENS:**  Understood that, Your Honor.  We

21  intend that one of the topics of discussion will be who we

22  can depose and how quickly.

23          **THE COURT:**  So some of this -- I mean, when you

24  come back to me, I'm hoping there's going to be progress on

25  some depositions may have occurred or have been scheduled,

1   right -- or if not before the 12th, shortly thereafter, and

2   that some documents have been produced.  I mean, between,

3   you know, what the auditors have given you and what you

4   have -- which I understand you don't feel like you have

5   enough, you know, it still feels like there's a closer

6   finish line for what is the current state of assets, right;

7   is that fair to say?

8           **MS. FARER:**  We're hopeful that's the case, Your

9   Honor.

10          **THE COURT:**  And so, I mean, given at least that's

11  a big portion of the case -- not the case, I should say of

12  this expedited discovery question resolved, that would be

13  great.  So continue to think about targeted discovery for

14  that or whatever we need to to get there.  And on these

15  other parts, it's -- you know, you've just got to -- what is

16  it you're going to be willing to live with.  Because I'm

17  sure -- I mean, as you can imagine, I'm not going to meet

18  you full way.  I don't know who I'm going to meet halfway.

19  But at some point, we're going to have to defer to the fact

20  that counsel of record, parties in this case are saying this

21  person has control of it.

22          Now, you've still got to pressure test it, I'm

23  with you a hundred percent.  And I think that the people

24  you've identified for depositions are entirely reasonable.

25  I'm putting aside this former CEO.  Again, you're welcome to

1  tell me on the 12th that he said he's good to go now, he's

2  got no issues.  Even if that were the case, I would

3  anticipate, just to keep things moving -- I mean, you still

4  can only do so much, so why not just do the other people

5  first and keep them for last?  There's no reason not to,

6  because it may obviate it.

7          You may also say after the third person -- I mean,

8  I'm sure this is not the case, and BAM -- I'm not saying it

9  is.  But if a third person says oh, my God, I have no

10 control, it's some entity you've never heard of, you may not

11 even need to get to that person.  Because you might be look,

12 it just has to be somebody else, it's not this.  But also

13 you could -- I'd like to believe that you could be -- get to

14 a point where you say this is not great, but we're willing

15 to take it -- we want to get to the merits of this case.

16 This is too important to continue to slow this down, so I'm

17 going to put them last no matter what.

18         But right now, the current CFO is not in play, and

19 he is last.  So let's just focus on the other folks and get

20 it going, and see if it can get to something that you can

21 live with in terms of custody and control and asking more

22 narrow questions.  Let's not go back to November.  To the

23 extent you're asking things, you have the right to come

24 back, right, when someone comes and says like -- you know,

25 someone on August 1st says, you know, except for that one

1    thing we promised, you know, in 2019 or something,

2    everything else says we're in control.  Well, yeah,

3    obviously then you're going to have to ask about that.  But

4    it will be a narrowed request.  And I don't think even then

5    it would be going back to 2019, it would be tell me about

6    this one thing.  So let's just keep it smaller than you'd

7    want, but understanding that you all -- so far I don't think

8    you've gotten a no on the ability to go back.

9          And so I understand it's every lawyer's sort of

10   thing, like you just don't want to give up something because

11   it's hard to go back, right.  I mean, I understand it's easy

12   for me to say this because the mechanics are simple, but the

13   actual review and analysis and thought process is hard.  But

14   that's just what I need you to do, because this is

15   circumspect, what we're supposed to be doing.  And so let's

16   ask more maybe recent stuff with the hope that you'll be

17   able to, if need be, go back to the well.

18         But I do think that you all are asking -- I think

19   that I am with Judge Jackson still having concern about the

20   ease at which things could move overseas, and that I need to

21   have greater fidelity about the custody and control.  Right

22   now, I feel confident -- I believe that BAM believes that

23   this is there.  I have no doubt in my mind that BAM believes

24   that.  And I just need to -- you all to help me understand

25   why you're so certain of that.  I think that's all the SEC

1   wants.  Now, obviously they are the government, they're more

2   suspicious, but that's their job.  And it's your job to say

3   at some point, like, enough is enough.  But just I think we

4   need more than we've got right now.

5          **MS. FARER:**  Your Honor, I would just say on that

6   point, that is exactly what we're asking for.  And so part

7   of the issue is just getting actual evidence of that.

8          **THE COURT:**  No, I got you, that's what you're

9   going to get.  So I think it also would be helpful -- I

10  don't want to create work, but if we're meeting on the 12th

11  and we'll pick a date and time -- I'm sorry, we'll pick a

12  time, rather, for the 12th, is what about maybe a status

13  report just flagging for issues, what there may be, on --

14  let's say by 9:00 a.m. on the 10th.

15          Do you think, Ms. Farer, that makes some sense?  I

16  mean, I don't want to come into this hearing just totally

17  blind as to -- I mean, it doesn't need to be some detailed

18  thing, but a joint status report just saying like we've

19  gotten -- we've scheduled 10 depositions, we have 10 -- you

20  know, whatever, three, one, zero, I don't care what it is.

21  But something by categories, right.  I mean, we have some

22  general categories here.  We've got -- right now we're

23  looking at depositions and requests for production.  That

24  seems to be the main issues.

25          And so I think -- I'll hear from them obviously,

1    but does that work for you all?

2            MS. FARER:  Yes, Your Honor.  I'm sure we could

3    sort out something to state our respective positions and

4    joint positions on various issues.

5            THE COURT:  Does that make sense for you?

6            MR. MARTENS:  That makes a lot of sense, Your

7    Honor.

8            THE COURT:  Okay, great.  So 9:00 a.m. on the 10th

9    we'll ask for a joint status report.  And now, how does it

10   look for BAM -- how does the 12th look for you?  Is there a

11   better morning or afternoon?

12           MR. MARTENS:  I was fine either way.

13           THE COURT:  Okay.  Government?

14           MS. FARER:  Either works for the government, Your

15   Honor.

16           THE COURT:  Okay.  Why don't we say 10:30.  Is

17   that good?

18           MR. MARTENS:  Great, that's fine, Your Honor.

19           MS. FARER:  That works, Your Honor.

20           THE COURT:  I know we've got other folks in the

21   back.  I just want to make sure for the folks -- Gibson,

22   Latham, are we good?  Yeah, okay.  Thanks so much.

23           Anything else on behalf of anybody on this side of

24   the -- the groom side?

25           MR. MARTENS:  No, Your Honor.

1      **THE COURT:**  Okay.  Anything on this side?

2      **MS. FARER:**  Nothing for the SEC, Your Honor.

3      **THE COURT:**  Okay, thanks so much.  I know that you

4  all are trying hard.  I know also it's frustrating from both

5  sides.  I mean, I can't encourage you all enough to just put

6  away in the rearview mirror -- please follow my wife's

7  advice of being happy is better than being right.  Because I

8  know many of you -- or at least I got to know you all very

9  well.  Some of you I know -- some folks from before, and

10  many of you are former government folks, some who even

11  weren't.  What's clear to me when I talk to you all is that

12  you are trying to be reasonable.

13      I do think -- and I know the SEC may not feel like

14  this.  I think it's very easy for -- especially with the

15  caliber of firms here, to have gone straight to the nuclear

16  option and just fight this TRO, understanding you might lose

17  or not.  And many clients, that's what they pay for, right,

18  when they have you all here.  And so I appreciate that you

19  all -- I think that -- I do believe that you are in this

20  with this desire to move the ball forward.  And I do

21  believe, from what I've seen from the SEC when I talked to

22  them, is that I don't think they are just trying to get all

23  the discovery out, because they're going to get it.  Like,

24  it doesn't make sense to just ask for these things thinking

25  like, oh, I can only get it in expedited discovery.  They're

1   going to get much of this, if not most of this, at merits

2   discovery, so I don't think they're doing this just to be

3   difficult.

4          It's just I need you all to try to turn down the

5   temperature and forget the past, and just try to get me some

6   of what you think you can figure out.  Because I really --

7   I'm sure you that all have known -- I mean, you're very

8   seasoned lawyers.  You have one person in the room who knows

9   how unpredictable I am in Ms. Rosen, and so you just don't

10  want me kind of picking random things.  I just don't think

11  that that's an efficient way to get this done.

12         So I appreciate all things being -- this is high

13  stakes litigation.  I don't want to in any way undercut

14  that.  I think you all -- all of you, have been extremely

15  professional and thorough.  I told my clerks not to get used

16  to briefing like this on everything else, because it's

17  all -- this is A plus stuff.

18         So thanks, I do appreciate it.  I look forward to

19  seeing what you have to file on the 10th.  We'll be back on

20  the 12th in the morning.  Thanks for staying late,

21  everybody, I really appreciate it.  Have a great day.

22         (Proceedings adjourned at 5:40 p.m.)

23

24

25

1                    **C E R T I F I C A T E**

2

3               I, **Jeff Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the remotely reported proceedings in the above-entitled

6    matter.

7                    **PLEASE NOTE:**   This hearing occurred by

8    videoconference and is therefore subject to the

9    technological limitations of court reporting remotely.

10

11

12

13        December 5, 2023                    _____

14             **DATE**                            **Jeff M. Hook**

15

16

17

18

19

20

21

22

23

24

25

**COURT REPORTER: [1]** 3/23
**DEPUTY CLERK: [1]**   3/1
**MR. BAKER: [1]** 3/19
**MR. BEVILLE: [1]**   3/13
**MR. LAROCHE: [1]**   3/15
**MR. MARTENS: [52]**   3/11 9/4 9/12 9/17 25/3 25/6 29/22 30/8 30/16 30/19 30/23 31/14 32/14 32/18 32/23 33/11 34/4 34/19 35/12 35/15 36/7 36/20 42/10 50/25 52/6 56/24 57/22 58/13 59/10 59/14 59/22 59/24 60/3 60/8 75/22 77/21 78/2 78/7 78/9 78/16 78/20 78/25 79/2 79/4 79/10 79/13 79/15 80/19 85/5 85/11 85/17 85/24
**MR. McLUCAS: [1]**   3/17
**MR. MENDRO: [2]**   4/7 70/4
**MS. FARER: [56]**   3/6 10/13 12/5 12/11 13/20 14/24 15/20 17/6 17/10 18/2 19/12 19/20 20/18 21/11 21/19 21/25 22/6 23/23 24/21 37/24 38/2 39/25 40/10 40/17 42/14 43/19 44/4

44/9 44/13 44/24 45/8 45/10 45/13 46/5 46/9 47/12 47/17 48/24 49/22 49/24 60/16 60/23 61/24 62/21 64/23 65/16 65/19 66/12 68/5 79/19 81/7 84/4 85/1 85/13 85/18 86/1
**THE COURT: [110]**

**1**
**10 [5]**   32/4 32/4 57/4 84/19 84/19
**100 [2]**   1/14 1/17
**1000 [1]**   2/3
**10001 [1]**   1/25
**10004 [1]**   1/18
**1050 [1]**   2/6
**10:30 [1]** 85/16
**10th [6]**   79/9 79/10 79/11 84/14 85/8 87/19
**11 [2]**   27/18 57/4
**11,000 [1]**   6/7
**11th [2]**   2/3 39/13
**12th [9]**   25/25 79/16 80/15 81/1 82/1 84/10 84/12 85/10 87/20
**134 [1]**   33/3
**13th [2]**   6/11 79/17
**14 [7]**   9/8 9/15 27/10 29/7 35/2 57/2 57/4
**15 [1]**   57/4
**1599 [2]**   1/4 3/2
**16 [1]**   60/25
**18 [2]**   1/5 57/4
**1:23-cv-1599 [1]**   1/4

**1st [1]**   82/25

**2**
**20001 [1]**   2/25
**20004 [1]**   2/4
**20037 [1]**   1/22
**2019 [2]**   83/1 83/5
**2022 [12]** 26/25 27/13 29/2 29/8 32/2 35/8 57/8 57/19 57/19 58/7 63/7 65/11
**2023 [3]**   1/5 27/19 57/20
**20549 [2]**   1/14 2/7
**21 [1]**   52/21
**2100 [1]**   1/21
**23-1599 [1]** 3/2
**25 [1]**   71/8
**250 [1]**   12/24
**26 [2]**   27/25 36/17
**27th [1]**   78/20
**28 [1]**   57/4
**28th [1]**   80/14
**29th [1]**   80/15
**2:30 [1]**   78/24
**2nd [2]**   27/19 27/21

**3**
**30 [8]**   49/11 49/20 52/2 55/24 55/24 56/13 56/13 57/5
**300 [1]**   2/6
**33 [1]**   57/5
**333 [1]**   2/24
**34D [3]**   59/19 59/23 60/5
**38 [1]**   57/5
**3:36 [1]**   1/6

**4**
**45-day [1]** 68/10
**4th [1]**   78/20

**5**
**50 [1]**   72/10
**50/50 [1]** 72/10
**55 [1]**   1/24

**555 [1]**   2/3
**5:16 [1]**   77/4
**5:17 [1]**   77/19
**5:17 and [1]** 77/13
**5:25 [2]**   77/4 77/18
**5:27 [1]**   77/20
**5:40 [1]**   87/22

**6**
**6,500 [1]** 38/19
**600-pound [1]** 14/22
**6th [6]**   78/20 78/24 79/1 79/2 79/3 79/6

**7**
**700,000 [1]** 6/7

**9**
**911 [1]**   6/6
**9:00 a.m [2]** 84/14 85/8
**9th [3]**   79/7 79/8 79/8

**A**
**A's [1]**   27/4
**a.m [2]**   84/14 85/8
**a/k/a [1]** 25/23
**abide [1]** 18/24
**ability [4]** 24/19 32/9 44/2 83/8
**able [8]**   3/25 18/22 40/8 44/21 49/5 55/17 71/7 83/17
**above [1]**   88/5
**above-entitled [1]**   88/5
**absent [2]** 8/12 49/7
**abundantly [1]** 49/2
**acceptable [1]** 17/22
**accepting [1]** 35/17
**access [9]**   8/9 17/19 32/13

