**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| *Plaintiff*, | |
| v. | **No. 1:23-cv-01599-ABJ-ZMF** |
| BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO, | **Oral Argument Requested** |
| *Defendants*. | |

**Reply In Support Of Joint Motion To Dismiss Claims
Against Defendants Binance Holdings Limited And Changpeng Zhao**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.    The SEC Fails To Plausibly Allege That Any Token, BNB Vault, Or Simple Earn Is A "Security."  (Most Of Count 1 And All Of Counts 2–3, 5–12).............. 2

    A.    The SEC's Interpretation Defies The Plain Text Of The Phrase "Investment Contract" And The Governing *Howey* Test. .......................... 2

        1.    An Investment Contract Requires A Contract. ............................... 3

        2.    An Investment Contract Requires An Investment Of Money Into A Common Enterprise. ......................................................... 5

        3.    Precedent Mandates A Transaction-By-Transaction Analysis. ................................................................................... 6

        4.    The SEC's ICO Cases Reinforce Defendants' Position. ................ 8

        5.    The SEC's Position Lacks Any Coherent Limiting Principle. ...................................................................................... 9

    B.    The SEC Has Not Plausibly Alleged Any Investment Contract. .............. 10

        1.    BNB .............................................................................................. 10

        2.    BUSD ........................................................................................... 13

        3.    The Third-Party Tokens ............................................................... 14

        4.    BNB Vault And Simple Earn ........................................................ 15

    C.    The Major-Questions Doctrine Forecloses The SEC's Claims. ............... 16

II.    The SEC's BNB Offering Claim Is Time-Barred.  (Remainder Of Count 1)....... 18

III.    The Claims Regarding Binance.com Transactions (Including BNB Vault And Simple Earn) And The BNB Offering Are Impermissibly Extraterritorial.  (Foreign Components Of Counts 1–2 & All Of Counts 3, 5–7, & 11) ..................................................................................................... 19

    A.    The SEC's Arguments Impermissibly Extend The Securities Laws Overseas. ................................................................................................ 19

    B.    The SEC's Preferred Test Was Rejected In *Morrison*. ............................ 20

    C.    The SEC Has Not Plausibly Alleged Domestic Violations. .................... 22

IV.    The SEC's Failure To Provide Fair Notice Compels Dismissal.  (All Counts) ..................................................................................................... 23

V.    The Complaint Fails To Adequately Allege Personal Jurisdiction As To Mr. Zhao.  (Counts 11 and 12) ....................................................................... 24

i

**TABLE OF CONTENTS**
(*continued*)

Page

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023)..................................................................................................19, 20, 23

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)......................................................................................19, 20, 22

*Audet v. Fraser*,
   605 F. Supp. 3d 372 (D. Conn. 2022)......................................................................................22

*Balestra v. ATBCOIN LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019)........................................................................................8

*Barron v. Helbiz, Inc.*,
   2021 WL 4519887 (2d Cir. Oct. 4, 2021)................................................................................22

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023)..............................................................................................................17

*In re BitConnect Sec. Litig.*,
   2019 WL 9104318 (S.D. Fla. Aug. 23, 2019)...........................................................................6

*Bloomgarden v. Coyer*,
   479 F.2d 201 (D.C. Cir. 1973)..................................................................................................3

*Brooks v. Weinberger*,
   637 F. Supp. 22 (D.D.C. 1986)................................................................................................14

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)..................................................................................................................24

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014).....................................................................................................22

*Continental Mktg. Corp. v. SEC*,
   387 F.2d 466 (10th Cir. 1967) ...................................................................................................5

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
   608 F.2d 1297 (9th Cir. 1979) ...................................................................................................3

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016).......................................................................................................24

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
   147 F.3d 118 (2d Cir. 1998)................................................................................................20, 21

*FEC v. Cruz*,
   596 U.S. 289 (2022)..................................................................................................................16

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019)........................................................................................2

*Garvey v. ARB*,
   56 F.4th 110 (D.C. Cir. 2022)............................................................................21

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985)........................................................................4, 6, 15

*Giunta v. Dingman*,
   893 F.3d 73 (2d Cir. 2018).................................................................................23

*Glen-Arden Commodities, Inc. v. Costantino*,
   493 F.2d 1027 (2d Cir. 1974)...............................................................................4

*Lay v. United States*,
   623 F. App'x 790 (6th Cir. 2015) ......................................................................22

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982)...............................................................................7, 8, 15

*Mazza v. Verizon Washington DC, Inc.*,
   852 F. Supp. 2d 28 (D.D.C. 2012) .....................................................................25

*McCown v. Heidler*,
   527 F.2d 204 (10th Cir. 1975) .............................................................................5

*Merck & Co. v. HHS*,
   962 F.3d 531 (D.C. Cir. 2020) ...........................................................................17

*Michel v. Anderson*,
   14 F.3d 623 (D.C. Cir. 1994) .............................................................................14

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)...........................................................................20, 21, 22

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
   890 F.3d 60 (2d Cir. 2018).................................................................................23

*N.C. Coastal Fisheries Reform Grp. v. Captain Gaston LLC*,
   76 F.4th 291 (4th Cir. 2023) ..............................................................................16

*NFIB v. OSHA*,
   595 U.S. 109 (2022)............................................................................................17

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) ..........................................................................11, 12

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016)................................................................................24

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994)......................................................................................7

*RJR Nabisco, Inc. v. European Cmty.*,
  579 U.S. 325 (2016)............................................................................................22

*Rodriguez v. Banco Cent. Corp.*,
  990 F.2d 7 (1st Cir. 1993)................................................................3, 5, 10, 15

*Schentag v. Nebgen*,
  2018 WL 3104092 (S.D.N.Y. June 21, 2018) ...........................................20, 21

*SEC v. Banner Fund Int'l*,
  211 F.3d 602 (D.C. Cir. 2000) ...........................................................................4

*SEC v. Benger*,
  934 F. Supp. 2d 1008 (N.D. Ill. 2013) .............................................................21

*SEC v. BitConnect*,
  No. 21-cv-07349 (S.D.N.Y. Sept. 1, 2021).........................................................6

*SEC v. C.M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943)................................................................................3, 4, 15

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)..........................................................................................17

*SEC v. Coinbase, Inc.*,
  No. 1:23-cv-04738 (S.D.N.Y. Aug. 2023).........................................................18

*SEC v. Edwards*,
  540 U.S. 389 (2004)............................................................................................3

*SEC v. Eurobond Exch., Ltd.*,
  13 F.3d 1334 (9th Cir. 1994) ...........................................................................11

*SEC v. Glob. Inv. Strategy UK Ltd.*,
  2021 WL 4896127 (S.D.N.Y. Oct. 19, 2021) ...................................................23

*SEC v. Globus Grp., Inc.*,
  117 F. Supp. 2d 1345 (S.D. Fla. 2000) ............................................................19

*SEC v. Goldman Sachs & Co.*,
  790 F. Supp. 2d 147 (S.D.N.Y. 2011)...............................................................21

*SEC v. Gruss*,
  859 F. Supp. 2d 653 (S.D.N.Y. 2012)...............................................................22

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020).............................................................8, 9

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996).....................................2, 3, 6, 9, 12, 13, 16

*SEC v. Ripple Labs, Inc.*,
  2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ....................................................23

*SEC v. Ripple Labs, Inc.*,
  2023 WL 4507900 (S.D.N.Y. July 13, 2023) ........................................................24

*SEC v. Scoville*,
  913 F.3d 1204 (10th Cir. 2019) ..............................................................................4

