## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS INC.,
AND CHANGPENG ZHAO,

Defendants.

**No. 1:23-cv-01599-ABJ-ZMF**

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS BAM TRADING SERVICES INC. AND BAM MANAGEMENT US
## HOLDINGS INC.'S MOTION TO DISMISS

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ................................................. 1

**I.    THE SEC FAILS TO ALLEGE ANY OF THE PRODUCTS ARE SECURITIES.**... 6

    A.    The SEC Was Required to Plead the Existence of a Contract. .............................. 6

        1.    The SEC Admits *Howey* Was Premised on a Contract………….……………8

        2.    The Term "Scheme" in *Howey* Does Not Magically Remove the "Contract" Requirement of "Investment Contract."………………..………….………10

    B.    Even if an Investment Contract Did Not Require a Contract (Which It Does), the SEC Fails to Plead the Elements of *Howey*. ........................................ 11

        1.    The SEC Fails to Plead that Purchasers of Digital Assets on BAM's Platform Invested Money into a "Common Enterprise."………………..………………11

        2.    The SEC Concedes "Post-Purchase Efforts" Are Necessary but Fails to Plead Any Such Efforts by BAM………………..………………….……………13

    C.    The Staking Claim Must be Dismissed. ................................................. 16

    D.    The Major Questions Doctrine Precludes SEC Action. ............................ 18

**II.   THE SEC FAILS TO STATE CLAIM UNDER SECTION 17(A).** .......................... 19

    A.    The SEC States No Claim of Fraud against BAM's Customers. .......................... 22

    B.    The SEC States No Claim of Fraud against Equity Investors in BAM. ............... 24

**CONCLUSION** ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Trade of City of Chicago v. SEC*,
    677 F.2d 1137 (7th Cir. 1982) ...................................................................................4

*Brink v. Raymond James & Assocs., Inc.*,
    892 F.3d 1142 (11th Cir. 2018) ..............................................................................23

*CFTC v. McDonnell*,
    287 F. Supp. 3d 213 (E.D.N.Y. 2018) .....................................................................5

*Chicago Mercantile Exch. v. SEC*,
    883 F.2d 537 (7th Cir. 1989) ...................................................................................4

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)....................................................................20

*Deckebach v. La Vida Charters, Inc. of Fla.*,
    867 F.2d 278 (6th Cir. 1989) .................................................................................13

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...............................................................................................18

*Friel v. Dapper Labs*,
    2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023).......................................................15

*Gregory v. ProNAi Therapeutics Inc.*,
    757 F. App'x 35 (2d Cir. 2018) .............................................................................25

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ...............................................................................10

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ....................................................................................23

*In re Bed Bath & Beyond Corp. Sec. Litig.*,
    2023 WL 4824734 (D.D.C. July 27, 2023).............................................................23

*In re Citigroup Sec. Litig.*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .......................................................19

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).....................................................................................22

*In re Xcel Energy, Inc.*,
 286 F. Supp. 2d 1047 (D. Minn. 2003) ...................................................................22

*Lorenzo v. SEC*,
 139 S. Ct. 1094 (2019) ...........................................................................................23

*Malouf v. SEC*,
 933 F.3d 1248 (10th Cir. 2019) .............................................................................23

*Masters v. GlaxoSmithKline*,
 271 F. App'x 46 (2d Cir. 2008) .............................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015) ...............................................................................................20

*Parnes v. Gateway 2000, Inc.*,
 122 F.3d 539 (8th Cir. 1997) .................................................................................24

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
 845 F.3d 1268 (9th Cir. 2017) ...............................................................................19

*Revak v. SEC Realty Corp.*,
 18 F.3d 81 (2d Cir. 1994) ................................................................................12, 13

*Rockies Fund, Inc. v. SEC*,
 428 F.3d 1088 (D.C. Cir. 2005) .............................................................................20

*Rollins v. Wackenhut Servs., Inc.*,
 703 F.3d 122 (D.C. Cir. 2012) ...............................................................................25

*Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
 682 F.2d 459 (3d Cir. 1982) ..................................................................................13

*SEC v. Banner Fund Int'l*,
 211 F.3d 602 (D.C. Cir. 2000) .................................................................................9

*SEC v. C. M. Joiner Leasing Corp.*,
 320 U.S. 344 (1943) .................................................................................................9

*SEC v. Digital Licensing Inc d/b/a Debt Box*,
 No. 23-cv-00482-RJS-DBP (D. Utah Nov. 30, 2023) .............................................5

*SEC v. Edwards*,
 540 U.S 389 (2004) ................................................................................................10

*SEC v. Goble*,
 682 F.3d 934 (11th Cir. 2012) ...............................................................................23

*SEC v. Int'l Loan Network, Inc.*,
  770 F. Supp. 678 (D.D.C. 1991), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992)...............................13

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020)....................................................................................12

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) ..........................................................................................13, 17

*SEC v. Payward*,
  23 Civ. 6003 (N.D. Cal. Nov. 20, 2023) ...............................................................................18

*SEC v. Rio Tinto*
  *plc*, 41 F.4th 47 (2d Cir. 2022).............................................................................................23

*SEC v. Ripple Labs, Inc.*,
  2022 WL 2705396 (S.D.N.Y. July 12, 2022) ..........................................................................5

*SEC v. Ripple Labs, Inc.*,
  2023 WL 4507900 (S.D.N.Y. July 13, 2023) .............................................................10, 14, 15

*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017).............................................................................19, 21, 22, 23

*SEC v. Rubera*,
  350 F.3d 1084 (9th Cir. 2003) ...............................................................................................16

*SEC v. Terraform Labs Pte., Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) ....................................................................10, 14

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)......................................................................................................... *passim*

*SEC v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017)....................................................................................22

*SEC v. Winemaster*,
  529 F. Supp. 3d 880 (N.D. Ill. 2021) .....................................................................................23

*State v. Gopher Tire & Rubber Co.*,
  177 N.W. 937 (Minn. 1920).....................................................................................................7

*State v. Heath*,
  153 S.E. 855 (N.C. 1930).........................................................................................................7

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
  2020 WL 686009 (D.D.C. Feb. 11, 2020) ..............................................................................22

*United States v. Bowdoin*,
    770 F. Supp. 2d 142 (D.D.C. 2011) ...................................................................17

*United States v. Coscia*,
    177 F. Supp. 3d 1087 (N.D. Ill. 2016) ...............................................................22

*United States v. Naftalin*,
    441 U.S. 768 (1979) ...........................................................................................23

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ......................................................................20, 21

*Wals v. Fox Hills Dev. Corp.*,
    24 F.3d 1016 (7th Cir. 1994) .............................................................................13

*Williams v. Taylor*,
    529 U.S. 362 (2000) .............................................................................................6

**Statutes**

7 U.S.C. § 2(a)(1)(H) ...............................................................................................3

7 U.S.C. § 2(c)(2)(D)(i)(II) .......................................................................................3

7 U.S.C. § 9 ..............................................................................................................3

7 U.S.C. § 9(1)(A) ....................................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376–
    2223 (2010) .........................................................................................................3

Securities Act, 5 U.S.C. §§ 77a-77aa (2018) ........................................................12

Wash. Rev. Code Ann. § 19.230.370 ........................................................................2

**Rules**

Fed. R. Civ. P. Rule 9(b) ...............................................................................*passim*

Fed. R. Civ. P. Rule 12(b)(6) ..................................................................................25

**Regulations**

17 C.F.R. § 180.1 ......................................................................................................3

