```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    Securities Exchange          )
      Commission,                  ) Civil Action
 4                                 ) No. 23-cv-1599
                        Plaintiff, )
 5                                 ) MOTIONS HEARING
      vs.                          )
 6                                 ) Washington, DC
      Binance Holdings Limited,    ) January 22, 2024
 7    et al.,                      ) Time:  10:00 a.m.
                                   )
 8                      Defendants. )
      _____
 9

10                   TRANSCRIPT OF MOTIONS HEARING
                              HELD BEFORE
11           THE HONORABLE JUDGE AMY BERMAN JACKSON
                     UNITED STATES DISTRICT JUDGE
12    _____

                         A P P E A R A N C E S
13

14    For Plaintiff:     Matthew Scarlato
                         Jennifer Farer
15                       Lisa Solomon
                         David Nasse
16                       Securities and Exchange Commission
                         100 F Street, NE
17                       Washington, DC  20549

18                       Jorge G. Tenreiro
                         John Emmett Murphy
19                       Securities and Exchange Commission
                         100 Pearl Street
20                       New York, NY  10004

21    For Defendant
        Binance:         Jason Mendro
22                       Daniel Nelson
                         Matthew Gregory
23                       Gibson, Dunn & Crutcher, LLP
                         1050 Connecticut Avenue, NW, Suite 300
24                       Washington, DC  20036

25
```

```
1    For Defendant
       BAM Entities:      Daniel Davis
2                         Gary DeWaal
                          Katten Muchin Bosenman, LLP
3                         1919 Pennsylvania Avenue, NW
                          Suite 800
4                         Washington, DC  20006

5

       Changpeng Zhao:   Abid R. Qureshi
6                         William R. Baker, III
                          Latham & Watkins, LLP
7                         555 11th Street, NW, Suite 1000
                          Washington, DC  20004

8
    _____
9
    Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
10                         Official Court Reporter
                           United States Courthouse, Room 6523
11                         333 Constitution Avenue, NW
                           Washington, DC  20001
12                         202-354-3267

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

2     This is civil action 23-1599, *Securities and Exchange*

3     *Commission versus Binance Holding Limited, et al.*  The parties

4     are all present in the courtroom.

5          Starting with the plaintiff, will all speaking

6     counsel please introduce themselves for the record by

7     approaching the lectern.

8          MR. TENREIRO:  Thank you.  Good morning, Your Honor.

9     I'm Jorge Tenreiro on behalf of plaintiff Securities and

10    Exchange Commission.  With me at counsel table are my

11    colleagues Ms. Jennifer Farer, Matthew Scarlato, Emmett Murphy,

12    who will be handling the bulk of the arguments.  And also at

13    counsel table are my colleagues Lisa Solomon and Dave Nasse.

14         THE COURT:  All right.  Good morning.

15         THE COURTROOM DEPUTY:  Defense counsel.

16         MR. MENDRO:  Good morning, Your Honor.  Jason Mendro

17    from Gibson Dunn on behalf of Binance Holdings, Limited, or

18    BHL.  I'm going to be speaking to you today, as well as my

19    colleague Matt Gregory.  And also with me at counsel table is

20    Dan Nelson.

21         THE COURT:  All right.  Good morning.

22         MR. DAVIS:  Good morning, Your Honor.  Dan Davis from

23    Katten Law Firm on behalf of the BAM defendants.  With me at

24    counsel table is Gary DeWaal.  I'll be speaking on behalf of

25    the BAM defendants.

 1              THE COURT:  All right.  Thank you.

 2              MR. QURESHI:  Good morning, Your Honor.  Abid R.

 3      Qureshi of Latham & Watkins on behalf of defendant Mr. Zhou.

 4      With me is my colleague Mr. Bill Baker, also from Latham &

 5      Watkins.

 6              THE COURT:  All right.  Good morning.  I want to say

 7      at the start, that I appreciate the quality and the clarity of

 8      all of the briefing, including the submissions by the amici,

 9      which I've also reviewed.

10              Given all of that, I'm likely to start right in with

11      questions when you get to the lectern, and we'll just assume

12      that the paragraph you had written or paragraphs you had

13      written to start with were terrific and persuasive.

14              I do want to say, I was a little taken aback by the

15      frequency with which you quoted things I said at the initial

16      TRO hearing in your pleadings.  I want to underscore that what

17      I was doing that day was asking questions.  I didn't rule on

18      anything, I didn't opine about anything.  So there is

19      absolutely no need for anyone to refer back to that and quote

20      me to me again today.

21              These are defendants' motions, so I'm going to start

22      with the defense.  I've organized my questions along the lines

23      of the issues that you have identified that you're each going

24      to be addressing, even if it wasn't how I originally had it

25      logically flowing.  I've now got it so that you don't have to

1    get up and down.

2          If I give counsel an opportunity to get back up in

3    reply, it's going to be very short and targeted and there won't

4    be a need to repeat what has been said during your primary

5    argument or in-depth -- and probably more than once -- in your

6    papers.

7          So I'm going to start with you, Mr. Mendro.

8          MR. MENDRO:  Thank you, Your Honor.  Good morning.

9          THE COURT:  Good morning.  Now, between you and the

10   amici I've received pages and pages about what the law

11   regarding investment contracts should be, what it was under the

12   state blue sky laws before the Securities and Exchange Act

13   passed.  I appreciate your argument based on the statutory text

14   and its history that something called an investment contract

15   has to involve some sort of contractual relationship.  And all

16   of that was very logical and very forceful.

17         The problem is, whether I agree that that's what the

18   Supreme Court should have said, I don't think that's what it

19   said.  *Howey* says an investment contract is, quote, a contract,

20   transaction, or scheme.  One of three things.  It didn't say a

21   contractual transaction or scheme.  So explain to me how your

22   view is consistent with *Howey*.

23         MR. MENDRO:  Yes, Your Honor.  Thank you.  So *Howey*

24   was obviously a case that involved contracts, involved

25   warrantee deeds, contracts for land sales.  It involved service

1    contracts.  So the starting point for the *Howey* analysis was

2    there was a contract.  And what *Howey* explains is why a

3    contract can be an investment contract, that's the standard set

4    forth.

5                THE COURT:  That's not what it said.

6                MR. MENDRO:  Well, it uses the words "schemes" --

7                THE COURT:  Or transaction.

8                MR. MENDRO:  -- "or transactions."  But it's clear

9    from the context in which the Court is evaluating numerous

10   contracts, that what the Court is explaining is several

11   different contractual obligations can be combined to be an

12   investment contract.  That's what the Court means by scheme.

13               THE COURT:  So, but if the D.C. Circuit didn't read

14   it that way, so how am I supposed to adhere to the *Banner Fund*

15   formulation, which says an investment contract is anything that

16   investors purchase with, one, an expectation of profits arising

17   from; two, a common enterprise that; three, depends on the

18   efforts of others, and find in your favor on that basis here?

19   I'm bound not only by the Supreme Court, but I'm also bound by

20   my own circuit.

21               MR. MENDRO:  Of course you're right about that, Your

22   Honor.  I think you're quoting from the *Banner Fund* case.  And

23   "anything" was just a figure of speech.  The D.C. Circuit has

24   never suggested that you can have an investment contract

25   without an option.

1          The Court is bound by two different things; by the

2     statute, which on its face says investment contract -- so there

3     must be a contract if you're applying the statute -- and you're

4     also bound by the case law.

5          And I think it's curious the SEC cites the *Joiner*

6     case, another Supreme Court decision, for the proposition that

7     an investment contract can exist without a contract.  In that

8     case the Supreme Court was reviewing a Fifth Circuit decision

9     that had found that oil leases were not investment contracts

10     because they only conveyed land and nothing more.  And then the

11     Supreme Court reversed the Fifth Circuit specifically because

12     it found that there was something more.

13          What it found was an ongoing contractual obligation

14     to drill.  And specifically what the Court said is the

15     acceptance of the offer quoted made a contract.  That's at page

16     349 of the Supreme Court's decision.  The Court went on to say

17     that the purchaser was paying both for a lease and for a

18     development project.

19          So the finding of a contractual obligation in *Joiner*

20     was essentially the Court's decision to reverse the Fifth

21     Circuit.  And so I think it's very clear that *Joiner* strongly

22     supports the conclusion that a contract is required.

23          THE COURT:  Well, it doesn't seem like the Southern

24     District of New York buys your theory either.  In *Telegram* the

25     Court talked about a "scheme or a contract," and it noted that

1    the use of the word was not nefarious.  We're not saying

2    schemes are bad, it's just meant to be a broad term for the set

3    of expectations surrounding a transaction.  Most courts in that

4    district have specifically ruled that *Howey* controls,

5    notwithstanding prior state blue sky decisions.

6         So notwithstanding the fact that you guys keep

7    telling me the same thing over and over again, has any court

8    expressly adopted your position?

9         MR. MENDRO:  Well, I think that position is inherent

10   in the *Joiner* decision, and I think several of the circuit

11   court decisions it cites for that proposition too, including

12   the *Rodriguez* case from the First Circuit.  That's a case that

13   was favorably cited by the D.C. Circuit in *Life Partners*,

14   *De Luz* by the Ninth Circuit, *Woodward* by the Tenth Circuit.

15        COURT REPORTER:  Sorry, could you just slow down on

16   the cases, please?

17        MR. MENDRO:  I apologize.  I'll slow down.

18        *De Luz*, D-E L-U-Z, from the Ninth Circuit, and

19   *Woodward* from the Tenth Circuit, those are all cases where the

20   court was looking for contractual terms to find that there was

21   an investment contract and rejected the proposition that you

22   can have an investment contract based on something other than

23   those terms.

24        Then, of course, the blue sky laws support the same

25   proposition, Your Honor.  The cases cited in *Howey* were cases

1   that involved contracts.  In *SEC versus Edwards*, another

2   Supreme Court case, the court handled an argument where the

3   defendant was arguing the contractual entitlement to a return

4   means that there's no investment contract.  And Justice

5   O'Connor's majority opinion emphasized, "We are considering

6   investment contracts."  She put italics on the word "contract."

7   So the word "contract" matters, and the fact --

8          THE COURT:  She put italics around it because it's

9   the word in the statute.  But that case, the question in that

10  case was whether a money-making scheme -- and they use the word

11  "scheme" often -- was excluded from the term "investment

12  contract" simply because the scheme offered a contractual

13  entitlement to a fixed return, as opposed to a variable return.

14  And they said it doesn't have to be fixed.  That's all they

15  decided.  So why are you pointing to that as something that

16  narrowed *Howey* in some way or really addressed this issue in

17  any way?

18          MR. MENDRO:  Well, you're quite right.  That's what

19  the court decided.  I was just pointing out that the court

20  emphasized the statutory language requiring a contract.  The

21  court pays attention to that language.  And the fact is that

22  every single Supreme Court case and every single circuit case

23  that I'm aware of has found an investment contract only on

24  facts where there actually was a contract.

25          The Court mentioned a moment ago some cases from the

1   Southern District of New York, which I agree they're not all

2   consistent with our argument, but they're not binding on this

3   Court.  In the *Telegram* case there actually was an investment

4   contract with lock-up provisions.  So, a written contract.

5           So, the facts of these cases are consistent with the

6   statutory text requiring a contract.  The courts are looking

7   for offer, acceptance, consideration and some sort of privity

8   between parties that represents a meeting of the mind creating

9   obligations.  That's what exists in all the cases where circuit

10  courts and the Supreme Court --

11          THE COURT:  Are you saying the *Telegram* case, the *Kik*

12  *Interactive* case, all the cases from the Southern District that

13  seem to have dealt with this more than our district are wrong?

14  Because you have said that an investment contract requires an

15  obligation -- as opposed to an expectation of future activity

16  on the part of the issuer or on the part of another -- that's

17  got to generate returns.  And they have said, over and over

18  again, we don't think so when *Howey* doesn't say that.  So are

19  they wrong?

20          MR. MENDRO:  I would submit, Your Honor, they are

21  wrong to the extent that their holding an investment contract

22  does not require a contract.  *Kik*, the case that you just

23  mentioned, also involved an investment contract with lock-up

24  provisions.

25          So the facts are there.  Those cases are also not

1    subject to the D.C. Circuit's holding in *Life Partners*, which

2    makes very clear that there has to be post-sale obligations on

3    the part of the promoter of an investment.  So those same cases

4    have said that's not required, and in this circuit they can't

5    rely on that.

6         THE COURT:  But did *Life Partners* say there has to be

7    a contract, or they're just obligation?

8         MR. MENDRO:  Well, in *Life Partners*, again, there

9    were contracts.  And it's sometimes difficult to find precedent

10   to support truisms that an investment contract requires a

11   contract.  But to answer your question, these specifically

12   speak in terms of --

13        THE COURT:  You're being a little too cute to say,

14   well, it's true that an investment contract means contract.

15   That is a natural proposition that I would tend to agree with

16   you on if court after court after court had -- why did they

17   bother to define it as something broader than a contract if

18   it's just a contract?  Like they said over and over again,

19   that's not what the court has to say.

20        MR. MENDRO:  Well, I think that the right way to

21   understand those opinions is there are opinions that explain

22   when the contract is an investment contract.  I don't think

23   there is any case -- with the possible exception of some of the

24   SDNY cases referred to -- that suggest the contractual

25   obligations are not necessary.  And to answer your question

1    about *Life Partners* --

2        THE COURT:  You don't think the *Banner Fund* language

3    says that?

4        MR. MENDRO:  I don't, Your Honor.  I think what the

5    Court's saying -- that was another case that involved

6    contracts.  There were investors that were investing into an

7    investment fund that was going to be used to generate returns

8    from arbitrage, so there was very clearly a contract.  I think

9    what the Court's saying, "anything," it was a figure of speech.

10        THE COURT:  Okay.  What about the language that's not

11    a figure of speech?  How do I square the arguments that you and

12    the amici are making regarding not using an ill-fitting, vague

13    mechanism, like an investment contract, to embark on the

14    regulation of this whole new industry without a clear

15    Congressional mandate, with case law that says over and over

16    and over again the statute was designed to be broad, it's

17    designed to be flexible, it's designed to protect the investing

18    public.  It's designed to reach new types of transactions and

19    assets not necessarily contemplated back in the '30s.  And all

20    of the cases we talked about say that over and over again as

21    well.

22        MR. MENDRO:  Again, I don't think that there are any

23    cases from the circuit courts or the Supreme Court that say

24    investment contract does not require a contract.  But I do

25    agree that they say the securities laws are intended to be

 1        broad.  I'm not disputing that.  But the statute has another

 2        purpose other than to be broad, it has a purpose to have a

 3        limiting distinction between securities and commodities.  That

 4        distinction keeps real estate from being a security.

 5              That same distinction defines both the authority of

 6        the SEC, as opposed to the CFTC, and the scope of private

 7        securities litigation.  If there was no distinction between

 8        securities and commodities, we would have class actions by

 9        private plaintiffs saying that everything is a security.  And

10        the point of the statute is to prevent that by drawing a

11        distinction that's meaningful.

12              There is no court, certainly outside of the SDNY,

13        that has said that a contract isn't required.

14              THE COURT:  All right.  Well, there was another

15        lawyer who said securities versus commodities and the scope of

16        the authority of the two agencies was going to be his issue.

17              MR. MENDRO:  Yes.  And that's going to be Mr. Davis,

18        who's counsel for BAM.

19              THE COURT:  Otherwise, I'd have to reorganize all of

20        my questions.

21              Let's say I reject your theory that *Howey* does not

22        apply without a contract and I have to go ahead and apply its

23        three-part test.  I would like to do that for each of the

24        alleged securities here.

25              So I want to talk about BNB first.  And I guess my

1   first question is:  Did the assets have any inherent value when

2   they were issued?  Could they be used as digital currency?

3        MR. MENDRO:  At the time they were issued it could be

4   used as currency, and that's true now.

5        THE COURT:  Now, did the value remain static from the

6   time it was first issued until now?

7        MR. MENDRO:  No.  The value has changed.

8        THE COURT:  It went up and down or just up?

9        MR. MENDRO:  It has gone up and down and it has not

10  always gone up and down for the fortunes of our client, BHL.

11       THE COURT:  So what would you attribute it to?

12       MR. MENDRO:  I think it's probably supply and demand.

13  It's hard to know exactly what drives the price of any asset.

14  But BNB is an asset, and my opinion of an asset, it's a thing

15  of value and goes up with equal desire and power.

16       So it could be desirable because others create use

17  cases for it.  It could be desirable because people decide they

18  want to invest in crypto currencies.  But with respect to

19  resales of BNB -- and I'll just -- I'll note for the court I

20  think this is probably clear from the papers, we have a

21  different --

22       THE COURT:  I'm going to get to resale.  Right now

23  I'm just talking about the offering itself.

24       MR. MENDRO:  Okay.  The --

25       THE COURT:  Go ahead.

1      MR. MENDRO:  Well, to answer your question very

2   specifically, yes, it had value and the value changed.  It's

3   hard for me to know exactly what causes the value to change,

4   but I suspect with most assets -- it is an asset, not a

5   contract, not a relationship, not an arrangement.  Doesn't have

6   post-sale obligations.

7      THE COURT:  I understand the contract argument, it's

8   a legal argument.  I might agree with you.  But if I don't

9   agree with you, we're going to be wasting a lot of time if we

10  go through the *Howey* factors with respect to each asset that's

11  been alleged and you tell me again it's not a contract.

12     MR. MENDRO:  Understood, Your Honor.

13     THE COURT:  I hear it, I appreciate it, I understand

14  it.  The fact that am asking you questions doesn't mean I also

15  don't also have questions for the government.  But I don't need

16  that point underscored while we're talking about something

17  else.

18     MR. MENDRO:  Yes, Your Honor.

19     THE COURT:  So am I correct that among other reasons,

20  you dispute that the coins meet the definition of an investment

21  contract, a *Howey* definition, if it applies, because increased

22  value and returns are a factor of market forces and not

23  promoter activity?

24     MR. MENDRO:  That's correct, Your Honor.  That's not

25  the only reason, but yes.  Another reason is -- when we're

1    talking about resales, there's no investment in the common

2    enterprise, which is why the essential --

3            THE COURT:  I'm going to talk about resale separately

4    because the answer may be different as to the initially and the

5    resale, so I would like to talk about resale separately.

6            So do you dispute the SEC's allegation that how

7    Binance was managed, how it created and supported its platform,

8    its entrepreneurial and managerial activities were supposed to

9    establish or enhance the value in?  Do you dispute that?

10            MR. MENDRO:  Well, I think the part that I -- I don't

11    dispute where there's entrepreneurial activity for the

12    exchange.  But I very much dispute there's any post-sale

13    entrepreneurial activity related to BNB.  What the SEC is

14    alleging, is that the company sells an asset, then uses some of

15    the proceeds of that asset to invest back in its business,

16    which the investor doesn't own any share of, and then maybe

17    those investments will cause the business to succeed, and

18    perhaps if the business succeeds, the asset it sold will go up

19    in value too.

20            The same point can be made about any company that

21    sells a durable good.  Anything that's sold will generate

22    proceeds for the seller.  The seller can invest in its

23    business, which might cause the asset to go up in value.  And

24    that can't be enough to make something a security because

25    otherwise all collectibles would be securities, baseball

1     cards --

2           THE COURT:  Why were consumers being encouraged to

3     purchase BNB, as opposed to any other coin?  What was all that

4     stuff that Binance was saying in its white paper and its public

5     statements over and over again for, if it didn't want the

6     investing public to think that the reason you want this coin,

7     the reason you want to give us your money is because we're

8     going to make this platform so much better, so much stronger,

9     that these coins are going to retain their value while the

10    other ones stall out?

11          MR. MENDRO:  Undoubtedly, anybody who sells any

12    assets wants to be successful.  But that's not the definition

13    of a security.  Why would they advertise it?  Because otherwise

14    the enterprise, the exchange enterprise would be a failure.

15    But I think --

16          THE COURT:  You're saying it's just puffery?  It's

17    just hype?  It's not really true?  All the platforms are

18    equally good?

19          MR. MENDRO:  That's not what I'm saying, Your Honor.

20    I'm saying that advertising a platform is something that you

21    would expect anybody who creates an annuity to do and it

22    doesn't define a security.

23          One thing I want to be clear about, because I think

24    it can get loss in the papers, in a lot of the SDNY cases the

25    asset was being issued at the time that the company was

1    developing a blockchain and that's the only place that that

2    asset could live.  Here the blockchain is not made by BHL, the

3    blockchain is -- the etherial blockchain existed before BHL.

4    What BHL was creating, this exchange, which is a meeting place,

5    like eBay, where people who want to buy and sell things can

6    come together to conduct transactions.

7           But BNB very much exists outside the exchange.  It

8    will trade on this blockchain if BHL goes away.  It can trade

9    on other people's exchanges.  So this isn't a case where the

10   asset had no existence outside of what BHL was building, which

11   is just an exchange, not a blockchain.

12          THE COURT:  Do you dispute the fact that they were

13   really touting the strength of the exchange and, indeed, using

14   these funds to create and strengthen the exchange as a reason

15   investors should buy these particular coins?

16          MR. MENDRO:  I will not dispute that they were

17   touting the exchange and their plans, with good reason.  They

18   had good management, they wanted people to know that, they

19   wanted people to buy their asset.  But, you know, Topps wants

20   people to buy their baseball cards and also receive the

21   proceeds and uses them to create an environment where people

22   might want more baseball cards.

23          THE COURT:  I don't think that's part of the

24   advertising, actually, for baseball cards that -- but anyway, I

25   don't know if that's your world's greatest analogy.

1           All right.  I don't think the government or any case

2    has said a digital coin is always a security.  The case law

3    seems to focus on the totality of the circumstances.  How is it

4    sold?  How is it marketed?  What were the reasonable

5    expectations for a return?  Were the fortunes tied to the

6    fortunes of the issuer?  Why does that not apply to the BNB

7    ICO.

8           MR. MENDRO:  So for the BNB ICO, Your Honor, we're

9    relying on extraterritorial arguments and we're relying on

10   statute of limitations arguments, which Mr. Gregory is going to

11   address.

12          THE COURT:  Let's say we're just talking about the

13   question I just asked you, which is which element of the *Howey*

14   test fails with respect to the BNB ICO?

15          MR. MENDRO:  The element requiring post-sale

16   obligations on the part of the promoter.

17          And the reason for that is --

18          THE COURT:  Where is that one of the three *Howey*

19   elements?

20          MR. MENDRO:  It's from *Life Partners*, Your Honor.

21   The reason for that is that the proceeds are not being used --

22   the investment proceeds are not being used to generate a return

23   for the investor after the investment is made.  The proceeds

24   are just going to BHL, which BHL is using as it pleases to

25   develop its exchange, but its exchange is separate.

1            But I do want to be very clear, in our brief, that

2     we're not relying on *Howey* for the ICO.  We're relying on time

3     bar, we're relying on extraterritorial.  I'm trying to be

4     responsive to the Court's questions.

5            THE COURT:  That's fine.

6            MR. MENDRO:  This isn't a point that we concede.  And

7     it is a point we would vigorously argue if this case proceeded.

8     But in this stage we wanted to give you the clearest way to

9     dismiss.  And I submit, and our briefs argue, the clearest way

10    to dismiss the ICO is time-barred and extraterritoriality.

11           THE COURT:  I forget, are those your arguments?

12           MR. MENDRO:  That's going to be my colleague.

13           THE COURT:  Putting aside then the argument that you

14    have to have a contract and it's not fair, why is the SEC wrong

15    about BUSD and whether the sale of that was an investment

16    contract?

17           MR. MENDRO:  If I could, Your Honor, just make one

18    closing point.  I know you want to get to resales later.  But

19    it was the thrust of what we argued in our brief about BNB.  So

20    I want to make this brief.

21           THE COURT:  Okay.

22           MR. MENDRO:  With respect to the resales of BNB,

23    customers aren't paying BHL anything.  They're just paying

24    whatever happens to be selling when they happen to be buying.

25           THE COURT:  It's the investment of money aspect?

1          MR. MENDRO:  It's the investment of money.  It's a

2     common enterprise.  If there's no investment of money, it's a

3     common enterprise.  Under *Life Partners*, to have that, you have

4     to have a pool of assets which share profits and share risks.

5     And you have no pooling of assets when a buyer is simply paying

6     the seller.  That's what happens over an exchange.

7          So that, we would submit, Your Honor, is a very

8     simple way to dismiss all of the SEC's claims about BNB

9     regarding resales over the exchange.

10          THE COURT:  Okay.  One of the cases, I think it was

11     *Telegram*, basically said, in terms of secondary sales, you

12     could be right, or it could depend on what was said about the

13     secondary sales as part of the initial offering.  In other

14     words, if there's something that they were -- at the beginning,

15     when they were touting their superior platform when they issued

16     them, could that still be part of the circumstances surrounding

17     secondary sales?

18          It seems to me, in the Second Circuit, also, there's

19     a -- well, not the circuit, in the Southern District of

20     New York there's a split between courts that are saying

21     secondary sales are not ever investment contracts, and some are

22     saying, well, it could be depending on what you said when you

23     sold them.  So, which line of authority is correct?  Is it

24     never an investment contract once it's past -- once it's been

25     sold the first time?  Or does it depend on the circumstances?

1    And then are there circumstances alleged here that could

2    plausibly allege, in even the secondary sale, was an investment

3    contract?

4              MR. MENDRO:  So there's a couple questions there and

5    I'll try to take them in turn.

6              THE COURT:  You wanted to skip ahead to secondary

7    sales, so I don't want to miss anything.

8              MR. MENDRO:  With regard to secondary sale, you can

9    never satisfy -- of an asset that's not a contract, you can

10   never satisfy the prong that requires there to be an investment

11   of money in a common enterprise because the money is a pool --

12   will the Court mind if I grab a drink of water?

13             THE COURT:  Go right ahead.  It does not count as a

14   phone.

15             MR. MENDRO:  Thank you, Your Honor.  There will never

16   be pooling of assets in that circumstance, so it doesn't really

17   matter what was said at the beginning, you know, at the outset

18   of the launch of the offering.

19             I think you're referring to two recent cases from the

20   SDNY, one is the *Ripple* case, and that's the case that makes

21   the point that people who are buying tokens on the secondary

22   market don't even know the seller.

23             THE COURT:  Right.  I think it found they were

24   generally excluded from the notion of an investment contract.

25   But I think the *Terraform Labs* case said there were some

1   circumstances where there could be.  So I want to know which

2   one is more similar to what we have here in terms of the

3   allegations and whether one of them was wrong, in your view.

4            MR. MENDRO:  Exactly, Your Honor.  That's the split.

5   So it's in the SDNY.

6            We obviously agree with the *Ripple* decision.  The

7   *Terraform* decision says that secondary scales can be investment

8   contracts because the proceeds of those sales feed back into

9   the blockchain.  That was the reasoning.  That can't -- with

10  respect to the Court, that cannot be right.  The proceeds of

11  those sales go to the seller.  And in this case the

12  blockchain -- this isn't even BHL's blockchain, it's the

13  etherial blockchain, which predates BHL.

14           So we think that reasoning is not correct.  We also

15  submit the allegations here wouldn't support that there's no

16  allegation that somebody who buys BNB, or any of the

17  third-party tokens, by the way, would have very similar

18  arguments for them.  There's no argument that the proceeds of

19  those sales would go back to BHL or go back to the creators.

20  So, no, you can't have an investment contract in this

21  circumstance.

22           We're not asking the Court to hold that there's no

23  circumstance in which an investment contract could be resold.

24  I don't think we need to go that far on the allegations of this

25  case.  And I can imagine, you know, there may be some

1    circumstance where there's a contract that has rights of

2    assignment, or maybe promoter of that contract agrees to an

3    assignment with a third party.  You could come up with a

4    hypothetical where I would be very hard-pressed to say that

5    that doesn't remain an investment contract.

6           But those circumstances aren't here.  These

7    circumstances are completely consistent with the transfer of

8    assets, which don't come with any kind of obligations and which

9    don't result in any pooling of assets.

10          THE COURT:  Okay.  Let's go back, because I do want

11   to touch on -- I want to be careful to make sure that I ask

12   each side about each asset that's at issue here.  Talk to me

13   about BUSD and why the SEC is wrong about it when they

14   characterize it as an investment contract.

15          MR. MENDRO:  In the case of BUSD, the problem is

16   there isn't a credible argument for the customer to expect a

17   profit.  BUSD is what's called a stable coin.  So its value is

18   fixed upon dollar, and it always remains fixed upon dollar.  So

19   there's no reasonable expectation of profits.  And with regard

20   to reselling of BUSD on the secondary market --

21          THE COURT REPORTER:  Sorry.  Could you repeat that?

22          MR. MENDRO:  With regard to resales of BUSD on the

23   secondary market, there's also, again, not an argument the

24   money was pooled.  I believe the SEC would say and it's

25   alleging BUSD in the U.S. was sold directly and over the

1    exchange.

2         So the principle argument is that customers cannot

3    expect a profit, which obviously is an essential element of the

4    *Howey* test.

5         THE COURT:  Going back to BNB for a minute, one of

6    the Southern District opinions made kind of a careful

7    differentiation based on who are you selling it to.  Just going

8    out to the investment public, what's reasonable for people to

9    anticipate might be different than if you're doing

10   institutional sales or you're going after sophisticated

11   investors that are actually reading your white papers and all

12   of those things.  Do you think that there should be a

13   differentiation in the analysis based on who a particular asset

14   is being marketed to?

15        MR. MENDRO:  That analysis also comes from the *Ripple*

16   case.  And I do believe that is a very relevant consideration,

17   Your Honor.  For one reason, it shows privity.  The seller and

18   the buyer are talking to each other, they know that the money

19   is going to the buyer, the buyer knows the money is going to be

20   used to promote the platform.  That's very different than when

21   a personal market happens over an exchange.  So I would agree

22   that's a relevant consideration.

23        THE COURT:  I don't think they meant privy in a

24   contractual sense.  I think they meant who is smart enough to

25   be paying attention to your documents and who is going to

1    bother to pay attention to your documents.  But, yes, I

2    thought -- it's a very thorough, well thought-through opinion.

3    I mean, a lot of them are.  But they don't all come out the

4    same way.

5         All right.  They have also alleged that the simple

6    earn and the BNB vault programs are also investment contracts.

7    What do you have to say about each of those?

8         MR. MENDRO:  There, Your Honor, so those are two

9    pages of allegations in a 134-page complaint with 500

10   paragraphs or more.

11        THE COURT:  I noticed that.

12        MR. MENDRO:  Yeah.  So I think the allegations are

13   quite conclusory.  We submit that those two programs are not

14   investment contracts because it's undisputed.  I think the SEC

15   would agree that the investment could be withdrawn at any time.

16        THE COURT:  Slow down, because now even I can't keep

17   up with you.

18        MR. MENDRO:  The funds can be withdrawn at any time.

19        THE COURT:  Okay.

20        MR. MENDRO:  The complaint describes them as loans at

21   paragraph 327, 329, and 331.  And there's no investment of

22   money under *Howey*, customers don't transfer anything, no

23   ownership is transferred.  And the *Daniel* case, the Supreme

24   Court case, *Teamsters versus Daniel*, the Court said that

25   ordinarily the investor has to give up specific consideration.

1    Whereas here, the allegations are not consistent with giving up

2    consideration.  They're more consistent with simply making a

3    deposit that can be gotten back at any time.

4         The other answer to Your Honor's question about why

5    the Simple Earn and BNB vault claim fails, this is Count 3, is

6    both of those programs are extraterritorial.  And Mr. Gregory

7    will address that.

8         THE COURT:  Okay.  And then you've taken on the

9    third-party tokens as one of your issues.  You've already

10   touched on it to a certain extent.  But if you have anything

11   else, any other reason why I should reject the notion that

12   those are being sold as investment contracts?

13        MR. MENDRO:  The argument for those third-party

14   tokens, Your Honor, are very similar to the resale argument for

15   BNB.  There's no pooling of assets because the money simply

16   goes from the buyer to the seller.  There are no post-sale

17   obligations to do anything for anyone.  So we would submit that

18   the Court should dismiss the claim about the third-party coins

19   for the same reason that the Court should dismiss the resale

20   claims for BNB.

21        THE COURT:  Do you want to direct me to the specific

22   page and language in *Life Partners* that says there must be

23   post-sale obligations in this circuit?

24        MR. MENDRO:  Yes, I would be happy to do that.  Bear

25   with me one moment, I'll grab a case.

1          THE COURT:  That's fine.

2          (Pause.)

3          MR. MENDRO:  Sorry, Your Honor.

4          Page 545, Your Honor.  This was a case, the entire

5     basis for the reasoning in the case, this was a case where the

6     defendant was selling an interest in viatical settlements and

7     the Court -- they were clearly an investment.  There was no

8     dispute that the only reason to buy this was to make money.

9     And the Court concluded that the requirement of *Howey* that says

10    that you have to have reasonable expectation of profits in the

11    endeavors of another was not satisfied because the return on

12    the viatical settlements was entirely based on the insured

13    passing away.  So the Court said there was no meaningful

14    entrepreneurial managerial efforts that the defendant LPI made.

15         THE COURT:  Right.  That's different from obligations

16    or contractual the way you've been reading it.  It was saying

17    that there's just nothing to do at all.  You were not doing

18    anything managerial or entrepreneurially that would affect the

19    value.  The value was determined by when the person died.

20         MR. MENDRO:  That's right, Your Honor.

21         THE COURT:  Okay.  Just want to make sure I didn't

22    miss something in there.

23         MR. MENDRO:  No, you didn't.  But the Court does

24    speak in terms of commitment, that's also on page 545.  It's

25    looking at the commitments made by the defendant, the promoter

1    of the investment, to engage in managerial or entrepreneurial

2    activities to earn a return from the investor's investment

3    after that investment is made.

4         THE COURT:  And with respect to BNB, you're not

5    disputing that there are allegations in the complaint -- which

6    is where we are right now, not proved -- that Binance was

7    saying we're going to do all these things to support our

8    exchange and all those things are going to support the value of

9    BNB, which you're relying on the time-barred and

10   extraterritoriality and the fact that there was no contract to

11   do that?

12        MR. MENDRO:  For the ICO, that's true.

13        THE COURT:  Right.

14        MR. MENDRO:  But for the resales, we would also

15   submit there's no obligation --

16        THE COURT:  Right.  I heard all that and I even took

17   notes.  So, I was planning to ask you about this question last,

18   but since it's assigned to you, I want to ask you a few more

19   questions before I go on to Mr. Gregory's issues, which I'm

20   also interested in.

21        But you have taken on the major questions doctrine.

22   And I have to say that while this may be a trillion dollar

23   industry, I'm not inclined to think it qualifies under the very

24   narrow circumstances outlined in these cases.  So is there

25   anything you want to add to what's in your brief with respect

1    to the major questions doctrine?

2            MR. MENDRO:  There is one thing I would like to add

3    to my last answer, if the Court would indulge me.

4            THE COURT:  Okay.

5            MR. MENDRO:  I would also point the Court to page 548

6    of *Life Partners*.

7            THE COURT:  Okay.

8            MR. MENDRO:  Where the court says:  For present

9    purposes we need only agree with the district court that

10   pre-purchase services cannot by themselves suffice to make the

11   profits of an investment arise predominantly from the efforts

12   of others.  That's --

13           THE COURT:  Right.  And it repeated that in the

14   denial of the rehearing, that that's all it was saying, the

15   pre-purchase activities alone weren't enough, there had to be

16   activities later.

17           MR. MENDRO:  Right, that were managerial and

18   entrepreneurial in the sense they generated returns for the

19   investor.

20           THE COURT:  Okay.

21           MR. MENDRO:  So on -- I just wanted to make sure I

22   gave you that quote too, since you asked me for a page number.

23           THE COURT:  All right.

24           MR. MENDRO:  The major questions, it's obviously a

25   multi-trillion dollar industry.  The complaint alleges, at

1    paragraph 102, that BHL alone had $9.5 trillion in trading

2    volume by 2021.  But that's not the only reason.  It's also an

3    issue of enormous political significance, which is another

4    factor for the major questions doctrine.  The regulation of the

5    crypto market has been the source of fierce public debate.

6    There have already been more than 20 proposals to enact laws

7    governing the industry.

8         And I would further submit that if the Court does

9    what the SEC is asking and it concludes that an investment

10   contract doesn't require a contract, this case becomes even

11   more major for purposes of the major questions doctrine because

12   it would mean that the SEC's authority to stretch to cover

13   virtually any asset that someone might hold that goes up and

14   down in value.  The SEC essentially would become the investment

15   exchange reach because there would be no distinction between

16   commodities and security that could be understood.

17        THE COURT:  You keep saying that, but that's like

18   saying there would be no difference between orange groves and

19   securities.  Every single one of these cases says, over and

20   over again, that there's a difference between the asset and the

21   investment contract to sell the asset, or the contract scheme

22   or transaction and the set of expectations and agreements

23   surrounding it that constitutes the transaction.  No one is

24   saying, not even the SEC, that every single digital coin is a

25   security, are they?  Are they asking me to find that?

1   Everybody is all up in arms about that, but I don't see where

2   anybody is asking me to do that.

3           MR. MENDRO:  I think it's a very fair question for

4   the SEC, Your Honor.  I mean, just last fall the chairman of

5   the SEC was unable to answer the question whether a digitized

6   Pokémon card was a security.  And so the problem is, the line

7   is very unclear.

8           THE COURT:  Well, the last time you all were up in

9   front of me you weren't able to answer the question of whether

10  it was a commodity and now you're all excited about it being a

11  commodity.  So people's positions change, even though the law

12  hasn't.

13          MR. MENDRO:  There certainly has -- we thought much

14  more about the issue since we came here for an emergency motion

15  almost -- nearly a year ago.  But the reason I'm emphasizing

16  the consequences of the SEC's position is because the *Merck*

17  case, which is a D.C. Circuit case, also binding on this court,

18  makes clear that even if you have a rule that in any particular

19  context is not offensive or difficult to comply with it, you

20  have to look at the further implications of what the agency is

21  asking for.

22          THE COURT:  But I think the major questions doctrine

23  isn't just saying will this affect the industry in its

24  entirety, it's suggesting:  Will that affect the economy of the

25  United States in its entirety?  Is that industry such a

1    fundamental part of how people operate in this country?  And

2    while the digital coin investments have been popular, they're

3    hardly driving our economy at this point, are they?

4             MR. MENDRO:  I don't know that it's in the record as

5    to whether -- what extent they're driving the economy, but it

6    is in the record that we're talking about trillions of dollars,

7    which is much, much more than what's at stake in many cases the

8    Supreme Court decided did implicate the major questions

9    doctrine.

10            So would you think that doctrine applies?  We do

11   think that's a separate, independent reason why the Court

12   should dismiss.  And it's very clear that there is no express

13   congressional authority for the SEC to be regulating the crypto

14   currency market.

15            THE COURT:  Well, there's no express authority for it

16   to regulate any of the things that courts have held were being

17   sold as investment contracts.

18            MR. MENDRO:  Well, to the extent that they actually

19   are contracts, the SEC has a better argument that they're

20   within the statutory authority.  I think if the Securities Act

21   and the Securities Exchange Act said the SEC has the ability to

22   regulate anything that somebody might buy for investment

23   purposes, or even principally for investment purposes, I would

24   have a harder argument to make.  But when the SEC argues an

25   investment contract doesn't require a contract, and the

1    consequence is that basically anything that's tokenized or

2    digital could be within its reach, there is a major question.

3                THE COURT:  All right.  Okay.  Thank you.

4                MR. MENDRO:  Thank you, Your Honor.

5                THE COURT:  Is there anything you want to add on any

6    of the points that you were assigned to that you haven't gotten

7    to say before I turn to the next counts?

8                MR. MENDRO:  Not at this point, Your Honor.  But with

9    the Court's indulgence, I would like to reserve the opportunity

10   for rebuttal.

11               THE COURT:  It will be short.

12               MR. MENDRO:  Thank you.

13               THE COURT:  Okay.  Mr. Gregory.

14               MR. GREGORY:  Thank you, Your Honor.

15               THE COURT:  All right.  Since we started with major

16   questions, I'm going to start with you with the due process

17   because I wasn't sure I found that one all that persuasive

18   either.  But, I want to know why I'm wrong about that.

19               So if you want to do more than just rest on your

20   pleadings with that, you can tell me.  But we've got a DAO

21   report in July of 2017 in which the SEC found that a German

22   company's marketing of tokens was a sale of securities and it

23   advised people in the industry to start paying attention and

24   comply with the securities laws.

25               It issued its framework about digital assets in 2019,

1    the *Kik* Securities case was filed in 2019, *Ripple Labs* was

2    filed in 2020, *Telegram* around the same time.  And the

3    complaint has multiple allegations in which Mr. Zhao is

4    discussing explicitly how to avoid SEC regulation earlier than

5    that.  So on what basis are you arguing that nobody was on

6    notice and this just came out of nowhere?

7           MR. GREGORY:  Couple of responses, Your Honor.

8    First, everything you just mentioned postdates the July 2017

9    ICO.  So even if Your Honor is not buying this argument more

10   broadly, that would still be a reason to dismiss any claims

11   related to the July 2017 offering of BNB tokens.  But more

12   broadly, I think the SEC to this day has been talking out of

13   both sides of its mouth when it comes to crypto tokens.

14   They're telling the industry, come in and register, while

15   simultaneously, with their other hand, holding the door closed,

16   preventing any viable path to do that.

17          THE COURT:  How are they holding the door closed?

18   There are points where they're not -- not saying the things

19   that they're saying now, but when were they stopping you?

20          MR. GREGORY:  You could look at the experience of

21   Coinbase, Your Honor, which tried to go to the SEC and say how

22   can we come in and register as a crypto exchange, given the

23   unique assets of this industry and the particular fact that

24   these tokens are used for transactions, they're not just used

25   solely for investments, like other securities.

1          The SEC refused to cooperate, refused to give them

2     any guidance.  In fact, just went ahead and sued Coinbase on

3     the same plot that they're bringing here, while simultaneously

4     telling the public, Come in and register, come in and register,

5     we'll work with you.  So I think that's the inherent problem

6     here, Your Honor, is they're simply refusing to give people a

7     viable path in the crypto space.

8          THE COURT:  All right.  Well, much of the brief has

9     been focused on what I would call loosely "policy arguments."

10    Congress is working on this, SEC has taken contrary positions

11    in the past.  And you could certainly have a legitimate

12    discussion about the fairness of using litigation to regulate

13    the crypto currency industry after years of inaction, or

14    whether it makes sense as a policy matter to go token by token,

15    court by court and risk, as we already have gotten some

16    conflicting decisions on different important points.  How does

17    any of that bear on a motion to dismiss under Rule 12(b)(6)?

18         MR. GREGORY:  It bears on the fair notice argument

19    and here's why:  The agency, of course, under *Chaney* has

20    discretion to choose to bring enforcement actions instead of

21    dual rulemaking.  But they always have the obligation to

22    provide the public fair notice of the conduct that it expects

23    of them, even if they're using enforcement, and they simply

24    haven't done that here.  And so that's where this argument

25    comes in for purposes of the motion to dismiss.

1          THE COURT:  Well, after -- yes, pre -- let's say I

2     agree with you pre-2019.  But after that, how can you say the

3     public is not aware of what's going on?

4          MR. GREGORY:  In 2018 the SEC is telling the public

5     that tokens are not securities.  As recently as, I believe,

6     2021 Chair Gensler said there is no regulatory framework for

7     this industry yet.  And so it's not just 2017.  I mean,

8     throughout this time period they are telling the public things

9     that are completely inconsistent with what they're saying in

10    court now, and they're seeking to apply that new interpretation

11    retroactively in our case.  They're saying there's not even a

12    limitations period.

13         THE COURT:  What authority do I have to impose any

14    preferences on how an agency should exercise its enforcement

15    authority?  I mean, let's say I think regulation is the way to

16    go.  What's it matter what I think?

17         MR. GREGORY:  For purposes of this motion, Your

18    Honor, it's the Due Process Clause.  It's the lack of fair

19    notice.  I understand Your Honor has concerns about this

20    argument, but that's where this fits into our motion to

21    dismiss.

22         THE COURT:  All right.  One of the things you all are

23    doing is saying, Look, there's proposed legislation over here,

24    that's the way for them to go.  Are you all supporting the

25    proposed legislation?

1          MR. GREGORY:  I'm not aware today of our client's

2     position on any particular legislation.  But this gets to the

3     major questions, Your Honor.  And of course that's not part of

4     Congress's interest in the question; it has decided that it

5     requires legislation.  It doesn't matter whether any particular

6     party is supporting that.

7          THE COURT:  All right.  Let's get to the legal

8     arguments.  Is there anything left to your argument that a U.S.

9     federal court and federal agency don't have subject matter

10    jurisdiction or personal jurisdiction over Binance now that

11    you've conceded jurisdiction in the CFTC case?

12         MR. GREGORY:  To be clear, BHL has not moved to

13    dismiss for lack of jurisdiction in this case.  Mr. Zhao has,

14    and I believe his counsel will address that issue for him.

15         THE COURT:  Okay.  What about subject matter

16    jurisdiction?  That's one of the arguments I think you're

17    holding onto, aren't you?

18         MR. GREGORY:  We are not arguing that the court lacks

19    subject matter jurisdiction.

20         THE COURT:  Just under the Extraterritorial Act?

21         MR. GREGORY:  We have argued the statute doesn't

22    apply beyond U.S. borders.  But the Court in *Morrison* made

23    clear that's not a jurisdictional question, that's simply a

24    statutory interpretation issue.

25         THE COURT:  So the government's position is:  We're

1    not seeking extraterritorial application of the securities laws

2    just because the buyers are U.S. residents.  In fact, they say

3    we're not seeking extraterritorial application at all.  These

4    were offers and sales in the United States and they're not

5    exclusively foreign.  So what's the response to that?

6        MR. GREGORY:  It's simply incorrect under *Morrison*

7    and *Abitron*.  So if you read *Abitron*, the Supreme Court was

8    very clear this last June that the defendant's conduct, conduct

9    that's alleged to have violated the statute on which the client

10   had argued the SEC was premising liability, the defendant's

11   conduct has to be what occurred in the United States.  Here

12   they pointed to vague allegations about bank accounts, they

13   pointed to consequences in the United States, the presence of

14   U.S. investors, marketing that reached the United States,

15   things of that nature.

16       Under *Morrison*, a decade of post-*Morrison* precedent

17   applying the transaction test, and even more clearly the

18   Supreme Court's decision in *Abitron*, that is simply not enough

19   to show a domestic application, and here's why:  It's a tight

20   test and it's supposed to be because otherwise the SEC could

21   bootstrap its ways into foreign countries, get around the

22   *Morrison* assumption against extraterritoriality simply by

23   pointing to any sort of domestic conduct, use vague hooks to

24   get the claim back into the United States.  The Supreme Court

25   has warned against this and said you are to be very wary of

1    arguments the SEC is making here when the specific statutory

2    violation by the defendant is not alleged to have occurred in

3    the United States.

4         THE COURT:  All right.  Well, *Morrison* was dealing

5    with the 10(b) type allegations and the portion of *Banner Fund*

6    that preceded *Morrison* that said the 10(b) was okay because it

7    affected our residents here -- which we know has now been

8    overturned by *Morrison* -- what about the portion of *Banner Fund*

9    that said the failure to register allegations apply here?  Is

10   that still good law after *Morrison*, too?

11        MR. GREGORY:  No, Your Honor, because *Morrison* makes

12   clear the test here is where the transaction occurred.  And all

13   of these statutes that speak of registration use the same

14   transactional language.  In fact, the language that is even

15   more clearly referring to transactions than Section 10(b) in

16   *Morrison* and *Morrison* itself discussed the registration

17   provision.  So *Morrison* discussed Section 5, drew from Section

18   5 the transactional test that it then put into 10(b) context.

19   So I think *Morrison* makes clear that's just off the table.

20        THE COURT:  All right.  Let's talk about the

21   limitations argument.

22        I understand that the initial coin offering began in

23   2017, but if Binance continued to sell the same coin

24   thereafter, does that extend the statute of limitations?  What

25   is the time boundary that you're talking about here?

1          MR. GREGORY:  The SEC specifically alleges in the

2     complaint that the offering, that the direct sales from BHL of

3     BNB tokens ended in early July 2017.  Now, if we're talking

4     about resales, we aren't seeking to dismiss those on

5     limitations grounds.  But any claims related to the alleged

6     direct sales by BHL, the SEC itself alleges they were over in

7     July 2017 and they haven't asserted any sort of continuing

8     violation or anything like that, they've just simply said the

9     limitations period doesn't apply at all.

10          THE COURT:  And why doesn't it apply at all?

11          MR. GREGORY:  The SEC's theory, as I understand it,

12     the foreign defendant never gets the benefit of a limitations

13     period, especially a foreign corporate defendant, which, of

14     course, can have physical presence through its employees.  The

15     relevant limitations period here include the exceptions for

16     when a defendant is either outside the United States or cannot

17     be found within the United States.  Here, at paragraph 24, the

18     SEC specifically alleges that BHL did have employees in the

19     United States.

20          So I think their theory is only the country of

21     corporation that counts.  And that would be a pretty bizarre

22     scheme for Congress to adopt, that foreign platforms are

23     somehow subject to the securities laws through their capacious

24     understanding of a domestic violation and get no limitations

25     period at all, even if they have employees in the

1    United States.

2         THE COURT:  All right.  And is there a specific case

3    that you're relying on that deals with that dichotomy between

4    you can't reach the foreign company so we need more time to get

5    them and then your argument?

6         MR. GREGORY:  There are cases, Your Honor.  There's

7    not many.  We've looked and we found essentially the same cases

8    that the SEC cited you.  There's the *Sharp* case from the

9    District of Massachusetts.  That case I think pretty clearly

10   says we're talking about physical presence.  Now, it involves

11   individuals, not a corporation.  And I'm not aware of any case

12   that addresses these facts for a corporation.  But I would

13   submit it simply can't be the case that Congress wanted foreign

14   corporate defendants to never have any limitations period, even

15   if they have a presence in the United States.

16        THE COURT:  All right.  Of the issues assigned to

17   you, is there anything that I haven't asked you about directly

18   that you want to emphasize before we turn to Mr. Davis?

19        MR. GREGORY:  A couple things, Your Honor.  First, I

20   do want to mention this other argument the SEC raised about the

21   limitations period.  They've pointed out the claim for

22   injunctive relief is subject to a longer time period, ten

23   years.  That is correct as far as is it goes, but the SEC

24   hasn't alleged requisite facts to seek injunctive relief.  We

25   explain that in our brief.

1          I think it's fully addressed in there, but I want to

2     make sure that doesn't get missed in this because I'm sure

3     they'll come up and mention the claim for injunctive relief.

4     The reason is, they have to allege that the violation is

5     essentially ongoing, the statutory language is engaged or about

6     to engage.

7          On extraterritoriality --

8          THE COURT:  Does the fact they're relying on that

9     suggest that they are relying on some sort of continuing

10    violation theory?

11         MR. GREGORY:  They don't allege it in the complaint,

12    Your Honor.  They did say that in the brief.  The allegation

13    perhaps would seek the opposite.  This is all over in the

14    brief.  I think it's far too late for them to bring a new

15    theory up now.

16         One other thing I would like to say on

17    extraterritoriality, Your Honor, is just remember there are

18    other cops on the beat here.  The world is not a void waiting

19    to be filled by SEC regulation.  Other countries regulate these

20    transactions, other countries regulate conduct that occurs

21    within their own borders.  Like *Morrison* --

22         THE COURT REPORTER:  Sir.

23         MR. GREGORY:  Sorry.

24         THE COURT:  Well, wasn't the point that they weren't

25    on any country's beat?  Didn't they deliberately not put

1    themselves down anywhere for that very reason?  What other

2    countries were on this beat?

3              MR. GREGORY:  To be clear, Your Honor, they allege

4    the Cayman Islands.  There's not more than that in the

5    complaint.  If you want me to go outside the record, I can.  We

6    are licensed in multiple jurisdictions.  When I say "we," I

7    mean Binance.com, the platform is licensed in more than a dozen

8    locations around the world.

9              But more importantly, under *Morrison* that is not the

10   test.  It's not our burden to show a specific country that

11   regulates conduct.  *Morrison* and *Abitron* say U.S. law stops at

12   the border and it's up to other countries to decide what

13   happens within their own borders.  Again, the world is not just

14   waiting for the SEC to come in and fill a gap.

15             THE COURT:  All right.

16             MR. GREGORY:  Thank you, Your Honor.  And I would

17   also like to reserve just a little bit of time for rebuttal, if

18   I may.

19             THE COURT:  All right.  We'll see how this goes.

20             Mr. Davis.

21             MR DAVIS:  Good morning, Your Honor.

22             THE COURT:  Good morning.  And without repeating the

23   arguments that I think the initial counsel has made very

24   forcefully about whether you need a contract, just assuming

25   that we're working through a *Howey* analysis, why is the SEC

1    wrong when applying *Howey* to the BAM trading staking program?

2         MR DAVIS:  Sure.  Two reasons, Your Honor, in

3    addition to the reasons that Mr. Mendro mentioned.  First of

4    all is the pooling question.  *Life Partners* is clear in this

5    circuit, to establish horizontal commonality you need to

6    establish pooling, and that is not present with the secondary

7    market transactions on BAM's platform.  None of the money that

8    it trades hands within those secondary market transactions goes

9    to the issuer.  And that's clear in the allegations in the

10   complaint.  You can look at paragraph 91, which says the buyers

11   and sellers of the digital assets of BAM's platform do not know

12   each other.

13        Paragraphs 223 and 224, which says the BAM matching

14   engine matches those bids and offers.  And 232, 233 where it

15   says the money trading hands is held at a trust company, not

16   anywhere else.  So that defeats the *Howey* analysis in the D.C.

17   Circuit because you don't have horizontal commonality because

18   you don't have pooling and that --

19        THE COURT:  Well, did *Life Partners* say that pooling

20   was indicative of horizontal commonality or did he say it was

21   necessary?

22        MR DAVIS:  He said it was an element.  And that

23   phrasing was repeated in the *Banner Fund* case four or five

24   years later, and it -- the *Life Partners* case required pooling

25   because the viatical settlements, the Court was saying, well,

1    if an individual can just purchase a fraction of a viatical

2    settlement and that's enough to purchase a viatical settlement,

3    then there's no pooling.  The Court found that was not the case

4    because you, me, and three other people had to purchase enough

5    fractional interest in a viatical settlement to purchase one

6    viatical settlement that was the pooling necessary to meet the

7    element that the D.C. Circuit established in *Life Partners*.

8         THE COURT:  All right.  You said you wanted to talk

9    about the displacement of CFTC jurisdiction if digital assets

10   are held to be securities, if I would permit.  And I can't say

11   I saw where that was in any of the defendants' briefs.  So, I'm

12   not sure why, since the government hasn't had an opportunity to

13   respond to that argument, I should let you address that now.

14   Do you want to explain that?

15        MR DAVIS:  Two reasons, Your Honor.  First of all, it

16   was discussed in the opening brief where we talked about there

17   was no limiting principle for the SEC's theory because it

18   would -- it would bleed into, you know, other assets and

19   commodities and Pokémon cards.  We elaborated on that in the

20   reply brief, especially the first five pages where we talked

21   about CFTC's antifraud query.  And the SEC brought this up

22   themselves and they cited a letter that was provided by the

23   Office of General Counsel in the *Telegram* case, which I'm very

24   familiar with because I was general counsel for the CFTC when

25   that letter was given to Judge Castel, which describes the

1    coterminous nature of the jurisdiction between the CFTC and the

2    SEC.  And you've seen this case very active in this space.

3    What's clear, Your Honor, is that where the CFTC's jurisdiction

4    ends with digital assets, it begins with the SEC.

5           So a decision by the Court helps decide that line.

6    And Congress was clear in Dodd-Frank that they wanted the CFTC

7    to have fraud and anti-manipulation authority for commodities

8    trading.  And so if this Court has any doubt or any concern --

9           THE COURT:  Well, where is it that the SEC is taking

10   the position that these are commodities and not securities?

11   They seem to be saying -- I mean, there's a very -- I think

12   it's the *Ripple Labs* that says it the most clearly.  But all of

13   these cases differentiate between the asset and the manner in

14   which a particular asset is sold and marketed to the public.

15   And, so, I don't see where the conflict is.

16          MR DAVIS:  Let me see if I can explain it to Your

17   Honor.  The SEC claims you don't need a contract, you -- you

18   know, talk about Mr. Mendro's arguments, if the Court adopts

19   the SEC's view, there's no meaningful distinction between

20   regulated products on the CFTC's purview and what the SEC

21   regulates.  It is common in the CFTC markets for an asset to be

22   promoted by somebody and for people to potentially view and

23   even rely on those statements of promotion in determining to

24   purchase an asset.  What is missing --

25          THE COURT:  Are you saying there would never be, in

1    the investment contract, something that is not itself a

2    security?

3              MR DAVIS:  No, Your Honor.

4              THE COURT:  That's what all the cases are about,

5    isn't that correct?

6              MR DAVIS:  I don't think that's correct, Your Honor.

7    And I'll give the --

8              THE COURT:  An orange grove isn't a security, is it?

9              MR DAVIS:  No.

10             THE COURT:  No.

11             MR DAVIS:  An orange grove is not, but a token can be

12   a security if it includes those contractual commitments.

13             Now, you mentioned the DAO report.  If you look at

14   the DAO token, that was a token that conveyed voting rights.

15   That was a token that conveyed the rights to proceeds from

16   activities that the DAO decided to engage in.  That token

17   itself included an investment contract.  The transactions that

18   are happening --

19             THE COURT:  So if what they're doing is saying we

20   want to go after what we think are investment contracts --

21   whether you disagree as to whether they qualify is another

22   point -- investment contracts involving the sale of digital

23   assets, how does that conflict with the Commodities Future

24   Trading Commission's ability to do what it's going to do?

25             MR DAVIS:  Because the SEC is adopting or -- adopting

1    a theory on investment contract that has no limiting principle

2    and, therefore, it breaches or interrupts the CFTC's

3    jurisdiction.

4         Your Honor, bitcoin and ether products, there are

5    future-based bitcoin and ether products that have been trading

6    on the CFTC for years.  There are a number of additional assets

7    that have recent -- digital assets that have been

8    self-certified by CFTC-regulated entities whose jurisdictional

9    basis would be questioned should this Court adopt the SEC's

10   view.  The CFTC --

11        THE COURT:  Haven't multiple courts adopted the SEC's

12   view and the world did not come to an end?

13        MR DAVIS:  No, they have not, Your Honor, because the

14   cases like *Terraform* is an ICO case where there is contractual,

15   you know, arrangements between the two parties.  *Ripple* is a

16   little different.  There weren't such contractual agreements.

17   It's a type -- from my CFTC background, I recall those spot

18   transactions.  And in the business it's understood that spot

19   transactions are under the enforcement jurisdiction of the

20   CFTC.

21        And if you -- you know, the CFTC has brought numbers

22   of cases.  The CFTC has asserted USD is a commodity, CFTC has

23   asserted that Tether is a commodity.  The CFTC reached a

24   settlement with Coinbase regarding wash sales, which I know is

25   one of the bases for their fraud allegations against us.

1          THE COURT:  Apparently, last week the CFTC and these

2     defendants entered into a consent agreement that the BUSD was a

3     commodity.  And not one of the 45 lawyers that have entered

4     their appearance for the defendants decided to bring that to my

5     attention prior to this hearing.  So, it seems like it was

6     timed so you can stand up here and make this argument to me.

7     It seems very strategic.

8          MR DAVIS:  There's nothing strategic about it at all,

9     Your Honor.  Quite frankly, I was very surprised when the SEC

10    gave you notice of the DOJ and the FinCEN settlements that they

11    did not mention the CFTC settlement at the same time because

12    those three settlements were named in the exact same press

13    conference.  About ten days after the SEC notified this Court

14    of the DOJ and the FinCEN settlements, the CFTC consent order,

15    which had already been discussed publicly, was made public.

16    And so I don't understand why the SEC did not tell you about

17    that settlement either.

18          THE COURT:  I went back, because I -- your notice

19    saying, I would like to talk about this, I thought, well, gee I

20    thought they took -- they were taking the position that it

21    wasn't a commodity either because that was where you were at

22    the initial hearing.  And so it wasn't until I went back and

23    looked at the docket in the Illinois case that I discovered the

24    consent agreement.

25          So, I guess my point is, though, assuming it's

1    correct and assuming BUSD is a commodity, does that matter?  Do

2    you agree that there could be -- and I think you've said yes --

3    an investment contract to sell commodities even if there is not

4    one here?  So that doesn't answer the question at the end of

5    the day, does it?

6            MR DAVIS:  So I'm saying that secondary market

7    transactions in and of themselves is not sufficient to get you

8    out of the *Howey* test.  All right?  And that's the distinction

9    I'm making between the DAO token and the DAO report.  If you

10   look at all of the allegations regarding all of the third-party

11   digital assets -- and we double-checked over the weekend --

12   there are no allegations regarding voting rights, there are no

13   allegations regarding some sort of, you know, pro rata share of

14   the activity --

15           THE COURT:  So secondary transactions in a coin that

16   is initially a commodity can't ever be a security in your -- is

17   what you're saying?

18           MR DAVIS:  I don't think I follow the question, Your

19   Honor.

20           THE COURT:  I asked you, does it matter, if a

21   particular asset is in fact a commodity, could there be an

22   investment contract to sell that commodity?  And your answer

23   was:  Not the secondary market.  So, I want, first of all, an

24   answer to my original question and then, second, I'm just

25   repeating to make sure I understand that you're saying, if it's

1    a secondary sale of a digital asset, it's always -- you're

2    always selling it.

3              MR DAVIS:  I'm not saying that, Your Honor.

4              THE COURT:  Okay.  Tell me what you're saying.

5              MR DAVIS:  What I am saying, if you have a digital

6    asset, that itself does not include the characteristics of a

7    security, right?  The ones that are sold on BAM's platform do

8    not.  Those types of secondary asset sales are not securities

9    transactions.  I am distinguishing that from the DAO report and

10   the DAO token in which the SEC says that DAO token, quite

11   frankly, acts a lot like a stock because it comes with it

12   certain voting rights and certain -- you know, rights to

13   certain, you know, proceeds from the products of the DAO.

14             THE COURT:  So there are digital assets, in your

15   view, that could have aspects of a security, all the earmarks

16   of an actual security?

17             MR DAVIS:  That is possible, Your Honor.

18             THE COURT:  Could there be an investment contract to

19   sell the ones that don't, that are commodities by your

20   definition but are being sold and marketed with the

21   understandings and expectations around it that would satisfy

22   *Howey*?

23             MR DAVIS:  It's difficult for me to think of an

24   example of that, Your Honor, because the description you just

25   gave is a very good description of the spot markets that the

1    CFTC has enforcement jurisdiction over.  Let me give you an

2    example:  Carbon credits.  Carbon credit is something that

3    doesn't have any inherent value in and of itself.  It's

4    something that people tout left and right about the ability of

5    carbon credits to be useful to help with climate change.  The

6    CFTC, not two weeks ago, issued a proposed release asking for

7    comments about voluntary carbon credits.  Right?  And the fact

8    that it's an ecosystem -- to use a term that the SEC likes to

9    use -- is not sufficient to transform that into an investment

10   contract.

11        THE COURT:  What if the money is supposed to be used

12   to create the ecosystem -- a term I'm not really loving either.

13        MR DAVIS:  So that goes to the pooling argument, Your

14   Honor.  Now, there may be situations where there is money that

15   goes directly from the purchaser to the issuer, where the

16   purchaser has an understanding that those will be used for

17   certain capital promotion activities.  Again, not this case,

18   not the transactions happening on the platform.

19        THE COURT:  I'm still talking about the hypothetical

20   case.  And I want to know, do you agree that there could be an

21   investment contract to sell things that are themselves

22   commodities, even if there isn't one here?

23        MR DAVIS:  I guess I would qualify that.  They would

24   need to have some other indicia, right?  You would need digital

25   asset plus.  Right?  Because otherwise you're just -- you're

1     selling gold, you're trading natural gas, you're trading oil.

2     You're trading all of the types of products that the CFTC has

3     been long understood to be in charge of with respect to its

4     enforcement.

5          THE COURT:  And the reason you're differentiating

6     between commodities and securities is because commodities --

7     basically gold, cotton -- they're fungible, the seller can't do

8     anything about it, can't do anything managerial or

9     entrepreneurial to create their value or to have their price go

10    up in the future.

11         MR DAVIS:  Some commodities it's harder.  But to go

12    back to my carbon credit example, that is widely understood to

13    be a commodity.  Right?  I think about less in terms of

14    commodity versus security.  I think of it more in terms of CFTC

15    jurisdiction versus assets jurisdiction.  Right?  CFTC

16    jurisdiction is for those types of products, those assets that

17    lack the type of contractual arrangements that you see in your

18    standard, you know, investment contract, you see in stocks, you

19    see in bonds, you see in all of the 20-some-odd definitions of

20    a security in the securities laws.

21         That's why I think, you know, the argument that the

22    SEC's argument here has no limiting principle is of great force

23    because it creates these complicated questions where someone

24    like me, who has spent, you know, most of the past ten years

25    working in the CFTC side of the ledger, reads the allegations

1    in the complaint, reads the types of attributes of these

2    particular digital assets, and I see oil, I see natural gas, I

3    see carbon credits, I see rare earth metals, you know, that

4    have just a couple of people that, you know, control what

5    happens with them.

6            I also see bitcoin, Your Honor.  It takes less than

7    15 minutes of online searching to find a number of people who

8    are very active in the bitcoin ecosystem and who have an

9    important role to play in the development of that --

10           THE COURT:  Let's talk about this case.  The core

11   allegations in the part of the complaint that talks about BNB,

12   is that Binance coupled the initial coin offering with the

13   representations that it was going to do something, it was going

14   to build a better and more efficient platform, that these coins

15   were going to be worth more because of what it did.  I mean,

16   would you be comfortable with a press article coming out after

17   this hearing that said, you know, the Binance lawyers told the

18   Court that Binance couldn't actually do anything managerial or

19   entrepreneurial to sustain or increase the value of BNB or

20   BUSD, that was just all smoke?

21           MR. DAVIS:  Not arguing that, Your Honor.  So, first

22   of all, my client, BAM, was not involved in the ICO.

23           THE COURT:  I know, you were assigned this issue.

24   And I don't know why, actually, because these issues seem to be

25   the other defendants' issues, but you're the one who is

1    standing here.

2              MR DAVIS:  So those aren't our issues, but I will say

3    I'm very comfortable saying that it's perfectly legitimate for

4    this Court to conclude that the transactions on these -- on

5    BAM's platform are subject to the CFTC's enforcement

6    jurisdiction.  The CFTC can bring claims of fraud --

7              THE COURT:  That is just not the question that I am

8    asking.  And no one is saying -- and even you are not saying --

9    that something that is a digital asset, something that is a

10   commodity, something that the CFTC could regulate if it chose

11   to do so, could not be the subject of, as opposed to being one

12   in and of itself, an investment contract.

13             MR DAVIS:  Maybe I'm misunderstanding the question.

14   Because I don't disagree that a digital asset could be the

15   subject of an investment contract, if that's the way you're

16   formulating --

17             THE COURT:  And if SEC went after that, it would be

18   disrupting the jurisdiction of the CFTC, would it?

19             MR DAVIS:  If it was indeed an investment contract,

20   it would be disruptive of the jurisdiction of the CFTC because

21   it would be in the jurisdiction of the SEC.

22             THE COURT:  Okay.  And I think the reason they're

23   saying that this fell within the jurisdiction of the SEC is

24   because it was marketed with the understandings and

25   expectations around it that it was going to use the money to

1    improve its own platform or ecosystem in such a way that people

2    who were buying BNB had a better chance of making a profit than

3    people who are buying Bitcoin.  And that was the deal.  That

4    was what they were promising.  That is why the SEC says it's a

5    security.

6              Now, two counsel have already stood up here and I've

7    read a brief arguing very effectively that unless it's in the

8    contract to do that, it's not an investment contract.  And now

9    I have briefs from the SEC and I've read all the cases from all

10   the judges that have said, Not really.  So I have to figure out

11   which side of that I'm coming down on.  But, what you're saying

12   is, I think, is that unless I actually find the actual contract

13   that the first two lawyers are saying is necessary, that then

14   the SEC has exceeded its jurisdiction.  Is that the basic

15   principle?

16             MR DAVIS:  That's one of the reasons, Your Honor.

17   The other is something you said in your just last statement.

18   You talked about the issue of taking the money that was given

19   to them.  My point regarding the pooling argument is that the

20   transaction that happens on BAM's platform, that money never

21   reaches the issuers and the promoters' hands.  So that element

22   is also missing.  And that's the *Life Partners* argument that I

23   started off the argument.

24             THE COURT:  Was Judge Weinstein wrong in *CFTC versus*

25   *McDonnell* when he said more than one agency could have

1    concurrent jurisdiction?

2         MR DAVIS:  I think what Judge McConnell (sic) meant

3    was the type of discussion that we've been having, Your Honor,

4    digital asset itself generally is a commodity, and then you're

5    asking is there something that's being put on top of the

6    digital asset that is sufficient to transform it into an

7    investment contract and move it over to the SEC's jurisdiction,

8    right?

9         So in that sense -- in the broad sense I think what

10   Judge Weinstein was saying was that both agencies have a claim

11   to jurisdiction and it depends on the particular circumstances

12   of the transactions in place.  Like when we did -- we were --

13   footnote 11 tells the Court to do, is to analyze the

14   transaction separately.  And these, again, like I said, these

15   types of transactions are transactions within the CFTC's

16   enforcement.

17        THE COURT:  And why should I entertain the view of

18   one of the defendants that this is a problem for the CFTC, if

19   the CFTC hasn't sought to intervene in this lawsuit and say we

20   have a problem here, Judge?

21        MR DAVIS:  Couple of reasons, Your Honor.  First of

22   all, the Commodity Exchange Act is there, the Dodd-Frank

23   statutory provisions are there.  The CFTC wasn't around when

24   *Howey* was decided.  It wasn't around when the securities laws

25   were initially put into place.  And just like the *FDA v. Brown*

1      *& Williamson*, you know, the Court considers what the

2      authorities are of the various jurisdictions that claim to have

3      authority there.

4              So I think you can look to that regardless of who

5      comes in and who doesn't come in.  It's part of the full

6      analysis of the context of whether there is a real limiting

7      principle to the SEC's theory in this case.

8              Second of all, the CFTC has been very active.  As you

9      noted, they brought a case against BHL and Mr. Zhao that

10     settled out, it was determined that BUSD was a commodity.  So I

11     say that the CFTC has spoken in this case, and has in other

12     cases.  Like I mentioned, they settled the case with Coinbase

13     regarding wash sales, which is a theory that the SEC brings in

14     this case.

15             So I think that that holistic -- there's a third

16     reason.  The other reason I think you can bring it up is

17     because, you know, there's a thread in some of the cases, such

18     as in *Woodward* and in *Gary Plastic v. Merrill Lynch*.

19             And in *Gary Plastic* the Second Circuit said, twice,

20     one of the reasons that we're finding that this particular

21     product is a security is otherwise there's no federal remedy

22     available.  And with the Dodd-Frank provisions that we talked

23     about and with the jurisdiction of the CFTC, that is no longer

24     the case.

25             And so I think you don't have to ask the CFTC --

1    there's some relevance the CFTC isn't here -- but the presence

2    of their jurisdiction distinguishes the analysis of the Second

3    Circuit in the case like *Gary Plastic*.

4              THE COURT:  Right.  I just think the issue is whether

5    there's an absence of SEC jurisdiction, and that's what we've

6    been talking about all morning.

7              MR DAVIS:  I agree that's the key issue, Your Honor.

8    But, again, because the CFTC's jurisdiction is right up next to

9    the SEC's, wherever you say, it moves the line.

10             THE COURT:  Okay.  I hear you.  All right.  Thank

11   you.

12             I would like to hear from Mr. Qureshi now.

13             Good morning.  I thought you should get up when it

14   was still morning.  Maybe we will still be able to do that,

15   maybe not.

16             Does the consent order in the CFTC case in which the

17   defendants agreed that Binance was offering digital assets

18   under Zhao's direction and control change the personal

19   jurisdiction calculus in any way?

20             MR. QURESHI:  It makes our arguments harder, Your

21   Honor, but it's not game over.

22             THE COURT:  Okay.  Let's talk about something else

23   that also makes your argument harder, which is the criminal

24   plea.  I realize, again, it's criminal and it's not saying he's

25   operating an exchange or broker deal or clearing agency, it's

1  talking about something else.  But still, it's all talking

2  about what he's personally doing to extend his tentacles into

3  the United States.  So now that we've conceded that your

4  argument is harder, tell me why it's still alive.

5         MR. QURESHI:  It's still alive for three reasons,

6  Your Honor.  The first one you've alluded to, there's a

7  different statutory and regulatory scheme that's in play in the

8  criminal pleas, that's the Bank Secrecy act.  There's one count

9  that Mr. Zhao pled guilty to having to do with maintaining an

10  effective AML program.  The other reason is timing.  When the

11  SEC file its complaint in June, these events, these pleas, they

12  occurred almost six months later.  Of course the

13  jurisdiction --

14         THE COURT:  But the basis -- I'm not saying it's the

15  fact that he conceded jurisdiction, it's the basis for it,

16  which is his activities from wherever he is that are

17  purposefully directed through either Binance or the U.S.

18  affiliates at the U.S., that is what he's admitted gives these

19  courts, federal courts in the United States, being asked to

20  exercise jurisdiction by federal law enforcement agents is --

21  it's that.  It's not the timing of the complaint or the timing

22  of the concession that matters, it's does the underlying

23  conduct suffice?

24         MR. QURESHI:  It does not from our perspective, Your

25  Honor.  And the reason it doesn't is that these jurisdictional

1    facts were all available to the SEC before it filed its

2    complaint.  It conducted a multi-year investigation, had

3    available to it all of these documents that these other

4    agencies have relied on and they chose not to put it in the

5    complaint.  That decision has to have consequence.

6         They only allege two causes of action against

7    Mr. Zhou, as you pointed out.  Both are failure to register

8    claims.  They're both predicated on control person liability.

9    And when you look at other failure to register cases, the SEC

10   is able to establish jurisdiction by alleging things like bank

11   account, active solicitation of the U.S. investors.  And when

12   you compare that framework to what's actually in the complaint,

13   they fall short in their opposition, on page 70, they cite

14   eight paragraphs of the complaint that they claim show support

15   that Mr. Zhao maintained signatory authority over U.S. bank

16   accounts.

17        But when you actually look at the complaint, the

18   closest any of those eight paragraphs comes is paragraph 166,

19   and that paragraph says that Binance required that Zhao and/or

20   the Binance back office manager have signatory authority over

21   the accounts.  And then just three paragraphs later the SEC

22   concedes, you know what, it was the Binance bank office manager

23   and not Mr. Zhao that had signatory authority over the

24   accounts.

25        And then if you move over to their assertions about

1    active solicitation of U.S. investors, that's really their most

2    powerful allegation.  And it's in paragraphs 118 through 140 of

3    the complaint.  The headline there is Mr. Zhao used his social

4    media platforms to actively solicit U.S. investors, but then

5    the specific facts that support that assertion, there's only

6    one, paragraph 216, they say that Mr. Zhao had a Twitter

7    account and he posted when there were new products or services

8    available in either of the platforms.  That's not enough.  So

9    they pivot to this strategy of saying that Mr. Zhao directed

10   Binance to encourage U.S. investors to concealed their U.S.

11   locations.

12           Okay, we have a conclusory assertion.  Let's look at

13   that under the framework of the specific facts that they're

14   required to allege.  Paragraph 129, they attribute a statement

15   to Mr. Zhao.  All he says there is that VIP customers

16   contribute to a large volume and they ought to conduct their

17   activities on the platform through foreign registered

18   companies.  That's it.

19           Paragraph 131, he acknowledges that customers can

20   supplement their KYC information.  And in paragraph 133 they

21   refer to a VIP handling document.  But the document, as quoted

22   by the SEC, actually says, "We cannot teach users how to

23   circumvent controls."  There's no allegation that Mr. Zhao

24   wrote the document, that he approved its contents, or that he

25   even reviewed it.  It's their burden to prove a *prima facie*

1    case of specific personal jurisdiction in connection with the

2    two claims they brought against him.  And it's our position

3    they haven't done that.

4         THE COURT:  Right now they just have to plausibly

5    allege it, right?

6         MR. QURESHI:  They have to plausibly allege it with

7    specific facts and not conclusionary assertions.  That's what

8    this Court has instructed over and over again.

9         THE COURT:  And one of the things the parties talk

10   about is the weight to be given the control person allegations.

11   And if I agree with you and with Judge Huvelle, I think that

12   the Sixth Circuit is correct and control person allegations

13   standing alone are not sufficient.  Are you saying that there

14   are no allegations in the complaint that go beyond that, that

15   go to him personally?

16        MR. QURESHI:  There are conclusory assertions that go

17   to him personally, but we don't think they're the requisite

18   specific facts that are tied directly to these causes of

19   action.  They may refer to him strong-arming the CEO of BAM to

20   allow BNB to be traded on the platform.  That's got nothing to

21   do with the two claims they bought against him, whether or not

22   these platforms were required to be registered.  That's our

23   position.

24        THE COURT:  All right.  I know there have been a lot

25   of other issues addressed by the other lawyers on behalf of all

1    of the defendants, but is there anything else that I haven't

2    asked you about right now that you want to emphasize on behalf

3    of Mr. Zhao?

4              MR. QURESHI:  No, Your Honor.  We join all of the

5    other dismissal arguments.  We just bring a separate 12(b)(2)

6    motion for lack of personal jurisdiction.

7              THE COURT:  Thank you.

8              What I would like to do then is, so everybody else

9    and our court reporter can function, is take a ten-minute break

10   before I hear from the SEC.  Thank you.

11             (Recess from 11:37 a.m. to 11:53 a.m.)

12             THE COURT:  All right.  Let me hear from the SEC,

13   please.

14             MS. FARER:  Good afternoon, Your Honor.

15             THE COURT:  Good afternoon.  All right.  Is it fair

16   to say -- did you need a second to organize yourself?

17             MS. FARER:  I appreciate it.  I'm a paper person.

18   And while I'm doing that, Your Honor, I would like to highlight

19   that I will be handling most of the *Howey* issues, which some of

20   my colleagues will be handling *Morrison*, major question,

21   jurisdiction and fairness.

22             THE COURT:  All right.  I think that's the way I've

23   got this organized, but if there's something that's somebody

24   else's issue, just tell me when I ask the question and I'll

25   save it.

1          Just to get started, is it fair to say that the SEC

2     is not taking the position that every digital asset, token, or

3     crypto asset is a security?

4          MS. FARER:  Yes, Your Honor.

5          THE COURT:  And it's also your position -- not your

6     position that one of the these tokens standing alone is a

7     security simply because somebody who buys it might make a

8     profit?

9          MS. FARER:  Yes, Your Honor.

10         THE COURT:  Now, do you agree that there is a

11    difference between the coins, the subject of the investment

12    contracts, and the contracts themselves?  That is, the totality

13    of the circumstances, or as the *Telegram* case puts it, the full

14    set of contracts, expectations, or understandings surrounding

15    how any particular coin is sold or distributed, and it's the

16    latter that's dispositive?

17         MS. FARER:  Yes, Your Honor.  The crypto asset, as we

18    briefed, as Your Honor has seen in these cases, is simply a

19    line of code and what we're looking at is the economic

20    realities and the totality of circumstances of how they're

21    offered and sold.

22         THE COURT:  All right.  So in particular then, would

23    you agree that there's nothing about a stablecoin, with its

24    value pegged to something else, that in and of itself would

25    make it a security, as opposed to just an asset?

1          MS. FARER:  The allegation in the complaint, Your

2     Honor, is that it's offered and sold as an investment contract

3     based on its opportunity for other profit-yielding measures.

4     And this so-called "stablecoin" term is a characterization that

5     defendants make and is a facts-and-circumstances test that we

6     need to bear out if the Court finds that dispositive.  But

7     that's not the claim before the Court, Your Honor.

8          THE COURT:  But as to those in particular, or all of

9     them, I guess, a standalone sale is not enough, it has to be

10    based on how it was sold and marketed?

11         MS. FARER:  Correct, Your Honor.  You would have to

12    take all of the complex realities, including promotion, the

13    efforts of the issuers, the retention of any tokens.  I could

14    go through a variety of categories and factors that are

15    evaluated in these cases.

16         THE COURT:  All right.  The complaint alleges that

17    BNB and BUSD were created on the Ethereum blockchain.  Have you

18    identified any crypto assets as securities that were not, that

19    are -- in other words, is there anything about the validation

20    method that factors into the *Howey* analysis, or is it all still

21    about how it is sold and marketed?  I want to make sure I

22    understand the boundaries of what we're dealing with.

23         MS. FARER:  I'm not sure I exactly understand your

24    question, Your Honor, but I will note that the technology at

25    issue here is important for the Court's consideration because

1    when someone buys a token, they are necessarily inextricably

2    intertwined with the blockchain and the values of the token

3    rise and fall together.

4         So the investors are all interdependent and reliant

5    upon the efforts of those who are creating the blockchain,

6    developing the blockchain, continually maintaining the

7    blockchain, adding particular apps or other protocols on top of

8    the blockchain.  That's a significant feature here that

9    defendants ignore, that all of these -- based on the nature of

10   the technology, there is a common enterprise and everyone is

11   inextricably intertwined and interdependent, which was the

12   critical determinate factor *Life Partners* was looking at.

13        THE COURT:  Well, that goes to the buyers.  But does

14   that make them interdependent with the issuers or the sellers

15   necessarily?

16        MS. FARER:  It makes it interdependent on their

17   efforts because the ongoing -- the ongoing technology in terms

18   of the development of the blockchain, the maintenance of the

19   blockchain, different protocols and programs that are alleged

20   in our complaint that increase the value of these particular

21   tokens.

22        BNB is a good example, Your Honor, where Binance and

23   Mr. Zhao have developed a number of investment programs that

24   are developed here and other protocols that tie into their

25   ecosystem.  And as a result of that, again, the technology

 1    makes all of this inextricably intertwined.

 2              THE COURT:  So is that what differentiates these from

 3    commodities in your viewpoint?  That you can't just sell one

 4    and leave it out there like a gold bar?

 5              MS. FARER:  It is one differentiating factor.  The

 6    defendants make a lot about market forces and point to those

 7    cases that involve gold bars, precious metals, et cetera, and

 8    in doing so the defendants ignore the integral efforts that

 9    defendants make in developing, maintaining, and enhancing the

10    ongoing market at issue here.

11              THE COURT:  But that alone wouldn't be enough, if you

12    didn't make all three of the *Howey* factors.

13              MS. FARER:  Correct, Your Honor.  It is one factor

14    for the Court's evaluation here.  Alone it is not

15    determinative, but it is an important factor with respect to

16    these crypto assets.

17              But also, to Your Honor's point that, as we've

18    alleged for BNB and other tokens, the issuers, promoters,

19    et cetera, retain a significant repository of these tokens,

20    both to message to the market -- this is expressed, for

21    example, in Viola coin -- that they are tied to the ongoing

22    development efforts and their value of the tokens that they

23    retain rises and falls without the investors, based on their

24    efforts.

25              THE COURT:  All right.  And I don't know if this

1   is -- well, first, I just want to make sure that I understand

2   the complaint completely.  And I want to make sure, is there

3   any count in the complaint that does not depend on a finding

4   that crypto assets sold to U.S. customers were in fact

5   securities?

6           MS. FARER:  One moment, Your Honor.

7           THE COURT:  I don't think so.

8           (Pause.)

9           MS. FARER:  Your Honor, we consider the fraud claim

10  based on investors.  That does not turn on whether the crypto

11  asset security at issue here qualifies as investment contracts.

12          THE COURT:  All right.  So Count 13 against BAM

13  Management and BAM Trading, is that the one you're talking

14  about?

15          MS. FARER:  Yes, Your Honor.

16          THE COURT:  All right.  And it alleges that they made

17  materially false and misleading statements to investors and

18  engaging in acts and practices that operated as fraud upon

19  purchasers in the offer and sale of securities.  So when you're

20  talking about investors there, you're talking about investors

21  in those entities?

22          MS. FARER:  In the BAM entities, yes, Your Honor.

23          THE COURT:  Okay.  All right.  And that would matter

24  even if we're not talking about the offer or sale of

25  securities?

```
1              MS. FARER:  With respect to the crypto asset tokens,
2    yes, Your Honor.
3              THE COURT:  All right.  Now, I don't know whether
4    this is a you question or a question for someone else, but if
5    it's so obvious that these are securities, where has the agency
6    been and why isn't it relevant that the SEC took the opposite
7    position or no position for so many years?
8              MS. FARER:  One of my colleagues is going to handle
9    the due process, fair notice argument Your Honor.
10             THE COURT:  All right.
11             MS. FARER:  As Your Honor recognized, we have issued
12   prior guidance, and even the 2017 guidance that Your Honor
13   referenced includes references to cases from 2013.
14             THE COURT:  All right.  And the time-barred issue, is
15   that also for somebody else?
16             MS. FARER:  No, that's me, Your Honor.
17             THE COURT:  Let's talk about that then.  Why aren't
18   the claims as to the initial ICO, whether it's contract or not
19   a contract, time barred?
20             MS. FARER:  All right.  One moment, Your Honor.  I
21   will highlight, as I'm rifling through my papers here, that the
22   Securities Acts Section 5 claim as it pertains to BNB is not
23   limited to the ICO.  The complaint specifically alleges that
24   the -- that there are ongoing primary sales from Binance.  This
25   is paragraph 288.  From the time of the ICO to the present BNB
```

1    was offered and sold as an investment contract and, therefore,

2    as a security.

3           Paragraph 299 does not limit the allegation to the

4    ICO where it alleges that Binance offered and sold BNB as an

5    exchange token, marketing it to investors as investment in the

6    success of the Binance.com platform and touting potential

7    returns that investors could achieve from purchasing the token

8    on the platform.  And other paragraphs --

9           THE COURT:  There you're not talking about secondary

10   sales, you're talking about it selling directly to the public?

11          MS. FARER:  Correct, Your Honor.  These are direct

12   sales from Binance.  So I just want to clarify that there are

13   ongoing primary direct sales that fall within our particular

14   claim.

15          And then in addition, we -- a portion of our claim

16   relates to the offer and sale of BNB to employees.  So there

17   are a number of direct sales for purposes of that claim beyond

18   simply the ICO.

19          That being said, we do maintain that the claim as it

20   pertains to the ICO is not time barred.  And I think that

21   defense counsel mischaracterizes the law with respect to the

22   fact that the statute of limitations does not need to -- does

23   not start to run until -- unless and until the defendant is

24   within the United States.

25          Your Honor asked if a court had grappled with the

1   very issue about whether, you know, someone was always outside

2   of the United States.  And I believe it was -- the *Sharp* and

3   *Straub* cases are the two cases that touch on this issue, Your

4   Honor, and they've really traced the history of this provision,

5   saying initially when this particular language -- they're

6   talking time when the penalty language in 2462 was added, the

7   legislators recognized that they only had the ability to

8   provide for personal service in the United States.  And so they

9   specifically included that language to protect against external

10  service, that, notably, the Court said that language has not

11  changed and even though we are now in a world where there is

12  worldwide service of process opportunities through the Hague or

13  elsewhere, that does not change the analysis.

14          The point the courts are focused on with respect to

15  these positions is not location for purposes of personal

16  jurisdiction, subject matter jurisdiction, it is solely for

17  purposes of service.  And here, as Your Honor acknowledged, the

18  defendants are nowhere and everywhere and have not authorized

19  any of the employees upon which they point to to accept service

20  in the United States.  And notably, the analysis for purposes

21  of this defense must rise and fall on the allegations in the

22  complaint.  And the complaint says that at no time during these

23  periods was the defendant in the United States.

24          THE COURT:  All right.  I want to get into the

25  particular assets at issue and I want to start with BNB and the

1     *Howey* test.  Person investing money, I think there's not that

2     much to discuss there.  Then we get to in a common enterprise.

3     Now, is it your theory at the time of the ICO that there was

4     horizontal commonality, broad vertical commonality, or strict

5     commonality?

6              MS. FARER:  All three, Your Honor.

7              THE COURT:  The only D.C. Circuit statement I see

8     about what commonality consists of is the one in *Banner Fund*

9     that said the test is ordinarily met by a showing of

10    horizontal.  And the New York cases you cite generally also all

11    talk about horizontal, although *Telegram* also talks about the

12    possibility of strict commonality as an option.  But is there

13    any circuit support for the notion that there is a vertical

14    option?

15             MS. FARER:  Yes, Your Honor.  I believe the Eleventh

16    Circuit focuses primarily on broad or strict.  And I defer to

17    my colleagues who may be better -- have better recollection of

18    the particular circuit split on some of these tests.  But I do

19    know that not all of the circuits -- I think the *Bitcoin* case,

20    for example, refers to the vertical commonality and not all the

21    circuits require horizontal commonality.

22             I would also note, Your Honor, that the Supreme Court

23    hasn't adopted any of the tests at issue.  And what the Supreme

24    Court is focused on is the common enterprise.  And these

25    circuits have developed these tests as a construct to evaluate

1    the interdependence at issue between the investors, the success

2    of the enterprise and the fortunes of the issuers or promoters.

3    As I previously stated, with respect to this technology, that

4    interdependency, left, right, up, down, is present.  And here,

5    with respect to the particular tokens, and BNB in particular,

6    there is a pooling, if the Court requires that.

7            But as the Court recognized in *Life Partners*, the,

8    quote/unquote, pooling, it looks past sort of the

9    administrative handling of the funds.  And the Court in that

10   case did stress that it was focused on the interdependency.

11   And while defense counsel is correct in that one could view

12   that there was pooling in that particular case, even with the

13   staggering of purchases, the Court stressed that the

14   interdependency was the focus.  And I think that if the Court

15   looks at the themes and analysis of all of the tests across the

16   circuit, that's the Court's focus.

17           THE COURT:  All right.  Well, I want to stick --

18   we're just talking about BNB right now.  And certainly the

19   initial stage, are you suggesting that there was pooling of the

20   assets that came in from the investors?

21           MS. FARER:  Yes, Your Honor.

22           THE COURT:  Now, one of the things you did was point

23   to the statement of the district court in *Life Partners* as a

24   source for the statement in the brief that courts in this

25   district have evaluated broad and strict vertical commonality.

1    But when you get to the circuit opinion, it only talks about

2    horizontal, it never mentions vertical at all, in either of its

3    decisions.  So should I draw any conclusion from that?

4           MS. FARER:  Yes, Your Honor.  The cite that we had in

5    the brief was simply to reference that courts in this district

6    have evaluated the variety of the tests and the circuit court

7    in *Life Partners* found horizontal commonality present and so

8    determined that it didn't need to reach the other tests.  So

9    the question remains open in this circuit as to whether the

10   circuit has adopted one test over another.  It just has looked

11   at horizontal commonality.  In the instance of *Life Partners,*

12   found that sufficient and moved on.  But in other cases in the

13   district, as we highlighted and as the district court

14   highlighted, courts have looked at the variety of the tests.

15          THE COURT:  All right.  I think that the thing that

16   most differentiates this situation or a securities situation

17   from a commodities situation, because in a commodity everybody

18   is buying something, is buying something that goes up and down

19   the same way as to all of them is the third element when you

20   get to the expectation of profits solely from the efforts of a

21   third party.

22          So what is your response to the argument by one of

23   the amici that, sure, issuers say lots of things, issuers say

24   we're going to build the best platform ever.  But what's the

25   support that it was reasonable for buyers to rely on that sort

1    of thing?

2            MS. FARER:  It's reasonable, Your Honor, for one

3    of -- first, the reason I said it is that these issuers, many

4    of them, and including all of the ones that are alleged in our

5    complaint, have retained tokens, so they -- as their efforts

6    impact the value of the enterprise, the value of the particular

7    crypto asset securities goes up and they benefit just like

8    other investors -- just like the investors on the platform.

9            In addition, Your Honor, we just have ongoing

10   statements where they represent that they are going to make

11   these ongoing efforts, and they do in fact do so.  The

12   allegations show that this is in fact occurring.  And so the --

13   you know, at this stage, Your Honor, the standard is that all

14   facts alleged in the complaint and reasonable inferences

15   thereupon must be accepted as true and viewed in the light most

16   favorable to the plaintiff.

17           THE COURT:  Well, do you agree with the approach

18   taken by the court in *Ripple Labs* that what a reasonable,

19   sophisticated institutional investor might understand is

20   different than what a member of the public might reasonably

21   understand?  Does it matter who the asset is being marketed to?

22           MS. FARER:  We disagree with that particular portion

23   of the *Ripple* decision, Your Honor.  *Howey* does not draw a

24   distinction if classes of investors.  It's an objective test of

25   a reasonable investor.

1          THE COURT:  So are they saying at the outset we're

2     holding onto some of these coins?  I mean, is that something

3     that John Q. Public is relying on when he's making a decision?

4          MS. FARER:  Yes, Your Honor.  And courts have found

5     that exact point.  And often in the distribution papers there

6     will be a file, for example, it's either in the white paper or

7     an associated terminomics paper where that distribution is laid

8     out.  And as to the facts alleged for the other third-party

9     tokens at issue, that is also the case.  And in particular to

10    BNB, which is the focus of Your Honor's questions, the

11    retention of tokens by Mr. Zhao and others and offering that

12    for employees was publicly marketed and promoted.

13         THE COURT:  All right.  Well, this question is

14    somewhat related to the concept, I think, of whether a

15    contractual promise is needed.  While courts have agreed with

16    you that there doesn't have to be a written contract that binds

17    the issuer to do the things that increases the asset's value,

18    it's true that in *Howey* there were separate contracts that

19    covered what the seller was supposed to do, and in many of the

20    other cases that we're relying on here there were.

21         Here what you have is promotional and marketing

22    statements.  And is that enough?  Is it enough to say this is

23    how it was marketed, as opposed to it was sold with a specific

24    set of understandings?

25         MS. FARER:  It can be enough, Your Honor.  The courts

1    look at the totality of the facts and circumstances, all of the

2    .com realities relating to the offer, sale, plan of

3    distribution, marketing, and efforts to evaluate whether there

4    is an investment contract at issue.

5            THE COURT:  Well, was Binance bound in any way to do

6    what it said it planned to do?  I mean, what if it didn't use

7    the proceeds to develop the proof-of-stake protocol or develop

8    the platform?  Does that matter?

9            MS. FARER:  No, Your Honor.  As we've argued in our

10   brief, a contractual obligation, privity, whatever defendants

11   want to call it at the moment, a commitment undertaking,

12   et cetera, a legally enforceable agreement is not required.

13   Indeed, Your Honor, the securities laws were enacted to --

14   because there was a finding that there were deficiencies in

15   common law protections, like contract law.

16           Congress wanted to make sure that investors were

17   protected in both the offer and the sale.  If -- defendants

18   have not explained how their contractual arrangement,

19   obligation, however they frame it, reconciles with the fact

20   that these securities laws regulate offers, as well as sales.

21   And Courts have found that "offer," for terms of the security

22   laws, is broader than common law contracts for offering sales.

23           I will also highlight, Your Honor, that it's

24   interesting to us that the parties seem to be referring to the

25   same cases for diametrically opposite positions.  So I just

1       want to give a little bit more context to the *Joiner* case at

2       issue.

3               Interestingly, if you look at the underlying record

4       of that case, notwithstanding that it's decades ago, the court

5       was pressed with many of the same arguments defendants make

6       here about the expansion and lack of limiting principles, the

7       example at the time -- it was not Beanie Babies or Pokémon

8       cards -- but given the times, was ration cards and the risk of

9       usurping the functions of Congress.  So since *Joiner*, since the

10      1940s, these very same arguments have been considered and

11      routinely rejected.

12              In analyzing and going to the textual analysis here,

13      I think that the analysis that the court undertook in *Joiner* is

14      helpful on this point as well.

15              In analyzing the facts and circumstances at issue,

16      the court looked at the various categories, including in the

17      statutes, terms "security" -- noticed that some, such as

18      "notes, bonds, and stocks" are pretty much standardized and the

19      name alone carries well-settled meaning.

20              It elaborated that others are of a more variable

21      character and were necessarily designated by more descriptive

22      terms, such as transferable share, investment contract, and in

23      general any interest or instrument commonly known as a

24      security.  We cannot read out of the statute these general

25      descriptive designations merely because more specific ones have

1    been used to reach some kinds of documents.

2           Now, defendants argue that "contract" is a standard

3    term and needs to be read by the plain text.  The Court

4    explained that's not how we analyze the term "investment

5    contract."  It is a descriptive term, and it goes on to say

6    that the reach of the act and application of this particular

7    term is -- doesn't stop with the obvious and commonplace.

8           THE COURT:  Okay.  Well, even the cases you point to,

9    such as *Telegram*, when they talk about the totality of the

10   circumstances, they talk about contents of the instruments in

11   question and the expectations and the understandings.  Are

12   there any written instruments, besides the marketing materials,

13   that you're relying on with respect to whether BNB is an

14   investment contract?

15          MS. FARER:  Your Honor, the complaint has a number of

16   allegations with respect to contracts at issue, the terms of

17   use, the -- under defendant's argument a written agreement is

18   not required and some type of privity.  And so, arguably, the

19   privity for ICO holder, ICO purchasers would be present there,

20   as well as any other purchasers making direct purchases from

21   Binance.

22          But as we said, Your Honor, that relationship and

23   those obligations we don't believe are necessary, but the

24   complaint does have a number of allegations that give rise

25   to -- that reference a number of other contracts at issue,

1     combinations, arrangements.  Again, however, defendants want to

2     put that --

3              THE COURT:  With respect to BNB in particular, are

4     you relying on something other than the marketing materials and

5     the social media statements and the white paper?

6              MS. FARER:  No, Your Honor.

7              THE COURT:  All right.  One factor you pointed to is

8     the Binance statements that it was going to burn BNB

9     periodically to sustain its value.  And one of the amici, I

10    think it's the Investor Choice Advocates Network, took issue

11    with predicating a finding that an asset is an investment

12    contract on sort of preprogrammed, built-in supply rules.  Are

13    you talking about preprogrammed, built-in supply rules in

14    connection with BNB, or was that something that was up to

15    Binance's discretion to do whatever it wanted to do with it?

16             MS. FARER:  The particular allegations that we make

17    with respect to BNB are strategically implemented by Binance

18    and Mr. Zhao.  And Mr. Zhao even touts this very point in

19    talking about the burn and saying that it could be -- it's

20    treated similar to a dividend.  So he highlights that this is a

21    strategic planning that they have implemented to give rise to a

22    reasonable expectation of profits based on their efforts.

23             THE COURT:  One of the things that you mentioned is

24    the fact that these assets could be staked.  And how does that

25    bear on whether they're securities or not?

 1          MS. FARER:  It depends on the particular offerings.

 2     Staking in and of itself is a consensus mechanism that

 3     facilitates the blockchain.  But we have allegations relating

 4     to staking programs or --

 5          THE COURT:  Right.  We'll get to those.

 6          MS. FARER:  Right.  So in those instances the way in

 7     which the particular staking program is offered and sold is --

 8     we've -- we allege that that is an investment contract.

 9          THE COURT:  All right.  So just the fact that it can

10     be staked, that's something that the buyer is doing for his own

11     purposes, to increase his value or to use its value for

12     something.  That's not something that's dependent on the

13     efforts of others to give it its value, is it?

14          MS. FARER:  In the programs that we have alleged, the

15     particular programs at issue are dependent upon the efforts of

16     others because the efforts that we need to look at, as everyone

17     agrees, would be entrepreneurial and managerial ones.  And as

18     *Life Partners* explains, those are the ones that efforts are

19     those that determine or impact the reward itself.  And the way

20     that Binance markets and executes its particular staking

21     programs -- and when I say "Binance" in that particular

22     instance, I'm also referring to the BAM defendants for the

23     staking claim against them -- is that they have a strategy and

24     manage the program in such a way and manage the technology and

25     the pooling of assets that directly impacts the rewards that

1    may be distributed to the investors on their platforms.

2         THE COURT:  All right.  I'm going to talk about the

3    staking programs in a minute.  I'm just going back to whether

4    BNB itself was being marketed and sold as the security.  And

5    one of the things you mentioned was that it could be staked.

6    And I don't see how that, separate and apart from the staking

7    programs, enhances or changes the calculus as to whether it's a

8    security or not.

9         MS. FARER:  It is, Your Honor, in the sense of that

10   if one looks at the totality of the circumstances and how the

11   particular crypto asset is offered and sold.  And so, Binance

12   has generated and created a number of investment programs that

13   provide for the deployment of BNB specifically to attract

14   investors, increase demand in its value.  There are statements

15   in our complaint and in the supporting materials that we

16   filed --

17        THE COURT:  So that's the thing that Binance is

18   doing, permitting you to use it in that fashion, that enhances

19   its value that they said up front that you could do?  Is that

20   the point?

21        MS. FARER:  Correct, Your Honor.

22        THE COURT:  You've pointed out that in some

23   circumstances Binance crypto assets were used as compensation.

24   So how does that advance the investment contract argument?  In

25   *Ripple Labs* the Court said, well, if a token is being used as

1    compensation, that takes it out of *Howey* because there's no

2    money being invested as the first element.  So how does that

3    bear on the decision?

4         MS. FARER:  Yes, Your Honor.  The *Houghton* case and

5    the *One-O-One Enterprise versus Caruso* case from this District,

6    as well as others, provide the "investment of money" prong can

7    be satisfied with the provision of services.  And here the

8    employees, through the acceptance of an offer of employment

9    when it relates to an incentive bonus, for example, they just

10   give up their rights to the specific consideration at issue

11   that -- and provide for the receipt of BNB.

12        THE COURT:  Well, if the company says we're giving

13   you this as your compensation, are you saying that the

14   employees had a choice about that?  Is it alleged that they had

15   a choice?

16        MS. FARER:  Well, whether they have a choice, Your

17   Honor, is something that isn't appropriate for resolution at

18   this stage.  The complaint alleges that the employees gave

19   their services, time, and efforts in exchange for BNB, and

20   that's all they're required for the investment of money.

21        THE COURT:  All right.  Back when I asked you if

22   marketing statements are enough if there's no actual contract

23   or obligation to do what they say they're going to do, and you

24   said it can be enough, we look at all the economic realities.

25   So, the amicus briefs and the defendants are saying, well,

1    that's a little vague.  Where's the boundary of that?  So

2    what's your answer to that?  When can it be and when is it not

3    enough?

4              MS. FARER:  So, Your Honor, I think it may be helpful

5    to point to some of the courts that have analyzed this very

6    issue.  And again, interestingly, these are some of the same

7    cases that defense counsel relies on.  But in cases such as

8    *Scoville* from the Tenth Circuit, *U.S. v. Bowdoin* from this

9    District, *SG Limited*, *Gary Plastic*, *Joiner*, *Glen-Arden*

10   *Commodities*, and the list goes on.  The, quote/unquote,

11   contract that may have been in issue isn't the instrument or

12   representations associated with the expectations of profits and

13   the efforts of others, which is the critical determination

14   here.

15             So defense counsel talks a lot about the facts and

16   circumstances.  And there are contracts here, but there are a

17   number of examples that there may a contracts for SG Limited,

18   for example, the contracts was associated with the purchase of

19   whiskey, but the promises in marketing and the reliance on the

20   effort of others was derived from marketing.

21             Similar to *Gary Plastic*, the marketing in the form of

22   the information bulletin and other sales communications, it was

23   those messages talking about profitability and what they were

24   going to do about the secondary market, et cetera, that's what

25   gave rise to the investment contract.  It wasn't -- and *Gary*

1    *Plastic* didn't have a contract at all.  But in these other

2    cases where -- like *SG Limited*, for example, where there was a

3    contract, that wasn't the determinative factor in terms of

4    whether it was an investment contract.

5           THE COURT:  One of the things you provided as

6    supplemental authority is Judge Rakoff's opinion in *Terraform*

7    for this summary judgment stage, where he uses the *Howey*

8    language -- we're still talking about the third *Howey* language

9    in BNB -- about profits based solely on the activity of the

10   promoter.  Is it your position that market forces and other

11   factors don't affect the value of BNB?

12          MS. FARER:  Market forces may be involved here, but,

13   again, the defense counsel's focus, its sole focus on that

14   being the sole determinative is just a false dichotomy here

15   because it disregards that the market at issue was created and

16   continues to be developed and enhanced by Binance.  And I'm not

17   saying that just in the terms of development of the technology

18   and ecosystem, I'm saying they created Binance, they marketed

19   and increased the demand for value.  They have mechanisms in

20   place, like the burn mechanism, for example, that impacts

21   supply and demand.  So they are doing -- they create new

22   programs where they expressly say that they're trying to

23   attract new purchasers.

24          So what the focus simply on market supply and demand

25   ignores, all of the allegations in the complaint with respect

1    to BNB and these other tokens and just the realities of this

2    space in general.

3              THE COURT:  So if the -- the price of the coin is

4    going up and down and what you're saying is what they're doing

5    managerially isn't staffed during that period, they can do

6    things that affect the price continuously, not just at the

7    outset --

8              MS. FARER:  Correct, Your Honor.

9              THE COURT:  -- how do the allegations that Binance

10   made the coin available for sale on other on other platforms

11   tie into your theory?  I mean, once it's out there, how do they

12   have any control anymore on what's happened?

13             MS. FARER:  The development of a secondary market is

14   a factor that courts have looked at in terms of whether there

15   are -- there is a reasonable expectation based on the profits

16   of others.  The widespread adoption of these tokens is an

17   important factor.  If you look at some of the statements in the

18   allegations for the third-party tokens, for example, Your

19   Honor, folks are really focused on widespread adoption.

20             There are a number -- I mean, this is just code, so

21   these issuers need to find a way to distinguish their

22   particular project and token from all of the others at issue

23   and they want to -- they give rise to a reasonable expectation

24   of profits, but they're marketing that we're going to develop a

25   secondary market, you're going to -- liquidity is important for

1  these investors.  You're going to be able to sell these tokens

2  and make a profit in these markets.  And as we alleged in our

3  complaint and argued in our brief, this development of a

4  secondary market is intentional, it's just not by happenstance

5  that these tokens are appearing on various platforms.

6  They're --

7          THE COURT:  Let's say that's a going-in promise that

8  affects our going-in representation, expectation created by the

9  issuer that affects when somebody buys it the first time

10 whether they're participating in an investment contract.  But

11 you're suggesting that there's an across-the-board rule that

12 once something was sold as a contract, as an investment

13 contract, that it retains its character as a security forever?

14 How is that consistent with all the case law that says whether

15 something is a security or not, you have to look at the

16 totality of the circumstances surrounding its sale and

17 marketing.

18          If somebody just goes to another platform and

19 they're, like, which one do I want?  I guess I'll take two

20 Binance and two of somebody else.  How does that now -- why is

21 that still a security and it's not a commodity anymore?

22          MS. FARER:  So, Your Honor, to clarify, if anything

23 that I said suggested that we think something once an

24 investment contract is always an investment contract, that's

25 not the case.  That's not our position at issue.

1          THE COURT:  Okay.  So when you're talking about

2     secondary sales of BNB, then what is your position about why

3     even when it's resold it's a security?  I thought you took that

4     position pretty strongly.

5          MS. FARER:  With respect to BNB, yes, Your Honor.

6          THE COURT:  Yes, and if it's not because it was when

7     it started because all these expectations were baked in from

8     the beginning, then why is it?

9          MS. FARER:  It's because there are continuing,

10    ongoing efforts on the part of Binance and Mr. Zhao and others

11    with respect to the marketing and promotion as an investment,

12    the marketing of their efforts and tying the value of BNB to

13    their ecosystem and the efforts that they are developing the

14    platform, bringing in all these new programs, including

15    relationships with third parties, they -- I think Mr. Zhao even

16    said that when they're focusing on -- when they're advertising

17    new programs, he said, "For anything we are significantly

18    involved in, we'll push BNB as much as we can."

19          So this is an ongoing enterprise, that they are

20    marketing an investment opportunity to new BNB purchasers

21    beyond, well past the ICO and to the present.

22          I would contrast this, Your Honor, for example, the

23    Bahamas test that was discussed in the *Telegram* case where the

24    court was grappling with similar limiting principles and said

25    this isn't a situation where everyone associated with the

1    development of this platform and this token just went off to

2    the British Virgin Islands or the Bahamas and there was no

3    further connection to this enterprise or ongoing efforts.

4    That's -- that's just not present here for BNB and all those --

5              THE COURT:  There may be an ongoing relationship to

6    the product, but didn't *Telegram* require that after the

7    initial -- for the court to reach resales after the initial

8    distribution, you needed allegations that the resale was

9    specifically contemplated and that there were understandings at

10   the beginning that this was going to happen?

11             I mean, every single case you've cited talks about

12   totality of the circumstances.  What are people telling the

13   investors when they buy?  And what you're saying is Binance is

14   still out there touting BNB, and that distinction is to make

15   every downstream sale a sale of a security?

16             MS. FARER:  Your Honor, it's not that they touted BNB

17   at the start and were asking the court to accept that that

18   continuing promise is enough -- it may be enough in certain

19   circumstances, but that's not what is present here.  There are

20   continuing representations by defendant Binance and Mr. Zhao

21   and others related to Binance about their efforts to enhance

22   the value, about the profitability and investment opportunity

23   for investors.

24             THE COURT:  Well, one of the things that you said in

25   your brief when you made this argument was, well, secondary

1    sales of stock in a company are still dependent on the

2    management of the company, even after the IPO and the stock.

3    But stock is different, stock doesn't have to make a -- meet

4    the test of an investment contract.  So if the buyer and the

5    ICO could reasonably think Binance is going to use my

6    investment and it's going to develop this platform and it's

7    going to support this coin, and you're not saying that carries

8    over, necessarily, after the buyer sells it to someone else,

9    what are the expectations and understandings for contracts that

10   are the circumstance that surround any resale?  And also, how

11   do you meet the investment of money situation because the

12   second buyer isn't giving the money to Binance, they're giving

13   it to the owner of the coin.

14          MS. FARER:  So, Your Honor, the token itself

15   represents the investment contract.  And this will go to both

16   points of the, quote/unquote, investment of money and the

17   ongoing efforts.  I will just note, Your Honor, for the

18   investment of money prong, a capital contribution is not

19   required and no court has said that it is.  The -- what is

20   occurring here is the purchase of the token is you're buying

21   into the enterprise.  And as the court in *Joiner* said, that the

22   investment contract is interwoven with the particular

23   instrument at issue.

24          And so here there is a pooling at the initial ICO and

25   the investors purchase based on marketing and the promise of

1    profitability, that these -- and that these -- that was based

2    on the efforts of the issuers and promoters.  That then carries

3    through with the token.  The token represents and embodies that

4    investment contract.  And nothing has changed simply because

5    someone buys it directly from the purchasers on the -- in a

6    primary sale ICO or on a resale.  There are still all of the

7    allegations alleged in the complaint about the representations

8    about profitability, the structure of the holdings by the

9    particular issuers, where their value is tied to that of the

10   investors.  They are continuingly -- they have to maintain the

11   blockchain.

12           This is not an asset that has inherent value in and

13   of itself.  Its value derives solely from the blockchain and

14   related products at issue and the -- as alleged in the

15   complaint with respect to BNB, but for all the other tokens,

16   that there are ongoing representations about what they're going

17   to do, and they are in fact doing it, as demonstrated by the

18   continued viability of this token and this market.

19           THE COURT:  All right.  Well, I'm not sure I have

20   heard from the SEC before that token represents the investment

21   contract.  That is -- there was very nice, clear distinction in

22   *Ripple Labs* between the item that is the subject of the

23   investment contract and the investment contract, which is the

24   totality of the understandings and expectations that surround a

25   particular distribution or sale of the item.

1          Now you're saying that they basically merged.  And if

2     that's true, then let's go back to the original question.  If

3     blockchain always depends on your maintaining it, what is the

4     difference between a crypto asset that is a security and a

5     crypto asset that isn't?

6          MS. FARER:  So, Your Honor, the SEC did take this

7     position, and the court adopted it in *Telegram*, that the asset

8     itself embodies the investment contract.  And we maintain a

9     consistent position with respect to that.  And I think, you

10    know, even before that, in *SEC v. Joiner*, the particular -- the

11    drilling at issue that enhanced the value of the leaseholds was

12    not a contract between the -- was not a contract involving the

13    particular investor.  The court said that the --

14         THE COURT:  I'm not asking anymore the -- whether it

15    has to be a contractual promise, the second piece.  What you're

16    saying is that there's no differentiation between the token and

17    the -- essentially, the managerial and entrepreneurial efforts

18    that are being offered along with it.  And so -- and there's

19    always commonality because all the buyers -- the coins have the

20    same value, they can go up and down together, they're not

21    separate.  So what is it then that differentiates the

22    investment contract from the asset?

23         MS. FARER:  So, Your Honor, and just to clarify, my

24    reference to *Joiner* was the point about the court found that

25    that drilling was interwoven in the instrument at issue,

1   similar to the argument we're making here.  And here the

2   difference is that, as we've highlighted, there is a common

3   enterprise where the economic inducements that are afforded by

4   the issuers, promoters, et cetera, that include promotions,

5   marketing, the efforts that they promise, the retention of

6   intellectual property, ongoing decisions, et cetera, the

7   expertise and experience of the team, the strategy and

8   structure of the activities, the development of the secondary

9   market, all of this gives rise to a reasonable expectation of

10   profits.  The reasonable expectation of profits depends on

11   these ongoing efforts.  That's what distinguishes it from an

12   ordinary asset.  There is --

13         THE COURT:  But the third *Howey* element is that the

14   buyer bought it because of that.  The buyer has made a

15   reasonable determination that this is there.  And I guess I

16   don't understand how you're saying that those expectations and

17   understandings are present at the moment of the resale.

18         MS. FARER:  Because these efforts and promotions are

19   publicly and widely available.  I will note, Your Honor, that

20   we're talking about this in the context of Binance, but -- and

21   BNB, but Binance's specifically and intentionally established

22   the breadth as the largest platform.  Most people associated

23   with crypto know what Binance is, know what seizing is, and

24   know that BNB, their token, is at the heart of all of this.

25   And how do they know that?  It is because through these

1    intentional efforts, these marketing -- the marketing as

2    alleged in the complaint that they undertake, the statements

3    that they make, et cetera.

4         Frankly, Your Honor, it's quite remarkable to us that

5    given these intentional efforts to establish this global

6    footprint and this expansive brand that Binance and CZ are now

7    trying to separate themselves from BNB that they continue to

8    offer and sell as an investment contract.

9         THE COURT:  So you are linking, then, as they did in

10   the Southern District in the one case, the representations made

11   at the outset, you're saying those carry -- that at the outset

12   they were saying that they were going to do this and that

13   carries throughout.

14        MS. FARER:  Those can be considered as part of it.  I

15   think *Howey* and other cases have acknowledged that you need to

16   consider all of the facts and circumstances, both the -- those

17   from inception and carrying forward.  And as to Your Honor's

18   point that, you know, depending on how things may or may not

19   change, that may impact the reasonableness analysis as to

20   whether there is a reasonable expectation of profits.  But that

21   fact pattern is simply not here, Your Honor.

22        For both BNB and all of the third-party tokens there

23   are consistent representations about the investment opportunity

24   and the efforts that they are undertaking and how those efforts

25   drive the value of the particular tokens at issue.  And as I

1    noted with respect to BNB itself, the investors know that BNB

2    is Binance's coin.  It was called Binance's Coin through 2022.

3              And I would just clarify, Your Honor --

4              THE COURT:  Well, as to the second *Howey* element, was

5    the nature of the commonality any more after real sales?

6    Where's pooling?  Where's the -- that important aspect of it to

7    you?

8              MS. FARER:  Yes, Your Honor.  So we maintain that all

9    of the tests for commonality are met.  As I discussed

10   previously with respect to the interdependency and for the

11   pooling, there is an initial pooling and the token itself

12   represents that pooled investment, and further purchases --

13   purchasers are buying the token to buy into that enterprise.

14             I will submit, Your Honor, the *Ripple* case --

15             THE COURT:  I was going to ask you, why is that court

16   wrong about secondary sales?

17             MS. FARER:  So the *Ripple* case does not address

18   secondary sales, Your Honor.

19             THE COURT:  Puts it aside, basically.

20             MS. FARER:  Well, the programmatic sales at issue on

21   *Ripple* were direct sales on the platform.  They weren't

22   secondary sales.  And the court made very clear in its opinion,

23   subsequent opinion, that it was specifically not addressing

24   secondary sales and they had made the determination, focusing

25   on the programmatic sales, based on a very developed record of

1    the facts and circumstances, expert testimony, et cetera.  And

2    while we disagree with the court's analysis there because it

3    imposes a knowledge requirement and other factors that we don't

4    believe are mandated by *Howey*, we do want to make sure that the

5    Court is aware that it is not dealing with secondary sales.

6          In fact, Your Honor, in light of the focus on

7    secondary sales, we would offer -- there are a number of

8    opinions that address the point of secondary sales and find

9    that secondary sales can constitute an investment contract and

10   be the subject of a claim for Securities Act Section 5

11   liability.  And that would be -- there was a recent case --

12   sorry, Your Honor, let me just pull my notes on this.

13         There is a recent arbitration case relating to the

14   *Terraform* where the purchases were made on the secondary

15   platform and the court found that there was an investment

16   contract at issue.  The court didn't even need to reach the

17   fact that it was sold on the secondary market.  But other cases

18   are consistent.

19         So there are two cases in the private sector

20   involving class action claims, the *Owen v. Elastos Foundation*,

21   an SDNY case, 2021, and a case relating to *Ripple*, actually,

22   where private investors who purchased tokens on the particular

23   platforms asserted a claim under Securities Act Section 12(a),

24   and under that provision it allows private investors

25   essentially to make a claim for --

1          THE COURT:  Are those cited in your reply brief?  Or

2     are you just telling me about them now?  I'm not saying there's

3     anything wrong with that, I just want to know.

4          MS. FARER:  They are not, Your Honor.

5          THE COURT:  Then you need to file something that has

6     the cites.

7          MS. FARER:  We will, Your Honor.  We have copies --

8          THE COURT:  You can just file something that says the

9     cases cited in court today are, and give me the cites.

10          MS. FARER:  And we also have copies here for the

11     court and parties as well.

12          The point for those cases -- and we will file

13     something, Your Honor -- is that in both cases this exact issue

14     was raised as to whether secondary sales were at issue.  And

15     the court rejected that argument and said that violations of

16     Securities Act Section 5 may occur as a result of initial or

17     secondary sales of securities.  And we would submit that, you

18     know, the *Terraform* court, Judge Rakoff, he explained this

19     quite well.  He doesn't make a distinction between primary and

20     secondary sales.

21          THE COURT:  Let me talk about BUSD.  If expectation

22     of profit alone isn't sufficient -- and it has to be an

23     expectation of profit based on managerial, entrepreneurial

24     efforts of others -- how does that apply to a digital asset

25     whose valued is tied to the U.S. dollar?

1    MS. FARER:  Our claim at issue with respect to BUSD,

2    Your Honor, we're not alleging that the token itself is a

3    crypto asset security.  We can quibble based on the facts as to

4    whether there is an actual pegging issue.  But what we are

5    focusing on is that the claim provides -- was -- BUSD was

6    offered and sold as a package, as an opportunity for purchasers

7    to participate in these other profit-making programs.  We

8    reference Binance earned and Binance rewards.  And it's

9    advertised, "BUSD is now more rewarding."  It offers you the

10   opportunity to participate in these programs, earn high rewards

11   of 20 to 30 percent APY.

12        And while defendants may complain about the way that

13   our claim is framed, this is the way that it was framed in the

14   *Terraform* case, for example, Your Honor, where we made a claim

15   based on USDT, which was also a stablecoin, and there Judge

16   Rakoff found that there was a security at issue because it --

17   the offer and sale of BUSD -- of USDT in that case provided

18   opportunities to be deployed in yield-generating programs like

19   the Anchor Protocol there.

20        It's no different than here, Your Honor.  There is a

21   particular token and there are opportunities offered with the

22   token to be deployed and earn the profits.

23        THE COURT:  Well, paragraph 321 alleges that the

24   proceeds from investors, purchasers were pooled.  Binance

25   earned 50 percent of the returns on the pooled assets and it

1    used at least a portion of those returns to enable and promote

2    the Binance ecosystem.  That's very different from what you

3    said about BNB.  So how does that meet the investment contract

4    test?

5              MS. FARER:  I'm not sure that it's different in what

6    we said about BNB.  This is -- we're outlining here all of the

7    economic realities associated with BUSD and that purchasers

8    funds are pooled and a portion of the interest earned on that

9    is used by Binance and the trust company here to develop the

10   ecosystem associated with BUSD.  But the fact remains, Your

11   Honor, that the offer and sale at issue provides opportunities

12   to deploy the particular token for profit-making endeavors.

13             THE COURT:  You did allege that Binance offered BUSD

14   reward programs and other profit-making opportunities.  Are

15   those the investment contracts that you're alleging, or are you

16   also alleging that the initial BUSD sale was an investment

17   contract?

18             MS. FARER:  We're alleging that the BUSD is offered

19   as an opportunity to be deployed in these profit-making

20   endeavors is the investment contract.

21             THE COURT:  So only when it was offered in connection

22   with that is it an investment contract?  Otherwise it's not,

23   it's a commodity?

24             MS. FARER:  The claim, for present purposes, focuses

25   on the deployment and the particular programs here, as well as

1    others that the BUSD could be deployed for.  But we are

2    focusing on these here.  And Judge Rakoff rejected --

3           THE COURT:  Putting aside Judge Rakoff, I'm just

4    trying to figure out what you're alleging because I don't think

5    that's clear to me from reading the complaint and the briefs,

6    that you're not alleging that the initial sale of BUSD was an

7    investment contract and it's only these particular -- when it's

8    tied to these particular profit-making opportunities, is that

9    correct?

10          MS. FARER:  Yes, Your Honor.  It's when it's offered

11   and sold as an opportunity for performing in these

12   profit-making opportunities.

13          THE COURT:  As opposed to BNB that was offered and

14   sold as one and remained as one in perpetuity because it's all

15   tied to what Binance said it was going to do?

16          MS. FARER:  Yes, Your Honor.  We're not focused on

17   the particular --

18          THE COURT:  All right.  Now, I'm not sure how simple

19   earn and BNB vault programs fit into the program either.  It's

20   alleged that they're marketed as a program that pays interest

21   to an investor that will lend their assets to Binance for fixed

22   or flexible periods of time.  And the interest rate was

23   established at the outset.  So how is that the same as an

24   investment that earns returns solely due to the efforts of

25   others?  The investor is earning interest on something it did.

1    It's saying, Here, you can have my assets and you have to pay

2    me interest.  So where -- how does that fit the paradigm?

3              MS. FARER:  The -- so the -- for these particular

4    programs, the assets that investors purchase are deployed into

5    these programs and they allow for Binance to use these for a

6    variety of endeavors and it is through those -- through the use

7    of those assets and their efforts that gives rise to the value

8    proposition and the expectation of profits.  With respect to --

9              THE COURT:  It's not the value proposition when they

10   have of yield, an annual percentage yield offered up at the

11   get-go.

12             MS. FARER:  So the yield itself varies and it's

13   within Binance's sole discretion, and that's alleged in the

14   complaint.  And it is -- the yield return is based on Binance's

15   efforts and how it deploys these funds.  The rewards, in fact,

16   are distributed from Binance's own funds as described in the

17   introduction to the Simple Earn.  They use their -- they pool

18   the assets and use their expertise to deploy them for a variety

19   of reasons and opportunities.  It could include staking, it

20   could include loans, it could include use for their own

21   operational purposes.  And it is, then, as a result of their

22   efforts in the deployment of these funds that give rise to the

23   profits.  I mean, BNB vaults --

24             THE COURT:  So they don't have to pay interest if

25   they don't want to?

1            MS. FARER:  There is no obligation to pay interest,

2      Your Honor.

3            THE COURT:  But what about the BAM staking program

4      that had the annual percentage yield at the outset?

5            MS. FARER:  For all of these programs, Your Honor,

6      there is no guaranteed return.  The allegations are that these

7      programs, the investment yield was in either Binance or BAM's

8      sole discretion.  But courts like *Edwards* and *Rivera* have

9      evaluated fixed or variable returns and found that's not

10      determinative.  What is determinative is whether the profits

11      are based on the efforts of others.

12            THE COURT:  All right.  Now, getting into the

13      third-party assets issue and whether they fall into the

14      definition of investment contracts.  So, first, I just want to

15      get more clarity about why we have these 40 pages in the

16      complaint?  And I'm a little concerned about the discovery and

17      mini trials that each of these are going to generate,

18      especially when the issuers aren't even parties to the lawsuit.

19            You stated clearly at the TRO hearing that the

20      securities laws are violated even if just one of Binance's

21      crypto assets is a security.  And I understand that Counts 1

22      through 4 relate to the offer and sale of particular assets and

23      products without a registration statement as to them.  But then

24      when you get to Count 5, Binance's failure to register as an

25      exchange; 6, Binance's failure to register as a broker-dealer;

1    and, 7, Binance's failure to register as a clearing agency, all

2    related to the Binance.com platform.

3              If I find that BNB was sold as a security, is that

4    all that's necessary for those counts, or does there need to be

5    more than that?  And if there doesn't, then what is the point

6    of all the other assets?  Is that just a warning shot to the

7    other issuers?  I guess, do we need those for Counts 5, 6, and

8    7?  Do you have to have more than one?

9              MS. FARER:  Your Honor, BNB would be sufficient to

10   state our claim as the affecting sales solicitation, et cetera,

11   involving the crypto assets at issue.  We have alleged the

12   other tokens because we maintain that this representative

13   sample is just that, it's a representative sample of another

14   crypto asset securities that are offered and traded on the

15   platform, and so that is relevant both to the scope of the

16   violation and the remedy at issue.

17             THE COURT:  Well, if what you're saying is -- and

18   what you said isn't what the law is -- that each crypto asset

19   has to be looked at in terms of the totality of the

20   circumstances surrounding its original issuance and promotion

21   and what the statements are and the representations were and

22   what the understandings were, putting aside whether they're

23   contractual or not, with respect to that, how is -- what are

24   you saying?  That anybody operating a platform has to do the

25   kind of discovery you did and look behind every coin out there

1   before they can sell it on their platform?

2          MS. FARER:  Your Honor, regulated exchanges all the

3   time need to evaluate whether they are offering regulated

4   products and to satisfy their obligations under the laws.  And

5   in this particular instance, with respect to these crypto asset

6   securities, the -- there are allegations that nothing has

7   changed, that there are ongoing representations and efforts

8   that give rise to a reasonable expectation of profits that make

9   clear that these are investment contracts as they are offered

10  and sold to investors.

11         THE COURT:  Was there some point where, then, if

12  we're going on to all these, if I find that BNB is a security

13  or was sold as a security and, therefore, we have to address

14  these other issues about whether they're a broker-dealer,

15  whether there's failure to register as an exchange, and then

16  whether the U.S. entities have the same problems, how do we go

17  on and deal with all these third parties without the third

18  parties being part of the case?

19         MS. FARER:  Your Honor, we can certainly work with

20  the Court and defense counsel to come up with an appropriate

21  discovery plan, but the extent of the violation which may turn

22  on the different crypto assets at issue is relevant to both the

23  scope of the violations and the remedies at issue.  And so we

24  understand the practical implications that may be at issue here

25  and we are not saying we would pursue or need to evaluate the

1    hundreds of tokens on the particular -- on these platforms.

2    And, again, would work with the Court and the parties to come

3    up with a solution on how to address those issues.

4             THE COURT:  Well, when you say that the token

5    represents the investment contract and then you say we've

6    devoted 40 pages and hundreds of allegations to all these other

7    points out there which are only representative, only the tip of

8    the iceberg, let's go back to my original question, are you --

9    it doesn't seem that you're saying that these are generally

10   commodities, and it's just how these particular ones were sold

11   that makes them investment contracts.  It seems like you're

12   trying to say that all digital assets, at the end of the day,

13   have the earmarks of a security.  And if you're not, where is

14   the boundary of what you're saying?

15            MS. FARER:  We're not saying that, Your Honor.

16            THE COURT:  I know you said you're not saying that,

17   but then you said some things that really seemed to slip-slide

18   into that in ways that I wasn't anticipating.  So what is the

19   boundary of your definition?  And don't just say *Howey*, which

20   is what, you know, was said to me, I thought almost glibly, at

21   the TRO hearing.  There has to be a set of understanding --

22   people out in this industry who are buying them, selling them,

23   trading them, need to know what they're getting.  And the

24   federal government has certainly taken the position that by and

25   large they're commodities, everybody who gets one gets the same

1      thing, they go up and down, price of everybody's goes up and

2      down the same.

3              A lot of what these platforms are doing, just making

4      sure their platforms work, seems somewhat more in the

5      ministerial side than the entrepreneurial side.

6              Now, what you were saying at the beginning with BNB,

7      these came out and they were issued and all of a sudden they're

8      saying we're using your money to bid BNB, we're going to make

9      the best platform with this, and so that's why this is the coin

10     you want, because you're investing in us and we're investing in

11     you.  Are you saying that with respect to all these coins --

12     and if you're not saying it with respect to all these coins,

13     how are the issuers supposed to know when they cross the line?

14             MS. FARER:  So the answer for these particular coins,

15     Your Honor, is yes, that at inception, similar to BNB, they

16     gave rise to a reasonable expectation of profits from the

17     development of their platform, or whatever the particular

18     protocol was.  But our argument, Your Honor -- and this is

19     where the limiting principle comes in -- is that you

20     evaluate -- that these are -- there are ongoing efforts.  You

21     look at the offer, the plan of inducement, how they're

22     distributed and you look at the totality of the circumstances.

23             I mean, Foreman has evaluated incorporation of

24     looking at whether they are solely for use.  And if a token is

25     particularly solely for use, maybe that falls outside of the

1    analysis here.

2         You look at how many particular tokens purchasers

3    have to determine is this really for a use-case scenario or is

4    this for investment opportunities?  I mean, I know that the

5    court may be frustrated that there's no bright line, but *Howey*

6    is intentionally the flexible test to look at all of the

7    economic realities at issue.  And while the -- like

8    hypothetical bounds the defendants raise, argue are limitless,

9    that's just not what is at issue with these particular tokens.

10        And the same could be said for many of the others

11   that are on the platform, is that there are issuers, promoters,

12   et cetera, that are continually developing and maintaining that

13   technology, promising returns, et cetera.  And these aren't

14   just use cases or whatever else, plain commodities.  They have

15   no inherent use in and of itself, unless given that.

16        THE COURT:  But what you said at the very beginning

17   was that ongoing relationship is inherent in blockchain,

18   period.

19        MS. FARER:  Yes, Your Honor.

20        THE COURT:  And so, it doesn't matter what -- with

21   that, it wouldn't matter what you said or did at the start and

22   what you committed to do and what the understanding was if they

23   always have to do something.  But if they always have to do

24   something, doesn't that start to become more ministerial?  You

25   have to validate it, you have to make it available for sale,

1    people have to find you on your platform.  And aren't you

2    blending the distinction between the coin and the manner in

3    which the coin is sold?

4         MS. FARER:  We don't believe so, Your Honor.  And,

5    yes, while the underlying technology and that, the value is

6    inextricably intertwined with the technology and the value that

7    the other investors and issuers have is a factor for

8    consideration that is important here.  It is the surrounding

9    economic realities that also are an important role.  These are

10   offered and sold as investment opportunities.  These issuers

11   are saying that we are going to -- our particular efforts are

12   driving the value.

13        I think perhaps maybe a particular example beyond BNB

14   would be helpful.  BNB, obviously, we've talked about a lot and

15   that there are ongoing efforts and promises of profits,

16   et cetera, that we think satisfies the test, but if you look at

17   another example, Filecoin, for example, it was created by an

18   entity called Protocol Labs and it has a number of the

19   structure and characteristics that we just described.  There

20   were rounds of sales for initial fundraising that were pooled

21   together and expressly to fund the development, including

22   rounds for advisors that were offered discounts and alining the

23   fortunes of the founders and initial investors.  They are

24   affected pursuant to agreements for future tokens.  And then

25   three years after these sales is when the public version of the

1    network launched.

2         So there was no value at the time that these were

3    purchased.  Then there was a promise of a development of a

4    secondary market, which came into fruition in October 2020 for

5    .com and 2021 for Binance U.S.  And as I explained, Your Honor,

6    the development of a secondary market is an important feature

7    for investors because they want to know that there is a value

8    proposition here at issue, that there is liquidity that they

9    could use, they could sell their token and get the profits

10   based on this value proposition.

11        There is a limited circulation supply with a

12   structured distribution that included not only the significant

13   retention of tokens by the owners and others as I've described

14   by vesting such that it was encouraging continued alignment

15   among all of these parties.

16        THE COURT:  This whole discussion underscores the

17   point that it doesn't depend on the fact that the nature of

18   blockchain means that the issuer always has to do something.

19        MS. FARER:  Yes, Your Honor.  So to be clear, that is

20   one factor.  And I don't want to overstate that factor.  It is

21   an important factor, but it is one factor among many.  And if I

22   may, Your Honor, because I, again, don't want defense counsel

23   to jump up here and say those were all presale, post -- presale

24   efforts.  Since the launch there have been -- they've continued

25   to use funds from the sale of Filecoin, including funds that

1    they've gotten through the increase in value their own tokens.

2    They made various ongoing statements touting the expertise of

3    their team, ongoing efforts of development, and the investment

4    proposition that would induce continued investors in the market

5    wherever they purchased because these are widely disseminated

6    statements through, you know, web pages, social media,

7    et cetera, where they repeatedly reference how the success of

8    the ecosystem would reward investors and encourage initial

9    investors to increase success.

10             So, for example, they specifically acknowledge the

11   large scale --

12             THE COURT:  It's either in your complaint or it's

13   not.

14             MS. FARER:  It's in our complaint, Your Honor.

15             THE COURT:  Then you don't need to read it to me.

16             I want to ask you a larger question and then I think

17   I need to get to whoever is going to be talking about

18   extraterritoriality and personal jurisdiction, although I think

19   you said at the beginning it wasn't going to be you.  And that

20   is, is there any consistency between allegations in this case

21   and -- about the way to categorize Binance.com and BAM

22   Trading -- exchanges, brokers, clearing agencies -- with

23   allegations in the criminal case that they're operating as a

24   money exchange, or can those two things be side by side?  And

25   is there any inconsistency between what's going on in the CFTC

1    case and this case?

2         MS. FARER:  No, Your Honor.  As the *McDonnell* case

3    explained, that different agencies have -- may have overlapping

4    jurisdiction as to particular products or regimes, and that's

5    exactly what's at issue here.

6         And I think what's also important to highlight is

7    that these different agencies and their regulatory framework

8    are focused on different things.  FinCEN is focused on -- and

9    DOJ were focused on anti-money laundering and counter-terrorist

10   financing.  The security laws are focused on the protection of

11   the investors, protection of the markets, ensuring full

12   disclosure.  None of those interests are at issue in either the

13   DOJ FinCEN or CFTC settlement.

14        And I would note, Your Honor, that CFTC settlement

15   did not reference BUSD.  There was reference to BUSD as a

16   commodity in the initial complaint.  It was not identified

17   specifically for any of the claims and it was not referenced in

18   the settlement itself.

19        I would just like to clarify, Your Honor, with our

20   claim with respect to BUSD --

21        THE COURT:  What commodity are they selling,

22   according to CFTC, if it's not BUSD?  Because they were one in

23   the complaint.

24        MS. FARER:  They were focused on different futures

25   and derivatives products, Your Honor.

1          THE COURT:  But futures and derivatives based on

2     BUSD?  It had to be based on something.  You had to be doing a

3     future and derivative of the commodity in order for it to be

4     under their jurisdiction, correct?

5          MS. FARER:  Yes, Your Honor.  But the particular

6     futures and derivatives at issue in the CFTC complaint did not

7     turn on the USD.  I don't want to speak for them, but our

8     review of the complaint is that --

9          THE COURT:  It did initially, but --

10          MS. FARER:  But that was not the underlying token as

11     part of the futures and derivatives in that case.  But as Your

12     Honor recognized, that commodity could be the subject of an

13     investment contract, just as it could be issued with future

14     derivatives product that is governed and regulated by the CFTC.

15          As the former CFTC general counsel submitted his

16     letter in *Telegram*.  The issue before these courts is not

17     whether something is a commodity, it's whether something is a

18     security, and the court has jurisdiction under the securities

19     laws.

20          Again, just to clarify our point on the offering of

21     the BUSD, I do want to make clear that is the initial offering

22     of BUSD, where it was coupled with the investment

23     opportunities.  The package can't be artificially separated, as

24     courts from *Howey* through Judge Rakoff's *Terraform* decision

25     have made clear.

1          THE COURT:  Okay.  So it was the initial offer, but

2     you're saying the initial offer, part of the initial offer was

3     then you can use it for these programs?

4          MS. FARER:  Correct, Your Honor.  So I did just want

5     to clarify that the entire scheme at issue turns on the

6     promotion of these profit yield opportunities.

7          THE COURT:  Okay.  All right.  I want to talk about

8     extraterritoriality and personal jurisdiction, and I guess the

9     larger question about proceeding in this manner, as opposed to

10     any regulatory or legislative manner, briefly.  So whoever is

11     doing that can -- all right.

12          MR. SCARLATO:  Your Honor, I'm handling

13     extraterritoriality.  And if you have any questions about 17A I

14     can handle those.

15          THE COURT:  Okay.  How do I, consistent with

16     *Morrison*, have subject matter jurisdiction over 2017

17     allegations about something marketed to the whole world on the

18     internet from a company that was outside the United States?

19          MR. SCARLATO:  Thank you, Your Honor.  If I could

20     start by -- you mentioned subject matter jurisdiction.  I just

21     want to clarify that since *Morrison*, I guess you're referring

22     to *Banner Fund*, and *Banner Fund* -- it was *Morrison* that

23     clarified it's really the substantive provisions.  But I think

24     the analysis doesn't change.

25          THE COURT:  Okay.

1            MR. SCARLATO:  So Your Honor asked about the BNB

2    offering.  The -- you're asking why it's a domestic application

3    of U.S. law to me, right?  Is that the question?

4            THE COURT:  Well, what is the purposeful direction at

5    the United States in the original ICO and how do those claims

6    survive *Morrison*?

7            MR. SCARLATO:  Okay.  Because it's based on the focus

8    of the provision at issue, which is Securities Act Section 5.

9    And since *Morrison* the test has been -- and it's been refined

10   up until this Supreme Court's recent decision in *Abitron* --

11   that the court must first identify the focus of a statute.  And

12   once it identifies that focus, it looks to the facts alleged at

13   the motion to dismiss stage and determines whether the focus is

14   alleged to be this.  Okay?

15         And so for specifically as to the BNB offering that

16   Your Honor references, the domestic action that's the focus of

17   Securities Act Section 5 is the offer, sale, or distribution of

18   securities into the United States.  That is the focus of

19   Securities Act Section 5, which is consistent with -- Your

20   Honor cited the *Banner Fund* case which relies on cases we

21   discussed, including *Banque Paibas* and then the Regulation S,

22   which is SEC regulation regarding Securities Act Section 5.

23         All of that makes clear that the focus of Securities

24   Act Section 5 is not what the defendants argue, which are

25   transactions.  That's not the focus.  And we know that in part

1    not only because of the authorities I cite, Your Honor, but

2    because Section 5 covers not just responses, it covers

3    delivery.  So you cannot -- it's a square peg in a round hole

4    to apply a transaction test to something that's broader than

5    that.  And that's what the case is entirely consistent with.

6            So that's step one of this two-step test.  This is

7    the first step of step two, if that makes any sense.  So now

8    we've identified the focus of Section 5, Your Honor applies

9    that to the BNB offering.  And as we allege, Binance offered

10   and sold BNB, BNB Vault, Simple Earn, and BUSD all to U.S.

11   investors, and we allege specific numbers.  I can give the

12   Court the complaint number, if you like.

13           And that's the end of the analysis.  You have the

14   focus, you have a domestic application of that focus, and you

15   can -- and from that we plausibly allege Securities Act Section

16   5 is a BNB offer.

17           You asked about the BNB offering, I went beyond that.

18   That also is the same analysis you would apply, Your Honor, to

19   the other securities I just mentioned.

20           THE COURT:  One of the things you said is that the

21   SEC is good from a *Morrison* perspective because we're following

22   our Regulation S.  But one of the ways the regulation defines

23   offshore is no offers are made to a person in the U.S.  And,

24   so, if *Morrison* says it doesn't matter where the buyer lives,

25   the question is what you did in the U.S., how does the reg.

1    save you here?

2            MR. SCARLATO:  I think Your Honor is conflating the

3    two tests.  *Morrison* talks about the transactions in the

4    context of Exchange Act 10(b) and *Abitron* makes clear that

5    *Morrison's* holding is limited to that provision.  If we're

6    looking at any other provision, right -- here we're talking

7    about Securities Act Section 5 -- you have to do a separate

8    analysis of the focus of that.  So that's where the two paths

9    merge.

10           THE COURT:  So are there any counts -- so your only

11   10b-5 -- your only count involving material and misleading

12   statements is the U.S. entities, Count 13.

13           MR. SCARLATO:  Correct.

14           THE COURT:  And, otherwise, everything else is under

15   a different provision.

16           MR. SCARLATO:  It would either be Securities Act

17   Section 5 or the Exchange Act registration provision.

18           THE COURT:  All right.

19           MR. SCARLATO:  Which all have the same focus as I

20   just explained with respect to Securities Act Section 5.  The

21   Exchange Act provisions regulate the security intermediary

22   services, rather than offers of sales of securities.

23           THE COURT:  Okay.  With respect to personal

24   jurisdiction over Mr. Zhao --

25           MR. SCARLATO:  That's not my issue, Your Honor.  I'm

1    doing 17A.

2              THE COURT:  What other issue is your issue?

3              MR. SCARLATO:  The 17A fraud charges.  If you have

4    any questions about that, those claims against BAM, BAM

5    Management and BAM Trading.

6              THE COURT:  I don't think so right now.

7              MR. SCARLATO:  I'll be here, if you have any other

8    questions.

9              THE COURT:  I'm going to leave at some point.  You

10   can stay all day, if you like.

11             So you were not the one who was going to talk about

12   the regulation versus litigation, the whole "What are we doing

13   here" aspect of these?

14             MR. SCARLATO:  No, Your Honor, I'm not.

15             THE COURT:  Well, then you can just stay and think

16   about fraud.

17             All right.  Who is coming next?

18             MR. SCARLATO:  Thank you.

19             THE COURT:  Thank you.

20             MR. MURPHY:  Good afternoon, Your Honor.  Emmett

21   Murphy of the SEC.  Give me a minute to get settled here with

22   my unwieldy binders.

23             THE COURT:  You may have more binders than you need

24   to answer the questions I'm going to ask you.

25             But I want to talk about personal jurisdiction

1    briefly.  Counsel for the individual defendant was brief.

2         Now, does the law require that this be decided on a

3    claim-by-claim basis, or is one enough?

4         MR. MURPHY:  I believe that it's right, that it does

5    have to be based -- that each claim -- that personal

6    jurisdiction is assessed on a claim-by-claim basis.

7         THE COURT:  Now, as far as I can tell, with respect

8    to most of the claims, your allegation as to why we can reach

9    him is very similar, that he's controlling everything,

10   essentially.  But if I agree that you need more than a

11   plausible allegation that he's controlling everything, have you

12   met that test that there are aspects about what he did

13   personally with respect to every claim for which he's charged

14   personally?

15        MR. MURPHY:  Yes, Your Honor, except the control can

16   have different meanings depending on the defendant.  Defense

17   counsel is making the argument that you cannot rely on the fact

18   that you've met your elements for the 20A control claim to

19   satisfy personal jurisdiction.  We don't argue with that.  But

20   the same underlying factual arguments can satisfy both the 20A

21   control claim and personal jurisdiction.  And in this case it

22   makes perfect sense that they do.

23        These are two platforms.  He was the founder of the

24   Binance.com platform.  He ruled both platforms with an iron

25   fist.  Those are our allegations.  And the exchange clearing

1    agency, broker-dealer, it's all baked into this model that he

2    created.  Defense counsel, I think, is zooming in with such

3    specificity.  Sometimes when you zoom in close enough things

4    become blurry, I would submit.  And here, stepping back, he

5    does not address the fact that when you're talking about

6    personal jurisdiction, it's a question of was Mr. Zhao put on

7    notice?  Did he have meaningful contacts with the United States

8    such that he had notice that he might be brought to court here?

9           He doesn't talk about the fact that he hired a

10   consultant because of his exposure to the SEC's jurisdiction

11   and claims by the SEC under the securities laws.  He makes no

12   mention of that.  And it's hard no imagine a circumstance where

13   it's clear -- it's harder to think of allegations that are this

14   unusually detailed showing that he directed all of these

15   activities of BHL and BAM, keenly aware of his exposure to the

16   U.S. securities laws and created BAM with that in mind, to

17   insulate himself.

18          And the -- the specific arguments I would say are all

19   strawmen in the idea that we don't allege that he had personal

20   contact with U.S. investors, that's just not the standard

21   under -- in this kind of situation, or any that I'm aware of.

22   Defense counsel said that Mr. -- our allegation that Mr. Zhou

23   overruled the BAM CEO on the decision whether to list BNB on

24   the U.S. platform, despite her concerns that this would create

25   exposure under the securities laws, has nothing to do with the

1    claims.

2          We have an allegation that they're trading

3    securities, they are an exchange of securities, they're taking

4    customer assets.  So I think you have the point.  But I think

5    he's avoiding the bigger picture, the overwhelming allegations

6    showing that not only should he have been on notice that he

7    should be subject to the U.S. jurisdiction, but that he was in

8    fact.

9          THE COURT:  All right.  Are you the one who is going

10   to address the, kind of, first background big-picture question

11   that I asked the original arguing counsel?

12          MR. MURPHY:  I think so.  But if you don't mind just

13   asking so I'm sure to --

14          THE COURT:  I guess the point was, where has the SEC

15   been?  Does that matter if this was so obvious?  And why is it

16   that if they're trying to achieve legislation, isn't that some

17   suggestion that there's something missing in the statute to

18   cover this?  Why are we doing this on a coin-by-coin,

19   case-by-case, judge-by-judge litigation attack, which depends

20   on, you know, vagaries of the individual district in district

21   court?  And the asset itself, as opposed to issuing a reg. that

22   tells everybody this is it, and then we have people who

23   challenge the reg. as being arbitrary and capricious or beyond

24   the scope of the statute, et cetera.

25          There's a lot of process-related attack, and all the

1    briefs spent pages on it.  So I want to know what your answer

2    to all of that is.

3              MR. MURPHY:  Your Honor, there's a lot there so I'm

4    going to try to address as much as I can based on the notes I

5    just made and then we'll walk back through what I missed.  So

6    it seems with the complaint, where has the SEC been?  And I

7    think baked into that is the SEC has made contradictory

8    statements and I just have to -- I have to disagree with the

9    premise of both of those.  And I understand your challenging

10   the defendants in saying these things.

11             The SEC -- Binance started as part of a boom of ICOs

12   in 2017 and 2018.  They solicited millions of dollars of

13   customer money in something that looks an awful lot like --

14   well, it's called an ICO.  It looks an awful lot like an IPO,

15   of someone trying to solicit public investor assets.  And

16   within a month of doing that, the SEC released guidance

17   pointing out the obvious:  When you elicit customer money with

18   a promise of profits based on a common enterprise and your

19   efforts, you are subject to the securities laws.

20             The SEC didn't have to do that because, as the court

21   in *Kik* and the court in *Logan* said, the securities laws are not

22   unconstitutionally vague.  You only need notice of the statute,

23   *Howey* is clear, and you don't need a regulator to reach out

24   specifically to remind you that you might be violating

25   securities laws; but they will remind you.  Before they built

1    up this business on a critical mass, they were reminded.  And

2    they this knew it.  It's hard for them to say they -- it's hard

3    to believe that they didn't know it.  And the facts are they

4    didn't -- they did know, that's why they hired a consultant,

5    that's why they built the business and the protections and the

6    evasions that they tried to.

7         On the question of regulation versus enforcement,

8    I'll just note, that's an argument that they made halfheartedly

9    during the TRO proceedings when we were here.  I don't think

10   they really make that argument here because they would say we

11   don't have any power to make regulations.  The -- as you know,

12   the SEC has discretion on whether to proceed through

13   enforcement or regulation.  And when we're doing this, we're

14   thinking about the capital markets writ large, and there are

15   consequences to rewriting regs. to have carve-outs, to rewrite

16   regulations in ways that the crypto industry like.

17        There's really smart people at the SEC who figure out

18   rulemaking.  I'm not sure we're thinking about rule-making

19   right now.  But in the agency's discretion, have decided that

20   this -- to proceed on a fact-by-fact basis, on a case-by-case

21   basis, like we are here, is reasonable and the best way to

22   address facts as they are developing in this industry.

23        You mentioned gaps in the law.  To the extent that

24   there are, I'm not sure if that's touching on major questions.

25   But we don't believe there are gaps in the law.  We think *Howey*

1    is crystal clear and we think that there's a lot of courts and

2    decisions that you've cited that pointed to -- while you were

3    sitting here, Your Honor, who agree that *Howey* is clear.

4         I don't know if that addresses everything.

5         THE COURT:  I think -- I thought the question needed

6    to be asked, given a lot that is in the background of the

7    defense briefs, they're probably going to stand up and remind

8    me what Mr. Genzer said again.  And I remember.  So, you know,

9    that's what they keep saying, you know, that this is new, this

10   came out of nowhere.  I'm not sure I find that persuasive, but

11   it does seem like -- this action seems like a long time coming,

12   given when things started happening and 2023.  And so there's a

13   question about, I guess, why.

14        MR. MURPHY:  The SEC has brought over 100 actions

15   dealing with crypto assets.  The defense counsel would argue

16   that *Howey* applies to crypto assets.  So if it took too long --

17   investigations can take a long time.  The SEC acts prudently as

18   they're going along.

19        But again, I would disagree with the premise that the

20   SEC has contradicted itself.  I think if you look -- and I

21   won't repeat our briefs -- but if you look at every statement

22   they cite as a supposed contradiction, on closer examination it

23   just isn't.

24        On the gaps in the law, I would just direct you to

25   the letter that counsel apparently supervised and wrote in

1    *Telegram.*  I think that answers everything on the issue between

2    FTC and SEC and that's the direction you should look, as

3    opposed to arguments that they discovered on the fly here.

4              With that, Your Honor, unless there is any --

5              THE COURT:  If I think that the complaint plausibly

6    alleges that there is an asset, called commodity or not, that's

7    being marketed and sold with all the surrounding circumstances

8    as a security, do I have to even address whether that intrudes

9    on the jurisdiction of the CFTC?

10             MR. MURPHY:  No, Your Honor.  I would point to the

11   final sentences in counsel's letter in *Telegram* and I think

12   that gives the answer.

13             THE COURT:  All right.

14             MR. MURPHY:  *Howey* applies.  If *Howey* applies, it's a

15   security and the SEC has authority to enforce.

16             THE COURT:  All right.  Thank you.  Is there anything

17   somebody on this side of the room was planning to talk about

18   that I haven't asked them to talk about yet?

19             MR. TENREIRO:  Your Honor, if I just may clarify.

20   Defense counsel has suggested they might do some rebuttal

21   points and we would like to reserve a couple minutes as well,

22   although I'm happy to do them now.

23             THE COURT:  It's their motion.  So you want to

24   reserve time -- you're not reserving time to rebut their

25   rebuttal.  And their rebuttal, I can tell you -- it's 1:30 --

1    is going to be brief.  It's not as if people haven't had a lot

2    of time to talk to me.  So if I let them say anything, unless

3    they say something that they never said before and you must

4    address it, probably going to be done.

5               MR. TENREIRO:  Okay.

6               THE COURT:  I think I've been generous to everybody

7    as to time.

8               MR. TENREIRO:  Absolutely, Your Honor.  On

9    commonality, the Court asked for Court of Appeals authority on

10   that.  I have the case, we can also --

11              THE COURT:  Put them in writing.

12              MR. TENREIRO:  Thank you.

13              THE COURT:  All right.  Now, I don't want to hear a

14   word that you said before.  If there is something new that you

15   need to say, that you feel like you must say before you go

16   home, I will let each of you do it.  I really don't think I

17   need to hear from counsel for Mr. Zhao on personal jurisdiction

18   again.  And I don't want to hear anything more about intruding

19   on the authority of the CFTC again.

20              And I'm not sure really there's been that much with

21   respect to the U.S. entities that I need to hear again.  But if

22   counsel for Binance want to address something and you feel like

23   there's something that you need to say that you have not yet

24   said in writing or in court, I'll give you no more than five

25   minutes to do it.

1           MR. MENDRO:  Thank you, Your Honor.  Jason Mendro for

2     BHL.  And you have been very patient and I will be very brief.

3           Just to point back to Ms. Farer's arguments, you

4     asked:  What is the boundary?  And her response was:  There's

5     no bright line.  We think that's a problem because *Life Partner*

6     says that we should be looking to find a distinction between

7     securities and non-securities.

8           She says that there are ongoing efforts.  But mostly

9     what we're talking about is promotion.  Promotion is something

10    that every business does.  And that also is not a distinction

11    between securities and non-securities.  And there's no dispute

12    BNB exists separately from BHL, trades on an etherial block and

13    doesn't require ongoing efforts to have value.  In fact, BHL

14    traded at its six-month high at the time the company was

15    entering into these resolutions.  So there's not a direct

16    connection, there doesn't have to be.

17          The SEC has also suggested that statements last

18    February --

19          THE COURT REPORTER:  Mr. Mendro.

20          MR. MENDRO:  -- securities last forever.  If that

21    were true and I could find a way to transfer a security to a

22    friend, it could mean that I'm engaged in the illegal sale of

23    securities based on statements that were made decades ago,

24    after the token had changed hands thousands of times.  That

25    can't possibly be the test.  And requiring privity is the

1    answer to that because if one party is contracting with another

2    party and they have an understanding, a meeting of the minds,

3    then you always know what the rules are.

4           If the contract could be assigned, then the contract

5    can be assigned.  But everyone should be involved and know who

6    they're dealing with, and you don't have that on the SEC's

7    theory.

8           Counsel also mentioned the creation of a secondary

9    market.  And I would just briefly note that the *Life Partners*

10   case specifically rejects that helping with resale of the

11   viatical settlement interest is sufficient.  That's at page

12   546.

13          There was some discussion about direct sales other

14   than the offering of BNB, but I would submit that the complaint

15   does not plead any direct sales of BNB, other than the ICO.

16   Paragraphs 288 and 289 simply say that BNB was offered and then

17   offered on the exchange, which is the same sort of blind bid

18   ask transactions on the exchange that *Ripple* rejected because

19   it's impersonal and because the parties didn't know each other.

20          In paragraph 363, which is what they cited in their

21   briefing for this point, simply says that assets were sold, not

22   that BNB was.

23          There was brief mention of --

24          THE COURT:  So that point goes to your statute of

25   limitations argument?

1      MR. MENDRO:  It does, and also if there is a

2  distinction between resale and direct offerings, they haven't

3  shown that the direct offerings actually create the sort of

4  privity that we maintain is necessary to distinguish between

5  securities and non-securities because if it's done over the

6  exchange, nobody knows who they're dealing with.  Nobody has

7  any reason to believe --

8      THE COURT:  Okay.

9      MR. MENDRO:  -- that their money is being pooled for

10  investment.

11      THE COURT:  I heard that.  Okay.  All right.

12      MR. MENDRO:  The SEC briefly mentioned payments to

13  employees which did not come up in my presentation.  So I would

14  just note our briefs make this point:  If there is an

15  investment by these employees within the meaning of securities

16  laws, again, *Teamsters versus Daniel* rejects the very same

17  argument, that an employee's work accounts is the investment.

18  In that case *Ripple* rejected the same argument.  And the *Rivera*

19  case says if you have to give something up, then you run a risk

20  of loss.

21      We think all three of those cases show that the

22  payments to employees aren't enough.  Paragraph 310 of the

23  SEC's complaint makes clear that these are payments to

24  high-performing employees.  So there's no allegation that this

25  is all the compensation anyone got.  These are bonuses.  And

1    there's no allegation that there was an agreement between BHL

2    and any employees to receive BNB.  And in fact, in paragraph

3    308 of the complaint the SEC alleges there's no restriction on

4    resale.  So this isn't like a stock option that you get after

5    working for a few years.  You get this as payment, as a bonus

6    and can use it any time you wish.  That's alleged directly in

7    paragraph 308.

8            BUSD came up and the SEC said something that was a

9    little different from what I read from the complaint, in the

10   briefing.  They said they're not alleging that BUSD is a

11   security independently.  If that's where the SEC is, I think

12   it's important for the Court's ruling to make that

13   clarification too.

14           I look at Count 2 of the complaint and see an

15   allegation that BUSD in and of itself is a security, which is,

16   I think, what was said at one point and then taken back later.

17   If Count 2 is about programs --

18           THE COURT:  What it says is what it says and I will

19   look at it and it either says it or it doesn't.  I mean, I

20   certainly -- the question has been raised and the language of

21   the complaint is going to control and there's no point arguing

22   about what we remember it said.

23           MR. MENDRO:  That's fair, Your Honor.  I just would

24   point out that Count 3 specifically makes allegations about

25   programs.  And I don't understand the distinction between 2 and

1    3, if 2 is also about the programs.

2              But, the response, even if the Court disagrees with

3    me on that, is very similar to the response I gave you about

4    the two programs that are addressed in Count 3.  This is --

5    there's no allegation of a real risk, which the Supreme Court

6    says must be given adequate weight in the *Meridian Bank* case.

7    This is just -- the allegations are completely consistent with

8    a deposit that can be withdrawn at any time.  And there's been

9    no dispute about that.  Those deposits that the complaint

10   alleges are deposits that BHL is using to divest on its own

11   behalf.  Paragraphs 317 and 320 make that clear.  It's not

12   using the deposits to generate returns that go to the

13   investors, it's, instead, just paying them for the use of its

14   funds.

15             Paragraph 324 actually describes it as being like a

16   savings account without a deposit.  So there's not even

17   necessarily a choice being made to use the savings feature.

18             So, Your Honor, I think that that addresses all of

19   the things separate from what I said before.  I don't want to

20   repeat it.  I do have citations from our brief where the CFTC

21   displacement point was raised, if you would like to know where.

22             Thank you, Your Honor.  I'm very grateful for your

23   time, unless you have other questions.

24             THE COURT:  I don't think so.

25             MR. MENDRO:  Thank you.

1          MR DAVIS:  Sorry, BAM defense did not get a chance to

2     address the staking program in Count 4.  Can I spend 60 seconds

3     and give you a couple points?

4          THE COURT:  Sixty seconds.  Give me points you didn't

5     make before.

6          MR DAVIS:  I haven't discussed staking, Your Honor.

7          THE COURT:  Okay.  I asked about it.  Gave everybody

8     a chance to talk about it.  You wanted to talk about something

9     else, go ahead.

10          MR DAVIS:  I misunderstood the question, Your Honor.

11     I'll be very brief.

12          Page 546 of the *Life Partners* case talks about the

13     need for post-purchase entrepreneurial activity, can

14     meaningfully affect the profitability of the investment.

15     That's not met.  Here most of the work that's being done is by

16     the staking protocol itself.  And most of the activities

17     alleged in the staking section are pre-purchase activities by

18     BAM.

19          THE COURT:  All right.

20          MR DAVIS:  The only post-purchase activity is

21     paragraph 350, which is pooling, which is a ministerial action.

22     If it's not a ministerial action, it's not the type of

23     entrepreneurial activity that overwhelms what the stake in

24     protocol does itself.

25          Thank you, Your Honor.

1          THE COURT:  All right.  I do have one question of the

2    SEC.  When I started down the statute of limitations argument,

3    the answer was:  Well, they're still selling BNB.  If I'm just

4    looking at the ICO portion involving BNB, what is the answer to

5    the statute of limitations issue?

6          MS. FARER:  Your Honor, we would maintain that the

7    ICO is not time-barred for the reasons we said previously.

8          THE COURT:  Okay.  And why not?

9          MS. FARER:  Because during -- the statute of

10   limitations did not start to run because the defendant was not

11   present in the United States for purposes of service of

12   process.

13         THE COURT:  Okay.  All right.  Thank you.

14         MR. GREGORY:  Your Honor, may I respond briefly to

15   that point?

16         THE COURT:  Okay.

17         MS. FARER:  Your Honor, we would also just note that

18   there is the injunctive relief point, that there is the longer

19   statute of limitations.

20         THE COURT:  All right.

21         MS. FARER:  And, Your Honor, if I just may, I don't

22   think we --

23         THE COURT:  I think they already addressed that

24   point.

25         MS. FARER:  They did, Your Honor.

1          With respect to staking, I don't think that we

2     specifically addressed that as well, but if I just may, one

3     minute, Your Honor, if that.

4          THE COURT:  All right.

5          MS. FARER:  I would just note for the staking

6     program, as well as the other investment programs, all

7     defendants challenge the entrepreneurial and managerial

8     efforts.  And we would note, at a minimum, Your Honor, it's a

9     fact intense question that the court in *Life Partners*, in

10    evaluating whether something was ministerial or not, had to

11    evaluate all of the evidence before it as to really determine

12    what impacted the return and the reward.  And here, Your Honor,

13    we would respectfully submit that --

14         THE COURT:  I understand there's a difference between

15    summary judgment and a motion to dismiss.  I know that I went

16    through staking, I went through every single asset that was

17    alleged to be a security.  So I'm pretty sure I asked both

18    sides about the staking program.  And I do have questions about

19    the vault and the staking and whether those qualify, but it

20    depends on what's been alleged.

21         MS. FARER:  My apologies, Your Honor.  When you asked

22    about staking, I thought you were just talking about the

23    technology.

24         THE COURT:  In general.  I talked about it when I

25    talked about BNB and I asked you why your allegation -- could

1    it be staked and didn't hear the answer.  But then I think I

2    specifically asked about the BAM staking program.

3               MS. FARER:  If you did, Your Honor, I don't recall.

4               THE COURT:  If I skipped it, I skipped it.  But

5    you've answered it.

6               MS. FARER:  We would just note that the efforts that

7    defense counsel specifically referenced, the pooling of assets

8    really impacts whether a validator is elected to be a part of

9    that process which impacts the return, as well as the

10   maintenance of the infrastructure and technology, the,

11   quote/unquote, up time is critical to -- again, to the

12   selection.

13              So these efforts, we would maintain, satisfy the test

14   under *Life Partners* that defendants rely so heavily upon.

15              THE COURT:  Okay.  Thank you.

16              All right.  You're the last one to speak.  It better

17   be really, really good if you want to walk out of here in a

18   cloud of glory.  Go ahead.

19              MR. GREGORY:  I can do it in one minute, Your Honor.

20              THE COURT:  Fabulous.

21              MR. GREGORY:  On this point about service of process

22   and the limitations period --

23              THE COURT REPORTER:  Sir, you're going to have to

24   slow down.

25              MR. GREGORY:  Okay.  Thank you.  That case is from

1   the Southern District of New York.  It's an opinion by Judge

2   Sullivan, he specifically rejected the link they're asking you

3   to draw here between service of process and the running of the

4   limitations period.  In that case the defendant was subject to

5   service of process and the court said that doesn't matter, what

6   matters under the statute is physical presence.  And, actually,

7   this wouldn't matter anyway because the burden-shifting, even

8   at the motion to dismiss stage, for them to show that an

9   exception to a limitations period applies, they have the burden

10  to allege all of the facts to support it.  That's the *Firestone*

11  case and the *Sharp* case that the SEC itself cites in its brief.

12          THE COURT:  All right.  Thank you.

13          MR. GREGORY:  Thank you, Your Honor.

14          THE COURT:  I appreciate everyone's patience this

15  morning.  I appreciate everyone's attempt to be responsive to

16  the questions and dealing with the fact that there were a lot

17  of them.  And I will take this matter, or complicated set of

18  matters, and all the circumstances that surround them under

19  advisement.

20          Thank you.

21                          *   *   *

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                          Dated this 25th day of January, 2024

9

10

11                      _____

12                       Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
13                       Room 6523
                         333 Constitution Avenue, N.W.
14                       Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'30s** [1] - 12:19

**1**

**1** [1] - 104:21
**10(b** [5] - 40:5, 40:6, 40:15, 40:18, 118:4
**100** [3] - 1:16, 1:19, 125:14
**1000** [1] - 2:7
**10004** [1] - 1:19
**102** [1] - 31:1
**1050** [1] - 1:23
**10:00** [1] - 1:7
**10b-5** [1] - 118:11
**11** [1] - 58:13
**118** [1] - 63:2
**11:37** [1] - 65:11
**11:53** [1] - 65:11
**11th** [1] - 2:7
**12(a** [1] - 98:23
**12(b)(2** [1] - 65:5
**12(b)(6** [1] - 36:17
**129** [1] - 63:14
**13** [2] - 70:12, 118:12
**131** [1] - 63:19
**133** [1] - 63:20
**134-page** [1] - 26:9
**140** [1] - 63:2
**15** [1] - 55:7
**166** [1] - 62:18
**17A** [3] - 115:13, 119:1, 119:3
**1919** [1] - 2:3
**1940s** [1] - 80:10
**1:30** [1] - 126:25

**2**

**2** [4] - 131:14, 131:17, 131:25, 132:1
**20** [2] - 31:6, 100:11
**20-some-odd** [1] - 54:19
**20001** [2] - 2:11, 138:14
**20004** [1] - 2:7
**20006** [1] - 2:4
**20036** [1] - 1:23
**2013** [1] - 71:13
**2017** [10] - 34:21, 35:8, 35:11, 37:7, 40:23, 41:3, 41:7, 71:12, 115:16, 123:12
**2018** [2] - 37:4, 123:12
**2019** [2] - 34:25, 35:1
**202-354-3267** [1] - 2:12

**2020** [2] - 35:2, 111:4
**2021** [4] - 31:2, 37:6, 98:21, 111:5
**2022** [1] - 97:2
**2023** [1] - 125:12
**2024** [2] - 1:6, 138:8
**20549** [1] - 1:16
**20A** [2] - 120:18, 120:20
**216** [1] - 63:6
**22** [1] - 1:6
**223** [1] - 45:13
**224** [1] - 45:13
**23-1599** [1] - 3:2
**23-cv-1599** [1] - 1:4
**232** [1] - 45:14
**233** [1] - 45:14
**24** [1] - 41:17
**2462** [1] - 73:6
**25th** [1] - 138:8
**288** [2] - 71:25, 129:16
**289** [1] - 129:16
**299** [1] - 72:3

**3**

**3** [4] - 27:5, 131:24, 132:1, 132:4
**30** [1] - 100:11
**300** [1] - 1:23
**308** [2] - 131:3, 131:7
**310** [1] - 130:22
**317** [1] - 132:11
**320** [1] - 132:11
**321** [1] - 100:23
**324** [1] - 132:15
**327** [1] - 26:21
**329** [1] - 26:21
**331** [1] - 26:21
**333** [2] - 2:11, 138:13
**349** [1] - 7:16
**350** [1] - 133:21
**363** [1] - 129:20

**4**

**4** [2] - 104:22, 133:2
**40** [2] - 104:15, 107:6
**45** [1] - 50:3

**5**

**5** [18] - 40:17, 40:18, 71:22, 98:10, 99:16, 104:24, 105:7, 116:8, 116:17, 116:19, 116:22, 116:24, 117:2, 117:8, 117:16, 118:7, 118:17, 118:20
**50** [1] - 100:25

**500** [1] - 26:9
**545** [2] - 28:4, 28:24
**546** [2] - 129:12, 133:12
**548** [1] - 30:5
**555** [1] - 2:7

**6**

**6** [2] - 104:25, 105:7
**60** [1] - 133:2
**6523** [2] - 2:10, 138:13

**7**

**7** [2] - 105:1, 105:8
**70** [1] - 62:13

**8**

**800** [1] - 2:3

**9**

**9.5** [1] - 31:1
**91** [1] - 45:10

**A**

**a.m** [3] - 1:7, 65:11
**aback** [1] - 4:14
**Abid** [2] - 2:5, 4:2
**ability** [5] - 33:21, 48:24, 53:4, 73:7, 138:7
**Abitron** [6] - 39:7, 39:18, 44:11, 116:10, 118:4
**able** [4] - 32:9, 60:14, 62:10, 89:1
**absence** [1] - 60:5
**absolutely** [2] - 4:19, 127:8
**accept** [2] - 73:19, 91:17
**acceptance** [3] - 7:15, 10:7, 85:8
**accepted** [1] - 77:15
**according** [1] - 113:22
**account** [3] - 62:11, 63:7, 132:16
**accounts** [5] - 39:12, 62:16, 62:21, 62:24, 130:17
**accurate** [1] - 138:5
**achieve** [2] - 72:7, 122:16
**acknowledge** [1] - 112:10
**acknowledged** [2] -

73:17, 96:15
**acknowledges** [1] - 63:19
**across-the-board** [1] - 89:11
**act** [2] - 61:8, 81:6
**Act** [20] - 5:12, 33:20, 33:21, 38:20, 58:22, 98:10, 98:23, 99:16, 116:8, 116:17, 116:19, 116:22, 116:24, 117:15, 118:4, 118:7, 118:16, 118:17, 118:20, 118:21
**action** [8] - 3:2, 62:6, 64:19, 98:20, 116:16, 125:11, 133:21, 133:22
**Action** [1] - 1:3
**actions** [2] - 13:8, 36:20, 125:14
**active** [5] - 47:2, 55:8, 59:8, 62:11, 63:1
**actively** [1] - 63:4
**activities** [12] - 16:8, 29:2, 30:15, 30:16, 48:16, 53:17, 61:16, 63:17, 95:8, 121:15, 133:16, 133:17
**activity** [9] - 10:15, 15:23, 16:11, 16:13, 51:14, 87:9, 133:13, 133:20, 133:23
**Acts** [1] - 71:22
**acts** [3] - 52:11, 70:18, 125:17
**actual** [4] - 52:16, 57:12, 85:22, 100:4
**add** [3] - 29:25, 30:2, 34:5
**added** [1] - 73:6
**adding** [1] - 68:7
**addition** [3] - 45:3, 72:15, 77:9
**additional** [1] - 49:6
**address** [16] - 19:11, 27:7, 38:14, 46:13, 97:17, 98:8, 106:13, 107:3, 121:5, 122:10, 123:4, 124:22, 126:8, 127:4, 127:22, 133:2
**addressed** [6] - 9:16, 43:1, 64:25, 132:4, 134:23, 135:2
**addresses** [3] - 42:12, 125:4, 132:18
**addressing** [1] - 4:24, 97:23
**adequate** [1] - 132:6
**adhere** [1] - 6:14
**administrative** [1] -

75:9
**admitted** [1] - 61:18
**adopt** [2] - 41:22, 49:9
**adopted** [5] - 8:8,
49:11, 74:23, 76:10,
94:7
**adopting** [2] - 48:25
**adoption** [2] - 88:16,
88:19
**adopts** [1] - 47:18
**advance** [1] - 84:24
**advertise** [1] - 17:13
**advertised** [1] - 100:9
**advertising** [3] -
17:20, 18:24, 90:16
**advised** [1] - 34:23
**advisement** [1] -
137:19
**advisors** [1] - 110:22
**Advocates** [1] - 82:10
**affect** [6] - 28:18,
32:23, 32:24, 87:11,
88:6, 133:14
**affected** [2] - 40:7,
110:24
**affecting** [1] - 105:10
**affects** [2] - 89:8, 89:9
**affiliates** [1] - 61:18
**afforded** [1] - 95:3
**afternoon** [3] - 65:14,
65:15, 119:20
**agencies** [6] - 13:16,
58:10, 62:4, 112:22,
113:3, 113:7
**agency** [9] - 32:20,
36:19, 37:14, 38:9,
57:25, 60:25, 71:5,
105:1, 121:1
**agency's** [1] - 124:19
**agents** [1] - 61:20
**ago** [5] - 9:25, 32:15,
53:6, 80:4, 128:23
**agree** [20] - 5:17, 10:1,
11:15, 12:25, 15:8,
15:9, 23:6, 25:21,
26:15, 30:9, 37:2, 51:2,
53:20, 60:7, 64:11,
66:10, 66:23, 77:17,
120:10, 125:3
**agreed** [2] - 60:17,
78:15
**agreement** [5] - 50:2,
50:24, 79:12, 81:17,
131:1
**agreements** [3] -
31:22, 49:16, 110:24
**agrees** [2] - 24:2,
83:17
**ahead** [7] - 13:22,
14:25, 22:6, 22:13,

36:2, 133:9, 136:18
**al** [2] - 1:7, 3:3
**alignment** [1] - 111:14
**alining** [1] - 110:22
**alive** [2] - 61:4, 61:5
**allegation** [16] - 16:6,
23:16, 43:12, 63:2,
63:23, 67:1, 72:3,
120:8, 120:11, 121:22,
122:2, 130:24, 131:1,
131:15, 132:5, 135:25
**allegations** [43] - 23:3,
23:15, 23:24, 26:9,
26:12, 27:1, 29:5, 35:3,
39:12, 40:5, 40:9, 45:9,
49:25, 51:10, 51:12,
51:13, 54:25, 55:11,
64:10, 64:12, 64:14,
73:21, 77:12, 81:16,
81:24, 82:16, 83:3,
87:25, 88:9, 88:18,
91:8, 93:7, 104:6,
106:6, 107:6, 112:20,
112:23, 115:17,
120:25, 121:13, 122:5,
131:24, 132:7
**allege** [15] - 22:2, 43:4,
43:11, 44:3, 62:6,
63:14, 64:5, 64:6, 83:8,
101:13, 117:9, 117:11,
117:15, 121:19, 137:10
**alleged** [28] - 13:24,
15:11, 22:1, 26:5, 39:9,
40:2, 41:5, 42:24,
68:19, 69:18, 77:4,
77:14, 78:8, 83:14,
85:14, 89:2, 93:7,
93:14, 96:2, 102:20,
103:13, 105:11,
116:12, 116:14, 131:6,
133:17, 135:17, 135:20
**alleges** [13] - 30:25,
41:1, 41:6, 41:18,
67:16, 70:16, 71:23,
72:4, 85:18, 100:23,
126:6, 131:3, 132:10
**alleging** [10] - 16:14,
24:25, 62:10, 100:2,
101:15, 101:16,
101:18, 102:4, 102:6,
131:10
**allow** [2] - 64:20,
103:5
**allows** [1] - 98:24
**alluded** [1] - 61:6
**almost** [3] - 32:15,
61:12, 107:20
**alone** [8] - 30:15, 31:1,
64:13, 66:6, 69:11,
69:14, 80:19, 99:22

**amici** [5] - 4:8, 5:10,
12:12, 76:23, 82:9
**amicus** [1] - 85:25
**AML** [1] - 61:10
**AMY** [1] - 1:10
**analogy** [1] - 18:25
**analysis** [20] - 6:1,
25:13, 25:15, 44:25,
45:16, 59:6, 60:2,
67:20, 73:13, 73:20,
75:15, 80:12, 80:13,
96:19, 98:2, 109:1,
115:24, 117:13,
117:18, 118:8
**analyze** [2] - 58:13,
81:4
**analyzed** [1] - 86:5
**analyzing** [2] - 80:12,
80:15
**Anchor** [1] - 100:19
**annual** [2] - 103:10,
104:4
**annuity** [1] - 17:21
**answer** [20] - 11:11,
11:25, 15:1, 16:4, 27:4,
30:3, 32:5, 32:9, 51:4,
51:22, 51:24, 86:2,
108:14, 119:24, 123:1,
126:12, 129:1, 134:3,
134:4, 136:1
**answered** [1] - 136:5
**answers** [1] - 126:1
**anti** [2] - 47:7, 113:9
**anti-manipulation** [1]
- 47:7
**anti-money** [1] - 113:9
**anticipate** [1] - 25:9
**anticipating** [1] -
107:18
**antifraud** [1] - 46:21
**anyway** [2] - 18:24,
137:7
**apart** [1] - 84:6
**apologies** [1] - 135:21
**apologize** [1] - 8:17
**Appeals** [1] - 127:9
**appearance** [1] - 50:4
**appearing** [1] - 89:5
**application** [6] - 39:1,
39:3, 39:19, 81:6,
116:2, 117:14
**applies** [7] - 15:21,
33:10, 117:8, 125:16,
126:14, 137:9
**apply** [11] - 13:22,
19:6, 37:10, 38:22,
40:9, 41:9, 41:10,
99:24, 117:4, 117:18
**applying** [3] - 7:3,
39:17, 45:1

**appreciate** [6] - 4:7,
5:13, 15:13, 65:17,
137:14, 137:15
**approach** [1] - 77:17
**approaching** [1] - 3:7
**appropriate** [2] -
85:17, 106:20
**approved** [1] - 63:24
**apps** [1] - 68:7
**APY** [1] - 100:11
**arbitrage** [1] - 12:8
**arbitrary** [1] - 122:23
**arbitration** [1] - 98:13
**Arden** [1] - 86:9
**arguably** [1] - 81:18
**argue** [7] - 20:7, 20:9,
81:2, 109:8, 116:24,
120:19, 125:15
**argued** [5] - 20:19,
38:21, 39:10, 79:9,
89:3
**argues** [1] - 33:24
**arguing** [7] - 9:3, 35:5,
38:18, 55:21, 57:7,
122:11, 131:21
**argument** [48] - 5:5,
5:13, 9:2, 10:2, 15:7,
15:8, 20:13, 23:18,
24:16, 24:23, 25:2,
27:13, 27:14, 33:19,
33:24, 35:9, 36:18,
36:24, 37:20, 38:8,
40:21, 42:5, 42:20,
46:13, 50:6, 53:13,
54:21, 54:22, 57:19,
57:22, 57:23, 60:23,
61:4, 71:9, 76:22,
81:17, 84:24, 91:25,
95:1, 99:15, 108:18,
120:17, 124:8, 124:10,
129:25, 130:17,
130:18, 134:2
**arguments** [20] - 3:12,
12:11, 19:9, 19:10,
20:11, 23:18, 36:9,
38:8, 38:16, 40:1,
44:23, 47:18, 60:20,
65:5, 80:5, 80:10,
120:20, 121:18, 126:3,
128:3
**arise** [1] - 30:11
**arising** [1] - 6:16
**arming** [1] - 64:19
**arms** [1] - 32:1
**arrangement** [2] -
15:5, 79:18
**arrangements** [3] -
49:15, 54:17, 82:1
**article** [1] - 55:16
**artificially** [1] - 114:23

**aside** [4] - 20:13, 97:19, 102:3, 105:22
**aspect** [3] - 20:25, 97:6, 119:13
**aspects** [2] - 52:15, 120:12
**asserted** [4] - 41:7, 49:22, 49:23, 98:23
**assertion** [2] - 63:5, 63:12
**assertions** [3] - 62:25, 64:7, 64:16
**assessed** [1] - 120:6
**asset** [56] - 14:13, 14:14, 15:4, 15:10, 16:14, 16:15, 16:18, 16:23, 17:25, 18:2, 18:10, 18:19, 22:9, 24:12, 25:13, 31:13, 31:20, 31:21, 47:13, 47:14, 47:21, 47:24, 51:21, 52:1, 52:6, 52:8, 53:25, 56:9, 56:14, 58:4, 58:6, 66:2, 66:3, 66:17, 66:25, 70:11, 71:1, 77:7, 77:21, 82:11, 84:11, 93:12, 94:4, 94:5, 94:7, 94:22, 95:12, 99:24, 100:3, 105:14, 105:18, 106:5, 122:21, 126:6, 135:16
**asset's** [1] - 78:17
**assets** [52] - 12:19, 14:1, 15:4, 17:12, 21:4, 21:5, 22:16, 24:8, 24:9, 27:15, 34:25, 35:23, 45:11, 46:9, 46:18, 47:4, 48:23, 49:6, 49:7, 51:11, 52:14, 54:15, 54:16, 55:2, 60:17, 67:18, 69:16, 70:4, 73:25, 75:20, 82:24, 83:25, 84:23, 100:25, 102:21, 103:1, 103:4, 103:7, 103:18, 104:13, 104:21, 104:22, 105:6, 105:11, 106:22, 107:12, 122:4, 123:15, 125:15, 125:16, 129:21, 136:7
**assigned** [6] - 29:18, 34:6, 42:16, 55:23, 129:4, 129:5
**assignment** [2] - 24:2, 24:3
**associated** [7] - 78:7, 86:12, 86:18, 90:25, 95:22, 101:7, 101:10
**assume** [1] - 4:11
**assuming** [3] - 44:24,

50:25, 51:1
**assumption** [1] - 39:22
**attack** [2] - 122:19, 122:25
**attempt** [1] - 137:15
**attention** [5] - 9:21, 25:25, 26:1, 34:23, 50:5
**attract** [2] - 84:13, 87:23
**attribute** [2] - 14:11, 63:14
**attributes** [1] - 55:1
**authorities** [2] - 59:2, 117:1
**authority** [18] - 13:5, 13:16, 21:23, 31:12, 33:13, 33:15, 33:20, 37:13, 37:15, 47:7, 59:3, 62:15, 62:20, 62:23, 87:6, 126:15, 127:9, 127:19
**authorized** [1] - 73:18
**available** [7] - 59:22, 62:1, 62:3, 63:8, 88:10, 95:19, 109:25
**Avenue** [4] - 1:23, 2:3, 2:11, 138:13
**avoid** [1] - 35:4
**avoiding** [1] - 122:5
**aware** [7] - 9:23, 37:3, 38:1, 42:11, 98:5, 121:15, 121:21
**awful** [2] - 123:13, 123:14

## B

**Babies** [1] - 80:7
**background** [3] - 49:17, 122:10, 125:6
**bad** [1] - 8:2
**Bahamas** [2] - 90:23, 91:2
**baked** [3] - 90:7, 121:1, 123:7
**Baker** [2] - 2:6, 4:4
**BAM** [23] - 2:1, 3:23, 3:25, 13:18, 45:1, 45:13, 55:22, 64:19, 70:12, 70:13, 70:22, 83:22, 104:3, 112:21, 119:4, 119:5, 121:15, 121:16, 121:23, 133:1, 133:18, 136:2
**BAM's** [6] - 45:7, 45:11, 52:7, 56:5, 57:20, 104:7
**bank** [4] - 39:12,

62:10, 62:15, 62:22
**Bank** [2] - 61:8, 132:6
**Banner** [10] - 6:14, 6:22, 12:2, 40:5, 40:8, 45:23, 74:8, 115:22, 116:20
**Banque** [1] - 116:21
**bar** [2] - 20:3, 69:4
**barred** [6] - 20:10, 29:9, 71:14, 71:19, 72:20, 134:7
**bars** [1] - 69:7
**baseball** [4] - 16:25, 18:20, 18:22, 18:24
**based** [30] - 5:13, 8:22, 25:7, 25:13, 28:12, 49:5, 67:3, 67:10, 68:9, 69:23, 70:10, 82:22, 87:9, 88:15, 92:25, 93:1, 97:25, 99:23, 100:3, 100:15, 103:14, 104:11, 111:10, 114:1, 114:2, 116:7, 120:5, 123:4, 123:18, 128:23
**bases** [1] - 49:25
**basic** [1] - 57:14
**basis** [10] - 6:18, 28:5, 35:5, 49:9, 61:14, 61:15, 120:3, 120:6, 124:20, 124:21
**Beanie** [1] - 80:7
**bear** [5] - 27:24, 36:17, 67:6, 82:25, 85:3
**bears** [1] - 36:18
**beat** [3] - 43:18, 43:25, 44:2
**become** [3] - 31:14, 109:24, 121:4
**becomes** [1] - 31:10
**BEFORE** [1] - 1:10
**began** [1] - 40:22
**beginning** [7] - 21:14, 22:17, 90:8, 91:10, 108:6, 109:16, 112:19
**begins** [1] - 47:4
**behalf** [8] - 3:9, 3:17, 3:23, 3:24, 4:3, 64:25, 65:2, 132:11
**behind** [1] - 105:25
**benefit** [2] - 41:12, 77:7
**BERMAN** [1] - 1:10
**best** [4] - 76:24, 108:9, 124:21, 138:7
**better** [7] - 17:8, 33:19, 55:14, 57:2, 74:17, 136:16
**between** [34] - 5:9, 10:8, 13:3, 13:7, 21:20,

31:15, 31:18, 31:20, 42:3, 47:1, 47:13, 47:19, 49:15, 51:9, 54:6, 66:11, 75:1, 93:22, 94:4, 94:12, 94:16, 99:19, 110:2, 112:20, 112:25, 126:1, 128:6, 128:11, 130:2, 130:4, 131:1, 131:25, 135:14, 137:3
**beyond** [7] - 38:22, 64:14, 72:17, 90:21, 110:13, 117:17, 122:23
**BHL** [24] - 3:18, 14:10, 18:2, 18:3, 18:4, 18:8, 18:10, 19:24, 20:23, 23:13, 23:19, 31:1, 38:12, 41:2, 41:6, 41:18, 59:9, 121:15, 128:2, 128:12, 128:13, 131:1, 132:10
**BHL's** [1] - 23:12
**bid** [2] - 108:8, 129:17
**bids** [1] - 45:14
**big** [1] - 122:10
**big-picture** [1] - 122:10
**bigger** [1] - 122:5
**bill** [1] - 4:4
**Binance** [58] - 1:6, 1:21, 3:3, 3:17, 16:7, 17:4, 29:6, 38:10, 40:23, 55:12, 55:17, 55:18, 60:17, 61:17, 62:19, 62:20, 62:22, 63:10, 68:22, 71:24, 72:4, 72:12, 79:5, 81:21, 82:8, 82:17, 83:20, 83:21, 84:11, 84:17, 84:23, 87:16, 87:18, 88:9, 89:20, 90:10, 91:13, 91:20, 91:21, 92:5, 92:12, 95:20, 95:23, 96:6, 100:8, 100:24, 101:2, 101:9, 101:13, 102:15, 102:21, 103:5, 104:7, 111:5, 117:9, 123:11, 127:22
**Binance's** [11] - 82:15, 95:21, 97:2, 103:13, 103:14, 103:16, 104:20, 104:24, 104:25, 105:1
**Binance.com** [5] - 44:7, 72:6, 105:2, 112:21, 120:24
**binders** [2] - 119:22, 119:23
**binding** [2] - 10:2,

32:17
**binds** [1] - 78:16
**bit** [2] - 44:17, 80:1
**bitcoin** [4] - 49:4, 49:5, 55:6, 55:8
**Bitcoin** [2] - 57:3, 74:19
**bizarre** [1] - 41:21
**bleed** [1] - 46:18
**blending** [1] - 110:2
**blind** [1] - 129:17
**block** [1] - 128:12
**blockchain** [24] - 18:1, 18:2, 18:3, 18:8, 18:11, 23:9, 23:12, 23:13, 67:17, 68:2, 68:5, 68:6, 68:7, 68:8, 68:18, 68:19, 83:3, 93:11, 93:13, 94:3, 109:17, 111:18
**blue** [3] - 5:12, 8:5, 8:24
**blurry** [1] - 121:4
**BNB** [94] - 13:25, 14:14, 14:19, 16:13, 17:3, 18:7, 19:6, 19:8, 19:14, 20:19, 20:22, 21:8, 23:16, 25:5, 26:6, 27:5, 27:15, 27:20, 29:4, 29:9, 35:11, 41:3, 55:11, 55:19, 57:2, 64:20, 67:17, 68:22, 69:18, 71:22, 71:25, 72:4, 72:16, 73:25, 75:5, 75:18, 78:10, 81:13, 82:3, 82:8, 82:14, 82:17, 84:4, 84:13, 85:11, 85:19, 87:9, 87:11, 88:1, 90:2, 90:5, 90:12, 90:18, 90:20, 91:4, 91:14, 91:16, 93:15, 95:21, 95:24, 96:7, 96:22, 97:1, 101:3, 101:6, 102:13, 102:19, 103:23, 105:3, 105:9, 106:12, 108:6, 108:8, 108:15, 110:13, 110:14, 116:1, 116:15, 117:9, 117:10, 117:16, 117:17, 121:23, 128:12, 129:14, 129:15, 129:16, 129:22, 131:2, 134:3, 134:4, 135:25
**board** [1] - 89:11
**bonds** [2] - 54:19, 80:18
**bonus** [2] - 85:9, 131:5

**bonuses** [1] - 130:25
**boom** [1] - 123:11
**bootstrap** [1] - 39:21
**border** [1] - 44:12
**borders** [3] - 38:22, 43:21, 44:13
**Bosenman** [1] - 2:2
**bother** [2] - 11:17, 26:1
**bought** [2] - 64:21, 95:14
**bound** [5] - 6:19, 7:1, 7:4, 79:5
**boundaries** [1] - 67:22
**boundary** [5] - 40:25, 86:1, 107:14, 107:19, 128:4
**bounds** [1] - 109:8
**Bowdoin** [1] - 86:8
**brand** [1] - 96:6
**breaches** [1] - 49:2
**breadth** [1] - 95:22
**break** [1] - 65:9
**brief** [24] - 20:1, 20:19, 20:20, 29:25, 36:8, 42:25, 43:12, 43:14, 46:16, 46:20, 57:7, 75:24, 76:5, 79:10, 89:3, 91:25, 99:1, 120:1, 127:1, 128:2, 129:23, 132:20, 133:11, 137:11
**briefed** [1] - 66:18
**briefing** [3] - 4:8, 129:21, 131:10
**briefly** [5] - 115:10, 120:1, 129:9, 130:12, 134:14
**briefs** [9] - 20:9, 46:11, 57:9, 85:25, 102:5, 123:1, 125:7, 125:21, 130:14
**bright** [2] - 109:5, 128:5
**bring** [6] - 36:20, 43:14, 50:4, 56:6, 59:16, 65:5
**bringing** [2] - 36:3, 90:14
**brings** [1] - 59:13
**British** [1] - 91:2
**broad** [8] - 8:2, 12:16, 13:1, 13:2, 58:9, 74:4, 74:16, 75:25
**broader** [3] - 11:17, 79:22, 117:4
**broadly** [2] - 35:10, 35:12
**broker** [4] - 60:25, 104:25, 106:14, 121:1

**broker-dealer** [3] - 104:25, 106:14, 121:1
**brokers** [1] - 112:22
**brought** [6] - 46:21, 49:21, 59:9, 64:2, 121:8, 125:14
**Brown** [1] - 58:25
**build** [2] - 55:14, 76:24
**building** [1] - 18:10
**built** [4] - 82:12, 82:13, 123:25, 124:5
**built-in** [2] - 82:12, 82:13
**bulk** [1] - 3:12
**bulletin** [1] - 86:22
**burden** [4] - 44:10, 63:25, 137:7, 137:9
**burden-shifting** [1] - 137:7
**burn** [3] - 82:8, 82:19, 87:20
**BUSD** [35] - 20:15, 24:13, 24:15, 24:17, 24:20, 24:22, 24:25, 50:2, 51:1, 55:20, 59:10, 67:17, 99:21, 100:1, 100:5, 100:9, 100:17, 101:7, 101:10, 101:13, 101:16, 101:18, 102:1, 102:6, 113:15, 113:20, 113:22, 114:2, 114:21, 114:22, 117:10, 131:8, 131:10, 131:15
**business** [8] - 16:15, 16:17, 16:18, 16:23, 49:18, 124:1, 124:5, 128:10
**buy** [8] - 18:5, 18:15, 18:19, 18:20, 28:8, 33:22, 91:13, 97:13
**buyer** [12] - 21:5, 25:18, 25:19, 27:16, 83:10, 92:4, 92:8, 92:12, 95:14, 117:24
**buyers** [5] - 39:2, 45:10, 68:13, 76:25, 94:19
**buying** [10] - 20:24, 22:21, 35:9, 57:2, 57:3, 76:18, 92:20, 97:13, 107:22
**buys** [6] - 7:24, 23:16, 66:7, 68:1, 89:9, 93:5

## C

**calculus** [2] - 60:19, 84:7
**cannot** [8] - 23:10,

25:2, 30:10, 41:16, 63:22, 80:24, 117:3, 120:17
**capacious** [1] - 41:23
**capital** [3] - 53:17, 92:18, 124:14
**capricious** [1] - 122:23
**Carbon** [1] - 53:2
**carbon** [5] - 53:2, 53:5, 53:7, 54:12, 55:3
**card** [1] - 32:6
**cards** [7] - 17:1, 18:20, 18:22, 18:24, 46:19, 80:8
**careful** [2] - 24:11, 25:6
**carries** [4] - 80:19, 92:7, 93:2, 96:13
**carry** [1] - 96:11
**carrying** [1] - 96:17
**Caruso** [1] - 85:5
**carve** [1] - 124:15
**carve-outs** [1] - 124:15
**case** [114] - 5:24, 6:22, 7:4, 7:6, 7:8, 8:12, 9:2, 9:9, 9:10, 9:22, 10:3, 10:11, 10:12, 10:22, 11:23, 12:5, 12:15, 18:9, 19:1, 19:2, 20:7, 22:20, 22:25, 23:11, 23:25, 24:15, 25:16, 26:23, 26:24, 27:25, 28:4, 28:5, 31:10, 32:17, 35:1, 37:11, 38:11, 38:13, 42:2, 42:8, 42:9, 42:11, 42:13, 45:23, 45:24, 46:3, 46:23, 47:2, 49:14, 50:23, 53:17, 53:20, 55:10, 59:7, 59:9, 59:11, 59:12, 59:14, 59:24, 60:3, 60:16, 64:1, 66:13, 74:19, 75:10, 75:12, 78:9, 80:1, 80:4, 85:4, 85:5, 89:14, 89:25, 90:23, 91:11, 96:10, 97:14, 97:17, 98:11, 98:13, 98:21, 100:14, 100:17, 106:18, 109:3, 112:20, 112:23, 113:1, 113:2, 114:11, 116:20, 117:5, 120:21, 122:19, 124:20, 127:10, 129:10, 130:18, 130:19, 132:6, 133:12, 136:25, 137:4, 137:11
**case-by-case** [2] -

122:19, 124:20
**cases** [53] - 8:16, 8:19, 8:25, 9:25, 10:5, 10:9, 10:12, 10:25, 11:3, 11:24, 12:20, 12:23, 14:17, 17:24, 21:10, 22:19, 29:24, 31:19, 33:7, 42:6, 42:7, 47:13, 48:4, 49:14, 49:22, 57:9, 59:12, 59:17, 62:9, 66:18, 67:15, 69:7, 71:13, 73:3, 74:10, 76:12, 78:20, 79:25, 81:8, 86:7, 87:2, 96:15, 98:17, 98:19, 99:9, 99:12, 99:13, 109:14, 116:20, 130:21
**Castel** [1] - 46:25
**categories** [2] - 67:14, 80:16
**categorize** [1] - 112:21
**causes** [3] - 15:3, 62:6, 64:18
**Cayman** [1] - 44:4
**CCR** [1] - 138:12
**CEO** [2] - 64:19, 121:23
**certain** [6] - 27:10, 52:12, 52:13, 53:17, 91:18
**certainly** [7] - 13:12, 32:13, 36:11, 75:18, 106:19, 107:24, 131:20
**CERTIFICATE** [1] - 138:2
**certified** [1] - 49:8
**certify** [1] - 138:4
**cetera** [14] - 69:7, 69:19, 79:12, 86:24, 95:4, 95:6, 96:3, 98:1, 105:10, 109:12, 109:13, 110:16, 112:7, 122:24
**CFTC** [49] - 13:6, 38:11, 46:9, 46:24, 47:1, 47:6, 47:21, 49:6, 49:8, 49:10, 49:17, 49:20, 49:21, 49:22, 49:23, 50:1, 50:11, 50:14, 53:1, 53:6, 54:2, 54:14, 54:15, 54:25, 56:6, 56:10, 56:18, 56:20, 57:24, 58:18, 58:19, 58:23, 59:8, 59:11, 59:23, 59:25, 60:1, 60:16, 112:25, 113:13, 113:14, 113:22, 114:6, 114:14, 114:15, 126:9, 127:19,

132:20
**CFTC's** [7] - 46:21, 47:3, 47:20, 49:2, 56:5, 58:15, 60:8
**CFTC-regulated** [1] - 49:8
**Chair** [1] - 37:6
**chairman** [1] - 32:4
**challenge** [2] - 122:23, 135:7
**challenging** [1] - 123:9
**chance** [3] - 57:2, 133:1, 133:8
**Chaney** [1] - 36:19
**change** [7] - 15:3, 32:11, 53:5, 60:18, 73:13, 96:19, 115:24
**changed** [6] - 14:7, 15:2, 73:11, 93:4, 106:7, 128:24
**changes** [1] - 84:7
**Changpeng** [1] - 2:5
**character** [2] - 80:21, 89:13
**characteristics** [2] - 52:6, 110:19
**characterization** [1] - 67:4
**characterize** [1] - 24:14
**charge** [1] - 54:3
**charged** [1] - 120:13
**charges** [1] - 119:3
**checked** [1] - 51:11
**Choice** [1] - 82:10
**choice** [4] - 85:14, 85:15, 85:16, 132:17
**choose** [1] - 36:20
**chose** [2] - 56:10, 62:4
**Circuit** [21] - 6:13, 6:23, 7:8, 7:11, 7:21, 8:12, 8:13, 8:14, 8:18, 8:19, 21:18, 32:17, 45:17, 46:7, 59:19, 60:3, 64:12, 74:7, 74:16, 86:8
**circuit** [16] - 6:20, 8:10, 9:22, 10:9, 11:4, 12:23, 21:19, 27:23, 45:5, 74:13, 74:18, 75:16, 76:1, 76:6, 76:9, 76:10
**Circuit's** [1] - 11:1
**circuits** [3] - 74:19, 74:21, 74:25
**circulation** [1] - 111:11
**circumstance** [6] - 22:16, 23:21, 23:23,

24:1, 92:10, 121:12
**circumstances** [27] - 19:3, 21:16, 21:25, 22:1, 23:1, 24:6, 24:7, 29:24, 58:11, 66:13, 66:20, 67:5, 79:1, 80:15, 81:10, 84:10, 84:23, 86:16, 89:16, 91:12, 91:19, 96:16, 98:1, 105:20, 108:22, 126:7, 137:18
**circumvent** [1] - 63:23
**citations** [1] - 132:20
**cite** [5] - 62:13, 74:10, 76:4, 117:1, 125:22
**cited** [10] - 8:13, 8:25, 42:8, 46:22, 91:11, 99:1, 99:9, 116:20, 125:2, 129:20
**cites** [5] - 7:5, 8:11, 99:6, 99:9, 137:11
**civil** [1] - 3:2
**Civil** [1] - 1:3
**claim** [34] - 27:5, 27:18, 39:24, 42:21, 43:3, 58:10, 59:2, 62:14, 67:7, 70:9, 71:22, 72:14, 72:15, 72:17, 72:19, 83:23, 98:10, 98:23, 98:25, 100:1, 100:5, 100:13, 100:14, 101:24, 105:10, 113:20, 120:3, 120:5, 120:6, 120:13, 120:18, 120:21
**claim-by-claim** [2] - 120:3, 120:6
**claims** [17] - 21:8, 27:20, 35:10, 41:5, 47:17, 56:6, 62:8, 64:2, 64:21, 71:18, 98:20, 113:17, 116:5, 119:4, 120:8, 121:11, 122:1
**clarification** [1] - 131:13
**clarified** [1] - 115:23
**clarify** [9] - 72:12, 89:22, 94:23, 97:3, 113:19, 114:20, 115:5, 115:21, 126:19
**clarity** [2] - 4:7, 104:15
**class** [2] - 13:8, 98:20
**classes** [1] - 77:24
**Clause** [1] - 37:18
**clear** [34] - 6:8, 7:21, 11:2, 12:14, 14:20, 17:23, 20:1, 32:18, 33:12, 38:12, 38:23, 39:8, 40:12, 40:19, 44:3, 45:4, 45:9, 47:3,

47:6, 93:21, 97:22, 102:5, 106:9, 111:19, 114:21, 114:25, 116:23, 118:4, 121:13, 123:23, 125:1, 125:3, 130:23, 132:11
**clearest** [2] - 20:8, 20:9
**clearing** [4] - 60:25, 105:1, 112:22, 120:25
**clearly** [7] - 12:8, 28:7, 39:17, 40:15, 42:9, 47:12, 104:19
**client** [3] - 14:10, 39:9, 55:22
**client's** [1] - 38:1
**climate** [1] - 53:5
**close** [1] - 121:3
**closed** [2] - 35:15, 35:17
**closer** [1] - 125:22
**closest** [1] - 62:18
**closing** [1] - 20:18
**cloud** [1] - 136:18
**CMR** [1] - 138:12
**code** [2] - 66:19, 88:20
**coin** [23] - 17:3, 17:6, 19:2, 24:17, 31:24, 33:2, 40:22, 40:23, 51:15, 55:12, 66:15, 69:21, 88:3, 88:10, 92:7, 92:13, 97:2, 105:25, 108:9, 110:2, 110:3, 122:18
**Coin** [1] - 97:2
**coin-by-coin** [1] - 122:18
**Coinbase** [4] - 35:21, 36:2, 49:24, 59:12
**coins** [11] - 15:20, 17:9, 18:15, 27:18, 55:14, 66:11, 78:2, 94:19, 108:11, 108:12, 108:14
**colleague** [3] - 3:19, 4:4, 20:12
**colleagues** [5] - 3:11, 3:13, 65:20, 71:8, 74:17
**collectibles** [1] - 16:25
**COLUMBIA** [1] - 1:1
**com** [2] - 79:2, 111:5
**combinations** [1] - 82:1
**combined** [1] - 6:11
**comfortable** [2] - 55:16, 56:3
**coming** [4] - 55:16, 57:11, 119:17, 125:11
**comments** [1] - 53:7

**Commission** [5] - 1:3, 1:15, 1:18, 3:3, 3:10
**Commission's** [1] - 48:24
**commitment** [2] - 28:24, 79:11
**commitments** [2] - 28:25, 48:12
**committed** [1] - 109:22
**commodities** [18] - 13:3, 13:8, 13:15, 31:16, 46:19, 47:7, 47:10, 51:3, 52:19, 53:22, 54:6, 54:11, 69:3, 76:17, 107:10, 107:25, 109:14
**Commodities** [2] - 48:23, 86:10
**Commodity** [1] - 58:22
**commodity** [24] - 32:10, 32:11, 49:22, 49:23, 50:3, 50:21, 51:1, 51:16, 51:21, 51:22, 54:13, 54:14, 56:10, 58:4, 59:10, 76:17, 89:21, 101:23, 113:16, 113:21, 114:3, 114:12, 114:17, 126:6
**common** [13] - 6:17, 16:1, 21:2, 21:3, 22:11, 47:21, 68:10, 74:2, 74:24, 79:15, 79:22, 95:2, 123:18
**commonality** [17] - 45:5, 45:17, 45:20, 74:4, 74:5, 74:8, 74:12, 74:20, 74:21, 75:25, 76:7, 76:11, 94:19, 97:5, 97:9, 127:9
**commonly** [1] - 80:23
**commonplace** [1] - 81:7
**communications** [1] - 86:22
**companies** [1] - 63:18
**company** [11] - 16:14, 16:20, 17:25, 42:4, 45:15, 85:12, 92:1, 92:2, 101:9, 115:18, 128:14
**company's** [1] - 34:22
**compare** [1] - 62:12
**compensation** [4] - 84:23, 85:1, 85:13, 130:25
**complain** [1] - 100:12
**complaint** [58] - 26:9, 26:20, 29:5, 30:25, 35:3, 41:2, 43:11, 44:5,

45:10, 55:1, 55:11, 61:11, 61:21, 62:2, 62:5, 62:12, 62:14, 62:17, 63:3, 64:14, 67:1, 67:16, 68:20, 70:2, 70:3, 71:23, 73:22, 77:5, 77:14, 81:15, 81:24, 84:15, 85:18, 87:25, 89:3, 93:7, 93:15, 96:2, 102:5, 103:14, 104:16, 112:12, 112:14, 113:16, 113:23, 114:6, 114:8, 117:12, 123:6, 126:5, 129:14, 130:23, 131:3, 131:9, 131:14, 131:21, 132:9
**complete** [1] - 138:6
**completely** [4] - 24:7, 37:9, 70:2, 132:7
**complex** [1] - 67:12
**complicated** [2] - 54:23, 137:17
**comply** [1] - 32:19, 34:24
**concealed** [1] - 63:10
**concede** [1] - 20:6
**conceded** [3] - 38:11, 61:3, 61:15
**concedes** [1] - 62:22
**concept** [1] - 78:14
**concern** [1] - 47:8
**concerned** [1] - 104:16
**concerns** [2] - 37:19, 121:24
**concession** [1] - 61:22
**conclude** [1] - 56:4
**concluded** [1] - 28:9
**concludes** [1] - 31:9
**conclusion** [2] - 7:22, 76:3
**conclusionary** [1] - 64:7
**conclusory** [3] - 26:13, 63:12, 64:16
**concurrent** [1] - 58:1
**conduct** [10] - 18:6, 36:22, 39:8, 39:11, 39:23, 43:20, 44:11, 61:23, 63:16
**conducted** [1] - 62:2
**conference** [1] - 50:13
**conflating** [1] - 118:2
**conflict** [2] - 47:15, 48:23
**conflicting** [1] - 36:16
**Congress** [6] - 36:10, 41:22, 42:13, 47:6,

79:16, 80:9
**Congress's** [1] - 38:4
**congressional** [1] - 33:13
**Congressional** [1] - 12:15
**Connecticut** [1] - 1:23
**connection** [5] - 64:1, 82:14, 91:3, 101:21, 128:16
**consensus** [1] - 83:2
**consent** [4] - 50:2, 50:14, 50:24, 60:16
**consequence** [2] - 34:1, 62:5
**consequences** [3] - 32:16, 39:13, 124:15
**consider** [2] - 70:9, 96:16
**consideration** [8] - 10:7, 25:16, 25:22, 26:25, 27:2, 67:25, 85:10, 110:8
**considered** [2] - 80:10, 96:14
**considering** [1] - 9:5
**considers** [1] - 59:1
**consistency** [1] - 112:20
**consistent** [14] - 5:22, 10:2, 10:5, 24:7, 27:1, 27:2, 89:14, 94:9, 96:23, 98:18, 115:15, 116:19, 117:5, 132:7
**consists** [1] - 74:8
**constitute** [1] - 98:9
**constitutes** [2] - 31:23, 138:5
**Constitution** [2] - 2:11, 138:13
**construct** [1] - 74:25
**consultant** [2] - 121:10, 124:4
**consumers** [1] - 17:2
**contact** [1] - 121:20
**contacts** [1] - 121:7
**contemplated** [2] - 12:19, 91:9
**contents** [2] - 63:24, 81:10
**context** [7] - 6:9, 32:19, 40:18, 59:6, 80:1, 95:20, 118:4
**continually** [2] - 68:6, 109:12
**continue** [1] - 96:7
**continued** [5] - 40:23, 93:18, 111:14, 111:24, 112:4
**continues** [1] - 87:16

**continuing** [5] - 41:7, 43:9, 90:9, 91:18, 91:20
**continuingly** [1] - 93:10
**continuously** [1] - 88:6
**contract** [136] - 5:14, 5:19, 6:2, 6:3, 6:12, 6:15, 6:24, 7:2, 7:3, 7:7, 7:15, 7:22, 7:25, 8:21, 8:22, 9:4, 9:6, 9:7, 9:12, 9:20, 9:23, 9:24, 10:4, 10:6, 10:14, 10:21, 10:22, 10:23, 11:7, 11:10, 11:11, 11:14, 11:17, 11:18, 11:22, 12:8, 12:13, 12:24, 13:13, 13:22, 15:5, 15:7, 15:11, 15:21, 20:14, 20:16, 21:24, 22:3, 22:9, 22:24, 23:20, 23:23, 24:1, 24:2, 24:5, 24:14, 29:10, 31:10, 31:21, 33:25, 44:24, 47:17, 48:1, 48:17, 49:1, 51:3, 51:22, 52:18, 53:10, 53:21, 54:18, 56:12, 56:15, 56:19, 57:8, 57:12, 58:7, 67:2, 71:18, 71:19, 72:1, 78:16, 79:4, 79:15, 80:22, 81:2, 81:5, 81:14, 82:12, 83:8, 84:24, 85:22, 86:11, 86:25, 87:1, 87:3, 87:4, 89:10, 89:12, 89:13, 89:24, 92:4, 92:15, 92:22, 93:4, 93:21, 93:23, 94:8, 94:12, 94:22, 96:8, 98:9, 98:16, 101:3, 101:17, 101:20, 101:22, 102:7, 107:5, 114:13, 129:4
**contracting** [1] - 129:1
**contracts** [35] - 5:11, 5:24, 5:25, 6:1, 6:10, 7:9, 9:1, 9:6, 11:9, 12:6, 21:21, 23:8, 26:6, 26:14, 27:12, 33:17, 33:19, 48:20, 48:22, 66:12, 66:14, 70:11, 78:18, 79:22, 81:16, 81:25, 86:16, 86:17, 86:18, 92:9, 101:15, 104:14, 106:9, 107:11
**contractual** [20] - 5:15, 5:21, 6:11, 7:13, 7:19, 8:20, 9:3, 9:12,

11:24, 25:24, 28:16, 48:12, 49:14, 49:16, 54:17, 78:15, 79:10, 79:18, 94:15, 105:23
**contradicted** [1] - 125:20
**contradiction** [1] - 125:22
**contradictory** [1] - 123:7
**contrary** [1] - 36:10
**contrast** [1] - 90:22
**contribute** [1] - 63:16
**contribution** [1] - 92:18
**control** [10] - 55:4, 60:18, 62:8, 64:10, 64:12, 88:12, 120:15, 120:18, 120:21, 131:21
**controlling** [2] - 120:9, 120:11
**controls** [2] - 8:4, 63:23
**conveyed** [3] - 7:10, 48:14, 48:15
**cooperate** [1] - 36:1
**copies** [2] - 99:7, 99:10
**cops** [1] - 43:18
**core** [1] - 55:10
**corporate** [2] - 41:13, 42:14
**corporation** [3] - 41:21, 42:11, 42:12
**correct** [19] - 15:19, 15:24, 21:23, 23:14, 42:23, 48:5, 48:6, 51:1, 64:12, 67:11, 69:13, 72:11, 75:11, 84:21, 88:8, 102:9, 114:4, 115:4, 118:13
**coterminous** [1] - 47:1
**cotton** [1] - 54:7
**counsel** [31] - 3:6, 3:10, 3:13, 3:15, 3:19, 3:24, 5:2, 13:18, 38:14, 44:23, 46:24, 57:6, 72:21, 75:11, 86:7, 86:15, 106:20, 111:22, 114:15, 120:1, 120:17, 121:2, 121:22, 122:11, 125:15, 125:25, 126:20, 127:17, 127:22, 129:8, 136:7
**Counsel** [1] - 46:23
**counsel's** [2] - 87:13, 126:11
**count** [4] - 22:13, 61:8, 70:3, 118:11
**Count** [9] - 27:5,

70:12, 104:24, 118:12, 131:14, 131:17, 131:24, 132:4, 133:2
**counter** [1] - 113:9
**counter-terrorist** [1] - 113:9
**countries** [5] - 39:21, 43:19, 43:20, 44:2, 44:12
**country** [3] - 33:1, 41:20, 44:10
**country's** [1] - 43:25
**counts** [4] - 34:7, 41:21, 105:4, 118:10
**Counts** [2] - 104:21, 105:7
**couple** [7] - 22:4, 35:7, 42:19, 55:4, 58:21, 126:21, 133:3
**coupled** [2] - 55:12, 114:22
**course** [6] - 6:21, 8:24, 36:19, 38:3, 41:14, 61:12
**COURT** [260] - 1:1, 3:14, 3:21, 4:1, 4:6, 5:9, 6:5, 6:7, 6:13, 7:23, 8:15, 9:8, 10:11, 11:6, 11:13, 12:2, 12:10, 13:14, 13:19, 14:5, 14:8, 14:11, 14:22, 14:25, 15:7, 15:13, 15:19, 16:3, 17:2, 17:16, 18:12, 18:23, 19:12, 19:18, 20:5, 20:11, 20:13, 20:21, 20:25, 21:10, 22:6, 22:13, 22:23, 24:10, 24:21, 25:5, 25:23, 26:11, 26:16, 26:19, 27:8, 27:21, 28:1, 28:15, 28:21, 29:4, 29:13, 29:16, 30:4, 30:7, 30:13, 30:20, 30:23, 31:17, 32:8, 32:22, 33:15, 34:3, 34:5, 34:11, 34:13, 34:15, 35:17, 36:8, 37:1, 37:13, 37:22, 38:7, 38:15, 38:20, 38:25, 40:4, 40:20, 41:10, 42:2, 42:16, 43:8, 43:22, 43:24, 44:15, 44:19, 44:22, 45:19, 46:8, 47:9, 47:25, 48:4, 48:8, 48:10, 48:19, 49:11, 50:1, 50:18, 51:15, 51:20, 52:4, 52:14, 52:18, 53:11, 53:19,

54:5, 55:10, 55:23, 56:7, 56:17, 56:22, 57:24, 58:17, 60:4, 60:10, 60:22, 61:14, 64:4, 64:9, 64:24, 65:7, 65:12, 65:15, 65:22, 66:5, 66:10, 66:22, 67:8, 67:16, 68:13, 69:2, 69:11, 69:25, 70:7, 70:12, 70:16, 70:23, 71:3, 71:10, 71:14, 71:17, 72:9, 73:24, 74:7, 75:17, 75:22, 76:15, 77:17, 78:1, 78:13, 79:5, 81:8, 82:3, 82:7, 82:23, 83:5, 83:9, 84:2, 84:17, 84:22, 85:12, 85:21, 87:5, 88:3, 88:9, 89:7, 90:1, 90:6, 91:5, 91:24, 93:19, 94:14, 95:13, 96:9, 97:4, 97:15, 97:19, 99:1, 99:5, 99:8, 99:21, 100:23, 101:13, 101:21, 102:3, 102:13, 102:18, 103:9, 103:24, 104:3, 104:12, 105:17, 106:11, 107:4, 107:16, 109:16, 109:20, 111:16, 112:12, 112:15, 113:21, 114:1, 114:9, 115:1, 115:7, 115:15, 115:25, 116:4, 117:20, 118:10, 118:14, 118:18, 118:23, 119:2, 119:6, 119:9, 119:15, 119:19, 119:23, 120:7, 122:9, 122:14, 125:5, 126:5, 126:13, 126:16, 126:23, 127:6, 127:11, 127:13, 128:19, 129:24, 130:8, 130:11, 131:18, 132:24, 133:4, 133:7, 133:19, 134:1, 134:8, 134:13, 134:16, 134:20, 134:23, 135:4, 135:14, 135:24, 136:4, 136:15, 136:20, 136:23, 137:12, 137:14, 138:2
**court** [56] - 8:7, 8:11, 8:20, 9:2, 9:19, 9:21, 11:16, 11:19, 13:12, 14:19, 30:8, 30:9, 32:17, 36:15, 37:10, 38:9, 38:18, 65:9, 72:25, 75:23, 76:6, 76:13, 77:18, 80:4, 80:13, 80:16, 90:24, 91:7, 91:17, 92:19,

92:21, 94:7, 94:13, 94:24, 97:15, 97:22, 98:15, 98:16, 99:9, 99:11, 99:15, 99:18, 109:5, 114:18, 116:11, 121:8, 122:21, 123:20, 123:21, 127:24, 135:9, 137:5
**Court** [72] - 2:9, 2:10, 5:18, 6:9, 6:10, 6:12, 6:19, 7:1, 7:6, 7:8, 7:11, 7:14, 7:16, 7:25, 9:2, 9:22, 9:25, 10:3, 10:10, 12:23, 22:12, 23:10, 23:22, 26:24, 27:18, 27:19, 28:7, 28:9, 28:13, 28:23, 30:3, 30:5, 31:8, 33:8, 33:11, 38:22, 39:7, 39:24, 45:25, 46:3, 47:5, 47:8, 47:18, 49:9, 50:13, 55:18, 56:4, 58:13, 59:1, 64:8, 67:6, 67:7, 73:10, 74:22, 74:24, 75:6, 75:7, 75:9, 75:13, 75:14, 81:3, 84:25, 98:5, 106:20, 107:2, 117:12, 127:9, 132:2, 132:5, 138:12
**court's** [1] - 98:2
**Court's** [12] - 7:16, 7:20, 12:5, 12:9, 20:4, 34:9, 39:18, 67:25, 69:14, 75:16, 116:10, 131:12
**Courthouse** [1] - 2:10
**courtroom** [1] - 3:4
**COURTROOM** [2] - 3:1, 3:15
**Courts** [1] - 79:21
**courts** [22] - 8:3, 10:6, 10:10, 12:23, 21:20, 33:16, 49:11, 61:19, 73:14, 75:24, 76:5, 76:14, 78:4, 78:15, 78:25, 86:5, 88:14, 104:8, 114:16, 114:24, 125:1
**cover** [2] - 31:12, 122:18
**covered** [1] - 78:19
**covers** [2] - 117:2
**CRC** [1] - 2:9
**create** [8] - 14:16, 18:14, 18:21, 53:12, 54:9, 87:21, 121:24, 130:3
**created** [9] - 16:7, 67:17, 84:12, 87:15, 87:18, 89:8, 110:17,

121:2, 121:16
**creates** [2] - 17:21, 54:23
**creating** [3] - 10:8, 18:4, 68:5
**creation** [1] - 129:8
**creators** [1] - 23:19
**credible** [1] - 24:16
**credit** [2] - 53:2, 54:12
**credits** [4] - 53:2, 53:5, 53:7, 55:3
**criminal** [4] - 60:23, 60:24, 61:8, 112:23
**critical** [4] - 68:12, 86:13, 124:1, 136:11
**cross** [1] - 108:13
**CRR** [2] - 2:9, 138:12
**Crutcher** [1] - 1:22
**crypto** [30] - 14:18, 31:5, 33:13, 35:13, 35:22, 36:7, 36:13, 66:3, 66:17, 67:18, 69:16, 70:4, 70:10, 71:1, 77:7, 84:11, 84:23, 94:4, 94:5, 95:23, 100:3, 104:21, 105:11, 105:14, 105:18, 106:5, 106:22, 124:16, 125:15, 125:16
**crystal** [1] - 125:1
**curious** [1] - 7:5
**currencies** [1] - 14:18
**currency** [4] - 14:2, 14:4, 33:14, 36:13
**customer** [4] - 24:16, 122:4, 123:13, 123:17
**customers** [6] - 20:23, 25:2, 26:22, 63:15, 63:19, 70:4
**cute** [1] - 11:13
**CZ** [1] - 96:6

**D**

**D.C** [9] - 6:13, 6:23, 8:13, 11:1, 32:17, 45:16, 46:7, 74:7, 138:14
**Dan** [2] - 3:20, 3:22
**Daniel** [5] - 1:21, 2:1, 26:23, 26:24, 130:16
**DAO** [10] - 34:20, 48:13, 48:14, 48:16, 51:9, 52:9, 52:10, 52:13
**Dated** [1] - 138:8
**Dave** [1] - 3:13
**David** [1] - 1:15
**DAVIS** [34] - 3:22, 44:21, 45:2, 45:22,

46:15, 47:16, 48:3, 48:6, 48:9, 48:11, 48:25, 49:13, 50:8, 51:6, 51:18, 52:3, 52:5, 52:17, 52:23, 53:13, 53:23, 54:11, 55:21, 56:2, 56:13, 56:19, 57:16, 58:2, 58:21, 60:7, 133:1, 133:6, 133:10, 133:20
**Davis** [2] - 2:1, 3:22, 13:17, 42:18, 44:20
**days** [1] - 50:13
**DC** [6] - 1:6, 1:16, 1:23, 2:4, 2:7, 2:11
**De** [2] - 8:14, 8:18
**DE** [1] - 8:18
**deal** [3] - 57:3, 60:25, 106:17
**dealer** [3] - 104:25, 106:14, 121:1
**dealing** [7] - 40:4, 67:22, 98:5, 125:15, 129:6, 130:6, 137:16
**deals** [1] - 42:3
**dealt** [1] - 10:13
**debate** [1] - 31:5
**decade** [1] - 39:16
**decades** [2] - 80:4, 128:23
**decide** [3] - 14:17, 44:12, 47:5
**decided** [9] - 9:15, 9:19, 33:8, 38:4, 48:16, 50:4, 58:24, 120:2, 124:19
**decision** [16] - 7:6, 7:8, 7:16, 7:20, 8:10, 23:6, 23:7, 39:18, 47:5, 62:5, 77:23, 78:3, 85:3, 114:24, 116:10, 121:23
**decisions** [6] - 8:5, 8:11, 36:16, 76:3, 95:6, 125:2
**deeds** [1] - 5:25
**defeats** [1] - 45:16
**Defendant** [2] - 1:20, 2:1
**defendant** [16] - 4:3, 9:3, 28:6, 28:14, 28:25, 40:2, 41:12, 41:13, 41:16, 72:23, 73:23, 91:20, 120:1, 120:16, 134:10, 137:4
**defendant's** [2] - 39:8, 39:10, 81:17
**Defendants** [1] - 1:8
**defendants** [27] - 3:23, 3:25, 42:14, 50:2, 50:4, 58:18, 60:17, 65:1,

67:5, 68:9, 69:6, 69:8, 69:9, 73:18, 79:10, 79:17, 80:5, 81:2, 82:1, 83:22, 85:25, 100:12, 109:8, 116:24, 123:10, 135:7, 136:14
**defendants'** [3] - 4:21, 46:11, 55:25
**defense** [18] - 3:15, 4:22, 72:21, 73:21, 75:11, 86:7, 86:15, 87:13, 106:20, 111:22, 120:16, 121:2, 121:22, 125:7, 125:15, 126:20, 133:1, 136:7
**defer** [1] - 74:16
**deficiencies** [1] - 79:14
**define** [2] - 11:17, 17:22
**defines** [2] - 13:5, 117:22
**definition** [6] - 15:20, 15:21, 17:12, 52:20, 104:14, 107:19
**definitions** [1] - 54:19
**deliberately** [1] - 43:25
**delivery** [1] - 117:3
**demand** [5] - 14:12, 84:14, 87:19, 87:21, 87:24
**demonstrated** [1] - 93:17
**denial** [1] - 30:14
**dependent** [3] - 83:12, 83:15, 92:1
**deploy** [2] - 101:12, 103:18
**deployed** [5] - 100:18, 100:22, 101:19, 102:1, 103:4
**deployment** [3] - 84:13, 101:25, 103:22
**deploys** [1] - 103:15
**deposit** [3] - 27:3, 132:8, 132:16
**deposits** [3] - 132:9, 132:10, 132:12
**depth** [1] - 5:5
**DEPUTY** [2] - 3:1, 3:15
**derivative** [1] - 114:3
**derivatives** [5] - 113:25, 114:1, 114:6, 114:11, 114:14
**derived** [1] - 86:20
**derives** [1] - 93:13
**described** [3] - 103:16, 110:19, 111:13
**describes** [3] - 26:20,

46:25, 132:15
**description** [2] - 52:24, 52:25
**descriptive** [3] - 80:21, 80:25, 81:5
**designated** [1] - 80:21
**designations** [1] - 80:25
**designed** [4] - 12:16, 12:17, 12:18
**desirable** [2] - 14:16, 14:17
**desire** [1] - 14:15
**despite** [1] - 121:24
**detailed** [1] - 121:14
**determinate** [1] - 68:12
**determination** [3] - 86:13, 95:15, 97:24
**determinative** [5] - 69:15, 87:3, 87:14, 104:10
**determine** [3] - 83:19, 109:3, 135:11
**determined** [3] - 28:19, 59:10, 76:8
**determines** [1] - 116:13
**determining** [1] - 47:23
**develop** [6] - 19:25, 79:7, 88:24, 92:6, 101:9
**developed** [5] - 68:23, 68:24, 74:25, 87:16, 97:25
**developing** [6] - 18:1, 68:6, 69:9, 90:13, 109:12, 124:22
**development** [14] - 7:18, 55:9, 68:18, 69:22, 87:17, 88:13, 89:3, 91:1, 95:8, 108:17, 110:21, 111:3, 111:6, 112:3
**devoted** [1] - 107:6
**DeWaal** [2] - 2:2, 3:24
**diametrically** [1] - 79:25
**dichotomy** [2] - 42:3, 87:14
**Dickman** [2] - 2:9, 138:12
**DICKMAN** [1] - 138:4
**died** [1] - 28:19
**difference** [6] - 31:18, 31:20, 66:11, 94:4, 95:2, 135:14
**different** [24] - 6:11, 7:1, 14:21, 16:4, 25:9,

25:20, 28:15, 36:16, 49:16, 61:7, 68:19, 77:20, 92:3, 100:20, 101:2, 101:5, 106:22, 113:3, 113:7, 113:8, 113:24, 118:15, 120:16, 131:9

**differentiate** [1] - 47:13

**differentiates** [3] - 69:2, 76:16, 94:21

**differentiating** [2] - 54:5, 69:5

**differentiation** [3] - 25:7, 25:13, 94:16

**difficult** [1] - 11:9, 32:19, 52:23

**digital** [25] - 14:2, 19:2, 31:24, 33:2, 34:2, 34:25, 45:11, 46:9, 47:4, 48:22, 49:7, 51:11, 52:1, 52:5, 52:14, 53:24, 55:2, 56:9, 56:14, 58:4, 58:6, 60:17, 66:2, 99:24, 107:12

**digitized** [1] - 32:5

**direct** [14] - 27:21, 41:2, 41:6, 72:11, 72:13, 72:17, 81:20, 97:21, 125:24, 128:15, 129:13, 129:15, 130:2, 130:3

**directed** [3] - 61:17, 63:9, 121:14

**direction** [3] - 60:18, 116:4, 126:2

**directly** [8] - 24:25, 42:17, 53:15, 64:18, 72:10, 83:25, 93:5, 131:6

**disagree** [6] - 48:21, 56:14, 77:22, 98:2, 123:8, 125:19

**disagrees** [1] - 132:2

**disclosure** [1] - 113:12

**discounts** [1] - 110:22

**discovered** [2] - 50:23, 126:3

**discovery** [3] - 104:16, 105:25, 106:21

**discretion** [6] - 36:20, 82:15, 103:13, 104:8, 124:12, 124:19

**discuss** [1] - 74:2

**discussed** [8] - 40:16, 40:17, 46:16, 50:15, 90:23, 97:9, 116:21, 133:6

**discussing** [1] - 35:4

**discussion** [4] - 36:12, 58:3, 111:16, 129:13

**dismiss** [15] - 20:9, 20:10, 21:8, 27:18, 27:19, 33:12, 35:10, 36:17, 36:25, 37:21, 38:13, 41:4, 116:13, 135:15, 137:8

**dismissal** [1] - 65:5

**displacement** [2] - 46:9, 132:21

**dispositive** [2] - 66:16, 67:6

**dispute** [10] - 15:20, 16:6, 16:9, 16:11, 16:12, 18:12, 18:16, 28:8, 128:11, 132:9

**disputing** [2] - 13:1, 29:5

**disregards** [1] - 87:15

**disrupting** [1] - 56:18

**disruptive** [1] - 56:20

**disseminated** [1] - 112:5

**distinction** [17] - 13:3, 13:4, 13:5, 13:7, 13:11, 31:15, 47:19, 51:8, 77:24, 91:14, 93:21, 99:19, 110:2, 128:6, 128:10, 130:2, 131:25

**distinguish** [2] - 88:21, 130:4

**distinguishes** [2] - 60:2, 95:11

**distinguishing** [1] - 52:9

**distributed** [4] - 66:15, 84:1, 103:16, 108:22

**distribution** [7] - 78:5, 78:7, 79:3, 91:8, 93:25, 111:12, 116:17

**District** [10] - 7:24, 10:1, 10:12, 21:19, 25:6, 42:9, 85:5, 86:9, 96:10, 137:1

**DISTRICT** [3] - 1:1, 1:1, 1:11

**district** [10] - 8:4, 10:13, 30:9, 75:23, 75:25, 76:5, 76:13, 122:20

**divest** [1] - 132:10

**dividend** [1] - 82:20

**docket** [1] - 50:23

**doctrine** [7] - 29:21, 30:1, 31:4, 31:11, 32:22, 33:9, 33:10

**document** [3] - 63:21,

63:24

**documents** [4] - 25:25, 26:1, 62:3, 81:1

**Dodd** [3] - 47:6, 58:22, 59:22

**Dodd-Frank** [3] - 47:6, 58:22, 59:22

**DOJ** [4] - 50:10, 50:14, 113:9, 113:13

**dollar** [5] - 24:18, 29:22, 30:25, 99:25

**dollars** [2] - 33:6, 123:12

**domestic** [6] - 39:19, 39:23, 41:24, 116:2, 116:16, 117:14

**done** [5] - 36:24, 64:3, 127:4, 130:5, 133:15

**door** [2] - 35:15, 35:17

**double** [1] - 51:11

**double-checked** [1] - 51:11

**doubt** [1] - 47:8

**down** [18] - 5:1, 8:15, 8:17, 14:8, 14:9, 14:10, 26:16, 31:14, 44:1, 57:11, 75:4, 76:18, 88:4, 94:20, 108:1, 108:2, 134:2, 136:24

**downstream** [1] - 91:15

**dozen** [1] - 44:7

**draw** [3] - 76:3, 77:23, 137:3

**drawing** [1] - 13:10

**drew** [1] - 40:17

**drill** [1] - 7:14

**drilling** [2] - 94:11, 94:25

**drink** [1] - 22:12

**drive** [1] - 96:25

**drives** [1] - 14:13

**driving** [3] - 33:3, 33:5, 110:12

**dual** [1] - 36:21

**due** [3] - 34:16, 71:9, 102:24

**Due** [1] - 37:18

**Dunn** [2] - 1:22, 3:17

**durable** [1] - 16:21

**during** [5] - 5:4, 73:22, 88:5, 124:9, 134:9

---

**E**

**early** [1] - 41:3

**earmarks** [2] - 52:15, 107:13

**earn** [5] - 26:6, 29:2, 100:10, 100:22, 102:19

**Earn** [3] - 27:5, 103:17, 117:10

**earned** [4] - 100:8, 100:25, 101:8

**earning** [1] - 102:25

**earns** [1] - 102:24

**earth** [1] - 55:3

**eBay** [1] - 18:5

**economic** [6] - 66:19, 85:24, 95:3, 101:7, 109:7, 110:9

**economy** [3] - 32:24, 33:3, 33:5

**ecosystem** [10] - 53:8, 53:12, 55:8, 57:1, 68:25, 87:18, 90:13, 101:2, 101:10, 112:8

**Edwards** [2] - 9:1, 104:8

**effective** [1] - 61:10

**effectively** [1] - 57:7

**efficient** [1] - 55:14

**effort** [1] - 86:20

**efforts** [53] - 6:18, 28:14, 30:11, 67:13, 68:5, 68:17, 69:8, 69:22, 69:24, 76:20, 77:5, 77:11, 79:3, 82:22, 83:13, 83:15, 83:16, 83:18, 85:19, 86:13, 90:10, 90:12, 90:13, 91:3, 91:21, 92:17, 93:2, 94:17, 95:5, 95:11, 95:18, 96:1, 96:5, 96:24, 99:24, 102:24, 103:7, 103:15, 103:22, 104:11, 106:7, 108:20, 110:11, 110:15, 111:24, 112:3, 123:19, 128:8, 128:13, 135:8, 136:6, 136:13

**eight** [2] - 62:14, 62:18

**either** [16] - 7:24, 34:18, 41:16, 50:17, 50:21, 53:12, 61:17, 63:8, 76:2, 78:6, 102:19, 104:7, 112:12, 113:12, 118:16, 131:19

**elaborated** [2] - 46:19, 80:20

**Elastos** [1] - 98:20

**elected** [1] - 136:8

**element** [10] - 19:13, 19:15, 25:3, 45:22, 46:7, 57:21, 76:19, 85:2, 95:13, 97:4

**elements** [2] - 19:19, 120:18

**Eleventh** [1] - 74:15

**elicit** [1] - 123:17
**elsewhere** [1] - 73:13
**embark** [1] - 12:13
**embodies** [2] - 93:3, 94:8
**emergency** [1] - 32:14
**Emmett** [3] - 1:18, 3:11, 119:20
**emphasize** [2] - 42:18, 65:2
**emphasized** [1] - 9:5, 9:20
**emphasizing** [1] - 32:15
**employee's** [1] - 130:17
**employees** [14] - 41:14, 41:18, 41:25, 72:16, 73:19, 78:12, 85:8, 85:14, 85:18, 130:13, 130:15, 130:22, 130:24, 131:2
**employment** [1] - 85:8
**enable** [1] - 101:1
**enact** [1] - 31:6
**enacted** [1] - 79:13
**encourage** [2] - 63:10, 112:8
**encouraged** [1] - 17:2
**encouraging** [1] - 111:14
**end** [4] - 49:12, 51:4, 107:12, 117:13
**endeavors** [4] - 28:11, 101:12, 101:20, 103:6
**ended** [1] - 41:3
**ends** [1] - 47:4
**enforce** [1] - 126:15
**enforceable** [1] - 79:12
**enforcement** [11] - 36:20, 36:23, 37:14, 49:19, 53:1, 54:4, 56:5, 58:16, 61:20, 124:7, 124:13
**engage** [3] - 29:1, 43:6, 48:16
**engaged** [2] - 43:5, 128:22
**engaging** [1] - 70:18
**engine** [1] - 45:14
**enhance** [2] - 16:9, 91:21
**enhanced** [2] - 87:16, 94:11
**enhances** [2] - 84:7, 84:18
**enhancing** [1] - 69:9
**enormous** [1] - 31:3
**ensuring** [1] - 113:11

**entered** [2] - 50:2, 50:3
**entering** [1] - 128:15
**Enterprise** [1] - 85:5
**enterprise** [18] - 6:17, 16:2, 17:14, 21:2, 21:3, 22:11, 68:10, 74:2, 74:24, 75:2, 77:6, 90:19, 91:3, 92:21, 95:3, 97:13, 123:18
**entertain** [1] - 58:17
**entire** [2] - 28:4, 115:5
**entirely** [1] - 28:12, 117:5
**entirety** [2] - 32:24, 32:25
**entities** [6] - 49:8, 70:21, 70:22, 106:16, 118:12, 127:21
**Entities** [1] - 2:1
**entitlement** [2] - 9:3, 9:13
**entity** [1] - 110:18
**entrepreneurial** [15] - 16:8, 16:11, 16:13, 28:14, 29:1, 30:18, 54:9, 55:19, 83:17, 94:17, 99:23, 108:5, 133:13, 133:23, 135:7
**entrepreneurially** [1] - 28:18
**environment** [1] - 18:21
**equal** [1] - 14:15
**equally** [1] - 17:18
**especially** [3] - 41:13, 46:20, 104:18
**essential** [2] - 16:2, 25:3
**essentially** [7] - 7:20, 31:14, 42:7, 43:5, 94:17, 98:25, 120:10
**establish** [1] - 5:19, 45:5, 45:6, 62:10, 96:5
**established** [3] - 46:7, 95:21, 102:23
**estate** [1] - 13:4
**et** [16] - 1:7, 3:3, 69:7, 69:19, 79:12, 86:24, 95:4, 95:6, 96:3, 98:1, 105:10, 109:12, 109:13, 110:16, 112:7, 122:24
**ether** [2] - 49:4, 49:5
**Ethereum** [1] - 67:17
**etherial** [3] - 18:3, 23:13, 128:12
**evaluate** [6] - 74:25, 79:3, 106:3, 106:25, 108:20, 135:11

**evaluated** [5] - 67:15, 75:25, 76:6, 104:9, 108:23
**evaluating** [2] - 6:9, 135:10
**evaluation** [1] - 69:14
**evasions** [1] - 124:6
**events** [1] - 61:11
**everywhere** [1] - 73:18
**evidence** [1] - 135:11
**exact** [3] - 50:12, 78:5, 99:13
**exactly** [5] - 14:13, 15:3, 23:4, 67:23, 113:5
**examination** [1] - 125:22
**example** [19] - 52:24, 53:2, 54:12, 68:22, 69:21, 74:20, 78:6, 80:7, 85:9, 86:18, 87:2, 87:20, 88:18, 90:22, 100:14, 110:13, 110:17, 112:10
**examples** [1] - 86:17
**exceeded** [1] - 57:14
**except** [1] - 120:15
**exception** [2] - 11:23, 137:9
**exceptions** [1] - 41:15
**exchange** [28] - 16:12, 17:14, 18:4, 18:7, 18:11, 18:13, 18:14, 18:17, 19:25, 21:6, 21:9, 25:1, 25:21, 29:8, 31:15, 35:22, 60:25, 72:5, 85:19, 104:25, 106:15, 112:24, 120:25, 123:3, 129:17, 129:18, 130:6
**Exchange** [11] - 1:3, 1:15, 1:18, 3:2, 3:10, 5:12, 33:21, 58:22, 118:4, 118:17, 118:21
**exchanges** [3] - 18:9, 106:2, 112:22
**excited** [1] - 32:10
**excluded** [2] - 9:11, 22:24
**exclusively** [1] - 39:5
**executes** [1] - 83:20
**exercise** [2] - 37:14, 61:20
**exist** [1] - 7:7
**existed** [1] - 18:3
**existence** [1] - 18:10
**exists** [3] - 10:9, 18:7, 128:12
**expansion** [1] - 80:6
**expansive** [1] - 96:6

**expect** [3] - 17:21, 24:16, 25:3
**expectation** [17] - 6:16, 10:15, 24:19, 28:10, 76:20, 82:22, 88:15, 88:23, 89:8, 95:9, 95:10, 96:20, 99:21, 99:23, 103:8, 106:8, 108:16
**expectations** [12] - 8:3, 19:5, 31:22, 52:21, 56:25, 66:14, 81:11, 86:12, 90:7, 92:9, 93:24, 95:16
**expects** [1] - 36:22
**experience** [2] - 35:20, 95:7
**expert** [1] - 98:1
**expertise** [3] - 95:7, 103:18, 112:2
**explain** [5] - 5:21, 11:21, 42:25, 46:14, 47:16
**explained** [6] - 79:18, 81:4, 99:18, 111:5, 113:3, 118:20
**explaining** [1] - 6:10
**explains** [2] - 6:2, 83:18
**explicitly** [1] - 35:4
**exposure** [3] - 121:10, 121:15, 121:25
**express** [2] - 33:12, 33:15
**expressed** [1] - 69:20
**expressly** [2] - 8:8, 87:22, 110:21
**extend** [2] - 40:24, 61:2
**extent** [6] - 10:21, 27:10, 33:5, 33:18, 106:21, 124:23
**external** [1] - 73:9
**extraterritorial** [5] - 19:9, 20:3, 27:6, 39:1, 39:3
**Extraterritorial** [1] - 38:20
**extraterritoriality** [8] - 20:10, 29:10, 39:22, 43:7, 43:17, 112:18, 115:8, 115:13

---

## F

**Fabulous** [1] - 136:20
**face** [1] - 7:2
**facie** [1] - 63:25
**facilitates** [1] - 83:3
**fact** [38] - 8:6, 9:7,

9:21, 15:14, 18:12, 29:10, 35:23, 36:2, 39:2, 40:14, 43:8, 51:21, 53:7, 61:15, 70:4, 72:22, 77:11, 77:12, 79:19, 82:24, 83:9, 93:17, 96:21, 98:6, 98:17, 101:10, 103:15, 111:17, 120:17, 121:5, 121:9, 122:8, 124:20, 128:13, 131:2, 135:9, 137:16

**fact-by-fact** [1] - 124:20

**factor** [15] - 15:22, 31:4, 68:12, 69:5, 69:13, 69:15, 82:7, 87:3, 88:14, 88:17, 110:7, 111:20, 111:21

**factors** [6] - 15:10, 67:14, 67:20, 69:12, 87:11, 98:3

**facts** [23] - 9:24, 10:5, 10:25, 42:12, 42:24, 62:1, 63:5, 63:13, 64:7, 64:18, 67:5, 77:14, 78:8, 79:1, 80:15, 86:15, 96:16, 98:1, 100:3, 116:12, 124:3, 124:22, 137:10

**facts-and-circumstances** [1] - 67:5

**factual** [1] - 120:20

**fails** [2] - 19:14, 27:5

**failure** [8] - 17:14, 40:9, 62:7, 62:9, 104:24, 104:25, 105:1, 106:15

**fair** [9] - 20:14, 32:3, 36:18, 36:22, 37:18, 65:15, 66:1, 71:9, 131:23

**fairness** [2] - 36:12, 65:21

**fall** [6] - 32:4, 62:13, 68:3, 72:13, 73:21, 104:13

**falls** [2] - 69:23, 108:25

**false** [2] - 70:17, 87:14

**familiar** [1] - 46:24

**far** [4] - 23:24, 42:23, 43:14, 120:7

**FARER** [92] - 65:14, 65:17, 66:4, 66:9, 66:17, 67:1, 67:11, 67:23, 68:16, 69:5, 69:13, 70:6, 70:9, 70:15, 70:22, 71:1,

71:8, 71:11, 71:16, 71:20, 72:11, 74:6, 74:15, 75:21, 76:4, 77:2, 77:22, 78:4, 78:25, 79:9, 81:15, 82:6, 82:16, 83:1, 83:6, 83:14, 84:9, 84:21, 85:4, 85:16, 86:4, 87:12, 88:8, 88:13, 89:22, 90:5, 90:9, 91:16, 92:14, 94:6, 94:23, 95:18, 96:14, 97:8, 97:17, 97:20, 99:4, 99:7, 99:10, 100:1, 101:5, 101:18, 101:24, 102:10, 102:16, 103:3, 103:12, 104:1, 104:5, 105:9, 106:2, 106:19, 107:15, 108:14, 109:19, 110:4, 111:19, 112:14, 113:2, 113:24, 114:5, 114:10, 115:4, 134:6, 134:9, 134:17, 134:21, 134:25, 135:5, 135:21, 136:3, 136:6

**Farer** [2] - 1:14, 3:11

**Farer's** [1] - 128:3

**fashion** [1] - 84:18

**favor** [1] - 6:18

**favorable** [1] - 77:16

**favorably** [1] - 8:13

**FDA** [1] - 58:25

**feature** [3] - 68:8, 111:6, 132:17

**February** [1] - 128:18

**federal** [6] - 38:9, 59:21, 61:19, 61:20, 107:24

**feed** [1] - 23:8

**fell** [1] - 56:23

**few** [2] - 29:18, 131:5

**fierce** [1] - 31:5

**Fifth** [3] - 7:8, 7:11, 7:20

**figure** [6] - 6:23, 12:9, 12:11, 57:10, 102:4, 124:17

**file** [5] - 61:11, 78:6, 99:5, 99:8, 99:12

**Filecoin** [2] - 110:17, 111:25

**filed** [4] - 35:1, 35:2, 62:1, 84:16

**fill** [1] - 44:14

**filled** [1] - 43:19

**final** [1] - 126:11

**financing** [1] - 113:10

**FinCEN** [4] - 50:10, 50:14, 113:8, 113:13

**fine** [2] - 20:5, 28:1

**Firestone** [1] - 137:10

**Firm** [1] - 3:23

**first** [22] - 13:25, 14:1, 14:6, 21:25, 35:8, 42:19, 45:3, 46:15, 46:20, 51:23, 55:21, 57:13, 58:21, 61:6, 70:1, 77:3, 85:2, 89:9, 104:14, 116:11, 117:7, 122:10

**First** [1] - 8:12

**fist** [1] - 120:25

**fit** [2] - 102:19, 103:2

**fits** [1] - 37:20

**fitting** [1] - 12:12

**five** [3] - 45:23, 46:20, 127:24

**fixed** [6] - 9:13, 9:14, 24:18, 102:21, 104:9

**flexible** [3] - 12:17, 102:22, 109:6

**flowing** [1] - 4:25

**fly** [1] - 126:3

**focus** [21] - 19:3, 75:14, 75:16, 78:10, 87:13, 87:24, 98:6, 116:7, 116:11, 116:12, 116:13, 116:16, 116:18, 116:23, 116:25, 117:8, 117:14, 118:8, 118:19

**focused** [11] - 36:9, 73:14, 74:24, 75:10, 88:19, 102:16, 113:8, 113:9, 113:10, 113:24

**focuses** [2] - 74:16, 101:24

**focusing** [4] - 90:16, 97:24, 100:5, 102:2

**folks** [1] - 88:19

**follow** [1] - 51:18

**following** [1] - 117:21

**footnote** [1] - 58:13

**footprint** [1] - 96:6

**FOR** [1] - 1:1

**force** [1] - 54:22

**forceful** [1] - 5:16

**forcefully** [1] - 44:24

**forces** [4] - 15:22, 69:6, 87:10, 87:12

**foregoing** [1] - 138:5

**foreign** [8] - 39:5, 39:21, 41:12, 41:13, 41:22, 42:4, 42:13, 63:17

**Foreman** [1] - 108:23

**forever** [2] - 89:13, 128:20

**forget** [1] - 20:11

**form** [1] - 86:21

**former** [1] - 114:15

**formulating** [1] - 56:16

**formulation** [1] - 6:15

**forth** [1] - 6:4

**fortunes** [5] - 14:10, 19:5, 19:6, 75:2, 110:23

**forward** [1] - 96:17

**Foundation** [1] - 98:20

**founder** [1] - 120:23

**founders** [1] - 110:23

**four** [1] - 45:23

**fraction** [1] - 46:1

**fractional** [1] - 46:5

**frame** [1] - 79:19

**framed** [2] - 100:13

**framework** [5] - 34:25, 37:6, 62:12, 63:13, 113:7

**Frank** [3] - 47:6, 58:22, 59:22

**frankly** [2] - 50:9, 52:11, 96:4

**fraud** [7] - 47:7, 49:25, 56:6, 70:9, 70:18, 119:3, 119:16

**frequency** [1] - 4:15

**friend** [1] - 128:22

**front** [2] - 32:9, 84:19

**fruition** [1] - 111:4

**frustrated** [1] - 109:5

**FTC** [1] - 126:2

**full** [4] - 59:5, 66:13, 113:11, 138:6

**fully** [1] - 43:1

**function** [1] - 65:9

**functions** [1] - 80:9

**Fund** [10] - 6:14, 6:22, 12:2, 40:5, 40:8, 45:23, 74:8, 115:22, 116:20

**fund** [2] - 12:7, 110:21

**fundamental** [1] - 33:1

**fundraising** [1] - 110:20

**funds** [10] - 18:14, 26:18, 75:9, 101:8, 103:15, 103:16, 103:22, 111:25, 132:14

**fungible** [1] - 54:7

**future** [6] - 10:15, 49:5, 54:10, 110:24, 114:3, 114:13

**Future** [1] - 48:23

**future-based** [1] - 49:5

**futures** [4] - 113:24, 114:1, 114:6, 114:11

# G

**game** [1] - 60:21
**gap** [1] - 44:14
**gaps** [3] - 124:23, 124:25, 125:24
**Gary** [8] - 2:2, 3:24, 59:18, 59:19, 60:3, 86:9, 86:21, 86:25
**gas** [2] - 54:1, 55:2
**gee** [1] - 50:19
**General** [1] - 46:23
**general** [6] - 46:24, 80:23, 80:24, 88:2, 114:15, 135:24
**generally** [4] - 22:24, 58:4, 74:10, 107:9
**generate** [6] - 10:17, 12:7, 16:21, 19:22, 104:17, 132:12
**generated** [2] - 30:18, 84:12
**generating** [1] - 100:18
**generous** [1] - 127:6
**Gensler** [1] - 37:6
**Genzer** [1] - 125:8
**German** [1] - 34:21
**get-go** [1] - 103:11
**Gibson** [2] - 1:22, 3:17
**given** [11] - 4:10, 35:22, 46:25, 57:18, 64:10, 80:8, 96:5, 109:15, 125:6, 125:12, 132:6
**Glen** [1] - 86:9
**Glen-Arden** [1] - 86:9
**glibly** [1] - 107:20
**global** [1] - 96:5
**glory** [1] - 136:18
**going-in** [2] - 89:7, 89:8
**gold** [4] - 54:1, 54:7, 69:4, 69:7
**governed** [1] - 114:14
**governing** [1] - 31:7
**government** [4] - 15:15, 19:1, 46:12, 107:24
**government's** [1] - 38:25
**grab** [2] - 22:12, 27:25
**grappled** [1] - 72:25
**grappling** [1] - 90:24
**grateful** [1] - 132:22
**great** [1] - 54:22
**greatest** [1] - 18:25
**Gregory** [5] - 1:22, 3:19, 19:10, 27:6, 34:13

**GREGORY** [25] - 34:14, 35:7, 35:20, 36:18, 37:4, 37:17, 38:1, 38:12, 38:18, 38:21, 39:6, 40:11, 41:1, 41:11, 42:6, 42:19, 43:11, 43:23, 44:3, 44:16, 134:14, 136:19, 136:21, 136:25, 137:13
**Gregory's** [1] - 29:19
**grounds** [1] - 41:5
**grove** [2] - 48:8, 48:11
**groves** [1] - 31:18
**guaranteed** [1] - 104:6
**guess** [11] - 13:25, 50:25, 53:23, 67:9, 89:19, 95:15, 105:7, 115:8, 115:21, 122:14, 125:13
**guidance** [4] - 36:2, 71:12, 123:16
**guilty** [1] - 61:9
**guys** [1] - 8:6

# H

**Hague** [1] - 73:12
**halfheartedly** [1] - 124:8
**hand** [1] - 35:15
**handle** [2] - 71:8, 115:14
**handled** [1] - 9:2
**handling** [6] - 3:12, 63:21, 65:19, 65:20, 75:9, 115:12
**hands** [4] - 45:8, 45:15, 57:21, 128:24
**happenstance** [1] - 89:4
**happy** [2] - 27:24, 126:22
**hard** [6] - 14:13, 15:3, 24:4, 121:12, 124:2
**hard-pressed** [1] - 24:4
**harder** [6] - 333:24, 54:11, 60:20, 60:23, 61:4, 121:13
**hardly** [1] - 33:3
**headline** [1] - 63:3
**hear** [10] - 15:13, 60:10, 60:12, 65:10, 65:12, 127:13, 127:17, 127:18, 127:21, 136:1
**heard** [3] - 29:16, 93:20, 130:11
**HEARING** [2] - 1:5, 1:9
**hearing** [6] - 4:16,

50:5, 50:22, 55:17, 104:19, 107:21
**heart** [1] - 95:24
**heavily** [1] - 136:14
**held** [3] - 33:16, 45:15, 46:10
**HELD** [1] - 1:10
**help** [1] - 53:5
**helpful** [3] - 80:14, 86:4, 110:14
**helping** [1] - 129:10
**helps** [1] - 47:5
**hereby** [1] - 138:4
**high** [3] - 100:10, 128:14, 130:24
**high-performing** [1] - 130:24
**highlight** [4] - 65:18, 71:21, 79:23, 113:6
**highlighted** [3] - 76:13, 76:14, 95:2
**highlights** [1] - 82:20
**himself** [1] - 121:17
**hired** [2] - 121:9, 124:4
**history** [2] - 5:14, 73:4
**hold** [2] - 23:22, 31:13
**holder** [1] - 81:19
**Holding** [1] - 3:3
**holding** [7] - 10:21, 11:1, 35:15, 35:17, 38:17, 78:2, 118:5
**Holdings** [2] - 1:6, 3:17
**holdings** [1] - 93:8
**hole** [1] - 117:3
**holistic** [1] - 59:15
**home** [1] - 127:16
**Honor** [205] - 3:1, 3:8, 3:16, 3:22, 4:2, 5:8, 5:23, 6:22, 8:25, 10:20, 12:4, 15:12, 15:18, 15:24, 17:19, 19:8, 19:20, 20:17, 21:7, 22:15, 23:4, 25:17, 26:8, 27:14, 28:3, 28:4, 28:20, 32:4, 34:4, 34:8, 34:14, 35:7, 35:9, 35:21, 36:6, 37:18, 37:19, 38:3, 40:11, 42:6, 42:19, 43:12, 43:17, 44:3, 44:16, 44:21, 45:2, 46:15, 47:3, 47:17, 48:3, 48:6, 49:4, 49:13, 50:9, 51:19, 52:3, 52:17, 52:24, 53:14, 55:6, 55:21, 57:16, 58:3, 58:21, 60:7, 60:21, 61:6, 61:25, 65:4,

65:14, 65:18, 66:4, 66:9, 66:17, 66:18, 67:2, 67:7, 67:11, 67:24, 68:22, 69:13, 70:6, 70:9, 70:15, 70:22, 71:2, 71:9, 71:11, 71:12, 71:16, 71:20, 72:11, 72:25, 73:4, 73:17, 74:6, 74:15, 74:22, 75:21, 76:4, 77:2, 77:9, 77:13, 77:23, 78:4, 78:25, 79:9, 79:13, 79:23, 81:15, 81:22, 82:6, 84:9, 84:21, 85:4, 85:17, 86:4, 88:8, 88:19, 89:22, 90:5, 90:22, 91:16, 92:14, 92:17, 94:6, 94:23, 95:19, 96:4, 96:21, 97:3, 97:8, 97:14, 97:18, 98:6, 98:12, 99:4, 99:7, 99:13, 100:2, 100:14, 100:20, 101:11, 102:10, 102:16, 104:2, 104:5, 105:9, 106:2, 106:19, 107:15, 108:15, 108:18, 109:19, 110:4, 111:5, 111:19, 111:22, 112:14, 113:2, 113:14, 113:19, 113:25, 114:5, 114:12, 115:4, 115:12, 115:19, 116:1, 116:16, 116:20, 117:1, 117:8, 117:18, 118:2, 118:25, 119:14, 119:20, 120:15, 123:3, 125:3, 126:4, 126:10, 126:19, 127:8, 128:1, 131:23, 132:18, 132:22, 133:6, 133:10, 133:25, 134:6, 134:14, 134:17, 134:21, 134:25, 135:3, 135:8, 135:12, 135:21, 136:3, 136:19, 137:13
**Honor's** [4] - 27:4, 69:17, 78:10, 96:17
**HONORABLE** [1] - 1:10
**hooks** [1] - 39:23
**horizontal** [10] - 45:5, 45:17, 45:20, 74:4, 74:10, 74:11, 74:21, 76:2, 76:7, 76:11
**Houghton** [1] - 85:4
**Howey** [46] - 5:19, 5:22, 5:23, 6:1, 6:2, 8:4, 8:25, 9:16, 10:18, 13:21, 15:10, 15:21,

19:13, 19:18, 20:2, 25:4, 26:22, 28:9, 44:25, 45:1, 45:16, 51:8, 52:22, 58:24, 65:19, 67:20, 69:12, 74:1, 77:23, 78:18, 85:1, 87:7, 87:8, 95:13, 96:15, 97:4, 98:4, 107:19, 109:5, 114:24, 123:23, 124:25, 125:3, 125:16, 126:14
**hundreds** [2] - 107:1, 107:6
**Huvelle** [1] - 64:11
**hype** [1] - 17:17
**hypothetical** [3] - 24:4, 53:19, 109:8

**I**

**iceberg** [1] - 107:8
**ICO** [27] - 19:7, 19:8, 19:14, 20:2, 20:10, 29:12, 35:9, 49:14, 55:22, 71:18, 71:23, 71:25, 72:4, 72:18, 72:20, 74:3, 81:19, 90:21, 92:5, 92:24, 93:6, 116:5, 123:14, 129:15, 134:4, 134:7
**ICOs** [1] - 123:11
**idea** [1] - 121:19
**identified** [4] - 4:23, 67:18, 113:16, 117:8
**identifies** [1] - 116:12
**identify** [1] - 116:11
**ignore** [2] - 68:9, 69:8
**ignores** [1] - 87:25
**III** [1] - 2:6
**ill** [1] - 12:12
**ill-fitting** [1] - 12:12
**illegal** [1] - 128:22
**Illinois** [1] - 50:23
**imagine** [2] - 23:25, 121:12
**impact** [3] - 77:6, 83:19, 96:19
**impacted** [1] - 135:12
**impacts** [4] - 83:25, 87:20, 136:8, 136:9
**impersonal** [1] - 129:19
**implemented** [2] - 82:17, 82:21
**implicate** [1] - 33:8
**implications** [2] - 32:20, 106:24
**important** [13] - 36:16, 55:9, 67:25, 69:15, 88:17, 88:25, 97:6,

110:8, 110:9, 111:6, 111:21, 113:6, 131:12
**importantly** [1] - 44:9
**impose** [1] - 37:13
**imposes** [1] - 98:3
**improve** [1] - 57:1
**IN** [1] - 1:1
**in-depth** [1] - 5:5
**inaction** [1] - 36:13
**incentive** [1] - 85:9
**inception** [2] - 96:17, 108:15
**inclined** [1] - 29:23
**include** [6] - 41:15, 52:6, 95:4, 103:19, 103:20
**included** [3] - 48:17, 73:9, 111:12
**includes** [2] - 48:12, 71:13
**including** [9] - 4:8, 8:11, 67:12, 77:4, 80:16, 90:14, 110:21, 111:25, 116:21
**inconsistency** [1] - 112:25
**inconsistent** [1] - 37:9
**incorporation** [1] - 108:23
**incorrect** [1] - 39:6
**increase** [6] - 55:19, 68:20, 83:11, 84:14, 112:1, 112:9
**increased** [2] - 15:21, 87:19
**increases** [1] - 78:17
**indeed** [3] - 18:13, 56:19, 79:13
**independent** [1] - 33:11
**independently** [1] - 131:11
**indicative** [1] - 45:20
**indicia** [1] - 53:24
**individual** [3] - 46:1, 120:1, 122:20
**individuals** [1] - 42:11
**induce** [1] - 112:4
**inducement** [1] - 108:21
**inducements** [1] - 95:3
**indulge** [1] - 30:3
**indulgence** [1] - 34:9
**industry** [14] - 12:14, 29:23, 30:25, 31:7, 32:23, 32:25, 34:23, 35:14, 35:23, 36:13, 37:7, 107:22, 124:16, 124:22

**inextricably** [4] - 68:1, 68:11, 69:1, 110:6
**inferences** [1] - 77:14
**information** [2] - 63:20, 86:22
**infrastructure** [1] - 136:10
**inherent** [7] - 8:9, 14:1, 36:5, 53:3, 93:12, 109:15, 109:17
**initial** [23] - 4:15, 21:13, 40:22, 44:23, 50:22, 55:12, 71:18, 75:19, 91:7, 92:24, 97:11, 99:16, 101:16, 102:6, 110:20, 110:23, 112:8, 113:16, 114:21, 115:1, 115:2
**injunctive** [4] - 42:22, 42:24, 43:3, 134:18
**instance** [3] - 76:11, 83:22, 106:5
**instances** [1] - 83:6
**instead** [2] - 36:20, 132:13
**institutional** [2] - 25:10, 77:19
**instructed** [1] - 64:8
**instrument** [4] - 80:23, 86:11, 92:23, 94:25
**instruments** [2] - 81:10, 81:12
**insulate** [1] - 121:17
**insured** [1] - 28:12
**integral** [1] - 69:8
**intellectual** [1] - 95:6
**intended** [1] - 12:25
**intense** [1] - 135:9
**intentional** [2] - 89:4, 96:1, 96:5
**intentionally** [2] - 95:21, 109:6
**Interactive** [1] - 10:12
**interdependence** [1] - 75:1
**interdependency** [4] - 75:4, 75:10, 75:14, 97:10
**interdependent** [4] - 68:4, 68:11, 68:14, 68:16
**interest** [12] - 28:6, 38:4, 46:5, 80:23, 101:8, 102:20, 102:22, 102:25, 103:2, 103:24, 104:1, 129:11
**interested** [1] - 29:20
**interesting** [1] - 79:24
**interestingly** [2] - 80:3, 86:6

**interests** [1] - 113:12
**intermediary** [1] - 118:21
**internet** [1] - 115:18
**interpretation** [2] - 37:10, 38:24
**interrupts** [1] - 49:2
**intertwined** [4] - 68:2, 68:11, 69:1, 110:6
**intervene** [1] - 58:19
**interwoven** [2] - 92:22, 94:25
**introduce** [1] - 3:6
**introduction** [1] - 103:17
**intrudes** [1] - 126:8
**intruding** [1] - 127:18
**invest** [3] - 14:18, 16:15, 16:22
**invested** [1] - 85:2
**investigation** [1] - 62:2
**investigations** [1] - 125:17
**investing** [6] - 12:6, 12:17, 17:6, 74:1, 108:10
**investment** [144] - 5:11, 5:14, 5:19, 6:3, 6:12, 6:15, 6:24, 7:2, 7:7, 7:9, 8:21, 8:22, 9:4, 9:6, 9:11, 9:23, 10:3, 10:14, 10:21, 10:23, 11:3, 11:10, 11:14, 11:22, 12:7, 12:13, 12:24, 15:20, 16:1, 19:22, 19:23, 20:15, 20:25, 21:1, 21:2, 21:21, 21:24, 22:2, 22:10, 22:24, 23:7, 23:20, 23:23, 24:5, 24:14, 25:8, 26:6, 26:14, 26:15, 26:21, 27:12, 28:7, 29:1, 29:2, 29:3, 30:11, 31:9, 31:14, 31:21, 33:17, 33:22, 33:23, 33:25, 48:1, 48:17, 48:20, 48:22, 49:1, 51:3, 51:22, 52:18, 53:9, 53:21, 54:18, 56:12, 56:15, 56:19, 57:8, 58:7, 66:11, 67:2, 68:23, 70:11, 72:1, 72:5, 79:4, 80:22, 81:4, 81:14, 82:11, 83:8, 84:12, 84:24, 85:6, 86:20, 86:25, 87:4, 89:10, 89:12, 89:24, 90:11, 90:20, 91:22,

92:4, 92:6, 92:11, 92:15, 92:16, 92:18, 92:22, 93:4, 93:20, 93:23, 94:8, 94:22, 96:8, 96:23, 97:12, 98:9, 98:15, 101:3, 101:15, 101:16, 101:20, 101:22, 102:7, 102:24, 104:7, 104:14, 106:9, 107:5, 107:11, 109:4, 110:10, 112:3, 114:13, 114:22, 130:10, 130:15, 130:17, 133:14, 135:6
**investments** [3] - 16:17, 33:2, 35:25
**Investor** [1] - 82:10
**investor** [10] - 16:16, 19:23, 26:25, 30:19, 77:19, 77:25, 94:13, 102:21, 102:25, 123:15
**investor's** [1] - 29:2
**investors** [46] - 6:16, 12:6, 18:15, 25:11, 39:14, 62:11, 63:1, 63:4, 63:10, 68:4, 69:23, 70:10, 70:17, 70:20, 72:5, 72:7, 75:1, 75:20, 77:8, 77:24, 79:16, 84:1, 84:14, 89:1, 91:13, 91:23, 92:25, 93:10, 97:1, 98:22, 98:24, 100:24, 103:4, 106:10, 110:7, 110:23, 111:7, 112:4, 112:8, 112:9, 113:11, 117:11, 121:20, 132:13
**involve** [2] - 5:15, 69:7
**involved** [10] - 5:24, 5:25, 9:1, 10:23, 12:5, 55:22, 87:12, 90:18, 129:5
**involves** [1] - 42:10
**involving** [6] - 48:22, 94:12, 98:20, 105:11, 118:11, 134:4
**IPO** [2] - 92:2, 123:14
**iron** [1] - 120:24
**Islands** [2] - 44:4, 91:2
**issuance** [1] - 105:20
**issue** [68] - 9:16, 13:16, 24:12, 31:3, 32:14, 38:14, 38:24, 55:23, 57:18, 60:4, 60:7, 65:24, 67:25, 69:10, 70:11, 71:14, 73:1, 73:3, 73:25, 74:23, 75:1, 78:9, 79:4, 80:2, 80:15, 81:16, 81:25, 82:10, 83:15,

85:10, 86:6, 86:11, 87:15, 88:22, 89:25, 92:23, 93:14, 94:11, 94:25, 96:25, 97:20, 98:16, 99:13, 99:14, 100:1, 100:4, 100:16, 101:11, 104:13, 105:11, 105:16, 106:22, 106:23, 106:24, 109:7, 109:9, 111:8, 113:5, 113:12, 114:6, 114:16, 115:5, 116:8, 118:25, 119:2, 126:1, 134:5
**issued** [10] - 14:2, 14:3, 14:6, 17:25, 21:15, 34:25, 53:6, 71:11, 108:7, 114:13
**issuer** [7] - 10:16, 19:6, 45:9, 53:15, 78:17, 89:9, 111:18
**issuers** [18] - 57:21, 67:13, 68:14, 69:18, 75:2, 76:23, 77:3, 88:21, 93:2, 93:9, 95:4, 104:18, 105:7, 108:13, 109:11, 110:7, 110:10
**issues** [11] - 4:23, 27:9, 29:19, 42:16, 55:24, 55:25, 56:2, 64:25, 65:19, 106:14, 107:3
**issuing** [1] - 122:21
**italics** [2] - 9:6, 9:8
**item** [2] - 93:22, 93:25
**itself** [28] - 14:23, 40:16, 41:6, 48:1, 48:17, 52:6, 53:3, 56:12, 58:4, 66:24, 83:2, 83:19, 84:4, 92:14, 93:13, 94:8, 97:1, 97:11, 100:2, 103:12, 109:15, 113:18, 122:21, 125:20, 131:15, 133:16, 133:24, 137:11

## J

**JACKSON** [1] - 1:10
**Janice** [2] - 2:9, 138:12
**JANICE** [1] - 138:4
**January** [2] - 1:6, 138:8
**Jason** [3] - 1:21, 3:16, 128:1
**Jennifer** [2] - 1:14, 3:11
**John** [2] - 1:18, 78:3

**join** [1] - 65:4
**Joiner** [11] - 7:5, 7:19, 7:21, 8:10, 80:1, 80:9, 80:13, 86:9, 92:21, 94:10, 94:24
**Jorge** [2] - 1:17, 3:9
**judge** [2] - 122:19
**JUDGE** [2] - 1:10, 1:11
**Judge** [13] - 46:25, 57:24, 58:2, 58:10, 58:20, 64:11, 87:6, 99:18, 100:15, 102:2, 102:3, 114:24, 137:1
**judge-by-judge** [1] - 122:19
**judges** [1] - 57:10
**judgment** [2] - 87:7, 135:15
**July** [5] - 34:21, 35:8, 35:11, 41:3, 41:7
**jump** [1] - 111:23
**June** [2] - 39:8, 61:11
**jurisdiction** [55] - 38:10, 38:11, 38:13, 38:16, 38:19, 46:9, 47:1, 47:3, 49:3, 49:19, 53:1, 54:15, 54:16, 56:6, 56:18, 56:20, 56:21, 56:23, 57:14, 58:1, 58:7, 58:11, 59:23, 60:2, 60:5, 60:8, 60:19, 61:13, 61:15, 61:20, 62:10, 64:1, 65:6, 65:21, 73:16, 112:18, 113:4, 114:4, 114:18, 115:8, 115:16, 115:20, 118:24, 119:25, 120:6, 120:19, 120:21, 121:6, 121:10, 122:7, 126:9, 127:17
**jurisdictional** [3] - 38:23, 49:8, 61:25
**jurisdictions** [2] - 44:6, 59:2
**Justice** [1] - 9:4

## K

**Katten** [2] - 2:2, 3:23
**keenly** [1] - 121:15
**keep** [4] - 8:6, 26:16, 31:17, 125:9
**keeps** [1] - 13:4
**key** [1] - 60:7
**Kik** [4] - 10:11, 10:22, 35:1, 123:21
**kind** [5] - 24:8, 25:6, 105:25, 121:21, 122:10
**kinds** [1] - 81:1
**knowledge** [1] - 98:3

**known** [1] - 80:23
**knows** [2] - 25:19, 130:6
**KYC** [1] - 63:20

## L

**Labs** [7] - 22:25, 35:1, 47:12, 77:18, 84:25, 93:22, 110:18
**lack** [5] - 37:18, 38:13, 54:17, 65:6, 80:6
**lacks** [1] - 38:18
**laid** [1] - 78:7
**land** [2] - 5:25, 7:10
**language** [15] - 9:20, 9:21, 12:2, 12:10, 27:22, 40:14, 43:5, 73:5, 73:6, 73:9, 73:10, 87:8, 131:20
**large** [4] - 63:16, 107:25, 112:11, 124:14
**larger** [2] - 112:16, 115:9
**largest** [1] - 95:22
**last** [10] - 29:17, 30:3, 32:4, 32:8, 39:8, 50:1, 57:17, 128:17, 128:20, 136:16
**late** [1] - 43:14
**Latham** [3] - 2:6, 4:3, 4:4
**latter** [1] - 66:16
**launch** [2] - 22:18, 111:24
**launched** [1] - 111:1
**laundering** [1] - 113:9
**Law** [1] - 3:23
**law** [19] - 5:10, 7:4, 12:15, 19:2, 32:11, 40:10, 44:11, 61:20, 72:21, 79:15, 79:22, 89:14, 105:18, 116:3, 120:2, 124:23, 124:25, 124:24
**laws** [23] - 5:12, 8:24, 12:25, 31:6, 34:24, 39:1, 41:23, 54:20, 58:24, 79:13, 79:20, 79:22, 104:20, 106:4, 113:10, 114:19, 121:11, 121:16, 121:25, 123:19, 123:21, 123:25, 130:16
**lawsuit** [2] - 58:19, 104:18
**lawyer** [1] - 13:15
**lawyers** [4] - 50:3, 55:17, 57:13, 64:25
**lease** [1] - 7:17

**leaseholds** [1] - 94:11
**leases** [1] - 7:9
**least** [1] - 101:1
**leave** [2] - 69:4, 119:9
**lectern** [2] - 3:7, 4:11
**ledger** [1] - 54:25
**left** [3] - 38:8, 53:4, 75:4
**legal** [2] - 15:8, 38:7
**legally** [1] - 79:12
**legislation** [5] - 37:23, 37:25, 38:2, 38:5, 122:16
**legislative** [1] - 115:10
**legislators** [1] - 73:7
**legitimate** [2] - 36:11, 56:3
**lend** [1] - 102:21
**less** [2] - 54:13, 55:6
**letter** [5] - 46:22, 46:25, 114:16, 125:25, 126:11
**liability** [3] - 39:10, 62:8, 98:11
**licensed** [2] - 44:6, 44:7
**Life** [25] - 8:13, 11:1, 11:6, 11:8, 12:1, 19:20, 21:3, 27:22, 30:6, 45:4, 45:19, 45:24, 46:7, 57:22, 68:12, 75:7, 75:23, 76:7, 76:11, 83:18, 128:5, 129:9, 133:12, 135:9, 136:14
**light** [2] - 77:15, 98:6
**likely** [1] - 4:10
**limit** [1] - 72:3
**limitations** [20] - 19:10, 37:12, 40:21, 40:24, 41:5, 41:9, 41:12, 41:15, 41:24, 42:14, 42:21, 72:22, 129:25, 134:2, 134:5, 134:10, 134:19, 136:22, 137:4, 137:9
**Limited** [6] - 1:6, 3:3, 3:17, 86:9, 86:17, 87:2
**limited** [3] - 71:23, 111:11, 118:5
**limiting** [8] - 13:3, 46:17, 49:1, 54:22, 59:6, 80:6, 90:24, 108:19
**limitless** [1] - 109:8
**line** [8] - 21:23, 32:6, 47:5, 60:9, 66:19, 108:13, 109:5, 128:5
**lines** [1] - 4:22
**link** [1] - 137:2
**linking** [1] - 96:9

**liquidity** [2] - 88:25, 111:8
**Lisa** [2] - 1:14, 3:13
**list** [2] - 86:10, 121:23
**litigation** [4] - 13:7, 36:12, 119:12, 122:19
**live** [1] - 18:2
**lives** [1] - 117:24
**LLP** [3] - 1:22, 2:2, 2:6
**loans** [2] - 26:20, 103:20
**location** [1] - 73:15
**locations** [1] - 44:8, 63:11
**lock** [2] - 10:4, 10:23
**lock-up** [2] - 10:4, 10:23
**Logan** [1] - 123:21
**logical** [1] - 5:16
**logically** [1] - 4:25
**Look** [1] - 37:23
**look** [26] - 32:20, 35:20, 45:10, 48:13, 51:10, 59:4, 62:9, 62:17, 63:12, 79:1, 80:3, 83:16, 85:24, 88:17, 89:15, 105:25, 108:21, 108:22, 109:2, 109:6, 110:16, 125:20, 125:21, 126:2, 131:14, 131:19
**looked** [7] - 42:7, 50:23, 76:10, 76:14, 80:16, 88:14, 105:19
**looking** [9] - 8:20, 10:6, 28:25, 66:19, 68:12, 108:24, 118:6, 128:6, 134:4
**looks** [6] - 75:8, 75:15, 84:10, 116:12, 123:13, 123:14
**loosely** [1] - 36:9
**loss** [2] - 17:24, 130:20
**loving** [1] - 53:12
**LPI** [1] - 28:14
**Luz** [2] - 8:14, 8:18
**LUZ** [1] - 8:18
**Lynch** [1] - 59:18

## M

**maintain** [8] - 72:19, 93:10, 94:8, 97:8, 105:12, 130:4, 134:6, 136:13
**maintained** [1] - 62:15
**maintaining** [1] - 61:9, 68:6, 69:9, 94:3, 109:12

**maintenance** [2] - 68:18, 136:10
**major** [13] - 29:21, 30:1, 30:24, 31:4, 31:11, 32:22, 33:8, 34:2, 34:15, 38:3, 65:20, 124:24
**majority** [1] - 9:5
**manage** [2] - 83:24
**managed** [1] - 16:7
**management** [2] - 18:18, 92:2
**Management** [2] - 70:13, 119:5
**manager** [2] - 62:20, 62:22
**managerial** [11] - 16:8, 28:14, 28:18, 29:1, 30:17, 54:8, 55:18, 83:17, 94:17, 99:23, 135:7
**managerially** [1] - 88:5
**mandate** [1] - 12:15
**mandated** [1] - 98:4
**manipulation** [1] - 47:7
**manner** [4] - 47:13, 110:2, 115:9, 115:10
**market** [29] - 15:22, 22:22, 24:20, 24:23, 25:21, 31:5, 33:14, 45:7, 45:8, 51:6, 51:23, 69:6, 69:10, 69:20, 86:24, 87:10, 87:12, 87:15, 87:24, 88:13, 88:25, 89:4, 93:18, 95:9, 98:17, 111:4, 111:6, 112:4, 129:9
**marketed** [15] - 19:4, 25:14, 47:14, 52:20, 56:24, 67:10, 67:21, 77:21, 78:12, 78:23, 84:4, 87:18, 102:20, 115:17, 126:7
**marketing** [20] - 34:22, 39:14, 72:5, 78:21, 79:3, 81:12, 82:4, 85:22, 86:19, 86:20, 86:21, 88:24, 89:17, 90:11, 90:12, 90:20, 92:25, 95:5, 96:1
**markets** [6] - 47:21, 52:25, 83:20, 89:2, 113:11, 124:14
**mass** [1] - 124:1
**Massachusetts** [1] - 42:9
**matches** [1] - 45:14
**matching** [1] - 45:13

**material** [1] - 118:11
**materially** [1] - 70:17
**materials** [3] - 81:12, 82:4, 84:15
**Matt** [1] - 3:19
**matter** [22] - 22:17, 36:14, 37:16, 38:5, 38:9, 38:15, 38:19, 51:1, 51:20, 70:23, 73:16, 77:21, 79:8, 109:20, 109:21, 115:16, 115:20, 117:24, 122:15, 137:5, 137:7, 137:17
**matters** [4] - 9:7, 61:22, 137:6, 137:18
**Matthew** [3] - 1:13, 1:22, 3:11
**McConnell** [1] - 58:2
**McDonnell** [2] - 57:25, 113:2
**mean** [19] - 15:14, 26:3, 31:12, 32:4, 37:7, 37:15, 44:7, 47:11, 55:15, 78:2, 79:6, 88:11, 88:20, 91:11, 103:23, 108:23, 109:4, 128:22, 131:19
**meaning** [2] - 80:19, 130:15
**meaningful** [4] - 13:11, 28:13, 47:19, 121:7
**meaningfully** [1] - 133:14
**meanings** [1] - 120:16
**means** [4] - 6:12, 9:4, 11:14, 111:18
**meant** [4] - 8:2, 25:23, 25:24, 58:2
**measures** [1] - 67:3
**mechanism** [3] - 12:13, 83:2, 87:20
**mechanisms** [1] - 87:19
**media** [3] - 63:4, 82:5, 112:6
**meet** [5] - 15:20, 46:6, 92:3, 92:11, 101:3
**meeting** [3] - 10:8, 18:4, 129:2
**member** [1] - 77:20
**MENDRO** [74] - 3:16, 5:8, 5:23, 6:6, 6:8, 6:21, 8:9, 8:17, 9:18, 10:20, 11:8, 11:20, 12:4, 12:22, 13:17, 14:3, 14:7, 14:9, 14:12, 14:24, 15:1, 15:12, 15:18, 15:24, 16:10,

17:11, 17:19, 18:16, 19:8, 19:15, 19:20, 20:6, 20:12, 20:17, 20:22, 21:1, 22:4, 22:8, 22:15, 23:4, 24:15, 24:22, 25:15, 26:8, 26:12, 26:18, 26:20, 27:13, 27:24, 28:3, 28:20, 28:23, 29:12, 29:14, 30:2, 30:5, 30:8, 30:17, 30:21, 30:24, 32:3, 32:13, 33:4, 33:18, 34:4, 34:8, 34:12, 128:1, 128:20, 130:1, 130:9, 130:12, 131:23, 132:25

**Mendro** [6] - 1:21, 3:16, 5:7, 45:3, 128:1, 128:19

**Mendro's** [1] - 47:18
**mention** [5] - 42:20, 43:3, 50:11, 121:12, 129:23

**mentioned** [13] - 9:25, 10:23, 35:8, 45:3, 48:13, 59:12, 82:23, 84:5, 115:20, 117:19, 124:23, 129:8, 130:12
**mentions** [1] - 76:2
**Merck** [1] - 32:16
**merely** [1] - 80:25
**merge** [1] - 118:9
**merged** [1] - 94:1
**Meridian** [1] - 132:6
**Merrill** [1] - 59:18
**message** [1] - 69:20
**messages** [1] - 86:23
**met** [5] - 74:9, 97:9, 120:12, 120:18, 133:15
**metals** [2] - 55:3, 69:7
**method** [1] - 67:20
**might** [12] - 15:8, 16:23, 18:22, 25:9, 31:13, 33:22, 66:7, 77:19, 77:20, 121:8, 123:24, 126:20
**millions** [1] - 123:12
**mind** [4] - 10:8, 22:12, 121:16, 122:12
**minds** [1] - 129:2
**mini** [1] - 104:17
**minimum** [1] - 135:8
**ministerial** [5] - 108:5, 109:24, 133:21, 133:22, 135:10
**minute** [6] - 25:5, 65:9, 84:3, 119:21, 135:3, 136:19
**minutes** [3] - 55:7, 126:21, 127:25

**mischaracterizes** [1] - 72:21
**misleading** [2] - 70:17, 118:11
**miss** [2] - 22:7, 28:22
**missed** [1] - 43:2, 123:5
**missing** [3] - 47:24, 57:22, 122:17
**misunderstanding** [1] - 56:13
**misunderstood** [1] - 133:10
**model** [1] - 121:1
**moment** [6] - 9:25, 27:25, 70:6, 71:20, 79:11, 95:17
**money** [34] - 9:10, 17:7, 20:25, 21:1, 21:2, 22:11, 24:24, 25:18, 25:19, 26:22, 27:15, 28:8, 45:7, 45:15, 53:11, 53:14, 56:25, 57:18, 57:20, 74:1, 85:2, 85:6, 85:20, 92:11, 92:12, 92:16, 92:18, 108:8, 112:24, 113:9, 123:13, 123:17, 130:9
**money-making** [1] - 9:10
**month** [2] - 123:16, 128:14
**months** [1] - 61:12
**morning** [16] - 3:1, 3:8, 3:14, 3:16, 3:21, 3:22, 4:2, 4:6, 5:8, 5:9, 44:21, 44:22, 60:6, 60:13, 60:14, 137:15
**Morrison** [26] - 38:22, 39:6, 39:16, 39:22, 40:4, 40:6, 40:8, 40:10, 40:11, 40:16, 40:17, 40:19, 43:21, 44:9, 44:11, 65:20, 115:16, 115:21, 115:22, 116:6, 116:9, 117:21, 117:24, 118:3
**Morrison's** [1] - 118:5
**most** [11] - 15:4, 47:12, 54:24, 63:1, 65:19, 76:16, 77:15, 95:22, 120:8, 133:15, 133:16
**Most** [1] - 8:3
**mostly** [1] - 128:8
**motion** [10] - 32:14, 36:17, 36:25, 37:17, 37:20, 65:6, 116:13, 126:23, 135:15, 137:8

**motions** [1] - 4:21
**MOTIONS** [2] - 1:5, 1:9
**mouth** [1] - 35:13
**move** [2] - 58:7, 62:25
**moved** [2] - 38:12, 76:12
**moves** [1] - 60:9
**MR** [166] - 3:8, 3:16, 3:22, 4:2, 5:8, 5:23, 6:6, 6:8, 6:21, 8:9, 8:17, 9:18, 10:20, 11:8, 11:20, 12:4, 12:22, 13:17, 14:3, 14:7, 14:9, 14:12, 14:24, 15:1, 15:12, 15:18, 15:24, 16:10, 17:11, 17:19, 18:16, 19:8, 19:15, 19:20, 20:6, 20:12, 20:17, 20:22, 21:1, 22:4, 22:8, 22:15, 23:4, 24:15, 24:22, 25:15, 26:8, 26:12, 26:18, 26:20, 27:13, 27:24, 28:3, 28:20, 28:23, 29:12, 29:14, 30:2, 30:5, 30:8, 30:17, 30:21, 30:24, 32:3, 32:13, 33:4, 33:18, 34:4, 34:8, 34:12, 34:14, 35:7, 35:20, 36:18, 37:4, 37:17, 38:1, 38:12, 38:18, 38:21, 39:6, 40:11, 41:1, 41:11, 42:6, 42:19, 43:11, 43:23, 44:3, 44:16, 44:21, 45:2, 45:22, 46:15, 47:16, 48:3, 48:6, 48:9, 48:11, 48:25, 49:13, 50:8, 51:6, 51:18, 52:3, 52:5, 52:17, 52:23, 53:13, 53:23, 54:11, 55:21, 56:2, 56:13, 56:19, 57:16, 58:2, 58:21, 60:7, 60:20, 61:5, 61:24, 64:6, 64:16, 65:4, 115:12, 115:19, 116:1, 116:7, 118:2, 118:13, 118:16, 118:19, 118:25, 119:3, 119:7, 119:14, 119:18, 119:20, 120:4, 120:15, 122:12, 123:3, 125:14, 126:10, 126:14, 126:19, 127:5, 127:8, 127:12, 128:1, 128:20, 130:1, 130:9, 130:12, 131:23, 132:25, 133:1, 133:6, 133:10, 133:20,

134:14, 136:19, 136:21, 136:25, 137:13
**MS** [92] - 65:14, 65:17, 66:4, 66:9, 66:17, 67:1, 67:11, 67:23, 68:16, 69:5, 69:13, 70:6, 70:9, 70:15, 70:22, 71:1, 71:8, 71:11, 71:16, 71:20, 72:11, 74:6, 74:15, 75:21, 76:4, 77:2, 77:22, 78:4, 78:25, 79:9, 81:15, 82:6, 82:16, 83:1, 83:6, 83:14, 84:9, 84:21, 85:4, 85:16, 86:4, 87:12, 88:8, 88:13, 89:22, 90:5, 90:9, 91:16, 92:14, 94:6, 94:23, 95:18, 96:14, 97:8, 97:17, 97:20, 99:4, 99:7, 99:10, 100:1, 101:5, 101:18, 101:24, 102:10, 102:16, 103:3, 103:12, 104:1, 104:5, 105:9, 106:2, 106:19, 107:15, 108:14, 109:19, 110:4, 111:19, 112:14, 113:2, 113:24, 114:5, 114:10, 115:4, 134:6, 134:9, 134:17, 134:21, 134:25, 135:5, 135:21, 136:3, 136:6
**Muchin** [1] - 2:2
**multi** [2] - 30:25, 62:2
**multi-trillion** [1] - 30:25
**multi-year** [1] - 62:2
**multiple** [3] - 35:3, 44:6, 49:11
**Murphy** [3] - 1:18, 3:11, 119:21
**MURPHY** [8] - 119:20, 120:4, 120:15, 122:12, 123:3, 125:14, 126:10, 126:14
**must** [8] - 7:3, 27:22, 73:21, 77:15, 116:11, 127:3, 127:15, 132:6

---

**N**

**N.W** [1] - 138:13
**name** [1] - 80:19
**named** [1] - 50:12
**narrow** [1] - 29:24
**narrowed** [1] - 9:16
**Nasse** [2] - 1:15, 3:13
**natural** [3] - 11:15, 54:1, 55:2

**nature** [5] - 39:15, 47:1, 68:9, 97:5, 111:17

**NE** [1] - 1:16

**nearly** [1] - 32:15

**necessarily** [6] - 12:19, 68:1, 68:15, 80:21, 92:8, 132:17

**necessary** [7] - 11:25, 45:21, 46:6, 57:13, 81:23, 105:4, 130:4

**need** [36] - 4:19, 5:4, 15:15, 23:24, 30:9, 42:4, 44:24, 45:5, 47:17, 53:24, 65:16, 67:6, 72:22, 76:8, 83:16, 88:21, 96:15, 98:16, 99:5, 105:4, 105:7, 106:3, 106:25, 107:23, 112:15, 112:17, 119:23, 120:10, 123:22, 123:23, 127:15, 127:17, 127:21, 127:23, 133:13

**needed** [3] - 78:15, 91:8, 125:5

**needs** [1] - 81:3

**nefarious** [1] - 8:1

**Nelson** [2] - 1:21, 3:20

**network** [1] - 111:1

**Network** [1] - 82:10

**never** [11] - 6:24, 21:24, 22:9, 22:10, 22:15, 41:12, 42:14, 47:25, 57:20, 76:2, 127:3

**new** [12] - 12:14, 12:18, 37:10, 43:14, 63:7, 87:21, 87:23, 90:14, 90:17, 90:20, 125:9, 127:14

**New** [6] - 1:19, 7:24, 10:1, 21:20, 74:10, 137:1

**next** [3] - 34:7, 60:8, 119:17

**nice** [1] - 93:21

**Ninth** [2] - 8:14, 8:18

**nobody** [3] - 35:5, 130:6

**non** [3] - 128:7, 128:11, 130:5

**non-securities** [3] - 128:7, 128:11, 130:5

**none** [2] - 45:7, 113:12

**notably** [2] - 73:10, 73:20

**note** [13] - 14:19, 67:24, 74:22, 92:17,

95:19, 113:14, 124:8, 129:9, 130:14, 134:17, 135:5, 135:8, 136:6

**noted** [3] - 7:25, 59:9, 97:1

**notes** [5] - 29:17, 80:18, 98:12, 123:4, 138:6

**nothing** [8] - 7:10, 28:17, 50:8, 64:20, 66:23, 93:4, 106:6, 121:25

**notice** [11] - 35:6, 36:18, 36:22, 37:19, 50:10, 50:18, 71:9, 121:7, 121:8, 122:6, 123:22

**noticed** [2] - 26:11, 80:17

**notified** [1] - 50:13

**notion** [3] - 22:24, 27:11, 74:13

**notwithstanding** [3] - 8:5, 8:6, 80:4

**nowhere** [1] - 35:6, 73:18, 125:10

**number** [14] - 30:22, 49:6, 55:7, 68:23, 72:17, 81:15, 81:24, 81:25, 84:12, 86:17, 88:20, 98:7, 110:18, 117:12

**numbers** [2] - 49:21, 117:11

**numerous** [1] - 6:9

**NW** [4] - 1:23, 2:3, 2:7, 2:11

**NY** [1] - 1:19

# O

**O'Connor's** [1] - 9:5

**objective** [1] - 77:24

**obligation** [10] - 7:13, 7:19, 10:15, 11:7, 29:15, 36:21, 79:10, 79:19, 85:23, 104:1

**obligations** [12] - 6:11, 10:9, 11:2, 11:25, 15:6, 19:16, 24:8, 27:17, 27:23, 28:15, 81:23, 106:4

**obvious** [4] - 71:5, 81:7, 122:15, 123:17

**obviously** [5] - 5:24, 23:6, 25:3, 30:24, 110:14

**occur** [1] - 99:16

**occurred** [4] - 39:11, 40:2, 40:12, 61:12

**occurring** [2] - 77:12, 92:20

**occurs** [1] - 43:20

**October** [1] - 111:4

**OF** [3] - 1:1, 1:9, 138:2

**offensive** [1] - 32:19

**offer** [20] - 7:15, 10:7, 70:19, 70:24, 72:16, 79:2, 79:17, 79:21, 85:8, 96:8, 98:7, 100:17, 101:11, 104:22, 108:21, 115:1, 115:2, 116:17, 117:16

**offered** [23] - 9:12, 66:21, 67:2, 72:1, 72:4, 83:7, 84:11, 94:18, 100:6, 100:21, 101:13, 101:18, 101:21, 102:10, 102:13, 103:10, 105:14, 106:9, 110:10, 110:22, 117:9, 129:16, 129:17

**offering** [18] - 14:23, 21:13, 22:18, 35:11, 40:22, 41:2, 55:12, 60:17, 78:11, 79:22, 106:3, 114:20, 114:21, 116:2, 116:15, 117:9, 117:17, 129:14

**offerings** [3] - 83:1, 130:2, 130:3

**offers** [6] - 39:4, 45:14, 79:20, 100:9, 117:23, 118:22

**office** [2] - 62:20, 62:22

**Office** [1] - 46:23

**OFFICIAL** [1] - 138:2

**Official** [2] - 2:10, 138:12

**offshore** [1] - 117:23

**often** [2] - 9:11, 78:5

**oil** [3] - 7:9, 54:1, 55:2

**once** [7] - 5:5, 21:24, 88:11, 89:12, 89:23, 116:12

**One** [2] - 85:5

**one** [79] - 5:20, 6:16, 17:23, 19:18, 20:17, 21:10, 22:20, 23:2, 23:3, 25:5, 25:17, 27:9, 27:25, 30:2, 31:19, 31:23, 34:17, 37:22, 38:16, 43:16, 46:5, 49:25, 50:3, 51:4, 53:22, 55:25, 56:8, 56:11, 57:16, 57:25, 58:18, 59:20, 61:6, 61:8, 63:6, 64:9, 66:6, 69:3, 69:5, 69:13, 70:6,

70:13, 71:8, 71:20, 74:8, 75:11, 75:22, 76:10, 76:22, 77:2, 82:7, 82:9, 82:23, 84:5, 84:10, 87:5, 89:19, 91:24, 96:10, 102:14, 104:20, 105:8, 107:25, 111:20, 111:21, 113:22, 117:6, 117:20, 117:22, 119:11, 120:3, 122:9, 129:1, 131:16, 134:1, 135:2, 136:16, 136:19

**One-O-One** [1] - 85:5

**ones** [8] - 17:10, 52:7, 52:19, 77:4, 80:25, 83:17, 83:18, 107:10

**ongoing** [26] - 7:13, 43:5, 68:17, 69:10, 69:21, 71:24, 72:13, 77:9, 77:11, 90:10, 90:19, 91:3, 91:5, 92:17, 93:16, 95:6, 95:11, 106:7, 108:20, 109:17, 110:15, 112:2, 112:3, 128:8, 128:13

**online** [1] - 55:7

**open** [1] - 76:9

**opening** [1] - 46:16

**operate** [1] - 33:1

**operated** [1] - 70:18

**operating** [3] - 60:25, 105:24, 112:23

**operational** [1] - 103:21

**opine** [1] - 4:18

**opinion** [8] - 9:5, 14:14, 26:2, 76:1, 87:6, 97:22, 97:23, 137:1

**opinions** [4] - 11:21, 25:6, 98:8

**opportunities** [12] - 73:12, 100:18, 100:21, 101:11, 101:14, 102:8, 102:12, 103:19, 109:4, 110:10, 114:23, 115:6

**opportunity** [11] - 5:2, 34:9, 46:12, 67:3, 90:20, 91:22, 96:23, 100:6, 100:10, 101:19, 102:11

**opposed** [11] - 9:13, 10:15, 13:6, 17:3, 56:11, 66:25, 78:23, 102:13, 115:9, 122:21, 126:3

**opposite** [3] - 43:13, 71:6, 79:25

**opposition** [1] - 62:13

**option** [4] - 6:25,

74:12, 74:14, 131:4
**orange** [3] - 31:18, 48:8, 48:11
**order** [3] - 50:14, 60:16, 114:3
**ordinarily** [2] - 26:25, 74:9
**ordinary** [1] - 95:12
**organize** [1] - 65:16
**organized** [2] - 4:22, 65:23
**original** [6] - 51:24, 94:2, 105:20, 107:8, 116:5, 122:11
**originally** [1] - 4:24
**otherwise** [8] - 13:19, 16:25, 17:13, 39:20, 53:25, 59:21, 101:22, 118:14
**ought** [1] - 63:16
**outlined** [1] - 29:24
**outlining** [1] - 101:6
**outs** [1] - 124:15
**outset** [7] - 22:17, 78:1, 88:7, 96:11, 102:23, 104:4
**outside** [8] - 13:12, 18:7, 18:10, 41:16, 44:5, 73:1, 108:25, 115:18
**overlapping** [1] - 113:3
**overruled** [1] - 121:23
**overstate** [1] - 111:20
**overturned** [1] - 40:8
**overwhelming** [1] - 122:5
**overwhelms** [1] - 133:23
**Owen** [1] - 98:20
**own** [10] - 6:20, 16:16, 43:21, 44:13, 57:1, 83:10, 103:16, 103:20, 112:1, 132:10
**owner** [1] - 92:13
**owners** [1] - 111:13
**ownership** [1] - 26:23

# P

**package** [2] - 100:6, 114:23
**page** [9] - 7:15, 27:22, 28:4, 28:24, 30:5, 30:22, 62:13, 129:11, 133:12
**pages** [8] - 5:10, 26:9, 46:20, 104:15, 107:6, 112:6, 123:1
**Paibas** [1] - 116:21

**paper** [5] - 17:4, 65:17, 78:6, 78:7, 82:5
**papers** [6] - 5:6, 14:20, 17:24, 25:11, 71:21, 78:5
**paradigm** [1] - 103:2
**paragraph** [20] - 4:12, 26:21, 31:1, 41:17, 45:10, 62:18, 62:19, 63:6, 63:14, 63:19, 63:20, 71:25, 72:3, 100:23, 129:20, 130:22, 131:2, 131:7, 132:15, 133:21
**paragraphs** [10] - 4:12, 26:10, 45:13, 62:14, 62:18, 62:21, 63:2, 72:8, 129:16, 132:11
**part** [21] - 10:16, 11:3, 13:23, 16:10, 18:23, 19:16, 21:13, 21:16, 33:1, 38:3, 55:11, 59:5, 90:10, 96:14, 106:18, 114:11, 115:2, 116:25, 123:11, 136:8
**participate** [2] - 100:7, 100:10
**participating** [1] - 89:10
**particular** [62] - 18:15, 25:13, 32:18, 35:23, 38:2, 38:5, 47:14, 51:21, 55:2, 58:11, 59:20, 66:15, 66:22, 67:8, 68:7, 68:20, 72:13, 73:5, 73:25, 74:18, 75:5, 75:12, 77:6, 77:22, 78:9, 81:6, 82:3, 82:16, 83:1, 83:7, 83:15, 83:20, 83:21, 84:11, 88:22, 92:22, 93:9, 93:25, 94:10, 94:13, 96:25, 98:22, 100:21, 101:12, 101:25, 102:7, 102:8, 102:17, 103:3, 104:22, 106:5, 107:1, 107:10, 108:14, 108:17, 109:2, 109:9, 110:11, 110:13, 113:4, 114:5
**particularly** [1] - 108:25
**parties** [13] - 3:3, 10:8, 49:15, 64:9, 79:24, 90:15, 99:11, 104:18, 106:17, 106:18, 107:2, 111:15, 129:19
**Partner** [1] - 128:5
**Partners** [24] - 8:13,

11:1, 11:6, 11:8, 12:1, 19:20, 21:3, 27:22, 30:6, 45:4, 45:19, 45:24, 46:7, 57:22, 68:12, 75:7, 75:23, 76:7, 76:11, 83:18, 129:9, 133:12, 135:9, 136:14
**party** [14] - 23:17, 24:3, 27:9, 27:13, 27:18, 38:6, 51:10, 76:21, 77:8, 88:18, 96:22, 104:13, 129:1, 129:2
**passed** [1] - 5:13
**passing** [1] - 28:13
**past** [5] - 21:24, 36:11, 54:24, 75:8, 90:21
**path** [2] - 35:16, 36:7
**paths** [1] - 118:8
**patience** [1] - 137:14
**patient** [1] - 128:2
**pattern** [1] - 96:21
**pause** [1] - 28:2
**Pause** [1] - 70:8
**pay** [4] - 26:1, 103:1, 103:24, 104:1
**paying** [7] - 7:17, 20:23, 21:5, 25:25, 34:23, 132:13
**payment** [1] - 131:5
**payments** [3] - 130:12, 130:22, 130:23
**pays** [2] - 9:21, 102:20
**Pearl** [1] - 1:19
**peg** [1] - 117:3
**pegged** [1] - 66:24
**pegging** [1] - 100:4
**penalty** [1] - 73:6
**Pennsylvania** [1] - 2:3
**people** [25] - 14:17, 18:5, 18:18, 18:19, 18:20, 18:21, 22:21, 25:8, 33:1, 34:23, 36:6, 46:4, 47:22, 53:4, 55:4, 55:7, 57:1, 57:3, 91:12, 95:22, 107:22, 110:1, 122:22, 124:17, 127:1
**people's** [2] - 18:9, 32:11
**percent** [2] - 100:11, 100:25
**percentage** [2] - 103:10, 104:4
**perfect** [1] - 120:22
**perfectly** [1] - 56:3
**performing** [2] - 102:11, 130:24
**perhaps** [3] - 16:18, 43:13, 110:13

**period** [14] - 37:8, 37:12, 41:9, 41:13, 41:15, 41:25, 42:14, 42:21, 42:22, 88:5, 109:18, 136:22, 137:4, 137:9
**periodically** [1] - 82:9
**periods** [2] - 73:23, 102:22
**permit** [1] - 46:10
**permitting** [1] - 84:18
**perpetuity** [1] - 102:14
**person** [7] - 28:19, 62:8, 64:10, 64:12, 65:17, 74:1, 117:23
**personal** [17] - 25:21, 38:10, 60:18, 64:1, 65:6, 73:8, 73:15, 112:18, 115:8, 118:23, 119:25, 120:5, 120:19, 120:21, 121:6, 121:19, 127:17
**personally** [5] - 61:2, 64:15, 64:17, 120:13, 120:14
**perspective** [2] - 61:24, 117:21
**persuasive** [3] - 4:13, 34:17, 125:10
**pertains** [2] - 71:22, 72:20
**phone** [1] - 22:14
**phrasing** [1] - 45:23
**physical** [3] - 41:14, 42:10, 137:6
**picture** [2] - 122:5, 122:10
**piece** [1] - 94:15
**pivot** [1] - 63:9
**place** [5] - 18:1, 18:4, 58:12, 58:25, 87:20
**plain** [1] - 81:3, 109:14
**plaintiff** [3] - 3:5, 3:9, 77:16
**Plaintiff** [2] - 1:4, 1:13
**plaintiffs** [1] - 13:9
**plan** [3] - 79:2, 106:21, 108:21
**planned** [1] - 79:6
**planning** [3] - 29:17, 82:21, 126:17
**plans** [1] - 18:17
**Plastic** [6] - 59:18, 59:19, 60:3, 86:9, 86:21, 87:1
**platform** [38] - 16:7, 17:8, 17:20, 21:15, 25:20, 44:7, 45:7, 45:11, 52:7, 53:18, 55:14, 56:5, 57:1,

57:20, 63:17, 64:20, 72:6, 72:8, 76:24, 77:8, 79:8, 89:18, 90:14, 91:1, 92:6, 95:22, 97:21, 98:15, 105:2, 105:15, 105:24, 106:1, 108:9, 108:17, 109:11, 110:1, 120:24, 121:24
**platforms** [14] - 17:17, 41:22, 63:4, 63:8, 64:22, 84:1, 88:10, 89:5, 98:23, 107:1, 108:3, 108:4, 120:23, 120:24
**plausible** [1] - 120:11
**plausibly** [5] - 22:2, 64:4, 64:6, 117:15, 126:5
**play** [2] - 55:9, 61:7
**plea** [1] - 60:24
**plead** [1] - 129:15
**pleadings** [2] - 4:16, 34:20
**pleas** [2] - 61:8, 61:11
**pleases** [1] - 19:24
**pled** [1] - 61:9
**plot** [1] - 36:3
**plus** [1] - 53:25
**point** [50] - 6:1, 13:10, 15:16, 16:20, 20:6, 20:7, 20:18, 22:21, 30:5, 33:3, 34:8, 43:24, 48:22, 50:25, 57:19, 69:6, 69:17, 73:14, 73:19, 75:22, 78:5, 80:14, 81:8, 82:18, 84:20, 86:5, 94:24, 96:18, 98:8, 99:12, 105:5, 106:11, 111:17, 114:20, 119:9, 122:4, 122:14, 126:10, 128:3, 129:21, 129:24, 130:14, 131:16, 131:21, 131:24, 132:21, 134:15, 134:18, 134:24, 136:21
**pointed** [7] - 39:12, 39:13, 42:21, 62:7, 82:7, 84:22, 125:2
**pointing** [4] - 9:15, 9:19, 39:23, 123:17
**points** [8] - 34:6, 35:18, 36:16, 92:16, 107:7, 126:21, 133:3, 133:4
**Pokémon** [3] - 32:6, 46:19, 80:7
**policy** [2] - 36:9, 36:14
**political** [1] - 31:3
**pool** [3] - 21:4, 22:11,

103:17
**pooled** [7] - 24:24, 97:12, 100:24, 100:25, 101:8, 110:20, 130:9
**pooling** [24] - 21:5, 22:16, 24:9, 27:15, 45:4, 45:6, 45:18, 45:19, 45:24, 46:3, 46:6, 53:13, 57:19, 75:6, 75:8, 75:12, 75:19, 83:25, 92:24, 97:6, 97:11, 133:21, 136:7
**popular** [1] - 33:2
**portion** [7] - 40:5, 40:8, 72:15, 77:22, 101:1, 101:8, 134:4
**position** [21] - 8:8, 8:9, 32:16, 38:2, 38:25, 47:10, 50:20, 64:2, 64:23, 66:2, 66:5, 66:6, 71:7, 87:10, 89:25, 90:2, 90:4, 94:7, 94:9, 107:24
**positions** [4] - 32:11, 36:10, 73:15, 79:25
**possibility** [1] - 74:12
**possible** [2] - 11:23, 52:17
**possibly** [1] - 128:25
**post** [10] - 11:2, 15:6, 16:12, 19:15, 27:16, 27:23, 39:16, 111:23, 133:13, 133:20
**post-Morrison** [1] - 39:16
**post-purchase** [2] - 133:13, 133:20
**post-sale** [6] - 11:2, 15:6, 16:12, 19:15, 27:16, 27:23
**postdates** [1] - 35:8
**posted** [1] - 63:7
**potential** [1] - 72:6
**potentially** [1] - 47:22
**power** [2] - 14:15, 124:11
**powerful** [1] - 63:2
**practical** [1] - 106:24
**practices** [1] - 70:18
**pre** [4] - 30:10, 30:15, 37:1, 133:17
**pre-2019** [1] - 37:2
**pre-purchase** [3] - 30:10, 30:15, 133:17
**preceded** [1] - 40:6
**precedent** [2] - 11:9, 39:16
**precious** [1] - 69:7
**predates** [1] - 23:13

**predicated** [1] - 62:8
**predicating** [1] - 82:11
**predominantly** [1] - 30:11
**preferences** [1] - 37:14
**premise** [2] - 123:9, 125:19
**premising** [1] - 39:10
**preprogrammed** [2] - 82:12, 82:13
**presale** [2] - 111:23
**presence** [6] - 39:13, 41:14, 42:10, 42:15, 60:1, 137:6
**present** [13] - 3:4, 30:8, 45:6, 71:25, 75:4, 76:7, 81:19, 90:21, 91:4, 91:19, 95:17, 101:24, 134:11
**presentation** [1] - 130:13
**press** [2] - 50:12, 55:16
**pressed** [2] - 24:4, 80:5
**pretty** [5] - 41:21, 42:9, 80:18, 90:4, 135:17
**prevent** [1] - 13:10
**preventing** [1] - 35:16
**previously** [3] - 75:3, 97:10, 134:7
**price** [5] - 14:13, 54:9, 88:3, 88:6, 108:1
**prima** [1] - 63:25
**primarily** [1] - 74:16
**primary** [5] - 5:4, 71:24, 72:13, 93:6, 99:19
**principally** [1] - 33:23
**principle** [7] - 25:2, 46:17, 49:1, 54:22, 57:15, 59:7, 108:19
**principles** [2] - 80:6, 90:24
**private** [5] - 13:6, 13:9, 98:19, 98:22, 98:24
**privity** [7] - 10:7, 25:17, 79:10, 81:18, 81:19, 128:25, 130:4
**privy** [1] - 25:23
**pro** [1] - 51:13
**problem** [7] - 5:17, 24:15, 32:6, 36:5, 58:18, 58:20, 128:5
**problems** [1] - 106:16
**proceed** [2] - 124:12, 124:20

**proceeded** [1] - 20:7
**proceeding** [1] - 115:9
**proceedings** [2] - 124:9, 138:7
**proceeds** [13] - 16:15, 16:22, 18:21, 19:21, 19:22, 19:23, 23:8, 23:10, 23:18, 48:15, 52:13, 79:7, 100:24
**Process** [1] - 37:18
**process** [9] - 34:16, 71:9, 73:12, 122:25, 134:12, 136:9, 136:21, 137:3, 137:5
**process-related** [1] - 122:25
**product** [3] - 59:21, 91:6, 114:14
**products** [12] - 47:20, 49:4, 49:5, 52:13, 54:2, 54:16, 63:7, 93:14, 104:23, 106:4, 113:4, 113:25
**profit** [15] - 24:17, 25:3, 57:2, 66:8, 67:3, 89:2, 99:22, 99:23, 100:7, 101:12, 101:14, 101:19, 102:8, 102:12, 115:6
**profit-making** [6] - 100:7, 101:12, 101:14, 101:19, 102:8, 102:12
**profit-yielding** [1] - 67:3
**profitability** [5] - 86:23, 91:22, 93:1, 93:8, 133:14
**profits** [23] - 6:16, 21:4, 24:19, 28:10, 30:11, 76:20, 82:22, 86:12, 87:9, 88:15, 88:24, 95:10, 96:20, 100:22, 103:8, 103:23, 104:10, 106:8, 108:16, 110:15, 111:9, 123:18
**program** [11] - 45:1, 61:10, 83:7, 83:24, 102:19, 102:20, 104:3, 133:2, 135:6, 135:18, 136:2
**programmatic** [2] - 97:20, 97:25
**programs** [31] - 26:6, 26:13, 27:6, 68:19, 68:23, 83:4, 83:14, 83:15, 83:21, 84:3, 84:7, 84:12, 87:22, 90:14, 90:17, 100:7, 100:10, 100:18, 101:14, 101:25,

102:19, 103:4, 103:5, 104:5, 104:7, 115:3, 131:17, 131:25, 132:1, 132:4, 135:6
**project** [2] - 7:18, 88:22
**promise** [8] - 78:15, 89:7, 91:18, 92:25, 94:15, 95:5, 111:3, 123:18
**promises** [2] - 86:19, 110:15
**promising** [2] - 57:4, 109:13
**promote** [2] - 25:20, 101:1
**promoted** [2] - 47:22, 78:12
**promoter** [6] - 11:3, 15:23, 19:16, 24:2, 28:25, 87:10
**promoters** [5] - 69:18, 75:2, 93:2, 95:4, 109:11
**promoters'** [1] - 57:21
**promotion** [8] - 47:23, 53:17, 67:12, 90:11, 105:20, 115:6, 128:9
**promotional** [1] - 78:21
**promotions** [2] - 95:4, 95:18
**prong** [3] - 22:10, 85:6, 92:18
**proof** [1] - 79:7
**proof-of-stake** [1] - 79:7
**property** [1] - 95:6
**proposals** [1] - 31:6
**proposed** [3] - 37:23, 37:25, 53:6
**proposition** [10] - 7:6, 8:11, 8:21, 8:25, 11:15, 103:8, 103:9, 111:8, 111:10, 112:4
**protect** [2] - 12:17, 73:9
**protected** [1] - 79:17
**protection** [2] - 113:10, 113:11
**protections** [2] - 79:15, 124:5
**Protocol** [2] - 100:19, 110:18
**protocol** [4] - 79:7, 108:18, 133:16, 133:24
**protocols** [3] - 68:7, 68:19, 68:24
**prove** [1] - 63:25
**proved** [1] - 29:6

**provide** [5] - 36:22, 73:8, 84:13, 85:6, 85:11
**provided** [3] - 46:22, 87:5, 100:17
**provides** [2] - 100:5, 101:11
**provision** [9] - 40:17, 73:4, 85:7, 98:24, 116:8, 118:5, 118:6, 118:15, 118:17
**provisions** [6] - 10:4, 10:24, 58:23, 59:22, 115:23, 118:21
**prudently** [1] - 125:17
**Public** [1] - 78:3
**public** [16] - 12:18, 17:4, 17:6, 25:8, 31:5, 36:4, 36:22, 37:3, 37:4, 37:8, 47:14, 50:15, 72:10, 77:20, 110:25, 123:15
**publicly** [3] - 50:15, 78:12, 95:19
**puffery** [1] - 17:16
**pull** [1] - 98:12
**purchase** [16] - 6:16, 17:3, 30:10, 30:15, 46:1, 46:2, 46:4, 46:5, 47:24, 86:18, 92:20, 92:25, 103:4, 133:13, 133:17, 133:20
**purchased** [3] - 98:22, 111:3, 112:5
**purchaser** [3] - 7:17, 53:15, 53:16
**purchasers** [11] - 70:19, 81:19, 81:20, 87:23, 90:20, 93:5, 97:13, 100:6, 100:24, 101:7, 109:2
**purchases** [4] - 75:13, 81:20, 97:12, 98:14
**purchasing** [1] - 72:7
**purpose** [2] - 13:2
**purposeful** [1] - 116:4
**purposefully** [1] - 61:17
**purposes** [14] - 30:9, 31:11, 33:23, 36:25, 37:17, 72:17, 73:15, 73:17, 73:20, 83:11, 101:24, 103:21, 134:11
**pursuant** [1] - 110:24
**pursue** [1] - 106:25
**purview** [1] - 47:20
**push** [1] - 90:18
**put** [10] - 9:6, 9:8, 40:18, 43:25, 58:5, 58:25, 62:4, 82:2,

121:6, 127:11
**Puts** [1] - 97:19
**puts** [1] - 66:13
**putting** [3] - 20:13, 102:3, 105:22

## Q

**qualifies** [2] - 29:23, 70:11
**qualify** [3] - 48:21, 53:23, 135:19
**quality** [1] - 4:7
**query** [1] - 46:21
**questioned** [1] - 49:9
**questions** [28] - 4:11, 4:17, 4:22, 13:20, 15:14, 15:15, 20:4, 22:4, 29:19, 29:21, 30:1, 30:24, 31:4, 31:11, 32:22, 33:8, 34:16, 38:3, 54:23, 78:10, 115:13, 119:4, 119:8, 119:24, 124:24, 132:23, 135:18, 137:16
**quibble** [1] - 100:3
**quite** [6] - 9:18, 26:13, 50:9, 52:10, 96:4, 99:19
**quote** [3] - 4:19, 5:19, 30:22
**quote/unquote** [4] - 75:8, 86:10, 92:16, 136:11
**quoted** [3] - 4:15, 7:15, 63:21
**quoting** [1] - 6:22
**QURESHI** [7] - 4:2, 60:20, 61:5, 61:24, 64:6, 64:16, 65:4
**Qureshi** [3] - 2:5, 4:3, 60:12

## R

**raise** [1] - 109:8
**raised** [4] - 42:20, 99:14, 131:20, 132:21
**Rakoff** [4] - 99:18, 100:16, 102:2, 102:3
**Rakoff's** [2] - 87:6, 114:24
**rare** [1] - 55:3
**rata** [1] - 51:13
**rate** [1] - 102:22
**rather** [1] - 118:22
**ration** [1] - 80:8
**reach** [11] - 12:18, 31:15, 34:2, 42:4, 76:8, 81:1, 81:6, 91:7, 98:16,

120:8, 123:23
**reached** [2] - 39:14, 49:23
**reaches** [1] - 57:21
**read** [8] - 6:13, 39:7, 57:7, 57:9, 80:24, 81:3, 112:15, 131:9
**reading** [3] - 25:11, 28:16, 102:5
**reads** [2] - 54:25, 55:1
**real** [4] - 13:4, 59:6, 97:5, 132:5
**realities** [8] - 66:20, 67:12, 79:2, 85:24, 88:1, 101:7, 109:7, 110:9
**realize** [1] - 60:24
**really** [20] - 9:16, 17:17, 18:13, 22:16, 53:12, 57:10, 63:1, 73:4, 88:19, 107:17, 109:3, 115:23, 124:10, 124:17, 127:16, 127:20, 135:11, 136:8, 136:17
**reason** [26] - 15:25, 17:6, 17:7, 18:14, 18:17, 19:17, 19:21, 25:17, 27:11, 27:19, 28:8, 31:2, 32:15, 33:11, 35:10, 43:4, 44:1, 54:5, 56:22, 59:16, 61:10, 61:25, 77:3, 130:7
**reasonable** [19] - 19:4, 24:19, 25:8, 28:10, 76:25, 77:2, 77:14, 77:18, 77:25, 82:22, 88:15, 88:23, 95:9, 95:10, 95:15, 96:20, 106:8, 108:16, 124:21
**reasonableness** [1] - 96:19
**reasonably** [2] - 77:20, 92:5
**reasoning** [3] - 23:9, 23:14, 28:5
**reasons** [10] - 15:19, 45:2, 45:3, 46:15, 57:16, 58:21, 59:20, 61:5, 103:19, 134:7
**rebut** [1] - 126:24
**rebuttal** [5] - 34:10, 44:17, 126:20, 126:25
**receipt** [1] - 85:11
**receive** [2] - 18:20, 131:2
**received** [1] - 5:10
**recent** [5] - 22:19, 49:7, 98:11, 98:13,

116:10
**recently** [1] - 37:5
**recess** [1] - 65:11
**recognized** [4] -
71:11, 73:7, 75:7,
114:12
**recollection** [1] -
74:17
**reconciles** [1] - 79:19
**record** [6] - 3:6, 33:4,
33:6, 44:5, 80:3, 97:25
**refer** [3] - 4:19, 63:21,
64:19
**reference** [7] - 76:5,
81:25, 94:24, 100:8,
112:7, 113:15
**referenced** [3] - 71:13,
113:17, 136:7
**references** [2] - 71:13,
116:16
**referred** [1] - 11:24
**referring** [5] - 22:19,
40:15, 79:24, 83:22,
115:21
**refers** [1] - 74:20
**refined** [1] - 116:9
**refused** [2] - 36:1
**refusing** [1] - 36:6
**reg** [3] - 117:25,
122:21, 122:23
**regard** [3] - 22:8,
24:19, 24:22
**regarding** [10] - 5:11,
12:12, 21:9, 49:24,
51:10, 51:12, 51:13,
57:19, 59:13, 116:22
**regardless** [1] - 59:4
**regimes** [1] - 113:4
**register** [11] - 35:14,
35:22, 36:4, 40:9, 62:7,
62:9, 104:24, 104:25,
105:1, 106:15
**registered** [2] - 63:17,
64:22
**registration** [4] -
40:13, 40:16, 104:23,
118:17
**regs** [1] - 124:15
**regulate** [8] - 33:16,
33:22, 36:12, 43:19,
43:20, 56:10, 79:20,
118:21
**regulated** [5] - 47:20,
49:8, 106:2, 106:3,
114:14
**regulates** [2] - 44:11,
47:21
**regulating** [1] - 33:13
**Regulation** [2] -
116:21, 117:22

**regulation** [10] -
12:14, 31:4, 35:4,
37:15, 43:19, 116:22,
117:22, 119:12, 124:7,
124:13
**regulations** [2] -
124:11, 124:16
**regulator** [1] - 123:23
**regulatory** [4] - 37:6,
61:7, 113:7, 115:10
**rehearing** [1] - 30:14
**reject** [2] - 13:21,
27:11
**rejected** [7] - 8:21,
80:11, 99:15, 102:2,
129:18, 130:18, 137:2
**rejects** [2] - 129:10,
130:16
**relate** [1] - 104:22
**related** [8] - 16:13,
35:11, 41:5, 78:14,
91:21, 93:14, 105:2,
122:25
**relates** [2] - 72:16,
85:9
**relating** [4] - 79:2,
83:3, 98:13, 98:21
**relationship** [5] - 5:15,
15:5, 81:22, 91:5,
109:17
**relationships** [1] -
90:15
**release** [1] - 53:6
**released** [1] - 123:16
**relevance** [1] - 60:1
**relevant** [6] - 25:16,
25:22, 41:15, 71:6,
105:15, 106:22
**reliance** [1] - 86:19
**reliant** [1] - 68:4
**relied** [1] - 62:4
**relief** [4] - 42:22,
42:24, 43:3, 134:18
**relies** [2] - 86:7,
116:20
**rely** [5] - 11:5, 47:23,
76:25, 120:17, 136:14
**relying** [13] - 19:9,
20:2, 20:3, 29:9, 42:3,
43:8, 43:9, 78:3, 78:20,
81:13, 82:4
**remain** [2] - 14:5, 24:5
**remained** [1] - 102:14
**remains** [3] - 24:18,
76:9, 101:10
**remarkable** [1] - 96:4
**remedies** [1] - 106:23
**remedy** [2] - 59:21,
105:16
**remember** [3] - 43:17,

125:8, 131:22
**remind** [3] - 123:24,
123:25, 125:7
**reminded** [1] - 124:1
**reorganize** [1] - 13:19
**repeat** [4] - 5:4, 24:21,
125:21, 132:20
**repeated** [2] - 30:13,
45:23
**repeatedly** [1] - 112:7
**repeating** [2] - 44:22,
51:25
**reply** [3] - 5:3, 46:20,
99:1
**report** [4] - 34:21,
48:13, 51:9, 52:9
**REPORTER** [6] - 8:15,
24:21, 43:22, 128:19,
136:23, 138:2
**reporter** [1] - 65:9
**Reporter** [3] - 2:9,
2:10, 138:12
**repository** [1] - 69:19
**represent** [1] - 77:10
**representation** [1] -
89:8
**representations** [9] -
55:13, 86:12, 91:20,
93:7, 93:16, 96:10,
96:23, 105:21, 106:7
**representative** [3] -
105:12, 105:13, 107:7
**represents** [6] - 10:8,
92:15, 93:3, 93:20,
97:12, 107:5
**require** [8] - 10:22,
12:24, 31:10, 33:25,
74:21, 91:6, 120:2,
128:13
**required** [11] - 7:22,
11:4, 13:13, 45:24,
62:19, 63:14, 64:22,
79:12, 81:18, 85:20,
92:19
**requirement** [2] -
28:9, 98:3
**requires** [5] - 10:14,
11:10, 22:10, 38:5,
75:6
**requiring** [4] - 9:20,
10:6, 19:15, 128:25
**requisite** [2] - 42:24,
64:17
**resale** [13] - 14:22,
16:3, 16:5, 27:14,
27:19, 91:8, 92:10,
93:6, 95:17, 129:10,
130:2, 131:4
**resales** [9] - 14:19,
16:1, 20:18, 20:22,

21:9, 24:22, 29:14,
41:4, 91:7
**reselling** [1] - 24:20
**reserve** [4] - 34:9,
44:17, 126:21, 126:24
**reserving** [1] - 126:24
**residents** [2] - 39:2,
40:7
**resold** [2] - 23:23,
90:3
**resolution** [1] - 85:17
**resolutions** [1] -
128:15
**respect** [38] - 14:18,
15:10, 19:14, 20:22,
23:10, 29:4, 29:25,
54:3, 69:15, 71:1,
72:21, 73:14, 75:3,
75:5, 81:13, 81:16,
82:3, 82:17, 87:25,
90:5, 90:11, 93:15,
94:9, 97:1, 97:10,
100:1, 103:8, 105:23,
106:5, 108:11, 108:12,
113:20, 118:20,
118:23, 120:7, 120:13,
127:21, 135:1
**respectfully** [1] -
135:13
**respond** [2] - 46:13,
134:14
**response** [5] - 39:5,
76:22, 128:4, 132:2,
132:3
**responses** [2] - 35:7,
117:2
**responsive** [2] - 20:4,
137:15
**rest** [1] - 34:19
**restriction** [1] - 131:3
**result** [4] - 24:9,
68:25, 99:16, 103:21
**retain** [3] - 17:9,
69:19, 69:23
**retained** [1] - 77:5
**retains** [1] - 89:13
**retention** [4] - 67:13,
78:11, 95:5, 111:13
**retroactively** [1] -
37:11
**return** [11] - 9:3, 9:13,
19:5, 19:22, 28:11,
29:2, 103:14, 104:6,
135:12, 136:9
**returns** [11] - 10:17,
12:7, 15:22, 30:18,
72:7, 100:25, 101:1,
102:24, 104:9, 109:13,
132:12
**reverse** [1] - 7:20

**reversed** [1] - 7:11
**review** [1] - 114:8
**reviewed** [2] - 4:9,
63:25
**reviewing** [1] - 7:8
**reward** [4] - 83:19,
101:14, 112:8, 135:12
**rewarding** [1] - 100:9
**rewards** [4] - 83:25,
100:8, 100:10, 103:15
**rewrite** [1] - 124:15
**rewriting** [1] - 124:15
**rifling** [1] - 71:21
**rights** [7] - 24:1,
48:14, 48:15, 51:12,
52:12, 85:10
**Ripple** [16] - 22:20,
23:6, 25:15, 35:1,
47:12, 49:15, 77:18,
77:23, 84:25, 93:22,
97:14, 97:17, 97:21,
98:21, 129:18, 130:18
**rise** [11] - 68:3, 73:21,
81:24, 82:21, 86:25,
88:23, 95:9, 103:7,
103:22, 106:8, 108:16
**rises** [1] - 69:23
**risk** [4] - 36:15, 80:8,
130:19, 132:5
**risks** [1] - 21:4
**Rivera** [2] - 104:8,
130:18
**RMR** [1] - 2:9
**Rodriguez** [1] - 8:12
**role** [2] - 55:9, 110:9
**room** [1] - 126:17
**Room** [2] - 2:10,
138:13
**round** [1] - 117:3
**rounds** [2] - 110:20,
110:22
**routinely** [1] - 80:11
**Rule** [1] - 36:17
**rule** [4] - 4:17, 32:18,
89:11, 124:18
**rule-making** [1] -
124:18
**ruled** [2] - 8:4, 120:24
**rulemaking** [2] -
36:21, 124:18
**rules** [3] - 82:12,
82:13, 129:3
**ruling** [1] - 131:12
**run** [3] - 72:23,
130:19, 134:10
**running** [1] - 137:3

## S

**sale** [33] - 11:2, 15:6,

16:12, 19:15, 20:15,
22:2, 22:8, 27:16,
27:23, 34:22, 48:22,
52:1, 67:9, 70:19,
70:24, 72:16, 79:2,
79:17, 88:10, 89:16,
91:15, 93:6, 93:25,
100:17, 101:11,
101:16, 102:6, 104:22,
109:25, 111:25,
116:17, 128:22
**sales** [47] - 5:25,
21:11, 21:13, 21:17,
21:21, 22:7, 23:8,
23:11, 23:19, 25:10,
39:4, 41:2, 41:6, 49:24,
52:8, 59:13, 71:24,
72:10, 72:12, 72:13,
72:17, 79:20, 79:22,
86:22, 90:2, 92:1, 97:5,
97:16, 97:18, 97:20,
97:21, 97:22, 97:24,
97:25, 98:5, 98:7, 98:8,
98:9, 99:14, 99:17,
99:20, 105:10, 110:20,
110:25, 118:22,
129:13, 129:15
**sample** [2] - 105:13
**satisfied** [2] - 28:11,
85:7
**satisfies** [1] - 110:16
**satisfy** [7] - 22:9,
22:10, 52:21, 106:4,
120:19, 120:20, 136:13
**save** [2] - 65:25, 118:1
**savings** [2] - 132:16,
132:17
**saw** [1] - 46:11
**scale** [1] - 112:11
**scales** [1] - 23:7
**SCARLATO** [13] -
115:12, 115:19, 116:1,
116:7, 118:2, 118:13,
118:16, 118:19,
118:25, 119:3, 119:7,
119:14, 119:18
**Scarlato** [2] - 1:13,
3:11
**scenario** [1] - 109:3
**scheme** [11] - 5:20,
5:21, 6:12, 7:25, 9:10,
9:11, 9:12, 31:21,
41:22, 61:7, 115:5
**schemes** [2] - 6:6, 8:2
**scope** [5] - 13:6,
13:15, 105:15, 106:23,
122:24
**Scoville** [1] - 86:8
**SDNY** [6] - 11:24,
13:12, 17:24, 22:20,

23:5, 98:21
**searching** [1] - 55:7
**SEC** [92] - 7:5, 9:1,
13:6, 16:13, 20:14,
24:13, 24:24, 26:14,
31:9, 31:14, 31:24,
32:4, 32:5, 33:13,
33:19, 33:21, 33:24,
34:21, 35:4, 35:12,
35:21, 36:1, 36:10,
37:4, 39:10, 39:20,
40:1, 41:1, 41:6, 41:18,
42:8, 42:20, 42:23,
43:19, 44:14, 44:25,
46:21, 47:2, 47:4, 47:9,
47:17, 47:20, 48:25,
50:9, 50:13, 50:16,
52:10, 53:8, 56:17,
56:21, 56:23, 57:4,
57:9, 57:14, 59:13,
60:5, 61:11, 62:1, 62:9,
62:21, 63:22, 65:10,
65:12, 66:1, 71:6,
93:20, 94:6, 94:10,
116:22, 117:21,
119:21, 121:11,
122:14, 123:6, 123:7,
123:11, 123:16,
123:20, 124:12,
124:17, 125:14,
125:17, 125:20, 126:2,
126:15, 128:17,
130:12, 131:3, 131:8,
131:11, 134:2, 137:11
**SEC's** [16] - 16:6,
21:8, 31:12, 32:16,
41:11, 46:17, 47:19,
49:9, 49:11, 54:22,
58:7, 59:7, 60:9,
121:10, 129:6, 130:23
**second** [6] - 51:24,
59:8, 65:16, 92:12,
94:15, 97:4
**Second** [3] - 21:18,
59:19, 60:2
**secondary** [42] -
21:11, 21:13, 21:17,
21:21, 22:2, 22:6, 22:8,
22:21, 23:7, 24:20,
24:23, 45:6, 45:8, 51:6,
51:15, 51:23, 52:1,
52:8, 72:9, 86:24,
88:13, 88:25, 89:4,
90:2, 91:25, 95:8,
97:16, 97:18, 97:22,
97:24, 98:5, 98:7, 98:8,
98:9, 98:14, 98:17,
99:14, 99:17, 99:20,
111:4, 111:6, 129:8
**seconds** [2] - 133:2,

133:4
**Secrecy** [1] - 61:8
**Section** [18] - 40:15,
40:17, 71:22, 98:10,
98:23, 99:16, 116:8,
116:17, 116:19,
116:22, 116:24, 117:2,
117:8, 117:15, 118:7,
118:17, 118:20
**section** [1] - 133:17
**sector** [1] - 98:19
**securities** [55] - 12:25,
13:3, 13:7, 13:8, 13:15,
13:24, 16:25, 31:19,
34:22, 34:24, 35:25,
37:5, 39:1, 41:23,
46:10, 47:10, 52:8,
54:6, 54:20, 58:24,
67:18, 70:5, 70:19,
70:25, 71:5, 76:16,
77:7, 79:13, 79:20,
82:25, 99:17, 104:20,
105:14, 106:6, 114:18,
116:18, 117:19,
118:22, 121:11,
121:16, 121:25, 122:3,
123:19, 123:21,
123:25, 128:7, 128:11,
128:20, 128:23, 130:5,
130:15
**Securities** [22] - 1:3,
1:15, 1:18, 3:2, 3:9,
5:12, 33:20, 33:21,
35:1, 71:22, 98:10,
98:23, 99:16, 116:8,
116:17, 116:19,
116:22, 116:23,
117:15, 118:7, 118:16,
118:20
**security** [52] - 13:4,
13:9, 16:24, 17:13,
17:22, 19:2, 31:16,
31:25, 32:6, 48:2, 48:8,
48:12, 51:16, 52:7,
52:15, 52:16, 54:14,
54:20, 57:5, 59:21,
66:3, 66:7, 66:25,
70:11, 72:2, 79:21,
80:17, 80:24, 84:4,
84:8, 89:13, 89:15,
89:21, 90:3, 91:15,
94:4, 100:3, 100:16,
104:21, 105:3, 106:12,
106:13, 107:13,
113:10, 114:18,
118:21, 126:8, 126:15,
128:21, 131:11,
131:15, 135:17
**see** [16] - 32:1, 44:19,
47:15, 47:16, 54:17,

54:18, 54:19, 55:2, 55:3, 55:6, 74:7, 84:6, 131:14
**seek** [2] - 42:24, 43:13
**seeking** [4] - 37:10, 39:1, 39:3, 41:4
**seem** [7] - 7:23, 10:13, 47:11, 55:24, 79:24, 107:9, 125:11
**seizing** [1] - 95:23
**selection** [1] - 136:12
**self** [1] - 49:8
**self-certified** [1] - 49:8
**sell** [12] - 18:5, 31:21, 40:23, 51:3, 51:22, 52:19, 53:21, 69:3, 89:1, 96:8, 106:1, 111:9
**seller** [9] - 16:22, 21:6, 22:22, 23:11, 25:17, 27:16, 54:7, 78:19
**sellers** [2] - 45:11, 68:14
**selling** [9] - 20:24, 25:7, 28:6, 52:2, 54:1, 72:10, 107:22, 113:21, 134:3
**sells** [4] - 16:14, 16:21, 17:11, 92:8
**sense** [8] - 25:24, 30:18, 36:14, 58:9, 84:9, 117:7, 120:22
**sentences** [1] - 126:11
**separate** [9] - 19:25, 33:11, 65:5, 78:18, 84:6, 94:21, 96:7, 118:7, 132:19
**separated** [1] - 114:23
**separately** [4] - 16:3, 16:5, 58:14, 128:12
**service** [10] - 5:25, 73:8, 73:10, 73:12, 73:17, 73:19, 134:11, 136:21, 137:3, 137:5
**services** [5] - 30:10, 63:7, 85:7, 85:19, 118:22
**set** [7] - 6:3, 8:2, 31:22, 66:14, 78:24, 107:21, 137:17
**settled** [4] - 59:10, 59:12, 80:19, 119:21
**settlement** [11] - 46:2, 46:5, 46:6, 49:24, 50:11, 50:17, 113:13, 113:14, 113:18, 129:11
**settlements** [6] - 28:6, 28:12, 45:25, 50:10, 50:12, 50:14
**several** [2] - 6:10, 8:10

**SG** [3] - 86:9, 86:17, 87:2
**share** [5] - 16:16, 21:4, 51:13, 80:22
**Sharp** [3] - 42:8, 73:2, 137:11
**shifting** [1] - 137:7
**short** [3] - 5:3, 34:11, 62:13
**shot** [1] - 105:6
**show** [6] - 39:19, 44:10, 62:14, 77:12, 130:21, 137:8
**showing** [3] - 74:9, 121:14, 122:6
**shown** [1] - 130:3
**shows** [1] - 25:17
**sic** [1] - 58:2
**side** [8] - 24:12, 54:25, 57:11, 108:5, 112:24, 126:17
**sides** [2] - 35:13, 135:18
**signatory** [3] - 62:15, 62:20, 62:23
**significance** [1] - 31:3
**significant** [3] - 68:8, 69:19, 111:12
**significantly** [1] - 90:17
**similar** [10] - 23:2, 23:17, 27:14, 82:20, 86:21, 90:24, 95:1, 108:15, 120:9, 132:3
**simple** [3] - 21:8, 26:5, 102:18
**Simple** [3] - 27:5, 103:17, 117:10
**simply** [21] - 9:12, 21:5, 27:2, 27:15, 36:6, 36:23, 38:23, 39:6, 39:18, 39:22, 41:8, 42:13, 66:7, 66:18, 72:18, 76:5, 87:24, 93:4, 96:21, 129:16, 129:21
**simultaneously** [2] - 35:15, 36:3
**single** [6] - 9:22, 31:19, 31:24, 91:11, 135:16
**sitting** [1] - 125:3
**situation** [6] - 76:16, 76:17, 90:25, 92:11, 121:21
**situations** [1] - 53:14
**six** [2] - 61:12, 128:14
**six-month** [1] - 128:14
**Sixth** [1] - 64:12
**sixty** [1] - 133:4

**skip** [1] - 22:6
**skipped** [2] - 136:4
**sky** [3] - 5:12, 8:5, 8:24
**slide** [1] - 107:17
**slip** [1] - 107:17
**slip-slide** [1] - 107:17
**slow** [3] - 8:15, 8:17, 136:24
**Slow** [1] - 26:16
**smart** [2] - 25:24, 124:17
**smoke** [1] - 55:20
**so-called** [1] - 67:4
**social** [3] - 63:3, 82:5, 112:6
**sold** [37] - 16:18, 16:21, 19:4, 21:23, 21:25, 24:25, 27:12, 33:17, 47:14, 52:7, 52:20, 66:15, 66:21, 67:2, 67:10, 67:21, 70:4, 72:1, 72:4, 78:23, 83:7, 84:4, 84:11, 89:12, 98:17, 100:6, 102:11, 102:14, 105:3, 106:10, 106:13, 107:10, 110:3, 110:10, 117:10, 126:7, 129:21
**sole** [4] - 87:13, 87:14, 103:13, 104:8
**solely** [8] - 35:25, 73:16, 76:20, 87:9, 93:13, 102:24, 108:24, 108:25
**solicit** [2] - 63:4, 123:15
**solicitation** [3] - 62:11, 63:1, 105:10
**solicited** [1] - 123:12
**Solomon** [2] - 1:14, 3:13
**solution** [1] - 107:3
**someone** [8] - 31:13, 54:23, 68:1, 71:4, 73:1, 92:8, 93:5, 123:15
**sometimes** [2] - 11:9, 121:3
**somewhat** [2] - 78:14, 108:4
**sophisticated** [2] - 25:10, 77:19
**Sorry** [1] - 8:15
**sorry** [5] - 24:21, 28:3, 43:23, 98:12, 133:1
**sort** [11] - 5:15, 10:7, 39:23, 41:7, 43:9, 51:13, 75:8, 76:25, 82:12, 129:17, 130:3
**sought** [1] - 58:19

**source** [2] - 31:5, 75:24
**Southern** [7] - 7:23, 10:1, 10:12, 21:19, 25:6, 96:10, 137:1
**space** [3] - 36:7, 47:2, 88:2
**speaking** [3] - 3:5, 3:18, 3:24
**specific** [15] - 26:25, 27:21, 40:1, 42:2, 44:10, 63:5, 63:13, 64:1, 64:7, 64:18, 78:23, 80:25, 85:10, 117:11, 121:18
**specifically** [23] - 7:11, 7:14, 8:4, 11:11, 15:2, 41:1, 41:18, 71:23, 73:9, 84:13, 91:9, 95:21, 97:23, 112:10, 113:17, 116:15, 123:24, 129:10, 131:24, 135:2, 136:2, 136:7, 137:2
**specificity** [1] - 121:3
**speech** [3] - 6:23, 12:9, 12:11
**spend** [1] - 133:2
**spent** [2] - 54:24, 123:1
**split** [3] - 21:20, 23:4, 74:18
**spoken** [1] - 59:11
**spot** [3] - 49:17, 49:18, 52:25
**square** [2] - 12:11, 117:3
**stable** [1] - 24:17
**stablecoin** [3] - 66:23, 67:4, 100:15
**staffed** [1] - 88:5
**stage** [7] - 20:8, 75:19, 77:13, 85:18, 87:7, 116:13, 137:8
**staggering** [1] - 75:13
**stake** [3] - 33:7, 79:7, 133:23
**staked** [4] - 82:24, 83:10, 84:5, 136:1
**staking** [21] - 45:1, 83:2, 83:4, 83:7, 83:20, 83:23, 84:3, 84:6, 103:19, 104:3, 133:2, 133:6, 133:16, 133:17, 135:1, 135:5, 135:16, 135:18, 135:19, 135:22, 136:2
**stall** [1] - 17:10
**stand** [2] - 50:6, 125:7
**standalone** [1] - 67:9

**standard** [5] - 6:3, 54:18, 77:13, 81:2, 121:20

**standardized** [1] - 80:18

**standing** [3] - 56:1, 64:13, 66:6

**start** [14] - 4:7, 4:10, 4:13, 4:21, 5:7, 34:16, 34:23, 72:23, 73:25, 91:17, 109:21, 109:24, 115:20, 134:10

**started** [7] - 34:15, 57:23, 66:1, 90:7, 123:11, 125:12, 134:2

**starting** [2] - 3:5, 6:1

**state** [3] - 5:12, 8:5, 105:10

**statement** [7] - 57:17, 63:14, 74:7, 75:23, 75:24, 104:23, 125:21

**statements** [18] - 17:5, 47:23, 70:17, 77:10, 78:22, 82:5, 82:8, 84:14, 85:22, 88:17, 96:2, 105:21, 112:2, 112:6, 118:12, 123:8, 128:17, 128:23

**States** [25] - 2:10, 32:25, 39:4, 39:11, 39:13, 39:14, 39:24, 40:3, 41:16, 41:17, 41:19, 42:1, 42:15, 61:3, 61:19, 72:24, 73:2, 73:8, 73:20, 73:23, 115:18, 116:5, 116:18, 121:7, 134:11

**STATES** [2] - 1:1, 1:11

**static** [1] - 14:5

**statute** [22] - 7:2, 7:3, 9:9, 12:16, 13:1, 13:10, 19:10, 38:21, 39:9, 40:24, 72:22, 80:24, 116:11, 122:17, 122:24, 123:22, 129:24, 134:2, 134:5, 134:9, 134:19, 137:6

**statutes** [2] - 40:13, 80:17

**statutory** [9] - 5:13, 9:20, 10:6, 33:20, 38:24, 40:1, 43:5, 58:23, 61:7

**stay** [2] - 119:10, 119:15

**stenographic** [1] - 138:6

**step** [4] - 117:6, 117:7

**stepping** [1] - 121:4

**stick** [1] - 75:17

**still** [15] - 21:16, 35:10, 40:10, 53:19, 60:14, 61:1, 61:5, 67:20, 87:8, 89:21, 91:14, 92:1, 93:6, 134:3

**stilt** [1] - 61:4

**stock** [6] - 52:11, 92:1, 92:2, 92:3, 131:4

**stocks** [2] - 54:18, 80:18

**stood** [1] - 57:6

**stop** [1] - 81:7

**stopping** [1] - 35:19

**stops** [1] - 44:11

**strategic** [3] - 50:7, 50:8, 82:21

**strategically** [1] - 82:17

**strategy** [3] - 63:9, 83:23, 95:7

**Straub** [1] - 73:3

**strawmen** [1] - 121:19

**Street** [3] - 1:16, 1:19, 2:7

**strength** [1] - 18:13

**strengthen** [1] - 18:14

**stress** [1] - 75:10

**stressed** [1] - 75:13

**stretch** [1] - 31:12

**strict** [4] - 74:4, 74:12, 74:16, 75:25

**strong** [1] - 64:19

**strong-arming** [1] - 64:19

**stronger** [1] - 17:8

**strongly** [2] - 7:21, 90:4

**structure** [3] - 93:8, 95:8, 110:19

**structured** [1] - 111:12

**stuff** [1] - 17:4

**subject** [19] - 11:1, 38:9, 38:15, 38:19, 41:23, 42:22, 56:5, 56:11, 56:15, 66:11, 73:16, 93:22, 98:10, 114:12, 115:16, 115:20, 122:7, 123:19, 137:4

**submissions** [1] - 4:8

**submit** [14] - 10:20, 20:9, 21:7, 23:15, 26:13, 27:17, 29:15, 31:8, 42:13, 97:14, 99:17, 121:4, 129:14, 135:13

**submitted** [1] - 114:15

**subsequent** [1] - 97:23

**substantive** [1] -

115:23

**succeed** [1] - 16:17

**succeeds** [1] - 16:18

**success** [4] - 72:6, 75:1, 112:7, 112:9

**successful** [1] - 17:12

**sudden** [1] - 108:7

**sued** [1] - 36:2

**suffice** [2] - 30:10, 61:23

**sufficient** [8] - 51:7, 53:9, 58:6, 64:13, 76:12, 99:22, 105:9, 129:11

**suggest** [2] - 11:24, 43:9

**suggested** [4] - 6:24, 89:23, 126:20, 128:17

**suggesting** [3] - 32:24, 75:19, 89:11

**suggestion** [1] - 122:17

**Suite** [3] - 1:23, 2:3, 2:7

**Sullivan** [1] - 137:2

**summary** [2] - 87:7, 135:15

**superior** [1] - 21:15

**supervised** [1] - 125:25

**supplement** [1] - 63:20

**supplemental** [1] - 87:6

**supply** [6] - 14:12, 82:12, 82:13, 87:21, 87:24, 111:11

**support** [11] - 8:24, 11:10, 23:15, 29:7, 29:8, 62:14, 63:5, 74:13, 76:25, 92:7, 137:10

**supported** [1] - 16:7

**supporting** [3] - 37:24, 38:6, 84:15

**supports** [1] - 7:22

**supposed** [7] - 6:14, 16:8, 39:20, 53:11, 78:19, 108:13, 125:22

**Supreme** [19] - 5:18, 6:19, 7:6, 7:8, 7:11, 7:16, 9:2, 9:22, 10:10, 12:23, 26:23, 33:8, 39:7, 39:18, 39:24, 74:22, 74:23, 116:10, 132:5

**surprised** [1] - 50:9

**surround** [3] - 92:10, 93:24, 137:18

**surrounding** [8] - 8:3,

21:16, 31:23, 66:14, 89:16, 105:20, 110:8, 126:7

**survive** [1] - 116:6

**suspect** [1] - 15:4

**sustain** [2] - 55:19, 82:9

## T

**table** [5] - 3:10, 3:13, 3:19, 3:24, 40:19

**talks** [1] - 55:11, 74:11, 76:1, 86:15, 91:11, 118:3, 133:12

**targeted** [1] - 5:3

**teach** [1] - 63:22

**team** [2] - 95:7, 112:3

**Teamsters** [2] - 26:24, 130:16

**technology** [12] - 67:24, 68:10, 68:17, 68:25, 75:3, 83:24, 87:17, 109:13, 110:5, 110:6, 135:23, 136:10

**Telegram** [15] - 7:24, 10:3, 10:11, 21:11, 35:2, 46:23, 66:13, 74:11, 81:9, 90:23, 91:6, 94:7, 114:16, 126:1, 126:11

**ten** [4] - 42:22, 50:13, 54:24, 65:9

**ten-minute** [1] - 65:9

**tend** [1] - 11:15

**Tenreiro** [2] - 1:17, 3:9

**TENREIRO** [5] - 3:8, 126:19, 127:5, 127:8, 127:12

**tentacles** [1] - 61:2

**Tenth** [3] - 8:14, 8:19, 86:8

**term** [9] - 8:2, 9:11, 53:8, 53:12, 67:4, 81:3, 81:4, 81:5, 81:7

**terminomics** [1] - 78:7

**terms** [17] - 8:20, 8:23, 11:12, 21:11, 23:2, 28:24, 54:13, 54:14, 68:17, 79:21, 80:17, 80:22, 81:16, 87:3, 87:17, 88:14, 105:19

**Terraform** [8] - 22:25, 23:7, 49:14, 87:6, 98:14, 99:18, 100:14, 114:24

**terrific** [1] - 4:13

**terrorist** [1] - 113:9

**test** [25] - 13:23, 19:14, 25:4, 39:17,

39:20, 40:12, 40:18, 44:10, 51:8, 67:5, 74:1, 74:9, 76:10, 77:24, 90:23, 92:4, 101:4, 109:6, 110:16, 116:9, 117:4, 117:6, 120:12, 128:25, 136:13

**testimony** [1] - 98:1

**tests** [9] - 74:18, 74:23, 74:25, 75:15, 76:6, 76:8, 76:14, 97:9, 118:3

**Tether** [1] - 49:23

**text** [3] - 5:13, 10:6, 81:3

**textual** [1] - 80:12

**THE** [262] - 1:1, 1:1, 1:10, 3:1, 3:14, 3:15, 3:21, 4:1, 4:6, 5:9, 6:5, 6:7, 6:13, 7:23, 9:8, 10:11, 11:6, 11:13, 12:2, 12:10, 13:14, 13:19, 14:5, 14:8, 14:11, 14:22, 14:25, 15:7, 15:13, 15:19, 16:3, 17:2, 17:16, 18:12, 18:23, 19:12, 19:18, 20:5, 20:11, 20:13, 20:21, 20:25, 21:10, 22:6, 22:13, 22:23, 24:10, 24:21, 25:5, 25:23, 26:11, 26:16, 26:19, 27:8, 27:21, 28:1, 28:15, 28:21, 29:4, 29:13, 29:16, 30:4, 30:7, 30:13, 30:20, 30:23, 31:17, 32:8, 32:22, 33:15, 34:3, 34:5, 34:11, 34:13, 34:15, 35:17, 36:8, 37:1, 37:13, 37:22, 38:7, 38:15, 38:20, 38:25, 40:4, 40:20, 41:10, 42:2, 42:16, 43:8, 43:22, 43:24, 44:15, 44:19, 44:22, 45:19, 46:8, 47:9, 47:25, 48:4, 48:8, 48:10, 48:19, 49:11, 50:1, 50:18, 51:15, 51:20, 52:4, 52:14, 52:18, 53:11, 53:19, 54:5, 55:10, 55:23, 56:7, 56:17, 56:22, 57:24, 58:17, 60:4, 60:10, 60:22, 61:14, 64:4, 64:9, 64:24, 65:7, 65:12, 65:15, 65:22, 66:5, 66:10, 66:22, 67:8,

67:16, 68:13, 69:2, 69:11, 69:25, 70:7, 70:12, 70:16, 70:23, 71:3, 71:10, 71:14, 71:17, 72:9, 73:24, 74:7, 75:17, 75:22, 76:15, 77:17, 78:1, 78:13, 79:5, 81:8, 82:3, 82:7, 82:23, 83:5, 83:9, 84:2, 84:17, 84:22, 85:12, 85:21, 87:5, 88:3, 88:9, 89:7, 90:1, 90:6, 91:5, 91:24, 93:19, 94:14, 95:13, 96:9, 97:4, 97:15, 97:19, 99:1, 99:5, 99:8, 99:21, 100:23, 101:13, 101:21, 102:3, 102:13, 102:18, 103:9, 103:24, 104:3, 104:12, 105:17, 106:11, 107:4, 107:16, 109:16, 109:20, 111:16, 112:12, 112:15, 113:21, 114:1, 114:9, 115:1, 115:7, 115:15, 115:25, 116:4, 117:20, 118:10, 118:14, 118:18, 118:23, 119:2, 119:6, 119:9, 119:15, 119:19, 119:23, 120:7, 122:9, 122:14, 125:5, 126:5, 126:13, 126:16, 126:23, 127:6, 127:11, 127:13, 128:19, 129:24, 130:8, 130:11, 131:18, 132:24, 133:4, 133:7, 133:19, 134:1, 134:8, 134:13, 134:16, 134:20, 134:23, 135:4, 135:14, 135:24, 136:4, 136:15, 136:20, 136:23, 137:12, 137:14

**themes** [1] - 75:15

**themselves** [8] - 3:6, 30:10, 44:1, 46:22, 51:7, 53:21, 66:12, 96:7

**theory** [13] - 7:24, 13:21, 41:11, 41:20, 43:10, 43:15, 46:17, 49:1, 59:7, 59:13, 74:3, 88:11, 129:7

**thereafter** [1] - 40:24

**therefore** [3] - 49:2, 72:1, 106:13

**thereupon** [1] - 77:15

**they've** [5] - 41:8, 42:21, 73:4, 111:24, 112:1

**thinking** [2] - 124:14, 124:18

**third** [18] - 23:17, 24:3, 27:9, 27:13, 27:18, 51:10, 59:15, 76:19, 76:21, 78:8, 87:8, 88:18, 90:15, 95:13, 96:22, 104:13, 106:17

**third-party** [9] - 23:17, 27:9, 27:13, 27:18, 51:10, 78:8, 88:18, 96:22, 104:13

**thorough** [1] - 26:2

**thought-through** [1] - 26:2

**thousands** [1] - 128:24

**thread** [1] - 59:17

**three** [12] - 5:20, 6:17, 13:23, 19:18, 46:4, 50:12, 61:5, 62:21, 69:12, 74:6, 110:25, 130:21

**three-part** [1] - 13:23

**throughout** [2] - 37:8, 96:13

**thrust** [1] - 20:19

**tie** [2] - 68:24, 88:11

**tied** [7] - 19:5, 64:18, 69:21, 93:9, 99:25, 102:8, 102:15

**tight** [1] - 39:19

**time-barred** [4] - 20:10, 29:9, 71:14, 134:7

**timed** [1] - 50:6

**timing** [3] - 61:10, 61:21

**tip** [1] - 107:7

**today** [4] - 3:18, 4:20, 38:1, 99:9

**together** [4] - 18:6, 68:3, 94:20, 110:21

**token** [37] - 36:14, 48:11, 48:14, 48:15, 48:16, 51:9, 52:10, 66:2, 68:1, 68:2, 72:5, 72:7, 84:25, 88:22, 91:1, 92:14, 92:20, 93:3, 93:18, 93:20, 94:16, 95:24, 97:11, 97:13, 100:2, 100:21, 100:22, 101:12, 107:4, 108:24, 111:9, 114:10, 128:24

**tokenized** [1] - 34:1

**tokens** [37] - 22:21, 23:17, 27:9, 27:14, 34:22, 35:11, 35:13, 35:24, 37:5, 41:3, 66:6,

67:13, 68:21, 69:18, 69:19, 69:22, 71:1, 75:5, 77:5, 78:9, 78:11, 88:1, 88:16, 88:18, 89:1, 89:5, 93:15, 96:22, 96:25, 98:22, 105:12, 107:1, 109:2, 109:9, 110:24, 111:13, 112:1

**took** [6] - 29:16, 50:20, 71:6, 82:10, 90:3, 125:16

**top** [2] - 58:5, 68:7

**Topps** [1] - 18:19

**totality** [11] - 19:3, 66:12, 66:20, 79:1, 81:9, 84:10, 89:16, 91:12, 93:24, 105:19, 108:22

**touch** [2] - 24:11, 73:3

**touched** [1] - 27:10

**touching** [1] - 124:24

**tout** [1] - 53:4

**touted** [1] - 91:16

**touting** [6] - 18:13, 18:17, 21:15, 72:6, 91:14, 112:2

**touts** [1] - 82:18

**traced** [1] - 73:4

**trade** [2] - 18:8

**traded** [3] - 64:20, 105:14, 128:14

**trades** [2] - 45:8, 128:12

**Trading** [4] - 48:24, 70:13, 112:22, 119:5

**trading** [10] - 31:1, 45:1, 45:15, 47:8, 49:5, 54:1, 54:2, 107:23, 122:2

**transaction** [11] - 5:20, 5:21, 6:7, 8:3, 31:22, 31:23, 39:17, 40:12, 57:20, 58:14, 117:4

**transactional** [2] - 40:14, 40:18

**transactions** [22] - 6:8, 12:18, 18:6, 35:24, 40:15, 43:20, 45:7, 45:8, 48:17, 49:18, 49:19, 51:7, 51:15, 52:9, 53:18, 56:4, 58:12, 58:15, 116:25, 118:3, 129:18

**transcript** [2] - 138:5, 138:6

**TRANSCRIPT** [1] - 1:9

**transfer** [3] - 24:7, 26:22, 128:21

**transferable** [1] - 80:22

**transferred** [1] - 26:23

**transform** [2] - 53:9, 58:6

**treated** [1] - 82:20

**trials** [1] - 104:17

**tried** [2] - 35:21, 124:6

**trillion** [3] - 29:22, 30:25, 31:1

**trillions** [1] - 33:6

**TRO** [4] - 4:16, 104:19, 107:21, 124:9

**true** [10] - 11:14, 14:4, 17:17, 29:12, 77:15, 78:18, 94:2, 128:21, 138:5, 138:6

**truisms** [1] - 11:10

**trust** [2] - 45:15, 101:9

**try** [2] - 22:5, 123:4

**trying** [7] - 20:3, 87:22, 96:7, 102:4, 107:12, 122:16, 123:15

**turn** [6] - 22:5, 34:7, 42:18, 70:10, 106:21, 114:7

**turns** [1] - 115:5

**twice** [1] - 59:19

**Twitter** [1] - 63:6

**two** [26] - 6:17, 7:1, 13:16, 22:19, 26:8, 26:13, 45:2, 46:15, 49:15, 53:6, 57:6, 57:13, 62:6, 64:2, 64:21, 73:3, 89:19, 89:20, 98:19, 112:24, 117:6, 117:7, 118:3, 118:8, 120:23, 132:4

**two-step** [1] - 117:6

**tying** [1] - 90:12

**type** [6] - 40:5, 49:17, 54:17, 58:3, 81:18, 133:22

**types** [6] - 12:18, 52:8, 54:2, 54:16, 55:1, 58:15

## U

**U.S** [29] - 24:25, 38:8, 38:22, 39:2, 39:14, 44:11, 61:17, 61:18, 62:11, 62:15, 63:1, 63:4, 63:10, 70:4, 86:8, 99:25, 106:16, 111:5, 116:3, 117:10, 117:23, 117:25, 118:12, 121:16, 121:20, 121:24, 122:7, 127:21

**unable** [1] - 32:5

**unclear** [1] - 32:7

**unconstitutionally** [1] - 123:22

**under** [25] - 5:11, 26:22, 29:23, 36:17, 36:19, 38:20, 39:6, 39:16, 44:9, 49:19, 60:18, 63:13, 81:17, 98:23, 98:24, 106:4, 114:4, 114:18, 118:14, 121:11, 121:21, 121:25, 136:14, 137:6, 137:18

**Under** [1] - 21:3

**underlying** [5] - 61:22, 80:3, 110:5, 114:10, 120:20

**underscore** [1] - 4:16

**underscored** [1] - 15:16

**underscores** [1] - 111:16

**understandings** [10] - 52:21, 56:24, 66:14, 78:24, 81:11, 91:9, 92:9, 93:24, 95:17, 105:22

**understood** [5] - 15:12, 31:16, 49:18, 54:3, 54:12

**undertake** [1] - 96:2

**undertaking** [2] - 79:11, 96:24

**undertook** [1] - 80:13

**undisputed** [1] - 26:14

**undoubtedly** [1] - 17:11

**unique** [1] - 35:23

**UNITED** [2] - 1:1, 1:11

**United** [25] - 2:10, 32:25, 39:4, 39:11, 39:13, 39:14, 39:24, 40:3, 41:16, 41:17, 41:19, 42:1, 42:15, 61:3, 61:19, 72:24, 73:2, 73:8, 73:20, 73:23, 115:18, 116:5, 116:18, 121:7, 134:11

**unless** [7] - 57:7, 57:12, 72:23, 109:15, 126:4, 127:2, 132:23

**unusually** [1] - 121:14

**unwieldy** [1] - 119:22

**up** [49] - 5:1, 5:2, 10:4, 10:23, 14:8, 14:9, 14:10, 14:15, 16:18, 16:23, 24:3, 26:17, 26:25, 27:1, 31:13, 32:1, 32:8, 43:3, 43:15, 44:12, 46:21, 50:6,

54:10, 57:6, 59:16, 60:8, 60:13, 75:4, 76:18, 77:7, 82:14, 84:19, 85:10, 88:4, 94:20, 103:10, 106:20, 107:3, 108:1, 111:23, 116:10, 124:1, 125:7, 130:13, 130:19, 131:8, 136:11

**USD** [2] - 49:22, 114:7

**USDT** [2] - 100:15, 100:17

**use-case** [1] - 109:3

**useful** [1] - 53:5

**users** [1] - 63:22

**uses** [4] - 6:6, 16:14, 18:21, 87:7

**usurping** [1] - 80:9

## V

**vagaries** [1] - 122:20

**vague** [5] - 12:12, 39:12, 39:23, 86:1, 123:22

**validate** [1] - 109:25

**validation** [1] - 67:19

**validator** [1] - 136:8

**value** [52] - 14:1, 14:5, 14:7, 14:15, 15:2, 15:3, 15:22, 16:9, 16:19, 16:23, 17:9, 24:17, 28:19, 29:8, 31:14, 53:3, 54:9, 55:19, 66:24, 68:20, 69:22, 77:6, 78:17, 82:9, 83:11, 83:13, 84:14, 84:19, 87:11, 87:19, 90:12, 91:22, 93:9, 93:12, 93:13, 94:11, 94:20, 96:25, 103:7, 103:9, 110:5, 110:6, 110:12, 111:2, 111:7, 111:10, 112:1, 128:13

**valued** [1] - 99:25

**values** [1] - 68:2

**variable** [3] - 9:13, 80:20, 104:9

**varies** [1] - 103:12

**variety** [5] - 67:14, 76:6, 76:14, 103:6, 103:18

**various** [4] - 59:2, 80:16, 89:5, 112:2

**Vault** [1] - 117:10

**vault** [4] - 26:6, 27:5, 102:19, 135:19

**vaults** [1] - 103:23

**version** [1] - 110:25

**versus** [11] - 3:3, 9:1,

13:15, 26:24, 54:14, 54:15, 57:24, 85:5, 119:12, 124:7, 130:16

**vertical** [5] - 74:4, 74:13, 74:20, 75:25, 76:2

**vesting** [1] - 111:14

**viability** [1] - 93:18

**viable** [2] - 35:16, 36:7

**viatical** [8] - 28:6, 28:12, 45:25, 46:1, 46:2, 46:5, 46:6, 129:11

**view** [9] - 5:22, 23:3, 47:19, 47:22, 49:10, 49:12, 52:15, 58:17, 75:11

**viewed** [1] - 77:15

**viewpoint** [1] - 69:3

**vigorously** [1] - 20:7

**Viola** [1] - 69:21

**violated** [2] - 39:9, 104:20

**violating** [1] - 123:24

**violation** [7] - 40:2, 41:8, 41:24, 43:4, 43:10, 105:16, 106:21

**violations** [2] - 99:15, 106:23

**VIP** [2] - 63:15, 63:21

**Virgin** [1] - 91:2

**virtually** [1] - 31:13

**void** [1] - 43:18

**volume** [2] - 31:2, 63:16

**voluntary** [1] - 53:7

**voting** [3] - 48:14, 51:12, 52:12

**vs** [1] - 1:5

## W

**waiting** [2] - 43:18, 44:14

**walk** [2] - 123:5, 136:17

**wants** [2] - 17:12, 18:19

**warned** [1] - 39:25

**warning** [1] - 105:6

**warrantee** [1] - 5:25

**wary** [1] - 39:25

**wash** [2] - 49:24, 59:13

**Washington** [7] - 1:6, 1:16, 1:23, 2:4, 2:7, 2:11, 138:14

**wasting** [1] - 15:9

**water** [1] - 22:12

**Watkins** [3] - 2:6, 4:3,

4:5
**ways** [4] - 39:21, 107:18, 117:22, 124:16
**web** [1] - 112:6
**week** [1] - 50:1
**weekend** [1] - 51:11
**weeks** [1] - 53:6
**weight** [2] - 64:10, 132:6
**Weinstein** [2] - 57:24, 58:10
**well-settled** [1] - 80:19
**whereas** [1] - 27:1
**whiskey** [1] - 86:19
**white** [4] - 17:4, 25:11, 78:6, 82:5
**whole** [4] - 12:14, 111:16, 115:17, 119:12
**widely** [3] - 54:12, 95:19, 112:5
**widespread** [2] - 88:16, 88:19
**William** [1] - 2:6
**Williamson** [1] - 59:1
**wish** [1] - 131:6
**withdrawn** [3] - 26:15, 26:18, 132:8
**Woodward** [3] - 8:14, 8:19, 59:18
**word** [6] - 8:1, 9:6, 9:7, 9:9, 9:10, 127:14
**words** [3] - 6:6, 21:14, 67:19
**world** [6] - 43:18, 44:8, 44:13, 49:12, 73:11, 115:17
**world's** [1] - 18:25
**worldwide** [1] - 73:12
**worth** [1] - 55:15
**writ** [1] - 124:14
**writing** [2] - 127:11, 127:24
**written** [6] - 4:12, 4:13, 10:4, 78:16, 81:12, 81:17
**wrote** [2] - 63:24, 125:25

## Y

**year** [2] - 32:15, 62:2
**years** [8] - 36:13, 42:23, 45:24, 49:6, 54:24, 71:7, 110:25, 131:5
**yield** [8] - 100:18, 103:10, 103:12, 103:14, 104:4, 104:7, 115:6
**yield-generating** [1] -

100:18
**yielding** [1] - 67:3
**York** [6] - 1:19, 7:24, 10:1, 21:20, 74:10, 137:1
**yourself** [1] - 65:16

## Z

**Zhao** [24] - 2:5, 35:3, 38:13, 59:9, 61:9, 62:15, 62:19, 62:23, 63:3, 63:6, 63:9, 63:15, 63:23, 65:3, 68:23, 78:11, 82:18, 90:10, 90:15, 91:20, 118:24, 121:6, 127:17
**Zhao's** [1] - 60:18
**Zhou** [3] - 4:3, 62:7, 121:22
**zoom** [1] - 121:3
**zooming** [1] - 121:2