## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>BINANCE HOLDINGS LIMITED, BAM TRADING SERVICES INC., BAM MANAGEMENT US HOLDINGS INC., AND CHANGPENG ZHAO,<br><br>*Defendants*. | No. 1-23-cv-01599-ABJ-ZMF |

## JOINT STATUS REPORT

Pursuant to the Court's January 26, 2024 Minute Order, Plaintiff Securities and Exchange Commission ("SEC"), Defendants BAM Management US Holdings Inc., BAM Trading Services Inc. (collectively, "BAM"), Binance Holdings Limited ("BHL" or "Binance"), and Changpeng Zhao ("Zhao"), respectfully submit this Joint Status Report.

### I.  **BAM-Related Discovery**

#### A.  The SEC's Position

##### 1.  Status of Expedited Discovery

Since the parties' last status report, submitted on January 25, 2024, the SEC has continued to work with BAM regarding expedited discovery to attempt to resolve outstanding questions relating to BAM's compliance with the Consent Order, Dkt. No. 71.  But the SEC believes it is at an impasse with BAM as to certain key questions that BAM has been unable or unwilling to answer, and thus, the Court's intervention is warranted, as explained below.

On January 23, 2024, BAM conducted what it considered an "inspection" of its software and infrastructure relating to Customer Assets.[1]  Despite multiple meet and confers concerning its scope and process, BAM refused to conduct anything more than an unrecorded,[2] mostly choreographed tour of certain relevant software and infrastructure relevant to its Customer Assets, subject to the SEC's objections.  BAM's counsel also refused the SEC's requests to review different components of BAM's software, and then refused to answer several questions SEC counsel raised during the inspection that relate to core issues under the Consent Order.  For example, BAM refused to answer questions regarding how its PNK system interacts with the wallet software and private keys, and BAM refused to demonstrate its process for "whitelisting" wallets to enable transfers of crypto assets.  *See also* Ex. 1, Feb. 8, 2024 Matthew Scarlato Ltr., at 2-3 (describing several flaws in BAM's inspection).  That BAM was able to show how it inputs instructions, and how transfers were effected as a result does not demonstrate how the systems and software work, or how the private keys are controlled to effectuate these transfers.

Later on January 23, 2024, BAM informed the SEC that it would produce certain specific communications the SEC requested nearly four months earlier in its September 21, 2023 targeted discovery requests, and asserted that "any additional discovery would far exceed the bounds of the Consent Order and the Federal Rules of Evidence"—notwithstanding various pending requests and outstanding issues that the SEC had previously described to BAM in its December 22, 2023 letter (*see, e.g.*, Jan. 25, 2024 Joint Status Report, at 1-2, Dkt. No. 211).  *See* Ex. 2, Jan. 23, 2024 Matthew Laroche Ltr., at 2.  Among other things, BAM refused to comply with basic

---

[1] "Customer Assets" and other capitalized, undefined terms herein are defined consistent with the Consent Order.

[2] BAM refused the SEC's requests to record or otherwise memorialize the inspection, instead representing that it took screenshots of the materials presented, which BAM will not produce to the SEC because of purported security issues.

discovery obligations, such as producing attachments and metadata associated with responsive

documents, or providing written responses to each of the SEC's September 21, 2023 targeted

discovery requests, which would identify the scope of BAM's production and state whether

BAM was withholding documents on the basis of privilege.  *Id*.

On February 8, 2024, the SEC sent BAM a letter detailing the deficiencies in BAM's

inspection, and again identifying the key issues that remain to be resolved by expedited

discovery, including those set forth below.  Ex. 1, Feb. 8, 2024 Scarlato Ltr.[3]  BAM responded

on February 13, 2024, disputing the SEC's factual assertions and again affirming that it believes

it "has more than adequately complied with its obligations under the Consent Order." Ex. 3, Feb.

13, 2024 Laroche Ltr.  Yet, given the outstanding questions that remain, the SEC cannot simply

accept BAM's representations concerning the security of its assets and that it is in compliance

with the Consent Order without further discovery.

From the beginning of this litigation, BAM has represented to the SEC and to the Court

that it has sole custody and control over its Customer Assets (including Private and

Administrative Keys) and related transfers and withdrawals, including to the exclusion of the

Binance Entities.  *See, e.g.*, Ex. 4, June 12, 2023 Decl. of Erik Kellogg ("Kellogg Decl."), ¶ 33.d,

Dkt. No. 42 ("BAM Trading maintains exclusive control over the crypto assets it maintains in

the wallet custody software on behalf of its customers and its own account."); *id.* ¶ 42 ("No BHL

employee or combination of employees have the ability or authority to move assets within BAM

Trading's wallets (whether cold or hot) or to external wallets outside of BAM Trading'[s]

---

[3] On February 7, 2024, BAM made the promised production of certain communications
responsive to the SEC's September 21, 2023 targeted discovery requests.  Given its size, the SEC
has still not been able to process it for review, but, based on counsel's representations, it does not
appear that this production will answer the outstanding questions.

control."); *see also id.* ¶¶ 29, 30.a.ii, 44.  Among other things, BAM's representations rested upon the PNK and TSS systems and related controls, including its "whitelisting" process whereby crypto assets could only be transferred to wallets that were previously approved by all of its key shardholders, some of which were BAM employees, because that effectively prohibited BHL from "transfer[ing] staked crypto assets off of the BAM Trading platform."  *Id.* ¶ 36.b.  BAM also relied on its six-member clearing team that it initiated transfer requests to shardholders, and asserted they were not "currently associated with BHL" and did not have "any relationship with Mr. Zhao."  *Id.* ¶ 33.c.  Then, after the Court entered the Consent Order, BAM certified it has "maintained sole possession, custody, and control of Customer Assets in the United States since at least June 17, 2023, except to the extent that Customer Assets are held by non-affiliated third-party custodians located in the United States" to the exclusion of BHL, Zhao, or any other Binance Entity.  Ex. 5, June 29, 2023 Confirmation of Erik Kellogg, ¶¶ 2-3, 6.

Since June 2023, the SEC has engaged in expedited discovery to evaluate and confirm BAM's assertions and its compliance with the Consent Order.  This discovery included whether BAM was in compliance with the Consent Order's core provisions that (1) BAM personnel in the United States have "sole" and "complete" possession, custody, and control of all Customer Assets; (2) all transfers and withdrawals of Customer Assets will solely be under the direction and control of BAM personnel or a non-affiliated third party custodian located in the United States; (3) the Binance Entities lack "possession, custody or control over Customer Assets;" and (4) BAM will establish New Private and Administrative Keys that are within "the sole possession, custody, and control of BAM Trading officers and employees who are located in the United States . . . [and they] will not be provided to or in any way shared with the Binance Entities."  Consent Order §§ I-II.

Expedited discovery to date has revealed facts that appear different than the state of affairs certified by BAM in June 2023 and do not sufficiently demonstrate BAM's compliance with some of the Consent Order's core requirements.  Moreover, it has become apparent that BAM made various changes to the processes and controls it described in these initial declarations, including as to the roles and access of BAM and BHL personnel with respect to systems relevant to the custody and control of BAM's corporate and Customer Assets (described below).  However, for almost all of these changes, BAM has not affirmatively disclosed or provided sufficient information in a timely manner, requiring the SEC to try to piece together these events after the fact through depositions and delayed and incomplete document productions, which has undermined the efficiency of this process.  The following are the key outstanding questions concerning BAM's compliance with the Consent Order.

     i.   ***Whether BHL has Any Custody or Control of BAM's Hot and Customer Deposit Wallets***

*First,* expedited discovery has cast doubt upon BAM's claims that it exclusively controls the private keys, Customer Assets, and related transfers and withdrawals in its customer deposit and "hot" (or internet-connected) wallets through its "PNK" system.

BAM witnesses have testified that BHL established and still retains custody of the private keys to these wallets in an Amazon Web Services ("AWS") environment that hosts BHL's servers and wallet software for BAM's wallets, and that BAM had no access to the AWS environment, servers, or software.  Ex. 6, Erik Kellogg Depo. Tr. 199:4-16; 200:11-204:2; Ex. 7, Justin Brecese Depo. Tr. 42:7-12, 46:1-47:6.

In November 2023, BAM supplemented its interrogatory responses, stating for the first time that BAM "is now in control of the root account for the Amazon Web Services ("AWS") datacenter in northern Virginia that houses the servers running the wallet custody software used

by BAM." Ex. 8, BAM's Supp. Response to Interrogatory No. 6. However, the SEC has not

had an opportunity to evaluate that assertion with a knowledgeable witness, including to confirm

the parties are discussing the same AWS environment among the multiple AWS environments

that are relevant to the Binance.US Platform and BAM corporate and Customer Assets.

Moreover, BAM has not explained whether BHL or any other Binance Entity shares such

control. In addition, BAM has not claimed that gaining "control of the root account" provides

BAM with access to and exclusive control of the wallet software and private keys to its wallets,

or answers the ultimate question of how the private keys for these wallets are held, which

remains unanswered as of today. Indeed, BAM's Chief Information Security Officer ("CISO")

previously testified that being a root account holder for a particular AWS environment generally

does not itself entail rights over or access to servers, software, and data maintained in that

particular AWS environment. Ex. 6, Kellogg Depo. Tr. 126:6-129:8. If that is the case here,

BAM would still have no access to, or control over, the servers and software associated with

BAM's wallets and private keys. BAM has not produced any evidence that its newly acquired

control of the root account to the AWS environment provides it with such access, or that it

results in the exclusion of BHL's custody and control over the private keys and Customer Assets,

as the Consent Order requires.

Moreover, discovery has revealed that BHL can at least effect transfers of BAM's crypto

assets from customer deposit wallets to hot wallets when transfers get "stuck" while using the

PNK system. BAM's Head of Clearing, Tao Zhang, testified that he routinely reaches out to a

chat group involving BHL employees that he calls the "BHL wallet team" when BAM's clearing

team has "technical issues" with respect to asset movement. *See* Ex. 9, Tao Zhang Depo. Tr.

70:6-72:13. He described one instance where BHL intervened to effectuate a movement of

customer assets to BAM's hot wallet, but he could not describe how BHL fixed the issue.  *Id.*
72:14-74:3 ("They didn't tell us what they did with it, so I don't know.  It is just that afterwards
they would tell…us that it's been fixed.  And then when we go to check the deposit address, we
notice that the transfer has been successful.  It has been transferred to the hot wallet from the
deposit wallet.").  The SEC has repeatedly sought further discovery to confirm the scope of
BHL's ability to move customer assets, as it raised at the last Court hearing.  *See* Ex. 10, Nov.
27, 2023 Hr'ing Tr. 10-12.  But BAM has not meaningfully responded, including by failing to
explain how PNK interacts with the wallet software and private keys.

Further, BAM recently produced PNK access logs that reflect frequent access by several
individuals with email addresses that have a "binancecf.net" domain name, and, despite repeated
requests, BAM has refused to provide information concerning this domain name to determine
whether these employees are associated with a Binance Entity.  *See* Ex. 11, Excerpt of
BAM_SEC_LIT_00005053.  In all, these facts that have been revealed in expedited discovery
raise questions as to BAM's assertion that the PNK system controls BAM's customer deposit
and hot wallets to the exclusion of BHL or any other Binance Entity.

### ii.  *Whether BHL Has Custody or Control of BAM's Cold Storage and Staking Wallets*

*Second*, as to BAM's cold storage wallets and staking wallets—which BAM claims it
controls through its Threshold Signature Scheme, or "TSS," protocol and seven key shard
devices—expedited discovery has revealed that BAM has only a surface-level interaction with
the TSS software.  BAM does not have access to or control of the back end of the software, and
BAM witnesses could not explain how the TSS software operates to control and otherwise
transfer Customer Assets.  *See, e.g.*, Ex. 6, Kellogg Depo. Tr. 75:1-76:17, 106:12-107:9.  Again,
that BAM's inspection demonstrated how it inputs instructions into the software interface, and

how transfers were effected as a result, does not evidence how the systems and software work to effectuate these transfers.

The evidence demonstrates that, as of June 2023, a senior BHL employee, Guangying "Heina" Chen, set up at least three electronic devices that maintained BAM's key shards, and maintained a hardware wallet on which BAM customer and company assets were staked. In fact, BAM's CISO had to meet Chen abroad in June 2023 to retrieve and repatriate BAM's key shard devices and staking ledger. *See* Ex. 6, Kellogg Depo. Tr. 338:20-344:16; Ex. 12, Depo. Ex. 104; Ex. 13, Gerry Ho Depo. Tr. 242:7-22; 278:20-284:20.

The evidentiary record further suggests that Chen has continued to play a role in BAM's TSS protocol post-Consent Order. On August 31, 2023, BAM's Head of Clearing testified that Chen was the "administrator" of its TSS protocol, with the ability to designate who has access to the TSS system. Ex. 9, Zhang Depo. Tr. 133:7-134:18. And as recently as September 2023, Chen and other BHL personnel have accessed TSS. *See, e.g.*, Ex. 14, Excerpt of BAM_SEC_LIT_00005075. Further, an Apple ID address that appears to be associated with Chen also appeared on several repatriated key shard devices. Ex. 15, ▇▇▇▇▇ Depo. Tr. 71:3-72:19; Ex. 16, ▇▇▇▇▇ Depo. Tr. 292:2-23.[4]

While BAM made conclusory representations during the inspection that Chen is no longer the administrator of the TSS Portal, BAM refused to show real-time access and administrative rights to the TSS Portal to confirm this representation. Further, BAM has not sufficiently explained how recently produced screenshots that appear to reflect some individuals

---

[4] Chen's involvement with the TSS Protocol is particularly concerning given that she is at the heart of the Complaint's factual allegations concerning BHL's control over BAM's operations, such as that Chen (who is identified as the "Back Office Manager" in the Complaint) controlled BAM's bank accounts and clearing operations. *See, e.g.*, Compl. ¶¶ 166, 169, 200, Dkt. No. 1.

with access to TSS provide complete information as to what users have access to and their

administrative rights for the TSS portal.  Nor do these screenshots demonstrate what rights the

identified individuals with access have, and when this identified change to TSS Portal

administrator occurred.  Like many other aspects of expedited discovery, access and

administration of the TSS Portal appears to be a moving target.  BAM has not provided an

updated access or activity log, change management log, or description of different user rights

that evidence Chen's or other BHL employee's current access to these systems.

### iii.   *Whether BAM Personnel Located Outside the United States Are Controlling BAM Customer Assets and Are Also Receiving Compensation from Binance Entities*

*Third*, expedited discovery has raised additional questions as to whether BAM employees

in the United States exercise complete control over Customer Assets and related transfers, and

whether its employees are working solely for BAM without control or influence by Binance

Entities.  BAM's Head of Clearing, Zhang, is based in Canada, and expedited discovery has

revealed he is the "initiator" of transfers of Customer Assets from BAM's cold to hot wallets and

its staking operations, and whitelisting requests.  *See* Ex. 9, Zhang Depo. Tr. 113:12-115:24,

143:12-144:4; Ex. 17, Christopher Blodgett Depo. Tr. 105:20-25.  Thus, regardless of whether

BAM's TSS key shards are currently within the United States and controlled by U.S.-based

employees, Zhang's role is necessary to initiate asset transfers, its staking operations, and to

whitelist wallets.

Further, several BAM shardholders have testified that they rely on Zhang when

approving requests Zhang initiates.  *See, e.g.*, Ex. 15, ███ Depo. Tr. 88:23-94:12; Ex. 7, ███

Depo. Tr. 54:14-55:15; 57:11-58:6, 63:5-64:19; Ex. 16, ███ Depo. Tr. 250:14-259:21.

Although deponents more recently identified a new process in which BAM's Head of Treasury

conducts a first-level review of transactions initiated by Zhang, BAM has not provided any information detailing what this new approval process examines to ensure compliance with the Consent Order.  And during her testimony, the Head of Treasury did not sufficiently describe her process for reviewing these transactions, or describe how her review ensures compliance with the Consent Order.  Ex. 18, Sara Sisenwein Depo. Tr. 213:1-215:8.  Put together, the evidentiary record indicates that significant control over BAM's crypto assets and Customer Assets and related transfers is exercised from outside the United States.

In addition, expedited discovery has revealed that numerous Canada-based BAM employees receive substantial compensation that is not paid by BAM, but directly or indirectly by ***Binance Entities***.  BAM's counsel has admitted this fact.  Ex. 19, Nov. 20, 2023 Matthew Beville Ltr., at 2 ("[C]ertain BAM employees who relocated to Vancouver, including Gerry Ho and Rose Gao, receive an allowance that is currently being paid by an entity affiliated with BHL.").  Counsel for BAM has further indicated that one source of compensation is an entity called "BPlay," but has refused to provide any other detail.[5]  *See* Ex. 2, Jan. 23, 2024 Laroche Ltr.  But depositions revealed that Gerry Ho (BAM's Head of Product) receives hundreds-of-thousands of dollars in bonus and other payments directly from Binance Entities through an account he has on the Binance.com Platform, and BHL personnel conduct his annual performance review to determine his bonus.  Ex. 13, Ho Depo. Tr. 77:1-81:3; 82:23-90:6, 123:1-130:14.  In his deposition, Ho could not explain why BHL was making these payments or was managing his performance reviews.  *Id.* 85:1-9; 91:2-21; 132:12-25.[6]  Ho also testified that he

---

[5] Evidence indicates that BPlay is a Binance-related entity.  Chen has represented that BPlay is an affiliate of Binance Switzerland AG, and that she is its owner.  Ex. 20, SEC-SGB-E-0022892.

[6] BAM's assertion that Ho has no "role with respect to BAM's customer assets," Ex. 3, Feb. 13, 2024 Ltr. at 5-6, is contradicted by the evidence.  *See, e.g.*, Ex. 6, Kellogg Depo. Tr. 85:10-86:10

knew of about ten other employees in BAM's Canadian office who receive such crypto

payments, *id.* 154:7-24, and BAM's Director of Operations in Canada testified that she receives

similar payments from BHL.  Ex. 21, Rose Gao Depo. Tr. 63:1-67:7.

Further, BAM's Head of Clearing receives about half of his salary from an entity called

"Boran," an entity counsel for BAM has described as a "payment processor based in China that

pays certain BAM employees."  Ex. 3, Feb. 13, 2024 Laroche Ltr., at 5.  BHL has a history of

paying bonuses directly to Boran employees; in at least once instance, BAM later reimbursed

BHL by sending crypto assets to Zhao's entity, Sigma Chain AG, that was a market maker on the

Binance.US Platform.  Ex. 22, Mar. 4, 2022 Grant P. Fondo Ltr. at 1-2; *see also* Ex. 23, Depo.

Ex. 102 (Binance invoice to BAM for "payment of employee bonus"); Ex. 24, Feb. 1, 2023

Fondo Ltr., Appx. II (identifying crypto asset wallet in Depo. Ex. 102 as Sigma Chain's).[7]

This evidence that BAM's Canadian-based senior personnel, including those with

significant involvement in the control of BAM's Customer Assets, receive compensation from

---

("[Ho] was the only person within BAM that could give me the information I was asking for [about the key shards]"); *id.* 235:4-24 (explaining Ho was Kellogg's "internal point of contact who knew the most about our shards and custody kind of posture"); Ex. 25, Joel Moore Depo. Tr. at 48:10-25 (Ho told Moore that Ho performed unstaking from BAM's ledger device and withdrawal back to the TSS wallets); Ex. 13, Ho Tr. at 278:3-289:25 (testifying as to interactions with Chen regarding BAM's staking ledger device).  In addition, BAM produced several memos that appear to identify Ho's involvement in addressing changes to BAM's custody and control of Customer Assets after the Consent Order, including BHL's role, but the SEC has not had the opportunity to question Ho about these documents because BAM produced them ***after*** his deposition.  *See* Ex. 26, BAM_SEC_LIT_00014554 (with attachment BAM_SEC_LIT_00017753); Ex. 27, BAM_SEC_LIT_00014847 (with attachment BAM_SEC_LIT_00017757).

[7] At least one witness testified that BAM conducted due diligence to determine if Boran was, or had a relationship with, any of the Binance Entities.  *See* Ex. 17, Blodgett Depo. Tr. 75:25-76:19; 117:6-117:25. Yet despite the SEC's repeated requests, BAM has not provided the SEC with any further information to substantiate this purported due diligence or that otherwise demonstrates whether Boran is a Binance Entity.

Binance Entities, directly or indirectly, raises questions as to the extent to which those employees are or can be influenced or controlled by any of the Binance Entities.  Nevertheless, BAM is either unwilling or unable to produce any other discovery on this issue to enable the SEC to understand the full scope and impact of this issue as it relates to BAM's compliance with the Consent Order.

### iv.   *Whether BAM's Monitoring for Transfers Involving Binance Entities are Sufficient*

*Fourth*, BAM has not demonstrated that it is has controls in place to ensure there are no prohibited transfers to Binance Entities under the Consent Order, despite its reliance on the key shard and whitelisting processes.  *See* Kellogg Decl. ¶ 33.b.  The SEC has asked BAM witnesses to explain how BAM is monitoring for compliance with the Consent Order.  For example, with respect to TSS, as noted above, several of BAM's key shardholders have testified that they do not conduct significant due diligence before approving transfers, including that they rely on Zhang.  *See, e.g.*, Ex. 15, ██ Depo. Tr. 88:23-94:12; Ex. 7, ██ Depo. Tr. 54:14-55:15; 57:11-58:6, 63:5-64:10; ██ Depo. Tr. 250:14-259:21.  Further, BAM's Head of Treasury testified that she had not reviewed a list of BHL- or Zhao-affiliated entities that would enable her to determine whether transactions were prohibited by the Consent Order.  Ex. 18, Sisenwein Depo. Tr. 101:1-104:11, 112:3-20, 206:1-207:17.

BAM has also not produced evidence that BHL is unable to whitelist wallets or otherwise override that control, given that BHL personnel may still have access and user rights to the TSS Portal.  And, as noted above, during the inspection, BAM inexplicably refused to walk through its whitelisting process.  Finally, despite the SEC's repeated requests, BAM has not provided a list of Binance Entities for which it is monitoring for prohibited transactions and control of

Customer Assets to ensure compliance with the Consent Order, even though at least one BAM witness stated that such a list exists. *See, e.g.,* Ex. 17, Blodgett Depo. Tr. 135:20-138:2.

<p style="text-align:center">*     *     *</p>

All told, BAM cannot claim it has satisfied its obligations in expedited discovery when the above issues remain. The SEC therefore respectfully submits that Court intervention is necessary and requests that this Court order BAM to engage in additional discovery to address the fundamental outstanding issues. The SEC believes that a targeted Rule 30(b)(6) deposition of BAM regarding the above-referenced issues would serve as an efficient next step in this process and minimize BAM's purported burdens in a manner proportional to the needs in this case. But the SEC is also open to other possible avenues of discovery to resolve these issues, including a limited follow-up inspection or other depositions, which could include questions about documents and information produced after the deposition of relevant witnesses. To the extent BAM is unable to provide information to address these outstanding issues, which itself is relevant to an evaluation of BAM's compliance under the Consent Order, it should be required to certify that under penalty of perjury.

### 2. Other Issues Relating to BAM's Compliance with the Consent Order

In addition, the SEC has raised several other issues relating to BAM's compliance with the Consent Order that requires Court intervention. The SEC's February 8 letter sought BAM's responses to these issues, and, as explained below, several issues remain outstanding. *See* Ex. 1, Feb. 8, 2024 Scarlato Ltr. at 5-6.

#### i. *New Wallet Information*

BAM has not provided sufficient information to the SEC to demonstrate its compliance with specific provisions of the Consent Order relating to its creation of new crypto asset wallets

<p style="text-align:center">13</p>

and deletion or destruction of certain Private and Administrative Keys.  *See* Ex. 1, Feb. 8, 2024 Scarlato Ltr. at 5.

First, pursuant to Section II.2 of the Consent Order, BAM was required to establish new wallets with new Private and Administrative keys, and to transfer all Customer Crypto Assets to the new wallets within the sole possession, custody, and control of BAM personnel located in the United States.  Counsel for BAM represented to the SEC that the movement of assets and establishment of new wallets referenced in various communications in 2023, including after the Consent Order, was not part of the process to establish new wallets under the Consent Order. But BAM has not provided any additional information, including whether BAM has deleted or destroyed any Private and Administrative Keys or copies thereof that do not currently control BAM's wallets pursuant to the Consent Order, such as any shard devices that were not transferred to the United States.  *See* Consent Order § II.1.  The SEC has previously requested information about the configuration of vaults, wallets, and corresponding controlling key shards to, in relevant part, evaluate this issue, and BAM has not provided that information.

Second, Section II.5 of the Consent Order requires BAM to provide the SEC with current lists of its hot and cold wallets upon request.  BAM previously produced a list to the SEC, and, on February 8, 2024, the SEC requested that BAM confirm whether that list remains current.  Ex. 1, Feb. 8, 2024 Scarlato Ltr., at 5. BAM's response did not address this issue.  *See* Ex. 3, Feb. 13, 2024 Laroche Ltr.

      **ii.**      ***Outstanding Accounting Information***

There are also a few open questions as to whether BAM has complied with the accounting requirements in Section IV of the Consent Order.  *See* Ex. 1, Feb. 8, 2024 Scarlato Ltr., at 5-6.  First, BAM has still not provided additional information requested in connection

14

with a previously discussed discrepancy in its accounting documentation.  BAM responded that it was willing to "explore any perceived discrepancies," but it has now declined to provide this information, stating that it relates to a non-material amount of corporate assets.  *See* Ex. 3, Feb. 13, 2024 Laroche Ltr.  Second, BAM previously provided information concerning transfers between BAM and Sigma Chain subsequent to the Consent Order, and requested additional information from BAM that it has still not provided.  Third, BAM has not provided a status update on the production of supplemental deposit wallet information to associate the deposit wallets with the User IDs, which is a request that has been pending since at least November 2023.  *See* Ex. 28, Nov. 17, 2023 Beville email, at 1-2 ("we will confer with our client and provide an update on when the supplemental deposit wallet information will be available.").

### B.  BAM's Position

Since the last status update, BAM has completed its search for and production of documents in response to the SEC's 70-plus document requests, dated September 21, 2023 and the SEC inspected several of BAM's systems involved in customer asset custody.  At this point, BAM respectfully submits that the Court should end expedited discovery with respect to BAM.

Since June 2023, BAM has gone above and beyond its obligations to provide "limited" expedited discovery pursuant to the Consent Order by responding to the SEC's exceptionally broad requests and unsubstantiated concerns related to asset custody.  BAM has produced thousands of documents about every conceivable aspect of its asset custody practices; provided a verified accounting; responded to dozens of interrogatories and supplemented those interrogatories; submitted numerous declarations and certifications under oath concerning its asset custody practices and compliance with the Consent Order; provided the SEC with monthly reports summarizing its expenses by category; and facilitated the SEC's inspection of multiple

shard devices and key systems involving customer assets. The SEC has also deposed a dozen witnesses during expedited discovery, and obtained extensive discovery (including documents and deposition testimony) from third parties.

As set out below, the SEC's purported bases for further extending this eight-month-long discovery process are unavailing. BAM has engaged in this process in good faith, while, by contrast, it appears that the SEC is not evaluating in good faith the issue at the core of the Consent Order: whether BAM's customer assets are secure and available for withdrawal. The SEC has not pointed to any evidence that BAM's customer assets are not secure or have been misused or dissipated in any way. Moreover, the principal concern that was purportedly animating the SEC's desire for expedited discovery at the outset of this case—that Mr. Zhao may dissipate assets—has evaporated given that Mr. Zhao has no role at BAM or BHL, and BHL has agreed to have an independent compliance monitor put into place.

By contrast, the harm that the SEC's motion for a temporary restraining order and approach to expedited discovery have inflicted upon BAM has been material. As a direct result of the SEC's unsubstantiated assertions that BAM's customers' assets are at risk, BAM has had to reduce its workforce by hundreds of full-time employees; BAM's existing banking partner limited or effectively ended their relationships with BAM; and BAM's active trading users have fled the platform. *See, e.g.*, Ex. 29, Blodgett Depo. Tr. 145:3- 155:17 (Dec. 15, 2023); Ex. 39, Nov. 27, 2023 Conf. Tr. at 29:8-33:1.

Against this backdrop, BAM respectfully submits that this Court should end the "expedited" discovery process has already far exceeded the typical limited approach for pre-merits-stage discovery. *See Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015) (expedited discovery "limited in scope to requesting specific records or information" that bear on

a particular issue).  The Court should deny the SEC's request for a 30(b)(6) deposition or any additional discovery arising from the Consent Order.

> ### 1.  The SEC's Inspection of BAM's Systems Related to Customer Asset Custody Complied with the Consent Order

The SEC's selective description of the January 23, 2024 inspection omits key components of the multi-hour review BAM facilitated of its systems related to customer asset custody.  BAM met-and-conferred with the SEC in good faith before the inspection, but the SEC failed to meaningfully engage and instead persistently attempted to broaden the scope of the inspection well beyond any reasonable standard for expedited discovery.  By way of example, the SEC insisted that BAM should undertake a packet-capture exercise, which would have required BAM to cut a fiber optic cable in real-time during the inspection.  BAM objected to that and certain other requests that far exceed the scope of discovery required by the Consent Order, but facilitated a substantive review of all of BAM's systems relevant to customer asset custody.

Contrary to the SEC's representations, BAM demonstrated how its PNK system interacts with its wallet software and private keys.  Specifically, BAM addressed the SEC's stated primary issues for the inspection by providing a detailed review of controls for setting thresholds for automatic transfers between wallets and approving customer-initiated external transfers.  *See* Ex. 3, Laroche Ltr. at 3; Ex. 10, Nov. 27, 2023 Hearing Tr. 10.  Indeed, BAM changed PNK thresholds for a digital asset in real-time, resulting in asset transfers between BAM wallets operating on BHL software.  BAM further provided the SEC with access to PNK source code and demonstrated the process by which BAM changes access rights to PNK.

The SEC's specific criticism regarding the whitelisting process is also misleading.  BAM's CISO explained that he did not request access to the whitelisting feature for security reasons.  However, BAM has provided extensive information regarding the whitelisting process in

document productions, depositions and sworn declarations. *See e.g.,* Ex. 4, Kellogg Decl. at ¶ 36(b) ("Adding a new whitelisted wallet requires the unanimous approval of all seven shard holders."); BAM's Responses and Objections to First Set of Interrogatories at 14 (stating that the individuals involved in the whitelisting process are those that hold the New Private and Administrative Keys). Multiple shardholders also testified about the whitelisting process.

BAM has devoted significant resources to meeting the SEC's requests for a comprehensive demonstration of its systems related to customer asset custody. The SEC's inspection covered all those systems. Notwithstanding this comprehensive process, the SEC continues to move the goalposts of expedited discovery such that its requests pertaining to the inspection now far exceed the scope of the Consent Order. BAM respectfully requests that the Court rule that BAM has satisfied its obligation to submit to an inspection of its customer asset custody systems.

### 2. No Further Discovery is Required with Respect to Control of BAM's Hot and Customer Deposit Wallets

As the SEC concedes, BAM has supplemented its interrogatory responses to confirm that BAM "is now in control of the root account for the Amazon Web Services ('AWS') datacenter in northern Virginia that houses the servers running the wallet custody software used by BAM. Ex. 8, BAM's Supp. Response to Interrogatory No. 6 (Nov. 20, 2023). The SEC does not explain why it did not have "an opportunity to address that assertion," in the nearly-three months since BAM supplemented its interrogatory responses. Regardless, the SEC again moves the target of expedited discovery by now demanding "evidence" that BAM's control of the root account excludes or limits BHL's custody and control over the private keys and Customer Assets.

Moreover, the SEC is simply incorrect that BAM has not provided discovery concerning the extent of BHL's control over transfers. As discussed above, BAM has produced documents and its witnesses have provided testimony under oath showing that BHL cannot transfer assets.

*See* Ex. 30, Kellogg Tr. 148:9-17; 148:24-149:6; 150:24-151:1; 198:4-15; 199:24-200:18; Ex.

33, Zhang Tr. 132:21-133:2.  The SEC relies on testimony from BAM's clearing lead that he

occasionally contacted BHL personnel for technical assistance to insinuate that—contrary to all

other evidence produced in expedited discovery—BHL has control over asset transfers.  But

BAM contacting personnel employed by its wallet software provider, BHL, does not amount to

ceding any control to that provider over customer assets, much less run afoul of the terms of the

Consent Order.  The SEC has not provided a modicum of evidence that BHL controls customer

assets such that further burdensome discovery on this subject would be merited.  Moreover, if the

SEC has further questions about BHL's access with respect to asset transfers, it can ask BHL for

clarification at its upcoming deposition of a BHL employee.

### 3.  No Further Discovery is Required with Respect to Control of BAM's Cold Storage and Staking Wallets

The SEC's criticisms regarding discovery concerning BAM's cold storage and staking

wallets are also unfounded.   BAM facilitated a comprehensive inspection of its TSS system,

including a real-time asset transfer with BAM's shardholders.  During the inspection, BAM's

personnel confirmed that no BHL employee acts as an administrator to the TSS Portal.  BAM

then produced documents confirming that only BAM personnel are administrators of TSS and no

BHL personnel has an administrative role.  Ex. 31, BAM_SEC_LIT_00293277-283.  The SEC

labeling these representations and documents "conclusory" does not justify interminably

extending "expedited" discovery to accommodate the SEC's unsupported speculation concerning

control of the TSS system.  All available evidence produced in discovery contradicts the SEC's

speculative claims.

**4.   BAM Provided Sufficient Discovery Concerning Its Employees Outside of the United States**

The SEC's insinuation that BAM employees outside of the US exercise control over customer assets is plainly false.  The SEC understands the distinction between BAM's clearing lead ***requesting*** transfers from BAM's cold wallets to its hot wallets and ***controlling*** customer assets, but continues to attempt to blur that clear line.  As the SEC now concedes, any transfer from cold to hot wallets now requires the approval of BAM's Head of Treasury (the clearing lead's supervisor) based in the United States ***and*** four of the seven shardholders, all of whom are based in the United States.  More specifically, the testimonial record confirms that BAM's Head of Treasury or CFO review and approve any transfer request ***before*** the shardholders are asked to approve a request to transfer assets by BAM's clearing lead.  Moreover, the SEC's suggestion that the shardholders undertake a purely ministerial role is contradicted by the actual record.  The shardholders have testified that they engage in substantial diligence and exercise their independent judgment before approving asset transfers.  *See, e.g.,* Ex. 29, Blodgett Tr. 107:1-4; Ex. 32, Brennan Rough Tr. 76:24-77:7; Ex. 15, Fava Tr. 88-91.

The SEC's unsupported suggestion that certain employees' compensation structure "raises questions as to the extent to which those employees are or can be influenced or controlled by any of the Binance Entities," does not merit the continued extension of expedited discovery.  The SEC continues to suggest that Boran is affiliated with Binance Entities in the face of deposition testimony that an independent investigation confirmed that Boran is an independent entity without any affiliation with BHL.  *See* Ex. 29, Blodgett Tr. 74:17-76:1.  More to the point, Gerry Ho, BAM's Head of Product referenced in the SEC's filing, testified that he provides no services to BHL and is not influenced or controlled by BHL and/or Mr. Zhao.  He further testified that he has no role with respect to customer assets.  *See* Ex. 34, Ho Tr. 206:2-6 (no role

20

"at all" with respect to BAM's cold wallets; 206:20-23; 209:14-17 (No involvement in the key shard process); 304:16-21 (no knowledge as to how BAM stores keys for customer deposit wallets).

### 5.   BAM's Disclosures Regarding Controls Concerning Prohibited Transfers Comply with the Consent Order

As noted above, BAM has sufficient controls in place the protect against prohibited transactions under the Consent Order.  The Shardholders testified that they engage in substantial diligence before approving transactions. The testimony elicited from over a dozen depositions in expedited discovery further confirms that BAM has taken substantial steps to ensure compliance with the Consent Order. *See, e.g.,* Ex. 29, Blodgett Tr. 121:5-9; 122:9-16; 48:19-49:1; 50:1-16; Ex. 30, Kellogg Tr. 196:2-12; 214:25-215:12; 349:6-350:17; Ex. 33, Zhang Tr. 132:21-133:2.

### 6.   The SEC's New Requests Exceed the Scope of the Consent Order

The SEC's new requests for information concerning the deletion or destruction of any Private and Administrative Keys or copies thereof that do not currently control BAM's wallets and "current lists of its hot and cold wallets upon request" are outside the scope of the Consent Order and demonstrate the SEC's continuing whack-a-mole approach to this purportedly expedited discovery process.  Likewise, the "accounting information" the SEC requests relates to (1) a purported discrepancy regarding non-material amount of corporate assets and (2) transfers involving Sigma Chan, which BAM has already explained to the SEC.

<p style="text-align:center">*       *       *</p>

The additional discovery the SEC seeks over 8 months into "expedited" discovery far exceeds the bounds of the Consent Order and the Federal Rules of Evidence.  In particular, the SEC's request for a 30(b)(6) deposition is unduly burdensome, particularly in light of the 12 fact depositions of BAM employees, substantial document productions, and written interrogatory

responses addressing all of the issues raised in the SEC's submission.  There is also no justification for additional depositions given that after 8 months of discovery, the SEC still has not identified the slightest evidence that BAM's customer assets are not secure or have been misused or dissipated in any way.  BAM respectfully submits that the Court declare that expedited discovery has ended as to BAM.

## II.   Binance/Zhao-Related Discovery

### A.  The SEC's Position

#### 1.  Document Productions

The Court gave straightforward directives to BHL's counsel at the last status conference. It made clear that BHL should produce evidence relating to BAM's assertion that neither BHL nor any other Binance Entity has possession, custody, or control over BAM's Customer Assets that address control both as a matter of (1) technical operation of software and services and (2) control over individuals (through payments or otherwise) who operate the software.  *See, e.g.*, Ex. 10, Nov. 27, 2023 Hr'ing Tr. 93, 95, 97.  The Court also directed BHL's counsel not to merely respond to the few examples or categories of documents the SEC was able to identify, but to conduct a reasonable search and explain in the next report to the Court what categories of documents it was able (or unable) to obtain through its purported ongoing searches.  *Id.* at 99-101.  To date, BHL has not yet fully complied with these clear directives, and the SEC has accordingly continued to press BHL and Zhao for expedited discovery to address these issues.

##### i.  *Documents Concerning the Operation of BHL Wallet Software and Related Services*

The SEC has continued to ask BHL for documents explaining the operation of its software and related services that would support BAM's and Binance's assertions that BHL does not have access to or the ability to transfer Customer Assets, including custody, control of, or

access to the private keys that control those assets.  To date, BHL has produced or offered to

consider producing only a handful of categories of documents, none of which would appear to

address the core underlying issues.

*Service Contracts*:  In response to the SEC's requests for documents demonstrating how

its wallet software operates, BHL has produced service agreements between BHL and BAM.

Needless to say, preexisting contractual terms do not explain the relevant issues of technical

operation and access under the Consent Order, and BHL's reliance on these agreements here is

especially problematic since BAM has disclosed to its own auditor the parties' past *disregard* of

contractual terms on the precise issue of BHL's custody over Customer Assets.  *See* Ex. 35, Aug.

18, 2023 BAM Ltr. (explaining that the Wallet Custody Agreement with BHL "was legally

binding" but acknowledging that "the custodial arrangement of the parties was not implemented

pursuant to the terms described").

*SOC Reports*:  BAM's counsel and witnesses have referred to a System and Organization

Controls ("SOC") report that BHL provided and which BAM's CISO claimed to have relied

upon in assessing BHL's handling of BAM's Customer Assets.  *See*, *e.g.*, Ex. 6, Kellogg Depo.

Tr. 77:2-19.  BHL has produced two SOC reports (Type 1 and Type 2), and they relate to

supposed controls for a completely different entity (called "Block Technologies") for assets

apparently held in AWS servers located in Ireland and Sweden.  *See* Ex. 36, BHL-SEC-DDC-

00000101 (SOC Report as of Aug. 1, 2022); Ex. 37, BHL-SEC-DDC-00000152 (SOC Report

covering Aug. 1, 2022, to Oct. 31, 2022).  The SEC has asked BHL once again to confirm

whether BHL engaged a third party to assess the software implementation that actually hosts

BAM's assets and ensures they are secure, as the CISO requested from BHL (but never got a

response) and to produce any such reports.  Ex. 6, Kellogg Depo. Tr. 314:9-316:18.

*Public Source Code*:  In a meet-and-confer call last November, counsel for BHL stated that it would consider directing the SEC to public, open-source code that BHL apparently uses in some form to implement the wallet custody software instance holding BAM's Customer Assets. The SEC noted that such code might be helpful in understanding the underlying technology at issue, though it would require additional information regarding modifications BHL may have made to the public source code and the layers of applicable infrastructure to meaningfully address BAM's and BHL's assertions about custody, control, and access.  BHL has still not taken a position on whether it is willing to direct the SEC to the public source code (which necessarily would present no burden or confidentiality issues).  During a recent meet and confer, counsel for BHL stated they would confirm whether they are willing to produce this public source code, and the SEC reiterated its request for information reflecting modifications, noting it reserved all rights and would follow up on this issue once it had an opportunity to review the public source code.

<p align="center">*     *     *</p>

BHL's counsel has stated that there is no "definitive guide to how everything works," Ex. 10, Nov. 27, 2023 Hr'ing Tr. 50, but of course the SEC does not need, and is not seeking, all the answers in one document.  The issue is simple:  over a billion dollars of BAM's assets and Customer Assets are being held in BHL's infrastructure and controlled by BHL's systems and software that remain a black box.  Indeed, as described above, multiple BAM witnesses have expressed ignorance about the wallet software, back-end operations, and how BAM systems interact with the BHL wallet software and the private keys, and they have confirmed their reliance on BHL with respect to such issues.

Given the purpose of the Consent Order, BHL must produce documents that, as a technical matter, support its claim that BHL does not have custody, control, or access to the private keys that control the Customer Assets held through that software and demonstrates the assets are secure and exclusively within BAM's custody and control.  If no such documents exist, BHL must confirm that troubling fact in writing.  While the SEC is hopeful that BHL witnesses will address many of these issues (discussed below) the SEC objects to the practice of withholding relevant documents prior to depositions so that the SEC is hamstrung in understanding and testing assertions from defendants' witnesses.  See Ex. 10, Nov. 27, 2023 Hr'ing Tr. 57 (Court noting need for documents in preparing for upcoming depositions).

### ii.    *Payments to BAM Personnel by Binance Entities*

As noted above, expedited discovery has revealed that Binance Entities directly or indirectly provide substantial compensation for numerous BAM employees.  Thus, the SEC has requested that BHL and Zhao produce documents sufficient to identify any compensation, including in crypto assets, made directly or indirectly by any Binance Entity to a BAM employee while such person was a BAM employee.  The SEC also requested that BHL and Zhao search for and produce any communications concerning this compensation.  In BHL's response, it offered to search only for documents sufficient to show payments made by BHL to BAM employees from June 1, 2023 to the present.  But the SEC maintains that BHL and Zhao must both produce documents sufficient to identify all payments made by, or for the benefit of, any Binance Entity, which includes any entity affiliated with Zhao, to BAM employees for the entire time period any BAM employee received such payments, to understand the full scope of this arrangement.  This request is not burdensome, or whatever burden it poses is proportional to the specific need in this case of identifying who controls billions of BAM Customer Assets, and it is critical to

understanding the nature of the relationship between the Binance Entities and the BAM employees receiving such payments.  For example, even if Binance Entities made payments to BAM employees before the Consent Order, they may be of such a significant nature or amount that they continue to affect these employees' independence in working for BAM.  And BHL's and Zhao's production should also include communications relating to these payments, which may shed light on, among other things, why these payments were made.  The SEC further submits that the time period for communications relating to these payments should start from when any such employees began working with or for BAM, or at a minimum from January 1, 2023 to the present, if BHL sufficiently demonstrates that the burden of such a search would be disproportional to the needs of the case.  The parties have met and conferred on these issues and appear to be at an impasse at least as to the time period relevant to this request, and potentially as to the SEC's request for related communications.

### iii.    *Communications Between BAM and BHL Relating to the Consent Order*

There is no real dispute that BAM employees have communicated with Binance Entities on issues critical to the issue of BHL's control of BAM's corporate and Customer Assets.  For example, BAM's Head of Clearing testified that he communicated with Chen of BHL regarding transferring shard devices to BAM personnel in the United States and requesting access for BAM employees to obtain access to the TSS system.  *See* Ex. 9, Zhang Depo. Tr. 133:7-135:22.  On January 11, the SEC requested several key categories of communications, from March 1, 2023, to the present, including communications: (1) concerning the possession, security, custody, control, segregation, transfer, encumbrances, and/or withdrawal of BAM's corporate or Customer Assets between BAM personnel and Zhao, Chen, or any other employees of or affiliated with BHL that are responsible for providing wallet, engineering, and clearing support

to BAM; (2) reflecting notes or investments between Zhao or his affiliates and BAM; and (3) between Sigma Chain and any BAM employee.  With its requests, the SEC also identified relevant testimony from BAM witnesses describing communications with BHL personnel in these categories.

BHL responded on February 7, 2024, and agreed to search the wallet services chat group over a BHL-created service called "Wea," from June 1, 2023, to the present, for messages between BHL and BAM personnel concerning the security and control of BAM customer assets, but has yet to produce any responsive documents or indicate in writing that none exist.  *See* Ex. 38, Feb. 7, 2024 Mendro Ltr.  In a separate letter dated February 8, 2024, BHL has otherwise objected to the SEC's communications requests as overbroad, but neither BHL nor Zhao have offered a proposal for narrowing the scope of these requests.  Nor did BHL respond to the SEC's request for communications outside of the Wea group chat.

The SEC's position is that BHL should produce communications, including on the Wea platform and other platforms, concerning the possession, security, custody, control, segregation, transfer, encumbrances, and/or withdrawal of BAM's corporate or Customer Assets, from at least June 1, 2023, to the present so that the SEC can better understand the full scope of involvement by BHL and Zhao, and any related entities, including Sigma Chain, in any aspect of BAM's corporate or Customer Assets.  The parties have recently met and conferred concerning the scope of these requests, and the SEC understands that BHL is considering the SEC's position on these requests for communications.

### 2.  Depositions

As the parties reported in the last status report, BHL has tentatively agreed to produce a technical fact witness to address questions concerning issues regarding access to BAM's

corporate and Customers Assets discussed at the last hearing.  Jan. 25, 2024 Joint Status Report, at 5.  The parties have tentatively scheduled the deposition for February 29.

The SEC has reiterated that the scope of the deposition is defined by the Consent Order. BHL has identified topics to be addressed during the deposition, such as the services that BHL provides in support of the BAM Hot Wallet System, including as to "stuck" assets, and has represented it has identified a witness knowledgeable on these issues.  The SEC has asked for the witness's name and expedited production of relevant discovery to be able to sufficiently prepare and ensure there are no issues it needs to raise with the Court in advance of the deposition.  BHL has not agreed to move forward with the deposition (or even to provide the witness's name) until the parties agree on confidentiality terms.  The SEC's position is that there should be one Court-approved protective order governing all discovery in the case to ensure consistency in scope, applicable terms, and the Court-approved process for use of the information in court filings and proceedings and has asked BHL to propose terms in the current draft proposed protective order to address its concerns.  The parties recently met and conferred on this issue.  BHL has proposed an updated draft of the protective order to incorporate issues relating to this deposition, which the SEC is considering.  The SEC is hopeful that this issue is resolved soon because the protective order has been delayed for many months and should not be a basis to hinder discovery.

In addition, the SEC noticed additional witnesses, including Chen and other BHL personnel who are involved in the issues relevant to the Consent Order.  Although the SEC has agreed to begin with the technical fact witness and to proceed with other witnesses as needed from there, the SEC has asked BHL to propose dates and locations for the additional noticed witnesses to avoid unnecessary delays in scheduling these depositions, which involve personnel outside the United States.  BHL has thus far refused this request.

The SEC has also noticed Zhao's deposition.  Zhao has taken the position that a deposition of Zhao is unnecessary given that "Zhao has stepped down as CEO and no longer has a role in operating or managing BHL's business."  Ex. 1, Feb. 8, 2024 Ltr.  The SEC disagrees that Zhao's change in position obviates the need for his deposition in light of Zhao's continued financial relationship with both BAM and BHL; however, the SEC is prioritizing other depositions and discovery while reserving all rights concerning the deposition and any other discovery as to Zhao.

### B.  BHL's and Mr. Zhao's Position

BHL and Mr. Zhao write briefly to apprise the Court of the status of expedited discovery, which they understand to be the purpose of the Joint Status Report.  Despite submitting 22 pages of argumentative briefing (more akin to a summary judgment motion), the SEC largely confirms that the parties are working cooperatively to resolve the SEC's discovery requests and that there is no issue that requires intervention by the Court at this time.  For example, as the SEC acknowledges, BHL has agreed to confirm whether there are any additional relevant SOC Reports; agreed to look into how the open source code could be efficiently produced; agreed to produce Wea chats most relevant to SEC's requests and to consider the SEC's request for additional communications; and agreed to search for records relating to compensation paid to BAM employees (and is still considering the appropriate timeframe).  As discussed below, BHL also has agreed to make a witness available to testify on many topics that are central to the SEC requests and has worked in good faith to schedule the deposition this month.

### 1.  BHL Document Productions

As explained by the SEC, BHL continues to meet and confer with the SEC regarding its document requests.  Following the September 18 hearing, the SEC served new document requests on BHL on October 5, 2023 and January 11, 2024.  Despite its objections regarding the

relevance and scope of the requests, BHL agreed to conduct a reasonable search for and produce non-privileged chats between BHL and BAM personnel relating to wallet services, from June 1, 2023 to present; BHL anticipates producing these documents before the next Status Conference. BHL also agreed to search for documents sufficient to show any compensation paid by BHL to a BAM employee from June 1, 2023 to present (and, at a recent meet and confer, BHL agreed to consider the SEC's request for an expanded time period).

Certain of the SEC's January 11, 2024 requests were addressed jointly to BHL and Mr. Zhao. Mr. Zhao joined BHL's objections to those requests and has informed the SEC of his position that BHL's agreement to search for responsive documents adequately addresses any request directed to both BHL and Mr. Zhao.

### 2. Deposition Testimony

BHL has offered to produce a witness who can testify about the services that BHL provides in support of the BAM Hot Wallet System and the issue of "stuck" assets. BHL offered February 8 for the deposition, and the parties coordinated scheduling and other logistics—including the inter-agency process—and the deposition is now tentatively scheduled for February 29.

The SEC has also asked to schedule Mr. Zhao's deposition. Mr. Zhao has objected to this request based on the SEC's failure to provide a credible basis for deposing Mr. Zhao pursuant to the Consent Order. Not only has Mr. Zhao stepped down as CEO, he no longer has a role in operating or managing BHL's business. Moreover, he has stepped down from his prior role as a BAM director. Furthermore, none of the discovery taken to date suggests that Mr. Zhao has unique knowledge that would justify even a very focused discovery request to Mr. Zhao, let alone the SEC's request for a deposition. This undisputed factual record exposes the motivation

underlying the SEC's request for Mr. Zhao's deposition: an improper desire to conduct merits discovery under the pretext of the Consent Order.

## III.    **<u>Proposed Protective Order</u>**

The parties continue to negotiate a proposed protective order and anticipate that Defendants will file a proposed order with the Court by next week.

Dated:  February 15, 2024

Respectfully submitted,

*/s/ Daniel W. Nelson*
Daniel W. Nelson (D.C. Bar #433415)
Richard W. Grime (*pro hac vice*)
Jason J. Mendro (D.C. Bar #482040)
Stephanie Brooker (*pro hac vice*)
M. Kendall Day (*pro hac vice*)
Amy Feagles (*pro hac vice*)
Matt Gregory (D.C. Bar #1033813)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
DNelson@gibsondunn.com
RGrime@gibsondunn.com
JMendro@gibsondunn.com
SBrooker@gibsondunn.com
KDay@gibsondunn.com
AFeagles@gibsondunn.com
MGregory@gibsondunn.com

*Attorneys for Defendant Binance
Holdings Limited*

*/s/ Elisa S. Solomon*
Elisa S. Solomon
J. Emmett Murphy
Jorge G. Tenreiro
SECURITIES AND EXCHANGE
COMMISSION
100 Pearl Street
New York, NY 10004
(212) 336-0078 (Murphy)
murphyjoh@sec.gov
tenreiroj@sec.gov
solomonel@sec.gov

Matthew F. Scarlato (D.C. Bar No. 484124)
Jennifer L. Farer (D.C. Bar No. 1013915)
David A. Nasse
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549-9040
(202) 551-3749 (Scarlato)
nassed@sec.gov
farerj@sec.gov
scarlatom@sec.gov

*Attorneys for Plaintiff Securities and
Exchange Commission*

<div style="display: flex;">
<div>

*/s/ Abid R. Qureshi*
Abid R. Qureshi (D.C. Bar No. 459227)
William R. Baker, III (D.C. Bar No. 383944)
Erik S. Volkman (D.C. Bar No. 490999)
Michael E. Bern (D.C. Bar No. 994791)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
abid.qureshi@lw.com
william.baker@lw.com
eric.volkman@lw.com
michael.bern@lw.com

Douglas K. Yatter (*pro hac vice pending*)
Benjamin Naftalis (*pro hac vice pending*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
douglas.yatter@lw.com
benjamin.naftalis@lw.com

Heather A. Waller (*pro hac vice pending*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Fax: (312) 993-9767
heather.waller@lw.com

Melanie M. Blunschi (*pro hac vice pending*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Tel: (415) 391-0600
Fax: (415) 395-8095
melanie.blunschi@lw.com

*Attorneys for Defendant Changpeng Zhao*

</div>
<div>

*/s/ Daniel J. Davis*
Daniel J. Davis (D.C. Bar #484717) (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave NW
Washington DC 20006
daniel.davis@katten.com

Christian T. Kemnitz (*pro hac vice*)
Levi Giovanetto (D.C. Bar #1001160) (*pro hac vice*)
Sheehan H. Band (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
christian.kemnitz@katten.com
levi.giovanetto@katten.com
sheehan.band@katten.com

Gary DeWaal (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
gary.dewaal@katten.com

George S. Canellos (*pro hac vice*)
Matthew Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
212-530-5792
gcanellos@milbank.com
mlaroche@milbank.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc.*

</div>
</div>