```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *    )
      SECURITIES AND EXCHANGE          )     Civil Action
 4    COMMISSION,                      )     No. 23-01599
                                       )
 5                    Plaintiff,       )
                                       )
 6       vs.                           )
                                       )
 7    BINANCE HOLDINGS LIMITED, et al., )    Washington, D.C.
                                       )     February 26, 2024
 8                    Defendants.      )
                                       )
 9    * * * * * * * * * * * * * * *    )

10

11                  TRANSCRIPT OF STATUS CONFERENCE
               BEFORE THE HONORABLE ZIA M. FARUQUI
12                 UNITED STATES MAGISTRATE JUDGE
                 (Transcribed from the Audio Recording)

13

14    APPEARANCES:

15    FOR THE PLAINTIFF:       ELISA SOLOMON, ESQ.
                               SECURITIES AND EXCHANGE COMMISSION
16                             100 Pearl Street
                               Suite 20-100
17                             New York, New York 10004

18                             JENNIFER L. FARER, ESQ.
                               MATTHEW F. SCARLATO, ESQ.
19                             DAVID A. NASSE, ESQ.
                               SECURITIES AND EXCHANGE COMMISSION
20                             100 F Street, Northeast
                               Washington, D.C. 20549
21

22    FOR THE DEFENDANT        JASON MENDRO, ESQ.
       BINANCE HOLDINGS:       TEDDY KRISTEK, ESQ.
23                             GIBSON, DUNN & CRUTCHER, LLP
                               1050 Connecticut Avenue, Northwest
24                             Suite 300
                               Washington, D.C. 20036
25
```

```
 1      APPEARANCES, CONT'D:

 2      FOR THE BAM              DAVID LUGER, ESQ.
        DEFENDANTS:              KATTEN, MUCHIN, ROSENMAN, P.A.
 3                               525 West Monroe Street
                                 Chicago, Illinois 60661
 4
                                 DANIEL J. DAVIS, ESQ.
 5                               KATTEN, MUCHIN, ROSENMAN, P.A.
                                 1919 Pennsylvania Avenue, Northwest
 6                               Suite 800
                                 Washington, D.C. 20006
 7

 8      FOR THE DEFENDANT        ABID R. QURESHI, ESQ.
        CHENGPENG ZHAO:          WILLIAM R. BAKER, III, ESQ.
 9                               NATALIE RAO, ESQ.
                                 LATHAM & WATKINS, LLP
10                               555 Eleventh Street, Northwest
                                 Suite 1000
11                               Washington, D.C. 20004

12
        TRANSCRIBED BY:          LISA EDWARDS, RDR, CRR
13                               Official Court Reporter
                                 United States District Court for the
14                                District of Columbia
                                 333 Constitution Avenue, Northwest
15                               Room 6706
                                 Washington, D.C. 20001
16                               (202) 354-3269

17

18

19

20

21

22

23

24

25
```

```
1            THE COURTROOM DEPUTY:  Good morning, your Honor.
2    This is Civil Case 23-1599, Securities and Exchange
3    Commission versus Binance Holdings, Limited, et al.  And
4    this matter is set for a status conference.
5            Parties, please approach the lectern and introduce
6    yourself to the Court.
7            MS. SOLOMON:  Good morning, your Honor.  Elisa
8    Solomon on behalf of the SEC.  With me are Jenn Farer, Matt
9    Scarlato and David Nasse.
10           THE COURT:  Good morning.
11           MR. QURESHI:  Good morning, your Honor.  Abid
12   Qureshi of Latham & Watkins on behalf of individual
13   Defendant Mr. Zhao.
14           With me are my colleagues Mr. Baker and Ms. Rao.
15           THE COURT:  Okay.
16           MR. LUGER:  Good morning, your Honor.  David Luger
17   from Katten, Muchin, Rosenman on behalf of BAM Trading
18   Services, Inc., BAM Management U.S. Holdings.
19           And with me is my colleague, Dan Davis.
20           MR. MENDRO:  And good morning, your Honor.  Jason
21   Mendro from Gibson Dunn.  I'm here today on behalf of BHL.
22           And with me is my colleague, Teddy Kristek.
23           THE COURT:  Is that everybody?  Yes.  Okay.  We're
24   great.  Just one second.
25           All right.  So some progress, but it also feels
```

```
 1    like -- I think as to BAM and SEC, it feels like we're at a
 2    decision point.  But I'm happy to go through -- I mean, I
 3    just have some questions about some particular things in the
 4    JSR today and some overall thoughts.  But I'll go back and
 5    forth.
 6              I don't think I need to hear from the parties at
 7    first unless you all really need something -- a burning
 8    desire to share.  But I think I just have questions to start
 9    with.  Okay?  Okay.  Great.
10              All right.  So I think, you know, it appears
11    there's, like, four kind of big issues that we have with
12    BAM.  And I do think we need to -- it's time to -- everyone
13    wants to wrap this up.  That's the one thing everyone agrees
14    on.  That's good, right?  So let's start with what we agree
15    on.
16              We need to get on to the -- obviously, have the
17    actual litigation going on, you know, with Judge Jackson.
18    You need to get to -- you know, real discovery going.  And
19    so my sort of sense is this:  That we'll talk about the four
20    kind of big issues that have come out of the inspection and
21    updated discovery; and then I'm not -- I think, you know --
22    and I think BAM kind of, you know, in its JSR at this
23    point -- and I think it's a good one.
24              So I guess my first question for the SEC -- and
25    you all can just stay at the table.  You don't have to keep
```

1    running back and forth.  That's okay.  You're welcome to

2    come if you want.  Yes.  Get your steps in.  Whatever you

3    want.

4              But it seems like we're coming at this from two

5    ways.  Right?  And at some point, right, no matter what, I

6    think you're going to get to a point where maybe you'll get

7    to, you know, the known unknown with BAM.  But then we have

8    BHL, right?  Which is a safety valve.

9              And so it just feels like maybe we're -- there's

10   more stuff I want to get from BAM, but there's also stuff

11   from the SEC that I think we're just going to have to let

12   go.  But before we actually -- if we have to litigate, you

13   know, or if I just have to rule, I guess I should say,

14   potentially with some additional briefing, I feel like

15   seeing some data from BHL would be helpful.  Right?

16             On the flip side, there are things from BHL that

17   you learned.  So, I mean, I'll be more pointed:  In terms of

18   your request for a 30(b)(6) deposition, wouldn't it be more

19   efficient to get as much or all of the information you're

20   going to get out of BHL first?  Otherwise, you potentially

21   are coming back and there could be new things.  I mean,

22   every time we've done something, I think, you at the SEC

23   have maintained you've learned something new that raises

24   questions.  Let's not say concerns or questions.  And so

25   what about sequencing?  Let's just start with that.  Do you

```
1    think the 30(b)(6) could -- shouldn't it wait until
2    afterwards, some BHL sort of decisions have been made?  Does
3    that make sense?  Do you all -- have you thought?  No?  Any
4    thoughts?
5              MS. SOLOMON:  Your Honor, I appreciate your
6    careful review of the papers and paying attention to the
7    issues we've raised.
8              In terms of your question on sequencing, you know,
9    as a practical matter, we're scheduled for our first
10   deposition with BHL this week.  So some -- some testimony
11   will be taken prior to any 30(b)(6), should the Court order
12   one.
13             In addition, you know, we have started engaging in
14   the process of collecting documents at least from what we
15   have requested as documents from both BHL and Mr. Zhao.  But
16   we've started receiving documents from BHL.
17             So, you know, that process has started.  And we've
18   done exactly what the Court instructed us to do and -- in
19   terms of identifying the gaps in the, you know, productions
20   that we've received from BAM.  So as a practical matter,
21   there will be, you know, some staggering.
22             You know, that said, I think one of the reasons
23   that we think a 30(b)(6) would be better relatively soon,
24   even while we continue with Mr. Zhao and Binance, is that a
25   lot of our questions to Binance and Mr. Zhao stem from
```

1   things that we've learned from BAM.  And it's their customer

2   assets that's our issue.

3          And it may be -- I hope this came through in our

4   papers -- it may be the fact that, you know, BAM doesn't

5   know the answers to some of the questions that we are

6   asking.  And part of what we think a 30(b)(6) would be

7   effective for and part of why we'd ask for written responses

8   on our discovery requests is because at this point, a lot of

9   answers to our questions are a little unclear.

10          And so, you know, there's a difference between BAM

11   not being willing to provide information and BAM not knowing

12   the information.  And that information is helpful as we

13   approach Binance.

14          THE COURT:  Okay.  Got it.

15          One question for the SEC.  We talked a little bit

16   last time about sort of the sort of change in landscape

17   after the, you know, criminal case out in Washington State.

18   I mean, again, you're just -- I know you're anxious to get

19   the case going forward.  And you're also concerned about

20   consumer protection.

21          And I mean, I don't think -- it's hard to imagine

22   at some point, right, like, that you have total certainty,

23   but you want to get to a place where you're comfortable.

24   Right?  Where you can feel, you know, whatever, that this is

25   the best-case scenario, that you think you know enough and

1    you can go forward.

2         And I just am still trying to get a sense, you

3    know, now the company having a monitor, you know, they

4    indicate that in their joint status report, you know,

5    subjecting themselves to criminal jurisdiction.  We talked a

6    little bit about that before.  But now, I mean, there's a

7    monitor.  I mean, at least it moves the needle higher in

8    terms of confidence, right, for the SEC.  And just -- I feel

9    like for me, it moves it more than a little.

10        But I'm just curious to hear from you.  I

11   understand they're totally unrelated issues, totally

12   unrelated cases.  But now -- I mean, there's another cook in

13   the kitchen kind of watching this.  Isn't that helpful?  I

14   don't know.  Do you have any thoughts on that?

15        MS. SOLOMON:  Your Honor, I think we -- you know,

16   our position last time was preliminary, you know, in

17   discussing similar issues.

18        But I don't think our position has changed that

19   much with a few things to keep in mind:  One that, as you

20   just noted, Mr. [Indiscernible] just noted, the issues in

21   that case are of course different.  They're focused on AML,

22   KYC.  And it may be that some aspects of what the monitor is

23   going to be focused on overlap.

24        But we wouldn't know that, because no information,

25   no discovery, has been provided.  Our understanding --

1    again, not being involved in those cases -- but our

2    understanding is that the monitor's not yet in place.  It's

3    an undertaking, I suspect --

4              THE COURT:  Sure.

5              MS. SOLOMON:  -- for this monitor as well.  And

6    it's going to take time for that monitor to get, you know,

7    their hands around an international organization with, you

8    know, complex technology.

9              As you can see from the amount of time it's taken

10   us in expedited discovery to focus on relatively discrete

11   issues, I would imagine that that monitor is going to have a

12   lot to engage in.

13             So it may be the fact that, over time, as this

14   monitor is in place for several years, they'll start to, you

15   know, truly have their hands around everything.

16             But at this point, our understanding is that the

17   monitor is not in place.  Its preliminary focus, at least at

18   minimum, we would assume, would be focused on AML and KYC,

19   which are issues that may have some overlap --

20             THE COURT:  Right.

21             MS. SOLOMON:  -- but are still distinct from.

22             And then, you know, finally I'd add that the

23   monitor is going to be focused on Binance and the issues

24   related to Binance.  And we're here with BAM's customer

25   assets.

1          THE COURT:  Yes.

2          MS. SOLOMON:  And so again, it may be that this

3   monitor would flag a transfer or something, but it may be

4   that they wouldn't, because it's just not what they're being

5   asked to do.

6          And again, to the extent those assumptions are

7   incorrect, your Honor, the Defendants are free -- they're

8   the ones relying on the fact that this monitor is in place,

9   and they can volunteer information and we can have a

10  discussion.

11         But so far, no information other than what you've

12  seen in the joint status report has been disclosed about the

13  monitor.

14         THE COURT:  Okay.  And I guess the last thing this

15  is -- and maybe relatedly; I hear you -- is that, you know,

16  the monitor is -- that's maybe potentially outside the

17  scope; or even if it's within the scope, it's at the margins

18  of what the monitor is supposed to do once they ramp up.

19         Maybe just stepping back, sort of what is the --

20  it's almost a parade of horribles.  I mean, like, what's

21  our -- what are we trying to protect against?  As I

22  understand it, it's kind of upside-down from normal, I would

23  think.  Like normally, you're concerned about the

24  dissipation of assets because the overseas entity is -- has

25  less wealth than the domestic right here, like the foreign

1    company it appears has a lot more assets.

2            So it's not just that like -- well, I would

3    assume, but you can tell me -- I don't think you're afraid

4    or the SEC is not concerned about just, like, a run on the

5    foreign entity and then they have to sort of fund their

6    accounts.

7            Is it more just that, like -- I mean, I guess,

8    what is the concern?  I know we're talking about, like,

9    people in Canada and the control and things like that.  But

10   is it the concern that the overseas entities is going to go

11   for assets from here or telling people what to do and, you

12   know -- I guess part of what I think about the monitor is I

13   would think that if you then said -- is your fear then

14   relatedly you won't know?  Because I feel like if you do

15   know, you're going to get it back.

16           Now, I mean, I don't know if that's a great way

17   to -- I don't know if the right word is "parent," but you

18   don't wait until someone gets caught to know that you can do

19   corrective things.  But it just feels like a worst-case

20   scenario, I would agree.

21           At the beginning -- at the first hearing in front

22   of Judge Jackson, there were a lot of worries and fears.

23   And generally, things have moved towards -- I mean -- and I

24   know you haven't gotten the access that you wanted.  But we

25   still haven't seen a lot that's giving a lot of heartburn.

1       And I just don't understand -- and the worst-case scenario

2       now just seems like the ceiling has come down on it because

3       of the monitor, because of the guilty plea, because that

4       company has more money.  And so I'm just a little less

5       nervous.

6               And so I guess, what should I be nervous about?

7       Maybe that's an easier way to ask it.  Or what is the SEC

8       nervous about?

9               MS. SOLOMON:  Your Honor --

10              THE COURT:  And if you don't -- there are unknown

11      unknowns.  So -- go ahead.

12              MS. SOLOMON:  Your Honor, the SEC is nervous about

13      the same things it was nervous about when we talked to Judge

14      Jackson.  It's the risk that Binance and Mr. Zhao's

15      influence and control over BAM's day-to-day operations and

16      its assets allow it to access its funds, which is prohibited

17      by the consent order.  And it was prohibited by the consent

18      order due to this concern.

19              At the time the consent order was entered, Binance

20      was a bigger entity than BAM.

21              And we might assume that in some worlds that, you

22      know, BAM would have been able to operate more

23      independently, because if it were true that Binance wasn't

24      too worried about their relatively small billions of dollars

25      in assets -- everything's relative --

```
1                THE COURT:  Yes.

2                MS. SOLOMON:  -- in BAM's possession, then why

3      hasn't BAM been able to, you know, operate more

4      independently?  And that's a theme in our complaint.  And

5      not trying to get into the merits, but --

6                THE COURT:  Right.

7                MS. SOLOMON:  -- [indiscernible] relationship.

8                You know, and instead what we've seen, you know --

9      and I think in our first status conference here, you know,

10     there was a discussion about whether or not BAM could just

11     use a different wallet software provider.  And the answer

12     was no.

13               So on the one hand, yes, there's a relative, you

14     know, David and Goliath potentially in the room.  One is a

15     smaller entity.

16               On the other hand, we have a lot of evidence

17     suggesting that Binance or, you know, people at Binance have

18     been hesitant to give up control of BAM.

19               And so again, if the wallet software -- a lot of

20     issues we've pointed to today.

21               So if Binance was not so interested in the assets

22     that BAM has in its possession and control, then, you know,

23     maybe some of those questions would have been easier to

24     address.  But they haven't been.  BAM told us very

25     definitively in court that they could not move on to a
```

 1    third-party software.

 2                THE COURT:  Yes.

 3                MS. SOLOMON:  I don't believe more information was

 4    provided as to why not.  They just said it was not feasible.

 5                And again, I think what we've tried to describe in

 6    our papers -- and I know it's, you know, selective facts

 7    that we've tried to bring to your attention -- is that the

 8    claws that Binance has continue to be in BAM's day-to-day

 9    operations.  The TSS operations -- sorry -- are an example

10    of that.

11                If it were true that Binance was not so focused on

12    the assets that BAM has, you know, why haven't they just

13    transferred the TSS administrator?  I realize that BAM has

14    made certain representations that administrators have

15    changed.  But the information we've described in that point

16    suggests that if changes have happened, they've either

17    happened very recently --

18                THE COURT:  Right.

19                MS. SOLOMON:  -- and they haven't been fully

20    explained.

21                But we're seeing, you know, Ms. Chen, who's a

22    senior Binance executive who's just very involved in the

23    day-to-day.  She's involved in creating key shards.  She's

24    been involved -- at least through October of this year, late

25    October of this year, she was the TSS administrator,

1     according to the head of clearing at BAM.

2              And so on the one hand, they do care.  The facts

3     on the ground indicate that they do care.

4              And going back to your initial question, your

5     Honor, about the risk:  Again, the risk is that, you know,

6     these assets could be controlled by someone other than BAM.

7     And that's exactly what the consent order is about.

8              The --

9              THE COURT:  I hear you.  I guess, is there -- in

10    terms of, like, the consent order, it's just that.  It's by

11    consent.  And I think when we were negotiating, the parties

12    always had the ability to take it back to the Court and get

13    a court order if they sort of felt like that no longer was

14    it effective.  So let's just put aside that if one side is

15    not doing what they were -- said they were going to do.

16             The sort of purpose -- is there a purpose besides

17    making sure that there's consumer protection?  Is there more

18    to the -- what are the purposes, I guess, of the order?  Is

19    it more than just, I mean, that they're doing something that

20    they're not supposed to be doing, I mean, in terms of the

21    merits?  That is obviously its own sort of -- a bit

22    circular, and so it's fraud.

23             So -- but I get that.  That's one bucket.  One

24    bucket is:  We want to make sure money doesn't get taken

25    overseas, because that's really important.  We want to make

```
1    sure U.S. customers are protected.

2           Is there anything else?  Because at the end of the

3    day, if I'm making a decision on these things, what am I --

4    what should be sort of animating my -- besides the fact that

5    they agreed to it, the consent order?  What else besides

6    those two buckets of they're doing something that

7    potentially the SEC has determined is, you know, not allowed

8    and consumers?  Is there a third or fourth thing that should

9    be, like, animating my sort of thoughts, Well, here's what

10   we have to fashion a system to protect or Here's what we

11   have to fashion a system of getting knowledge to ensure that

12   this thing isn't going to happen?

13          MS. SOLOMON:  Your Honor, you're absolutely

14   correct that the remaining force behind the SEC's, you know,

15   pursuit of a TRO and expedited discovery and the consent

16   order is the protection of consumer assets and ensuring that

17   there are sufficient assets in the United States to protect

18   consumers here.

19          You know, we talked extensively at the TRO hearing

20   about the interconnectedness of these entities --

21          THE COURT:  Yes.

22          MS. SOLOMON:  -- and the ease with which assets

23   could be transferred overseas.  All those concerns still

24   exist.

25          The one thing that -- or I would say the couple of
```

1    things that we do know is that even past that point, after

2    months of expedited discovery, again, what you'd expect to

3    be maybe an easy unraveling has not been an easy unraveling.

4    And I think that just further underscores the points that we

5    made at that TRO hearing.

6              I would also add that we know more about Binance,

7    quite frankly.  They've now pled guilty -- so has

8    Mr. Zhao -- to various regulators and to the Department of

9    Justice.

10             And so in many respects I think, again, that

11   further underscores our concerns.  We are not dealing with a

12   company that has robust compliance in place.  We're talking

13   about massive criminal pleas and, you know, arrangements

14   with regulators.

15             And so in our view, those concerns don't go away.

16             THE COURT:  Yes.

17             MS. SOLOMON:  They just further -- we are, you

18   know, full belts-and-suspenders confident that we -- they

19   were happy we pursued this route, because we are concerned

20   about customer assets.  And we now know that the risk was

21   real.

22             THE COURT:  Okay.  I get it.  That's helpful.

23             So in terms of the -- moving just to maybe more

24   specifics, the inspection -- I don't think a follow-on

25   inspection at this point is -- the one thing that we'll

1    always all agree on is that neither side will be satisfied

2    with these things.  I mean, it may be choreographed.  But

3    when one side thinks the [indiscernible], then that's a

4    problem.

5           So I think we -- I'm hoping just through other

6    discovery tools we're going to get the answers that we need.

7    But, you know, I'm not saying, you know, never or whatever.

8    I think right now we got what we're going to get from the

9    inspection.  And so it's kind of where it is.

10          I just -- to me, what I see -- well, one thing on

11   the September 21st request, so the SEC -- just correct me if

12   I'm wrong -- but the SEC appeared to indicate that BAM did

13   not include attachments and metadata associated with

14   responsive documents or provide written responses

15   identifying the productions, scope and claims of privilege.

16          So does that still sound right?

17          MS. SOLOMON:  Your Honor, that's correct.

18          And just to clarify, on the attachments and

19   metadata point, I just want you to understand there have

20   been some attachments and some metadata produced.  But it's

21   been incomplete.

22          THE COURT:  Okay.

23          MS. SOLOMON:  On the metadata we've asked for

24   that -- to be completed, our understanding is that generally

25   that is not a very burdensome thing to produce and it's just

1     done in the ordinary course.

2              As to attachments, we have not gone through every

3     single document --

4              THE COURT:  Sure.

5              MS. SOLOMON:  -- produced and asked for

6     attachments.  We've tried to be targeted.  As we've reviewed

7     documents, we've seen a lot of embedded spreadsheets that

8     seemed particularly on point as well as attachments and

9     we've identified a handful, I would say, of those

10    attachments.

11             And to give you just one illustration of that, in

12    documents produced just this month on February 7th, there's

13    a reference to a TSS procedure handbook.  We haven't seen

14    that.  We've asked in lots of depositions about, you know,

15    the types of guidelines and other things that neither of the

16    shard holders had.  And not knowing what's in there,

17    certainly on its face it seems like something that would be

18    responsive and relevant.

19             But we don't have it.  And it's embedded.

20             And so again, we've identified those documents and

21    likewise metadata.

22             I would say in response that we haven't received

23    any explanation as to why they can't provide those.  The

24    last correspondence we received from BAM said -- and

25    referencing our page number -- "We will not be providing

1   those attachments, period."

2          And so I would say there's been no demonstration

3   of burden or why these documents are not relevant.

4          THE COURT:  That's helpful.

5          So my question for BAM -- and if I were BAM, I

6   would think part of the -- what's animating that answer is

7   just you're at the end of your rope in terms of expedited

8   discovery.  And so I hear that.

9          But I hope that you're going to be saying, "I

10  agree.  We've got to wrap it up."  And I think this is -- I

11  think you've made great efforts to try to get information

12  over.  And so now I want to -- but I don't want the end if I

13  feel like we kind of have a drop-off.  I think that's going

14  to hurt sort of BAM's argument if there ultimately needs to

15  be an adjudication.

16         So I guess my request is to -- I want to get those

17  attachments and metadata out.

18         Now, if you want to be heard on that particular

19  issue at this moment, I'm happy to hear from you.  But, you

20  know, it's hard for me to imagine a scenario in which things

21  that you've already given over -- and I don't want to punish

22  you for doing the right thing -- but things that you've

23  already given over, if they're not asking for every single

24  thing to have an attachment, it makes sense to me that they

25  should get that to sort of close the loop on that.

```
1              So, I mean, from BAM's perspective, do you have
2       something to add?  Or you think you've done enough and --
3       but that you're willing to accommodate me on this and help
4       me with the attachment issue, understanding that it's
5       begrudging?  I'm glad to take begrudging.
6              So any thoughts on that?
7              MR. LUGER:  Yes, your Honor.  And we want to
8       accommodate the Court.  And, yes, you're right that our main
9       goal here is to get to the end.
10             I think the burden question, you know, if you look
11      at the deposition transcripts, every deposition has multiple
12      requests for documents when they're referenced to.
13             So we just want to make sure the universe is
14      confined.
15             THE COURT:  It's got to be.
16             MR. LUGER:  And we understand exactly what's being
17      asked for and, you know, we'll accommodate on that --
18             THE COURT:  Okay.  Great.
19             MR. LUGER:  -- [indiscernible] as practical.
20             THE COURT:  Okay.  Great.  Thank you.
21             In terms of the --
22             MS. SOLOMON:  Your Honor?
23             THE COURT:  Yes.  Yes.  I was going to ask a
24      second part -- well, let me tell you what I was going to
25      ask, and then you tell me if you were going to tell me that.
```

1    And, if not, then I want you to add more, which was about

2    the written responses identifying scope and claims of

3    privilege.  So that was going to be the next issue.

4                Is that what you're --

5                MS. SOLOMON:  Your Honor, you read my mind.

6                THE COURT:  Okay.  And so have you been getting, I

7    guess, privilege logs outside of this or is that what you're

8    hoping to get?

9                MS. SOLOMON:  Yeah.  I mean, as an initial matter,

10   we want written responses that specify what or wasn't

11   produced.

12               THE COURT:  So it's not just a privilege log; it's

13   also a written indication -- right.  Sorry.  Okay.  Go

14   ahead.

15               MS. SOLOMON:  Yes, your Honor.

16               THE COURT:  Go ahead.

17               MS. SOLOMON:  You know, written responses

18   contouring what they've produced and whether or not

19   documents have been withheld.

20               Presumably -- we're making assumptions, since we

21   don't have those written responses and we don't have a

22   privilege log -- we would expect that at least some of the

23   documents maybe have been withheld on the basis of

24   privilege.  And we've got inclinations of that during

25   depositions.

1          For example, one of our unanswered requests deals

2     with a list of Binance entities.  Inexplicably, it just has

3     not been produced.  In our view, it's pretty impossible to

4     try to comply with the consent order without having a list

5     of which entities are affiliated with Binance.

6          And if your Honor recalls, the consent order has a

7     fairly broad definition of what a Binance entity is.  And we

8     don't have in our possession a complete list.

9          So as your Honor may recall, Sigma Chain, for

10    example, was an entity that --

11         THE COURT:  Yes.

12         MS. SOLOMON:  -- was affiliated with Binance and

13    through which transfers have been made, transactions have

14    been made.  So without that complete list, we and in our

15    view BAM personnel are not in a position to really comply

16    with the consent order.

17         We've spoken to at least one deponent who

18    mentioned the existence of such a list, but it hasn't been

19    produced.  Whether that hasn't been produced because they're

20    taking a position that it's privileged, an assertion that we

21    might challenge, but we don't know because we don't have

22    that written description of, you know, what the contours are

23    and whether or not they've withheld documents.

24         And yes, your Honor.  As you said, we also do not

25    have a privilege log.

```
 1                    THE COURT:  Okay.

 2                    MS. SOLOMON:  And if I could --

 3                    THE COURT:  Yes.  Please.  Go ahead.

 4                    MS. SOLOMON:  -- [indiscernible] to one item in

 5       counsel's response.

 6                    In regards to requests made during depositions,

 7       you know, we have made requests during depositions.  That's

 8       kind of the nature of this process, that we're learning

 9       things; and therefore when, you know, a clearly relevant

10       document is described in depositions, we ask for it.

11                    In our view, that's in some ways the easiest way.

12       You have a discrete document that a particular deponent is

13       testifying to the existence about.  You know, we haven't

14       actually gotten most of the documents that have come up in

15       those depositions.

16                    And in December, we sent a letter describing

17       outstanding discovery requests and, yes, we went through our

18       list of existing requests.  But we emphasized really stuff

19       we have learned since September, the stuff that we had

20       identified in depositions.

21                    And many of those things just haven't been

22       produced.

23                    So while, you know, I hear counsel's discussion

24       about burden, it's somewhat odd to us because we haven't

25       actually gotten the documents in response to many of those
```

1    requests.

2          THE COURT:  And I think from their perspective --

3    and it isn't wrong from your perspective; it just -- there's

4    no limiting principle to, when is it going to end?  And from

5    your perspective, you just keep learning new stuff and so

6    you've got to ask those questions.

7          And so that's why, you know, it's now on to me.

8    I've just got to set, I think, some parameters.

9          But I understand why they are where they are.  But

10    I hear you very clearly.  It's like, yeah.  That is a pretty

11    reasonable thing instead of asking very broad requests

12    saying:  Okay.  You just said this TSS handbook exists.  We

13    need that.

14          You know, so I'll come back to, I think, maybe

15    some thoughts on how we can scope that.

16          But in terms of the written responses identifying

17    the production scope and the claims of privilege, is that

18    something that you all can tee up or you have teed up or

19    you've thought about?  And again, you know, understanding

20    perhaps with this reframing that there is some boundaries

21    here, I mean, I have a hot take that I think the privilege

22    logs are unnecessary because we don't have relevancy logs,

23    but I have yet to convince perhaps anyone else in the

24    judiciary of that.

25          So we won't start this as my test case on that

```
 1    belief.

 2              But --

 3              MR. LUGER:  Well, your Honor --

 4              THE COURT:  Yes.

 5              MR. LUGER:  -- just to that point, you know, we --

 6    I think it helps to think of where we are in the process.

 7    We're in the expedited discovery process.  It's governed by

 8    a reasonableness standard the Court has to apply.  We have a

 9    fully briefed motion to dismiss, which again --

10              THE COURT:  Yeah.

11              MR. LUGER:  -- [indiscernible] on that decision.

12    And so to your point, you know, with respect to privilege,

13    is that, you know, we've produced thousands of documents in

14    this expedited posture.

15              There is a burden to going back and, you know,

16    working through the privilege questions that attach to those

17    thousands of documents and figuring out however many more

18    that have been part of the review there.

19              And so in the expedited posture, you know, our

20    view is that it's -- the burden is going to outweigh what --

21    the benefit that we're going to get in this expedited

22    posture to get to the ultimate question of asset dissipation

23    and availability of assets for customers.

24              THE COURT:  I hear -- you know, I think -- what's

25    the traditional?  "Regular"?  "Actual discovery" when it
```

1    happens?  I mean, I presume some of this will still come up

2    and so perhaps there's some value in getting ahead of it.

3          But I also agree.  I mean, I don't -- we can't

4    have the full -- expedited discovery has, I'm sure, from

5    your perspective just started to feel like regular

6    discovery.  And that's not what it's meant to be.

7          You know, in terms of at least written responses

8    identifying kind of the scope and maybe not, you know, a

9    full -- right? -- privilege log, is there expedited versions

10   of these things that at least you guys can think about

11   doing?

12         Because I think it would be helpful -- it's going

13   to be important again in -- less so, though, identifying the

14   claims of privilege, but the production and the scope,

15   that's going to be important if we're sitting here the next

16   time we're here, you know -- hopefully not -- just on the

17   papers having briefed these issues on a renewed motion to

18   compel.  I think you're going to want to have been able to

19   very concretely show how you've answered everything and,

20   where you didn't, you know, why, either burden or privilege

21   or both.

22         And so I think it's going to be pretty helpful if

23   you can do that.

24         And so my charge to you is not the full, but maybe

25   the -- you know, an expedited version of it.  Does that make

1    sense?

2             MR. LUGER:  Yes, it does, your Honor.

3             THE COURT:  All right.  Thanks.

4             So again, there were kind of four issues, so I'll

5    go through the four that I see from, I guess, as a result of

6    the inspection where, you know, BAM's sort of productions

7    have led the SEC.

8             Now, the first is whether BHL has any custody over

9    BAM's hot and customer deposit wallets.  One of the issues,

10   it seems like, at the JSR that's identified is that there's

11   a concern from SEC that BAM might not exclusively control

12   the private keys, customer assets and related transfers and

13   withdrawals in its customers' hot wallets through its Pane

14   [indiscernible] case system.

15            One thing that was helpful, I guess, is that we

16   saw that BAM, you know -- the JSR indicates that BAM was,

17   like -- it gained control of the root account.

18            But there's questions from the SEC about that --

19   if I have that correct -- the AWS environment, if BHL has

20   lost access to that environment or if there's any access or

21   rights or -- to the contents.

22            And so those, I think, are questions that the SEC

23   feels that are important.  Questions about BAM's control

24   over what they describe as, quote, "the servers and

25   softwares associated with BAM's wallet and private keys."

1    Again, they're looking to the consent order.

2                    I'll start with the SEC, I guess, on that.  Do you

3    have -- is that something that you feel -- is this something

4    that you feel like the 30(b)(6) will answer or is there

5    somebody else that you're hoping to get answers from or have

6    you talked to -- I guess, what have you heard?  Because I'm

7    going to ask BAM next who they think can answer those

8    questions or what it is.  And so obviously, you're

9    speculating.  But I'll just start with you.  Do you have a

10   sort of plan to get that -- or desire to how to get that

11   answered?

12                   MS. SOLOMON:  Your Honor, this is, I think, one of

13   the exact types of topics that we feel can be answered by a

14   30(b)(6).

15                   And I think part of -- part of what's animating

16   that request is if we think about it from our perspective,

17   we have depositions where we're told that BAM does not have

18   access to private keys and that there has been, you know, a

19   Binance AWS environment to which BAM does not have access,

20   you know.

21                   And then we hear from BAM saying that in their

22   supplemental interrogatory response, which your Honor just

23   alluded to, that maybe something has changed.

24                   And the emphasis is on "maybe."  It's very hard

25   based on the information how it's been provided to us to say

1   whether this is a change.  Is it wordsmithing?  You know, is

2   this -- you know, and maybe something has changed.  And that

3   could be great.  And that's what we want to hear.  You know,

4   we're not on a witch hunt.  We just want to know the answers

5   to questions.

6          And so, you know, I think a 30(b)(6) could speak

7   to, we think, what the current state of affairs is, you

8   know, at this moment and allow us the opportunity to, you

9   know, press information that we've received in that

10  supplemental interrogatory response.  It may be that BAM has

11  to provide more than one witness.

12          We're also open to alternatives.  For example, if

13  one of the individuals we previously deposed who gave us

14  some of the testimony we've pointed to, for example, Eric

15  Kellogg wants to have an additional deposition where he

16  says, Yes, I told you that then and, you know, this is the

17  new policy; it changed in this period, something along those

18  lines, we're very open to discussions about how that could

19  be done.

20          But we do need a more definitive understanding of

21  those issues.

22          THE COURT:  Okay.  So I didn't get into the

23  30(b)(6) yet.  So I just want to know, outside of the

24  30(b)(6), any thoughts about this?  Or it seems like to

25  me -- I took this as a really positive answer -- you know, I

1       understand the SEC -- they may not have gotten their full

2       comfort with it, but it sounds to me like BAM is doing what

3       they've been supposed to do and that it's a good sign.

4               So given that it's a good thing, is there more

5       meat on the bones that you can add to that that you think,

6       you know, it may not satisfy the SEC but it would be

7       helpful?  Or do you think there's kind of more there?

8               MR. LUGER:  Your Honor, I'm just not sure what

9       else we can do from our perspective.  We've done the

10      inspection with the PNK system that governs the hot wild

11      process, was inspected by the SEC.  Counsel referred to the

12      supplemental interrogatory response that showed that BAM now

13      has control over the root account for the AWS data center.

14              And, you know, there's an allusion in there to

15      confusion about which AWS we're talking about.  There was a

16      letter back in June that explained the AWS environments.

17              BAM has always had access and housed the AWS

18      environment for PNK.  It now has access and is the root

19      access holder for the wallet software environment on the BHL

20      software.  So that's the development in the root account.

21      And we've -- we've, you know, supplemented our interrogatory

22      responses to reflect that.

23              We have sworn declarations from Mr. Kellogg about

24      access that BHL would not have to the assets.

25              We have testimony from multiple deponents about

1    whether BHL can access these assets or transfer them; you

2    know, multiple shard holders and others who have testified

3    on that point.

4           So from our perspective, I'm not sure what else we

5    can do at this point.  There is, you know, as your Honor

6    alluded to -- there's the deposition of BHL.  If there are

7    questions about the interaction there, then we agree that

8    that's the next logical step here.  That's how the consent

9    order was envisioned, for the BAM side to go first and to

10   fill in gaps and, you know, if there are gaps there -- we

11   don't think there are -- then that's the logical next step

12   on that.

13          THE COURT:  Okay.  From the SEC, I'm happy to hear

14   from you.  I guess is there -- do you think outside of the

15   deposition, which we'll get to, is there something where you

16   could ask a few questions?  I know whenever you ask a

17   lawyer, you're never going to get a full answer.  But is it

18   something where just with the written questions, some

19   additional interrogatory, maybe?

20          Because I think that, you know, where they are is

21   that it's going to be an answer that is what you're hoping

22   to hear.  But is it something -- is there anything short of

23   a deposition?  Not that you'd be giving that up, because my

24   inclination is that it might be pretty helpful to have one

25   final 30(b)(6).  But again, I'm going to hold off on

```
1     sequencing things.

2              But in the interim, is there like one or two

3     questions about this that could be helpful?

4              MS. SOLOMON:  Your Honor, if I may -- I'll of

5     course get to your question.

6              THE COURT:  Yes.

7              MS. SOLOMON:  If I can just clarify a few

8     issues --

9              THE COURT:  Yes.

10             MS. SOLOMON:  -- in counsel's response.

11             In particular, what I described as maybe

12    something's changed; we don't know.

13             THE COURT:  Yes.

14             MS. SOLOMON:  And then on the other hand,

15    counsel's alluding back to declarations that were submitted

16    in June.

17             THE COURT:  Right.

18             MS. SOLOMON:  And I can't think of a better

19    illustration of why we need clarification.

20             We have deposition testimony from Eric Kellogg in

21    August describing that though don't have -- that BAM does

22    not have access to the private keys and that they are held

23    in an AWS environment by Binance.

24             BAM also, we understand, has an AWS environment.

25             Notably also, Mr. Kellogg testified that simply
```

1    being a root accountholder does not necessarily mean you

2    have access to all the individual servers that are in that

3    AWS environment.

4            And so, you know, again, yes, we have those

5    declarations in June and then we have the deposition in

6    August.  And then we have a supplemental interrogatory

7    response in November.

8            We cannot piece together those issues.  And this

9    all brings me back to your Honor's question.  We are happy

10   to propound, you know, additional interrogatories.  We've

11   been hesitant to add --

12           THE COURT:  Yeah.  Which I appreciate.

13           MS. SOLOMON:  -- [indiscernible] discussions about

14   burden.  But we're happy to, to the extent it would be

15   helpful --

16           THE COURT:  Yeah.

17           MS. SOLOMON:  -- to have those responses.

18           That said, you know, we're not looking at the

19   response.  Maybe that response will map everything out

20   perfectly.  But we anticipate that having deposition

21   testimony in addition to that will be helpful to explore the

22   topics --

23           THE COURT:  Yes.

24           MS. SOLOMON:  -- and interrogatory.

25           THE COURT:  Yes.  And again, I hear what you're

1     both saying.

2              I mean, I think things could have changed.  But

3     all documents could be helpful if they've laid out, like,

4     the topography and you just said, you know, We've moved the

5     boundaries of these, you know, two places.  But the

6     topography is the same.

7              So I hear what you're saying, but I get it.  I

8     don't think written questions are helpful.  So that's great.

9     That's helpful on that.

10             A question for the SEC:  In the JSR, the SEC

11    has -- well, so just to make sure we're talking about the

12    same issue, I think you just kind of referenced this.  We've

13    talked about in the past, I believe -- right? -- that

14    there's evidence that BHL can effect transfers of BAM's

15    crypto assets from customer deposit logs to hot logs when

16    transfers get stuck, you know, sort of that help desk as we

17    understand it while using the PNK system.

18             You indicate that the SEC has sought discovery to

19    confirm the scope of BHL's ability to move assets, but

20    haven't gotten an answer that, including an inspection,

21    where you feel that BAM failed to explain how PNK interacts

22    the wallet software and private key.

23             So outside the inspection, is there other

24    discovery that you've propounded to confirm the scope of

25    BHL's ability to move assets but that you've kind of been

1    rebuffed on?  Or -- I don't know if you have specific

2    things.  It's hard.  There's a lot that's happened.

3          MS. SOLOMON:  Your Honor, I'd have to probably

4    consult the full list of requests.

5          And one of the things we've tried to do is move

6    beyond Request No. 5 --

7          THE COURT:  Yes.

8          MS. SOLOMON:  -- and Request No. 6 and just focus

9    on what the issues are.

10         And again, as your Honor alluded to in the

11   inspection, you know, we went into that with open eyes.  We

12   were hoping to learn as much as we could from that.

13         What we didn't see is the back-end access of how

14   PNK is -- you know, operates from the back end.

15         We saw discrete issues such as the changing of

16   thresholds.  What we didn't see is whether or not, you know,

17   someone hosting a server, for example, like the AWS

18   environment, for example, or through some other mechanism

19   has access.

20         And so short of that, it's hard to know.

21         What we do know again is what your Honor just

22   alluded to, that they have some potential ability to use the

23   BHL wallet software, it seems to get transactions unstuck

24   or, you know, if transactions aren't going through to go

25   through them.

1      And so I would say we know as little about that

2  now as we did when that testimony came through in a

3  deposition, I believe, over the summer.

4      And so, you know, we are open to, you know, if

5  counsel wants to explain something in a letter and we

6  propound a rog response and we get a sworn statement, you

7  know, there are ways that could be explored.

8      Again, we think a 30(b)(6) would be a good way to

9  confirm our understanding, even if there is a burden, a

10  description of something.  And again, we were open to that

11  in the inspection.  But our view of the inspection is that

12  it did not focus on PNK's back end.  It didn't describe or

13  demonstrate how the BHL wallet software interacts with the

14  PNK interface.

15      So we know that BAM [indiscernible] now has access

16  to the BAM interface.  And we appreciate the efforts that

17  went into that inspection.  But what we don't know is at the

18  end of the day someone from BHL is able to on the back end.

19  And that inspection didn't answer those questions.

20      And I would say finally -- and this, I think,

21  confounded us as an example, but there's this domain name --

22      THE COURT:  Yeah.

23      MS. SOLOMON:  -- that we alluded to in our papers

24  that we see all over the access logs for PNK.

25      THE COURT:  That's the binancecf.net?

1          MS. SOLOMON:  Yes.

2          THE COURT:  Okay.

3          MS. SOLOMON:  It took me a while to remember that

4    domain name, so I'm impressed.

5          But, you know, that's a perfect example of, we

6    asked about it during the inspection; we asked about it, you

7    know, in written requests as well or at least in

8    correspondence.  And we'd like an answer to that as well.

9          And then finally -- and our view is that or our

10   understanding is that this is not burdensome -- is updated

11   PNK access logs, which will show us what the state of

12   affairs is today because, as we've discussed, the extent,

13   you know, things have changed, that would be helpful to

14   know.

15         And I know I said "finally," but there is one

16   more, I think:  The AWS environment as well, it would be

17   helpful to have updated access logs to the AWS environment;

18   and to clarify, within the provision of access logs should

19   also be some description, whether it's generated from the

20   system, of what individual usernames -- what individual user

21   roles actually mean and what they pertain to.  And that's

22   probably something that could also be covered in a 30(b)(6).

23         THE COURT:  So I guess, BAM, working backwards, is

24   there -- I very much understand this.  It's death by a

25   thousand cuts, which I hate to say now, because Judge

1   Upadhyaya got so excited that she thought I was making a

2   Taylor Swift reference, which I also am of the belief as

3   another judge that [indiscernible] that, but I am still

4   going to use it.

5           But I get it.  It's just -- there's thousands of

6   these requests.  And so there is always going to be from

7   Binance EF to, you know, something else and something else.

8   But, you know, you understand it's hard when I hear this.

9   It's just like, can't you just tell them that one thing?

10          And so I know that the one thing adds up.  Right?

11  I get it.  But can we just start with that?  Is there an

12  easy way to button that up or not really?

13          MR. LUGER:  I don't know as I sit here today --

14          THE COURT:  Yes.  I don't expect you to give a

15  fact expert about Binance's --

16          MR. LUGER:  -- an answer about that specifically.

17          THE COURT:  Yes.  But can you put that one -- I

18  guess that one is one I'd like to get an answer to the SEC.

19          MR. LUGER:  We can -- yes.  We'll take it back.  I

20  mean, I just do want to, you know -- as you were saying and

21  I've written down, you know, this is the issue with the

22  no-limiting-principle concept.  Right?  I mean, at some

23  point, you know, there's always something interesting that's

24  coming out of the discovery.

25          THE COURT:  Yeah.

1          MR. LUGER:  Right?  And so our concern is that the

2     goalposts are just continuing to move.

3          THE COURT:  Yes.

4          MR. LUGER:  And so, you know, the questions about

5     PNK, we -- during the inspection, you know, PNK is the

6     wallet software on the BAM end.  You know?  We're talking

7     about the back end.  And again, maybe that's a question for

8     BHL, if there's a back-end-type question --

9          THE COURT:  Yes.

10         MR. LUGER:  -- that they can ask.

11         But, you know, there's no -- PNK is the wallet

12    software on BAM's end of the transactions.  And that was

13    demonstrated to them.  There was source code that they could

14    review during the inspection.

15         And so, you know, to the point that if a

16    transaction gets stuck that there's BHL software personally

17    that have been consulted before, you know, that doesn't

18    demonstrate control.  Right?  That's -- what's the issue in

19    the consent order?  Is there an asset control issue?  And

20    there is no evidence in this case after eight months of

21    discovery that there's an asset control issue, full stop.

22         And so, sure, do other questions arise as you go

23    along?  Yes.  That's understandable.  You know, there's

24    merits discovery, you know, that could potentially come down

25    the road here.  But in an expedited posture, that -- you

1    know, our view is just that the goalposts continue to move.

2    And so we think we provided the response.  We can take back

3    the Court's question about the domain.  But again, you know,

4    where does it end?

5              THE COURT:  No.  It's got to end.  I hear you.  I

6    am certainly with you on that.

7              And just relatedly, I guess, if there's anything

8    else you can do to help sort of flesh out what the scope is,

9    I agree that BHL is going to have some of the answers to

10   these questions of what happens when a transaction gets

11   stuck, you know, in terms of the mechanics of it.

12             But that -- I mean, you know, we cannot get into

13   the ones and zeroes of every single -- like the little

14   computer source code, because then also there's a question

15   of, how does it work?  Right?  And presumably some people

16   can use code more powerfully, right?  Like a vehicle.  Some

17   can drive it faster and in different ways than others can.

18             So I think -- I get why there's heartburn on their

19   end, from the SEC side, on this issue.  But I also tend to

20   agree with BAM that you've kind of said and laid out what it

21   is.  Right?  That they can unstuck transactions; that's the

22   help desk.  But that as long as you're saying you have

23   control, that's that.  The end.  Let's move on.

24             And so I'm -- I hear you on that.  And I think

25   that your point is valid.

```
 1            Can I ask -- while I have you, before I go to the

 2    next issue, in terms of, again, knowing that you assuredly

 3    do not need or want another deposition, but do you feel like

 4    if a 30(b)(6) deposition were to occur that it should occur

 5    further down the road after some of the BHL work is done?

 6    Or does it just feel like, Look, we have what we have, and

 7    so it's kind of irrelevant what BHL -- because we're going

 8    to tell you what we know.  We know the same thing now that

 9    we know three months from now.

10            I don't know if you want to chew on that for a few

11    minutes and think about it or if you have an immediate

12    thought.  You can also always change your answer.

13            MR. LUGER:  Our immediate thought is that the

14    Court's thinking on sequencing makes sense.  Our view is

15    that, you know, that another 30(b)(6) is not going to move

16    the needle on the question of custody and dissipation of

17    assets.  You know, I don't see the benefit of that coming

18    before -- I mean, the BHL deposition is imminent.  So that

19    wouldn't even happen from a practical perspective.

20            THE COURT:  Yes.

21            MR. LUGER:  But I'm just not sure what else we

22    would -- how we would move the needle on the questions that

23    are arising from the consent order specifically.

24            THE COURT:  Okay.  All right.  So those are my

25    main issues on that first topic.
```

```
 1                 MS. SOLOMON:  Your Honor?

 2                 THE COURT:  Yes.  Yes.

 3                 MS. SOLOMON:  Excuse me.  If I may.

 4                 THE COURT:  Yes.  Please.

 5                 MS. SOLOMON:  Again, just to clarify a few issues.

 6                 THE COURT:  Please.

 7                 MS. SOLOMON:  As an initial matter, just a small

 8       issue:  That domain name question has been outstanding since

 9       August.

10                 THE COURT:  Which question?

11                 MS. SOLOMON:  The domain name.

12                 THE COURT:  The domain name.  Okay.

13                 MS. SOLOMON:  The question.  Or perhaps September.

14                 THE COURT:  That's fine.  Yes.

15                 MS. SOLOMON:  But, you know, I think there's --

16       it's important to note there's a difference between a

17       question not being answered and continuing to be live and a

18       new question.

19                 And a lot of the things that counsel has been

20       referring to as new requests just aren't.  It's a discrete

21       issue.  We got the access logs, I believe, in September.

22       They were generated on September 13th.  I believe it was in

23       that context that our question came up, or around that time,

24       also in the scope of a deposition of an internal audit

25       member.
```

1        It's not a new request.  And so it's tempting to

2   give in to this assumption that the SEC just keeps coming up

3   with new requests, but it's simply not accurate.  There are

4   things that have come up later on, you know, the TSS

5   procedures thing.  We would not be doing our jobs if we saw

6   a reference to a document like that and we didn't ask for

7   it.

8        THE COURT:  Right.  For sure.

9        MS. SOLOMON:  And arguably, that's responsive to

10  our prior request and should have been produced anyways.  So

11  a lot of these fall into that scope.

12       THE COURT:  Yes.

13       MS. SOLOMON:  But there are things like the domain

14  name that just -- that are just not new requests.

15       The other thing that --

16       THE COURT:  Real quick:  I don't think -- I mean,

17  if they were at the beginning or they were for now, from

18  yesterday, but they go to the core issue of customer assets

19  and making sure that there is a separation that needs to

20  occur, I mean, that's your job.  You've got to do that.

21       So I don't -- I'm not going to privilege one

22  request and say, Well, it should be let in the door because

23  it was at the front of the line and the other one is new.  I

24  mean, I get it.  I don't -- it doesn't appear to me -- just

25  like from their perspective, "Too much, it's adding up,"

1    every one of these questions on its own doesn't seem like

2    it's anything other than trying to get to the answers.

3         And I mean, I don't think your incentive is

4    anything other than this.  Right?  To get the answers to

5    these questions, again, to get your comfort so you can move

6    on to merits discovery, the merits portion of the case.

7         And so I don't think that anything that SEC has

8    done here -- there's no indication to me that anything

9    is other than within the sort of boundaries of what we're

10   trying to do.

11        The problem is just -- and this is a monumental

12   undertaking from your end and from their end.  And it is not

13   ultimately the undertaking that can be the one that sort of

14   takes in all the oxygen.  So I'm just trying to figure out

15   where I do have to arbitrarily cut things off.

16        But even when I do, I think there's a real risk of

17   not only obviously -- I don't think there's a question of --

18   it's not like they're saying that -- if they are, they are

19   wrong -- that there's a relevancy question; it's just really

20   burden.  And there's a risk that I could make -- you know, I

21   will make a decision and that it's going to cut you off from

22   getting data that you need that actually could prevent some

23   of the bad things from happening.  But I think that's just a

24   risk that eventually I'm going to have to take.

25        So sorry.  I interrupted.  But continue.  I just

1    wanted you to know what I think would be helpful

2    information.

3                From my perspective, Question 1:  whether BHL has

4    custody or control of BAM's hot and customer deposit

5    wallets.  Those are my main issues there.

6                I want to go to -- the other issues are much more

7    tailored or -- yeah.  They're more tailored, more narrow.

8                So No. 2 is whether BHL has custody or control of

9    BAM's cold storage and staking wallets, which is controlled

10   through the TSS protocol and the shard devices.

11               And so here we have Ms. Hannah Chen.  As I

12   understand the dispute here, the belief of the SEC from the

13   depositions is that she, a senior BHL employee, was the

14   administrator of the TSS protocol as of August 2023 but that

15   BAM has said she's no longer.  And the SEC would like

16   some -- something more to sort of corroborate that.

17               Is that right from the SEC?

18               MS. SOLOMON:  Your Honor, mostly.  If I can add a

19   few details.

20               THE COURT:  Yes.

21               MS. SOLOMON:  In deposition testimony in August,

22   BAM's head of clearing identified Ms. Chen as the

23   administrator of TSS.  Just this month, a few weeks ago and

24   recently processed by us, we received documents that

25   continue to identify Ms. Chen as the TSS administrator.  The

1    last of those documents that we've identified so far is

2    October 26th of 2023.

3            And it's not just on the TSS protocol, but also on

4    the shards.  And again, we've just received those documents

5    this month.  But in some of those documents, we also see

6    discussion of creating new shards and BAM's chief

7    information security officer is discussing with BAM's head

8    of clearing how to get new shards.  And in response, Taos

9    Zheng, BAM's head of clearing, responds that we need to go

10   to Hannah for that.

11           So we understand -- we've recently received these

12   screenshots in that same production that BAM has described

13   as reflecting that BAM are the TSS administrators.  What we

14   don't have are -- well, those are all the administrators,

15   how that reconciles with prior evidence.

16           And I'd say on this point, to the extent there are

17   things that are moving targets, there's kind of a difference

18   between, We understand what was said; here's new

19   information; it changed on this date to just providing new

20   screenshots in a different format than the prior information

21   we received.

22           So previously, again, we had this deposition

23   testimony.  We haven't got a new deposition testimony that

24   contradicts that.

25           And again, we've gotten these more recent

1    documents.  We've also gotten access logs from TSS that were

2    generated in September that reflect not just Ms. Chen, but

3    also other members of Binance accessing the TSS portal.

4            So we got the screenshots.  We understand -- we

5    don't know much about them, where they were pulled, how they

6    interact with that prior evidence.  And we also haven't

7    gotten updated access logs.

8            And to the extent -- we're not trying to get a new

9    access log every month.  That's not what our request is.

10   But to the extent something has changed, getting a new

11   access log and information about what individual users are

12   able to access in TSS is essential, you know.

13           We've heard your Honor's point about, you know,

14   this can't go on forever.  We completely agree.  But again,

15   to the extent something has changed, that's a moment in time

16   to generate a new log and to give us new information about

17   access rates to the extent they've changed.

18           THE COURT:  Okay.  So a fairly narrow issue is --

19   again, I guess I want the SEC to know who -- make sure we

20   understand who the administrator is now and that as I

21   understand it, you know, from the JSR that BAM feels that no

22   BHL employee administers the TSS protocol; and that was

23   demonstrated during the inspection, and that you felt you've

24   provided evidence.

25           I think, you know, at least from what they've said

1    that there's things that as of September that postdated that

2    August date, obviously.

3            I just want to button this up, because it seems

4    like an easy thing to button up.  I'm easy.  I'm not the one

5    doing it.  So I mean, help me right now if you can.  And

6    maybe it's more for something later in the papers.

7            But I want to keep this really narrow because I

8    don't think we can keep convincing the SEC every time.  And

9    I hear you when you say their concerns are speculative.  I

10   mean, everything they're doing is speculative.  Right?

11   That's, I mean, I think at some point they would say part of

12   their job.  But you have to live in the real world.  Right?

13   And that's why there's just inherent tension here.

14           But can we do -- you know, try to button this up

15   as to what is Hannah Chen's sort of involvement right now?

16   You know, I'm not thinking about June or March of 2023.  I

17   want to know, you know, post-August '23, more importantly

18   right now, 2024, just confirming what you've said, that no

19   BHL employee administers the TSS protocol and that Hannah

20   Chen doesn't have, I guess, or anyone -- I mean, it's not

21   just about her, right?  It's about anyone at BHL.  Can we

22   sort of try to drill down on that?  Because at least they've

23   given some questions where I do have some -- I'm nervous.

24   I'm a little concerned.

25           MR. LUGER:  Your Honor, we produced recently

1    screenshots -- and they're attached in the JSR --

2              THE COURT:  Yes.  I saw that.

3              MR. LUGER:  -- that are more current than the June

4    and the September dates that show that BHL personnel have no

5    administrative access.  And again, you know, the question is

6    control.  Right?  And there's no administrative access for

7    any BHL employees, including Ms. Chen.  And that's

8    demonstrated in those documents that are attached to the

9    JSR.  We thought that was buttoning it up.  I mean, I won't

10   go back to the testimony in the depositions --

11             THE COURT:  You're right.  Yeah.

12             MR. LUGER:  -- that confirm that Ms. Chen had no

13   role in -- with respect to BAM's wallets.

14             THE COURT:  And the only issue that I have there

15   is just trying to address -- because I think you covered

16   just pre-August 2023 or whatever -- is to the extent that

17   there -- you know, some of it is just, you know, people in

18   the office who aren't living and breathing this litigation

19   might say, like, Oh, you've got to ask so-and-so.  It's

20   like, actually, that's not the case.  That doesn't mean that

21   that person actually has it.

22             So to the extent there are discrete things that

23   they have identified after the date of August 2023, which is

24   what, you know, I believe the evidence sort of from the

25   depositions and things shows, if you can answer that, that's

 1    helpful, because, you know, maybe it makes them less

 2    concerned, although I don't think you can make them stop

 3    being concerned.  But again, that's not your job, nor is it

 4    their job to not be concerned --

 5                MR. LUGER:  I suppose I would --

 6                THE COURT:  -- and --

 7                MR. LUGER:  Sorry.

 8                THE COURT:  That's all right.  Go ahead.

 9                MR. LUGER:  Your Honor, I would want to understand

10    what about those screenshots concerning administrative

11    access are unclear.

12                THE COURT:  So we're going to hear from them.  I

13    think there's two things.  Right?  One is other evidence

14    that's been obtained that they are concerned is in contrast

15    or contradicts that August 2023 information.  And then the

16    separate question is:  How helpful were those screenshots?

17    So those are the two issue I see.  Right?  And so can you

18    sort of dive into both of those?

19                MS. SOLOMON:  Your Honor, yes.

20                Those are essentially -- you know, the screenshots

21    do show that BAM personnel appear based on the screenshots

22    without more explanation.  We understand how they're being

23    represented.  What we don't know is how they were pulled,

24    where they were pulled from.

25                One thing that we've asked about and we mentioned

1    in the joint status report is that a change management log

2    for TSS -- and we understand something like that likely can

3    be generated -- that that would show when access rates

4    changed.

5           So we have -- as your Honor pointed out, we have

6    the screenshots on the one hand.  However, we have

7    deposition testimony; we have documents, you know,

8    correspondence in late October; and we also have, you know,

9    these access logs.  So we have three categories of discrete

10   types of information on the one hand against the

11   screenshots.  And again, we don't know where the screenshots

12   were pulled from.  We don't know that they're complete.  But

13   it's that contradiction as your Honor described, that

14   just -- we have a lot more information on one side.

15          And the answer may be that things have changed and

16   they changed as of this date; and as of that date, no one

17   from Binance has access anymore.

18          But we would not be doing our jobs again if we

19   just speculated all that just based on these screenshots

20   alone.

21          So what would be most helpful are in particular

22   updated access logs, something that describes what rights

23   are associated with each of the roles that are described in

24   those access logs as well as a change management log that

25   would reflect when those access rates changed.

1          And again, this is another topic that we think

2     would be worth exploring, potentially, based on how the

3     information goes in a 30(b)(6).

4          THE COURT:  So I'm going to go through the four

5     sort of -- this is two of four.  We'll get to three of four

6     and four of four, and then I'm happy to talk a little bit

7     more about this.

8          But I think the more that you can give them before

9     a potential -- potential, although I'm leaning -- towards a

10    potential 30(b)(6), the more that they get from BHL, the

11    more it just cuts down the scope of what they're going to be

12    able to really do with that deposition.  I mean, I know new

13    things will come up from that.  And it's just -- again,

14    we're just going to have to cut it off.

15         I see -- to me, the end of the road I view right

16    now is getting some of these things together to prepare them

17    along with the BHL depositions, to prepare them for a final

18    30(b)(6), and that's the end.  And then we just move

19    forward.

20         Or, you know, obviously it was -- both sides have

21    the opportunity to go Judge Jackson.

22         But that -- so I get that it's frustrating that

23    we're -- it feels like we're still back at square one on

24    some of this stuff after you've tried to say it a couple

25    different ways.  But I think that it's different right now

1    because I just -- it is very difficult, if not impossible,

2    for me to imagine; and just going past a 30(b)(6) on this

3    and getting some of this stuff before is just going to help

4    and make that more efficient.  But that really feels like to

5    me is the end of the road for the discovery, for the

6    expedited discovery.

7         So I guess to the extent -- you've heard them.

8    There are a couple things that -- logs that they're

9    requesting.  And I don't doubt, again, not -- they're doing

10   their job.  When they see that, they're going to have

11   questions.  It's their job.  That's what the SEC does.  The

12   SEC asks questions.  They don't just sort of say, "Okay,

13   great" and rubber-stamp it, because then -- I mean, they're

14   not serving the purpose of what they've been organized to do

15   and are charged with doing.

16        But again, it's my job, not theirs, to cut it off.

17   And so I think to the extent you can get them some of those

18   logs and things like that, it's just going to help the

19   persuasion of your argument after the 30(b)(6) when they

20   invariably will ask for more.  Right?  Because they should.

21   And that's what they need to do.

22        But enough's enough.  So I think the more that you

23   can give them this stuff beforehand, those logs, other

24   things, I mean, the screenshots from my perspective, when I

25   look at them, you know, there's not a ton that I can divine.

```
 1    But I'm not living and breathing the discovery.  But it's

 2    not -- it seems like you might need something more than just

 3    screenshots to get -- to close the loop on all this.

 4              Does that make sense?

 5              MR. LUGER:  Yeah, your Honor.  Yes.  It does make

 6    sense.

 7              THE COURT:  I know I'm putting you in a tough spot

 8    because I'm asking you sort of just very general things

 9    that's sort of hard to answer.

10              MR. LUGER:  I'm happy to go back.

11              THE COURT:  Yes.

12              MR. LUGER:  And I think the information on the

13    screenshots, to give more context, I think, is workable.  I

14    just worry about, you know, the continuing, you know, update

15    requests.

16              THE COURT:  Yes.  I hear you.  I just want you

17    to -- it's not from them.  I need you to hear it from me.  I

18    know and you know -- right? -- many of you worked at the SEC

19    before.  You know that they're going to ask more questions.

20    And again, because they're supposed to.  That's -- they're

21    trying to get to the bottom of this.

22              And so that's not a "them" thing; that's a "me"

23    thing now.  We've got to shift off.  You've got to stop

24    worrying about that and just really be doing your best part

25    to document, you know, that you're doing everything that you
```

1    can do, what you have done and why it's time for me to just

2    say -- to cut it off.  Because that's the only way it's

3    going to end, right, is I just think these are really hard

4    questions that there can't be certainty on.  It's not like

5    math where we could say, like, two and two is four.  We've

6    done our proof.

7              This is like art.  And I'm just going to have to

8    say this -- you know, it's complete.  But the more that you

9    can do to help me on that by answering their questions now,

10   it's just making it a lot easier for me.  So that's my

11   request.

12             MR. LUGER:  Understood.

13             THE COURT:  Thanks.

14             Okay.  I'm going to go to category three unless

15   you have something else on this.  Well, I'll tell you what

16   category three is and I'll come back if you want to before

17   we get into it.

18             My third category is whether BAM personnel located

19   outside the United States or controlling BAM customer assets

20   and also receiving compensation from Binance entities.

21             So before we get into any of that, is there

22   anything on category two, as to whether BHL has custody or

23   control of BAM's cold storage and staking wallets in which

24   they particularly have, you know, sort of identified the TSS

25   protocols of the seven shard devices?

1          MS. SOLOMON:  Your Honor, yeah.  There's just

2     within topic -- and I alluded to it earlier -- about the

3     issue with the shards.

4          And what we, you know, heard in deposition

5     testimony is that Hannah Chen was involved in giving the

6     shards; and we saw correspondence again as late as early

7     November of 2023 in which BAM personnel -- again, BAM's head

8     of clearing, BAM's CISO, as well as BAM's deputy CISO are

9     trying to discuss creating a new shard for one of the shard

10    holders.

11         And again, we see his name involved and saying

12    "We're waiting for Ms. Chen."  And so we just want to be

13    sure that, you know, that counsel understands that when we

14    talk about access to TSS and particularly in a 30(b)(6)

15    context that the issue of who holds the shards still,

16    whether the shards have been -- the shards were previously

17    held or continue to be held -- we don't know -- by Binance

18    out of the United States have been destroyed and, you know,

19    why Ms. Chen is still involved.

20         And part of that request is one thing that we've

21    seen in the shard inspections, is that there are different

22    vaults associated with the different shard devices.  These

23    devices are actually phones.

24         We've -- you know, counsel has been very

25    cooperative in facilitating our looking at them.  And what

1    we've seen is lots of different vaults associated with the

2    shards.  We understand there's a pool of seven shards.  Our

3    rudimentary understanding is that, you know, they each get

4    to approve transfers.

5         But what we don't know is how those shards relate

6    to those different vaults.  And so to us, that is all part

7    of that question of TSS protocol and who has access to these

8    keys.  But we just want to ensure that, you know, the record

9    is clear that that -- that we view that as part of this

10   issue.

11        THE COURT:  And my fourth category -- I guess I

12   should have said this; it would have been helpful -- is the

13   monitoring for transfers are sufficient.  And so some of

14   that sort of is baked into this.  But I hear you on that.

15        MS. SOLOMON:  Thank you, your Honor.

16        THE COURT:  Okay.

17        MR. LUGER:  Just on that point, your Honor --

18        THE COURT:  Yeah.  Please.

19        MR. LUGER:  -- the appearance of an Apple ID on a

20   legacy shard device isn't evidence of access rights.  You

21   know, this is sort of our concern.  Right?  It's that, you

22   know, an Apple ID appears and it becomes the subject of a

23   supplemental request.

24        And so, you know, does that go to the animating

25   issues behind the consent order, is the ultimate question

1    here.  And, you know, we hear you about going back and

2    giving, you know, comfort to the Court.  But, you know,

3    again, it's the type of request that --

4              THE COURT:  Yeah.

5              MR. LUGER:  -- stands out to us as, is this really

6    going to the core issue with, you know, the backing of no

7    evidence of any dissipation of assets?

8              THE COURT:  I get it.  I just think that your

9    point is really well-taken, is that a lot of these things,

10   there's going to be smoke but it doesn't mean there's a

11   fire.  And we've just got to move on.

12             So I get it.  But the more that you can help me,

13   I'd appreciate it.

14             All right.  So the third category is whether BAM

15   personnel located outside the United States or controlling

16   BAM customer assets and also receiving compensation from

17   Binance entities.

18             So I mean, I think there's no dispute that BAM's

19   head of clearing lives in Canada and is involved in the

20   process of transferring assets.  It also seems like he

21   receives half his salary from an entity that may be

22   affiliated with BHL.

23             We also have BAM's head of product and director of

24   operations living in Canada.  It seems like they also may be

25   paid by outside entities.  And the SEC wants more discovery

1    to determine -- and I understand this is in your view --

2    this is as it relates to BAM's compliance with the consent

3    order.

4          You know, BAM's response here is the employees

5    outside of the United States do not exercise control over

6    customer assets, that the head of clearing requests, not

7    authorizes, but requests transfers from cold to hot wallets

8    but does not control, and that the transfers now from cold

9    to hot wallets require approval of BAM's head of treasury

10   and four of the seven shard holders.

11         They also say that at least the one entity, Pane,

12   is not associated with Binance.  And the questions about

13   employee independence do not merit the continuation of

14   expedited discovery and that BAM's head of product has

15   testified that he isn't controlled or influenced by BHL or

16   Zhao.

17         That's kind of the overview of this.

18         And so let me just -- I guess of the four issues,

19   this is the place where I just sort of see the least value

20   of going down this path.  I mean, I think from the SEC's

21   perspective, the more questions that you ask -- you already

22   know you're not going to get answers to everything, and

23   everything that you do get answers on is going to generate

24   more questions.  And so we just have to triage.  And we know

25   that these folks live outside the United States.

1          I understand the consent order very well.  But

2     still, I mean, at least in my perspective, of the four

3     categories, this is the least important.  People live

4     outside the United States.

5          I mean, if the concerns you have are true, I mean,

6     there's just as much of a risk of someone in the United

7     States being -- you know, the strings being puppeted by

8     someone overseas as someone in Canada.  And, you know, how

9     they're paid still -- I mean, I don't know that that's --

10    nothing that -- I feel like you have bigger concerns than

11    just who's cutting the checks to them.

12          And so I'm really hesitant to sort of give

13    anything on this.  I just want to -- I feel like this is a

14    thing that I'm less interested in than the other three

15    categories, which are much larger, not that this isn't

16    important, and it certainly is squarely within the consent

17    order.  I get that.

18          What I want to really drill down on this is BAM's

19    language.  It says that -- BAM says that the SEC understands

20    the distinction between BAM's clearing lead requesting

21    transfer from BAM cold wallets to its hot wallets and

22    controlling customer assets, but that -- but continues to

23    attempt to blur that line.

24          So I mean, I think they view our request as

25    different than control.  Let me just start with BAM.  Right?

1       Isn't that the -- is there not the distinction?  Because I

2       see that as a distinction.

3                   MR. LUGER:  Right.

4                   THE COURT:  It's:  Who cares?

5                   MR. LUGER:  I would use the word "initiate" also.

6       Right?  There's still the shard holder process with which

7       he's not involved that actually is required for the

8       execution of any transfers.

9                   So while -- you know, we're saying initiating

10      doesn't equal control --

11                  THE COURT:  Got it.

12                  MR. LUGER:  -- of the process.

13                  THE COURT:  Yeah.  And you feel like you've done

14      your work on that and, you know, set the protocols in place

15      and things like that such that we're good on this.  Is that

16      fair?

17                  MR. LUGER:  Correct.

18                  THE COURT:  Okay.  So I'm not asking you to give

19      this up, because I understand it's like our children.  We

20      love each one equally.  But I'm -- I kind of feel like this

21      one's, you know -- we've just got to start prioritizing.

22      Right?

23                  And I need you to -- let me tell you this and then

24      I'll let you talk:  One of my sort of [indiscernible] for

25      the SEC -- and it's hard, I know, for you all because all

1    these are important -- is I think we're just going to have

2    to get a -- it's either now to BAM or now and certainly when

3    we're going to be -- to the extent I have to write an order

4    making a decision on this in the very near future -- is I

5    think you're going to have to make a list of your

6    outstanding requests.

7            And I agree with you.  I don't care if it was

8    because of something you learned yesterday or something I've

9    been waiting for from the beginning.  I mean, I guess that

10   goes to -- somewhat to the, you know -- your frustration.

11   But ultimately, you just want the data; and something could

12   happen that's really important now.

13           Let's just get it -- I'm going to need it -- it's

14   going to have to be in rank order.  And it's hard because,

15   you know, the first thing they're going to say is, "There's

16   50" and like:  "Okay.  Well, there's 50, so, you know, when

17   I say I gave ten, see how magnanimous I am," you're going to

18   be well, like, "Well, there was like another 100 that we

19   didn't ask, because we can't put everything on there and

20   that's like insane to have to list every single thing."

21           But at some point I'm going to have to -- as part

22   of triage, we're just going to have to pick some and tell

23   them.

24           Now, I'm hoping that the deposition is -- the

25   30(b)(6) is really just going to cover what we need.  But if

```
1    there's like one or two things that, yeah.  I mean -- and

2    knowing that that one thing is not a simple yes or no, so I

3    don't want to extend this.  But I'm hoping before the

4    deposition that you all are going to make your sort of wish

5    list of, "Here are the things that we just absolutely have

6    to get" and you start going through and making a very

7    difficult decision.

8            And I take the difficulties that you're trying to

9    protect customers.  So it's not, like, difficult because

10   it's hard to pick, you know, two different strategic things;

11   it's just -- you want to make sure that you're doing your

12   job of protecting people.  But we're going to need to get a

13   list.

14           And to that end, just -- I'm very ready to sort of

15   move on from this.  But I'm happy to hear something that you

16   have on it to tee up for them things that they need to

17   figure out or that might be -- I still think this is a

18   bucket, though.  If I have these four buckets, if there is a

19   30(b)(6), I only anticipate it being about these four

20   buckets.  And so something on this --

21           Did you want to hit on it?

22           MS. SOLOMON:  Your Honor, if I may.

23           The SEC's view on this is essentially, follow the

24   money.  And the way we view this issue is, you know, the

25   consent order focuses on where someone is located, of
```

1    course, as your Honor noted.

2          But to clarify, if one of the shard holders was

3    receiving compensation from a Binance entity, we would be

4    here asking the same questions.

5          So there's the geography component, of course, but

6    there's also the component of, this is just an unusual

7    arrangement and it really has not been explained at all.  We

8    first heard about it in November in a discovery-related

9    letter that we received from BAM's counsel.  They told us

10   some employees in Canada get payments from Binance entities.

11   We don't know who else has them.  So, for example, the head

12   of clearing, who's just all over several of the critical

13   issues, we don't know if he gets similar allowances.

14         And while, you know, I've heard your Honor's point

15   about, you know, prioritizing issues, it's very hard for us

16   to know whether this is a priority without having a more

17   complete picture of who receives those payments.

18         And --

19         THE COURT:  No.  I get it.  I'm asking you to

20   make -- I don't even know if they're educated guesses, but

21   I'm asking you to make guesses.  And so I get that that's

22   hard.

23         MS. SOLOMON:  And, your Honor, we've also directed

24   these questions to Binance.

25         THE COURT:  Yes.

1          MS. SOLOMON:  And we're hopeful that we'll get

2     some information --

3          THE COURT:  Me, too.

4          MS. SOLOMON:  -- and we'll get to that.  And we

5     can hear your Honor's view as to whether or not your

6     comments also relate to them.

7          But we do think that understanding who pays these

8     employees is critical to understanding whether or not

9     they're even BAM employees.  So, for example, if we find out

10    that BAM's head of clearing, for example, received half his

11    compensation from a Binance entity, he's a former Binance

12    employee and we know he interacts on a regular basis with

13    several people at Binance, including Mr. Zhou, or he has at

14    some point interacted regularly.

15         I think we would take the position that, what does

16    it mean that he's a BAM employee?  And to that point, we

17    have his contracts.  They're with Bora and they're not even

18    with BAM.  So there's assumptions in place about who is a

19    BAM employee and who is a Binance employee that really just

20    make us hesitant to move on from this, which is why we've

21    pressed on it.

22         And I would add also that in terms of burden, we

23    would think that generating a list of people who have

24    received compensation from Binance entities is not

25    particularly burdensome.  And so we've considered that in

1      making these requests as well.

2              THE COURT:  Yeah.  I think maybe, again, I just --

3      these are the four buckets.  This one to me, it sounds like

4      maybe there is a targeted final sort of thing to button up

5      on here, which is just who's paying these folks.  That would

6      be great.

7              But I am sympathetic to you to BAM's sort of point

8      that from your perspective, that you've got the seven shard

9      holders.  I mean, four of the seven have to approve and

10     that -- so does the head of treasury.  I mean, you know, is

11     there something more, even if it's a little bit that, we can

12     give on this to -- just all good faith.  That's all I'm

13     asking for before we sort of --

14             MR. LUGER:  Understood.  And just to underscore

15     your point, you know, your Honor, that there is an extensive

16     amount of detail in the record about the oversight process

17     and the transfer process.  The shard holders, the extra

18     layer of oversight that's come in from the head of treasury

19     that has to review these transactions before they even get

20     to the shard holders.

21             So I just want to set the context in terms of what

22     we're talking about here in terms of control.

23             And, you know, the fact that somebody initiated --

24     that the SEC's harping on the person that initiates this

25     process, where there's then and before it reaches that

1    person several levels of protection and oversight.

2          So I just want that to -- you know, the Court to

3    be aware of that context.

4          And on the payment issue, we agree that this is

5    likely the most speculative of the four that you've

6    highlighted, your Honor.  And, you know, again, the question

7    for the Court is how reasonable is it to compel --

8          THE COURT:  Yeah.

9          MR. LUGER:  -- BAM to sort of jump down this

10   rabbit hole again when the issue before the Court and

11   pursuant to the consent order is narrow.

12         And, you know, to this point, the SEC focuses on

13   the head of product, who has testified that he doesn't have

14   any involvement or role at all in the custody and control of

15   the assets.  And much of the focus of the payment portion of

16   this is on that -- on that individual, who doesn't have a

17   role in this context of the case.

18         And so, you know, again, it's -- what is

19   reasonable for us to follow up on?  And we're happy to, you

20   know, give the Court comfort so we can be done.

21         THE COURT:  Yeah.

22         MR. LUGER:  But this category in particular we

23   agree is the farthest afield.

24         THE COURT:  Okay.  Anything on that?

25         MS. SOLOMON:  Yes, your Honor.

1          Counsel just mentioned the head of product and

2     that he doesn't have any information.  And we've heard this

3     before.

4          We deposed him and we did so because Eric Kellogg,

5     BAM's chief information security officer, identified him as

6     the person most knowledgeable about the shards.

7          Then in early December, we received documents

8     where this individual is also describing how the -- I'm

9     sorry; I'll get the exhibit numbers in a moment -- but how

10    BAM can transfer shards to the United States to comply with

11    the consent order.

12         And so we're scratching our heads a little bit to

13    hear that he's not involved in light of all this evidence --

14    it's Exhibits 26 and 27 -- where, you know, we don't know

15    who drafted those.  And again, they were produced, you know,

16    relatively late.  But, you know, they reference the consent

17    order; they reference the requirements of the consent order.

18    And they were sent by Jerry Ho.

19         So it's hard for us to just say, Yeah, he's just

20    not that involved just because BAM's counsel says so,

21    because the evidence just strongly suggests otherwise.  Both

22    documentary and deposition testimony.

23              MR. LUGER:  Your Honor --

24              THE COURT:  Yeah.

25              MR. LUGER:  -- I just -- it's not -- at some

1    point, sworn deposition testimony has to mean something.

2             THE COURT:  Yeah.

3             MR. LUGER:  It's not me sitting here today saying.

4    It's at Page 327 of his transcript, where he said he has no

5    role at all in the custody and control of BAM's assets.

6             So, you know, I'll leave it at that.  But --

7             THE COURT:  I will say I guess for the SEC's -- I

8    mean, I think sometimes maybe you feel like these, you know,

9    sworn statements, things in declarations, often they're --

10   it feels like maybe some of the folks don't, you know --

11   part of this is maybe startup culture; part of this is

12   litigation going on, things like that -- sometimes things

13   are said that feels like either people don't know something

14   or then they should have known it or they do know it and it

15   is -- would give me pause were I sitting in your chair.

16            But I do tend to agree with BAM, generally

17   speaking.  It's like it wants folks who kind of said

18   something.  They've said it under oath.  I mean, I've got

19   to -- it's not just a lawyer saying it.

20            So there have been repeated instances, though,

21   where people have said things and it's sort of -- it's

22   not -- I don't think they're not being truthful.  I think

23   they either just don't know -- it just feels like they may

24   not know what's going on.  There's a lot that's happening.

25   And from their perspective, perhaps, there's not really a

1    big -- certainly prior to the complaint, maybe there was --

2    I mean, I think you would argue there was insufficient

3    separation between the entities.  And so, you know,

4    sometimes people say things and maybe they're still not

5    getting the clear picture.

6         But I'm going to rely at the end -- once this has

7    ended -- and it's going to end -- I think that some of the

8    things that I will rely is, like, "But someone said this,

9    you know, in sworn testimony."  And I don't think it matters

10   to this issue particularly because I think, you know, you've

11   identified your concerns with it.

12        So I'm just telling you sort of a more global

13   issue, I mean, that, because I think that's more helpful for

14   where we are right now, is you're trying to unfortunately

15   be -- for both of you all -- both sides are being dragged to

16   finish this by me.  And I think that both sides feel like

17   it's not the most efficient way, but we can't get an

18   efficient way to resolve it.

19        So does that make sense?  I don't know.  Yeah.

20        MS. SOLOMON:  Your Honor, it does make sense.

21        I just -- if I could point out one more issue.

22        THE COURT:  Yeah.

23        MS. SOLOMON:  We're talking about what Mr. Ho

24   testified to under oath.  And what Mr. Ho testified to under

25   oath also includes his discussion about his involvement in

1  the ledger devices and withdrawal -- and getting the staking

2  ledger from Ms. Chen.

3          So yes, defense counsel read from a certain

4  portion of a lengthy deposition that was conducted through a

5  translator.  You know, but we also have deposition testimony

6  from Mr. Kellogg that I alluded to before and also

7  deposition testimony within Mr. Ho.

8          So, you know, sometimes there are reasons why a

9  witness answers a question a certain way --

10          THE COURT:  Yeah.

11          MS. SOLOMON:  -- and they understand words a

12  certain way.  A translator speaks a certain -- you know,

13  says a certain thing maybe differently than we expected.

14          THE COURT:  Yeah.

15          MS. SOLOMON:  But, you know, it's -- there is also

16  deposition testimony -- and we summarized some of this in

17  Footnote 6 of the joint status report, you know, describing

18  some of the statement that Ho himself made about his

19  involvement particularly as to the ledgers.

20          THE COURT:  Yes.  And I think -- let me put it

21  this way:  The things that are most helpful as you are

22  pushing back is when -- and you have -- identify specific

23  things that in depositions -- certainly with Mr. Kellogg you

24  have done that before and now Mr. Ho -- where it's their

25  statements that are giving you, you know, concern as opposed

1   to still, you know -- and, you know, the inspection being

2   ineffective or things like that.

3        So I want to rely as much as I can, I guess, to

4   put a -- close the loop on this -- I want to rely as much as

5   I can on that actual testimony of people, because I agree

6   with you:  I think that's -- we've got to at some point make

7   decisions.

8        And with the SEC, you're saying the same thing:

9   We've got to make decisions based on what the people have

10  said, not what we don't know.

11       All right.  We have to keep it moving.

12       So the last category is whether BAM's monitoring

13  for transfers involving Binance entities are sufficient.

14       Mr. Ticklee's [phonetic] top-level takeaway from

15  the SEC's description is that BAM hasn't shown -- they feel

16  that it has controls in place to ensure that there are no

17  prohibited transfers to Binance entities under the consent

18  order.

19       They believe that BAM's head of treasury said she

20  has not reviewed a list of BHL- or Zhou-affiliated entities

21  in order to determine whether transactions are prohibited

22  and that there's a concern that BHL may be able to whitelist

23  wallets through the TSS protocols, which we can come back to

24  that, that they may have access to, and that BAM has also --

25  we've talked about this earlier -- a concern that they

1    haven't provided a list of entities -- well, more

2    specifically here, they haven't provided a list of entities

3    for which it's monitoring transactions, although, as I think

4    we've heard earlier and certainly it's in the JSR, is that

5    there is a witness who said a list exists.

6            And so is your concern here -- I guess for the

7    SEC, primarily Hannah Chen, or is there someone else that

8    you view as -- I understand of course you're worried about

9    everything.  But do you have a specific concern about Hannah

10   Chen or is it just something more than that?

11           MS. SOLOMON:  Our concern more broadly, if I can

12   start first --

13           THE COURT:  Yeah.

14           MS. SOLOMON:  -- is ensuring that the seven -- and

15   this alludes to something I said previously -- but that the

16   seven shards that we've talked about being in the United

17   States in fact control all the wallets.

18           We don't have a current list of wallets.  We don't

19   have an update from BAM as to the creation of new wallets.

20   And both of those would include confirmation that the shard

21   devices that were previously held by Binance employees

22   outside of the United States have been deleted and that they

23   no longer control any of the shards.

24           So that's kind of obviously a threshold question,

25   because all of BAM's arguments rely on the existence of

1   these seven shards and the approval rights that those seven

2   shards have.

3           If in fact it turns out that there are shards that

4   are not located in the United States and are outside of

5   these seven, all of that goes out the window.

6           So it's essential in our view to first set that

7   threshold issue.  And I want to make sure that that's clear.

8   And it's also spelled out in the consent order for that

9   exact reason.  It's kind of an important threshold issue to

10  know which wallets are actually in play.

11          You know, in terms of the controls in place -- and

12  back to your Honor's question about Ms. Chen -- she

13  certainly is a name that's come up.  Her fingerprints are in

14  a lot of different places.

15          That said, the TSS access log that we saw

16  previously had other Binance employees that were accessing

17  it, you know, through some period after the consent order.

18  Hannah Chen I know is through September.  Some of the other

19  employees may have been after.  But there were other

20  employees after the consent order.

21          So, you know, again, we focused a lot on her, but

22  I wouldn't say that our concerns are limited to her if in

23  fact --

24          THE COURT:  Sure.

25          MS. SOLOMON:  -- another Binance employee -- if we

1   get a new log and we see another Binance employee who's

2   accessing all the time, we'd have the same questions.  It's

3   nothing personal, so to speak.

4           THE COURT:  Yeah.  Yeah.  That makes sense.

5           So I guess on that first sort of point from the

6   SEC, I mean, about the shards and -- I do agree with them.

7   I think that's pretty foundational.  You know, I'm happy to

8   hear anything you have on that.

9           To the second point, I think this is something

10  that hopefully we can get from BAM, which is getting the

11  BAM's head of treasury to say something quite simple, which

12  is:  Okay.  I have now reviewed a list of BHL- or

13  Zhou-affiliated entities to the extent that we have, you

14  know, a list of such entities, you know -- if not, we'll

15  make one -- and for which we're monitoring, just like we

16  monitor for, you know, sanctions compliance and anything

17  else, we're going to monitor these; and that a confirmation

18  that BHL -- I think -- I'm sure you've felt like you've

19  already had this been said -- but that it'll be said again

20  that BHL is not able to whitelist wallets through the TSS

21  protocols because as I reviewed your answer in the JSR --

22  and I understand why -- I think it's just you're asking the

23  same thing again, SEC.

24          And, Judge, just -- are you not hearing us?  We

25  have sufficient controls in place.  We've taken substantial

1      steps to comply with the consent order.  We've done our job.

2      You can't ask us ten different ways if we've done our job.

3      We've done our job.  That's the end of it, and you're going

4      to have to believe us or not.  But we can't just go in

5      circles.

6              At some point, fine.  If you don't believe in us,

7      then punish us.  Do whatever you're going to do.  I mean,

8      obviously, that's not what you're asking.

9              But what you're not asking is to just in this

10     circle -- just keep going over and over and over and over

11     again.

12             So I think that their request as to the shards, I

13     get it.  This seems reasonable to me.  Getting this list of

14     entities to monitor, I'd like that.  That seems reasonable

15     that they get that, and to make sure that it's being done.

16     And then I think it's already been -- it's baked into one of

17     the other categories -- but again, being clear that there's

18     not a way to whitelist wallets that someone knows through

19     TSS protocols.

20             So I mean, I think that kind of ends the

21     discussion on this category for me.

22             MR. LUGER:  Your Honor, I would just -- to me,

23     this jumps out as a category that I'm not sure what a

24     30(b)(6) would add.  We have deposition testimony from the

25     shard holders.  We have deposition testimony from the head

 1    of treasury.  They've affirmed these -- you know, the

 2    process by which they conduct the diligence on any

 3    transfers.

 4            You know, the company saying that again in a

 5    30(b)(6), I'm not sure what that adds.

 6            I'll add that BAM produced a list in August as

 7    part of its verified accounting of Binance-affiliated user

 8    IDs.  That's in the record.  If the Court is ordering that

 9    we update that or, you know, if that's what I'm hearing,

10    that you want a sort of current state of play, understood.

11    But, you know, that has been in the record and produced in

12    this case with specific user IDs.

13            So I just want the Court to know that BAM has

14    taken steps there in addition --

15            THE COURT:  Well, no.  To be very clear, you've

16    taken a ton of steps so far.

17            MR. LUGER:  Right.  And in addition to making

18    available the shard holders and have treasury to sort of

19    button up the process and give the SEC comfort about --

20    around that, I'm just not sure what else a 30(b)(6) would

21    add.

22            THE COURT:  And so as I understand, we're not

23    talking about the user IDs; we're talking about the actual

24    entities.  Right?  And so that's all we need to get.  And it

25    may be that some witness -- do you remember who the witness

1    was who thought there might be a list offhand?  If not,

2    don't worry about it.  You can always get it offline.

3              MS. SOLOMON:  I do, but I believe it would be

4    confidential --

5              THE COURT:  Oh, okay.  Great.

6              MS. SOLOMON:  -- as he is also a shard holder.

7              THE COURT:  Got it.

8              MS. SOLOMON:  As --

9              THE COURT:  Right.  So you can work offline.  But

10   the request is as to -- and that's great.  I think, again,

11   you've given one thing and they want something else, which I

12   know is what you feel.

13             But this is what I want.  And it's helping to end

14   this, which is they want a list of all the Binance -- they

15   want a list of all the BHL- or Zhou-affiliated entities and

16   they want to make sure that the -- there's monitoring that's

17   in place to -- that there aren't transactions involving

18   those entities.  Correct?

19             MS. SOLOMON:  Your Honor, that's correct.

20             And I would just add one thing.  We've talked a

21   lot about the shard holders and the wallets.  To the first

22   issue of the wallets and user IDs, yes, there was a list

23   produced.  But we've also heard that wallets are changing.

24   There's been creation of new wallets.  We've discussed that

25   with BAM's prior counsel as well as in depositions and in

1    documents.  So a list is only as good as it's current.  And

2    so we'd ask for the current list of wallets and associated

3    with user IDs, which would allow us to pair that information

4    together.

5            And then returning to your Honor's comment about

6    the list of entities, you know, thank you.  For us, it seems

7    like obviously a very key issue.

8            The other thing that would, you know -- when we

9    tested questions about compliance with the consent order

10   during our depositions of shard holders, we asked them if

11   they'd seen a list, because it's hard to imagine conducting

12   diligence related to the consent order if you don't know

13   what the targets are, if you don't know who's allowed to get

14   the funds.

15           And so I think part of that, you know, there's the

16   list for wallets.  There's a list of user IDs associated

17   with it.

18           But there's also, going back to what we would

19   cover in a 30(b)(6), the question would be:  What is it that

20   shard holders are expected to do and what is it that the,

21   you know, head of treasury who is responsible for this

22   relatively new approval process -- what is it that they're

23   actually doing to comply with the consent order?

24           Because some of those shard holder inspections

25   happened -- depositions happened before this, quote-unquote,

1    "new process."  Some of those shard holders told us that

2    they really rely on the initiator in approving requests.

3             Maybe that's changed.  If that's the case, good

4    news.  We think a 30(b)(6) is a great way to cover what the

5    current state of affairs is.

6             And then finally, I do want to ensure that we talk

7    about -- you know, we talked about TSS in this context.  But

8    of course PNK, which covers the -- you know, hot wallet, you

9    know, when assets actually leave the platform is of course

10   part of this conversation as well.

11            THE COURT:  Yeah.  For sure.  Yeah.

12            Just one thing.  I know it's self-evident, but I

13   want to be clear, because this is kind of weird with

14   expedited discovery.  I mean, to the extent, you know, as

15   your folks figure things out or things change, I mean, it's

16   a dynamic company.  Things may change.  I mean, who knows --

17   right? -- tomorrow some new software may be created which is

18   how you all will have the wallets managed.

19            I would anticipate, you know, just explain to your

20   client -- I know you know this, but they need to understand

21   that as things change, you know, they have to understand the

22   spirit of the agreement here, that they are -- they will

23   continue to update you all and that you will then be able to

24   then in turn, you know, forthwith update the SEC on that.

25            So if protocols change, you know, absent -- it

1   sounds like some things may have changed since prior

2   depositions, things that we don't want -- I don't view that

3   as the discovery with no end point.  I mean, that's just as

4   long as -- hopefully, the company -- that's a good thing.

5   The company is ongoing.  It's dynamic.  It's evolving.  If

6   things related to these issues about control of assets or

7   ways that it can be documented, observed, come up, just if

8   you can -- I'm sure you know -- just keep the SEC in the

9   loop.  Okay.

10          MR. LUGER:  Okay, your Honor.

11          THE COURT:  Great.

12          All right.  So that was the fourth, whether BAM's

13  monitoring for transfers involves Binance entities are

14  sufficient.  I think I've got whatever I want on that.

15          I have a couple other just side issues.  One issue

16  is on the new wallet information.  You know, we just sort of

17  talked about this, the creation of new wallets and deletion

18  of certain private keys.  You know, I view this as kind of

19  baked into that category four, but I just want to make sure

20  that -- I just need BAM to verify that its list of -- its

21  list of hot and cold wallets is current.  I think that's

22  really important.

23          So I think from the SEC, that's a pretty

24  straightforward request.  Right?  You just want to make sure

25  it's current, the list of wallets.  Correct?

1          MS. SOLOMON:  Correct.

2          THE COURT:  Okay.  Yeah.  So I think that's an

3   important one.  So I am definitely ordering any -- BAM to

4   get that done.

5          In terms of outstanding information on Section 4,

6   there's some -- there's three things in here of the SEC,

7   that SEC asserts that BAM has not provided requested

8   additional information about a discrepancy in accounting

9   documentation.

10          The second thing is additional information about

11   the BAM Sigma Chain transfers.

12          And the third thing is a status report on the

13   production of supplemental information to match deposit

14   wallets with user IDs.

15          And so for the -- sorry -- the BAM responses

16   said -- the BAM responses said that accounting information

17   request is about a nonmaterial amount of assets and concerns

18   only sigma chin have already been explained -- Sigma Chain;

19   sorry -- have already been explained.

20          So that's two of the three issues.  I just -- I

21   tend to agree a little bit with BAM that at some point some

22   of these things are for nonmaterial amounts of assets.  I

23   guess it's the SEC's point you don't know the amount of

24   assets and you're just deferring -- they're just stating

25   that.  Or do you have some -- what is -- this was at 14,

1      Page 14 to 15 of the JSR, talking about not providing

2      additional information about discrepancy in the accounting

3      documentation.

4             Go ahead.

5             MS. SOLOMON:  Yeah, your Honor.  And you may

6      recall in -- I believe in our October status conference, we

7      talked about a greater discrepancy and then we had a

8      productive conversation back and forth with BAM's counsel

9      about getting updated information to correct this

10     discrepancy.

11            They provided updated information that eliminated

12     a much larger discrepancy, but there was still some

13     discrepancy.

14            We would agree this is not a priority issue.  I

15     think one of the reasons we included it is because it's to

16     us an example of, you know, they said they'd consider it.  I

17     believe that was in November, shortly after the hearing.

18     And then there's radio silence rather than closing the loop,

19     which is one of the reasons we included it.

20            I would think that it is probably not as great a

21     priority as the other things we've included in our joint

22     status report.

23            THE COURT:  I appreciate that.  Thank you.  I

24     appreciate that.

25            Same thing on Sigma Chain, I guess.  I mean,

1    there's going to be a lot of questions, it seems, that comes

2    to these entities about new entities, unique species that we

3    don't know about that -- you know, it's like the Galapagos.

4    It's just -- there's a lot going on there.

5              We're losing sleep on BAM's Sigma Chain transfers?

6              MS. SOLOMON:  I think this goes into the same

7    category.

8              THE COURT:  Same category?

9              MS. SOLOMON:  Again --

10             THE COURT:  That's what I feel like it is.

11             MS. SOLOMON:  -- we wanted to follow up on it.

12   But it's not as great of a priority, assuming that the

13   wallet and user ID information don't demonstrate a whole --

14             THE COURT:  Right.

15             MS. SOLOMON:  -- new set of facts.  But of

16   course -- and that goes to the more priority items in the

17   section of our joint status report that deal with the new

18   wallets and the user IDs associated with them as well as an

19   update from BAM on creation of new wallets, which is

20   discussed in the consent order.

21             THE COURT:  And so I didn't hear from them.  I

22   think -- I'm hoping, because BAM's working on this, is that

23   production of supplemental information to match wallets to

24   user IDs, that is pretty important, as I understand it.

25   Right?

1           MS. SOLOMON:  Yes, your Honor.

2           THE COURT:  And so I'm, you know, sure SEC is

3     absolutely preserving their right to demand Sigma Chain and

4     these accounting discrepancies.  But I just -- I'm less

5     focused on that.

6           So I just need BAM -- I mean, it's more important

7     what I'm concerned about.  I'm concerned about I need that

8     production of supplemental information to match deposit

9     wallets with user IDs, you know, to the extent you want --

10    you think it would be helpful to throw in the other stuff;

11    or I think a lot of it is kind of -- it may be trivial

12    amounts or things that it's just a question of getting

13    people to get around to it.  Maybe it helps when you're

14    arguing these issues at the next point.  But I'm not -- I

15    don't think that it's something I'm super concerned about,

16    given your representations so far.

17          So I think what I'm hoping the next steps are

18    going to be is that BAM is going to give the SEC the things

19    that we've talked about today.  We're going to circle back

20    to BHL and counsel for Mr. Zhao to talk about sort of where

21    that's going.

22          I think it's really important as the SEC -- what

23    ultimately you get, you start that priority list.  And that

24    might be something before a deposition.  There's always the

25    possibility that -- I don't want to rule on this 30(b)(6)

1     question until -- right? -- I think it disincentivizes BAM

2     employees, you know, folks who -- if they think they're just

3     going to get put through the -- you know, the grinder on

4     that, why would they try to get all this done?

5              I think that there is realistically -- and I say

6     this in sincerity -- although I'm leaning towards at least

7     some 30(b)(6), I think there's a possibility that you all

8     convinced me that you give this stuff before that and you

9     really, you know, went above and beyond knowing that you had

10    that sort of sword of Damocles over you with a 30(b)(6).

11    And so you did it all, and so why should you have it?

12             And so I'm willing to listen to you on that.  I

13    think after you make that production of these final things

14    or things that you're going to do -- and I don't think we

15    have to have a hearing, although I'll defer to you all on

16    that -- I think it's just a question of then:  We've hit the

17    end of our road.  We don't think we need a 30(b)(6).  That's

18    essentially what I want to hear from BAM in the future when

19    you get there.  Obviously, go there.  And I'm hoping it's a

20    robust road ahead of us.

21             But does that make sense?  I mean, I don't think

22    it makes sense to hear from you on it right now.  I mean, I

23    know why you don't want the 30(b)(6).  You already feel like

24    you've done your job and, like, way above and beyond done

25    your job.  And I'm asking you to now triple above and above

1    and beyond your job.

2              So let's get that done and try to take out some of

3    the issues that the SEC has before I rule on that 30(b)(6),

4    but understanding I'm hoping it animates what you're doing,

5    is that I think that's not an unreasonable way to close this

6    out.

7              Does that make sense?

8              MR. LUGER:  It does, your Honor.

9              THE COURT:  Okay.  It looks like -- SEC, do you

10   have something you want to say there?  I'm hoping no,

11   because -- but you can.

12             MS. SOLOMON:  No, your Honor.  Again, we

13   appreciate and we are flexible and open to discussing about

14   ways to do this efficiently --

15             THE COURT:  Yeah.

16             MS. SOLOMON:  -- and, you know, having that

17   conversation after we get any supplemental productions.

18             THE COURT:  Yeah.  Okay.  So let's go to BHL.

19             Thank you, BAM counsel.  I appreciate it.

20             MR. LUGER:  Thank you, your Honor.

21             THE COURT:  It's not easy when you're kind of

22   thrown into this.  And you're doing a great job, so thank

23   you.

24             All right.  I feel like from the BHL end, has

25   that -- you're doing your searches.  You've got a deposition

1     upcoming.  And I appreciate that you feel like there's no

2     issue on your end.

3              And I think that everything that you do -- I

4     believe -- I mean, I appreciate, you know; you've been here,

5     listening -- is informed.  You know what the issues are,

6     right?  You have the benefit that BAM didn't of that --

7     they've already tread a lot of these -- the water on these

8     grounds and they're just going to be asking the same things

9     but just asking it from now the BHL perspective, right, when

10    they asked BAM, you know, How does BHL get involved and BAM

11    said, We don't know or it's so-and-so.

12             BHL can really, you know, close the loop on these

13    questions.  And so I'm hoping it's going to be very

14    efficient as we go forward.

15             The only thing that jumped out to me from the

16    JSR -- because, like I said, I think BHL's position makes a

17    lot of sense to me -- is, you know, I don't want to -- I

18    don't think I need to get into it from the SEC's

19    perspective, but they've indicated that, you know, BHL's

20    produced the SOC reports related to which SEC has

21    outstanding questions.  I don't really think I need to know

22    what those questions are.  It sounds like you all are still

23    considering it.

24             But one thing that did jump out to me, though, was

25    that the SEC had some concern about receiving documents in

1    advance of depositions.  And I'm sure you all are doing what

2    you can to be diligent.  But I do think, again, as we're

3    trying to be efficient, I think that it's very helpful to

4    them to get that.  And so I mean, from BHL's perspective,

5    I'm hoping you can tell your client that they can just

6    prioritize getting those documents together.  Is that

7    something you all can do?

8              MR. MENDRO:  Absolutely, your Honor.

9              THE COURT:  Okay.

10             MR. MENDRO:  We are working on that.

11             THE COURT:  Well, I'm happy to hear from the --

12   oh, I'm sorry.  The one other issue was on payments to BAM

13   personnel by Binance entities.  I mean, I think a date

14   restriction is reasonable.

15             I agree with the SEC that, you know, it's hard to

16   imagine why six additional months is so burdensome.  But I

17   mean, just -- let's -- I guess we can start with the SEC.

18   Why not just start with June 1, 2023, to the present,

19   presuming that there is very little or nothing there that

20   perhaps that obviates the need to go back?

21             I mean, you're not giving up your right to go back

22   there.  But unfortunately, I will also say it just feels

23   like a lot of things have [indiscernible].  Usually, there

24   is something.  And so then we can get [indiscernible].  So

25   why not just start and be super reasonable?  Not that you're

1    unreasonable, but make it easier on me -- let me put it that

2    way -- and start with June 1, 2023, to the present for a

3    question of documentation of all payments made by any

4    Binance entity to any BAM employees during their tenure.

5                    MS. SOLOMON:  Your Honor --

6                    THE COURT:  Yes.

7                    MS. SOLOMON:  -- of course we're open to

8    staggering this.

9                    Our concern about timeline -- and this is

10   something we explained to Binance's counsel -- is, you know,

11   for example, if someone receives an annual bonus, we might

12   not see it in June to the present.  And that doesn't mean

13   that there's not another annual bonus coming.  Different

14   companies have different payment schedules.  We just don't

15   know any of that information.

16                   And our understanding again is that there's really

17   been no burden demonstrated.  And so if a key person has a

18   bonus coming and we don't know who those people are who are

19   receiving a bonus and they have it coming soon and they had

20   it coming last year, you know, we just don't understand the

21   burden associated; and why not --

22                   THE COURT:  Yeah.

23                   MS. SOLOMON:  -- kind of just get all the

24   information.

25                   THE COURT:  Sure.  I mean, I agree.  It doesn't

1    feel extra burdensome if you're doing those searches and

2    things to add in six months.  But let's just start with

3    June.  But understand, there's almost no world in which I

4    can imagine they're not going to ask for those six

5    additional months.

6           And so I think that you're just going to be

7    creating -- clients -- creating additional work for

8    themselves because it's -- there's always going to be

9    something that's going to come up that's going to raise some

10   issue.

11          And so I mean, I'm going to tell you as closely as

12   I think that I just want to get January 1st so we can just

13   wrap this up.  But if you want to start your searches from

14   June, then so be it.  But I think it doesn't -- it would not

15   make sense to not go back to January 1st.

16          And I'll let you all continue to talk.  I think

17   their point is well-taken.  And, you know, that would just

18   wrap this up, so why not just do that?

19          So anyway, anything about BHL?  I'm happy to hear.

20   It sounds like they're going to get you the documents in

21   advance at least from June 1, 2023, to the present.  We're

22   looking at the payments to BAM personnel by Brian Sinodese

23   [phonetic], but understanding that they should be doing it

24   back to January 1st and that you may want from before then,

25   depending on what comes.  So I get it.

1           Anything else on BHL?

2           MS. SOLOMON:  Your Honor, I think, as I hope --

3           THE COURT:  On the documents.  Sorry.

4           MS. SOLOMON:  Of course.  Yes.

5           As I hope was clear in our papers, you know, we

6     wanted to highlight issues that we think we might get an

7     impasse at in the interest of furthering this conversation

8     along.

9           THE COURT:  Yeah.

10          MS. SOLOMON:  To the extent Binance is still

11    considering something and conferring with their client on

12    issues, you know, by all means.  That's great.  And that's

13    the progress we want to see in our interest in kind of

14    putting things front and center so we can progress this

15    along.

16          We've heard lots of complaints about how long

17    things have gone on for, so we're balancing that against

18    other things.

19          One of those issues -- and maybe Binance has an

20    update on its position on this -- is communications related

21    to those payments, which again we think is a discrete issue.

22    But, for example, one BAM deponent said that he received his

23    performance review from Binance.

24          If, you know, Binance has an HR personnel folder

25    with performance reviews and those performance reviews and

1     why they're getting those bonuses we feel is really

2     critical, you know, if there's something in there that

3     suggests because they're performing services for or expected

4     to do something for the benefit of Binance, even though they

5     are, quote-unquote, a BAM employee, then it would of course

6     be relevant.

7            Again, there hasn't been a discussion of burden.

8     But so far, Binance I believe said they were considering

9     this; and we haven't heard an update.  If they're still

10    considering it, then of course we're not at an impasse yet.

11           THE COURT:  Okay.  I think BHL's perspective is --

12    yes, sir.  You have to use the microphone.  Thanks.

13           MR. MENDRO:  No, your Honor.  I don't think

14    there's anything that merits the attention of the Court at

15    this time.  We will start with the June 2023 production.

16    We'll continue to speak with the SEC about this and assess

17    what's reasonable to do beyond that, if anything.

18           THE COURT:  Okay.  That sounds great.

19           MS. SOLOMON:  And, your Honor --

20           THE COURT:  Yeah.

21           MS. SOLOMON:  -- if I may, before we move on from

22    communications, we have, you know, requests for certain key

23    communications with key personnel involved in BAM's wallet

24    support and wallet support offered to BAM.

25           And we've requested those communications

1   generally.

2         I believe likewise we are not yet in a position to

3   approach the Court because Binance told us that they were

4   going to take that back.  I believe that was, you know,

5   around two weeks ago in a meet-and-confer.

6         So I believe, you know, I would be interested in

7   confirmation from Binance's counsel that we're still, you

8   know, waiting for them to confer with their client on that

9   point, because if there is a ripe issue, we're happy to

10  cover that as well.

11        THE COURT:  It sounds like they're still talking,

12  but --

13        MR. MENDRO:  We're still talking.

14        THE COURT:  That sounds great.

15        MR. MENDRO:  And as the Court knows and has come

16  up several times today, the guiding principle for the

17  discovery from our perspective has been to take discovery

18  from BAM first, try to identify gaps and then work in good

19  faith with the SEC to see if there's places where we can

20  fill those gaps.

21        THE COURT:  Yeah.

22        MR. MENDRO:  And we have been working in abundant

23  good faith with the SEC for that purpose.

24        There's been one series of chats that came up at

25  the last hearing.  We agreed to search for those.  We're in

1      the process of reviewing them for production now.

2              And so we'll -- we're going to get that done

3      imminently.  There are other things we're considering.  We

4      don't obviously think it's reasonable to reproduce all of

5      the --

6              THE COURT:  Sure.

7              MR. MENDRO:  -- communications that have already

8      been requested from BAM.  But we'll continue to speak with

9      our client and confer with the SEC about that, too.

10             THE COURT:  Okay.  Sounds great.

11             In terms of the depositions, that's on the

12     document productions.  So BHL has a fact witness for this

13     week.

14             Is the SEC still in the same position of not

15     knowing who that person is or have you all sort of worked

16     that out?

17             MS. SOLOMON:  Your Honor, we now have that

18     person's name, title --

19             THE COURT:  Great.

20             MS. SOLOMON:  -- and some other information.

21             THE COURT:  Okay.  Where do things stand in terms

22     of, I guess, the additional witnesses?  Or are you all still

23     talking about that?

24             MS. SOLOMON:  Your Honor, we've propounded -- I'm

25     sorry -- we sent, rather, certain deposition notices of

1    other personnel.

2              THE COURT:  Great.

3              MS. SOLOMON:  We agreed to defer taking those

4    depositions until after this engineering or technical

5    deposition.

6              THE COURT:  Yes.

7              MS. SOLOMON:  That said, we asked to schedule

8    those depositions because the personnel we understand are

9    all outside of the United States.  And we expect that some

10   of them will just be necessary depositions.

11             Ms. Chen comes as an obvious example to us of

12   someone whose name just keeps appearing in depositions and

13   in documents.  And we don't think it's likely that this

14   deposition will eliminate our desire to take Ms. Chen's

15   deposition.  So we had requested that.

16             I mean, it's taken a couple of months to schedule

17   this technical expert and, you know, we have to travel

18   abroad.  We have to find a location that works best.  I

19   mean, unless Binance tells us that that personnel is going

20   to travel to the United States, which we expect will not be

21   the answer -- so I'm assuming these depositions are

22   happening abroad.

23             Again, in the interest of moving things along,

24   getting us through closing, you know, with regards to our

25   interim Defendants as we're hearing from the Court, you

1      know, we thought it would be best to schedule at least some

2      of those depositions.  We so far have been stonewalled on

3      that request.  We followed up in, I believe, January to some

4      requests we had made in the fall.

5              But again, we're happy, for example, to identify

6      maybe which depositions we want to schedule now if they

7      again open that dialogue again with us about at least

8      scheduling some of them.

9              THE COURT:  Is it your preference or BHL's

10     preference or everybody's that they be in person, not

11     remote?

12             MS. SOLOMON:  I can't say for certainty with all.

13     We have done some remote depositions.

14             THE COURT:  Right.

15             MS. SOLOMON:  Our preference generally is that

16     they happen in person.

17             THE COURT:  Okay.

18             MS. SOLOMON:  And I'd also add that some of the

19     rules in place involved in taking depositions outside of the

20     United States --

21             THE COURT:  Yeah.

22             MS. SOLOMON:  -- matter whether or not they're

23     remote or in person.

24             THE COURT:  Yes.

25             MS. SOLOMON:  So it doesn't necessarily speed

1   things up quite as much as you might expect.

2          THE COURT:  Yeah.  We just had this come up in a

3   different case with someone in Russia.

4          So okay.  From BHL, is it possible to -- it's hard

5   for me to imagine it's just going to be one deposition.  It

6   seems -- Hannah Chen does seem like someone that's come up a

7   lot, so it seems pretty likely that someone who may, you

8   know -- there may need to be inquiries made upon.

9          Is there -- I think it would be helpful to

10  schedule some.  But absolutely preserve your right to object

11  for any -- after the first one.

12         I mean, if this first one gets what you need and

13  understanding how much ground has been covered by BAM, I'm

14  not going to say that one is not going to be enough.  It's

15  hard to imagine it, but it's possible.  But should we not

16  just start scheduling some, given all the logistics

17  involved?  Does that make sense?

18         MR. MENDRO:  Well, I think that one of the

19  difficulties, your Honor, is going to be that we are not

20  going to have an agreement at this point as to which

21  depositions are reasonable.

22         THE COURT:  Yeah.

23         MR. MENDRO:  And so going through the process of

24  trying to schedule them and starting to prep with people who

25  are in very different time zones in many occasions is a huge

1    burden for us.  So we have attempted to identify a witness

2    in response to the specific issues the SEC has raised.  It's

3    our hope that this deposition is going to be fruitful --

4              THE COURT:  Yeah.

5              MR. MENDRO:  -- and will fill in a lot of the

6    answers.

7              THE COURT:  Yes.

8              MR. MENDRO:  I think it's -- I'm a realist.  I'm

9    an optimist, but also a realist.  And I fully expect that

10   the SEC will say that it wants to know more.  That's what

11   the SEC has to do.

12             THE COURT:  Yeah.

13             MR. MENDRO:  But from our perspective, it makes

14   sense to go through this deposition, see what remains to be

15   decided.  And if we have to have a dispute about apex

16   depositions involving the most senior people, I think we

17   would be all best served by putting those disputes off for

18   another time.

19             THE COURT:  Okay.  And how many -- do you have

20   a -- back of the envelope, do you remember how many folks

21   you were hoping to depose?  If you guys need a minute to

22   talk, please take your time.

23             MS. SOLOMON:  Yeah.  As you can see, we're

24   conferring.

25             THE COURT:  Yeah.  Confer.  Confer.  You don't

 1   need -- you're not on the hot seat.

 2            MS. SOLOMON:  I believe it was three or four --

 3            THE COURT:  Total?

 4            MS. SOLOMON:  -- as well as a 30(b)(6) deposition

 5   total, and separate from this area.

 6            THE COURT:  Yeah.  So like five?  Five more than

 7   this person who's already done, about?

 8            MS. SOLOMON:  I believe that does not include an

 9   outstanding notice for deposition of Mr. Zhao.

10            THE COURT:  Don't worry.

11            MS. SOLOMON:  [Indiscernible] to table --

12            THE COURT:  No.  We'll get to that.  We'll get to

13   that.

14            I mean, I think from BHL, I hear you.  It's not a

15   question of preparing them.  And I think even if they are

16   noticed and something comes up, I would hope -- and I would

17   be quite frustrated with the SEC if, like, you know, someone

18   gets sick or something comes up or you found your documents.

19   You're like, Hey, why would we -- you know, if something was

20   planned three months out from now and a month, you know, to

21   Day 25 you find a whole tranche of documents that's going to

22   be relevant, you're like, Look, this person's just not going

23   to be ready.  They're just going to have to wait.

24            And so, I mean, this is not -- I mean, these

25   aren't "save the dates."  Something even lesser than that.

1    But I think it would be advisable at this point to get

2    things moving.

3            I'd like -- I mean, five is not 20.  Let's just

4    get some dates on the calendar, especially as you're trying

5    to figure out logistics.  You know, I don't know what your

6    logistics issues are and what the sort of country issues are

7    and things like that.  But to even just say, you know, the

8    next one's going to be three weeks later and, you know, in

9    no way binding you to that, but at least so they can -- and

10   you all can even just on the travel logistics start thinking

11   about that or to the extent people have vacation travel or

12   other things planned, I think just getting five -- it feels

13   like we should be able to get five on the books.  But

14   understand that you absolutely have the right to object

15   after the first one, that there's no need, and that those

16   dates aren't binding.  But at least it gives a framework.

17   Right?

18           MR. MENDRO:  I certainly appreciate that everyone

19   has an interest in trying to move this forward.

20           I am concerned, and for a couple reasons.  But,

21   one, a lot of these witnesses are going to be difficult to

22   reach at this time because the Chinese New Year is being

23   observed and some people will not be as accessible as they

24   otherwise would be.  So this is a difficult time for that

25   reason.

1          But I think that some of them are people that

2     it's -- we're very likely to have a disagreement about

3     whether that person should have to testify, which is very

4     similar to what the Court sees all the time with CEOs and

5     other higher-ranking executives.

6              THE COURT:  Yeah.

7              MR. MENDRO:  So I could see us being put in a

8     position where we have to litigate that before the discovery

9     has played out.  And --

10             THE COURT:  Yeah.  I think that's going to happen.

11    I agree.

12             MR. MENDRO:  Yeah.  And I just worry that that

13    would be --

14             THE COURT:  Well, let me --

15             MR. MENDRO:  -- an unnecessary use of our

16    resources and the Government's resources.

17             THE COURT:  Let me put it this way, then.  I guess

18    I'll leave it to you.  You have two ways to sort of handle

19    this.  And one is to -- and it's reasonable -- to say, look,

20    we don't think we should have to -- that's more -- we're

21    stretched thin on what we're doing and so we're not going to

22    schedule it.

23             If that's what you're going to do, if they're

24    ultimately successful in requiring it, there's going to be a

25    real short fuse on it.  It's going to have to be where, no

1   matter what that person then has kind of going on, it's

2   going to be very difficult, you know, outside of some

3   serious health issue, you know.  If there's not enough time

4   to prepare, well, then, it's going to be a lot of

5   caffeinated beverages to keep people up late at night there

6   and here to get them ready.

7          And so I think I like my way better.  But it's up

8   to you all, which is, you know, even if you block out a week

9   of time and say, like, this will be -- if there's deposition

10  two, this will be for deposition, you know, two within this

11  week, we can -- you know, plus or minus two days.  We can,

12  you know -- we'll be available and we'll make two of these

13  people, you know, maybe available that are not.

14         So just, I mean, making a seating chart I think

15  still is more helpful in getting some hypothetical dates.

16         I'm not talking about today or tomorrow.  I

17  understand that of course, not just the lunar new year, but

18  people have things going on.

19         But in the next, you know, week or so, I mean,

20  this other deposition is going to happen and they're going

21  to come back pretty quickly like, you know, we all know,

22  again, not wrongly, and saying:  Okay.  So, like, Hannah

23  Chen.  I mean, that seems pretty clear.  We're ready to talk

24  to her next or someone else like her.  And they're going to

25  want to do that in the next couple, you know, weeks.  I

 1    don't think it's months.

 2            And if it just then becomes a delay, it's, well,

 3    they have a lot of things going on, if nothing else I think

 4    you should notify those folks.  They need to be cognizant.

 5    Now is not the time to go and do a, you know, six-month

 6    sabbatical in a place without the internet or something.

 7    Like they need to be on the ready because it's likely

 8    there's going to be more than one and we want it to happen

 9    quickly.

10            So I think there are all different ways to get to

11    that end point.  Right?  So long as they've got that sense

12    and you know it and that -- we're good.  Does that sound

13    good?

14            MR. MENDRO:  It does, your Honor.  We can commit

15    to continue to confer with the SEC about this.

16            THE COURT:  Okay.  Yeah.  Which is great.  I would

17    appreciate that.

18            MS. SOLOMON:  Your Honor, if I may.

19            THE COURT:  Yeah.

20            MS. SOLOMON:  You know, I think part of what I'm

21    hearing from Binance's counsel is that they may have a

22    substantive objection as to certain specific witnesses.

23    And, you know, we've talked about scheduling them.

24            But, you know, I think part of that conversation

25    needs to be if we have a more substantive conversation that

1    they don't think some of these deponents are fair -- we

2    haven't had that conversation.

3              THE COURT:  Yeah.

4              MS. SOLOMON:  We haven't heard that response back.

5              THE COURT:  Let's get that on February -- well, on

6    March 1st.  So let's get through February 20th -- but I

7    agree.  I mean, I think very shortly, if not immediately,

8    after -- I mean, you all should be preparing now.  You're

9    going to write a letter and things like that or have

10   something to go out.

11             You know, whatever your objections are beyond the

12   "This ground has already been covered," right?  I think

13   they'll need that as soon as possible.  Right?  That's what

14   the SEC asking for.  Let's just not kill the vibes before

15   the 29th, the good vibes.

16             MS. SOLOMON:  Of course, your Honor.  We never

17   need to be doing that.

18             THE COURT:  Okay.

19             MS. SOLOMON:  And, you know, I think part of that

20   relates to us.  And you may have seen this in our papers.

21   But there's been some back-and-forth about the scope of this

22   technical deposition.  We've described it as the scope is

23   governed by the consent order and --

24             THE COURT:  I agree.

25             MS. SOLOMON:  -- we think that, you know, that's

1    fair.

2              We've heard Binance -- Binance's counsel, rather,

3    you know, introduce it in more, we would say, vague language

4    about what they understand.  We asked during our

5    meet-and-confer about when they -- how they think that

6    language is different than the consent order.

7              And we haven't really heard a response, which is

8    all to say the more robust that deposition is, the -- you

9    know, maybe the fewer [indiscernible] we'll have.  And to

10   give you an example, you know, we're hoping that this

11   inspection of -- I'm sorry --

12             THE COURT:  You're fine.

13             MS. SOLOMON:  -- this deposition should cover PNK;

14   it should cover TSS; it should cover all aspects of BHL's

15   support to BAM.  If it doesn't cover one of those things,

16   there's going to be more of a need for depositions that

17   cover those topics.

18             And so, you know, again, we think -- I'm not sure

19   that we actually have any dispute on this issue.  But I did

20   just want to flag, the better the deposition is, you know,

21   hopefully the sooner things wrap up and the less we have to

22   do afterwards.

23             THE COURT:  Yeah.  And I think from my

24   perspective, we talked about this previously when, you know,

25   we started with prior counsel for BAM and BHL.  We've talked

1   about all these things of -- I mean, I understand while you

2   all feel like -- I mean, you've said it very clearly -- it's

3   not fair to assume when there's what you feel like a

4   limitless topic area is going to be the limiting thing for a

5   deposition.  In fact, we've talked in the past about having

6   something in lieu of or in addition to.  And I just don't

7   think that's helpful.

8          I think the consent order, although you all both

9   have different views, that is what limits the scope of this

10   deposition.  That's all that we're going to have.  We're not

11   going to add some additional constraints upon it.  But that

12   is a constraint, and it needs to be real.  They can't just

13   ask for, you know, everything.  So you all are going to have

14   to work within those confines.  Okay?

15          MR. MENDRO:  Yes, your Honor.

16          THE COURT:  Okay.

17          MR. MENDRO:  And to be clear, we have not been

18   stopping people from testifying.

19          THE COURT:  No, no.  Not at all.

20          MR. MENDRO:  There really isn't a dispute here.

21   The witness will testify to what the witness knows.

22          THE COURT:  Perfect.  That sounds great.  Thanks.

23          Okay.  And so I appreciate [indiscernible]'s

24   patience getting here to Mr. Zhao.

25          I mean, I know -- I think, Mr. Qureshi, you

1      weren't at the last hearing.  You were?

2                  MR. QURESHI:  I was not.

3                  THE COURT:  Yeah.

4                  MR. QURESHI:  The one before that.

5                  THE COURT:  Yes.  You know, I think that counsel

6      for Latham made the point -- and, you know, the SEC feels

7      it's not a strong point, but it is a point -- that has a

8      basis in law now that Mr. Zhao is -- I mean, the consent

9      order's about the dissipation of assets.  And we're very

10     forward-looking.

11                 And Mr. Zhao has -- although you all identified

12     some ways that he still has some interest certainly in the

13     companies and things like that, I mean, it's certainly

14     different now than it was at the beginning of the

15     litigation.  So a deposition of Mr. Zhao seems -- it may be

16     necessary, but less necessary than before.

17                 I think that continues to be Latham's point of

18     view.  Is that right?

19                 MR. QURESHI:  That's correct, your Honor.

20                 In addition, when we negotiated the consent order

21     last summer, we foresaw this possibility, that they're just

22     going to want to depose him and that's why we inserted

23     language that everybody agreed to that they need to meet a

24     threshold standard.  They have to show that he's currently

25     involved or knowledgeable about asset clearing or custody of

1    customer assets.

2              And so they periodically tell us they want to

3    depose Mr. Zhao.  We push back and say, You haven't met this

4    standard.  We did that, I think, most recently on February

5    8th.

6              We never got a response.

7              And then in addition to that, as you point out and

8    as I think we highlighted at the last conference, he's not

9    currently involved in management or operation of BHL.  He

10   stepped down as a board member of BAM.  There's no questions

11   related to expedited discovery that could be put to him.

12             So we don't think a deposition of him is

13   appropriate.

14             THE COURT:  Okay.  So I'm happy to hear from the

15   SEC.  And I get why, you know, historical is important.  But

16   I'm most concerned particularly, as you all know, I mean,

17   what's happening at -- BAM and BHL's changing from a

18   technology perspective as well as a personnel perspective.

19   And so, you know, how much is he going to be able to answer?

20             MS. SOLOMON:  Your Honor, I mean, I'm not sure we

21   truly have a ripe dispute, I think --

22             THE COURT:  Right.

23             MS. SOLOMON:  -- for the reasons --

24             THE COURT:  Oh, I don't need an answer to that.

25   That's my thoughts out loud.  So when you do -- sorry.  I

1        should have been clearer.

2                 MS. SOLOMON:  Well --

3                 THE COURT:  I think that's what I'm going to want

4        to hear if you get there.

5                 And I do think that, you know, in terms of

6        sequencing, that's the very -- it's hard to imagine that not

7        being -- coming at the very end after everything is done

8        with everyone else at that table -- and fortunately for

9        Mr. Zhao, unfortunately for everyone else, the more that

10       they do, the less it feels like it's needed.  But I mean, it

11       still might be.  We'll wait to hear that.

12                But I don't think we need to do it -- I don't

13       think we need to hear anything on this and I don't think --

14       I mean, you not answering Latham on that is simply -- I

15       think that you've heard what they've said and you continue

16       to think about it and -- I mean, I don't think you all are

17       looking, the four of you, for more litigation on this,

18       especially if you have other litigation to do.

19                And so I understand that this will necessarily --

20       it's impossible to imagine a deposition of Mr. Zhao not

21       leading to litigation on this as just, please continue, as

22       I'm sure you do, to just try to assess what has the best

23       bang for the buck.

24                MS. SOLOMON:  Your Honor, we will.  And that's

25       exactly why we've, you know, tabled this certainly before we

1   do, you know, other Binance depositions.

2           THE COURT:  Yeah.

3           MS. SOLOMON:  And since, you know, affiliation --

4   I'll just add that, you know, we have not -- there's the

5   deposition, but there's also the aspect of documents from

6   Mr. Zhao.  I don't know if you were -- if your Honor was

7   going to get to that.

8           THE COURT:  Sure.  That we can do.

9           MS. SOLOMON:  If you'd like, I can address that

10  now.

11          THE COURT:  Yeah.

12          MS. SOLOMON:  I think, you know, there is this

13  aspect of the deposition.  But we've also propounded very

14  narrow requests related to -- directed both to Binance and

15  to Mr. Zhao.  If the answer is that there's no responsive

16  documents because Mr. Zhao is not involved in these issues,

17  then that is an answer --

18          THE COURT:  Sure.

19          MS. SOLOMON:  -- in and of itself.

20          THE COURT:  Yeah.

21          MS. SOLOMON:  But that's different than saying,

22  "We think Binance has it covered," which is essentially the

23  response --

24          THE COURT:  Sure.

25          MS. SOLOMON:  -- we [indiscernible] now.  So we

1      don't know what documents exist, of course.  But Mr. Zhao

2      does and his counsel --

3                  THE COURT:  Yeah.  I get you.

4                  MS. SOLOMON:  -- are those that can learn that

5      answer.

6                  And so, you know, our position is that the

7      document requests that we've propounded to Binance are

8      narrow.  To the extent Mr. Zhao has responsive documents, of

9      course, that might color a request for deposition down the

10     road --

11                 THE COURT:  Yeah.

12                 MS. SOLOMON:  -- which is why I bring it up in

13     this context.  But it's important that we get those

14     documents and that some search is done.

15                 And I think it's especially important in light of

16     the fact that Mr. Zhao may have connections to certain of

17     the Binance entities that Binance itself does not have.  And

18     so this brings us back to that list of Binance entities that

19     we spoke about previously.

20                 THE COURT:  Yeah.

21                 MS. SOLOMON:  But to the extent there are entities

22     that are involved that Mr. Zhao has a relationship with,

23     we're going to have to, you know, ask follow-up questions of

24     course from that.

25                 THE COURT:  Yeah.  So I mean, I think -- I'm happy

1   to hear from you.  I do think if it's -- in terms of how

2   invasive it is, the deposition seems very invasive.  But I'm

3   hoping that, you know, with document requests or things like

4   that, I mean, if you're able to answer some of these

5   questions -- and certainly the more times you can say, you

6   know, "He doesn't have that; he doesn't work there anymore,"

7   that's really going to help when, you know -- to the extent

8   you're objecting to --

9           MR. QURESHI:  Certainly, your Honor.

10          And we understand the request and have been

11  working with our colleagues from Binance on responding to

12  that.

13          THE COURT:  Great.

14          MR. QURESHI:  But we'll certainly continue to do

15  so going forward.

16          THE COURT:  That sounds great.

17          All right.  So that's really it from my end except

18  for the next steps.

19          I think, again, I don't -- as to BAM, I don't

20  foresee the benefit of -- I mean, we can set another joint

21  status report date for all the parties.  But I don't think

22  it's a question of where we need to get back in front.  I

23  think it's going to be where you say:  This is it.  We don't

24  need a 30(b)(6).  I think it's where they're going to say

25  they need a 30(b)(6).

1      And to the extent that they're going to say that,

2   I think that should be my sort of housekeeping preference,

3   is to deny the prior motions to compel as moot.  I mean, I

4   think we've advanced so far from there.  And it's time for

5   some pointed -- because whatever it is that the SEC is going

6   to request above and beyond a 30(b)(6), I mean, I think I

7   just want to get very pointed requests in the actual motion.

8      I mean, before, it made sense.  It was the

9   beginning of a discovery dispute, whether sort of very macro

10  issues and, you know, you weren't getting the things, you

11  know, productions hadn't been made and for good reason.  But

12  now we've got that.  Now it's where we've honed in on,

13  "Let's get down to these ten or 15 or 20," whatever things

14  it is that you want in addition to the 30(b)(6).

15      And so, I mean, I think the -- to the extent it's

16  helpful, we could have a joint status report be the next

17  thing where that is -- you are then proposing a briefing

18  schedule on filing the new motion to compel, you know, the

19  protective order.

20      Does that make sense from -- I'll let BAM start.

21  What do you all think?

22      MR. LUGER:  That makes sense conceptually from our

23  point of view.

24      THE COURT:  From the SEC's?  I mean, does that

25  make sense?  We can pick a date.  But that date is really to

1    just say, like, you know, what is the new -- I mean, you're

2    seeking a motion for the 30(b)(6), which I've already

3    indicated, you know, I don't think that's -- that's not

4    unreasonable from where we are today, but that's because I

5    want some more stuff to come out.  If that comes out, then

6    perhaps it won't be.

7            And, you know, perhaps you will modify your

8    request and say:  You know what?  We don't need a 30(b)(6).

9    Honestly, just get us these five last things.  Clearly, we

10   want a lot more.  But these five things, you know, I think

11   it's just what you're seeking to compel next from them.

12           Does that make sense?

13           MS. SOLOMON:  Your Honor, we -- you know, one

14   thing that we've really seen is that a lot of things happen

15   right before joint status reports are due.

16           THE COURT:  Yeah.

17           MS. SOLOMON:  And so --

18           THE COURT:  So I want to -- I think the joint

19   status report is -- at that point, I want to shape what it's

20   going to be.  I don't just want a lay of the land.  I want

21   then briefing or a plan for how we're going to resolve this.

22           MS. SOLOMON:  Your Honor, absolutely.

23           THE COURT:  And from your perspective, it's like:

24   You know what?  We need a lot more than a 30(b)(6) and 20

25   things.

1          I'm not saying you can't ask for it.  I'm just

2     saying at least right now, it's hard for me to imagine being

3     receptive to a lot more than that.

4          MS. SOLOMON:  Understood.

5          THE COURT:  Okay.  And then from -- I mean, I

6     think from the BHL and Zhao's perspective, it'll just be

7     continue what you're doing, which is, you know, piggybacking

8     on that, although I do think that at whatever -- if there is

9     a, you know, next hearing, to the extent there is one -- I

10    think there likely needs to be for BHL -- I mean, BHL's

11    going to be doing more of the talking and BAM is, I hope,

12    receding from BAM's perspective to the background.

13         Does that make sense?  Or I mean -- that's what I

14    kind of imagine.

15         MR. QURESHI:  That's certainly my expectation --

16         THE COURT:  Okay.

17         MR. QURESHI:  -- to be talking about how we're in

18    agreement and we're ready to move --

19         THE COURT:  I love it.  Yeah.  I love

20    [indiscernible].  That's great.

21         So what do you think is helpful for a next date?

22    Is it a month?  Is it -- do you all just want to talk

23    offline and pick a date?  There's no point -- this isn't --

24         MS. SOLOMON:  Yeah.  I mean, we're happy to talk

25    offline --

```
1                 THE COURT:  Okay.

2                 MS. SOLOMON:  -- with defense counsel.  We'd say,

3      you know, we'd like to see progress, of course.  And so

4      it's -- a lot is going to depend on how quickly they produce

5      documents.

6                 THE COURT:  Yeah.

7                 MS. SOLOMON:  And our view is probably something

8      in the next three weeks to --

9                 THE COURT:  Yeah.

10                MS. SOLOMON:  -- [indiscernible] days, something

11     along those lines.

12                THE COURT:  I thinking at maximum four weeks.  So

13     that was my impression.  Certainly no more than four weeks.

14     But, you know, if you both agree because things are moving

15     that you need more time, that's great.  But it's hard for me

16     to imagine that -- I want to get this resolved, as I know

17     everyone else does.

18                So you all propose a date; and that's great in

19     terms of that.

20                I think that it may feel like this is mostly

21     things that BAM and BHL have to do and Mr. Zhao and that I

22     think I probably agree factually with a lot of the things

23     that you say that you need, that they would be helpful.

24                The one thing to me, there's -- the biggest

25     problem for the SEC is the -- brooding on the presence of
```

1   this is not just the guilty plea, but the fact that BHL is

2   not just sending counsel to one hearing, but another,

3   because if your buckets, the second one, is the fear of

4   customers losing assets, I believe that if the worst

5   happens, like let's say some rogue BHL employee goes and

6   hacks the system and moves all the money to BHL from BAM.  I

7   mean, I think that -- I'm not asking BHL today, but perhaps

8   it's something that they and BAM and -- will want to include

9   in their briefing, is that they say, Well, we just move it

10  back.  This just isn't the normal SEC litigation where the

11  overseas -- I've said this before, but it's even more so

12  now, with the overseas purported actor who could do the bad

13  things.  We have a check on that.  Not one check, but we

14  have two checks on them.

15          And so if the fear is that something is going to

16  happen with customer assets and they dissipate but you don't

17  know it, I mean, but that doesn't really matter until the

18  customers start trying to withdraw it.  I assume, like,

19  concretely, it matters; it is important.  But it's not

20  urgent until people go and try to withdraw their money and

21  it's not there.

22          And if that happens, and it's because BHL has done

23  something or someone -- right? -- someone totally untoward,

24  not -- has gone outside the boundaries of anything we know,

25  I still think BHL is just going to correct that.

1          So, like, you have a corrective action that I feel

2     like -- I mean, I don't know SEC litigation, but 99 times

3     out of 100 you don't have -- having those folks here.  And

4     maybe -- and that's what you're just going to have to

5     educate me on.

6          I don't need an answer on this.  But when you are

7     on that next thing seeking leave to compel, I think, as

8     frustrated as you might be as to where things have gotten, I

9     believe that, you know, I'm sure DOJ is out there in the

10    safety sea raising the "mission accomplished" banner,

11    talking all the credit for the work done.  But we all know

12    who came first here.  It's you all.

13         And so perhaps that was a big prompt for what

14    happened in that other case.  And so I see that stuff

15    happening as a credit to you all and that you all have, you

16    know, caused things to happen which now in another way is

17    going to remedy your concern, because that's what I'm

18    concerned about, is your concern.

19         And even though it may not be the traditional

20    remedy, it seems like there's an atypical remedy here that

21    actually is much more fulsome than any document you could

22    ever get, even if you could look at the -- every inspection

23    they gave you a blank check to look at everything in there,

24    at the end of the day, these are -- it's a dynamic

25    situation.  There are humans that are unpredictable and, you

1     know, other things outside of that, like software and

2     things.

3               But usually there's no safety net.

4               And so here, I think there is a safety net.  And

5     so that's all -- I'm going to need you -- when you are

6     briefing this issue and asking for additional discovery, is

7     I want to know why that's not enough.  That's my big

8     concern, because I feel like it is a bit of a sort of safety

9     valve for them to always fall back on.

10              And I don't -- I think that they've highlighted it

11    in a fair way and I think that they haven't beaten you over

12    the head with it.  But they could.

13              And so that's my -- I don't need an answer to

14    that.  I don't want you to right now.  I just want you to be

15    thinking about it.  That's my big -- because I feel like

16    without that, a lot of the close calls -- and some of them

17    aren't even close calls, I think -- go your all way [sic].

18    But now I think even some of the not-close calls I think

19    just say, let's just get to merits discovery.  The

20    worst-case scenario, BHL is just going to cut a check and

21    move that money back, whatever it is.

22              And if that's not good enough, I just need to know

23    why.  Okay?

24              MS. SOLOMON:  Understood, your Honor.

25              And I just want to allude to one thing I said

1   previously, which is --

2          THE COURT:  Yeah.

3          MS. SOLOMON:  -- that we really haven't received

4   much information about the specific steps that are being

5   taken.  I know we're part of the U.S. government, but as

6   your Honor knows --

7          THE COURT:  Yeah.

8          MS. SOLOMON:  -- we're not all the same --

9          THE COURT:  Right.  Right.

10         MS. SOLOMON:  -- entity, you know.  And so to the

11  extent there is information related to that process that's

12  helpful for the SEC to know, we're very helpful -- we're

13  very happy to evaluate that information.  But we would

14  actually need the information --

15         THE COURT:  Yeah.

16         MS. SOLOMON:  -- rather than just the --

17         THE COURT:  Right.  You can't just put the DOJ

18  press release --

19         (Speaker overlap.)

20         MS. SOLOMON:  -- monitor in place or will be in

21  place or --

22         THE COURT:  Yeah.

23         MS. SOLOMON:  -- without any of those details.

24         THE COURT:  Yeah.  And so, I mean, I hope you hear

25  me, because this is the biggest sort of lifeline I can throw

1    to you all, is that I think there's a potential which --

2    that resolves all the questions.  Right?  And it's not just

3    the monitoring.  Right?  I mean, I think that's helpful,

4    getting that as much as you can, I'm sure.  Right?  You've

5    got to handle that in and of its own case.  And so it's not

6    like you all are sitting on that anyway.

7            But I think sharing as much of that with the SEC

8    as you can, but doing as much as you can to say, you know,

9    not -- it's not just the monitor.  Here's what BHL is

10   committing to.  You know, if someone from BHL or someone

11   else -- right? -- let's just say some third-party actor

12   hacks BAM and moves the money to BHL or something else just

13   to, you know, cause trouble.  Obviously, what planet would

14   BHL be on where they didn't just move that money right back?

15   Normally, I think that we don't have that.

16           And the more that you can sort of have robust

17   showings and, you know, whatever it is, declarations, things

18   like that, to show that there's this insurance, I think it

19   just -- it cuts to the core of what I believe is the

20   question here, is:  What were we doing -- I mean, sure.  I

21   want to -- I don't want to be the U.S. healthcare system and

22   just do emergency room medical care.  Preventative is

23   better.

24           But if we have a place -- a system in check that

25   really feels like -- right?  Because again, the overseas

 1    company is not the smaller one.  So even if it's like, Oh,

 2    if it was flipped, I could understand where we're like, Oh.

 3    But, you know, even if money moves overseas, the overseas

 4    entity is so tiny that maybe it can't absorb this.  It's

 5    just hard for me to imagine if all of BAM's assets got moved

 6    tomorrow to BHL that -- I mean, understanding these are

 7    large numbers -- that BHL still doesn't dwarf it and can't

 8    just fix this.

 9         And if I have that comfort, it's hard for me to

10    imagine a scenario in which I am asking for more and more

11    discovery when you say, "But we have solved the problem.

12    Why are we doing more preventative tests when we've cured

13    the disease?"

14         And I don't know if that's possible, because this

15    is all just me imagining -- I mean, I know less than the

16    SEC; and the SEC I don't think knows a lot.  And, you know,

17    I understand they're saying that BHL tomorrow can fire

18    counsel and they can, you know, say, "Come get me in China."

19    So it's not quite as cut and dried as I'm making it.

20         And that's all I need to hear from you all.

21    That's all I need to hear from you all on that.

22         So all right.  So we'll work in reverse order.

23         Anything else from counsel for Mr. Zhao?

24         MR. QURESHI:  No, your Honor.

25         THE COURT:  Okay.  Great.

```
1                    Anything from counsel for BHL?

2                    MR. MENDRO:  Just --

3                    THE COURT:  Yeah.  Please.

4                    MR. MENDRO:  -- [indiscernible].

5                    THE COURT:  Yeah.

6                    MR. MENDRO:  I know we will work with the SEC on

7       the timing for the next joint status report.

8                    The one issue that I just wanted to raise is that

9       the status reports in this case evolved in a way that is

10      somewhat unconventional.  They're now over 30 pages long

11      with --

12                   THE COURT:  Yeah.

13                   MR. MENDRO:  -- dozens of exhibits, many of

14      which --

15                   THE COURT:  Yeah.  They're not just joint status

16      reports.

17                   MR. MENDRO:  -- confidential -- right.  They're

18      more like summary judgment briefs.

19                   THE COURT:  Yeah.  I want less exhibits.  I'd be

20      quite happy to have no exhibits in our next JSR.  I don't

21      think that that's helpful, especially -- if we need to, we

22      can have a hearing.  I mean, we're going to go through it.

23      But I don't think that's helpful.

24                   You know what I want to know is:  Do you need a

25      hearing?  And what do you want to happen in the next stages
```

1    of the litigation?  That's really all I'm looking for.

2          I mean, this was very helpful, I think, for me.

3    It's going to be helpful to what happens in any motions to

4    compel.  But it did feel a little bit like we were getting

5    more into what than we needed to, which I think is your

6    point.

7          MR. MENDRO:  That is my point, your Honor.  And I

8    appreciate the Court's recognition of that.

9          And I was going to suggest that we make these four

10   or five pages apiece with no exhibits.  And then we could

11   propose in there briefing, if briefing is necessary for the

12   Court, on issues wherever we'll have a fair amount of time

13   to evaluate the arguments and exhibits and make decisions

14   regarding confidentiality instead of getting hundreds of

15   pages of materials in the hours before the filing.

16         THE COURT:  Yeah.  And so -- and I appreciate --

17   I'm sorry that, you know, we kicked some of this stuff back

18   to ask for more information about the sealing.  It just -- I

19   want to be very cognizant of the public right to access.

20   And I think it's difficult when you have, I mean, a lot of

21   balls that you're juggling up in the air right now to

22   [indiscernible] sealing.

23         And so once exhibits start being requested, I

24   mean, you can't not respond with other exhibits.  Right?

25   You can't just be -- the record can't be the SEC's exhibits

1    and not yours in response or adding color or flavor to it.

2            So I mean, I'm in -- I think I'm not -- I don't

3    want to say no rush, but it's not urgent to get buttoned up

4    on the exhibits on the prior one to the extent that, you

5    know, you still think even those exhibits are necessary.

6    Perhaps they're not even necessary.  So I would encourage

7    you all to think back and, say, maybe just leave the JSR or

8    just modify it, you know.

9            Is that not an option?  Maybe.  I'll probably get

10   in trouble with my clerk.  If I go missing, you'll know what

11   happened.

12           So you can figure it out on the sealing issue.  I

13   mean, I kind of told you -- you've already put it out there,

14   so probably the best practice would be to just -- I think

15   the shard holder part was clear.

16           And this isn't what you're asking, but since we're

17   here I just want to -- the basis for redactions for the

18   shard holders was clear.  I think to the extent more you

19   have those factors about, you know, privilege related to

20   business, whatever, et cetera, secrets and, you know, the

21   economic crimes, et cetera, all those things -- whatever --

22   it would be helpful to get that.

23           I want to avoid this in the future, though.  I

24   absolutely do want to avoid.  So I will say -- I'm not going

25   to put a page limit, but I don't want exhibits.  I really

1   don't.  And if you want to put exhibits, then seek leave to

2   file an exhibit and tell me why it's necessary.  Does that

3   work?

4              MR. MENDRO:  That's helpful.  Thank you, your

5   Honor.

6              THE COURT:  Okay.  I'll come back.

7              Anything else from counsel for BAM?

8              MR. LUGER:  Nothing from us.  Thank you.

9              THE COURT:  Okay.  Anything from the SEC about

10  that?

11             MS. SOLOMON:  No, your Honor.

12             Just on the joint status report, you know, this is

13  the first joint status report where we put exhibits.  We've

14  heard you about, you know, not doing this in the future.

15             THE COURT:  Well, I mean, I'm not criticizing.  I

16  think it becomes -- there's a little -- I mean, this is a

17  massive litigation already.  And so, I mean, I think you all

18  are handling this -- I say this every time -- I'm

19  [indiscernible].  I think you all are handling it better

20  than anyone could possibly have hoped for or imagined.

21             It may not feel like that from where you are, but

22  from where I am it feels like you all are trying to work

23  things out.  You have worked things out.  You disagree.

24  That's actually, you know, your job.

25             But it's not like -- I didn't feel like you were

1    trying to bury us.  I get it.

2              I mean, seeing those screenshots, that was

3    helpful.  I couldn't tell you it wasn't.  We sat and looked

4    at it and it raised some questions that I think led to

5    helpful answers.

6              And it just could be the type of thing where you

7    just say, like, Hey, maybe -- here are the categories of

8    exhibits we want to add that will be helpful for the next

9    hearing so I don't come in there and be like, "What?

10   There's screenshots?  Well, what do those look like?"  And

11   then you get up and you're working the ELMO and things like

12   that.  That is the least efficient.

13             So --

14             MS. SOLOMON:  Yes, your Honor.  In the future, if

15   we feel, you know -- we've done joint status reports where

16   we briefly jointly make a statement; and those have been

17   great from our perspective as well, and we'll try to do that

18   wherever possible.

19             And in the future, if you think exhibits are

20   necessary, we'll --

21             THE COURT:  Okay.

22             MS. SOLOMON:  -- submit briefing as you directed.

23             THE COURT:  Okay.  That sounds great.

24             Anything else, then, from the SEC going forward?

25             MS. SOLOMON:  No, your Honor.

1           THE COURT:  Okay.  All right.  That's it for

2    today.  Thanks, everybody.  Best of luck to you.  Take care.

3           MR. QURESHI:  Thank you.

4           THE COURT:  The parties are excused.

5           (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10             Dated this 28th day of February, 2024.

11

12         <u>/s/ Lisa Edwards, RDR, CRR</u>
           Official Court Reporter
13         United States District Court for the
             District of Columbia
14         333 Constitution Avenue, Northwest
           Washington, D.C. 20001
15         (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## '

**'23** [1] - 49:17

## /

**/s** [1] - 131:12

## 1

**1** [4] - 46:3, 90:18, 91:2, 92:21
**100** [4] - 1:16, 1:20, 63:18, 120:3
**1000** [1] - 2:10
**10004** [1] - 1:17
**1050** [1] - 1:23
**13th** [1] - 43:22
**14** [2] - 83:25, 84:1
**15** [2] - 84:1, 115:13
**1919** [1] - 2:5
**1st** [4] - 92:12, 92:15, 92:24, 106:6

## 2

**2** [1] - 46:8
**20** [3] - 102:3, 115:13, 116:24
**20-100** [1] - 1:16
**20001** [2] - 2:15, 131:14
**20004** [1] - 2:11
**20006** [1] - 2:6
**20036** [1] - 1:24
**202** [2] - 2:16, 131:15
**2023** [11] - 46:14, 47:2, 49:16, 50:16, 50:23, 51:15, 57:7, 90:18, 91:2, 92:21, 94:15
**2024** [3] - 1:7, 49:18, 131:10
**20549** [1] - 1:20
**20th** [1] - 106:6
**21st** [1] - 18:11
**23-01599** [1] - 1:4
**23-1599** [1] - 3:2
**25** [1] - 101:21
**26** [2] - 1:7, 69:14
**26th** [1] - 47:2
**27** [1] - 69:14
**28th** [1] - 131:10
**29th** [1] - 106:15

## 3

**30** [1] - 125:10
**30(b)(6** [31] - 5:18, 6:1, 6:11, 6:23, 7:6, 29:4, 30:6, 30:23, 30:24, 37:8, 42:4, 42:15, 53:10, 53:18, 54:2, 54:19, 57:14, 63:25, 64:19, 77:24, 78:5, 78:20, 80:19, 81:4, 86:25, 87:7, 88:3, 101:4, 115:6, 116:2, 116:24
**30(b)(6)** [11] - 29:14, 32:25, 38:22, 53:3, 87:10, 87:17, 87:23, 114:24, 114:25, 115:14, 116:8
**300** [1] - 1:24
**327** [1] - 70:4
**333** [2] - 2:14, 131:14
**354-3269** [2] - 2:16, 131:15

## 4

**4** [1] - 83:5

## 5

**5** [1] - 36:6
**50** [2] - 63:16
**525** [1] - 2:3
**555** [1] - 2:10

## 6

**6** [2] - 36:8, 72:17
**60661** [1] - 2:3
**6706** [1] - 2:15

## 7

**7th** [1] - 19:12

## 8

**800** [1] - 2:6
**8th** [1] - 110:5

## 9

**99** [1] - 120:2

## A

**Abid** [1] - 3:11
**ABID** [1] - 2:8
**ability** [5] - 15:12, 35:19, 35:25, 36:22, 131:7
**able** [12] - 12:22, 13:3, 27:18, 37:18, 48:12, 53:12, 73:22, 76:20, 81:23, 102:13, 110:19, 114:4
**abroad** [2] - 97:18, 97:22
**absent** [1] - 81:25
**absolutely** [8] - 16:13, 64:5, 86:3, 90:8, 99:10, 102:14, 116:22, 127:24
**absorb** [1] - 124:4
**abundant** [1] - 95:22
**access** [42] - 11:24, 12:16, 28:20, 29:18, 29:19, 31:17, 31:18, 31:19, 31:24, 32:1, 33:22, 34:2, 36:13, 36:19, 37:15, 37:24, 38:11, 38:17, 38:18, 43:21, 48:1, 48:7, 48:9, 48:11, 48:12, 48:17, 50:5, 50:6, 51:11, 52:3, 52:9, 52:17, 52:22, 52:24, 52:25, 57:14, 58:7, 58:20, 73:24, 75:15, 126:19
**accessible** [1] - 102:23
**accessing** [3] - 48:3, 75:16, 76:2
**accommodate** [3] - 21:3, 21:8, 21:17
**accomplished** [1] - 120:10
**according** [1] - 15:1
**account** [3] - 28:17, 31:13, 31:20
**accountholder** [1] - 34:1
**accounting** [5] - 78:7, 83:8, 83:16, 84:2, 86:4
**accounts** [1] - 11:6
**accurate** [2] - 44:3, 131:4
**action** [1] - 120:1
**Action** [1] - 1:3
**actor** [2] - 119:12, 123:11

**actual** [5] - 4:17, 26:25, 73:5, 78:23, 115:7
**add** [17] - 9:22, 17:6, 21:2, 22:1, 31:5, 34:11, 46:18, 66:22, 77:24, 78:6, 78:21, 79:20, 92:2, 98:18, 108:11, 112:4, 129:8
**adding** [2] - 44:25, 127:1
**addition** [8] - 6:13, 34:21, 78:14, 78:17, 108:6, 109:20, 110:7, 115:14
**additional** [13] - 5:14, 30:15, 32:19, 34:10, 83:8, 83:10, 84:2, 90:16, 92:5, 92:7, 96:22, 108:11, 121:6
**address** [3] - 13:24, 50:15, 112:9
**adds** [2] - 39:10, 78:5
**adjudication** [1] - 20:15
**administers** [2] - 48:22, 49:19
**administrative** [3] - 50:5, 50:6, 51:10
**administrator** [6] - 14:13, 14:25, 46:14, 46:23, 46:25, 48:20
**administrators** [3] - 14:14, 47:13, 47:14
**advance** [2] - 90:1, 92:21
**advanced** [1] - 115:4
**advisable** [1] - 102:1
**affairs** [3] - 30:7, 38:12, 81:5
**affiliated** [7] - 23:5, 23:12, 59:22, 73:20, 76:13, 78:7, 79:15
**affiliation** [1] - 112:3
**affirmed** [1] - 78:1
**afield** [1] - 68:23
**afraid** [1] - 11:3
**afterwards** [2] - 6:2, 107:22
**ago** [2] - 46:23, 95:5
**agree** [24] - 4:14, 11:20, 18:1, 20:10, 27:3, 32:7, 41:9, 41:20, 48:14, 63:7, 68:4, 68:23, 70:16, 73:5, 76:6, 83:21, 84:14, 90:15, 91:25, 103:11, 106:7,

**106:24, 118:14, 118:22
**agreed** [4] - 16:5, 95:25, 97:3, 109:23
**agreement** [3] - 81:22, 99:20, 117:18
**agrees** [1] - 4:13
**ahead** [8] - 12:11, 22:14, 22:16, 24:3, 27:2, 51:8, 84:4, 87:20
**air** [1] - 126:21
**al** [2] - 1:7, 3:3
**allow** [3] - 12:16, 30:8, 80:3
**allowances** [1] - 65:13
**allowed** [2] - 16:7, 80:13
**allude** [1] - 121:25
**alluded** [7] - 29:23, 32:6, 36:10, 36:22, 37:23, 57:2, 72:6
**alludes** [1] - 74:15
**alluding** [1] - 33:15
**allusion** [1] - 31:14
**almost** [2] - 10:20, 92:3
**alone** [1] - 52:20
**alternatives** [1] - 30:12
**AML** [2] - 8:21, 9:18
**amount** [5] - 9:9, 67:16, 83:17, 83:23, 126:12
**amounts** [2] - 83:22, 86:12
**AND** [3] - 1:3, 1:15, 1:19
**animates** [1] - 88:4
**animating** [5] - 16:4, 16:9, 20:6, 29:15, 58:24
**annual** [2] - 91:11, 91:13
**answer** [26] - 13:11, 20:6, 29:4, 29:7, 30:25, 32:17, 32:21, 35:20, 37:19, 38:8, 39:16, 39:18, 42:12, 50:25, 52:15, 55:9, 76:21, 97:21, 110:19, 110:24, 112:15, 112:17, 113:5, 114:4, 120:6, 121:13
**answered** [4] - 27:19, 29:11, 29:13, 43:17
**answering** [2] - 56:9, 111:14

answers [13] - 7:5, 7:9, 18:6, 29:5, 30:4, 41:9, 45:2, 45:4, 60:22, 60:23, 72:9, 100:6, 129:5
anticipate [3] - 34:20, 64:19, 81:19
anxious [1] - 7:18
anyway [2] - 92:19, 123:6
anyways [1] - 44:10
apex [1] - 100:15
apiece [1] - 126:10
appear [2] - 44:24, 51:21
appearance [1] - 58:19
aPPEARANCES [1] - 1:14
APPEARANCES [1] - 2:1
appeared [1] - 18:12
appearing [1] - 97:12
Apple [2] - 58:19, 58:22
apply [1] - 26:8
appreciate [15] - 6:5, 34:12, 37:16, 59:13, 84:23, 84:24, 88:13, 88:19, 89:1, 89:4, 102:18, 105:17, 108:23, 126:8, 126:16
approach [3] - 3:5, 7:13, 95:3
appropriate [1] - 110:13
approval [3] - 60:9, 75:1, 80:22
approve [2] - 58:4, 67:9
approving [1] - 81:2
arbitrarily [1] - 45:15
area [2] - 101:5, 108:4
arguably [1] - 44:9
argue [1] - 71:2
arguing [1] - 86:14
argument [2] - 20:14, 54:19
arguments [2] - 74:25, 126:13
arise [1] - 40:22
arising [1] - 42:23
arrangement [1] - 65:7
arrangements [1] - 17:13
art [1] - 56:7
aside [1] - 15:14
aspect [2] - 112:5,

112:13
aspects [2] - 8:22, 107:14
assertion [1] - 23:20
asserts [1] - 83:7
assess [2] - 94:16, 111:22
asset [4] - 26:22, 40:19, 40:21, 109:25
assets [41] - 7:2, 9:25, 10:24, 11:1, 11:11, 12:16, 12:25, 13:21, 14:12, 15:6, 16:16, 16:17, 16:22, 17:20, 26:23, 28:12, 31:24, 32:1, 35:15, 35:19, 35:25, 42:17, 44:18, 56:19, 59:7, 59:16, 59:20, 60:6, 61:22, 68:15, 70:5, 81:9, 82:6, 83:17, 83:22, 83:24, 109:9, 110:1, 119:4, 119:16, 124:5
associated [10] - 18:13, 28:25, 52:23, 57:22, 58:1, 60:12, 80:2, 80:16, 85:18, 91:21
assume [5] - 9:18, 11:3, 12:21, 108:3, 119:18
assuming [2] - 85:12, 97:21
assumption [1] - 44:2
assumptions [3] - 10:6, 22:20, 66:18
assuredly [1] - 42:2
attach [1] - 26:16
attached [2] - 50:1, 50:8
attachment [2] - 20:24, 21:4
attachments [9] - 18:13, 18:18, 18:20, 19:2, 19:6, 19:8, 19:10, 20:1, 20:17
attempt [1] - 61:23
attempted [3] - 10:1, 14:7, 94:14
atypical [1] - 120:20
Audio [1] - 1:12
audit [1] - 43:24
August [11] - 33:21, 34:6, 43:9, 46:14, 46:21, 49:2, 49:17, 50:16, 50:23, 51:15, 78:6

authorizes [1] - 60:7
availability [1] - 26:23
available [3] - 78:18, 104:12, 104:13
Avenue [4] - 1:23, 2:5, 2:14, 131:14
avoid [2] - 127:23, 127:24
aware [1] - 68:3
AWS [28] - 28:19, 29:19, 31:13, 31:15, 31:16, 31:17, 33:23, 33:24, 34:3, 36:17, 38:16, 38:17

B

back-and-forth [1] - 106:21
back-end [1] - 36:13
back-end-type [1] - 40:8
background [1] - 117:12
backing [1] - 59:6
backwards [1] - 38:23
bad [2] - 45:23, 119:12
baked [3] - 58:14, 77:16, 82:19
Baker [1] - 3:14
BAKER [1] - 2:8
balancing [1] - 93:17
balls [1] - 126:21
BAM [113] - 2:2, 3:17, 3:18, 4:1, 4:12, 4:22, 5:7, 5:10, 6:20, 7:1, 7:4, 7:10, 7:11, 12:20, 12:22, 13:3, 13:10, 13:18, 13:22, 13:24, 14:12, 14:13, 15:1, 15:6, 18:12, 19:24, 20:5, 23:15, 28:11, 28:16, 29:7, 29:17, 29:19, 29:21, 30:10, 31:2, 31:12, 31:17, 32:9, 33:21, 33:24, 35:21, 37:15, 37:16, 38:23, 40:6, 41:20, 46:15, 47:12, 47:13, 48:21, 51:21, 56:18, 56:19, 57:7, 59:14, 59:16, 61:19, 61:21, 61:25, 63:2, 66:9, 66:16, 66:18, 66:19, 68:9, 69:10, 70:16, 73:15, 73:24, 74:19,

76:10, 78:6, 78:13, 82:20, 83:3, 83:7, 83:11, 83:15, 83:16, 83:21, 85:19, 86:6, 86:18, 87:1, 87:18, 88:19, 89:6, 89:10, 90:12, 91:4, 92:22, 93:22, 94:5, 94:24, 95:18, 96:8, 99:13, 107:15, 107:25, 110:10, 110:17, 114:19, 115:20, 117:11, 118:21, 119:6, 119:8, 123:12, 128:7
BAM's [49] - 9:24, 12:15, 13:2, 14:8, 20:14, 21:1, 28:6, 28:9, 28:23, 28:25, 35:14, 40:12, 46:4, 46:9, 46:22, 47:6, 47:7, 47:9, 50:13, 56:23, 57:7, 57:8, 59:18, 59:23, 60:2, 60:4, 60:9, 60:14, 61:18, 61:20, 65:9, 66:10, 67:7, 69:5, 69:20, 70:5, 73:12, 73:19, 74:25, 76:11, 79:25, 82:12, 84:8, 85:5, 85:22, 94:23, 117:12, 124:5
bang [1] - 111:23
banner [1] - 120:10
based [5] - 29:25, 51:21, 52:19, 53:2, 73:9
basis [4] - 22:23, 66:12, 109:8, 127:17
beaten [1] - 121:11
becomes [3] - 58:22, 105:2, 128:16
BEFORE [1] - 1:11
beforehand [1] - 54:23
beginning [5] - 11:21, 44:17, 63:9, 109:14, 115:9
begrudging [2] - 21:5
behalf [4] - 3:8, 3:12, 3:17, 3:21
behind [2] - 16:14, 58:25
belief [3] - 26:1, 39:2, 46:12
belts [1] - 17:18
belts-and-suspenders [1] - 17:18

benefit [5] - 26:21, 42:17, 89:6, 94:4, 114:20
best [9] - 7:25, 55:24, 97:18, 98:1, 100:17, 111:22, 127:14, 130:2, 131:7
best-case [1] - 7:25
better [6] - 6:23, 33:18, 104:7, 107:20, 123:23, 128:19
between [5] - 7:10, 43:16, 47:18, 61:20, 71:3
beverages [1] - 104:5
beyond [7] - 36:6, 87:9, 87:24, 88:1, 94:17, 106:11, 115:6
BHL [75] - 3:21, 5:8, 5:15, 5:16, 5:20, 6:2, 6:10, 6:15, 6:16, 28:8, 28:19, 31:19, 31:24, 32:1, 32:6, 35:14, 36:23, 37:13, 37:18, 40:8, 40:16, 41:9, 42:5, 42:7, 42:18, 46:3, 46:8, 46:13, 48:22, 49:19, 49:21, 50:4, 50:7, 53:10, 53:17, 56:22, 59:22, 60:15, 73:20, 73:22, 76:12, 76:18, 76:20, 79:15, 86:20, 88:18, 88:24, 89:9, 89:10, 89:12, 92:19, 93:1, 96:12, 99:4, 101:14, 107:25, 110:9, 117:6, 117:10, 118:21, 119:1, 119:5, 119:6, 119:7, 119:22, 119:25, 121:20, 123:9, 123:10, 123:12, 123:14, 124:6, 124:7, 124:17, 125:1
BHL's [10] - 35:19, 35:25, 89:16, 89:19, 90:4, 94:11, 98:9, 107:14, 110:17, 117:10
big [6] - 4:11, 4:20, 71:1, 120:13, 121:7, 121:15
bigger [2] - 12:20, 61:10
biggest [2] - 118:24, 122:25
billions [1] - 12:24
BINANCE [2] - 1:7,

1:22

**Binance** [65] - 3:3,
6:24, 6:25, 7:13, 9:23,
9:24, 12:14, 12:19,
12:23, 13:17, 13:21,
14:8, 14:11, 14:22,
17:6, 23:2, 23:5, 23:7,
23:12, 29:19, 33:23,
39:7, 48:3, 52:17,
56:20, 57:17, 59:17,
60:12, 65:3, 65:10,
65:24, 66:11, 66:13,
66:19, 66:24, 73:13,
73:17, 74:21, 75:16,
75:25, 76:1, 78:7,
79:14, 82:13, 90:13,
91:4, 93:10, 93:19,
93:23, 93:24, 94:4,
94:8, 95:3, 97:19,
107:2, 112:1, 112:14,
112:22, 113:7,
113:17, 113:18,
114:11

**Binance's** [5] -
39:15, 91:10, 95:7,
105:21, 107:2

**Binance-affiliated**
[1] - 78:7

**binancecf.net** [1] -
37:25

**binding** [2] - 102:9,
102:16

**bit** [9] - 7:15, 8:6,
15:21, 53:6, 67:11,
69:12, 83:21, 121:8,
126:4

**blank** [1] - 120:23

**block** [1] - 104:8

**blur** [1] - 61:23

**board** [1] - 110:10

**bones** [1] - 31:5

**bonus** [4] - 91:11,
91:13, 91:18, 91:19

**bonuses** [1] - 94:1

**books** [1] - 102:13

**Bora** [1] - 66:17

**bottom** [1] - 55:21

**boundaries** [4] -
25:20, 35:5, 45:9,
119:24

**breathing** [2] -
50:18, 55:1

**Brian** [1] - 92:22

**briefed** [2] - 26:9,
27:17

**briefing** [8] - 5:14,
115:17, 116:21,
119:9, 121:6, 126:11,
129:22

**briefly** [1] - 129:16

**briefs** [1] - 125:18

**bring** [2] - 14:7,
113:12

**brings** [2] - 34:9,
113:18

**broad** [2] - 23:7,
25:11

**broadly** [1] - 74:11

**brooding** [1] -
118:25

**buck** [1] - 111:23

**bucket** [3] - 15:23,
15:24, 64:18

**buckets** [5] - 16:6,
64:18, 64:20, 67:3,
119:3

**burden** [14] - 20:3,
21:10, 24:24, 26:15,
26:20, 27:20, 34:14,
37:9, 45:20, 66:22,
91:17, 91:21, 94:7,
100:1

**burdensome** [5] -
18:25, 38:10, 66:25,
90:16, 92:1

**burning** [1] - 4:7

**bury** [1] - 129:1

**business** [1] -
127:20

**button** [6] - 39:12,
49:3, 49:4, 49:14,
67:4, 78:19

**buttoned** [1] - 127:3

**buttoning** [1] - 50:9

**BY** [1] - 2:12

---

**C**

---

**caffeinated** [1] -
104:5

**calendar** [1] - 102:4

**Canada** [3] - 11:9,
59:19, 59:24, 61:8,
65:10

**cannot** [2] - 34:8,
41:12

**care** [5] - 15:2, 15:3,
63:7, 123:22, 130:2

**careful** [1] - 6:6

**cares** [1] - 62:4

**Case** [1] - 3:2

**case** [19] - 7:17,
7:19, 7:25, 8:21,
11:19, 12:1, 25:25,
28:14, 40:20, 45:6,
50:20, 68:17, 78:12,
81:3, 99:3, 120:14,
121:20, 123:5, 125:9

**cases** [2] - 8:12, 9:1

**categories** [5] - 52:9,
61:3, 61:15, 77:17,
129:7

**category** [13] -
56:14, 56:16, 56:18,
56:22, 58:11, 59:14,
68:22, 73:12, 77:21,
77:23, 82:19, 85:7,
85:8

**caught** [1] - 11:18

**caused** [1] - 120:16

**ceiling** [1] - 12:2

**center** [2] - 31:13,
93:14

**CEOs** [1] - 103:4

**certain** [11] - 14:14,
72:3, 72:9, 72:12,
72:13, 82:18, 94:22,
96:25, 105:22, 113:16

**certainly** [17] - 19:17,
41:6, 61:16, 63:2,
71:1, 72:23, 74:4,
75:13, 102:18,
109:12, 109:13,
111:25, 114:5, 114:9,
114:14, 117:15,
118:13

**certainty** [3] - 7:22,
56:4, 98:12

**CERTIFICATE** [1] -
131:1

**certify** [1] - 131:4

**cetera** [2] - 127:20,
127:21

**Chain** [6] - 23:9,
83:11, 83:18, 84:25,
85:5, 86:3

**chair** [1] - 70:15

**challenge** [1] - 23:21

**change** [9] - 7:16,
30:1, 42:12, 52:1,
52:24, 81:15, 81:16,
81:21, 81:25

**changed** [18] - 8:18,
14:15, 29:23, 30:2,
30:17, 33:12, 35:2,
38:13, 47:19, 48:10,
48:15, 48:17, 52:4,
52:15, 52:16, 52:25,
81:3, 82:1

**changes** [1] - 14:16

**changing** [3] - 36:15,
79:23, 110:17

**charge** [1] - 27:24

**charged** [1] - 54:15

**chart** [1] - 104:14

**chats** [1] - 95:24

**check** [5] - 119:13,
120:23, 121:20,
123:24

**checks** [2] - 61:11,
119:14

**Chen** [14] - 14:21,
46:11, 46:22, 46:25,
48:2, 49:20, 50:7,
50:12, 57:5, 57:12,
57:19, 72:2, 74:7,
74:10, 75:12, 75:18,
97:11, 99:6, 104:23

**Chen's** [2] - 49:15,
97:14

**CHENGPENG** [1] -
2:8

**chew** [1] - 42:10

**Chicago** [1] - 2:3

**chief** [2] - 47:6, 69:5

**children** [1] - 62:19

**chin** [1] - 83:18

**China** [1] - 124:18

**Chinese** [1] - 102:22

**choreographed** [1] -
18:2

**circle** [2] - 77:10,
86:19

**circles** [1] - 77:5

**circular** [1] - 15:22

**CISO** [2] - 57:8

**Civil** [2] - 1:3, 3:2

**claims** [4] - 18:15,
22:2, 25:17, 27:14

**clarification** [1] -
33:19

**clarify** [5] - 18:18,
33:7, 38:18, 43:5,
65:2

**claws** [1] - 14:8

**clear** [11] - 58:9,
71:5, 75:7, 77:17,
78:15, 81:13, 93:5,
104:23, 108:17,
127:15, 127:18

**clearer** [1] - 111:1

**clearing** [1] - 15:1,
46:22, 47:8, 47:9,
57:8, 59:19, 60:6,
61:20, 65:12, 66:10,
109:25

**clearly** [4] - 24:9,
25:10, 108:2, 116:9

**clerk** [1] - 127:10

**client** [5] - 81:20,
90:5, 93:11, 95:8,
96:9

**clients** [1] - 92:7

**close** [8] - 20:25,
55:3, 73:4, 88:5,
89:12, 121:16,
121:17, 121:18

**closely** [1] - 92:11

**closing** [2] - 84:18,

97:24

**code** [3] - 40:13,
41:14, 41:16

**cognizant** [2] -
105:4, 126:19

**cold** [6] - 46:9,
56:23, 60:7, 60:8,
61:21, 82:21

**colleague** [2] - 3:19,
3:22

**colleagues** [2] -
3:14, 114:11

**collecting** [1] - 6:14

**color** [2] - 113:9,
127:1

**COLUMBIA** [1] - 1:1

**Columbia** [2] - 2:14,
131:13

**comfort** [6] - 31:2,
45:5, 59:2, 68:20,
78:19, 124:9

**comfortable** [1] -
7:23

**coming** [10] - 5:4,
5:21, 39:24, 42:17,
44:2, 91:13, 91:18,
91:19, 91:20, 111:7

**comment** [1] - 80:5

**comments** [1] - 66:6

**Commission** [1] -
3:3

**COMMISSION** [3] -
1:4, 1:15, 1:19

**commit** [1] - 105:14

**committing** [1] -
123:10

**communications** [5]
- 93:20, 94:22, 94:23,
94:25, 96:7

**companies** [2] -
91:14, 109:13

**company** [9] - 8:3,
11:1, 12:4, 17:12,
78:4, 81:16, 82:4,
82:5, 124:1

**compel** [7] - 27:18,
68:7, 115:3, 115:18,
116:11, 120:7, 126:4

**compensation** [5] -
56:20, 59:16, 65:3,
66:11, 66:24

**complaint** [2] - 13:4,
71:1

**complaints** [1] -
93:16

**complete** [6] - 23:8,
23:14, 52:12, 56:8,
65:17, 131:6

**completed** [1] -
18:24

**completely** [1] - 48:14
**complex** [1] - 9:8
**compliance** [4] - 17:12, 60:2, 76:16, 80:9
**comply** [5] - 23:4, 23:15, 69:10, 77:1, 80:23
**component** [2] - 65:5, 65:6
**computer** [1] - 41:14
**concept** [1] - 39:22
**conceptually** [1] - 115:22
**concern** [17] - 11:8, 11:10, 12:18, 28:11, 40:1, 58:21, 72:25, 73:22, 73:25, 74:6, 74:9, 74:11, 89:25, 91:9, 120:17, 120:18, 121:8
**concerned** [15] - 7:19, 10:23, 11:4, 17:19, 49:24, 51:2, 51:3, 51:4, 51:14, 86:7, 86:15, 102:20, 110:16, 120:18
**concerning** [1] - 51:10
**concerns** [10] - 5:24, 16:23, 17:11, 17:15, 49:9, 61:5, 61:10, 71:11, 75:22, 83:17
**concluded** [1] - 130:5
**concretely** [2] - 27:19, 119:19
**conduct** [1] - 78:2
**conducted** [1] - 72:4
**conducting** [1] - 80:11
**confer** [7] - 95:5, 95:8, 96:9, 100:25, 105:15, 107:5
**CONFERENCE** [1] - 1:10
**conference** [4] - 3:4, 13:9, 84:6, 110:8
**conferring** [2] - 93:11, 100:24
**confidence** [1] - 8:8
**confident** [1] - 17:18
**confidential** [2] - 79:4, 125:17
**confidentiality** [1] - 126:14
**confined** [1] - 21:14
**confines** [1] - 108:14
**confirm** [4] - 35:19,

35:24, 37:9, 50:12
**confirmation** [3] - 74:20, 76:17, 95:7
**confirming** [1] - 49:18
**confounded** [1] - 37:21
**confusion** [1] - 31:15
**Connecticut** [1] - 1:23
**connections** [1] - 113:16
**consent** [38] - 12:17, 12:19, 15:7, 15:10, 15:11, 16:5, 16:15, 23:4, 23:6, 23:16, 29:1, 32:8, 40:19, 42:23, 58:25, 60:2, 61:1, 61:16, 64:25, 68:11, 69:11, 69:16, 69:17, 73:17, 75:8, 75:17, 75:20, 77:1, 80:9, 80:12, 80:23, 85:20, 106:23, 107:6, 108:8, 109:8, 109:20
**consider** [1] - 84:16
**considered** [1] - 66:25
**considering** [5] - 89:23, 93:11, 94:8, 94:10, 96:3
**constitutes** [1] - 131:4
**Constitution** [2] - 2:14, 131:14
**constraint** [1] - 108:12
**constraints** [1] - 108:11
**consult** [1] - 36:4
**consulted** [1] - 40:17
**consumer** [3] - 7:20, 15:17, 16:16
**consumers** [2] - 16:8, 16:18
**CONT'D** [1] - 2:1
**contents** [1] - 28:21
**context** [8] - 43:23, 55:13, 57:15, 67:21, 68:3, 68:17, 81:7, 113:13
**continuation** [1] - 60:13
**continue** [15] - 6:24, 14:8, 41:1, 45:25, 46:25, 57:17, 81:23, 92:16, 94:16, 96:8, 105:15, 111:15, 111:21, 114:14, 117:7
**continues** [2] -

61:22, 109:17
**continuing** [3] - 40:2, 43:17, 55:14
**contouring** [1] - 22:18
**contours** [1] - 23:22
**contracts** [1] - 66:17
**contradiction** [1] - 52:13
**contradicts** [2] - 47:24, 51:15
**contrast** [1] - 51:14
**control** [26] - 11:9, 12:15, 13:18, 13:22, 28:11, 28:17, 28:23, 31:13, 40:18, 40:19, 40:21, 41:23, 46:4, 46:8, 50:6, 56:23, 60:5, 60:8, 61:25, 62:10, 67:22, 68:14, 70:5, 74:17, 74:23, 82:6
**controlled** [3] - 15:6, 46:9, 60:15
**controlling** [3] - 56:19, 59:15, 61:22
**controls** [3] - 73:16, 75:11, 76:25
**conversation** [7] - 81:10, 84:8, 88:17, 93:7, 105:24, 105:25, 106:2
**convince** [1] - 25:23
**convinced** [1] - 87:8
**convincing** [1] - 49:8
**cook** [1] - 8:12
**cooperative** [1] - 57:25
**core** [3] - 44:18, 59:6, 123:19
**correct** [12] - 16:14, 18:11, 18:17, 28:19, 62:17, 79:18, 79:19, 82:25, 83:1, 84:9, 109:19, 119:25
**corrective** [2] - 11:19, 120:1
**correspondence** [4] - 19:24, 38:8, 52:8, 57:6
**corroborate** [1] - 46:16
**counsel** [26] - 31:11, 37:5, 43:19, 57:13, 57:24, 65:9, 69:1, 69:20, 72:3, 79:25, 84:8, 86:20, 88:19, 91:10, 95:7, 105:21, 107:2, 107:25, 109:5, 113:2, 118:2, 119:2,

124:18, 124:23, 125:1, 128:7
**counsel's** [4] - 24:5, 24:23, 33:10, 33:15
**country** [1] - 102:6
**couple** [7] - 16:25, 53:24, 54:8, 82:15, 97:16, 102:20, 104:25
**course** [19] - 8:21, 19:1, 33:5, 65:1, 65:5, 74:8, 81:8, 81:9, 85:16, 91:7, 93:4, 94:5, 94:10, 104:17, 106:16, 113:1, 113:9, 113:24, 118:3
**Court** [23] - 2:13, 2:13, 3:6, 6:11, 6:18, 15:12, 21:8, 26:8, 59:2, 68:2, 68:7, 68:10, 68:20, 78:8, 78:13, 94:14, 95:3, 95:15, 97:25, 103:4, 126:12, 131:12, 131:13
**court** [2] - 13:25, 15:13
**COURT** [225] - 1:1, 3:10, 3:15, 3:23, 7:14, 9:4, 9:20, 10:1, 10:14, 12:10, 13:1, 13:6, 14:2, 14:18, 15:9, 16:21, 17:16, 17:22, 18:22, 19:4, 20:4, 21:15, 21:18, 21:20, 21:23, 22:6, 22:12, 22:16, 23:11, 24:1, 24:3, 25:2, 26:4, 26:10, 26:24, 28:3, 30:22, 32:13, 33:6, 33:9, 33:13, 33:17, 34:12, 34:16, 34:23, 34:25, 36:7, 37:22, 37:25, 38:2, 38:23, 39:14, 39:17, 39:25, 40:3, 40:9, 41:5, 42:20, 42:24, 43:2, 43:4, 43:6, 43:10, 43:12, 43:14, 44:8, 44:12, 44:16, 46:20, 48:18, 50:2, 50:11, 50:14, 51:6, 51:8, 51:12, 53:4, 55:7, 55:11, 55:16, 56:13, 58:11, 58:16, 58:18, 59:4, 59:8, 62:4, 62:11, 62:13, 62:18, 65:19, 65:25, 66:3, 67:2, 68:8, 68:21, 68:24, 69:24, 70:2, 70:7, 71:22, 72:10,

72:14, 72:20, 74:13, 75:24, 76:4, 78:15, 78:22, 79:5, 79:7, 79:9, 81:11, 82:11, 83:2, 84:23, 85:8, 85:10, 85:14, 85:21, 86:2, 88:9, 88:15, 88:18, 88:21, 90:9, 90:11, 91:6, 91:22, 91:25, 93:3, 93:9, 94:11, 94:18, 94:20, 95:11, 95:14, 95:21, 96:6, 96:10, 96:19, 96:21, 97:2, 97:6, 98:9, 98:14, 98:17, 98:21, 98:24, 99:2, 99:22, 100:4, 100:7, 100:12, 100:19, 100:25, 101:3, 101:6, 101:10, 101:12, 103:6, 103:10, 103:14, 103:17, 105:16, 105:19, 106:3, 106:5, 106:18, 106:24, 107:12, 107:23, 108:16, 108:19, 108:22, 109:3, 109:5, 110:14, 110:22, 110:24, 111:3, 112:2, 112:8, 112:11, 112:18, 112:20, 112:24, 113:3, 113:11, 113:20, 113:25, 114:13, 114:16, 115:24, 116:16, 116:18, 116:23, 117:5, 117:16, 117:19, 118:1, 118:6, 118:9, 118:12, 122:2, 122:7, 122:9, 122:15, 122:17, 122:22, 122:24, 124:25, 125:3, 125:5, 125:12, 125:15, 125:19, 126:16, 128:6, 128:9, 128:15, 129:21, 129:23, 130:1, 130:4
**Court's** [3] - 41:3, 42:14, 126:8
**COURTROOM** [1] - 3:1
**cover** [9] - 63:25, 80:19, 81:4, 95:10, 107:13, 107:14, 107:15, 107:17
**covered** [5] - 38:22, 50:15, 99:13, 106:12, 112:22
**covers** [1] - 81:8

**created** [1] - 81:17
**creating** [5] - 14:23, 47:6, 57:9, 92:7
**creation** [4] - 74:19, 79:24, 82:17, 85:19
**credit** [2] - 120:11, 120:15
**crimes** [1] - 127:21
**criminal** [3] - 7:17, 8:5, 17:13
**critical** [3] - 65:12, 66:8, 94:2
**criticizing** [1] - 128:15
**CRR** [3] - 2:12, 131:3, 131:12
**CRUTCHER** [1] - 1:23
**crypto** [1] - 35:15
**culture** [1] - 70:11
**cured** [1] - 124:12
**curious** [1] - 8:10
**current** [9] - 30:7, 50:3, 74:18, 78:10, 80:1, 80:2, 81:5, 82:21, 82:25
**custody** [8] - 28:8, 42:16, 46:4, 46:8, 56:22, 68:14, 70:5, 109:25
**customer** [14] - 7:1, 9:24, 17:20, 28:9, 28:12, 35:15, 44:18, 46:4, 56:19, 59:16, 60:6, 61:22, 110:1, 119:16
**customers** [5] - 16:1, 26:23, 64:9, 119:4, 119:18
**customers'** [1] - 28:13
**cut** [7] - 45:15, 45:21, 53:14, 54:16, 56:2, 121:20, 124:19
**cuts** [3] - 38:25, 53:11, 123:19
**cutting** [1] - 61:11

# D

**D.C** [7] - 1:7, 1:20, 1:24, 2:6, 2:11, 2:15, 131:14
**Damocles** [1] - 87:10
**Dan** [1] - 3:19
**DANIEL** [1] - 2:4
**data** [4] - 5:15, 31:13, 45:22, 63:11
**date** [12] - 47:19,

49:2, 50:23, 52:16, 90:13, 114:21, 115:25, 117:21, 117:23, 118:18
**Dated** [1] - 131:10
**dates** [5] - 50:4, 101:25, 102:4, 102:16, 104:15
**DAVID** [2] - 1:19, 2:2
**David** [3] - 3:9, 3:16, 13:14
**DAVIS** [1] - 2:4
**Davis** [1] - 3:19
**day-to-day** [3] - 12:15, 14:8, 14:23
**days** [2] - 104:11, 118:10
**deal** [1] - 85:17
**dealing** [1] - 17:11
**deals** [1] - 23:1
**death** [1] - 38:24
**December** [2] - 24:16, 69:7
**decided** [1] - 100:15
**decision** [6] - 4:2, 16:3, 26:11, 45:21, 63:4, 64:7
**decisions** [4] - 6:2, 73:7, 73:9, 126:13
**declarations** [5] - 31:23, 33:15, 34:5, 70:9, 123:17
**DEFENDANT** [2] - 1:22, 2:8
**Defendant** [1] - 3:13
**DEFENDANTS** [1] - 2:2
**Defendants** [3] - 1:8, 10:7, 97:25
**defense** [2] - 72:3, 118:2
**defer** [2] - 87:15, 97:3
**deferring** [1] - 83:24
**definitely** [1] - 83:3
**definition** [1] - 23:7
**definitive** [1] - 30:20
**definitively** [1] - 13:25
**delay** [1] - 105:2
**deleted** [1] - 74:22
**deletion** [1] - 82:17
**demand** [1] - 86:3
**demonstrate** [1] - 37:13, 40:18, 85:13
**demonstrated** [4] - 40:13, 48:23, 50:8, 91:17
**demonstration** [1] - 20:2

**deny** [1] - 115:3
**Department** [1] - 17:8
**deponent** [3] - 23:17, 24:12, 93:22
**deponents** [2] - 31:25, 106:1
**depose** [3] - 100:21, 109:22, 110:3
**deposed** [2] - 30:13, 69:4
**deposit** [5] - 28:9, 35:15, 46:4, 83:13, 86:8
**deposition** [59] - 5:18, 6:10, 21:11, 30:15, 32:6, 32:15, 32:23, 33:20, 34:5, 34:20, 37:3, 42:3, 42:4, 42:18, 43:24, 46:21, 47:22, 47:23, 52:7, 53:12, 57:4, 63:24, 64:4, 69:22, 70:1, 72:4, 72:5, 72:7, 72:16, 77:24, 77:25, 86:24, 88:25, 96:25, 97:5, 97:14, 97:15, 99:5, 100:3, 100:14, 101:4, 101:9, 104:9, 104:10, 104:20, 106:22, 107:8, 107:13, 107:20, 108:5, 108:10, 110:15, 110:12, 111:20, 112:5, 112:13, 113:9, 114:2
**depositions** [32] - 19:14, 22:25, 24:6, 24:7, 24:10, 24:15, 24:20, 29:17, 46:13, 50:10, 50:25, 53:17, 72:23, 79:25, 80:10, 80:25, 82:2, 90:1, 96:11, 97:4, 97:8, 97:10, 97:12, 97:21, 98:2, 98:6, 98:13, 98:19, 99:21, 100:16, 107:16, 112:1
**DEPUTY** [1] - 3:1
**deputy** [1] - 57:8
**describe** [3] - 14:5, 28:24, 37:12
**described** [7] - 14:15, 24:10, 33:11, 47:12, 52:13, 52:23, 106:22
**describes** [1] - 52:22
**describing** [4] - 24:16, 33:21, 69:8, 72:17

**description** [4] - 23:22, 37:10, 38:19, 73:15
**desire** [3] - 4:8, 29:10, 97:14
**desk** [2] - 35:16, 41:22
**destroyed** [1] - 57:18
**detail** [1] - 67:16
**details** [2] - 46:19, 122:23
**determine** [2] - 60:1, 73:21
**determined** [1] - 16:7
**development** [1] - 31:20
**device** [1] - 58:20
**devices** [6] - 46:10, 56:25, 57:22, 57:23, 72:1, 74:21
**dialogue** [1] - 98:7
**difference** [7] - 7:10, 43:16, 47:17
**different** [23] - 8:21, 13:11, 41:17, 47:20, 53:25, 57:21, 57:22, 58:1, 58:6, 61:25, 64:10, 75:14, 77:2, 91:13, 91:14, 99:3, 99:25, 105:10, 107:6, 108:9, 109:14, 112:21
**differently** [1] - 72:13
**difficult** [7] - 54:1, 64:7, 64:9, 102:21, 102:24, 104:2, 126:20
**difficulties** [2] - 64:8, 99:19
**diligence** [2] - 78:2, 80:12
**diligent** [1] - 90:2
**directed** [2] - 65:23, 112:14, 129:22
**director** [1] - 59:23
**disagree** [1] - 128:23
**disagreement** [1] - 103:2
**disclosed** [1] - 10:12
**discovery** [36] - 4:18, 4:21, 7:8, 8:25, 9:10, 16:15, 17:2, 18:6, 20:8, 24:17, 26:7, 26:25, 27:4, 27:6, 35:18, 35:24, 39:24, 40:21, 40:24, 45:6, 54:5, 54:6, 55:1, 59:25, 60:14, 65:8, 81:14, 82:3, 95:17, 103:8, 110:11, 115:9,

121:6, 121:19, 124:11
**discovery-related** [1] - 65:8
**discrepancies** [1] - 86:4
**discrepancy** [6] - 83:8, 84:2, 84:7, 84:10, 84:12, 84:13
**discrete** [7] - 9:10, 24:12, 36:15, 43:20, 50:22, 52:9, 93:21
**discuss** [1] - 57:9
**discussed** [3] - 38:12, 79:24, 85:20
**discussing** [3] - 8:17, 47:7, 88:13
**discussion** [7] - 10:10, 13:10, 24:23, 47:6, 71:25, 77:21, 94:7
**discussions** [2] - 30:18, 34:13
**disease** [1] - 124:13
**disincentivizes** [1] - 87:1
**dismiss** [1] - 26:9
**dispute** [7] - 46:12, 59:18, 100:15, 107:19, 108:20, 110:21, 115:9
**disputes** [1] - 100:17
**dissipate** [1] - 119:16
**dissipation** [5] - 10:24, 26:22, 42:16, 59:7, 109:9
**distinct** [1] - 9:21
**distinction** [3] - 61:20, 62:1, 62:2
**District** [3] - 2:13, 2:14, 131:13
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 131:13
**dive** [1] - 51:18
**divine** [1] - 54:25
**document** [9] - 19:3, 24:10, 24:12, 44:6, 55:25, 96:12, 113:7, 114:3, 120:21
**documentary** [1] - 69:22
**documentation** [3] - 83:9, 84:3, 91:3
**documented** [1] - 82:7
**documents** [39] - 6:14, 6:15, 6:16, 18:14, 19:7, 19:12, 19:20, 20:3, 21:12,

22:19, 22:23, 23:23, 24:14, 24:25, 26:13, 26:17, 35:3, 46:24, 47:1, 47:4, 47:5, 48:1, 50:8, 52:7, 69:7, 80:1, 89:25, 90:6, 92:20, 93:3, 97:13, 101:18, 101:21, 112:5, 112:16, 113:1, 113:8, 113:14, 118:5
**DOJ** [2] - 120:9, 122:17
**dollars** [1] - 12:24
**domain** [7] - 37:21, 38:4, 41:3, 43:8, 43:11, 43:12, 44:13
**domestic** [1] - 10:25
**done** [30] - 5:22, 6:18, 19:1, 21:2, 30:19, 31:9, 42:5, 45:8, 56:1, 56:6, 62:13, 68:20, 72:24, 77:1, 77:2, 77:3, 77:15, 83:4, 87:4, 87:24, 88:2, 96:2, 98:13, 101:7, 111:7, 113:14, 119:22, 120:11, 129:15
**door** [1] - 44:22
**doubt** [1] - 54:9
**down** [13] - 10:22, 12:2, 39:21, 40:24, 42:5, 49:22, 53:11, 60:20, 61:18, 68:9, 110:10, 113:9, 115:13
**dozens** [1] - 125:13
**drafted** [1] - 69:15
**dragged** [1] - 71:15
**dried** [1] - 124:19
**drill** [2] - 49:22, 61:18
**drive** [1] - 41:17
**drop** [1] - 20:13
**drop-off** [1] - 20:13
**due** [2] - 12:18, 116:15
**DUNN** [1] - 1:23
**Dunn** [1] - 3:21
**during** [10] - 22:24, 24:6, 24:7, 38:6, 40:5, 40:14, 48:23, 80:10, 91:4, 107:4
**dwarf** [1] - 124:7
**dynamic** [3] - 81:16, 82:5, 120:24

### E

**early** [2] - 57:6, 69:7

**ease** [1] - 16:22
**easier** [4] - 12:7, 13:23, 56:10, 91:1
**easiest** [1] - 24:11
**easy** [6] - 17:3, 39:12, 49:4, 88:21
**economic** [1] - 127:21
**educate** [1] - 120:5
**educated** [1] - 65:20
**Edwards** [1] - 131:12
**EDWARDS** [2] - 2:12, 131:3
**EF** [1] - 39:7
**effect** [1] - 35:14
**effective** [2] - 7:7, 15:14
**efficient** [7] - 5:19, 54:4, 71:17, 71:18, 89:14, 90:3, 129:12
**efficiently** [1] - 88:14
**efforts** [2] - 20:11, 37:16
**eight** [1] - 40:20
**either** [5] - 14:16, 27:20, 63:2, 70:13, 70:23
**Eleventh** [1] - 2:10
**eliminate** [1] - 97:14
**eliminated** [1] - 84:11
**ELISA** [1] - 1:15
**Elisa** [1] - 3:7
**ELMO** [1] - 129:11
**embedded** [2] - 19:7, 19:19
**emergency** [1] - 123:22
**emphasis** [1] - 29:24
**emphasized** [1] - 24:18
**employee** [12] - 46:13, 48:22, 49:19, 60:13, 66:12, 66:16, 66:19, 75:25, 76:1, 94:5, 119:5
**employees** [11] - 50:7, 60:4, 65:10, 66:8, 66:9, 74:21, 75:16, 75:19, 75:20, 87:2, 91:4
**encourage** [1] - 127:6
**end** [37] - 16:2, 20:7, 20:12, 21:9, 25:4, 36:13, 36:14, 37:12, 37:18, 40:6, 40:7, 40:8, 40:12, 41:4, 41:5, 41:19, 41:23, 45:12, 53:15, 53:18,

54:5, 56:3, 64:14, 71:6, 71:7, 77:3, 79:13, 82:3, 87:17, 88:24, 89:2, 105:11, 111:7, 114:17, 120:24
**ended** [1] - 71:7
**ends** [1] - 77:20
**engage** [1] - 9:12
**engaging** [1] - 6:13
**engineering** [1] - 97:4
**enough's** [1] - 54:22
**ensure** [4] - 16:11, 58:8, 73:16, 81:6
**ensuring** [2] - 16:16, 74:14
**entered** [1] - 12:19
**entities** [29] - 11:10, 16:20, 23:2, 23:5, 56:20, 59:17, 59:25, 65:10, 66:24, 71:3, 73:13, 73:17, 73:20, 74:1, 74:2, 76:13, 76:14, 77:14, 78:24, 79:15, 79:18, 80:6, 82:13, 85:2, 90:13, 113:17, 113:18, 113:21
**entity** [13] - 10:24, 11:5, 12:20, 13:15, 23:7, 23:10, 59:21, 60:11, 65:3, 66:11, 91:4, 122:10, 124:4
**envelope** [1] - 100:20
**environment** [11] - 28:19, 28:20, 29:19, 31:18, 31:19, 33:23, 33:24, 34:3, 36:18, 38:16, 38:17
**environments** [1] - 31:16
**envisioned** [1] - 32:9
**equal** [1] - 62:10
**equally** [1] - 62:20
**Eric** [3] - 30:14, 33:20, 69:4
**especially** [4] - 102:4, 111:18, 113:15, 125:21
**ESQ** [11] - 1:15, 1:18, 1:18, 1:19, 1:22, 1:22, 2:2, 2:4, 2:8, 2:8, 2:9
**essential** [2] - 48:12, 75:6
**essentially** [4] - 51:20, 64:23, 87:18, 112:22
**et** [4] - 1:7, 3:3, 127:20, 127:21

**evaluate** [2] - 122:13, 126:13
**eventually** [1] - 45:24
**evidence** [12] - 13:16, 35:14, 40:20, 47:15, 48:6, 48:24, 50:24, 51:13, 58:20, 59:7, 69:13, 69:21
**evident** [1] - 81:12
**evolved** [1] - 125:9
**evolving** [1] - 82:5
**exact** [2] - 29:13, 75:9
**exactly** [4] - 6:18, 15:7, 21:16, 118:25
**example** [18] - 14:9, 23:1, 23:10, 30:12, 30:14, 36:17, 36:18, 37:21, 38:5, 65:11, 66:9, 66:10, 84:16, 91:11, 93:22, 97:11, 98:5, 107:10
**except** [1] - 114:17
**EXCHANGE** [3] - 1:3, 1:15, 1:19
**Exchange** [1] - 3:2
**excited** [1] - 39:1
**exclusively** [1] - 28:11
**excuse** [1] - 43:3
**excused** [1] - 130:4
**execution** [1] - 62:8
**executive** [1] - 14:22
**executives** [1] - 103:5
**exercise** [1] - 60:5
**exhibit** [2] - 69:9, 128:2
**exhibits** [15] - 125:13, 125:19, 125:20, 126:10, 126:13, 126:23, 126:24, 126:25, 127:4, 127:5, 127:25, 128:1, 128:13, 129:8, 129:19
**Exhibits** [1] - 69:14
**exist** [2] - 16:24, 113:1
**existence** [3] - 23:18, 24:13, 74:25
**existing** [1] - 24:18
**exists** [2] - 25:12, 74:5
**expect** [7] - 17:2, 22:22, 39:14, 97:9, 97:20, 99:1, 100:9
**expectation** [1] - 117:15

**expected** [3] - 72:13, 80:20, 94:3
**expedited** [16] - 9:10, 16:15, 17:2, 20:7, 26:7, 26:14, 26:19, 26:21, 27:4, 27:9, 27:25, 40:25, 54:6, 60:14, 81:14, 110:11
**expert** [2] - 39:15, 97:17
**explain** [3] - 35:21, 37:5, 81:19
**explained** [6] - 14:20, 31:16, 65:7, 83:18, 83:19, 91:10
**explanation** [2] - 19:23, 51:22
**explore** [1] - 34:21
**explored** [1] - 37:7
**exploring** [1] - 53:2
**extend** [1] - 64:3
**extensive** [1] - 67:15
**extensively** [1] - 16:19
**extent** [27] - 10:6, 34:14, 38:12, 47:16, 48:8, 48:10, 48:15, 48:17, 50:16, 50:22, 54:7, 54:17, 63:3, 76:13, 81:14, 86:9, 93:10, 102:11, 113:8, 113:21, 114:7, 115:1, 115:15, 117:9, 122:11, 127:4, 127:18
**extra** [2] - 67:17, 92:1
**eyes** [1] - 36:11

### F

**face** [1] - 19:17
**facilitating** [1] - 57:25
**fact** [13] - 7:4, 9:13, 10:8, 16:4, 39:15, 67:23, 74:17, 75:3, 75:23, 96:12, 108:5, 113:16, 119:1
**factors** [1] - 127:19
**facts** [3] - 14:6, 15:2, 85:15
**factually** [1] - 118:22
**failed** [1] - 35:21
**fair** [6] - 62:16, 106:1, 107:1, 108:3, 121:11, 126:12
**fairly** [2] - 23:7, 48:18

**faith** [3] - 67:12, 95:19, 95:23
**fall** [3] - 44:11, 98:4, 121:9
**far** [7] - 10:11, 47:1, 78:16, 86:16, 94:8, 98:2, 115:4
**Farer** [1] - 3:8
**FARER** [1] - 1:18
**farthest** [1] - 68:23
**FARUQUI** [1] - 1:11
**fashion** [2] - 16:10, 16:11
**faster** [1] - 41:17
**fear** [3] - 11:13, 119:3, 119:15
**fears** [1] - 11:22
**feasible** [1] - 14:4
**February** [6] - 1:7, 19:12, 106:5, 106:6, 110:4, 131:10
**felt** [3] - 15:13, 48:23, 76:18
**few** [7] - 8:19, 32:16, 33:7, 42:10, 43:5, 46:19, 46:23
**fewer** [1] - 107:9
**figure** [5] - 45:14, 64:17, 81:15, 102:5, 127:12
**figuring** [1] - 26:17
**file** [1] - 128:2
**filing** [2] - 115:18, 126:15
**fill** [3] - 32:10, 95:20, 100:5
**final** [4] - 32:25, 53:17, 67:4, 87:13
**finally** [5] - 9:22, 37:20, 38:9, 38:15, 81:6
**fine** [3] - 43:14, 77:6, 107:12
**fingerprints** [1] - 75:13
**finish** [1] - 71:16
**fire** [2] - 59:11, 124:17
**first** [21] - 4:7, 4:24, 5:20, 6:9, 11:21, 13:9, 28:8, 32:9, 42:25, 63:15, 65:8, 74:12, 75:6, 76:5, 79:21, 95:18, 99:11, 99:12, 102:15, 120:12, 128:13
**five** [8] - 101:6, 102:3, 102:12, 102:13, 116:9, 116:10, 126:10

**fix** [1] - 124:8
**flag** [2] - 10:3, 107:20
**flavor** [1] - 127:1
**flesh** [1] - 41:8
**flexible** [1] - 88:13
**flip** [1] - 5:16
**flipped** [1] - 124:2
**focus** [5] - 9:10, 9:17, 36:8, 37:12, 68:15
**focused** [7] - 8:21, 8:23, 9:18, 9:23, 14:11, 75:21, 86:5
**focuses** [2] - 64:25, 68:12
**folder** [1] - 93:24
**folks** [9] - 60:25, 67:5, 70:10, 70:17, 81:15, 87:2, 100:20, 105:4, 120:3
**follow** [5] - 17:24, 64:23, 68:19, 85:11, 113:23
**follow-on** [1] - 17:24
**follow-up** [1] - 113:23
**followed** [1] - 98:3
**Footnote** [1] - 72:17
**FOR** [5] - 1:1, 1:15, 1:22, 2:2, 2:8
**force** [1] - 16:14
**foregoing** [1] - 131:4
**foreign** [2] - 10:25, 11:5
**foresaw** [1] - 109:21
**foresee** [1] - 114:20
**forever** [1] - 48:14
**format** [1] - 47:20
**former** [1] - 66:11
**forth** [4] - 4:5, 5:1, 84:8, 106:21
**forthwith** [1] - 81:24
**fortunately** [1] - 111:8
**forward** [8] - 7:19, 8:1, 53:19, 89:14, 102:19, 109:10, 114:15, 129:24
**forward-looking** [1] - 109:10
**foundational** [1] - 76:7
**four** [24] - 4:11, 4:19, 28:4, 28:5, 53:4, 53:5, 53:6, 56:5, 60:10, 60:18, 61:2, 64:18, 64:19, 67:3, 67:9, 68:5, 82:19, 101:2, 111:17, 118:12,

118:13, 126:9
**fourth** [3] - 16:8, 58:11, 82:12
**framework** [1] - 102:16
**frankly** [1] - 17:7
**fraud** [1] - 15:22
**free** [1] - 10:7
**front** [4] - 11:21, 44:23, 93:14, 114:22
**fruitful** [1] - 100:3
**frustrated** [2] - 101:17, 120:8
**frustrating** [1] - 53:22
**frustration** [1] - 63:10
**full** [9] - 17:18, 27:4, 27:9, 27:24, 31:1, 32:17, 36:4, 40:21, 131:5
**fully** [3] - 14:19, 26:9, 100:9
**fulsome** [1] - 120:21
**fund** [1] - 11:5
**funds** [2] - 12:16, 80:14
**furthering** [1] - 93:7
**fuse** [1] - 103:25
**future** [6] - 63:4, 87:18, 127:23, 128:14, 129:14, 129:19

## G

**gained** [1] - 28:17
**Galapagos** [1] - 85:3
**gaps** [5] - 6:19, 32:10, 95:18, 95:20
**general** [1] - 55:8
**generally** [5] - 11:23, 18:24, 70:16, 95:1, 98:15
**generate** [2] - 48:16, 60:23
**generated** [4] - 38:19, 43:22, 48:2, 52:3
**generating** [1] - 66:23
**geography** [1] - 65:5
**GIBSON** [1] - 1:23
**Gibson** [1] - 3:21
**given** [7] - 20:21, 20:23, 31:4, 49:23, 79:11, 86:16, 99:16
**glad** [1] - 21:5
**global** [1] - 71:12

**goal** [1] - 21:9
**goalposts** [2] - 40:2, 41:1
**Goliath** [1] - 13:14
**governed** [2] - 26:7, 106:23
**government** [1] - 122:5
**Government's** [1] - 103:16
**governs** [1] - 31:10
**great** [33] - 3:24, 4:9, 11:16, 20:11, 21:18, 21:20, 30:3, 35:8, 54:13, 67:6, 79:5, 79:10, 81:4, 82:11, 84:20, 85:12, 88:22, 93:12, 94:18, 95:14, 96:10, 96:19, 97:2, 105:16, 108:22, 114:13, 114:16, 117:20, 118:15, 118:18, 124:25, 129:17, 129:23
**greater** [1] - 84:7
**grinder** [1] - 87:3
**ground** [3] - 15:3, 99:13, 106:12
**grounds** [1] - 89:8
**guess** [33] - 4:24, 5:13, 10:14, 11:7, 11:12, 12:6, 15:9, 15:18, 20:16, 22:7, 28:5, 28:15, 29:2, 29:6, 32:14, 38:23, 39:18, 41:7, 48:19, 49:20, 54:7, 58:11, 60:18, 63:9, 70:7, 73:3, 74:6, 76:5, 83:23, 84:25, 90:17, 96:22, 103:17
**guesses** [2] - 65:20, 65:21
**guidelines** [1] - 19:15
**guiding** [1] - 95:16
**guilty** [3] - 12:3, 17:7, 119:1
**guys** [2] - 27:10, 100:21

## H

**hacks** [1] - 119:6, 123:12
**half** [2] - 59:21, 66:10
**hand** [6] - 13:13, 13:16, 15:2, 33:14,

52:6, 52:10
**handbook** [2] - 19:13, 25:12
**handful** [1] - 19:9
**handle** [2] - 103:18, 123:5
**handling** [2] - 128:18, 128:19
**hands** [2] - 9:7, 9:15
**Hannah** [10] - 46:11, 47:10, 49:15, 49:19, 57:5, 74:7, 74:9, 75:18, 99:6, 104:22
**happy** [20] - 4:2, 17:19, 20:19, 32:13, 34:9, 34:14, 53:6, 55:10, 64:15, 68:19, 76:7, 90:11, 92:19, 95:9, 98:5, 110:14, 113:25, 117:24, 122:13, 125:20
**hard** [23] - 7:21, 20:20, 29:24, 36:2, 36:20, 39:8, 55:9, 56:3, 62:25, 63:14, 64:10, 65:15, 65:22, 69:19, 80:11, 90:15, 99:4, 99:15, 111:6, 117:2, 118:15, 124:5, 124:9
**harping** [1] - 67:24
**hate** [1] - 38:25
**head** [21] - 15:1, 46:22, 47:7, 47:9, 57:7, 59:19, 59:23, 60:6, 60:9, 60:14, 65:11, 66:10, 67:10, 67:18, 68:13, 69:1, 73:19, 76:11, 77:25, 80:21, 121:12
**heads** [1] - 69:12
**health** [1] - 104:3
**healthcare** [1] - 123:21
**hear** [42] - 4:6, 8:10, 10:15, 15:9, 20:8, 20:19, 24:23, 25:10, 26:24, 29:21, 30:3, 32:13, 32:22, 34:25, 35:7, 39:8, 41:5, 41:24, 49:9, 51:12, 55:16, 55:17, 58:14, 59:1, 64:15, 66:5, 69:13, 76:8, 85:21, 87:18, 87:22, 90:11, 92:19, 101:14, 110:14, 111:4, 111:11, 111:13, 114:1, 122:24, 124:20, 124:21

**heard** [17] - 20:18, 29:6, 48:13, 54:7, 57:4, 65:8, 65:14, 69:2, 74:4, 79:23, 93:16, 94:9, 106:4, 107:2, 107:7, 111:15, 128:14

**hearing** [16] - 11:21, 16:19, 17:5, 76:24, 78:9, 84:17, 87:15, 95:25, 97:25, 105:21, 109:1, 117:9, 119:2, 125:22, 125:25, 129:9

**heartburn** [2] - 11:25, 41:18

**held** [4] - 33:22, 57:17, 74:21

**help** [10] - 21:3, 35:16, 41:8, 41:22, 49:5, 54:3, 54:18, 56:9, 59:12, 114:7

**helpful** [45] - 5:15, 7:12, 8:13, 17:22, 20:4, 27:12, 27:22, 28:15, 31:7, 32:24, 33:3, 34:15, 34:21, 35:3, 35:8, 35:9, 38:13, 38:17, 46:1, 51:1, 51:16, 52:21, 58:12, 71:13, 72:21, 86:10, 90:3, 99:9, 104:15, 108:7, 115:16, 117:21, 118:23, 122:12, 123:3, 125:21, 125:23, 126:2, 126:3, 127:22, 128:4, 129:3, 129:5, 129:8

**helping** [1] - 79:13

**helps** [2] - 26:6, 86:13

**hereby** [1] - 131:3

**hesitant** [4] - 13:18, 34:11, 61:12, 66:20

**higher** [2] - 8:7, 103:5

**higher-ranking** [1] - 103:5

**highlight** [1] - 93:6

**highlighted** [3] - 68:6, 110:8, 121:10

**himself** [1] - 72:18

**historical** [1] - 110:15

**hit** [2] - 64:21, 87:16

**Ho** [6] - 69:18, 71:23, 71:24, 72:7, 72:18, 72:24

**hold** [1] - 32:25

**holder** [5] - 31:19,

62:6, 79:6, 80:24, 127:15

**holders** [15] - 19:16, 32:2, 57:10, 60:10, 65:2, 67:9, 67:17, 67:20, 77:25, 78:18, 79:21, 80:10, 80:20, 81:1, 127:18

**Holdings** [2] - 3:3, 3:18

**HOLDINGS** [2] - 1:7, 1:22

**holds** [1] - 57:15

**hole** [1] - 68:10

**honed** [1] - 115:12

**honestly** [1] - 116:9

**Honor** [84] - 3:1, 3:7, 3:11, 3:16, 3:20, 6:5, 8:15, 10:7, 12:9, 12:12, 15:5, 16:13, 18:17, 21:7, 21:22, 22:5, 22:15, 23:6, 23:9, 23:24, 26:3, 28:2, 29:12, 29:22, 31:8, 32:5, 33:4, 36:3, 36:10, 36:21, 43:1, 46:18, 49:25, 51:9, 51:19, 52:5, 52:13, 55:5, 57:1, 58:15, 58:17, 64:22, 65:1, 65:23, 67:15, 68:6, 68:25, 69:23, 71:20, 77:22, 79:19, 82:10, 84:5, 86:1, 88:8, 88:12, 88:20, 90:8, 91:5, 93:2, 94:13, 94:19, 96:17, 96:24, 99:19, 105:14, 105:18, 106:16, 108:15, 109:19, 110:20, 111:24, 112:6, 114:9, 116:13, 116:22, 121:24, 122:4, 124:24, 126:7, 128:5, 128:11, 129:14, 129:25

**Honor's** [6] - 34:9, 48:13, 65:14, 66:5, 75:12, 80:5

**HONORABLE** [1] - 1:11

**hope** [8] - 7:3, 20:9, 93:2, 93:5, 100:3, 101:16, 117:11, 122:24

**hoped** [1] - 128:20

**hopeful** [1] - 66:1

**hopefully** [4] - 27:16, 76:10, 82:4, 107:21

**hoping** [17] - 18:5,

22:8, 29:5, 32:21, 36:12, 63:24, 64:3, 85:22, 86:17, 87:19, 88:4, 88:10, 89:13, 90:5, 100:21, 107:10, 114:3

**horribles** [1] - 10:20

**hosting** [1] - 36:17

**hot** [12] - 25:21, 28:9, 28:13, 31:10, 35:15, 46:4, 60:7, 60:9, 61:21, 81:8, 82:21, 101:1

**hours** [1] - 126:15

**housed** [1] - 31:17

**housekeeping** [1] - 115:2

**HR** [1] - 93:24

**huge** [1] - 99:25

**humans** [1] - 120:25

**hundreds** [1] - 126:14

**hunt** [1] - 30:4

**hurt** [1] - 20:14

**hypothetical** [1] - 104:15

## I

**ID** [3] - 58:19, 58:22, 85:13

**identified** [11] - 19:9, 19:20, 24:20, 28:10, 46:22, 47:1, 50:23, 56:24, 69:5, 71:11, 109:11

**identify** [5] - 46:25, 72:22, 95:18, 98:5, 100:1

**identifying** [6] - 6:19, 18:15, 22:2, 25:16, 27:8, 27:13

**IDs** [10] - 78:8, 78:12, 78:23, 79:22, 80:3, 80:16, 83:14, 85:18, 85:24, 86:9

**III** [1] - 2:8

**Illinois** [1] - 2:3

**illustration** [2] - 19:11, 33:19

**imagine** [16] - 7:21, 9:11, 20:20, 54:2, 80:11, 90:16, 92:4, 99:5, 99:15, 111:6, 111:20, 117:2, 117:14, 118:16, 124:5, 124:10

**imagined** [1] - 128:20

**imagining** [1] - 124:15

**immediate** [2] - 42:11, 42:13

**immediately** [1] - 106:7

**imminent** [1] - 42:18

**imminently** [1] - 96:3

**impasse** [2] - 93:7, 94:10

**important** [19] - 15:25, 27:13, 27:15, 28:23, 43:16, 61:3, 61:16, 63:1, 63:12, 75:9, 82:22, 83:3, 85:24, 86:6, 86:22, 110:15, 113:13, 113:15, 119:19

**importantly** [1] - 49:17

**impossible** [3] - 23:3, 54:1, 111:20

**impressed** [1] - 38:4

**impression** [1] - 118:13

**Inc** [1] - 3:18

**incentive** [1] - 45:3

**inclination** [1] - 32:24

**inclinations** [1] - 22:24

**include** [4] - 18:13, 74:20, 101:8, 119:8

**included** [3] - 84:15, 84:19, 84:21

**includes** [1] - 71:25

**including** [3] - 35:20, 50:7, 66:13

**incomplete** [1] - 18:21

**incorrect** [1] - 10:7

**independence** [1] - 60:13

**independently** [2] - 12:23, 13:4

**indicate** [4] - 8:4, 15:3, 18:12, 35:18

**indicated** [2] - 89:19, 116:3

**indicates** [1] - 28:16

**indication** [2] - 22:13, 45:8

**indiscernible** [16] - 8:20, 13:7, 18:3, 21:19, 24:4, 26:11, 28:14, 34:13, 37:15, 39:3, 62:24, 101:11, 107:9, 112:25, 118:10, 126:22

**indiscernible]** [5] -

90:23, 90:24, 117:20, 125:4, 128:19

**indiscernible]'s** [1] - 108:23

**individual** [7] - 3:12, 34:2, 38:20, 48:11, 68:16, 69:8

**individuals** [1] - 30:13

**ineffective** [1] - 73:2

**inexplicably** [1] - 23:2

**influence** [1] - 12:15

**influenced** [1] - 60:15

**information** [47] - 5:19, 7:11, 7:12, 8:24, 10:9, 10:11, 14:3, 14:15, 20:11, 29:25, 30:9, 46:2, 47:7, 47:19, 47:20, 48:11, 48:16, 51:15, 52:10, 52:14, 53:3, 55:12, 66:2, 69:2, 69:5, 80:3, 82:16, 83:5, 83:8, 83:10, 83:13, 83:16, 84:2, 84:9, 84:11, 85:13, 85:23, 86:8, 91:15, 91:24, 96:20, 122:4, 122:11, 122:13, 122:14, 126:18

**informed** [1] - 89:5

**inherent** [1] - 49:13

**initial** [3] - 15:4, 22:9, 43:7

**initiate** [1] - 62:5

**initiated** [1] - 67:23

**initiates** [1] - 67:24

**initiating** [1] - 62:9

**initiator** [1] - 81:2

**inquiries** [1] - 99:8

**insane** [1] - 63:20

**inserted** [1] - 109:22

**inspected** [1] - 31:11

**inspection** [20] - 4:20, 17:24, 17:25, 18:9, 28:6, 31:10, 35:20, 35:23, 36:11, 37:11, 37:17, 37:19, 38:6, 40:5, 40:14, 48:23, 73:1, 107:11, 120:22

**inspections** [2] - 57:21, 80:24

**instances** [1] - 70:20

**instead** [3] - 13:8, 25:11, 126:14

**instructed** [1] - 6:18

**insufficient** [1] - 71:2

**insurance** [1] - 123:18
**interact** [1] - 48:6
**interacted** [1] - 66:14
**interaction** [1] - 32:7
**interacts** [3] - 35:21, 37:13, 66:12
**interconnectedness** [1] - 16:20
**interest** [5] - 93:7, 93:13, 97:23, 102:19, 109:12
**interested** [2] - 13:21, 61:14, 95:6
**interesting** [1] - 39:23
**interface** [2] - 37:14, 37:16
**interim** [2] - 33:2, 97:25
**internal** [1] - 43:24
**international** [1] - 9:7
**internet** [1] - 105:6
**interrogatories** [1] - 34:10
**interrogatory** [7] - 29:22, 30:10, 31:12, 31:21, 32:19, 34:6, 34:24
**interrupted** [1] - 45:25
**introduce** [2] - 3:5, 107:3
**invariably** [1] - 54:20
**invasive** [2] - 114:2
**involved** [19] - 9:1, 14:22, 14:23, 14:24, 57:5, 57:11, 57:19, 59:19, 62:7, 69:13, 69:20, 89:10, 94:23, 98:19, 99:17, 109:25, 110:9, 112:16, 113:22
**involvement** [4] - 49:15, 68:14, 71:25, 72:19
**involves** [1] - 82:13
**involving** [3] - 73:13, 79:17, 100:16
**irrelevant** [1] - 42:7
**issue** [43] - 7:2, 20:19, 21:4, 22:3, 35:12, 39:21, 40:18, 40:19, 40:21, 41:19, 42:2, 43:8, 43:21, 44:18, 48:18, 50:14, 51:17, 57:3, 57:15, 58:10, 59:6, 64:24, 68:4, 68:10, 71:10, 71:13, 71:21, 75:7,

75:9, 79:22, 80:7, 82:15, 84:14, 89:2, 90:12, 92:10, 93:21, 95:9, 104:3, 107:19, 121:6, 125:8, 127:12
**issues** [41] - 4:11, 4:20, 6:7, 8:11, 8:17, 8:20, 9:11, 9:19, 9:23, 13:20, 27:17, 28:4, 28:9, 30:21, 33:8, 34:8, 36:9, 36:15, 42:25, 43:5, 46:5, 46:6, 58:25, 60:18, 65:13, 65:15, 82:6, 82:15, 83:20, 86:14, 88:3, 89:5, 93:6, 93:12, 93:19, 100:2, 102:6, 112:16, 115:10, 126:12
**it'll** [2] - 76:19, 117:6
**item** [1] - 24:4
**items** [1] - 85:16
**itself** [2] - 112:19, 113:17

**J**

**Jackson** [4] - 4:17, 11:22, 12:14, 53:21
**January** [4] - 92:12, 92:15, 92:24, 98:3
**JASON** [1] - 1:22
**Jason** [1] - 3:20
**Jenn** [1] - 3:8
**JENNIFER** [1] - 1:18
**Jerry** [1] - 69:18
**job** [16] - 44:20, 49:12, 51:3, 51:4, 54:10, 54:11, 54:16, 64:12, 77:1, 77:2, 77:3, 87:24, 87:25, 88:1, 88:22, 128:24
**jobs** [2] - 44:5, 52:18
**joint** [15] - 8:4, 10:12, 52:1, 72:17, 84:21, 85:17, 114:20, 115:16, 116:15, 116:18, 125:7, 125:15, 128:12, 128:13, 129:15
**jointly** [1] - 129:16
**JSR** [14] - 4:4, 4:22, 28:10, 28:16, 35:10, 48:21, 50:1, 50:9, 74:4, 76:21, 84:1, 89:16, 125:20, 127:7
**judge** [1] - 39:3
**Judge** [6] - 4:17, 11:22, 12:13, 38:25,

53:21, 76:24
**JUDGE** [1] - 1:11
**judgment** [1] - 125:18
**judiciary** [1] - 25:24
**juggling** [1] - 126:21
**jump** [2] - 68:9, 89:24
**jumped** [1] - 89:15
**jumps** [1] - 77:23
**June** [12] - 31:16, 33:16, 34:5, 49:16, 50:3, 90:18, 91:2, 91:12, 92:3, 92:14, 92:21, 94:15
**jurisdiction** [1] - 8:5
**Justice** [1] - 17:9

**K**

**KATTEN** [2] - 2:2, 2:5
**Katten** [1] - 3:17
**keep** [9] - 4:25, 8:19, 25:5, 49:7, 49:8, 73:11, 77:10, 82:8, 104:5
**keeps** [2] - 44:2, 97:12
**Kellogg** [7] - 30:15, 31:23, 33:20, 33:25, 69:4, 72:6, 72:23
**key** [6] - 14:23, 35:22, 80:7, 91:17, 94:22, 94:23
**keys** [6] - 28:12, 28:25, 29:18, 33:22, 58:8, 82:18
**kicked** [1] - 126:17
**kill** [1] - 106:14
**kind** [31] - 4:11, 4:20, 4:22, 8:13, 10:22, 18:9, 20:13, 24:8, 27:8, 28:4, 31:7, 35:12, 35:25, 41:20, 42:7, 47:17, 60:17, 62:20, 70:17, 74:24, 75:9, 77:20, 81:13, 82:18, 86:11, 88:21, 91:23, 93:13, 104:1, 117:14, 127:13
**kitchen** [1] - 8:13
**knowing** [6] - 7:11, 19:16, 42:2, 64:2, 87:9, 96:15
**knowledge** [1] - 16:11
**knowledgeable** [2] - 69:6, 109:25

**known** [2] - 5:7, 70:14
**knows** [6] - 77:18, 81:16, 95:15, 108:21, 122:6, 124:16
**KRISTEK** [1] - 1:22
**Kristek** [1] - 3:22
**KYC** [2] - 8:22, 9:18

**L**

**laid** [2] - 35:3, 41:20
**land** [1] - 116:20
**landscape** [1] - 7:16
**language** [4] - 61:19, 107:3, 107:6, 109:23
**large** [1] - 124:7
**larger** [2] - 61:15, 84:12
**last** [12] - 7:16, 8:16, 10:14, 19:24, 47:1, 73:12, 91:20, 95:25, 109:1, 109:21, 110:8, 116:9
**late** [5] - 14:24, 52:8, 57:6, 69:16, 104:5
**Latham** [3] - 3:12, 109:6, 111:14
**LATHAM** [1] - 2:9
**Latham's** [1] - 109:17
**law** [1] - 109:8
**lawyer** [2] - 32:17, 70:19
**lay** [1] - 116:20
**layer** [1] - 67:18
**lead** [1] - 61:20
**leading** [1] - 111:21
**leaning** [2] - 53:9, 87:6
**learn** [2] - 36:12, 113:4
**learned** [5] - 5:17, 5:23, 7:1, 24:19, 63:8
**learning** [2] - 24:8, 25:5
**least** [23] - 6:14, 8:7, 9:17, 14:24, 22:22, 23:17, 27:7, 27:10, 38:7, 48:25, 49:22, 60:11, 60:19, 61:2, 61:3, 87:6, 92:21, 98:1, 98:7, 102:9, 102:16, 117:2, 129:12
**leave** [6] - 70:6, 81:9, 103:18, 120:7, 127:7, 128:1
**lectern** [1] - 3:5
**led** [2] - 28:7, 129:4

**ledger** [2] - 72:1, 72:2
**ledgers** [1] - 72:19
**legacy** [1] - 58:20
**lengthy** [1] - 72:4
**less** [11] - 10:25, 12:4, 27:13, 51:1, 61:14, 86:4, 107:21, 109:16, 111:10, 124:15, 125:19
**lesser** [1] - 101:25
**letter** [5] - 24:16, 31:16, 37:5, 65:9, 106:9
**level** [1] - 73:14
**levels** [1] - 68:1
**lieu** [1] - 108:6
**lifeline** [1] - 122:25
**light** [2] - 69:13, 113:15
**likely** [7] - 52:2, 68:5, 97:13, 99:7, 103:2, 105:7, 117:10
**likewise** [2] - 19:21, 95:2
**limit** [1] - 127:25
**LIMITED** [1] - 1:7
**limited** [1] - 75:22
**Limited** [1] - 3:3
**limiting** [3] - 25:4, 39:22, 108:4
**limitless** [1] - 108:4
**limits** [1] - 108:9
**line** [2] - 44:23, 61:23
**lines** [2] - 30:18, 118:11
**LISA** [2] - 2:12, 131:3
**Lisa** [1] - 131:12
**list** [36] - 23:2, 23:4, 23:8, 23:14, 23:18, 24:18, 36:4, 63:5, 63:20, 64:5, 64:13, 66:23, 73:20, 74:1, 74:2, 74:5, 74:18, 76:12, 76:14, 77:13, 78:6, 79:1, 79:14, 79:15, 79:22, 80:1, 80:2, 80:6, 80:11, 80:16, 82:20, 82:21, 82:25, 86:23, 113:18
**listen** [1] - 87:12
**listening** [1] - 89:5
**litigate** [2] - 5:12, 103:8
**litigation** [11] - 4:17, 50:18, 70:12, 109:15, 111:17, 111:18, 111:21, 119:10, 120:2, 126:1, 128:17
**live** [4] - 43:17,

49:12, 60:25, 61:3

**lives** [1] - 59:19

**living** [3] - 50:18, 55:1, 59:24

**LLP** [2] - 1:23, 2:9

**located** [4] - 56:18, 59:15, 64:25, 75:4

**location** [1] - 97:18

**log** [11] - 22:12, 22:22, 23:25, 27:9, 48:9, 48:11, 48:16, 52:1, 52:24, 75:15, 76:1

**logical** [2] - 32:8, 32:11

**logistics** [4] - 99:16, 102:5, 102:6, 102:10

**logs** [18] - 22:7, 25:22, 35:15, 37:24, 38:11, 38:17, 38:18, 43:21, 48:1, 48:7, 52:9, 52:22, 52:24, 54:8, 54:18, 54:23

**Look** [2] - 42:6, 101:22

**look** [6] - 21:10, 54:25, 103:19, 120:22, 120:23, 129:10

**looked** [1] - 129:3

**looking** [7] - 29:1, 34:18, 57:25, 92:22, 109:10, 111:17, 126:1

**looks** [1] - 88:9

**loop** [6] - 20:25, 55:3, 73:4, 82:9, 84:18, 89:12

**losing** [2] - 85:5, 119:4

**lost** [1] - 28:20

**loud** [1] - 110:25

**love** [3] - 62:20, 117:19

**luck** [1] - 130:2

**Luger** [1] - 3:16

**LUGER** [48] - 2:2, 3:16, 21:7, 21:16, 21:19, 26:3, 26:5, 26:11, 28:2, 31:8, 39:13, 39:16, 39:19, 40:1, 40:4, 40:10, 42:13, 42:21, 49:25, 50:3, 50:12, 51:5, 51:7, 51:9, 55:5, 55:10, 55:12, 56:12, 58:17, 58:19, 59:5, 62:3, 62:5, 62:12, 62:17, 67:14, 68:9, 68:22, 69:23, 69:25, 70:3, 77:22, 78:17,

82:10, 88:8, 88:20, 115:22, 128:8

**lunar** [1] - 104:17

## M

**macro** [1] - 115:9

**MAGISTRATE** [1] - 1:11

**magnanimous** [1] - 63:17

**main** [3] - 21:8, 42:25, 46:5

**maintained** [1] - 5:23

**managed** [1] - 81:18

**Management** [1] - 3:18

**management** [3] - 52:1, 52:24, 110:9

**map** [1] - 34:19

**March** [2] - 49:16, 106:6

**margins** [1] - 10:17

**massive** [2] - 17:13, 128:17

**match** [3] - 83:13, 85:23, 86:8

**materials** [1] - 126:15

**math** [1] - 56:5

**Matt** [1] - 3:8

**matter** [9] - 3:4, 5:5, 6:9, 6:20, 22:9, 43:7, 98:22, 104:1, 119:17

**matters** [2] - 71:9, 119:19

**MATTHEW** [1] - 1:18

**maximum** [1] - 118:12

**mean** [130] - 4:2, 5:17, 5:21, 7:18, 7:21, 8:6, 8:7, 8:12, 10:20, 11:7, 11:16, 11:23, 15:19, 15:20, 18:2, 21:1, 22:9, 25:21, 27:1, 27:3, 34:1, 35:2, 38:21, 39:20, 39:22, 41:12, 42:18, 44:16, 44:20, 44:24, 45:3, 49:5, 49:10, 49:11, 49:20, 50:9, 50:20, 53:12, 54:13, 54:24, 59:10, 59:18, 60:20, 61:2, 61:5, 61:9, 61:24, 63:9, 64:1, 66:16, 67:9, 67:10, 70:1, 70:8, 70:18, 71:2, 71:13, 76:6, 77:7, 77:20, 81:14,

81:15, 81:16, 82:3, 84:25, 86:6, 87:21, 87:22, 89:4, 90:4, 90:13, 90:17, 90:21, 91:12, 91:25, 92:11, 97:16, 97:19, 99:12, 101:14, 101:24, 102:3, 104:14, 104:19, 104:23, 106:7, 106:8, 108:1, 108:2, 108:25, 109:8, 109:13, 110:16, 110:20, 111:10, 111:14, 111:16, 113:25, 114:4, 114:20, 115:3, 115:6, 115:8, 115:15, 115:24, 116:1, 117:5, 117:10, 117:13, 117:24, 119:7, 119:17, 120:2, 122:24, 123:3, 123:20, 124:6, 124:15, 125:22, 126:2, 126:20, 126:24, 127:2, 127:13, 128:15, 128:16, 128:17, 129:2

**means** [1] - 93:12

**meant** [1] - 27:6

**meat** [1] - 31:5

**mechanics** [1] - 41:11

**mechanism** [1] - 36:18

**medical** [1] - 123:22

**meet** [3] - 95:5, 107:5, 109:23

**meet-and-confer** [2] - 95:5, 107:5

**member** [2] - 43:25, 110:10

**members** [1] - 48:3

**MENDRO** [29] - 1:22, 3:20, 90:8, 90:10, 94:13, 95:13, 95:15, 95:22, 96:7, 99:18, 99:23, 100:5, 100:8, 100:13, 102:18, 103:7, 103:12, 103:15, 105:14, 108:15, 108:17, 108:20, 125:2, 125:4, 125:6, 125:13, 125:17, 126:7, 128:4

**Mendro** [1] - 3:21

**mentioned** [3] - 23:18, 51:25, 69:1

**merit** [1] - 60:13

**merits** [7] - 13:5,

15:21, 40:24, 45:6, 94:14, 121:19

**met** [1] - 110:3

**metadata** [8] - 18:13, 18:19, 18:20, 18:23, 19:21, 20:17

**microphone** [1] - 94:12

**might** [15] - 12:21, 23:21, 28:11, 32:24, 50:19, 55:2, 64:17, 79:1, 86:24, 91:11, 93:6, 99:1, 111:11, 113:9, 120:8

**mind** [2] - 8:19, 22:5

**minimum** [1] - 9:18

**minus** [1] - 104:11

**minute** [1] - 100:21

**minutes** [1] - 42:11

**missing** [1] - 127:10

**mission** [1] - 120:10

**modify** [1] - 116:7, 127:8

**moment** [4] - 20:19, 30:8, 48:15, 69:9

**money** [9] - 12:4, 15:24, 64:24, 119:6, 119:20, 121:21, 123:12, 123:14, 124:3

**monitor** [21] - 8:3, 8:7, 8:22, 9:5, 9:6, 9:11, 9:14, 9:17, 9:23, 10:3, 10:8, 10:13, 10:16, 10:18, 11:12, 12:3, 76:16, 76:17, 77:14, 122:20, 123:9

**monitor's** [1] - 9:2

**monitoring** [7] - 58:13, 73:12, 74:3, 76:15, 79:16, 82:13, 123:3

**Monroe** [1] - 2:3

**month** [7] - 19:12, 46:23, 47:5, 48:9, 101:20, 105:5, 117:22

**months** [6] - 17:2, 40:20, 42:9, 90:16, 92:2, 92:5, 97:16, 101:20, 105:1

**monumental** [1] - 45:11

**moot** [1] - 115:3

**morning** [6] - 3:1, 3:7, 3:10, 3:11, 3:16, 3:20

**most** [9] - 24:14, 52:21, 68:5, 69:6, 71:17, 72:21, 100:16, 110:4, 110:16

**mostly** [2] - 46:18,

118:20

**motion** [5] - 26:9, 27:17, 115:7, 115:18, 116:2

**motions** [2] - 115:3, 126:3

**move** [20] - 13:25, 35:19, 35:25, 36:5, 40:2, 41:1, 41:23, 42:15, 42:22, 45:5, 53:18, 59:11, 64:15, 66:20, 94:21, 102:19, 117:18, 119:9, 121:21, 123:14

**moved** [3] - 11:23, 35:4, 124:5

**moves** [5] - 8:7, 8:9, 119:6, 123:12, 124:3

**moving** [6] - 17:23, 47:17, 73:11, 97:23, 102:2, 118:14

**MR** [85] - 3:11, 3:16, 3:20, 21:7, 21:16, 21:19, 26:3, 26:5, 26:11, 28:2, 31:8, 39:13, 39:16, 39:19, 40:1, 40:4, 40:10, 42:13, 42:21, 49:25, 50:3, 50:12, 51:5, 51:7, 51:9, 55:5, 55:10, 55:12, 56:12, 58:17, 58:19, 59:5, 62:3, 62:5, 62:12, 62:17, 67:14, 68:9, 68:22, 69:23, 69:25, 70:3, 77:22, 78:17, 82:10, 88:8, 88:20, 90:8, 90:10, 94:13, 95:13, 95:15, 95:22, 96:7, 99:18, 99:23, 100:5, 100:8, 100:13, 102:18, 103:7, 103:12, 103:15, 105:14, 108:15, 108:17, 108:20, 109:2, 109:4, 109:19, 114:9, 114:14, 115:22, 117:15, 117:17, 124:24, 125:2, 125:4, 125:6, 125:13, 125:17, 126:7, 128:4, 128:8, 130:3

**MS** [141] - 3:7, 6:5, 8:15, 9:5, 9:21, 10:2, 12:9, 12:12, 13:2, 13:7, 14:3, 14:19, 16:13, 16:22, 17:17, 18:17, 18:23, 19:5, 21:22, 22:5, 22:9,

22:15, 22:17, 23:12, 24:2, 24:4, 29:12, 33:4, 33:7, 33:10, 33:14, 33:18, 34:13, 34:17, 34:24, 36:3, 36:8, 37:23, 38:1, 38:3, 43:1, 43:3, 43:5, 43:7, 43:11, 43:13, 43:15, 44:9, 44:13, 46:18, 46:21, 51:19, 57:1, 58:15, 64:22, 65:23, 66:1, 66:4, 68:25, 71:20, 71:23, 72:11, 72:15, 74:11, 74:14, 75:25, 79:3, 79:6, 79:8, 79:19, 83:1, 84:5, 85:6, 85:9, 85:11, 85:15, 86:1, 88:12, 88:16, 91:5, 91:7, 91:23, 93:2, 93:4, 93:10, 94:19, 94:21, 96:17, 96:20, 96:24, 97:3, 97:7, 98:12, 98:15, 98:18, 98:22, 98:25, 100:23, 101:2, 101:4, 101:8, 101:11, 105:18, 105:20, 106:4, 106:16, 106:19, 106:25, 107:13, 110:20, 110:23, 111:2, 111:24, 112:3, 112:9, 112:12, 112:19, 112:21, 112:25, 113:4, 113:12, 113:21, 116:13, 116:17, 116:22, 117:4, 117:24, 118:2, 118:7, 118:10, 121:24, 122:3, 122:8, 122:10, 122:16, 122:20, 122:23, 128:11, 129:14, 129:22, 129:25

**MUCHIN** [2] - 2:2, 2:5

**Muchin** [1] - 3:17

**multiple** [3] - 21:11, 31:25, 32:2

## N

**name** [10] - 37:21, 38:4, 43:8, 43:11, 43:12, 44:14, 57:11, 75:13, 96:18, 97:12

**narrow** [6] - 46:7, 48:18, 49:7, 68:11, 112:14, 113:8

**NASSE** [1] - 1:19
**Nasse** [1] - 3:9
**NATALIE** [1] - 2:9
**nature** [1] - 24:8
**near** [1] - 63:4
**necessarily** [3] - 34:1, 98:25, 111:19
**necessary** [8] - 97:10, 109:16, 126:11, 127:5, 127:6, 128:2, 129:20
**need** [59] - 4:6, 4:7, 4:12, 4:16, 4:18, 18:6, 25:13, 30:20, 33:19, 42:3, 45:22, 47:9, 54:21, 55:2, 55:17, 62:23, 63:13, 63:25, 64:12, 64:16, 78:24, 81:20, 82:20, 86:6, 86:7, 87:17, 89:18, 89:21, 90:20, 99:8, 99:12, 100:21, 101:1, 102:15, 105:4, 105:7, 106:13, 106:17, 107:16, 109:23, 110:24, 111:12, 111:13, 114:22, 114:24, 114:25, 116:8, 116:24, 118:15, 118:23, 120:6, 121:5, 121:13, 121:22, 122:14, 124:20, 124:21, 125:21, 125:24
**needed** [2] - 111:10, 116:5
**needle** [3] - 8:7, 42:16, 42:22
**needs** [5] - 20:14, 44:19, 105:25, 108:12, 117:10
**negotiated** [1] - 109:20
**negotiating** [1] - 15:11
**nervous** [6] - 12:5, 12:6, 12:8, 12:12, 12:13, 49:23
**net** [2] - 121:3, 121:4
**never** [4] - 18:7, 32:17, 106:16, 110:6
**New** [3] - 1:17, 102:22
**new** [36] - 5:21, 5:23, 25:5, 30:17, 43:18, 43:20, 44:1, 44:3, 44:14, 44:23, 47:6, 47:8, 47:18, 47:19, 47:23, 48:8, 48:10, 48:16, 53:12, 57:9,

74:19, 76:1, 79:24, 80:22, 81:1, 81:17, 82:16, 82:17, 85:2, 85:15, 85:17, 85:19, 104:17, 115:18, 116:1
**news** [1] - 81:4
**next** [23] - 22:3, 27:15, 29:7, 32:8, 32:11, 42:2, 86:14, 86:17, 102:8, 104:19, 104:24, 104:25, 114:18, 115:16, 116:11, 117:9, 117:21, 118:8, 120:7, 125:7, 125:20, 125:25, 129:8
**night** [1] - 104:5
**no-limiting-principle** [1] - 39:22
**nonmaterial** [2] - 83:17, 83:22
**normal** [2] - 10:22, 119:10
**normally** [2] - 10:23, 123:15
**Northeast** [1] - 1:20
**Northwest** [5] - 1:23, 2:5, 2:10, 2:14, 131:14
**not-close** [1] - 121:18
**notably** [1] - 33:25
**note** [1] - 43:16
**noted** [3] - 8:20, 65:1
**notes** [1] - 131:5
**nothing** [5] - 61:10, 76:3, 90:19, 105:3, 128:8
**notice** [1] - 101:9
**noticed** [1] - 101:16
**notices** [1] - 96:25
**notify** [1] - 105:4
**November** [4] - 34:7, 57:7, 65:8, 84:17
**number** [1] - 19:25
**numbers** [2] - 69:9, 124:7

## O

**oath** [3] - 70:18, 71:24, 71:25
**object** [2] - 99:10, 102:14
**objecting** [1] - 114:8
**objection** [1] - 105:22
**objections** [1] - 106:11

**observed** [2] - 82:7, 102:23
**obtained** [1] - 51:14
**obviates** [1] - 90:20
**obvious** [1] - 97:11
**obviously** [12] - 4:16, 15:21, 29:8, 45:17, 49:2, 53:20, 74:24, 77:8, 80:7, 87:19, 96:4, 123:13
**occasions** [1] - 99:25
**occur** [3] - 42:4, 44:20
**October** [5] - 14:24, 14:25, 47:2, 52:8, 84:6
**odd** [1] - 24:24
**OF** [2] - 1:1, 1:10
**offered** [1] - 94:24
**offhand** [1] - 79:1
**office** [1] - 50:18
**officer** [2] - 47:7, 69:5
**official** [1] - 131:12
**Official** [1] - 2:13
**offline** [4] - 79:2, 79:9, 117:23, 117:25
**often** [1] - 70:9
**once** [3] - 10:18, 71:6, 126:23
**one** [92] - 3:24, 4:13, 4:23, 6:12, 6:22, 7:15, 8:19, 13:13, 13:14, 15:2, 15:14, 15:23, 16:25, 17:25, 18:3, 18:10, 19:11, 23:1, 23:17, 24:4, 28:9, 28:15, 29:12, 30:11, 30:13, 32:24, 33:2, 36:5, 38:15, 39:9, 39:10, 39:17, 39:18, 44:21, 44:23, 45:1, 45:13, 49:4, 51:13, 51:25, 52:6, 52:10, 52:14, 52:16, 53:23, 57:9, 57:20, 60:11, 62:20, 62:24, 64:1, 64:2, 65:2, 67:3, 71:21, 76:15, 77:16, 79:11, 79:20, 81:12, 82:15, 83:3, 84:15, 84:19, 89:24, 90:12, 93:19, 93:22, 95:24, 99:5, 99:11, 99:12, 99:14, 99:18, 102:15, 102:21, 103:19, 105:8, 107:15, 109:4, 116:13, 117:9, 118:24, 119:2, 119:3,

119:13, 121:25, 124:1, 125:8, 127:4
**one's** [2] - 62:21, 102:8
**ones** [2] - 10:8, 41:13
**ongoing** [1] - 82:5
**open** [8] - 30:12, 30:18, 36:11, 37:4, 37:10, 88:13, 91:7, 98:7
**operate** [2] - 12:22, 13:3
**operates** [1] - 36:14
**operation** [1] - 110:9
**operations** [4] - 12:15, 14:9, 59:24
**opportunity** [2] - 30:8, 53:21
**opposed** [1] - 72:25
**optimist** [1] - 100:9
**option** [1] - 127:9
**order** [44] - 6:11, 12:17, 12:18, 12:19, 15:7, 15:10, 15:13, 15:18, 16:5, 16:16, 23:4, 23:6, 23:16, 29:1, 32:9, 40:19, 42:23, 58:25, 60:3, 61:1, 61:17, 63:3, 63:14, 64:25, 68:11, 69:11, 69:17, 73:18, 73:21, 75:8, 75:17, 75:20, 77:1, 80:9, 80:12, 80:23, 85:20, 106:23, 107:6, 108:8, 109:20, 115:19, 124:22
**order's** [1] - 109:9
**ordering** [2] - 78:8, 83:3
**ordinary** [1] - 19:1
**organization** [1] - 9:7
**organized** [1] - 54:14
**otherwise** [3] - 5:20, 69:21, 102:24
**outside** [18] - 10:16, 22:7, 30:23, 32:14, 35:23, 56:19, 59:15, 59:25, 60:5, 60:25, 61:4, 74:22, 75:4, 97:9, 98:19, 104:2, 119:24, 121:1
**outstanding** [6] - 24:17, 43:8, 63:6, 83:5, 89:21, 101:9
**outweigh** [1] - 26:20
**overall** [1] - 4:4
**overlap** [3] - 8:23,

9:19, 122:19
**overseas** [10] -
10:24, 11:10, 15:25,
16:23, 61:8, 119:11,
119:12, 123:25, 124:3
**oversight** [3] - 67:16,
67:18, 68:1
**overview** [1] - 60:17
**own** [3] - 15:21, 45:1,
123:5
**oxygen** [1] - 45:14

**P**

**P.A** [2] - 2:2, 2:5
**Page** [2] - 70:4, 84:1
**page** [2] - 19:25,
127:25
**pages** [3] - 125:10,
126:10, 126:15
**paid** [2] - 59:25, 61:9
**pair** [1] - 80:3
**Pane** [2] - 28:13,
60:11
**papers** [8] - 6:6, 7:4,
14:6, 27:17, 37:23,
49:6, 93:5, 106:20
**parade** [1] - 10:20
**parameters** [1] - 25:8
**parent** [1] - 11:17
**part** [24] - 7:6, 7:7,
11:12, 20:6, 21:24,
26:18, 29:15, 49:11,
55:24, 57:20, 58:6,
58:9, 63:21, 70:11,
78:7, 80:15, 81:10,
105:20, 105:24,
106:19, 122:5, 127:15
**particular** [6] - 4:3,
20:18, 24:12, 33:11,
52:21, 68:22
**particularly** [7] -
19:8, 56:24, 57:14,
66:25, 71:10, 72:19,
110:16
**parties** [5] - 3:5, 4:6,
15:11, 114:21, 130:4
**party** [2] - 14:1,
123:11
**past** [4] - 17:1,
35:13, 54:2, 108:5
**path** [1] - 60:20
**patience** [1] - 108:24
**pause** [1] - 70:15
**paying** [2] - 6:6, 67:5
**payment** [3] - 68:4,
68:15, 91:14
**payments** [6] -
65:10, 65:17, 90:12,

91:3, 92:22, 93:21
**pays** [1] - 66:7
**Pearl** [1] - 1:16
**Pennsylvania** [1] -
2:5
**people** [26] - 11:9,
11:11, 13:17, 41:15,
50:17, 61:3, 64:12,
66:13, 66:23, 70:13,
70:21, 71:4, 73:5,
73:9, 86:13, 91:18,
99:24, 100:16,
102:11, 102:23,
103:1, 104:5, 104:13,
104:18, 108:18,
119:20
**perfect** [2] - 38:5,
108:22
**perfectly** [1] - 34:20
**performance** [3] -
93:23, 93:25
**performing** [1] - 94:3
**perhaps** [11] - 25:20,
25:23, 27:2, 43:13,
70:25, 90:20, 116:6,
116:7, 119:7, 120:13,
127:6
**period** [3] - 20:1,
30:17, 75:17
**periodically** [1] -
110:2
**person** [12] - 50:21,
67:24, 68:1, 69:6,
91:17, 96:15, 98:10,
98:16, 98:23, 101:7,
103:3, 104:1
**person's** [2] - 96:18,
101:22
**personal** [1] - 76:3
**personally** [1] -
40:16
**personnel** [14] -
23:15, 50:4, 51:21,
56:18, 57:7, 59:15,
90:13, 92:22, 93:24,
94:23, 97:1, 97:8,
97:19, 110:18
**perspective** [29] -
21:1, 25:2, 25:3, 25:5,
27:5, 29:16, 31:9,
32:4, 42:19, 44:25,
46:3, 54:24, 60:21,
61:2, 67:8, 70:25,
89:9, 89:19, 90:4,
94:11, 95:17, 100:13,
107:24, 110:18,
116:23, 117:6,
117:12, 129:17
**persuasion** [1] -
54:19

**pertain** [1] - 38:21
**phones** [1] - 57:23
**phonetic** [2] - 73:14,
92:23
**pick** [4] - 63:22,
64:10, 115:25, 117:23
**picture** [2] - 65:17,
71:5
**piece** [1] - 34:8
**piggybacking** [1] -
117:7
**place** [18] - 7:23, 9:2,
9:14, 9:17, 10:8,
17:12, 60:19, 62:14,
66:18, 73:16, 75:11,
76:25, 79:17, 98:19,
105:6, 122:20,
122:21, 123:24
**places** [3] - 35:5,
75:14, 95:19
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:15
**plan** [2] - 29:10,
116:21
**planet** [1] - 123:13
**planned** [2] - 101:20,
102:12
**platform** [1] - 81:9
**play** [2] - 75:10,
78:10
**played** [1] - 103:9
**plea** [2] - 12:3, 119:1
**pleas** [1] - 17:13
**pled** [1] - 17:7
**plus** [1] - 104:11
**PNK** [13] - 31:10,
31:18, 35:17, 35:21,
36:14, 37:14, 37:24,
38:11, 40:5, 40:11,
81:8, 107:13
**PNK's** [1] - 37:12
**point** [56] - 4:2, 4:23,
5:5, 5:6, 7:8, 7:22,
9:16, 14:15, 17:1,
17:25, 18:19, 19:8,
26:5, 26:12, 32:3,
32:5, 39:23, 40:15,
41:25, 47:16, 48:13,
49:11, 58:17, 59:9,
63:21, 65:14, 66:14,
66:16, 67:7, 67:15,
68:12, 70:1, 71:21,
73:6, 76:5, 76:9, 77:6,
82:3, 83:21, 83:23,
86:14, 92:17, 95:9,
99:20, 102:1, 105:11,
109:6, 109:7, 109:17,
110:7, 115:23,
116:19, 117:23,
126:6, 126:7

**pointed** [6] - 5:17,
13:20, 30:14, 52:5,
115:5, 115:7
**points** [1] - 17:4
**policy** [1] - 30:17
**pool** [1] - 58:2
**portal** [1] - 48:3
**portion** [2] - 45:6,
68:15, 72:4
**position** [11] - 8:16,
8:18, 23:15, 23:20,
66:15, 89:16, 93:20,
95:2, 96:14, 103:8,
113:6
**positive** [1] - 30:25
**possession** [3] -
13:2, 13:22, 23:8
**possibility** [3] -
86:25, 87:7, 109:21
**possible** [5] - 99:4,
99:15, 106:13,
124:14, 129:18
**possibly** [1] - 128:20
**post** [1] - 49:17
**post-August** [1] -
49:17
**postdated** [1] - 49:1
**posture** [4] - 26:14,
26:19, 26:22, 40:25
**potential** [5] - 36:22,
53:9, 53:10, 123:1
**potentially** [7] - 5:14,
5:20, 10:16, 13:14,
16:7, 40:24, 53:2
**powerfully** [1] -
41:16
**practical** [4] - 6:9,
6:20, 21:19, 42:19
**practice** [1] - 127:14
**pre** [1] - 50:16
**pre-August** [1] -
50:16
**preference** [4] -
98:9, 98:10, 98:15,
115:2
**preliminary** [2] -
8:16, 9:17
**prep** [1] - 99:24
**prepare** [3] - 53:16,
53:17, 104:4
**preparing** [2] -
101:15, 106:8
**presence** [1] -
118:25
**present** [4] - 90:18,
91:2, 91:12, 92:21
**preserve** [1] - 99:10
**preserving** [1] - 86:3
**press** [2] - 30:9,
122:18

**pressed** [1] - 66:21
**presumably** [2] -
22:20, 41:15
**presume** [1] - 27:1
**presuming** [1] -
90:19
**pretty** [10] - 23:3,
25:10, 27:22, 32:24,
76:7, 82:23, 85:24,
99:7, 104:21, 104:23
**prevent** [1] - 45:22
**preventative** [2] -
123:22, 124:12
**previously** [9] -
30:13, 47:22, 57:16,
74:15, 74:21, 75:16,
107:24, 113:19, 122:1
**primarily** [1] - 74:7
**principle** [3] - 25:4,
39:22, 95:16
**prioritize** [1] - 90:6
**prioritizing** [2] -
62:21, 65:15
**priority** [6] - 65:16,
84:14, 84:21, 85:12,
85:16, 86:23
**private** [6] - 28:12,
28:25, 29:18, 33:22,
35:22, 82:18
**privilege** [16] - 18:15,
22:3, 22:7, 22:12,
22:22, 22:24, 23:25,
25:17, 25:21, 26:12,
26:16, 27:9, 27:14,
27:20, 44:21, 127:19
**privileged** [1] - 23:20
**problem** [4] - 18:4,
45:11, 118:25, 124:11
**procedure** [1] -
19:13
**procedures** [1] -
44:5
**proceedings** [2] -
130:5, 131:6
**process** [19] - 6:14,
6:17, 24:8, 26:6, 26:7,
31:11, 59:20, 62:6,
62:12, 67:16, 67:17,
67:25, 78:2, 78:19,
80:22, 81:1, 96:1,
99:23, 122:11
**processed** [1] -
46:24
**produce** [2] - 18:25,
118:4
**produced** [18] -
18:20, 19:5, 19:12,
22:11, 22:18, 23:3,
23:19, 24:22, 26:13,
44:10, 49:25, 69:15,

78:6, 78:11, 79:23, 89:20, 131:6
**product** [4] - 59:23, 60:14, 68:13, 69:1
**production** [9] - 25:17, 27:14, 47:12, 83:13, 85:23, 86:8, 87:13, 94:15, 96:1
**productions** [6] - 6:19, 18:15, 28:6, 88:17, 96:12, 115:11
**productive** [1] - 84:8
**progress** [4] - 3:25, 93:13, 93:14, 118:3
**prohibited** [4] - 12:16, 12:17, 73:17, 73:21
**prompt** [1] - 120:13
**proof** [1] - 56:6
**propose** [2] - 118:18, 126:11
**proposing** [1] - 115:17
**propound** [2] - 34:10, 37:6
**propounded** [4] - 35:24, 96:24, 112:13, 113:7
**protect** [4] - 10:21, 16:10, 16:17, 64:9
**protected** [1] - 16:1
**protecting** [1] - 64:12
**protection** [4] - 7:20, 15:17, 16:16, 68:1
**protective** [1] - 115:19
**protocol** [6] - 46:10, 46:14, 47:3, 48:22, 49:19, 58:7
**protocols** [6] - 56:25, 62:14, 73:23, 76:21, 77:19, 81:25
**provide** [4] - 7:11, 18:14, 19:23, 30:11
**provided** [9] - 8:25, 14:4, 29:25, 41:2, 48:24, 74:1, 74:2, 83:7, 84:11
**provider** [1] - 13:11
**providing** [3] - 19:25, 47:19, 84:1
**provision** [1] - 38:18
**public** [1] - 126:19
**pulled** [4] - 48:5, 51:23, 51:24, 52:12
**punish** [2] - 20:21, 77:7
**puppeted** [1] - 61:7
**purported** [1] -

119:12
**purpose** [4] - 15:16, 54:14, 95:23
**purposes** [1] - 15:18
**pursuant** [1] - 68:11
**pursued** [1] - 17:19
**pursuit** [1] - 16:15
**push** [1] - 110:3
**pushing** [1] - 72:22
**put** [15] - 15:14, 19:17, 63:19, 72:20, 73:4, 87:3, 91:1, 103:7, 103:17, 110:11, 122:17, 127:13, 127:25, 128:1, 128:13
**putting** [3] - 55:7, 93:14, 100:17

## Q

**questions** [49] - 4:3, 4:8, 5:24, 6:25, 7:5, 7:9, 13:23, 25:6, 26:16, 28:18, 28:22, 28:23, 29:8, 30:5, 32:7, 32:16, 32:18, 33:3, 35:8, 37:19, 40:4, 40:22, 41:10, 42:22, 45:1, 45:5, 49:23, 54:11, 54:12, 55:19, 56:4, 56:9, 60:12, 60:21, 60:24, 65:4, 65:24, 76:2, 80:9, 85:1, 89:13, 89:21, 89:22, 110:10, 113:23, 114:5, 123:2, 129:4
**quick** [1] - 44:16
**quickly** [3] - 104:21, 105:9, 118:4
**quite** [6] - 17:7, 76:11, 99:1, 101:17, 124:19, 125:20
**quote** [3] - 28:24, 80:25, 94:5
**quote-unquote** [2] - 80:25, 94:5
**QURESHI** [11] - 2:8, 3:11, 109:2, 109:4, 109:19, 114:9, 114:14, 117:15, 117:17, 124:24, 130:3
**Qureshi** [2] - 3:12, 108:25

## R

**rabbit** [1] - 68:10

**radio** [1] - 84:18
**raise** [2] - 92:9, 125:8
**raised** [3] - 6:7, 100:2, 129:4
**raises** [1] - 5:23
**raising** [1] - 120:10
**ramp** [1] - 10:18
**rank** [1] - 63:14
**ranking** [1] - 103:5
**RAO** [1] - 2:9
**Rao** [1] - 3:14
**rates** [3] - 48:17, 52:3, 52:25
**rather** [4] - 84:18, 96:25, 107:2, 122:16
**RDR** [3] - 2:12, 131:3, 131:12
**reach** [1] - 102:22
**reaches** [1] - 67:25
**read** [2] - 22:5, 72:3
**ready** [6] - 64:14, 101:23, 104:6, 104:23, 105:7, 117:18
**real** [7] - 4:18, 17:21, 44:16, 45:16, 49:12, 103:25, 108:12
**realist** [2] - 100:8, 100:9
**realistically** [1] - 87:5
**realize** [1] - 14:13
**really** [40] - 4:7, 15:25, 23:15, 24:18, 30:25, 39:12, 45:19, 49:7, 53:12, 54:4, 55:24, 56:3, 59:5, 59:9, 61:12, 61:18, 63:12, 63:25, 65:7, 66:19, 70:25, 81:2, 82:22, 86:22, 87:9, 89:12, 89:21, 91:16, 94:1, 107:7, 108:20, 114:7, 114:17, 115:25, 116:14, 117:12, 122:3, 123:25, 126:1, 127:25
**reason** [3] - 75:9, 102:25, 115:11
**reasonable** [11] - 25:11, 68:7, 68:19, 77:13, 77:14, 90:14, 90:25, 94:17, 96:4, 99:21, 103:19
**reasonableness** [1] - 26:8
**reasons** [6] - 6:22, 72:8, 84:15, 84:19, 102:20, 110:23
**rebuffed** [1] - 36:1

**receding** [1] - 117:12
**received** [14] - 6:20, 19:22, 19:24, 30:9, 46:24, 47:4, 47:11, 47:21, 65:9, 66:10, 66:24, 69:7, 93:22, 122:3
**receives** [3] - 59:21, 65:17, 91:11
**receiving** [6] - 6:16, 56:20, 59:16, 65:3, 89:25, 91:19
**recent** [1] - 47:25
**recently** [5] - 14:17, 46:24, 47:11, 49:25, 110:4
**receptive** [1] - 117:3
**recognition** [1] - 126:8
**reconciles** [1] - 47:15
**record** [5] - 58:8, 67:16, 78:8, 78:11, 126:25
**Recording** [1] - 1:12
**redactions** [1] - 127:17
**reference** [5] - 19:13, 39:2, 44:6, 69:16, 69:17
**referenced** [2] - 21:12, 35:12
**referencing** [1] - 19:25
**referred** [1] - 31:11
**referring** [1] - 43:20
**reflect** [3] - 31:22, 48:2, 52:25
**reflecting** [1] - 47:13
**reframing** [1] - 25:20
**regarding** [1] - 126:14
**regards** [2] - 24:6, 97:24
**regular** [3] - 26:25, 27:5, 66:12
**regularly** [1] - 66:14
**regulators** [2] - 17:8, 17:14
**relate** [2] - 58:5, 66:6
**related** [11] - 9:24, 28:12, 65:8, 80:12, 82:6, 89:20, 93:20, 110:11, 112:14, 122:11, 127:19
**relatedly** [3] - 10:15, 11:14, 41:7
**relates** [2] - 60:2, 106:20
**relationship** [2] -

13:7, 113:22
**relative** [2] - 12:25, 13:13
**relatively** [5] - 6:23, 9:10, 12:24, 69:16, 80:22
**release** [1] - 122:18
**relevancy** [2] - 25:22, 45:19
**relevant** [5] - 19:18, 20:3, 24:9, 94:6, 101:22
**rely** [6] - 71:6, 71:8, 73:3, 73:4, 74:25, 81:2
**relying** [1] - 10:8
**remaining** [1] - 16:14
**remains** [1] - 100:14
**remedy** [3] - 120:17, 120:20
**remember** [3] - 38:3, 78:25, 100:20
**remote** [3] - 98:11, 98:13, 98:23
**renewed** [1] - 27:17
**repeated** [1] - 70:20
**report** [13] - 8:4, 10:12, 52:1, 72:17, 83:12, 84:22, 85:17, 114:21, 115:16, 116:19, 125:7, 128:12, 128:13
**Reporter** [2] - 2:13, 131:12
**reports** [5] - 89:20, 116:15, 125:9, 125:16, 129:15
**representations** [2] - 14:14, 86:16
**represented** [1] - 51:23
**reproduce** [1] - 96:4
**Request** [2] - 36:6, 36:8
**request** [22] - 5:18, 18:11, 20:16, 29:16, 44:1, 44:10, 44:22, 48:9, 56:11, 57:20, 58:23, 59:3, 61:24, 77:12, 79:10, 82:24, 83:17, 98:3, 113:9, 114:10, 115:6, 116:8
**requested** [6] - 6:15, 83:7, 94:25, 96:8, 97:15, 126:23
**requesting** [2] - 54:9, 61:20
**requests** [27] - 7:8, 21:12, 23:1, 24:6, 24:7, 24:17, 24:18,

25:1, 25:11, 36:4,
38:7, 39:6, 43:20,
44:3, 44:14, 55:15,
60:6, 60:7, 63:6, 67:1,
81:2, 94:22, 98:4,
112:14, 113:7, 114:3,
115:7
   **require** [1] - 60:9
   **required** [1] - 62:7
   **requirements** [1] -
69:17
   **requiring** [1] -
103:24
   **resolve** [2] - 71:18,
116:21
   **resolved** [1] - 118:16
   **resolves** [1] - 123:2
   **resources** [2] -
103:16
   **respect** [2] - 26:12,
50:13
   **respects** [1] - 17:10
   **respond** [1] - 126:24
   **responding** [1] -
114:11
   **responds** [1] - 47:9
   **response** [20] -
19:22, 24:5, 24:25,
29:22, 30:10, 31:12,
33:10, 34:7, 34:19,
37:6, 41:2, 47:8, 60:4,
100:2, 106:4, 107:7,
110:6, 112:23, 127:1
   **responses** [12] - 7:7,
18:14, 22:2, 22:10,
22:17, 22:21, 25:16,
27:7, 31:22, 34:17,
83:15, 83:16
   **responsible** [1] -
80:21
   **responsive** [5] -
18:14, 19:18, 44:9,
112:15, 113:8
   **restriction** [1] -
90:14
   **result** [1] - 28:5
   **returning** [1] - 80:5
   **reverse** [1] - 124:22
   **review** [5] - 6:6,
26:18, 40:14, 67:19,
93:23
   **reviewed** [4] - 19:6,
73:20, 76:12, 76:21
   **reviewing** [1] - 96:1
   **reviews** [2] - 93:25
   **rights** [4] - 28:21,
52:22, 58:20, 75:1
   **ripe** [2] - 95:9,
110:21
   **risk** [8] - 12:14, 15:5,

17:20, 45:16, 45:20,
45:24, 61:6
   **road** [7] - 40:25,
42:5, 53:15, 54:5,
87:17, 87:20, 113:10
   **robust** [4] - 17:12,
87:20, 107:8, 123:16
   **rog** [1] - 37:6
   **rogue** [1] - 119:5
   **role** [4] - 50:13,
68:14, 68:17, 70:5
   **roles** [2] - 38:21,
52:23
   **Room** [1] - 2:15
   **room** [2] - 13:14,
123:22
   **root** [5] - 28:17,
31:13, 31:18, 31:20,
34:1
   **rope** [1] - 20:7
   **Rosenman** [1] - 3:17
   **ROSENMAN** [2] -
2:2, 2:5
   **route** [1] - 17:19
   **rubber** [1] - 54:13
   **rubber-stamp** [1] -
54:13
   **rudimentary** [1] -
58:3
   **rule** [3] - 5:13, 86:25,
88:3
   **rules** [1] - 98:19
   **run** [1] - 11:4
   **running** [1] - 5:1
   **rush** [1] - 127:3
   **Russia** [1] - 99:3

# S

   **sabbatical** [1] -
105:6
   **safety** [5] - 5:8,
120:10, 121:3, 121:4,
121:8
   **salary** [1] - 59:21
   **sanctions** [1] - 76:16
   **sat** [1] - 129:3
   **satisfied** [1] - 18:1
   **satisfy** [1] - 31:6
   **save** [1] - 101:25
   **saw** [6] - 28:16,
36:15, 44:5, 50:2,
57:6, 75:15
   **SCARLATO** [1] -
1:18
   **Scarlato** [1] - 3:9
   **scenario** [6] - 7:25,
11:20, 12:1, 20:20,
121:20, 124:10

   **schedule** [8] - 97:7,
97:16, 98:1, 98:6,
99:10, 99:24, 103:22,
115:18
   **scheduled** [1] - 6:9
   **schedules** [1] -
91:14
   **scheduling** [3] -
98:8, 99:16, 105:23
   **scope** [17] - 10:17,
18:15, 22:2, 25:15,
25:17, 27:8, 27:14,
35:19, 35:24, 41:8,
43:24, 44:11, 53:11,
106:21, 106:22, 108:9
   **scratching** [1] -
69:12
   **screenshots** [17] -
47:12, 47:20, 48:4,
50:1, 51:10, 51:16,
51:20, 51:21, 52:6,
52:11, 52:19, 54:24,
55:3, 55:13, 129:2,
129:10
   **sea** [1] - 120:10
   **sealing** [3] - 126:18,
126:22, 127:12
   **search** [2] - 95:25,
113:14
   **searches** [3] - 88:25,
92:1, 92:13
   **seat** [1] - 101:1
   **seating** [1] - 104:14
   **SEC** [84] - 3:8, 4:1,
4:24, 5:11, 5:22, 7:15,
8:8, 11:4, 12:7, 12:12,
16:7, 18:11, 18:12,
28:7, 28:11, 28:18,
28:22, 29:2, 31:1,
31:6, 31:11, 32:13,
35:10, 35:18, 39:18,
41:19, 44:2, 45:7,
46:12, 46:15, 46:17,
48:19, 49:8, 54:11,
54:12, 55:18, 59:25,
61:19, 62:25, 68:12,
73:8, 74:7, 76:6,
76:23, 78:19, 81:24,
82:8, 82:23, 83:6,
83:7, 86:2, 86:18,
86:22, 88:3, 88:9,
89:20, 89:25, 90:15,
90:17, 94:16, 95:19,
95:23, 96:9, 96:14,
100:2, 100:10,
100:11, 101:17,
105:15, 106:14,
109:6, 110:15, 115:5,
118:25, 119:10,
120:2, 122:12, 123:7,

124:16, 125:6, 128:9,
129:24
   **SEC's** [10] - 16:14,
60:20, 64:23, 67:24,
70:7, 73:15, 83:23,
89:18, 115:24, 126:25
   **second** [5] - 3:24,
21:24, 76:9, 83:10,
119:3
   **secrets** [1] - 127:20
   **Section** [1] - 83:5
   **section** [1] - 85:17
   **SECURITIES** [3] -
1:3, 1:15, 1:19
   **Securities** [1] - 3:2
   **security** [2] - 47:7,
69:5
   **see** [24] - 9:9, 18:10,
28:5, 36:13, 36:16,
37:24, 42:17, 47:5,
51:17, 53:15, 54:10,
57:11, 60:19, 62:2,
63:17, 76:1, 91:12,
93:13, 95:19, 100:14,
100:23, 103:7, 118:3,
120:14
   **seeing** [3] - 5:15,
14:21, 129:2
   **seek** [1] - 128:1
   **seeking** [3] - 116:2,
116:11, 120:7
   **seem** [2] - 45:1, 99:6
   **sees** [1] - 103:4
   **selective** [1] - 14:6
   **self** [1] - 81:12
   **self-evident** [1] -
81:12
   **sending** [1] - 119:2
   **senior** [3] - 14:22,
46:13, 100:16
   **sense** [25] - 4:19,
6:3, 8:2, 20:24, 28:1,
42:14, 55:4, 55:6,
71:19, 71:20, 76:4,
87:21, 87:22, 88:7,
89:17, 92:15, 99:17,
100:14, 105:11,
115:8, 115:20,
115:22, 115:25,
116:12, 117:13
   **sent** [3] - 24:16,
69:18, 96:25
   **separate** [2] - 51:16,
101:5
   **separation** [2] -
44:19, 71:3
   **September** [9] -
18:11, 24:19, 43:13,
43:21, 43:22, 48:2,
49:1, 50:4, 75:18

   **sequencing** [5] -
5:25, 6:8, 33:1, 42:14,
111:6
   **series** [1] - 95:24
   **serious** [1] - 104:3
   **served** [1] - 100:17
   **server** [1] - 36:17
   **servers** [2] - 28:24,
34:2
   **Services** [1] - 3:18
   **services** [1] - 94:3
   **serving** [1] - 54:14
   **set** [7] - 3:4, 25:8,
62:14, 67:21, 75:6,
85:15, 114:20
   **seven** [10] - 56:25,
58:2, 60:10, 67:8,
67:9, 74:14, 74:16,
75:1, 75:5
   **several** [5] - 9:14,
65:12, 66:13, 68:1,
95:16
   **shape** [1] - 116:19
   **shard** [26] - 19:16,
32:2, 46:10, 56:25,
57:9, 57:21, 57:22,
58:20, 60:10, 62:6,
65:2, 67:8, 67:17,
67:20, 74:20, 77:25,
78:18, 79:6, 79:21,
80:10, 80:20, 80:24,
81:1, 127:15, 127:18
   **shards** [21] - 14:23,
47:4, 47:6, 47:8, 57:3,
57:6, 57:15, 57:16,
58:2, 58:5, 69:6,
69:10, 74:16, 74:23,
75:1, 75:2, 75:3, 76:6,
77:12
   **share** [1] - 4:8
   **sharing** [1] - 123:7
   **shift** [1] - 55:23
   **short** [3] - 32:22,
36:20, 103:25
   **shortly** [2] - 84:17,
106:7
   **show** [7] - 27:19,
38:11, 50:4, 51:21,
52:3, 109:24, 123:18
   **showed** [1] - 31:12
   **showings** [1] -
123:17
   **shown** [1] - 73:15
   **shows** [1] - 50:25
   **sic]** [1] - 121:17
   **sick** [1] - 101:18
   **side** [8] - 5:16, 15:14,
18:1, 18:3, 32:9,
41:19, 52:14, 82:15
   **sides** [3] - 53:20,

71:15, 71:16
**Sigma** [6] - 23:9, 83:11, 83:18, 84:25, 85:5, 86:3
**sigma** [1] - 83:18
**sign** [1] - 31:3
**silence** [1] - 84:18
**similar** [3] - 8:17, 65:13, 103:4
**simple** [2] - 64:2, 76:11
**simply** [3] - 33:25, 44:3, 111:14
**sincerity** [1] - 87:6
**single** [4] - 19:3, 20:23, 41:13, 63:20
**Sinodese** [1] - 92:22
**sit** [1] - 39:13
**sitting** [4] - 27:15, 70:3, 70:15, 123:6
**situation** [1] - 120:25
**six** [4] - 90:16, 92:2, 92:4, 105:5
**six-month** [1] - 105:5
**sleep** [1] - 85:5
**small** [2] - 12:24, 43:7
**smaller** [2] - 13:15, 124:1
**smoke** [1] - 59:10
**so-and-so** [2] - 50:19, 89:11
**SOC** [1] - 89:20
**software** [13] - 13:11, 13:19, 14:1, 31:19, 31:20, 35:22, 36:23, 37:13, 40:6, 40:12, 40:16, 81:17, 121:1
**softwares** [1] - 28:25
**Solomon** [1] - 3:8
**SOLOMON** [142] - 1:15, 3:7, 6:5, 8:15, 9:5, 9:21, 10:2, 12:9, 12:12, 13:2, 13:7, 14:3, 14:19, 16:13, 16:22, 17:17, 18:17, 18:23, 19:5, 21:22, 22:5, 22:9, 22:15, 22:17, 23:12, 24:2, 24:4, 29:12, 33:4, 33:7, 33:10, 33:14, 33:18, 34:13, 34:17, 34:24, 36:3, 36:8, 37:23, 38:1, 38:3, 43:1, 43:3, 43:5, 43:7, 43:11, 43:13, 43:15, 44:9, 44:13, 46:18, 46:21, 51:19, 57:1, 58:15, 64:22, 65:23, 66:1, 66:4, 68:25,

71:20, 71:23, 72:11, 72:15, 74:11, 74:14, 75:25, 79:3, 79:6, 79:8, 79:19, 83:1, 84:5, 85:6, 85:9, 85:11, 85:15, 86:1, 88:12, 88:16, 91:5, 91:7, 91:23, 93:2, 93:4, 93:10, 94:19, 94:21, 96:17, 96:20, 96:24, 97:3, 97:7, 98:12, 98:15, 98:18, 98:22, 98:25, 100:23, 101:2, 101:4, 101:8, 101:11, 105:18, 105:20, 106:4, 106:16, 106:19, 106:25, 107:13, 110:20, 110:23, 111:2, 111:24, 112:3, 112:9, 112:12, 112:19, 112:21, 112:25, 113:4, 113:12, 113:21, 116:13, 116:17, 116:22, 117:4, 117:24, 118:2, 118:7, 118:10, 121:24, 122:3, 122:8, 122:10, 122:16, 122:20, 122:23, 128:11, 129:14, 129:22, 129:25
**solved** [1] - 124:11
**someone** [22] - 11:18, 15:6, 36:17, 37:18, 61:6, 61:8, 64:25, 71:8, 74:7, 77:18, 91:11, 97:12, 99:3, 99:6, 99:7, 101:17, 104:24, 119:23, 123:10
**something's** [1] - 33:12
**sometimes** [4] - 70:8, 70:12, 71:4, 72:8
**somewhat** [3] - 24:24, 63:10, 125:10
**soon** [3] - 6:23, 91:19, 106:13
**sooner** [1] - 107:21
**sorry** [13] - 14:9, 22:13, 45:25, 51:7, 69:9, 83:15, 83:19, 90:12, 93:3, 96:25, 107:11, 110:25, 126:17
**sort** [56] - 4:19, 6:2, 7:16, 10:19, 11:5,

15:13, 15:16, 15:21, 16:4, 16:9, 20:14, 20:25, 28:6, 29:10, 35:16, 41:8, 45:9, 45:13, 46:16, 49:15, 49:22, 50:24, 51:18, 53:5, 54:12, 55:8, 55:9, 56:24, 58:14, 58:21, 60:19, 61:12, 62:24, 64:4, 64:14, 67:4, 67:7, 67:13, 68:9, 70:21, 71:12, 76:5, 78:10, 78:18, 82:16, 86:20, 87:10, 96:15, 102:6, 103:18, 115:2, 115:9, 121:8, 122:25, 123:16
**sought** [1] - 35:18
**sound** [2] - 18:16, 105:12
**sounds** [12] - 31:2, 67:3, 82:1, 89:22, 92:20, 94:18, 95:11, 95:14, 96:10, 108:22, 114:16, 129:23
**source** [2] - 40:13, 41:14
**speaker** [1] - 122:19
**speaking** [1] - 70:17
**speaks** [1] - 72:12
**species** [1] - 85:2
**specific** [7] - 36:1, 72:22, 74:9, 78:12, 100:2, 105:22, 122:4
**specifically** [3] - 39:16, 42:23, 74:2
**specifics** [1] - 17:24
**specify** [1] - 22:10
**speculated** [1] - 52:19
**speculating** [1] - 29:9
**speculative** [3] - 49:9, 49:10, 68:5
**speed** [1] - 98:25
**spelled** [1] - 75:8
**spirit** [1] - 81:22
**spoken** [1] - 23:17
**spot** [1] - 55:7
**spreadsheets** [1] - 19:7
**square** [1] - 53:23
**squarely** [1] - 61:16
**stages** [1] - 125:25
**staggering** [2] - 6:21, 91:8
**staking** [3] - 46:9, 56:23, 72:1
**stamp** [1] - 54:13
**stand** [1] - 96:21

**standard** [3] - 26:8, 109:24, 110:4
**stands** [1] - 59:5
**start** [25] - 4:8, 4:14, 5:25, 9:14, 25:25, 29:2, 29:9, 39:11, 61:25, 62:21, 64:6, 74:12, 86:23, 90:17, 90:18, 90:25, 91:2, 92:2, 92:13, 94:15, 99:16, 102:10, 115:20, 119:18, 126:23
**started** [5] - 6:13, 6:16, 6:17, 27:5, 107:25
**starting** [1] - 99:24
**startup** [1] - 70:11
**State** [1] - 7:17
**state** [4] - 30:7, 38:11, 78:10, 81:5
**statement** [3] - 37:6, 72:18, 129:16
**statements** [2] - 70:9, 72:25
**STATES** [2] - 1:1, 1:11
**States** [17] - 2:13, 16:17, 56:19, 57:18, 59:15, 60:5, 60:25, 61:4, 61:7, 69:10, 74:17, 74:22, 75:4, 97:9, 97:20, 98:20, 131:13
**stating** [1] - 83:24
**status** [20] - 3:4, 8:4, 10:12, 13:9, 52:1, 72:17, 83:12, 84:6, 84:22, 85:17, 114:21, 115:16, 116:15, 116:19, 125:7, 125:9, 125:15, 128:12, 128:13, 129:15
**STATUS** [1] - 1:10
**stay** [1] - 4:25
**stem** [1] - 6:25
**stenographic** [1] - 131:5
**step** [2] - 32:8, 32:11
**stepped** [1] - 110:10
**stepping** [1] - 10:19
**steps** [7] - 5:2, 77:1, 78:14, 78:16, 86:17, 114:18, 122:4
**still** [31] - 8:2, 9:21, 11:25, 16:23, 18:16, 27:1, 39:3, 53:23, 57:15, 57:19, 61:2, 61:9, 62:6, 64:17, 71:4, 73:1, 84:12,

89:22, 93:10, 94:9, 95:7, 95:11, 95:13, 96:14, 96:22, 104:15, 109:12, 111:11, 119:25, 124:7, 127:5
**stonewalled** [1] - 98:2
**stop** [3] - 40:21, 51:2, 55:23
**stopping** [1] - 108:18
**storage** [2] - 46:9, 56:23
**straightforward** [1] - 82:24
**strategic** [1] - 64:10
**Street** [4] - 1:16, 1:20, 2:3, 2:10
**stretched** [1] - 103:21
**strings** [1] - 61:7
**strong** [1] - 109:7
**strongly** [1] - 69:21
**stuck** [3] - 35:16, 40:16, 41:11
**stuff** [13] - 5:10, 24:18, 24:19, 25:5, 53:24, 54:3, 54:23, 86:10, 87:8, 116:5, 120:14, 126:17
**subject** [1] - 58:22
**subjecting** [1] - 8:5
**submit** [1] - 129:22
**submitted** [1] - 33:15
**substantial** [1] - 76:25
**substantive** [2] - 105:22, 105:25
**successful** [1] - 103:24
**sufficient** [5] - 16:17, 58:13, 73:13, 76:25, 82:14
**suggest** [1] - 126:9
**suggesting** [1] - 13:17
**suggests** [3] - 14:16, 69:21, 94:3
**Suite** [4] - 1:16, 1:24, 2:6, 2:10
**summarized** [1] - 72:16
**summary** [1] - 125:18
**summer** [2] - 37:3, 109:21
**super** [2] - 86:15, 90:25
**supplemental** [9] - 29:22, 30:10, 31:12, 34:6, 58:23, 83:13,

85:23, 86:8, 88:17
  **supplemented** [1] -
31:21
  **support** [3] - 94:24,
107:15
  **suppose** [1] - 51:5
  **supposed** [4] -
10:18, 15:20, 31:3,
55:20
  **suspect** [1] - 9:3
  **suspenders** [1] -
17:18
  **Swift** [1] - 39:2
  **sword** [1] - 87:10
  **sworn** [5] - 31:23,
37:6, 70:1, 70:9, 71:9
  **sympathetic** [1] -
67:7
  **system** [9] - 16:10,
16:11, 28:14, 31:10,
35:17, 38:20, 119:6,
123:21, 123:24

**T**

  **table** [3] - 4:25,
101:11, 111:8
  **tabled** [1] - 111:25
  **tailored** [2] - 46:7
  **takeaway** [1] - 73:14
  **Taos** [1] - 47:8
  **targeted** [2] - 19:6,
67:4
  **targets** [2] - 47:17,
80:13
  **Taylor** [1] - 39:2
  **technical** [3] - 97:4,
97:17, 106:22
  **technology** [2] - 9:8,
110:18
  **TEDDY** [1] - 1:22
  **Teddy** [1] - 3:22
  **tee** [2] - 25:18, 64:16
  **teed** [1] - 25:18
  **tempting** [1] - 44:1
  **ten** [3] - 63:17, 77:2,
115:13
  **tend** [3] - 41:19,
70:16, 83:21
  **tension** [1] - 49:13
  **tenure** [1] - 91:4
  **terms** [23] - 5:17, 6:8,
6:19, 8:8, 15:10,
15:20, 17:23, 20:7,
21:21, 25:16, 27:7,
41:11, 42:2, 66:22,
67:21, 67:22, 75:11,
83:5, 96:11, 96:21,
111:5, 114:1, 118:19

**test** [1] - 25:25
  **tested** [1] - 80:9
  **testified** [6] - 32:2,
33:25, 60:15, 68:13,
71:24
  **testify** [2] - 103:3,
108:21
  **testifying** [2] - 24:13,
108:18
  **testimony** [21] -
6:10, 30:14, 31:25,
33:20, 34:21, 37:2,
46:21, 47:23, 50:10,
52:7, 57:5, 69:22,
70:1, 71:9, 72:5, 72:7,
72:16, 73:5, 77:24,
77:25
  **tests** [1] - 124:12
  **THE** [231] - 1:1, 1:11,
1:15, 1:22, 2:2, 2:8,
3:1, 3:10, 3:15, 3:23,
7:14, 9:4, 9:20, 10:1,
10:14, 12:10, 13:1,
13:6, 14:2, 14:18,
15:9, 16:21, 17:16,
17:22, 18:22, 19:4,
20:4, 21:15, 21:18,
21:20, 21:23, 22:6,
22:12, 22:16, 23:11,
24:1, 24:3, 25:2, 26:4,
26:10, 26:24, 28:3,
30:22, 32:13, 33:6,
33:9, 33:13, 33:17,
34:12, 34:16, 34:23,
34:25, 36:7, 37:22,
37:25, 38:2, 38:23,
39:14, 39:17, 39:25,
40:3, 40:9, 41:5,
42:20, 42:24, 43:2,
43:4, 43:6, 43:10,
43:12, 43:14, 44:8,
44:12, 44:16, 46:20,
48:18, 50:2, 50:11,
50:14, 51:6, 51:8,
51:12, 53:4, 55:7,
55:11, 55:16, 56:13,
58:11, 58:16, 58:18,
59:4, 59:8, 62:4,
62:11, 62:13, 62:18,
65:19, 65:25, 66:3,
67:2, 68:8, 68:21,
68:24, 69:24, 70:2,
70:7, 71:22, 72:10,
72:14, 72:20, 74:13,
75:24, 76:4, 78:15,
78:22, 79:5, 79:7,
79:9, 81:11, 82:11,
83:2, 84:23, 85:8,
85:10, 85:14, 85:21,
86:2, 88:9, 88:15,

88:18, 88:21, 90:9,
90:11, 91:6, 91:22,
91:25, 93:3, 93:9,
94:11, 94:18, 94:20,
95:11, 95:14, 95:21,
96:6, 96:10, 96:19,
96:21, 97:2, 97:6,
98:9, 98:14, 98:17,
98:21, 98:24, 99:2,
99:22, 100:4, 100:7,
100:12, 100:19,
100:25, 101:3, 101:6,
101:10, 101:12,
103:6, 103:10,
103:14, 103:17,
105:16, 105:19,
106:3, 106:5, 106:18,
106:24, 107:12,
107:23, 108:16,
108:19, 108:22,
109:3, 109:5, 110:14,
110:22, 110:24,
111:3, 112:2, 112:8,
112:11, 112:18,
112:20, 112:24,
113:3, 113:11,
113:20, 113:25,
114:13, 114:16,
115:24, 116:16,
116:18, 116:23,
117:5, 117:16,
117:19, 118:1, 118:6,
118:9, 118:12, 122:2,
122:7, 122:9, 122:15,
122:17, 122:22,
122:24, 124:25,
125:3, 125:5, 125:12,
125:15, 125:19,
126:16, 128:6, 128:9,
128:15, 129:21,
129:23, 130:1, 130:4
  **theirs** [1] - 54:16
  **theme** [1] - 13:4
  **themselves** [2] - 8:5,
92:8
  **therefore** [1] - 24:9
  **they've** [17] - 14:16,
17:7, 22:18, 23:23,
31:3, 35:3, 48:17,
48:25, 49:22, 54:14,
70:18, 78:1, 89:7,
89:19, 105:11,
111:15, 121:10
  **thin** [1] - 103:21
  **thinking** [5] - 42:14,
49:16, 102:10,
118:12, 121:15
  **thinks** [1] - 18:3
  **third** [6] - 14:1, 16:8,
56:18, 59:14, 83:12,

123:11
  **third-party** [2] - 14:1,
123:11
  **thoughts** [8] - 4:4,
6:4, 8:14, 16:9, 21:6,
25:15, 30:24, 110:25
  **thousand** [1] - 38:25
  **thousands** [3] -
26:13, 26:17, 39:5
  **three** [12] - 42:9,
52:9, 53:5, 56:14,
56:16, 61:14, 83:6,
83:20, 101:2, 101:20,
102:8, 118:8
  **threshold** [4] -
74:24, 75:7, 75:9,
109:24
  **thresholds** [1] -
36:16
  **throw** [2] - 86:10,
122:25
  **thrown** [1] - 88:22
  **Tickle's** [1] - 73:14
  **timeline** [1] - 91:9
  **timing** [1] - 125:7
  **tiny** [1] - 124:4
  **title** [1] - 96:18
  **today** [12] - 3:21, 4:4,
13:20, 38:12, 39:13,
70:3, 86:19, 95:16,
104:16, 116:4, 119:7,
130:2
  **together** [4] - 34:8,
53:16, 80:4, 90:6
  **tomorrow** [4] -
81:17, 104:16, 124:6,
124:17
  **ton** [2] - 54:25, 78:16
  **took** [2] - 30:25, 38:3
  **tools** [1] - 18:6
  **top** [1] - 73:14
  **top-level** [1] - 73:14
  **topic** [4] - 42:25,
53:1, 57:2, 108:4
  **topics** [3] - 29:13,
34:22, 107:17
  **topography** [2] -
35:4, 35:6
  **total** [3] - 7:22,
101:3, 101:5
  **totally** [3] - 8:11,
119:23
  **tough** [1] - 55:7
  **towards** [3] - 11:23,
53:9, 87:6
  **Trading** [1] - 3:17
  **traditional** [2] -
26:25, 120:19
  **tranche** [1] - 101:21
  **transaction** [2] -

40:16, 41:10
  **transactions** [9] -
23:13, 36:23, 36:24,
40:12, 41:21, 67:19,
73:21, 74:3, 79:17
  **Transcribed** [1] -
1:12
  **TRANSCRIBED** [1] -
2:12
  **transcript** [3] - 70:4,
131:5, 131:6
  **TRANSCRIPT** [1] -
1:10
  **transcripts** [1] -
21:11
  **transfer** [5] - 10:3,
32:1, 61:21, 67:17,
69:10
  **transferred** [2] -
14:13, 16:23
  **transferring** [1] -
59:20
  **transfers** [15] -
23:13, 28:12, 35:14,
35:16, 58:4, 58:13,
60:7, 60:8, 62:8,
73:13, 73:17, 78:3,
82:13, 83:11, 85:5
  **translator** [2] - 72:5,
72:12
  **travel** [4] - 97:17,
97:20, 102:10, 102:11
  **tread** [1] - 89:7
  **treasury** [8] - 60:9,
67:10, 67:18, 73:19,
76:11, 78:1, 78:18,
80:21
  **triage** [2] - 60:24,
63:22
  **tried** [5] - 14:5, 14:7,
19:6, 36:5, 53:24
  **triple** [1] - 87:25
  **trivial** [1] - 86:11
  **TRO** [3] - 16:15,
16:19, 17:5
  **trouble** [2] - 123:13,
127:10
  **true** [5] - 12:23,
14:11, 61:5, 131:4,
131:5
  **truly** [2] - 9:15,
110:21
  **truthful** [1] - 70:22
  **try** [10] - 20:11, 23:4,
49:14, 49:22, 87:4,
88:2, 95:18, 111:22,
119:20, 129:17
  **trying** [19] - 8:2,
10:21, 13:5, 45:2,
45:10, 45:14, 48:8,

50:15, 55:21, 57:9, 64:8, 71:14, 90:3, 99:24, 102:4, 102:19, 119:18, 128:22, 129:1
**TSS** [27] - 14:9, 14:13, 14:25, 19:13, 25:12, 44:4, 46:10, 46:14, 46:23, 46:25, 47:3, 47:13, 48:1, 48:3, 48:12, 48:22, 49:19, 52:2, 56:24, 57:14, 58:7, 73:23, 75:15, 76:20, 77:19, 81:7, 107:14
**turn** [1] - 81:24
**turns** [1] - 75:3
**two** [20] - 5:4, 16:6, 33:2, 35:5, 51:13, 51:17, 53:5, 56:5, 56:22, 64:1, 64:10, 83:20, 95:5, 103:18, 104:10, 104:11, 104:12, 119:14
**type** [3] - 40:8, 59:3, 129:6
**types** [3] - 19:15, 29:13, 52:10

## U

**U.S** [4] - 3:18, 16:1, 122:5, 123:21
**ultimate** [2] - 26:22, 58:25
**ultimately** [5] - 20:14, 45:13, 63:11, 86:23, 103:24
**unanswered** [1] - 23:1
**unclear** [2] - 7:9, 51:11
**unconventional** - 125:10
**under** [4] - 70:18, 71:24, 73:17
**underscore** [1] - 67:14
**underscores** [2] - 17:4, 17:11
**understandable** [1] - 40:23
**understood** [5] - 56:12, 67:14, 78:10, 117:4, 121:24
**undertaking** [3] - 9:3, 45:12, 45:13
**unfortunately** [3] - 71:14, 90:22, 111:9
**unique** [1] - 85:2

**UNITED** [2] - 1:1, 1:11
**United** [16] - 16:17, 56:19, 57:18, 59:15, 60:5, 60:25, 61:4, 61:6, 69:10, 74:16, 74:22, 75:4, 97:9, 97:20, 98:20, 131:13
**united** [1] - 2:13
**universe** [1] - 21:13
**unknown** [2] - 5:7, 12:10
**unknowns** [1] - 12:11
**unless** [3] - 4:7, 56:14, 97:19
**unnecessary** [2] - 25:22, 103:15
**unpredictable** [1] - 120:25
**unquote** [2] - 80:25, 94:5
**unraveling** [2] - 17:3
**unreasonable** [3] - 88:5, 91:1, 116:4
**unrelated** [2] - 8:11, 8:12
**unstuck** [2] - 36:23, 41:21
**untoward** [1] - 119:23
**unusual** [1] - 65:6
**up** [48] - 4:13, 10:18, 13:18, 20:10, 24:14, 25:18, 27:1, 32:23, 39:10, 39:12, 43:23, 44:2, 44:4, 44:25, 49:3, 49:4, 49:14, 50:9, 53:13, 62:19, 64:16, 67:4, 68:19, 75:13, 78:19, 82:7, 85:11, 90:21, 92:9, 92:13, 92:18, 95:16, 95:24, 98:3, 99:1, 99:2, 99:6, 101:16, 101:18, 104:5, 104:7, 107:21, 113:12, 113:23, 126:21, 127:3, 129:11
**Upadhyaya** [1] - 39:1
**upcoming** [1] - 89:1
**update** [8] - 55:14, 74:19, 78:9, 81:23, 81:24, 85:19, 93:20, 94:9
**updated** [7] - 4:21, 38:10, 38:17, 48:7, 52:22, 84:9, 84:11
**upside** [1] - 10:22
**upside-down** [1] -

10:22
**urgent** [2] - 119:20, 127:3
**user** [12] - 38:20, 78:7, 78:12, 78:23, 79:22, 80:3, 80:16, 83:14, 85:13, 85:18, 85:24, 86:9
**usernames** [1] - 38:20
**users** [1] - 48:11

## V

**vacation** [1] - 102:11
**vague** [1] - 107:3
**valid** [1] - 41:25
**value** [2] - 27:2, 60:19
**valve** [2] - 5:8, 121:9
**various** [1] - 17:8
**vaults** [3] - 57:22, 58:1, 58:6
**vehicle** [1] - 41:16
**verified** [1] - 78:7
**verify** [1] - 82:20
**version** [1] - 27:25
**versions** [1] - 27:9
**versus** [1] - 3:3
**vibes** [2] - 106:14, 106:15
**view** [3] - 17:15, 23:3, 23:15, 24:11, 26:20, 37:11, 38:9, 41:1, 42:14, 53:15, 58:9, 60:1, 61:24, 64:23, 64:24, 66:5, 74:8, 75:6, 82:2, 82:18, 109:18, 115:23, 118:7
**views** [1] - 108:9
**volunteer** [1] - 10:9
**vs** [1] - 1:6

## W

**wait** [4] - 6:1, 11:18, 101:23, 111:11
**waiting** [3] - 57:12, 63:9, 95:8
**wallet** [14] - 13:11, 13:19, 28:25, 31:19, 35:22, 36:23, 37:13, 40:6, 40:11, 81:8, 82:16, 85:13, 94:23, 94:24
**wallets** [32] - 28:9, 28:13, 46:5, 46:9, 50:13, 56:23, 60:7,

60:9, 61:21, 73:23, 74:17, 74:18, 74:19, 75:10, 76:20, 77:18, 79:21, 79:22, 79:23, 79:24, 80:2, 80:16, 81:18, 82:17, 82:21, 82:25, 83:14, 85:18, 85:19, 85:23, 86:9
**wants** [6] - 4:13, 30:15, 37:5, 59:25, 70:17, 100:10
**Washington** [8] - 1:7, 1:20, 1:24, 2:6, 2:11, 2:15, 7:17, 131:14
**watching** [1] - 8:13
**water** [1] - 89:7
**Watkins** [1] - 3:12
**WATKINS** [1] - 2:9
**ways** [11] - 5:5, 24:11, 37:7, 41:17, 53:25, 77:2, 82:7, 88:14, 103:18, 105:10, 109:12
**wealth** [1] - 10:25
**week** [5] - 6:10, 96:13, 104:8, 104:11, 104:19
**weeks** [7] - 46:23, 95:5, 102:8, 104:25, 118:8, 118:12, 118:13
**weird** [1] - 81:13
**welcome** [1] - 5:1
**well-taken** [2] - 59:9, 92:17
**West** [1] - 2:3
**whitelist** [3] - 73:22, 76:20, 77:18
**whole** [2] - 85:13, 101:21
**wild** [1] - 31:10
**WILLIAM** [1] - 2:8
**willing** [3] - 7:11, 21:3, 87:12
**window** [1] - 75:5
**wish** [1] - 64:4
**witch** [1] - 30:4
**withdraw** [2] - 119:18, 119:20
**withdrawal** [1] - 72:1
**withdrawals** [1] - 28:13
**withheld** [3] - 22:19, 22:23, 23:23
**witness** [9] - 30:11, 72:9, 74:5, 78:25, 96:12, 100:1, 108:21
**witnesses** [3] - 96:22, 102:21, 105:22
**word** [2] - 11:17,

62:5
**words** [1] - 72:11
**wordsmithing** [1] - 30:1
**workable** [1] - 55:13
**works** [1] - 97:18
**world** [2] - 49:12, 92:3
**worlds** [1] - 12:21
**worried** [2] - 12:24, 74:8
**worries** [1] - 11:22
**worry** [4] - 55:14, 79:2, 101:10, 103:12
**worrying** [1] - 55:24
**worst** [4] - 11:19, 12:1, 119:4, 121:20
**worst-case** [3] - 11:19, 12:1, 121:20
**worth** [1] - 53:2
**wrap** [5] - 4:13, 20:10, 92:13, 92:18, 107:21
**write** [2] - 63:3, 106:9
**written** [14] - 7:7, 18:14, 22:2, 22:10, 22:13, 22:17, 22:21, 23:22, 25:16, 27:7, 32:18, 35:8, 38:7, 39:21
**wrongly** [1] - 104:22

## Y

**year** [4] - 14:24, 14:25, 91:20, 104:17
**Year** [1] - 102:22
**years** [1] - 9:14
**yesterday** [2] - 44:18, 63:8
**York** [2] - 1:17
**yourself** [1] - 3:6

## Z

**zeroes** [1] - 41:13
**ZHAO** [1] - 2:8
**Zhao** [24] - 3:13, 6:15, 6:24, 6:25, 17:8, 60:16, 86:20, 101:9, 108:24, 109:8, 109:11, 109:15, 110:3, 111:9, 111:20, 112:6, 112:15, 112:16, 113:1, 113:8, 113:16, 113:22, 118:21, 124:23
**Zhao's** [2] - 12:14,

117:6
**Zheng** [1] - 47:9
**Zhou** [4] - 66:13, 73:20, 76:13, 79:15
**Zhou-affiliated** [3] - 73:20, 76:13, 79:15
**ZIA** [1] - 1:11
**zones** [1] - 99:25