# Exhibit 3



# Milbank

**MATTHEW LAROCHE**

*Partner*

55 Hudson Yards  |  New York, NY 10001-2163

T: +1 (212) 530-5514

mlaroche@milbank.com  |  milbank.com

February 13, 2024

**VIA EMAIL**

Jennifer L. Farer
Matthew F. Scarlato
Emmett J. Murphy
Elisa S. Solomon
Senior Trial Counsel
Division of Enforcement
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

Re:   *SEC v. Binance Holdings Limited et al.*, No. 1:23-cv-01599 (ABJ)

Dear Counsel:

We write on behalf of BAM Trading Services Inc. and BAM Management US Holdings Inc. (collectively, "BAM") in response to the SEC's February 8, 2024 letter. BAM is disappointed and troubled by the SEC's letter, which contains numerous misleading and, at times, false statements concerning expedited discovery, omits material information concerning BAM's document productions, and otherwise identifies issues that the SEC has known about for almost a year and BAM has addressed repeatedly. BAM has grave concerns that the SEC is not evaluating in good faith whether BAM's customer assets are secure and available for withdrawal—the core purpose of expedited discovery under the Consent Order—but rather is seeking to harass, cause unnecessary harm, and needlessly increase the cost of litigation to BAM. BAM's concerns are only heightened by the fact that, after almost 8 months of expedited discovery, the SEC still has not identified the slightest evidence that BAM's customer assets are not secure or have been misused or dissipated in any way, and BAM has enhanced the security of its asset custody practices since this case began.

BAM also strongly disagrees with the SEC's claim that "BAM has repeatedly sought to delay or refuse to provide basic information evidencing BAM's compliance with the Consent Order." Ltr. at 1. As you know, since June 2023, BAM has gone above and beyond its obligations to provide "limited" expedited discovery pursuant to the Consent Order by responding to the SEC's exceptionally broad requests and unsubstantiated concerns related to asset custody. BAM has

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

produced thousands of documents about every conceivable aspect of its asset custody practices; provided a verified accounting; responded to dozens of interrogatories and supplemented those interrogatories; submitted numerous declarations and certifications under oath concerning its asset custody practices and compliance with the Consent Order; provided the SEC with a monthly report summarizing its expenses by category; and facilitated the SEC's inspection of multiple shard devices and key systems involving customer assets. The SEC has also deposed a dozen witnesses during expedited discovery, and obtained extensive discovery (including documents and deposition testimony) from third parties.

The SEC appears to be unwilling or unable to review this voluminous record objectively and confirm what BAM has stated since this matter began—BAM's customer assets are secure and available for withdrawal. To the contrary, the SEC's letter demonstrates that it has ignored or failed to review evidence provided by BAM that answers questions the SEC claims are still open. The SEC also has consistently moved the goal posts during expedited discovery (indeed, the SEC's letter makes yet more new requests) and spent months exploring issues that are irrelevant to whether BAM's customer assets are secure. The SEC also seeks to impose additional and unnecessary burdens on BAM, such as demanding "written responses" to over 70 discovery requests even though BAM has already responded in writing on several occasions and doing so again on a request-by-request basis would not assist the SEC in evaluating whether BAM's customer assets are secure.

Beyond that, the SEC's letter reflects its erroneous view that BAM must provide every conceivable document and piece of information relating to customer assets to comply with its expedited discovery obligations set forth in the Consent Order. Expedited discovery is intended to be "limited in scope to requesting specific records or information" that bear on a particular issue, and the burden for the defendants to comply with expedited discovery should be "low, such as responding to only one or a few discovery requests." *See Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015). The SEC's approach and expectations are exactly the opposite. Not only has the SEC demanded that BAM respond to over 70 discovery requests, over 20 interrogatories, and sit for a dozen depositions, but the SEC also now demands that BAM disprove every potential concern that the SEC has conjured up about BAM's asset custody practices in the face of zero evidence suggesting improper asset custody practices at BAM. BAM has no obligation to do so to comply with the Consent Order.

Against this backdrop, any additional discovery would far exceed the bounds of the Consent Order and the Federal Rules of Evidence. This is particularly the case given how much harm the SEC's motion for a temporary restraining order and approach to expedited discovery has inflicted on BAM. As a direct result of the SEC's unsubstantiated assertions that BAM's customers' assets are at risk, BAM has had to reduce its workforce by hundreds of full-time employees; BAM's existing banking partners limited or effectively ended their relationships with BAM; and BAM's active trading users have fled the platform. *See, e.g.*, Blodgett Dep. Tr. 145:3-155:17 (Dec. 15, 2023); Nov. 27, 2023 Conf. Tr. at 29:8-33:1.

For these reasons, and those below, BAM strongly objects to continuing expedited discovery.

## I.      THE SEC'S INSPECTION OF BAM'S SYSTEM COMPLIED WITH THE CONSENT ORDER

The SEC's description of the January 23, 2024 inspection is misleading and omits much of what actually happened during the inspection.

By way of background, BAM devoted significant resources to preparing for the inspection, which involved multiple meetings with BAM personnel across several groups, including Information Security, Clearing, Legal, and Treasury. Although BAM attempted to work in good faith with the SEC concerning the scope of the inspection, the SEC failed to meaningfully engage, persistently tried to broaden the scope of the inspection, and otherwise made unreasonable requests, including that BAM should undertake a packet-capture exercise, which would have required BAM to cut a fiber optic cable in real-time during the inspection. While BAM did not agree to all the SEC's requests, it did make efforts to accommodate the SEC, including by allowing the SEC to review source code during the inspection.

Ultimately, BAM facilitated the SEC's comprehensive inspection that covered all material aspects of its asset custody practice. As to PNK, the inspection included a detailed review of controls for setting thresholds for automatic transfers between wallets and approving customer-initiated external transfers, which the SEC identified as the primary issues for which it was seeking the inspection. *See* Nov. 27, 2023 Hearing Tr. 10. BAM also changed the automatic transfer threshold for a wallet in real-time, which resulted in on-chain activity between wallets, and then showed the corresponding changes in BAM's SQL database.

BAM also facilitated the SEC's review of PNK's change management platform, including reviewing in detail how new software versions are deployed and software issues are addressed by BAM personnel, as well as providing the SEC with access to PNK source code. The SEC also reviewed BAM's internal systems that control access rights to PNK and showed the process by which BAM changes those access rights. The SEC also conducted an inspection of BAM's TSS platform. As part of that component of the inspection, BAM initiated an asset transfer with the shardholders in real time. BAM personnel also answered numerous questions throughout the inspection, except for a very limited few that were plainly beyond the scope of the inspection.

The SEC's letter ignores the foregoing and does not explain why the inspection was insufficient for purposes of the Consent Order. The SEC's specific criticisms of the inspection are meritless.

*First*, the SEC claims that BAM did not establish that it maintains control of customer assets because it did not address how PNK interacts with BHL wallet software. This is incorrect. During the inspection, BAM showed how its systems interacted with the wallet software in real-

time.  As explained above, during the inspection, BAM made changes to PNK thresholds for a digital asset and conducted a TSS initiated transfer of a digital asset by shardholders.  Both actions resulted in asset transfers between BAM's wallets (*i.e.*, wallets operating on BHL's software).  In any event, BAM's inspection is only one aspect of the extensive expedited discovery that confirms BAM has exclusive control of its assets within the meaning of the Consent Order.  Moreover, if the SEC's complaint is that BAM did not conduct the packet-capture exercise, BAM's CISO already described that process during his deposition.  *See* Kellogg Tr. 77:24-79:22; 80:7-24.

*Second*, the SEC criticizes BAM for not providing a real time "sample of current personnel access and the scope of user rights to PNK."  But the SEC's inspection showed the controls for PNK access rights, including by reviewing the multiple systems and processes involved in reviewing, approving, and modifying those rights.  BAM also has already produced documents reflecting who has access to PNK and confirmed that BHL personnel do not have access to it. Multiple witnesses also testified under oath that BHL does not have access to PNK.  *See, e.g.*, Kellogg Tr. 140:19-141:1, 148:24-149:6; 151:2-5, 349:19-350:1; Blodgett Tr. 62:20-22; Brecese Tr. 44:13-21, 45:5-13.  The SEC does not explain why it needed a "real time" review of PNK access rights.

*Third*, the SEC criticizes BAM for not showing the whitelisting process.  BAM's CISO explained that he did not request access to the whitelisting feature for security reasons.  Regardless, BAM has provided extensive information on the whitelisting process, including through document productions, depositions, and sworn declarations.  *See, e.g.*, Kellogg Decl. (ECF 42) at ¶ 36(b) ("Adding a new whitelisted wallet requires the unanimous approval of all seven shard holders."); BAM's Responses and Objections to First Set of Interrogatories at 14 (stating that the individuals involved in the whitelisting process are those that hold the New Private and Administrative Keys); BAM_SEC_LIT_00000132 (showing that BAM employees are the holders of the New Private and Administrative Keys).

*Finally*, the SEC argues that BAM "did not present any information concerning access and rights to the TSS Portal."  This is false.  During the inspection, BAM's personnel confirmed that no BHL employee acts as an administrator to the TSS Portal.  And following the inspection, BAM produced documents confirming that only BAM personnel are administrators of TSS and that no BHL personnel has an administrative role.  *See* BAM_SEC_LIT_00293277-283.

## II.    BAM HAS MORE THAN ADEQUATELY ADDRESSED THE SEC'S QUESTIONS CONCERNING CUSTOMER ASSETS

BAM has provided extensive discovery concerning the custody and control of its customers' assets and repeatedly answered the SEC's questions on these issues, including during the inspection.  In identifying certain issues as "outstanding," the SEC ignores and mischaracterizes evidence that BAM has provided and points to inaccurate or outdated information about how BAM's systems work.

**BAM's Systems Interaction with BHL Wallet Software**:  BAM has repeatedly explained how its systems interact with the wallet software and identified the BAM personnel with access to those systems—the SEC has ignored the extensive record on those issues.  Instead, the SEC claims that BHL plays "critical roles" or has "pervasive involvement" concerning BAM's customer assets, but those assertions are based on false and material misrepresentations.  For example, (i) the SEC claims that "BAM cannot access" the AWS environment that houses the servers running the wallet custody software used by BAM, but months ago BAM told the SEC that BAM's CISO is now the root administrator of that AWS environment (*see* BAM's Supplemental Response to Interrogatory No. 6 (Nov. 20, 2023)); (ii) the SEC claims that BAM provided "no evidence concerning how PNK interacts" with BHL's wallet software or showing that BHL cannot transfer assets, but ignores extensive deposition testimony, document discovery, and the inspections of BAM's shard devices and other systems that address those topics (*see, e.g.*, Kellogg Decl. (ECF 42) at ¶ 30; BAM_SEC_LIT_00005052-00005053 (access log for BAM's PNK system); Kellogg Tr. 148:9-17; 148:24-149:6; 150:24-151:1; 198:4-15; 199:24-200:18; Zhang Tr. 132:21-133:2); (iii) the SEC claims that BAM has not provided information concerning the controls to prevent manual transfers of Customer Assets, but that is incorrect given the various documents that set forth the policies and procedures concerning asset transfers and deposition testimony addressing the same (*see, e.g.*, Kellogg Decl. (ECF 42) at ¶ 30(b)(iv); BAM_SEC_LIT_00000001-00000018 (Binance.US Digital Asset & Custody Operations Policy); Kellogg Tr. 207:17-209:3; Blodgett Tr. 103:10-104:8); and (iv) the SEC claims that a BHL employee is the administrator of the TSS Portal, but, as explained above, that is incorrect (BAM_SEC_LIT_00293277-283).

The SEC is left citing limited testimony by BAM's Clearing Lead that he occasionally contacted BHL personnel for technical assistance concerning the wallet software, which is unsurprising given that BHL is BAM's wallet software provider.  *See* Zhang Tr. 72-76.  Although this testimony does not in any way reflect "pervasive involvement" by BHL with respect to BAM's customer assets, the SEC can explore this issue in its upcoming deposition of a BHL employee.

**BAM Employees Payment Arrangements**:  The SEC states that "BAM employees outside the United States are controlling transfers of Customer Assets," but that is, again, false. The SEC has known since at least early- to mid-2023 that BAM's Clearing Lead is able to ***request*** transfers from BAM's cold wallets to its hot wallets.  However, any such transfer requires the approval of BAM's Head of Treasury (who is the Clearing Lead's supervisor based in the United States) and four of seven shardholders (all of whom are based in the United States).  An employee's ability to request, but not approve, an asset transfer does not amount to controlling customer assets.

The SEC is also wrong to suggest that Boran, a payment processor based in China that pays certain BAM employees, is affiliated with BHL.  The SEC has presented no evidence to support that assertion and otherwise ignores the information provided by BAM on this issue in expedited discovery.  BAM's Chief Operating Officer testified that BAM determined, following an independent investigation, that Boran is an independent entity without any affiliation with BHL. *See* Blodgett Tr. 74:17-76:1.  Moreover, while one BAM employee testified that he receives payments indirectly from BHL, he explained that he provides no services to BHL and is not

influenced or controlled by BHL and/or Mr. Zhao in any way.  Regardless, that employee has no role with respect to BAM's customer assets.  *See* Ho Tr. 206:2-6 (no role "at all" with respect to BAM's cold wallets); 206:20-23, 209:14-17 (no involvement in the key shard process); 304:16-21 (no knowledge as to how BAM stores keys for customer deposit wallets).

**BAM's Controls Concerning Prohibited Transfers**:  The SEC argues that BAM has not identified sufficient controls to ensure there are no prohibited transactions under the Consent Order, but this assertion is based on grossly misleading characterizations of the record.  For example, the SEC claims that the shardholders testified that "they simply rely on" BAM's Clearing Lead.  In truth, the shardholders testified that they engage in substantial diligence and exercise their independent judgment before approving asset transfers.  *See, e.g.*, ▮▮▮▮ Tr. 107:1-4; ▮▮▮▮ Rough Tr. 76:24-77:7; ▮ Tr. 88-91.  Moreover, before the shardholders are asked to approve a request to transfer assets by BAM's Clearing Lead, BAM's Head of Treasury (or CFO) have already reviewed and approved the request.  *See* Sisenwein Tr. 144-145.  Multiple witnesses also testified concerning the steps taken to ensure compliance with the Consent Order.  *See, e.g.*, Blodgett Tr. 121:5-9; 122:9-16; 48:19-49:1; 50:1-16; Kellogg Tr. 196:2-12; 214:25-215:12; 349:6-350:17; Zhang Tr. 132:21-133:2.

## III.   THE SEC'S REMAINING ISSUES DO NOT JUSTIFY EXTENDING EXPEDITED DISCOVERY

The SEC raises other issues that do not justify extending expedited discovery.  The SEC makes several new requests for information that exceed what is required under the Consent Order.  *See, e.g.*, Ltr. at 5 (demanding that BAM provide "information on the deletion or destruction of any Private and Administrative Keys" and "current lists of its hot and cold wallets upon request"). As to "accounting information," BAM declines to provide additional information concerning the purported discrepancy identified in the SEC's November 17, 2023 email, which relates to a non-material amount of corporate assets, or additional information concerning transfers involving Sigma Chain, which BAM has already explained.

February 13, 2024                                                                                          Page 7

## **<u>CONCLUSION</u>**

As detailed above, BAM has more than adequately complied with its obligations under the Consent Order, and the SEC's contentions otherwise are based principally on misleading and false characterizations of the record.  To the extent the SEC intends to present these claims to the Court, BAM reminds the SEC of its obligations under Federal Rule of Civil Procedure 11 and that the SEC's desire to pursue this case cannot "interfere with its duty to be accurate and candid." Response to Order to Show Cause at 1, *SEC v. Digital Licensing Inc. d/b/a Debt Box*, No. 23 Civ. 482 (RJS) (DBP) (D. Utah Dec. 21, 2023).

Yours sincerely,

Matthew Laroche

cc:      Counsel of record