# Exhibit 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>BINANCE HOLDINGS LIMITED, )<br>BAM TRADING SERVICES, INC., )<br>BAM MANAGEMENT US HOLDINGS, INC., )<br>and CHANGPENG ZHAO, )<br><br>Defendants. ) | Civil Action No. 1:23-cv-01599 |

## DECLARATION OF ERIK KELLOGG

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      I am the Chief Information Security Officer ("CISO") of BAM Trading Services, Inc. ("BAM Trading").  I have held this role since March 2022.  In that role, I am responsible for, among other things, administering and managing the security of crypto assets held by BAM Trading on behalf of its customers and for its own account.

2.      I have over 25 years of experience working in the technology and cybersecurity field.  Much of this experience has involved developing and maintaining technology for financial services companies including trading platforms, clearing agencies, institutional investment managers, and proprietary trading firms.  Over the course of my career, I have had direct engagement with regulators, including the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission, and the Federal Financial Institutions Examination Council ("FFIEC"), regarding cybersecurity standards, governance, frameworks, and related requirements.

3.     As set forth below, the crypto assets that BAM Trading custodies on behalf of its customers are safe, secure, and within the sole possession, custody, and control of BAM Trading.

4.     The following describes the state of BAM Trading's custody arrangements as of the date of this declaration.  My understanding is that all of this information has already been provided to the SEC Staff in connection with its investigation of BAM Trading.

I.     **CRYPTO ASSETS**

5.     Crypto assets (also known as "digital assets") are a digital, encrypted, and decentralized medium of exchange that is not reliant on a third party to verify transactions.  Crypto assets are also referred to as "tokens" or "coins."

  A.     *Crypto Asset Networks*

6.     Most crypto assets are built on distributed ledgers, generally known as "blockchains."  Blockchains are shared and immutable ledgers that facilitate and record transactions that occur for a respective crypto asset.  The function of blockchain is analogous to what we may traditionally think of as a database or accounting ledger.  Most banks and other financial institutions maintain records of customer holdings in an internal database, which they updates to reflect new account activity.  However, this ledger can be changed and its security depends on the trustworthiness and capabilities of the chosen institution.  In contrast, a blockchain is an immutable record that relies on technological controls to securely verify transactions without needing to know or trust the counterparty to a transaction or any other market participants.  This is, in part, due to the public nature of the blockchain, which reflects the current holdings and historic transactions of every account (known as a "wallet") that has been established on the blockchain, which enables trustless verification mechanisms to determine if the parties to a transaction actually hold the assets they are proposing to transfer.

7.     While the focus of my declaration will be on "public blockchains," which as the name indicates are accessible by anyone, it is important to note that there are certain permissioned blockchains, that are only accessible by the persons that have been given specific access.

8.     The principal difference between traditional database or accounting ledgers maintained by entities such as banks or financial institutions and the blockchain is that the blockchain is decentralized and transactions are facilitated without a centralized third party.  For a crypto asset transaction to be added to the blockchain, it must be validated by a party referred to as a "validator," which runs open-source software that implements the rules of the underlying crypto asset protocol (referred to as a "consensus mechanism") for determining whether a proposed transaction is valid.

9.     Once a crypto asset transaction is initiated, validators on the network verify the transaction based on publicly available information.  The verified transaction is then added to a block—a collection of verified transactions—and the block is then added to the chain of verified blocks.  The recording of a transaction on the blockchain is sometimes referred to as occurring "on-chain."  The blockchain is organized chronologically, with the most recent block at the beginning, and the oldest block at the end.  After the crypto asset transaction is approved, the balances for the accounts (i.e., wallets) sending and receiving the crypto assets are increased or decreased based on the transaction amount.

10.    The combination of one or more crypto assets, the associated blockchain, and the protocol for validating transactions and adding new blocks to the blockchain is considered a "crypto asset network."

B. *Consensus Mechanisms*

11. As noted above, these transactions are validated using the consensus mechanism that is embedded in the crypto asset network's protocol. These consensus mechanisms require at least two "validators" to review each proposed transaction to confirm that the transferring party has the assets necessary to complete the transaction and to ensure that the assets have not already been sent to another party (known as "double spending"). If the transaction is valid, it is included in a new block recorded on the relevant blockchain.

12. The two main consensus mechanisms for approving crypto asset transactions are "proof of work" and "proof of stake."

   a. Proof of work, most famously associated with Bitcoin, requires the network participants to confirm transactions by competing against each other by solving a mathematical equation in order to produce new blocks in the blockchain. The entity that solves the question first is awarded a newly minted crypto asset on the blockchain.

   b. For a proof of stake consensus mechanism, networks require participants to deposit (or "stake") tokens to the network in order to obtain the right to validate transactions on the network (or act as a "validator"), and earn fees for performing this service. The staked tokens serve as collateral to incentivize accurate and efficient validation of transactions; networks typically reward a validator for effective service with tokens as compensation (a "staking reward") and may punish a validator for ineffective service by seizing some of their staked tokens (referred to as "slashing"). This process of depositing tokens to a network and acting as a validator is commonly referred to as "staking."

      i. Any network participant can generally download the required open-source software to act as a validator on a network.

ii.      In addition, holders of crypto assets can "delegate" their tokens to a validator in order to earn staking rewards.  These validators may also be known as "node operators."  The validator typically performs the technical transaction validation services on the crypto asset network and earns staking rewards as compensation for performing this service.  The validator in turn provides the staking rewards to the holders of crypto assets whot "staked" their tokens, minus a fee as compensation for its services.

iii.      In these arrangements, the holders of the staked assets retain title and custody of their tokens.  However, the delegation of their tokens to the validator is reflected on the crypto asset network's public blockchain.  In addition, some crypto asset networks impose "bonding" or "unbonding" periods on staked assets, which restrict the asset's ability to be transferred or sold for some period of time after being staked or being unstaked.

13.      For both proof of work and proof of stake consensus mechanisms, the protocol typically compensates transaction validators by generating a new token (or part of a new token) on that network, a process referred to as "minting."  The newly minted crypto asset rewards are delivered "on-chain" and reported on the blockchain (i.e., publicly viewable).

C.      *Crypto Asset Wallets*

14.      In either case, each crypto asset network maintains its public blockchain that reflects all the transactions ever conducted on the network, with each transaction attributable to digital "wallets" that have unique, publicly identifiable blockchain "addresses."  A crypto wallet is software or hardware that enables users to store and use crypto assets.  It is similar to a typical wallet where a user may hold cash and credit cards; however, instead of holding physical items a crypto wallet stores private "keys" which allows for transaction verification.  Each crypto wallet

address contains information related to the wallet's current balance, as well as the wallet's history of transactions, and can be viewed on the relevant crypto asset network's public blockchain.

15.     A crypto wallet has two main components: (i) the publicly identifiable blockchain address, and (ii) a "private key," which acts as a password to authorize transactions from the wallet.

      a.     Assets cannot be transferred from a crypto wallet without the private key. However, anyone with the private key can authorize a transfer from a crypto wallet, similar to how anyone that has possession of a bearer bond can redeem it.  As a result, it is critical for wallet holders to securely maintain their private keys, both to ensure that they are not shared with third parties and that they are not lost, permanently locking the contents of the wallet.

      b.     Wallets can be configured to use a single private key that is independently sufficient to authorize a transfer from the wallets (known as "single-signature wallets").  Wallets can also be configured to require the approval from multiple private keys or multiple portions of a larger private key (known as "multi-signature wallets").  Multi-signature wallets can provide additional protections over single-signature wallets, such as requiring authorization from multiple individuals to approve a transaction or providing ways to recover keys that are lost or destroyed.

16.     Individuals and entities can maintain their own crypto wallets and private keys. This is known as "self-custody."

17.     Alternatively, individuals and entities can rely on crypto asset trading platforms or other third parties to custody crypto assets on their behalf.

      a.     Typically, these third-party custodians maintain assets on behalf of multiple customers in a single wallet "an omnibus wallet" and track the holdings of individuals via a private ledger, which shows all transactions into and out of the wallet.

b.      Omnibus wallets are employed for security purposes.  As explained, each crypto wallet has a public identifiable address where anyone can view the transactions in which that respective wallet engaged and how much of a respective crypto asset a wallet contains at any point in time.  By maintaining assets on behalf of multiple customers in an omnibus wallet, a third-party custodian can protect each customer by not making public their total balance of any respective crypto asset.  When someone views the omnibus wallet's public blockchain address, all they will see is the total number of crypto assets contained in the wallet and transactions associated with the omnibus wallet address.  In addition, as explained below, the use of an omnibus wallet can reduce the number of on-chain transactions, thereby reducing transaction costs.

18.      Crypto asset wallets can also either be "hot" or "cold."

a.      Hot wallets are connected to the internet and are able to immediately conduct transactions.

b.      Cold wallets are not available to immediately conduct transactions either because they are not connected to the internet or are otherwise subject to technical controls limiting their ability to conduct on-chain transactions (i.e., transactions that would be publicly available on the blockchain).  These additional protections provide additional layers of security and make it more difficult to compromise a cold wallet.

B.      *Off-Chain Transactions*

19.       In addition to on-chain transactions, many crypto asset trading platforms facilitate "off-chain" transactions.

20.      As noted above in Paragraph 17, crypto asset trading platforms that hold crypto assets on behalf of their customers typically rely on omnibus wallets to hold customer assets.

Individual customer holdings are recorded on a private ledger maintained by the platform (i.e., an internal ledger).

21.     When customers transact on a crypto asset trading platform, the transaction is typically recorded as a change in ownership on the crypto asset trading platform's internal ledger. However, because customer holdings are maintained on an omnibus basis, no on-chain transaction is recorded on the relevant blockchain.  This is possible because the trades are conducted between customers whose assets are both held in omnibus wallets by the trading platform: when the trade occurs, the trading platform updates its internal ledger to reflect the trade, but no assets enter or leave the trading platform's omnibus wallets.

## II.     BAM TRADING

22.     BAM Trading operates a crypto asset trading platform in the United States.

23.     BAM Trading is registered as a money services business with the Financial Crimes Enforcement Network ("FinCen"), a bureau of the United States Department of Treasury.

24.     BAM Trading is also licensed to conduct business as a money services business, or otherwise permitted to operate, in 43 states and the District of Columbia.  I have been involved in responding to examinations by certain of these state regulators.

25.     As described below, BAM Trading provides customers a safe and secure wallet custody solution if they choose to leave their crypto assets on the platform.  These crypto assets are generally held on an omnibus basis.  If customers do not wish to keep their crypto assets on the BAM Trading platform, they are free to withdraw their crypto assets to any alternative third-party custodian, or to self-custody their crypto assets (i.e., maintain their crypto assets in the customer's own wallet).

26.     BAM Trading offers customers the ability to buy and sell crypto assets through its electronic trading facilities.

      a.     BAM Trading currently lists approximately 150 crypto assets on its platform.

      b.     Because BAM Trading holds customer assets on an omnibus basis, transactions on the platform are recorded on its internal ledger but do not generally result in an on on-chain transaction.

27.     In addition, BAM Trading also provides customers the ability to participate in a staking service for certain crypto assets that use proof of stake consensus mechanisms (the "Staking Service").

      a.     Currently, BAM Trading's Staking Service supports approximately 17 assets.

      b.     As part of the Staking Service, BAM Trading contracts with third-party node operators that act as validators for the relevant crypto asset networks.  BAM Trading delegates the tokens of customers wishing to participate in the Staking Service to the validators. As explained earlier, the process of delegation does not require a customer to give up title to his or her assets.

      c.     The third-party node operator retains a portion of the rewards generated from staking these customer assets.  BAM Trading retains a portion of the remainder as its fee for offering the service.  Customers participating in the program receive the balance of the rewards associated with staking their tokens.

## III.    CUSTODY OF CUSTOMERS' CRYPTO ASSETS

28.     I will now describe how BAM Trading maintains custody of its customers' crypto assets if they choose to keep their crypto asserts on the BAM Trading platform.  As I will describe, BAM Trading employs a number of security measures to ensure that it maintains ultimate control

over the crypto asset that it holds on behalf of its customers and for its own proprietary account and that those crypto assets are safe from cyberattacks or other malfeasance.

29.     BAM Trading maintains custody of most customer assets using wallet custody software developed by and licensed from Binance Holdings Limited ("BHL"), a distinct legal entity, separate from BAM Trading that is also ultimately owned by Changpeng Zhao ("Zhao"). Although BAM Trading and BHL share common majority ownership, they are not within the same corporate structure. Although this software was developed by BHL, BAM Trading maintains custody and control over the crypto assets held in these wallets which were created for BAM customers through the use of BHL's software. There are separate custody arrangements for certain asset that are staked through BAM Trading's Staking Program. I will describe each below.

### A.     *Wallet Custody Software*

30.     The wallet custody software licensed to BAM Trading by BHL provides a multi-tiered wallet structure that is designed to securely hold crypto assets while maintaining sufficient liquidity to facilitate near-term customer demand. Specifically, the wallet custody software has three types of wallets: (i) customer-specific deposit wallets; (ii) omnibus hot wallets; and (iii) omnibus storage wallets. I describe each below.

a.     The wallet custody software runs on servers in an Amazon Web Services ("AWS") datacenter in northern Virginia. The AWS account was established by BHL on behalf of BAM Trading.

i.     Currently this AWS environment is used exclusively to host the wallets used to maintain BAM Trading's crypto assets.

ii.      As described below, while BHL established the AWS account that hosts BAM Trading's wallet custody software, BHL does not have access to, or control over, the assets BAM Trading maintains on behalf of its customer or for its own account.

iii.      Thus, this arrangement provides BAM Trading control over a licensed copy of the wallet custody software while protecting BHL's interest in the intellectual property embedded in the wallet custody software and its source code.

b.      Transfers between wallets maintained by means of the wallet custody software are directed from BAM Trading's internal ledger management system, known as PNK. In addition to facilitating transfers, PNK maintains the official ledger that reflects each customer's crypto asset holdings on the BAM Trading platform.

i.      The software underlying PNK was also originally developed by BHL. However, BAM Trading received a copy of the PNK source code, and BAM Trading personnel are now solely responsible for managing BAM Trading's use of PNK, without the involvement of BHL.

ii.      Certain transfers are conducted automatically by PNK, subject to dollar thresholds managed by BAM Trading personnel.

iii.      Other transfers must be manually initiated and approved.

iv.      BAM Trading requires multiple levels of approval for manually initiated and approved transfers to ensure that a single person does not have authority to transfer assets off of the platform.

31.     **Deposit Wallets**. If a BAM Trading customer seeks to transfer existing crypto assets from a wallet outside the BAM platform (i.e., an external wallet) to their BAM Trading account, the wallet custody software automatically assigns the customer a deposit wallet to receive

those funds.  These wallets are customer-specific and only hold assets on behalf of the assigned customer.

    a.  For such customers, the PNK system is configured to assign a unique, customer specific, deposit wallet for each respective crypto asset network currently supported by BAM Trading even if the customer is only depositing one such crypto asset.

    b.  PNK is configured to automatically transfer the contents of customer-specific deposit wallets to BAM Trading's omnibus hot wallets, described in Paragraph 32 below, if their balance exceeds predefined thresholds.

    32.  **Omnibus Hot Wallets**.  BAM Trading maintains omnibus hot wallets to conduct on-chain transactions, such as facilitating customer withdrawals.  There is at least one hot wallet for each crypto asset network supported by the BAM Trading platform.  These wallets are omnibus wallets and hold assets on behalf of multiple customers, as well as proprietary assets owned by BAM Trading.

    a.  These wallets are configured to hold approximately five-times the volume of daily withdrawals for each crypto asset. The withdrawal limit can vary based on prevailing market conditions, but the design is intended to minimize the security risk of storing too many crypto assets in the hot wallet yet still maintaining sufficient liquidity to support customer requests.

    b.  PNK is configured to automatically transfer the contents of these omnibus hot wallets to BAM Trading's omnibus cold wallets, described in paragraphs 33 below, if their balance exceeds predefined thresholds.  These transfers are entirely automated and subject to thresholds controlled by BAM Trading.

    c.  BAM Trading's omnibus hot wallets are configured to allow transfers to external wallets.

i.      Customer initiated-transfers of less than $1 million (or other applicable customer-specific limit) are automatically approved by PNK.

ii.     Liquidity management transfers initiated by BAM Trading or a larger customer-initiated transfer must be approved by two different members of BAM Trading' clearing team.

iii.    No BHL personnel have access or authority to initiate or approve transfers from BAM Trading's hot wallets.  Certain entities ultimately owned by Mr. Zhao that are BAM Trading customers can, like any other customer, withdraw crypto assets from their own BAM Trading accounts.  However, these transfers are limited to those entities' own crypto assets.

33.     **Omnibus Cold Wallets**.  BAM Trading maintains omnibus cold wallets to securely custody customer and proprietary crypto assets that are not immediately needed to conduct on-chain transactions.   In other words, cold wallets are more secure than hot wallets but they have additional security controls that make them more difficult to access than hot wallets.  There is at least one cold wallet for each crypto asset network supported by the BAM Trading platform.  These wallets are omnibus wallets and hold assets on behalf of multiple customers, as well as proprietary assets owned by BAM Trading.  These omnibus cold wallets have several important security features.

a.      First, these wallets are controlled using the Threshold Signature Scheme ("TSS").  Under TSS, the private key for a wallet is split multiple ways into "shards" and distributed to multiple persons "shard holders."  Assets can only be moved if the transaction is approved by a defined quorum of shard holders.

        i.      BAM Trading's omnibus cold wallets currently have seven key shards.  Votes by four shard holders approving the transaction are necessary for any crypto asset movement.

        1.      Senior BAM Trading personnel with experience in crypto asset custody hold four key shards.  Three of these individuals are located in Canada; one is located in the United States.  Two of these individuals were formerly employed by BHL but has worked solely for BAM Trading since the summer of 2021.  None of these individuals is currently associated with BHL or has any relationship with Mr. Zhao.

        2.      BHL personnel hold the remaining three key shards.  As described below, BHL holds these shards for disaster recovery purposes. In the unlikely event that three of BAM Trading's key shards are simultaneously impaired, BAM Trading can continue to operate and move assets to and from its cold wallets by leveraging BHL's key shards.  However, BHL's shard holders may participate to approve transactions in the normal course for various reasons, including when transactions are initiated after-hours in the United States, but during working hours in the locations that the BHL shard holders reside.

        3.      As a result of BHL only having three key shards, any transfer from BAM Trading's cold wallets requires the approval of at least one BAM Trading personnel.  As an added security measure, no single key shard holder knows the identities of the other key shard holders. It is my understanding that pursuant to BAM Trading's proposed stipulation with the SEC, all seven key shards for BAM Trading omnibus cold wallets would be held by BAM Trading personnel in the United States.

        ii.      If a key shard is lost, destroyed, or compromised, a quorum of the remaining key shards can vote to approve the creation of a replacement.  This process

requires approval from four key shard holders. As a result, BHL cannot unilaterally create or replace any of BAM Trading's key shards.

b. Second, assets from the omnibus cold wallets can only be transferred to a list of pre-approved "whitelisted" wallets.

i. The only whitelisted wallets for BAM Trading's omnibus cold wallets are BAM Trading's omnibus hot wallets, and as described below, BAM Trading's staking wallets. I understand that BAM Trading previously produced a list of these whitelisted wallet addresses to the SEC Staff.

ii. Adding a new whitelisted wallet requires the unanimous approval of all seven shard holders.

iii. As a result, even if an unauthorized transfers from BAM Trading's cold wallets occurred, those crypto assets could only be moved to another wallet controlled by BAM Trading personnel. Crypto assets could not be transferred to external wallets controlled by third parties.

c. Third, transfers of crypto assets from BAM Trading's omnibus cold wallets may only be initiated by designated members of BAM Trading's clearing team. This team is comprised of six well-qualified people. None of these individuals are currently associated with BHL or has any relationship with Mr. Zhao.

i. Thus, crypto asset transfer requests require the involvement of two separate groups of BAM Trading personnel: the clearing team that will initiate a transfer request and the key shard holders who only to confirm, deny or take no action on a respective transfer request. Requests must be sent to a dedicated member of BHL's security operations team, who then issues the TSS-approval request.

ii.     No BHL personnel, nor Mr. Zhao himself, have access or are authorized to initiate transfers from BAM Trading's cold wallets.

d.     As a result of these controls, which are specifically designed to ensure BHL does not have the access or authority to unilaterally transfer crypto assets from BAM Trading's omnibus hot and cold wallets to external wallets, BAM Trading maintains exclusive control over the crypto assets it maintains in the wallet custody software on behalf of its customers and its own account.

e.     External transfers may only be conducted from BAM Trading's omnibus hot wallets.  Transfers that exceed pre-set thresholds may only be approved by designated members of BAM Trading's Clearing team.   Other customer-initiated transfers may be automatically approved by PNK.

f.     Transfers from BAM Trading's omnibus cold wallet require the approval of four key shard holders, at least one of whom must be a BAM Trading employee.  These wallets are configured so that assets may only be transferred to predefined whitelisted wallets controlled by BAM Trading.   And again, the only whitelisted wallets are BAM Trading's omnibus hot wallets.

g.     Under these controls, there is no way for third parties, including BHL, to transfer assets from the BAM Trading platform to external wallets.

B.     *Custody of Staked Assets*

34.     In addition to the default custody arrangement described above, BAM Trading also offers its Staking Services, which are subject to different custody arrangements.

35.     Staked assets are currently maintained in three ways.  The allocation of assets depends across custody solutions depends on several factors, including when the asset became compatible with the TSS encryption protocol described above.

36.     First, certain staked assets are custodied in TSS-enabled staking wallets within the wallet custody software.

a.     These wallets are subject to the same TSS security as BAM Trading's omnibus cold wallets, except that they are configured to use four of the seven key shards.  Two of these key shards are held by BAM Trading personnel; the remaining two key shards are held by BHL personnel.  It is my understanding that pursuant to BAM Trading's proposed stipulation with the SEC, all four key shards for BAM Trading staking cold wallets would be held by BAM Trading personnel in the United States.

b.     Two key shards are required to authorize a transfer or staking operation. The only whitelisted wallets for BAM Trading's staking cold wallets are BAM Trading's omnibus cold wallets.   As all whitelisted wallets are BAM Trading omnibus cold wallets, BHL unilaterally with its two key shards does not have the capability to transfer staked crypto assets off of the BAM Trading platform. To whitelist additional addresses requires all four key shard holders (to unanimously approve the wallet address.  To reiterate, because of the security measure of only permitting staked assets to be transferred to whitelisted wallet addresses, BHL could not transfer staked assets to any external wallets.

i.     In terms of transfers, the only whitelisted wallets for the TSS-enabled staking wallets are BAM Trading's omnibus cold wallets and certain "fee" wallets used to retain BAM Trading's portion of the staking rewards earned from participating in the Staking Service.  As a result, crypto assets in these TSS-enabled staking wallets may only be

transferred to BAM Trading's omnibus cold wallets or the fee wallets that are also under its control.

              ii.       In terms of staking operations, two shards are also needed to stake or unstake assets. These operations do not result in a transfer of the assets from the TSS-enabled staking wallets. Instead, they merely reflect that the relevant tokens have been delegated to the third-party node operator for participating in a staking pool. At all times, staked assets remain in the TSS-enabled staking wallet, subject to BAM Trading's custody and control.

37.      Second, certain crypto assets offered through the Staking Service are held in wallets maintained by BitGo and Aegis, two U.S.-based third-party custody providers.

              a.       These assets are custodied by BitGo and Aegis through their commercial custody services.

              b.       I understand that, BitGo and Aegis both employ mutli-signature private keys. As a result, transfers of crypto assets from BitGo and Aegis must be approved by both a BAM Trading key holder, as well as, respectively, a keyholder from BitGo or Aegis.

              c.       Assets staked through the BitGo and Aegis wallets remain in the BitGo and Aegis wallets. As with the TSS-enabled staking wallets, the staking process results in the delegation of governance rights, but does not result in a transfer of the crypto asset to another party, or a change in custody or control of the crypto asset.

38.      Third, a small number of staked assets were previously held on a Ledger hardware wallet ("Ledger Device"). The Ledger Device is a cold wallet custody product produced by an unaffiliated third-party entity. Ledger devices are publicly available for purchase and are marketed as a personal custody solution for individuals or entities.

        a.      The Ledger Device is maintained in a safe deposit box in Singapore that is exclusively under the control of BAM Trading personnel.  The private key for this device is held by a BHL employee.

        b.      As of today, there are no customer assets held on the Ledger hardware wallet.

## IV.    ADDITIONAL CONTROLS

39.    In addition to the controls described above, BAM Trading has implemented numerous surveillance mechanisms and alerts to ensure the safety and security of customer assets.

40.    For example, these controls automatically alert members of BAM Trading's clearing and security teams of any transfers of greater than $100,000.  There are also alerts if anyone requests access credentials to the PNK system.

## V.    CONCLUSION

41.    Based on my experience and current knowledge, I understand that these practices are consistent with industry best practices regarding the custody of crypto assets.

42.    No BHL employee or combination of employees have the ability or authority to move assets within BAM Trading's wallets (whether cold or hot) or to external wallets outside of BAM Trading' control.

43.    I am not aware of any instances in which BHL employees sought to move BAM Trading's crypto assets or otherwise attempted to interact with BAM Trading's crypto assets without authorization or instruction from BAM Trading personnel.

44.    I am not aware of any other facts that would affect my conclusion that BAM Trading maintains custody and control over the crypto assets that it maintains on behalf of its customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of June, 2023, in Washington, DC.

_____
Erik Kellogg