# Exhibit 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| * * * * * * * * * * * * * * * * ) | |
| SECURITIES AND EXCHANGE COMMISSION, ) | Civil Action No. 23-01599 |
| Plaintiff, ) | |
| vs. ) | |
| BINANCE HOLDINGS LIMITED, et al., ) | Washington, D.C. November 27, 2023 9:39 a.m. |
| Defendants. ) | |
| * * * * * * * * * * * * * * * * ) | |

TRANSCRIPT OF STATUS CONFERENCE
CONDUCTED IN PERSON AND VIA VIDEOCONFERENCE
BEFORE THE HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE
*(Transcribed from the Audio Recording)*

APPEARANCES:

FOR THE PLAINTIFF: JOHN EMMETT MURPHY, ESQ.
SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street
Suite 20-100
New York, New York 10004

JENNIFER L. FARER, ESQ.
SECURITIES AND EXCHANGE COMMISSION
100 F Street, Northeast
Washington, D.C. 20549

FOR THE DEFENDANT BINANCE HOLDINGS: JASON MENDRO, ESQ.
DANIEL W. NELSON, ESQ.
RICHARD W. GRIME, ESQ.
AMY FEAGLES, ESQ.
TEDDY KRISTEK, ESQ.
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, Northwest
Suite 300
Washington, D.C. 20036

APPEARANCES, CONT'D:

FOR THE BAM DEFENDANTS:

MATTHEW LAROCHE, ESQ.
MILBANK, LLP
55 Hudson Yards
New York, New York 10001

WILLIAM R. McLUCAS, ESQ.
MATTHEW BEVILLE, ESQ.
WILMER, CUTLER, PICKERING, HALE & DORR, LLP
2100 Pennsylvania Avenue, Northwest
Washington, D.C. 20037

DANIEL J. DAVIS, ESQ.
KATTEN, MUCHIN, ROSENMAN, P.A.
1919 Pennsylvania Avenue, Northwest
Suite 800
Washington, D.C. 20006

FOR DEFENDANT CHENGPENG ZHAO:

WILLIAM R. BAKER, III, ESQ.
MOLLY ROSEN, ESQ.
LATHAM & WATKINS, LLP
555 Eleventh Street, Northwest
Suite 1000
Washington, D.C. 20004

TRANSCRIBED BY:

LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

THE COURT: No. No. I appreciate it.

MR. MURPHY: -- set out the fundamentals here.

BHL had to destroy any keys that it had. And just so that we didn't have to worry about whether they follow through on that, BAM had to create new wallets and new keys to make sure they were wallets and keys that BHL never had access to.

You know these. You helped us. You very helpfully helped us negotiate these terms.

But it's important because it frames what we're trying to get at here. Those are the requirements we're focused on.

We've taken a lot of discovery of BAM here. And BAM has made the assertion that, despite using Binance's wallet custody software, they have exclusive control of the keys. So we've been pushing on that.

And it boils -- and BAM counsel can get up and correct anything I'm saying here or clarify it. But it really boils down to, they have this PNK system. It's an interface. And when they do a manual transfer, they're looking at a list of wallets, and they put in a number and it goes from wallet A to wallet B and it seems to go through. And that's a blockchain transaction.

And they set thresholds. They say: If this crypto asset goes over X number of whatever it is, it'll

automatically transfer over to a different wallet. And it seems to work.

That seems to be the basis of their assertion of exclusive control. And we've pressed on that.

For example, the PNK system, I don't think it's disputed, doesn't have the private keys. In fact, the private keys are nowhere within BAM's environment. It's somewhere else. It appears to be in a BHL environment that is controlled by BHL and that BAM does not have access to.

So we've asked the question: How do you know that you have exclusive --

THE COURT: And I assume from your perspective you'd view that as inconsistent with the consent order. Is that right or no?

MR. MURPHY: It depends. This is what we're getting at, right? Because there's a story. It starts with the deposition of Eric Kellogg, where he said, I don't have access to the back-end system. I don't have any reason to think that they have unfettered access, but I don't have any access to the back-end system. I can't tell you exactly how it works.

More recently, his deputy, CISO, said he thinks BHL stores the keys. He doesn't understand how the PNK system interacts with the private keys. He has no understanding of any controls that prevents any BHL employee

to access the private keys.

And there are little glitches that cause us to have questions about the arrangement, like the head of clearing, who's in Canada, who really makes the decisions about many of these transfers, said almost always when he puts in the transfer, it goes through. But -- except when it doesn't. And in one instance, it didn't go through and he had to call BHL. And he doesn't know what they did, but whatever they did caused the assets to transfer.

The same for the shards that you've heard about. It's -- they have phones. We've done -- BAM has been great in facilitating inspections of these really helpful -- gave us plenty of time with the witnesses. But they're pressing buttons. They have no idea what's under the hood.

THE COURT: Are you the good cop and Ms. Farer is the bad cop? This is great. I love it.

MR. MURPHY: If you see me up here, you can assume that she has more important things to do.

THE COURT: No. I like that. I'm sure. Right now. Great. That was very holiday spirit. Thank you. I'm glad to hear the inspection went well.

MR. MURPHY: There could be -- and a lot of this has happened recently, since we last saw you. Right?

It may be that BHL doesn't control the keys. Right? There could be some cryptographic technology that

confirm what are the right reports. When we confirm what are the right reports, we're going to produce those.

So again, we're going to fill the gap. That's -- that's what we've agreed to do. That's what we have considered at the Court's request.

But we don't agree that there's much more to do at this point, your Honor.

The SEC has said, We don't understand how it works. But they've been told how it works. If they're trying to understand this at some molecular level, you know, I don't know how that understanding is going to be conveyed.

If there were a document, a definitive guide to how everything works, and we were able to find that document and produce it, I think that's something we'd be open to. But there isn't a definitive guide to how everything works.

BHL is a young company that grew very fast. It invented the software. It understands the software. It's explained the software to BAM in all relevant respects, and BAM has testified about that.

We just don't think that there's any blanks left to fill on that front.

So we respectfully submit that what we have offered, above and beyond what BAM has produced, should be more than enough at this stage. Merits discovery is stayed by the district court judge. Expedited discovery should be

THE COURT: From BAM's perspective?

MR. MENDRO: From BAM's perspective. That's right, your Honor. Which is, I think, the relevant perspective at this point.

But, you know, to be able to prove the negative is a very difficult thing. As I said, if there were a document that says, "Here are the ten reasons why the SEC shouldn't have any concerns," I think we would be glad to hold that document up in court and produce it to the SEC.

We -- the struggle we're having is we don't think there's a document on that and we don't know what specific question.

I've heard a lot of vague questions; I've heard a lot of metaphysical concerns. Right? How does it really work? What makes it work?

There isn't a "yes" or "no" answer to that question. There isn't a specific way to explain how it works or even to understand what it means.

So I think if we had specific direction about, Is there a certain thing that they need to know, and that's going to be the end, then we're done, so if we answered this specific question, then we're done, I think we could try our best to find out if there's a way to answer it. And I don't think there's going to be a document. I don't know that there is going to be a person who --

THE COURT: I don't think there's going to be a document. I agree with that. I mean, I think those can still be helpful, though, to prepare to ask the relevant questions to a witness or witnesses.

But I want to be clear to both BAM and BHL: I don't want you all -- I was trying to say this before to BAM: I don't want you all to -- right. I get it. You want to get off the hamster wheel. And they're never going to let you off. I agree. I mean, that's the Government's job. I don't think they're doing it wrong. I mean, they have to do what they have to do. But that's ultimately why we have a system where we are. It's my job. It's not their job to get you out of there.

And so I just don't want you all to not answer things, to just think: This is only going to lead to 10,000 more questions. Right? Like what's the point?

MR. MENDRO: Right.

THE COURT: So I think once we hear from the Government again, I'm going to try to narrow this down. But I do think, right, it's not only like a hypothetical of, like, what does BHL know on its end?

There is at least some example that they can point to where something happened. So even if it's just sussing out what happened on that one transaction and asking that person, right, Since then, have you had to do this again or

final fact deposition, about doing a joint status report?

MR. LAROCHE: Yeah. That makes sense, your Honor.

THE COURT: Okay. Great. So I think we're good on that, and we'll leave that where it is.

I'm just going to remind -- I know that you view those as intertwined. Who's paying who? Because if someone's paying somebody, presumably they have some control over that person. It's just -- there's a difference between that sort of, you know, spiritual control and just the ones and zeroes. And I get it: They're intertwined.

But let's really focus on, right -- at the end of the day, if someone put a gun to my head, which I hope they don't, and said, like, What's our number one issue, that is my number one issue still. It's like: Does the software -- let's just start with that baseline. Does the software allow for this?

But I think it's reasonable to ask, you know, what are people's incentives in here? Because, you know, software's manipulated by people. It's controlled by people. We've not yet reached the, you know --

MR. MURPHY: It's more like the lack of clarity.

THE COURT: Okay.

MR. MURPHY: The word "allowance" was used very precisely, and we were told: That's the only -- I didn't really get an allowance growing up. It was capricious when

point to and it's sort of been given up front. So I think it helps you if we're going to avoid litigation. I think it helps them if we get to litigation.

But I think we're going to avoid that, because I keep hearing from them: We're getting there. And I do think that we are. So we'll leave it at that with BAM.

Okay. For BHL, why don't we -- I think, you know, I don't know if there's any more questions from my end. You've heard me. It's that sentence that they've read. I just want to get to the bottom.

And I think that I need some -- that these are questions that need to be answered by people, not just through documents alone. And so that there is some, you know, tailored, narrow discovery.

But, you know, some of that is also based in fact, not just hypotheticals, so that we understand how the software works, but that I also agree that, you know, of the things BAM has done, the things that have happened since our last hearing, have all continued to put you in a better position to say: Look, at the end of the day, no one is going to be able to say with 100 percent nothing can happen. But we're not at, you know 49 or 51 percent. You know, we're at -- in the 70s and 80s based not only upon the testimony, but just the reality. Right?

What has happened? This is an investigation that

joint status report? I mean, it seems like you can be pretty curt and just say, "Still working on it; we'll get back to you," which is fine. Or do you think that that -- it's sort of so perfunctory it's not helpful?

MR. MURPHY: No. It's just -- it would be strange to get a report in mid-December saying "We're still working on it."

THE COURT: Okay.

MR. MURPHY: Right? The issues are clear enough. So that's the only thing I would like to signal to the Court.

THE COURT: Yes.

MR. MURPHY: And I think counsel has that point.

THE COURT: Great. So let's plan on getting our update then; and we've heard the SEC is hopeful that, you know, you'll have things to show them.

And I think it's hard for me to imagine that it isn't a few things that -- not just the documents, but documents and again witness testimony. Someone who's going to be able to say with knowledge, having created this software, managing this environment, right, we can answer this question. We don't need to get into a million different things here. But do we have control over what BAM employees are doing in terms of the management of assets and do we have software control? Those seem to be the two big

that there are any more open issues with respect to any documents.

THE COURT: Yes. Why don't we hear from -- do you all believe -- or at least are those the two big buckets to start with, but there might be some ancillary stuff?

MR. MURPHY: We're looking for documents that'll support the assertion that says BHL does not have access to BAM's assets.

THE COURT: True.

MR. MURPHY: If the SOC report answers that, fine. If the SOC report talks about how everyone has security badges to get into the building, that's not going to answer the question.

THE COURT: No. I've got you.

MR. MURPHY: Okay.

THE COURT: So I think -- I mean, I can clear that as my concern. I think that you understand that that's a concern. So I don't think we should limit ourselves to just the things that they have said have been helpful that you'll produce.

I think that you all, as I'm sure you must be, continue to do your due diligence, figure out: Are there other documents that would answer those questions? And if there are, great. And, you know, within reason. Right? I mean, this is not just a simple Google search within your

software. Right? You know, it's limited expedited discovery.

And so I think the things that are helpful also, if there is litigation, is that you set -- it shouldn't be just, "They said these are the two things. We identified that and we gave them those two things."

I think you're going to need to be able to say a little bit of, What are all the other things you tried to do to suss out there's anything else to answer that question? Which there may not be.

MR. MENDRO: Yes.

THE COURT: Okay.

MR. MENDRO: And we are, your Honor. To be clear, we're working closely with our client on that. My concern is, is the documentation of this company wasn't around rebutting this sort of accusation --

THE COURT: Right. I'm totally with you.

MR. MENDRO: -- which doesn't have any support or any historical basis to be there.

So I --

THE COURT: I hear you loud and clear.

MR. MENDRO: We're working hard on this. And I don't know that there will be a lot more in terms of documentation on this front.

THE COURT: That's okay. Right? If that's where

you get to, as long as you think you have some -- the working-hard part, you can flesh that out whenever it is, at the next hearing or in litigation, whatever it is. That's what I'm going to want to know.

I think ultimately that's what the SEC is going to still want to know, because if you say there aren't more documents, I think they're going to say, Well, why aren't there?

But if you can say, like, Hey, here's all the different types of things we've done to try to find those different documents, I would like to think that they would say: Okay. We're not satisfied, but we also think that you've done what you can do.

So that's the document request.

Yes.

MR. MURPHY: Just one other thing. I mean, Mr. Mendro, like me, like all of us in this room, are more comfortable with documents. Right? But engineers are used to answering these questions all the time about access.

THE COURT: Yes.

MR. MURPHY: So I think it will require speaking to an engineer. And they have code, right, that they write and they keep in a repository by design to make sure that they can spot bugs. They all go to this.

I'll say -- I'll remind Mr. Mendro that he did say