```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3   SECURITIES AND EXCHANGE        ) Civil Action
     COMMISSION,                    ) No. 23-CV-1599
 4                                  )
                       Plaintiff,   ) STATUS CONFERENCE
 5                                  )
     vs.                            )
 6                                  ) Washington, D.C.
     BINANCE HOLDINGS LIMITED, et   )
 7   al.,                           ) October 13, 2023
                                    ) Time:  10:37 a.m.
 8                     Defendants,  )
     _____
 9
                  TRANSCRIPT OF STATUS CONFERENCE
10          BEFORE THE HONORABLE JUDGE ZIA M. FARUQUI
                  UNITED STATES MAGISTRATE JUDGE
11   _____

12               A P P E A R A N C E S

13
     For Plaintiff:     JENNIFER L. FARER
14                      DAVID A. NASSE
                        MATTHEW F. SCARLATO
15                      U.S. Securities and Exchange Commission
                        100 F Street, NE
16                      Washington, DC 20549

17                      JOHN EMMETT MURPHY
                        ELISA SOLOMON
18                      U.S. Securities and Exchange Commission
                        100 Pearl Street
19                      Suite 20-100
                        New York, NY 10004
20

21   For Defendant      JASON J. MENDRO
     Binance Holdings:  DANIEL W. NELSON
22                      RICHARD W. GRIME
                        Gibson, Dunn & Crutcher, LLP
23                      1050 Connecticut Avenue, NW
                        Suite 300
24                      Washington, DC 20036

25
```

```
 1                    A P P E A R A N C E S   (CONT'D.)

 2

 3   For Defendant        MATTHEW T. MARTENS
     BAM Trading:         MATTHEW BEVILLE
                          WILLIAM R. McLUCAS
 4                        Wilmer Cutler Pickering Hale and Dorr, LLP
                          2100 Pennsylvania Avenue NW
 5                        Washington, DC 20037

 6                        MATTHEW LAROCHE
                          Milbank, LLP
 7                        55 Hudson Yards
                          New York, NY 10001

 8

 9   For Defendant        ABID RIAZ QURESHI
     Changpeng Zhao:      RAGAD ALFARAIDY
10                        Latham & Watkins, LLP
                          555 11th Street NW
11                        Suite 1000
                          Washington, DC 20004
12

13

14

15

16

17
     _____
18
     Proceedings reported by audio recording.
19

20   Transcribing Court Reporter:

21                        Tamara M. Sefranek, RMR, CRR, CRC
                          Official Court Reporter
22                        United States Courthouse, Room 6714
                          333 Constitution Avenue, NW
23                        Washington, DC  20001
                          202-354-3246
24

25
```

```
 1                       P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  All rise.  This court is now

 3     in session.  Magistrate Judge Zia M. Faruqui presiding.  Please

 4     be seated and come to order.

 5              Good morning, Your Honor.  This is Civil Case

 6     23-01599, Securities and Exchange Commission v. Binance

 7     Holdings Limited, et al.  And this matter is set for a status

 8     conference.

 9              Parties, please introduce yourselves for the record,

10     starting with the plaintiff.  Please come to the podium.

11              MS. FARER:  Good morning, Your Honor.  Jennifer Farer

12     for the Securities and Exchange Commission.  With me at counsel

13     table are Matthew Scarlato, Emmett Murphy, Dave Nasse, and

14     Elisa Solomon.

15              MR. MARTENS:  Good morning, Your Honor.  Matthew

16     Martens of WilmerHale.  With me at counsel table are Matt

17     Beville, Bill McLucas, and Matt Laroche for the BAM entities.

18              MR. MENDRO:  Good morning, Your Honor.  Jason Mendro

19     from Gibson Dunn on behalf of Binance Holdings Limited.  With

20     me today are my partners Dan Nelson and Richard Grime.

21              MR. QURESHI:  Good morning, Your Honor.  Abid Qureshi

22     of Latham & Watkins with my colleague Ragad Alfaraidy, on

23     behalf of Defendant Changpeng Zhao.

24              THE COURT:  I worked for a summer for Abid, so it's

25     just really gratifying when your boss comes up here, your
```

 1   former boss, and has to -- thank you.  It's great to see you,

 2   Mr. Qureshi.

 3           Okay.  Sorry.  Technical problems.  If Duo was not

 4   going to work, I would not be able to do anything, but we got

 5   it to work, so all is not lost.

 6           Okay.  Well, thanks everybody for the status update.

 7   I think we're making progress.  It may not feel like it where

 8   you-all are, but I really think that we are.  So I appreciate

 9   that.  Again, as I said last time, I think this could be and

10   perhaps will be highly litigated, but I think that you-all are

11   doing a phenomenal job of still finding, where you can, places

12   to continue to find space to narrow the, sort of, issues.

13           So I think what makes most sense is just to go,

14   again, by the different topics, one after the other, in terms

15   of the different tranches of, sort of, discovery buckets.

16   Buckets -- yeah.  Mixed my metaphors here.

17           All right.  So, Ms. Farer, you want to start with the

18   RFPs.  That makes sense to me.  I think that's where the -- a

19   lot of, kind of, detail went to in the status report, and I

20   think there's a lot of things to cover there.  But, yeah.

21           It's also good news.  Right?  There's some -- there's

22   agreement on some of the requests for production?  You can say

23   yes.

24           MS. FARER:  Your Honor, I think that we have a

25   fundamental disagreement --

1              THE COURT:  Okay.  Well --

2              MS. FARER:  -- about the fact that we are making

3    progress here.  While we appreciate the language in the -- in

4    the status report has representations from BAM counsel that

5    they agree to a number of things, that language was provided to

6    us at the 11th hour -- really, the 8:00 hour before the 9:00

7    filing -- and that was the first time that we had heard that

8    they would agree to produce the documents in response to a

9    number of the requests.

10             But that being said, Your Honor, we've been down this

11   road a number of times where they say we will agree to produce

12   this and let's talk about this, and we've had a number of

13   meet-and-confers and no specifics as to what will be produced,

14   when it will be produced.  And the period of time since this --

15   since we were last here really demonstrates that this is just

16   like a revolving door with not much progress being made in the

17   sense that we were here on September 18th.  In that time

18   period, we have received -- starting almost two and a half

19   weeks later, we've received 150 documents produced.  Of the 150

20   documents produced, 122 of them are, essentially, the same

21   version of a daily reconciliation.

22             And so that really leaves a subset of approximately

23   20 to 30 documents.  Many of them are not in the proper format

24   and provide little information, and it's important -- so

25   really, what we're saying, Your Honor, we're here again today,

1    it's -- expedited discovery was supposed to be 90 days where it

2    was entered in June, and all we're really asking for is

3    sufficient evidence, not counsel representations, that the BAM

4    assets and both customer and company assets are segregated,

5    safe, and secure, and available for withdrawal.

6             And, Your Honor, we just want to put this all in

7    context.  Because of the gap of time and the discourse of

8    narrowing the issues, we want to make sure this isn't just

9    becoming an academic exercise.  Like, this is very important --

10            THE COURT:  Sure.

11            MS. FARER:  As the Court is very aware, we filed a

12   complaint with very serious allegations, claiming securities

13   law violations.  And the heart of this consent order and

14   expedited discovery is to make sure that investors' assets are

15   safe and secure, and they can be returned.

16            THE COURT:  Right.  No.  I got you.  I mean, I

17   appreciate the SEC's concern, and I understand that if you get

18   a decision perhaps at a later time than you're hoping to in

19   terms of what they're agreeing to do, then it's hard to then,

20   sort of, recalibrate.  And there's, I see on both sides, a

21   hesitation to trust the other side, which I get.  I mean, that

22   is the oppositional framework.  I get that.

23            But -- but I also think that, even if they've at the

24   last minute agreed, they still agreed.  And so I hear you, that

25   time frame.  So I think that's reasonable.  Like, when will

1    productions happen?

2            And I think they're concerned about things -- I mean,

3    I don't think they want things to drag on forever more than you

4    do.  And I know that you also have your -- I don't want to

5    mitigate or, sort of, minimize.  I don't want to minimize your

6    timeliness concerns, but I think theirs are more acute in some

7    sense.  And if they're dragging things out, I don't think it's

8    to their benefit.

9            So I don't think they want to, although that may have

10   been what -- if it feels like that's what's happening.  But --

11   so I'm happy to talk about, let's get some benchmarks for when

12   things will be produced, but at least let's just start with the

13   requests for productions.

14           That when I -- as I see it now, they said they will

15   continue to make productions on a rolling basis to request --

16   except for Document Request 1, 23, 30, and 31.  So outside of

17   that, as I understand it, is -- is your concern that -- I mean,

18   I hear that you haven't -- you're not -- what you've gotten is

19   not sufficient, but without something like -- let's say that I

20   was to rule today and compel them to produce everything by a

21   certain time.  I don't think it would be any different than

22   what they're saying they're going to do.  Right?

23           Like, you would still have to wait to get -- see what

24   they got, and then you might think it was deficient and then go

25   back.  But on the things they're agreeing to, why aren't we

1    okay on that?  Outside of a deadline; outside of a deadline.

2              MS. FARER:  We are in alignment on that, Your Honor.

3              THE COURT:  Okay.

4              MS. FARER:  We are hopeful that they are operating in

5    good faith and agreeing to produce the -- excuse me -- the full

6    scope of documents that are requested.  We will note that those

7    documents that they say that they have already produced

8    documents are -- those productions are complete.  But we agree

9    with Your Honor; that's something that can be worked out.

10             THE COURT:  Okay.

11             MS. FARER:  Our hope here today is, really, just to

12   focus.  And if they agree to produce them, let's set benchmarks

13   about when productions will be done so we can move this

14   forward.

15             Because we agree with Your Honor, that our interests

16   should be aligned.  They -- they act like we're acting --

17   asking for the world.  We're just asking for actual evidence

18   that the assets are safe, secure, and within BAM possession,

19   custody, and control in the United States; and they should be

20   bending over backwards, frankly, to provide us the evidence and

21   the assurances to confirm their own representations.

22             THE COURT:  Well, I'm sure that they feel they are

23   bending over backwards, and I -- but I appreciate what you're

24   saying.  You just want to get some benchmarks.  So I want to

25   turn to the disputed request because what I've heard is that

```
1    for the -- well, let me go back.

2              At the -- in the joint status reports, they've said

3    that they have satisfied 11 of the requests.  And so is your

4    position, then, that that is not -- that they need to be

5    supplemented, the ones, or are you still sort of sorting that

6    out?

7              MS. FARER:  Some of them have been -- we believe are

8    probably satisfied.

9              THE COURT:  Okay.

10             MS. FARER:  We, obviously, don't know what we don't

11   know.

12             THE COURT:  Yeah.

13             MS. FARER:  They appear to be satisfied.

14             THE COURT:  Okay.

15             MS. FARER:  There are some -- and we have followed up

16   with counsel.  So, for example --

17             THE COURT:  Okay.

18             MS. FARER:  -- you know, one of the citations for

19   diagrams references Mr. Kellogg's testimony that there were

20   updated diagrams created.  And so we said, have you searched

21   for those updated diagrams --

22             THE COURT:  Yeah.

23             MS. FARER:  -- and they're running those things down.

24             THE COURT:  Yeah.

25             MS. FARER:  And it's those kind of things, Your
```

1     Honor, that is frustrating to us.  Mr. Kellogg's deposition was

2     over a month and a half ago.

3              THE COURT:  Yeah.  Let's focus on the --

4              MS. FARER:  And it should be easy.

5              THE COURT:  I got you.

6              MS. FARER:  We talked about at the deposition.

7              THE COURT:  That's right.  I got you.

8              MS. FARER:  Just asking for it.

9              THE COURT:  No, no.  I understand.  But I just want

10    to focus right now on what we -- where we can get the

11    agreement.  I hear you.  And I just don't want to start

12    litigating the nitty-gritty of the agreed-upon ones.  Let's --

13    I want to get to the nitty-gritty of the ones in dispute.

14              But the agreed-upon ones, do you have a proposed time

15    frame that you've suggested to them, or are you just sort of --

16    would you like to hear from them as to what a proposed time

17    frame would look like on those agreed-upon ones?

18              MS. FARER:  We requested, when we sent the letter on

19    September 21st, two weeks, and that time has long passed and a

20    number of these --

21              THE COURT:  Okay.

22              MS. FARER:  -- have not been satisfied.

23              THE COURT:  So let's just say -- yeah.  So, like, two

24    weeks from today; is that fair, maybe, you would say?

25              MS. FARER:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  Okay.  That is your

2    request.  One second.

3          All right.  Did you have a chance to review the --

4    well, yes.  I mean, you have your -- so as I look at document

5    request -- can we go through some of the disputed ones; is that

6    good?

7          MS. FARER:  Yes.

8          THE COURT:  Okay.  All right.  Document Request

9    Numbers 1, 2, and Communication Request No. 2 seem to me to be

10   all related.  And as I understand BAM's position, they are

11   concerned about a -- a lack of date restriction.  And they also

12   said -- but they said that BAM agreed to search for any

13   documents beyond those already produced that would further

14   demonstrate that BAM licenses wallet custody software from BHL

15   and has no relationship with Ceffu.

16         And I guess my question is, is what -- do you have

17   some sense or impression of what has not been produced or what

18   you're missing on this?

19         MS. FARER:  So, Your Honor, when we had conversations

20   with counsel about those specific requests, they were standing

21   on their objections.  And as I said, they included that

22   language at the last minute, and it's not clear to us --

23         THE COURT:  What does it --

24         MS. FARER:  -- what they intend to produce.

25         THE COURT:  Okay.

```
1            MS. FARER:  We will note that they seem to be strict
2   constructionists with regard to a number of the document
3   requests and --
4            THE COURT:  That's kind of in fashion these days, but
5   okay.
6            MS. FARER:  -- don't have a -- which we don't believe
7   is a fulsome response.
8            And so, again, we were encouraged by that language in
9   their --
10            THE COURT:  Yeah.
11            MS. FARER:  -- status report.  But, again, Your
12   Honor, because we don't want to have ongoing
13   meet-and-confers --
14            THE COURT:  No, no.
15            MS. FARER:  We would just ask for --
16            THE COURT:  Yeah, yeah.
17            MS. FARER:  -- some benchmarks on this.
18            THE COURT:  Okay.  Okay.
19            MS. FARER:  And so what we're looking for, Your
20   Honor -- as Your Honor may recall from the last hearing, those
21   requests are the crux of a very key issue.
22            THE COURT:  No, no.  Yeah, I got that.  I got that.
23            MS. FARER:  Binance's custody and control.
24            THE COURT:  Did you understand that -- I want to make
25   sure I understand.  What is -- and I get that this is sort of
```

1      the chicken -- maybe it's chicken and egg here.  But what is

2      the SEC's impression of the relationship between BAM and Ceffu?

3      Do you -- was your impression that they -- as they say, that

4      they had no relationship with Ceffu?

5                  MS. FARER:  So, Your Honor, that is the -- the moving

6      target.  The documents suggest that there is a relationship and

7      that Ceffu is the service provider.

8                  THE COURT:  Uh-huh.

9                  MS. FARER:  BAM has since represented that that is

10     not the case and rely heavily upon Mr. Kellogg's testimony that

11     he was mistaken and that there was a name change.  And so all

12     we're asking, Your Honor, if that is, in fact, the case --

13                 THE COURT:  Yeah.

14                 MS. FARER:  -- because there is now disputed

15     evidence, show us evidence that Mr. Kellogg said that he was

16     confused; he reached out to an individual named Bob from

17     Binance to discuss this; there was apparent confusion,

18     name-branding situation.  There should be evidence to support

19     Mr. Kellogg's testimony that this was a mistake and confusion.

20                 But, Your Honor, the documents provided to the

21     auditor, questionnaires -- security questionnaires that

22     Mr. Kellogg, who is the chief information security officer,

23     relied upon, are -- are from Ceffu or its predecessor, Block

24     Technologies.

25                 So it defies logic to us that Mr. Kellogg relied upon

1    security questionnaires, a SATU report, which is a security

2    report, that is focused on Ceffu and Block Technologies.

3    Counsel, in a letter to us, said that BAM set up wallets in

4    consultation with Ceffu and so that we would need to go to

5    Ceffu for information

6              THE COURT:  Yeah.

7              MS. FARER:  And now we hear from Mr. Kellogg that

8    this was all a mistake.  We're just asking for more information

9    and actual evidence to sort this out.

10             THE COURT:  Okay.  But tell me about the time frame

11   because -- I mean, what -- what -- I mean, whatever Ceffu did

12   or may not have done years ago is -- is less relevant, right?

13   I mean, you're -- when they say there's no time frame, I just

14   want to make sure, you -- to the SEC's credit -- narrowed the

15   time frame -- right? -- to January.  And that's what we're

16   saying -- so is that time frame not applicable to this request?

17             MS. FARER:  So as we explained to counsel --

18             THE COURT:  Yeah.

19             MS. FARER:  -- this specific request was in the

20   framework of the larger discovery requests.

21             THE COURT:  Yeah.

22             MS. FARER:  So the Document Requests 1 through 3 --

23             THE COURT:  Yeah.

24             MS. FARER:  -- and certain communication requests are

25   within that time frame.  So there is a time frame.

1          THE COURT:  Okay.

2          MS. FARER:  It starts from November 2022.  And we

3    don't think that's unreasonable because, as we said to Your

4    Honor, that is when the software technology-related services

5    regarding the TSS portal, the shards, all of that started

6    shifting.

7          THE COURT:  Uh-huh.

8          MS. FARER:  And we think that's a reasonable starting

9    time frame for those specific requests.  And we heeded Your

10   Honor's guidance at the last hearing and went through our list

11   of requests and came up with a more narrow time frame, where

12   appropriate, for others.

13         THE COURT:  Yeah.  For the -- okay.  But for this

14   one -- got it.  Okay.  Understood.

15         I'll, obviously, be coming back to BAM on all of

16   these issues.

17         MS. FARER:  Your Honor, we would just note on

18   number -- we just want a little bit more specificity on these

19   requests, because --

20         THE COURT:  Okay.

21         MS. FARER:  -- they have blanket objections to

22   overbreadth and burden without any specificity.  To us, these

23   are not overly broad.

24         The first one, essentially, asks what are your wallet

25   custody software services provided, and what is the Binance

1    entity that provides them?  This is the crux of the issue of

2    custody and control of assets.  They should be able to provide

3    evidence that goes to that issue and goes to the heart of the

4    consent order.

5         For No. 2, you know, it appears to be long because it

6    is many lines long.  But we did that in an effort to include

7    specific issues that relate to this confusion about Ceffu, that

8    this is -- this is evidence that we're hoping -- that we're

9    expecting to see on this issue, you know, relating to why it

10   was included in your own policy and procedure, why these are

11   the security reports that you're relying upon.  Like, this is

12   the evidence that we want to see.

13        So, in fact, the -- the length of this request

14   narrows it, and it doesn't make it any broader.  And to date,

15   with all of these requests, but including these, defendants

16   have not had any specificity about how any of this is

17   burdensome.

18        THE COURT:  No.  I hear you.  I don't want to get too

19   deep in the weeds here on argument on this.  I just want to

20   first figure out my framework.  But I hear -- I appreciate -- I

21   understand your frustration.  I know they're going to get up

22   here and they're going to be frustrated, which is just how it

23   works.

24        And -- and we will, you know, at some point, as I've

25   told you all, try to explain -- Ms. Rosen knows -- I was not

1    here, but at some point -- right? -- you have both -- you have

2    two unpredictable actors here; one with me and then, you know,

3    Judge Jackson, and we will just pick random things.

4           I continue to think things that you are unhappy with

5    will be better than whatever thing that I will pick.  So I

6    still think we're getting closer to there, but I appreciate --

7    I just don't -- I don't want to get -- veer too much into the

8    argument issues because I'm just trying to figure out the

9    framework right now.

10           So I agree that -- I mean, the rules of civil

11   procedure -- right? -- are pretty clear, and the case law is

12   clear, as I'm sure counsel knows, that just, you know, sort of

13   generic overbreadth and burden obligations are not going to

14   carry the day.  We need a little more specificity about that.

15   I don't need that today.  I think you need that -- to hear that

16   if they have those concerns.  And, if not, then the Court will

17   need that as we litigate these.

18           But I understand wanting to -- about those group of

19   requests.  So let's go to Document Request 23.  Any notes of

20   meetings with the auditor relating to security, custody,

21   control of the assets.

22           As I understand it, BAM's concerns on those is that

23   they've already received documents from the auditors, so I

24   think I'm -- I'm pretty buttoned up on that.  I don't think I

25   need to hear anything else from you on that.

```
 1              As I understand it, again, these are, as we've

 2     discussed, date-limited by the overall framework, and you're

 3     just looking for the notes from --

 4              MS. FARER:  Internal notes and communications.

 5              THE COURT:  Yeah.  Communications, yeah.

 6              MS. FARER:  Because the FGMA -- FGMK audit and the

 7     topics that are cited here are focused on custody, control of

 8     assets, and a lot of Ceffu discussion.

 9              And on the date issue, Your Honor, this is even more

10     narrowly tailored because FGMK audit was only for a discrete

11     period of time, even into 2023.

12              THE COURT:  Okay.

13              MS. FARER:  So, again, there were a --

14              THE COURT:  Yep.

15              MS. FARER:  -- handful of people --

16              THE COURT:  Got it.

17              MS. FARER:  -- that were involved.  Just asked them

18     for the documents.

19              THE COURT:  Got it.  Yeah.  And then 30 and 31?  So

20     I'm going to imagine your answer is that you are not yet -- it

21     was a surprise to hear that, perhaps -- it sounds like BAM is

22     open to a potential inspection.

23              But let's focus on the positive, which is that, have

24     you had a chance to discuss what that would look like with

25     them?  If not --
```

1              MS. FARER:  We recently talked to them about it.

2              THE COURT:  Okay.

3              MS. FARER:  And as -- as we explained to them and as

4      we are going to explain to you, these -- they make them seem

5      that these are outrageous requests; asking for proprietary

6      information, et cetera.  There are -- these, as Your Honor

7      knows, are very basic requests when it comes to these types of

8      cases to understand how the technology works.

9              And so this information, in particular, is highly

10     relevant because the two systems, PNK and the TSS portal, are

11     the systems upon which BAM relies to say that they have custody

12     and control of the keys.

13             We actually have no evidence of how these systems

14     work other than representations from Mr. Kellogg.  And when we

15     asked Mr. Kellogg the basis of his understanding or Mr. --

16             THE COURT:  Yeah.  No.  I remember.

17             MS. FARER:  -- they said they learned it from

18     Binance.

19             So all we're asking -- and we're trying to work with

20     them -- tell us what you can provide to us to show us that it

21     is configured as you described, that this software actually

22     works as you describe.

23             THE COURT:  Sure.  So I hear you.  But the inspection

24     that they have agreed to, have you already determined that it's

25     insufficient?  It wouldn't be good to just do it and to find

```
 1      out if it's going --

 2              MS. FARER:  So we would just ask Your Honor.  They

 3      appear amenable to more of a surface walking through, like, the

 4      front end that, you know, that -- who sets the threshold.  So

 5      as Your Honor knows, we would just need more information to

 6      confirm that these are actually operating as they -- as they

 7      are represented to be; not like how things are actually set.

 8              Similarly, we looked at the shard, and that was a

 9      helpful exercise.  So we do appreciate that.  Again, there are

10      some areas like that where we are coming closer.  But, again,

11      we just need more of a back-end confirmation about, again, that

12      this is how it's working on the back end, and Binance doesn't

13      have access and control on the back end.

14              THE COURT:  Don't we just begin with the inspection;

15      get what we get from that and then just -- I mean, you are

16      asking for an iterative process.  Don't we need to go through

17      the iterative process?

18              I mean, have you sort of predetermined that it's

19      not -- what they're offering is -- it's impossible it's going

20      to be of value or --

21              MS. FARER:  So we are hopeful.  They were going to

22      come back to us.

23              THE COURT:  Okay.

24              MS. FARER:  We had the same conversation that I'm

25      expressing to you.
```

```
 1                 THE COURT:  Okay.  Okay.

 2                 MS. FARER:  And so we would just ask Your Honor, so

 3       that we don't have to keep going through this back-and-forth --

 4                 THE COURT:  Yeah.

 5                 MS. FARER:  -- to mandate a requirement that we get

 6       the evidence that confirms that these controls are being

 7       implemented as described.  And, you know, information like

 8       that --

 9                 THE COURT:  I think everyone -- I think there's just

10       a dispute as to what -- that would confirm that, but I got you.

11       Okay.  Well, I mean, I think it's still a good sign that

12       they're -- even if the inspection is not as fulsome -- I mean,

13       nothing is going to be as fulsome, neither what I give you nor

14       what they give you -- right?  Depends on which one is going to

15       be worse, but it's going to be as fulsome as you probably want

16       it at the end of the day.

17                 And as I know, as I've said, you-all clearly want to

18       move on with the actual substance of this case and move past

19       this.  And at some point, I will just end it, if that's what I

20       have to do.  And then go back to Judge Jackson, I would

21       imagine, and then she will do the same thing.  But I think it

22       is a good step -- first step to just do the inspection, right?

23       And -- you don't have a date, I assume, for that?

24                 MS. FARER:  Again, Your Honor, we would just

25       appreciate benchmarks.
```

```
 1                  THE COURT:  Okay.

 2                  MS. FARER:  So date, the systems that would be

 3      governed, obviously, these key systems, like the TSS portal,

 4      the protocol on the phones, the -- and the PNK system.

 5                  THE COURT:  Yes.  Okay.  All right.  Let's stop there

 6      before we get to depositions and hear from BAM, and then I'll

 7      come back to you for depositions.  Thanks, Ms. Farer.

 8                  MS. FARER:  Thank you, Your Honor.

 9                  THE COURT:  You could just tell me that you're

10      hopeful and that things are -- I mean, if you wanted to.

11                  MR. MARTENS:  I'm hopeful.  I'm hopeful

12                  THE COURT:  You could be the good cop, and she's the

13      bad cop.  See, thank you.  Thank you.

14                  MR. MARTENS:  Apologies if I'm a little squeaky this

15      morning.  I woke up this morning having lost my voice.

16                  THE COURT:  Oh, no.

17                  MR. MARTENS:  So, Your Honor, I think it's useful

18      just to back up here.  I just want to revisit something that

19      the Court said at the end of the hearing last time, which is

20      the Court was under the view that this is all just a timing

21      issue and, ultimately, the SEC will get all of this

22      information.  That's -- that's not correct.

23                  THE COURT:  Okay.

24                  MR. MARTENS:  And I think that's important to

25      recognize because this is a sideshow.  It may be an important
```

1    one; I'm not here disputing that.  But it is a sideshow.

2    There's no merits claim here --

3              THE COURT:  Yep.

4              MR. MARTENS:  -- that has anything to do with the

5    security of assets.  This is to give the SEC some minimal

6    comfort pending litigation.

7              And I think that's important in considering what is

8    the necessary -- what is the appropriate burden to place on my

9    client to provide that when the SEC has no evidence of any

10   misappropriation.

11             I'd also note that my client has gone through

12   significant layoffs, in part because of the litigation.  And so

13   to the extent that the SEC is frustrated with the pace, that's

14   a pace that the SEC, in part, caused.  And so it's a little

15   rich for them to complain about that now.

16             There's been no lack of diligence on the part of

17   either the firms involved or our clients.  But just to take one

18   example, our general counsel is -- has, you know, moved on.

19   And so there's been substantial turnover both on the business

20   side and on the legal side.  But there's no foot-dragging here

21   on the part of my client.

22             THE COURT:  Yeah.

23             MR. MARTENS:  It's the realities of a --

24             THE COURT:  Well, I imagine you want to move faster

25   than they do.

1          MR. MARTENS:  Certainly.  But we have a tremendously

2     slimmed-down staff at our client --

3          THE COURT:  Right.  No, no.  Yeah.

4          MR. MARTENS:  -- which impairs that.  We'd all like

5     to just move on to the motion to dismiss and --

6          THE COURT:  Right.

7          MR. MARTENS:  And then, if necessary, merits

8     discovery.  With regard --

9          THE COURT:  I appreciate that framing.

10          MR. MARTENS:  I think that context is important.

11          THE COURT:  No.  I agree.

12          MR. MARTENS:  With regard to the document request,

13     Document No. 1 -- Document Request No. 1, which asks for

14     documents to -- sufficient to identify the software, the reason

15     we're objecting to that is because we've identified the

16     software.  We've had testimony about that.

17          And so to have -- when you're talking about documents

18     sufficient to identify, it's entirely redundant of what

19     evidence has already been provided here.  So that's the basis

20     for our objection, is we've already satisfied the objective

21     here, which is to identify the wallet custody software and who

22     provides it.

23          The second request --

24          THE COURT:  Yeah.  Can I -- hold on.  Before we go --

25     yeah -- to the request, I wanted to step back and appreciate

1   you-all -- a substantial number -- right? -- just my math --

2   you have picked a large number of their requests and said

3   you're willing to produce documents, and you heard the SEC say

4   for ones that you believe that are already done, for some --

5   maybe not all -- but some they agree.

6        So there's, like, one bucket where all agree they're

7   done; maybe some of those 11 requests.  There's still some

8   supplementation.  And now there's a new batch here outside of

9   1, 2, 23, 30, 31, and Communication Request 2, where you said

10  you're going to produce things.

11       And so I think, to me, the main thing I want to try

12  to get today is either if you want to give me a time frame to

13  start -- right? -- the rolling productions -- I hear you.  I

14  mean, it's -- there's obvious reductions in force, the change

15  of general counsel.  These are all things that, understandably,

16  are slowing things down.

17       So, I mean, of all the things I'm sympathetic to the

18  SEC and probably the least sympathetic to, their concerns that

19  things are dragging out because I maintain I think it is,

20  without some more concrete evidence -- which I understand from

21  their perspective, they're going to say they -- they can't get

22  until they get the stuff.

23       But until there's more concrete evidence about the

24  dissipation of assets or that there's some instability about,

25  you know, sort of, consumer safety, I maintain that the delay

1    is still more harmful to you-all.  So I would imagine that you

2    are moving as fast as you can.

3              MR. MARTENS:  Exactly.

4              THE COURT:  So that being said, I do agree we got to

5    get things moving.  And, unfortunately, while I believe that

6    I'm sure you all are working as -- at as furious of a pace as

7    possible; I'm sure your client is also, too.

8              I mean, whenever I -- I talk to law students, they

9    talk about wanting to be in-house.  I always say, well, you're

10   just a cost center.  No one in businesses likes cost centers.

11   And so that's why deadlines do help sometimes; is that -- then

12   it forces the business people -- because they're trying to keep

13   the company afloat, which is important.  They need to do that.

14             But without a deadline, I'm concerned that it will

15   always kind of go to the bottom of the list of the things when

16   they're literally trying to keep their nose above water, right?

17   And so I don't want to drown.  But, I mean, there's a little

18   bit of space there.

19             And so do you have a sense today on that other -- the

20   group of things that you've agreed to produce?  Which, again,

21   super grateful for.  Do you have a sense -- you know, they've

22   asked for two weeks from today.

23             And I don't think that anyone could reasonably think

24   that you're going to get everything done, but right -- to start

25   producing, some sort of rolling production, but, you know, a

```
1    robust one, understanding that if it's not robust, then -- I
2    mean, you get to tell your client that the judge has already
3    said, like, he's just going to put some arbitrary deadline.
4    Like, we don't want that.  Can we increase the pace?
5              And so do you have a sense, if it's not two weeks,
6    what it is to sort of start, and then also to get to near an
7    end of this part that you all agree?  Like, I mean, you have
8    some sense, I imagine, hopefully, of the stuff that you agree
9    on what the scope of that might be and the burden?
10             MR. MARTENS:  Yeah.  So just to be clear, Your Honor,
11   we've already started.
12             THE COURT:  Yeah.
13             MR. MARTENS:  I don't want to leave the impression
14   that --
15             THE COURT:  No, no.
16             MR. MARTENS:  -- that we've just agreed and haven't
17   been producing.  Another -- another production just went out
18   yesterday.
19             THE COURT:  Okay.
20             MR. MARTENS:  So we've continued to make --
21             THE COURT:  Yeah.
22             MR. MARTENS:  -- rolling productions.
23             THE COURT:  Yeah.
24             MR. MARTENS:  There's no way we could come close to
25   finishing this in two weeks.  Do I expect there will be another
```

 1   production in the two weeks?

 2               THE COURT:  Yeah.

 3               MR. MARTENS:  I couldn't imagine there wouldn't be.

 4               THE COURT:  Yeah.  How about, do you think within two

 5   weeks, could you tell me what you believe is a reasonable time

 6   frame for -- I mean, again, we're not talking about --

 7               MR. MARTENS:  Yeah.  I think I could do that.

 8               THE COURT:  For concluding -- for concluding these

 9   productions, right?  We're not talking about the

10   unknown-unknown.  Okay.  So, obviously, there could be things

11   that come up.  Of course.  Right.  But just -- yeah.

12               So within two weeks, that you could provide a

13   benchmark for when you think the things that you have agreed to

14   produce in the status report, when that will be.

15               MR. MARTENS:  Yes.  We can do that.

16               THE COURT:  Okay.  And then --

17               MR. MARTENS:  We can come back with an estimate

18   within two weeks.

19               THE COURT:  Yeah.  That would be great.  And that

20   you'll continue to produce things in that time frame?

21               MR. MARTENS:  Correct.

22               THE COURT:  Okay.  Great.  That's on the things that

23   you've agreed to produce.

24               And if you can -- you know, and it's -- I know

25   you-all are in communication, but follow up with Ms. Farer and

1    her team about the 11 requests that you feel are satisfied.  If

2    you-all can, you know --

3              MR. MARTENS:  We will do that as well.  Follow up

4    with regard to any loose ends on those.

5              THE COURT:  Great.  Thank you.  All right.

6              Now, let's get to the -- a little more challenging.

7    So document request, we went to -- you started with No. 1, and

8    I apologize.  I was looking at my notes and trying to listen.

9    So let's go back to that.

10             So you said that you feel that you've produced

11   everything sufficient to identify all wallet custody software

12   and related services; is that right?

13             MR. MARTENS:  Well, I think we've identified it.

14             THE COURT:  Yeah.  Okay.

15             MR. MARTENS:  I mean, we've identified -- so when it

16   says documents sufficient to identify, it's already been

17   identified that BHL is the wallet custody software provider.  I

18   don't think that there's anything else necessary to provide

19   that identification.

20             THE COURT:  And you think -- you know, I think their

21   point is that there was some confusion from, perhaps,

22   potentially, witnesses about what Ceffu's role was in this.

23   And that -- that is why they want to, sort of -- maybe it's a

24   belt-and-suspender from your perspective, but that's what they

25   want to get that suspender on is to make sure that the

 1   confusion, in fact, was not in earnest for some reason.  It was

 2   just truly confusion.

 3          So how do we -- you don't feel like -- that there's

 4   some way to mitigate that by perhaps -- is there not more

 5   documents to produce to identify what role Ceffu and the

 6   identity of a corresponding entity or individual providing such

 7   services, or is that sort of --

 8          MR. MARTENS:  Well, so, first of all, I just want to

 9   say they've taken sworn testimony on this and testimony is

10   evidence.

11          THE COURT:  Yeah.  Sure.

12          MR. MARTENS:  But as we noted on page 9 of the status

13   report, we did agree to make some search for some documents

14   that would further demonstrate that.

15          So -- so we are doing some additional searching on

16   that to see whether there's some documents.  But this request,

17   as written, which does -- is, essentially, all documents, is

18   what we're objecting to.  So we are going to take some

19   additional steps there to see whether -- to see whether there

20   are some documents that could satisfy those concerns.

21          THE COURT:  Yeah.  And I think just to tee up, I

22   mean, I imagine at what likely would be the next hearing is

23   that we'll have made progress on what is -- things that will be

24   produced in a time frame and that there's going to always be

25   friction as to --

1          MR. MARTENS:  We can give them that.  And if they say

2     that's still not enough, then we can come back, and the Court

3     can make a decision on that.

4          THE COURT:  Exactly.  Exactly.

5          MR. MARTENS:  We have said we will go and make some

6     additional search with regard to that.

7          THE COURT:  And so I just want to be clear, I think

8     that's what the next hearing would be, and it would be helpful

9     from you-all is to -- when you come back and they say they have

10    this request and you say it's too broad, is if you can really

11    put a fine point on, well, this is the question that we

12    answered, right?

13         MR. MARTENS:  Yep.

14         THE COURT:  That would be super helpful.

15         MR. MARTENS:  Yep.

16         THE COURT:  Great.  Thank you.  Okay.  I just want to

17    sort of -- I viewed these in, sort of, three different buckets.

18    And so this one, you know -- it's hard because, you know, in

19    terms of the burden, if there is no relationship with Ceffu, I

20    just feel like this should be pretty straightforward in terms

21    of a search.

22         And so I guess this one, I'm not trying to, sort of,

23    signal the way that I think I'm going to rule.  I'm just

24    telling -- because I don't know.  I haven't seen -- dug further

25    into this.  But right now, not knowing, again, what you've

 1       produced, I do have some concerns about Ceffu and their role.

 2               I appreciate, it seems like you-all have got it

 3       buttoned up to where it is, but this is one where I think

 4       we want to really -- I do want to get -- find whether -- you

 5       know, the devil is in the detail.  I agree with the SEC that I

 6       have some heartburn about some of this because it seems to be a

 7       real important, kind of, core issue.  And so -- but we'll get

 8       to the --

 9               MR. MARTENS:  So hearing that -- so hearing that,

10       that's helpful.  And to the extent that hearing that that is a

11       particular concern for the Court will help us focus our search

12       to alleviate that concern.

13               THE COURT:  Thank you.  That's great.  But I will

14       give you good news when we get to one of the other ones, so

15       don't worry.

16               MR. MARTENS:  Understood.

17               THE COURT:  Thank you.  All right.  So Document

18       Request 23, any notes with the auditor.

19               And so I appreciate that they got, you know, their

20       records from the auditor, but I think it is relevant what

21       people would -- inside of BAM are saying.  Because if they're

22       saying -- and I'm not saying that they're saying this.

23               But if they said things like, oh, this -- that

24       auditor totally missed something or, like, oh, that auditor was

25       great and they got everything; could be also positive things,

1    whatever it is.  I think the -- the thoughts and impressions of

2    what the auditor is doing from the, you know, in-house side

3    seems relevant and important, and it seems like this is not as

4    far-ranging as their request is.

5            I agree that their requests are written in a way that

6    it could be interpreted very broadly.  That's every litigator's

7    default.  And so -- but I think that what we're hopefully

8    today, having heard from them and from me, is that we're

9    scoping it to something pretty narrow.

10           And so I'm hoping that this one -- I don't have a

11   question, but I'm happy to hear it if you have a concern on

12   this.  I think it's one we need to -- I think we can get a

13   pretty finite universe of documents out on this and get it to

14   them, I'm hoping.  Does that sound reasonable?

15               MR. MARTENS:  I mean, the -- the concern is --

16               THE COURT:  Please tell me.

17               MR. MARTENS:  -- what is the date restriction.  And

18   the concern is also that it's labor-intensive; that you've got,

19   again, in an organization that's strapped for people --

20               THE COURT:  Yeah.

21               MR. MARTENS:  -- many of whom may not be there

22   anymore.  And so it's not just as easy as saying it's this ten

23   people, let's go out and ask those ten people --

24               THE COURT:  Yeah.

25               MR. MARTENS:  -- if they have any notes.  It's

```
1    figuring out --

2              THE COURT:  Yeah.

3              MR. MARTENS:  -- who are all the people.

4              THE COURT:  Yeah.  No, no.  And so -- I hear you.

5              MR. MARTENS:  -- who talked to auditors --

6              THE COURT:  I hear you.

7              MR. MARTENS:  They're not here.  Do we even know

8    where their notes are?

9              THE COURT:  Uh-huh.

10             MR. MARTENS:  Like, this is not an easy task.

11             THE COURT:  Yeah.  Well, I want you to find the

12   easiest parts of these tasks, just do those, so you look really

13   good when you come back.

14             MR. MARTENS:  Understood.

15             THE COURT:  If -- if you -- because I think at some

16   point they're just -- they're not going to be happy.  Right?

17   I'm not looking at them now because I don't want to make eye

18   contact, but they're not going to be happy.  Okay?

19             But if you can come back and give me at some -- at

20   least maybe, like, look, yeah, I mean, I agree.  I think you're

21   right.  It's like, it's not as simple as -- I mean, as --

22             MR. MARTENS:  I hear you as well.  I understand

23   what --

24             THE COURT:  Yeah.

25             MR. MARTENS:  -- you're asking us to do.
```

1        THE COURT:  Yeah.  I think that if -- if you can

2   get -- I mean, if -- because if there's three, they're going to

3   want five, right?  And if there were five, they're going to

4   want seven.

5        So at some point, though, I'm just going to say,

6   like, you got three, right?  It just can't be this constant

7   boogeyman of, like, well, someone somewhere in Binance,

8   someplace might have said, like, we've got access to these

9   assets and we can get them this auditor; he's an idiot, right?

10  Like, that -- that just -- we can't rely on that.

11       And if you get some of the notes from some of the

12  folks and they seem like they're relevant folks -- right? --

13  like, I think -- again, you-all are super smart.  You're going

14  to just -- I'm asking you to prioritize -- and not only

15  prioritize by import, but by access -- and they're going to

16  have to live with that.

17       Because if they're -- if they're like, oh, well, you

18  didn't get so and so's and he's super important, but you're

19  like, he doesn't work there anymore, and we've got ten people.

20  And either I can get you the five people who are still there

21  now, or we could have those -- the entire staff work to find

22  what they might not find in one person's.  I mean, that's

23  burden, right?

24       MR. MARTENS:  Yep.

25       THE COURT:  That is burden.  And so if you -- and if

1     you come back and you tell me, you know what, Judge, it's

2     really hard to even find the five people because things are so,

3     you know, right now -- again, nose barely above water and --

4               MR. MARTENS:  Yep.

5               THE COURT:  -- I'm willing to hear that.  And I -- I

6     appreciate that you're hearing me, so just see if you can get

7     the easy out and -- and then -- but -- and then flag what --

8     why it's difficult because I'm hearing you on burden.  I'm

9     hearing you.  I'm telling you.  Okay?

10              MR. MARTENS:  Okay.  Understood.

11              THE COURT:  Now, on 30 and 31.  To me --

12              MR. MARTENS:  Seems like inspection, right?

13              THE COURT:  Yeah.  I think that we're not going to

14    get back to the original source code on some of this stuff.  At

15    some point they're just going to have to believe that -- not

16    just officers of the court, but as I said at the prior hearing,

17    this is atypical, I think, of this type of litigation.  You

18    have the -- the parade of horribles; usually the people in that

19    parade aren't also present.

20              And, again, no, I'm not -- mean to cast aspersion on

21    those folks.  But, like, I just -- I find it difficult to

22    believe that through counsel for CZ and for -- we have all --

23    all the parties here.  And so, ultimately, they -- if everyone

24    is saying, we understand the Court's order, we've -- and

25    there's been sufficient pressure testing, so it's not just

1    that, I think that that is, like, a plus factor, right?

2             It's not that -- I mean, there's counsel here for CZ;

3    there's counsel here for the other entities.  And if they're

4    saying, we hear you, Court, and there's been some pressure

5    testing, then why do we need to go and dissect the -- because

6    the code -- right? -- like any code, I presume, not being a

7    computer person, like, there will always be some

8    vulnerabilities or flaws, right?

9             So, again, there will -- and I -- I think that -- you

10   know, the SEC is trying to get to their level of comfort, and

11   your level is somewhere else, and I'm probably just going to do

12   what all judges do -- which is frustrating -- just pick

13   something in the middle.  But I think this one I'm -- I

14   appreciate.

15            I think an inspection is a great place to start and

16   perhaps to finish.  I think it should be robust, it should just

17   be like this is what the monitors look like if this is the

18   program.  I think getting some additional information -- but I

19   will tell you -- and for the SEC's benefit, I think I'm

20   probably more in your camp on this one given that there's

21   inspection.

22            But, I mean, of course, on all these things,

23   I'm going to wait until -- we haven't gotten into the details.

24   And while I understand that the SEC is, like, well, we need to

25   see that the devil is in the detail, we're starting, the ball

```
1    is rolling here.  I still think we're moving in the right
2    direction.  So -- but I'm probably with you-all.
3              So, again, if you're prioritizing to me that Ceffu
4    and the auditor notes this, I was concerned, but I think that
5    the inspection mitigates a lot of my concerns.  And so I think
6    you're moving in the right direction there.  Sound good?
7              MR. MARTENS:  Thank you, Your Honor.
8              THE COURT:  Okay.  Great.  Ms. Farer?  I'm hoping --
9    I don't want to be abused on the source code, but you can
10   just -- because I'm not saying that I don't -- I'm not with you
11   on it.  I'm just saying I think that's maybe -- I'm saying
12   you're in a really good position with the other ones, so we've
13   just got to pick our battles here.
14             But I will listen to you.  If, after the inspection,
15   you're just, like, look, this is totally -- like, this is
16   veneer and we don't see anything behind it, then I'll hear from
17   you.  But I'm hoping some of the other stuff, like, maybe you
18   could agree with me, that if you got some of the other stuff
19   and it allays concerns in some other places, perhaps it might
20   allay them on this one.
21             MS. FARER:  Your Honor, I would never abuse you.  And
22   you're getting me on a good day with my Phillies win.
23             THE COURT:  Okay.
24             MS. FARER:  I do want to note a couple points in --
25             THE COURT:  Yeah.
```

1          MS. FARER:  -- in response to Mr. Martens.  First of

2     all, we object strongly to the notion that this is a sideshow

3     and that we caused the -- the devolution of the business.

4          THE COURT:  No.  Okay.  No.  All right.  Well, I'll

5     leave -- I'll leave it -- no, no.  The devolution, that's every

6     defense counsel's --

7          MS. FARER:  Exactly.

8          THE COURT:  -- fair and right place to say that, and

9     it's your fair and right place to say that it's not.

10          Now, the sideshow, I think it's -- that has -- I

11     don't think that means in a pejorative.  This is a -- it is a

12     side from the main event, but that doesn't mean it's a

13     sideshow -- I agree with you -- in the sort of negative

14     context.

15          But you agree that we've got to get to the merits.

16     That's the main course, right?

17          MS. FARER:  And we're doing -- we're doing that in

18     parallel, Your Honor.

19          THE COURT:  Yeah.

20          MS. FARER:  So we are very much wanting this --

21          THE COURT:  Okay.

22          MS. FARER:  -- these issues to be resolved.

23          THE COURT:  Yeah.

24          MS. FARER:  But we would highlight -- and as we've

25     explained to counsel, we have identified discrepancies between

1    the assets held --

2              THE COURT:  Yeah.

3              MS. FARER:  -- and the outstanding balances for the

4    crypto assets alone of $50 million.  So we do need this

5    evidence to get this resolved.

6              THE COURT:  Right.  I think you're going to get it.

7              MS. FARER:  Okay.

8              THE COURT:  And I think I -- I mean, I hope I've been

9    clear.  I think they heard me, that they have to -- we need to

10   start prioritizing document production over just maintaining

11   and keeping the business afloat; although that still matters

12   for consumers, I think everyone would agree.

13             And so we'll -- we're going to try to continue to

14   navigate it this one last time without up to two weeks to get

15   those benchmarks.  And then after that, if we can't get that,

16   that's when I will just start arbitrarily imposing.  But I want

17   you to understand I'm going to be sympathetic to them.

18             And so if they say they need six weeks, it may end up

19   being longer, or four weeks or whatever it is.  And so I still

20   think it's better for you-all to work it out than to get me

21   because I might still give something that you feel is -- is,

22   you know, way too slow.

23             MS. FARER:  Understood, Your Honor.  And -- and we

24   would also just note that the point about redundancy, we

25   also -- as Your Honor identified, belts and suspenders.  So we

1    have these open questions about Ceffu, who is providing what.

2         THE COURT:  Yeah.

3         MS. FARER:  So we include the request.  We get a

4    letter from counsel -- we ask counsel, tell us the requests

5    that you think are satisfied.

6         THE COURT:  Yeah.

7         MS. FARER:  We get a letter from counsel.  Number 1

8    is not on there.  So this gives rise to our question of we

9    anticipated that they would point to the wallet software --

10        THE COURT:  Yeah.

11        MS. FARER:  -- and some --

12        THE COURT:  Well, they just made a production

13   yesterday.  So, I mean, maybe it's -- it's late-breaking --

14   like, on the crawl, there's late-breaking news.  Okay.  But

15   there's --

16        MS. FARER:  No, the production yesterday did not

17   contain that.

18        THE COURT:  No?  Didn't -- okay.  Well, you know --

19        MS. FARER:  But we would ask Your Honor and we do

20   appreciate that --

21        THE COURT:  Yeah.

22        MS. FARER:  -- the benchmarks and asking counsel to

23   provide specifics.  But we would ask them to provide specifics

24   about the timing for the entirety and not just what they expect

25   to start producing in two weeks.

1           THE COURT:  Okay.  No.  Yeah.  No, no.  Yeah.  Sorry.

2     I should be -- yes, that's totally fair.  So I would like on

3     the -- so the -- yes.  Two weeks is that -- that time frame

4     that I want is on the -- certainly, on the agreed-upon, but

5     I -- sorry.  Yes, that is a fair point.  Let's be very clear

6     here.  [Indiscernible] -- another two weeks.

7           The other things that they have agreed to produce as

8     to the disputed issues, including when the inspection is,

9     hopefully that will have been within the two weeks.  But, if

10    not, that -- that's in there.  But I suspect it will be within

11    the two weeks.

12          But everything else on the document request, 30, 31,

13    23, Document Requests Nos. 1 and 2 and Communication Request

14    No. 2.  So that's the disputed bunch I need within two weeks to

15    have a time frame when -- whatever BAM is going to produce will

16    be produced.  And then, of course, on the -- what's not -- what

17    they're not, sort of, maintaining their objections, they agreed

18    to make productions on.

19          So, yes, I'm with you.  Thanks for clarifying that.

20          MS. FARER:  No.  I guess -- I guess my -- my question

21    is that we ask for -- for all of the requests that they agree

22    to produce, when they're going to produce it.

23          THE COURT:  Yes.

24          MS. FARER:  Maybe we're talking past each other.

25          THE COURT:  No, no.  I think we're saying the same

 1    thing.

 2              MS. FARER:  Okay.

 3              THE COURT:  So I think -- let's be clear.  The things

 4    they agreed to produce that aren't in those numbers I just

 5    said, I think when we were talking, I said that I want within

 6    two weeks a time frame for that.  And I think that you have

 7    rightly pointed out, we also -- that two-week frame also needs

 8    to include these things where there's like a -- there's some

 9    general dispute, but within that they're still saying they're

10    going to produce stuff.  So everything.

11              MS. FARER:  Great.

12              THE COURT:  Every document request in two weeks I

13    need an answer as to what the time frame that they're proposing

14    is.

15              MS. FARER:  And we would also ask for some more

16    specifics about the categories that they intend to produce

17    within that because, as I've said, the strict

18    constructionists -- we're getting --

19              THE COURT:  Yeah.  Sure.  Yeah.  I mean, I think as

20    much -- I think they understand where I am.  I mean, I said

21    that I want as much of a sneak preview as they can get.  And,

22    you know, when -- I mean, I think it's going to be important if

23    there is any of the litigation, I want them to come up with

24    each document request.

25              I want a -- when -- if we have -- or when we have a

1    hearing next to go over what the inadequacies are, I want both

2    sides not to just give me Document Request 1, is that what

3    you've given me, and they say overburdensome.  I want you to

4    say we think that they have produced this, which only satisfies

5    30 percent of this request.  I want them to say, here's what we

6    have produced.  Like, we re-interpreted this because it was too

7    broad, and here's what we have satisfied.

8            So then, I think, baked into that is something within

9    that timeline of, like, what is it we're going to produce,

10   right?  Like, they have some idea of what they're going to

11   produce.

12           MS. FARER:  Yes.  That's what we're asking.  And

13   we've asked them for that a number of times.

14           THE COURT:  Okay.  Well, I'm telling them that.

15           MS. FARER:  So we appreciate Your Honor --

16           THE COURT:  Yep.

17           MS. FARER:  -- to set that marker down.  And we would

18   also note that we will continue to be reasonable and work with

19   them; for example --

20           THE COURT:  That was a nice thing to say.

21           MS. FARER:  -- for the FGMK, like the internal

22   materials.

23           THE COURT:  Yeah.

24           MS. FARER:  We're not asking for every custodian

25   under the sun.  We've cited specific exhibits with key

1          personnel and the key issues.

2                    THE COURT:  Yeah.

3                    MS. FARER:  As Your Honor identified, a great place

4          to start.

5                    THE COURT:  Yeah.  Great.  And I think, again, you

6          can benefit yourself from -- I mean, you have some sense, I

7          think, of who are still employees or things there or -- I mean,

8          I believe, at least, like, from the depositions, those things,

9          you have tried to identify, as you continue, please -- it

10         sounds like you will -- continue to do, like, hey, here's our

11         wish list; it's these five people.

12                   But if you only were going to do two -- right? --

13         we're not going to agree, we're not waiving, no one is waiving

14         any objections or anything like that, but if you're only going

15         to do two, could you do these two?  I think telling them things

16         like that, even if you're still going to maintain in front of

17         me, hey, we needed all five and without the five -- and I'm not

18         going to say -- I'm not going to then be, like, well, you got

19         two and you said those two.

20                   Like, I just need you-all to do things that

21         litigators cannot do normally, which is, like, if I give in on

22         this thing, I'm going to lose at the argument.  That's not

23         going to be the case here.

24                   It's just -- it's going to be worse for everybody if

25         we just do the it's better to just not prioritize two because

1   then we can't argue for our five.  Because then you're going to

2   get nothing, and then I think everyone is worse off.  So I

3   think if you could say, look, two is insufficient, and these

4   two are not the people that we want, but if it's literally who

5   you're going to do, let's just get that done to start with

6   because there is a chance that it actually might.

7          But I am not going to listen to them or vice versa if

8   they give you two things, somebody will be, like, well,

9   whatever.  We got -- you know, what was the point of giving

10  that?  The point was to narrow the field, so --

11         MS. FARER:  Understood, Your Honor.  And -- and,

12  again, we heard you last time, we're hearing you now, and --

13  and we encourage counsel to revisit the specific citations.

14  Again, not as strict constructionists, but we did provide

15  guideposts as to what we're looking for; the relevant

16  custodians, et cetera.

17         THE COURT:  Perfect.  Okay.

18         MS. FARER:  On the inspection issue, again, we do

19  think that is a helpful start.  And -- and as we explained, and

20  as we explained to BAM counsel previously, they know what we're

21  asking for.

22         THE COURT:  Yeah.

23         MS. FARER:  Like, we don't -- we don't need the

24  world.  We know that we're never going to get --

25         THE COURT:  Yeah.

1          MS. FARER:  -- 100 percent comfort that there are no

2    vulnerabilities in the system.  So provide us the evidence

3    sufficient --

4          THE COURT:  Yeah.

5          MS. FARER:  -- that these controls that you're

6    relying upon are -- in fact, do what they say that -- you say

7    that they do.  That's all we're asking for.  Show us how they

8    work.

9          THE COURT:  Yeah.

10          MS. FARER:  So as we said, the surface level may not

11    be enough.  But because we don't know how the back end works,

12    we've asked them, take a look and see what you can provide

13    short of source code, et cetera.

14          THE COURT:  Yeah.  Okay.  I think we can go to

15    depositions then?  Okay.

16          Actually, I think I'm -- I'm pretty clear in -- in

17    terms of depositions, I'm not going to set a time limit to

18    start with.  However, as this is iterative, I think -- look, I

19    mean, you have said here -- and I'm going to hold you to

20    this -- that, I agree, the length will vary based on the

21    deponent's knowledge.  Some will take fewer than seven hours,

22    as you've said.  If the first one happens and it ends up

23    taking, you know, seven hours or eight hours, I think that

24    they're going to be in a much better position to come back and

25    argue for a time restriction or something here.

1           I agree that -- that the scope is -- I'm not going to

2     limit the scope to other than what they want, which is also

3     what you want.  You-all are saying the same thing, as I

4     understand it.  And if not, I'm still saying it, so that's all

5     that matters, but -- is that it should extend to the deponent's

6     knowledge about customer assets and other topics permitted

7     under consent order.

8           I mean, you can't be deposing folks on stuff outside

9     of the consent order.  I understand this is frustrating because

10    that's what lawyers do.  You have a different interpretation

11    than they do, but I want you to be real cautious on this

12    because I think you will get to talk to these people again,

13    potentially.

14          Let's just focus on that and keep these tight and --

15    if we can do that.  I believe that you will.  You've said that

16    in the last hearing.  I believe that you will.

17          I -- I mean, there's just math.  There's less lawyers

18    here, there's more lawyers there.  You have lots of other

19    things you want to do.  As I recall, you probably have even

20    other cases.  And so just -- let's keep them efficient.

21          MS. FARER:  Yes, Your Honor.  Just one point of

22    clarification.

23          THE COURT:  Yeah.

24          MS. FARER:  I don't think that's the issue in

25    dispute.

1           THE COURT:  Okay.

2           MS. FARER:  The issue is that the defendant wants to

3     limit the shardholder depositions --

4           THE COURT:  Yeah.

5           MS. FARER:  -- to only shardholder topics.

6           THE COURT:  Okay.

7           MS. FARER:  And our view is that, to the extent there

8     are roles beyond that, that are within the scope of the consent

9     order --

10          THE COURT:  Yes.  No.

11          MS. FARER:  -- they should be allowed.

12          THE COURT:  That's what we'll do.  Yes.

13          MR. MARTENS:  Your Honor -- [off microphone] --

14          THE COURT:  But I'm going to come to you.  No, no.

15    Okay.  Well -- I -- yeah.  You can -- I want to talk to them.

16          MS. FARER:  Thank you, Your Honor.

17          THE COURT:  As you might imagine, a lot of times

18    judges have their minds made up before, but I'm willing to

19    listen.  I have been known to change my mind.  And I just want

20    to be clear.  I'm just talking about the first deposition right

21    now.  Hopefully, it wasn't like, man, Judge --

22          MR. MARTENS:  So, Your Honor --

23          THE COURT:  I want to be clear -- right? -- first

24    deposition.  Because if the first deposition starts going into,

25    like, five minutes of shardholder and six hours and 55 minutes

1    of other stuff, I want you to file an emergency motion, and

2    then I'm going to tell them, like, what the hell are we doing

3    here.  So I just -- I'm not -- I want to be very clear.  I will

4    listen to you even on the -- just limit it to shardholder, and

5    I'll think about it.

6            I'm just telling you where my strong inclination is

7    for the first -- even the first and the second.  Because if

8    they start taking -- to me, I think a lot of your concerns on

9    the -- on -- and I'll hear, again.  A lot of your concerns are

10   you just don't have a reason to trust them right now.

11           So you're -- like, why wouldn't you think that

12   they're going to go into everything and it's going to go ten

13   hours.  Forget the seven hours or whatever.  And so you just

14   want some guardrails.  And I think that when the first

15   deposition happens, it's going to, hopefully, allay some of

16   those concerns.  If it doesn't, I'm going to get very

17   frustrated.

18           So that is -- that is the global thing.  But now tell

19   me specifically.  Go ahead.

20           MR. MARTENS:  So when we were here last time, I

21   specifically -- there was a request to take the depositions of

22   all the shardholders.

23           THE COURT:  Yeah.

24           MR. MARTENS:  I noted that the first shardholder got

25   a seven-hour deposition.

```
 1                    THE COURT:  Yeah, yeah.  Right.

 2                    MR. MARTENS:  And we were assured --

 3                    THE COURT:  Right.

 4                    MR. MARTENS:  -- it will be more streamlined.

 5                    THE COURT:  Right.

 6                    MR. MARTENS:  So we said, okay, essentially, put your

 7     money where your mouth is.

 8                    THE COURT:  Yeah.

 9                    MR. MARTENS:  Secondly, we're already talking about

10     more than the number of depositions allowed under the rules on

11     the merits.

12                    THE COURT:  Yeah.

13                    MR. MARTENS:  So it is not an unreasonable request to

14     say, to the extent we're going to go above the ten permitted

15     and depose every shardholder, when they ask for a deposition of

16     shardholders, that implies shardholders as such; otherwise,

17     you're just saying I want to depose Sally and Barry and Ralph.

18                    But when you say, I want to depose the shardholders,

19     the implication is shardholders as such.  And this isn't a

20     small thing.  Because to not limit it to their role as a

21     shardholder means more prep time in an -- in an organization

22     already strapped in terms of resources.

23                    THE COURT:  Yeah.

24                    MR. MARTENS:  And so that is why we are asking to say

25     limit their testimony to shardholders as such.  It's not that
```

1   they -- I don't know whether they know other things or not.  We

2   have to figure that out in prep.

3                  THE COURT:  Yeah, of course.

4                  MR. MARTENS:  But the point is, you don't get

5   unlimited numbers of depositions of everybody who might know

6   something.  We're already over the limit --

7                  THE COURT:  Yeah.

8                  MR. MARTENS:  -- that would apply on the merits.  And

9   so I'm saying, if we're going to go above the limit of ten --

10                 THE COURT:  Yeah.

11                 MR. MARTENS:  -- it is not unreasonable to say that

12  those ones that are taking us over the limit should be limited

13  in subject matter and in length.  That's what we're asking for.

14  If at the end of the day -- and I -- if at the end of the day

15  they -- they're here saying we talked to the shardholders and

16  all the other people, including 30(b)(6) witnesses --

17                 THE COURT:  Yeah, yeah.

18                 MR. MARTENS:  That's another thing we're talking

19  about.  They want a 30(b)(6) --

20                 THE COURT:  Yeah.

21                 MR. MARTENS:  -- and they want to talk to the

22  shardholders about all those other topics on which we're going

23  to have to prep them.

24                 And so on this one I am, as you can probably tell, a

25  little cranked up about this.

```
 1              THE COURT:  No, no.  That's fair.

 2              MR. MARTENS:  That we -- it is not unreasonable in an

 3     instance where they're going above the ten to say limit it to

 4     three and a half hours, limit it to their role as shardholders

 5     as such.  And if after they do that and the 30(b)(6) and all

 6     the other things, they still have a for-cause basis --

 7              THE COURT:  Yeah.

 8              MR. MARTENS:  -- to investigate with those people

 9     further, at least then we can limit our prep accordingly.

10              THE COURT:  Yep.

11              MS. FARER:  Your Honor, may we be heard on this?

12              THE COURT:  I'll always let everyone be heard.  You

13     don't need to ask.  But that doesn't mean I also haven't made

14     up my mind because, you know, again, that's part of the problem

15     with the job here from your perspective.

16              I just want to get one or two depositions done.  I

17     understand what you're saying.  And I think that if it

18     becomes -- again, if it's 5 percent shardholder, 95 percent

19     other stuff, I'm going to be real -- a lot more sympathetic to

20     what you're saying; because right now I still feel like -- and

21     I'm going to -- I'm admonishing them, they're hearing me --

22     right? -- you're hearing me.  This isn't in a vacuum; it's not

23     an ex parte thing.  They're hearing what I'm saying.

24              It's not going to be seven hours -- right? -- unless,

25     you know, the first question from the shardholder is something
```

1      like, yeah, let me tell you what Binance -- you know, something

2      like -- it's outlandish or something that I don't think exists,

3      which, again, I don't think you objected --

4                MR. MARTENS:  But, again, there's a real cost on my

5      client of having to -- on -- both in terms of dollars --

6                THE COURT:  Right.

7                MR. MARTENS:  -- and also time spent by these

8      individuals to prep them --

9                THE COURT:  Yeah.

10               MR. MARTENS:  -- because I can't show up at the first

11     one without prepping them on every other topic --

12               THE COURT:  Right, right.

13               MR. MARTENS:  -- they might know on this issue.

14               THE COURT:  Well, I'm hoping that we're just going to

15     prep one or two to start with at a time -- right? -- and then

16     after that one or two, and if things go totally sideways --

17     which I don't think that they are -- that it will then address

18     your concerns about burden.

19               But I think that there is a -- I mean, it does seem

20     still -- they do seem connected to me, and -- and it's hard for

21     me to just say that I can take out these other issues.  But let

22     me hear from Ms. Farer real quick, and I'll come back to you.

23               I mean, Ms. Farer, do you think it's fair to say that

24     the shardholder portion of the deposition will be mostly

25     focused or not mostly -- let's be candid here because, I mean,

1      you know -- I mean --

2               MS. FARER:  It depends on the individual, Your Honor.

3      I want to give you a little bit of background --

4               THE COURT:  Yeah.

5               MS. FARER:  -- on the first shardholder.

6               THE COURT:  Okay.  And we're not going to say

7      anyone's name.  I don't think --

8               MS. FARER:  Exactly.  So it took longer for the

9      following three reasons:  One, he --

10              THE COURT:  Oh, okay.  The one that already happened,

11     yes.  No, no.

12              MS. FARER:  He was the head of internal audits --

13              THE COURT:  Right, right.  No.  You explained that --

14              MS. FARER:  -- and he had a lot of extensive

15     information --

16              THE COURT:  You explained that in the prior hearing,

17     yes, why that one took a lot longer.  But what about --

18              MS. FARER:  Including the shard review.

19              THE COURT:  Yeah.

20              MS. FARER:  Like, we had a lot of -- it was clunky --

21              THE COURT:  Yeah.

22              MS. FARER:  -- was looking at the shard.

23              THE COURT:  Yeah.

24              MS. FARER:  So we anticipate that we're going to do

25     some advance review before going on the record.

1              THE COURT:  Right.

2              MS. FARER:  We anticipate that these are going to be

3      shorter, as we've explained to counsel.

4              THE COURT:  Right.

5              MS. FARER:  But there are certain individuals that

6      are shardholders that have roles and have been identified by

7      counsel as having knowledge that is directly within the four

8      corners of the consent order in terms of custody and control.

9              THE COURT:  Right.  Right.  No.  I understand.

10             MS. FARER:  And that doesn't necessarily relate to

11     the -- their actual role as shardholders.

12             So we are -- we don't want to say that it's going to

13     be 5 percent shard and the rest other things.  But we do

14     understand -- I anticipate that there is going to be discussion

15     on these other topics.

16             THE COURT:  Can you help us within the two-week

17     deadline and can you start to divorce out who are the

18     shardholders with primary shardholder -- you know, and then

19     maybe even prioritize having those as the beginning depositions

20     so they can prep more narrowly those?  I mean, does it --

21             MS. FARER:  So we have done exactly that, Your Honor.

22             THE COURT:  Okay.

23             MS. FARER:  The person that we anticipate next week

24     is going to have a dual role, and there's another individual

25     that we anticipate is solely going to be a shardholder.

```
1                  THE COURT:  Okay.

2                  MS. FARER:  And so --

3                  THE COURT:  Shouldn't you do the shardholder-only

4       first so you guys look good and it's only three and a half --

5                  MS. FARER:  We were hoping for that, Your Honor --

6                  THE COURT:  Okay.  Okay.

7                  MS. FARER:  -- but it was a date issue.

8                  THE COURT:  Okay.

9                  MS. FARER:  That is exactly how we wanted to do it.

10      And not just because of the reason Your Honor identified.

11                 THE COURT:  No, no, no, no.

12                 MS. FARER:  It was because we are coupling it with

13      the shard review.

14                 THE COURT:  Sure.  Yeah.

15                 MS. FARER:  So we thought it was going to be most

16      efficient.  But that's just date -- we're happy to coordinate

17      dates --

18                 THE COURT:  Okay.

19                 MS. FARER:  -- juggle dates.

20                 THE COURT:  Yeah.

21                 MS. FARER:  But it sounds like for travel and other

22      reasons --

23                 THE COURT:  No, no.  I got you.

24                 MS. FARER:  -- we're accommodating counsel on that.

25                 THE COURT:  Do you have a sense of -- have you gone
```

1    through and done that sort of analysis on who is the shard-only

2    and who is shard-plus?

3               MS. FARER:  Yes, Your Honor.

4               THE COURT:  And do they have that?

5               MS. FARER:  We think that there's only one individual

6    that is shard-only.

7               THE COURT:  Okay.  Well, that's probably not what

8    they wanted to hear, but okay.

9               MS. FARER:  But the -- the level of knowledge of the

10   others ranges.  And as -- as counsel has identified himself,

11   there's one individual who they've agreed, as put in the status

12   report, that they will allow for a more extensive --

13              THE COURT:  Is that the person who is upcoming that

14   they agreed upon?

15              MS. FARER:  No.

16              THE COURT:  It's someone else?  Yeah.

17              MS. FARER:  Correct, Your Honor.

18              THE COURT:  Do you anticipate that of this person who

19   is upcoming, the person who is the person with shard knowledge

20   and other, you continue to believe that it's not going to be a

21   seven-hour deposition for that person; is that right?  You hope

22   that's going to --

23              MS. FARER:  Correct.

24              THE COURT:  Okay.  And --

25              MS. FARER:  Again, unless something happens --

1          THE COURT:  Yeah.  No, no.  Of course.  Yeah.

2          MS. FARER:  This individual also was a prior

3     shard- -- and when I say prior shardholder, before the consent

4     order and there was a shifting of the shards.  So he has

5     maintained.

6          THE COURT:  Yep, yep.

7          MS. FARER:  So there's going to become, obviously, a

8     discussion about that transition.

9          THE COURT:  Okay.  And do you have a -- is it fair to

10    say that you still believe that will be the bulk of the

11    questions or -- I mean, I understand it's hard to draft exactly

12    what's going to happen and depends on what they say.  But do

13    you feel that that is the, sort of, primary focus of the

14    inquiry?

15         MS. FARER:  I think it is going to be a significant

16    amount, but this person, again, has been identified as having

17    access and control --

18         THE COURT:  Yeah.

19         MS. FARER:  -- to some of the other systems that

20    defendants rely upon for their control --

21         THE COURT:  Okay.  Great.

22         MS. FARER:  -- so we'll want to explore that as well.

23         THE COURT:  Okay.  All right.  I'm ready to talk.

24    Here's what I want to do.  Just hear me out.  Hear me out.

25    Okay.  You go first.  That's fine.

```
1              MR. MARTENS:  Two points.

2              THE COURT:  Yeah.

3              MR. MARTENS:  Which is, one, for those who are

4     shard-plus, as we're calling it --

5              THE COURT:  Well, apparently, it's nine of the ten.

6              MR. MARTENS:  Which is exactly where I thought this

7     was going.  I was concerned about that.

8              That we should at least be able to get a list of what

9     the plus is so that we're not guessing at all the other issues

10    or that we have to prep on.  So it's one thing to say we have

11    to prep, it's another thing to say I've got to prep on

12    everything imaginable.

13             And so I do think it would be fair for the Court to

14    order that we be provided a list of the other topics that --

15    that compromise that plus.

16             THE COURT:  Well, I think they're going to say

17    that it's -- they're just going to list the consent order, but

18    I'm -- I'm going to suggest a little more than that to them.

19    I -- I think that's a fair, sort of -- we're trying to -- this

20    is expedited discovery.  While you normally wouldn't do that,

21    that's the expedited part, right?

22             So I'm going to -- I hear you on that.  I'm going to

23    talk to Ms. Farer about that and -- but I want to still address

24    your concerns.  I think on the first one -- right?  We have two

25    coming up, it sounds like.  One --
```

1          MR. MARTENS:  Well, the other point I wanted to make

2     was the date, if we're going to go broader, they've got to

3     accept it's going to go slower.

4          THE COURT:  Yeah.  No.

5          MR. MARTENS:  So those dates, I can't promise that

6     we're going to stick to those dates at all.

7          THE COURT:  Well, on one, hopefully, it's still fine

8     because it's shard-only.  But the -- the -- the other

9     one that's -- yeah.  If you need -- I mean, yeah.  I'm with

10    you.

11         MR. MARTENS:  When you ask for more, it takes longer.

12    It's that simple.

13         THE COURT:  I've already said, I -- it's going to be

14    real difficult for me to see how the -- the slowness of pace is

15    not hurting you-all more than them.  So I'll -- without some

16    greater indicia that right now -- I hear they're saying there's

17    some $50-million delta, whatever that is --

18         MR. MARTENS:  Which I'd like to know more about.

19    This is the first I've heard about it today.

20         THE COURT:  I'll -- I'll let them get into that with

21    you offline.  But still, I think that the -- the pace being

22    reduced is something that you-all are going to be most acutely

23    fighting against.  And when it is slow, because you're trying

24    to do things, that they're just going to have to deal with that

25    generally.  Not always; generally.

1    And so if it takes more time, that's -- but they're

2    getting the deposition subjects they want, and that's sort

3    of -- there's give and take.  But on this first one -- okay? --

4    or the first two, whatever, we'll talk, I'm sure, afterwards.

5    And if it -- you know -- if it, you know, feels like it was --

6    we're getting -- I'm encouraging them to focus as much on the

7    shard, but I agree with them; I do.  That I think they can get

8    into some of these other issues.

9    But also, at the 8th and the 9th and the 10th, it

10   starts to feel like maybe we've already covered our ground.  So

11   now I've said I wanted these depositions, but I'm willing to

12   listen to you-all.  That at some point, you know, after two or

13   three on the plus part, why aren't we narrowing the plus part?

14   And that's just an encouragement.

15   So -- but if they're at -- if they're at three and a

16   half hours and they're doing shard and shard-plus in three and

17   a half hours, you know, I'm probably going to be not too

18   sympathetic.  I understand you've still spent a lot of time

19   prepping them, but, hopefully, we've built in a little bit of

20   guardrails on that.  Okay?

21   MR. MARTENS:  Thank you.

22   THE COURT:  Okay.  So, Ms. Farer, I'm not asking you

23   to send a deposition outline, you know, obviously.  But to

24   the -- it's just -- it's just going to make things easier when

25   you come back up here and say that things are moving too slow

 1    or things like that.  You say like, hey, we give them, you

 2    know, not just, like, the consent order, but specific topics or

 3    things.

 4              MS. FARER:  Your Honor, we're completely open to

 5    that.

 6              THE COURT:  Okay.

 7              MS. FARER:  We would just ask, because we have

 8    limited documents to date, that defense counsel work with us

 9    and provide some -- some additional background and information

10    about these people so we understand in advance what the full

11    scope of their role --

12              THE COURT:  Sure.

13              MS. FARER:  -- related to these topics may be.  And

14    we -- we're happy to work with counsel --

15              THE COURT:  Yeah.

16              MS. FARER:  -- and -- and focus the issues and

17    identify categories that we'll discuss.

18              THE COURT:  Great.

19              MS. FARER:  I will note that if your -- your next

20    review is going to be of these first two, the second one isn't

21    only the shardholder, so --

22              THE COURT:  Okay.

23              MS. FARER:  -- he is going to have a more extensive

24    role, especially on the technology information.  But we've

25    already talked to counsel about having one of the shardholders

```
 1    with more extensive technology information.

 2              THE COURT:  Sure.  Yeah.

 3              MS. FARER:  And the ten -- all ten aren't

 4    shardholders, so we --

 5              THE COURT:  Okay.

 6              MS. FARER:  -- maintain that there is that initial

 7    set --

 8              THE COURT:  Yeah.

 9              MS. FARER:  -- that is going to likely take more time

10    because their knowledge is going to be separate from being a

11    shardholder.

12              THE COURT:  Okay.  Great.  You can stay up.  Yes.  So

13    interrogatories.

14              MS. FARER:  It's not clear to us why they didn't

15    supplement them.

16              THE COURT:  Okay.  Well, I just want to -- so they

17    believe that they have provided additional information.  It's

18    not just that you're missing the certification; is that

19    correct?  You don't feel that you've gotten the actual

20    substantive information; is that right?

21              MS. FARER:  Correct.  Well, it's a mixture of both.

22              THE COURT:  Mixture of both.  Okay.  Okay.  Yep.

23    That's it.  I want -- I want to talk to them.  Actually, wait.

24    One -- on the -- I guess within two weeks as well, I'd like to

25    just have some more general outlines of what the deposition
```

1    timetable -- I understand it's going to go past the two weeks,

2    of course, but let's have in two weeks some -- let's start

3    getting some -- like we would in traditional discovery, some --

4    some more, sort of, deadlines; proposed deadlines and things

5    like that.  And I understand it might be disagreement.

6            So I'm not asking for person one on January, you

7    know, whatever, October 22nd; person two on, you know,

8    October 31st.  I'm just saying, like, we anticipate we'll be

9    getting maybe group one and group two done in this -- the next

10   two weeks, four weeks, six weeks, whatever it is.  But I'd like

11   that in that, sort of, two weeks from today.  So --

12           MS. FARER:  And it's our understanding, Your Honor,

13   that three dates are set and that --

14           THE COURT:  Great.

15           MS. FARER:  -- counsel is working on others.  And I

16   don't know if the -- the current set dates are now subject to

17   Mr. Martens' view that things may need to be juggled.

18           THE COURT:  We'll wait and see.

19           MS. FARER:  But we've asked for dates in our --

20           THE COURT:  Let's hope on October -- well, let's do

21   this.  Give you the full two weeks and then a little bit extra.

22   On October 30th.  On October 30th.

23           So two weeks and a couple days, you-all will find --

24   send to me a, you know, joint status report on, sort of, what

25   the proposed, sort of, timetable is going forward.  Does that

```
 1    sound good, Ms. Farer?

 2              MS. FARER:  Yes, Your Honor.

 3              THE COURT:  Okay.

 4              MS. FARER:  We do have a couple outstanding items.

 5              THE COURT:  No.  I want to talk about the

 6    interrogatories.

 7              MS. FARER:  Sounds good.

 8              THE COURT:  Okay.  So, yeah, tell me about the -- I

 9    mean, the certification I'm not worried about.  I'm sure

10    you-all are going to handle that.

11              But it seems like they feel that there should be more

12    substantive supplement.  Did you-all feel that you were done

13    with that, or is that still ongoing?

14              MR. MARTENS:  So I think this just isn't ripe yet,

15    Your Honor.

16              THE COURT:  Okay.

17              MR. MARTENS:  And I think that we have to provide the

18    supplemental responses and then --

19              THE COURT:  Yeah.

20              MR. MARTENS:  -- once they've had a chance to look at

21    that --

22              THE COURT:  Great.

23              MR. MARTENS:  -- if there's more particular things,

24    then we can address those.

25              THE COURT:  Great.
```

```
 1              MR. MARTENS:  But it seems like -- and we just
 2    haven't been prioritizing that because we've been focused on
 3    documents.
 4              THE COURT:  Right.  There's a lot -- yeah.
 5              MR. MARTENS:  It may be that they're unsatisfied with
 6    it.  It may be that they're satisfied.  I just don't think it's
 7    ripe yet.
 8              THE COURT:  Yeah.  I mean, they know, and I'll remind
 9    them.  It's just -- they can't get everything everywhere always
10    at once, right?  So, I mean, the interrogatories, to me, seem a
11    little -- I mean, if I had to prioritize it, I do feel like the
12    documents are more important.  And so --
13              MR. MARTENS:  That's how we've been treating it.
14              THE COURT:  Yeah.
15              MR. MARTENS:  So we intend to give our supplemental
16    responses.  We'll -- if what you're asking is within the two
17    weeks --
18              THE COURT:  Yeah.
19              MR. MARTENS:  -- you have a timeline for that --
20              THE COURT:  You can tell the future.
21              MR. MARTENS:  Suggesting where you'd be going on
22    that --
23              THE COURT:  Yeah, yeah.
24              MR. MARTENS:  -- we can do that as well.
25              THE COURT:  That would be wonderful.  Thank you.
```

1    Okay.  All right.

2              I want to go back to Ms. Farer.  My next thing on my

3    punch list was the -- I thought, again, very appreciative of

4    BAM, that they were discussing in, sort of, the consent order

5    Part 4, that BAM is discussing the request internally and finds

6    the issue premature as to these individualized, not aggregate,

7    wallet and account data.

8              And just -- can we just wait for two weeks to see how

9    things continue to shake out on that?

10             MS. FARER:  Your Honor, there's nothing to meet and

11   confer on.

12             THE COURT:  Okay.

13             MS. FARER:  The consent order language is very

14   clear --

15             THE COURT:  Right.

16             MS. FARER:  -- to provide individual account

17   information.

18             THE COURT:  Okay.

19             MS. FARER:  And so --

20             THE COURT:  But let's hope they're --

21             MS. FARER:  If -- if they're willing to provide that,

22   then great.

23             THE COURT:  Well, I think they're figuring out --

24   right? -- you know, what that means for them.  So within two

25   weeks -- I just don't think today to talk about more than --

1      they've got to do what the consent order says; they know that.

2           And that, hopefully, in that two weeks in that status

3      report, whatever -- the October 30th status report is going to

4      have a -- a, sort of, crystallized position as to what it is

5      they want to produce and what they don't want to produce.

6           MS. FARER:  And, Your Honor, we would just ask that

7      in setting the deadlines for whatever they come back with on

8      that, that that one be of -- of greater priority because it

9      does relate to the 50 million, and we do need to get to the

10     bottom of that.

11          THE COURT:  Okay.  So is it fair to say then -- I

12     mean, they will then certainly bring this up and -- when they

13     get together next.  Is that -- I mean, is it fair to say this

14     is priority number one?  I mean, something has to be priority

15     number one.  That's how it works.

16          MS. FARER:  I think some of the disputed documents

17     are priority one.  But this should come above, for example,

18     interrogatory responses.

19          THE COURT:  Okay.  Great.  I think that makes sense

20     to me too.

21          MS. FARER:  And some of these requests, we

22     anticipate, while the account information, but related requests

23     for the documents, facilitates this review, like, general

24     ledger and monthly trial balances, that it is -- we cannot

25     anticipate what the burden would be to just pull down reports

1    from January to, you know, June or the present.

2              THE COURT:  Yeah.

3              MS. FARER:  And -- so, hopefully, they'll be able to

4    get us some type of rolling production on related information

5    on a priority pace.

6              THE COURT:  Okay.  Great.  I'm going to talk to them.

7    Counsel?  Yeah.

8              MR. MARTENS:  Is this about the accounts?

9              THE COURT:  Well, I think -- I think we're on the

10   same sheet of music, which is --

11             MR. MARTENS:  We're trying to figure out if we can do

12   it.

13             THE COURT:  Yeah.  Perfect.

14             MR. MARTENS:  I mean, that's -- we -- we got the

15   request last week.  We're trying to figure out.

16             THE COURT:  Perfect.

17             MR. MARTENS:  I don't know whether it will be, but

18   we're working on it.

19             THE COURT:  Yep.  That sounds great.  And I think

20   that's what your status report said, and I was super

21   appreciative of that.  And I think you're right.  Just keep

22   working on it and let us know.

23             I think, in that updated -- again, it's not -- it's

24   what you can do, right?  Just tell us -- tell me what you can

25   do.  And even if you can't do what they want, just tell me what

1      you can or have done and -- because --

2              (Simultaneous talking.)

3              THE COURT:  Great.  Thank you.  All right.  I'll go

4      back to Ms. Farer.  Sorry for the -- it just is easier for me,

5      instead of going -- to go, sort of, back and forth.

6              All right.  The sort of last things I had

7      outstanding -- happy to cover anything you have and, of course,

8      we'll go back to defense counsel -- is that BAM, sort of, wants

9      an end date on expedited discovery.  I don't -- I don't see

10     a -- a point to that because I think whatever is going to be --

11     they produce, you're going to want, potentially, to think that

12     there's going to be discussions whether it has to be

13     supplemented or not.

14             So I could say it's done in two weeks and then just

15     say now I'm extending it.  So I kind of am with the government

16     on that.

17             We just need to -- we need to make some progress,

18     some real progress, which I think that we're going to do with

19     this next status report and the intervening productions to then

20     say -- at some point I will have to say, because I think your

21     appetite for getting additional information is going to be such

22     that I will have to say at some point enough is enough.

23     Let's -- I think we've gotten to what we need to.  But I'm not,

24     certainly, close to there yet.

25             So I'm -- I'm -- I don't have a, sort of, deadline in

1    mind other than I want to get this moving, as -- which everyone

2    does.

3            MS. FARER:  And we appreciate that, Your Honor.  As

4    we explained to counsel when they imposed -- imposed that

5    condition tied to their production of documents, we said

6    that -- exactly as Your Honor just said.

7            We do want to get to the finish line, too.  We just

8    need the confirmation and actual evidence that the assets are

9    safe and secure.

10           THE COURT:  You got it.  So I'll hear from counsel

11   from Binance and from Mr. Zhao.  But as I understand it on

12   there, that you sent your document requests and you-all are

13   reviewing and there's not yet any issues, right?

14           MS. FARER:  We are working on dates for a

15   meet-and-confer.

16           THE COURT:  Okay.  Great.  And then, finally -- and

17   I'll come back to them, but I want to address with you while I

18   have you up here, I know that you are all -- you-all are all

19   anxious to get this protective order, and I think Judge Jackson

20   wants to hold on to that.  I'll continue to follow up with her.

21           I think what would be helpful from my perspective

22   is -- I'm just handling expedited discovery, right?  So if you

23   want to recraft and make a motion for -- or even just send a

24   proposed order of what a -- a protective order as to expedited

25   discover will be, that would be great.

1          I just want to remind you all to be sure to look at

2     the local rules, which have some, you know, guidance as to when

3     things will be presumptively sealed or not sealed.  I think

4     that's where some, the Court's perspective, always there's

5     heartburn on.

6          But I think what I'm happy to rule on is expedited

7     discovery.  So if you just want to craft a more narrow

8     request -- not narrow in terms of substance but just in terms

9     of its scope, right?  I -- I'm not here yet -- but if Judge

10    Jackson wants me to, I certainly can -- get involved in

11    deciding what the -- sort of should be happening outside of

12    expedited discovery.

13         Understand, you know, that's all we're talking about

14    right now, but I think she's not interested in having a broad

15    protective order when we're right now just dealing with

16    something narrow.

17         So let's focus on the narrow.  Because as I think she

18    viewed it and maybe this -- I think that the way that the

19    protective order was described, it was just sort of for

20    discovery in general, not just as expedited discovery --

21              MS. FARER:  Correct, Your Honor.

22              THE COURT:  Yep.  So --

23              MS. FARER:  And I think one thing we just want to

24    flag is, given the probably large volume of sensitive

25    information that may be produced, including going forward,

1    we've all met and conferred and created a process for sealing

2    where the sealing process doesn't happen on the front end,

3    which is what is anticipated in the local rules.

4            So I think that is one proposed modification that we

5    would just ask the Court to consider for this case, which has

6    worked out to date with respect to expedited discovery, as Your

7    Honor has watched that play out.

8            THE COURT:  -- yeah.  Yeah.

9            MS. FARER:  And part of the reason that we're anxious

10   for having the protective order entered is that certain parties

11   are, you know, not willing to move forward in producing

12   information --

13           THE COURT:  Got it.

14           MS. FARER:  -- short of having a protective order

15   entered --

16           THE COURT:  Got it.

17           MS. FARER:  -- while others are amenable to producing

18   subject to --

19           THE COURT:  Yeah.

20           MS. FARER:  -- the one that is pending.

21           THE COURT:  Yeah.

22           MS. FARER:  So having something on the record seems

23   helpful.

24           THE COURT:  Yeah.  Okay.  Well, if you -- the soonest

25   possible, you-all get us what you want it for.  And we need to

1    be clear that it's for expedited discovery, then I'm happy

2    to -- Ms. Jensen and I will work on that and get that to you.

3           That's really helpful to understand why you need

4    that.

5           MS. FARER:  Yeah.  And it would be helpful, Your

6    Honor, if you want to hear from us as to, sort of, the proposed

7    modifications and the process in the local rules.

8           As I explained, it seems to be working well and Your

9    Honor seems to be okay with it, but we're happy to talk about

10   why we think that makes sense here in advance of submitting

11   something.

12          THE COURT:  No.  I think if you don't -- can we just

13   put it in the submission; is that okay?

14          MS. FARER:  Great.

15          THE COURT:  Thank you.  Okay.  Let's start -- we had

16   a couple issues.  I think one is on the expedited discovery,

17   and then -- well, let's start backwards.

18          I think on the -- the protective order, I think we're

19   all on the same --

20          MR. MARTENS:  Yeah.  I understood what she said.

21   Let's get one that's tied to expedited, and we can do that.

22          THE COURT:  And the only thing, I think, left that I

23   have for your client is -- I just hear you -- I really do -- on

24   the -- this has got to end.  It just cannot --

25          MR. MARTENS:  Yeah.  We just want an end in sight.  I

1    mean, to say --

2           THE COURT:  There is an end in sight.

3           MR. MARTENS:  -- if we're going to do all this,

4    already blowing through the ten limit on depositions, 61 more

5    requests, and then we're going to get another round; I hear you

6    that you're not going to make that decision yet, but we want to

7    put down a marker.

8           It's -- it's comforting to know the Court understands

9    our concern.  You know, we -- we feel like we're running out

10   of --

11          THE COURT:  Yep.

12          MR. MARTENS:  -- real estate here on this, or they

13   should be running out of real estate.

14          THE COURT:  No.  They are.  They're going to.  It's

15   just -- it's just we've got to get this resolved.  As I said, I

16   think they're very clear with you.

17          I know -- we're going to get a comfort level of mine,

18   not theirs.  So you can relay that to your client.

19          MR. MARTENS:  Understood.

20          THE COURT:  It's my comfort level as to the -- the

21   assets are safe, secure, and that we can go forward, so --

22          MR. MARTENS:  Understood.

23          THE COURT:  I'll be cognizant.  Yep.  I think

24   that's -- is that it from your end, from your client's

25   perspective?  I don't --

```
 1              MR. MARTENS:  I think that's it from our end, Your

 2    Honor.

 3              THE COURT:  Okay.  Thanks so much.  All right.  Who

 4    else from -- who wants to go next?  Because I think there's

 5    some other issues.

 6              I don't know -- here in terms of -- I mean, it sounds

 7    like you're meeting and conferring on these other issues, so I

 8    don't know if there's anything.  But I'm happy to hear.  Okay.

 9              MR. MENDRO:  Jason Mendro, Your Honor.  I'm pleased

10    to say I can be very brief.  We have no other issues, we have

11    no disputes that are ripe for decision --

12              THE COURT:  Okay.

13              MR. MENDRO:  -- and nothing to add to our report.

14    I've been authorized by counsel for Mr. Zhao to say that that's

15    their position, too.

16              THE COURT:  Okay.  All right.  Great.  And so -- and

17    just to keep it real quick.  And I'm sure you're both -- I

18    mean, obviously, you're here, which I appreciate.  Thank you

19    for being here so you can hear, right?

20              This is, for better or for worse, a sneak preview of

21    what you could, potentially, have, you know, in terms of any

22    discovery disputes that you-all -- obviously, you have some

23    other legal issues as well for your clients that are totally

24    distinct from here, but I think -- I'm hoping still from a

25    framework perspective, this is instructive as you-all go back
```

```
 1    and forth.

 2              But also, I'm sure that you will tell me the same

 3    thing as, like, this is expedited discovery.  And so I -- you

 4    know, I appreciate that you-all also want this to end.  But I

 5    hope that this will provide a framework for you-all for going

 6    forward and how to try to get some guidance on what my concerns

 7    are so that you-all will, you know, maybe move forward on

 8    things that you otherwise wouldn't have.

 9              But also give you some comfort as to there's got to

10    be some guardrails, and it just can't be the SEC, sort of,

11    continuing its, you know, investigation ad nauseam.  We've got

12    to get to the case here, right?

13              So, hopefully, it's helpful being here.

14              MR. MENDRO:  Yes, Your Honor.  It's been instructive.

15    We've listened with great interest.

16              THE COURT:  Okay.  Great.  All right.  Well, thank

17    you and thanks to Mr. Qureshi.

18              All right.  Anything else?  No?  Anyone else?

19    Defense counsel, anything you need to cover?  No?  Okay.  So

20    we've got our marching orders.

21              We've got October 30th.  Hopefully, very soon before

22    then we're going to get our proposed protective order in terms

23    of expedited discovery.  I think that's all we have to look

24    forward to.

25              And then on the 30th we'll, sort of, confer, I mean,
```

1    and probably circle back with you-all to see what makes sense

2    in terms of a next hearing date; if it's just a hearing to just

3    ensure that things keep kind of moving along, or is it a time

4    to start just putting some sort of -- I don't want to say

5    arbitrary.  I want to say judicially imposed, sort of, ceilings

6    and deadlines and basements.

7            Sound good, Ms. Farer?  Okay.  Great.  Yeah.  You're

8    good.

9            MS. FARER:  Yes, Your Honor.

10           THE COURT:  Okay.  Thanks, everybody.  Again, I

11   just -- I don't agree that it's not working.  I think it's

12   working.  It is oppositional, right?  But it is working.

13           I mean, I will just close with, we had our historical

14   society presentation yesterday.  Chief Judge Boasberg was

15   talking and, of course, most importantly, making fun of the

16   circuit, as we should always do, for those nerds.

17           And he talked about all the glorious things that

18   happen in trial courts.  And then he said discovery disputes.

19   He was like, oh, I guess no one thinks that.  And Ms. Jensen

20   was sitting next to me, and I elbowed her.  I said, except for

21   you; that's your -- your memory of your clerkship.

22           But I promise you, as you all know, there are far

23   worse than this.  I mean, you are making progress.  We are

24   getting things done.  And so I'm really appreciative.

25           Again, you-all -- this could not be higher stakes,

1     I'm sure, it feels from both of your -- all of your clients'

2     and your perspective, and you are still working together.  It's

3     really important.

4              And so thanks for doing that.  I really appreciate

5     it.

6              Thank you.  So take care, everybody.  Have a great

7     weekend.

8              (Proceedings concluded at 11:55 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3            I, TAMARA SEFRANEK, Official Court Reporter, certify

4     that the foregoing constitutes a true and correct transcript of

5     the audio-recorded proceedings in this matter, audio recorded

6     on October 13, 2023, and transcribed from the audio recording

7     to the best of my ability, and that said transcript has been

8     compared with the audio recording.

9

10

11

12

13                          Dated this 18th day of October 2023.

14

15                          /s/ Tamara M. Sefranek_____
                            Tamara Sefranek, RMR, CRR, CRC
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

**$50** [1] - 40:4

**/**

**/s** [1] - 81:15

**1**

**1** [10] - 7:16, 11:9, 14:22, 24:13, 25:9, 29:7, 41:7, 42:13, 44:2
**100** [3] - 1:15, 1:18, 47:1
**1000** [1] - 2:11
**10001** [1] - 2:7
**10004** [1] - 1:19
**1050** [1] - 1:23
**10:37** [1] - 1:7
**10th** [1] - 62:9
**11** [3] - 9:3, 25:7, 29:1
**11:55** [1] - 80:8
**11th** [2] - 2:10, 5:6
**122** [1] - 5:20
**13** [2] - 1:7, 81:6
**150** [2] - 5:19
**18th** [2] - 5:17, 81:13

**2**

**2** [7] - 11:9, 16:5, 25:9, 42:13, 42:14
**20** [1] - 5:23
**20-100** [1] - 1:19
**20001** [1] - 2:23
**20004** [1] - 2:11
**20036** [1] - 1:24
**20037** [1] - 2:5
**202-354-3246** [1] - 2:23
**2022** [1] - 15:2
**2023** [4] - 1:7, 18:11, 81:6, 81:13
**20549** [1] - 1:16
**2100** [1] - 2:4
**21st** [1] - 10:19
**22nd** [1] - 65:7
**23** [5] - 7:16, 17:19, 25:9, 32:18, 42:13
**23-01599** [1] - 3:6
**23-CV-1599** [1] - 1:3

**3**

**3** [1] - 14:22
**30** [7] - 5:23, 7:16, 18:19, 25:9, 36:11, 42:12, 44:5

**30(b)(6** [3] - 52:16, 52:19, 53:5
**300** [1] - 1:23
**30th** [5] - 65:22, 69:3, 78:21, 78:25
**31** [5] - 7:16, 18:19, 25:9, 36:11, 42:12
**31st** [1] - 65:8
**333** [1] - 2:22

**4**

**4** [1] - 68:5

**5**

**5** [2] - 53:18, 56:13
**50** [1] - 69:9
**50-million** [1] - 61:17
**55** [2] - 2:7, 49:25
**555** [1] - 2:10

**6**

**61** [1] - 76:4
**6714** [1] - 2:22

**8**

**8:00** [1] - 5:6
**8th** [1] - 62:9

**9**

**9** [1] - 30:12
**90** [1] - 6:1
**95** [1] - 53:18
**9:00** [1] - 5:6
**9th** [1] - 62:9

**A**

**a.m** [2] - 1:7, 80:8
**abid** [1] - 3:21
**ABID** [1] - 2:9
**Abid** [1] - 3:24
**ability** [1] - 81:7
**able** [4] - 4:4, 16:2, 60:8, 70:3
**abuse** [1] - 38:21
**abused** [1] - 38:9
**academic** [1] - 6:9
**accept** [1] - 6:3
**access** [4] - 20:13, 35:8, 35:15, 59:17
**accommodating** [1] - 57:24
**accordingly** [1] - 53:9
**account** [3] - 68:7, 68:16, 69:22

**accounts** [1] - 70:8
**act** [1] - 8:16
**acting** [1] - 8:16
**Action** [1] - 1:3
**actors** [1] - 17:2
**actual** [6] - 8:17, 14:9, 21:18, 56:11, 64:19, 72:8
**acute** [1] - 7:6
**acutely** [1] - 61:22
**ad** [1] - 78:11
**add** [1] - 77:13
**additional** [7] - 30:15, 30:19, 31:6, 37:18, 63:9, 64:17, 71:21
**address** [4] - 54:17, 60:23, 66:24, 72:17
**admonishing** [1] - 53:21
**advance** [3] - 55:25, 63:10, 75:10
**afloat** [2] - 26:13, 40:11
**afterwards** [1] - 62:4
**aggregate** [1] - 68:6
**ago** [2] - 10:2, 14:12
**agree** [27] - 5:5, 5:8, 5:11, 8:8, 8:12, 8:15, 17:10, 24:11, 25:5, 25:6, 26:4, 27:7, 27:8, 30:13, 32:5, 33:5, 34:20, 38:18, 39:13, 39:15, 40:12, 42:21, 45:13, 47:20, 48:1, 62:7, 79:11
**agreed** [17] - 6:24, 10:12, 10:14, 10:17, 11:12, 19:24, 26:20, 27:16, 28:13, 28:23, 42:4, 42:7, 42:17, 42:24, 58:11, 58:14
**agreed-upon** [4] - 10:12, 10:14, 10:17, 42:4
**agreeing** [3] - 6:19, 7:25, 8:5
**agreement** [2] - 4:22, 10:11
**ahead** [1] - 50:19
**al** [2] - 1:7, 3:7
**ALFARAIDY** [1] - 2:9
**Alfaraidy** [1] - 3:22
**aligned** [1] - 8:16
**alignment** [1] - 8:2
**allay** [2] - 38:20, 50:15
**allays** [1] - 38:19
**allegations** [1] - 6:12
**alleviate** [1] - 32:12
**allow** [1] - 58:12
**allowed** [2] - 49:11,

51:10
**almost** [1] - 5:18
**alone** [1] - 40:4
**amenable** [2] - 20:3, 74:17
**amount** [1] - 59:16
**analysis** [1] - 58:1
**AND** [1] - 1:3
**answer** [2] - 18:20, 43:13
**answered** [1] - 31:12
**anticipate** [9] - 55:24, 56:2, 56:14, 56:23, 56:25, 58:18, 65:8, 69:22, 69:25
**anticipated** [2] - 41:9, 74:3
**anxious** [2] - 72:19, 74:9
**apologies** [1] - 22:14
**apologize** [1] - 29:8
**apparent** [1] - 13:17
**appear** [2] - 9:13, 20:3
**appetite** [1] - 71:21
**applicable** [1] - 14:16
**apply** [1] - 52:8
**appreciate** [4] - 4:8, 5:3, 6:17, 8:23, 16:20, 17:6, 20:9, 21:25, 24:9, 24:25, 32:2, 32:19, 36:6, 37:14, 41:20, 44:15, 72:3, 77:18, 78:4, 80:4
**appreciative** [3] - 68:3, 70:21, 79:24
**appropriate** [2] - 15:12, 23:8
**arbitrarily** [1] - 40:16
**arbitrary** [2] - 27:3, 79:5
**areas** [1] - 20:10
**argue** [2] - 46:1, 47:25
**argument** [3] - 16:19, 17:8, 45:22
**aspersion** [1] - 36:20
**assets** [15] - 6:4, 6:14, 8:18, 16:2, 17:21, 18:8, 23:5, 25:24, 35:9, 40:1, 40:4, 48:6, 72:8, 76:21
**assume** [1] - 21:23
**assurances** [1] - 8:21
**assured** [1] - 51:2
**atypical** [1] - 36:17
**audio** [5] - 2:18, 81:5, 81:6, 81:8
**audio-recorded** [1] - 81:5
**audit** [2] - 18:6, 18:10

**auditor** [9] - 13:21, 17:20, 32:18, 32:20, 32:24, 33:2, 35:9, 38:4
**auditors** [2] - 17:23, 34:5
**audits** [1] - 55:12
**authorized** [1] - 77:14
**available** [1] - 6:5
**Avenue** [3] - 1:23, 2:4, 2:22
**aware** [1] - 6:11

**B**

**back-and-forth** [1] - 21:3
**back-end** [1] - 20:11
**background** [2] - 55:3, 63:9
**backwards** [3] - 8:20, 8:23, 75:17
**bad** [1] - 22:13
**baked** [1] - 44:8
**balances** [2] - 40:3, 69:24
**ball** [1] - 37:25
**BAM** [20] - 2:3, 3:17, 5:4, 6:3, 8:18, 11:12, 11:14, 13:2, 13:9, 14:3, 15:15, 18:21, 19:11, 22:6, 32:21, 42:15, 46:20, 68:4, 68:5, 71:8
**BAM's** [2] - 11:10, 17:22
**barely** [1] - 36:3
**Barry** [1] - 51:17
**based** [1] - 47:20
**basements** [1] - 79:6
**basic** [1] - 19:7
**basis** [4] - 7:15, 19:15, 24:19, 53:6
**batch** [1] - 25:8
**battles** [1] - 38:13
**become** [1] - 59:7
**becomes** [1] - 53:18
**becoming** [1] - 6:9
**BEFORE** [1] - 1:10
**begin** [1] - 20:14
**beginning** [1] - 56:19
**behalf** [2] - 3:19, 3:23
**behind** [1] - 38:16
**belt** [1] - 29:24
**belt-and-suspender** [1] - 29:24
**belts** [1] - 40:25
**benchmark** [1] - 28:13
**benchmarks** [7] - 7:11, 8:12, 8:24,

12:17, 21:25, 40:15, 41:22
**bending** [2] - 8:20, 8:23
**benefit** [3] - 7:8, 37:19, 45:6
**best** [1] - 81:7
**better** [5] - 17:5, 40:20, 45:25, 47:24, 77:20
**between** [2] - 13:2, 39:25
**Beville** [1] - 3:17
**BEVILLE** [1] - 2:3
**beyond** [2] - 11:13, 49:8
**BHL** [2] - 11:14, 29:17
**Bill** [1] - 3:17
**BINANCE** [1] - 1:6
**Binance** [10] - 1:21, 3:6, 3:19, 13:17, 15:25, 19:18, 20:12, 35:7, 54:1, 72:11
**Binance's** [1] - 12:23
**bit** [5] - 15:18, 26:18, 55:3, 62:19, 65:21
**blanket** [1] - 15:21
**Block** [2] - 13:23, 14:2
**blowing** [1] - 76:4
**Boasberg** [1] - 79:14
**Bob** [1] - 13:16
**boogeyman** [1] - 35:7
**boss** [2] - 3:25, 4:1
**bottom** [2] - 26:15, 69:10
**branding** [1] - 13:18
**breaking** [2] - 41:13, 41:14
**brief** [1] - 77:10
**bring** [1] - 69:12
**broad** [4] - 15:23, 31:10, 44:7, 73:14
**broader** [2] - 16:14, 61:2
**broadly** [1] - 33:6
**bucket** [1] - 25:6
**buckets** [3] - 4:15, 4:16, 31:17
**built** [1] - 62:19
**bulk** [1] - 59:10
**bunch** [1] - 42:14
**burden** [10] - 15:22, 17:13, 23:8, 27:9, 31:19, 35:23, 35:25, 36:8, 54:18, 69:25
**burdensome** [1] - 16:17
**business** [4] - 23:19, 26:12, 39:3, 40:11
**businesses** [1] -

26:10
**buttoned** [2] - 17:24, 32:3

## C

**camp** [1] - 37:20
**candid** [1] - 54:25
**cannot** [3] - 45:21, 69:24, 75:24
**care** [1] - 80:6
**carry** [1] - 17:14
**Case** [1] - 3:5
**case** [7] - 13:10, 13:12, 17:11, 21:18, 45:23, 74:5, 78:12
**cases** [2] - 19:8, 48:20
**cast** [1] - 36:20
**categories** [2] - 43:16, 63:17
**caused** [2] - 23:14, 39:3
**cautious** [1] - 48:11
**Ceffu** [16] - 11:15, 13:2, 13:4, 13:7, 13:23, 14:2, 14:4, 14:5, 14:11, 16:7, 18:8, 30:5, 31:19, 32:1, 38:3, 41:1
**Ceffu's** [1] - 29:22
**ceilings** [1] - 79:5
**center** [1] - 26:10
**centers** [1] - 26:10
**certain** [4] - 7:21, 14:24, 56:5, 74:10
**certainly** [5] - 24:1, 42:4, 69:12, 71:24, 73:10
**certification** [2] - 64:18, 66:9
**certify** [1] - 81:3
**cetera** [3] - 19:6, 46:16, 47:13
**challenging** [1] - 29:6
**chance** [4] - 11:3, 18:24, 46:6, 66:20
**change** [3] - 13:11, 25:14, 49:19
**Changpeng** [2] - 2:9, 3:23
**chicken** [2] - 13:1
**Chief** [1] - 79:14
**chief** [1] - 13:22
**circle** [1] - 79:1
**circuit** [1] - 79:16
**citations** [2] - 9:18, 46:13
**cited** [2] - 18:7, 44:25
**Civil** [2] - 1:3, 3:5
**civil** [1] - 17:10

**claim** [1] - 23:2
**claiming** [1] - 6:12
**clarification** [1] - 48:22
**clarifying** [1] - 42:19
**clear** [16] - 11:22, 17:11, 17:12, 27:10, 31:7, 40:9, 42:5, 43:3, 47:16, 49:20, 49:23, 50:3, 64:14, 68:14, 75:1, 76:16
**clearly** [1] - 21:17
**clerkship** [1] - 79:21
**client** [9] - 23:9, 23:11, 23:21, 24:2, 26:7, 27:2, 54:5, 75:23, 76:18
**client's** [1] - 76:24
**clients** [2] - 23:17, 77:23
**clients'** [1] - 80:1
**close** [3] - 27:24, 71:24, 79:13
**closer** [2] - 17:6, 20:10
**clunky** [1] - 55:20
**code** [5] - 36:14, 37:6, 38:9, 47:13
**cognizant** [1] - 76:23
**colleague** [1] - 3:22
**COLUMBIA** [1] - 1:1
**comfort** [6] - 23:6, 37:10, 47:1, 76:17, 76:20, 78:9
**comforting** [1] - 76:8
**coming** [5] - 15:15, 20:10, 60:25
**COMMISSION** [1] - 1:3
**Commission** [4] - 1:15, 1:18, 3:6, 3:12
**Communication** [3] - 11:9, 25:9, 42:13
**communication** [2] - 14:24, 28:25
**communications** [2] - 18:4, 18:5
**company** [2] - 6:4, 26:13
**compared** [1] - 81:8
**compel** [1] - 7:20
**complain** [1] - 23:15
**complaint** [1] - 6:12
**complete** [1] - 8:8
**completely** [1] - 63:4
**compromise** [1] - 60:15
**computer** [1] - 37:7
**concern** [8] - 6:17, 7:17, 32:11, 32:12,

33:11, 33:15, 33:18, 76:9
**concerned** [5] - 7:2, 11:11, 26:14, 38:4, 60:7
**concerns** [14] - 7:6, 17:16, 17:22, 25:18, 30:20, 32:1, 38:5, 38:19, 50:8, 50:9, 50:16, 54:18, 60:24, 78:6
**concluded** [1] - 80:8
**concluding** [2] - 28:8
**concrete** [2] - 25:20, 25:23
**condition** [1] - 72:5
**confer** [3] - 68:11, 72:15, 78:25
**CONFERENCE** [2] - 1:4, 1:9
**conference** [1] - 3:8
**conferred** [1] - 74:1
**conferring** [1] - 77:7
**confers** [2] - 5:13, 12:13
**configured** [1] - 19:21
**confirm** [3] - 8:21, 20:6, 21:10
**confirmation** [2] - 20:11, 72:8
**confirms** [1] - 21:6
**confused** [1] - 13:16
**confusion** [6] - 13:17, 13:19, 16:7, 29:21, 30:1, 30:2
**connected** [1] - 54:20
**Connecticut** [1] - 1:23
**consent** [12] - 6:13, 16:4, 48:7, 48:9, 49:8, 56:8, 59:3, 60:17, 63:2, 68:4, 68:13, 69:1
**consider** [1] - 74:5
**considering** [1] - 23:7
**constant** [1] - 35:6
**constitutes** [1] - 81:4
**Constitution** [1] - 2:22
**constructionists** [3] - 12:2, 43:18, 46:14
**consultation** [1] - 14:4
**consumer** [1] - 25:25
**consumers** [1] - 40:12
**CONT'D** [1] - 2:1
**contact** [1] - 34:18
**contain** [1] - 41:17
**context** [3] - 6:7, 24:10, 39:14
**continue** [4] - 4:12, 7:15, 17:4, 28:20, 40:13, 44:18, 45:9,

45:10, 58:20, 68:9, 72:20
**continued** [1] - 27:20
**continuing** [1] - 78:11
**control** [10] - 8:19, 12:23, 16:2, 17:21, 18:7, 19:12, 20:13, 56:8, 59:17, 59:20
**controls** [2] - 21:6, 47:5
**conversation** [1] - 20:24
**conversations** [1] - 11:19
**coordinate** [1] - 57:16
**cop** [2] - 22:12, 22:13
**core** [1] - 32:7
**corners** [1] - 56:8
**correct** [8] - 22:22, 28:21, 58:17, 58:23, 64:19, 64:21, 73:21, 81:4
**corresponding** [1] - 30:6
**cost** [3] - 26:10, 54:4
**counsel** [35] - 3:12, 3:16, 5:4, 6:3, 9:16, 11:20, 14:3, 14:17, 17:12, 23:18, 25:15, 36:22, 37:2, 37:3, 39:25, 41:4, 41:7, 41:22, 46:13, 46:20, 56:3, 56:7, 57:24, 58:10, 63:8, 63:14, 63:25, 65:15, 70:7, 71:8, 72:4, 72:10, 77:14, 78:19
**counsel's** [1] - 39:6
**couple** [4] - 38:24, 65:23, 66:4, 75:16
**coupling** [1] - 57:12
**course** [9] - 28:11, 37:22, 39:16, 42:16, 52:3, 59:1, 65:2, 71:7, 79:15
**Court** [14] - 2:20, 2:21, 6:11, 17:16, 22:19, 22:20, 31:2, 32:11, 37:4, 60:13, 74:5, 76:8, 81:3, 81:16
**court** [2] - 3:2, 36:16
**COURT** [279] - 1:1, 3:24, 5:1, 6:10, 6:16, 8:3, 8:10, 8:22, 9:9, 9:12, 9:14, 9:17, 9:22, 9:24, 10:3, 10:5, 10:7, 10:9, 10:21, 10:23, 11:1, 11:8, 11:23, 11:25, 12:4, 12:10, 12:14,

12:16, 12:18, 12:22, 12:24, 13:8, 13:13, 14:6, 14:10, 14:18, 14:21, 14:23, 15:1, 15:7, 15:13, 15:20, 16:18, 18:5, 18:12, 18:14, 18:16, 18:19, 19:2, 19:16, 19:23, 20:14, 20:23, 21:1, 21:4, 21:9, 22:1, 22:5, 22:9, 22:12, 22:16, 22:23, 23:3, 23:22, 23:24, 24:3, 24:6, 24:9, 24:11, 24:24, 26:4, 27:12, 27:15, 27:19, 27:21, 27:23, 28:2, 28:4, 28:8, 28:16, 28:19, 28:22, 29:5, 29:14, 29:20, 30:11, 30:21, 31:4, 31:7, 31:14, 31:16, 32:13, 32:17, 33:16, 33:20, 33:24, 34:2, 34:4, 34:6, 34:9, 34:11, 34:15, 34:24, 35:1, 35:25, 36:5, 36:11, 36:13, 38:8, 38:23, 38:25, 39:4, 39:8, 39:19, 39:21, 39:23, 40:2, 40:6, 40:8, 41:2, 41:6, 41:10, 41:12, 41:18, 41:21, 42:1, 42:23, 42:25, 43:3, 43:12, 43:19, 44:14, 44:16, 44:20, 44:23, 45:2, 45:5, 46:17, 46:22, 46:25, 47:4, 47:9, 47:14, 48:23, 49:1, 49:4, 49:6, 49:10, 49:12, 49:14, 49:17, 49:23, 50:23, 51:1, 51:3, 51:5, 51:8, 51:12, 51:23, 52:3, 52:7, 52:10, 52:17, 52:20, 53:1, 53:7, 53:10, 53:12, 54:6, 54:9, 54:12, 54:14, 55:4, 55:6, 55:10, 55:13, 55:16, 55:19, 55:21, 55:23, 56:1, 56:4, 56:9, 56:16, 56:22, 57:1, 57:3, 57:6, 57:8, 57:11, 57:14, 57:18, 57:20, 57:23, 57:25, 58:4, 58:7, 58:13, 58:16, 58:18, 58:24, 59:1, 59:6, 59:9, 59:18, 59:21, 59:23, 60:2, 60:5, 60:16,

61:4, 61:7, 61:13, 61:20, 62:22, 63:6, 63:12, 63:15, 63:18, 63:22, 64:2, 64:5, 64:8, 64:12, 64:16, 64:22, 65:14, 65:18, 65:20, 66:3, 66:5, 66:8, 66:16, 66:19, 66:22, 66:25, 67:4, 67:8, 67:14, 67:18, 67:20, 67:23, 67:25, 68:12, 68:15, 68:18, 68:20, 68:23, 69:11, 69:19, 70:2, 70:6, 70:9, 70:13, 70:16, 70:19, 71:3, 72:10, 72:16, 73:22, 74:8, 74:13, 74:16, 74:19, 74:21, 74:24, 75:12, 75:15, 75:22, 76:2, 76:11, 76:14, 76:20, 76:23, 77:3, 77:12, 77:16, 78:16, 79:10
**Court's** [2] - 36:24, 73:4
**Courthouse** [1] - 2:22
**COURTROOM** [1] - 3:2
**courts** [1] - 79:18
**cover** [3] - 4:20, 71:7, 78:19
**covered** [1] - 62:10
**craft** [1] - 73:7
**cranked** [1] - 52:25
**crawl** [1] - 41:14
**CRC** [2] - 2:21, 81:15
**created** [2] - 9:20, 74:1
**credit** [1] - 14:14
**CRR** [2] - 2:21, 81:15
**Crutcher** [1] - 1:22
**crux** [2] - 12:21, 16:1
**crypto** [1] - 40:4
**crystallized** [1] - 69:4
**current** [1] - 65:16
**custodian** [1] - 44:24
**custodians** [1] - 46:16
**custody** [12] - 8:19, 11:14, 12:23, 15:25, 16:2, 17:20, 18:7, 19:11, 24:21, 29:11, 29:17, 56:8
**customer** [2] - 6:4, 48:6
**Cutler** [1] - 2:4
**CZ** [2] - 36:22, 37:2

**D**

**D.C** [1] - 1:6

**daily** [1] - 5:21
**Dan** [1] - 3:20
**DANIEL** [1] - 1:21
**data** [1] - 68:7
**date** [14] - 11:11, 16:14, 18:2, 18:9, 21:23, 22:2, 33:17, 57:7, 57:16, 61:2, 63:8, 71:9, 74:6, 79:2
**date-limited** [1] - 18:2
**Dated** [1] - 81:13
**dates** [8] - 57:17, 57:19, 61:5, 61:6, 65:13, 65:16, 65:19, 72:14
**Dave** [1] - 3:13
**DAVID** [1] - 1:14
**days** [3] - 6:1, 12:4, 65:23
**DC** [5] - 1:16, 1:24, 2:5, 2:11, 2:23
**deadline** [6] - 8:1, 26:14, 27:3, 56:17, 71:25
**deadlines** [5] - 26:11, 65:4, 69:7, 79:6
**deal** [1] - 61:24
**dealing** [1] - 73:15
**deciding** [1] - 73:11
**decision** [4] - 6:18, 31:3, 76:6, 77:11
**deep** [1] - 16:19
**default** [1] - 33:7
**Defendant** [4] - 1:21, 2:2, 2:9, 3:23
**defendant** [1] - 49:2
**defendants** [2] - 16:15, 59:20
**Defendants** [1] - 1:8
**defense** [4] - 39:6, 63:8, 71:8, 78:19
**deficient** [1] - 7:24
**defies** [1] - 13:25
**delay** [1] - 25:25
**delta** [1] - 61:17
**demonstrate** [2] - 11:14, 30:14
**demonstrates** [1] - 5:15
**deponent's** [2] - 47:21, 48:5
**depose** [3] - 51:15, 51:17, 51:18
**deposing** [1] - 48:8
**deposition** [13] - 10:1, 10:6, 49:20, 49:24, 50:15, 50:25, 51:15, 54:24, 58:21, 62:2, 62:23, 64:25

**depositions** [13] - 22:6, 22:7, 45:8, 47:15, 47:17, 49:3, 50:21, 51:10, 52:5, 53:16, 56:19, 62:11, 76:4
**DEPUTY** [1] - 3:2
**describe** [1] - 19:22
**described** [3] - 19:21, 21:7, 73:19
**detail** [3] - 4:19, 32:5, 37:25
**details** [1] - 37:23
**determined** [1] - 19:24
**devil** [2] - 32:5, 37:25
**devolution** [2] - 39:3, 39:5
**diagrams** [3] - 9:19, 9:20, 9:21
**different** [5] - 4:14, 4:15, 7:21, 31:17, 48:10
**difficult** [3] - 36:8, 36:21, 61:14
**diligence** [1] - 23:16
**direction** [2] - 38:2, 38:6
**directly** [1] - 56:7
**disagreement** [2] - 4:25, 65:5
**discourse** [1] - 6:7
**discover** [1] - 72:25
**discovery** [20] - 4:15, 6:1, 6:14, 14:20, 24:8, 60:20, 65:3, 71:9, 72:22, 73:7, 73:12, 73:20, 74:6, 75:1, 75:16, 77:22, 78:3, 78:23, 79:18
**discrepancies** [1] - 39:25
**discrete** [1] - 18:10
**discuss** [3] - 13:17, 18:24, 63:17
**discussed** [1] - 18:2
**discussing** [2] - 68:4, 68:5
**discussion** [3] - 18:8, 56:14, 59:8
**discussions** [1] - 71:12
**dismiss** [1] - 24:5
**dispute** [4] - 10:13, 21:10, 43:9, 48:25
**disputed** [6] - 8:25, 11:5, 13:14, 42:8, 42:14, 69:16
**disputes** [3] - 77:11, 77:22, 79:18
**disputing** [1] - 23:1

**dissect** [1] - 37:5
**dissipation** [1] - 25:24
**distinct** [1] - 77:24
**DISTRICT** [2] - 1:1, 1:1
**divorce** [1] - 56:17
**Document** [7] - 7:16, 14:22, 24:13, 32:17, 42:13, 44:2
**document** [11] - 11:4, 11:8, 12:2, 17:19, 24:12, 29:7, 40:10, 42:12, 43:12, 43:24, 72:12
**documents** [28] - 5:8, 5:19, 5:20, 5:23, 8:6, 8:7, 8:8, 11:13, 13:6, 13:20, 17:23, 18:18, 24:14, 24:17, 25:3, 29:16, 30:5, 30:13, 30:16, 30:17, 30:20, 33:13, 63:8, 67:3, 67:12, 69:16, 69:23, 72:5
**dollars** [1] - 54:5
**done** [14] - 8:13, 14:12, 25:4, 25:7, 26:24, 46:5, 53:16, 56:21, 58:1, 65:9, 66:12, 71:1, 71:14, 79:24
**door** [1] - 5:16
**Dorr** [1] - 2:4
**down** [7] - 5:10, 9:23, 24:2, 25:16, 44:17, 69:25, 76:7
**draft** [1] - 59:11
**drag** [1] - 7:3
**dragging** [3] - 7:7, 23:20, 25:19
**drown** [1] - 26:17
**dual** [1] - 56:24
**dug** [1] - 31:24
**Dunn** [2] - 1:22, 3:19
**Duo** [1] - 4:3

**E**

**earnest** [1] - 30:1
**easier** [2] - 62:24, 71:4
**easiest** [1] - 34:12
**easy** [4] - 10:4, 33:22, 34:10, 36:7
**efficient** [2] - 48:20, 57:16
**effort** [1] - 16:6
**egg** [1] - 13:1
**eight** [1] - 47:23
**either** [3] - 23:17, 25:12, 35:20
**elbowed** [1] - 79:20

**ELISA** [1] - 1:17
**Elisa** [1] - 3:14
**emergency** [1] - 50:1
**Emmett** [1] - 3:13
**EMMETT** [1] - 1:17
**employees** [1] - 45:7
**encourage** [1] - 46:13
**encouraged** [1] - 12:8
**encouragement** [1] - 62:14
**encouraging** [1] - 62:6
**end** [20] - 20:4, 20:11, 20:12, 20:13, 21:16, 21:19, 22:19, 27:7, 40:18, 47:11, 52:14, 71:9, 74:2, 75:24, 75:25, 76:2, 76:24, 77:1, 78:4
**ends** [2] - 29:4, 47:22
**ensure** [1] - 79:3
**entered** [3] - 6:2, 74:10, 74:15
**entire** [1] - 35:21
**entirely** [1] - 24:18
**entirety** [1] - 41:24
**entities** [2] - 3:17, 37:3
**entity** [2] - 16:1, 30:6
**especially** [1] - 63:24
**essentially** [4] - 5:20, 15:24, 30:17, 51:6
**estate** [2] - 76:12, 76:13
**estimate** [1] - 28:17
**et** [5] - 1:6, 3:7, 19:6, 46:16, 47:13
**event** [1] - 39:12
**everywhere** [1] - 67:9
**evidence** [20] - 6:3, 8:17, 8:20, 13:15, 13:18, 14:9, 16:3, 16:8, 16:12, 19:13, 21:6, 23:9, 24:19, 25:20, 25:23, 30:10, 40:5, 47:2, 72:8
**ex** [1] - 53:23
**exactly** [10] - 26:3, 31:4, 39:7, 55:8, 56:21, 57:9, 59:11, 60:6, 72:6
**example** [4] - 9:16, 23:18, 44:19, 69:17
**except** [2] - 7:16, 79:20
**EXCHANGE** [1] - 1:3
**Exchange** [4] - 1:15, 1:18, 3:6, 3:12
**excuse** [1] - 8:5
**exercise** [2] - 6:9, 20:9

**exhibits** [1] - 44:25
**exists** [1] - 54:2
**expect** [2] - 27:25, 41:24
**expecting** [1] - 16:9
**expedited** [16] - 6:1, 6:14, 60:20, 60:21, 71:9, 72:22, 72:24, 73:6, 73:12, 73:20, 74:6, 75:1, 75:16, 75:21, 78:3, 78:23
**explain** [2] - 16:25, 19:4
**explained** [10] - 14:17, 19:3, 39:25, 46:19, 46:20, 55:13, 55:16, 56:3, 72:4, 75:8
**explore** [1] - 59:22
**expressing** [1] - 20:25
**extend** [1] - 48:5
**extending** [1] - 71:15
**extensive** [4] - 55:14, 58:12, 63:23, 64:1
**extent** [4] - 23:13, 32:10, 49:7, 51:14
**extra** [1] - 65:21
**eye** [1] - 34:17

## F

**facilitates** [1] - 69:23
**fact** [5] - 5:2, 13:12, 16:13, 30:1, 47:6
**factor** [1] - 37:1
**fair** [12] - 10:24, 39:8, 39:9, 42:2, 42:5, 53:1, 54:23, 59:9, 60:13, 60:19, 69:11, 69:13
**faith** [1] - 8:5
**far** [2] - 33:4, 79:22
**far-ranging** [1] - 33:4
**Farer** [13] - 3:11, 4:17, 22:7, 28:25, 38:8, 54:22, 54:23, 60:23, 62:22, 66:1, 68:2, 71:4, 79:7
**FARER** [174] - 1:13, 3:11, 4:24, 5:2, 6:11, 8:2, 8:4, 8:11, 9:7, 9:10, 9:13, 9:15, 9:18, 9:23, 9:25, 10:4, 10:6, 10:8, 10:18, 10:22, 10:25, 11:7, 11:19, 11:24, 12:1, 12:6, 12:11, 12:15, 12:17, 12:19, 12:23, 13:5, 13:9, 13:14, 14:7, 14:17, 14:19, 14:22, 14:24,

15:2, 15:8, 15:17, 15:21, 18:4, 18:6, 18:13, 18:15, 18:17, 19:1, 19:3, 19:17, 20:2, 20:21, 20:24, 21:2, 21:5, 21:24, 22:2, 22:8, 38:21, 38:24, 39:1, 39:7, 39:17, 39:20, 39:22, 39:24, 40:3, 40:7, 40:23, 41:3, 41:7, 41:11, 41:16, 41:19, 41:22, 42:20, 42:24, 43:2, 43:11, 43:15, 44:12, 44:15, 44:17, 44:21, 44:24, 45:3, 46:11, 46:18, 46:23, 47:1, 47:5, 47:10, 48:21, 48:24, 49:2, 49:5, 49:7, 49:11, 49:16, 53:11, 55:2, 55:5, 55:8, 55:12, 55:14, 55:18, 55:20, 55:22, 55:24, 56:2, 56:5, 56:10, 56:21, 56:23, 57:2, 57:5, 57:7, 57:9, 57:12, 57:15, 57:19, 57:21, 57:24, 58:3, 58:5, 58:9, 58:15, 58:17, 58:23, 58:25, 59:2, 59:7, 59:15, 59:19, 59:22, 63:4, 63:7, 63:13, 63:16, 63:19, 63:23, 64:3, 64:6, 64:9, 64:14, 64:21, 65:12, 65:15, 65:19, 66:2, 66:4, 66:7, 68:10, 68:13, 68:16, 68:19, 68:21, 69:6, 69:16, 69:21, 70:3, 72:3, 72:14, 73:21, 73:23, 74:9, 74:14, 74:17, 74:20, 74:22, 75:5, 75:14, 79:9
**Faruqui** [1] - 3:3
**FARUQUI** [1] - 1:10
**fashion** [1] - 12:4
**fast** [1] - 26:2
**faster** [1] - 23:24
**fewer** [1] - 47:21
**FGMA** [1] - 18:6
**FGMK** [3] - 18:6, 18:10, 44:21
**field** [1] - 46:10
**fighting** [1] - 61:23
**figure** [5] - 16:20, 17:8, 52:2, 70:11, 70:15
**figuring** [2] - 34:1,

68:23
**file** [1] - 50:1
**filed** [1] - 6:11
**filing** [1] - 5:7
**finally** [1] - 72:16
**fine** [3] - 31:11, 59:25, 61:7
**finish** [2] - 37:16, 72:7
**finishing** [1] - 27:25
**finite** [1] - 33:13
**firms** [1] - 23:17
**first** [24] - 5:7, 15:24, 16:20, 21:22, 30:8, 39:1, 47:22, 49:20, 49:23, 49:24, 50:7, 50:14, 50:24, 53:25, 54:10, 55:5, 57:4, 59:25, 60:24, 61:19, 62:3, 62:4, 63:20
**five** [9] - 35:3, 35:20, 36:2, 45:11, 45:17, 46:1, 49:25
**flag** [2] - 36:7, 73:24
**flaws** [1] - 37:8
**focus** [10] - 8:12, 10:3, 10:10, 18:23, 32:11, 48:14, 59:13, 62:6, 63:16, 73:17
**focused** [4] - 14:2, 18:7, 54:25, 67:2
**folks** [4] - 35:12, 36:21, 48:8
**follow** [3] - 28:25, 29:3, 72:20
**followed** [1] - 9:15
**following** [1] - 55:9
**foot** [1] - 23:20
**foot-dragging** [1] - 23:20
**FOR** [1] - 1:1
**for-cause** [1] - 53:6
**force** [1] - 25:14
**forces** [1] - 26:12
**foregoing** [1] - 81:4
**forever** [1] - 7:3
**forget** [1] - 50:13
**format** [1] - 5:23
**former** [1] - 4:1
**forth** [3] - 21:3, 71:5, 78:1
**forward** [8] - 8:14, 65:25, 73:25, 74:11, 76:21, 78:6, 78:7, 78:24
**four** [3] - 40:19, 56:7, 65:10
**frame** [20] - 6:25, 10:15, 10:17, 14:10, 14:13, 14:15, 14:16, 14:25, 15:9, 15:11,

25:12, 28:6, 28:20, 30:24, 42:3, 42:15, 43:6, 43:7, 43:13
**framework** [7] - 6:22, 14:20, 16:20, 17:9, 18:2, 77:25, 78:5
**framing** - 24:9
**frankly** [1] - 8:20
**friction** [1] - 30:25
**front** [3] - 20:4, 45:16, 74:2
**frustrated** [3] - 16:22, 23:13, 50:17
**frustrating** [3] - 10:1, 37:12, 48:9
**frustration** [1] - 16:21
**full** [3] - 8:5, 63:10, 65:21
**fulsome** [4] - 12:7, 21:12, 21:13, 21:15
**fun** [1] - 79:15
**fundamental** [1] - 4:25
**furious** [1] - 26:6
**future** [1] - 67:20

## G

**gap** [1] - 6:7
**general** [6] - 23:18, 25:15, 43:9, 64:25, 69:23, 73:20
**generally** [2] - 61:25
**generic** [1] - 17:13
**Gibson** [2] - 1:22, 3:19
**given** [3] - 37:20, 44:3, 73:24
**global** [1] - 50:18
**glorious** [1] - 79:17
**governed** [1] - 22:3
**government** [1] - 71:15
**grateful** [1] - 26:21
**gratifying** [1] - 3:25
**great** [31] - 4:1, 28:19, 28:22, 29:5, 31:16, 32:13, 32:25, 37:15, 38:8, 43:11, 45:3, 45:5, 59:21, 63:18, 64:12, 65:14, 66:22, 66:25, 68:22, 69:19, 70:6, 70:19, 71:3, 72:16, 72:25, 75:14, 77:16, 78:15, 78:16, 79:7, 80:6
**greater** [2] - 61:16, 69:8
**Grime** [1] - 3:20
**GRIME** [1] - 1:22
**gritty** [2] - 10:12, 10:13

**ground** [1] - 62:10
**group** [4] - 17:18, 26:20, 65:9
**guardrails** [3] - 50:14, 62:20, 78:10
**guess** [6] - 11:16, 31:22, 42:20, 64:24, 79:19
**guessing** [1] - 60:9
**guidance** [3] - 15:10, 73:2, 78:6
**guideposts** [1] - 46:15
**guys** [1] - 57:4

**H**

**Hale** [1] - 2:4
**half** [6] - 5:18, 10:2, 53:4, 57:4, 62:16, 62:17
**handful** [1] - 18:15
**handle** [1] - 66:10
**handling** [1] - 72:22
**happy** [11] - 7:11, 33:11, 34:16, 34:18, 57:16, 63:14, 71:7, 73:6, 75:1, 75:9, 77:8
**hard** [5] - 6:19, 31:18, 36:2, 54:20, 59:11
**harmful** [1] - 26:1
**head** [1] - 55:12
**Hear** [1] - 59:24
**hear** [32] - 6:24, 7:18, 10:11, 10:16, 14:7, 16:18, 16:20, 17:15, 17:25, 18:21, 19:23, 22:6, 25:13, 33:11, 34:4, 34:6, 34:22, 36:5, 37:4, 38:16, 50:9, 54:22, 58:8, 59:24, 60:22, 61:16, 72:10, 75:6, 75:23, 76:5, 77:8, 77:19
**heard** [9] - 5:7, 8:25, 25:3, 33:8, 40:9, 46:12, 53:11, 53:12, 61:19
**hearing** [21] - 12:20, 15:10, 22:19, 30:22, 31:8, 32:9, 32:10, 36:6, 36:8, 36:9, 36:16, 44:1, 46:12, 48:16, 53:21, 53:22, 53:23, 55:16, 79:2
**heart** [2] - 6:13, 16:3
**heartburn** [2] - 32:6, 73:5
**heavily** [1] - 13:10
**heeded** [1] - 15:9

**held** [1] - 40:1
**hell** [1] - 50:2
**help** [3] - 26:11, 32:11, 56:16
**helpful** [10] - 20:9, 31:8, 31:14, 32:10, 46:19, 72:21, 74:23, 75:3, 75:5, 78:13
**hesitation** [1] - 6:21
**higher** [1] - 79:25
**highlight** [1] - 39:24
**highly** [2] - 4:10, 19:9
**himself** [1] - 58:10
**historical** [1] - 79:13
**hold** [3] - 24:24, 47:19, 72:20
**HOLDINGS** [1] - 1:6
**Holdings** [3] - 1:21, 3:7, 3:19
**Honor** [68] - 3:5, 3:11, 3:15, 3:18, 3:21, 4:24, 5:10, 5:25, 6:6, 8:2, 8:9, 8:15, 10:1, 10:25, 11:19, 12:12, 12:20, 13:5, 13:12, 13:20, 15:4, 15:17, 18:9, 19:6, 20:2, 20:5, 21:2, 21:24, 22:8, 22:17, 27:10, 38:7, 38:21, 39:18, 40:23, 40:25, 41:19, 44:15, 45:3, 46:11, 48:21, 49:13, 49:16, 49:22, 53:11, 55:2, 56:21, 57:5, 57:10, 58:3, 58:17, 63:4, 65:12, 66:2, 66:15, 68:10, 69:6, 72:3, 72:6, 73:21, 74:7, 75:6, 75:9, 77:2, 77:9, 78:14, 79:9
**Honor's** [1] - 15:10
**HONORABLE** [1] - 1:10
**hope** [6] - 8:11, 40:8, 58:21, 65:20, 68:20, 78:5
**hopeful** [5] - 8:4, 20:21, 22:10, 22:11
**hopefully** [11] - 27:8, 33:7, 42:9, 49:21, 50:15, 61:7, 62:19, 69:2, 70:3, 78:13, 78:21
**hoping** [9] - 6:18, 16:8, 33:10, 33:14, 38:8, 38:17, 54:14, 57:5, 77:24
**horribles** [1] - 36:18
**hour** [4] - 5:6, 50:25,

58:21
**hours** [10] - 47:21, 47:23, 49:25, 50:13, 53:4, 53:24, 62:16, 62:17
**house** [2] - 26:9, 33:2
**Hudson** [1] - 2:7
**hurting** [1] - 61:15

**I**

**idea** [1] - 44:10
**identification** [1] - 29:19
**identified** [11] - 24:15, 29:13, 29:15, 29:17, 39:25, 40:25, 45:3, 56:6, 57:10, 58:10, 59:16
**identify** [8] - 24:14, 24:18, 24:21, 29:11, 29:16, 30:5, 45:9, 63:17
**identity** [1] - 30:6
**idiot** [1] - 35:9
**imaginable** [1] - 60:12
**imagine** [8] - 18:20, 21:21, 23:24, 26:1, 27:8, 28:3, 30:22, 49:17
**impairs** [1] - 24:4
**implemented** [1] - 21:7
**implication** [1] - 51:19
**implies** [1] - 51:16
**import** [1] - 35:15
**important** [13] - 5:24, 6:9, 22:24, 22:25, 23:7, 24:10, 26:13, 32:7, 33:3, 35:18, 43:22, 67:12, 80:3
**importantly** [1] - 79:15
**imposed** [3] - 72:4, 79:5
**imposing** [1] - 40:16
**impossible** [1] - 20:19
**impression** [4] - 11:17, 13:2, 13:3, 27:13
**impressions** [1] - 33:1
**IN** [1] - 1:1
**in-house** [2] - 26:9, 33:2
**inadequacies** [1] - 44:1
**inclination** [1] - 50:6
**include** [3] - 16:6, 41:3, 43:8
**included** [2] - 11:21, 16:10

**including** [5] - 16:15, 42:8, 52:16, 55:18, 73:25
**increase** [1] - 27:4
**indicia** [1] - 61:16
**Indiscernible** [1] - 42:6
**individual** [8] - 13:16, 30:6, 55:2, 56:24, 58:5, 58:11, 59:2, 68:16
**individualized** [1] - 68:6
**individuals** [2] - 54:8, 56:5
**information** [22] - 5:24, 13:22, 14:5, 14:8, 19:6, 19:9, 20:5, 21:7, 22:22, 37:18, 55:15, 63:9, 63:24, 64:1, 64:17, 64:20, 68:17, 69:22, 70:4, 71:21, 73:25, 74:12
**initial** [1] - 64:6
**inquiry** [1] - 59:14
**inside** [1] - 32:21
**inspection** [12] - 18:22, 19:23, 20:14, 21:12, 21:22, 36:12, 37:15, 37:21, 38:5, 38:14, 42:8, 46:18
**instability** [1] - 25:24
**instance** [1] - 53:3
**instead** [1] - 71:5
**instructive** [2] - 77:25, 78:14
**insufficient** [2] - 19:25, 46:3
**intend** [3] - 11:24, 43:16, 67:15
**intensive** [1] - 33:18
**interest** [1] - 78:15
**interested** [1] - 73:14
**interests** [1] - 8:15
**internal** [3] - 18:4, 44:21, 55:12
**internally** [1] - 68:5
**interpretation** [1] - 48:10
**interpreted** [2] - 33:6, 44:6
**interrogatories** [3] - 64:13, 66:6, 67:10
**interrogatory** [1] - 69:18
**intervening** [1] - 71:19
**introduce** [1] - 3:9
**investigate** [1] - 53:8
**investigation** [1] -

78:11
**investors'** [1] - 6:14
**involved** [3] - 18:17, 23:17, 73:10
**issue** [13] - 12:21, 16:1, 16:3, 16:9, 18:9, 22:21, 32:7, 46:18, 48:24, 49:2, 54:13, 57:7, 68:6
**issues** [18] - 4:12, 6:8, 15:16, 16:7, 17:8, 39:22, 42:8, 45:1, 54:21, 60:9, 62:8, 63:16, 72:13, 75:16, 77:5, 77:7, 77:10, 77:23
**items** [1] - 66:4
**iterative** [3] - 20:16, 20:17, 47:18

**J**

**Jackson** [4] - 17:3, 21:20, 72:19, 73:10
**January** [3] - 14:15, 65:6, 70:1
**JASON** [1] - 1:21
**Jason** [2] - 3:18, 77:9
**JENNIFER** [1] - 1:13
**Jennifer** [1] - 3:11
**Jensen** [2] - 75:2, 79:19
**job** [2] - 4:11, 53:15
**JOHN** [1] - 1:17
**joint** [2] - 9:2, 65:24
**Judge** [8] - 3:3, 17:3, 21:20, 36:1, 49:21, 72:19, 73:9, 79:14
**JUDGE** [2] - 1:10, 1:10
**judge** [1] - 27:2
**judges** [2] - 37:12, 49:18
**judicially** [1] - 79:5
**juggle** [1] - 57:19
**juggled** [1] - 65:17
**June** [2] - 6:2, 70:1

**K**

**keep** [8] - 21:3, 26:12, 26:16, 48:14, 48:20, 70:21, 77:17, 79:3
**keeping** [1] - 40:11
**Kellogg** [6] - 13:15, 13:22, 13:25, 14:7, 19:14, 19:15
**Kellogg's** [4] - 9:19, 10:1, 13:10, 13:19
**key** [4] - 12:21, 22:3, 44:25, 45:1

**keys** [1] - 19:12
**kind** [7] - 4:19, 9:25, 12:4, 26:15, 32:7, 71:15, 79:3
**knowing** [1] - 31:25
**knowledge** [6] - 47:21, 48:6, 56:7, 58:9, 58:19, 64:10
**known** [1] - 49:19
**knows** [4] - 16:25, 17:12, 19:7, 20:5

## L

**labor** [1] - 33:18
**labor-intensive** [1] - 33:18
**lack** [2] - 11:11, 23:16
**language** [5] - 5:3, 5:5, 11:22, 12:8, 68:13
**large** [2] - 25:2, 73:24
**larger** [1] - 14:20
**Laroche** [1] - 3:17
**LAROCHE** [1] - 2:6
**last** [13] - 4:9, 5:15, 6:24, 11:22, 12:20, 15:10, 22:19, 40:14, 46:12, 48:16, 50:20, 70:15, 71:6
**late** [2] - 41:13, 41:14
**late-breaking** [2] - 41:13, 41:14
**Latham** [2] - 2:10, 3:22
**law** [3] - 6:13, 17:11, 26:8
**lawyers** [3] - 48:10, 48:17, 48:18
**layoffs** [1] - 23:12
**learned** [1] - 19:17
**least** [6] - 7:12, 25:18, 34:20, 45:8, 53:9, 60:8
**leave** [3] - 27:13, 39:5
**leaves** [1] - 5:22
**ledger** [1] - 69:24
**left** [1] - 75:22
**legal** [2] - 23:20, 77:23
**length** [3] - 16:13, 47:20, 52:13
**less** [2] - 14:12, 48:17
**letter** [4] - 10:18, 14:3, 41:4, 41:7
**level** [6] - 37:10, 37:11, 47:10, 58:9, 76:17, 76:20
**licenses** [1] - 11:14
**likely** [2] - 30:22, 64:9
**limit** [13] - 47:17, 48:2,

49:3, 50:4, 51:20, 51:25, 52:6, 52:9, 52:12, 53:3, 53:4, 53:9, 76:4
**limited** [3] - 18:2, 52:12, 63:8
**LIMITED** [1] - 1:6
**Limited** [2] - 3:7, 3:19
**line** [1] - 72:7
**lines** [1] - 16:6
**list** [7] - 15:10, 26:15, 45:11, 60:8, 60:14, 60:17, 68:3
**listen** [6] - 29:8, 38:14, 46:7, 49:19, 50:4, 62:12
**listened** [1] - 78:15
**literally** [2] - 26:16, 46:4
**litigate** [1] - 17:17
**litigated** [1] - 4:10
**litigating** [1] - 10:12
**litigation** [4] - 23:6, 23:12, 36:17, 43:23
**litigator's** [1] - 33:6
**litigators** [1] - 45:21
**live** [1] - 35:16
**LLP** [4] - 1:22, 2:4, 2:6, 2:10
**local** [3] - 73:2, 74:3, 75:7
**logic** [1] - 13:25
**look** [14] - 10:17, 11:4, 18:24, 34:12, 34:20, 37:17, 38:15, 46:3, 47:12, 47:18, 57:4, 66:20, 73:1, 78:23
**looked** [1] - 20:8
**looking** [6] - 12:19, 18:3, 29:8, 34:17, 46:15, 55:22
**loose** [1] - 29:4
**lose** [1] - 45:22
**lost** [2] - 4:5, 22:15

## M

**magistrate** [1] - 3:3
**MAGISTRATE** [1] - 1:10
**main** [3] - 25:11, 39:12, 39:16
**maintain** [4] - 25:19, 25:25, 45:16, 64:6
**maintained** [1] - 59:5
**maintaining** [2] - 40:10, 42:17
**man** [1] - 49:21
**mandate** [1] - 21:5
**marching** [1] - 78:20

**marker** [2] - 44:17, 76:7
**MARTENS** [103] - 2:2, 3:15, 22:11, 22:14, 22:17, 22:24, 23:4, 23:23, 24:1, 24:4, 24:7, 24:10, 24:12, 26:3, 27:10, 27:13, 27:16, 27:20, 27:22, 27:24, 28:3, 28:7, 28:15, 28:17, 28:21, 29:3, 29:13, 29:15, 30:8, 30:12, 31:1, 31:5, 31:13, 31:15, 32:9, 32:16, 33:15, 33:17, 33:21, 33:25, 34:3, 34:5, 34:7, 34:10, 34:14, 34:22, 34:25, 35:24, 36:4, 36:10, 36:12, 38:7, 49:13, 49:22, 50:20, 50:24, 51:2, 51:4, 51:6, 51:9, 51:13, 51:24, 52:4, 52:8, 52:11, 52:18, 52:21, 53:2, 53:8, 54:4, 54:7, 54:10, 54:13, 60:1, 60:3, 60:6, 61:1, 61:5, 61:11, 61:18, 62:21, 66:14, 66:17, 66:20, 66:23, 67:1, 67:5, 67:13, 67:15, 67:19, 67:21, 67:24, 70:8, 70:11, 70:14, 70:17, 75:20, 75:25, 76:3, 76:12, 76:19, 76:22, 77:1
**Martens** [2] - 3:16, 39:1
**Martens'** [1] - 65:17
**materials** [1] - 44:22
**math** [2] - 25:1, 48:17
**Matt** [2] - 3:16, 3:17
**matter** [3] - 3:7, 52:13, 81:5
**matters** [2] - 40:11, 48:5
**MATTHEW** [4] - 1:14, 2:2, 2:3, 2:6
**Matthew** [2] - 3:13, 3:15
**McLucas** [2] - 2:3, 3:17
**mean** [64] - 6:16, 6:21, 7:2, 7:17, 11:4, 14:11, 14:13, 17:10, 20:15, 20:18, 21:11, 21:12, 22:10, 25:14, 25:17, 26:8, 26:17, 27:2, 27:7, 28:6,

29:15, 30:22, 33:15, 34:20, 34:21, 35:2, 35:22, 36:20, 37:2, 37:22, 39:12, 40:8, 41:13, 43:19, 43:20, 43:22, 45:6, 45:7, 47:19, 48:8, 48:17, 53:13, 54:19, 54:23, 54:25, 55:1, 56:20, 59:11, 61:9, 66:9, 67:8, 67:10, 67:11, 69:12, 69:13, 69:14, 70:14, 76:1, 77:6, 77:18, 78:25, 79:13, 79:23
**means** [3] - 39:11, 51:21, 68:24
**meet** [4] - 5:13, 12:13, 68:10, 72:15
**meet-and-confer** [1] - 72:15
**meet-and-confers** [2] - 5:13, 12:13
**meeting** [1] - 77:7
**meetings** [1] - 17:20
**memory** [1] - 79:21
**Mendro** [2] - 3:18, 77:9
**MENDRO** [5] - 1:21, 3:18, 77:9, 77:13, 78:14
**merits** [5] - 23:2, 24:7, 39:15, 51:11, 52:8
**met** [1] - 74:1
**metaphors** [1] - 4:16
**microphone** [1] - 49:13
**middle** [1] - 37:13
**might** [11] - 7:24, 27:9, 35:8, 35:22, 38:19, 40:21, 46:6, 49:17, 52:5, 54:13, 65:5
**Milbank** [1] - 2:6
**million** [2] - 40:4, 69:9
**mind** [3] - 49:19, 53:14, 72:1
**minds** [1] - 49:18
**mine** [1] - 76:17
**minimal** [1] - 23:5
**minimize** [1] - 7:5
**minute** [2] - 6:24, 11:22
**minutes** [1] - 49:25
**misappropriation** [1] - 23:10
**missed** [1] - 32:24
**missing** [2] - 11:18, 64:18
**mistake** [2] - 13:19, 14:8

**mistaken** [1] - 13:11
**mitigate** [2] - 7:5, 30:4
**mitigates** [1] - 38:5
**mixed** [1] - 4:16
**mixture** [2] - 64:21, 64:22
**modification** [1] - 74:4
**modifications** [1] - 75:7
**money** [1] - 51:7
**monitors** [1] - 37:17
**month** [1] - 10:2
**monthly** [1] - 69:24
**morning** [7] - 3:5, 3:11, 3:15, 3:18, 3:21, 22:15
**most** [4] - 4:13, 57:15, 61:22, 79:15
**mostly** [2] - 54:24, 54:25
**motion** [3] - 24:5, 50:1, 72:23
**mouth** [1] - 51:7
**move** [7] - 8:13, 21:18, 23:24, 24:5, 74:11, 78:7
**moved** [1] - 23:18
**moving** [3] - 13:5, 26:2, 26:5, 38:1, 38:6, 62:25, 72:1, 79:3
**MR** [107] - 3:15, 3:18, 3:21, 22:11, 22:14, 22:17, 22:24, 23:4, 23:23, 24:1, 24:4, 24:7, 24:10, 24:12, 26:3, 27:10, 27:13, 27:16, 27:20, 27:22, 27:24, 28:3, 28:7, 28:15, 28:17, 28:21, 29:3, 29:13, 29:15, 30:8, 30:12, 31:1, 31:5, 31:13, 31:15, 32:9, 32:16, 33:15, 33:17, 33:21, 33:25, 34:3, 34:5, 34:7, 34:10, 34:14, 34:22, 34:25, 35:24, 36:4, 36:10, 36:12, 38:7, 49:13, 49:22, 50:20, 50:24, 51:2, 51:4, 51:6, 51:9, 51:13, 51:24, 52:4, 52:8, 52:11, 52:18, 52:21, 53:2, 53:8, 54:4, 54:7, 54:10, 54:13, 60:1, 60:3, 60:6, 61:1, 61:5, 61:11, 61:18, 62:21, 66:14, 66:17, 66:20, 66:23,

67:1, 67:5, 67:13, 67:15, 67:19, 67:21, 67:24, 70:8, 70:11, 70:14, 70:17, 75:20, 75:25, 76:3, 76:12, 76:19, 76:22, 77:1, 77:9, 77:13, 78:14
**MS** [173] - 3:11, 4:24, 5:2, 6:11, 8:2, 8:4, 8:11, 9:7, 9:10, 9:13, 9:15, 9:18, 9:23, 9:25, 10:4, 10:6, 10:8, 10:18, 10:22, 10:25, 11:7, 11:19, 11:24, 12:1, 12:6, 12:11, 12:15, 12:17, 12:19, 12:23, 13:5, 13:9, 13:14, 14:7, 14:17, 14:19, 14:22, 14:24, 15:2, 15:8, 15:17, 15:21, 18:4, 18:6, 18:13, 18:15, 18:17, 19:1, 19:3, 19:17, 20:2, 20:21, 20:24, 21:2, 21:5, 21:24, 22:2, 22:8, 38:21, 38:24, 39:1, 39:7, 39:17, 39:20, 39:22, 39:24, 40:3, 40:7, 40:23, 41:3, 41:7, 41:11, 41:16, 41:19, 41:22, 42:20, 42:24, 43:2, 43:11, 43:15, 44:12, 44:15, 44:17, 44:21, 44:24, 45:3, 46:11, 46:18, 46:23, 47:1, 47:5, 47:10, 48:21, 48:24, 49:2, 49:5, 49:7, 49:11, 49:16, 53:11, 55:2, 55:5, 55:8, 55:12, 55:14, 55:18, 55:20, 55:22, 55:24, 56:2, 56:5, 56:10, 56:21, 56:23, 57:2, 57:5, 57:7, 57:9, 57:12, 57:15, 57:19, 57:21, 57:24, 58:3, 58:5, 58:9, 58:15, 58:17, 58:23, 58:25, 59:2, 59:7, 59:15, 59:19, 59:22, 63:4, 63:7, 63:13, 63:16, 63:19, 63:23, 64:3, 64:6, 64:9, 64:14, 64:21, 65:12, 65:15, 65:19, 66:2, 66:4, 66:7, 68:10, 68:13, 68:16, 68:19, 68:21, 69:6, 69:16, 69:21, 70:3, 72:3, 72:14,

73:21, 73:23, 74:9, 74:14, 74:17, 74:20, 74:22, 75:5, 75:14, 79:9
**MURPHY** [1] - 1:17
**Murphy** [1] - 3:13
**music** [1] - 70:10

**N**

**name** [3] - 13:11, 13:18, 55:7
**name-branding** [1] - 13:18
**named** [1] - 13:16
**narrow** [8] - 4:12, 15:11, 33:9, 46:10, 73:7, 73:8, 73:16, 73:17
**narrowed** [1] - 14:14
**narrowing** [2] - 6:8, 62:13
**narrowly** [2] - 18:10, 56:20
**narrows** [1] - 16:14
**NASSE** [1] - 1:14
**Nasse** [1] - 3:13
**nauseam** [1] - 78:11
**navigate** [1] - 40:14
**NE** [1] - 1:15
**near** [1] - 27:6
**necessarily** [1] - 56:10
**necessary** [2] - 23:8, 24:7, 29:18
**need** [32] - 9:4, 14:4, 17:14, 17:15, 17:17, 17:25, 20:5, 20:11, 20:16, 26:13, 33:12, 37:5, 37:24, 40:4, 40:9, 40:18, 42:14, 43:13, 45:20, 46:23, 53:13, 61:9, 65:17, 69:9, 71:17, 71:23, 72:8, 74:25, 75:3, 78:19
**needed** [1] - 45:17
**needs** [1] - 43:7
**negative** [1] - 39:13
**NELSON** [1] - 1:21
**Nelson** [1] - 3:20
**nerds** [1] - 79:16
**never** [2] - 38:21, 46:24
**New** [2] - 1:19, 2:7
**new** [1] - 25:8
**news** [3] - 4:21, 32:14, 41:14
**next** [12] - 10:22, 31:8, 44:1, 56:23, 63:19, 65:9, 68:2, 69:13,

71:19, 77:4, 79:2, 79:20
**nice** [1] - 44:20
**nine** [1] - 60:5
**nitty** [2] - 10:12, 10:13
**nitty-gritty** [2] - 10:12, 10:13
**normally** [2] - 45:21, 60:20
**Nos** [1] - 42:13
**nose** [2] - 26:16, 36:3
**note** [8] - 8:6, 12:1, 15:17, 23:11, 38:24, 40:24, 44:18, 63:19
**noted** [2] - 30:12, 50:24
**notes** [9] - 17:19, 18:3, 18:4, 29:8, 32:18, 33:25, 34:8, 35:11, 38:4
**nothing** [4] - 21:13, 46:2, 68:10, 77:13
**notion** [1] - 39:2
**November** [1] - 15:2
**number** [13] - 5:5, 5:9, 5:11, 5:12, 10:20, 12:2, 15:18, 25:1, 25:2, 44:13, 51:10, 69:14, 69:15
**Number** [1] - 41:7
**Numbers** [1] - 11:9
**numbers** [2] - 43:4, 52:5
**NW** [4] - 1:23, 2:4, 2:10, 2:22
**NY** [2] - 1:19, 2:7

**O**

**object** [1] - 39:2
**objected** [1] - 54:3
**objecting** [2] - 24:15, 30:18
**objection** [1] - 24:20
**objections** [4] - 11:21, 15:21, 42:17, 45:14
**objective** [1] - 24:20
**obligations** [1] - 17:13
**obvious** [1] - 25:14
**obviously** [8] - 9:10, 15:15, 22:3, 28:10, 59:7, 62:23, 77:18, 77:22
**October** [10] - 1:7, 65:7, 65:8, 65:20, 65:22, 69:3, 78:21, 81:6, 81:13
**OF** [2] - 1:1, 1:9
**offering** [1] - 20:19
**officer** [1] - 13:22

**officers** [1] - 36:16
**Official** [3] - 2:21, 81:3, 81:16
**offline** [1] - 61:21
**once** [2] - 66:20, 67:10
**one** [57] - 4:14, 9:18, 11:2, 15:14, 15:24, 17:2, 21:14, 23:1, 23:17, 25:6, 26:10, 27:1, 31:18, 31:22, 32:3, 32:14, 33:10, 33:12, 35:22, 37:13, 37:20, 38:20, 40:14, 45:13, 47:22, 48:21, 52:24, 53:16, 54:11, 54:15, 54:16, 55:9, 55:10, 55:17, 58:5, 58:11, 60:3, 60:10, 60:24, 60:25, 61:7, 61:9, 62:3, 63:20, 63:25, 65:6, 65:9, 69:8, 69:14, 69:15, 69:17, 73:23, 74:4, 74:20, 75:16, 75:21, 79:19
**One** [1] - 64:24
**ones** [10] - 9:5, 10:12, 10:13, 10:14, 10:17, 11:5, 25:4, 32:14, 38:12, 52:12
**ongoing** [2] - 12:12, 66:13
**open** [3] - 18:22, 41:1, 63:4
**operating** [2] - 8:4, 20:6
**oppositional** [2] - 6:22, 79:12
**order** [24] - 3:4, 6:13, 16:4, 36:24, 48:7, 48:9, 49:9, 56:8, 59:4, 60:14, 60:17, 63:2, 68:4, 68:13, 69:1, 72:19, 72:24, 73:15, 73:19, 74:10, 74:14, 75:18, 78:22
**orders** [1] - 78:20
**organization** [2] - 33:19, 51:21
**original** [1] - 36:14
**otherwise** [2] - 51:16, 78:8
**outlandish** [1] - 54:2
**outline** [1] - 62:23
**outlines** [1] - 64:25
**outrageous** [1] - 19:5
**outside** [6] - 7:16, 8:1, 25:8, 48:8, 73:11
**outstanding** [3] - 40:3, 66:4, 71:7

**overall** [1] - 18:2
**overbreadth** [2] - 15:22, 17:13
**overburdensome** [1] - 44:3
**overly** [1] - 15:23
**own** [2] - 8:21, 16:10

**P**

**pace** [7] - 23:13, 23:14, 26:6, 27:4, 61:14, 61:21, 70:5
**page** [1] - 30:12
**parade** [2] - 36:18, 36:19
**parallel** [1] - 39:18
**Part** [1] - 68:5
**part** [10] - 23:12, 23:14, 23:16, 23:21, 27:7, 53:14, 60:21, 62:13, 74:9
**parte** [1] - 53:23
**particular** [3] - 19:9, 32:11, 66:23
**parties** [3] - 3:9, 36:23, 74:10
**partners** [1] - 3:20
**parts** [1] - 34:12
**passed** [1] - 10:19
**past** [3] - 21:18, 42:24, 65:1
**Pearl** [1] - 1:18
**pejorative** [1] - 39:11
**pending** [2] - 23:6, 74:20
**Pennsylvania** [1] - 2:4
**people** [17] - 18:15, 26:12, 32:21, 33:19, 33:23, 34:3, 35:19, 35:20, 36:2, 36:18, 45:11, 46:4, 48:12, 52:16, 53:8, 63:10
**percent** [5] - 44:5, 47:1, 53:18, 56:13
**perfect** [3] - 46:17, 70:13, 70:16
**perhaps** [7] - 4:10, 6:18, 18:21, 29:21, 30:4, 37:16, 38:19
**period** [3] - 5:14, 5:18, 18:11
**permitted** [2] - 48:6, 51:14
**person** [10] - 37:7, 56:23, 58:13, 58:18, 58:19, 58:21, 59:16, 65:6, 65:7
**person's** [1] - 35:22
**personnel** [1] - 45:1

**perspective** [8] - 25:21, 29:24, 53:15, 72:21, 73:4, 76:25, 77:25, 80:2
**phenomenal** [1] - 4:11
**Phillies** [1] - 38:22
**phones** [1] - 22:4
**pick** [4] - 17:3, 17:5, 37:12, 38:13
**picked** [1] - 25:2
**Pickering** [1] - 2:4
**place** [5] - 23:8, 37:15, 39:8, 39:9, 45:3
**places** [2] - 4:11, 38:19
**Plaintiff** [2] - 1:4, 1:13
**plaintiff** [1] - 3:10
**play** [1] - 74:7
**pleased** [1] - 77:9
**plus** [8] - 37:1, 58:2, 60:4, 60:9, 60:15, 62:13, 62:16
**PNK** [2] - 19:10, 22:4
**podium** [1] - 3:10
**point** [20] - 16:24, 17:1, 21:19, 29:21, 31:11, 34:16, 35:5, 36:15, 40:24, 41:9, 42:5, 46:9, 46:10, 48:21, 52:4, 61:1, 62:12, 71:10, 71:20, 71:22
**pointed** [1] - 43:7
**points** [2] - 38:24, 60:1
**policy** [1] - 16:10
**portal** [3] - 15:5, 19:10, 22:3
**portion** [1] - 54:24
**position** [6] - 9:4, 11:10, 38:12, 47:24, 69:4, 77:15
**positive** [2] - 18:23, 32:25
**possession** [1] - 8:18
**possible** [2] - 26:7, 74:25
**potential** [1] - 18:22
**potentially** [4] - 29:22, 48:13, 71:11, 77:21
**predecessor** [1] - 13:23
**predetermined** [1] - 20:18
**premature** [1] - 68:6
**prep** [10] - 51:21, 52:2, 52:23, 53:9, 54:8, 54:15, 56:20, 60:10, 60:11
**prepping** [2] - 54:11,

62:19
**present** [2] - 36:19, 70:1
**presentation** [1] - 79:14
**presiding** [1] - 3:3
**pressure** [2] - 36:25, 37:4
**presume** [1] - 37:6
**presumptively** [1] - 73:3
**pretty** [6] - 17:11, 17:24, 31:20, 33:9, 33:13, 47:16
**preview** [2] - 43:21, 77:20
**previously** [1] - 46:20
**primary** [2] - 56:18, 59:13
**prioritize** [5] - 35:14, 35:15, 45:25, 56:19, 67:11
**prioritizing** [3] - 38:3, 40:10, 67:2
**priority** [5] - 69:8, 69:14, 69:17, 70:5
**problem** [1] - 53:14
**problems** [1] - 4:3
**procedure** [2] - 16:10, 17:11
**Proceedings** [2] - 2:18, 80:8
**proceedings** [1] - 81:5
**process** [5] - 20:16, 20:17, 74:1, 74:2, 75:7
**produce** [25] - 5:8, 5:11, 7:20, 8:5, 8:12, 11:24, 25:3, 25:10, 26:20, 28:14, 28:20, 28:23, 30:5, 42:7, 42:15, 42:22, 43:4, 43:10, 43:16, 44:9, 44:11, 69:5, 71:11
**produced** [15] - 5:13, 5:14, 5:19, 5:20, 7:12, 8:7, 11:13, 11:17, 29:10, 30:24, 32:1, 42:16, 44:4, 44:6, 73:25
**producing** [5] - 26:25, 27:17, 41:25, 74:11, 74:17
**production** [9] - 4:22, 26:25, 27:17, 28:1, 40:10, 41:12, 41:16, 70:4, 72:5
**productions** [10] - 7:1, 7:13, 7:15, 8:8, 8:13, 25:13, 27:22, 28:9,

42:18, 71:19
**program** [1] - 37:18
**progress** [7] - 4:7, 5:3, 5:16, 30:23, 71:17, 71:18, 79:23
**promise** [2] - 61:5, 79:22
**proper** [1] - 5:23
**proposed** [8] - 10:14, 10:16, 65:4, 65:25, 72:24, 74:4, 75:6, 78:22
**proposing** [1] - 43:13
**proprietary** [1] - 19:5
**protective** [8] - 72:19, 72:24, 73:15, 73:19, 74:10, 74:14, 75:18, 78:22
**protocol** [1] - 22:4
**provide** [17] - 5:24, 8:20, 16:2, 19:20, 23:9, 28:12, 29:18, 41:23, 46:14, 47:2, 47:12, 63:9, 66:17, 68:16, 68:21, 78:5
**provided** [6] - 5:5, 13:20, 15:25, 24:19, 60:14, 64:17
**provider** [2] - 13:7, 29:17
**provides** [2] - 16:1, 24:22
**providing** [2] - 30:6, 41:1
**pull** [1] - 69:25
**punch** [1] - 68:3
**put** [7] - 6:6, 27:3, 31:11, 51:6, 58:11, 75:13, 76:7
**putting** [1] - 79:4

## Q

**questionnaires** [3] - 13:21, 14:1
**questions** [2] - 41:1, 59:11
**quick** [2] - 54:22, 77:17
**QURESHI** [2] - 2:9, 3:21
**Qureshi** [3] - 3:21, 4:2, 78:17

## R

**RAGAD** [1] - 2:9
**Ragad** [1] - 3:22
**Ralph** [1] - 51:17
**random** [1] - 17:3

**ranges** [1] - 58:10
**ranging** [1] - 33:4
**re** [1] - 44:6
**re-interpreted** [1] - 44:6
**reached** [1] - 13:16
**ready** [1] - 59:23
**real** [10] - 32:7, 48:11, 53:19, 54:4, 54:22, 61:14, 71:18, 76:12, 76:13, 77:17
**realities** [1] - 23:23
**really** [18] - 3:25, 4:8, 5:6, 5:15, 5:22, 5:25, 6:2, 8:11, 31:10, 32:4, 34:12, 36:2, 38:12, 75:3, 75:23, 79:24, 80:3, 80:4
**reason** [5] - 24:14, 30:1, 50:10, 57:10, 74:9
**reasonable** [5] - 6:25, 15:8, 28:5, 33:14, 44:18
**reasonably** [1] - 26:23
**reasons** [2] - 55:9, 57:22
**recalibrate** [1] - 6:20
**received** [3] - 5:18, 5:19, 17:23
**recently** [1] - 19:1
**recognize** [1] - 22:25
**reconciliation** [1] - 5:21
**record** [3] - 3:9, 55:25, 74:22
**recorded** [2] - 81:5
**recording** [3] - 2:18, 81:6, 81:8
**records** [1] - 32:20
**recraft** [1] - 72:23
**reduced** [1] - 61:22
**reductions** [1] - 25:14
**redundancy** [1] - 40:24
**redundant** [1] - 24:18
**references** [1] - 9:19
**regard** [5] - 12:2, 24:8, 24:12, 29:4, 31:6
**regarding** [1] - 15:5
**relate** [3] - 16:7, 56:10, 69:9
**related** [6] - 11:10, 15:4, 29:12, 63:13, 69:22, 70:4
**relating** [2] - 16:9, 17:20
**relationship** [5] - 11:15, 13:2, 13:4, 13:6, 31:19

**relay** [1] - 76:18
**relevant** [6] - 14:12, 19:10, 32:20, 33:3, 35:12, 46:15
**relied** [2] - 13:23, 13:25
**relies** [1] - 19:11
**rely** [3] - 13:10, 35:10, 59:20
**relying** [2] - 16:11, 47:6
**remember** [1] - 19:16
**remind** [2] - 67:8, 73:1
**report** [14] - 4:19, 5:4, 12:11, 14:1, 14:2, 28:14, 30:13, 58:12, 65:24, 69:3, 70:20, 71:19, 77:13
**reported** [1] - 2:18
**Reporter** [4] - 2:20, 2:21, 81:3, 81:16
**reports** [3] - 9:2, 16:11, 69:25
**representations** [4] - 5:4, 6:3, 8:21, 19:14
**represented** [2] - 13:9, 20:7
**Request** [6] - 7:16, 11:8, 11:9, 24:13, 25:9, 32:18, 42:13, 44:2
**request** [25] - 7:15, 8:25, 11:2, 11:5, 14:16, 14:19, 16:13, 17:19, 24:12, 24:23, 24:25, 29:7, 30:16, 31:10, 33:4, 41:3, 42:12, 43:12, 43:24, 44:5, 50:21, 51:13, 68:5, 70:15, 73:8
**requested** [2] - 8:6, 10:18
**requests** [26] - 4:22, 5:9, 7:13, 9:3, 11:20, 12:3, 12:21, 14:20, 14:24, 15:9, 15:11, 15:19, 16:15, 17:19, 19:5, 19:7, 25:2, 25:7, 29:1, 33:5, 41:4, 42:21, 69:21, 69:22, 72:12, 76:5
**Requests** [2] - 14:22, 42:13
**requirement** [1] - 21:5
**resolved** [3] - 39:22, 40:5, 76:15
**resources** [1] - 51:22
**respect** [1] - 74:6
**response** [5] - 5:8, 12:7, 39:1

**responses** [3] - 66:18, 67:16, 69:18
**rest** [1] - 56:13
**restriction** [3] - 11:11, 33:17, 47:25
**returned** [1] - 6:15
**review** [6] - 11:3, 55:18, 55:25, 57:13, 63:20, 69:23
**reviewing** [1] - 72:13
**revisit** [2] - 22:18, 46:13
**revolving** [1] - 5:16
**RFPs** [1] - 4:18
**RIAZ** [1] - 2:9
**rich** [1] - 23:15
**RICHARD** [1] - 1:22
**Richard** [1] - 3:20
**rightly** [1] - 43:7
**ripe** [3] - 66:14, 67:7, 77:11
**rise** [2] - 3:2, 41:8
**RMR** [2] - 2:21, 81:15
**road** [1] - 5:11
**robust** [3] - 27:1, 37:16
**role** [9] - 29:22, 30:5, 32:1, 51:20, 53:4, 56:11, 56:24, 63:11, 63:24
**roles** [2] - 49:8, 56:6
**rolling** [6] - 7:15, 25:13, 26:25, 27:22, 38:1, 70:4
**Room** [1] - 2:22
**Rosen** [1] - 16:25
**round** [1] - 76:5
**rule** [3] - 7:20, 31:23, 73:6
**rules** [5] - 17:10, 51:10, 73:2, 74:3, 75:7
**running** [3] - 9:23, 76:9, 76:13

## S

**safe** [5] - 6:5, 6:15, 8:18, 72:9, 76:21
**safety** [1] - 25:25
**Sally** [1] - 51:17
**satisfied** [9] - 9:3, 9:8, 9:13, 10:22, 24:20, 29:1, 41:5, 44:7, 67:6
**satisfies** [1] - 44:4
**satisfy** [1] - 30:20
**SATU** [1] - 14:1
**Scarlato** [1] - 3:13
**SCARLATO** [1] - 1:14

**scope** [7] - 8:6, 27:9, 48:1, 48:2, 49:8, 63:11, 73:9
**scoping** [1] - 33:9
**sealed** [2] - 73:3
**sealing** [2] - 74:1, 74:2
**search** [5] - 11:12, 30:13, 31:6, 31:21, 32:11
**searched** [1] - 9:20
**searching** [1] - 30:15
**seated** [1] - 3:4
**SEC** [11] - 22:21, 23:5, 23:9, 23:13, 23:14, 25:3, 25:18, 32:5, 37:10, 37:24, 78:10
**SEC's** [4] - 6:17, 13:2, 14:14, 37:19
**second** [4] - 11:2, 24:23, 50:7, 63:20
**secondly** [1] - 51:9
**secure** [5] - 6:5, 6:15, 8:18, 72:9, 76:21
**SECURITIES** [1] - 1:3
**securities** [1] - 6:12
**Securities** [4] - 1:15, 1:18, 3:6, 3:12
**security** [7] - 13:21, 13:22, 14:1, 16:11, 17:20, 23:5
**see** [19] - 4:1, 6:20, 7:14, 7:23, 16:9, 16:12, 22:13, 30:16, 30:19, 36:6, 37:25, 38:16, 47:12, 61:14, 65:18, 68:8, 71:9, 79:1
**seem** [7] - 11:9, 12:1, 19:4, 35:12, 54:19, 54:20, 67:10
**Sefranek** [3] - 2:21, 81:15, 81:15
**SEFRANEK** [1] - 81:3
**segregated** [1] - 6:4
**send** [3] - 62:23, 65:24, 72:23
**sense** [14] - 4:13, 4:18, 5:17, 7:7, 11:17, 26:19, 26:21, 27:5, 27:8, 45:6, 57:25, 69:19, 75:10, 79:1
**sensitive** [1] - 73:24
**sent** [2] - 10:18, 72:12
**separate** [1] - 64:10
**September** [2] - 5:17, 10:19
**serious** [1] - 6:12
**service** [1] - 13:7
**services** [4] - 15:4,

15:25, 29:12, 30:7
**session** [1] - 3:3
**set** [9] - 3:7, 8:12, 14:3, 20:7, 44:17, 47:17, 64:7, 65:13, 65:16
**sets** [1] - 20:4
**setting** [1] - 69:7
**seven** [7] - 35:4, 47:21, 47:23, 50:13, 50:25, 53:24, 58:21
**seven-hour** [2] - 50:25, 58:21
**shake** [1] - 68:9
**shard** [15] - 20:8, 55:18, 55:22, 56:13, 57:13, 58:1, 58:2, 58:6, 58:19, 59:3, 60:4, 61:8, 62:7, 62:16
**shard-only** [3] - 58:1, 58:6, 61:8
**shard-plus** [3] - 58:2, 60:4, 62:16
**shardholder** [17] - 49:3, 49:5, 49:25, 50:4, 50:24, 51:15, 51:21, 53:18, 53:25, 54:24, 55:5, 56:18, 56:25, 57:3, 59:3, 63:21, 64:11
**shardholder-only** [1] - 57:3
**shardholders** [14] - 50:22, 51:16, 51:18, 51:19, 51:25, 52:15, 52:22, 53:4, 56:6, 56:11, 56:18, 63:25, 64:4
**shards** [2] - 15:5, 59:4
**sheet** [1] - 70:10
**shifting** [2] - 15:6, 59:4
**short** [2] - 47:13, 74:14
**shorter** [1] - 56:3
**show** [4] - 13:15, 19:20, 47:7, 54:10
**side** [5] - 6:21, 23:20, 33:2, 39:12
**sides** [2] - 6:20, 44:2
**sideshow** [5] - 22:25, 23:1, 39:2, 39:10, 39:13
**sideways** [1] - 54:16
**sight** [2] - 75:25, 76:2
**sign** [1] - 21:11
**signal** [1] - 31:23
**significant** [2] - 23:12, 59:15

**similarly** [1] - 20:8
**simple** [2] - 34:21, 61:12
**Simultaneous** [1] - 71:2
**sitting** [1] - 79:20
**situation** [1] - 13:18
**six** [3] - 40:18, 49:25, 65:10
**slimmed** [1] - 24:2
**slimmed-down** [1] - 24:2
**slow** [3] - 40:22, 61:23, 62:25
**slower** [1] - 61:3
**slowing** [1] - 25:16
**slowness** [1] - 61:14
**small** [1] - 51:20
**smart** [1] - 35:13
**sneak** [2] - 43:21, 77:20
**so's** [1] - 35:18
**society** [1] - 79:14
**software** [10] - 11:14, 15:4, 15:25, 19:21, 24:14, 24:16, 24:21, 29:11, 29:17, 41:9
**solely** [1] - 56:25
**SOLOMON** [1] - 1:17
**Solomon** [1] - 3:14
**someone** [2] - 35:7, 58:16
**someplace** [1] - 35:8
**sometimes** [1] - 26:11
**somewhere** [2] - 35:7, 37:11
**soon** [1] - 78:21
**soonest** [1] - 74:24
**sorry** [4] - 4:3, 42:1, 42:5, 71:4
**sort** [41] - 4:12, 4:15, 6:20, 7:5, 9:5, 10:15, 12:25, 14:9, 17:12, 20:18, 25:25, 26:25, 27:6, 29:23, 30:7, 31:17, 31:22, 39:13, 42:17, 58:1, 59:13, 60:19, 62:2, 65:4, 65:11, 65:24, 65:25, 68:4, 69:4, 71:5, 71:6, 71:8, 71:25, 73:11, 73:19, 75:6, 78:10, 78:25, 79:4, 79:5
**sorting** [1] - 9:5
**sound** [4] - 33:14, 38:6, 66:1, 79:7
**sounds** [7] - 18:21, 45:10, 57:21, 60:25, 66:7, 70:19, 77:6

**source** [3] - 36:14, 38:9, 47:13
**space** [2] - 4:12, 26:18
**specific** [7] - 11:20, 14:19, 15:9, 16:7, 44:25, 46:13, 63:2
**specifically** [2] - 50:19, 50:21
**specificity** [4] - 15:18, 15:22, 16:16, 17:14
**specifics** [4] - 5:13, 41:23, 43:16
**spent** [2] - 54:7, 62:18
**squeaky** [1] - 22:14
**staff** [2] - 24:2, 35:21
**stakes** [1] - 79:25
**standing** [1] - 11:20
**start** [21] - 4:17, 7:12, 10:11, 25:13, 26:24, 27:6, 37:15, 40:10, 40:16, 41:25, 45:4, 46:5, 46:19, 47:18, 50:8, 54:15, 56:17, 65:2, 75:15, 75:17, 79:4
**started** [3] - 15:5, 27:11, 29:7
**starting** [4] - 3:10, 5:18, 15:8, 37:25
**starts** [3] - 15:2, 49:24, 62:10
**STATES** [2] - 1:1, 1:10
**States** [2] - 2:22, 8:19
**STATUS** [2] - 1:4, 1:9
**status** [14] - 3:7, 4:6, 4:19, 5:4, 9:2, 12:11, 28:14, 30:12, 58:11, 65:24, 69:2, 69:3, 70:20, 71:19
**stay** [1] - 64:12
**step** [3] - 21:22, 24:25
**steps** [1] - 30:19
**stick** [1] - 61:6
**still** [29] - 4:11, 6:24, 7:23, 9:5, 17:6, 21:11, 25:7, 26:1, 31:2, 35:20, 38:1, 40:11, 40:19, 40:21, 43:9, 45:7, 45:16, 48:4, 53:6, 53:20, 54:20, 59:10, 60:23, 61:7, 61:21, 62:18, 66:13, 77:24, 80:2
**stop** [1] - 22:5
**straightforward** [1] - 31:20
**strapped** [2] - 33:19, 51:22
**streamlined** [1] - 51:4
**Street** [3] - 1:15, 1:18,

2:10
**strict** [3] - 12:1, 43:17, 46:14
**strong** [1] - 50:6
**strongly** [1] - 39:2
**students** [1] - 26:8
**stuff** [9] - 25:22, 27:8, 36:14, 38:17, 38:18, 43:10, 48:8, 50:1, 53:19
**subject** [3] - 52:13, 65:16, 74:18
**subjects** [1] - 62:2
**submission** [1] - 75:13
**submitting** [1] - 75:10
**subset** [1] - 5:22
**substance** [2] - 21:18, 73:8
**substantial** [2] - 23:19, 25:1
**substantive** [2] - 64:20, 66:12
**sufficient** [8] - 6:3, 7:19, 24:14, 24:18, 29:11, 29:16, 36:25, 47:3
**suggest** [2] - 13:6, 60:18
**suggested** [1] - 10:15
**suggesting** [1] - 67:21
**Suite** [3] - 1:19, 1:23, 2:11
**summer** [1] - 3:24
**sun** [1] - 44:25
**super** [5] - 26:21, 31:14, 35:13, 35:18, 70:20
**supplement** [2] - 64:15, 66:12
**supplemental** [2] - 66:18, 67:15
**supplementation** [1] - 25:8
**supplemented** [2] - 9:5, 71:13
**support** [1] - 13:18
**supposed** [1] - 6:1
**surface** [2] - 20:3, 47:10
**surprise** [1] - 18:21
**suspect** [1] - 42:10
**suspender** [2] - 29:24, 29:25
**suspenders** [1] - 40:25
**sworn** [1] - 30:9
**sympathetic** [5] - 25:17, 25:18, 40:17, 53:19, 62:18

**T**

**table** [2] - 22:4, 47:2
**systems** [6] - 19:10, 19:11, 19:13, 22:2, 22:3, 59:19

**T**

**table** [3] - 3:13, 3:16
**tailored** [1] - 18:10
**TAMARA** [1] - 81:3
**Tamara** [3] - 2:24, 81:15, 81:15
**target** [1] - 13:6
**task** [1] - 34:10
**tasks** [1] - 34:12
**team** [1] - 29:1
**technical** [1] - 4:3
**Technologies** [2] - 13:24, 14:2
**technology** [4] - 15:4, 19:8, 63:24, 64:1
**technology-related** [1] - 15:4
**tee** [1] - 30:21
**ten** [11] - 33:22, 33:23, 35:19, 50:12, 51:14, 52:9, 53:3, 60:5, 64:3, 76:4
**terms** [14] - 4:14, 6:19, 31:19, 31:20, 47:17, 51:22, 54:5, 56:8, 73:8, 77:6, 77:21, 78:22, 79:2
**testimony** [7] - 9:19, 13:10, 13:19, 24:16, 30:9, 51:25
**testing** [2] - 36:25, 37:5
**THE** [282] - 1:1, 1:1, 1:10, 3:2, 3:24, 5:1, 6:10, 6:16, 8:3, 8:10, 8:22, 9:9, 9:12, 9:14, 9:17, 9:22, 9:24, 10:3, 10:5, 10:7, 10:9, 10:21, 10:23, 11:1, 11:8, 11:23, 11:25, 12:4, 12:10, 12:14, 12:16, 12:18, 12:22, 12:24, 13:8, 13:13, 14:6, 14:10, 14:18, 14:21, 14:23, 15:1, 15:7, 15:13, 15:20, 16:18, 18:5, 18:12, 18:14, 18:16, 18:19, 19:2, 19:16, 19:23, 20:14, 20:23, 21:1, 21:4, 21:9, 22:1, 22:5, 22:9, 22:12, 22:16, 22:23, 23:3, 23:22, 23:24,

24:3, 24:6, 24:9, 24:11, 24:24, 26:4, 27:12, 27:15, 27:19, 27:21, 27:23, 28:2, 28:4, 28:8, 28:16, 28:19, 28:22, 29:5, 29:14, 29:20, 30:11, 30:21, 31:4, 31:7, 31:14, 31:16, 32:13, 32:17, 33:16, 33:20, 33:24, 34:2, 34:4, 34:6, 34:9, 34:11, 34:15, 34:24, 35:1, 35:25, 36:5, 36:11, 36:13, 38:8, 38:23, 38:25, 39:4, 39:8, 39:19, 39:21, 39:23, 40:2, 40:6, 40:8, 41:2, 41:6, 41:10, 41:12, 41:18, 41:21, 42:1, 42:23, 42:25, 43:3, 43:12, 43:19, 44:14, 44:16, 44:20, 44:23, 45:2, 45:5, 46:17, 46:22, 46:25, 47:4, 47:9, 47:14, 48:23, 49:1, 49:4, 49:6, 49:10, 49:12, 49:14, 49:17, 49:23, 50:23, 51:1, 51:3, 51:5, 51:8, 51:12, 51:23, 52:3, 52:7, 52:10, 52:17, 52:20, 53:1, 53:7, 53:10, 53:12, 54:6, 54:9, 54:12, 54:14, 55:4, 55:6, 55:10, 55:13, 55:16, 55:19, 55:21, 55:23, 56:1, 56:4, 56:9, 56:16, 56:22, 57:1, 57:3, 57:6, 57:8, 57:11, 57:14, 57:18, 57:20, 57:23, 57:25, 58:4, 58:7, 58:13, 58:16, 58:18, 58:24, 59:1, 59:6, 59:9, 59:18, 59:21, 59:23, 60:2, 60:5, 60:16, 61:4, 61:7, 61:13, 61:20, 62:22, 63:6, 63:12, 63:15, 63:18, 63:22, 64:2, 64:5, 64:8, 64:12, 64:16, 64:22, 65:14, 65:18, 65:20, 66:3, 66:5, 66:8, 66:16, 66:19, 66:22, 66:25, 67:4, 67:8, 67:14, 67:18, 67:20, 67:23, 67:25, 68:12, 68:15, 68:18, 68:20, 68:23,

69:11, 69:19, 70:2, 70:6, 70:9, 70:13, 70:16, 70:19, 71:3, 72:10, 72:16, 73:22, 74:8, 74:13, 74:16, 74:19, 74:21, 74:24, 75:12, 75:15, 75:22, 76:2, 76:11, 76:14, 76:20, 76:23, 77:3, 77:12, 77:16, 78:16, 79:10
**theirs** [2] - 7:6, 76:18
**they've** [9] - 6:23, 9:2, 17:23, 26:21, 30:9, 58:11, 61:2, 66:20, 69:1
**thinks** [1] - 79:19
**thoughts** [1] - 33:1
**three** [10] - 31:17, 35:2, 35:6, 53:4, 55:9, 57:4, 62:13, 62:15, 62:16, 65:13
**threshold** [1] - 20:4
**tied** [2] - 72:5, 75:21
**tight** [1] - 48:14
**timeline** [2] - 44:9, 67:19
**timeliness** [1] - 7:6
**timetable** [2] - 65:1, 65:25
**timing** [2] - 22:20, 41:24
**today** [13] - 3:20, 5:25, 7:20, 8:11, 10:24, 17:15, 25:12, 26:19, 26:22, 33:8, 61:19, 65:11, 68:25
**together** [2] - 69:13, 80:2
**took** [2] - 55:8, 55:17
**topic** [1] - 54:11
**topics** [9] - 4:14, 18:7, 48:6, 49:5, 52:22, 56:15, 60:14, 63:2, 63:13
**totally** [5] - 32:24, 38:15, 42:2, 54:16, 77:23
**Trading** [1] - 2:3
**traditional** [1] - 65:3
**tranches** [1] - 4:15
**transcribed** [1] - 81:6
**Transcribing** [1] - 2:20
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 81:4, 81:7
**transition** [1] - 59:8
**travel** [1] - 57:21
**treating** [1] - 67:13

**tremendously** [1] - 24:1
**trial** [2] - 69:24, 79:18
**tried** [1] - 45:9
**true** [1] - 81:4
**truly** [1] - 30:2
**trust** [2] - 6:21, 50:10
**try** [4] - 16:25, 25:11, 40:13, 78:6
**trying** [11] - 17:8, 19:19, 26:12, 26:16, 29:8, 31:22, 37:10, 60:19, 61:23, 70:11, 70:15
**TSS** [3] - 15:5, 19:10, 22:3
**turn** [1] - 8:25
**turnover** [1] - 23:19
**two** [54] - 5:18, 10:19, 10:23, 17:2, 19:10, 26:22, 27:5, 27:25, 28:1, 28:4, 28:12, 28:18, 40:14, 41:25, 42:3, 42:6, 42:9, 42:11, 42:14, 43:6, 43:7, 43:12, 45:12, 45:15, 45:19, 45:25, 46:3, 46:4, 46:8, 53:16, 54:15, 54:16, 56:16, 60:1, 60:24, 62:4, 62:12, 63:20, 64:24, 65:1, 65:2, 65:7, 65:9, 65:10, 65:11, 65:21, 65:23, 67:16, 68:8, 68:24, 69:2, 71:14
**two-week** [2] - 43:7, 56:16
**type** [2] - 36:17, 70:4
**types** [1] - 19:7

**U**

**U.S** [2] - 1:15, 1:18
**ultimately** [2] - 22:21, 36:23
**under** [4] - 22:20, 44:25, 48:7, 51:10
**understandably** [1] - 25:15
**understood** [9] - 15:14, 32:16, 34:14, 36:10, 40:23, 46:11, 75:20, 76:19, 76:22
**unfortunately** [1] - 26:5
**unhappy** [1] - 17:4
**United** [2] - 2:22, 8:19
**UNITED** [2] - 1:1, 1:10
**universe** [1] - 33:13

**unknown** [2] - 28:10
**unknown-unknown**
  [1] - 28:10
**unless** [2] - 53:24,
  58:25
**unlimited** [1] - 52:5
**unpredictable** [1] -
  17:2
**unreasonable** [4] -
  15:3, 51:13, 52:11,
  53:2
**unsatisfied** [1] - 67:5
**up** [27] - 3:25, 9:15,
  14:3, 15:11, 16:21,
  17:24, 22:15, 22:18,
  28:11, 28:25, 29:3,
  30:21, 32:3, 40:14,
  40:18, 43:23, 47:22,
  49:18, 52:25, 53:14,
  54:10, 60:25, 62:25,
  64:12, 69:12, 72:18,
  72:20
**upcoming** [2] - 58:13,
  58:19
**update** [1] - 4:6
**updated** [3] - 9:20,
  9:21, 70:23
**useful** [1] - 22:17

### V

**vacuum** [1] - 53:22
**value** [1] - 20:20
**vary** [1] - 47:20
**veer** [1] - 17:7
**veneer** [1] - 38:16
**versa** [1] - 46:7
**version** [1] - 5:21
**vice** [1] - 46:7
**view** [3] - 22:20, 49:7,
  65:17
**viewed** [2] - 31:17,
  73:18
**violations** [1] - 6:13
**voice** [1] - 22:15
**volume** [1] - 73:24
**vs** [1] - 1:5
**vulnerabilities** [2] -
  37:8, 47:2

### W

**wait** [5] - 7:23, 37:23,
  64:23, 65:18, 68:8
**waiving** [2] - 45:13
**walking** [1] - 20:3
**wallet** [7] - 11:14,
  15:24, 24:21, 29:11,
  29:17, 41:9, 68:7
**wallets** [1] - 14:3

**wants** [5] - 49:2, 71:8,
  72:20, 73:10, 77:4
**Washington** [6] - 1:6,
  1:16, 1:24, 2:5, 2:11,
  2:23
**watched** [1] - 74:7
**water** [2] - 26:16, 36:3
**Watkins** [2] - 2:10,
  3:22
**weeds** [1] - 16:19
**week** [4] - 43:7, 56:16,
  56:23, 70:15
**weekend** [1] - 80:7
**weeks** [35] - 5:19,
  10:19, 10:24, 26:22,
  27:5, 27:25, 28:1,
  28:5, 28:12, 28:18,
  40:14, 40:18, 40:19,
  41:25, 42:3, 42:6,
  42:9, 42:11, 42:14,
  43:6, 43:12, 64:24,
  65:1, 65:2, 65:10,
  65:11, 65:21, 65:23,
  67:17, 68:8, 68:25,
  69:2, 71:14
**WILLIAM** [1] - 2:3
**willing** [6] - 25:3, 36:5,
  49:18, 62:11, 68:21,
  74:11
**Wilmer** [1] - 2:4
**WilmerHale** [1] - 3:16
**win** [1] - 38:22
**wish** [1] - 45:11
**withdrawal** [1] - 6:5
**witnesses** [2] - 29:22,
  52:16
**woke** [1] - 22:15
**wonderful** [1] - 67:25
**works** [5] - 16:23,
  19:8, 19:22, 47:11,
  69:15
**world** [2] - 8:17, 46:24
**worried** [1] - 66:9
**worry** [1] - 32:15
**worse** [5] - 21:15,
  45:24, 46:2, 77:20,
  79:23
**written** [2] - 30:17,
  33:5

### Y

**Yards** [1] - 2:7
**years** [1] - 14:12
**yesterday** [4] - 27:18,
  41:13, 41:16, 79:14
**York** [2] - 1:19, 2:7
**you-all** [30] - 4:8, 4:10,
  21:17, 25:1, 26:1,
  28:25, 29:2, 31:9,

32:2, 35:13, 38:2,
40:20, 45:20, 48:3,
61:15, 61:22, 62:12,
65:23, 66:10, 66:12,
72:12, 72:18, 74:25,
77:22, 77:25, 78:4,
78:5, 78:7, 79:1,
79:25
**yourself** [1] - 45:6
**yourselves** [1] - 3:9

### Z

**Zhao** [4] - 2:9, 3:23,
  72:11, 77:14
**ZIA** [1] - 1:10
**Zia** [1] - 3:3