# EXHIBIT A



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 11, 2024

**By CM/ECF**
Hon. Arun Subramanian
United States District Court
500 Pearl Street
New York, NY 10007

Re: <u>United States</u> v. <u>Avraham Eisenberg</u>, 23 Cr. 10 (AS)

Dear Judge Subramanian:

The Government writes to propose an instruction regarding "mixed swaps" and to respond to an argument raised by the defense about the meaning of "price" in Count Two. The Government will raise additional proposals or objections to other portions of the proposed jury instructions before, or at, the charge conference.

**I. Mixed Swaps**

**A. The Government's Proposed Instruction**

The Government proposes the following instruction on swaps and mixed swaps, which closely tracks the version that is in the Court's most recent set of proposed instructions.

> The second element of commodities fraud is that the defendant committed his fraudulent act in connection with a "swap." Here, the government contends that the MNGO Perpetuals involved in the alleged scheme were "swaps."
>
> A "swap" includes any agreement, contract, or transaction that provides for payment based on the occurrence, or non-occurrence, of a financially consequential event. It also includes an agreement, contract, or transaction that provides for an exchange of payments based on the value of one or more rates, commodities, indices, or other property that transfers, in whole or in part, the risk of changes in value of the things underlying the swap, without actually exchanging those things.
>
> If you find the Government has proven beyond a reasonable doubt that MNGO Perpetuals are "swaps" as I defined that term a moment ago, you must then determine whether they are "swaps" that are covered by the commodities laws.
>
> To find that MNGO Perpetuals are swaps covered by the commodities laws, you must find beyond a reasonable doubt at least one of the following:

      First, that MNGO Perpetuals are based, in part, on the value of USDC, and that USDC is a currency or a financial or economic interest or property of any kind; OR

      Second, that MNGO Perpetuals are based, in part, on a funding rate, and that a funding rate is a rate or quantitative measure;

      If you find one of these two things beyond a reasonable doubt, then MNGO Perpetuals are swaps covered by the commodities laws. If you find that the government has not proved either of these two things beyond a reasonable doubt, or if you find that MNGO Perpetuals are not "swaps" as I defined them above, then you should acquit Mr. Eisenberg as to Count One.

As the Court has recognized, there is a fourth way that the Government could prove MNGO Perpetuals are swaps within the reach of the commodities laws: namely, by proving that MNGO is not a security. If the Court intends to offer the proposed instruction above, or a similar instruction, the Government does not intend to seek an instruction directing the jury that another way they can find MNGO Perpetuals fall within the commodities laws is by finding that MNGO is not a security. As described further below, the Government believes this means there will be no need for the jury to decide whether or not MNGO is a security.

**B. Legal Basis for the Proposed Instruction**

The Government's proposed instruction regarding mixed swaps tracks the language of the statute and applicable regulatory guidance. The arguments that the defense has made for narrowing the definition of mixed swap have no basis in the statutory scheme or logic.

The Government's first proposed basis for finding that MNGO Perpetuals are mixed swaps is that they are based on the value of USDC, and that USDC is a currency or a financial or economic interest or property of other kind. This comes straight from the text of the statute. The CEA defines mixed swaps as any security-based swap based on the value of one or more "currencies . . . other financial or economic interest[s] or property of any kind." 7 U.S.C. § 1a(47)(D). The only exception is if USDC qualifies as a "security." *See id.* But there is no factual basis for treating USDC as a security or putting that question to the jury. A core component of a security is that the holders of the security "expect profits" from the efforts of others. *SEC v. Howey*, 328 U.S. 293, 299 (1946). The evidence at trial uniformly showed that holders of USDC do not expect profits from the token because the token is advertised as "maintain[ing] a value of one U.S. dollar." Tr. 214:4-9. While that dollar peg is not always successful, there is no basis for a jury to conclude that holders of USDC expect to profit from holding it, so there is no basis for putting an instruction to the jury requiring them to find that USDC is not a security.

The defense has not offered any legal justification for refusing to give the Government's proposed instruction regarding USDC. Legally, there is no textual basis in the CEA for limiting "mixed swaps" to only security-based swaps that are also based on "commodities." Congress

Case 1:23-cr-00010-AS Document 143 Filed 04/18/24 Page 4 of 7 Case 1:23-cr-00010-AS Document 143 Filed 04/18/25 Page 4 of 7

Page 3

would not have included the long list of other references in 7 U.S.C. § 1a(47)(D) if it intended "commodities" to be the only operative word.

Factually, the defense's claim that MNGO Perpetuals are not really based on the value of USDC is not a basis to refuse to give the Government's proposed instruction. That is a fact argument the defense can make to the jury. And in any event, the defense's claim is belied by the record. MNGO Perpetuals appeared on the Mango Markets website as being based on the relative value of MNGO and USDC. GX991. And Christopher Hermida testified that the MNGO Perpetual oracle, which was used to price MNGO Perpetuals, drew from sources that reflected the relative value MNGO and USDC on Serum Dex, MNGO and USDT on AscendEx, and MNGO and stablecoins generally on FTX. Tr. 455-57. The claim that USDC does not factor into the value of the perpetual because it is "stable" is a red herring. For one, even if its value is stable, that is still part of the value of the perpetual. For example, many countries peg their currencies to the value of the dollar, or some ratio to the dollar. A swap based on the value of one of those currencies would still be based on the value of one of those currencies (and thus squarely within the definition of a mixed swap), even though that currency has a peg relative to the dollar. Moreover, the defense's argument misunderstands how cryptocurrency markets operate. As Kapil Jain explained, the relative value of a cryptocurrency pair on a particular marketplace depends on the supply and demand conditions between those two cryptocurrencies on that exchange at that time. *See* Tr. 209-10. By artificially changing the supply and demand conditions for the MNGO/USDC pair on three exchanges, the defendant manipulated the price of the perpetuals. USDC is an inseparable component of that scheme and the pricing of the swaps.

The Government's second proposed basis for finding that MNGO Perpetuals are mixed swaps relies on the funding rate. Specifically, the Government proposes instructing the jury that the commodities laws apply if the jury finds that MNGO Perpetuals are based, in part, on a funding rate, and that funding rate is a rate or a quantitative measure. This, again, comes straight from the statutory text. The definition of mixed swap includes a security-based swap that is also based on the value of any "rates" or "quantitative measures." 7 U.S.C. § 1a(47)(D).

During the Rule 29 motion, the defense argued that this exception does not apply because the funding rate is a narrow-based security index. That argument is legally wrong because a funding rate is not an "index." Accordingly, it would be inappropriate for the Court to have the jury consider whether a funding rate is a narrow-based security index.

The defense's legal error begins with the name of the term itself. Mango Markets documents repeatedly refer to a "funding rate." *See* GX1011 at 45, 52, 92. The use of the term makes sense: the funding rate is a stream of payments based on the difference between two things. *See* "Rate," *Merriam Webster* (defining "rate" as "an amount of payment or charged based on another amount," or "a charge, payment, or price fixed according to a ratio, scale, or standard"). Specifically, as the Mango Markets documents show, and as Kapil Jain explained, the funding rate is a payment stream based on the difference between (1) the mid-price between bids and asks on the MNGO Perpetual orderbook, and (2) the oracle for MNGO Perpetuals. *See* GX1011, at 92; Tr. 232-33, 241-45. This fits the plain meaning of "rate" or, in the alternative, is a "quantitative measure" because it reflects the differential between the orderbook mid-price and the oracle. 7 U.S.C. § 1a(47)(D).

There is no textual basis for treating the funding rate as an "index," which is a prerequisite for qualifying as a "narrow-based security index." 7 U.S.C. § 1a(35) (defining a narrow-based security index as a type of index). Unlike the funding rate, an index is a basket of securities. The securities laws define "index" to mean "an index or group of securities, including any interest therein or based on the value thereof." 15 U.S.C. § 78c(a)(68)(E). This definition and the statutory structure make clear that "index" refers to a basket of securities, not to a stream of payments based on a differential, like the funding rate. Similarly, the term "narrow-based securities index" is defined as an index with "9 or fewer component securities" or an index in which the "weight[]" assigned a particular security is above a certain threshold. 7 U.S.C. § 1a(35)(A). This plainly contemplates a basket of securities or assets. Joint rulemaking by the SEC and CFTC regarding narrow-based security indexes also refer to them as portfolios "designed to reflect the performance of a market or sector by reference to representative securities or interest in securities." 77 Fed. Reg. 48,285. This, too, envisions an index as a basket of securities. And more broadly, the plain meaning of index in the context of investing refers to baskets of securities or other assets, like the S&P 500, the NASDAQ, the DOW, or (outside the securities context) the consumer price index.

Against this legal backdrop, the defense's effort to call the funding rate a "narrow-based security index" is trying to squeeze a square peg into a round hole. The funding rate is not a basket of securities; it is a payment rate based on the differential between, on the one hand, the mid-price between bids and asks for MNGO Perpetuals and, on the other hand, the MNGO Perpetual oracle. That does not fit the meaning of the term "index," and if it did, it would render the terms "rate" and "quantitative measure" in the "mixed swap" definition meaningless. It would be legally wrong for the jury to find that the funding rate is a narrow-based security index, so this Court should not instruct the jury to consider whether the funding rate is a narrow-based security index.

## II. Prices

During the Rule 29 motion, the defense argued that the only relevant "price" for Count Two in this case is the reference price at which MNGO Perpetuals trade on Mango Markets, and not the prices at which those perpetuals settle. The Government has introduced evidence showing that the defendant intentionally and artificially inflated both prices, but the defense is legally wrong to limit Count Two only to the reference price of MNGO Perpetuals on Mango Markets and the jury instructions should provide clarity on that point.

Testimony during trial established that there are multiple prices relevant to an MNGO Perpetual. When parties create a MNGO Perpetual on Mango Markets, they agree to a reference price for the contract. That price is the baseline for determining which side of the contract is winning. From there, Mango Markets relies on an oracle to determine the price at which MNGO Perpetuals settle. If that settlement price is higher than the original reference price, the long side stands to gain and the short side stands to lose. If the settlement price is below the reference price, then the short side stands to gain and the long side stands to lose.

Throughout trial, the defense has sought to characterize the reference price as the "market" price and the settlement price as, somehow, not the "market" price. This does not make sense: both prices are references for determining whether there are gains or losses and both prices come

from market forces. Witnesses have, accordingly, resisted the defense's characterization. *See, e.g.*, Tr. 331 (Jain explaining that it is not correct to call the reference price the "market" price); Tr. 784 (same). At the close of the Government's case, it became clear that the defense's believes only manipulation with respect to the reference price of MNGO Perpetuals is relevant to Count Two and not the settlement price.

This position is legally wrong. For one, it does not have a home in the text of the statute. The anti-manipulation law in the CEA makes it a crime for "[a]ny person to manipulate or attempt to manipulate the price of . . . any swap." 7 U.S.C. § 13(a)(2). The statute does not use the phrase "market" price or restrict the type of price that is covered by the statute in any way. The defense's interpretation of the term "price" also makes little sense within the context of the statutory scheme. The anti-manipulation law in § 13(a)(2) is a remedial statute. It would make little sense to limit its reach only to the reference price of a swap and not the swap's settlement price; after all, the settlement price is ultimately what determines who wins or loses on a bet.

The case law and regulatory decisions supports the commonsense position that "price" in the CEA's anti-manipulation law includes settlement prices. In 2008, the CFTC issued a formal opinion, rejecting the argument that "settlement prices are not legally cognizable as prices that can be the subject of a manipulation charge under the [CEA]," including § 13(a)(2) (identified in the decision as "Section 9(a)(2) of the Act"). *In re DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *30-31 (Nov. 5, 2008). The agency explained that "settlement prices are market prices that can be manipulated." *Id.* at *31. The Second Circuit affirmed that decision. *See DiPlacido v. CFTC*, 364 F. App'x 657, 660 & n.1 (2d Cir. 2009). This position is also consistent with antitrust law, where exercising artificial control over a settlement price is actionable. *See Gelboim v. Bank of America*, 823 F.3d 759, 768 (2d Cir. 2016).

None of the cases the defense cited during the Rule 29 argument support the position that manipulation of a settlement price is not actionable under § 13(a)(2). The defense referenced *ATSI Commc'ns v. Shaar Fund*, but that case does not even address the relevant statute or settlement prices. 579 F.3d 143 (2d Cir. 2009). Indeed, on the few occasions when the Second Circuit has addressed cases involving settlement prices, it has treated those as actionable under § 13(a)(2). For instance, in *Amaranth Natural Gas Commodities Litig.*, the Circuit considered a manipulation claim related to settlement prices under § 13(a)(2). 730 F.3d 170, 177 (2d Cir. 2013). While the Court upheld dismissal of the claim in that case, that decision was not because a settlement price was not actionable. *See id.* Indeed, a parallel CFTC action based on "manipulat[ing] the settlement price[s]" of certain futures was allowed to proceed by a district court. *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523, 535 (S.D.N.Y. 2008).

The defense's reliance during the Rule 29 argument on *Vitanza v. Board of Trade* and *Three Crown Ltd. v. Caxton* was also misplaced. Those decisions did not address § 13(a)(2). Instead, they addressed the reach of the CEA's private right of action provision. *See Vitanza*, 2002 WL 424699, at *5 (S.D.N.Y. March 18, 2002). The CFTC considered these decisions in its *DiPlacido* ruling and rejected their applicability to § 13(a)(2), concluding that it was inappropriate to extend decisions about private rights of action to the reach of the Government's authority and finding the reasoning of the decisions incorrect because "settlement prices are market prices that can be manipulated." 2008 WL 4831204, at *30-31; *see also DiPlacido*, 364 F. App'x at 660 n.1

(explaining the distinction the CFTC drew). The CFTC's decision, affirmed by the Second Circuit, deserves deference and is consistent with the text and statutory scheme. Indeed, the CFTC has continued to regulate against the backdrop of *DiPlacido*. *See also* 76 Fed. Reg. 41,408 (2011) ("[W]here, as in *DiPlacido*, a trader violates bids and offers in order to influence the volume-weighted average settlement price, an artificial price will be a 'reasonably probable consequence' of the trader's intentional misconduct.").

Given the defense's efforts throughout trial to define "market price" in a factually and legally incorrect way, the Court should not use the term "market price" in its instructions on either Count One or Count Two. That term does not appear in the statute, and using it in the context of this case would be confusing, in light of the defense's lines of questioning and argument. *See United States v. Futch*, 278 F. App'x 387, 394 (5th Cir. 2008) (rejecting defense request to "judicially insert[] the word 'market'" before "price" in a § 13(a)(2) case). Instead, the Court should use the word "price" and specify that the term includes both the reference price and the settlement price of MNGO Perpetuals on Mango Markets. In the alternative, the Court should simply use the word "price" without further elaboration. Adopting the term "market price" would confuse the jurors, potentially lead to a legally incorrect result, and would significantly prejudice the Government.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: \_\_/s_____
Thomas Burnett
Peter Davis
Assistant United States Attorneys
(212) 637-1064 / 2468

Tian Huang
Special Assistant United States Attorney
(202) 598-2523