# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE | § | No. 1:22-CV-00950-DAE |
| COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| IAN BALINA, | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Before the Court are two Motions for Summary Judgment, one filed by Plaintiff the United States Securities and Exchange Commission (the "SEC") (Dkt. # 33) and one filed by Defendant Ian Balina (Dkt. # 23).

The Court conducted a hearing on May 9, 2024. After careful consideration of the evidence and the arguments set forth in the pleadings and advanced by Counsel at the hearing, for the reasons that follow, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the SEC's Motion for Summary Judgment and **DENIES** Defendant Ian Balina's Motion for Summary Judgment.

<u>BACKGROUND</u>

The SEC alleges that Sparkster, Ltd. ("Sparkster"), a software development company located in the Cayman Islands, conducted an unregistered securities offering of cryptocurrency ("crypto") asset securities called SPRK Tokens. (Dkt. # 1 at 1.) The SEC contends that the offering took place between April and July 2018, raising approximately $30 million from nearly 4,000 investors located abroad and in the United States. (Id.) The SEC required Sparkster to disgorge the $3 million, imposed civil penalties, and set up a Fair Fund for the benefit of persons harmed by the violations.

This lawsuit, however, focuses on Defendant Ian Balina, a cryptocurrency ("crypto") investor and influencer. (Dkt. # 1 at 1, App. 575.) The SEC alleges that Balina signed a contract to invest $5 million in the Sparkster offering and sold, offered, and promoted SPRK Tokens, without disclosing compensation, violating Section 5(a), 5(c), and 17(b) of the Securities Act. (Id. at 2.)

Balina operated a Patreon account, a paid subscription platform. (App. 41.) On his Patreon, Balina stated that he has "come up with a methodology of evaluating and grading" Initial Coin Offerings ("ICOs") using data and prior success. (App. 571.) By doing so, Balina was "trying to find undervalued ICOs

that have the best chance of making money." (Id.) He states that a spreadsheet summing up his methodology has "gone viral." (Id.)

Balina offered paid subscribers of his platform the opportunity to gain access to Balina's deal flow and his favorite ICOs before he shares them publicly. (App. 571–72.) He also gave options for those who could not afford a subscription, stating that he will "always help out the little guys for free" on YouTube live steams and his Telegram group. (App. 572.)

On May 4, 2018, Balina traveled abroad on a "World Tour" to try and help the public identify "good projects from the fraudulent projects." (Dkt. # 7 at 2.) During this world tour, Balina emceed a "Shark Tank like event" in Amsterdam (the "Event") as part of this World Tour. (Id.) During the Event, Balina introduced himself as a "blockchain angel investor . . . trying to find the next big ICO[,]" and held a cryptocurrency pitch contest for ICO investment opportunities. (App. 351).

Throughout the Event, Sparkster's CEO, Sajjad Daya, pitched the Sparkster platform and the SPRK Token. (App. 354.) Essentially, Daya explained that there are "two parts" to Sparker's technology. First, there is the product that allows users to "build software without writing any code." (App. 356.) Daya stated that this product was "finished" and "blockchain integrated." (Id.) The other part is the blockchain that runs on people's computers as a decentralized

3

cloud and can "earn tokens." (App. 357.) Daya continued that Sparkster was "going to hopefully run a public demonstration of [its] network" the following month. (App. 363.) Daya pitched that Sparkster's decentralized cloud achieves 10 million transactions per second ("TPS"). (Id.) However, when Balina asked, Daya admitted that "right now" the TPS was really at "6-1/2 thousand TPS across six cells," and that they needed to add more cells to achieve linear growth. (App. 362.) Finally, Daya announced that he "built Sparkster to change the world" and that he can only do that "with your support and the support of people like Ian[.]" (App. 365.)

> After the contest, Balina and Daya began negotiating a contract for Balina to purchase SPRK Tokens. (App. 146.) Balina originally asked Sparkster's CEO whether he could obtain a "5,000 ETH," or approximately a $3,500,000 allocation of Tokens in a private sale. (App. 146.) Then, he increased the allocation to $10 million because of the "level of interest in the project based on talking to other investors or other people." (App. 70.) Then, Daya countered with a $5 million allocation, Balina accepted, and Daya responded, "Our pleasure. We're honored to have you onboard." (Id., App. 147)

> On May 20, 2018, nine days after the Event, Balina and Sparkster memorialized their agreement in writing in the Simple Agreement for Future Tokens (the "SAFT"). (App 183.) In the SAFT, it states Balina agreed to

purchase 43,333,333 tokens at $0.15 a token and receive a 30% bonus.  (Id. at

183).  Balina, however, states in his affidavit that he only purchased 450,932.77

SPRK Tokens in exchange for 150 ETH, approximately $106,915.50.  (Dkt. # 23,

Ex. 1.)  He states that he paid the same price for each SPRK token as other

members of the pool and paid the same fees.  (Dkt # 23 at 23.)

      That same day, Balina introduced a "Sparkster Private Sale Whitelist"

on Telegram, his preferred messaging platform for Patreon subscribers, stating,

"Please fill out this form to get whitelisted for my Sparkster pool."  (App. 48, 206).

Balina asked the subscribers to fill out a Google Form for investors to identify

personal information, how much they were willing to invest, and their Ethereum

wallet ("ETH") that they intended to use for the sale.  (App. 206, App. 245).  The

Google Form also inquired about Patreon subscriber status, including "1 on 1 Tier"

or "Hangout Tier."  (App. 247.)  Finally, the Google Form included the following

admonition:

> THE ICOS IDENTIFIED HEREIN MAY CONSTITUTE SECURITIES
> PURSUANT TO FEDERAL AND STATE SECURITIES LAWS AND
> MAY NOT BE APPROPRIATE FOR, OR OFFERE[D] TO, INVESTORS
> RESIDING IN THE UNITED STATES. IN MAKING AN INVESTMENT
> DECISION, INVESTORS MUST RELY ON THEIR OWN
> EXAMINATION OF THE PERSON OR ENTITY ISSUING THE ICO
> AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS
> AND RISKS INVOLVED.
> INVESTMENT IN ICOS INVOLVES A HIGH DEGREE OF RISK AND
> SHOULD BE CONSIDERED ON BY PERSONS WHO CAN AFFORD
> TO SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT.

(App. 246.)

On May 21, 2018, Balina announced the sale was live on his
Telegram chat for Patreon subscribers.  (App. 48, 206–07.)  Within the hour,
subscribers contributed to the pool using a PrimaBlock link provided by Balina and
thanked Balina for the opportunity to do so.  (App 206–227).  According to the
SEC's expert, at least nine of these purchasers either self-identified as being
located in the United States or had an IP address from the United States.
(App. 276–78).  For the next few days, subscribers discussed the sale, and Balina
periodically chimed in.  (Id.)

The PrimaBlock pool address was located on the Ethereum
blockchain.  (App. 280)  The address contains a smart contract that provides the
ability for Balina to direct administrative and operational activities of the pool.
(Id.)

On May 26, 2018, Balina posted on Telegram: "Sending funds soon.
Those that want to pull please do so asap. We won't wait long."  (App. 237–39.)
He testified that he then initiated a transaction in the smart contract to send funds
from the pool to Sparkster.  (App. 142–43.)  He then updated the group that funds
were sent, and the Sparkster CEO thanked him for his contribution.  (App. 149,
239.)

6

Below is a diagram constructed by the SEC's expert, Dr. Kogan, explaining the transaction:



Figure 8. Sparkster Investment Pool Participants, Balina, and Sparkster Interaction with Primablock Pool at 0x5b05

This figure shows the flow of ETH and SPRK tokens between the Sparkster Investment Pool participants, Balina, the Primablock pool at 0x5b05 and Sparkster. Balina's Ethereum address 0xe33e controlled administrative and operational functions of the Primablock Pool at 0x5b05 and also participated in the investment pool.

(App. 281.)

Balina included Sparkster on his "Hall of Fame" on his publicly distributed website. (Dkt # 23 at 1.) In his post where he declared that Sparkster was included on his "Hall of Fame" on his spreadsheet, Balina said that the crowd voted for them to win the Amsterdam Event, and that he agrees. (App. 87–88.) In a YouTube video, when discussing Sparkster, Balina stated, "our team basically came to a conclusion that this was a project that we wanted to be a part of. Right? So disclosure: I have invested. I was part of their token sale. Now, with that being

said, this is not a paid endorsement." (App. 397.) In multiple YouTube videos over the next month, Balina emphasized that Sparkster was on his "Hall of Fame." (App. 324, 408–09, 412–13.)

While still on his World Tour in June 2018, Balina declared to a Budapest crowd that "Sparkster is, still right now . . . the best ICO of the month." (App. 408–09.) He stated that he was "very bullish" on Sparkster. (App 412.) In July 2018, Balina echoed these sentiments in Moscow and stated, "Sparkster is a better investment" than Quarkchain and he was "pretty certain" Sparkster would be profitable. (App 412.) Balina did, however, preface this opinion by claiming he "was not paid off by Sparkster." (App. 418.)

The SEC alleges that Balina violated Sections 5(a), 5(c), and 17(b) of the Securities Act. (Id.) In sum, the SEC alleges that Balina violated Section 5 by selling and offering to sell unregistered securities through his offering of SPRK Tokens through the pool. (Id.) The SEC further contends that Balina violated Section 7 by agreeing to receive a 30% bonus from Sparkster on the tokens he purchased in the Sparkster offering, while never disclosing the consideration he received when promoting the token. (Id.) The SEC filed its Complaint against Balina on September 19, 2022, seeking injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief. (Id.)

On November 18, 2022, Balina filed his answer.  (Dkt. # 7.)  Balina contends that he was fooled by Sparkster and, like the other members of the pool, lost money after purchasing SPRK Tokens.  (Dkt. # 23 at 2.)  He also denies that he received compensation from Sparkster, alleging that he simply received a volume discount during a private pre-sale purchase, which is other purchasers typically receive in the industry.  (Id. at 3.)

The case was reassigned to the undersigned on April 21, 2023. (Dkt. # 17.)  Balina filed a Motion for Summary Judgment on September 23, 2023. (Dkt. # 23). The SEC responded on October 12, 2023. (Dkt. # 27).  Balina filed a reply on October 23, 2023 (Dkt. #29).  The SEC filed their Cross Motion for Partial Summary Judgment on November 21, 2023.  (Dkt. # 33).  Balina responded on December 11, 2023.  (Dkt. # 36).  Then, the SEC filed a Reply on December 22, 2023.  (Dkt. # 38).  The SEC filed Notices of Supplemental Authority on March 12, 2024 and April 4, 2024.  (Dkts. ## 39, 41.)  The Court held a hearing on May 9, 2024.

## LEGAL STANDARDS

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists when the

'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" Kim v. Hospira, Inc., 709 F. App'x 287, 288 (5th Cir. 2018) (quoting Nola Spice Designs, 783 F.3d at 536). While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if it "might affect the outcome of the suit." Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019) (citing Anderson, 477 U.S. at 248).

"When the moving party has met its Rule 56(c) burden, the

nonmoving party cannot survive a summary judgment motion by resting on the

mere allegations of its pleadings." Jones v. Anderson, 721 F. App'x 333, 335

(5th Cir. 2018) (quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir.

2010)). The nonmovant must identify specific evidence in the record and articulate

how that evidence supports that party's claim. Infante v. Law Office of Joseph

Onwuteaka, P.C., 735 F. App'x 839, 843 (5th Cir. 2018) (quoting Willis v. Cleco

Corp., 749 F.3d 314, 317 (5th Cir. 2014)). "This burden will not be satisfied by

'some metaphysical doubt as to the material facts, by conclusory allegations, by

unsubstantiated assertions, or by only a scintilla of evidence.'" McCarty v.

Hillstone Rest. Grp., Inc., 864 F.3d 354, 357 (5th Cir. 2017) (quoting Boudreaux v.

Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary

judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party. Wease v. Ocwen Loan Servicing, LLC,

915 F.3d 987, 992 (5th Cir. 2019).

Additionally, at the summary judgment stage, evidence need not be

authenticated or otherwise presented in an admissible form. See Fed. R. Civ. P.

56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir.

2017). However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012)

(quoting Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)).

## ANALYSIS

Balina and the SEC each ask the Court to decide several issues on

summary judgment. First, Balina asked for this Court to find on summary

judgment that he did not violate Section 5 and Section 17 of the Securities Act

because SPRK Tokens are not a security and because the alleged promotions and

transactions occurred outside the United States. Balina also argues that he did not

violate Section 5(a) and Section 5(c) of the Securities Act because he did not sell

SPRK tokens, and that he did not violate Section 17(b) because he did not agree to

accept any compensation for promotion of SPRK tickets. Lastly, Balina argues

that he did not violate the Securities Act because any purported sales and offers to

sell are exempt under Section 4(a)(1) of the Securities Act.

Conversely, the SEC argues that many of these issues can be decided

on summary judgment in the SEC's favor. The SEC contends that the SPRK

tokens are securities and that U.S. securities laws apply to Balina's conduct

because he targeted U.S. investors on U.S. social media platforms. Then, the SEC

avers that it established as a matter of law that Balina violated Section 5(a) and

Section 5(c) of the Securities Act.

12

I.    Application of the United States Securities Laws to Balina's Conduct

Balina argues the SEC is attempting to extend its jurisdiction outside the United States.  (Dkt. # 23 at 2.)  Balina contends that the domestic transactions test from Morrison v. National Australia Bank Ltd. forecloses the SEC's ability to exercise jurisdiction because no domestic transaction occurred. (Id. at 8) (citing 561 U.S. 247 (2010)).

In opposition, the SEC advances that the domestic transaction test from Morrison does not apply because Morrison applies Section 10 of the Exchange Act, an anti-fraud provision, as opposed to the registration (Section 5) and promotions (Section 17) provisions of the Securities Act at issue here. (Dkt. # 33 at 14.)  The SEC contends that instead, the Court should focus on the fact that Balina used U.S. social media channels to target U.S. investors.  (Id.) Alternatively, even if Morrison does apply, the SEC maintains a genuine issue of material fact exists "as to whether Balina's sales were domestic transactions." (Id. at 20).

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  Morrison, 591 U.S. at 255 (quoting EEOC v. Am. Oil. Co. (Amarco), 499 U.S. 244, 248 (1991), superseded by statute on other grounds 42 U.S.C. § 2000e(f), as recognized in Arbaugh v. Y&H Corp.,

13

549 U.S. 500 (2006)).  The crux of this presumption is that Congress's grasp does not extend beyond domestic matters.  See Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 (2007) ("United States law governs domestically but does not rule the world . . . .").  "When a statute gives no clear indication of an extraterritorial application, it has none."  Morrison, 561 U.S. at 255 (2010).  And "extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case."  Id.

The Court must use a "two-step framework" to apply the presumption against extraterritoriality.  Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 417 (2023).  At step one, the Court must determine whether a provision is extraterritorial by evaluating whether "Congress has affirmatively and unmistakably instructed that" the provision at issue should "apply to foreign conduct."  Id. at 417.  Neither party asserts that Congress has expressly provided that the statutes here should apply extraterritorially.

Therefore, the Court proceeds to step two, where it must determine where the "conduct relevant to the statute's focus occurred."  Abitron Austria GmbH, 600 U.S. 412, 419 (2023).  If the conduct relevant to the focus occurred in the United States, then the statute may be applied domestically even if other conduct occurred abroad.  Id.  However, if the relevant conduct occurred in another country, then the case involves an impermissible extraterritorial application

14

regardless of any other conduct that occurred in U.S. territory.  Id.  Therefore, the

Court must first determine what conduct occurred is relevant to the focus of the

Section 5(a), 5(c), and 17(b) of the Securities Act, and where it occurred.

Balina contends that the Morrison domestic transaction test, should

govern our analysis of the relevant conduct.  The Morrison court held that there is

a domestic application of Section 10(b) of the Exchange Act when (1) "the

purchase or sale is made in the United States" or (2) the transaction "involves a

security listed on a domestic exchange."  Morrison, 591 U.S. at 269–70.  As the

SEC correctly points out, Morrison relies on the fact that Section 10(b) was

focused on *sales* of securities, rather than offers and promotions like Section 5 and

Section 17.  While Morrison's domestic transactions test may be properly applied

to determine where *sales* occurred for the purpose of Section 5, the same is not true

when the Court is determining where *other conduct* relevant to the focus of Section

5 and Section 17 occurred, like promotions and offers.  As the Supreme Court

stated, the "analysis applies at the level of the particular provision."  Abitron, 600

U.S. at 419, n.3.  Section 5 and 17 also regulate offers and promotions, not just

completed transactions and sales.  Therefore, Morrison does not cabin this Court to

only find SEC's jurisdiction when there is a purchase or sale made in the United

States or a security listed on the domestic exchange, as this is only the test for

location where relevant sales occur.  Therefore, to the extent the Court is

determining whether sales occurred domestically, the Court will use the domestic

transaction test from Morrison.  See Sec. & Exch. Comm'n v. Ripple Labs, Inc.,

No. 20CIV10832ATSN, 2022 WL 762966, at *11 (S.D.N.Y. Mar. 11, 2022)

(finding that Morrison governs the domesticity of sales, but not offers, and

applying different tests for both).  But as to offers under Section 5(e) and

promotions under Section 17(b), the Court will look to other tests to determine the

conduct relevant to the focus of the statute.

      The court must examine the focus of congressional intent of a

statute to determine whether domestic conduct occurred.  Abitron, 600 U.S. at 418.

To make that determination, the court looks to the "object of the [statute's]

solicitude, which can include the conduct it seeks to regulate, *as well as the* parties

and interests it seeks to protect or vindicate."  Id. (internal citations omitted).

      Section 5(e) seeks to regulate offers in the United States securities

market without proper registration, like standardized disclosures.  15 U.S.C.

§ 77e.4.  The Securities Act defines an "offer" as "every attempt or offer to dispose

of, or solicitation of an offer to buy, a security or interest in a security, for value."

Id. § 77b(1)(3).  The SEC's own regulations expressly state that:

> "For the purposes only of section 5 of the Act (15 U.S.C. sec. 77e),
> terms *offer*, *offer to sell*, *sell*, *sale*, and *offer* to buy shall be deemed to
> include offers and sales that occur within the United States and shall be
> deemed not to include offers and sales that occur outside the United States."

    17 C.F.R. sec 230.901 (2020).

16

Other district courts have held that "offers" under the Security Act have occurred where a person has either offered to dispose of securities in the United States or solicited an offer to buy securities or security-based swaps in the United States. See Ripple Labs, Inc., 2022 WL 762966, at *12; S.E.C. v. Goldman Sachs & Co., 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011). In S.E.C. v. Goldman Sachs & Co, the Court relied on the offeror's presence in the United States to find that an offer occurred domestically, stating that phone calls made and emails sent from New York City were enough to constitute a domestic offer. Id. Balina's location during the offers and promotions is debated, so there are not sufficient facts for the Court to find as a matter of law that he was located in the United States.

However, the object at the focus of a statute does not only include the conduct it seeks to regulate, but also those parties and interests that the statute intends to protect. Abitron, 600 U.S. at 418. Balina used U.S. channels, like U.S. social media networks, to target U.S. investors. Section 5(e) seeks to protect United States investors and United States financial markets from the offer of unregistered securities. So the Court must determine if the SEC can conclusively establish that Balina targeted United States investors.

Balina promoted SPRK Tokens on social media platforms, like YouTube, X, Instagram, Discord, Telegram, Google, and his blog site, to sell

17

SPRK tokens to United States investors.  (App. 29.)   All of these platforms are

available in the United States, and YouTube, X, Instagram, and Balina's blog are

U.S. based platforms.  (Dkt. # 38, Ex. A.)  To market his Sparkster investment pool

to investors, Balina announced to the Sparkster Investment Pool Telegram Group

that "Sparkster Primablock is now live" and included a URL to contribute to the

investment pool using Primablock.  (App. 276.)   Primablock recorded certain

investors' names, IP addresses, and physical addresses.  (Id.)  Four out of the 24

Sparkster Investment Pool participants listed their country as the United States, and

nine of the IP addresses were located in the United States.  (App. 277.)  Brian

Furano, a participant in Balina's pool, was in Santa Monica, California when he

participated in the pool.  (App. 427–28; 432, 436–37.)  Marc Molinaro, another

participant in Balina's pool, was located in the United States when he completed

the Google Form and transferred ETH to purchase SPRK Tokens from Balina's

allocation.  (App. 604–05.)  Though the location of the majority of the investors is

unknown, the United States is the location of the largest share of investors from a

known country.

        Balina points to evidence of conduct related to the promotion, offer,

and sale of SPRK that occurred outside the United States.  For example, Sparkster

is a company incorporated in the Cayman Islands.  (Dkt. # 36, Ex. 2 at 156.)

Balina also declared that the offering by Sparker was in the United Kingdom and

that PrimaBlock is a company registered under the laws of Estonia.  (Dkt. # 36, Ex. 2 at 4.)  Lastly, the "Shark Tank" like event at which Balina participated occurred in Amsterdam.  (App. 349.)

Nonetheless, the SEC contends that the ties to United States here are sufficient to show that Balina purposefully targeted United States investors, and the Court agrees.  Unfortunately, many elements of crypto transactions, like the identity and location of the purchasers, are characterized by anonymity.  However, due to Balina's use of United States social media platforms, along with the larger share of United States pool investors compared to other known countries, the Court finds that the SEC conclusively established that Section 5(e) may apply to Balina's offers under the Securities Act.

Section 17 prohibits the use of instruments of communication in interstate commerce to *promote* securities in the United States without disclosing the amount of consideration received for that promotion.  15 U.S.C. § 77q(b) (emphasis added).  For the same reasons listed above, Balina's promotions that used platforms available in the United States to reach Unites States investors is sufficient to show domestic conduct under Section 17(b).

Lastly, as it relates to the sales of securities under Section 5(a), the Court will apply the Morrison test.  Morrison held that Section 10(b) can be applied to domestic purchases and sales.  However, Morrison did not define what

19

constitutes a domestic sale, and neither has the Fifth Circuit.  Balina argues that this Court should adopt the standard articulated by the Second Circuit in Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 68 (2d Cir. 2012).  There, the Second Circuit stated that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States."  Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 68 (2d Cir. 2012).

Both Balina and the SEC argue that the "irrevocable liability" test supports their arguments.  Balina argues that because he was outside the United States from prior to May 4, 2018 until July 18, 2018, and that all his alleged promotions occurred at locations outside the United States.  Therefore, he argues, liability did not attach in the United States.

On the other hand, the SEC argues that the transactions here are domestic even under the Absolute Activist standard because some of Balina's investors were in the United States when they committed to purchase SPRK Token through Balina's investment pool.  (Dkt. # 33 at 25.)  Courts in the Second and Tenth circuit have found that a domestic transaction occurs when either the seller or the buyer is present in the United States.  Williams v. Binance, No. 22-972, 2024 WL 995568, at *140 (2d Cir. Mar. 8, 2024) (stating that when Plaintiffs sent

buy orders and payments on the Binance platform, they "irrevocably committed" to the investments while in the United States); SEC v. Traffic Monsoon, LLC, 245 F. Supp. 3d 1275, 1295 (D. Utah 2017) ("Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of" the U.S. securities laws), aff'd sub nom. SEC v. Scoville, 913 F.3d 1204 (10th Cir. 2019). Here, even if Balina and the relevant companies are technically located outside the United States, many of the "buyers" in Balina's pool were in the United States when they opted-in to the Sparkster pool.

Balina also asks the Court to use the test advanced by the Second Circuit in Parkcentral Glob. HUB Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 216 (2d Cir. 2014). There, the Second Circuit held that a "domestic transaction is necessary but not necessarily sufficient to make § 10(b) applicable." Id. Rather, the claims may be dismissed as extraterritorial when they are "so predominantly foreign as to be impermissibly extraterritorial." Id. Balina noted that a court in this district cited Parkcentral approvingly in Eng v. AKRA Agric. Partners, Inc., 2017 WL 5473481 (W.D. Tex. Aug. 9, 2017). However, since Eng was decided, many other courts have declined to follow Parkcentral, stating that it is inconsistent with Morrison. SEC v. Morrone, 997 F.3d 52, 60 (1st Cir. 2021) ("[W]e reject Parkcentral as inconsistent with Morrison."); Stoyas v. Toshiba Corp., 896 F.3d 933, 950 (9th Cir. 2018) ("[T]he principal reason we should not

21

follow the Parkcentral decision is because it is contrary to Section 10(b) and
Morrison itself."); In re Volkswagen AG Sec. Litig., 2023 WL 2505539, at *10-11
(E.D. Va. Mar. 14, 2023) (rejecting Parkcentral as inconsistent with Morrison).
Therefore, the Court will not rely on Parkcentral here.

> The Court also notes that finding that a domestic transaction
occurred here is consistent with public policy. If Balina could evade the SEC's
lawsuit simply because he was located outside the United States while promoting
crypto investments to United States investors on United States social media
platforms, then others could follow in his footsteps in the future, by temporarily
leaving the United States, to evade United States securities regulations while
targeting United States investors and United Sates financial markets.

> Accordingly, the Court finds Balina's broader challenge to
domesticity fails. Section 5(a), 5(c), and 17(b) of the Securities Act apply to
Balina's conduct in this case as a matter of law.

## II.  Whether the SPRK Tokens are Securities

> Balina argues that this Court should grant summary judgment in his
favor because the SPRK Tokens are not securities and therefore not subject to the
SEC's jurisdiction. (Dkt. # 23 at 10.) The SEC, on the other hand, argues that the
Court should grant summary judgment because the SPRK Tokens were offered and
sold as securities. (Dkt. # 33 at 2.) Therefore, a threshold issue common to both

the SEC's Section 5 and Section 7 claims is whether SPRK Tokens were offered and sold as securities.

Under the Securities Act, the term "security" includes any "investment contract." 15 U.S.C. §77b(a)(1). The Supreme Court's decision in SEC v. Howey, 328 U.S. 293 (1946) defines "an investment contract" as "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." SEC v. Sethi, 910 F.3d 198, 203 (5th Cir. 2018) (citing Williamson v. Tucker, 645 F.2d 401, 417–18 (5th Cir. 1981).

The Howey test embodies a "flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey, 328 U.S. at 299. Ultimately, there is sufficient evidence to show that Sparkster sought money from investors, through the purchase of SPRK Tokens, on the promise of development of Sparkster and an increased value of the investment. The Court will analyze each prong in turn.

A. Investment of Money

The first prong of the definition is clearly satisfied. The SPRK Token purchasers paid for their tokens using a crypto asset known as Ethereum in exchange for SPRK Tokens. (App. 594.) The investment of crypto assets is

equivalent to an investment of money.  SEC v. Shavers, No. 4:13–CV–416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that use of Bitcoin was an investment of money).

B.  Common Enterprise

For the second prong, the Court must consider whether there is a "common enterprise." S.E.C. v. Koscot Interplanetary, Inc., 497 F.2d 473, 478 (5th Cir. 1974).  A common enterprise is "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." Id.  This prong focuses on the "uniformity of impact of the promoter's efforts." Id.  A common enterprise can be "evidenced by the fact that fortunes of all investors are inextricably tied to the efficacy" of the party seeking the investment. Id. at 479.  Additionally, the Fifth Circuit has stated that the critical inquiry is confined to "whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." Long v. Shultz Cattle Co., Inc., 881 F.2d 129, 140 (5th Cir. 1989) (citing Sec. & Exch. Comm'n v. Cont'l Commodities Corp., 497 F.2d 516 (5th Cir. 1974)).

In the context of cryptocurrency, other district courts have held that the nature of a common enterprise is one that pools invested proceeds, in an effort to create an ecosystem for the token, and thus boost the value of the investment. See, e.g., U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc., 492 F. Supp. 3d 169,

24

179 (S.D.N.Y. 2020).

Sparkster promised to use the funds from the sale of the SPRK Tokens to develop and promote the digital ecosystem it created, establishing a common enterprise. Sparkster stated in its Whitepaper that "[t]he development and launch of the Sparkster Platform by Sparkster Enterprise Ltd will be funded by the Company using the proceeds of the sale of the Tokens." (App. 442.) In a June 1, 2018, YouTube presentation, when asked what Sparkster would do with the money it raised, Sparkster's CEO answered, "Vast majority of money we've raised will be used to promote Sparkster and tell the world about Sparkster." (App. 532.) Daya also emphasized how the Sparkster platform was continuing to grow and increase in transaction per second ("TPS") speed. (See App. 362.) The evidence shows that Sparkster was asking the purchasers of its tokens to make a bet on the success of Sparkster by soliciting investments through token purchases, key features of a common enterprise. See SEC v. Kik Interactive Inc., 492 F.Supp.3d 169 (S.D.N.Y. 2020) (holding that Kik's use of funds from its issuance of tokens to develop and construct its digital ecosystem established a common enterprise); SEC v. Telegram Grp. Inc., 448 F.Supp.3d 352, 369 (S.D.N.Y. 2020) (finding a common enterprise where "[t]he ability to each Initial Purchaser to profit was entirely dependent on the successful launch" of the blockchain).

Other facts indicate that Sparkster was seeking purchasers of tokens

much like a company would seek investors before an I.P.O. Sparkster highlighted

the company's current and upcoming partnerships. (App. 400.) The Whitepaper

contained eight pages of biographies of executives and other employees,

highlighting their educational and professional backgrounds. (App. 497–505.)

Essentially, Sparkster was highlighting the "promoter expertise" to give comfort to

the investors about the "fortuity of the investments," supporting a common

enterprise. See Long v. Shultz Cattle Co., Inc., 881 F.2d 129, 140 (5th Cir. 1989).

Balina argues that the "common enterprise" prong is not met

because the SPRK Tokens did not entitle or grant its owner (1) any shares of stock

in Sparkster (or any other company); (2) any voting rights; (3) any rights to a

dividend or other profit share; or (4) any other financial rights. (See Dkt. # 23,

Ex.4 at 34-47). Balina argues that to find a common enterprise under Howey, the

Court must find that the investors share in the profits of the company.

No Fifth Circuit case requires that an investor own a stock or rights

in a company for an investment contract to exist. In fact, the Fifth Circuit has

stated that the common enterprise prong does not require "interdependence

narrowly in terms of shared profits or losses." Long, 881 F.2d at 141. "Rather, the

necessary interdependence may be demonstrated by the investors' collective

reliance on the promoter's expertise." Id. Here, the investors relied on Sparkster's

expertise and technical skill to develop the underlying software and blockchain

26

technology, engaging in a common enterprise that correlated with the success of the promoter. This is evidenced by Sparkster's promotion of the credentials of its management and constant assurance that the underlying software technology was in the process of improving, and even capable of changing the world. (See App. 354–63.)

C. Expectation of Profits Derived From Efforts of Promoter or Third Party

For the third prong, the court must analyze whether the investment contract is one in which the investor is "led to expect profits solely from the efforts of the promoter or a third party." Howey, 328 U.S. at 298-99; see also S.E.C. v. Koscot Interplanetary, Inc., 497 F.2d 473, 483 (5th Cir. 1974). The word "solely" has not been construed literally. Long, 881 F.2d at 133. Instead, the "critical inquiry" is instead "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." Id. (citing Williamson, 645 F.2d at 418). Out of circuit district courts have found that this prong is satisfied in the context of other crypto tokens in similar circumstances. See SEC v. Terraform Labs Pte. Ltd., No. 23-cv-1346, 2023 WL 4858299, at *1 (S.D.N.Y. July 31, 2023) (determining the "reasonable expectation of profits" prong to be satisfied because an objective investor would have perceived defendants' statements and actions promising to use the funds from the sale of tokens to continue to improve the

underlying ecosystem as indicating the possibility of profitable returns); SEC v.
Coinbase, Inc., 23-cv-4738, 2024 WL 1304037, at *20 (S.D.N.Y. Mar. 27, 2024).

      Balina principally argues that this prong could not be satisfied
because Balina and other investors were buying a "finished product." (Dkt. # 23 at
11–13.) Balina points out that Sparkster's CEO stated there was a finished
product at the Amsterdam Event and marketed the SPRK Tokens as the means by
which an individual could use the finished product. Essentially, Balina contends
that the token is more like a commodity that may increase in value, but that
increase in value would not be dependent on the continuing efforts of the promoter.
(Dkt. # 23 at 17.)

      In support of this argument, Balina also points the Court to the
SEC's guidance on the topic that was available in 2018. In 2018, Chairman Jay
Clayton made a statement on cryptocurrencies and initial coin offerings,
emphasizing that whether a token is a security varies on a case-by-case basis. SEC
Chairman Jay Clayton, "Statement on Cryptocurrencies and Initial Coin
Offerings," Dec. 11, 2017, https://www.sec.gov/news/public-statement/statement-
clayton-2017-12-11. To distinguish, the SEC Chairman drew an example:

> For example, a token that represents a participation interest in a
> book-of-the-month club may not implicate our securities laws, and may well
> be an efficient way for the club's operators to fund the future acquisition of
> books and facilitate the distribution of those books to token holders. In
> contrast, many token offerings appear to have gone beyond this construct
> and are more analogous to interests in a yet-to-be-built publishing house

with the authors, books and distribution networks all to come.

Id.

SPRK's Token is more like the "yet-to-be-built publishing house." The Sparkster CEO admitted that the underlying technology had not reached its peak speeds, stating that the TPS was really at "6-1/2 thousand TPS across 6 cells" and that they needed to add more cells to achieve linear growth.  In fact, the Whitepaper had a section titled "The Road to 10 Million+ TPS."  (App. 478.)  The Sparkster CEO admitted that Sparkster would use the proceeds from the sale of SPRK tokens to market and grow the business.  (App. 442.)  He also announced that he "built Sparkster to change the world" and that he can only do that with the support of investors and people like Ian.  (App. 365.)  Essentially, the tokens were a vehicle for Sparkster to finance its company as investors bet on the underlying technology.  If the investors did not trust Sparkster's CEO to grow the platform and improve the technology, the SPRK tokens would be worthless.  This is why the Sparkster CEO highlighted the backgrounds and prestige of the management of the company.  Though the Court recognizes that the SEC's guidance is not binding, the Court finds that Balina is incorrect that the SPRK token represents a "finished product."

Balina argues that the SAFT and Whitepaper characterize the token as a finished product that can only be used within the Sparkster ecosystem.

29

(Dkt. # 36 at 5.)  However, when a Court analyzes whether something is a security, the Court will look to substance over form. Tcherepnin v. Knight, 389 U.S. 332, 336 (1967).  Therefore, the Court will not consider express disclaimers in a contract when determining the character of the security. See SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352–55 (1943) (courts consider may look "outside the instrument itself" to consider the character of an instrument).

      For the reasons stated above, and because the SPRK tokens meet all three prongs of the Howey test, the Court holds that the SPRK tokens are securities as a matter of law.

## III.   Violation of Section 17(b) under the Act

      Balina asks the Court to dismiss the SEC's claim under Section 17(b) of the Securities Act on summary judgment.  He argues that he "never accepted and never agreed to accept any compensation for allegedly promoting SPRK tokens."  (Dkt. # 23 at 3.)  He contends his involvement was merely a bulk purchaser and he gained the same advantage as other pool purchasers.  (Id. at 3–5).  In support, he directs the Court to redacted portions of the deposition of a fellow SPRK investor, Brian Furano.  (Id. at 5).

      The SEC maintains that Balina received a significantly larger amount than the other members in the pool.  Namely, the SEC purports Balina was able to purchase $5 million worth of tokens, wheares others were not allowed to

invest more than the minimum.  (Dkt. # 24 at 2.)

Section 17(b) of the Act reads:

It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b).

It is obvious that Balina promoted Sparkster.  He included Sparkster on his "Hall of Fame" list and repeatedly spoke favorably of a Sparkster investment on his World Tour.  However, promotion alone is not sufficient to constitute a violation of Section 17(b).  Balina must also have "directly or indirectly," received, consideration and failed to disclose this consideration.  Id.

Balina constantly denied that he was being compensated for his promotion of Sparkster.  He stated that he was not getting paid off by Sparkster and that he was not being compensated.  (App 397, 481.)  Balina claims he simply thought it was a good product and disclosed his opinion to the public, much like he did not for other crypto projects.  (Dkt. # 23 at 4.)  Therefore, it is also obvious that he did not disclose he was being

31

compensated.  The only issue remaining is whether Balina was actually compensated for his promotions.

Balina states in his affidavit that he simply received the same volume discount of 30% as every other purchaser in the pool.  (Dkt. # 23, Ex. 1.)  He further states that the discount was not conditioned on Balina's promotion of Sparkster or its tokens.  (Id.)  Lastly, he claims that he did not have the opportunity to purchase more tokens than any other investor.  (Id.)

The SEC, however, points to evidence that Balina received certain benefits that other investors and the general public did not receive. The SAFT states that Balina is the purchaser, and that he may purchase an amount of $10 million for 43,333,333 Tokens.  (App. 183.)   Sparkster's CEO told Balina that everyone else's contribution had been capped, but Balina was allowed to invest above the minimum.  (App. 148) ("You're the only one that's been allowed to invest more than the min.")

Regarding the bonus, Sparkster's CEO explicitly stated that Balina would receive a 30% bonus, and that there would be "no bonus" for "everyone else."  (App. 148.)   Balina acknowledged that he may "have to publicly disclose it to [his audience] due to SEC regulations."  (Id.)

After the SAFT was executed, Balina added Sparkster to his Hall of Fame and continued to promote Sparkster around the world over the

next few months.  (App. 147, 397, 408.)  The conversations between Daya
and Balina also indicate that there possibly could have been a prior
conversation and understanding regarding a bonus and allocation to Balina
in exchange for a spot in the Amsterdam event.  For example, Balina told
Daya, "Hey Etienne is telling me he's not getting an allocation even though
he's the one who helped you get into the pitch contest."  (App. 148.)

       If, however, Balina is correct that he did not actually receive
compensation for his promotion, but rather the same bonus and allocation
cap as everyone else, then a violation of Section 17(b) cannot be shown.
Ultimately, the Court finds that there is a fact issue regarding the discount
other members of the pool received, if any, whether there was a prior
agreement for compensation in exchange for promotion, and whether Balina
was given the opportunity to purchase more shares than other members of
the Pool. There are inconsistencies between Balina's affidavit, the
WhatsApp messages between Balina and Daya, and the SAFT.  Therefore,
there is an issue of material fact regarding the existence of a *quid pro quo,*
and the Court declines to decide this issue on summary judgment.

IV.   <u>Violations of Section 5 under the Act</u>

       The SEC argues that Balina violated Section 5(a) and 5(c) of
the Securities Act as a matter of law.  Conversely, Balina argues that it is

conclusively established that Balina did not sell or offer to sell SPRK

Tokens.  Therefore, both parties ask this Court to decide this issue on

summary judgment.

 To establish a Section 5 violation, the SEC must prove: "(1)

[N]o registration statement was in effect as to the securities, (2) the

defendant sold or offered to sell these securities, and (3) interstate

transportation or communication and the mails were used in connection with

the sale or offer of sale."  <u>SEC v. Cont'l Tobacco Co. of South Carolina</u>, 463

F.2d 137, 155 (5th Cir.1972).  Neither party asserts that Balina registered the

security, so the first element is clearly met.

 The parties dispute the second element. Balina contends that

he did not sell or offer to sell SPRK tokens, but rather, he was a member of a

pool of numerous individuals who purchased SPRK tokens.  (Dkt. # 23 at 6.)

Balina highlights that he did not receive a commission for such sales and

that other pool members purchased their SPRK tokens on the same price and

paid the same fees.  (<u>Id.</u>)  He asserts the pool members did not purchase their

tokens from him, and that the SEC cannot point to evidence that anyone

purchased SPRK tokens from Balina himself.

 The SEC, on the other hand, points to evidence showing that

Balina sold the securities. Balina signed a $5 million contract with Sparkster

to buy 43,333,333 SPRK Tokens.  (App. 183.)  The same day that he signed the contract, Balina posted in a Telegram invitation to "fill out [link to Google form] to get whitelisted for my Sparkster pool. It will be starting one day." (App. 48, 206.)  The next day, he went live and told his supporters to contribute.  (Id.)  Balina told the members that he was sending their contributions to Sparkster, notifying them when the funds were sent. (App. 149, 239.)  Balina sent the pool funds to Sparkster with the smart contract at PrimaBlock.  (App. 142.)  Sparkster's CEO thanked Balina when he received the funds.  (App. 149.)  Then, the smart contract for the pool distributed the tokens to investors after they were received from Sparkster. (App. 256, 285.)

Balina possessed title to the tokens under the SAFT. The SEC's expert stated that Balina actually received 690,471.1 tokens, which is much less than the amount stated in the SAFT.  (App 285.)  However, the SAFT still represents the fact that Balina is the "purchaser" of 433,333,333 Tokens.  (App. 183, 189.)  Then, Balina allowed his paid subscribers an allocation of the Tokens he bought through the SAFT by allowing the subscribers to buy SPRK Tokens from *his* pool that he had control over.

Balina's reliance on the lack of commission he received for the sale is also irrelevant.  First, Balina cites no case to support the

35

contention that a commission is needed to show a sale under Section 5. More importantly, Balina states that a lack of commission is relevant because it shows that Balina would have no incentive to sell the Tokens at the same price that he bought them. However, Balina would have an incentive for selling the tokens—increased liquidity and value of the token due to an increase in investors.

In sum, Balina's actions show that he violated Section 5(a) and Section 5(c) of the Securities Act by selling SPRK, an unregistered security, to investors through his pool of SPRK tokens.

V. <u>Whether Balina is Exempt from Liability under Section 4(a)(1) of the Securities Act</u>

Under Section 4(a)(1) of the Securities Act, exempt transactions include "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Balina claims that because he is not an issuer, underwriter, or dealer, he cannot be held liable for violations of the Securities Act.

Under Section 2(a)(11), an "underwriter" is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking…" 15 U.S.C. § 77b(a)(11).

36

By offering SPRK Tokens through his pool, Balina acted as an underwriter, purchasing SPRK Tokens from Sparkster's distribution to sell to members of his pool.  He formed the pool the same day he signed the SAFT, indicating his intent to distribute the tokens immediately.  (App. 183.)  He also asked to receive more SPRK Tokens from Sparkster due to the amount of investor interest.  (App. 70.)  These facts show that he purchased the tokens from Sparkster with the intent to distribute the tokens.  Therefore, Balina is not exempt under this provision.  See Vohs v. Dickson, 495 F.2d 607, 620 (5th Cir. 1974) (holding that an underwriter is a purchaser with a view to a public offering of a security).

## CONCLUSION

For these reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment and **DENIES** Defendant's Motions for Summary Judgment.  The Court holds as a matter of law that U.S. securities laws apply to Balina's conduct and that the SPRK tokens are securities. The Court also holds as a matter of law that Balina violated Section 5(a) and 5(c) of the Securities Act.  The Court denies Defendant's motion for summary judgment on the SEC's Section 17 claim, which shall survive and not be decided as a matter of law.

**DATED:** Austin, Texas, May 22, 2024.


_____

David Alan Ezra
Senior United States District Judge