# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re RIPPLE LABS, INC. LITIGATION

_____

This Document Relates To:

　　All Actions

_____

Case No. 18-cv-06753-PJH

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. 325, 326, 329

　　　Defendants' motion for summary judgment came on for hearing on May 30, 2024. Plaintiff appeared through his counsel, Nicholas Spear, Oleg Elkhunovich, Michael Tayag, and James Taylor-Copeland. Defendants appeared through their counsel, Bradley Oppenheimer, Andrew Michaelson, and Bethan Jones. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

　　　This is a securities case. The factual and procedural backgrounds of the case are lengthy, and largely laid out in the court's previous orders. As relevant here, plaintiff Bradley Sostack asserts securities claims against defendants Ripple Labs, XRP II (a subsidiary of Ripple), and Bradley Garlinghouse, CEO of Ripple.

　　　The following claims remain in the case:

1.　　Violation of Section 12(a)(1) of the Securities Act (Title 15 U.S.C. § 77l(a)(1)) against defendants for the unregistered offer and sale of securities;

2.　　Violation of Section 15 of the Securities Act (Title 15 U.S.C. § 77o) against defendant Ripple and defendant Garlinghouse for control person liability for the primary violation of Title 15 U.S.C. § 77l(a)(1);

3.　　Violation of California Corporations Code § 25503 against defendants for a primary violation of § 25110's restriction on the offer or sale of unregistered securities;

4.      Violation of California Corporations Code § 25501 against defendant Ripple and defendant XRP II, as well as a parallel material assistance claim under § 25504.1 against defendant Ripple and defendant Garlinghouse, for misleading statements in connection with the offer or sale of securities in violation of § 25401; and

5.      Violation of California Corporations Code § 25504 against defendant Ripple and defendant Garlinghouse for control person liability in connection with defendants' primary violation of § 25110.

Four of the causes of action relate to defendants' failure to register XRP as a security; specifically alleging a failure to register the XRP security under federal law (first cause of action) and state law (third cause of action), and that Ripple and Garlinghouse "controlled" the primary violation under federal law (second cause of action) and state law (fifth cause of action).

Plaintiff sought and obtained class certification on the 'failure to register' claims, as follows:

Federal securities claims class: all persons or entities who purchased XRP from May 3, 2017 through the present and who have (a) retained the XRP, and/or (b) sold the XRP at a loss.

California state securities claims class: all persons or entities who purchased XRP from defendants and/or from any person or entity selling XRP on defendants' behalf from May 3, 2017 through the present and who have (a) retained the XRP, and/or (b) sold the XRP at a loss.

The court also added the limitation that the class include only class members who purchased XRP within the United States.

The fourth cause of action, for misleading statements in connection with the offer or sale of securities under California state law, is asserted only by the named plaintiff in his individual capacity. The claim arises out of a single alleged misleading statement made by defendant Garlinghouse regarding his "long" position on XRP. See Dkt. 115 at 18-20.

## DISCUSSION

A.     Legal standard

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to

United States District Court
Northern District of California

1    judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may

2    affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3    (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a

4    reasonable jury to return a verdict for the nonmoving party. Id. "A 'scintilla of evidence,'

5    or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to

6    present a genuine issue as to a material fact." United Steelworkers of Am. v. Phelps

7    Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citation omitted).

8        Courts recognize two ways for a moving defendant to show the absence of

9    genuine dispute of material fact: (1) proffer evidence affirmatively negating any element

10   of the challenged claim and (2) identify the absence of evidence necessary for plaintiff to

11   substantiate such claim. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099,

12   1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must

13   either produce evidence negating an essential element of the nonmoving party's claim or

14   defense or show that the nonmoving party does not have enough evidence of an

15   essential element to carry its ultimate burden of persuasion at trial.")

16       "Once the moving party meets its initial burden, the nonmoving party must go

17   beyond the pleadings and, by its own affidavits or by the depositions, answers to

18   interrogatories, and admissions on file, come forth with specific facts to show that a

19   genuine issue of material fact exists." Hansen v. United States, 7 F.3d 137, 138 (9th Cir.

20   1993) (per curiam). "When the nonmoving party relies only on its own affidavits to

21   oppose summary judgment, it cannot rely on conclusory allegations unsupported by

22   factual data to create an issue of material fact." Id.

23       The court must view the evidence in the light most favorable to the nonmoving

24   party: if evidence produced by the moving party conflicts with evidence produced by the

25   nonmoving party, the judge must assume the truth of the evidence set forth by the

26   nonmoving party with respect to that fact. See Tolan v. Cotton, 134 S. Ct. 1861, 1865

27   (2014); Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). However, when a non-

28   moving party fails to produce evidence rebutting defendants' showing, then an order for

United States District Court
Northern District of California

3

1    summary adjudication is proper.  <u>Nissan Fire</u>, 210 F.3d at 1103 ("If the nonmoving party

2    fails to produce enough evidence to create a genuine issue of material fact, the moving

3    party wins the motion for summary judgment.").

4    B.    Legal analysis

5         The court will start by addressing the 'failure to register' claims, brought on behalf

6    of the certified classes, and then will address the named plaintiff's individual claim for

7    misleading statements.

8         1.    <u>Federal law claims - statute of repose</u>

9         As to the federal claims for failure to register, defendants argue that they are

10   entirely foreclosed by the statute of repose, which bars claims brought "more than three

11   years after the security was bona fide offered to the public."  15 U.S.C. § 77m.

12        During the motion to dismiss stage, the court considered whether the statute of

13   repose is controlled by the "first-offered" rule, under which the three-year period begins

14   when the alleged security is first bona fide offered, or by the "last-offered" rule, under

15   which the three-year period begins when the alleged security was last offered to the

16   public.  <u>See</u> Dkt. 85 at 10-15 (citing <u>Stoltz Family Partnership L.P. v. Daum</u>, 355 F.3d 92

17   (2nd Cir. 2004); <u>In re Bestline Products Securities and Antitrust Litigation</u>, 1974 WL 1384

18   (S.D. Fla. 1975)).  The court ultimately concluded that the "first-offered" rule of <u>Stoltz</u> was

19   better reasoned, and applies it on this motion.

20        As a threshold matter, the parties disagree as to the relevant date to use as the

21   commencement of this lawsuit, with defendants' motion arguing that the relevant date is

22   August 5, 2016 (three years before the named plaintiff's complaint was filed), but

23   plaintiff's opposition argues that the relevant date should be July 3, 2015 (three years

24   before the federal securities claims were asserted in the earlier-filed <u>Greenwald</u> case,

25   which was consolidated into this case).

26        Plaintiff cites a 2021 case from the District of Oregon acknowledging that, in

27   general, "a party may not rely on a filing in a separate forum, on a separate date, by a

28   separate named party as the same 'action,' 'proceeding,' or 'suit' for purposes of the

statute of repose," but that such a rule was "inapposite to the pending case, in which a putative class action plaintiff files an amended complaint asserting a claim and then a court appoints a different lead plaintiff in the same case, who files a further amended complaint asserting the same claim." See In re LexinFintech Ltd. Securities Litigation, 2021 WL 5530949, at *18 (D. Or. Nov. 24, 2021).

In reply, defendants cite a SDNY case stating as follows: "That a plaintiff has a right to raise claims for a class does not, however, authorize other plaintiffs to intervene in the case and exercise statutory or Article III standing after the statute of repose period has expired."  In re Morgan Stanley Mortg. Pass-Through Certificates Litigation, 23 F.Supp.3d 203, 207 (S.D.N.Y. 2014).

In the absence of any controlling authority on the issue, the court opts to apply the earlier date, especially given that, as will be discussed below, the result of the statute of repose analysis would be the same under either date.

Defendants' motion cites evidence that XRP was listed on three digital asset exchanges (Kraken, Poloniex, and Bittrex) in 2013, 2014, and 2014 respectively, and that on Poloniex alone, before July 3, 2015, there were over 100,000 XRP transactions involving over 2,000 different buyer accounts and 200 million XRP transacted.  See Dkt. 339 at 24 (citing Dkt. 339, Ex. 19).

Defendants also cite to evidence of sales made directly through the XRP ledger or through "Ripple Trade," on which over 500 million XRP units were transacted before July 3, 2015.  See Dkt. 339 at 25 (citing Dkt. 339, Ex. 43).

Plaintiff's primary response to defendants' evidence is to argue that the early offers were not actually "bona fide" offers, as evidenced by the increased marketing that was put into XRP after 2017.  Plaintiff also argues that defendants engaged in "separate offerings," which would restart the statute of repose clock.

Plaintiff cites a five-factor test that the Ninth Circuit uses to determine whether securities sales are separate or integrated offerings: (1) whether the offerings are part of a single plan of financing, (2) whether the offerings involve issuance of the same class of

5

securities, (3) whether the offerings are made at or about the same time, (4) whether the same kind of consideration is to be received and (5) whether the offerings are made for the same general purposes.  SEC v. Murphy, 626 F.2d 633, 645 (9th Cir. 1980).

Defendants argue that there is no triable issue on the 'separate offerings' issue, because XRP is fungible, and because plaintiffs cannot identify any meaningful differences between the alleged separate offerings.  Defendants' reply argues that the one case cited by plaintiff on the 'separate offerings' issue was decided at the motion to dismiss stage, and was based on the fact that the company "offered a new series of securities and issued new certificates of investment," to which there is no analogy in this case.  See Dkt. 402 at 14 (citing Takiguchi v. MRI Int'l, Inc., 47 F.Supp.3d 1100, 1117 (D. Nev. 2014)).  The court agrees that plaintiff has not identified any meaningful differences between the alleged separate offerings, and thus finds no triable issue as to the presence of separate offerings.

The remainder of plaintiff's argument focuses on the fact that, after 2017, defendants vastly increased their efforts to market and publicize XRP.  Plaintiff discusses how defendants began publishing new reports for public consumption, began pushing to be listed on more exchanges, and spent more money on marketing.  None of these are inconsistent with XRP being publicly offered for sale years earlier.

Overall, based on the evidence that XRP was bona fide offered to the public before July 3, 2015, the court finds that plaintiffs' federal securities claims are barred by the statute of repose and accordingly GRANTS defendants' motion for summary judgment on the federal class claims for unregistered securities.

2.    State law claims – privity requirement

During the pleadings stage of this case, the parties argued whether a California state law claim for failure to register a security required plaintiff to allege privity, and the court concluded that plaintiff indeed "must allege privity to state a claim under § 25503." Dkt. 85 at 27 (citing Bowden v. Robinson, 67 Cal.App.3d 705 (1977)).

And while the court held that plaintiff had adequately alleged privity for pleading

purposes, it also noted that he would need to obtain actual evidence of privity through discovery:

> The court finds that plaintiff plausibly alleged that he purchased his XRP from defendants for purpose of stating a primary violation claim under § 25503. As an initial matter, plaintiff alleges that he, along with members of the putative class, "purchased XRP securities from defendants." Compl. ¶¶ 172, 187. While the court recognizes that the above allegations do not specify a direct purchase, they also do not foreclose any inference of such purchase.
> …
> In any event, at this stage in the litigation, where the court may draw reasonable inferences and the relationship between defendants, subsequent purchasers, and the exchange is unclear, the court concludes that plaintiff has adequately alleged privity in support of his § 25503 claim, though he may ultimately be unable to prove it.

Dkt. 85 at 28.

On this motion, defendants argue that plaintiff is indeed unable to prove privity with defendants. According to defendants' summary judgment motion, plaintiff contends that he learned through discovery that two out of his 40+ XRP purchase transactions were from a market-maker who sold on Ripple's behalf (referred to as "GSR"). See Dkt. 339 at 19 (citing Dkt. 339, Ex. 30, 31). Defendants argue that the two transactions represented only approximately 117 out of the total 129,000 XRP units purchased by plaintiff. See id. Defendants further argue that the market-maker involved in those two transactions was representing multiple sellers at once, including non-defendant sellers. See Dkt. 339 at 20. Defendants argue that "[t]here is no evidence that the market-maker was trading on Ripple's behalf, as opposed to another seller's, in the two specific sales to plaintiff." Id.

Plaintiff's opposition does not respond to defendants' argument regarding privity. Instead, to the extent that the opposition discusses the "downstream purchaser" argument, it does so only in the context of the "solicitation" theory of relief under federal law, and does not address the stricter privity requirement under California state law. See, e.g., Dkt. 372 at 52-57.

Defendants' reply points out that "plaintiff has not even tried to meet his burden of demonstrating that he can prove liability on his state law claims," noting that plaintiff

offered no rebuttal to defendants' argument that "plaintiff has failed to identify any direct purchasers or the damages they sustained."  Dkt. 402 at 10.

At the hearing, plaintiff first responded by suggesting that defendants' motion did not properly move for summary judgment of the state law claims based on a failure of proof.  <u>See</u> Dkt. 415 at 43.  The court finds no merit in that argument, as defendants' motion expressly argues that "[t]he same failure of proof forecloses the claim advanced by the California Class," because "California law [] limits recovery to direct purchasers" and "plaintiff has offered no way to determine who those direct purchasers actually are or what damages they sustained."  Dkt. 339 at 52.

Plaintiff also argued that, even if defendants had properly raised the privity argument, that "the evidence exists . . . in our class cert motion."  Dkt. 415 at 43.

Plaintiff's brief made no attempt to incorporate or reference the previously-submitted evidence.  Based on that omission alone, the court need not consider the evidence submitted in connection with class certification, which effectively results in plaintiff having waived his argument regarding privity as a result of his failure to offer any argument on the issue.

That said, even if plaintiff had incorporated or referenced the prior evidence, it would not be sufficient to overcome summary judgment.  In his class certification motion, plaintiff argued only that "[e]very member of the proposed State Securities Class purchased XRP either (1) from defendants, or (2) from defendants' market makers."  Dkt. 180-1 at 36.  No citation to evidence was provided for that assertion.

Plaintiff's class certification motion then asserted that "[n]o evidence beyond the purchase is needed to establish privity for those who purchased directly from defendants," and that "[f]or those who purchased from market makers, common evidence will establish that the market makers were defendants' agents and were operating on their behalf [], which is sufficient to establish privity between proposed class members and defendants for market maker sales."  Dkt. 180-1 at 36.  No citation was provided for that argument – although, to be clear, plaintiff's class certification motion needed only

1    establish that privity could be shown through common evidence, it did not necessarily
2    need to come forth with the evidence at that time.

3            In his class certification reply, plaintiff did cite more substantive evidence –
4    namely, a declaration from a corporate representative of defendants' execution agent
5    GSR, from whom he purchased XRP on the Poloniex exchange. See Dkt. 218-1 at 13.
6    Plaintiff cited the declaration for the proposition that "defendants supplied a pro rata
7    portion of the XRP used in every sale GSR made on Poloniex in January 2018." Id.
8    (citing Dkt. 181-64, Ex. 64).

9            However, as mentioned above, defendants' summary judgment motion directly
10   addresses the issue of whether GSR was operating as defendants' agents in connection
11   with its sales to plaintiff, and presented evidence that only approximately 117 out of the
12   total 129,000 XRP units purchased by plaintiff were purchased from GSR, and that, even
13   with respect to those units, GSR was representing multiple sellers at once, and that there
14   is "no evidence that the market-maker was trading on Ripple's behalf, as opposed to
15   another seller's, in the two specific sales to plaintiff." See Dkt. 339 at 20. Plaintiff's
16   opposition did not challenge or even reference defendants' evidence.

17           Plaintiff argues that "defendants directly benefit from all XRP sales" because
18   "every sale of XRP (regardless of seller or buyer) increases the trading volume of XRP."
19   Dkt. 372 at 18. Even taken as true, plaintiff offers no authority for his argument that such
20   a benefit is sufficient to establish privity under California state law.

21           Overall, plaintiff has failed to raise a triable issue that he or any class members
22   were in privity with defendants or their agents in connection with the class members'
23   purchases of XRP, and accordingly, summary judgment must be GRANTED on the
24   'failure to register' claims asserted on behalf of the California state securities class.

25           The preceding rulings fully resolve all class claims, for both the federal class and
26   the state class. That leaves only one claim remaining, the named plaintiff's individually-
27   asserted claim for misleading statements in connection with the offer or sale of a security.

28

United States District Court
Northern District of California

3. <u>Misleading statements claim</u>

During the pleadings stage, this claim was narrowed such that it now arises out of a single alleged misleading statement by defendant Garlinghouse – namely, the following statement made during a December 14, 2017 televised interview with the Business News Network, a link to which was also posted on Ripple's Twitter account:

> I'm long XRP, I'm very, very long XRP as a percentage of my personal balance sheet. . . . . [I am] not long on some of the other [digital] assets, because it is not clear to me what's the real utility, what problem are they really solving . . . if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that. We have been really fortunate obviously, I remain very, very, very long XRP, there is an expression in the industry HODL, instead of hold, it's HODL . . . I'm on the HODL side.

<u>See</u> Dkt. 115 at 18 (citing CFAC, ¶ 52).

Plaintiff alleges that the above statement was false when made because "throughout 2017 Garlinghouse sold millions of XRP on various cryptocurrency exchanges." <u>See</u> Dkt. 115 at 19 (citing CFAC, ¶ 53).

As mentioned above, defendants make only one argument in support of summary judgment on this claim – that XRP is not a 'security' under <u>Howey</u>, and thus cannot give rise to a claim for misleading statements in connection with a security. While the court did not reach the <u>Howey</u> test in connection with the 'failure to register' claims, it must do so here.

The Supreme Court in <u>SEC v. Howey</u> set forth the test for what qualifies as a 'security.' 328 U.S. 293 (1946). The Ninth Circuit has "distilled" <u>Howey</u> into a three-part test requiring: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits produced by the efforts of others. <u>Warfield v. Alaniz</u>, 569 F.3d 1015, 1020 (9th Cir. 2009).

The "investment of money" prong "requires that the investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." <u>Warfield</u>, 569 F.3d at 1021.

The second, common enterprise prong "exists where the investment scheme

United States District Court
Northern District of California

1    involves either 'horizontal commonality' or 'strict vertical commonality.'" <u>SEC v. NAC</u>

2    <u>Found.</u>, 512 F.Supp.3d 988, 996 (N.D. Cal. 2021) (citing <u>Hocking v. Dubois</u>, 885 F.2d

3    1449, 1459-60 (9th Cir. 1989)).  Horizontal commonality exists where two or more

4    investors pool their investments together and split the net profits/losses in accordance

5    with their pro rata investments, and strict vertical commonality is where "the fortunes of

6    the investors are linked with those of the promoters."  <u>Id.</u>

7         The third and final prong of the <u>Howey</u> test is whether there was an "expectation of

8    profit produced by the efforts of others."  <u>Warfield</u>, 569 F.3d at 1020.

9         The <u>Howey</u> test is an "objective inquiry into the character of the instrument or

10   transaction offered based on what the purchasers were led to expect."  <u>Warfield</u>, 569

11   F.3d at 1021.

12        Defendants challenge all three prongs of <u>Howey</u>.

13             a.    "investment of money"

14        On the first prong, defendants argue that there was no "investment of money" from

15   exchange-based purchasers, because the purchasers' money went to the exchange

16   sellers, not to defendants.  However, courts have expressly rejected this argument, and

17   defendants cite no cases supporting their position.  See <u>SEC v. Coinbase, Inc.</u> 2024 WL

18   1304037, at *23 (S.D.N.Y. Mar. 27, 2024) ("whether a particular transaction in a crypto-

19   asset amounts to an investment contract does not necessarily turn on whether an

20   investor bought tokens directly from an issuer or, instead, in a secondary market

21   transaction."); <u>SEC v. Terraform Labs Pte. Ltd.</u>, --- F.Supp.3d. ---, 2023 WL 4858299, at

22   *15 (July 31, 2023) ("the court declines to draw a distinction between these coins based

23   on their manner of sale, such as that coins sold directly to institutional investors are

24   considered securities and those sold through secondary market transactions to retail

25   investors are not.").

26        Accordingly, the court cannot find as a matter of law that XRP purchasers on the

27   secondary market did not make an 'investment of money' sufficient to satisfy the <u>Howey</u>

28   test.

b.    "common enterprise"

As mentioned above, the "common enterprise" prong is met where the investment scheme involves either 'horizontal commonality' or 'strict vertical commonality.' Horizontal commonality exists where two or more investors pool their investments together and split the net profits/losses in accordance with their pro rata investments, and the key inquiry for strict vertical commonality is whether there is a "direct relation" between the success or failure of the investor and that of the promoter.  Mordaunt v. Incomco, 686 F.2d 815, 817 (9th Cir. 1982)

As with the first prong, defendants' primary argument with regard to horizontal commonality is that any exchange-based purchasers, by definition, cannot be part of a common enterprise because their funds were not "pooled" with other XRP purchasers. See Dkt. 339 at 35-39.  However, as set forth above, courts have expressly rejected the argument that the Howey test turns on whether a purchaser bought tokens directly from an issuer or on the secondary market.  See Coinbase, 2024 WL 1304037 at *23; Terraform, 2023 WL 4858299, at *15.

Moreover, the very statement at issue on this claim serves to support plaintiff's argument that a reasonable investor would have understood there to be a "direct relation" between the success or failure of the investor and that of the promoter:

> I'm long XRP, I'm very, very long XRP as a percentage of my personal balance sheet.  . . . . [I am] not long on some of the other [digital] assets, because it is not clear to me what's the real utility, what problem are they really solving . . . if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that. We have been really fortunate obviously, I remain very, very, very long XRP, there is an expression in the industry HODL, instead of hold, it's HODL . . . I'm on the HODL side.

CAFC, ¶ 52 (quote from Garlinghouse 12/14/17 interview)

Plaintiff's opposition brief cites another statement supporting their argument that a reasonable investor would have seen such a "direct relation":

> It's that Ripple's future value and revenue is directly tied to the future value and liquidity of XRP.  For some time, Ripple will be the largest holder of XRP and it will dominate over every other source of value Ripple has. . . . I

think most others do realize that the success of Ripple and the success of XRP are tightly tied.

Dkt. 372 at 32 (citing Ex. 89, Internet post by David Schwartz, Ripple's then-chief cryptographer).

Accordingly, the court cannot find as a matter of law that XRP purchasers on the secondary market did not enter into a 'common enterprise' sufficient to satisfy the <u>Howey</u> test.

c.    "expectation of profit due to efforts of others"

Defendants first argue that the court should follow the reasoning of the Southern District of New York in the parallel case of <u>SEC v. Ripple</u>, and grant summary judgment based on this prong.  In that case, the SEC brought suit on behalf of multiple groups of purchasers, including "institutional buyers" who bought XRP under written contracts, and "programmatic buyers" who bought XRP on digital asset exchanges.  <u>See</u> 682 F.Supp.3d 308 (S.D.N.Y. 2023).  In the S.D.N.Y. case, Judge Torres concluded that institutional buyers did indeed have an expectation of profit due to the efforts of others, and granted summary judgment to the SEC as to those buyers, but held that programmatic buyers had no such expectation, and granted summary judgment to the defendants as to the programmatic buyers.  Defendants in this case argue that the 'programmatic buyer' reasoning applies with equal force to this case.

Defendants also argue that the lack of any post-sale obligations on defendants' part is fatal to plaintiff's claim that XRP is a security.  However, defendants raised that same argument in the S.D.N.Y. case, and "the court reject[ed] defendants' argument that all investment contracts must include post-sale obligations on the promoter."  <u>SEC v. Ripple</u>, 682 F.Supp.3d at 323.

The S.D.N.Y. court's ultimate holding on the third <u>Howey</u> prong was that "[i]t certainly may be the case that many programmatic buyers purchased XRP with an expectation of profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)."  <u>SEC v. Ripple</u>, 682 F.Supp.3d at 329.  The court further explained that, "[o]f course, some

programmatic buyers may have purchased XRP with the expectation of profits to be derived from Ripple's efforts," but "the inquiry is an objective one" rather than a "search for the precise motivation of each individual participant," and the S.D.N.Y. court concluded that the reasonable programmatic buyer would not have such an expectation. Id. at 326.

As stated above, the S.D.N.Y. court reached a different conclusion as to the institutional buyers, holding that a reasonable investor in their position would indeed have had an expectation of profit due to the efforts of others. Specifically, after citing the relevant evidence, the court held that "[c]learly, the institutional buyers would have understood that Ripple was pitching a speculative value proposition for XRP with potential profits to be derived from Ripple's entrepreneurial and managerial efforts." SEC v. Ripple, 682 F.Supp.3d at 328.

The S.D.N.Y. opinion lays out the efforts that defendants were undertaking. First, "Ripple's communications" and "marketing campaign" informed investors that Ripple would use its capital to "improve the market for XRP and develop uses for the XRP Ledger, thereby increasing the value of XRP." SEC v. Ripple, 682 F.Supp.3d at 326. Ripple's promotional materials explained that its "business model is predicated on a belief that demand for XRP will increase . . . if the Ripple protocol becomes widely adopted." Id. Ripple further connected the price of XRP with its own efforts, attributing price increases to events such as Ripple's "escrow and decentralization announcements." Id. at 327.

The S.D.N.Y. court's order cites a July 2017 Internet post on the Reddit website from David Schwartz, Ripple's then-chief cryptographer, stating that "Ripple can justify spending $100 million on a project if it could reasonably be expected to increase the price of XRP by one penny over the long term." SEC v. Ripple, 682 F.Supp.3d at 327. The order also cites a February 2018 Reddit post from Schwartz stating that what "really set[s] XRP apart from any other digital asset" is the "amazing team of dedicated professionals that Ripple has managed to amass to develop an ecosystem around XRP."

1    Id.

2          The S.D.N.Y. court ultimately concluded that "Ripple's promotional materials, such

3    as the 'Ripple primer' and the 'Gateways' brochure, were widely circulated amongst

4    potential investors like the Institutional Buyers.  But, there is no evidence that these

5    documents were distributed more broadly to the general public, such as XRP purchasers

6    on digital asset exchanges."  SEC v. Ripple, 682 F.Supp.3d at 329-30.

7          While this court agrees that certain promotional materials were distributed on a

8    limited basis, the evidentiary record also contains numerous promotional materials that

9    were distributed to the general public via widely-viewed Internet posts and videos.  In

10   addition to the above Internet posts from Schwartz cited by the S.D.N.Y. court, plaintiff in

11   this case has also identified other statements regarding Ripple's entrepreneurial and/or

12   managerial efforts.  In particular, plaintiff cites publicly-disseminated statements

13   regarding Ripple's efforts with regard to the cross-border payments industry, an area that

14   defendants acknowledge they have "expressly targeted" as part of their "mission" to

15   "realize an 'Internet of Value' – using technology to enable value to move as seamlessly

16   as information does today over the Internet."  See Dkt. 339 at 14.

17         Plaintiff then cites statements made during the above-mentioned December 14,

18   2017 interview of defendant Garlinghouse, including that "the reason why XRP has

19   performed so well this year, we're solving a real problem, it's a multi-trillion-dollar problem

20   around cross-border payments.  There is a lot of friction it's very slow it's expensive,

21   we're working with the institutions to deal with that, so people have gotten excited.  We

22   now have over 100 customers we've announced publicly."  Dkt. 115 at 16 (citing CFAC, ¶

23   74).

24         In another interview, defendant Garlinghouse stated that "if we continue to drive

25   the success we're driving, we're going to drive a massive amount of demand for XRP,

26   because we're solving a multi-trillion dollar problem."  Dkt. 372 at 15 (citing Ex. 97,

27   Garlinghouse 10/18/17 interview).

28         Plaintiff also argues that Ripple worked with a marketing agency to answer

United States District Court
Northern District of California

1  questions directly from XRP purchasers, including "Ask Me Anything" interviews by

2  Schwartz and Garlinghouse, which received over 46,000 and 52,000 views (respectively)

3  on the YouTube website.  Dkt. 372 at 50 (citing Ex. 99, Ex. 100).

4       Overall, given the relative novelty of cryptocurrency, and given the lack of any

5  controlling law regarding the motivation of a reasonable cryptocurrency investor, the court

6  declines to find as a matter of law that a reasonable investor would have derived any

7  expectation of profit from general cryptocurrency market trends, as opposed to Ripple's

8  efforts to facilitate XRP's use in cross-border payments, among other things.

9  Accordingly, the cannot find as a matter of law that Ripple's conduct would not have led a

10  reasonable investor to have an expectation of profit due to the efforts of others.

11       Because, as mentioned above, defendants made no other argument in favor of

12  summary judgment on plaintiff's fourth cause of action for misleading statements in

13  connection with the offer or sale of a security, summary judgment on that cause of action

14  is DENIED and the claim will proceed to trial.

15       4.    Daubert motions

16       Before the court are six motions to exclude expert testimony under Daubert.  Two

17  of the Daubert motions relate to expert testimony on the issue of classwide damages,

18  and because the class claims are no longer in the case, those two motions – namely,

19  defendants' motion to exclude the testimony of Steven P. Feinstein (Dkt. 326), and

20  plaintiff's motion to exclude the testimony of S.P. Kothari and M. Laurentius (Dkt. 325) –

21  are DENIED as moot.

22       As to the remaining four motions, given the narrowed scope of the case, the court

23  will give the parties an opportunity to evaluate which expert testimony they will continue

24  to rely upon, which will determine which Daubert motions need to be resolved by the

25  court.  Accordingly, the court defers judgment on the remaining four Daubert motions –

26  namely, plaintiff's motion to exclude testimony of Alan Schwartz (Dkt. 318), defendants'

27  motion to exclude testimony of Saifedean Ammous (Dkt. 328), defendants' motion to

28  exclude testimony of Jeremy Clark (Dkt. 327), defendants' motion to exclude testimony of

United States District Court
Northern District of California

16

1   Joel Seligman (Dkt. 323).  Within 28 days of the date of this order, the parties shall file a

2   notice indicating whether they continue to seek the exclusion of these four experts'

3   testimony.

4          5.      Motions to seal

5          At the hearing, the court directed the parties to re-assess their sealing motions in

6   light of the court's denial of the sealing of any portions of the parties' briefs.  The parties

7   have since filed their unredacted briefs, and also filed a request to extend, by three

8   weeks, the deadline to file a narrowed motion to seal certain exhibits.  See Dkt. 417.  The

9   parties' request is GRANTED, and the deadline to file the narrowed motion to seal is now

10  **July 8, 2024**.  The court will issue a separate order on the narrowed motion to seal.

**CONCLUSION**

12         For the reasons set forth above, defendants' motion for summary judgment (Dkt.

13  329) is GRANTED in part and DENIED in part.  Defendants are granted summary

14  judgment on the federal and state class claims.  Defendants are denied summary

15  judgment on plaintiff Sostack's individual claim under California law.  Defendants' motion

16  to exclude the testimony of Steven P. Feinstein (Dkt. 326) is DENIED as moot, and

17  plaintiff's motion to exclude the testimony of S.P. Kothari and M. Laurentius (Dkt. 325) is

18  DENIED as moot.  Resolution of the remaining Daubert motions is deferred as set forth

19  above.

20         **IT IS SO ORDERED.**

21  Dated:  June 20, 2024

22                                          ____/s/ *Phyllis J. Hamilton*_____

23                                          PHYLLIS J. HAMILTON
                                            United States District Judge

24

25

26

27

28

United States District Court
Northern District of California