# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff*,

v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

*Defendants*.

No. 1-23-cv-01599-ABJ-ZMF

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM
OF LAW IN SUPPORT OF MOTION FOR LEAVE TO AMEND THE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

BACKGROUND ........................................................................................................................... 3

LEGAL STANDARD ................................................................................................................... 5

ARGUMENT ............................................................................................................................... 6

I.      The Proposed Amendments Are Not Futile ..................................................................... 6

      A.      The PAC Plausibly Alleges Binance's Post-ICO Unregistered Offers and Sales of BNB to Employees Violated Securities Act Section 5 ...................................... 7

      B.      The PAC Cures Pleading Deficiencies as to Binance's Unregistered Offers and Sales of Simple Earn, in Violation of Securities Act Section 5 ............................. 9

      C.      The PAC Cures Pleading Deficiencies as to the Exchange Act Claims Based on Defendants' Intermediating Transactions in BNB as it Was Offered and Sold as a Security ................................................................................................... 13

            1.      *Investment of Money* .................................................................................... 13

            2.      *Common Enterprise* ..................................................................................... 14

            3.      *Reasonable Expectation of Profits From the Efforts of Others* ................. 19

      D.      The PAC Plausibly Alleges Exchange Act Claims Based on Defendants' Intermediating Transactions in the Ten Crypto Assets That Are Offered and Sold as Securities ...................................................................................... 23

            1.      *Investment of Money* .................................................................................... 25

            2.      *Common Enterprise* ..................................................................................... 26

            3.      *Reasonable Expectation of Profits From the Efforts of Others* ................. 28

II.     Amendment is in the Interests of Justice, and There is No Basis to Deny the SEC's Motion ............................................................................................................................ 34

CONCLUSION .......................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Balestra v. Atbcoin LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019)..............................................................................28

*Djourabchi v. Self*,
   240 F.R.D. 5 (D.D.C. 2006)..............................................................................................34

*Dufoe v. DraftKings, Inc.*,
   2024 WL 3278637 (D. Mass. Jul. 2, 2024).......................................................................22

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996) ...........................................................................................5

*Foman v. Davis*,
   371 U.S. 178 (1962).............................................................................................................5

*Friel v. Dapper Labs, Inc.*,
   657 F. Supp. 3d 422 (S.D.N.Y. 2023)...............................................................................31

*Frisch v. Likeopedia, LLC*,
   2024 WL 3938345 (S.D.N.Y. Aug. 26, 2024) ....................................................................8

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985)......................................................................... 11, 12, 17, 28

*Hocking v. Dubois*,
   885 F. 2d 1449 (9th Cir. 1989) ...................................................................................14, 17

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ............................................................................................6

*In re BitConnect Secs. Litig.*,
   2019 WL 9104318 (S.D. Fla. Aug. 23, 2019) ..............................................................17, 18

*In re Interbank Funding Corp. Securities Litig.*,
   629 F.3d 213 (D.C. Cir. 2010) ............................................................................................5

*In re Ripple Labs, Inc. Litig.*,
   2024 WL 3074379 (N.D. Cal. Jun. 20, 2024)......................................................14, 17, 19

*Landreth Timber Co. v. Landreth*,
   471 U.S. 681 (1985)...........................................................................................................16

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
   366 F.3d 930 (D.C. Cir. 2004) ............................................................................................5

*Patterson v. Jump Trading LLC*,
2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ................................................................ 14, 17

*Ramos v. Barr*,
2020 WL 13695151 (D.D.C. Aug. 11, 2020) .................................................................. 34

*SEC v. Banner Fund Int'l*,
211 F.3d 602 (D.C. Cir. 2000) ........................................................................................ 16

*SEC v. Better Life Club of America, Inc.*,
995 F. Supp. 167 (D.D.C. 1998) ..................................................................................... 10

*\*SEC v. C.M. Joiner Leasing Corp.*,
320 U.S. 344 (1943) .................................................................................................. 22, 33

*\*SEC v. Coinbase, Inc. et al.*,
2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ......................................................... passim

*SEC v. Edwards*,
540 U.S. 389 (2004) ........................................................................................................ 12

*\*SEC v. Genesis Glob. Cap., LLC*,
2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) .................................................. 10, 11, 12

*SEC v. Int'l Loan Network, Inc.*,
770 F. Supp. 668 (D.D.C. 1991),
*aff'd* 968 F.2d 1304 (D.C. Cir. 1992) ............................................................................ 18

*SEC v. Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) ............................................................................ 31

*\*SEC v. LBRY*,
39 F. Supp. 3d 211 (D.N.H. 2022) ................................................................................. 30

*SEC v. Life Partners, Inc.*,
102 F.3d 587 (D.C. Cir. 1996) ........................................................................................ 11

*\*SEC v. Life Partners, Inc.*,
87 F.3d 536 (D.C. Cir. 1996) ..................................................................................... passim

*SEC v. Life Partners, Inc.*,
898 F. Supp. 14 (D.D.C. 1995),
*rev'd on other grounds*, 87 F.3d 536 (D.C. Cir. 1996) ................................................. 18

*\*SEC v. Payward, Inc., et al.*,
No. 3:23-cv-06003-WHO (N.D. Cal. Aug. 23, 2024) ................................................ passim

*SEC v. Shavers*,
  2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) ............................................... 8

*\*SEC v. Telegram*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................................... 18, 23

*\*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. Jul. 31, 2023) ..................................................... 17

*\*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ......................................................................... passim

*United Housing Foundation, Inc. v. Forman*,
  421 U.S. 837 (1975) .............................................................................. 22

*United States v. Bowdoin*,
  770 F. Supp. 2d 142 (D.D.C. 2011) .............................................................. 13

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
  940 F.2d 564 (10th Cir. 1991) .................................................................... 8

*Wilcox v. Georgetown Univ.*,
  2023 WL 2734224 (D.D.C. Mar. 31, 2023)
  *aff'd.* 2024 WL 1739266 (D.C. Cir. Apr. 23, 2024) ............................................ 35

It is in the interests of justice to grant Plaintiff Securities and Exchange Commission ("SEC") leave to amend its Complaint to address the factual pleading deficiencies identified in the Court's June 28, 2024 Memorandum Opinion & Order (Dkt. No. 248, "MTD Order") and to further address certain defense arguments challenging the SEC's claims based on the offers and sales of BNB to employees and of the Ten Crypto Assets[1] as to which the Court has not yet ruled.  Granting the SEC leave to amend would permit full adjudication of the SEC's plausible claims concerning Defendants' years-long unlawful conduct, whereby they deprived millions of investors necessary information and other protections under the federal securities laws.[2]

The PAC allegations plausibly demonstrate that Defendant Binance Holdings Limited ("Binance") violated Section 5 of the Securities Act of 1933 ("Securities Act") by engaging in the unregistered offers and sales of (1) BNB as a security to Binance's and Defendant BAM Trading Services, Inc.'s ("BAM Trading" or "BAM") employees, and (2) the Simple Earn investment program on the Binance.com Platform (in addition to other conduct already found to have been properly alleged as the basis for violations of Securities Act Section 5).

The PAC allegations also plausibly demonstrate that Binance and BAM Trading and Defendant Changpeng Zhao ("Zhao," as control person), violated certain registration provisions of the Securities Exchange Act of 1934 ("Exchange Act") by unlawfully intermediating securities transactions on the Binance Platforms involving (1) BNB and (2) the Ten Crypto Assets, while these assets were being offered and sold as securities, without registering with the

---

[1] Unless otherwise stated, capitalized terms within this Memorandum incorporate by reference the definitions of the same capitalized terms in the Complaint and PAC.

[2] The Proposed Amended Complaint ("PAC") is attached as Exhibit A.  For the Court's convenience, attached as Exhibit B is a redline comparing the PAC to the original Complaint.

SEC (in addition to other conduct already found to have been properly alleged as the basis for violations of the Exchange Act).

Specifically, the PAC's allegations demonstrate that, during and after the initial offers and sales of these crypto assets (including BNB), investors were inundated with statements by issuers, in many cases in a coordinated effort with Defendants, that promoted the crypto assets as *investment* opportunities from which investors could reasonably expect to profit by sharing in the success of the enterprise developed through the efforts of the issuers and other third parties. These statements—widely available on the internet and amplified on the Binance Platforms and Defendants' social media platforms and other marketing channels—explicitly invoked the language and appearance of the traditional securities markets and included discussion of the issuers' efforts and economic realities that would increase the value of these crypto assets. These allegations, when taken as true, demonstrate that the offers and sales of these various investment opportunities by their issuers, including on the Binance Platforms, as well as between investors in secondary market transactions, satisfy the test for investment contracts set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*").

Even if discovery later reveals that some purchasers viewed certain of the Ten Crypto Assets as a "commodity" or product to use or consume, such as oranges or beanie babies, that possibility is insufficient to warrant dismissal of the SEC's claims on this subset of transactions at the pleadings stage—particularly since the PAC specifically alleges that BNB and the Ten Crypto Assets *were not* being offered and sold as such. Rather, the PAC alleges that they were publicly treated by all involved—Defendants, the third-party issuers, and investors—as investments in a common enterprise from which investors reasonably expected to profit from the efforts of others, particularly the assets' issuers and promoters.

2

Further, there is no basis to deny the SEC leave to amend.  First, the proposed amendments are not futile.  The MTD Order identified factual deficiencies as to certain claims— specifically, Simple Earn and the "secondary sales of BNB, by sellers other than Binance."  The PAC cures these deficiencies.  The PAC also adds allegations as to matters upon which the MTD Order did not rule—Binance's offers and sales of BNB to Binance and BAM employees, and the Ten Crypto Assets offered and sold as securities while trading on the Binance Platforms.  As the Federal Rules of Civil Procedure contemplate, parties routinely amend allegations in response to a motion to dismiss.

Second, this is the SEC's first request to amend, there was no undue delay in seeking leave to amend, and the proposed pre-Answer amendment at the very outset of discovery will not delay this action.  Similarly, Defendants will not suffer any prejudice, particularly given the limited scope of the issues to which the amendments are relevant and for which Defendants have already been on notice.  Moreover, the proposed amendments do not put at issue any additional statutes as having been violated.  Accordingly, this Court should grant the SEC's Motion.

## BACKGROUND

On June 5, 2023, the SEC filed its Complaint asserting 13 claims against Defendants for their violations of the federal securities laws.  Dkt. No. 1.  As relevant here, the SEC alleged that Binance and BAM violated Securities Act Section 5 through their unregistered offers and sales of several securities, including Binance's unregistered offers and sales of BNB, BUSD, and its "Simple Earn" and "BNB Vault" programs.  *Id.*, Claims I-IV.  The SEC also alleged that Defendants (including Zhao as a control person) violated the Exchange Act by acting as unregistered exchanges, broker-dealers, and clearing agencies through their respective operation of the Binance Platforms by providing intermediary services and making crypto assets available for trading by investors in the United States, including BNB, BUSD, the Ten Crypto Assets, and

three investment programs, all while they were being offered and sold as investment contracts and, therefore, as securities ("Exchange Act Claims"). *Id.*, Claims V-XII.

Defendants filed motions to dismiss, Dkt. Nos. 117, 118, which the SEC opposed, Dkt. No. 172. After a hearing, on June 28, 2024 the Court entered the MTD Order, granting in part and denying in part Defendants' motions, ruling that "the bulk of this action will move forward." MTD Order at 1. Indeed, each of the charged provisions—Securities Act Sections 5(a), 5(c), and 17(a), and Exchange Act Sections 5, 15(a), and 17A survives as to the Defendants against which they were alleged. But the MTD Order dismissed subsets of allegations that the SEC intends to use to support certain of these claims.

In relevant part, the MTD Order dismissed: the SEC's claims as to (1) secondary sales of BNB by sellers other than Binance,[3] (2) the offers and sales of BUSD (Count II), and (3) the portion of Count III concerning Binance's offers and sales of Simple Earn (the other part of Count III being claims as to BNB Vault, which survived). MTD Order at 89. The MTD Order dismissed these claims based on insufficient factual allegations to meet the *Howey* test, as opposed to a defective legal theory. *Id.* at 32, 39, 42 n.15, 43, 44 n.16 (BNB); 47, 51 n.21 (BUSD); 52-54 (Simple Earn). The MTD Order expressly notes that, as to BNB, "[i]t may be that the SEC can establish that sales after the ICO or certain groups of secondary sales meet the criteria of an investment contract." *Id.* at 39; *see also* Jul. 9 Hr'g Tr. at 30-31 (similar).

---

[3] Although the MTD Order identifies Count One in dismissing BNB secondary sales by sellers other than Binance, Count One charges Binance's unregistered offers and sales of BNB in violation of Securities Act Section 5 and not sales by other persons. The SEC's Exchange Act Claims against Defendants Binance, BAM, and Zhao address the intermediary services these Defendants provide through their operation of the Binance Platforms, and rely upon offers and sales of, among other things, BNB and the Ten Crypto Assets, including offers and sales both by the original issuers (including Binance as the issuer of BNB) as well as between investors.

The MTD Order did not rule on the sufficiency of the SEC's allegations that (1) Binance's offers and sales of BNB to Binance and BAM employees and contractors could also form the basis of Securities Act Section 5 claims, *see, e.g.*, Compl. ¶¶ 306-310, or (2) transactions in the Ten Crypto Assets, by their issuers or between investors, could further support the SEC's Exchange Act Claims, *see* Compl. ¶¶ 352-509.  MTD Order at 35 n.11, 57.

In accordance with the Court's August 13, 2024 Scheduling Order (Dkt. No. 254), the SEC now respectfully moves to amend its Complaint to address the areas the MTD Order found lacking and further substantiate certain aspects of claims upon which the Court has not yet ruled.

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleading with opposing parties' consent or leave of court.  The grant or denial of leave to amend is left to the discretion of the court, which must heed Rule 15's mandate that leave "shall be freely given when justice so requires."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotation omitted).  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Accordingly, denial of a motion for leave to amend constitutes an abuse of discretion "unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive … repeated failure to cure deficiencies by previous amendments … [or] futility of amendment.'"  *Firestone*, 76 F.3d at 1208 (quoting *Foman*, 371 U.S. at 182).

Amending is futile if the proposed pleading would not survive a motion to dismiss.  *E.g.*, *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004).  Accordingly, the Court's review of a motion to amend, is "for practical purposes, identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint."  *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 216 (D.C. Cir. 2010).  The Court must "treat

5

the complaint's factual allegations as true … and must grant plaintiff the benefit of all inferences

that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333

F.3d 156, 165 (D.C. Cir. 2003) (citation and quotation omitted).

## ARGUMENT

### I.   The Proposed Amendments Are Not Futile

This Court should grant the SEC's Motion because amending the Complaint would not

be futile.  The PAC does not simply restate the same facts or claims upon which the Court

already ruled, nor does this Motion re-argue the *Howey* and other legal arguments that the Court

squarely resolved in its MTD Order.  *See* Jul. 9 Hr'g Tr. at 25-26.  Rather, it adds substantial new

allegations that address the factual deficiencies that appeared to be the basis for dismissal of

certain claims.  The PAC also bolsters allegations not expressly ruled upon concerning certain

offers and sales of BNB and the Ten Crypto Assets to address Defendants' prior dismissal

arguments and Defendants' anticipated argument that the MTD Order's reasoning as to BNB

secondary sales should apply to allegations concerning the Ten Crypto Assets.  Specifically, the

PAC sets forth well-pled allegations supporting the SEC's claims as follows:

(1) *Post-ICO BNB Offers and Sales to Employees*.  The PAC bolsters allegations
    supporting the Securities Act Section 5 claim against Binance for its unregistered
    offers and sales of BNB since the ICO (Count I) to Binance and BAM employees,
    upon which the Court has not yet ruled;[4]

(2) *Simple Earn.*  The PAC also bolsters allegations to cure deficiencies identified in the
    MTD Order as to the Securities Act Section 5 Claim against Binance for the
    unregistered offers and sales of its Simple Earn investment program (Count III); and

---

[4] The PAC also states new allegations concerning Binance's other post-ICO offers and sales of
BNB made directly or through underwriters, agents, market makers, and other accounts controlled
by Binance.  *See* PAC ¶¶ 338-39.  The Court has already sustained the claim as to Binance's post-
ICO offers and sales, and thus, these additional allegations are not further addressed here.  *See*
MTD Order at 35.  The Motion does not seek leave to substantively amend Count II, relating to
Binance's unregistered offers and sales of BUSD under Securities Act Section 5.  Solely for
purposes of any potential appeal, the PAC repeats that claim without modification.

(3) *Offers and Sales of BNB and the Ten Crypto Assets on the Binance Platforms.*  The PAC bolsters allegations supporting the Exchange Act Claims (Counts V-XII) by curing pleading deficiencies identified in the MTD Order as to offers and sales of BNB on the Binance Platforms, and by bolstering allegations as to the Ten Crypto Assets offered and sold as securities on the Binance Platforms, both by their issuers and between investors, upon which the Court has not yet ruled.

## A.     The PAC Plausibly Alleges Binance's Post-ICO Unregistered Offers and Sales of BNB to Employees Violated Securities Act Section 5

The Court has already sustained the SEC's Securities Act Section 5 claim that Binance offered and sold BNB as an investment contract during the BNB ICO and during post-ICO sales. MTD Order at 28-36.  However, the MTD Order did not rule on whether allegations relating to Binance's unregistered offers and sales of BNB to Binance and BAM employees could also be the basis of these claims.  MTD Order 35 n.11.  The PAC provides additional factual allegations that show that Binance also violated Section 5 of the Securities Act by offering and selling BNB to Binance and BAM employees (and contractors) as an investment contract, and therefore a security, when it offered and sold BNB to employees.

The PAC alleges that Binance has offered and sold BNB to Binance and BAM employees and contractors, including those in the United States, as various forms of compensation in BNB rather than in fiat currency or other assets.  The PAC alleges that Binance offered and sold BNB by permitting employees to elect to take, in whole or in part, their regular salaries in BNB, and in providing various types of bonuses, allowances, and "Employee Token Option Plan" ("ETOP") in BNB.  PAC ¶¶ 309-37.  These various forms of compensation in BNB were part of each employee's total compensation package in lieu of other forms of compensation.  *Id*.  Binance, for example, negotiates these various forms of compensation in BNB when hiring its own new employees and has worked with BAM in offering such bonuses for new BAM employees.  *Id.* ¶¶ 313-14.  When BAM's first CEO negotiated her compensation package with Binance, the parties

negotiated an overall compensation package with a BNB signing bonus rather than other forms of compensation. *Id.* ¶ 314. In receiving BNB as compensation, employees gave specific, identifiable consideration in exchange for BNB—the right to receive the amounts they are owed in connection with their employment services in other forms such as fiat currency.

Thus, the PAC plausibly alleges that Binance and BAM employees and contractors who received BNB as compensation in these various ways were investing in a common enterprise with a reasonable expectation of profiting from Binance's efforts. *See* MTD Order at 13 (quoting *SEC v. Life Partners, Inc.*, 87 F.3d 536, 542 (D.C. Cir. 1996)). Binance and BAM employees' "investment of money" comprised the services to BAM and Binance they provided, and they made an investment decision in receiving BNB rather than other forms of compensation. *See, e.g., Uselton v. Com, Lovelace Motor Freight, Inc.*, 940 F.2d 564, 576 (10th Cir. 1991) (holding that employee stock program satisfied *Howey's* investment-of-money element); *see also Frisch v. Likepedia, LLC*, 2024 WL 3938345, at *4 (S.D.N.Y. Aug. 26, 2024) (finding an investment of money under *Howey* when a consultant agreed to receive a portion of his fee in exchange for LLC interests in the client); *SEC v. Shavers*, 2014 WL 12622292, at *5 (E.D. Tex. Aug. 26, 2014) (collecting cases).

In addition, these individuals invested in a common enterprise for the exact same reasons the BNB ICO and post-ICO investors did. *See* MTD Order at 28-29, 35-36. Specifically, given the fungibility of all BNB tokens and Binance's pooling of BNB sales proceeds to further develop the BNB ecosystem, employees' and contractors' financial fortunes in investing in BNB were tied to the financial fortunes of other BNB investors and Binance (BNB's largest holder), as well as to the overall success of Binance's ventures as to BNB. PAC ¶¶ 335-37, 346.

Finally, the economic reality of BNB, together with Binance's promotions and

representations as to BNB, led its and BAM's employees and contractors to reasonably expect to profit from Binance's efforts—exactly in the same way they led any other investor in BNB to do so. As the MTD Order concluded, the SEC has sufficiently and plausibly alleged that Binance promoted BNB as an investment in Binance. MTD Order at 27-36. From the Binance Whitepaper and other promotional statements Binance made equally available to the public, including employees, Binance made clear its commitment to continuing to develop the BNB ecosystem and enhance the value of BNB, such that Binance and BAM employees could reasonably expect to profit from Binance's continuing efforts to increase BNB's price for all BNB holders. *See id.*; *see also* PAC ¶¶ 327-37. This was certainly the case as to Binance and BAM Trading employees. For example, in internal town halls, Zhao frequently compared the ETOP program to employee stock options and an investment in the company, and he encouraged them to hold BNB to share in the company's profits. PAC ¶¶ 329-32 (alleging, among other things, Zhao stating to employees that the Binance.com Platform "is [a] relatively big driving force for [BNB's] value," and that "[s]o long as we do our jobs right, as long as we work hard … I'm fully bullish that BNB will outrun BTC.").

Accordingly, the proposed amendment of Count I is not futile.

**B.    The PAC Cures Pleading Deficiencies as to Binance's Unregistered Offers and Sales of Simple Earn, in Violation of Securities Act Section 5**

The PAC addresses the pleading deficiencies identified in the MTD Order and plausibly alleges that Binance violated Securities Act Section 5 for its unregistered offers and sales of its Simple Earn investment program as an investment contract under *Howey*.

First, the PAC alleges that the Simple Earn investors committed their assets to the enterprise and also faced the risk of loss, including as to Binance's entrepreneurial activities into which the funds would be deployed, Binance's solvency, and changes to the value of the crypto

assets committed to the programs.  PAC ¶¶ 425, 434, 436.  This constitutes an "investment of money."  *See SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998) (loaning money to a common enterprise constitutes an "investment of money" under *Howey*).

Second, the PAC plausibly alleges a common enterprise under both the horizontal and vertical commonality tests.  The PAC plausibly alleges horizontal commonality because Simple Earn investors' proceeds are pooled for the enterprise, they are told that Binance will deploy these funds to generate returns, and their fortunes are interdependent.  Specifically, each investor is alleged to earn returns on a *pro rata* basis (*i.e.*, in direct proportion to the amount invested) and to be equally reliant on Binance's efforts to generate yield, including using its skills and expertise to deploy assets into various profit-making opportunities (including on-chain staking, margin lending, and Binance's operational purposes), negotiating competitive rates, and distributing the yield among investors.  PAC ¶¶ 426-27, 430-31, 435.  These allegations are substantially identical to those the court found plausibly alleged horizontal commonality in *SEC v. Genesis Glob. Cap., LLC*, 2024 WL 1116877, at *7-8 (S.D.N.Y. Mar. 13, 2024), where Genesis pooled investors' crypto assets, made decisions on how to lend the crypto assets, and paid returns dependent on Gensis' managerial efforts and risk management in its lending activities.

Similarly, broad vertical commonality exists because the fortunes of the investor and promoter are interdependent and reliant upon Binance's entrepreneurial and managerial efforts and expertise to earn yield on investors' assets—investors are entirely passive as to whether their investment in Simple Earn returns investments or results in losses.  PAC ¶¶ 426-27, 430-31, 435.

Finally, investors in Simple Earn have a reasonable expectation of profits from Binance's efforts because this is precisely what Binance invites them to expect when it touts the

opportunity for investors to earn "passive" returns based on Binance's entrepreneurial and managerial skills and expertise, in deploying "idle assets" to generate returns through on-chain staking, margin lending, and other opportunities. *Id.* ¶¶ 422, 424-26, 431-32, 435.  Similar to the alleged statements supporting the SEC's claims as to the BNB Vault and BAM's Staking program, the PAC further highlights promotional statements about Simple Earn that highlight Binance's sophisticated efforts in running the entire investment process to achieve the competitive rates it touted, which efforts investors would have to undertake should they wish to lend, stake, or otherwise deploy their crypto assets on their own. *See Genesis Glob. Cap.*, 2024 WL 11116877, at *8-9 (prong satisfied given plausible allegations that Genesis highlighted its "complete discretion" in undertaking "complex tasks" and using its skill and experience to maximize profits and offering "among the highest rates in the market" that it would revise on a monthly basis).

In contrast, *Howey* does not require, and the SEC does not understand the MTD Order to require, that in order to reasonably expect profits, investors must be told the exact manner in which proceeds will be used to generate returns—after all, it is the managerial and technical efforts and expertise of *others* upon which investors' expectation of profits depends, and even pre-purchase efforts—before the use of any funds—are relevant. *See SEC v. Life Partners*, 87 F.3d 536 at 545-548; *SEC v. Life Partners, Inc.*, 102 F.3d 587, 588 (D.C. Cir. 1996); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240-41 (2d Cir. 1985) (holding offer and sale of CD program constitutes an investment contract because investors reasonably expected profits based on expertise and efforts of Merrill Lynch).  In any event, the PAC alleges that, with respect to Simple Earn, Binance *does* inform investors the primary ways their funds will be deployed.  *See, e.g.*, PAC ¶ 431 (alleging Binance public

statements as to Simple Earn that assets would be pooled and deployed into on-chain staking and to margin lending as profit-making opportunities).

Nor does the SEC understand the MTD Order to require that the returns from a particular investment contract necessarily must come from the issuer's entire or general business. Rather, the PAC alleges that the common enterprise is the Simple Earn investment program, a specific offering for which Binance enticed investors to earn "passive income" and take advantage of Binance's efforts and expertise. PAC ¶ 425; *see Genesis Glob. Cap., LLC*, 2024 WL 11116877, at *7 (finding investors' profits tied to the success of the specific lending enterprise based on allegations that investors' returns turned on how Genesis pooled and deployed the investors' crypto assets); s*ee also SEC v. Edwards*, 540 U.S. 389, 396 (2004) (confirming "commonsense understanding of 'profits' in the *Howey* test as simply financial returns on … investments," which could include "participation in earnings resulting from the use of investors' funds."). This is like the common enterprise offered and sold in *Howey* itself—an investment into certain orange groves that the Howey Corporation managed, which were separate and apart from Howey's corporate enterprise, which included other endeavors. *See, e.g., Howey*, 328 U.S. 293 at 296-97 (identifying Howey Corporation's ownership and operation of tourist hotel); *see also Gary Plastic Packaging Corp.*, 756 F.2d at 240-41 (expected investor profits "derived solely from the efforts of Merrill Lynch and the banks," with respect to Merrill Lynch's CD program it offered and sold, not from Merrill Lynch's or the banks' overall profits).

Accordingly, the PAC sufficiently pleads that Binance offered and sold Simple Earn as an investment contract under *Howey* and the proposed amendment of Count III is not futile.

**C.  The PAC Cures Pleading Deficiencies as to the Exchange Act Claims Based on Defendants' Intermediating Transactions in BNB as it Was Offered and Sold as a Security**

The PAC plausibly alleges Exchange Act Claims against Defendants for intermediating transactions in BNB because when BNB was available for trading on the Binance Platforms, Binance was offering and selling BNB as an investment contract and, therefore, as a security. The PAC plausibly alleges that Binance's promotion of BNB as a contract, transaction, or scheme involving the investment of money in a common enterprise with a reasonable expectation of profit from the efforts of others did not cease after the ICO.  Instead, it continued and continues, including from the launch of the Binance Platforms to today.  The SEC does not allege that *simply because* BNB was offered and sold as a security during the ICO it *immediately follows* that it was offered and sold as such in subsequent transactions.  *See also* MTD Order at 38-43 (rejecting any such argument).  Instead, the SEC alleges that one cannot ignore the way BNB was originally offered and sold, *e.g.*, *Kraken* at 18,[5] and that those original promotions, together with BNB's ongoing economic reality, as well as additional ongoing post-ICO representations and promotions, make clear that the post-ICO sales of BNB, including between investors on the Binance Platforms, satisfy *Howey*.

*1.  Investment of Money*

The PAC alleges an investment of money because investors on the Binance Platforms purchased BNB with fiat currency or crypto assets and because BNB could lose its value, such that an investor could lose her investment.  PAC ¶¶ 344-46; *see United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) (an "investment of money" occurs when an investor "places his

---

[5] The order denying defendants' motion to dismiss in *SEC v. Payward, Inc., et al.*, No. 3:23-cv-06003-WHO (N.D. Cal. Aug. 23, 2024) is attached as Exhibit C and will be cited as "*Kraken*."

money at risk in anticipation of a profit") (cleaned up).

As the MTD Order observed, other courts have concluded that purchases on a crypto asset trading platform can constitute an investment of money.  MTD Order at 43.  Multiple courts have in fact so held because "[i]t defies common sense to suggest that when someone purchases crypto assets from a reseller or another investor, that person or entity does not understand themselves to be investing money in the asset."  *Kraken*, at 20-21 (citing *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989)); *Patterson v. Jump Trading LLC*, 2024 WL 49055, at *11 (N.D. Cal. Jan. 4, 2024) (finding investment of money as to tokens trading on "exchanges like Binance US and Kraken, which allowed retail investors to purchase the Terra Tokens with traditional and other currencies") (internal quotation omitted).

And contrary to Defendants' suggestion, *see, e.g.*, Dkt. No. 118 at 19, whether the money goes to the issuer's pocket does not impact this analysis.  *See In re Ripple Labs, Inc. Litig.*, 2024 WL 3074379, at *7 (N.D. Cal. Jun. 20, 2024) (rejecting argument that because the purchasers' money went to the exchange sellers, not to the issuers, there was no "investment of money") (collecting cases).  Were this not the case, it would severely, if not fatally, undermine this Court's and every other court's reasoning that a contract or privity between the issuer and the investor is not required to meet *Howey, see* MTD Order at 15-18, and potentially carve out "investment contracts" from the definition of "securities" in the Exchange Act (which is focused on resales of securities, including investment contracts, in secondary markets).

      2.    *Common Enterprise*

The PAC also alleges that investors who purchased BNB from other investors on the Binance Platforms invested in a common enterprise.

First, the PAC alleges horizontal commonality, *i.e.*, that investors' fortunes are tied together and dependent upon the success of the issuer's and other third parties' efforts.  The PAC alleges that the BNB that investors purchase on the Binance Platforms in secondary market transactions is just as fungible as those that an investor may purchase directly from Binance—with all investors profiting equally by the increase in price in proportion to their *pro rata* ownership of BNB—such that the fortunes of investors are interdependent and tied to efforts of Binance.  PAC ¶ 346; *see Life Partners*, 87 F.3d at 544.  Binance does not manage separate accounts or separate enterprises for investors who purchase BNB directly from Binance and for investors who may purchase it from someone else.  *Id.* ¶¶ 347, 350.

Further, the economic reality is that BNB investors' fortunes, regardless of whether they purchase BNB in the primary or secondary market, all rise and fall together and are dependent upon not just the successful launch of the token, but on Binance's post-launch continued efforts to increase the price of BNB.  *Id.* ¶¶ 344-45, 350-51, 403.  If Binance's publicly-touted development of the BNB ecosystem were to slow or halt altogether—for example if Binance abandoned the Binance Platforms—all purchasers of the token would be equally affected and lose their opportunity to profit from Binance's efforts.  *See SEC v. Coinbase, Inc. et al.*, 2024 WL 1304037, at *21 (S.D.N.Y. Mar. 27, 2024).  What shows the economic interdependence in all BNB investors' fortunes is that they are all in the boat together by virtue of holding BNB.  *See* PAC ¶¶ 344-46, 350-51, 403.  Their economic fortunes will be affected equally, regardless of *when* or *how* they got into the boat in the first place.  *See id.*

Finally, the PAC alleges that Binance promoted this economic interdependence, including promoting that it is using BNB and BNB sales proceeds to grow its enterprise, such as by compensating its employees with BNB with the express intention that this growth would

generate return for all BNB holders.  *Id.* ¶¶ 320, 335, 349; *see also id.* ¶ 385 (Zhao promoting that Binance would "benefit the same way as all BNB holders").

The foregoing allegations suffice to establish horizontal commonality as defined by the D.C. Circuit.  Specifically, in *Life Partners*, the Court of Appeals emphasized that "the inter-dependency of the investors … transforms the transaction substantively into a pooled investment," and "commingling [of funds] in itself is but an administrative detail."  87 F.3d at 544; *see also* MTD Order at 43.  Although the D.C. Circuit in *SEC v. Banner Fund Int'l* stated that horizontal commonality "requires that there be a pooling of investment funds, shared profits and shared losses," 211 F.3d 602, 614 (D.C. Cir. 2000) (citing *Life Partners, Inc.*, 87 F.3d at 543), it did not purport to depart from *Life Partners*' reasoning that the commonality evaluation is context specific, and that what controls is the interdependency of investors and shared profits and losses, which is an "implicit form of pooling," *Life Partners*, 87 F.3d at 544.

As they do with respect to the investment of money, Defendants appear to contend that there can be no "common enterprise" with investors who purchased BNB from other investors, because those investors' funds do not flow into the coffers of the issuer (but instead simply buy out a prior investor who is substituted for a new one).  This contention is just as incorrect with respect to "common enterprise" as it is with respect to "investment of money."  If Defendants are correct, no resales of "investment contracts" could ever satisfy the *Howey* test, even if nothing has changed about the economic realities of these transactions.  It would erase the term "investment contract" in the context of the Exchange Act, even though the Act's focus is precisely on transactions in secondary markets—*i.e.*, resales from investors to investors—and even though the Supreme Court has explicitly stated that the term "investment contract" is *identical* in both acts.  *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n.1 (1985)

(definitions of "security" in the Securities Act and Exchange Act are "virtually identical and will be treated as such in our decisions dealing with the scope of the term.").  This is not the law.

Defendants have cited no case for the proposition that *who* an investor bought the asset from affects the common enterprise analysis.  To the contrary, courts in various contexts consistently have evaluated *Howey* and found it satisfied, including with respect to resales of investment contracts or of investment contracts sold by issuers who do not receive the proceeds of the sale.  *E.g.*, *Hocking v. Dubois*, 885 F.2d at 1459 (funds need not go to the issuer for secondary market condominium resale coupled with the sale of a rental pool agreement from an independent third party to constitute an investment contract); *In re Ripple Labs.,* 2024 WL 3074379, at *7 (rejecting argument that because funds of investors who purchase on trading platforms are not "pooled" with other purchasers there can be no common enterprise, holding instead that promoter statements established the "direct relation" between secondary investor fortunes and success of promotor); *Patterson*, 2024 WL 49055, at *11 (common enterprise alleged as to secondary market purchasers because their profits were intertwined with those of defendants and other investors, and their fortunes "depended on the success of the [d]efendants' efforts and strategy and Terraform ecosystem as a whole); *In re BitConnect Sec. Litig.*, 2019 WL 9104318, at *8 (S.D. Fla. Aug. 23, 2019) (rejecting argument that investors were never led to believe their crypto asset purchases would be used to invest in or develop any future product or common enterprise as "miss[ing] the forest for the trees"); *Gary Plastic*, 756 F.2d at 234 (finding existence of a common enterprise where funds flowed to the third-party banks that sold the CDs and not to Merrill Lynch, which was the seller of the investment contract); *see generally Coinbase*, 2024 WL 1304037, at *21, 23 ("whether a particular transaction in a crypto asset amounts to an investment contract does not necessarily turn on whether an investor bought

17

tokens directly from an issuer or, instead, in a secondary market transaction."); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 197-98 (S.D.N.Y. 2023) (same).

Here, as alleged in the PAC, investors who purchased BNB on the Binance Platforms bought into and replaced the sellers within the common enterprise with no change to the economic realities. These new investors' financial fortunes were just as interdependent with other investors'. *See* MTD Order at 43; *SEC v. Telegram*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020) ("The plain economic reality is that, post-launch, the [crypto assets] themselves continue to represent the Initial Purchasers' pooled funds.").

Second, the PAC alleges broad and strict vertical commonality, which courts in this district have also evaluated. *See SEC v. Life Partners, Inc.*, 898 F. Supp. 14, 19 (D.D.C. 1995), *rev'd on other grounds*, 87 F.3d 536, 549 (D.C. Cir. 1996); *SEC v. Parkersburg Wireless LLC*, 991 F. Supp. 6, 8 (D.D.C. 1997); *see SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 668, 690, 691-92 (D.D.C. 1991), *aff'd* 968 F.2d 1304, 1307-08 (D.C. Cir. 1992); s*ee also* MTD Order at 13-14 (recognizing these tests could be satisfied). Specifically, the PAC alleges that Binance was the largest holder of BNB, establishing strict vertical commonality. PAC ¶¶ 354-62; *see also Kraken*, at 23; *Telegram*, 448 F. Supp. 3d at 370 (both reasoning strict vertical commonality could be or likely was satisfied based on large holdings of asset by the promoter). The PAC also alleges that BNB investors' financial fortunes depended on Binance undertaking efforts to grow its value, PAC ¶¶ 350-61, 403, satisfying broad vertical commonality. *E.g.*, *In re BitConnect*, 2019 WL 9104318, at *8 (broad vertical commonality satisfied when the fortunes of the investors are tied to the expertise and efforts of the promoter).

3. *Reasonable Expectation of Profits From the Efforts of Others*

Finally, the PAC addresses the Court's ruling that, as to BNB secondary sales, the "facts needed to plausibly allege an 'expectation of profits' in the form of a return on an investment have not yet been alleged." MTD Order at 43-44.

As an initial matter, the PAC reasserts extensive *public* statements and inducements Binance made with respect to BNB. PAC ¶¶ 295-300, 307-08, 335-36, 362-97. These extensive allegations suffice to establish the *Howey* test as to the initial and post-ICO BNB offers and sales by Binance, MTD Order at 27-36, and the PAC alleges that the public statements and inducements remained available to BNB investors trading on the Binance Platforms, past the point of the ICO. *See, e.g,* PAC ¶ 364; *see also Kraken*, at 18 ("[I]f a reasonable investor would understand representations made during the primary market transactions to carry forward into the secondary market, then those representations may be considered. … That a transaction does not involve the asset's primary issuer does not foreclose the possibility that the primary issuer's representations follow the asset through to the secondary market."); *see also In re Ripple Labs*, 2024 WL 3074379, at *10 (denying defendant's summary judgment motion as to the expectation-of-profits element on platform-based sales due to "numerous promotional materials that were distributed to the general public via widely viewed Internet posts and videos.").

Moreover, the PAC includes additional allegations that these inducements did not cease in 2017, when BNB was first offered and sold, but continued unbroken and continues to this day, making clear that BNB remains the center of the BNB ecosystem, both facilitating and benefiting from Binance's ongoing development and expansion efforts. PAC ¶¶ 295-300, 307-08, 335-36, 362-97. For example, the PAC specifically alleges that the Binance.com Platform since August 2020 has had a page devoted to "How to Buy BNB" that contained a link directing investors to

19

purchase BNB and touting its potential price appreciation.  The first option in the webpage section "What to Do After I Buy BNB" was to "Store/Hold BNB," noting that "[*m*]*any users hold on to their BNB with the expectation of it increasing in value*."  *Id.* ¶ 369 (emphasis added). As of at least February 22, 2022, that webpage further promoted that a "Reason to Buy BNB" included to "[m]ake it part of a short or long-term investment strategy," and "[h]old your coin and use it as a store of value."  *Id.* ¶ 370.

Further, well past 2017, Defendants—including BAM Trading, a company Zhao and Binance controlled—frequently continued to publicly promote, via means widely available to investors worldwide, their efforts to develop the Binance ecosystem and grow BNB's price on internet-based platforms, including (1) Binance's "blog" posts on its website, (2) Binance's X account that exceeded 11 million followers in 2023, and (3) Binance's YouTube channel, which surpassed one million followers in August 2024, where they post various interviews and content promoting BNB, among other things.  *See, e.g.*, PAC ¶¶ 363-97; *id.* ¶¶ 366, 381, 388 (examples of Zhao promotions of BNB); *id.* ¶¶ 398-99 (examples of BAM Trading promotions of BNB, including promoting that BNB investors on the secondary market should buy and were buying BNB as an investment in Binance).

Through these various public channels, Binance consistently and widely promoted BNB's price as tied to Binance's on-going development and efforts, including specifically to increase BNB's value through: (1) its efforts to continue to operate and expand the Binance ecosystem, and (2) promotion of additional use cases to drive demand, thereby increasing the price and investment returns for BNB holders.  *Id.* ¶¶ 363-97.  In these promotions, Defendants cast their current efforts and any other efforts that may be required as ongoing, complex, and specialized, implicitly requiring significant funds, expertise, and time to undertake.  *Id.* ¶¶ 297,

299, 387, 389-96.  Indeed, in rebranding the token's name from "Binance Coin," Binance chose

"BNB," which stands for "Build and Build"—signaling both Binance's managerial efforts as

well as their ongoing nature.  *Id.* ¶ 353.  These additional promotions include, for example:

- In a February 6, 2019 blog post on Binance's website called "10 for 10: How the Binance Ecosystem drives BNB to Top 10," Binance reported that BNB had become a top 10 trading crypto asset, and described "the different ways that each Binance division contributes to BNB's Top 10 status."  *Id.* ¶ 387.

- On January 10, 2020, in an interview broadcasted on YouTube, Binance's Managing Director stated, "Recently we launched lending, we launched staking, we launched futures, all of those new businesses contribute to the value of BNB."  *Id.* ¶ 390.

- A February 22, 2021 Binance website blog post reported that BNB's market price surpassed $50 for the first time, explained numerous ways in which Binance's efforts have driven this increase, and further promised that Binance "will continue to work on adding more use cases for BNB for the sake of our community, which has driven unprecedented growth for the token today."  *Id.* ¶ 393.  It also quoted Zhao as stating that Binance's efforts to expand BNB's use cases "are reflected in its growing price."  *Id.*

- On July 15, 2022, Zhao tweeted, "I am spending all of my efforts on #BNB.  And shill #Bitcoin from time to time, when I am too shy to explicitly shill #BNB[]."  *Id.* ¶ 396.  That same day, in a live public event Binance hosted and that it broadcast on its YouTube channel to celebrate the company's fifth anniversary, Binance's Chief Marketing Officer exclaimed, "We only have one job – that's working for the Binance user, and working for the BNB holder.  Do we have a BNB holder here today?"  *Id.*¶ 395.

- On June 13, 2024, Binance Labs announced a "BNB Incubation Alliance" with others "to foster early-stage blockchain innovation" around BNB, and as part of its public announcement, it noted that its launch "coincides with a surge in BNB's market performance."  *Id.*¶ 397.

Binance also promoted Binance's on-going BNB "burn" program, which Binance was in

full control of until at least December 2021, *id.* ¶¶ 374-78, as impacting BNB's market price.

*See Coinbase*, 2024 WL 1304037, at *22-23 (concluding that expectation of profits from issuer's

efforts could be demonstrated by public statements that issuers would employ deflationary

strategies to reduce the total supply of tokens and thereby affect the token price).  In fact, for at

least two years after the ICO and until at least June 2019, Binance's BNB burn program was directly tied to Binance's profits—the more money Binance made the more BNB it burned.  As Zhao explained, this mechanism "works the same way as a dividend economically."  PAC ¶ 375. And, as Binance posted on its website, at least as of November 14, 2019, "Binance schedules quarterly BNB burns to permanently reduce the supply of BNB, in turn, increasing its value."  *Id.* ¶ 376.

Finally, Binance specifically encouraged the readers of these broad, public disseminations to view BNB as an investment, not as something they would "use," when it repeatedly encouraged investor to buy and *hold* BNB (unlike a product that one "uses").  *Id.* ¶ 366; *see Dufoe v. DraftKings, Inc.*, 2024 WL 3278637, at *7 (D. Mass. Jul. 2, 2024) ("[t]he fact that a product has some potential usefulness or intrinsic value will not defeat a reasonable expectation of profit where the primary motivation is the profit") (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 853 (1975)).  BAM did as well.  PAC ¶ 399.

Drawing all plausible inferences in favor of the SEC, the PAC plausibly alleges that investors who bought BNB on the Binance Platforms reasonably expected to profit from Binance's efforts—just as the original BNB purchasers did, at Binance's invitation.  "[I]t was the expectations created by the seller, which were inextricable from the interest being offered, that brought the transaction within the scope of the federal securities law."  MTD Order at 16 (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 349 (1943)).

These allegations cure the deficiencies identified in the MTD Order concerning secondary sales of BNB by sellers other than Binance and further sustain the SEC's Exchange Act Claims.  Accordingly, these proposed amendments are not futile.

**D.     The PAC Plausibly Alleges Exchange Act Claims Based on Defendants'
        Intermediating Transactions in the Ten Crypto Assets That Are Offered and
        Sold as Securities**

The Court did not expressly rule on allegations in further support of the SEC's Exchange

Act Claims that, in addition to transactions involving Binance's offers and sales of BNB and

Binance's and BAM's investment programs, Defendants have provided intermediary services on

the Binance Platforms as to transactions involving the Ten Crypto Assets that are offered and

sold as investment contracts and, therefore, as securities.

The SEC continues to maintain that, for the Exchange Act Claims to survive, it need only

sufficiently allege transactions on the Binance Platforms involving one investment program or

crypto asset that is being offered and sold as a security.  MTD Order at 6; *see also Kraken*, at 4

(denying motion to dismiss Exchange Act claims based on analysis of two example crypto

assets); *Coinbase*, 2024 WL 1304037, at *6 (same).  Accordingly, addressing the sufficiency of

the allegations as to the Ten Crypto Assets is not needed.

Nevertheless, should the Court decide to address these allegations, the PAC provides

additional facts concerning the Ten Crypto Assets to address Defendants' arguments not already

addressed by the MTD Order—namely that, for the transactions in the Ten Crypto Assets on the

Binance Platforms, there is no common enterprise or investment "into" a common enterprise and

no reasonable expectation of profits from the efforts of others—*see* Dkt. No. 118 at 19, 21-24,

26-28; Dkt. No. 117-1 at 20-31; *see also* MTD Order at 37-44—and any anticipated defense

argument that the MTD Order's reasoning as to BNB secondary sales should apply to the Ten

Crypto Assets' secondary sales, *see* Jul. 9 Hr'g Tr. at 13.[6]

Critically, the PAC alleges that the economic realities and widely disseminated promotional statements persisted while the Ten Crypto Assets were trading on the Binance Platforms. *E.g.*, PAC ¶¶ 534-46 (SOL); ¶¶ 552-61 (ADA); ¶¶ 567-83 (MATIC); ¶¶ 594, 613-17 (FIL); ¶¶ 631-40 (ATOM); ¶¶ 644-62 (SAND); ¶¶ 673-90 (MANA); ¶¶ 707-22 (ALGO); ¶¶ 731-46 (AXS); ¶¶ 753-75 (COTI). Indeed, these promotions were directed specifically at investors trading on those platforms, including by Defendants themselves. *E.g., id.* ¶¶ 88, 227, 461, 463, 469-72, 483-85 470, 492-513. Defendants disseminated their own research reports and other information about the Ten Crypto Assets and their ongoing development, and they republished and amplified the issuers' and the promoters' statements and activities to secondary market investors on the Binance Platforms. *E.g., id.* ¶¶ 492-513. After the MTD Order, another court evaluating Exchange Act claims nearly identical to those alleged in the PAC held the SEC had plausibly alleged transactions in at least two of the Ten Crypto Assets alleged here—SOL and ALGO—were being offered and sold as securities when available for trading on the crypto

---

[6] As this Court noted and as the SEC reiterates, with its use of the term "crypto asset securities," the SEC is not referring to the crypto asset itself as the security; rather, as the SEC has consistently maintained since the very first crypto asset *Howey* case the SEC litigated, the term is a shorthand. *See Telegram*, 448 F. Supp. 3d 352, 379 ("While helpful as a shorthand reference, the security in this case is not simply the [crypto asset], which is little more than alphanumeric cryptographic sequence … [the] security … [in] [t]his case … consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the [crypto asset]."). Nevertheless, to avoid any confusion, the PAC no longer uses the shorthand term, and the SEC regrets any confusion it may have invited in this regard. MTD Order at 19-20. As the Court explained, the crypto asset is the subject of the investment contract. Defendants appear to argue that, even if the Ten Crypto Assets were offered and sold as securities during the ICOs, they do not remain securities into perpetuity. The SEC is not advancing this argument. The SEC's allegations with respect to the Ten Crypto Assets at issue in secondary markets are that their promotions and economic realities have not changed in any meaningful way under *Howey*, such that they continue to be offered and sold as investment contracts.

trading platforms.  *See Kraken*, at 4, 20-28; *see also Coinbase*, 2024 WL 1304037, at *6, 20-25 (focusing on allegations regarding SOL and CHZ); PAC ¶¶ 522-46 (SOL), 691-722 (ALGO).

>    1.    *Investment of Money*

The PAC alleges that investors paid consideration for the Ten Crypto Assets in the form of cash or other crypto assets, and that in doing so they risked losing their investments if the assets went down in value.  PAC ¶¶ 353 (Ten Crypto Assets bought and sold for consideration including fiat currency or other crypto assets); *e.g.,* ¶¶ 524-25 (SOL), 548 (ADA); 566-68 (MATIC).  This alleges an "investment of money" under *Howey*.  *See*, *e.g.*, *Kraken*, at 20-21 ("The SEC has plausibly alleged that Kraken users who purchased assets on Kraken's platform made an 'investment of money.'").  Moreover, as discussed above, whether investors' funds go directly to the issuer does not impact this analysis.  *See id.*, at 20; *see generally supra* § I.C.1, 2.

In any event, even if such a requirement existed, the PAC alleges that issuers themselves offered and sold their crypto assets on the Binance Platforms—much like Binance sold BNB on the Binance Platforms—such that at least *some* of the investor funds did flow directly to the issuers' coffers.  For example, the PAC alleges that the issuers of three of the Ten Crypto Assets—MATIC, AXS, and SAND—all went to market initially by offering and selling the token in so-called Initial Exchange Offerings or "IEOs" on the Binance.com Platform.  PAC ¶ 467.  As reflected in public statements advertising and promoting the IEOs, the proceeds of these initial fundraising efforts were to be used for the development of the crypto assets' respective ecosystems.  *Id.* ¶¶ 463-67; *see also id.* ¶ 468 (alleging non-IEO issuer offers and sales for at least SOL, SAND, and MANA).

2.    *Common Enterprise*

The PAC sufficiently alleges a common enterprise as to the Ten Crypto Assets under either the horizontal or vertical commonality tests, for much the same reasons it does with respect to BNB.  *Supra* § I.C.

Horizontal commonality is satisfied because the PAC alleges that investors' fortunes were interdependent and dependent upon the success of the enterprise because they purchased identically fungible tokens whose prices rise and fall together based upon the issuers' and other third parties' efforts.  PAC ¶¶ 514-21.  As discussed above, regardless of whether investors purchase the Ten Crypto Assets in the primary or secondary markets, the fortunes of investors are interdependent, and therefore pooled, and dependent upon the continued skills and expertise of the issuers and other third parties and their development of the relevant ecosystem.  *See id.* ¶¶ 514-788; s*ee Life Partners*, 87 F.3d at 544 (interdependency is "implicit form of pooling"); *see generally supra* § I.C (citing cases).  This economic reality does not change in any way simply because an investor happens to have purchased the token on the platform from an issuer selling it there, or from another investor.

To the extent Defendants may argue that there is no common enterprise because the funds of a resale investor did not land directly in the coffers of the issuer, that argument should be rejected for the same reasons it should be rejected as to BNB.  *Supra* § I.C.1, 2.

In addition, this invented requirement is nevertheless met because the PAC alleges that issuers publicized to investors in the primary and secondary markets that proceeds from initial sales (including IEO sales on the Binance.com Platform) and profits from the continued sale of tokens would be fed back to the issuer or other third parties to further develop the crypto asset's ecosystem, which would, in turn, increase the crypto asset's value as reflected in the increased

price.  *See* PAC ¶¶ 463-68 (alleging IEOs on the Binance.com Platform provide for issuers to raise capital and investors to "have the opportunity to participate in the growth of these networks"); *id.* ¶¶ 463, 468 (issuers, including for SOL, SAND, and MANA, sold their holdings on the Binance Platforms including through affiliates and intermediaries); *id.* ¶¶ 526-27 (public statements by Solana Labs that it would pool the proceeds from its private and public SOL sales and use those proceeds to hire engineers and staff to help develop and grow Solana's ecosystem and related endeavors); *id.* ¶ 648 (describing investment of revenues in the Sandbox Foundation whose "role . . . is to support the ecosystem of The Sandbox" and that "[t]he overall valuation of the metaverse grow"); *id.* ¶¶ 566-71 (Polygon stated in its whitepaper that investment proceeds would be pooled to develop and grow its business and then advertised that the $450 million raised through additional sales of MATIC after the IEO would "secure Polygon's lead"); *id.* ¶¶ 591, 597-606 (similar for FIL); *id.* ¶¶ 622-29 (similar for ATOM); *id.* ¶ 671 (similar for MANA); *id.* ¶¶ 733-39 (similar for AXS).  As the PAC also alleges, Binance and BAM publicly amplify these statements to investors.  *Id.* ¶¶ 492-513.

The PAC also plausibly alleges both broad and strict vertical commonality for the Ten Crypto Assets.  The PAC alleges broad vertical commonality because the allegations show that investors' fortunes were dependent on the success of the enterprise, as the issuers and promoters of the crypto assets expressly tied the value of the asset (and thus investors' fortunes) to the success of their efforts in operating and developing the crypto asset ecosystems, such that the more successful the efforts, the greater the profits for investors, and vice versa as to losses.  *See id.* ¶¶ 460-788.  The PAC also plausibly alleges strict vertical commonality, at least with respect to those crypto assets in which the issuers and promoters continued to hold the crypto assets, tying their financial fortunes to the value of the crypto asset—just as investors' financial fortunes

27

were tied.  *E.g.*, *id.* ¶¶ 528, 530 (allocation of SOL to founders and related entities, including 50 million SOL tokens to "support operations"); *id.* ¶¶ 550-51 (ADA); *id.* ¶ 570 (MATIC); *id.* ¶¶ 599-600, 606 (FIL); *id.* ¶ 629 (ATOM); *id.* ¶ 651 (SAND); *id.* ¶¶ 667-68 (MANA); *id.* ¶¶ 692, 703-06 (alleging that billions of ALGO are held by the issuer and related entities and persons); *id.* ¶ 748 (COTI); s*ee also Kraken*, at 22-25 (using ALGO as an example, "the SEC has plausibly alleged vertical commonality between the investors using Kraken to purchase crypto assets and the promoters whose job it is to promote those assets and grow their associated networks").

### 3.   *Reasonable Expectation of Profits From the Efforts of Others*

Finally, the PAC plausibly alleges that, given the persistent economic reality of the Ten Crypto Assets and the issuers' and promoters' ongoing statements, efforts, and representations (as republished and amplified by Defendants), investors in the Ten Crypto Assets reasonably expected profits from the issuers' and other third parties' entrepreneurial and managerial expertise and efforts, including when they purchased them on the Binance Platforms.

First, as alleged in the PAC, from the time of initial development to the present, the issuers, promoters, and other third parties engaged in broad, publicly available promotions, marketing the crypto assets, their skills and expertise, and their ongoing development that would give the crypto assets value and the potential to increase in price over time.  *Id.* ¶¶ 469-72, 492; *see also id.* ¶¶ 536-539 (statements regarding SOL).  Many of these initial statements are still widely available today.  *E.g., id.*. ¶¶ 492; ¶ 676 (MANA).

At least for some of the Ten Crypto Assets, a critical part of these promotional statements was that the issuers' development of the secondary market, including listing and ongoing promotion on the Binance Platforms (the Binance.com Platform was/is the largest crypto asset trading platform in the world), was an intentional and integral component of the issuers' strategy

to promote the crypto assets, develop a liquid market for them, and increase their value—and, therefore, a key reason investors should reasonably expect to profit. *E.g.*, *id.* ¶¶ 469-72, 604, 650 (alleging that the issuers of at least SAND, FIL, and COTI publicly promoted ongoing efforts to develop a secondary market); *see also id.* ¶¶ 532-33 (SOL), 572 (MATIC), 730 (AXS), 757 (COTI); *Gary Plastic*, 756 F.2d at 233, 234, 240-41 (promise to maintain secondary market fueled expectation of profits); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356 n.14 (S.D.N.Y. 2019) (same).

The PAC further alleges that, consistent with these representations, the issuers undertook entrepreneurial and managerial efforts to go through Binance's and BAM's listing process, including participating in extensive due diligence through which Binance and BAM evaluated the technical and commercial viability, regulatory risks, and ongoing plan to evaluate whether the crypto asset would be attractive to investors. *See* PAC ¶¶ 473-491. They also agreed to Binance's and BAM's requirements, including contractually binding themselves to undertake ongoing development and efforts relevant to the crypto assets' value, to continue marketing efforts to ensure active trading, and to take steps to maintain liquidity on the platform, such as onboarding market makers to trade the assets. *See* PAC ¶¶ 479-91.

Second, the PAC alleges that, after initial sales and during and after the development of these secondary markets, issuers and promoters of the Ten Crypto Assets continue to widely disseminate statements and other materials promoting these assets in the same ways they did during the initial sales. *E.g.*, PAC ¶¶ 492-513; ¶¶ 761-63 (Coti continues to promote COTI on its website, the Medium website, and YouTube as an investment in Coti's efforts). Moreover, once approved for listing, Defendants themselves participated in these coordinated campaigns of widespread promotion, targeting investors to purchase the Ten Crypto Assets based on the

expectation of profits from the ongoing efforts of the issuers and others.  *See, e.g.*, *id.* ¶¶ 494-513.  Specifically, immediately upon listing, the issuers engaged in far-reaching promotion through their websites, social media channels, YouTube videos, rewards promotions, and other means, announcing the listing and providing information about the crypto asset and ongoing development that would lead investors to reasonably expect profits from the efforts of the issuers.  *E.g., id.* PAC ¶¶ 534-46 (SOL); ¶¶ 552-561 (ADA); ¶¶ 567-83 (MATIC); ¶¶ 594, 613-617 (FIL); ¶¶ 631-640 (ATOM); ¶¶ 644-662 (SAND); ¶¶ 673-690 (MANA); ¶¶ 707-722 (ALGO); ¶¶ 731-746 (AXS); ¶¶ 753-775 (COTI).

　　　For example, after initial sales issuers and promoters continue to tout that they and their advisers and other team members involved in the development of the ecosystem hold large amounts of their respective tokens after initial sales, and some holdings were subject to vesting or holding periods.  *E.g., id.* ¶¶ 528, 530 (SOL); ¶¶ 550-51 (ADA); ¶ 570 (MATIC); ¶¶ 599-600, 606 (FIL); ¶ 620 (ATOM); ¶ 645 (SAND); ¶¶ 667-68 (MANA); ¶¶ 692, 703-706 (ALGO); ¶ 748 (COTI).  This has led investors to understand that the issuers and promoters were financially compelled to undertake efforts to increase the price of the tokens, an economic reality that endures past the point of the initial offers and sales of the asset.  *E.g., id.* ¶ 738 (Sky Mavis promoting its AXS holdings as keeping its team "incentivized to keep building after a successful token sale.");  *see SEC v. LBRY*, 39 F. Supp. 3d 211, 220 (D.N.H. 2022) (issuer's retention of tokens signaled it would work to improve the value of blockchain, "intertwining [its] financial fate with the commercial success of LBC").

　　　Similarly, like Binance did as to BNB, certain promoters marketed the ways in which they managed supply, including through limiting the initial supply and subsequent "burn" events that led investors to reasonably expect profits because reducing supply would increase the value

of their respective tokens.  *E.g.*, PAC ¶ 540 (Solana Labs markets that it burns SOL as part of a "deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price"); ¶ 578-79 (Polygon markets that it burns MATIC, which will have a deflationary effect); ¶¶ 653-655 (public statements promoting limited supply and burn program that would lead to an increase in the value of SAND); ¶¶ 607, 614 (FIL limited supply and burn); ¶¶ 680,682 (MANA); ¶ 740 (AXS issuer explicitly promoted an increase in the price of AXS and boosting of liquidity through burning tokens); *see also Coinbase,* 2024 WL 1304037, at *22 (citing allegations relating to SOL's "burn" mechanism); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020) (finding the "role of supply and demand in driving the value of Kin" sufficient to establish the expectation of profits); *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 444 (S.D.N.Y. 2023) (same); *see generally supra,* I.C.3.

Defendants, who were integral in creating a critical part of the market for the Ten Crypto Assets by listing them on their platforms, amplify these statements by explicitly linking or repeating statements and other marketing activities on the Binance Platforms and their social media channels, while also disseminating their own promotions.  *E.g.*, PAC ¶¶ 88, 227, 461, 492-513.  In so doing, both the issuers and Defendants continue to equate investing in the Ten Crypto Assets with investing in the traditional securities market, providing significant information about the crypto assets and broader ecosystems—including the ownership and development team, distribution, "burn" and other components that impact supply and demand, and ongoing efforts— all of which impact the crypto assets' value and, ultimately, investor profits.  *See id.*

In fact, Binance and BAM also touted the importance of research and due diligence before buying an asset.  *E.g.*, *id.* ¶¶ 510-12.  To that end, they encouraged investors to access the research materials and other information Binance, BAM, and issuers publicize, which, among

other information, provides economic fundamentals or "tokenomics" that impact the value of the crypto asset. *See id.* ¶¶ 492-511; ¶¶ 534-46 (SOL); ¶¶ 557-61 (ADA); ¶¶ 717-22 (ALGO); ¶¶ 742-46 (AXS).

For example, the trading pages on the Binance Platforms where investors go to buy, sell, and trade the crypto assets contain tabs with a summary of the crypto asset and links to the issuer sites and related information to investors. *Id.* ¶¶ 88, 227, 499-510. The Binance Platforms' various other webpages on their websites provide extensive information about the crypto asset, its profitability, its history, and ongoing plans for development, often a link to buy or sell the particular asset. *E.g., id.* ¶¶ 541-46 (SOL); ¶¶ 556-61 (ADA); ¶¶ 580-83 (MATIC); ¶¶ 613-17 (FIL); ¶¶ 636-40 (ATOM); ¶¶ 657-62 (SAND); ¶¶ 683-90 (MANA); ¶¶ 717-22 (ALGO); ¶¶ 741-746 (AXS); ¶¶ 769-75 (COTI). These webpages often link directly to the issuers' website, whitepaper, and social media content, and provide investors on the Binance Platforms a direct link to issuer statements. *See, e.g.*, *id.*, ¶¶ 499-503. Defendants also post webpages with extensive price analysis and prepare and post extensive research papers concerning each crypto asset trading on the Binance Platforms, including those alleged in the PAC. *See, e.g.*, *id.* ¶ 495 (SOL); ¶ 582 (MATIC); ¶ 616 (FIL); ¶ 637 (ATOM); ¶ 658 (SAND); ¶ 689 (MANA); ¶¶ 719, 721 (ALGO); ¶¶ 742, 745 (AXS); ¶ 772 (COTI).

Binance and BAM Trading also host and promote "Ask Me Anything" ("AMA") interviews with crypto asset issuers on social media via their YouTube and other communications channels, providing information about the projects and opportunities for investors to engage with the issuers. *Id.* ¶¶ 498; 581 (BAM Trading promoting an AMA with MATIC's cofounder on Binance.US Telegram channel soon after the listing of MATIC on Binance.US); ¶¶ 685, 688 (Binance and BAM both promoted MANA through AMAs on their

Telegram channels); ¶ 718 (Binance has hosted several AMAs with Algorand Foundation Leadership); ¶ 744 (BAM Trading hosted AMA on Twitter with Axie Infinity Team); ¶ 770 (Binance hosted AMAs with COTI team on Telegram channel).

In other words, the totality of the well-pled PAC allegations demonstrate that the issuers of the Ten Crypto Assets treated the offer and sale of these assets as *investments* whose success inured to the investors' financial benefit—and publicly promoted them as such—and not at all as an ordinary item in commerce that one would "use" for whatever reason.  It is, therefore, reasonable to infer investors did so as well.  *Cf. Kraken* at 26 (rejecting comparison of crypto asset to gold and silver "because the Complaint alleges that promoters for the various crypto assets identified by the SEC worked to create the networks or 'ecosystems' that would support the value of the digital assets they distributed."); *Coinbase*, 2024 WL 1304037, at *25 ("Unlike in the transaction of commodities or collectibles[,] including the Beanie Babies … which may be independently consumed or used, a crypto-asset is necessarily intermingled with its digital network—a network without which no token can exist.").

In short, amendment as to the Ten Crypto Assets is not futile.  The Court has not ruled on the sufficiency of the original allegations as to those assets.  To the extent Defendants advanced various arguments for their dismissal, those arguments are incorrect as a matter of law.  But, even if they were not, the PAC's factual allegations would satisfy them.  The PAC alleges that investors in the Ten Crypto Assets on the Binance Platforms were inundated with statements and information from issuers, promotors, developers, and Defendants themselves on an ongoing basis concerning information about the crypto asset and the ongoing skills, expertise, and efforts and development undertaken by the issuers and other third parties.

Like the leasehold interests in *Joiner* that were considered part of an investment contract based on the promotion of the drilling undertaking, here, "an economic interest in [the enterprise] was what brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure"; the issuer efforts were "woven into [the instrument], in both an economic and legal sense … run[ning] through the whole transaction as the thread on which everybody's beads were strung."  *C.M. Joiner Leasing Corp.*, 320 U.S. at 348-49; *see Kraken*, at 27 (finding sufficient allegations that crypto asset investors on a crypto trading platform had a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others); *Coinbase*, 2024 WL 1304037, at *23 (same).

## II.   Amendment is in the Interests of Justice, and There is No Basis to Deny the SEC's Motion

Not only would amendment not be futile, but there is no undue delay, undue prejudice, bad faith, or any other basis for denying the SEC's motion.

To the contrary, allowing the SEC to further substantiate its allegations, including as to claims the Court has not expressly ruled on, will facilitate proper resolution on the merits of the SEC's claims.  Moreover, the PAC will better inform evaluation of all the economic realities surrounding the alleged unlawful offers and sales of securities, as *Howey* requires.

This is the SEC's first proposed amendment, filed in compliance with the Court-ordered schedule.  Dkt. No. 254.  Defendants have not yet filed an Answer, and the SEC is seeking leave to amend at the very outset of merits discovery.  *See id.*  Further, the PAC does not allege any new claims.  Indeed, claims under all the statutory provisions the SEC original alleged were violated have survived.  The PAC simply reasserts or adds allegations as to certain bases for these various violations, seeking to address a limited subset of pleading deficiencies as well as arguments set forth in Defendants' motions to dismiss as to which there has been no ruling.

Finally, and for many of these reasons, Defendants will suffer no prejudice at all, which is the "most important factor the Court must consider when deciding whether to grant a motion for leave to amend." *Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006).  They can challenge the claims and allegations on both the facts and the law as the case proceeds, and they have been on notice of all these claims at a minimum since the original Complaint.  S*ee Ramos v. Barr*, 2020 WL 13695151, at *4-5 (D.D.C. Aug. 11, 2020) ("An amendment may cause prejudice to a defendant when granting it 'would necessitate reopening discovery at a relatively late stage in the proceedings.'") (internal citations omitted); *Wilcox v. Georgetown Univ.*, 2023 WL 2734224, at *8 (D.D.C. Mar. 31, 2023) ("To demonstrate the necessary additional element of undue prejudice, '[the opposing party] must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely.'") (internal citations omitted) *aff'd*., 2024 WL 1739266 (D.C. Cir. Apr. 23, 2024)).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Plaintiff's Motion to Amend.

Respectfully submitted,


s/Matthew Scarlato
Matthew F. Scarlato (D.C. Bar No. 484124)
Jennifer L. Farer (D.C. Bar No. 1013915)
David A. Nasse (D.C. Bar No. 1002567)
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549-9040
(202) 551-3749 (Scarlato)
scarlatom@sec.gov

J. Emmett Murphy
Elisa S. Solomon
Jorge G. Tenreiro
SECURITIES AND EXCHANGE
COMMISSION
100 Pearl Street
New York, NY 10004

*Attorneys for Plaintiff Securities and
Exchange Commission*