**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE
COMMISSION,

               *Plaintiff*,

    v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

            *Defendants*.

**No. 1:23-cv-01599-ABJ-ZMF**

**Oral Argument Requested**

**Joint Motion To Dismiss Amended Complaint Against Defendants**
**Binance Holdings Limited And Changpeng Zhao**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 6

I.    The First Motion-To-Dismiss Ruling ..................................................... 6

II.   The Amended Complaint And The SEC's New Theory For Regulating
      Crypto Assets. ......................................................................................... 7

ARGUMENT ........................................................................................................ 9

I.    The Amended Complaint Fails To Plausibly Plead Facts That Satisfy
      *Howey*.  (Amended Portions Of Count 1, Count 3, And All Of Counts 5–
      12) .......................................................................................................... 9

      A.    The SEC Fails To Plausibly Allege Securities Transactions On The
            Binance.com Or Binance.US Exchanges.  (Counts 5–12) ...................... 10

            1.    Blind Resale Transactions Not Involving Token Developers
                  Were Not Investment Contracts. .................................................... 12

            2.    The Sales By Token Developers Were Not Investment
                  Contracts. ....................................................................................... 20

                  a.    Blind Sales By Token Developers Were Not Investment
                        Contracts. ............................................................................ 20

                  b.    The So-Called "Initial Exchange Offerings" Were Not
                        Investment Contracts. ......................................................... 22

            3.    For All Of The Transactions, The SEC Fails To Plausibly
                  Allege That A Reasonable Buyer Purchased The Tokens
                  Primarily For Investment Purposes. .............................................. 23

            4.    The SEC's Control-Person Claims Against Mr. Zhao Are
                  Derivative Of Its Exchange Act Claims, So They Should
                  Also Be Dismissed. ........................................................................ 32

      B.    The SEC Fails To Plausibly Allege That Post-ICO Sales Of BNB
            Constituted "Investment Contracts."  (Count 1) ........................................ 32

      C.    The SEC Fails To Plausibly Allege That Employee Compensation
            Constituted "Investment Contracts."  (Count 1) ........................................ 33

      D.    All The Claims Concerning Token Sales On Binance.com Or
            Binance.US Fail To Plead Post-Sale Obligations.  (All Claims
            Except Count 1 Concerning the BNB ICO And Count 3) ......................... 37

      E.    Simple Earn Was Not Offered Or Sold As An Investment Contract.
            (Count 3) .................................................................................................... 38

II.   The Court Should Dismiss All Claims Related To Third-Party Tokens For

Failure To Join Required Third Parties.  (Counts 5–10)......................................... 39

    A.       The Third Parties Are Required Under Rule 19(a). .................................. 40

    B.       Joinder Is Not Feasible............................................................................. 41

    C.       The Proper Remedy Is Dismissal.............................................................. 42

III.      The Court Should Strike The SEC's Requests For Disgorgement From BHL And Mr. Zhao And Injunctive Relief Against Mr. Zhao. ........................... 44

CONCLUSION................................................................................................................... 45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*,
276 F.R.D. 8 (D.D.C. 2011) ................................................................................40

*Adams v. Bell*,
711 F.2d 161 (D.C. Cir. 1983) .............................................................................43

*\*Ali v. Carnegie Inst. of Wash.*,
306 F.R.D. 20 (D.D.C. 2014) ..........................................................................41, 43

*Alvarez v. United States*,
862 F.3d 1297 (11th Cir. 2017) ...........................................................................44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................9, 12, 22, 24

*Cerebral Palsy Ass'n of Nassau Cnty., Inc. v. Cochran*,
2021 WL 1037865 (D.D.C. Feb. 10, 2021) .........................................................42

*CFTC v. S. Tr. Metals, Inc.*,
894 F.3d 1313 (11th Cir. 2018) ...........................................................................44

*Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*,
699 F.2d 1274 (D.C. Cir. 1983) ...........................................................................43

*Delgado-Caraballo v. Hosp. Pavia Hato Rey, Inc.*,
889 F.3d 30 (1st Cir. 2018) ..................................................................................42

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
192 F. Supp. 3d 54 (D.D.C. 2016) ..................................................................40, 43

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
503 F. Supp. 2d 25 (D.D.C. 2007) .......................................................................32

*Foltz v. U.S. News & World Rep., Inc.*,
627 F. Supp. 1143 (D.D.C. 1986) ...................................................................35, 36

*Fraser v. Fiduciary Tr. Co. Int'l*,
2005 WL 6328596 (S.D.N.Y. June 23, 2005) ......................................................36

*Freeland v. Iridium World Commc'ns, Ltd.*,
545 F. Supp. 2d 59 (D.D.C. 2008) .......................................................................32

*Glen-Arden Commodities, Inc. v. Costantino*,
493 F.2d 1027 (2d Cir. 1974) ..............................................................................14

*Harran Transp. Co. v. Nat'l Trailways Bus Sys.*,
1985 WL 2349 (D.D.C. Aug. 5, 1983) .................................................................42

*Int'l Bhd. of Teamsters v. Daniel,*
    439 U.S. 551 (1979) ........................................................................24, 33, 34, 36, 38

Kickapoo Tribe of Indians v. Babbitt,
    43 F.3d 1491 (D.C. Cir. 1995) ..............................................................................40, 43

Laker Airways, Inc. v. British Airways, PLC,
    182 F.3d 843 (11th Cir. 1999) ...................................................................................40

Lewis v. Gov't of District of Columbia,
    324 F.R.D. 296 (D.D.C. 2018) ..................................................................................40

*Liu v. SEC,*
    591 U.S. 71 (2020) ......................................................................................................44

*Marine Bank v. Weaver,*
    455 U.S. 551 (1982) ..............................................................................................10, 39

Mart v. Forest River, Inc.,
    854 F. Supp. 2d 577 (N.D. Ind. 2012) .......................................................................37

McCown v. Heidler,
    527 F.2d 204 (10th Cir. 1975) ...................................................................................13

Moody v. Bache & Co.,
    570 F.2d 523 (5th Cir. 1978) .....................................................................................16

Noa v. Key Futures, Inc.,
    638 F.2d 77 (9th Cir. 1980) .......................................................................................16

Peyton v. Morrow Elecs., Inc.,
    587 F.2d 413 (9th Cir. 1978) .....................................................................................35

Phillips v. Kaplus,
    764 F.2d 807 (11th Cir. 1985) ...................................................................................35

Ramah Navajo Sch. Bd., Inc. v. Babbitt,
    87 F.3d 1338 (D.C. Cir. 1996) ...................................................................................41

Republic of Philippines v. Pimentel,
    553 U.S. 851 (2008) ...................................................................................................43

In re Ripple Labs, Inc. Litig.,
    2024 WL 3074379 (N.D. Cal. June 20, 2024) ...........................................14, 15, 25

*Rodriguez v. Banco Cent. Corp.,*
    990 F.2d 7 (1st Cir. 1993) ..............................................................................16, 17, 25

SEC v. Belmont Reid & Co.,
    794 F.2d 1388 (9th Cir. 1986) ...................................................................................16

SEC v. Berry,
    2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) .........................................................44

*SEC v. Binance Holdings Ltd.,
  2024 WL 3225974 (D.D.C. June 28, 2024)........1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
                                                17, 18, 19, 21, 23, 24, 25, 26, 33, 37, 38, 39, 43

SEC v. C.M. Joiner Leasing Corp.,
  320 U.S. 344 (1943).............................................................................................................6, 37

SEC v. City of Victorville,
  2014 WL 12588688 (C.D. Cal. Oct. 14, 2014)......................................................................44

SEC v. Coinbase, Inc.,
  2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) .......................................................................14

SEC v. Edwards,
  540 U.S. 389 (2004)...............................................................................................................24

SEC v. Govil,
  86 F.4th 89 (2d Cir. 2023) .....................................................................................................44

*SEC v. Life Partners, Inc.,
  102 F.3d 587 (D.C. Cir. 1996) ...............................................................................9, 10, 19, 37

*SEC v. Life Partners, Inc.,
  87 F.3d 536 (D.C. Cir. 1996) ......................................................................................17, 20, 24

SEC v. Ripple Labs, Inc.,
  2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) .........................................................................44

*SEC v. Ripple Labs, Inc.,
  682 F. Supp. 3d 308 (S.D.N.Y. 2023).........................................3, 6, 14, 18, 19, 21, 23, 25, 33

*SEC v. Ripple Labs, Inc.,
  697 F. Supp. 3d 126 (S.D.N.Y. 2023)..........................................................................14, 16, 19

SEC v. Rubera,
  350 F.3d 1084 (9th Cir. 2003) ...........................................................................................13, 38

SEC v. Telegram Group Inc.,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020)................................................................................14, 16, 34

SEC v. Terraform Labs Pte Ltd.,
  684 F. Supp. 3d 170 (S.D.N.Y. 2023)................................................................................14, 15

*SEC v. W.J. Howey Co.,
  328 U.S. 293 (1946)..............................................................................................2, 9, 13, 14, 15

Sparrow v. United Air Lines, Inc.,
  216 F.3d 1111 (D.C. Cir. 2000) .............................................................................................21

Steele v. United States,
  2023 WL 6215790 (D.D.C. Sept. 25, 2023) ..........................................................................11

Thorpe v. Borough of Thorpe,
  2011 WL 13134010 (M.D. Pa. Feb. 4, 2011) ........................................................................41

*In re Toyota Motor Corp.*,
    785 F. Supp. 2d 883 (C.D. Cal. 2011) ................................................................42

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975)....................................................................................16, 24

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
    940 F.2d 564 (10th Cir. 1991) ..............................................................................35

*Whitney v. Obama*,
    845 F. Supp. 2d 136 (D.D.C. 2012) ......................................................................45

**Rules**

Fed. R. Civ. P. 12(b)(7).................................................................................5, 39, 40

Fed. R. Civ. P. 19(a)(1)..........................................................................................40, 42

Fed. R. Civ. P. 19(b)(1)..........................................................................................42, 43

Fed. R. Civ. P. 19(b)(2)..........................................................................................42, 43

Fed. R. Civ. P. 19(b)(3)................................................................................................43

Fed. R. Civ. P. 19(b)(4)................................................................................................43

**Treatises**

1 Steven C. Alberty, *Advising Small Businesses* § 16:15 (2024)................................35

7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1604 (3d ed.) ........................................40

7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1609 (3d ed.) ........................................41

**Regulations**

*SEC, *Employee Benefit Plans; Interpretations of Statute*, 45 Fed. Reg. 8,960
    (Feb. 11, 1980)........................................................................................................35

**Other Authorities**

*Algorand (ALGO)*, Binance.com (June 21, 2019),
    https://www.binance.com/en/research/projects/algorand ......................................31

*AMA with Polygon Cofounder and COO Sandeep Nailwal*, Binance.US (Mar. 5,
    2021), https://tinyurl.com/5x2djn3m .....................................................................30

*Axie Infinity Shards (AXS)*, Axieinfinity.com, https://tinyurl.com/bddzhabz..............28

Binance, *Binance AMA with CZ: Highlights* 14:24-14:49 (July 12, 2019),
    https://tinyurl.com/44zeb6pd .................................................................................27

*Binance Simple Earn Terms* (May 29, 2024), https://www.binance.com/en/terms-
    simple-earn.............................................................................................................39

*Binance.US Lists COTI (COTI)*, Binance.US (Apr. 6, 2022),
    https://tinyurl.com/8z6x478r ............................................................................................32

Boxmining, *Binance – Interview with CEO Changpeng Zhao* 20:42-20:58 (Sept.
    2, 2017), https://tinyurl.com/y4rb79zh .....................................................................27

Complaint, *SEC v. Payward, Inc.*,
    3:23-cv-06003 (N.D. Cal. Nov. 20, 2023) ...................................................................6

Complaint, *SEC v. Wahi*,
    2:22-cv-01009-TL (W.D. Wash. July 21, 2022) ...........................................................6

*Cosmos Network (ATOM)*, Binance.com (Apr. 28, 2019),
    https://www.binance.com/en/research/projects/cosmos-network ...............................31

*Cosmos Plan* (Mar. 31, 2017), https://tinyurl.com/mrxzx7yp .....................................31

*Decentraland White Paper*, https://tinyurl.com/584rncnk.........................................28

*How to Buy BNB* (Feb. 28, 2022), https://tinyurl.com/2v2f3prr..................................26

*Introducing the Sandbox (SAND) Token Sale on Binance Launchpad*, (Aug. 5,
    2020), https://www.binance.com/en/support/announcement/introducing-the-
    sandbox-sand-token-sale-on-binance-launchpad-
    b8e11c5870ba4d16810839473e69a90d .....................................................................23

*Introduction to Binance Simple Earn* (Sept. 22, 2022),
    https://www.binance.com/en/support/faq/introduction-to-binance-simple-earn-
    8df6abf5930e4ef4977d84f45d99d491 .......................................................................38

*IOHK | Contact,* Input | Output (Oct. 10, 2024), https://tinyurl.com/yryjt7kp ............42

Press Release, Animoca Brands, ASX Release (May 23, 2019),
    https://tinyurl.com/6fc84hhj.......................................................................................28

*Protocol Labs Company Profile*, LinkedIn (Oct. 10, 2024),
    https://tinyurl.com/ya7x8hpe .....................................................................................42

Protocol Labs, Inc., *Filecoin Primer* (July 25, 2017),
    https://tinyurl.com/ywbtw8ak ....................................................................................30

Sandbox, *The Sandbox Tokens: $SAND* (July 25, 2019),
    https://tinyurl.com/5f8849yv .....................................................................................28

*Sky Mavis Overview*, PitchBook (Oct. 10, 2024), https://tinyurl.com/bdfbux22 .........42

*Terms and Conditions*, Decentraland (Oct. 10, 2024),
    https://tinyurl.com/h8sb72xe......................................................................................42

*What Is Cardano (ADA)? A Guide for Beginners*, Binance.US (July 15, 2024),
    https://tinyurl.com/y6jmx453.....................................................................................29

*What is Cardano (ADA)?*, Binance.com (Aug. 21, 2022),
    https://tinyurl.com/4sc9c48u......................................................................................29

*What is Filecoin (FIL)?*, Binance.com (Aug. 21, 2022),
    https://tinyurl.com/bdftsyuu ................................................................................................30

*What Is Solana (SOL)?*, Binance.com (Sept. 1, 2024), https://tinyurl.com/44z55shf ..................29

Defendants Binance Holdings Limited ("BHL") and its former CEO, Changpeng Zhao, submit this motion to dismiss the SEC's Amended Complaint and, in the alternative, to strike portions of the SEC's requested relief.

## Introduction

In its Amended Complaint, the SEC pays lip service to the Court's ruling that crypto assets are not in and of themselves "securities," but refuses to accept the logical conclusion of that ruling—that secondary market resales of the assets long after they were first distributed by their developers are not "securities" transactions. Instead, the SEC's Amended Complaint continues to insist that virtually all transactions involving crypto assets—including blind secondary market resales of tokens—are securities transactions because some buyers might hope the assets will increase in value. This Court correctly rejected the SEC's initial attempt to conflate crypto assets with investment contracts, recognizing that although crypto assets can be sold as part of an investment contract, each transaction must independently satisfy *Howey* for the securities laws to apply to that transaction. As the Court correctly observed, the SEC's argument that crypto assets "embod[y]" investment contracts "muddied the issues" and "ignored" Supreme Court precedent. *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *11 (D.D.C. June 28, 2024). In seeking leave to amend its complaint, the SEC apologized and purported to abandon its meritless "crypto asset securit[y]" theory. ECF 273-1 ("Mot. Am.") at 24 n.6. But the agency's reformulated allegations suffer from the same infirmities.

Missing from the Amended Complaint is any coherent legal basis to separate *assets* that are part of investment contracts from *investment contracts* themselves. Assets—whether oranges, Beanie Babies, or crypto assets—do not become investment contracts in perpetuity simply because they were initially offered and sold to customers as part of a package of promises and expectations

that collectively qualify as "investment contracts" under the *Howey* test. The SEC still refuses to articulate any standard for courts, litigants, or market participants to know which crypto-asset transactions qualify as investment contracts, and which do not. And the SEC continues to choose winners and losers arbitrarily, recently abandoning with no explanation its claim that transactions involving Ether—the second most common crypto asset, after Bitcoin—are investment contracts. The agency even admits that its non-test cannot differentiate securities from Beanie Babies at the pleading stage. Mot. Am. 2.

The SEC's amended claims include new allegations challenging several types of transactions—each of which must independently satisfy the *Howey* test to come within the scope of the SEC's authority. *Binance*, 2024 WL 3225974, at *11, *14 (applying *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)). The five main kinds of transactions at issue in this motion are:

1. blind resales of *any* tokens by sellers who did not develop those tokens;

2. blind sales of BNB, SOL, SAND, and MANA by their developers;

3. "initial exchange offerings" of MATIC, AXS, and SAND;

4. employee compensation using BNB; and

5. deposits of crypto assets into the Simple Earn program.

The first category involves anonymous resales of crypto assets by someone other than the tokens' developers. These transactions are plainly not investment contracts. The agency's argument appears to be that if the token was ever sold to *anyone* in a transaction that was an investment contract, then all subsequent resales of the token between *any* buyers and sellers are necessarily securities transactions going forward indefinitely. This Court already rejected that interpretation of *Howey*, correctly recognizing that it does not comply with Supreme Court precedent requiring each transaction to be analyzed based on its own circumstances. *Binance*,

2024 WL 3225974, at *11, *14.

Resales of tokens over an exchange are impersonal; the buyers and sellers are both oblivious to one another's identity. One party places an order to buy while another places an order to sell, and matching software completes a transaction without any interaction between the parties. No investment of money can be made into a common enterprise when an unknown seller, separate from any common enterprise, receives the money. And buyers lack a reasonable expectation that their money will be used by the managers of any common enterprise to generate profits on their investment when they have no reason to think they are investing in the enterprise itself. *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328 (S.D.N.Y. 2023) ("*Ripple I*"), *appeal pending*, No. 24-2648 (2d Cir.). In fact, this Court has already held that the SEC must allege facts supporting a "plausible inference that the reasonable secondary buyer would expect [the token's developer] to use their investment to generate profits on the buyer's behalf." *Binance*, 2024 WL 3225974, at *21 n.15. Because the SEC fails to do so for blind resales, the Court should dismiss the Exchange Act claims involving resale transactions (the bulk of Counts 5–10).

The second category involves alleged blind sales of BNB by BHL and three third-party tokens by their developers, and the third involves three "initial exchange offerings." These sales were not investment contracts either. The blind transactions on Binance.com and Binance.US are similar to resales because buyers had no idea who was selling or where their money was going. And the SEC's claims concerning three alleged "initial exchange offerings" likewise fail to plausibly allege facts satisfying *Howey*'s requirement of a *reasonable* expectation that their money would be used to earn them profits from the token developers' efforts. Thus, the Court should dismiss the SEC's amended Securities Act claim concerning BHL's post-ICO sales of BNB (Count 1) and the SEC's Exchange Act claims premised on sales of tokens by their developers (the

rest of Counts 5–10).

The Court should also dismiss all claims concerning exchange transactions in BNB and other tokens—*i.e.*, blind resales, blind sales by developers, and initial exchange offerings—because the SEC fails to plausibly allege that the tokens were sold primarily as an investment. Rather, the Amended Complaint and incorporated materials make clear that the tokens were marketed as resources buyers could use—for example, to pay fees on a blockchain, exchange for goods and services, or play games online. As the Court previously recognized, several of the tokens at issue were marketed in ways that might have induced buyers to purchase them for consumptive (rather than investment) purposes. Additionally, the fact that some buyers may have speculated that the tokens would increase in value is plainly insufficient for *all* transactions involving those tokens to be investment contracts, and even for those buyers who may be speculating, the SEC has not plausibly alleged that the speculation would be based on the efforts of the promoters instead of, for example, other market dynamics. Otherwise, resales of ordinary assets like gold, silver, or real estate would be securities transactions. For this reason, too, the SEC's Exchange Act claims should be dismissed (Counts 5–10), along with the SEC's Securities Act claims concerning blind post-ICO sales of BNB by BHL (Count 1).

The fourth category of transactions the SEC challenges relates to employee compensation. The Amended Complaint alleges that BHL violated the Securities Act when it allegedly paid workers using BNB as an alternative to fiat currency. But the SEC fails to allege that any employee invested money by receiving BNB; in fact, employee compensation via BNB illustrates BNB's real-world use for consumptive purposes, not investment purposes. The SEC also fails to plausibly allege that employees invested money into a common enterprise. The SEC's claims based on employee compensation in BNB should therefore be dismissed (Count 1).

The SEC's claim that Simple Earn, the fifth category of challenged transactions, is a security largely rehashes its former, deficient allegations. Even the SEC's new allegations confirm that, at most, users deposited money with BHL and received ordinary interest, not that users bought shares in a common enterprise. The Court should again dismiss this claim (Count 3).[1]

The Court should also dismiss the SEC's claims concerning third-party tokens (Counts 5–10) on the independent ground that the SEC failed to join required parties. *See* Fed. R. Civ. P. 12(b)(7). The SEC asks this Court to rule that those sales were unlawful in the absence of the directly interested parties that allegedly developed and distributed those tokens. Nor is joinder feasible, since none of the absent parties is subject to service of process in this District. In these circumstances, Rule 19(b) provides the Court ample discretion to dismiss the SEC's claims concerning the third-party tokens given the unfair prejudice that would result from deciding whether sales of those tokens were investment contracts in the absence of their alleged developers.

Finally, the Court should strike the SEC's request for disgorgement. After an extensive pre-suit investigation and 16 months of "expedited discovery" into BAM's custody of customer wallets and assets, ECF 71 at 9, the Amended Complaint still conspicuously lacks any allegations that the challenged conduct by BHL or Mr. Zhao harmed customers, as is required for the SEC to seek disgorgement. The Court should also dismiss as moot the SEC's request to enjoin Mr. Zhao from participating in securities markets "through any entity owned or controlled by BAM Trading [or] Binance." Am. Compl., Prayer for Relief ¶ V.

---

[1] The Court should also dismiss Count 2, which concerns BUSD. *Binance*, 2024 WL 3225974, at *24–25. The SEC's motion for leave to amend indicated that it included Count 2 in the Amended Complaint solely for preservation and does not seek to re-litigate this claim. Mot. Am. 6 n.4.

**Background**

**I.    The First Motion-To-Dismiss Ruling**

In support of its initial complaint, the SEC argued that BNB and other tokens constituted "crypto asset securities," Compl. ¶ 2, that allegedly "embodied" investment contracts, *e.g.*, ECF 172 at 29.  The SEC had pursued that theory for years, using the phrase "crypto asset securities" in multiple enforcement actions alleging that developers and exchanges engaged in unlawful securities transactions.  *See, e.g.*, *SEC v. Payward, Inc.*, 3:23-cv-06003 (N.D. Cal. Nov. 20, 2023), ECF 1; *SEC v. Wahi*, 2:22-cv-01009-TL (W.D. Wash. July 21, 2022), ECF 1.

BHL and Mr. Zhao moved to dismiss the SEC's claims against them, *see* ECF 118, as did BAM, ECF 117-1.  The Court partially granted and partially denied BHL's and Mr. Zhao's motion and denied BAM's motion.  *Binance*, 2024 WL 3225974, at *1.

The Court rejected "the SEC's suggestion that [a] token is 'the embodiment of [an] investment contract,'" and that a token once sold as part of an investment contract always retains that status.  *Binance*, 2024 WL 3225974, at *11; *see also, e.g.*, *id.* at *19–20.  The Court explained that it was "inclined to agree with the approach of the court in *Ripple Labs*"—namely, that each transaction must be analyzed on its own circumstances.  *Id.* at *20 (citing *Ripple I*, 682 F. Supp. 3d at 329 n.16).  Conversely, the Court disagreed with Defendants' contention that an "investment contract" arises only when the promoter promises to assume post-sale contractual obligations, holding the argument to be foreclosed under *Howey* and *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943).  *Binance*, 2024 WL 3225974, at *8–10.  The Court also rejected Defendants' arguments under the major-questions doctrine, Due Process Clause, and BHL's and Mr. Zhao's arguments that certain of the SEC's claims are time-barred or impermissibly extraterritorial.  *Id.* at *32–36, *41–44.  And the Court denied Mr. Zhao's motion to dismiss for lack of personal jurisdiction.  *Id.* at *29–32.

**II.    The Amended Complaint And The SEC's New Theory For Regulating Crypto Assets.**

In its motion for leave to amend, the SEC purportedly disavowed its "crypto asset securit[y]" theory.  Mot. Am. 24 n.6.  But the SEC continues to assert that crypto assets were sold "as investment contracts" (*i.e.*, as securities).  *Id.*

*Sales Of Third-Party Tokens And Resales Of BNB On Binance.com And Binance.US (Counts 5–10).*  The Exchange Act Counts (Counts 5–10) allege that BHL or BAM (or both) operated as an unregistered securities exchange, broker-dealer, and clearing agency in violation of the Exchange Act.  In its first order, the Court held that these claims could proceed "[g]iven the Court's findings" concerning sales of BNB by BHL, BNB Vault, and BAM's Staking Program. *Binance*, 2024 WL 3225974, at *28.  With respect to the SEC's allegations concerning resales of BNB, however, the SEC had not "plausibly allege[d] an 'expectation of profits' in the form of a return on an investment."  *Id.* at *22.

The Amended Complaint includes new allegations about sales of the third-party tokens and BNB, including referring to various marketing pitches that third parties made to customers, which BHL and BAM allegedly "republish[ed] and amplif[ied]."  Am. Compl. ¶ 496.  The SEC predominantly argues that resales (*i.e.*, sales to which BHL and the third-party tokens' developers were not counterparties) violated the Exchange Act.  Despite purportedly abandoning its "embodiment" theory, the SEC alleges that BNB, for example, was sold as a security "[*a*]*t all times*," and in all transactions, *id.* ¶ 341 (emphasis added), no matter how many times the token was resold, and no matter whether any money from those resales went to BHL, *see id.* ¶ 345.

The SEC also alleges that some developers (including BHL) themselves sold tokens on Binance.com or Binance.US.  These alleged sales include: (1) blind sales in which the developers allegedly sold tokens on the exchanges but the buyers had no idea who they were buying from, Am. Compl. ¶¶ 338, 468; and (2) "Initial Exchange Offerings" or "IEOs" where developers

allegedly sold tokens on the exchanges in publicized distributions, *id.* ¶ 68; *see also id.* ¶¶ 464–66.

*Sales Of BNB By BHL On Binance.com And Binance.US (Counts 1 And 5–10)***.** The Court's first motion-to-dismiss order determined that the SEC plausibly alleged that BNB was offered and sold as an investment contract during its ICO (which BHL and Mr. Zhao did not contest at the motion-to-dismiss stage). *Binance*, 2024 WL 3225974, at *15–17. It likewise construed the SEC's complaint to plead that BHL sold BNB after the ICO. *Id.* at *17–18.

In the Amended Complaint, the SEC now makes clear, for the first time, that this claim does not concern an offering akin to the BNB ICO in which buyers allegedly knew they were purchasing BNB from BHL. Instead, the SEC alleges that BHL sold BNB in blind transactions *on* the Binance.com and Binance.US exchanges to buyers who did not know they were purchasing tokens from BHL. Am. Compl. ¶¶ 91, 338. As noted above, for Counts 5–10 the SEC claims that these blind sales of BNB by BHL violated the relevant provisions of the Exchange Act. *Id.* ¶ 459. The SEC also alleges that these same transactions violated Section 5 of the Securities Act (because they qualify as unregistered securities offerings). *Id.* ¶ 781.

*Employee Compensation (Count 1)***.** The Amended Complaint also adds a new claim that "offer[s]" of BNB to BHL and BAM employees constituted the offer and sale of "investment contracts." Am. Compl. ¶ 309. The SEC contends that BHL offered BNB to employees "as part of [their] regular salary" or, occasionally, for bonuses. *Id.* ¶¶ 310–12, 320. And BHL allegedly paid "allowances" in BNB to defray "increased living expenses" when employees "move[d] to more expensive geographic locations to work." *Id.* ¶ 324. The SEC alleges that BHL "has not placed any restriction" on how employees use the tokens and permits employees "to exchange the BNB into the fiat currencies they would need to spend as they desired." *Id.* ¶ 326.

*Simple Earn (Count 3)***.** In the Court's first motion-to-dismiss order, the Court dismissed

Count 3 in part. The Court held that the SEC plausibly alleged that BHL's BNB Vault program generated securities transactions, but it dismissed the claims concerning the Simple Earn program, explaining that the SEC failed to plead any "scheme or transaction in which investors were urged to put their money in [BHL's] hands so that they could share in the return that [BHL] would generate through its managerial or entrepreneurial efforts." *Binance*, 2024 WL 3225974, at *26. The SEC's new allegations consist largely of new marketing statements that BHL made about Simple Earn. *See* Am. Compl. ¶¶ 424–37.

## Argument

Under Rule 12(b)(6), a complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face." *Binance*, 2024 WL 3225974, at *4 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is not "plausible" when it is "merely consistent with" unlawful conduct; there must be "further factual enhancement" pushing the allegations over the threshold. *Iqbal*, 556 U.S. at 678. The Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Binance*, 2024 WL 3225974, at *4 (quotations omitted).

## I.    The Amended Complaint Fails To Plausibly Plead Facts That Satisfy *Howey*. (Amended Portions Of Count 1, Count 3, And All Of Counts 5–12)

All the SEC's claims rest on the proposition that the digital assets and deposit services at issue were "investment contract[s]" under 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10). "[I]nvestment contract[s]" refer to transactions whereby "a person invests his money in a common enterprise and is led to expect profits solely from the efforts of [a] promoter or a third party." *Howey*, 328 U.S. at 298–99. In the D.C. Circuit, the "efforts of others" prong differentiates between pre-purchase and post-purchase activities. *Binance*, 2024 WL 3225974, at *14 (citing *SEC v. Life Partners, Inc.* ("*Life Partners II*"), 102 F.3d 587, 588 (D.C. Cir. 1996) (per curiam order denying rehearing)).

"[P]re-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others." *Life Partners II*, 102 F.3d at 588 (statement of Ginsburg, J.) (quotations omitted). In applying that test, "[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982).

### A. The SEC Fails To Plausibly Allege Securities Transactions On The Binance.com Or Binance.US Exchanges. (Counts 5–12)

The SEC's Exchange Act counts claim that token sales on Binance.com and Binance.US were securities transactions, and therefore that BHL and BAM operated the websites as unregistered exchanges, clearing agencies, and broker-dealers. The Amended Complaint clarifies that the SEC's Exchange Act claims hinge on the "intermediary services" that BHL and BAM allegedly provided when tokens were bought and sold in secondary-market transactions on Binance.com and Binance.US. Specifically, the SEC alleges that BHL and BAM provided "intermediary services" by facilitating transactions involving the third-party tokens and BNB. Am. Compl. ¶ 459; *see also id.* ¶ 292; Mot. Am. 4 n.3; *id.* at 13, 23.

Importantly, the SEC's focus on intermediary services that facilitate token *sales* on exchanges confirms that services such as BNB Vault, Simple Earn, and BAM's Staking Program are *not* the basis for the agency's Exchange Act claims. Accordingly, the Court should not adhere to its prior ruling that these programs can support the SEC's Exchange Act allegations. *Cf. Binance*, 2024 WL 3225974, at *28. Those programs were allegedly services that BHL or BAM directly provided to customers on Binance.com and Binance.US, not transactions on the exchanges for which BHL or BAM was acting as an intermediary. Am. Compl. ¶¶ 401–58. Similarly, the SEC's claims concerning the BNB ICO—which is *not* alleged to have occurred on the Binance.com or Binance.US platform (and in fact, predates their existence, *id.* ¶ 294)—are *not* a

basis for the agency's Exchange Act claims.  Instead, the SEC's Exchange Act claims (Counts 5–10) require the SEC to plausibly allege that the third-party tokens or BNB were offered or sold *on the Binance.com or Binance.US exchanges* as investment contracts.

The Amended Complaint fails to do so.  The SEC's claims under the Exchange Act are predicated upon the SEC's effort to allege that three different kinds of transactions each involve sales of investment contracts.  *First*, the SEC asserts that resale transactions that do not involve a token's developer are *all* investment contracts.  *Second*, the SEC asserts that token developers' blind sales over an exchange to buyers who were oblivious to the sellers' identity are also investment contracts.  *Third*, the SEC asserts that so-called "initial exchange offerings" or "IEOs" are investment contracts.  The SEC alleges that purchasers in these public offerings could have expected that they were purchasing from the developer of the token because they involve "initial distributions of [a] crypto asset by the issuer or promoter" using Binance.com or Binance.US "as the primary means of distribution[]."  Am. Compl. ¶ 68; *see also id.* ¶¶ 464–66.

Each type of transaction, for each token, and in each alleged timeframe, must meet the plausibility standard to survive a motion to dismiss.  Thus, although the SEC organized its claims under the Exchange Act into omnibus "counts" alleging violations of specific provisions of the Act, each of those "counts" actually includes many discrete claims—*i.e.*, distinct alleged violations of the statute for which the SEC says it is independently entitled to relief.  *Steele v. United States*, 2023 WL 6215790, at *1, *9 (D.D.C. Sept. 25, 2023) (a claim is "'the aggregate of operative facts which give rise to a right enforceable in the courts.'").  This Court has already applied this principle to the SEC's claims, dismissing the SEC's original claims within Count 1 concerning BNB resales but allowing the SEC's other claims in Count 1 to proceed.  *Binance*, 2024 WL 3225974, at *44; *see also id.* (similar for Count 3 and Simple Earn).  And the SEC itself says that its allegations

concerning the third-party tokens are "relevant both to the scope of the violation and the remedy at issue." *Id.* at *28 (quoting Mot. Hr'g Tr. at 105). Accordingly, to the extent any of these claims proceeds, Defendants are entitled to a ruling as to which, if any, specific claims or types of claims included in the SEC's Exchange Act counts may go forward.

The SEC's claims for each kind of transaction fail because the SEC cannot establish one or more of *Howey*'s elements. And all of the SEC's claims concerning token sales on Binance.com and Binance.US, for all of the transactions, fail for the additional and independent reason that the SEC fails to plausibly allege that reasonable buyers purchased the tokens primarily for the purpose of investing money into a common enterprise.[2]

## 1. Blind Resale Transactions Not Involving Token Developers Were Not Investment Contracts.

The SEC claims that resales of the 10 third-party tokens and BNB on Binance.com violated the Exchange Act. *See, e.g.*, Am. Compl. ¶ 521 (targeting "resales"). By itself, dismissal of these transactions would eliminate the SEC's claims concerning five of the tokens (ADA, FIL, ATOM, ALGO, and COTI). In addition, dismissal of this category would eliminate the SEC's claims concerning resale transactions for the remaining six tokens, further simplifying the scope of the case even if those six tokens otherwise remain in the case.

Resale transactions obviously fall outside *Howey*'s promoter-focused inquiry. *Howey* does not concern the simple purchase and sale of assets, but the investment of money into a common enterprise and the expectation the promoter will use that money to generate profits. Blind resale

---

[2] The SEC vaguely asserts that four additional tokens "have been the subject of prior SEC enforcement actions." Am. Compl. ¶ 460. The SEC does not even attempt to plausibly allege facts suggesting that these four tokens were sold as "investment contracts," and the bare reference to prior enforcement actions is insufficient to state a plausible claim. *See, e.g.*, *Iqbal*, 556 U.S. at 678. Thus, the Court should hold that the Amended Complaint fails to state any plausible claims as to those four tokens, too.

transactions—which not only are anonymous but also do not involve any money going into any alleged common enterprise—fall well outside those requirements. And that is fatal to the SEC's claims concerning these transactions, since the SEC bears the burden of alleging "enough of the facts and circumstances surrounding ongoing secondary sales to support . . . a plausible inference that the reasonable secondary buyer would expect [the seller] to use [the buyer's] investment to generate profits on the buyer's behalf." *Binance*, 2024 WL 3225974, at *21 n.15.

   ***No investment of money into a common enterprise.*** For starters, nowhere does the SEC allege that money from resales *went back to* BHL or the third-party tokens' developers. Instead, the SEC simply denies that this requirement exists. *See* Mot. Am. 14. *Howey* is crystal clear that an investment contract requires "*the placing of capital or laying out of money* in a way intended to secure income or profit *from its employment*." 328 U.S. at 298 (emphases added). Thus, investment contracts require an "investment of money *in* a common enterprise." *Id.* at 301 (emphasis added). Likewise, the test is designed to capture "schemes devised by those who seek *the use of the money of others* on the promise of profits," *id.* at 299 (emphasis added)—meaning schemes where investors "provide the capital" that will be used to generate returns, *id.* at 300.

   Whether analyzed under the "investment of money" or "common enterprise" prongs, *Howey* meant what it said—an investment contract requires that an "investment of money" flow *into* a "common enterprise." Together, these two prongs require that "the investor commit his assets *to* the enterprise in such a manner as to subject himself to financial loss." *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (emphasis added; quotations omitted); *see also, e.g.*, *McCown v. Heidler*, 527 F.2d 204, 211 (10th Cir. 1975) ("The utilization of purchase money accumulated from lot sales to build the promised improvements brings the scheme within the 'common enterprise' definition.").

In *Ripple I*, the Southern District of New York recognized this requirement in the specific context of crypto assets. "The proper inquiry is whether [the buyers] 'provided the capital,' 'put up their money,' or 'provided cash'" to fund a common enterprise. 682 F. Supp. 3d at 325 (quoting *Howey*, 328 U.S. at 300, *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974), and *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352, 368–69 (S.D.N.Y. 2020)) (alterations and citations omitted). Several categories of transactions analyzed in *Ripple I* failed to satisfy *Howey* because the token recipients did not pay money "to Ripple" and the SEC failed to show that Ripple "received the payments from these XRP distributions." *Id.* at 330; *see also SEC v. Ripple Labs, Inc.*, 697 F. Supp. 3d 126, 134 (S.D.N.Y. 2023) ("*Ripple II*") (similar).

To be sure, "[o]ther courts have not been troubled by payments made to an exchange instead of the issuer." *Binance*, 2024 WL 3225974, at \*22 (citing *SEC v. Coinbase, Inc.*, 2024 WL 1304037, at \*24 (S.D.N.Y. Mar. 27, 2024)); *SEC v. Terraform Labs Pte Ltd.*, 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023); *In re Ripple Labs, Inc. Litig.*, 2024 WL 3074379, \*1, 7 (N.D. Cal. June 20, 2024) ("*Ripple III*"). But these decisions misconstrue *Howey* and fail to apply its test on a transaction-by-transaction basis, as this Court held was required in the investment-contract context. *Binance*, 2024 WL 3225974, at \*20.

In *Coinbase*, for example, the Southern District of New York assumed that resales of crypto assets must be treated the same as their initial sales, 2024 WL 1304037, at \*23, disregarding the rule that each transaction's circumstances must be analyzed independently, *Binance*, 2024 WL 3225974, at \*20. Based on that threshold error, *Coinbase* did not examine the investment-of-money requirement at all. 2024 WL 1304037, at \*23; *see also Terraform*, 684 F. Supp. 3d at 197

(similar).[3]  The Northern District of California's decision in *Ripple III* did not independently analyze the issue either, and instead simply cited *Coinbase* and *Terraform*.  2024 WL 3074379, at *1, *7.  And that court's subsequent decision in *SEC v. Payward, Inc.*, similarly conflated investment contracts with assets that are *part* of investment contracts, reasoning that it would "def[y] common sense to suggest" that resellers do "not understand themselves to be investing money in the asset."  Mot. Am. Ex. C, ECF 273-4 at 20.  But the court's analysis failed to acknowledge that investing money "in [an] *asset*," *id.* (emphasis added), is not the same thing as investing money "in a *common enterprise*," *Howey*, 328 U.S. at 298 (emphasis added).

This Court has correctly rejected the premise underlying these cases, which is that resales of crypto tokens must be treated as identical to initial distributions by the tokens' developers. *Binance*, 2024 WL 3225974, at *19–20.  Instead of accepting that flawed logic, the Court "agree[d] with the approach of the court in *Ripple [I]*," *id.* at *20, because the "'it-is-what-it-is' approach" is "inconsistent with the clear Supreme Court directives . . . which hold that it is the economic reality of the particular transaction, based on the entire set of contracts, expectations, and understandings of the parties, that controls," *id.*

Of course, resales of investment contracts are possible.  For example, an initial purchaser could reassign her rights under an investment contract to someone else.  Then, the second purchaser would take ownership of the entire relationship that constituted an investment of money into a common enterprise in the first place.  Similarly, there might be circumstances in which resales of unique types of crypto assets could be securities transactions.  For example, a developer could create a token that functions like a share of stock, conferring ownership and voting rights on

---

[3] In *Terraform*, the defendants did "not dispute" the investment of money requirement, 684 F. Supp. 3d at 195, so the issue was not before the court.

its holders that carry forward to subsequent purchasers. Alternatively, a developer might work together with an initial buyer who purchases tokens from the developer, resells them, and funnels the money from those sales back to the developer. *See Binance*, 2024 WL 3225974, at *20 (citing *Telegram*, 448 F. Supp. 3d at 380–81); *Ripple II*, 697 F. Supp. 3d at 135–36 ("secondary market transactions" might be investment contracts if the reasonable buyer believes her money will "be fed back into" the common enterprise). In either scenario, resales might potentially satisfy *Howey* (though the full analysis necessarily would hinge on all other relevant circumstances surrounding each sale). But nothing like these scenarios is alleged in the Amended Complaint.

*Resale purchasers did not join any common enterprise*. The SEC also fails to plausibly allege that purchasers in blind resales joined a common enterprise. The mere *existence* of a common enterprise is insufficient. There must be some type of relationship such that the purchaser's funds go into the common enterprise in a way that goes beyond simply aligning the economic interests of an investor and a promoter. *See, e.g.*, *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11–12 (1st Cir. 1993).

After all, *Howey* requires a "common enterprise," not merely "common interests." *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 854 (1975). A common interest alone is legally insufficient for a common enterprise under *Howey*, and is inadequate to distinguish situations where many customers all hold the same fungible asset in hopes it will appreciate. *See, e.g.*, *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1390 (9th Cir. 1986) (no investment contract where "profits to the coin buyer depended upon the fluctuations of the gold market"); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (per curiam) (same with silver); *Moody v. Bache & Co.*, 570 F.2d 523, 526 (5th Cir. 1978) (similar as to commodity futures contracts). Were it otherwise, anyone who bought orange groves in Florida would have been in a "common

enterprise" with the Howey Company, collectively rooting for an increase in demand for oranges.

Instead, *Howey* requires an ongoing relationship pursuant to which investors are entitled to a share of profits generated with the capital they and other investors provided to the enterprise, which the issuer raised and pooled for that purpose. "The leading D.C. Circuit case on investment contracts," *Life Partners*, therefore explained that the presence of a common enterprise "ordinarily" is tested with an inquiry into "horizontal commonality"—whether there was a "pooling of investment funds, shared profits, and shared losses." *Binance*, 2024 WL 3225974, at *12 (quoting *SEC v. Life Partners, Inc.*, 87 F.3d 536, 543 (D.C. Cir. 1996) ("*Life Partners I*"), *rehearing denied*, *Life Partners II*, 102 F.3d at 588).[4]

Where a purchaser simply buys an asset—even if "for investment" purposes or in the hope it would "increase in . . . value"—the purchaser has not bought *into* a common enterprise as required for an "investment contract" under *Howey*, even if the purchaser's long-term economic interests are aligned with the seller's economic interests. *Rodriguez*, 990 F.2d at 10; *see also id.* ("'securities' are interests in an enterprise").

Here, the SEC's singular argument appears to be that a "common enterprise" exists (and somehow connects to purchasers of tokens in blind resale transactions) simply because the tokens were "fungible." Am. Compl. ¶¶ 345–46; *id.* ¶ 517. To be sure, fungibility might help the SEC satisfy the requirement that profits are realized on a pro rata basis across token owners. *Binance*, 2024 WL 3225974, at *16. But that does nothing to satisfy the independent requirement that "the proceeds of the offering were 'pooled,'" which is a "critical aspect" of the test. *Id.* For resale

---

[4] Some circuits look to "vertical commonality"—and, more specifically, either "broad" or "strict" vertical commonality. *Binance*, 2024 WL 3225974, at *13 (quotations omitted). Neither is a valid way to establish *Howey*'s requirement of a common enterprise, as BAM explains in its brief. To avoid duplication, BHL and Mr. Zhao do not repeat those arguments here. Under any form of commonality, the SEC's claims would fail here.

transactions, the SEC has failed to allege any facts suggesting that the tokens' developers pooled purchasers' funds (nor could it, since the developers didn't receive the funds in the first place). Nor has the SEC alleged any other facts that could establish *any* kind of ongoing relationship between purchasers who bought their token from a third party and a common enterprise.

  ***No reasonable expectation of profits from the efforts of the enterprise***.  For a transaction to satisfy *Howey*, investors must join a common enterprise expecting "profits solely," or at least "predominantly," "from the efforts of the promoter or a third party."  *Binance*, 2024 WL 3225974, at \*14 (quotations omitted).  "[A]n objective buyer's understandings" control, *id.* at \*19 n.13, rather than "the precise motivation of each individual participant," *id.* at \*14 (quotations omitted).

  The mere expectation that an asset will increase in value is insufficient.  *Binance*, 2024 WL 3225974, at \*21–22, \*24.  Accordingly, the SEC must "plausibly allege an 'expectation of profits' in the form of a return on an investment."  *Id.* at \*22.  As this Court explained in dismissing the SEC's claims concerning resales of BNB, to state a claim the SEC must allege facts supporting a "plausible inference that the reasonable secondary buyer would expect [the token's developer] to use their investment to generate profits on the buyer's behalf."  *Id.* at \*21 n.15.

  In *Ripple I* and *II*, Judge Torres similarly recognized that a reasonable buyer purchasing tokens from their developer might reasonably expect "that [the developer] would use the capital received" to increase the value of the tokens, and therefore the buyer might have a reasonable expectation "that they would derive profits from [the developer]'s efforts."  *Ripple I*, 682 F. Supp. 3d at 326.  In contrast, buyers who purchase tokens in "blind bid/ask transactions," in which they have no reason to think they are purchasing from the tokens' developer, "could not reasonably expect the same," even if (unlike in resale transactions) the developer happened to be the counterparty.  *Id.* at 328.  No "investment contract" occurs when the buyer lacks any reasonable

expectation that her capital is being "fed back into" efforts to increase the tokens' value. *Ripple II*, 697 F. Supp. 3d at 136.

Moreover, what matters in the D.C. Circuit are the *post-purchase* efforts of the promoter to provide returns, rather than merely pre-purchase efforts to develop an asset or scheme in the first instance. *See Binance*, 2024 WL 3225974, at *14. "[P]re-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others." *Id.* (quoting *Life Partners II*, 102 F.3d at 588). Additionally, these post-purchase efforts must be "entrepreneurial"—requiring some form of creativity or risk-taking by the promoter of the common enterprise—not merely "ministerial functions" that occur on autopilot. *Id.* (quoting *Life Partners II*, 102 F.3d at 588). In *Life Partners II*, for example, fractional interests in viatical settlements were not securities because the SEC could not identify "even one entrepreneurial post-purchase service" undertaken by the promoter. 102 F.3d at 588 (statement of Ginsburg, J.). "[T]here simply [was] no on-going common enterprise involved in owning an interest in an insurance contract from which the profit depends entirely upon the mortality of the insured." *Id.*

Here, purchasers who bought the third-party tokens or BNB from third parties on Binance.com or Binance.US lacked any reasonable expectation that the tokens' developers would feed their money into a common enterprise "to generate profits on the buyer's behalf." *Binance*, 2024 WL 3225974, at *21 n.15; *Ripple I*, 682 F. Supp. 3d at 326. Instead, the SEC's claims concerning resales involve transactions in which the buyers were purchasing from third parties, not the tokens' developers, and had no idea where their money was going. *See* Am. Compl. ¶ 91.

The SEC's allegations about purported "burn[s]" of BNB, *e.g.*, Am. Compl. ¶¶ 293, 304, 374, or the third-party tokens, *e.g.*, *id.* ¶¶ 540, 682, do nothing to salvage the agency's claims concerning resales. The SEC alleges that BHL executed burns by using its "profits" from running

Binance.com and selling BNB to "repurchase and then destroy BNB," creating a deflationary effect that would "increase [BNB's] price" and thus lead purchasers to expect profits. *Id.* ¶ 304. But if BNB purchasers were not buying from BHL and instead from another seller entirely, they lacked any reasonable expectation that BHL would use *their* capital contributions to burn BNB.

Moreover, many of the alleged burns could not be entrepreneurial because the SEC admits they were automatic. For example, all of the alleged burns of SOL and MATIC were automatic, not discretionary or entrepreneurial. Am. Compl. ¶ 540 (alleging SOL burns are "built-in"); *id.* ¶¶ 578–79 (similar for MATIC). Burning tokens *automatically* based on a preset formula is a ministerial, not entrepreneurial effort, and is therefore insufficient under *Howey* and *Life Partners*. *See Life Partners I*, 87 F.3d at 547. For MANA, the SEC specifically alleges that its developer promised to "*increase* the MANA supply by 8 percent in the first year, followed by a lower rate in subsequent years," and therefore that the token is automatically *inflationary*, not deflationary. Am. Compl. ¶ 680 (emphasis added). Given that specific allegation concerning automatic *increases* in supply, the SEC's vague reference to the "MANA burn," *id.* ¶ 682, is insufficient to state a plausible claim that a reasonable buyer would expect to earn profits through deflationary burns.

\*     \*     \*

For each of these independent reasons, the Court should dismiss the SEC's Exchange Act claims concerning resales of all eleven tokens. For five of the tokens—ADA, FIL, ATOM, ALGO, and COTI—these are the SEC's only claims, so they would be eliminated from the case entirely.

## 2. The Sales By Token Developers Were Not Investment Contracts.

### a. Blind Sales By Token Developers Were Not Investment Contracts.

In addition to the blind resales of SOL, SAND, and MANA (which are independent transactions that should be dismissed for the reasons explained above), the SEC also claims that

these tokens' developers sold them to buyers in blind transactions, outside the context of a public offering, on the Binance.com Platforms. Am. Compl. ¶ 468. Similarly, the SEC alleges that BHL itself directly sold BNB on the Platforms post-ICO. *Id.* ¶ 338. In these transactions, even though the developers were the counterparties, buyers "could not reasonably expect" their money would be used to earn them profits, *Ripple I*, 682 F. Supp. 3d at 328, since they had no idea whether they were purchasing tokens from their developers or other third parties. Thus, these claims fail too.

**The SEC's new allegations concerning BHL's alleged post-ICO sales of BNB.** In its first motion-to-dismiss decision, the Court held that the SEC's original version of Count 1 alleged (barely) enough to state a plausible claim concerning post-ICO sales, but that the SEC's allegations were "quite conclusory." *Binance*, 2024 WL 3225974, at *17–18. Though the Court previously held that these claims can move forward based on the allegations in the *initial* complaint's assertion of these claims, the SEC's new allegations "plead [it]self out of court" by adding specific facts making clear that these transactions were not investment contracts. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000). In particular, the Amended Complaint adds new facts making clear that the SEC's claims concerning post-ICO sales of BNB by BHL concern blind transactions that BHL allegedly entered through "accounts on the Binance Platforms, including through market makers such as Sigma Chain." Am. Compl. ¶ 348.

**No reasonable expectation of profits from the efforts of others**. For all four tokens (SOL, SAND, MANA, and BNB), the SEC fails to plausibly allege that buyers had a reasonable expectation that the tokens' developers would "use their investment to generate profits on the buyer's behalf." *Binance*, 2024 WL 3225974, at *21 n.15; *supra* at 18–20. As with the resale transactions, the SEC fails to allege facts suggesting that any reasonable buyer would expect someone to use *her* money to take any efforts to increase the value of her tokens.

21

*No supporting factual allegations for SOL, SAND, or MANA.*  For SOL, SAND, and MANA, the SEC's claims concerning sales by the tokens' developers fail for the additional reason that the Amended Complaint lacks any alleged facts about the circumstances of those sales other than that they were conducted "on at least the Binance.com Platform directly or through [the developers'] intermediaries."  Am. Compl. ¶ 468.  The SEC bears the burden to allege specific facts sufficient to state a plausible claim.  *Iqbal*, 556 U.S. at 678.  Its vague and conclusory allegations in paragraph 468 fail to do so here.[5]

\*     \*     \*

For these reasons, the Court should dismiss the SEC's Exchange Act claims concerning blind sales by token developers which results in the dismissal of the SEC's remaining Exchange Act claims concerning BNB, SOL, and MANA, and leaves only three third-party tokens (MATIC, AXS, and SAND) in the case.

### b.     The So-Called "Initial Exchange Offerings" Were Not Investment Contracts.

The SEC's remaining allegations concern public "IEOs," where the SEC alleges that token developers used Binance.com "to engage directly in capital-raising distributions."  Am. Compl. ¶ 464.  The SEC alleges that the three remaining tokens—MATIC, AXS, and SAND—"conducted IEOs on the Binance.com Platform."  *Id.* ¶ 467.[6]

*No reasonable expectation of profits from the efforts of others*.  For AXS and SAND, the SEC specifically alleges that resales began contemporaneously with the IEOs.  *See* Am. Compl.

---

[5] For SAND, the SEC does allege specific facts concerning an "IEO," Am. Compl. ¶ 644, which is a separate kind of transaction analyzed separately below, *infra* at 23.

[6] Because these claims involve Binance.com specifically, and not Binance.US, they are at issue only for Counts 5–7, and would not provide a basis for sustaining any part of Counts 8–10 even if the SEC could plausibly allege that the initial exchange offerings were investment contracts.

¶¶ 646, 731.[7]  The SEC alleges no facts suggesting that, even during the IEOs, purchasers had any way to know whether they were buying from the token's developer or a third-party reseller.  The SEC thus fails to allege purchasers had any reasonable expectation that their money would be used to earn profits when they did not even know who they were buying from.  *Ripple I*, 682 F. Supp. 3d at 326; *Binance*, 2024 WL 3225974, at *21 n.15.

For MATIC, the Amended Complaint lacks any specific allegations concerning the "efforts" that Polygon Labs purportedly offered to undertake in exchange for buyers' funds or how, specifically, MATIC would allegedly use buyers' funds to earn them profits.  The SEC alleges that MATIC "marketed that it 'burns' MATIC tokens accumulated as fees," but makes clear that the burns were made pursuant to a "protocol upgrade" announced simultaneously with the marketing, and that the burns occurred pursuant to a "built-in mechanism," not pursuant to discretionary or entrepreneurial post-sale efforts.  Am. Compl. ¶¶ 578–79.  Those ministerial efforts are insufficient as a matter of law.  *See supra* at 19.

### 3. For All Of The Transactions, The SEC Fails To Plausibly Allege That A Reasonable Buyer Purchased The Tokens Primarily For Investment Purposes.

The SEC's Exchange Act claims concerning all of the transactions involving the third-party tokens and BNB should be dismissed on the alternative ground that the SEC fails to plausibly allege that buyers purchased the tokens primarily as an investment.  Buyers purchase crypto tokens for any number of non-investment purposes, as the Amended Complaint and the various materials

---

[7] The SEC's reference to SAND's "October 2020" IEO, Am. Compl. ¶ 646, appears to be inadvertent; the IEO was in August 2020, as the SEC elsewhere pleads, *id.* ¶ 644, and as incorporated documents confirm, *see Introducing the Sandbox (SAND) Token Sale on Binance Launchpad*, Binance.com (Aug. 5, 2020), https://www.binance.com/en/support/announcement/introducing-the-sandbox-sand-token-sale-on-binance-launchpad-b8e11c5870ba4d16810839473e69a90d.

incorporated by reference make clear.  At the pleading stage, the SEC must allege more than the "mere possibility" that buyers bought crypto tokens on Binance.com primarily for investment purposes.  *Iqbal*, 556 U.S. at 679.  Allegations that are consistent with both lawful and unlawful conduct "stop[] short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 678 (quotations omitted).

If an objective "purchaser is motivated by a desire to use or consume the item purchased"— even if the purchaser "expected profits" as a result—the transaction is not an investment contract. *Binance*, 2024 WL 3225974, at *14 (quotations omitted).  Accordingly, for the SEC to show that a particular transaction was an "investment contract," it must allege facts showing that the reasonable buyer would understand herself to be purchasing an investment in a common enterprise, not an asset she could use for other purposes.  *See SEC v. Edwards*, 540 U.S. 389, 395–96 (2004) (contrasting asset purchases for consumption with situations "in which the investor is 'attracted solely by the prospects of a return' on the investment") (quoting *Forman*, 421 U.S. at 852).

Where a transaction arguably exhibits "intermingled security and nonsecurity aspects"— such as both investment *and* consumptive purposes—the transaction will be deemed an "investment contract" only when it has "to a very substantial degree elements of investment contracts."  *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979).  In *Daniel*, for example, pension plans were not investment contracts because the employees' "compensation package" was "substantially devoid of aspects resembling a security," even though the package included a "purported investment."  *Id.*  Because the "noninvestment interests" could not "be segregated from the possible pension benefits," there was no securities transaction.  *Id.*  Moreover, even where purchasers have investment motives, they must intend to rely on the *promoter's efforts* for profit, as opposed to "hoping" for an "increase in … value" for some other reason, like rapidly reselling

tokens to make markets or exploit arbitrage. *Rodriguez*, 990 F.2d at 10.

Here, the Amended Complaint relies on cherry-picked marketing statements to assert that buyers might have hoped their tokens would increase in value. But the SEC fails to plausibly allege that a reasonable buyer on Binance.com or Binance.US would have even been aware of those statements, let alone that any investment motives were tied to the promoter's efforts—as opposed to arbitrage or naked speculation about trends in the crypto markets more broadly. *See Ripple I*, 682 F. Supp. 3d at 329 ("expectation of profit" must "derive . . . from [promoter's] efforts," not "other factors, such as general cryptocurrency market trends").

**BNB.** The SEC repeatedly makes clear that BNB was marketed as something that buyers could *use*. For example, BHL allegedly highlighted the "utility" of the token, Am. Compl. ¶ 391, explained that its value derived from that "utility," *id.* ¶ 394, and explained that "use cases" for the token were expanding—from 180 in late 2019, to over 200 by early 2021, *id.* ¶¶ 389, 393. And BHL allegedly increased (and marketed) BNB's utility by offering discounts when Binance.com purchasers *used* BNB to buy other tokens. *Id.* ¶ 372. Although these efforts "to increase demand may have the *effect* of enhancing BNB's value," "emphasizing the ways [BNB] can be used raises questions about the strength of the showing supporting the existence of the 'expected profits' element over time." *Binance*, 2024 WL 3225974, at *19.

Nor does the SEC's raft of other allegations about BHL's purported marketing statements bring the SEC closer to stating a plausible claim. Few of the statements explained any concrete "effort" that BHL intended to undertake on purchasers' behalf, distinguishing the SEC's complaint from *Ripple III*, where the plaintiff's complaint alleged that the token's developer promised to, for instance, "spen[d] $100 million on a project" to "increase the price of [the token]" by even "one penny" and touted its efforts to "realize" new industries for tokens. 2024 WL 3074379, at *9.

Rather, here the SEC alleges paragraphs of generic platitudes about the BNB "community" and "growth environment," Am. Compl. ¶¶ 361, 394; the truism that price increases benefit BNB owners, *id.* ¶ 361; and general puffery suggesting that BNB owners should hold the token, *id.* ¶¶ 366, 369, 370.  None of that concerns any actual post-sale entrepreneurial "effort" that BHL was marketing to purchasers in exchange for their money.

Moreover, the specific materials the SEC incorporates by reference and then quotes— selectively—to show BNB's purported marketing for "investment purposes" reveal that the token was marketed as having at least as many *consumptive* purposes.  *Binance*, 2024 WL 3225974, at *4 (at the pleading stage, a court may consider materials referenced in the complaint).  For instance, the SEC singles out "a specific page" of BHL's website called "How to Buy BNB."  Am. Compl. ¶¶ 369–70.  The SEC quotes and italicizes language from that page noting that some users "*hold*" the token "*with the expectation of it increasing in value.*"  *Id.*  Yet the same page encouraged purchasers *not* to view BNB as an ordinary investment (like a stock), but as a medium of exchange akin to fiat currency, explaining that BNB "does not . . . provide users with a share of Binance's profits, represent an investment in Binance, or provide any compensation."[8]  Rather, it is a "utility token" that buyers can "[u]se . . . to pay for goods and services," "[s]end money to friends and family," or "trade" for other tokens.  *Id.*  BHL explained that "[a]n increasing number of small merchants and large businesses are now accepting BNB payments."  *Id.*  The statements allegedly made by Mr. Zhao in discussing BNB are similar.  The SEC focuses on his comment that BHL was "incentivized to increase [BNB's] value," Am. Compl. ¶ 356, but ignores that Mr. Zhao went on to explain that he hoped BNB's value would rise through "increased utility," meaning to have

---

[8] *How to Buy BNB*, Binance.com (Feb. 28, 2022), https://tinyurl.com/2v2f3prr.

"BNB *used* in as many places as possible" by "getting more merchants to adopt it."[9]

The SEC's other allegations are likewise deficient.  In terms of concrete efforts to increase the value of the token that are unrelated to its real-world uses, the SEC alleges at most: (1) burns, *e.g.*, Am. Compl. ¶¶ 360, 391; and (2) efforts to launch a new platform ("Binance DEX"), *id.* ¶ 385.  The burns are insufficient because no reasonable purchaser would expect her purchase of BNB to be used to burn the token.  *Supra* at 20.  As for Binance DEX, BHL allegedly made clear that it would "*not* directly increase profitability for Binance," Am. Compl. ¶ 385 (emphasis added).  In any event, these allegations are insufficient to overcome the more plausible inference that given the extensive promotion of BNB as a token with real-world uses, including for discounts on Binance.com itself, reasonable purchasers buying BNB on the website would have understood that BNB was marketed for purposes other than as an investment in a common enterprise.

***The Game Tokens (SAND, MANA, and AXS).***  Although the SEC has derided the observation that its overbroad legal theories could extend SEC authority over the regulation of Beanie Babies, the agency overtly claims the power to regulate online gaming:  Three of the third-party tokens—SAND, MANA, and AMX—are tokens used in online games or similar virtual platforms.  The Amended Complaint illustrates the consumptive purposes of each token within its virtual environment.  Am. Compl. ¶¶ 642 ("SAND is required to access The Sandbox platform, participate in the platform's governance, and earn rewards through the staking program on the platform."), 664 ("MANA serves as the crypto asset involved in all transactions in the Decentraland virtual reality ecosystem. This includes the purchase of a digital asset called

---

[9]     Binance, *Binance AMA with CZ: Highlights* 14:24-14:49 (July 12, 2019), https://tinyurl.com/44zeb6pd (emphasis added);  *see also* Boxmining, *Binance – Interview with CEO Changpeng Zhao* 20:42-20:58 (Sept. 2, 2017), https://tinyurl.com/y4rb79zh (explaining that BNB's "long-term value" would derive from its use as "the medium for paying fees" on blockchains).

'land[.]'"), 725 (players "can use AXS to make in-game purchases").

The allegations also incorporate by reference material further showing that the tokens were marketed for consumption. For example, the Amended Complaint incorporates a press release explaining that "SAND will be utili[z]ed to purchase LAND, which are the spaces (or Worlds), in which players create and play."[10] The SEC selectively quotes a Medium blog stating that SAND "can accrue in value over time." Am. Compl. ¶ 653. Yet the same blog post explains that SAND is the "medium of exchange within The Sandbox" game, and "can be transferred an unlimited number of times" between players for the purchase or sale of in-game assets.[11]

Similarly, the SEC quotes a statement in the MANA white paper that MANA's developer "will help bootstrap the utility value of the network until it independently attracts users and developers." Am. Compl. ¶ 679. Yet the SEC omits other statements promoting the fact that "MANA tokens will be used to purchase land, goods, and services in-world."[12] The SEC alleges that the developer of AXS promoted its reserve holdings, Am. Compl. ¶ 735, but the same webpage details AXS's uses "as currency within the Axie NFT marketplace," "to determine eligibility for participation in certain sales/auctions," and to engage in network governance.[13]

The SEC's claims concerning the remaining seven tokens—SOL, ADA, MATIC, FIL, ATOM, ALGO, and COTI—fail for similar reasons. The Amended Complaint alleges that BHL "amplif[ied]" various of the promoters' statements, Am. Compl. ¶ 496, but merely linking to a tweet or whitepaper does not plausibly show that purchasers even read that information, much less

---

[10] Am Compl. ¶ 643 (citing Press Release, Animoca Brands, ASX Release (May 23, 2019), https://tinyurl.com/6fc84hhj).

[11] The Sandbox, *The Sandbox Tokens: $SAND*, Medium.com (July 25, 2019), https://tinyurl.com/5f8849yv.

[12] *Decentraland White Paper*, https://tinyurl.com/584rncnk.

[13] *Axie Infinity Shards (AXS)*, Axieinfinity.com, https://tinyurl.com/bddzhabz.

that as a result they decided to "invest" primarily because they sought to rely on the promoter's efforts, as opposed to seeking gains from arbitrage or speculation, or simply using the token for whatever real-world uses the developers intended.

*SOL.*  The Amended Complaint's allegations (and incorporated materials) concerning SOL suggest that it was marketed to be used, not as an investment into a common enterprise.  *See* Am. Compl. ¶ 523 ("SOL may be 'staked' on the Solana blockchain to earn rewards, and a certain infinitesimal amount of SOL must be 'burned' to propose a transaction on the Solana blockchain[.]").  The SEC points to a report on Binance.com that allegedly "republish[es] and amplif[ies]" statements about SOL.  *Id.* ¶¶ 541, 545.  But the "Key Takeaways" of the report explain that "[u]sers can pay their transaction fees and interact with smart contracts using SOL," among other ways to use the token.[14]

*ADA.*  The SEC alleges that ADA was marketed as an investment, citing efforts to develop "the Cardano blockchain."  Am. Compl. ¶¶ 547–51, 555–56, 558.  The SEC also cites a blog post from BAM Trading.  *Id.* ¶ 559.  Yet that post promotes ADA as "the digital currency that makes transactions on the [Cardano] blockchain possible," such as "smart contracts" and "decentralized finance tools."[15]  And the "What is Cardano (ADA)?" webpage on Binance.com, Am. Compl. ¶ 560, describes ADA as "the native currency of Cardano" which "is used to perform operations on the Cardano blockchain, much like the relationship between ether (ETH) and Ethereum."[16]

*MATIC.*  For MATIC, too, the Amended Complaint alleges that "MATIC holders can earn additional MATIC" by engaging in staking "on the Polygon platform," which does not occur on

---

[14] *What Is Solana (SOL)?*, Binance.com (Sept. 1, 2024), https://tinyurl.com/44z55shf.

[15] *What Is Cardano (ADA)? A Guide for Beginners*, Binance.US (July 15, 2024), https://tinyurl.com/y6jmx453.

[16] *What is Cardano (ADA)?*, Binance.com (Aug. 21, 2022), https://tinyurl.com/4sc9c48u.

Binance.com and Binance.US and would be an example of a buyer *using* MATIC to earn profits on a different platform *after* purchasing it on the exchange. Am. Compl. ¶ 565. The SEC also alleges that a Polygon founder stated that short-term MATIC holders could invest the token and receive staking rewards, while long-term holders may benefit from "increased demand for MATIC over time." *Id.* ¶ 581. During the same "Ask Me Anything" session, MATIC was described as a "utility token" whose purposes include "paying for the gas fees for transactions on Polygon," serving as a payment method on "several external platforms," and "secur[ing] P2P loans."[17]

**FIL.** The SEC alleges that statements in the Filecoin Primer, a document "made available to investors ahead of" an alleged public offering in 2017, Am. Compl. ¶ 601, showcase FIL's investment potential: "the more things people and organizations spend Filecoin on, and the greater the value and worth of the token." *Id.* ¶ 602. Those statements predate the alleged blind transactions on Binance.com by at least three years and on Binance.US by eight more months. *Id.* ¶ 594. Even those 2017 statements make clear that FIL was marketed as something buyers would be able to *use* after the platform's launch, and other statements in the Primer similarly explain that FIL "is used to pay for storage, retrieval, and transactions in the network."[18] The "What is Filecoin (FIL)" article "on Binance Academy," Am. Compl. ¶ 616, similarly describes a "peer-to-peer network," and explains that "[c]lients pay FIL tokens both to store and retrieve data."[19]

**ATOM.** The Amended Complaint, citing the "Cosmos whitepaper," admits that it touted ATOM's practical uses (1) as a "staking token" permitting holders to validate transactions, and (2) for paying "transaction fees to mitigate spam." Am. Compl. ¶ 621. The SEC further cites a March

---

[17] *AMA with Polygon Cofounder and COO Sandeep Nailwal*, Binance.US (Mar. 5, 2021), https://tinyurl.com/5x2djn3m.

[18] Protocol Labs, Inc., *Filecoin Primer* (July 25, 2017), https://tinyurl.com/ywbtw8ak.

[19] *What is Filecoin (FIL)?*, Binance.com (Aug. 21, 2022), https://tinyurl.com/bdftsyuu.

2017 blog post that "emphasized that the purchase of ATOM was a long-term investment," but admits that at the time of the post the "Cosmos Network [was] still in an early development stage" and that the tokens were not yet "available for use." *Id.* ¶ 625. The same post emphasized that the token was "not designed to be . . . a store of value" and that "[i]nstead, atoms are a tool, like Bitcoin miners are a tool."[20] ATOM is not alleged to have been available on Binance.com or Binance.US until years *after* the alleged fundraising for the Cosmos network in 2017, and months after the tokens were released for buyers to use freely. Am. Compl. ¶¶ 630–31. The Amended Complaint also incorporates by reference "a Binance Research project report," *id.* ¶ 639, which explains that "the ATOM token is used as a work token, whereby users can stake their ATOM or delegate their ATOM to other validators who are participating in validation."[21]

*ALGO.* The SEC alleges that "those utilizing the Algorand blockchain need to hold (and potentially stake) certain amounts of ALGO," Am. Compl. ¶ 691—*i.e.*, that ALGO is a token that is necessary to use a blockchain. The SEC also points to a Binance Research report, *id.* ¶¶ 717, 721, but the report explains that "ALGO is the currency of the Algorand Protocol and serves as the medium of exchange and store of value"—again, marketing how the token is used.[22]

*COTI.* The SEC alleges that COTI "is the native token of the Coti blockchain and ecosystem." Am. Compl. ¶ 747. The Amended Complaint describes alleged fundraising efforts by COTI's developers in 2019, *id.* ¶¶ 749–52, but alleges that COTI first became available on Binance.com several months later, "in February 2020," *id.* ¶ 770, and on Binance.US "in April

---

[20] *Cosmos Plan* (Mar. 31, 2017), https://tinyurl.com/mrxzx7yp.

[21]      *Cosmos      Network      (ATOM)*,      Binance.com      (Apr.      28,      2019), https://www.binance.com/en/research/projects/cosmos-network.

[22]      *Algorand      (ALGO)*,      Binance.com      (June      21,      2019), https://www.binance.com/en/research/projects/algorand.

2022," *id.* ¶ 773. The SEC alleges that in 2022, a BAM website post marketed "the purported benefits of the 'COTI ecosystem.'" *Id.* The same post prominently explains that the COTI tokens "are used as a medium of exchange for payments between COTI users and their respective customers, for staking, and for paying transaction fees within the COTI ecosystem."[23]

### 4. The SEC's Control-Person Claims Against Mr. Zhao Are Derivative Of Its Exchange Act Claims, So They Should Also Be Dismissed.

The SEC's two control-person claims against Mr. Zhao (Counts 11 and 12) are both predicated on its Exchange Act claims against BHL and BAM. *See* Am. Compl. ¶¶ 810–19. Because each of the SEC's Exchange Act claims against BHL (Counts 5–10) fails for the reasons set forth above, Count 11 fails in its entirety for lack of a primary violation, and Count 12 fails to the extent it relies on primary violations of the Exchange Act by BHL. *See, e.g.*, *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 81 (D.D.C. 2008) ("Establishing control person liability requires Plaintiffs to show … an underlying violation of the securities laws by the controlled person."); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 43 (D.D.C. 2007) (dismissing control-person claims). If the Court finds the SEC's Exchange Act claims against BAM insufficient, Count 12 should be dismissed in its entirety.

### B. The SEC Fails To Plausibly Allege That Post-ICO Sales Of BNB Constituted "Investment Contracts." (Count 1)

The SEC's amended claims in Count 1 allege that BHL violated the Securities Act by offering and selling unregistered securities. As relevant here, the SEC's amended claims allege that, after the July 2017 ICO, BHL sold BNB on Binance.com and Binance.US through intermediaries it controlled.[24] But these too were blind transactions, Am. Compl. ¶¶ 91, 338, that

---

[23] *Binance.US Lists COTI (COTI)*, Binance.US (Apr. 6, 2022), https://tinyurl.com/8z6x478r.

[24] The July 2017 ICO sales are not at issue here other than to the extent BHL and Mr. Zhao renew (for preservation purposes) the arguments in their prior motion to dismiss. *See infra* at 37.

are not investment contracts, *see supra* at 12–20. It makes no difference whether the seller happens to be associated with the tokens when the buyer is oblivious to the seller's identity. Therefore, just as the alleged blind sales by token developers fail to state a claim under the Exchange Act, these same sales fail to state a plausible claim under the Securities Act.

### C.    The SEC Fails To Plausibly Allege That Employee Compensation Constituted "Investment Contracts." (Count 1)

The SEC contends that BHL periodically offered BNB to BHL and BAM employees as a form of compensation, whether "as part of a regular salary," "a periodic bonus," "a signing bonus," or as "additional incentive-based compensation." Am. Compl. ¶ 310. These allegations fail to state a claim for many of the same reasons that the SEC's similar allegations failed in *Ripple I*— using crypto assets to give compensation *to* employees as a substitute for paying them in fiat currency is hardly the same thing as receiving an investment of money *from* the employees in exchange for a share in a common enterprise pursuant to which the employees would earn profits from the efforts of others. 682 F. Supp. 3d at 330.

***The SEC's allegations show that BHL and its employees used BNB for consumptive purposes.*** The SEC fails to allege that employees intended to invest in BNB with an expectation of profits from the efforts of others—as opposed to viewing BNB as a cash-equivalent currency. Indeed, the SEC's allegations concerning employee compensation provide a paradigmatic illustration of how BNB was exchanged for *consumptive* purposes, rather than primarily as an investment. *Binance*, 2024 WL 3225974, at \*14; *supra* at 24–26. An employee does not make an investment when her primary motivation is to "obtain a livelihood." *Daniel*, 439 U.S. at 560.

Here, the Amended Complaint makes clear that BHL and its employees treated the token as economically equivalent to fiat currency and used the token as a form of payment. For each form of compensation allegedly paid in BNB, the SEC alleges that BNB was used interchangeably

with cash or other currencies:  "Binance permitted its employees to elect to receive their salaries in *either BNB, fiat currency, or other crypto assets*."  Am. Compl. ¶ 311 (emphasis added); *accord id.* ¶¶ 313, 316, 321, 325.  For example, BHL anticipated that employees would liquidate their BNB to pay increased cost-of-living expenses when they relocated to more expensive cities.  *Id.* ¶ 324.  BHL placed no restriction on employees' ability "to spend" the BNB "as they desired."  *Id.* ¶ 326; *cf. Telegram*, 448 F. Supp. 3d at 373 ("[T]he existence of the lockups tend to negate the likelihood that a reasonable Round One Purchaser purchased Grams for consumptive use.").  And no wonder—if "[m]any" employees took "100%" of their compensation in BNB, Am. Compl. ¶ 335, then they would need to use the BNB to pay for food, housing, and clothing.

The SEC's allegations about BHL encouraging employees to "hold" BNB do not push its employee-compensation claim over the plausibility threshold.  *E.g.*, Am. Compl. ¶¶ 331–36.  These general statements are not linked to any of the transactions the SEC alleges as the basis of Count 1, and thus they do not permit the inference that those specific transactions were investment contracts, even if some employees decided to hold BNB with an expectation of long-term profits.  *Id.* ¶¶ 309–28.  In any event, the puffery alleged in the Amended Complaint cannot overcome the SEC's specific, concrete allegations that, as explained above, make clear that BHL and its employees treated the tokens as a form of payment and a 1:1 substitute for fiat currency.  *Id.* ¶ 326.

**No investment of money by any of the employees.**  To plead an investment of money, the SEC must allege that employees receiving BNB as compensation voluntarily "gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security."  *Daniel*, 439 U.S. at 560.  "Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment."  *Id.*  Simply providing labor to a company does not constitute an "investment of

money" into that company, since the provision of services in exchange for compensation does not, by itself, give the company additional capital to develop. *See, e.g.*, *Phillips v. Kaplus*, 764 F.2d 807, 816 (11th Cir. 1985) (no "investment of money" where interest was given "as compensation for services rendered"); *Peyton v. Morrow Elecs., Inc.*, 587 F.2d 413, 414 (9th Cir. 1978) (similar). "[A]n investment of labor will not be sufficient unless the employee can prove that the work performed was *more valuable* than the direct compensation received," since underpaying employees frees up capital that otherwise would have been spent on wages. 1 Steven C. Alberty, *Advising Small Businesses* § 16:15 (2024) (emphasis added).

Moreover, an employee's decision to accept an employment benefit instead of forgoing it entirely is not an investment of money. *Foltz v. U.S. News & World Rep., Inc.*, 627 F. Supp. 1143, 1158 (D.D.C. 1986). The SEC itself has maintained that employee benefits create "investment contracts" only in limited circumstances. *See* SEC, *Employee Benefit Plans; Interpretations of Statute*, 45 Fed. Reg. 8,960 (Feb. 11, 1980). *First*, employees must *voluntarily* choose to receive a benefit. *Id.* at 8,964/1–2 & n.42. *Second*, employees must *contribute* to the employer in some way beyond mere labor, such as by voluntarily accepting a reduced salary. *Id.* at 8,964/3–8,965/1.

The SEC's own case—*Uselton v. Commercial Lovelace Motor Freight, Inc.*—illustrates the point. 940 F.2d 564 (10th Cir. 1991). There, the Tenth Circuit held that employees' decision to opt into employee stock options constituted an investment contract, but only because the employees "did more than merely contribute labor." *Id.* at 577. Specifically, pursuant to a "Wage Reduction Program," the employees voluntarily agreed to accept 17.35% less in wages as consideration to join a stock-option program. *Id.* at 570. The reduction in employees' wages contributed capital to the company, since the company saved capital that it otherwise would have

needed to pay as compensation for labor.

The Amended Complaint alleges nothing like this. For each of the various forms of compensation, the SEC does not assert that BHL or BAM employees made a voluntary decision to accept a *lower overall salary* (as measured in fiat currency plus its equivalent in BNB) in return for the opportunity to make a long-term investment in the company—only that they "gave up the legal right to receive that portion of [their] salar[ies] in fiat currency" at the time of payment, at which point they were free to spend the BNB or exchange it for other digital assets or currencies. Am. Compl. ¶ 311. Thus, it was not an investment of money under *Howey*.

For several forms of alleged compensation (periodic bonuses, the "ETOP" plan, and relocation allowances), the Amended Complaint also fails to allege that employees voluntarily exchanged specific consideration for BNB, as opposed to receiving BNB as a unilateral benefit conferred by BHL. *See, e.g.*, *Foltz*, 627 F. Supp. at 1158; *Fraser v. Fiduciary Tr. Co. Int'l*, 2005 WL 6328596, at *5 (S.D.N.Y. June 23, 2005) (no investment contract because plaintiff did not allege that he specifically bargained for stock or acquired it through a voluntary investment decision). The periodic bonuses, for example, were "determined" unilaterally by BHL based on performance reviews. Am. Compl. ¶ 316. Employees who received these discretionary bonuses by virtue of their job performance did not make a voluntary investment decision. The SEC similarly alleges that the "ETOP" payments were "granted" "to high performing employees." *Id.* ¶ 320. The SEC does not allege that any employee receiving ETOP payments voluntarily exchanged specific consideration for them, *id.* ¶¶ 320–23, or facts suggesting that ETOP payments were anything more than "incident[al]" components of a broader compensation package, *Foltz*, 627 F. Supp. at 1158. Similarly, the alleged relocation allowances were a unilateral benefit offered by BHL, which were, at most, incidental to an employee's overall compensation. *Daniel*, 439 U.S.

at 560.  Employees who simply relocated for work did not invest money into a common enterprise. Am. Compl. ¶¶ 324–25; *cf. Mart v. Forest River, Inc.*, 854 F. Supp. 2d 577, 586 (N.D. Ind. 2012) ("moving locations to take another job" was not "independent consideration").

### D.    All The Claims Concerning Token Sales On Binance.com Or Binance.US Fail To Plead Post-Sale Obligations.  (All Claims Except Count 1 Concerning the BNB ICO And Count 3)

For the reasons explained above, the SEC's amended claims are irreconcilable with this Court's first motion-to-dismiss decision or a proper understanding of *Howey*.  The Court should also dismiss the SEC's claims on the alternative ground that the SEC fails to allege that secondary-market crypto transactions involved contractual, post-sale obligations, for the reasons BHL and Mr. Zhao have previously explained.  *See, e.g.*, ECF 118 at 15–19.  In the Court's prior decision, the Court reasoned that the Supreme Court's decision in *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 349 (1943), "pointedly declined to determine whether the seller's representations gave rise to an enforceable contract." *Binance*, 2024 WL 3225974, at *8.  But whether a contract is *enforceable* under state law is not the issue; what matters is whether the promoter *represented* that it would assume obligations—which the promoter indisputably did in *Joiner*.  Under controlling precedent, post-sale obligations are a necessary component of any investment contract.  *Life Partners II*, 102 F.3d at 588 (statement of Ginsburg, J.).

Further, and for purposes of issue preservation, Defendants respectfully renew their arguments that the Court should dismiss the SEC's claims: (1) under the major-questions doctrine; (2) for lack of fair notice; and (3) because certain of the SEC's claims are barred by the statute of limitations or the presumption against extraterritoriality.  *See* ECF 118.  Defendants also renew their argument that the Court should dismiss the SEC's claim concerning BNB Vault on the ground that the SEC fails to plausibly allege that BNB Vault was offered or sold as an investment contract. *Id.* at 28–30.

**E.     Simple Earn Was Not Offered Or Sold As An Investment Contract.  (Count 3)**

The remaining amended claim concerns Simple Earn.  The SEC's new allegations fail to cure the deficiencies the Court identified in the SEC's first complaint.

The SEC still fails to plausibly allege that Simple Earn participants have a reasonable expectation that BHL will "generate the return or make the[ir] assets more valuable." *Binance*, 2024 WL 3225974, at *26.  Although BHL allegedly tells participants about a wide range of activities that it will undertake, *see* Am. Compl. ¶¶ 427, 435, the alleged profits to participants come from "[d]aily rewards [that] are distributed from Binance's own funds," *Introduction to Binance Simple Earn* (Sept. 22, 2022), https://www.binance.com/en/support/faq/introduction-to-binance-simple-earn-8df6abf5930e4ef4977d84f45d99d491 (incorporated at Am. Compl. ¶ 436). The Amended Complaint includes a conclusory allegation that Binance promised to "deploy [customers'] assets to generate these profits," Am Compl. ¶ 425, but is still devoid of any allegation "that the interest rate was dependent on that enterprise's success." *Binance*, 2024 WL 3225974, at *26.  Indeed, the SEC alleges that the Simple Earn reward APR is calculated by accounting for "the crypto asset invested . . . [and] the duration of the investment" as well as assessing "market conditions" to "make sure that the APRs are both competitive in the market and also reasonable." Am. Compl. ¶¶ 428, 431.  Nowhere does it allege that the APR for Simple Earn is linked to Binance's profitability.  Thus, it remains the case that, even if Simple Earn participants expected "that they would be paid," no participant would expect that those payments are the result of BHL's managerial or entrepreneurial efforts. *Binance*, 2024 WL 3225974, at *26.

Moreover, the SEC still fails to allege an "investment of money" involving a transfer of ownership and the risk of loss to the alleged investor.  *See Daniel*, 439 U.S. at 559 (requiring a showing that a person "chose to give up a specific consideration"); *Rubera*, 350 F.3d at 1090 (investor must "subject himself to financial loss" (quotations omitted)).  Simple Earn participants

can "withdraw their subscribed assets from the program at any time," even if those assets are part of a "locked" offering.  Am. Compl. ¶ 428.  Simple Earn therefore involves a loan of tokens, not a transfer of their ownership.  And because BHL affirms that it will return Simple Earn tokens "in full, in the same quantity and type of Digital Asset with which [the participant] Subscribed," *Binance Simple Earn Terms* (May 29, 2024), https://www.binance.com/en/terms-simple-earn (incorporated at Am. Compl. ¶ 436), there is essentially no risk of loss.  The Amended Complaint cites "various risks" that in extreme and "exceptional circumstances . . . could negatively impact the ability of Binance to return [a customer's] Simple Earn Assets in full or at all."  Am. Compl. ¶ 436.  But even that statement makes clear that Simple Earn participants are still "virtually guaranteed" to receive their tokens back "in full."  *Marine Bank*, 455 U.S. at 558.

Indeed, Simple Earn operates like a bank account.  Participants deposit their tokens with BHL, and BHL guarantees redemption in full with guaranteed interest.  A participant's Simple Earn interest rate may fluctuate over time just like a variable interest rate at a bank could, which still would not—and does not—transform that transaction nor the token into a security.  To label such services a security would radically expand the phrase "investment contract" to encompass any arrangement where a person lends an asset to another in exchange for interest.  The Supreme Court and this Court have rejected such an aggressive interpretation.  *See Marine Bank*, 455 U.S. at 558–59 (overly broad constructions of the securities laws are disfavored); *see also Binance*, 2024 WL 3225974, at *26 ("Not every 'profit-making opportunity' is an investment contract[.]").

## II.    The Court Should Dismiss All Claims Related To Third-Party Tokens For Failure To Join Required Third Parties.  (Counts 5–10)

All of the SEC's claims concerning third-party tokens should be dismissed because the SEC failed to join indispensable parties—namely, the parties allegedly involved in the issuance of those tokens.  *See* Fed. R. Civ. P. 12(b)(7).  The Court "may consider both exhibits to pleadings

and materials outside the pleadings in resolving a motion to dismiss under Rule 12(b)(7)." *16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8, 12–13 (D.D.C. 2011). Under Rule 19, the Court determines: (1) if an absent party is required, then, if so, (2) if joinder is feasible, and then, if not, (3) if the plaintiff's claims should proceed without the absent party. *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1494 (D.C. Cir. 1995). "The rule calls for a pragmatic decision based on practical considerations in the context of particular litigation." *Id.* at 1495.[25]

### A.    The Third Parties Are Required Under Rule 19(a).

As relevant here, an absent party is required if: (1) the party has an "interest relating to the subject of the action" and (2) resolving the plaintiff's claims without the absent party may, as a practical matter, "impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B); 7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1604 (3d ed.).

Third parties involved in the issuance of the third-party tokens have an undeniable interest in the SEC's claims concerning those tokens: a decision in the SEC's favor would adjudicate whether at least some transactions involving their tokens were investment contracts, likely including some transactions in which they were counterparties. The SEC's claims also "necessarily require that [the Court] evaluate" the "conduct" of those third parties, since they are "active participant[s]" in the SEC's claims. *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) (quotations omitted). The SEC may later use a ruling in its favor to support enforcement actions impacting the interests of these absent third parties.

Further, holding that transactions involving the third-party tokens are securities would

---

[25] Where the absent party is required for some, but not all of a plaintiff's claims, the Court can dismiss those claims only. Fed. R. Civ. P. 12(b)(7) (failure to join a party is a "defense to a claim for relief"); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 68 (D.D.C. 2016) (Michigan was "a necessary party to the resolution of Count 7").

"necessarily impact the operations" of third parties "as a practical matter." *Lewis v. Gov't of District of Columbia*, 324 F.R.D. 296, 298, 303 (D.D.C. 2018) (quotations omitted). For example, the SEC alleges that nine of those tokens are used as the "native token[s]" on related crypto platforms with which the absent third parties are associated, *e.g.*, Am. Compl. ¶ 522, and that the tenth token, MANA, "serves as the crypto asset involved in all transactions in the Decentraland virtual reality ecosystem," *id.* ¶ 664. *See supra* at 27–32 (discussing the SEC's allegations and incorporated documents explaining how each of the tokens is used on a third-party platform).

Proceeding without parties involved in issuing the third-party tokens would be prejudicial to their interests because Defendants cannot "adequately represent[] [them]" "in [their] absence." *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996). Hundreds of tokens trade on Binance.com and Binance.US, Am. Compl. ¶ 514, and thus, compared to the missing third parties, Defendants have far less incentive "to vigorously litigate the case to the bitter end" over any individual token, *Ali v. Carnegie Inst. of Wash.*, 306 F.R.D. 20, 28 (D.D.C. 2014). For example, Defendants could "be incentivized to settle the case" in a way that protects their own interests, but not the interests of some or any of the individual third parties associated with the tokens at issue in the Amended Complaint. *Id.* And of course, the third parties associated with these tokens know their businesses better than Defendants do, and are better equipped to sift through their own records to identify evidence that undermines the SEC's allegations.

### B.    Joinder Is Not Feasible.

To avoid potential dismissal, the SEC bears the burden to show that the absent third parties can be joined. *See* 7 Fed. Prac. & Proc. Civ. § 1609 ("[W]hen an initial appraisal of the facts reveals the possibility that an unjoined party whose joinder is required under Rule 19 exists, the burden devolves on the party whose interests are adverse to the unjoined party to negate this conclusion and a failure to meet that burden will result in the joinder of the party or dismissal of

the action."); *Thorpe v. Borough of Thorpe*, 2011 WL 13134010, at \*13-14 (M.D. Pa. Feb. 4, 2011), *rev'd in part on other grounds* 770 F.3d 255 (3d Cir. 2014). Either way, the Amended Complaint and publicly available information make clear that joinder is not feasible.

Among other reasons, joinder is not feasible when the absent third party is not "subject to service of process." Fed. R. Civ. P. 19(a)(1); *Delgado-Caraballo v. Hosp. Pavia Hato Rey, Inc.*, 889 F.3d 30, 36 (1st Cir. 2018) (absentees who are "beyond the personal jurisdiction of the court" cannot be feasibly joined); *Harran Transp. Co. v. Nat'l Trailways Bus Sys.,* 1985 WL 2349, at \*5 n.18 (D.D.C. Aug. 5, 1983) (similar). Here, seven of the third-party tokens—SOL, ADA, MATIC, ATOM, SAND, ALGO, and COTI—are specifically alleged to have been created and distributed by parties who are based outside the District of Columbia, with some based abroad. *See* Am. Compl. ¶¶ 522, 548–49, 562, 620, 641, 701, 747. Publicly available information shows that parties associated with the three remaining tokens—FIL, MANA, AXS—are also based outside of the District of Columbia.[26] Thus, none is subject to service of process in this Court. *See Cerebral Palsy Ass'n of Nassau Cnty., Inc. v. Cochran*, 2021 WL 1037865, at \*5 n.3 (D.D.C. Feb. 10, 2021); *In re Toyota Motor Corp.,* 785 F. Supp. 2d 883, 907 (C.D. Cal. 2011).

## C.    The Proper Remedy Is Dismissal.

Next, the Court must determine "whether, in equity and good conscience," the claims "should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). Rule 19(b) lists four non-exclusive factors to guide that inquiry: (1) prejudice to the absent party or

---

[26] *See IOHK | Contact*, Input | Output (Oct. 10, 2024), https://tinyurl.com/yryjt7kp (entity associated with ADA based in Singapore); *Protocol Labs Company Profile*, LinkedIn (Oct. 10, 2024), https://tinyurl.com/ya7x8hpe (entity associated with FIL located in San Francisco); *Terms and Conditions*, Decentraland (Oct. 10, 2024), https://tinyurl.com/h8sb72xe (entity associated with MANA is a "Cayman Islands registered" company "with registered address in Cayman Islands"); *Sky Mavis Overview*, PitchBook (Oct. 10, 2024), https://tinyurl.com/bdfbux22 (entity associated with AXS based in Singapore).

existing parties if the claims proceed; (2) the extent to which that prejudice could be lessened or avoided; (3) the adequacy of a judgment without the absent party; and (4) whether the plaintiff would have an adequate remedy if the claims are dismissed.  *Id.*  The Court has "substantial discretion" in weighing these factors.  *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1277 (D.C. Cir. 1983).  Here, each favors dismissal.

      *Prejudice.*  The first and most important two factors concern prejudice to the parties (including the absent party) in proceeding with the claims and the possibility that the prejudice could be "lessened or avoided."  Fed. R. Civ. P. 19(b)(1)–(2); *Kickapoo*, 43 F.3d at 1498; *Adams v. Bell*, 711 F.2d 161, 171 n.42 (D.C. Cir. 1983) (en banc); *Detroit Int'l*, 192 F. Supp. 3d at 70.  As explained above, those parties involved in issuing the third-party tokens are "crucially linked" to the SEC's allegations.  *Ali*, 306 F.R.D. at 30.  And there is no way to tailor the SEC's relief to avoid that prejudice without dismissing the third-party claims.  The SEC claims that the third-party tokens are "relevant both to the scope of the violation and the remedy at issue."  *Binance*, 2024 WL 3225974, at *28 (quoting Mot. Hr'g Tr. 105).  Granting the SEC any remedy with respect to the third-party tokens would "require a conclusion" that they were sold as unregistered securities. *Detroit Int'l*, 192 F. Supp. 3d at 69.

      *Adequacy Of Judgment And Remedy.*  The third and fourth Rule 19(b) factors ask "whether a judgment rendered in the person's absence would be adequate" and whether the SEC "would have an adequate remedy" if the SEC's claims are dismissed for nonjoinder.  Fed. R. Civ. P. 19(b)(3)–(4).  Whether a judgment is "adequate" under Rule 19(b)(3) refers to "the public stake in settling disputes by wholes, whenever possible."  *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008) (quotations omitted).  In contrast, Rule 19(b)(4) concerns the adequacy of the plaintiff's remedy if its claims are dismissed.  Here, a judgment without the missing third parties

would be more than adequate because this litigation can still resolve the SEC's core claims against Defendants without the third-party tokens. The SEC can still seek every category of relief it seeks, none of which is unique to the third-party tokens. Am. Compl. at 193–95 (Prayer for Relief).

For these reasons, the Court should dismiss the SEC's claims concerning the third-party tokens for failure to join indispensable parties.

## III. The Court Should Strike The SEC's Requests For Disgorgement From BHL And Mr. Zhao And Injunctive Relief Against Mr. Zhao.

The Court should also strike the SEC's requests: (1) for disgorgement; and (2) to enjoin Mr. Zhao from future participation in the securities markets.

***Disgorgement.*** Disgorgement is inappropriate for two reasons. *First*, disgorgement is an equitable remedy "restricted" to whatever net profits can be "awarded for victims." *Liu v. SEC*, 591 U.S. 71, 79 (2020). Disgorgement therefore "requires" that any "relief be 'awarded for victims.'" *SEC v. Govil*, 86 F.4th 89, 106 (2d Cir. 2023). Here, there are no alleged victims, since the SEC fails to allege that any investor suffered "pecuniary harm" from BHL's registration failures. *Id.* at 98. In the *Ripple* litigation, Judge Torres recognized as much and held that disgorgement was unavailable because the SEC lacked any evidence that Ripple's failure to register sales of the XRP token caused harm to customers. *See SEC v. Ripple Labs, Inc.*, 2024 WL 3730403, at *6 (S.D.N.Y. Aug. 7, 2024); *see also CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018) (registration violations are unlikely to cause harm, since "any loss will result from some other factor"); *Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) (lack of registration "had no effect" on investors).

Accordingly, the Court should strike the SEC's request for disgorgement from BHL and Mr. Zhao. *See SEC v. City of Victorville*, 2014 WL 12588688, at *12 (C.D. Cal. Oct. 14, 2014); *SEC v. Berry*, 2008 WL 4065865, at *10 (N.D. Cal. Aug. 27, 2008). Dismissing these meritless

requests now will further streamline the case, including by avoiding burdensome and irrelevant discovery into Defendants' finances.

***Injunctive Relief.***    The Court should strike the request to enjoin Mr. Zhao from participating in the issuance, purchase, offer, or sale of any unregistered security, or from acting as an unregistered exchange, broker, dealer, or clearing agency "through any entity owned or controlled by BAM Trading [or] Binance." Am. Compl., Prayer for Relief ¶ V.  As the SEC admits, Mr. Zhao is no longer BAM Trading's Chairman or BHL's CEO, *id.* ¶ 30, and thus he lacks control over BAM and BHL and cannot direct them to do anything.  The SEC does not allege that Mr. Zhao will resume his roles at BAM or BHL in the future.  In fact, BHL's plea agreement, which the SEC filed in this case, ECF 188-1, prohibits Mr. Zhao "from any . . . involvement in operating or managing [BHL's] business," *id.* at 9.  Accordingly, the Court should dismiss this portion of the SEC's request for injunctive relief against Mr. Zhao as moot.  *See, e.g.*, *Whitney v. Obama*, 845 F. Supp. 2d 136, 139 (D.D.C. 2012) (claims for injunctive relief moot when alleged conduct ceased).

## Conclusion

The SEC has now submitted two prolix complaints, requiring Defendants to expend great resources in responding and the Court to expend countless hours parsing the allegations and the parties' briefing.  Yet even after 89 pages of guidance from the Court and over a hundred new allegations (not to mention 16 months of expedited discovery), the SEC's amended claims still fail as a matter of law.  The problem is with the SEC's legal theories, not the facts at its disposal.

For these reasons, the SEC's claims against BHL and Mr. Zhao should be dismissed with prejudice and without leave to amend.  The SEC's control-person claims against Mr. Zhao (Counts 11 and 12) should be dismissed in their entirety.

Dated:  November 4, 2024                    Respectfully submitted,


  */s/ Daniel W. Nelson*         
Daniel W. Nelson (D.C. Bar #433415)
Jason J. Mendro (D.C. Bar #482040)
M. Kendall Day (*pro hac vice*)
Amy Feagles (*pro hac vice*)
Matt Gregory (D.C. Bar #1033813)
Jeremy M. Christiansen (D.C. Bar # 1044816)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel: (202) 955-8500
Fax: (202) 467-0539
dnelson@gibsondunn.com
jmendro@gibsondunn.com
kday@gibsondunn.com
afeagles@gibsondunn.com
mgregory@gibsondunn.com
jchristiansen@gibsondunn.com


*Attorneys for Defendant Binance Holdings Limited*

_/s/ William A. Burck_____

William A. Burck
Avi Perry
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
1300 I Street, NW, Suite 900
Washington, D.C.  20005
Tel.: (202) 538-8120 (Burck)
williamburck@quinnemanuel.com
aviperry@quinnemanuel.com

Emily Kapur (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
555 Twin Dolphin Dr.
5th Floor
Redwood Shores, CA  94065
Tel: (650) 801-5122
emilykapur@quinnemanuel.com

*Attorneys for Defendant Changpeng Zhao*