Exhibit 5

**ASX Release**                                                                 **23 May 2019**

# "The Sandbox" (TSB Gaming) receives ~$3.6m in investment from major blockchain companies

- Animoca Brands receives approx A$3.6 million (US$2.5m) in cash and cryptocurrency via the issue, by its wholly owned subsidiary TSB Gaming Ltd., of SAFE convertible securities and SAND utility tokens to fund development of the upcoming blockchain version of *The Sandbox*

- The investment was led by Hashed, the largest crypto assets fund and accelerator in South Korea, with operations based in San Francisco and Seoul

- Partnership with Klaytn to distribute *The Sandbox* through its Klaytn ecosystem. Klaytn is the blockchain platform and subsidiary of leading Korean mobile technology company Kakao, the dominant messaging app in South Korea with over 50 million monthly active users and ~US$9.2bn market cap

- *The Sandbox* is currently a highly successful mobile game franchise (40m installs, 1.2m active monthly users); once the blockchain version is launched it will become one of the first decentralised, community driven game platforms, providing users with true ownership of their creations as non-fungible tokens (NFTs: virtual tokens for digital scarcity, security and authenticity representing game items)

- The Company expects *The Sandbox*'s decentralised marketplace to launch Q3 2019

Animoca Brands Corporation Limited (ASX: **AB1**, "**Animoca Brands**," or the "**Company**") is pleased to advise that its wholly owned subsidiary TSB Gaming Ltd. ("TSB Gaming") has raised US$2.5 million (approximately A$3.6 million), consisting of 40% in cash and 60% in Bitcoin cryptocurrency, through the issue of "SAND" utility tokens and simple agreement for future equity (SAFE) convertible securities. The majority of Investors allocated their investment to the purchase of both SAND and future equity via the SAFE notes (in the amount of US$2 million), while some Investors allocated their investment exclusively to the purchase of SAND tokens (US$500,000). SAND will be utilised in the upcoming blockchain version of *The Sandbox* user generated content game platform (the "**Game**").

The investment into TSB Gaming was led by Distributed Protocols PTE LTD ("**Hashed**"), the largest crypto assets fund and accelerator in South Korea, with operations based in San Francisco and Seoul. Other investors included Helix Accelerator Limited, Mind Fund Group Ltd., Blocore (Gameberry Inc.), Thundercore Token Ltd., Klaytn PTE. Ltd., and Alexis Bonte (a partner at Atomico Ventures, the leading technology venture capital firm in Europe), among others (the "**Investors**").

For personal use only



For personal use only

Additionally, TSB Gaming has also entered into a Partnership Agreement with Klaytn PTE. Ltd. ("**Klaytn**"), a recently established permissioned blockchain project led by Kakao, the largest instant-messenger corporation in Korea, to distribute, promote, and market *The Sandbox* game through its ecosystem, which includes Kakao. Kakao has a market cap of approximately US$9.2 billion (approximately A$13.3 billion) and is one of the dominant messaging apps with over 50 million monthly active users worldwide.



### TSB Gaming, *The Sandbox*, and SAND

In 2018, Animoca Brands acquired the entirety of Pixowl and all of its assets, including *The Sandbox* (refer to ASX announcement of 27 August 2018). TSB Gaming Ltd. is a wholly owned spin-off company of Pixowl, incorporated in Malta in September 2018, set up to hold all the intellectual property (both new and existing) for *The Sandbox* (the "Sandbox IP") and to manage the development and operation of *The Sandbox* game platform.

TSB Gaming currently has 1,200 ordinary shares outstanding, all of which are owned by Pixowl. Pixowl is currently in the process of transferring the Sandbox IP to TSB Gaming, in return for which TSB Gaming will issue 10 million newly issued shares to Pixowl. After this process is completed (which is expected to occur by 30 June 2019), TSB Gaming will have 10,001,200 ordinary shares outstanding, all of which will be owned by Pixowl.

After transferring the Sandbox IP to TSB Gaming, Pixowl's main assets will consist of the following properties together with their respective assets (as well as its ownership interest in TSB Gaming):

- Garfield: Survival of the Fattest
- Snoopy's Town Tale
- Goosebumps HorrorTown
- Wonder Park Magic Rides

*The Sandbox* is already among the world's largest independent user generated content (UGC) platforms and ecosystems, with over 40 million downloads and one million monthly active users around the world. Its upcoming blockchain version is based on the Ethereum platform, an open-source platform that enables thousands of decentralized cryptocurrencies and projects to be built and deployed on its open and public blockchain. *The Sandbox* will be one



For personal use only

of the world's first decentralised community-driven user generated game platforms built and deployed on an open public blockchain.

The Company intends to capitalise on the popularity of UGC gaming by giving players the added benefits of true digital ownership of their UGC creations: assets in *The Sandbox* will be non-fungible tokens (NFTs), allowing players to trade or sell them without restrictions. NFTs are virtual tokens for digital scarcity, security and authenticity, and in *The Sandbox* they represent items inside the Game.

User-generated digital assets in the blockchain version of *The Sandbox* are ERC-721 or ERC-1155 tokens, depending on their scarcity. Smart contracts will track token ownership at the individual token level: each item has a unique identifier and, optionally, unique properties stored as metadata.

SAND is the utility token used throughout *The Sandbox* ecosystem as the basis of transactions and interactions. It is an ERC-20 utility token built on the Ethereum blockchain. It will be used across the ecosystem by gamers, developers, and publishers, allowing content creators and players to exchange content such as assets and games, and build a user-based platform of rewards while developing an ecosystem where users share their unique gaming creations.



In *The Sandbox*, SAND will be utilised to purchase LAND, which are the spaces (or Worlds), in which players create and play. LANDs are limited, non-fungible, transferable digital assets stored in an Ethereum smart contract.



For personal use only

In addition to acquiring LAND, SAND will also be used to purchase, create, or develop in-game content in the form of NFTs, including digital items such as ASSETs (user-generated voxel items that appear in the game worlds). The uses for SAND are summarised in the table below:

| SAND Utility | Description |
|---|---|
| **Marketplace and in-game currency** | The SAND utility token will be used as the official currency in *The Sandbox* game platform and marketplace for purchasing Voxel Assets. |
| **UGC Content Policies** | Staking fee system mechanism to prevent copies of digital assets or inappropriate content by using the community to curate the content uploaded. |
| **Crowdfunding** | Creators can post ideas for new projects and receive development funding in SAND tokens from the community.<br><br>Artists can be paid in SAND by Creators to produce voxel models required by them. |
| **Governance** | Users can vote on the theme of a new upcoming creation contest, sale event, on the next features for the creation software. |

SAND will enable players to monetise the time and effort they invest into *The Sandbox* by creating NFTs and then selling those creations in the Game's decentralised marketplace as well as on Animoca Brands' partner NFT e-commerce platforms, such as the Worldwide Asset eXchange ("WAX" - refer to ASX announcement of 16 January 2019).

The SAND utility token confers no equity or ownership rights in TSB Gaming Ltd. The Company is working to make SAND available on a number of public decentralized exchanges later this year. The Company expects *The Sandbox*'s decentralised marketplace to launch in Q3 2019, with the full launch of the blockchain version of the Game to follow. The Company will update shareholders on major developments.



For personal use only



*Example of Voxel Assets*

## Transaction details

The Company's wholly owned subsidiary TSB Gaming Ltd. has raised US$2.5 million (approximately A$3.6 million) via the issue of SAND utility tokens and simple agreement for future equity (SAFE) notes to the Investors.

The SAND utility token portion of the transaction has been conducted subject to the following provisions:

- Total token Supply: 3 billion SAND
- Investors acquired SAND at the price per token of US$0.0072 (approximately A$0.01)
- A total of **333,333,333** SAND utility token will be released to the Investors within 30 days, representing 11.11% of the total token supply
- Lockup Restrictions: The SAND utility token issued to the Investors are subject to a 12-month lockup, with 1/12 of the total being released from lockup each month starting from the earlier of (a) June 1, 2020, or (b) the launch date for the full release of *The Sandbox*
- Future Plans: TSB Gaming aims to sell up to an additional 566,666,667 SAND (for a total of 900,000,000 SAND), and will maintain a reserve of 1.2 billion SAND for future use
- Additional Notes: should SAND not be launched by 6 June 2020, TSB Gaming will be required to refund the investment made by Hashed, the lead investor, equal to US$1 million (approximately A$1.44 million). SAND is on track to launch in Q3 2019

**SAND proposed allocation**



For personal use only



*Total token supply: 3 billion SAND*

In addition to the 333,333,333 SAND, the Investors have been issued a SAFE (simple agreement for future equity). The SAFE provides for a valuation cap for TSB Gaming equal to US$10 million (A$14.4 million) pre-money. If TSB Gaming stock is issued to the Investors under the SAFE, it will be standard preferred stock.

Under the SAFE the Investors have the following rights:

- Equity Financing: if there is a future equity raising, each Investor would be issued shares of standard preferred stock based on the greater of (a) such Investor's investment divided by the lowest price per share of standard preferred stock (which is the price of the preferred stock issued to investors investing new money in TSB Gaming in connection with the Equity Financing), and (b) such Investor's investment divided by the SAFE price (which is equal to the Valuation Cap divided by TSB Gaming's pre-equity financing capitalization).

- Liquidity Event: each Investor would automatically be entitled to receive a portion of the proceeds equal to the greater of (a) the Investor's investment (the "**Cash Out Amount**"), or (b) the amount payable on the number of shares of common stock of TSB Gaming as would result from application of a formula calculated based on the Valuation Cap[1].

- Dissolution Event: each Investor would be entitled to receive a portion of the Proceeds equal to such Investor's investment, but subject to payment of higher ranking claims (such as those of creditors and promissory notes).

---

[1] Please refer to the Annexures for further details on how an Equity Financing or a Liquidity Event would operate under various scenarios.



The SAFE would automatically terminate on the earliest of an Equity Financing, Liquidity Event, or Dissolution Event.

The Annexure to this announcement includes tables setting out the possible range of stockholding that the Investors could hold in TSB Gaming in the future based on different Equity Financing and Liquidity Event scenarios.

The funds raised through this transaction will be used to grow the development team and infrastructure for the Game Platform, support marketing efforts through acquisition of creators and IP licenses, and provide for security, legal, and compliance expenses as well as general and administrative costs. The Company expects that the sale of SAND tokens will be treated as revenues, while proceeds from the SAFEs will be treated as liabilities, subject to confirmation by the Company's auditors.

As part of the Partnership Agreement with Klaytn, TSB Gaming will make *The Sandbox* available on to Klaytn's Main Net, at which time TSB Gaming will obtain the right to exchange a maximum of US$200,000 (approximately A$288,000) worth of SAND tokens for $400,000 (approximately A$576,000) worth of Klay tokens. Klay is the ERC-20 token that will be powering Klaytn's network that will allow partners' decentralized applications to run on its permissioned blockchain. Klay will be available on exchanges starting later this year, will be usable in other Klaytn partners' applications.

In addition, TSB Gaming has entered into an Advisory Services Agreement with Hashed wherein Hashed will provide services to *The Sandbox* game platform (including but not limited to business, strategy, promotion, public relations, networking, and potential listing services for the SAND utility tokens) in return for a payment of 55,555,555.56 SAND tokens with a worth of US$400,000.

## Management commentary

Yat Siu, co-founder and chairman of Animoca Brands, said: "We are honoured that domain-expert companies such as Hashed and Klaytn, among others, have chosen to join us in this journey of helping bring blockchain to the masses through gaming. This is a major milestone for the company, validating our blockchain strategy and the NFT-centred blockchain and brand partnerships on which we have been working recently, such as Formula 1."

Arthur Madrid, CEO of Pixowl and of TSB Gaming, commented: "The Sandbox offers everyone access to a new economic model where players and creators fully participate in the value creation chain and can benefit from the new paradigm where content is the platform."

Sebastien Borget, COO of Pixowl and of TSB Gaming, said: "Our vision for the future of decentralized gaming is that NFTs are a catalyst for mass adoption. Players will benefit from

For personal use only



For personal use only

NFT interoperability across games, giving items a value beyond their utility based on factors such as an emotional attachment to their creator, the fame of previous owners, or track record across games."

Jason Han, the Project Head of Klaytn, stated "We are very excited at the opportunity to bring The Sandbox to the Korean gaming market; this game is one of the first of its kind, allowing for user-generated non-fungible tokens to be traded in-game."

**-END**

**About Animoca Brands**
Animoca Brands (ASX: AB1) leverages gamification, blockchain, and artificial intelligence technologies to develop and publish a broad portfolio of mobile products including games such as *The Sandbox*, *Crazy Kings*, and *Crazy Defense Heroes* as well as products based on popular intellectual properties such as Garfield, Snoopy, Thomas & Friends™, Ever After High and Doraemon. Animoca Brands' portfolio of blockchain investments and partnerships includes Dapper Labs, WAX, Harmony, and Decentraland, and it is also the exclusive China distributor of *CryptoKitties*. The Company is based in Hong Kong, Canada, Finland, and Argentina. For more information visit www.animocabrands.com or get updates by following Animoca Brands on Facebook or Twitter.

**Contact:** press@animocabrands.com

**ANNEXURE[2]**

### Equity Financing Scenarios: TSB Gaming Ltd.

| NEW INVESTOR INVESTED AMOUNT (VALUATION)[34] | NEW INVESTOR EQUITY | THE INVESTOR'S EQUITY (AGGREGATE) | REMAINING EQUITY IN TSB GAMING[5] |
|---|---|---|---|
| US$ 1 million (US$ 10 m) | 10% | 20% | 70% |
| US$ 1 million (US$ 15 m) | 7% | 13% | 80% |
| US$ 1 million (US$ 20 m) | 5% | 10% | 85% |
| US$ 1 million (US$ 25 m) | 4% | 8% | 88% |
| US$ 2 million (US$ 15 m) | 13% | 13% | 73% |
| US$ 2 million (US$ 20 m) | 10% | 10% | 80% |
| US$ 2 million (US$ 25 m) | 8% | 8% | 84% |
| US$ 3 million (US$ 15 m) | 20% | 13% | 67% |
| US$ 3 million (US$ 20 m) | 15% | 10% | 75% |
| US$ 3 million (US$ 25 m) | 12% | 8% | 80% |

[2] Please note that the following are scenarios, not forecasts.

[3] Under a future equity raising.

[4] Assuming a price per share equal to US$ 1.00

[5] This represents the Company's equity interest in TSB Gaming

For personal use only

**Animoca Brands Corporation Limited**
ACN 122 921 813
Level 12, 225 George Street, Sydney NSW 2000
http://www.animocabrands.com/

| | | | |
|---|---|---|---|
| US$ 4 million (US$ 15 m) | 27% | 13% | 60% |
| US$ 4 million (US$ 20 m) | 20% | 10% | 70% |
| US$ 4 million (US$ 25 m) | 16% | 8% | 76 % |



## Liquidity Event Scenarios

Under a Liquidity Event (a change in control or an initial public offering), each Investor will have the right to receive a portion of the proceeds equal to the higher of (a) the Investor's investment (the "**Cash Out Amount**"), or (b) such number of shares of common stock of TSB Gaming as would result from application of a formula calculated based on the Valuation Cap[6].

EXAMPLE SCENARIOS:[7]

| INVESTOR INVESTMENT AMOUNT | VALUATION CAP | POTENTIAL PROCEEDS TO INVESTORS IN A MERGER/ACQUISITION OR IPO SCENARIO[8] | | | POTENTIAL PROCEEDS TO AB1 (ASSUMING SAME DEAL VALUE/IPO VALUATION AND NO SHAREHOLDERS OTHER THAN THE INVESTORS AND AB1) |
|---|---|---|---|---|---|
| | | DEAL VALUE OR IPO VALUATION | CASH OUT AMOUNT (RETURN OF INVESTMENT) | CONVERSION AMOUNT (NUMBER OF SHARES/VALUE) | |
| US$ 2 million | US$ 10 million | US$ 10 million | US$ 2 million | 2,000,400 shares / US$ 1,666,778 | US$ 8 million |
| US$ 2 million | US$ 10 million | US$ 20 million | US$ 2 million | 2,000,400 shares / US$ 3,333,556 | US$ 16,666,444 |
| US$ 2 million | US$ 10 million | US$ 30 million | US$ 2 million | 2,000,400 shares/ US$ 5,000,333 | US$ 24,999,667 |
| US$ 2 million | US$ 10 million | US$ 40 million | US$ 2 million | 2,000,400 shares/ US$ 6,667,111 | US$ 33,332,889 |
| US$ 2 million | US$ 10 million | US$ 50 million | US$ 2 million | 2,000,400 shares/ US$ 8,333,889 | US$ 41,666,111 |

---

[6] The formula used would be [Investment Amount / Per Share Price], where the per share price is calculated by applying the formula [Valuation Cap / Total Number of Shares Outstanding] (including common stock, preferred stock, and options, but excluding any unissued option pool and convertible securities such as the SAFEs).

[7] Based on 10,001,200 total shares outstanding pre-conversion, and on a per share price of US$ 0.9998

[8] As explained above, Investors would automatically receive higher valued proceeds from (a) Cash Out Amount, or (b) Conversion Amount

**Animoca Brands Corporation Limited**
ACN 122 921 813
Level 12, 225 George Street, Sydney NSW 2000
http://www.animocabrands.com/



**Sample Token Purchase Agreement & SAFE (Redacted)**



**TSB GAMING LTD.**
**TOKEN PURCHASE & SAFE**

THIS CERTIFIES THAT in exchange for the payment by <mark>ENTITY</mark>, a <mark>JURISDICTION</mark> company bearing registration number <mark>REGISTRATION NUMBER</mark> (the "**Investor**"), of US$<mark>AMOUNT</mark> or its equivalent in Bitcoin (the "**Purchase Amount**"), on or about <mark>DATE</mark>, **TSB GAMING LTD.**, a company duly incorporated under the laws of Malta bearing a Company Registration No. C88474 (the "**Company**"), issues to the Investor the right to (a) certain units of its SAND Tokens, and (b) certain shares of the Company's Capital Stock, subject to the terms described below.

See **Section 3** for certain additional defined terms.

1. *Purchase of SAND Tokens*

    (a) **Purchase**. The Investor hereby irrevocably purchases <mark>AMOUNT OF SAND</mark> Tokens (the "**Acquisition Tokens**") for the Purchase Amount.

    (b) **Lock-Up**. The Investor hereby agrees that, without the prior written consent of the Company and except as set forth below, the Investor will not during the period commencing on the date of this SAFE and ending on the 12 month anniversary of the Launch (the "**Lock Up Period**") (i) offer, pledge, gift, donate, trade, sell, option, or contract to do the same, or otherwise transfer or dispose of, directly or indirectly, any SAND Tokens, or (ii) enter into any other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of SAND Tokens, in cash, cryptocurrency, or otherwise ((i) and (ii) being hereinafter collectively referred to as the "**Lock Up**").

    (c) **Release from Lock-Up**. 1/12th of the Acquisition Tokens will automatically be released from the Lock-Up 30 days following the Launch, and an additional 1/12th of the Acquisition Tokens will automatically be released from the Lock-Up on the last day of each calendar month thereafter, until all of the Acquisition Tokens are released from the Lock-Up.

    In connection with and prior to the issuance of the Acquisition Tokens by the Company to the Investor pursuant to this Section 1(a), the Investor shall: (1) execute and deliver to the Company any and all other transaction documents related to this SAFE; and (2) provide to the Company a network address for which to allocate the Acquisition Tokens. The Investor shall strictly follow any requirements and procedures required to receive the Acquisition Tokens. The Company shall deliver the Acquisition Tokens to the Investor within 30 days of the date of this SAFE.

2. *Bonus on Certain Events*

    (a) **Equity Financing**. If there is an Equity Financing before the termination of this SAFE, on the initial closing of such Equity Financing, the Company will issue to the Investor into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of SAFE Preferred Stock equal to the Purchase Amount divided by the SAFE Price.

    In connection with the issuance of Standard Preferred Stock or SAFE Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided*, that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the SAFE Preferred Stock if applicable, and *provided further*, that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor.

    (b) **Liquidity Event**. If there is a Liquidity Event before the termination of this SAFE, this SAFE will automatically be entitled to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity

For personal use only

Price (the "**Conversion Amount**"). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 2(d).

(c) **Dissolution Event**. If there is a Dissolution Event before the termination of this SAFE, the Investor will automatically be entitled to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this SAFE is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

(i)        Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)       On par with payments for other SAFEs and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other SAFEs and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other SAFEs and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)      Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other SAFEs and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**. This SAFE will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this SAFE) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to Section 2(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 2(b) or Section 2(c).

3.   *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the

-2-

For personal use only

Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) Promised Options;
- Excludes the Unissued Option Pool; and
- Excludes all Convertible Securities.

"**Convertible Securities**" includes this SAFE and other convertible securities issued by the Company, including but not limited to: (i) other SAFEs; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means (i) in the case of an offering in the United States, a public offering of the Company's shares of common stock pursuant to an effective Registration Statement under the Securities Act that results in a listing of such shares of common stock on the New York Stock Exchange or NASDAQ, and, (ii) in the case of an offering in any other jurisdiction, any offering in which both retail and institutional investors are eligible to buy in accordance with the securities laws of such jurisdiction made together with an application for listing of the Company's shares of common stock and for the admission to trading of those shares of common stock on a stock exchange in such jurisdiction.

"**Launch**" means the date (a) The Sandbox and SAND Tokens are both available to the general public in a publicized product launch, or (b) June 1, 2020, whichever is earlier. (The June 1, 2020 date may be extended upon the mutual agreement of the parties).

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Excludes the Unissued Option Pool; and
- Excludes all Convertible Securities.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

-3-

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet for the Equity Financing (or the initial closing of the Equity Financing, if there is no term sheet), or (ii) treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share.

"**SAFE**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this SAFE" mean this specific instrument.

"**SAFE Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the SAFE Price; and (ii) the basis for any dividend rights, which will be based on the SAFE Price.

"**SAFE Price**" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**The Sandbox**" means The Sandbox gaming platform that leverages blockchain technology to allow users to monetize voxel assets and gaming experiences, and consisting of the following components: (i) the VoxEdit 3D modeling desktop software, (ii) a web-based marketplace and the Game Maker on desktop, and (iii) the Game Viewer on mobile/desktop.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

"**Valuation Cap**" means US$10,000,000.

4.  *Company Representations*

    (a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

    (b)  The execution, delivery and performance by the Company of this SAFE is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to Section 4(d)). This SAFE constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current articles of association or memorandum of association, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

    (c)  The performance and consummation of the transactions contemplated by this SAFE do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition

-4-

For personal use only

For personal use only

of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d) No consents or approvals are required in connection with the performance of this SAFE, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 2.

(e) To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others. The SAND Token is not a proprietary trade name of the Company.

5. *Investor Representations*

(a) The Investor has full legal capacity, power and authority to execute and deliver this SAFE and to perform its obligations hereunder. This SAFE constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the right to (i) the purchase of SAND Tokens, and (ii) certain shares of the Company's Capital Stock, or any use of this Agreement, including (A) the legal requirements within its jurisdiction for the purchase of certain shares of the Company's Capital Stock, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of certain shares of the Company's Capital Stock. The Investor's subscription and payment for and continued beneficial ownership of certain shares of the Company's Capital Stock will not violate any applicable securities or other laws of the Investor's jurisdiction.

(c) The Investor understands and accepts that SAND Tokens will be used as utility tokens. The Investor expressly agrees that SAND Tokens are not securities, are not registered with any government entity as the securities, shall not be considered as such, are not intended to be commodity or any other kind of financial instrument, do not represent any share, stake, security or equivalent rights, including, but not limited to, any right to receive future revenue shares and intellectual property rights, and do not represent any ownership right.

(d) The Investor has been advised that this SAFE and any underlying securities have not been registered under any country's securities laws and, therefore, cannot be resold except in compliance with the applicable country's laws. The Investor is purchasing this SAFE and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters, including a sufficient understanding of blockchain or cryptographic tokens and other digital assets, smart contracts, storage mechanisms (such as digital or token wallets), blockchain-based software systems and blockchain technology, that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. The Investor has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of this SAFE with the Company's management.

(e) If the Investor is an individual, then the Investor resides in the state, province, and/or country identified in the address of the Investor set forth on the signature page hereto; if the Investor is a partnership, corporation, limited liability company or other entity, then the office or offices of the Investor in which its principal place of business is identified in the address or addresses of the Investor on the signature page hereto.

-5-



For personal use only

(f)  The Investor acknowledges and agrees that if the Company determines that the Investor has breached any representation in this Section 5, the Company may void this SAFE and return the Purchase Amount, and the Investor shall immediately return the Acquisition Tokens.

6.  *Payment*

(a)  The Company will accept payment of the Purchase Amount in U.S. Dollars or Bitcoin. The Investor shall make the required payment to the Company in consideration for the Investor's rights hereunder in accordance with the procedures reasonably requested by the Company.

(b)  For purposes of this SAFE, the value of the Purchase Amount shall be deemed in U.S. Dollars even if the Investor pays in Bitcoin, valued at the Applicable Exchange Rate for Bitcoin to U.S. Dollars. The term "**Applicable Exchange Rate**" shall mean the opening price of Bitcoin on https://www.coindesk.com/price/bitcoin / in the 24-hour period (Eastern Time) following the day and time that the Company notifies the Investor, in writing, that the Company has accepted the Investor's offer to invest in the Company under this SAFE.

7.  *Miscellaneous*

(a)  Any provision of this SAFE may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding SAFEs with the same "Valuation Cap" as this SAFE (and SAFEs lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) neither the Purchase Amount nor the Acquisition Tokens may be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such SAFEs must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of SAFEs whose SAFEs have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of SAFEs.

(b)  Any notice required or permitted by this SAFE will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this SAFE, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this SAFE be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 2.

(d)  Neither this SAFE nor the rights in this SAFE are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other, *provided, however,* that this SAFE and/or its rights may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further,* that the Company may assign this SAFE in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this SAFE is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this SAFE operate or would prospectively operate to invalidate this SAFE, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this SAFE and the remaining provisions of this SAFE will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

-6-

(f)  All rights and obligations hereunder will be governed by the laws of Malta, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for tax purposes this SAFE is, and at all times has been, intended to be characterized as stock. Accordingly, the parties agree to treat this SAFE consistent with the foregoing intent for all tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

-7-



IN WITNESS WHEREOF, the undersigned have caused this SAFE to be duly executed and delivered.

**TSB GAMING LTD.**

By: _____

Name: Arthur Madrid

Title: CEO

Address:    Ground Floor, Palace Court Church
Street, St. Julians, STJ 3049, Malta

Email:_____

**INVESTOR:**

By: _____

Name:_____

Title:_____

Address:_____

_____

Email:_____

For personal use only