**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE
COMMISSION,

               *Plaintiff*,

     v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

             *Defendants*.

**No. 1:23-cv-01599-ABJ-ZMF**

**Oral Argument Requested**

**DEFENDANTS BAM TRADING SERVICES INC.**
**AND BAM MANAGEMENT US HOLDINGS INC.'S**
**<u>MOTION TO DISMISS AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 4

LEGAL STANDARD.............................................................................................................. 6

ARGUMENT ......................................................................................................................... 7

I.    The SEC Failed to Plead Any Secondary Sales of Crypto Assets Were Sold as an Investment of Money *in* a Common Enterprise. ................................................................... 7

    A.    *Howey* and This Circuit Require Pooling of Investment Funds. .............................. 7

    B.    The Court Should Reject the SEC's Latest Attempt to Bring Commodities Transactions under the Securities Laws by Ignoring or Replacing the "Pooling" Requirement. ................................................................................................. 9

        1.    Economic Interdependence Does Not Establish Pooling............................ 9

        2.    Pooling by Primary Purchasers Does Not Establish Pooling by Secondary Purchasers. ............................................................. 11

    C.    The SEC's "New" Theory Is the Same One This Court Rejected........................ 14

        1.    The SEC's Theory Has No Limiting Principle. ........................................ 15

        2.    The SEC's Theory Still Encroaches on CFTC Jurisdiction..................... 17

    D.    The SEC Cannot Rely on Vertical Commonality to Save Its Claims.................. 21

II.   The SEC Failed to Plead the Expectation of Profits Due to the Efforts of Others. .......... 23

    A.    No Promises Were Made to Purchasers of Crypto Assets on BAM's Platform... 23

    B.    The SEC Failed to Allege Sufficient Post-Sale Activities.................................... 26

    C.    The SEC Failed to Allege Expectations of Profits Resulted Predominantly from the Efforts of Others........................................................................ 28

III.  Individual Allegations as to Each Crypto Asset Fail. ....................................................... 29

    A.    SOL .................................................................................................. 30

    B.    ADA ................................................................................................. 31

    C.    MATIC.............................................................................................. 32

D. FIL ..................................................................................................... 34

E. ATOM ............................................................................................... 35

F. SAND ................................................................................................. 36

G. MANA ............................................................................................... 37

H. ALGO ................................................................................................ 37

I. AXS .................................................................................................... 39

J. COTI .................................................................................................. 39

K. BNB ................................................................................................... 40

L. The SEC Failed to Allege Secondary Sales Here Constituted Investment Contracts. .................................................................................. 43

IV. THE SEC FAILS TO STATE REGISTRATION CLAIMS AGAINST BAM ................ 43

CONCLUSION ........................................................................................ 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bankers Ass'n v. SEC*,
  804 F.2d 739 (D.C. Cir. 1986) ................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..............................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..............................................................................6

*Cerebral Palsy Ass'n of Nassau County, Inc. v. Cochran*,
  2021 WL 1037865 (D.D.C. Feb. 10, 2021) ..........................................45

*Coinbase Inc. v. SEC*,
  No. 23-3202 (3rd Cir. Sept. 24, 2024) ..............................................3, 11

*Davis v. Billington*,
  681 F.3d 377 (D.C. Cir. 2012) ..............................................................6

*Deckebach v. La Vida Charters, Inc. of Fla.*,
  867 F.2d 278 (6th Cir. 1989) ...............................................................22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985)..................................................................11

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
  396 F. Supp. 175 (N.D. Cal. 1975) ..................................................24, 42

*Hocking v. Dubois*,
  885 F.2d 1449 (9th Cir. 1989) ..............................................................11

*In re BitConnect Sec. Litig.*,
  2019 WL 9104318 (S.D. Fla. Aug. 23, 2019).......................................11

*In re Ripple Labs.*,
  2024 WL 3074379 (N.D. Cal. June 20, 2024) .......................................11

*In the Matter of CQC Impact Investors LLC*,
  3-22224 ..................................................................................................20

*In the Matter of eToro USA LLC*,
  (3-22106, September 12, 2024) ............................................................16

*In the Matter of Jason Steele*,
   CFTC 24-36 (September 30, 2024) ...................................................................18, 20

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004) ................................................................................5

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ...............................................................................6

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) .........................................................................................6, 7

*Meredith v. Conticommodity Servs., Inc.*,
   No. 79-1282, 1980 WL 1465 (D.D.C. Nov. 24, 1980) ..........................................21

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (1980) .................................................................................................29

*Patrick v. Dist. of Columbia*,
   126 F. Supp. 3d 132 (D.D.C. 2015) .......................................................................5

*Patterson v. Jump Trading LLC*,
   710 F. Supp. 3d 692 (N.D. Cal. 2024) ..................................................................11

*Salameh v. Tarsadia Hotel*,
   726 F.3d 1124 (9th Cir. 2013) ..............................................................................26

*Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   682 F.2d 459 (3d Cir. 1982)..................................................................................22

*SEC v. Aqua-Sonic Prods. Corp.*,
   524 F. Supp. 876 (S.D.N.Y. 1981).........................................................................42

*SEC v. Banner Fund*,
   211 F.3d 602 (D.C. Cir. 2000) ...................................................................... *passim*

*SEC v. Binance Holdings Ltd.*,
   2024 WL 3225974 (D.D.C. June 28, 2024)..........................................................34

*SEC v. Int'l Loan Network, Inc.*,
   770 F. Supp. 678 (D.D.C. 1991), *aff'd* 968 F.2d 1304, 1307-08 (D.C. Cir.
   1992) ................................................................................................................22, 23

*SEC v. Kik Interactive, Inc.*,
   492 F. Supp. 3d 169 (D. Conn. 2020) ..............................................................10, 24

*SEC v. Life Partners, Inc.*,
   102 F.3d 587 (D.C. Cir. 1996)....................................................................1, 21, 23, 27

*SEC v. Life Partners, Inc.*,
   87 F.3d 536 (D.C. Cir. 1996) ........................................................................... *passim*

*SEC v. Life Partners, Inc.*,
   898 F. Supp. 14 (D.D.C. 1995), *rev'd on other grounds*, 87 F.3d 536 (D.C.
   Cir. 1996) ...................................................................................................................21

*SEC v. Mut. Benefits Corp.*,
   408 F.3d 737 (11th Cir. 2005) ..................................................................................29

*SEC v. Parkersburg Wireless LLC*,
   991 F. Supp. 6 (D.D.C. 1997) .............................................................................21, 24

*SEC v. Payward, Inc., et al.*,
   23-cv-06003-WHO (N.D. Cal. August 23, 2024) ....................................................11

*SEC v. Ripple Labs*,
   682 F. Supp. 3d 308, 328-29 (S.D.N.Y. 2023) ....................................7, 8, 10, 13

*SEC v. Ripple Labs, Inc.*
   682 F. Supp. 3d 308 (S.D.N.Y. 2023) ...............................................................7, 8, 24

*SEC v. RPM Int'l, Inc.*,
   282 F. Supp. 3d 1 (D.D.C. 2017) ...........................................................................4, 6

*SEC v. Telegram*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................................11, 23, 29

*SEC v. Terraform Labs PTE, Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) .............................................................11, 12

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................................... *passim*

*Sickle v. Torres Advanced Enter. Sols., LLC*,
   884 F.3d 338 (D.C. Cir. 2018) ..................................................................................28

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
   253 F. Supp. 359 (S.D.N.Y. 1966) ...........................................................................23

*Timmreck v. Munn*,
   433 F. Supp. 396 (N.D. Ill. 1977) ............................................................................24

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ...................................................................................................23

*United States v. Bowdoin*,
   770 F. Supp. 2d 142 (D.D.C. 2011) ...................................................................22, 24

*United States v. Harmon*,
    No. 19 Cr. 395 (BAH), 2021 WL 1518344 (D.D.C. Apr. 16, 2021) .....................................38

*United States v. Newcombe*,
    No. 24 Cr. 567 (JSR) (S.D.N.Y. Sept. 30, 2024) ..............................................................19, 20

*Wals v. Fox Hills Dev. Corp.*,
    24 F.3d 1016 (7th Cir. 1994) ..........................................................................................22

*Wisconsin Central Ltd. v. United States*,
    585 U.S. 274 (2018) ...........................................................................................................6

**Statutes**

7 U.S.C. § 2(a)(1)(H) .............................................................................................................2, 17

7 U.S.C. § 9 ......................................................................................................................2, 15, 21

7 U.S.C. §§ 9, 13(a)(2) ...............................................................................................................20

15 U.S.C. § 78e .........................................................................................................................44

15 U.S.C. §§ 78e(a), (c) ............................................................................................................44

15 U.S.C. § 78o(a) ....................................................................................................................44

15 U.S.C. § 78q-1(b) .................................................................................................................44

ACA § 23-55-801 .......................................................................................................................3

Arizona Revised Statutes § 6-1226 ............................................................................................3

Arizona Revised Statutes § 6-1231 ............................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act ..............................................17

Exchange Act ..................................................................................................................... *passim*

Securities Act §§ 5(a) and 5(c) .................................................................................................43

**Rules**

Fed. R. Civ. P. 12(b)(7) ............................................................................................................45

Fed. R. Civ. Proc. 12(b)(6) and 12(b)(7) ...................................................................................1

Rule 12(b)(6) ...............................................................................................................................6

Rule 12(b)(7) ...............................................................................................................................6

Rule 19 ................................................................................................................................45

Rule 19(b) ..........................................................................................................................45

**Regulations**

17 C.F.R. § 180.1 ..........................................................................................................2, 15

Defendants BAM Trading Services Inc. and BAM Management US Holdings Inc. (together, "BAM") move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(b)(7) to dismiss Counts Eight, Nine and Ten of the First Amended Complaint ("FAC") for failure to state a claim.

## PRELIMINARY STATEMENT

This Court's previous opinion and D.C. Circuit precedent doom the SEC's amplified but fundamentally similar amended complaint. To sufficiently plead that secondary sales of crypto assets were part of an investment contract, the SEC must show an investment of money *in* a common enterprise. It cannot. The SEC must also show a linkage to the efforts of others. It cannot. Notwithstanding its now more than 800 paragraphs of allegations, the SEC, once again, has offered a theory that "marks a departure from the *Howey* framework that leaves the Court, the industry, and future buyers and sellers with ***no clear differentiating principle*** between tokens in the marketplace that are securities and tokens that aren't." Dkt. 248 (Memorandum Opinion and Order) ("Opinion") at 42-43 (emphasis added). As explained below, the crypto assets listed by BAM (each a token created by a third party) are commodities, properly and appropriately regulated by the CFTC.

Although the SEC purports to abandon its claim that the crypto asset is the embodiment of the investment contract, its new allegations are burdened with the same flaws that this Court correctly rejected. Dkt. 273, SEC Memo in Support of Motion for Leave to Amend the Complaint ("SEC Brief") at 13; Dkt. 172, SEC's Opposition to Defendants' Motions to Dismiss ("SEC MTD Opposition") at 29. For every crypto asset at issue, the SEC continues to argue that once the crypto asset was sold as part of an investment contract, it always remains part of an investment contract upon its resale. *Id.* at 13, 16-17. Under the SEC's theory, once an original purchaser invests in the

common enterprise, that investment of money somehow travels with the token to all subsequent purchasers, along with how the token "was originally offered and sold" and its "original promotions." *Id.* All future purchasers on the secondary market hold an investment contract because, the SEC now says, they are "in the boat together" and it does not matter "*when* or *how* they got into the boat in the first place." SEC Brief at 15 (emphasis in original). In other words, the SEC's new theory simply repackages its old theory this Court already rejected.

The SEC suggests that promotions of the ecosystem have continued. But, for the SEC, such continuing promotion may simply include BAM providing the same type of market information to its customers common in all commodity markets or prior "public statements and inducements [that] remained available." SEC Brief at 19-22. These allegations are insufficient to state a claim under the Exchange Act because they are tantamount to saying the crypto asset is the "embodiment" of the investment contract. *See* Opinion at 20-21. The Court should reject this theory just as it did before. *Id.*

The SEC claims that it requires this expanded jurisdiction for its own "critical regulatory oversight." SEC Brief at 1; FAC ¶¶ 3, 40-61. The SEC's misreading of *Howey* continues to improperly limit the CFTC's jurisdiction and impede its Congressionally mandated role to regulate the commodities markets.[1] The SEC also ignores the numerous state regulators (with whom BAM

---

[1] *See* 7 U.S.C. § 2(a)(1)(H) (specifically excluding "any security" from the CFTC's jurisdiction); 7 U.S.C. § 9 (prohibiting fraud in sale of any commodity in interstate commerce); 17 C.F.R. § 180.1 (adopting regulation to prohibit fraud or material misstatements in the sale of commodities); *see also id.* § 1.6 (adopting rules prohibiting willful evasion of CFTC authority).

The CFTC actively brings enforcement actions for fraud and manipulation in the sale of crypto assets. As the CFTC announced in its 2023 Year End Review, "the CFTC cemented its reputation as a premier enforcement agency in the digital asset space. It filed high-profile complaints addressing frauds by major exchanges … and continued its efforts to protect the public in the decentralized finance space. In FY 2023, the CFTC brought 47 actions involving conduct related to digital asset commodities, representing more than 49% of all actions filed during that period." *See* https://www.cftc.gov/PressRoom/PressReleases/8822-23.

is registered) that each have their own regulatory and enforcement regimes. FAC ¶ 29.[2] The SEC suggests that purchasers of crypto assets require additional disclosures (FAC ¶ 40), but if that was truly its aim, the SEC would create rules for the industry to follow and identify what tokens are sold as securities. But the SEC does not care whether registration or compliance with its view of the securities laws is possible for the crypto industry.[3] Notably, the SEC does not take the same aggressive approach to *Howey* as it does here with other crypto assets it has arbitrarily chosen to allow (Bitcoin and Ether), nor other virtual commodities like Voluntary Carbon Credits ("VCCs"). But the legal requirements of *Howey* do not shift based on the SEC's enforcement whims.

The SEC spilled substantial ink attempting to strengthen its allegations but still failed to sufficiently allege that any secondary sales of crypto assets on BAM were sold as investment contracts. In particular, the SEC has failed to allege an investment in a common enterprise because no funds from secondary purchasers were pooled into a common enterprise, nor could purchasers have had an expectation they would be. The SEC has also failed to allege the expectation of profits due to the efforts of others, failing to allege any actual promises or offers were made to any purchasers of crypto assets, that any significant entrepreneurial activities promised would occur in the future, or that any purchasers could have reasonably expected any profits would result from such efforts. For these reasons, the SEC's claims as to secondary sales should be dismissed with prejudice, along with Counts Eight, Nine and Ten of the FAC.

---

[2] *See, e.g.*, Arizona ST § 6-1226 (providing disclosure requirements for all money transmitters); Arizona ST § 6-1231 (prohibiting fraud, intentional misrepresentation or gross negligence); Arkansas § 23-55-608 (providing disclosure requirements for all money transmitters); ACA § 23-55-801 (prohibiting fraud, intentional misrepresentation, or gross negligence).

[3] Transcript of Oral Argument at 27:5-10, *Coinbase Inc. v. SEC*, No. 23-3202 (3rd Cir. Sept. 24, 2024) (Answering question on whether it is possible for Coinbase to register by stating that "[t]he securities framework is not premised on compliance being possible…. And not everybody who comes and wants to participate in a securities marketplace is able to do what they want to do.").

## BACKGROUND[4]

BAM's core trading platform allows customers to place orders anonymously for listed crypto assets on a continuously updated electronic order book.[5] As a spot trader in commodities, the CFTC's enforcement authority applies to the transactions on BAM's platform. The SEC alleges that eleven of the crypto assets offered on BAM's Platform have only ever been sold as part of investment contracts – the "Ten Crypto Assets" (SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI) and BNB (collectively, "the At-Issue Tokens").[6] SEC Brief at 23-25. As noted below, the FAC alleges that primary offerings of each of the At-Issue Tokens occurred before (and sometimes years before) BAM listed them on its trading platform. BAM launched a digital asset trading platform in the United States in September 2019 (FAC ¶ 211) but most of the At-Issue Tokens were still not listed on BAM until months or years later. *See* Ex 1.

Each crypto asset sold on BAM includes a web page that identifies historical trading data, a description of the crypto asset (including its history, its uses, and its blockchain or network), details on how to trade the crypto asset, resources related to the crypto asset (including the original whitepaper and official website) and recent news stories about the crypto asset.[7] BAM also informs

---

[4] Only for purposes of this motion, BAM assumes the truth of the FAC's well-pleaded factual allegations. *See SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 11–12 (D.D.C. 2017).

[5] Ex. 2, available at https://www.binance.us/trading-rules.

[6] In addition to the Ten Crypto Assets and BNB, the FAC also alleged that BAM's platform offered BUSD as an investment contract. However, the Court previously held that the SEC failed to plausibly allege that Binance offered and sold BUSD as an investment contract (Op. at 47), and the SEC did not seek leave to amend the allegations concerning BUSD (Dkt. 273-1, at 6 n.4). The FAC's allegations about BUSD being offered as an investment contract on BAM's platform are identical to those this Court previously found insufficient. As a result, the Court should dismiss any claims against BAM premised on BUSD being offered as a security.

[7] *See, e.g.,* Ex 3 (https://www.binance.us/price/solana); Ex. 4 (https://www.binance.us/price/ethereum). The SEC previously asserted that the entirety of the BAM website is incorporated into its complaint. Dkt. 205. On a motion to dismiss, the Court may consider documents incorporated by reference in the Complaint. *See Patrick v. Dist. of Columbia,*

users each time that "[t]his material has been prepared for general informational purposes only and should NOT be: (1) considered an individualized recommendation or endorsement of any digital asset or services discussed herein; and (2) relied upon for any investment activities .... BAM does NOT provide investment [] advice in any manner or form." *Id.* BAM provides this same information for each crypto asset it lists, including those the SEC does not contend were sold as part of an investment contract, such as ETH, the native token of the Ethereum blockchain, and Bitcoin.[8]

The FAC contains no well-pleaded allegations that any issuers of the At-Issue Tokens sold those tokens on BAM. The FAC vaguely asserts that issuers would sometimes engage market makers to support liquidity on BAM, but does not allege that such market making was profitable to the issuers or that any such profits were invested into the alleged common enterprise. FAC ¶¶ 462-490. There are no allegations that BAM made any promises or offers to any purchasers of the At-Issue Tokens on its platform beyond the fact that they could purchase the token. The FAC contains no allegations that (1) the money spent by purchasers to buy any of the At-Issue Tokens on BAM was provided to the issuers of those tokens or (2) that any purchaser of the At-Issue Tokens on BAM reasonably believed or expected that the money they spent to purchase the At-Issue Tokens would be provided either to the issuers of those tokens, the managers of any common enterprise to generate profits on their investments or to any of the parties the SEC has identified were working to develop the ecosystem associated with each of those tokens.

---

126 F. Supp. 3d 132, 135–136 (D.D.C. 2015). *See* Appendix of Exhibits. A court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963-65 (D.C. Cir. 2004).

[8] Ex.4 (BAM ETH page); Ex. 5 (BAM Bitcoin page).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must only "accept as true the well-pleaded factual allegations of the complaint." *Davis v. Billington*, 681 F.3d 377, 379 (D.C. Cir. 2012). However, "[a] pleading must offer more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action' . . . and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12 (D.D.C. 2017) (quoting *Iqbal*, 556 U.S. at 678). The court "need not accept inferences drawn by the plaintiff if those inferences are unsupported by the facts alleged in the Complaint. Nor must the Court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Under Rule 12(b)(7), the Court may dismiss a complaint or portions of a complaint for failure to join a party.

When interpreting a statute's meaning, such statutes "do—in fact, must—have a single, best meaning. That is the whole point of having written statutes; 'every statute's meaning is fixed at the time of enactment.'" *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) (quoting *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 284 (2018)) (emphasis deleted). And for the key phrase in the securities laws at issue in this case – "investment contract" – Congress has *not* delegated authority to the SEC to interpret the meaning of that term. *See Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 754-755 (D.C. Cir. 1986) (SEC cannot use definitional authority to expand its own jurisdiction or invade the jurisdiction of other agencies).

# ARGUMENT

## I.    THE SEC FAILED TO PLEAD ANY SECONDARY SALES OF CRYPTO ASSETS WERE SOLD AS AN INVESTMENT OF MONEY *IN* A COMMON ENTERPRISE.

### A.    *Howey* and This Circuit Require Pooling of Investment Funds.

This Court's previous analysis dooms the SEC's recycled theory of its jurisdiction.[9] The SEC must establish "an investment of money *in* a common enterprise." Opinion at 21 (emphasis added). An investment of money *and* a common enterprise do not suffice, as that is within the enforcement jurisdiction of the CFTC. Binding authority in this Circuit confirms that horizontal commonality "*requires* that there be a pooling of investment funds, shared profits and shared losses." Opinion at 23-24; *SEC v. Banner Fund*, 211 F.3d 602, 614 (D.C. Cir. 2000) ("*Banner Fund*") (emphasis added) (citing *SEC v. Life Partners, Inc.*, 87 F.3d 536, 542 (D.C. Cir. 1996) ("*Life Partners I*") (emphasis added)). As this Court recognized, "[t]he case law points to whether the proceeds of the offering were 'pooled' as a critical aspect of analysis." Opinion at 29. The court in *SEC v. Ripple Labs, Inc.* ("*Ripple I*") similarly found that pooling was required when it distinguished between sales to institutional investors (primary sales) and sales to programmatic buyers (sales by Ripple on the secondary market). 682 F. Supp. 3d 308, 328 (S.D.N.Y. 2023). The SEC failed to establish pooling because purchasers on the secondary market could not have reasonably expected that the proceeds from their sales would be invested into the common enterprise without knowing from whom they were buying. *Id.* ("Whereas the Institutional Buyers reasonably expected that Ripple would use the capital it received from its sales to improve the

---

[9] Defendants reserve their views previously argued, including that an investment contract requires a contract. *See, e.g.*, BAM Memorandum of Law in Support of Defendants' Motion to Dismiss, 1:23-cv-01599, Dkt. 117 at *12-15 (D.D.C. Sept. 21, 2023); BAM Reply Memorandum of Law in Support of Defendants' Motion to Dismiss, 1:23-cv-01599, Dkt. 191 at *6-8 (D.D.C. Dec. 12, 2023); *see also Loper Bright*, 144 S. Ct. at 2266.

XRP ecosystem and thereby increase the price of XRP [ ], Programmatic Buyers could not reasonably expect the same… Ripple's Programmatic Sales were blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to Ripple, or any other seller of XRP."). *Ripple I* applied its pooling analysis to "the expectation of profits due to the efforts of others" element of an investment contract. *Id.*[10] In either case, the requirement is the same – funds must have been pooled and investors must have reasonably understood such pooling would occur.

The FAC entirely fails to establish this element. Whereas the Court allowed allegations regarding the BNB ICO to go forward even though they were "thin" on the pooling requirement for horizontal commonality (Opinion at 29), no such allegation of pooling exists for transactions on BAM's platform regarding the At-Issue Tokens. One searches the much-lengthened FAC in vain for any factual allegation that a purchaser on BAM's platform would have his funds end up in the hands of the issuer of the digital asset.[11] The SEC does allege generally that issuers would sometimes engage "market makers" to support liquidity on BAM but only as a required service – not a way to make money, let alone make money that would be invested into the alleged common enterprise. FAC ¶¶ 338, 462-490.[12]. The SEC does not allege that any purchaser on BAM knew

---

[10] In *Ripple II*, the court noted that its conclusion that the SEC had failed to meet its burden was based on its assessment of the totality of the circumstances. *SEC v. Ripple Labs, Inc*. 682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023) ("*Ripple Labs II*"). But the court did not alter the test it applied – whether purchasers reasonably expected that the proceeds from their sales would be invested into the common enterprise.

[11] Although the SEC makes a conclusory allegation that some of the "issuers" of the Ten Crypto Assets sold them on Binance.com, those allegations are not applicable to BAM. FAC ¶¶ 467-468.

[12] The only specific allegation is that Sigma Chain, a company with common ownership as Binance but not a subsidiary, would engage in market making on BAM. FAC ¶¶ 186-193. A market maker is a firm that stands ready to buy or sell a stock at publicly quoted prices. *See* Ex. 2 (BAM Trading Rules). The SEC does not allege that Sigma Chain sold more BNB than it bought or raised profits that it then transferred to Binance for investment in the common enterprise. FAC ¶ 338. Despite numerous detailed claims about how Sigma Chain transferred money, the SEC never alleges Sigma

from whom they were buying, let alone reasonably believed their purchases would be pooled into a common enterprise. The SEC has failed in its two opportunities to sufficiently allege pooling into a common enterprise.

**B.    The Court Should Reject the SEC's Latest Attempt to Bring Commodities Transactions under the Securities Laws by Ignoring or Replacing the "Pooling" Requirement.**

Pooling of funds is a "critical aspect of analysis" in part because the economic reality of a transaction whose pooled assets are used by an enterprise is far different from an enterprise that never receives the benefit of the additional funds to deploy as it sees fit. *See* Opinion at 29. Lacking this key element that the Court emphasized in the original opinion, the SEC makes several arguments that fail to fill the breach.

**1.    Economic Interdependence Does Not Establish Pooling.**

The SEC first attempts to replace the requirement of pooling with one of "economic interdependence," meaning purchasers' "economic fortunes will be affected equally." SEC Brief at 15. But this simply is another way to describe "shared profits and losses," which *Life Partners I* requires as an element separate and apart from pooling. 87 F.3d at 543. The SEC conflates its "economic interdependence" with the "interdependency" actually examined in *Life Partners I* – the requirement that the seller would use the funds of each investor together to make the common enterprise work, whether or not the funds were explicitly pooled into the same account. *Life Partners I*, 87 F.3d at 544 ("[I]f LPI must have investors ready to buy some minimum percentage of the policy before the transaction will occur, then the investment is contingent upon a pooling of capital.").

---

Chain transferred money to Binance or that Binance used proceeds from Sigma Chain to create profits for holders of BNB. *See, e.g.*, FAC ¶¶ 186-193.

Interdependency as examined in *Life Partners I* means that the combined buying power of the investors' funds are needed for the profitability of the common enterprise. *Id.* The same was true in *Banner Fund*, where the court found pooling despite individual investor funds being held in separate accounts because "[t]he very premise upon which Swiss Trade marketed the program was that Banner Fund would combine funds from small investors so that they could participate in deals requiring large capital outlays." 211 F.3d at 615. As the court in *SEC v. Kik Interactive, Inc.* wrote, *Howey* is meant to adapt to the "variable schemes devised by those who seek the *use* of the money of others on the promise of profits." 492 F. Supp. 3d 169, 177 (D. Conn. 2020) (emphasis added). *Kik Interactive* found that "[t]he economic reality" of the transactions in question displayed horizontal commonality because the defendant "pooled proceeds from its sales of [the token] Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment." 492 F. Supp. 3d at 179.

If the investors' funds never reach the enterprise, then the proceeds cannot be combined with others and cannot boost the value of the enterprise. There is no interdependence and thus no pooling. *SEC v. Ripple Labs*, 682 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2023) ("*Ripple Labs I*"). The economic reality when funds are pooled and used to build infrastructure or otherwise develop the enterprise is materially different from when a buyer acquires an asset in exchange for funds that do not support the enterprise. That is why, as this Court has already recognized, the pooling of funds is a "critical aspect of analysis," an aspect that is ***entirely missing*** here. Opinion at 29. This by itself is fatal to the SEC's Amended Complaint.

### 2.     Pooling by Primary Purchasers Does Not Establish Pooling by Secondary Purchasers.

The SEC asks this Court to ignore the pooling requirement for secondary investors so long as funds from the primary investors were pooled together. The SEC's argument is inconsistent with *Howey* and simply reframes the embodiment theory this Court has already rejected.

The SEC cites *SEC v. Terraform Labs PTE, Ltd*., 684 F. Supp. 3d 170, 193 (S.D.N.Y. 2023) ("*Terraform I*") and a series of cases[13] that rely on *Terraform I* for the proposition that "investors who purchased BNB on the Binance Platforms bought into and replaced the sellers within the common enterprise with no change to the economic realities." SEC Brief at 16-18. The parties already briefed this very contention and this Court already rejected it – determining that primary and secondary sales must be analyzed separately, following the approach in *Ripple Labs I*. Opinion at 37-44; *see also SEC v. Payward, Inc., et al.*, 23-cv-06003-WHO at *18 n.8 (N.D. Cal. August 23, 2024) ("*Kraken*") (contrasting the approach taken by this Court and *Ripple Labs I* with

---

[13] The SEC cites to *Terraform I*, 684 F. Supp. 3d at 197; *Coinbase*, 2024 WL 1304037 at *21 ( (relying on *Terraform I*); *In re Ripple Labs.*, 2024 WL 3074379, at *7 (N.D. Cal. June 20, 2024) (relying on *Terraform I*); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 711 (N.D. Cal. 2024) (relying on *Terraform I*)). The other cases cited by the SEC do not support its position. *See In re BitConnect Sec. Litig.*, 2019 WL 9104318, at *8 (S.D. Fla. Aug. 23, 2019) (analyzing vertical commonality without discussing "pooling" at all); *Hocking v. Dubois*, 885 F.2d 1449 at 1459 (9th Cir. 1989) (finding pooling of the assets invested by the secondary market participants *was* required and occurred because the real estate was pooled into the common enterprise of the rental pool arrangement being offered); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 234-235 (2d Cir. 1985) (not discussing pooling of secondary sales but finding pooling occurred because investor funds in fact went to the parties from whom plaintiffs expected the efforts for their profits, Merrill Lynch and third party banks); *SEC v. Telegram*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020) (not discussing pooling of secondary sales but finding horizontal commonality because funds from the initial purchasers in two rounds were pooled together to develop the blockchain and associated programs). And none of these cases were in this Circuit and so were not subject to the elements that the D.C. Circuit established in *Life Partners I* and confirmed in *Banner Fund* – that an investment contract requires a pooling of funds for there to be horizontal commonality.

the approach in *Terraform I* and agreeing with this Court's conclusion that primary and secondary sales should be treated differently).

The SEC has expressly disavowed that there is any privity between primary and secondary purchasers. SEC MTD Opposition at 20-28; *see also* Opinion at 15-18. Yet now, the SEC essentially argues that the At-Issue Token transactions should be treated like an assignable contract – when the rights and benefits are assigned to a new party, the offers and promises from the original seller flow to the new buyer. SEC Brief at 13, 24. The SEC cannot have it both ways. For example, with COTI, the original investors acquired the tokens in 2019 through a "Purchase Agreement" that included stating what the funds would be used for and requiring a lockup period. FAC ¶¶ 749, 751. Secondary purchasers did not enter into any purchase agreements, and no rights of the 2019 Purchase Agreements were transferred to the secondary purchasers when they simply bought the asset, COTI, via anonymous trades on BAM more than three years later. FAC ¶ 753. The promises to the original purchaser of an investment contract ***do not flow*** to a new purchaser when the original purchaser merely sells the underlying asset.

This Court recognized the distinction between primary and secondary sales already. *See* Opinion at 19-21 (distinguishing between the coins themselves and offers to sell them); *id.* at 37-43 (discussing secondary sales). Indeed, the purchasers in the initial or primary coin offerings sometimes do not purchase just the crypto asset – they may enter into purchase agreements, lockup periods, and often are just purchasing the right to future delivery of tokens. *E.g.*, FAC ¶¶ 522-525 (SOL); FAC ¶¶ 586-591 (FIL). The original purchases may be based on the promise of the sellers to use the funds to develop the blockchain. *Id.* But on the secondary market for the At-Issue Tokens, the SEC alleges nothing more than the purchase and sale of the crypto asset itself – the transactions are between anonymous parties and nothing else is transferred.

The SEC disingenuously argues that *Howey* cannot require pooling for secondary sales because then secondary sales could never be part of investment contracts, somehow undermining the Exchange Act. SEC Brief at 16-17. This betrays a fundamental misunderstanding of the nature of secondary market transactions, particularly transactions that are common in the commodities markets subject to CFTC enforcement jurisdiction. Investment contracts can, of course, be sold in the secondary market, but the SEC has not alleged that happened here. As discussed, this would be true when the purchaser was in privity with the original seller. Crypto assets also can be designed to provide a payment to the original creator of a token every time the token is sold in the secondary market.[14] It is just that none of the At-Issue Tokens include this feature.

The SEC claims that "Defendants have cited no case for the proposition that who an investor bought the asset from affects the common enterprise analysis." SEC Brief at 17. *Life Partners I*, however, makes that very point by requiring the pooling of the investors' funds. 87 F.3d at 542. The *Ripple I* court similarly distinguished between primary and secondary sales, finding that secondary purchasers needed to reasonably have believed that such pooling would occur. *Ripple I*, 682 F. Supp. 3d at 328. This Court, following *Ripple I*, similarly concluded that distinctions between purchasers in the primary and secondary sales context impact the common enterprise analysis and should be analyzed on a case-by-case basis. Opinion at 37-38.

Finally, the Court should reject the SEC's odd claim that investor funds from *all* anonymous secondary trades should be treated as if they reached the issuers because issuers sometimes made subsequent sales of tokens after their initial primary offerings or used market

---

[14] For example, many non-fungible tokens ("NFTs") are designed to automatically provide the creator of an NFT with a royalty payment every time the NFT is transferred between owners on the secondary market. *See, e.g.*, https://www.coinbase.com/learn/your-crypto/what-are-nft-royalties.

makers to promote liquidity. SEC Brief at 26-27. The SEC has failed to allege any funds from sales on BAM reached the issuers or third parties developing the common enterprise or that BAM customers could have had a reasonable expectation they would.

**C.    The SEC's "New" Theory Is the Same One This Court Rejected.**

This Court previously rejected the SEC's theory that the crypto asset itself is the security and remains a security "as it moves forward in commerce and is bought and sold by private individuals on any number of exchanges, and is used in any number of ways over an indefinite period of time." Opinion at 42-43. According to the Court, the SEC's proposed test "marks a departure from the *Howey* framework that leaves the Court, the industry, and future buyers and sellers with ***no clear differentiating principle*** between tokens in the marketplace that are securities and tokens that aren't." *Id.* (emphasis added). The SEC suggests it never made this argument before and then presents the same argument as a new theory. *SEC Brief* at 16-17; 23-25 (*but see* Opinion at 20). The new theory suffers from the same flaws as the first, and the SEC continues to fail to establish a clear differentiating principle.

The SEC claims that it never meant "crypto asset securities" to refer to the "crypto asset itself" but merely as a "shorthand" for being the subject of an investment contract. SEC Brief at 24 n. 6. In reality, the SEC still asserts that there are no circumstances under which the Tokens at Issue can be sold as commodities. The SEC still believes that the crypto asset is intertwined with the investment contract based primarily on how it was originally sold and continues to be so intertwined for an indefinite period. *Id.* at 13. The Amended Complaint is rife with allegations confirming that the SEC continuous to rely on this flawed theory. For example, the SEC repeatedly points to the original whitepapers and offers to the primary investors from issuers that remain posted on websites. SEC Brief at 28 (noting that "many of these initial statements are still widely available today"); FAC ¶ 492 ("Many of these statements are still widely available as of September

2024"). If the author of the whitepaper no longer posts it, that does not matter because the whitepaper still is "readily available" elsewhere on the web. FAC ¶ 300. Most of the "efforts of others" identified by the SEC are activities that occurred prior to or at the beginning of the launch of the token and its listing on secondary markets. *See, e.g.*, FAC ¶ 533 (SOL); FAC ¶ 556 (ADA); FAC ¶ 597-605) (FIL); FAC ¶ 634-35 (ATOM); SEC Brief at 28 (describing how a "critical part" of the initial promotional statements to primary investors was that the coins would be listed on a platform). BAM customers simply trade the asset itself, anonymously – buyers receive no assurance their funds will be invested in the ecosystem and any rights primary buyers may have (from a purchase agreement or otherwise) similarly do not transfer. Ex. 2 (BAM Trading Rules); FAC ¶¶ 158-165, 518. The SEC alleges that *every* post-ICO sale of the tokens at issue satisfies *Howey* regardless of why they were bought or sold and regardless of when the sale occurred. SEC Brief at 13 (BNB), 28 (Ten Crypto Assets); FAC ¶ 521.

### 1.    The SEC's Theory Has No Limiting Principle.

Just as before, the SEC's theory destroys the distinction between investment contracts (for which it does have authority) and investments in commodities (for which the CFTC, not the SEC, has authority). The SEC alleges its enforcement authority is necessary to ensure accuracy of statements made about crypto. FAC ¶ 513. But the CFTC can already prosecute any fraudulent conduct and material misstatements related to commodities, including crypto assets.[15] Similarly, the numerous state money transmitter laws under which BAM is registered also provide states with

---

[15] 7 U.S.C. § 9 (prohibiting fraud in sale of any commodity in interstate commerce); 17 C.F.R. § 180.1 (adopting regulation to prohibit fraud or "any untrue or misleading statement of a material fact" in sale of commodities); *see also id.* § 1.6 (adopting rules prohibiting willful evasion of CFTC authority).

the authority to require registration, require certain disclosures and police false statements. *See supra* n.1.

There is no limiting principle to the SEC's position on investment contracts. The FAC makes numerous allegations concerning the information BAM provides to customers about the At-Issue Tokens and alleges this is "amplifying" promotions of an investment contract and "akin" to how exchanges sell securities. *See*, *e.g.*, FAC ¶ 636. The "touting" activity the SEC alleges includes linking to copies of the whitepaper, listing detailed pricing information, linking to the website of the entity that created the blockchain or the non-profit setup to help manage the blockchain, and providing information about new developments on the blockchain. *See, e.g.*, FAC ¶¶ 272, 556. What the SEC fails to mention is that every allegation it makes about why the At-Issue Tokens were sold as securities is equally applicable to ETH – a crypto asset the SEC currently does not allege is sold as an investment contract when traded on the secondary market.[16]

BAM provides similar information about all the commodities it lists, both the At-Issue Tokens and those the SEC does not claim to be sold as part of investment contracts. For example, for ETH, BAM provides live and historical price information, details about the "Ethereum ecosystem", links to the ETH whitepaper and official website, and regular updates on recent news articles discussing (or in SEC parlance, "touting") ETH.[17] BAM tweets about ETH opportunities

---

[16] The SEC affirmed that ETH is not a security when sold on secondary markets on May 23, 2024, when it approved the listing and trading of spot ether ETPs under the rules for non-securities commodity-based trust shares. *See* Securities and Exchange Commission, Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, to List and Trade Shares of Ether-Based Exchange-Traded Products, Exchange Act Release No. 100224, 2024 WL 2746091 (May 23, 2024). *See also In the Matter of eToro USA LLC* (3-22106, September 12, 2024); https://www.sec.gov/newsroom/press-releases/2024-125 (SEC announcing a settlement with eToro, stating that it was "removing tokens offered as investment contracts from its platform" but would still sell Bitcoin, Bitcoin Cash, and ETH to US customers).

[17] *See* Ex. 4 (https://www.binance.us/price/ethereum).

and price movements.[18] The Ethereum website describes Ethereum as "the strongest ecosystem," touts the more than $100 billion worth of ETH locked in staking and encourages people to join the ecosystem.[19] But the SEC does not currently claim that ETH transactions are subject to the securities laws.

There is no principled way to distinguish how ETH is sold on BAM from how each of the At-Issue Tokens are sold on BAM. From the beginning of the case, the SEC has refused to distinguish what crypto assets it alleges were sold as securities on the BAM platform from which crypto assets were sold only as commodities.[20] The reason is because the SEC's proposed framework cannot distinguish between the two and still "leaves the Court, the industry, and future buyers and sellers with no clear differentiating principle between tokens in the marketplace that are securities and tokens that aren't." Opinion at 43. The SEC's test would have sales of all crypto assets (and many other commodities) treated as sales of securities in all contexts, so it must be rejected.

### 2. The SEC's Theory Still Encroaches on CFTC Jurisdiction.

Applying the SEC's theory improperly encroaches on the CFTC's jurisdiction. The CFTC's jurisdiction is strictly limited when commodities are sold as securities, and in the SEC's view the crypto assets at issue can only be sold as part of investment contracts and thus as securities.[21] If the SEC's theory is right, the CFTC should not be bringing enforcement actions

---

[18] *See* https://x.com/BinanceUS/status/1656780218286350336.

[19] *See* https://ethereum.org/en/.

[20] *See, e.g.*, Temporary Restraining Order Hearing Transcript, Dkt. 69 at 11:18 – 12:25 (SEC answering questions about whether tokens other than the At-Issue tokens are commodities or securities and stating, "We are not taking a position at this time.").

[21] 7 U.S.C. § 2(a)(1)(H) (specifically excluding "any security" from the CFTC's expanded jurisdiction under the Dodd-Frank Wall Street Reform and Consumer Protection Act).

over fraud or material misstatements in the sale of crypto assets and cannot be "a premier enforcement agency in the digital asset space" as it claims. *Supra* n.1.

The encroachment does not stop there. Other intangible commodities regulated by the CFTC would be swallowed by the SEC's expansive interpretation of "investment contract." For example, under the SEC's theory, transactions in VCCs should be deemed securities transactions, but the SEC and CFTC have not proceeded that way. VCCs are an example of an environmental commodity, "a tradeable intangible instrument that is issued by a carbon crediting program."[22] Just like crypto assets, VCCs are not physical commodities – they are a representation of a reduction of carbon in the atmosphere from a particular project or "ecosystem." *Id.* VCCs "are not at all like oranges, diamonds, or oil in any way that is dispositive in a securities analysis" and, just like a crypto asset, "does nothing on its own." SEC MTD Opposition at 27-28.

VCCs have identified parties advancing the enterprise. "The issuance of VCCs typically involve three categories of participants: (1) the developer (e.g., the Carbon Project Developer) of a mitigation project or activity that is intended to reduce or remove greenhouse gas emissions from the atmosphere ("project developer"); (2) a crediting program (e.g., the Carbon Credit Registry) that, among other things, issues VCCs for mitigation projects or activities that satisfy the crediting program's standards; and (3) third-party VVBs that validate and verify the mitigation project or activity." *Steele* at 3. In SEC parlance, these are the "third parties" on whom investors will depend for profits.

An original purchaser of a VCC invests funds into the particular project or ecosystem that is pooled with the proceeds from other investors to develop the ecosystem and create reductions

---

[22] *In the Matter of Jason Steele*, CFTC 24-36 ("Steele") (September 30, 2024) at 3-5 (available at https://www.cftc.gov/media/11381/enfjasonsteeleorder093024/download).

in carbon emissions (such as retrofitting coal power plants).[23] *See, e.g.*, *Newcombe Indictment* ¶ 25. In SEC parlance, these are a "common enterprise" to develop the "ecosystem" in which the value of the VCC is created by the efforts of others. *Id.* ¶ 7 (explaining that "[t]he value of a [carbon] credit . . . depends . . . on how market participants view the quality and integrity of the process used to issue the credit").

Although VCCs have a use (offsetting one's carbon emissions), purchasers are encouraged to treat them as an investment and the price may rise over time based on the efforts of the project developer, crediting program and verifiers. For example, platforms and other secondary markets have been set up to buy and sell VCCs.[24] "Market participants that are purchasing VCCs to help meet their carbon mitigation goals may be focused largely or primarily on price . . . ."[25] Purchasers of VCCs "hope to achieve a return through their subsequent resale at a higher price."[26]

Just like BAM does for the At-Issue Tokens, VCC Registries "publicly report key information … concerning the supply and project specifications of VCCs, thereby assisting market participants in making informed evaluations and comparisons of VCC supply and quality" and platforms tout the investment opportunities of different products and recent price movements.[27]

---

[23] *United States v. Newcombe*, No. 24 Cr. 567 (JSR) (S.D.N.Y. Sept. 30, 2024) ("Newcombe Indictment").

[24] *See CFTC, Commission Guidance Regarding the Listing of Voluntary Carbon Credit Derivative Contracts* (Sept. 19, 2024) (pre-publication version), FN 42. (available at https://www.cftc.gov/media/11301/FederalRegister092024_VCCDerivativesGuidance/download ).

[25] *Id.* at 13.

[26] Int'l Org. of Sec. Comm'ns, Voluntary Carbon Markets: Consultation Report (2023) at 21 (available at https://www.iosco.org/library/pubdocs /pdf/IOSCOPD749.pdf).

[27] *See, e.g., One Swallow doesn't make a Summer & Bull Markets don't last forever.* May 9, 2021 Wayne Sharpe, posted on Carbon TradeXchange ("With HUGE buyer interest in the market, we have seen a massive run on lower priced credits (under US$2/tonne), which has seen prices driven

*Steele* at 4; *see also Newcombe Indictment* ¶ 9 (noting that a Carbon Project Developer submits a "project proposal" (similar to a whitepaper) to a VCC Registry, which publishes it online). In the SEC's parlance, developers of VCCs have "explicitly invoked the language and appearance of the traditional securities markets" with things like brokers, providing pricing information to customers and encouraging investment.[28] *See, e.g.*, SEC Brief at 2, 31; FAC ¶¶ 87-89; 227-313.

Given the remarkable similarities between the VCC market and crypto assets markets, one would expect the SEC to treat VCCs the same way – as investment contracts. They do not. The SEC and CFTC recently worked cooperatively in bringing related cases involving fraud in the VCC market. The SEC brought charges alleging fraud in ***an equity offering*** but did not pursue fraud or registration charges related to ***the trading of the VCCs***.[29] The CFTC charged Steele and others with violation of 7 U.S.C. §§ 9, 13(a)(2), authority granted to the CFTC in Dodd-Frank that excludes the CFTC authority over securities. *Steele* at 3. The CFTC has also issued detailed guidance to market participants about the VCC market.[30]

What does this example show? That the SEC has a special rule for crypto assets (first designated as "crypto asset securities" and now under their refashioned theory) that it does not apply elsewhere. That is because the SEC's theory here is not consistent with *Howey* or the

---

up and inventory being snapped up at rates that we have NEVER seen before.") (available at https://ctxglobal.com/one-swallow-doesnt-make-a-summer-bull-markets-dont-last-forever/).

[28] The SEC ignores that *securities* markets are not the only markets and that the "language and appearance of the traditional securities markets" is also the "language and appearance of" markets generally, including commodities and derivatives markets under CFTC jurisdiction.

[29] *See* Press Release No. 8994-24, *CFTC Charges Former CEO of Carbon Credit Project Developer with Fraud Involving Voluntary Carbon Credits*, Commodities Futures Trading Commission (Oct. 2, 2024), https://www.cftc.gov/PressRoom/PressReleases/8994-24; *In the Matter of CQC Impact Investors LLC*, 3-22224 available at https://www.sec.gov/files/litigation/admin/2024/33-11315.pdf.

[30] *See CFTC, Commission Guidance Regarding the Listing of Voluntary Carbon Credit Derivative Contracts* (Sept. 19, 2024).

meaning of investment contract and so inappropriately infringes on the CFTC's authority. But whether the SEC chooses to use its enforcement authority has no bearing on whether the CFTC has jurisdiction. The SEC does not have the right to decide whether secondary sales of VCCs are sold as investment contracts any more than it can decide whether secondary sales of ETH are sold as investment contracts. The SEC claims for itself "critical regulatory oversight" over crypto assets, but Congress gave such authority to the CFTC. FAC ¶ 3; 7 U.S.C. § 9.

While the SEC offers no limiting principle to *Howey*, this Court already has. The Court should reject the *Howey* analysis urged by the SEC and instead analyze the totality of the circumstances and economic realities of each sale. Opinion at 29. Using this approach, the SEC's allegations again fail and the distinction between SEC and CFTC authority is preserved.

**D.      The SEC Cannot Rely on Vertical Commonality to Save Its Claims.**

Without horizontal commonality, the SEC is forced to argue for vertical commonality, a position that has never been adopted in this Circuit. This Court should not endorse the SEC's continuing venture to expand its jurisdiction at the expense of another federal agency. *Life Partners I, Life Partners II* and *Banner Fund* each adopted horizontal commonality. *Life Partners I*, 87 F.3d at 543; *SEC v. Life Partners*, 102 F.3d 587, 589 (D.C. Cir. 1996) ("*Life Partners II*"); *Banner Fund*, 211 F.3d at 614. No district court in this Circuit has adopted vertical commonality as sufficient and none since *Life Partners I* has applied it, let alone adopted it.[31]

---

[31] Prior to *Life Partners I*, courts in this district either rejected certain forms of vertical commonality or noted the minority view of vertical commonality and found they did not need to resolve whether vertical commonality was sufficient because the purported investment contract either met both vertical and horizontal commonality or neither. *Meredith v. Conticommodity Servs., Inc.*, No. 79-1282, 1980 WL 1465, at *4 (D.D.C. Nov. 24, 1980) (rejecting vertical commonality as expressed in the Fifth Circuit); *SEC v. Life Partners, Inc.*, 898 F. Supp. 14, 19 (D.D.C. 1995), *rev'd on other grounds*, 87 F.3d 536, 549 (D.C. Cir. 1996) ("[t]he Court need not decide which measure of commonality is appropriate because each type is present in the instant case")); *SEC v. Parkersburg Wireless LLC*, 991 F. Supp. 6, 8 (D.D.C. 1997) ("Although at least one judge in this district has held either horizontal or vertical commonality will suffice to establish

Vertical commonality has been expressly rejected in other circuits. In *Deckebach v. La Vida Charters, Inc. of Fla.*, the court rejected vertical commonality because eliminating pooling unreasonably expands *Howey* by essentially eliminating the "common interest" requirement, making it a two-part test rather than three-part test. 867 F.2d 278, 281 (6th Cir. 1989). In *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994), the Seventh Circuit similarly rejected vertical commonality as going beyond the limited statutory purpose of an investment contract. *See also Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 682 F.2d 459, 460 (3d Cir. 1982) (rejecting a claim that a commodity account could be an investment contract without a showing of pooling). This Court should not accept the SEC's urging to expand *Howey* and reject this Circuit's previous holdings that horizontal commonality requires "a pooling of investment funds, shared profits and shared losses", elements that the SEC cannot demonstrate here. *Banner Fund*, 211 F.3d at 614.

But even if this Court applied vertical commonality, the SEC's claims would still fail. The SEC has still not alleged an investment of money in a common enterprise. The SEC does not (and could not) allege that BAM's customers have strict vertical commonality with either BAM (who solely receives transaction fees) or the issuers of the crypto assets (whose fortunes could rise or fall independently of the prices of the assets they once issued for any number of reasons). And even if the SEC could establish an "investment of money in a common enterprise" through vertical

---

the second element of an 'investment contract,'…the Court finds that both horizontal and vertical commonality exist here") (internal citations omitted)); *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 690, 691-92 (D.D.C. 1991) (explaining that its approach following "a definition of commonality requiring some correlation between the profits and losses of individual investors and the fortunes of the investors as a group (horizontal commonality) or with the enterprise itself (vertical commonality)")), *aff'd* 968 F.2d 1304, 1307-08 (D.C. Cir. 1992). After *Life Partners I*, the court in *United States v. Bowdoin*, 770 F. Supp. 2d 142, 150 (D.D.C. 2011) applied horizontal commonality without discussing vertical commonality. This Court discussed both but only applied horizonal commonality. *See Order* at 22-23.

commonality, as discussed below, they have nevertheless failed to show that secondary purchasers on BAM were led to expect profits solely from the efforts of the promoter or a third party.

## II.    THE SEC FAILED TO PLEAD THE EXPECTATION OF PROFITS DUE TO THE EFFORTS OF OTHERS.

The Amended Complaint fails to allege that purchasers had a reasonable expectation of profits due predominantly to the efforts of others. Opinion at 25 (citing *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992)). The efforts of others must predominate in affecting the profits, must include post-purchase activities and "ministerial functions should receive a good deal less weight than entrepreneurial activities." *Id.* at 26 (quoting *Life Partners I*, 87 F.3d at 545–46 and *Life Partners II*, 102 F.3d at 588 (internal quotations omitted)). The expected profits must be in the form of a return on investment and not consumption. *Id.* at 26 (citing *Life Partners I*, 87 F.3d at 543; *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, at 853 (1975)). The Court must engage in an objective inquiry, "focusing on the promises and offers made to investors." *Id.* at 26 (quoting *Telegram*, 448 F. Supp. 3d at 371); *see, e.g.*, *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) (finding purchaser's mere hope that an asset will increase in value insufficient to satisfy this element). The SEC has failed to allege that promises were made to secondary purchasers, that investors could have had an expectation of sufficient post-sale activities, or that any expected profits from their purchases would result predominantly from the efforts of others. Thus, the secondary sales claims must be dismissed on this basis as well.

### A.    No Promises Were Made to Purchasers of Crypto Assets on BAM's Platform.

The SEC has failed to allege that the public statements set forth in the FAC include promises or offers to the secondary market purchasers. Statements in whitepapers and other materials provided to initial investors are not promises or offers to secondary traders. Promotional

statements of a "general nature" that are not accompanied by "actual commitments to perform specific services" are mere marketing puffery; they do not establish a reasonable expectation of profits. *Happy Inv. Grp. V. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975); *see also Timmreck v. Munn*, 433 F. Supp. 396, 403 n.4 (N.D. Ill. 1977) ("A court must distinguish between mere puffery, generalizations, and other talk designed to create an 'illusion' of extensive development plans, from cases where the real burden of development is not placed upon the purchasers"). Indeed, the vague statements cited in the FAC about the ecosystem or development of projects are materially different than the specific offers or promises that have been deemed to create a reasonable expectation of profits in other circumstances. *See, e.g.*, *United States v. Bowdoin*, 770 F. Supp. 2d 142 (D.D.C. 2011) (company promised to pay back 125% of the value paid to the company via rebates); *SEC v. Parkersburg Wireless Liab. Co.*, 991 F. Supp. 6 (D.D.C. 1997) (investors were told by promoters that they would receive a pro rata share of the revenues generated from the wireless cable operation). As the Court in *Ripple I* concluded, "Ripple did not make any promises or offers [to secondary purchasers] because Ripple did not know who was buying the XRP, and the purchasers did not know who was selling it." *Ripple I* at 329. Likewise, the FAC does not allege that any seller on BAM knew who was buying the crypto asset or that any buyer knew who was selling it. Statements about greater use cases for the tokens (consumption) are not promises of an investment opportunity. *See* Opinion at 26; *Life Partners I*, 87 F.3d at 543.

Even if the SEC had pled any specific promise or offer, it must plead that these offers actually reached a buyer. *Life Partners I*, 87 F.3d at 544; *Banner Fund*, 211 F.3d at 615; *Kik Interactive*, 492 F. Supp. At 177-79. Yet the FAC lacks allegations that even a single individual investor actually reviewed recent public statements, let alone relied on them to understand that by purchasing a specific token on a secondary market, she was buying an investment in an ecosystem

from which she could reasonably expect to receive profits based on the efforts of third parties described in those public statements. Instead, the SEC appears to claim that anything available on the Internet must have been considered by anyone who purchased tokens on the BAM platform. It is telling that the SEC does not attribute the actual source for any of the websites it quotes in the FAC. In at least two cases, the SEC attributes statements purportedly made as promotions to investors about "Buyback and Burn" that are from fake news articles.[32] Even those allegations that quote from actual statements by individuals involved with the tokens offer nothing to suggest they were viewed by buyers on BAM. Many of the Medium articles are from sites that have minimal followers.[33] There can be no reasonable inference that a statement made on a website viewed by a few hundred (or even tens of thousands) of people would have been considered by the

---

[32] Paragraph 740 alleges:

> Sky Mavis has at other times explicitly promoted an increase in the price of AXS through burning AXS. In announcing a "Buyback and Burn Promo Sale" in April 2023, the development team stated that "[w]hen AXS tokens are purchased from the buyback promo sales through the secondary market, AXS tokens are automatically burnt from the total supply which permanently reduces the number of AXS from circulation. This achieves a deflationary tokenomics model through the buyback promo program in order to boost liquidity, reduce volatility, and contribute to price appreciation."

The FAC does not allege to whom the development announced this promotion or where they obtained the statement. It comes from https://axieinifinity.medium.com/axie-infinity-buyback-burn-sales-program-c15a506f1a6b. *See* Ex. 6. This is a fake account. The actual Axie Infinity Medium page is https://axieinifinity.medium.com/. There is an errant "i" in "axieinifinity." https://axieinifinity.medium.com has a single post (the fake post about the buyback and burn that never happened) and has 0 followers. Axie Infinity has never announced a burn or buyback program for AXS.

The FAC makes the same false allegation with respect to SAND (¶ 655), again taking a quote from another fake medium post, https://sand-burn.medium.com/sandbox-buyback-and-burn-sales-program-20a579d5dc09. Ex. 7. https://sand-burn.medium.com has zero followers and only lists the one fake article. The official Sandbox Medium page is https://medium.com/sandbox-game.

[33] For example, COTI's medium page has less than 7000 followers and the posts identified have a few dozen likes. According to the FAC, hundreds of thousands or millions of COTI coins were sold per day. FAC ¶ 277; COTI, BAM (last accessed Oct. 18. 2024) https://www.binance.us/price/coti (showing a daily volume of $7.85 Million).

numerous users on BAM and thus something a reasonable purchaser would have relied upon before transacting in a particular token. The Court need not accept vague assertions that statements were made or that files exist on the Internet as well-pleaded allegations that purchasers reasonably relied on those statements.

The SEC is simply rehashing its embodiment theory – the promises and offers made to the primary purchasers somehow travel with the crypto token through subsequent purchases and are thus attributable to new buyers. But the crypto assets sold on BAM are just the assets themselves – sales from unknown sellers to unknown buyers. Indeed, primary purchasers may sign purchase agreements, have lock-up periods, purchase only the right to receive tokens in the future, or purchase based on a promise and expectation that their funds would be pooled together to invest in the common enterprise. *See, e.g.*, FAC ¶¶ 454, 525. The FAC does not allege that any secondary market purchasers encountered any such agreements or promises when transacting on BAM's platform.

Without allegations that many, some, or even one investor on BAM's platform encountered the statements upon which the SEC relies, the SEC has not plausibly alleged that such statements created an expectation of profits from others' efforts. *See, e.g.*, *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013) (extra-contractual representations that were not made to the purchasers before the sale were "irrelevant" and failed to state a claim). The SEC's implication that *every single sale* was necessarily the sale of an investment contract because promotional materials (often from years earlier) were available online is insufficient to state a claim under the Exchange Act.

### B.    The SEC Failed to Allege Sufficient Post-Sale Activities.

Secondary sales must be analyzed differently from primary sales in this Circuit because of the need for post-sale activities. Allegations about statements and conduct prior to listing on BAM

have limited value in assessing whether purchasers reasonably expected to profit from the efforts of others. *Life Partners I* at 543, 549; *Banner Fund* at 606, 615. In analyzing the allegations as to each crypto asset, the Court must consider what constitutes pre- and post-sale activities for each sale. As shown in the below chart, each of the At-Issue Tokens was offered in a primary sale before (often years before) being listed on BAM. *See* Ex. 1 (chart depicted below). Allegations for any conduct post-sale are absent or woefully insufficient, so the secondary trading claims must be dismissed.



**BAM Generally Listed the At-Issue Tokens for Trading Years After Initial Sales**

**C.    The SEC Failed to Allege Expectations of Profits Resulted Predominantly from the Efforts of Others.**

At the motion to dismiss stage, the SEC must include well-pleaded facts that the post-purchase efforts of the promoters of the crypto asset will predominantly determine whether the crypto asset is profitable. *Life Partners I*, 87 F.3d at 545–46; *Life Partners II*, 102 F.3d at 588 (internal quotations omitted). In *Life Partners I*, the court looked at what would actually affect the value of the life insurance policies (how long the individual lived), not just what was said by promoters. *Life Partners I*, 87 F.3d at 546-47. Yet the SEC has not alleged (even once) that the value of the crypto assets depended at all on any of the third-party activities it alleges were promised. Instead, the FAC simply includes identical allegations for each of the At-Issue Tokens that (i) the assets' promoters publicly disseminated information that led ***all purchasers*** to view their assets "as an investment" and to "reasonably expect to profit from" the promoters' efforts, and (ii) BAM was "an integral part of the markets" for the assets and "fill[ed] these markets with information republishing and amplifying the issuer and promoter statements and activity promoting [the asset] as an investment." *See, e.g.*, FAC ¶¶ 492-513, 536, 541. These are "legal conclusions cast as factual allegations," and the Court need not accept them as true because they are unsupported by the facts alleged. *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018).

Purchasers of crypto assets might expect *pre*-purchase efforts to affect the price of the crypto asset – like the technology itself and getting the token listed on a platform for secondary trading. But the SEC offers no plausible factual allegations that anything other than pre-purchase efforts or the general market for crypto currencies would predominantly affect the price. More detailed allegations regarding *post*-purchase efforts are required to sufficiently plead the existence of an investment contract. *See Noa v. Key Futures, Inc.*, 638 F.2d 77 (1980) (finding silver was

not an investment contract because even though various services were promised and promoted, "[o]nce the purchase of silver bars was made, the profits to the investor depended upon the fluctuations in the silver market, not the managerial efforts of Key Futures"); *see also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) (finding Howey's third prong not met "if the realization of profits depends significantly on the post-investment operations of market forces" beyond the control of the promoter). Post-launch and after the coin is already listed on an platform (a necessary condition for any secondary sales on such a platform), there must be a reasonable basis for investors to believe that profitability will depend on some future efforts. *See Telegram I*, 448 F. Supp. 3d at 370 ("profit was entirely dependent on the successful launch of the TON blockchain"). None is offered. The SEC has failed to allege the expectation of profits due to the efforts of others in any secondary sales and the claims must be dismissed.

## III.    INDIVIDUAL ALLEGATIONS AS TO EACH CRYPTO ASSET FAIL.

The SEC has offered little more than thin allegations that the original issuers offered the At-Issue-Tokens as part of investment contracts. But these allegations are totally insufficient with respect to sales on BAM, months or years later. The vast majority of the allegations pre-date the tokens' listing on BAM. *See* Ex. 1. For each At-Issue-Token, the FAC alleges that BAM announced when they were available on its platform, provided general information about the assets on its website (such as when they were created and how they can be used), and posted links to the relevant network's website and whitepaper (often without describing the contents of those materials). The FAC's remaining post-sale allegations consist of snippets – generally taken out of context – from isolated tweets, press releases, and other Internet materials without alleging that anyone reviewed them. In addition to reasons set forth above, the FAC fails to allege for the At-Issue Tokens either an investment of money in a common enterprise or an expectation of profits due to the efforts of others at the time of sale on BAM's platform.

A.    SOL

SOL is the native token of the Solana blockchain, created in 2018 with a series of primary sales between 2018 and March 2020 that offered purchasers the right to receive tokens in the future and a promise that funds raised would be used to develop the blockchain. FAC ¶¶ 522-525. Solana Labs conducted a subsequent primary sale in August 2021 and required purchasers to sign a purchase agreement and promised that funds would be used to hire engineers and develop applications on the Solana network, among other things. FAC ¶¶ 525-527.

SOL was listed on BAM in September 2020. The FAC alleges that several announcements were made when SOL was listed on BAM. FAC ¶¶ 544, 546. The SEC then mischaracterizes these announcements as offering "an opportunity to increase the value of SOL," but that is not actually what they say. FAC ¶ 533. The actual announcement only states that "the community's hard work has driven significant value." *Id.* This description applies to past (not future) behavior and, even then, attributes the increase to the decentralized community that contributes to Solana, not Solana Labs or the Solana Foundation. *Id.* This cannot establish a common enterprise.

The announcement then talks about sharing "more of the genuinely great projects currently underway" – not a promise of investment opportunity but, if anything, a use case. *Id.* There are no allegations that anything BAM stated online conveyed any expectation that Solana would undertake efforts to generate profits for SOL purchasers. The information that BAM posted about Solana (and the other At-Issue Tokens) – background information about the asset and ecosystem and links to the ecosystem's website and whitepaper – is the exact information that BAM provides to its customers about Bitcoin and Ether, crypto assets that the SEC has determined are not securities when sold on the secondary market. *See supra* at 5 n. 9; Exs. 5 (BAM Bitcoin page) and 4 (BAM ETH page).

The only other statements that post-date trading of SOL on BAM either concern SOL's primary sales or have no relevance to whether SOL was offered as an investment contract on BAM's platform. The FAC selectively quoted from a June 2021 press release announcing that Solana planned to use "investor funds" from a "sale of SOL" to, among other things, "help grow [Solana's] developer ecosystem." FAC ¶ 527. But the "investors" were individuals and entities who had already purchased SOL directly from Solana through "a private token sale" that "was only made available to off-shore investors." Ex. 8 (June 9, 2021 Solana Press Release). The SEC attempted to obfuscate this point by twice deleting the word "private" before "sale of SOL" even though the SEC described it as a "private sale" in the original Complaint. Dkt. 273-3, FAC ¶¶ 525, 527 (Redline Complaint). Whether these private sales were part of an investment contract, the secondary sales on BAM were not.

The FAC also claims that Solana undertook "promotional efforts" to increase demand for SOL. FAC ¶ 539. But the only facts alleged are that Solana discussed its technical capabilities and the network's potential – not that it tied this to future value or as an investment opportunity. *Id.* The SEC alleges Solana "burns" SOL tokens as part of a "deflationary model," but these allegations do not plausibly imply expectations of profits for investors. FAC ¶ 540. The FAC pled that Solana burned SOL to "maintain" (not increase) its price. *Id.* And the actual announcement by Solana about its burn mechanism explains the reason is to "sustain the network's security" because "burnt fees . . . help prevent malicious validators from censoring transactions." Ex. 9 (Fees on Solana page).

### B.    ADA

ADA is the native token of the Cardano blockchain, created in 2015, with primary sales between 2015-2017. FAC ¶ 547. ADA did not begin trading on BAM until four years after its creation, in September 2019. FAC ¶ 552. The FAC's allegations for ADA on BAM's platform

focus principally on a single BAM blog post. FAC ¶ 559.[34] The post does not state that ADA is being sold "as an investment," as the FAC alleges. *Id.* But even if it did, it does not convey it as an "investment contract." It simply encourages customers to "make a plan" before buying ADA and to "research the market" as to what might "cause a price to rise or fall." *Id.* This is the same type of information BAM provides in connection with every commodity that trades on its platform, such as BTC or ETH.[35] It certainly does not establish an expectation of profits from others.

Otherwise, the FAC alleges that entities responsible for Cardano posted information on their website (to an unknown audience) or were discussed in news articles (with limited readership) about how they would continue the improve the Cardano network – again, with no allegation that this was tied to the profitability of the token or was a basis for an investment. FAC ¶ 556. These statements do not include promises to undertake any activity on behalf of anyone, they are not directed to secondary market purchasers, they do not mention secondary market transactions involving ADA and merely reflect a plan to grow the Cardano network.

## C.    MATIC

MATIC is the native token of the Polygon blockchain, created in 2017 with primary sales beginning in 2018. It was not listed on BAM until June 2020. FAC ¶¶ 562-572. The FAC highlights a BAM blog post from March 2021 in which one of Polygon's founders, Sandeep Nailwal, answered questions about MATIC. FAC ¶ 581. The SEC mischaracterizes the article as suggesting the value of MATIC would increase over time. But that is not what Nailwal said. *See* Ex. 10. Nailwal said that holders of MATIC could earn rewards by taking actions themselves and earning

---

[34] BAM's blog post is dated July 15, 2024, and, thus, has no relevance to assessing whether ADA was offered as an investment contract on BAM's platform prior to that date.

[35] *See, e.g.,* "What is Ethereum: Everything You Should Know," Blog Post, BAM (March 17, 2023), https://blog.binance.us/what-is-ethereum/ (repeatedly recommending that customers research the crypto market before making decisions regarding purchases of ETH).

fees as a "validator." *Id.* at 5. Although Nailwal suggested that the value of a Polygon token was likely to increase over time, when specifically asked "[w]hy should an investor or person put their own hard earned money into Polygon vs. other cryptos?," he responded, "[t]o clarify, Polygon is a utility token and is not an investment asset. The token is meant to provide access to the Polygon blockchain applications." *Id.* at 10. Polygon's founder was plainly describing the consumptive benefits of owning MATIC, not an opportunity for profit, and he disclaimed that MATIC should be viewed as an investment. Opinion at 26 (citing *Life Partners I*, 87 F.3d at 543 (consumption not basis of investment contract)). Otherwise, the SEC just alleges that BAM's website linked to Polygon's website and whitepaper. FAC ¶ 583.

The FAC claims that Polygon's founders "regularly encouraged MATIC purchasers to expect profits from Polygon's efforts," but then the FAC quotes from public statements that do not say that. Polygon said it was developing its network and that the network was succeeding, not that anyone should expect profits.[36] The only statement in which MATIC's price is mentioned is a tweet in which MATIC's founder said "***I never talk about token price***" and does not make any promise that Polygon will do anything to increase MATIC's price. FAC ¶ 575(a) (emphasis added).

Finally, the FAC alleged that since January 2022, Polygon has "marketed" that it "burns" MATIC tokens as a "deflationary effect," and then concludes this must mean that MATIC led purchasers to have a reasonable expectation of profit. FAC ¶ 578. However, Polygon's actual public statements reflect that the burning mechanism was imported from Ethereum, was automatic

---

[36] *See* FAC ¶ 575(b) ("[W]e are working around the clock on adoption and that's why we are currently the most adopted scaling infrastructure platform"); FAC ¶ 575(c) ("Polygon is top free project in the industry when it comes to fundamentals, when it comes to adoption, and when it comes to technology"); FAC ¶ 575(e) ("Polygon has grown exponentially"); *See also FAC* ¶ 576 (Polygon blog post titled "Accomplishments and Vibe Check after a Year of Building," which "described detailed changes to the network").

when transaction fees were paid, and that its purpose was to "allow users to better estimate costs," not generate profits. Ex. 11 (EIP-1559 Upgrades Are Going Live on Polygon Mainnet). Moreover, Polygon estimated that the "annualized burn would represent 0.27% of the total MATIC supply." *Id.* No reasonable investor could possibly infer an expectation of future profits based on an annual burn of 0.27%.

### D.    FIL

FIL is the native asset of the Filecoin network, a storage network designed in 2014 to allow holders of the tokens to utilize available storage space across a decentralized network of computers. FAC ¶¶ 584-585. The developers conducted a fundraising round in 2017 that did not involve the sale of FIL but rather the sale of an agreement for future delivery of tokens with a vesting period in exchange for a discounted price and a promise that funds would be used to develop the network. FAC ¶¶ 586-591, Ex. 12 (SEC registration form). FIL was not listed on BAM until four years later in June 2021. FAC ¶ 594. Secondary traders on BAM do not buy and sell what purchasers in 2017 bought – they anonymously trade the commodity FIL at a set price without any promises about how funds will be used, agreement for future delivery, vesting periods or discounts. *See* Ex. 2 (BAM Trading Rules explaining anonymous trading on BAM). For BAM, all the FAC alleges is that BAM once tweeted that FIL increased in value. FAC ¶ 614. As discussed, commodities markets regularly track and publicize which commodities performed better or worse over various time periods.[37] "Not every 'profit making opportunity' is an investment contract." *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *26 (D.D.C. June 28, 2024). In fact, BAM's webpage "All About Filecoin (FIL)," which the FAC references (¶ 614) describes FIL as "a

---

[37] *See, e.g.*, Ex. 14 (Top Commodity Gainers and Losers (babypips.com)).

decentralized storage network" and does not mention Protocol Labs or suggest in any way that anyone would undertake efforts to increase FIL's value. Ex. 12.

Outside of the original primary offering (that itself explained that funds would be used to create the file storage network, not increase profits[38]), the FAC alleges that Filecoin "implemented a process to burn FIL tokens," but not why Filecoin did so. FAC ¶ 607. Filecoin implemented a burn mechanism to deter denial-of-service attacks on the network – not to increase the value of FIL. *Id.*; Ex. 15 (technical specs for Filecoin explaining that rewards for miners can lead to denial-of-service attacks and so "[i]n order to overcome this situation, the Filecoin blockchain defines a BaseFee, which is burnt for every message").

### E.     ATOM

Atom is the native crypto asset of the Cosmos Hub, a blockchain developed in 2017 from donations (not investments) solicited in 2017. FAC ¶¶ 618-630. Atom was listed on BAM two years later, in October 2019. FAC ¶ 631. For BAM, the FAC simply alleges that BAM provided information on ATOM's performance that, as discussed, is the type of information provided by any commodities market. FAC ¶ 640. Otherwise, the FAC alleges that BAM posted ATOM's whitepaper and links to its site without pointing to any statements from those posts that would have led secondary market purchasers to reasonably expect profits from the efforts of others. *Id.*[39]

The FAC then selectively quotes from several public statements by ICF and on Cosmos's website, which the FAC contended led secondary market purchasers to reasonably expect profits.

---

[38] For example, the FAC alleged that investor funds from the primary sales would be used to build "a ***decentralized*** storage network", suggesting that future token holders should not rely on managerial efforts of Protocol Labs. FAC ¶¶ 598, 603-05 (emphasis added).

[39] The FAC's allegations about ATOM's ICO from years before its listing on BAM discuss using the initial investors' money to develop the Cosmos network – something that happened before the token was listed on BAM. *See* FAC ¶¶ 622-629 (alleging, for example, that Cosmos disclosed how investor funds were used (past tense) in 2019, prior to listing on BAM).

FAC ¶¶ 634-35. These statements simply describe the growth and potential of the Cosmos ecosystem and ICF's "expertise in developing blockchain networks" and do not plausibly allege a reasonable expectation of profits or reflect that ICF planned to do anything to increase ATOM's price in the future. FAC ¶¶ 634, 635(b), 635(e). Nor do the statements link ATOM's value to any efforts to develop the Cosmos ecosystem. *See* Opinion at 48. The only statement that even referenced ATOM described it as a "staking token," meaning it could be used by its holder to earn staking rewards, not from the efforts of others, but from the protocol itself. FAC ¶ 635(e); *see also id.* ¶ 621 (alleged that the Cosmos Whitepaper described ATOM as a "staking token" that "can also be used to pay for transaction fees to mitigate spam").

**F.  SAND**

SAND is a gaming token required to play videogames on Sandbox, a virtual gaming platform first released in 2012 and now run by TSB Gaming ("TSB"). FAC ¶¶ 641-42. An initial offering was held in 2019, a whitepaper was released in 2020, but SAND was not listed on BAM until October 2022. FAC ¶¶ 643-646. For BAM, the FAC merely alleges that SAND has been available on BAM's platform since October 2022 and that BAM posted information on its website about SAND, "including a pricing page." FAC ¶ 662. These allegations fall far short of pleading that SAND was offered as an investment contract through BAM. The only allegation for any time period even discussing that SAND's value might increase over time is from 2019 (three years before it was sold by BAM) and suggests that the value will rise based on the characteristics of the blockchain (scarcity) as opposed to the efforts of others. FAC ¶ 653 (TSB said a "feature" of SAND "is that it can accrue in value over time" because it is scarce). FAC ¶ 653. Finally, the FAC also alleged that TSB took steps to control the demand for SAND by announcing a burn and buyback program on the Medium website in July 2023. FAC ¶ 655. As explained above, however, this post was not made by TSB and is, in fact, fake. *See supra* n. 32.

### G.    MANA

MANA is another gaming token that can be used, among other things, to buy virtual property in Decentraland. FAC ¶¶ 663-64. Development started in 2015, an ICO was held in 2017, but it was not listed on BAM until August 2020. FAC ¶¶ 663, 666, 687. As to BAM, the FAC merely alleges that BAM provided the same general information about MANA that it provided for all the commodities for sale on its site and hosted an "Ask Me Anything" or "AMA" event with one of MANA's developers. FAC ¶¶ 687-690. The FAC also alleges that BAM gave away MANA to customers who "watched a short video and took a quiz about MANA." FAC ¶ 686. Notably missing are any allegations about the contents of the "project guide," "short video," "AMA event," or BAM's website, or anything else that supports a plausible inference that MANA was offered as an investment contract on BAM's platform. There are no allegations that those materials included statements about how purchasers could expect "profits" from MANA based on the efforts of others or even that MANA should be viewed as an investment, rather than an asset for consumption. In fact, BAM's website page about MANA, which the FAC references but does not describe, states that "[o]ne of the *main features* of the [Decentraland] platform is the ability to purchase land in its virtual reality & build on it," which users can only do by consuming MANA. Ex. 16 (emphasis added).

### H.    ALGO

ALGO is the native token of the decentralized Algorand blockchain in which a user's ability to influence the blockchain depends on the number of ALGO tokens they possess.[40] FAC ¶ 691. The Algorand Foundation first began to raise equity in February 2018, 18 months before

---

[40] In 2019, Gary Gensler publicly praised the founder of Algorand's blockchain and the blockchain's potential. *See* https://www.youtube.com/watch?v=2D3SbYzzJLc. This statement is still publicly available.

the token was listed on BAM. FAC ¶¶ 693, 707. Primary purchasers bought not just ALGO tokens but the right to return those tokens for 90% of the original purchase price during two refund windows. FAC ¶¶ 692-699. However, secondary purchases of ALGO only bought the ALGO token itself – not the rights and offers made to the original purchasers such as the right to a refund. FAC ¶¶ 696, 699.

As to BAM, the FAC alleged that BAM posted general information about ALGO on its website and conducted a "promotion . . . by tweeting trivia questions about ALGO that included information about how it works, its history, and founder." FAC ¶¶ 719-20, 722. There are no alleged statements involving BAM's platform reflecting ongoing obligations to deliver future value or even representations that ALGO should be viewed as an investment for profit. In fact, BAM's website described ALGO as a "medium of exchange and store of value," *i.e.*, a currency, which is how courts define bitcoin. *See, e.g.*, *United States v. Harmon*, No. 19 Cr. 395 (BAH), 2021 WL 1518344, at *5 (D.D.C. Apr. 16, 2021) ("Bitcoin is . . . a medium of exchange, method of payment, and store of value that falls under the definition of money.").

The SEC argues that Algorand Foundation and Algorand, Inc. publicly disseminated statements that led those who purchased ALGO on the secondary market to view it as an investment and to reasonably expect profits from the efforts of others. FAC ¶ 710. But the FAC's well-pleaded factual allegations do not support this conclusion. The post-ICO allegations focus on earning awards based on one's own efforts and agreeing to be a participant in the ecosystem – rather than relying on the efforts of others promising returns. *E.g.*, FAC ¶¶ 711-12 (describing "participation rewards" for holding ALGO in an online wallet and "governance rewards" when ALGO "holders vote on the future of Algorand"). The Algorand blockchain is decentralized and

controlled by the general holders of ALGO and not the creators of the blockchain who never control more than 49% of governance. FAC ¶ 703.

### I.    AXS

AXS is another gaming token, the native token of the Axie Infinity game ("Axie"), a decentralized blockchain game that allows players to interact in a virtual world using digital pets. FAC ¶ 723. Axie players can earn AXS by playing the game and can use AXS to make in-game purchases. FAC ¶ 724. AXS was launched in 2018 and initial fundraising occurred in 2020. FAC ¶¶ 723-746. AXS was listed on BAM three years later, on November 11, 2021. FAC ¶ 743.

The FAC alleges that BAM held an AMA with the Sky Mavis team and tweeted about it. FAC ¶ 744. The FAC does not allege anything about what was said at the AMA and certainly does not allege that Sky Mavis made any offers or promises to anyone purchasing AXS on BAM. The FAC alleges BAM's website posts information about AXS, including a project report about Axie and a pricing page. FAC ¶ 746. The FAC does allege that Sky Mavis "explicitly promoted an increase in the price of AXS through burning AXS." FAC ¶ 740. However, as discussed, the FAC based this claim on a posting from a scam website with a single subscriber pretending to be Axie Infinity. *See supra* n. 32.

### J.    COTI

COTI is the native token of the COTI ecosystem that provides a digital infrastructure for payment solutions. FAC ¶ 747. The COTI whitepaper was published in October 2018 and COTI stands for "currency of the internet." *Id.*; Ex. 17. As the name suggests, COTI is described as a currency, not an investment. *Id.* Primary sales to investors occurred in 2019 and included a "Purchase Agreement" that included stating what the funds would be used for and requiring a lockup period. FAC ¶¶ 749; 751 (describing purchase agreement); Ex. 18 (quoting from article describing lockup period). Secondary sales on BAM did not begin until three years later in April

2022 and secondary purchasers did not enter into any purchase agreements – any rights of the 2019 Purchase Agreements are not alleged to have transferred to the secondary purchasers. FAC ¶ 753.

The allegations as to BAM simply allege that BAM announced trading and posted general information about COTI on its website. FAC ¶¶ 773-775. BAM's announcement that COTI was available for trading did not even describe COTI as an investment, but as a token to be "used as a medium of exchange for payments between COTI users and their respective customers, for staking, and for paying transaction fees within the COTI ecosystem." FAC ¶ 769; Ex. 19.

The FAC then cites sporadic public statements by COTI representatives from either COTI's social media or Medium posts, without alleging that any purchasers on BAM ever saw these articles, let alone so many that a reasonable purchaser of COTI on BAM would have relied upon them. The statements themselves simply highlight that the COTI ecosystem reached certain milestones, was growing, and was supported by a high-quality team; no one promised it was this team that would increase the value of COTI in the future and certainly not based on any new purchases of COTI. *See, e.g.*, FAC ¶¶ 759-771. Publicly talking about a commodity's value or even its potential to increase in value does not transform the commodity into a security. The FAC needed to plead that there was a transaction "in which investors were urged to put their money in [the promoter's] hands so that they could share in the return that [the promoter] would generate through its managerial or entrepreneurial efforts." Opinion at 52. There are no such allegations here.

### K.    BNB

This Court previously found the allegations of the SEC's first complaint insufficient to allege that BNB was sold in the secondary market as part of a security. Opinion at 37-43. The FAC does not cure these deficiencies. BNB was launched in 2017 and sold to primary purchasers in 2017, two years before BAM existed. FAC ¶¶ 294, 340. BNB issued a whitepaper informing those

initial investors how the proceeds of the ICO would be used but did not make any promises or offers directed to secondary purchasers of BNB. FAC ¶¶ 302-304.

The incredibly sparse allegations as to what BAM did and what was available on BAM's website in no way indicate that secondary purchasers of BNB on BAM purchased it as part of an investment contract. The FAC alleged that BAM maintained a webpage about BNB with "BNB Price Information" (¶ 368) and tweeted about pricing information (¶ 399), just as it did with every commodity for sale on its site. Then the FAC alleges BAM tweeted about the use case for BNB – fee discounts available to customers who held BNB on BAM's platform. FAC ¶¶ 373, 399. These were invitations to *use* BNB – not to *invest* into it. Opinion at 36. The FAC's only other BAM-specific BNB allegation is that on July 29, 2021, a former BAM executive stated that "increasingly people are choosing to hold [BNB], rather than spend it for the discount because they found that the increased value of the token as the company grows, exceeds the financial value of the discounts" and, as a result, customers "want the company to succeed; their interests are aligned with that of the company." FAC ¶ 398. Contrary to the FAC's characterization, BAM's executive did not "promote[]" that people "should and were buying BNB as an investment in Binance." *Id.* He observed only that some unspecified number of those who previously bought BNB were now holding onto it because its value had increased. Observing that existing BNB holders' and the company's interests were aligned does not mean future BNB holders would reasonably expect profits from the company's efforts. In any case, the FAC does not allege the Forbes interview was shared with BAM customers or relied on by them.

Otherwise, the SEC points to general statements by Zhao or Binance, without alleging any BAM customers viewed such statements. For example, BNB changed its name to "Build and Build" (FAC ¶ 353), Binance announced that it still is a large holder of BNB (FAC ¶¶ 358-360,

362), and Binance discussed the benefits of holding BNB including the use of BNB (FAC ¶¶ 361, 366). As this Court previously noted, many of these statements support a finding of the consumption rather than investment benefits of holding or using BNB. Opinion at 30-31. No reasonable individual would objectively view Binance's statements as suggesting an expectation of profits from purchasing BNB on BAM's platform. None of these alleged statements were directed to secondary market purchasers, and many of them were made months or even years before BAM existed. *See, e.g.*, FAC ¶¶ 356, 381-89; *see Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) (explaining that the Court must consider the relevant circumstances "as of the time that the transaction took place"). To be sure, the FAC alleged several statements in which Binance or its executives stated that they will "grow" or promote the ecosystem and BNB and that they expected BNB's value to increase. *See, e.g.*, FAC ¶¶ 386, 388, 393, 395-96. But these statements do not reflect "actual commitments to perform specific services." *Happy Inv. Grp.*, 396 F. Supp. at 181. Even if they did, they would not establish a reasonable expectation of profits in the context of secondary purchases of BNB on BAM's platform.

The SEC alleges a burn program for BNB but does not allege it was discussed on BAM. FAC ¶¶ 374-379. This Court already considered that allegation and found it did not support a finding that secondary sales were part of an investment contract. Opinion at 30, 43. In any case, the SEC alleges that the burn program was announced prior to the formation of BAM, Zhao promised that 50% of BNB would be burned over time and such promises were directed to the initial primary purchasers of BNB. FAC ¶¶ 374-378. There may be a plausible inference that initial purchasers of BNB viewed the facts that Binance created only 200 million BNB (with the supply to increase) and that Binance would burn 50% of that total over time as likely to increase the value of their investment. FAC ¶¶ 301, 304. However, any economic benefit of this was priced in from

the beginning, so future buyers of BNB would not have believed this would lead to future profits. FAC ¶¶ 374-375. The process of actually burning the tokens – pressing a few buttons on a keyboard to divert tokens into an inaccessible account – could only be considered ministerial efforts. *See Life Partners I*, 87 F.3d at 546-46. Had BNB announced a new plan to burn *more* than the 50% previously promised, then perhaps purchasers could have reasonably expected profits in the future. No such allegation is made here.

**L.**     **The SEC Failed to Allege Secondary Sales Here Constituted Investment Contracts.**

As discussed for each token, the SEC has failed to allege any secondary sale of a token was sold as an investment contract. This is not to say that secondary market transactions of the At-Issue Tokens or other crypto assets could never be part of an investment contract. *Howey*'s test looks to the "economic reality" of each specific transaction and the promises and offers made. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 398 (1946). A trading platform *could* provide specific assurances to its users that a purchase of a token was a great investment and that the funds used would be pooled and used in a common enterprise by third parties from whose future efforts profits would flow. But the term investment contract does not encompass transactions as attenuated as those pled in the FAC, where the only apparent relationship between the secondary market purchaser and the asset's creator is general public statements promoting the ecosystem and the potential for the asset's value to improve. Thus, the SEC's secondary trading claims fail.

**IV.   THE SEC FAILS TO STATE REGISTRATION CLAIMS AGAINST BAM.**

The Court previously determined that the SEC sufficiently alleged that BAM offered its Staking Program as an investment contract. Opinion at 56. This allows Count Four to proceed (the unregistered offer and sale of its Staking Program in violation of Sections 5(a) and 5(c) of the Securities Act). However, the Staking Program alone cannot form the basis of a violation of Counts

Eight, Nine and Ten (the "Exchange Act Claims") because the SEC does not allege that BAM "effect[s] any transaction" in its Staking Program on the BAM platform.[41] Instead, the FAC alleges only that BAM's Staking Program constituted an unregistered offer and sale of securities under 15 U.S.C. §§ 78e(a), (c). *See* FAC ¶¶ 455, 523-525, 798-809. In support of its Exchange Act Claims against BAM, the FAC alleges that BAM's facilitating ***secondary sales*** of the At-Issue Tokens required BAM to register as an exchange, broker-dealer and clearing agency. FAC ¶¶ 535-543; 776-779. The FAC does not allege that BAM offers its Staking Program for purchase, sale or trading on its platform such that it would independently require BAM to register as an exchange, broker-dealer, or clearing agency under the Exchange Act. *Id.*

The Court found that the SEC's allegations concerning secondary sales of crypto assets could not sustain the Exchange Act Claims because "the complaint does not include sufficient facts to support a plausible inference that ***any particular secondary sales*** satisfy the *Howey* test for an investment contract." (*Id.* at 43) (bold added). The SEC subsequently filed its First Amended Complaint (Dkt. 273) adding additional allegations on secondary sales. As discussed, the SEC has still failed to allege sufficient facts to support that any secondary sales satisfy the *Howey* test. Thus, Counts Eight, Nine and Ten against BAM must be dismissed.

Additionally, while the Court found the SEC had made sufficient allegations for Count Thirteen on fraud to proceed, the SEC actually espoused two separate theories of fraud – a fraud on investors in BAM Trading (a claim that does not depend on whether secondary tokens were traded as part of investment contracts on BAM's platform) and a fraud on BAM's customers on

---

[41] Count Eight alleges BAM failed to register BAM as an exchange in violation of 15 U.S.C. § 78e. Count Nine alleges BAM failed to register as a broker for the BAM platform in violation of 15 U.S.C. § 78o(a). Count Ten alleges BAM failed to register as a clearing agency for the BAM platform in violation of 15 U.S.C. § 78q-1(b).

the basis that BAM allowed wash trading to occur in COTI and other assets not alleged to be securities. As discussed, COTI was not sold as part of an investment contract on BAM's platform, so the latter of the SEC's fraud theories must fail.

All of the SEC's Exchange Act claims concerning third-party tokens should also be dismissed because the SEC failed to join indispensable parties – namely, the parties allegedly involved in the issuance of those tokens. *See* Fed. R. Civ. P. 12(b)(7); Rule 19. Joinder is not feasible because none of these token issuers are based in the District of Columbia and so are not subject to service of process here. *See Cerebral Pal sy Ass'n of Nassau County, Inc. v. Cochran*, 2021 WL 1037865, at *5 n.3 (D.D.C. Feb. 10, 2021). Dismissal, at least as to the claims associated with each, is the appropriate remedy as proceeding would prejudice both defendants and the token issuers, while the SEC can still proceed on each of its claims and each category of relief it seeks, including with respect to secondary sales, because Binance (the issuer of BNB) is already a party. *See* Rule 19(b).

## **CONCLUSION**

None of the tokens listed on BAM were sold as securities. Counts Eight, Nine and Ten of the FAC must be dismissed and the SEC should not be allowed to proceed on a theory that secondary sales sold by BAM were sold as securities. Based on this Court's prior Order, the SEC's case may proceed, for now, as to BAM with respect to Count Four for staking and Count Thirteen for fraud as to the investors in BAM. For the foregoing reasons, and as the SEC has already been given the opportunity to replead its secondary sales allegations, BAM's Motion to Dismiss should be granted with prejudice.

Dated: November 4, 2024

Respectfully submitted,

/s/ Daniel J. Davis

Daniel J. Davis (D.C. Bar #484717) (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave NW
Washington DC 20006
daniel.davis@katten.com

Christian T. Kemnitz (*pro hac vice*)
Levi Giovanetto (D.C. Bar #1001160) (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
christian.kemnitz@katten.com
levi.giovanetto@katten.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc.*

/s/ George S. Canellos

George S. Canellos (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
GCanellos@milbank.com
MLaroche@milbank.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc*