**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————

SECURITIES AND EXCHANGE
COMMISSION,

                  **Plaintiff,**

                  **v.**

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

                  **Defendants.**

———————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

    **No. 1:23-cv-01599-ABJ-ZMF**

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 5

STANDARD OF REVIEW ................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.  The Amended Complaint Properly Pleads That BNB and the Ten Crypto Assets
    Continue to be Offered and Sold as Investment Contracts. .............................................. 7

    A.  Defendants' Invented Requirement That Funds Must "Flow Into" the
        Hands of the Issuer Has No Basis in Law or Logic. .............................................. 8

    B.  Purchasers of BNB and the Ten Crypto Assets on the Binance Platforms
        Make an "Investment of Money." ......................................................................... 17

    C.  Investors who Purchase BNB and the Ten Crypto Assets on the Binance
        Platforms Invest in a Common Enterprise. .......................................................... 18

        1.  Horizontal Commonality Exists. ............................................................... 18

        2.  Broad and Strict Vertical Commonality Exist. ......................................... 24

    D.  Investors in BNB and in the Ten Crypto Assets on the Binance Platforms
        Have a Reasonable Expectation of Profits From the Efforts of Others. ............... 26

        1.  Secondary Market Investors in BNB Have a Reasonable
            Expectation of Profits from Binance's Efforts. ......................................... 27

        2.  Investors in the Ten Crypto Assets Have a Reasonable Expectation
            of Profits from the Efforts of Others. ....................................................... 32

        3.  Defendants' Comparisons of the Offers and Sales on the Binance
            Platforms to the Offers and Sales of Commodities for "Use" or
            "Consumption" Fail. .............................................................................. 43

        4.  Defendants' Additional Arguments are Unavailing. ................................. 47

    E.  BAM's Arguments for Dismissal Based on the CFTC's Jurisdiction and
        the Status of Other Crypto Assets Not At Issue Here Should be Rejected. .......... 52

II.  The Amended Complaint Plausibly Alleges Binance's Unregistered Offers and
     Sales of BNB to Employees Violated Securities Act Section 5. ...................................... 53

III. The Amended Complaint Plausibly Alleges that Binance Offered and Sold Simple
     Earn as an Investment Contract. .................................................................................. 58

IV.    Defendants' Invitation to Reconsider the Court's Holding Sustaining the SEC's Exchange Act Claims Should Be Rejected. ........................................................ 61

V.    The SEC's Choice of Defendants Cannot Serve as a Basis for Dismissal. ...................... 62

    A.    Defendants Fail to Overcome the Presumption that the SEC's Discretionary Charging Decisions are Immune From Judicial Review ............... 62

    B.    Defendants Fail to Establish that Dismissal is Required for Failure to Join a Party Under Rule 19 ......................................................................................... 63

        1.    The Third-Party Issuers are Not Required Parties. .................................. 64

        2.    Defendants Fail to Show Joinder is Not Feasible. ................................... 66

        3.    The Absence of the Third-Party Issuers Does Not Otherwise Require Dismissal. .................................................................................. 66

VI.    Binance's Request to Dismiss Specific Forms of Relief Should be Rejected. ................. 67

CONCLUSION .............................................................................................................................. 69

**TABLE OF AUTHORITIES**

**Cases**

*16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*,
    276 F.R.D. 8 (D.D.C. 2011) ............................................................................... 7

*Ali v. Carnegie Inst. of Wash.*,
    306 F.R.D. 20 (D.D.C. 2014) ........................................................................... 65

*Audet v. Fraser*,
    605 F. Supp. 3d 372 (D. Conn. 2022) ............................................................... 9

*Balestra v. Atbcoin LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................................. 35

*Barron v. Helbiz Inc.*,
    2021 WL 229609 (S.D.N.Y. Jan. 22, 2021),
    *vacated on other grounds*, 2021 WL 4519887 (2d Cir. Oct. 4, 2021) ............. 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 6

*Cameron v. Outdoor Resorts of Am.*,
    608 F.2d 187 (5th Cir. 1979) ..................................................................... 44, 45

*CFTC v. McDonnell*,
    287 F. Supp. 3d 213 (E.D.N.Y. 2018) ............................................................ 52

*CFTC v. Southern Tr. Metals, Inc.*,
    894 F.3d 1313 (11th Cir. 2018) ....................................................................... 68

*Cherokee Nation of Okla. v. Babbitt*,
    117 F.3d 1489 (D.C. Cir. 1997) ....................................................................... 63

*Continental Mktg. Corp. v. SEC*,
    387 F.2d 466 (10th Cir. 1967) ......................................................................... 44

*de Csepel v. Republic of Hungary*,
    27 F.4th 736 (D.C. Cir. 2022),
    *cert. denied sub nom. Museum of Fine Arts v. Csepel*, 143 S. Ct. 630 (2023) ................ 65

*de Csepel v. Republic of Hungary*,
    714 F.3d 591 (D.C. Cir. 2013) ........................................................................... 6

*Deckebach v. La Vida Charters, Inc. of Fla.*,
    867 F.2d 278 (6th Cir. 1989) ........................................................................... 26

*Direct Supply, Inc. v. Specialty Hosps. of Am., LLC*,
    878 F. Supp. 2d 13 (D.D.C. 2012) ................................................................. 64

*Dubin v. E.F. Hutton Grp. Inc.*,
    695 F. Supp. 138 (S.D.N.Y. 1988) ............................................................. 55, 57

*Dufoe v. DraftKings, Inc.*,
    2024 WL 3278637 (D. Mass. Jul. 2, 2024)........................................... 10, 20, 43

*Fan v. StoneMor Partners LP*,
    927 F.3d 710 (3d Cir. 2019)............................................................................ 15

*Fedance v. Harris*,
    1 F.4th 1278 (11th Cir. 2021) ........................................................................ 43

*Foltz v. U.S. News & World Rep., Inc.*,
    627 F. Supp. 1143 (D.D.C. 1986) ................................................................. 58

*Fraser v. Fiduciary Tr. Co. Int'l*,
    2005 WL 6328596 (S.D.N.Y. June 23, 2005) .................................................. 58

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023)............................................................. 30

*Frisch v. Likeopedia, LLC*,
    2024 WL 3938345 (S.D.N.Y. Aug. 26, 2024)........................................... 55, 56

*\*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985)....................................................................... 23, 35

*Glen-Arden Commodities v. Constantino*,
    493 F.2d 1027 (2d Cir. 1974)......................................................................... 47

*Grenader v. Spitz*,
    537 F.2d 612 (2d Cir. 1976)........................................................................... 44

*Hardin v. Tron Found.*,
    2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024) .................................................. 10

*\*Harper v. O'Neal*,
    2024 WL 3845444 (S.D. Fla. Aug. 16, 2024)............................... 10, 31, 46, 50

*Harris v. Republic Airlines*, Inc.,
    1988 WL 56256 (D.D.C. May 19, 1988)........................................... 55, 56, 57

*Heckler v. Chaney*,
    470 U.S. 821 (1985)....................................................................................... 62

iv

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ........................................................ 23

*HODL Law v. SEC*,
    2024 WL 3898607 (9th Cir. Aug. 22, 2024)........................................ 66

*Houghton v. Leshner*,
    2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) ................................... 10

*In re BitConnect Sec. Litig.*,
    2019 WL 9104318 (S.D. Fla. Aug. 23, 2019).............................. 23, 25

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    238 F. Supp. 3d 799 (S.D. Tex. 2017) .............................................. 56

*\*In re Ripple Labs Inc.*,
    2024 WL 3074379 (N.D. Cal. Jun. 20, 2024)............................ 10, 16, 23, 48

*Int'l Bhd. of Teamsters v. Daniel*,
    439 U.S. 551 (1979)................................................................. 44, 56

*Kemmerer v. Weaver*,
    445 F.2d 76 (7th Cir. 1971) .............................................................. 44

*Lewis v. Gov't of District of Columbia*,
    324 F.R.D. 296 (D.D.C. 2018)......................................................... 64

*Liu v. SEC*,
    591 U.S. 71 (2020).......................................................................... 68

*Lorenzo v. SEC*,
    587 U.S. 71 (2019).................................................................... 16, 48

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)........................................................................ 59

*McCown v. Heidler*,
    527 F.2d 204 (10th Cir. 1975) ..................................................... 11, 12

*Owen v. Elastos Found.*,
    2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) .................................... 10

*Patterson v. Jump Trading*,
    710 F. Supp. 3d 692 (N.D. Cal. 2024) ......................................... 10, 18

*Peyton v. Morrow Electronics, Inc.*,
    587 F.2d 413 (9th Cir. 1978) ........................................................... 58

*Phillips v. Kaplus*,
   764 F.2d 807 (11th Cir. 1985) ...................................................................... 58

*Pino v. Cardone Capital LLC*,
   55 F.4th 1253 (9th Cir. 2022) ...................................................................... 48

*Pyramid Lake Paiute Tribe v. Burwell*,
   70 F. Supp. 3d 534 (D.D.C. 2014) .................................................................. 7

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
   87 F.3d 1338 (D.C. Cir. 1996) ...................................................................... 65

*Rensel v. Centra Tech., Inc.*,
   2018 WL 4410126 (S.D. Fla. June 25, 2018) ................................................. 25

*Rudder v. Williams*,
   666 F.3d 790 (D.C. Cir. 2012) ...................................................................... 70

*Salameh v. Tarsadia Hotel*,
   726 F.3d 1124 (9th Cir. 2013) ...................................................................... 48

*Samuels v. Lido DAO*,
   2024 WL 4815022 (N.D. Cal. Nov. 18, 2024) ....................................... 10, 48

*SEC v. Almagarby*,
   92 F.4th 1306 (11th Cir. 2024) .................................................................... 68

*SEC v. Banner Fund Int'l*,
   211 F.3d 602 (D.C. Cir. 2000) ............................................................... 20, 26

*SEC v. Berry*,
   2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) .............................................. 67

*SEC v. Better Life Club of America, Inc.*,
   995 F. Supp. 167 (D.D.C. 1998) .................................................................. 58

*SEC v. Bilzerian*,
   29 F.3d 689 (D.C. Cir. 1994) ...................................................................... 67

**SEC v. Binance Holdings. Ltd.*,
   2024 WL 3225974 (D.D.C. Jun. 28, 2024) ........................................... passim

**SEC v. C.M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943) .................................................................. 3, 32, 43, 51

*SEC v. City of Victorville*,
   2014 WL 12588688 (C.D. Cal. Oct. 14, 2014) ............................................ 67

\*_SEC v. Coinbase_,
   726 F. Supp. 3d 260 (S.D.N.Y. 2024) .................................................................... passim

_SEC v. Edwards_,
   540 U.S. 389 (2004) ......................................................................................... 59, 61

_SEC v. E-Smart Techs., Inc._,
   139 F. Supp. 3d 170 (D.D.C. 2015) ............................................................................ 69

_SEC v. Feng_,
   935 F.3d 721 (9th Cir. 2019) ..................................................................................... 47

_SEC v. GenAudio_,
   32 F.4th 902 (10th Cir. 2022) .................................................................................... 68

\*_SEC v. Genesis Glob. Cap., LLC_,
   2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ......................................................... 60, 67

_SEC v. Glenn W. Turner Enters., Inc._,
   474 F.2d 476 (9th Cir. 1973) ................................................................................ 34, 50

_SEC v. Govil_,
   86 F.4th 89 (2d Cir. 2023) ........................................................................................ 68

_SEC v. Green United_,
   23-cv-159, Dkt. 115 (D. Utah Nov. 26, 2024) ............................................................ 23

\*_SEC v. Grybniak_,
   2024 WL 4287222 (E.D.N.Y. Sept. 24, 2024) ........................................... 20, 29, 35, 43

\*_SEC v. Howey Co._,
   328 U.S. 293 (1946) ......................................................................................... passim

_SEC v. Int'l Loan Network, Inc._,
   770 F. Supp. 668 (D.D.C. 1991),
   _aff'd_ 968 F.2d 1304 (D.C. Cir. 1992) ....................................................................... 24

_SEC v. Int'l Loan Network_, Inc.,
   968 F.2d 1304 (D.C. Cir. 1992) .......................................................................... 20, 26

_SEC v. Kik Interactive Inc._,
   492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................................................... 30, 47

\*_SEC v. LBRY, Inc._,
   639 F. Supp. 3d 211 (D.N.H. 2022) ............................................................. 9, 34, 43, 47

\*_SEC v. Life Partners, Inc._,
   102 F.3d 587 (D.C. Cir. 1996) ............................................................................ 35, 49

*SEC v. Life Partners, Inc.,
    87 F.3d 536 (D.C. Cir. 1996) ................................................................. passim

SEC v. Life Partners, Inc.,
    898 F. Supp. 14 (D.D.C. 1995),
    rev'd on other grounds, 87 F.3d 536 (D.C. Cir. 1996) ................................... 24

SEC v. Merchant Capital, LLC,
    483 F.3d 747 (11th Cir. 2007) ........................................................................ 14

SEC v. NAC Found.,
    512 F. Supp. 3d 988 (N.D. Cal. 2021) ........................................................... 25

SEC v. Navellier & Assocs., Inc.,
    108 F.4th 19 (1st Cir. 2024) ........................................................................... 68

SEC v. Norstra Energy Inc.,
    2016 WL 4530893 (S.D.N.Y. Jan. 19, 2016) .................................................. 62

SEC v. Parkersburg Wireless LLC,
    991 F. Supp. 6 (D.D.C. 1997) .................................................................. 24, 26

*SEC v. Payward Ventures, Inc.,
    2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ........................................ passim

SEC v. Payward Ventures, Inc.,
    2024 WL 4819259 (N.D. Cal. Nov. 18, 2024) ................................................ 13

SEC v. Princeton Econ. Int'l Ltd.,
    2001 WL 102333 (S.D.N.Y. Feb. 7, 2001) ..................................................... 63

SEC v. Ripple Labs Inc.,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023) .................................................... passim

SEC v. Ripple Labs Inc.,
    697 F. Supp. 3d 126 (S.D.N.Y. 2023) ............................................................ 11

SEC v. Ripple Labs, Inc.,
    2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) .................................................. 68

SEC v. Rubera,
    350 F.3d 1084 (9th Cir. 2003) ........................................................................ 11

SEC v. Sethi,
    910 F.3d 198 (5th Cir. 2018) .......................................................................... 15

*SEC v. SG Ltd.,
    265 F.3d 42, 53-54 (1st Cir. 2001) ........................................................... 44, 46

*SEC v. Tambone*,
   802 F. Supp. 2d 299 (D. Mass. 2011) ............................................................ 67

\*SEC v. Telegram Grp., Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................................... passim

\*SEC v. Terraform Labs PTE Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) ............................................... 14, 27, 31

*SEC v. Terraform Labs PTE Ltd.*,
   708 F. Supp. 3d 450 (S.D.N.Y. 2023) ............................................................. 9

*SEC v. The Movie Studio, Inc.*,
   2023 WL 5805587 (S.D. Fla. Aug. 18, 2023) .............................................. 67

*SEC v. Wahi*,
   2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ............................................... 9

*SEC. v. Bergin*,
   2015 WL 4275509 (N.D. Tex. Jul. 15, 2015) .............................................. 15

\*United Housing Foundation, Inc. v. Forman*,
   421 U.S. 837 (1975) ................................................................................ 44, 46

*United States v. Bowdoin*,
   770 F. Supp. 2d 142 (D.D.C. 2011) ............................................................. 17

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
   940 F.2d 564 (10th Cir. 1991) .............................................................. 54, 57

*Whitney v. Obama*,
   845 F. Supp. 2d 136 (D.D.C. 2012) ............................................................. 69

*Yeend v. Akima Glob. Servs., LLC*,
   2024 WL 4278641 (N.D.N.Y. Sept. 24, 2024) ............................................ 64

*Zacharias v. SEC*,
   569 F.3d 458 (D.C. Cir. 2009) .................................................................... 67

## **Statutes**

7 U.S.C. § 1a ..................................................................................................... 53

7 U.S.C. § 2 ....................................................................................................... 53

15 U.S.C. § 77b ................................................................................................. 56

15 U.S.C. § 77t ................................................................................................. 62

15 U.S.C. § 78b ............................................................................................... 12

15 U.S.C. § 78c ............................................................................................... 12

15 U.S.C. § 78u .............................................................................................. 62

**Rules**

Fed. R. Civ. P. 19 ..................................................................................... 63, 66

**Regulations**

SEC, *Employee Benefit Plans Employee Benefit Plans*,
    45 Fed. Reg. 8960 (Feb. 1, 1980) .................................................... 57

**Other Authorities**

CFTC Letter, *SEC v. Telegram Grp. Inc.*,
    19-cv-09439, Dkt. 203 (S.D.N.Y. Feb. 18, 2020) ............................. 52

*IMVU, Inc.*, SEC No-Action Letter,
    2020 WL 12949519 (Nov. 9, 2020) .................................................. 45

*Pocketful of Quarters, Inc.*, SEC No-Action Letter,
    2019 WL 8128104 (July 25, 2019) .................................................... 45

SEC, Strategic Hub for Innovation & Fin. Tech.,
    "Framework for 'Investment Contract' Analysis of Digital Assets" (Apr. 3, 2019) ........ 44

Thomas Lee Hazen,
    The Law of Securities Regulation, § 1.49 ........................................ 43

*Turnkey Jet, Inc.*, SEC No-Action Letter,
    2019 WL 1554004 (Apr. 3, 2019) .................................................... 45

What is a security?—Partnership, joint venture, and limited liability company interests,
    1 U.S. SEC. LAW FOR FINANCIAL TRANS. § 1:20 (2d ed.) ................................ 15

*Written Testimony of Chairman. J. Christopher Giancarlo before the Senate Banking
    Committee* (Feb. 6, 2018) ............................................................... 53

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Memorandum of Law in Opposition to the Motions to Dismiss filed by Defendants (1) Binance Holdings Limited and Changpeng Zhao ("Binance"), Dkt. 285 ("BHL Mem."); and (2) BAM Trading Services Inc. and BAM Management US Holdings Inc. ("BAM"), Dkt. 287 ("BAM Mem."). For the reasons stated below, the motions should be denied.

## PRELIMINARY STATEMENT

This case involves Defendants intermediating transactions in BNB and ten other fungible crypto assets (the "Ten Crypto Assets") that their issuers created from thin air and that have no inherent use or value unless and until someone develops and later maintains one. The Amended Complaint alleges Binance, and the other Ten Crypto Assets' issuers, are targeting secondary market investors with widespread promotions touting purchases of the assets as investments in an enterprise whereby the issuers' ongoing efforts to increase demand for the assets may lead to an increase in their value. In doing so, these issuers underscore their strong financial incentives to undertake such efforts and, critically, promote their efforts to develop and support secondary markets as key to the ongoing funding of the enterprise and to the realization of investor profits.

Based on the foregoing promotions as to BNB, the Court held that Binance offered and sold BNB as a security in its initial offering, as well as in subsequent sales, including on Binance and BAM's trading platforms (the "Binance Platforms"). *SEC v. Binance Holdings. Ltd.*, 2024 WL 3225974, at *14-19, *44 (D.D.C. Jun. 28, 2024) ("*Binance*, at *__") (the "Order"). But, with respect to secondary market resales of BNB, the Court held that "the facts needed to plausibly allege an 'expectation of profits' in the form of a return on an investment have not yet been alleged." *Id.* at *22. The Order did not address whether the other Ten Crypto Assets are being offered and sold as securities on the Binance Platforms. *Id.* at *28.

The SEC has now filed an Amended Complaint, Dkt. 282 ("AC"), aimed largely at the key issues identified by the Order, distilled into the following questions. If Binance offered and sold BNB as a security, did the economic reality change after Binance began executing its plan for a robust secondary trading market, such that resales of BNB between investors no longer involved securities? Are the Ten Crypto Assets, which the SEC alleges are marketed similarly to BNB in all key respects, also being offered and sold as securities? In amending its complaint, the SEC took particular heed of the Court's reference to another court's "careful, fact-based reasoning" in finding secondary market transactions involved securities based on the "'numerous promotional materials that were distributed to the general public via widely distributed internet posts and videos'" and "other 'publicly disseminated' statements regarding … entrepreneurial and/or managerial efforts," while noting the original complaint "does not contain analogous allegations concerning outreach to retail buyers by Binance." *Binance*, at *22 n.16.

The Amended Complaint's allegations address the Court's concerns. As to BNB, it confirms that the same sales pitches cited as creating investment contracts in the initial sales were reiterated and became more widely amplified over time, such as on popular social media accounts. It also details Defendants' continuing, widely distributed promotional statements targeting retail investors and touting BNB as an investment from which investors would profit from Binance's ongoing efforts. This includes, for example, Binance's assurances that it was "still incentivized to increase the BNB value" and that Binance's and Zhao's ongoing "work" to grow BNB was "reflected in its growing price," which created a "very sticky ecosystem" from which the company benefits along with those who buy BNB. AC ¶¶ 356, 360-61, 393.

The Amended Complaint similarly spells out the Ten Crypto Assets' issuers' extensive ongoing public campaigns targeting retail investors, urging them to buy the assets as an

investment in their enterprise of working to make the tokens more valuable, made all the more plausible given the issuers' publicized large retained stakes. It sets out how the issuers and Defendants broadly announced token listings with all the fanfare of the opening bell on the New York Stock Exchange, including widespread marketing flooding investors through websites, social media, and other forums. Although the details vary, the underlying pitch is the same. And the listing on the Binance Platforms is one of many powerful signals of the issuers' determination to undertake managerial efforts to increase the value of the asset, which includes creating and maintaining a robust secondary market to allow investors to profit.

Defendants, whose trade-based fees give them every incentive to create a trading frenzy, do their part. They conduct due diligence and publicly advertise their vetting to signal investment quality. They contractually require certain issuers to follow through on project development and other efforts to raise the assets' prices and help maintain liquidity in the secondary market for the assets. They target retail investors by modeling the Binance Platforms on regulatorily compliant securities markets, with taglines urging investors to "Trade Anywhere." *E.g.*, *id.* ¶ 105. Like regulatory compliant sites, Defendants offer sophisticated trading tools and an array of "research report[s]" analyzing the plans for specific assets, or purport to help even "a veteran looking to develop a trading strategy." *See id.* ¶¶ 227, 495, 499-508, 542, 637, 772. They explain that "a good sense of a company's fundamentals … allows one to … deriv[e] fair value estimates for tokens." *Id.* ¶ 511. And they repeatedly rebroadcast and amplify the promoters' claims about their on-going efforts to increase value of their assets.

These allegations amply demonstrate what Defendants resist: a secondary trading market is integral to *all* these promises, "run[ning] through the whole transaction as the thread on which everybody's beads were strung." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943).

This is true at the time Binance and other issuers first offered their crypto assets, and it remains true during the time they continue to promote and foster a secondary market for those assets.

Defendants' motions to dismiss seek to avoid these scores of allegations with newly invented rigid requirements not found in *Howey*'s test. Their main argument is that "blind" and "impersonal" transactions, BHL Mem. 3, cannot involve investment contracts because the investor is not—or at least is not knowingly—putting his funds "in the hands of the issuer." BAM Mem. 8. *Howey* and its progeny have never imposed a requirement that the investor must understand her funds "flow *into*" the issuer. *See* BHL Mem. 13. But of the many other responses to this argument the simplest and most decisive perhaps comes from Defendants who eventually concede, as they must, that "[i]nvestment contracts can … be sold in the secondary market." BAM Mem. 13; *see also* BHL Mem. 15-16. This admits too much, as secondary market sales, by definition, mean an investor does not put funds "in the hands of the issuer." Defendants' attempt to bridge that contradiction quickly collapses into previously rejected arguments and illogical hypotheticals.

Defendants also argue that the SEC fails to allege that secondary buyers were primarily motivated by investment intent, and BAM asks the Court to recast the Amended Complaint as alleging unadorned sales of commodities while claiming the SEC offers no limiting principle to distinguish the offers and sales of these crypto assets from those of commodities.

However, dozens of cases provide such workable principles. Critically, the question is not whether the asset being offered and sold *has* a "use"—many cases decided under *Howey* involved such assets—but whether they are being offered and sold primarily for their use or, rather, as an investment. In answering this question, courts have looked to, among other things, whether the amount or price of the asset sold was indicative of a consumptive purpose, whether

the promoter despite disclaimers about "use" also made representations that created reasonable expectations of profit, and whether it is reasonable to expect the targeted purchasers to "use" the item.  This multitude of factors is intentionally not a bright-line rule, but they do provide the SEC, courts, and market participants guideposts and limiting principles.  Here, not even one of the relevant factors suggests Defendants were intermediating naked sales of commodities.  Instead, the Amended Complaint plausibly alleges that the crypto assets at issue in this case are being offered and sold as investment contracts.

The same infirmities pervade Binance's dismissal bid as to two other securities offerings bolstered by the Amended Complaint: the offers and sales of BNB to employees and the Simple Earn program.  *Infra* §§ II, III.  Nor is dismissal proper based on the SEC's decision not to sue the Ten Crypto Asset issuers, as that exercise of discretion is not reviewable.  *Infra* § V.  Finally, arguments to dismiss the Exchange Act claims the Court already sustained should be rejected, and bids to dismiss certain relief at this stage are premature and wrong.  *Infra* §§ IV, VI.

## BACKGROUND

The SEC's Complaint asserted 13 claims for relief against Defendants for their violations of the federal securities laws.  Dkt. 1 ("Compl.").  As relevant here, the SEC alleged that Binance violated Securities Act Section 5 by its unregistered offers and sales of BNB and of its "Simple Earn" program ("Securities Act Claims").  *Id.*, Claims I, III.  The SEC alleged that Defendants (including Zhao as a control person) violated the Exchange Act by acting as unregistered exchanges, broker-dealers, and clearing agencies with respect to securities transactions, including those involving BNB, the Ten Crypto Assets, and the Binance BNB Vault and Simple Earn and BAM Staking programs ("Exchange Act Claims").  *Id.*, Claims V-XII.

Defendants filed motions to dismiss, Dkt. 117, 118, which the SEC opposed, Dkt. 172.  On June 28, 2024, the Court granted in part and denied in part Defendants' motions, ruling that

"the bulk of this action will move forward." *Binance*, at *1. The Court dismissed the SEC's claims as to (1) secondary sales of BNB by sellers other than Binance, *id.*, at *22,[1] and (2) the portion of Claim Three concerning Binance's offers and sales of Simple Earn. *Id.* at *26-27.[2]

The Order did not rule on the sufficiency of the SEC's allegations that (1) Binance's offers and sales of BNB to employees could also form the basis of the Securities Act Claim, *see, e.g.*, Compl. ¶¶ 306-10, or (2) transactions on the Binance Platforms in the Ten Crypto Assets, directly or indirectly by their issuers or between investors, could also support the Exchange Act Claims. *See id.* ¶¶ 352-509; *see also Binance*, at *18 n.11, 29. The SEC then amended its Complaint, adding allegations (set forth, in relevant part, below) relating to BNB sales between investors, Binance's offers and sales of Simple Earn, Binance's offers and sales of BNB to employees, and offers and sales of the Ten Crypto Assets. Dkt. 282. Defendants have moved to dismiss these claims.

## STANDARD OF REVIEW

A complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citation omitted). In ruling on a motion to dismiss, the Court must accept as true all factual allegations and draw all reasonable inferences in the SEC's favor. *Binance*, at *4 (citing cases). Any fact issues are not to be resolved. *See de Csepel v. Republic of Hungary*, 714 F.3d 591, 607 (D.C. Cir. 2013).

---

[1] The Order identifies Claim One in dismissing BNB offers and sales by sellers other than Binance, but this claim charges only Binance's unregistered offers and sales of BNB. The Exchange Act Claims address the intermediary services Defendants provide, and rely upon offers and sales of, among other things, BNB and the Ten Crypto Assets, including offers and sales both by the original issuers (including Binance as the issuer of BNB) and between investors.

[2] The SEC did not substantively amend Claim Two, relating to Binance's unregistered offers and sales of BUSD under Securities Act Section 5. Solely for purposes of any potential appeal, the Amended Complaint repeats that claim without modification.

"Courts are generally reluctant to grant motions to dismiss" based on a purported failure to join an indispensable party under Rule 19. *16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8, 12 (D.D.C. 2011) (cleaned up). The moving party "has the burden to demonstrate the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence," *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 540 (D.D.C. 2014) (cleaned up), which it may carry by "providing affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence." *16th & K Hotel*, 276 F.R.D. at 12-13 (cleaned up).

## ARGUMENT

### I.     The Amended Complaint Properly Pleads That BNB and the Ten Crypto Assets Continue to be Offered and Sold as Investment Contracts.

Much of the work deciding these motions will be done by dispensing with the shaky foundation on which Defendants' motions rest—the familiar but widely rejected "flow into" argument. Dispersed throughout the briefs, spanning *Howey* elements and various other issues Defendants raise, and varying in detail by Defendant, the gist is that "blind," "impersonal" and "anonymous" sales (including "blind" sales directly or indirectly by the issuer) cannot involve investment contracts because *Howey* requires the funds to "flow *into* a 'common enterprise'" by being "funnel[ed] … back to the developer," BHL Mem. 13, 14, and that the investor *knows* that her funds are "flowing" to the issuer[3] to be used for the development of the enterprise. *E.g.*, *id.* 1-3, 11-23, 32-33; BAM Mem. 3, 7-14, 24, 26, 34, 43. This argument, seeking again to impose nonexistent brightline tests to overrun *Howey*'s intentionally flexible approach, is contrary to law, logic, and all applicable precedent, and should be rejected. *Infra* § I.A.

---

[3] The parties and many of the cases cited herein often use the terms "issuer," "developer," and "promoter" of an enterprise interchangeably.

Instead, just as the Complaint did for Binance's initial and subsequent sales of BNB, the Amended Complaint's allegations establish that the offers and sales of BNB (between investors) and of the Ten Crypto Assets (by their issuers in initial or subsequent sales and between investors), satisfy *Howey*'s actual test. They show that the respective issuers are continuing to urge investors to buy "with an expectation of profit, in the form of future appreciation, that would derive from a common enterprise dependent upon the managerial and entrepreneurial efforts of others." *Binance*, at *15; *see infra* §§ I.B, I.C, I.D.1-2.

Defendants also argue that the Amended Complaint insufficiently links any expectation of profits to the efforts of the Ten Crypto Asset issuers who loudly champion them, and Defendants even question whether purchasers had investment intent at all, once again suggesting that these blockchain ledger entries (*i.e.*, the crypto assets at issue), arise naturally without human effort solely to be used or consumed like oranges. These arguments, too, fly in the face of economic reality and fail to grapple with *Howey*'s actual test. *Infra* §§ I.D.3-4, I.E.

A. **Defendants' Invented Requirement That Funds Must "Flow Into" the Hands of the Issuer Has No Basis in Law or Logic.**

Defendants' multi-faceted purported legal requirement—that the investor (i) must know that (ii) her funds "flow into" the hands of the issuer and (iii) expect that they will be used for the enterprise—does not appear in *Howey*. That *Howey* may have presented those facts does not create a legal requirement, any more than the existence in that case of contractual obligations created one. Thus, none of the cases applying *Howey* over nearly eighty years, including the dozens cited across hundreds of pages of briefing in this litigation, impose as a legal requirement that the investor must know her funds are flowing to be used by the issuer. To the contrary, Defendants' line of demarcation drawn at resales is inconsistent with long-standing precedent and the Court's holding that even for secondary market transactions "it is the economic reality of

the particular transaction, based on the *entire* set of contracts, expectations, and understandings of the parties, that controls." *Binance*, at \*20 (emphasis added).

Accordingly, courts around the country have upheld claims that offers and sales of crypto assets, including on secondary markets or transactions, were offers and sales of securities, implicitly rejecting that *Howey* includes Defendants' requirements. *See SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 381 (S.D.N.Y. 2020) ("Telegram's implied undertakings, and its understandings with the Initial Purchasers, including the intended and expected resale of Grams into a public market, amount to the distribution of securities"); *SEC v. LBRY, Inc*., 639 F. Supp. 3d 211, 217-21 (D.N.H. 2022) (blind sales by issuer on secondary platform satisfied *Howey*); *SEC v. Terraform Labs PTE Ltd.*, 708 F. Supp. 3d 450, 471-76 (S.D.N.Y. 2023) (same); *Audet v. Fraser*, 605 F. Supp. 3d 372, 394-97 (D. Conn. 2022) (same).

No court anywhere has *ever* dismissed securities laws claims, even though such claims were premised solely on secondary market transactions in crypto assets, on the grounds that these transactions categorically cannot involve securities. To the contrary, many courts have allowed a variety of securities laws claims to proceed premised on such sales. *SEC v. Coinbase*, 726 F. Supp. 3d 260, 290-96 (S.D.N.Y. 2024) (noting "whether a particular transaction in a crypto-asset amounts to an investment contract does not necessarily turn on whether an investor bought tokens directly from an issuer or, instead, in a secondary market transaction" in upholding Exchange Act registration claims based on purely secondary sales of crypto assets); *SEC v. Payward Ventures, Inc.*, 2024 WL 4511499, at \*7-17 (N.D. Cal. Aug. 23, 2024) (cited as "*Kraken I*, at \*_") (same); *SEC v. Wahi*, 2024 WL 896148, at \*4-7 (W.D. Wash. Mar. 1, 2024) (insider trading claims based on secondary market purchases of tokens that satisfy *Howey*, holding "[t]he Court's analysis remains the same even to the extent Ramani traded tokens on the

secondary market." (default judgment)); *Harper v. O'Neal*, 2024 WL 3845444, at *8-10 (S.D.

Fla. Aug. 16, 2024) (upholding various securities laws claims premised on purchases of tokens in

secondary markets satisfying *Howey*); *Dufoe v. DraftKings Inc.*, 2024 WL 3278637, at *4-10 (D.

Mass. July 2, 2024) (same); *In re Ripple Labs Inc.*, 2024 WL 3074379, at *6-10 (N.D. Cal. Jun.

20, 2024) ("*Ripple III*") (noting that "courts have expressly rejected the argument that

the *Howey* test turns on whether a purchaser bought tokens directly from an issuer or on the

secondary market") (citations omitted); *Patterson v. Jump Trading*, 710 F. Supp. 3d 692, 710-11

(N.D. Cal. 2024) (secondary market purchases of crypto assets on BAM Platform satisfy

*Howey*); *Barron v. Helbiz Inc.*, 2021 WL 229609, at *2-4 (S.D.N.Y. Jan. 22, 2021) (tokens

bought in ICO and also in blind transactions on secondary market platforms satisfied *Howey*),

*vacated on other grounds*, 2021 WL 4519887 (2d Cir. Oct. 4, 2021); *see also Samuels v. Lido*

*DAO*, 2024 WL 4815022, at *13-15 (N.D. Cal. Nov. 18, 2024) (upholding securities laws claims

based on tokens bought on secondary markets including Binance, with no *Howey* analysis);

*Hardin v. Tron Found.*, 2024 WL 4555629, at *11-15 (S.D.N.Y. Oct. 23, 2024) (same);

*Houghton v. Leshner*, 2023 WL 6826814, at *2-6 (N.D. Cal. Sept. 20, 2023) (same); *Owen v.*

*Elastos Found.*, 2021 WL 5868171, at *3, *12-16 (S.D.N.Y. Dec. 9, 2021) (same).

Binance invites the court to reject all these decisions, arguing they all "misconstrue

*Howey*" by "fail[ing] to apply its test on a transaction-by-transaction basis," BHL Mem. 14, but

that is not the case. *E.g.*, *Kraken I*, at *11 n.8 (applying *Howey* to secondary market transaction).

Defendants put all their eggs in the basket of a single case, where a court held based on a

complete record that the crypto assets were not offered and sold *by the issuer* on secondary

market platforms as investment contracts. *See SEC v. Ripple Labs Inc.*, 682 F. Supp. 3d 308

(S.D.N.Y. 2023) ("*Ripple I*"). But *Ripple* does not at all impose Defendants' "flow into"

requirements.  Instead, the court's decision was based on a myriad of factors, such as that some of the promotional materials supposedly were not available to investors buying on exchanges.  *See id.* at 330 ("[A]n examination of the entirety of the parties' understandings and expectations … supports the conclusion that a reasonable investor, situated in the position of the Institutional Buyers, would have been aware of Ripple's marketing campaign and public statements connecting XRP's price to its own efforts" and finding no evidence that showed the investors on the platform shared similar understandings and expectations) (citation omitted); *see also SEC v. Ripple Labs Inc.*, 697 F. Supp. 3d 126, 133-35 (S.D.N.Y. 2023) ("*Ripple II*").

Moreover, Defendants' reliance on *Ripple I* also ignores what this Court recognized, that *Ripple I* did not rule on whether secondary market transactions satisfy *Howey*.  *Binance*, at *19.  Instead, *Ripple I* put forth the very analysis this Court has endorsed, and the SEC agrees should apply—"whether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme."  *Ripple I*, 697 F. Supp. 3d at 133 n.16.  While the SEC disagrees with how *Ripple I* construed the undisputed facts in that record or that some of the facts it considered are relevant to *Howey*'s test, the test that it applied is the same test to be applied here, and the Amended Complaint meets that test.

Binance also cites *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) and *McCown v. Heidler*, 527 F.2d 204, 211 (10th Cir. 1975), *see* BHL Mem. 13, but these cases also do not help Binance.  In *Rubera* the court found "investment of money" *satisfied* so long as investors commit their capital to the enterprise in a way that subjects them "to financial loss," 350 F.3d at 1090, which is what occurs here.  *McCown* also found an investment contract in the context of a real estate transaction in part because the promoter used funds to develop the property, but the court

did not purport to *require* knowledge about the flow of funds or how they would be used.  527

F.2d at 211.  Neither case mentions anything about funds that "flow into" an enterprise.

Ultimately, Defendants' argument fails because it runs headlong into several indisputable

principles:  (1) the Exchange Act was largely motivated by concerns about trading of securities

on secondary markets, including trading platforms like exchanges, and related conduct, *e.g.*, AC

¶ 41 (quoting 15 U.S.C. § 78b); (2) "investment contracts" are explicitly included in the list of

securities subject to the Exchange Act protections over these secondary markets, 15 U.S.C.

§ 78c(a)(10); and (3) secondary market sales that occur in these markets by definition do not

involve a payment of money to the issuer (otherwise, the issuer would be receiving payment

twice—once from the original investor, and once from the secondary market purchaser), and the

sales on these platforms (either by the issuer or between investors) are done in "blind" form,

without a buyer understanding that her specific funds are going to be deployed by the issuer.

This all means that the implication of Defendants' arguments is either that certain

investment contracts are somehow uniquely and silently carved out of the law that expressly

covers them, or that Congress made a mistake in including investment contract in the definition

of "securities" in the Exchange Act.  Their arguments also suggest the Supreme Court created a

test that protects only the initial investors lured by promises about citrus groves and pay phone

schemes but leaves any subsequent investors in those schemes to fend for themselves.  *E.g.*, BHL

Mem. 12 ("Resale transactions obviously fall outside *Howey*'s promoter-focused inquiry").

Faced with this dilemma, Defendants candidly admit that "[o]f course, resales of

investment contracts are possible."  BHL Mem. 15; *see also* BAM Mem. 13.  And Defendants

must make this admission, as this Court similarly acknowledged that secondary sales may

involve investment contracts.  *Binance*, at *21.  In doing so, however, Defendants kill their "flow

into" argument before it is out of the gate.  To state the obvious and fatal consequence of

Defendants' admission:  if investment contracts can be sold on secondary markets, that means,

by definition, sales of investment contracts do *not* require the proceeds to go to the issuer

because again, secondary sales *do not* feature any such funds that "flow into" the enterprise.

Defendants' attempts to escape the implication of their concession are futile.  They

mostly retreat to previously rejected theories, as where BAM states that investment contracts do

not require funds to flow to the issuer if the buyer "was in privity with the original seller."  BAM

Mem. 13; *see also* BHL Mem. 17 (arguing "*Howey* requires an ongoing relationship pursuant to

which investors are entitled to a share of the profits").  This is just Defendants' attempt to sneak

back in their rejected "ongoing contractual relationship" and privity arguments in the guise of a

"flow into" rule.  The Court has rejected this "contractual relationship" argument and should do

so again here.  *Binance*, at *8-10; *see also SEC v. Payward Ventures, Inc.*, 2024 WL 4819259, at

*1 (N.D. Cal. Nov. 18, 2024) ("*Kraken II*") ("[C]ourts around the country have … refused to

import a 'privity of contract' element into the *Howey* test[.]").

Binance similarly argues that resales might be covered by the Exchange Act if "an initial

purchaser could reassign her rights under an investment contract to someone else."  BHL

Mem. 15.  To the extent Binance, in focusing on formal "assignments" and "rights," is also

resurrecting the privity-based or contract-based theory, its argument is still meritless.  And if

Binance is arguing something more subtle, such that the buyer of a crypto asset must step into

the shoes of, and enjoy the same economic benefits as, the original purchaser, that *is in fact what

is alleged here* (and underlies the issuers' pitches generally).  Binance and the other issuers

promise investors that when they buy the token, they are buying into the enterprise and are

afforded the corresponding rights and benefits, including to enjoy investment-like returns from

the appreciation of the assets based on others' efforts, *e.g.*, AC ¶¶ 398, 533, 559, 568, 575, 577, 581, 597, 614, 637, 658, 711-712, 729, 765, 773, profits that can be most easily realized by selling into a secondary market.  Or, to use the euphemism for "investors" common in these markets, the buyer becomes a member of the "community."  *See, e.g.*, *id.* ¶¶ 394, 533, 611, 637.

Defendants' other musings about resales that satisfy Defendants' new tests veer into the nonsensical, as when they appear to endorse transactions where the issuer is paid twice.  BHL Mem. 16 (a "developer might work together with an initial buyer who purchases tokens from the developer, resells them, and funnels the money from those sales … to the developer.").

It is also worth noting the insidious ironies of Defendants' arguments that the "impersonal" and "anonymous" nature of the Binance Platforms exempts them from the Exchange Act.  The issuers (including Defendants) intentionally develop and foster a secondary market for investors to be able to realize profits and from which the issuers also benefit.  Further, in designing platforms "capable of sustaining 1,400,000 orders/second," AC ¶ 82, Defendants explicitly emulate regulated exchanges where trades are "impersonal" and "anonymous" because these markets are structured and regulated to dispense with the need for face-to-face transactions between purchasers and sellers.  Investors in those platforms are not focused on *who* they are buying from, but on *what they are buying into*, in the hopes of finding an asset they can sell for more than they paid.  *See SEC v. Terraform Labs PTE Ltd.*, 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023) ("*Terraform*").  The expectations of profits Defendants are fostering are the same as they would have for stocks or bonds, and for investment contracts that routinely trade in established secondary markets, like units of master limited partnerships.[4]  The Exchange Act was enacted

---

[4] Limited partnership interests can be offered and sold as investment contracts.  *E.g.*, *SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007); *SEC v. Sethi*, 910 F.3d 198, 204-05 (5th

precisely to protect investors who buy securities in these markets because, among other reasons, "the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation." AC ¶¶ 13, 41, 43, 48. It is hard to find words that better describe trading in BNB and the Ten Crypto Assets on the Binance Platforms, and why intermediary services relating to this trading squarely fall within the prescriptions of the Exchange Act.

Finally, even though Defendants' invented test is not the law, the Amended Complaint in fact alleges that issuers of some of the Ten Crypto Asset sold to investors through the Binance Platforms while advertising that the proceeds from these sales would be used to develop the enterprises—and Binance similarly sold BNB—such that at least *some* funds did flow to the issuers as Binance acknowledges. BHL Mem. 21-23; *e.g.*, AC ¶¶ 463-67 (issuers of MATIC, AXS, and SAND initially offered and sold the token on the Binance.com Platform). In addition, the Amended Complaint contains sufficient facts to plausibly allege that Binance directly and indirectly sold BNB on the Binance Platforms after the ICO, as did issuers of SOL, SAND, and MANA, AC ¶ 468, and Defendants' suggestion that the specific amounts and timing of each such sale have to be alleged at the pleadings stage, *e.g.*, BHL Mem. 22, is wrong.

Defendants' attempt to combat the allegations of issuer sales on the Binance Platforms by relying on their blind bid/ask nature should be rejected for the reasons set forth herein. Since the

---

Cir. 2018). Likewise master limited partnership interests ("MLPs") can be securities and regularly the subject of claims under the securities laws. *E.g.*, *Fan v. StoneMor Partners LP*, 927 F.3d 710, 713 (3d Cir. 2019); *SEC. v. Bergin*, 2015 WL 4275509, at *1 (N.D. Tex. Jul. 15, 2015). Certain types of MLPs, typically representing investment ventures with respect to certain commodities, routinely change hands on secondary markets and at enormous volumes, including on exchanges like NASDAQ. *See, e.g.*, What is a security?—Partnership, joint venture, and limited liability company interests, 1 U.S. SEC. LAW FOR FINANCIAL TRANS. § 1:20 (2d ed.) ("Certainly, units in a 'master limited partnership,' a publicly-held limited partnership whose interests are listed on an exchange or quoted in Nasdaq are securities" under *Howey*).

"flow into" requirement is wrong, so too is the additional gloss that investors *must know* where funds are flowing. In particular, these knowledge-based tests would impose extraneous rules onto *Howey* sounding in "reliance" and subjective beliefs by individual investors, concepts that are not proper in this SEC enforcement action. *See infra* § I.D.4 (citing *Lorenzo v. SEC*, 587 U.S. 71, 84 (2019) and *Binance* at *14).

Defendants repeatedly attempt to conjure this knowledge requirement from a single footnote in the Order. *E.g.*, BHL Mem. 3, 13, 18, 19, 23 (citing *Binance*, at *21 n.15). That footnote was addressing a different point: whether the SEC's argument was that initial issuer promises travel indefinitely with the token or that "Binance continued to market the BNB to new buyers as an investment contract." *Binance*, at *21 n.15. The Amended Complaint allegations clearly satisfy this assertion. Defendants' interpretation, by contrast, conflicts with the Order's very next footnote, which noted the "careful, fact-based reasoning" of a decision that found investment contracts in secondary markets and, thus, necessarily rejected the idea that investors must know their funds are flowing into the enterprise. *Binance*, at *21 n.16 (discussing *Ripple III*). The Amended Complaint is faithful to this decision, too. By contrast, Defendants' gloss on a single line would read investment contracts out of the Exchange Act, impose a requirement that has no reason to exist and does not in fact exist with respect to the resale of any other type of securities, and runs contrary to the flexible, context-specific *Howey* test that applies to this case.[5]

In short, Defendants' invented requirements should be rejected. As set forth below, when

---

[5] BAM argues that the SEC does not allege that Binance "sold more BNB than it bought or raised profits" on BAM's Platform. BAM Mem. 5, 8 n.12. This is another invented requirement that makes no sense and shows that these arguments have no grounding in law.

the actual *Howey* test is applied to resales of BNB[6] and offers and sales of the Ten Crypto Assets on the Binance Platforms, the Amended Complaint states a plausible claim for relief.

### B.    Purchasers of BNB and the Ten Crypto Assets on the Binance Platforms Make an "Investment of Money."

The Amended Complaint alleges an investment of money as to each of the Ten Crypto Assets on the Binance Platforms, regardless of the seller of the asset, because it alleges that the investors purchase the Ten Crypto Assets with fiat currency or crypto assets, and they risk losing their investment if the Ten Crypto Assets lose their value.  AC ¶ 98; ¶¶ 344, 347 (BNB); ¶ 514 (all Ten Crypto Assets); ¶¶ 524-25, 534 (SOL); ¶¶ 548, 552 (ADA); ¶¶ 566-68, 571-72 (MATIC); ¶¶ 586-88, 594 (FIL); ¶¶ 622, 627, 631 (ATOM); ¶¶ 644, 646 (SAND); ¶¶ 666, 673 (MANA); ¶¶ 694, 707 (ALGO); ¶¶ 726-28, 731 (AXS); ¶¶ 749-50, 753 (COTI); *see United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011) (an "investment of money" occurs when an investor "places his money at risk in anticipation of a profit") (cleaned up).

Relying on their familiar refrain, Defendants argue an "investment of money" requires the funds to go to the issuers' pockets.  *E.g.*, BHL Mem. 12-13.  In addition to the reasons discussed above regarding these invented flow of funds requirements, this argument should be rejected because courts have specifically concluded that payments to a trading platform (which are not kept by the platform but are tendered to the seller), constitute an "investment of money" because "[i]t defies common sense to suggest that when someone purchases crypto assets from a reseller or another investor, that person or entity does not understand themselves to be investing

---

[6] Binance also asks the Court to reconsider its prior ruling as to Binance's post-ICO offers and sales of BNB for the same reasons it challenges all other secondary market transactions on the Binance Platforms.  BHL Mem. 21, 32-33.  Contrary to Binance's characterization of the Amended Complaint, there has been no change that warrants reconsideration of the Court's decision sustaining these transactions.  *See Binance*, *18-19, *44.

money in the asset." *Kraken I*, at \*13; *Patterson*, 710 F. Supp. 3d at 710-11 (finding investment of money as to tokens trading on BAM's Platform).

    **C.**     **Investors who Purchase BNB and the Ten Crypto Assets on the Binance Platforms Invest in a Common Enterprise.**

    The Amended Complaint also alleges that investors who purchase BNB and the Ten Crypto Assets on the Binance Platforms—either from other investors (Binance's category one) or from the issuers (categories two and three), BHL Mem. 2—invest in a common enterprise.

    *1.  Horizontal Commonality Exists.*

    First, the Amended Complaint alleges horizontal commonality, *i.e.*, that investors' fortunes are tied together and dependent upon the success of the issuers' and other third parties' efforts. *SEC v. Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996). For example, the BNB that investors purchase on the Binance Platforms is just as fungible as those that an investor may have purchased during the ICO—with all profiting equally from the increase in price in proportion to their ownership. Thus, the fortunes of investors who purchase on the Binance Platforms are interdependent with that of all other investors in the same asset. AC ¶¶ 344-51, 403. Binance promotes this economic interdependence, including promoting that it is using BNB and BNB sales proceeds to grow its enterprise and the price of BNB. *E.g.*, *id.* ¶¶ 320, 335, 349, 354-62. Further, Binance does not manage separate enterprises for investors who purchased BNB directly from Binance or those who purchase it from third parties. *E.g.*, *id.* ¶¶ 350-51.

    The same interdependence exists with respect to investments in the Ten Crypto Assets. Investors' fortunes are interdependent and dependent upon the success of the enterprise because they purchased fungible tokens whose prices rise and fall together. *Id.* ¶¶ 515-21. Issuers also broadly publicize both in the primary and secondary markets that proceeds from their initial sales (including "IEO sales"), as well as revenues from later sales, would be fed back to the issuer to

further develop the asset's ecosystem, which would increase its value and price. *See id.* ¶¶ 464-67 (IEOs on Binance allows issuers to raise capital and investors to "have the opportunity to participate in the growth of these networks."); ¶¶ 526-27 (Solana Labs public statements that it would pool the proceeds from its private and public sales and use them to develop and grow Solana's ecosystem and related endeavors); ¶¶ 652 (TSB press release and Sandbox Whitepaper publicly state that proceeds of IEO and other SAND token sales would be used to develop and promote the use of the Sandbox platform); ¶¶ 569-71 (Polygon's whitepaper stating that it would pool the proceeds of private and public MATIC sales, including its Binance IEO, to develop and grow its business, and later touted that a $450 million fundraise would "secure Polygon's lead"); ¶¶ 671, 681 (MANA promoters stating that "[t]he proceeds of the tokens sold … will finance Decentraland over the long haul, perpetually aligning it with the prosperity of the network"); ¶¶ 591, 593, 597-99, 603 (FIL); ¶¶ 622-29 (ATOM); ¶¶ 734-39 (AXS); ¶¶ 693-96 (ALGO); ¶¶ 751, 757, 767 (COTI).  As the Amended Complaint further alleges, Binance and BAM publicly amplify these statements to investors.  *Id.* ¶¶ 492-513, 520.

In fact, the secondary market is a key component in facilitating and growing the ongoing common enterprise for crypto assets that have no inherent value and depend on a secondary trading market to support it.  When an investor buys the asset in the secondary market, she is helping support the asset's price.  This, in turn, increases the value of the issuers' and other investors' own holdings, can generate more investment interest from other investors, and further facilitate additional sales by the issuer that will help further develop the enterprise.

These allegations establish horizontal commonality in this Circuit.  In *SEC v. Int'l Loan Network, Inc.*, a common enterprise existed where "the fortunes of investors [we]re clearly linked to each other and to the success of … [the] enterprise."  968 F.2d 1304, 1308 (D.C. Cir.

1992).  In *Life Partners*, the court similarly emphasized that "the inter-dependency of the investors … transforms the transaction substantively into a pooled investment."  87 F.3d at 544.

Subsequently, in *SEC v. Banner Fund International*, the court stated that horizontal commonality "requires that there be a pooling of investment funds, shared profits and shared losses," 211 F.3d 602, 614 (D.C. Cir. 2000) (citing *Life Partners*, 87 F.3d at 543), but it did not purport to depart from *Life Partners*' or *International Loan*'s reasoning that the commonality evaluation is flexible and context specific, and that what controls is the interdependency of investors.  *Life Partners*, 87 F.3d at 544.  What mattered was that the capital of "small investors" could be used "in deals requiring large capital outlays," *id.*, which is precisely what is occurring with respect to BNB and the Ten Crypto Assets here—small, retail investors buy these assets even in small, fractionalized amounts while the sophisticated developers deploy billions in building (and marketing their efforts to build) products, technology, and a secondary market.

What demonstrates economic interdependence here—for example in all BNB investors' fortunes—is that there is a promoter whose efforts to increase the price of the tokens inure equally to all investors, who are in the same boat by virtue of holding the asset.  *See* AC ¶¶ 293, 307, 327, 329-32, 334-37, 344-46, 349-51, 403.  Their economic fortunes will be affected equally, regardless of *when* or *how* they got into the boat.  *See SEC v. Grybniak*, 2024 WL 4287222, at *8 (E.D.N.Y. Sept. 24, 2024) ("[I]nvestors reaped [or expected to reap] their profits in the form of the increased value" of the tokens, which would be "dictated by the success of the …enterprise as a whole, thereby establishing horizontal commonality") (cleaned up); *Dufoe*, 2024 WL 3278637, at *5 ("[I]n cases involving fungible cryptocurrency, the value of every investor's holding … rises and falls uniformly with the price of the cryptocurrency, such that the fortunes of all investors are linked together by the success of the underlying blockchain

technology and digital ecosystem" and "horizontal commonality exists even though individual investors may independently buy or sell their holdings") (cleaned up).

BAM appears to argue that *Life Partners*' holding concerning inter-dependency is rigid and limited to the *initial* "combined buying power of investor funds" needed to effectuate the particular transaction at issue. BAM Mem. 9-10. But *Life Partners* expressly eschewed such formalism, characterizing "commingling" as an unnecessary "administrative detail," and nothing in the holding suggests interdependency ceases to exist upon a resale of the instrument. *Life Partners*, 87 F.3d at 544. Indeed, the *Life Partners* court noted that an issuer who "scrupulously avoided" commingling or handling investor funds might avoid liability under such a formulaic approach. *Id.* Rather, the court explained that because "any individual investor would find that the profitability if not the completion of his or her purchase depends upon the completion of the larger deal" there was "inter-dependency" and thus horizontal commonality. *Id.*

That same exact interdependence exists here. The initial and subsequent purchasers are all equally dependent on the promoters' ability to deliver, including on their promise to create a robust secondary market in which purchasers could realize their investment and issuers can continue raising capital. All that is occurring is that secondary purchasers replace initial purchaser in this inter-dependency. *See Telegram*, 448 F. Supp. at 369 ("The plain economic reality is that, post-launch, the Grams themselves continue to represent the Initial Purchasers' pooled funds"). Neither the timing of the purchase (in the ICO/IEO or later) nor the source of the crypto asset purchased (from the promoters or another investor) transforms the economic reality of what the investor is buying—they are purchasing access into the same common enterprise as the initial investors. In fact, this is the whole purpose of secondary markets—to enable original investors to profit and subsequent investors to buy into the enterprise—

particularly in the context of crypto assets created out of thin air with no inherent value without a promoter. *See id.* at 372 (finding that "without the expected ability to resell Grams into the secondary market, the $1.7 billion paid to Telegram would not have been raised."). It is also particularly so where, as here, investors do not receive an equity interest or dividend in the enterprise, and the secondary market is the *only* place where they can realize a profit.

BAM says this means that the SEC is arguing that once there has been a purchase of an investment contract as to a crypto asset, all subsequent purchases involve securities. BAM Mem. 1-2, 14-15; *see also* BHL Mem. 1, 7. But this is not correct. In some circumstances—say if the issuer disappears or "ceased all further efforts to support the" project—the timing of the purchase may prove critical and lead to a different outcome. *Telegram*, 448 F. Supp. 3d. at 375.[7] But nothing like that is what occurred with these Ten Crypto Assets. Here, the economic realities and widely disseminated promotional statements of the efforts are ongoing (with the original promotional statements still available and original promoters still promoting). This includes while the assets have been trading on the Binance Platforms, and the economic realities and corresponding promotional statements are rebroadcast and further amplified by Defendants, targeting investors on their Platforms. *See also infra* §§ I.D.1-2.

Defendants also argue there can be no "common enterprise" with investors who purchased from other investors based on their "flow into" requirement. *E.g.*, BAM Mem. 10-14; BHL Mem. 12-16, 17-18. Again, Defendants are wrong, *see supra* § I.A, which is why courts in various contexts consistently have evaluated *Howey* and found it satisfied, including with respect

---

[7] Moreover, a change in shorthand terminology for briefing purposes is neither an actual nor attempted revision or recasting of the SEC's long-standing and consistent position that crypto assets can be offered and sold as investment contracts based on the entirety of the facts and circumstances of a given transaction, and that they can similarly *continue to be* and *are being* offered and sold as investment contracts, as long as the facts and circumstances of their offers and sales satisfy *Howey*. *See* Dkt. 273-1 at 24 n.6.

to sales of investment contracts by those who do not receive the proceeds from the sale of the asset underlying the investment contract.  *E.g.*, *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc) (horizontal commonality where funds for purchase of third-party condominium did not go to the promoter of the venture, a real estate developer); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 233, 240-41 (2d Cir. 1985) (common enterprise existed where funds for purchase of third-party certificates of deposit (CDs) went to the banks issuing them, not to Merrill Lynch, the promoter of the scheme).

Defendants also return to *Ripple I*, *e.g.*, BAM Mem. 13; *see also* BHL Mem. 17-18, but the court there did not find there to be no investment contract based on any lack of pooling, as there indeed was pooling.  The ruling Binance points to had to do with "reasonable expectation of profits."  *Ripple I*, 682 F. Supp. 3d at 317-18; *see also supra* § I.A (further distinguishing *Ripple I*); *Ripple III*, at *7 (rejecting argument that because funds of investors who purchase on trading platforms are not "pooled" with other purchasers there can be no common enterprise). *Cf. SEC v. Green United*, 23-cv-159, Dkt. 115, at 3-4 (D. Utah Nov. 26, 2024) (rejecting argument that "common enterprise" requires "the profits flow from the 'business venture'"); *In re BitConnect Sec. Litig.*, 2019 WL 9104318, at *8 (S.D. Fla. Aug. 23, 2019) (rejecting argument that common enterprise did not exist because investors were "never led to believe" their funds would be used to develop the common enterprise as "miss[ing] the forest for the trees").

Finally, the SEC is not alleging that investors have just a "common interest" or common investment in the assets.  *See* BHL Mem. 15, 16.  Instead, the holders' financial fortunes are interdependent and intertwined, as reflected in ongoing fluctuations in the price of the asset, and equally dependent on a promoter's deployment of the capital raised from selling the asset

23

(including sales after the initial distributions) and undertaking ongoing efforts.  *See Life Partners*, 87 F.3d at 544 (interdependency of financial fortunes is "implicit form of pooling").

### 2.    Broad and Strict Vertical Commonality Exist.

The Amended Complaint alleges broad and strict vertical commonality, which courts in this Circuit have also analyzed.  *SEC v. Life Partners, Inc.*, 898 F. Supp. 14, 19-20 (D.D.C. 1995), *rev'd on other grounds*, 87 F.3d 536; *SEC v. Parkersburg Wireless LLC*, 991 F. Supp. 6, 8 (D.D.C. 1997); *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 668, 690-92 (D.D.C. 1991), *aff'd* 968 F.2d 1304 (D.C. Cir. 1992); *see also Binance*, at *13 (recognizing these tests could be satisfied).

For strict vertical commonality, where investors' and promoters' fortunes are tied, the Amended Complaint alleges that Binance was the largest holder of BNB.  AC ¶¶ 354-62; *see also id.* ¶¶ 302-03 (BNB allocation and vesting plan for founding team and investors).  Thus, Zhao publicized the obvious point that a rising BNB price would increase the wealth not just of investors, but also Binance's and his own.  *E.g.*, *id.* ¶¶ 361, 385 (Zhao promoting the creation of "a very sticky ecosystem," and that Binance would "benefit the same way as all BNB holders"); *see also id.* ¶¶ 320, 335-36, 349, 356, 360 (Binance promoting that its fortunes were tied to BNB investors' fortunes, that its employees had strong financial incentives to undertake efforts to increase BNB's value, and that it is using BNB sales proceeds to grow its enterprise).

For each of the Ten Crypto Assets, the Amended Complaint also specifically alleges that the issuers and promoters retained significant amounts of the crypto assets and continued to hold large amounts, tying their financial fortunes to investors.  *E.g.*, *id.* ¶¶ 528, 530 (Solana Labs retaining an estimated 50 million SOL "to support operations"); ¶¶ 550-51 (ADA); ¶¶ 570; 576(e) (MATIC); ¶¶ 599-600, 606 (FIL distribution to groups "critical to the network's creation, development, growth, and maintenance," and a vesting schedule to "create[] long-term

alignment"); ¶¶ 628-29 (ATOM); ¶¶ 645, 651 (SAND); ¶¶ 667-68 (promoting MANA allocation with vesting schedule for project leads); ¶¶ 692, 703-06 (ALGO promoters publicly stating they would be holding founders' tokens for the long term and not selling them, using them to support the ecosystem, and releasing periodic "Transparency Reports" on their website disclosing promoter's ALGO holdings); ¶¶ 735, 738-39 (AXS); ¶¶ 748, 767 (Coti promotion of its COTI allocation with lock-up periods that were later extended).

Courts have found strict vertical commonality under such circumstances. *E.g.*, *Kraken I*, at \*16 (using SOL and ALGO as examples, "the SEC has plausibly alleged vertical commonality between the investors using Kraken to purchase crypto assets and the promoters whose job it is to promote those assets and grow their associated networks"); *Telegram*, 448 F. Supp. 3d at 370-71; *SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021).

As to broad vertical commonality, when investors' success is tied to the success of the promoter's efforts, the Amended Complaint also alleges that BNB investors' financial fortunes depended on Binance undertaking efforts to grow its value. AC ¶¶ 304, 307, 327, 329-32, 334-37, 350-405. Similarly, the Amended Complaint alleges that, for the Ten Crypto Assets, investors' fortunes were dependent on the success of the enterprise, as the issuers and promoters of these assets expressly tied the value of the asset (and thus investors' fortunes) to the success of promoters' efforts in operating and developing the ecosystems for these assets, such that the more successful the efforts, the greater the profits. *See id.* ¶¶ 460-775 (promotional statements and various efforts for all of the Ten Crypto Assets). Courts have found broad vertical commonality under such circumstances. *See, e.g.*, *In re BitConnect*, 2019 WL 9104318, at \*7-8; *Rensel v. Centra Tech., Inc.*, 2018 WL 4410126, at \*5 (S.D. Fla. June 25, 2018).

BAM urges the Court to reject all forms of vertical commonality, arguing that "[v]ertical commonality has been expressly rejected in other circuits."  BAM Mem. 22; *see also* BHL Mem. 17 n.4.  But the cases BAM cites rejected *broad vertical*, not *strict vertical* commonality, and are plainly distinguishable, as they involve one-to-one arrangements between one seller and one promoter with respect to a unique asset like a condominium.  *E.g.*, *Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 281 (6th Cir. 1989) (describing the venture "as essentially a one-on-one vertical relationship").  That is nothing like what the SEC alleges here.  Further, while the D.C. Circuit has held horizontal commonality is ordinarily enough and thus "has not needed to reach vertical commonality," *Life Partners*, 87 F.3d at 544, it has not officially adopted a test.  BAM contends that no district court in this Circuit since *Life Partners* has applied vertical commonality, but its own citations show this is not true.  *See* BAM Mem. 21-22 n.31 (citing *Parkersburg Wireless*, 999 F. Supp. at 8).

BAM also incorrectly contends there is no strict vertical commonality because the issuers' fortunes "could rise or fall independently of the prices of the assets … for any number of reasons."  BAM Mem. 22.  But this could be true in any investment contract where the promoter has multiple sources of revenue.  A company may run businesses as to which it has not offered investment contracts, like the promoter in *Howey* did.  *See SEC v. Howey Co.*, 328 U.S. 293, 296-97 (1946).

### D.    Investors in BNB and in the Ten Crypto Assets on the Binance Platforms Have a Reasonable Expectation of Profits From the Efforts of Others.

The Amended Complaint plausibly alleges investors had a reasonable expectation of profits "at least predominantly from the efforts of others."  *Int'l Loan*, 968 F.2d at 1308.  Pre-purchase efforts may be relevant but "cannot by themselves suffice," and such efforts must be more than "ministerial" or "clerical."  *Life Partners*, 87 F.3d at 545, 548; *Banner Fund*, 211 F.3d

at 615.  Moreover, "the expected profits must … be in the form of a financial return on the investment, not in the form of consumption."  *Life Partners*, 87 F.3d at 543.

In assessing this element, courts analyze the totality of the circumstances, and "[t]he inquiry is an objective one focusing on the promises and offers made to investors" without searching "for the precise motivation of each individual participant."  *Binance*, at *14 (quoting *Telegram*, 448 F. Supp. 3d at 371).  Where, as here, Defendants "embarked on a public campaign to encourage" all investors to purchase the relevant crypto assets in furtherance of the larger enterprise, whether "a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts."  *Terraform*, 684 F. Supp. 3d at 197.  Indeed, other courts evaluating Exchange Act claims like those alleged in this case held the SEC had plausibly alleged at least two of the Ten Crypto Assets—SOL and ALGO—were being offered and sold as securities when the defendants in those cases made them available for trading on their crypto trading platforms.  *See Kraken I*, at *3-6, *14-17; *Coinbase*, 726 F. Supp. 3d at 275-76, 290-94 (focusing on SOL and CHZ).

> 1.  *Secondary Market Investors in BNB Have a Reasonable Expectation of Profits from Binance's Efforts.*

The Amended Complaint now sets forth additional allegations about the "expectation of profits" the Court held were originally wanting as to resales of BNB on the Binance Platforms.  *See Binance*, at *22.  Specifically, the Amended Complaint allegations show that Binance made and is making extensive, widespread public ongoing statements and inducements to encourage retail investing in BNB.  AC ¶¶ 295-300, 307-08, 335-36, 351-97.  These allegations are in addition to those in the original Complaint that establish a reasonable expectation of profits in initial and post-ICO BNB investors.  *Binance*, at *15-19.

27

As a threshold matter, the Amended Complaint makes clear that the public inducements to buy BNB for investment purposes are not historical artifacts that Defendants "no longer post[]," BAM Mem. 15, but are statements they continue to make available to BNB investors trading on the Binance Platforms and through their social media and other internet-based platforms post-ICO. *See, e.g.*, AC ¶¶ 351, 353, 363-70, 375, 379-87, 390, 395-96, 398-99 (detailing numerous post-ICO statements and actions promoting BNB's profit potential from value appreciation based on Binance's efforts).

These statements and efforts include, first and critically, ongoing plans to undertake efforts lasting well into the future. They speak—on widely followed social media channels available to retail investors worldwide—of Binance's efforts to increase the value of BNB by growing the Binance.com Platform, *e.g.*, *id.* ¶¶ 372-73, 384, 387, 390, 393-95, which investors understand remains Binance's primary business, as well as other products and services that are part of the BNB ecosystem. *E.g., id.* ¶¶ 379-383, 386-87. In other words, Defendants continue to publicly promote their efforts to continue to develop, operate, and expand the BNB ecosystem to increase BNB demand, tying the increase in BNB's price to Binance's on-going efforts. *E.g.*, *id.* ¶¶ 366, 381, 388 (Zhao's and Binance's promotions). As reflected in a July 2021 Forbes interview, BAM's former CEO B confirmed that investors view BNB as an investment in Binance and its efforts:

> [I]ncreasingly, people are choosing to hold the token, rather than spend it for the discount because they found that the increased value of the token as the company grows, exceeds the financial value of the discounts. And so it gets our customers to act a little bit more like owners—people who want the company to succeed; their interests are aligned with that of the company.

AC ¶ 398; *see also id.* ¶ 399 (other BAM promotions of BNB as an investment).

It is not that these representations indefinitely "travel" with the asset. BAM Mem. 26. Rather, Binance continues to post and make these representations available on widely accessed

public platforms, while also making similar new ones, addressing efforts it would make beyond the ICO. This means that a reasonable investor understands that the promised efforts do not cease on the day they are promised. Instead, the efforts, like the representations, are ongoing. *Kraken*, at \*11 ("[I]f a reasonable investor would understand representations made during the primary market transactions to carry forward into the secondary market, then those representations may be considered. … That a transaction does not involve the asset's primary issuer does not foreclose the possibility that the primary issuer's representations follow the asset through to the secondary market.").

Second, the Amended Complaint includes allegations that Binance continues to promote BNB specifically as an investment whose potential returns are tied to Binance's and others' ongoing efforts, and that these promotions and inducements, like others, also did not cease when BNB was first sold, but continue to this day. *E.g.*, AC ¶¶ 295-300, 307-08, 335-36, 351-97.

For example, the SEC alleges that, from at least August 2020 until February 22, 2022, the Binance.com Platform had a webpage devoted to "How to Buy BNB" that contained a link to where investors could purchase BNB and touted its potential price appreciation. *Id.* ¶¶ 369-70. Under a section entitled, "What to Do After I Buy BNB," the first option was "Store/Hold BNB," noting that "[m]any users hold on to their BNB with the expectation of it increasing in value," AC ¶ 369, and by February 22, 2022, the webpage further promoted that among "Reasons to Buy BNB" included to "[m]ake it part of a short or long-term investment strategy," AC ¶ 370; *see also Grybniak*, 2024 WL 4287222, at \*11 (considering statements about price appreciation based on plans to generate liquidity by listing the token on secondary trading platforms and "encourag[ing] investors to purchase *and hold* their" tokens).

Third, Binance also promoted its ongoing BNB "burn" program.  AC ¶¶ 374-78; *see also Coinbase*, 726 F. Supp. 3d at 292 (expectation of profits could be demonstrated by statements that issuers employ deflationary strategies to reduce the total supply); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020) (finding the "role of supply and demand in driving the value of Kin" sufficient to establish expectation of profits); *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 444 (S.D.N.Y. 2023) (same).  Until at least June 2019, Binance's BNB burn program was directly tied to Binance's profits—the more money Binance made, the more BNB it burned.  AC ¶ 374.  As Zhao explained, this mechanism "works the same way as a dividend economically."  *Id.* ¶ 375.  And, as Binance posted on its website, at least as of November 14, 2019, "Binance schedules quarterly BNB burns to permanently reduce the supply of BNB, in turn, increasing its value."  *Id.* ¶ 376.  Binance fully controlled the amount of BNB burned until at least December 2021, when it created an "Auto-Burn" program that purports to be based on a formula accounting for BNB's price.  *Id.* ¶ 378.

In short, through these various public channels, Defendants have engaged in persistent pre- and post-ICO promotion of their efforts as ongoing, complex, and specialized, implicitly requiring significant funds, expertise, and time to undertake, all the while casting the purchase of BNB as an investment in that enterprise.  *E.g.*, ¶¶ 297, 299, 379-383, 386-87, 389-97.  Some examples include:

- In an October 10, 2018 interview broadcast globally on YouTube that is still available online as of September 2024, Binance's Chief Growth Officer stated, "By having people invest in BNB token, they're even more interested in the success [of the Binance.com Platform] … By holding BNB, you are effectively holding an influential share of the crypto project."  *Id.* ¶ 384.

- In a February 6, 2019, blog post on Binance's website called "10 for 10:  How the Binance Ecosystem drives BNB to Top 10," Binance reported that BNB had become a top 10 trading crypto asset and described "the different ways that each Binance division contributes to BNB's Top 10 status."  *Id.* ¶ 387.

- On January 10, 2020, in an interview broadcast on YouTube, Binance's Managing Director stated, "Recently we launched lending, we launched staking, we launched futures, all of those new businesses contribute to the value of BNB." *Id.* ¶ 390.

- A February 22, 2021, Binance's website blog post reported that BNB's market price surpassed $50, explained numerous ways in which Binance's efforts have driven this increase, and further promised that Binance "will continue to work on adding more use cases for BNB for the sake of our community, which has driven unprecedented growth for the token today." *Id.* ¶ 393. It also quoted Zhao as stating that Binance's efforts to expand BNB's use cases "are reflected in its growing price." *Id.*

- In July 2022 Zhao tweeted, "I am spending all of my efforts on #BNB. And shill #Bitcoin from time to time, when I am too shy to explicitly shill #BNB[]." *Id.* ¶ 396.

- On June 13, 2024, Binance Labs announced a "BNB Incubation Alliance" with others "to foster early-stage blockchain innovation" around BNB, and noted that its launch "coincides with a surge in BNB's market performance." *Id.* ¶ 397.

All these promotions lead an investor to understand and expect that Binance's efforts as to BNB did not cease after the ICO and will continue into the foreseeable future. More importantly, an investor understands that Binance's experience and expertise is critical to giving BNB its market value. As discussed more fully below, *infra* § I.D.3, even if BNB has a "use," without Binance's ongoing efforts to maintain the Binance Platforms, BNB could lose its value. By contrast, if Binance continues its efforts as it has consistently publicly stated it will, and as its own large BNB holdings compel it to do, all investors could profit. *E.g.*, *Telegram*, 448 F. Supp. 3d at 367 (reasonable investor understands she "will only profit if the reputation, skill, and involvement of Telegram and its founders remain behind the enterprise, including through the sale of Grams from the Initial Purchasers into the public market").

The Amended Complaint thus plausibly alleges that investors who buy BNB on the Binance Platforms reasonably expect to profit from Binance's efforts—just as the original BNB purchasers did. This is true whether they bought from Binance or from another investor. *E.g.*, *Harper*, 2024 WL 3845444, at *10 (citing *Terraform*). "[I]t was the expectations created by the

31

seller, which were inextricable from the interest being offered, that brought the transaction within the scope of the federal securities law." *Binance*, at *8 (citing *Joiner*, 320 U.S. at 349).

> ### 2. *Investors in the Ten Crypto Assets Have a Reasonable Expectation of Profits from the Efforts of Others.*

The Amended Complaint similarly plausibly alleges that, given the persistent economic reality of the Ten Crypto Assets and the issuers' ongoing targeting of retail investors with continued efforts, and representations about those efforts (as amplified by Defendants), investors in the Ten Crypto Assets reasonably expect to profit from the entrepreneurial and managerial expertise and efforts of others, including when they purchase them on the Binance Platforms.

As a general matter, from the initial development and sales of the Ten Crypto Assets to the present, the issuers have widely and publicly touted their skills, expertise, and ongoing development work that would give value to the Ten Crypto Assets and create the potential for investment returns, in the form of price increases, which could be realized in a secondary market. These efforts are not historical, but are forward-looking, long-term endeavors anticipated to continue for the foreseeable future. These promotions were made in various media and are still available today, *e.g.*, AC ¶¶ 492-94, and some were directed at investors trading on the Binance Platforms. *See, e.g.*, *id.* ¶¶ 88, 227, 461, 463, 469-72, 483-85, 492-513. Some are rebroadcast by Defendants. *See id.* ¶¶ 495-504. These statements "reached not only the purchasers in the primary market at the [ICO] stage, but also those potential investors considering whether to acquire the Crypto-Assets in the secondary market." *Coinbase*, 726 F. Supp. 3d at 292.

First, the Amended Complaint alleges that, even after the initial sales, the issuers of the Ten Crypto Assets engage in promotions about their efforts, and in actual efforts that they later promoted, with respect to their respective assets and related ecosystems. The post-launch efforts include operating and building out new components of the enterprise centered on the asset,

engaging in strategic partnerships and deals, and hiring talented new leadership that could continue these efforts. The public promotions include touting actual as well as envisioned efforts, at times casting them as complex or long-term, and tying them to the growth of demand or value for the assets. *E.g.,* AC ¶ 575(e) ("Polygon has grown exponentially. To continue on this path of stupendous growth we have crystallized our strategy for the next 5 yrs to drive mass adoption of web3 by scaling Ethereum. Our treasury remains healthy with a balance of over $250 million and over 1.9 billion MATIC."); ¶ 761 (Coti is "uniquely optimized to solve challenges around payments," … will "continue to gain more traction with more enterprises," … "plan[s] on expanding," and the "ecosystem of [COTI] holders will continue to benefit from the network's success" with "new and innovative features geared toward the growth of value captured."); *see also* ¶ 539 (SOL); ¶¶ 555-56 (ADA); ¶¶ 597-606 (FIL); ¶¶ 634-35 (ATOM); ¶¶ 650-56 (SAND); ¶¶ 676-82 (MANA); ¶¶ 711-16 (ALGO); ¶¶ 736-39 (AXS).

Second, in addition to the statements above, since the initial sales, the Ten Crypto Assets' issuers continue to tout that they and their team members hold large amounts of their respective tokens, and that some holdings are subject to vesting or holding periods, or that token sales are being used to fund operations. *E.g.*, *id.* ¶¶ 528, 530 (SOL); ¶¶ 550-51 (ADA); ¶¶ 570, 575(e) (MATIC); ¶¶ 599-600, 606 (FIL) ("vesting creates long-term alignment" and proves the Filecoin Team "is deeply committed for the long-term … to all other network participants"); ¶¶ 628-29 (ATOM); ¶ 645 (SAND); ¶¶ 667-68 (MANA); ¶¶ 692, 704-06, 703 (ALGO) ("We will be holding our founder's tokens for the long term and will not be selling them," identifying they would "use our founder's tokens to support the ecosystem and encourage development"); ¶¶ 748, 767 (COTI).

This has led investors to understand that the issuers are financially compelled to undertake efforts to increase the price of the tokens, even after the initial sales. *E.g.*, *id.* ¶ 738 (promotion of AXS holdings as keeping AXS team "incentivized to keep building after a successful token sale"); *see also id.* ¶¶ 735, 739 (AXS); *see LBRY*, 639 F. Supp. 3d at 220 (issuer's retention of tokens signaled it would work to improve the value of blockchain, creating a reasonable expectation of profits in holders, including those who bought on trading platforms).

Third, like Binance did as to BNB, certain promoters also market the ways in which they managed supply, including through limiting supply and subsequent "burn" events, leading investors to reasonably expect profits because reducing supply would increase the price of their tokens. *E.g.*, AC ¶ 540 (Solana markets that SOL burns as a "deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price"); ¶¶ 578-79 (Polygon markets that it burns MATIC, which will have a deflationary effect); ¶¶ 653-54 (statements that limited supply of SAND "will produce a scarcity effect reducing the SAND available … and foster[] demand"); ¶¶ 607, 614 (FIL limited supply and burn); ¶¶ 680, 682 (MANA control of supply and demand, including through burns); ¶¶ 696-98 (ALGO buybacks to preserve price floor); ¶ 767 (COTI amending distribution plan to give token holders "more clarity" and announcing repurchases in the market); *see also Coinbase*, 726 F. Supp. 3d at 276 (Solana emphasizing its SOL burns contributed to an expectation of profits).

Defendants' argument that the "burn" efforts are "ministerial" because they are "automatic," not discretionary, or easy to carry out, is incorrect. *E.g.*, BHL Mem. 20; BAM Mem. 42-43. The question is whether the efforts are managerial and entrepreneurial, *i.e.*, efforts that "affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). The management of a token's supply is critical to the success or

failure of enterprises premised on these tokens, because if supply becomes too high or too scarce, the entire secondary market upon which their value depends could collapse.  That something may be done by automation does not mean it must be ministerial, any more than something done manually means the task is managerial.  Moreover, that some of the burn mechanisms were built into the protocol before sales on the Binance Platforms does not impact the analysis.  Pre-purchase entrepreneurial efforts are properly considered, particularly where, as here, they are ongoing.  *See SEC v. Life Partners*, *Inc.*, 102 F.3d 587, 588 (D.C. Cir. 1996).  For example, the Amended Complaint alleges Binance's periodic modification of its own burn mechanism.  *E.g.*, AC ¶ 304, 378.  Further, the issuers' intent behind implementing a burn, *e.g.*, BAM Mem. 31, is not relevant.  The issuers' own additional motivations do not negate the deflationary impact (as the issuers touted), and the expectation of profits they created in investors.

Third, the issuers also deployed funds to attract additional investors and promoted the development of a liquid secondary market, including by listing and/or promoting the listing on secondary trading platforms, including the Binance Platforms.  *E.g.*, *id.* ¶¶ 469-72 (general); ¶¶ 531-33 (SOL); ¶ 556 (ADA); ¶ 572 (MATIC); ¶ 601 (FIL); ¶¶ 644, 650 (SAND); ¶ 681 (MANA); ¶ 697 (ALGO); ¶ 730 (AXS); ¶¶ 752, 771 (COTI).  These sorts of promises typically fuel an expectation of profits.  *E.g.*, *Grybniak*, 2024 WL 4287222, at *11 (statements "regarding the possibility of resale in the secondary market are crucial to the investor with respect to the expectation of realizing profits from capital appreciation") (cleaned up); *Gary Plastic*, 756 F.2d at 233, 234, 240-41 (promise to maintain secondary market fueled expectation of profits); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356 n.14 (S.D.N.Y. 2019) (same).

Fourth, the Amended Complaint alleges that, to develop the secondary market, issuers have undertaken entrepreneurial and managerial efforts to go through Binance's and BAM's

listing process. *E.g.*, AC ¶¶ 473-91. The process includes extensive due diligence through which Defendants evaluated whether the Ten Crypto Assets would be attractive for investors based on such considerations as the token team project's technical and commercial viability, regulatory risks, and ongoing plans. *See, e.g.*, *id.* ¶¶ 465-67, 474-78, 490-91. In some cases, the issuers of the Ten Crypto Assets entered into contracts with Binance and BAM, binding themselves to undertake ongoing development and other efforts to increase the Ten Crypto Assets' value, to engage in marketing efforts to ensure active trading, and to maintain liquidity on the Binance Platforms, such as by onboarding market makers to trade. *See id.* ¶¶ 479-90. This all occurred because, as Zhao touted, value for these crypto assets comes from investors "[m]ak[ing] sure [project] teams are WORKING." *Id.* ¶ 491.

Thus, gaining entry to the ongoing secondary market on the Binance Platforms was a signal to investors that the original representations about the issuers' efforts carried through to the present, and that the promoters were making good on their promises. This is why, upon listing, issuers promoted it as another reason investors could expect profits from purchasing the assets. *E.g.*, *id.* ¶ 532 (SOL); ¶¶ 645, 650 (SAND); ¶¶ 730, 742 (AXS); ¶ 766 (COTI).

Finally, Defendants themselves participate in the coordinated campaigns of widespread promotion, targeting investors to purchase the Ten Crypto Assets based on the expectation of profits from the ongoing efforts of the issuers and others. *See generally* AC ¶¶ 494-513. By having their sources summarized and linked at the Binance Platform trading and other webpages, the issuers and promoters leverage Defendants' broad user bases and connections to expand their audience, increase trading volume and revenue, and facilitate additional development opportunities. *E.g.*, *id.* ¶ 771 (Coti Medium post: "The exposure granted to us by listing on

36

Binance is priceless. We have been getting non-stop offers for new partnerships, listing opportunities, and more").

Specifically, upon or after listing one of the Ten Crypto Assets, Defendants have engaged in far-reaching promotion through their websites, social media channels, YouTube videos, rewards promotions, and other means, announcing the listing and providing information about the crypto asset and ongoing development by the issuers. These promotions cast the assets as investments in their specific enterprises. *E.g.*, *id.* ¶¶ 541-46 (SOL); ¶¶ 557-61 (ADA); ¶¶ 581-83 (MATIC); ¶¶ 594, 613-17 (FIL); ¶¶ 636-40 (ATOM); ¶¶ 657-62 (SAND); ¶¶ 683-90 (MANA); ¶¶ 717-22 (ALGO); ¶¶ 741-46 (AXS); ¶¶ 769-75 (COTI). These promotions extend to the trading pages on the Binance Platforms where investors go to buy, sell, and trade the Ten Crypto Assets, and which contain tabs with a summary of information about the crypto asset and links to the issuer sites and related information to investors. *Id.* ¶¶ 88, 227, 499-510.

Defendants also post extensive price analysis and research papers concerning each asset. *E.g.*, *id.* ¶ 495 (SOL); ¶¶ 560-61 (ADA); ¶ 582 (MATIC); ¶ 616 (FIL); ¶ 637 (ATOM); ¶ 658 (SAND); ¶ 689 (MANA); ¶¶ 719, 721 (ALGO); ¶¶ 742, 745 (AXS); ¶ 772 (COTI).

Further, Defendants host and promote "Ask Me Anything" ("AMA") interviews with certain of the Ten Crypto Asset issuers on broadly available social media channels, providing further information about the projects and opportunities for investors to engage with the issuers. *Id.* ¶¶ 498, 581 (BAM promoting an AMA with MATIC's cofounder on Telegram channel); ¶¶ 685, 688 (Binance and BAM both promoted MANA through AMAs on their Telegram channels); ¶ 718 (Binance has hosted several AMAs with ALGO team); ¶ 744 (BAM Trading hosted AMA on Twitter with AXS team); ¶ 770 (same with COTI team).

Notably, in providing this extensive information, including amplification of issuer and promoter statements and other materials, Defendants tell investors to "do your own research and trade on your own knowledge," encouraging investors to read information provided by the Defendants and the issuers and developers. *Id.* ¶ 367. These sources include ongoing team and project updates from the issuers, Binance's "Project Reports" providing a "deep dive" into the crypto projects, and other information about the "tokenomics" for each asset—a "portmanteau of 'token' and 'economics'" that "refers to a token's fundamental characteristics and how they may impact a token's market value." *Id.* ¶¶ 504, 508, 512; *see also id.* ¶¶ 88, 227, 461, 492-513. In so doing, both the issuers and Defendants continue to equate investing in the Ten Crypto Assets with investing in traditional securities like stocks and bonds.

In addition to the examples discussed above about promised and actual entrepreneurial efforts, the development of secondary markets, efforts to manage supply, and Defendants' rebroadcasting of these various inducements, set forth below is a sampling of specific examples of the ongoing, widely publicized statements by each of the Ten Crypto Assets' issuers and promoters make on websites, various social media platforms, YouTube, platforms with channels to communicate with issuers, industry publications, and other internet and public fora, as well as in-person events. These statements promote the Ten Crypto Assets as investments by providing specific information about the asset, the developers' expertise, experience, and managerial and entrepreneurial efforts, and touting that if these efforts are successful, the demand (and, therefore, the value) for the assets will increase. Critically, the Amended Complaint alleges that the economic realities and widely disseminated promotional statements persisted while the Ten Crypto Assets were trading on the Binance Platforms. *E.g.*, AC ¶¶ 534-46 (SOL); ¶¶ 552-61 (ADA); ¶¶ 567-83 (MATIC); ¶¶ 594, 613-17 (FIL); ¶¶ 631-40 (ATOM); ¶¶ 644-62 (SAND);

¶¶ 673-90 (MANA); ¶¶ 707-22 (ALGO); ¶¶ 731-46 (AXS); ¶¶ 753-75 (COTI).  These examples do not substitute for the full set of allegations in the Amended Complaint and all the reasonable inferences that may be drawn in the SEC's favor.

**SOL** (AC ¶¶ 522-46).  "SOL" is the native token of the Solana blockchain.  *Id.* ¶ 522. Solana's website, podcast, YouTube channel, and other social media feature interviews of management, posts, and videos about media events and enterprise updates, highlighting the experience of the team's "pioneering technologists" and their continuing efforts to increase demand for SOL.  *Id.* ¶¶ 537-40; *see also id.* ¶ 533 (Solana touting the opportunity to increase value of SOL and ecosystem through trading on platforms including Binance.US and announcing Binance.US listing as an "exciting milestone" that "provides the Solana community with another first-rate liquidity partner to support our rapidly growing American audience").

**ADA** (AC ¶¶ 547-61).  "ADA" is the native token of the Cardano blockchain.  *Id.* ¶ 547. The team behind Cardano publicly touted the skills and experience of "expert engineers and researchers," *id.* ¶ 558, and their efforts to introduce "innovations, new functionality, and new features" and "improv[e] the underlying performance of the Cardano network to better support growth and adoption of thousands of applications with high transaction volumes," which would drive demand, *id.* ¶ 556; *see also id.* ¶¶ 554-55.  Defendants amplify this promotion, guiding investors to "learn[] about" the token and "research the … Cardano market," so "you know … the factors that cause a price to rise or fall."  *Id.* ¶ 559.

**MATIC** (AC ¶¶ 562-83).  "MATIC" is the native token "expected to provide the economic incentives … of the Matic Network," now called Polygon.  *Id.* ¶¶ 562, 564.  Polygon widely touted its numerous efforts to grow the Polygon network by "working around the clock to continue delivering great results" to scale and "to drive mass adoption" of the platform.  *Id.*

¶ 575.  The founders and promoters explicitly link the value of MATIC to their efforts to grow the Polygon network, acknowledging that their public sales gave them "responsibility" and that "we are trying our best to protect even the small, uneducated retail investors."  *Id.* ¶¶ 575, 581.

**FIL** (AC ¶¶ 584-617).  "FIL" is the crypto asset that powers the Filecoin network, a data storage network that runs on a blockchain.  *Id.* ¶ 584.  From inception, the Filecoin Team told investors that "Filecoin['s] success will reward the investment of supporters like you by … increasing the value of the Filecoin tokens," *id.* ¶ 597, and has promoted that it would work to achieve these results: "We think and are working for Filecoin to be worth a lot more in the future," *id.* ¶ 605; *see also id.* ¶¶ 609-10 (touting "roadmaps," "master plans," and information about additional plans to advance the network).  In another example, the promoter explicitly linked its efforts, the growth of the network, and the increased value of the token, noting that "[g]rowth of the network will drive demand for the token" and "[t]he more value created by the Filecoin Network, … the greater the value and worth of the token."  *Id.* ¶ 602; *see also* ¶¶ 585, 598.  BAM then did its part, tweeting that if investors "bought $10 of $FIL in weekly recurring buys last month, your portfolio could now be up 19.62%!"  *Id.* ¶ 614.

**ATOM** (AC ¶¶ 618-40).  "ATOM" is the native crypto asset of the Cosmos Hub blockchain that is part of, and provides services to, other blockchains in the Cosmos network.  *Id.* ¶¶ 618-19.  The Cosmos team promotes their "years of experience in building and launching chains," *id.* ¶ 635(d), and extensive ongoing efforts to develop the Cosmos network.  *E.g.*, *id.* ¶¶ 632-35.  They also use widely available website postings and an annual conference to "update the community" and tout the token as "uniquely positioned" among other possible crypto assets. *Id.* ¶ 635.  Again, BAM does its part, promoting ATOM as a "top gainer" crypto asset, noting its "+6.1%" price increase.  *Id.* ¶ 638.

**SAND** (AC ¶¶ 641-62).  "SAND" is the native token for the Sandbox gaming platform. *Id.* ¶ 641.  The Sandbox team promotes how it is deploying funds to fund efforts to grow the SAND ecosystem, *id.* ¶ 651, touts its founders as "game industry veterans who have developed multimillion dollar franchises" who "will significantly increase our development capabilities," *id.* ¶ 656(a), and promotes efforts to "encourage the broader adoption of SAND," *id.* ¶ 651(c), (d).  They also tie the value of the SAND ecosystem to the value of the games.  *E.g.*, *id.* ¶ 651(a) ("[T]he overall valuation of the metaverse grow through the valuation of all games funded by the Foundation, creating a virtuous circle to enable funding bigger games.")

**MANA** (AC ¶¶ 663-90).  "MANA" is the crypto asset of the Decentraland virtual reality ecosystem.  *Id.* ¶ 664.  The Decentraland team has promoted MANA to the public as an investment in the team's ongoing efforts to grow the Decentraland protocol and "Foster the Network," providing "project updates" and promoting "exciting milestones" to "increase MANA liquidity."  *Id.* ¶ 679, 682.  The team also provides a MANA token-specific page on its website "to help our community better understand the MANA token," including by providing "a summary of the most important stats, such as total supply, circulating supply, and how these may be affected by the aforementioned (and all future) MANA burn."  *Id.* ¶ 682.

**ALGO** (¶¶ 691-722).  "ALGO" is the native token of the Algorand blockchain.  *Id.* ¶ 691.  The Algorand websites tout the "internationally recognized" teams behind the project and their technical and economics experience and expertise and promotes their efforts to develop and grow the ecosystem.  *Id.* ¶¶ 713-14.  Since inception, with the structuring of initial sales and refund policies, the team has tied the value of ALGO to their ongoing efforts, underscoring their "goal is to invest in the growth, sustainability and performance of that economy."  *Id.* ¶ 696.

BAM further touted the expertise of the Algorand team, posting on the Binance.US website that the Algorand protocol was for "the next generation of financial products." *Id.* ¶ 719.

**AXS** (AC ¶¶ 723-46). "AXS" are tokens native to the blockchain game Axie Infinity. *Id.* ¶ 723. The AXS team publicized plans to use funds from AXS sales, including the IEO on the Binance Platform, to develop and market the Axie ecosystem, *id.* ¶¶ 734, 738, while touting the experience and efforts of the team leading the product development and growth, and setting "growth goals in terms of daily average users of Axie Infinity and average weekly growth rates," *id.* ¶¶ 736-37. The team further explicitly ties value of AXS to these ongoing efforts and promotions, including by likening ownership of AXS tokens to ownership in the Axie ecosystem, and touting that owning AXS is like owning a "reasonable slice of a huge ecosystem" given the limited supply of AXS tokens. *Id.* ¶ 739.

**COTI**[8] (AC ¶¶ 747-75). "COTI" is the native token of the Coti blockchain, which purports to provide a digital infrastructure for payments. *Id.* ¶ 747. Coti regularly and publicly posted about its team's expertise, "meaningful milestones," and planned steps to grow the network to "continue to benefit" COTI holders. *Id.* ¶¶ 755, 758-61. Similarly, Coti provided regular "COTI updates" on its YouTube channel in which its CEO promoted COTI as a good investment, promising that "those who will be patient" with respect to COTI "will reap the fruits." *Id.* ¶¶ 763-65.

---

[8] Because COTI was offered and sold as a security, BAM's attempt to dismiss the portion of the SEC's fraud claim alleging a fraud on BAM's customers fails. *See* BAM Mem. 44-45. Moreover, this portion of the claim is not limited to fraud on COTI investors or dependent on the alleged wash trading in COTI, and the Court already rejected the argument that the alleged misrepresentations and omissions were not made "in the offer or sale" of any securities in finding BNB was offered and sold as a security while available on the Binance.US Platform. *Binance*, at *40.

3.  *Defendants' Comparisons of the Offers and Sales on the Binance Platforms to the Offers and Sales of Commodities for "Use" or "Consumption" Fail.*

As they did in their first motions, Defendants again argue the SEC seeks to regulate "commodities," and that the SEC has not alleged that reasonable buyers purchased the token "primarily as an investment," noting the purported "utility" of, or marketed "uses" for, certain of the Ten Crypto Assets.  BHL Mem. 25-32; BAM Mem. 23-24, 33-42.

As court after court has stated in rejecting arguments that the "use" of a crypto token precluded application of the federal securities laws, "[p]lenty of items that can be consumed or used … have been the subject of transactions determined to be securities because they had the attributes of an investment."  *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021) (citing Thomas Lee Hazen, The Law of Securities Regulation, § 1.49, at 116-19).  "Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract."  *LBRY*, 639 F. Supp. 3d at 220.  The "'utility token' characterization does little to counteract … representations that purchasers would see their tokens increase in value."  *Grybniak*, 2024 WL 4287222, at *11; *see also Dufoe*, 2024 WL 3278637, at *7 ("[T]hat a product has some potential usefulness or intrinsic value will not defeat a reasonable expectation of profit where the primary motivation is profit") (collecting cases).

Rather than focus on the existence of a "use," courts look to the totality of circumstances of the economic realities and the "economic inducements" to determine whether there was a reasonable expectation of profits.  *Joiner*, 320 U.S. at 352-53.  Defendants claim that there is "no limiting principle," BAM Mem. 15-16, but there is a long line of cases providing such guardrails. The starting point is *United Housing Foundation, Inc. v. Forman*, where the Supreme Court explained that where the "inducement to purchase was solely to acquire subsidized low-cost living space" and the "investors were attracted *solely*" by that prospect and "not by financial

43

returns on their investments," the purchase would not be subject to the federal securities laws. 421 U.S. 837, 852-53 (1975) (emphasis added).[9]  Applying *Forman*, courts considering whether an instrument was purchased for use consider various factors such as:

> (1) whether the amount sold was indicative of a true consumptive purpose, *compare Grenader v. Spitz*, 537 F.2d 612, 617-618 (2d Cir. 1976) (co-op shares were not investment contracts because "[t]he number of shares [available was] … in proportion to the size and location of the apartment"), *with Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir. 1979) (sale of large campsites blocks constituted investment contracts as investors "manifestly could not use" all of them);

> (2) whether the promoter, despite disclaiming that the instruments could only be "used," also made representations that "fueled expectations of profit," *SEC v. SG Ltd.*, 265 F.3d 42, 53-54 (1st Cir. 2001) (holding that that sales of online gaming tokens was sales of securities, and that defendant's promotion of potential returns "constitute[s] a not-very-subtle form of economic inducement" unlike *Forman* where promoter "[n]owhere" sought "to attract investors by the prospect of profits") (quoting *Forman*, 421 U.S. at 854));

> (3) whether it is reasonable to expect purchasers to "use" the item, *e.g.*, *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (contract for sale and care of beavers was investment contract because "as a practical matter, it would have been physically impossible for the average purchaser of live breeding beaver to take absolute possession of his animals"); and

> (4) whether the price at which the item is sold indicates a consumptive as opposed to an investment motivation.  *E.g.*, *Continental Mktg. Corp. v. SEC*, 387 F.2d 466, 471 (10th Cir. 1967) (promoter who sold nothing but beavers marketing the potential return on investment provided by a separate animal breeding service sold investment contracts in part because "the beavers as mere animals and not as part of the enterprise did not have value consistent with the price many of the purchasers paid").

*See generally*, SEC, Strategic Hub for Innovation & Fin. Tech., "Framework for 'Investment Contract' Analysis of Digital Assets," (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

---

[9] It is simply not the case, as Binance contends, that there can be no securities transactions where "'noninvestment interests' could not 'be segregated from'" investment intent.  BHL Mem. 24 (quoting *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979)).  Binance quotes *Daniel*'s analysis of whether an employee who participated in a noncontributory, compulsory pension plan provided something of value to his employer for purposes of *Howey*, which has no bearing on *Forman*'s analysis of when a seller promotes an item for investment, rather than consumption.

These factors together provide the "limiting principle[s]" Defendants claim are absent. Here, the Amended Complaint's allegations belie any argument that BNB or any of the Ten Crypto Assets are being offered or sold "solely" or even principally for "use."

First, BNB and the Ten Crypto Assets are available on the Binance Platforms in all quantities, from infinitesimal fractions to billions, wholly unrelated to consumptive intent, at wildly fluctuating prices, and with market capitalizations that can reach into the tens-of-billions of dollars—all wholly unrelated to their consumptive value. AC ¶¶ 406-07 (BNB); ¶¶ 515-17 (Ten Crypto Assets generally); ¶ 535 (SOL); ¶ 553 (ADA); ¶ 573 (MATIC); ¶ 595 (FIL); ¶ 632 (ATOM); ¶ 647 (SAND); ¶ 674 (MANA); ¶ 708 (ALGO); ¶ 732 (AXS); ¶ 754 (COTI). Moreover, any amount will be available and transferable at any price. *Id.* ¶ 519. This economic reality is inconsistent with true consumptive use. *See Outdoor Resorts*, 608 F.2d at 193.

Second, the transferability of BNB or the Ten Crypto Assets is not limited, like the co-op shares in *Forman* and *Grenader* were. When restrictions on transfers exist that limit the crypto assets to being transferred into the supposed "games" or "ecosystems" where they can be "used" (making them look more like commodities for use in a program and less like a vehicle for speculative investment) the SEC staff has had no trouble recognizing those limiting principles and declaring publicly that transactions would not be considered securities transactions. *See IMVU, Inc.*, SEC No-Action Letter, 2020 WL 12949519 (Nov. 9, 2020) (Commission staff no-action letter regarding particular crypto asset being sold only for use within its ecosystem); *Pocketful of Quarters, Inc.*, SEC No-Action Letter, 2019 WL 8128104 (July 25, 2019) (same); *Turnkey Jet, Inc.*, SEC No-Action Letter, 2019 WL 1554004 (Apr. 3, 2019) (same).

Third, while Defendants contend that BNB and at least certain of the Ten Crypto Assets have been marketed for consumptive use, they cannot and do not dispute that their promoters

(including Binance) also pointed to the potential for profit in their promotions. *See generally supra* §§ I.D.1-2. Thus, the Amended Complaint forecloses any conclusion that "[n]owhere" do the promoters' marketing speak of the possibility of profits. *Forman*, 421 U.S. at 854.

Defendants' contrary arguments are just an invitation to this Court to decide, for example, that as a matter of law an investor would be guided only by issuers' post-ICO references to "utility," or "currency." This would ignore exhortations about investment returns, such as in the case of BNB where Binance consistently touted how its efforts to grow the BNB ecosystem was positively impacting BNB's price. *E.g.*, AC ¶¶ 386-97. The arguments are also asking the Court to focus myopically on statements that BNB may be used to "pay for goods and services" and ignore Mr. Zhao's and Binance's tweets to their millions of followers suggesting that holding BNB as an investment could make you rich. *Id.* ¶ 366. It is not the SEC that is "cherry-picking," BHL Mem. 25, and, to the extent Defendants can reconcile their blatant investment pitches with purported "uses," the Court has already held at best they only "raise questions about what will be established at the end of the day" (*i.e.*, on a full factual record). *Binance*, at *16. The same is true regarding whether some of the statements at issue are "generic platitudes," a "truism," or "general puffery." BHL Mem. 26; *see Binance*, at *30-32, *35-36.

Fourth, for many of the same reasons, it is not reasonable to expect the purchasers of the Ten Crypto Assets to "use" them. While the "use of gaming language is roughly analogous to the cooperative's emphasis on the nonprofit nature of the housing endeavor" in *Forman*, where the promoter "made additional representations on its website that played upon greed and fueled expectations of profit," these "not very-subtle form[s] of economic inducement[] [are] closely analogous to the advertising representations in *Joiner*." *SG Ltd.*, 265 F.3d at 54; *see also Harper*, 2024 WL 3845444, at *10 (evaluation of totality of circumstances surrounding tokens

associated with metaverse game demonstrated investment intent versus consumptive intent). "It ill behooves [Defendants], after enticing their customers with fancy brochures touting their investment plan, now to claim there was no investment plan but the mere sale of an unadorned commodity." *Glen-Arden Commodities v. Constantino*, 493 F.2d 1027, 1034-35 (2d Cir. 1974).

Finally, even if some subset of purchasers was motivated by a desire to "use" the Ten Crypto Assets, that would not make the offers and sales at issue here something other than an investment contract. The existence of *some* consumptive intent does not defeat *Howey*. As explained in *Ripple I*, "[t]he reasonable expectation of profits from the efforts of others need not be the sole reason a purchaser buys an investment; an asset may be sold for both consumptive and speculative uses." 682 F. Supp. 3d at 326 (citing *LBRY*, 639 F. Supp. 3d at 220-21); *see also SEC v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019) (prong is satisfied even when "the investors' primary reason to participate" in a scheme was to gain a U.S. visa).

At a more fundamental level, in analyzing the transactions at the crux of this case, the Court should not accept Defendants' unsubtle invitation to gloss over the fundamental characteristics of the Ten Crypto Assets, which:

> '[W]ill generate no profit absent an ecosystem that drives demand,'—which is precisely what the issuers and promoters of the Crypto-Assets here promised to design and build … *Howey*'s focus on the economic reality of the transaction undermines any attempt to equate the sale of real properties, which possess inherent value and utility, to discrete groups of buyers, with capital raises on [the Platforms] by issuers and promoters, through the sale of fungible assets with no inherent value, to a potentially unlimited number of public buyers.

*Coinbase*, 726 F. Supp. 3d at 295 (quoting *Kik*, 492 F. Supp. 3d at 180).

### 4. Defendants' Additional Arguments are Unavailing.

Unable to grapple with the flood of promotional statements and activities that establish a reasonable expectation of profits from the efforts of others, Defendants resort to a hodgepodge of arguments that do not support dismissal.

First, Defendants erroneously contend that the SEC must allege that the relevant "offers actually reached a buyer," that the investors relied upon such statements in deciding to invest, and that post-purchase efforts do not count if the buyers have "no idea where their money was going."  BHL Mem. 19; BAM Mem. 24-26; *see also* BHL Mem. 25 (SEC must allege "that a reasonable buyer on [the Binance Platforms] would have even been aware of those statements"). In addition to the reasons discussed above refuting "flow into" arguments, the SEC need not prove subjective belief by any particular investor or reliance.  *Lorenzo*, 587 U.S. at 84; *Binance* at *14; *cf. Ripple III*, at *9 (considering "numerous promotional materials that were distributed to the general public via widely-viewed Internet posts and videos").

This is particularly so in the context of the *Howey* test, which is not a search for subjective, individual motivations.  Thus, courts hold that solicitations do not "need to be 'direct or personal to a particular purchaser,' or akin to 'contractual privity,'" and there is no "need to plead either reliance or causation" in the analogous context of holding private parties liable based on widely available promotions for crypto assets.  *Samuels*, 2024 WL 4815022, at *12 (quoting *Pino v. Cardone Capital LLC*, 55 F.4th 1253, 1259-60 (9th Cir. 2022)).  By contrast, none of the cases Defendants cite, including *Life Partners*, *Banner Fund*, and *Kik*, BAM Mem. 24-26, stand for the proposition that the SEC must prove what each investor saw, let alone relied on, to satisfy *Howey*.  *Salameh v. Tarsadia Hotel*, *see id.* at 26, is particularly inapposite, as the court's holding hinged on the timing of certain promotional statements.  726 F.3d 1124, 1131-32 (9th Cir. 2013).  Here, the promoters spoke loudly, repeatedly, and to the world at large.

In any event, the Amended Complaint's extensive, specific allegations show that the promotions at issue were made on widely available social media channels and were rebroadcast

by Defendants on the Binance Platforms. *See generally supra* §§ I.D.1-2. A more than reasonable inference is that the average investor *was* aware of these statements.

Second, BAM's attempt to dismiss promotions about crypto assets' "value" or "pricing," supposedly because it is information one may provide about a commodity, BAM Mem. 40-41, is a misguided labels-driven argument that elides economic reality and common sense. It ignores well-pled allegations about other information provided, such as that focused on the prospects for developing the enterprise, or discussing information about management, the business plan, and financial health and progress to date, as well as the broad public promotions of the issuers' ongoing efforts. *See generally supra* §§ I.D.1-2. This information is provided to those who invest in securities, but it is likely irrelevant and even non-existent for items being sold as commodities. The supermarket, for example, does not market oranges by discussing the historical prices or the potential price appreciation of the item, nor does it identify the manager of an enterprise or pitch that the reason to buy the orange is based on its efforts.

Third, Defendants' contention that the SEC has not pled post-purchase efforts by the promoters, *e.g.*, BHL Mem. 19; BAM Mem. 26-27, is wrong. As a threshold matter, Defendants ignore that initial development efforts *are* relevant entrepreneurial and managerial efforts that are part of the totality of the economic realities to be considered. *See Life Partners*, 102 F.3d at 588; *see also Kraken I*, at *11 ("[I]f a reasonable investor would understand representations made during the primary market transactions to carry forward into the secondary market, then those representations may be considered."). More importantly, the SEC has alleged specific, persistent *ongoing* efforts and corresponding promotional statements by Binance and each of the Ten Crypto Assets' promoters and developers and their strong financial incentives (and in some cases contractual obligations with Defendants) to undertake these efforts. *See supra* §§ I.D.1-2. Given

this ongoing activity, that a token may have been listed on the Binance Platforms *after* the tokens' initial sales, as purportedly reflected in BAM's chart, is irrelevant here. *See* BAM Mem. 27. *Howey* itself involved a promoter marketing its orange groves in part by noting the results of its *past* harvesting efforts, while promising subsequent ones. 328 U.S. at 296.

Fourth, Defendants' argument that the SEC's post-ICO allegations focus on awards and profits dependent upon investors' own efforts similarly is incorrect. *See, e.g.*, BAM Mem. 30, 34-35 & n. 38, 38-39. The Amended Complaint shows the promoters' efforts, not that of the investors, "form the 'essential managerial efforts which affect the failure or success of the enterprise.'" *Harper*, 2024 WL 3845444, at *9-10 (finding that, even though investors engaged in some effort to increase the value of the NFTs, defendants owned and operated the website, market place, and ownership and intellectual property rights and were "reinvesting into the business and committing to growing the project for the long term") (quotation omitted); *see also Glenn Turner*, 474 F.2d at 482 (holding that "the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that the Plan or Adventure is an investment contract").

Finally, BAM spills a lot of ink challenging the factual allegations as to each of the Ten Crypto Assets, mostly by battling specific characterizations or introducing evidentiary principles—such as that two discrete representative internet posts are purportedly fake or not explicitly sourced to the issuer, to tout the "use" of these tokens, or to claim "decentralization" or participation in the efforts by investors. BAM Mem. 25 n.32. These arguments are all improper for resolution at this stage and should be rejected out of hand.

***

In sum, the SEC's claims are not based on the fact that "some buyers might hope the assets will increase in value." BHL Mem. 1; *see also* BAM Mem. 23. They are based on the flood of statements and information from issuers, promoters, developers, and Defendants themselves on an ongoing basis inundating investors with information about the crypto asset and the ongoing skills, expertise, and efforts and development undertaken by the issuers and other third parties. The totality of the well-pled allegations demonstrates that the issuers of the Ten Crypto Assets and Defendants treated the offer and sale of these assets as *investments* whose success inured to the investors' financial benefit—and publicly promoted them as such. It is, therefore, reasonable to infer investors did so as well. *E.g.*, *Coinbase*, 726 F. Supp. 3d at 292 (promoters "repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset, and continued to do so long after the tokens were made available for trading on the secondary market"); *Kraken I*, at *16-17 (promoters "worked to create the networks or 'ecosystems' that would support the value of the digital assets they distributed" and investors "possessed an expectation of profits from the efforts of others that they derived from the promoters' representations that Kraken republished and reasserted on its platform").

Like the leasehold interests in *Joiner* that were sold as part of an investment contract based on the promotion of the drilling undertaking, here, "an economic interest in [the enterprise] was what brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure"; the issuer efforts were "woven into [the instrument], in both an economic and legal sense … run[ning] through the whole transaction as the thread on which everybody's beads were strung." *Joiner*, 320 U.S. at 348-49.

E.    **BAM's Arguments for Dismissal Based on the CFTC's Jurisdiction and the Status of Other Crypto Assets Not At Issue Here Should be Rejected.**

BAM casts a separate version of the "limiting principle" argument as an accusation that the SEC seeks "encroachment" into the CFTC's jurisdiction, and also argues that dismissal is warranted because the SEC's positions are inconsistent with its treatment of Bitcoin ("BTC") and Ether ("ETH").  BAM Mem. 15-21; *see also* BHL Mem. 1-2.

At the outset it is important to note the contradictory nature of this argument.  On the one hand Defendants assert that the SEC's application of *Howey* has no limiting principle, yet on the other hand highlight how the SEC has never taken the position that the offers and sales of two crypto assets that together constitute the overwhelming majority of the market capitalization of all crypto assets are securities.  The foretold vast and purported suffocating assertion of regulatory dominion over an entire industry has not occurred, but they complain about that, too.

Further, Defendants decry the SEC's refusal to make blanket determinations about which assets on the Binance Platform are commodities and which are not, but the SEC has no authority to find that something is a "commodity."  It has authority with respect to "securities."  Even an SEC "pronouncement" that something is not a being offered and sold as security would not be a pronouncement that it is a "commodity."  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228-29 (E.D.N.Y. 2018) (discussing "overlapping regulatory regimes" including as to crypto assets).  As the CFTC's Office of General Counsel has stated, "while digital currency is a commodity, that does not resolve the question of whether the '33 Act applies to [the asset].  That depends on the securities laws."  CFTC Letter, *SEC v. Telegram Grp. Inc.*, 19-cv-09439, Dkt. 203 (S.D.N.Y. Feb. 18, 2020).  As noted, Defendants have not cited a single case in which a court held that, simply because the underlying instrument was a commodity, the securities laws did not apply.

BAM's curious sojourn to virtual carbon credits ("VCC") is equally unavailing. BAM's supposed comparison begins with the false premise that "in the SEC's view the crypto assets at issue can *only* be sold as part of investment contracts and thus as securities." BAM Mem. 17 (emphasis added). As explained above, the SEC is making no such argument. *See supra* § I.D.3. In any event, the offers and sales of other assets like VCCs, ETH, or BTC, the circumstances of which are not before the Court, are of little help in determining whether the specifically alleged offers and sales of the Ten Crypto Assets satisfy *Howey*. Ironically, while accusing the SEC of a "land grab," implicit in Defendants' arguments is that the offer and sale of *all* crypto assets are so similar such that if the SEC asserts *some* crypto assets are being offered and sold as securities (as it does here) but *does not* state that other assets are being sold as a security, it creates a notice or doctrinal problem with respect to the assets it does allege are being sold as securities.

Finally, despite BAM's claim that the crypto assets on the BAM Platform are "properly and appropriately regulated by the CFTC," BAM knows that the CFTC's jurisdiction is limited to futures or derivative transactions, and *not* the spot sales that are at issue in this case, unless fraud is involved. BAM Mem. at 1; 7 U.S.C. §§ 1a(47)(B), 2(c)(2); *see also Written Testimony of Chairman. J. Christopher Giancarlo before the Senate Banking Committee* (Feb. 6, 2018) *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37 (CFTC "does not have authority to conduct regulatory oversight over spot virtual currency platforms"). The SEC's authority is not so limited. Moreover, the Commodities Exchange Act expressly states that nothing in it shall be construed as limiting the SEC's jurisdiction. 7 U.S.C. § 2(a)(1).

## II. The Amended Complaint Plausibly Alleges Binance's Unregistered Offers and Sales of BNB to Employees Violated Securities Act Section 5.

Binance's unregistered offers and sales of BNB to its and BAM's employees and contractors provide another basis for the Securities Act Section 5 charge against Binance that the

Court has already sustained (Claim I). The Amended Complaint alleges that Binance actively encourages employees to elect to receive BNB in lieu of other forms of salary payments, in whole or in part. AC ¶¶ 311-12. Further, Binance has offered and sold BNB through bonuses, allowances, and an "Employee Token Option Plan" ("ETOP") that employees could elect to receive in lieu of other forms of compensation, such as when BAM's first CEO negotiated a signing bonus. *Id.* ¶¶ 313-37. In effect, Binance has offered and sold BNB in exchange for these employees' services, and employees thereby invested in the Binance enterprise.

Binance created in these employees and contractors a reasonable expectation of profits, based on Binance's efforts to increase BNB's value, with the same general promotions of BNB it made to the public market, *see supra* § I.D.1, as well as in direct pitches to employees, such as in company "town halls," where Binance promoted BNB as a potentially lucrative investment in the company's success. AC ¶¶ 330-31 (Zhao stating in an employee town hall that the Binance.com Platform "is [a] relatively big driving force for [BNB's] value," and "[s]o long as we do our jobs right, as long as we work hard … I'm fully bullish that BNB will outrun BTC"); ¶ 334 (BAM discussing whether to offer a potential employee a signing bonus in BNB, noting this would get her "invested" in the Binance enterprise). Defendants acknowledged this economic reality in their internal policies as well as publicly, such as when Zhao touted that Binance employees were taking compensation in BNB because they believed doing so would enable them to profit as an investment in Binance. *Id.* ¶¶ 333, 335-36.

These allegations plausibly allege "sales" of securities under Securities Act Section 5. *E.g.*, *Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572-79 (10th Cir. 1991) (benefit program was an investment contract where employees received less wages in exchange for an investment in a stock ownership and profit-sharing plan); *Frisch v. Likeopedia, LLC*, 2024

WL 3938345, at *4-7 (S.D.N.Y. Aug. 26, 2024) (investment contract existed as to membership interests that a consultant received instead of other forms of compensation); *Harris v. Republic Airlines*, *Inc.*, 1988 WL 56256, at *6-8 (D.D.C. May 19, 1988) (holding that partnership plan "embodied a classic investment contract" where it "asked the employees to invest part of their compensation package on [the company's] future profitability"); *Dubin v. E.F. Hutton Grp. Inc.*, 695 F. Supp. 138, 145 (S.D.N.Y. 1988) (sales of securities where employee "exchange[d] something of tangible value—he changed his way of life and his job—in return for stock").

Binance challenges this claim on two grounds. First, it asserts that the Amended Complaint alleges only that BNB was used for "consumptive purposes … as a form of payment" or a "1:1 substitute for fiat," and not as an investment, citing allegations that some employees could and did resell their BNB after receiving it from Binance. BHL Mem. 33-34. That employees resold some of their BNB for cash, however, is irrelevant to whether they acquired BNB as an investment in the first instance. There is no question that Binance offered BNB as something of value, such that employees could exchange it for something else—as one can exchange a stock certificate, a dollar bill, or an orange. This does not end the analysis; nor does it mean the item is the equivalent of currency or is not being sold as a security. *See Harris*, 1988 WL 56256, at *8 (the compensation plan "provided that securities would be the currency in which most of the profits would be distributed"). Instead, the *Howey* analysis hinges upon how Binance is marketing BNB (Binance's argument ignores that it was specifically telling employees that BNB was a way to profit from Binance's efforts, AC ¶¶ 329-36, the economic reality of the transactions, and how the employees are treating BNB.

In any event, to the extent that discovery reveals that employees were reselling their BNB, it would demonstrate that the BNB that Binance sold employees did not come to rest with

them but, rather, were part of Binance's unlawful public distribution; the employees would be conduits—underwriters—in a chain of transactions emanating from the issuers and coming to rest in the hands of public investors.  Binance did not impose restrictions on employee BNB resales, and, given that many employees took their entire compensation in BNB, *see id.* ¶¶ 311, 326, 335, employee resales into the secondary market were not only foreseeable but inevitable. *See Telegram*, 448 F. Supp. 3d at 380 ("Telegram's sale of Grams to the Initial Purchasers, who will function as statutory underwriters, is the first step in an ongoing public distribution").

Second, Binance argues that the SEC fails to plausibly allege an investment of money because employees were "[s]imply providing labor" without giving Binance "additional capital." BHL Mem. 34-35.  As a threshold matter, though Binance couches its arguments as relating to the investment of money requirement, it appears to also argue that the SEC does not allege a "sale" of securities under Section 2(a)(3) of the Securities Act, 15 U.S.C. § 77b(a)(3).  *See generally In re Enron Corp. Sec., Derivative & ERISA Litig.*, 238 F. Supp. 799, 832-39 (S.D. Tex. 2017) (discussing authorities applying "investment contract" and "sale" requirements in employee compensation context).

Both an investment of money and a sale are alleged here.  An investment of money exists when an employee's services are exchanged for an opportunity to invest in the enterprise by whom she is employed.  *E.g., Frisch*, 2024 WL 3938345, at *5 (plaintiff "offered his services in exchange for an economic stake" in the company); *Harris*, 1988 WL 56256, at *9 ("[A] person's 'investment' may take the form of goods and services.") (citing *Daniel*, 439 U.S. at 560 n.12). The SEC alleges that Binance offered and sold BNB to its and BAM's employees and contractors in lieu of other forms of compensation that they would have received.  AC ¶¶ 311, 313-14, 316-18, 321-23.  The other way this could have happened was if Binance paid the

employee her salary in cash, and then she tendered it back to Binance for BNB.  *See Uselton*,

940 F.2d at 574-75 (investment of money where "economic realities of the transaction … was

that plaintiffs contributed their legal right to a portion of their wages to [the company] in return

for their right to acquire [company] stock").  In compensating employees in BNB, Binance thus

retained the capital the employees would have received, which constitutes the "'tangible' and

'definable' consideration required."  *Harris*, 1988 WL 56256, at *9 (collecting cases).[10]

As to the "sale" requirement, it is satisfied if an "employee bargains to contribute cash or

other tangible or definable consideration."  *Dubin*, 695 F. Supp. at 146 (citing SEC, *Employee

Benefit Plans Employee Benefit Plans*, 45 Fed. Reg. 8960, 8968 (Feb. 1, 1980)).  The SEC

plausibly alleges such sales because Binance and BAM employees and contractors voluntarily

chose to receive BNB from Binance as salary, bonuses, ETOP, and agreed to receive relocation

allowances in BNB as part of bargained-for exchanges.  AC ¶ 311 (employees *elected* to receive

salary in BNB); ¶¶ 313-14, 323 (new employees *negotiated* BNB bonuses and ETOP); ¶¶ 324-25

(employees *agreed* to relocate in exchange for allowances in BNB).  Thus, Binance is incorrect

that the Amended Complaint alleges only that these BNB payments were "involuntary" or that

they conferred a "unilateral benefit[]" by Binance.  BHL Mem. 35-36.  And given these

allegations, Binance's attempt to split hairs by focusing on allegations that certain BNB

payments were "determined" or "granted" by Binance, *id.* 36, cannot help it on a motion to

dismiss.  Nor does Binance cite any case to the contrary.[11]

---

[10] To be sure, the investment of money was in a common enterprise because the success or
failure of Binance as a whole was significantly affected by the managerial or entrepreneurial
efforts of persons other than the investor employee.  *Harris*, 1988 WL 56256, at *7 ("The fact
that the employee's own efforts may have had a marginal impact on the success or failure of the
enterprise did not alter the fundamental nature of the deal.") (citations omitted).

[11] *See Phillips v. Kaplus*, 764 F.2d 807, 816-17 (11th Cir. 1985) (no investment of money for

### III.     The Amended Complaint Plausibly Alleges that Binance Offered and Sold Simple Earn as an Investment Contract.

The Amended Complaint resolves any pleading deficiencies the Court identified in dismissing Claim Three as to Simple Earn with additional and more detailed factual allegations showing investors had a reasonable expectation to "share in the return that Binance would generate through its entrepreneurial and managerial efforts." *Binance*, at *26. Specifically, the Amended Complaint alleges how Binance touts Simple Earn as a form of "passive investing" to earn returns on "idle assets" from Binance's efforts, including on-chain staking, margin lending, and other opportunities, all efforts investors would have to actively undertake themselves should they wish to lend, stake, or otherwise deploy their assets. AC ¶¶ 421-26, 431-32, 435.

First, investors commit their assets to the Simple Earn enterprise and faced a risk of loss, including from Binance's investment activities, Binance's solvency, and changes to the value of crypto assets committed to the program. *Id.* ¶¶ 434-37. This constitutes an "investment of money." *See SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167, 173-74 (D.D.C. 1998) (loaning money constitutes an "investment of money").

Binance claims that the SEC fails to allege an "investment of money" because Simple Earn investors "can 'withdraw their subscribed assets from the program at any time.'" BHL

---

attorney who received company's securities for services unrelated to the company's business operations); *Peyton v. Morrow Electronics, Inc.*, 587 F.2d 413, 414 (9th Cir. 1978) (same for employee who received contingent stock purchase rights post-hiring for no consideration and never received the stock); *Ripple I*, 682 F. Supp. 3d at 330-31 (no evidence that employees paid money or other consideration); *Fraser v. Fiduciary Tr. Co. Int'l*, 2005 WL 6328596, at *5 (S.D.N.Y. June 23, 2005) (no sale where plaintiff did not receive stock for "any consideration in exchange," and did not "specifically bargained" for it or otherwise make a "voluntary investment decision"); *Foltz v. U.S. News & World Rep., Inc.*, 627 F. Supp. 1143, 1158 (D.D.C. 1986) (no investment of money where employees received profit-sharing plan that did not offset other compensation and employees choice was limited to foregoing the "receipt of benefits entirely").

Mem. 38-39.  But the Court already rejected this argument in sustaining the claim as to BAM's

staking program because revocable commitments of cash satisfy *Howey*.  *Binance*, at *27, n.24.

Binance also argues there is no risk of loss because it promised to return committed funds

"in full."  BHL Mem. 39.  Putting aside that Binance cannot on a motion to dismiss contradict its

own other warnings that investor funds *are* at risk (*e.g.*, AC ¶¶ 434-37), the Supreme Court long

ago rejected the argument that investments are exempt from the securities laws if they are

"pitched as low-risk."  *SEC v. Edwards*, 540 U.S. 389, 394-95 (2004).  The problems with

Binance's "no risk" argument are further underscored by its reliance on *Marine Bank v. Weaver*

in arguing that "Simple Earn operates like a bank account."  BHL Mem. 39 (citing 455 U.S. 551,

558-59 (1982)).  *Marine Bank* held that a certificate of deposit was not a security in part because

it was "issued by a federally regulated bank which is subject to the comprehensive set of

regulations governing the banking industry" and the investor was "virtually guaranteed payment

in full."  455 U.S. at 558.  In contrast, Binance's "guarantee" is backed by nothing and offered

while it has declared itself free from the kinds of reporting and inspection requirements and

corresponding protections *Marine Bank* cited, all while taking in hundreds of millions of dollars

of funds from thousands of investors and treating them as fungible with its own.  *See* AC ¶ 433.

Second, the Amended Complaint addresses any shortcoming to the extent the previous

dismissal was based on a failure to plead a common enterprise.  Horizontal commonality exists

because each investor is alleged to earn returns from their pooled assets on a *pro rata* basis (*i.e.*,

in direct proportion to the amount invested) and to be equally reliant on Binance's skills and

expertise to deploy assets into various profit-making opportunities, negotiating competitive rates,

and distributing the yield among investors.  AC ¶¶ 425-27, 430-31, 435, 442.  These allegations

are substantially identical to those where the court found horizontal commonality in *SEC v.*

*Genesis Glob. Cap., LLC*, 2024 WL 1116877, at *7-8 (S.D.N.Y. Mar. 13, 2024).  Similarly, broad vertical commonality exists because Binance's and the Simple Earn's investors' fortunes are interdependent as to Simple Earn and reliant upon Binance's efforts to earn yield on investors' assets.  AC ¶¶ 426-27, 430-31, 435.  Binance accordingly does not and cannot contest a common enterprise exists as to Simple Earn.  *See* BHL Mem. 38-39.

Finally, the Amended Complaint also plausibly alleges that investors in Simple Earn have a reasonable expectation of profits from Binance's efforts because this is precisely what Binance invites them to expect.  Binance employees managing Simple Earn held webinars and posted on the Binance website emphasizing their constant monitoring of market conditions in search of yield, including for on-chain staking and adjustments to APRs to reflect those conditions.  *Id.* ¶¶ 424-25, 428-32.  That investors did not know or control precisely how Binance would deploy Simple Earn funds, AC ¶ 435, makes it more, not less likely, that the scheme involved an investment contract because in "passive investment" schemes investors are looking to the promoter's expertise to make these decisions.  *See Genesis*, 2024 WL 11116877, at *8-9 (reasonable expectation of profits from company's efforts where Genesis highlighted its "'complete discretion'" in using its skill and experience to maximize profits).

Binance attempts to wave away allegations tying investor profits to Binance's efforts as "conclusory" and argues that "no participant would expect that [Simple Earn] payments are the result of BHL's managerial or entrepreneurial efforts."  BHL Mem. 38 (citing *Binance*, at *26).  But this ignores the detailed allegations of Binance statements explicitly tying the promised APRs to the source of yield—Binance's efforts.  *See*, *e.g.*, AC ¶ 431 (explaining that APRs reflect constant monitoring of and deployment to yield-generating opportunities such as on-chain staking); *see also id.* ¶¶ 422, 424-26, 431-32, 435.  Binance also argues that "[n]owhere does [the

SEC] allege that the APR for Simple Earn is linked to *Binance*'s profitability," BHL Mem. 38 (emphasis added), but the relevant enterprise is not Binance the company, it is the Simple Earn enterprise. *See Howey*, 328 U.S. at 296-97 (two corporations with various lines of business, including operating a hotel, offered security as to another line of business, the orange groves). And the "profits" described in *Howey* need not be directly proportional to the returns Binance obtains from the Simple Earn enterprise, since "profits" means "the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Edwards*, 540 U.S. at 394.

## IV. Defendants' Invitation to Reconsider the Court's Holding Sustaining the SEC's Exchange Act Claims Should Be Rejected.

As the Court noted, the registration provisions of the Exchange Act "are triggered by transactions involving just one security." *Binance*, at *28. The Amended Complaint alleges numerous securities transactions on both Platforms, and no Defendant disputes that they perform the functions typically associated with exchanges, broker-dealers, and clearing agencies under the Exchange Act. *Id.* Defendants use the Amended Complaint as an opening to reargue whether the services they provide involving the offers, sales, and transactions in certain already-upheld securities can alone serve as a predicate for those Exchange Act Claims, *e.g.*, BHL Mem. 10; BAM Mem. 43-44, but the Court should decline this thinly veiled motion for reconsideration. In advancing this argument, Defendants too narrowly construe the SEC's claims and the breadth of activity covered by each of the relevant provisions of the Exchange Act. Moreover, for all their argument, no Defendant disputes that, at a minimum, Binance's post-ICO sales of BNB on both Platforms, which the Court already held are securities transactions, would serve as a predicate for all three intermediary claims, and that "the bulk of this action will move forward." *Binance*, at *1.

Further, because the Exchange Act Claims (Claims V-X) survive there is no basis to dismiss the control person claims against Zhao (Claims XI and XII), and his request should be denied.  *See* BHL Mem. 32.

## V.  The SEC's Choice of Defendants Cannot Serve as a Basis for Dismissal.

Defendants' argument that the Amended Complaint should be dismissed because the SEC failed to charge the third-party token issuers similarly fails.  First, Defendants ignore the well-settled principle that the SEC has discretion in its charging decisions, and they fail to overcome the presumption that the exercise of such discretion is immune from judicial review and cannot be overcome by an attempt to invoke compulsory joinder under Rule 19.  Second, even if the Court were to apply Rule 19, dismissal is not warranted because Defendants fail to establish that the issuers are required parties who are indispensable to this case.

### A.  Defendants Fail to Overcome the Presumption that the SEC's Discretionary Charging Decisions are Immune From Judicial Review.

The relevant statutes provide that the decision to bring an enforcement action is entrusted to the SEC "in its discretion."  15 U.S.C. §§ 77t(b), 78u(d)(1); *see also id.* § 78u(g) (prohibiting consolidation of enforcement actions with other actions absent the SEC's consent).  An agency's decision not to bring an enforcement action against a person or entity is thus "presumed immune" from judicial review.  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).  To rebut that presumption, a party must show that the agency's decision was "so extreme as to amount to an abdication of its statutory responsibilities."  *Id.* at 833 n.4.  Given this high standard, courts have consistently denied motions to dismiss based on attempts to invoke Rule 19.  *See SEC v. Norstra Energy Inc.*, 2016 WL 4530893, at *1 (S.D.N.Y. Jan. 19, 2016) (collecting cases).  Instead, courts recognize that the SEC is "the sole architect[] of its enforcement proceedings and

[defendant] may not circumvent the exercise of agency discretion through compulsory joinder rules." *SEC v. Princeton Econ. Int'l Ltd.*, 2001 WL 102333, at *1 (S.D.N.Y. Feb. 7, 2001).

Defendants ignore these long-standing principles and have not and cannot even attempt to show the SEC's decision not to sue issuers for unregistered sales—in a case that is about the liability of unregistered intermediaries—was an abdication of responsibility. Notably, they fail to cite a single case where *the SEC* (as opposed to a private party) was required to add a party or face dismissal. Defendants' joinder arguments should be rejected on this basis alone.

### B. Defendants Fail to Establish that Dismissal is Required for Failure to Join a Party Under Rule 19.

Defendants' arguments would also fail even if the Court were to consider whether Defendants can seek dismissal for failure to join an indispensable party.

To determine whether an action must be dismissed because of the absence of a party, the court must first determine whether the absent party is a "required party" that is necessary to the litigation. *See Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1495-96 (D.C. Cir. 1997); Fed. R. Civ. P. 19(a)(1). A party is required and necessary if, in its absence, "complete relief cannot be accorded among" the parties, or the absent party "claims an interest relating to the subject of the action" and its absence may either impair its "ability to protect that interest" or subject an existing party to multiple or inconsistent obligations. Fed. R. Civ. P. 19(a)(1).

If such a party exists and joinder is not feasible, the court must still "determine whether in equity and good conscience, the action should proceed among the parties before it, or should be dismissed." *Cherokee Nation*, 117 F.3d at 1495-96. Courts consider the extent to which a judgment rendered in the person's absence might prejudice that person or the parties, whether the prejudice can be lessened, and whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. Fed. R. Civ. P. 19(b).

### 1. The Third-Party Issuers are Not Required Parties.

Defendants fail to show that the third-party issuers are required parties.  First, the Court can grant full relief without the third-party issuers.  The SEC seeks a ruling that Defendants acted as unregistered securities intermediaries and that the Court enjoin Defendants and impose other relief on them.  Moreover, whether the underlying transactions are securities transactions does not require the third-party issuers to be named.  Indeed, if the third-party issuers were named, the claims against them would necessarily be different—limited to their own offers and sales under Securities Act Section 5—and require evaluation of separate issues and potential defenses that would only apply to them (for example, whether those transactions, though transactions in securities, were exempt from registration under Securities Act Section 5, which would not impact Defendants' liability).

Second, despite the filing of multiple *amici* briefs and the attention this case has received, not one third-party issuer has filed a brief or otherwise claimed an interest in this action, which weighs against finding them to be a required party.  *E.g.*, *Yeend v. Akima Glob. Servs., LLC*, 2024 WL 4278641, at *7 (N.D.N.Y. Sept. 24, 2024).

Third, Defendants offer nothing more than conclusory, speculative assertions as to the purported interests of these third parties.  For example, Binance asserts that a "decision in the SEC's favor" would "'necessarily impact the operations' of third parties 'as a practical matter.'" BHL Mem. 40-41 (citing *Lewis v. Gov't of District of Columbia*, 324 F.R.D. 296, 298, 303 (D.D.C. 2018) (cleaned up)).  Defendants' failure to explain how exactly the operations would be "impacted" or provide any affidavits of persons having knowledge or other evidence concerning these purported interests is too conclusory and speculative to make the third-party issuers required parties.  *See, e.g.*, *Direct Supply, Inc. v. Specialty Hosps. of Am., LLC*, 878 F. Supp. 2d 13, 24 (D.D.C. 2012).

Defendants have similarly failed to show how litigating the case without the issuers will prejudice their ability to defend any legally protected interest, or that Defendants and the issuers have opposing claims to the same property. Binance argues it cannot adequately represent the issuers' interests because it is less incentivized to litigate the interests of each third-party token among the hundreds trading on the Binance Platforms. BHL Mem. 41. But the history of this case undermines Defendants' arguments, as Defendants have demonstrated they *are* motivated to defend claims based on the Ten Crypto Assets—including seeking a ruling about the legality of those transactions in their first motion to dismiss and then pressing a second motion to dismiss on that basis in the absence of such a ruling. *Cf. de Csepel v. Republic of Hungary*, 27 F.4th 736, 747 (D.C. Cir. 2022), *cert. denied sub nom. Museum of Fine Arts v. Csepel*, 143 S. Ct. 630 (2023) (finding that an absent required party who had "'opposing, irreconcilable claims to the same' property" as the named party nonetheless did not need to be joined because the interests of other named parties were sufficiently aligned with the absent party's) (citation omitted). The cases upon which Defendants rely do not help them, as they either found the absent parties were not necessary, *e.g.*, *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996), or that the absent party's own financial liability was at stake, *Ali v. Carnegie Inst. of Wash.*, 306 F.R.D. 20, 28 (D.D.C. 2014), which is not the case here.

That the third-party issuers may "know their businesses better" and be better able to identify evidence to challenge the SEC's allegations, *see* BHL Mem. 41, also does not demonstrate that the third-party issuers are required parties under Rule 19. It simply means that the parties may need discovery from the third-party issuers to prove their respective positions. Finally, Defendants do not even attempt to argue that they will be subject to multiple or otherwise inconsistent obligations if the case is adjudicated without the third-party issuers.

### 2. *Defendants Fail to Show Joinder is Not Feasible.*

Defendants' argument that joinder is not feasible because the issuers are supposedly located outside this District is incorrect. BHL Mem 42; BAM Mem. 45. Defendants' reliance solely on cases between private parties is fatal to their claims. *See Binance*, at \*29 (securities laws authorize nationwide service of process). There are a variety of means by which the issuers can be served in the United States or abroad, and Defendants have failed to demonstrate otherwise. Thus, even to the extent the Court determines in its discretion that joinder is required, dismissal is not the answer—joinder is, which would implicate the SEC's discretion.

### 3. *The Absence of the Third-Party Issuers Does Not Otherwise Require Dismissal.*

Nor can Defendants show that "equity and good conscience" require dismissal even if it were proper to conduct the joinder analysis in this SEC action (it is not), and the issuers were necessary parties (they are not). Again, Defendants have only offered vague and conclusory assertions of prejudice to the issuers, particularly while Defendants insist some of the Ten Crypto Assets belong to "decentralized" communities that are not the responsibility of any issuer. *E.g.*, BAM Mem. 30, 34, 37. *Cf. HODL Law v. SEC*, 2024 WL 3898607, at \*2 (9th Cir. Aug. 22, 2024) (potential that price of token may fall if SEC alleges it is being sold as a security is not a "concrete" or "particularized" enough injury to confer standing to sue). Defendants also cannot show that the issuers will be subject to conflicting or otherwise irreconcilable claims.

Nor can Defendants contend that a judgment against them, rendered in the issuers' absence, would *not* be adequate, Fed. R. Civ. P. 19(b)(3), because it would be—it would provide the SEC the full relief it seeks and protect investors in precisely the way in which the SEC has chosen, consistent with its statutory discretion. By contrast, the SEC would not have an adequate remedy against Defendants as to the intermediary services that they provide concerning

transactions in the Ten Crypto Assets if this case were dismissed as to the assets, which are relevant to the scope of liability and remedy against Defendants.

## VI.    Binance's Request to Dismiss Specific Forms of Relief Should be Rejected.

The Amended Complaint alleges that Binance obtained billions of dollars in ill-gotten gains from their violations of the federal securities laws. *E.g.*, AC ¶¶ 30, 80, 103, 338. Despite this, Binance asks the Court to strike potential remedies at the pleading stage.

However, on a motion to dismiss, it is "premature to determine whether the specific forms of disgorgement sought by the SEC are prohibited," *Genesis*, 2024 WL 1116877, at *16-17 (collecting cases); *see also SEC v. The Movie Studio, Inc.*, 2023 WL 5805587, at *5 (S.D. Fla. Aug. 18, 2023), and the same is true of attempts to dismiss claims for injunctive relief. *E.g.*, *SEC v. Tambone*, 802 F. Supp. 2d 299, 306 (D. Mass. 2011) (collecting cases).

Binance's reliance on *SEC v. City of Victorville*, 2014 WL 12588688, at *12 (C.D. Cal. Oct. 14, 2014) and *SEC v. Berry*, 2008 WL 4065865, at *9-10 (N.D. Cal. Aug. 27, 2008) is misplaced because the disgorgement claims there were dismissed against defendants that were not alleged to have received ill-gotten gains, a fact amply alleged here.

Similarly, Binance's argument that disgorgement is not available because it is a victim-based remedy and the SEC has not charged Binance with fraud contradicts binding D.C. Circuit law holding that "the primary purpose of disgorgement is not to refund others for losses suffered but rather to 'deprive the wrongdoer of his ill-gotten gain.'" *Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009) (quoting *SEC v. Bilzerian*, 29 F.3d 689, 696 (D.C. Cir. 1994)). Nor does the Supreme Court's decision in *Liu v. SEC* (*see* BHL Mem. 44) alter this analysis. To the contrary, *Liu* reinforces *Zacharias* because it underscores that properly ordered disgorgement is a "profits-based," not loss-based, remedy that is "tethered to a wrongdoer's net unlawful profits"

and achieves its equitable objective by taking "money out of the wrongdoer's hands." *Liu v. SEC*, 591 U.S. 71, 80, 82 (2020); *see also id.* at 82, 84-85, 88, 90, 92.

Defendants' reliance on *SEC v. Ripple Labs, Inc.*, 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024), and *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023), is also misplaced. First, those cases evaluated whether disgorgement was appropriate based on the facts developed in those cases at the remedies stage—*after* discovery, and *after* liability had been established. Second, *Govil*, which remanded the district court's disgorgement order for a factual determination that the defrauded investors suffered pecuniary harm, runs counter to binding D.C. Circuit authority as set forth in *Zacharias*. Indeed, no other Circuit has adopted *Govil's* pecuniary harm requirement, and one Circuit has expressly rejected it because "[n]either *Liu* nor our case law … require investors to suffer pecuniary harm as a precondition to a disgorgement award" and such a requirement "mischaracterizes the nature and purpose of disgorgement." *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 41 & n.14 (1st Cir. 2024); *see also SEC v. GenAudio*, 32 F.4th 902, 952-54 (10th Cir. 2022) (upholding disgorgement measured by profits from unregistered sale of securities and rejecting claim that disgorgement must be tied to injury).

Defendants also cannot rely on *CFTC v. Southern Tr. Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018), which was about restitution (that focuses on investor losses, not unjust enrichment), particularly when the Eleventh Circuit has since specifically held that disgorgement is available for registration violations. *SEC v. Almagarby*, 92 F.4th 1306, 1320-21 (11th Cir. 2024).

Finally, Binance inappropriately reduces the multifactor injunction inquiry to a single consideration: whether Zhao is in a position to violate the federal securities laws vis-à-vis the Defendants, two entities over which he disclaims current control. However, in this Circuit courts consider three factors in deciding whether to impose an injunction, which include whether a

violation was isolated, flagrant, or deliberate, and whether the defendant is in a position where there will be other opportunities to violate the law. *E.g.*, *SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 178 (D.D.C. 2015). Here, irrespective of Zhao's disclaimers of control (a fact that should be tested by discovery), the SEC alleges Zhao's multiple, deliberate violations stretching back years. Moreover, his ownership and control over various corporate entities also supports an inference that he is in a position where he could violate these laws in the future.

Defendants cite *Whitney v. Obama*, 845 F. Supp. 2d 136, 139 (D.D.C. 2012) for the point that injunctive relief is moot when illegal activity ceases, but in that case the conduct had ceased and could not "be undone." Here, the activity has *not* ceased, Zhao remains a beneficial owner of Binance and BAM, and there is no reason to think he cannot violate the federal securities laws through these entities or another entity among the "opaque web of corporate entities" that he beneficially owns and controls. AC ¶ 26; *see e.g.*, *id.* ¶¶ 27-29, 33-35.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendants' Motions to Dismiss.[12]

---

[12] To the extent the Court dismisses any of the SEC's claims, it should be without prejudice. "'The standard for dismissing a complaint with prejudice is high … and warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (citation omitted). Defendants have not offered any basis to support their request for dismissal with prejudice.

Dated: December 4, 2024                   Respectfully submitted,

/s/ J. Emmett Murphy_____
J. Emmett Murphy
Jorge G. Tenreiro
Elisa S. Solomon
SECURITIES AND EXCHANGE
COMMISSION
100 Pearl Street
New York, NY 10004

Jennifer L. Farer (D.C. Bar No. 1013915)
David Nasse (D.C. Bar. No. 1002567)
Matthew Scarlato (D.C. Bar No. 484124)
SECURITIES AND EXCHANGE
COMMISSION
100 F Street N.E.
Washington, D.C. 20549

Rachel Yeates
SECURITIES AND EXCHANGE
COMMISSION
1961 Stout Street, Suite 1700
Denver, CO 80294

*Attorneys for Plaintiff Securities and
Exchange Commission*