## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff*,

v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

*Defendants*.

**No. 1:23-cv-01599-ABJ-ZMF**

**Oral Argument Requested**

**Reply In Support Of Joint Motion To Dismiss Amended Complaint
Against Defendants Binance Holdings Limited And Changpeng Zhao**

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

    I.      The SEC Fails To Show How The Amended Complaint Satisfies *Howey*. (Amended Portions Of Count 1, Count 3, And All Of Counts 5–12) .................... 3

            A.     The SEC Fails To Show How *Howey* Is Satisfied For The Particular Kinds Of Transactions Challenged Under The Exchange Act. (Counts 5–12) ........................................................................ 3

                 1.     The SEC Fails To Show That Blind Resale Transactions Involving Token Developers Were Investment Contracts.    4

                 2.     The SEC Fails To Show That The Alleged Sales By Token Developers Were Investment Contracts.    14

                 3.     For All Of The Transactions, The SEC Fails To Show That A Reasonable Buyer Purchased The Tokens Primarily For Investment Purposes.    15

            B.     The SEC Pled Itself Out Of Court For Post-ICO Sales Of BNB. (Count 1) .................................................................................... 17

            C.     The SEC Fails To Show That Employee Compensation Constituted "Investment Contracts." (Count 1) ............................ 17

            D.     The SEC Fails To Salvage Its Claim Concerning Simple Earn. (Count 3) ...................................................................................... 19

    II.     The SEC Fails To Explain Why Its Claims Concerning Third-Party Tokens Should Proceed Without Their Developers. (Counts 5–10) .................... 20

            A.     The SEC Is Not Immune From Rule 19 .................................. 21

            B.     Under Rule 19, The Third-Party Developers Are Required Parties, And The SEC Fails To Justify Proceeding Without Them. ...................... 22

    III.    The SEC Fails To Show That Its Request For Disgorgement Should Proceed To Discovery. ............................................................................. 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ali v. Carnegie Inst. of Wash.*,
   306 F.R.D 20 (D.D.C. 2014)................................................................23

*Audet v. Fraser*,
   605 F. Supp. 3d 372 (D. Conn. 2022)...................................................7

*Barron v. Helbiz Inc.*,
   2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) .........................................7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................15

*Cameron v. Outdoor Resorts of Am., Inc.*,
   608 F.2d 187 (5th Cir. 1979) ..............................................................16

*Cloverleaf Standardbred Owners Ass'n v. Nat'l Bank of Wash.*,
   699 F.2d 1274 (D.C. Cir. 1983)...........................................................24

*Dufoe v. DraftKings Inc.*,
   2024 WL 3278637 (D. Mass. July 2, 2024)..........................................7

*Eco Tour Adventures, Inc. v. Zinke*,
   249 F. Supp. 3d 360 (D.D.C. 2017).....................................................22

*Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*,
   452 F.2d 1346 (D.C. Cir. 1971)............................................................8

*Frisch v. Likeopedia, LLC*,
   2024 WL 3938345 (S.D.N.Y. Aug. 26, 2024)......................................19

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985).................................................................6

*Hardin v. TRON Found.*,
   2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024).......................................7

*Harper v. O'Neal*,
   2024 WL 3845444 (S.D. Fla. Aug. 16, 2024).................................7, 17

*Heckler v. Chaney*,
   470 U.S. 821 (1985).............................................................................21

*Hocking v. Dubois*,
   885 F.2d 1449 (9th Cir. 1989) ...........................................................6, 9

*Houghton v. Leshner*,
   2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) .....................................7

*Hourani v. Mirtchev*,
  943 F. Supp. 2d 159 (D.D.C. 2013) ................................................................25

*\*Int'l Bhd. of Teamsters v. Daniel*,
  439 U.S. 551 (1979)...........................................................................15, 18

*Iweala v. Operational Techs. Servs., Inc.*,
  634 F. Supp. 2d 73 (D.D.C. 2009) ..............................................................4, 17

*Kemmerer v. Weaver*,
  445 F.2d 76 (7th Cir. 1971) ......................................................................16

*Kokesh v. SEC*,
  581 U.S. 455 (2017)...............................................................................25

*Lewis v. Gov't of D.C.*,
  324 F.R.D. 296 (D.D.C. 2018).....................................................................23

*Liu v. SEC*,
  591 U.S. 71 (2020)................................................................................25

*Marine Bank v. Weaver*,
  455 U.S. 551 (1982)................................................................................4

*McCown v. Heidler*,
  527 F.2d 204 (10th Cir. 1975) .....................................................................6

*Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*,
  723 F. Supp. 2d 886 (S.D. W. Va. 2010).........................................................22

*Owen v. Elastos Found.*,
  2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) .......................................................7

*Patterson v. Jump Trading LLC*,
  710 F. Supp. 3d 692 (N.D. Cal. 2024) .............................................................7

*In re Ripple Labs, Inc. Litig.*,
  2024 WL 3074379 (N.D. Cal. June 20, 2024) ......................................................7

*Rodriguez v. Banco Cent. Corp.*,
  990 F.2d 7 (1st Cir. 1993).....................................................................9, 11

*Saad v. SEC*,
  873 F.3d 297 (D.C. Cir. 2017) ....................................................................25

*Samuels v. Dao*,
  2024 WL 4815022 (N.D. Cal. Nov. 18, 2024) ......................................................7

*SEC v. Almagarby*,
  92 F.4th 1306 (11th Cir. 2024) ...................................................................25

*SEC v. Berry*,
  2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ......................................................24

*SEC v. Better Life Club*,
    995 F. Supp. 167 (D.D.C. 1998) ....................................................................................20

*\*SEC v. Binance Holdings Ltd.*,
    2024 WL 3225974 (D.D.C. June 28, 2024) ................................. 1, 4, 5, 7, 9, 12, 14, 16, 19, 20

*SEC v. Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) ....................................................................................23

*SEC v. City of Victorville*,
    2014 WL 12588688 (C.D. Cal. Oct. 14, 2014) .............................................................24

*SEC v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024) ............................................................................7

*SEC v. Collins & Aikman Corp.*,
    256 F.R.D. 403 (S.D.N.Y. 2009) ..................................................................................21

*SEC v. e-Smart Techs., Inc.*,
    828 F. Supp. 2d 167 (D.D.C. 2011) ..............................................................................23

*SEC v. GenAudio Inc.*,
    32 F.4th 902 (10th Cir. 2022) ......................................................................................25

*SEC v. Genesis Glob. Cap., LLC*,
    2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ..............................................................20

*SEC v. Glenn W. Turner Enters., Inc.*,
    474 F.2d 476 (9th Cir. 1973) ........................................................................................13

*SEC v. Govil*,
    86 F.4th 89 (2d Cir. 2023) ......................................................................................24, 25

*SEC v. LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022) ...............................................................................7

*\*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) ...............................................................3, 10, 11, 13, 14

*SEC v. Navellier & Assocs., Inc.*,
    108 F.4th 19 (1st Cir. 2024) .........................................................................................25

*SEC v. Norstra Energy Inc.*,
    2016 WL 4530893 (S.D.N.Y. Jan. 19, 2016) ...............................................................22

*SEC v. Payward, Inc.*,
    2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ............................................................5, 7

*SEC v. Princeton Economic International Ltd.*,
    2001 WL 102333 (S.D.N.Y. Feb. 7, 2001) ..................................................................22

*SEC v. Ripple Labs, Inc.*,
    2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) ...............................................................25

*SEC v. Ripple Labs, Inc.,*
   682 F. Supp. 3d 308 (S.D.N.Y. 2023)..................................................4, 5, 12, 14, 18

*SEC v. Rubera,*
   350 F.3d 1084 (9th Cir. 2003) ...............................................................................6

*SEC v. SG Ltd.,*
   265 F.3d 42 (1st Cir. 2001)...................................................................................17

*SEC v. Telegram Group Inc.,*
   448 F. Supp 3d 352 (S.D.N.Y. 2020)...............................................................7, 9, 18

*SEC v. Terraform Labs Pte. Ltd.,*
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) ....................................................................7

*SEC v. Variable Annuity Life Ins. Co.,*
   359 U.S. 65 (1959)...............................................................................................15

*SEC v. W.J. Howey Co.,*
   328 U.S. 293 (1946)..........................................................................................1, 5

*SEC v. Wahi,*
   2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ........................................................7

*SEC v. Wyly,*
   71 F. Supp. 3d 399 (S.D.N.Y. 2014)......................................................................25

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,*
   559 U.S. 393 (2010)............................................................................................21

*Stand Up for Cal.! v. U.S. Dep't of Interior,*
   204 F. Supp. 3d 212 (D.D.C. 2016) .....................................................................24

*Stenger v. R.H. Love Galleries, Inc.,*
   741 F.2d 144 (7th Cir. 1984) .................................................................................9

*United Hous. Found., Inc. v. Forman,*
   421 U.S. 837 (1975)............................................................................................15

*Uselton v. Commercial Lovelace Motor Freight, Inc.,*
   940 F.2d 564 (10th Cir. 1991) .............................................................................19

*Woodward v. Terracor,*
   574 F.2d 1023 (10th Cir. 1978) .............................................................................9

*Woytowicz v. George Washington Univ.,*
   327 F. Supp. 3d 105 (D.D.C. 2018)......................................................................18

*Zacharias v. SEC,*
   569 F.3d 458 (D.C. Cir. 2009).............................................................................24

**Statutes**

15 U.S.C. § 78c(a)(1)..............................................................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................4

Fed. R. Civ. P. 19 ...........................................................................................21, 22

**Treatises**

7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1602 (3d ed.) .........................................21

**Regulations**

*SEC, *Employee Benefit Plans; Interpretations of Statute*, 45 Fed. Reg. 8,960
  (Feb. 11, 1980) .............................................................................................19

**Other Authorities**

*An Introduction: Master Limited Partnerships*, Vinson & Elkins (Apr. 23, 2018),
  https://tinyurl.com/5bbkjxv9 ..............................................................................8

*Beanie Babies*, Public.com, https://tinyurl.com/h59c9sf8 (last accessed Dec. 22,
  2024) ..........................................................................................................2

*Collectible Phenomenon*, Vintage Virtue, https://tinyurl.com/mu9862ms (last
  accessed Dec. 22, 2024) ....................................................................................2

*Introduction to Binance Simple Earn* (Sept. 22, 2022),
  https://www.binance.com/en/support/faq/introduction-to-binance-simple-earn-
  8df6abf5930e4ef4977d84f45d99d491 .................................................................20

## Introduction

In a clear demonstration that the SEC cannot meet its pleading burden in this case, the agency once again ignores the transaction-specific analysis required by *Howey* and this Court's prior motion-to-dismiss ruling. Despite this Court's clear guidance, the SEC still refuses to evaluate different kinds of transactions, for different kinds of tokens, for different kinds of buyers and sellers, and at different points in time. Instead, the agency insists that the "economic realities" for *all* digital-asset transactions remain the same no matter the circumstances, including for blind resale transactions. *E.g.*, Opp. 8, 21, 22, 38. According to the SEC, that is because crypto tokens (with the possible and unexplained exceptions of Bitcoin and Ether) "have no inherent use or value." Opp. 1. But that incorrect assertion is both beside the point and belied by the Amended Complaint, which describes numerous ways each of the challenged tokens *is* used in the real world for purposes as varied as paying employee salaries, purchasing data storage, and playing games online. The result is the same as in the last round of briefing on secondary sales: the SEC has failed to show that each "particular transaction" at issue was an investment contract. *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *20 (D.D.C. June 28, 2024).

The SEC spends much of its brief complaining that Defendants seek to impose "rigid requirements not found in *Howey*'s test." Opp. 4. In doing so, the SEC ignores *Howey*'s explicit requirement of an "investment of money *in* a common enterprise," *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) (emphasis added), deriding this part of the test as a "flow *into*" requirement, without ever providing another interpretation. Opp. 4. Rather than looking to whether a promoter used investors' capital to create or fuel a profit-making business, the SEC argues that a common enterprise requires only that purchasers hold a "fungible" asset that appreciates or depreciates due to "ongoing fluctuations" in the market. *Id.* at 18, 23. But that is just another way of saying

1

purchasers own the same asset—which fails to provide courts a rational way to distinguish crypto tokens that are sold as investment contracts from tokens that are simply commodities (such as Bitcoin and Ether, which the SEC concedes are not securities).

According to the SEC, applying *Howey* to resales would impose a "categorical[]" rule that secondary-market transactions "cannot involve securities." Opp. 9. But there are, of course, ways that secondary-market transactions can satisfy *Howey*'s transaction-by-transaction analysis, such as, for example, where an investor reassigns an investment contract to someone else. The SEC refuses to engage in that analysis for the transactions at issue here, choosing instead to conflate the blind resale of a crypto token—an asset that this Court has already held does *not* embody an investment contract—with the initial sale of the token years earlier as part of an investment contract with the token's developer.

Indeed, the SEC does not dispute that its test cannot distinguish Beanie Babies from investment contracts until (maybe) summary judgment. *See* Mot. 2. Nor could it. Every aspect of the SEC's arguments about blind resales could have applied to resales of Beanie Babies in the 1990s. Ty Warner cultivated "a sense of rarity and exclusivity" with a "unique distribution model" that tightly controlled which retailers received which Beanie Babies, retired and then "un-retire[d]" "specific designs" to generate hype and demand, and even announced that it would "stop making Beanie Babies," promising to reduce supply and thereby increase prices—all of which produced a highly speculative secondary market.[1]

So, were Beanie Babies "investment contracts"? The SEC's answer appears to be "maybe." *See* ECF 273-1 at 2 (Mot. to Amend). The agency's inability to articulate a coherent

---

[1] *The Beanie Baby Craze: A Look Back at the 90s Collectible Phenomenon*, Vintage Virtue, https://tinyurl.com/mu9862ms (last accessed Dec. 22, 2024); *The Insane History of Beanie Babies*, Public.com, https://tinyurl.com/h59c9sf8 (last accessed Dec. 22, 2024).

line between investment contracts and resales of Beanie Babies (or other assets) confirms that its test "provides no basis upon which to distinguish securities from non-securities." *SEC v. Life Partners, Inc.*, 87 F.3d 536, 545 (D.C. Cir. 1996) ("*Life Partners I*").

The SEC's claims concerning employee compensation and Simple Earn similarly rest on a misapplication of *Howey* and therefore also fail. And all the agency's claims concerning the third-party tokens fail for the independent reason that the SEC failed to join required parties—namely, the tokens' developers. The SEC insists that its discretion to bring enforcement actions somehow exempts it from the requirements of the Federal Rules of Civil Procedure. Not so. The SEC, like any other litigant, must comply with the rules when it brings a lawsuit.

Finally, the SEC's requests for disgorgement against Defendants should be dismissed because the SEC still fails to articulate any theory of liability that could entitle the agency to that equitable relief.

## Argument

**I.    The SEC Fails To Show How The Amended Complaint Satisfies *Howey*. (Amended Portions Of Count 1, Count 3, And All Of Counts 5–12)**

### A.    The SEC Fails To Show How *Howey* Is Satisfied For The Particular Kinds Of Transactions Challenged Under The Exchange Act. (Counts 5–12)

The SEC's Exchange Act claims fail because they hinge entirely on the SEC's inadequate allegations that token sales on the Binance.com and Binance.US exchanges were investment contracts. Mot. 10–32 (explaining why none of the challenged token sales satisfies *Howey*). The SEC now confirms that its "Exchange Act Claims address the *intermediary services*" Defendants purportedly provided to facilitate "offers and sales" of BNB and other tokens—not separate programs like BNB Vault, Simple Earn, or BAM's Staking Program that BHL or BAM offer directly to their customers. Opp. 6 n.1 (emphasis added); *see also* Mot. 10–11. And the SEC never attempts to explain why the Court should allow Counts 5–12 to proceed based on programs that are irrelevant

to those Counts.[2]

The agency must satisfy its burden to state a claim as to all eleven tokens (BNB and ten third-party tokens).  Mot. 10–12.  The SEC admits that whether claims related to the third-party tokens are "dismissed" implicates "the scope of liability and remedy," Opp. 67—*i.e.*, its claims concerning the third-party tokens are separate claims.  And the SEC has forfeited any argument to the contrary by failing to address the issue in its opposition brief.  *See, e.g.*, *Iweala v. Operational Techs. Servs., Inc.*, 634 F. Supp. 2d 73, 80 (D.D.C. 2009).

### 1.   The SEC Fails To Show That Blind Resale Transactions Involving Token Developers Were Investment Contracts.

Blind resale transactions, in which a purchaser neither invests her money into a common enterprise nor has any expectation that her money will be used to create profits, are not investment contracts under *Howey*.  Mot. 12–20.  The SEC's opposition brief refuses to distinguish these transactions from initial sales, *e.g.*, Opp. 32, instead simply repeating its mantra that the "economic reality" is the same regardless of the time, manner, or parties to a sale, *e.g.*, *id.* at 21.[3]  But *Howey* applies on a transaction-by-transaction basis, *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982), and "it is the economic reality of *the particular transaction*, based on the entire set of contracts, expectations, and understandings of the parties, that controls," *Binance*, 2024 WL 3225974, at *1, *20 (emphasis added); *see also SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308,

---

[2] Likewise, the SEC never disputes that BNB's ICO—which did not occur on the Binance.com or Binance.US platforms and predates their existence—cannot support its Exchange Act claims.  The SEC briefly argues that cabining its Exchange Act claims to their admitted scope (token sales), would require "reconsideration" of the Court's prior order.  Opp. 61.  Not so.  The SEC filed an amended complaint with new allegations, and Defendants seek dismissal of those amended claims for failure to state a claim under Rule 12(b)(6).  Defendants do not seek reconsideration.

[3] The SEC does not dispute that dismissing this bucket of transactions would remove five third-party tokens from the case altogether (ADA, FIL, ATOM, ALGO, and COTI) and substantially narrow the case for the remaining six tokens (BNB, SOL, SAND, MANA, MATIC, and AXS).

329 n.16 (S.D.N.Y. 2023) ("*Ripple I*") (courts look to "the totality of [the] circumstances and the economic reality of th[e] specific … transaction"), *appeal pending*, No. 24-2648 (2d Cir.).

    *No investment of money into a common enterprise.* The SEC makes no attempt to show that purchasers in resale transactions contributed capital to the promoter's "common enterprise," and the agency admits that purchasers did "not put funds 'in the hands of the issuer.'" Opp. 4.

    That concession should put an end to the SEC's claims concerning blind resales. *Howey* requires "the placing of capital or laying out of money in a way intended to secure income or profit *from its employment*." 328 U.S. at 298 (emphasis added). Purchasers must "provide the capital." *Id.* at 300–01. The SEC never squares its test with this language in *Howey*. Instead, the SEC claims that the test is satisfied if a purchaser "invest[s] money *in the asset*." Opp. 17–18 (quoting *SEC v. Payward, Inc.*, 2024 WL 4511499, at *1, *13 (N.D. Cal. Aug. 23, 2024)) (emphasis added). But *Howey* requires an "investment of money *in a common enterprise*." 328 U.S. at 300–01 (emphasis added). In addition to disregarding *Howey*'s clear language, the SEC's approach fails to differentiate securities transactions from ordinary asset sales where an investor hopes her asset will increase in value, which is a critical purpose of the *Howey* analysis. *See Binance*, 2024 WL 3225974, at *26 ("Not every 'profit-making opportunity' is an investment contract.").

    The SEC argues that no court has ever held that *Howey* requires an investor's money to "flow into" a common enterprise, Opp. 8, but that is false. Setting aside that *Howey* itself imposes that requirement, *Ripple I* applied this requirement to digital-asset sales, holding that certain XRP "[d]istributions did not constitute the offer and sale of investment contracts" "because Ripple never received the payments from these XRP distributions," and the SEC had done nothing to show that "payment of money for these XRP sales [e]ver traced back to Ripple." 682 F. Supp. 3d at 330–

31.  The SEC's attempt to distinguish *Ripple I* ignores that clear holding.  Opp. 23.[4]

The SEC invokes out-of-circuit decisions in *Gary Plastic* and *Hocking*, Opp. 23, but neither case held that *Howey* is satisfied even when a purchaser does not invest money into a common enterprise.  In *Gary Plastic*, Merrill Lynch "pooled funds" to facilitate the enterprise.  756 F.2d 230, 235 (2d Cir. 1985).  Moreover, the banks—which indisputably received purchasers' money— were *also* part of a common enterprise that was "essentially a joint effort between the issuer of the CD, the deposit bank, and Merrill Lynch."  *Id.* at 241–42.

*Hocking* is similarly distinguishable.  There, the owner of a condo entrusted his property to the operator of a rental-pool arrangement in exchange for "a pro rata share of the rental income" the operator generated.  *Hocking v. Dubois*, 885 F.2d 1449, 1453 n.4 (9th Cir. 1989) (en banc); *id.* at 1459.  The owner bought the condo itself from an unrelated third party, but only as part of "a package" that included the offer of a rental arrangement in which he and other "participants" "pool[ed] their assets"—their condos—in "a single common enterprise."  *Id.* at 1459.  If the trans- action had involved merely "[t]he simple purchase of real estate," and "no pooling of interests," *Howey* would not have been satisfied.  *Id.*  Indeed, the SEC's own amicus brief in that case took pains to emphasize that owners who merely "resell their own individual units" would *not* fall within the securities laws.  Brief of Amicus Curiae SEC, at 13 (attached as Exhibit 1).

The SEC also points to recent district court opinions that purportedly conclude that resales of digital assets are "investment contracts" if the assets were initially sold as part of an investment

---

[4] The SEC's treatment of *Rubera* and *McCown* similarly ignores those cases' holdings.  Opp. 11– 12.  In *SEC v. Rubera*, investors "turned over substantial amounts of money to Alpha [the pro- moter]."  350 F.3d 1084, 1090 (9th Cir. 2003).  In *McCown v. Heidler*, purchasers similarly "en- trusted their monies solely to the management of Heidler Corporation" to facilitate real-estate de- velopment.  527 F.2d 204, 209 (10th Cir. 1975).  In both cases, unlike here, the purchasers' capital contributions went to the enterprise.

contract. Opp. 9–10. Defendants have already addressed many of the SEC's cases, Mot. 14–15, and the rest either diverge from *Howey*'s transaction-by-transaction analysis or present no reasoned analysis. In several (some of which involve sales by developers), the "investment of money" element was undisputed, so there was no analysis of the element's application to *resales*.[5] In others, the defendants did not make substantive *Howey* arguments.[6] In still others, the courts incorrectly assumed that "investing in an asset" (*i.e.*, simply buying it) is sufficient.[7] And in two, the courts simply cited *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023).[8] This Court declined to follow *Terraform*, instead adopting Judge Torres's transaction-by-transaction approach from *Ripple I*, which *Howey* requires. *See Binance*, 2024 WL 3225974, at *19–20.

Next, the SEC contends that failing to treat resales of tokens as investment contracts imposes a categorical rule that investment contracts can *never* be sold on secondary markets. But Defendants have not argued for any such categorical rule—to the contrary, it is the SEC that is

---

[5] *See, e.g.*, *SEC v. Telegram Group Inc.*, 448 F. Supp 3d 352, 369 (S.D.N.Y. 2020) ("Telegram does not dispute that there was an investment of money by the Initial Purchasers."); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 216 (D.N.H. 2022) ("[O]nly the third component of the *Howey* test is in dispute"); *Audet v. Fraser*, 605 F. Supp. 3d 372, 390 (D. Conn. 2022) (parties "do not dispute" investment of money); *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 290 (S.D.N.Y. 2024) ("Defendants do not dispute" investment of money); *Dufoe v. DraftKings Inc.*, 2024 WL 3278637, at *1, *4 (D. Mass. July 2, 2024) ("Defendants d[id] not debate" investment of money); *Barron v. Helbiz Inc.*, 2021 WL 229609, at *1 (S.D.N.Y. Jan. 22, 2021) (case concerned "money raised in the ICO").

[6] *See Samuels v. Dao*, 2024 WL 4815022 (N.D. Cal. Nov. 18, 2024); *Hardin v. TRON Found.*, 2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024); *Houghton v. Leshner*, 2023 WL 6826814 (N.D. Cal. Sept. 20, 2023); *Owen v. Elastos Found.*, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021).

[7] *See, e.g.*, *Payward*, 2024 WL 4511499, at *1, *13 ("investing money in the asset"); *SEC v. Wahi*, 2024 WL 896148, at *1, *5 (W.D. Wash. Mar. 1, 2024) (purchaser "paid for the tokens"); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710 (N.D. Cal. 2024) (purchasers "invested fiat … to purchase" tokens).

[8] *See In re Ripple Labs, Inc. Litig.*, 2024 WL 3074379, at *1, *7 (N.D. Cal. June 20, 2024); *Harper v. O'Neal*, 2024 WL 3845444, at *1, *10 (S.D. Fla. Aug. 16, 2024).

asking for a categorical rule that resales of crypto tokens are essentially *always* investment con-

tracts, no matter the circumstances of the individual resales.

To be clear, there are multiple ways to resell an investment contract that satisfy the require-

ment of an investment of money in a common enterprise.  For example, an investor could resell an

investment contract on the secondary market by assigning her rights to a purchaser, at which point

that purchaser would step into the investor's shoes.  The second purchaser acquires an investment

contract, not simply an asset, because the resale transfers the entire relationship between the orig-

inal purchaser and the common enterprise (including the investment of money in a common enter-

prise).  *Cf. Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 452 F.2d 1346, 1357 n.69

(D.C. Cir. 1971) ("an assignee stands in the shoes of his assignor").  The SEC concedes that this

does *not* occur for the resales at issue here.  Opp. 28 (acknowledging that "the public inducements

to buy BNB" do not "indefinitely 'travel' with the asset").

The SEC provides another example in its brief, noting that "units of master limited part-

nerships" "routinely trade in established secondary markets."  Opp. 14–15 & n.4.  Units of a master

limited partnership entitle their holders "to quarterly cash distributions" from the partnership's

"operating surplus."[9]  Thus, when a unit is resold, the secondary-market purchaser steps into the

entire relationship that made the unit an investment contract in the first place, acquiring both the

unit itself and the entitlement to earnings from the partnership.

The difference here is simple: the SEC is challenging resales of crypto tokens that are assets

involving no ongoing relationship with a common enterprise, much less a relationship that one

person could transfer to another in a resale.  Put differently, the blind resale of an ordinary token

---

[9] *An Introduction:  Master Limited Partnerships* 9, Vinson & Elkins (Apr. 23, 2018), https://ti-nyurl.com/5bbkjxv9.

on an impersonal exchange does not transfer the "entire set of understandings and expectations" that might have satisfied *Howey* when the developer initially sold the token to known buyers. *Binance*, 2024 WL 3225974, at *11 (rejecting "embodiment" theory). Accepting that common-sense distinction would not mean that contractual obligations are always required for investment contracts to exist, as the SEC suggests. Opp. 13. Instead, it simply enforces the distinction between assets that are the subject of investment contracts and an investment contract itself, ensuring that resellers of assets like citrus groves and beavers do not become the focus of the securities laws.[10]

The Exchange Act also potentially covers certain categories of secondary sales (not alleged here) that lack any reassignments of rights or contractual obligations. Mot. 15–16. For example, a developer could publicly enlist an underwriter to purchase an initial distribution of tokens for immediate resale on an exchange to increase the tokens' circulation. The SEC dismisses this example as "nonsensical," Opp. 14, but this Court cited a similar real-world example in explaining that "certain groups of secondary sales [might] meet the criteria of an investment contract." *Binance*, 2024 WL 3225974, at *20 (citing *Telegram*, 448 F. Supp. 3d at 380–81).

Given these examples, the SEC's concern that applying *Howey* would remove investment contracts from the scope of the Exchange Act is unfounded. Opp. 12. Moreover, the Exchange Act is *not* a statute targeted solely at resales, but applies broadly to entities that create "a market

---

[10] *See, e.g.*, *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) ("A simple sale of land, whether for investment or use, is not a 'security.'"); *accord Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) ("[T]he expectation of a profit on resale is insufficient to transform what is essentially a sale of real property into the sale of an investment contract."); *Hocking*, 885 F.2d at 1462 (distinguishing "isolated resales"); *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) ("ordinary retail sale of paintings" not an investment contract).

place or facilities" to sell securities, 15 U.S.C. § 78c(a)(1), including issuer sales.  The SEC understands this, given that it is pursuing Exchange Act claims against BHL for allegedly intermediating sales of BNB.  *E.g.*, Opp. 61 (asserting that the "intermediary claims" can move forward based on "Binance's post-ICO sales of BNB"); *id.* at 15 (similar alleged sales for other tokens).

**No commonality.**  The SEC's claims concerning blind resales also fail to satisfy the commonality requirement.  Mot. 16–18.  According to the SEC, commonality is satisfied whenever multiple people purchase a "fungible" asset, placing them all "in the same boat."  Opp. 18, 20.  The SEC's novel test has no basis in the D.C. Circuit's settled approach to the common-enterprise element.  The D.C. Circuit's decisions all involve "horizontal commonality," which requires pooling of funds.  Mot. 17.  For resales, the SEC obviously cannot establish "a pooling of investment funds," Opp. 20, given that "investment funds" concededly go to resellers—not developers, *id.* at 4, 12.

The SEC asserts that token purchasers' supposed "interdependenc[e]" is an "'implicit form of pooling.'"  Opp. 24 (citation omitted).  Although this "implicit pooling" language comes from *Life Partners I*, that language is plainly inapplicable to the facts alleged in the Amended Complaint.  In *Life Partners I*, the promoter "aggregate[d] th[e] funds" of investors "to purchase … fractional interests" in the same life-insurance policies.  87 F.3d at 539, 543.  To make the investment profitable and offset costs, a critical mass of investors had to purchase "some minimum acceptable percentage" of the policy.  *Id.* at 544.  Thus, in *Life Partners I*, a group of investors pooled their resources into the *same* life-insurance policy even though the promoter kept their funds in separate accounts.  Here, by contrast, crypto purchasers all independently procure s*eparate tokens*, and one purchaser's liquidation of her tokens in a resale transaction has no effect on other purchasers' ability to realize a profit.  The purchasers' money is not pooled into the same asset, unlike

in *Life Partners*.  Thus, "each investor's acquisition is independent of all the other investors' acquisitions," and "there is no pooling."  *Id.*[11]

Moreover, any form of commonality still requires a relationship between investors' fortunes and the promoter, not just a common interest in the value of a fungible asset.  Where a purchaser simply buys an asset—even if "for investment" purposes or in the hope it would "increase in . . . value"—the investor has not bought into a common enterprise as required for an "investment contract" under *Howey*, even if the purchaser's long-term economic interests are aligned with the seller's economic interests.  *Rodriguez*, 990 F.2d at 10; *see also id.* ("'securities' are interests in an enterprise").  By contrast, under the SEC's version of the test, de Beers, OPEC, or Ty Warner would be in "common enterprises" with resale purchasers of diamonds, oil, or Claude the Crab.[12]

**No reasonable expectation of profits.**  Finally, the SEC's claims concerning blind resales fail under *Howey*'s requirement of a reasonable expectation of profits.  Mot. 18–20.  The SEC again argues that purchasers need not have an understanding that they are making an investment into a common enterprise with a developer.  *See, e.g.*, Opp. 4, 7.  But that argument directly contradicts this Court's prior discussion of this issue.  *Howey* requires a "plausible inference that the

---

[11] The SEC's only attempt to establish actual pooling is its vague suggestion that token purchasers are "dependent on a promoter's deployment of the capital raised from selling the asset."  Opp. 23.  But as applied to blind resales, the SEC's argument is a sleight of hand:  *Howey* looks to whether *the purchaser* made a capital contribution—not whether, in the absence of that contribution, the promoter used *somebody else's* capital from a different transaction to spur generally applicable price appreciation.  Again, the SEC refuses to correctly apply *Howey* to *each* transaction's specific economic realities.

[12] The SEC eventually pivots to so-called "vertical commonality," claiming that a common enterprise exists either because developers also retained holdings of the tokens they issued, Opp. 24–25, or because purchasers' "financial fortunes" purportedly depended on developers' efforts, *id.* at 25.  This argument fails for the reasons BAM has explained.  BAM Mot. 21–23.

reasonable secondary buyer would expect [the token's developer] to use their investment to gen-erate profits on the buyer's behalf," and thus that purchasers be "told" how the "proceeds from" their purchases "were to be deployed … to generate a return for *their* benefit." *Binance*, 2024 WL 3225974, at *21–22, *24; *see also id.* at *21 n.15.[13]  As Judge Torres explained in *Ripple I*, pur-chasers in blind resale transactions "could not reasonably expect" a developer to use their funds *to do anything*, since they could not even reasonably expect that the developer was the seller.  682 F. Supp. 3d at 328.

The SEC rejoins that investors could have expected to be making an investment in a profit-making enterprise for three reasons:  (1) developers' ongoing marketing statements to generate buzz about their tokens, Opp. 27–29, 32–33; (2) BHL's listing the tokens on Binance.com, *id.* at 35–37; and (3) alleged "burns" to control token supply, *id.* at 30, 34–35.  None of these theories suffices to satisfy *Howey*.

As to marketing statements, the SEC rehashes statements developers made to popularize their tokens, Opp. 27–29, 32–33, which the SEC asserts drove "demand," *id.* at 28, 33, and thus "price," *id.* at 28.  But that indiscriminate approach could apply to any business that advertises its products.  Rolex promotes its products and provides maintenance services that help them maintain value, but that does not turn resales of wristwatches into investment contracts.

The SEC's "amplification" theory is even further afield.  The SEC argues that *BHL* en-gaged in post-sale efforts to promote tokens created by other developers.  *Id.* at 2–3, 38.  But the

---

[13] The SEC contends that Defendants misread footnote 15 of this Court's opinion.  Opp. 16.  The Court's opinion speaks for itself: the SEC's first "complaint d[id] not lay out enough of the facts and circumstances surrounding ongoing secondary sales to support … a plausible inference that the reasonable secondary buyer would expect Binance to use their investment to generate profits on the buyer's behalf."  *Binance*, 2024 WL 3225974, at *21 n.15.  So too here.

SEC's Exchange Act theory is not that BHL was in a common enterprise with those other developers under *Howey*; instead, the SEC claims that BHL provided "intermediary services" to buyers and sellers. *Id.* at 15. BHL's alleged promotion of third-party tokens on its website is more akin to a retail website advertising products that might be sold by other companies than to a developer promising post-sale efforts to earn profits for members of a common enterprise. Repeatedly telling consumers that "Every kiss begins with K" does not transform Kay outlets into securities exchanges just because it makes diamonds more valuable.

The SEC's argument that BHL created an expectation of profits by listing tokens for sale ignores controlling precedent. In *Life Partners I*, the D.C. Circuit rejected a similar argument that providing a "secondary market" was a sufficient entrepreneurial effort. 87 F.3d at 546. Moreover, pre-purchase efforts "cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others." *Id.* at 548. Listing a token on an exchange so that it can be purchased in the future is by definition an activity undertaken *before* a token is purchased on Binance.com. It therefore does not establish the requisite "*post-purchase* services."

Finally, the SEC points to burns that occurred for some (but not all) of the tokens at issue. Opp. 30, 34–35. With respect to BNB burns specifically, the SEC contends that BHL used its "profits" from its token sales to "repurchase and then destroy BNB," reducing supply and increasing price. Am. Compl. ¶ 304. But the SEC never explains why purchasers in blind resale transactions could reasonably expect BHL to put *their payments* toward the burn. The SEC simply denies that this showing is necessary. Opp. 16.[14]

---

[14] The SEC also has no answer to the ministerial nature of several of the burns at issue, Mot. 20, citing out-of-circuit authority to the effect that efforts are "managerial and entrepreneurial" when they merely "'affect the failure or success of the enterprise,'" Opp. 34 (quoting *SEC v. Glenn W.*

### 2. The SEC Fails To Show That The Alleged Sales By Token Developers Were Investment Contracts.

*Blind Sales By Token Developers.* The SEC's claims concerning blind sales of SOL, SAND, MANA, and BNB by their developers fail for similar reasons. Mot. 21. The SEC never disputes that sales of these four tokens were blind bid/ask transactions, precluding any reasonable expectation that developers would deploy purchasers' money "to use their investment to generate profits on the buyer's behalf." *Binance*, 2024 WL 3225974, at *21 n.15; *see also Ripple I*, 682 F. Supp. 3d at 328; *supra* at 11–13.

The SEC also does not dispute (nor could it) that its only reference to sales by "the issuers of SOL, SAND, and MANA" (other than the MANA IEO) comes in a single conclusory paragraph, Am. Compl. ¶ 468, shorn of any facts about "the particular transaction[s]" alleged, *Binance*, 2024 WL 3225974, at *20. For this independent reason, the SEC's claims concerning developer sales of these three tokens should be dismissed.

*Initial Exchange Offerings.* The SEC provides virtually no substantive defense of its claims concerning three tokens (MATIC, AXS, and SAND) allegedly sold on Binance.com in IEOs. To the extent the agency analyzes the IEOs at all, it addresses them under the common-enterprise prong and notes simply that their developers "publicize[d]" that they would use sales proceeds "to further develop the asset[s'] ecosystem[s]," thus increasing "value." Opp. 18–19. Defendants have not moved to dismiss the SEC's IEO claims under that prong of Howey, and the SEC has no specific response to Defendants' explanation of why these transactions fail to satisfy the requirement of a reasonable expectation of profits from the efforts of others. Mot. 22–23.

---

*Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)). In the D.C. Circuit, *Life Partners I* requires the Court to look to the nature of the act, not whether it has some de facto effect on purchasers' returns. 87 F.3d at 545–46.

### 3. For All Of The Transactions, The SEC Fails To Show That A Reasonable Buyer Purchased The Tokens Primarily For Investment Purposes.

The SEC's Exchange Act claims fail for the additional reason that the SEC does not plausibly allege the tokens were promoted and purchased primarily as an investment. Mot. 23–32. At the pleading stage, it is the SEC's burden to allege facts showing *substantial* elements of an investment contract. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (allegations consistent with both lawful and unlawful conduct "stop[] short of the line between possibility and plausibility"). The SEC has not done so.

In response, the SEC incorrectly argues that transactions involving the tokens are investment contracts if their real-world applications were not the *sole* "inducement to purchase," relying on *Forman*'s observation that the buyers' motivation to acquire housing units in that case "was solely to acquire subsidized low-cost living space." Opp. 43–44 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851 (1975)). But in *Forman*, the Supreme Court did not decide how *Howey* would apply to transactions in mixed-motive cases. 421 U.S. at 853 n.17 (noting such cases "may raise difficult questions that are not present in this case"). A few years later, in *Daniel*, the Court took on that question directly and held that if a transaction has "intermingled security and nonsecurity aspects," it is an "investment contract" only when the transaction has "'to a very substantial degree elements of investment contracts.'" 439 U.S. at 560 (quoting *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 91 (1959) (Brennan, J., concurring)); *see also* Mot. 24.

For the token sales challenged here, the SEC points to a host of generalized statements marketing the tokens and asserting that the tokens would increase in value. *E.g.*, Opp. 28–31, 39–42. But the SEC fails to respond to Defendants' explanation of the myriad ways the tokens at issue were marketed to be used rather than as investments in a common enterprise. Mot. 25–32. The Amended Complaint makes plain that the average crypto purchaser is far more capable of using

the tokens for their intended purposes than a purchaser acquiring, for example, "live breeding bea-ver[s]" raised on someone else's farm. *Kemmerer v. Weaver*, 445 F.2d 76, 80 (7th Cir. 1971).[15]

In any event, the securities laws do not apply to an asset merely because some purchasers speculate that it will increase in value or that they will otherwise earn money. *Binance*, 2024 WL 3225974, at *26. Purchasers might speculate that tokens would be good investments for any num-ber of reasons (*e.g.*, because of general trends in crypto markets or as a hedge against inflation). The SEC's reliance on a few selective, out-of-context quotes from token developers fails to plau-sibly allege facts showing that for the specific transactions challenged in the Amended Complaint, the more plausible inference is that reasonable investors viewed the tokens primarily as opportu-nities to earn a share of the profits of a common enterprise.

**BNB.** The SEC attempts to minimize statements about BNB's utility by characterizing them as "post-ICO references to 'utility,' or 'currency.'" Opp. 46. The SEC's Exchange Act claims concerning BNB *all* concern "post-ICO" transactions, and the SEC fails to explain why "post-ICO" marketing would somehow be less relevant to why a reasonable purchaser would buy the token for those transactions. The SEC points to "exhortations about investment returns," *id.*, but ignores Defendants' detailed explanation of how the same allegations and incorporated docu-ments cited by the SEC show how BNB was marketed for consumptive purposes, Mot. 25–27.

***The Game Tokens (SAND, MANA, and AXS).*** The SEC concedes that non-transferable game tokens are not securities, Opp. 45, but never explains why that line makes sense under *Howey* for otherwise similar tokens, used on similar platforms, for similar purposes. Indeed, the SEC fails

---

[15] The SEC's argument that the tokens' available trading quantity reveals their investment purposes also fails. Opp. 45. Even assuming that were a relevant factor, the agency makes no attempt to differentiate large token transactions whose sheer size makes clear that purchasers "manifestly could not use" the tokens. *Cf. Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 193 (5th Cir. 1979) ("Karl obviously could not himself use twenty-five lots" at a campsite).

to specifically respond at all to Defendants' arguments concerning the three gaming tokens the agency included in the Amended Complaint—SAND, MANA, and AXS—or dispute the various ways they are marketed to be used on their respective platforms. Mot. 27–29.[16]

**SOL, ADA, MATIC, FIL, ATOM, ALGO, and COTI.** For the remaining tokens, the SEC never responds to Defendants' arguments. Mot. 29–32. Thus, the SEC has forfeited any argument that they were marketed primarily as investment contracts. *See Iweala,* 634 F. Supp. 2d at 80.

### B.    The SEC Pled Itself Out Of Court For Post-ICO Sales Of BNB. (Count 1)

The SEC's amended allegations about BHL's purported post-ICO sales of BNB undisputedly target blind bid/ask transactions, and thus fail to plausibly plead the required reasonable expectation of profits from the promoter's efforts. *Supra* at 11–13. That requires dismissal of those portions of Count 1 (brought under Section 5 of the Securities Act) for the same reasons as those portions of Counts 5–12 (brought under the Exchange Act). Mot. 32.

The SEC argues that BHL's motion to dismiss these claims somehow seeks reconsideration of the Court's order allowing those claims to move forward under the allegations in the SEC's *original* complaint, Opp. 17 n.6, but presents no substantive response to Defendants' argument that the agency's *amended* allegations as to BHL's alleged post-ICO BNB sales pled the SEC out of court by confirming that these claims target blind transactions on the exchanges, Mot. 21.

### C.    The SEC Fails To Show That Employee Compensation Constituted "Investment Contracts." (Count 1)

The SEC also fails to rehabilitate its claim that BHL's salary and bonus payments to its

---

[16] The SEC cites two cases in support of treating game tokens as securities, Opp. 46–47, but each is inapposite. In *SG Limited*, unlike here, the developer sold "shares in a particular virtual enterprise" that offered no utility other than equity ownership. 265 F.3d 42, 44 (1st Cir. 2001). *Harper* involved purchases of digital avatars that "cannot be used and are currently just digital pictures." 2024 WL 3845444, at *10. Unlike here, the "'consumptive use'" of the avatars "was not yet in play." *Id.*

employees in BNB as a 1:1 substitute for fiat currency represented securities transactions.  Mot. 33–37.  The SEC's theory, expressly rejected in *Ripple I*, 682 F. Supp. 3d at 330, departs from established caselaw and the SEC's own prior regulatory guidance defining the narrow circumstances in which employee compensation can constitute "investment contracts."

The SEC admits that BNB was provided to employees as a cash-equivalent currency that could be—and was—resold or otherwise used to support living expenses.  Opp. 54, 56 (resales "inevitable"); *e.g.*, Am. Compl. ¶ 311.  That concession is fatal, as an employee does not enter an investment contract when her primary motivation is to "obtain a livelihood." *Daniel*, 439 U.S. at 560.  Tokens used as the equivalent of cash-based compensation, and even more obviously as a relocation stipend to defray cost-of-living expenses, Am. Compl. ¶ 324, lack the "elements of" an investment contract "to a very substantial degree." *Daniel*, 439 U.S. at 560.

In response, the SEC announces a new theory that employees were "underwriters" helping BHL distribute BNB to "public investors."  Opp. 56.  This theory appears nowhere in the Amended Complaint, which the SEC "may not amend" through its "brie[f] in opposition." *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 119 n.4 (D.D.C. 2018).  The SEC's new theory is incomplete and insufficiently developed, given that the SEC never explains how *Howey* would be satisfied for transactions between employees and the businesses or individuals who gave them money, goods, or services for BNB.  The SEC also gets backwards the significance of the lack of any lockup period for those BNB payments.  *Cf.* Opp. 56.  That BHL "did not impose restrictions," *id.*, makes BNB *more* like cash wages, which also have no lockup period.  Courts have reasoned that lockup periods "negate" the inference that tokens were used for consumption, *Telegram*, 448 F. Supp. 3d at 373, so the *absence* of a lockup period *supports* consumptive use.

The SEC separately fails to explain how employees made an "investment of money" in

18

BHL.  The SEC previously acknowledged that employee labor alone is not an "investment of money" under *Howey*, and that employees must do *something more* that contributes additional capital to their employers (like accepting reduced wages for greater benefits) to trigger the securities laws.  SEC, *Employee Benefit Plans; Interpretations of Statute*, 45 Fed. Reg. 8,960, 8,964/2–8,965/1 (Feb. 11, 1980).  The SEC alleges no additional contribution here.   The SEC ignores that its own case, *Uselton*, held that employees "did more than merely contribute labor" by voluntarily accepting wage reductions.  940 F.2d 564, 570, 577 (10th Cir. 1991); *see also Frisch v. Likeopedia, LLC*, 2024 WL 3938345, at *2, *5 (S.D.N.Y. Aug. 26, 2024) (employee agreed to defer *all* cash compensation in favor of equity).  And the SEC presents no substantive response to the multiple cases holding that labor alone is not an "investment of money."  *See* Opp. 57 n.11.

With respect to periodic bonuses, ETOP payments, and relocation allowances, the SEC's claims also fail because the Amended Complaint does not allege that employees voluntarily opted to receive these payments in BNB, or that the BNB payments were more than incidental to their overall compensation.  Mot. 36.  Discretionary bonuses, for example, are unilaterally given by an employer without a voluntary exchange of specific consideration from the employee.  The SEC cannot show otherwise by citing paragraphs of the Amended Complaint regarding salary payments and signing bonuses; nor does an employee's agreement to relocate equate to a voluntary choice to receive a relocation allowance in BNB as opposed to some other currency.  Opp. 57.

### D.    The SEC Fails To Salvage Its Claim Concerning Simple Earn.  (Count 3)

The SEC's claim concerning Simple Earn fails because the agency still has not alleged "any connection between the use of the funds" in Simple Earn and "the rewards paid."  *Binance*, 2024 WL 3225974, at *26; *see also* Mot. 38–39.  The SEC suggests that the APR is linked to the profitability of the "Simple Earn enterprise," Opp. 61, but that is incorrect.  "[T]he APR offered

to Simple Earn users is discretionary and doesn't reflect any indication of profitability within Binance's various operations."[17]  APRs are not "dependent on" the success of any BHL enterprise nor related to BHL's efforts across its "various operations," *Binance*, 2024 WL 3225974, at *26 & n.22, including Simple Earn.  And although BHL allegedly told users that it "may" deploy Simple Earn tokens in multiple ways, Am. Compl. ¶ 427, no allegation says that BHL actually took those steps, unlike in *Genesis*, where the SEC alleged far more about what the defendants did with the money they received, *see* 2024 WL 1116877, at *9 (S.D.N.Y. Mar. 13, 2024).

The SEC also fails to refute that Simple Earn participants "loan" their tokens without surrendering ownership of them.  Mot. 39.  Unlike the BAM staking program and the program in *SEC v. Better Life Club*, 995 F. Supp. 167, 173–74 (D.D.C. 1998), Opp. 59, Simple Earn participants can "withdraw" their tokens "at any time," thus retaining ownership rights, Am. Compl. ¶ 428.  At bottom, Simple Earn operates like a bank account, not a security.  The SEC insists that Simple Earn is "backed by nothing" and is not subject to comprehensive regulation.  Opp. 59.  But that is not the test under *Howey*.  "Not every 'profit-making opportunity' is an investment contract," *Binance*, 2024 WL 3225974, at *26, and the SEC again fails to distinguish investment contracts from assets or accounts Congress did not intend to be subject to the securities laws.

## II.    The SEC Fails To Explain Why Its Claims Concerning Third-Party Tokens Should Proceed Without Their Developers.  (Counts 5–10)

The SEC fails to explain why this case should proceed without the third-party developers that the SEC named in the Amended Complaint—just not as defendants.

---

[17] *Introduction to Binance Simple Earn* (Sept. 22, 2022), https://www.binance.com/en/support/faq/introduction-to-binance-simple-earn-8df6abf5930e4ef4977d84f45d99d491  (incorporated at Am. Compl. ¶ 436).

### A.    The SEC Is Not Immune From Rule 19.

The SEC's primary argument is that it is immune from Rule 19 under *Heckler v. Chaney*,

470 U.S. 821, 832 (1985), which held that an agency's failure to bring an enforcement action is

presumptively nonreviewable "under § 701(a)(2)" of the Administrative Procedure Act.  This ar-

gument lacks merit.

*First*, this is not an APA case, and nobody is seeking to force the SEC to bring an enforce-

ment action—to the contrary, BHL is seeking to *dismiss* portions of an enforcement action that the

SEC, in its discretion, *has already brought*.  Even for the third-party developers themselves, the

SEC *did* exercise its enforcement discretion when it named them and their tokens in the Amended

Complaint while omitting hundreds of other tokens that trade on Binance.com and Binance.US.

*Second*, "Congress may limit an agency's exercise of enforcement power," including by

"circumscribing an agency's power to discriminate among issues or cases it will pursue."  *Heckler*,

470 U.S. at 833.  As relevant here, Congress authorized Rule 19 through the Rules Enabling Act,

circumscribing the SEC's power to unilaterally choose the parties that the agency includes in a

civil enforcement action.  *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393,

406–07 (2010) (Rules Enabling Act authorizes Supreme Court to promulgate rules of procedure

"subject to [Congress's] review").  Nothing suggests Congress intended to exempt the SEC from

Rule 19, which is designed precisely for this scenario—"to protect the interests of absent persons."

7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1602 (3d ed.).  "Like any ordinary litigant, the Gov-

ernment must abide by the Federal Rules of Civil Procedure."  *SEC v. Collins & Aikman Corp.*,

256 F.R.D. 403, 414 (S.D.N.Y. 2009).

The SEC's non-binding and unpublished cases are easily distinguishable and, in any event

unpersuasive because they fail to grapple with the actual reasoning in *Heckler* (which was about

APA lawsuits in which the government is a defendant) or the Rules Enabling Act (which authorized

Rule 19 and nowhere exempts the SEC from its requirements). In neither of the SEC's cases did the agency exercise its discretion to bring otherwise unnecessary challenges to third-party companies or products that the SEC says violate the securities laws.[18] Moreover, here, unlike in the SEC's cases, the SEC's enforcement action against BHL and BAM can proceed without the third parties—in other words, it was not necessary for the SEC to include claims about the ten third-party tokens. The problem is that the SEC did so but omitted their developers as parties.

### B. Under Rule 19, The Third-Party Developers Are Required Parties, And The SEC Fails To Justify Proceeding Without Them.

Under Rule 19, the SEC's claims concerning the third-party tokens should be dismissed.

***Required Parties Under Rule 19(a).*** The SEC's assertion that the third-party developers are not required parties is premised on a misrepresentation of what is at stake for the developers. The SEC explicitly "seeks a ruling that Defendants acted as unregistered securities intermediaries." Opp. 64. Such a ruling would require a conclusion that the tokens issued by the absent third parties are, in fact, sold as securities.

It makes no difference that none of the third-party developers sought to intervene or filed a standalone amicus brief on top of the multiple briefs filed by associations and others representing the industry. Opp. 64. Rule 19 provides a clear standard for determining when joinder is mandatory, and it does not hinge on absent parties. *See Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 390 (D.D.C. 2017); *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 915 (S.D. W. Va. 2010) (Rule 19's interest requirement is not contingent on an absent party's

---

[18] In *SEC v. Norstra Energy Inc.*, 2016 WL 4530893, at *2 (S.D.N.Y. Jan. 19, 2016), fraud claims against a company and its executive did not require similar charges against another executive because any judgment would bind the company. And the "alleged fraudulent conduct" by an individual defendant in *SEC v. Princeton Economic International Ltd.*, 2001 WL 102333, at *1 (S.D.N.Y. Feb. 7, 2001), did not require a judgment that other entities had committed wrongdoing.

active involvement in the case); *see also Lewis v. Gov't of D.C.*, 324 F.R.D. 296, 301 (D.D.C. 2018) (court ordering *sua sponte* joinder of the U.S. Attorney).  Imposing the SEC's intervention requirement would be especially unfair to the third parties at issue here, which are not subject to jurisdiction in this Court.  *See* Mot. 41–42.

The SEC also disregards the potential divergence of interests between Defendants and the developers.  If the SEC seeks to settle its claims, Defendants may be presented with strategic decisions that might not fully protect the interests of the absent third parties.  For example, compared to the third-party developers, Defendants would have less reason to turn down a settlement offer that required it to kick a particular token off its platform.  Defendants would also be less certain to appeal a narrow decision holding that only a particular subset of transactions involving a single token qualified as investment contracts.  In those scenarios, the absent developers could face severe challenges, including "potential liability" in private securities class actions premised on sales of their tokens on Binance.com.  *Ali v. Carnegie Inst. of Wash.*, 306 F.R.D 20, 28 (D.D.C. 2014).

***Feasibility of Joinder.***  The SEC fails to meet its burden of demonstrating that joinder of the absent third-party developers would be feasible.  Mot. 41.  The agency suggests it can serve the developers, but provides no details other than alluding vaguely to nationwide service of process and "a variety of means" "in the United States or abroad."  Opp. 66.  The SEC does not even attempt to explain any "minimum contacts" the third parties have with the United States (or Washington, D.C.), as required by the Due Process Clause.  *SEC v. e-Smart Techs., Inc.*, 828 F. Supp. 2d 167 (D.D.C. 2011); *SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997).

Since the SEC has not even attempted to satisfy its burden to show that it can join the required third parties, the Court should hold that joinder is not feasible.  Alternatively, the Court could order the SEC to join the absent developers within 30 days of the Court's order, after which

the Court could dismiss the claims for any developer that the SEC fails to join.

*Dismissal Under Rule 19(b).*  Dismissal is the appropriate remedy where, as here, required parties cannot be joined and would be severely prejudiced if the case proceeds without them.  Rule 19(b) is grounded in equitable considerations and requires a case-specific analysis.  *See Stand Up for Cal.! v. U.S. Dep't of Interior*, 204 F. Supp. 3d 212, 252 (D.D.C. 2016).  This Court enjoys substantial discretion in balancing the relevant factors.  *See Cloverleaf Standardbred Owners Ass'n v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1277 (D.C. Cir. 1983).  Further, the SEC's assertion that a judgment without the third-party developers would be inadequate is wrong.  Opp. 66.  The SEC would remain free to pursue enforcement actions directly against the third-party developers, and it can attempt to proceed against BHL based on its claims concerning BNB, BNB Vault, and Simple Earn without unfairly imposing the consequences of this case on absent third parties.

## III.    The SEC Fails To Show That Its Request For Disgorgement Should Proceed To Discovery.

Contrary to the SEC's argument, Defendants' motion to strike the agency's request for disgorgement is not "premature," Opp. 67, and Defendants should not face burdensome discovery concerning disgorgement the SEC cannot recover.  The SEC does not deny that courts have granted similar motions at the pleading stage when, as here, the SEC fails to allege necessary facts to support disgorgement.  *See SEC v. City of Victorville*, 2014 WL 12588688, at *12 (C.D. Cal. Oct. 14, 2014); *SEC v. Berry*, 2008 WL 4065865, at *10 (N.D. Cal. Aug. 27, 2008).

The SEC does not dispute its failure to allege that a single investor suffered pecuniary harm, as required for the agency to seek disgorgement.  *SEC v. Govil*, 86 F.4th 89, 103 (2d Cir. 2023).  Instead, the SEC contends that this requirement "runs counter to binding D.C. Circuit authority."  Opp. 68 (citing *Zacharias v. SEC*, 569 F.3d 458, 471–72 (D.C. Cir. 2009) (per curiam)).  But *Zacharias* is no longer good law in light of *Kokesh v. SEC*, 581 U.S. 455, 463 (2017) ("SEC

disgorgement constitutes a penalty within the meaning of § 2462"). *See also Saad v. SEC*, 873 F.3d 297, 305 (D.C. Cir. 2017) (Kavanaugh, J., concurring) (*Kokesh* "overturned" *Zacharias*). And another recent Supreme Court decision, *Liu v. SEC*, makes clear that for the SEC to recover disgorgement it must be "for victims." 591 U.S. 71, 75, 88 (2020). As the Second Circuit recognized in *Govil*, *Liu* "presupposes pecuniary harm." 86 F.4th at 103.

The SEC's cases are inapposite because each indisputably involved victims who lost money due to the defendant's activity. *See SEC v. Almagarby*, 92 F.4th 1306, 1320 (11th Cir. 2024) (investors suffered from "the price impact" of high-frequency "selling activity"); *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 41 n.14 (1st Cir. 2024) (misrepresentations induced payment of advisory fees); *SEC v. GenAudio Inc.*, 32 F.4th 902, 917 (10th Cir. 2022) (investment based on multiple misrepresentations). Here, by contrast, nothing in the Amended Complaint suggests that "but for" BHL's violations, investors lost money. *SEC v. Wyly*, 71 F. Supp. 3d 399, 414 (S.D.N.Y. 2014). Unlike in the SEC's cases, here the agency alleges nothing to suggest that, "had [BHL] complied with [the securities laws'] registration requirements," anything would have been different at all for investors. *SEC v. Ripple Labs, Inc.*, 2024 WL 3730403, at *6 (S.D.N.Y. Aug. 7, 2024).

## Conclusion

For these reasons and those in Defendants' opening brief, the SEC's claims against BHL and Mr. Zhao should be dismissed. Dismissal should be with prejudice and without leave to amend because the SEC has "already had two bites at the proverbial apple"—including after the Court spelled out the SEC's pleading deficiencies—and yet has failed to remedy these flaws. *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 172 (D.D.C. 2013).

Dated:  December 23, 2024

Respectfully submitted,


  */s/ Daniel W. Nelson*
Daniel W. Nelson (D.C. Bar #433415)
Jason J. Mendro (D.C. Bar #482040)
M. Kendall Day (*pro hac vice*)
Amy Feagles (*pro hac vice*)
Matt Gregory (D.C. Bar #1033813)
Jeremy M. Christiansen (D.C. Bar #1044816)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Tel: (202) 955-8500
Fax: (202) 467-0539
dnelson@gibsondunn.com
jmendro@gibsondunn.com
kday@gibsondunn.com
afeagles@gibsondunn.com
mgregory@gibsondunn.com
jchristiansen@gibsondunn.com


*Attorneys for Defendant Binance Holdings
Limited*

*/s/ William A. Burck*
William A. Burck
Avi Perry
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C.  20005
Tel: (202) 538-8120 (Burck)
williamburck@quinnemanuel.com
aviperry@quinnemanuel.com

Emily Kapur (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive
5th Floor
Redwood Shores, CA  94065
Tel: (650) 801-5122
emilykapur@quinnemanuel.com

*Attorneys for Defendant Changpeng Zhao*