# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

        *Plaintiff*,

    v.

BINANCE HOLDINGS LIMITED,
BAM TRADING SERVICES INC.,
BAM MANAGEMENT US HOLDINGS
INC., AND CHANGPENG ZHAO,

        *Defendants*.

**No. 1:23-cv-01599-ABJ-ZMF**

**Oral Argument Requested**

**DEFENDANTS BAM TRADING SERVICES INC.
AND BAM MANAGEMENT US HOLDINGS INC.'S
<u>REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

ARGUMENT ......................................................................................................................... 2

    I.     THE SEC CANNOT ESTABLISH ANY SECONDARY SALES ON BAM WERE AN INVESTMENT CONTRACT. ............................................................ 2

        A.     An Investment Contract Requires Pooling of Investor Funds. ................... 3

        B.     SEC Does Not Allege Any Funds from Sales on BAM Were Pooled........ 7

        C.     Vertical Commonality Does Not Save the SEC's Claims .......................... 8

        D.     Investors Had No Reasonable Expectation of Profits from the Efforts of Others................................................................................................... 9

    II.    THE SEC ARTICULATES NO LIMITING PRINCIPLE. .................................. 10

    III.   TOKEN-BY-TOKEN ANALYSIS DEMONSTRATES THE INSUFFICIENCY OF THE SEC'S ALLEGATIONS. ........................................ 13

    IV.   THE SEC MAKES NO REGISTRATION CLAIMS AGAINST BAM OUTSIDE OF SECONDARY SALES................................................................. 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barron v. Helbiz Inc.*,
2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) ....................................................7

*Brodt v. Bache & Co.*,
595 F.2d 459 (9th Cir. 1978) ........................................................................9

*Deckebach v. La Vida Charters, Inc. of Fla.*,
867 F.2d 278 (6th Cir. 1989) .......................................................................4

*Dufoe v. DraftKings Inc.*,
2024 WL 3278637 (D. Mass. July 2, 2024)..................................................7

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019)....................................................................6, 10

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985)..........................................................................7

*Grayscale Investments, LLC v. SEC*,
82 F.4th 1239 (D.C. Cir. 2023)...................................................................11

*Hardin v. Tron Found.*,
2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024) ..............................................7

*Harper v. O'Neal*,
2024 WL 3845444 (S.D. Fla. Aug. 16, 2024)..............................................7

*Henthorn v. Dep't of Navy*,
29 F.3d 682 (D.C. Cir. 1994) ......................................................................14

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) (en banc) .....................................................7

*Houghton v. Leshner*,
2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) ............................................7

*In re Ripple Labs Inc.*,
2024 WL 3074379 (N.D. Cal. Jun. 20, 2024)......................................5, 7, 13

*Kentucky et al. v. SEC*,
2024 Civ. 69 (E.D. Ky. Nov. 14, 2024)......................................................11

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ............................................................................8, 9

*Owen v. Elastos Found.*,
    2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ...........................................................................7

*S.E.C. v. Banner Fund Int'l*,
    211 F.3d 602 (D.C. Cir. 2000) ..................................................................................... *passim*

*Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    682 F.2d 459 (3d Cir. 1982)......................................................................................................8

*Samuels v. Lido DAO*,
    2024 WL 4815022 (N.D. Cal. Nov. 18, 2024) .......................................................................7

*SEC v. Binance*,
    2024 WL 3225974 (D.D.C. June 28, 2024).........................................................................19

*SEC v. Digital Licensing Inc.*,
    2024 WL 1157832 (D. Utah Mar. 18, 2024) ......................................................................13

*SEC v. Energy Grp. of Am., Inc.*,
    459 F. Supp. 1234 (S.D.N.Y. 1978).......................................................................................9

*SEC v. Glenn W. Turner Enters., Inc.*,
    474 F.2d 476 (9th Cir. 1973) ................................................................................................16

*SEC v. Grybniak*,
    2024 WL 4287222 (E.D.N.Y. Sept. 24, 2024) ......................................................................7

*SEC v. Int'l Loan Network*,
    968 F.2d 1304 (D.C. Cir. 1992) ..............................................................................................4

*SEC v. LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022).......................................................................................7

*SEC v. Life Partners*,
    87 F.3d 536 (D.C. Cir. 1996) ...................................................................................... *passim*

*SEC v. Merchant*,
    483 F.3d 747 (11th Cir. 2007) ..............................................................................................10

*SEC v. Ripple Labs, Inc.*
    682 F. Supp. 3d 308 (S.D.N.Y. 2023)......................................................................5, 10, 13

*SEC v. Ripple Labs, Inc.*,
    697 F. Supp. 3d 126 (S.D.N.Y. 2023)..............................................................................7, 10

*SEC v. Terraform Labs PTE, Ltd.*,
     684 F. Supp. 3d 170 (S.D.N.Y. 2023) ........................................................................6

*SEC v. Wahi*,
     2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ..........................................................7

**Statutes**

15 U.S.C. § 78b ..............................................................................................................5

15 U.S.C. § 78c(a)(10) ...................................................................................................6

Exchange Act ...........................................................................................................5, 25

After years of investigation, more than a year of litigating this case, and adding hundreds of new allegations to the First Amended Complaint ("FAC"), the SEC is still unable or unwilling to articulate a theory distinguishing the eleven crypto assets it alleges to be sold as securities from the two crypto assets (Bitcoin and Ether) it admits are not. When questioned on the effect its unlimited application of *Howey* will have on other federal and state regulators, market participants and other commodities such as Voluntary Carbon Credits, the SEC demurs and claims that is not its responsibility. The SEC's theory raises the same issues and lack of limiting principle the Court rejected in its June 28, 2024 Memorandum Opinion and Order regarding Defendants' original Motion to Dismiss (the "Opinion"). The Court should apply the basic principle articulated in this Circuit and elsewhere applying *Howey*: an investment in a common enterprise requires an investment in the enterprise. The SEC cannot collapse the test for horizontal commonality by cutting out the requirement of pooling, which this Court has already found is a "critical aspect of [the] analysis." Opinion at 29. This threshold issue can resolve all claims related to secondary sales on BAM's platform.

The SEC's attempt to collapse the test for horizontal commonality by eliminating the requirement of pooling fundamentally undermines the established legal framework set forth by precedent. Horizontal commonality, as articulated in cases such as *Banner Fund* and *Life Partners*, requires the pooling of investment funds, shared profits, and shared losses among investors. This requirement ensures that the economic reality of the transaction reflects a collective investment scheme where the fortunes of all investors are tied to the success of the common enterprise. By cutting out the pooling requirement, the SEC conflates mere economic interdependence with the essential element of pooled resources, eliminating the distinction between securities transactions and other types of commercial dealings. Without this requirement, the SEC continues to "leave[]

the Court, the industry and future buyers and sellers with no clear differentiating principle between tokens in the marketplace that are securities and tokens that aren't." Opinion at 43.

Even if the SEC could ignore pooling, a token-by-token assessment of the SEC's claims reveals what they have tried to hide among a flurry of generalizations and pages and pages of additional allegations: the SEC cannot plausibly allege that the secondary sales of the At-Issue Tokens on BAM's platform—often *years* after initial offerings—constitute investment contracts. The SEC does not attempt to address any of the specific deficiencies in its allegations, including those discussing consumptive benefits (Mot. at 33, 37, 42), the token holders themselves increasing the value of the token (*id.* at 30, 40), or third-party websites of which no reasonable investor would have been aware (*id.* at 25; 25 nn. 32-33, 36, 40).[1] Taking all these points into consideration, the Court may then appropriately consider whether for each token the well pled allegations can support a finding that sales were part of an investment contract. They do not. As the Court recognized, analyzing the offerings token-by-token is critical to the *Howey* inquiry. As set forth in the Motion, the allegations in the FAC fail to state a claim that any sales of crypto assets on BAM's platform were part of an investment contract.

## **ARGUMENT**

### I.    THE SEC CANNOT ESTABLISH ANY SECONDARY SALES ON BAM WERE AN INVESTMENT CONTRACT.

The SEC failed to allege that any of the funds used to purchase any of the At-Issue Tokens

---

[1] Troublingly, the SEC continues to rely on statements from posts on websites it now knows are fake. Opp. at 33, 38, 41 (citing ¶ 655 for SAND), 42 (citing ¶ 740 for AXS). The posts which the SEC relies on are purported statements from AXS and SAND's official Medium accounts – but the sites have no followers (while the real AXS and SAND Medium accounts have many). One of the two posts (SAND) is no longer available, with the webpage now stating, "This account is under investigation or was found in violation of the Medium Rules." https://sand-burn.medium.com/sandbox-buyback-and-burn-sales-program-20a579d5dc09.

on BAM were invested in a common enterprise. BAM's arguments in the Motion that the FAC entirely failed to allege pooling – which the Court identified as a "critical aspect of [the] analysis" – are entirely unrebutted in the SEC's Opposition Brief (the "Opposition"). *See* Opinion at 29. The SEC's failure to establish pooling, and, thus, horizontal commonality, is fatal to its secondary trading claims. The Court also should not apply vertical commonality, but even if it does, the SEC has failed to establish vertical commonality as well.

### A.    An Investment Contract Requires Pooling of Investor Funds.

*Life Partners* requires pooling to satisfy horizontal commonality. The pooling element cannot be satisfied if "each investor's acquisition is independent of all the other investors' acquisitions;" rather the seller "must have investors ready to buy some minimum percentage of the policy before the transaction will occur" for the element to be met. *SEC v. Life Partners*, 87 F.3d 536, 544 (D.C. Cir. 1996) ("*Life Partners I*"). The crux of the distinction is whether the investment of money is necessary to the common enterprise. For *primary* sales, it may well be that money is pooled because the issuers require sufficient capital to fund the purported common enterprise. But for blind secondary sales in which the funds do not support the issuers' or third parties' efforts, each investor's acquisition is independent and thus not part of a common enterprise, as defined by *Life Partners*.

Similarly, in *Banner Fund*, the D.C. Circuit explicitly held that horizontal commonality requires a pooling of investors' funds, shared profits, and shared losses and this pooling is essential to establish the "common enterprise" element of the *Howey* test. *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 614 (D.C. Cir. 2000). The Banner Fund Program met the horizontal commonality requirement because it pooled investment funds from individual investors to leverage their funds collectively. *Id.* The program's marketing materials explicitly stated that it would "put individual small investors together with others to leverage their funds" in larger deals. *Id.* This pooling of

funds and the sharing of profits and losses among investors, recruiters, and the managing entity demonstrated the necessary horizontal commonality. *Id.*

Despite the clear requirement established by precedent, the SEC claims that a mere suggestion that pooling requires the use of the buyers' funds "has no basis in law or logic." Opp. at 8-16; *see Life Partners I* and *Banner Fund*. The SEC creates a new test for horizontal commonality (with no basis in law) requiring "that investors' fortunes are tied together and dependent upon the success of the issuers' and other third parties' efforts." Opp. at 18. The first part of the SEC's new test, fortunes being "tied together," is the same as "shared profits and shared losses." *Id*. Horizontal commonality requires *both* pooling *and* shared profits and shared losses. *Life Partners I*, 87 F.3d at 543; *Banner Fund*, 211 F.3d at 614. The second part of the SEC's new test, "dependent upon the success of the issuers' and other third parties' efforts" is just a rephrasing of the *third* element of *Howey* – reasonable expectation of profits from the efforts of others. The SEC cannot collapse the second and third elements. *See Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278 (6th Cir. 1989). The Court should reject this new test.[2]

The SEC attempts to limit *Life Partners* as requiring only "that the capital of 'small investors' could be used 'in deals requiring large capital outlays.'" Opp. at 20. But the SEC fails to meet even this minimal standard as the capital of small investors purchasing crypto assets from anonymous sellers on BAM are not used in the deals at all.

The SEC concedes the Court must evaluate the economic realities of each transaction (Opp. at 21, 32, 45, 49, 54-55) but then asserts that distinguishing the economic realities of secondary

---

[2] The SEC also attempts to avoid the pooling requirement by citing to a single line in *SEC v. Int'l Loan Network*, 968 F.2d 1304 (D.C. Cir. 1992) (Opp. at 20), but that case was decided prior to *Life Partners* and there was no question that the funds from all investors were directly invested into the common enterprise and so the court did not address pooling.

trades on BAM from sales in which investors provide funds for a common enterprise is somehow "formalistic" and "rigid." *Id.* at 21. But the SEC seeks the formalistic conclusion that the original investment of money in the purchase of an investment contract utilizing a crypto asset necessarily follows along each subsequent sale of that crypto asset. The Court rejected the "it-is-what-it-is" approach that the SEC continues to assert in the Opposition, and instead adopted the *Ripple Labs* approach to evaluate "the totality of the circumstances and the economic reality of that specific contract, transaction, or scheme." Opinion at 37 (citing *SEC v. Ripple Labs, Inc.* ("*Ripple I*") 682 F. Supp. 3d 308, 328 (S.D.N.Y. 2023)).

The SEC's other pooling arguments are unpersuasive. First, the SEC argues that this Court should reject 80 years of case law interpreting *Howey* and take the novel approach of interpreting "investment contract" based on the purpose of the Exchange Act. Opp. at 12. This argument fails for multiple reasons. The SEC argues that the Exchange Act was "largely" motivated by concerns about trading of securities on secondary markets on exchanges similar to the platforms operated by BAM. *Id.* But the actual statutory language the SEC cites does not say this. It does not even mention secondary sales and says that the concern is over both "exchanges and over-the-counter markets." FAC ¶ 41; 15 U.S.C. § 78b. Over-the-counter markets typically do not involve anonymous trading and both exchanges and over-the-counter markets may involve primary sales.

Next, the SEC suggests, without citing any supporting authority, that the inclusion of the term "investment contract" in the list of securities subject to the Exchange Act necessarily means every type of security must somehow be tradeable on every exchange regulated by the Act. Opp. at 12. Under the Exchange Act, the term "security" is defined to encompass a wide range of financial instruments, many of which are not traded in blind secondary markets on exchanges at

all. 15 U.S.C. § 78c(a)(10). For instance, preorganization certificates or subscriptions are typically used in the early stages of forming a company and are not traded on public exchanges.

Finally, the SEC criticizes BAM's discussion of a secondary sale of investment contracts containing transferable and assignable rights because this Court held that investment contracts do not *require* contractual rights. Opp. at 12. BAM is not saying (for purposes of its motion) that investment contracts must include contractual rights but merely pointing out that a resale in which all the rights of an investment contract are transferred may remain investment contracts in secondary sales based on the totality of the circumstances.[3] Furthermore, as BAM pointed out in the Motion, blind secondary sales of certain digital assets actually include pooling – by providing a royalty or other payment to the issuer upon every transaction. Mot. at 13, n. 14. This is not "nonsensical" as the SEC suggests – these assets exist. *See* Opp. at 13. The SEC's criticism is just another attempt to obfuscate a simple point – in this Circuit, pooling requires that the investor's funds are used together with other investor funds.

The cases the SEC cites also do not support its position. BAM already addressed most of these cases in its opening brief. *See* Mot. at 11, n. 13. The SEC again cites a series of cases following the approach in *SEC v. Terraform Labs PTE, Ltd.*, 684 F. Supp. 3d 170, 193 (S.D.N.Y. 2023) ("*Terraform I*") that *Howey* makes no distinction between purchasers, a position this Court already rejected. Opinion at 37-38. The SEC otherwise cites cases that involved *primary* sales in which funds were in fact transferred to the third-party upon whose managerial actions the

---

[3] Indeed, the SEC specifically points to the sale of limited partnership interests as an example of the type of investment contract that may be sold on the secondary market – interests that include transferable and assignable contractual rights. Opp. at 14-15, n. 4. (citing *Fan v. StoneMor Partners LP*, in which the partnership interests at issue were sold on the secondary market. 927 F.3d 710, 713 n. 1 (3d Cir. 2019)).

purchasers relied or cases that did not involve horizontal commonality.[4] The appropriate test is whether investor funds were actually pooled together with the common enterprise.

### B.    SEC Does Not Allege Any Funds from Sales on BAM Were Pooled.

As BAM explained in its Motion, the SEC never alleged that Binance or any of the issuers of the Ten Crypto Assets conducted direct sales on BAM's platform or that the proceeds of any sales on BAM's platform were pooled as part of any common enterprise. Mot. at 8. The SEC does not argue otherwise in its Opposition and instead attempts to confuse the point by referring to the "Binance Platforms" repeatedly, while citing allegations in the FAC that discuss sales only on Binance.[5] The SEC has not alleged that funds from any secondary sales of the At-Issue Tokens

---

[4] The SEC again misleadingly cites both *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc) and *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 233, 240-41 (2d Cir. 1985), to suggest secondary trades do not require pooling. In *Hocking*, the investment being pooled was not cash but condominiums and secondary purchasers pooled their condominiums. 885 F.2d at 1459. The condominiums were then placed together into a rental pool. *Id.* Just like with primary purchasers, the secondary purchaser's cash for the condo did not go to those running the rental pool – it was the use of the condominium itself that did. *Id.* In *Gary Plastic*, the court explicitly found that the funds went to *both* the banks issuing them *and* Merrill Lynch, the promoter. 756 F.2d at 233. The SEC also misleadingly claims *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 217-21 (D.N.H. 2022), found blind secondary sales to be transactions in securities, but the only issue before the court was whether *primary* sales by the *issuer* were securities. *See also SEC v. Wahi*, 2024 WL 896148, at *1, 6 (W.D. Wash. Mar. 1, 2024) (primary sales and pooling); *Harper v. O'Neal*, 2024 WL 3845444, at *10-11 (S.D. Fla. Aug. 16, 2024) (same); *Dufoe v. DraftKings Inc.*, 2024 WL 3278637, at *4-10 (D. Mass. July 2, 2024) (same.); *In re Ripple Labs Inc.*, 2024 WL 3074379, at *9-10 (N.D. Cal. Jun. 20, 2024) ("*Ripple III*") (same); *SEC v. Grybniak*, 2024 WL 4287222, at *8 (E.D.N.Y. Sept. 24, 2024) (same); *Barron v. Helbiz Inc.*, 2021 WL 229609, at *2-4 (S.D.N.Y. Jan. 22, 2021) (same); *SEC v. Ripple Labs, Inc.*, 697 F. Supp. 3d 126, 131 (S.D.N.Y. 2023) ("*Ripple II*") (same); *Samuels v. Lido DAO*, 2024 WL 4815022, (N.D. Cal. Nov. 18, 2024) (no horizontal commonality); *Hardin v. Tron Found.*, 2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024) (same); *Houghton v. Leshner*, 2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) (same); *Owen v. Elastos Found.*, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) (same). *See generally*, Mot. at 11, n. 13.

[5] *See, e.g.*, Opp. at 15 ("the Amended Complaint contains sufficient facts to plausibly allege that Binance directly and indirectly sold BNB on the *Binance Platforms* after the ICO, as did issuers of SOL, SAND, and MANA") (emphasis added) (citing FAC ¶ 468 which states "the issuers of SOL, SAND, and MANA, have conducted offers and sales of their own holdings of crypto assets on at least the *Binance.com* Platform directly or through intermediaries.") (emphasis added).

were provided to the issuers or used in the common enterprise, so it has failed to allege a common enterprise with respect to the At-Issue Tokens.

### C.    Vertical Commonality Does Not Save the SEC's Claims

Vertical commonality cannot save the SEC's claims. The SEC vaguely notes that vertical commonality has been "analyzed" in the D.C. Circuit but admits that no district or appellate court in the Circuit has ever adopted it or found vertical commonality was sufficient in the absence of horizontal commonality. Opp. at 24. Several courts, including this one, have either recognized that horizontal commonality is typically used or else not considered vertical commonality at all. Opinion at 30 (declining to address vertical commonality); *Life Partners I*, 87 F.3d at 544 (declining to address vertical commonality); *see generally, SEC v. Life Partners*, 102 F.3d 587 (D.C. Cir. 1996) ("*Life Partners II*") (not discussing vertical commonality); *Banner Fund*, 211 F.3d 602 (not discussing vertical commonality).[6]

Even were the Court to apply a test of vertical commonality, it would fail. To show strict vertical commonality, the SEC must plausibly allege a "one-to-one relationship between the investors" and the issuers "such that there is an interdependence of *both profits and losses* of the investment." *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (emphasis in original); *see also Life Partners I*, 87 F.3d at 544 (citing *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978)). The FAC alleges no such relationship between any issuer and purchaser on BAM's platform. The SEC argues that issuers and purchasers owned the same tokens (Opp. at 24-25) but

---

[6] The SEC claims no court has rejected strict vertical commonality but that is also incorrect. Opp. at 26. While the court in *Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc*. did not explicitly use the words "strict vertical commonality", that is the test the court rejected. 682 F.2d 459, 460 (3d Cir. 1982). The court determined that the commodity account did not constitute a "security" because it was not part of a pooled group of funds, the court implicitly rejected the notion that the investor's fortunes were tied to the promoter's fortunes in a manner consistent with strict vertical commonality. *Id.*

at best that shows a common *interest* in the token's value, not a common enterprise. *See Marini*, 812 F. Supp. 2d at 257 ("[T]he Court disagrees with plaintiffs that [defendants'] ownership of the same types of coins necessarily links their fortunes together for purposes of the strict vertical commonality analysis."). The token is not the investment contract.

The SEC argues, without citation to any authority, that vertical commonality exists even if the issuers' fortunes rise and fall independently of the purchaser because a company may profit for other reasons, such as products that it has not offered as an investment contract. Opp. at 26. The SEC's position is contrary to law. For example, in *Brodt*, which *Life Partners* cited when discussing strict vertical commonality, the Ninth Circuit held that there is no strict vertical commonality where a brokerage house "could reap large commissions for itself and be characterized as successful, while the individual accounts could be wiped out," despite being reliant at least in part on the brokerage house for profits. *Brodt*, 595 F.2d at 461. Here, even if issuers profited from selling tokens through the ICOs but token prices declined due to market forces, token purchasers could have suffered losses. Similarly, an issuer's business could fail, but the network and asset could still exist and increase in price due to other market forces, such as the broader digital asset market. *Cf. SEC v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1241 (S.D.N.Y. 1978) ("Thus, if the customer sells the lease not to EGA, but on the market, he or she is not at all dependent upon EGA for his or her profits."). There is no vertical commonality.

### D.    Investors Had No Reasonable Expectation of Profits from the Efforts of Others.

As discussed, under horizontal commonality or even under an ill-advised test of vertical commonality, the SEC has failed to establish an investment of money in a common enterprise for sales of the At-Issue Tokens on BAM. But even if the SEC had done so, the Court should still reject these claims based on the holdings in *Ripple I* and *Ripple II* that the third prong of *Howey*

requires an investor to have a reasonable expectation that her funds will be used to fund the common enterprise. The SEC has failed to allege that any buyer on BAM had such a reasonable expectation.[7] The SEC's secondary sales claims must be dismissed on this basis as well.

## II.    THE SEC ARTICULATES NO LIMITING PRINCIPLE.

The SEC offers no compelling response to this Court's concern of a framework that "leaves the Court, the industry and future buyers and sellers with no clear differentiating principle between tokens in the marketplace that are securities and tokens that aren't." Opinion at 43. The SEC's proposed framework would mean any number of crypto assets sold on BAM are and always will be sold only as investment contracts, even those such as Bitcoin and Ether, which the SEC appears to believe are not investment contracts. Mot. at 15-21; Opp. at 52. Numerous other commodities could also only be sold as investment contracts – including Voluntary Carbon Credits. *See* Mot. at 18. "It is a fundamental principle of administrative law that agencies must treat like cases alike." *Grayscale Investments, LLC v. SEC*, 82 F.4th 1239, 1259 (D.C. Cir. 2023) (vacating SEC order for failing to explain different treatment for exchange-traded products holding bitcoins and those holding bitcoin futures).

The SEC does not substantively engage with these concerns. Brazenly, the SEC argues the Court should find all the Ten Crypto Assets are securities just like BNB because they were "marketed similarly to BNB in all key respects." Opp. at 2. Yet the SEC does not dispute that

---

[7] The SEC's argument that the expectations of profits fostered by Defendants are akin to those for investment contracts like master limited partnerships ("MLPs") and registered limited liability partnerships ("RLLPs") is fundamentally flawed and unsupported by the cases it cites. Opp. at 14-15, n. 4. Unlike the At-Issue Tokens, MLPs and RLLPs (i) depend on the pooling of funds as part of their investment structure with investors' funds being combined and used to generate profits for the partnership; (ii) are contractually based, traditional partnership structures in which the full rights are transferred in each sale; and (iii) are governed by partnership laws and securities regulations specific to their structure. *See, e.g.*, *Merchant*, 483 F.3d at 752, 765; *StoneMor*, 927 F.3d. at 713 & n. 1.

Bitcoin, Ether and even Voluntary Carbon Credits were marketed in the same way as well without being sold as securities. *See* Mot. at 3. Knowing what crypto assets are sold as securities is a statutory question in need of clear resolution with profound impacts on the jurisdiction of the CFTC and state regulators, as well as all market participants. The SEC repeatedly refers to its mandate to protect investors, *see* Opp. at 15, 66, but overlooks that other federal and state regulators perform that same investor protection function within their proper jurisdictions. Indeed, in *Kentucky et al. v. SEC*, 18 state attorneys general recently sued the SEC seeking declaratory and injunctive relief and alleging that the SEC's expansive and unjustified theory of *Howey* has unlawfully encroached on the states' existing money transmitting licensing regimes for entities – specifically identifying BAM as one of those entities. 2024 Civ. 69 (E.D. Ky. Nov. 14, 2024). Moreover, most securities litigation involves private litigants, not the SEC.

The SEC oddly asks the Court to ignore the absence of a limiting principle because the SEC has no authority to determine whether something is a commodity. Opp. at 52. There is no dispute that all the crypto assets are commodities. The question is whether these commodities are being offered and sold as investment contracts and, thus, as securities. The answer to this question has existential significance to private parties, including BAM, in determining whether and with which entity they need to register. The SEC's continued and repeated refusal to provide any meaningful guidance is baffling.

Rather than address these points, the SEC attempts to create a strawman by suggesting that the only limiting principle it needs is one to distinguish commodities purchased *solely* for consumptive use from those purchased at least in part by at least some buyers with an investment purpose. Opp. at 43-47. As discussed, many commodities are purchased for investment purposes without being classified as securities (Bitcoin, Ether, VCCs, gold, and numerous others). The

SEC's proposed limiting principle provides no guidance to the crypto industry, courts, or future buyers and sellers as to when crypto assets are being sold as investment contracts.

The SEC all but admits that its new theory, just like its old theory, is that the crypto asset is intertwined with or the embodiment of the investment contract. The SEC merely performed "a change in shorthand terminology." Opp. at 22, n. 7. The SEC still has no coherent response to the obvious implication of its theory that these crypto assets will always be sold only as investment contracts. The SEC suggests that theoretically if an issuer disappears or ceases *all* efforts to support a project, then maybe a subsequent sale is not part of an investment contract. *Id.* at 22. Of course, the SEC also claims that having a secondary market for the crypto asset is a necessary part of supporting the project and a secondary market is the only way a buyer can sell a token. *Id.* at 21-22. So, by the SEC's logic, the only time a crypto asset could ever be sold without being sold as a part of an investment contract is if it becomes worthless, not supported by anyone, and has no market for trading. The SEC's maximalist position is not surprising, given that it believes the only limiting principle necessary is whether there is an investment purpose.

The Court already laid out clear limiting principles that exclude the At-Issue Tokens from the SEC's grasp. The Court identified pooling as a "critical aspect" of the horizontal commonality analysis. Opinion at 29. The Court accepted the SEC's "thin" allegation regarding pooling with respect to BNB, but the FAC fails to meet the Court's bar with respect to secondary sales of the At-Issue Tokens. *See id.* The Court further adopted the limiting principle in *Ripple* requiring a "totality of the circumstances" analysis of "the economic reality of [the] specific contract, transaction, or scheme" to determine whether a particular secondary market sale constitutes an offer or sale of an investment contract. *Id.* at 37 (quoting *Ripple I*, 682 F. Supp. 3d at 329, n.16).

*Life Partners* and *Banner Fund* establish the clear limiting principle that pooling requires investor funds to be used together in the common enterprise.

## III.    TOKEN-BY-TOKEN ANALYSIS DEMONSTRATES THE INSUFFICIENCY OF THE SEC'S ALLEGATIONS.

BAM's Motion also detailed why the individual allegations as to each crypto asset fail. Mot. at 29-43. The FAC repeatedly misrepresented and mischaracterized documents incorporated by reference and even relied on fake Internet posts. The SEC did not engage with BAM's arguments, claiming they "should be rejected out of hand," and even continued to rely on allegations that it knows to be based on fake evidence. Opp. at 33. The SEC's failure to correct the record is stunning given its duty of candor to the Court. *See, e.g.*, *SEC v. Digital Licensing Inc.*, 2024 WL 1157832, at *24 (D. Utah Mar. 18, 2024) (sanctioning the SEC for failing to correct false statements made during the litigation).

Instead of addressing BAM's arguments and assessing assets individually, as the Court did in its previous Opinion, the SEC points to categories of allegations that purportedly apply to each asset, such as that the issuers made ongoing promotional statements about the ecosystems and assets, the issuers promised to develop the secondary market for the assets, and BAM amplified those statements. The SEC's categories are not supported and, at times, are flatly contradicted by the actual allegations in the FAC or the documents incorporated by reference.[8] *See, e.g.*, *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994) (arguments in briefs "most certainly may not be considered when the facts they contain contradict those alleged in the complaint").

---

[8] The SEC does not dispute that Exhibits 2 through 19 to BAM's Motion, which are publicly available materials referenced and quoted in the FAC, are incorporated by reference into the FAC. As a result, the statements in the actual documents control.

For example, the SEC argues that issuers made ongoing promotions "touting actual as well as envisioned efforts . . . and tying [those efforts] to the growth of demand or value for the assets" Opp. at 33, but none of those statements tie the demand or value of the asset to the issuers' efforts. The SEC argues that the issuers "continue to tout" that they hold large amounts of their tokens (Opp. at 33-34), but almost all the alleged statements were made in connection with primary sales and none of them were directed to secondary market purchasers. The SEC argues that the issuers promoted secondary market listings "as another reason investors could expect profits from purchasing the assets," Opp. at 36, but none of the cited allegations say that; they simply announce availability on the secondary market. The SEC argues that BAM engaged in "coordinated campaigns of widespread promotion" encouraging the purchase of the At-Issue Tokens "as investments based on the expectation of profits from the ongoing efforts of the issuers," Opp. 36-37, but the factual allegations do not say that either; BAM provided the same basic pricing and background information for the At-Issue Tokens that it does for other commodities.

The SEC's approach is improper and designed to gloss over several fundamental deficiencies in the FAC's allegations. *First*, the FAC does not include any promises or offers to secondary market purchasers on BAM's platform. In fact, many of the so-called "promotional statements," which occurred sporadically over many years, simply suggest use cases for the tokens, not promises of an investment opportunity. *See* Opinion at 26; *Life Partners I*, 87 F.3d at 543. The SEC counters that a token still can be sold as an investment contract when it has both consumptive and use functions. Opp. at 43-47. This misses BAM's point. The SEC is relying on allegations promoting the ***consumptive*** function of tokens as if they are promoting the sale of the token as an investment contract. The SEC could have alleged investment uses (it did not), but alleging the consumptive uses alone does not plausibly state a claim.

*Second*, the FAC's allegations focus principally on pre-sale activities, while allegations of post-sale conduct are absent or woefully insufficient. The SEC says it is irrelevant whether efforts were undertaken pre- or post-purchase or when the promotional statements were made. Opp. at 49-50. That contradicts the standard set out by *Life Partners*. *See also* Opinion at 26 (citing *Life Partners II*'s holding that "pre-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others"). Here, the SEC is focused almost entirely on promotional statements and activities pre-launch or in connection with initial offerings that were not directed to the secondary market and often were made years before the assets were ever listed on BAM's platform.

*Finally*, BAM-specific allegations are incredibly sparse and amount to BAM posting basic pricing and background information about the assets. The SEC acknowledges that pricing information is routinely provided about commodities. Opp. at 49. But it argues that other information provided such as "the prospects for developing the enterprise, or discussing information about management, the business plan, and financial health and progress to date, as well as the broad public promotions of the issuers' ongoing efforts" is "likely irrelevant and even non-existent for items being sold as commodities." *Id.* BAM is not alleged to have provided all that information for each asset. Regardless, BAM explained in its Motion and the SEC failed to address that BAM provides the exact same information about the At-Issue Tokens as it does for Bitcoin and Ether – crypto assets the SEC agrees are commodities. Mot. at 30.

At bottom, by painting with a broad brush, ignoring BAM's arguments, and not analyzing each asset individually, the SEC tries to obfuscate its pleading failures. When the SEC's arguments are tested against the FAC's actual allegations, on an asset-by-asset basis, they fall apart.

**SOL:** SOL was created in 2018 but not listed on BAM until September 2020. FAC ¶¶ 522-527. Solana's "ongoing" "promotional statements" did not include promises to increase "the demand or value" of SOL. Opp. at 33, 39 (citing FAC ¶¶ 537-40). Solana made various public statements about its technical capabilities and the network's growth and potential, none of which were tied to SOL's future value. FAC ¶¶ 537-39. Contrary to the SEC's assertion, Solana's "burn" program was designed to "maintain" (not increase) SOL's price (FAC ¶ 540), which does not imply an expectation of profits from such efforts. Opp. at 35; *see also* Ex. 9 (Solana page explaining that the burn mechanism was designed to "sustain the network's security").[9]

The SEC argues that Solana promoted SOL's listing on BAM "as another reason investors could expect profits from purchasing" SOL (Opp. at 36 (citing FAC ¶ 532)), but the actual allegation only states that SOL was available on BAM's platform. The SEC claims Solana's announcement suggested "an opportunity to increase the value of SOL" (Opp. at 39 (citing FAC ¶533))[10] without addressing what it actually did, that the decentralized community had "driven significant value" (in the past) and promoted, if anything, a use case for SOL. Mot. at 30.

Finally, the FAC includes no allegations that BAM promoted SOL as an investment in a specific enterprise. *See* Opp. at 36-37 (citing FAC ¶¶ 541-46). BAM posted pricing information about SOL, background information about its ecosystem, and links to the ecosystem's website and

---

[9] The SEC also claims that "automatic" efforts are somehow managerial and entrepreneurial, relying on *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). Opp. at 34. However, *Glenn* discussed specific managerial efforts of sales, not anything done automatic *prior* to the sales. *Id.*

[10] The SEC contends that issuers undertook efforts to go through BAM's listing process, which "signal[ed] to investors that the original representations about the issuers' efforts carried through to the present." Opp. at 36. The SEC cites no record support for those statements and the FAC's allegations do not support them. In fact, there are no allegations suggesting that investors were aware of BAM's listing process or what the issuers did to become listed on BAM's platform. In any event, the issuers' efforts occurred prior to being listed on BAM's platform and do not support that the issuers promised ongoing efforts to increase the assets' value after listing.

whitepaper, which is the same information it provides about Bitcoin and Ether. The FAC includes no allegations that any of that content conveyed an expectation that Solana would undertake efforts to increase SOL's value.

**ADA:** ADA was created in 2015, had primary sales between 2015 and 2017, and was listed on BAM's platform in September 2019. FAC ¶¶ 547, 552. The SEC argues that post-ICO promotional statements "would drive demand" of ADA. Opp. at 39 (citing FAC ¶¶ 554-56, 558). However, the cited paragraphs allege public statements about the development and performance of the Cardano network and in no way tied network improvements to an increase in ADA's value. At most, those statements promoted potential consumptive uses of ADA given that they highlight the network's planned adoption of "thousands of applications with high transaction volumes." FAC ¶ 556. The entities responsible for ADA also did not "continue to tout" holding large amounts of ADA that would be used to fund operations. Opp. at 34 (citing FAC ¶¶ 550-51). The cited allegations state that those entities received a percentage of ADA to develop the network in connection with primary sales, which occurred in 2015 to 2017, but there are no allegations that the entities continued to hold ADA years later when it was listed on BAM's platform.

BAM also did not "amplify" any of those public statements or otherwise cast ADA as an investment. Opp. at 39 (citing FAC ¶ 559). The single BAM blog post cited by the SEC states that BAM encouraged customers to "make a plan" and "conduct research." BAM did not convey that ADA would increase in value or that anyone would undertake post-sale efforts to generate profits from ADA. The SEC also did not respond to BAM's argument that the blog post is dated from July 2024, meaning it has no relevance to assessing whether ADA was offered as an investment contract prior to that date. Mot. at 32, n. 34.

**MATIC:** MATIC was created in 2017, had primary sales beginning in 2018, and was listed on BAM beginning in June 2020. FAC ¶¶ 562-72. Polygon's founders did not make ongoing promotional statements tying its efforts to improve the network "to the growth of demand or value for the assets." Opp. at 33 (citing FAC ¶ 575(e)). The cited allegation states that one of Polygon's founders tweeted in February 2023 that Polygon had grown and had a "strategy" to drive adoption of "web3" (*i.e.*, decentralized blockchain technology), but he in no way conveyed an expectation of profits from purchasing MATIC. Nor did Polygon's public statements "explicitly link the value of MATIC to their efforts to grow the Polygon network." Opp. at 40 (citing FAC ¶ 575(c)). In fact, the cited allegation says nothing about increasing MATIC's price and, at most, suggests that individuals should buy MATIC to "participate" in the network (*i.e.*, for consumption).

The SEC argues that Polygon marketed that it burned MATIC for its deflationary effect. Opp. at 34 (citing FAC ¶ 540). However, the burn mechanism was designed to "allow users to better estimate costs" and represented 0.27% of the total MATIC supply on an annual basis. Ex. 11. No reasonable investor could plausibly infer an expectation of future profits.

Finally, BAM did not promote MATIC as an investment in an enterprise. Opp. at 37 (citing FAC ¶¶ 581-83). In fact, as BAM's Motion explained, BAM posted statements expressly disclaiming that MATIC should be viewed as an investment. Ex. 10 (Polygon's founder stated that MATIC was "a utility token and is not an investment asset. The token is meant to provide access to the Polygon blockchain applications"). The SEC overlooked that argument as well.

**FIL:** The FAC's allegations about FIL focus on a fundraising round in 2017 regarding the sale of an agreement for future delivery of tokens. FAC ¶¶ 586-591. The SEC argues that after those initial sales, FIL's developers continued to "engage in promotions about their efforts" to increase FIL's demand, continued to "tout that they . . . hold large amounts of [FIL]," and promoted

the development of a liquid secondary market. Opp. at 33, 35 (citing FAC ¶¶ 597-606). However, the cited FAC paragraphs reference statements made in connection with FIL's initial fundraising in 2017 – ***four years before FIL was listed on BAM in June 2021***. Outside of the original primary offering, the only "promotional statements" identified in the FAC were announcements concerning the growth and planned growth of the network, none of which promised profits from purchasing FIL on the secondary market. *See* FAC ¶¶ 608-610. The SEC also points to an allegation that FIL is burned to reduce its supply, but the burn mechanism was designed for network security, not to increase FIL's value. Opp. at 34 (citing FAC ¶¶ 607, 614)); *see* Ex. 15.

Finally, the FAC includes no allegations that BAM promoted FIL as an investment in a specific enterprise. Opp. at 37, 40 (citing FAC ¶¶ 613-17). BAM provided information about FIL's price, as it does for other commodities, and BAM's website described FIL as a "decentralized storage network" without any reference to FIL's founders or suggestion that anyone would undertake efforts to increase FIL's value. These allegations are insufficient to plausibly state a claim. *See, e.g.*, *Binance*, 2024 WL 3225974, at *26.

**ATOM:** ATOM was developed in 2017 from donations and listed on BAM's platform in October 2019. ATOM's developers did not "tout[]" efforts that would grow the demand or value of ATOM after its launch. Opp. at 32-33 (citing FAC ¶¶ 634-35). The cited allegations described the growth and potential of the Cosmos ecosystem and the team's expertise, but there is not a single allegation reflecting that ATOM's developers planned to do anything to increase ATOM's price in the future. The SEC argues that ATOM's developers were "financially compelled" to increase the value of ATOM for the secondary market because they held significant quantities of it (Opp. at 33 (citing FAC ¶¶ 628-29)), but paragraph 628 alleges statements from materials distributed in 2017 and paragraph 629 alleges statements about what ICF held in its treasury

(including ADA, Bitcoin, and Ether). None of those statements were directed to secondary market purchasers or promised ongoing efforts because ATOM's developers held ADA along with other assets.[11]

BAM also did not promote ATOM as an investment in a specific enterprise. Opp. at 40 (citing FAC ¶¶ 636-40). The FAC alleges that BAM provided information on ATOM's performance, as it does for other commodities, and links to its whitepaper and site, without identifying statements from those posts that support ATOM was offered as an investment contract.

**SAND:** SAND's initial offering was held in 2019, a whitepaper was released in 2020, and SAND was listed on BAM's platform in October 2022. FAC ¶¶ 643-46. The FAC includes no allegations that SAND's developers promoted efforts to increase the demand and value of SAND after the initial offering. Opp. at 32-33, 41 (citing FAC ¶¶ 650-56). Several of the statements cited by the SEC were made around SAND's initial offering. *See, e.g.*, FAC ¶¶ 651, 656. None of the statements that post-date SAND's initial offering even mention SAND's value or include a promise to use efforts to increase its value in the future. The SEC also continues to rely on a fake Internet post to allege that SAND's developers announced a burn and buyback program for SAND. Opp. at 34 (citing FAC ¶¶ 653-54). The Court should disregard that allegation.

The SEC argues that SAND's listing on BAM's platform was promoted "as another reason investors could expect profits from purchasing" SAND, but the FAC does not say that. Opp. at 36 (citing FAC ¶¶ 645, 650). The FAC contains very sparse allegations about SAND transactions on BAM's platform. Opp. at 36-37 (citing FAC ¶¶ 657-62). Far from "touting" SAND as an investment in an enterprise, the FAC alleges that SAND has been available on BAM's platform

---

[11] There are no allegations that ATOM's developers promoted managing ATOM's supply or the development of the secondary market.

since October 2022 and that BAM posted information on its website about SAND, "including a pricing page." FAC ¶ 662.

**MANA:** MANA was developed in 2015, had an ICO in 2017, and was not listed on BAM's platform until three years later. The FAC includes no allegations that MANA's developers promoted efforts to increase the demand and value of MANA after the ICO. Opp. at 32-33 (citing FAC ¶¶ 676-82). The SEC is relying on statements dated from 2017 and 2018, years before MANA was listed on BAM's platform, that were not directed to secondary market purchasers. The SEC argues that one of those statements (from 2017) shows that MANA's developers managed supply to increase profits, but the FAC's allegations state that MANA's developers ***increased*** MANA supply each year to "expand" and "accommodate new users," not to increase MANA's value. Opp. at 35 (citing FAC ¶ 680). The SEC also contends that another of those statements (also from 2017) reflects MANA's developers promoting the development of the secondary market for MANA, but the cited paragraph does not mention the secondary market at all. Opp. at 35 (citing FAC ¶ 681).

The FAC's allegations also do not support that BAM promoted MANA as an investment in an enterprise. Opp. at 36-37 (citing FAC ¶¶ 683-90). As BAM's Motion explained, the FAC alleged that BAM provided a MANA "project guide" and held an "Ask Me Anything" event without describing the project guide or what was discussed during the event. Mot. at 37.

**ALGO:** ALGO's developers began to raise equity in February 2018 and ALGO was first offered on BAM's platform 18 months later. FAC ¶¶ 693, 707. The FAC does not allege that ALGO's developers made ongoing promotional statements about efforts to increase the growth or value of ALGO. Opp. 32-33 (citing FAC ¶¶ 711-16). The cited paragraphs announced "participation rewards" for holding ALGO and "governance rewards" when ALGO "holders vote

on the future of Algorand." FAC ¶¶ 711-12. But earning awards based on one's own efforts does not create an investment contract. *See, e.g.*, *Life Partners*, 87 F.3d at 546.

The SEC also argues that ALGO's developers engaged in buybacks to preserve the floor price of ALGO, which led secondary market purchasers to expect profits from others' efforts. Opp. at 34 (citing FAC ¶¶ 696-98). But the FAC alleges that the buyback program was made available to primary purchasers only – secondary market purchasers of ALGO bought just the ALGO token and had no rights to participate in any buyback program. This is because secondary market purchasers in all cases alleged bought the tokens themselves – not the investment contracts sold to primary purchasers. The SEC also contends that ALGO's developers promoted the development of the secondary market for ALGO, but the cited paragraph describes ALGO's initial token sale and is wholly unrelated to secondary market transactions in ALGO. Opp. at 35 (citing FAC ¶ 697). Finally, the FAC includes no allegations that BAM touted ALGO as an investment in an enterprise. Opp. at 36-37 (citing FAC ¶¶ 717-22). As with other commodities on its platform, BAM posted general information about ALGO and even referred to ALGO as a "medium of exchange and store of value," which is how courts define Bitcoin, a commodity.

**AXS:** AXS was launched in 2018, had an initial fundraising in 2020, and was listed on BAM's platform in November 2021. FAC ¶¶ 723-746. The SEC claims that Sky Mavis made post-launch promotional statements describing efforts to grow the demand or value of AXS and that it would be holding onto AXS. Opp. at 32-34 (citing FAC ¶¶ 736-39). However, the cited allegations relate to statements made in connection with AXS's initial fundraising in 2020 and were not directed to secondary market purchasers. Several of the statements also reflect a goal of improving the ecosystem and gaming functions, not increasing AXS's value. FAC ¶¶ 736, 738.

AXS's founders also did not promote AXS's listing on the Binance Platforms "as another reason investors could expect profits from purchasing" AXS. Opp. at 36 (citing FAC ¶¶ 730, 742)). The cited allegations do not promise profits from purchasing AXS on the secondary market and, in fact, one of the allegations states that AXS's listing on the Binance.com platform would "empower millions of gamers" (FAC ¶ 730), which supports consumptive uses not profits. There also are no allegations supporting that BAM promoted AXS as an investment in a specific enterprise. Opp. at 36-37 (citing FAC ¶¶ 741-46). The FAC merely alleged that BAM provides basic pricing and background information about AXS and held an AMA event with the Sky Mavis team without describing anything about what was said at the event that supports a plausible inference that AXS was offered as an investment contract on BAM's platform. Mot. at 39.

**COTI:** COTI's whitepaper was published in October 2018, primary sales to investors occurred in 2019, and sales on BAM's platform began in April 2022. FAC ¶ 747, 749, 753. COTI's founders did not promote post-launch efforts to increase COTI's demand or value. Opp. at 32-33 (quoting FAC ¶ 761). In fact, the cited paragraph alleges that representatives stated that COTI holders would "continue to benefit from the network's success by engaging with our Treasury App," not because COTI would increase in value. FAC ¶ 761. The SEC is also wrong that COTI's listing on BAM's platform was promoted as a reason to expect profits from purchasing COTI. Opp. at 36 (citing FAC ¶ 766). The cited paragraph alleges that COTI was listed on Binance.com and states that "our excitement is peaking" and that "now is a great time to look at what lies ahead for COTI over the coming weeks." There is no allegation that COTI's founders made any offers or promises to anyone purchasing COTI on BAM's platform.

The FAC's BAM-specific allegations do not support that BAM promoted COTI as an investment. Opp. at 36-37 (citing FAC ¶¶ 769-75). In fact, BAM's announcement that COTI was

available for trading described COTI as a token to be "used as a medium of exchange for payments between COTI users and their respective customers, for staking, and for paying transaction fees within the COTI ecosystem." FAC ¶ 769; Ex. 19. The only other information provided by BAM about COTI was general pricing and background information. FAC ¶¶ 773-775.

**BNB:** The SEC does not meaningfully dispute that the FAC's allegations concerning BNB transactions on BAM's platform were incredibly sparse. Mot. at 40-43. The only point the SEC addresses is that a BAM executive made statements "confirm[ing] that investors view BNB as an investment in Binance and its efforts." Opp. at 28 (citing FAC ¶ 398). But the BAM executive simply stated that some BNB holders viewed their interests as aligned with the company, not that future BNB holders could reasonably expect profits from Binance's efforts. The "other BAM promotions of BNB" referenced by the SEC (Opp. at 28 (citing FAC ¶ 399)) involved BAM tweeting about the use case for BNB – fee discounts available to customers who held BNB on BAM's platform. FAC ¶¶ 373, 399. These were invitations to *use* BNB, not to *invest* into it. Opinion at 36. The SEC's remaining arguments focus on sporadic statements by Zhao or Binance, not directed to secondary market purchasers on BAM's platform, with several of them made months or even years before BAM existed. *See, e.g.*, Opp. at 30 (citing FAC ¶¶ 384, 387). Finally, the SEC notes that Binance promoted a BNB burn program (Opp. at 30), but it was announced prior to BAM's formation and was directed to the initial primary purchasers of BNB.

For all these reasons, the SEC's claims based on secondary sales must be dismissed.[12]

---

[12] Additionally, the SEC asks this Court to simply ignore the joinder arguments based on the SEC's discretionary authority. Opp. at 62-63. They offer no plausible explanation to this Court as to why they are pursuing an exchange on which the Ten Crypto Assets were traded without also pursuing the Issuer of the crypto asset or why Rule 19 has a special exemption for the SEC. Therefore, the claims should be dismissed on this basis as well.

## IV. THE SEC MAKES NO REGISTRATION CLAIMS AGAINST BAM OUTSIDE OF SECONDARY SALES.

As BAM explained in its Motion, the SEC's Exchange Act claims cannot move forward on the basis of staking alone. Mot. at 43-44. The SEC does not dispute this point in its Opposition, vaguely asserting that "the breadth of activity covered by" the Exchange Act applies to "the services they provide … in certain already-upheld securities." Opp. at 61. The SEC only specifically argues that absent secondary trading, the Exchange Act claims should move forward on the basis that "Binance's post-ICO sales of BNB on both Platforms, which the Court already held are securities transactions, would serve as a predicate for all three intermediary claims." Opp. at 61. However, as discussed, the SEC has only alleged that Binance conducted post-ICO sales of BNB on Binance, not on BAM. Mot. at 41. As such, the Exchange Act claims as to BAM must be dismissed (Counts 8, 9, 10 and 12). The fraud claims premised on misstatements to crypto currency traders should similarly be dismissed, as BNB was only sold on BAM's platform as part of secondary sales and not as part of a security.[13]

## CONCLUSION

None of the tokens listed on BAM were sold as securities. Counts 8, 9 and 10 of the FAC must be dismissed and the SEC should not be allowed to proceed on a theory that secondary sales on BAM were sold as securities. For the foregoing reasons, and as the SEC has already been given the opportunity to replead its secondary sales allegations, BAM's Motion to Dismiss should be granted with prejudice.

---

[13] Had the SEC decided not to file an amended complaint, BAM would have filed a motion for clarification on these narrow points. However, as the SEC filed an amended complaint, such a motion became moot.

Dated: December 23, 2024

Respectfully submitted,

/s/ Daniel J. Davis
Daniel J. Davis (D.C. Bar #484717) (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave NW
Washington DC 20006
daniel.davis@katten.com

Christian T. Kemnitz (*pro hac vice*)
Levi Giovanetto (D.C. Bar #1001160) (*pro hac vice*)
David Luger (*pro hac vice*)

KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
christian.kemnitz@katten.com
levi.giovanetto@katten.com
david.luger@katten.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc.*

/s/ George S. Canellos
George S. Canellos (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
GCanellos@milbank.com
MLaroche@milbank.com

*Attorneys for Defendants BAM Trading Services Inc. and BAM Management Holdings US Inc*