32/21 38/10 39/11 41/24 44/19 59/1
**according [1]** 51/3
**account [3]** 5/7 10/24 39/9
**accounting [3]** 10/20 65/3 69/13
**accounts [3]** 8/10 11/1 20/21
**accurate [3]** 14/17 19/16 21/10
**accurately [1]** 16/2
**acknowledged [1]**   6/11
**across [1]** 72/7
**Action [1]**   1/3
**actors [1]** 17/22
**actual [4]** 5/10 22/17 83/13 84/7
**actually [8]** 21/12 22/3 23/14 24/3 29/4 44/6 47/6 79/8
**acute [1]**   6/18
**add [5]**   13/15 17/11 19/21 20/17 23/5
**added [1]**   43/2
**addition [4]** 11/10 13/23 55/22 65/20
**additional [15]** 10/18 11/9 17/7 20/17 38/20 43/22 48/9 48/17 49/15 49/19 52/15 52/21 63/10 66/15 74/19
**address [9]** 21/7 27/6 28/16 31/14 32/20 35/5 39/13 63/21 77/6
**addressed [3]** 52/22 65/21

**A**

addressed...
  **[1]**  70/21
adjourned **[1]**
  87/22
administrative
  **[3]**  8/8 17/14
  17/14
administrator
  **[2]**  20/23
  23/4
advice **[1]**
  86/7
affiliated **[2]**
  15/13 18/10
affiliates **[1]**
  17/12
afternoon **[7]**
  3/12 3/16 3/18
  3/20 4/8 78/25
  85/11
again **[44]**
  4/22 6/23 9/11
  11/13 13/9
  14/5 15/22
  16/12 16/19
  18/7 21/7
  21/20 23/11
  26/10 30/2
  31/17 32/24
  33/4 33/16
  34/8 36/20
  40/19 40/21
  47/2 48/1 48/8
  48/11 50/1
  51/10 52/8
  54/2 54/3
  55/24 56/18
  58/6 61/8
  62/10 63/14
  68/25 73/11
  73/17 75/9
  76/4 81/25
against **[1]**
  64/4
aggregate **[2]**
  10/23 11/7
ago **[1]**  57/21
agree **[6]**
  39/19 40/23
  55/24 57/25
  62/1 74/8
agreed **[4]**
  45/1 68/22
  70/22 79/23
agreement **[2]**
  14/11 63/18
ahead **[1]**

77/21
AI **[1]**  69/22
al **[2]**  1/6 3/4
alerts **[1]**
  20/1
aligned **[1]**
  47/22
allay **[2]**
  29/10 35/4
allegations **[1]**
  20/22
alleviated **[1]**
  48/2
allow **[5]**
  21/17 48/22
  54/20 58/11
  62/2
allows **[3]**
  15/4 48/23
  76/9
along **[3]**
  37/10 39/15
  77/1
alternative **[3]**
  17/20 17/25
  35/10
although **[2]**
  49/20 72/24
always **[5]**
  18/15 59/21
  70/7 71/14
  76/9
Amazon **[4]**
  39/8 58/15
  58/17 58/17
ambitious **[1]**
  80/17
amount **[3]**
  22/16 23/11
  49/4
amounts **[1]**
  24/2
analogy **[1]**
  53/10
analysis **[1]**
  83/13
anecdotes **[1]**
  37/21
answered **[4]**
  14/13 33/5
  44/4 75/5
anticipate **[3]**
  45/6 45/7 82/3
anymore **[1]**
  51/2
apart **[1]**  5/12
apex **[1]**  51/3
apologies **[1]**

60/18
app **[2]**  22/19
  22/19
apparent **[1]**
  16/10
apparently **[1]**
  20/17
appearance **[2]**
  4/4 4/11
appearances **[3]**
  1/11 2/1 4/1
appears **[4]**
  15/5 16/13
  19/15 48/2
Apple **[2]**  23/9
  48/16
application **[1]**
  25/8
applied **[1]**
  51/5
applies **[1]**
  51/6
appreciate **[20]**
  7/9 7/11 9/21
  30/14 31/5
  33/8 34/1
  41/16 53/12
  53/18 54/3
  64/25 67/14
  68/12 71/17
  77/12 86/18
  87/12 87/18
  87/21
appreciated **[1]**
  6/20
approaching **[1]**
  35/22
appropriate **[4]**
  7/24 36/14
  36/16 55/15
approval **[1]**
  20/1
approve **[1]**
  22/20
arbitrary **[1]**
  64/19
arduously **[1]**
  66/17
arguing **[1]**
  17/24
argument **[1]**
  53/19
arguments **[1]**
  5/23
around **[6]**
  33/2 34/7
  43/22 47/10
  58/16 60/6

arrangement **[1]**
  40/25
aside **[5]**
  37/12 45/6
  49/19 52/3
  81/25
asserted **[1]**
  39/14
asset **[2]**  11/4
  51/19
assets **[45]**
  6/12 7/2 7/3
  7/18 8/7 8/9
  8/25 10/2 10/7
  10/8 10/16
  11/5 11/21
  12/1 14/3 21/6
  21/14 24/9
  24/19 25/12
  28/25 31/13
  32/14 32/21
  33/10 33/19
  35/23 37/20
  39/20 41/1
  50/14 56/14
  57/15 58/24
  63/12 63/13
  63/16 67/23
  70/18 70/19
  70/19 73/20
  74/4 74/14
  81/6
associated **[2]**
  8/10 63/11
atmospherics
  **[1]**  40/4
attached **[2]**
  27/22 36/15
attrition **[1]**
  73/5
audit **[1]**
  33/14
auditor **[4]**
  33/15 49/8
  62/9 63/1
auditors **[4]**
  7/2 16/1 38/17
  81/3
August **[3]**
  27/19 27/21
  82/25
August 1st **[1]**
  82/25
August 2nd **[2]**
  27/19 27/21
Australian **[1]**
  73/14
authority **[1]**

23/7
autopsy **[1]**
  7/16
availability
  **[2]**  7/4 28/25
available **[5]**
  11/22 12/1
  14/3 80/13
  80/14
Ave **[2]**  1/21
Avenue **[1]**
  2/24
away **[2]**  74/14
  86/6
AWS **[3]**  8/10
  39/9 62/20

**B**

baby **[1]**  72/4
back **[50]**  5/2
  8/6 12/24 15/8
  20/15 23/21
  24/15 25/4
  29/14 29/24
  31/4 35/15
  35/20 35/22
  35/24 40/9
  41/1 41/17
  43/8 43/23
  46/25 50/19
  62/3 64/9
  67/13 67/15
  71/18 71/25
  73/15 73/19
  75/5 75/5 75/8
  76/7 76/10
  76/11 77/4
  77/10 77/16
  77/18 77/20
  80/24 82/22
  82/24 83/5
  83/8 83/11
  83/17 85/21
  87/19
back-end **[1]**
  15/8
backdoor **[4]**
  8/3 24/19
  67/18 69/11
backed **[1]**
  78/15
backwards **[2]**
  50/18 64/22
bad **[2]**  6/15
  17/1
BAKER **[2]**  2/2
  3/21
balances **[7]**

**B**

balances... [7]
   5/7 10/3
   10/16 10/19
   11/7 19/2 56/8
ball [2]   69/2
   86/20
BAM [94]
BAM is [1]
   8/20
BAM's [20]   7/1
   8/9 8/11 8/25
   19/18 24/19
   33/25 36/5
   38/17 44/16
   44/21 47/18
   51/18 51/25
   55/21 58/23
   62/9 63/16
   63/17 67/14
BAM-Ceffu [1]
   29/25
bandwidth [1]
   7/8
bank [2]   11/14
   19/10
Bankruptcy [1]
   2/24
based [11]
   15/7 20/3 20/5
   20/18 21/2
   22/1 23/2
   43/10 50/2
   67/5 67/7
baseline [1]
   7/23
basically [1]
   41/9
basis [2]
   63/20 64/15
be difficult
   [1]   75/24
become [2]   8/1
   8/2
bed [2]   10/6
   76/4
beforehand [1]
   6/9
begin [4]   9/8
   9/15 60/23
   70/20
beginning [3]
   4/25 9/19 40/5
begun [1]   9/13
behalf [4]
   3/21 4/9 39/10
   85/23
behind [1]

54/16
belabor [1]
   4/3
believes [2]
   83/22 83/23
bench [2]   25/2
   43/3
benchmarks [1]
   80/6
beneath [1]
   43/16
benefit [2]
   28/1 48/11
best [1]   9/3
better [5]
   9/24 26/22
   68/12 85/11
   86/7
BEVILLE [2]
   1/19 3/14
beyond [4]
   20/18 34/15
   49/9 67/1
BHL [60]   2/5
   8/22 9/23
   14/18 17/6
   18/23 19/7
   21/7 21/9
   23/23 24/9
   24/18 25/11
   25/15 25/23
   26/1 30/3 30/6
   30/6 30/7 30/9
   30/10 30/11
   31/13 31/24
   32/9 32/20
   33/24 39/5
   39/9 40/5 40/7
   41/3 43/24
   43/25 44/2
   44/24 44/25
   45/3 45/20
   45/23 46/17
   68/2 68/4
   68/18 68/19
   68/21 68/24
   69/3 69/4 69/8
   69/8 69/14
   70/2 70/5
   70/21 75/20
   76/22 76/25
   80/1
BHL's [1]   30/8
BHL-Ceffu [2]
   9/23 14/18
BHL/Ceffu [1]
   24/18
big [1]   81/11

bigger [1]
   65/4
Bill [2]   3/18
   3/20
billion [1]
   33/10
BINANCE [21]
   1/6 3/3 4/9
   8/13 8/16 15/5
   15/10 15/16
   15/22 16/9
   16/13 17/12
   20/12 20/15
   20/20 44/15
   46/8 46/21
   50/6 65/13
   68/8
Binance's [2]
   21/15 63/15
Binance.us [3]
   8/10 46/18
   47/7
bit [6]   16/24
   21/16 21/17
   58/21 62/2
   65/4
bite [3]   72/15
   72/16 74/16
blind [1]
   84/17
blind as [1]
   84/17
blunderbuss [1]
   30/25
board [2]
   65/22 65/23
both [18]   5/12
   5/15 6/14
   14/23 15/23
   38/21 42/18
   45/22 46/2
   46/8 54/13
   63/1 66/1
   69/20 72/12
   72/19 79/18
   86/4
bottom [2]
   16/18 69/16
boundaries [1]
   56/2
break [2]
   71/18 77/4
breaking [1]
   50/22
Brian [1]
   50/24
bridges [1]
   6/21

brief [5]   24/4
   31/19 31/22
   59/12 59/19
briefing [2]
   15/23 87/16
briefs [1]
   12/14
bringing [1]
   37/21
broad [4]
   17/15 35/10
   41/22 64/11
broader [1]
   72/18
build [1]   64/5
bullet [3]
   72/15 72/17
   74/16
bullied [1]
   75/15
burden [4]
   28/1 28/2
   52/12 67/24
burdensome [2]
   13/16 64/7
buying [1]
   7/12

**C**

calendar [1]
   78/22
caliber [1]
   86/15
call [6]   6/6
   15/17 22/18
   31/16 32/11
   54/19
called [4]
   31/24 32/20
   60/5 61/17
calling [1]
   32/13
calls [2]
   12/15 12/15
came [8]   13/13
   16/4 26/23
   31/5 63/19
   73/12 73/12
   73/15
can [78]   5/15
   6/2 6/14 8/1
   9/25 10/12
   11/9 15/14
   18/15 19/9
   19/9 20/13
   20/16 20/17
   21/24 22/20
   25/1 25/2
   26/14 27/18

28/15 29/15
   29/16 31/21
   31/21 32/13
   35/4 42/22
   43/21 44/13
   46/3 46/3 48/8
   48/19 48/25
   51/10 51/16
   52/8 54/20
   55/10 55/11
   55/15 56/17
   56/18 57/11
   58/20 59/15
   59/21 60/1
   60/14 61/1
   61/12 61/22
   62/3 62/14
   62/17 64/5
   66/10 66/11
   68/11 68/12
   68/18 70/6
   70/7 70/8
   71/25 72/6
   72/23 78/6
   78/8 79/16
   80/22 81/17
   82/4 82/20
   82/20 86/25
   87/6
Canada [8]
   20/3 21/22
   21/25 22/6
   22/7 23/2
   32/12 67/9
Canadian [2]
   20/18 73/13
capabilities
   [1]   23/7
capital [1]
   65/5
car [1]   33/25
care [2]   56/7
   84/20
carefully [1]
   10/20
carve [2]   70/3
   70/4
carve-out [1]
   70/3
case [15]   3/2
   16/11 73/1
   73/4 74/11
   74/16 75/1
   76/10 81/8
   81/11 81/11
   81/20 82/2
   82/8 82/15
castle [1]

**C**

**castle... [1]**
50/13
**catastrophe [1]**
73/20
**catch [1]**
74/24
**categories [6]**
4/18 13/1
41/13 80/6
84/21 84/22
**caveat [1]**    9/3
**Ceffu [32]**
9/23 14/18
15/22 15/25
16/4 16/6
16/10 17/3
23/23 24/18
25/23 28/9
29/25 30/6
37/18 40/5
40/7 40/19
40/20 40/22
40/24 40/25
41/2 41/3 44/6
44/11 44/11
45/12 45/15
63/19 75/20
76/22
**center [1]**
39/8
**CEO [9]**    47/11
47/12 49/19
52/3 53/6 53/7
53/20 65/18
81/25
**certain [9]**
5/7 8/21 33/19
37/19 37/20
63/11 64/24
65/7 83/25
**certainly [19]**
11/23 24/22
26/14 33/20
44/15 45/16
48/25 53/5
64/4 66/7
66/14 67/8
67/11 67/12
67/25 68/6
68/12 70/25
72/1
**certifications
[1]**   19/15
**certify [1]**
88/4
**cetera [10]**
4/19 10/19

15/16 38/12
38/21 39/4
41/1 41/14
65/13 78/4
**CFO [4]**   49/19
52/3 53/7
82/18
**Chain [1]**
20/21
**chance [3]**    5/2
25/3 77/22
**change [2]**
20/17 47/19
**changed [1]**
41/4
**changes [2]**
13/25 28/23
**changing [2]**
63/15 65/10
**Changpeng [1]**
3/21
**channel [1]**
61/16
**channels [1]**
42/1
**characteristics
[1]**   76/13
**characterizatio
n [1]**   66/21
**charge [1]**
15/6
**chasing [1]**
26/2
**check [2]**
78/21 79/6
**checking [1]**
73/18
**checks [1]**
22/23
**Chen [1]**   23/4
**chief [8]**   25/9
26/9 30/20
32/25 33/12
34/6 34/11
53/10
**chime [1]**   4/21
**China [1]**
20/12
**circuit [3]**
56/3 58/12
58/20
**circumspect [1]**
83/15
**circumstances
[3]**   15/24
24/23 46/22
**CISO [1]**   32/25
**civil [2]**   1/3

3/2
**claim [3]**   15/3
25/14 52/12
**claims [2]**
21/4 41/10
**clear [19]**
4/23 8/22 23/6
25/10 26/1
26/19 27/15
30/9 32/16
33/8 34/2
36/17 38/8
43/25 46/13
49/3 50/3
80/10 86/11
**clearance [1]**
51/19
**clearing [10]**
16/10 20/11
21/5 21/22
22/7 24/5
31/12 33/15
61/15 66/2
**clearly [1]**
38/17
**clerks [1]**
87/15
**client [1]**
41/19
**clients [1]**
86/17
**closer [1]**
81/5
**closing [1]**
73/17
**code [2]**   76/14
76/15
**cognisant [1]**
8/3
**cold [3]**   22/10
22/12 23/14
**colleague [1]**
3/22
**collection [1]**
14/10
**colors [1]**
40/3
**COLUMBIA [1]**
1/1
**combination [1]**
35/24
**comfortable [2]**
18/2 43/14
**coming [6]**
7/25 13/18
13/20 33/21
64/9 67/13
**commandeer [1]**

69/23
**comments [1]**
4/16
**commingled [1]**
6/13
**COMMISSION [4]**
1/3 1/13 1/17
3/3
**communicate [1]**
61/14
**communications
[16]**   6/7 16/3
16/11 27/10
27/11 28/10
28/21 35/1
41/14 41/22
50/6 57/3 57/8
58/25 61/13
66/2
**companies [1]**
6/17
**company [13]**
14/1 20/4
25/10 26/25
29/1 29/7
46/25 47/25
51/2 65/24
69/22 71/6
76/24
**compared [1]**
11/14
**comparison [1]**
46/16
**complaint [1]**
6/6
**complete [2]**
8/11 28/7
**completed [1]**
61/4
**compliance [2]**
22/25 24/23
**complied [2]**
9/19 28/14
**comply [1]**
33/22
**complying [2]**
16/17 16/17
**components [2]**
58/24 61/7
**concern [7]**
6/18 10/4 13/9
21/7 40/9
67/22 83/19
**concerned [6]**
13/10 13/13
19/8 27/4 31/8
72/21
**concerning [5]**

7/2 28/21 29/4
38/18 58/23
**concerns [21]**
5/19 5/23 7/9
13/5 19/8
19/22 20/7
20/13 26/14
28/15 30/16
30/18 30/22
31/23 34/13
34/23 35/4
35/4 54/8 59/3
73/25
**concrete [1]**
74/1
**condition [1]**
35/19
**conduct [1]**
41/9
**conducted [1]**
42/9
**conducting [2]**
49/4 61/19
**confer [5]**
27/18 41/21
51/11 61/22
77/23
**conferred [3]**
12/12 31/20
41/7
**confers [5]**
12/10 12/23
14/6 38/4
68/15
**confident [4]**
33/7 74/3 74/4
83/22
**configurations
[1]**   24/3
**configured [1]**
62/24
**confirm [1]**
9/2
**confirmed [1]**
58/22
**confused [1]**
58/15
**confusion [2]**
16/1 16/10
**conjecture [1]**
53/15
**Connecticut [1]**
2/6
**connection [1]**
13/23
**consent [37]**
5/18 6/19 6/21
6/24 8/5 8/6

**C**

**consent... [31]**
8/22 10/21
13/24 15/12
16/14 16/18
16/22 17/11
17/16 18/4
18/10 18/14
18/14 18/15
20/7 21/8
22/25 24/23
25/13 25/17
25/22 33/22
34/9 35/18
45/2 46/14
49/6 50/15
52/23 63/22
70/12
**consider [5]**
48/19 48/25
69/5 71/1
74/20
**consideration
[5]** 70/3 70/7
70/7 71/11
71/14
**considering [3]**
45/16 75/12
75/22
**consistent [2]**
36/18 37/2
**Constitution
[1]** 2/24
**consumer [3]**
7/20 10/2 13/9
**consumers [1]**
13/11
**CONT [1]** 2/1
**contact [5]**
21/7 24/9
31/13 52/1
55/20
**contacted [1]**
44/9
**contain [2]**
34/22 34/23
**contains [1]**
27/22
**contemplated
[1]** 16/22
**context [1]**
51/5
**continue [9]**
29/9 36/8
43/17 56/4
61/22 80/4
80/9 81/13
82/16

**continued [2]**
65/13
**continues [1]**
6/3
**continuing [2]**
60/21 80/11
**control [65]**
7/3 8/11 8/17
8/25 9/10
11/24 14/17
15/1 15/4
15/10 15/14
16/14 17/13
17/18 17/19
18/8 19/1
19/16 19/18
20/24 20/25
21/4 21/13
21/14 22/5
23/11 23/14
24/14 24/18
25/22 26/6
26/15 28/23
31/10 32/10
32/13 33/9
33/19 37/16
37/18 37/20
38/10 38/18
39/24 44/19
44/21 46/4
46/15 50/7
53/24 54/14
54/19 56/14
59/1 62/13
63/16 65/13
65/24 69/12
74/4 81/21
82/10 82/21
83/2 83/21
**controlled [4]**
9/9 39/20 46/4
73/9
**controlling [1]**
50/12
**controls [6]**
15/3 21/13
28/22 40/25
62/24 63/5
**conversations
[5]** 16/9 38/5
38/23 68/7
68/11
**cool [1]** 48/20
**coordinating
[1]** 68/15
**copied [1]**
46/21
**copies [2]**

8/24 65/12
**core [3]** 49/5
49/13 75/3
**costly [1]**
75/21
**counsel [25]**
3/6 3/8 12/13
14/6 18/22
18/24 19/11
19/14 38/3
38/24 41/11
42/6 47/18
47/20 47/25
47/25 50/11
50/9 60/25
63/17 66/8
66/16 66/23
71/4 81/20
**counsel's [1]**
61/17
**count [1]** 52/2
**counts [2]**
57/12 57/24
**couple [4]**
49/22 64/13
64/22 77/11
**course [1]** 9/3
38/20 41/8
60/2 78/23
**court [23]** 1/1
2/23 2/23 3/25
4/5 4/21 6/11
6/18 36/16
41/12 50/2
51/3 51/4 53/2
69/19 70/16
71/21 74/10
74/12 78/10
78/11 88/3
88/9
**Court's [1]**
45/3
**courtroom [1]**
54/17
**Courts [1]**
2/24
**cover [1]** 47/6
**create [1]**
84/10
**created [1]**
62/19
**creates [1]**
15/7
**creating [2]**
15/2 15/2
**creation [1]**
17/16
**credible [1]**

17/4
**criminal [1]**
19/5
**cross [1]**
74/24
**cross-examine
[1]** 74/24
**Crutcher [1]**
2/6
**crypto [4]** 8/9
11/4 11/10
17/19
**cumbersome [1]**
21/16
**currency [1]**
11/12
**current [7]**
20/18 51/7
51/22 52/3
55/16 81/6
82/18
**custodial [3]**
41/9 49/4
61/20
**custodian [6]**
15/18 16/6
18/11 30/7
30/10 40/24
**custodians [7]**
7/2 15/14 18/4
27/11 28/10
35/2 58/1
**custody [28]**
7/3 8/11 8/17
9/10 11/24
14/16 16/14
17/13 17/19
19/1 19/18
21/14 25/12
25/22 25/24
26/5 26/15
28/23 30/12
38/18 39/7
39/24 44/16
53/24 63/15
63/18 82/21
83/21
**customer [15]**
6/12 7/3 7/18
8/7 8/9 8/25
12/1 28/25
56/14 57/15
58/24 63/12
63/13 76/12
76/12
**customers [3]**
7/6 11/22 14/4
**cuts [1]** 64/4

**cutting [1]**
19/12
**cv [1]** 1/4
**CZ [4]** 18/23
45/19 46/8
68/24

**D**

**dart [1]** 77/13
**data [1]** 39/8
**date [12]**
19/24 46/24
58/1 58/3 61/3
63/7 64/19
64/20 77/23
78/13 84/11
88/14
**DAVID [2]** 1/12
3/8
**day [6]** 12/16
16/13 32/25
34/18 68/10
87/21
**days [7]** 9/8
9/16 29/7
35/21 55/2
57/21 77/11
**DC [6]** 1/5
1/14 1/22 2/4
2/7 2/25
**deadline [2]**
9/17 78/13
**deadlines [1]**
14/8
**deal [1]** 4/25
**debate [1]**
58/13
**deceptive [1]**
19/4
**decision [2]**
51/4 51/4
**declaration [5]**
25/8 25/11
25/25 26/12
59/18
**declarations
[1]** 9/6
**decline [1]**
22/21
**deemed [1]**
25/22
**defendant [6]**
2/2 2/5 18/23
45/19 75/14
75/14
**defendants [11]**
1/7 1/19 5/20
7/1 10/19
11/17 12/16

**D**

**defendants... [4]**   13/12
14/13 15/11
66/16

**defer [1]**
81/19

**definition [1]**
17/15

**delete [1]**
8/23

**demonstrated [3]**   12/13
15/23 55/3

**demonstrates [1]**   42/8

**denied [1]**
36/10

**depends [1]**
57/24

**depo [1]**   60/6

**deponent [2]**
65/21 80/12

**deponents [7]**
41/13 41/25
61/16 62/8
66/1 66/20
72/20

**depose [3]**
49/21 80/16
80/22

**deposed [10]**
22/22 23/17
32/25 33/13
33/14 33/14
33/15 52/11
57/3 80/14

**deposing [1]**
24/4

**deposit [3]**
23/16 23/19
28/23

**deposition [13]**
16/8 21/6
31/12 34/7
39/6 47/12
49/3 50/25
54/3 55/20
61/3 62/1
74/23

**depositions [28]**   4/18
33/16 37/11
38/4 40/7 41/9
42/16 43/22
47/3 47/9 48/5
48/6 48/10
48/21 49/17

50/19 51/13
56/15 61/14
66/14 67/25
74/18 75/3
78/1 80/25
81/24 84/19
84/23

**described [2]**
38/8 71/5

**describes [1]**
15/25

**designated [1]**
40/20

**desire [1]**
86/20

**desk [1]**   32/11

**destroy [1]**
8/23

**detail [2]**
11/8 48/22

**detail-specific [1]**   48/22

**detailed [1]**
84/17

**details [2]**
10/25 14/21

**determine [1]**
24/23

**determined [1]**
51/11

**developed [1]**
46/20

**developing [1]**
66/18

**device [6]**
22/14 22/17
22/19 23/9
23/11 62/2

**devices [2]**
19/25 20/25

**diagrams [7]**
38/11 38/21
41/14 58/22
59/7 60/22
61/5

**difference [2]**
54/22 76/21

**different [14]**
4/17 4/18 6/22
12/8 14/8 23/5
38/4 38/4 38/9
46/24 47/2
62/8 64/6
64/12

**difficult [4]**
38/22 71/9
75/24 87/3

**digital [1]**

11/5

**diligence [5]**
26/11 33/2
34/7 34/13
47/3

**direct [2]**
19/18 46/15

**directed [1]**
44/6

**directing [2]**
15/15 22/4

**direction [1]**
18/7

**directions [1]**
50/7

**directly [1]**
8/25

**director [3]**
51/18 51/24
55/19

**disappear [1]**
64/1

**discovery [47]**
1/9 3/4 4/18
6/9 6/10 7/1
7/13 8/1 13/6
14/2 14/11
30/13 30/15
30/16 36/18
37/7 37/17
39/22 41/17
44/25 45/2
45/9 45/17
46/23 49/7
53/4 56/4 56/5
56/20 56/23
56/24 61/19
61/20 64/10
64/12 68/9
70/9 70/11
70/21 71/25
73/11 77/9
81/12 81/13
86/23 86/25
87/2

**discrepancies [2]**   11/4
11/11

**discrete [4]**
34/4 37/15
50/12 67/4

**discretion [2]**
22/2 22/24

**discussed [1]**
14/6

**discussion [8]**
33/4 36/9
57/12 58/8

60/3 60/6
63/25 80/21

**discussions [1]**
52/14

**dispute [3]**
3/4 8/5 42/3

**disputes [1]**
71/25

**dissipated [1]**
6/13

**dissipating [1]**
10/8

**distinction [1]**
46/11

**district [6]**
1/1 1/1 2/24
51/3 51/4 51/4

**diverge [1]**
53/25

**divide [1]**
5/11

**doctrine [1]**
51/3

**document [13]**
4/14 26/23
26/24 27/1
29/1 29/7 33/6
34/17 35/24
41/12 48/15
71/3 71/5

**documents [44]**
5/16 10/21
12/25 16/1
27/10 27/11
27/12 28/4
28/21 29/17
30/21 31/17
32/2 33/3 35/1
36/5 38/12
38/15 38/18
38/19 38/20
38/25 41/11
41/13 41/14
42/7 48/7 49/2
49/7 49/9
49/15 57/1
58/22 61/1
61/2 61/3
61/23 62/8
72/19 74/21
74/23 75/4
80/11 81/2

**dollar [1]**
33/10

**done [15]**   5/22
9/2 9/12 9/13
12/10 19/12
23/21 48/9

48/9 53/2 53/7
57/24 64/24
69/14 87/11

**doors [1]**
73/17

**doubt [1]**
83/23

**down [9]**   25/17
26/2 53/11
56/21 61/11
71/3 76/19
82/16 87/4

**downside [2]**
63/23 64/21

**dozen [1]**   71/3

**draft [1]**
40/15

**draw [1]**   53/14

**drawn [1]**
54/23

**due [4]**   26/11
34/7 34/13
47/3

**Dunn [2]**   2/6
4/9

**during [8]**
31/12 38/19
61/2 63/16
65/6 68/16
73/11 80/11

**E**

**e-mail [4]**
27/19 27/21
36/15 58/5

**e-mails [2]**
6/8 12/15

**ease [2]**   5/20
83/20

**easier [1]**
75/19

**easiest [2]**
36/23 52/8

**easily [1]**
42/2

**easy [3]**   13/7
83/11 86/14

**ECF [1]**   42/22

**effect [1]**   9/6

**efficiencies [1]**   54/6

**efficient [5]**
68/13 70/10
70/15 70/20
87/11

**efficiently [1]**
77/2

**effort [1]**
38/5

**E**

**either [5]**
34/14 47/25
76/11 85/12
85/14

**elapsed [1]**
13/7

**else [13]**   4/7
18/19 54/14
67/20 75/19
76/18 77/5
77/16 79/13
82/12 83/2
85/23 87/16

**EMMETT [2]**
1/16 3/9

**emphasize [1]**
28/13

**employee [3]**
20/12 27/4
47/16

**employees [1]**
9/11

**encourage [3]**
54/1 71/23
86/5

**encouraged [1]**
61/10

**encumber [2]**
47/15 63/12

**encumbering [1]**
11/21

**encumbrance [1]**
7/5

**encumbrances**
**[2]**   63/11
63/25

**end [14]**   15/8
16/12 23/21
34/18 46/4
46/25 65/10
71/6 72/10
72/11 72/21
76/10 77/14
78/17

**endless [1]**
29/10

**ends [2]**   45/22
46/2

**enforce [1]**
29/6

**engage [1]**
50/5

**engaged [1]**
27/17

**enough [21]**
10/2 10/7
10/16 18/25

19/3 19/6 43/9
43/14 64/23
69/21 69/21
70/18 73/10
74/11 74/11
74/13 75/6
81/5 84/3 84/3
86/5

**ensure [5]**
10/16 14/2
17/17 22/25
50/14

**ensuring [1]**
65/12

**entire [2]**
15/8 32/25

**entirely [3]**
7/24 19/16
81/24

**entirety [2]**
28/19 57/7

**entities [4]**
3/13 5/25 8/13
8/16

**entitled [1]**
88/5

**entity [16]**
15/1 15/5 15/5
15/6 15/6
15/10 15/16
16/2 16/13
18/9 26/10
44/7 44/15
45/15 51/6
82/10

**entry [1]**   4/4

**environment [3]**
39/5 39/7
61/6

**Eric [2]**   25/8
26/7

**especially [1]**
86/14

**essentially [1]**
26/24

**establish [1]**
9/8

**established [2]**
6/15 39/9

**et [12]**   1/6
3/4 4/19 10/19
15/16 38/12
38/21 39/3
41/1 41/14
65/13 78/4

**eternal [1]**
78/7

**evaluate [8]**

11/9 11/20
16/15 18/6
19/14 24/22
62/2 62/14

**evaluating [2]**
22/3 22/24

**evaluation [1]**
19/24

**even [16]**   6/3
24/16 28/17
29/23 32/1
32/9 39/18
39/19 40/4
53/19 67/5
74/3 82/2
82/11 83/4
86/10

**ever-changing**
**[2]**   63/15
65/10

**everybody [2]**
49/24 87/21

**everybody's [1]**
19/3

**everyone [4]**
4/12 53/1
68/24 69/13

**evidence [24]**
6/12 10/15
11/25 13/2
15/1 15/7
15/18 16/3
16/15 17/7
19/13 19/24
21/2 21/10
21/21 23/12
23/13 23/25
32/15 32/21
32/22 50/14
55/2 84/7

**evolution [1]**
65/12

**exacerbates [1]**
14/24

**exact [2]**
46/11 65/2

**exactly [8]**
15/19 25/18
26/2 26/9 38/8
50/5 55/11
84/6

**examine [1]**
74/24

**example [13]**
31/11 38/7
39/5 42/1
46/19 49/11
57/1 57/5

61/15 61/15
62/5 62/22
65/1

**examples [2]**
62/23 74/2

**except [1]**
82/25

**exception [1]**
8/12

**excerpt [1]**
39/6

**EXCHANGE [4]**
1/3 1/13 1/17
3/3

**exclusion [1]**
21/9

**exclusive [3]**
17/18 31/10
46/15

**exercise [1]**
22/2

**exercises [1]**
22/24

**Exhibit [1]**
27/18

**Exhibit 11 [1]**
27/18

**exhibits [2]**
12/14 53/15

**exist [4]**
38/15 38/22
38/25 59/7

**existing [2]**
8/8 8/24

**expand [1]**
64/15

**expands [1]**
67/1

**expect [1]**
39/5

**expedited [14]**
6/25 13/6
14/11 30/15
37/7 39/22
49/6 53/3 56/4
64/12 70/9
77/9 81/12
86/25

**expense [1]**
11/20

**expenses [2]**
11/18 65/6

**expensive [1]**
17/23

**experience [3]**
67/5 67/8 72/1

**experiencing**
**[1]**   14/9

**explain [1]**
21/17

**explained [9]**
23/16 23/17
25/10 38/10
39/1 50/9 63/9
65/3 66/23

**explanation [2]**
24/12 39/2

**explanations**
**[2]**   49/14
74/5

**explore [1]**
44/15

**exploring [1]**
56/15

**express [1]**
8/12

**expressed [1]**
20/8

**expressly [2]**
17/12 17/17

**extend [1]**
77/9

**extended [3]**
14/7 14/7
65/14

**extending [2]**
14/11 37/7

**extensive [2]**
38/16 39/3

**extent [4]**
22/3 59/6 80/8
82/23

**external [1]**
33/15

**extremely [1]**
87/14

**F**

**face [1]**   71/3

**facilitate [2]**
49/8 70/14

**fact [9]**   21/10
25/15 25/23
26/7 31/23
32/19 38/25
55/3 81/19

**factually [1]**
17/6

**failed [2]**
21/6 31/13

**failsafe [1]**
76/9

**fair [6]**   14/24
32/9 67/19
76/3 79/18
81/7

**fairly [1]**

**F**

fairly... [1]
67/12

faith [2]
27/18 31/20

familiar [1]
44/17

far [4]   5/11
35/15 46/24
83/7

FARER [10]
1/12 3/8 9/25
36/22 52/9
57/9 58/21
59/21 60/14
84/15

Farer's [1]
59/18

FARUQUI [1]
1/9

fatal [1]
30/24

feasible [2]
75/24 76/2

feel [17]
12/10 13/15
16/24 18/1
19/6 32/9 37/2
43/14 43/15
44/3 60/19
69/17 69/18
70/23 81/4
83/22 86/13

feeling [1]
36/11

feels [3]
64/17 69/19
81/5

fell [1]   65/6

felt [1]   60/22

ferret [1]
74/13

few [4]   4/1
52/10 58/3
77/4

fiat [1]   11/12

fidelity [1]
83/21

field [1]   8/15

fight [1]
86/16

fighting [2]
36/13 72/21

figure [8]
33/20 34/3
37/17 39/23
40/12 43/7
76/23 87/6

file [1]   87/19

finally [3]
11/16 55/4
73/5

financial [3]
10/18 11/9
11/19

financials [1]
66/3

find [4]   6/20
59/5 60/21
76/18

fine [7]   13/14
42/14 51/17
66/9 77/17
85/12 85/18

finish [3]
42/18 72/23
81/6

firms [1]
86/15

first [17]
8/19 9/22
10/10 10/12
10/14 11/23
16/7 28/8
48/21 51/14
54/5 67/5 67/8
71/24 72/16
78/15 82/5

fits [1]   80/5

five [3]   35/20
51/14 57/21

fix [5]   13/7
31/24 54/20
76/12 76/15

flag [1]   67/11

flagging [1]
84/13

flaw [1]   30/24

flaws [1]
76/18

flow [1]   74/7

focus [5]   18/7
30/4 40/2 75/3
82/19

focused [6]
10/6 10/11
39/17 39/18
67/2 67/5

folk [1]   56/1

folks [16]
7/10 7/24 8/20
18/1 32/13
49/22 51/20
53/22 54/9
55/21 76/24
82/19 85/20

85/21 86/9
86/10

folks' [1]
57/7

follow [3]
60/1 72/19
86/6

followed [1]
40/21

following [1]
5/18

foolishness [2]
26/22 27/2

For BAM [1]
1/19

forbidden [1]
25/21

forced [2]
41/9 42/3

foregoing [1]
88/4

foreign [2]
19/10 20/6

forensic [1]
7/16

foresee [1]
47/16

forever [2]
14/12 78/18

forget [1]
87/5

forked [1]
46/21

form [1]   19/17

former [11]
20/11 51/4
51/23 52/3
53/19 53/19
55/17 64/18
75/15 81/25
86/10

forth [2]   5/3
41/18

forward [12]
13/18 36/3
45/20 49/13
57/8 69/2
74/11 74/20
75/21 80/18
86/20 87/18

found [1]   59/8
30/4

four [4]   10/21
41/12 52/6
64/2

four-page [1]
41/12

frame [1]   5/14
frames [1]

5/14

framework [3]
5/11 6/24
68/22

frankly [2]
39/4 52/22

Friday [2]
79/2 79/3

front [1]
54/11

fruit [1]
45/21

fruitful [2]
43/24 48/7

frustrated [2]
42/19 42/20

frustrating [1]
86/4

frustration [1]
67/14

full [5]   7/16
8/1 18/21
24/17 81/18

fully [1]   12/1

functions [1]
18/9

fundamentally
[1]   11/2

funds [1]   6/16

further [2]
11/10 62/3

**G**

gained [1]
54/6

gave [2]   20/7
62/23

gears [1]   58/9

geek [1]   69/9

general [7]
10/18 11/6
11/13 11/19
12/17 65/1
84/22

generated [1]
71/6

genuine [1]
25/16

genuinely [1]
58/15

geography [1]
30/4

Gibson [3]   2/6
4/9 85/21

given [7]   5/19
5/21 30/14
41/10 55/14
81/3 81/10

gives [1]

32/21

giving [5]
42/21 42/24
70/24 72/18
75/7

glad [1]   31/7

global [1]
13/3

goal [1]   6/20

God [3]   19/9
73/13 82/9

God's [1]
74/14

goes [3]   6/8
63/1 63/3

good [14]   3/7
3/12 3/16 3/18
3/20 4/8 27/18
31/20 53/2
73/10 79/12
82/1 85/17
85/22

gorilla [1]
14/22

gotcha [2]
29/24 31/3

gotta [1]
33/25

governed [2]
20/15 63/18

governing [1]
20/14

government [15]
26/23 51/6
51/22 53/14
55/25 67/15
72/16 75/16
79/19 79/20
80/5 84/1
85/13 85/14
86/10

government's
[2]   5/23
16/25

grant [1]
36/16

granular [3]
10/24 11/8
40/16

great [14]
3/11 3/23 4/12
9/7 31/23
60/12 60/15
78/2 78/14
81/13 82/14
85/8 85/18
87/21

greater [1]

**G**

greater... [1]
83/21
gritty [1]
14/21
groom [1]
85/24
guess [17]   9/1
18/12 21/11
25/3 32/1 32/7
33/18 36/5
50/17 51/14
51/25 52/8
52/21 59/6
62/16 63/23
77/6
guidance [1]
10/13
gulf [1]   32/8
gun [1]   9/4
guy [1]   31/24
guys [1]   41/23

**H**

half [1]   61/2
halfway [1]
81/18
hands [1]   41/5
happen [2]
17/2 68/3
happened [5]
12/20 17/1
24/10 37/15
56/10
happening [4]
15/19 21/11
69/12 73/16
happens [2]
10/8 37/10
happy [18]
9/24 15/21
25/2 33/3
33/17 35/5
36/8 42/22
43/1 55/13
55/13 58/8
60/7 70/8
71/22 72/5
79/13 86/7
hard [6]   17/1
29/21 70/13
83/11 83/13
86/4
harm [1]   37/6
hate [1]   78/25
head [9]   20/11
21/5 21/21
22/7 24/5

31/12 33/14
33/14 51/25
headache [1]
75/13
heads [1]
79/10
health [1]
7/17
hear [30]   3/25
4/22 7/24 9/22
17/9 18/12
24/25 29/14
29/15 33/17
36/2 36/19
39/17 40/13
41/2 42/17
46/5 50/16
56/22 57/22
58/21 66/6
66/7 66/10
66/11 68/18
71/19 77/5
77/6 84/25
heard [6]
26/16 27/5
44/8 47/15
52/13 82/10
hearing [10]
1/9 6/11 20/8
36/6 37/3
63/17 77/24
78/11 84/16
88/7
heart [9]
19/23 20/21
38/8 40/23
41/15 49/6
63/2 70/8
71/13
heartburn [1]
5/25
held [1]   11/12
help [8]   11/20
31/7 32/11
32/11 68/2
69/1 72/8
83/24
helped [2]
42/3 49/8
helpful [5]
31/6 54/12
55/12 57/22
84/9
helps [1]   5/14
here to [1]
28/15
here's [2]
22/16 32/3

hey [2]   68/24
77/11
high [1]   87/12
highlight [1]
63/7
historically
[1]   56/10
hit [3]   22/20
57/12 57/24
hitting [1]
58/3
hold [2]   59/18
79/4
holder [18]
20/1 20/3
22/22 50/3
50/3 51/22
51/23 52/11
52/19 54/4
55/16 55/17
66/21 66/25
67/1 67/3 67/6
67/8
holders [13]
22/2 22/14
49/22 50/4
50/11 52/7
52/15 52/22
54/7 55/8
66/24 74/18
76/23
HOLDINGS [5]
1/6 3/3 4/9
46/8 68/8
holiday [1]
79/9
Honestly [1]
58/15
Honor [89]
HONORABLE [1]
1/9
HOOK [3]   2/23
88/3 88/14
hoops [1]
73/23
hope [4]   12/3
54/4 78/7
83/16
hopeful [1]
81/8
hopefully [1]
54/18
hoping [10]
43/5 52/5
55/14 56/16
57/17 58/13
58/20 62/16
80/7 80/24

horribles [1]
6/4
hot [5]   21/4
22/10 23/15
23/19 31/10
hour [3]   25/2
39/13 54/3
hours [3]
52/11 52/21
66/20
house [1]
62/20
Hudson [1]
1/24
hundred [6]
43/13 69/17
69/18 74/2
76/2 81/23
HYBRID [1]   1/9

**I**

ID [2]   23/9
48/17
idea [7]   30/5
36/18 47/1
53/10 53/12
54/16 59/6
ideal [1]
75/20
ideas [1]   18/1
identified [31]
11/3 11/11
12/25 13/21
15/13 16/5
16/8 18/4 23/4
23/9 32/5
38/20 40/24
42/1 42/2
46/23 49/1
51/22 52/1
59/8 60/23
61/2 62/11
62/12 63/4
65/3 66/24
67/4 74/19
80/13 81/24
identify [5]
15/1 24/2
41/11 41/18
49/13
identifying [2]
24/5 41/12
identity [2]
5/7 41/14
IDs [1]   20/25
imagine [3]
67/12 73/1
81/17
immediately [1]
61/16

immutable [1]
76/13
implication [1]
26/5
importance [1]
13/22
important [7]
7/11 9/21
25/24 39/12
55/9 70/12
82/16
importantly [1]
30/21
impossible [1]
17/6 70/4
in-house [1]
62/20
inadequate [1]
42/23
Inaudible [1]
4/11
inclination [1]
55/14
inclined [4]
53/5 53/6
58/11 62/17
include [1]
8/8
included [5]
16/5 17/17
46/6 46/7 58/5
included in [1]
46/6
including [4]
10/18 10/22
58/23 68/14
incomplete [1]
61/6
independent [1]
44/6
indicate [1]
39/10
indicated [5]
9/12 12/17
15/18 37/3
47/21
indicates [1]
47/11
indicating [1]
16/7
individual [7]
6/7 11/4 20/19
20/22 21/21
22/20 47/25
individual's
[1]   20/4
individuals [7]
5/7 16/4 24/1

**I**

individuals...
**[4]**   49/18
49/20 67/2
74/19
information
**[28]**   10/18
10/23 10/24
10/25 11/3
11/9 11/11
11/19 12/18
12/20 25/9
26/9 30/20
33/1 33/13
34/6 34/12
40/22 44/19
44/22 48/22
49/16 50/8
63/10 66/18
72/7 73/19
74/7
informed [1]
60/4
infrastructure
**[6]**   15/6 15/8
38/12 38/21
47/6 58/23
infusion [1]
65/5
initial [3]
20/8 43/9 50/2
initially [4]
12/18 40/17
59/7 65/1
initiates [3]
22/8 22/9
22/13
initiator [6]
20/2 20/11
21/23 22/15
23/2 67/9
initiators [2]
20/18 23/6
input [1]   24/2
inquiry [1]
66/16
inspection [7]
14/20 37/12
38/13 58/10
58/11 58/14
62/15
instance [1]
31/9
instead [3]
32/1 41/22
64/10
insubstantial
**[1]**   54/4

insufficient
**[2]**   10/22
38/13
intend [1]
80/21
interact [1]
15/3
interacts [1]
15/9
interesting [1]
66/7
internal [3]
11/6 33/14
55/20
interrogatories
**[4]**   4/19 36/3
37/9 71/8
interrupt [1]
3/24
interview [1]
49/5
interviews [2]
41/10 61/20
into [16]   4/1
5/6 5/13 7/14
8/3 8/18 14/16
24/2 34/9
34/25 51/17
52/23 56/4
67/18 76/5
84/16
introduce [1]
3/5
investigation
**[1]**   55/2
investor [1]
13/22
invited [1]
61/10
involved [3]
6/19 30/3
46/13
involvement [1]
21/15
involves [2]
23/10 23/10
irrelevant [2]
56/11 76/5
issue [33]
10/9 10/10
10/11 10/12
12/21 19/23
21/7 23/12
23/25 26/15
28/6 31/14
32/20 36/14
38/7 38/9
40/24 46/12

47/17 47/19
48/1 51/10
52/21 52/22
55/13 55/25
62/5 63/2
68/17 73/13
75/16 75/16
84/7
issues [33]
4/17 5/1 10/7
13/23 14/2
14/9 24/5 24/6
32/4 41/15
49/1 49/6
49/13 50/2
59/1 62/11
63/21 65/8
65/9 65/15
67/1 67/3
68/14 70/15
70/21 71/13
75/4 75/8 78/5
82/2 84/13
84/24 85/4
item [2]   28/8
40/21
items [1]
65/20
iteratively [3]
53/7 53/17
69/1

**J**

Jackson [6]
5/24 19/22
20/8 72/1 72/5
83/19
Jackson's [3]
5/18 19/8 54/8
January [1]
57/20
January 1 [1]
57/20
JASON [3]   2/5
4/8 70/5
JEFF [4]   2/23
3/25 88/3
88/14
JENNIFER [2]
1/12 3/7
job [3]   19/11
84/2 84/2
joint [3]
84/18 85/4
85/9
JORGE [2]   1/16
3/9
judge [15]
1/10 3/24 5/18

5/24 19/8
19/22 20/8
53/10 54/8
71/25 72/3
72/3 72/5 72/8
83/19
judges [1]
53/11
jump [5]   43/21
47/9 47/9
73/23 74/16
June [2]   6/11
25/25
June 12th [1]
25/25
June 13th [1]
6/11
just ask [1]
43/21

**K**

keep [12]
37/19 48/21
50/10 50/10
50/12 61/12
72/20 73/18
79/23 82/3
82/5 83/6
keeping [1]
66/15
keeps [1]
20/22
Kellogg [12]
16/8 25/9 26/8
41/24 41/25
47/4 51/25
55/19 58/22
59/8 60/23
61/4
Kellogg's [4]
39/6 49/3 61/3
61/25
kept [1]   5/5
key [5]   8/23
20/14 49/22
54/10 55/21
keys [16]   8/8
8/24 9/9 15/2
15/4 17/14
17/14 19/17
20/25 24/14
33/25 44/21
50/13 54/10
62/13 65/12
keywords [3]
57/6 57/11
58/2
kick [2]   45/3
77/15

kicked [1]
56/20
kind [9]   4/14
4/17 14/23
29/17 29/21
64/4 72/2
78/12 87/10
knew [4]   39/2
40/17 55/21
73/14
knowing [1]
52/1
knowledge [10]
9/3 41/19
51/12 56/13
61/8 65/25
66/1 66/3
66/25 74/22
known [11]
25/12 25/16
30/2 30/3 30/7
30/12 33/24
39/14 39/22
39/23 87/7
knows [3]
23/24 70/10
87/8

**L**

lack [2]   22/1
41/10
land [1]   65/5
language [2]
27/22 61/9
large [2]
65/24 77/12
LAROCHE [2]
1/23 3/17
last [7]   4/1
19/19 46/11
71/6 82/5
82/17 82/19
late [1]   87/20
later [4]
37/11 53/8
56/23 62/17
Latham [3]   2/3
3/21 85/22
latter [1]
55/7
lawyer's [1]
83/9
lawyers [1]
87/8
lay [1]   65/4
leader [1]
51/7
leaders [1]
51/18

**L**

**leading [2]**
69/4 71/16
**learned [1]**
16/6
**least [18]**
10/4 36/1 36/3
48/19 49/18
53/6 57/11
58/20 59/2
68/16 69/3
69/4 72/25
75/22 78/5
78/12 81/10
86/8
**leave [3]**
55/23 56/15
72/3
**leaving [1]**
16/20
**lecturn [1]**
4/24
**led [1]**   13/24
**ledger [4]**
11/6 11/13
11/19 12/18
**ledgers [2]**
10/19 65/1
**Lee [1]**   65/25
**left [1]**   32/1
**legit [1]**   5/19
**less [1]**   12/24
**letters [1]**
39/3
**level [4]**   11/4
15/10 24/17
40/16
**levers [1]**
40/8
**liabilities [1]**
12/2
**liability [1]**
19/5
**licenser [1]**
30/10
**lie [1]**   74/24
**life [2]**   4/13
75/14
**light [2]**
36/11 79/21
**limit [1]**   21/8
**limitations [2]**
7/5 88/9
**limited [7]**
1/6 3/4 4/10
19/24 36/18
46/23 56/1
**linchpin [1]**

54/8
**line [3]**   42/18
72/23 81/6
**lion [1]**   14/19
**liquidate [1]**
73/22
**list [8]**   6/8
17/21 22/20
28/8 32/3 69/5
70/25 71/12
**literally [4]**
27/12 50/13
54/10 62/18
**Lithuania [1]**
44/14
**litigate [3]**
5/9 73/1 75/1
**litigation [3]**
27/2 74/14
87/13
**little [16]**
8/15 12/8
16/24 21/16
21/17 25/5
31/8 43/18
58/21 62/2
64/12 65/4
68/1 69/25
71/17 78/15
**live [3]**   75/6
81/16 82/21
**LLP [3]**   1/24
2/3 2/6
**located [3]**
9/11 17/17
18/11
**log [1]**   54/15
**loggerhead [1]**
12/11
**logs [3]**   21/23
22/8 58/25
**long [3]**   15/15
25/16 25/20
**longer [2]**
47/11 47/16
**look [22]**   7/12
7/16 7/22
23/15 27/7
28/20 30/1
31/2 35/11
39/6 43/1
43/19 50/18
60/8 64/9 70/4
73/5 76/17
82/11 85/10
85/10 87/18
**looked [2]**
5/16 49/20

**looking [11]**
6/24 7/1 7/15
7/21 8/6 10/9
12/4 43/2
57/10 79/14
84/23
**looks [2]**   7/20
79/12
**lose [1]**   86/16
**lot [11]**   5/22
7/14 20/6
26/16 40/16
43/16 55/22
59/2 60/5
73/23 85/6
**lower [1]**
63/13
**Luckily [1]**
49/7

**M**

**magistrate [2]**
1/10 53/11
**mail [4]**   27/19
27/21 36/15
58/5
**mails [2]**   6/8
12/15
**main [6]**   10/4
13/4 18/7
37/12 48/2
84/24
**maintenanced
[1]**   25/15
**major [2]**
14/24 14/25
**makes [8]**   25/4
43/10 48/13
54/11 64/16
77/7 84/15
85/6
**managed [1]**
62/6
**manager [1]**
20/16
**manages [1]**
46/22
**manner [1]**
70/10
**many [5]**   55/4
76/17 86/8
86/10 86/17
**MARTENS [2]**
1/20 3/13
**match [1]**
22/23
**materials [2]**
5/5 5/10
**matter [11]**

3/4 5/2 5/8
25/19 30/2
40/4 53/16
56/10 76/20
82/17 88/6
**MATTHEW [8]**
1/13 1/19 1/20
1/23 3/9 3/12
3/14 3/16
**maxed [1]**
52/11
**may [24]**   5/12
15/10 15/11
18/6 18/9
19/15 23/10
30/12 32/12
33/24 38/13
39/22 48/16
50/7 53/13
53/22 62/3
71/6 80/25
82/6 82/7
82/10 84/13
86/13
**maybe [12]**
9/25 14/15
17/9 25/4
48/20 59/8
64/2 73/6 75/5
75/8 83/16
84/12
**McLUCAS [2]**
1/20 3/19
**mean [97]**
**means [3]**   10/5
10/10 54/20
**meant [1]**   56/5
**measure [2]**
15/14 24/13
**mechanics [1]**
83/12
**meet [16]**   10/3
10/16 12/10
12/23 14/6
27/18 27/25
38/4 39/24
41/21 51/10
54/2 61/22
68/15 81/17
81/18
**meeting [1]**
84/10
**member [2]**
65/22 65/22
**MENDRO [3]**   2/5
4/9 70/5
**mere [1]**   25/23
**merits [5]**

56/5 56/23
73/3 82/15
87/1
**message [1]**
22/14
**met [3]**   12/12
31/20 41/7
**microphone [1]**
4/2
**microscopic [1]**
24/17
**Microsoft [2]**
45/24 45/25
**middle [2]**
55/10 69/11
**might [4]**   18/1
45/21 82/11
86/16
**Milbank [2]**
1/24 3/17
**mile [1]**   75/18
**mind [2]**   17/25
83/23
**mine [1]**   54/9
**minute [1]**
77/4
**mirror [3]**
16/21 57/20
86/6
**misbranding [1]**
15/25
**misguided [1]**
35/5
**misnomer [1]**
15/25
**mistake [1]**
16/8
**misused [1]**
6/13
**modified [1]**
18/15
**MOLLY [2]**   2/2
3/22
**moment [1]**
7/22
**money [4]**   5/20
6/1 19/9 73/6
**monitored [2]**
45/25 46/3
**month [1]**
80/15
**monthly [1]**
11/18
**months [6]**
12/24 13/15
64/2 64/2
64/14 64/22
**moot [1]**   59/2

**M**

**more [46]**   6/7
10/24 11/8
11/8 12/19
13/8 13/13
13/15 13/16
13/16 16/14
21/20 23/12
23/25 27/5
28/4 30/21
30/25 36/13
37/8 38/2
39/17 39/18
40/16 41/24
43/11 43/18
48/7 48/22
48/23 60/6
62/3 64/7
64/10 65/17
67/5 67/9
68/13 69/25
72/6 74/23
80/19 82/21
83/16 84/1
84/4

**morning [4]**
3/7 31/6 85/11
87/20

**most [7]**   11/2
19/7 27/8 52/1
55/21 70/10
87/1

**mostly [1]**
10/9

**motion [14]**
27/7 28/6
28/20 29/23
30/25 31/2
34/22 36/10
36/14 36/16
42/13 45/1
45/4 45/6

**move [13]**   19/9
21/6 23/19
31/13 49/12
68/5 69/1
75/21 77/1
80/3 80/18
83/20 86/20

**moved [3]**   24/9
28/6 34/9

**movement [4]**
6/1 7/4 28/24
68/16

**movements [1]**
22/10

**moving [11]**
5/20 13/5 13/8

37/10 48/21
72/20 74/20
75/3 77/8
79/23 82/3

**Mr. [17]**   16/8
24/4 39/6
41/24 41/25
47/4 47/20
49/3 50/7 53/6
60/23 61/3
61/4 61/25
63/8 65/21
65/22

**Mr. Kellogg [6]**
16/8 41/24
41/25 47/4
60/23 61/4

**Mr. Kellogg's
[4]**   39/6 49/3
61/3 61/25

**Mr. Shroder [3]**
47/20 53/6
65/21

**Mr. Zhang [1]**
24/4

**Mr. Zhao [3]**
50/7 63/8
65/22

**Ms. [11]**   9/25
36/22 52/9
57/9 58/21
59/18 59/21
60/14 65/25
84/15 87/9

**Ms. Farer [8]**
9/25 36/22
52/9 57/9
58/21 59/21
60/14 84/15

**Ms. Farer's [1]**
59/18

**Ms. Lee [1]**
65/25

**Ms. Rosen [1]**
87/9

**much [15]**   3/11
19/23 30/3
30/4 43/22
47/10 51/6
57/9 58/3
67/16 72/3
82/4 85/22
86/3 87/1

**muddled [2]**
15/22 15/24

**multiple [8]**
12/15 16/9
38/5 38/23

40/22 41/7
42/1 68/10

**multitude [1]**
71/8

**murky [1]**   8/15

**MURPHY [2]**
1/16 3/9

**music [1]**   8/19

**must [2]**   38/3
47/2

**mustard [1]**
19/12

**N**

**named [1]**
20/15

**names [1]**
51/17

**narrow [27]**
7/7 7/15 29/9
29/16 29/21
29/21 29/23
31/1 31/25
36/17 38/23
41/20 42/3
50/1 50/8
61/11 64/9
69/5 70/17
70/24 71/12
72/7 72/13
72/14 75/4
78/5 82/22

**narrowed [2]**
65/7 83/4

**narrowing [2]**
12/9 27/20

**narrowly [1]**
56/18

**NASSE [2]**   1/12
3/8

**nature [6]**
5/19 5/25 6/16
6/17 18/5 30/8

**NE [1]**   1/14

**necessarily [1]**
46/5

**necessary [1]**
71/13

**necessitate [1]**
52/15

**need [65]**   5/3
5/6 7/23 8/2
10/24 14/2
14/13 15/1
15/9 16/15
17/7 18/6
19/13 21/20
23/13 24/22
26/17 26/17

27/9 27/19
29/16 29/20
31/7 32/11
39/12 42/15
43/8 43/18
44/10 48/18
49/9 49/14
53/21 54/23
55/4 55/25
56/12 58/17
63/9 64/10
64/15 65/4
66/11 68/1
69/25 72/13
72/14 73/21
74/7 74/17
74/21 74/22
77/6 77/11
77/12 78/11
81/14 82/11
83/14 83/17
83/20 83/24
84/4 84/17
87/4

**needs [3]**   5/21
42/9 80/13

**negative [2]**
16/25 34/18

**negotiated [2]**
70/13 70/22

**neither [1]**
26/3

**new [11]**   1/18
1/25 8/8 9/8
9/9 17/14 25/1
30/16 37/23
48/15 73/18

**news [1]**   50/22

**night [1]**
69/11

**Nina [1]**   23/4

**nine [1]**   57/4

**nitty [1]**
14/21

**nitty-gritty
[1]**   14/21

**nobody [3]**
23/19 23/24
78/18

**nodding [1]**
79/9

**non [3]**   15/13
18/10 40/21

**non-affiliated
[2]**   15/13
18/10

**non-priority
[1]**   40/21

**none [4]**   26/13
57/12 57/13
58/3

**nor [1]**   26/3

**normal [1]**
18/17

**normally [4]**
7/16 19/10
64/10 64/11

**Northern [1]**
39/9

**note [8]**   21/4
46/10 51/1
51/2 63/8
63/12 65/17
88/7

**noted [1]**   23/8

**notes [2]**
59/17 59/18

**noteworthy [1]**
27/7

**noticed [1]**
66/4

**notwithstanding
[1]**   21/15

**November [12]**
26/25 27/13
29/2 29/8 32/2
35/2 35/8 57/8
57/19 58/7
63/7 82/22

**November 2022
[7]**   27/13
32/2 35/8 57/8
57/19 58/7
63/7

**Nowhere [1]**
39/10

**nuclear [1]**
86/15

**nullify [1]**
59/2

**number [24]**
10/22 12/13
12/14 12/15
13/25 19/25
20/2 20/20
20/22 22/16
22/18 23/16
27/9 28/21
28/25 38/6
38/11 41/25
46/16 47/4
65/23 66/1
70/16 74/3

**numbers [1]**
50/10

**NW [4]**   1/21

**N**

**NW... [3]**   2/3
2/6 2/24
**NY [2]**   1/18
1/25

**O**

**object [1]**
42/11
**objected [2]**
14/14 66/17
**objecting [2]**
48/13 66/10
**objection [1]**
50/25
**objections [1]**
68/9
**obligation [1]**
34/21
**obligations [1]**
63/11
**obtained [2]**
19/23 51/13
**obviate [1]**
82/6
**obviously [18]**
5/4 7/12 7/21
9/2 9/5 13/6
13/22 20/13
32/10 40/9
43/25 48/15
57/6 62/20
77/8 83/3 84/1
84/25
**occasions [6]**
12/13 12/16
38/7 38/11
41/7 47/4
**occur [1]**
74/18
**occurred [5]**
6/9 57/13 58/4
80/25 88/7
**October [2]**
78/15 79/2
**October 6th [1]**
79/2
**off [4]**   25/2
56/20 60/3
63/8
**offered [1]**
51/21
**office [2]**
20/15 62/18
**officer [8]**
20/21 25/9
26/9 30/21
33/1 33/13

**officers [3]**
9/10 53/2
74/12
**Official [2]**
2/23 88/3
**officially [2]**
47/22 47/24
**offshore [1]**
5/19
**often [1]**
23/10
**once [4]**   4/14
7/13 41/18
49/15
**one [54]**   6/10
10/2 10/17
10/23 11/7
12/15 13/4
18/20 19/24
20/18 21/3
22/22 26/5
26/21 28/21
29/1 29/25
32/5 33/9 34/5
35/8 35/9
35/11 36/25
38/2 50/3
51/13 51/14
52/11 52/19
55/1 57/1 57/4
57/4 57/5
58/10 59/19
62/23 64/8
64/8 64/8
65/17 69/6
69/14 73/14
73/25 75/11
79/4 79/14
80/21 82/25
83/6 84/20
87/8
**One's [1]**   32/1
**one-way [1]**
6/10
**onerous [1]**
71/10
**ones [3]**   52/2
52/4 56/19
**ongoing [1]**
79/22
**only [9]**   7/7
20/16 50/10
56/7 67/15
73/20 76/6
82/4 86/25
**onus [1]**   41/18
**open [10]**   4/14

12/19 36/6
37/3 44/11
66/14 66/15
70/24 71/10
71/14
**operate [1]**
24/18
**operates [2]**
26/10 38/9
**operation [1]**
33/1
**operationalized
[1]**   63/19
**operations [5]**
51/18 51/23
51/24 55/16
55/19
**opinion [1]**
76/21
**opportunity [2]**
52/19 66/20
**opposed [1]**
66/3
**opposition [1]**
48/2
**optimistic [2]**
78/8 80/17
**option [1]**
86/16
**options [2]**
45/17 61/11
**order [49]**
5/18 6/19 6/21
6/24 8/6 8/6
8/22 10/21
13/24 15/12
16/15 16/18
16/22 17/11
17/16 18/4
18/10 18/14
18/14 18/24
20/7 21/1 21/8
23/1 24/24
25/13 25/17
25/22 29/6
29/12 31/2
31/21 33/22
34/9 34/23
36/15 43/3
45/2 46/14
49/6 50/15
52/23 55/14
56/1 56/12
56/12 57/2
63/22 70/12
**order's [1]**
35/18
**original [1]**

31/1
**others [1]**
66/4
**out [26]**   11/10
13/20 31/5
33/21 34/3
37/17 39/23
40/12 43/7
43/18 48/22
52/11 53/20
60/12 64/5
65/6 70/3 70/4
74/6 76/23
78/4 78/5 78/6
85/3 86/23
87/6
**outside [3]**
33/9 39/21
56/2
**outweigh [1]**
28/1
**over [23]**   6/7
19/17 22/5
22/6 23/11
24/14 24/18
29/2 29/2 29/3
33/19 38/19
46/21 52/16
52/16 52/16
58/1 60/21
62/13 69/22
69/23 70/10
74/4
**overall [3]**
4/15 4/25
29/18
**overarching [1]**
67/22
**overlapping [3]**
5/21 68/9
68/14
**overseas [5]**
6/17 19/8 19/9
73/20 83/20
**own [2]**   53/10
61/20
**ownership [1]**
5/21
**Oz [1]**   40/8

**P**

**p.m [4]**   1/6
77/19 77/20
87/22
**pace [4]**   13/8
13/18 42/20
42/21
**page [3]**   41/12
59/13 61/2

**papers [6]**
13/25 15/11
19/15 48/1
49/25 65/21
**parade [1]**   6/3
**paragraph [2]**
59/19 59/23
**parallel [2]**
68/5 80/3
**paranoia [1]**
29/10
**part [11]**
12/21 20/4
27/8 42/13
45/10 45/20
55/7 57/23
70/12 71/20
84/6
**particular [11]**
10/24 23/8
23/11 26/17
26/18 27/9
35/3 57/25
59/12 59/13
66/25
**particularized
[13]**   26/18
28/5 28/15
31/1 33/5
33/17 34/17
34/17 34/21
34/25 35/6
42/12 78/3
**particularly
[3]**   27/4
44/20 61/6
**parties [10]**
3/5 9/22 16/17
47/10 49/12
69/20 69/21
71/19 77/5
81/20
**parties' [1]**
15/23
**parts [1]**
81/15
**party [6]**   7/2
15/14 17/4
18/3 18/11
44/18
**past [3]**   39/16
60/20 87/5
**path [3]**   6/20
36/3 76/19
**pay [2]**   27/4
86/17
**paycheck [1]**
20/4

**P**

**paying [1]**
76/14
**Pearl [1]**  1/17
**Pennsylvania**
**[1]**  1/21
**people [14]**
4/22 31/16
40/7 46/25
49/13 50/6
51/21 54/19
55/10 62/21
74/23 74/24
81/23 82/4
**perceives [1]**
72/9
**percent [7]**
43/13 43/15
69/17 69/19
74/2 76/2
81/23
**perfect [1]**
9/20
**perfectly [3]**
25/10 26/1
27/15
**performed [2]**
42/9 62/7
**perhaps [5]**
48/12 48/14
75/2 76/25
77/24
**period [8]**
13/6 14/11
58/1 63/6
63/20 65/14
68/10 79/21
**periods [1]**
65/7
**permissible [1]**
24/21
**permission [1]**
80/16
**permitted [2]**
16/14 18/10
**person [15]**
5/2 20/15
20/16 20/17
22/5 23/2 25/1
67/15 73/12
80/16 81/21
82/7 82/9
82/11 87/8
**personally [1]**
73/6
**personnel [5]**
15/15 16/9
17/17 18/8

57/3
**perspective [8]**
5/17 16/25
29/19 30/1
36/6 53/1 53/4
64/3
**pertains [1]**
61/6
**phone [3]**
19/25 20/2
22/17
**pick [3]**  64/18
84/11 84/11
**picked [1]**
64/20
**picking [1]**
87/10
**picture [2]**
18/21 43/13
**pin [2]**  29/17
48/14
**pipe [1]**  59/21
**place [6]**  5/20
5/21 16/7
32/13 63/5
68/15
**Plaintiff [2]**
1/4 1/12
**plaintiff's [1]**
3/6
**platform [3]**
8/10 46/18
46/20
**play [1]**  82/18
**playing [1]**
8/15
**pleading [4]**
9/1 19/20
37/19 47/11
**pleadings [4]**
5/15 8/21
36/25 59/5
**please [9]**  3/5
4/5 4/7 4/21
25/6 60/2
65/19 86/6
88/7
**plus [1]**  87/17
**PNK [13]**  11/6
11/13 21/5
23/18 24/2
31/11 46/19
62/5 62/6 62/9
62/12 62/23
62/25
**point [36]**
7/25 14/24
14/25 22/17

24/7 25/25
31/20 32/15
39/12 40/19
40/19 41/8
42/7 43/2 44/7
46/11 48/3
51/11 51/14
52/1 54/24
55/5 55/20
64/25 66/13
68/25 72/25
73/4 73/7
74/10 74/15
76/6 81/19
82/14 84/3
84/6
**pointing [1]**
50/12
**points [2]**
20/6 35/9
**policies [1]**
28/22
**policy [1]**
16/5
**popping [1]**
20/23
**portal [3]**
21/23 22/8
23/8
**portion [2]**
24/4 81/11
**position [9]**
35/18 39/14
47/19 47/22
47/24 50/21
50/23 51/8
68/12
**positions [2]**
85/3 85/4
**possession [4]**
7/3 9/10 17/13
34/10
**possibility [2]**
40/14 68/1
**possible [3]**
17/10 19/4
67/12
**potential [1]**
73/20
**pound [1]**
14/22
**power [1]**
75/17
**pre [2]**  6/6
55/2
**Pre-complaint**
**[1]**  6/6
**pre-investigati**
**on [1]**  55/2

**Precision [1]**
9/21
**preconfigured**
**[2]**  23/18
23/20
**predetermined**
**[1]**  24/8
**predication [1]**
53/16
**predictions [1]**
45/7
**premature [1]**
51/15
**prepared [2]**
10/20 61/5
**present [2]**
41/12 65/11
**press [1]**  49/5
**pressure [6]**
37/22 53/5
55/5 55/5 63/4
81/22
**presumably [6]**
19/3 23/23
30/5 45/24
52/16 63/24
**presume [7]**
17/23 45/24
46/1 54/13
73/11 76/11
76/16
**pretty [4]**
13/7 37/2
68/23 70/17
**primary [2]**
52/1 55/20
**principled [1]**
64/19
**prior [2]**
66/20 78/17
**prioritized [1]**
11/24
**priority [3]**
40/21 63/11
63/13
**private [6]**
8/8 8/24 9/9
17/13 17/14
20/25
**probably [4]**
53/25 64/7
69/17 73/10
**problem [5]**
13/18 21/25
32/3 37/7
59/17
**procedure [1]**
16/5

**procedures [1]**
28/22
**proceed [1]**
70/24
**proceeding [2]**
6/9 6/10
**proceedings [2]**
87/22 88/5
**process [13]**
8/1 9/19 21/18
23/3 25/21
37/17 65/10
65/10 65/12
68/15 70/9
70/9 83/13
**produce [11]**
16/11 28/4
29/7 41/22
43/4 43/4
44/22 57/2
61/23 80/8
80/11
**produced [9]**
6/6 10/23 13/2
41/11 42/8
46/23 59/10
60/5 81/2
**producing [2]**
27/23 59/5
**product [1]**
55/19
**production [11]**
28/7 36/5
36/24 37/9
38/16 43/9
51/25 56/16
60/9 60/25
84/23
**productions [8]**
4/19 12/4
14/8 29/11
29/11 50/20
66/19 79/22
**productive [1]**
57/7
**profess [1]**
27/17
**professes [1]**
27/16
**professional**
**[1]**  87/15
**progress [1]**
80/24
**prohibited [1]**
15/17
**prohibits [1]**
17/12
**promise [1]**

**P**

promise... [1]
68/20

promised [1]
83/1

promissory [2]
63/8 63/12

pronunciation
[1]   9/24

property [1]
58/17

proposal [4]
18/5 18/6 57/6
58/4

proposals [1]
77/15

propose [3]
37/4 41/20
77/23

proposed [6]
29/12 34/22
36/15 52/5
57/2 65/2

proposing [1]
41/17

prosecutor [2]
64/18 75/15

protect [1]
7/18

protection [4]
7/20 10/3 13/9
13/22

protective [1]
56/1

protocol [6]
20/17 20/23
21/15 22/10
22/11 23/5

protocols [2]
20/14 28/22

prove [3]
16/25 17/2
34/18

provide [6]
10/25 12/17
25/23 31/15
49/14 61/11

provided [7]
8/13 11/15
11/21 31/17
38/19 39/3
62/25

provider [2]
44/17 45/16

provides [1]
25/11

providing [4]
12/19 26/2

provision [1]
17/15

provisions [2]
46/14 62/24

public [2]
32/16 33/9

publicly [1]
14/1

pull [3]   40/8
57/7 59/19

purported [1]
74/13

purpose [4]
39/21 39/23
53/3 80/2

purposes [1]
26/1

pursuant [2]
24/8 34/9

pursue [1]
52/20

put [18]   9/4
9/5 10/5 25/8
29/17 48/14
50/23 57/9
57/16 63/13
68/19 68/20
72/16 73/6
76/4 77/23
82/17 86/5

putting [1]
81/25

**Q**

quality [1]
13/19

quantity [1]
13/19

quicker [1]
56/3

quickly [2]
48/9 80/22

quite [2]   4/23
50/8

quote [9]   5/19
19/25 21/22
46/7 46/12
46/21 47/3
62/9 63/18

quoting [1]
59/22

**R**

rabbit [1]
25/17

raised [3]   7/9
13/23 30/16

raises [3]

20/13 26/13
34/16

random [1]
87/10

ranging [1]
71/9

rather [2]
9/17 84/12

re [2]   62/24
64/8

re-configured
[1]   62/24

re-slicing [1]
64/8

read [3]   24/4
27/1 27/18

readily [1]
41/13

reading [1]
74/1

real [5]   4/12
14/21 23/13
53/11 67/22

realize [1]
58/2

really [20]
5/6 5/8 5/22
7/19 9/23 10/1
13/17 16/15
23/24 29/5
33/25 37/6
41/3 41/6
52/12 61/11
63/3 71/22
87/6 87/21

realm [1]   68/1

realtime [2]
66/18 66/19

rear [1]   16/21

rearview [2]
57/20 86/6

reason [7]
53/17 66/24
70/13 76/7
79/25 80/15
82/5

reasonable [12]
27/24 29/8
38/6 41/6 50/1
61/18 68/23
70/1 71/15
74/5 81/24
86/12

reasonably [2]
73/8 73/9

reasons [3]
10/17 10/22
11/8

receive [4]
24/11 38/16
47/19 80/4

received [6]
11/3 18/5 21/2
47/24 60/25
71/6

receiving [1]
66/18

recent [2]
13/25 83/16

recently [1]
20/12

Recess [1]
77/19

reconciliation
[1]   63/2

record [9]   3/6
15/22 15/24
32/17 33/9
42/15 60/3
77/20 81/20

records [1]
45/8

reference [1]
19/22

referenced [2]
26/8 27/5

referencing [1]
59/16

referred [3]
58/25 60/25
66/1

referring [1]
59/12

reflect [2]
5/24 16/2

reflected [8]
13/24 15/11
19/14 22/18
45/1 45/2 48/1
49/25

reflects [1]
20/2

regard [2]
51/8 52/7

regardless [2]
15/4 15/17

registered [1]
44/14

regular [3]
7/13 11/17
73/11

rejecting [1]
26/19

relate [2]
20/7 22/10

related [5]

10/21 28/10
33/3 44/15
61/7

relates [1]
39/7

relating [4]
8/9 11/18
56/14 65/23

relationship
[2]   17/5
63/18

relevant [7]
35/16 35/17
35/18 41/18
58/24 59/1
67/1

relied [1]
47/5

relies [2]
20/24 21/13

relocated [1]
20/12

rely [2]   10/20
25/14

relying [1]
18/20

remain [1]
13/1

remind [1]
56/17

reminder [1]
4/4

remotely [2]
88/5 88/9

repatriated [1]
73/21

repatriation
[1]   52/23

repeat [1]
29/2

repeated [1]
67/25

repeatedly [1]
38/15

reply [5]
20/10 31/5
31/19 31/21
74/1

report [4]
77/7 84/13
84/18 85/9

reported [4]
11/5 11/12
14/1 88/5

reporter [6]
2/23 2/23 3/25
4/5 4/21 88/3

reporting [2]

**R**

reporting...
**[2]**   11/17
88/9
reports **[3]**
11/20 38/21
47/5
representations
**[2]**   19/14
52/17
representative
**[2]**   26/7 50/4
represented **[4]**
18/22 38/22
51/2 61/5
request **[20]**
5/4 22/23
26/20 26/23
27/10 27/14
27/24 27/25
28/14 29/8
31/1 31/2
31/25 33/3
35/6 41/21
46/7 57/6 58/7
83/4
requested **[5]**
11/20 14/10
27/11 43/23
44/19
requesting **[2]**
29/12 48/5
requests **[52]**
4/19 12/4 20/3
26/19 27/1
27/3 27/6 27/8
27/17 28/5
28/11 29/5
29/9 33/5 33/6
33/17 34/21
36/4 36/7 36/9
36/11 36/24
37/3 37/8 37/9
38/6 38/23
41/8 41/18
42/10 42/12
43/11 48/15
48/23 50/19
56/16 58/8
61/8 61/19
61/20 64/25
70/25 71/3
72/8 72/13
72/14 72/17
72/18 72/19
78/3 80/5
84/23
require **[2]**

49/2 67/13
required **[6]**
8/7 8/22 9/14
20/2 50/15
62/4
requirement **[1]**
11/18
requirements
**[1]**   27/25
requires **[1]**
28/1
requiring **[2]**
17/16 21/8
resolution **[1]**
70/15
resolutions **[1]**
65/23
resolve **[1]**
36/23
resolved **[3]**
10/10 54/5
81/12
resolving **[1]**
55/9
respect **[7]**
20/23 23/8
23/13 61/13
63/1 63/6 66/2
Respectfully
**[1]**   34/20
respective **[1]**
85/3
respond **[8]**
26/21 27/14
28/5 28/11
28/19 33/5
36/12 71/10
responded **[3]**
26/20 35/6
61/16
response **[15]**
25/7 27/13
28/7 31/18
31/25 32/4
34/25 35/2
35/16 42/9
47/20 60/10
61/18 61/19
61/25
responses **[1]**
27/20
responsibility
**[2]**   23/3
61/18
rest **[2]**   41/24
74/16
restate **[1]**
7/7

result **[1]**
24/12
review **[2]**
50/5 83/13
revisit **[1]**
51/10
RFP **[1]**   27/12
RFPs **[5]**   27/20
27/23 28/7
28/19 57/3
right **[103]**
rings **[1]**
22/17
rise **[1]**   20/7
role **[4]**   30/8
63/15 67/1
67/3
rolled **[1]**
12/22
room **[3]**   68/5
70/11 87/8
Rorschach **[1]**
72/2
ROSEN **[4]**   2/2
3/22 3/23 87/9
route **[1]**   8/9
rule **[5]**   27/25
28/18 36/17
45/6 72/1
ruling **[1]**
45/3
run **[3]**   57/11
57/25 58/1
running **[2]**
25/17 46/25
runs **[1]**   39/8

**S**

safe **[5]**   14/3
16/20 50/14
56/9 73/8
sails **[1]**
53/20
sake **[1]**   53/23
sakes **[1]**
74/14
same **[7]**   5/16
6/23 8/19 40/6
51/9 52/16
72/12
sat **[1]**   61/13
satisfaction
**[1]**   11/25
satisfied **[2]**
26/12 74/9
satisfy **[1]**
12/1
save **[4]**   53/7
56/23 62/17

75/12
saying **[17]**
20/24 21/13
27/9 28/3 28/4
28/18 35/20
35/21 37/19
58/6 61/12
64/16 72/12
72/14 81/20
82/8 84/18
SCARLATO **[2]**
1/13 3/10
scattershot **[1]**
30/25
scheduled **[2]**
80/25 84/19
scheduling **[1]**
78/1
scope **[1]**
41/20
scoped **[2]**
57/16 63/21
screen **[1]**   3/9
seal **[2]**   5/5
5/6
sealing **[1]**
5/9
search **[3]**
42/8 61/18
78/3
searchable **[1]**
58/25
seasoned **[1]**
87/8
SEC **[28]**   3/8
6/3 6/5 6/10
6/15 10/15
11/11 13/4
17/25 25/8
26/18 27/8
27/16 34/15
39/18 53/22
64/7 70/8
70/22 70/24
73/17 74/9
74/19 76/5
83/25 86/2
86/13 86/21
SEC's **[4]**   5/17
7/13 7/19
69/16
second **[10]**
9/7 10/9 10/11
14/16 28/8
28/9 59/20
67/19 79/4
79/14
section **[1]**

10/21
secure **[6]**
14/3 26/12
50/14 56/9
67/24 70/19
SECURITIES **[4]**
1/3 1/13 1/17
3/3
security **[11]**
7/4 25/9 26/9
28/24 30/20
33/1 33/13
34/6 34/12
47/5 69/25
seeing **[2]**
64/22 87/19
seek **[1]**   71/5
seeking **[2]**
23/12 47/12
seem **[1]**   30/4
seems **[26]**
5/22 7/23 13/4
13/7 14/19
14/22 20/16
24/20 30/13
32/7 33/7 37/2
37/11 37/14
37/18 45/21
48/1 48/11
51/15 52/20
58/16 59/1
64/17 68/23
69/1 84/24
segregation **[2]**
7/4 28/25
sends **[1]**   20/3
senior **[2]**
51/7 51/18
sense **[16]**
4/15 14/25
25/4 37/13
37/23 43/10
48/13 54/11
55/22 64/16
75/2 77/7
84/15 85/5
85/6 86/24
separate **[2]**
16/2 45/15
separated **[2]**
47/22 47/24
separately **[2]**
51/1 61/4
September **[1]**
1/5
sequencing **[2]**
48/6 48/21
serious **[3]**

**S**

serious... [3]
27/2 58/7 58/8
seriously [4]
6/5 28/18 29/4
29/5
serve [1]    18/9
served [1]
44/25
servers [1]
39/8
serves [1]
21/22
services [5]
17/5 18/6 39/8
58/16 58/18
Services' [1]
58/17
serving [1]
15/17
set [10]    3/4
12/25 24/3
38/19 54/2
67/3 67/19
69/15 75/4
78/13
sets [1]    38/20
setting [3]
37/12 45/6
49/18
seven [4]
36/12 52/11
54/3 66/20
seven-hour [1]
54/3
Shanghai [1]
20/5
shard [36]
19/25 20/1
20/3 20/25
22/2 22/13
22/22 23/3
49/22 50/3
50/3 50/4
50/11 51/22
51/23 52/7
52/11 52/15
52/19 52/21
54/3 54/7 55/8
55/16 55/17
62/2 65/9
66/21 66/24
66/25 67/1
67/3 67/6 67/8
74/18 76/23
shards [8]
8/23 20/14
21/16 34/9

34/14 52/18
54/10 55/21
share [2]
14/19 73/25
shared [1]
8/13
sheet [1]    8/19
shock [3]
25/14 25/16
26/10
shoes [1]
75/18
short [4]    56/3
58/12 58/20
72/11
shorten [1]
58/3
shortly [1]
81/1
show [2]    54/18
61/1
showing [1]
5/9
shows [1]
29/12
Shroder [4]
47/20 53/6
65/21 66/8
Shroder's [1]
50/24
side [6]    18/20
68/24 73/25
85/23 85/24
86/1
sides [4]
14/23 42/18
54/13 86/5
Sigma [1]
20/21
significant [2]
23/10 49/4
similar [2]
62/10 71/4
similarly [1]
63/14
simple [3]
46/24 58/12
83/12
simply [5]
22/23 35/11
42/25 49/4
62/9
Singapore [3]
20/2 22/18
32/12
single [4]
26/21 28/13
36/25 71/5

sit [1]    62/18
site [1]    62/20
sitting [1]
19/11
situation [3]
18/18 67/12
68/2
six [5]    13/15
52/2 52/5 57/4
57/4
Skynet [1]
69/24
Slack [3]
22/14 42/1
61/16
slicing [1]
64/8
slow [2]    12/22
82/16
slowly [1]
13/5
small [3]    6/8
64/5 64/21
smaller [1]
83/6
snapshot [5]
12/18 35/13
65/2 65/4 65/6
sneak [1]
69/11
software [47]
15/7 22/19
23/20 25/11
25/14 25/18
25/24 26/2
26/3 26/4
26/10 26/12
28/9 28/22
30/10 30/12
31/15 31/16
31/17 31/24
32/11 32/20
33/2 34/7
34/10 38/9
39/7 44/16
44/20 45/16
46/12 46/17
46/20 46/22
46/24 47/6
54/15 62/6
62/12 62/12
62/19 62/24
63/3 69/8 69/9
76/8 76/9
sole [3]    9/9
17/18 65/21
solely [3]
8/11 62/6 67/2

solution [1]
42/25
somebody [4]
31/24 39/20
76/18 82/12
someone [12]
18/19 32/19
67/13 69/22
72/10 75/19
76/8 76/14
76/14 80/14
82/24 82/25
someone's [3]
29/19 72/9
72/15
something's [1]
80/8
sometimes [1]
12/15
somewhat [1]
10/5
somewhere [1]
69/20
sorry [5]    3/24
30/11 59/11
79/8 84/11
sort [46]    4/15
4/18 5/23 6/5
7/23 8/2 8/14
9/16 12/3 13/3
14/18 16/20
17/21 17/25
18/1 19/8 21/8
24/10 33/21
35/8 35/10
35/12 36/5
36/23 37/12
37/22 45/1
50/22 50/24
52/2 54/25
55/1 55/8
55/14 55/18
58/12 59/8
62/19 67/19
69/23 73/21
75/9 77/8 80/6
83/9 85/3
sound [1]    73/9
sounded [1]
60/11
sounds [7]
30/14 34/1
59/4 64/19
71/15 78/2
78/14
speak [1]    68/6
speaking [3]
4/1 47/10 62/8

special [1]
35/3
specific [6]
10/25 38/6
40/15 41/8
48/22 69/6
specifically
[2]    6/25
40/20
speed [1]
13/19
spend [1]    49/3
splits [1]
72/4
spoken [3]
24/1 47/20
66/4
spot [3]    50/23
68/19 68/20
springs [1]
78/7
squad [1]
69/10
staggered [2]
68/22 70/11
staggering [2]
45/2 68/10
staging [1]
66/14
stakes [1]
87/13
staking [1]
22/12
standard [1]
56/20
stands [1]
21/2
staring [1]
71/3
start [22]
9/25 13/18
22/5 22/6 25/2
36/22 37/8
43/9 50/17
52/8 60/16
64/1 64/5 64/8
64/11 64/13
72/17 73/15
76/19 77/15
started [1]
4/13
starting [5]
3/6 25/24 42/7
64/21 65/10
state [3]
68/11 81/6
85/3

**S**

**stated [1]**
37/1
**statements [1]**
11/14
**STATES [14]**
1/1 1/10 8/12
9/11 15/15
17/18 18/8
18/11 34/10
34/14 39/21
39/25 52/18
52/24
**status [5]**
50/24 77/7
84/12 84/18
85/9
**stay [4]**   45/10
45/18 46/8
80/3
**stayed [1]**
68/23
**staying [1]**
87/20
**step [2]**   43/23
74/10
**stepping [1]**
31/4
**stick [1]**
72/11
**still [16]**
6/18 19/1 19/6
31/18 32/5
36/12 47/12
57/17 66/12
72/6 72/23
73/24 81/5
81/22 82/3
83/19
**stop [1]**   10/8
**storage [1]**
28/24
**story [1]**
63/15
**straight [1]**
86/15
**strawman [1]**
39/4
**Street [3]**
1/14 1/17 2/3
**strictures [1]**
33/23
**strong [1]**
68/8
**strongly [1]**
70/23
**studious [1]**
18/14

**stuff [4]**
60/21 66/12
83/16 87/17
**style [1]**   40/9
**subject [3]**
5/2 14/16 88/8
**submit [2]**
42/5 42/6
**subparts [1]**
71/8
**subsequent [2]**
60/24 66/18
**subsequently
[3]**   12/19
41/1 63/19
**substance [1]**
49/8
**successful [1]**
24/12
**sufficient [6]**
7/18 10/15
11/25 21/1
44/4 67/23
**sufficiently
[2]**   63/21
67/24
**suggesting [1]**
35/15
**suggests [1]**
24/13
**Suite [2]**   2/3
2/6
**sunset [1]**
9/16
**super [2]**   55/9
74/4
**supposed [3]**
44/16 46/15
83/15
**sure [26]**   5/12
6/18 8/5 8/19
16/16 17/8
18/16 21/19
29/14 30/23
30/23 33/18
44/17 45/19
54/14 59/15
59/17 68/11
68/18 78/16
79/15 81/17
82/8 85/2
85/21 87/7
**surety [1]**
75/10
**surprise [3]**
25/14 25/16
26/11
**surprisingly
[1]**   51/5

**suspect [1]**
51/7
**suspicious [1]**
84/2
**suss [1]**   60/12
**sweeping [1]**
70/20
**switch [1]**
58/9
**sworn [1]**
25/11
**system [10]**
11/6 11/13
11/14 21/5
21/21 23/18
24/6 31/11
46/19 46/20
**systems [4]**
15/3 15/9
41/20 61/9

**T**

**table [1]**   3/8
**tailor [1]**
43/6
**tailored [4]**
37/8 56/19
72/17 80/4
**take like [1]**
77/3
**talk [22]**   5/10
26/16 37/10
38/7 41/23
43/8 52/19
54/2 55/15
55/23 56/18
58/17 60/1
60/13 66/9
70/8 76/16
77/10 78/1
78/24 80/9
86/11
**talked [5]**
32/24 33/12
35/8 68/4
86/21
**talking [4]**
4/23 12/9
50/10 75/11
**talks [2]**   8/6
8/7
**targeted [24]**
26/20 27/3
27/5 27/6 27/8
27/16 27/21
27/24 28/14
31/25 32/4
36/7 36/9
36/10 43/11

48/23 52/10
52/13 65/7
69/5 69/15
70/25 71/12
81/13
**task [1]**   38/17
**team [1]**   51/19
**tech [1]**   62/21
**technically [1]**
44/5
**technological
[1]**   88/9
**technology [1]**
58/23
**teed [1]**   52/3
**telling [3]**
18/23 36/2
50/10
**temperature [1]**
87/5
**TENREIRO [2]**
1/16 3/9
**tense [1]**
60/20
**terminated [1]**
63/19
**terms [12]**
10/2 18/25
35/7 36/1 47/8
49/17 50/25
62/15 68/3
72/19 78/4
82/21
**test [7]**   37/22
49/15 53/5
55/5 62/19
63/4 81/22
**tested [1]**
55/6
**testified [9]**
21/5 26/8
26/11 31/12
34/6 34/8
34/11 34/12
47/4
**testify [1]**
55/18
**testimony [3]**
26/8 34/17
34/24
**tests [1]**   72/2
**thanks [9]**
3/11 24/25
36/20 50/16
71/16 85/22
86/3 87/18
87/20
**thereafter [1]**

81/1
**therefore [2]**
54/9 88/8
**thereto [1]**
28/23
**things being
[1]**   87/12
**thinking [3]**
48/5 48/24
86/24
**third [8]**   7/2
15/14 18/3
18/11 44/18
47/10 82/7
82/9
**third-party [4]**
7/2 15/14
18/3 18/11
**thorough [1]**
87/15
**though [2]**
31/4 32/8
**thought [6]**
4/15 4/16 26/5
52/22 59/7
83/13
**three [9]**
12/24 49/18
49/19 51/21
54/25 61/14
64/2 71/3
84/20
**thresholds [2]**
23/18 24/8
**throwing [1]**
77/13
**tie [1]**   11/10
**tied [2]**   45/3
65/2
**timeframe [2]**
35/7 35/9
**times [3]**
25/15 40/22
55/4 70/17
**to-do [1]**
22/19
**today [12]**
6/25 12/9
13/14 26/16
28/3 28/18
32/1 35/19
35/23 42/4
71/2 77/25
**together [1]**
41/21
**token [2]**
22/16 22/23
**tokens [1]**

**T**

tokens... **[1]**
23/19
told **[6]**   28/12
38/14 44/10
53/3 76/11
87/15
tomorrow **[1]**
10/8
top **[2]**   13/22
53/13
topics **[2]**
56/13 80/21
total **[7]**   11/5
11/12 27/19
28/6 37/20
64/16 74/4
totally **[4]**
19/2 56/6
56/11 84/16
touch **[1]**   20/6
touched **[1]**
11/17
touchpoints **[1]**
38/10
toward **[1]**
78/13
track **[1]**   68/9
trading **[3]**
9/10 39/10
46/19
trail **[1]**
25/18
tranche **[1]**
55/2
transcript **[2]**
1/9 88/4
transfer **[6]**
7/4 7/6 8/23
24/7 28/24
37/16
transfers **[10]**
15/16 22/4
22/9 22/9
22/12 22/13
22/16 22/25
23/1 24/6
transition **[1]**
55/18
translate **[1]**
34/24
treasury **[1]**
51/18
trenches **[1]**
53/12
trial **[1]**
10/19
tried **[5]**

40/13 45/13
50/1 53/14
68/14
triggered **[1]**
63/8
TRO **[5]**   13/24
25/7 25/8
25/13 86/16
trouble **[1]**
4/6
true **[7]**   5/15
6/2 6/2 6/14
6/16 52/13
88/4
try **[9]**   4/14
4/23 6/20 14/8
43/17 69/15
80/1 87/4 87/5
trying **[23]**
7/7 7/19 9/4
14/23 14/23
16/24 18/16
25/18 31/6
37/21 41/6
43/12 43/14
48/8 53/24
60/12 71/23
74/25 74/25
75/1 86/4
86/12 86/22
TSS **[6]**   20/14
21/15 21/23
22/8 22/10
22/11
turn **[2]**   20/11
87/4
turned **[1]**
19/17
turning **[1]**
9/23
two **[19]**   5/15
6/22 10/1 10/6
18/3 18/13
21/13 27/9
34/5 36/13
37/1 51/20
52/4 52/5 64/6
77/16 77/24
77/25 80/3
type **[3]**   27/13
27/13 28/11
typically **[1]**
64/17

**U**

U.S **[2]**   2/24
61/17
uh **[3]**   59/24
59/24 73/16

uh-oh **[1]**
73/16
Uh-uh **[1]**
59/24
unambiguous **[1]**
46/14
unanswered **[1]**
13/1
unauthorized
**[1]**   23/1
unavailable **[3]**
7/6 78/20
79/5
unconstrained
**[1]**   29/11
under **[11]**   5/5
5/6 9/4 10/21
16/14 18/7
18/10 19/18
46/15 46/17
50/15
undercut **[1]**
87/13
underpin **[2]**
5/22 46/17
understood **[8]**
25/20 26/4
30/7 38/17
43/20 45/18
46/13 80/20
unduly **[1]**
11/21
Unfortunately
**[1]**   78/19
unique **[3]**
52/14 65/25
66/3
uniquely **[1]**
51/12
UNITED **[14]**
1/1 1/10 8/12
9/11 15/15
17/18 18/8
18/11 34/10
34/14 39/21
39/25 52/18
52/23
universe **[1]**
50/11
unnecessary **[2]**
35/23 52/20
unpredictable
**[1]**   87/9
unquote **[6]**
19/25 21/22
46/7 46/12
46/21 47/3
unreasonable
**[2]**   35/21

42/8
unrelated **[1]**
19/2
unstay **[1]**
68/4
unsure **[1]**
19/6
unworkable **[1]**
35/25
up **[36]**   4/24
13/13 13/14
16/4 16/10
20/23 25/5
29/14 32/11
33/21 37/21
40/15 40/21
41/10 48/17
52/3 54/2
54/18 57/16
59/19 60/1
66/6 66/6
67/21 71/14
72/10 72/18
72/19 72/21
73/12 73/12
73/15 73/19
75/7 78/15
83/10
up here **[1]**
13/13
updated **[1]**
22/20
upload **[1]**
42/23
upon **[4]**   10/20
20/24 21/13
47/5
use **[6]**   26/4
45/24 47/7
53/9 54/15
61/10
used **[5]**   8/25
25/12 25/23
26/1 87/15
user **[1]**   76/10
using **[1]**
37/17
utilized **[1]**
25/21
utilizing **[1]**
26/13

**V**

vague **[1]**
34/23
value **[2]**
22/23 43/1
Vancouver **[1]**
20/12

various **[4]**
14/6 19/17
58/25 85/4
vendor **[1]**
44/18
verify **[2]**
23/20 62/11
via **[1]**   19/11
videoconference
**[1]**   88/8
view **[5]**   7/19
10/9 16/21
17/4 21/24
violation **[2]**
15/12 36/17
Virginia **[1]**
39/9
virtually **[2]**
8/1 71/5
visibility **[1]**
53/13
voice **[1]**
22/17
volume **[2]**
42/20 58/2
VP **[2]**   51/23
55/16

**W**

wait **[2]**   56/6
80/15
waiting **[1]**
37/9
walk **[6]**   31/7
58/16 62/9
62/10 62/14
62/25
walk-through
**[4]**   62/9
62/10 62/14
62/25
walked **[1]**
75/18
wallet **[7]**
11/7 16/6
30/12 39/7
40/24 44/16
63/17
wallets **[19]**
9/8 15/2 15/8
17/16 21/4
22/11 22/12
22/12 23/14
23/15 23/16
23/19 23/19
24/14 31/10
44/20 61/7
61/15 61/17
wants **[3]**   57/9

**W**

**wants... [2]**
78/18 84/1
**war [1]** 73/5
**warranted [1]**
65/14
**Washington [6]**
1/5 1/14 1/22
2/4 2/7 2/25
**watermark [1]**
39/24
**Watkins [2]**
2/3 3/21
**way [26]** 6/10
6/13 8/3 8/13
24/19 26/25
27/21 34/4
35/12 46/16
49/12 56/3
58/12 64/1
64/5 64/11
66/5 66/6
67/18 70/23
72/24 76/6
81/18 85/12
87/11 87/13
**ways [2]** 49/11
64/6
**we're in [1]**
83/2
**weatherproof**
**[1]** 55/6
**Web [4]** 39/8
58/15 58/17
58/18
**week [4]** 77/14
78/15 78/17
79/13
**weeks [2]**
77/24 77/25
**welcome [2]**
68/16 81/25
**weren't [3]**
4/1 59/8 86/11
**what's [19]**
13/20 15/19
16/19 21/11
27/7 28/5
31/25 35/19
37/6 43/13
47/1 53/10
54/16 60/5
63/23 64/21
69/12 73/16
86/11
**white [1]**
17/21
**who's [3]**

55/16 69/14
80/12
**whole [1]**
68/25
**whose [1]** 26/8
**wide [1]** 71/9
**wife's [1]**
86/6
**wifi [1]** 42/23
**wildly [2]**
17/23 51/15
**WILLIAM [2]**
1/20 2/2
**willing [11]**
12/17 27/6
29/9 38/14
56/21 61/23
68/4 69/4 75/6
81/16 82/14
**WilmerHale [4]**
1/21 3/13 3/15
3/19
**wind [1]** 53/20
**withdrawal [2]**
7/6 28/24
**withdrawals [2]**
15/16 22/4
**within [5]** 9/8
9/15 51/12
57/2 68/1
**witnesses [3]**
23/17 34/11
67/25
**Wizard [1]**
40/8
**word [3]** 26/22
29/4 45/24
**word's [1]**
58/2
**work [21]** 14/9
21/18 31/16
38/5 38/14
41/20 43/17
52/20 53/11
54/17 54/21
56/21 64/11
66/5 66/6 78/4
78/5 78/13
79/18 84/10
85/1
**worked [2]**
39/3 78/6
**working [4]**
6/23 36/4
64/22 66/12
**works [11]**
23/3 25/19
26/3 39/11

47/5 54/17
63/3 77/24
79/20 85/14
85/19
**world [3]**
16/23 17/3
48/6
**worth [2]**
48/24 56/15
**wrap [1]** 71/14
**wringing [1]**
41/5
**writ [1]** 65/24
**write [1]**
76/14
**written [3]**
28/19 29/5
33/6
**wrong [1]**
76/21

**Y**

**Yards [1]** 1/24
**year [4]** 35/22
35/24 65/11
71/7
**yield [2]**
43/24 45/21
**York [2]** 1/18
1/25
**you're just [1]**
7/10

**Z**

**zero [1]** 84/20
**Zhang [1]** 24/4
**Zhao [6]** 2/2
3/21 50/7 63/8
65/22 68/8
**ZIA [1]** 1/9