*SEC v. SG Ltd.*,
  265 F.3d 42 (1st Cir. 2001)....................................................................................24

*SEC v. Terraform Labs Pte Ltd.*,
  2022 WL 2066414 (2d Cir. June 8, 2022) ............................................................25

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) .....................................................8, 9

*\*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)......................................................................................2, 5, 14

*Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*,
  883 F.3d 904 (D.C. Cir. 2018) ..............................................................................21

*Texas v. NRC*,
  78 F.4th 827 (5th Cir. 2023) ..................................................................................16

*UBS Asset Mgmt. (N.Y.) Inc. v. Wood Gundy Corp.*,
  914 F. Supp. 66 (S.D.N.Y. 1996) ..........................................................................22

*United States v. Kumbhani*,
  No. 22-cr-395 (S.D. Cal. Feb. 25, 2022).................................................................6

*United States v. Santos*,
  553 U.S. 507 (2008)...............................................................................................16

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013).....................................................................................23

*Uselton v. Com. Lovelace Motor Freight, Inc.*,
  940 F.2d 564 (10th Cir. 1991) ...............................................................................13

*Walden v. Fiore*,
  571 U.S. 277 (2014)...............................................................................................25

*\*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)......................................................................................17, 18

*Wilson v. Garcia*,
  471 U.S. 261 (1985)...............................................................................................18

*Woodhull Freedom Found. v. United States*,
  72 F.4th 1286 (D.C. Cir. 2023)..............................................................................24

*\*Woodward v. Terracor*,
  574 F.2d 1023 (10th Cir. 1978) ...............................................................................3

*Woytowicz v. George Washington Univ.*,
   327 F. Supp. 3d 105 (D.D.C. 2018) ......................................................................11

**Statutes**

7 U.S.C. § 2(a)(1)(H) ............................................................................................10

15 U.S.C. § 77b(a)(1) ............................................................................................16

15 U.S.C. § 77d(a)(6) ............................................................................................21

15 U.S.C. § 78c(a)(10) ...........................................................................................16

15 U.S.C. § 78o .....................................................................................................22

15 U.S.C. § 78u(d)(1) ............................................................................................19

Dodd-Frank Act, Pub. L. No. 111-203, § 753, 124 Stat. 1376 (2010) .........................10

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................6

**Regulations**

17 C.F.R. § 230.901 ...............................................................................................21

**Other Authorities**

54 Fed. Reg. 30,013 (July 18, 1989) .........................................................................21

63 Fed. Reg. 14,806 (Mar. 27, 1998) ........................................................................21

*Hearing on Oversight of the SEC*, 117th Cong. (2023) .................................................2

Statement of CFTC Commissioner Pham (July 21, 2022) ..........................................10

**Introduction**

For more than a decade after Bitcoin launched in 2009, the SEC stood idle as Binance.com and several other crypto platforms grew in plain sight, allowing users to buy and sell crypto tokens without any indication that the SEC would later argue the entire industry was violating the securities laws.  The SEC was on the sidelines for good reason—unlike the CFTC, the SEC lacks statutory authority over exchange sales of crypto assets.  Yet the SEC now asks this Court to accept a novel, contorted interpretation of the securities laws, hinging virtually its entire case on the argument that an "investment contract" need not include either an investment or a contract.  That interpretation is untenable under the plain text of the securities laws, binding precedent, and common sense.

The SEC's Complaint focuses on transactions by customers who clicked on a website, bought tokens from other anonymous token owners, and then logged off.  In none of the transactions at issue did a contract exist with a promoter to invest money into a common business enterprise.  As a result, the SEC asks this Court to disregard text and precedent requiring contractual commitments and to overlook the requirement of an investment *into* a "common enterprise" between a promoter and purchaser.  The SEC also ignores the requirement that the existence of an "investment contract" must be determined on a transaction-by-transaction basis.

The SEC unsurprisingly cannot identify any coherent limiting principle for its novel theory, instead simply blustering that Defendants' arguments concerning citrus groves and baseball cards are "absurd" because they take the SEC's theory to its logical (and absurd) conclusion.  Opp. 3.  The SEC fails to explain why its theory does *not* convert sales of assets such as real estate, gold, or oil into securities transactions.  At a recent congressional hearing, Chair Gensler could not even say whether the agency's new theory would turn electronic Pokémon cards into securities.

1

*Hearing on Oversight of the SEC*, 117th Cong. (2023), https://tinyurl.com/d74us89n (2:50:00–2:52:37) (questioning from Rep. Torres).

To be sure, the "investment contract" test is "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  But the test is not an inkblot that means whatever the SEC wants.  There are real limits even for assets that might, in colloquial terms, be thought of as "investments."  *See, e.g.*, *SEC v. Life Partners, Inc.*, 87 F.3d 536, 538 (D.C. Cir. 1996) (rejecting theory that instruments purchased for investment purposes were "investment contracts").  The SEC's repeated appeals for a "flexible" approach that eschews the text and precedent betray the lack of legal support for its position.  Tellingly, the SEC's own amicus argues expressly what the SEC leaves implicit: that its approach would require abandoning precedent and overhauling *Howey*.  NFI Br. 1–4.[1]

**Argument**

I.    **The SEC Fails To Plausibly Allege That Any Token, BNB Vault, Or Simple Earn Is A "Security."  (Most Of Count 1 And All Of Counts 2–3, 5–12)**

A.    **The SEC's Interpretation Defies The Plain Text Of The Phrase "Investment Contract" And The Governing *Howey* Test.**

The securities laws define a "security" to encompass specific instruments such as "stock[s]," "bond[s]," and "investment contract[s]."  Mot. 14.  Statutory interpretation starts with the text and, when the text is clear, ends there too.  *See, e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).  Yet the SEC never tries to reconcile its arguments with the

---

[1] For a table summarizing the grounds on which each count of the Complaint against Defendants should be dismissed, see Exhibit A to this brief.

text of these laws—the SEC even ridicules the idea that "the words" matter.  Opp. 26.  The reason

is clear: any interpretation of "investment contract" requires a contract and an investment.

### 1.    An Investment Contract Requires A Contract.

The SEC's cases confirm that "the words" mean what they say—*i.e.*, an investment

contract requires **a contract**.  *See, e.g.*, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 349

(1943) (investment contract existed because "the acceptance of the offer quoted *made a contract*")

(emphasis added); *SEC v. Edwards*, 540 U.S. 389, 397 (2004) ("We are considering investment

*contracts*.").  The D.C. Circuit has likewise confirmed that an investment contract by definition

requires "post-purchase commitments."  *Life Partners*, 87 F.3d at 545.

Case law also makes clear that assets standing alone without contractual post-sale

obligations are *not* investment contracts.  *See, e.g.*, *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7,

10 (1st Cir. 1993) ("Even if bought for investment, the land itself does not constitute a business

enterprise[.]"); *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th

Cir. 1979) (similar); *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (similar where

defendant "was under no contractual obligation to the plaintiffs other than to deliver title").[2]

The SEC's quest to paint Defendants as advocating for a wooden, "formal" contract

requirement falls flat.  Opp. 9, 24.  Nothing about the existence of a contract requires a "formal"

instrument.  *See, e.g.*, *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973) ("An implied-

in-fact contract is a true contract[.]").  Nor does the question require diving into state law, as the

SEC suggests.  Opp. 25.  Federal law controls the question whether there is an investment contract,

---

[2] The SEC contends that *Woodward* does not support the contract requirement because it found that defendants did not "*promise* to run the development" and distribute profits.  Opp. 23.  But the lack of a "promise"—*i.e.*, there was "no management *contract* between plaintiff and defendants, nor were defendants obligated by [the land-sale contract] to perform any such services"—was why the court found a lack of an "investment contract."  *Woodward*, 574 F.2d at 1026 (emphasis added).

as *Joiner* made clear when deeming it "unnecessary" to determine whether a purchaser enjoyed a specific state-law remedy.  320 U.S. at 348–49.  Federal law also incorporates contract-law principles like "offer" and "acceptance" as required elements of an "investment contract."  *Id.*

Tellingly, the SEC fails to identify a single appellate decision holding that an investment contract need not include post-sale contractual obligations, an inherent attribute of any contract. *Banner Fund* involved the promoter's (fraudulent) promise to take individuals' money, invest it in various opportunities, and periodically deliver returns.  211 F.3d 602, 606 (D.C. Cir. 2000).  The *Glen-Arden* promoter nominally sold casks of whiskey, but coupled the sales with promises to store the whiskey, procure insurance, assist with resale, and "handle all administrative details"— all "commitments" that were "absolutely necessary to the turning of the promised profit."  493 F.2d 1027, 1032, 1034–35 (2d Cir. 1974).  The *Scoville* defendant sold a service that entitled websites to "the opportunity to share in [the defendant's] revenue," thus promising periodic profit distributions in exchange for the purchasers' capital.  913 F.3d 1204, 1210 (10th Cir. 2019).  *SG* involved a scheme where purchasers bought "virtual companies" and were guaranteed to receive later profit distributions from the defendant.  265 F.3d 42, 45, 52 (1st Cir. 2001).  In *Gary Plastic*, the defendant worked with multiple banks to "specially create[]" certificates of deposit to be sold in the defendant's "CD Program," and then promised to "maintain a secondary market" for the "CD Program" and "monitor the creditworthiness of issuing banks on a regular basis."  756 F.2d 230, 232, 240 (2d Cir. 1985).  The common thread is that if the promoters had failed to execute post-sale, profit-generating activities, they would have breached a formal or implied contract.  In none of the cases did courts find bare assets to be "investment contracts."  This dooms most of the SEC's case, because the agency does not allege post-sale contractual obligations for secondary-market sales of crypto tokens.  Mot. 21, 26–27.

4

*Continental* illustrates the point nicely.  There, promoters selling investments in beavers—*i.e.*, semi-aquatic mammals, not investment contracts—split the transaction "into separate contracts for purchasing and ranching," one of which ran to the beaver seller and the other to the beaver rancher, who both "act[ed] in concert in the promotion" of the scheme.  387 F.2d 466, 469 (10th Cir. 1967).  *Continental* thus reinforces the need for contractual, post-sale obligations.

### 2.      An Investment Contract Requires An Investment Of Money Into A Common Enterprise.

The text of the securities laws and *Howey* likewise require the "investment of money *in* a common enterprise" with the promoter—yet another longstanding requirement the SEC asks the Court to ignore.  *Howey*, 328 U.S. at 301 (emphasis added).  The SEC disavows *any* requirement that purchasers' money go to a common enterprise, Opp. 31–32, yet the SEC never articulates how a purchaser can "invest" money in an enterprise when no money goes to the enterprise.  Nor is the SEC's view reconcilable with basic notions of investment, in which an investor provides capital *to* an enterprise in the hopes of a return *from* the enterprise.  *See, e.g.*, *McCown v. Heidler*, 527 F.2d 204, 211 (10th Cir. 1975) ("The utilization of purchase money accumulated from lot sales to build the promised improvements brings the scheme within the 'common enterprise' definition.").

The SEC also says that "resale[s] do[] not in any way alter the economic reality" of the transactions it alleges took place on Binance.com because resale purchasers of crypto tokens expect to make money (and might lose money) through their secondary-market transactions.  Opp. 33–34.  That argument confuses *Howey*'s requirement of an "expectation of profits" with the additional and *separate* requirements of (1) an "investment of money" (2) "in a common enterprise."  All three must be satisfied in order to have an "investment contract."  *E.g.*, *Rodriguez*, 990 F.2d at 11 ("[E]ven if every buyer bought for investment, what was purchased in this case was not a share of a business enterprise and so not a security.").

As with the contract requirement, the "investment of money in a common enterprise" test is adaptable, but it cannot simply be disregarded. The SEC cites several cases for the unremarkable proposition that the test does not turn on the nuances of accounting or "obsequious focus on how proceeds are handled." Opp. 32. But unlike this case, they all satisfied the basic requirement of an "investment of money in a common enterprise." *See Life Partners*, 87 F.3d at 543 (promoter brought "together multiple investors and aggregate[d] their funds"); *Gary Plastic*, 756 F.2d at 241–42 (funds went to Merrill Lynch via commissions and interest payments in connection with its "CD Program," which was "essentially a joint effort between the issuer of the CD, the deposit bank, and Merrill Lynch"); *In re BitConnect Sec. Litig.*, 2019 WL 9104318, at *1 (S.D. Fla. Aug. 23, 2019) ("Bitconnect operated a pyramid/Ponzi scheme" via two "BitConnect Investment Programs"); *id.* at *7 (recognizing that *Howey* requires "an arrangement whereby an investor commits assets to an enterprise or venture") (quotation marks omitted).[3]

### 3.    Precedent Mandates A Transaction-By-Transaction Analysis.

The SEC also repeatedly conflates transactions during the BNB Offering and other tokens' ICOs with secondary-market transactions. The SEC apparently believes that if some initial offerings are investment contracts, all subsequent transactions involving these tokens are likewise investment contracts.[4] That is wrong.

---

[3] Notably, in its enforcement action against BitConnect, the SEC did not allege that the cryptocurrency token created by BitConnect (BCC) was a security, *SEC v. BitConnect*, No. 21-cv-07349 (S.D.N.Y. Sept. 1, 2021), ECF No. 1, at 2, whereas the Department of Justice in a related action alleged that BCC was in fact a commodity, *United States v. Kumbhani*, No. 22-cr-395 (S.D. Cal. Feb. 25, 2022), ECF No. 1, ¶ 69. The SEC's arbitrary picking and choosing of assets to characterize as securities (or not) in 2021–2022 only underscores the lack of authority for its sweeping position in 2023 that virtually all such assets are securities.

[4] The SEC curiously makes much of the notion that Defendants do "not dispute" that BNB was initially offered as an investment contract. Opp. 34, 36. That is false. Given the Rule 12 standard,

The analysis must be conducted transaction-by-transaction; accordingly, a transaction involving an exchange of an asset (as distinguished from the asset itself) might constitute an investment contract in some circumstances, but not others. *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982); Mot. 15. Even the SEC admits that under *Howey*, "[w]here those requirements" of an investment contract "do not exist, even with respect to the same instruments, courts find no investment contract." Opp. 31. This admission refutes the agency's insistence that a blind secondary-market transaction must be treated the same as a token sale in an ICO years earlier.

Nor does the fact that the Exchange Act sometimes applies to investment contracts mean that it applies to sales of bare assets such as citrus groves or crypto tokens. The SEC implies that Defendants' interpretation is somehow in conflict with the inclusion of the phrase "investment contract" in the Exchange Act's definition section. Opp. 10. But the basic requirements of an investment contract are entirely consistent with the Exchange Act. Courts have drawn a clear distinction between the sale of investment contracts and the sale of assets that were involved in those contracts. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88–89 (2d Cir. 1994). When all that is sold is an asset—stripped of the circumstances that made the original transaction an investment contract under *Howey*—no "security" changes hands. *Id.* at 89. That the Exchange Act, among other things, regulates secondary markets for things that are always securities (like stock) is beside the point; here the threshold question is whether crypto tokens *are* securities in the first place.

Here, the SEC fails to plead how secondary-market sales of tokens involved any post-sale contractual obligations or any investment of money into a common enterprise. The SEC

---

Defendants have not moved to dismiss the SEC's claim concerning the Offering on the ground that those transactions did not involve any investment contract; however, Defendants dispute that the Offering was an "investment contract" and reserve all arguments in that regard for later stages in the case. And there are multiple alternative reasons the Court should dismiss that claim now.

accordingly provides no basis to distinguish secondary-market sales from any other asset sale where the purchaser buys an asset from a third party hoping it will appreciate in light of subsequent advertising or other activities that increase the demand for the asset.  Indeed, until very recently, SEC officials took the same position as Defendants, correctly explaining that a "token . . . all by itself is not a security, just as the orange groves in *Howey* were not."  Mot. Appx. tbl. A line 2.

The SEC's final rejoinder is that Defendants' understanding of the test produces absurd results: that it would find an investment contract in one sale, yet no investment contract where the same asset is resold by a third party.  Opp. 33.  That is not absurd; it reflects the transaction-by-transaction analysis mandated by Supreme Court precedent, *Marine Bank*, 455 U.S. at 560 n.11, which ensures that resellers of assets like citrus groves and beavers do not become the focus of the securities laws.  It also gives effect to Congress's decision to delegate enforcement authority over commodities to the CFTC, while carving out a narrower subset of assets—securities—for which the SEC is the primary federal agency.

### 4.    The SEC's ICO Cases Reinforce Defendants' Position.

The SEC invokes a handful of out-of-circuit district-court opinions concerning crypto assets.  Yet all but one involved solely ICOs, which are not at issue in this motion.  In each instance, the promoters at least arguably made offers that buyers accepted by investing money *into the enterprise*.  For example, in *Balestra* promoters sought to "raise capital" to "launch a new blockchain."  380 F. Supp. 3d 340, 347 (S.D.N.Y. 2019).  The *Audet* promoters similarly raised money to launch their program.  605 F. Supp. 3d 372, 382–84 (D. Conn. 2022).  These cases are fundamentally different from the asset sales at issue here, which are akin to the resale of land that may have *previously* been the subject of an investment contract.

Only two of the cases even discuss the contract requirement.  *See SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023); *SEC v. Kik Interactive Inc.*, 492 F.

Supp. 3d 169, 178 (S.D.N.Y. 2020). The facts of *Kik* easily fit into the implied-in-fact contract framework—the promoters took investors' money and expressly promised to use the money for "the development of the Kin Ecosystem"; the developer could not have pocketed the money and absconded without breaching a contract. 492 F. Supp. 3d at 174–76.[5] *Terraform* (another out-of-circuit case) found that issuer sales on "secondary market[s]" can constitute "investment contracts," 2023 WL 4858299, at *3, *15, but did not determine whether third-party resales satisfy the "investment of money" or "common enterprise" prong. *See also* Mot. 18–19.

### 5.  The SEC's Position Lacks Any Coherent Limiting Principle.

The SEC describes its test as follows: for crypto assets, an investment contract is anything that gives investors "the opportunity to participate—via the potential appreciation of the value of the crypto assets—in the promoters' efforts to develop and grow the issuers' blockchain-based business." Opp. 3. That test provides no "basis upon which to distinguish securities from non-securities." *Life Partners*, 87 F.3d at 545. A diamond dealer that undertakes an advertising campaign provides everyone who owns a diamond the "opportunity to participate" "via the potential appreciation" of the value of the stones. But nobody thinks diamonds are securities.

The SEC calls that argument a "strawman," "absurd," and a "canard." Opp. 3, 28. Yet the SEC fails to explain why its theory does not lead to that absurd result. The SEC suggests its new test applies only where an asset lacks "inherent" value, a reverse-engineered category that, under the agency's telling, includes only crypto tokens. Opp. 30. However, courts have long recognized that other assets can be "worthless" without further development, but nevertheless are not

---

[5] *Kik* also incorrectly stated that *Howey* does not require an "ongoing" obligation after a sale, 492 F. Supp. 3d at 178, which cannot be squared with controlling case law in this Circuit. *See Life Partners*, 87 F.3d at 545 (requiring "post-purchase commitments").

"investment contracts" without contractual obligations, an investment of money into a common enterprise, and the other prerequisites.  *See Rodriguez*, 990 F.2d at 8 ("worthless swamp land"). The SEC's approach would also extend the securities laws to Bitcoin, a conceded non-security. Opp. 49.[6]

The SEC also has no answer for the displacement of the CFTC's enforcement authority in crypto spot markets that would flow from the SEC's newfound approach.  Mot. 6–7; *see also, e.g.*, Dodd-Frank Act, Pub. L. No. 111-203, § 753, 124 Stat. 1376, 1750–54 (2010) (expanding CFTC's anti-fraud authority over commodities in interstate commerce); 7 U.S.C. § 2(a)(1)(H) (explaining that CFTC "ha[s] no jurisdiction under" the Dodd-Frank Act "with respect to[] any security other than a security-based swap").[7]  The SEC studiously avoids discussing the harm its approach does to the longstanding statutory framework governing financial markets.

### B.     The SEC Has Not Plausibly Alleged Any Investment Contract.

Here, the SEC has failed to plausibly allege facts establishing any investment contract, which is sufficient to dismiss almost its entire Complaint.

#### 1.     BNB

*No Contract.*  The SEC fails to argue that secondary-market BNB transactions created any prospective contractual obligations on Defendants' behalf, thereby forfeiting any such argument, and confirming the absence of a contract.

---

[6] The SEC's need to feign ignorance of the meaning of an "asset sale," Opp. 28, confirms it has no answer to the problems caused by its distortion of *Howey*.  The meaning is obvious: the sale of something of value (be it citrus groves or crypto tokens) without post-sale obligations to develop the asset or an investment into a common enterprise.

[7] *See also* Statement of CFTC Commissioner Pham (July 21, 2022), https://tinyurl.com/2p96hsv8 (noting that SEC enforcement action that "allege[d] that dozens of digital assets . . . are securities" "could have broad implications" and that these "[m]ajor questions are best addressed through a transparent process that engages the public to develop appropriate policy with expert input").

***No Investment Of Money Into A Common Enterprise.***  The SEC also fails to plausibly allege how secondary-market BNB transactions involved any "common enterprise" between BHL and purchasers.  Mot. 21–24.  The SEC says it alleged that BHL sold BNB directly to exchange purchasers.  Opp. 33 (citing Compl. ¶¶ 363, 388, 441).  But that mischaracterizes the Complaint.  Paragraphs 388 and 441 concern third-party tokens, and have nothing to do with BHL or BNB.  Paragraph 363 makes the conclusory statement that "issuers" of crypto tokens sell them on Binance.com, in a section *about third-party* tokens, not BNB.  The SEC devoted an entire section of the Complaint to BNB, yet notably did not allege that *BHL* sold the token on Binance.com.  Compl. ¶¶ 287–314.  The SEC "may not amend [its] complaint[] through [its] brief[] in opposition."  *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 119 n.4 (D.D.C. 2018).

Moreover, the SEC has not plausibly alleged a "common enterprise" under any test, even if vertical commonality were viable (it is not).  Strict vertical commonality considers whether the investor's and promoter's "fortunes" were intertwined, meaning whether both the investor *and* the promoter drew profits from the enterprise and shared them, and whether both likewise "shared the risk of loss."  *E.g.*, *SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1339–40 (9th Cir. 1994).  Even for the few courts that allow "broad" vertical commonality, to our knowledge none has found an investment contract without investors committing money to an ongoing enterprise.

The SEC does not explain how that standard could be satisfied here, other than its attempt to transform the common enterprise test into a "common *interest*" test, Opp. 16 (emphasis added), claiming that BHL and purchasers held the same assets and hoped they would appreciate.  But that is insufficient for a "common enterprise."  *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (per curiam).  Nor was there a shared risk of loss.  The value of BNB can continue to fluctuate regardless of the financial fortunes of BHL—much like Bitcoin, which maintains value

even though its creator's identity is a mystery.  As the SEC alleges, BNB was created on the Ethereum blockchain—which neither depends on BHL nor is under its control.  Compl. ¶¶ 287, 293.  Indeed, the SEC admits that BNB trades on other platforms.  *Id.* ¶ 305.

   ***No Reasonable Expectation Of Profits From The Efforts Of Others*.**  The SEC likewise fails to plausibly allege that BNB holders reasonably expected profits from BHL's alleged efforts. The SEC must show that "profits flow *predominantly* from the efforts of others," *Life Partners*, 87 F.3d at 548 (emphasis added), rather than market fluctuations, *see Noa*, 638 F.2d at 79, or marketing puffery.  *See* ICAN Br. 13–14.  In response, the SEC again resorts to vague musings concerning BHL's alleged ownership of BNB, Opp. 17–18, which supposedly sent a "signa[l]" that BHL would work to increase BNB's value.  But that could be said of *any* company (such as an oil producer) that holds an asset and profits when the asset appreciates in value.  Mot. 24.

   As for the SEC's alternative theory concerning BNB burns, the SEC fails to plausibly allege sufficient *post-purchase* efforts.  *Life Partners*, 87 F.3d at 548.  At most, the SEC generically pleads that BHL used "Binance's profits with respect to the Binance.com Platform" to occasionally execute burns.  Compl. ¶ 295.  The SEC's core theory is that burns were "coded into the protocol" when the entire supply of BNB was created, and the SEC alleges that BHL was otherwise involved only "at times."  Opp. 15.  Assuming those allegations as true, efforts coded into an asset necessarily occur prior to secondary-market transactions, and thus do not indicate that profits flow "predominantly" from post-sale efforts.  *Life Partners*, 87 F.3d at 538; *see* ICAN Br. 7–8.

   ***Employee Payments In BNB Do Not Constitute "Investment Contracts."***  The SEC's allegation that BNB payments to BHL employees separately constitute "investment contracts" fails

for the same reasons.[8]  The SEC fails to plead the existence of any contract between BHL and its employees obligating BHL to undertake post-sale efforts on their behalf to increase BNB's value. And the SEC's theory fails the "investment of money" element, too.  The case the SEC cites for the proposition that employees' labor constitutes an "investment of money into a common enterprise" states the opposite.  Opp. 38; *see Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 577 (10th Cir. 1991) (defendant's argument against investment contract "ignores that Lee Way's union employees did *more than merely contribute labor*") (emphasis added).

### 2.    BUSD

As for BUSD, the SEC presents no coherent argument about how a stablecoin pegged to $1 and mechanically converted into dollars on a 1:1 basis can be an "investment contract."  The agency contends that Defendants "offer[] no support for [their] position" that converting 1 BUSD into $1 is "ministerial," Opp. 40, but it is the SEC that has the burden to show (and plausibly allege) how mechanically exchanging 1 BUSD for $1 entails "entrepreneurial" effort.  *See Life Partners*, 87 F.3d at 545.  The SEC makes no effort to do so.

Unable to explain how a stablecoin designed *not* to result in profits satisfies *Howey*, the SEC argues that BUSD can be "*deploy[ed]* . . . so as to generate profits" via *other* schemes, such as the "BUSD Reward Program" or the "Binance Flexible Savings" program.  Opp. 39–40 (emphasis added).  Whether *other* programs combined with the sale of stablecoins constitute "investment contracts" is not at issue here because the SEC pleaded only that BUSD *itself* is the "investment contract" and has doubled down on that false premise in its brief.

---

[8] The SEC says that Defendants' "only challenge" to the Complaint's throwaway allegations about employee payments is the "investment of money" element, Opp. 38, ignoring that this theory also fails "for the same reasons" as the SEC's other theories concerning BNB, Mot. 20 n.5.

The SEC itself likens BUSD to "the citrus groves in *Howey*."  Opp. 39.  But the citrus groves themselves were *not* investment contracts.  Instead, the investment contracts comprised a scheme to invest money in a common enterprise to develop the orange groves and earn profits. 328 U.S. at 299–300.  Ironically, the SEC's own allegations in Count 3 illustrate the difference between a claim challenging an asset like a citrus grove (or crypto token) and a claim challenging a broader scheme that allegedly packages various assets and promises into a single investment contract.  Though deficient for other reasons, Count 3 *did* challenge Binance.com programs on the theory that they offer customers an opportunity to use tokens to earn money by pooling funds into profit-making enterprises.  The SEC's failure to do that in Count 2 confirms that the agency deliberately chose to pursue a different theory for BUSD.  The SEC is stuck with that theory for purposes of this motion to dismiss.  *See, e.g.*, *Brooks v. Weinberger*, 637 F. Supp. 22, 25 (D.D.C. 1986) (plaintiffs "are bound by" the complaint's allegations).  Indeed, even after an amicus offering a competing stablecoin incorrectly argued that Count 2 challenged the Binance.com *programs* (not BUSD itself), Circle Br. 3–4, the SEC did not (and could not) pursue a challenge to the Binance.com programs themselves, whether combined with sales of BUSD or otherwise. And the SEC's own theory—that BUSD, the "crypto asset," Opp. 41, is a security (as distinct from the "profitmaking opportunities that depend upon its purchase," *id.* at 40)—fails under *Howey*.[9]

### 3.     The Third-Party Tokens

The SEC's treatment of the third-party tokens underscores just how unmoored its approach is from text and precedent.  The SEC fails to argue that *any* third-party token was a contract with ongoing obligations that the promoters owed to the purchasers of the tokens.  The most the SEC

---

[9] Amicus's attempt to re-plead the SEC's Complaint, Circle Br. 3–4, is in any event not before the court.  *See, e.g.*, *Michel v. Anderson*, 14 F.3d 623, 625 (D.C. Cir. 1994).

alleges is that purchasers might have had the impression that third-party issuers "were financially compelled to undertake" post-sale "efforts" because the issuers also owned the tokens and had economic interests that were aligned with other holders.  Opp. 19.  Whatever that means, the Supreme Court confirmed 80 years ago that an investment contract must entail obligations "in *both* an economic *and* a legal sense."  *Joiner*, 320 U.S. at 348–49 (emphases added).

The SEC's arguments concerning the "investment of money" into "common enterprise" elements are similarly underdeveloped and conclusory.  The agency's only substantive argument is that creators and purchasers held "identical tokens whose prices rise and fall together."  Opp. 18. That cannot establish that purchasers paid for an "interest acquired . . . in an ongoing business enterprise."  *Rodriguez*, 990 F.2d at 11; *supra* at 11 (discussing why this theory fails as to BNB).[10]

### 4.      BNB Vault And Simple Earn

The SEC contends that BNB Vault and Simple Earn constitute "investment contracts" because they involve an "investment of money" and a risk of loss of that money.  The Court need not reach these arguments because the SEC's claims concerning Vault and Earn are impermissibly extraterritorial.  Mot. 39–41; *infra* at 19–23.  In any event, the SEC's arguments fail.

Although the SEC now asserts that investors could incur losses from so-called "slashing penalties," Opp. 43, the Complaint lacks any corresponding allegation.  The Complaint's slashing allegations all concern *BAM's* staking program.  Compl. ¶¶ 341, 343, 349.  Moreover, the risk of loss must be realistic rather than merely theoretical.  *See Marine Bank*, 455 U.S. at 558–59; *Gary Plastic*, 756 F.2d at 239.  The SEC never alleges that *any* slashing event has occurred with respect

---

[10] The SEC also does not rebut the argument that purchasers in blind transactions lack any reasonable expectation that someone will use their money to earn them profits.  *See* Mot. 27–28.

to Vault or Earn, nor facts suggesting that one is realistic.[11]  The SEC's contention that staking is "a complex, resource-intensive endeavor" relies on a link to Ethereum.org, which is not in the Complaint or incorporated by reference.  Opp. 41 n.2.  The SEC fails to explain how the conclusory facts actually alleged in the Complaint plausibly show that staking is more than the mechanical validation of on-chain transactions.  *Cf. Life Partners*, 87 F.3d at 546.  For Simple Earn, the SEC's even more conclusory allegations concerning unspecified efforts other than staking, Compl. ¶ 329, similarly lack any specific facts to support the SEC's claim.

### C.     The Major-Questions Doctrine Forecloses The SEC's Claims.

The SEC contends that the major-questions doctrine governs only cases involving an agency's rulemaking authority.  Opp. 45–46.  That argument fails for several reasons.  For starters, an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute."  *FEC v. Cruz*, 596 U.S. 289, 301 (2022).  Thus, the SEC cannot pursue rulemaking *or* enforcement without statutory authority.  And nothing about the securities laws provides that the definition of "security" somehow changes based on how the agency administers them.  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The Supreme Court has "forcefully rejected" the notion that "the same word, *in the same statutory provision*," can have "different meanings in different factual contexts." *United States v. Santos*, 553 U.S. 507, 522 (2008).  That is why courts have applied the major-questions doctrine in individualized adjudications having nothing to do with rulemaking, and even in suits between private parties.  *See, e.g.*, *Texas v. NRC*, 78 F.4th 827, 844 (5th Cir. 2023); *N.C. Coastal Fisheries Reform Grp. v. Captain Gaston LLC*, 76 F.4th 291, 299 (4th Cir. 2023).

---

[11] As for an investment of money, the cases the SEC cites to demonstrate the commitment of capital to an enterprise are inapposite.  *See* Opp. 42–43.  In those cases, investors relinquished money to a common investment pool but were granted a right to force the company to buy back their investment; in none did investors, as here, get back the same asset they had loaned.

Moreover, the major-questions doctrine is not just a restriction on rulemaking authority or Congress's attempts to punt quintessentially legislative decisions to the Executive Branch. First and foremost, it is a canon of statutory interpretation—a clear-statement rule, cautioning courts against allowing dramatic expansions of agency power without express permission from Congress. *E.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Yet here the SEC seeks to wrest "a matter of 'earnest and profound debate'" from Congress's hands. *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023).[12]

The SEC next argues that Congress "could reasonably be seen to have granted to the SEC" the claimed authority, since the SEC invokes its flagship statute, rather than an "ancillary" or little-used provision. Opp. 48. But the doctrine applies equally where, as here, an agency applies a flagship statute in a new way. *NFIB*, 595 U.S. at 117–18. Indeed, the "lack of historical precedent" for the SEC's current approach "is a 'telling indication'" that the agency is beyond the envelope of its statutory authority. *Id.* at 119.

The SEC's portrayal of the stakes here as a single "civil enforcement action" similarly fails. Opp. 47. Agencies can make policy either through rulemaking or enforcement. *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947). Accordingly, the relevant question here is not just the economic ramifications of *this* action (though they are very large), but also the knock-on effects of the SEC's novel position. *Merck & Co. v. HHS*, 962 F.3d 531, 541 (D.C. Cir. 2020). The SEC's plain goal is to secure a decision that crypto tokens—with the possible and unexplained exception of Bitcoin—are "investment contracts," a result with massive implications, which increase exponentially due to the SEC's inability to distinguish real estate or commodities. The potential

---

[12] The SEC asserts that pending legislative proposals have no relevance, Opp. 46, a position that defies Supreme Court precedent. *See, e.g.*, *Nebraska*, 143 S. Ct. at 2373 & n.8 (noting "discussion" in "the halls of Congress"); *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) (similar).

fallout is why multiple amici have appeared here and in similar litigation on both sides of the issue. *See* Dkts. 50, 53, 55, 60, 62, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. Aug. 2023).

Thus, the major-questions doctrine applies here and requires clear authorization in the statutory text. The SEC's only response is that its new policy is "embodied in the securities laws." Opp. 45. That is obviously circular—an agency cannot avoid a major-questions problem simply by positing that the statute already says what the agency wishes it to say. And the SEC fails even to attempt a textual argument. Instead, the agency decries the very idea that it might need textual authorization. Opp. 26–27 (mocking "the words"). The SEC's argument that the statutes *implicitly* contain express authorization makes no sense either. The whole point of the major-questions doctrine is to require agencies to show that Congress enacted clear statutory authorization in the text itself. *West Virginia*, 142 S. Ct. at 2609. Nor does the SEC dispute that, without its novel theory of what constitutes an "investment contract," the vast majority of its claims fail.

## II.     The SEC's BNB Offering Claim Is Time-Barred.   (Remainder Of Count 1)

As for the claim regarding the BNB Offering, the SEC argues that the limitations periods *still* have not started because BHL "is located outside of the United States." Opp. 37. But the SEC itself says that BHL has engaged in sufficient activities "within the United States" to be sued here and for U.S. securities laws to apply. Compl. ¶ 24; Opp. 61. Coupled with its overbroad definition of "domestic conduct," *infra* at 23, the SEC's interpretation of the limitations periods would allow it to pursue penalties against foreign companies engaged in foreign transactions without *any* temporal limitation. Such infinite liability has long been disfavored. *Wilson v. Garcia*, 471 U.S. 261, 271 (1985). The SEC cannot have it both ways. Either the Offering occurred outside the United States, such that the SEC's claim is extraterritorial, or it is untimely.

Nor does the SEC's request for injunctive relief save its claims. Opp. 37. The SEC lacks authority to seek an injunction unless it alleges that a defendant "is engaged or is about to engage

in acts or practices constituting a violation" of the securities laws.  15 U.S.C. § 78u(d)(1).  There

is no allegation that the Offering is ongoing or will imminently recur.  *See SEC v. Globus Grp.,*

*Inc.*, 117 F. Supp. 2d 1345, 1347 (S.D. Fla. 2000) (denying injunction absent evidence indicating

likelihood of future violations).

III.   **The Claims Regarding Binance.com Transactions (Including BNB Vault And Simple**
       **Earn) And The BNB Offering Are Impermissibly Extraterritorial.   (Foreign**
       **Components Of Counts 1–2 & All Of Counts 3, 5–7, & 11)**

   A.   **The SEC's Arguments Impermissibly Extend The Securities Laws Overseas.**

The SEC makes no attempt to argue that the securities laws apply beyond U.S. borders,

instead arguing that the Complaint alleges "domestic violations" of those statutes.  Opp. 61.  As

the SEC sees it, if U.S. investors knowingly engage in online transactions with a global website,

that is a "domestic" violation of the securities laws "regardless of where . . . a 'transaction'

ultimately occurs."  *Id.*  But the Supreme Court has repeatedly rejected such expansive conceptions

of "domestic" conduct because they would render the presumption against extraterritoriality a

"muzzled Chihuahua."  *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 426 (2023).

The presumption does not retreat simply because "particular 'effects are likely to occur in the

United States.'"  *Id.*  The SEC's theory has been consistently rejected by courts and would

impermissibly extend U.S. law wherever U.S. consumers go (on the internet or otherwise).  *See,*

*e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012); ICAN

Br. 3–4.  Consider the SEC's theory as applied to the London Stock Exchange.  Americans might

direct their brokers or investment advisers to transact on the London Stock Exchange, whose

website is freely accessible to U.S. persons, but that does not make the exchange subject to the

U.S. securities laws.

In response, the SEC attacks a strawman.  Defendants have not argued that the SEC can

regulate only companies that are incorporated or have their principal place of business in the

United States.  Opp. 69.  The point is that the SEC "must establish that the conduct relevant to the statute's focus occurred in the United States."  *Abitron*, 600 U.S. at 418 (emphasis, quotation marks, and citation omitted).  And "the focus" of the securities laws is "purchases and sales of securities in the United States," *i.e.*, "domestic *transactions*."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266–68 (2010) (emphasis added).  The test for whether a transaction is domestic turns on the location where "irrevocable liability was incurred" or "title was transferred."  *Absolute Activist*, 677 F.3d at 67–68.  The SEC has not met this test.  *See* Mot. 39–41.

**B.    The SEC's Preferred Test Was Rejected In *Morrison*.**

The SEC's proposed test, by contrast, ignores *Morrison* and *Abitron* and instead asks vaguely whether defendants engage in "pervasive U.S.-focused conduct," Opp. 60, activity "directed to the United States," *id.* at 62, activity that "create[s] or facilitate[s] a market for securities in the United States," *id.* at 61, or securities-related functions "with U.S. investors," *id.* at 63 (emphasis omitted).  In other words, the SEC asks the Court to apply something like the "'conduct' and 'effects' tes[t]" that was specifically rejected in *Morrison*.  561 U.S. at 257–59. Indeed, the SEC relies heavily on a case that *Morrison* abrogated.  Opp. 61–62; *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998), *abrogated by Morrison*, 561 U.S. at 258.

The SEC also is wrong to claim that "the registration provisions" at issue here are not transaction-focused.  Opp. 61.  *Morrison* held that "the focus" of both Acts *as a whole* is on "domestic transactions."  561 U.S. at 266–68.  The Court cited (among other provisions) the Exchange Act's "registration requirements" and Section 5 of the Securities Act, and observed that the Acts form a "comprehensive regulation of securities *trading*."  *Id.* at 266–69 (emphasis added). Accordingly, courts have correctly applied *Morrison*'s "transactional test," *id.* at 269–70, to provisions in the securities laws other than Section 10(b) of the Exchange Act.  *See Schentag v.*

*Nebgen*, 2018 WL 3104092, at \*5, \*10–13 (S.D.N.Y. June 21, 2018) (Section 5 of the Securities Act); *SEC v. Benger*, 934 F. Supp. 2d 1008, 1013 (N.D. Ill. 2013) (15 U.S.C. § 78o).[13]

The SEC mainly relies on its own statements.  Opp. 60–64.  But agency pronouncements are irrelevant in this context because courts do not defer to agency positions that would give a statute extraterritorial reach unless Congress gave an "affirmative indication that the statute applies extraterritorially."  *Garvey v. ARB*, 56 F.4th 110, 121–23 (D.C. Cir. 2022).  Nor do they help the SEC on their own terms.  The SEC relies on Regulation S to argue that Section 5 applies to any offers and sales "directed to the United States—*i.e.*, to U.S. investors."  Opp. 62.  But *Morrison* itself cited Regulation S in concluding that the "focus on domestic transactions is evident in the Securities Act."  561 U.S. at 268–69 (citing 17 C.F.R. § 230.901).  Moreover, Regulation S merely establishes "safe harbors."  *Commodity Traders*, 147 F.3d at 124.  It does not purport to delineate the *exclusive* conditions under which an offer or sale is foreign.  *See id.* at 125.[14]

The SEC also relies on *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018), but that copyright case is not probative of the focus or scope of securities laws under *Morrison*.  Many of the SEC's other cases are likewise not about the laws at issue here.  *See*

---

[13] The SEC states that an "offer of securities . . . does not require a *completed* transaction," Opp. 62 (emphasis altered), but the securities laws confirm that an offer is a type of transaction, *see, e.g.*, 15 U.S.C. § 77d(a)(6) (referring to "transactions involving the offer or sale of securities by an issuer").  For these transactions, the relevant question is whether the offer was made "in" or "from" the United States.  *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (offer was domestic because it was allegedly made "in and from New York City") (citing *Morrison*, 561 U.S. at 269–70).  The SEC does not plausibly allege that any offers at issue here—including the BNB Offering—were made in or from the United States.  Mot. 39–41; *infra* at 22.

[14] The SEC also cites a pair of agency statements in arguing that foreign broker-dealers that have "contacts" with "'the U.S. securities markets or a U.S. investor in the United States'" must register under the Exchange Act.  Opp. 63.  But one of these statements specifically refers to "*transaction*-oriented contact[s]," 54 Fed. Reg. 30,013, 30,015 n.20 (July 18, 1989) (emphasis added), and the other likewise refers to "securities *transactions*," 63 Fed. Reg. 14,806, 14,812 (Mar. 27, 1998) (emphasis added).

*Lay v. United States*, 623 F. App'x 790, 795 (6th Cir. 2015) (Section 206 of the Investment Advisers Act); *SEC v. Gruss*, 859 F. Supp. 2d 653, 661 (S.D.N.Y. 2012) (same); *Barron v. Helbiz, Inc.*, 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021) (New York state-law claims). And the SEC's lone case that discussed a securities law (15 U.S.C. § 78o) predates *Morrison*, *did* focus on a defendant's "transactions," and involved an exemption under a provision not at issue here. *UBS Asset Mgmt. (N.Y.) Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66, 70 (S.D.N.Y. 1996).

      **C.**      **The SEC Has Not Plausibly Alleged Domestic Violations.**

Because *Morrison*'s transactional test applies to all of the statutory provisions at issue here, the proper inquiry is whether "irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist*, 677 F.3d at 68.[15]

Allegations regarding solicitation of U.S. users, the presence of U.S. bank accounts, and instrumentalities of interstate commerce are insufficient to plead that irrevocable liability was incurred or title was transferred in the United States. Mot. 40–41.[16] As for BHL's alleged use of "U.S. high-volume traders to maintain liquidity on the platform," Opp. 60, a trader's residency "does not affect whether the transaction was foreign or domestic," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014), and the increased "liquidity" is alleged only to have "encouraged other investors to trade on the platform," Compl. ¶ 109.

---

[15] Contrary to the SEC's argument that "the motion to dismiss stage is not the place to resolve" extraterritoriality, Opp. 66, the Supreme Court often resolves claims on extraterritoriality grounds at this stage, *see Morrison*, 561 U.S. at 265; *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016).

[16] Contrary to the SEC's arguments in a "Notice of Supplemental Authority," ECF No. 188, Defendants' admissions in recent plea agreements do not alter this analysis (nor the analysis of fair notice, *see infra* at 23, or personal jurisdiction, *see infra* at 24, for the reasons set forth in Defendants' Response to the SEC's Notice of Supplemental Authority, ECF No. 189.

The SEC erroneously contends that the "irrevocable liability standard" is "satisfied here" based on cases involving transactions that *did* occur in the United States.  Opp. 66.  For example, in *Giunta* a buyer committed to transactions during conversations with the seller in the United States.  893 F.3d 73, 76 (2d Cir. 2018); *see also United States v. Vilar*, 729 F.3d 62, 77–78 (2d Cir. 2013) (one set of investors "committed to the investment while in Puerto Rico" and the other investor "irrevocably committed . . . in New York").  Other cases are similarly inapposite.  *See SEC v. Glob. Inv. Strategy UK Ltd.*, 2021 WL 4896127, at *7 (S.D.N.Y. Oct. 19, 2021) (dealing with "U.S. purchasers acquiring U.S. securities in the United States" via U.S.-registered broker-dealers); *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 63 (2d Cir. 2018) (defendant did not dispute that derivatives trades were matched in the United States).

More broadly, the SEC's allegations regarding Binance.com (including BNB Vault and Simple Earn) and the BNB Offering fail to satisfy *any* sensible definition of "domestic conduct." The SEC argues it can regulate any "crypto asset trading platform" that is made "available all over the world via the internet."  Opp. 59–60.  The Supreme Court has consistently and forcefully rejected such conceptions of the reach of domestic law, because "'United States law . . . does not rule the world.'"  *Abitron*, 600 U.S. at 428 (citation omitted).[17]

## IV.   The SEC's Failure To Provide Fair Notice Compels Dismissal.  (All Counts)

The SEC argues that its failure to provide notice is *irrelevant* to the case, arguing that defendants are not entitled to fair notice of an "'agency's interpretation of the statute.'"  Opp. 51.

---

[17] The SEC does not dispute its failure to allege transactions that were *predominantly* domestic, which independently bars its claims.  Opp. 68; Mot. 38, 41.  Instead, the SEC halfheartedly contends that the "predominantly foreign" test "has no bearing" in "an SEC enforcement action," without explaining why the applicability of U.S. law to a foreign defendant would turn on the name of the plaintiff.  And at least one court has applied the test in an SEC enforcement action.  *See SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at *14 (S.D.N.Y. Mar. 11, 2022).

But in the D.C. Circuit, it is "Rule of Law 101" that an agency "violate[s] due process" where it attempts to "retroactively appl[y]" its "new . . . interpretation of [a] statute" in an enforcement proceeding. *PHH Corp. v. CFPB*, 839 F.3d 1, 46–48 (D.C. Cir. 2016), *reinstated in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc).

Next, the SEC contends that its inaction is irrelevant to fair notice, Opp. 51, but that argument is similarly foreclosed. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157–58 (2012); Mot. 43. The SEC's first guidance—a 2017 report—post-dated the BNB Offering, Compl. ¶¶ 78, 81, and an SEC official declared in a 2018 speech that a "token . . . all by itself is not a security," Mot. Appx. tbl. A line 2, which flatly contradicts the agency's new theory.[18]

The SEC also argues that Defendants had notice due to alleged statements by a BHL officer and outside consultant in late 2018. Opp. 52. These allegations are irrelevant because the fair-notice inquiry is "objective." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303 (D.C. Cir. 2023). Moreover, they occurred well after the 2017 BNB Offering. Compl. ¶¶ 110–40.

## V.   The Complaint Fails To Adequately Allege Personal Jurisdiction As To Mr. Zhao. (Counts 11 and 12)

All claims against Mr. Zhao should also be dismissed for lack of personal jurisdiction. *First*, the SEC concedes that control person status cannot alone support personal jurisdiction. Opp. 71. Rather, citing only to *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016), the SEC seeks to impute the contacts of Binance and BAM to Mr. Zhao. But in this Circuit, a corporation's contacts may *not* be imputed to an affiliated entity unless the parties

---

[18] Nor can the SEC manufacture fair notice from one-off enforcement actions targeting different crypto transactions. Opp. 50. These enforcement actions are themselves "inconsistent," *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *15 n.20 (S.D.N.Y. July 13, 2023), and the SEC only recently (and well after the BNB Offering) brought enforcement actions premised on its new view that virtually all crypto assets are investment contracts, Mot. 9; *see also id.* at 34 n.12.

are "alter egos," *Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28, 41 (D.D.C. 2012), which the SEC has not alleged here.

*Second*, the SEC points to Mr. Zhao's purported involvement in "operating two unregistered exchanges, broker-dealers, and clearing agencies targeting U.S. investors."  Opp. 72. This merely repackages control person allegations that the SEC concedes are insufficient to support specific personal jurisdiction.  *See* Mot. 44.  The SEC also offered no response on its failure to distinguish between Mr. Zhao and Binance, when each defendant's contacts with the forum must be assessed individually.  *See id.* at 43 (citing cases).

*Finally*, the SEC failed to allege any direct, suit-related contact between Mr. Zhao and purported U.S. users.  *See Mazza*, 852 F. Supp. 2d at 40 (corporate parent setting subsidiary's "revenue targets" and "strategies" was insufficient to support personal jurisdiction).  The SEC's attempt to analogize to *SEC v. Terraform Labs Pte Ltd.*, 2022 WL 2066414, at *3 (2d Cir. June 8, 2022), likewise fails.  There, the court found that the defendants availed themselves of the forum by personally taking business trips to the United States and retaining U.S.-based employees whose sole duty was to solicit investment in the United States—none of which is alleged here.  *Id.*  And even if the Complaint had adequately alleged "purposeful[] avail[ment]" of the United States, it nonetheless fails to allege sufficient "suit-related" contacts of Mr. Zhao personally that created a "substantial connection" with the forum.  *Walden v. Fiore*, 571 U.S. 277, 283–84 & n.6 (2014).

## Conclusion

The SEC's claims against BHL and Mr. Zhao should be dismissed with prejudice.

Dated:  December 12, 2023

Respectfully submitted,


 */s/ Daniel W. Nelson*

Daniel W. Nelson (D.C. Bar #433415)
Jason J. Mendro (D.C. Bar #482040)
Stephanie Brooker (*pro hac vice*)
M. Kendall Day (*pro hac vice*)
Richard W. Grime (*pro hac vice*)
Amy Feagles (*pro hac vice*)
Matt Gregory (D.C. Bar #1033813)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
Fax: (202) 467-0539
dnelson@gibsondunn.com
jmendro@gibsondunn.com
sbrooker@gibsondunn.com
kday@gibsondunn.com
rgrime@gibsondunn.com
afeagles@gibsondunn.com
mgregory@gibsondunn.com

*Attorneys for Defendant Binance Holdings
Limited*

  /s/ Abid R. Qureshi
Abid R. Qureshi (D.C. Bar No. 459227)
William R. Baker, III (D.C. Bar No. 383944)
Eric S. Volkman (D.C. Bar No. 490999)
Michael E. Bern (D.C. Bar No. 994791)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
abid.qureshi@lw.com
william.baker@lw.com
eric.volkman@lw.com
michael.bern@lw.com

Douglas K. Yatter (*pro hac vice*)
Benjamin Naftalis (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
douglas.yatter@lw.com
benjamin.naftalis@lw.com

Heather A. Waller (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
heather.waller@lw.com

Melanie M. Blunschi (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: (415) 391-0600
Fax: (415) 395-8095
melanie.blunschi@lw.com

*Attorneys for Defendant Changpeng Zhao*