17 C.F.R. § 240.17a-2 .............................................................................................25

17 C.F.R. § 240.17a-3 .......................................................................................23, 25

**Other Authorities**

Brief for the *Amici Curiae* DeFi Education Fund, *SEC v. Coinbase, Inc.*, No. 23-cv-04738-KPF (S.D.N.Y. Aug. 11, 2023) .............................................................16

Brief for the *Amici Curiae* Securities Law Scholars, *SEC v. Coinbase, Inc.*, No. 23-cv-04738-KPF (S.D.N.Y. Aug. 11, 2023).............................................................7

Brief for the SEC, *SEC v. W.J. Howey Co.*, No. 843, 1946 WL 50582 (U.S. Apr. 17, 1946) ...........................................................................................................8

Brief for the SEC, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455, (U.S. June 26, 2003) ...........................................................................................................8

CFTC, *Security Futures Products Overview* (Jan. 13, 2015) ........................................5

Digital Asset Market Structure and Investor Protection Act, H.R. 5745, 118th Cong. (2023) ...........................................................................................................4

FinCEN, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* (May 9, 2019) ........................................2

FinCEN, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013)........................................2

Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021)...............18

*In re: Coinbase Inc.*, 23-1779 (3d Cir. 2023) ...........................................................................................18

*In the Matter of Coinbase Inc.*, CFTC Docket No. 21-03 (Mar. 19, 2021) ...................................................................3

*In the Matter of Jeremy Rounsville*, CFTC Docket No. 23-02 (Nov. 3, 2022) ...................................................................3

*In the Matter of Randy Craig Levine*, CFTC Docket No. 23-31 (July 6, 2023) ...................................................................3

Katanga Johnson, *U.S. SEC Chair Gensler calls on Congress to help rein in crypto "Wild West"*, Reuters (Aug. 3, 2021).............................................................18

Keep Innovation in America Act, H.R. 1414, 118th Cong. (2023) ...............................5

Letter for Respondent SEC, *In re: Coinbase Inc.*, 23-1779 (3d Cir. Nov. 21, 2023)...................18

Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023)...........................................................................................................4

Pennsylvania Department of Banking and Securities, *Money Transmitter Act Guidance for Virtual Currency Businesses* (Jan. 23, 2019)......................................................2

SEC Dir. Div. of Corp. Fin. William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) .................................................................5

Tr. of Oral Arg. at 55:17-24, *Terraform Labs*, No. 23 Civ. 1346 (S.D.N.Y. June 15, 2023) ......................................................................................................................15

Virginia Bureau of Financial Institutions, *Notice to Virginia Residents Regarding Virtual Currency* (Aug. 25, 2021)..................................................................................2

Washington Department of Financial Institutions, *Industry Guidance for Virtual Currency, Cryptocurrency, and Digital Assets* (May 13, 2023)..................................2

The Securities and Exchange Commission ("SEC") seeks regulatory jurisdiction over virtual commodities that Congress has not conferred on it. To accomplish this, the SEC in its Response to BAM Trading's and BAM Management's (collectively "BAM") Motion to Dismiss ("Resp.") argues that this Court should remove the word "contract" from the legislative limitation on its jurisdiction as dictated by the law's inclusion of the term "investment contract" and ignore the Supreme Court's well-established, three-prong test for identifying an investment contract, set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). As BAM set forth in its Memorandum of Law in Support of Their Motion to Dismiss ("MTD"), the SEC has not adequately alleged that the Digital Asset transactions on BAM's platform constitute investment contracts. As a result, BAM has not violated any of the securities laws. Moreover, even if there is ambiguity about how to apply the term "investment contract" to digital assets, such a major question should be addressed by Congress and not by a court, a separation of powers proven necessary by the SEC's own history of territorial aggrandizement.

## PRELIMINARY STATEMENT

The SEC argues that Congress enacted the securities laws in the 1930s to provide the SEC such flexibility that it would have jurisdiction over every potential financial asset, despite Congress's use of precise words with crystallized meaning that concretely limited the SEC's reach. The only way to apply the securities laws to the Digital Assets[1] on BAM's platform is to ignore the word "contract" in the term "investment contract," a term deliberately included by Congress to define and limit the SEC's jurisdiction. That language has a clear meaning, and the Supreme Court has been clear that this Court cannot ignore it.

---

[1] Where capitalized, "Digital Assets" refers collectively to the twelve assets offered on BAM's platform that are alleged by the SEC to be investment contracts (BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI). *See* MTD at 7.

The SEC also urges this Court to ignore the other agencies that already have jurisdiction over the very digital asset transactions at issue in this case. Resp. at 40. BAM obtained a license as a money services business with the Financial Crimes Enforcement Network of the US Department of Treasury ("FinCEN") and as a money transmitter in each of 43 states and territories requiring it where it conducted business. Compl. ¶ 29. Unlike the SEC's approach to the digital asset space, FinCEN[2] and state regulators[3] have each issued guidance explaining the applicability of their regulatory regimes to virtual currency transmission.[4] Additionally, BAM has previously acknowledged that it must follow the guidelines set forth by the Commodity Futures Trading Commission ("CFTC") to cover the sale of commodities. MTD Ex. 1.[5] The SEC wrongly believes it can unilaterally ignore the existing regulation of Digital Assets and Digital Assets transactions in the United States.

The SEC protests that the only issue here is whether digital assets are securities and urges the Court to ignore the ramifications on the jurisdiction of the CFTC and other federal (and state)

---

[2] *See, e.g.*, FinCEN, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019); FinCEN, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 (Mar. 18, 2013).

[3] *See, e.g.,* Washington Department of Financial Institutions, *Industry Guidance for Virtual Currency, Cryptocurrency, and Digital Assets* (May 13, 2023); Virginia Bureau of Financial Institutions, *Notice to Virginia Residents Regarding Virtual Currency* (Aug. 25, 2021); Pennsylvania Department of Banking and Securities, *Money Transmitter Act Guidance for Virtual Currency Businesses* (Jan. 23, 2019).

[4] Pursuant to its money transmitter licenses, BAM is subject to, and follows, robust customer disclosure requirements. *See, e.g.,* Wash. Rev. Code Ann. § 19.230.370 (requiring virtual currency licensees to disclose: "[a] schedule of fees the licensee may assess on a transaction"; "whether the product or service provided is insured or guaranteed by an agency of the United States"; "[a] notice that the transfer of virtual currency or digital units is irrevocable"; "a notice describing the licensee's liability for unauthorized, mistaken, or accidental transfers").

[5] Indeed, the non-BAM Defendants recently settled various actions with the Department of Justice, CFTC, and FinCEN. *See* Dkt. 188 (Dec. 8, 2023). The BAM Defendants were not a defendant in any of those actions or settlements.

regulators. Resp. 41. But if digital assets are "securities," then the CFTC loses its own regulatory and enforcement authority in numerous contexts. In 2010, Congress adopted the Dodd-Frank Wall Street Reform and Consumer Protection Act which significantly expanded the CFTC's enforcement authority over swap transactions and fraud in the sale of commodities.[6] However, Congress specifically excluded "any security" from the CFTC's expanded jurisdiction[7] — enforcement authority that the CFTC has repeatedly used against fraud in the sale of digital assets.[8] The SEC's position would limit the CFTC's jurisdiction over digital assets in other contexts as well.[9]

Regrettably, this is not the first time the SEC has inappropriately attempted to seize the jurisdiction of the CFTC. As just one example from a different but analogous context, in 1981, after the CFTC exercised regulatory authority over a then innovative product by authorizing the Chicago Board of Trade ("CBOT") (a futures exchange) to offer futures on Government National Mortgage Association certificates, the SEC authorized the Chicago Board of Options Exchange (a securities exchange) to trade options on the same instrument despite the CFTC's "exclusive jurisdiction" over such products. In subsequent litigation, the court rebuked the SEC and found

---

[6] 7 U.S.C. § 9 (prohibiting fraud in sale of any commodity in interstate commerce); 17 C.F.R. § 180.1 (adopting regulation to prohibit fraud in sale of commodities); *see also id.* § 1.6 (adopting rules prohibiting willful evasion of CFTC authority).

[7] 7 U.S.C. § 2(a)(1)(H).

[8] *See, e.g.*, *In the Matter of Coinbase Inc.*, CFTC Docket No. 21-03 (Mar. 19, 2021) (liability under § 9(1)(A) for wash trading in digital assets by former employee); *In the Matter of Randy Craig Levine*, CFTC Docket No. 23-31 (July 6, 2023) (liability under § 9(1)(A) for deceptive and fraudulent scheme to induce investors to send money to purchase digital assets); *In the Matter of Jeremy Rounsville*, CFTC Docket No. 23-02 (Nov. 3, 2022) (liability under § 9(1)(A) for individual's participation "in a scheme to solicit customers for the alleged managed trading virtual currencies").

[9] When leveraged digital asset transactions in such assets are offered to retail participants, the CFTC has full regulatory authority to require entities to register with the CFTC, as such transactions are economically similar to futures transactions. *See* 7 U.S.C. § 2(c)(2)(D)(i)(II).

that options on the certificates fell within the CFTC's "exclusive jurisdiction" because they "ha[d] the character of a legitimate commodity derivative" and "Congress quite clearly intended to create one federal agency with the expertise to regulate the commodities industry." *Bd. of Trade of City of Chicago v. SEC*, 677 F.2d 1137, 1159 (7th Cir. 1982) (internal citations omitted). A few years later when the SEC again sought to extend jurisdiction over another novel instrument – index participations (effectively perpetual future contracts based on the value of a basket of securities) – courts again rejected the SEC's bold attempt to seize control of that market because of the exclusive jurisdiction of the CFTC. *See Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 550 (7th Cir. 1989).

The ultimate resolution of those disputes is instructive here – concurrently with being rebuked by the courts, the SEC and CFTC proposed jurisdictional solutions, recognized they did not have the authority to implement those solutions, reached an agreement, proposed agreed legislation to Congress and Congress then enacted appropriate legislation. Judge Campbell correctly concluded that proposed joint legislation to Congress "could and should have been pursued at the inception of this controversy." *See Bd. of Trade of City of Chicago v. SEC*, 677 F.2d 1137, 1167 (7th Cir. 1982) (Campbell, W., concurring). Nearly 40 years ago, the courts, the SEC, and the CFTC recognized that only Congress could determine the major questions at issue (without using the phrase) to resolve their jurisdictional disputes. *Id.* ("The proper authority to resolve this matter is, of course, Congress.").

Accepting the SEC's theory would allow the SEC to impose its unbounded view of its jurisdiction and frustrate Congress's nascent but incomplete efforts to develop a comprehensive framework for digital assets. *See, e.g.*, Digital Asset Market Structure and Investor Protection Act, H.R. 5745, 118th Cong. (2023); Lummis-Gillibrand Responsible Financial Innovation Act, S.

4

2281, 118th Cong. (2023); Keep Innovation in America Act, H.R. 1414, 118th Cong. (2023). "Congress has yet to authorize a system to regulate virtual currency," and the overlapping claims of authority by numerous regulators are "incomplete." *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 220-21 (E.D.N.Y. 2018). The Digital Assets sold on BAM are strings of computer code and, like the virtual currencies at issue in *McDonnell*, "fall well-within the common definition of 'commodity.'" *Id.* at 228. Assets that fall under the definition of commodities may be regulated by the SEC only when they have characteristics that make them securities, otherwise the SEC necessarily seizes jurisdiction that Congress has allocated to the CFTC. The SEC offers inadequate and shifting guidance for why digital assets are investment contracts in certain contexts but not others and for how secondary market transactions of digital assets can be investment contracts.[10] The SEC even seeks to extend "investment contract" to the provision of IT services to facilitate customers staking their own digital assets, ignoring both the words "investment" and "contract."

In addition, the SEC seems determined to destroy BAM even before the Court can rule on any of the significant questions presented by the case. A single day after filing the Complaint, the SEC brought an "emergency" TRO to shut down BAM entirely. *See* Dkt. 4.[11] The SEC's

---

[10] Until recently, the SEC acknowledged that a particular digital asset may be the subject of an investment contract in one context but not others. SEC Dir. Div. of Corp. Fin. William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ("Can a digital asset that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security? . . . [Y]es."). In *SEC v. Ripple Labs*, *Inc.*, the court rejected the SEC's attempt to "distance[] itself" from Hinman's remarks. 2022 WL 2705396, at *3 (S.D.N.Y. July 12, 2022). It is not extraordinary for financial instruments to morph between securities and non-securities. For example, futures on a security index are exclusively under the CFTC's jurisdiction if the index is broad based, but the same product may be deemed a security if the index's composition changes. *See, generally,* CFTC, *Security Futures Products Overview* (Jan. 13, 2015), available at https://cftc.gov/IndustryOversight/ContractsProducts/SecurityFuturesProduct/sfpoverview.html.

[11] The SEC's excessive overreach in its attempted TRO and related discovery is instructive to the SEC's overall approach. A district court recently ordered the SEC in another digital assets case to

Complaint is filled with vague allegations of fraud, "manipulative trading," and "wash trading." But the only "fraud" the SEC actually alleges is that BAM's adoption of a standard compliance program became securities fraud because it was not 100% effective. Resp. at 38-39. Such allegations fall well short of Rule 9(b)'s heightened pleading standard. The Court must give effect to the actual statutes passed by Congress and halt the SEC's regulate-and-strangulate-by-enforcement strategy.[12]

## ARGUMENT

### I.   THE SEC FAILS TO ALLEGE ANY OF THE PRODUCTS ARE SECURITIES.

#### A.   The SEC Was Required to Plead the Existence of a Contract.

The Court must dismiss the SEC's claims regarding secondary market trading in the Digital Assets because the claims are entirely premised on the flawed argument that the SEC can simply delete "contract" from the term "investment contract." The SEC fails to allege the existence of any sort of contractual arrangement between BAM's customers and BAM (or any other party) in connection with the sale of the Digital Assets on BAM's platform and instead advances the untenable position that an investment contract can exist without any sort of contractual arrangement.[13] The SEC's pleading is thus fatally deficient and should be dismissed.

---

show cause for why the court should not impose sanctions on the SEC due to concerns that "the Commission made materially false and misleading representations" while "seeking an ex parte TRO and while later seeking to preserve the TRO." Order to Show Cause, *SEC v. Digital Licensing Inc d/b/a Debt Box,* No. 23-cv-00482-RJS-DBP, Dkt. 215 (D. Utah Nov. 30, 2023).

[12] *See* Nov. 27, 2023 Status Conf. Tr. at 31-32, Dkt. 180 (detailing the "significant harm" to BAM due to the SEC's unwarranted TRO, including layoffs of hundreds of employees, limited or terminated relationships with many banking partners, average monthly volume of assets on the platform decreasing "by almost 90 percent," and a loss of "almost half" of users on a monthly basis).

[13] The *Amicus Curiae* brief filed by the New Finance Institute *concedes* that the crystallized *Howey* test does not extend to the Digital Assets by proposing that the SEC be granted permission to regulate investment contracts pursuant to a novel, disjunctive, "Modified *Howey*" test with no legal basis whatsoever. *See* Br. *Amicus Curiae* New Finance Institute at 3-4, Dkt. 176.

Courts must "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000). The SEC does not have free rein to inject into "investment contract" whatever expansive meaning it sees fit by claiming that the statutory terms "investment" and "contract" are not words to be given effect but mere "labels" that "do not themselves define the term." Resp. at 26, 27. The phrase "investment contract" is no mere "label." Instead, in *Howey* the Supreme Court held that the term "investment contract" not only had meaning but had a very clear meaning, and that its meaning had been "crystallized by . . . prior judicial interpretation" of decades of state court opinions that "uniformly applied" the definition for an "investment contract." *Howey*, 328 U.S. at 298.

*Howey* followed the numerous state courts that endorsed the standard articulated in *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937 (Minn. 1920), that an "investment contract" unsurprisingly includes an investment and a contract. *Id.*[14] The SEC misleadingly claims that *Gopher Tire* supports its position because post-sale obligations were placed "on the investor, not the promoter." Resp. at 24. However, in *Gopher Tire*, the court identifies several profit-sharing obligations imposed on the promoters, plainly refuting the SEC's stance. 177 N.W. at 937-39. When Congress enacted the securities laws, state courts applying the definition of "investment contract" consistently included: (1) a contractual right and (2) a right to future value. *Howey*, 328 U.S. at 298; *see also* Br. Amicus Curiae Paradigm Operations LP at 8, Dkt. 128-1 ("Paradigm Br."). The SEC asks this Court to disregard both the actual words used by Congress ("contract") and the clear Congressional intent as articulated in *Howey*. The SEC only seeks to do so here

---

[14] *See, e.g., State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) (reasoning that "investment contract" "implies the apprehension of an investment as well as of a contract."); Br. at 13, 13 n. 6 (collecting cases). *see also* Brief for the *Amici Curiae* Securities Law Scholars at 3-17, *SEC v. Coinbase, Inc.*, Case No. 23-cv-04738-KPF (S.D.N.Y. Aug. 11, 2023), Dkt. 59 (discussing pre-*Howey* state cases).

because it cannot plead that the transactions on BAM's platform confer to customers any contractual claim to the future income, profit, or assets of a business enterprise.

### 1.    The SEC Admits *Howey* Was Premised on a Contract.

The SEC concedes that contractual terms were "present and relevant" in *Howey* but then claims "they were not dispositive or required." Resp. at 21. The SEC selectively quotes a portion of one sentence in *Howey* stating that it is "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 328 U.S. at 299. But the Supreme Court was not stating that a contractual arrangement was "immaterial." Rather, the Supreme Court was explaining that when deciding if an investment agreement exists, a court should look not only to the four corners of each individual contract or arrangement but also to the broader context of the relevant transaction. Doing this, the *Howey* Court determined that the "shares in the enterprise are evidenced by land sales contracts and warranty deeds." *Id.* at 300. These associated contracts and contractual terms were the essence of the investment and certainly were "required" for the investment contract to exist.[15]

The SEC's position that Howey does not "require[]" contractual terms is also inconsistent with its own prior briefing. *See* MTD at 13, 17-18; Brief for the SEC, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455, at *17 (U.S. June 26, 2003) ("[t]he second word in the quoted term, 'contract,' means '[a]n agreement between two or more persons to do or forbear something.' Thus, the very term 'investment contract' makes clear that instruments of that name include those in

---

[15] Nor should the Court give any credence to the SEC's unmoored claim in its Response that the district court cases from this Circuit cited in BAM's MTD somehow "foreclose any argument that post-sale, legally enforceable managerial efforts or payments are required" to find an investment contract. Resp. at 24. In its opening brief, BAM identified promises by promoters to deliver future value to investors in each of the three cases the SEC cites (and in the five other decisions the SEC does not even attempt to distinguish). *See* MTD at 14-15 n. 7.

which a return—whether labeled income or profit—*is promised in a contract*") (emphasis added);

Brief for the SEC at 9, 28-29, *SEC v. W.J. Howey Co*., No. 843, 1946 WL 50582 (U.S. Apr. 17,

1946) ("*contractual* rights of investors" are probative of whether the "character of a transaction

was that of an investment contract") (emphasis added). The SEC tries to walk back this language

by suggesting its briefs only argued investment contracts can "include" contractual arrangements,

not that they must do so. Resp. at 27. However, if the SEC's briefing did not address whether all

investment contracts require a contractual arrangement, then the SEC certainly cannot have it both

ways by arguing that, in *Howey* or *Edwards*, the Supreme Court ruled on a question not before it

and found that an investment contract does not require a contractual arrangement. Resp. at 21.

The SEC cannot avoid the multiple contractual arrangements necessary to form the

investment contract identified in *Howey.* Resp. at 21. The SEC quotes from the Supreme Court's

decision in *Joiner* in which the Court found it "unnecessary to determine" an issue of state contract

law in assessing whether an investment contract existed. Resp at 25 (quoting *SEC v. C. M. Joiner

Leasing Corp*., 320 U.S. 344, 349 (1943)). However, the full context directly contradicts the SEC's

claims that contracts are not essential: "But at any rate, the acceptance of the offer quoted made a

contract in which payments were timed and contingent upon completion of the well and therefore

a form of investment contract in which the purchaser was paying both for a lease and for a

development project." *Joiner*, 320 U.S. at 349.[16]

---

[16] The SEC quotes *SEC v. Banner Fund Int'l* to suggest that an investment contract is "*anything that investors purchase*" (emphasis added), so a contract is not required. Resp. at 21 (citing *Banner Fund*, 211 F.3d 602, 614 (D.C. Cir. 2000)). However, the SEC glosses over the full context of the quotation, which is that "[a]n investment contract is, for these purposes, anything that investors purchase with (1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others." 211 F.3d at 614 (restating *Howey*). The SEC also fails to acknowledge that there was a contract at issue in *Banner*, just as there was in every other case the SEC tries to cite for the proposition that investment contracts do not require contracts. *Id.* at 606.

9

 2. **The Term "Scheme" in *Howey* Does Not Magically Remove the "Contract" Requirement of "Investment Contract."**

The SEC also seeks refuge in the term "scheme" in *Howey* and subsequent case law to argue that an investment contract can be found in the absence of any contractual arrangement. *See* Resp. at 21 (*citing Hocking v. Dubois,* 885 F.2d 1449, 1457 (9th Cir. 1989)). No case supports this position and *Howey* itself rejects the notion that a "scheme" can be severed from a contractual arrangement, explaining the flexibility of the *Howey* test as addressing "the countless and variable schemes devised by those *who seek the use of the money of others on the promise of profits*." *Howey*, 382 U.S. at 299 (emphasis added). Similarly, the *Edwards* Court emphasized the importance of contracts to investment contracts by finding a negotiated, contractual entitlement to a fixed return could form the basis of an investment contract. *Edwards*, 540 U.S. at 397 ("We are considering investment *contracts.*") (emphasis in original).

The SEC also incorrectly suggests that *Terraform Labs* concluded that a scheme under *Howey* can apply in the absence of contractual obligations. Resp. at 26 (quoting *SEC v. Terraform Labs Pte., Ltd.*, 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023)). While the court in *Terraform* noted that a "technically valid written or oral contract under state law" was not required, it still required a contractual relationship – acknowledging that "scheme" applied to circumstances where the "contracting parties agree – that is, scheme – that the contractee will make an investment of money in the contractor's profit-seeking endeavor." *Terraform,* 2023 WL 4858299, at *11. The same is true for the other district court digital assets decisions the SEC cites. *See SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *7 (S.D.N.Y. July 13, 2023) (institutional sales of XRP token through contracts reflected "an investment in Ripple's efforts").[17]

---

[17] The SEC mischaracterizes BAM's position as being that "sales of crypto assets on trading platforms and in secondary markets can never be sales of investment contracts." Resp. at 33. BAM

**B.      Even if an Investment Contract Did Not Require a Contract (Which It Does), the SEC Fails to Plead the Elements of *Howey*.**

The SEC does not dispute that the Digital Assets are solely computer code but claims they are different from ordinary commodities like an orange which can be separated from the "orange grove enterprise" at issue in *Howey* because "[a] crypto asset does nothing on its own." Resp. at 28-29. The SEC's circular definition cannot differentiate the Digital Assets the SEC claims are securities from others such as bitcoin and ether which it says are "not at issue" here. *Id.* at 74. Even if the Court were to accept the SEC's incorrect proposition that an "investment contract" does not require a contract, its hodge podge of general allegations about the Digital Assets do not allege the elements of an investment contract under *Howey*.

**1.      The SEC Fails to Plead that Purchasers of Digital Assets on BAM's Platform Invested Money into a "Common Enterprise."**

The SEC fails to allege a "common enterprise" under *Howey* because the Complaint's allegations foreclose the possibility of finding either horizontal or vertical commonality. Horizontal commonality is "defined by the pooling of investment funds, shared profits, and shared losses . . . ." *SEC v. Life Partners, Inc.*, 87 F.3d 536, 543 (D.C. Cir. 1996). The SEC concedes that the funds BAM received for sales of Digital Assets were never remitted to the issuers or developers associated with those assets. Compl. ¶ 91 (buyers and sellers of Digital Assets are not known to each other, and "[u]pon execution of a trade, other functionality in the Binance.com Platform settles the trade"); *id.* ¶¶ 223-24 (BAM matching engine functions similarly); *id.* ¶¶ 232-33 (customer funds are held at Trust Company B). This is fatal to a finding of horizontal commonality. As the SEC admits, "courts have found horizontal commonality where investors' funds were

---

never argued that. Rather, BAM's position is that simply because an asset may, at some point, be part of an investment contract does not make the asset itself an investment contract in perpetuity.

pooled to develop a crypto asset and related ecosystem, or investors shared *pro rata* in the success or failure of the enterprise through changes in the price of the crypto asset," but there was no pooling here, nor does the SEC allege that Digital Assets included rights to the profits of any enterprise. Resp. at 12.

The SEC cannot cure its deficient pleading by arguing horizontal commonality exists because secondary market purchasers "purchased identical tokens whose prices rise and fall together," making their fortunes "interdependent." Resp. at 18. This situation is no different than what secondary market purchasers experience with bitcoin—a commodity that the SEC concedes is not at issue. The essential piece missing from the SEC's analysis is that horizontal commonality requires that "the fortunes of each investor depend on the *profitability of the enterprise* as a whole . . ." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (internal citations omitted) (emphasis added). By conflating BAM's customers' interests in the value of the Digital Assets with interests in the value of the respective issuer's or promoter's business as a whole, the SEC "seeks to impose liability by reducing the 'common *enterprise*' requirement to a 'common *interest*' requirement." Paradigm Br. at 15 (emphasis in original). Indeed, secondary market purchases of the Digital Assets in the absence of proceeds being remitted to the issuers of those assets are nothing like the "common enterprise" found by the court in *SEC v. Kik Interactive Inc.*, in which the issuer "pooled proceeds from its sales of Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment." 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020).

The SEC also suggests that in the absence of horizontal commonality a form of "vertical commonality" may be sufficient to find a common enterprise. Resp. at 11-12. It is not.[18] This Court

---

[18] While this Circuit has not ruled on this question, horizontal commonality is the only approach that is consistent with the Securities Act. Horizontal commonality fits within the securities laws

previously concluded that using vertical commonality – which requires the investors' success to rely on "the skill of the promoter" – would "impermissibly collaps[e] the second and third elements of *Howey*." *SEC v. Int'l Loan Network, Inc*., 770 F. Supp. 678, 690 (D.D.C. 1991), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992) (internal citation omitted); *see also Revak*, 18 F. 3d at 88. The Court should also not accept "strict vertical commonality" (which requires that the fortunes of investors are tied to the fortunes of the promoter), but even if it did, the SEC's allegations fall plainly short. *See* Resp. at 11-12 (*citing Life Partners*, 87 F.3d at 543-45). The SEC does not (and could not) allege that BAM's customers have strict vertical commonality with either BAM (who solely receives transaction fees) or the issuers of the Digital Assets (whose fortunes could rise or fall independently of the prices of the assets they once issued for any number of reasons).

### 2.  The SEC Concedes "Post-Purchase Efforts" Are Necessary but Fails to Plead Any Such Efforts by BAM.

The SEC concedes that, in this Circuit, the "efforts of others" prong of *Howey* requires "post-purchase efforts." Resp. at 14 (citing *Life Partners*, 102 F.3d at 548).[19] To meet this prong, this Circuit requires "post-purchase service . . . that could be fairly characterized as entrepreneurial." *Id.* at 548 (recognizing that "post-purchase entrepreneurial activities are the 'efforts of others' most obviously relevant to the question whether a promoter is selling a

---

because the Securities Act "is a disclosure statute" and "requires promoters and issuers to make *uniform* disclosure to all investors, and this requirement makes sense only if the investors are obtaining the same thing, namely, an undivided share in the same pool of assets and profits." *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994) (emphasis in original). By contrast, vertical commonality does not fit and has also been rejected in other Circuits. *See, e.g., id.* at 1018; *Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 281 (6th Cir. 1989); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 682 F.2d 459, 460 (3d Cir. 1982).

[19] The *Life Partners* court also noted the SEC's failure to point "to a single case in which an investment vehicle was deemed a security subject to the federal securities laws although the investor did not look to the promoter (or another party) to provide significant post-purchase efforts." *Id*.

'security'"). The SEC claims to have "well-pled allegations" of post-purchase efforts by "issuers, developers, and promoters." Resp. at 20. However, the SEC fails to allege that the buyers of the Digital Assets on BAM's platform were parties to any contractual arrangements with the issuers or promoters that could create such post-purchase obligations.[20] The SEC tries to address this by claiming that "[t]he Complaint alleges that all investors received the same marketing materials and other public promises of promoters and issuers." Resp. at 35; *see also* Resp. at 20 n. 1. Yet the SEC contradicts that premise by conceding that buyers and sellers of the Digital Assets on BAM's platform had no idea who any of the other buyers and sellers were. Compl. ¶¶ 91, 224, 262. For OCBS and Convert services, the SEC pleads BAM was the counterparty. *Id.* ¶ 228. This Court correctly observed that once the Digital Assets are available "on the platform and people can trade them, sell them, and repurchase them . . . people aren't responding to the initial offering, ***they're responding to the asset***." MTD at 24 (citing Tr. of TRO Hr'g at 14–15 (June 13, 2023), Dkt. 69 (cleaned up) (emphasis added)).[21]

Even in *Ripple*, where the court (not in this Circuit) explicitly stated the SEC did not need to show post-purchase efforts by the promoter, the court nevertheless found that the XRP token was not a security when sold through "blind bid/ask transactions" because the sellers "could not have known if their payment of money went to *Ripple*, or any other seller of XRP." *SEC v. Ripple*

---

[20] Likewise, the SEC fails to identify any significant post-purchase managerial or entrepreneurial efforts promised or undertaken by BAM with respect to any of the Digital Assets. Resp. at 14, 20; *see generally* Compl. ¶¶ 352-509. The SEC's Response also fails to identify any allegations in the Complaint of BAM amplifying token issuers' messages on its platform. *See* Resp. at 19.

[21] The SEC's deficient allegations are easily distinguishable from the SEC's registration claims against Terraform Labs. As previously discussed, *SEC v. Terraform Labs* does not negate the contract requirement of an "investment contract." In addition, the court there was addressing whether the developer and issuer of the assets in question could have violated the securities laws by selling those assets directly to buyers on secondary markets, but the court did not address secondary market transactions in those assets solely between third parties (like those here). *Terraform Labs*, 2023 WL 4858299, at *3, 15.

*Labs, Inc.*, 2023 WL 4507900, at *11 (S.D.N.Y. July 13, 2023). The "economic reality is that a Programmatic Buyer stood in the same shoes as a secondary market purchaser who did not know to whom or what it was paying its money." *Id.* The SEC correctly notes that the *Ripple* court did not explicitly conclude that all secondary market sales of XRP could not be investment contracts as that question was not before the court. However, it logically follows that if blind bid-ask sales by the issuer of XRP itself were not investment contracts, then blind bid-ask sales by any number of anonymous sellers on BAM's platform are not either. *Id.* at *11 n. 16.

Instead of pleading facts about how the Digital Assets could be investment contracts when bought and sold on BAM's platform, the SEC simply asserts that the "crypto assets cannot be separated from the investment contracts they represent," Resp. at 29, *but that simply is not the law*. No court has concluded this and in *Terraform Labs*, on which the SEC relies, the SEC conceded that the relevant digital asset was not itself an investment contract. *See* Tr. of Oral Arg. at 55:17-24, *Terraform Labs*, No. 23 Civ. 1346, (S.D.N.Y. June 15, 2023), Dkt. 42. The SEC relies on *Friel v. Dapper Labs*, but that was a case brought against a company that issued NFTs while also creating and controlling a private blockchain that was the only market where purchasers could trade those NFTs – a point the court found decisive. 2023 WL 2162747, at *1 (S.D.N.Y. Feb. 22, 2023) (The "critical causal connection" alleged was that "if, hypothetically, Dapper Labs went out of business and shut down the Flow Blockchain, the value of all Moments would drop to zero"). This is materially distinguishable from the BAM platform's role as one of numerous markets for the purchase and sale of the Digital Assets (none of which the SEC alleges BAM created). The SEC has thus failed to plead the elements of *Howey* itself, requiring dismissal of the registration claims.

### C.     The Staking Claim Must be Dismissed.

BAM's role in staking——facilitating customer orders with IT and providing other ministerial services——is not an investment contract. The SEC concedes it is "the blockchain protocol" that "select[s] block validators from crypto asset holders who have committed or 'staked'" their assets, Compl. ¶ 68,[22] but nevertheless argues that BAM "offer[s] and sell[s]" an investment contract because it provides ministerial technical services to customers who wish to stake their own digital assets with third-party node operators. *See* Resp at 41. The SEC is wrong.

First, the SEC fails to plead that BAM's staking services involve an "investment of money." MTD at 32-34. No part of the process by which customers designate their own digital assets for staking and receive staking rewards involves a customer "commit[ting] his assets to the enterprise in such as a manner as to subject himself to financial loss." *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003); *see* Resp. at 43. When a BAM customer elects to stake his or her digital assets, the customer maintains ownership over the assets, including staking "for as long as the [customers] choose to stake their tokens." Compl. ¶ 350; *see also* MTD Ex. 5 ("Notwithstanding anything herein to the contrary, . . . the Digital Assets held in your Account(s) are *owned and controlled by you and title to the Digital Assets held in your Account(s) shall at all times remain with you*.") (emphasis added). The SEC tries to plead a "risk of loss" by vaguely pointing to "slashing penalties," "operational risks," "[BAM's] solvency," and "changes in the value of . . . crypto assets while committed to these programs" as "unique risks" associated with BAM's staking services. Resp. at 43. However, the risks customers face from slashing and potential changes in value of the staked assets are the same risks customers would face if staking without BAM's

---

[22] For an accurate explanation of how the technical process of staking through third-party service providers works, *see* Brief for the *Amici Curiae* DeFi Education Fund at 10-19, *SEC v. Coinbase, Inc.*, Case No. 23-cv-04738-KPF (S.D.N.Y. Aug. 11, 2023), Dkt. 60.

involvement, and the SEC does not even allege any slashing-related losses by BAM's staking customers occurred. *See* Compl. ¶¶ 341, 349.[23] Vague allegations regarding BAM's potential solvency and operational risks without a specific connection to its ministerial role in the customer's staking process are insufficient for the Court to find that BAM's customers "place[] [their] money at risk in anticipation of a profit." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) (internal citation omitted).

Second, the SEC fails to plead that BAM's ministerial staking services constitute significant entrepreneurial post-purchase "efforts of others." Resp. at 43-44. In *Life Partners*, the court found that the "efforts of others" prong was not satisfied by the combination of "pre-purchase services as a finder-promoter" and "largely ministerial post-purchase services." 87 F.3d at 548. After customers purchased a fractional interest in a medical insurance policy from LPI, LPI would provide on-going administrative services that included ensuring the policy did not lapse, converting group policies into individual polices and arranging for resale of the customer's interest. *Id.* at 540. The court noted that purchasers' "profit depends entirely upon the mortality of the insured," categorized LPI services as "ministerial" and refused to find that LPI's efforts were those from which purchasers expected to profit. *Id.* at 548. The SEC's allegations that BAM offered "technical expertise and knowhow, industry relationships, and infrastructure" are unavailing; to the extent any of these characteristics refer to services provided by BAM, they do

---

[23] The SEC miscasts the risk of staked assets changing in value as related to BAM when it alleges that "BAM Trading will not allow users to sell or withdraw crypto assets while they are staked." Compl. ¶ 349. The SEC recognizes that certain blockchain protocols, and not BAM, designate "bonding" or "lock-up" periods for staked assets. *See id.* ¶ 347; *see also* MTD at 34 n. 12, 42.

not satisfy *Howey* because they refer to pre-purchase efforts, comparable to the pre-purchase services that LPI provided as a "finder-promoter." Compl. ¶ 343; *Life Partners*, 87 F.3d at 548.[24]

## D.     The Major Questions Doctrine Precludes SEC Action.

The SEC contends this is simply a "routine" enforcement action. Resp. at 46. That assertion is false. Chair Gensler previously urged Congress to act to provide the SEC additional authority to regulate cryptocurrencies.[25] Having failed to achieve authority from Congress, the SEC decided to act on its own, bringing multiple lawsuits against various digital asset platforms, while at the same time avoiding formal rulemaking.[26] As this Court wisely questioned during a previous hearing, "Why is it prudent, from the Commission's point of view, to assign the determination that would have such far-reaching [e]ffects in a billion dollar industry to a lone federal district judge . . . ?" Dkt. 69 at 28:12-16 (June 13, 2023). The SEC asks this Court for a radical expansion of the agency's authority under *Howey* to allow it to impose substantial penalties on a trillion-dollar industry without Congressional approval. Whether as a matter of statutory construction or by invoking the major questions doctrine, the Court should intervene to preserve the CFTC's and

---

[24] The SEC's generalized allegations regarding BAM's solvency and operations also do not satisfy the "efforts of others" requirement of *Howey*. *See Life Partners*, 87 F.3d at 545 ("The promoter's 'efforts' not to engage in criminal or tortious behavior, or not to breach its contract are not the sort of entrepreneurial exertions that the Howey Court had in mind when it referred to profits arising from 'the efforts of others.'").

[25] Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021); *see also* Katanga Johnson, *U.S. SEC Chair Gensler calls on Congress to help rein in crypto "Wild West"*, REUTERS (Aug. 3, 2021) (Chair Gensler stated, "We need additional congressional authorities to prevent transactions, products and platforms from falling between regulatory cracks.").

[26] In 2022, Coinbase submitted a rulemaking petition seeking clarity around how existing securities laws affect digital assets and on April 26, 2023 filed a petition with the Third Circuit seeking a writ of mandamus to force the SEC to respond to its petition. *In re: Coinbase Inc.*, 23-1779 (3d Cir. 2023). The SEC has still failed to do so, repeatedly urging delay. *Id.* (Letter for Respondent SEC, Dkt. 37). Meanwhile, the SEC continues regulating by enforcement. *See SEC v. Payward,* 23 Civ. 6003 (N.D. Cal. Nov. 20, 2023).

other agencies' (as well as states') existing jurisdiction and allow Congress to decide. *See FDA v. Brown & Williamson*, 529 U.S. 120, 144 (2000) (court must interpret scope of regulatory authority granted by statute "as a symmetrical and coherent regulatory scheme").

## II.     THE SEC FAILS TO STATE CLAIM UNDER SECTION 17(A).

The SEC's unsupported allegations of fraud leveled against BAM have succeeded in doing great damage to BAM, *see supra* at 6 n.12, but fail to state a plausible legal claim. The SEC needed to plead with specificity that (1) a material volume of the self-match trades was executed with the intent to deceive by the individual entities or algorithms that made those trades and (2) BAM knowingly misrepresented the presence of those trades through its descriptions of its compliance programs. The SEC has not adequately alleged either set of facts under Rule 9(b). Thus, even if the Digital Assets were securities (and they are not), the SEC's fraud claims should be dismissed.

BAM's purported "misstatements" include the compliance policy itself, requirements that users follow the policy, and descriptions about BAM's compliance with the policy. Such statements regarding a compliance program are inherently aspirational even when describing present (rather than future) activity, and the SEC does not distinguish the cases BAM cited to this effect. MTD at 42 (citing *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *15 (S.D.N.Y. Mar. 24, 2023) (present tense statement about compliance too general and aspirational to be actionable)).[27] BAM's statements that it had compliance procedures "did not reasonably suggest that there would be no violations." *Retail Wholesale*, 845 F.3d at 1278.

---

[27] *See also Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (compliance materials "inherently aspirational" despite being "stated affirmatively and in the present tense"). The SEC relies on this Court's decision in *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 25 (D.D.C. 2017), but in that case, numerous misstatements were alleged, only one of which related to the effectiveness of internal controls, and the Court never addressed the sufficiency of that particular allegation.

The SEC attempts to transform those statements into misrepresentations by claiming they were made at a time that BAM knew wash trading was taking place and at a level that would be material to an investor. Resp. at 54. But that sleight-of-hand does not relieve the SEC of its burden to plead wash trading with particularity. A wash trade does not occur every time orders for the same beneficial owner match. Instead, a self-matched trade is only a wash trade if the trader also intends the two trades to match and does so hoping to deceive investors. Compl. ¶ 240; *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005). The SEC cannot say "wash trading" without also pleading facts that establish the elements of wash trading. Similarly, the SEC's allegation that one employee in January 2021 noted that it was theoretically possible for wash trading to occur does not amount to alleging that such wash trading by third parties actually *did* occur and was known to BAM. Compl. ¶ 264; *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (complaint must plead sufficient facts showing defendant did not genuinely believe its statements were true at the time they were made).

Focusing on the adequacy of the wash trading allegations is not a "fundamental misunderstanding of the SEC's claim." Resp. at 55. Rule 9(b) requires *all* averments of fraud to be pled with specificity or else the "district court should disregard those averments or strip them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003). "[W]here, as here, securities fraud claims are based on failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 803 (S.D.N.Y. 2018). So too here, the SEC cannot charge that BAM was negligent for failing to detect purported wash trading without properly alleging the underlying wash trading with particularity. The SEC admits that the Complaint does not allege

intent to deceive but only allegations equally consistent with trading activity that the SEC recognizes as lawful and legitimate—"bona fide self-trades" from separate trading strategies at the same firm. MTD at 39-40; *see* Compl. ¶ 33. Thus, every wash-trading allegation by the SEC is conclusory and the Court must "strip" all such allegations from the Complaint. *Vess*, 317 F.3d at 1104.

Even if the SEC had alleged wash trading occurred, the minimal amount alleged is immaterial as a matter of law. Information qualifies as material only if "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision as a result of it "having significantly altered the 'total mix' of information made available." *RPM Int'l.*, 282 F. Supp. 3d at 23 (internal citations omitted). The only specific self-trading the SEC alleges is in *one* digital asset, COTI, during an 11-day period. Compl. ¶ 274.[28] The SEC attributes this trading to Sigma Chain, not BAM, in the conclusory allegation "Sigma Chain also engaged in wash trading." *Id*. Even if the SEC had alleged with particularity that the trading by Sigma Chain was done with improper intent, and that BAM was aware of Sigma Chain's intent during this one cherry-picked example, the alleged self-trading accounted for only 7.8% of the volume of COTI sold on BAM.[29] But more importantly, it represented only 0.01% of the total volume on BAM during this "strategic" 11-day period.[30]

---

[28] The SEC also alleges that "wash trading" occurred from June through August 2021 in 51 of 58 digital assets. Compl. ¶¶ 272-275. These vague allegations fail Rule 9(b) as the SEC makes no allegations regarding the volume of such trading, despite having available all trading data. *See also* Dkt. 40 at 30 (noting that only 0.14% of BAM's aggregate trading volume from June through August 2021 resulted from the purported self-trades by Sigma Chain).

[29] Total volume of purported "wash trades" (3,712,678) divided by total volume of trades (47,740,838). Compl. ¶ 274.

[30] COTI was trading at 25 cents (*see* https://www.coindesk.com/price/coti/) and total volume times 25 cents equals $891,042, which is $81,004 per day. At the time, BAM was trading $24 billion

The SEC theorizes that self-trading could have affected the decisions of some unspecified digital asset investors as to which digital asset to trade. Resp. at 57. But that allegation is absent from the Complaint. *See* Compl. ¶ 278 (alleging only that "[v]olume is important for investors in crypto asset securities"). It also does nothing to suggest that BAM could have been negligent in failing to identify that 0.01% of its trades purportedly resulted from wash trading. Materiality is not a "quibble" and nothing prevents it from resolution on a motion to dismiss. Resp. at 55. The SEC attempts to rely on *In re Xcel Energy, Inc.*, 286 F. Supp. 2d 1047, 1056 (D. Minn. 2003), but that case actually helps BAM. The court noted that less than 10% of revenue coming from wash trading might not be material but 50% would be. *Id.*[31] Here, the SEC only alleges a volume of 0.01% during a "strategic" period. Compl. ¶ 271. Courts regularly find impacts of less than 1% immaterial as a matter of law and should do the same here.[32]

### A.    The SEC States No Claim of Fraud against BAM's Customers.

The claims relating to BAM's customers fail for additional reasons. The SEC has failed to plausibly allege that defendants obtained money or property "*through* the use of the misstatements or omissions." *RPM Int'l.*, 282 F. Supp. 3d at 14, 30 (emphasis added) (noting SEC cannot leave court "guessing as to whether . . . compensation was affected by making a false statement"). The

---

monthly or $800 million per day. Compl. ¶ 256. $800 million daily revenue divided by $81,003 in daily self-trades equals 0.01% of trading volume during the 11-day period.

[31] The SEC also quotes dicta out of context from a case involving spoofing (not wash trading). Resp. at 55 (quoting *United States v. Coscia*, 177 F. Supp. 3d 1087, 1091-92 (N.D. Ill. 2016)).

[32] *See In re Xcel Energy, Inc.*, 286 F. Supp. 2d at 1056; *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) (misstatements affecting 1.2% immaterial as matter of law at pleading stage); *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 50 (2d Cir. 2008) (affirming dismissal at pleading stage as misstatements relating to 3% of revenue immaterial as a matter of law); *RPM Int'l,*, 282 F. Supp. 3d at 24 (noting 5% threshold for materiality); *United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, 2020 WL 686009, at *23 (D.D.C. Feb. 11, 2020) (discussing 10% threshold).

SEC claims that the "money or property" increased trading revenues by BAM but never connects the trading revenue to the purported misstatements. Resp. at 55. It "is not sufficient that a materially untrue statement was made and the person also made money." *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017).

For its Section 17(a)(3) claim, the SEC only alleges misstatements, and, as this Court has noted, such a claim "must include more than the same misrepresentations or omissions underlying the misstatement." *RPM Int'l*, 282 F. Supp. 3d at 31. The SEC argues that *Lorenzo v. SEC*, 139 S. Ct. 1094, 1096 (2019), stands for the proposition that misrepresentations alone are sufficient. Resp. at 56. But the SEC made the same argument in *SEC v. Rio Tinto PLC*, 41 F.4th 47, 55 (2d Cir. 2022), and the Second Circuit rejected it, finding that *Lorenzo* held only that dissemination of false information provides a basis for scheme liability—not that misstatements alone can trigger scheme liability. *Id.*[33] Alternatively, the SEC suggests its allegations concerning unspecified dissemination are sufficient but fails to identify (as required) any allegations about the who, what, when, where and how any such dissemination occurred.

Any purported statements to customers touting BAM as an exchange were not "in the offer-or-sale" because they only would have influenced *which* exchange to use. The SEC offers no case that contradicts this view.[34] Alternatively, the SEC theorizes that BAM's statements could have

---

[33] The cases cited by the SEC only address whether dissemination of false statements can form the basis of scheme liability; none address whether false statements alone can do so. Resp at 55 (citing *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (analyzing whether dissemination is sufficient for scheme liability); *United States SEC v. Winemaster*, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021) (same); *Malouf v. SEC*, 933 F.3d 1248, 1259 (10th Cir. 2019) (same); *In re Bed Bath & Beyond Corp. Sec. Litig.*, 2023 WL 4824734, at *12 (D.D.C. July 27, 2023) (denying motion to dismiss because the claim involved *more* than misstatements)).

[34] The SEC argues that the cases cited by BAM, *Brink* and *Goble*, conflict with *United States v. Naftalin*, 441 U.S. 768, 773 (1979). Resp. at 57. They do not. In *Naftalin*, the defendant lied to brokers to induce them to place fraudulent sales, and the court found the defendant liable even

affected the decisions of some unspecified investors as to which digital asset to trade. Resp. at 57.

But that allegation is entirely absent from the Complaint. *See* Compl. ¶ 278 (alleging only that

"[v]olume is important for investors in crypto asset securities"). And even if the alleged statements

had influenced which digital asset a particular investor purchased, such statements would not have

resulted in BAM obtaining any additional "money or property" (as BAM would have made money

regardless of which digital asset the investor obtained).

Finally, the SEC's Response addresses arguments BAM raised as to why certain statements

(trading rules and 2019 webinar) were not applicable to equity investors and argues those

statements instead apply to digital asset traders. Resp. at 57-59. But these statements fail for the

same reasons discussed above as all the others.

### B.    The SEC States No Claim of Fraud against Equity Investors in BAM.

In addition to the fundamental lack of adequate allegations of fraud in connection with

purported wash trading, the specific allegations as to BAM equity investors fail for additional

reasons. The SEC argues BAM misrepresented its trade surveillance program to equity investors

in the 2021 pitch deck and in a trade surveillance manual. Resp. at 59; MTD Exs. 3 & 4.[35] As

discussed, such aspirational statements are not actionable, but even if they were, the SEC fails to

allege how it could be important to sophisticated investors that BAM had issues for a few months

effectively using one of seven vendors referenced a single time in the middle of a lengthy slide

---

though he was using an intermediary. *Id.* In contrast, *Brink* and *Goble* found statements to *investors* about which trading platform, broker or investment account to use were not "in the offer-or-sale." *Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1148-50 (11th Cir. 2018); *SEC v. Goble*, 682 F.3d 934, 943 (11th Cir. 2012).

[35] BAM's MTD argues that the trading rules and statements in the 2019 webinar cannot be actionable against equity investors. The SEC's Response does not dispute this, only arguing that these statements are applicable to digital asset investors (which as discussed above, they are not). Resp. at 57-58.

deck. MTD Ex. 4; *see also Parnes v. Gateway Inc.*, 122 F.3d 539, 546 (8th Cir. 1997). The SEC

has also failed to meet Rule 9(b)'s burden by alleging the "who" and "when"—pointing only to a

vague allegation that the July 2021 trade surveillance manual was "provided to Equity Investors"

without alleging that it was provided as part of a solicitation or at a time when the surveillance

procedures in it were not being followed. *See* Resp. at 59; Compl. ¶ 249. Thus, for all these reasons

the SEC has failed to properly allege any fraud claim under Section 17(a)(2) or 17(a)(3), and so

Count 13 must be dismissed.

## **CONCLUSION**

There are no securities at issue in the SEC's enforcement action against BAM. Instead, the

SEC is repeating its errors of the past by endeavoring to expand its jurisdiction through unilateral

actions and litigation regardless of the consequences to a large and growing industry and its

trespass into other regulators' jurisdiction against Congressional direction. The correct way to

resolve these issues is through Congress, supported by interagency coordination. The Court should

put an end to the SEC's reckless and destructive jurisdictional landgrab. For the foregoing reasons,

BAM's Motion to Dismiss should be granted with prejudice.[36]

---

[36] In a footnote at the end of its brief, the SEC requests the Court find any dismissal of any of its
claims for any reason to be without prejudice and leave to amend. Resp. at 72 n. 6. The Court
should disregard this unsupported request. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x
35, 39 (2d Cir. 2018) (affirming denial of leave to amend securities claim where "plaintiffs sought
leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and
"included no proposed amendments"). "Rule 12(b)(6) dismissals are typically with prejudice and
do not require particular justification by the district court." *Rollins v. Wackenhut Servs., Inc.*, 703
F.3d 122, 132 (D.C. Cir. 2012) (J. Kavanaugh, concurring) (explaining that parties have right to
amend their complaint within 21 days of receiving a motion to dismiss).

Dated: December 12, 2023

Respectfully submitted,

/s/ Daniel J. Davis

Daniel J. Davis (D.C. Bar #484717) (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave NW
Washington DC 20006
daniel.davis@katten.com

Christian T. Kemnitz (*pro hac vice*)
Levi Giovanetto (D.C. Bar #1001160) (*pro hac vice*)
Sheehan H. Band (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
christian.kemnitz@katten.com
levi.giovanetto@katten.com
sheehan.band@katten.com

Gary DeWaal (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
gary.dewaal@katten.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc.*

/s/ George S. Canellos

George S. Canellos (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
GCanellos@milbank.com
MLaroche@milbank.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc*